TOGUT, SEGAL & SEGAL LLP
Bankruptcy Conflicts Counsel for Delphi Corporation, et al.,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Neil Berger (NB-3599)
Richard K. Milin (RM-7755)

**HEARING DATE:** 12/6/2007
**AT: 10:00 a.m.**

**RESPONSE DEADLINE:** 11/16/2007

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :
In re:                                      :
                                            :    Chapter 11
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 [RDD]
                                            :
                        Debtors.            :    Jointly Administered
                                            :
------------------------------------------------------------x

## DEBTORS' MEMORANDUM IN SUPPORT OF THEIR MOTION
## FOR A SUMMARY JUDGMENT EXPUNGING
## CLAIM NUMBER 2247 ASSERTED BY SIEMENS VDO AUTOMOTIVE S.A.S.

# TABLE OF CONTENTS

Page(s)

**TABLE OF CONTENTS** ........................................................................ i

**TABLE OF AUTHORITIES** ................................................................. ii

**PRELIMINARY STATEMENT** ............................................................. 1

**STATEMENT OF FACTS** ..................................................................... 3

**ARGUMENT**: THIS COURT SHOULD GRANT A SUMMARY
JUDGMENT EXPUNGING VDO'S CLAIM BECAUSE
THE DEBTORS HAVE NO LEGAL OBLIGATION
TO PAY VDO THE SUMS IT DEMANDS ................................... 11

**POINT I**: VDO HAS NO CONTRACTUAL
RIGHT TO THE SUMS IT DEMANDS ............................................ 11

    A. The Terms of the LTC Do Not Give VDO
a Contractual Right to the Sums it Demands ................................. 12

    B. The Parties' Pre-Contractual Correspondence
Does Not Give VDO a Right to Compensation .............................. 12

    C. The Parties' Post-Contractual Correspondence
Does Not Give VDO a Right to Compensation .............................. 16

**POINT II**: VDO CANNOT STATE A "PROMISSORY ESTOPPEL"
CAUSE OF ACTION FOR THE SUMS IT DEMANDS................... 16

**CONCLUSION** ................................................................................... 18

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Allen v. Coughlin*, 64 F.3d 77 (2d Cir. 1995) .................................................................. 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 11

*Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465 (6th Cir. 1989) .................................... 17

*Dunn v. Bruzzese*, 2007 WL 1976657 (Ohio App. 7th Dist.) ....................................... 18

*Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities*,
    678 N.E.2d 519 (Ohio 1997) ..................................................................................... 14

*Hooper v. California*, 155 U.S. 648 (1895) ....................................................................  1

*Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8 (2d Cir. 1989) ................................. 11

*National Coin Laundry, Inc. v. Solon Automated Servs.*,
    933 F.2d 1009, 1991 WL 88192 (6th Cir. 1991) ....................................................... 18

*O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578 (2007) ......................................................... 16

*Ulmo v. Gilmour Academy*, 273 F.3d 671 (6th Cir. 2001) ............................................ 15


<u>Statutes and Rules</u>

Fed. R. Bankr. P. 7056.................................................................................................... 11

Fed. R. Civ. P. 56........................................................................................................... 11


<u>Other Authorities</u>

*Merriam-Webster's Collegiate Dictionary* (12th ed. 2004) ............................................ 13

**DEBTORS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR A SUMMARY JUDGMENT EXPUNGING
<u>CLAIM NUMBER 2247 ASSERTED BY SIEMENS VDO AUTOMOTIVE S.A.S.</u>**

Debtor Delphi Corporation and certain of its subsidiaries and affiliates,
debtors and debtors-in-possession in the above-captioned cases (collectively, the
"Debtors"), by their attorneys Togut, Segal & Segal LLP, respectfully submit this memo-
randum of law in support of their motion for a summary judgment under Federal Rule
of Civil Procedure 56, made applicable here by Federal Rule of Bankruptcy Procedure
7056, expunging the claim for approximately $8 million (the "Claim") that Siemens
VDO Automotive S.A.S. ("VDO") asserts against the Debtors for sums in connection
with VDO's development of an automotive "electronic control unit."

<u>PRELIMINARY STATEMENT</u>

VDO's Claim seeks almost $8 million that the Debtors never agreed to pay
and do not owe.  To be binding, a contractual provision must represent a "meeting of
the minds," not a mere unilateral demand that other contracting parties have rejected.
*See, e.g., Hooper v. California*, 155 U.S. 648, 657 (1895).  Here, VDO undoubtedly ***requested***
that the Debtors pay an "equitable cancellation charge" if the Debtors could not use the
electronic control unit ("ECU") that VDO had offered to manufacture.  The Debtors ***did
not agree*** to pay a "cancellation charge," however, as the parties' contract reflects.

