Hearing Date & Time:  November 30, 2007 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
            In re                       :   Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :   Case No. 05-44481 (RDD)
                                        :
                    Debtors.            :   (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF
OF CLAIM NO. 1279 (NU-TECH PLASTICS ENGINEERING, INC.)

("SUPPLEMENTAL REPLY – NU-TECH PLASTICS ENGINEERING, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplemental Reply With Respect To Proof Of Claim No. 1279 (Nu-Tech Plastics Engineering, Inc.).

### Introduction

1.      Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") supplied parts to General Motors Corporation ("GM") and Delphi Automotive Systems LLC ("DAS") until Nu-Tech sold substantially all of its assets to another supplier, Rapid Product Technologies, L.L.C. ("RPT"), effective December 1, 1999.  The parts included a fuel reservoir with part number 25160694 (the "Part").  GM issued purchase orders for the Part in November 1997 and June 1998 (the "June 1998 GM PO"), and it reissued the second purchase order using a form generated by its new purchasing system in August 1998 (the "August 1998 GM PO").  One month later, DAS was formed as a limited liability company.  DAS issued its first purchase order for the Part in May 1999 (the "May 1999 DAS PO").[1]  DAS did not place orders under the May 1999 DAS PO because, as Nu-Tech knew, GM had agreed to withdraw production from Nu-Tech as part of its settlement of a major labor strike in July 1998.  In accordance with that settlement, the tools needed to make the Part were removed from Nu-Tech's plant by the end of 1998.

2.      Although Nu-Tech now claims that DAS breached the Part-related purchase orders, resulting in damages of nearly $14 million, it did not complain about DAS's performance until December 2002, when it sued GM and DAS in Michigan state court (the "Michigan Action").  Nu-Tech's theory in the Michigan Action, and the basis for its Claim, is that the June 1998 GM PO, the August 1998 GM PO, and the May 1999 DAS PO are requirements contracts that obligated the

---

[1]     The June 1998 GM PO, the August 1998 GM PO, and the May 1999 DAS PO are included in DAS's exhibits as Exhibit A, Exhibit B, and Exhibit C, respectively.

purchaser to buy from Nu-Tech 100% of its needs for the Part.  Nu-Tech's contract theory fails on

three grounds:

- First, Nu-Tech sold the June 1998 GM PO, the August 1998 GM PO, the May 1999 DAS PO, and the right to sue for any alleged breach of those contracts to RPT effective December 1, 1999.  Accordingly, Nu-Tech was not the real party in interest when it brought the Michigan Action.  And although Nu-Tech attempted to reacquire the right to sue by entering into an assignment with RPT in March 2005, that assignment was ineffective because it was executed after the statute of limitations expired.

- Second, DAS cannot be held responsible for any breach of the June 1998 GM PO or the August 1998 GM PO because DAS was not a party to those contracts; indeed, DAS did not exist when GM issued those contracts.  Nu-Tech sued GM for breaching its contracts in the Michigan Action and it has since settled with GM. There is no basis for Nu-Tech's continued pursuit of those same claims against DAS.

- Third, assuming for the sake of argument that DAS breached a Part-related contract, Nu-Tech cannot recover damages because it did not take any steps to mitigate its losses.

> 3.    In addition to its contract claim, Nu-Tech asserts a promissory-estoppel claim,

arguing that DAS broke a promise to award Nu-Tech new business to replace the lost Part business.

Like Nu-Tech's contract claim, however, this claim fails because Nu-Tech sold it to RPT effective

December 1, 1999.  This claim also fails on the merits for the following reasons:

- First, Nu-Tech has submitted a declaration from Trenia Patrick, a former DAS employee who is assisting Nu-Tech in this litigation, establishing that the promise, if made at all, was made by GM, not DAS.

- Second, only a clear and definite promise qualifies for enforcement, but Nu-Tech cannot identify the person who made the promise, when the promise was made (other than the vague assertion that it was sometime in the fall of 1998), or any of the material terms of the proposed agreement.

- Third, Nu-Tech did not take any action in reliance on the alleged promise, nor would any such action have been reasonable given Nu-Tech's knowledge that DAS awarded new business by issuing a purchase order, not by casually mentioning it in conversation.

- Fourth, the May 1999 DAS PO incorporated an integration clause, rendering Nu-Tech's reliance on the pre-contractual promise unreasonable as a matter of law.

- Fifth, enforcement of the promise is not necessary to avoid injustice, but rather

would provide Nu-Tech's owner, John G. Cooper, with a windfall.  The bulk of the damages Nu-Tech seeks for this claim are based on lease payments made by Nu-Tech to companies owned or controlled by Mr. Cooper.  If DAS reimburses Nu-Tech for those payments, the money will go to Mr. Cooper again, this time as the owner of Nu-Tech.

Argument

I.     Nu-Tech's Contract Theory Is Without Merit.

    A.     Nu-Tech Sold Its Part-Related Contracts And Contract Claims To RPT.

4.     In September 1999, Nu-Tech was placed in Delphi's troubled-supplier program based on its poor financial condition, and soon after that it began discussions with potential acquirers.  (DAS Ex. R ¶ 9; DAS Ex. T ¶ 4.)  In December 1999, Nu-Tech entered into a preliminary Memorandum and Agreement Regarding Purchase and Sale of Assets (the "Preliminary Agreement") with RPT.  (DAS Ex. F.)  The Preliminary Agreement contemplated that Nu-Tech and RPT would later execute a definitive agreement for the sale of Nu-Tech's assets, and that RPT would take over operation of Nu-Tech's business.  (Id. at 2.)  Nu-Tech and RPT entered into that definitive agreement – the Purchase and Sale of Business Assets (the "Definitive Agreement") – on January 14, 2000, effective December 1, 1999.  (DAS Ex. G art. I, ¶ 1.1.)

