# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, et al. [1]
**Case Number:** Jointly Administered 05-44481 (RDD)

**Monthly Operating Report for the Month Ended:**
September 30, 2007

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Monthly Operating Loss:** $418 million

**Debtors' Attorneys:**
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** October 31, 2007          /s/ THOMAS S. TIMKO
                                                      Thomas S. Timko
                                                      Controller and Chief Accounting Officer

---

(1)    See next page for a listing of Debtors by case number.
(2)    All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

**DELPHI CORPORATION, et al.**
**MONTHLY OPERATING REPORT**

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, et al.**
**MONTHLY OPERATING REPORT**
**INDEX**

| **Description** | **Page** |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the month ended September 30, 2007 and Year-to-Date January 1 to September 30, 2007 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of September 30, 2007 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the month ended September 30, 2007 | 6 |
| Notes to Monthly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 23 |
| Schedule of Payroll Taxes Paid | 24 |
| Schedule of Other Taxes Collected, Incurred and Paid | 26 |
| Schedule of Disbursements | 29 |

**DELPHI CORPORATION, et al.**
**MONTHLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

| | Month Ended September 30, 2007 | Year-to-Date January 1 to September 30, 2007 |
|---|---|---|
| | (in millions) | |
| Net sales: | | |
| General Motors and affiliates | $ 644 | $ 6,856 |
| Other customers | 440 | 4,560 |
| Non-Debtor affiliates | 61 | 446 |
| Total net sales | 1,145 | 11,862 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 1,214 | 11,957 |
| U.S. employee workforce transition program charges | 223 | 238 |
| Long-lived asset impairment charges | — | 195 |
| Depreciation and amortization | 40 | 423 |
| Selling, general and administrative | 86 | 791 |
| Securities & ERISA litigation charge | — | 353 |
| Total operating expenses | 1,563 | 13,957 |
| | | |
| Operating loss | (418) | (2,095) |
| Interest expense (contractual interest expense was $38 million and $326 million, respectively) | (396) | (596) |
| Loss on extinguishment of debt | — | (23) |
| Other income, net | 33 | 84 |
| Loss before reorganization items, income tax expense, and equity income | (781) | (2,630) |
| Reorganization items, net | (8) | (98) |
| Income tax expense | (5) | (28) |
| Equity income from non-consolidated affiliates, net of tax | 3 | 30 |
| Equity (loss) income from non-Debtor affiliates, net of tax | (3) | 309 |
| | | |
| Net loss | $ (794) | $ (2,417) |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**MONTHLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | September 30, 2007 (in millions) |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $ 107 |
| Restricted cash | 123 |
| Accounts receivable, net: | |
| General Motors and affiliates | 1,628 |
| Other third parties | 885 |
| Non-Debtor affiliates | 258 |
| Notes receivable from non-Debtor affiliates | 289 |
| Inventories, net: | |
| Productive material, work-in-process and supplies | 854 |
| Finished goods | 260 |
| Other current assets | 408 |
| Total current assets | 4,812 |
| Long-term assets: | |
| Property, net | 1,796 |
| Investments in affiliates | 372 |
| Investments in non-Debtor affiliates | 4,026 |
| Goodwill | 152 |
| Other intangible assets, net | 27 |
| Other | 547 |
| Total long-term assets | 6,920 |
| Total assets | $ 11,732 |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Debtor-in-possession financing | $ 3,226 |
| Accounts payable | 1,266 |
| Accounts payable to non-Debtor affiliates | 707 |
| Accrued liabilities | 1,446 |
| Notes payable to non-Debtor affiliates | 65 |
| Total current liabilities not subject to compromise | 6,710 |
| Long-term liabilities not subject to compromise: | |
| Employee benefit plan obligations and other | 1,043 |
| Liabilities subject to compromise | 16,992 |
| Total liabilities | 24,745 |
| Stockholders' deficit: | |
| Total stockholders' deficit | (13,013) |
| Total liabilities and stockholders' deficit | $ 11,732 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**MONTHLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Month Ended September 30, 2007 (in millions) |
|---|---:|
| Cash flows from operating activities: | |
| Net loss ...................................................................................... | $ (794) |
| Adjustments to reconcile net income to net cash used in operating activities: | |
| Depreciation and amortization...................................................... | 40 |
| Deferred income taxes ................................................................. | (2) |
| Pension and other postretirement benefit expenses ............................... | 62 |
| Equity income from unconsolidated affiliates, net of tax ...................... | 3 |
| Equity income from non-Debtor affiliates, net of tax ........................... | (3) |
| Reorganization items ..................................................................... | 8 |
| U.S. employee workforce transition program charges............................ | 223 |
| Changes in operating assets and liabilities: | |
| Accounts receivable, net ............................................................... | 61 |
| Inventories, net ........................................................................... | (24) |
| Other assets ............................................................................... | (4) |
| Accounts payable, accrued and other long-term liabilities ..................... | 441 |
| Other ....................................................................................... | 22 |
| U.S. employee workforce transition program payments........................... | (12) |
| Other postretirement benefit payments ............................................. | (20) |
| Pension contributions .................................................................. | (6) |
| Payments for reorganization items, net............................................. | (9) |
| Net cash used in operating activities................................................ | (14) |
| | |
| Cash flows from investing activities: | |
| Capital expenditures..................................................................... | (18) |
| Proceeds from divestitures ............................................................ | 62 |
| Decrease in restricted cash ............................................................ | 16 |
| Other ....................................................................................... | (15) |
| Net cash provided by investing activities .......................................... | 45 |
| | |
| Cash flows from financing activities: | |
| Net proceeds from debtor-in-possession credit facility .......................... | 120 |
| Repayments on borrowings from non-Debtor affiliates........................... | (64) |
| Net cash provided by financing activities .......................................... | 56 |
| | |
| Increase in cash and cash equivalents ............................................... | 87 |
| Cash and cash equivalents at beginning of period ................................ | 20 |
| Cash and cash equivalents at end of period ........................................ | $ 107 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

## 1. Background and Organization

*General –* Delphi Corporation ("Delphi" or the "Company") is a world-leading supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

*Chapter 11 Reorganization Cases –* On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (collectively with the Initial Filers, the "Debtors") filed voluntary petitions for relief under the Bankruptcy Code (the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein collectively as the "Chapter 11 Filings"). See the second page of this report for a listing of the Debtors and case number information. The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings and will continue their business operations without supervision from U.S. courts. On October 17, 2005, the Office of the United States Trustee for the Southern District of New York appointed a statutory committee of unsecured creditors. The composition of the creditors' committee was subsequently changed. On March 22, 2006, the Court granted a motion to create an equity committee to represent the interests of Delphi's stock owners and on April 28, 2006, the U.S. Trustee appointed a committee of equity security holders in these chapter 11 cases. The equity committee's composition was also later changed.

On January 20, 2006, the Debtors filed with the Court the Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements"), as required by the Bankruptcy Code. Subsequently, on February 14, 2006, April 18, 2006, and October 12, 2007, the Debtors filed certain amendments to the Schedules and Statements.

