**Hearing Date and Time: November 16, 2007 at 10:00 a.m.**
**Objection Deadline: November 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                            :
      In re                       :     Chapter 11
                            :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                            :
                 Debtors.   :     (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER SUPPLEMENTING JANUARY 5, 2007
DIP ORDER (DOCKET NO. 6461) AND AUTHORIZING DEBTORS TO
(I) EXTEND MATURITY DATE OF DIP FACILITY, (II) ENTER INTO
RELATED DOCUMENTS, AND (III) PAY FEES IN CONNECTION THEREWITH

("DIP EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion (the "Motion") For Order Supplementing January 5, 2007

DIP Order (Docket No. 6461) And Authorizing Debtors To (I) Extend Maturity Date Of DIP

Facility, (II) Enter Into Related Documents, And (III) Pay Fees In Connection Therewith, and

respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005 (the "Petition Dates"), the Debtors filed

voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors-in-

possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint

administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (together with the Creditors'

Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

2

9264) (the "Disclosure Statement"). While no order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court, the Court commenced the hearing on the Disclosure Statement and related solicitation procedures motion on October 3, 2007 and has entered two Orders with respect thereto on October 9, 2007 (Docket No. 10497) and October 19, 2007 (Docket No. 10662).  On October 29, 2007, the Debtors filed a notice of potential amendments and changed pages to the Disclosure Statement (Docket No. 10759).  No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

4.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

6.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[2]

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency

7.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.     Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

---

proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

10.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

11.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements. Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in
calendar year 2004 was $482 million.

5

operations. The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement. On
July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment
agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan
investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill
Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate
of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa
EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the
reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court
approved the Delphi-Appaloosa EPCA on August 2, 2007. On October 29, 2007, the Debtors filed an expedited
motion seeking authority to enter into certain amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).
A hearing on this motion is scheduled for November 8, 2007.

[5]    As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and
each of its U.S. labor unions:
•    International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America
(Docket No. 8693);
•    International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
Workers of America (Docket No. 9106);
•    International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die
Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals
832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
•    United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
International Union and USW Local 87L (Docket No. 9169).
On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's
motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective
bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6]    On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global
Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval
as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding
disputes between Delphi and GM. The Global Settlement Agreement and Master Restructuring Agreement
were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29,
2007, the Debtors filed certain proposed amendments to the Global Settlement Agreement and Master
Restructuring Agreement. The approval of such amendments will be considered in connection with the
confirmation of the Plan.

market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and

devising a workable solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization

13.    By filing the Plan and related Disclosure Statement on September 6, 2007,

the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a

series of global settlements and compromises that involve every major constituency in the

Debtors' reorganization cases, including GM.  Attached as exhibits to the Plan are two

---

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses.  The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business and of bid procedures related to the upcoming sale of substantially all assets used in their interiors and closures businesses.  In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering business.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

agreements, a Global Settlement Agreement and a Master Restructuring Agreement (the "GM

Settlement Documents"), which provide for a comprehensive settlement with GM.  Both

agreements are subject to this Court's approval as part of the confirmation process.

14.    A hearing on the Debtors' solicitation procedures and Disclosure

Statement commenced on October 3, 2007 and is scheduled to continue on November 8, 2007.

If this Court authorizes the Debtors to begin soliciting acceptances or rejections of the Plan (as

such Plan may be modified) by November 21, 2007, the Debtors expect that the confirmation

hearing on the Plan will be conducted on January 10 and 11, 2007 and the Debtors will

commence the rights offering contemplated by the Plan later in January 2008 and emerge from

chapter 11 as soon as practicable thereafter during the first quarter of 2008.

15.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

F.    The Current DIP Facility

16.    On January 5, 2007, pursuant to the Order Under 11 U.S.C. §§ 105, 361,

362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002,

4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)

Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured

Debt (the "DIP Order") (Docket No. 6461), this Court authorized the Debtors to enter into the

current $4.5 billion postpetition financing facility (the "Current DIP Facility") governed by the

Revolving Credit, Term Loan, and Guaranty Agreement  (the "Current DIP Credit Agreement").

