Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: 212.859.8000
Facsimile: 212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
In re:                                            :   Chapter 11
                                                  :
  Delphi Corporation, et al.,                     :   Case No. 05-44481 (RDD)
                                                  :   (Jointly Administered)
                      Debtors.              :
                                                  :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION TO DEBTORS' EXPEDITED MOTION FOR ORDER UNDER 11
U.S.C. §§ 105(a) 363(b), 503(b), AND 507(a) AUTHORIZING AND APPROVING
AMENDMENT TO DELPHI-APPALOOSA EQUITY PURCHASE AND
COMMITMENT AGREEMENT**

The Official Committee of Equity Security Holders (the "Equity Committee") of Delphi Corporation ("Delphi") and the other above-captioned debtors (collectively, the "Debtors") by and through its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, files this objection (the "Objection") to the Debtors' Expedited Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to Delphi Appaloosa Equity Purchase and Commitment Agreement (the "Motion"). In support of this Objection, the Equity Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      In December of 2006, after several months of negotiations, the Debtors entered into an equity purchase and commitment agreement with a group of investors led by Appaloosa Management L.P. ("Appaloosa") and Cerberus Management, L.P. ("Cerberus"). The Equity Committee objected to the Debtors' motion for approval of that agreement on the grounds that, among other things, it was illusory and provided an unconscionable windfall to the plan investors. As a result of the Equity Committee's objection, the agreement was changed to require the plan investors to actually make a binding commitment – to assume risk – in exchange for tens of millions of dollars of fees and the protection of a $100 million break up fee.

2.      This agreement was ultimately terminated and a new equity purchase and commitment agreement was negotiated, with a bid by an Appaloosa led investment group (the "Plan Investors") selected by the Debtors over a bid by Highland Capital Management, LP ("Highland"). The Equity Committee, in order to facilitate a consensual process, supported this new equity purchase and commitment agreement, and it was approved on August 2, 2007 (the "Current EPCA"). The Current EPCA again guaranteed tens of millions of dollars of fees and the protection of an $82.5 million break up fee in exchange for a binding commitment – the assumption of risk.

3.      The Debtors are now seeking approval of what amounts to a third equity purchase and commitment agreement (the "New EPCA") which attempts to eliminate the risk that the Plan Investors assumed under the Current EPCA – for which they were paid tens of millions of dollars – by simply providing additional value to the Plan Investors without receiving any additional consideration. There is simply no basis in law or equity to allow the Plan Investors to

2

renegotiate the economic terms of the EPCA. The Plan Investors have received tens of million of dollars in "commitment fees," as well as a separate "arrangement fee" for Appaloosa, in addition to unlimited expense reimbursement. The Current EPCA has not been terminated, and there is no contractual basis for doing so. No material change has occurred to the Debtors' businesses or prospects. By opening the door to inappropriate renegotiation, the Debtors have permitted the Plan Investors to enhance an already rich deal for themselves at the expense of the Debtors' stakeholders.

4.  The Debtors' willingness to allow a renegotiation is inexplicable and calls into question the good faith and arms-length nature of the process. The Plan Investors remain bound by the Current EPCA, and the Debtors as fiduciaries for all parties must hold the Plan Investors to their bargain. The New EPCA would result in the Plan Investors receiving a $1 billion reduction in the total enterprise value upon which the purchase price is based (even though the midpoint in Rothschild's valuation range has only been reduced by $200 million). The combined impact of the billion dollar reduction in total enterprise value and the new capital structure results in an additional windfall of well over $100 million to the Plan Investors. It is important to remember that the Current EPCA was selected over the proposals from third party investors because it was viewed as requiring the least diligence and having the greatest certainty of closing pursuant to its terms. The capital market fluctuations and relatively minor adjustments in the Debtors' business plan cited by the Debtors in the Motion as justification for the Plan Investors' re-trade are among the risks the Plan Investors agreed to assume when they bound themselves to the EPCA.

5.  In any event, as described herein, the attempts in the Motion and New Disclosure Statement to characterize the renegotiation as necessary because of changed projections related

to GM sales and a difficult financing market are unfounded, disingenuous and misleading. The only relief the Debtors should be seeking with respect to the Current EPCA at this time should be the enforcement of its terms as to the Plan Investors. The Motion should be denied in all respects.

## BACKGROUND

6. On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

7. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "UCC"). On April 28, 2006, the U.S. Trustee appointed the Equity Committee. On May 8, 2006, the Equity Committee engaged Fried, Frank, Harris, Shriver & Jacobson LLP as counsel, with such retention approved by this Court on June 19, 2006.

