Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone:  212.859.8000
Facsimile:  212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Delphi Corporation, et al., | : | Case No.  05-44481 (RDD) |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
TO DEBTORS' MOTION FOR ORDER APPROVING (I) DISCLOSURE
STATEMENT, (II) RECORD DATE, VOTING DEADLINE, AND PROCEDURES
FOR TEMPORARY ALLOWANCE OF CERTAIN CLAIMS, (III) HEARING DATE
TO CONSIDER CONFIRMATION OF PLAN, (IV) PROCEDURES FOR FILING
OBJECTIONS TO PLAN, (V) SOLICITATION PROCEDURES FOR VOTING ON
PLAN, (VI) CURE CLAIM PROCEDURES, (VII) PROCEDURES FOR RESOLVING
DISPUTES RELATING TO POST-PETITION INTEREST, AND
(VIII) RECLAMATION CLAIM PROCEDURES

TO:     THE HONORABLE ROBERT D. DRAIN
           UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Equity Security Holders (the "Equity Committee") of Delphi

Corporation ("Delphi") and the other above-captioned debtors (collectively, the "Debtors") by

and through its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, files this objection (the

"Objection") to the Debtors' motion (the "Disclosure Statement Motion") for an order approving

the Debtors' (i) disclosure statement, (ii) record date, voting deadline, and procedures for

-1-

temporary allowance of certain claims, (iii) hearing date to consider confirmation of plan, (iv)

procedures for filing objections to plan, (v) solicitation procedures for voting on plan, (vi) cure

claim procedures, (vii) procedures for resolving disputes relating to post-petition interest, and

(viii) reclamation claim procedures.[1]  In support of this Objection, the Equity Committee

respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The principle of adequate disclosure concerning a debtor's proposed plan of

reorganization lies at the heart of the chapter 11 process.  As required by section 1125(a)(1) of

the Bankruptcy Code, a chapter 11 disclosure statement must contain information sufficient to

enable holders of claims and interests in the debtor's estates to make an informed judgment on

the plan.  To that end, it is critical for debtors to make meaningful and accurate disclosure

concerning, among other things, the claims of various stakeholders, the value of assets held by

the debtor's estate, the assumptions underlying the debtor's alternative liquidation analysis, and

the recoveries for and distributions to be made to respective classes of stakeholders.  The

principle of adequate disclosure applies with even greater force where, as is the case here,

several classes of claimants and interest holders are impaired under the proposed plan and the

plan is contested by a statutory committee.

2.      The plan documents now before the Court fall woefully short of achieving this

fundamental purpose and requirement.  The Debtors' "amended" plan documents reflect a non-

consensual proposed chapter 11 plan that dramatically changes the fundamental financial

underpinnings of the consensual plan publicly announced by the Debtors on July 18, 2007 and

---

[1]        Terms used herein that are otherwise undefined shall have the same meaning ascribed to them in the
Disclosure Statement Motion, which was filed with this Court on September 6, 2007.

filed with this Court on September 6, 2007.  Despite the many economic and structural changes

in the Debtors' proposed plan, which affect virtually every one of the Debtors' constituencies,

the New Disclosure Statement does not provide information critical to the ability of the Debtors'

stakeholders to make an informed judgment to vote to accept or reject the New Plan.  Moreover,

as discussed further herein, the proposed plan is unconfirmable as a matter of law.

3.      In reliance on the agreements by the Debtors and others in connection with the

consensual deal, including the proposed recoveries to existing equity, the Equity Committee

supported the Debtors in their chapter 11 cases, including with respect to extensions of the

Debtors' exclusivity and post-petition financing and proposed sales of certain of the Debtors'

assets and business units.  The Equity Committee also abandoned efforts to seek, facilitate and

propose alternative and competing investment proposals for the Debtors and cooperated with the

Debtors towards implementation of the Original Plan.

4.      However, on October 29, 2007, the Debtors filed a virtually unrecognizable

revised plan of reorganization (the "New Plan") and disclosure statement (the "New Disclosure

Statement") that reflects a complete re-trade of the consensual deal memorialized in the Original

Plan.  This re-trade, on information and belief, was instigated by groups who are using the

tightening in the credit markets and certain minor short term inventory adjustments related to

GM as a pretext for demanding more value for themselves, at the expense of existing equity.

5.      The tightening of the credit markets was hardly an unforeseen subsequent event;

to the contrary, reports of decreased credit capacity date back to the mid-July 2007 timeframe,

almost two months prior to the filing of the Original Plan and Original Disclosure Statement on

September 6.[2]  Similarly, forecasts relating to North American automotive production levels were announced prior to the time the Original Disclosure Statement was filed and by their own admission the Debtors characterized such information as overstated.[3]  The Debtors nonetheless facilitated this improper and unwarranted re-trade by, among other things:

- excluding the Equity Committee from the critical negotiation sessions at which the New Plan was formulated, and only "inviting" them back to the table after existing equity's recoveries had already been gutted;

- acceding to the demands of unsecured creditors that they be given the right (allocated to existing equity under the Original Plan) to participate in a discount equity offering that was intended to be a significant source of value for existing equity;

- agreeing to replace equity holders' previously agreed recoveries with "rights" with de minimus value to monetize portions of other stakeholders' primary distributions of new common stock; and

- permitting the group of investors (collectively, the "Plan Investors") led by Appaloosa Management, L.P.  ("Appaloosa") to renegotiate their contractual commitment to invest in the reorganized Debtors, effectively creating a windfall of value for their investment.

6.      First and foremost, the New Disclosure Statement does not contain sufficient disclosure as to the reasons why the Debtors determined it necessary and in the best interest of stakeholders to renegotiate the fully consensual agreement embodied in the Original Plan or the basis for the changes underlying the New Plan.  The New Disclosure Statement provides no rational basis for the Debtors' significant downward adjustment of its total enterprise value (approximately $900 million) and the subsequent shifting of value from equity holders to unsecured creditors (to such a degree that their recovery becomes legally and equitably excessive) and to the Plan Investors.  The New Disclosure Statement's vague references to

---

[2]      See e.g., Marie Beaudette, Credit Crunch Spurs Uncertainty on Bankruptcy Exit Loans, Assoc. Press NewsWires, Aug. 29, 2007, available at http://global.factiva.com (noting subprime meltdown that started rocking credit markets in late June).

[3]      See Original Disclosure Statement at DS-100.

"lowered projections" and "changes in the Business Plan" provide no such explanation because, as explained further below, the changes in the Business Plan consist of reduced EBITDAR projections for a single year of the Debtors' four year business plan, with <u>increases</u> in projected cash flows for the entire 2008 through 2011 period due to the New Plan's changes in the reorganized Debtors' capital structure and the reduction of its debt burden.  These changes neither justify nor explain the virtual elimination of an estimated $470 million of value to equity holders.

7.    The Disclosure Statement is also devoid of any reasonable justification for the Debtors' allowing the Plan Investors and others to escape their commitments to the terms of the Original Plan as set forth in the Delphi-Appaloosa Equity Purchase and Commitment Agreement approved by this Court on August 2, 2007 (the "EPCA").  The EPCA has not been terminated and remains in full force.  Thus, it appears that the Debtors made the fundamental changes embodied in the New Plan, with its effective elimination of the ability of existing equity holders to realize <u>any</u> meaningful value from the Debtors' reorganization, simply because the Plan Investors and others allied with the Plan Investors demanded that they do so.  The absence of justification is especially egregious since the Plan Investors were awarded and paid substantial fees and break up protections in exchange for their commitment to the deal embodied in the Original Plan.

8.    Separate and apart from the misleading or inadequate disclosures regarding the changes to the recoveries set forth in the Original Plan and the reasons for such changes, the New Disclosure Statement also fails to disclose additional material information about the New Plan to which the Debtors' stakeholders, including existing equity, must have in order to make an informed decision with respect to the New Plan.  For instance, one of the Debtors' most

significant assets is its affirmative claims against and defenses to claims by GM. It is the proposed settlement of these claims that has enabled the Debtors to reach its transformation agreements with GM and various unions, formulate a chapter 11 plan and propose to pay creditors in full on their allowed claims. This value from GM appropriately provided the source of the recovery to equity under the Original Plan. Yet, despite the importance of the GM claims and the settlement thereof, the New Disclosure Statement's assessment of the claims falls well short of what is needed to make an informed judgment as to the merits and reasonableness of the settlement.

9.          As a result of the foregoing and as discussed further below, the New Disclosure Statement fails to provide adequate disclosure to permit the Debtors' stakeholders, especially existing equity, to make an informed judgment on the New Plan. Moreover, many of these disclosure deficiencies relate to provisions of the New Plan that violate applicable bankruptcy law and render the New Plan unconfirmable. As such, the New Disclosure Statement should not be approved.

