| | |
|---|---|
| KIRKPATRICK & LOCKHART<br>PRESTON GATES ELLIS LLP<br>Edward M. Fox, Esq. (EF1619)<br>599 Lexington Avenue<br>New York, New York 10022<br>Telephone (212) 536-3900 | Hearing Date: November 8, 2007<br>10:00 A.M. |

Attorneys for Wilmington Trust Company,
as Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                                           :        Chapter 11
                                                                 :        Case No. 05-44481 (RDD)
DELPHI CORPORATON, *et al*.,          :        (Jointly Administered)
                                                                 :
       Debtors.                                          :
---------------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE
TRUSTEE, TO MOTION FOR ORDER APPROVING (I) DISCLOSURE
STATEMENT, (II) RECORD DATE, VOTING DEADLINE, AND
PROCEDURES FOR TEMPORARY ALLOWANCE OF CERTAIN CLAIMS,
(III) HEARING DATE TO CONSIDER CONFIRMATION OF PLAN,
(IV) PROCEDURES FOR FILING OBJECTIONS TO PLAN,
(V) SOLICITATION PROCEDURES FOR VOTING ON PLAN,
(VI) CURE CLAIM PROCEDURES, (VII) PROCEDURES FOR
RESOLVING DISPUTES RELATING TO POSTPETITION
<u>INTEREST, AND (VIII) RECLAMATION CLAIM PROCEDURES</u>**

Wilmington Trust Company ("WTC"), as indenture trustee for the senior notes

and debentures (the "Senior Debt") in the aggregate principal amount of $2 billion issued by

Delphi Corporation ("Delphi"), by and through its attorneys, Kirkpatrick & Lockhart Preston

Gates Ellis LLP, hereby objects to the Motion for Order Approving (i) Disclosure Statement, (ii)

Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (iii)

Hearing Date to Consider Confirmation of Plan, (iv) Procedures for Filing Objections to Plan, (v)

Solicitation Procedures for Voting on Plan, (vi) Cure Claim Procedures, (vii) Procedures for

Resolving Disputes Relating to Postpetition Interest, and (viii) Reclamation Claim Procedures

NY-557803 v2

(the "Motion")[1] filed by Delphi and its debtor subsidiaries and affiliates (collectively, the "Debtors"), stating as follows:

## PRELIMINARY STATEMENT

1.      Distilled to its essence, WTC's objection to the Motion raises three central issues. First, the Debtors' proposed disclosure statement (the "Disclosure Statement") must clearly and concisely inform the holders of the Senior Debt of the actual value of their recovery under the Plan. Valuation euphemisms such as "negotiated plan value" or "deemed value" are not acceptable. Rather, the Debtors must indicate the value of recoveries on a fully diluted basis based on the range of value estimated by the Debtors' investment banker and financial advisor, Rothschild, with particular emphasis on its mid-point valuation.

2.      Second, the Debtors must clearly and concisely indicate the value the holders of the Senior Debt are being asked to give up to the plaintiffs in the MDL Actions in connection with confirmation of the proposed plan of reorganization (the "Plan"), as well as the value that the holders of the Senior Debt are being asked to give up under the Plan to holders of the TOPrS Claims on account of the proposed subordination waiver.

3.      Third, the holders of the Senior Debt must be allowed to fairly vote their claims as part of a properly structured class of creditors. It is inappropriate for the Debtors to include within the class of unsecured claims the holders of both the Senior Debt and the TOPrS Claims given that the treatment of the TOPrS Claims is different under the Plan than the treatment of the holders of Senior Debt. Moreover, it would be patently unfair to include the votes of holders of TOPrS Claims when determining whether the holders of the Senior Debt have

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.B of the Debtors' proposed Plan.

- 2 -

voted, as a class, to give up or limit contractual subordination rights that they hold under the Subordinated Notes Indenture against the recoveries of the TOPrS Claims.

