1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION,

9

10        Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            U.S. Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            October 25, 2007

19            10:08 a.m.

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4         Attorneys for Debtor

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR., ESQ.

9

10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

11        Attorneys for Debtor

12        Four Times Square

13        New York, NY 10036

14

15   BY:   KAYALYN A. MARAFIOTI, ESQ.

16        ALBERT HOGAN, ESQ.

17

18   TOGUT, SEGAL & SEGAL, LLP

19        Attorneys for Debtor

20        One Penn Plaza

21        New York, NY 10119

22

23   BY:   NEIL BERGER, ESQ.

24

25

3

1

2   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP

3         Attorneys for Delphi Trade Committee

4         1633 Broadway

5         New York, NY 10019

6

7   BY:   DANIEL N. ZINMAN, ESQ.

8

9   LATHAM & WATKINS, LLP

10         Attorneys for the Unsecured Creditors' Committee

11         53rd at Third

12         885 Third Avenue

13         New York, NY 10022

14

15   BY:   MARK A. BROUDE, ESQ.

16

17   KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

18         Attorneys for Wilmington Trust Company

19             as indenture trustee

20         599 Lexington Avenue

21         New York, NY 10022

22

23   BY:   EDWARD M. FOX, ESQ.

24

25

4

1

2   LOWENSTEIN SANDLER PC

3         Attorneys for Securities Class

4         65 Livingston Avenue

5         Roseland, New Jersey 07068

6

7   BY:   MICHAEL S. ETKIN, ESQ.

8

9   GOODWIN PROCTER

10         Attorneys for Castlerigg Master Investments Ltd

11            CR Intrinsic Investors, LLC

12            Davidson Kempner Capital Management LLC

13            Elliot Associates, L.P.

14            SPCP Group LLC

15         599 Lexington Avenue

16         New York, NY 10022

17

18   BY:   ALLAN S. BRILLIANT, ESQ.

19         CRAIG P. DRUEHL, ESQ.

20

21

22

23

24

25

5

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

    Attorneys for equity committee

    One New York Plaza

    New York, NY 10004


BY:   BONNIE STEINGART, ESQ.


U.S. DEPARTMENT OF JUSTICE

    Office Of The United States Trustee

    33 Whitehall Street

    New York, New York 10004


BY:   ANDREW D. VELEZ-RIVERA, ESQ.

6

1                           P R O C E E D I N G S

2              THE COURT:  Please be seated.  Hi.  Good morning.

3     Delphi Corporation.

4              MR. BUTLER:  Good morning, Your Honor.  Jack Butler,

5     Kayalyn Marafioti and Al Hogan here on behalf of Delphi

6     Corporation along with Neil Berger, co-counsel, for the 23rd

7     omnibus hearing in these Chapter 11 cases.  Your Honor, we

8     filed an agenda listing the fifty matters for consideration at

9     today's hearing.  We'd like to move in the agenda order.

10             THE COURT:  That's fine.

11             MR. BUTLER:  Thank you.  Your Honor, the first item

12    on the agenda is the Saganaw Chassis asset sale motion filed at

13    docket number 9368.  There have been some limited objections

14    filed.  Your Honor will recall from prior hearings that the

15    Asset Purchase Agreement in this particular transaction has a

16    closing condition at Section 9180 which requires that TRW

17    Integrated Chassis Systems, LLC, as purchaser, is to enter into

18    a supply agreement with General Motors.  That originally was to

19    occur by the close of business on September 26, 2007.  Those

20    matters are still under discussion between General Motors and

21    TRW.

22             The debtors, at least at this time, are not prepared

23    to move forward with this transaction until we understand that

24    TRW and General Motors have agreed finally to the terms of that

25    transaction.  And, therefore, we'd ask to move this matter to

7

1     the November 16th omnibus hearing.

2                THE COURT:  Okay.  And as I remember, the union

3     objection was no longer --

4                MR. BUTLER:  Correct.  We resolved that objection.

5                THE COURT:  Right.  Okay.

6                MR. BUTLER:  So the only real --

7                THE COURT:  The only issue is the negotiation between

8     TRW and GM?

9                MR. BUTLER:  That's correct, Your Honor.

10               THE COURT:  Okay.

11               MR. BUTLER:  Your Honor, the next matter on the

12    agenda is the Verizon administrative expense motion, and Mr.

13    Berger is handling that for the debtors.

14               MR. BERGER:  Good morning, Judge.

15               THE COURT:  Good morning.

16               MR. BERGER:  Your Honor entered an order authorizing

17    the sale of the debtor's mobile area business unit previously.

18    Leading up to that sale there was a cure dispute between Mobile

19    Area and Verizon Services, Corp. concerning a GPS system and

20    services agreement between the parties.  Your Honor's sale

21    order had a specific provision that preserved the right of

22    Verizon to assert the cure plans as administrative expense

23    claims, and that's what this motion is about.

24               I spoke with counsel for Verizon.  Our business

25    people are gearing up to try to work together.  We've agreed,

8

1    subject to Your Honor's consent, to adjourn this to the

2    November 29 omnibus hearing date.  As part of the agreement to

3    adjourn that, we did, as the debtors, agree to file our

4    response by November 14th so there would be sufficient time for

5    Verizon to respond as well.  So, subject to Your Honor's

6    consent, this matter will be moved to November 29.

7                THE COURT:  All right.  That's fine.

8                MR. BUTLER:  Your Honor, matter number 3 on the

9    agenda is the Technology Properties 1318 motion filed at docket

10   number 10425.  Your Honor, the way we would like to handle this

11   procedurally is to adjourn this to the November 16th hearing

12   for status only.  If in fact Your Honor grants the solicitation

13   procedures motion on November 8th and establishes a 3018

14   hearing date for 3018 motions, then at the November 16th

15   hearing this would be moved to that date with all the other

16   3018 matters that may come before the Court.

17               THE COURT:  Okay.

18               MR. BUTLER:  Thank you.  Your Honor, the next matter

19   on the agenda is matter number 4, the recently filed motion

20   filed at docket number 10449.  This is the motion of Scott

21   Darrell Reiss (ph.) to allow payment of a claim and for other

22   relief.  The debtors have filed an objection at docket number

23   10647.  And the parties, prior to today's hearing, agreed to

24   move this to the claims track and have this heard at the

25   October 26th claims hearing.

9

1      THE COURT:  Okay.

2      MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

3   next matter on the agenda is matter number 5.  This is the

4   Valeo settlement motion at docket number 10482.  This involves,

5   Your Honor, the resolution of a pre-petition cause of action

6   from the debtor against a supplier in connection with some

7   warrantee and other claims arising from the supply of

8   multifunction electrical switches to DAS, LLC, which was then

9   used in steering column assemblies sold to customers.

10      I'm pleased to report, Your Honor, this matter has

11   been resolved by the payment of four million dollars by Valeo

12   to DAS, LLC to resolve these issues.  The important aspects of

13   this particular transaction is that obviously the settlement

14   agreement needs to be approved by Your Honor; that's a

15   requirement by Valeo, and that the order become final and

16   nonappealable.  They would make the payment to us.  We would

17   grant releases to Valeo, and certain related persons and

18   entities, from further liability with respect to the switches

19   that are involved.

20      We would also represent to Valeo that DAS, LLC is the

21   sole owner of those claims and we'd indemnify Valeo from any

22   other claims that would come at them from some other party if

23   it was later determined that was not the case.  That's the sum

24   and substance of the proposal, Your Honor.  Valeo, I should

25   point out, continues to be a valuable supplier to the debtors.

10

 1    And Mr. Sheehan, our chief restructuring officer, is here and,

 2    Your Honor, could provide a proffer if you'd like, under 9019

 3    as to why this is in the interest of the estate.  But this

 4    matter has been reviewed with our statutory committees and

 5    there are no objections.

 6              THE COURT:  All right.  Well, it seemed to me to be a

 7    fairly complicated contract dispute involving many elements of

 8    the party's business.  And, frankly, I'm going to rely largely

 9    on the committee's review as well as the debtor's heavy

10    involvement in the process in the first instance.  Clearly the

11    settlement ends up in a net payment to the debtor, so I will

12    approve it.

13              MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

14    next matter on the agenda, matter number 6, is the second IRS

15    pension funding waiver motion of the debtors at docket number

16    10483.  Your Honor, this is an important matter for the

17    debtors.  This completes the work that needed to be done with

18    respect to the fifth element of the five point transformation

19    plan the debtors announced back in March of 2006.

20              As you know, since the outset of these Chapter 11

21    cases, the debtors have been searching for ways to preserve

22    their pension programs, albeit frozen upon emergence but going

23    forward, and that's been something we've been working very hard

24    to do.  That required government relief.  And we have been

25    working very closely with the PBGC and with the IRS in

11

1   addressing these matters.  And I'm very pleased to be able to

2   present this motion to you, which is uncontested, regarding the

3   second and we hope final, set of waivers from the IRS with

4   respect to the pension matters that we need relief on.

5         This particular waiver will, most importantly,

6   address the temporary waiver of minimum funding obligations

7   involving our hourly plan for the plan year ending September

8   30, 2007, and will, in conjunction with other opinions issued

9   to us by the IRS, facilitate the provision in our plan of

10   reorganization that would allow us to transfer certain hourly

11   pension obligations to General Motors under the GM settlement

12   agreements, pursuant to Section 414(l) of the Internal Revenue

13   Code, in exchange for the financing transaction set forth in

14   the GM settlement documentation.

15         That transaction, which is an important element of

16   our overall settlement with General Motors and an important

17   element of our pension preservation plan, is only able to be

18   accomplished if it's economically efficient.  And without

19   trying to hold myself out as a pension expert here, the reality

20   is, having been involved in these discussions, there are

21   some -- when you look at the regulations and the requirements,

22   we in fact could have been in a position, without this waiver,

23   of trying to effectuate that transfer but still be responsible

24   for making payments in connection with the September 30, 2007

25   year, including related to the significant portion of

12

1   transferred liabilities under the hourly plan.  That would have

2   made that entire transaction not economically attractive to the

3   debtors or to their reorganization.  And so being able to work

4   out these waivers is extremely important to our overall

5   transformation objectives.

6        The second waiver includes a series of terms,

7   including a time line by which we must complete the

8   reorganization.  We're well on our way in connection with the

9   Chapter 11 plan that they require to be filed by the end of

10  this year, and we've already filed.  They have required that we

11  satisfy any minimum funding requirements for the plan ending

12  September 30, 2007, within five days following the effective

13  date of a plan.  That has to occur.  That is, the effective

14  date has to occur no later than February 29, 2008 in order for

15  us not to have to go back and renegotiate these waivers.  And

16  there is a requirement that we contribute twenty million

17  dollars to the hourly plan within five days following the

18  effective date, in addition to other payments, in addition to

19  the twenty million in accelerated contributions that we agreed

20  to under the first waivers.

21       Your Honor may also recall, in connection with the

22  first waivers the Court approved, that we provided the PBGC a

23  right to hold a hundred million dollar letter of credit that

24  was drawable under certain conditions.  There's nothing in

25  these waivers that would affect the PBGC's rights in those

13

1   respects with respect to the first waivers.

2            THE COURT:  And you're not adding any additional LC?

3            MR. BUTLER:  We are not, Your Honor.  Your Honor,

4   given the importance of this, I would like to just briefly

5   introduce into the evidentiary record seven exhibits which have

6   been provided to the Court.  These would include, Exhibit 1 is

7   the letter dated September 28, 2007 that grants the second

8   pension funding waiver.  Exhibit 2 is the letter dated October

9   4th which grants Delphi's request for modification of the

10  conditional waiver of minimum funding standard for the hourly

11  plan for September 30, 2006 for that particular year.  Exhibit

12  3 is another letter of the same date, October 4, granting also

13  a Delphi request for modification for the salary plan for the

14  plan year ending September 30, 2006.  Exhibit 4 is a letter

15  dated July 13, 2007 which granted Delphi's waiver for a

16  modification of conditional waivers relating to the hourly

17  plan.  And Exhibit 5 is another letter dated July 13, 2007 --

18  these are all from the Internal Revenue Service Your Honor --

19  granting a request for a modification of the conditional waiver

20  for the salary plan.  There's also a declaration of Mr.

21  Sheehan, I explained the business purposes of these

22  transactions for the debtors, at Exhibit 6 and then the notice

23  of service and the affidavits, Exhibit 7, Your Honor.  I'd like

24  to move those exhibits into evidence in this hearing.

25            THE COURT:  Okay.  Does anyone have any objection to

14

1   the admission of those exhibits?  Does anyone want to cross-

2   examine Mr. Sheehan?  All right.  I will admit the exhibits.

