**Hearing Date And Time: November 16, 2007 At 10:00 a.m.**
**Objection Deadline: November 13, 2007 At 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
**http://www.delphidocket.com**

UNITED STATES COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                :   Chapter 11
In re                          :
                                :   Case No. 05-44481 (RDD)
DELPHI CORPORATION, et al.,    :
                                :   (Jointly Administered)
            Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

EXPEDITED MOTION UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002, 6004, 9006,
AND 9007 FOR ORDER AUTHORIZING DEBTORS' ENTRY INTO EXIT FACILITY
ENGAGEMENT AND FEE LETTERS AND PERFORMANCE THEREUNDER

("EXIT FINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this Motion under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 for entry of an order authorizing the Debtors to enter into Engagement and Fee Letters (as defined below) in connection with certain Exit Financing Arrangements (as defined below) and perform their obligations thereunder, including the payment of fees and expenses and the provision of certain indemnities provided for therein.

<u>Background</u>

A.          <u>The Chapter 11 Filings</u>

1.          On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.          No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.          On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

2

9264) (the "Disclosure Statement"). No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.[1]

4. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief requested herein is section 363(b) of the Bankruptcy Code and rules 2002, 6004, 9006, and 9007 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

6. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[3]

---

[1]    The Court commenced the hearing on the Disclosure Statement and related solicitation procedures motion on October 3, 2007 and has entered two Orders with respect thereto on October 9, 2007 (Docket No. 10497) and October 19, 2007 (Docket No. 10662).

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company under a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]  In 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  In 2006

---

[4]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10.    The Debtors believe that the Company's financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Debtors from exiting unprofitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs, (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures, and (c) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.        The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[5]  first, modifying the

---

[5]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the

*(cont'd)*

Company's labor agreements to create a competitive arena in which to conduct business;[6]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[7]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[8] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

_____

*(cont'd from previous page)*

reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[6] As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:

- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);

- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);

- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and

- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[7] On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement and a Master Restructuring Agreement, both of which are subject to this Court's approval as part of the plan confirmation process. Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The Global Settlement Agreement and Master Restructuring Agreement were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29, 2007, the Debtors filed certain proposed amendments to the Global Settlement Agreement and the Master Restructuring Agreement. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[8] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business and of bid procedures related to the upcoming sale of substantially all assets used in their interiors and closures business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering businesses.

structure is competitive and aligned with its product portfolio and manufacturing footprint;[9] and

fifth, devising a workable solution to their current pension situation.[10]

E.        The Debtors' Plan Of Reorganization

13.    By filing the Plan and related Disclosure Statement on September 6, 2007,

the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a

series of global settlements and compromises that involve every major constituency in the

Debtors' reorganization cases, including GM.  The Debtors currently intend to emerge from

chapter 11 during the first quarter of 2008.

14.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

---

[9]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[10]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Motion, Delphi requests entry of an order, substantially in the form

attached hereto as <u>Exhibit A</u> (the "Proposed Order"), under Bankruptcy Code section 363(b) and

Bankruptcy Rules 2002, 6004, 9006, and 9007, authorizing the Debtors to enter into Engagement

and Fee letters in connection with the Exit Financing Arrangements and perform their

obligations thereunder, including the payment of fees and expenses and the provision of certain

indemnities provided for therein.

Basis For Relief

16.    Exit financing is a necessary and integral component of the Debtors'

strategy for emergence from chapter 11.  As is customary in plans of reorganization filed in large,

complex chapter 11 cases, section 7.14 of the proposed Plan provides that the Debtors "shall

enter into the Exit Financing Arrangements" to (a) satisfy certain claims arising in connection

with the existing debtor-in-possession financing, (b) make other payments required to be made

on the Plan Effective Date, and (c) fund the Debtors' post-reorganization operations.  In addition,

as a condition precedent to the effectiveness of the proposed Plan, Section 12.2(a) of the Plan

provides that the Debtors shall have entered into the Exit Financing Arrangements and that all

conditions precedent to the consummation of the Exit Financing Arrangements shall have been

waived or satisfied in accordance with the terms thereof.

17.    To ensure that the Exit Financing Arrangements are in place upon the

Debtors' emergence from chapter 11, the Debtors have obtained an engagement letter from

JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc.

(collectively, the "Engagement Parties"), a redacted copy of which is attached to the Proposed

8

Order as <u>Exhibit 1</u> (the "Engagement Letter").[11]  Under the Engagement Letter, the Engagement Parties have agreed "to use commercially reasonable best efforts" to assemble a syndicate of lenders to provide the Exit Financing Arrangements.  For the reasons described below, and in the exercise of their reasonable business judgment, the Debtors have determined that, given the current state of the capital markets, the appropriate course of action to take in connection with obtaining the Exit Financing Arrangements is to proceed with a "best efforts" engagement letter rather than a "commitment letter."

