## EXHIBIT B

### Appendix B To The Disclosure Statement

[Consolidated Financial Statements and Notes to Consolidated Financial Statements Included In the Delphi Corporation Form 10-Q for the Quarter Ended September 30, 2007]

**APPENDIX B-2**

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter Ended September 30, 2007

**PART I. FINANCIAL INFORMATION**

**ITEM 1.    FINANCIAL STATEMENTS**

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2007** | **2006** | **2007** | **2006** |
| | (in millions, except per share amounts) | | | |
| Net sales: | | | | |
| General Motors and affiliates | $ 2,626 | $ 2,598 | $ 8,302 | $ 8,884 |
| Other customers | 3,595 | 3,410 | 11,615 | 11,092 |
| Total net sales | 6,221 | 6,008 | 19,917 | 19,976 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 5,972 | 6,083 | 18,835 | 19,185 |
| U.S. employee workforce transition program charges | 244 | 1,043 | 238 | 2,948 |
| Depreciation and amortization | 232 | 262 | 736 | 804 |
| Long-lived asset impairment charges | 23 | 15 | 222 | 15 |
| Selling, general and administrative | 408 | 392 | 1,218 | 1,155 |
| Securities & ERISA litigation charge | — | — | 353 | — |
| Total operating expenses | 6,900 | 7,795 | 21,602 | 24,107 |
| | | | | |
| Operating loss | (679) | (1,787) | (1,685) | (4,131) |
| Interest expense (contractual interest expense for the three and nine months ended September 30, 2007 was $118 million and $360 million, respectively, and for the three and nine months ended September 30, 2006 was $150 million and $434 million, respectively) | (454) | (116) | (630) | (319) |
| Loss on extinguishment of debt | — | — | (23) | — |
| Other income, net | 22 | 8 | 60 | 31 |
| Loss before reorganization items, income taxes, minority interest, equity income, and cumulative effect of accounting change | (1,111) | (1,895) | (2,278) | (4,419) |
| Reorganization items | (39) | (25) | (120) | (58) |
| Loss before income taxes, minority interest, equity income, and cumulative effect of accounting change | (1,150) | (1,920) | (2,398) | (4,477) |
| Income tax expense | (17) | (46) | (123) | (137) |
| Loss before minority interest, equity income, and cumulative effect of accounting change | (1,167) | (1,966) | (2,521) | (4,614) |
| Minority interest, net of tax | (12) | (4) | (38) | (28) |
| Equity income (loss), net of tax | 10 | (3) | 36 | 28 |
| | | | | |
| Loss before cumulative effect of accounting change | (1,169) | (1,973) | (2,523) | (4,614) |
| Cumulative effect of accounting change, net of tax | — | — | — | 3 |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |
| | | | | |
| Basic and diluted loss per share: | | | | |
| Before cumulative effect of accounting change | $ (2.08) | $ (3.51) | $ (4.49) | $ (8.22) |
| Cumulative effect of accounting change | — | — | — | 0.01 |
| Basic and diluted loss per share | $ (2.08) | $ (3.51) | $ (4.49) | $ (8.21) |

See notes to consolidated financial statements.

### DELPHI CORPORATION
### (DEBTOR-IN-POSSESSION)
### CONSOLIDATED BALANCE SHEETS

| | September 30, 2007 (Unaudited) | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,433 | $ 1,667 |
| Restricted cash | 180 | 146 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,959 | 2,078 |
| Other customers | 3,000 | 2,691 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 1,586 | 1,598 |
| Finished goods | 631 | 577 |
| Other current assets | 633 | 458 |
| Total current assets | 9,422 | 9,215 |
| Long-term assets: | | |
| Property, net | 4,289 | 4,695 |
| Investments in affiliates | 428 | 417 |
| Goodwill | 391 | 378 |
| Other intangible assets, net | 43 | 51 |
| Other | 868 | 636 |
| Total long-term assets | 6,019 | 6,177 |
| Total assets | $ 15,441 | $ 15,392 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt | $ 3,966 | $ 3,339 |
| Accounts payable | 3,083 | 2,820 |
| Accrued liabilities | 2,395 | 2,211 |
| Total current liabilities | 9,444 | 8,370 |
| Long-Term liabilities: | | |
| Other long-term debt | 37 | 49 |
| Employee benefit plan obligations | 601 | 550 |
| Other | 1,355 | 859 |
| Total long-term liabilities | 1,993 | 1,458 |
| Liabilities subject to compromise | 16,914 | 17,416 |
| Total liabilities | 28,351 | 27,244 |
| Minority interest | 209 | 203 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2007 and 2006 | 6 | 6 |
| Additional paid-in capital | 2,781 | 2,769 |
| Accumulated deficit | (14,434) | (11,893) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans | (1,855) | (3,041) |
| Other | 435 | 156 |
| Total accumulated other comprehensive loss | (1,420) | (2,885) |
| Treasury stock, at cost (3.2 million shares in 2007 and 2006) | (52) | (52) |
| Total stockholders' deficit | (13,119) | (12,055) |
| Total liabilities and stockholders' deficit | $ 15,441 | $ 15,392 |

See notes to consolidated financial statements.

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net loss | $(2,523) | $(4,611) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 736 | 804 |
| Long-lived asset impairment charges | 222 | 15 |
| Deferred income taxes | — | 23 |
| Pension and other postretirement benefit expenses | 795 | 1,189 |
| Equity income | (36) | (28) |
| Reorganization items | 120 | 58 |
| U.S. employee workforce transition program charges | 238 | 2,948 |
| Loss on extinguishment of debt | 23 | — |
| Securities & ERISA litigation charge | 353 | — |
| Loss on liquidation/deconsolidation of investment | 79 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (752) | (415) |
| Inventories, net | (125) | (319) |
| Other assets | (11) | (91) |
| Accounts payable | 368 | 445 |
| Accrued and other long-term liabilities | 697 | 256 |
| Other, net | 36 | 55 |
| U.S. employee workforce transition program payments | (571) | (326) |
| U.S. employee workforce transition program reimbursement by GM | 265 | 215 |
| Pension contributions | (230) | (219) |
| Other postretirement benefit payments | (149) | (182) |
| Net payments for reorganization items | (91) | (39) |
| Net cash used in operating activities | (556) | (222) |
| | | |
| Cash flows from investing activities: | | |
| Capital expenditures | (483) | (606) |
| Proceeds from sale of property | 37 | 53 |
| Proceeds from sale of non-U.S. trade bank notes | 150 | 130 |
| Increase in restricted cash | (30) | (110) |
| Proceeds from divestitures | 71 | 24 |
| Other, net | (4) | (6) |
| Net cash used in investing activities | (259) | (515) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost | 2,739 | — |
| Repayments of borrowings under debtor-in-possession facility | (250) | — |
| Repayments of borrowings under prepetition term loan facility | (988) | — |
| (Repayments) borrowings under prepetition revolving credit facility | (1,508) | 2 |
| Net borrowings under refinanced debtor-in-possession facility | 480 | — |
| Net borrowings (repayments) under other debt agreements | 77 | (27) |
| Repayments under cash overdraft | — | (29) |
| Dividends paid to minority partners | (45) | (16) |
| Other, net | — | (3) |
| Net cash provided by (used in) financing activities | 505 | (73) |
| | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 76 | 32 |
| | | |
| Decrease in cash and cash equivalents | (234) | (778) |
| Cash and cash equivalents at beginning of period | 1,667 | 2,221 |
| Cash and cash equivalents at end of period | $ 1,433 | $ 1,443 |

See notes to consolidated financial statements.

3

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2007** | **2006** | **2007** | **2006** |
| | | (in millions) | | |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |
| Other comprehensive income: | | | | |
| Currency translation adjustments, net of tax | 71 | 42 | 217 | 128 |
| Net change in unrecognized gain on derivative instruments, net of tax | 9 | 66 | 62 | 68 |
| Employee benefit plans adjustment, net of tax | 1,191 | (284) | 1,186 | 575 |
| Other comprehensive income (loss) | 1,271 | (176) | 1,465 | 771 |
| Comprehensive income (loss) | $   102 | $(2,149) | $(1,058) | $(3,840) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. BASIS OF PRESENTATION

*General*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, engine management systems, safety components, thermal management systems and other transportation components. Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code. However, Delphi's Board of Directors authorized Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L ("DASE"), to file a petition for Concurso, or bankruptcy, under Spanish law, exclusively for that entity. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations beginning in the quarter ended December 31, 2005. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi adopted SOP 90-7 effective on October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to reduce wage and benefit costs and liabilities during the bankruptcy process; (iv) to return to profitability; (v) to generate sufficient cash flow from operations; and (vi) to obtain financing sources to meet the Company's future obligations. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. A confirmed plan of reorganization could materially change the amounts and

classifications reported in the consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim. During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi shall be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through December 31, 2007. During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims. The accrued interest payable of $369 million is included in accrued liabilities on the accompanying balance sheet. This estimate is based on numerous factual and legal assumptions. Absent developments that alter Delphi's view of the likelihood of amounts that may be paid under the Plan to holders of allowed unsecured claims, Delphi expects to accrue interest on such unsecured claims in future periods, to the extent required under applicable law. Such interest will be discharged at the emergence date under the provisions of plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During the third quarter and first nine months of 2007, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, worker's compensation and healthcare. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Valuation of Long-Lived Assets*—Delphi periodically evaluates the carrying value of long-lived assets held for use including intangible assets, when events or circumstances warrant such a review. The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or from appraisals performed by valuation experts. Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced by the cost of disposing of the assets. During the third quarter and first nine months of 2007, Delphi recorded impairment charges of $23 million and $222 million, respectively, related to long-lived assets. Refer to Note 6. Long-Lived Asset Impairment for more information.

*Valuation Allowance for Deferred Tax Assets* — Realization of deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carryforwards. Valuation allowances are provided against deferred tax assets when, based on all available evidence, it is considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods. In the third quarter of 2006, Delphi recorded valuation allowances of $36 million for the net deferred tax assets of certain non-U.S. operations, primarily operations in Spain, Portugal and Romania. Delphi determined based on historical losses and expected future taxable income (loss) that it was no longer more likely than not that these net deferred tax assets would be realized. During the third quarter of 2007, Delphi reduced the valuation allowance by net $11 million, for deferred tax assets of certain non-US operations, primarily operations in Poland, offset by increases in Germany and Mexico.

*Postemployment Benefits*— Delphi accrues for costs associated with postemployment benefits provided to inactive employees throughout the duration of their employment. Delphi uses future production estimates combined with workforce geographic and demographic data to develop projections of time frames and related expense for postemployment benefits. For purposes of accounting for postemployment benefits, inactive employees represent those employees who have been other than temporarily idled. Delphi considers all idled employees in excess of approximately 10% of the total workforce at a facility to be other than temporarily idled. During the second quarter of 2006, the Company entered into special attrition programs for certain union-represented U.S. hourly employees that significantly decreased the future cash expenditures expected during the period between the idling of the affected employees and the time when such employees were redeployed, retired, or otherwise terminated their employment. As a result, Delphi determined that certain previously recorded accruals were no longer necessary and accordingly Delphi reduced such accruals by $4 million and $107 million for the three and nine months ended September 30, 2006, respectively, which were recorded in cost of sales.

*Employee Termination Benefits and Other Exit Costs*—Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower its operating costs. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are accrued when incurred. Delphi incurred expenses related to these actions of $112 million and $51 million for the three months ended September 30, 2007 and 2006, of which $108 million and $51 million, respectively, were included in cost of sales, and $4 million was included in selling, general and administrative expenses for the three months ended September 30, 2007. During the nine months ended September 30, 2007 and 2006 Delphi incurred expenses related to these actions of $532 million and $186 million, of which $503 million and $186 million, respectively, were included in cost of sales, and $29 million was included in selling, general and administrative expenses for the nine months ended September 30, 2007. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for employee termination benefits and other exit costs related to non-core product lines included in the amount above and refer to Note 12. U.S. Employee Workforce Transition Programs for employee termination benefits and other exit costs related to the 2007 U.S. labor agreements.

*Share-Based Compensation*— Delphi's stock-based compensation programs include stock options, restricted stock units, and stock appreciation rights. The Company adopted the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standards No. 123 (Revised 2004), *"Share-Based Payments"* ("SFAS 123(R)"), effective January 1, 2006 using the modified-prospective method. SFAS 123(R) requires compensation cost to be recognized for equity or liability instruments based on the grant-date fair value, with expense recognized over the periods that an employee provides service in exchange for the award and requires the Company to estimate forfeitures at the grant date. In addition, while the Company will recognize compensation cost for newly issued equity or liability instruments over the periods that an employee provides service in exchange for the award, the Company will continue to follow a nominal vesting approach for all awards issued prior to the adoption of SFAS 123(R). Total share-based compensation cost was $5 million and $11 million for the three months ended September 30, 2007 and 2006, respectively, and $12 million and $20 million for the nine months ended September 30, 2007 and 2006, respectively.

