LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4802
(212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION., et al | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO DEBTORS' EXPEDITED MOTION
UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002, 6004, 9006, AND
9007 FOR ORDER AUTHORIZING DEBTORS' ENTRY INTO EXIT FACILITY
ENGAGEMENT AND FEE LETTERS AND PERFORMANCE THEREUNDER**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the Debtors' *Expedited Motion Under 11 U.S.C. § 323 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 for Order Authorizing Debtors' Entry into Exit Facility Engagement*

*and Fee Letters and Performance Thereunder* (the "Motion").[1] The Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    This Motion should be denied in light of two important developments since the filing of the Motion. First, Appaloosa, in a recent public filing, disclosed that the EPCA Amendment has terminated. The Exit Financing Arrangements envisaged by the Engagement Letter into which the Debtors seek authority to enter were conceived to support a very specific plan structure – the structure that is outlined and embodied in the now-terminated EPCA Amendment. Thus, the Debtors are seeking to obligate the estate to at the very least pay the expenses of the Engagement Parties to support a transaction that has been publicly terminated.

2.    Second, the Debtors have informed the Committee that they expect to propose a completely new transaction under which the distributions to unsecured creditors will deteriorate substantially from those proposed in the EPCA Amendment. The newest proposal reduces the price at which the Investors are purchasing equity in reorganized Delphi, allowing the Investors to acquire even more of the reorganized equity for the same investment. Because little has happened over the recent period that would cause the Debtors' enterprise value to go down, this reduction in the buy-in price from that in the EPCA Amendment represents a transfer of value to the plan investors. If enterprise value is static, the additional value transferred to the Investors must be taken from another constituency – in this case, the unsecured creditors. The cost of the Investors' capital has simply gotten to be too high. Because the Committee will not accept the Debtors' insistence that still yet more value be transferred from unsecured creditors to the Investors as the price of the Investors' participation in the transaction, the Committee strenuously

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2

NY\1345925.12

opposes the new plan proposal. Furthermore, based upon the opposition to the EPCA Amendment already filed by other significant creditors, and based upon the market's reaction to the EPCA Amendment, the Committee believes that the unsecured creditors as a whole will reject the significantly worse new plan proposal. Given that the plan proposal provides for distributions in complete disregard to the absolute priority rule (for example, providing distributions to contractually and statutorily subordinated creditors as well as equity without regard to whether senior creditors have been paid in full), the new plan proposal will be unconfirmable if the unsecured creditors reject it. As a result, this plan proposal, as with the EPCA Amendment, is quite simply dead on arrival.

3.  It simply makes no sense to have the Debtors incur any obligation chasing financing for a plan that is doomed from the beginning to failure. Furthermore, prematurely entering into the Engagement Letter, even if the Engagement Letter is a "best efforts" letter that is not binding on the parties, represents at the very least a reputational commitment by the Debtors that will make it extremely unlikely that the Debtors would later be able to obtain exit financing on better terms, and may also be cited as a justification for pushing forward with a plan structure without regard to its chances of success.

## BACKGROUND

4.  On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"). On October 14, 2005, the three remaining Debtors similarly filed voluntary petitions.

3

5.      The Committee was appointed nine days after the Petition Date, on October 17, 2005.[2] Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker.

6.      On July 18, 2007, the Debtors filed an expedited motion for an order approving a new equity purchase and commitment agreement (the "EPCA") with the affiliates of Appaloosa Management L.P. ("Appaloosa"); Harbinger Capital Partners Master Fund I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc.; UBS; Goldman Sachs & Co.; and Pardus Capital Management L.P. (collectively, the "Investors"). The EPCA outlined the terms of the investment and the expected treatment of the Debtors' stakeholders in the anticipated plan of reorganization and provided a framework for several other aspects of the Debtors' reorganization. On August 2, 2007, this Court granted the motion and approved the EPCA.[3]

7.      On September 6, 2007, the Debtors filed initial versions of their plan of reorganization and disclosure statement. On September 7, 2007, the Debtors filed a motion seeking, among other things, entry of an order approving the disclosure statement.

