**Hearing Date And Time: November 16, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (IL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
     In re                                :   Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :   Case No. 05-44481 (RDD)
                                          :
                    Debtor.               :   (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

DEBTORS' OMNIBUS REPLY IN SUPPORT OF DEBTORS'
EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P.
2002, 6004, 9006, AND 9007 AUTHORIZING DEBTORS' ENTRY INTO EXIT FACILITY
<u>ENGAGEMENT AND FEE LETTERS AND PERFORMANCE THEREUNDER</u>

("DEBTORS' OMNIBUS REPLY – EXIT FINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this Omnibus Reply (the "Omnibus Reply") in Support of the Expedited Motion For Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002, 6004, 9006, And 9007 Authorizing Debtors' Entry Into Exit Facility Engagement and Fee Letters And Performance Thereunder (the "Motion") (Docket No. 10854).[1]  The Debtors filed the Motion on November 6, 2007.  The Debtors sought and obtained an expedited hearing on the Motion pursuant to the terms of the Case Management Order (as amended) governing these chapter 11 cases.  By order of this Court, the filing deadline for objections to the Motion was November 13, 2007 at 4:00 p.m.[2]  The Debtors received three timely-filed objections to the Motion:  The first of these (the "Ad Hoc Bondholders' Committee Limited Objection") was filed by a group of seven entities[3] all of which purport to hold claims against the Debtors' estates (collectively, the "Ad Hoc Bondholders Committee") (Docket No. 10903).  The second (the "Wilmington Trust Objection") was filed by Wilmington Trust Company in its capacity as indenture trustee ("Wilmington Trust") (Docket No. 109105).  The third (the "Creditors' Committee Objection") was filed by the official committee of unsecured creditors appointed in these cases (the "Creditors' Committee") (Docket No. 10930).[4]  Two charts summarizing the objections and the Debtors' responses are attached to

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

[2] With this Court's approval, the Debtors extended the objection deadline for the Creditors' Committee until November 14, 2007 at 11:00 p.m. EST.

[3] The members of the Ad Hoc Bondholders' Committee participating in this particular objection are Caspian Capital Advisors, LLC, Castlerigg Master Investments, Ltd., Davidson Kemper Capital Management LLC, Elliott Associates, L.P., Nomura Corporate Research & Asset Management, Inc.; Sailfish Capital Partners, LLC, and Whitebox Advisors, LLC

[4] Subsequently, the Creditors' Committee filed an unredacted version of its objection, which can be found at Docket No. 10933.

2

this Omnibus Reply as <u>Exhibits A and B</u>.  This Omnibus Reply addresses three responses to the Motion.

Preliminary Statement

1.    It is one of the oldest and most fundamental axioms of commercial law that "old money hates new money."  This axiom rings true principally because new sources of capital provide their infusions on new, and often better, terms than did previous sources of capital.  The Creditors' Committee's objection is, in large part, simply a reflection of this principle.[5]

2.    On November 14, 2007, the Debtors announced that they had reached agreement with GM and the Plan Investors on amendments to its Joint Plan of Reorganization, Global Settlement Agreement and Master Restructuring Agreement between Delphi and GM, and the Investment Agreement with Delphi's Plan Investors led by an affiliate of Appaloosa Management, L.P.[6]  These filings constituted focused potential amendments to the Debtors' September 6 Plan of Reorganization and related documents.  The filings represent the Debtors continuing efforts to emerge from Chapter 11 protection as quickly as possible in order to maximize value for all stakeholders.  The September 6 Plan of Reorganization and related Disclosure Statement, as well as the potential amendments filed on October 29 and November 14, 2007 were the products of a series of intense negotiations involving the Debtors, the Plan Investors, the Statutory Committees, and GM, all conducted in the context of the current

---

[5]    As explained more fully below, the objections of the Ad Hoc bondholders Committee and Wilmington Trust have been obviated by the Debtors' filing of new amendments to its Plan of reorganization and equity investment agreement, and the acknowledgement by the Lead Arrangers for the Debtors' proposed exit financing efforts that they intend to proceed on the terms of the Debtors' new Plan.

[6]    The Debtors filed a Notice Of Further Proposed Amendments To Certain Appendices To Debtors Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 10932).  A copy of the Debtors' press release announcing these agreements and filings is attached to this Reply as <u>Exhibit C</u>.

