**REED SMITH LLP**                                    Attorneys for Claimant
By:  Elena Lazarou (EL 5681)                          Siemens VDO Automotive SAS
599 Lexington Avenue, 29th Floor
New York, NY 10022
(212) 521-5400

and

Randall D. Lehner (IL # 6237535)
Max A. Stein (IL #6275993)
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
(312) 207-1000
(admitted *pro hac vice*)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| DELPHI CORPORATION, *et al.*, | ) | Case No. 05-44481 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

### CLAIMANT SIEMENS VDO AUTOMOTIVE SAS'S MEMORANDUM IN RESPONSE TO DEBTORS' MOTION FOR A SUMMARY JUDGMENT EXPUNGING CLAIM NUMBER 2247

In its Initial Memorandum in Support of Claim 2247 ("Initial Memorandum"), VDO set forth three alternative bases for its Claim.[1]  First, VDO demonstrated that language drafted by Delphi incorporated terms into the parties' "Contract" that unquestionably allow VDO to recover on its Claim.  Second, VDO showed that Delphi accepted the terms of VDO's Offer through

---

[1] Consistent with the usage in its Initial Memorandum, "VDO" means VDO Automotive SAS; "Claim" means  Claim 2247; "Delphi" means Debtor Delphi Automotive Systems Energy & Chassis Systems; "RFQ" means Delphi's April 2000 Request for Quotation; "Long Term Contract" and "LTC" mean Delphi's Long Term Contract; "Terms and Conditions" and "T&C" mean the Delphi Standard Purchase Order Terms and Conditions; the "Offer" means VDO's response to Delphi's RFQ, including a copy of the LTC executed only by Delphi; "Nomination Letter" means Delphi's letter to VDO dated August 2, 2000; and "Updated Quote" means VDO's December 13, 2002 letter.

Delphi's Nomination Letter.  Finally, VDO explained that, if Delphi were to succeed in its argument that the Contract consists of nothing more than Delphi's Long Term Contract and Terms and Conditions, then the Contract is not an enforceable requirements contract, and VDO may therefore pursue its Claim under the doctrine of promissory estoppel.  VDO raised these alternative bases for recovery pursuant to a Stipulation between the parties through which the Court was to determine, as a threshhold matter, which documents comprise the parties' Contract and whether VDO may pursue its Claim on a theory of breach of contract or, alternatively, under the doctrine of promissory estoppel.

Rather than proceed as contemplated in the Stipulation, Delphi has moved for summary judgment by simply assuming away the fundamental issue between the parties over the contents and validity of the Contract.  Because of these improper assumptions, Delphi not only fails to prove its entitlement to summary judgment, but it also fails to dispute VDO's evidence that in signing and returning the LTC, VDO made that document part of, and not the entirety of, its Offer.  Because this fact is not in dispute, the Court may now determine as a matter of law that the Contract includes both VDO's response to the RFQ and Delphi's Long Term Contract, and that where those documents conflict, the response controls.  And once the Court makes that determination, it should also allow VDO to pursue its Claim under the Contract.

## STATEMENT OF FACTS

VDO hereby incorporates the Background section of its Initial Memorandum and its response to Delphi's Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Debtors' Motion for A Summary Judgment Expunging Claim Number 2247 Asserted by Siemens VDO Automotive S.A.S. ("Delphi's Statement") as its Statement of Facts.

## ARGUMENT

**I.    THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE PARTIES'
AGREEMENT INCLUDES PROVISIONS ENTITLING VDO TO PURSUE ITS
CONTRACT CLAIM.**

### A.    By Signing Delphi's Long Term Contract, VDO Made It Part Of Its Offer.

In its Initial Memo, VDO explained how the terms of its Offer became part of the parties'

Contract.    In support of that explanation, VDO's Michel Poulet stated that VDO's Offer

consisted of (1) the July 20, 2000 letter VDO sent in response to Delphi's RFQ and (2) Delphi's

Long Term Contract, which incorporated Delphi's Terms and Conditions.  (Initial Memo at 4-5;

Poulet Decl. ¶ 5-7 and Exs. A and B.)  VDO's Initial Memo also explained how VDO's response

to Delphi's RFQ modified several terms of the Long Term Contract.  (Initial Memo, § I.D.)

