# EXHIBIT "A"

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor: **Delphi Corporation** | Case Number: **05-44481** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): **Morgan Advanced Ceramics/Diamonex Products Div.**

Name and address where notices should be sent:
**Paul M. Rosenblatt, Esq.**
**Kilpatrick Stockton LLP**
**1100 Peachtree Street, Suite 2800**
**Atlanta, GA 30309**

Telephone number: **404-815-6321**

- ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
- ☐ Check box if you have never received any notices from the bankruptcy court in this case.
- ☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

COPY

| Account or other number by which creditor identified debtor: **See attached** | Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated: _____ |
|---|---|

**1. Basis for Claim**
- ☒ Goods sold
- ☒ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

- ☐ Retiree benefits as defined in U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Your SS #:_____
  Unpaid compensation for services performed
  from _____ to _____
  (date)              (date)

**2. Date debt was incurred: See attached**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**
If all or part of your claim is secured or entitled to priority, also complete Item 5 and 6 below. $ **550,547.81**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☒ Other  **Recoupment / see attached**

Value of Collateral:  **$550,547.81**

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority_____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___)

*Amounts are subject to adjustment on 4.1.04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments has been credited and deducted for the purpose of making this proof of claim.

**8. Support Documents:** *Attach copies of support documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED

AUG 0 4 2006

KURTZMAN CARSON

| Date **7/24/06** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): Paul M. Rosenblatt, Esq., Kilpatrick Stockton LLP | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# TABLE OF CONTENTS

Proof of Claim Form
Summary of Recoupment Claim
A – Quotation – March 22, 2004
B – Contract – October 5, 2005 Version
C – Contract – December 1, 2005 Version
D – Delphi Corporation General Terms and Conditions
E – Invoice Summary of Morgan A/R from Delphi
F – Invoice Summary of Morgan A/P to Delphi

## Summary of Recoupment Claim

Morgan Advanced Ceramics, Inc. ("Morgan") interacts with Delphi Corporation ("Delphi") by purchasing a certain engine valve from Delphi, coating the valve with a special product, and reselling the coated valve to Delphi (Delphi refers to these valves as material number "25365391 valve asm-coated"). Both prior to October 8, 2005 (the "Petition Date") and after, Delphi transacted, and continues to transact, business with Morgan.

As a result of this business arrangement, as of the Petition Date, Morgan asserts a claim in the amount of $550,547.81 against Delphi for sales of coated valves to Delphi (the "Morgan Claim"). It is our understanding that Delphi asserts a claim of at least $550,547.81 (the "Morgan Debt") against Morgan for uncoated valves purchased by Morgan from Delphi ($342,045.32 for valves purchased pre-petition and $208,502.49 for valves purchased post-petition).

The Morgan Claim arises under a "Requirements Contract" (the "Contract") between Morgan and Delphi's Energy & Chassis Systems division. Under the Contract, Delphi is entitled to purchase, and Morgan is obligated to sell, specific coated valves. Morgan purchases uncoated valves from Delphi for the sole and exclusive purpose of coating those valves for Delphi and reselling the coated valves to Delphi. Delphi only sells to Morgan the number of valves Delphi needs coated. Absent this arrangement, Delphi would not sell the valves to Morgan and Morgan would not coat the valves for Delphi.

Morgan has recoupment rights equal in value to the Morgan Claim. It is well established that a debtor-in-possession takes property of the estate subject to rights of

recoupment.[1]  Recoupment is an issue of state law and bankruptcy courts look to applicable state law to determine the validity and extent of a recoupment right asserted against property of the estate.[2]  Pursuant to section 26.1 of the Contract, the terms and conditions of the Contract are governed by the laws of Michigan.

The doctrine of recoupment is recognized under Michigan common law.[3]  To assert recoupment under Michigan common law, Morgan must show that (a) Morgan has a claim against Delphi; (b) that Delphi asserts a claim against Morgan; (c) that Morgan's claim and Morgan's debts arose out of the same "subject matter"; and (d) that Morgan's claim and Morgan's debts are susceptible of adjustment in one action.[4]  All these elements are met in this situation.  First, Delphi assert a claim against Morgan.  Second, Morgan asserts a claim against Delphi.  Third, the Morgan Claim and the Morgan Debt arise out of the same "subject matter".[5]  Last, it is clear that the Morgan Claim and the Morgan Debt are susceptible of adjustment in one action because both demands could be raised in the same action (whether within or outside the bankruptcy context).

---

[1] See In re 105 East Second Street Associates, 207 B.R. 64, 69 (Bankr. S.D.N.Y. 1997) (citing In the Matter of Holford, 896 F.2d 176 (5th Cir. 1990)); see also In re Flagstaff Realty Associates t/a F.R.A., 60 F.3d 1031, 1035 (3rd Cir. 1995) ("The 'trustee of a bankruptcy estate takes the property subject to rights of recoupment.' ") (quoting In re Matter of Holford, 896 F.2d 176 (5th Cir.1990)).

[2] In re Malinowski, 156 F.3d 131, 133 (2d Cir. 1998); In re McMahon, 129 F.3d 93, 96 (2nd Cir. 1997) ("Recoupment and setoff rights are determined by non-bankruptcy law, which ordinarily is state law.").

[3] See generally, Ward v. Fellers et al., 1854 WL 3486 (Mich. 1854); see also Ward v. Alpine Township, 171 N.W. 446, 450 (Mich. 1919); In re Thompson Boat Co., 230 B.R. 815, 824, n.11 (Bankr. E.D. Mich. 1995).

[4] See Ward v. Alpine Township, 171 N.W at 450; In re Thompson Boat Co., 230 B.R. at 824, n.11.

[5] See Ward, 171 N.W. 446 (where plaintiff sought to recover value of construction supplies used in erecting a bridge that was deemed unacceptable, and township counterclaimed for the cost incurred in taking down the unacceptable bridge, the Michigan Supreme Court held that "[r]ecoupment is not strictly limited to the exact provisions of the contract involved, or sued upon" but rather "[i]t is sufficient that the counterclaims arise out of the same subject-matter and that they are susceptible of adjustment in one action" and found that the township's costs were "distinctly an item of damages resulting to defendant from [the contractor's] nonperformance of his contract" and that "[c]learly, the counterclaims of the parties arose of the same subject-matter, or transaction, and were susceptible of adjustment in one action."); see also, In re Thompson Boat Co., 230 B.R. at 824, n.11 (quoting Ward v. Alpine Township, 171 N.W. 446).

# EXHIBIT A

**Morgan**
*Advanced Ceramics*

**Diamonex Products Division**
7331 William Avenue • Allentown, PA 18106
610-366-7100 • Fax: 610-366-7144



ISO 9001:2000
FM 81121

# QUOTATION

| To: | **Delphi Automotive Systems**<br>**5500 West Henrietta Road, M/C 146.HEN.595**<br>**West Henrietta, NY 14586** |
|---|---|

| QUOTATION # | **DLC-DEL-032204-Q** |
|---|---|
| **DATE:** | **March 22, 2004** |
| **Reference:** | **A. Degner 1/15/04 RFQ**<br>DX RFQ#: 506 |

| **Attn:** | **Andy Degner – Sr. Buyer** |
|---|---|
| **Tel:** | **585-359-6220** | **Fax:** | **585-359-6186** |

| **Email:** | andrew.v.degner@delphi.com |
|---|---|
| **Cc:** | |

We are pleased to quote you as follows subject to the Conditions stated below and/or on the reverse:

**Quoted Service**     Volume Production

**Purpose of Order**     Briefly, this application involves the vacuum deposition of Diamonex® DLC coating upon Delphi supplied Multech 3.5 diesel fuel injector valves that act in fuel flow control capacity in E85 (Ethanol) compatible diesel fuel injectors.

