**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4802
(212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
           mitchell.seider@lw.com
           mark.broude@lw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION., et al | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ORDER APPROVING
(I) DISCLOSURE STATEMENT, (II) RECORD DATE, VOTING DEADLINE,
AND PROCEDURES FOR TEMPORARY ALLOWANCE OF CERTAIN CLAIMS,
(III) HEARING DATE TO CONSIDER CONFIRMATION OF PLAN,
(IV) PROCEDURES FOR FILING OBJECTIONS TO PLAN, (V) SOLICITATION
PROCEDURES FOR VOTING ON PLAN, (VI) CURE CLAIM PROCEDURES,
(VII) PROCEDURES FOR RESOLVING DISPUTES RELATING TO POSTPETITION
INTEREST, AND (VIII) RECLAMATION CLAIM PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the

"Debtors"), by and through its undersigned counsel, hereby submits this objection (the

"Objection") to the Debtor's Motion for Order Approving (I) Disclosure Statement, (II) Record

Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims,

(III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to

NY\1347249.5

Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures (the "Motion").[1]  The Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Plan that is the subject of the Disclosure Statement represents the fourth iteration of the Debtors' attempts to restructure with the sponsorship of the Plan Investors (as defined below).  With each iteration, the treatment of General Unsecured Claims has gotten progressively worse, and the economics for the Plan Investors have gotten progressively better.  In the first proposed plan construct in early 2007, set forth in the Original EPCA (as defined in the Disclosure Statement), General Unsecured Creditors were to receive payment of par plus post-petition interest, 80% in cash and 20% in stock.  The next proposed plan set forth in the EPCA (as defined below) and in the Debtors' first plan of reorganization (the "Original Plan") filed in the summer of 2007, still provided for payment of par plus accrued, but flipped those percentages – the payment was originally 20% in cash and 80% in equity.  In the third iteration, set forth in the EPCA Amendment (as defined below) in October of 2007, all of the cash was gone; instead, for the first time General Unsecured Creditors were asked to purchase their recovery.  Under that construct, General Unsecured Creditors were to receive 92.4% of the recovery in equity (at an assumed enterprise value, or "plan value" of $13.044 billion) and the remainder of their recovery was in the form of a rights offering, under which they would have the opportunity to purchase new equity at a discount to plan value.  However, to achieve the touted par plus accrued recovery, the General Unsecured Creditors would have to exercise their

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2

rights in full; thus those who were unable or unwilling to pay for new equity would receive much less than par plus accrued.

2. However, that plan structure was short lived, and has been replaced by a new structure that presents even worse economics to General Unsecured Creditors. The overall structure has remained substantially the same – General Unsecured Creditors receive a combination of new equity and rights to purchase new equity – but the value has shifted even further away from the direct equity grant. Under the newest structure, the General Unsecured Creditors receive only 75.5% of their recovery in new equity (and that at a higher "plan value" of $13.433 billion) with the rest in the form of rights to purchase new equity. While those rights are now transferable, the simple fact is that the Debtors are pushing a plan that is extremely disadvantageous to all but the largest and most sophisticated creditors. Those who do not have the wherewithal or ability to purchase new equity or access the capital markets to sell their rights will receive only a paltry recovery, not the promised par plus accrued. Thus, to achieve the purported recovery under the Plan, the Debtors are requiring that General Unsecured Creditors come out of pocket even more than they already have and take significant market risk with a company that has failed them once before.

3. With each iteration of the plan, unsecured creditors have received a worse deal; by contrast, with each iteration the terms for the Plan Investors have improved. Each time the Debtors have proposed a new plan construct, the enterprise value at which the Plan Investors have agreed to purchase their equity has dropped, allowing them to purchase more and more equity of the reorganized Debtors for each dollar paid. As described in detail below, each drop in the "buy-in" price for the Plan Investors has represented in effect a transfer of value to the Plan Investors away from other constituencies, almost exclusively the General Unsecured

3

Creditors. Until recently the Committee has been willing to accept that trade off; however, with the current Plan, the Debtors have gone one step too far.

4. The Original Plan incorporated agreements reached after lengthy negotiations among several parties in interest in these chapter 11 cases, including the Committee, GM, the Equity Committee and the Plan Investors . The recoveries provided under that plan to the classes of General Unsecured Claims, GM Claims, Section 510(b) Note Claims and Section 510(b) Equity Claims[2] and Existing Common Stock reflected those agreements.

