**LATHAM & WATKINS LLP**

885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
   mitchell.seider@lw.com
   mark.broude@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE EXPEDITED MOTION FOR ORDER UNDER
11 U.S.C. §§ 105(a), 363(b), 503(b) AND 507(a) AUTHORIZING AND
APPROVING AMENDMENT TO DELPHI-APPALOOSA EQUITY
PURCHASE AND COMMITMENT AGREEMENT FILED ON NOVEMBER 14, 2007**

   The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation, *et al.* (collectively, the "Debtors"), by and through its

counsel, hereby files this objection to the *Expedited Motion for Order Under 11 U.S.C. §§*

*105(a), 363(b), 503(b) and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa*

*Equity Purchase and Commitment Agreement* (the "Motion"), as it relates to the Restated First

Amendment to the Equity Purchase and Commitment Agreement (the "Restated EPCA

Amendment") that the Debtors filed with this Court on November 14, 2007.  In support of this

Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Pursuant to the Motion, the Debtors are seeking this Court's imprimatur on a transaction that has been dictated to the Debtors by the Plan Investors (as defined below).  On several occasions now the Debtors have capitulated to the demands of the Plan Investors to re-trade the economic terms of the Plan Investors' sponsorship of the Debtors' plan of reorganization, even though those demands had nothing to do with any changes to the Debtors' fundamental enterprise value.  Quite simply, the Plan Investors have insisted upon receiving opportunities for increased short-term gain as the price for their remaining in the transaction, and the Debtors have acceded to those demands without regard to the consequences.  With each re-trade, the benefits to the Plan Investors have gone up while the treatment of unsecured creditors has deteriorated.  Such a trade-off is fundamentally at odds with the fiduciary duties that the Debtors owe to their creditors.

2.        The Debtors now attempt to hide behind their purported "business judgment" as the basis for seeking this Court's approval of the Restated EPCA Amendment.  In their view, the analysis should be limited to whether the Debtors' board was informed and deliberative, without regard to the outcome.  Yet we have reached the point where no deal can be so justified.  This is not simply a question of myopically reviewing the process by which the board reached its conclusion.  The actual terms of the deal and its broader context make clear that the proposed transaction cannot be justified on any grounds.  This Court should analyze the Motion in light of the Debtors' fiduciary duties to its stakeholders.  Providing more and more favorable economics to the Plan Investors at the expense of unsecured creditors, and knuckling under repeatedly to the demands of the Plan Investors, is frankly inconsistent with those duties.  Kowtowing to the Plan Investors is not the fulfillment of fiduciary duties, but instead represents the Debtors' abdication

of those duties.  The Debtors have sacrificed their duties at the altar of the deal (a deal that is

opposed by virtually all the beneficiaries of the Debtors' fiduciary duties) and still seek this

Court's blessing.  This Court should see the transaction for the one-sided deal that it is and

withhold that blessing.  This Court should deny the Motion.

## BACKGROUND

### A.    General Background

3.        On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this

Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14,

2005, the three remaining Debtors also filed voluntary petitions.

4.        The Committee was appointed nine days after the Petition Date, on October 17,

2005.[1]  Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel,

Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its

investment banker.

### B.    The History of the EPCA

5.        The transaction embodied by the Restated EPCA Amendment represents the

fourth iteration of the Debtors' attempts to propose a plan of reorganization with the sponsorship

of the Plan Investors.  With each iteration of the EPCA and the proposed plan of reorganization

embodied in that agreement, the treatment of general unsecured creditors has gotten

progressively worse, while the economics for the Plan Investors have gotten progressively better.

---

[1]  The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale
Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee; (e) Tyco Electronics
Corporation and (f) SABIC Innovative Plastics US LLC.  The Pension Benefit Guaranty Corporation and the
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio*
members of the Committee.

NY\1348621.5

6.     In the Debtors' first proposed plan construct in early 2007, envisioned by the

original Equity Purchase and Commitment Agreement (the "Original EPCA") among Delphi

Corp.; A-D Acquisition Holdings, LLC (an affiliate of Appaloosa Management L.P.

"Appaloosa"); Dolce Investments LLC (an affiliate of Cerberus Capital Management, L.P.);

Harbinger Del-Auto Investment Company, Ltd. (an affiliate of Harbinger Capital Partners

Master Fund I, Ltd.); Merrill Lynch, Pierce, Fenner & Smith Inc.; and UBS Securities LLC,

general unsecured creditors were to receive distributions equal to the full amount of their claims

plus post-petition interest at a negotiated plan value that was higher than the midpoint of

Rothschild Inc.'s range of valuations for the Debtors (what is informally referred to as "par plus

accrued" recovery).[2] Eighty percent of the distributions would have been in the form of cash and

the remaining 20% would have been in the form of equity in the reorganized Debtors.  By order

dated January 12, 2007, this Court approved the Original EPCA.  However, because of various

disagreements among the parties thereto, the Original EPCA was terminated in the early summer

of 2007.

7.     On July 18, 2007, the Debtors filed a motion for authority to enter into a new

Equity Purchase and Commitment Agreement (the "August EPCA") with A-D Acquisition

Holdings, LLC; Harbinger Del-Auto Investment Company, Ltd.; Merrill Lynch, Pierce, Fenner

& Smith Inc.; UBS; Goldman Sachs & Co.; and Pardus DPH Holding LLC (an affiliate of Pardus

Capital Management L.P.) (collectively, the "Plan Investors").  The Committee did not object to

that motion, and on August 2, 2007, this Court approved the August EPCA.  The August EPCA

formed the basis of the Debtors' first plan of reorganization that was filed on September 6, 2007,

which provided for the Plan Investors to invest in the reorganized Debtors at a blended total

---

[2]  Rothschild Inc. is the Debtors' financial advisor and investment banker.

NY\1348621.5

enterprise value of approximately $12.3 billion, and still provided for a "par plus accrued" recovery to general unsecured creditors at a negotiated plan value that was higher than the midpoint of Rothschild Inc.'s range of valuations for the Debtors. However, the allocation of distributions to general unsecured creditors under that plan had reversed from that embodied by the Original EPCA to 20% in cash and 80% in equity.

8.     Citing various events in the Debtors' chapter 11 cases and the state of the credit markets, in October 2007 the Plan Investors insisted on amending the August EPCA in a manner beneficial to the Plan Investors and harmful to the Debtors' other constituencies. This is despite the fact that the credit market conditions were known by all parties when this Court entered its order approving the August EPCA. In this third iteration of the deal, the Plan Investors would invest in the reorganized Debtors at a blended total enterprise value of approximately $11.6 billion (versus approximately $12.3 billion in the plan formulated under the August EPCA). Moreover, under the October plan construct, general unsecured creditors would not receive any cash recovery, but rather would have to purchase their recoveries. Specifically, general unsecured creditors were to receive 92.4% of their recovery in equity (at an assumed plan value of $13.044 billion) and the remainder of their recovery was to be in the form of a rights offering, under which they would have the opportunity to purchase new equity at a discount to plan value. However, to achieve the touted "par plus accrued" recovery at negotiated plan value, general unsecured creditors would have to exercise their rights in full. As such, general unsecured creditors who are unable or unwilling to pay for new equity would receive much less than a "par plus accrued" recovery. The Debtors filed a motion to approve this amendment to the August EPCA on October 30, 2007 (docket number 10760), and the Committee filed an objection to that motion on November 2, 2007. The Court did not rule on that motion.

9.        After one of the Plan Investors balked at executing the October amendment to the

August EPCA, that amendment was terminated but the August EPCA remained in place.  The

Debtors agreed to this last demand by the Plan Investors' to re-trade (yet again) the terms of their

investment to provide even more economic value to the Plan Investors.  The August EPCA as

amended by the Restated EPCA Amendment (the "Amended EPCA"), which the Committee had

no role in negotiating, further reduces the price at which the Plan Investors may purchase equity

in the reorganized Debtors, allowing them to acquire even more of the reorganized Debtors'

equity for the same investment.  The blended total enterprise value at which the Plan Investors

would invest now is only approximately $10.45 billion (versus approximately $11.6 billion under

the October amendment and approximately $12.3 billion in the August EPCA).[3]

10.        Because little has happened since August that would cause the Debtors' enterprise

value to fall, this reduction in the Plan Investors' buy-in price from $12.3 billion to $10.45

billion simply represents a transfer of value to the Plan Investors.  *It is not an accurate reflection

of the intrinsic value of the Debtors' businesses.*  As the Plan Investors' buy-in price drops, the

enterprise value that the Debtors must achieve for general unsecured creditors to receive a full

recovery increases.  However, if real enterprise value remains static, a zero-sum game exists and

the additional value being transferred to the Plan Investors must be taken away from another

constituency.  Put another way, to provide the Proposed Investors with the additional economic

benefits that they demanded in their latest re-trade, the Debtors had to take value away from

someone else.  The Debtors and the Plan Investors have decided to yank that value away from

only one constituency – the general unsecured creditors.  Notably, General Motors Corporation

---

[3]  This equity valuation is 15% below the buy-in valuation agreed to by the Plan Investors in early November, and
far below the lowest end of the valuation range set by Rothschild, the Debtors' own investment banker, at that time.
Moreover, 82% of the Plan Investors' investment would be in the form of preferred stock that has considerable
additional  value in terms of preferential status, dividends and governance rights.

(whose claims are potentially subject to subordination to general unsecured claims pursuant to section 510(c) of the Bankruptcy Code) and the Multi-District Litigation plaintiffs (whose claims are legally subordinated to those of general unsecured creditors) are not giving up anything, and current equity holders still retain significant value (indeed, the value being provided to equity actually increased under the Restated EPCA Amendment).

