**Hearing Date & Time: November 29, 2007 at 10:00 a.m.**
**Objection Deadline: November 21, 2007 at 9:30 p.m.**

David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to the Delphi Trade Committee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| DELPHI CORPORATION, et al., | : Case No. 05-44481 (RDD) |
| | : |
| Debtors. | : (Jointly Administered) |

------------------------------------------------------x

### OBJECTION OF THE DELPHI TRADE COMMITTEE TO THE DEBTORS' EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a) AUTHORIZING AND APPROVING AMENDMENT TO DELPHI-APPALOOSA EQUITY PURCHASE AND COMMITMENT AGREEMENT

The Committee of Delphi Trade Claim Holders (the "Delphi Trade Committee"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Expedited Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment Agreement* (the "EPCA Amendment Motion"),[1] and respectfully represents as follows:

---

[1] Capitalized terms used but not defined herein have the meanings assigned in the EPCA Amendment Motion.

**PRELIMINARY STATEMENT**

The Debtors ask this Court to disregard its approval, and the very existence, of the Original Appaloosa EPCA. In August 2007 – just 3 months ago – the Court approved the Plan Investors as "plan sponsors" to embark upon a potential chapter 11 plan. Yet, through the EPCA Amendment Motion, those same alleged "plan sponsors" are high-jacking the plan process and pillaging the Debtors' coffers to compensate the already well compensated Plan Investors further. The Debtors have ratified these actions by pressing the EPCA Amendment Motion.

The Second Amended Appaloosa EPCA would commit the Debtors to pursue an unacceptable material modification to prior plans unjustified by any changes in the Debtors' businesses. If the Debtors prosecute this plan, the creditors and the Court will reject it, and the Debtors will have succeeded only in damaging their companies and the constituents for whom they supposedly act. While the Second Amended Appaloosa EPCA and the plan resulting therefrom will state it is "payment in full," that, of course, is not the case. And everyone knows it. The plan will require massive unsecured creditor investment based on a flawed valuation belied by the Debtors' own valuation expert, even using the mid-point of its extraordinarily wide range of "valuation". Despite this, the Second Amended Appaloosa EPCA utilizes the fictional valuation to grant distributions to junior interests (that, the Delphi Trade Committee believes, the Plan Investors own) in direct violation of the absolute priority rule and, for no justifiable reason, shifts value away from general unsecured creditors to the Plan Investors. Greed apparently becomes unbounded when the Debtors lock themselves into a single investor group, permit the investor group to lock up key market participants, and then go cup in hand to the investors each time the bonds trade down and the investors want to lower their investment price. The Debtors

are not exercising business judgment, sound or otherwise. The Plan Investors are, but for the benefit of the Plan Investors' investors, not for the benefit of these estates.

The Original Appaloosa EPCA remains valid and enforceable. The Plan Investors remain contractually bound to meet their commitments thereunder. In an apparent attempt to obfuscate that fact, the Debtors point to changes in capital markets and GM's projected output as meriting amendments to the Original Appaloosa EPCA. However, the Debtors have not explained, and it is not readily apparent, why these market changes necessitate amendments to the EPCA, when the Court approved the Original Appaloosa EPCA on the understanding that there were minimal financial outs, and did so at a time when the current market changes had already begun, were known to all, and were part of the "risk" of the transaction for which the Debtors handsomely paid the Plan Investors.

The Second Amended Appaloosa EPCA is such a dramatic departure from the Original Appaloosa EPCA that calling it an "amendment" is misleading. The Debtors and Plan Investors are attempting to cut a new deal under the guise of modifying the EPCA approved by this Court. That new deal would nearly double the discount at which Plan Investors can buy equity, leading to a mirror-image reduction in creditor distributions. And that is the clear mission of the proposed EPCA amendments: to transfer additional value from the Debtors' creditors to the Plan Investors.

