GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York  10022
(212) 813-8800
Allan S. Brilliant (AB 8455)
Craig P. Druehl (CD 2657)
Meagan E. Costello (MC 0962)

    - and -

GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1330
Gina Lynn Martin (GM 1324)

Attorneys for Caspian Capital Advisors, LLC;
Castlerigg Master Investments Ltd.;
CR Intrinsic Investors, LLC; Davidson
Kempner Capital Management LLC; Elliott
Associates, L.P.; Nomura Corporate Research
& Asset Management, Inc; Sailfish Capital Partners,
LLC; and Whitebox Advisors, LLC

Hearing Date:  November 29, 2007 at 10:00 a.m.
Objection Deadline:  November 21, 2007 at 9:30 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

**SUPPLEMENTAL AND RESTATED OBJECTION OF CASPIAN CAPITAL ADVISORS, LLC; CASTLERIGG MASTER INVESTMENTS LTD.; CR INTRINSIC INVESTORS, LLC; DAVIDSON KEMPNER CAPITAL MANAGEMENT LLC; ELLIOTT ASSOCIATES, L.P.; NOMURA CORPORATE RESEARCH & ASSET MANAGEMENT, INC.; SAILFISH CAPITAL PARTNERS, LLC; AND WHITEBOX ADVISORS, LLC TO MOTION TO APPROVE (A) PROPOSED DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION, AND (B) MOTION FOR ORDER APPROVING (I) DISCLOSURE STATEMENT, (II) RECORD DATE, VOTING DEADLINE, AND PROCEDURES FOR TEMPORARY ALLOWANCE OF CERTAIN CLAIMS, (III) HEARING DATE TO CONSIDER CONFIRMATION OF PLAN, (IV) PROCEDURES FOR FILING OBJECTIONS TO PLAN, (V) SOLICITATION PROCEDURES FOR VOTING ON PLAN, (VI) CURE CLAIM PROCEDURES, (VII) PROCEDURES FOR RESOLVING DISPUTES RELATING TO POSTPETITION INTEREST, AND (VIII) RECLAMATION CLAIM PROCEDURES**

**Table of Contents**

                                                                                    **Page**

PRELIMINARY STATEMENT ................................................................................. 1
RELEVANT BACKGROUND ................................................................................... 7
ARGUMENT.............................................................................................................. 10
    I. DISCLOSURE STATEMENT CANNOT BE CONFIRMED WHERE PLAN
       IS PATENTLY UNCONFIRMABLE.............................................................. 10
        A.    The Disclosure Statement Cannot Be Approved Because The Plan
             Violates Section 1122 Of The Bankruptcy Code.................................... 12
        B.    The Disclosure Statement Cannot Be Approved Where Plan Is
             Unconfirmable Because Claims Classified Together Receive
             Unequal Treatment In Violation Of Section 1123(a)(4) Of The
             Bankruptcy Code .................................................................................. 21
        C.    The Disclosure Statement Cannot Be Approved Where Plan Is
             Unconfirmable Because It Does Not Enforce Subordination
             Agreement In Violation of Section 510(a) of the Bankruptcy Code ....... 22
        D.    The Disclosure Statement Cannot Be Approved Where Plan Is
             Premised on Impermissible Deemed Consolidation ................................ 23
    II. DISCLOSURE STATEMENT IS REQUIRED TO, BUT DOES NOT,
       CONTAIN ADEQUATE INFORMATION...................................................... 25
        A.    Disclosure Statement Lacks Adequate Disclosure on the
             Implications of the Value of the New Common Stock and the
             Range of Recoveries Afforded to General Unsecured Creditors
             Under the Plan...................................................................................... 26
        B.    The Rothschild Valuation Does Not Contain Adequate Information
             Regarding the Value of the Debtors........................................................ 30
        C.    Disclosure Statement Lacks Adequate Disclosure on the Economic
             Interests and Involvement of the Plan Investors and GM in
             "Negotiating" the Plan ......................................................................... 32
        D.    Disclosure Statement Lacks Adequate Disclosure on the Plan's
             Proposed Treatment of Intercreditor Rights ........................................... 35
        E.    Disclosure Statement Lacks Adequate Information of Impact of
             Debtors' Present Lack of Committed Exit Financing.............................. 37
        F.    Disclosure Statement Lacks Adequate Disclosure Regarding
             Substantive Consolidation .................................................................... 39
        G.    Disclosure Statement Lacks Adequate Disclosure on the GM
             Claim................................................................................................... 41
        H.    Disclosure Statement Does Not Contain Adequate Information on
             Releases Under the Plan........................................................................ 43
        I.    The Disclosure Statement Does Not Contain Adequate Information
             on the MDL Settlements ....................................................................... 46
WAIVER OF MEMORANDUM OF LAW ................................................................. 48
CONCLUSION........................................................................................................... 48

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Caspial Capital Advisors, LLC; Castlerigg Master Investments Ltd.; CR Intrinsic

Investors, LLC; Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura

Corporate Research & Asset Management, Inc; Sailfish Capital Partners, LLC; and Whitebox

Advisors, LLC or any respective affiliates thereof or funds and accounts directly managed by

each of the foregoing (each, a "Creditor"), each in their individual capacity as a Creditor of

Delphi Corporation (together with certain of its debtor affiliates and subsidiaries, collectively the

"Debtors"), and collectively substantial creditors thereof, by and through their counsel, Goodwin

Procter LLP, as and for this supplemental and restated objection (this "Objection") to the

Disclosure Statement with Respect to the Joint Plan of Reorganization of Delphi Corporation and

Certain Affiliates, Debtors and Debtors-in-Possession [Docket No. 9264], and the Motion For

Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, And Procedures

For Temporary Allowance Of Certain Claims, (III) Hearing Date To Consider Confirmation Of

Plan, (IV) Procedures For Filing Objections To Plan, (V) Solicitation Procedures For Voting On

Plan, (VI) Cure Claim Procedures, (VII) Procedures For Resolving Disputes Relating To

Postpetition Interest, And (VIII) Reclamation Claim Procedures [Docket No. 9266] (the

"Disclosure Statement Motion") respectfully states as follows:

## PRELIMINARY STATEMENT

The Disclosure Statement,[1] in its current form, should not be approved.  First, as a

threshold matter, the Court should not approve the Disclosure Statement and allow the Debtors

to solicit acceptances of the Plan because the Plan is opposed by substantially all of the Debtors'

major creditor constituencies.  Each Creditor opposes the Plan.  The Official Committee of

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Disclosure
Statement.

Unsecured Creditors opposes the Plan, calling it "dead on arrival."  In fact, the only creditor

constituencies that appear to support the current Plan are those that impermissibly benefit from

it:  the Plan Investors, who are seeking to put in new money at an outsized amount, and GM, who

is seeking a cash payment and senior securities on account of its unsecured claims.  This Court

should not approve, and waste the time, money and effort associated with solicitation of, a Plan

that is unable to be confirmed because it will not garner the requisite votes.

Moreover, the Disclosure Statement should not be approved because the Plan contains a

patently nonconfirmable classification scheme that (i) classifies dissimilar claims in the same

class in violation of Section 1122(a) of the Bankruptcy Code and (ii) provides different treatment

to claims classified together within a single class in violation of Section 1123(a)(4) of the

Bankruptcy Code.  Class 1C of the Plan contains the claims of the holders of the Senior Notes

and the holders of the subordinated TOPrS each of which were issued by Delphi or its

predecessor in interest, as well as certain trade claims held by creditors not only of Delphi, but

also other Debtors.  The classification of claims with different priorities—both senior and

subordinated claims—in the same class violates Section 1122(a) of the Bankruptcy Code, which

allows only "substantially similar" claims to be classified together.  The placement of claims

against different Debtors in the same class also violates Section 1122.  The Plan is also

nonconfirmable because the holders of the TOPrS claims, although classified in the same class

with the holders of the Senior Notes and other General Unsecured Creditors, do not receive the

same distribution as the other Claims in Class 1C, in violation of Section 1123(a)(4).

Additionally, the Plan cannot be confirmed because it does not enforce the subordination

agreement between the Senior Notes and TOPrS thereby violating Section 510(a) of the

Bankruptcy Code.  In light of these clear violations of the Bankruptcy Code, this Court should

not approve the Disclosure Statement and permit the Debtors to incur the expenses associated with the solicitation of votes on the Plan because the Plan is patently unconfirmable.

Another aspect of the Plan that renders solicitation unwarranted is the assumption made in the Plan that this Court can order the substantive consolidation of certain Debtors for voting and distribution purposes only.  The Debtors, however, are not seeking true substantive consolidation, but instead an improper and inappropriate "deemed consolidation."  As with the other violations of the Bankruptcy Code described herein, the assumption that substantive consolidation can be ordered renders the Plan nonconfirmable because the Debtors have not met and will be unable to meet their burden of proof for substantive consolidation.  Accordingly, the Court should not approve the Disclosure Statement and permit the Debtors to commence the costly and time-consuming solicitation process when the Plan is premised on impermissible and unattainable substantive consolidation.

In addition to the substantive violations of bankruptcy law described above, the Disclosure Statement contains inadequate disclosure on many critical issues.  First, the Plan does not accurately disclose the value of the distributions that are being made to creditors.  The Plan assumes and repeatedly states that General Unsecured Creditors are being paid in full at the "Plan Equity Value" of $61.72 per share of the New Common Stock, even though Rothschild, Inc. ("Rothschild"), the Debtors' financial advisor, has valued the New Common Stock between $45.25-$66.79 per share, with a mid-point of $56.05 (as amended, the "Rothschild Valuation").  What the Disclosure Statement does not adequately disclose is that (i) even the Rothschild calculation of the per share values appear to be false and misleading because they do not ascribe any value to the Series A or Series B New Preferred Stock; (ii) there is no evidence, and there has been no finding, that the New Common Stock will actually be valued at $61.72 per share; (iii) at values lower than the "Plan Equity Value," including at the mid-point of the range of the

values under the Rothschild Valuation, General Unsecured Creditors including the Senior Notes will not receive full payment on account of their claims; and (iv) that <u>unless</u> General Unsecured Creditors fully participate in the Discount Rights Offering, such creditors will actually receive a recovery of between 55.4% and 81.7% on account of their claims.[2]

The recovery to General Unsecured Creditors is currently comprised of two components: (a) New Common Stock in an amount equal to 75.5% of the claim (based on a $61.72 per share value) and (b) the value of discount rights equal to 24.5% of the claim (the option to purchase New Common Stock supposedly worth $61.72 at a per share price of $38.39). Thus, in order to receive a 100% recovery on account of their claims, the New Common Stock must be actually worth $61.72 per share <u>and</u> holders of General Unsecured Claims must fully participate in the Discount Rights Offering—meaning that these creditors must purchase additional shares of New Common Stock and assume all of the attendant market risks associated with such ownership. In fact, General Unsecured Creditors other than the holders of the TOPrS and the MDL claims <u>must</u> invest approximately $1.3 billion, or approximately $0.40 for every $1.00 of claims, in order to receive this alleged 100% recovery.

Notwithstanding the Debtors' statements that the Senior Notes (and General Unsecured Creditors) are getting "100% recovery," the implied range of recovery is actually between 62.6% and 111.5%,[3] with a mid-point recovery of 87.1%, under the Rothschild Valuation. Moreover, Rothschild has set forth an unusually wide range for the Total Equity Value of the Reorganized Debtors and, as a result, the recoveries afforded the General Unsecured Creditors under the Plan will likely vary significantly from the 100% recovery estimated by the Debtors. Thus, it is far

---

[2]    Each Creditor expressly reserves all of its rights and remedies regarding the valuation of the Debtors, and any references to the Debtors' valuation report herein shall not be construed as an acceptance of the valuation report by any Creditor or a waiver of any of such Creditor's rights or remedies in connection therewith.

[3]    This range is based on Rothschild's per share prices which as noted herein appear to be inflated.

from certain that General Unsecured Creditors will be paid in full under the Plan, and it is misleading for the Debtors to say in the Disclosure Statement that General Unsecured Creditors are receiving a 100% recovery, when such creditors are forced to bear significant uncertainty associated with the market value of the New Common Stock.

