Hearing Date & Time: November 29, 2007 at 10:00 a.m.
Objection Deadline: November 21, 2007 at 9:30 p.m.

David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to the Delphi Trade Committee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, <u>et al.</u>, | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------x

### OBJECTION OF THE DELPHI TRADE COMMITTEE TO THE FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION

The Committee of Delphi Trade Claim Holders (the "<u>Delphi Trade Committee</u>"), by and through its undersigned counsel, hereby files this Objection to the First Amended Disclosure Statement With Respect to the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (collectively, the "<u>Debtors</u>"),[1] and respectfully represents as follows:

### PRELIMINARY STATEMENT

The Debtors are bullheadedly pushing forward with a disclosure statement that supports a plan that (a) cannot be confirmed because of the gerrymandered classification of subordinated

---

[1] Capitalized terms used but not defined have the meanings assigned in the Plan.

debt along with senior debt, (b) the entirety of its creditor body opposes, and (c) fails to disclose the economic reality of the already rejected treatment as the Debtors seek to add additional wasted solicitation costs to the $320 million in bankruptcy costs the Debtors already have incurred. This Court should protect these estates from the Debtors' failure to heed the very creditors for whom they are supposed to be fiduciaries and deny approval of the Current Disclosure Statement (as defined below) now.

Unlike other cases, in which creditor opposition to disclosure approval may be viewed as tactical, here, the Debtors present the actual case in which they are trying to stare down and to threaten those they represent rather than reach consensus on a viable, supportable plan. The remedy here, should the Debtors press forward, should be termination of exclusivity to permit the Unsecured Creditors Committee and the ad hoc groups of its constituents to promote the plan the Debtors should be pursuing. The Court, of course, could schedule a hearing to do so *sua sponte*.

The Debtors' Current Disclosure Statement is wrong and misleading. The latest plan iteration states that it is providing General Unsecured Claims "payment in full" while requiring massive unsecured creditor investment based on a flawed fictional valuation belied by the Debtors' own financial advisor that, even if rectified, is still not full payment. This manipulation of value seems to be the result of the Debtors' attempt to hide the fact that the Plan Investors appear to watch the markets and re-price their deal based upon changes in the prices on Delphi's bonds. And though their valuation indicates that the subordinated debt is far out of the money, as the apparent owner of the majority of the subordinated debt (upon information and belief), the Plan Investors (or at least Appaloosa) still demand a recovery. In each iteration of the Plan, more and more value is shifted from the creditors to the Plan Investors, notwithstanding the fact

that there has been no statement or basis that the Original EPCA (as defined below) has been terminated or is unenforceable. This shift in value has occurred in the face of universal opposition from every constituency. The Delphi Trade Committee has had discussions with other similarly situated parties-in-interest, and it is clear if this Court were to approve the Current Disclosure Statement, the Current Plan would be emphatically and decisively rejected by the class of general unsecured creditors.

Given all of the foregoing problems and the universal opposition of every constituency in these cases, this Court need no longer acquiesce to the Debtors' errantly exercised business judgment, should deny approval of the Current Disclosure Statement, protect those left unprotected by the Debtors, save the estates the further waste of resources, and enable the opening of the process to promote a plan that will be confirmed.

## BACKGROUND

1.      On October 8 and 14, 2005 (as applicable, the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2.      The members of the Delphi Trade Committee hold trade claims against Delphi Corp., Delphi Automotive Systems LLC and its domestic operating subsidiaries.

3.      On or about August 2, 2007, this Court entered the Order (the "EPCA Order") authorizing and approving the Delphi-Appaloosa Equity Purchase and Commitment Agreement (the "Original Appaloosa EPCA") pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a). The Original Appaloosa EPCA includes the Plan Framework and Special Statutory Committee Provisions (the "Plan Framework"), an exhibit stating certain agreed upon terms for a plan of reorganization.

4.     On September 6, 2007, the Debtors filed the Disclosure Statement With Respect

To Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and

Debtors-in-Possession (the "Original Disclosure Statement") [Docket No. 9264] and the Joint

Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-

Possession (the "Original Plan").

5.     On October 29, 2007, the Debtors filed:  (1) the Notice of Potential Amendments

to the Original Disclosure Statement, which attached changed pages to the Original Plan (with

such changes, the "First Amended Plan"), the Original Disclosure Statement (with such changes,

the "First Amended Disclosure Statement") and the exhibits and appendices thereto; and (2) the

Notice of Expedited Motion For Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a)

Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment

Agreement, which attached changed pages to the Original Appaloosa EPCA (with such changes,

the "First Amended Appaloosa EPCA"), among other documents.