The following key facts are undisputed:

- In April 2000, the Debtors sent VDO a Request for Quotation asking
  how much VDO would charge to manufacture ECUs for certain truck
  and automobile suspension systems.  (*See* Declaration of VDO's Michel
  Poulet dated October 9, 2007 ("VDO Decl."), ¶ 2; *id.*, Exh. A.)

- On July 20, 2000, VDO responded in a letter quoting its price for the
  ECUs.  VDO also proposed terms for the parties' agreement, including

1

a right to a "cancellation charge" if the Debtors cancelled their order. (*See* VDO Decl., ¶ 5; *id.*, Exh. B.)

- In reply, the Debtors insisted that VDO provide "a signed version of Delphi's Long Term Contract" (the "LTC") – in which the Debtors did *not* agree to pay a "cancellation charge" – "before Delphi would consider [VDO's] quotation." (*See* VDO Decl., ¶ 6.)  VDO did so.  (*Id.*)

- In August 2000, the Debtors provisionally chose VDO to manufacture the ECUs: "Provided that … your company is able to meet or exceed the agreed upon terms … *we intend to execute (sign) the long term contract already agreed to with Siemens on these programs*." (*See* Letter, VDO Decl., Exh. C (emphasis added).)  The Debtors' letter choosing VDO, which reaffirmed the Debtors' insistence on the terms of the LTC, is the letter VDO describes as "accepting VDO's offer" with its request that the Debtors pay a "cancellation charge."  (VDO Decl., ¶ 11.)

- On October 31, 2000, the Debtors signed the LTC and thereby agreed to purchase "approximately 100 percent" of their requirements for the ECUs specified in the LTC from VDO.  (*See* VDO Decl., Exh. D.)

- The LTC did not give VDO a right to a "cancellation charge" if the Debtors could not use VDO's ECU, or ordered fewer units, because of decisions by the Debtors' customer General Motors ("GM").  (*See* LTC, VDO Decl., Exh. D.)  Also, the LTC incorporated the Debtors' Terms and Conditions ("T&C"), which stated that, together with documents such as purchase orders, the LTC would constitute the entire agreement of the parties and could only be "modified by a written contract amendment" issued by the Debtors.  (T&C at ¶ 29, VDO Decl., Exh. D.)

- VDO has identified no contractual amendment that gave it a right to compensation if the Debtors ordered fewer ECUs than expected or if GM decided that it could not use VDO's ECU.  (*See* VDO's Initial Memorandum in Support of Claim Number 2247 ("VDO Mem.").)

- GM decided not to use VDO's ECU for the GMT 800 program and ordered fewer parts using VDO's ECUs for the GMX 245 and 295 pro-

2

grams than the Debtors and VDO expected. (*See* Declaration of Jane S. Thompson dated October 30, 2007 ("Thompson Decl.") ¶¶ 14, 16.)

- The Debtors used VDO's ECUs for the GMT 800 program, with a modified connector, in the later GMT 900 program. (*See* Thompson Decl. ¶ 17.) The Debtors continue to order VDO's ECUs for the GMT 900, GMX 245, GMX 295 and other programs. (*Id.*, ¶¶ 14-18; *id.*, Exh. 3.)

- Nevertheless, in reliance on its own letters rather than on the parties' agreements, VDO has filed its Claim seeking almost $7.3 million for "cancellation" of the Debtors' order for GMT 800 ECUs and more than $400,000 for the Debtors' failure to order more ECUs for GMX 245 and GMX 295. (*See* Proof of Claim No. 2247, Thompson Decl., Ex. 4.)

As the foregoing facts show, the Debtors never agreed to compensate VDO if they could not use VDO's ECU for the GMT 800 program or ordered fewer ECUs for the GMX 245 and 295 programs. Rather, the Debtors **rejected** VDO's request for compensation by repeatedly insisting that the terms of the LTC must govern. VDO's Claim has no contractual basis and lacks merit.

VDO's alternative theory of "promissory estoppel," like its theory of contractual entitlement, must be dismissed as a matter of law. The LTC is a valid, perfectly ordinary requirements contract which VDO cannot circumvent. Further, VDO does not identify a "clear and unambiguous promise" that the Debtors would compensate VDO for program cancellation or ordering reduced volumes – and as VDO admits, such a promise is necessary to support its promissory estoppel claim. (*See* VDO Mem. at 18.) VDO's Claim therefore should be expunged in its entirety as a matter of law.