5.     In paragraph 1.1 of the Definitive Agreement, Nu-Tech agreed to "sell, assign, convey, transfer, set over, and deliver" to RPT "all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on [December 1, 1999,] were owned by [Nu-Tech] or in which [Nu-Tech] ha[d] an interest of any kind." [2]  (Id. art. I, ¶ 1.1.)  The assigned assets included, "without limitation," Nu-Tech's "existing customer purchase orders," "contracts and service agreements," and "contracts and service records relating to sales." (Id. art. I, ¶ 1.1(c), (f)-(g).)  There is no question that the May 1999 DAS PO, as well as the Part-

---

[2]     As Mr. Cooper acknowledged in his deposition testimony in the Michigan Action, Nu-Tech "ceased to exist" from an operating standpoint as a result of the asset sale.  (DAS Ex. Q at 30:17-31:4.)

related contracts issued by GM, were included in the sale.  Indeed, the day after Nu-Tech executed

the Definitive Agreement, DAS issued an amendment to the May 1999 DAS PO naming RPT as the

new supplier.  (See DAS Ex. D.)

6.       Furthermore, any claims arising out of the May 1999 DAS PO and the Part-

related contracts issued by GM were also covered by the plain language of these provisions.  The

Michigan Uniform Commercial Code – Sales, Mich. Comp. Laws ch. 440, art. 2 (the "UCC"),

confirms that "an assignment of 'the contract' . . . or an assignment in similar general terms is an

assignment of rights" arising under that contract.[3]  Id. § 440.2210(5); accord FDIC v. Cuvrell (In re

F & T Contractors, Inc.), 17 B.R. 966, 987 (Bankr. E.D. Mich. 1982) (stating that "[t]he law in

Michigan has a long and consistent history of cases which hold that an assignment of a contract

constitutes an assignment of the rights thereof"), rev'd on other grounds, 718 F.2d 171 (6th Cir.

1983).

7.       In arguing that it did not assign its contract claim to RPT, Nu-Tech notes that

the general terms and conditions applicable to the May 1999 DAS PO (the "Terms and Conditions")

provided that Nu-Tech "may not assign or delegate its obligations under this contract without

Buyer's [DAS's] prior written consent," and that DAS did not provide its prior written consent.

(DAS Ex. E § 27.)  This argument misconstrues the legal effect of the non-assignment provision.

The plain language of the provision is limited to an assignment or delegation of "obligations," and

does not address an assignment of rights.  This is important under the UCC because a non-

assignment provision generally will not be read as prohibiting the assignment of rights unless it

contains specific language on that point.  See Mich. Comp. Laws § 440.2210(4) (stating that "a

prohibition of assignment of 'the contract' is to be construed as barring only the delegation to the

---

[3]     The general terms and conditions applicable to the Part-related contracts contain a Michigan choice-of-law clause.
(See DAS Ex. E § 29.)

assignee of the assignor's performance"); <u>accord</u> <u>In re Jackson</u>, 311 B.R. 195, 201 (Bankr. W.D.

Mich. 2004) (explaining that non-assignment provisions are interpreted "narrowly, as barring only

the delegation of duties, and not necessarily as precluding the assignment of rights").

8.      Furthermore, under the UCC, the "right to damages for breach of [a] whole

contract . . . can be assigned <u>despite agreement otherwise</u>."  Mich. Comp. Laws § 440.2210(2)

(emphasis added).  Thus, even if the non-assignment provision barred an assignment of rights in

general, it did not apply to the specific right to damages for breach of the May 1999 DAS PO.

Finally, even assuming that Nu-Tech's assignment <u>did</u> violate the non-assignment provision, that

violation "'does not render the assignment ineffective'" under Michigan law, but rather gives DAS a

right to damages for breach of the provision.  <u>Suggs ex rel. Posner v. Gen. Am. Life Ins. Co.</u>, No.

05-60023, 2006 WL 1109270, at *6 (E.D. Mich. Apr. 24, 2006) (quoting Restatement (Second) of

Contracts § 322(2)(b) (1981)).

9.      Nu-Tech's also argues that its contract claim was covered by the Definitive

Agreement's definition of "Excluded Assets," which encompassed "those assets not specifically or

by inference included" in the sold assets.  (DAS Ex. G art I, ¶ 1.4(d).)  The Definitive Agreement's

listing of sold assets, however, did specifically include Nu-Tech's "purchase orders" and

"contracts."  (<u>Id.</u> ¶ 1.1(c), (f)-(g).)  Nu-Tech's sale of the contracts necessarily included the right to

sue for breach because that right is one that arises from the contracts.  <u>See</u> Mich. Comp. Laws §

440.2210(5); <u>F & T Contractors</u>, 17 B.R. at 987.

10.      The fact that Nu-Tech transferred its contracts and any contract claims it had

to RPT under the Definitive Agreement is dispositive.  In Michigan courts and federal courts alike,

a cause of action must be asserted by the real party in interest.  <u>See</u> Mich. Ct. R. 201(B) ("An action

must be prosecuted in the name of the real party in interest . . . ."); Fed. R. Civ. P. 17(a) ("Every

action shall be prosecuted in the name of the real party in interest.").  Under Michigan law, a real

party in interest "is one who is vested with the right of action on a given claim." Miller v. Chapman Contracting, 730 N.W.2d 462, 464 (Mich. 2007); Moses, Inc. v. SEMCOG, 716 N.W.2d 278, 287 (Mich. Ct. App. 2005).[4]  When a claim is assigned from one person to another, the real party in interest is the assignee – in this case, RPT.  See Jewel Constr. Co. v. Genoak Constr. Co., Docket No. 268070, 2006 WL 2924528, at *3 (Mich. Ct. App. Oct. 12, 2006) (concluding that assignee "was the real party in interest"); DeJong v. B. F. Goodrich, Inc., 292 N.W.2d 157, 160 (Mich. Ct. App. 1980) (explaining that an "assignee of [a] cause of action . . . is the real party in interest and suit must be brought in its name").