On February 3, 2006, the United States Trustee convened a meeting of creditors of Delphi pursuant to section 341 of the Bankruptcy Code. A section 341 meeting is a statutorily mandated meeting of creditors, presided over by the United States Trustee, at which a debtor's representatives appear and all creditors of the debtor are entitled to attend. At the conclusion of the section 341 meeting, the United States Trustee closed the meeting.

On April 12, 2006, the Court established a bar date of July 31, 2006 for filing proofs of claim against the Debtors' estates.

DASE Liquidation

In February 2007, Delphi's non-Debtor indirect wholly owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain. The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006. The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity. In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso, which provides DASE support by managing the process of closing the Puerto Real site in Cadiz, Spain in accordance with applicable Spanish law. The Spanish court subsequently appointed three receivers of DASE (the "DASE Receivers"). During the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to the separation allowance with the unions representing the affected employees. On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million (then approximately $161 million) for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan"). Delphi concluded that it was in its best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million (then approximately $14 million) for the purpose of funding payment of the claims of DASE's other creditors.

As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of the DASE Receivers, Delphi no longer possesses effective control over DASE and has de-consolidated the financial results of DASE effective April 2007. The total year-to-date expense through June 30, 2007 associated with the exit of the Puerto Real site in Cadiz, Spain is approximately $268 million, of which $61 million was recorded by DASE

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

in the first quarter of 2007 and is reflected as a component of equity income from non-Debtor affiliates, and approximately $207 million was recorded in June 2007 as a component of cost of sales.

***Equity Purchase and Commitment Agreements* –** In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and General Motors Corporation ("GM"). On April 19, 2007, Delphi confirmed that it anticipated negotiating changes to the agreements, primarily as a result of addressing differences in views regarding the Company's reorganization enterprise value among the investors, GM, the Statutory Committees, and the Company. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P. ("Appaloosa"), affiliates of Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "Investors"). On August 2, 2007 the Court granted the Company's motion for an order authorizing and approving the EPCA and on August 3, 2007 the Investors and the Debtors executed the EPCA. On October 30, 2007, the Debtors announced that they filed with the Court a motion seeking approval of a proposed amendment to the EPCA (the "Proposed EPCA Amendment") as a result of anticipated changes to its proposed plan of reorganization as well as the passage of time. The Proposed EPCA Amendment, which has been agreed to by Appaloosa and a supermajority of the Investors, is subject to the satisfaction of various conditions including Appaloosa's approval of exit financing terms currently under discussion with the Debtors' principal lead lenders and agreement to the amendment by an Investor prior to the Court hearing on November 8, 2007. Under the EPCA, the Investors may invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan announced on March 31, 2006 on the terms and subject to the conditions contained in the EPCA. Upon the entry by the Court of the approval order and subject to the other conditions described in the EPCA, the Investors agreed to enter into the EPCA and affiliates of certain Investors committed to deliver equity commitment letters in the forms attached to the proposal letter.

The EPCA incorporates Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and to fund required contributions to the plans that were not made in full as permitted under the Bankruptcy Code. The discussion above is qualified in its entirety by the terms of the underlying proposal. In particular, as more fully outlined in the proposal, the effectiveness and consummation of the transactions contemplated by the EPCA, are subject to a number of conditions precedent, including, among others, agreement on certain key documents and those conditions relating to financing of the emergence transactions.

***U.S. Labor Agreements* –** On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions. These settlement agreements include those with the:

- International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), dated June 22, 2007;
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), dated August 5, 2007;
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78 ("IAM"), dated July 31, 2007;
- International Brotherhood of Electrical Workers ("IBEW") and its Local 663 relating to Delphi Electronics and Safety, dated July 31, 2007;
- IBEW relating to Delphi's Powertrain division, dated July 31, 2007;
- International Union of Operating Engineers Local 18S, dated August 1, 2007;
- International Union of Operating Engineers Local 101S, dated August 1, 2007;
- International Union of Operating Engineers Local 832S (collectively, with the International Union of Operating Engineers Local 18S and the International Union of Operating Engineers Local 101S, the "IUOE"), dated August 1, 2007;

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (the "USW") relating to Delphi's operations at Home Avenue, dated August 16, 2007; and
- USW relating to Delphi's operations at Vandalia, dated August 16, 2007.

Each union settlement agreement was subject to court approval as well as ratification by its respective union's membership, except for the IUOE agreement relating to Local 101S which did not require ratification because there were no active bargaining unit members at the Olathe International Union of Operating Engineers Local 101S site. The UAW settlement agreement was approved by the Court on July 19, 2007 and ratified by the UAW as of June 28, 2007. The IUE-CWA, IAM, IBEW, and IUOE settlement agreements were approved by the Court on August 16, 2007 and were ratified as follows: by the IUE-CWA as of August 20, 2007, by the IAM and IBEW as of August 4, 2007, and by the IUOE (relating, respectively, to each of Local 832S and Local 18S) as of August 9 and August 10, 2007. The USW settlement agreements were approved by the Court on August 29, 2007, and were ratified by the USW as of August 30, 2007 for Home Avenue and as of August 31, 2007 for Vandalia.

On September 4, 2007, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) (Docket No. 9221), the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, as to all parties and the intervening respondents, subject to the Court's prior settlement approval orders pertaining to each of Delphi's unions.

***Non-Represented Hourly Active Employees and Retirees –*** On July 23, 2007, Delphi and GM agreed to the treatment of certain non-represented hourly individuals, and on August 3, 2007, this agreement was formalized in the "Term Sheet – Delphi Cessation and GM Provision of Other Postretirement Benefits Obligations ("OPEB") For Certain Non-Represented Delphi Employees and Retirees" (the "Non-Represented Term Sheet"). On August 16, 2007, the Court granted the Debtors' motion pursuant to 11 U.S.C. § 363 to modify retiree welfare benefits for certain non-represented hourly active employees and retirees of Debtors and approving the Non-Represented Term Sheet.

***Plan of Reorganization*** – On September 6, 2007, Delphi filed its proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outline Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. As discussed in the Disclosure Statement, Delphi's Plan filed on September 6, 2007 contemplates, among other things, obtaining funded debt of up to $7.5 billion and a $1.6 billion asset-based revolving loan to finance Delphi's emergence from chapter 11. The Plan filed on September 6, 2007 and Disclosure Statement also include information regarding the treatment of claims and interests and an outline of the Investor agreement and rights offering.

The Disclosure Statement also outlines Delphi's transformation centering around five core areas:

- Agreements reached with all principal U.S. labor unions which create a competitive arena in which to conduct its business;
- Agreements with GM outlining its financial support for certain legacy and labor costs and certain future business commitments to Delphi;
- Delphi's future product portfolio and manufacturing footprint;
- Delphi's planned transformation of its salaried workforce and progress in reducing selling, general and administrative expenses to support its realigned portfolio; and
- Delphi's plan to fund its U.S. defined benefit programs.