The Current DIP Facility refinanced both the $2.0 billion first amended DIP credit facility and

the approximate $2.5 billion outstanding on the Debtors' $2.825 billion prepetition credit facility.

The Current DIP Facility consists of a $1.75 billion first priority revolving credit facility

("Tranche A"), a $250 million first priority term loan ("Tranche B"), and an approximate $2.5

billion second priority term loan ("Tranche C").  JPMorgan Chase Bank, N.A. ("JPMorgan" or

the "Agent") is the administrative agent for the lenders under the Current DIP Facility (the "DIP

Lenders").

        17.    The Current DIP Facility is secured by (a) a perfected first-priority lien on

substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions),

(b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets

(subject to certain exclusions), (c) superpriority administrative expense claims under section

364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the Current DIP

Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy

Code on substantially all of the Debtors' property.  The Current DIP Facility has a current

maturity date of the earlier of (i) December 31, 2007 or (ii) the date of the substantial

consummation of a reorganization plan that is confirmed pursuant to an order of this Court.[10]

Borrowings under the Current DIP Facility are prepayable at the Debtors' option without

premium or penalty.

---

[10]   A more detailed description of the terms of the Current DIP Facility is contained in the expedited motion for
approval of the Current DIP Facility dated December 18, 2006 (Docket No. 6180) (the "DIP Motion"), the DIP
Order, and the form of Current DIP Credit Agreement attached thereto.

<u>Relief Requested</u>

18.    By this Motion, the Debtors seek entry of an order supplementing the DIP

Order and authorizing the Debtors to (i) extend the maturity date of the Current DIP Facility, (ii)

enter into related documents, and (iii) pay fees in connection therewith.

<u>Basis For Relief</u>

19.    In January 2007, the Debtors were able to benefit from the then-favorable

market conditions by entering into the Current DIP Facility.  Under the terms of the Current DIP

Facility, the Debtors saved millions of dollars per month in financing costs.  As stated above, the

Current DIP Facility currently matures on December 31, 2007.  At present, the Debtors expect to

emerge from chapter 11 by the end of the first quarter of 2008 and thus the maturity of the

existing credit facility must be extended.

20.    The Debtors accordingly seek approval to enter into an amendment (the

"Amendment") to the Current DIP Credit Agreement (the "Amended and Restated DIP Credit

Agreement") to, among other things, extend the term of the Current DIP Facility from December

31, 2007 to June 30, 2008, with an option to further extend to September 30, 2008.  As discussed

above, the Debtors have filed their Plan and Disclosure Statement, as well as proposed

amendments to each, and have commenced the hearing to approve the Disclosure Statement.

Entering into the Amended and Restated DIP Credit Agreement will, among other things, extend

the maturity of the Current DIP Facility and thereby provide the Debtors with necessary liquidity

and enhance their ability to continue forward on a path to emergence from chapter 11.

B.    <u>The Amended and Restated DIP Credit Agreement</u>

21.    The Debtors and the DIP Lenders have negotiated and entered into the

Amended and Restated DIP Credit Agreement, which is subject to the approval of this Court.  A

copy of the form of Amendment is attached hereto as <u>Exhibit A</u>, and the form of Amended and

Restated DIP Credit Agreement is an exhibit to the Amendment.[11]  The terms of the Amended

and Restated DIP Credit Agreement are substantially similar to those of the Current DIP Credit

Agreement.