8. On January 12, 2007, the Court approved the Debtors' original equity purchase and commitment agreement (the "Original EPCA") with affiliates of Appaloosa, Cerberus, and Harbinger Capital Partners Master Fund I., LTD ("Harbinger"), among others. This agreement was subsequently amended as announced by the Debtors on February 28, 2007. After discussion over the summer of 2007, on July 9, 2007, the Debtors publicly disclosed that they had terminated this agreement.

9.      On July 18, 2007, after extensive negotiations with stakeholders, the Debtors announced that they had accepted a new proposal (the Current EPCA) from an investment group led by Appaloosa over a proposal put forth by Highland.[1]  This new proposal would form the basis for the Debtors' chapter 11 plan.  On August 2, 2007, the Court entered an order authorizing and approving the Current EPCA [Docket No. 8856].

10.     On September 6, 2007, the Debtors filed the Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (the "September Plan") [Docket No. 9263] and the Disclosure Statement with respect to the September Plan (the "September Disclosure Statement") [Docket No. 9264].

11.     On October 19, 2007, the Court entered the Supplemental Order (A) Establishing Revised Hearing Date And Related Procedures On Disclosure Statement And Solicitations Procedure Motion And (B) Setting Hearing Date And Related Procedures For Potential Motions Amending Investment Agreement And Approving Certain Exit Financing Agreements [Docket No. 10661] (the "Supplemental Disclosure Statement Order"), which among other things, scheduled the hearing on the Motion (the "EPCA Hearing") for November 8, 2007 with an objection deadline of November 2, 2007, provided that the Debtors filed the Motion on or before October 29, 2007.

12.     On October 27, 2007, the Debtors provided the Equity Committee with a preliminary version of their proposed amendments to the Current EPCA.  The documents were marked "Highly Confidential."  Pursuant to the protocols established by the Debtors, the "Highly Confidential" designation prevented the Equity Committee's professionals from

---

[1]     The plan investors are led by an affiliate of Appaloosa and include affiliates of Harbinger, Merrill Lynch, Pierce, Fenner & Smith Inc., UBS, Goldman Sachs & Co., and Pardus Capital Management L.P.

5

distributing the documents to the actual members of the Equity Committee.

13.    On October 29, 2007, the Debtors filed a Notice of Potential Amendments to Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto, which contained proposed modifications to the September Disclosure Statement (the "New Disclosure Statement").

14.    On October 30, 2007, the Debtors filed the Motion. The Debtors' filings failed to comply with the terms of the Supplemental Disclosure Statement Order which required that the Motion and the proposed amendments to the September Plan and September Disclosure Statement be filed on or before October 29, 2007. The Debtors did not file the Motion until 1:25 a.m. on October 30, 2007.[2] In addition, the arguments and conclusory statements in the Motion were filed without a scintilla of factual support in the form of affidavits or otherwise. The Motion was thus incomplete as well as untimely.

## OBJECTION

15.    As described in more detail below, as a matter of fact and a matter of law, the Motion must be denied in all respects. As a matter of fact and law, the Current EPCA has not been terminated and remains enforceable. As a matter of fact and law, the New EPCA would provide an additional windfall to the Plan Investors and as such a diversion of estate assets from the Debtors' other stakeholder to the Plan Investors. As a matter of fact and law, the process surrounding the negotiation of the New EPCA raises issues that call the good faith and the arms-

---

[2]    The Debtors' position is that is was timely filed because they are relying on California time. As neither the Court, the Debtors, nor counsel for any of the principal parties are based in California, this position is most kindly described as "a bit of a stretch."

length nature of the negotiations into question. As a matter of law, the relief requested in the Motion cannot be granted without substantial investigation and a complete evidentiary record. As a matter of law, the request for the waiver of the ten day stay under Bankruptcy Rule 6004(g) is inappropriate. To the extent the Court is not prepared to deny the Motion outright at this time, certainly the Current EPCA cannot be amended absent discovery and development of a factual record that is commensurate with the difficulty of the issues presented, the questionable circumstances surrounding the significant transfer of value to the Plan Investors and issues concerning conflicts that may have existed during the time management was involved in negotiations concerning the New EPCA.

**I.      The EPCA is a Binding Agreement that Must be Enforced**

16.     The Current EPCA is a binding, enforceable agreement that cannot be disregarded at the whim of the Plan Investors. The Debtors have no authority to transfer additional value from the Debtors' estates for the same consideration the Plan Investors committed to under an agreement approved by the Court three months ago. The Current EPCA was announced publicly by the Debtors on July 18, 2007, and approved by the Court on August 2, 2007. The Current EPCA has not been terminated pursuant to section 12 thereof or otherwise. If the Current EPCA had been terminated, if a notice of termination had been given or if an event had occurred that gave parties the right to terminate the Current EPCA, the Debtors would have had to disclose such occurrence as a public reporting company.