## **BACKGROUND**

10.          On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

11.          On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "UCC"). On April 28, 2006, the

U.S. Trustee appointed the Equity Committee.  On May 8, 2006, the Equity Committee engaged

Fried, Frank, Harris, Shriver & Jacobson LLP as counsel, with such retention approved by this

Court on June 19, 2006.

12.    On December 18, 2006, after months of negotiations involving various

constituencies, the Debtors filed a motion seeking approval of its first Equity Purchase and

Commitment Agreement (the "original EPCA") with Appaloosa, Cerberus Capital Management,

L.P., and other potential plan investors that purported to provide a framework for the Debtors'

chapter 11 plan of reorganization.  Because the Equity Committee did not believe that the

original EPCA maximized the value of, and represented the best possible deal for, the Debtors'

estates, the Equity Committee objected to the Debtors' motion to approve the original EPCA

based on, among other things, issues of timing, fairness, equity, and the illusory nature of the

agreement.  On January 12, 2007, after substantial amendments were made to the original EPCA

in response to the Equity Committee's objection, the Court authorized the Debtors to enter into

the original EPCA.  On January 18, 2007, the Debtors entered into the original EPCA.

13.    It subsequently became clear for various reasons that the original EPCA would

not be implemented.  The original EPCA was eventually terminated on July 7, 2007.  The

Debtors then proceeded down the path of considering offers submitted by two separate plan

investor groups, one headed by Appaloosa and the other by Highland Capital Management, LP

("Highland").  On July 17, 2007, the Debtors held an all-day meeting of its various

constituencies and potential plan investors to select a plan investor proposal.  These negotiations

extended late into the evening, at which point it became clear to the Equity Committee that the

Debtors' board of directors were likely to select the proposal submitted by the plan investor

group led by Appaloosa.  While the economics of the Appaloosa proposal with respect to equity

-7-

were not as favorable to equity holders as those the Equity Committee had sought, after being

presented with a "take-it or leave-it" offer, the Equity Committee decided to provide its support

for the proposed transaction in order to facilitate a consensual deal.

14.    The Debtors issued a press release on the morning of July 18, 2007.  The press

release detailed certain terms of the EPCA, including among other things, that all creditors would

be paid in full.  The press release also described the proposed recoveries to equity holders and

emphasized the consensual nature of the proposed deal.  (A copy of the press release is attached

hereto as Exhibit 1).  This Court entered the Order Authorizing and Approving the EPCA on

August 2, 2007.  The approval of the EPCA permitted the Debtors to pay the Plan Investors

substantial commitment fees, reimbursement of expenses and provided break-up protection upon

the achievement or waiver by the Plan Investors of certain benchmarks.  Under the terms of the

EPCA, approximately tens of millions in aggregate fees and unlimited expenses were to become

due and payable prior to or upon the Debtors' filing of their chapter 11 plan and disclosure

statement. EPCA, Sections 2(h)-(i).

15.    After court approval of the EPCA, the statutory committees worked with the

Debtors through multiple rounds of comments and revisions to the drafts of the Original Plan and

Original Disclosure Statement.  The parties worked cooperatively to ensure that the consensual

terms of the EPCA were accurately incorporated into the Original Plan and Original Disclosure

Statement.  The Original Plan and the Original Disclosure Statement were each filed with the

Court on September 6, 2007.

16.    Under the terms of the consensual deal embodied in the Original Plan, existing

equity holders were to receive a direct distribution of 1,476,000 shares of newly issued common

stock (about 1% of total new equity) of reorganized Delphi with a plan value of $45 per share;

five-year warrants to acquire an additional 5% of New Common Stock at the plan value of $45

per share; transferable rights to purchase up to 90% of the new equity (up to 40,845,016 shares)

offered pursuant to a discount rights offering (with the remaining 10% participation allocated to

the Plan Investors) at an exercise price of $38.56 per share (a 16% discount from plan value);

and rights to purchase 12,711,111 additional new equity shares at plan value in a par value rights

offering.  In the aggregate, these distributions had a value of approximately $470 million.

17.    While this value was minuscule relative to the total value of the Debtors' estates

and the distributions to other stakeholders, the Equity Committee was supportive of the Debtors'

efforts to reach a consensual resolution among all stakeholders and accepted that the total

package provided a reasonable recovery under the circumstances to existing equity holders in

respect of their interests.

18.    Shortly after the filing of the Original Plan and Original Disclosure Statement, the

Debtors indicated that it appeared that the markets did not have capacity for the $7.0 billion to

$7.5 billion of funded debt that the Debtors were seeking on the terms originally contemplated.

Yet, even prior to the time the Appaloosa proposal was accepted on July 17, 2007, the Debtors

informed both the UCC and the Equity Committee at regular update meetings that the Debtors

had already begun to look for exit financing.  Moreover, at the time the EPCA was submitted for

this Court's approval in late July 2007, the corporate credit markets were already being

negatively affected by the backlog of buyout-related financings and adverse developments in the

domestic housing markets, with a tightening throughout the credit markets[4].  These

---

[4]    See Delphi Conference Call on Plan of Reorganization Filing and  GM Settlement Announcement,
       Transcript, Sep. 6, 2007, available at http://www.lexis.com (quoting John Sheehan, Chief Restructuring
       Officer, as having "no doubt that over the last 60 to 90 days, the market has experienced a difficult
       period").  See also, Beaudette, supra note 2, Exit from Bankruptcy Could Get Tougher; Lenders Retooling

developments, which were completely unrelated to the Debtors' financial performance, still existed at the time of the filing of the Original Plan and Original Disclosure Statement on September 6, 2007.

19.    The Disclosure Statement Hearing commenced on October 3, 2007.  After certain objections were heard and adjudicated and the Debtors moved certain evidence into the record, the Debtors sought and received a continuance for the completion of the Disclosure Statement Hearing.  On October 9, 2007, the Court entered the Order (A) Disposing of Certain Objections to Debtors' Disclosure Statement and Solicitation Procedures Motion and (B) Setting Further Non-Omnibus Hearing Date and Related Procedures (the "Disclosure Statement Order") which, among other things, continued the Disclosure Statement Hearing until October 25, 2007.  The Disclosure Statement Order established a schedule for the Disclosure Statement Hearing that was "subject to the filing of and the Court's consideration of the Potential Amendments" to the Original Plan and Original Disclosure Statement.  Disclosure Statement Order at ¶1.

20.    On October 9, 2007, the Debtors held a meeting of its statutory committees and Plan Investors to discuss the exit financing issues and the related "laser-like changes" needed in the Original Plan and Original Disclosure Statement.  At the meeting, the Debtors first alluded to certain difficulties they were having with the Plan Investors, the UCC and the members of a certain group of bondholders (the "Ad Hoc Committee").

21.    Contrary to the Debtors' representations to the Bankruptcy Court in early October that merely "laser-like" changes would be made, the Equity Committee learned by e-mail from John Sheehan that the Debtors, after negotiations (from which the Equity Committee was excluded) with the UCC, the Ad Hoc Committee, the Plan Investors and GM, had negotiated a

Terms of Financing, Chi. Trib., Aug. 30, 2007, Business at 3.  Copies of the articles and transcript are attached hereto as Exhibit 2.

new plan that would dramatically shift value away from the equity holders to unsecured creditors

and the Plan Investors.  An October 13 term sheet was transmitted with a writing from the

Debtors urging the Equity Committee to accept the proposal, and belatedly inviting the Equity

Committee to a final "negotiation" session to be held on Monday, October 15, 2007.  This

invitation rang especially hollow on the heels of the October 13 term sheet and was a poorly

crafted ploy to attempt to cover the Debtors' previous exclusion of the Equity Committee from

participation in the negotiations.

22.     In light of the proposal and the manner in which it was formulated, the Equity

Committee did not attend the October 15 meeting.  Instead, the Equity Committee delivered a

letter to the Debtors voicing its vehement opposition to the sudden and unwarranted changes to

equity's recovery and reiterated the Equity Committee's long-standing request to meet with the

Debtors' board of directors.  This request was ignored, and instead the Equity Committee

received another e-mail in the evening of October 15, 2007 that indicated further changes that

reduced recoveries to equity even more drastically.  These changes, together with those that had

already been made, rendered the consensual deal that had been negotiated among all

stakeholders, disclosed to the Court, and publicly announced by press release and 8K filings,

totally unrecognizable.  The cumulative effect of the changes made in the October 13 and

October 15 proposals was far more than a modification of the agreed upon recoveries to existing

equity; the changes effectively shifted the entire value of equity's recoveries to others, inflated

recoveries that had already provided other stakeholders with 100% recovery on their claims, and

delivered a windfall to the Plan Investors by affording them with a purchase price based on

nearly a $1.0 billion dollar discount in enterprise valuation from the EPCA.