## FACTUAL BACKGROUND

4. On October 8, 2005 (the "Petition Date"), Delphi Corporation and each of the other Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and remained in possession of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. On August 6, 2007, the Court entered an Order Scheduling Non-Omnibus Hearing on Debtors' Motion to Approve Solicitation Procedures and Disclosure Statement (the "Scheduling Order"), which provided, among other things, that if the Debtors were to file a disclosure statement on or prior to September 6, 2007, the Court would hold a hearing on approval of the same on October 3, 2007.

6. In accordance with the Scheduling Order, on September 6, 2007, the Debtors filed their Disclosure Statement, together with the Motion, which seeks entry of an order: (i) approving the Disclosure Statement pursuant to 11 U.S.C. § 1125; and (ii) establishing various solicitation procedures and filing deadlines prior to an anticipated hearing on confirmation of the Debtors' proposed Plan on November 19, 2007.

7. Subsequently, during an omnibus hearing held on September 27, 2007, the Debtors announced that while they intended to commence a hearing with respect to the Disclosure Statement on October 3, 2007, they did not expect to request approval of the Disclosure Statement on that date. Instead, the Debtors indicated that, due to conditions in the capital markets and continuing negotiations with their various creditor constituencies, the

Disclosure Statement would not be finalized and ready for approval until sometime later in October 2007.

8. On October 19, 2007, the Court entered a Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Potential Motions Amending Investment Agreement and Approving Certain Exit Financing Agreements, which, among other things, established November 8, 2007 as the date for a continued hearing on approval of the Debtors' Disclosure Statement.

9. On October 29, 2007, the Debtors filed their Notice of Potential Amendments to Debtors' Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors, and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto.

## **THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION**

10. The Disclosure Statement may only be approved if it is found to contain "adequate information" regarding the Debtor's Plan. "Adequate information" means:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and of the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan….

11 U.S.C. § 1125(a)(1) (2004). Thus, the Disclosure Statement may not be approved unless and until it contains information sufficient to permit the Debtors' creditors to "make an intelligent and informed decision as to whether to accept or reject the plan." In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); In re Ferretti, 128 B.R. 16, 19 (Bankr. D. N.H. 1991) ("[A] proper disclosure statement must clearly and succinctly inform the

- 4 -

average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

11. The Disclosure Statement should also provide creditors with meaningful information regarding "the consequences of the proposed plan on their claims and the possible Code alternatives so that they can intelligently accept or reject the Plan." In re Copy Crafters Quickprint, Inc., 92 B.R. at 981.

12. As explained below, the Debtors' Disclosure Statement lacks adequate information regarding a number of issues that are critical to creditors' ability to make an intelligent and informed evaluation of the Plan. The Motion must therefore be denied.

13. Beginning with its Executive Summary, Section G on page DS-xii, throughout the balance of the Executive Summary and in discussions elsewhere in the Disclosure Statement concerning the value of recoveries, including on pages DS-167 and DS-239 therein, the Debtors are inconsistent in their use of various valuation terminologies. Creditor recoveries are based on "plan value" or "deemed value" rather than on the actual valuation of the reorganized entity as determined by the Debtors' investment banker and financial advisor, Rothschild, which, according to the Debtors, has indicated that the Reorganized Debtor will have an enterprise value range between $11.2 billion and $14.1 billion, with a mid-point of approximately $12.7 billion at December 31, 2007. Accordingly, all valuations set forth in the Disclosure Statement for investment by the Plan Investors and recoveries by the Unsecured Creditors should be set forth in terms of the Rothschild valuation using actual per share valuations and actual valuations of the recoveries Unsecured Creditors can expect to receive on a fully diluted basis.

14. In addition, when calculating actual distribution values, the Debtors should take into account the dilution which can be expected as a result of the management compensation plan and any potential allowance of trade and unsecured claims in excess of $1.45 billion.

15. The tables in the Disclosure Statement showing the recoveries to creditors should also indicate what creditor recoveries might otherwise be if the MDL settlement is not approved and if the contractual subordination rights provided for in the Subordinated Notes Indenture is fully effectuated without the limitations set forth in Section 11.10 of the Plan. This will enable holders of the Senior Debt to determine the amount of recovery on account of the contractual subordination provision and otherwise that they are being asked under the Plan to give up in favor of these otherwise subordinated groups of creditors.