3   (IRS letter dated 9/28/07 granting the second pension funding

4   waiver was hereby received as Debtor's Exhibit 1 for

5   identification, as of this date.)

6   (IRS letter dated October 4th granting Delphi's request for

7   modification of the conditional waiver of minimum funding

8   standard for the hourly plan for 9/30/06. was hereby received

9   as Debtor's Exhibit 2 for identification, as of this date.)

10  (IRS letter dated October 4th granting Delphi's request for

11  modification for the salary plan for the plan year ending

12  9/30/06 was hereby received as Debtor's Exhibit 3 for

13  identification, as of this date.)

14  (IRS letter dated 7/13/07 granting Delphi's request for a

15  modification of conditional waivers relating to the hourly plan

16  was hereby received as Debtor's Exhibit 4 for identification,

17  as of this date.)

18  (IRS letter dated 7/13/07 granting a request for a modification

19  of the conditional waiver for the salary plan was hereby

20  received as Debtor's Exhibit 5 for identification, as of this

21  date.)

22  (Declaration of Mr. Sheehan was hereby received as Debtor's

23  Exhibit 6 for identification, as of this date.)

24  (Notice of service and the affidavits was hereby received as

25  Debtor's Exhibit 7 for identification, as of this date.)

15

1          THE COURT:  I had a couple of questions related to

2     this.  First, are the debtors reasonably confident that they

3     will be able to meet the deadline for this particular waiver,

4     the February deadline?

5          MR. BUTLER:  Your Honor, we certainly hope to be able

6     to do that.  We filed an 8-K last week, indicating that the

7     company plans to emerge during the first quarter of 2008.  We

8     have a timetable.  Your Honor may recall that in connection

9     with the disclosure settlement, the timetable, not later than

10    November 7th the debtors are required to file publicly a

11    schedule, a modified schedule, of how the timetable would work

12    and what the plan emergence date is.

13         Your Honor has indicated that assuming we're able to

14    go forward with the November 8th disclosure statement hearing,

15    that there would be a disclosure or a confirmation hearing in

16    the second week of January of 2008.  That should allow us to

17    emerge, even conducting rights offerings, by the end of

18    February.  That, like everything else in these matters, there

19    are many, many stakeholders with many disparate interests and

20    as we try to sort through all those matters, we may or may not

21    have a seriously contested confirmation hearing in process.

22    And we'll have to sort through all of that.  We continue to try

23    to work on those matters.

24         But the debtors certainly anticipate before the

25    February 29th date if we can.  We've set publicly the first

16

1   quarter, because we don't want to hold ourselves to specific

2   dates.  But we are mindful and we have reminded our

3   stakeholders that in addition to the macroeconomic risks that

4   exist in the capital markets and elsewhere, there are a series

5   of event risks that we need to manage in the first quarter of

6   2008.  And we're mindful of those.  We're working hard to do

7   them, and I would say that we have made very substantial

8   progress along those lines.

9           THE COURT:  Okay.  And I guess implicit in that

10  answer is that the debtors are reasonably comfortable that

11  they'll also be able to meet the funding condition set forth in

12  the waiver?

13          MR. BUTLER:  Yes, Your Honor.  I believe the plan of

14  reorganization that we filed on September 6th, including any

15  modifications that the debtors plan to file later this month,

16  will in fact -- I think the company believes that if that plan

17  is confirmed and we go effective on that plan, we will be able

18  to meet the conditions set forth in the waivers.

19          THE COURT:  Okay.  And then my last question, and I

20  believe you gave me the answer to this in connection with the

21  first waiver, but let me ask it anyway.  What is the basis for

22  the twenty million dollar, ten million, ten million, twenty

23  million dollar amount?

24          MR. BUTLER:  The short answer, Your Honor, it's the

25  product of a negotiation between the government and the company

17

1    and consideration of the government in granting these waivers.

2    So the government isn't, as you know, obliged to grant these.

3    And the government believed that providing some accelerated

4    funding into these programs was appropriate.

5            THE COURT:  On the other hand, the cost of not

6    getting the waiver would have exceeded that amount in terms

7    of --

8            MR. BUTLER:  Yes, Mr. Sheehan's declaration indicates

9    the inability, for example, to have gotten the second pension

10    funding where it is before the Court now would have essentially

11    made a billion-five transaction, which is one of the major

12    elements of our fabric of the reorganization settlement, not

13    economically efficient.

14            THE COURT:  Okay.  All right.  Does anyone have

15    anything to say on this motion?  All right.  I will approve it

16    for the reasons stated in the motion and on the record.

17            MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

18    next matter before the Court, matter number 7 is the Interiors

19    and Closures business' sale motion filed at docket number

20    10606.  Your Honor, this agreement contemplates a global

21    divestiture of the company's cockpits and interior systems

22    business and its integrative closure systems business to the

23    proposed purchasers for consideration in the amount of

24    approximately of 106 million dollars.  This is comprised of a

25    preliminary purchase price of approximately 80 million dollars,

18

1    subject to certain adjustments, and a post closing set of

2    payments, series of payments, or earnout as I would call them,

3    of approximately 26 million dollars.  This proposed sale is

4    subject to approval by this Court and additional competitive

5    bidding pursuant to the proposed bidding procedures.  Those

6    bidding procedures are the primary subject of the hearing

7    today, as well as the bid protections for the purchasers.

8              The proposed purchaser is Inteva Products LLC, which

9    is a wholly owned entity of the Renco Group, Inc.  Your Honor,

10   if the Court approves these bidding procedures, which are

11   substantially similar to procedures we've used for other

12   divestitures in this case where we've employed a two-step

13   process.  We would in fact have a bid deadline of November 26,

14   2007.  There would be an auction on or about December 6, 2007,

15   and the sale hearing would occur at the December omnibus

16   hearing, which is presently scheduled for December 20, 2007.

17             There are bid protections proposed in this order to

18   be approved by Your Honor, if Your Honor is prepared to move

19   forward with this two-step approach which would provide the

20   purchaser with a break-up fee protection which consists of the

21   lesser of 2.4 million, which is calculated at three percent of

22   the preliminary purchase price, or 2.3 percent of the total

23   purchase price if you use the earnout, if you count the

24   earnout, or three percent of the post termination alternative

25   transaction purchase price.  That would be the price that we

19

1    obtain from someone else within twelve months.  The lesser of

2    those two amounts would be payable to the purchasers and it

3    would be payable only in the event that the seller debtor

4    entities consummated an alternative transaction within twelve

5    months after the termination of the agreement.

6            There's also an expense reimbursement provision which

7    is two-tenths of a percent of the purchase price, or 250

8    thousand dollars.  And as the motion indicates, there's a

9    series of other conditions that might occur, ranging from the

10   timing of closing, approval of sale orders, and other events

11   under the agreement that would give rise to the payment of that

12   expense reimbursement.

13           I would characterize the payment of that expense

14   reimbursement as more likely than not or more probable than not

15   in terms of as you work through it, in the sense that the

16   passage of time could in fact, in and of itself, cause the

17   expense reimbursement provision to be paid.

18           I would also point out to Your Honor that with

19   respect to this matter we received comments from both the

20   creditors' committee and from the UAW.  In the case of the

21   committee, the committee asked us to lower the bid increments

22   to 500 thousand dollars from one million, which has been

23   accommodated in the revised order.

24           And the UAW requested a modification to Section 6.6

25   of the agreement, which -- or I should say 6.6 of the agreement

20

1    notice, which required -- deals with -- and I'll just read the

2    language in the record.  It states now "qualified bidders

3    should note that Section 6.6 of the agreement addresses, among

4    other things, the terms and conditions of employment of UAW

5    represented employees.  And these issues remain subject to the

6    party's rights and obligations related to bargaining with the

7    UAW."  And that, of course, comes in part, Your Honor, from the

8    labor MOUs approval order in this Court, which is a final order

9    of this Court.

10       Those are the only changes, Your Honor, to the

11   package as it was originally filed before the Court.  In terms

12   of the -- given the size of this, this is probably the second

13   largest of the transactions, the various non-core divestitures,

14   Your Honor, that we'll bring to you as part of the third tenant

15   of our transformation plan, again, announced back in March of

16   2006, which said that we would identify core, non-core assets

17   and we would divest those non-core assets.  Those divestitures

18   have in every case required cooperation from our unions and

19   from General Motors, who is the primary customer for those

20   plants and those businesses here in North America.  And this

21   one is the second largest.

22       We have a series of exhibits in connection with this

23   matter we've provided the Court.  There are just six of them.

24   Exhibit 1 is the agreement, Exhibit 2 through 4 are the

25   motions, form of orders and the black lines.  There is a

21

1    declaration from Mr. Sheehan to support this because this is an

2    expedited motion at Exhibit 5.  And Exhibit 6 is the affidavit

3    of service involving the service of these matters in accordance

4    with the case management order.  Your Honor, I'd move into

5    evidence exhibits 1 through 6.

6              THE COURT:  Okay.  Does anyone have any objection to

7    the admission of those exhibits?  Does anyone wish to cross-

8    examine Mr. Sheehan on his declaration?  Okay.  I will approve

9    the admission of the exhibits.

10   (Agreement was hereby received as Debtor's Exhibit 1 for

11   identification, as of this date.)

12   (Motions, form of orders and black lines was hereby received as

13   Debtor's Exhibits 2 - 4 for identification, as of this date.)

14   (Declaration from Mr. Sheehan was hereby received as Debtor's

15   Exhibit 5 for identification, as of this date.)

16   (Affidavit of service was hereby received as Debtor's Exhibit 6

17   for identification, as of this date.)

18             MR. BUTLER:  Thank you.

19             THE COURT:  Does anyone have anything to say on the

20   motion?  All right.  I will grant the relief sought today

21   pursuant to the motion, which is approval of the bidding

22   procedures and the break-up fee and expense reimbursement

23   provisions as well as the notice provisions.  I'm comfortable

24   with the formulation of the break-up fee.  The expense

25   reimbursement could conceivably be viewed as simply a reduction

22

 1    to the purchase price.  But the motion makes it clear that the

 2    sale has already been extensively marketed and that the debtors

 3    believe this is the best, at least the best stalking horse.  So

 4    I'm quite comfortable approving the relief sought today.

 5           MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

 6    next matter is matter number 8 on the agenda.  This is another

 7    divestiture related motion.  It's the steering entity's

 8    formation motion.  It's found at docket number 10608, and it

 9    involves procedural steps that we need to take from a corporate

10    planning perspective in connection with the disposition of our

11    largest non-core business.  And it's really important, I think,

12    in connection with the steering business, when we talk about

13    the steering business, and we'll talk about it more in the

14    coming days and weeks.

15           The steering business is a nonstrategic business for

16    the company going forward.  But it's a very large, very

17    important business in terms of its global reach.  It is a

18    company that we think is important to market and move forward

19    with as a going concern.  It, we think, has significant value

20    to our customers and to our unions.  There are many thousands

21    of people employed there, principally by the UAW, but also by

22    others, and we have worked very, very hard to sort out an

23    appropriate disposition of the steering business, and we expect

24    to come to the Court before the end of the year with a

25    transaction in dealing with that.

23

1          In preparing for that transaction, there are many,

2   many things that we need to do, given the global nature of the

3   steering business, in terms of various platforms we have to

4   deal with and various countries we have to deal with.

5          This particular motion deals with asking for

6   authority to establish two new U.S. entities which would not be

7   debtors, in order to have them hold an interest in a Mexican

8   entity, which in turn would hold permits and licenses required

9   in Mexico in order to be able to operate that business in

10  Mexico.  One of them, most importantly, is an explosives

11  permit.  That transaction under Mexican law requires that there

12  be at least two shareholders in connection with that particular

13  transaction.  And, therefore, we have sorted out an appropriate

14  structuring transaction to do that.

15         That's the purpose of this motion.  We have reviewed

16  this with our statutory committees.  The creditors' committee,

17  in particular, has taken a considerable amount of time -- and

18  when I say considerable amount of time I should probably say a

19  considerable amount of effort, because this has been done in a

20  short period of time -- to examine this and examine the

21  background behind it, and I believe counsel wishes to comment

22  on this particular motion.