18.    The Exit Financing Arrangements will consist primarily of the following facilities: (a) a senior secured first lien asset-based revolving credit facility in an aggregate principal amount of $1.6 billion; (b) a senior secured first-lien term facility in an aggregate principal amount of $3.7 billion; and (c) a senior secured second-lien term facility in the amount of $1.5 billion, of which up to $750 million will be in the form of a note issued to GM in connection with the distributions contemplated under the Plan.[12]  Under the Engagement Letter, once the Engagement Parties have assembled a lending syndicate satisfactory to all parties, the Debtors would negotiate and enter into definitive credit documents with respect to the Exit Financing Arrangements as soon as practicable.  The lenders' obligation to fund the Exit Financing Arrangements under such definitive documents would be contingent upon, among other things, confirmation of the Plan (as may be modified in a manner not inconsistent with the terms of the Engagement Letter).

---

[11]    The Debtors have submitted to the Court an <u>ex parte</u> application under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 for an order under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 authorizing the Debtors to file a redacted version of the Engagement Letter.  The application is awaiting Court review.

[12]    Exhibit A to the Engagement Letter contains a redacted, more detailed description of the terms and conditions applicable to the Exit Financing Arrangements.  In the event of any inconsistency between this Motion and the Engagement Letter or any exhibits thereto, the Engagement Letter and such exhibits shall govern, and this Motion shall not be referenced to resolve interpretive disputes.

19.    The proceeds of the Exit Financing Arrangements will be used to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims (each as defined in the Plan and referred to herein collectively as the "DIP Facilities"), to make other required payments on the Plan Effective Date, and to conduct the post-reorganization operations of the Reorganized Debtors (as defined in the Plan).

20.    The Engagement Letter provides that, as consideration for the commitments and agreements by the Engagement Parties, the Debtors would agree to pay certain nonrefundable fees and reimburse certain expenses as described in the Engagement Letter or in any fee letter ("Fee Letter") delivered to the Debtors therewith, the terms of which the Debtors and the Engagement Parties have agreed to file under seal with this Court and keep confidential pursuant to the terms of the Engagement Letter as is the customary practice in such transactions.[13]  The Engagement Letter requires the Debtors to indemnify the Engagement Parties and other "indemnified persons" (as defined therein) in certain circumstances and subject to certain conditions.  Payment of certain fees or expenses may be required prior to the Debtors' emergence from chapter 11.  No amount, however, would be payable upon entry of the Proposed Order.  Moreover, no fees would be payable prior to the Engagement Parties having completed syndication and the Debtors having agreed to the terms of definitive documents.  Finally, in the event that the transactions contemplated in the Engagement Letter are not completed, the Debtors would not be obligated to reimburse the Engagement Parties for expenses in excess of $500,000.

---

[13]    The Debtors have submitted to the Court an ex parte application under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 for an order under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 authorizing the Debtors to file any Fee Letter delivered to the Debtors in connection with the Engagement Letter under seal.  The application is awating Court review.

Applicable Authority

21.     Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it.  In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate.  Cf. Orion Pictures Corp. v. Showtime Networks, Inc (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365).  To

a bankruptcy court, "'business judgment'...is just that – a judgment of the sort a businessman

would make." Id.

22.     Once the debtor articulates a valid business justification, the business

judgment rule creates "a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656

(S.D.N.Y. 1992) (citation omitted).  The debtor's business judgment "should be approved by the

court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

"Courts are loath to interfere with corporate decisions absent a showing of bad faith, self interest

or gross negligence." Integrated Resources, 147 B.R. at 656.  "Parties opposing the proposed

11

exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.

23.    As discussed herein, the Debtors' determination to enter into and perform their obligations under the Engagement and Fee Letters represents a sound exercise of the Debtors' business judgment, especially when viewed in the context of prevailing conditions in the capital markets.  The relief requested herein serves a valid and justifiable business purpose. Likewise, the terms of the Engagement and Fee Letters are fair and reasonable.

24.    It is typical for debtors in large chapter 11 cases to seek and obtain approval prior to their confirmation hearings to enter into exit financing arrangements, agree to pay exit financing providers' fee and expenses, and grant indemnities such as the ones described in this Motion.  See, e.g., In re Delta Air Lines, Inc., No. 05-17923 (ASH) (Bankr. S.D.N.Y. Apr. 17, 2007); In re Owens Corning, No. 00-3837 (Bankr. D. Del. July 20, 2006); In re Meridian Auto Sys.-Composites Operations, Inc., No. 05-11168 (Bankr. D. Del. June 14, 2006).  Chapter 11 debtors frequently make use of exit financing to repay outstanding obligations under debtor-in-possession financing facilities, make one-time payments due upon the occurrence of the effective date under a plan of reorganization, and fund post-emergence operations.  As discussed above, the Debtors in these chapter 11 cases intend to use the proceeds of the Exit Financing Arrangements for precisely these purposes.