*Recently Issued Accounting Pronouncements*— In June 2006, the FASB issued FASB Interpretation 48 ("FIN 48"), *"Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109."* FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with FASB Statement No. 109, *"Accounting for Income Taxes."* Delphi adopted FIN 48 effective January 1, 2007. The impact of initially applying FIN 48 was recognized as a cumulative effect adjustment increasing the January 1, 2007 opening balance of accumulated deficit by $18 million. Refer to Note 5. Income Taxes for more information regarding the impact of adopting FIN 48.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *"Fair Value Measurements."* SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Delphi is currently evaluating the requirements of SFAS 157, and has not yet determined the impact on its financial statements. Delphi expects to use the new definition of fair value upon adoption of SFAS 157 as of January 1, 2008 and apply the disclosure requirements of SFAS 157 for Delphi's 2008 financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *"Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)."* SFAS 158 requires, among other things, an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Delphi currently measures the funded status of certain of its plans, primarily the U.S. other postretirement benefit plans, as of September 30 of each year. Delphi expects to adopt the measurement date provisions of SFAS 158 as of January 1, 2008. Delphi is currently evaluating the requirements of the measurement date provisions of SFAS 158 and has not yet determined the impact on its financial statements.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *"The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115."* SFAS 159 permits

entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi is currently evaluating the requirements of SFAS 159, and has not yet determined the impact on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On September 6, 2007 Delphi filed its proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outline Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. At a Court hearing on September 27, 2007, Delphi stated that the current dynamics of the capital markets prompted Delphi to consider whether amendments to the Plan filed on September 6 might be necessary. Delphi commenced its Disclosure Statement hearing on October 3, 2007, and after resolving certain objections, requested that the hearing be continued to October 25, 2007. On October 19, 2007, the Court granted Delphi's request to further continue the hearing on the adequacy of the Disclosure Statement to November 8, 2007. The adjournment of the hearing allowed Delphi to continue to negotiate potential amendments to the Plan filed on September 6 with key stakeholders. On October 29, 2007, Delphi filed a notice of potential amendments to the Plan and Disclosure Statement filed on September 6 (the "Potential Amendments") and the hearing was scheduled to recommence on November 8, 2007. On November 5, 2007, Delphi asked the Court to adjourn until later in November the hearing on its Disclosure Statement, including the Potential Amendments and amendments to the Equity Purchase and Commitment Agreement ("EPCA") between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus") and Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), which are described in more detail below (the "Proposed EPCA Amendment"). Delphi sought adjournment while it continues discussing the Potential Amendments with its statutory committees, both of whom have filed objections to the Potential Amendments, and other stakeholders. In addition, Delphi did not believe that all of the conditions to the execution of the Proposed EPCA Amendment would be satisfied prior to the commencement of the scheduled November 8, 2007 Court hearing. In their proposal letter dated October 29, 2007 submitted by a supermajority of the Investors (the "Proposal Letter"), such Investors expressly conditioned their agreement to execute the Proposed EPCA Amendment on (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors. If any of the conditions set forth in the Proposal Letter are not satisfied or waived, the Investors will not be obligated to execute the Proposed EPCA Amendment. Delphi cannot provide any assurances as to whether or when the Proposed EPCA Amendment will be executed and, if it in fact is executed, whether there will be additional amendments than those described below. Delphi continues its transformation activities, including ongoing discussion with its relationship banks regarding an emergence financing package that can be executed under existing market conditions, with the goal of emergence from chapter 11 as soon as practical. Currently, Delphi expects to emerge during the first quarter of 2008, however, no assurances can be provided that the emergence date will not be delayed.

### Proposed Plan of Reorganization and Transformation Plan

On March 31, 2006, Delphi announced its transformation plan centered around five key elements, each of which is also addressed in its proposed Plan and the series of settlement agreements it embodies. The progress on each element is discussed below.

Labor - Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements have already become effective, while other portions will not become effective until the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial and other matters between Delphi and GM and substantial consummation of the Plan as confirmed by the Court which incorporates, approves and is

consistent with the terms of each agreement.

These U.S. labor settlement agreements include those with the:

- UAW, dated June 22, 2007;
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), dated August 5, 2007;
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78 ("IAM"), dated July 31, 2007;
- International Brotherhood of Electrical Workers and its Local 663 ("IBEW") relating to Delphi Electronics and Safety, dated July 31, 2007;
- IBEW relating to Delphi's Powertrain division, dated July 31, 2007;
- International Union of Operating Engineers ("IUOE") Local 18S, dated August 1, 2007;
- IUOE Local 101S, dated August 1, 2007;
- IUOE Local 832S, dated August 1, 2007;
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (together, the "USW") relating to Delphi's operations at Home Avenue, dated August 16, 2007; and
- USW relating to Delphi's operations at Vandalia, dated August 16, 2007.

Subject to these settlement agreements, the existing collective bargaining agreements:

- were modified and extended to September 14, 2011 for the UAW, the IAM, the IBEW, the IUOE Local 18S, the IUOE Local 832S, and the USW;

- were modified and extended to October 12, 2011 for the IUE-CWA; and

- were terminated and superseded for the IUOE Local 101S by the settlement agreement for the IUOE Local 101S.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

During the third quarter of 2007, approximately 725 employees eligible to participate in the attrition programs encompassed in the workforce transition programs elected to leave Delphi and Delphi recorded $67 million in U.S. employee workforce transition program charges. Amortization expense related to the buy-down payments encompassed in the workforce transition programs of $2 million was recorded in U.S. employee workforce transition program charges. Additionally, hourly pension curtailment charges of $59 million were recorded in U.S. employee workforce transition program charges. The hourly pension curtailment charges are discussed further in Note 13. Pension and Other Postretirement Benefits. Costs related to severance payments for employees at sites that will be sold or wound down were recorded in the amount of $48 million in cost of sales. Refer to Note 12 U.S. Employee Workforce Transition Programs for more information.

GM - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

On March 31, 2006, the Debtors filed a motion with the Court seeking authority to reject certain customer contracts with GM under section 365 of the Bankruptcy Code. On the same date, Delphi delivered a letter to GM initiating a process to reset the terms and conditions of more than 400 commercial agreements that expired between October 1, 2005 and March 31, 2006.

- The initial GM contract rejection motion covered approximately half of the North American annual purchase volume revenue from GM.

- The hearing on the motion was initially scheduled to commence on September 28, 2006 but has been adjourned on multiple occasions to enable the parties to concentrate their resources and activities on discussions aimed at achieving a consensual resolution, and additional proceedings on the motion are currently suspended until further order of the Court. In the interim, periodic chambers conferences have been conducted to provide the Court with updates regarding the status of negotiations to consensually resolve the motions.

Delphi and GM have entered into comprehensive settlement agreements consisting of a Global Settlement Agreement, as amended (the "GSA") and a Master Restructuring Agreement, as amended (the "MRA"). The accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA. The net results of these agreements will be a material reduction in Delphi's liabilities related to the workforce transition programs. Delphi will not account for the impact of the GSA or the MRA until the conditions of the agreements are satisfied, which will likely occur at emergence.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter. By contrast, resolution of most of the matters addressed in the MRA will require a significantly longer period that will extend for a number of years after confirmation of the Plan.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Plan, including payment of amounts to settle GM claims as outlined below.

- Upon approval of the GSA and MRA as part of the Plan confirmation process, the Debtors anticipate seeking a withdrawal without prejudice of their motions filed under section 365 of the Bankruptcy Code.

The GSA is intended to resolve outstanding issues among Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term. On October 29, 2007, Delphi and GM agreed to certain amendments to the GSA (the "GSA Amendment"). The GSA Amendment provides that instead of Delphi paying GM $2.7 billion in cash as had originally been agreed, on the effective date of the Plan, subject to certain surviving claims in the GSA and in satisfaction of various GM claims, Delphi would pay GM (i) $1.5 billion in a combination of at least $750 million in cash and a second lien note; and (ii) $1.2 billion in junior preferred convertible stock. The GSA Amendment contains a provision that (i) if the Proposed EPCA Amendment in the form filed with the Court on October 29, 2007 has not been signed by Delphi and the Investors on or before November 17, 2007, the GSA Amendment is terminable by either Delphi or GM upon delivery of written notice to the other, and (ii) upon such written notice, the GSA Amendment becomes null and void as if it had never been entered into by Delphi and GM. As noted above, Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM. Upon delivery of written notice by either Delphi or GM to the other after November 17, 2007, the GSA Amendment would become null and void and the GSA will continue in force without giving regard to the GSA Amendment. At this time GM and Delphi are continuing discussions.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will make significant contributions to cover costs associated with certain post-retirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as possible following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly Pension Plan, as set forth in the union term sheets;

- Shortly after the effective date of the Plan, GM will receive a subordinated interest bearing note from Delphi in the amount of $1.5 billion to be paid within 10 days of its issuance;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing

labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour at specified manufacturing facilities;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

Portfolio - Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. Effective November 1, 2006, in connection with the Company's continuous evaluation of its product portfolio, it decided that power products no longer fit within its future product portfolio and that business line was moved to Delphi's Automotive Holdings Group. With the exception of the catalyst product line with $249 million of year-to-date 2007 net sales included in the Powertrain Systems segment, and the Steering segment with $2,053 million of year-to-date 2007 net sales, these non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 16. Segment Reporting.

Throughout 2007, Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

- During the third quarter of 2007, Delphi closed on the sales of assets related to its catalyst and brake hose product lines and obtained the Court's approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business, refer to Note 4. Acquisitions and Divestitures to the consolidated financial statements for more information.

- Although the Company intends to sell or wind-down its remaining non-core product lines and manufacturing sites, these product lines and manufacturing sites were not classified as held for sale in the current period because the court approval process required by the Bankruptcy Code is not complete and other held for sale criteria of SFAS No. 144 ("SFAS 144"), "Accounting for the Impairment or Disposal of Long-Lived Assets," were not met as of September 30, 2007.

Costs recorded in the three and nine months ended September 30, 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets recorded as a component of long-lived asset impairment charges of $20 million and $217 million, respectively, and employee termination benefits and other exit costs of $66 million and $373 million, respectively (of which $65 million and $370 million were recorded as a component of cost of sales and $1 million and $3 million were recorded as a component of selling, general and administrative expenses). Included in employee termination benefits and other exit costs for the nine months ended September 30, 2007 were $268 million recorded as a component of cost of sales related to a manufacturing facility in Cadiz, Spain discussed below.

Cost Structure - Transform Delphi's salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services and information technology outsourcing activities, reduction in the global salaried workforce by taking advantage of attrition and

using salaried separation plans, and realignment of the salaried benefit programs to bring them in line with more competitive industry levels.   Given the investment required to implement these initiatives, Delphi does not expect to realize substantial savings until 2009 and beyond.

    <u>Pensions</u> - Devise a workable solution to Delphi's current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

    Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.  On March 9, 2007, Delphi received approval from the IRS to change the asset valuation method for purposes of funding for the Hourly and Salaried Plans for plan years beginning on and after October 1, 2005.  The new asset valuation method uses fair market value as permitted in the U.S. Internal Revenue Code (the "IRC").  On May 29, 2007, Delphi, acting pursuant to the Court's authority, secured from the IRS a favorable ruling regarding the transfer of unfunded liabilities from its Hourly Plan to a pension plan sponsored by GM.

    On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers").  On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers.  On July 13, 2007, the IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11.  On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver").  On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver. The 2007 Hourly Plan Waiver is necessary to make the transfer of hourly pension obligations to the GM plan economically efficient by avoiding redundant cash contributions that would result in a projected overfunding of the Hourly Plan.  On October 4, 2007, the IRS further modified the 2006 Waivers at Delphi's request by making confirming amendments to the 2006 Waivers, as modified on July 13, 2007.  The amendments modify the conditions to the 2006 Waivers so that they are generally consistent with the conditions to the 2007 Hourly Plan Waiver.  The conditional funding waivers will permit Delphi to defer funding contributions due under ERISA and the IRC until after Delphi emerges from chapter 11.

    <u>The pertinent terms of the 2006 Waivers, as modified, are:</u>

- No later than December 31, 2007, the Company must file a plan of reorganization with the Court providing for the continuation of the Hourly and Salaried Plans and compliance with the conditions of the waiver.  The Company has satisfied this condition.

- The effective date of the Company's plan of reorganization must occur no later than February 29, 2008.

- Effective June 16, 2007, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $100 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan, which letters of credit will expire once Delphi satisfies the contribution requirements described below which must be satisfied within five days following the Company's emergence from chapter 11.

    <u>With respect to the 2006 Waiver for the Hourly Plan:</u>

- Not later than five days after the effective date of the Company's plan of reorganization, the Company either (1) effects a transfer under IRC § 414(l) to a GM plan, (2) makes cash contributions to the Hourly Plan, or (3) makes a combination thereof that reduces the net unfunded liabilities of the Hourly Plan by at least $1.5 billion as determined on a basis in accordance with FASB Statement No. 87, "*Employers' Accounting for Pensions.*"

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes a contribution equal to approximately $575 million. The Company must also deposit into escrow an amount equal to approximately $200 million.

- Not later than five months after the effective date of the Company's plan of reorganization, the Company calculates and contributes from the escrow account and, if necessary, from general Company assets the amount sufficient to result in a funded current liability percentage as of the effective date of the Company's plan of reorganization that is the same funded current liability percentage that would have existed as of the effective date of the Company's plan of reorganization if (a) the funding waiver had not been granted, (b) the § 414(l) transfer had not occurred, and (c) a

contribution was made on the effective date of the Company's emergence equal to the accumulated ERISA funding deficiency as of September 30, 2007.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes $20 million for the plan year ended September 30, 2007, which includes a full settlement of the potential excise tax claims for the accumulated funding deficiencies for the Hourly and Salary Plans related to the plan year ended September 30, 2005, and which amount cannot be taken into account for purposes of the calculation in the immediately preceding paragraph.
.
- Not later than five days after the effective date of the Company's plan of reorganization, the Company reimburses the PBGC for outside consulting fees incurred in reviewing the Company's funding waiver request in an amount not to exceed $2 million.

- The Company makes contributions to the Hourly Plan in amounts sufficient to meet the minimum funding standard for the Hourly Plan for the plan year ended September 30, 2007, by June 15, 2008.

With respect to the 2006 Waiver for the Salaried Plan:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes contributions to the Salaried Plan for the year ended September 30, 2007 equal to the lesser of (i) the amount necessary to maintain a credit balance in the funding standard account of the Salaried Plan as of September 30, 2007, not less than the outstanding balance of the amortization base with respect to the waived amount that is established and maintained under IRC § 412(b)(2), or (ii) the full funding limitation for the plan year ended September 30, 2007.

- Certain funding requirements are met with regard to post emergence plan years.

With respect to the 2007 Hourly Plan Waiver:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company effects a transfer under section 414(1) of the IRC of $1.5 billion in net unfunded liabilities under the Hourly Plan to an overfunded GM plan.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes $20 million to the Hourly Plan (in addition to the $20 million contributions described in the conditions of the 2006 Waiver for the Hourly Plan).