8.      On October 29, 2007, the Debtors filed their *Notice Of Potential Amendments to Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto*, which included their first amended disclosure

---

[2] The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee; (e) Tyco Electronics Corporation and (f) SABIC Innovative Plastics US LLC. The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

[3] This was in fact the second version of the EPCA. A prior version of the EPCA (the "Original EPCA") was approved by this Court on January 12, 1007, and subsequently terminated on July 7, 2007.

4

statement (the "Disclosure Statement") and accompanying proposed first amended plan of reorganization (the "Plan").

9. Also on October 29, 2007, the Debtors filed their *Expedited Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase And Commitment Agreement* (the "EPCA Amendment Motion") seeking this Court's approval for the proposed amendment to the EPCA (the "EPCA Amendment") entered into by the Debtors and the Investors.

10. On November 6, 2007, after the Debtors filed the Motion, Appaloosa filed a Schedule 13D/A with the U.S. Securities and Exchange Commission (the "Schedule 13D/A").[4] In its Schedule 13D/A, Appaloosa disclosed that the conditions to the effectiveness of the EPCA Amendment had not been satisfied and that as a result, the EPCA Amendment had been terminated in accordance with its terms. *See* Schedule 13D/A, at 11 ("On November 6, 2007, as a result of certain of the conditions set forth therein not being satisfied, the Revised Proposal terminated in accordance with its terms.").

11. On November 7, 2007, this Court entered the *Second Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Motion to Amend Investment Agreement*, which, among other things, adjourned the hearing on the Disclosure Statement to November 29, 2007, and provided that the "Debtors shall use commercially reasonable efforts to file a notice of any further proposed amendments to the Plan and Disclosure Statement" by November 16, 2007. *See Second Supplemental Disclosure Statement Order* at ¶¶ 2-3.

---

[4] A copy of the Schedule 13D/A (without its related exhibits) is attached hereto as Exhibit A.

5

NY\1345925.12

## OBJECTION

### A. The Motion Should Be Denied Because The Plan Structure Supported By The Exit Financing Arrangements Has Been Terminated

12. As stated in the Engagement Letter and the Motion, the Exit Financing Arrangements were expressly designed to provide exit financing for a plan structure that has now been terminated. This alone is sufficient reason for denial of the Motion. The Engagement Letter relating to the Exit Financing Arrangements expressly states that the Debtors seek to obtain $6.05 billion of exit financing to finance in part the distributions to be made under the Plan. *See* Engagement Letter at 1. The Debtors' intention, as stated in the Motion, is to obtain the total funding necessary for the Plan through (i) the Exit Financing Arrangements and (ii) an equity investment and rights offering of a combined amount of not less than $2.55 billion cash backstopped by the Investors pursuant to the EPCA Amendment. *See id.* at 2. Clearly, the Engagement Letter contemplates exit financing that would support a very specific plan structure – the structure that is outlined and embodied in the EPCA Amendment. However, as described above, that plan structure has been publicly terminated by Appaloosa.

### B. The Motion Should Be Denied Even If The Debtors Propose To Utilize The Proposed Exit Financing Arrangements To Support A New Plan Proposal Because The New Plan Proposal Is Not Confirmable And Not Viable

13. The Debtors' attempts to slide into the Engagement Letter a new plan structure (the "New Plan Proposal") that is no more viable than the repudiated EPCA Amendment are equally unavailing. As described below, that plan structure (which the Committee had no role in negotiating) is almost certain to be rejected by unsecured creditors, and as a result is completely unconfirmable.[5]

---

[5] On November 13, 2007, prior to the filing of this Objection, the Committee sent a letter (the "Board Letter") to the Board of Directors of Delphi explaining (i) the reasons why the Committee opposes both the revised