3

economic realities of the marketplace known to all parties.[7] Notwithstanding the fact that the Creditors' Committee, just weeks ago, publicly supported the Debtors' Plan under which the Plan Investors would provide new money, and under which the creditors would receive a full recovery at an agreed Plan value (which was reduced from the Plan value previously agreed to by the Creditors' Committee in early September), the Creditors' Committee now claims, in essence, that the Plan Investors' terms are too generous, and that the creditors' own recovery (still at a Plan value that is in the middle of the range of Plan values previously agreed to by the Creditors' Committee in the September 6 and October 29 filings) is too little. Moreover, the Creditors' Committee now, in essence, complains that the Plan Investors are receiving an unreasonable discount for certain investments while at the same time complaining that the Plan value from which the discount is derived is too much (which, if it were really true, would render the "discounts" illusory). Certainly as of today, old money hates new money.

        3.      Notwithstanding the Creditors' Committee's decision to publicly attack the Debtors' latest Plan as "doomed" and "dead on arrival," it is the Debtors' intention to continue to work towards a consensus among their principal stakeholders, including the Statutory Committees. Recognizing that the prospect of achieving this consensus is uncertain, the Debtors' are firmly resolved to move forward with a plan for emergence from Chapter 11 protection as quickly as possible. This result can be achieved in a variety of ways including by way of illustration but not limitation: (1) first (most preferably), there are additional potential amendments agreed to consensually by both Statutory Committees, GM , the Plan Investors and

---

[7] The uncertainties underlying the global capital markets have drawn the attention of a broad range of economists, business leaders, and government officials. For example, in remarks following a speech before the China Institute Executive Summit held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP in New York on November 8, 2007, United States Treasury Secretary Henry M. Paulson Jr. observed that "we're going through some turbulence in our capital markets. Risk is being reassessed and repriced." Sheila Mullan and Carolyn Crapo, US's Pauslon Q&A: US To Grow Despite Problems, THE MAIN WIRE, Nov. 9, 2007.

4

Delphi by November 28th (the deadline established by this Court for the Debtors to file additional changed pages prior to the November 29, 2007 hearing); (2) a second alternative is for the Debtors to be authorized to and successfully solicit acceptances for its Plan of Reorganization and to successfully confirm the Plan by this Court; and (3) a third alternative is for the Debtors to obtain this Court's finding in a contested hearing that the "par plus accrued" recovery at Plan value in fact provides such a recovery to creditors. All of this of course underscores that the objectors have filed papers relevant to another hearing rather than to the merits of the Motion to be decided by the Court here.

          4.       Turning to this Motion, it is clear that the objections, and in particular the Creditors' Committee's attack on the Debtors' Plan, are simply misplaced. The Debtors' need for exit financing is not in dispute. Moreover, the fact that the Debtors, by proceeding under the terms of the proposed exit financing Engagement Letter, stand to obtain that exit financing on fair and reasonable terms in light of current economic conditions, is also not in dispute. The single point raised by the objectors that has any relevance to this Motion – the notion that the Engagement Letter is based on an exit plan that is too uncertain – has no vitality in light of the Debtors' filings of yesterday. The Engagement Parties have now acknowledged that the proposed amendments to the Plan and the EPCA filed by the Debtors on November 14, 2007 are consistent with the relevant provisions of the Engagement Letter.[8] Given the substantial benefits that the Debtors may achieve by proceeding under the terms of the exit financing Engagement Letter, and the relatively minimal burdens imposed on the estates under this agreement, there can be no question that the Debtors' business judgment in seeking to proceed on these terms should be respected.

---

[8]    A copy of this communication from the Engagement Parties is attached hereto as Exhibit D.

5

5. At the outset, it is worth noting several of the important aspects of the Exit Financing Arrangements contemplated in the Engagement and Fee Letters to which no party has objected. For example, none of the objecting parties has disputed the Debtors' conclusion, reached in the reasonable exercise of their business judgment, that exit financing is a necessary and integral component of their strategy for emergence from Chapter 11. In fact, Wilmington Trust and the Ad Hoc Bondholders' Committee have expressly declared their support for the Debtors' efforts to obtain exit financing.[9] Moreover, the objecting parties generally agree with Delphi (and the Creditors' Committee has acknowledged expressly in its own objection) that the Debtors, through tremendous effort, have largely achieved the objectives that they established for themselves in these chapter 11 cases, including the negotiation of new labor arrangements and the realignment of their commercial relationship with GM and that emergence from chapter 11 as soon as practicable would serve the best interests of all stakeholders.