Delphi, however, has assumed that VDO's act of signing the Long Term Contract

amounted to an acceptance of all of its terms.    (Debtors' Memorandum in Support of their

Motion for a Summary Judgment Expunging Claim Number 2247 Asserted by Siemens VDO

Automotive S.A.S. ("Delphi's Motion") at 5, 11.)  Delphi's Motion offers no evidence to support

that assumption.  Delphi's Motion also offers no evidence to dispute that, when VDO signed the

Long Term Contract, VDO incorporated into its Offer those terms of the LTC that VDO had not

already rejected in its response to the RFQ.  Indeed, the Thompson Declaration is silent on this

point, stating only that VDO responded to the RFQ with its July 20, 2000 letter and that it "later

sent a signed copy of the LTC."  (Thompson Decl. ¶ 8.)

With  no  evidence  of  its  own,  Delphi  instead  relies  on  an  incomplete  quotation  from

Michel Poulet, VDO's senior business manager, to support its position.  (Delphi's Motion at 5;

Delphi's  Statement  ¶  10.)    Delphi  has  argued  that  its  request  for  VDO  to  sign  the  LTC

constitutes Delphi's insistence on the terms of the LTC, and VDO's act of signing the LTC

represents VDO's acceptance of those terms.  (Delphi's Motion at 5.)  To support this position,
Delphi quotes part of Mr. Poulet's statement:

> "[a]fter VDO submitted its quote, Delphi informed VDO that it required VDO to
> include a signed version of Delphi's Long Term Contract as part of its submission
> before Delphi would consider the quotation.  In response to this request, VDO, as
> instructed, forwarded a version of Delphi's Long Term Contract signed only by
> it."

(*Id.*; *see also* Delphi's Statement ¶ 10 (both quoting Poulet Decl. ¶ 6).)  Yet even this part of Mr.

Poulet's statement shows that the Long Term Contract was only "part of its [VDO's]

submission."  (Poulet Decl. ¶ 6.)  Moreover, Delphi's quotation is incomplete, because it omits

the final sentence of the paragraph, which states:  "The Long Term Contract then became part of

VDO's response to Delphi's RFQ."   (Poulet Decl. ¶ 6.)   When viewed in its entirety, this

statement from Mr. Poulet directly rebuts Delphi's position and confirms that the only evidence

on this crucial issue shows that VDO's Offer undisputedly included the terms proposed by VDO

and the terms of the Long Term Contract that VDO did not reject.

**B.    Because Delphi Accepted All Of The Relevant Terms Of VDO's Offer, The
Parties' Agreement Includes Provisions Entitling VDO To Pursue Its
Contract Claim.**

The undisputed facts here demonstrate both that VDO's Offer included the "Program

Cancellation" and the "Unit Prices and Annual Volumes" provisions and that Delphi accepted

the provisions of that Offer.  As VDO explained in its Initial Memo, Delphi's Nomination Letter

accepted VDO's Offer.  This acceptance means that the entirety of VDO's Offer—including the

provisions allowing VDO to recover its Claim—and not just the Long Term Contract, is part of

the parties' agreement.

In response, Delphi's Motion claims that VDO's argument asks the Court to ignore the

"parties' actual, jointly executed contract."   Delphi's argument overlooks the basic contracting

concepts of offer and acceptance.  Where there is a question as to whether a contract between

two parties exists, courts look for the essential elements of a contract:  offer, acceptance, and

consideration.  *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (citing

*Helle v. Landmark, Inc.*, 472 N.E.2d 765, 773 (Ohio Ct. App. 1984)).  Under Delphi's argument,

its RFQ, which was sent to multiple potential suppliers, would have to be the offer, while VDO's

acceptance of that offer would be its response to the RFQ, since it is undisputed that VDO signed

the Long Term Contract only as part of that response.  (*Compare* Poulet Decl. ¶ 6 *with*

Thompson Decl. ¶ 8.)