**Hardware Overview:**

| | |
|---|---|
| Part description: | valve assembly – coated; Dwg. Nbr. 25358705A-REV 1 10APR03 |
| Part composition\Ra: | stainless w/laser welded steel ball |
| Part dimensions: | 16.6mm L x 6.0mm OD |
| Part Temperature Limitations: | 200°C Max |
| Part Cleaning: | Alkaline Ultrasonic |
| Area to coat \ Masking: | Refer to drawings, Masking: None |
| Coating Thickness \ Uniformity: | Refer to drawings. |

**Order Deliverables**

| Item | Qty | U/M | Description/Comments | Unit Price |
|---|---|---|---|---|
| 1 | 1 | EA | **(440) Multec 3.5 valves per coating run for CY04-05**<br>**(440) Multec 3.5 valves per coating run for CY06-09** | $0.87<br>$0.83 |
| 2 | 1 | EA | **(484) Multec 3.5 valves per coating run for CY04-05**<br>**(484) Multec 3.5 valves per coating run for CY06-09** | $0.82<br>$0.77 |
| 3 | 1 | EA | **(880) Multec 3.5 valves per coating run for CY04-05**<br>**(880) Multec 3.5 valves per coating run for CY06-09** | $0.73<br>$0.68 |
| 4 | 1 | LOT | **NRE - Tooling (16) Fixture assemblies for SORP** | $65,120.00 |

**Testing & Material Characterization**

| | |
|---|---|
| Thickness 1 | Profilometry upon process Si witness coupon |
| Thickness 2 | FTIR Microscope of coated parts and witness coupons |
| Coverage | 20-40x Microscopic inspection for defects,voids and coverage |
| Adhesion 1 | Scratch test of coated barrel OD |
| Adhesion 2 | 5x Thermal Cycle of selected-coated parts |
| Adhesion 3 | Heated Ultrasonic submersion |

**Notes:**
1. Above stated pricing is for the DLC coating only.
2. If requested by Delphi to purchase valves from CPV @ $0.66 (valve cost to Diamonex), please add $0.03 to DLC coating price above.
3. As of 03/22/04, Diamonex has not produced coated valves based on a 484 valve batch size.
4. If additional handling and material transfer is required to transfer 484 coated valves into a 440 shipping container back to CPV, additional costs (not yet determined) will be added to above coating only unit price.

**Morgan**
**Advanced Ceramics**

**Diamonex Products Division**
7331 William Avenue • Allentown, PA  18106
610-366-7100 • Fax: 610-366-7144



ISO 9001:2000
FM 61121

In accordance with Quality System procedures, we will not be permitted to begin processing your order until receipt (fax or mail) and acceptance of your order and credit references.

| | |
|---|---|
| Shipment Terms: | FOB Allentown, Pennsylvania U.S.A. |
| Freight Charge Basis: | Collect Delphi UPS Acct#. |
| Payment Terms: | NET 30 DAYS. |

If any shipment or other act or condition affecting payment for the material, product, or equipment or any part thereof shall, for any reason be delayed by you, payment shall become due upon notice by us that the material, product, or equipment is ready for shipment, and thereafter we shall hold the material, product, or equipment at your risk and expense.

Quote Expiration: 45 days from quote date.

**Morgan Advanced Ceramics . . .**
is pleased to provide the direct assistance and expertise of our regional technical specialists to you during all phases of our collaboration.

**Mr. John Mastrogiacomo, MAC Regional Manager**
**Morgan Advanced Ceramics**
**12 Delaware Road**
**Whitehouse Station, NJ 08889**

Office:   908-534-6009 Fax: 908-534-6510
Email:    john.mastrogiacomo@morganplc.com

Quote prepared by:_____
Joseph Rogers, Applications & Product Development Mgr  - Diamonex
Direct Line: (610) 366-2106 \ Email: joe.rogers@morganplc.com

**Morgan**
# Advanced Ceramics

**Diamonex Products Division**
7331 William Avenue • Allentown, PA 18106
610-366-7100 • Fax: 610-366-7144


ISO 9001:2000
FM 81121

## SALES CONDITIONS - QUOTATION

**ACCEPTANCE:** Upon acceptance of this Quotation by Buyer, Seller agrees to sell or perform and Buyer to purchase the products or services described for the specified prices (provided that Seller may adjust prices for products or services using precious metals to reflect cost increases for the relevant precious metal(s) prior to shipment or performance). Unless accepted in writing by an executive officer of Seller, any additional, different or inconsistent terms or conditions in Buyer's acceptance of this Quotation, whether in the form of a purchase order, acknowledgment, confirmation or otherwise, are objected to by Buyer and shall not be binding on Seller nor have the effect of preventing the formation of a contract or of varying or otherwise leaving open any terms or conditions. Neither Seller's failure to respond to any such additional, different or inconsistent terms or conditions, nor Seller's commencement of performance shall be constitute assent thereto. These Sales Conditions form part of, and are to be interpreted together with, the body of the Quotation to which they are attached and any contract resulting herefrom. In the event of any conflict or inconsistency between these Sales Conditions and the body of the Quotation, the latter will prevail. This Quotation may be revoked by Seller at any time prior to acceptance by Buyer.

**ASSIGNMENT:** This Quotation is issued solely to Buyer and is non-transferable. Seller may assign any contract resulting from this Quotation, in whole or in part, to any affiliate of Seller, or to any purchaser of substantially all of Seller's business or assets related to performance hereof.

**CHANGES IN DESIGN OR CONSTRUCTION:** Seller may change the design or construction of any products or services as it determines (unless the specifications, drawings and design therefor were provided by Buyer, provided that such modified products or services meet any warranted performance specifications. All Buyer change orders are subject to Seller's written acceptance, in Seller's sole discretion.

**BUYER DESIGNED PRODUCTS:** As to any products or services for which Buyer provides any or all of the design, specifications or machining or detailed part drawings, Buyer agrees to indemnify and hold harmless Seller and its affiliates from and against any and all liabilities, claims, costs, expenses (including attorneys' fees and amounts paid in settlement), damages or losses at any time incurred by any of them as a result of the manufacture or sale of such products in accordance with such design, specifications or drawings, or the subsequent possession, use or re-sale of such products by any person. Seller's delivery of not less than ninety percent of the quantity of each Buyer designed product covered hereby will constitute satisfaction of Seller's obligations. Notwithstanding the foregoing, Buyer agrees to accept and pay for up to one hundred ten percent of the quantity of each such product covered hereby.

**DELIVERY:** Seller will use its reasonable efforts to meet any delivery estimates and performance timetables specified in this Quotation, but in no event will Seller be liable for delivery or performance delays, regardless of cause. All products or other deliverables shall be delivered FOB the Seller's named facility. Buyer must inspect all deliveries upon receipt. Claims in respect of defects, shortages or non-conformities reasonably discoverable by inspection must be asserted in writing within thirty (30) days after receipt or will be deemed waived.