5. After the filing of the Original Plan, changes in market conditions caused the Debtors and the Plan Investors to reach the conclusion that the exit financing required to fund the Original Plan was unavailable, and thus the Original Plan as filed could not be consummated. As a result, the various parties resumed negotiations seeking to achieve consensual modifications to the Original Plan to reflect the changed market conditions. Those negotiations resulted in a new plan embodied in the EPCA Amendment; however, that agreement was recently terminated by Appaloosa before it went effective. Further negotiations ensued. These subsequent negotiations, during which the Debtors sought to appease every constituency except the Committee, have resulted in an overhaul of the Plan that is wholly unacceptable to the Committee. In short, the Debtors have bent over backwards to appease GM, which needs the Plan Investors' funds to recover the amount of cash it desires; the Plan Investors, who stand to reap huge profits as a result of their investments with little downside risk; and the MDL Plaintiffs and holders of Existing Common Stock, each of which is not entitled to a recovery until General Unsecured Claims receive distributions in full.

---

[2] The Section 510(b) Note Claims and Section 510(b) Equity Claims arise from claims held by the plaintiffs in the MDL Actions (the "MDL Plaintiffs").

4

6.      The newest plan proposal reduces the price at which the Plan Investors are purchasing equity in reorganized Delphi, allowing the Plan Investors to acquire even more of the reorganized equity for the same purchase price.  Because little has happened in the recent period that would cause the Debtors' enterprise value to go down (particularly in the month between the filing of the EPCA Amendment and the filing of the most recent Plan), the reduction in the buy-in price from that contained in the EPCA Amendment represents a transfer of value to the Plan Investors.  If enterprise value is static, the additional value transferred to the Plan Investors must be taken from another constituency – in this case, the unsecured creditors. However, the cost of the Plan Investors' capital has simply gotten to be too high.  Because the Committee objects to the allocation of an unreasonably large amount of value away from general unsecured creditors and will no longer accept the Debtors' insistence that additional value be transferred from unsecured creditors to the Plan Investors as the price of the Plan Investors' participation in the transaction, the Committee strenuously opposes the new plan proposal.  The Committee believes that the General Unsecured Claims will vote overwhelmingly to reject the Plan as well.  Given that the plan proposal provides for distributions in complete disregard to the absolute priority rule (for example, providing distributions to contractually and statutorily subordinated creditors and equity without regard to whether senior creditors have been paid in full), the new plan proposal will be simply unconfirmable if the unsecured creditors reject it.[3]

---

[3]    The Committee believes the newest plan structure is unconfirmable for a variety of legal and factual reasons in addition to those stated herein.  The Committee expressly reserves its rights to oppose confirmation of the such plan or any other plan of reorganization proposed in these chapter 11 cases, by any party, on any grounds, including issues not expressly raised herein.

In addition, on November 2, 2007, the Committee filed an objection (the "First Objection") to the Disclosure Statement.  The current plan structure does not cure any of the infirmities raised in the First Objection.  The Committee also expressly reserves its rights to continue prosecuting any and all issues raised in the First Objection.

NY\1347249.5

7. Accordingly, the Disclosure Statement does not contain adequate information and must be revised to reflect the Committee's opposition to the Plan and its belief that the Plan cannot be confirmed without the support of the class of General Unsecured Claims.

## BACKGROUND

8. On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code").  On October 14, 2005, the three remaining Debtors similarly filed voluntary petitions.

9. The Committee was appointed nine days after the Petition Date, on October 17, 2005.[4]  Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker.

10. On December 18, 2006, the Debtors filed a motion for an order approving the Original EPCA.  That motion was granted on January 12, 2007.  However, the Debtors were unable to convert the Original EPCA into a plan of reorganization, and on July 7, 2007 the Original EPCA was terminated by the parties thereto.

11. On July 18, 2007, the Debtors filed an expedited motion for an order approving a new equity purchase and commitment agreement (the "EPCA") with the affiliates of Appaloosa Management L.P. ("Appaloosa"); Harbinger Capital Partners Master Fund I, Ltd.; Merrill Lynch, Pierce, Fenner & Smith Inc.; UBS; Goldman Sachs & Co.; and Pardus Capital Management L.P. (collectively, the "Plan Investors").  The EPCA outlined the terms of the

---

[4] The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee; (e) Tyco Electronics Corporation and (f) SABIC Innovative Plastics US LLC.  The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

6

investment and the expected treatment of the Debtors' stakeholders in the anticipated plan of reorganization and provided a framework for several other aspects of the Debtors' reorganization. On August 2, 2007, this Court granted the motion and approved the EPCA.[5]

13. On September 6, 2007, the Debtors filed initial versions of their plan of reorganization and disclosure statement, which embodied the structure contained in the EPCA. On September 7, 2007, the Debtors filed a motion seeking, among other things, entry of an order approving the disclosure statement.