11.    Under the Amended EPCA, the Debtors still must pay total commitment fees to the Plan Investors totaling $57,375,000 (consisting of an $18 million Preferred Commitment Fee and a $39,375,000 Standby Commitment Fee) and a $6,375,000 arrangement fee.  *See* Amended EPCA, § 2(h).  Upon this Court's approval of the Motion, the Debtors would have to pay the Plan Investors a total of $28,687,500 (representing the remaining 50% of the commitment fees that had not already been paid to the Investors).  *See id.*, 2(h) (as amended by §1(j) of the Restated EPCA Amendment).

###         C.    The Current Plan Proposed by the Debtors

12.    Under the Amended EPCA and the Debtors' currently proposed plan of reorganization (the "Plan") as described in the Restated EPCA Amendment, general unsecured creditors would receive a combination of new equity and rights to purchase new equity (but no cash).  However, under the Plan, the value has shifted even further away from the direct equity grant, because general unsecured creditors would now receive only 75.5% of their recovery in new equity (and that at a higher assumed plan value of $13.433 billion, as compared to $13.044 billion under the aborted October amendment) with the rest in the form of rights to purchase new equity at $38.39 per share.  General unsecured creditors who do not have the ability or desire to purchase new equity or access the capital markets to sell their rights will receive only a paltry recovery.

7

13.    Notably, while general unsecured creditors are being treated significantly worse than ever under the Plan terms filed with this Court on November 14, holders of existing Delphi common stock are being treated much better than they had been in the previous iteration of the Plan .  Specifically, the estimated recovery for existing Delphi common stockholders increased from approximately $69 million under the Plan terms filed on October 29, to approximately $190 million under the Plan terms filed on November 14.

14.    As it noted in its objection to the Debtors' motion to approve the exit facility engagement and fee letters, the Committee strongly opposes the Plan.  Furthermore, based upon the objections to various motions that have been filed by other significant creditors, and based upon the market's reaction to the Amended EPCA, the Committee believes that the unsecured creditor body as a whole resoundingly will reject the Plan.  Because the Plan provides for distributions to junior parties in complete disregard of the absolute priority rule (*e.g.*, providing distributions to contractually and statutorily subordinated creditors as well as equity holders without regard to whether senior creditors have been paid in full), the Plan will be unconfirmable if the general unsecured creditor classes reject it.

### D.    The Lockup Arrangements

15.    Given that the Amended EPCA is the vehicle by which value is unjustifiably being taken from general unsecured creditors, the Committee believes that alternative sources of plan funding should be pursued.  **However, the continuing existence of the August EPCA and certain ancillary documents not previously disclosed to this Court inhibit, if not eliminate, the Debtors' and the Committee's ability to explore alternative sources of plan funding, because the Plan Investors and other potential investors have signed agreements prohibiting them from pursuing an alternate transaction or taking any other action that**

**can reasonably be expected to lead to an alternate transaction.**  These "lockup" provisions
are set forth in paragraph 8(d) of a letter agreement among the Plan Investors, dated July 18,
2007 (the "Side Letter") and in paragraph 12 of that certain Additional Investor Agreement,
dated July 23, 2007 (the "Additional Investor Agreement").  The parties to the Additional
Investor Agreement (other than the Plan Investors) are not publicly identified therein, so it is not
possible for the Committee or this Court to know at this time which institutions have agreed to
these lockup provisions.  The publicly-filed versions of the Side Letter and the Additional
Investor Agreement are annexed hereto as Exhibits A and B, respectively.[4]

## OBJECTION

16.    Because the Amended EPCA improperly diverts significant value from general
unsecured creditors to the Plan Investors and forms the basis of a doomed Plan, the Motion must
be denied.  The Debtors can point to no rational business judgment to support their decision to
agree to the Plan Investors' demands to re-trade the August EPCA, particularly where (a) the
Plan Investors may still be legally obligated to perform under the August EPCA and (b) the
result of the re-trade is a reorganization plan that is not supported by any major constituency
other than General Motors Corporation (which needs the Debtors to raise outside capital so that
it can retain its cash distributions under a reorganization plan).  The decision to pursue the
current Plan also is not an appropriate exercise of the Debtors' business judgment because that
Plan likely will be soundly rejected by the classes of unsecured creditors, and thus would be
unconfirmable because it violates the absolute priority rule.

---

[4]  The version of the Side Letter annexed hereto as Exhibit A was filed with the Securities and Exchange
Commission on Schedule 13D/A on July 20, 2007.  The version of the Additional Investor Agreement annexed
hereto as Exhibit B was filed with the Securities and Exchange Commission on Schedule 13D/A on July 25, 2007.

NY\1348621.5

17.    However, in evaluating this Motion, it is apparent that the Debtors' business judgment is not the end of the analysis, or quite frankly even the beginning.  Instead, this Court should examine whether the Debtors' directors and officers properly have exercised their fiduciary duties to creditors by agreeing to the exorbitant demands of the Plan Investors.  Where a debtor had breached its fiduciary duties in connection with a transaction, the business judgment rule no longer applies to the Court's analysis of that transaction.  *See, e.g.*, *Mims v. Kennedy Capital Management, Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 111-12 (Bankr. N.D. Tex. 1999) (stating that "[a]ny business justification [the CEO and Board Chairman] might provide for the proposed sale cannot be a sound business justification in light of his breaches of the duty of care and the duty of loyalty."); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (stating that the business judgment rule in Delaware is rebutted if there is evidence that the directors breached their fiduciary duties).[5]

18.    This is not a simple transaction outside the ordinary course of business, such as the sale of an asset or line of business.  Rather, the Debtors are seeking to enter into an agreement that sets the terms of their plan of reorganization, that seeks to determine how all creditors and equityholders are to be treated.  As such, this Court's analysis must go beyond the Debtors' business judgment, and the deference to management that that standard implies.  Instead, this Court should evaluate the Restated EPCA Amendment through the prism of the fiduciary duties that the Debtors owe to their stakeholders (which are most certainly not owed to the Plan Investors).  This Court must examine whether the Debtors' directors and officers properly have exercised their fiduciary duties to creditors by agreeing to the exorbitant demands

---

[5]  Delphi Corporation is incorporated in Delaware.  In Delaware, the business judgment rule is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.  *See Technicolor,* 634 A.2d at 360.

NY\1348621.5

of the Plan Investors.  The Debtors' (a) agreement to amend the August EPCA to take substantial value away from general unsecured creditors for the benefit of the Plan Investors, based on the Plan Investors' excuses about the credit markets and the Debtors' businesses, and (b) dogged pursuit of a Plan that the two official committees (who represent the constituencies to whom the Debtors owe their fiduciary duties) and several of the Debtors' largest creditors vehemently oppose, raise serious doubts about whether the Debtors are acting with the unsecured creditors' best interests in mind.  Indeed, it appears that the Debtors are looking after the interests of the Plan Investors only.  When this Motion is examined through the lens of whether the Debtors properly have exercised their fiduciary duties, it is clear that they have not done so, and that the Motion should be denied.

19.    The Debtors have capitulated to the Plan Investors' demands and transferred value away from unsecured creditors in an attempt to placate the Plan Investors and to secure a quick exit from chapter 11.  It cannot honestly be argued that the value of the Debtors' businesses deteriorated so much since August or October to justify the massive reduction in enterprise value at which the Plan Investors have now agreed to invest.  The Plan Investors are using their power to hold up the Debtors (derived largely from the lockups discussed below) to demand that the Debtors give them more.  It is not a proper exercise of business judgment or a valid exercise of fiduciary duties to take value from unsecured creditors in this fashion.

20.    The Committee particularly is disturbed about the lockup provisions of the Side Letter and the Additional Investor Agreement, which remain in effect as long as the August EPCA exists, and which could be extended under the Additional Investor Agreement even after the termination of the August EPCA.  These lockup provisions prohibit the Plan Investors, their affiliates, their directors, their agents, and any other investor that participates in the transactions

11

described in the August EPCA from taking any action that might reasonably be expected to lead to an alternate transaction. This means that potential investors who signed the lockup, but might be willing to pursue an alternate transaction, are forbidden from participating in any transaction that might actually reflect the fundamental value of the Debtors' enterprise.

21.    Paragraph 8(d) of the Side Letter states that until December 31, 2007 (or such later date as may be mutually agreed by the Plan Investors, such agreement not to be unreasonably withheld), the Plan Investors shall:

> "not, directly or indirectly (i) initiate, solicit, knowingly cooperate with, or knowingly encourage any inquiries or the making of any proposal or offer that constitutes, or can reasonably be expected to lead to, any Alternate Transaction, (ii) engage in, continue, or otherwise participate in any negotiations regarding any Alternate Transaction, (iii) enter into any letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternate Transaction or (iv) withhold, withdraw, qualify, or modify (or resolve to do so) in a manner adverse to the parties to this letter agreement its approval or recommendation of this letter agreement, the Plan or the transactions contemplated hereby and thereby; and that it will cause its subsidiaries and controlled affiliates not to undertake, directly or indirectly, any of the actions described in the immediately preceding clauses (i) through (iv); and that it will use its commercially reasonable efforts to cause its respective directors, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives not to undertake, directly or indirectly, any of such actions; provided however, that if this provision is extended beyond December 31, 2007, with [Appaloosa]'s prior consent, all parties hereto may be released from any and all of the foregoing prohibitions of this letter agreement[.]"