Given the new deal on the table and, critically, the massive additional value to be transferred to the Plan Investors, the Court must examine the entirety of the Second Amended Appaloosa EPCA and the Debtors' plan that to which it is intertwined. The Debtors cannot articulate a business justification for continuing with a closed process rather than opening the EPCA and the Debtors' proposed plan to the market, nor can they explain why, in their sound

3

business judgment, they decided that despite the huge concessions to Plan Investors now required under the Second Amended Appaloosa EPCA, proceeding with any equity purchase commitment remains in the best interests of their estates. As such, the Debtors have not yet shown sufficient bases for this Court, exercising the critical standards of section 363 of the Bankruptcy Code, to approve the new proposed EPCA structure.

For the reasons set forth herein, the EPCA Amendment Motion and the Second Amended Appaloosa EPCA should be denied.

## BACKGROUND

1. The members of the Delphi Trade Committee hold trade claims primarily against Delphi Automotive Systems LLC and its domestic operating subsidiaries and, in a smaller amount, also against Delphi Corporation.

2. On December 18, 2006, the Debtors filed an expedited motion (the "Original EPCA Motion") seeking authority and approval of the Original PSA and the Original EPCA. On January 12, 2007, the Court entered an Order granting the Original EPCA Motion.

3. On July 9, 2007, the Debtors publicly disclosed that they had terminated the Original EPCA and the Original PSA.

4. On or about August 2, 2007, this Court entered the Order (the "EPCA Order") authorizing and approving the Delphi-Appaloosa Equity Purchase and Commitment Agreement (the "Original Appaloosa EPCA") pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a).

5. On September 6, 2007, the Debtors filed the Disclosure Statement With Respect To Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (the "Original Disclosure Statement") and the Joint Plan of

4

Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (the "Original Plan").

6.  On October 29, 2007, the Debtors filed: (1) the Notice of Potential Amendments to the Original Disclosure Statement, which attached changed pages to the Original Plan (with such changes, the "First Amended Plan"), the Original Disclosure Statement (with such changes, the "First Amended Disclosure Statement") and the exhibits and appendices thereto; and (2) the Notice of Expedited Motion For Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment Agreement, which attached changed pages to the Original Appaloosa EPCA (with such changes, the "First Amended Appaloosa EPCA"), among other documents.

7.  On November 1, 2007, Goldman Sachs Group, Inc., a Plan Investor, filed a Schedule 13D/A with the U.S. Securities and Exchange Commission (the "SEC") indicating that it had not signed onto the First Amended Appaloosa EPCA.

8.  On November 8, 2007, after the Debtors filed the EPCA Amendment Motion, Appaloosa filed a Schedule 13D/A with the SEC disclosing that conditions to the effectiveness of the First Amended Appaloosa EPCA had purportedly not been satisfied (*i.e.*, Goldman had walked) and that as a result, the First Amended Appaloosa EPCA has been terminated in accordance with its terms.

9.  On November 14, 2007, the Debtors filed their Notice of Further Proposed Amendments to Certain Appendices to the First Amended Disclosure Statement, which attached changed pages to the First Amended Plan (with such changes, the "Second Amended Plan"), the First Amended Appaloosa EPCA (with such changes, the "Second Amended Appaloosa EPCA") and certain other documents.

10. On November 16, 2007, the Debtors filed their Notice of Further Proposed Amendments to Debtors' Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, which attached changed pages to the First Amended Disclosure Statement (with such changes, the "Second Amended Disclosure Statement").

11. As incorporated into the Second Amended Plan, the Second Amended Appaloosa EPCA would, among other things, require that the Plan distribute New Common Stock to the General Unsecured Creditors at a supposed "value" of $61.72 per share. Second Amended Plan § 5.3(a). The ridiculously optimistic valuation analysis attached to the Second Amended Disclosure Statement puts the implied potential price per share from $45.25 to $66.79 per share, with a midpoint of approximately $56.06. (Appendix D to Disclosure Statement). Even under the Debtors' valuation, the $61.72 per share price set forth in the EPCA is $5.67 or 10.1% higher than the midpoint. The low point of course is 36.4% lower than the supposed Plan value. The low point is also much closer to what market participants think Delphi is worth, and, of course, the Plan Investors buy into Delphi at a value lower than Rothschild's low point (so the Court may note what they think). Thus, while the Second Amended Disclosure Statement states "each holder of an Allowed General Unsecured Claim will receive the number of shares of New Common Stock (at Plan Equity Value, as defined below) equal to 75.5% of such Claim (including any applicable Postpetition Interest)" (Second Amended Disclosure Statement at § IX.E(2)(b)(i)), the real equity grant to general unsecured creditors equates to 68.56% at Rothschild's mid-point, 54.7% at Rothschild's low point, and 48.7% at the $10.5 billion at which the Plan Investors buy.