Moreover, the stated increases in the Total Enterprise Value and the negotiated value of the New Common Stock under the most recent Plan revisions, from $41.58 per share to $61.72 per share, is not a result of any increase in value of the Debtors from previous versions of the Plan but, rather, a convenient mathematical equation that allows the Plan Investors to purchase shares at a steep discount while still allowing the Debtors to claim that holders of Senior Notes will receive a 100% recovery.

Second, the Disclosure Statement does not provide sufficient information on the valuation of the New Common Stock, given its importance in assessing the distributions to creditors. The Rothschild Valuation annexed as Appendix D to the Disclosure Statement and subsequently amended is incomplete and misleading. It fails to set forth any of the hallmarks of a well-reasoned, well-founded valuation. It fails to contain details concerning a comparable company analysis, discussions of an appropriate EBITDAR multiple, a discounted cash flow analysis, a range of recoveries under these analyses at the low, mid-point and high end of the valuation or the impact of any dilution from the New Warrants, the Management Compensation Plan, any claims above the $1.475 billion threshold, or shares issued to the Plan Investors on account of their anti-dilution protection associated therewith (and the significant option value granted to the Plan Investors). Moreover, the recoveries to subordinated creditors such as the TOPrS and to interest holders is premised upon the General Unsecured Creditors receiving a full recovery, yet the Disclosure Statement is devoid of any discussions of the impact of recoveries of all creditors and interest holders at different points in the valuation—including at points where

5

senior creditors are not paid in full.  Without additional and more complete disclosure, parties-in-interest will be unable to assess complete valuation information and decide how to vote on the Plan.

Third, the Disclosure Statement should also disclose whether the Plan Investors are also holders of the subordinated TOPrS and (i) the amounts and types of the Debtors' debt and equity interests held by the Plan Investors; (ii) the role the Plan Investors played in negotiating the recoveries afforded to (a) the Senior Notes (b) the TOPrS and (c) Existing Common Stock; (iii) whether the Plan Investors exerted any influence over the terms and economics of the Plan and (iv) whether the Plan Investors misused their position to ensure that the subordinated TOPrS receive a distribution under the Plan.

Fourth, the Disclosure Statement must also contain additional disclosure on the numerous intercreditor issues implicated by the Plan.  Not only are the holders of the Senior Notes and the subordinated TOPrS classified together, but by voting to accept the Plan, holders of the Senior Notes are forced by the Debtors to waive their contractual seniority vis à vis the TOPrS—including payment of some or all of the accrued and unpaid post-petition interest—even if the Debtors are solvent.  Moreover, the Plan deems the subordination provisions between the TOPrS and the Senior Notes "satisfied" under the Plan, but the Disclosure Statement does not disclose that the holders of Senior Notes have not consented to this treatment nor does it describe the impact of this deemed satisfaction or the authority pursuant to which the Debtors may alter parties' contractual relationships.

Lastly, the Disclosure Statement lacks meaningful disclosure regarding a number of other topics, including: (i) the likelihood of the Debtors obtaining Exit Financing, the consequences if such is not obtained before the Confirmation Hearing or the Effective Date; (ii) the factors required for substantive consolidation and the effect it has on various creditor groups; (iii) the

costs, benefits and effects of the settlement of the GM Claim; (iv) the releases provided to non-

Debtor parties under the Plan, each of which is necessary to enable a hypothetical investor to

make an informed judgment about the Plan; and (v) the impact on the recoveries paid to General

Unsecured Creditors of the Debtors' attempts to provide a recovery to otherwise subordinated

creditors under the MDL Settlements.

Absent additional disclosure on these matters and the other matters described in this

Objection, the Disclosure Statement does not contain adequate information as required by 11

U.S.C. § 1125(a) and should not be approved.

## **RELEVANT BACKGROUND**

1.      On October 8 and 14, 2005, each of the Debtors commenced these cases (the

"Cases") under chapter 11 of title 11, United States Code, 11 U.S.C. § 101 *et seq.* (the

"Bankruptcy Code").  The Cases have been consolidated for administrative purposes only, but

have not been substantively consolidated.

2.      On July 18, 2007, the Debtors filed their Motion for Order Authorizing and

Approving Delphi-Appaloosa Investment Equity Purchase and Commitment Agreement

Pursuant to 11 U.S.C. §§105(a), 363(b), 503(b), and 507(a), dated July 18, 2007 [Docket No.

8673] (the "Delphi-Appaloosa EPCA").

3.      On September 6, 2007, the Debtors filed the Plan and Disclosure Statement and

the Motion for Order Approving (I) Disclosure Statement, (II) Record Date, (III) Hearing Date to

Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation

Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving

Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures.

4.      On October 3, 2007 the Debtors began the hearing to approve the Disclosure

Statement before this Court.  The hearing was continued to October 25, 2007 and has

subsequently been continued to November 8, 2007 pursuant to the Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitations Procedure Motion and (B) Setting Hearing Date and Related Procedures for Potential Motions Amending Investment Agreement and Approving Certain Exit Financing Agreements dated October 19, 2007 [Docket No. 10662].

5.       On October 29, 2007, the Debtors filed the Notice of Potential Amendments To Debtors' Disclosure Statement With Respect To Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices and Exhibits Related Thereto [Docket No. 10759] (the "DS Notice").  Attached thereto as various exhibits were, inter alia, (i) certain pages of the First Amended Disclosure Statement With Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and certain Affiliates, Debtors and Debtors-In-Possession, (Exhibit A) (the "First Amended Disclosure Statement"), reflecting changes to the intial Disclosure Statement; (ii) certain pages of the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (Exhibit B) (the "First Amended Plan"), reflecting changes to the intial Plan; and (iii) a valuation analysis (Exhibit E).

6.       On October 30, 2007, the Debtors filed the Expedited Motion For Order Under 11 U.S.C. Sections 105(a), 363(b), 503(b), And 507(a) Authorizing And Approving Amendment To Delphi-Appaloosa Equity Purchase And Commitment Agreement [Docket No. 10760].  Attached thereto was the First Amendment to the Equity Purchase and Commitment Agreement (the "EPCA Amendment").

7.       On November 2, 2007, certain of the Creditors filed the Objection of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; Davidson Kempner Capital Management Llc; Elliott Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners,

LLC; and Whitebox Advisors, LLC to Motion to Approve (A) Proposed Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, and (B) Motion for Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures [Docket No. 10803] (the "Initial Objection").

8.      On November 7, 2007, this Court entered the Second Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Motion to Amend Investment Agreement [Docket No. 10864], pursuant to which the Debtors were to use commercially reasonable efforts to file notice of further amendments to, among other things, the Plan and the Disclosure Statement on November 16, 2007.

9.      On November 14, 2007, the Debtors filed the Notice Of Further Proposed Amendments To Certain Appendices To Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession [Docket No. 10932] (the "Second DS Notice").  Attached thereto as various exhibits were, inter alia, (i) marked changed pages to the First Amended Plan (the "Restated First Amended Plan"), along with the Restated First Amendment To The Equity Purchase And Commitment Agreement ("Restated EPCA") (together with the Restated First Amended Plan, Exhibit A), and (ii) marked changed pages to the valuation analysis (Exhibit C) (as amended, the "Rothschild Valuation").

9

10.      On November 16, 2007, the Debtors filed the Notice Of Further Proposed
Amendments To Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization
Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession [Docket No.
10964] (the "Third DS Notice").  Attached thereto as Exhibit A were marked changed pages to
the First Amended Disclosure Statement ("Restated First Amended Disclosure Statement").

11.      In the amended valuation filed on November 14, 2007, Rothschild estimates that
total enterprise value of the Debtors is between $11.2 and $14.1 billion, with a mid-point of
$12.7 billion.  Rothschild Valuation at p. 2.  At the mid-point of the Rothschild Valuation, New
Common Stock is valued at $56.05 per share.  The "Plan Equity Value" of the New Common
Stock under the Plan is $61.72 per share, which amounts to an "negotiated" enterprise value of
the Reorganized Debtors of approximately $13.4 billion, an increase over the First Amended
Plan of $400,000,000.  See Restated First Amended Disclosure Statement at pp. xiii, xvii; First
Amended Disclosure Statement at p. xvii.  Despite the "Plan Equity Value" of the New Common
Stock and the increase in the "negotiated" enterprise value, the Plan Investors are afforded the
opportunity to purchase two series of preferred stock convertible at an "assumed" enterprise
value of $10.25 billion and $10.75 billion respectively, a decrease over the First Amended Plan
from $10.80 billion and $11.80 billion respectively, or an average discount of approximately
35% to the "Plan Equity Value".  See Restated First Amended Disclosure Statement at p. xiii;
First Amended Disclosure Statement at p. xiv.

## ARGUMENT

## I.

## DISCLOSURE STATEMENT CANNOT BE CONFIRMED WHERE PLAN IS PATENTLY UNCONFIRMABLE

12.      Under Section 1129(a)(1), in order for a Bankruptcy Court to confirm a Plan, the
Plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C.

§1129(a)(i).  Included in this mandate are, <u>inter alia</u>, Sections 510(a) (enforcement of subordination agreements), 1122 (classification of claims), and 1123 (treatment of creditors in same class) of the Bankruptcy Code.

13.     Where a disclosure statement accompanies a plan that is unable to be confirmed under the applicable provisions of the bankruptcy code, such disclosure statement should not be approved by a bankruptcy court.  <u>See</u>, <u>e.g.</u>,  <u>In re 3dfx Interactive, Inc.</u>, 2006 WL 2010786, *6 (Bankr. N.D. Cal. 2006) (even if disclosure statement contains adequate information, court may not approve the disclosure statement if the plan could not be confirmed);  <u>In re Main Street AC, Inc.</u>, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (same); <u>In re Curtis Center LP</u>, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) (a disclosure statement should not be approved where the plan it describes is patently unconfirmable); <u>In re 266 Washington Associates</u>, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) (disclosure statement not approved where plan contained patent legal defects); <u>In re Copy Crafters Quickprint, Inc.</u>, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1989) (approval of a disclosure statement should be withheld if it is apparent that the plan will not comply with Section 1129(a)).

14.     As set forth in greater detail below, the Plan violates Sections 510(a), 1122 and 1123(a)(4) of the Bankruptcy Code and is patently unconfirmable for many reasons.  <u>First</u>, the Plan improperly classifies several different types of claims and claims against different Debtors together in Class 1C.  <u>Second</u>, the Plan treats members of the same class differently by providing different recoveries to creditors classified in the same class.  <u>Third</u>, the Plan does not provide for the enforcement of a valid subordination agreement and does not properly seek the consent of the requisite majority of the Senior Notes to waive such subordination agreement.  <u>Finally</u>, the Plan impermissibly presupposes so-called "substantive consolidation" of certain Debtor entities for voting and distribution purposes only, in violation of applicable law.  For these reasons, the Plan

does not, and cannot, comply with Section 1129 of the Bankruptcy Code. As such, this Court should deny the motion to approve the Disclosure Statement and avoid the time and expense of having to re-solicit votes on a Plan that, in its current form, cannot be confirmed by this Court.

**A.    The Disclosure Statement Cannot Be Approved Because The Plan Violates Section 1122 Of The Bankruptcy Code**

15.    Section 1122 of the Bankruptcy Code provides in relevant part that "a plan may place a claim or an interest in a particular class <u>only</u> if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). As such, dissimilar claims <u>must</u> be separately classified. <u>In re Boston Post Road Limited Partnership</u>, 21 F.3d 477, 481 (2d Cir. 1994); <u>see also</u> <u>In re Worldcom, Inc.</u>, 2003 Bankr. LEXIS 1401, *138 (Bankr. S.D.N.Y. Oct. 31, 2003) (noting that if claims are classified together, they must be substantially similar). Additionally, a debtor's classification scheme cannot be designed with the "sole purpose of creating an impaired assenting class." <u>In re Chateaugay Corp.</u>, 89 F.3d 942, 949 (2d Cir. 1996) (a debtor may not classify claims with the "sole purpose of creating an impaired assenting class").