6.     On November 15, 2007, the Debtors filed the Notice of Further Proposed

Amendments to Certain Appendices to the First Amended Disclosure Statement, which attached

changed pages to First Amended Plan (with such changes, the "Current Plan"), the First

Amended Appaloosa EPCA (with such changes, the "Current Appaloosa EPCA") and certain

other documents.

7.     On November 16, 2007, the Debtors filed their First Amended Disclosure

Statement With Respect to the Second Amended Plan (with such changes, the "Current

Disclosure Statement").

## OBJECTION

### A.    Standards For Approval Of Disclosure Statements.

8.      To approve the Current Disclosure Statement, this Court must find that it contains

adequate information to enable a reasonable creditor typical of the Debtors' claim holders to

make an informed judgment about the Plan.  11 U.S.C. § 1125(a).  "Adequate information"

means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of

the nature and history of the debtor and the condition of the debtor's books and records, that

would enable a hypothetical reasonable investor typical of holders of claims or interests of the

relevant class to make an informed judgment about the plan.  11 U.S.C. § 1125(a)(1);

Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.), 25

F.3d 1132, 1136 (2d Cir. 1994); In re BSL Operating Corp., 57 B.R. 945, 950 (Bankr. S.D.N.Y.

1986).

9.      Section 1125 of the Bankruptcy Code places a heavy burden on the debtor to

provide information, and the disclosure statement hearing is to be the "heart" of the bankruptcy

case.  See H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 408 (1977) (Section 1125 "is the heart of

the consolidation of the various reorganization chapters found in current law.").  The importance

of full disclosure is under-laid by the reliance placed upon the disclosure statement by the

creditors and the court.  The principle of disclosure is "of prime importance in the reorganization

process . . . .  The [Bankruptcy] Code obliges a Debtor to engage in full and fair disclosure . . . ."

In re Momentum Mfg. Corp., 25 F.3d at 1136, and "is the 'pivotal' concept of Chapter 11

reorganization," Kuniea v. St. Jean Fin. Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999); see also Burnes

v. Pemco Aeroplex Inc., 291 F.3d 1282, 1286 (11th Cir. 2002) (full and honest disclosure in a

bankruptcy case is crucial); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417

(3d Cir. 1988) cert. denied, 488 U.S. 967 (1988).

10.    A disclosure statement "must clearly and succinctly inform the average unsecured creditor *what it is going to get*, when it is going to get it, and what contingencies there are to getting its distribution." In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (emphasis added). "[T]he information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." In re Stanley Hotel, Inc., 13 B.R. 926, 929-30 (Bankr. D. Colo. 1981).

**B.    The Current Disclosure Statement Fails To Disclose The Reasons That The Current Plan Improperly Classifies The TOPrS Claims And, Therefore, Renders The Current Plan Unconfirmable.**

11.    The Current Plan classifies the TOPrS Claims with General Unsecured Claims in the same class.  Current Plan §§ 1.88, 5.3.   Under Section 1122(a) of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a). Dissimilar claims must be put in separate classes.  In re Boston Post Road Ltd. P'ship., 21 F.3d 477, 481 (2d Cir. 1994).  The TOPrS Claims arise from the Trust Preferred Securities issued by non-Debtor affiliates, which ultimately resulted from a transfer of the Subordinated Notes to holders of Trust Preferred Securities.  DS-32.[2] Section 17.01 of the Indenture for the Subordinated Notes provides that Delphi "covenants and agrees that . . . the [TOPrS] are subordinate and junior in right of payment to all Senior Debt . . . In the event of any . . . bankruptcy . . . all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall be first paid in full before any payment or distribution . . . shall be made to any Holder of any of the Debt Securities or Coupons on account thereof."  Since the TOPrS are subordinate, they should not be classified together with general unsecured claims.

---

[2]    Each citation herein beginning with "DS" corresponds with pages or sections of the Current Disclosure Statement.

See St. Louis Union Trust Co. v. Champion Shoe Mach. Co., 109 F.2d 313, 316 (8th Cir. 1940)

(subordinated creditors should be in separate class from senior creditors); In re Walnut Equip.