## STATEMENT OF FACTS

The relevant history of the Debtors' contract with VDO, which is summarized above, is as follows:

3

      1.  **The Debtors' Request for Quotation**.  On or about April 6, 2000, the Debtors' Jane Thompson and Brigette Colter sent a "Request for Quotation" ("RFQ") to VDO's Mike Tramutolo.  The RFQ stated that the Debtors would be "evaluating a select group of suppliers" to manufacture ECUs to be used in the 2004 and later model years. (RFQ at 1, VDO Decl., Exh. A.)  The number of ECUs the Debtors would need, the RFQ stated, was "subject to some variation" because the RFQ's numbers were "projections," and the RFQ's dates were "generic" for "planning purposes only."  (*Id.* at 1-2.)

      The RFQ also stated that suppliers would be solely responsible for development costs:  "The Supplier bears the cost of development.  Cost recovery can occur only from within the production piece price, production tooling and/or the Development/Alpha/Beta/Prototype piece price and tooling."  (*Id.* at 2.)  The Debtors agreed, however, that they would pay "tooling costs."  (*Id.* at 5.)  The RFQ also referred to and included the Debtors' LTC and T&C, which the LTC expressly incorporated.  (*See* VDO Decl., ¶ 3; *id.*, Exh. D at ¶ 5.)

      2.  **VDO Requests Changes to the Debtors' Contract and Is Refused.**  On June 8, 2000, after the Debtors sent their RFQ, VDO's Tramutolo emailed to request changes in the LTC.  Tramutolo complained that the LTC allowed the Debtors to "re-source" with a new supplier "as early as 31-Jul-05.  We would only be 2 years into production and would not have recovered our amortized costs."  (Thompson Decl., Exh. 1.) Accordingly, Tramutolo asked, "Can you accommodate us for this issue?  Either, Delphi could change the verbiage or we could add a noted exception."  (*Id.*)

      The Debtors refused in an email dated June 12, 2000:  "These are our standard terms.  You need to accept our standard terms in total, without change….I hope you can get Siemens to agree to the standard terms, as any deviation will weight heavily in our selection."  (*Id.*)

3. **VDO's Response to the Debtors' RFQ**. VDO responded to the RFQ in a letter from Tramutolo and Michel Poulet dated July 20, 2000. (*See* VDO Decl., ¶ 5; *id.*, Exh. B.) The letter proposed prices for ECUs and discussed a number of technical issues. It also stated that, "Siemens reserves the right to submit to Delphi revised pricing in instances where the actual annual volume purchased is below the quoted volume by 20% or more" and that, "[i]n the event that the program covered in this letter is cancelled prior to production, without fault by Siemens, an equitable cancellation charge will be negotiated to cover the appropriate costs incurred by Siemens in supporting this program." (*Id.*, Exh. B.)

4. **The Debtors Insist on the Terms of the LTC and VDO assents.**

VDO's Poulet states, "[a]fter VDO submitted its quote, Delphi informed VDO that it required VDO to include a signed version of Delphi's Long Term Contract as part of its submission before Delphi would consider the quotation. In response to this request, VDO, as instructed, forwarded a version of Delphi's Long Term Contract signed only by it." (VDO Decl., ¶ 6.)

5. **The Debtors Agree To Sign the LTC if Certain Conditions Are Met.**

In a "Nomination Letter" dated August 2, 2000, the Debtors stated that they had selected VDO to supply the ECUs for model years 2004 through 2008. (*See* VDO Decl., Exh. C.) However, the Debtors added that they "continue to disagree" concerning an aspect of the pricing. The Nomination Letter also indicated that the Debtors' selection of VDO was subject to certain conditions and that their relationship would be governed by the LTC: "Provided that … your company is able to meet or exceed the agreed upon terms for service, quality, technology, price, investment/tooling and timing, *we intend to execute (sign) the long term contract already agreed to with Siemens on these programs*." (VDO Decl., Exh. C (emphasis added).) Despite the Nomination Letter's insistence on

5

the terms of the LTC, VDO describes the Letter as "accepting VDO's offer" with its

proposed "cancellation charge." (*See* VDO Decl., ¶ 11.)

      6. **The Debtors Sign the LTC.**    On or about October 31, 2000, the Debtors

signed the copy of the LTC that had been signed by VDO and thereby agreed to

purchase "approximately 100 percent (100%) of [their] production and service require-

ments" for the specified ECUs from VDO. (*See* VDO Decl., ¶ 13; *id.*, Exh. D.)  The LTC

provided that "[a]ll Products will be ordered by Buyer, and delivered by Seller, in

accordance with written purchase orders … issued by Buyer from time to time." (VDO

Decl., Exh. D at ¶ 5).