> B.    Nu-Tech Did Not Reacquire The Contract Claim Within The Limitations Period.

11.    The limitations period applicable to Nu-Tech's contract claim expired no later than December 31, 2004.[5]  Approximately three months later, in March 2005, Nu-Tech and RPT entered into an Acknowledgment and Assignment Agreement (the "Assignment Agreement") providing that:

> In the event it is ever determined by anyone that Nu-Tech in fact did transfer any cause of action it possessed against General Motors and/or Delphi Corporation to [RPT] as part of the Asset Purchase Agreement, [RPT] hereby assigns all of its rights, title and interest in and to said cause of action back to Nu-Tech.

(DAS Ex. H § 2.)  Although Nu-Tech argues that this provision cured any real-party-in-interest defect that existed when it filed the Michigan Action in December 2002, this argument fails for two

---

[4]    All of the Part-related contracts are governed by Michigan law, and this Court must look to Michigan law "to determine whether [Nu-Tech] properly possesses the right of action that it asserts in this case." Stichting Ter Behartiging Van De Belangen Van Oudaandeel-Houders In Het Kapitaal Van Saybolt B.V. v. Schreiber, 407 F.3d 34, 49 (2d Cir. 2005).

[5]    Under the UCC, "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." Mich. Comp. Laws § 440.2725(1).  "A cause of action accrues" under this provision "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Id. § 440.2725(2).  In this case, any breach of contract by DAS occurred no later than December 31, 2000, when the May 1999 DAS PO expired, and the four-year limitations period therefore expired no later than December 31, 2004.

reasons.[6]

12.      First, the provision applies only to claims against GM and Delphi, and is triggered only by a determination that Nu-Tech transferred those claims under the "Asset Purchase Agreement," which is defined as the "Memorandum and Agreement Regarding Purchase and Sale of Assets dated December 1, 1999" – i.e., the Preliminary Agreement.  (DAS Ex. H at 1 & § 2.) What DAS seeks is a determination that Nu-Tech transferred its causes of action under paragraph 1.1 of the Definitive Agreement.  And the causes of action at issue here are against DAS, a legal entity that is separate from Delphi.  Accordingly, the Assignment Agreement is of no help to Nu-Tech here.

13.      Even more damaging to Nu-Tech's argument is the well-established principle that an "assignee stands in the shoes of the assignor and acquires the same rights as the assignor possessed."  First of Am. Bank v. Thompson, 552 N.W.2d 516, 520 (Mich. Ct. App. 1996); accord 3333 Centerpoint Parkway Invs. Ltd. P'ship v. Forster, No. 265727, 2006 WL 785369, at *1 (Mich. Ct. App. Mar. 28, 2006) (per curiam) ("Causes of action are generally freely assignable and the assignee acquires the rights and stands in the shoes of the assignor.").  As such, the assignee "is subject to the same defenses . . . , including the statute of limitations, as the [assignor] would have been."  First of Am. Bank, 552 N.W.2d at 521.  The discussion of assignments in the Restatement (Second) of Contracts includes an illustration of this point, explaining that when A assigns a right to C, "C's right is barred by the Statute of Limitations when A's right would have been."  Restatement

---

[6]      Nu-Tech also cites a provision in the Assignment Agreement providing that the Definitive Agreement did not cover Nu-Tech's alleged claims against Delphi.  (DAS Ex. H § 1.)  The meaning of the Definitive Agreement, however, must be determined based on its clear and unambiguous language, not on the parties' revisionist explanations of what they intended.  See Harbor Park Market, Inc. v. Gronda, Nos. 267207, 267288, 2007 WL 3119755, at *1 n.3 (Mich. Ct. App. Oct. 25, 2007) (stating that when a contract "is unambiguous, [a] party's understanding of what was intended by the language is irrelevant to determining what the language actually says"); Zurich Ins. Co. v. CCR & Co., 576 N.W.2d 392, 395 ("This court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definitive meaning.").

(Second) of Contracts § 363 cmt. b., illus. 3 (1981).[7]

14.    The Michigan Court of Appeals applied this rule in <u>3333 Centerpoint</u>

<u>Parkway</u>, a case in which the plaintiffs asserted certain claims against the defendants before the

limitations period expired, but also before the plaintiffs possessed those claims.  2006 WL 785369,

at *2.  After the limitations period expired, a third party assigned the claims to the plaintiffs.  <u>Id.</u>

The court reasoned that the claims were time-barred, even though the plaintiffs had filed their

complaint within the limitations period.  <u>Id.</u>  The court reasoned that the plaintiffs' complaint "could

not have tolled the limitations period as to [the assigned] claims, because plaintiffs had not yet

'stepped into [the assignor's] shoes' at that time."  <u>Id.</u>  The sequence of events in this case – Nu-Tech

sued DAS, the limitations period expired, then Nu-Tech executed the Assignment Agreement – is

identical to the facts in <u>3333 Centerpoint Parkway</u>, and the Court should therefore reach the same

conclusion here.[8]

---

[7]    Nu-Tech argues that DAS is barred from raising this issue based on the Michigan trial court's decision denying DAS's summary-disposition motion in the Michigan Action.  That is incorrect.  The Michigan court's decision was not a final judgment under Michigan law, which controls this issue because bankruptcy courts "must give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  <u>Kelleran v. Andrijevic</u>, 825 F.2d 692, 694 (2d Cir. 1987).  A decision denying "a motion for summary disposition [is] interlocutory in nature," and res judicata therefore "does not apply" to those decisions.  <u>Ind. Ins. Co. v. Auto-Owners Ins. Co.</u>, 680 N.W.2d 466, 471 n.8 (Mich. Ct. App. 2004).  Furthermore, a decision is "final" only when "all appeals have been exhausted or when the time available for an appeal has passed."  <u>Leahy v. Orion Twp.</u>, 711 N.W.2d 438, 441 (Mich. Ct. App. 2006) (per curiam).  DAS did not have the right to appeal until the Michigan court issued a final judgment.  That never happened because DAS filed its voluntary petition with this Court shortly before the action was scheduled to go to trial.  As a result, DAS never exhausted its appeal rights with respect to the Michigan court's decision, nor did the time for appealing the decision pass.