Delphi's Plan filed on September 6, 2007 was based upon a series of global settlements and compromises which involved every major constituency of Delphi and its affiliated Debtors' reorganization cases, including Delphi's principal U.S. labor unions, GM, the official committee of unsecured creditors (the "Creditors' Committee") and the official committee of equity security holders (the "Equity Committee") appointed in Delphi's chapter 11 cases, and the lead plaintiffs in certain securities and Employee Retirement Income Security Act ("ERISA") multidistrict litigation (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA).

The Plan filed on September 6, 2007 provides for a recovery through a distribution of reorganized Delphi common stock and cash. General unsecured creditors were to receive the principal amount of their claims plus accrued interest at a negotiated plan value. Other classes of creditors and interests were to receive agreed upon

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

distributions.  GM was to receive a $2.7 billion cash distribution in satisfaction of certain of its claims against Delphi.  As part of the settlement of the Securities and ERISA litigation discussed further in Note 2. Basis of Presentation, Securities and ERISA Litigation Charges, distributions were to be made using Plan currency in the same form, ratio, and treatment as that which will be used to satisfy the holders of general unsecured claims.  The allowed claims and interests of the settling Securities and Litigation claimants total approximately $25 million for the ERISA plan class and a total of $204 million for the debt securities class and the common stock securities class.  The Plan filed on September 6, 2007 contemplates that rights offerings featuring transferable and non-transferable rights would made to holders of Delphi's existing common stock.  The rights offerings were to occur after the Court had confirmed Delphi's Plan and a registration statement for the rights offerings had been declared effective by the Securities and Exchange Commission ("SEC").  Under the terms of the Plan filed on September 6, 2007, holders of existing Delphi common stock were also to receive a distribution of shares of reorganized Delphi and five-year warrants exercisable to purchase shares of reorganized Delphi.

At a Court hearing on September 27, 2007, Delphi stated that the current dynamics of the capital markets had prompted it to consider whether amendments to the Plan may be necessary.  Delphi commenced its Disclosure Statement hearing on October 3, 2007, and after resolving certain objections, requested that the hearing be continued to October 25, 2007.  On October 19, 2007, the Court granted Delphi's request to continue the hearing on the adequacy of the Disclosure Statement on November 8, 2007.  Delphi plans to resume the hearing to approve the Disclosure Statement on November 8, 2007.

On October 29, 2007 Delphi filed a notice of potential amendments (the "Potential Amendments") to the Plan and Disclosure Statement.  The Potential Amendments contemplate an approximate $2 billion reduction in the Delphi's net debt at emergence.  Delphi plans to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first lien-funded financing, and second-lien funded financing in the amount of $1.5 billion.  Further, the Potential Amendments reflect reductions in stakeholder distributions to some junior creditors and interest holders required to obtain consensus among the Creditors' Committee, the Investors, and settling parties, and changes required by the Investors to obtain endorsement of the Plan and Disclosure Statement, Delphi's settlement with GM and Delphi's U.S. labor unions, Delphi's emergence business plan, and related agreements.

The Potential Amendments include the following changes to the Investors' direct investment and certain stakeholder recoveries:

| Party | Original Plan | Potential Amendment |
|---|---|---|
| **Plan Investors** | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.75 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $12.80 billion<br>- Purchase $175 million of New Common Stock at an assumed enterprise value of $12.8 billion | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.80 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.80 billion<br>- Purchase $175 million of New Common Stock at an assumed enterprise value of $11.8 billion |
| **GM** | **Recovery of $2.7 billion**<br>- $2.7 billion in Cash | **Recovery of $2.7 billion**<br>- $750 million in Cash<br>- $750 million in a second lien note<br>- $1.2 billion in junior convertible preferred stock |

DELPHI CORPORATION, et al.
NOTES TO MONTHLY OPERATING REPORT

| Party | Original Plan | Potential Amendment |
|---|---|---|
| **Unsecured Creditors** | **Par plus accrued recovery at Plan value of $13.9 billion** <br> - 80% in New Common Stock valued at $45 per share <br> - 20% in Cash | **Par plus accrued recovery at Plan value of $13.0 billion** <br> - 92.4% in New Common Stock valued at $41.58 per share <br> - 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **TOPrS** | **Par plus accrued recovery at Plan value of $13.9 billion** <br> - 100% in New Common Stock valued at $45 per share | **Par only recovery at Plan value of $13.0 billion** <br> - 92.4% in New Common Stock valued at $41.58 per share <br> - 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **Existing Common Stockholders** | **Par Value Rights** <br> - Right to acquire approximately 12,711,111 shares of New Common Stock at a purchase price of $45.00 per share | **Par Value Rights** <br> - Right to acquire approximately 12,711,111 shares of New Common Stock at a purchase price of $41.58 per share |
| | **Warrants** <br> - Warrants to acquire an additional 5% of New Common Stock at $45.00 per share exercisable for five years after emergence | **Warrants** <br> - Warrants to acquire $1.0 billion of New Common Stock at $45.00 per share exercisable for six months after emergence |
| | **Direct Distribution** <br> - 1,476,000 shares of New Common Stock | **No provision for Direct Distribution** |
| | **Discount Rights** <br> - Right to purchase 40,845,016 shares of New Common Stock at a purchase price of $38.56 per share | **No provision for Participation in Discount Rights Offering** |

The Potential Amendments are supported by the Creditors' Committee, GM, and the Investors. Delphi has been advised by the Equity Committee that it will no longer support Delphi's Plan if it is amended to reduce recoveries to common stockholders as contemplated in the Potential Amendments. Absent a consensual resolution of the Equity Committee's concerns, the Equity Committee is expected to file objections to the Disclosure Statement and Plan, seek a further adjournment of the continued Disclosure Statement hearing and current emergence timetable, and seek other relief from the Court. Delphi will continue to work towards a consensus among its principal stakeholders, including the Equity Committee. The likelihood of such an outcome, however, is speculative and not assured.

Delphi continues its transformation activities, including ongoing discussion with its relationship banks regarding an emergence financing package that can be executed under existing market conditions, with the goal of emergence from chapter 11 as soon as practical. Currently, Delphi expects to emerge during the first quarter of 2008.

***GM Settlement –*** Also on September 6, 2007, Delphi entered into a Global Settlement Agreement ("GSA") and a Master Restructuring Agreement ("MRA") with GM. On October 29, 2007, Delphi entered into amendments to both the GSA and the MRA. Together, these agreements provide for a comprehensive settlement of all outstanding issues between Delphi and GM, including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Plan; and various other legacy and ordinary course business matters between the companies.

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably practicable thereafter. The GSA is intended to resolve outstanding issues among Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11 and will be implemented by Delphi and GM in the short term. The GSA addresses, among other things, commitments by Delphi and GM regarding pensions and OPEB, and other GM contributions with respect to labor matters, releases and claims treatment.

By contrast, resolution of most of the matters addressed in the MRA will require a significantly longer period that will extend for a number of years after the confirmation of the Plan. The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.

Delphi filed the GSA and the MRA as exhibits to the Plan. Both agreements, as amended, are subject to approval by the Court as part of the Plan confirmation process.