       22.      The key modifications achieved as a result of the amendments are

summarized in the chart below:[12]

|  | Current DIP Credit Agreement | Amended And Restated DIP Credit Agreement |
| --- | --- | --- |
| **Maturity Date** | Earlier of (i) December 31, 2007 and (ii) substantial consummation of plan | Earlier of (i) June 30, 2008, with option to further extend to September 30, 2008 if Delphi pays an amount equal to 25 basis points of the Tranche A commitment, the Tranche B loan, and the Tranche C loan and (ii) substantial consummation of plan |
| **Additional Interest On JPMorgan's Alternate Base Rate[13]** | Tranche A Borrowings: 1.50% Tranche B Borrowings: 1.25% Tranche C Borrowings: 1.75% | **Prior To July 1, 2008** Tranche A Borrowings: 1.75% Tranche B Borrowings: 1.75% Tranche C Borrowings: 2.25% <br><br> **From And After July 1, 2008** Tranche A Borrowings: 2.00% Tranche B Borrowings: 2.00% Tranche C Borrowings: 2.50% |
| **Additional Interest On LIBOR** | Tranche A Borrowings: 2.50% Tranche B Borrowings: 2.25% Tranche C Borrowings: 2.75% | **Prior To July 1, 2008** Tranche A Borrowings: 2.75% Tranche B Borrowings: 2.75% Tranche C Borrowings: 3.25% <br><br> **From And After July 1, 2008** Tranche A Borrowings: 3.00% Tranche B Borrowings: 3.00% Tranche C Borrowings: 3.50% |

---

[11]    A marked copy of the Amended and Restated DIP Credit Agreement is attached to the Amendment to reflect changes from the Current DIP Credit Agreement.  A clean copy is not attached to the Amendment, but is available upon request.

[12]    The chart below is intended only as an illustrative summary.  To the extent the description contained in this chart is inconsistent with the Amendment, the Current DIP Credit Agreement, or the Amended and Restated DIP Credit Agreement, the applicable document controls.

[13]    The base interest rate under the Current DIP Credit Agreement and the Amended and Restated DIP Credit Agreement is Delphi's option of (i) JPMorgan's Alternate Base Rate or (ii) LIBOR.

|  | Current DIP Credit Agreement | Amended And Restated DIP Credit Agreement |
|---|---|---|
| Global EBITDAR Covenants | For each rolling 12 fiscal month period ending on the last day of the months March 31, 2007 through November 30, 2007 with a global EBITDAR ranging from $130,000,000 to $375,000,000 | For each rolling 12 fiscal month period ending on the last day of the months December 31, 2007 through August 31, 2008 with a global EBITDAR ranging from $475,000,000 to $500,000,000 |
| PBGC Replacement Liens | None | DIP Lender consent to the consummation of the transactions authorized under the DASHI Intercompany Transfer Order |

23.     The proposed Amended and Restated DIP Credit Agreement contains fee provisions, many of which are outlined in the proposed form of the Amended and Restated DIP Credit Agreement, including, among other things, certain commitment fees and letter of credit fees.  Other fee provisions are contained in a separate fee letter, which the parties have agreed would be kept confidential.[14]

24.     The Debtors also propose that they be authorized, but not directed, to perform, and take all actions necessary to make, execute, and deliver the Amendment together with all other documentation executed in connection therewith (the "Amendment Documents") and to pay the related fees.  Upon execution and delivery of each of the Amendment Documents and such other instruments and documents as may be necessary to effectuate the Amendment, the Debtors propose that such instruments and documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their respective terms.

25.     The Debtors propose that the DIP Order be deemed supplemented by the order approving this Motion, and that the DIP Order would continue in full force and effect as supplemented.  The DIP Order, as supplemented by the proposed order approving this Motion,

---

[14]    The fee letter will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

would not treat secured creditors any differently than such secured creditors are treated under the

DIP Order.  In connection with all obligations and indebtedness arising under the Amended and

Restated DIP Credit Agreement, the Agent and the DIP Lenders would be granted each and

every right and remedy granted to the Agent and the DIP Lenders under the DIP Order.