17.     The Debtors must not be permitted to allow the Plan Investors and creditors to use capital market hiccups to retrade the fully consensual deal that was based on the Current EPCA and memorialized in the September Plan. This Court so admonished the Debtors in September

when responding to the Debtors' assertion that certain "laser-like" charges to the September Plan might be forthcoming. The Court stated:

> I have the understanding that Delphi's own business has not changed; . . . And it seems to me that, if the markets themselves have changed, the value of the company has not, and that should be the basis of your negotiations. This isn't the type of company that one can deal with based on short-term swings in the marketplace, generally, and you have to base it on the fundamentals of the company. So I would strongly encourage, as you've represented that they are doing, the parties to take that approach in responding to the liquidity changes in the marketplace. The value is there, and I assume that those with information know it's there.

September 27, 2007 Transcript, pp. 49:15–50:8.

18. The Debtors are, however, letting the Plan Investors "renegotiate the deal" and "go back to the drawing board" even though the Debtors stated that they would not entertain such an approach. See September Transcript pp. 46:25-47:7. As set forth herein, even a cursory analysis of the two reasons articulated by the Debtors for the changes – capital market dislocation and reduced GM production volumes – reveals that they are completely unsupported and without merit. No doubt other purported justifications will emerge in the time between the filing of this Objection and the hearing on November 8.

GM Volume

19. The Debtors' note that in September GI/DRI revised downward its outlook for GM production volumes and that such projections could have a "material impact" on the Debtors' business plan. As an initial matter, it strains credulity that Delphi, with all of its automotive expertise and insight, as well as its relationship with GM, was unaware of a potential downward projection by GI/DRI when they filed their plan on September 6, 2007 (which incorporated their business plan). In any event, notwithstanding the implication Delphi seeks to

8

create, the adjustments have not resulted in a material change in the business plan.

20.  The Motion itself states that Delphi has concluded "GMNA will have a short term inventory adjustment period rather than the long-term sales reduction of the magnitude forecast by GI/DRI.  Accordingly, Delphi has left its GMNA projections for 2009 through 2011 unchanged but has reduced its projections for 2008."  Motion at ¶ 23.  In fact, Delphi has left projections for total sales and operating expenses the same for 2009 through 2011, which results in there being no material change to cumulative EBITDAR over the projection period.  While the business plan shows a slight decline in EBITDAR for 2008, the Debtors now project that revenue will grow in 2008-2011 by a compound annual growth rate of 6.3% (higher then the 5.7% level cited in the business plan).  New Disclosure Statement at DS-ix.  A comparison of Appendix C to the New Disclosure Statement with Appendix C to the September Disclosure Statement further illustrates that under the revised projections the Debtors will actually generate over $550 million more in cash flow before financing from 2008 through 2011, which represents a significant benefit to the reorganized Debtors.

Capital Markets

21.  The Debtors also cite to the dislocation in the capital markets as a basis for permitting the renegotiation.  The argument that market conditions and changes to capital structure justify the revisions to the Current EPCA is completely disingenuous and misleading.  As an initial matter, as noted by this Court, the conditions of financing markets do not affect the intrinsic value of a company.  In addition, the market conditions the Debtors refer to existed at the time the parties agreed to the consensual deal, and certainly at the time the Debtors filed the September Plan.  See articles attached hereto as Exhibit A.  As indicated in the Disclosure

9

Statement, the credit markets have in fact improved since that time. See New Disclosure Statement at DS-131. Furthermore, by reducing the debt to be carried by the reorganized Debtors by $1.95 billion,[3] the changes to the capital market structure contemplated by the New Plan actually make the post-emergence Debtors' equity more valuable, rather than less; in addition, as the New Disclosure Statement indicates, the reduction in debt results in an increase in cumulative cash flow for the period 2008-2011. Nothing in the Motion supports the Debtors' argument that the change in capital structure negatively affects the Debtors' value or the Plan Investors' investment. In short, Delphi has actually gotten better, not worse.