23.     On October 19, 2007, the Court entered the Supplemental Order (A) Establishing

Revised Hearing Date and Related Procedures On Disclosure Statement And Solicitations

Procedure Motion And (B) Setting Hearing Date and Related Procedures For Potential Motions

Amending Investment Agreement And Approving Certain Exit Financing Agreements [Docket

No. 10661], which among other things, further continued the Disclosure Statement Hearing until

November 8, 2007.  The Equity Committee and certain other parties were granted an extension

of the time to file an objection to the Disclosure Statement Motion until November 2, 2007.

24.     On October 29, 2007, in anticipation of the filing of the revised plan (the "New

Plan") and revised disclosure statement (the "New Disclosure Statement"), the Debtors, the

statutory committees and other key stakeholders participated in a chambers conference regarding

the Equity Committee's request to adjourn the hearing on the Disclosure Statement Motion and

the motion to approve the modifications to the EPCA.  The Court indicated that it would permit

such a motion to be heard on November 8, 2007, the date for the resumption of the hearing on

the Debtors' Motion, and would further determine whether the New Plan altered the "financial

underpinnings" of the Original Plan.

25.     The New Plan, as described in the New Disclosure Statement, purports to cut the

value of the recoveries for existing equity holders to $69 million — a massive reduction of more

than $400 million in value off of an already meager recovery.

26.     On October 30, 2007, the Debtors issued a press release to announce the filing,

which characterizes the dramatic revisions to the Original Plan as

> … very focused potential amendments [that] reflect current market conditions,
> commensurate changes to our proposed emergence capital structure and form of plan
> currency contemplated for stakeholder distributions, and an effective reduction of less

-12-

than five percent in plan value to reflect macroeconomic and industry conditions and uncertainties.[5]

27.    However, another portion of the press release hinted at the real reason for the

transformation of the consensual Original Plan into the contested New Plan:

> …the potential amendments reflect reductions in stakeholder distributions to some … interest holders required to obtain consensus among Delphi's Creditors' Committee, Plan Investors and settling parties, and changes required by our Plan Investors and settling parties to obtain their endorsement of the Plan and Disclosure Statement, the Company's settlements with GM and its US labor unions, the Company's emergence business plan and related agreements.

October Press Release, supra note 5.  In other words, the evisceration of existing equity's

recoveries was demanded by the Debtors' unsecured creditors, GM  and the Plan Investors.

## OBJECTIONS[6]

### I.    The Disclosure Statement Does Not Contain Adequate Information Under Section 1125 of the Bankruptcy Code

28.    The Disclosure Statement cannot be approved because it does not contain

adequate information concerning numerous aspects of the New Plan.  Adequate information is

defined under section 1125(a)(1) of the Bankruptcy Code as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … that would enable . . . a hypothetical investor [typical of the holders of claims or interests in the case] of the relevant class to make an informed judgment about the plan . . . .

---

[5]    Press Release, Delphi Corp., Delphi Announces Filing of Potential Amendments to Disclosure Statement and Plan of Reorganization (Oct. 30, 2007) (hereinafter, the "October Press Release").  A copy of the October Press Release is attached as Exhibit 3.

[6]    The Equity Committee opposes the New Plan and intends to file with the Court a letter to shareholders indicating its opposition and the reasons therefore, which the Equity Committee would ask the Court to require inclusion in any solicitation package with respect to the New Plan.  The Equity Committee also takes issue with certain of the disclosures made in the New Disclosure Statement with regard to the Equity Committee's actions and positions taken in the Debtors chapter 11 cases; the Equity Committee will be providing the Debtors with a separate writing so that such disclosures may be corrected by the Debtors.

11 U.S.C. § 1125(a)(1).  It is essential for the Debtors to provide full and adequate disclosure in

the Disclosure Statement to satisfy the standards set forth in the Bankruptcy Code.  Courts have

repeatedly held that "[t]he importance of full disclosure is underlaid by the reliance placed upon

the disclosure statement by the creditors and the court.  Given this reliance, we cannot

overemphasize the debtor's obligation[s] to provide sufficient data to satisfy the Code standard

of 'adequate information.'" <u>Oneida Motor Freight, Inc. v. United Jersey Bank</u>, 848 F.2d 414, 417

(3d Cir. 1988), <u>cert. denied</u>, 488 U.S. 967 (1988).

29.    The principle of disclosure is "[o]f prime importance in the reorganization

process[.]"  <u>In re Momentum Mfg. Corp.</u>, 25 F.3d 1132, 1136 (2d Cir. 1994).  This Court has

held that the provision of adequate disclosure is at the very heart of the reorganization process,

and necessary to an effective reorganization.  <u>See</u> <u>In re Crowthers McCall Pattern, Inc.</u>, 120 B.R.

279, 300 (Bankr. S.D.N.Y. 1990).  "The disclosure statement was intended by Congress to be the

primary source of information upon which creditors and shareholders could rely in making an

informed judgment about a plan of reorganization."  <u>In re Scioto Valley Mortgage Co.</u>, 88 B.R.

168, 170 (Bankr. S.D. Ohio 1988).  As such, "[a] disclosure statement … is evaluated … in

terms of whether it provides sufficient information to permit enlightened voting by holders of

claims or interest."  <u>In re BSL Operating Corp.</u>, 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986).

Courts look at each disclosure statement individually to discern whether the "adequate

information" requirement of the Bankruptcy Code is satisfied.  <u>See</u> <u>In re Worldcom, Inc.</u>, 2003

U.S. Dist. LEXIS 11160 (S.D.N.Y. June 30, 2003) ("the approval of a disclosure statement …

involves a fact-specific inquiry into the particular plan to determine whether it possess 'adequate

information' under § 1125") (citing <u>In re Ionosphere Clubs</u>, 179 B.R. 24, 29 (S.D.N.Y 1995)).

As elaborated below, the New Disclosure Statement fails in numerous ways to set forth

important information necessary to allow the Debtors' shareholders, and other parties in interest, to make an informed decision with respect to the New Plan.

A.    **The New Disclosure Statement Does Not Contain Adequate Information Concerning the Changes in the Debtors' Valuation and the Structure of Stakeholder Recoveries under the New Plan and Related New EPCA**

30.    The Debtors have not provided in the New Disclosure Statement any legitimate basis or explanation for the Debtors' adjustments to the financial underpinnings and assumptions upon which the Original Plan was based and the corresponding effect on stakeholder recoveries. Furthermore, the New Disclosure Statement is void of any meaningful discussion as to why such changes were justified or necessary, the circumstances surrounding the negotiations of the changes or the efforts that were undertaken by the Debtors to minimize changes to the agreed upon recoveries.

31.    The blacklined New Disclosure Statement (the "DS Blackline") filed on October 29, 2007 shows that the midpoint in Rothschild's estimated valuation range has been revised downward by only $200 million since the filing of the Original Plan on September 6, 2007.[7] Yet, "for the purpose of making distributions to permit a par plus accrued recovery for holders of general unsecured claims," the Debtors, the Creditors' Committee, GM and the Plan Investors negotiated a reduction in the implied total enterprise value of the Debtors from $13.9 billion to $13.0 billion. *Id.* The New Disclosure Statement does not disclose why or how a $200 million reduction in the Rothschild valuation range translates into a $900 million reduction for purposes of the plan value and EPCA.

---

[7]    The blackline shows that Rothschild's valuation range decreased from $11.4 billion to $14.4 billion to $11.2 billion to $14.2 billion with a reduction in the disclosed midpoint valuation from $12.9 billion to $12.7 billion. See DS Blackline at DS-xvii.  The DS Blackline is filed as Exhibit A to the Notice of Potential Amendments to Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization [Docket no. 10759].

32.     To justify these changes in the Debtors' total enterprise value, the Debtors have attempted to connect the reductions in equity holders' recoveries to "macroeconomic and industry conditions and uncertainties." October Press Release, supra note 5; see also DS Blackline at DS-121-22 (citing dislocations in the capital markets as the cause for change in distributions under the New Plan), DS Blackline at DS-131 (citing dynamics of the capital markets in the third quarter of 2007 as the impetus for Debtors' reduced proposed debt levels). However, this vague assertion is undermined by the Debtors' awareness of the tightening credit markets, and their potential impact on the Debtors' ability to obtain the amount of exit financing that it sought, when it announced the terms of the consensual deal on July 18, 2007, when the EPCA was approved on August 2, 2007, and when the Original Plan and Original Disclosure Statement were filed on September 6, 2007.  See supra note 4; see also Original Disclosure Statement at DS-109 (discussing exit financing and the reaffirming of lenders' interest shortly after the "recent changes in the debt market," albeit on different terms and pricing dependent on market conditions).  The New Disclosure Statement's formulaic references to "changes in the capital markets" do not provide stakeholders with information adequate to permit them to make an informed judgment as to the reallocation of the reorganized Debtors' value reflected in the New Plan.