16. In the discussion beginning on page DS-95, the Disclosure Statement indicates that the long-term incentive plan assumes that 10% of the available shares of Delphi's fully diluted common stock will be reserved for future annual grants to executives with an initial target grant of equity as of the Effective Date expected to constitute approximately 3% of the available shares of Delphi's fully diluted common stock. The Debtors should indicate in this discussion the total cost, both initially and over time, of this incentive plan, as well as indicate the dilution in value of the recovery to unsecured creditors that is expected to be caused as a result of this incentive plan. Moreover, as indicated in paragraph 13 above, the recoveries to unsecured creditors should be set forth in the disclosure statement on a fully diluted basis so that unsecured creditors can understand the true value of their recoveries under the Plan.

17. On page DS-119 through DS-120 of the Disclosure Statement, the discussion concerning the Discount Rights Offering to holders of General Unsecured Claims should indicate how the Debtors determined the value of the rights.

18. The Debtors' discussion of substantive consolidation beginning on page DS-157 of the Disclosure Statement fails to set forth any facts which would warrant the Debtors' determination that "on balance, substantive consolidation . . . is appropriate and in the best interest of the Company's creditors." DS-160. Although the Debtors set forth numerous factors that they considered, they fail to indicate any of the actual facts determined in connection with these factors which led the Debtors to reach their conclusion that substantive consolidation was appropriate here. The Disclosure Statement should provide the facts on which the Debtors' determination was made to enable Creditors to decide for themselves whether or not to vote for a Plan calling for substantive consolidation. Furthermore, the Debtors should explain why substantive consolidation of the Debtors' assets and liabilities is necessary and appropriate while consolidation of the 42 Debtor entities is not.

19. The discussion on page DS-205 of the Disclosure Statement discusses the Plan's effect on the subordination rights of the holders of Senior Debt as against the holders of TOPrS Claims. This discussion, however, should indicate the amount of additional recovery that holders of Senior Debt could otherwise recover on account of the subordination provision of the Subordinated Notes Indenture but for Section 11.10 of the Plan purporting to satisfy the contractual subordination provisions of the Subordinated Notes Indenture. Moreover, to the extent the waiver of the subordination provision will provide a benefit to the Plan Investors in their capacity as holders of TOPrS Claims, the Debtors should set forth the amount of such claims held by the Plan Investors, the amount of additional recovery that the Plan Investors are

expected to receive on their TOPrS Claims as a result of the effect of this provision and a discussion of any negotiations the Debtors have had with the Plan Investors concerning this provision of the Plan.

20. On page DS-221 of the Disclosure Statement, the Debtors should set forth both here and in the Executive Summary the dollar amount of potential dilution caused by options or warrants that is expected.

21. In paragraph J on page DS-221, concerning the potential dilution caused by the distribution of New Common Stock with respect to Trade and Other Unsecured Claims in excess of $1.45 billion, the Debtors should set forth both here and in the Executive Summary the amount of any expected dilution as a result of such additional claims. The Debtors should also indicate the likelihood that such additional claims may exist and be allowed and the effect of the dilution on recoveries of holders of Unsecured Claims as a result of the allowance of such additional claims.

22. On page DS-240, the Debtors should indicate the basis on which they believe that the Plan can be crammed down over the objection holders of Unsecured Claims given the recoveries provided for in the Plan to the plaintiffs in the MDL Action and the proposed subordination waiver by the holders of Senior Debt for the benefit of the holders of TOPrS Claims. Holders of Senior Debt have a right to know when voting on the Plan what the actual likelihood is that these junior interests could receive the recoveries proposed under the Plan in the event of an attempted cram down of the proposed Plan by the Debtors.

23. On page DS-241, the Debtors describe the limited circumstances in which they can amend the proposed Plan. The Debtors fail to indicate, however, the circumstances

under which 11 U.S.C. § 1127 would permit the Debtors to modify the Plan either before or after confirmation.