23         We are grateful to the committee that they are

24  supportive of this and that they are prepared to have this

25  motion go forward.  It is, of course, subject to their

24

1    reservation of rights to challenge how proceeds might be

2    allocated down the line when the sale occurs.  They're not

3    agreeing that because we needed to go through and establish

4    these particular companies that that somehow is dispositive

5    from an allocation of proceeds matter when that final agreement

6    comes to the Court.  But I think they recognize, having

7    completed the due diligence, as the debtors do, that this is an

8    important step in terms of preparing the company for sale.  So,

9    Your Honor, with that in mind, are there any comments, Mr.

10   Broude, you'd like to make in connection with the motion?

11           MR. BROUDE:  Your Honor, Mike Broude, Latham &

12   Watkins on behalf of the committee.  Mr. Butler is correct.  We

13   spent a lot of time looking at this from both a structural and

14   economic perspective.  And our only issue is just making sure

15   that since the steering business in Mexico is currently owned

16   by Delphi Automotive Systems (Holding), Inc., or DASHI, and

17   these two new companies may or may not be owned by DASHI, that

18   that not affect this sort of transfer or movement of value from

19   one place to another.  We'll, you know, look at that in the

20   context of any actual transaction.  But I just wanted to make

21   sure that that reservation of rights was clear.

22           THE COURT:  Okay.  And these are truly supposed to be

23   holding companies, right?

24           MR. BROUDE:  Yeah.

25           THE COURT:  This is their sole function, really is to

25

1   own this stock?

2          MR. BROUDE:  That's correct, Your Honor.

3          THE COURT:  And how are you going to, practically

4   speaking, reserve the rights as to allocation?

5          MR. BROUDE:  Well, there will be a motion at some

6   point filed before the Court seeking to approve a transaction,

7   as has been the case with prior transactions where there have

8   been both debtor and nondebtor sellers.  Part of that motion,

9   part of the acquisition agreement will involve an allocation of

10  proceeds across debtors and nondebtors and, you know, across

11  particular sellers.  In that context we'll review that to make

12  sure that there isn't any inordinate amount of value being

13  allocated to the permit that this entity holds.

14         MR. BUTLER:  And, Your Honor, the debtors have agreed

15  we're not going to use this motion, if Your Honor grants this

16  motion, as dispositive in any way to that allocation discussion

17  that we would have with the committee, as we've had with them

18  on every transaction we've brought --

19         THE COURT:  Notwithstanding the potential ownership

20  now of the stock in someone else's --

21         MR. BUTLER:  Correct, Your Honor.

22         THE COURT:  -- bailiwick.  Okay.  Okay.

23         MR. BUTLER:  This is being done -- without being able

24  to move forward with this transaction, we would seriously

25  impair the value that could be --

26

1          THE COURT:  Right.

2          MR. BUTLER:  -- from this transaction.  So --

3          THE COURT:  Okay.  All right.  Well, the rational for

4     the relief sought is clear and beneficial to the debtor, so

5     I'll approve the motion, having noted the reservations of

6     rights that have been confirmed on the record.

7          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

8     next matter on the agenda is matter number 9.  This is the MDL

9     and Insurance settlement approval motion at docket number 9296.

10    There are two objections that have been filed by the Goodwin

11    Procter firm on behalf of a group of bondholders, one at docket

12    number 10687, the other at docket number 10689.  The debtors

13    have filed yesterday, in accordance with the case management,

14    our reply to that matter.

15          This particular motion before the Court today, or the

16    relief we're seeking before the Court today, has changed from

17    the time that we originally filed the MDL and insurance

18    settlement approval motion.  We have spent a great deal of time

19    over the last number of weeks consulting with the official

20    committee of unsecured creditors, our creditors' committee, the

21    security's lead plaintiffs, the ERISA named plaintiffs, and a

22    series of other ad hoc committees and advisors.  We've also

23    discussed the form of order with the equity committee in terms

24    of the equity committee's rights being preserved, and I'll

25    address that in a few minutes.

27

1        And we have, in reviewing those matters and trying to

2    sort out our time table, we have concluded as the company, that

3    we would ask the Court to consider a bifurcated approval

4    process here, pretty much in the same way the district court

5    has dealt with the bifurcated approval process of this matter

6    in the district court.

7        As Your Honor may recall back on September 5th, the

8    district court gave preliminary approval to the MDL motions

9    there and set final approval hearings for mid-November of this

10   year, which were the fairness hearings and the right for people

11   to object to the merits of the proposed settlements.

12       In the preliminary approval order heard in the

13   district court, the district court, among other things,

14   certified classes and granted a series of other relief,

15   approved notices, and set forth all the procedural mechanics,

16   if you will, of moving that motion forward.

17       We believe that it is appropriate to do the same

18   thing in this Court at this time and, therefore, similar to the

19   bifurcated process that was utilized by Judge Rosen, which

20   preliminarily approved the security stipulation and the ERISA

21   stipulation back on September 5th, we would ask the Court

22   today, this Court, to preliminarily approve this motion at this

23   stage only under two circumstances.  First, that Your Honor

24   determines that the relief we seek in this preliminary order

25   should be granted at this time.  And that relief, I'll go

28

1    through, is, I believe, procedural in nature but important to

2    the company.  It deals with certifying classes.  It deals with

3    who we need to solicit going forward.  It addresses who can

4    vote in connection with the plan as it relates to this

5    particular -- the MDL plaintiffs.  We think it's quite

6    important to get that established now and grant the other

7    relief that's set forth in the motion.

8              And we also think, just as Judge Rosen dealt with in

9    the district court, that the relief sought in the motion, that

10   by preliminarily approving this, you should only do it if Your

11   Honor believes that the relief sought in the motion was capable

12   of final approval at the confirmation hearing on the debtor's

13   plan of reorganization, but subject in all respects to the

14   Court's consideration of any objections filed by the potential

15   objectors, whose rights are fully preserved under paragraph 13

16   of the preliminary order.

17             Paragraph 13 of the preliminary order has been

18   carefully negotiated with all of the potential objectors and

19   there is only one set of potential objectors, that is the group

20   or committee, as we believe they are operating, represented by

21   Goodwin Procter, who continues to press an objection, and we'll

22   deal with that during this contested hearing.

23             We think it is noteworthy that none of the other

24   potential objectors, that is neither of the statutory

25   committees, the U.S. Department of Labor, Wilmington Trust

29

1    Company as indenture trustee, or the ad hoc committee of trade

2    creditors, share the ad hoc bondholder committee's views on

3    this preliminary order, and we believe are satisfied with the

4    preliminary order in the form submitted to the Court for

5    consideration.

6         I should note, Your Honor, in connection with the

7    equity committee, who may have arguably waived their right to

8    object to this, in discussions with the equity committee

9    following up from the colloquy we had on the record last time

10   when this matter was before the Court, the company decided that

11   it was appropriate, particularly given this bifurcation

12   approach, for the equity committee, as one of our official

13   statutory committees, have the right and all of the privileges

14   of a potential objector.  And this order provides that they'll

15   be deemed a potential objector and they will have all of those

16   rights reserved to them at the confirmation hearing to object

17   to the merits of this, in the same way all of the other

18   potential objectors were.  And this order specifically provides

19   for those rights.

20        THE COURT:  Okay.  That's good.

21        MR. BUTLER:  Your Honor, in terms of the actual

22   relief, we provided a draft order to the Court.  I can walk

23   through it, but I think it's pretty clear what we're seeking in

24   the particular matter.  And maybe the appropriate thing to do

25   now would be to cede the podium to Mr. Brilliant and let him

30

1    press his objections, and then we'd be able to respond to them

2    and walk through the order.

3            THE COURT:  Well, there was one point, one question I

4    had to you on the proposed order.  And I think it's probably

5    worth going through that now.

6            MR. BUTLER:  Sure.

7            THE COURT:  I had a couple other comments on it too.

8    But if you turn to page 5, paragraph J.  This is the paragraph

9    that basically recites what you intend to do as far as the

10   seeking final approval of the settlements.  And the question I

11   had is, and it's a little vague right now, it says "The debtor

12   has further stated that with the concurrence of the security's

13   lead plaintiffs and the ERISA named plaintiffs, the debtors

14   will seek final approval of the settlements contemplated by the

15   security stipulation, the ERISA stipulation and the insurance

16   stipulation."  And I assume the final approval is in respect of

17   the other objectors --

18           MR. BUTLER:  Right.

19           THE COURT:  -- the people's whose rights have been

20   preserved --

21           MR. BUTLER:  Correct.

22           THE COURT:  -- as part of the debtor's plan of

23   reorganization, and in the confirmation order.  And my question

24   is is that what you really mean -- or do you really mean to say

25   at the same time that they seek confirmation of the plan and

31

1    that such approval, if granted, would be incorporated in the

2    confirmation order?  And the reason I ask that is that some

3    settlements, like the GM settlement, are literally part of the

4    plan.  Other settlements, sort of stand on their own; they only

5    make sense in the context of a plan.  But I had viewed this

6    settlement as one that falls into the latter category i.e. it

7    stands on its own merits.  People aren't voting on it, in

8    essence, but it only makes sense in the context of a plan that

9    contemplates it.  But I don't know what the parties had in mind

10   on that point.

11          MR. BUTLER:  Well, I think from the debtor's

12   perspective, if you go back and look at our September 6th plan,

13   the plan in fact includes the MDL settlements as a dependency

14   to the plan, just like it does with the GM settlement and the

15   labor settlements.  It does incorporate them into the plan and

16   in fact the treatment of those stakeholders is built into the

17   treatment section, and people vote on that.

18          I know, and Mr. Broude may have his own views and

19   want to express this, but I know in my conversations with his

20   colleague, with Mr. Rosenberg, that one of the things that was

21   important, that that committee has expressed to us, is that the

22   committee wanted this taken up at the confirmation hearing in

23   the context of the votes being in on the plan.

24          THE COURT:  I understand that, and I understand that

25   that's the whole purpose of this two-step process is that it

32

1    gives everyone a chance to put it in a context.  But at the

2    same time, particularly since you had previously noticed this

3    for approval --

4            MR. BUTLER:  Right.

5            THE COURT:  -- and in this motion, those who didn't

6    object, you're seeking to, in essence, well not in essence,

7    you're seeking to bar from objecting.

8            MR. BUTLER:  Absolutely.

9            THE COURT:  If it's part of a plan, I'm not sure how

10   far that bar goes, because they could still object to the plan.

11   On the other hand, if it's in the context of a plan, their

12   rights are only to object to the plan, but as far as the

13   settlement is concerned, they can't object to that settlement.

14   Of course, the objectors, the preserved objectors, can do both.

15           MR. BUTLER:  Right.  I think we viewed that as being

16   the process, Your Honor, that in fact the only people that can

17   object to the MDL are those people who reserved their rights to

18   do it.  And we also wanted to make clear that people who wanted

19   to object to the plan itself, that this order wasn't precluding

20   them from objecting --

21           THE COURT:  Right, but it --

22           MR. BUTLER:  -- to the plan, no matter who they were.

23           THE COURT:  But if this is part of the plan, I'm not

24   sure how you can bar people from objecting to the settlement

25   without barring them from objecting to the plan.  I don't think

33

1    that's what you intended to do.

2            MR. BUTLER:  No.  I'm certainly comfortable with the

3    formulation, Your Honor, the Court suggested.  What we were

4    really trying to achieve here, frankly, in these discussions,

5    was to achieve a result the creditors' committee wanted us to,

6    which was they wanted to be able to address this at the

7    confirmation hearing and have the results of that hearing

8    incorporated into the confirmation order.  I think I have that

9    right, Mr. Broude, right?

10           MR. BROUDE:  Yes, Your Honor.  I think you do.  And

11   part of the problem is we don't -- the creditors' committee, we

12   don't think that you can object to or evaluate the settlement

13   in a vacuum.  It has to be in the context of a particular plan.

14           THE COURT:  I understand that.

15           MR. BROUDE:  And to -- you almost have sort of a

16   chicken and an egg problem if you're seeking to have the

17   settlement approved except in the context of confirming

18   particular plans --

19           THE COURT:  Well, let me read you the language again.

20           MR. BROUDE:  Sure.

21           THE COURT:  Because I think it's consistent with

22   that, which is that I would put in, instead of "as part of" I'd

23   say "at the same time that they seek confirmation of the plan

24   of reorganization and that such approval, if granted, would be

25   incorporated in the confirmation order."  So it does all happen

34

1    at the same time. But I think it's more than just an angels on

2    the head of a pin difference in that as far as the people who

3    haven't objected --

4         MR. BROUDE: Your Honor, I am certainly not opposed

5    to whatever the debtors need to do to make sure that those who

6    have not objected, or are not in the potential objector group,

7    are not permitted to object to that element of the plan.  I

8    think we may, to a certain extent, have a metaphysical issue

9    here as opposed to a substantive one.