25.    Furthermore, as discussed above, the proposed Plan requires that, as a condition to its effectiveness, the Exit Financing Arrangements shall have been executed, all conditions precedent to the consummation of the Exit Financing Arrangements shall have been waived or satisfied in accordance with the terms thereof, and funding pursuant to the Exit Financing Arrangements shall have occurred.  In addition, as a condition precedent to the

effectiveness of the proposed Plan, the Plan provides that the Debtors shall have entered into the Exit Financing Arrangements and that all conditions precedent to the consummation of the Exit Financing Arrangements shall have been waived or satisfied in accordance with the terms thereof.

26.    Moreover, the Debtors have conducted an expansive and thorough investigation of available exit financing alternatives.  In the second quarter of 2007, the Debtors initiated an extensive canvass of potential lenders to ascertain the best available terms and conditions for their exit financing requirements.  On three separate occasions over the past several months, the Debtors contacted groups of as many as ten prospective lenders to solicit proposals regarding a potential exit facility and to conduct negotiations with respect to the terms of the proposals.  On each such occasion, the Debtors distributed information packages to the financial institutions that were possible sources of exit financing.  On September 6 and 7, 2007, Delphi held financing due diligence meetings in Troy, Michigan with ten potential exit lenders.  At the meetings, Delphi distributed a term sheet to potential lead lenders containing Delphi's financing request for a $1.6 billion asset-based revolving facility, a $5.6 billion exit term loan, and $1.5 billion in unsecured notes.  Delphi requested responses from potential lead lenders by September 14, 2007.

27.    By early September, however, the debt market had suffered a severe correction.  The prospective lenders unanimously informed the Debtors that, given the state of the credit markets, they did not believe Delphi could raise $7.1 billion in funded debt.  In addition, the lenders informed the Debtors that obtaining a firm commitment from lenders in the current market to provide exit financing availability would require the Debtors to agree to accept a significantly greater degree of interest rate risk or "flex" than the market had demanded before the second quarter correction.

28.      Given the continuing uncertainty in the market, by late September 2007, the Debtors had begun considering alternative proposals.  Subsequently, the Debtors began discussions with potential lenders concerning an alternative financing package with a lower aggregate total of funded debt.  In an effort to avoid the burden of increased interest rate flex, the Debtors also began discussing potential arrangements that would require something less than an immediate firm commitment to lend from participating financial institutions.  These discussions culminated in the negotiation of the Exit Financing Arrangements described in the Engagement Letter and accompanying term sheet.

29.      Based on certain recent activity in the debt markets, conditions for borrowers in Delphi's position appear to have improved moderately since the first interest rate cut announced by the Federal Reserve Board earlier this fall.  The Debtors aim to take advantage of this relative improvement in what remains a challenging financial environment by moving expeditiously to obtain the financing that they believe they will need upon the conclusion of these chapter 11 cases.[14]  The approval of the Proposed Order will permit the Debtors to avail themselves of current conditions to begin implementing the Exit Financing Arrangements this year.  In addition, by agreeing to the "commercially reasonable best efforts" standard in the Engagement Letter for the performance of the Engagement Parties thereunder, the Debtors would avoid increased interest rate flex and additional potential costs that they would incur in connection with more rigid financing agreements.

30.      The Debtors seek to avoid the risk of further disruption in the capital markets and to permit the Engagement Parties to initiate syndication at the earliest possible

---

[14]    In the Engagement Letter, the Engagement Parties have stated that they "intend to commence syndication efforts promptly," and upon approval of the Proposed Order, the Debtors would provide material assistance to the Engagement Parties in support of such efforts, as specified in the Engagement Letter.

opportunity.  The Debtors have been advised that they should seek to commence syndication

efforts as early as practicable.  As a consequence, the Debtors have filed this Motion on an

expedited basis and have requested that the Court consider the relief requested herein at the

hearing scheduled for November 16, 2007.  The Creditors' Committee has consented to

expedited notice of the Motion.

        31.     In light of the extensive canvass of the credit markets undertaken by the

Debtors to secure competitive terms, the fees and expenses payable in connection with the

Engagement and Fee Letters constitute reasonable and appropriate compensation for the value

the Debtors' will receive.  Accordingly, in light of the foregoing, the Debtors believe that they

have demonstrated that their entry into the Engagement and Fee Letters constitute a valid

exercise of their business judgment.

Effectiveness

        32.     Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing

the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order,

unless the court orders otherwise." The Debtors request that any order approving the Motion be

effective immediately.

Notice

        33.     Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), the Ninth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered October 19, 2007 (Docket No. 10661), and the

15

Supplemental Order (A) Establishing Revised Hearing Date And Related Procedures On

Disclosure Statement And Solicitations Procedure Motion And (B) Setting Hearing Date And

Related Procedures For Potential Motions Amending Investment Agreement And Approving

Certain Exit Financing Agreements, entered October 19, 2007 (Docket No. 10662).  In light of

the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

34.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order substantially in the form of Exhibit A attached hereto and grant them such other and further relief as is just.

Dated:      New York, New York
            November 6, 2007

                                SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                                By:    /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr. (JB 4711)
                                    George N. Panagakis (GP 0770)
                                    Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                        - and -

                                By:    /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                    Debtors and Debtors-in-Possession