- Other provisions related to treatment of contributions that may create a credit balance.

- No effect on the PBGC's right to hold the $100 million letter of credit with respect to the 2006 Waivers. Certain funding requirements are met with regard to post emergence plan years.

The Company has represented that it intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from bankruptcy protection. If the Company's plan of reorganization becomes effective later than February 29, 2008, the Company will seek an extension of the waiver terms with the IRS and the PBGC.

The conditional waivers described above contemplate that two large payments related to the Company's qualified defined benefit pension plans will be made upon emergence from bankruptcy. The first payment will be a contribution directly to the Hourly and Salaried Plans as described above, and is estimated to be approximately $1.25 billion with approximately $1.05 billion in plan contributions and approximately $200 million into escrow. Delphi expects that the majority of the escrow ultimately will be contributed to the Hourly and Salaried Plans based on true-up calculations. The second payment will be effected through an IRC § 414(1) transfer of $1.5 billion of Hourly Plan net unfunded liabilities to a GM hourly pension plan. Delphi and GM have agreed to the IRC § 414(1) transfer of $1.5 billion of net unfunded liability to GM's hourly plan, in exchange for a note given to GM by Delphi in the amount of $1.5 billion to be paid off by Delphi within ten days. The foregoing description of the pension funding plan is a summary only and is qualified in its entirety by the terms of the waivers and the orders of the Court.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the labor section, Delphi intends to freeze the Salaried Plan effective upon emergence. The freeze of this plan became probable in the third quarter resulting in curtailment charges of $116 million. Refer to Note 13. Pension and Other Postretirement Benefits for more information.

Other Elements of Proposed Plan of Reorganization

The Disclosure Statement and Plan include detailed information regarding the treatment of claims and interests and an outline of the EPCA and rights offering. Delphi's Plan filed on September 6 was based upon a series of global settlements and compromises that involved every major constituency of Delphi and its affiliated Debtors' reorganization cases, including Delphi's principal U.S. labor unions, GM, the official committee of unsecured creditors (the "Creditors' Committee") and the official committee of equity security holders (the "Equity Committee") appointed in Delphi's chapter 11 cases, and the lead plaintiffs in certain securities and Employee Retirement Income Security Act ("ERISA") multidistrict litigation (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA). As discussed in the Disclosure Statement, Delphi's Plan filed on September 6 contemplated, among other things, obtaining up to $7.5 billion in funded debt and a $1.6 billion asset-based revolving loan to finance Delphi's emergence from chapter 11.

The Plan filed on September 6 provided for a recovery through a distribution of reorganized Delphi common stock and cash. General unsecured creditors were to receive the principal amount of their claims plus accrued interest at a negotiated plan value. Other classes of creditors and interests were to receive agreed upon distributions. Under the Plan filed on September 6, GM was to receive a $2.7 billion cash distribution in satisfaction of certain of its claims against Delphi. As part of the settlement of the Securities and ERISA litigation discussed further in Bankruptcy Related Litigation, distributions were to be made using Plan currency in the same form, ratio and treatment as that which will be used to satisfy the holders of general unsecured claims. The allowed claims and interests of the settling Securities and Litigation claimants total approximately $25 million for the ERISA plan class and a total of $204 million for the debt securities class and the common stock securities class. The Plan filed on September 6 contemplated that rights offerings featuring transferable and non-transferable rights would be made to holders of Delphi's existing common stock. The rights offerings were to occur after the Court had confirmed Delphi's Plan and the registration statement filed with the SEC had been declared effective. Under the Plan filed on September 6, holders of existing Delphi common stock were also to receive a distribution of shares of reorganized Delphi and five-year warrants exercisable to purchase shares of reorganized Delphi.

At a Court hearing on September 27, 2007, Delphi stated that the dynamics of the capital markets prompted Delphi to consider whether amendments to its Plan filed on September 6 might be necessary. On October 29, 2007 Delphi filed a notice containing the Potential Amendments to the Plan and Disclosure Statement.

The Potential Amendments are supported by GM and a supermajority of the Investors. Delphi has been advised by the Equity Committee that it will no longer support Delphi's Plan if amended to reduce recoveries to common stockholders as contemplated in the Potential Amendments. On November 2, 2007 the Equity Committee filed objections to the Disclosure Statement and Plan and sought an adjournment of the continued Disclosure Statement hearing. In addition, the Creditors' Committee, certain holders of senior notes, the senior notes indenture trustee, and the lead plaintiffs in the Securities Litigation filed objections to the Disclosure Statement and the Potential Amendments.

The Potential Amendments contemplate an approximate $2 billion reduction in Delphi's net debt at emergence. Delphi plans to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first lien-funded financing, and second-lien funded financing in the amount of $1.5 billion. Further, the Potential Amendments reflect reductions in stakeholder distributions to some junior creditors and interest holders required to obtain consensus among the Creditors' Committee, the Investors (as defined below), and settling parties, and changes required by the Investors to obtain endorsement of the Plan and Disclosure Statement, Delphi's settlement with GM and Delphi's U.S. labor unions, Delphi's emergence business plan, and related agreements.

The Potential Amendments include the following changes to the Investors' direct investment and certain stakeholder recoveries:

| Party | Plan | Potential Amendment |
|---|---|---|
| **Plan Investors** | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.75 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $12.80 billion<br>- Purchase $175 million of new common stock of reorganized Delphi at an assumed enterprise value of $12.8 billion | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.80 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.80 billion<br>- Purchase $175 million of new common stock of reorganized Delphi at an assumed enterprise value of $11.8 billion |

| Party | Plan | Potential Amendment |
|---|---|---|
| **GM** | **Recovery of $2.7 billion**<br>- $2.7 billion in Cash | **Recovery of $2.7 billion**<br>- $750 million in Cash<br>- $750 million in a second lien note<br>- $1.2 billion in junior convertible preferred stock |
| **Unsecured Creditors** | **Par plus accrued recovery at Plan value of $13.9 billion**<br>- 80% in new common stock of reorganized Delphi valued at $45 per share<br>- 20% in Cash | **Par plus accrued recovery at Plan value of $13.0 billion**<br>- 92.4% in new common stock of reorganized Delphi valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **Delphi Trust I and Delphi Trust II Preferred Securities** | **Par plus accrued recovery at Plan value of $13.9 billion**<br>- 100% in new common stock of reorganized Delphi valued at $45 per share | **Par only recovery at Plan value of $13.0 billion**<br>- 92.4% in new common stock of reorganized Delphi valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **Existing Common Stockholders** | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of new common stock of reorganized Delphi at a purchase price of $45.00 per share | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of new common stock of reorganized Delphi at a purchase price of $41.58 per share |
| | **Warrants**<br>- Warrants to acquire an additional 5% of new common stock of reorganized Delphi at $45.00 per share exercisable for five years after emergence | **Warrants**<br>- Warrants to acquire $1.0 billion of new common stock of reorganized Delphi at $45.00 per share exercisable for six months after emergence |
| | **Direct Distribution**<br>- 1,476,000 shares of new common stock of reorganized Delphi | **No provision for Direct Distribution** |
| | **Discount Rights**<br>- Right to purchase 40,845,016 shares of new common stock of reorganized Delphi at a purchase price of $38.56 per share | **No provision for participation in Discount Rights Offering** |

The Potential Amendments do not affect the treatment of holders of claims arising from the Securities and ERISA litigation discussed further in Bankruptcy Related Litigation. Under the Potential Amendments, such claim holders will receive distributions using Plan currency in the same form, ratio, and treatment as that which will be used to satisfy the holders of general unsecured claims.

Pursuant to an order entered by the Court on June 29, 2007, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended to and including December 31, 2007, and the Debtors' exclusivity period for soliciting acceptances of the Plan was extended to and including February 29, 2008.

<u>Equity Purchase and Commitment Agreement</u>

Delphi was party to (i) a Plan Framework Support Agreement (the "PSA") with Cerberus Capital Management, L.P. ("Cerberus"), Appaloosa, Harbinger, Merrill, UBS and GM, which outlined a framework for the Plan, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues and the corporate governance of reorganized Delphi, and (ii) an Equity Purchase and Commitment Agreement (the "Terminated EPCA") with affiliates of Cerberus, Appaloosa and Harbinger (the "Investor Affiliates"), as well as Merrill and UBS, pursuant to which these investors would invest up to $3.4 billion in reorganized Delphi. Both the PSA and the

Terminated EPCA were subject to a number of conditions, including Delphi reaching consensual agreements with its U.S. labor unions and GM.

On April 19, 2007, Delphi announced that it anticipated negotiating changes to the Terminated EPCA and the PSA and that it did not expect that Cerberus would continue as a plan investor.  On July 7, 2007, pursuant to Section 12(g) of the Terminated EPCA, Delphi sent a termination notice of the Terminated EPCA to the other parties to the Terminated EPCA. As a result of the termination of the Terminated EPCA, a Termination Event (as defined in the PSA) occurred, and all obligations of the parties to the PSA under the PSA were immediately terminated and were of no further force and effect.  Delphi incurred no fees under the Terminated EPCA as a result of this termination.  On July 9, 2007, Delphi announced that it formally had terminated the Terminated EPCA and PSA and that it expected to enter into new framework agreements later in July.  Delphi also announced that these developments were not expected to prevent Delphi from filing the Plan and related documents with the Court prior to the current expiration of the company's exclusivity period or emerging from chapter 11 reorganization this year.

On July 18, 2007, Delphi announced that the Investors had submitted a proposal letter to Delphi to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan announced on March 31, 2006 and its Plan, on the terms and subject to the conditions contained in the form of equity purchase and commitment agreement attached to their proposal.  On August 2, 2007, the Court granted the Company's motion for an order authorizing and approving the EPCA, and on August 3, 2007 the Investors and the Company executed the EPCA.  On October 30, 2007, the Debtors announced they filed with the Court a motion seeking approval of the Proposed EPCA Amendment. The Proposed EPCA Amendment, has been agreed to by Appaloosa and a supermajority of the Investors; however, as noted above, the execution of the Proposed EPCA Amendment is subject to the satisfaction of various conditions set forth in the Proposal Letter, including (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors.  As noted above, Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM.  Absent satisfaction or waiver of the conditions set forth in the Proposal Letter, the Investors will not be obligated to execute the Proposed EPCA Amendment, and absent execution of the Proposed EPCA Amendment, the GSA Amendment may be voidable by either GM or Delphi.

Under the terms and subject to the conditions of the EPCA, the Investors will commit to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, the Investors will commit to purchasing any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that will be made available to existing common stockholders (or to unsecured creditors under the terms of the Proposed EPCA Amendment, if such amendment is executed) subject to approval of the Court and satisfaction of other terms and conditions. The rights offering would commence following confirmation of the Company's Plan and conclude 30 days thereafter, prior to the Company's emergence from Chapter 11 reorganization.  Altogether, the Investors could invest up to $2.55 billion in the reorganized Company.

The EPCA is subject to the satisfaction or waiver of numerous conditions, including the condition that Appaloosa is reasonably satisfied with the terms of certain material transaction documents, including the Plan and disclosure statement, confirmation order, business plan, certain constituent documents, and labor agreements to the extent the terms thereof would have an impact on the Investors' proposed investment in the Company.  With respect to a settlement with GM, Appaloosa must also be satisfied in its reasonable discretion taking into account whether the GM settlement has a material impact on the Investors' proposed investment in the Company and other relevant factors.  There also must not have occurred any material strike or material labor stoppage or slowdown involving certain labor unions, including the UAW, at either Delphi or GM or any of their respective subsidiaries; or any strike, labor stoppage or slowdown involving certain labor unions, including the UAW, either at Ford Motor Company or Chrysler Group or at any of their respective subsidiaries that would have a material impact on the Investors' proposed investment in Delphi.  As noted below, several of these conditions will be modified pursuant to the Proposed EPCA Amendment, if such amendment is executed.

Delphi can terminate the EPCA in certain circumstances, including: subject to certain exceptions, if the Company agrees to engage in an alternative transaction or any time on or after March 31, 2008 if the Plan has not become effective.  An affiliate of Appaloosa can terminate the EPCA, including: at any time on or after March 31, 2008, if the Plan has not become effective; if the Company has changed its recommendation or approval of the transactions contemplated by the EPCA, the Plan terms or the settlement with GM in a manner adverse to the Investors or approved or recommended an alternative transaction; or if the Company has entered into any agreement, or taken any action to seek Court approval relating to any plan, proposal, offer or transaction, that is inconsistent with the EPCA, the Plan terms, the settlement with GM or the Plan.  In the event of certain terminations of the EPCA pursuant to the terms thereof, the Company may be obligated to pay the Investors $83 million plus certain transaction expenses in connection with an alternative investment transaction as described in the immediately following paragraph.

In exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company will pay an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company will pay an aggregate commitment fee of $18 million. In addition, the Company will pay an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The commitment and arrangement fees paid in installments, as follows: $14 million was paid during the third quarter of 2007 on the first business day following the first date that the approval order is issued by the Court, $21 million was paid during the third quarter of 2007 on the date that the disclosure statement was filed, and $29 million is to be paid on the first business day following the entry of an order by the Court approving the disclosure statement. The Company is required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA is terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdraws its recommendation of the transaction or the Company willfully breaches the EPCA, and within the next 24 months thereafter, the Company then agrees to an alternative investment transaction. The Company also has agreed to pay out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. In no event, however, shall the Company's aggregate liability under the EPCA, including any liability for willful breach, exceed $100 million on or prior to the Disclosure Statement Approval Date, or $250 million thereafter.