6

NY\1345925.12

14.     In sum, the New Plan Proposal represents a shift of value from general unsecured creditors to the Investors. On several occasions already, the Investors have changed the terms of their investment (each time insisting on acquiring more and more of the reorganized equity for the same purchase price). Using the current state of the credit markets as a rationale for insisting on this latest re-trade, the Investors now have insisted on being able to invest in the reorganized Debtors at a far steeper discount to plan value than the Committee has ever found acceptable. In fact, the blended total enterprise value at which the Investors have agreed to invest is now only $10.45 billion, almost $1 billion below the "buy-in" price agreed to by the Investors a mere two weeks ago. This has made the cost to the Debtors and their estates of raising new capital rise dramatically, making doing so prohibitively expensive. Nevertheless, without seeking input from the Committee, Delphi's management and advisors have agreed to the Investors' latest proposal. It appears to be General Motors' ("GM") insistence on receiving cash that is principally driving this downward-spiraling process; if so, GM should sell its own distributions to the Investors at a discount, rather than seeking to impose that discount on the unsecured creditors.

15.     Under the terms of the New Plan Proposal, if unsecured creditors receive the recovery being touted therein (*i.e.,* the shares of reorganized Delphi achieve "plan value" in the marketplace), the Investors will make an immediate profit well in excess of 55%. However, it is extremely unlikely that that value will be achieved, as it would require the enterprise value of the reorganized Debtors to be significantly higher than the mid-point of the range of valuations calculated by Rothschild, Inc., financial advisors to the Debtors. This is the result of the Investors' insistence that they be allowed to purchase equity at lower and lower enterprise

---

plan structure and (ii) the reasons why the Committee believes the revised plan structure will almost certain to be rejected by unsecured creditors, making such plan structure completely unconfirmable. A copy of the Board Letter is attached hereto as <u>Exhibit B</u>.

7

values. As their buy-in price drops, the enterprise value that the Debtors must achieve (the "plan value" referred to above) for unsecured creditors to receive a full recovery goes up. With this New Plan Proposal, the plan value has far exceeded the Committee's tolerance.

16.     Viewed another way, because little has happened over the recent period that would decrease the Debtors' enterprise value, the reduction in the Investors' buy-in price from that in the EPCA Amendment represents a transfer of value to the Investors. If enterprise value is static, the additional value transferred to the Investors must be taken from another constituency. Delphi's management and advisors have asked just one constituency to pay for this giveaway of value to the Investors: the unsecured creditor body. GM is not being asked to sacrifice at all, and the multi-district litigation plaintiffs (the "MDL Plaintiffs") (despite the fact that their claims are legally subordinated to general unsecured claims) still stand to receive a recovery on par with unsecured creditors. As fiduciaries for unsecured creditors, the Committee simply cannot agree to or recommend the terms of this New Plan Proposal, which guts the value of distributions to unsecured creditors while GM suffers no reduction in its distribution and the MDL Plaintiffs and current equity holders retain significant value.

17.     The Committee simply will not tolerate such a massive shift of value away from general unsecured creditors to the Investors and other parties whose claims or interests are legally or contractually subordinated to the claims of general unsecured creditors. Accordingly, the Committee will urge that unsecured creditors reject any chapter 11 plan embodying the New Plan Proposal. The Committee believes that a large majority of unsecured creditors (and not just the one-third in amount necessary to block class acceptance) will vote against such plan. Any plan providing for distributions to junior classes cannot be confirmed over the rejection by the class of general unsecured claims. The New Plan Proposal, by providing distributions to the

MDL plaintiffs, existing equity and GM (whose claims are subject to equitable subordination), will therefore fail in the face of a rejection by the class of unsecured creditors. Thus, while a such plan could be confirmed over the rejection by the class of equity security holders, a plan that violates the absolute priority rule cannot be confirmed over the rejection by the class of general unsecured creditors. For the foregoing reasons, pursuing the New Plan Proposal will be a futile exercise that will only keep the Debtors in chapter 11 for a longer period of time, consuming valuable estate assets and risking value deterioration.