6. More specifically, none of the objecting parties has challenged the Debtors' proposed use of proceeds from the Exit Financing Arrangements – namely, to repay obligations owed under the DIP Facilities, make certain payments required under the Debtors' proposed Plan, and fund the post-emergence operations of the Reorganized Debtors. There has been no objection to the selection of the Engagement Parties or to the process pursuant to which the Debtors chose them from among various potential lenders. And none of the objecting parties has alleged that the interest, fees, and other costs specified in the Engagement and Fee Letters are unreasonable for transactions of the magnitude of those contemplated by the Exit Financing Arrangements. In other words, no objector has claimed that Delphi did not "take reasonable

---

[9] See Wilmington Trust Objection ¶ 4 ("[Wilmington Trust] fully supports the Debtors' efforts to obtain exit financing and emerge from bankruptcy as soon as reasonably possible"); Ad Hoc Bondholders' Committee Limited Objection ¶ 15 ("[E]ach [of the Ad Hoc Bondholders' Committee] supports the Debtors' attempts to obtain exit financing").

6

steps to get the best deal it could." In re Adelphia Commc'ns Corp., 2004 WL 1634538 at * 2 (Bankr. S.D.N.Y. June 22, 2004). Likewise, no one has alleged that the Debtors negotiated the Engagement and Fee Letters in a manner that was not disinterested or that was inconsistent with overriding principles of good faith and fair dealing.

7. In short, the objections devote minimal attention to the terms of the Engagement and Fee Letters and virtually ignore the legal standards governing the reasonable use of a debtor's business judgment under Bankruptcy Code section 363. By contrast, all three objections contain relatively lengthy treatments of the Debtors' proposed Plan, the EPCA, amendments to the EPCA, and related public statements by the Debtors and the Plan Investors. The majority of the argument in the Creditor's Committee Objection consists of a diatribe against the terms of the EPCA; what little discussion of the Exit Financing Arrangements there is appears to serve mostly as ancillary support for the Creditors' Committee's EPCA critique.

8. The objectors' underlying argument appears to rest on the notion that granting the relief requested in the Motion would be "premature" as a result of recent events and announcements related to the Plan and the EPCA. This argument is premised on a material misreading of the Engagement Letter and a flawed conception of the business judgment rule. The provisions of the Engagement Letter are not contingent upon the inclusion of particular terms in the EPCA or in any amendment thereto, and the objectors have failed to rebut the strong presumption in favor of the Debtors' reasonable business judgment. In any event, neither the Plan, nor the EPCA, nor any proposed amendment to the EPCA is before the Court at the hearing on the Motion.

9. All three objections touch on the same themes. To one degree or another, each of them represents an attempt to shoehorn objections to the Plan or the EPCA into pleadings

7

ostensibly focused on exit financing.  Taken together, the objections to this Motion are wholly unpersuasive, and this Court has solid grounds upon which to overrule them.

        10.       Following the filing of the Motion, the Engagement Parties requested that the Debtors include additional language to the Proposed Order clarifying that to the extent that the Debtors incur payment obligations under the Engagement and Fee Letters, such obligations will be entitled to administrative expense priority under Bankruptcy Code sections 503(b) and 507(a)(1).  These protections are routinely provided to prospective lenders under exit financing facilities.  See, e.g., Order Authorizing The Debtors To (A) Perform Obligations Under Exit Facility Commitment Letter And Fee Letters, (B) Pay The Fees And Expenses Associated Therewith And (C) Furnish Related Indemnities, In re Delta Airlines, Inc., No. 05-17923 (ASH) (Bankr. S.D.N.Y. April 17, 2007).  In light of the benefits the Debtors will receive as a result of entering into the Engagement Letter, the Debtors have agreed to the Engagement Parties' request.  A revised Proposed Order is attached hereto as Exhibit E.

Response To Objections

A.      The Terms And Conditions Of The Engagement Letter Do Not Depend Upon The Inclusion Of Particular Provisions In The EPCA Or In Any Amendment Thereto

        11.       Contrary to several assertions in the objections, the terms and conditions of the Engagement Letter do not require that the EPCA or any amendment thereto contain any specified provisions.  All three objections rely to a greater or lesser extent on the supposition that (a) the Engagement Letter is somehow dependent upon the existence (and Court approval) of the EPCA, apparently amended to reflect extremely precise terms and (b) such terms are no longer available.  For example, Wilmington Trust asserts that the terms of the Engagement Letter "are apparently premised on approval of the Amended EPCA" and that in light of the recent termination of the Amended EPCA, such terms may not "remain suited to the Debtors' exit financing needs."  Wilmington Trust Objection ¶ 4.  Based on the foregoing, Wilmington Trust

8

urges that the Debtors have not offered any good business reason for continuing to seek the relief requested in the Motion.  Id. at ¶ 5 (quotations omitted).