Ohio courts define an offer as a "manifestation of willingness to enter into a bargain, so

made as to justify another person in understanding that his assent to that bargain is invited and

will conclude it."  *Leaseway Distrib. Ctrs., Inc. v. Dep't of Admin. Servs.*, 550 N.E.2d 955, 961

(Ohio Ct. App. 1988); *see also Dyno Constr. Co.*, 198 F.3d at 572 (willingness to be bound

determines existence of offer (citing *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868,

871 (7th Cir. 1976); *Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp.*, 632 F.

Supp. 1082, 1089 (D.D.C. 1986))).  Applying this standard, courts have also held that requests

for quotation cannot be offers, as they lack the willingness on the part of the party seeking the

response to be bound by a contract with any one responder.  *Dyno Constr. Co.*, 198 F.3d at 572.[2]

Instead, courts hold that a request for quotation represents an invitation for an offer and the

response to that invitation is the actual offer.  *Id.*  Acceptance of that offer forms the contract.  *Id.*

Applying these principles here, Delphi's RFQ is simply the invitation to VDO to make an

offer.  This conclusion is confirmed by the language of the RFQ, which makes clear that Delphi

never intended to be bound to multiple suppliers.  (Poulet Decl. Ex. A.)  VDO's response to the

---

[2] Although some courts have held that price quotations may not be offers in certain circumstances, VDO's
offer does not fit those circumstances.  VDO intended its Offer to be an offer and was willing to be bound
by the terms set forth in its Offer should Delphi accept it, which it did.  (Poulet Decl. ¶ 7.)

RFQ then presented VDO's Offer to Delphi, setting forth the terms under which VDO was willing to be bound. Finally, Delphi accepted that Offer and communicated that acceptance in its Nomination Letter. The result was, as VDO argues, a contract on the terms set forth in VDO's Offer.[3]

Delphi tries to avoid this conclusion by claiming that its continued disagreement with VDO's flash price quotation means its Nomination Letter rejected VDO's Offer. Assuming, *arguendo*, that Delphi could prove that its Nomination Letter actually rejected VDO's Offer (despite no language conveying such a rejection in the letter), the Long Term Contract alone still would not be the parties' contract. Rather, for the Long Term Contract to have become the parties' agreement following Delphi's Nomination Letter, one of two scenarios must have existed: either the Nomination Letter would have to represent (1) Delphi's acceptance of an offer that the Long Term Contract would constitute the only terms of the parties' agreement; or (2) Delphi's rejection of VDO's Offer and a counteroffer to VDO presenting the terms of the Long Term Contract as the sole basis for agreement, which VDO then accepted. Delphi, however, presents no evidence demonstrating that either scenario occurred.

As to the first scenario, Delphi never presented the Long Term Contract as an offer. The only instance in which this scenario is even possible was when Delphi sent its RFQ to VDO; but

---

[3] The fact that the Offer initially did not include a version of the Long Term Contract signed by VDO does not change the analysis. VDO's oversight in not including a signed version of the Long Term Contract either resulted (1) in Delphi requesting that VDO correct the oversight or (2) Delphi rejecting VDO's response to the RFQ and making a counteroffer on the terms of the Long Term Contract. Under the first scenario, VDO agreed to Delphi's request by adding a signed version of the Long Term Contract to its response, which, when combined with its response to the RFQ, resulted in VDO's Offer. Alternatively, if Delphi's insistence on receiving a signed copy meant it rejected VDO's response to the RFQ, then VDO's incorporation of the signed version of the Long Term Contract into its response to the RFQ, (Poulet Decl. ¶ 6), represented a rejection of Delphi's counteroffer and a further counteroffer from VDO on the terms of its Offer. Either way, Delphi's Nomination Letter is Delphi's acceptance of the terms in VDO's Offer.

the law is clear that, because Delphi did not intend for VDO's acceptance of the RFQ to bind the parties, the RFQ cannot be an offer. *Leaseway Distrib. Ctrs.*, 550 N.E.2d at 961. Further, even if Delphi could somehow argue that its RFQ was an offer to VDO, then VDO's own Offer represents a counteroffer, which, by definition, rejected Delphi's offer. *See In re Halishak*, 324 B.R. 641 (Bankr. N.D. Ohio 2005) (counteroffer "operates so as to reject and extinguish all previous offers" (citing *Sandvick v. Bohn*, 17 Ohio Law Abs. 593 (1934))).