**DRAWINGS & DOCUMENTATION:** Ownership of all drawings, inventions, bills of materials, flow diagrams, plot plans, details, specifications and other data or documentation (regardless of medium) prepared by Seller and all associated intellectual or industrial property rights shall be the property of Seller, and Buyer will execute such confirmatory assignments as Seller may from time to time reasonably request. Buyer will use any product manuals or documentation (regardless of medium), including any wiring schematics or assembly drawings, solely for the purpose of installation, maintenance, operation and authorized repair of the products. Buyer's use and disclosure of any such manuals or other documentation shall be subject to any confidentiality or nondisclosure agreement between Seller and Buyer.

**FORCE MAJEURE:** Seller shall have no liability or be in breach for any failure or delay in performance due to strikes, lockouts, concerted acts of workmen or other industrial disturbances, fires, explosions, floods or other natural catastrophes, civil disturbance or riots, armed conflict whether declared or undeclared, terrorist acts, curtailment, shortage, rationing or allocation of normal sources of supply of labor, materials, transportation, energy or utilities, accidents, acts of God, delays of subcontractors or vendors, sufferance of or voluntary compliance with acts of government and government regulations, embargoes or any other similar or dissimilar cause which is beyond the reasonable control of Seller.

**INTERPRETATION; DISPUTE RESOLUTION:** This Quotation and any related contract shall be governed by and construed according to the laws of Delaware, USA, without regard to its principles of conflicts of laws, provided that the U.N. Convention on the International Sale of Goods shall not apply. All disputes arising out of this Quotation or any related contract will be brought solely in the courts of the state or federal courts having jurisdiction over the county in which Seller's facility named in this Quotation is located, and Buyer consents to the personal jurisdiction of and laying of venue in any such court, and waives any objection based on lack of personal jurisdiction or forum non conveniens.

**INVOICES & PAYMENT:** Payment will be due 30 days after the date of Seller's invoice. All overdue amounts will bear interest at the lesser of 1.5% per month or the highest rate allowed by law. If any amount due hereunder is collected through a collection agency or attorney, Buyer will pay Seller's costs of collection, including reasonable attorneys' fees.

**LIABILITY: EXCEPT AS EXPRESSLY PROVIDED IN THE "WARRANTY" SECTIONS BELOW, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO ANY PRODUCTS, SERVICES OR DOCUMENTATION, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, AND SELLER HEREBY DISCLAIMS SAME. ANY ADVICE REGARDING PRODUCT OR SERVICE SELECTION OR SUITABILITY FOR ANY APPLICATION IS PROVIDED SOLELY AS A CONVENIENCE TO BUYER, ON AN AS-IS BASIS AND WITHOUT ANY WARRANTY (EXPRESS OR IMPLIED).** Under no circumstances will Seller be liable, whether in contract, tort or otherwise (including based on negligence or strict liability), for any special, indirect, incidental, punitive or consequential damages of any kind. Without limiting any other provision hereof, Seller's maximum liability for direct damages in respect of any products or services furnished to Buyer shall not exceed the actual price paid to Seller in respect thereof. Buyer covenants that its use of any products furnished hereunder will comply with all applicable laws and regulations, and with any applicable product specifications and documentation.

**TAXES:** Quoted prices do not include any excise, sales, value added, goods and services, privilege, use or similar taxes or levies, or import or export duties payable in connection with sale or delivery of any products or performance of any services, all of which shall remain the sole responsibility of Buyer. If Seller is required to collect or pay any such taxes, levies or duties, Buyer shall pay such amounts to Seller upon invoice.

**WAIVER:** No waiver of any term or condition by Seller shall be valid unless in writing, and no such waiver shall constitute a precedent or waiver of the same or any other term or condition on any future occasion.

**WARRANTY - PRODUCTS:** Seller warrants that, under proper and normal use (ordinary wear and tear excepted), any products manufactured by it (other than prototype and customer-designed products) will be free from defects in material and workmanship for a period of one (1) year from the date of shipment from Seller's facility. With respect to any product (or component) not manufactured by Seller, Seller's sole obligation will be to assign to Buyer any rights under any warranties in favor of Seller from the vendors thereof, to the extent permitted by the terms thereof.

Seller further warrants that, at delivery, the products (other than prototype and customer-designed products) manufactured by it will perform in all material respects in accordance with any performance specifications expressly referenced in this Quotation. If any such specifications provide for performance or acceptance test(s), compliance with such performance specifications shall be exclusively determined by the result of such test(s), and Seller's liability under this warranty will terminate upon successful completion of such test(s) or, sixty (60) days after delivery if such performance or acceptance test(s) are not completed within such period for reasons beyond Seller's control.

If, during the applicable warranty period, any warranted product fails to conform to the applicable warranties, Seller's sole obligation, and Buyer's sole remedy, will be, at Seller's option, to repair or replace the non-conforming product, FOB Seller's facility, or to refund the price paid to Seller therefor, provided in each case that Buyer gives Seller immediate written notice upon discovery of such non-conformity, specifying in reasonable detail the nature thereof. Seller shall have the option of requiring the return of the allegedly non-conforming product, freight prepaid, to verify the claim.

Repairs or alterations made without Seller's written consent shall render all of Seller's product warranties void and of no effect. Buyer shall be solely responsible for all defects or damages attributable to Buyer or damage occurring to any product after delivery, including as a result of the use of such product with any other product not provided or approved by Seller.

**WARRANTY - SERVICES:** Seller warrants that all services (including any engineering services in connection with the design or production of any prototypes) will be performed in a workmanlike manner in accordance with any express specifications set forth in this Quotation. In the event of any breach of the foregoing warranty, Seller's sole obligation, and Buyer's sole remedy, will be to re-perform the relevant service, without additional charge, or to refund any price paid with respect to such non-conforming service, at Seller's option.

DLC DEL 032204 Q

# EXHIBIT B

# DELPHI

Energy & Chassis Systems

Page  1  of  4

| Buyer: |
| --- |
| DELPHI<br>ENERGY & CHASSIS SYSTEMS<br>5820 DELPHI DR<br>TROY MI 48098 |

| Deliver to: |
| --- |
| DELPHI E & C COOPERSVILLE<br>999 W.RANDALL RD<br>COOPERSVILLE MI 49404 |

| |
| --- |
| MORGAN ADVANCED CERAMICS INC<br>DIAMONEX<br>7331 WILLIAM AVE<br>ALLENTOWN PA 18106 |

**Requirements Contract**

| PO Number | Date Issued |
| --- | --- |
| 550057834 | 04-Aug-2004 |
| Version | |
| 05-Oct-2005 09:32:38 | |

## ALTERATION TO REQUIREMENT CONTRACT

| Vendor No: | 1015222 |
| --- | --- |
| DUNS No: | 943714030 |

**Payment Terms:** ZCAD    **Currency:** USD

**Incoterms:** FOB-Freight Collect

| Item No. | Material No. Description | Plant |
| --- | --- | --- |
| 00010 | 25365391<br>VALVE ASM-COATED | F701 DELPHI E & C  COOPERSVILLE |