13. On October 29, 2007, the Debtors filed their *Notice Of Potential Amendments to Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto*, which included their first amended disclosure statement (the "Disclosure Statement") and accompanying proposed first amended plan of reorganization (the "Plan").

14. Also on October 29, 2007, the Debtors filed their *Expedited Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase And Commitment Agreement* (the "EPCA Amendment Motion") seeking this Court's approval for the proposed amendment to the EPCA (the "EPCA Amendment") entered into by the Debtors and the Investors.

15. On November 6, 2007, after the Debtors filed the Motion, Appaloosa filed a Schedule 13D/A with the U.S. Securities and Exchange Commission (the "Schedule 13D/A"). In its Schedule 13D/A, Appaloosa disclosed that the conditions to the effectiveness of the EPCA Amendment had not been satisfied and that as a result, the EPCA Amendment had been

---

[5] This was in fact the second version of the EPCA. As discussed above, the Original EPCA was approved by this Court on January 12, 2007, and subsequently terminated on July 7, 2007.

7

NY\1347249.5

terminated in accordance with its terms.  *See* Schedule 13D/A, at 11 ("On November 6, 2007, as a result of certain of the conditions set forth therein not being satisfied, the Revised Proposal terminated in accordance with its terms.").

16.    On November 7, 2007, this Court entered the *Second Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Motion to Amend Investment Agreement*, which, among other things, adjourned the hearing on the Disclosure Statement to November 29, 2007, and provided that the "Debtors shall use commercially reasonable efforts to file a notice of any further proposed amendments to the Plan and Disclosure Statement" by November 16, 2007.  *See Second Supplemental Disclosure Statement Order* at ¶¶ 2-3.

17.    On November 14, 2007 the Debtors filed their *Notice of Further Proposed Amendments to Certain Appendices to Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession* (the "Notice").  Attached to the Notice were exhibits containing marked changed pages to the Debtors' Plan and related exhibits, including the amendments to the EPCA.

## OBJECTION TO THE DISCLOSURE STATEMENT

18.    Section 1125(b) of the Bankruptcy Code requires that before acceptances of a proposed plan may be solicited, the plan proponent must transmit to all holders of claims and interests "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  *See* 11 U.S.C. § 1125(b).  Section 1125(a) of the Bankruptcy Code, as applicable to the Debtors' chapter 11 cases, defines "adequate information" as

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the

> debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan[.]

11 U.S.C. § 1125(a)(1) (pre-BAPCPA).[6]

19. Under section 1125 of the Bankruptcy Code, a disclosure statement must contain adequate information such that a hypothetical reasonable investor may make an informed judgment about acceptance or rejection of a plan. *See* 11 U.S.C. § 1125(a); *see also Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) (stating that section 1125 of the Bankruptcy Code "seeks to guarantee a minimum amount of information to the creditor asked for its vote."). Sufficient financial information must be provided so that a creditor can make an informed judgment whether to accept or reject the plan. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (noting that "substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

20. Although the type and amount of information required to be contained in a disclosure statement varies from case to case, section 1125 of the Bankruptcy Code is biased toward more disclosure than less. *See, e.g.*, *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (stating that "[b]ecause creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed

---

[6] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective as of October 17, 2005 and does not affect these chapter 11 cases, which were filed on October 8, 2005.

9

reorganization plan, the importance of full and honest disclosure cannot be overstated"); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3rd Cir. 1988) (stating that the fact that creditors and courts heavily rely on disclosure statements increases a debtor's obligation to provide necessary, adequate information upon which such parties can make informed decisions regarding proposed plan). It is not only the quantity, but also the quality, of the disclosed information that matters. Frequently, courts have found that a disclosure statement that does not provide sufficient factual support for its position cannot be approved. *See, e.g.*, *In re Egan*, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) (noting that a disclosure statement is "intended to be a source of factual information upon which one can make an informed judgment about a reorganization plan.").