Side Letter ¶ 8(d). The Side Letter terminates upon the earliest to occur of (a) the termination of the EPCA in accordance with its terms, (b) the closing date of the transaction and (c) a "limited termination" by any Plan Investor other than the Appaloosa affiliate on or after June 30, 2008. *See* Side Letter ¶ 9.

22.    While section 8(d) of the Side Letter states that the lockup period may end on December 31, 2007, the Plan Investors may not "unreasonably withhold" their consent to extend the lockup period to a later date. If the lockup period is extended, then the Plan Investors can be

NY\1348621.5

released from their lockup obligations only with Appaloosa's consent.  Because no

reorganization plan will be confirmed and become effective before December 31, it is a near

certainty that the lockup period will extend past December 31.  If the lockup period is extended

past that date, then the Plan Investors must obtain Appaloosa's consent to be released from their

lockup obligations.  Given Appaloosa's interest in retaining its negotiation leverage over the

Debtors, it is very unlikely indeed that it would consent to any Plan Investor being released from

its lockup obligations.

     23.     Paragraph 12 of the Additional Investor Agreement (which is titled "Non-

Interference") provides as follows:

> "(a) Each Additional Investor represents, warrants and covenants that neither it
> nor any of its Affiliates is, and it will not become and will cause its Affiliates to
> not become, a party to or participant in any competing or other transaction
> inconsistent with this Agreement or the EPCA. …"

Additional Investor Agreement ¶ 12.[6]  With certain exceptions, the Additional Investors' lockup

obligations under paragraph 12 of the Additional Investor Agreement expire upon the

termination of the EPCA in accordance with its terms.  However, the termination of the EPCA

for purposes of the Additional Investor Agreement will not be effective if the "Initial Investors"

(*i.e.*, the affiliate of Appaloosa, the affiliate of Harbinger, UBS and Merrill Lynch) notify the

Additional Investors that they have submitted to the Debtors a substantive proposal for, or are

actively negotiating with the Debtors regarding, a transaction similar to those described in the

EPCA.  *See id.* ¶ 11.  This means that the Initial Investors can continue to bind the Additional

Investors to their lockup obligations under the Additional Investor Agreement either by

submitting a substantive proposal to the Debtors, or simply "actively negotiating with or entering

---

[6] Paragraph 12 of the Additional Investor Agreement excludes "fiduciary affiliates" from the lockup provision, and
permits Additional Investors to engage in certain transactions with the Debtors, so long as those transactions are not
connected with a "Competing Transaction" as defined in the Additional Investor Agreement.

into" a similar transaction with the Debtors.  In effect, Appaloosa and the other Initial Investors
can maintain their leverage over the Debtors by continuing the Additional Investors' obligations
under the lockup in perpetuity.

24.    Making matters worse, the Additional Investor Agreement does not specify who
the "Additional Investors" are.  The term "Additional Investor" is defined in the Additional
Investor Agreement as "the investors listed on the signature pages hereto."  *See* Additional
Investor Agreement, Recitals.  These signature pages have not been publicly filed.  Accordingly,
the Committee and this Court are unable to determine exactly who has agreed to prohibit
themselves from exploring alternate transactions.  From all appearances, Appaloosa and the other
Plan Investors are attempting to lock up as many potential investors as possible, while refusing to
disclose who is being locked up.

25.    By blocking the Debtors' and the Committee's access to other potential investors,
the lockup provisions of the Side Letter and Additional Investor Agreement effectively prevent
the Debtors and the Committee from pursuing an alternative investment arrangement that does
not involve Appaloosa.  This gives Appaloosa a "blocking position" that enables it to hold the
Debtors' reorganization hostage to its demands.  The Committee emphatically opposes the
lockup provisions of these agreements, and for obvious reasons, the Debtors should oppose them
as well.  That the Debtors appear to support these lockup provisions further calls into question
their business judgment and whether their directors and officers truly are exercising their
fiduciary duties to creditors.

26.    The Debtors should be demanding that the Plan Investors perform under the
August EPCA.  Indeed, it is doubtful that the Plan Investors are legally entitled to back away
from their obligations thereunder.  If the Plan Investors refuse to close the transaction described

in the August EPCA, then the Debtors should seek this Court's permission to terminate the

August EPCA because it is impossible to perform.[7]  In addition, if the Plan Investors refuse to

perform under the terms of the August EPCA, this Court should release all parties from their

obligations under the lockup provisions of the Side Letter and the Additional Investor

Agreement, so that a new transaction that makes economic sense can be negotiated with full

recognition of the Debtors' fundamental enterprise value.  The Debtors are not making those

demands to the Plan Investors or those requests to this Court.  The path the Debtors have chosen

in no way can be interpreted as an appropriate exercise of business judgment or as a fulfillment

of their fiduciary duties.[8]

        27.     Finally, if this Motion is approved, the Plan Investors would be entitled to a

$28,687,500 commitment fee installment payment under the EPCA.  *See id.* ¶ 2(h) (as amended

by ¶ 1(j) of the Restated First Amendment to the Equity Purchase and Commitment Agreement).

Given the broad opposition to the Plan, the Committee believes that the classes of general

unsecured creditors will vote overwhelmingly to reject the Plan.  The Plan violates the absolute

priority rule, so it cannot be confirmed over the rejection of these classes.  In light of this reality,

the Committee submits that it would be prudent for the Court to deny the Motion and save the

Debtors' estates the cost of the $28,687,500 commitment fee installment.

---

[7]  The Committee is (or soon will be) taking discovery on the matter of whether Appaloosa and the other Plan
Investors intend to perform their obligations under the August EPCA and, if they refuse to perform their obligations,
what legal basis they have for their refusal.  If discovery demonstrates that the Plan Investors are refusing to perform
those obligations, the Committee reserves its right to request that this Court consider an expedited motion by the
Committee to declare the August EPCA terminated and all parties released from the restrictions of the two lock-up
agreements, while preserving any claims for damages against Appaloosa and the other Plan Investors.

[8]  The Committee also reserves the right to file a motion for an order terminating the exclusive periods during which
only the Debtors could file and solicit acceptances for a plan of reorganization, if the Committee determines that the
Debtors are not satisfying their responsibilities to creditors.

NY\1348621.5

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion

and (b) grant it such other relief as is just and proper.

Dated:  November 21, 2007
          New York, New York

**LATHAM & WATKINS LLP**

By: /s/ Robert J. Rosenberg
    Robert J. Rosenberg (RR-9585)
    Mitchell A. Seider (MS-4321)
    Mark A. Broude (MB-1902)
    885 Third Avenue, Suite 1000
    New York, New York 10022
    Telephone:  (212) 906-1200

Counsel for the Official Committee
of Unsecured Creditors

NY\1348621.5

# EXHIBIT A

## Side Letter

```
<DOCUMENT>
<TYPE>EX-99.2
<SEQUENCE>3
<FILENAME>ex99-2.txt
<DESCRIPTION>LETTER AGREEMENT
<TEXT>
```

APPALOOSA MANAGEMENT, L.P.<br>
26 Main Street<br>
Chatham, New Jersey 07928

July 18, 2007

Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn:  Philip A. Falcone

Merrill Lynch, Pierce, Fenner & Smith Incorporated
4 World Financial Center
New York, New York  10080
Attention:  Robert Spork / Rick Morris

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Attention:  Steve Smith / Osamu Watanabe

Goldman Sachs & Co.
1 New York Plaza
New York, NY  10004
Attention:  David Mullen / Tom Wagner

Pardus Special Opportunities Master Fund L.P.
590 Madison Avenue
Suite 25E
New York, NY 10022
Attention: Timothy Bass

Ladies and Gentlemen:

        Reference is made to that certain Equity Purchase and Commitment
Agreement (the "Agreement"), to be entered into by and among A-D Acquisition
Holdings, LLC, a limited liability company formed under the laws of the State of
Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted
company formed under the laws of the Cayman Islands ("Harbinger"), Merrill
Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation ("Merrill"),
UBS Securities LLC, a limited liability company formed under the laws of the
State of Delaware ("UBS"), Goldman Sachs & Co., a limited partnership formed
under the laws of the State of New York ("GS") and Pardus DPH Holding LLC, a
limited liability company formed under the laws of the State of Delaware
("Pardus"; Harbinger, Merrill, UBS, GS and Pardus herein referred to
collectively as the "Other Investors" and each individually as an "Other
Investor"), on the one hand, and Delphi Corporation, a Delaware corporation, on
the
```
<PAGE>
```
other hand. Capitalized terms used but not defined herein shall have the
meanings set forth in the Agreement.

        1.    Appaloosa Management L.P. ("AMLP") hereby acknowledges and agrees
with each Other Investor that it will cause ADAH to not approve the Disclosure

Letter, Plan, Confirmation Order, Business Plan, the Rights Offering Registration Statement, Rights Offering Prospectus and Issuer Free Writing Prospectus, or GM Settlement (or amendments to the foregoing) without first providing drafts of such documents to such Other Investors for their review, to the extent practicable, consulting with such Other Investor regarding such documents and considering in good faith any reasonable comments of such other parties and their respective counsel related thereto.

2.    In addition, through the Closing Date, only to the extent that ADAH is entitled to deliver a deficiency notice as set forth in Section 9(a)(xxviii) of the Agreement with respect to any of the following matters, AMLP agrees that the relevant Material Investment Document will not be satisfactory to ADAH, to the extent any such Material Investment Document materially and adversely modifies the rights of the Series B Preferred Stock as specifically set forth in the Preferred Term Sheet under the headings "Securities to be Issued", "Mandatory Conversion Into Common Stock", "Liquidation Rights", "Ranking", "Conversion of Preferred Stock Into Common Stock", "Dividends", "Preference with Respect to Dividends", "Restriction on Redemptions of Junior Stock", "Registration Rights", "Preemptive Rights", or "Commitment Fee", AMLP will cause ADAH to promptly issue (and not withdraw) a deficiency notice with respect thereto and AMLP shall cause ADAH to use all reasonable efforts to ensure that, if such circumstances exist, the condition set forth in Section 9(a)(xxviii) or any other relevant condition of the Agreement shall not be satisfied or waived.