6

## OBJECTION[2]

### A. THE EPCA AMENDMENT MOTION IS PROCEDURALLY DEFICIENT.

12. The EPCA Amendment Motion seeks approval of the First Amended Appaloosa EPCA. It does not seek approval of the Second Amended Appaloosa EPCA and, in fact, could not do so, because the Second Amended Appaloosa EPCA was filed approximately two weeks after the EPCA Amendment Motion.

13. The Debtors never filed a separate motion to approve the Second Amended Appaloosa EPCA. Rather, apparently relying on this Court's scheduling Orders [Docket Nos. 10662 & 10864], the Debtors consider the EPCA Amendment Motion procedurally sufficient to seek approval of the Second Amended Appaloosa EPCA. It is not.

14. The Second Amended Appaloosa EPCA is a total abandonment of the Original Appaloosa EPCA. It requires a new motion establishing the bases for the relief sought, any bases as to the lack of enforceability of the Court-approved EPCA, any bases for the Debtors' abandonment of the Court-approved EPCA, and, of course, fully describing the entirety of the new agreement *on sufficient notice to all creditors with the corresponding right for them to be heard*. The Debtors failed to file such a motion or to provide notice. Thus, the EPCA Amendment Motion is procedurally deficient and should be denied.

### B. THE ORIGINAL APPALOOSA EPCA REMAINS VALID AND ENFORCEABLE.

15. The Original Appaloosa EPCA has not been terminated and the Plan Investors remain obligated to meet their obligations thereunder. The Original Appaloosa EPCA was

---

[2] The Delphi Trade Committee reserves its rights to supplement this objection with information learned in ongoing discovery.

7

presented to the Court and accepted under the guise that it was a real commitment that exposed the Plan Investors to real risk, including risks that capital markets could get weaker and GM revenues might decrease. In exchange for that risk, the Plan Investors received tens of millions of dollars in commitment fees.

16. The Debtors' assertions that the Original Appaloosa EPCA needs to be amended due to capital market dislocation and reduced GM production value are disingenuous and misplaced. See EPCA Amendment Motion ¶¶ 21 – 25. The fact is that the Original Appaloosa EPCA did not terminate.[3] There is no justifiable basis for the Plan Investors to just walk away from the deal negotiated, agreed to, and approved by this Court just 3 months ago.

17. Section 12(d) of the Original Appaloosa EPCA permits the Plan Investors to terminate the agreement upon occurrence of certain events. Upon information and belief, none of those events has occurred. Specifically, Section 12(d)(v), which permits termination if the Debtors breach certain representations, warranties, and covenants, was never triggered so as to permit termination.

18. As this Court expressed at the November 16, 2007 hearing on the Debtors' request for authority to obtain exit financing:

> I also approved the August amendment to the [EPCA] because it curtailed the number of outs that the investors had. And in particular, it curtailed the financing out and the market condition out in the material adverse effect provision. I am very distressed, at least based upon what I have seen as the basis for the change to the EPCA, which is financing conditions that were well known to the parties in August and which they said would not constitute a material adverse effect being asserted, as well as a minor change, generally, as to GM's requirements in the business. Which, frankly, also appears to be to have been excluded from the material adverse effect provision of the agreement. Now, you may say that the plan has changed because you can't provide as much cash to cash out creditors. I have a hard time seeing how that effects the equity investors, particularly given

---

[3] If the Original Appaloosa EPCA was terminated, the Debtors failed to disclose that publicly. Unlike when the Original EPCA was terminated, the Debtors never filed any SEC statements or otherwise stating that the agreement terminated.