16.    These rules ensure that creditors holding sufficiently distinct interests and motivated by different considerations enjoy a sufficient and distinct voice in reorganization in order to protect their interests. <u>See</u> <u>In re Greystone III Joint Venture</u>, 995 F.2d 1274, 1277 (5th Cir. 1991) (Section 1122 prevents debtors from disenfranchising the votes of creditors holding distinct legal rights against the debtor's assets "by artful classification"); <u>In re Durrett</u>, 139 B.R. 1, 3 (Bankr. D.N.H. 1992) (Section 1122 protects the votes of creditors motivated by "totally different considerations" from undue influence by other creditors). As explained in greater detail below, the classification scheme proposed by the Plan violates these fundamental rules.

### 1.    The Claims in Class 1C Are Not "Substantially Similar"

17.    The Bankruptcy Code does not define what is meant by "substantially similar." The Second Circuit, however, has indicated that claims "enjoy[ing] similar rights and privileges" are substantially similar and should be classified together.  In re Boston Post Road Limited Partnership, 21 F.3d 477, 483 (2d Cir. 1994); see also In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (stating that the "relevant inquiry is whether all the claims of a class have substantially similar rights to the debtors' assets"); In re Northeast Dairy Cooperative Federation, Inc., 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987) ("[T]he primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant.  Emphasis is not upon the holder so much as it is on that which is held."); 7 Collier On Bankruptcy ¶1122.03[6] (L. King Rev. 15th ed. 2007) ("[O]nly claims carrying a similar interest in voting to accept or reject a plan should be classified together.").

18.    The claims in Class 1C are dissimilar for two reasons.  First, the Plan fails to distinguish between senior claims and subordinate claims.  Second, the Plan places creditors of different Debtors in the same class.   For both of these reasons, the Plan and, at this stage, the accompanying Disclosure Statement, should not be approved.

    a.    Senior and Subordinate Claims Cannot
         Be Classified in the Same Class

19.    The Plan violates the mandate of Section 1122 that only similar claims be classified together because it classifies dissimilar claims—the TOPrS and Senior Notes—together in Class 1C.  See Plan at §§ 1.82, 5.3.  Holders of subordinated claims have different rights to a debtor's assets than holders of claims senior to them and may not receive a distribution of estate property until senior claims are satisfied in full.  See In re McKenzie, 4 B.R. 88, 90 (Bankr. W.D.N.Y. 1980) ("Where each of two classes is unsecured, but one is by contract subordinated to the other, they have different rights in whatever property of the estate is

available for unsecured claims."). The Subordinated Notes Indenture provides that, in the event

of a bankruptcy, the holders of the Senior Notes must be paid in full (with interest) before any

distribution is made to the holders of the Subordinated Notes. See Subordinated Notes Indenture

at § 17.01 ("In the event of any . . . bankruptcy . . . all Senior Debt (including any interest

thereon accruing after the commencement of any such proceedings) shall first be paid in full

before any payment or distribution, whether in cash, securities, or other property, shall be made

to any Holder of any of the Debt Securities or Coupons on account thereof."). As such, the

subordination provision establishes "different rights" for holders of Senior Notes and holders of

subordinated TOPrS "in whatever property of the estate is available for unsecured claims."

McKenzie, 4 B.R. at 90.

      20.    Courts recognized the importance of the distinction between senior and

subordinated claims even prior to the enactment of the Bankruptcy Code. See e.g., Bartle v.

Markson, 314 F.2d 303, 305 (2d Cir. 1963) (confirming a portion of a plan allowing holders of

subordinated debentures to fully recover because the subordinated creditors were separately

classified and the senior unsecured creditors, who were aware of the subordination agreement,

voted to accept the plan) (emphasis added); Scolnick v. Connecticut Telephone & Electric Corp.,

265 F.2d 133, 135 (2d Cir. 1959) (confirming a plan separately classifying subordinated

debentures and other unsecured claims and providing for a lesser recovery to the holders of the

subordinated debt).

      21.    In St. Louis Union Trust Co. v. Champion Shoe Mach. Co., 109 F.2d 313 (8th

Cir. 1940), certain bondholders appealed a confirmation order on the grounds that the plan

classified all bondholders in the same class despite the existence of a subordination clause

affecting certain bondholders who had agreed to extensions of time for payment. 109 F.2d at

313, 315. The Eighth Circuit reversed the confirmation of the plan, finding that "the appellants'

14

rights were sufficiently distinct from those other bondholders to entitle the appellants and those who were similarly situated to a separate classification." Id. at 316.  The court noted that "[t]he rights of the bondholders who consented to the last extension were, by the terms of the trust indenture, subordinated to the rights of those who never consented to any extension and to the rights of those who consented only to the first extension." Id.  As such, "[t]he  plan which compels them to surrender, without adequate consideration and for the benefit of other bondholders, the superior rights which they acquired is inequitable and unfair." Id.  The Second Circuit Court of Appeals, citing St. Louis Union Trust, adopted this holding in Kyser v. MacAdam, 117 F.2d 232, 237 (2d Cir. 1941), when it held that a mortgage and a materialmen's lien, which have different priorities, could not be placed in the same class.

22.      Similarly, in In re Discon Corp., 346 F. Supp. 839 (S.D. Fla. 1971), unsecured creditors challenged the confirmation of a plan which placed all unsecured creditors, including holders of subordinated debentures, in one, equally treated class.  346 F. Supp. at 841-42.  The district court, noting that the Bankruptcy Act required separate classifications of debt and different treatment thereof where parties had contractually agreed to subordination, vacated the confirmation order.  Id. at 841, 845.  The court determined that the plan's single classification and equal treatment of all creditors failed to give proper recognition to the subordination agreement.  Id. at 845.

23.      The principles set forth in the pre-code cases apply with equal force today.  See Thomas C. Given and Linda J. Philipps, Equality in the Eye of the Beholder—Classification of Claims and Interests in Chapter 11 Reorganizations, 43 Ohio St. L.J. 735, 749 (1982) ("[C]lassification by subordination, as practiced by the bankruptcy courts sitting as courts of equity, has taken its place in the Code and deserves important consideration by a plan proponent when formulating a classification scheme.").  Indeed, in enacting Section 1122, Congress

indicated that the statute merely codified prior caselaw.  H.R. Rep. No. 95-595, 95th Cong., 1st

Sess. 406 (1977); S. Rep. No. 95-989, 95th Cong., 2nd Sess. 118 (1978); see also McKenzie, 4

B.R. at 90 (discussing the legislative history of Section 1122). Thus, courts have readily

approved classification schemes under the Bankruptcy Code where subordinate claims are

separately classified from senior claims.  See, e.g.,  In re Worldcom, 2003 Bankr. LEXIS 1401 at

*139 (finding that, because subordinated notes are dissimilar from senior notes, separate

classification was appropriate); In re Walnut Equip. Leasing Co., 1999 Bankr. LEXIS 1460, *4

n.4 (Bankr. E.D. Pa. Nov. 23, 1999) (finding it "rather obvious" that senior creditors and

subordinated creditors are not substantially similar and should be separately classified); In re

Cook, 26 B.R. 187, 190 (D.N.M. 1982) (noting that under the strictest interpretation of Section

1122, one of the only possible bases for separate classification of unsecured claims is the

existence of a subordination agreement); see also In re Solar King Corp., 90 B.R. 808, 819

(Bankr. W.D. Tex. 1988) (determining that claims subordinated under Section 510(b) are

properly placed in separate classes); John C. Anderson, Classification of Claims and Interests in

Reorganization Cases Under the New Bankruptcy Code, 58 Am. Bankr. L.J. 99, 116

(1984) (stating that "a subordination agreement would normally dictate separate classification for

nonsubordinated creditors"); 7 Collier On Bankruptcy ¶1122.03[4][a][ii] (L. King Rev. 15th ed.

2007) (stating that separate classification of subordinated claims is appropriate, if not required,

where some claims are subordinated to other unsecured creditors).[4]

24.    As in St. Louis Union Trust, Kyser v. MacAdam and their prodigy, the

classification scheme proposed by the Plan deprives the holders of Senior Notes of the right to be

a separate class and vote on whether to compromise their seniority or insist on their right to be

---

[4]    The Debtors tacitly acknowledge this principle by classifying their Section 510(b) claims separately.  See Plan
§5.5, 5.8.

paid in full (including interest) before the subordinated TOPrS receive any distributions.[5]

Approval of the classification structure under the Plan would yield the absurd result of having

subordinated creditors voting together with the senior creditors to waive the very rights that

distinguish them.

      b.     Claims Against Different Debtors Have Different
                Rights to the Debtors' Assets and Cannot Be Classified Together

    25.     The Plan further errs by placing creditors of different Debtors in the same class,

violating the mandate of Section 1122 that "all the claims of a class have substantially similar

rights to the debtor's assets." Drexel Burnham Lambert 138 B.R. at 757; see also Northeast

Dairy Cooperative, 73 B.R. at 250 (stating that, when analyzing a plan's classification scheme,

"[e]mphasis is not upon the holder so much as it is on that which is held."); cf. In re Richard

Buick, Inc., 126 B.R. 840, 853 (Bankr. E.D. Pa. 1991) (refusing to confirm a plan which

classified claims secured by different property in the same class). By their very nature, creditors

of different Debtors will look to and have the right to look to different and distinct entities for the

satisfaction of their claims. However, under the Debtors' Plan, this basic right is erased through

erroneous classification predicated entirely on substantive consolidation of the Debtors. As

explained in Part I.D., infra, the Debtors' substantive consolidation scheme is not true

consolidation, but, rather, an artificial "deemed" consolidation for voting and distribution

purposes only that has no basis in law. Substantive consolidation cannot be used, as the Debtors

propose here, solely to gerrymander votes and to disenfranchise senior creditors of Delphi

---

[5]    The plan, however, claims to satisfy the subordination provision by assuming that General Unsecured Creditors are being paid in full. See Restated First Amended Disclosure Statement at p. xxv. However, this is not a substitution for the proper classification mandated by the Bankruptcy Code. Moreover, whether or not General Unsecured Creditors are actually paid in full is not guaranteed under the range of values set forth in the Rothschild Valuation.

17

Corporation.[6]  See In re Owens Corning, 419 F.3d 195, 215 (3d Cir. 2005) (stating that

substantive consolidation should not be used "offensively" to achieve advantage over creditors,

"for example, by deeming assets redistributed to negate plan voting rights").

26.    Moreover, given the high burden the Debtors face in proving true substantive

consolidation (without regard for the artificial consolidation described in the Disclosure

Statement), it is improper for the Plan to assume for voting and distribution purposes that

substantive consolidation has been ordered.  The Disclosure Statement should not be approved

unless and until such an order has actually been entered based on an appropriate evidentiary

showing.[7]

**2.    *The Plan's Classification Scheme Is Designed for Gerrymandering Purposes***

27.    The Debtors disregard the purpose of classification by placing substantially

dissimilar claims together for the purpose of creating an impaired assenting class.  See In re

Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996) (stating that a debtor may not classify claims

with the "sole purpose of creating an impaired assenting class"); see also In re Boston Post Rd.

Ltd. Partnership, 21 F.3d 477, 481 (2d Cir. 1994) (classification to gerrymander an affirmative

vote is impermissible); In re Mid-State Raceway, Inc., 343 B.R. 21, 29-31 (Bankr. N.D.N.Y.

2006) (same).  While courts often invoke this principle to prevent a debtor from placing similar

claims in separate classes for gerrymandering purposes, the converse holds equally true: a debtor

cannot place dissimilar claims in the same class for the purpose of creating an impaired assenting

---

[6]    As this Court noted at the October 25, 2007 omnibus hearing, on the preliminary approval of the MDL
Settlement, there is an inherent risk of vote dilution on imperative issues when claims are not properly
classified.  See Transcript of October 25, 2007 Hearing, 05-44481 at pp. 56-57 (noting that allowing the MDL
class representatives to vote on the Plan before the MDL Settlement is approved did not harm the Creditors
because the MDL Settlement claims are separately classified so as not to dilute the votes of the objecting
parties).  However, by classifying the TOPrS and the General Unsecured Creditors of non-Delphi Debtors in the
same class as the holders of the Senior Notes, the votes of the holders of the Senior Notes are impermissibly
diluted.