Leasing Co., 1999 Bankr. LEXIS 1460, at *4 n.4 (Bankr. E.D. Pa., Nov. 23, 1999) (it is "obvious

that the holders of subordinated debt do not have claims substantially similar to the holders of

senior debt."). C.f. In re Solar King Corp., 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) (section

510(b) subordinated claims are properly placed in a separate class); In re McKenzie, 4 B.R. 88,

90 (Bankr. W.D.N.Y. 1980) (contractually subordinated and senior claims "have different rights"

in the property of the estate).  Further, because the TOPrS Claims arose from the Trust Preferred

Securities and not direct obligations of the Debtors, they should be separately classified.  In re

WorldCom, Inc., 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. October 31, 2003) (based upon the

existence of the subordination provisions of subordinated notes indenture, subordinated claims

are dissimilar in their legal nature and their equitable rights and separate classification under the

Plan is appropriate).  Thus, the classification of the TOPrS with General Unsecured Creditors

renders the Current Plan patently unconfirmable, mandating that this Court refuse to approve the

Current Disclosure Statement. In re 3dfx Interactive, Inc., 2006 WL 2010786, *6 (Bankr. N.D.

Cal. June 29, 2006) (court may not approve a disclosure statement if the related plan cannot be

confirmed); In re Main Street AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (same); In re

Curtis Center LP, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) (courts should not approve a

disclosure statement where the related plan is patently unconfirmable); In re 266 Washington

Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1993) (court rejected disclosure statement where

the plan had patent legal defects); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr.

N.D.N.Y. 1988) (Courts should reject disclosure statements if plan will not comply with the

requirements of section 1129(a)).

12.      Even if such classification does not render the Current Plan patently

unconfirmable, the Court must reject the Current Disclosure Statement unless and until the

Debtors disclose the basis for classifying the TOPrS with the other General Unsecured Creditors,

the apparent known (to the Debtors or the Plan Investors) ownership of Plan Investors

(Appaloosa), the tie-in to the investment of the TOPrS treatment, and all other relevant facts as to

why the Debtors are providing the TOPrS a (1) 74% recovery for a clearly out of the money,

subordinate constituent when the senior creditors receive 87% at Rothschild's mid-point and/or a

(2) 52% recovery for a clearly out of the money, subordinate constituency when the senior

creditors receive 61% at Rothschild's low point.[3]

## C.    The Current Disclosure Statement Fails To Disclose Adequately The Treatment Of General Unsecured Creditors.

### 1.    The Current Disclosure Statement Falsely Asserts That General Unsecured Creditors Will Be Paid In Full.

13.      Notwithstanding the Debtors' numerous statements that General Unsecured

Creditors are getting "paid in full" and will receive payment of a value equal to "100%" of their

allowed claims, in actuality General Unsecured Creditors will only receive approximately 87%

of their claims even using the midpoint of the Debtors' valuation, which has one of the largest

ranges of value ever seen.  Using Rothschild's low point, the recovery is 61%.  Of course the

Debtors have, without adequate or even any disclosure or explanation, adopted a valuation only

5% less than Rothschild's highest and one that has grown $400 million in the last two weeks for

no reason, disclosed or undisclosed, whatsoever.  And then, the Debtors predicate even these

---

[3]      Furthermore, since the Current Plan provides that Section 510(b) Claims are to receive treatment *pari passu* with General Unsecured Creditors – notwithstanding the fact that the Section 510(b) Claims are subordinated – if General Unsecured Creditors receive an 87% recovery on their allowed claims, the holders of Section 510(b) Claims will also receive an 87% recovery on their allowed claims.  This too must be clearly disclosed.

non-full payment recoveries on the required investment by creditors of over $1.4 billion in additional consideration.

14.    Accordingly, the Current Plan fails to pay unsecured creditors in full in several ways. First, the Current Plan provides for the distribution of undervalued stock to the holders of unsecured claims. Second, the Current Plan does not provide for full payment of post-petition interest to unsecured creditors. Third, a huge portion of the recovery is in rights that (1) require massive investment and (2) are highly sensitive and susceptible both to (a) incorrect valuation and (b) changes in the stock price. For example, if Delphi claims that its shares will be worth $61 and they actually are worth only $38, the creditors have lost $23 per share, a loss of 37.7%, and instead of receiving 75.5% in stock, they receive 47%. And the stock may one day appreciate in value or a creditor may cut its (undisclosed and potentially actionable) losses because it still holds a security. If, on the other hand, the right is similarly priced at $38, *it becomes worthless*, transferable or not (one cannot transfer something worthless – there typically are no buyers), and expires unexercised and unsold. The creditor receives *zero*, not 24.5% in rights, and those rights disappear, with nothing to appreciate or to sell one day.