      As stated in the RFQ with which the LTC had originally been sent, the

LTC made VDO responsible for its own development costs:  the LTC did not require the

Debtors to pay a "cancellation charge" or to compensate VDO if GM needed fewer con-

trollers.  To the contrary, the LTC insulated the Debtors from liability for any increases

in the Seller's costs or "failure to achieve any expected cost savings." (LTC, ¶ 3.)

      The LTC also incorporated the Debtors' Terms and Conditions, which pro-

vided the Debtors with additional protections against liability for cancellation charges

or reduced orders.  The T&C were incorporated into "each purchase order, release,

requisition, work order, shipping instruction, specification and other document … relat-

ing to the goods and/or services to be provided" by VDO pursuant to the parties' con-

tract. (T&C, ¶ 1.)  Once VDO accepted the Debtors' contract or began work, it accepted

the T&C "in their entirety without modification." (*Id.*)  Also, "[a]ny additions to,

changes in, modifications of, or revisions of this Contract (including these General

Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer

except to the extent that Buyer expressly agrees to accept any such proposals in writ-

ing." (*Id.*)

The LTC restricted the Debtors' rights to buy from other suppliers, but insulated the Debtors from liability for changes in the quantity, timing and specifications of the items they purchased.  The LTC incorporates the T&C, which state that, if the Debtors determine "that the requirements of Buyers' customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract."  (T&C, ¶ 2.3.)  The T&C gave the Debtors the right "at any time [to] require Seller to implement changes to the specifications or design" of the ECUs, and to determine the amount of "any equitable adjustment in price," subject only to "work[ing] to resolve [any] disagreement in good faith."  (*Id.*, ¶ 3.)  The T&C also gave Debtors the right to substitute goods or terminate the LTC if "Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract."  (T&C, ¶ 6.)  In addition, the T&C required VDO to warrant that its ECUs would be "fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer."  (*Id.*, ¶ 7.1.)

The parties' contract did not wholly favor the Debtors, however.  Although it gave the Debtors a right to "terminate all or any part of this Contract, at any time and for any reason" (T&C, ¶ 11), the LTC expressly limited this provision:  "the Buyer's right to 'terminate for convenience' under the General Terms and Conditions will be inapplicable to this Contract until the end 2004 model year."  (LTC, ¶ 5.)

7.  **VDO's "Updated Quote."**   After the parties signed the LTC, they continued to discuss issues relating to production of the ECUs.  (*See* VDO Mem. at 6.)  More than two years after the LTC was signed, on or about December 13, 2002, VDO sent the Debtors a letter modeled on their letter of July 20, 2000 which, as noted above, included terms that the Debtors had rejected in favor of the LTC.  (*See* VDO Decl., Exh. E.)

7

The "Updated Quote," as VDO refers to it, contained terms even more favorable to VDO than those in its July 20, 2000 "Offer" letter. For example, VDO now reserved the right to submit revised pricing if "annual volume is above or below the quoted volume by 10% or more," whereas two years earlier, the figure had been 20%. (*See* "Updated Quote" at 1, VDO Decl., Exh. E; VDO Decl., Exh. B.)

VDO also again requested an "equitable cancellation charge" in the event of "Program Cancellation." This time, VDO clarified some of the ambiguities in its prior letter: "In the event that the program covered in this letter is cancelled prior to the launch of the production tooling at Siemens VDO Automotive S.A.S., without fault by Siemens VDO Automotive S.A., then equitable cancellation charge, including [VDO] R&D cost, will be negotiated to cover the appropriate costs incurred by [VDO] in supporting this program." ("Updated Quote" at 3.) VDO did not explain, however, whether "the program" meant *all* types of ECU identified in the letter, what "cancellation" meant, how an "equitable" charge would be determined, what "appropriate costs" were, or what VDO thought the Debtors' obligations would be if negotiation did not yield agreement.

VDO's "Updated Quote" added that "[t]otal development cost" for the ECUs was $3,625,000 and proposed that it be amortized over model years 2005 and 2006. (VDO Decl., Exh. E at 2.)

8. **The Debtors Reject VDO's Proposed Terms in Favor of the LTC.** According to VDO, the Debtors responded to their "Updated Quote" by saying that "'most things' look okay." (VDO Mem. at 7.) In fact, as in August 2000, the Debtors also rejected VDO's proposed business terms by reiterating that the LTC would control: "I think we are real close to getting all the details behind us, *updating the Long Term Contract*

and issuing the additional tooling purchase orders …"  (*See* Email, VDO Decl., Exh. F (emphasis added).)  In the end, the LTC was not revised.  (Thompson Decl., ¶ 12.)