[8]    <u>Gaia Techs., Inc. v. Reconversion Techs., Inc.</u>, 93 F.3d 774 (Fed. Cir. 1993), an intellectual-property case, explains the negative implications of permitting plaintiffs to cure standing defects after filing an action:

As a general matter, parties should possess rights before seeking to have them vindicated in court.  Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue.  Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent.  Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation.  Inevitably, delay and expense would be the order of the day.

<u>Id.</u> at 780.

15.     Approaching the issue from a slightly different angle, the Michigan Supreme

Court held this year in <u>Miller</u> that a plaintiff cannot cure a real-party-in-interest defect by

substituting the real party in interest as the named plaintiff "after the expiration of the period of

limitations." 730 N.W.2d at 465.  Thus, if Nu-Tech had tried to substitute RPT as the plaintiff in

the Michigan Action in March 2005, there is no question that its attempt would have been rejected

under <u>Miller</u>.  Although Nu-Tech argues that the result should be different in this case, there is no

reason to differentiate between a belated attempt to substitute the real party in interest (as in <u>Miller</u>)

and a belated attempt involving an assignment (the situation here).[9]

16.     In sum, Nu-Tech sold its contract claim to RPT effective December 1, 1999,

and did not reacquire the claim before the statute of limitations expired at the end of December

2004.  Accordingly, Nu-Tech's contract claim should be disallowed and expunged in its entirety.

C.     <u>DAS Was Not A Party To The June 1998 GM PO Or The August 1998 GM PO.</u>

17.     Nu-Tech argues that it is entitled to damages on its contract claim from

January 1, 1999, through December 31, 2000, even though DAS did not issue the May 1999 DAS

PO until May 3, 1999.  From January 1, 1999, until May 3, 1999, the operative agreement was the

August 1998 GM PO issued by GM.  (DAS Ex. B.)  Thus, even if one assumes that Nu-Tech did

not transfer its claim to RPT or that there was a valid reassignment of the claim to Nu-Tech, DAS

cannot be held responsible for any breach of the August 1998 GM PO because it was not a party to

that contract.  There is no risk that an alleged wrong will go unpunished here, because Nu-Tech

---

[9]     Nu-Tech's suggestion that <u>Miller</u> involved a <u>defendant</u> who was not named as a party defendant during the
limitations period is false.  (Docket No. 8688 at 17.)  Moreover, the two cases cited by Nu-Tech on this point –
<u>George Morris Cruises v. Irwin Yacht & Marine Corp.</u>, 478 N.W.2d 693 (Mich. Ct. App. 1991), and <u>Thomas v.
Costa</u>, No. 235031, 2003 WL 460222 (Mich. Ct. App. Feb. 21, 2003) – are inapposite.  Both cases involved
plaintiffs who owned a claim but lacked the legal capacity to sue, whereas in this case Nu-Tech sold the claim it
now seeks to assert.  Moreover, neither case cited by Nu-Tech indicated that the plaintiff's attempt to cure the
standing defect occurred after the limitations period expired, a critical fact that distinguishes those cases from
<u>Miller</u>.  And in any event, to the extent those cases conflict with <u>Miller</u>, they no longer represent Michigan law.

sued GM in the Michigan Action and has since settled with GM for an undisclosed amount.

18.    Nu-Tech's counterargument is based on the declaration of Ms. Patrick, a former Delphi employee who is now cooperating with Nu-Tech.  Ms. Patrick asserts that the August 1998 GM PO constituted an "assumption" by DAS of the June 1998 GM PO.[10]  (Patrick Aff. ¶¶ 24, 29.)  According to Ms. Patrick, DAS issued the August 1998 GM PO in August 1998 when "Delphi was spun off by General Motors."  (Id. ¶ 24.)  In fact, however, the spin-off was not completed until May 1999; indeed, DAS itself did not even exist until September 1998, one month after GM issued the August 1998 GM PO.  (DAS Ex. R ¶ 6; DAS Ex. N.)  Moreover, as explained in the declaration of Tina Weber, Ms. Patrick's supervisor in August 1998, the August 1998 GM PO was merely a reissue of the June 1998 GM PO using GM's new purchasing system, and did not represent an assumption of the June 1998 GM PO by DAS.  (DAS Ex. R ¶¶ 5-6.)

D.    Nu-Tech Failed To Mitigate Its Damages.

19.    Under Michigan law, when a person has breached a contract or committed some "other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable to under the circumstances to avoid or minimize the damages.  The person wronged cannot recover for any item of damage that which could thus have been avoided."  Complete Auto & Truck Parts, Inc. v. City of Flint, No. 268485, 2007 1934792, at *2 (Mich. Ct. App. Jul. 3, 2007) (quoting Shiffer v. Bd. of Educ. of Gibraltar Sch. Dist., 224 N.W.2d 255, 258 (Mich. 1974)).  In this case, it is undisputed that Nu-Tech knew on January 1, 1999 – the first day of its two-year damages period – that it lacked the tools needed to produce the Part and that GM (before May 1999) and DAS (after May 1999) could not order the Part from Nu-Tech because of the strike settlement.  (See Cooper Dec. ¶ 17; DAS Ex. Q at 43:12-44:3; DAS Ex. R ¶ 7.)  Yet Nu-Tech took no steps to

---

[10]    The parties agree that the June 1998 GM PO was between Nu-Tech and GM.

mitigate its losses at any point during the damages period, and in fact did not raise any issue with

DAS's performance.  Instead it remained silent and inactive month after month as it allegedly

incurred losses of nearly $14 million, a figure that exceeds Nu-Tech's entire gross revenue for 1998.