**2. Basis of Presentation**

*Condensed Combined Debtor-in-Possession Financial Statements* – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. In addition, the financial statements and supplemental information contained herein represent the condensed combined financial information for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in the attached financial statements, and as such, their net income (loss) is included as "Equity income from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11, generally does not change the manner in which financial statements are prepared. It does require, however, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2006 and the Company's quarterly periodic reports for the subsequent periods filed with the SEC.

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions with the Debtors' non-Debtor affiliates have not been eliminated in the financial statements and are reflected as intercompany receivables, loans, investments, and payables.

*General Motors and Affiliates* – Includes activity with GM and its consolidated subsidiaries. Activity with GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly to GM is classified as other (non-GM) customer activity. On September 24, 2007 certain UAW-represented hourly

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

employees of GM ceased production at GM's manufacturing plants in North America. Work stoppages were resolved by September 26, 2007 when tentative agreements between the UAW and GM were reached. The impact of the work stoppage was not material to Delphi or Delphi's operations.

*Restricted Cash* – Primarily includes balances restricted for use for the pre-retirement portion of the special attrition program.

*Property* – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

*Long-Lived Asset Impairment Charges* – In accordance with Financial Accounting Standards Board ("FASB") Statement No. 144 ("SFAS 144"), "*Accounting for the Impairment or Disposal of Long-Lived Assets*," Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets. Delphi recognized asset impairment charges related to long-lived assets held-for use of $157 million in March 2007 and $39 million in June 2007.

*Securities and ERISA Litigation Charges* – Delphi, along with certain of its subsidiaries and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. Delphi's best estimate as of July 31, 2007 of liability for these matters was $340 million excluding any insurance proceeds that may be receivable under Delphi's insurance policies. Delphi had an $8 million liability recorded as of March 31, 2007; therefore, a net charge of $332 million was recorded in June 2007. Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the securities actions, ERISA action, and shareholder derivative actions to consolidated proceedings (the "Multidistrict litigation" or "MDL"), were able to reach an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a $361 million settlement of the Multidistrict Litigation (the "MDL Settlements"). As a result of the MDL Settlements, Delphi recognized additional charges of $21 million to increase the previously recognized liability for the final settlement amount in August 2007. Recoveries for the settlement amounts from insurers, underwriters, and third-party reimbursements have not been recorded because the MDL Settlements are pending Court approval.

On September 5, 2007 the U.S. District Court for the Eastern District of Michigan (the "District Court") entered an order preliminarily certifying the class and approving the settlement and scheduled the matter for a fairness hearing on November 13, 2007. On October 25, 2007 the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's Plan and the Court's consideration of certain objections that may be filed as to the MDL Settlements. The following is a summary of the principal terms of the MDL Settlements as they relate to the Company and its affiliates and related parties and is qualified in its entirety by reference to the complete agreements to be submitted to the Court for approval.

Under the terms of the MDL Settlements, the Lead Plaintiffs and the ERISA Plaintiffs will receive claims that will be satisfied through Delphi's final Plan as confirmed by the Court. The Lead Plaintiffs will be granted a single allowed claim in the face amount of $204 million, which will be satisfied by Delphi providing $204 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the settlement reached with the Lead Plaintiffs. Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged. The settlement with the ERISA Plaintiffs is structured similarly to the settlement reached with the Lead Plaintiffs. The ERISA Plaintiffs' claim will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the Plan. Unlike the settlement reached with the Lead Plaintiffs, the ERISA Plaintiffs will not be able to opt out of their settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer- and director-named defendants in defense of any future civil actions arising from the allegations raised in the securities cases. The ERISA Plaintiffs will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007 pending Court approval. Delphi has separately agreed with a third party for reimbursement of $15 million as consideration for the releases described below.

The MDL Settlements include a dismissal with prejudice of the ERISA and securities cases and a full release as to certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or their fiduciary duties. The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand. As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

*Warranty Matters* – Delphi recognizes expected warranty costs for products sold principally at the time of sale based on an estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims. In June 2007, Delphi recorded an adjustment to increase its warranty reserve in the amount of approximately $91 million based on a tentative settlement with GM over a range of specific warranty matters.

On September 27, 2007, the Court granted Delphi's motion to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM to settle certain known warranty claims. Under the terms of the Warranty Settlement Agreement, Delphi will pay GM an estimated $200 million, comprised of approximately $130 million to be paid in cash over time as noted below, and up to approximately $70 million to be paid in the form of delivery by Delphi to GM of replacement product. The Warranty Settlement Agreement settles all outstanding warranty claims and issues related to any component or assembly supplied by Delphi to GM, which as of August 10, 2007 are (a) known by GM, subject to certain specified exceptions, (b) believed by GM to be Delphi's responsibility in whole or in part, and (c) in GM's normal investigation process, or which should have been within that process, but were withheld for the purpose of pursuing a claim against Delphi. Included in the settlement are all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases ("GM's Proof of Claim").

In addition, the Warranty Settlement Agreement limits Delphi's liability related to certain other warranty claims that have become known by GM on or after June 5, 2007, and generally prohibits both GM and Delphi from initiating actions against the other related to any warranty claims settled in the agreement. Pursuant to the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007, (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million, or GM believed the claim would exceed $1 million, (iii) the claim is in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed or reasonably should have believed that Delphi had some responsibility for the claim.

Pursuant to the Warranty Settlement Agreement, Delphi has advised GM that upon entry of an order approving the agreement, Delphi's claims agent would be directed (a) to reduce the liquidated component relating to warranty claims contained in GM's Proof of Claim by $530,081,671, which includes, among other things, those personal injury claims asserted in GM's Proof of Claim that relate to warranty claims settled in the agreement, and (b) to expunge with prejudice the unliquidated component relating to warranty claims asserted in its Proof of Claim. Nothing contained in the Warranty Settlement Agreement would be construed to reduce any amounts to be paid to GM pursuant to the terms of the GSA and/or the MRA entered into by Delphi and GM and incorporated into Delphi's Plan.

DELPHI CORPORATION, et al.
NOTES TO MONTHLY OPERATING REPORT

Delphi has elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM on or about the time of its emergence from bankruptcy.  As a result, GM will set off these payments against the amounts then payable to Delphi by GM.  Because Delphi has elected to defer these payments, GM will receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts are paid by Delphi or set off against amounts payable by GM.

During September 2007 with the filing of Delphi's Plan on September 6, 2007, Delphi determined that the warranty claims totaling $257 million previously included in liabilities subject to compromise would be resolved in the ordinary course of business without Court intervention and were therefore not subject to compromise, including amounts that were addressed in the warranty settlement agreement reached with GM.  In September 2007, Delphi reclassified $143 million of these claims to accrued liabilities and $114 million of these claims to long-term liabilities, from liabilities subject to compromise

**Contractual Interest Expense and Interest Expense on Unsecured Claims** – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until September 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim.  In September 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi shall be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through December 31, 2007.  In September 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims.  The accrued interest payable of $369 million is included in Accrued liabilities on the accompanying balance sheet.

**Taxes** – Delphi accounts for income taxes in accordance with FASB Statement No. 109 ("SFAS 109"), "*Accounting for Income Taxes*," and recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws.  Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result, does not recognize income tax benefits for net operating losses for its U.S. entities.