26.    In addition, the Amended and Restated DIP Credit Agreement addresses

certain matters related to the Order Under 11 U.S.C. §§ 363(c), 1107, and 1108, and Cash

Management Order, and Alternatively, Under 11 U.S.C. §§ 363(b)(1) and 364(c), Confirming

Authority of Delphi Automotive Systems (Holding), Inc. to Complete Intercompany Transfer of

Funds, entered on October 25, 2007 (Docket No. 10725) (the "DASHI Intercompany Transfer

Order"), which authorizes Delphi Automotive Systems (Holding), Inc. ("DASHI") to effectuate a

transfer (the "Intercompany Transaction") of funds accumulated from certain of its global

affiliates to Delphi Automotive Systems LLC ("DAS LLC").  Specifically, the DASHI

Intercompany Transfer Order provides that the proceeds of the Intercompany Transaction shall

be used by the Debtors in accordance with the terms of the order and this Court's previous Cash

Management Order (Docket No. 882), but subject to the requisite consent of the DIP Lenders.

As memorialized in the Amended and Restated DIP Credit Agreement, the DIP Lenders have

consented to the Intercompany Transaction, including the use of proceeds set forth in the DASHI

Intercompany Transfer Order and the granting of replacement liens in accordance with the

DASHI Intercompany Transfer Order.[15]  Accordingly, approval of this Motion will allow the

---

[15]    The DASHI Intercompany Transfer Order grants adequate protection of the asserted interest of Pension Benefit
Guaranty Corporation (the "PBGC"), on account of unpaid contributions to certain Delphi pension plans, in
$255 million of cash that will be accumulated by DASHI from the Debtors' global affiliates.  To secure the
adequate protection obligation, this Court's order grants the PBGC, upon the transfer of the accumulated cash
from DASHI to DAS LLC, replacement liens in the amount of $255 million (the "Replacement Liens") upon
those DASHI assets already encumbered by the Current DIP Facility.  The DASHI Intercompany Transfer
Order provides that the Replacement Liens shall be subject and subordinate to the liens granted to the DIP
Lenders and any Setoff Claimant (as defined in the DIP Order).  The DASHI Intercompany Transfer Order

Debtors to consummate the Intercompany Transaction in accordance with the DASHI
Intercompany Transfer Order, which, among other things, will provide a definitive source of
liquidity on favorable terms to the Debtors and enable the Debtors to maximize efficiencies.

       27.     In the event the Debtors accumulate any further funds from their global
affiliates, the Debtors also negotiated a provision that should obviate the need for further consent
by the DIP Lenders.  Specifically, the Amended and Restated DIP Credit Agreement provides
that the replacement liens granted to the PBGC under the DASHI Intercompany Transfer Order,
or similar liens that may be granted to the PBGC (collectively the "PBGC Liens"), shall be
permitted but subject to and subordinate to the liens granted to the Agent for the benefit of the
DIP Lenders and the liens granted to any Setoff Claimant (as defined in the DIP Order).

       28.     Finally, in connection with their consent to the PBGC Liens, the DIP
Lenders required clarification that the PBGC will be treated like all other subordinated secured
creditors under the DIP Order.  Accordingly, the proposed order provides that the PBGC shall (i)
take no action to foreclose upon or recover in connection with the PBGC Liens or otherwise
exercise remedies against any collateral subject to the PBGC Liens, except to the extent
authorized by an order of this Court, (ii) be deemed to have consented to any release of any
collateral subject to the PBGC Liens authorized under the DIP Documents (as defined in the DIP
Order), and (iii) not file any further financing statements, trademark filings, copyright filings,
mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their
security interests in the collateral subject to the PBGC Liens (the actions in this clause (iii)
hereinafter referred to as the "Lien Actions").  The PGBC may undertake the Lien Actions,

---

further provides, among other things, that the Replacement Liens shall be valid only to the extent that the
PBGC's asserted liens on the cash to be accumulated by DASHI from the global affiliates are valid, perfected,
enforceable and non-avoidable against such assets; and further provides that all parties in interest in these cases
retain and reserve the right to challenge the PBGC's purported liens on any grounds and that all of PBGC's
claims, defenses and arguments with respect to any such challenges are expressly reserved and preserved.

however, if the DIP Lenders file or have filed financing statements or other documents to perfect

the liens granted under any order approving this Motion, or as may be required by applicable

state law to continue the perfection of valid and unavoidable liens or security interests as of the

Petition Date.