22. The Debtors have lost sight of one simple but very important fact: the Current EPCA was approved by this Court and remains binding. The agreement was presented to the Court and accepted under the guise that it was a real commitment that exposed the Plan Investors to real risk, including risks that capital markets could get weaker and GM revenues might decrease. Tens of millions of dollars have been paid to the Plan Investors in exchange for their commitment. To the extent the Court permits the amendments that have been suggested, the Debtors will have succeeded in paying the Plan Investors fees of tens of millions of dollars and exposing the Debtors to the risk of an $82.5 million break up fee in exchange for an illusory promise from the Plan Investors. It is ironic that this was precisely this kind of illusory promise that the Equity Committee objected to as a waste of the Debtors' estates during the hearing on the original Motion in January 2007; as the Court is aware, ultimately the Debtors and the Plan Investors were forced to amend the original EPCA to eliminate numerous "escape hatches" that would have permitted them to renege on their commitment after the payment of substantial

---

[3] The entire funding shortfall caused by the reduction in debt is filled by the change to the consideration provided to GM under the New Plan. Under the original plan GM was to receive $2.7 billion in cash. Under the revised plan, GM receives cash in the amount of $750 million and securities worth $1.95 billion, resulting in a reduction of the external funding requirements by $1.95 billion.

10

commitment fees.  The Motion must be denied.

## II.     The New ECPA Would Result in a Windfall to Plan Investors

23.     What the Debtors fail to disclose in the Motion or, for that matter, in the New Disclosure Statement, is the windfall that the Plan Investors are receiving under the New EPCA. In light of the material incremental value to the Plan Investors, this lack of candor is astounding. Assuming arguendo the reduced total enterprise value of $13 billion, because of the reduced debt upon emergence, under the September Plan the implied aggregate equity value was approximately $5.8 billion and under the New Plan the implied aggregate equity value is approximately $7.8 billion.  Under the Original EPCA, assuming the rights were fully subscribed, the Plan Investors would have received securities valued at $1.087 billion (18.7% x $5.8 billion).  In contrast, under the New EPCA, again assuming the rights are fully subscribed, the Plan Investors will receive securities valued at $1.24 billion (15.9% x $7.8 billion).  Thus even assuming the $13 billion enterprise value (with which the Equity Committee disagrees), the Plan Investors are receiving $157 million of incremental value, in addition to the windfalls that they were previously getting, on the same $975 million investment.  To the extent the rights are not fully subscribed the windfalls would be greater.  Such an increase in value is unconscionable and simply cannot be approved without a full examination of each of the issues described in paragraphs 15 and 29 herein.

24.     In considering the windfalls provided by the New EPCA, it is important to remember that the deal under even the Current EPCA was and is extremely rich for the Plan Investors.  As the Equity Committee noted in its objection to the Original EPCA, unlike most cases, the Plan Investors are actually buying preferred stock that converts into common shares at

11

a discount (not a premium) to plan value. Specifically, they purchase the series A preferred stock based on a total enterprise value that is over $2 billion less then plan value, and the series B preferred stock based on a total enterprise value that is over $1 billion less than plan value.

### III. The New EPCA Raises Questions Regarding the Process and the Good Faith and Arms-Length Nature Thereof

25. The simple fact that the process would result in such windfall recoveries to the Plan Investors notwithstanding the commitments for which they were well compensated puts the process in question. In addition, there are numerous other facts and circumstances that put the process and actions of parties in question.

26. On information and belief, certain of the Plan Investors are also bondholders (and may also sit on the Ad Hoc Bondholder Committee that has formed and been active of late) and may have in their plan investor capacity used unrelated market conditions and the Debtors' desire to emerge from bankruptcy to negotiate a far lower purchase price, and then turned around and, in their bondholder capacity, used that very lowering of the purchase price to renegotiate creditor recoveries. These dual roles, if they existed, put the process and the good faith nature thereof in question.

27. Moreover, it is important to note that it appears that management was negotiating its compensation and incentive plans with the Plan Investors and the UCC at the same time they were allowing the Plan Investors to drastically renegotiate the terms of the New EPCA. Specifically, the Plan Investors had to sign off on all compensation arrangements and the UCC had consultation rights with respect thereto (rights that the Equity Committee specifically requested at the time of the September Plan but that the Debtors adamantly refused to provide). The breadth and complexity of the management compensation is evidenced by the more than

fifteen pages of disclosure in the New Disclosure Statement describing these plans and programs, which include the Salaried Employee Compensation Program, the Competitively Benchmarked Salaried Employee Compensation Program, the new Executive Employment Agreements, the Short Term Incentive Plan, the Long Term Incentive Plan, the Chapter 11 Effective Date Executive Payments Program, the Supplemental Executive Retirement Program, the Salaried Retirement Equalization Savings Program, and the new Change of Control Agreements.