33.     The Debtors also cite to the dislocation in the capital markets as a basis for permitting the renegotiation.  This argument that credit market conditions and changes to capital structure justify the revisions to the Original Plan and EPCA is completely disingenuous and misleading.  As an initial matter, as noted by this Court, the conditions of the financing markets do not effect underlying valuation of a company.  In addition, the credit market conditions existed at the time the parties reached terms on the consensual deal, and certainly at the time the

-16-

Debtors filed the Original Plan; as the Debtors acknowledge, they have since improved.  See DS

Blackline at DS-131.  In any event, as a result of the credit market conditions, the Debtors

reduced the financing they sought to raise from third parties by $1.95 billion.  What the Debtors

fail to disclose directly is that the entire funding shortfall is filled by the change to the

consideration to GM under the New Plan.  Thus it is unclear how the change in capital structure

could possibly negatively effect the Plan Investors or justify the EPCA and plan renegotiation.

To the contrary, as noted in the New Disclosure Statement, the revised capital structure results in

less net debt and as a result an increase in cumulative cash flow during 2008 - 2011.  **Delphi has

actually gotten better, not worse**.

34.    The proposal of a drastically revised New Plan is likewise not adequately

explained by reference to modest revisions to the Debtors' Business Plan in the New Disclosure

Statement.  These revisions consist of (a) a de minimis reduction in EBITDAR in the first year

(2008) of the four year plan due to lower projected sales in that single year; projected sales have

remained the same in all other years of the Business Plan, which results in there being no

material change to cumulative EBITDAR over the projection period; and (b) a meaningful

increase in cumulative cash flow over the four year span (2008 –2011) of the revised Business

Plan. DS Blackline at DS-121-23[8]  The New Disclosure Statement does not explain how these

limited revisions to the Business Plan led to the proposed revisions to the economics of the Plan

Investors' funding commitments when, notwithstanding the implication the Debtors seek to

create, the adjustments clearly have not resulted in a material change in the Business Plan and in

fact, the Debtors now expect to generate more than $550 million of incremental cash flow before

---

[8]      These revisions were in turn based on revised GMNA production forecasts for 2008-2011 published in
early September 2007 by a third party industry source, GI/DRI.  DS Blackline at DS-ix,121-22.

financing from 2008 through 2011, which represents a significant benefit to the reorganized

Debtors.

35.     The internally inconsistent explanation for the evisceration of existing equity's

recoveries is a tacit admission that the third quarter fluctuations in the credit markets and the

nominal changes in the Debtors' business plans are only pretexts for elimination of value for

existing equity.[9]

B.     **The New Disclosure Statement Does Not Contain Adequate Information
Concerning the Renegotiation of the Terms of the Plan Investors' Acquisition
of the Debtors and the Reasons why the Debtors Allowed the Plan Investors
to Renegotiate the EPCA**

36.     The terms of the Original Plan reflected the fully consensual deal that was

memorialized, agreed to and approved by this Court in the EPCA.  The EPCA was and continues

to set forth the terms of and encompass the binding commitment by the Plan Investors with

respect to their investment in the Debtors and the allocation of value to stakeholders.

37.     The Debtors have made no representations, in the New Disclosure Statement, to

the Court or otherwise, that the EPCA had been terminated by any party thereto or that the Plan

Investors were no longer bound to their commitments thereunder.  Yet, without justification or

disclosure relating thereto, the Debtors have acquiesced to demands by the Plan Investors and

---

[9]     The Debtors' attempts to justify the New Plan's treatment of existing equity also ignore the basis upon
which existing equity's recoveries under the Original Plan were to be made.  It has consistently been the
position of the Equity Committee that recoveries for its constituents were not based solely on the
application of the absolute priority rule, but instead on existing equity's unique interest in the value of the
GM Claims.  The GM Settlement resolves claims arising from the repeated injuries inflicted by GM on the
Debtors' estates over a long course of dealing; GM's conduct harmed Delphi's existing equity holders by
drastically diminishing the value of their equity interests in the Debtors' estates, which were deliberately
and systematically robbed of value by GM.

other constituencies to renegotiate the already binding agreements contained in the EPCA, with all such changes to the EPCA to the detriment of existing equity.[10]

38.    The lack of disclosure regarding the Debtors' basis for renegotiating the EPCA and the windfall Plan Investors are to receive under the New Plan is astounding.  Assuming arguendo the reduced total enterprise value of $13 billion, because of the reduced debt upon emergence, under the Original Plan the implied aggregate equity value was approximately $5.8 billion and under the New Plan the implied aggregate equity value is approximately $7.8 billion.  Under the Original Plan, assuming the rights were fully subscribed, the Plan Investors would have received securities valued at $1.087 billion (18.7% x $5.8 billion).  In contrast, under the New Plan, again assuming the rights are fully subscribed, the Plan Investors will receive securities valued at $1.24 billion (15.9% x $7.8 billion).  Thus even assuming the $13 billion enterprise value (with which the Equity Committee disagrees), the Plan Investors are receiving $157 million of incremental value, in addition to the windfalls that they were previously getting, on the same $975 million investment.  To the extent the rights are not fully subscribed, the windfalls would be greater.  This causes the Plan Investors' <u>immediate</u> return on investment to increase from 11.5% to 27.6%.  Such an increase in value and return on investment is unconscionable and simply cannot be approved without a full examination of the process to ensure good faith and that the Plan Investors' new bid (with its extraordinary returns) is in fact the best available.

---

[10]    Simultaneously with seeking approval of the New Disclosure Statement, the Debtors are seeking approval of certain amendments to the EPCA that are embodied in the New Plan.  The Equity Committee opposes and has objected to approval of the amendments to the EPCA for many of the reasons set forth herein.  The Equity Committee's objection to entry of an order approving the amendments to the EPCA is being filed contemporaneously with this Objection and is incorporated herein by reference.

C.    **The New Disclosure Statement Does Not Contain Adequate Information Concerning the Process by which the Terms of the New Plan were Negotiated and the Good Faith and Arms-Length Nature Thereof**

39.    Given the magnitude of the changes embodied in the New Plan and their importance to stakeholders, the Debtors must disclose in detail in the New Disclosure Statement the circumstances surrounding, the participants in (including the interests in the Debtors held by each participant) and the nature of and process for the renegotiation so that stakeholders may determine whether the New Plan was formulated and is being proposed in good faith and at arms-length.

40.    On information and belief, the Plan Investors have syndicated their commitments to numerous other institutions and hedge funds.  The disclosure of all of the plan investors and backstop providers is critical.  Yet, the New Disclosure Statement fails to disclose the identities of any of these institutions and funds.  In addition, it is not disclosed in the New Disclosure Statement the range of interests in the Debtors each of these funds hold, what communications, participations and roles each fund had or played in the formulation of the New Plan and the level of strategizing, urging, cajoling and prodding each such entity undertook of other parties and the Debtors.

41.    For instance, it is possible, and the Equity Committee suspects on information and belief, that the ability of the Plan Investors to demand changes to the EPCA, despite their contractual commitment to fund the Debtors' Original Plan, rests in part on the multiple roles some of them play in the Debtors' chapter 11 cases.  On information and belief, certain of the Plan Investors own various securities of the Debtors and have used their dual roles to increase

their leverage to put pressure on the UCC, the Ad Hoc Committee and the Debtors.[11]    The Plan

Investors have used unrelated and pre-existing "macroeconomic" conditions to negotiate a

significant reduction in their purchase price, only to insist, wearing their creditor hats, that the

Plan Investors' reduced purchase price requires a commensurate <u>increase</u> in the value of

unsecured creditors' distributions.   This patently artificial process has resulted in an effective

increase in the value of unsecured creditors' distributions such that their recovery will <u>exceed</u>

their allowed claim**.**

      42.    So that investors and this Court may determine whether the New Plan and New

Disclosure Statement were formulated and are being proposed in good faith and whether

recoveries are being maximized, the circumstances surrounding the re-trade of the Debtors'

consensual deal reached in the EPCA, including the interests, motivation and positions of the

Plan Investors, the members of the UCC and the members of the Ad Hoc Committee, must be

fully disclosed.

      43.    These significant issues and concerns regarding the facts, circumstances and good

faith nature of the process surrounding the renegotiation of the Original Plan and the EPCA also

apply to the Debtors.  It is important to note that it appears that management was negotiating its

compensation and incentive plans with the Plan Investors and the UCC at the same time they

were allowing the Plan Investors and the UCC to drastically renegotiate the terms of the Original

Plan and the EPCA.  Specifically, the Plan Investors had to sign off on all compensation

arrangements and the UCC had consultation rights with respect thereto (rights that the Equity

Committee specifically requested at the time of the Original Plan but that the Debtors adamantly

---

[11]      The EPCA specifically did not restrict any of the Plan Investors from acquiring, selling and trading in the
Debtors' securities before, during and after becoming part of the Plan Investor group.

refused to provide).  The breadth of the management compensation is evidenced by the more

than 15 pages of disclosure in the New Disclosure Statement describing these plans and

programs, which include, the Salaried Employee Compensation Program, the Competitively

Benchmarked Salaried Employee Compensation Program, the new Executive Employment

Agreements, the Short Term Incentive Plan, the Long Term Incentive Plan, the Chapter 11

Effective Date Executive Payments Program, the Supplemental Executive Retirement Program,

the Salaried Retirement Equalization Savings Program, and the new Change of Control

Agreements.