24. On page DS-244, the Debtors state it is not clear whether the Debtors could survive as a going concern in a protracted chapter 11 case, but provide no facts which would indicate an inability to do so, particularly given that the Debtors' businesses have now been substantially stabilized while an amended plan of reorganization is negotiated or litigated. The Debtor must provide such facts.

### THE PLAN IMPERMISSIBLY PLACES SENIOR DEBT AND SUBORDINATED DEBT IN THE SAME CLASS IN VIOLATION OF 11 U.S.C. § 1122

25. Section 1123(a)(4) of the Bankruptcy Code provides, in pertinent part, that "a plan shall provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . . agrees to less favorable treatment . . . ." 11 U.S.C. § 1123(a)(4).

26. This statutory requirement of equal treatment includes at least two distinct aspects. First, a plan must provide the same rate and measure of recovery for all members of a class. In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("[T]he most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."). Second, a plan must require substantially equal consideration from all class members in exchange for their equal distributions. Id. ("It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claim against specific property of the debtor or some other cognizable chose in action – in exchange for the same percentage recovery.").

27. The Debtors' plan appears to satisfy the first of these requirements by assigning all General Unsecured Claims against the Delphi-DAS Debtors, including both the Senior Debt and the TOPrS Claims, which are contractually subordinate to the Senior Debt, to a

- 9 -

single class – Class 1C -- and providing that all claims in that class will receive equal distributions. (Plan, § 5.3).

28. The Plan fails to satisfy the second requirement, however, because it requires in Section 11.10 that the holders of Senior Debt relinquish their subordination rights against the holders of TOPrS Claims in consideration for their treatment under the Plan, but does not require any comparable sacrifice on the part of the holders of TOPrS Claims in exchange for the same treatment.[2]

29. This disparate treatment of Senior Debt holders assuredly forms the basis for a potential objection to confirmation of the Plan. See 11 U.S.C. § 1129(a)(1). It is equally relevant to the solicitation and voting issues raised by the Motion, however, because, by assigning the Senior Debt and the TOPrS Claims to the same class for voting purposes, the Debtors propose to allow the holders of TOPrS Claims to vote on the question of whether the holders of Senior Debt should be required to relinquish their subordination rights.

30. There is no legal basis for allowing the TOPrS Claims holders to vote on the question of whether the Senior Debt holders should be required to waive their subordination rights. Consequently, the Debtors should be required to place the Senior Debt claims and the TOPrS Claims in different classes in order to ensure that the votes of Senior Debt holders are not artificially diluted by the votes of holders of TOPrS Claims.

---

[2] See Plan § 11.9(a) ("[A]ll rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against . . . the Debtors, based upon any subordination rights . . . to holders of Claims having such subordination rights, and **such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date.**") (emphasis added).

## THE PROPOSED RECORD DATES

31. In the Motion, the Debtors requested that the Court fix September 28, 2007 as the Voting Record Date. As it is no longer necessary to fix such an early Voting Record Date, and given that the Senior Debt has continued to trade, WTC requests that the Court follow Fed. R. Bankr. P. 3018(a) and fix the date of the order approving the Disclosure Statement as the Voting Record Date.

32. For the sake of clarity, the Disclosure Statement should indicate that the distribution record date for holders of Senior Debt shall be as of the commencement of distribution, as provided under Fed. R. Bankr. P. 3021.

WHEREFORE, WTC respectfully requests the Court to enter an order: (i) denying the Motion to approve the Debtors' Disclosure Statement unless and until it is supplemented with adequate information of the kind discussed herein; (ii) directing the Debtors to reclassify the Senior Debt and the TOPrS Claims in different classes; and (iii) granting such other and further relief as this Court deems just.

Dated: New York, New York
       November 2, 2007

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

By:  */s/ Edward M. Fox*
     Edward M. Fox (EF1619)
     A Member of the Firm
Attorneys for Wilmington Trust Company,
as Indenture Trustee
599 Lexington Avenue
New York, NY 10022
(212) 536-3900