10        THE COURT: Okay.

11        MS. STEINGART: Good morning. Bonnie Steingart from

12   Fried, Frank on behalf of the equity committee. I think it's

13   slightly more than a metaphysical issue. Part of the

14   settlement to the MDL include payments from the debtor's

15   estate. And because of that, the propriety of those

16   distributions are an integral part of the debtor's plan. So

17   there are amounts for which the debtor takes the position that

18   it's not part of the estate, others part of the estate. And

19   because of that I'm not sure the debtors can cut off rights to

20   object as the plan changes. But that's a different issue and

21   that's an issue that the Court and the debtors will deal with

22   as people may object. But the settlement itself can have no

23   vitality and really cannot be approved in terms of involving

24   the debtor's assets outside of the plan.

25        THE COURT: Well, it's to be embodied in a plan.  I

35

1    understand that.  But in terms of the process for evaluating

2    it, I think you can do it either way.  And quite properly, I

3    think the debtor has agreed to let those who wanted to preserve

4    their rights do that.

5           MR. BUTLER:  And, Your Honor, in response to Ms.

6    Steingart, she and, I think, probably don't agree on this

7    point.  I think the debtors have chosen not to press this point

8    at this time.

9           THE COURT:  And it may never be pressed.

10          MR. BUTLER:  Right.

11          MS. STEINGART:  Right.

12          MR. BUTLER:  The debtors actually believe this can

13   be --

14          MS. STEINGART:  That's what we're hoping.

15          MR. BUTLER:  -- approved outside of a plan.  Our view

16   was that we don't, you know -- we have tried in this case not

17   to ask this Court to make rulings or decisions on things that

18   don't matter.

19          THE COURT:  All right.

20          MR. BUTLER:  And, ultimately, if that issue doesn't

21   matter at the point, in part because we spent time negotiating

22   with the ERISA plaintiffs and the MDL plaintiffs who were

23   prepared to amend their settlement agreement in the district

24   court to allow us to bifurcate, which was a concession from the

25   agreements and the requirements set forth.  Without that, we

36

1    would be in a different position here.  And I should point out

2    that there was an extensive discussion with them and they

3    considered it with their clients and agreed to this

4    bifurcation, which is essentially putting them through four

5    hearings in two courts --

6              THE COURT:  Right.

7              MR. BUTLER:  -- as opposed to it.  But I think they

8    understood and I give the creditors' committee credit for this,

9    I think there was a wisdom in the committee's approach to this.

10   And I thought it was thoughtful.  We told the plaintiffs that.

11   I think they concurred with that.  And so what you have before

12   you is the product of that.  And we're certainly comfortable,

13   Your Honor, with the modified language that the Court's

14   proposing.

15             THE COURT:  Okay.  All right.  So why don't I hear

16   then from Mr. Brilliant?

17             MR. BUTLER:  So I think Mr. Brilliant is up next,

18   Your Honor.

19             THE COURT:  Okay.

20             MR. BRILLIANT:  Good morning, Your Honor.  Allan

21   Brilliant on behalf of Castlerigg Master Investments Ltd.,

22   CR Intrinsic Investors, LLC, Davidson Kempner Capital

23   Management LLC, Elliot Associates, L.P. and SPCP Group LLC.

24   Your Honor, as a preliminary matter, you know, the debtors, you

25   know, say that we're a committee.  You know, we obviously

37

1    dispute that.  The debtors have indicated that they're going to

2    file a motion under 2019.  When they file that, we'll respond

3    to it.  Your Honor presumably will rule on it.  But we both

4    agree that it's not subject to a decision today.  And all we

5    say on that point at this point is that just as the debtors

6    reserve all their rights with respect to the issue, we do so as

7    well.

8            The motion that has been filed, Your Honor, in

9    connection with the MDL settlement, seeks extraordinary relief.

10   It seeks to elevate claims that are statutorily subordinate,

11   pursuant to the Bankruptcy Code under Section 510(b), to being

12   general unsecured claims.

13           The relief requested is expressly contrary to binding

14   authority in the Second Circuit in the Iridium case which, you

15   know, states that whether or not a settlement is fair and

16   equitable is the most important factor in determining, under

17   Rule 9019, whether or not a settlement should be approved.  And

18   the Court found that specific credible grounds to justify the

19   deviation from absolute priority needs to be provided in order

20   to justify a court approving such a settlement.

21           Here in their motion the debtors do not provide such

22   specific credible, you know, grounds in order to justify a

23   deviation.  At this point in time, whether pursuant to a plan

24   that may or may not be confirmed by Your Honor, or just

25   generally under Rule 9019, why should creditors who are

38

1   statutorily subordinate be treated as general unsecured

2   creditors for purposes of distribution under a plan of

3   reorganization because the relief that they seek, you know,

4   doesn't meet the standards set out by the Second Circuit in the

5   Iridium case?  We don't believe that the Court should enter any

6   order with respect to the motion until a final hearing, whether

7   it be on an interim basis or as they call it, a preliminary

8   approval, or on a final basis, until the debtors have

9   established that relief, you know, is in fact, you know,

10  justified.

11          In addition, Your Honor, you know, we believe that

12  the hearing today is still premature.  Effectively, what the

13  debtors say -- and we'll go through the order, because I

14  believe that what they're seeking pursuant to the order, you

15  know, is very different than what they say in their papers.

16  But what they're seeking today is premature.  We have a plan

17  that's on file.  They've said they're going to modify it on

18  Monday.  There's going to be a hearing on November 8th in

19  connection with approval of a settlement statement.  And,

20  effectively, at this point among other things -- and it's the

21  among other things that are most troubling to my clients -- but

22  among other things, they're seeking at this point under Rule

23  3018(a), presumably -- they don't say in their order, but

24  presumably under 3018(a) -- to have the claims authorized for

25  purposes of voting of these class action plaintiffs as general

39

1    unsecured claims pursuant to a plan of reorganization that is

2    not currently on file.  They have a plan on file, but they have

3    acknowledged many times it's going to be amended.  And we have

4    no idea at this point whether it's going to be amended with

5    respect to, you know, treatment of the MDL or other classes.

6    We understand --

7         THE COURT:  Well, it wouldn't be amended as to the

8    treatment of the MDL, because they could only vote pursuant to

9    the terms of the settlement which incorporates the settlement

10   into any plan.  They're not, under this order, allowed to vote

11   on anything other than a plan that has a settlement in it.

12         MR. BRILLIANT:  That's right, Your Honor.  But under

13   this plan, any amended plan or any subsequent plan, if Your

14   Honor were to deny confirmation of the current plan or any

15   amended plan all the way into the future without this order

16   that they would ask Your Honor to enter today, you know, ever,

17   you know, terminating at all.  The order would continue into

18   effect during the entire pendency of this case so long as the

19   debtors propose, you know, an order that, you know, contains

20   the terms of the settlement.

21         But the key thing, Your Honor, here is that under

22   Rule 3018(a), ordinarily a court will not allow someone to

23   temporarily have the right to vote on a claim except under a

24   specific plan.  And here they're seeking to have that, under

25   the current plan that's on file, any amended plan, which

40

1   presumably will be filed on Monday, and any future plan, even

2   if that plan wouldn't be confirmed.  One of the things that we

3   had requested --

4        THE COURT:  But they're in a separate class and the

5   vote doesn't count if the settlement isn't approved.

6        MR. BRILLIANT:  Your Honor --

7        THE COURT:  And it's only in connection with a plan

8   that has an MDL settlement -- the MDL settlement in it.  I

9   don't see why this is anything more than a provisional vote.

10        MR. BRILLIANT:  Your Honor, we had asked that there

11   be language in there that specifically said that if the

12   settlement wasn't approved that the vote wouldn't count.  They

13   rejected the comment.

14        THE COURT:  It's already there.

15        MR. BRILLIANT:  It's not, Your Honor.  The

16   determination provisions in the order do not provide, you know,

17   that the vote wouldn't count.

18        THE COURT:  But the vote doesn't matter.  It's in a

19   separate class.  All they're saying is reaffirming their

20   support for the settlement.  It's a technical thing so that

21   they're not objecting to the plan.  They're actually voting in

22   favor of the plan.  But it doesn't affect any calculus of

23   anyone else's right to vote because they're in a -- they're in

24   their own class.

25        MR. BRILLIANT:  Your Honor --

41

1          THE COURT:  I understand.  If for some reason they

2     needed an accepting impaired class to confirm the plan there

3     might be an issue, but that's where you can designate the vote

4     for gerrymandering purposes.   But that's not what's going on

5     here.

6          MR. BRILLIANT:  Right.  Well, Your Honor, maybe we

7     should, you know, turn to the order.

8          THE COURT:  Maybe we should.

9          MR. BRILLIANT:  We don't believe that at this point

10    in time, you know, based upon the fact that Your Honor, you

11    know, should approve the entire motion on a preliminary basis.

12    And we believe that notwithstanding what they're saying in

13    their motion, that when you look at the form of the order that

14    they're proposing, that is in fact what they are seeking to do.

15    Your Honor, if you look at, you know, the title, you know, of

16    the order, it's "Order preliminarily approving multi-district

17    litigation and insurance settlement."  Now, we had asked them

18    to change it to say "Order preliminarily approving certain

19    provisions of the multi-district litigation and insurance

20    settlement."  And they refused to do that.  You know, we said

21    well, but that -- you're saying that it's only approving

22    certain mechanics.

23          THE COURT:  I don't have any problem with that,

24    except that it is being approved as to those who didn't object.

25          MR. BRILLIANT:  Well and then maybe Your Honor can

42

1   say that it's not being approved as to those who didn't object.

2   But at least with respect to everybody else --

3           THE COURT:  Well --

4           MR. BRILLIANT:  Your Honor should not be giving

5   your --

6           THE COURT:  Don't we all really know what's happening

7   here?  I mean, do we really have to be that specific and

8   lengthen the terms of the order with unnecessary clauses?

9           MR. BRILLIANT:  Your Honor, you know, I don't --

10          THE COURT:  Particularly when you have a settlement

11  that's heavily negotiated between about forty-five different

12  parties?

13          MR. BRILLIANT:  Your Honor, we believe this is

14  substantive.  You know, Mr. Butler in his presentation and in

15  their reply, you know, said that Your Honor shouldn't approve

16  this unless you believe that it is being capable of being

17  approved --

18          THE COURT:  I agree with that.

19          MR. BRILLIANT:  And so we believe --

20          THE COURT:  I think that's your only legitimate point

21  here.  I really do.

22          MR. BRILLIANT:  Okay.

23          THE COURT:  Unless you can point me to some other

24  language that somehow prejudices you.  And I've gone through it

25  in pretty thoroughly, I think, and come to the conclusion that

43

1    you're not prejudiced.  I think it is true, just as one should

2    not authorize a disclosure statement to go out if you don't

3    believe that there's any chance of the plan being confirmed,

4    because the debtor's asking for certain relief.  I think there

5    is some threshold inquiry I need to make here to let this

6    settlement be binding as to those who didn't object.  And to

7    some extent, although I think it's a pretty low inquiry, to

8    grant the other relief provided here, which is really

9    procedural as opposed to anything else.  But certainly there

10   has to be some threshold inquiry on my part to bind those who

11   didn't object.

12            MR. BRILLIANT:  Your Honor, as I said earlier, we

13   don't believe under the Iridium decision in the Second Circuit,

14   you know, given the fact that, you know, the settlement, you

15   know, changes priority that it meets that minimum threshold.

16   You know, as we had said in our limited objection, we tried to

17   work out, you know, the form of an order that we thought would

18   be more appropriate here.  We, as Your Honor had said, you

19   know, don't have a problem with, you know, the debtor saving

20   money by only having, you know, by approving the class

21   settlement and allowing the, you know, the class

22   representative, you know, to vote rather than having to have,

23   you know, the votes from all the parties.  But we don't believe

24   that, you know, that the order adequately reflects it.  Now, I

25   understand what Your Honor is saying.  And I ask you to turn to

44

1   paragraph 1 as well.

2          THE COURT:  Okay.

3          MR. BRILLIANT:  And the paragraph 1, you know, starts

4   off keeping in mind, you know, the caption of the order as I

5   already pointed out.  And it says the settlements proposed in

6   the motion are preliminarily approved.  And it's, you know, we

7   had said to them well, no, it's not preliminarily approved, you

8   know, the Court is not making findings of fact that it's fair

9   and equitable that it meets the standards of 9019 and Iridium.

10  All the Court is really doing is approving certain relief

11  herein.

12          We had proposed that after the words " preliminarily

13  approved," language be added that says "solely as to the relief

14  granted in this order."  And the debtors told us no, they won't

15  do that, it is being preliminarily approved.  Now, we said

16  well, we can't agree that it could be preliminarily approved,

17  because it doesn't meet the standards to be preliminarily

18  approved.  You know, they're --

19          THE COURT:  I'd put in "to the extent provided

20  herein."  I mean, I'll hear from the debtors on that, but I

21  don't have a problem with that.