The EPCA also includes certain corporate governance provisions for the reorganized Company, each of which has been incorporated into Delphi's proposed Plan, which governance provisions would be unchanged by the Proposed EPCA Amendment. The reorganized Company would be governed initially by a nine-member, classified Board of Directors consisting of the Company's Chief Executive Officer and President ("CEO"), and Executive Chairman, three members nominated by Appaloosa, three members nominated by the statutory creditors' committee, and one member nominated by the co-lead investor representative on a search committee with the approval of either the Company or the statutory creditors' committee. As part of the new corporate governance structure, the current Company's Board of Directors along with the Investors, mutually recognized that Rodney O'Neal would continue as CEO of the reorganized Company. Subject to certain conditions, six of the nine directors would be required to be independent from the reorganized Company under applicable exchange rules and independent of the Investors.

A five-member search committee will select the Company's post-emergence Executive Chairman, have veto rights over all directors nominated by the Investors and statutory committees, and appoint initial directors to the committees of the Company's Board of Directors. The search committee consists of John D. Opie, the Company's Board of Directors' lead independent director, a representative of each of the Company's two statutory committees and a representative from Appaloosa and one of the other co-investors (other than UBS, Goldman and Merrill). Appaloosa, through its proposed preferred stock ownership, would have certain veto rights regarding extraordinary corporate actions such as change of control transactions and acquisitions or investments in excess of $250 million in any twelve-month period after issuance of the preferred stock

Executive compensation for the reorganized company must be on market terms, must be reasonably satisfactory to Appaloosa, and the overall executive compensation plan design must be described in the Company's disclosure statement and incorporated into the Plan. The foregoing description of the EPCA does not purport to be complete and is qualified in its entirety by reference to the EPCA, which is filed as an exhibit to the quarterly report, for the quarter ended June 30, 2007.

The Proposed EPCA Amendment if executed, would revise a number of provisions in the EPCA to reflect events and developments since August 3, 2007 including those relating to Court approvals in connection with the Proposed EPCA Amendment; delivery of a revised and supplemented disclosure letter by the Company; delivery of a revised business plan by the Company; updates and revisions to representations and warranties; agreements with principal labor unions; and the execution and amendment of the GSA and MRA. The Proposed EPCA Amendment if executed, would amend provisions of the EPCA relating to the discount rights offering (including the replacement of existing common stockholders with unsecured creditors and the provision of over-subscription rights); and to reflect the issuance of Series C Preferred Stock to be issued to GM.

The Proposed EPCA Amendment if executed, would remove or narrow the scope of certain conditions to closing, including: the no-strike conditions, to include only strikes that occur after October 29, 2007; the capitalization condition to reduce the net debt required for the Company on the closing date; and to exclude from the condition relating to the approval of material investment documents, numerous documents which have already been delivered by the Company to the Investors such as the Plan, the disclosure statement, the MRA and GSA and the business plan. However, certain conditions to closing would be added by the Proposed EPCA Amendment, if such amendment is executed, such as those requiring: release and exculpation of each Investor as set forth in the Proposed EPCA Amendment; that the Company will have undrawn availability of $1.4 billion including a letter of credit carve out of at least $100 million; that the Company shall have demonstrated and certificated, to the reasonable satisfaction of ADAH, that its pro forma interest expense during 2008 on the Company's indebtedness will not exceed $575 million; that certain PBGC liens are withdrawn; and that the aggregate amount of trade and unsecured claims be no more than $1.45 billion (subject to certain waivers and exclusions).

17

There can be no assurances that the Debtors will be successful in achieving their objectives and as discussed above, Delphi cannot provide any assurances as to whether or when the Proposed EPCA Amendment will be executed and, if in fact is executed, whether there will be further changes in addition to those described herein.  The Debtors' ability to achieve their objectives is conditioned, in most instances, on the approval of the Court and the support of their stakeholders, including GM and the Debtors' labor unions.  In accordance with U.S. GAAP, the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Plan, such as the U.S. labor agreements, the GSA, and the MRA become effective.  The Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from bankruptcy, among others.  Such adjustments will have a material impact on Delphi's financial statements.

**DASE Liquidation**

Delphi's Chapter 11 Filings related solely to its U.S. operations because Delphi's operations outside the United States generally are profitable and have positive cash flow.  Nevertheless, Delphi has been seeking and will continue to seek to optimize its manufacturing footprint to lower its overall cost structure by focusing on strategic product lines where it has significant competitive and technological advantages and selling or winding down non-core product lines.  In particular, in February 2007, Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain.  The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006.  The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity.  In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso, which provides DASE support by managing the process of closing the Puerto Real site in Cadiz, Spain in accordance with applicable Spanish law.  The Spanish court subsequently appointed three receivers of DASE (the "DASE Receivers").  During the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to the separation allowance with the unions representing the affected employees.  On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million (then approximately $161 million) for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan").  Delphi concluded that it was in its best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million (then approximately $14 million) for the purpose of funding payment of the claims of DASE's other creditors.

As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of the DASE Receivers, Delphi no longer possesses effective control over DASE and has de-consolidated the financial results of DASE effective April 2007.  The total year-to-date expense through September 30, 2007 associated with the exit of the Puerto Real site in Cadiz, Spain is approximately $268 million, of which $61 million was recorded in the first quarter of 2007 ($30 million in the Steering segment and $31 million in the Automotive Holdings segment) and approximately $207 million was recorded in the second quarter 2007 ($77 million in the Steering segment and $130 million in the Automotive Holdings segment) as a component of cost of sales.

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements.  During the three and nine months ended September 30, 2007, the Debtors received approximately $47 million and $77 million ,

18

respectively, of dividends from non-debtor allied affiliates which are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in Other income (expense), net.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim.  During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi shall be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through December 31, 2007.  During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims.  The accrued interest payable of $369 million is included in accrued liabilities on the accompanying balance sheet

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi.  The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $321 million and were recorded as a wage asset and liability.  At September 30, 2007, $88 million was recorded in other current assets and $231 million was recorded in other long-term assets in the accompanying balance sheet, net of $2 million of amortization expense recorded in the third quarter of 2007.  Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2007** | **2006** | **2007** | **2006** |
|  | (in millions) | | | |
| Net sales | $ 3,681 | $ 3,883 | $11,862 | $13,236 |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 3,809 | 4,239 | 12,047 | 13,496 |
| U.S. employee workforce transition program charges | 244 | 1,043 | 238 | 2,948 |
| Depreciation and amortization | 125 | 166 | 422 | 497 |
| Long-lived asset impairment charges | 17 | — | 212 | — |
| Selling, general and administrative | 270 | 260 | 791 | 787 |
| Securities & ERISA litigation charge | 21 | — | 353 | — |
| Total operating expenses | 4,486 | 5,708 | 14,063 | 17,728 |
| Operating loss | (805) | (1,825) | (2,201) | (4,492) |
| Interest expense (contractual interest expense for the three and nine months ended September 30, 2007 was $108 million and $326 million, respectively, and for the three and nine months ended September 30, 2006 was $137 million and $397 million, respectively) | (444) | (105) | (596) | (283) |
| Loss on extinguishment of debt | — | — | (23) | — |
| Other income (expense), net | 50 | (4) | 84 | (8) |
| Loss before reorganization items, income taxes, equity income, and cumulative effect of accounting change | (1,199) | (1,934) | (2,736) | (4,783) |
| Reorganization items | (32) | (17) | (98) | (42) |
| Loss before income tax expense, equity income, and cumulative effect of accounting change | (1,231) | (1,951) | (2,834) | (4,825) |
| Income tax (expense) benefit | (4) | 6 | (28) | — |
| Loss before equity income and cumulative effect of accounting change | (1,235) | (1,945) | (2,862) | (4,825) |
| Equity income (loss) from non-consolidated affiliates, net of tax | 8 | (5) | 30 | 21 |
| Equity income (loss) from non-Debtor affiliates, net of tax | 58 | (23) | 309 | 190 |
| Loss before cumulative effect of accounting change | (1,169) | (1,973) | (2,523) | (4,614) |
| Cumulative effect of accounting change | — | — | — | 3 |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | September 30, 2007 (Unaudited) | December 31, 2006 |
|---|---|---|
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $    107 | $    376 |
| Restricted cash | 123 | 107 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,628 | 1,739 |
| Other third parties | 885 | 906 |
| Non-Debtor affiliates | 258 | 328 |
| Notes receivable from non-Debtor affiliates | 289 | 346 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 854 | 938 |
| Finished goods | 260 | 263 |
| Other current assets | 408 | 290 |
| Total current assets | 4,812 | 5,293 |
| Long-term assets: | | |
| Property, net | 1,784 | 2,240 |
| Investments in affiliates | 372 | 366 |
| Investments in non-Debtor affiliates | 4,026 | 3,273 |
| Goodwill | 152 | 152 |
| Other intangible assets, net | 27 | 36 |
| Other | 546 | 344 |
| Total long-term assets | 6,907 | 6,411 |
| Total assets | $  11,719 | $  11,704 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $  3,226 | $  2,742 |
| Notes payable to non-Debtor affiliates | 65 | — |
| Accounts payable | 1,266 | 1,108 |
| Accounts payable to non-Debtor affiliates | 707 | 434 |
| Accrued liabilities | 1,446 | 1,250 |
| Total current liabilities not subject to compromise | 6,710 | 5,534 |
| Long-term liabilities not subject to compromise: | | |
| Employee benefit plan obligations and other | 1,136 | 737 |
| Liabilities subject to compromise | 16,992 | 17,488 |
| Total liabilities | 24,838 | 23,759 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (13,119) | (12,055) |
| Total liabilities and stockholders' deficit | $  11,719 | $  11,704 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | **2007** | **2006** |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (682) | $ (582) |
| Cash flows from investing activities: | | |
| Capital expenditures | (171) | (229) |
| Proceeds from sale of property | 13 | 23 |
| Proceeds from divestitures | 62 | — |
| Increase in restricted cash | (12) | (101) |
| Other, net | (10) | (22) |
| Net cash used in investing activities | (118) | (329) |
| Cash flows from financing activities: | | |
| Proceeds from refinanced debtor-in-possession facility | 2,739 | — |
| Repayments of borrowings under debtor-in-possession facility | (250) | — |
| (Repayments of) proceeds from prepetition revolving credit facility, net | (1,508) | 2 |
| Repayments of borrowings under prepetition term loan facility | (988) | — |
| Net borrowings under refinanced debtor-in-possession facility | 480 | — |
| Repayments under cash overdraft | — | (29) |
| Repayments of borrowings under other debt agreements | (7) | (9) |
| Net proceeds from borrowings from Non-Debtor affiliates | 65 | — |
| Net cash provided by (used in) financing activities | 531 | (36) |
| Decrease in cash and cash equivalents | (269) | (947) |
| Cash and cash equivalents at beginning of period | 376 | 1,361 |
| Cash and cash equivalents at end of period | $ 107 | $ 414 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. The Debtors' reorganization items consist of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| | (in millions) | | | |
| Professional fees directly related to reorganization | $ 41 | $ 41 | $ 128 | $ 108 |
| Interest income | (2) | (16) | (8) | (47) |
| Gain on settlement of prepetition liabilities | — | — | — | (3) |
| Total Reorganization Items | $ 39 | $ 25 | $ 120 | $ 58 |

For the nine months ended September 30, 2007 and 2006, reorganization items resulted in $9 million and $53 million, respectively, of cash received entirely related to interest income and $100 million and $84 million, respectively, of cash paid for professional fees. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Company's debtor-in-possession credit facilities (both the one in effect during the nine months ended September 30, 2006 and the refinanced credit facility currently in effect) and prepetition credit facility, the unions, and other professional fees directly related to the reorganization.

## 4. ACQUISITIONS AND DIVESTITURES

### Catalyst Product Line Sale

On June 5, 2007, Delphi entered into an agreement with Belgium-based Umicore and certain of its affiliates (collectively, "Umicore") for the sale of Delphi's global original equipment and aftermarket catalyst business (the "Catalyst Business") which is included in Delphi's Powertrain Systems segment for a purchase price of $56 million, subject to adjustments. The Catalyst Business revenues were $260 million in 2006 and $249 million for the nine month period ended September 30, 2007. On August 8, 2007, in accordance with bidding procedures approved by the Court, Delphi conducted an auction and selected Umicore as the successful bidder with a revised purchase price of $75 million. On August 16, 2007, Delphi received approval from the Court to proceed with the sale of the Catalyst Business to Umicore and the assets of the Catalyst Business were deemed held for sale in accordance with SFAS 144. As discussed in Note 6. Long-Lived Asset Impairment, the carrying value of certain of the assets of the Catalyst Business were previously impaired and adjusted to their fair value under the "held for use" provision of SFAS 144. On September 28, 2007, Delphi closed on the sale of the Catalyst Business to Umicore for approximately $67 million which included certain post-closing working capital adjustments. Delphi recorded the loss of $30 million on the sale of the Catalyst Business in cost of sales in the third quarter of 2007.

### Global Battery Product Line Sale

On June 30, 2005, Delphi reached final agreement to sell its global battery product line, with the exception of two U.S. operations, to Johnson Controls Inc. ("JCI"). Delphi's 2005 sale of its global battery product line, with the exception of the two U.S. operations, to JCI contemplated a future possible transfer of certain of the operating assets of Delphi's New Brunswick, New Jersey manufacturing facility (the "New Brunswick Facility"), which was one of the remaining U.S. plants supplying batteries to JCI under a manufacturing supply agreement. In connection with the anticipated transfer of its New Brunswick operations to JCI, on May 25, 2006, Delphi entered into an agreement with the IUE-CWA and its Local 416, which included an attrition plan with respect to the hourly employees of the New Brunswick Facility (the "Attrition Plan"). On August 1, 2006, Delphi sold JCI certain assets related to the New Brunswick Facility free and clear of liens, claims, and encumbrances in exchange for JCI's payment to Delphi of $1 plus approximately $4 million for certain inventory, and Delphi implemented the Attrition Plan. Pursuant to the May 2006 agreement, Delphi agreed to the continuation and transition of supply of battery products to JCI from Delphi's remaining U.S. battery manufacturing facility located in Fitzgerald, Georgia ("Fitzgerald") pursuant to a component supply agreement entered into in connection with the initial sale in 2005. The sale of the New Brunswick Facility resulted in a loss of approximately $1 million, which was recorded in cost of sales. JCI paid Delphi approximately $13 million to reimburse Delphi for a significant portion of the amounts to be spent under the Attrition Plan, which was recorded as a reduction to U.S. employee workforce transition program charges.