C. **Entry Into The Engagement Letter Is Not In The Best Interests Of The Debtors' Estates Because It Will Expose The Debtors' Estates To Liability While Providing No Benefits**

18. In the face of one plan proposal that has been publicly terminated, and another plan proposal that is dead on arrival, the Debtors insist upon prematurely pushing forward with the Engagement Letter. On its face, the Engagement Letter seeks to secure exit financing for a structure that has been publicly terminated. On that basis alone, the Motion should be denied. In response, the Debtors are seeking to substitute the terminated structure with a new one that requires the same exit financing. However, that new plan structure is no more viable than the one that has been terminated. As described above, the New Plan Proposal that it appears that the Debtors will be filing on November 16 (after the hearing on the Motion) will lack the support of, and indeed will be staunchly opposed by, the Committee. On the basis of that opposition, together with the clear opposition by a substantial number of creditors to the current structure, the Committee expects that the New Plan Structure will be rejected by unsecured creditors and thus will be doomed to failure.

19. By blinding themselves to the reality of their situation and insisting on entering into the Engagement Letter, the Debtors will expose their estates to liability of up to $500,000

9

NY\1345925.12

for reimbursement of the out-of-pocket expenses of various agents under the Exit Financing Arrangements. While many of the fees and expenses outlined in the Engagement Letter are not payable if the exit financing is not consummated, the Debtors remain obligated to reimburse certain agents for reasonable and documented expenses up to a maximum of $500,000 regardless of whether the Exit Financing Arrangements are consummated.

20. While $500,000 may not be a large sum of money in the context of these chapter 11 cases, the Committee does not support paying any sum, no matter how small, to support an attempt to syndicate exit financing that does not relate to a viable plan of reorganization – an attempt which the Committee believes would be futile. It is simply not in the best interests of the Debtors' estates to enter into the Engagement Letter without an actual and viable plan structure in place because to do so will harm the estates (to the tune of $500,000) while providing no benefit, as the Debtors will be unable to obtain syndication of exit financing without a viable plan framework to present to potential lenders.

21. In addition, even though the Engagement Letter does not constitute a legal commitment by either side, it nonetheless represents at the very least a positional and reputational commitment by the Debtors. The Debtors are putting their imprimatur on a plan structure and asking the Engagement Parties to syndicate that structure. If the Engagement Parties are successful, it will be hard for the Debtors to back away from that structure or to seek alternative financing for any different structure that may develop. Furthermore, there would be a real risk that through the syndication effort the Engagement Parties would seek to lock up potential syndicate participants (much as Appaloosa has sought to do with potential investors), thus putting the Debtors at a significant disadvantage in exit financing negotiations should the structure of the final plan be different from the one embodied in the Engagement Letter.

NY\1345925.12

22.     Finally, because the New Plan Proposal was formulated well after the Debtors and the Engagement Parties signed the Engagement Letter, it is not at all clear that the Engagement Parties have seen, much less approved, the plan that will embody such new proposal. As a result, the Debtors are asking for this Court to authorize them to incur obligations under an agreement supporting a plan proposal that has already been terminated but will be replaced by a new proposal that the Committee opposes and the Engagement Parties may have not even seen.

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion and (b) grant the Committee such other relief that it deems just and proper under the circumstances.

Dated: November 14, 2007
      New York, New York

                                 **LATHAM & WATKINS LLP**

                                 By: /s/ Robert J. Rosenberg
                                     Robert J. Rosenberg (RR-9585)
                                     Mitchell A. Seider (MS 4321)
                                     Mark A. Broude (MB-1902)
                                     885 Third Avenue, Suite 1000
                                     New York, New York 10022
                                     Telephone: (212) 906-1200

                                 Attorneys for the Official Committee
                                 of Unsecured Creditors

NY\1345925.12