12.     The Creditors' Committee Objection echoes the same theme.  The Creditors' Committee contends that the Exit Financing Arrangements "were conceived to support a very specific plan structure – the structure that is outlined and embodied in the now-terminated EPCA Amendment."  Creditors' Committee Objection ¶ 1.  Because the EPCA Amendment has been terminated, the basis for the Exit Financing Arrangements described in the Engagement Letter no longer exists.  As a result, the Creditors' Committee maintains that the Debtors' efforts to obtain exit financing are premature and that the Motion should be denied.  Id. at ¶¶ 12, 18.

13.     The objectors apparently would have the Court believe that the Engagement Letter has been rendered obsolete as a result of the Debtors' ongoing negotiations with the Plan Investors and other parties.  The Engagement Letter, however, is not conditioned on specific terms of the EPCA or any EPCA amendment.  The second paragraph of the Engagement Letters states that the Debtors "have…advised" the Engagement Parties that the consideration necessary to finance the Debtors' proposed Plan "is intended to be provided through" various means that are subsequently set forth, including "an equity investment and rights offering of a combined amount of not less than $2.55 billion backstopped by the" Plan Investors.  (emphasis added).  The actual language of the Engagement Letter displays a degree of flexibility and sensitivity to the ongoing negotiations over the Plan and related agreements that the objecting parties appear to have overlooked or ignored.  When the Engagement Parties signed the Engagement Letter and consented to the filing of the Motion, they were fully cognizant that these negotiations were continuing and that the outcome had not been settled.  The structure of the Engagement Letter and the conditions to performance thereunder reflect a keen

9

understanding by the Debtors and the Engagement Parties of the fluid nature of the later stages of many large, complex chapter 11 cases.

14.     More importantly, as discussed, the Debtors have now filed new proposed amendments to their Plan and the equity investment agreements. The amendments contemplate exit financing on substantially identical terms as those called for under the Debtor's previous Plan, and as contemplated in the Engagement Letter. The equity investment by the Plan Investors, through direct investments and the backstop commitments, is entirely consistent with the level of investment by the Plan Investors contemplated in the Engagement Letter. Therefore, even if the amount of the Plan Investors' proposed investment in the Company were a condition to the Engagement Letter (as the objectors seem to suggest), under the terms of the proposed amendment to the EPCA, the Debtors would be in a position to satisfy it.

15.     Likely for all of these reasons, the Debtors today received a confirmation from the Lead Arrangers that they have reviewed the Debtors' latest filings, that the Debtors' filings are reasonably acceptable to them, and that they intend to proceed under the terms of the Engagement Letter in light of the Debtors' latest filings.

C.      **The Relief Requested In The Motion Reflects A Reasonable Exercise Of The Debtors' Business Judgment**

16.     The Creditors' Committee Objection consists largely of its attack on the Debtors' Plan, and the notion that the Plan would not meet the requirements of confirmation under the Bankruptcy Code. As a result, the Creditors' Committee argues that entering into the Engagement Letter would not serve the best interests of the Debtors' estates because (a) although the Debtors' financial exposure is admittedly minimal, no such expense should be permitted absent "a viable plan of reorganization," and (b) although the Creditors' Committee concedes that the Engagement Letter "does not constitute a legal commitment by either side," it maintains that

10

"it nonetheless represents…a positional and reputational commitment by the Debtors."  Creditors Committee Objection ¶¶ 20, 21.

17.     Since well before the filing of these chapter 11 cases, the Debtors have repeatedly stated their intention to seek a consensual resolution of the disputes related to their restructuring with their major stakeholders.  Ultimately, however, the likelihood of either a consensual resolution with key stakeholders or the confirmation of the Plan giving effect to the recently proposed amendments should only affect the Court's consideration of the relief requested in the Motion to the extent that the Court concludes that the outcome bears directly on the Debtors' business judgment in entering into the Engagement Letter.  For now, neither the Plan nor the new EPCA amendments are before the Court.  The Court will address the EPCA amendments at a subsequent hearing, and the Plan will undergo the rigors of the confirmation process as required by the Bankruptcy Code.