Under the second scenario, Delphi would need to show that its Nomination Letter rejected VDO's Offer and revived the Long Term Contract by making its terms the sole basis of a counteroffer that VDO accepted. In addition to the complete lack of evidence showing such conduct by Delphi, there is also no evidence that VDO accepted such a counteroffer. Indeed, Delphi does not even argue that VDO did so. Instead, Delphi argues that, because VDO signed the Long Term Contract, the LTC must be the sole basis of the parties' agreement. This argument ignores the reality of the events that occurred. If the Nomination Letter is Delphi's rejection/counteroffer, then VDO would have signed the Long Term Contract before Delphi ever made its counteroffer, and could not represent acceptance of a counteroffer not yet made. (Poulet Decl. ¶ 6, 11-12.) Thus, under either scenario, the Long Term Contract would not become the parties' contract.

In its Nomination Letter, Delphi did object to two terms offered by VDO: the flash pricing quotation and service part pricing. Neither of these terms is at issue in the current dispute. Delphi's objection, however, proves that Delphi could and did reject some terms of VDO's Offer. But importantly, Delphi <u>never</u> objected to or rejected the "Program Cancellation" or "Unit Prices and Annual Volumes" provisions of VDO's Offer. *Huron Cty. Bd. of Commrs. v.*

*Saunders*, 775 N.E.2d 892, 898 (Ohio Ct. App. 2002) ("inclusion of a specific thing implies the exclusion of those not mentioned").

Finally, Delphi's reliance on VDO signing the Long Term Contract also ignores that VDO included the signed Long Term Contract as part of its Offer. (Poulet Decl. ¶ 6.)  Because VDO's Offer rejected numerous terms of the Long Term Contract, VDO's signature on the Long Term Contract did not represent its agreement to the Long Term Contract.  Rather, it represented VDO's willingness to enter into a contract with Delphi on the terms VDO proposed in the totality of its Offer, including the modifications of the provisions in the Long Term Contract, as described in VDO's response to RFQ.

The case of *Mead Corporation v. McNally-Pittsburgh Manufacturing Corporation*, 654 F.2d 1197 (6th Cir. 1981), confirms that Delphi's acceptance of VDO's Offer resulted in an agreement on terms consistent with VDO's Offer.  In *Mead*, just as here, Mead solicited bids from potential builders of a coal washing plant.  *Id.* at 1198-1200.  McNally, one such builder, submitted a bid that included a number of modifications to the terms initially sought by Mead. *Id.* at 1200-1201.  Among these modifications, McNally included two terms that expressly limited its liability.  After reviewing the submissions, Mead tentatively selected McNally.  *Id.* at 1200.  Mead and McNally then engaged in negotiations to resolve the terms modified or rejected by McNally's bid, resolving most of them.  *Id.* at 1201.  The parties did not resolve, however, their disagreement as to the two terms McNally added limiting its liability.  *Id.*  Mead then sent McNally a purchase order for the plant.  *Id.* at 1201-1202.