***THIS AMENDMENT CHANGES ITEM***

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
| --- | --- | --- | --- | --- | --- |
| 01-Aug-2004 | 30-Jun-2006 | USD | 1,520.00 | 1,000 | PC |
| 01-Jul-2006 | 31-Dec-2006 | USD | 1,330.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

| Notes: |
| --- |
| This Contract replaces previous contract # --.<br>********************<br><br>********************<br>As a supplier to Delphi Energy & Chassis you must use a Delphi<br>approved transportation provider when Delphi is paying the bill. If you require assistance or routing instructions please contact Menlo Worldwide Logistics at<br>800-805-9433. Failure to follow these instructions could result in a charge back to your company |

| Purchasing Contact: DeVilbiss, Rick | Contact Address: |
| --- | --- |
| Phone: 937-455-7824<br>Fax: 937-455-9133 | DELPHI ENERGY & CHASSIS SYSTEMS<br>2000 FORRER BLVD,<br>KETTERING OH 45420 |

Date and Time Printed:  05-Oct-2005 09:32:38

# DELPHI

MORGAN ADVANCED CERAMICS INC
DIAMONEX
7331 WILLIAM AVE
ALLENTOWN PA 18106

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550057834 | 04-Aug-2004 |
| Version | |
| 05-Oct-2005  09:32:38 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

### Notes Continued

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements .  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
1.
Consignee agrees to maintain perpetual inventory records and retain records for at least 2 years.
2.
Consignee agrees to submit and reconcile an up-to-date as of the end of the month inventory status (on Delphi  Energy and Chassis Form 409F1) monthly to the designated Delphi Chassis PC&L contact by the third working day of each month for prior month.
3.
Consignee agrees to segregate Delphi  Energy and Chassis' material and provide adequate protection for Delphi  Energy Chassis' inventory.
4.
Consignee agrees to accept responsibility for inventory losses.
5.
Consignee agrees to accept responsibility for scrap incurred by the Consignee.
6.
Consignee agrees to allow Delphi  Energy and  Chassis PC&L and Finance Representatives the right to audit inventories as requested.
7.



_____ Energy & Chassis Systems

Page 3 of 4

| MORGAN ADVANCED CERAMICS INC<br>DIAMONEX<br>7331 WILLIAM AVE<br>ALLENTOWN PA 18106 | **Requirements Contract** |  |
|---|---|---|
|  | PO Number<br>550057834<br>Version<br>05-Oct-2005  09:32:38 | Date Issued<br>04-Aug-2004 |

| Item No. | Material No.<br>Description |  | Plant |
|---|---|---|---|

**Notes Continued:**

Consignee agrees to receive any materials from other suppliers used in the consignment situation. Consignee agrees to complete a receiving report-off site form 409F2 . Upon receipt of material from another Delphi Energy and Chassis Supplier, the Consignee must audit all receipts for correct part numbers and quantity. In addition, the Consignee must weigh or physically count minimum of one receipt per Vendor/Consignor per month. Any quantity discrepancies must be reported on the receiving report-off site form  409F2  and the PC&L contact should be notified immediately. After completing the receiving report-off site form 409F2, the Consignee will fax a copy of form  409F2 to the PC&L contact the same day. The consignee must attach all freight bills and bills of lading to the original copy of the receiving report-off site form 409F2 and mail to the PC&L contact in the applicable plant based on PC&L requirements. The Consignee will maintain a copy of the packing slip and receiving report-off site form  409F2 for 2 years.
8.
Consignee agrees to provide a once/year certified (Notarized) inventory letter for the Delphi  Energy and  Chassis Physical Inventory. Type "A" Consignee inventory must be observed by Delphi  Energy and Chassis personnel. Date for both inventory options to be determined by plant PC&L and communicated by Finance.
9.
Consignee agrees to provide a completed  409F1 Form as the inventory date of the respective Delphi  Energy and  Chassis plant communicated in Note 1, Section 8.
10.Tools provided by Delphi for performance of an operation by Consignee remain the property of Delphi Chassis unless otherwise noted.
11.Consignee agrees to ship material directly to Delphi   Energy and  Chassis' Customers if the physical flow warrants. (See Plant WI on shipping ).
12.Additional terms and conditions subject to negotiations.
13. Processor/Subcontractor returns all scrap material generated by the process to Delphi Energy and Chassis as part number originally received on Form 409F4 "Material Returned as Scrap from Outside Locations" unless otherwise instructed by plant PC&L contact
14. For non-conforming material from Delphi Energy and        Chassis, the processor/subcontractor will contact the PC&L coordinator and the material should be returned to Delphi Energy and Chassis on a shipper stating the reason for return unless directed otherwise by the PC&L contact.
********************

********************
The term of this contract is for the period(s) of purchase indicated in the line item notes on the face of this contract.

"Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs.  In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer."


"Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following 12 months from contract issuance date Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive.  If, within ninety (90) days, Seller does not agree to immediately



_____ Energy & Chassis Systems

Page  4  of  4

MORGAN ADVANCED CERAMICS INC
DIAMONEX
7331 WILLIAM AVE
ALLENTOWN  PA  18106

**Requirements Contract**

PO Number                                    Date Issued
550057834                                    04-Aug-2004
Version
05-Oct-2005  09:32:38

| Item No. | Material No. Description | Plant |
|----------|-------------------------|-------|

**Notes Continued:**

sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract."

Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until 12 months from contract issuance date.
*************************

05/12/05 - Alteration to change the buyer from (116) Jennifer Devole to (073) Rick DeVilbiss.  dmp

08/16/05 - Alteration to change price validity on Material 25365391 (Item 10).  dmp

Supplier acknowledges that payment terms are strictly confidential and not to be disclosed to any third party whatsoever without the prior written consent of Delphi.

Payment Terms are Net Immediatewith a 2.0% discount, valid from 10/03/05 to 12/31/05 per agreement with Rich Hobbs.

10/05/05 - Alteration to change payment terms from (ZMN2) Payment due 2nd day, 2nd month to (ZCAD) Net Immediate.  cap

# EXHIBIT C

# DELPHI

_____ Energy & Chassis Systems

Page  1  of  4

**Buyer:**

DELPHI
ENERGY & CHASSIS SYSTEMS
5820 DELPHI DR
TROY MI 48098

**Deliver to:**

DELPHI E & C COOPERSVILLE
999 W.RANDALL RD
COOPERSVILLE MI 49404

MORGAN ADVANCED CERAMICS INC
DIAMONEX
7331 WILLIAM AVE
ALLENTOWN PA 18106

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550057834 | 04-Aug-2004 |
| Version | |
| 01-Dec-2005  17:02:17 | |

## ALTERATION
## TO REQUIREMENT CONTRACT

Vendor No:  1015222
DUNS No:   943714030

**Payment Terms:** ZCAD          **Currency:** USD

**Incoterms:** FOB-Freight Collect

| Item No. | Material No. Description | | | Plant | | |
|---|---|---|---|---|---|---|
| 00010 | 25365391 | | | F701 DELPHI E & C   COOPERSVILLE | | |
| | VALVE ASM-COATED | | | | | |
| | ***THIS AMENDMENT EXTENDS ITEM*** | | | | | |
| | ***THIS AMENDMENT CHANGES PRICE AND VALIDITY*** | | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-Aug-2004 | 11-Dec-2005 | USD | 1,520.00 | 1,000 | PC |
| 12-Dec-2005 | 30-Jun-2006 | USD | 870.00 | 1,000 | PC |
| 01-Jul-2006 | 30-Jun-2007 | USD | 830.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