21.     Here, the Debtors' Disclosure Statement fails to provide adequate information concerning matters that are important to the Debtors' creditors in their evaluation of whether to vote for or against the Plan. As discussed further below, the Committee opposes any plan (the "New Plan") that embodies the new plan proposal (the "New Plan Proposal"), which the Committee had no role in negotiating, and believes that the New Plan cannot be confirmed without the support of the general unsecured creditors, and as a result is completely unconfirmable.

22.     In sum, the New Plan Proposal represents an unreasonably large shift of value from general unsecured creditors to the Plan Investors. As described above, on several occasions already, the Plan Investors have changed the terms of their investment (each time insisting on acquiring more and more of the reorganized equity for the same purchase price). Using the current state of the credit markets as a rationale for demanding this latest re-trade, the Plan Investors now have insisted on being able to invest in the reorganized Debtors at a far steeper

10

discount to plan value than the Committee has ever found acceptable. In fact, the blended total enterprise value at which the Plan Investors have agreed to invest is now only $10.45 billion, almost $1 billion below the "buy-in" price agreed to by the Plan Investors a mere month ago. This has made the cost to the Debtors and their estates of raising new capital prohibitively expensive. Nevertheless, without seeking input from the Committee, Delphi's management and advisors have agreed to the Plan Investors' latest proposal. It appears to be GM's insistence on receiving cash that is principally driving this downward-spiraling process; if so, GM should sell its own distributions to the Plan Investors at a discount, rather than seeking to impose that discount on the unsecured creditors.

23.   Under the terms of the New Plan Proposal, if unsecured creditors receive the recovery being touted therein (*i.e.,* the shares of reorganized Delphi achieve "plan value" in the marketplace), the Plan Investors will make an immediate profit well in excess of 55%. However, it is extremely unlikely that that value will be achieved, as it would require the enterprise value of the reorganized Debtors to be significantly higher than the mid-point of the range of valuations calculated by Rothschild, Inc., financial advisors to the Debtors. This is the result of the Plan Investors' insistence that they be allowed to purchase equity at lower and lower enterprise values. As their buy-in price drops, the enterprise value that the Debtors must achieve (the "plan value" referred to above) for unsecured creditors to receive a full recovery goes up. With this New Plan Proposal, the plan value has far exceeded the Committee's tolerance.

24.   Viewed another way, because little has happened over the recent period that would decrease the Debtors' enterprise value, the reduction in the Plan Investors' buy-in price from that in the EPCA Amendment represents a transfer of value to the Plan Investors. If enterprise value is static, the additional value transferred to the Investors must be taken from

11

NY\1347249.5

another constituency. Delphi's management and advisors have asked just one constituency to pay for this giveaway of value to the Investors: the unsecured creditor body. GM is not being asked to sacrifice at all, and the MDL Plaintiffs (despite the fact that their claims are legally subordinated to general unsecured claims) still stand to receive a recovery on par with unsecured creditors. The equity also receives a substantial recovery. As fiduciaries for unsecured creditors, the Committee simply cannot agree to or recommend the terms of this New Plan Proposal, which guts the value of distributions to unsecured creditors while GM suffers no reduction in its distribution and the MDL Plaintiffs and current equity holders retain significant value.

25. For the foregoing reasons, certain modifications to the Disclosure Statement are necessary. First, the last sentence of the first paragraph of Section F of the Executive Summary must be replaced with the following bolded text:

> **The Plan is not supported by the Creditors' Committee on behalf of unsecured creditors. The Creditors' Committee opposes confirmation of the Plan.**

*See* Disclosure Statement at x.

26. Second, the last sentence of the last paragraph of Section G of the Executive Summary must be deleted and the following must be inserted as a new, separate paragraph immediately after the last paragraph of Section G (in the same style, font size and formatting as the existing text):

> **THE CREDITORS' COMMITTEE STRONGLY OPPOSES THE PLAN AND BELIEVES THAT THE PLAN DOES NOT PROVIDE APPROPRIATE OR ACCEPTABLE RECOVERIES FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTORS. MOREOVER, THE CREDITORS' COMMITTEE BELIEVES THAT THE CLASS OF GENERAL UNSECURED CLAIMS WILL REJECT THE PLAN AND THAT THE PLAN CANNOT BE CONFIRMED OVER THE REJECTION OF SUCH CLASS. THE CREDITORS' COMMITTEE STRONGLY**

12

**RECOMMENDS THAT YOU VOTE TO REJECT THE PLAN.**

*See* Disclosure Statement at x.