3.    Additionally, AMLP hereby acknowledges and agrees with each other party that only to the extent that ADAH is entitled to deliver a deficiency notice as set forth in Section 9(a)(xxviii) of the Agreement with respect to any of the following matters, AMLP agrees that the relevant Material Investment Document will not be satisfactory to ADAH, to the extent any such Material Investment Document materially and adversely modifies the rights of the Series B Preferred Stock to appoint a member of the "Search Committee" (subject to determination by ADAH) or with respect to the "Joint Investor Director" (each as defined in the Preferred Term Sheet), the initial term of the Joint Investor Director, or the conversion rights of the Series B Preferred Stock set forth in the Preferred Term Sheet upon a "Change of Control" (as defined in the Preferred Term Sheet) under the heading "Governance - Voting Rights" in the Preferred Term Sheet and AMLP will cause ADAH to promptly issue (and not withdraw) a deficiency notice with respect thereto and AMLP shall cause ADAH to use all reasonable efforts to ensure that, if such circumstances exist, the condition set forth in Section 9(a)(xxviii) or any other relevant condition of the Agreement shall not be satisfied or waived.

4.    Each party hereto represents and warrants to the other parties hereto that such party (and its affiliates) is not party to any agreement with any other party to this Agreement (or its affiliates) relating to the transactions contemplated by the Agreement that has not been disclosed to each other party to this letter agreement.
<PAGE>
5.    Prior to entry of the Confirmation Order, except as set forth in Section 7 hereof, each party hereto agrees that it shall not (and shall cause its subsidiaries and controlled affiliates not to) (a) sell, transfer, assign, pledge, or otherwise dispose, directly or indirectly, of its right, title or interest in respect of its claims against or interests in any of the Debtors (to the extent held by it on the date hereof or acquired hereafter), in whole or in part, or (b) grant any proxies, deposit any such claims or interests (to the extent held by it on the date hereof or acquired hereafter) into a voting trust, or enter into a voting agreement with respect to such claims or interests, as the case may be, unless in the case of either (a) or (b), the transferee agrees in writing at the time of such transfer to be bound by all obligations of the

transferor contained in Sections 5 to 8 of this letter agreement, and the transferor, within three (3) Business Days, provides written notice of such transfer to each other party, together with a copy of the written agreement of the transferee agreeing to be so bound. Each party hereto further agrees that it may not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any member of the Debtors without causing such subsidiary or affiliate to become a party to this letter agreement prior to such acquisition.

          6.   Prior to entry of the Confirmation Order, each party hereto hereby confirms, on a several but not joint basis, that it and its affiliates remains the beneficial holder of, and/or the holder of investment authority over, the claim and interests, if any, previously disclosed in connection with its applicable non-disclosure agreement with the Debtors and that it will advise each party hereto upon any change in its or its affiliates' holdings, except with respect to any transaction covered by Section 7 hereof.

          7.   Notwithstanding anything contained in this letter agreement, each party hereto can, without following the procedures set forth in Sections 5 or 6 hereof, (a) purchase, sell, transfer, pledge or otherwise dispose, directly or indirectly any rights to purchase shares of New Common Stock it receives pursuant to the Rights Offering, (b) engage in market making in any of the Debtors' equity and debt securities as well as claims, and (c) engage in proprietary trading in any of the Debtors' debt securities and claims. The term "subsidiaries", "controlled affiliates" and "affiliates" shall exclude Fiduciary Affiliates. "Fiduciary Affiliates" shall mean, with respect to any party, the specific entities identified as such on Annex A hereto, who are prohibited by their fiduciary duties from complying with this letter agreement. Such Annex A to be delivered to and reasonably satisfactory to each other party within 3 Business Days of the date hereof.

          8.   Unless and until this letter agreement has been terminated, and subject to each party's obligations under this section 8 of this letter agreement being subject to (a) the Plan Terms set forth in Exhibit B to the Agreement, and (b) Delphi and GM reaching agreement on all documents pertinent in any way to GM's participation in the Plan and/or all transactions contemplated thereby, including, without limitation, definitive documentation evidencing all aspects of the commercial, business and labor-related agreements between Delphi and GM and any other Designated Issues (as defined in the Original PSA) (collectively, the "Delphi/GM Definitive Documents"), and provided that any failure by any party to take or refrain from taking, as the case may be, any actions described below in this letter agreement shall not create any claim or cause of action against them or any of their affiliates, each party agrees (and shall cause its respective subsidiaries and controlled affiliates to agree) that it will:
<PAGE>
          (a)   Support the entry by the Bankruptcy Court of an order approving the Disclosure Statement (the "Disclosure Statement Order");

          (b)   Not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to entry of the Disclosure Statement Order;

          (c)   Not, nor will it encourage any other person or entity to, object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with, entry of the Disclosure Statement Order;

          (d)   Until December 31, 2007, or such later date as may be mutually agreed by the parties to this letter agreement (such agreement not to be unreasonably withheld), not, directly or indirectly (i) initiate, solicit,

knowingly cooperate with, or knowingly encourage any inquiries or the making of
any proposal or offer that constitutes, or can reasonably be expected to lead
to, any Alternate Transaction, (ii) engage in, continue, or otherwise
participate in any negotiations regarding any Alternate Transaction, (iii) enter
into any letter of intent, memorandum of understanding, agreement in principle,
or other agreement relating to any Alternate Transaction or (iv) withhold,
withdraw, qualify, or modify (or resolve to do so) in a manner adverse to the
parties to this letter agreement its approval or recommendation of this letter
agreement, the Plan or the transactions contemplated hereby and thereby; and
that it will cause its subsidiaries and controlled affiliates not to undertake,
directly or indirectly, any of the actions described in the immediately
preceding clauses (i) through (iv); and that it will use its commercially
reasonable efforts to cause its respective directors, officers, employees,
investment bankers, attorneys, accountants, and other advisors or
representatives not to undertake, directly or indirectly, any of such actions;
provided however, that if this provision is extended beyond December 31, 2007,
as provided above, from and after December 31, 2007, with AMLP's prior consent,
all parties hereto may be released from any and all of the foregoing
prohibitions of this letter agreement;

        (e)  Support the Confirmation Order; provided, however, that, for the
avoidance of doubt, nothing in this letter agreement is an agreement by any of
the parties hereto to vote to accept or reject the Plan;

        (f)  Not commence any proceeding or prosecute, join in, or otherwise
support any action to oppose or object to the Plan; and

        (g)  Not, nor will it encourage any other person or entity to, delay,
object to, impede, appeal, or take any other action, directly or indirectly, to
interfere with the acceptance, confirmation or occurrence of the effective date
of the Plan.

Notwithstanding any other term or provision of this letter agreement, nothing
herein shall prevent any party hereto from taking any action as it determines is
necessary or appropriate to protect its interests, including, without
limitation, objecting (in writing or orally) or filing a response to any
document, such as the Plan or Disclosure Statement, adversary proceeding or
objection filed in the Chapter 11 Cases by any party in interest.
<PAGE>
        9.   This letter agreement shall become effective only upon the
effectiveness of the Agreement and shall terminate automatically upon the
earliest to occur of (i) the termination of the Agreement in accordance with its
terms, (ii) the Closing Date, and (iii) with respect to any Other Investor
exercising its rights under Section 12(d) of the Agreement, a Limited
Termination.

        This letter agreement shall be governed by, and construed in
accordance with, the laws of the State of New York (without giving effect to the
conflict of laws principles thereof). ADAH AND THE INVESTORS HEREBY IRREVOCABLY
SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE COUNTY
OF NEW YORK, STATE OF NEW YORK AND WAIVE ANY OBJECTION BASED ON VENUE OR FORUM
NON CONVENIENS.

        This letter agreement may be executed in any number of counterparts
and by the parties hereto in separate counterparts, each of which when so
executed shall be deemed to be an original and all of which taken together shall
constitute one and same instrument.

                              *  *  *  *

<PAGE>

Sincerely,

APPALOOSA MANAGEMENT, L.P.


By: /s/ James E. Bolin
    ----------------------
Name:
Title:


Agreed to and accepted as of the date first
above written:

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.

By: Harbinger Capital Partners Offshore
    Manager, L.L.C., as investment manager


By: /s/ William R. Lucas, Jr.
    ------------------------------------------
Name:  William R. Lucas, Jr.
Title: Executive Vice President

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED


By: /s/ Graham Goldsmith
    ------------------------------------------
Name:  Graham Goldsmith
Title: Managing Director

UBS SECURITIES LLC


By: /s/ Steven Smith
    ------------------------------------------
Name:  Steven Smith
Title: Managing Director


By: s/s Andrew Kramer
    ------------------------------------------
Name:  Andrew Kramer
Title: Managing Director
<PAGE>
GOLDMAN SACHS & CO.


By: /s/ Thomas A. Wagner
    ------------------------------------------
Name:  Thomas A. Wagner
Title: Managing Director

PARDUS SPECIAL OPPORTUNITIES MASTER FUND L.P.