GMs responsible agreements here to take less cash as a customer and as part of its settlement.

Transcript of November 16, 2007 Hearing at 22:19 – 23:10.

19.     In fact, in the EPCA Amendment Motion, the Debtors never state that the Original Appaloosa EPCA was terminated. Rather, they carefully and vaguely argue that the proposed EPCA amendment "reflects the Debtors' efforts to adapt, improvise, and overcome various industry specific and macroeconomic challenges that have arisen during the past several months." (Motion at ¶ 41). But those "challenges" do not permit the Plan Investors to highjack the plan process and, as described below, to usurp value that was properly to be provided to General Unsecured Creditors.

20.     Ironically, the Debtors further argue that the First Amended Appaloosa EPCA "would provide greater certainty that the transactions contemplated in the Delphi-Appaloosa EPCA ultimately will be concluded." Id. However, just two weeks after making this statement, the Plan Investors killed that amended EPCA and Appaloosa issued a 13D/A saying: "On November 6, 2007, as a result of certain of the conditions set forth therein not being satisfied, the Revised Proposal terminated in accordance with its terms."

21.     Shamelessly, the Debtors then filed the Second Amended Appaloosa EPCA that transferred *enormous* value from the Debtors' creditors to their Plan Investors and that has been met with universal creditor opposition.[4] Therefore, it is clear that the proposed EPCA amendments provide no "certainty," whatsoever, but rather threaten the process altogether.

---

[4]     See e.g. *Objection of the Official Committee of Unsecured Creditors to Debtors' Expedited Motion Under 11 U.S.C. Section 363 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 for Order Authorizing Debtors' Entry Into Exit Facility Engagement and Fee Letters and Performance Thereunder* [Docket No. 10930]; *Limited Objection and Reservation of Rights filed by Allan S. Brilliant on behalf of Caspian Capital Advisors, LLC, Castlerigg Master Investments Ltd., Davidson Kempner Capital Management LLC, Elliot Associates, L.P., Nomura Corporate Research & Asset Management, Inc., Sailfish Capital Partners, LLC, Whitebox Advisors, LLC* [Docket No. 10903]; *Joinder of Caspian Capital Advisors, LLC; Castlerigg Master Investment Ltd.; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; Nomura Corporate Research & Asset Management, Inc.; Sailfish Capital*

9

22.     The Debtors' determination to proceed regardless demonstrates an utter lack of business judgment, a complete abandonment of its fiduciary responsibilities, and a basis to terminate exclusivity.

### C.  THE PROPOSED EPCA AMENDMENTS ARE ATTEMPTS TO USURP VALUE FROM GENERAL UNSECURED CREDITORS FOR PLAN INVESTORS BOTH AS INVESTORS AND SUBORDINATED CREDITORS.

#### 1.  The Plan Investors Would Profit Generously From The Proposed Amendments.

23.     The Second EPCA Amendment allows the Plan Investors to acquire more of the Reorganized Debtors' equity in exchange for the same investment, and value that was to be distributed to General Unsecured Creditors is being redistributed to the Plan Investors.

24.     As the following chart illustrates, from the Original Plan and the Original Appaloosa EPCA, to the First Amended Plan and the First Amended Appaloosa EPCA, through the Second Amended Plan and Second Amended Appaloosa EPCA, the percentage return on investment to the Plan Investors has gone up, while the value being distributed to the General Unsecured Creditors has gone down.