[7]    For the same reasons, the Ballots should not be approved on a consolidated basis as the Debtors have proposed.

class.  See 7 Collier On Bankruptcy ¶1122.03[4][a][ii] (L. King Rev. 15th ed. 2007)

("[C]lassification of senior and subordinated claims in the same class is not permitted where the

votes of the subordinated claims could bind the holders of the senior claims to a plan that did not

enforce the subordination agreement."); In re Perskin, 9 B.R. 626, 631 (Bankr. D. Tex. 1981)

("[Section] 1122 prevents discrimination occasioned by amalgamating dissimilar claims into one

class to gerrymander a plan around typical multi-creditor difficulties faced by debtors.").

28.     Even where it is unclear whether various unsecured claims are dissimilar, courts

have, as a preventative matter, required a debtor to provide separate classifications where one

group of claimants may influence the outcome of the vote.  See, e.g., In re WorldCom, Inc., 2003

Bankr. LEXIS 1401, *18 (Bankr. S.D.N.Y. Oct. 31, 2003) (noting that the court had previously

required the debtor to separately classify trade claims and general unsecured claims because of

the court's concern that trade claimants could unduly influence the outcome of the vote if all the

claimants were in one class).  In In re Durrett, certain general unsecured creditors objected to the

inclusion in the same class of a creditor who had waived distributions under the plan in exchange

for a transfer of real property.  Durrett, 139 B.R. at 3.  The court determined that the creditor

receiving property must be classified separately.  Id.  Noting that the creditor was "influenced by

totally different consideration from those motivating the other creditors," the court determined

that, even if that creditor possessed a "claim similar to that of other members of the class . . . . the

vote of [that creditor] should not be permitted to tilt the class in favor of accepting the plan . . . ."

Id.

29.     As in Durrett, the classification scheme proposed by the Debtors can be

considered nothing other than an attempt to orchestrate the acceptance of the Plan by the holders

of Senior Notes by placing them in a class with other creditors so they can be outvoted as to a

plan that blatantly violates the absolute priority rule and section 510(a) of the Bankruptcy Code.

Upon information and belief, Appaloosa and the other Plan Investors, whose entire economic

interests in these Cases have not been adequately disclosed in the Disclosure Statement, are large

holders of the subordinated TOPrS.  As parties that were involved in the negotiation of terms and

economics of the Plan, the forced waiver of the subordination of the TOPrS under the Plan can

only be assumed to be part of the Plan at the insistence of the Plan Investors.  This Court should

not countenance the blatant attempts by the Plan Investors to force the Debtors to gerrymander

the votes so that the Plan Investors can enjoy an increased distribution in respect of their TOPrS

claims.  See In re Chateaugary Corp., 89 F.3d 942, 949 (2d Cir. 1996) (stating that a debtor may

not classify claims "for the sole purpose of creating an impaired assenting class").  By appeasing

the demands of the Plan Investors and classifying the TOPrS and General Unsecured Claims

together with the Senior Notes, the Debtors allow the entire class, including the TOPrS, to vote

to waive the right of the holders of Senior Notes to enforce the subordination agreement to which

the holders of TOPrS are bound.  See Subordinated Notes Indenture at § 17.01 ("In the event of

any . . . bankruptcy . . . all Senior Debt (including [interest]) shall first be paid in full before any

payment or distribution . . . shall be made to any Holder of any of the Debt Securities . . . .").[8]

Similarly, the disenfranchisement of the holders of Senior Notes is exacerbated by the inclusion

of claims against different Debtors despite there being no basis for substantive consolidation.

30.    Thus, through improper classification, the Debtors seek to silence the vote of

holders of Senior Notes and to give undue influence to the Plan Investors, thereby violating

Section 1122.  7 Collier On Bankruptcy ¶ 1122.03[6] (L. King Rev. 15th ed. 2007) ("[O]nly

claims carrying a similar interest in voting to accept of reject a plan should be classified

---

[8]    In addition, the Disclosure Statement Motion asks this Court to "clarify that claim splitting is not permitted and
order  that creditors who vote must vote all their claims within a particular class either to accept or reject the
Plan."  Disclosure Statement Motion at ¶ 69.  Thus, by classifying Senior Note Claims, TOPrS Claims and
General Unsecured Claims in one mega class of unsecured creditors, the Debtors are requiring that holders of
these claims vote to either accept or reject the Plan on account as a whole, without regard for the different
economic underpinnings of these claims.

together.").  Because the Plan impermissibly classifies dissimilar claims together in attempt to

gerrymander the votes of impaired debtors, the classification scheme renders the Plan patently

unconfirmable.  Accordingly, the Disclosure Statement cannot be approved.

**B.     The Disclosure Statement Cannot Be Approved Where Plan Is Unconfirmable
         Because Claims Classified Together Receive Unequal Treatment In Violation Of
         Section 1123(a)(4) Of The Bankruptcy Code**

31.     Section 1123(a)(4) requires that a plan "provide the same treatment for each claim

or interest of a particular class."  11 U.S.C. § 1123(a)(4).  Assuming, <u>arguendo</u>, that the

classification of the holders of Senior Notes with the other members of Class 1C were proper, the

Plan still fails the test established by Section 1129(a)(1) of the Bankruptcy Code because the

claims that are classified together in Class 1C receive different treatment under the Plan.  Courts

have held that, pursuant to Section 1123, each member of a class must receive the same

percentage recovery.  <u>See</u>, <u>e.g.</u>, <u>In re AOV Industries, Inc.</u>, 792 F.2d 1140, 1152 (D.C. Cir. 1986)

(Section 1123(a)(4) prohibits different percentage settlements to co-class members).

32.     Here, the Amended Plan provides that Post-Petition Interest will be paid to the

holders of General Unsecured Claims, but shall not be paid to TOPrS.  <u>See</u> <u>Restated First

Amended Plan</u> at § 1.156.  Despite this disparity, the holders of the Senior Notes, certain General

Unsecured Creditors and the TOPrS are classified together in Class 1C.  Although the Amended

Plan purports to provide a full recovery to each class member, because the holders of Senior

Notes will receive different recoveries than the holders of the subordinated TOPrS, members of

Class 1C will realize different recoveries on account of their claims:  some will receive post-

petition interest and still recover less than the full amount of their claim while other subordinated

creditors will not receive post-petition interest but will still receive more than they are entitled to

if the subordination provisions are not enforced.

33.     The Plan cannot be confirmed pursuant to Section 1129(a)(1), because it does not satisfy the requirements of Section 1123(a)(4).  As a result of these defects, the Disclosure Statement should not be approved.

**C.     The Disclosure Statement Cannot Be Approved Where Plan Is Unconfirmable Because It Does Not Enforce Subordination Agreement In Violation of Section 510(a) of the Bankruptcy Code**

34.     Section 510(a) of the Bankruptcy Code expressly preserves the right of senior claimants to enforce subordination agreements in bankruptcy proceedings.  See 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); see also In re Kors, Inc., 819 F.2d 19, 24 (2d Cir. 1987) (holding that a chapter 7 trustee cannot ignore the provisions of a subordination agreement); In re Credit Industrial Corp., 366 F.2d 402, 408-10 (2d Cir. 1966) (bankruptcy courts "must enforce lawful subordination agreements according to their terms"). As discussed in paragraph 13, supra, the TOPrS Claims are expressly subordinated to the Senior Notes claims.  However, the Plan purports to waive such subordination agreement without the requisite consent of the Senior Notes in that it provides recoveries to the TOPrS claims without affording the Senior Notes payment in full.[9]  As such, the Plan nullifies the subordination agreement and thereby violates Section 510(a) of the Bankruptcy Code.  Moreover, even if Class 1C as currently classified were to approve the Plan, the Plan would still violate Section 510(a) of the Bankruptcy Code as the General Unsecured Creditors and the TOPrS do not have the authority to waive the subordination agreement.

---

[9]     Under the Rothschild Valuation (and assuming full participation in the Discount Rights Offering), the Senior Notes will receive between 62.6%-111.5% with a midpoint recovery of 87.1% depending on the value of the New Common Stock.  The recent trading values of the Senior Notes imply a 61% recovery.

35.    The Plan cannot be confirmed pursuant to Section 1129(a)(1), because it does not satisfy the requirements of Section 510(a).  As a result, the Disclosure Statement should not be approved.

**D.    The Disclosure Statement Cannot Be Approved Where Plan Is Premised on Impermissible Deemed Consolidation**

36.    The voting and treatment offered to creditors under the Plan is <u>predicated</u> in its entirety on the entry of an order substantively consolidating the Debtors.[10]  However, the consolidation sought by the Debtors is not even true substantive consolidation but an artificial consolidation that has no basis in law or equity.  <u>See</u> <u>Owens Corning</u>, 419 F.3d at 212 (holding that "'deemed' consolidation cuts across the grain of all the principles [of substantive consolidation].").  The Disclosure Statement itself belies the Debtors true intentions.  First, the Debtors are not even seeking to consolidate the "substantively" consolidated entities post-petition—they are seeking consolidation of certain groups for voting and confirmation purposes only.  <u>Disclosure Statement</u> at p. 145.[11]  Second, the Debtors are not seeking waiver of all Intercompany Claims (a hallmark of substantive consolidation), rather they are only seeking to waive the Intercompany Claims among the debtors in each consolidated grouping.  <u>Disclosure Statement</u> at pp. 148-49, 156-57.  This is not true, "substantive" consolidation, but an impermissible, artificial consolidation designed to give the Debtors and certain creditors advantages with respect to confirmation—to the detriment of other creditors—while

---

[10]    Under the applicable law of this Circuit, substantive consolidation is a threshold issue that must be dealt with before confirmation.  <u>See</u> <u>Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)</u>, 860 F.2d at 515, 520 (2d Cir. 1988) ("We do not believe that a proposed reorganization plan alone can justify substantive consolidation.").  To the extent the Debtors are intending the Restated First Amended Disclosure Statement to serve as a motion for substantive consolidation, each Creditor objects and respectfully asks this Court to require the Debtors to file a motion or other pleading setting forth the Debtors' reasons for such consolidation.

[11]    Citations to "Disclosure Statement" refer to the Disclosure Statement With Respect To Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession [Docket No. 9264].

simultaneously maintaining corporate separateness.  See Owens Corning, 419 F.3d at 216 ("If

Debtors' corporate and financial structure was such a sham before the filing of the motion to

consolidate, then how is it that post the Plan's effective date this structure stays largely

undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits

achieved by forming subsidiaries in the first place?").

37.      Even if the Debtors affirmatively sought proper substantive consolidation, the

burden is high.  Under the binding law of this Circuit, debtors must establish that creditors dealt

with the debtors as a single economic entity or that the debtors' affairs are so entangled that they

can only be administered as a single entity.  Augie/Restivo, 860 F.2d at 518; see also Owens

Corning, 419 F.3d at 209 (noting "nearly unanimous consensus" that substantive consolidation

remedy be used sparingly).  There is no evidence that financial creditors, such as the pre-petition

bank lenders, holders of Senior Notes and TOPrS Claims treated the Debtors as a single

economic entity; and there is significant evidence that they understood the different credit of the

various Debtors.  Thus, the Debtors will not be able to prove at the confirmation hearing that

creditors dealt with the Debtors as a single entity.