15.    The Disclosure Statement hardly and certainly not adequately discloses in a prominent, understandable manner, these facts and probabilities. The Disclosure Statement contains no easily understood outcomes under various valuations that Rothschild promotes.

     **a.**     **The Current Disclosure Statement Fails To Disclose Adequately That The Current Plan Provides For <u>The Distribution Of Undervalued Stock.</u>**

16.    Since the Current Plan purports to pay General Unsecured Claims in full with consideration consisting of 75.5% in New Common Stock and 24.5% in Discount Rights, Current Plan § 5.3, whether General Unsecured Claims are, in fact, paid in full depends almost entirely on the value of the New Common Stock and the Discount Rights.

17.    The Current Plan distributes the New Common Stock to the General Unsecured Creditors at a value of $61.72 per share.  Current Plan § 5.3(a).  This price, however, is in excess of the actual value of the shares, or the values provided within the Current Disclosure Statement and the value of the shares as attributed to the Plan Investors.  The valuation analysis set forth in Appendix D to the Current Disclosure Statement puts the implied potential price per share from $45.25 to $66.79 per share, with a midpoint of approximately $56.06.  Thus, even assuming the Debtors' valuation analysis is accurate (which the Delphi Trade Committee does not think it is), the $61.72 per share price is $5.67 or 10.1% higher than the midpoint.  The Current Disclosure Statement must disclose that it is not, in fact, paying General Unsecured Creditors in full.  The equity grant does not equate to 75.5% of the unsecured creditor's claim at the mid-point of the Debtors' expert's valuation, rather it equates to 68.56% even at their own valuation.  The Current Disclosure Statement must also disclose what the recovery is at the low point of Rothschild's valuation and the probability of the valuation being low, medium, or high.

18.    The Current Disclosure Statement also fails to disclose – even assuming the New Common Stock is worth $61.72 – how a General Unsecured Creditor is paid in full if it must pay $38.39 per share for 24.5% of its recovery and, as described above, the volatility of the right based on the underlying stock price.  Again, even at Rothschild's (overstated) midpoint, the right is worth 25% less than the Debtors say (a loss in value of a further 6%) and, at the low point, is worth 50% less.  Equally important is the level of capital that the Debtors are requiring creditors to invest.  Trade creditors, who may not have ready access to trading and the markets, to get the so-called 24.5% of their recovery, have to pay and to take a further risk of being an involuntary investor in Delphi.  And for this obligation, the Debtors force them to invest at the lowest level of the capital structure, the common stock, when the Plan Investors – those who know the

companies, are now insiders, are essentially plan proponents if not promoters, and likely are

fiduciaries to the Debtors' creditors – invest their money senior to the trade creditors, as

preferred stock.  The Current Disclosure Statement must tell creditors plainly the truth and the

full truth of where the people "in the know" are investing and what the risk of loss in value does

to the creditors' forced investment.

19.    Further, the Current Disclosure Statement must disclose that the reason General

Unsecured Creditors are not being paid in full is that the value that they are entitled to has been

incrementally redistributed to the Plan Investors through each iteration of the EPCA and the

Plan.  As the following chart illustrates, from the Original Plan and the Original Appaloosa

EPCA, to the First Amended Plan and the First Amended EPCA, through the Current Plan and

Current EPCA, the percentage return on investment to the Plan Investors has gone up, while the

value being distributed to the General Unsecured Creditors has gone down (but, nevertheless is

continued to be described as providing "payment in full" to General Unsecured Creditors at the

respective plan's value).[4]

---

[4]    A Disclosure Statement cannot state that creditors are getting paid in full even though the Debtors could pick any deemed plan value, whether based in reality or not, and even where they are recovering pennies on the dollar.  The entire plan value is misleading and inaccurate.

| | Consideration to Unsecured Creditors | Plan Value | Rothschild Mid-Point[5] | Return on Investment to Plan Sponsors | | Recovery of Unsecured Creditors | |
|---|---|---|---|---|---|---|---|
| | | | | Plan Value | Rothschild Mid-Point[5] | Plan Value | Rothschild Mid-Point[5] |
| Original Plan/Original Appaloosa EPCA | 80% Stock; 20% Cash | $13.9 billion | $12.9 billion | 28.1% | 13.6% | 100% | 89.1% |
| First Amended Plan/EPCA | 92.4% Stock; 7.6% Discount Rights | $13.0 billion | $12.7 billion | 26.0% | 17.6% | 100% | 92.9%[6] |
| Current Plan/EPCA | 75.5% Stock; 24.5% Discount Rights | $13.4 billion | $12.7 billion | 54.8% | 40.6% | 100% | 87.1%[6] |

From the First Amended Plan/EPCA to the Current Plan/EPCA – documents that were filed approximately two weeks apart – over $500 million of value was transferred from the unsecured creditors to the Plan Investors as a result of the reduction in the stock grant and the significant discount on the conversion of the preferred stock. Further, in each iteration of the Plan/EPCA, the amount of the distribution to unsecured creditors that the unsecured creditors have to purchase (through the Discount Rights Offering) has increased. Overall, from the first iteration of the Plan to the Current Plan, the Plan Investors have gotten more, while the General Unsecured Creditors ultimately have gotten less.