        9.  **The Debtors Pay VDO for Tooling.**   In December 2003, the Debtors paid VDO $618,000 for production tooling.  (Thompson Decl., ¶ 13; *id.*, Exh. 2.)  To effectuate the purchase, the Debtors sent VDO a purchase order for the tooling which expressly incorporated, and indeed reprinted in full, the Debtors' T&C.  (*Id.*)

        10.  **The Debtors Purchase 24,000 ECUs for the GMX 245 and 295 Programs, and order 100 % of their ECU Requirements for the GMT 800 Program, Pursuant to Purchase Orders Incorporating the LTC**.  Using VDO's numbers, the Debtors purchased 8,208 ECUs from VDO for the GMX 245 and 16,325 ECUs for the GMX 295 by the date of VDO's Claim.  (VDO Decl., ¶ 27.)  As the LTC required, the Debtors purchased these ECUs pursuant to purchase orders (LTC ¶ 5, VDO Decl., Exh. D), all of which expressly incorporated the Debtors' T&C.  (*See* Thompson Decl., ¶¶ A-B.)

        Also, except when the purchase orders called for definite quantities of ECUs, they reaffirmed that the parties' contract was for "100%" of the Debtors' requirements and reiterated that the LTC controlled the parties' transaction:  "This agreement reflects the latest part numbers, pricing and timing for Suspension ECUs described in the existing Long Term Contract (LTC) executed by buyer and seller as of June 16, 2000.  All other Terms and Conditions of June 16, 2000 LTC remain in effect."  (*See* Thompson Decl., ¶ 14; *id.*, Exh. 3.)

        The Debtors also issued what VDO calls "a blanket purchase order for the GMT 800 program" on July 30, 2004.  (*See* VDO Decl., ¶ 30; *id.*, Exh. J.)  This "blanket purchase order," like the other purchase orders, provided that "[t]his Requirement Contract is for 100% unless otherwise specified" and reiterated that the "Terms and Conditions of June 16, 2000 LTC remain in effect."  (*See id.*; Thompson Decl., Exh. 3.)  Further,

the purchase order stated, as the T&C did, that "[a]ny additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing." (*Id.*)

11. **The Debtors Cannot Use VDO's ECU's.**  Because of GM's requirements, the Debtors could not use VDO's ECU for the GMT 800 program.  The Debtors were able to use substantially the same ECUs with different connectors, however, in the GMT 900 program.  (*See* Thompson Decl., ¶¶ 16-17.)  From July 8, 2005 through October 27, 2007, the Debtors purchased approximately 400,000 ECUs from VDO for the GMT 900 program – under the LTC – at prices between $52.30 and $56.26 each.  (*Id.*, ¶ 18.)

12. **VDO's claim and computation of damages**.  On or about January 24, 2006, VDO filed its Claim, Proof of Claim No. 2247, against Delphi Automotive Systems LLC seeking $9.3 million.  The Claim seeks $7,763,230 for "Non amortized R&D costs due to [VDO] … following cancellation of GMT 800 application and volume shortfall of GMX 245 and GMX 295 applications."  (*See* Thompson Decl., Exh. 4.)  The Claim also seeks $1.5 million in trade payables, but VDO sold the trade payables portion of its Claim, and eventually agreed to reduce the Claim to account for the sale in a stipulation executed on October 24, 2007.

In VDO's February 2007 "Supplemental Response" to the Debtors' objection to its Claim, VDO provided a one-page itemization of the Claim's components. (*See* Thompson Decl, Exh. 5.)  The itemization shows that more than $1.2 million of VDO's Claim does not represent reimbursement of development costs, but rather "missing" profit.  (*See id.*)  VDO has provided no more detailed calculation of its Claim. (*See* Thompson Decl, ¶ 21.)

**ARGUMENT**

**THIS COURT SHOULD GRANT A SUMMARY JUDGMENT
EXPUNGING VDO'S CLAIM BECAUSE THE DEBTORS
HAVE NO LEGAL OBLIGATION TO PAY VDO THE SUMS IT DEMANDS**

Federal Rule of Civil Procedure 56, made applicable here by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment as to "all or any part" of a cause of action "shall be rendered forthwith if . . . there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

Summary judgment is appropriate when the court, having drawn all reasonable inferences in favor of the non-moving party, determines that no reasonable trier of fact could find in its favor. *See Allen v. Coughlin*, 64 F.3d at 79; *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir. 1989). Summary judgment should be granted here because the undisputed facts, unambiguous contracts and controlling principles of law entitle the Debtors to judgment on the issues before the Court.