The mitigation principle prohibits Nu-Tech from "capitalizing on a breach or exploiting a breaching

defendant for a windfall" in this manner.  Charter Twp. of Marquette v. City of Marquette, No.

268535, 2006 WL 3500896, at *7 (Mich. Ct. App. Dec. 5, 2006).

II.    Nu-Tech's Promissory-Estoppel Theory Is Also Without Merit.

        20.    Nu-Tech's promissory-estoppel claim is based on a vague promise allegedly

made by DAS concerning an award of new business to Nu-Tech.  As a threshold matter, this claim

fails for the same reasons set forth in Part I.A above – by selling "all of [its] assets, rights, and

interests of every conceivable kind or character whatsoever" under the Definitive Agreement (DAS

Ex. G art. I, ¶ 1.1), Nu-Tech assigned its claim to RPT, and Nu-Tech's attempt to regain possession

of the claim in March 2005 is invalid under Michigan law because the applicable statute of

limitations had already expired.[11]  In addition, the claim fails on the merits.

        21.    Michigan courts have made clear that "promissory estoppel must be

cautiously applied, and only where the facts are unquestionable and the wrong to be prevented

undoubted."  Booker v. City of Detroit, 650 N.W.2d 680, 685 (Mich. Ct. App. 2002) (internal

quotation marks omitted here and throughout), rev'd in part on other grounds, 668 N.W.2d 623

(Mich. 2003); Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 552 (Mich. Ct. App. 1999).  To

---

[11]    A promissory-estoppel claim accrues when the alleged promise is broken, Alliance Assocs., L.C. v. Alliance
Shippers, Inc., No. 265101, 2006 WL 1506687, at *4 (Mich. Ct. App. June 1, 2006) (per curiam), which in this case
occurred no later than the end of 1998, when the tools needed to make the Part were removed from Nu-Tech's plant
and Nu-Tech did not receive any replacement business.  The limitations period applicable to such claims is
generally six years from the date of accrual, Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 643 (Mich. 1977), but
where the alleged promise is akin to an agreement governed by the UCC, as in this case, the UCC's four-year
period is a better fit.  Thus, the limitations period for Nu-Tech's claim expired either at the end of 2004 or the end
of 2002, in either case before Nu-Tech entered into the Assignment Agreement with RPT in March 2005.

maintain this claim, Nu-Tech must establish that (1) DAS made a promise, (2) DAS reasonably

should have expected the promise to cause Nu-Tech to act in a definite and substantial manner, (3)

Nu-Tech did in fact rely on the promise by acting in accordance with its terms, and (4) the promise

must be enforced to avoid injustice.  <u>Crown Tech. Park v. D&N Bank, FSB</u>, 619 N.W.2d 66, 71

(Mich. Ct. App. 2000); <u>Novak</u>, 599 N.W.2d at 552.  None of these elements are satisfied here.

A.    <u>DAS Did Not Make The Promise.</u>

22.    The most obvious problem is that DAS did not make the alleged promise.  At

his deposition in the Michigan Action, Mr. Cooper, Nu-Tech's owner, testified that Ms. Patrick

made the promise to him in the fall of 1998.  (DAS Ex. Q at 42:2-42:15.)  But Ms. Patrick swears

that Mr. Cooper is wrong.  In her declaration, Ms. Patrick stated that she was "not personally aware

of such a promise."  (Patrick Aff. ¶ 38.)  She also stated that Mr. Cooper had told her "that <u>General

Motors</u> had promised to provide to Nu-Tech a replacement part."[12]  (<u>Id.</u> (emphasis added).)

Because the declaration of Nu-Tech's own witness establishes that Ms. Patrick did not make the

alleged promise, and that the alleged promise (if it was made at all) came from GM, Nu-Tech

cannot sustain its claim against DAS.  <u>See</u> <u>Capital 1 Commercial Group, Inc. v. Tortora</u>, No. 2006-

075550-CZ, 2007 WL 1485865, at *3 (Mich. Ct. App. May 22, 2007) (per curiam) (rejecting

promissory-estoppel claim when plaintiff failed to show that "defendant made a promise, verbally

or in writing"); <u>Jungslager v. Lampe</u>, No. 264441, 2006 WL 335836, at *3 (Mich. Ct. App. Feb. 14,

2006) (per curiam) (rejecting claim when plaintiffs failed to "present anything showing a specific

promise by defendant").

B.    <u>The Promise Was Not Clear And Definite.</u>

23.    The promise of new business alleged by Nu-Tech is too vague to be enforced.

---

[12]  Ms. Patrick's recollection is consistent with that of John W. Mailey, the head of Nu-Tech during the relevant period,
who stated in his affidavit in the Michigan Action that DAS "at no time prior to the sale of Nu-Tech to Rapid
Product Technologies, LLC made any promise of additional business."  (DAS Ex. P ¶ 12.)