The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course.  Accordingly, the Debtors have paid the applicable taxes when due.  See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

In June 2006, the FASB issued FASB Interpretation 48 ("FIN 48"), "*Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109.*" FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with SFAS 109. The impact of initially applying FIN 48 was recognized as a cumulative effect adjustment increasing the April 1, 2007 opening balance of accumulated deficit by $18 million.

**Other Postretirement Benefit (Payments) Receipts, Net of Reimbursement by GM** – As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA were eligible to retire as employees of Delphi or flow back to GM and retire.  During 2006, approximately 10,000 employees elected to flow back to GM and retire.  Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans.  Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for its actual costs for providing such coverage.  As of September 30, 2007, Delphi's receivable from GM for these costs was $5 million.

**Pension Funding** – Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain

**DELPHI CORPORATION, <u>et al.</u>**
**NOTES TO MONTHLY OPERATING REPORT**

unfunded liabilities to a pension plan sponsored by GM.  On March 9, 2007, Delphi received approval from the IRS to change the asset valuation method for purposes of funding for the Hourly and Salaried Plans for plan years beginning on and after October 1, 2005.  The new asset valuation method uses fair market value as permitted in the U.S. Internal Revenue Code (the "IRC").  On May 29, 2007, Delphi, acting pursuant to the Court's authority, secured from the IRS a favorable ruling regarding the transfer of unfunded liabilities from its Hourly Plan to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers").  On July 13, 2007, Delphi received modifications of the 2006 Waivers, mainly related to reversing certain deadlines. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver").  The second waiver is necessary to make the transfer of hourly pension obligations to the GM plan economically efficient by avoiding redundant cash contributions that would result in a projected overfunding of the Hourly Plan.  On October 4, 2007, the IRS issued second modifications to the 2006 Waivers.  The second modifications revising the deadlines contained in the 2006 Waivers to match the deadlines set forth in the 2007 Hourly Plan Waiver. The conditional funding waivers will permit Delphi to defer funding contributions due under ERISA and the IRC until after Delphi emerges from chapter 11.

<u>The pertinent terms of the conditional waivers, as modified, are:</u>

- No later than December 31, 2007, the Company must file a plan of reorganization with the Court providing for the continuation of the Hourly and Salaried Plans and compliance with the conditions of the waiver.  The Company has satisfied this condition.

- The effective date of the Company's plan of reorganization must be no later than February 29, 2008.

- Effective June 16, 2007, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $100 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan, which letters of credit will expire once Delphi satisfies the contribution requirements described below which must be satisfied within five days following the Company's emergence from chapter 11.

<u>With respect to the 2006 Waiver for the Hourly Plan:</u>

- Not later than five days after the effective date of the Company's plan of reorganization, the Company either (1) effects a transfer under IRC § 414(l) to a GM plan, (2) makes cash contributions to the Hourly Plan, or (3) a combination, thereof,  that reduces the net unfunded liabilities of the Hourly Plan by at least $1.5 billion as determined on a basis in accordance with FASB Statement No. 87, "*Employers' Accounting for Pensions.*"

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes a contribution equal to approximately $575 million. The Company must also deposit into escrow an amount equal to approximately $200 million.

- Not later than five months after the effective date of the Company's plan of reorganization, the Company calculates and contributes from the escrow account and, if necessary, from general Company assets the amount necessary to result in a funded current liability percentage as of the effective date of the Company's plan of reorganization that is the same funded current liability percentage that would have existed as of the effective date of the Company's plan of reorganization if (a) the funding waiver had not been granted, (b) the § 414(l) transfer had not occurred, and (c) a contribution was made on the effective date of the Company's emergence equal to the accumulated ERISA funding deficiency as of September 30, 2007.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes $20 million for the plan year ended September 30, 2007, which includes a full settlement of the potential excise tax claims for the accumulated funding deficiencies for the Hourly and Salary Plans related to the plan year ended September 30, 2005, and which amount cannot be taken into account for purposes of the calculation in the immediately preceding paragraph.

.

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

- Not later than five days after the effective date of the Company's plan of reorganization, the Company reimburses the PBGC for outside consulting fees in an amount not to exceed $2 million.

- The Company makes contributions to the Hourly Plan in amounts sufficient to meet the minimum funding standard for the Hourly Plan for the plan year ended September 30, 2007, by June 15, 2008.

With respect to the 2006 Waiver for the Salaried Plan:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes contributions to the Salaried Plan for the year ended September 30, 2007 equal to the lesser of (i) the amount necessary to maintain a credit balance in the funding standard account of the Salaried Plan as of September 30, 2007, not less than the outstanding balance of the amortization base with respect to the waived amount that is established and maintained under IRC § 412(b)(2), or (ii) the full funding limitation for the plan year ended September 30, 2007.

- Certain funding requirements are met with regard to post emergence plan years.

With respect to the 2007 Hourly Plan Waiver:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company effects a transfer under section 414(1) of the IRC of $1.5 billion in net unfunded liabilities under the Hourly Plan to an overfunded GM plan.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes an additional $20 million to the Hourly Plan (in addition to the $20 million contributions described in the conditions of the 2006 Waiver for the Hourly Plan).

- Other provisions related to treatment of contributions that may create a credit balance.

- Certain funding requirements are met with regard to post emergence plan years.

The Company has represented that it intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from bankruptcy protection. If the Company's plan of reorganization becomes effective later than February 29, 2008, the Company will seek an extension of the waiver terms with the IRS and the PBGC.

The conditional waivers described above contemplate that two large payments related to the Company's qualified defined benefit pension plans will be made as of the emergence from bankruptcy. The first payment will be a contribution directly to the Hourly and Salaried Plans as described above, and is estimated to be approximately $1.25 billion with approximately $1.05 billion in plan contributions and approximately $200 million into escrow. Delphi expects that the majority of the escrow ultimately will be contributed to the Hourly and Salaried Plans based on true-up calculations. The second payment will be effected through an IRC § 414(l) transfer of $1.5 billion of Hourly Plan net unfunded liabilities to a GM hourly pension plan. Delphi and GM have agreed to the IRC § 414(l) transfer of $1.5 billion of net unfunded liability to GM's hourly plan, in exchange for a note given to GM by Delphi in the amount of $1.5 billion to be paid off by Delphi within ten days. The foregoing description of the pension funding plan is a summary only and is qualified in its entirety by the terms of the waivers and the order of the Court.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the labor section, Delphi intends to freeze the Salaried Plan effective upon emergence. The freeze of this plan became probable in the third quarter resulting in curtailment charges of $116 million.