<u>Applicable Authority</u>

A.    <u>This Court Should Authorize The Proposed Amended
and Restated DIP Credit Agreement</u>

(a)    <u>The Amended and Restated DIP Credit Agreement Is Appropriate
Under Section 364(c) Of The Bankruptcy Code</u>

29.    The Debtors propose to enter into the Amendment to the Current DIP

Facility by continuing to provide security interests and liens as set forth in the Amended and

Restated DIP Credit Agreement pursuant to sections 364(c) of the Bankruptcy Code.  The

statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made

after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under

section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  This Court has already

made this finding in entering the DIP Order, which approved the Debtors' Current DIP Facility.

Because the Current DIP Facility will remain in place, subject to certain terms under the

Amended and Restated DIP Credit Agreement, the Debtors should be permitted to continue to

grant the liens in accordance with section 364(c) of the Bankruptcy Code.

30.    Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

<u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987),

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

    31.  Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

   (a)  the debtor is unable to obtain unsecured credit under section 364(b), i.e.,
      by allowing a lender only an administrative claim;

   (b)  the credit transaction is necessary to preserve the assets of the estate; and

   (c)  the terms of the transaction are fair, reasonable, and adequate, given the
      circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met

when it entered the DIP Order.  Because the Current DIP Facility will remain in place, albeit

supplemented by the Amendment, this Court's findings should continue to apply.

   (b)  The Financing Facility Is Appropriate Under
      Section 364(d) Of The Bankruptcy Code

     32.  Section 364(d)(1) provides that the court may, after notice and a hearing,

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on

property of the estate that is subject to a lien only if–

   (a)  the trustee is unable to obtain credit otherwise; and

   (b)  there is adequate protection of the interest of the holder of the lien on the
      property of the estate on which such senior or equal lien is proposed to be
      granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be

decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its

application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.'"  Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the

Debtors have already established that they are unable to get credit without priming liens.  The

priming lien structure under the Current DIP Facility, as amended, including the adequate

protection provided to parties whose liens are primed, will continue essentially unchanged from

the Current DIP Credit Agreement.

        (c)      <u>Compliance With General Order No. M-274</u>

        33.      The Debtors believe that the relief requested in this Motion and the notice

to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"),

adopted under General Order No. M-274 of the Board of Judges for the Southern District of New

York.  The Debtors do not believe that entering into the Amendment to the Current DIP Credit

Agreement creates any incremental right that would trigger the application of the Extraordinary

Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in

the DIP Motion and approved by this Court pursuant to the DIP Order.  Accordingly, the Debtors

submit that they have satisfied the Guidelines.

        (d)      <u>Application Of The Business Judgment Standard</u>

        34.      Based on the foregoing, the Debtors submit that entry of an order

approving the proposed Amended and Restated DIP Credit Agreement is necessary and

appropriate to enable the Debtors to reorganize successfully.  The proposed Amended and

Restated DIP Credit Agreement has been negotiated in good faith, at arm's length and pursuant

to the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including the decision to borrow money.  <u>See</u> <u>Group of</u>

<u>Institutional Investors v. Chicago,  Milwaukee, St. Paul & Pac. R.R. Co.</u>, 318 U.S. 523, 550

17

(1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985). In considering

whether a debtor has exercised its business judgment, a court is not free to second-guess

particular provisions but rather determines whether the proposed action "as a whole is within

reasonable business judgment." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr.

S.D.N.Y. 1990).