28.   At a time when they were allowing the Plan Investors to structure a more favorable deal (which eviscerates recoveries to equity holders), the Debtors negotiated their own compensation schemes that included emergence bonuses for management that were in excess of equity holder recoveries.  Appropriate inquiries must be made to address the obvious questions raised by this scenario.

29.   Simply stated, there are significant questions surrounding (i) the basis for the amendment to the Current EPCA, (ii) the reasonableness of the suggested amendment to the Current EPCA and (iii) the process of the renegotiation of the Current EPCA.  The possibility that ulterior motives guided actions on both sides of the negotiating table cannot be ignored.  These issues preclude the good faith finding sought in the Motion.

**IV.     Appropriate Investigations and Discovery Must be Allowed to Occur Before the Relief Requested in the Motion can be Granted**

30.   As a matter of law and fact, the Motion should be denied.  However, if the Court is at all inclined to consider the amendments to the Current EPCA and to consider allowing the Plan Investors to renegotiate their commitments under the Current EPCA in connection with the New EPCA, it is imperative that the Motion be adjourned to allow substantial investigation into

13

(i) the basis for the amendment to the Current EPCA, (ii) the reasonableness of the suggested amendment to the Current EPCA and (iii) the process of the renegotiation of the Current EPCA, including by full-scale discovery. The relief requested by the Motion diverts further value from the estates to already overly compensated Plan Investors and creditors already receiving a par plus accrued recovery under the Current EPCA and September Plan. Although the Debtors may attempt to argue that there are only a few, targeted changes in the document, the effects are far reaching and show that the Debtors have given in to the Plan Investors' and creditors' demands with little or no effort at impeding their advances.

31. The Debtors' decision to relieve the Plan Investors of their commitments and grant them windfall recoveries must be subject to close scrutiny through discovery and investigation. Inquiries must be made into why, how and when modifications where made and why they were considered reasonable.

32. The Debtors' business judgment must also be put to test, because based on the unjustified changes it is lacking on its face. The Debtors have failed to entertain further bids even though the New EPCA results in a significantly reduced purchase price. This is so even though the bidding process with respect to a sale in a chapter 11 case is extremely important. The process serves as an inherent vehicle to maximize value to the estates. Abruptly reducing the basis of the Plan Investors' price without having sought competitive bids simply undermines the possibility for increased potential value for the estates. During the time leading up to approval of the Current EPCA, the Debtors received an alternative offer that would be a far better deal than the New EPCA. Depriving the estates of an opportunity to explore available options again has eliminated any incentive on the part of the Plan Investors to uphold the terms of the Current EPCA, and cannot be considered an appropriate exercise of business judgment.

14

33.     For the foregoing reasons, and as set forth in detail in the Equity Committee's emergency motion to adjourn the Motion, if the Court determines not to deny the Motion, the Court should establish a schedule for investigation and discovery so that an appropriate evidentiary record can be developed.

**V.    The Requested Waiver of the Ten Day Stay Provided by Bankruptcy Rule 6004 is Inappropriate**

34.     The Debtors request for a waiver of the ten day stay period under Rule 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is inappropriate and unnecessary.  Bankruptcy Rule 6004(g) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Bankruptcy Rule 6004(g).  While courts have waived the stay in certain circumstances, the stay should be eliminated or reduced only upon a showing that there is a sufficient business need to close the transaction within the 10-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.  Collier on Bankruptcy, 15th ed. Revised, 6004.10.

35.     There has not been, nor can there be, a showing of sufficient business need to warrant the elimination of the 10-day stay period under Bankruptcy Rule 6004(g).  In light of the four days notice for parties to object to the Motion and the expedited time frame pursuant to which the hearing on the Motion will be held, eliminating the 10-day stay would be particularly unjust in this circumstance.  There is no basis for the Debtors to assert that any business exigency exists to warrant the elimination of the 10-day stay and, as a result, there is no basis for the Court to waive the stay.  See e.g., In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (request to dispense with the 10-day period of Bankruptcy Rule 6004(g) denied where

15

debtor made no evidentiary showing of a business exigency requiring a closing within 10 days).

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Equity Committee respectfully requests that the Court deny the Motion and grant such other and further relief as is appropriate.

Dated:  November 2, 2007
New York, New York

                FRIED, FRANK, HARRIS, SHRIVER
                   & JACOBSON LLP

                /s/ Bonnie Steingart
                Bonnie Steingart (BS-8004)
                Debra Torres (DT-9093)
                One New York Plaza
                New York, New York  10004
                Phone: (212) 859-8000
                Fax:    (212) 859-4000

                *Counsel for the Official Committee of Equity*
                *Security Holders*

601867