44.    At a time when they were allowing the Plan Investors and the UCC to eviscerate

recoveries to equity holders, the Debtors negotiated compensation schemes in which the

emergence bonuses for executives alone are far in excess of the recoveries now proposed for

equity.  The New Disclosure Statement should address the timing of the negotiation of

compensation plans and the protections (if any) that were put in place to ensure that the parties

negotiating on behalf of the Debtors had no interest in such plans.  It is also unseemly and

compromises the legitimacy of our system in the eyes of the public, not to mention stakeholders,

for the Debtors to make additional disclosures of compensation plans of this magnitude after the

objection deadline for all but a chosen few parties has passed.

D.    **The Disclosure Statement Provides Inadequate Disclosure About The Value
of the Potential GM Claims and the GM Settlement**

45.    GM's conduct leading up to and following the spin-off of Delphi gave rise to

significant affirmative claims and causes of action of the Debtors against GM, as well as

significant defenses and objections to any claims GM may assert against the Debtors

(collectively, the "GM Claims").  The relationship between GM and the Debtors, and fraudulent

pattern of conduct by GM towards Delphi both before and after GM's spin-off of the Debtors as

-22-

a nominally independent company, caused devastating harm and damage to the Debtors and their

estates and, consequently, to the value of the equity held by the Debtors' common shareholders.

The GM Claims' significance as an asset to the Debtors' estates is evidenced by the fact that

both the Creditors' Committee and the Equity Committee sought permission to assert those

claims on behalf of the Debtors.

46.    Despite their importance, the New Disclosure Statement provides no estimation

whatsoever for recoveries relating to potential affirmative damage claims against GM.  In the

New Disclosure Statement section describing the investigation into GM Claims, the Debtors

state that the Equity Committee's "analysis indicated that the claims against GM could have a

value as high as approximately $26 billion…."  Original Disclosure Statement at DS-60.  Yet

nowhere do the Debtors state their own assessment of the value of the GM Claims within this

extraordinarily broad range, beyond stating some of the potential claims against GM raised by

the Equity Committee or the UCC may be stronger than others.  Id. at DS-61.  The lengthy but

virtually substance-free description of the Debtors' own "investigation" into the GM claims, id.

at DS-55-61, does not provide an adequate basis for stakeholders to make an informed

assessment concerning the Debtors view that the terms of the GM Settlement are in the best

interests of the Debtors' estates.  DS Blackline at DS-63.

47.    Further, the New Disclosure Statement lacks sufficient detail regarding the basis

for the GM Settlement, and importantly, the allocation of the value and proceeds therefrom.  The

recoveries to stakeholders are substantially based on the allocation of the proceeds of the GM

Settlement.  In order for any GM settlement to be approved it must provide meaningful

recoveries to existing equity holders.  Yet, despite the significant value the Debtors are receiving

from the GM Settlement, recoveries to equity have been eviscerated.

-23-

48.    In addition, GM is seeking a third party release from current equity holders under the New Plan despite the fact that equity is not benefiting from the GM Settlement as it rightfully should.  The justification for such unfair and baseless treatment must be fully disclosed in the New Disclosure Statement as it bears on both the reasonableness of the GM Settlement as well as the propriety of the proposed third party releases.

49.    The New Disclosure Statement's failure to provide the Debtors' own assessment of the value of the GM Claims also undermines the credibility of its liquidation analysis, performed to buttress the Debtors' assertion that the New Plan provides its stakeholders with at least as much value as would a chapter 7 liquidation.  The liquidation analysis states that no estimate for the value of the GM Claims is included in the liquidation analysis because the Debtors believe that such an estimate would be "highly subjective" and subject to various contingencies making it unlikely to alter the outcome of the liquidation analysis.  DS Blackline at DS-265.  In a further  attempt to justify the exclusion of the GM Claims from the liquidation analysis, the Debtors refer to a  "sensitivity analysis" that purports to show that the likely recoveries would not be high enough to impact the "best interests" test.  Original Disclosure Statement, Exh. E (Liquidation Analysis) at 6.  But the sensitivity analysis shows that, even on an absolute priority basis in a liquidation, equity would achieve a recovery of over $1.6  billion assuming a $15 billion value for the GM Claims.  The liquidation analysis shows a range of possible values for the GM Claims of between $0 and $26 billion, with the amount needed to generate a $1.6 billion dollar equity recovery only slightly over the midpoint of the range.  Id. The liquidation analysis also fails to account for the trebling of recoveries from GM on the basis of well-founded RICO claims.  By refusing to disclose its view of what the likely recovery against GM would be and neglecting to include the impact of trebling of the range of possible

-24-

recoveries, the Debtors make it impossible for stakeholders to make an informed judgment that the "best interests" test can be met. In order to be approved, the New Disclosure Statement must include a liquidation analysis that appropriately values the GM Claims (including trebling for RICO claims).

> E.    **The Disclosure Statement Lacks Adequate Information Regarding Vital Aspects of the MDL Proceedings and Related Settlement**

50.    The MDL proceedings and related MDL Settlement are a significant part of the Debtors' New Plan and overall restructuring process, yet the New Disclosure Statement glosses over vital details regarding the MDL proceedings and the MDL Settlement. This does not provide stakeholders with adequate information to evaluate the reasonableness of the related MDL Settlement or the releases granted thereunder. At a minimum, the New Disclosure Statement must include disclosure with respect to the bases of the various claims asserted in the various MDL proceedings, the Debtors' assessment of the liability of each of Delphi, its officers and directors and the benefits insiders, including certain officers and directors, are receiving as a result of the MDL Settlement, especially in comparison to the benefits to the Debtors' estates and stakeholders.

51.    In addition, as described in greater detail below, pursuant to the MDL Settlement, all MDL claimants are placed in the same class and are to receive an unsecured claim under the New Plan. Certain of the claims asserted in the MDL proceedings are pari passu with existing equity. See infra Section II.D. However, without any asserted justification and without existing equity's consent, their claims are receiving greater treatment and recoveries than equity in violation of the Bankruptcy Code. The New Disclosure Statement must set forth the Debtors' the basis for providing this elevated treatment for certain MDL claimants above equity holders in violation of bankruptcy law.

-25-

F.    **The Disclosure Statement Fails to Demonstrate the Basis for Providing Unsecured Creditors with Post-Petition Interest**

52.    The New Disclosure Statement is inadequate in that it completely fails to disclose the basis upon which the New Plan justifies providing unsecured creditors with post-petition interest. Simply arguing that the Debtors are solvent is not enough. In this case the analysis is even more critical because the Debtors may only be solvent based on their claims against GM. Any settlement with GM must also provide for a fair allocation of the settlement value to all parties that have been harmed by GM actions, including the equity holders.

53.    As a general rule, unsecured creditors are not entitled to post-petition interest. In re Manville Forest Products Corp., 43 B.R. 293, 299 (Bankr. S.D.N.Y. 1984). In order to provide post-petition interest to unsecured creditors the Debtors must show that it is required under either the best interest test set forth in section 1129(a)(7)(ii) of the Bankruptcy Code or the fair and equitable test set forth in section 1129(b)(1). As set forth in Section II.C. infra, the New Disclosure Statement fails to demonstrate that the New Plan satisfies the best interest test or fair and equitable test in order to justify the allowance of post-petition interest. It is important to note that even if there was a justification for post-petition interest under the best interest test or the fair and equitable standard, such justification would only apply to creditors who voted to reject the plan (in the case of best interest) or if the class of unsecured creditors as a whole voted to reject the Plan (in the case of fair and equitable). As described further below, in addition to the disclosure being inadequate, the New Plan provisions for post-petition interest can not be justified under the best interest test or the fair and equitable standard, thus rendering such provisions unconfirmable.

-26-

G.     **The New Disclosure Statement Does Not Provide Adequate Information to
Support Its Assertion That The Debtors May Be Substantively Consolidated
Under the New Plan**

54.     The New Disclosure Statement provides that certain of the Debtors' estates will

be substantively consolidated under the New Plan.  See DS Blackline at DS-174 et seq. (Art.

IX.D.).   Substantive consolidation is a drastic remedy that should only be used "sparingly."