22          MR. BRILLIANT:  Your Honor --

23          THE COURT:  And then carrying on with the rest of it,

24  which does have the language about final consideration at the

25  confirmation hearing, but I understand your argument on that

45

1    point.

2           MR. BRILLIANT:  You know, Your Honor, with respect to

3    paragraph 4 and paragraph 8, you know, we ask that the language

4    here which deals with the allowance for voting purpose, we

5    thought it should trap Rule 3018.  And in the second line after

6    the word "hereby," we proposed putting in the word

7    "temporarily," which is the language of 3018.  When you approve

8    allowance to vote under Rule 3018(a), you were doing it

9    temporarily.  It's not on a permanent basis.  And then we --

10          THE COURT:  But doesn't the clause "solely for the

11   purpose of" govern that?  I mean, it is temporary because it's

12   only for that purpose.  It's actually clearer than saying

13   temporarily, because the plaintiffs could say well, you know,

14   temporary for how long?

15          MR. BRILLIANT:  Well --

16          THE COURT:  For five minutes?  For five years?  I

17   mean, I think this is more specific and clear.

18          MR. BRILLIANT:  You know, Your Honor, our view is

19   that Your Honor really shouldn't approve this until November

20   8th when you know what the plan is, and you should only do it

21   in connection, you know, with that plan.  And if that plan's

22   not confirmed then the authority would disappear, which is the

23   way --

24          THE COURT:  I think if they were going to -- and

25   again, this is done in the same sentence.  They say in the next

46

1    paragraph that that claim will be classified in its own class.

2    If they weren't going to do that, I would agree with you.  But

3    I think as long as it's in one class, it's not adversely

4    affecting anyone else's right to vote.  And it really is parked

5    up there as the settlement to the extent that that's going to

6    be approved as part of the plan.  I just don't see how anyone's

7    real voting rights are affected by that.

8           MR. BRILLIANT:  Your Honor, in paragraph 12, which is

9    the, you know, the termination provisions here.  You know, the

10   voting rights, as we discussed earlier, you know, they continue

11   for this plan, any amended plan, or any other plan that

12   contemplates the stipulation.  Effectively, this preliminary

13   approval, you know, doesn't ever terminate.  If you do an

14   interim DIP order, you have a final hearing, it terminates at

15   the end of the, you know, final hearing, whether it's approved

16   or it's not approved.

17          We had proposed, and it's not too different than Your

18   Honor's question about what is it exactly that is going to

19   happen, you know, at the confirmation hearing that there be,

20   you know, a third issue here and that the right to continue to

21   have the right to vote would terminate if the relief sought in

22   the motion is not granted at the final hearing regarding the

23   proposed settlement.  So that it's not a situation where you

24   get to the confirmation hearing and the motion, you know, is

25   not ruled on or it's withdrawn and this just continues to be

47

1    out there as a preliminary approval, you know, of the

2    settlement.

3          It should terminate as a matter of law if it's not

4    approved on a final basis by Your Honor, you know, at the

5    hearing on the motion, which will occur contemporaneously to

6    the confirmation hearing.  The way they have it currently it

7    would only terminate if either the debtors or the class action

8    plaintiffs were to terminate it as provided under these, you

9    know, here in the paragraph.  And we didn't think that that was

10   appropriate.  If it's a preliminary order with certain

11   procedural relief, it should be limited in scope to, you know,

12   our view, you know, one plan and to a limited period of time.

13         THE COURT:  You don't understand that it says "or is

14   otherwise terminated pursuant to applicable law as determined

15   by a court of competent jurisdiction."

16         MR. BRILLIANT:  So, but, Your Honor, you know, no one

17   should have to file a motion to terminate this.  If it's not

18   approved on a final basis, it should be terminated.

19         THE COURT:  I really think you're splitting hairs

20   here.  As a practical matter, you can conceive of situations

21   where a court would say something needs to be adjusted here to

22   make it work.  And that something may not necessarily be in the

23   settlement.  It may be somewhere in the plan.  And someone else

24   may be willing enough, because their economic stake in having

25   the plan be confirmed, that they'll make the adjustment, not

48

1   the settling parties.  That's conceivable.

2           On the other hand, when push comes to shove that's

3   not going to happen, it's going to be pretty easy, I think, for

4   the parties to decide this is a waste of time.  And if they

5   can't decide it then the Court will say the stipulation's over.

6   But I don't see why you need to make it as brittle as you want

7   to make it.  I think there needs to be some flexibility here

8   because, as everyone acknowledges, this is built into an

9   overall set of transactions that the debtor wants to have

10  confirmed as part of its plan.

11          But I think no one would dispute that before a plan

12  gets confirmed there may well be some adjustment to that

13  overall set of transactions.  I mean, this isn't saying I

14  think, what you're afraid of, which is that it's locked in

15  forever at the debtors and the settling party's discretion.  It

16  has termination by a court of competent jurisdiction and

17  everyone's subject to the requirements of the Bankruptcy Code

18  as well as the requirements that the district court has to

19  apply when it does final approval.

20          MR. BRILLIANT:  Your Honor, I think, you know --

21          THE COURT:  I certainly wouldn't want to put a

22  harness around the district court and say that, you know, one

23  element of the settlement, which is this voting right,

24  terminates if the district court disapproves the settlement.

25  Because, as we all know, sometimes when there's a legitimate

49

1   objection to a settlement, people scratch their heads and say

2   well, you know, maybe we can adjust things to deal with that.

3   And I just think that that's all the -- I can understand if

4   that's the rational for the debtors opposing your change.  And

5   again, if there's some ulterior purpose, that can be dealt with

6   under the appropriate circumstances.

7           MR. BRILLIANT:  I guess, Your Honor, you know, in

8   sum, you know, given the, you know, the extraordinary relief

9   here that, you know, they wanted on an interim basis,

10  preliminary basis against, you know, parties here that we

11  believe aren't in violation at all, we don't think that any

12  order should be entered to the extent that Your Honor does

13  decide that some kind of preliminary order is appropriate.  We

14  would like, at a minimum, that it be clarified to provide that

15  the relief that's being granted is only with respect to the

16  specific procedural terms here and that it's not being approved

17  on a preliminary basis, you know, as being fair and equitable,

18  meeting the 9019 and the Iridium standards.  We just don't

19  believe that they have met that, can meet that, will be able to

20  meet that, whether it be today or at the final hearing and we

21  would not want them to be able to use this to, you know,

22  bootstrap any arguments they would have at a final hearing.

23          THE COURT:  Okay.

24          MR. BUTLER:  Your Honor, two preliminary matters in

25  responding.  First, Mr. Brilliant in his comments led off, in

50

1   addition to the Iridium argument -- led off with the fact that

2   he believed that this was a concealed attempt under 3018(a) to

3   have these claims allowed as members of the general unsecured

4   claims class and to vote general unsecured claims.  I think

5   Your Honor disposed of that when you looked at the actual

6   language in paragraph 4.  I mean, the words were carefully

7   chosen here and carefully negotiated.  And the order, if Your

8   Honor approves this -- the securities' allowed claim in

9   interest could only be voted in a separate class.  It's an

10  imperative the way it's drafted:  "shall be in a separate

11  class".  There is no effort here to have this be a disguised

12  3018(a) determination of moving the MDL plaintiffs or the lead

13  plaintiffs into the general unsecured class.

14          The second point I just wanted to make so we do have

15  the basis of the record here:  we did provide exhibits for this

16  particular hearing which are simply the stipulations as

17  Exhibits 1 through 3; the Exhibit 4 with the change of the

18  bifurcation change of procedure outline that went to the

19  parties including Mr. Brilliant.  Exhibit 5 and 6 are the

20  district court preliminary approvals, and I do think it's

21  instructive for Your Honor to be able to look at Exhibit 5, the

22  preliminary approval that Judge Rosen gave.  He called his a

23  preliminary approval order too and it's quite clear that he is

24  holding his full fairness hearing and merits hearing in mid-

25  November.  And then, finally, Exhibits 7 through 13 are the

51

1    motions, the objections filed, our reply, the former proposed

2    order and the blacklines and service matters.  And so we do

3    have those on the record.  I'd like to move Exhibits 1 through

4    13 into evidence.

5            THE COURT:  Okay.  Does anyone have any objection to

6    the admission of those exhibits?

7            MR. BRILLIANT:  No objection, Your Honor.

8    (Stipulations was hereby received as Debtor's Exhibit 1 - 3 for

9    identification, as of this date.)

10   (Bifurcation change of procedure outline was hereby received as

11   Debtor's Exhibit 4 for identification, as of this date.)

12   (District court preliminary approvals was hereby received as

13   Debtor's Exhibit 5 - 6 for identification, as of this date.)

14   (Motions, objections, blacklines, service matters was hereby

15   received as Debtor's Exhibit 7 - 13 for identification, as of

16   this date.)

17           THE COURT:  Okay.  They'll be admitted.

18           MR. BUTLER:  Your Honor, with respect to the Iridium

19   matter and to the Second Circuit's announcement on that, I

20   think the Second Circuit was careful in their wording.  I

21   concur with Mr. Brilliant's statements that the priority scheme

22   of the Bankruptcy Code is deemed by the Second Circuit as being

23   a most important factor or the most important factor generally

24   but the Second Circuit went to great length to not adopt the

25   per se rule -- I think it was at the Fifth Circuit at the time

52

1   in the opinion -- and this was in the context of a settlement

2   as opposed to being decided at the time of the plan of

3   confirmation hearing.  And ultimately, in discussing this with

4   the creditors committee, we believed we addressed the Iridium

5   issue in part by having this considered in the context of the

6   confirmation hearing process.  Certainly with Your Honor's

7   amendments, we understood that.

8           And we believe that if Your Honor examines the

9   stipulations, examines the plan that is on file, we believe

10  that that plan is capable of confirmation and ultimately, when

11  we look at the Iridium case, I certainly don't see the Iridium

12  case in any respect as a bar on this Court or providing this

13  Court with a bar to making the determination now that this is

14  capable of approval at the merits hearing in connection with

15  the confirmation hearing here and therefore, Your Honor, we

16  believe that this preliminary relief ought to be granted.  We

17  think it's been carefully crafted with our statutory committees

18  and other parties in interest other than Mr. Brilliant's group

19  to try to achieve that and we think this is an extremely

20  important element of the overall fabric of settlements here.

21          This is a case which has just a multitude of

22  settlements in it.  It is a real challenge for the debtors to

23  try to maintain all of those settlements as people's economic

24  interests change and claims trade and other matters occur here

25  and it's not always entirely clear to the debtors positions

53

1    people take and why they take them but we believe there is, as

2    a matter of law, nothing in the Second Circuit Iridium decision

3    that would prevent this Court from making the determinations

4    today and we believe that, based on the evidentiary before Your

5    Honor as it relates to the actual substance of the settlements

6    and what they're trying to accomplish and how they're being

7    processed, that you can make the same kind of preliminary

8    approval in the bankruptcy context that Judge Rosen was able to

9    make in the district court securities context, which is a

10   determination that it is appropriate to proceed with the

11   procedural relief set forth in this order and that Your Honor

12   will consider, at the confirmation hearing, any valid

13   objections raised by any of the parties in interest who

14   retained their rights to object, which includes Mr. Brilliant's

15   clients.

16            THE COURT:  Okay.  All right.  I have before me a

17   modified motion by the debtors seeking certain relief now in

18   connection with their proposed settlement with class plaintiffs

19   in the MDL litigation pending in Michigan embodied in three

20   stipulations:  the securities stipulation, the ERISA

21   stipulation and the insurance stipulation.  Originally, the

22   debtors sought approval of this settlement under Rule 9019 and

23   Section 363(b) of the Bankruptcy Code gave parties in interest

24   a deadline to object to the merits of the settlement and

25   scheduled a hearing thereon.  Certain parties in interest

54

1    sought an extension of the deadline and/or were granted an

2    extension of the deadline to object and had persuaded the

3    debtors that, as to those entities who did receive an extension

4    of the deadline to object, that that deadline would be further

5    extended to the same date as the date for objecting to

6    confirmation of the debtors' plan of reorganization.

7         It's contemplated that that plan would include as a

8    condition or be premised upon, among other things, the

9    implementation of the MDL settlement.  And the objecting

10   parties or the potentially objecting parties persuaded the

11   debtor that their objections, if any, should be heard in the

12   context of the particular plan that would be premised in part

13   upon the settlement.  Among other things, that makes sense

14   because the Bankruptcy Code permits parties in their vote on a

15   plan as a class to express their preference for altering the

16   priority scheme otherwise set forth in the Bankruptcy Code and

17   an element of this settlement, it is argued and it may well be

18   the case, does just that.