In August 2006, Delphi received approximately $10 million as agreed upon in the 2005 agreement between Delphi and GM, the principal battery customer, which was executed in connection with the sale of Delphi's global battery business. $6 million was recognized as a reduction of costs, with approximately $4 million recorded as a reduction of cost of sales and approximately $2 million recorded as a reduction to U.S. employee workforce transition program charges. Approximately $4 million was recorded as deferred income as it related to future price reductions on batteries produced at Fitzgerald and the transition of battery supply from Fitzgerald to JCI.

On June 29, 2007, Delphi ceased production at Fitzgerald, the remaining U.S. battery manufacturing facility, and closed the facility in July 2007. The 2005 agreement between Delphi and GM, the principal battery customer, stipulated payment of $6 million to Delphi upon completion of the transition of the supply of battery products to JCI. Delphi received this $6 million payment in August 2007, which was recorded as a reduction to cost of sales in the third quarter of 2007.

### Other Acquisitions and Divestitures

On September 28, 2007, Delphi closed on the sale of substantially all of the assets exclusively used in the brake hose product line produced at one of Delphi's manufacturing sites located in Dayton, Ohio (the "Brake Hose Business"). The sales price for the Brake Hose Business was $10 million and the sale resulted in a gain of $2 million, which was recorded as a reduction to cost of sales in the third quarter of 2007. On July 19, 2007, Delphi received approval from the Court to proceed with the sale of certain assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") for $15 million. The sale of the Mexico Brake Plant Business closed on October 1, 2007. The Brake Hose Business and the Mexico Brake Plant Business aggregate revenues were $280 million in 2006 and $179 million for the nine month period ended September 30, 2007. Delphi expects the gain or loss on sale of the Mexico Brake Plant Business will not significantly impact Delphi's results of operations in the fourth quarter of 2007.

In the second quarter 2006, Delphi's Thermal Systems division made an additional investment in Shanghai Delphi Automotive Air Conditioning Co. ("SDAAC") for approximately $14 million, which increased its equity ownership interest in SDAAC from 34 percent to 50 percent.  SDAAC's annual revenues for 2005 were approximately $133 million.  In the third quarter of 2006, Delphi obtained a controlling management interest in SDAAC and began consolidating the entity.  Prior to obtaining a controlling management interest, the entity was accounted for using the equity method.

Also in the third quarter of 2006, Delphi's Electronics and Safety division sold certain of its assets in MobileAria, a consolidated entity, which resulted in a gain of $7 million which was recognized as a reduction of cost of sales.

The results of operations associated with the acquisitions and divestitures and the gain or loss on the divestitures were not significant to the consolidated financial statements in any period presented.

## 5. INCOME TAXES

Effective January 1, 2007, Delphi adopted the provisions of FIN 48.  FIN 48 prescribes a recognition threshold and measurement attribute for the accounting and financial statement disclosure of tax positions taken or expected to be taken in a tax return.  The evaluation of a tax position is a two-step process.  The first step requires an entity to determine whether it is more likely than not that a tax position will be sustained upon examination based on the technical merits of the position.  The second step requires an entity to recognize in the financial statements each tax position that meets the more likely than not criteria, measured at the largest amount of benefit that has a greater than fifty percent likelihood of being realized.  FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

As a result of the adoption of FIN 48 as of January 1, 2007, Delphi recognized an $18 million increase, primarily in its long-term liabilities, with a corresponding increase to its accumulated deficit.  As of the adoption date, Delphi had recorded liabilities for unrecognized tax benefits of $95 million (including interest and penalties of $25 million) of which $71 million, if recognized, would impact the effective tax rate.  Delphi recognizes interest and penalties accrued related to unrecognized tax benefits in tax expense.

Delphi considers it is reasonably possible that approximately $10 million of unrecognized tax benefits could be recognized over the next twelve months due to expiring statutes of limitations in various foreign jurisdictions which may be offset in whole or in part by the results of various income tax examinations.

Delphi files U.S. and state income tax returns as well as income tax returns in several foreign jurisdictions.  Foreign taxing jurisdictions significant to Delphi include China, Mexico, Germany, France and Brazil.  In the U.S., federal income tax returns for years prior to 2006 have been effectively settled.  The examination of Delphi's 2006 U.S. federal tax return is expected to be completed during 2007. With respect to foreign taxing jurisdictions significant to Delphi, Delphi's affiliates are no longer subject to income tax examinations by foreign tax authorities for years before 2000. In addition, open tax years related to various states remain subject to examination but are not considered to be material.

In the third quarter of 2006, Delphi recorded valuation allowances of $36 million for the net deferred tax assets of certain non-U.S. operations, primarily operations in Spain, Portugal and Romania.  Delphi determined based on historical losses and expected future taxable income (loss) that it was no longer more likely than not that these net deferred tax assets would be realized.  During the third quarter of 2007, Delphi reduced the valuation allowance by net $11 million, for deferred tax assets of certain non-US operations, primarily operations in Poland, offset by increases in Germany and Mexico.

## 6. LONG-LIVED ASSET IMPAIRMENT

In accordance with SFAS 144, Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets.  Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets.  The fair value of the assets was determined based on the "held for use" classification in accordance with SFAS 144.  Delphi may incur significant impairment charges or losses on divestitures upon these assets being classified as "held for sale."

As previously disclosed, Delphi's Steering segment has been identified as a non-core product line, and Delphi is negotiating the disposition and sale of this business.  Due to various factors, including the current Court proceedings, long-lived assets of Delphi's Steering segment are accounted for as held-for-use under the provisions of SFAS 144.

Based on the ongoing sale and labor negotiations during March 2007, previous estimates of sale proceeds were reduced. Based on this development Delphi determined that an indicator of impairment was present for its Steering segment U.S. long-lived assets. Delphi tested the recoverability of the Steering segment U.S. long-lived assets by comparing the estimated undiscounted future cash flows from its use and anticipated disposition of those assets to their carrying value. Based on its recoverability assessment, Delphi determined that the carrying value of its Steering assets at its U.S. sites exceeded the undiscounted estimated future cash flows at those sites. Accordingly, Delphi determined the fair value of its held-for-use long-lived assets at those sites by applying various valuation techniques, including discounted cash flow analysis, replacement cost and orderly liquidation value. As a result of its fair value assessment, Delphi recognized asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering segment of $152 million in the first quarter of 2007, which reduced the carrying value of the Steering segment long-lived assets to $380 million.

Delphi's Sandusky, Ohio facility wheel bearing business in the Automotive Holdings Group segment ("Sandusky") was identified as a non-core product line, and Delphi is negotiating the disposition and sale of this business. In June 2007, Delphi reassessed its estimated net proceeds from disposition based on an agreement with GM to provide funding for the necessary capital investment for new programs awarded to Sandusky and to share in subsequent sales proceeds. Based on the new business award, incremental investment requirement, and the proceeds sharing agreement with GM, there was a change in expected future cash flows and a reduction in the amount of expected proceeds anticipated from a sale causing an indication of impairment. Based on testing methodology similar to that used for the Steering segment described above, Delphi determined that the carrying value of its Sandusky facility exceeded the undiscounted estimated future cash flows and consequently recognized an impairment charge of $26 million related to the valuation of long-lived assets held-for-use in the second quarter of 2007. This charge reduced the carrying value of the Sandusky site to approximately $70 million as of June 30, 2007.

In addition, Delphi recognized $7 million of long-lived asset impairment for the Catalyst Business in the Powertrain Systems segment in the second quarter of 2007, which was caused by a deterioration in the estimated future cash flows through the expected sale date. The Catalyst Business was sold during the third quarter of 2007, refer to Note 4. Acquisitions and Divestitures.

During the third quarter of 2007, Delphi recognized $13 million of long-lived asset impairment related to two plants in Delphi's Automotive Holdings segment. These impairments were caused by a deterioration in the expected net proceeds resulting from the use and ultimate sale of these assets.

Delphi recognized $10 million and $24 million of other long-lived asset impairment charges for operations in various segments in the three and nine months ended September 30, 2007. The total long-lived asset impairment charges for the three and nine months ended September 30, 2007 were $23 million and $222 million, respectively. Refer to Note 16. Segment Reporting for long-lived asset impairment by segment.

## 7. WEIGHTED AVERAGE SHARES

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in the nine months ended September 30, 2007 and 2006, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in thousands) | | | |
| Weighted average shares outstanding ....... | 561,782 | 561,782 | 561,782 | 561,782 |
| Effect of dilutive securities ...................... | — | — | — | — |
| Diluted shares outstanding ...................... | 561,782 | 561,782 | 561,782 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in thousands) | | | |
| Anti-dilutive securities.............................. | 68,873 | 77,826 | 68,873 | 77,826 |

## 8. LIABILITIES

Accrued liabilities consisted of the following:

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Payroll related obligations | $ 288 | $ 268 |
| Employee benefits, including current pension obligations | 167 | 216 |
| Accrued income taxes | 167 | 142 |
| Taxes other than income | 180 | 144 |
| Warranty obligations (Note 9) | 253 | 214 |
| U.S. Employee Workforce Transition Program Charges (Note 12) | 320 | 626 |
| Manufacturing plant rationalization | 195 | 154 |
| Interest (Note 1) | 383 | 29 |
| Other | 442 | 418 |
| Total | $2,395 | $2,211 |

Other long-term liabilities consisted of the following:

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Employee benefits | $ 303 | $ 282 |
| Environmental | 120 | 116 |
| U.S. Employee Workforce Transition Program Charges (Note 12) | 298 | 204 |
| Extended disability benefits | 102 | 95 |
| Warranty obligations (Note 9) | 316 | — |
| Other | 216 | 162 |
| Total | $1,355 | $ 859 |

## 9. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the nine months ended September 30, 2007:

| | September 30, 2007 |
|---|---|
| | (in millions) |
| Accrual balance at beginning of year | $ 388 |
| Provision for estimated warranties | 264 |
| Settlements made during the period (in cash or in kind) | (88) |
| Foreign currency translation and other | 5 |
| Accrual balance at end of period | $ 569 |

Approximately $253 million and $214 million of the warranty accrual balance as of September 30, 2007 and December 31, 2006, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $316 million of the warranty accrual balance as of September 30, 2007 is included in other long-term liabilities and approximately $174 million of the warranty accrual balance as of December 31, 2006 is included in liabilities subject to compromise (refer to Note 10. Liabilities Subject to Compromise). During the third quarter of 2007 with the filing of Delphi's Plan on September 6, 2007, Delphi determined that the warranty claims previously included in liabilities subject to compromise would be resolved in the ordinary course of business outside of the Court and were therefore not subject to compromise, including

amounts that were addressed in the warranty settlement agreement reached with GM discussed further in Note 17. Commitments and Contingencies, Ordinary Business Litigation. During the second quarter of 2007, Delphi recorded an increase to warranty reserves in the amount of $91 million for a range of specific GM warranty claims, primarily in the Automotive Holdings Group and Powertrain Systems segments. Of the $264 million provision for estimated warranties reflected above, approximately $124 million was recorded during the third quarter of 2007 which included a $93 million increase to warranty reserves for specific warranty claims related to the Powertrain Systems segment.

## 10. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' Plan. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, the Debtors may reject prepetition executory contracts and unexpired leases with respect to the Debtors' operations, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. To date, the Debtors have received approximately 16,700 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $37 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. The Debtors believe that many of these claims are duplicative, based on contingencies that have not occurred, or are otherwise overstated, and are therefore invalid. As a result, the Debtors believe that the aggregate amount of claims filed with the Court will likely exceed the amount that ultimately will be allowed by the Court. As of September 30, 2007 the Debtors have filed twenty-one omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,400 proofs of claim which asserted approximately $10.4 billion in aggregate liquidated amounts plus additional unliquidated amounts. To date, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,400 of those claims, which orders reduced the amount of asserted claims by approximately $9.6 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order modifying approximately 3,000 claims reducing the aggregate amounts asserted on those claims from $476 million to $410 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. The determination of how liabilities will ultimately be settled and treated cannot be made until the Court approves a chapter 11 plan of reorganization. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

Liabilities subject to compromise consist of the following:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (in millions) | |
| Pension obligations (Note 13) | $ 3,323 | $ 4,257 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,410 | 9,109 |
| Debt and notes payable | 2,046 | 2,054 |
| Accounts payable | 751 | 754 |
| Junior subordinated notes due 2033 | 391 | 391 |
| Prepetition warranty obligation (Note 9) | — | 174 |
| GM claim for U.S. employee workforce transition programs | 312 | 315 |
| Securities & ERISA litigation liability (Note 17) | 361 | 8 |

| | | |
|---|---|---|
| Other ................................................................................................... | 320 | 354 |
| Total Liabilities Subject to Compromise ............................................ | $ 16,914 | $ 17,416 |

Pursuant to the Plan filed on September 6, 2007, warranty and environmental claims were determined to be settled in the ordinary course of business and are no longer subject to compromise. Such amounts were reclassified from liabilities subject to compromise to accrued liabilities and other long-term liabilities during the third quarter of 2007. Refer to Note 8. Liabilities.

## 11. DEBT

On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion. On January 9, 2007, Delphi refinanced its prepetition and postpetition credit facilities obligations by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan"). The Refinanced DIP Credit Facility was obtained to refinance both the $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 21, 2005 (as amended, the "Amended DIP Credit Facility") and the approximate $2.5 billion outstanding on its $2.8 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility"). The Refinanced DIP Credit Facility will expire on the earlier of December 31, 2007 and the date of the substantial consummation of a reorganized plan that is confirmed pursuant to an order of the Court. As noted below, Delphi is discussing an amendment with its lenders to extend the term of the facility.