18.     Judging from their pleadings, the objectors evidently would prefer to focus the Court's attention on the Plan and the EPCA rather than the express terms of the Engagement Letter and the business judgment standard under Bankruptcy Code section 363.  The latter provides far more challenging terrain for the objectors.  Thus, their efforts to avoid it are not surprising.

19.     In <u>In re Adelphia Commc'ns Corp.</u>, this Court approved a chapter 11 debtor's motion for approval to enter into an exit financing commitment agreement under circumstances remarkably similar to those before the Court here.  <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 2004 WL 1634538 at * 2 (Bankr. S.D.N.Y. June 22, 2004).  In <u>Adelphia</u>, although the debtors had filed a plan of reorganization before seeking authority to obtain exit financing, it was generally understood that ongoing negotiations with various constituencies would result in amendments to the plan that had been filed.  <u>In re Adelphia Commc'ns Corp.</u>, 336 B.R. 610, 628

11

(Bankr. S.D.N.Y. 2006).  Various parties objected to the debtors' exit financing motion, primarily on the grounds "that securing the commitments for the exit financing [at that time was] premature and, at least impliedly, bad business judgment" and that "the fees associated with securing it [were] an unwise expenditure of funds."  <u>Adelphia</u>, 2004 WL 1634538 at * 1.

20.     In granting the debtors' motion under the business judgment standard of section 363, Judge Gerber observed that "[t]he decision as to whether the exit financing should be locked in now or not [and] whether it is worth the money [it costs] is a classic business decision."  <u>Id.</u> at * 2.  The Court took note that Adelphia's management concluded that "it was desirable to lock in advantageous economic terms while they could be obtained, in an environment of expected increases in interest rates, and other potential changes in the financing environment" and held that this was "exactly the kind of business decision that the business judgment rule respects."  <u>Id.</u> at 3.  In that case, the Court found that the debtors' "decision was hardly an abuse of discretion or a waste of corporate assets."  <u>Id.</u>  Likewise, the Court found that the debtors' "agreement to pay the particular fees in question, especially as modified downward, likewise is neither a waste of corporate assets or an abuse of discretion," nor did the amounts in question "cause the motion for approval to pay them to fall beyond business judgment protection."  <u>Id.</u> at 4.

21.     The Debtors' determination to enter into the Engagement and Fee Letters and perform their obligations thereunder warrants the protection of the business judgment rule.  None of the objecting parties has disputed Delphi's need for exit financing, regardless of what final permutations of the Plan or the EPCA are ultimately negotiated.  As in <u>Adelphia</u>, the Debtors here have filed a Plan that remains the subject of continuing negotiations.  Like Adelphia's management, Delphi's management, together with Delphi's Board of Directors and the Debtors' restructuring professionals, have concluded that acting expeditiously to enter into an

12

agreement to obtain exit financing would be desirable in light of turbulence in the capital markets through the third and early fourth quarter of 2007 and the more recent period of relatively favorable conditions. And like the <u>Adelphia</u> debtors, Delphi has structured the Engagement Letter to minimize costs to the Debtors' estates (in the form of interest expense and fees). Under the circumstances, committing to pay up to $500,000 of the actual expenses of the Engagement Parties is neither an abuse of the Debtors' discretion nor a waste of estate resources.

22.    Delphi's decision to enter into the Engagement Letter is a classic business decision that should be evaluated under the business judgment standard. Based on this standard, the Debtors have presented a compelling case in support of the relief requested in the Motion. By contrast, the objecting parties have sought to muddy the waters with criticism of filings that are not before the Court and have failed to rebut the presumption in favor of the Debtors' exercise of their reasonable business judgment. Accordingly, the objections should be overruled.

Conclusion

WHEREFORE the Debtors respectfully request that the Court enter the revised Proposed Order in substantially the form of the attached as Exhibit B to this Omnibus Reply and that the Court grant the Debtors all such other and further relief as is just and equitable.

Dated: New York, New York
November 15, 2007

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

        By:   /s/ John Wm. Butler, Jr.
            John Wm. Butler, Jr. (JB 4711)
            George N. Panagakis (GP 0770)
            Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

              - and -

        By:   /s/ Kayalyn A. Marafioti
            Kayalyn A. Marafioti (KM 9632)
            Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
         Debtors and Debtors-in-Possession