When McNally failed to deliver the plant to Mead on the schedule called for in the parties' agreement, a dispute arose about McNally's liability for the resulting consequential damages suffered by Mead.  The dispute centered on whether the terms added by McNally

limiting its liability were actually part of the parties' agreement.  In resolving this dispute, the court determined that those terms were part of the agreement because McNally's bid was an offer that Mead's purchase order accepted.  *Id.* at 1203.  In reaching this conclusion, the court noted that the purchase order on its face "clearly indicates an assent to the terms"—terms which included McNally's bid—and that McNally began performance after receiving the purchase order.  *Id.* at 1204.  Because the purchase order represented Mead's acceptance, the court held that § 1302.10 of the Ohio UCC "would exclude any additional terms in Mead's purchase order (the acceptance) that materially altered McNally's [bid] (the offer)."  *Id.*

Similarly, here Delphi's Nomination Letter indicated Delphi's acceptance of the terms of VDO's Offer.  Indeed, just as in *Mead*, Delphi's Nomination Letter included a reference to the offer being accepted, informing VDO that Delphi's decision "was based, in part, on your final quote and pricing matrix and your technical presentations." (Poulet Decl. Ex. C.)  VDO then began its performance by participating in a kickoff meeting held eight days after the date of Delphi's Nomination Letter, (Poulet Decl. ¶ 14).  Accordingly, Delphi cannot escape that it accepted VDO's Offer.

Consequently, Delphi cannot escape the Contract provisions under which VDO now seeks to recover its Claim.  Indeed, just as in *Mead*, Delphi's acceptance of VDO's Offer means it agreed to the Unit Prices and Annual Volumes and Program Cancellation provisions that VDO included in its Offer and excluded any additional terms that materially altered that Offer.  *Mead,* 654 F.2d at 1204.

## II.    DELPHI'S MOTION MUST BE DENIED BECAUSE IT IS BASED ON DELPHI'S FLAWED ASSUMPTIONS OF MATERIAL FACT.

Delphi presents three reasons in its Motion why VDO allegedly has no contractual right to its Claim.  Each of these reasons, however, sidesteps the relevant issue—what documents

comprise the parties' agreement—and instead assumes Delphi's position that the parties' agreement is limited to the Long Term Contract.  These assumptions are incorrect and should be rejected.  At a minimum, they present genuine issues of material fact that defeat Delphi's Motion.

### A.    Delphi's Focus On Whether The Long Term Contract Allows For VDO's Claim Ignores The Threshold Issue:  What Terms Comprise The Parties' Agreement.

Delphi first argues that the terms of the Long Term Contract do not include a contractual right allowing VDO to recover on its Claim.  Although that statement is correct, it is also irrelevant.  The question to be resolved at this stage of the proceedings is whether the Long Term Contract represents the totality of the parties' agreement.  As demonstrated above and in VDO's Initial Memo, the Long Term Contract is not the totality of the parties' agreement.

### B.    VDO's Offer Is Part Of The "Contract" Based On Language That Delphi Itself Drafted.

Delphi's Terms and Conditions define "Contract" to include each "other document…relating to the goods and/or services to be provided by [VDO] pursuant to this contract."  (*See* VDO's Initial Memo at 10-11; T&C ¶ 1.)  This language is plain on its face, but to the extent ambiguous, it must be construed against Delphi as its drafter.  *Central Realty Co. v. Clutter*, 406 N.E.2d 515, 517 (Ohio 1980).  VDO's Offer is a document "relating to the goods and services provided" pursuant to the Contract, as it inarguably relates to the goods and service provided by VDO under the parties' agreement.  Accordingly, the Offer is part of the parties' "Contract."

In an effort to avoid the impact of its own language, Delphi has presented five different theories to argue that its language does not mean what it says.  Each of these theories fails.

      1.      **The language Delphi drafted includes none of the modifiers that Delphi now tries to insert into the Terms and Conditions.**

Delphi first argues that its definition of "Contract," which it drafted, does not apply to "***pre-contractual*** documents." (Delphi's Motion at 13 (emphasis in original).) Instead, Delphi argues the definition "only makes agreements entered into ***at the same time as the LTC or later***" part of the parties' agreement. (*Id.*) But none of these phrases actually appear in Delphi's Terms and Conditions. Indeed, the actual language of Delphi's Terms and Conditions includes no mention of "pre-contractual" or "agreements entered into at the same time or later" in the definition of "Contract." Instead, Delphi's definition incorporates "each…other document" into the parties' "Contract." And because VDO's Offer is one such "other document," VDO's Offer is, by Delphi's own definition, part of that "Contract." Therefore, Delphi's attempt to read new language into its Terms and Conditions should be rejected.