This Contract replaces previous contract # --.
*********************

*********************
As a supplier to Delphi Energy & Chassis you must use a Delphi

Purchasing Contact: DeVilbiss, Rick
Phone:  937-455-7824
Fax:  937-455-9133

Contact Address:

DELPHI ENERGY & CHASSIS SYSTEMS
2000 FORRER BLVD,
KETTERING OH 45420

# DELPHI

Energy & Chassis Systems

Page  2  of  4

MORGAN ADVANCED CERAMICS INC
DIAMONEX
7331 WILLIAM AVE
ALLENTOWN PA 18106

## Requirements Contract

PO Number
550057834
Version
01-Dec-2005  17:02:17

Date Issued
04-Aug-2004

| Item No. | Material No. Description | Plant |
|----------|-------------------------|-------|

## Notes Continued:

approved transportation provider when Delphi is paying the bill. If you require assistance or routing instructions please contact Menlo Worldwide Logistics at 800-805-9433. Failure to follow these instructions could result in a charge back to your company

**********************
**********************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material.  EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.
**********************
**********************************************************
Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements .  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements  in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
**********************************************************

**********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
**********************

**********************
1.
Consignee agrees to maintain perpetual inventory records and retain records for at least 2 years.
2.
Consignee agrees to submit and reconcile an up-to-date as of the end of the month inventory status (on Delphi  Energy and Chassis Form 409F1) monthly to the designated Delphi Chassis PC&L contact by the third working day of each month for prior month.
3.
Consignee agrees to segregate Delphi  Energy and Chassis' material and provide adequate protection for Delphi  Energy Chassis' inventory.
4.
Consignee agrees to accept responsibility for inventory losses.
5.
Consignee agrees to accept responsibility for scrap incurred by the Consignee.
6.

# DELPHI



_____ Energy & Chassis Systems

Page  3  of  4

| MORGAN ADVANCED CERAMICS INC<br>DIAMONEX<br>7331 WILLIAM AVE<br>ALLENTOWN PA 18106 | **Requirements Contract** |
|---|---|
| | PO Number                        Date Issued<br>550057834                        04-Aug-2004<br>Version<br>01-Dec-2005  17:02:17 |

| Item No.    Material No.<br>Description | Plant |
|---|---|

**Notes Continued:**

Consignee agrees to allow Delphi Energy and Chassis PC&L and Finance Representatives the right to audit inventories as requested.
7.
Consignee agrees to receive any materials from other suppliers used in the consignment situation. Consignee agrees to complete a receiving report-off site form 409F2 . Upon receipt of material from another Delphi Energy and Chassis Supplier, the Consignee must audit all receipts for correct part numbers and quantity. In addition, the Consignee must weigh or physically count minimum of one receipt per Vendor/Consignor per month. Any quantity discrepancies must be reported on the receiving report-off site form  409F2 and the PC&L contact should be notified immediately. After completing the receiving report-off site form 409F2, the Consignee will fax a copy of form  409F2 to the PC&L contact the same day. The consignee must attach all freight bills and bills of lading to the original copy of the receiving report-off site form 409F2 and mail to the PC&L contact in the applicable plant based on PC&L requirements. The Consignee will maintain a copy of the packing slip and receiving report-off site form 409F2 for 2 years.
8.
Consignee agrees to provide a once/year certified (Notarized) inventory letter for the Delphi Energy and Chassis Physical Inventory. Type "A" Consignee inventory must be observed by Delphi Energy and Chassis personnel. Date for both inventory options to be determined by plant PC&L and communicated by Finance.
9.
Consignee agrees to provide a completed 409F1 Form as the inventory date of the respective Delphi Energy and Chassis plant communicated in Note 1, Section 8.
10.Tools provided by Delphi for performance of an operation by Consignee remain the property of Delphi Chassis unless otherwise noted.
11.Consignee agrees to ship material directly to Delphi  Energy and Chassis' Customers if the physical flow warrants. (See Plant WI on shipping ).
12.Additional terms and conditions subject to negotiations.
13. Processor/Subcontractor returns all scrap material generated by the process to Delphi Energy and Chassis as part number originally received on Form 409F4 "Material Returned as Scrap from Outside Locations" unless otherwise instructed by plant PC&L contact
14. For non-conforming material from Delphi Energy and     Chassis, the processor/subcontractor will contact the PC&L coordinator and the material should be returned to Delphi Energy and Chassis on a shipper stating the reason for return unless directed otherwise by the PC&L contact.
********************

********************
The term of this contract is for the period(s) of purchase indicated in the line item notes on the face of this contract.

"Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer."

"Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following 12 months from contract issuance date Seller will also assure that each Product remains competitive in terms of

# DELPHI

MORGAN ADVANCED CERAMICS INC
DIAMONEX
7331 WILLIAM AVE
ALLENTOWN PA 18106

## Requirements Contract

| PO Number | Date Issued |
|-----------|-------------|
| 550057834 | 04-Aug-2004 |
| Version | |
| 01-Dec-2005  17:02:17 | |

| Item No. | Material No. Description | Plant |
|----------|-------------------------|-------|

## Notes Continued:

price with any similar product available to Buyer.  If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive.  If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract."

Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until 12 months from contract issuance date.
*************************
05/12/05 - Alteration to change the buyer from (116) Jennifer Devole to (073) Rick DeVilbiss.  dmp

08/16/05 - Alteration to change price validity on Material 25365391 (Item 10).  dmp

Supplier acknowledges that payment terms are strictly confidential and not to be disclosed to any third party whatsoever without the prior written consent of Delphi.

Payment Terms are Net Immediatewith a 2.0% discount, valid from 10/03/05 to 12/31/05 per agreement with Rich Hobbs.

10/05/05 - Alteration to change payment terms from (ZMN2) Payment due 2nd day, 2nd month to (ZCAD) Net Immediate.  cap

12/01/05 - Alteration to extend, change price and price validity on Material 25365391 (Item 10).  cap

# EXHIBIT D

**Effective March 2004**

## DELPHI CORPORATION

### GENERAL TERMS AND CONDITIONS

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Taxes. Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer. Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges. Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4 Withholding of Taxes by Buyer. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

1

Effective  March 2004

2.5 <u>Delivery Schedules</u>. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6 <u>Premium Shipments</u>. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7 <u>Volume Forecasts</u>. Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

2

**Effective March 2004**

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non- conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense.  Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods.  Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter).  Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures.  During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract.  If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11.  Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1  General.  Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2  Warranty Period.  In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise

expressly agreed in writing by an authorized employee of Buyer, end forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods.  In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3  <u>Remedies and Damages</u>.  If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods.  Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4  <u>Recalls</u>.  Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8.  INGREDIENTS AND HAZARDOUS  MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients.  Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9.  INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.  Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1 Information Disclosed by Seller. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2 Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3 Repair and Rebuild. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 Software and Written Works. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing

Effective March 2004

this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.  If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.  Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 13. INDEMNIFICATION

13.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.    Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety.  Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

**Effective March 2004**

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case <u>less</u> any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment. The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers. Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1 <u>Acquisition of Tooling and Materials</u>. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2 <u>Bailment of Buyer's Property</u>. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3 <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's

Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4  <u>Return of Buyer's Property</u>.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.  Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5  <u>Disclaimer of Warranties</u>.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6  <u>Use of Buyer's Information</u>.  Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer.  Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer.   "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1  Credits and Refunds.  Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2  Customs-Trade Partnership Against Terrorism.  To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by

deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any single or partial exercise thereof preclude other or further exercise thereof. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

**26.1  U.S. Contracts**.  If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

**26.2  Non-U.S. Contracts**.  In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out

**Effective  March 2004**

of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.