27.     Finally, because of the significance of the Committee's opposition to the Plan and the importance that such opposition, and the reasons for it, be disclosed to holders of interests and claims entitled to vote on the Plan, the Committee requests that the Court require the Debtors to include in each Solicitation Package a letter from the Committee to recipients of Solicitation Packages in the form of Exhibit A hereto.  Specifically, the Committee requests that the Court require the Debtors to include such letter inside the front cover of the Disclosure Statement in each Solicitation Package.  This will ensure that the Committee's opposition to the Plan, the reasons for such opposition, its recommendation that unsecured creditors vote to reject the Plan and its belief that the class of General Unsecured Claims will reject the Plan, rendering the Plan uncomfirmable, will be disclosed to those parties entitled to vote on the Plan so that such parties can make an informed decision regarding their votes.

NY\1347249.5

**WHEREFORE,** the Committee respectfully requests that this Court (a) reject the Disclosure Statement unless the infirmities described herein are remediated and (b) grant the Committee such other relief that it deems just and proper under the circumstances.

Dated: November 21, 2007
New York, New York

**LATHAM & WATKINS LLP**

By: /s/ Robert J. Rosenberg
 Robert J. Rosenberg (RR-9585)
 Mitchell A. Seider (MS 4321)
 Mark A. Broude (MB-1902)
 885 Third Avenue, Suite 1000
 New York, New York 10022
 Telephone: (212) 906-1200

Attorneys for the Official Committee
of Unsecured Creditors

14

NY\1347249.5

# Exhibit A

[      ], 2007

       The Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors") is providing this letter to all holders of General Unsecured Claims against the Debtors to set forth the Committee's position on the Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (the "Plan").[1]  In short, **the Committee urges holders of General Unsecured Claims to vote to reject the Plan**.

       **Under the Plan you will not be receiving a check, or any cash at all, but instead will be receiving stock and the right to purchase more stock.**

       Under the Plan, you will be receiving two forms of consideration:  75.5% of your recovery comes from shares of New Common Stock at an assumed "plan value" of $61.72 per share (which equates to a $13.4 billion total enterprise value for Reorganized Delphi), and 24.5% comes from the right to purchase New Common Stock at a price of $38.39 per share.  At the same time, the Plan Investors are being allowed to purchase New Preferred Stock at a common-stock equivalent price of $38.39 per share (representing a $10.25 billion total enterprise value for Reorganized Delphi, **$3.183 billion less than the value at which you are receiving stock**).  Thus, you are being asked to accept stock at a value that is 60% higher than the price at which the Plan Investors are acquiring stock.  Further, **the only way in which you will achieve the purported "par plus accrued" recovery that the Debtors are touting is by coming out of pocket and purchasing all of the New Common Stock offered to you**.  The Committee strongly believes that this proposal is unacceptably favorable to almost every other constituency (particularly the Plan Investors) and unfavorable to you, and thus strongly opposes the Plan.  Yet at the same time that you are receiving and paying for this illusory recovery, and even though you have not truly been paid in full, other constituencies that are junior to you – including the MDL Plaintiffs and the Existing Equity – are receiving material recoveries, recoveries that come out of your pocket.

       In addition, the Plan has defects that will cause further deterioration to your recovery.  First, the Plan provides that Post-Petition Interest ceases accruing on January 31, 2008, regardless of when the Plan is confirmed and consummated.  Second, the Debtors essentially have the right to waive the requirement that General Unsecured Claims not exceed a set amount, which will entitle the Plan Investors to even more equity, further diluting your recovery.  All of this puts your recovery at further risk.

       Because the Committee objects to the allocation of large amounts of value away from you, the Committee has withdrawn its support of the Plan, and indeed, strongly opposes the Plan.  The Committee believes that the General Unsecured Claims will vote overwhelmingly to reject the Plan, and that the Plan cannot be confirmed over the rejection of this class.

       The Committee urges you to read the Disclosure Statement carefully, so that you fully and completely understand the Plan and the bases for the Committee's opposition.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

NY\1335797.6

**FOR THE FOREGOING REASONS, THE COMMITTEE STRONGLY OPPOSES THE PLAN AND URGES HOLDERS OF GENERAL UNSECURED CLAIMS TO VOTE TO REJECT THE PLAN.**

NY\1335797.6