By: PARDUS CAPITAL MANAGEMENT L.P.,
    its investment manager

```
By: PARDUS CAPITAL MANAGEMENT L.L.C.,
    its general partner


By: /s/ Joseph Thorton
    ------------------------------------------
Name:  Joseph Thorton
Title:
</TEXT>
</DOCUMENT>
```

# EXHIBIT B

## Additional Investor Agreement

```
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>2
<FILENAME>ex99.txt
<DESCRIPTION>EXHIBIT 99 ADDITIONAL AGREEMENT
<TEXT>
```

EXECUTION COPY

ADDITIONAL INVESTOR AGREEMENT

ADDITIONAL INVESTOR AGREEMENT, dated as of July 23, 2007 (this "Agreement"), by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands, UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a corporation formed under the laws of Delaware (each an "Initial Investor" and collectively, the "Initial Investors") and the investors listed on the signature pages hereto (each an "Additional Investor" and collectively, the "Additional Investors").

Section 1. General. Reference is made to the Equity Purchase and Commitment Agreement, by and among the Initial Investors, Pardus DPH Holding LLC, Goldman Sachs & Co. and Delphi Corporation (the "Company"), in the form attached hereto as Exhibit A (as amended, supplemented or otherwise modified, the "EPCA"). Capitalized terms used herein that are not defined herein but are defined in the EPCA shall have the meanings assigned to them in the EPCA.

Each Initial Investor is relying on the obligations, representations and warranties of the Additional Investors contained herein.

Section 2. Agreement to Sell and Purchase Shares. (a) To the extent the Initial Investors purchase Direct Subscription Shares or Unsubscribed Shares pursuant to the EPCA, the Initial Investors shall sell to each Additional Investor (i) the sum of (A) the aggregate amount of Direct Subscription Shares purchased by the Initial Investors plus (B) the aggregate amount of Unsubscribed Shares purchased by the Initial Investors multiplied by (ii) the fractional amount set forth for each Additional Investor as set forth on Schedule I hereto, rounded down to the next whole Share for the aggregate Purchase Price; provided, that the Purchase Price payable by any Additional Investor shall not be increased above $38.39 per Share without the written consent of such Additional Investor. No Additional Investor shall be required to purchase more than its maximum number of Unsubscribed Shares as set forth on Schedule I hereto. The Shares to be sold to and purchased by the Additional Investors as set forth in this Section 2(a) are referred to as the "Purchased Shares". The product of the Purchase Price multiplied by the number of Purchased Shares that each Additional Investor is obligated to purchase pursuant hereto is referred to herein as such Additional Investor's "Purchase Commitment."

(b)  ADAH shall provide a copy of the Purchase Notice or the Satisfaction Notice, as applicable, to each Additional Investor promptly upon receipt of such notice from the Company. ADAH shall send to each Additional Investor at least two (2) Business Days before the Settlement Date (as hereinafter defined) a written notice specifying the aggregate amount of Purchased Shares being purchased by the Initial Investors pursuant to the EPCA and the number of Purchased Shares to be purchased by each Additional Investor pursuant to this Agreement (the "Additional Investor Purchase Notice"). Each Additional Investor agrees that such Additional Investor shall, on the Settlement Date, purchase from the Initial Investors the aggregate amount of Purchased Shares specified in such Additional Investor Purchase Notice at the

Purchase Price.
<PAGE>

(c)    Each Additional Investor's payment of its Purchase Commitment for Purchased Shares, if any, shall be made without setoff or counterclaim not later than 12:00 Noon, New York City time, on the second Business Day after the Business Day that such Additional Investor receives the Additional Investor Purchase Notice. Such Business Day is hereinafter referred to as a "Settlement Date." The Purchased Shares shall be delivered against payment therefor on the Settlement Date or as soon as practicable thereafter.

(d)    Each Additional Investor's payment pursuant to Section 2(c) shall be made by wire transfer to the Initial Investors at the account set forth on Schedule II hereto (or as otherwise notified to the Initial Investors in accordance with Section 8), in U.S. Dollars ("Dollars") and in immediately available funds. Interest shall be payable to the Initial Investors as directed by ADAH on any unpaid amounts from the Settlement Date until payment in full at the rate that is equal to the 1-month London Interbank Offered Rate for Dollar deposits appearing on the Reuters Screen LIBO Page as of approximately 11:00 a.m. London time on the date two business days prior to the Settlement Date (or, if such rate does not appear on such Reuters Screen LIBO Page, from such other source as the Initial Investors shall reasonably determine), plus six percent. In addition, if any Additional Investor defaults in its obligation under Section 2(a), such Additional Investor shall pay or reimburse each Initial Investor for its reasonable costs and expenses, including the fees and expenses of its counsel, of collecting and enforcing the obligations of such defaulting Additional Investor.

(e)    The delivery on the Settlement Date by the Initial Investors to each Additional Investor of Purchased Shares to be purchased by such Additional Investors pursuant to this Agreement may, at the election of ADAH, be effected by the direct issuance of such Purchased Shares to the Additional Investors by the Company.

(f)    The following shall be conditions to the purchase and sale of any Purchased Shares under this Agreement: (a) any applicable waiting period under the HSR Act shall have expired or been terminated; and (b) other waiting periods under any comparable laws or regulations in any foreign jurisdiction (all such laws and regulations, together with the HSR Act, are referred to as "Competition Laws") required for the consummation of the transactions contemplated by this Agreement shall have expired or been terminated and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority (all such authorities, including, without limitation, the United States Federal Trade Commission, the United States Department of Justice Antitrust Division and the European Commission, are referred to as "Regulatory Authorities") shall have been made or obtained for the transactions contemplated by this Agreement. Each Additional Investor shall use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under Competition Laws to consummate and make effective the transactions contemplated by this Agreement, including furnishing all information required by applicable law in connection with approvals of or filings with a Regulatory Authority, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms or similar filings under Competition Laws with the applicable Regulatory Authority. In furtherance of the foregoing, each Additional Investor shall: (1) promptly file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission; (2) respond promptly to

2

<PAGE>

any request made by a Regulatory Authority for additional information, data or documents, whether formal or informal, mandatory or voluntary, including, without limitation, a request for additional information or documentary material under the HSR Act; (3) promptly notify the Initial Investors of, and, subject to appropriate confidentiality safeguards, if in writing and subject to reasonable confidentiality safeguards, furnish the Initial Investors with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with a Regulatory Authority in connection with any of the transactions contemplated by this Agreement; (4) not participate in any meeting with a Regulatory Authority unless it consults with ADAH in advance and, to the extent permitted by such Regulatory Authority, gives ADAH a reasonable opportunity to attend and participate thereat and to comment on any written submissions or presentations made to any Regulatory Authority; (5) furnish the Initial Investors with copies of all correspondence, filings and communications between it and any Regulatory Authority with respect to any of the transactions contemplated by this Agreement; (6) at its sole cost, timely comply with all restrictions and conditions, if any, specified or imposed (either as a condition to granting clearance or as a condition to averting or settling any lawsuit that is or may be filed by any Regulatory Authority or private party to prevent consummation of the transactions contemplated by this Agreement) by any Regulatory Authority with respect to any laws as a requirement for granting any necessary clearance or terminating any applicable waiting period, subject to the approval of such course of action by ADAH, including agreeing to hold separate, divest, license or cause a third party to purchase assets and/or businesses of such Additional Investor, it being understood that such Additional Investor shall be permitted to negotiate in good faith with the Regulatory Authority; (7) not agree with any Regulatory Authority to delay the Settlement Date, and shall not agree to provide advance notice of the Settlement Date to any Regulatory Authority, in each case, without the consent of ADAH; and (8) otherwise use its best efforts to (a) cause the waiting periods under any Competition Laws to terminate or expire, or (b) obtain approval for the transactions contemplated by this Agreement under any Competition Laws, in each case, at the earliest possible date after the date of filing. Each Additional Investor shall reimburse or pay, as the case may be, its own out-of-pocket expenses incurred pursuant to this Section 2(f). Additionally, if any Initial Investor incurs out-of-pocket expenses in connection with any actions taken pursuant to this Section 2(f) with respect to any Additional Investor (including any required filing fees of any Initial Investor, reasonable fees, costs and expenses of counsel to each Initial Investor and the reasonable fees, costs and expenses of any other professionals obtained by each Initial Investor in connection therewith), then such Additional Investor shall reimburse or pay such expenses.

(g)    To the extent the Company pays to the Initial Investors any portion of the Standby Commitment Fee (the "Standby Fee") pursuant to the EPCA, the Initial Investors shall pay to each Additional Investor, within two (2) Business Days of the Initial Investors' receipt of any portion of the Standby Fee, an amount equal to (i) the portion of the Standby Fee so received multiplied by (ii) the fractional amount set forth for each Additional Investor as set forth on Schedule I hereto, rounded down to the next whole dollar; provided, if an Additional Investor notifies the Company that an Additional Investor Broker (such notification, and the identification of the Additional Investor Broker, to be made on Schedule I hereto on or prior to the execution and delivery of this Agreement) provided services in respect of the Standby Fee, the payment pursuant to this Section 2(g) shall be made to such Additional Investor Broker in consideration of such services rather than to the Additional Investor; provided further, that the aggregate amount of Standby Fees and Breakup Fees (as defined below) paid to each Additional Investor

3

<PAGE>

or Additional Investor Broker, as the case may be, shall not exceed 1.125% of such Additional Investor's Purchase Commitment. The Initial Investors' payment pursuant to this Section 2(g) shall be made by wire transfer to each Additional Investor or Additional Investor Broker, as appropriate, at the account set forth on Schedule I hereto, in U.S. Dollars ("Dollars") and in immediately available funds.