---

*Partners, LLC; and Whitebox Advisors, LLC to Objection of the Official Committee of Unsecured Creditors to Debtors' Expedited Motion Under 11 U.S.C. 363 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 For Order Authorizing Debtors' Entry Into Exit Facility Engagement and Fee Letters and Performance Thereunder* [Docket No. 10952]; *Joinder by the Delphi Trade Committee to the Objection of the Official Committee of Unsecured Creditors to Debtors' Expedited Motion Under 11 USC 363 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 for Order Authorizing Debtors' Entry into Exit Facility Engagement and Fee Letters and Performance Thereunder* [Docket No. 10953] (each voicing creditor opposition to the Second Amended Plan).

| | Consideration to Unsecured Creditors | Plan Value | Rothschild Mid-Point[5] | Return on Investment to Plan Sponsors | | Recovery of Unsecured Creditors | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Plan Value | Rothschild Mid-Point[1] | Plan Value | Rothschild Mid-Point |
| Original Plan/Original Appaloosa EPCA | 80% Stock; 20% Cash | $13.9 billion | $12.9 billion | 28.1% | 13.6% | 100% | 89.1% |
| First Amended Plan/EPCA | 92.4% Stock; 7.6% Discount Rights | $13.0 billion | $12.7 billion | 26.0% | 17.6% | 100% | 92.9% (if buy in) |
| Current Plan/EPCA | 75.5% Stock; 24.5% Discount Rights | $13.4 billion | $12.7 billion | 54.8% | 40.6% | 100% | 87.1% (if buy in) |

25.    Critically, in the Second Amended Appaloosa EPCA, unlike the Original Appaloosa EPCA, General Unsecured Creditors must pay the Debtors to receive their Plan treatment. Unlike the Original Appaloosa EPCA which provided 80% stock and 20% cash, the Second Amended Appaloosa EPCA, through the Discounted Rights Offering, requires substantial cash outlay without which General Unsecured Creditors are deprived of 25% of their recovery. Because the Second Amended Appaloosa EPCA requires General Unsecured Creditors to invest in the Debtors in order to realize their recovery, it necessarily depletes the value that is actually provided to General Unsecured Creditors. All that is done to the direct benefit of the Plan Investors who profit from the benefits transferred away from General Unsecured Creditors.

26.    From the First Amended Plan/EPCA to the Current Plan/EPCA -- documents that were filed approximately two weeks apart -- over $500 million of value was transferred from the unsecured creditors to the Plan Investors as a result of the reduction in the stock grant and the significant discount on the conversion of the preferred stock. Thus, overall, from the first

---

[5]    The Delphi Trade Committee does not agree that the Rothschild Mid-Point is a proper expression of the value of the Debtors. The Rothschild Mid-Point is used in this chart for illustrative purposes only.

11

iteration of the Plan to the Current Plan, the Plan Investors have gotten more, while the General Unsecured Creditors ultimately have gotten less. The Court should not countenance this result.

27.     This depletion is critically problematic because, as set forth above, there was no valid basis whatsoever for departure from the Original Appaloosa EPCA and because (as set forth below) this result was reached without any market testing and without the Debtors' showing of any justifiable reason supporting the exercise of their sound business judgment.

### 2.    The Potential Investors Are Using Their Positions As Investors To Obtain A Return On Their Subordinated Claims.

28.     In addition, it appears that the Plan Investors are utilizing their position as potential plan investors to leverage their recoveries as subordinated creditors. The Plan Investors are believed to be substantial holders of the TOPrS.[6] Under the Second Amended Appaloosa EPCA, the Plan Investors continue to require that the Plan place all General Unsecured Creditors, including the subordinated TOPrS in the same class and, moreover, that TOPrS receive a recovery even though General Unsecured Claims, which are senior, are not paid in full (as described above). This violates the absolute priority rule and the express language of the indenture governing the Subordinated Notes giving rise to the TOPrS claims. See Subordinated Notes Indenture at § 17.01 ("The Corporation covenants and agrees that anything in this Indenture or the Debt Securities of any series to the contrary notwithstanding, the indebtedness evidenced by the Debt Securities of each series or any Coupons appurtenant thereto is subordinate and junior in right of payment to all Senior Debt . . . In the event of any . . . bankruptcy . . . all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in

---

[6]    Although counsel for the Plan Investors filed a Verified Statement pursuant to Bankruptcy Rule 2019 on June 6, 2006 disclosing collective ownership of $285.43 million of the Debtors' debt securities, the Plan Investors have not publicly updated this information or disclosed specific issuances of these debt securities including in the TOPrS.