38.      The Debtors' filings and statements made to this Court consistently throughout

these Cases show that the Debtors are not hopelessly entangled.  The Debtors have filed separate

financial statements and schedules for each debtor entity.  Additionally, in seeking to continue

the use of their integrated cash management system, the Debtors stated that the system enables

"the Debtors, as well as their creditors and this Court, to trace funds through the system and

ensure that all transactions are adequately documented and readily ascertainable."  Motion for

Order Under 11 U.S.C. §§ 363 and 553 Authorizing (I) Continued Maintenance of Existing Bank

Accounts, (II) Continued Use of Existing Cash Management System, (III) Continued Use of

Existing Business Forms, (IV) Preservation and Exercise of Intercompany Setoff Rights, and (V)

<u>Grant of Administrative Status for Postpetition Intercompany Transactions ("Cash Management</u>

<u>Motion")</u> ¶ 47.  Similarly, the Debtors sought and were given authority to continue intercompany

transfers in the ordinary course of business, stating that the transactions would be recorded by

each entity and maintained in the appropriate intercompany account.  <u>Id.</u> at ¶ 52.  Finally, the

Debtors sought joint administration of these cases under the guise that "[e]ach creditor may still

file its claim against a particular estate, and the rights of all creditors will be enhanced by the

reduced costs that will result from the joint administration of these chapter 11 cases."  <u>Affidavit</u>

<u>in Support of First Day Motions</u> ¶ 31.

39.    The Debtors state that "the Plan will be deemed a request for entry of an order

[granting substantive consolidation] only for purposes of voting on the Plan and making

distributions to holders of Claims and Interests under the Plan."  <u>Restated Amended Disclosure</u>

<u>Statement</u> at p. 167.  However, nowhere have the Debtors proven why such relief is warranted

under the applicable law of this Circuit.  Because the Debtors will be unable to meet the

substantive consolidation standard, the Plan, as currently proposed, cannot be confirmed.

## II.

### DISCLOSURE STATEMENT IS REQUIRED TO, BUT
### DOES NOT, CONTAIN ADEQUATE INFORMATION

40.    The Disclosure Statement fails to satisfy Section 1125 of the Bankruptcy Code

which requires that, prior to voting on a plan, each holder of a claim against or interest in a

debtor receive a written disclosure statement that is approved by the Bankruptcy Court as

containing "adequate information."  11 U.S.C. § 1125.

41.    Section 1125(a) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and <u>in sufficient detail</u>, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records, that
> would enable a hypothetical investor typical of the holders of
> clams of interests of the relevant class to make an informed

> judgment about the plan, but adequate information need not
> include such information about any other possible or proposed
> plan.

11 U.S.C. § 1125(a) (emphasis added).

42.    It is incumbent on the Debtors to inform creditors what proposed distributions will be under the Plan, what their percentage recovery will be, and what contingencies will affect such recoveries with enough specificity so as to allow creditors to determine whether to support such plan.  See, e.g., In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (stating that a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution"); In re Metrocraft Publ'g Serv., 39 B.R. 567 (Bankr. N.D. Ga. 1984) (denying approval of disclosure statement that did not disclose what percentage recovery creditors would receive).  Without this information, the Disclosure Statement cannot be approved.

43.    Despite the requirement imposed by the Bankruptcy Code that a debtor set forth sufficient information to enable its creditors to make an informed judgment about the Plan, the Disclosure Statement fails in several material respects to provide adequate information on critical matters.  Without additional disclosure on the matters set forth herein, the Disclosure Statement does not provide creditors with the information needed to make "an informed judgment about the Plan," and should not be approved.  11 U.S.C. §1125(a).

**A.    Disclosure Statement Lacks Adequate Disclosure on the Implications of the Value of the New Common Stock and the Range of Recoveries Afforded to General Unsecured Creditors Under the Plan**

44.    Pursuant to the Restated EPCA, the Plan Investors will now invest in the reorganized Debtors at an average discount of approximately 35% to Plan Equity Value.  Rather than admitting that the Restated EPCA and its impact on the Plan represent a massive erosion in value to the Debtors' creditors in favor of the Plan Investors and holders of subordinated debt, as

illustrated below, the Debtors attempt to deceptively lull creditors to think that they are actually

getting an enhanced recovery under the Restated First Amended Plan:

| Recovery Range | First Amended Plan, October 29, 2007[12] | Restated First Amended Plan, November 14, 2007 |
|---|---|---|
| Recovery for General Unsecured Creditors at low-point of Rothschild Valuation | 70% at $31.85 per share | 62.6% at $45.25 per share |
| Recovery for General Unsecured Creditors at mid-point of Rothschild Valuation | 93% at $39.59 per share | 87.1% at $56.05 per share |
| Recovery for General Unsecured Creditors at high-point of Rothschild Valuation | 119% at $47.33 per share | 111.5% at $66.79 per share |

45.     As illustrated above, the Restated First Amended Plan reduces the recovery to

General Unsecured Creditors by 6% at the mid-point of the Rothschild Valuation.  Moreover, in

order to receive 24.5% of this reduced recovery, General Unsecured Creditors must fully

participate in the Discount Rights Offering.  Under the First Amended Plan, the rights offering

represented only 7.6% of such recovery.  In reality, the Restated First Amended Plan has

dramatically reduced creditor recoveries and shifted a massive portion of those purported

recoveries to participation in the Discount Rights Offering.

46.     The Disclosure Statement contains no information regarding how the "Plan

Equity Value" of $61.72 per share was arrived at or whether such value reflects the actual value

of the New Common Stock on the Effective Date.  Indeed, the Rothschild Valuation, as amended

on November 14, 2007, states that the valuation of the Debtors performed by Rothschild is as of

December 31, 2007, but also states that the Effective Date will not occur until the end of

February 2008.  Moreover, the disclosure statement ultimately approved by this Court should

state that the Rothschild Valuation sets forth an unusually wide range for the implied total

---

[12] For purposes of this chart, the calculations assume participation in the Discount Rights Offering.

reorganized equity value—$5.9 billion to $8.8 billion. At a spread of $2.9 billion or 50% greater than the low-point of the range, the recoveries afforded holders of Senior Notes will significantly vary from 62.6% to 111.5%. In fact, this is such a wide range that it is difficult to discern the usefulness of the Rothschild Valuation. Informing "hypothetical investors" that their recoveries may vary by more than 30% does not enable such parties to make an informed judgment about the Plan.

47.     General Unsecured Creditors must be provided with accurate and timely information in order to determine for themselves whether or not the $61.72 per share price is likely to be the <u>actual</u> value of the New Common Stock on the Effective Date. Without this information, creditors will not be able to ascertain the value of the proposed distribution before voting to accept the Plan. General Unsecured Creditors should be informed that the Bankruptcy Court has not approved the "Plan Equity Value" of $61.72 per share, that their actual recoveries may significantly vary based on the <u>actual</u> value of the New Common Stock, and, that at this price, the total enterprise value of the Debtors is significantly above the mid-point of the Rothschild Valuation. The Disclosure Statement should also disclose that the recent market prices of the Senior Notes predict recoveries well below the mid-point of the Rothschild Valuations.

48.     In addition, the per share values set forth in the Rothschild Valuation are based on the estimated fully diluted shares of the Reorganized Debtors. As such, the per share values are materially overstated as they do not ascribe any value to the Series A and B New Preferred Stock. This inflated pricing information is misleading for creditors and should be corrected or at a minimum the calculations should be fully disclosed.

49.     Further, even if the New Common Stock is ultimately found to be worth $61.72 per share, creditors <u>must</u> participate in the Discount Rights Offering (<u>i.e.</u> are forced to buy

additional shares of New Common Stock), invest approximately 40 cents for every dollar of an allowed claim and accept the attendant market risks of such ownership, in order to receive the 100% recovery the Debtors purport to provide.[13]  Absent such participation, General Unsecured Creditors will receive a recovery of between 55.4% and 81.7% with a 68.6% recovery at the midpoint of the valuation range, a substantial drop in recovery from that afforded under the First Amended Plan.  Thus, without additional and more fulsome disclosure regarding the range of recoveries under the Restated First Amended Plan, the reasons for the changes, the drop in the value at the mid-point of the Rothschild Valuation, and the need for creditors to participate in the Discount Rights Offering in order to receive even a purportedly full recovery, the Restated First Amended Disclosure Statement is inherently misleading.

50.    In addition to any other disclosure that may be warranted by the issues raised above and in the Initial Objection, each Creditor submits that the following disclosure should be added to the Disclosure Statement:

**Although the Plan purports to pay General Unsecured Creditors in full, the alleged 100% recovery afforded to such creditors under the Plan is premised upon a pre-negotiated "Plan Equity Value" of $61.72 per share.  The increase in negotiated per share value from the prior proposed Plans filed with the Bankruptcy Court, $45.00 and $41.58 respectively, is a result of a decrease in the shares of New Common Stock distributed under the Plan and does not represent an increase in valuation.**

**Although the "Plan Equity Value" of $61.72 per share is within the per share range under the Rothschild Valuation of between $45.25 and $66.79 per share, it is above the mid-point of this range, $56.05 per share, and there can be no assurance that the Rothschild Valuation is accurate.  Moreover, even if the Debtor's New Common Stock is ultimately valued at $61.72 per share, General Unsecured Creditors must participate in the Discount Rights Offering and purchase a significant amount of additional shares of New Common Stock if they are to ultimately receive a purportedly full recovery.**

**There is no guarantee that the actual TEV of the Reorganized Debtors is sufficient to pay General Unsecured Creditors in full, or that it is anywhere within the range of the**

---

[13]   The fact that the Discount Offering Rights are transferable is of little consolation, as it is doubtful that the Discount Offering Rights will trade at full value of the New Common Stock, whatever the value of such may be.

> **Rothschild valuation. Based on the unusually large TEV range advanced by Rothschild, which includes a spread of $2.9 billion between the low-point and high-point of the range, the value of the New Common Stock distributed to holders of General Unsecured Claims could range from $45.25 to $66.79. This represents a recovery to holders of General Unsecured Claims of between 62.6% and 111.5% with a midpoint of 87.1%. Further, the recent market prices of the Senior Notes reflect recoveries well below the mid-point of the Rothschild Valuations.**
>
> **IF THE ACTUAL VALUE OF THE NEW COMMON STOCK IS LESS THAN $61.72 PER SHARE, GENERAL UNSECURED CREDITORS THAT VOTE TO ACCEPT THE PLAN MAY BE ESTOPPED FROM ARGUING THAT THEY HAVE NOT RECEIVED PAYMENT IN FULL ON ACCOUNT OF THEIR CLAIMS.**
>
> **Holders of General Unsecured Claims should carefully consider the potential range of value of the Debtors as well as the impact of the "Plan Equity Value" on their recoveries and the underlying economic interests of the parties involved in the negotiation of this deemed value. Holders of General Unsecured Claims should be aware that a vote to accept the Plan may be construed by the Debtors as a waiver of certain objections to such holders receiving the full value of their claims.**

B.    **The Rothschild Valuation Does Not Contain Adequate Information Regarding the Value of the Debtors**

51.    As discussed in greater detail herein, acceptance of the Plan by parties entitled to vote and the approval of the Plan by the Bankruptcy Court will ultimately turn on whether or not these parties believe that their recovery is adequate and appropriate. In order for the creditors to evaluate whether or not they are receiving a full recovery, they must receive adequate information on the values of the New Common Stock utilizing the standard valuation methods employed in reorganization cases. See In re Oneida Ltd., 351 B.R. 79, 87 (Bankr. S.D.N.Y. 2006) (noting that creditor participation often hinges on the recoveries afforded creditors, which in turn, depends on the values espoused by the debtors) (citing Protective Comm for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson, 390 U.S. 414, 441 (1968)).

52.    The standard methods for computation of the anticipated value of a reorganized debtor are "a discounted cash flow analysis, which calculates the enterprise's future cash flow and discounts it back to present value; a comparable company analysis, estimating a company's

future value based on the market capitalization of comparable companies in the industry; and a

precedent transaction analysis that attempts to ascertain value based on the amounts paid for

comparable companies in the same industry in recent transactions." In re Granite Broadcasting

Corp., 369 B.R. 120, 141 (Banker. S.D.N.Y. 2007).  Moreover, "the goal of any valuation is to

make an estimate 'based on an informed judgment which embraces all facts relevant to future

earning capacity and hence to present worth, including, of course, the nature and conditions of

the properties, the past earnings record, and all circumstances which indicate whether or not that

record is a reliable criterion of future performance.'"  Oneida, 351 B.R. at 90 (quoting TMT

Trailer Ferry, 390 U.S. at 442).  The three-page Rothschild Valuation fails to provide sufficient

detail to enable creditors with the ability to make an estimate of their recovery based on an

informed judgment.