20.     The Current Disclosure Statement must clearly disclose how the Debtors and the Plan Investors have agreed to allocate to the Plan Investors more and more value over time at the expense of the General Unsecured Creditors, the reasons why that has happened, and how the Debtors have satisfied their fiduciary duties to their stakeholders by agreeing to such a value shift. See Tr. of Hearing (Nov. 16, 2007) at 21:15-23:10 (Court expresses distress at the changing terms of the EPCA and the seeming lack of justification pointing out that the Plan

---

[5]     The Delphi Trade Committee does not agree that the Rothschild Mid-Point is a proper expression of the value of the Debtors. The Rothschild Mid-Point is used in this chart for illustrative purposes only.

[6]     This percentage assumes that all of the General Unsecured Creditors exercise their Discount Rights.

Investors are "doubling the discount that had previously been negotiated and approved in August of this year. . . .").

21.     The Current Disclosure Statement must also more clearly disclose the changing plan value utilized to calculate the equity grant to unsecured creditors in the Plan, in comparison with the valuation of the Debtors' expert.  As the following graph illustrates, the plan value assigned to the Debtors' estates is consistently above the mid-point of the Debtors' valuation expert's valuation analysis, and, in the Current Plan, has increased $400 million since the First Amended Plan (filed only two weeks previously), even though the Debtors' valuation expert has not changed its valuation whatsoever.  In addition, while the plan value has increased during these two weeks, the plan value utilized to determine the Preferred Stock Conversion Price has decreased from $1.5 billion to $1.0 billion.  Because the "buy-in" price of the Plan Investors has decreased, they are purchasing a correspondingly larger share of the Debtors for the same consideration.  This also needs to be fully and prominently disclosed.



The Debtors must clearly disclose these facts and explain what methodology was used to select these values or whether they were simply picked out of thin air. The Debtors and Rothschild need to go on record as to what is the probable valuation and why the market appears categorically to reject the numbers that the Debtors spout.

**b.    The Current Disclosure Statement Hides The Fact That Not All General Unsecured Claims Will Receive Full Post-Petition Interest.**

22.    The Current Plan denies any General Unsecured Claim that is a Disputed Claim ("Disputed Unsecured Claim") post-Effective Date interest. Section 9.2 of the Current Plan provides that "interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim." The failure to pay Disputed Claims post-Effective Date interest has a dilutive effect on distributions to holders of Disputed Claims, as holders of claims disputed

on the Effective Date but later allowed will receive a distribution of less than 100 cents on the

dollar, in real dollars, due to the time value of money. The Current Disclosure Statement must

fully disclose and explain such dilutive effect. Furthermore, the Current Disclosure Statement

must warn holders of Disputed Claims that this dilutive effect of the failure to pay post-Effective

Date interest gives the Debtors great leverage in negotiations of claims disputes.

23.    The Current Plan also fails to provide for payment in full of General Unsecured

Claims through section IX.E.1(b)(i) of the Current Disclosure Statement and section 1.154 of the

Current Plan, which provide that post-petition interest on General Unsecured Claims will be paid

only through the earlier of the Confirmation Date or January 31, 2008, a date that is almost

certain to be before the Effective Date. The Current Disclosure Statement must disclose that the

failure to pay interest on General Unsecured Claims between such date and the Effective Date

means that General Unsecured Claims are not being paid in full.

> **2.    The Current Disclosure Statement Fails To
> Disclose Adequately Additional Dilution Risk.**

24.    Under the Current Plan, it is a condition to effectiveness that Trade and Other

Unsecured Claims not exceed $1.45 billion. Current Plan §§ 7.31, 12.2(i). If the Trade and

Other Unsecured Claims exceed this amount – most likely due to Later Allowed Claims – the

Plan Investors and the Debtors may waive this requirement, but in such event the Debtors must

distribute to the Plan Investors additional New Common Stock for no further consideration. See

Current EPCA at § 9(a)(xxii). Given that the value of the New Common Stock depends, in part,

on the amount of stock to be distributed, all holders of New Common Stock may have their stock

de-valued to the extent that Later Allowed Claims are sufficiently high so that the Trade and

Other Unsecured Claims exceed $1.45 billion. This dilution risk must be clearly disclosed in the

Current Disclosure Statement.