**POINT I**

**VDO HAS NO CONTRACTUAL RIGHT TO THE SUMS IT DEMANDS**

For three reasons, VDO has no contractual right to the sums it demands.[1] First, the terms of the LTC do not entitle VDO to compensation – VDO does not even claim that they do. Second, the LTC does not, as VDO argues, convert VDO's July 20, 2000 "Offer" into an enforceable contract. Third, VDO does not and cannot identify any contractual amendment that gives it a right to compensation. Accordingly, VDO's Claim, insofar as it is based on an asserted contractual entitlement, should be expunged.

---

[1] Although the Debtors do not concede that Ohio law governs the parties' contract, the Debtors will assume that Ohio law controls for purposes of this motion to avoid undue complication and because there currently do not appear to be relevant differences between Ohio and Michigan law.

A.    The Terms of the LTC Do Not Give VDO a
      Contractual Right to the Sums It Demands

The terms of the LTC do not entitle VDO to a "cancellation charge" or to
compensation for reduced orders.  Rather, as shown in Item 6 of the Statement of Facts,
the LTC preserves the Debtors' rights to change specifications, delivery schedules and
quantities without compensating VDO; requires VDO to guarantee that any parts it sold
would serve the Debtors' and their customer's purpose; and protects the Debtors from
claims based on VDO's failure to achieve cost savings.  Indeed, even VDO does not
maintain that the LTC's terms entitle them to compensation, and they plainly do not.

B.    The Parties' Pre-Contractual Correspondence
      Does Not Give VDO a Right to Compensation

Because the LTC's terms do not entitle VDO to compensation, VDO asks
the Court to treat VDO's unilateral demands in pre-contractual correspondence as if
they were part of the parties' contract – and to do so even though the Debtors clearly
rejected those demands.  According to VDO, the definition of "Contract" in the T&C
"includes the terms set forth in VDO's Offer, including provisions enabling VDO to re-
cover on its claim, in the parties' written agreement."  (VDO Mem. at 8.)  VDO's attempt
to elevate their rejected proposals into contractual provisions is without merit.

The definition of "Contract" in the T&C, on which VDO's argument
depends, reads as follows:

> Seller acknowledges and agrees that these General Terms and Conditions
> are incorporated in, and a part of, this contract and each purchase order,
> release, requisition, work order, shipping instruction, specification and
> other document … relating to the goods and/or services to be provided
> by Seller [VDO] pursuant to this contract (such documents are collectively
> referred to as this "Contract").

(T&C, ¶ 1; *see* VDO Mem. at 10.)

12

This definition, VDO maintains, converts all of the parties' pre-contractual "written dealings" into a binding agreement: "Because the 'Contract' documents include each 'other document … relating to the goods and/or services' (*id.*) to be provided by VDO," VDO asserts, "Delphi's language incorporates into the parties' agreement all of their written dealings regarding the parts to be provided by VDO." (VDO Mem. at 10-11.)

VDO also argues that the "integration clause" of the T&C, which provides that "[t]his Contract … constitutes the entire agreement between Seller and Buyer" (T&C, ¶ 29), converts VDO's "Offer" into part of the parties' contract: "By using the term 'This Contract,' Delphi's integration clause specifically references the definition of 'Contract' from the first paragraph of Delphi's Terms and Conditions. Thus, … Delphi defined the parties' agreement to consist of all of their written communications." (VDO Mem. at 11.)

VDO's argument – illogical on its face – fails for at least five independent reasons. First, the definition of "Contract" in the T&C does not transform ***pre-contractual*** documents such as VDO's "Offer" into part of the parties' "Contract." The definition only makes agreements entered into ***at the same time as the LTC or later*** into part of the "Contract" that is subject to the Terms and Conditions. Although the definition makes each "purchase order, release, requisition, work order, shipping instruction, [and] specification" part of the "Contract," these types of documents all ***follow*** rather than ***precede*** purchase contracts such as the LTC. The same is true of "other document[s] … relating to the goods and/or services to be provided by Seller [VDO] ***pursuant to*** this contract," because goods and services can only be provided ***pursuant to*** a contract if they are provided ***after*** the contract was entered into. *See, e.g., Merriam-Webster's Collegiate Dictionary* (12th ed. 2004) ("pursuant to" means "in carrying out" or

13

"in conformity with").  Thus, because VDO's July 2000 "Offer" **preceded** the Debtors'
execution of the LTC by three months, VDO's "Offer" is not part of the parties' "Contract."