"The sine qua non of the theory of promissory estoppel is that the promise be clear and definite."
Derderian v. Genesys Health Care Sys., 689 N.W.2d 145, 157 (Mich. Ct. App. 2004); accord First
Sec. Sav. Bank v. Aitken, 573 N.W.2d 307, 317 (Mich. Ct. App. 1997) ("Promissory estoppel
requires an actual, clear, and definite promise.").  Under this principle, "when material terms of the
agreement are lacking, the degree of certainty necessary in a promise is absent."  Kleiman v.
Johnson, No. 219117, 2000 WL 33417403, at *2 (Mich. Ct. App. June 30, 2000) (per curiam);
Tomaski v. SRW, Inc., No. 190978, 1997 WL 33343340, at *3 (Mich. Ct. App. Oct. 3, 1997) (per
curiam).

          24.      In Swartzenberg v. Swartzenberg (In re Swartzenberg), No. 196677, 1997
WL 33344999 (Mich Ct. App. June 24, 1997) (per curiam), for example, the defendant's promise to
financially support the plaintiff "was not a clear and definite promise" because "[n]o terms of the
support were specified, i.e., the amount of monetary support [the plaintiff] was to receive, the
payment schedule, and the method of payment."  Id. at *3.  And in Sales Engineering, Inc. v.
Collins & Aikman Plastics, Inc., No. 251348, 2005 WL 415674 (Mich. Ct. App. Feb. 22, 2005) (per
curiam), an alleged promise that the plaintiff would receive commissions for its sales of automotive
parts to GM was not clear and definite because the plaintiff "failed to specify which of [the] two
defendants made the promise or which parts program the promise related to."  Id. at *5.

          25.      In this case, Nu-Tech's ambiguous description of the alleged promise reveals
only that the new business would involve a price and volume "similar" to that reflected in the June
1998 GM PO and the August 1998 GM PO, and that the promise was made at some point in the
"fall of 1998."[13]  (Cooper Dec. ¶ 19; DAS Ex. Q at 42:2-42:15.)  Nu-Tech cannot state with
specificity the part that was to be covered by the award or any of the material terms regarding price,

_____

[13]    Nu-Tech also contends that it "believed" the new award would be for part number 25180510 (Cooper Dec. ¶ 19),
       but it does not assert that that part, or any other part for that matter, was mentioned in the alleged promise.

volume, or duration.  Nor can it identify with any reasonable degree of particularity when the

promise was made or, in light of Ms. Patrick's declaration, who made the promise.  This missing

information makes the alleged promise insufficiently clear and definite under Michigan law.

      C.    <u>Nu-Tech Did Not Reasonably Rely On The Promise.</u>

      26.    Nu-Tech's reliance theory is set forth in Mr. Cooper's declaration, which

states that Nu-Tech relied on GM's past practice "of substituting one part for another . . . , Delphi's

promises of a replacement part, the [May 1999 DAS PO], the process of testing a new tool for

production of [another] reservoir part . . . , [and] the mentorship relationship between Nu-Tech and

Delphi/General Motors" by "retaining the machines, staff and facilities it would need to run the

promised replacement part."  (Cooper Dec. ¶ 20.)

      27.    On its face, Mr. Cooper's declaration shows that Nu-Tech's actions were not

taken in reliance on the alleged promise of a replacement part, but rather were based on a

combination of factors that included GM's business practices, Nu-Tech's internal testing process, the

May 1999 DAS PO (which was issued several months after the alleged promise), and Nu-Tech's

relationship with Delphi and GM.  Indeed, Nu-Tech does not assert that the alleged promise,

standing alone, would have resulted in the actions it took, or that Nu-Tech would have behaved any

differently if the alleged promise had not been made.

      28.    Moreover, although Nu-Tech claims it retained machines and buildings in

reliance on the alleged promise, the record shows that Nu-Tech entered into leases covering those

machines and buildings <u>before</u> the alleged promise was made in the fall of 1998.[14]  To state the

obvious:  "To establish that plaintiff relied on the purported promise, the alleged reliance cannot

---

[14]    The three equipment leases and two building leases at issue are described in the declaration of Nu-Tech's damages
witness, Mr. Leeman (Leeman Aff. ¶ 5(J)-(K)), and are included in DAS's exhibits as Exhibits I-M.  Nu-Tech
entered into the equipment leases on November 15, 1997, December 15, 1997, and May 22, 1998, respectively, and
it entered into the building leases on January 1, 1998, and September 1, 1998, respectively.  (<u>See</u> DAS Exs. I-M.)

precede the promise."  Formicola v. CBS Corp., No. 227881, 2002 WL 1963780, at *2 (Mich. Ct.

App. Aug. 23, 2002) (per curiam); accord Marrero v. McDonnell Douglas Capital Corp., 505

N.W.2d 275, 278 (Mich. Ct. App. 1993) (per curiam) (explaining that plaintiff who cited post-

promise actions in an effort to establish reliance had "inverted the sequence of events necessary to

establish promissory estoppel").  Furthermore, under the leases, which did not grant Nu-Tech a

termination right, Nu-Tech was obligated to make payments well beyond December 31, 1999, the

end of the damages period proposed by Nu-Tech with respect to this claim.[15]  Because Nu-Tech

already had a duty to make the payments, it cannot claim that the payments resulted from its

reliance on the alleged promise.

29.    With respect to Nu-Tech's assertion that it retained staff in reliance on the

alleged promise, it is not clear from Mr. Cooper's declaration when those workers were hired,

making it difficult to ascertain whether they joined Nu-Tech before or after the promise.  In addition,

it is highly unlikely that those workers, who were supposedly hired to produce the replacement part,

were allowed to stay on the payroll and remain idle throughout calendar year 1999, as Nu-Tech

alleges.[16]  If Nu-Tech did allow that to happen, its behavior was unreasonable; it should have

terminated the employees or reassigned them to other duties when Nu-Tech did not receive the new

business.