***U.S. Employee Workforce Transition Programs* –** On June 22, 2007, Delphi, GM, and the UAW signed the UAW settlement agreement which included a workforce transition program for eligible UAW employees (the "UAW Workforce Transition Program"). Included in the UAW Workforce Transition Program is an attrition program similar to the U.S. employee special attrition programs offered in June 2006. The attrition program in the UAW Workforce Transition Program offers, among other options, certain eligible Delphi employees: (i) normal and early voluntary retirements with a lump sum incentive payment of $35,000, (ii) a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service are granted the ability to cease working

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments which, depending on the amount of seniority or credited service, range from $70,000 to $140,000. The UAW Workforce Transition Program also offers the following options: (i) flowback rights to eligible Delphi employees as of the date of the filing of Delphi's bankruptcy petition who do not elect the attrition options, including a relocation allowance of up to $67,000 in certain circumstances when plants cease production, (ii) buy-down payments totaling $105,000 for eligible traditional employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iii) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (iv) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to September 14, 2011.

On August 5, 2007, Delphi, GM, and the IUE-CWA signed the IUE-CWA settlement agreement, which included a workforce transition program for eligible IUE-CWA employees (the "IUE-CWA Workforce Transition Program") and included an attrition program similar to the 2006 U.S. employee special attrition programs. The attrition program in the IUE-CWA Workforce Transition Program is similar to the attrition program included in the UAW Workforce Transition Program except that the buyout payments based on seniority or credited service range from $40,000 to $140,000. The IUE-CWA Workforce Transition Program also offers the following options: (i) special employee placement opportunities with GM for eligible Delphi employees who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (ii) provision of buy-down payments totaling up to $125,000 for eligible employees who do not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA settlement agreement, and (iii) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to October 12, 2011.

On July 31 and August 1, 2007, Delphi and GM signed settlement agreements with the IAM, IBEW, and IUOE (collectively, the "Splinter Unions"). These Splinter Union settlement agreements, with the exception of the International Union of Operating Engineers Local 101S agreement, include workforce transition programs (the "Splinter Unions Workforce Transition Program") and include attrition programs similar to the attrition program included in the IUE-CWA Workforce Transition Program. The Splinter Unions Workforce Transition Program also offers options of buy-down payments totaling up to $10,000 for eligible employees or severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011.

On August 16, 2007, Delphi, GM, and the USW signed the USW settlement agreements, which included certain workforce transition options for eligible USW employees at the Home Avenue and Vandalia operations similar to certain options presented in the IUE-CWA Workforce Transition Program.

As of September 30, 2007, approximately 310 of the 3,700 eligible UAW-represented employees, approximately 190 of the 1,300 eligible IUE-CWA-represented employees, approximately 165 of the 800 eligible USW-represented employees, and approximately 60 of the 100 eligible Splinter Union-represented employees elected to participate in the attrition programs. Delphi recorded charges for the attrition programs of approximately $46 million in U.S. employee workforce transition program charges during September 2007. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $321 million and were recorded as a wage asset and liability at September 30, 2007, of which $115 million was recorded in Other current assets and $206 million was recorded in Other long-term assets in the accompanying balance sheet. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts*", the wage asset will be amortized over the life of the union workforce transition programs of which $2 million was recognized in September 2007. The corresponding wage liability will be reduced as buy-down payments are made. Pension curtailment losses of $59 million related to the Hourly Plan were recorded in U.S. employee workforce transition programs for the effect of employees who elected to participate in the workforce transition programs and the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried and certain hourly employees on emergence from bankruptcy. Finally, costs related to severance payments and supplemental unemployment benefits for U.S. employees at sites that will be sold or wound down in accordance with the workforce transition programs were recorded in the amount of $48 million in cost of sales.

***Salaried Pension Curtailment* –** During September 2007, Delphi recorded $116 million of pension curtailment losses related to the Salaried Plan in U.S. employee workforce transition program charges. The curtailment losses were to recognize the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried employees on emergence from bankruptcy.

Case Number: 05-44481 (RDD) (Jointly Administered)

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

## 3.  Debtor-in-Possession ("DIP") Financing

On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion to refinance both its $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated November 21, 2005 (the "Amended DIP Credit Facility"), and the approximate $2.5 billion outstanding on its $2.825 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility").

On January 9, 2007, Delphi entered into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and a second priority term loan of approximately $2.5 billion ("Tranche C" or the "Tranche C Term Loan").

The Refinanced DIP Credit Facility carries an interest rate at Delphi's option of either the Administrative Agent's Alternate Base Rate plus (i) with respect to Tranche A borrowings, 1.50%, (ii) with respect to Tranche B borrowings, 1.25%, and (iii) with respect to Tranche C borrowings, 1.75%, or London Interbank Borrowing Rate ("LIBOR") plus (x) with respect to Tranche A borrowings, 2.50%, (y) with respect to Tranche B borrowings, 2.25%, and (z) with respect to Tranche C borrowings, 2.75%. The interest rate period can be set at a two-week or one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility.  Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is pledging only 65% of the stock of its first tier non-U.S. subsidiaries) and further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession.

The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. The borrowing base computation was short of the Refinanced DIP Credit Facility commitment on September 30, 2007.  Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).

The Refinanced DIP Credit Facility includes affirmative, negative, and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets, and pay dividends or repurchase stock. So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and dispositions of assets do not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi which are not guarantors).

The covenants require Delphi to, among other things, maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on November 30, 2007 at the levels set forth in the Refinanced DIP Credit Facility.

The Refinanced DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest, or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

Also on January 9, 2007, both the $250 million Tranche B Term Loan and the $2.5 billion Tranche C Term Loan were funded and the proceeds were used to extinguish amounts outstanding under the Amended DIP Credit Facility and the Prepetition Facility.  Delphi incurred no early termination penalties in connection with the termination of these agreements.  However, as a result of the changes in the debt structure and corresponding cash

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

flows related to the refinancing, Delphi expensed $25 million of unamortized debt issuance and discount costs related to the Amended DIP Credit Facility and Prepetition Facility in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt as these fees relate to the refinancing of the term loans and $2 million was recognized as interest expense as these fees relate to the refinancing of the revolver. The Company elected to pay interest on the Tranche B Term Loan at LIBOR plus 2.25% for a three-month period and on the Tranche C Term Loan at LIBOR plus 2.75% for a three-month period. As of September 30, 2007, there was approximately $480 million outstanding under the Revolving Facility and the Company had approximately $263 million in letters of credit outstanding under the Revolving Facility as of that date, including $150 million related to the letters of credit provided to the PBGC discussed further in Note 2. Basis of Presentation.

On March 29, 2007, Delphi entered into the First Amendment to the Refinanced DIP Credit Facility (the "First Amendment"). The First Amendment provides for an amended definition of "Global EBITDAR," the addition of a two-week LIBOR interest election option, and amended monthly Global EBITDAR covenant levels. The amended definition of Global EBITDAR eliminates cash payment limits with respect to restructuring costs from the definition.

On September 27, 2007, Delphi entered into the Second Amendment to the Refinanced DIP Credit Facility (the "Second Amendment"). The Second Amendment provides for an extension of the expiration date of any Letter of Credit, as defined in the Refinanced DIP Credit Facility, issued on behalf of Delphi or any of its subsidiaries to the earlier of (i) one year after the date of the issuance of such Letter of Credit (or any renewal or extension thereof) and (ii) 365 days after the Maturity Date (as defined in the Refinanced DIP Credit Facility; such 365th day being the "LC Outside Date"). As originally drafted, clause (ii) of the Refinanced DIP Credit Facility provided for expiration of a Letter of Credit 180 days after the Maturity Date. The amendment also provides certain collateral security mechanisms to ensure Delphi's reimbursement of obligations in connection with the renewal or extension of any Letter of Credit beyond the LC Outside Date.