    35.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993). Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'" Official Comm. Of Subordinated Bondholders v. Integrated

resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection. Rather, an objector "is required to

produce some evidence respecting its objections." Comm. Of Equity Holders v. Lionel Corp. (In

re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

    36.    The Debtors have exercised sound business judgment in determining that

supplementing the DIP Order, among other things, to extend the maturity date under the terms

set forth in the Amended and Restated DIP Credit Agreement is appropriate. Indeed, terms of

the Amended and Restated DIP Credit Agreement are fair, reasonable, and necessary and are in

the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to

enter into the Amended and Restated DIP Credit Agreement and borrow funds on the secured,

administrative super-priority and priming basis as more fully described in the DIP Motion,

pursuant to sections 363 and 364 of the Bankruptcy Code, and take the other actions

contemplated by the Amended and Restated DIP Credit Agreement and as requested herein.

B.      The Amended DIP Financing Facility Should
        Be Accorded The Benefits Of Section 364(e)

        37.     No consideration is being provided to any party to, or guarantor of,

obligations arising under the amended Current DIP Facility, other than as disclosed in the

Amended and Restated DIP Credit Agreement.  Accordingly, the amended Current DIP Facility

should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set

forth herein.

C.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

        38.     Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-

day stay.  This Court previously granted similar relief from Bankruptcy Rule 6004(g) in

approving the DIP Order, and other courts in this district have waived this ten-day stay upon a

showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a

business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  By

waiving the ten-day stay period, the Debtors will be able to consummate the Intercompany

Transaction, thereby allowing the Debtors to immediately take advantage of the $650 million

available under the DASHI Intercompany Transfer Order.  By using these funds, the Debtors will

be able, among other things, to reduce their interest expense on the Current DIP Facility.

<u>Notice Of Motion</u>

39.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental

Case Management Order"), and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And

105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures, entered October 19,

2007 (Docket No. 10661) as well as Bankruptcy Rule 4001.  In addition, the Debtors have

served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter

into its original $2 billion postpetition credit facility and the DIP Motion.  The Debtors have also

provided notice to counsel to the agent for the Debtors' former prepetition credit facility.

Furthermore, the Debtors have complied with the Supplemental Case Management Order with

respect to the filing of this Motion and the need for expedited relief.[16]  In light of the nature of

the relief requested, the Debtors submit that no other or further notice is necessary.

---

[16]    The Debtors have noticed this Motion for the omnibus hearing on November 16, 2007. In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing. The Creditors'
Committee has consented to this Motion being heard on November 16, 2007. Because this Motion is being filed
on less than 20 days' notice, parties-in-interest will have until November 13, 2007 to file an objection to this
Motion.

<u>Memorandum Of Law</u>

40.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order

(a)  authorizing the Debtors to (i) extend the maturity date of the Current DIP Facility, (ii) enter

into related documents, and (iii) pay fees in connection therewith and (b) granting the Debtors

such other and further relief as is just.

Dated:       New York, New York
               November 1, 2007

               SKADDEN, ARPS, SLATE, MEAGHER
               & FLOM LLP

               By:    /s/ John Wm. Butler, Jr.
                     John Wm. Butler, Jr. (JB 4711)
                     John K. Lyons (JL 4951)
                     Ron E. Meisler (RM 3026)
               333 West Wacker Drive, Suite 2100
               Chicago, Illinois 60606
               (312) 407-0700


               By:    /s/ Kayalyn A. Marafioti
                     Kayalyn A. Marafioti (KM 9632)
                     Thomas J. Matz (TM 5986)
               Four Times Square
               New York, New York 10036
               (212) 735-3000

                       - and -

               SHEARMAN & STERLING LLP


               By:    /s/ Andrew V. Tenzer
                     Douglas P. Bartner (DB 2301)
                     Andrew V. Tenzer (AT 2263)
               599 Lexington Avenue
               New York, New York  10022
               (212) 848-4000

               Attorneys for Delphi Corporation, et al.,
                     Debtors and Debtors-in-Possession