Union Savings Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co., Ltd.),

860 F.2d 515, 518 (2d Cir. 1988) (quoting Flora Mir Candy Corp. v. R.S. Dickson & Co.,  432

F.2d 1060, 1062 (2d Cir. 1970) and Chem. Bank. N.Y. Trust Co. v. Kheel, 369 F.2d 845, 847 (2d

Cir. 1966); see also In re Owens Corning, 419 F.3d 195, 208-09 (3d Cir. 2005) (noting a "nearly

unanimous consensus that [substantive consolidation] is a remedy to be used 'sparingly'")

(citations omitted).  As such, a high threshold must be met for substantive consolidation to be

allowed.  In Owens Corning, the Third Circuit emphasized that

> …because substantive consolidation is extreme (it may affect profoundly
> creditors' rights and recoveries) and imprecise, this "rough justice" remedy
> should be rare and, in any event, one of last resort after considering and rejecting
> other remedies (for example, the possibility of more precise remedies conferred
> by the Bankruptcy Code).

Owens Corning, 419 F.3d at 211.

55.     Ignoring this admonition, the New Disclosure Statement portrays substantive

consolidation as a run-of-the-mill remedy that may be granted by the Court "in the exercise of its

general equitable discretionary powers under section 105(a) of the Bankruptcy Code to ensure

the equitable treatment of creditors."  DS Blackline at DS-174.  This superficial analysis is

directly contradicted by controlling Second Circuit precedent:

> "… substantive consolidation 'is no mere instrument of procedural convenience…but a
> measure vitally affecting substantive rights'…to be used 'sparingly'."

Augie/Restivo, 860 F.2d at 518 (citations omitted).  In order to obtain substantive consolidation, the Debtors must provide the Court with sufficient evidence as to "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, … or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."  Id. at 518.

56.    In presenting substantive consolidation as a foregone conclusion, the New Disclosure Statement fails to provide adequate information to permit stakeholders to make an informed assessment of whether substantive consolidation in this case is appropriate, and whether the New Plan, which is explicitly premised on substantive consolidation, is confirmable under the Bankruptcy Code.  Instead, the New Disclosure Statement does no more than list a series of factors that the Debtors purportedly assessed in determining whether to substantively consolidate any of the Debtors.  The Debtors should disclose in detail the underlying facts they relied on in determining that substantive consolidation is appropriate.  See In re Silver Falls Petroleum Corp., 55 B.R. 495, 498 (Bankr. S.D. Ohio 1985) (sustaining objection to substantive consolidation where no evidence supporting assertions of inter-relatedness of creditors' cross-claims among the debtors was offered).

57.    In addition, the Debtors state in a conclusory manner that any harm to creditors resulting from substantive consolidation would be negligible.  However, the Debtors must show that no stakeholders' (including equity holders) rights would be impaired by substantive consolidation.  See Owens Corning, 419 F.3d at 214.

58.    To attempt to remedy the deficiencies of disclosure related to substantive consolidation, the New Disclosure Statement should include:

(i) the approximate number and amount of allowed claims against each of the Debtors;

-28-

(ii) the nature of those claims, including a description regarding whether the claims were guaranty claims, inter-company claims or other types of claims that would help indicate whether the parties relied on the Debtors' corporate separateness;

(iii) the value of assets in each Debtor's estate;

(iv) liquidation analyses for each of the Debtors on an unconsolidated basis;[12]

(v) a discussion of the legal standards necessary for substantive consolidation that appropriately explains the impediments to obtaining such a remedy and the views courts take when determining if the remedy is appropriate; and

(vi) any other facts necessary to assist stakeholders in making an informed decision about whether or not to support the substantive consolidation of the Debtors' estates, including, without limitation:

  (a)  The degree of difficulty in segregating and ascertaining individual assets and liabilities;
  (b)  The presence or absence of consolidated financial statements;
  (c)  The profitability of consolidation at a single physical location;
  (d)  The commingling of assets and business functions;
  (e)  The unity of interests and ownership between the various corporate entities;
  (f)  The existence of parent and intercorporate guaranties on loans;
  (g)  The transfer of assets without formal observance of corporate formalities.

In re Vecco Const. Industries, Inc., 4 B.R. 407, 410 (Bankr. E.D. Va. 1980).

59.    The Debtors' conclusory assertion that it is entitled to substantive consolidation also infects the Chapter 7 liquidation analysis, as the liquidation analysis assumes one of the two alternative forms of substantive consolidation included in the New Plan.   Original Disclosure Statement, Exh. E. (Liquidation Analysis) at 1.  However, the Debtors must provide sufficient information so that each stakeholder may be satisfied that it would not be impaired by substantive consolidation and would not receive more in a non-consolidated scenario.

---

[12]    The Debtors have provided a liquidation analysis showing the substantive consolidation proposed by the New Plan and showing substantive consolidation of all of the Debtors.  The Debtors should also provide a liquidation analysis of each individual Debtor to show what would happen in a liquidation if none of the Debtors were consolidated.

H.    **The New Disclosure Statement Fails to Disclose the Basis for Providing Third Party Releases in the Non-Consensual New Plan**

60.    As mentioned above and described in greater detail below, the New Plan provides for certain impermissible third party releases. Specifically, the New Plan provide for the global release of a multitude of so-called participants in these chapter 11 cases from claims of the Debtors' and third parties.[13] In addition, the New Plan incorporates by reference to the GM Global Settlement Agreement a broad release of GM.[14]

---

[13]    "Released Parties" under the New Plan means, collectively, (a) all officers of each of the Debtors, all members of the boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) all Professionals , (g) the Unions and current or former members, officers, and committee members of the Unions, (i) [sic] the Indenture Trustees, in their capacities as such, and (j) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, and other representatives and professionals. Plan Blackline at 40. The Plan Blackline is filed as Exhibit B to the Notice of Potential Amendments to Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization filed with this Court on October 29, 2007 [Docket No. 10759].

[14]    The New Plan provides that effective as of the Effective Date, the GM-Related parties shall be forever released by the Additional Releasing Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Additional Releasing Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date related to (i) the Separation, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) the Chapter 11 Cases, or (v) the formulation, preparation, negotiation, dissemination, confirmation, or  consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Restructuring Agreement, the Labor Agreements, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing.  The releases provided for in this section… shall include any and all claims that any of the Additional Releasing Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Additional Releasing Parties. Delphi-GM Global Settlement Agreement, Art. IV, incorporated by reference pursuant to Plan Blackline at 60 (emphasis added).

-30-

61.     In the Second Circuit, a chapter 11 plan may only release non-debtors from

liability when the injunction supporting such releases "plays an important role in the debtors'

reorganization plan."  In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir.

1992).  "Such releases [are] proper only in rare cases," and "[n]o case has tolerated non-debtor

releases absent the finding of circumstances that may be characterized as unique."  In re

Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005).  In fact, applying the

Metromedia standard to a bankruptcy case in the Southern District, this Court found that "the

applicable law authorizing the approval of … third party releases has become increasingly

restrictive, and now permits such relief only under limited circumstances – most significantly,

where they are critical to the reorganization of the debtor."  In re Adelphia Commc'n Corp.,

2007 Bankr. Lexis 644 at *31 (Bankr. S.D.N.Y. 2007).  Thus, the Debtors carry a heavy burden

in demonstrating the their proposed third party releases should be allowed and are warranted.

62.     However, the Debtors provide no justification for the third party releases in this

matter and provide inadequate rationale as to why such releases are critical to the Debtors'

reorganization.  Blanket generalizations about complex negotiations and contributions are not

sufficient.  DS Blackline at DS-224.  The Debtors must disclose adequate information for

investors and voters on the New Plan to make a determination as to whether the releases are

justified with respect to any third party being released, including GM.  At the very least, the

Debtors must disclose each and every individual released party's (including each specific officer,

director and other released party) contribution to the reorganization in sufficient detail, including,

without limitation:

(i) whether the contribution was financial or otherwise;

(ii) a description of the amount and extent of the contribution;

(iii) any causes of actions that are being given up with respect to any third party being released;

(iv) the Debtors' view with respect to the value of such causes of action;[15] and

(iii) evidence that the releases are critical to the New Plan.

Without such information, equity security holders and creditors have no way to gauge whether any of the third party releases set forth in the New Plan and New Disclosure Statement can or should withstand the restrictive standard for third party releases that governs in this Circuit.

63.    Moreover, even if GM is making a meaningful contribution, it can not obtain a release from equity holders who are not meaningfully benefiting from such contribution.

64.    In addition, while the Equity Committee does not believe (as described below) that the New Plan is confirmable with the releases contained therein, to the extent the releases remain in the New Plan, it is imperative that the solicitation process include a mechanism by which creditors and interest holders may have the choice to decide whether or not to opt-in to the third party release provisions.

65.    Creditors and equity holders must have the option of voting on the New Plan while preserving their sizeable rights against third parties.[16]  Recently, this Court confirmed a plan in In re Oneida Ltd., which provided for a such a mechanism.  In Oneida, this Court found that the third party releases could be tolerated if affected creditors consent through a plan mechanism which provided for release of claims held by creditors who affirmatively indicate

---

[15]    See e.g., In re Source Enters., 2007 Bankr. LEXIS 2906 at *23 (Bankr. S.D.N.Y. 2007).