19        So, as far as the relief that's being sought today,

20   the debtors have been careful to make it clear throughout, and

21   the record certainly should be clear after this morning's

22   hearing, that as to the potentially objecting parties, and they

23   are listed in the proposed order, their rights to object to the

24   proposed settlement and of course their rights to object to the

25   proposed plan, too, are fully preserved.

55

1          Today, therefore, the debtors are seeking approval of

2    the settlement in the following respects:  first, provisional

3    certification of the securities and ERISA classes for purposes

4    of voting on a plan that would incorporate the MDL settlement

5    for solely those voting purposes, allowance solely for those

6    voting purposes of the claims of those two classes as set forth

7    in the MDL settlement or the proposed settlement and that the

8    settlement be binding on those who did not object to it.

9          As a lesser matter, the Court is also being asked to

10   modify the automatic stay or the conditions of previous

11   modifications of the automatic stay in the previously agreed

12   order regarding discovery that would lift the automatic stay

13   with respect to documents previously produced by the debtors to

14   the securities' lead plaintiffs under that agreed order so long

15   as the settlement has not been terminated for use as

16   contemplated in the settlement.

17         The modified relief that the debtors have sought is

18   unopposed except by an ad hoc group of plaintiffs who contend

19   that they hold an aggregate of not less than 420 million

20   dollars, an aggregate principal amount of senior notes.  They

21   had previously objected to the settlement on its merits

22   contending that it should not be approved in that it would

23   treat the allowed claims of the settling classes pari passu

24   with the allowed claims of other unsecured creditors

25   notwithstanding Section 510(b) of the Bankruptcy Code.

56

1        Obviously, that objection is fully preserved as I

2    said earlier but this ad hoc group represented by Goodwin

3    Procter has taken the position that the entry of the order that

4    the debtors are currently seeking, notwithstanding the

5    intention as set forth on the record to fully preserve its

6    objection, would prejudice the objection.

7        I, as perhaps indicated by my remarks during oral

8    argument, do not accept that logic.  I believe that as amended

9    on the record, it's crystal clear that the ad hoc group's

10   rights to object to the settlement and to any plan premised

11   upon in part the settlement are fully preserved as are the

12   rights of the other potentially objecting parties.

13       As I noted, the only potential risk of prejudice to

14   the objecting group as well as the potential objecting parties

15   could have been in the allowance for voting purposes of the

16   claims of the class representatives.  However, given that those

17   claims will be set forth in a separate class, they would in no

18   way dilute the votes of the Goodwin Procter group or any other

19   potentially objecting party or any party who wished to vote

20   against the plan, to the extent that the separate classes

21   consisting of the ERISA class representative and the securities

22   class representative would be the only accepting classes in

23   connection with the plan.  I would of course at that point

24   consider whether those classes would count and, as a practical

25   matter for reasons I'll get into in a moment, the issue would

57

1   in all likelihood be moved because it would reflect a negative

2   vote by every other class on the plan, which would have, in my

3   mind, a dramatically adverse effect on my likelihood of

4   approving the settlement.

5          But that, as the parties I think all recognize, is a,

6   at this point, highly hypothetical question and illustrates why

7   it was a very good idea to permit the objecting parties to have

8   an extension of their time to object so that everyone can see

9   the actual result of the vote on the plan and determine whether

10  to make their objection in light of that vote.

11         So I do not see a basis for the Goodwin Procter group

12  to sustain an objection to the relief that's being sought

13  today.  I do have to consider the merits of the settlement in

14  some respect, I believe, today, however, in that the debtors

15  are seeking to preclude those who did not object or get a

16  timely extension of their right to object to the settlement.

17         And secondly, I need to consider the settlement as

18  did Judge Rosen in this limited extent to determine whether it

19  is appropriate at this point to certify a class for settlement

20  purposes and whether the settlement is sufficient to warrant

21  the allowance of the class vote for voting purposes.  Let me

22  deal with that point first.

23         I can certainly conceive of circumstances pursuant to

24  which the requisite majorities in number and amount of

25  unsecured creditors would vote in favor of a plan premised

58

1    upon, among other things, this settlement.  The temporary

2    allowance for voting purposes of the class representatives'

3    votes pursuant to this proposed order would facilitate

4    confirmation of a plan that was otherwise approved by the

5    requisite majorities of unsecured creditors.  As I said before,

6    I believe it would have very little if no effect on

7    confirmation of a plan if the vote was a no-vote by the

8    requisite majorities of the unsecured creditors in the

9    unsecured creditor class, particularly if that was coupled with

10   a cogent objection to the settlement by the potentially

11   objecting parties.

12           So it certainly seems to me advisable to temporarily

13   allow the votes as provided in the proposed order to see if

14   that process will play out.

15           As far as approving the settlement over the

16   nonobjection of the nonobjecting parties and recognizing that,

17   as set forth in the order this approval is only as to them and

18   not to the potentially objecting parties or to the Goodwin

19   Procter group, I conclude that the settlement can indeed be

20   approved as to the nonobjecting parties in light of and first

21   and foremost because of the fact that after due notice they did

22   not object.  In assessing a proposed settlement under

23   Bankruptcy Rule 9019(a), the Court's review reflects a tension

24   between, on the one hand, that in reviewing the settlement

25   agreement the Court is not required to conduct a mini-trial of

59

1    the compromised issues and claims, and on the other hand that

2    the Court may not simply rubber stamp the recommendations of

3    the trustee or debtor in possession but instead must make an

4    independent assessment of the wisdom of the proposed

5    compromise.

6            The Second Circuit has identified factors that should

7    guide the Court's inquiry in resolving that tension that are

8    based upon the factors set forth by the Supreme Court in the

9    TMT Trailer Ferry case, 390 U.S. 414, 424-425 (1968).  I am of

10   course also guided by the Second Circuit's recent opinion in In

11   re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007) in which,

12   where a settlement was opposed, the Second Circuit said that

13   whether the settlement is fair and equitable is the primary

14   consideration for the court if in fact the settlement does

15   violate the fair and equitable rule as a term of art under the

16   Bankruptcy Code, that is, would alter the absolute priority

17   rule set forth in the Code.

18           Two things in this context, I think, are worth noting

19   about the Iridium opinion.  First, as Mr. Butler noted, the

20   Second Circuit was careful to say that while satisfaction of

21   the fair and equitable test is a primary, if not the primary,

22   matter upon which the court should focus, it is not the only

23   consideration and indeed the fact that a settlement violates

24   the fair and equitable rule does not necessarily doom it upon a

25   proper showing.

60

1          Second and equally important, the Iridium settlement

2    was opposed and it has long been recognized that particularly

3    where there is an arm's-length settlement, and it does appear

4    to me that this was an arm's-length negotiation following an

5    extensive mediation process in the district court, the Court

6    should pay great attention to the paramount interests of

7    creditors and in proper deference to their reasonable views.

8    Indeed, if creditors have been properly noticed and apprised of

9    the circumstances surrounding the settlement, the creditors'

10   failure to object indicates an informed judgment in support of

11   the settlement.  See In re Remsen Partners, Ltd., 294 B.R. 557,

12   567 (Bankr. S.D.N.Y. 2003).

13          On that basis, I conclude that those who failed to

14   object are properly bound by this settlement, which was

15   explained extremely thoroughly in the motion.  It may be also

16   at the end of the day in light of the class vote that the same

17   or similar considerations will apply in respect of any other

18   objection, which is, as I said before where I believe,

19   particularly given the protection set forth in this order, the

20   matter can proceed to the next stage.

21          So consequently, I'll grant the modified relief that

22   was sought.

23          MR. FOX:  Your Honor, can we clarify one point,

24   please?

25          THE COURT:  Sure.

61

1          MR. FOX:  Your Honor, Wilmington Trust Company as

2   indentured trustee represents the interests of all bondholders

3   in connection with this matter so when Your Honor says that

4   you're approving the settlement as to parties who have not

5   objected, I want it to be clear that, to the extent Wilmington

6   Trust files an objection and that objection is sustained, that

7   that applies to all bondholders.

8          THE COURT:  I understand your concern.  You can

9   voice -- the bondholders under the indenture give Wilmington

10  Trust the right, just as they do to file proofs of claim to

11  make an objection on their behalf.

12         MR. FOX:  Thank you, Your Honor.

13         THE COURT:  I do want to say, because as you can

14  tell, I take the views of creditors very seriously, that in

15  this context in particular, I think the Goodwin Procter group

16  would be well advised -- and this can be done pursuant to

17  proper procedures -- to clear up any issue as to whether, if

18  they are going to pursue their objection in the future, their

19  interests truly are in the class that they say they're in and

20  not affected by other interests elsewhere, the type of concern

21  I don't really have with regard to an official creditors

22  committee or an indentured trustee.

23         As far as the order is concerned, there are a couple

24  of provisions in this that I put a question mark next to and I

25  want to discuss them with you briefly.  In a couple of places,

62

1   and I know this is set forth in the settlement agreement and I

2   know it's also set forth in Judge Rosen's order, I believe,

3   too, which is fine, it states that the lead plaintiffs and the

4   ERISA lead plaintiffs shall vote in favor of the plan.  I'm a

5   little uncomfortable with that.  They've agreed to do so.  The

6   settlement's only effective if they do so but I'm uncomfortable

7   in directing them to do so and I would prefer it to say "have

8   agreed to cast any and all votes" as opposed to "shall cast any

9   and all votes".

10          MR. BUTLER:  (Indiscernible) I'd hate to do otherwise

11  and I think we would surely take the position, and Mr. Utland's

12  (ph.) present in the courtroom, that if they didn't, they'd be

13  violating the settlement --

14          THE COURT:  Well, they would be and I think they'd

15  also be violating Judge Rosen's order but for a bankruptcy

16  court to direct someone to vote is somewhat problematic.

17          MR. BUTLER:  I don't have a problem with that, Your

18  Honor.

19          MR. SPEAKER:  Your Honor, I would only have the

20  caveat that that agreement is premised on the plan being

21  consistent within --

22          THE COURT:  Right.  It has to have the settlement in

23  it.

24          MR. SPEAKER:  Right.

25          THE COURT:  Right.

63

1          MR. SPEAKER:  So with that caveat, yes.  That's what

2     we agreed to.

3          THE COURT:  Okay.

4          MR. BUTLER:  I think, Your Honor, we were actually --

5     the purpose of that and I'm perfectly acceptable -- understand

6     the change.  The purpose of that was in some respects to, you

7     know, to insulate the lead plaintiffs.  I mean, they're acting

8     pursuant to a district court order and pursuant to an

9     agreement --

10          THE COURT:  Right.

11          MR. BUTLER:  -- and we had thought that we should

12     carry that forward but I understand the distinction.

13          THE COURT:  Okay.  So where that comes up, and it

14     comes up in a few places, I've deleted it or said that they

15     have agreed to do so as opposed to -- I've also put in, where

16     their claims are allowed for voting purposes, that they're

17     granted an allowed claim or in the case of ERISA class an

18     allowed interest in these cases and I've added the phrase

19     "under the terms of the ERISA stipulation or under the terms of

20     the other stipulation" which makes it clear it's all in

21     connection with the settlement.

22          MR. BUTLER:  Yes, Your Honor.

23          THE COURT:  Okay.  All right.  So I'll make those

24     changes to the order and it will get entered.

25          MR. BUTLER:  Thank you, Your Honor.

64

1          MR. BRILLIANT:  Your Honor, Allan Brilliant on behalf

2     of the, you know, five, you know, those that I had mentioned

3     earlier.  In the colloquy we had at the podium, you had also

4     indicated you were going to make a change to paragraph --

5          MR. COURT:  Oh, that's in there.  Yeah, that's in

6     there.

7          MR. BRILLIANT:  Okay.  Thank you, Your Honor.

8          MR. COURT:  The one that says "to the extent provided

9     herein"?

10         MR. BRILLIANT:  Yes, Your Honor.

11         THE COURT:  Yeah.  Okay.

12         MR. BUTLER:  And on number 10, Your Honor?

13         THE COURT:  Yes.

14         MR. BUTLER:  Your Honor, the tenth matter on the

15    omnibus agenda today is the twenty-first omnibus claims

16    objection at docket number 9535.  Your Honor, in this omnibus

17    objection, there were 209 proofs of claim that were dealt with

18    on the objection and of those 209 claims, we received responses

19    covering sixty-one of those proofs of claim.