The Refinanced DIP Credit Facility carries an interest rate at the option of Delphi of either the Administrative Agent's Alternate Base Rate plus (i) with respect to Tranche A borrowings, 1.50%, (ii) with respect to Tranche B borrowings, 1.25%, or (iii) with respect to Tranche C borrowings, 1.75%, or the London Interbank Borrowing Rate ("LIBOR"), plus (x) with respect to Tranche A borrowings, 2.50%, (y) with respect to Tranche B borrowings, 2.25%, and (z) with respect to Tranche C borrowings, 2.75%. The interest rate period can be set at a two-week or one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility. Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of January 9, 2007, both the Refinanced DIP Credit Facility $250 million Tranche B Term Loan and approximately $2.5 billion Tranche C Term Loan were funded. As of September 30, 2007, total available liquidity under the Refinanced DIP Credit Facility was approximately $850 million. Also as of September 30, 2007, there was $480 million outstanding under the Revolving Facility and the Company had $263 million in letters of credit outstanding under the Revolving Facility as of that date, including $150 million related to the letters of credit provided to the PBGC discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is only pledging 65% of the stock of its first-tier non-U.S. subsidiaries) and further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession.

The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Refinanced DIP Credit Facility commitment at September 30, 2007. Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).

The Refinanced DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets do not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on November 30, 2007, at the levels set forth in the Refinanced DIP Credit Facility.

The Refinanced DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Refinanced DIP Credit Facility covenants at September 30, 2007.

On March 29, 2007, Delphi entered into the First Amendment to the Refinanced DIP Credit Facility (the "First Amendment"). The First Amendment provides for an amended definition of Global EBITDAR, the addition of a two-week LIBOR interest election option and amended monthly Global EBITDAR covenant levels. The amended definition of Global EBITDAR provides for the removal of cash payment limits in respect of restructuring costs from the definition.

On September 27, 2007, Delphi entered into the Second Amendment to the Refinanced DIP Credit Facility (the "Second Amendment"). The Second Amendment provides for an extension of the expiration date of any Letter of Credit (as defined in the Refinanced DIP Credit Facility) issued on behalf of Delphi or any of its subsidiaries to the earlier of (i) one year after the date of the issuance of such Letter of Credit (or any renewal or extension thereof) and (ii) 365 days after the Maturity Date (as defined in the Refinanced DIP Credit Facility; such 365th day being the "LC Outside Date"). As originally drafted, clause (ii) of the Refinanced DIP Credit Facility provided for expiration of a Letter of Credit 180 days after the Maturity Date. The amendment also provides certain collateral security mechanisms to ensure Delphi's reimbursement of obligations in connection with the renewal or extension of any Letter of Credit beyond the LC Outside Date.

Delphi is currently working with the Administrative Agent (as defined in the Refinanced DIP Credit Facility) and the Required Lenders (as defined in the Refinanced DIP Credit Facility) under the Refinanced DIP Credit Facility to enter into a third amendment to the Refinanced DIP Credit Facility. By such amendment, Delphi seeks to extend the facility until June 30, 2008 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court, with the ability to further extend the maturity to September 30, 2008 under certain conditions. Delphi expects that the amendment will become effective in November 2007.

Concurrent with the entry into the Refinanced DIP Credit Facility, the Amended DIP Credit Facility and the Prepetition Facility were terminated. The proceeds of the Tranche B Term Loan and Tranche C Term Loan were used to extinguish amounts outstanding under the Amended DIP Credit Facility and the Prepetition Facility. Delphi incurred no early termination penalties in connection with the termination of these agreements. However, as a result of the changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $25 million of unamortized debt issuance and discount costs related to the Amended DIP Credit Facility and Prepetition Facility in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt as these fees relate to the refinancing of the term loans and $2 million was recognized as interest expense as these fees relate to the refinancing of the revolving credit facility. Refer to Note 14. Debt, to the consolidated financial statements in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006 for additional information on the Amended DIP Credit Facility.

## 12. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

### 2007 Workforce Transition Programs

On June 22, 2007, Delphi, GM, and the UAW signed the UAW settlement agreement which included a workforce transition program for eligible UAW employees (the "UAW Workforce Transition Program"). Included in the UAW Workforce Transition Program is an attrition program similar to the U.S. employee special attrition programs offered in June 2006. The attrition program in the UAW Workforce Transition Program offers certain eligible Delphi employees the following options: (i) normal and early voluntary retirements with a lump sum incentive payment of $35,000, (ii) a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service are granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments which, depending on the amount of seniority or credited service, range from $70,000 to $140,000. The UAW Workforce Transition Program also offers the following options: (i) flowback rights to eligible Delphi employees as of the date of the filing of Delphi's bankruptcy petition who do not elect the attrition options, including a relocation allowance of up to $67,000 in certain circumstances when plants cease production, (ii) buy-down payments totaling up to $105,000 for eligible traditional employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iii) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (iv) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to September 14, 2011.

On August 5, 2007, Delphi, GM and the IUE-CWA signed the IUE-CWA settlement agreement, which included a workforce transition program for eligible IUE-CWA employees (the "IUE-CWA Workforce Transition Program") and included an attrition program similar to the 2006 U.S. employee special attrition programs. The attrition program in the IUE-CWA Workforce Transition Program is similar to the attrition program included in the UAW Workforce Transition Program except that the buyout payments based on seniority or credited service range from $40,000 to $140,000. The IUE-CWA Workforce Transition Program also offers the following options: (i) special employee placement opportunities with GM for eligible Delphi employees who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (ii) provision of buy-down payments totaling up to $125,000 for eligible employees who do not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA settlement agreement, and (iii) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to October 12, 2011.

On July 31 and August 1, 2007, Delphi and GM signed settlement agreements with the IAM, IBEW, IUOE Local 18S, IUOE Local 101S, and IUOE Local 832S (collectively the "Splinter Unions"). With the exception of the IUOE Local 101S Agreement, these Splinter Union settlement agreements included workforce transition programs (the "Splinter Unions Workforce Transition Program") and included attrition programs similar to the attrition program included in the IUE-CWA Workforce Transition Program. The Splinter Unions Workforce Transition Program also offers options of buy-down payments totaling up to $10,000 for eligible employees or severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011.

On August 16, 2007, Delphi, GM and the USW signed the USW settlement agreements, which included certain workforce transition options for eligible USW employees at the Home Avenue and Vandalia operations similar to certain options presented in the IUE-CWA Workforce Transition Program.

As of September 30, 2007, approximately 310 of the 3,700 eligible UAW-represented employees, approximately 190 of the 1,300 eligible IUE-CWA-represented employees, approximately 165 of the 800 eligible USW-represented employees, and approximately 60 of the 100 eligible Splinter Union-represented employees elected to participate in the attrition programs. Delphi recorded charges for the attrition programs of approximately $67 million in U.S. employee workforce transition program charges during the third quarter of 2007. These charges are included in the U.S. employee workforce transition program liability included in current liabilities in the consolidated balance sheet. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $321 million and were recorded as a wage asset and liability. At September 30, 2007, of which $88 million was recorded in Other current assets and $231 million was recorded in Other long-term assets in the accompanying balance sheet, net of $2 million of amortization expense recorded in the third quarter of 2007. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts*", the wage asset will be amortized over the life of the union workforce transition programs. The corresponding wage liability will be reduced as buy-down payments are made. Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of September 30, 2007. GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions. Therefore, as of September 30, 2007, Delphi has recorded a receivable from GM in the amount of $2 million. Pension curtailment charges related to the Delphi Hourly-Rate Employee' Pension Plan of $59 million resulted from the workforce transition programs and were recorded in U.S. employee workforce transition program charges, along with $116 million of pension curtailment losses related to the Delphi Retirement Program for Salaried Employees. The hourly and salaried pension curtailment charges are discussed further in Note 13. Pension and Other Postretirement Benefits. Finally, costs related to severance payments and supplemental unemployment benefits for U.S. employees at sites that will be sold or wound down in accordance with the workforce transition programs were recorded in the amount of $48 million in cost of sales.

**2006 Attrition Programs**

On March 22, 2006, Delphi, GM and the UAW agreed on a special attrition program (the "UAW Special Attrition Program"), and on May 12, 2006, the Court entered the final order approving Delphi's entry into the program with certain modifications. Delphi, GM, and the UAW agreed on a supplemental agreement on June 5, 2006 (the "UAW Supplemental Agreement") to the UAW Special Attrition Program which was approved by the Court by order entered on July 7, 2006 approving the motion (collectively, the UAW Special Attrition Program and UAW Supplemental Agreement are referred to herein as the "UAW Attrition Programs"). The UAW Attrition Programs offered, among other things, certain eligible Delphi U.S. hourly employees represented by the UAW normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The programs also provided a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service were granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they would be eligible to retire without additional incentives. The programs also provided buyout payments which, depending on the amount of seniority or credited service, ranged from $70,000 to $140,000.

GM has agreed to reimburse Delphi for one-half of these buyout payments and in exchange will receive an allowed prepetition general unsecured claim. In addition, employees who elected to participate in the UAW Attrition Programs were eligible to retire as employees of Delphi or flow back to GM and retire. During 2006, approximately 10,000 employees elected to flow back to GM and retire. Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for the actual costs of providing such coverage. As of September 30, 2007, Delphi's receivable from GM for these costs was $5 million.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the UAW Attrition Programs. The lump sum incentive payments of $35,000 per eligible employee and one-half of the $40,000 to $140,000 buyout payments are being paid by Delphi and reimbursed by GM. GM will receive an allowed prepetition general unsecured claim equal to the amount it reimburses Delphi for the buyout payments. The IUE-CWA special attrition program (the "IUE-CWA Special Attrition Program") was approved by the Court by order entered on July 7, 2006.

As discussed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006, Delphi recorded special termination benefit charges of approximately $1,117 million during the year ended December 31, 2006, for the pre-retirement and buyout portions of the cost of the U.S. employee workforce transition programs. Since GM will receive an allowed prepetition general unsecured claim for its 50% share of the financial responsibility of the buyout payments, Delphi expensed 100% of the buyout payments. During the first quarter of 2007, Delphi reversed $6 million of termination benefit charges due to a change in estimate.

The following table represents the changes in the U.S. employee workforce transition program liability during the nine months ended September 30, 2007:

| U.S. Employee Workforce Transition Program Liability | Special Termination Benefit (in millions) |
|---|---|
| Balance at December 31, 2006 | $ 830 |
| U.S. employee workforce transition program charges | 61 |
| Lump sum incentive obligation | 2 |
| Payments | (571) |
| Pension and other postretirement benefits (Note 13) | (39) |
| Other | 14 |
| Balance at September 30, 2007 | $ 297 |

Approximately $205 million and $92 million of the U.S. employee workforce transition program liability is included in accrued liabilities and other long-term liabilities, respectively, in the consolidated balance sheet as of September 30, 2007.

The following table details changes in the GM accounts receivable balance attributable to the U.S. employee workforce transition programs during the nine months ended September 30, 2007, recorded in General Motors and affiliates accounts receivable in the accompanying consolidated balance sheet at September 30, 2007:

| U.S. Employee Workforce Transition Program - GM Accounts Receivable | (in millions) |
|---|---|
| Balance at December 31, 2006 | $ 272 |
| Amount reimbursable from GM | 2 |
| Receipts from GM | (265) |
| Other | (7) |
| Balance at September 30, 2007 | $ 2 |

## 13. PENSION AND OTHER POSTRETIREMENT BENEFITS

Pension plans sponsored by the Debtors covering unionized employees in the U.S. generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The Debtors also sponsor defined benefit pension plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code.

Additionally, the Debtors sponsor other defined benefit plans that provide postretirement medical, dental, vision, and life insurance to certain hourly and salaried employees and eligible dependents in the U.S.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three- and nine-month periods ended September 30, 2007 and 2006 for salaried and hourly employees.  The settlements recorded in the nine months ended September 30, 2007 were primarily due to renegotiated labor contracts for two facilities in Mexico.  Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | (in millions) | | | | | |
|  | Three Months Ended September 30, | | | | | |
|  | **2007** | **2006** | **2007** | **2006** | **2007** | **2006** |
| Service cost (a) | $ 42 | $ 60 | $ 12 | $ 11 | $ 20 | $ 46 |
| Interest cost | 212 | 211 | 20 | 17 | 135 | 139 |
| Expected return on plan assets | (216) | (204) | (20) | (16) | — | — |
| Settlements | — | — | 8 | 1 | — | — |
| Curtailment loss/(gain) | 170 | 397 | — | — | (2) | (13) |
| Amortization of prior service costs | 13 | 27 | 1 | 1 | (24) | (25) |
| Amortization of actuarial losses | 18 | 33 | 8 | 6 | 19 | 78 |
| Net periodic benefit cost | $ 239 | $ 524 | $ 29 | $ 20 | $ 148 | $ 225 |

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | (in millions) | | | | | |
|  | Nine Months Ended September 30, | | | | | |
|  | **2007** | **2006** | **2007** | **2006** | **2007** | **2006** |
| Service cost (a) | $ 137 | $ 207 | $ 35 | $ 31 | $ 62 | $ 136 |
| Interest cost | 637 | 581 | 60 | 48 | 406 | 425 |
| Expected return on plan assets | (648) | (614) | (60) | (48) | — | — |
| Settlements | — | — | 41 | 1 | — | — |
| Curtailment loss/(gain) | 170 | 1,917 | 5 | — | (2) | (20) |
| Amortization of prior service costs | 41 | 92 | 3 | 3 | (74) | (74) |
| Amortization of actuarial losses | 69 | 148 | 25 | 19 | 57 | 234 |
| Net periodic benefit cost | $ 406 | $2,331 | $109 | $ 54 | $ 449 | $ 701 |

(a)  Includes $11 million and $39 million for the three and nine months ended September 30, 2007, respectively,  and $18 million and $21 million for the three and nine months ended September 30, 2006, of costs related to pre-retirement participants of the U.S. employee workforce transition program accrued in 2006.