Delphi also attempts to support its new definition of "Contract" by claiming that the six types of documents listed in the definition, including specifications and shipping instructions, consist of documents that "***follow*** rather than ***precede*** purchase contracts." (*Id.* (emphasis in original).) In addition to the fact neither "follow" nor "precede" appear in this specific provision, at least two of the document types Delphi specified can precede the "purchase contract." In fact, Delphi's own RFQ disproves its contention. The RFQ contains both specifications and shipping instructions. (*Compare* Poulet Decl. Ex. A at 5 ("The attached Specifications…") and Scenarios 1-3 (specifying "'Ship To' Location") *with* Poulet Decl. Ex. D.) Thus, Delphi's own language again proves its argument wrong.

In its final attempt to avoid the plain meaning of its own language, Delphi falls back on the dictionary definition of "pursuant to." By arguing that goods and services cannot be provided "pursuant to" a contract before that contract exists, Delphi's argument again ignores its

own plain language.  Under the definition of "Contract," the documents that become part of the parties "Contract" have to relate to the goods and services that are ultimately provided by VDO under the terms of the parties' agreement.  The documents do not have to be issued or created pursuant to that agreement.  Instead, "pursuant to," refers to the goods and services that are being provided pursuant to the parties' agreement.  Thus, Delphi's language makes clear that documents drafted before the existence of the agreement "relating to" to the goods and services being provided are part of the "Contract."

**2.      Giving Delphi's language its plain meaning does not make any provision of the parties' "Contract" meaningless.**

Delphi next argues that VDO's plain language interpretation of "Contract" would render the integration clause in Delphi's Terms and Conditions meaningless.  Accordingly, Delphi contends that principles of contract interpretation require VDO's argument to be rejected.  Once again Delphi is mistaken.

The integration clause applies only to documents that are outside the four corners of the parties' agreement.  For the integration clause to apply here, VDO's Offer would have to be included in the universe of "prior oral or written representations and agreements."  (T&C ¶ 29.)  It is not.  Rather, Delphi's own definition of "Contract" makes VDO's Offer a part of the parties' "Contract" itself.  Therefore, because Delphi's definition of "Contract" places VDO's Offer inside the four corners of that agreement, interpretation of the integration clause is unecessary.

Furthermore, Ohio courts hold that the intent of the parties' to be bound to the terms of a contract under the UCC, even one containing an integration clause, "cannot be based on the four corners of the document standing alone."  *In re Jasin*, 80 B.R. 418, 420 (Bankr. N.D. Ohio 1987) (citing *Camargo Cadillac v. Garfield Enterprises*, 445 N.E.2d 1141, 1144-45 (Ohio Ct. App. 1982)).  Instead, the court must consider "whatever evidence is put forward by the parties as to

their intentions." *Id.* Here, that evidence includes VDO's Offer, in which it set forth numerous terms showing that VDO never intended to be bound by all of the terms of the Long Term Contract. Thus, under Ohio law, Delphi cannot rely on its integration clause argument to obtain summary judgment. *Id.* (noting that summary judgment is not possible even where the contract contains an integration clause). Instead, the intent of the parties, and especially the positions VDO made clear in its Offer, must also be considered.

Delphi next claims that, under VDO's interpretation of the term "Contract," no prior written agreement could exist for purposes of the integration clause that would not fall within the definition of "Contract." Putting aside that any interpretation problems are the result of Delphi's drafting, VDO's interpretation of the term "Contract" could exclude prior written agreements between the parties that did not relate to the goods and services to be provided by VDO under the Contract. For example, if the parties previously had entered into a written agreement that all payments generally between them would be made in Canadian dollars, that written agreement would be superseded by their agreement in the Contract to make all payments in U.S. dollars.