## 27.  SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28.  RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, income statements, balance sheets, cash flow statements, payroll data, receipts and other related supporting data, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to (i) substantiate any charges and other matters under this Contract and (ii) assess Seller's ongoing ability to perform its obligations under the Production Purchase Order.  Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract.  Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits  by Buyer.

## 29.  ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer.  Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract).  All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

## 30.  TRANSLATIONS

Buyer may provide various translated versions of these General Terms and Conditions for informational purposes only.  However, the original English language version of these General Terms and Conditions will apply in the event of any disagreement over the meaning or construction of any provisions of these General Terms and Conditions.

# EXHIBIT E

Morgan Pre-Petition Shipments

**_Delphi/Morgan  - AR Chart_**

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi |
|---|---|---|---|
| 91666 | 7/29/2005 | 7,911.60 | 5205 |
| 91668 | 8/1/2005 | 13,172.32 | 8666 |
| 91676 | 8/2/2005 | 10,544.24 | 6937 |
| 91680 | 8/3/2005 | 5,266.80 | 3465 |
| 91685 | 8/3/2005 | 5,280.00 | 4 NRE |
| 91686 | 8/4/2005 | 10,545.76 | 6938 |
| 91689 | 8/5/2005 | 10,401.36 | 6843 |
| 91694 | 8/8/2005 | 13,173.84 | 8667 |
| 91699 | 8/9/2005 | 10,542.72 | 6936 |
| 91705 | 8/10/2005 | 10,550.32 | 6941 |
| 91711 | 8/12/2005 | 7,907.04 | 5202 |
| 91714 | 8/15/2005 | 10,539.68 | 6934 |
| 91721 | 8/16/2005 | 9,892.16 | 6508 |
| 91726 | 8/17/2005 | 6,595.28 | 4339 |
| 91727 | 8/18/2005 | 6,580.08 | 4329 |
| 91731 | 8/19/2005 | 7,885.76 | 5188 |
| 91738 | 8/22/2005 | 7,911.60 | 5205 |
| 91742 | 8/23/2005 | 7,896.40 | 5195 |
| 91746 | 8/24/2005 | 13,097.84 | 8617 |
| 91748 | 8/25/2005 | 8,543.92 | 5621 |
| 91757 | 8/26/2005 | 9,229.44 | 6072 |
| 91763 | 8/29/2005 | 19,110.96 | 12573 |
| 91767 | 8/30/2005 | 7,908.56 | 5203 |
| 91772 | 8/31/2005 | 10,550.32 | 6941 |
| 91778 | 9/1/2005 | 10,545.76 | 6938 |
| 91784 | 9/2/2005 | 10,544.24 | 6937 |
| 91790 | 9/6/2005 | 26,379.60 | 17355 |
| 91793 | 9/7/2005 | 10,553.36 | 6943 |
| 91796 | 9/8/2005 | 10,550.32 | 6941 |
| 91803 | 9/9/2005 | 10,551.84 | 6942 |
| 91809 | 9/13/2005 | 19,127.68 | 12584 |
| 91814 | 9/14/2005 | 11,868.16 | 7808 |
| 91817 | 9/15/2005 | 10,554.88 | 6944 |
| 91822 | 9/16/2005 | 10,547.28 | 6939 |
| 91829 | 9/19/2005 | 21,096.08 | 13879 |
| 91834 | 9/20/2005 | 10,553.36 | 6943 |
| 91838 | 9/21/2005 | 10,550.32 | 6941 |
| 91841 | 9/22/2005 | 13,155.60 | 8655 |
| 91848 | 9/23/2005 | 10,553.36 | 6943 |
| 91860 | 9/26/2005 | 21,096.08 | 13879 |
| 91864 | 9/27/2005 | 10,553.36 | 6943 |
| 91871 | 9/28/2005 | 13,184.48 | 8674 |
| 91873 | 9/29/2005 | 10,553.36 | 6943 |
| 91877 | 9/30/2005 | 13,182.96 | 8673 |
| 91885 | 10/3/2005 | 18,445.20 | 12135 |
| 91892 | 10/4/2005 | 13,186.00 | 8675 |
| 91901 | 10/5/2005 | 10,544.24 | 6937 |
| 91910 | 10/6/2005 | 11,632.29 | 7809 |
| | **Total Pre-Petition  $** | **550,547.81** | |

# EXHIBIT F

Morgan Shipments
Provided pursuant to Rule 408 of the Federal Rules of Evidence

### Delphi/Morgan - AP Chart

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi | Percentage Accrual for Cost of Uncoated Valves Delphi Sold to Morgan |
|---|---|---|---|---|
| 90578 | 09/03/04 | 2,570.32 | 1,691 | 1,048.42 |
| 90595 | 09/08/04 | 2,564.24 | 1,687 | 1,045.94 |
| 90717 | 10/06/04 | 6,426.56 | 4,228 | 2,621.36 |
| 90734 | 10/11/04 | 633.84 | 417 | 258.54 |
| 90744 | 10/12/04 | 639.92 | 421 | 261.02 |
| 90746 | 10/13/04 | 1,916.72 | 1,261 | 781.82 |
| 90829 | 11/05/04 | 1,918.24 | 1,262 | 782.44 |
| 90873 | 11/19/04 | 2,523.20 | 1,660 | 1,029.20 |
| 91103 | 02/03/05 | 1,938.00 | 1,275 | 790.50 |
| 91104 | 02/03/05 | 1,285.92 | 846 | 524.52 |
| 91108 | 02/04/05 | 1,278.32 | 841 | 521.42 |
| 91109 | 02/04/05 | 1,235.76 | 813 | 504.06 |
| 91110 | 02/04/05 | 1,279.84 | 842 | 522.04 |
| 91111 | 02/04/05 | 1,267.68 | 834 | 517.08 |
| 91112 | 02/04/05 | 2,533.84 | 1,667 | 1,033.54 |
| 91113 | 02/04/05 | 1,255.52 | 826 | 512.12 |
| 91116 | 02/04/05 | 1,229.68 | 809 | 501.58 |
| 91120 | 02/07/05 | 2,558.16 | 1,683 | 1,043.46 |
| 91122 | 02/07/05 | 1,220.56 | 803 | 497.86 |
| 91127 | 02/08/05 | 2,558.16 | 1,683 | 1,043.46 |
| 91136 | 02/09/05 | 2,504.96 | 1,648 | 1,021.76 |
| 91141 | 02/11/05 | 2,491.28 | 1,639 | 1,016.18 |
| 91163 | 02/17/05 | 2,483.68 | 1,634 | 1,013.08 |
| 91216 | 03/03/05 | 2,137.12 | 1,406 | 871.72 |
| 91230 | 03/08/05 | 2,567.28 | 1,689 | 1,047.18 |
| 91266 | 03/17/05 | 2,555.12 | 1,681 | 1,042.22 |
| 91286 | 03/24/05 | 2,482.16 | 1,633 | 1,012.46 |
| 91322 | 04/05/05 | 2,570.32 | 1,691 | 1,048.42 |
| 91399 | 05/05/05 | 4,613.20 | 3,035 | 1,881.70 |
| 91421 | 05/13/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91426 | 05/17/05 | 5,275.92 | 3,471 | 2,152.02 |
| 91430 | 05/18/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91434 | 05/19/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91450 | 05/23/05 | 5,277.44 | 3,472 | 2,152.64 |
| 91452 | 05/24/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91453 | 05/25/05 | 3,295.36 | 2,168 | 1,344.16 |
| 91462 | 05/27/05 | 7,910.08 | 5,204 | 3,226.48 |
| 91475 | 05/31/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91478 | 06/01/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91486 | 06/03/05 | 659.68 | 434 | 269.08 |
| 91492 | 06/06/05 | 2,634.16 | 1,733 | 1,074.46 |
| 91496 | 06/07/05 | 2,637.20 | 1,735 | 1,075.70 |
| 91500 | 06/08/05 | 2,629.60 | 1,730 | 1,072.60 |