(h)    To the extent the Company pays to the Initial Investors the Alternate Transaction Fee (the "Breakup Fee") pursuant to the EPCA, the Initial Investors shall pay to each Additional Investor, within two (2) Business Days of such Initial Investor's receipt of the Breakup Fee, an amount equal to (i) 1.125% of such Additional Investor's Purchase Commitment less (ii) any Standby Fee previously paid to such Additional Investor; provided, if an Additional Investor notifies the Company that an Additional Investor Broker (such notification, and the identification of the Additional Investor Broker, to be made on Schedule I hereto on or prior to the execution and delivery of this Agreement) provided services in respect of the Standby Fee, the payment pursuant to this Section 2(h) shall be made to such Additional Investor Broker in consideration of such services rather than to the Additional Investor. To the extent that the Company pays to the Initial Investors a Breakup Fee that is less than the full Breakup Fee to which the Initial Investors are entitled under the EPCA, the payment to the Additional Investors or Additional Investor Brokers, as the case may be, pursuant to this Section 2(h) shall be adjusted downward proportionately. The Initial Investors' payment pursuant to this Section 2(h) shall be made by wire transfer to each Additional Investor or Additional Investor Broker, as appropriate, at the account set forth on Schedule I hereto, in Dollars and in immediately available funds. The aggregate amount of Standby Fees and Breakup Fees paid to any Additional Investor or Additional Investor Broker shall not exceed 1.125% of such Additional Investor's Purchase Commitment.

(i)    Each of the Initial Investors agrees to use its commercially reasonably efforts to make available to each Additional Investor the registration rights referred to in Section 8(c)(iv) of the EPCA and to assign or otherwise make available to the Additional Investors any registration rights (other than demand registration rights) granted to the Initial Investors pursuant to the Registration Rights Agreement.

Section 3. Support of Restructuring. Each Additional Investor hereby agrees that concurrently with the execution of this Agreement such Additional Investor shall be bound, and shall cause its Affiliates to be bound, by the EPCA; provided, that the Initial Investors are not hereby assigning and the Additional Investors are not hereby assuming the primary obligations of the Initial Investors pursuant to the EPCA. Such agreement by each Additional Investor shall be a condition precedent to the obligations of the Initial Investors hereunder regarding such Additional Investor, and the Initial Investors may, in their sole discretion, terminate this Agreement with respect to such Additional Investor if such Additional Investor fails to comply with the requirements set forth in this Section. Notwithstanding the foregoing, no agreement is made on behalf of any Fiduciary Affiliate to the extent such agreement would be prohibited by the fiduciary duties of such Fiduciary Affiliates. The term Fiduciary Affiliates shall mean, with respect to any Additional Investor, the specific entities identified as such on Schedule I hereto.

Section 4. Nature of Obligations. Each Additional Investor's obligations under Section 2 shall be absolute, unconditional and irrevocable under any and all circumstances

4

<PAGE>
(including, without limitation, any adverse change in the business, prospects, condition (financial or otherwise) of the Company and its subsidiaries, or any disruption of or material adverse change in conditions in the financial, banking or capital markets except and only to the extent that the obligations of the Initial Investors are terminated under the EPCA) and irrespective of any setoff, counterclaim or defense to payment that such Additional Investor may have against any Initial Investor, the Company or any other Person. The Additional Investor also agrees that the Initial Investors shall not be responsible for, and such Additional Investor's obligations under Section 2 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged. Any determination made by the Initial Investors under the EPCA or this Agreement shall be binding on each Additional Investor absent willful misconduct. The Initial Investors shall not be liable for any error, omission, interruption or delay in connection with this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares or any transaction contemplated hereby or thereby, except for errors or omissions found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from willful misconduct of the Initial Investors. Any action taken or omitted by the Initial Investors under or in connection with this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares or any transaction contemplated hereby or thereby in the absence of willful misconduct, shall be binding on the Additional Investors and shall not result in any liability of any Initial Investor to any Additional Investor. The obligations of the Additional Investors and the Initial Investors under Section 2 shall terminate automatically upon the termination of the EPCA in accordance with its terms.

        Section 5. No Reliance on, or Liability of, Initial Investors. (a) Each Initial Investor shall have the same rights and powers as any Additional Investors and may exercise the same as though it were not an Initial Investor, and each Initial Investor and its Affiliates may engage in any kind of business with the Company or any Additional Investor as if it were not an Initial Investor.

        (b)  No Initial Investor nor any of its employees, officers, directors, representatives, attorneys, advisors or Affiliates (all of the foregoing collectively "Related Parties") shall have any duties or obligations to the Additional Investors in respect of the Company or under or in respect of this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares or any transaction contemplated hereby or thereby, except those expressly set forth herein and the duty to deal with such parties in good faith. Without limiting the generality of the foregoing, (i) no Initial Investor nor any of its Related Parties shall be subject to any fiduciary or other implied duties to the Additional Investors, (ii) no Initial Investor nor any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers, (iii)(A) no Initial Investor nor any of its Related Parties shall have any duty to the Additional Investors to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the Additional Investors any information relating to the Company or any of its Related Parties that may have been communicated to or obtained by the Initial Investor or any of its Affiliates in any capacity and (B) the Additional Investors may not rely, and confirm that they have not relied, on any due diligence investigation that any Initial Investor or any person or entity acting on its behalf may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, (iv) each Additional Investor acknowledges that no Initial Investor or any other Additional Investor is acting as a placement agent, initial

5

<PAGE>

purchaser, underwriter, broker or finder with respect to its Purchased Shares or Purchase Commitment, and (v) each Initial Investor acknowledges that no Initial Investor or any Additional Investor is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Shares or its obligations under the EPCA. No Initial Investor nor any of its Related Parties shall be liable to any Additional Investor or its Related Parties for any action taken or not taken by any of them with the written consent or at the written request of such Additional Investor or its Related Party or in the absence of its own willful misconduct. No Initial Investor nor any of its Related Parties shall have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares or any transaction contemplated hereby or thereby (other than such Initial Investor's own representations or warranties), or in any reports made by the Company with the Securities and Exchange Commission, (ii) the contents of any certificate, report or other document (other than such Initial Investor's own information contained in any such certificate, report or document) delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein (other than such Initial Investor's own covenants and agreements), (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares or any transaction contemplated hereby or thereby or any other agreement, instrument or document (other than the validity, enforceability, effectiveness or genuineness with respect to such Initial Investor), or (v) the satisfaction of any condition set forth in the EPCA or the Plan, nor shall they have any responsibility to any Additional Investor or any of its Related Parties in respect of any of the foregoing.

        (c)    Each Initial Investor and any of its Related Parties shall be entitled to rely on, and shall not incur any liability for relying on, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. Each Initial Investor and any of its Related Parties also may rely on any statement made to it orally or by telephone and believed by it to be made by the proper person, and shall not incur any liability for relying thereon. Each Initial Investor may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

        (d)    Each Initial Investor may perform any and all of its obligations and exercise its rights and powers by or through any one or more sub-agents appointed by the Initial Investor, which sub-agents shall be Affiliates of the Initial Investor. Each Initial Investor and any such sub-agent may perform any and all of its duties and exercise its rights and powers through Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Initial Investor and any such sub-agent, and shall apply to its respective activities in connection with the transactions provided for herein, in the EPCA or the Plan as well as activities as Initial Investor, provided that the Initial Investor shall continue to be responsible for its obligations hereunder.

        (e)    Each Additional Investor acknowledges that it has, independently and without reliance upon any Initial Investor, any of its Related Parties or any other person or entity, and based on such documents and information as it has deemed appropriate, made its own

6

<PAGE>

investment, tax, legal and economic analysis of this Agreement, the EPCA, the Company and its subsidiaries, the Rights and the Purchased Shares and its own independent decision to enter into this Agreement and any transaction contemplated hereby or thereby and is not relying on any representation or warranty of, or information or analysis provided by or on behalf of, any Initial Investor or any of its Related Parties concerning this Agreement, the EPCA, the Company and its subsidiaries, the Plan, the Rights and the Purchased Shares and any transaction contemplated hereby or thereby. Each Additional Investor also acknowledges that it will, independently and without reliance on any Initial Investor, any of its Related Parties or any other person or entity, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based on this Agreement, the EPCA, the Plan, the Rights, the Purchased Shares and any transaction contemplated hereby or thereby.

(f)   Each Additional Investor, severally and not jointly, agrees to indemnify each Initial Investor and its Related Parties, (i) for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by or asserted against such Initial Investor or any of its Related Parties as a result of any breach by such Additional Investor of any of its obligations hereunder or any representation or warranty of such Additional Investor made herein being untrue or incorrect, (ii) for its Pro Rata Share of any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by or asserted against such Initial Investor or any of its Related Parties in any way relating to or arising out of, this Agreement, the Purchased Shares or the transactions contemplated hereby or any action taken or omitted by such Initial Investor or its Related Parties under or in connection with any of the foregoing and (iii) for its Pro Rata Portion of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time be imposed on, incurred by or asserted against such Initial Investor or any of its Related Parties in any way relating to or arising out of, any documents contemplated by or referred to in this Agreement or any action taken or omitted by such Initial Investor or its Related Parties under or in connection with any of the foregoing other than those covered by clauses (i) and (ii) of this Section 5(f); provided, that no Additional Investor shall be liable to any Initial Investor for (i) the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Initial Investor's or its Related Parties' willful misconduct (including any willful breach of the EPCA) and (ii) any payment under this Section 5(f) in excess of such Additional Investor's Purchase Commitment. As used in this Section 5(f), the terms (i) "Pro Rata Share" shall mean, for any Additional Investor, such Additional Investor's respective Purchase Commitment hereunder as a proportion to the total Purchase Commitments hereunder, and (ii) "Pro Rata Portion" shall mean, for any Additional Investor, such Additional Investor's respective Purchase Commitment hereunder as a proportion of $2,550,000,000.