cash, securities, or other property, shall be made to any Holder of any of the Debt Securities or Coupons on account thereof."); 11 U.S.C. § 1129(b) (requiring for cramdown of classes of unsecured creditors that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."). Similarly, the placement of TOPrS claims in the class of general unsecured claims violates Section 1122 of the Bankruptcy Code, which renders the Second Amended Plan unconfirmable. Even if such classification did not render the Plan patently unconfirmable, the Court must reject the Second Amended Appaloosa EPCA unless and until the Debtors disclose the basis for classifying the TOPrS with the other General Unsecured Creditors, the known (to the Debtors or the Plan Investors) ownership of Plan Investors (Appaloosa), the tie-in to the investment of the TOPrS treatment, and all other relevant facts as to why the Debtors are providing the TOPrS a (1) 76.8% recovery for a clearly out of the money, subordinate constituent when the senior creditors receive 87% at Rothschild's mid-point and/or a (2) 50% recovery for a clearly out of the money, subordinate constituent when the senior creditors receive 62% at Rothschild's low point.

29.     Moreover, placing TOPrS claims in the class of general unsecured claims dilutes the votes of the holders of general unsecured creditors by such a large margin that the nearly universal creditor opposition to the Second Amended Plan may be drowned out by the fact that the class, as a whole, may accept that plan. If this is approved, it would permit the Plan Investors to gerrymander the votes on the Second Amended Plan and to quash any opposition to their continued and increased pillaging of the Debtors' estates. This should not be allowed. See In re Chateaugary Corp., 89 F.3d 942, 949 (2d Cir. 1996) (stating that a debtor may not classify claims "for the sole purpose of creating an impaired assenting class").

### D.  THE DEBTORS HAVE FAILED TO SHOW THAT AMENDING THE ORIGINAL APPALOOSA EPCA IS WITHIN THEIR SOUND BUSINESS JUDGMENT.

30. Through the EPCA Amendment Motion (and the Second Amended Appaloosa EPCA which is not addressed by that motion), the Debtors propose an entirely new deal that must, on its own, satisfy the requirements of section 363 of the Bankruptcy Code. The Debtors must demonstrate why simply revamping the Original Appaloosa EPCA – over the overwhelming opposition of their creditors – is an appropriate exercise of the Debtors' business judgment. The Debtors have failed to do so. Specifically, the Debtors have failed to demonstrate that they exercised sound business judgment in keeping the EPCA process with the Plan Investors away from an open market. They have also not shown why pursuing an EPCA (in any form), rather than an alternative plan structure, continues to be in the best interests of their estates.

#### 1.  The EPCA Process Should Be Opened Up To The Market.

31. The Debtors cannot explain why the EPCA should, at this point, be kept from competition on the open market. Although the Original Appaloosa EPCA resulted from a certain level of market competition, there appears to have been none in connection with the Second Amended Appaloosa EPCA. In fact, without market testing of the Second Amended Appaloosa EPCA, there is no way to determine whether the amendment is in the best interest of the Debtors' estates. See In re Bank of Am. Nat'l Trust & Sav. Assoc. v. N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999) (stating that the best way to determine value of debtor is exposure to market). If, as the Debtors contend, the proposed EPCA amendments are the result of dramatic changes in the markets, then testing a true alternative proposal is essential to examining their fairness and whether they are in the best interests of the Debtors' estates. That does not mean simply taking the Plan Investors deal to others and seeing if they will take it or better it. It is

14

seeing whether an alternative transaction that yields higher, truer value exists in the market for the benefit, not of the investors (or at least not exclusively them), but of the creditors.

32.     Indeed, if the Second Amended Appaloosa EPCA is approved, the Debtors are obligated to pay fees of $28,687,500 regardless of approval of the Second Amended Disclosure Statement or confirmation of the Second Amended Plan (in addition to the $35 million already paid) and be committed to an $82,500,000 break-up fee for a fundamentally flawed transaction that will be broken up. See Sections 2(l) and 12(g). Moreover, pursuant to Section 4(b) of the Second Amended Appaloosa EPCA, the Debtors provided a covenant that their proposed plan would contain terms "consistent" with the terms of the Second Amended Appaloosa EPCA. Accordingly, if the Court approves the Second Amended Appaloosa EPCA and, because of anticipated creditor opposition, the Debtors are forced to modify their plan in a manner deemed "inconsistent" with the Second Amended Appaloosa EPCA, the Debtors estates will necessarily lose $28,687,500; which would be at the expense of the Debtors' creditors.