53.    The information that is contained in the Rothschild Valuation is presented only in

summary form and does not provide the level of detail necessary to "enable a hypothetical

reasonable investor. . . to make an informed judgment about the Plan."  11 U.S.C. §1125(a).

First, the Rothschild Valuation, sets forth only (i) the proposed range of the Total Enterprise

Value of the Debtors; (ii) the range of the per-share prices of the New Common Stock; and (iii)

the range of the implied total reorganized equity value—with little or no discussion of the factors

underlying these ranges.  Second, although Rothschild purports to have considered or created (i)

a discounted cash flow analysis, (ii) certain discounts and multiples, (iii) a comparable

companies analysis, and (iv) a precedent transactions analysis, the Rothschild Valuation fails to

disclose discount rates, comparable companies, any changes that were made to the Projections,

and value ascribed to the Series A and Series B New Preferred Stock or the warrants proposed

for holders of Existing Common Stock, and other information, such that creditors can determine

whether they agree with the Rothschild Valuation without having to perform their own valuation.

Third, Rothschild states that "the value of [the] shares [of New Common Stock] is subject to dilution as a result of the exercise of certain rights (including options and other rights to acquire shares, etc.) and conversions in connection with certain equity incentive plans." Rothschild Valuation p.2. However, Rothschild does not provide any ranges of what this dilution may entail. The Disclosure Statement also does not disclose the effect of dilution based on claims aggregating more than $1.475 billion or provide any disclosure regarding or details of the anti-dilution protections granted to the Plan Investors and the impact of such on the range of recoveries afforded creditors. See Restated First Amended Disclosure Statement at p. 231.

54.     In addition to any other disclosure that may be warranted by the issues raised above, each Creditor submits that the following disclosure should be added to the Disclosure Statement:

> **The Rothschild Valuation does not disclose or provide any details regarding the Discounted Cash Flow Analysis, the Comparable Company Analysis or the Precedent Transaction Analysis performed by Rothschild. Additionally, the Rothschild Valuation does not disclose the effect of or economic impact on recoveries to General Unsecured Creditors if certain claims are in excess of $30 million over the $1.45 billion amount anticipated by the Debtors or the corresponding anti-dilution protections granted to the Plan Investors are utilized.**
>
> **CREDITORS MUST CAREFULLY CONSIDER THE DEFICIENCIES OF THE INFORMATION PROVIDED BY ROTHSCHILD IN ASSESSING THE VALUE OF THE DEBTORS ON THE EFFECTIVE DATE AND THEREFORE ON THEIR RECOVERIES.**

### C.     Disclosure Statement Lacks Adequate Disclosure on the Economic Interests and Involvement of the Plan Investors and GM in "Negotiating" the Plan

55.     The Restated First Amended Disclosure Statement repeatedly states that the Plan is based on a global compromise negotiated by the Debtors and "critical" stakeholders. See Restated First Amended Disclosure Statement at p. xvii. However, both the Disclosure Statement and the Amended Disclosure Statement are devoid of any discussions of the competing and conflicting interests that these parties represent. For example, the Plan Investors,

led by Appaloosa, are believed to be holders of the TOPrS—subordinated creditors that will receive a recovery under the Plan that vitiates their previously agreed to subordination if the New Common Stock is worth anything less than $61.72 per share. Although counsel for the Plan Investors filed a Verified Statement pursuant to Bankruptcy Rule 2019 on June 6, 2006 disclosing collective ownership of $285.43 million of the Debtors' "debt securities," the Plan Investors have not publicly updated this information or disclosed their trading histories, purchase price of or holdings specific issuances of these "debt securities."

56.    Under the Restated EPCA, the Plan Investors require that the Plan place all General Unsecured Creditors, including the subordinated TOPrS in the same class. If the Debtors deviate from the Plan structure demanded by the Plan Investors, the Plan Investors can abandon the deal <u>and</u> collect approximately $129.8 million in fees. Once it became clear that the original Delphi-Appaloosa EPCA required amending, the Debtors should have initiated an expedited and open market process to maximize value for the estates. The Debtors certainly should have done so once the EPCA Amendment terminated. By failing to test the market, there is no way to determine whether the Debtors maximized value for all of their stakeholders or only for the Plan Investors. This is especially problematic given that, as demonstrated in paragraph 6 <u>supra</u>, the Plan Investors are investing at or below the low end of the Rothschild Valuations and at an even further discount to the EPCA Amendment. Thus, the Plan Investors are re-allocating value to themselves from the Senior Noteholders.

57.    Similarly, GM, a party that negotiated and supports the Restated First Amended Plan, has a vested interest in the settlement of the MDL Actions. As with the TOPrS, the Plan seeks to provide a recovery to subordinated creditors—holders of 510(b) claims—regardless of whether senior creditors are actually paid in full. Thus, at least two of the Debtors' major constituents have interests that potentially conflict with the protections afforded to senior

creditors under the Bankruptcy Code.  It is axiomatic that, unless they agree otherwise, senior

creditors must be paid in full, plus applicable interest, before junior creditors receive any

recovery, yet this Plan is designed to mislead creditors into thinking that all General Unsecured

Creditors are being paid in full, which appears not to be true, or are already bound by the

purported settlement of the issues, which is not true.  The facts surrounding these conflicting

interests and the impact of these interests must be adequately disclosed in order for creditors to

understand the settlement dynamic and have all of the information needed to decide whether to

accept or reject the settlements embodied in the Plan.

58.    In addition to any other disclosure that may be warranted by the issues raised

above, each Creditor submits that the following disclosure should be added to the Disclosure

Statement:

---

**The Plan Investors hold a significant portion of the subordinated TOPrS and have used their position as Plan Investors to obtain better treatment for the TOPrS than is otherwise warranted under the priorities established by the Bankruptcy Code.  As a condition to the Investment Agreement, the Plan Investors have the right to approve any modifications to the Plan and to collect in excess of $129 million in fees if the Debtors modify or fail to confirm this Plan.**

**GM is a party-in-interest to the MDL Settlements.  Although the claims granted in accordance with the MDL Settlements would otherwise subject to subordination under Section 510 of the Bankruptcy Code, such claims will receive <u>pari passu</u> treatment with General Unsecured Creditors if the MDL Settlement is approved by the Bankruptcy Court, whether or not senior creditors are actually paid in full.**

**THERE IS NO GUARANTEE THAT GENERAL UNSECURED CREDITORS WILL BE PAID IN FULL UNDER THE PLAN.  EACH CREDITOR ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER THE PAROCHIAL INTERESTS OF THE PLAN INVESTORS AND GM AND WHETHER THESE INTERESTS HAVE UNFAIRLY IMPACTED CREDITOR DISTRIBUTIONS UNDER THE PLAN.**

---

**D.      Disclosure Statement Lacks Adequate Disclosure on the Plan's Proposed Treatment of Intercreditor Rights**

59.      Despite the clear language of the Subordinated Notes Indenture and no waiver of such by the Senior Noteholders, the Plan completely disregards the subordination provisions contained in the Subordinated Notes Indenture.  The Subordinated Notes Indenture provides that in the event of bankruptcy, "all Senior Debt (including any interest thereon accruing after the commencement of such proceedings) shall be paid in full before any payment of distribution, whether in cash, securities, or other property…" is made to the holders of the Subordinated Notes.  Subordinated Notes Indenture at § 17.01.[14]

60.      By accepting the Plan, the subordination provision in the TOPrS Indenture will be deemed satisfied.  Restated First Amended Disclosure Statement at p. xxv.  This "deemed satisfaction" is disadvantageous to holders of the Senior Notes because the holders of the Senior Notes are forced to allow the Debtors to distribute value to junior creditors before they receive full payment on account of their contractually senior claims.  In order for creditors to cast a vote for or against the Plan, the Disclosure Statement must prominently disclose adequate information on this waiver and its effect.

61.      The Subordinated Notes Indenture provides that holders of "Senior Debt" (as defined therein), are entitled to receive full payment (including interest) before the TOPrS receive any recovery.  However, the Plan provides that holders of subordinated claims and interests will receive significant recoveries before the Senior Notes have been paid in full.  The

---

[14]      A copy of the Subordinated Notes Indenture was attached as Exhibit A to the Verified Statement of Law Debenture Trust Company New York, as Successor Indenture Trustee, Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure [Docket No. 689].

Disclosure Statement must contain additional language discussing the entitlement of the Senior

Notes to all such payments.

62.    Moreover, under the Plan, the Debtors would make distributions to the

contractually subordinated TOPrS, to the Debtors' shareholders and to the holders of 510(b)

claims and other subordinated interest holders, many of whom have other conflicting interests in

these Cases.  The Debtors, by providing recoveries to all creditors and interest holders on the

Effective Date and by refusing to market-test the true value of the New Common Stock over a

period of time, are forcing the Senior Notes and the General Unsecured Creditors to bear all of

the risks associated with the New Common Stock while holders of junior claims and interests

enjoy only the upside.  The Disclosure Statement should (i) state in clear terms that the holders

of the Senior Notes and other General Unsecured Creditors are being asked to approve

distributions in violation of the absolute priority rule when senior creditors are only receiving an

87.1% recovery at the mid-point of the Rothschild Valuation; (ii) fully disclose and identify the

economic interests of the parties that agreed to and "negotiated" the economics of the Restated

First Amended Plan; (iii) clearly state the market risks that are being borne by General

Unsecured Creditors and (iv) fully disclose the need for General Unsecured Creditors to

participate in the Discount Rights Offering in order to receive the purportedly full recovery under

the Rothschild Valuation.

63.    Lastly, as noted in Section A(1)(a) above, the Plan classifies that holders of the

TOPrS, Senior Notes and other General Unsecured Claims together in Class 1C.  While each

Creditor maintains that this classification is impermissible, if the Debtors are allowed to solicit

votes based on the current classification scheme, additional language must be added to address

the impact of this classification on the treatment and recoveries of the holders of the Senior

Notes.

64.     In addition to any other disclosure that may be warranted by the issues raised

above, each Creditor submits that the following disclosure should be prominently added to the

Disclosure Statement:

> **The Subordinated Notes Indenture provides that the holders of "Senior Debt"—which includes the Senior Notes—shall be paid in full (including any applicable interest owed thereon) before the TOPrS can receive any distribution under a plan of reorganization. Pursuant to the Plan, the subordination provisions will be waived by the holders of the Senior Notes and payment will be made on account of the TOPrS without regard for whether the holders of the Senior Notes have actually been paid in full (including any applicable pre-petition or post-petition interest).**
>
> **The Plan provides a recovery to contractually subordinated creditors and to shareholders which the Plan cannot do without creditor approval.  At various points in the Rothschild valuation, including at the low-end and mid-point of the TEV range, General Unsecured Creditors will not be paid in full.  Even if the actual value of the New Common Stock is less than $61.72 per share and General Unsecured Creditors are not paid in full, but the Plan is otherwise accepted by the necessary classes of creditors, substantial distributions will be made to the TOPrS, shareholders, and claims subject to subordination under Section 510(b) of the Bankruptcy Code.  The value of the New Common Stock will not be market-tested and holders of General Unsecured Claims will be unable to recover distributions made to holders of junior claims and interests if the actual price of the New Common Stock is insufficient to provide senior creditors with a full recovery.  GENERAL UNSECURED CREDITORS THAT VOTE TO ACCEPT THE PLAN MAY BE ESTOPPED FROM ARGUING THAT THESE DISTRIBUTIONS VIOLATE APPLICABLE BANKRUPTCY LAW.**
>
> **The Plan classifies holders of General Unsecured Claims against the Delphi-DAS Debtors in Class 1C.  This proposed class includes the trade debt of these consolidated debtors, the Senior Notes, the TOPrS and certain other claims.  Because these creditors are voting in the same class, the TOPrS and other creditors are also casting a vote as to whether or not the applicable subordination provisions of the Subordinated Notes Indenture should be waived by the holders of the Senior Notes.**
>
> **Holders of Senior Notes should carefully consider, among other things, the impact of (i) the waiver of the subordination provisions under the Subordinated Notes Indenture; and (ii) the classification of the TOPrS and the Senior Notes in the same class, on their recoveries under the Plan.**

## E.    Disclosure Statement Lacks Adequate Information of Impact of Debtors' Present Lack of Committed Exit Financing

65.     The Plan contemplates that the Debtors will have Exit Financing in place to fund

the Debtors' post-petition operations.  <u>Restated First Amended Disclosure Statement</u> at p. 124.