25.    Furthermore, the Current Plan provides that the condition is waivable unless, among other things, the Creditors Committee votes or the Bankruptcy Court determines that the "recoveries of unsecured creditors would be materially adversely affected" by the waiver. Current Plan § 12.3. This provision, and section XIV.C. of the Current Disclosure Statement which discusses it, is unclear. First, the use of the lower case "unsecured creditors" rather than "Trade and Other Unsecured Creditors", "General Unsecured Creditors" or some other defined term is ambiguous. Second, no guidance or indication is given as to what would constitute a "materially" adverse affect and what would not. A further problem with these provisions is the fact that they ignore the absolute priority rule by sharing the dilution risk *pari passu* with the holders of Section 510(b) Claims,[7] the TOPrS Claims and other General Unsecured Claims, notwithstanding the fact that the TOPrS Claims and the Section 510(b) Claims are subordinate. This fact, along with the Debtors' rationale for its inclusion, must be clearly disclosed.

26.    Moreover, the Current Plan creates additional dilution risk based on the Current Plan's apparent insistence on assuming General Unsecured Claims will be $1.0 billion, $450 million below the claims cap.[8] While this may ultimately be the case, this assumption results in the Debtors' disclosure that only 131.26 million shares will be issued at the Current Plan value per share of $61.72. Current Plan § 5.3(a). However, if General Unsecured Claims are $1.45 billion, nearly 50% more shares (approximately 6.0 million) will be distributed to this class. Further, a claimant's pro-rata share of the Discount Rights Offering will be diluted by nearly

---

[7]    In addition, this is yet another way that the Current Plan may not provide the General Unsecured Creditors (at least those who hold undisputed claims on the Effective Date) with payment in full, as the value of their shares would be reduced by the additional shares provided to the Plan Investors without further compensation.

[8]    General Unsecured Claims were estimated by first calculating the assumed number of shares to be distributed to General Unsecured Claims – Debtors' estimate of 131.26 million total shares less shares to be issued in connection with the Discount Rights Offering, conversion of Preferred Stock, and Investor Shares. The total shares were then multiplied by the assumed plan value of $61.72 per share to determine the value of the 75.5% stock grant. General Unsecured Claims were then estimated based on Senior Notes of $2.0 billion, TOPrS Claims of $420 million, and projected interest of $397 million.

12%.  Therefore, the assertion that Debtors have provided to pay the General Unsecured

Creditors "in full" (which they are not doing in any case, as discussed above) is even further

from reality.  At the artificial plan value, this dilution reduces recoveries of General Unsecured

Claims nearly 3% to 97% and at Rothschild's mid-point, it reduces recoveries to 85%.

**D.    The Court Must Reject The Current Disclosure Statement Unless The
Debtors/Plan Investors Disclose The Claims That The Plan Investors Own
And Which Plan Provisions The Debtors Included To Benefit The Plan Investors.**

27.    Although the Current Disclosure Statement discloses the amount of equity

interests to be received by the Plan Investors allegedly "in exchange" for their investment, the

Current Disclosure Statement utterly fails to disclose the holdings of claims by the Plan

Investors.  The Current Disclosure Statement merely quotes certain SEC filings and a 2019

statement made by White & Case, none of which mentions how much of each type of claim (e.g.,

TOPrS Claims, trade claims, Senior Notes Claims) is held by the Plan Investors.  See DS at

VII.B.1.  In order to evaluate fully *everything* that the Debtors have given to the Plan Investors

and, equally important, recoveries that the Debtors have taken from trade creditors and delivered

to others at the behest of the Plan Investors, creditors must know precisely what the Plan

Investors hold.  This is particularly important given the fact that, as discussed above, the TOPrS

Claims, which are contractually subordinated claims, are misclassified and are to receive

significant distributions when the General Unsecured Creditors are not being paid in full, in

violation of the absolute priority rule.  If the Plan Investors were to hold significant portions of

TOPrS Claims, the reasoning for such treatment becomes apparent.  While investors in a debtor

are rightly concerned about how much equity they receive from the debtor versus how much

existing stakeholders such as creditors receive in general, they should not normally be concerned

with how the creditors agree to divide that portion of equity they are to receive – unless the

investors are themselves creditors.  The Debtors must disclose exactly what claims are owned by

the Plan Investors and whether the provisions of the Current Plan governing the treatment of

such claims were terms proposed and/or insisted on by one or more Plan Investors (and which

ones). Only then will the creditors have the necessary information to understand what the

creditors and the Plan Investors are receiving under the Current Plan and why.