Second, it is well established that courts should reject interpretations that
render contractual provisions meaningless.  *See*, *e.g.*, *Foster Wheeler Enviresponse, Inc. v.
Franklin County Convention Facilities*, 678 N.E.2d 519, 526 (Ohio 1997).  Yet VDO's interpretation of "Contract" would turn the T&C integration clause – which actually bars
VDO from arguing that their "Offer" is part of the parties' contract –  into nonsense.

The integration clause provides, in relevant part:  "This Contract, together
with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between the Seller and Buyer
with respect to the matters contained in this Contract and supersedes all prior oral or
written representations and agreements."  (T&C ¶ 29.)

If "Contract" in the integration clause is interpreted to mean, as the Debtors maintain, "the LTC and any agreements entered into at the same time or later," then
the integration clause has a natural meaning:  it precludes the parties from relying on
any agreement purportedly entered into before the LTC was signed, such as VDO's
"Offer."

If "Contract" in the integration clause is interpreted to include all agreements entered into **before** the LTC was executed, however – as VDO maintains – then
there would be no "prior oral or written representations and agreements" for the
"Contract" to supersede.  The clause would become meaningless, and clearly not what
the parties intended.  Further, to put this same point another way, VDO's interpretation
of "Contract" would change the integration clause into a statement that the "Contract,"
including all prior agreements, supersedes all prior agreements, which is nonsensical.

14

Thus VDO's interpretation of "Contract" would render the integration clause meaning-less, and the Court should reject it.

Third, even if VDO's interpretation of "Contract" were correct, that would not make any provision of VDO's "Offer" enforceable. Paragraph 1 of the T&C, which contains the definition of "Contract," merely makes all parts of the Contract subject to the T&C. Similarly, the integration clause in Paragraph 29 of the T&C makes the "Con-tract" supersede prior agreements, but does not make any part of the "Contract" – let alone rejected demands – enforceable against any party.

Fourth, if VDO's "Offer" is part of the parties' contract, the Debtors' reject-tion of that "Offer" in their Nomination Letter must be part of the contract as well. VDO does not, and cannot, show that their "Offer" somehow trumps the Debtors' later rejection of that "Offer" in favor of the terms of the LTC.

Fifth, even if VDO's "Offer" were part of the parties' contract, it is too vague and ambiguous to support their claim. For example, does VDO's "Offer" de-mand "an equitable cancellation charge" only if the *whole* of "the program covered in this letter is cancelled," or if any part of it is cancelled, and how much is an "equitable cancellation charge"? VDO's language is simply too vague to be binding. *See, e.g., Ulmo v. Gilmour Academy*, 273 F.3d 671, 677 (6th Cir. 2001) (the Ohio Supreme Court has made clear that "vague language will not warrant judicial enforcement").

VDO's fallback argument that VDO's "Offer" is part of the parties' agree-ment "because it sets forth the terms of the offer that Delphi accepted" (VDO Mem. at 11-12) is equally flawed. Apparently, VDO believes that "VDO's Offer and Nomination Letter provide the required elements of a contract," and that the Court should therefore ignore the parties' actual, jointly executed contract. (*Id.*) The Debtors did *not* agree to VDO's "Offer," however: the Debtors stated that they "continue to disagree" with VDO

concerning pricing, and that if VDO satisfied certain conditions, the Debtors "*intend to execute (sign) the long term contract already agreed to with Siemens on these programs.*" (*See* VDO Decl., Exh. C.)  In other words, the Debtors **rejected** VDO's proposed terms in favor of the LTC, and the Court should reject VDO's argument as well.

        C.     The Parties' Post-Contractual Correspondence
              Does Not Give VDO a Right to Compensation

VDO's post-contractual demands, like its pre-contractual demands, cannot supersede the LTC.  The T&C provides, "[t]his Contract may only be modified by a written contract amendment issued by Buyer." (T&C ¶ 29, VDO Decl., Exh. A.)  VDO identifies no such "written contract amendment," and its "Updated Quote," which the Debtors did not accept in writing, certainly does not qualify.  Accordingly, the LTC, T&C, purchase orders and related documents – the parties' genuine contract – controls the parties' relations.  VDO is not contractually entitled to compensation for reduced orders or the purported "cancellation" of the GMT 800 program.