30.    Finally, Nu-Tech's reliance on the alleged promise was unreasonable given

that DAS's standard practice, both in general and as to Nu-Tech, was to award new business through

a process that required potential suppliers to submit bids, followed by DAS reviewing the bids,

---

[15]    The equipment leases expired on October 15, 2002, November 15, 2002, and five years from either November 15, 1997, or May 22, 1998, respectively, and the building leases expired on January 1, 2003, and September 1, 2005, respectively.  (See DAS Exs. I-M.)

[16]    Nu-Tech is seeking more than $460,000 in wages and associated taxes on account of these workers.  (Leeman Aff. Ex. 12.)

selecting a supplier, and then issuing a purchase order.  As Mr. Cooper testified at his deposition in

the Michigan Action, Nu-Tech was well aware of this procedure.  (DAS Ex. Q at 23:16-24:3.)

Given Nu-Tech's understanding of the bid procedure and its knowledge of the fact that DAS did not

commit to new business until it issued a purchase order, its reliance on any naked promise of new

business was unreasonable.

> D.    <u>Nu-Tech's Reliance Was Unreasonable As A Matter Of Law.</u>

31.    As explained in Ms. Patrick's declaration, the May 1999 DAS PO was subject

to the Term and Conditions.  (Patrick Aff. ¶ 29.)  The Terms and Conditions included an integration

clause providing, "This contract, together with the attachments, exhibits supplements or other terms

of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and

Buyer with respect to the matters contained in this contract and supersedes all prior oral or written

representations and agreements."  (DAS Ex. E ¶ 31.)

32.    The promise alleged by Nu-Tech – i.e., that Nu-Tech would receive an award

for a new part as a substitute for the Part – is related to and in direct conflict with the May 1999

DAS PO, which essentially provides that Nu-Tech would remain the supplier of the Part.  Nu-Tech's

reliance on the earlier promise was therefore unreasonable as a matter of law from the date of the

May 1999 DAS PO forward.  <u>See</u> <u>N. Warehousing, Inc. v. State Dep't of Educ.</u>, 714 N.W.2d 287,

289 (Mich. 2006) ("Promissory estoppel requires reasonable reliance on the part of the party

asserting estoppel.  Reliance on pre-contractual representations is unreasonable as a matter of law

when the contract contains an integration clause."); <u>Able Demolition, Inc. v. City of Pontiac</u>, No.

273295, 2007 WL 1464616, at *4 n.4 (Mich. Ct. App. May 17, 2007) (per curiam) ("Furthermore,

the contract contains an integration clause and, therefore, it would have been unreasonable as a

matter of law for [plaintiff] to rely on any outside representations to support a promissory estoppel

claim.").

E.    Enforcing The Promise Is Not Necessary To Avoid Injustice.

33.    Under Michigan law, Nu-Tech must demonstrate that enforcing the alleged

promise is "necessary to avoid injustice." Crown Tech. Park, 619 N.W.2d at 71; Novak, 599

N.W.2d at 552.  There is no danger of injustice in this case.  Instead, enforcing the promise and

awarding Nu-Tech the damages it seeks would result in a windfall for Mr. Cooper.  In 1999, Nu-

Tech made monthly lease payments to entities owned or controlled by Mr. Cooper or to Mr. Cooper

himself under the equipment and building leases described above.[17]  Nu-Tech now seeks to recover

those lease payments, which would again flow to Mr. Cooper in his capacity as the sole owner of

Nu-Tech.  The equitable doctrine of promissory estoppel should not be applied when doing so

would provide a double recovery.

III.    Nu-Tech's Damages Report Significantly Overstates Nu-Tech's Alleged Loss.

34.    According to the damages report submitted by Nu-Tech's damages witness,

Gary Leeman (the "Nu-Tech Report"), Nu-Tech suffered an aggregate loss of $13,957,130.  This

calculation includes $7,648,671 in lost income from January 1, 1999, through December 31, 2000,

lost business value of $4,981,901 in connection with Nu-Tech's asset sale effective December 1,

1999, and excess costs of $1,336,558 related to payments under building and equipment leases and

wage-related payments in calendar year 1999.  The Nu-Tech Report substantially overstates Nu-

Tech's losses.

A.    Nu-Tech's Lost Income Does Not Exceed $531,092.

35.    The Nu-Tech Report's calculation of lost income assumes a damages period

of January 1, 1999, through December 31, 2000.  This period starts too early and ends too late.  As

---

[17]    The lessor receiving those payments under the equipment leases was ABX Leasing, Ltd., a company solely owned
by Mr. Cooper.  (See DAS Exs. I-K; DAS Ex. Q at 12:6-12:9.)  As for the two building leases, the lessor under the
first was Air Design. L.C., which was also owned or controlled by Mr. Cooper, and under the second was Mr.
Cooper himself.  (See DAS Exs. L-M.)

explained above, from January 1, 1999, through May 2, 1999, the operative agreement was the June

1998 GM PO between Nu-Tech and GM.  On January 14, 2000, Nu-Tech executed the Definitive

Agreement and sold the May 1999 DAS PO and any related causes of action to RPT.  Thus, neither

the period before May 3, 1999 (when DAS issued the May 1999 DAS PO) nor the period after

January 14, 2000 (when Nu-Tech executed the Definitive Agreement) should be included in any

damages calculation.

      36.     In addition, as explained in Mr. Francis's damages report, the Nu-Tech

Report's lost-income analysis includes three flawed assumptions that result in an inflated

calculation:  (i) it is based on an incorrect assumption regarding the number of parts produced by

DAS, (ii) it takes into account the financial performance of non-core aspects of Nu-Tech's business

that should not be included in a lost-income analysis, and (iii) it ignores income taxes.  (DAS Ex. T

¶¶ 6-9.)  As demonstrated in Mr. Francis's report, if one focuses on the appropriate damages period,

corrects the Nu-Tech Report's three flawed assumptions, and otherwise adopts the Nu-Tech's

Reports assumptions and methodology, Nu-Tech's lost income was limited to $531,092.  (Id. ¶ 10 &

Exs. I-II.)