Delphi is currently working with the Administrative Agent, as defined in the Refinanced DIP Credit Facility, and the Required Lenders, as defined in the Refinanced DIP Credit Facility, under the Refinanced DIP Credit Facility to enter into a third amendment to the Refinanced DIP Credit Facility. By such amendment, Delphi seeks to extend the facility until June 30, 2008 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court, with the ability to further extend the maturity to September 30, 2008 under certain conditions. Delphi expects that the amendment will be come effective in November 2007.

**4. Reorganization Items**

SOP 90-7 requires reorganization items such as realized gains and losses from the settlement of prepetition liabilities, provisions for losses resulting from the reorganization and restructuring of the business, as well as professional fees directly related to the process of reorganizing the Debtors under chapter 11, to be separately disclosed. The Debtors' reorganization items consist of the following:

| | Month Ended September 30, 2007 | Year-to-Date January 1 to September 30, 2007 |
|---|---|---|
| | (in millions) | |
| Professional fees directly related to reorganization ............ | $ (12) | $ (128) |
| Interest income................................................. | 4 | 30 |
| Total Reorganization Items.......................................... | $ (8) | $ (98) |

Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions. Professional Fees also include $7 million year-to-date of fees for certain legal advisors to GM, of which approximately $1 million was incurred in September. Professional Fees for the month ended September 30, 2007 were estimated by the Debtors and will be reconciled to actual invoices when received.

**5. Liabilities Subject to Compromise**

**DELPHI CORPORATION, et al.**
**NOTES TO MONTHLY OPERATING REPORT**

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under a plan of reorganization. Generally, actions to enforce or otherwise effect payment of pre-chapter 11 liabilities are stayed. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business.  In addition, the Debtors may reject prepetition executory contracts and unexpired leases with respect to the Debtors' operations with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. On April 12, 2006, the Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases.  The Debtors notified (including by publication notice) all known actual and potential creditors of the bar date and the required procedures with respect to the filing of proofs of claim with the Court.  Any differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors are being analyzed and, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims.

The Debtors have received approximately 16,700 proofs of claim, some of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $37 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time. As of September 30, 2007, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10 billion in aggregate liquidated amounts plus additional unliquidated amounts.  The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,400 of those proofs of claim, which reduced the amount of asserted claims by approximately $10 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order modifying approximately 3,000 claims, reducing the aggregate amounts asserted on those claims from $476 million to $410 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced.  Nonetheless, the determination of how liabilities will ultimately be settled and treated cannot be made until the Court approves a chapter 11 plan of reorganization. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.  Liabilities subject to compromise consist of the following:

|  | September 30, 2007 (in millions) |
| --- | --- |
| Pension obligations | $      3,323 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,410 |
| Debt and notes payable | 2,046 |
| Accounts payable | 829 |
| Other | 1,384 |

Case Number:  05-44481 (RDD) (Jointly Administered)

DELPHI CORPORATION, et al.
**NOTES TO MONTHLY OPERATING REPORT**

Total Liabilities Subject to Compromise ............................. $        16,992

#### 6. Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

#### 7. Divestitures

Delphi has begun the process of selling or winding down certain non-core product lines and manufacturing sites. On June 5, 2007, Delphi entered into an agreement with Belgium-based Umicore and certain of its affiliates (collectively, "Umicore") for the sale of Delphi's global original equipment and aftermarket catalyst business (the "Catalyst Business") which is included in Delphi's Powertrain Systems segment for a purchase price of $56 million, subject to adjustments. On August 8, 2007, in accordance with bidding procedures approved by the Court, Delphi conducted an auction and selected Umicore as the successful bidder with a revised purchase price of $75 million. On August 16, 2007, Delphi received approval from the Court to proceed with the sale of the Catalyst Business to Umicore and the assets of the Catalyst Business were deemed held for sale in accordance with SFAS 144. The carrying value of certain of the assets of the Catalyst Business were previously impaired and adjusted to their fair value under the "held for use" provision of SFAS 144. On September 28, 2007, Delphi closed on the sale of the Catalyst Business to Umicore and the Debtors received approximately $49 million which included certain post-closing working capital adjustments in the Debtors' financial statements. The Debtors recorded the loss of $18 million on the sale of the Catalyst Business in cost of sales in September 2007.

On September 28, 2007, Delphi closed on the sale of substantially all of the global assets exclusively used in the brake hose product line produced at one of Delphi's manufacturing sites located in Dayton, Ohio (the "Brake Hose Business"). The sales price for the Brake Hose Business was $10 million and the sale resulted in a gain of $2 million, which was recorded as a reduction to cost of sales in the Debtors' financial statements in September 2007.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**MONTH ENDED SEPTEMBER 30, 2007**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $ 190,382,158 | $ 52,587,183 | $ 13,519,710 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly
employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout
payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are
included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**MONTH ENDED SEPTEMBER 30, 2007**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $ 55,361,442 |
| State of Michigan | 2,064,049 |
| City of Flint, MI | 86,206 |
| City of Saginaw, MI | 85,410 |
| City of Detroit, MI | 5,562 |
| City of Grand Rapids, MI | 5,305 |
| City of Pontiac, MI | 790 |
| City of Walker, MI | 604 |
| City of Lapeer, MI | 80 |
| State of Indiana | 2,000,917 |
| State of New York | 1,480,476 |
| State of Ohio | 1,437,341 |
| City of Dayton, OH | 221,003 |
| City of Kettering, OH | 198,860 |
| City of Vandalia, OH | 87,542 |
| City of Moraine, OH | 56,089 |
| City of Warren, OH | 28,717 |
| Ohio School District | 28,645 |
| City of Rita, OH | 25,312 |
| City of Elyra, OH | 22,829 |
| City of Columbus, OH | 22,431 |
| City of Hubbard, OH | 4,292 |
| City of Dublin, OH | 3,867 |
| City of Huron, OH | 3,505 |
| City of Trotwood, OH | 1,636 |
| City of Lordstown, OH | 1,598 |
| City of Springfield, OH | 972 |
| City of Toledo, OH | 902 |
| City of Akron, OH | 383 |
| City of Cincinnati, OH | 158 |
| City of Canton, OH | 109 |
| City of Xenia, OH | 18 |
| City of West Carrollton, OH | 11 |
| State of Alabama | 505,295 |
| City of Gasden, AL | 15,390 |
| State of Oklahoma | 396,693 |
| State of Wisconsin | 177,796 |
| State of Mississippi | 175,378 |
| State of Georgia | 150,009 |
| State of California | 29,128 |
| State of Pennsylvania | 21,057 |
| City of Philadelphia, PA | 150 |
| City of Towamencin, PA | 36 |
| State of Colorado | 19,951 |
| City of Denver, CO | 2,739 |
| State of Illinois | 14,796 |
| State of New Mexico | 10,693 |
| State of South Carolina | 10,105 |
| State of Kansas | 7,421 |
| State of Missouri | 7,157 |
| State of Oregon | 3,012 |
| State of North Carolina | 2,598 |
| State of Virginia | 2,570 |
| State of Arizona | 2,303 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**MONTH ENDED SEPTEMBER 30, 2007**