[16]    See e.g., In re Specialty Equipment Cos., Inc., 3 F.3d 1043 (7th Cir. 1993) (affirming confirmation of plan that provided for the right of each creditor "to grant, or not grant, the release irrespective of the class of creditors or interest holders of the vote of the class of creditors or interest holders of which he or she is a member.  As a consequence, a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third party non-debtors"), Allied Holdings v. Allied Holdings, Inc., 2007 U.S. Dist. LEXIS 69296 at *15 (N.D. Ga. 2007) (citing bankruptcy court's confirmation of the plan at issue only on an express finding that certain non-consenting shareholders are not parties to and would not be bound by release of claims against third parties that were otherwise included in the plan).

their willingness to grant such releases by "checking a box" on their plan solicitation ballots.

351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006).

66.     It is especially important to provide such an option for equity holders who are

being enjoined by these broad releases but are receiving paltry recoveries under the New Plan.

The New Plan attempts to deprive equity holders of their valuable claims against third parties,

including GM, without any consideration for these very viable claims.  In the face of such a

blatant violation of due process, equity holders at least should be afforded a mechanism whereby

they can vote on the New Plan and retain their claims.  Therefore, the Debtors' solicitation

materials should be revised to give individual creditors and equity holders the option of granting

or not granting the releases.

## II.     The New Disclosure Statement Must Not Be Approved Because It Relates to a Plan That is Patently Unconfirmable

67.     It is well settled that a disclosure statement should not be approved where a

proposed plan is unconfirmable.  See, e.g., In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 638

(Bankr. E.D. Pa. 1996); In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (allowing an

unconfirmable plan to accompany a disclosure statement not only would constitute inadequate

information, but would be misleading and would be a needless expense to the estate).  When the

"disclosure statement describes a plan that is so 'fatally flawed' that confirmation is

'impossible,' the court should exercise its discretion to refuse to consider the adequacy of

disclosures."  In re E. Me. Elec. Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citations

omitted).  The Court should deny approval of the New Disclosure Statement to, among other

things, avoid the waste of time and expense associated with the distribution, review of, and

voting thereon.  See In re Dow Corning Corp., 237 B.R. 380, 384 (Bankr. E.D. Mich. 1999); In

re Felicity Assocs., Inc., 197 B.R. 12, 14 (Bankr. D.R.I. 1996); In re U.S. Brass Corp., 194 B.R.

-33-

420, 422 (Bankr. E.D. Tex. 1996); In re Bjolmes Realty Trust, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991).

68.    Courts have found that undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never be confirmed. In re Pecht, 57 B.R. at 139.  See In re Atlanta West VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1989) ("A court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies the disclosure statement is not confirmable.  This is to avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the proposed plan when the plan is unconfirmable on its face.  Such an exercise in futility only serves to further delay a debtor's attempts to reorganize.").  Here, because various provisions in the New Plan violate the Bankruptcy Code and other applicable laws, the New Plan could not survive the confirmation process.  As such, it would be a fruitless exercise to approve the New Disclosure Statement.

A.    **The New Plan Impermissibly Provides Senior Unsecured Creditors With More Than Par-Plus-Accrued Recovery**

69.    The Original Plan provided that senior unsecured creditors would receive approximately $697 million in cash and a primary equity distribution worth approximately $2.8 billion at the Original Plan value of $45.00 per share.  As disclosed to the markets in the Debtors' press release dated July 18, 2007, and as set forth in the Original Disclosure Statement, the aggregate value of these cash and primary equity distributions were to provide all unsecured creditors with a full recovery on their allowed claims (including post-petition interest).   Press Release, Delphi Corp., Delphi Announces New Plan Framework Agreement (Jul. 18, 2007); see also Original Disclosure Statement at DS-xvi.  According to the New Disclosure Statement, under the New Plan, all unsecured creditors (with the exception of holders of certain

-34-

subordinated notes) will still receive a 100% recovery, but instead of a combination of cash and primary equity at a plan value of $45 per share, senior unsecured creditors will receive a distribution of primary equity at a New Plan value of $41.58, plus rights to acquire additional equity shares at $34.98, a significant discount to the New Plan value of $41.58.

70.    However, the equity distributions to GM under the New Plan remain based on the total enterprise value set forth in the Original Plan of $45 per share.  See DS Blackline at DS-173.  The selective use of different plan values to determine the number of equity shares allocated to unsecured creditors, GM and existing equity exposes the artificiality of the Debtors' reduction of total enterprise value and plan value for purposes of the New Plan.  There is no logical or proper reason for ascribing a plan value of only $41.58 per share to the unsecured creditors' distributions of primary equity and discount rights, while calculating the number of shares available to GM at the former plan value of $45 per share.  This results in recoveries to senior unsecured creditors of 100% for their primary equity distribution alone assuming a constant and consistent total enterprise value of $45 per share and recoveries of 111.6% when taking into account the additional value senior unsecured creditors are receiving from the rights offering and their ability to exercise rights at $34.98 per share.[17]  This already excessive recovery is further enhanced by the value of the oversubscription rights senior unsecured creditors are afforded in the rights offering.

71.    The only possible reason is an improper one: to conceal the fact that, assuming a consistent plan value of $45 per share for all distributions to all stakeholders, under the New Plan senior unsecured creditors are to receive more than their allowed claims — a recovery that is

---

[17]    As noted in Section II.C hereof, this includes as part of the allowed unsecured claims post-petition interest which is inappropriate.

strictly prohibited by the Bankruptcy Code.  See 11 U.S.C. §1129(b)(2)(B).  Indeed, assuming a

plan value of $45 per share, the senior unsecured creditors are to receive 100% recovery just

from their distribution of primary equity, with incremental — and excessive — value distributed

pursuant to the discount rights.

72.    Further, even accepting the lower total enterprise value as the appropriate value

(which the Equity Committee does not concede), senior creditors still have the opportunity to

receive in excess of 100% recovery on their allowed claims.  In connection with the rights

offering in which creditors are to receive rights to purchase common stock of the reorganized

company, creditors who do not exercise such rights will also receive a cash payment which

inherently puts their recovery over 100% at the lower valuation.  See DS Blackline at DS-184.

B.    **The GM Settlement, a Cornerstone of the New Plan and the Basis for
Recoveries, is Not Reasonable or Appropriate**

73.    As mentioned above, the GM Settlement is a critical piece of the New Plan and

provides much of the value and basis for the various recoveries to stakeholders set forth in the

New Plan.  However, the GM Settlement is not reasonable and in the best interests of the

Debtors' estates because it does not provide for an equitable allocation of value.  As described

above, the Debtors have not assessed the value of such claims and therefore cannot make a sound

assessment as to whether the proposed settlement is fair and reasonable and in the best interests

of the Debtors' estates.  In light of the nature of the claims against GM (including RICO

liability), the settlement is not reasonable.  The Equity Committee was, however, willing to

support the settlement provided it allowed a fair recovery to equity holders (the party most

harmed by GM's actions).  However, the Equity Committee cannot support the settlement under

the New Plan since all of the value from the settlement of the GM Claims is being siphoned

-36-

away from existing equity and equity is not being provided with sufficient value to render the

GM Settlement fair and reasonable.

74.       In addition, embedded in the GM Settlement are the broad releases in favor of

GM described above, including releases by current equity holders.  However, current equity

holders are not receiving sufficient value from the GM Settlement in exchange for such imposed

releases; the GM Claims, which have value in the billions of dollars, cannot be released by

equity in exchange for $69 million of very short-term securities.  Therefore, under the New Plan,

GM impermissibly is to be given third party releases above the objection of existing equity for

no consideration.  This is not consistent with applicable bankruptcy law and case law.

C.       **The New Plan Impermissibly Provides for Post-Petition Interest on Creditors
Claims**

75.       As noted above, as a general rule, unsecured creditors are not entitled to post-

petition interest unless the debtors can demonstrate it is required under either the best interest test

set forth in section 1129(a)(7)(ii) of the Bankruptcy Code or the fair and equitable test set forth

in section 1129(b)(1).  The New Plan provisions for post-petition interest can not be justified

under either test.

76.       The best interest test set forth in section 1129(a)(7)(ii) requires that a holder of a

claim <u>either</u> vote to accept the plan or that such holder receive at least what it would receive

under chapter 7 of the Bankruptcy Code.  Pursuant to section 726(a)(5) of the Bankruptcy Code,

creditors are entitled to interest <u>at the legal rate</u> prior to a distribution to equity.  11 U.S.C.

§726(a)(5) (emphasis added).  As a result, creditors have argued that they are entitled to post-

petition interest when the liquidation analysis for a debtor shows that equity would receive a

recovery even in chapter 7.  As noted above, the best interest test would only apply to creditors

who have voted to reject the plan, not all creditors.  In any event, based on the liquidation

-37-

analysis set forth in the New Disclosure Statement, which shows equity receiving no value and

creditors receiving between 0% and 83% of their claims, no creditors (regardless of whether they

vote to accept or reject) are entitled to post-petition interest on the basis of the best interest test.