20         With respect to the sixty-one claims covered by

21    responses, one of the respondents -- International Rectifier,

22    proof of claim number 13788 -- consented to the relief

23    requested of the debtors so that would -- if you subtract the

24    sixty responses, that would bring you down to 149 proofs of

25    claim that we'll actually seek relief with today.

65

1          Reconciling another way, there were sixty-one

2    responses covered by the -- or sixty-one proofs of claim

3    covered by the responses; one settled, as I just described.  We

4    also withdrew an objection and that would be with respect to

5    the CTS Corporation proof of claim at claim number 11256.  That

6    was due to reconciliation there that we're going to correct and

7    we'll deal with that in a subsequent objection moving forward

8    but we did need to correct the reconciliation error that was

9    pointed out to us.

10          So, Your Honor, in today's hearing we'll actually ask

11   Your Honor in the order and our reply and the charts we provide

12   consistent with these omnibus objections -- we'll move forward

13   fifty-nine proofs of claim asserting liquidated damages or

14   approximately sixty-three million dollars to the claims track

15   and we'll deal with those in the regular custom in these cases

16   in the claims track.

17          At today's hearing, we'd ask Your Honor to grant

18   relief with respect to 149 claims that assert liquidated

19   damages for approximately 34.4 million dollars, specifically,

20   Your Honor, we'd ask the Court to expunge 36 of these claims

21   with an asserted claim amount of approximately 21.1 million,

22   and with respect to the remaining 113 claims we'd assert

23   approximately 13.3 million dollars.

24          We are seeking various modifications including

25   identifying the debtor against whom the proof of claim is

66

1    asserted, the class, the amount of the claim, reducing the

2    amounts of the claim and so forth.  There is approximately an

3    aggregate reduction in those claims of about 1.9 million

4    dollars, reducing them in the aggregate from 13.3 million to

5    11.4 million.

6            As Your Honor has inquired in prior hearings, we do

7    do the particularized notices that Your Honor wants in these

8    cases with respect to these things so that an objector

9    understands if their claim is being objected to and if Your

10   Honor grants the relief today, we will send out with the order

11   a particularized notice to the objectors whose claims are

12   affected by the relief being granted.

13           THE COURT:  Okay.  And I think you said this but I

14   just want to make sure, you incorporated into this order the

15   agreements that you reached with the few people who you've

16   agreed with?

17           MR. BUTLER:  Yes, Your Honor.

18           THE COURT:  Okay.  All right.  Does anyone have

19   anything to say on the omnibus objection?  All right.  I will

20   grant the omnibus objection as modified.  As modified, it

21   covers claims that have been settled following the notice of

22   objection and also claims where the claimant has not opposed

23   the debtors' objection after individual notice.  Based on my

24   review of the objection, the objection was sufficient to shift

25   the burden to the claimant to object to support his claim and

67

1    where they have not done so, their claim's properly either

2    disallowed or modified as provided in the objection.

3            MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

4    next matter on the agenda, matter number 11, is the DASHI

5    intercompany transfer motion.  We filed this at docket number

6    10484.  There was a preliminary objection from Wilmington Trust

7    who filed a document number 10564 which has been resolved and

8    there have been comments to the relief requested by both our

9    DIP lenders and by the PBGC which have been accommodated in a

10   form of proposed modified order.

11           Your Honor, in connection with this motion, what we

12   are seeking from the Court today is a confirmation of DASHI's

13   authority to consummate an intercompany transfer to DAS, LLC.

14   DASHI is in the process of accumulating cash balances from

15   nondebtors in the company's global corporate structure in an

16   amount that's expected to be up to 650 million dollars and upon

17   accumulation of those funds or after that process is completed,

18   DASHI intends to effectuate a transfer of those funds under the

19   cash management order entered in these cases to DAS, LLC.

20           We believe that this is in fact, and have contended

21   throughout these cases, this is from the debtor's view nothing

22   more than an ordinary course transaction for us.  We move cash

23   balances around our entire system on a regular basis; this one

24   is a larger one.  It's a larger one because it's no surprise, I

25   think, to any of the parties in this case who've been following

68

1    the case, that the debtors' North American business operations

2    are a consumer of cash and the global business operations have

3    been generally a generator of cash.

4            And, ultimately, we are in a position now where we

5    have moved for the first time recently in recent months in

6    being a constant net borrower under the DIP Revolver, you know,

7    within the debtor entities and generating interest expense that

8    could be saved simply by, in fact, repaying that with cash that

9    the company has.  The company has a very significant amount of

10   cash in its global -- globally and on a consolidated basis and

11   is in a position, as it has been throughout these cases, to

12   manage its business in the ordinary course of its business, you

13   know, in an area that the company -- and has owned the company,

14   continues to believe is quite comfortable in terms of the cash

15   that we have and the ability to fund our operations globally.

16           The company chose to make this transfer to respect

17   the terms of the cash management order that Your Honor entered.

18   We have been guided throughout these cases by the colloquy that

19   Your Honor had with us at the time of the first day hearing and

20   as the orders were amended after the creditors committee was

21   appointed in those discussions, in which Your Honor made clear

22   to us that you expected that we would -- the company would

23   exercise a reasonable business judgment from the perspective of

24   each of the various entities involved in these transactions to

25   make sure that these transactions made sense and were

69

1    reasonable from the various perspectives of the various

2    entities and that any transfer like these is subject to a lien

3    junior to the DIP lenders but still subject to a lien or a

4    priority.

5            And therefore we chose to move forward with this.  We

6    shared this information with our statutory committees.  Our

7    committees, in particular the creditors committee, asked us to

8    bring this on for motion.  We did so notwithstanding the fact

9    we believe it's completely authorized by the cash management

10   order but, as Your Honor knows, when you're in the middle of

11   plan time and lots of people's interests are being subject to

12   adjustment and compromise, it's a period in any

13   Chapter 11 case, certainly in a large Chapter 11 case, where it

14   is, as I sometimes think, difficult to do much of anything in

15   the ordinary course of business even if it is.

16           So we brought this motion on.  We have had extensive

17   discussions with the parties.  I am pleased to report, Your

18   Honor, that it is no longer contested.  We dealt with the

19   Pension Benefit Guaranty Corporation issue which is, you know,

20   in some respects, a fascinating issue as a matter from a legal

21   perspective but an issue frankly the debtors didn't want to

22   have to actually deal with here.  And while I would, you know,

23   in a classroom or in some other context love to debate the

24   extraterritorial rights of the PBGC, the fact of the matter is

25   Delphi did not want and does not want to take on that burden,

70

1    particularly given the fact that we have been quite

2    appreciative of the relationship that we've developed with the

3    PBGC during the course of these cases which has led to, among

4    other things, the waivers that we have received, the

5    preservation, the ability to actually preserve the pensions in

6    this case and we have worked cooperatively with them both in

7    their individual capacity and in their membership in the

8    creditors committee.

9           And so what we have chosen to do and what the order

10   reflects is a conditional adequate protection grant that

11   basically gives them a grant of adequate protection and a lien

12   junior to the liens of the DIP lenders that will become

13   effective, and this was the DIP lenders' comment late last

14   night that the PBGC has agreed to that will become effective

15   upon the transfer of the accumulative cash described in

16   paragraph 4 of the order, of the proposed order, and it is

17   conditional in the sense that if we ever have to argue it, we

18   can in fact -- if it ever becomes necessary, we can have the

19   debate and the proceeding in this Court and ask Your Honor to

20   address the extraterritorial and other issues.  It is an

21   argument and a debate that I firmly believe we should never

22   have to have and hope we never will.

23          So that we were appreciative that and we respected, I

24   must tell you, the view that this was, and at least we would

25   call it -- I'm not sure the PBGC would call it this -- but we

71

1    believe this to be a program or policy issue, an agency issue

2    for the PBGC where they needed to preserve this issue.  We

3    understood that and were pleased that the agreement in the

4    revised proposed order does that and provides them with the

5    conditional adequate protection to which they believe they're

6    entitled and to which we believe no one is prejudiced based on

7    the specific reservations of rights and the conditionality of

8    that.  We're also pleased that our DIP lenders are satisfied --

9    our DIP agent is satisfied with the proposal as modified with

10   the language I've just described on the record.

11            With respect to Wilmington Trust in its capacity as

12   indentured trustee, this issue was also resolved both by an

13   agreement between Wilmington and the debtors to provide

14   Wilmington with information independently of the creditors

15   committee.  It'll be the same information we're giving the

16   creditors committee but Wilmington Trust wanted to receive it

17   in its capacity as indentured trustee and to have -- and we

18   provided, agreed to a schedule of the information we would

19   provide them and the basis on which that would be pursued and

20   we've agreed that that need not be made a matter of public

21   record but it's satisfactory to Wilmington and it's

22   satisfactory to the debtors.  It is subject to the protective

23   order and other agreements we have with them and will be deemed

24   highly confidential in terms of that transaction but it was --

25   we do appreciate Wilmington Trust's and Mr. Fox's work with us

72

1  to try to make sure that that information exchange works to

2  everyone's mutual satisfaction.

3         We also agreed to a provision in the order which we

4  have dealt with in other situations that indicates that neither

5  Wilmington nor we will use the granting of this relief

6  adversely as precedent against the other should we have to

7  argue about this in the future.  And so we have had, I think,

8  that kind of understanding with them in other situations and

9  we're prepared to preserve that here and therefore have agreed

10  to do that as well.

11         There are, Your Honor, a brief number of exhibits in

12  connection with this particular transaction that we would

13  indicate, ask to have considered by the Court.  Let me briefly

14  summarize those.  Exhibits 1 through 4 are court documents

15  involving the motion, the objections and withdrawal of the

16  objection of Wilmington Trust and our reply.

17         We do have a declaration of Mr. Sheehan which has

18  been marked highly confidential as Exhibit 5.

19         Exhibits 6 through 8 are the motions and the orders

20  dealing with the cash management system that we've been

21  operating under during the pendency of these cases as well as

22  the DIP refinancing order that provides the senior lien issues

23  we've needed to respect in connection with the conditional

24  grant of adequate protection.

25         We have documented, designated for these purposes

73

1    some business records of ours, including the debtors' five-year

2    consolidated business plan which was filed as Appendix C to the

3    disclosure statement at docket number 9264.  That's Exhibit 9.

4             Exhibit 10 is the liquidation analysis filed as

5    Appendix E to the disclosure statement at docket number 9264.

6             We have made a presentation regarding this matter to

7    both statutory committees on October 17, 2007, and this is

8    marked highly confidential as Exhibit 11.

9             We provided Your Honor draft minutes of Delphi

10   Corporation's board of directors to indicate the manner in

11   which this has been reviewed from a corporate governance

12   perspective and those are marked highly confidential.  Those

13   are Exhibits 12 and 13 for the September 5th and 10th meetings.

14            And then we have provided information in Exhibit 14

15   regarding the amount of new business booked at the DAS, LLC

16   entity level.

17            A proposed order at Exhibit 15, which includes all of

18   the agreements reached now with Wilmington Trust, the PBGC and

19   our DIP lenders.

20            And Exhibit 16 is the affidavit of service.

21            Exhibit 17 is the Wilmington Trust -- is the

22   protective order, I should say, which we will be using for

23   purposes of exchanging information.

24            And Exhibit 18 is the letter agreement between

25   Wilmington Trust and DASHI which we've marked -- and the

74

1    company regarding any of the information exchanged -- we've

2    marked highly confidential but we wanted the Court to be able

3    to review it if it chose to in terms of the agreements between

4    the parties.

5              THE COURT:  Okay.

6              MR. BUTLER:  Your Honor, we've moved the addition of

7    Exhibits 1 through 18.

8              THE COURT:  Does anyone have an objection to the

9    admission of those exhibits?

10             MR. BROUDE:  Your Honor, just briefly on items 9 and

11   10, the two exhibits, the disclosure statement -- I assume

12   those are being entered for demonstrative purposes only, not

13   for the truth of the matters therein?

14             MR. BUTLER:  Well, they're being submitted as the

15   debtors' view of those issues.

16             MR. BROUDE:  Okay.

17             MR. BUTLER:  I mean, they're not binding on the

18   creditors committee --

19             THE COURT:  Exactly right.

20             MR. BUTLER:  -- or on any other party.

21             THE COURT:  All right.

22             MR. FOX:  Edward Fox, Your Honor, for Wilmington

23   Trust.  I have no objection but in view of the fact that the

24   order does not constitute precedent for any further matters, I

25   reserve our rights with respect to cross-examination of Mr.

75

1   Sheehan or any other challenge to the exhibits in future

2   matters.

3   (Motion, objections, withdrawal of Wilmington Trust objections,

4   debtor reply was hereby received as Debtor's Exhibit 1 - 4 for

5   identification, as of this date.)