During the three months ended September 30, 2007, Delphi recorded pension curtailment losses of approximately $175 million in U.S. employee workforce transition program charges of which $59 million related to the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and $116 million related to the Delphi Retirement Program for Salaried Employees (the "Salaried Plan").  The curtailment losses were recorded to recognize the effect of employees who elected to participate in the workforce transition programs and the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried and certain hourly employees on emergence from bankruptcy.  In addition, Delphi recorded pension and other postretirement benefit curtailment gains related to the divestiture of the Catalyst business.  During the nine months ended September 30, 2007, Delphi recorded pension curtailment losses of approximately $175 million in U.S. employee workforce transition program charges.  In addition, the nine months ended September 30, 2007 included pension and other postretirement benefit curtailment gains related to the divestiture of the Catalyst business and $5 million pension curtailment losses recorded during the second quarter of 2007 related to a non-U.S. entity.  During the three and nine months ended September 30, 2006, Delphi recorded net pension curtailment charges of approximately $384 million and $1,897 million, respectively, in U.S. employee workforce transition program charges for UAW-, IUE-CWA-, and USW-represented hourly employees who elected to participate in the Special Attrition Program.  Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

In conjunction with the curtailment losses discussed above and the significant amendments to the U.S. hourly and salaried pension plans and the hourly retiree health care plan, the obligations for these plans were remeasured as of August 31, 2007, the point at which the changes in benefits were probable and the impacts of the curtailments were reasonably estimable.  The $175 million pension curtailment and remeasurement resulted in a decrease of approximately $900 million in the accrued benefit liability and an increase to other comprehensive income of $1.1 billion.  Delphi will not recognize the impacts of the hourly retiree health care plan remeasurement and curtailment until three months subsequent to the remeasurement date due to the fact that this plan's annual measurement date is September 30 versus December 31.  The amounts shown below reflect the defined benefit pension obligations for the U.S. Hourly Plan and Salaried Plan as of the August 31, 2007 remeasurement.

| | U.S. Pension Benefits Plans (in millions) |
|---|---|
| **Change in benefit obligation:** | |
| Benefit obligation at beginning of year | $    14,558 |
| Expense | 672 |
| Benefits paid | (676) |
| Impact of curtailments, remeasurement and other | (838) |
| Benefit obligation at August 31, 2007 | $    13,716 |
| | |
| **Change in plan assets:** | |
| Fair value of plan assets at beginning of year | $    10,653 |
| Actual return on plan assets | 630 |
| Delphi contributions | 150 |
| Benefits paid | (676) |
| Fair value of plan assets at August 31, 2007 | $    10,757 |
| | |
| Underfunded status | $    (2,959) |
| Unamortized actuarial loss | 1,237 |
| Unamortized prior service cost | 157 |
| Net amount recognized in consolidated balance sheets | $    (1,565) |
| | |
| Amounts recognized in the consolidated balance sheets consist of: | |
| Accrued benefit liability | $    (2,959) |
| Accumulated other comprehensive income (pre-tax) | 1,394 |
| Net amount recognized | $    (1,565) |

Delphi selected discount rates based on analyzing the results of matching high quality fixed income investments rated AA- or higher by Standard and Poor's and the regular and above median Citigroup Pension Discount Curve, with expected benefit cash flows.  Since high quality bonds in sufficient quantity and with appropriate maturities are not available for all years when benefit cash flows are expected to be paid, hypothetical bonds were imputed based on combinations of existing bonds, and interpolation and extrapolation reflecting current and past yield trends.  The pension discount rate determined on that basis increased from 5.90% as of December 31, 2006 to 6.30% as of August 31, 2007.  Other assumptions utilized for the August 31, 2007 remeasurement such as asset rate of return and increase in compensation levels were consistent with the December 31, 2006 valuation.

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings.  During the nine months ended September 30, 2007, Delphi contributed approximately $154 million to its U.S. pension plans related to services rendered during the fourth quarter of 2006, first quarter of 2007, and second quarter of 2007.  On October 11, 2007, Delphi contributed approximately $49 million to its U.S. pension plans related to services rendered during the third quarter of 2007.  Under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), a minimum funding payment of approximately $1,100 million to the U.S. pension plans was due in the first nine months of 2007 and a minimum funding payment of approximately $113 million to the U.S. pension plans was due in October 2007.

Delphi has been in discussions with the Internal Revenue Service ("IRS") and the PBGC regarding the funding of the Hourly Plan and the Salaried Plan upon emergence from chapter 11.  These discussions have culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash

contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005.  The under-contributed amount of approximately $173 million was due on June 15, 2006.  The Company did not pay this amount and a related penalty was assessed by the IRS in the amount of approximately $17 million.  The penalty was recorded in liabilities subject to compromise in 2006.  Given the receipt of the funding waivers described above, it is no longer probable that Delphi will ultimately pay this penalty and therefore Delphi reversed the liability of $19 million (including $2 million of accrued interest) and recognized the funding commitment of up to $4 million to the PBGC in the second quarter of 2007.  During the three and nine months ended September 30, 2007, the unpaid portion of the minimum funding payments remains payable as a claim against Delphi and will be determined in Delphi's Plan along with other claims.  Delphi has appointed an independent fiduciary for all of its tax-qualified defined benefit pension plans who is charged with pursuing claims on behalf of the plans to recover minimum funding contributions.

Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service.  Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom and were under-funded by $610 million as of December 31, 2006.  In addition, Delphi has unfunded defined benefit plans in Korea, Italy and Turkey for which amounts are payable to employees immediately upon separation.

## 14. DERIVATIVES AND HEDGING ACTIVITIES

SFAS No. 133, "*Accounting for Derivative Instruments and Hedging Activities*," as amended ("SFAS 133") requires that all derivative instruments be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.  The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates.

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks.  To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets.  For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies.  Designation is performed on a transaction basis to support hedge accounting.  The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged.  Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy.  Delphi does not hold or issue derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of September 30, 2007 and December 31, 2006 are as follows:

|  | September 30, 2007 | December 31, 2006 |
| --- | --- | --- |
|  | (in millions) | |
| Current assets | $ 90 | $ 73 |
| Non-current assets | 25 | 3 |
| Total assets | $ 115 | $ 76 |
| Current liabilities | $ 37 | $ 61 |
| Non-current liabilities | — | — |
| Total liabilities | $ 37 | $ 61 |

The fair value of financial instruments recorded as assets increased from December 31, 2006 to September 30, 2007 primarily due to the increase in copper rates and favorable foreign currency trades involving the Mexican Peso and U.S. Dollar as well as favorable foreign currency trades involving the Turkish Lira and the Euro.  The fair value of financial instruments recorded as liabilities decreased from December 31, 2006 to September 30, 2007 primarily due to increases in copper and natural gas forward rates and the maturity of unfavorable foreign currency intercompany loan hedges.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in other comprehensive income ("OCI"), to the extent that hedges are effective, until the underlying transactions are recognized in earnings.  Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period.  Net gains included in OCI as of September 30, 2007, were $118 million pre-tax.  Of this pre-tax total, a gain of approximately $85 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $34 million is expected to be included in cost of

sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was approximately $1 million for the nine months ended September 30, 2007 and was approximately $7 million for the nine months ended September 30, 2006. The amount included in cost of sales related to the time value of options was not significant in the nine months ended September 30, 2007 and 2006. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was less than $1 million for the nine months ended September 30, 2007 and $11 million for the nine months ended September 30, 2006.

## 15. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | | (in millions) | | |
| Interest income | $ 19 | $ 12 | $ 51 | $ 35 |
| Other, net | 3 | (4) | 9 | (4) |
| Other income (expense), net | $ 22 | $ 8 | $ 60 | $ 31 |

## 16. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as two additional segments, Steering and Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's six reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, and power electronics, as well as advanced development of software and silicon.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronic controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Steering, which includes steering, halfshaft and column technology.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to the U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices. Corporate allocations are recorded within the operating segment results based on budgeted amounts and any variances to budget (gains or losses) are recognized in the Corporate and Other segment as these variances to corporate expenses are not included in segment performance measurements.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Effective January 1, 2007, Delphi modified its methodology for allocating certain U.S. employee historical pension, postretirement benefit and workers' compensation benefit costs to the segments to directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions.  Specifically, certain portions of U.S. employee historical pension, postretirement and workers' compensation benefit costs are now being allocated to Corporate and Other as opposed to the previous practice of allocating the majority of these costs to all reporting segments.  The reporting segment results shown below reflect expense related to the estimated service cost portion only of the U.S. pension, postretirement and workers' compensation benefit plans for their respective workforces.

Included below are sales and operating data for Delphi's reporting segments for the three and nine months ended September 30, 2007 and 2006.

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **For the Three Months Ended**: | | | | | | | | |
| September 30, 2007 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 345 | $ 321 | $ 404 | $ 423 | $ 402 | $ 617 | $ 114 | $ 2,626 |
| Net sales to other customers ....... | 736 | 224 | 784 | 955 | 231 | 403 | 262 | 3,595 |
| Inter-segment net sales .............. | 65 | 24 | 105 | 36 | 13 | 89 | (332) | — |
| Total net sales ...................... | $ 1,146 | $ 569 | $ 1,293 | $ 1,414 | $ 646 | $ 1,109 | $ 44 | $ 6,221 |
| Depreciation & Amortization ..... | $ 60 | $ 16 | $ 63 | $ 41 | $ 16 | $ 16 | $ 20 | $ 232 |
| Long-lived asset impairment charges.................................. | $ — | $ — | $ 1 | $ 2 | $ 7 | $ 13 | $ — | $ 23 |
| Operating income (loss)............. | $ 32 | $ (9) | $ (194) | $ (23) | $ 23 | $ (73) | $ (435) | $ (679) |
| Equity income (loss) .................. | $ — | $ 1 | $ 4 | $ 4 | $ 1 | $ (1) | $ 1 | $ 10 |
| Minority interest ....................... | $ (1) | $ (2) | $ (5) | $ (5) | $ — | $ (1) | $ 2 | $ (12) |
| September 30, 2006 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 327 | $ 320 | $ 368 | $ 388 | $ 347 | $ 709 | $ 139 | $ 2,598 |
| Net sales to other customers ....... | 745 | 206 | 733 | 808 | 197 | 469 | 252 | 3,410 |
| Inter-segment net sales .............. | 46 | 24 | 100 | 41 | 29 | 96 | (336) | — |
| Total net sales ...................... | $ 1,118 | $ 550 | $ 1,201 | $ 1,237 | $ 573 | $ 1,274 | $ 55 | $ 6,008 |
| Depreciation & Amortization ..... | $ 70 | $ 15 | $ 56 | $ 43 | $ 26 | $ 30 | $ 22 | $ 262 |
| Long-lived asset impairment charges.................................. | $ — | $ — | $ 12 | $ 1 | $ 2 | $ — | $ — | $ 15 |
| Operating income (loss)............. | $ 27 | $ (70) | $ (85) | $ (82) | $ (49) | $ (157) | $ (1,371) | $ (1,787) |
| Equity income (loss) .................. | $ 3 | $ (16) | $ — | $ 2 | $ 2 | $ 6 | $ — | $ (3) |
| Minority interest ....................... | $ (1) | $ 2 | $ (4) | $ (4) | $ — | $ (1) | $ 4 | $ (4) |

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **For the Nine Months Ended:** | | | | | | | | |
| September 30, 2007 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 1,091 | $ 997 | $ 1,243 | $ 1,326 | $ 1,264 | $ 2,045 | $ 336 | $ 8,302 |
| Net sales to other customers ....... | 2,413 | 692 | 2,645 | 2,956 | 749 | 1,377 | 783 | 11,615 |
| Inter-segment net sales .............. | 192 | 82 | 315 | 134 | 40 | 287 | (1,050) | — |
| Total net sales ................. | $ 3,696 | $ 1,771 | $ 4,203 | $ 4,416 | $ 2,053 | $ 3,709 | $ 69 | $ 19,917 |
| Depreciation & Amortization ..... | $ 196 | $ 47 | $ 197 | $ 127 | $ 46 | $ 61 | $ 62 | $ 736 |
| Long-lived asset impairment charges.................................. | $ 1 | $ — | $ 10 | $ 3 | $ 166 | $ 42 | $ — | $ 222 |
| Operating income (loss)............. | $ 153 | $ 26 | $ (219) | $ 16 | $ (147) | $ (388) | $ (1,126) | $ (1,685) |
| Equity income (loss) .................. | $ — | $ 4 | $ 12 | $ 11 | $ 6 | $ 2 | $ 1 | $ 36 |
| Minority interest ........................ | $ (2) | $ (2) | $ (21) | $ (18) | $ (1) | $ (2) | $ 8 | $ (38) |
| September 30, 2006 | | | | | | | | |
| Net sales to GM and affiliates .... | 1,058 | 1,095 | 1,305 | 1,332 | 1,212 | 2,414 | 468 | 8,884 |
| Net sales to other customers ....... | 2,459 | 620 | 2,384 | 2,561 | 662 | 1,601 | 805 | 11,092 |
| Inter-segment net sales .............. | 175 | 92 | 269 | 130 | 92 | 317 | (1,075) | — |
| Total net sales ................. | $ 3,692 | $ 1,807 | $ 3,958 | $ 4,023 | $ 1,966 | $ 4,332 | $ 198 | $ 19,976 |
| Depreciation & Amortization ..... | $ 199 | $ 52 | $ 185 | $ 127 | $ 75 | $ 100 | $ 66 | $ 804 |
| Long-lived asset impairment charges.................................. | $ — | $ — | $ 12 | $ 1 | $ 2 | $ — | $ — | $ 15 |
| Operating income (loss)............. | $ 228 | $ (44) | $ (47) | $ (21) | $ (96) | $ (397) | $ (3,754) | $ (4,131) |
| Equity income (loss) .................. | $ 5 | $ (14) | $ 7 | $ 12 | $ 4 | $ 13 | $ 1 | $ 28 |
| Minority interest ........................ | $ (3) | $ 3 | $ (21) | $ (12) | $ (1) | $ (1) | $ 7 | $ (28) |

### 17. COMMITMENTS AND CONTINGENCIES

#### Bankruptcy Related Litigation

For information on Delphi's reorganization cases, including adjourned motions filed by Delphi under sections 1113, 1114, and 365 of the Bankruptcy Code, refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy.