In addition, if inclusion of VDO's Offer as part of the Contract were contrary to a portion of the integration clause (which it is not), that fact does not render the entire clause meaningless. To the contrary, even if there were no conceivable prior written agreement that could be barred in light of what Delphi defined to be part of the Contract, the integration clause would remain a bar to any oral representations or agreements.

Finally, the potential that Delphi's definition of "Contract" and its integration clause might conflict does not mean, as Delphi asserts, that the latter must govern the former. Rather, this potential conflict means that Delphi drafted ambiguous terms that the Court must now interpret. And because these ambiguities must be construed against Delphi, the sole drafter of

Delphi's Long Term Contract and Terms and Conditions, Delphi's attempt to use this ambiguity to its advantage must be rejected. *See Central Realty*, 406 N.E.2d at 517.

> **3.    Delphi's alternate arguments about the meaning of VDO's Offer as part of the Contract make no sense.**

Delphi next argues that, if VDO's Offer is part of the Contract, the terms of that Offer have no meaning. Delphi's first argument in support of this contention is nonsensical. Delphi argues that the identification of the documents included in its term "Contract" does not actually determine which documents are enforceable. Yet Delphi's own integration clause states that the "Contract … constitutes the entire agreement between" the parties. Accordingly, if the documents that comprise the "Contract" constitute the parties' agreement, then they are enforceable against the parties. The extent of that enforcement is what this proceeding is intended to determine.

Delphi argues that it rejected the terms in VDO's Offer when it sent VDO the Nomination Letter informing VDO that it had been selected as the supplier for the suspension programs. Delphi's Motion, however, fails to identify any language from the Nomination Letter rejecting the relevant terms of VDO's Offer. (Delphi's Motion at 15.) Furthermore, a review of that Nomination Letter demonstrates that, except for the issue of the "flash price quotation" and service part pricing (neither of which are relevant to the present dispute), Delphi did <u>nothing</u> to reject any terms proposed by VDO. To the contrary, the Nomination Letter specifically affirms that Delphi accepted VDO's Offer because Delphi's selection of VDO "was based, in part, on your final quote," which was part of VDO's Offer. (Poulet Decl. Ex. C.)

Finally, in its last attempt to avoid the effect of its definition of "Contract," Delphi argues that the terms of VDO's Offer are too vague and ambiguous to support the Claim. Delphi claims that the Program Cancellation provision is unclear about whether it relates to cancellation of the

whole program, or just a part of the program, and about how much precisely is an equitable cancellation charge.  As an initial matter, this argument fails to recognize the legal standard for determining whether the terms of a contract are reasonably certain.  That standard does not require that the parties' Contract include a provision stating how much an equitable cancellation charge should be or whether it should apply only if the whole program is cancelled.  Instead, all that is necessary is that the provision "provide[s] a basis for determining the existence of a breach and for giving an appropriate remedy." *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgmt., Inc.*, 622 N.E.2d 1093, 1098 (Ohio Ct. App. 1993).  Because the Contract's Program Cancellation provision establishes both the basis for determining a breach— failure to pay an equitable cancellation charge—and a remedy for that breach—recovery of appropriate costs incurred by VDO—it is not too vague and ambiguous to support VDO's Claim.

Delphi also has ignored a key part of the provision's language.  The second half of the Program Cancellation provision states that "an equitable cancellation charge will be negotiated to cover the appropriate costs incurred by Siemens in supporting this program."  (Poulet Decl. Ex. B.)  By defining the cancellation charge to include "appropriate costs incurred," the language identifies what costs VDO is entitled to recover in the event of a cancellation.  Moreover, this language also makes clear that this charge was to be the subject of good-faith negotiations by the parties.  Delphi should not be allowed now to use its refusal to engage in those negotiations as a reason for avoiding the cancellation charge altogether.

### C.    VDO Never Argued That Its Updated Quote Provided An Independent Basis For Recovery Of Its Claim.

Finally, Delphi argues that VDO's Updated Quote cannot provide a basis for recovery. VDO, however, never argued that it could.  Rather, VDO stated that the Updated Quote confirmed that the parties' agreement already included the terms set forth in VDO's Offer,

including the "Program Cancellation" and "Unit Prices and Annual Volumes" provisions.
Notably, Delphi offers nothing in opposition to this understanding.

### III.    DELPHI'S ATTEMPTS TO AVOID THE ELEMENTS FOR A REQUIREMENTS CONTRACT FAIL.

If Delphi succeeds in arguing that the language it drafted does not mean what it says and, as a result, limits the parties' agreement to Delphi's Long Term Contract and Terms and Conditions, then the Long Term Contract lacks a required quantity term to make it a valid contract.  In its Motion, Delphi offers two responses to this poisition.  First, Delphi argues that the Long Term Contract is a valid requirements contract because, even though it does not contain a quantity term, it includes an implicit promise of exclusivity.  Although a promise of exclusivity can be implicit, *Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989), no such promise, explicit or implicit, exists in this case.  Indeed, Delphi's argument ignores the plain language of its Long Term Contract that explicitly states that the parties' agreement is *not* exclusive.  That language, presented in a paragraph that Delphi itself labeled "Right to Purchase from Others," explicitly grants Delphi the right to purchase parts from other suppliers and makes the Long Term Contract non-exclusive.  (Poulet Decl. Ex. D ¶ 4.)  When coupled with the Long Term Contract's failure to otherwise provide the required quantity term, this explicit right to purchase from others demonstrates that, without the RFQ and VDO's Offer, Delphi's Long Term Contract lacks the required quantity term to be valid.

Delphi also argues that the Long Term Contract became a valid requirements contract as a result of Delphi's purchase orders, which it claims included the required quantity term. Delphi's effort to resurrect the fatally flawed Long Term Contract, however, fails because, the purchase orders cannot supply a missing term for a contract that does not exist.  And since Delphi's insistence on excluding documents, like its RFQ and VDO's Offer, from the Long Term

Contract prevent the Long Term Contract from being a binding contract, Delphi cannot use purchase orders issued months and years later to revive it. Ohio Rev. Code § 1302.10 ("[a] definite and seasonable expression of acceptance or a written confirmation that is *sent within a reasonable time* operates as an acceptance…") (emphasis added).

Finally, Delphi argues that VDO's promissory estoppel claim fails because it does not identify the requisite promise. In support of this contention, Delphi argues that it made no clear promise to purchase a specific quantity of GMT 800 parts, to pay an equitable cancellation charge, or to purchase a set quantity of GMX 245 and GMX 295 ECUs. Delphi's argument again misses the mark. The promise that Delphi made, and that VDO relied on, was that VDO would be able to recoup its costs. Each of the documents exchanged by the parties in the Request for Quotation process included this promise, in some way. (Poulet Decl. Exs. A-D.) Thus, Delphi's claim that there was no promise on which VDO could rely must be rejected.

## CONCLUSION

The Contract between VDO and Delphi provides that VDO is entitled to recover costs it incurred in supporting parts programs for Delphi in the event that any of those programs were cancelled or the volume of parts ordered fell below a certain threshold. The undisputed facts show that VDO made an Offer to Delphi, which it accepted, containing the cost recovery provisions at issue. Accordingly, VDO respectfully requests that the Court deny Delphi's Motion for Summary Judgment and enter an Order finding that the parties' Contract includes the documents and provisions identified above by VDO and therefore VDO may pursue its Claim under the Contract.

Dated: November 19, 2007

Respectfully submitted,

**REED SMITH LLP**


By: _____/s/ Elena P. Lazarou_____
    Elena P. Lazarou (EL 5681)
    599 Lexington Avenue, 29th Floor
    New York, New York 10022
    (212) 521-5400

    and

    Randall D. Lehner (IL # 6237535)
    Max A. Stein (IL #6275993)
    10 South Wacker Drive, 40th Floor
    Chicago, Illinois 60606
    (312) 207-1000
    (admitted *pro hac vice*)

Attorneys for Claimant Siemens VDO Automotive
SAS