Morgan Shipments
Provided pursuant to Rule 408 of the Federal Rules of Evidence

**_Delphi/Morgan - AP Chart_**

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi | Percentage Accrual for Cost of Uncoated Valves Delphi Sold to Morgan |
|---|---|---|---|---|
| 91504 | 06/09/05 | 2,622.00 | 1,725 | 1,069.50 |
| 91507 | 06/10/05 | 2,637.20 | 1,735 | 1,075.70 |
| 91512 | 06/13/05 | 1,971.44 | 1,297 | 804.14 |
| 91517 | 06/14/05 | 4,532.64 | 2,982 | 1,848.84 |
| 91520 | 06/15/05 | 3,298.40 | 2,170 | 1,345.40 |
| 91525 | 06/16/05 | 3,287.76 | 2,163 | 1,341.06 |
| 91528 | 06/17/05 | 3,930.72 | 2,586 | 1,603.32 |
| 91533 | 06/20/05 | 3,948.96 | 2,598 | 1,610.76 |
| 91536 | 06/21/05 | 3,939.84 | 2,592 | 1,607.04 |
| 91541 | 06/22/05 | 3,947.44 | 2,597 | 1,610.14 |
| 91541 | 06/23/05 | 3,938.32 | 2,591 | 1,606.42 |
| 91544 | 06/24/05 | 5,225.76 | 3,438 | 2,131.56 |
| 91550 | 06/26/05 | 2,638.72 | 1,736 | 1,076.32 |
| 91552 | 06/27/05 | 5,268.32 | 3,466 | 2,148.92 |
| 91556 | 06/29/05 | 5,216.64 | 3,432 | 2,127.84 |
| 91561 | 07/01/05 | 5,323.04 | 3,502 | 2,171.24 |
| 91563 | 07/05/05 | 7,905.52 | 5,201 | 3,224.62 |
| 91563 | 07/05/05 | 5,268.32 | 3,466 | 2,148.92 |
| 91574 | 07/06/05 | 5,275.92 | 3,471 | 2,152.02 |
| 91574 | 07/06/05 | 5,274.40 | 3,470 | 2,151.40 |
| 91578 | 07/07/05 | 5,272.88 | 3,469 | 2,150.78 |
| 91583 | 07/08/05 | 5,272.88 | 3,469 | 2,150.78 |
| 91592 | 07/11/05 | 5,277.44 | 3,472 | 2,152.64 |
| 91596 | 07/12/05 | 5,268.32 | 3,466 | 2,148.92 |
| 91606 | 07/13/05 | 5,277.44 | 3,472 | 2,152.64 |
| 91613 | 07/14/05 | 5,269.84 | 3,467 | 2,149.54 |
| 91616 | 07/15/05 | 7,914.64 | 5,207 | 3,228.34 |
| 91621 | 07/18/05 | 5,274.40 | 3,470 | 2,151.40 |
| 91626 | 07/19/05 | 7,908.56 | 5,203 | 3,225.86 |
| 91631 | 07/20/05 | 7,913.12 | 5,206 | 3,227.72 |
| 91633 | 07/21/05 | 7,910.08 | 5,204 | 3,226.48 |
| 91639 | 07/22/05 | 7,911.60 | 5,205 | 3,227.10 |
| 91646 | 07/25/05 | 7,910.08 | 5,204 | 3,226.48 |
| 91653 | 07/26/05 | 7,907.04 | 5,202 | 3,225.24 |
| 91657 | 07/27/05 | 9,883.04 | 6,502 | 4,031.24 |
| 91660 | 07/28/05 | 7,913.12 | 5,206 | 3,227.72 |
| 91666 | 07/29/05 | 7,911.60 | 5,205 | 3,227.10 |
| 91668 | 08/01/05 | 13,172.32 | 8,666 | 5,372.92 |
| 91676 | 08/02/05 | 10,544.24 | 6,937 | 4,300.94 |
| 91680 | 08/03/05 | 5,266.80 | 3,465 | 2,148.30 |
| 91686 | 08/04/05 | 10,545.76 | 6,938 | 4,301.56 |
| 91689 | 08/05/05 | 10,401.36 | 6,843 | 4,242.66 |
| 91694 | 08/08/05 | 13,173.84 | 8,667 | 5,373.54 |

Morgan Shipments
Provided pursuant to Rule 408 of the Federal Rules of Evidence

**Delphi/Morgan - AP Chart**

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi | Percentage Accrual for Cost of Uncoated Valves Delphi Sold to Morgan |
|---|---|---|---|---|
| 91699 | 08/09/05 | 10,542.72 | 6,936 | 4,300.32 |
| 91705 | 08/10/05 | 10,550.32 | 6,941 | 4,303.42 |
| 91711 | 08/12/05 | 7,907.04 | 5,202 | 3,225.24 |
| 91714 | 08/15/05 | 10,539.68 | 6,934 | 4,299.08 |
| 91721 | 08/16/05 | 9,892.16 | 6,508 | 4,034.96 |
| 91726 | 08/17/05 | 6,595.28 | 4,339 | 2,690.18 |
| 91727 | 08/18/05 | 6,580.08 | 4,329 | 2,683.98 |
| 91731 | 08/19/05 | 7,885.76 | 5,188 | 3,216.56 |
| 91738 | 08/22/05 | 7,911.60 | 5,205 | 3,227.10 |
| 91742 | 08/23/05 | 7,896.40 | 5,195 | 3,220.90 |
| 91746 | 08/24/05 | 13,097.84 | 8,617 | 5,342.54 |
| 91748 | 08/25/05 | 8,543.92 | 5,621 | 3,485.02 |
| 91757 | 08/26/05 | 9,229.44 | 6,072 | 3,764.64 |
| 91763 | 08/29/05 | 19,110.96 | 12,573 | 7,795.26 |
| 91767 | 08/30/05 | 7,908.56 | 5,203 | 3,225.86 |
| 91772 | 08/31/05 | 10,550.32 | 6,941 | 4,303.42 |
| 91778 | 09/01/05 | 10,545.76 | 6,938 | 4,301.56 |
| 91784 | 09/02/05 | 10,544.24 | 6,937 | 4,300.94 |
| 91790 | 09/06/05 | 26,379.60 | 17,355 | 10,760.10 |
| 91793 | 09/07/05 | 10,553.36 | 6,943 | 4,304.66 |
| 91796 | 09/08/05 | 10,550.32 | 6,941 | 4,303.42 |
| 91803 | 09/09/05 | 10,551.84 | 6,942 | 4,304.04 |
| 91809 | 09/13/05 | 19,127.68 | 12,584 | 7,802.08 |
| 91814 | 09/14/05 | 11,868.16 | 7,808 | 4,840.96 |
| 91817 | 09/15/05 | 10,554.88 | 6,944 | 4,305.28 |
| 91822 | 09/16/05 | 10,547.28 | 6,939 | 4,302.18 |
| 91829 | 09/19/05 | 21,096.08 | 13,879 | 8,604.98 |
| 91834 | 09/20/05 | 10,553.36 | 6,943 | 4,304.66 |
| 91838 | 09/21/05 | 10,550.32 | 6,941 | 4,303.42 |
| 91841 | 09/22/05 | 13,155.60 | 8,655 | 5,366.10 |
| 91848 | 09/23/05 | 10,553.36 | 6,943 | 4,304.66 |
| 91860 | 09/26/05 | 21,096.08 | 13,879 | 8,604.98 |
| 91864 | 09/27/05 | 10,553.36 | 6,943 | 4,304.66 |
| 91871 | 09/28/05 | 13,184.48 | 8,674 | 5,377.88 |
| 91873 | 09/29/05 | 10,553.36 | 6,943 | 4,304.66 |
| 91877 | 09/30/05 | 13,182.96 | 8,673 | 5,377.26 |
| 91885 | 10/03/05 | 18,445.20 | 12,135 | 7,523.70 |
| 91892 | 10/04/05 | 13,186.00 | 8,675 | 5,378.50 |
| 91901 | 10/05/05 | 10,544.24 | 6,937 | 4,300.94 |
| 91910 | 10/06/05 | 11,632.29 | 7,809 | 4,841.58 |
| 91914 | 10/7/2005 | 8,402.83 | 5,641 | 3,497.42 |
| 91930 | 10/10/2005 | 5,818.38 | 3,906 | 2,421.72 |
| 91936 | 10/11/2005 | 7,091.99 | 4,761 | 2,951.82 |

Ex  F - AP Chart - Invoice.XLS

Morgan Shipments
Provided pursuant to Rule 408 of the Federal Rules of Evidence

### Delphi/Morgan - AP Chart

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi | Percentage Accrual for Cost of Uncoated Valves Delphi Sold to Morgan |
|---|---|---|---|---|
| 91943 | 10/12/2005 | 9,695.81 | 6,509 | 4,035.58 |
| 91948 | 10/13/2005 | 12,916.32 | 8,671 | 5,376.02 |
| 91949 | 10/14/2005 | 10,339.31 | 6,941 | 4,303.42 |
| 91956 | 10/17/2005 | 10,336.33 | 6,939 | 4,302.18 |
| 91956 | 10/17/2005 | 12,923.77 | 8,676 | 5,379.12 |
| 91960 | 10/18/2005 | 10,333.36 | 6,937 | 4,300.94 |
| 91963 | 10/19/2005 | 12,922.28 | 8,675 | 5,378.50 |
| 91970 | 10/20/2005 | 10,339.31 | 6,941 | 4,303.42 |
| 91979 | 10/21/2005 | 7,747.41 | 5,201 | 3,224.62 |
| 91987 | 10/24/2005 | 9,047.83 | 6,074 | 3,765.88 |
| 91987 | 10/24/2005 | 9,044.85 | 6,072 | 3,764.64 |
| 91991 | 10/26/2005 | 10,340.80 | 6,942 | 4,304.04 |
| 91992 | 10/26/2005 | 10,290.16 | 6,908 | 4,282.96 |
| 91998 | 10/27/2005 | 12,904.40 | 8,663 | 5,371.06 |
| 92003 | 10/28/2005 | 10,302.07 | 6,916 | 4,287.92 |
| 92013 | 10/31/2005 | 7,661.02 | 5,143 | 3,188.66 |
| 92013 | 10/31/2005 | 10,266.32 | 6,892 | 4,273.04 |
| 92017 | 11/1/2005 | 12,882.06 | 8,648 | 5,361.76 |
| 92026 | 11/2/2005 | 10,288.67 | 6,907 | 4,282.34 |
| 92028 | 11/3/2005 | 12,910.36 | 8,667 | 5,373.54 |
| 92034 | 11/4/2005 | 10,302.07 | 6,916 | 4,287.92 |
| 92039 | 11/7/2005 | 5,157.00 | 3,462 | 2,146.44 |
| 92040 | 11/7/2005 | 10,285.69 | 6,905 | 4,281.10 |
| 92045 | 11/8/2005 | 12,870.14 | 8,640 | 5,356.80 |
| 92053 | 11/9/2005 | 10,272.28 | 6,896 | 4,275.52 |
| 92060 | 11/10/2005 | 12,832.90 | 8,615 | 5,341.30 |
| 92068 | 11/11/2005 | 10,337.82 | 6,940 | 4,302.80 |
| 92077 | 11/14/2005 | 7,744.43 | 5,199 | 3,223.38 |
| 92077 | 11/14/2005 | 12,923.77 | 8,676 | 5,379.12 |
| 92083 | 11/15/2005 | 10,342.29 | 6,943 | 4,304.66 |
| 92090 | 11/16/2005 | 7,756.35 | 5,207 | 3,228.34 |
| 92094 | 11/17/2005 | 10,282.71 | 6,903 | 4,279.86 |
| 92098 | 11/18/2005 | 7,599.94 | 5,102 | 3,163.24 |
| 92108 | 11/21/2005 | 7,722.09 | 5,184 | 3,214.08 |
| 92113 | 11/22/2005 | 12,753.96 | 8,562 | 5,308.44 |
| 92114 | 11/23/2005 | 10,260.36 | 6,888 | 4,270.56 |
| 92121 | 11/28/2005 | 7,692.29 | 5,164 | 3,201.68 |
| 92127 | 11/29/2005 | 10,300.58 | 6,915 | 4,287.30 |
| 92134 | 11/30/2005 | 10,291.65 | 6,909 | 4,283.58 |
| 92139 | 12/1/2005 | 10,172.48 | 6,829 | 4,233.98 |
| 92143 | 12/2/2005 | 10,229.08 | 6,867 | 4,257.54 |
| 92152 | 12/5/2005 | 7,741.45 | 5,197 | 3,222.14 |
| 92155 | 12/6/2005 | 10,331.87 | 6,936 | 4,300.32 |

Morgan Shipments
Provided pursuant to Rule 408 of the Federal Rules of Evidence

## Delphi/Morgan - AP Chart

| Morgan Invoice # | Inv Date | Amount of Invoice | Quantity of Coated Valves Shipped to Delphi | Percentage Accrual for Cost of Uncoated Valves Delphi Sold to Morgan |
|---|---|---|---|---|
| 92164 | 12/7/2005 | 10,328.89 | 6,934 | 4,299.08 |
| 92170 | 12/8/2005 | 10,339.31 | 6,941 | 4,303.42 |
| 92178 | 12/9/2005 | 9,031.44 | 6,063 | 3,759.06 |
| 92184 | 12/12/2005 | 7,748.90 | 5,202 | 3,225.24 |
| | **Total** | | 894,120 | **$ 554,354.40** |
| | | | | |
| 91685 | 08/03/05 | 5,280.00 | 4 | NRE |

Ex  F - AP Chart - Invoice.XLS