(g)   If such indemnification is for any reason not available or is insufficient to hold any Initial Investor or its Related Parties harmless, each Additional Investor, severally and not jointly, agrees to contribute to the liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements referred to in Section 5(f) in such proportion

7

<PAGE>

as is appropriate to reflect the relative benefits received (or anticipated to be received) by such Additional Investor, on the one hand, and by such Initial Investor and its Related Parties, on the other hand, under this Agreement or, if such allocation is determined by a court or arbitral tribunal of competent jurisdiction to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of such Additional Investor, on the one hand and of such Initial Investor and its Related Parties, on the other hand. No Additional Investor shall be liable for any payment under this Section 5(g) in excess of such Additional Investor's Purchase Commitment.

(h)    Each Additional Investor acknowledges that the Initial Investors may disclose this Agreement and the transactions contemplated hereby, including in any filing with the Securities and Exchange Commission under the Securities Act or the Exchange Act.

(i)    Each Additional Investor acknowledges that (i) the Initial Investors may possess certain material, non-public information concerning the Company and its affiliates that may or may not be independently known to the Additional Investor (the "Non-Public Information"), (ii) the Additional Investor does hereby decline to receive such Non-Public Information, (iii) the Initial Investors are relying on this Section 5(i) and would not enter into the Agreement absent this Section 5(i) and (iv) the Additional Investor agrees to purchase the Purchased Shares from the Initial Investors notwithstanding that it is aware that the Non-Public Information may exist and that the Initial Investors are or may be involved in negotiations with the Company or its affiliates and that the Initial Investors have not disclosed information with respect to such negotiations or any Non-Public Information. Each Additional Investor does for itself and its respective successors and/or assigns, hereby irrevocably forever release, discharge and waive any and all claims, rights, causes of action, suits, obligations, debts, demands, liabilities, controversies, costs, expenses, fees, or damages of any kind (including, but not limited to, any and all claims alleging violations of federal or state securities laws, common-law fraud or deceit, breach of fiduciary duty, negligence or otherwise), whether directly, derivatively, representatively or in any other capacity, against the Initial Investors or any of their affiliates, including, without limitation, any and all of their present and/or past directors, officers, members, partners, employees, fiduciaries, agents or accounts under management, and their respective successors and assigns, which are based on or arise from or in any way relate to or involve, directly or indirectly, the existence or substance of the Non-Public Information or the Initial Investors' negotiations with the Company or its affiliates or the fact that the Non-Public Information or information with respect to Initial Investors' negotiations with the Company or its financial advisors have not been disclosed to it.

Section 6. Representations and Warranties of Each Additional Investor. Each Additional Investor, severally and not jointly, represents and warrants to, and agrees with, the Initial Investors as set forth below:

(a)    It has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its organization.

(b)    It has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder, including, without limitation, the purchase of the Purchased Shares it has agreed to purchase hereunder, and has taken all action required for the due authorization, execution, delivery and performance by it of this Agreement.

8

<PAGE>

(c)   Its execution and delivery of this Agreement and the performance of its obligations hereunder do not violate or conflict with any provision of its constitutional documents, any law, order or judgment applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

(d)   No material consent, authorization, approval, order, exemption, registration, qualification or other action of, or filing with or notice to, any federal or state regulatory or governmental agency (each, an "Authorization") is required in connection with its execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby, except (1) the approval of the Plan and receipt of the Initial Approval Order and Final Approval Order, and (2) Authorizations under Competition Laws. Prior to the Settlement Date, all Authorizations under Competition Laws will have been obtained, taken or made, as the case may be, and all waiting periods under Competition Laws will have expired or been terminated.

(e)   This Agreement has been duly and validly executed and delivered by such party and, assuming due execution and delivery by the other parties hereto, constitutes, or will constitute upon execution, as applicable, its valid and binding obligation, enforceable against it in accordance with its terms.

(f)   The Purchased Shares will not be offered for sale, sold or otherwise transferred by the Additional Investor except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and at all times in accordance with any applicable state securities laws.

(g)   It has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Shares being acquired hereunder. It is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act and a "qualified institutional buyer" as defined in Rule 144A under the Securities Act. It understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Shares for an indefinite period of time).

(h)   It acknowledges and understands that the Purchased Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available, and the certificates representing the Purchased Shares may contain a legend under the Securities Act to such effect.

(i)   It is not and, after giving effect to the transactions contemplated hereby, will not be an "investment company," as such term is defined in the Investment Company Act of 1940, as amended (the "1940 Act"), that is required to be registered under the 1940 Act.

(j)   It has obtained adequate information concerning the Company to make the decision to enter into this transaction and has been afforded an adequate opportunity to seek and obtain additional information from, and otherwise to conduct due diligence of, the Company.

(k)   It is acting and will at all times act independently of the Initial Investors with respect to the voting of or disposition of New Common Stock other than as may be contractually required or permitted by the Registration Rights Agreement.

9

<PAGE>

(l)   It agrees to be bound by, and cause its Affiliates who are not Fiduciary Affiliates to be bound by, the EPCA and, to the extent relevant, confirms the accuracy of the representations contained in Section 4 of the EPCA as to itself and such Affiliates; provided, that the Initial Investors are not hereby assigning, and the Additional Investors are not hereby assuming, the primary obligations of the Initial Investors pursuant to the EPCA.

(m)   It has funds available, and on the Settlement Date will have funds available, that are sufficient to perform its obligations hereunder.

Section 7. Representations and Warranties of the Initial Investors. Each Initial Investors, severally and not jointly, represents and warrants to, and agrees with each of the Additional Investors as set forth below:

(a)   It has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its organization.

(b)   It has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder, including, without limitation, the delivery of the Purchased Shares, and has taken all action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)   Its execution and delivery of this Agreement and the performance of its obligations hereunder do not violate or conflict with any provision of its constituent documents, any law, order or judgment applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

(d)   Except for the Plan and the Court Orders and as expressly disclosed in writing to the Additional Investors, no material consent, authorization, approval, order, exemption, registration, qualification or other action of, or filing with or notice to, any federal or state regulatory or governmental agency is required to be obtained by it in connection with its execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby. All such required material consents, authorizations, approvals, orders, exemptions, registrations, qualifications and other actions of and filings and notices will have been obtained, taken or made, as the case may be, and all statutory or regulatory waiting periods will have elapsed, prior to its sale of Shares hereunder on the Settlement Date.

(e)   This Agreement has been duly and validly executed and delivered by the Initial Investor and, assuming due execution and delivery by the other parties hereto, constitutes, or will constitute upon execution, as applicable, its valid and binding obligation, enforceable against it in accordance with its terms.

Section 8. Notices. (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or sent by telecopy, as follows:

10

<PAGE>

(i)   if to the Initial Investors, to:

(a)   If to:

    A-D Acquisition Holdings, LLC
    c/o Appaloosa Management L.P.
    26 Main Street,
    Chatham, New Jersey 07928
    Facsimile:  (973) 701-7055
    Attention:  Jim Bolin

    with a copy to:

    White & Case LLP
    Wachovia Financial Center
    200 South Biscayne Boulevard
    Suite 4900
    Miami, Florida 33131-2352
    Facsimile:  (305) 358-5744/5766
    Attention:  Thomas E. Lauria

    White & Case LLP
    1155 Avenue of the Americas
    New York, New York 10036-2787
    Facsimile: (212) 354-8113
    Attention: John M. Reiss
           Gregory Pryor

(b)   If to:

    Harbinger Del-Auto Investment Company, Ltd.
    c/o Harbinger Capital Partners Offshore Manager, LLC
    555 Madison Avenue, 16th Floor
    New York, NY 10022
    Attn: Philip A. Falcone

    with a copy to:

    Harbert Management Corp.
    One Riverchase Parkway South
    Birmingham, AL 35244
    Facsimile:  (205) 987-5505
    Attention:  General Counsel

    with a copy to:

    White & Case LLP

           11

<PAGE>

    Wachovia Financial Center
    200 South Biscayne Boulevard
    Suite 4900
    Miami, Florida 33131-2352
    Facsimile:  (305) 358-5744/5766
    Attention:  Thomas E. Lauria

    White & Case LLP
    1155 Avenue of the Americas
    New York, New York 10036-2787

```
                    Facsimile:  (212) 354-8113
                    Attention:  John M. Reiss
                                Gregory Pryor

                    with a copy to:

                    Kaye Scholer LLP
                    425 Park Avenue
                    New York, NY  10022-3598
                    Facsimile:  (212) 836-8689
                    Attention:  Benjamin Mintz and Lynn Toby Fisher


           (c)  If to:


                    UBS Securities LLC
                    299 Park Avenue
                    New York, New York  10171
                    Facsimile:  (212) 821-3008 / (212) 821-4042
                    Attention:  Steve Smith / Osamu Watanabe

                    with a copy to:

                    Cleary Gottlieb Steen & Hamilton LLP
                    One Liberty Plaza
                    New York, New York  10006
                    Facsimile:  (212) 225-3999
                    Attention:  Leslie N. Silverman


                                       12
<PAGE>

           (d)  If to:

                    Merrill Lynch, Pierce, Fenner & Smith Incorporated.
                    4 World Financial Center
                    New York, New York  10080
                    Facsimile:  (212) 449-0769
                    Attention:  Robert Spork / Rick Morris

                    with a copy to:

                    Paul, Weiss, Rifkind, Wharton & Garrison LLP
                    1285 Avenue of the Americas
                    New York, New York  10019-6064
                    Facsimile:  (212) 757-3990
                    Attention:  Andrew N. Rosenberg

           (ii)  if to an Additional Investor, to it at its address (or facsimile
                 number) set forth on Schedule I hereto.
```

     (b)  Any party hereto may change its address or telecopy number for
notices and other communications hereunder by notice to the other parties
hereto. All notices and other communications given to any party hereto in
accordance with the provisions of this Agreement shall be deemed to have been
given on the date of receipt.

        Section 9. Waivers; Amendments. (a) No failure or delay by any party
in exercising any right or power hereunder shall operate as a waiver thereof,
nor shall any single or partial exercise of any such right or power, or any

abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver of any provision of this Agreement or consent to any departure therefrom shall in any event be effective unless the same shall be permitted by subsection (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)    This Agreement and any provision hereof may be waived, amended or modified only pursuant to an agreement or agreements in writing entered into between the Initial Investors and the Additional Investors that are party hereto; provided, that this Agreement and any provision hereof may be waived, amended or modified pursuant to an agreement or agreements in writing with Additional Investors representing a majority of the aggregate Purchase Commitments (the "Requisite Additional Investors") and any such waiver, amendment or modification shall be binding on each Additional Investor; provided, further, that no such agreement shall (i) increase the Purchase Commitment of, or any amounts payable by, any Additional Investor without the written consent of such Additional Investor, (ii) reduce any amount payable hereunder to a party, without the written consent of such party, (iii) postpone the scheduled date of any delivery or payment hereunder, without the written consent of each party affected thereby, (iv) increase the Pro Rata Share of any Additional Investor (as referred to in Section 5(f)), without the written consent of such Additional Investor, (v) modify a representation or warranty of an Additional Investor in a manner so as to cause such Additional Investor to breach such representation or warranty, without the consent of such Additional

13

<PAGE>
Investor or (vi) change any of the provisions of Sections 9(b), 11 or 12 without the written consent of each Additional Investor.

Section 10. Successors and Assigns; No Assignments. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. No Initial Investor may assign or otherwise transfer any of its obligations hereunder, except to a Related Purchaser in accordance with the EPCA, without the prior written consent of the Requisite Additional Investors (and any attempted assignment or transfer by the Initial Investor without such consent shall be null and void) and (ii) no Additional Investor may assign or otherwise transfer its rights or obligations hereunder without the prior written consent of each Initial Investor. Nothing in this Agreement is intended to confer upon any person or entity other than the parties hereto any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 11. Survival. All covenants, agreements, representations and warranties made by the any party herein shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the closing of any transactions contemplated herein, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any other party may have had notice or knowledge of any incorrect representation or warranty at any time. Notwithstanding anything contained herein to the contrary (other than the last sentence of Section 4 of this Agreement), all covenants, agreements, representations and warranties made herein with respect to the Additional Investors and the Additional Investor Affiliates (as defined below) shall terminate and be of no force or effect upon: (i) the termination of the EPCA in accordance with its terms; provided, that, any such termination shall not be effective for these purposes if, within ten (10) days of said termination event, the Initial Investors shall notify the Additional Investors in accordance with Section 8 that the Initial Investors have submitted to the Company a substantive proposal for, or are actively

negotiating or entering into with the Company, a transaction similar to the transactions contemplated by the EPCA or any Alternate Transaction in respect of the Company, and the Initial Investors are continuing to actively pursue such transaction or (ii) the consummation of a plan of reorganization in respect of the Company other than the plan of reorganization implementing the transactions contemplated by the EPCA. Upon the consummation of a plan of reorganization implementing the transactions contemplated by the EPCA, the parties agree that the Additional Investors shall not be bound by Section 12 of this Agreement.

        Section 12. Non-Interference. (a) Each Additional Investor represents, warrants and covenants that neither it nor any of its Affiliates is, and it will not become and will cause its Affiliates to not become, a party to or participant in any competing or other transaction inconsistent with this Agreement or the EPCA. No representation, warranty or covenant is made pursuant to this Section 12 with respect to any Fiduciary Affiliate.

        (b)    Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, any provision hereof otherwise requiring the Additional Investor to comply with provisions of the EPCA), nothing in this Agreement shall be deemed to prohibit or restrict (i) any affiliate of any Additional Investor (each an "Additional Investor Affiliate") from providing financing to the Company under that certain Revolving Credit, Term Loan and Guaranty Agreement, dated as of January 9, 2007, among the Company, certain of its

                                    14

<PAGE>
subsidiaries and the lenders party thereto (as it may be amended, restated and/or continued from time to time, the "DIP Facility") or from continuing to act as a lender or from acting in its other capacities under, and exercising all rights and remedies under, the DIP Facility, (ii) any Additional Investor Affiliate from arranging, underwriting and/or providing any other financing to the Company or any of its affiliates other than in connection with any Competing Transaction, (iii) any Additional Investor Affiliate from arranging, underwriting and/or providing any other financing (x) to the Company or any other entity under or through any credit facilities to which any Additional Investor Affiliate is a party in effect as of the date hereof or (y) to any party other than the Company or its affiliates under or through any new credit facility, amendment to an existing credit facility, or debt or equity securities offering the proceeds of which are not restricted, so long as the Additional Investor Affiliate is not aware that such proceeds will be used for the purpose of financing a Competing Transaction or (iv) any ordinary course sales and trading undertaken by any Additional Investor Affiliate engaged in such activities in the ordinary course of its business. For the avoidance of doubt, no representation, warranty, agreement or covenant is made by the Additional Investor or any Additional Investor Affiliate pursuant to Sections 3 or 12 of this Agreement with respect to the transactions and the activities of the Additional Investor Affiliates described above. For the purpose of this Section, "Competing Transaction" means, in each case other than the transactions contemplated by the EPCA, (i) any proposal, offer or transaction regarding a merger, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, restructuring, plan of reorganization, share exchange, business combination or similar transaction (a "Strategic Transaction") in respect of the Company, (ii) any proposal, offer or transaction regarding an acquisition, directly or indirectly, of 5% or more of any class of equity securities of the Company or (iii) any Strategic Transaction involving a substantial portion of the consolidated total assets (including, without limitation, equity securities of its subsidiaries) of the Company and its subsidiaries taken as a whole.

Section 13. Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by each Initial Investor and when each Initial Investor shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 14. Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 15. Governing Law; Jurisdiction; Consent to Service of Process; Damage Waiver. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

15

<PAGE>

(b)   Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right any party may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)   Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   Each party to this Agreement irrevocably consents to service of process by registered mail. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)   To the extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against any other party hereto or any

employees, officers, directors, representatives, attorneys, advisors or
affiliates of any party hereto, on any theory of liability, for special,
indirect, consequential or punitive damages (as opposed to direct or actual
damages) arising out of, in connection with, or as a result of, this Agreement
or any transaction contemplated hereby.

        Section 16. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO
THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL
BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER
BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES
THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED,
EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF
LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT
AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.


                                    16
<PAGE>
        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to
be duly executed by their respective authorized officers as of the day and year
first above written.

                                A-D ACQUISITION HOLDINGS, LLC, as
                                Initial Investor


                                By: /s/ James E. Bolin
                                   -------------------------------
                                Name:
                                Title:


                                HARBINGER DEL-AUTO INVESTMENT
                                COMPANY, LTD., as Initial Investor


                                By: /s/ Charles D. Miller
                                   -------------------------------
                                Name:   Charles D. Miller
                                Title:  Vice President


                                UBS SECURITIES LLC, as Initial
                                Investor


                                By: /s/ Steven D. Smith
                                   -------------------------------
                                Name:   Steven D. Smith
                                Title:  Joint Global Head
                                        Leveraged Finance
                                        Americas Head Financial
                                        Sponsors


                                By: /s/ Andrew Kramer
                                   -------------------------------
                                Name:   Andrew Kramer

                                        Title:  Managing Director

                                        MERRILL LYNCH, PIERCE, FENNER
                                        & SMITH INCORPORATED, as Initial
                                        Investor


                                        By: /s/ Graham C. Goldsmith
                                           ------------------------------
                                        Name:   Graham C. Goldsmith
                                        Title:  Managing Director
<PAGE>
              [Additional Investor Signature Page]


                                        [ADDITIONAL INVESTOR], as
                                        Additional Investor


                                        By:
                                           ------------------------------
                                        Name:
                                        Title:
<PAGE>

                                                              Exhibit A

              EQUITY PURCHASE AND COMMITMENT AGREEMENT

                             See attached
<PAGE>
                             SCHEDULE I

Name of Additional Investor:

Address:

Facsimile Number:

Purchase Commitment:

Fractional amount of aggregate Direct Subscription Shares and Unsubscribed
Shares to be purchased: [0.00]

Maximum number of Unsubscribed Shares to be purchased:

Maximum aggregate number of Direct Subscription Shares and Unsubscribed Shares
to be purchased:

Fractional amount of aggregate Standby Fee to be received: [0.00]

Maximum Standby Fee to be received: $

Maximum aggregate amount of Standby Fee and Breakup Fee to be received:

Account Details of Additional Investor:

Fiduciary Affiliates:
<PAGE>
                             SCHEDULE II

Account Details of Initial Investors:

```
</TEXT>
</DOCUMENT>
```