33.     As such, the Second Amended Appaloosa EPCA locks the Debtors into paying an astronomical fee on a dead deal without ever looking for another.

**2.     The Debtors Must Demonstrate That An Equity Purchase Commitment, of Any Form, Remains In The Best Interests Of Their Estates.**

34.     The Second Amended Appaloosa EPCA is so drastically different from the Original Appaloosa EPCA, both in terms of value to the Debtors' creditors and consideration given to the Plan Investors that the Debtors also must, in their fiduciary capacity, reexamine and demonstrate to this Court whether an equity commitment, in any form, is the proper path for emergence rather than an alternative path (e.g., a creditor sponsored plan).

35.     Finally, upon information and belief, the individual entities that constitute the Plan Investors are contractually precluded from bidding on any competing plan structure. The

15

Debtors must disclose what weight they gave to this fact in deciding not to consider an alternative plan structure.

E.  **THE EPCA AMENDMENT SHOULD BE DENIED BECAUSE IT DICTATES A PLAN THAT IS UNCOMFIRMABLE**

36.  The Second Amended Appaloosa EPCA requires the Debtors to propose a Plan that is unconfirmable (See Section 4(b)) and is likely to be voted down for the following reasons among others:[7]

- Classification. The Second Amended Appaloosa EPCA requires that the Plan classify different claims, i.e., General Unsecured Claims and TOPrS, together in violation of Section 1122. The TOPrS are subordinate to General Unsecured Claims and must be classified and treated separately. See Subordinated Notes Indenture at § 17.01.

- Different Treatment Of Claims In Same Class. The current Plan treats allowed and disputed trade claims differently though they are classified together by denying Disputed Claims any post-Effective Date interest. That constitutes different treatment of claims in the same class in violation of § 1123(a)(4) of the Bankruptcy Code.

- Absolute Priority Rule. As described above, General Unsecured Claims are not being paid in full - - yet junior creditors, e.g. TOPrS, 510(b) claims and equity holders, are receiving a distribution.

- Post-Petition Interest. The Second Amended Appaloosa EPCA requires a Plan that provides for post-petition interest only through the earlier of January 31, 2008 or confirmation rather than through the payment date.

- Free Stock. The Second Amended Appaloosa EPCA requires that if the total amount of trade and other unsecured claims exceeds $1.45 Billion, that Plan Investors are entitled to receive additional common stock for no consideration. See Section 9(xxii). That provision, which is intended to protect the Plan Investors from dilution, has the exact opposite affect on General Unsecured Creditors by risking substantial dilution to their distributions.

---

[7] See also *Objection Of The Delphi Trade Committee To TheFirst Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession* (filed concurrently herewith); see also pleadings cited in note 5, supra.

- <u>Good Faith</u>.  The fact that the Debtors have not proposed the current Plan in good faith is evident.  For instance, the leverage of the TOPrS raises grave concerns about the good faith of the parties to the process.  This prevents this Court from finding that the Plan satisfies the good faith requirements of Section 1129(a)(3).

## **CONCLUSION**

For the foregoing reasons, the Delphi Trade Committee requests that the Court deny the EPCA Amendment Motion and grant such other and further relief as is just and proper.

Dated: New York, New York
November 21, 2007

> KASOWITZ, BENSON, TORRES
> & FRIEDMAN LLP
>
> <u>/s/ David S. Rosner</u>
> David S. Rosner (DR-4214)
> Adam L. Shiff (AS-7571)
> Daniel N. Zinman (DZ-7562)
> Daniel A. Fliman (DF-2236)
> 1633 Broadway
> New York, New York 10019
> Telephone: (212) 506-1700
> Facsimile:  (212) 506-1800