37

While it is a condition to consummation of the Plan, however, it is not a condition to Confirmation that the Exit Financing be in place, or that all of the terms of the Exit Financing even be disclosed to creditors.  Restated First Amended Plan at p. 68.  As it currently stands, the Voting Deadline may pass without creditors knowing whether the Debtors have obtained Exit Financing.  Moreover, there is no outside date by which the Plan must become effective.  Thus, the creditors have no protections from an unusually drawn out Exit Financing process.  See Restated First Amended Disclosure Statement at p. 116.

66.    Creditors are being asked to bear the risk associated with market fluctuations in the Debtors' value while the Debtors confirm a Plan and bind parties to that Plan for as long as it takes for the Debtors to obtain their Exit Financing.  The timing of the Exit Financing—or precise lack of timing in connection therewith—essentially serves as an indefinite extension to exclusivity, and provides creditors with no opportunity to submit their own plan or withdraw their acceptance of the current Plan.  Moreover, there is no ability for creditors, or even the Debtors, to waive the Exit Financing requirements.

67.    As the Exit Financing is critical to the Debtors' successful emergence and to the recoveries afforded to creditors, those creditors must be informed the risks they are being asked to bear.  In addition to any other disclosure that may be warranted by the issues raised above, each Creditor submits that the following disclosure should be added to the Disclosure Statement:

> **Although the Debtors have entered into a "best efforts" financing arrangement, the Debtors have not yet obtained Exit Financing and there is no requirement in the Plan that the Exit Financing be on market or commercially reasonable terms.  The approval of Exit Financing, though a condition to the consummation of the Plan, is not a condition to confirmation of the Plan.  Creditors receiving a distribution under the Plan may be forced to wait an unspecified and unknown amount of time for the Debtors to obtain Exit Financing after confirmation.  If this occurs, creditors will bear the attendant risk associated with this delay, including fluctuations in the Debtors' value during this period.  During this time, creditors will not be able to submit a competing plan or withdraw their acceptance of the current Plan.  Creditors should carefully weigh the impact of any delay**

> associated with the timing or terms of the Exit Financing on their recoveries when
> considering whether to vote to accept or reject the Plan.

**F.** **Disclosure Statement Lacks Adequate Disclosure Regarding Substantive
Consolidation**

68.     The Plan is predicated upon the "entry of an order substantively consolidating

certain of the Debtors' Estates…" for voting and distribution purposes <u>only</u>.  <u>See Restated First

Amended Disclosure Statement</u> at p. 163.  This is not true substantive consolidation, but an

artificial consolidation of convenience, as "none of the substantively consolidated Debtor entities

will be consolidated with each other."  <u>Plan</u> at §7.2(a).  As discussed in Section I, above, the

burden of proof for cases of true substantive consolidation is extremely high.  For the artificial

"deemed" consolidation embodied in the Plan, the threshold should be even higher.  Despite this

burden, the Disclosure Statement contains little to no information on the consolidation embodied

in the Plan.

69.     The Disclosure Statement is devoid of any discussion of the applicable law of this

Circuit regarding substantive consolidation or the application of the factors considered by the

Courts in this Circuit to the Debtors.  Although the Debtors claim to have assessed thirteen (13)

factors in arriving at the conclusion that substantive consolidation "under the Plan is appropriate

and in the best interests of the Company's creditors" (<u>Disclosure Statement</u> at pp. 147-48), the

Disclosure Statement fails to set forth a description of the analysis performed by the Debtor

regarding any factor, <u>including but not limited to, a discussion of how substantive consolidation

is enhancing or reducing the recoveries of the creditors of the entities being consolidated</u>.

Without this information, creditors are unable to ascertain whether, in the exercise of their own

judgment, voting for the plan is in their "best interests".

70.     The Disclosure Statement contemplates unsecured creditors of Delphi-DAS

Debtors, including the holders of Senior Note Claims and TOPrS will vote on a consolidated

basis, but does not disclose that the effect of this is to disenfranchise creditors of certain Debtors

or to manufacture an impaired accepting class at debtor entities where one might not otherwise

exist. The consolidation of the creditors of the Delphi-DAS Debtors solely for voting and

distribution purposes also impermissibly dilutes the votes of the holders of Senior Notes—the

only creditors that may properly vote in the waiver of subordination of the TOPrS—by

consolidating their votes with the other Debtors in the Delphi-DAS mega class. Similarly, the

Disclosure Statement does not address how various creditors will be treated under the Plan if

substantive consolidation is not approved.

71.     The Disclosure Statement notes that there were/are approximately $900 million of

Intercompany Claims. See Disclosure Statement at p. 137. However, the Disclosure Statement

purports to cancel only some of the Intercompany Claims and Reinstate others. See Disclosure

Statement at p. 149. There is no discussion of the impact of substantive consolidation on

Intercompany Claims (which under true substantive consolidation would be cancelled). There is

no disclosure concerning the amount of the Intercompany Claims that are being Reinstated and

the amount of such claims that are being cancelled, whether as a result of substantive

consolidation or otherwise.

72.     In addition to any other disclosure that may be warranted by the issues raised

above, each Creditor submits that the following disclosure should be added to the Disclosure

Statement:

> **The Plan is premised on the "substantive consolidation" of certain Debtors. Under the applicable law of this Circuit, true substantive consolidation is an equitable remedy that is designed to protect the interests of creditors and should be used sparingly. The Debtors are seeking to consolidate the creditors of certain entities for voting and distribution purposes, but are not seeking to consolidate the entities, themselves. Substantive consolidation of any of the Debtors has not yet been approved by the Bankruptcy Court. Substantive consolidation, if approved, will result in the cancellation of certain Intercompany Claims, but will also result in the Reinstatement of other claims. The**

> **recoveries afforded to other creditors and interest holders may be diminished based on the recoveries paid to Intercompany Claims.**
>
> **SUBSTANTIVE CONSOLIDATION MAY DIMINISH THE RECOVERIES OF CERTAIN CREDITORS OF THE CONSOLIDATED DEBTORS AND ENHANCE THE RECOVERIES OF CERTAIN OTHER CREDITORS AS FOLLOWS: [DEBTORS TO PROVIDE DETAIL]. SUBSTANTIVE CONSOLIDATION WILL ALSO RESULT IN THE CLAIMS OF SEVERAL DEBTORS BEING PLACED INTO THE SAME CLASS. THIS MAY DISENFRANCHISE CERTAIN MEMBERS OF THAT CLASS AND DILUTE THE VOTES OF THESE CREDITORS ON CERTAIN ISSUES INCLUDING WHETHER TO WAIVE THE CONTRACTUAL SUBORDINATION OF THE TOPrS AS WELL AS THE ABILITY OF THOSE CREDITORS TO SUCCESSFULLY CHALLENGE THE PLAN AT CONFIRMATION.**
>
> **Creditors should carefully weigh the impact of substantive consolidation on their recoveries and voting rights when considering whether to vote to accept or reject the Plan.**

**G.    Disclosure Statement Lacks Adequate Disclosure on the GM Claim**

73.    Though the Disclosure Statement contains certain general information on the settlement with GM, it lacks specific information regarding the actual terms of the settlement surrounding the GM claim.  The settlement of the GM Claim is, and has been, one of the cornerstones of the Debtors' ability to reorganize for some time.  Much of these negotiations have been conducted behind closed doors and shrouded in secrecy with even basic information filed under seal.  Now the Debtors' creditors are being asked to accept the settlement of the GM Claim as part of the Plan process, but the creditors are not being provided with any meaningful information about the economics of the settlement or the underlying claims.  Without such information, creditors are unable to make an informed decision on whether the GM settlement is reasonable, and whether the Plan that embodies that settlement should be accepted or rejected.

74.    Moreover, the Disclosure Statement fails to value GM's Claim, but instead states that such amount is an "Agreed Compromise" and lacks any disclosure on GM's involvement in the MDL Actions or the negotiation of the MDL Settlements.

75.     Similarly, the Disclosure Statement fails to quantify the recovery afforded to GM

pursuant to the GM Claim, instead again characterizing such amount as an "Agreed

Compromise."  Restated First Amended Disclosure Statement at p. xxvi.  Although the Restated

First Amended Disclosure Statement clarifies the recovery granted by GM, it fails to set forth

any information on the parameters of the Debtors' relationship with GM.   For example, the

Disclosure Statement notes that the Debtors are dependent upon the continued business of GM

(Disclosure Statement at p. 11), but there is no disclosure of how the Debtors are valuing GM's

future business with the Debtors, especially in light of the Debtors' admission that GM's

financial forecasts have declined.  Restated First Amended Disclosure Statement at p. ix.

76.     The discussion of the settlement with GM, contains little or no information that is

required by applicable bankruptcy law, including what would be required for a settlement under

Bankruptcy Rule 9019.  An abundance of information should not be mistaken for meaningful

disclosure.  The Disclosure Settlement must quantify, in economic terms, the value of the GM

Claim, and the amount of the recovery being afforded to such Claim under the Plan.  Creditors

need to understand how other, similarly situated creditors are being treated under the Plan, what

benefits creditors are gaining and what claims and recoveries creditors are abandoning under the

Plan in order to decide whether to vote to accept or reject the Plan.  With the little information

disclosed, creditors cannot determine whether they would be better off rejecting the Plan and

settlement and pursuing claims against GM.

77.     In addition to the inadequate disclosure surrounding the issues relating to the GM

settlement, Section 11.7 of the Plan provides broad releases to GM through the implementation

of the Delphi-GM Global Settlement Agreement.  Plan at § 11.7.  The Disclosure Statement

should disclose more clearly that it is not only the Debtors that are releasing GM, but also all

creditors of the Debtors and current and former holders of equity interests that are being

compelled to release GM under the Plan.  See Disclosure Statement at p. 70.  Under the

applicable law of this Circuit, broad non-debtor releases, such as those proposed by the Debtors

are rarely granted and "should not be approved absent the finding that truly unusual

circumstances render the release terms important to the success of the Plan."  In re Metromedia

Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005).  Despite this, there is inadequate

disclosure as to the existence and implications of the third-party releases and the factors to

demonstrate how such releases can be approved under the circumstances of this case.

78.    In addition to any other disclosure that may be warranted by the issues raised

above, each Creditor submits that the following disclosure should be added to the Disclosure

Statement:

> **The Plan purports to settle all claims between GM and the Debtors.  The Debtors, however, are unable to quantify and provide their creditors information concerning the value of the GM Claim, the actual recovery afforded to GM thereon, and economic benefits of the estates as a result of this settlement.  If the Plan is accepted, the Debtors, and their creditors and interest holders will abandon and release all claims and causes of action against GM and other third parties.  Under the applicable law of this Circuit, non-debtor releases are approved only in "unusual circumstances," which may not exist here.**
>
> **The Debtors submit that the settlement is fair and appropriate, but do not disclose sufficient information regarding the settlement to their creditors.  If approved, the recovery afforded to GM may diminish the recoveries otherwise afforded to the Debtors other creditors and shareholders.  Creditors should carefully weigh the Debtors' lack of full disclosure regarding the impact of the GM Claim and related settlement on their recoveries including the broad release of GM by creditors under the Plan when considering whether to vote to accept or reject the Plan.**

**H.    Disclosure Statement Does Not Contain Adequate Information on Releases Under the Plan**

79.    Third-party releases are granted sparingly under the binding law of this Circuit.

The Second Circuit has stated that a plan of reorganization may provide a release to third parties

only if the release "'plays an important part in the debtor's reorganization plan.'"  In re

Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir 2005) (quoting In re Drexel

Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992)); see also In re Lowenschuss,

67 F.3d 1394, 1401-02, 1402 n.6 (9th Cir. 1995) (finding that non-debtor releases are prohibited

by the Bankruptcy Code except in the asbestos context); In re W. Real Estate Fund, Inc., 922

F.2d 592, 600-02 (10th Cir. 1990) (per curiam) (same).  Nondebtor releases are "proper only in

rare cases" and, thus, prohibited "absent the finding of circumstances that may be characterized

as unique."  Metromedia, 416 F.3d at 142; see also In re Adelphia Commc'ns Corp., 368 B.R.

140, 267 (Bankr. S.D.N.Y. 2007) ("[Metromedia] requires the bankruptcy community in this

Circuit to be much more circumspect in providing for third-party releases than it used to be.").

80.      Nevertheless, under the Plan, the Debtors intend to release the "Released Parties"

which are comprised of:  (a) all officers of each of the Debtors, all members of the boards of

directors of each of the Debtors, and all employees of each of the Debtors, in each case in their

respective capacities as of the date of the commencement of the hearing on the Disclosure

Statement, (b) the Creditors' Committee and all current and former members of the Creditors'

Committee in their respective capacities as such, (c) the Equity Committee and all current and

former members of the Equity Committee in their respective capacities as such, (d) the DIP

Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) all

Professionals, (g) the Unions and current or former members, officers, and committee members

of the Unions, (h) the Indenture Trustees, in their capacities as such, and (i) with respect to each

of the above named Persons, such Person's affiliates, advisors, principals, employees, officers,

directors, representatives, financial advisors, attorneys, accountants, investment bankers,

consultants, agents, and other representatives and professionals.  First Amended Disclosure

Statement at p. 225.  In addition, by voting to accept the Plan or by accepting their rightful

distribution under the Plan, each holder of a Claim or Interest will also be deemed to have

unconditionally granted a release to the Released Parties for any action arising before the

Effective Date in any way relating to the Debtors.  First Amended Disclosure Statement at pp.

225-26.  Moreover, the Plan provides separate and overly-broad releases to the Plan Investors, not only on behalf of the Debtors but also on behalf of all of the Debtors' creditors.  <u>First Amended Disclosure Statement</u> at pp. 226-27.

81.     Despite the impermissible breadth of these releases, the Disclosure Statement and the Amended Disclosure Statement fail to provide any information surrounding these releases. The Debtors state that the "amounts contributed by each of these parties as part of the settlements or other agreements is substantial" and "the contributions made by some parties amount to billions of dollars…" <u>First Amended Disclosure Statement</u> at p. 224.  However, this disclosure is not meaningful disclosure.  The Debtors have a heavy burden to carry to prove that each of the Released Parties is entitled to the release contemplated under the Plan.  The Disclosure Statement fails to discuss how the release granted to each individual party plays an important role in the Plan and why each Released Party's contribution was so unique as to warrant the release.  It is also unclear precisely what causes of action may exist against each of these parties. There have been recent news articles surrounding an investigation by the Department of Justice of certain officers and directors.  The Disclosure Statement contains no information on this ongoing investigation.  Similarly, the MDL Settlement purports to release directors and officers that are not even party to the MDL Settlement, again with no information as to how these releases are being implemented or why they are justified.  Based on the disclosure currently set forth, creditors are unable to ascertain whether or not such releases are appropriate for each Released Party. It is one thing for parties that are involved in the negotiation of a Plan to be exculpated for negligence in connection with the negotiation of that plan, but it is quite another for virtually every party that has been employed by the Debtor to be released from all wrongdoing on the Effective Date.

82.    In addition to any other disclosure that may be warranted by the issues raised above, each Creditor submits that the following disclosure should be added to the Disclosure Statement:

> **THE PLAN SEEKS TO RELEASE EACH OF THE RELEASED PARTIES AND THE PLAN INVESTORS ON BEHALF OF THE DEBTORS, AND ALL HOLDERS OF CLAIMS AND INTERESTS FROM ANY AND ALL LIABILITY RELATING TO THE DEBTORS THAT WILL EXIST ON THE EFFECTIVE DATE. THE DEBTORS ARE UNABLE TO QUANTIFY THE VALUE OF THESE RELEASES OR THE VALUE PROVIDED BY THE RELEASED PARTIES SUFFICIENT TO JUSTIFY THESE RELEASES OR TO PROVIDE THEIR CREDITORS INFORMATION CONCERNING THE ECONOMIC BENEFITS TO THE DEBTORS AND THEIR CREDITORS RESULTING FROM THESE RELEASES. BY VOTING TO ACCEPT THE PLAN OR BY ACCEPTING THE DISTRIBUTION UNDER THE PLAN, EACH CREDITOR WILL BE DEEMED TO HAVE GRANTED BROAD RELEASES TO EACH OF THE RELEASED PARTIES AND THE PLAN INVESTORS FOR ANY AND ALL CAUSES OF ACTION THAT EXISTED AGAINST SUCH PARTY ON THE EFFECTIVE DATE AND RELATED TO THE DEBTORS. CREDITORS SHOULD CAREFULLY CONSIDER THE IMPACT OF THE BROAD RELEASES ON THEIR ULTIMATE RECOVERIES WHEN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

## I.    The Disclosure Statement Does Not Contain Adequate Information on the MDL Settlements

83.    On September 7, 2007, the Debtors filed the Motion for Order Approving Multidistrict Litigation and Insurance Settlements (the "<u>MDL Motion</u>"). Included with these settlements is the resolution of certain claims and causes of action against the Debtors relating to securities fraud and rescission that would otherwise be subject to subordination under Section 510 of the Bankruptcy Code (the "<u>MDL Securities Claims</u>"). But for the proposed settlement, the recoveries afforded to the MDL Securities Claims would otherwise be payable to the General Unsecured Creditors, to the extent such creditors are not receiving payment in full on account of their claims, as MDL Securities Claims would be subject to subordination under Section 510(b) of the Bankruptcy Code. Moreover, the holders of MDL Securities Claims are required to vote to accept the Plan as a term of the settlement. The Disclosure Statement needs to contain

additional information on the terms of the settlement, the economics of the settlement and the impact of the settlement on the rights of senior creditors.

84.     Unless and until the holders of General Unsecured Claims, including the holders of the Senior Notes are paid in full, there should be no distribution to the holders of subordinated claims under the absolute priority rule.  Payment of the MDL Securities Claims on a pari passu basis with the General Unsecured Creditors reduces the recoveries of such creditors.  The Disclosure Statement must contain additional information on the economic impact of this settlement on the holders of the General Unsecured Claims, including a description of the claims and causes of action that are being abandoned by the holders of the MDL Securities Claims and any alleged benefits that the holders of General Unsecured Claims are receiving under the Settlement.  It is also possible that the Debtors intend to argue that any creditors that vote to accept the Plan are judicially estopped from raising any issues surrounding the recoveries afforded to holders of the MDL Settlement Claims at the Confirmation Hearing.  If a vote to accept the Plan is also a waiver of these rights, this waiver must be disclosed conspicuously in the Disclosure Statement and creditors must be provided with sufficient information on the economics of the settlement and its effect on creditor recoveries.

85.     By requiring that the holders of MDL Securities Claims vote to accept the Plan, the Debtors are creating an impaired accepting classes thereby skewing the confirmation process in their favor.  Moreover, the Disclosure Statement must contain a discussion of the impact on the Plan if the MDL Motion is not approved.  In addition to any other disclosure that may be warranted by the issues raised above, each Creditor submits that the following disclosure should be added to the Disclosure Statement:

> **The Plan is premised on a settlement of certain securities claims and class actions between various creditors and the Debtors.  This settlement has not yet been approved by the Bankruptcy Court or the other courts in which such lawsuits are pending.  If approved, the**

**settlement will provide a recovery to creditors whose claims would otherwise be subordinated under applicable bankruptcy law.  In addition, if approved, certain of these subordinated creditors will be required to vote to accept the Plan.**

**THE SETTLEMENT OF SUBORDINATED CLAIMS MAY DIMINISH THE RECOVERIES OF CERTAIN SENIOR CREDITORS OF THE CONSOLIDATED DEBTORS AND ENHANCE THE RECOVERIES OF CERTAIN JUNIOR CREDITORS. THE SETTLEMENT WILL ALSO RESULT IN THE ACCEPTANCE OF THE PLAN BY IMPAIRED CLASSES.  THIS MAY IMPAIR THE ABILITY OF OTHER CREDITORS TO SUCCESSFULLY CHALLENGE THE PLAN AT CONFIRMATION.**

**GENERAL UNSECURED CREDITORS THAT VOTE TO ACCEPT THE PLAN MAY BE ESTOPPED FROM ARGUING THAT THESE DISTRIBUTIONS ARE PROHIBITED UNDER APPLICABLE BANKRUPTCY LAW.**

**Creditors should carefully weigh the impact of substantive consolidation on their recoveries and voting rights when considering whether to vote to accept or reject the Plan.**

## WAIVER OF MEMORANDUM OF LAW

86.    Because this Objection presents no novel issues of law and the authorities relied upon are set forth herein, each Creditor respectfully (i) requests that the Court waive the requirement of filing a separate memorandum of law in support of this Objection pursuant to L.B.R. 9013-1(b), and (ii) reserves its right to file a brief in reply to any response to this Objection.

## CONCLUSION

87.    For all of the foregoing reasons, the Disclosure Statement should not be approved.

88.    Each Creditor expressly reserves its rights to object to certain terms of the proposed order approving the Motion and the Disclosure Statement and solicitation procedures at the hearing to consider the Disclosure Statement, including without limitation regarding the proposed scheduling of new dates and deadlines in connection with confirmation, as well as any

changed to the Plan or Disclosure statement provided to each Creditor after the date of this

Objection.[15]

   89.  In addition, each Creditor expressly reserves its rights to oppose confirmation of

the Plan or any subsequent plan of reorganization proposed on these Cases on any grounds,

including issues not expressly raised herein.

*[Remainder of Page Intentionally Left Blank]*

---

[15] For example, given the passage of approximately eight weeks between the commencement of the Disclosure Statement hearing and the continuation thereof, the Court should not approve a voting record date of September 28, 2007 as requested, but rather the voting record date should be the date any order approving the Disclosure Statement is entered as contemplated by Bankruptcy Rule 3018(a).

WHEREFORE, each Creditor respectfully requests that this Court (a) either (1) deny approval of the Disclosure Statement and the Motion or (2) condition approval of the Disclosure Statement and the Motion on modification of the Plan, Disclosure Statement, and Motion to address the issues raised herein and the inclusion in the Disclosure Statement of the additional information sought herein and (b) grant such other relief as the Court deems just and proper.

Dated: New York, New York
        November 21, 2007

                                GOODWIN PROCTER LLP


                                By:  /s/  Allan S. Brilliant_____
                                Allan S. Brilliant (AB 8455)
                                Craig P. Druehl (CD 2657)
                                Meagan E. Costello (MC 0962)
                                599 Lexington Avenue
                                New York, New York 10022
                                (212) 813-8800

                                        - and -

                                GOODWIN PROCTER LLP
                                Gina Lynn Martin (GM 1324)
                                Exchange Place
                                Boston, Massachusetts  02109
                                (617) 570-1330

                                Attorneys for Caspian Capital Advisors, LLC;
                                Castlerigg Master Investments Ltd.;
                                CR Intrinsic Investors, LLC; Davidson
                                Kempner Capital Management LLC; Elliott
                                Associates, L.P.; Nomura Corporate Research
                                & Asset Management, Inc; Sailfish Capital Partners,
                                LLC; and Whitebox Advisors, LLC