E.      **The Current Disclosure Statement Must Explain The Changes In The EPCA.**

        28.     As discussed above, the Debtors have made significant changes in the EPCA from

the Original Appaloosa EPCA, to the First Amended EPCA, to the Current EPCA, amounting to

an increase in the return on the investment of the Plan Investors from 13.6% to 40.6%.

Seemingly, the only explanation provided by the Debtors is downturns in the credit markets,

minor modifications to the Debtors' 2008 projections, (see First Amended Disclosure Statement

at X.D., X.E.), and vague references to "current market conditions" and "macroeconomic and

industry conditions and uncertainties," Current Disclosure Statement at DS-xii. This is grossly

inadequate disclosure, considering the material adverse change to the recoveries of the General

Unsecured Creditors. This Court has already expressed its dismay over the ever-changing EPCA

and the ever-increasing benefits taken by the Plan Investors: "And I am very distressed that they

have changed [the EPCA], sucking out hundreds of millions of dollars over these apparent

excuses." Tr. Hearing (Nov. 16, 2007) at 23:14-23:16. Additional disclosure of exactly what

changed and why it changed is a necessary predicate to solicitation of the Current Plan.[9]

F.      **The $1.45 Billion Trade And Other Unsecured**
        **Claims Condition Requires Additional Disclosure.**

        29.     As discussed above, the Current Plan contains a condition to the Effective Date

that total Trade and Other Unsecured Claims not exceed $1.45 billion. Current Plan §§ 7.31,

---

[9] Concurrently herewith, the Delphi Trade Committee has filed an objection to the Expedited Motion for Order
Under 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a) Authorizing and Approving Amendment to Delphi-
Appaloosa Equity Purchase and Commitment Agreement, a copy of which is attached hereto as Exhibit A.

12.2(i).  Given the potential for dilution in value of the New Common Stock if the $1.45 billion

limit is exceeded, the disclosure of the status of claims objections and projections as to the

likelihood of satisfying the $1.45 billion cap is critical.  Although the Current Disclosure

Statement in section VIII.E.5. does provide disclosure as to how many disputed claims are

estimated, the Current Disclosure Statement does not state:  (a) the total amount of the allowed

and estimated Trade and Other Unsecured Claims; (b) the total amount of Trade and Other

Unsecured Claims that are disputed and not yet estimated; or (c) the likelihood, in the Debtors'

view, that the total Trade and Other Unsecured Claims will fall below $1.45 billion.  These

disclosures must be made.

30.     Furthermore, section VIII.E.2. of the Current Disclosure Statement and section

8.2 of the Current Plan provide for rejection damages claims to be determined, in some cases,

after the Effective Date, and section IX.H.6.(c) of the Current Disclosure Statement and section

9.6(c) of the Current Plan provide for objections to claims to be filed as late as 120 days after the

Effective Date.  Given the foregoing, the Current Disclosure Statement should also provide the

Debtors' estimate of the total amount of rejection damages claims not yet filed.

**G.     The Current Disclosure Statement Fails To Disclose
Adequately The Current Plan's Other Confirmation Risks.**

31.     The Current Plan contains various provisions that could render it unconfirmable

including, without limitation:

- **Different Treatment of Claims In The Same Class.**  11 U.S.C. §§ 1123(a)(4), 1129(a)(1).  The Current Plan treats allowed and disputed trade claims differently even though they are classified together by denying Disputed Claims any post-Effective Date interest, as discussed above.  Section 1123(a)(4) of the Bankruptcy Code provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest."  11 U.S.C. §1123(a)(4).  The Current Plan cannot treat claims in the same class differently from one another.  Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 186 (Bankr. Fed. App. 9th Cir. 2003) (plan violated

§ 1123(a)(4) because it treated a creditor with a disputed claim differently than other creditors in the same class).

- **Absolute Priority Rule / Cramdown.** 11 U.S.C. § 1129(b). As set forth above, General Unsecured Claims do not receive full payment under the Current Plan. However, the Current Plan provides a distribution to holders of junior claims and interests, including the TOPrS Claims, Section 510(b) Claims and equity interests. Current Plan §§ 5.5, 5.8 & 5.9. The Section 510(b) Claims are subordinate to the General Unsecured Claims. In re Specialty Equip. Cos., 3 F.3d 1043, 1045 (7th Cir. 1993) ("[C]laims for damages or rescission based on the sale of the debentures, . . . are subordinated to the claims of general unsecured creditors under section 510(b) of the Bankruptcy Code"); NationsBank, N.A. v. Commercial Fin. Servs. (In re Commercial Fin. Servs.), 268 B.R. 579, 594 (Bankr. N.D. Okla. 2001) ("[C]laims of rescinding security holders . . . should not be permitted to recover any assets until general unsecured creditors have been made whole."). The TOPrS Claims are contractually subordinate to much, if not all, of the General Unsecured Claims. Even if the Debtors valuation is to be believed (which it is not) and even if the General Unsecured Creditors are receiving stock at a price per share which corresponds to the stock's real value (which it doesn't), such subordinated claims (including the TOPrS Claims) cannot receive any distributions until the General Unsecured Claims are paid post-petition interest through the Effective Date, absent the consent of the General Unsecured Creditors. Accordingly, the Current Plan can only be confirmed if the class of General Unsecured Claims votes to approve the Current Plan, a result that will not occur, given the opposition to the Current Plan of every creditor constituency.[10]

- **Good Faith.** In order for the Current Plan to be confirmed, the Current Plan must be proposed in good faith (which would include all proponents and sponsors thereof). 11 U.S.C. § 1129(a)(3) (requiring the plan to have been "proposed in good faith and not by any means forbidden by law."). The fact that the Current Plan has not been proposed in good faith is evident from, among other things: (1) the fact that the Current Disclosure Statement does not disclose whether the Plan Investors are getting additional compensation by virtue of the distributions to subordinated creditors pursuant to distribution provisions in the Current Plan that they insisted on; (2) the failure to market the EPCA to other potential investors at any point; (3) the agreement to modify the Original EPCA when no one has publicly asserted that the Original EPCA has been terminated; and (4) through each iteration of the Plan, providing General Unsecured

---

[10] The Debtors cannot get around this provision by simply claiming that the payments to be provided to the holders of Section 510(b) Claims will be made pursuant to a settlement. In re Iridium Operating, LLC, 478 F.3d 452, 455 (2d Cir. 2007) ("[I]n a chapter 11 context, whether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important fact for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019. In most cases, it will be dispositive."); Matter of Dalen, 259 B.R. 586, 600 (Bankr. W.D. Mich. 2001) ("[S]ettlements and compromises which substantially affect a debtor's reorganization, whether incorporated into the plan itself or reached prior to plan confirmation, must meet the same standards for plan confirmation as any other plan term, including the requirement that each term be 'fair and equitable.'"); In re Present Co., Inc., 141 B.R. 18, 22 fn 2 (Bankr. W.D.N.Y. 1992) (in disapproving a proposed settlement, the court agreed that "the 'fair and equitable' standard established in the TMT Trailer case requires that the compromise respect the priority of senior interests over junior ones").

Creditors with inferior treatment, while giving superior treatment to the Plan Investors, based, upon information and belief, on the market price of the Senior Notes. Such actions prevent this Court from finding that the Plan satisfies the good faith requirements of Section 1129(a)(3). See In re Coram Healthcare Corp., 271 B.R. 228, 232 (Bankr. D. Del. 2001) (confirmation of debtor's plan denied for failure to satisfy good faith requirements of Section 1129(a)(3) where debtor's CEO had an undisclosed agreement with one of debtor's largest creditors).

32.    The Current Disclosure Statement must provide disclosure of these confirmation

risks, which render the Current Plan unconfirmable.

## CONCLUSION

For the foregoing reasons, the Delphi Trade Committee requests that the Court deny approval of the Current Disclosure Statement and grant such other and further relief as is just and proper.

Dated: New York, New York
       November 21, 2007

                                        KASOWITZ, BENSON, TORRES
                                          & FRIEDMAN LLP

                                          /s/ David S. Rosner
                                          David S. Rosner (DR-4214)
                                          Adam L. Shiff (AS-7571)
                                          Daniel N. Zinman (DZ-7562)
                                          Daniel A. Fliman (DF-2236)
                                          1633 Broadway
                                          New York, New York 10019
                                          Telephone: (212) 506-1700
                                          Facsimile:  (212) 506-1800

                                          *Counsel to the Delphi Trade Committee*