**POINT II**

**VDO CANNOT STATE A
"PROMISSORY ESTOPPEL" CAUSE OF ACTION FOR THE SUMS IT DEMANDS**

VDO cannot state a "promissory estoppel" cause of action for two equally dispositive reasons.  First, the parties' contract is a valid requirements contract that bars any promissory estoppel claim.  Second, VDO admits that a "clear and unambiguous" promise that they relied upon is essential for their claim, yet they do not and cannot identify one. (*See* VDO Mem. at 18-19.)

Under Ohio law, if the parties have an enforceable contract, they cannot assert a cause of action for promissory estoppel.  *See, e.g., O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (2007) (affirming summary judgment dismissing promissory estoppel claim because, "[i]n Ohio, [w]here the parties have an enforceable contract and merely

16

dispute its terms, scope, or effect, one party cannot recover for promissory estoppel….")
(quoting *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996)).

Here, the parties' LTC, reinforced by the T&C and purchase orders, is
plainly an enforceable contract.  VDO admits that, "to be valid and binding, a require-
ments contract must include '[a] term which measures the quantity by the output of
seller or the requirements of the buyer.'"  (VDO Mem. at 15-16 (quoting *Orchard Group,
Inc. v. Konica Med. Corp.*, 135 F.3d 421, 428 (6th Cir. 1998).)  Here, the quantity is meas-
ured by the requirements of the buyer:  the LTC requires the Debtors to buy "approxi-
mately 100 percent (100%) of Buyer's production and service requirements" for the rele-
vant ECUs from VDO.  (LTC ¶ 1, VDO Decl., Exh. A).  Moreover, the Debtors' purchase
orders dropped the word "approximately," stating, whenever they did not identify a
definite quantity, that:  "[T]his Requirement Contract is for 100% unless otherwise
specified."  (*See* Poulet Decl. Exh. J; Thompson Decl. Exh. 3.)  The purchase orders did
***not*** specify otherwise.  (*Id.*)  Accordingly, the Debtors LTC, T&C and purchase orders
formed a valid, enforceable requirements contract.  *Cf., e.g., Cyril Bath Co. v. Winters
Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) (under Ohio law, a valid requirements contract
measures quantity by such "requirements as may occur in good faith," does not need an
explicit promise of exclusivity, and may concern only part of a buyer's requirements).

Further, although the LTC, T&C and purchase orders allowed the Debtors
"to purchase the parts at issue elsewhere" (*see* VDO Mem. at 17), they limited Debtors'
right to do so to very specific times or circumstances, and did not allow the Debtors to
terminate or buy elsewhere at will.  Even the provision allowing termination for con-
venience could not be exercised until the end of the 2004 model year, and granted VDO
certain rights to compensation.  (*See* LTC ¶ 5, VDO Decl., Exh. A.)  At a minimum, VDO
has received millions of dollars in payments for ECUs for the GMX 245, GMX 295, GMT

17

900 and other programs, under the LTC.  (*See* Thompson Decl., ¶¶ 14-18.)  VDO should

not be heard to assert now that the LTC is invalid.

In addition, VDO does not and cannot identify the requisite "clear and

unambiguous" promise to support their claim.  As shown above, the Debtors did not

promise to purchase a specific quantity of ECUs for the GMT 800 program, to pay a

"cancellation charge," or to purchase a guaranteed volume of ECUs for the GMX 245 or

295, in any of the four documents on which VDO relies (*see* VDO Mem. at 18) – the RFQ,

Nomination Letter, LTC and "Offer," the last of which the Debtors did not even draft.

Accordingly, the Court should reject VDO's promissory estoppel claim as a matter of

law.  *See, e.g., National Coin Laundry, Inc. v. Solon Automated Servs.*, 933 F.2d 1009, 1991

WL 88192 at *7 (6th Cir. 1991) (affirming summary judgment dismissing promissory

estoppel claim because "there is no genuine issue of material fact concerning the exis-

tence of a crucial element … a clear and unambiguous promise"); *Dunn v. Bruzzese*, 2007

WL 1976657 at * 4 (Ohio App. 7th Dist.) (affirming summary judgment dismissing

promissory estoppel claim due to failure to allege "clear and unambiguous promise").

## CONCLUSION

For all of the foregoing reasons, the Debtors' motion for a summary

judgment expunging VDO's Claim should be granted.

Dated:    New York, New York
          October 31, 2007                DELPHI CORPORATION, *et al.*,
                                          By their Bankruptcy Conflicts Counsel,
                                          TOGUT, SEGAL & SEGAL LLP
                                          By:

                                          /s/ Neil Berger
                                          NEIL BERGER (NB-3599)
                                          RICHARD K. MILIN (RM-7755)
                                          One Penn Plaza, Suite 3335
                                          New York, New York 10119
                                          (212) 594-5000