      B.    <u>Nu-Tech Cannot Recover Damages For Lost Business Value.</u>

      37.     The starting point for the Nu-Tech Report's estimation of lost business value

is its flawed calculation of lost income.  The calculation essentially multiplies Nu-Tech's supposed

lost after-tax income in calendar year 1999 by a capitalization rate of 3.91, then subtracts the lost

pre-tax income for 1999 and the consideration Nu-Tech received from RPT effective December 1,

1999.  Nu-Tech is legally barred from recovering any damages under this measure under <u>American</u>

<u>Anodco, Inc. v. Reynolds Metal Co.</u>, 743 F.2d 417 (6th Cir. 1984).

      38.     In that case, a jury awarded the plaintiff-seller damages for "loss of earnings"

and "loss of business value" after finding that the defendant-buyer had breached a requirements

contract.  Id. at 423.  The plaintiff-seller calculated its lost business value by capitalizing its lost

earnings.  Id.  The Sixth Circuit, applying Michigan law, overturned this portion of the damages

award, stating:

> [L]ike any item of damages, loss of profits may only be recovered once.
> [Plaintiff-seller's calculation] set the loss of future profits from the breach at
> $739,269.  The removal of these same profits . . . caused the reduction in
> value of the business when capitalized by the [plaintiff-seller's] accountant.
> Where the loss of profits and loss of value are intertwined, as they are here,
> and the loss of value is based on loss of future profits, to allow both would be
> to permit a double recovery.

Id. at 424.  Like the plaintiff-seller in American Anodco, Nu-Tech has presented a calculation of

lost business value that is intertwined with and based on its calculation of lost income arising from

DAS's alleged failure to perform under a requirements contract.  Accordingly, allowing Nu-Tech to

recover any damages based on lost business value would provide it with an improper double

recovery.

        39.    Furthermore, Nu-Tech has not suffered any damages under this measure in

any event.  As explained in Mr. Francis's damages report, the Nu-Tech Report's calculation of

$4,981,901 in lost value is inflated because (i) it is based on the Nu-Tech Report's flawed

calculation of lost income, (ii) the basis for the calculation should be free cash flow rather than net

income because free cash flow is recognized as a better approximation of value, and (iii) the

calculation should use a discount rate rather than a capitalization multiplier because the May 1999

DAS PO was for a limited duration.  (DAS Ex. T ¶¶ 6, 13-15.)  Correcting these deficiencies results

in an estimated lost business value of $1,000,957 based on free cash flow for all of 1999.  (DAS Ex.

T ¶ 15 & Ex. III .)  If Nu-Tech's lost income and the sale price it obtained from RPT are subtracted

from this figure, as they are in the Nu-Tech Report, the calculation drops below zero.[18]

---

[18]    As calculated in the Nu-Tech Report, the sale price alone was more than $1.2 million.  (Leeman Aff. Ex. 12.)

Accordingly, Nu-Tech cannot recover any damages under a lost-business-value theory.

      C.     <u>Nu-Tech's Calculation Of Excess Costs Is Overstated.</u>

      40.     According to the Nu-Tech Report, DAS's conduct resulted in Nu-Tech incurring excess costs of $1,336,558 in 1999.  These costs comprise lease payments under two building leases and three equipment leases between Nu-Tech and Mr. Cooper or entities owned or controlled by Mr. Cooper, as well as wage-related payments.  These costs should be taken into account only to the extent that Nu-Tech was unable to use the buildings, equipment, and labor for other purposes.  Nu-Tech has not made any attempt to establish that that was the case.  Instead, it asks the Court to assume that the buildings, equipment, and workers were left to collect cobwebs throughout all of 1999, which seems unlikely at best.

      41.     Moreover, based on an analysis undertaken by BBK in 1999 as part of its assistance to Nu-Tech under Delphi's troubled-supplier program, the building and equipment leases executed by Nu-Tech and Mr. Cooper called for payments that were significantly above market rates for comparable buildings and equipment.  (DAS Ex. T ¶¶ 6, 16-19.)  With respect to the building leases, for example, BBK estimated that Nu-Tech paid approximately $11.99 per square foot under the lease for one building, and approximately $10.00 per square foot and under the lease for the other.  By contrast, BBK's market research showed that the market rate at that time was in the range of $4.00 to $5.00 per square foot.  (<u>Id.</u> ¶ 18.)  Thus, whereas Nu-Tech made aggregate lease payments of $501,920 for those two buildings in 1999, at market rates the aggregate payments would have been somewhere between $192,000 and $240,000.  (<u>Id.</u>)  This analysis suggests that Nu-Tech's leases with Mr. Cooper were negotiated at a distance short of arm's length, and heightens the concerns about providing Mr. Cooper with a windfall recovery as explained in Part II.E above.

<u>Conclusion</u>

WHEREFORE, the Debtors respectfully request that this Court disallow and

expunge the Claim and grant the Debtors such other and further relief as is just.

DATE: New York, New York
       October 31, 2007

                             SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                             By: <u>/s/ John Wm. Butler, Jr.</u>
                                  John Wm. Butler, Jr. (JB 4711)
                                  John K. Lyons (JL 4951)
                                  Albert L. Hogan, III (AH 8807)
                                  Ron E. Meisler (RM 3026)
                             333 West Wacker Drive, Suite 2100
                             Chicago, Illinois 60606
                             (312) 407-0700

                                        - and -

                             By: <u>/s/ Kayalyn A. Marafioti</u>
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                             Four Times Square
                             New York, New York 10036
                             (212) 735-3000

                             Attorneys for Delphi Corporation, <u>et al.</u>,
                              Debtors and Debtors-in-Possession