| Payee | Payroll Taxes Paid |
|---|---|
| State of Iowa | $          1,987 |
| State of Maryland | 1,392 |
| State of Arkansas | 1,384 |
| State of Kentucky | 1,239 |
| State of Connecticut | 743 |
| State of New Jersey | 689 |
| State of Delaware | 652 |
| State of Minnesota | 490 |
| State of Louisiana | 407 |
| Inland Revenue Service (UK) | 699,001 |
| Country of Switzerland | 6,251 |
| Total | $        65,505,573 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**MONTH ENDED SEPTEMBER 30, 2007**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| Buena Vista Township, Michigan | Personal Property | $ 2,469,825 | $ 2,469,825 |
| Montgomery County, Ohio | Personal Property | 1,934,472 | 1,934,472 |
| Erie County, Ohio | Personal Property | 855,745 | 855,745 |
| Franklin County, Ohio | Personal Property | 460,578 | 460,578 |
| Shelby Township, Michigan | Personal Property | 151,446 | 151,446 |
| Brighton Charter Township, Michigan | Personal Property | 54,175 | 54,175 |
| Alma, Michigan | Personal Property | 28,276 | 28,276 |
| Orion Charter Township, Michigan | Personal Property | 27,952 | 27,952 |
| Lake County, Ohio | Personal Property | 9,789 | 9,789 |
| Bangor Township, Michigan | Personal Property | 2,465 | 2,465 |
| Medina County, Ohio | Personal Property | 1,765 | 1,765 |
| Plymouth Charter Township, Michigan | Personal Property | 1,190 | 1,190 |
| Ottawa County, Ohio | Personal Property | 920 | 920 |
| Davison, Michigan | Personal Property | 867 | 867 |
| Thomaston, Connecticut | Personal Property | 787 | 787 |
| Shelby Charter Township, Michigan | Personal Property | 682 | 682 |
| Hawes Township Michigan | Personal Property | 510 | 510 |
| Summit County, Ohio | Personal Property | 466 | 466 |
| Butler County, Ohio | Personal Property | 450 | 450 |
| Lenox Township, Michigan | Personal Property | 228 | 228 |
| Logan County, Ohio | Personal Property | 169 | 169 |
| Cuyahoga County, Ohio | Personal Property | 143 | 143 |
| Addison, Michigan | Personal Property | 120 | 120 |
| Monroe County, Ohio | Personal Property | 116 | 116 |
| Licking County, Ohio | Personal Property | 110 | 110 |
| Lorain County, Ohio | Personal Property | 78 | 78 |
| Huron County, Ohio | Personal Property | 68 | 68 |
| Watertown Charter Township, Michigan | Personal Property | 60 | 60 |
| Delaware County, Ohio | Personal Property | 57 | 57 |
| Ashtabula County Treasurer, Ohio | Personal Property | 46 | 46 |
| Stark County, Ohio | Personal Property | 12 | 12 |
| North Muskegon, Michigan | Personal Property | 7 | 7 |
| Buena Vista Township, Michigan | Real Property | 805,456 | 805,456 |
| Lockport, New York | Real Property | 714,647 | 714,647 |
| Henrietta, New York | Real Property | 201,642 | 201,642 |
| Rochester, New York | Real Property | 190,043 | 190,043 |
| Lenawee County, Michigan | Real Property | 48,069 | 48,069 |
| Starpoint, New York | Real Property | 2,292 | 2,292 |
| State of Ohio | Use | 486,102 | 486,102 |
| State of Michigan | Use | 281,613 | 281,613 |
| State of New York | Use | 125,468 | 125,468 |
| State of Indiana | Use | 82,390 | 82,390 |
| State of Mississippi | Use | 50,632 | 50,632 |
| Limestone County, Alabama  (Pay to: Alabama Department of Revenue) | Use | 35,908 | 35,908 |
| State of Texas | Use | 21,138 | 21,138 |
| State of Wisconsin | Use | 10,672 | 10,672 |
| State of Georgia | Use | 5,890 | 5,890 |
| Gadsden, Alabama (Payee ALATAX - Tax Trust Account) | Use | 4,202 | 4,202 |
| Tuscaloosa County, Alabama | Use | 1,667 | 1,667 |
| Etowah County, Alabama  ( Payee LGREC Inc., AL) | Use | 909 | 909 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**MONTH ENDED SEPTEMBER 30, 2007**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| Colorado Department of Revenue | Use | $ 698 | $ 698 |
| Coaling, Alabama (Payee ALATAX - Tax Trust Account) | Use | 350 | 350 |
| State of Ohio | Kilowatt Hour | 71,865 | 71,865 |
| State of Alabama | Consumer Use | 37,238 | 37,238 |
| State of Washington | Business and Occupation | 36,791 | 36,791 |
| State of Alabama | Seller's Use | 24,937 | 24,937 |
| Department of Treasury | Withholding (non-payroll) | 10,500 | 10,500 |
| Mississippi Office of Revenue | Income | 4,522 | 4,522 |
| California Board of Equalization | Income | 2,252 | 2,252 |
| California Board of Equalization | Income | 800 | 800 |
| Wisconsin Department of Revenue | Income | 25 | 25 |
| US Internal Revenue Service | Federal Income | 6,738 | 6,738 |
| South Carolina Department of Revenue | Franchise | 2,766 | 2,766 |
| Colorado Department of Revenue | Utility | 175 | 175 |
| South Carolina Department of Revenue | Sales & Use | 95 | 95 |
| Colorado Department of Revenue | Sales | 31 | 31 |
| Total | | $ 9,272,097 | $ 9,272,097 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**MONTH ENDED SEPTEMBER 30, 2007**

Note 1:    The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:    Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF DISBURSEMENTS**
**MONTH ENDED SEPTEMBER 30, 2007**

| Debtor Name | Case Number | Amount [1] |
|---|---|---:|
| Delphi NY Holdings Corporation | 05-44480 | $ — |
| Delphi Corporation | 05-44481 | — |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 2,319,474 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 888,115 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 433,729 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 3,050,203 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 11,179,063 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | 18,220,017 |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 118,156 |
| Delphi International Services, Inc. | 05-44583 | 7,593,774 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | — |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | — |
| Delco Electronics Overseas Corporation | 05-44610 | 10,307,303 |
| Delphi Diesel Systems Corporation | 05-44612 | 33,629,357 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 38,404 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 169,802 |
| Delphi Connection Systems | 05-44624 | 5,532,277 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 132,596,150 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 125,973,405 |
| Delphi Automotive Systems LLC | 05-44640 | 1,418,355,114 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 2,936,264 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the month ended September 30, 2007 were used as a proxy for disbursements.