77.     As noted supra at Section I.D., however, the Equity Committee believes the

liquidation analysis is deficient because it does not include the value of the affirmative claims

against GM.  The footnotes to the liquidation analysis provide a sensitivity analysis which shows

liquidation recoveries based on a range of recoveries on the GM claims from zero to $26 billion.

Based on the sensitivity analysis, creditors would not be entitled to post-petition interest if

recoveries from the GM claims were $10 billion or less.  Based on the sensitivity analysis,

creditors who voted to reject the New Plan would be in a position to argue they are entitled to

post-petition interest if recoveries from GM were $15 billion or more, but in that scenario, equity

holders would be entitled to at least $1.6 billion of value according to the Debtors' own analysis.

Thus the creditors receive post-petition interest under the best interest test while equity only

receives $69 million of value under the New Plan.

78.     Under section 1129(b)(1), in order to confirm a plan that has been rejected by an

impaired class of creditors or interest holders, the plan must be "fair and equitable" with respect

to the rejecting class.   Although section 1129(b)(2) provides that the "fair and equitable"

requirement "includes" certain specified conditions (commonly known as the absolute priority

rule), section 102 of the Code provides that "includes" is not limiting.  Accordingly, courts have

held that, in addition to the specified requirements, courts may impose additional requirements to

ensure that the plan treats the rejecting class equitably under the particular circumstances.  For

example, despite section 502(b)(2)'s disallowance of claims for post-petition interest, courts

have held that, if the debtor is solvent, a plan ordinarily is not fair and equitable unless unsecured

-38-

creditors in the rejecting class receive post-petition interest before equity receives a recovery.

See In re Grossinger's Assoc., 116 B.R. 34, 35 (Bankr. S.D.N.Y. 1990) (holding that creditors

must be paid in full before equity holders may receive or retain their interests).  However, when

imposing additional requirements beyond those specified in section 1129(b)(2), courts take into

consideration the totality of the facts and circumstances, rather than apply a mechanical test, to

ensure an equitable outcome.  For example, in In re Mcorp Fin., Inc., the court held that a "death

trap" provision in a plan results in the plan not being fair and equitable under the circumstances

of the case.  160 B.R. 941, 959–60 (S.D. Tex. 1993).

79.    In this case, the plan would not be fair and equitable to the class of equity holders

if the class rejects the plan and the plan gives unsecured creditors post-petition interest that

derives from a GM settlement, unless the settlement also provides appropriate value to the

parties most harmed by GM – the Delphi equity holders. In fact, it would be grossly unfair and

inequitable to allow the GM settlement to boost the recovery of unsecured creditors beyond their

allowable claim (i.e., by giving them unmatured interest) while leaving those most harmed by

GM's conduct without any benefit from the settlement of the claims against GM.  A bankruptcy

court should not permit such an injustice to occur.

### D.    The Treatment of the Section 510(b) Equity Claims under the New Plan Violates the Bankruptcy Code

80.    Under the MDL Settlement and pursuant to the New Plan, the Securities Class

and ERISA Class would receive, in the aggregate, in addition to insurance proceeds and certain

other payments, an allowed claim and interest totaling $204 million.  See DS Blackline at DS-

xxii-xxv.  This amount is to be paid in the same plan currency that will be distributed to general

unsecured creditors.  Essentially, the recipients of the MDL Settlement, a significant percentage

of whom have claims that arise from the purchase or sale of equity securities of the Debtors (the

"section 510(b) equity claimholders"), would be treated in the same manner as general unsecured creditors and would receive recoveries that dwarf any amounts existing equity holders would receive. By this treatment under the New Plan, these claims arising out of the purchase or sale of equity securities would be placed in a class senior to equity, when at best they should be pari passu with equity pursuant to section 510(b) of the Bankruptcy Code.

81.     Section 510(b) provides that, for purpose of distribution under title 11, a claim arising from rescission of a purchase or sale of a security of the debtor of an affiliate debtor [or] for damages arising from the purchase or sale of such a security… shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock. § 510(b). Therefore, these section 510(b) equity claimholders who are accepting the MDL settlement must subordinate their claims to the level of existing equity interests, unless the existing equity class consents otherwise. Under the New Plan, however, these section 510(b) equity claims are not being subordinated; quite the contrary, they are being elevated above existing common stock interests.

82.     Absent the consent of the current equity class, this contemplated structure is clearly not permitted under the Bankruptcy Code and cannot withstand a confirmation objection. Under the Original Plan, the Equity Committee consented to the provisions which treated general unsecured creditors and section 510(b) equity claimholders equally in order to facilitate the consummation of a consensual plan and in consideration of the meaningful, albeit modest, recoveries that were to be distributed to existing equity under the Original Plan. However, the New Plan bears no resemblance to that which the Equity Committee gave its consent; but now, having achieved the settlement, under the New Plan the Debtors have jettisoned equity holders'

interests at the behest of its other constituents, granting existing equity with no meaningful

recovery while continuing to treat the section 510(b) equity claimholders as unsecured creditors

rather than pari passu with existing equity.

83.    The Equity Committee cannot and will not consent to a plan that obliterates all

but a token of equity's recovery while allowing section 510(b) equity claimholders an elevated

claim status that provides them with a recovery unconscionably greater than equity's.  Thus, this

treatment of the MDL claimants violates the Bankruptcy Code, rendering the New Plan

unconfirmable.

      **E.**      **There is No Basis for Substantive Consolidation of the Debtors under the New Plan**

84.    As described above, in order for Debtors to put forth a plan the provides for

substantive consolidation, the Debtors must provide a factual basis as to why substantive

consolidation is warranted, appropriate and necessary.  Further, the Debtors must show that no

stakeholder would receive less in a non-consolidated scenario.  The Debtors have provided no

such justification or evidence; rather, they have only provided boiler plate disclosure regarding

substantive consolidation.  This is insufficient to allow substantive consolidation, especially in

such heavily contested chapter 11 cases.  See discussion supra at Section I.G.

      **F.**      **The Third Party Releases Violate the Prevailing Law in the Second Circuit**

85.    As mentioned above, the New Plan contains broad third party releases in favor of

GM, officers and directors and others.  See discussion supra at Section I.H.  Pursuant to the

prevailing case law in the Second Circuit, these third party releases are inappropriate and should

not be allowed, given the Debtors' circumstances.

86.    As set forth elsewhere in this Objection, under Second Circuit law, third party

releases are rare and require a substantial showing that the released party provided substantial

financial consideration or other value to the Debtors' estates.  Further, non-debtor releases are

usually tolerated only if the affected stakeholders consent.  See In re Specialty Equip. Cos., 3

F.3d 1043, 1047 (7th Cir. 1993).

87.     As described supra at Section I.H., under the New Plan, the releases by existing

equity in favor of GM should not be approved by the Court because the GM Settlement provides

no appropriate benefit that would warrant the exchange of releases.  Equity holders, the most

harmed by GM, are not receiving a sufficient allocation of value from the GM Settlement and as

a result, the New Plan effectively requires existing equity to give third party releases virtually for

free.

88.     Similarly, there is no basis for the Debtors' directors and officers to receive

releases from existing equity.  As evidenced by the process undertaken by the Debtors in

connection with the renegotiation of the New Plan, the Debtors have abandoned all of their

duties to equity holders and have excluded the Equity Committee from participation in such

process in order to cater solely to the needs of GM, the Plan Investors and the UCC.  As a result,

on such directors' and officers' watch, the recoveries to existing equity have been stripped away

at the same time lucrative and generous compensation packages have been granted to

management.  Such "contributions" by management and directors provide no benefit to existing

equity and therefore, providing for the granting of releases by equity is unwarranted.  In fact,

such behavior may give rise to additional claims and liability of existing equity against officers

and directors for their post-petition behavior.

## CONCLUSION

89.     The New Disclosure Statement fails to provide "adequate information," or

information of the type that would allow a hypothetical investor to make an informed judgment

about the plan.  In addition, the New Plan is unconfirmable and, thus, it is a waste of estate

resources to solicit votes on the New Plan.  Accordingly, the Equity Committee respectfully

requests that the Court deny the Debtors' request for approval of the New Disclosure Statement.


[Remainder of the page left intentionally blank.]

Dated:   New York, New York                     Respectfully submitted,
         November 2, 2007

                                                FRIED, FRANK, HARRIS, SHRIVER
                                                   & JACOBSON LLP

                                                /s/ Bonnie Steingart
                                                Bonnie Steingart (BS-8004)
                                                Debra Torres (DT-9093)
                                                One New York Plaza
                                                New York, New York  10004
                                                Phone: (212) 859-8000
                                                Fax:    (212) 859-4000

                                                *Counsel for the Official Committee
                                                of Equity Security Holders*

602003

-44-