6   ((Confidential) Declaration of Mr. Sheehan was hereby received

7   as Debtor's Exhibit 5 for identification, as of this date.)

8   (Motions and orders re: cash management system, DIP refinancing

9   order was hereby received as Debtor's Exhibit 6-8 for

10  identification, as of this date.)

11  (Five-year business plan was hereby received as Debtor's

12  Exhibit 9 for identification, as of this date.)

13  (Liquidation analysis was hereby received as Debtor's Exhibit

14  10 for identification, as of this date.)

15  ((Confidential) Presentation re: liquidation analysis was

16  hereby received as Debtor's Exhibit 11 for identification, as

17  of this date.)

18  ((Confidential) Draft minutes of Delphi 9/5 and 9/10 board of

19  directors meetings was hereby received as Debtor's Exhibit 12 -

20  13 for identification, as of this date.)

21  (Info re: new business booked with DAS entity level was hereby

22  received as Debtor's Exhibit 14 for identification, as of this

23  date.)

24  (Proposed order was hereby received as Debtor's Exhibit 15 for

25  identification, as of this date.)

76

1    (Affidavit of service was hereby received as Debtor's Exhibit

2    16 for identification, as of this date.)

3    (Protective order was hereby received as Debtor's Exhibit 17

4    for identification, as of this date.)

5    ((Confidential) Letter agreement between Wilmington Trust and

6    DASHI was hereby received as Debtor's Exhibit 18 for

7    identification, as of this date.)

8              MR. COURT:  Okay.  I'm sure Mr. Sheehan is happy to

9    hear that and I take it no one else wants to cross-examine Mr.

10   Sheehan today?  All right.  I'll admit those exhibits for the

11   purposes that they've been offered for.

12             MR. BUTLER:  Your Honor, I think with that

13   evidentiary record with Mr. Sheehan's declaration in the record

14   now and our presentation and the proposed order, we submit the

15   matter, Your Honor, for consideration.

16             THE COURT:  Okay.  Does anyone have anything to say

17   on this motion?  Is there a problem in putting, in addition to

18   "valid, perfected and enforceable", putting an "and

19   nonavoidable" or "nonavoidable" in dealing with the liens?

20             MR. BUTLER:  I don't think there is an issue from our

21   perspective, Your Honor.

22             THE COURT:  Or "claims"?  Okay.  Again, the PGBC's

23   adequate protection replacement lien is only to the extent that

24   it is already in possession of a valid, perfected and

25   enforceable lien on such assets and I want to insert the phrase

77

1    "and nonavoidable" in a couple places and I think that's

2    implicit in "enforceable" but I wanted to make sure that was

3    the case.  Okay.  So that'll be in the order.

4              MR. BUTLER:  And counsel for the PBGC has indicated

5    that's fine with them.

6              MR. SPEAKER:  That's fine with us.

7              THE COURT:  Okay.  Great.  Thank you.  Okay, so that

8    will get entered today.

9              MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

10   remaining matters on the agenda deal with the fifth fee

11   applications of professionals.  These are items number 12

12   through 50 on the agenda.  A total of thirty-nine professionals

13   have timely submitted applications with respect to the fifth

14   fee interim application period which ended on May 31st of this

15   year.

16              All these professionals were retained in these cases

17   by the debtors, the unsecured creditors committee, the equity

18   committee and the joint fee review committee.  There is one

19   professional firm that has been retained in these cases and

20   that has not yet filed fee applications.  We wanted the court

21   to be aware the Crowell & Moring, or antitrust counsel to the

22   debtors, were retained on March 9th, 2006 at docket number

23   2773.  They were hired on a contingency fee basis.  They've not

24   submitted any invoices to the debtors for payment at this time.

25              I'm pleased to report, Your Honor, that there are no

78

1   objections that have been filed to any of the interim fee

2   applications or before the Court today, but that should not in

3   any way suggest that there has not been a thorough review of

4   the applications before the Court.  In fact, the fee review

5   committee has met on a number of occasions with each other and

6   have been through working with their -- the fee examiner or fee

7   auditor that is hired for them, and then they have been in

8   contact with all of the various applicants about their views.

9   They have worked out a consensual agreement regarding their

10  views with each of the professionals, which is reflected in the

11  proposed order that's been presented to Your Honor.  I would

12  indicate Mr. Sherbin, who is chairman of the fee committee, is

13  here in Court today as is Mr. Sheehan who is present and we

14  have been advised that the other members of the committee also

15  join in these requests.

16          The one point I would just indicate is there is a

17  recommendation here that the holdback for the fifth fee period,

18  which goes back to the December period of last year -- excuse

19  me, the February through May period of this year -- that it be

20  released in connection with Your Honor's consideration of this.

21  That's been recommended by the fee committee if on this

22  record -- to say it is not objected to by the U.S. Trustee.

23          THE COURT:  Okay.

24          MR. BUTLER:  Which is, it has been reviewed by them

25  and there is no objection to that relief that has been sought.

79

1          Your Honor, the proposed order sets forth the, in

2     separate columns, the date of each fee application, the total

3     amounts requested, the amounts -- in each case the amount

4     recommended by the fee committee.  Obviously there are blanks

5     for the columns for the Court's determination and the same is

6     true for charges and disbursements, both requested and sought

7     by the fee committee.  And then there's a column of the total

8     voluntary reductions by the applicants.  I would indicate that

9     there are in excess of 2.2 million dollars worth of voluntary

10    accommodations extended by the thirty-nine fee applicants,

11    either voluntarily in their applications or on a voluntary

12    basis after discussion with the fee committee and getting the

13    input from the fee committee and the fee committee's auditor

14    with respect to each individual fifth fee application.

15         With that in mind, Your Honor, Mr. Sherbin is here

16    and available to the Court to answer any questions on behalf of

17    the fee committee and I'm certainly available, both

18    individually for Skadden and also as counsel to the debtors, to

19    answer any questions you may have about these applications.

20         THE COURT:  Okay.  Does anyone have anything to say

21    on any of the fee applications?

22         MR. VELEZ-RIVERA:  I'll address the Court from here,

23    Your Honor.  Andrew Velez-Rivera for the United States Trustee.

24    This lender did advise me that indeed we adopt the view of the

25    fee committee and we have no objection to the releases and the

80

1   holdback which are reflected in our point of view.

2          THE COURT:  Okay.  Thank you.

3          MR. VELEZ-RIVERA:  Thank you.

4          THE COURT:  All right.  When I suggested that a fee

5   committee be set up, my hope was that if it was, as I believe

6   it is, composed of sophisticated businesspeople who are used to

7   dealing with professionals' bills, that it would provide the

8   type of review that's necessary in a case of this size.  From

9   what I see, that's the case.  Obviously if parties in interest,

10  including the professionals, feel that for some reason it's not

11  working as contemplated, i.e., fairly but professionally, they

12  should let me know.  But I meant to when this was set up, and

13  will, rely on those -- on the judgment of those businesspeople

14  as well as, of course, on the U.S. Trustee in their review of

15  the bills.  So I will approve the interim applications as

16  sought and as unopposed by the parties and also believe that

17  for this last period the twenty percent holdback can be

18  awarded, subject of course to the continued process for

19  submitting bills and the holdback associated with those on a

20  going forward basis.

21         MR. BUTLER:  Thank you, Your Honor.  Your Honor, with

22  respect to the go forward basis, the sixth fee application

23  period did pass in September.  It was completed in September.

24  Those applications will be filed at the end of November and the

25  company intends -- and we've talked briefly to Mr. Sherbin

81

1   about this -- that those would go on the same sort of number of

2   months, you know, down the line.  Those would come onto the

3   February omnibus hearing, which would give them the same amount

4   of time for the fee committee to continue to review that.

5           It is, I think, likely going to be the recommendation

6   of the company that the seventh fee application period which

7   covers the period through the end of January and into February,

8   that that period, which would be October, November, December

9   and January -- that even though the confirmation being in mid-

10  January, that if we're able to maintain that schedule we will

11  most likely in connection with the hearing on the sixth fee

12  application ask Your Honor to not require the filing of fee

13  applications for the seventh period on an interim basis but

14  instead maintain those holdbacks and maintain those

15  applications as part of the final fee application process, so

16  that it would save the time and expense for the estate of

17  having all these professionals prepare yet another interim fee

18  application basis because at some point, we need to get to a

19  final fee application hearing and we respect that both you and

20  we believe the U.S. Trustee is going to want a holdback

21  maintained for the final fee hearing.

22          THE COURT:  Okay.

23          MR. BUTLER:  In some amount.

24          THE COURT:  All right.

25          MR. BUTLER:  And so we're -- that's sort of what

82

1   we're planning to do depending on the timetable of emergence

2   and how that coincides with the fee application periods but

3   there will be at least one more interim fee hearing which will

4   likely be in February of next year.

5           THE COURT:  Okay.  I know that some professionals may

6   have some pressure from their partners to get as much in by

7   year-end but I think the interim procedures strike an

8   appropriate balance on that, so what you've laid out sounds

9   fine to me.

10          MR. BUTLER:  Thank you, Your Honor.  Your Honor, that

11  completes the matters on the omnibus agenda.

12          THE COURT:  Okay.  Thank you.

13          MR. BUTLER:  Thank you very much.

14      (Proceedings concluded at 12:07 p.m.)

15

16

17

18

19

20

21

22

23

24

25

83

**I N D E X**

**E X H I B I T S**

| DEBTOR'S | DESCRIPTION | PAGE |
|----------|-------------|------|
| 1 | 9/28/07 IRS letter granting second pension funding waiver. | 14 |
| 2 | 10/4 IRS letter granting modification of conditional waiver of minimum funding standard for hourly plan. | 14 |
| 3 | 10/4 IRS letter granting request for modification of salary plan. | 14 |
| 4 | 7/13/07 IRS letter granting modification of conditional waivers relating to the hourly plan. | 14 |

84

| | | |
|---|---|---|
| 5 | 7/13/07 IRS letter | 14 |
| | granting request | |
| | for modification | |
| | of conditional waiver | |
| | for salary plan. | |
| 6 | Mr. Sheehan | 14 |
| | declaration | |
| 7 | Notice of service | 14 |
| | and the affidavits | |
| 1 | Agreement | 21 |
| 2 - 4 | Motions, form of | 21 |
| | orders and black | |
| | lines | |
| 5 | Mr. Sheehan's | 21 |
| | declaration | |
| 6 | Affidavit of | 21 |
| | service | |
| 1 - 3 | Stipulations | 51 |
| 4 | Bifurcation change | 51 |
| | of procedure | |
| | outline | |
| 5 - 6 | District court | 51 |
| | preliminary | |
| | approvals | |
| 7 - 13 | Motions, | 51 |

85

```
 1                         objections,

 2                         blacklines,

 3                         service matters

 4    1 - 4                Motion,              75

 5                         objections,

 6                         withdrawal of

 7                         Wilmington Trust

 8                         objections, debtor

 9                         reply

10    5                    (Confidential)      75

11                         Declaration of Mr.

12                         Sheehan

13    6 - 8                Motions and orders  75

14                         re: cash

15                         management system,

16                         DIP refinancing

17                         Order

18    9                    Five-year business  75

19                         plan

20    10                   Liquidation         75

21                         analysis

22    11                   (Confidential)      75

23                         Presentation re:

24                         liquidation

25                         analysis
```

86

1   12 - 13              (Confidential)      75

2                        Draft minutes of

3                        Delphi 9/5 and

4                        9/10 board of

5                        directors meetings

6   14                   Info re: new        75

7                        business booked

8                        with DAS entity

9                        level

10  15                   Proposed order      75

11  16                   Affidavit of        76

12                       service

13  17                   Protective order    76

14  18                   (Confidential)      76

15                       Letter agreement

16                       between Wilmington

17                       Trust and DASHI

18

19  (Index continued on next page)

20

21

22

23

24

25

87

RULINGS

|  | Page | Line |
|---|---|---|
| Motion approved | 17 | 17 |
| Relief granted, pursuant to the motion | 21 | 21 |
| Motion approved (with reservations of rights) | 26 | 6 |
| Settlement to be approved as to the nonobjecting parties | 58 | 20 |
| Granting of modified relief sought | 60 | 21 |
| Granting of omnibus objection as modified | 66 | 20 |
| Approval of interim applications | 80 | 15 |

88

1

2                    C E R T I F I C A T I O N

3

4     I, Sharona Shapiro, court approved transcriber, certify that

5     the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9     _____  October 29, 2007

10    Signature of Transcriber              Date

11

12    Sharona Shapiro

13    typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25