As previously disclosed, Wilmington Trust Company ("Wilmington Trust"), as indenture trustee to the Debtors' senior notes and debentures, has filed notices of appeal from the orders approving the UAW Supplemental Agreement, the UAW Special Attrition Program, and the IUE-CWA Special Attrition Program. The appeals have been placed in suspense. Wilmington Trust was required to file a brief with respect to its appeal of the UAW Supplemental Agreement by September 15, 2007, and Wilmington Trust is required to file a brief with respect to its appeal of the UAW Special Attrition Program by December 31, 2007. In addition, on May 7 and July 19, 2007, the federal district court held status hearings regarding the Wilmington Trust appeal with respect to the IUE-CWA Special Attrition Program. Pursuant to an order entered following the status conference on July 19, 2007, briefing remains suspended. The next status conference on the UAW Supplemental Agreement and the IUE-CWA Special Attrition Program is scheduled for December 4, 2007. Delphi does not expect the resolution of the appeals to have a material impact on its financial statements.

#### Shareholder Lawsuits

As previously disclosed, the Company, along with Delphi Trust I and Delphi Trust II (subsidiaries of Delphi which issued trust preferred securities), current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits that were filed beginning in March 2005 following the Company's announced intention to restate certain of its financial statements. On December 12, 2005, the Judicial Panel on Multidistrict Litigation entered an order transferring the lawsuits to consolidated proceedings (the "Multidistrict Litigation" or "MDL") before the U.S. District Court for the Eastern District of Michigan (the "U.S. District Court"). On July 11, 2007, the U.S. District Court appointed the Honorable Layn R. Phillips, former United States District Judge, as a special master for settlement discussions. Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the MDL proceedings were able to reach an agreement with the lead plaintiffs in the Securities Actions as defined below (the "Lead Plaintiffs") and the named plaintiffs in the Amended ERISA Action as defined below (the "ERISA Plaintiffs") resulting in a $361 million settlement of the Multidistrict Litigation (the "MDL Settlements"). On September 5, 2007 the U.S. District Court entered an order preliminarily certifying the class and approving the settlement and scheduled the matter for a fairness hearing on November 13, 2007. On October 25, 2007 the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA (the "ERISA Actions"). Plaintiffs in the ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA. The ERISA Actions were subsequently transferred to the Multidistrict Litigation. On March 3, 2006, plaintiffs filed a consolidated class action complaint (the "Amended ERISA Action") with a class period of May 28, 1999 to November 1, 2005. The Company, which was previously named as a defendant in the ERISA Actions, was not named as a defendant in the Amended ERISA Action due to the Chapter 11 Filings, but the plaintiffs have stated that they plan to proceed with claims against the Company in the ongoing bankruptcy cases, and will seek to name the Company as a defendant in the Amended ERISA Action if the bankruptcy stay is modified or lifted to permit such action. As of June 12, 2006, the parties' pleadings on defendants' motions to dismiss the Amended ERISA Action were filed and are awaiting the Court's ruling. On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the lead plaintiffs and other parties in the case. On October 25, 2007, as part of its order preliminarily approving the MDL Settlements, the Court lifted the automatic stay as to the discovery provided to the plaintiffs.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 30, 2005, the court-appointed lead plaintiffs filed a consolidated class action complaint (the "Securities Actions") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Securities Actions name several additional defendants, including Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The

Securities Actions consolidated in the United States District Court for Southern District of New York (and a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I) were subsequently transferred to the United States District Court for Eastern District of Michigan as part of the Multidistrict Litigation. The action is stayed against the Company pursuant to the Bankruptcy Code, but is continuing against the other defendants.  As of June 12, 2006, the parties' pleadings on defendants' motions to dismiss the Amended Securities Action were filed and are awaiting the Court's ruling.  As of January 2, 2007, the parties' pleadings on plaintiffs' motion seeking leave to file an amended securities fraud complaint were filed and are awaiting the Court's ruling.  On February 15, 2007, the United States District Court for Eastern District of Michigan partially granted the plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the plaintiffs to obtain certain discovery from the defendants.  On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the lead plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions").  A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court (Oakland County Circuit Court in Pontiac, Michigan).  These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results.  The federal cases were consolidated with the securities and ERISA class actions in the U.S. District Court for the Eastern District of Michigan.  Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the derivative cases were administratively closed.

The following is a summary of the principal terms of the MDL Settlements as they relate to the Company and its affiliates and related parties and is qualified in its entirety by reference to the complete agreements submitted to the Court for approval and which were filed as exhibits to the Company's Current Report on Form 8-K dated September 5, 2007.

Under the terms of the MDL Settlements, the Lead Plaintiffs and the ERISA Plaintiffs will receive claims that will be satisfied through Delphi's final Plan as confirmed by the Court. The Lead Plaintiffs will be granted a single allowed claim in the face amount of $204 million, which will be satisfied by Delphi providing $204 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the settlement reached with the Lead Plaintiffs. Delphi will object to any claims filed by opt out plaintiffs in the Court, and will seek to have such claims expunged. The settlement with the ERISA Plaintiffs is structured similarly to the settlement reached with the Lead Plaintiffs. The ERISA Plaintiffs' claim will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as used to pay holders of general unsecured claims under the Plan. Unlike the settlement reached with the Lead Plaintiffs, the ERISA Plaintiffs will not be able to opt out of their settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases.  The ERISA Plaintiffs will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Settlement amounts from insurers and underwriters were placed in escrow in September 2007 pending Court approval.  Delphi has separately agreed with a third party for reimbursement of $15 million as consideration for the releases described below.

The MDL Settlements include a dismissal with prejudice of the ERISA and securities cases and a full release as to certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants.  The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties.  The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand.  As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL settlement, as of September 30, 2007, Delphi has a liability of $361 million recorded for this matter. The expense for this matter is $21 million and $353 million for the three and nine months ended September 30, 2007,

respectively.  As previously disclosed, Delphi maintains directors and officers insurance providing coverage for losses incurred by the Company of up to $100 million, subject to a $10 million deductible.  Delphi's insurance coverage contains a standard exclusion provision that may apply should there be a judgment or final adjudication that establishes a deliberate criminal or deliberate fraudulent act was committed by a past, present or future Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer or General Counsel.  Delphi had previously recorded an initial reserve in the amount of its $10 million insurance deductible, and net of related payments, had an $8 million liability recorded as of December 31, 2006 as at such date no other amount was deemed probable and estimable.  As discussed above, in conjunction with the MDL settlement, Delphi expects to receive recoveries of $148 million for the settlement amounts from insurers, underwriters and third-party reimbursements.  As of September 30, 2007 none of these recoveries have been recorded because the MDL Settlements are pending Court approval.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate.  Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under Delphi's Plan.  (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements.  However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates.  Additionally, in connection with the separation from GM in 1999 (the "Separation"), Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility.  Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

As previously disclosed, GM alleged that catalytic converters supplied by Delphi's Powertrain Systems segment to GM for certain 2001 and 2002 vehicle platforms did not conform to specifications.  In July 2006, the parties agreed to submit the dispute to binding arbitration.  In May 2007 GM informed Delphi that it has experienced higher than normal warranty claims with certain 2003-2005 vehicle models due to instrument clusters supplied by Delphi's Automotive Holdings Group segment.  In June 2007, Delphi reached a tentative agreement with GM to resolve these claims along with certain other known warranty matters.  Based on the tentative agreement, Delphi recorded $91 million of additional warranty expense in cost of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain segments.  On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving these and certain other known warranty matters.  Under the terms of the Warranty Settlement Agreement, Delphi will pay GM an estimated $199 million, comprised of approximately $127 million to be paid in cash over time as noted below, and up to approximately $72 million to be paid in the form of delivery by Delphi to GM of replacement product.  The Warranty Settlement Agreement settles all outstanding warranty claims and issues related to any component or assembly supplied by Delphi to GM, which as of August 10, 2007 are (a) known by GM, subject to certain specified exceptions, (b) believed by GM to be Delphi's responsibility in whole or in part, and (c) in GM's normal investigation process, or which should have been within that process, but were withheld for the purpose of pursuing a claim against Delphi.  Included in the settlement are all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases ("GM's Proof of Claim").

In addition, the Warranty Settlement Agreement limits Delphi's liability related to certain other warranty claims that have become known by GM on or after June 5, 2007, and generally prohibits both GM and Delphi from initiating actions against the other related to any warranty claims settled in the agreement.  In accordance with the Warranty Settlement Agreement, Delphi's claims agent has reduced the liquidated component relating to warranty claims contained in GM's Proof of Claim by $530,081,671, which includes, among other things, those personal injury claims asserted in GM's Proof of Claim that relate to warranty claims settled in the agreement, and has expunged with prejudice the unliquidated component relating to warranty claims asserted in GM's Proof of Claim.  Pursuant to the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007, (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million, or GM believed the claim would exceed $1 million, (iii) the claim is in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed or reasonably should have believed that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from bankruptcy. As a result, GM will set off these payments against the amounts then payable to Delphi by GM. Because Delphi has elected to defer these payments, GM will receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts are paid by Delphi or set off against amounts payable by GM.

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in the third quarter of 2007.

During the third quarter of 2006, Delphi's Thermal Systems segment began experiencing quality issues regarding parts that were purchased from one of Delphi's affiliated suppliers and subsequently established warranty reserves of $59 million to cover the cost of various repairs that may be implemented. Delphi is actively negotiating with the affiliated supplier to determine if any portion of the liability is recoverable.

Patent license negotiations are ongoing with Denso Corporation in connection with variable valve timing technology. Delphi expects that these negotiations will be concluded on commercially reasonable terms and in accordance with ordinary industry practices such that resolution of this matter will not have a material impact on Delphi's financial position. However, Delphi can give no assurances that those negotiations will be successful.

Litigation is subject to many uncertainties, and the outcome of individual litigated matters cannot be predicted with assurance. After discussions with counsel, it is the opinion of Delphi that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally. Although it is Delphi's intent to comply with all such requirements and regulations, it cannot provide assurance that it is at all times in compliance. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. Although such expenditures were not material during the past three years, Delphi is preparing to spend $11 million to install pollution control equipment on coal-fired boilers at its Saginaw, Michigan Steering Division facility, to meet U.S. and State of Michigan air emission regulations. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not be material.

Delphi recognizes environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multiparty sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remediation methodology to be used could significantly change Delphi's estimates.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a PRP in proceedings at various sites, including the Tremont City Barrel Fill Site located in Tremont City, Ohio. In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site. The Remedial Investigation has been completed, and an Alternatives Array Document has been finalized. A Feasibility Study and Record of Decision are expected to be completed in 2008. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, it appears that the State of Ohio will oppose that remedy. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of September 30, 2007, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase to $20 million in excess of its existing reserves. Delphi will continue to re-assess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

Delphi is in various stages of investigation and cleanup at its manufacturing facilities where contamination has been discovered. As previously disclosed in its Annual Report on Form 10-K for the year ended December 31, 2006, Delphi completed a number of environmental investigations during 2006 as it continues to pursue its transformation plan, which contemplates significant restructuring activity, including the sale or closure of numerous facilities. These assessments identified previously unknown conditions and led to new information that allowed Delphi to update its estimate of required remediation for previously identified conditions and resulted in Delphi recording an adjustment to its environmental reserves. As Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified and as known conditions are further delineated. Delphi cannot ensure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

As of September 30, 2007 and December 31, 2006, Delphi's reserve for environmental investigation and remediation was $120 million and $118 million, respectively. As of December 31, 2006, $3 million of the reserve was recorded in liabilities subject to compromise. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the Separation.

**Other**

As mentioned above, Delphi continues to pursue its transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities. As such, Delphi continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

## 18. SUBSEQUENT EVENTS

The events described below have occurred subsequent to September 30, 2007 and are material to the Company's ongoing operations but have no effect on the reported balances or results of operations for the quarterly period ended September 30, 2007. These events are listed below.

On February 20, 2007, Delphi announced that it had signed a non-binding term sheet with the Renco Group, Inc. for the sale of its interiors and closures product line. On October 15, 2007, Delphi and certain of its affiliates entered into a Master Sale and Purchase Agreement with Inteva Products, LLC and certain of its affiliates (the "Interiors and Closures Agreement") for the sale of substantially all of the assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business. Concurrently, the Debtors filed a motion requesting a hearing on October 25, 2007 to approve bidding procedures in connection with the sale. On October 26, 2007, the Bankruptcy Court approved those bidding procedures (the "Interiors and Closures Bidding Procedures Order"). It is anticipated that a hearing to approve the sale will be held on December 20, 2007. The effectiveness of the Interiors and Closures Agreement is subject to the competitive bidding process approved in the Interiors and Closures Bidding Procedures Order, including a potential auction, and Court approval.

Delphi is currently seeking to extend the Refinanced DIP Credit Facility until June 30, 2008 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court, with the ability to further extend the maturity to September 30, 2008 under certain conditions. Delphi expects that the amendment will become effective in November 2007. Refer to Note 11. Debt for more information.

On October 30, 2007, the Debtors announced they filed with the Court a motion seeking approval of a proposed amendment to the EPCA to be entered into by the Investors (the "Proposed EPCA Amendment"). The Proposed EPCA Amendment, has been agreed to by Appaloosa and a supermajority of the Investors. However, the execution of the Proposed EPCA Amendment is subject to the satisfaction of various conditions set forth in a proposal letter dated October 29, 2007 (the "Proposal Letter"), including (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors. Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM. If in fact any of the conditions set forth in the Proposal Letter are not satisfied the Investors will not be obligated to execute the Proposed EPCA Amendment. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy.