1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2
                                        .  Chapter 11
3                                       .
                                        .  Case No. 05-44481 (RDD)
4    IN RE:                             .
                                        .  (Jointly Administered)
5    DELPHI CORPORATION, et al,         .
                                        .  New York, New York
6                                       .  Thursday, September 27, 2007
                                        .  10:25 a.m.
7                    Debtors.           .
     . . . . . . . . . . . . . . . . .
8
               TRANSCRIPT OF TWENTY-SECOND OMNIBUS HEARING
9                 BEFORE THE HONORABLE ROBERT D. DRAIN
                     UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:            John Wm. Butler, Jr., Esq.
12                               Albert L. Hogan, III, Esq.
                                 John K. Lyons, Esq.
13                               SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM, LLP
14                               333 West Wacker Drive, Suite 2100
                                 Chicago, Illinois 60606
15
                                 Kayalyn A. Marafioti, Esq.
16                               SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM, LLP
17                               Four Times Square
                                 New York, New York 10036
18
     (Appearances continued.)
19
     Audio Operator:             Electronically Recorded
20                               by Kendra Harris, ECRO

21   Transcription Company:      Rand Reporting & Transcription, LLC
                                 80 Broad Street, Fifth Floor
22                               New York, New York 10004
                                 (212) 504-2919
23                               www.randreporting.com

24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.

```
1    APPEARANCES:  (Continued)

2    For the Official Committee
     of Unsecured Creditors:        Robert J. Rosenberg, Esq.
3                                   LATHAM & WATKINS, LLP
                                    53rd and Third, 885 Third Avenue
4                                   New York, New York 10022

5    For the Delphi Trade
     Committee:                     Daniel N. Zinman, Esq.
6                                   KASOWITZ, BENSON, TORRES
                                     & FRIEDMAN, LLP
7                                   1633 Broadway
                                    New York, New York 10010
8
     For the ACE Companies:         Wendy M. Simkulak, Esq.
9                                   DUANE MORRIS, LLP
                                    30 South 17th Street
10                                  Philadelphia, Pennsylvania 19103

11   For United Auto Workers:       Peter D. Dechiara, Esq.
                                    Babette Ceccotti, Esq.
12                                  COHEN, WEISS & SIMON, LLP
                                    330 West 42nd Street
13                                  New York, New York 10036

14   For Bank of America, NA:       Jeffrey Gerard Tougas, Esq.
                                    MAYER BROWN, LLP
15                                  1675 Broadway
                                    New York, New York 10019
16
     For Automodular:               Eduardo J. Glas, Esq.
17                                  MC CARTER & ENGLISH, LLP
                                    245 Park Avenue
18                                  New York, New York 10167

19   For IUE-CWA:                   Thomas M. Kennedy, Esq.
                                    KENNEDY, JENNICK & MURRAY, PC
20                                  113 University Place, Seventh Floor
                                    New York, New York 10003
21
     For IAM:                       Barbara S. Mehlsack, Esq.
22                                  GORLICK, KRAVITZ & LISTHAUS, PC
                                    17 State Street, Fourth Floor
23                                  New York, New York 10004

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   VIA TELEPHONE:

 3   For the TAI Unsecured
     Creditors' Liquidating
 4   Trust:                         David M. Dunn, Esq.
                                    AKIN, GUMP, STRAUSS, HAUER
 5                                   & FELD, LLP
                                    590 Madison Avenue, 20th Floor
 6                                  New York, New York 10022

 7   For Gary Whitney:              Theodore A. Cohen, Esq.
                                    SHEPPARD, MULLIN, RICHTER
 8                                   & HAMPTON, LLP
                                    333 South Hope Street, 48th Floor
 9                                  Los Angeles, California 90071

10   For the IBEW:                  Marianne Goldstein Robbins, Esq.
                                    PREVIANT, GOLDBERG, UELMEN, GRATZ,
11                                   MILLER & BRUEGGMAN
                                    1555 North River Center Drive, #202
12                                  Milwaukee, Wisconsin 53212

13   For Comerica Leasing
     Corp.:                         Ralph E. McDowell, Esq.
14                                  BODMAN, LLP
                                    6th Floor at Ford Field
15                                  1901 St. Antoine Street
                                    Detroit, Michigan 48226
16
     For Technology Partners,
17   Ltd.:                          Wendy W. Smith, Esq.
                                    BINDER & MALTER, LLP
18                                  2775 Park Avenue
                                    Santa Clara, California 95050
19

20

21

22

23

24

25
```

1                                    INDEX

2
CONTINUED OR ADJOURNED MATTERS                           Page

3
     Marsilli Late-Filing Motion                           5
4    Arkema Late-Filing Motion                             5
     MDL and Insurance Settlement Approval Motion          6
5

6    UNCONTESTED, AGREED, OR SETTLED MATTERS

7    GM Warranty Settlement Motion                          7
          (Exhibits 1 through 8 Received in Evidence.)      9
8    Motion to Amend Reclamation Procedures                12
     GM License Agreement Motion                           18
9         (Exhibits 1 through 4 Received in Evidence.)     22

10   CONTESTED MATTERS

11   TWENTIETH OMNIBUS CLAIMS OBJECTION                    22

12   CLAIMS ESTIMATION MOTION                              25
13        (Exhibits 1 through 7 Received in Evidence.)     36

     SAGINAW CHASSIS ASSET SALE MOTION                     40
14
     (Adjourned to October 3, 2007)
15
     KECP THIRD SUPPLEMENT                                 51
16        (Exhibits 1 through 43 Received in Evidence.)    54
          Argument by Mr. Butler                           56
17        Argument by Mr. Dechiara                         81
          Argument by Ms. Mehlsack                         96
18        Argument by Mr. Kennedy                         101
          Further Argument by Ms. Mehlsack                103
19        Response by Mr. Butler                          106
          Court Decision                                  112
20

21
     STATUS CONFERENCE RE:  PLAN PROGRESS                  41
22
23

24

25

1    (Proceedings commence at 10:25 a.m.)

2    (Call to order of the Court.)

3        THE COURT:  Be seated.

4        Okay.  Delphi Corporation.

5        MR. BUTLER:  Your Honor, Jack Butler, Kayalyn

6    Marafioti, and Al Hogan from Skadden, Arps, Slate, Meagher &

7    Flom, LLP, on behalf of Delphi Corporation for its September

8    Omnibus hearing.

9        Your Honor, we have filed a proposed agenda for this

10   twenty-second omnibus hearing; with Your Honor's permission,

11   we'll follow that agenda.

12       THE COURT:  That's fine.

13       MR. BUTLER:  Your Honor, the first two matters on the

14   agenda, Matters 1 and 2, are late-filed motions seeking

15   permission to file late lit. claims.

16       Matter No. 1 is the Marsilli Late-Filing Motion,

17   Docket No. 9113.

18       Number 2 is the Arkema Late-Filing Motion, filed at

19   Docket No. 9272.

20       We have been in contact with both of these claimants

21   who filed under the case management order for the omnibus

22   hearing.  They've agreed to move the motions to the claims

23   track, and they have been adjourned, with Your Honor's

24   permission, to the claims hearing tomorrow.

25       THE COURT:  Okay.  That's fine.

1        MR. BUTLER:  Your Honor, the next matter on the agenda

2   is Matter No. 3.  Matter No. 3 is the MDL and Insurance

3   Settlement Approval Motion, filed at Docket No. 9296.  This is

4   the companion settlement process to that occurring in the

5   United States District Court for the Eastern District of

6   Michigan.  That Court preliminarily approved the MDL settlement

7   earlier this month, and has scheduled a fairness hearing for

8   mid-November.

9        Your Honor, we have been in contact with certain of

10  the stakeholders, which I'll discuss in a few minutes, but

11  there have been no objections filed to this as of September 20,

12  the objection deadline.  We did agree to extend the deadline as

13  to the Department of Labor, the Unsecured Creditors' Committee,

14  Wilmington Trust Company as Indenture Trustee, the Ad Hoc

15  Committee of Trade Creditors, and a group of trade creditors --

16  excuse me -- a group of bondholders represented by Goodwin

17  Procter, DK Acquisition Company, Silver Point Capital, Sandler

18  Capital, and Elliot Management.  And we extended that matter,

19  that objection deadline, until Monday, and we have adjourned

20  this, with Your Honor's permission to October 3rd; we have a

21  date next week, and we'll address this further at the October

22  3rd hearing.

23        THE COURT:  All right.

24        MR. BUTLER:  Thank you, Your Honor.

25        Your Honor, the next matter on the agenda is the GM

1    Warranty Settlement Motion at Docket No. 9294.

2         Your Honor, this is the motion filed by the debtors

3    seeking an order authorizing and approving Delphi's entry into

4    and performance under a warranty settlement and release

5    agreement and covenant not to sue with General Motors

6    Corporation.  This was filed on September 7, 2007, as I

7    indicated, at Docket No. 9294.

8         The debtors estimate that the proposed warranty

9    settlement settles hundreds of millions of dollars of claims,

10   potential warranty claims, for approximately $200 million.

11        By way of example, GM filed a proof of claim on July

12   31, 2006, that alleged that it would incur approximately $530

13   million in damages, plus unliquidated amounts on account of

14   these claims, and that would incur additional costs over time.

15   Those costs have been accruing and are significantly -- GM

16   believes and we believe could have been significantly higher

17   than that amount.  And this settlement would, in fact, settle

18   those at a two-hundred-million-dollar amount, the majority of

19   which would be paid in cash; approximately $130 million paid in

20   cash over time, and an estimated 70 million paid through the

21   delivery of replacement product to General Motors under the

22   terms of the agreement.

23        Your Honor, I am not going to, on this record, discuss

24   in detail each of the claims that are being resolved.  As Your

25   Honor is aware, the Court entered an order earlier to protect

1  the information, as much of the information is sensitive

2  commercial information, and entered a protective order at

3  Docket No. 9268.

4       There is a publicly filed redacted motion that

5  summarizes the relief generally.  We have provided the complete

6  motion to counsel to the plan investors and to the statutory

7  committees' professionals for their review, as well, and

8  neither of them have objections to -- none of those parties

9  have objections to this particular matter.

10      I would, Your Honor, given the nature of this

11  particular matter, like to put in a brief evidentiary record.

12      We have eight items, eight exhibits that we'd like to

13  put into evidence:

14      Exhibit 1 is the warranty settlement and release

15  agreement.

16      Exhibit 2 are the court documents, including --

17  Exhibit 2 is the motion

18      Exhibit 3 is the form of order.

19      Exhibit 4 is the ex parte application.

20      Exhibit 5 was the order that authorized the filing of

21  the redacted agreements.

22      Exhibit 6 is the declaration of Mr. John D. Sheehan,

23  our Chief Restructuring Officer, giving testimony as to the

24  business justification and justification under Bankruptcy Rule

25  9019 for this settlement.

1    And then we have also filed as Exhibit 7 the

2  unredacted warranty settlement release agreement.

3    And Exhibit 8 is a copy of General Motors' proof of

4  claim, which has also been filed under seal.

5    Your Honor, I'd like to move for admission into

6  evidence Exhibits 1 through 8.

7    THE COURT:  Okay.  And again, the last two are covered

8  by the confidentiality order.

9    MR. BUTLER:  Correct, they are marked "confidential."

10    THE COURT:  Okay.  Does anyone wish to cross-examine

11  Mr. Sheehan on his declaration in support of the settlement?

12    (No verbal response.)

13    THE COURT:  Okay.  I'll admit each of the items into

14  evidence for purposes of this motion and accept the proffer of

15  Mr. Sheehan's testimony through his declaration.

16    MR. BUTLER:  Thank you, Your Honor.

17    (Exhibits 1 through 8 received in evidence.)

18    MR. BUTLER:  Your Honor, the only other item I wanted

19  to mention on the record, because I think the record is now

20  otherwise complete, is just to point out the payment terms of

21  the cash portion of the consideration under the agreement.

22    The payment is due on or before November 1st, 2007,

23  but there is an election for Delphi to defer those payments

24  until about the time of its emergence from Chapter 11; but, at

25  that point in time, there would be an accrual of interest at

1    the rate of six percent per annum from November 1, 2007 until

2    paid by Delphi or set off against payments that would be

3    payable by General Motors under the terms of the agreement.

4    And I did want to make that known.

5          Your Honor may recall just, also, even from the

6    beginning of these cases, we have said that you need to

7    separate -- when you look at General Motors and the discussions

8    we've been having with them over the course of this case, you

9    really do need to separate the legacy relationship from what

10   I'll call the "ordinary course customer relationship."  We have

11   a customer relationship, not just with General Motors, but with

12   many other of our global OEMs, and warranty is a part of that

13   business.  And ultimately, settling those disputes in the

14   ordinary course of business is something that needs to be done

15   between a Tier 1 supplier and its OEM customers.

16         And this is -- as Mr. Sheehan's declaration and his

17   testimony states, this is a good settlement for the debtors.

18   This resolves substantially all known claims.  I'm not going

19   to, by my summary here, in any way denigrate from what the

20   actual terms of the agreements are, but it essentially settles

21   all outstanding warranty claims and issues related to

22   components or assemblies supplied by Delphi to GM that, as of

23   August 10th, 2007, were known by GM -- there may be one or two

24   small exceptions to that -- believed by GM to be Delphi's

25   responsibility in whole or in part, and in GM's normal

1   investigation process or what should have been in that process,

2   but withheld for the purpose of pursuing a claim against Delphi

3        And it goes into the -- the settlement goes on to

4   limit the liability relating to certain other warranty claims

5   that have become known by GM on or after June 5, 2007, and also

6   prohibits both GM and Delphi from initiating any action against

7   the other related party to any of the warranty claims that are

8   settled in the agreement.

9        That's just, Your Honor, a brief summary.  As I

10  indicated, and as Mr. Sheehan has now testified to, the debtors

11  believe this is in the best interest of the estate.  The

12  debtors believe it's appropriate to approve this agreement

13  outside of the plan of reorganization process, and that it is

14  an appropriate use of -- both an appropriate settlement and

15  appropriate use of property of the estate.

16       THE COURT:  So, in other words, although this may well

17  have been negotiated in the context of the other negotiations

18  that the debtors were having with GM, and certainly in

19  contemplation of the projections and plan the debtors propose,

20  this is a stand-alone settlement; and the debtors, the official

21  committees, and the plan sponsors have all reviewed it in that

22  context.

23       MR. BUTLER:  That's correct, Your Honor.

24       I should point out -- and this is indicated in the

25  black-lined order -- that there are -- that in -- we've had

1    discussions with Wilmington Trust in connection with this

2    transaction.  We've agreed to make certain modifications to the

3    order.  The language is language at proposed Paragraph 6 and 7

4    that Your Honor has seen before in some other --

5              THE COURT:  Under the reservation.

6              MR. BUTLER:  The reservations.

7              THE COURT:  Inter-debtor issues.

8              MR. BUTLER:  Correct, Your Honor.

9              THE COURT:  Right.  And that language seemed fine to

10   me.

11        All right.  Does anyone else have anything to say on

12   this motion?

13      (No verbal response.)

14              THE COURT:  All right.  I will approve the motion and

15   settlement as being in the best interests of the debtors and

16   fair and reasonable for the reasons stated int he motion, and

17   also in light of the arm's length nature of the negotiations

18   and the review, which I assume was, as has been the case

19   throughout the case, thorough by the committees.

20              MR. BUTLER:  Thank you, Your Honor.

21        Your Honor, the next matter on the agenda is Matter

22   No. 5; this is a Motion to Amend Reclamation Procedures at

23   Docket No. 9295.  And, Your Honor, just a bit of background

24   with respect to this motion.

25              Your Honor will recall back at the beginning of the

1    cases, we filed our first reclamation motion, which sought the

2    institution of uniform procedures for the treatment of

3    reclamation claims and authorized a process that was later

4    amended on November 4th, 2005, by an amended final reclamation

5    order that dealt with issues raised by the creditors' committee

6    at that time and represented an agreement between the debtors

7    and the creditors' committee as to how we would process and

8    administer reclamation claims during these Chapter 11 cases.

9        Among other matters, that amended final reclamation

10   order required the debtors to provide reclamation claimants

11   with a -- what we called or characterized as a "statement of

12   reclamation," setting forth the extent and basis, if any, upon

13   which the debtors believed that the reclamation claimant's

14   reclamation claim was not legally valid.  We also were required

15   to identify any defenses that the debtors chose to reserve.

16       We did reserve, Your Honor, defenses, including the

17   right provided in each -- to each reclamation -- we reserved

18   the prior lien defense, which was the right to reduce or

19   disallow reclamation claim if the goods and/or the proceeds

20   from the sale of the goods were subject to a valid security

21   interest, and that has been reserved since the beginning of the

22   case.

23       During the course of the Chapter 11 case, we have

24   administered the reclamation claims and reconciled them.  The

25   actual reclamation claims that would be subject to potentially

1   being allowed as a reclamation claim are, in fact,

2   substantially lower, in terms of the face amount, than that

3   which was originally filed.

4        We now come to the emergence portion of the case, and

5   we have a situation where the plan and disclosure statement we

6   filed on September 6th includes, for unsecured creditors, both

7   payments of their principal amount and accrued interest at a

8   negotiated plan value under the terms of the plan, if that

9   plan, in fact, is confirmed by the Court and becomes effective.

10       With respect to reclamation claims, if they were

11  administrative claims, they would be paid cash on the effective

12  date, but there would be no interest component associated with

13  that.

14       In reviewing this and discussing it with your

15  committees, as well as reviewing it with some other parties and

16  evaluating internally, the company concluded that it was

17  appropriate to give reclamation claimants a reclamation

18  election notice and to allow each reclamation claimant to elect

19  for themselves whether they would like to be afforded the

20  general unsecured claims treatment, which would include the

21  opportunity to have their claim comprehend post-petition

22  interest on the allowed amount of the claim, rather than deal

23  with the administrative process of dealing with it as an

24  administrative claim, which would result, among other things,

25  that we would have hearings post-effective-date, in which the

1   debtors would press for a judicial determination that those

2   reclamation claims are subject to the prior lien defense.

3        Said another way, the debtors don't plan to

4   necessarily deal with the allowance, actual allowance of

5   reclamation claims, until after the effective date of a plan,

6   and we would assert and actually would litigate the -- plan to

7   litigate the prior lien defense in connection with that at

8   those hearings.

9        So we have a form of notice that we've worked out, we

10  have an approach to do it.  The procedures here are -- we're

11  seeking to amend the reclamation procedures order to allow

12  those to go forward.  We have had discussions with the

13  creditors' committee; I believe they support this approach.

14  There was some additional language that we agreed on with the

15  committee to go in the order that was to deal with giving the

16  opportunity for reclamation parties who make an election to

17  essentially have a second look if, in fact, there are events

18  subsequent that cause the debtors to re-solicit selected

19  acceptances or rejections of a plan that had already gone

20  through the disclosure statement process; and, therefore, we

21  added that language.

22       We agreed with the creditors' committee that we would

23  provide those reclamation parties under those narrow

24  circumstances the opportunity to rescind their election.  We'd

25  work out a form that would be acceptable with the creditors'

1   committee, we'd include that in any re-solicitation package if

2   that event ever occurred.  And so that language has been put in

3   place here.

4           The one element of the order that needs to be

5   resolved, corrected, and submitted to Your Honor later today or

6   tomorrow, is we had tied specific dates to the service of the

7   election notice and to the return of it; those dates, under the

8   proposed order, were October 29th and November 9th.  In fact,

9   those dates need to tie more directly to the solicitation

10  period, once we get a solicitation order approved by Your

11  Honor.  And so we want to simply put some clarifying language

12  into that.  We don't want people --

13          THE COURT:  Actually, that was my comment on the

14  order.

15          MR. BUTLER:  Right.

16          THE COURT:  I put in the later -- first, for sending

17  it out, I put in the later of the date for mailing of

18  disclosure statement and ballots, or -- and October 29th, but

19  ...

20          MR. BUTLER:  Great.  That was --

21          THE COURT:  Obviously, these people should see an

22  approved disclosure statement when they make this choice, and

23  I'm assuming you'll do it, at the same time you send out that

24  disclosure statement and the ballots, you'll send out this

25  notice, as well.

1          MR. BUTLER:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. BUTLER:  That was the point.  And we may send them

4   out in the separate package, so they have a chance to --

5          THE COURT:  Right.

6          MR. BUTLER:  -- get lost in the shuffle, but --

7          THE COURT:  All right.  But it should be no earlier

8   than the mailing of the disclosure statement and the ballots.

9          MR. BUTLER:  Right.  That was the only correction to

10  the order.  Thank you for sorting it through, as well.  And

11  otherwise, Your Honor, we would ask the Court to approve the

12  relief that we're seeking.

13         THE COURT:  Okay.  The other question I had, the

14  proposed order says that it supersedes the prior order.  But as

15  I read it, the only difference from the prior order was this

16  election procedure and a specific reference to the prior lien

17  defense; all the other procedures are the same.

18         MR. BUTLER:  That's correct, Your Honor.

19         THE COURT:  Okay.  All right.  Does anyone have

20  anything to say on this motion?

21     (No verbal response.)

22         THE COURT:  All right.  I think the motion is self-

23  explanatory, and the basis, as far as the estate is concerned,

24  for giving reclamation creditors this choice is reasonable in

25  the reasonable business judgment of the debtors, and I believe

1   does not discriminate, given the types of treatment that the

2   current plan affords unsecured creditors and reclamation

3   creditors, and the costs that might be incurred in finally

4   disposing of the reclamation claims.  So I'll approve the

5   motion with the clarifying change on the notice being sent

6   contemporaneously with the disclosure statement and ballots.

7          MR. BUTLER:  Thank you, Your Honor.

8          THE COURT:  Okay.

9          MR. BUTLER:  Your Honor, the next matter on the agenda

10  is Matter No. 6; this is the GM License Agreement Motion, filed

11  at Docket No. 9370.  And the only response filed to this is a

12  reservation of rights by the creditors' committee at Docket No.

13  9563, which I'll address in a couple of moments.

14         Your Honor, this request -- and I think it's important

15  to put it in context -- is we're seeking authorization and

16  approval today for a license agreement that would transfer to

17  the GM entities certain intellectual property owned by Delphi

18  and its subsidiary DTI that is required for the manufacture of

19  products that the debtor is no longer intending to supply to GM

20  after exiting their non-core businesses.

21         Delphi has also agreed to provide certain services

22  related to this intellectual property; and, in consideration,

23  GM has agreed to pay Delphi and DTI the aggregate sum of 38.5

24  million.

25         And what's important, I think, to note on this

1   particular license is this is dealing with the divesture of

2   non-core businesses and the intellectual property associated

3   with that.

4           And one of the reasons we filed this, Your Honor, on

5   an expedited time frame, and one of the reasons we're asking

6   for the Court's approval of this independent of the settlement

7   agreement, even though it's attached as an exhibit to the

8   settlement agreement, is that the company and General Motors

9   are working pretty much day by day together to sort through the

10  divestiture of non-core businesses.

11          And as I think Your Honor has become acutely aware, if

12  there is any value to be derived from these businesses, either

13  value in terms of aggregate consideration and recovery of

14  working capital and/or value from actually having them divested

15  from and the burdens associated with them eliminated from

16  Delphi's go-forward operations, it really is dependent upon two

17  key issues:

18          One is that there be appropriate labor agreements in

19  connection with those wound-down businesses in most instances,

20  and the other -- or divested businesses.

21          And the other is that there be appropriate supply

22  agreements and other relationships with General Motors.

23          And to the extent that they are -- these are divested

24  businesses, or if even they're going to be wound down -- and in

25  the case of a wind-down, they're going to be re-sourced, the

1  supplies are going to be re-sourced, there is technology there

2  that General Motors needs to have access to on a reasonable

3  basis, to be able to do the things it requires in moving

4  forward.

5          So there is a real legitimate business interest here

6  on General Motors' part and on Delphi's part in making sure

7  that there be -- an appropriate license agreement be negotiated

8  here that deals with a very specific set of circumstances and a

9  very -- and is limited in that respect.

10          Your Honor, the debtors believe that this license

11 agreement will confer immediate and material benefits upon

12 their estates that are independent of those arising directly

13 from the settlement agreement, including accelerating the

14 transition to other suppliers or production of products that

15 Delphi no longer desires to provide; and that delaying the

16 transition is likely to give rise to significant cost to

17 Delphi, which will ultimately be borne by the debtors' estates,

18 and ultimately then by their stakeholders.

19          I did indicate the license agreement is a subject of

20 the motion as Exhibit B to the settlement agreement and is

21 referred to in here, but the debtors had indicated their

22 decision to move forward on this independently.

23          We have reviewed this with our stakeholders.  There is

24 no objection that's been filed.  I did mention that there was a

25 reservation of rights filed by the creditors' committee.  We

1  did discuss the reservation of rights with the creditors'

2  committee, which really goes to the distribution of the

3  proceeds of the GM payment, and we agreed to add a new

4  paragraph in the proposed order approving the license agreement

5  that I think fully addresses the committee's concerns in that

6  respect, so ...

7          THE COURT:  Again, it's reserving rights as to inter-

8  debtor --

9          MR. BUTLER:  Yes, Your Honor.

10          THE COURT:  -- entitlement to those funds.

11          MR. BUTLER:  Correct, Your Honor.

12          THE COURT:  Okay.

13          MR. BUTLER:  So, Your Honor, again, briefly, because

14  of the nature of this particular motion, we'd like to make a

15  very brief evidentiary record.  There are four exhibits we'd

16  like to place into evidence; that includes:

17          Exhibit 1, the license agreement.

18          Exhibit 2 is a declaration, again, of Mr. Sheehan,

19  stating the debtors' justification under Section 363(b) of the

20  Bankruptcy Code for the use of the property of the estate in

21  this way.

22          And then Exhibits 3 and 4 are the plain and black-

23  lined orders of the proposed orders that we're asking Your

24  Honor to consider.

25          Your Honor, I'd like to move Exhibits 1 through 4 into

22

1  evidence.

2        THE COURT:  Okay.  Does anyone want to cross-examine

3  Mr. Sheehan on his declaration?

4     (No verbal response.)

5        THE COURT:  All right.  I'll admit the exhibits into

6  evidence, including his declaration.

7     (Exhibits 1 through 4 received in evidence.)

8        MR. BUTLER:  Your Honor, basically, I think the

9  company would rest on Mr. Sheehan's declaration as to the

10  business justification and on the papers as to the terms of the

11  agreement.

12        THE COURT:  Okay.  Does anyone want to address this

13  agreement; and, in particular, the fact that the debtors are

14  going forward with it now, as opposed to waiting for the

15  approval of the overall settlement with GM?

16     (No verbal response.)

17        THE COURT:  Okay.  In light of there being no

18  objections and the benefits to the debtors of their entry into

19  this agreement and its approval now, I will grant the motion.

20        MR. BUTLER:  Thank you, Your Honor.

21        Your Honor, the next matter on the agenda is Matter

22  No. 7.  This is the Twentieth Omnibus Claims Objection filed at

23  Docket No. 9151.

24        Under this objection, Your Honor, the debtors dealt

25  with 184 proofs of claim on the objection; 62 of those proofs

1   of claims were responded to by claimants.  We chose to withdraw

2   an erroneous claims objection dealing with Universal Tool, and

3   we also resolved two proofs of claims that were on the

4   responses that were given to us by the various claims holders.

5        That basically means that, in doing that math, that

6   there's 123 proofs of claim that no one filed a response to,

7   and that we'd ask for, for relief at today's hearing.

8        So as to these 184 claims, we filed the objections for

9   a series of substantive reasons, ranging from insufficient

10  documentation; in some cases, there were duplicative claims,

11  the liabilities or dollar amounts weren't reflected on the

12  debtors books and records, or other objections that the debtors

13  thought were appropriate, including timeliness and the

14  assertion of modified amounts or modified debtors.  And there

15  are some fifteen reasons we may have filed -- ultimately filed

16  on this particular substantive objection.  But again, in

17  dealing with the actual results, there are 123 claims we're

18  going to ask Your Honor to so order.

19       I do want to cover briefly, Your Honor, the two

20  resolved responses.  The debtors objected as to untimely-books-

21  and-records-basis objection to the State of New Jersey Division

22  of Taxation, and it agreed to the expungement of Proof of Claim

23  16546 that was filed in the amount of approximately $1.16

24  million.

25       The debtors also sought to modify the asserted amount

1   of a claim for IREPI Services, Inc., and that's Claim No.

2   14236, and the claimant agreed to a reduction of the proof of

3   claim against DOS, LLC, to approximately $489,000.

4          THE COURT:  Are those reflected in the modified order?

5          MR. BUTLER:  Yes, they are, Your Honor.  And all of

6   this is covered in the omnibus reply that we filed yesterday,

7   with each of the -- responding to each of the items that were

8   reconciling back from the 184 claims, back to the 123 claims.

9          So, Your Honor, specifically looking at the 123

10  claims, these are liquidated claims of approximately $369.8

11  million.  We're seeking to expunge thirty-three of these

12  claims, totalling 353.8 million; and with respect to the other

13  ninety claims that total approximately 16 million, we're

14  seeking modifications, either as to the identity of the debtor

15  against who the proof of claim is asserted, and/or the class

16  and the amount of the claim, and we would reduce the amount of

17  these claims by -- to approximately 13.9 million, so there

18  would be an overall reduction as to those ninety claims of

19  about $2.1 million.  That's the relief we're seeking here, Your

20  Honor.

21         As to the remaining claims, for which there were --

22  that are not resolved and for which there were timely responses

23  filed, that would be the -- there's approximately fifty-nine of

24  them, I believe, all tolled; fifty-nine or sixty of them that

25  will actually go over to the claims track under the claims

1   administration procedures.

2           THE COURT:  Okay.  And did the debtors give the

3   individualized notice to each of the claimants as contemplated

4   by the claims procedures order?

5           MR. BUTLER:  Yes, I believe we did, Your Honor.

6           THE COURT:  Okay.  All right.  Does anyone have

7   anything to say on this Twentieth Omnibus Claims Objection

8   Motion?

9       (No verbal response.)

10          THE COURT:  All right.  I will grant the modified

11  relief sought by the debtors, as modified on the record, on the

12  basis that the omnibus motion, with the particularized notice

13  required by the claims procedures order, shifted the burden

14  back onto the claimant to overcome the objection.  And as to

15  these particular claimants, since they did not respond or

16  object to the motion, they have not carried that burden; and,

17  as to the two who have settled, obviously that settlement is a

18  resolution of the objection in the debtors' favor.  So I'll

19  enter the modified order.

20          MR. BUTLER:  Thank you, Your Honor.

21          Your Honor, the next matter on the agenda is the

22  Claims Estimation Motion.  This is at Docket No. 9297.  And,

23  Your Honor, as to this matter, I want to take a few minutes to

24  explain for purposes of this motion.

25          As Your Honor knows from the claims administration

1    process, we have made very significant progress in

2    administering over 16,000 claims in this case, and we're moving

3    now into the territory of dealing with claims that were not

4    filed in a definite amount; or, if they were filed in a

5    definite amount, also said plus additional amounts or

6    unliquidated amounts, or there was a reason to look at them and

7    conclude they were either partially unliquidated or completely

8    unliquidated.

9         And as we move towards the conclusion of the case, and

10   we need to meet the conditions of our agreements with

11   stakeholders in reconciling general unsecured claims, other

12   than funded debt claims below the 1.7-billion-dollar watermark,

13   we need to be able to understand and resolve these claims for

14   unliquidated damages or unliquidated amounts against the

15   estate.

16        For this reason, Your Honor, we sought to estimate --

17   to set up estimation procedures, and we, in fact, made

18   estimations of to set a maximum cap on 316 contingent or

19   unliquidated proofs of claim filed by sixty-seven claimants;

20   these asserted claims totalling about $108 million, plus

21   unliquidated amounts.  So some of them were completely

22   unliquidated; others were partially unliquidated.  You tote it

23   up, when those numbers are actually put down on a piece of

24   paper, they total 108 million.  But the point from the debtors'

25   perspective is we have no confidence that that is -- really

1   represents 108 million of claims or 500 million of claims or

2   some other number.  And so we need, at this point in time, to

3   ask Your Honor to move into the estimation business.

4        At the beginning of the case, when we filed our claims

5   administration procedures, there was an estimation element of

6   those procedures.  Your Honor pointed out to us that it was

7   unnecessary to include the estimation procedures at that point

8   because of the due process that was included in claims

9   administration, that the Court was able to actually deal with

10   the claims, and went through that process on a final basis. But

11   where we are now, in terms of our emergence time line, we do

12   need now to move forward under the estimation provisions of the

13   Bankruptcy Code.

14        THE COURT:  Can I make sure I understand one point

15   about this?  Are any of these claims that would be subject to

16   these procedures, were they already -- were any of them already

17   subject or in the process of being dealt with by the claims

18   procedures?

19        MR. BUTLER:  There may have been a few that were, Your

20   Honor.

21        THE COURT:  Okay.

22        MR. BUTLER:  And I'll actually address a couple of

23   those, I think there was -- in a few minutes.

24        THE COURT:  Okay.

25        MR. BUTLER:  There was actually, I think, that -- as I

1   recall in preparing for this, there were a couple we actually -

2   - people have agreed to so-called "hard caps."

3           THE COURT:  All right.

4           MR. BUTLER:  Because the hard caps were already in the

5   claims administration process and --

6           THE COURT:  But the vast majority were ones that you

7   had been saving because they were unliquidated, or at least in

8   part unliquidated or contingent.

9           MR. BUTLER:  Correct.

10          THE COURT:  Okay.

11          MR. BUTLER:  So, Your Honor, in looking at the claims,

12  this dealt with setting a maximum cap on 316 contingent or

13  unliquidated proofs of claim filed by, as I said, sixty-seven

14  claimants.  We have proposed caps as to these 316 claims of

15  approximately 48.6 million.  That doesn't that the debtors

16  concede that that's amounts owed, but that would be caps for

17  purposes of the motion.  That's a reduction of almost $60

18  million.

19          As against those 316 claims, there have been sixteen

20  objections filed, which included -- some of which included

21  counter-proposals or reservation of rights, only six asserted

22  objections to the estimation procedures, and all of those have

23  been resolved in the proposed amended order that we submitted

24  to Your Honor for consideration for this hearing.

25          But to walk through the 316 unliquidated claims, there

1    were -- as we said, there were 316 claims on the motion,

2    involving sixty-seven claimants.  We had proposed a cap of 48.6

3    million or so for that group.

4         We have sixty claims on Exhibit A involving forty

5    claimants that deal with $27.2 million -- let me make sure I

6    get the numbers correct -- $27.2 million, and those were all

7    listed in Exhibit A, and those are all resolved objections.  So

8    we've been able to resolve those; those are agreed amounts.

9         We've also reached agreement with five claimants with

10   respect to six claims.  The cap amount of these claims are set

11   forth in the body of the order, and they've agreed to an

12   aggregate cap of $22 million as we walk through that.

13        So, Your Honor, and then -- so the first is the claims

14   in Exhibit A, 27.2 million cap; six claims on Exhibit -- within

15   the terms of the order at 22 million.  We have then dealt with

16   134 claims on various stipulations for an aggregate cap of 3

17   million.

18        And then there are claims that we have not agreed to,

19   that are going to go over to the claims process, and there's

20   approximately 112 of those claims; they're listed on Exhibit B,

21   involving ten claimants that will go over to the claims process

22   to have that estimation determination made.  And the cap we're

23   proposing for that group of claims is 6.7 million.

24             THE COURT:  I'm sorry.  For Exhibit A.

25             MR. BUTLER:  Right.

1    THE COURT:  Were those actually all agreements, or did

2  some people just not object?

3      (Counsel confer.)

4    MR. BUTLER:  Those are mostly no objections, Your

5  Honor, I believe.

6    THE COURT:  Okay.

7    MR. BUTLER:  There are no objections.  We didn't get

8  responses to those.

9    THE COURT:  All right.

10    MR. BUTLER:  I'm sorry.  Let me correct the record.

11    THE COURT:  Okay.

12    MR. BUTLER:  We didn't get responses from those folks.

13    THE COURT:  Did they get an individual notice?

14    MR. BUTLER:  Yes, everyone got individual notices of

15  this.

16      (Counsel confer.)

17    MR. BUTLER:  One moment, Your Honor.

18      (Counsel confer.)

19    MR. BUTLER:  Your Honor, on this, this had less than a

20  hundred objections -- or this had less than a hundred

21  claimants.  Mr. Lyons advises me that this -- the motion was

22  served on them, not individual notices.

23    THE COURT:  Okay.  All right.

24    MR. BUTLER:  As to this particular motion.

25    THE COURT:  Okay.

1          MR. BUTLER:  All right.  So, again -- so the relief

2    that we're seeking today, Your Honor, deals with Exhibit A, the

3    claims in the order, and the claims on the stipulations.  And

4    then Exhibit B, which is listed -- the ten claimants and the

5    112 claims, we're asking for those to be rolled over for

6    determination under the estimation procedures in the claims

7    track.

8          A couple of items, Your Honor, that I wanted to

9    address in connection with this.

10         There was a statement filed by the creditors'

11   committee at Docket No. 9442, in which they noted that the

12   motion doesn't actually seek to cap any unliquidated claims for

13   ultimate distribution purposes; saying, instead, that was an

14   element of our plan of reorganization that was filed on

15   September 6th.  And they obviously reserve their rights with

16   respect to the plan and the disclosure statement.

17         And I acknowledge that.  I mean, I acknowledge that

18   this motion does not seek an advisory opinion on whether the

19   distribution reserve provisions in our proposed plan of

20   reorganization filed on September 6th, which was set forth in

21   Section 9.8 of the plan, whether that is appropriate or not.

22   That is a matter for another day.  We believe it is

23   appropriate.  And both the committee and any other party are

24   free, obviously, to challenge whether that provision meets the

25   provisions of the Bankruptcy Code in connection with the

1   confirmation hearing.

2          I do, however, want to make clear on this record that

3   the claims that are estimated under the estimation procedures

4   are for the purpose of setting specific distribution reserves

5   for an estimated claim under the plan.  And ultimately, if Your

6   Honor confirms the plan, including Section 9.8, those claimants

7   would not be able to receive plan consideration in excess of

8   the reserve amounts, and so I want to deal with this in two

9   fronts:

10          The issue whether 9.8, and whether that approach and

11   that distribution reserve is appropriate, is a matter for the

12   confirmation hearing.

13          But the procedures for going forward and determining

14   what the actual claim amounts are and the cap amounts are, and

15   the due process to be afforded claimants, you know, is for

16   today; it's for the estimation procedures today.

17          And what we want to actually want to make sure does

18   not happen is that today is the day for any procedural

19   challenge to the fixing of a particular reserve amount, how

20   that's to be approached.  And I just want to make very clear

21   from the debtors' perspective, if the plan as written is

22   ultimately confirmed as it relates to Section 9.8, claimants

23   subject to the estimation procedures cannot later complain that

24   they didn't receive due process in how their specific reserve

25   amount was fixed; that it fixed the maximum amount of

1   distribution they were entitled to.  And I just want to make

2   clear that we're dealing with a procedural issue which has

3   subsequent aspects to it here.  And if people were unhappy with

4   how we were going to estimate people's claims, it ain't the day

5   for that fight.

6         Ultimately, how we choose to use the mechanics of

7   Section 9.8 of the plan, that's a confirmation hearing issue,

8   and we understand that.  But if the debtors prevail, as we

9   believe we will, with respect to Section 9.8, then the

10  estimation process Your Honor is about to embark on, if you

11  grant this relief, those determinations will, in fact, be

12  binding as it relates to how they'll be used under the plan.

13        THE COURT:  Okay.

14        MR. BUTLER:  And I just want to make that statement on

15  the record, so the record is clear in that respect.

16        As is always the case, we're dealing with many

17  creditors.  Your Honor, there are a group of creditors who are

18  represented by counsel today who asked us to make certain

19  statements on the record, and so I will, in dealing with this.

20        I believe counsel representing the Tower Automotive

21  estate wanted it stated on the record that the claim as to

22  Tower Automotive from these estimation procedures, that had

23  been withdrawn.  It was.

24        With respect to a claim involving Timken, as a

25  claimant, that is included in the 112 claims that are being

1    adjourned, and are listed on Exhibit B.

2         And with respect to Texas Instruments and with respect

3    to Gary Whitney, those claims, which include caps, are set

4    forth within the body of the order.  And I was asked that I

5    address those four items specifically.

6         I was also asked to specifically address the

7    stipulation entered into with ACE Insurance Company, Pacific

8    Employers Insurance Company, Illinois Union Insurance Company;

9    all of which are related insurance companies, with respect to

10   126 proofs of claims.  Each of the three files forty-two claims

11   against each debtor; one against each debtor.  These claims

12   were fully unliquidated and were for obligations due under the

13   insurance policies.

14        As Your Honor may recall, the Court entered an order

15   authorizing the debtors to assume certain insurance agreements

16   with ACE.  To the extent these claims did not arise out of

17   assume agreements, the parties have agreed the claims will be

18   capped at zero.  And to the extent that the claims are for

19   assumed agreements, those claims will be allowed pursuant to

20   Section 503(b)(1)(A) and accorded administrative priority

21   status.  These claims are, therefore, withdrawn from the

22   motion.

23        In addition, the parties have agreed to expunge the

24   Proof of Claim No. 15610 to E-S-I-S, Inc., a claims

25   administrator that is an ACE subsidiary.  And that claim was

1   not listed and included within the motion.

2        Your Honor, I believe those are all of the statements

3   for various creditors I was asked to make on the record, and

4   I'll just pause for a moment and see if there's anything else I

5   would say or have missed talking about.

6        (Counsel confer.)

7        MR. BUTLER:  All right.  Your Honor, given the nature

8   of this particular motion, we did want to make a record on it.

9   This is an important part of our Chapter 11 case, and so I just

10  wanted to make a brief evidentiary record.  We have seven

11  exhibits with respect to this:

12       The first -- Exhibits 1 and 2 are the proposed order

13  and the black-line.

14       Exhibit 3 is a declaration of John D. Sheehan in

15  support of the business reasons the debtors seek the relief

16  requested here.

17       Exhibit 4 is an e-mail from Bank of America resolving

18  their objections to the claims estimation motion, and that was

19  done -- handled separately by Mr. Berger, in terms of the

20  negotiations.

21       THE COURT:  And there's language in the proposed order

22  that deals with that.

23       MR. BUTLER:  Yes, Your Honor.

24       THE COURT:  Okay.

25       MR. BUTLER:  Exhibit No. 5 is an e-mail on behalf of

1   Technology Properties that resolved Technology Properties'

2   limited objection to the claims estimation motion.

3            Exhibit 6 is the joint plan of reorganization that was

4   filed on September 6th.

5            And Exhibit 7 is the equity purchase and commitment

6   agreement.

7            Your Honor, I'd like to move for entry of Exhibits 1

8   through 7 -- admission of Exhibits 1 through 7 into evidence.

9            THE COURT:  All right.  Does anyone want to cross-

10  examine Mr. Sheehan on his declaration?

11      (No verbal response.)

12           THE COURT:  Okay.  I will admit each of those exhibits

13  for purposes of this motion.

14      (Exhibits 1 through 7 received in evidence.)

15           MR. BUTLER:  Your Honor, as I indicated -- and I just

16  should say this on the record, and see if Mr. Berger -- where

17  is Mr. Berger?

18      (Counsel confer.)

19           MR. BUTLER:  To see whether the Togut firm wants to

20  comment on any of this.

21           The Togut firm handled both the Bank of America matter

22  and the matter involving Metaldyne.  Metaldyne's proof of claim

23  was 11934, and Bank of America's claim dealt with Claim No.

24  11660.  I don't know whether either Bank of America or

25  Metaldyne want to say anything, or anyone from the Togut firm

1   down, but I just wanted the record to be clear that was handled

2   by someone else.

3           THE COURT:  Is Metaldyne in the order, or is that just

4   reflected in the exhibit?

5           MR. BUTLER:  That, Your Honor, is going to be dealt

6   with; it's going to be disallowed and then expunged, and I

7   don't whether it's in this order.

8           THE COURT:  Okay.  So that will be in the exhibit.

9           MR. BUTLER:  Yes.

10          THE COURT:  Okay.  All right.

11          MR. BUTLER:  Your Honor, with the record having been

12  admitted and our papers, I would rest -- I'd rest on the record

13  at this point.

14          THE COURT:  Okay.  Does anyone have anything to say on

15  this matter?

16          MR. GLAS:  Good morning, Your Honor.  Eduardo Glas

17  from McCarter & English.  My firm represents Automodular; it is

18  one of the claimants affected by this motion.

19          And we do not object to the estimation amount, but we

20  want to note for the record that our -- the claim of our client

21  is not unliquidated or contingent.  So we just want to reserve

22  all our rights with respect to our claim and any other claims

23  that we may have against the debtors.

24          THE COURT:  Okay.  But you don't object to the cap.

25          MR. GLAS:  Right.  It was -- it's fine, the cap is

1    fine.

2         THE COURT:  All right.  Very well.  Okay.  All right.

3         Well, I think the motion was clear about the purpose

4    for which these claims would be estimated or were specifically

5    capped, but Mr. Butler's recitation on the record made it

6    perfectly clear that it is for voting and reserve purposes.

7    But the provision of the plan dealing with the reserve itself

8    is for another day.

9         There's a clear basis given the timing of the plan

10   process and the condition in the plan regarding unsecured

11   claims for these estimation procedures to be adopted.  I

12   believe that they are fair and comport with due process,

13   particularly given Paragraph 10(f), which is similar to the

14   claims procedures, generally, that I entered earlier in the

15   case.

16        And it appears to me that there has been sufficient

17   notice, particularly given the statement by Mr. Butler on the

18   record regarding the fact that, although, of course, if the

19   debtors' plan were confirmed, the reserve set a cap, an

20   effective cap on distributions, this motion doesn't decide

21   anything more than the amount of a reserve.  So I'll grant the

22   motion.

23        I had one question on the order.  As I understand it,

24   there were some objections to claims that you have resolved

25   already, correct?

1          MR. BUTLER:  Yes.

2          THE COURT:  It seems to me that, if you look at

3    Paragraph 8, it says:

4              "To the extent that a counter-proposal and an

5              objection was filed with respect to any claim listed

6              on Exhibit A to the motion, that contested claim will

7              be deemed to constitute a separate contested matter."

8          And I think maybe you should make it Exhibit B hereto,

9    instead of "Exhibit A to the motion," because I think your two

10   operative exhibits at this point are Exhibits A and B to the

11   order, as opposed to "Exhibit A to the motion."  Anyway, I just

12   want you to focus on that.

13         I think, otherwise, you're going to include some

14   people in this order who have actually settled with you, and

15   make it seem as if they still have a contested unliquidated

16   claim.

17         MR. BUTLER:  Your Honor, I think it's clear that the

18   only thing we're moving over to the claims track are the

19   Exhibit B matters.

20         THE COURT:  Right.

21         MR. BUTLER:  And I think we can change the reference

22   of "Exhibit A to the motion" to Exhibit B --

23         THE COURT:  To the order.

24         MR. BUTLER:  -- of the order.

25         THE COURT:  Okay.

1        MR. BUTLER:  Is that all, Your Honor, you had on that?

2        THE COURT:  Yes.  That's it.

3        MR. BUTLER:  Your Honor, looking at the balance of the

4   hearing, we have two matters left on the contested docket.

5   Matter No. 9 is the KECP Third Supplement at Docket No. 9298,

6   which is contested by our six U.S. labor unions.

7        And then on Matter No. 10, we have the Saginaw Chassis

8   Asset Sale Motion.  There was a limited objection filed by the

9   UAW, which we, in fact, have resolved, and that's not an issue.

10  But with respect to Matter No. 10, one of the issues under that

11  particular motion, a condition to go forward on the sale

12  procedures hearing, was that there be a negotiated, definitive

13  supply agreement between the purchaser and General Motors.

14        The work on that is still ongoing; it's not been

15  completed.  The time for that to be completed has been extended

16  until October 1st.  We would like then now, Your Honor,

17  therefore, to adjourn this matter to October 3rd.  We'll be

18  back before you, and we'd like to use that as a holding date.

19  If we can, in fact, get that condition precedent satisfied,

20  we'd like to go forward at that time.

21        THE COURT:  Okay.  But just for the record then,  your

22  proposed black-line of the bidding procedures order, that's

23  acceptable to the UAW?

24        MS. CECCOTTI:  Good morning, Your Honor.  Babette

25  Ceccotti for the UAW.

1          They are, the black-lines are acceptable.

2          THE COURT:  Okay.  Very well.  All right.  So that

3  will be adjourned to October 3rd.

4          MR. BUTLER:  Okay.  Thank you, Your Honor.

5          And, Your Honor, prior to beginning the contested

6  matter, which will have evidence involving the KECP, I'd like

7  to update you on our plan of reorganization process, if I may,

8  and then take a brief adjournment, so that parties who have

9  been involved in the other matters who don't necessarily want

10 to sit through the contested hearing can have the opportunity

11 to be excused.  Although I think there is some interest in the

12 courtroom about the debtors providing a progress report on the

13 plan process.

14         THE COURT:  Okay.

15         MR. BUTLER:  So if I can do that at this time, I'd

16 like to.

17         THE COURT:  All right.  That's fine.

18         MR. BUTLER:  Your Honor, since our last omnibus

19 hearing, it's obviously been a very dynamic time over the last

20 thirty days.

21         On September 6th, the company was able to announce a

22 definitive and comprehensive set of settlements with General

23 Motors Corporation and file publicly two documents, both a

24 restructuring agreement and a settlement agreement; a global

25 settlement agreement that really dealt with all of the issues

1   between General Motors and Delphi, and attached to it a master

2   restructuring agreement to define the relationship going

3   forward.

4        The debtors also filed a comprehensive plan of

5   reorganization and detailed disclosure statement that included

6   in it both five-year projections, valuations of the business by

7   our investment bankers, Delphi's investment bankers,

8   liquidation analyses, and a variety of other information.  And

9   we did that to move forward with an earlier scheduling order

10   that Your Honor indicated it would set the disclosure statement

11   hearing for October 3rd.

12        We made all of those filings at a time, as I said,

13   that was very dynamic.  What was going on in the marketplace at

14   that time, obviously it has been a very dynamic capital market

15   situation since mid-July, when the market essentially became

16   closed to large leveraged loan transactions.  There is a very

17   significant backlog, as I think most people who follow the

18   market know; a very significant backlog in forward sort of

19   inventory that has to -- the underwriters need to sell off into

20   the marketplace, hundreds of billions of dollars worth of

21   paper; more paper on their books now than, I think, probably

22   any time in recent memory.  That has affected market capacity,

23   which affects large-cap companies like Delphi Corporation.

24        We also had another very dynamic issue involving --

25   obviously involving General Motors.  We had -- because while we

1  are fully settled with our labor unions, the issues of how

2  General Motors would be resolving their quadrennial labor

3  issues with our labor agreement, the renegotiation of that

4  specifically with the UAW, was we were told by the capital

5  market it's going to be a condition to our financing.  Your

6  Honor may recall it already was a condition to the EPCA, in

7  terms of there not being any material strike with respect to

8  that, and that it be resolved.

9          And we -- and so, as we filed on September 6th, those

10  negotiations were ongoing.  And obviously, they led to that

11  contract being extended day by day, and then a forty-one-hour

12  strike, national strike, which was very happily resolved this

13  week, in a way that we now are able to move forward.  And both

14  those stakeholders dealing with Delphi, as General Motors'

15  largest supplier, and the capital markets now are able to check

16  the box in connection with Delphi's reorganization that there

17  was not a material strike involving General Motors, and that

18  there has been -- subject to ratification, obviously there has

19  been now a settlement with respect to GM and the UAW that I

20  think will continue to bring confidence to the agreements that

21  have been reached between Delphi and General Motors.  So we

22  were able to sort of check that box.

23          Now the capital markets, however, continue to be

24  challenging.  They are more settled now than they were a month

25  ago, but they are certainly not the markets they were earlier.

1      The uncertainty surrounding those -- and there was a

2  third -- by the way, a third matter that always happens in

3  large cases like this, at least in my experience -- is when you

4  have a large settlement case, particularly a case that involves

5  global settlements that are interrelated, preserving those

6  global settlements against the inevitable ebb and flow of

7  claims trading and folks coming in and out of the deal, and

8  everyone trying to figure out what's best for their individual

9  position is always a challenge in a large case.  And we're

10 obviously managing those activities here, as well.

11      The uncertainties relating to these three matters led

12 us to -- prior to the GM situation having resolved itself, led

13 us to agree with some of our key stakeholders that we would

14 adjourn the MDL settlement, which is an element of the plan of

15 reorganization, but being settled outside of the plan, to

16 October 3rd.  And we agreed to move that forward to next week.

17      We granted -- after conferring with chambers, granted

18 extensions to a couple of groups:  The Department of Labor, the

19 Creditors' Committee, Wilmington Trust as Indenture Trustee,

20 the Ad Hoc Committee of Trade Creditors, and again, the group

21 represented by Goodwin Procter, the DK Acquisition, Silver

22 Point, Sandler, and Elliot Group.  We granted extensions until

23 October 1st with respect to objection to the MDL settlement,

24 and set that for October 3rd, and I'll address that a little

25 bit more in just a couple of minutes.

1        In connection with the discussions that Delphi has had

2    with the capital markets, we have had I think both good news

3    and guidance.

4        And the good news is that we believe that we're

5    getting very positive feedback from the capital markets on

6    Delphi's transformation, on its business plan, on its future,

7    and on what I'll call "Delphi-centric issues."

8        With respect to market-centric issues, we're getting

9    guidance that our need for a 1.6-billion-dollar asset-based

10   revolver is likely to be met in the marketplace with what I'll

11   respond to as sort of ordinary course; that we'll not have a

12   problem placing that revolver, and that we can expect to have

13   market-competitive terms in connection with pricing of the

14   terms as it relates to that.

15       With respect to market capacity for $7.1 billion of

16   leveraged loan commitments, that is a very challenging

17   situation.  And we have received guidance from the major banks

18   that Delphi works with in the capital markets about the levels

19   of market capacity that might be available there.  And clearly,

20   to the extent that there is market capacity for less than 7.1

21   billion, then the company has to sit down with key stakeholders

22   and make some adjustments to cash distributions and the mix of

23   plan currency under the plan.  It does not require, in Delphi's

24   view, any material renegotiation of our plan of reorganization.

25   It does require that we make some adjustments to distributions.

1          We're in the process of doing that.  We have been

2     working very closely with our statutory committees, with

3     General Motors, with Appaloosas as lead plan investors,

4     reviewing these circumstances over the last number of weeks.

5     We have been meeting regularly with them, and we have met as

6     recently as yesterday.

7          All of our major stakeholders, we believe, agree with

8     Delphi's view that Delphi has completed substantially all of

9     the work to be accomplished in these Chapter 11 cases, and that

10    Delphi should emerge promptly and keep to the timetable that we

11    have established, to the extent that we can do that on a

12    practical basis, resolving these capital market issues.

13         Accordingly, Delphi is back in the capital markets.

14    We have issued something which is tantamount to a request for a

15    proposal to our lead capital market sources for exit financing

16    commitments at levels that are market-clearing, and we will

17    make adjustments to our plan consistent with the available

18    capital market funding that we are -- that is market-clearing

19    in the market that we're looking at, which is to emerge in a

20    defined time frame.  That will require the consensual

21    participation of some of our key stakeholders, and we are

22    confident that we should be able to obtain that in the near

23    term.

24         Delphi expects that any required plan amendments will,

25    from Delphi's perspective -- I'll use the phrase "be laser-

1   like."  That is to say, Delphi does not view this as an

2   opportunity to renegotiate the deal, either on behalf of

3   Delphi's part or on behalf of any other major stakeholder.  And

4   we have told our major stakeholders that Delphi is not

5   entertaining a "let's just go back to the drawing board"

6   approach, and nor frankly do I think that any of our

7   stakeholders are pushing that kind of agenda.

8         In terms of timetable, Delphi expects to commence, but

9   not conclude the disclosure statement hearing on October 3rd,

10  as scheduled.  As Your Honor may recall, we sent some 600,000 -

11  - a little more than 600,000 notices out with respect to the

12  disclosure statement, and we have an objection deadline for

13  Friday.  We have given some limited supplemental objection

14  extensions to the same group of people that we did on the MDL;

15  the Department of Labor and the other people I have identified

16  on the record, to deal with those issues.

17        And I expect that -- so that we make sure that, from a

18  due process perspective and noticing perspective, that we have

19  met our obligation -- we'll commence the hearing on Wednesday.

20  There are some preliminary matters we'll deal with.  To the

21  extent there are objections filed by other parties, we'll file

22  a response.  And then we'll ask Your Honor to deal with another

23  date on October 3rd, assuming that we can't resolve everything

24  we need to between now and October 3rd.

25        The fact is the parties are working on this carefully,

1   it's a day-to-day process, it is dynamic.  I think Your Honor

2   would be pleased, if you were sitting in the room, pleased with

3   the good-faith effort that people are bringing to the

4   situation.  It is, I think, probably it's fair to say

5   frustrating for everyone to have spent, you know, almost two

6   years working together to resolve a very, very complex set of

7   transactions, and then not to have the capital markets have the

8   capacity that should otherwise be available in what I'll call a

9   "normal market;" and to not have Delphi-centric issues, but to

10  rather have market issues, be dealing with -- and requiring the

11  parties to take another look at distributions.

12          So, in any event, Your Honor, that's how we're

13  intending to move forward.  We expect to emerge on a timetable

14  substantially consistent with our prior guidance.  There may be

15  some nonmaterial adjustments to that.  As a practical matter,

16  if we are able to complete the disclosure statement process, as

17  we expect, we should be able to complete the confirmation

18  process and commence rights offerings by the end of this year,

19  and our actual emergence date is likely to be some day in

20  January.  Rather than December 31st or January 1st, it's likely

21  to be some other day in January, as you work out the actual

22  mechanics of being able to complete all of that work.  And we

23  would still -- so we'd like to emerge very early -- very close

24  to the target of year-end as we move forward on that.

25          You know, and "dynamic" I think is the appropriate

1   word, Your Honor; that, you know, I've described Delphi's view

2   here, I've indicated to Your Honor the good-faith efforts of

3   our stakeholders.  I think people are trying very hard to do

4   the right thing here while representing vigorously their

5   constituents and their points of view and trying to move

6   forward on a consensual basis.  And I hope that we'll have more

7   to report to you next Wednesday on that particular point as we

8   continue to meet.  But I don't -- I would be less than candid

9   if I told Your Honor that I expect we'd be fully -- our work

10  would be fully complete by next Wednesday.  I think that will

11  be -- that may be just a little bit too ambitious, but we

12  certainly are working very hard on that subject every day.

13          THE COURT:  Okay.  Well, I think the approach you

14  outlined makes eminent sense.

15          I have the understanding that Delphi's own business

16  has not changed; and, secondly, that not only the fundamentals

17  of that business, but the details are, at this point -- given

18  all of the work that the various financial advisors and the

19  negotiators have done, not only on the company's part, but the

20  committees' part, both committees, and the plan sponsors' part

21  -- you all know the value of this debtor and its projections

22  more than the constituents of most companies in America.  And

23  it seems to me that, if the markets themselves have changed,

24  the value of the company has not, and that should be the basis

25  of your negotiations.  This isn't the type of company that one

1   can deal with based on short-term swings in the marketplace,

2   generally, and you have to base it on the fundamentals of the

3   company.

4        So I would strongly encourage, as you've represented

5   that they are doing, the parties to take that approach in

6   responding to the liquidity changes in the marketplace.  The

7   value is there, and I assume that those with information know

8   it's there.

9        MR. BUTLER:  So, Your Honor, if we may, unless anyone

10   else has anything they want to add to that, if we may, Your

11   Honor, I'd like to take a brief recess, allow people to -- who

12   want to excuse themselves to do so, and then get set up for the

13   contested hearing.

14        THE COURT:  Okay.  And that goes for the people on the

15   phone, too.  If you don't care to participate or listen in on

16   the issue on the compensation -- the six-month compensation

17   extension, then you're free to ring off, as well.  And I'll be

18   back in about five minutes.

19        MR. BUTLER:  Thank you, Your Honor.

20     (Recess taken at 11:29 a.m.)

21     (Proceedings resume at 11:47 a.m.)

22     (Call to order of the Court.)

23        THE COURT:  Be seated.

24        All right.  We're back on the record in _Delphi_.

25        MR. BUTLER:  Thank you, Your Honor.

1        Your Honor, the final matter on the agenda today is

2   Matter No. 9, the KECP Third Supplement, and this is seeking

3   relief to authorize the continuation of a short-term at-risk

4   performance payment program for the second half of 2007.  This

5   is filed at Docket No. 9298.

6        Your Honor, we have objections filed by our six U.S.

7   labor unions:

8        The UAW filed an objection at Docket No. 9445.

9        The IUE-CWA filed an objection at Docket No. 9467.

10       And the USW filed two objections, one at Docket No.

11  9490, and then again a corrected objection at Docket No. 9494.

12       And then, finally, the IUE, the IBEW, and the IAM

13  filed an untimely consolidated objection at Docket No. 9521, on

14  September 21st.  For purposes of this hearing, Your Honor, we

15  are not pressing the untimeliness of that objection.

16       THE COURT:  Right.  And I reviewed it.

17       MR. BUTLER:  Your Honor, and I believe present in the

18  courtroom -- we've held meet-and-confers with respect to

19  counsel.  I believe present in the courtroom are -- or on the

20  telephone, are counsel for all of the unions, except I don't

21  believe anyone is here on behalf of the USW.  I believe they're

22  resting on their written submission to the Court.

23       THE COURT:  Okay.

24       MR. BUTLER:  Or maybe I'm wrong, maybe on the phone.

25       MS. ROBBINS:  (Via telephone.)  Yes.  Marianne Robbins

1    is appearing only telephonically.

2             THE COURT:  Right.  But not for the USW.

3             MS. ROBBINS:  No.

4             THE COURT:  Okay.  All right.

5             MR. BUTLER:  All right.  I think all of the other --

6    the five other unions, Your Honor, I think are represented.

7             THE COURT:  Okay.

8             MR. BUTLER:  Your Honor, we've had meet-and-confers.

9    I believe the exhibits are uncontested, in terms of their

10   admission into evidence, and let me just quickly summarize what

11   they are.

12            Exhibit 1 are the financial performance targets and

13   panel curves [sic] for the six-month period ending July 1,

14   2007, and ending December 31st, 2007.

15            Exhibits 2 through 6 are a series of at-risk

16   performance compensation documents, including various

17   presentations, which were provided to the creditors' committee,

18   among others.

19            Exhibits 7, 8, and 9 are our declarations of

20   testimony:  Exhibit 7 is the declaration of our expert Nick

21   Bubnovich from Watson & Wyatt, the compensation consultant;

22   Exhibit 8 is the declaration of John D. Sheehan, our Chief

23   Restructuring Officer; and Exhibit 9 is the declaration of

24   Craig G. Naylor, Mr. Naylor is Chairman of the Compensation

25   Committee at Delphi.  And all three are present in the

1    courtroom today.

2           Exhibits 10 through 24 are AIP court documents,

3    covering prior periods and various filings.

4           Exhibits 25 through 29 are documents dealing with the

5    labor unions, including various MOUs that were approved, seeing

6    as some of the MOUs have been called into question in the

7    objections.

8           And then Exhibits 30 through 37 are demonstrative

9    exhibits.

10          And there were exhibits designated by the UAW,

11   Exhibits 38 through 43; various orders and objections filed, as

12   well as our disclosure statement and related matters.

13          Your Honor, those are the exhibits; Exhibits 1 through

14   43.  I'd move them for admission into evidence.

15          THE COURT:  Okay.  And certain of these exhibits, I

16   guess 2 through 6, and then 8, and then 31 through 36, and then

17   25 are confidential pursuant to your --

18          MR. BUTLER:  They are confidential, Your Honor;

19   they've been marked so on the exhibits.  We'd ask for them to

20   continue to have confidential treatment under seal, and they're

21   separated in a separate evidentiary binder.

22          THE COURT:  Okay.  And you said there are no

23   objections to the admission of the exhibits.

24          MR. BUTLER:  I believe there are none, Your Honor.

25          THE COURT:  All right.  I'll admit them.

1    (Exhibits 1 through 43 received in evidence.)

2         THE COURT:  At the appropriate time, I'll ask if

3    anybody wants to cross-examine any of the three declarants;

4    when you turn to the declarations, I'll do it then.

5         MR. BUTLER:  Well, Your Honor, why don't -- because

6    what I had planned to do here is to complete the evidentiary

7    record, and then make a presentation to the Court, in terms --

8    by way of argument --

9         THE COURT:  Right.

10        MR. BUTLER:  -- in connection with the matter because

11   there are a couple of key points.  So let me turn, if I may

12   then, to the declarations.

13        First, let me deal with Exhibit 7, which is the

14   declaration and expert report of Nick Bubnovich.  Mr. Bubnovich

15   is affiliated with Watson & Wyatt, who's the debtors'

16   compensation consultant and is known to the Court from his

17   testimony in prior hearings.  Mr. Bubnovich, will you please

18   stand.

19      (Mr. Bubnovich complies.)

20        MR. BUTLER:  And, Your Honor, I would move

21   specifically Mr. Bubnovich's declaration for admission in

22   evidence.

23        THE COURT:  Okay.  Does anyone want to cross-examine

24   Mr. Bubnovich?

25      (No verbal response.)

1          THE COURT:  All right.  I've reviewed his declaration,

2     and I will accept it as his testimony, and also as his expert

3     testimony.

4          MR. BUTLER:  Thank you, Your Honor.

5          Your Honor, Exhibit 8 is the declaration of John D.

6     Sheehan, our Vice President and Chief Restructuring Officer at

7     Delphi.  Mr. Sheehan, I know you're well known to the Court.

8     Would you please stand?

9       (Mr. Sheehan complies.)

10          MR. BUTLER:  And, Your Honor, we would move Mr.

11     Sheehan's testimony into evidence.

12          THE COURT:  All right.  Does anybody wish to cross-

13     examine Mr. Sheehan?

14       (No verbal response.)

15          THE COURT:  Okay.  I will -- as with Mr. Bubnovich and

16     Mr. Naylor, I read Mr. Sheehan's declaration, and I'll accept

17     it as his testimony.

18          MR. BUTLER:  And finally, Your Honor, our final

19     declaration is from the Chairman of our Compensation Committee

20     of Delphi's Board of Directors, and that's Mr. Craig D. Naylor,

21     an independent director.  Mr. Naylor is also here, fresh from

22     Peru, where he was -- so he flew back to be here at this

23     hearing.  And I'd ask Mr. Naylor's declaration be admitted into

24     evidence.

25          THE COURT:  Okay.  Does anyone wish to cross-examine

1    Mr. Naylor?

2        (No verbal response.)

3            THE COURT:  All right.  I will accept his declaration

4    as his testimony, as well.

5            MR. BUTLER:  Thank you, Your Honor.

6            Your Honor, what I'd like to do now, from the

7    company's perspective, as I've indicated, is to make a brief

8    presentation, in terms of the company's views, with respect to

9    this at-risk compensation program, and then reserve time to

10   respond to any specific objections or argument by the unions.

11   And I'll make reference -- we've got some -- we have some

12   charts up here, which I'd like to be able to --

13       (Counsel confer.)

14           MR. BUTLER:  We have some charts up here I'd like to

15   be able to walk through briefly, and they are exhibits that are

16   in evidence.

17           The first chart is Exhibit 30.1, under Exhibit 30.

18   And just as the Court has noted from prior hearings, this is a

19   depiction of the four elements of compensation that is the

20   historical Delphi executive compensation structure.  And this

21   and the next two exhibits have been prepared by Mr. Bubnovich

22   as part of his expert testimony.  And again, these four

23   elements are:  Salary, benefits, an annual incentive

24   opportunity, and a long-term incentive opportunity.

25           As we go into this hearing today seeking approval, as

1    Exhibit 30.2, the second page of Exhibit 30, would indicate,

2    Delphi's executive compensation structure today for all of its

3    executives, approximately thirty-seven percent is salary, which

4    is being paid; approximately eleven percent are benefits which

5    are accruing.  But there's a competitive shortfall going into

6    this hearing of over half of their compensation structure,

7    which are part of their market-based opportunities, because

8    there's neither a long-term program, nor is there an authorized

9    at-risk -- short-term at-risk compensation program for the

10   second half of this year, absent the Court's relief today.

11          Also clear on -- if you look at Exhibit 30.3 the third

12   page of Exhibit 30, even if the Court grants the relief today,

13   Mr. Bubnovich's calculations are that there will still be a

14   competitive shortfall as it relates to all executives of some

15   thirty-six percent, or more than a third of their compensation

16   structure, because the debtors have put off the element of the

17   original KECP that dealt with long-term incentive

18   opportunities; and, instead, as Your Honor is aware, we have

19   incorporated that into the plan of reorganization process.

20   That's been reviewed with the plan investors, we're consulting

21   with the creditors' committee about it.  It will be dealt with

22   under the plan.  But as it relates to the -- and there is an

23   element there that would address that competitive shortfall.

24          But even if, ultimately, that competitive shortfall is

25   confirmed as part of the plan of reorganization, there will

1   still, down the line, be -- this entire slice of the pie still

2   will not be ultimately satisfied because the program that's

3   being proposed by the debtors falls short of the thirty-six

4   percent that Mr. Bubnovich has calculated is not available.

5           And so, again, Your Honor, what we're dealing with

6   here is what we've dealt with throughout the Chapter 11 cases,

7   is Delphi's mission has been all about being competitive in

8   every element of its business, and that includes both hourly

9   and salaried compensation.  And we acknowledge that it has been

10  a point of stress in these cases because it's at least been

11  Delphi's view that our hourly compensation structure needed to

12  be brought -- realigned and transformed in some respects

13  downward to a more competitive nature.  And it is also the

14  facts, as indicated in Mr. Bubnovich's report, that Delphi's

15  executive compensation is not competitive, and we're trying to

16  bring that into a competitive structure here.  Mr. Naylor has

17  been involved over the last six or seven months in twenty or

18  twenty-five meetings of the Compensation Committee to work on

19  making sure that the programs are, in fact, competitive.

20          And so what we're seeking today is a continuation of a

21  program that's been approved three prior times by the Court,

22  and is constructed in the same manner.

23          Now I said "constructed in the same manner," Your

24  Honor, but actually there is one element here that is

25  different, and I wanted to point that out.  In Exhibit 35 --

1    it's been admitted into evidence -- is a page from the

2    statutory committee book, presented to the committees back on

3    August 9th of this year, in which the committees received a

4    presentation on the at-risk performance compensation program.

5    And this particular chart on Page 42 of that committee book and

6    Exhibit -- at Exhibit 35 here, shows that what the company did

7    in setting second-half targets for corporate OIBITDAR for each

8    of the divisions, was the company looked at its overall

9    business plan for 2007, which would have called for OIBITDAR in

10   the second half of the year to be $298 million; that's the blue

11   box.  That was the budget, that was the plan under the

12   preliminary business plan for this year.

13        When the company, however, constantly, at least on a

14   quarterly basis, updates its forecasts for the year, based on

15   actual performance and projected future performance; and when

16   the company ultimately did that overall for the company, the

17   company projected OIBITDAR to, in fact, improve, taking into

18   account the first -- or taking into account where the company

19   had been actually through the first half of the year, to have a

20   total OIBITDAR performance of 396 million, an improvement over

21   the budget.

22        The company wasn't satisfied, though, in setting the

23   targets at the three-hundred-and-ninety-six-million-dollar

24   level.  What the company did was, on a division-by-division

25   basis, the company went through and examined which forecast the

1   budget or the actual -- plus forecast -- the five plus seven,

2   or the actual budget, which of those was tougher on the

3   divisions.

4         And with the exception of one division, which is

5   having market issues -- it's one of the smaller visions, which

6   there's some real market issues out there -- the company led by

7   our Chief Executive Officer Mr. O'Neill, and by Mr. Webber,

8   who's present in the courtroom, the Executive Vice President of

9   the company, insisted that the division would be held to the

10  higher of those two thresholds.

11        So if your business plan originally was higher than

12  what you thought you were going to do after five months of

13  performance, you still were held to your business plan that you

14  submitted at the beginning of the year.  If your performance

15  had improved and you thought you were going to do better than

16  your business plan, then you were held to the performance

17  targets, not -- the updated target, and not to the business

18  plan.

19        The result of calculating those for overall OIBITDAR,

20  and then translating it to EBITDAR for the corporate level,

21  meant that, in fact, there was a four-hundred-and-forty-three-

22  million-dollar target.  Because when you add it arithmetically,

23  the toughest of each target, of each of the two targets for

24  each division up, you ended up with 443 million.

25        So unlike prior years -- in fact, in prior periods,

1   this particular buildup of the target was intended to capture,

2   holding people to what they originally were accountable for,

3   even if their divisions weren't performing well; or, if their

4   divisions were performing well, and they were going to do

5   better, to hold them their higher forecast.  And that's the

6   buildup of how this particular target was set.

7          All of this was reviewed with the statutory

8   committees, and it was studied specifically by the compensation

9   subcommittee of the creditors' committee and the -- and by the

10  financial advisors to the creditors' committee, including their

11  compensation consultant and Mesirow Financial.  So that's a

12  sense of how, Your Honor, the targets were put together in this

13  particular case.

14         There's also, in terms of -- I want to turn to Exhibit

15  34, which has been admitted into evidence; again, another page

16  from the same book, Page 39 of the statutory committee book

17  back from August 9th, when this was presented.

18         This is a summary of how the program has worked up

19  until now, and what the performance has been overall.  And as

20  Your Honor can see, in terms of the first half of 2006, the

21  EBITDAR target was negative-81 million.  In fact, the actual

22  performance was 510 million, which surpassed even the maximum

23  under the program, which was -- there was no payout.  That's

24  another point.

25         Another way of saying that, Your Honor, is there is no

1    payout under the at-risk performance program for doing better

2    than three forty.  So for going from three forty to five ten,

3    nobody got any more money for that.  That just enured to the

4    benefit of all the stakeholders, as the company continued to

5    try to do its best performance.  So the actual EBITDAR the

6    first half of 2006 was almost $600 million in 2006.

7         The payout above the AIP targets for that performance,

8    that performance above the negative-81 million; the payout for

9    getting from 81 million negative to five ten was an additional

10   $9 million that was paid to the executives.  So the payout was

11   about two percent, in terms of the relationship of the

12   additional value added to the estate and the payout to

13   executives.

14        In the second half of 2006, there was a negative-$411

15   million; and there, the actual performance was negative-263

16   million.  It was -- and as a result, the company did not meet

17   its maximum there, which would have been getting into positive

18   territory.  And so there was a very modest payout above the

19   KECP target of 2.9 million.  Obviously, the at-risk performance

20   targets were paid, but very little money above that was paid.

21        And then, if you look at the first half -- and

22   remember, as we talked about with Your Honor before, if you

23   look at the first half of 2006, the target was negative-eighty-

24   one; the second half was negative-four-eleven.  And we

25   explained last year, and it's in the record, why was that?

1    Because the second half of the year is generally much more

2    difficult for the company for a whole variety of reasons,

3    including model changeover, what occurs during the month of

4    July when the auto industry is shut down, including Delphi for

5    several weeks; there are model changeovers and all of the

6    activities that are embedded in the second half of the year.

7    It's a much more difficult performance period of time.

8            If you look at the first half of 2007, the period we

9    just finished -- and these calculations were reviewed and

10   agreed to by the creditors' committee, and the payments were

11   made under the AIP program, the at-risk performance program, to

12   the executives.  The target was 124 million; and, in fact, the

13   actual achievement was closer to 550 million, just modestly,

14   just a few million dollars over the maximum that could be paid.

15   And for that incremental achievement of $425 million over the

16   target performance, there was an additional payment under the

17   AIP program of about $15 million.

18           All tolled, if you look at the first three programs

19   Your Honor has approved over the last eighteen months, the

20   maximum payout, the actual maximum payouts of these programs in

21   the first half of 2006 was 46.9 million; the actual payout was

22   only 35 million.  In the second half of 2006, the maximum was

23   37.9; the actual was only 23.2.  And in the first half of 2007,

24   the maximum was 37 million, and close to the maximum, about

25   thirty-five, was paid.

1          And that's a function, Your Honor, as you know from

2     the program that has been before the Court, and it's the same

3     in this proposed supplement.  There are a number of screens one

4     goes through before an executive can get paid:  There is the

5     OIBITDAR performance of the division, there is the -- and then

6     there is the overall corporate performance.  That creates a

7     maximum payment opportunity.  But that particular executive

8     also has to individually perform, as the program indicates,

9     under his or her performance objectives; and, if they don't,

10    then their payout is reduced.  So that there are a number of

11    screens to what actually is the -- the dollars that are

12    actually paid out.

13         And so Your Honor can see from the first three

14    programs the Court has approved, there has been well over a

15    billion dollars of additional value added to the estate over

16    and above the business plans that have been vetted with our

17    statutory committees and other stakeholders; and there is --

18    for that, there have been payouts totalling just under $100

19    million for that, or something under ten percent of that

20    additional value that has been put into place, in terms of the

21    programs.

22         And I think, Your Honor, you've got a number of the

23    objections saying that all of these are lay-ups, and the

24    company is using all of the money available to it.  I would

25    just point out that Exhibit 35, I think, provides a very strong

1    evidentiary rebuttal to that.  The company doesn't use the

2    funds -- all the funds that are available to it.  It does not

3    achieve the targets in many instances that are set.  And it's

4    just not the case that these are guaranteed performance.  These

5    are at-risk performance amounts.

6            I would also, Your Honor, note back just for a moment

7    --

8        (Counsel confer.)

9            MR. BUTLER:  Back for a moment just on the -- as we

10   talked about our numbers here and the targets that are set here

11   in the business plans.

12           These business plans that are established, I think

13   Your Honor knows, and the evidentiary testimony in Mr.

14   Sheehan's declaration indicates this; these estimates and these

15   projections are not developed for compensation purposes.

16   They're developed for reorganization purposes.  And in fact, we

17   have now published the 2007 business plan in our -- in Exhibit

18   C or Appendix C to the disclosure statement, which is

19   underlining our entire reorganization.  And that's been vetted

20   with our plan investors, it's been vetted with our committees,

21   it's been vetted with many other stakeholders.  It doesn't mean

22   -- we haven't gotten to the confirmation process yet, as to

23   what people's views on that, if they choose to contest anything

24   here in the courtroom.  But I just want to underscore the

25   seriousness with which the company takes these things.  It's

1    not as though we develop a separate set of numbers for

2    executive performance.

3              One of the things that was said in the objections was

4    the UAW argued that somehow we were precluded from going

5    forward today with this third supplement to continue the

6    program that had been in place for the last eighteen months in

7    the three previous performance periods, because of the

8    memorandum of understanding that we agreed to, that was

9    approved by this Court earlier this summer.  And what was

10   specifically pointed out was the equivalence-of-sacrifice

11   provision, which is down here -- which is in Section 1, Page 20

12   of that agreement, setting forth a commitment to what the

13   principle of sacrifice means here.

14             And I would simply point out, as we indicated in our

15   omnibus reply, Your Honor, those same words; the words that are

16   in the MOU, which is a reaffirmation of a commitment, are the

17   same words that were in the UAW/Delphi supplemental agreement,

18   Article II, Page 6, that was part of the labor agreements that

19   have been governing this case from the commencement of the

20   Chapter 11 case, entered into back on April 29th of 2004.

21             And under Section 1113 of the code, we've obviously

22   been obliged to perform all of our performance obligations

23   under those agreements.  And I'm quite sure that the UAW, had

24   they thought we weren't performing those, would have raised

25   issues, if they had chosen to at that point in time.  And I

1    think it's just, frankly, not accurate to suggest that there is

2    some new news.  There is no new news here.

3         And in fact, Your Honor, I would argue that trying to

4    bring any population of workers at Delphi towards competitive

5    wages; be they salaried workers, salaried executive workers,

6    hourly workers, whoever they may be, bringing them towards

7    competitiveness in the marketplace can't possibly violate these

8    kinds of principles.

9         And, Your Honor, that exhibit is Exhibit 37, just for

10   the record, in terms of those in place.

11        The last point, Your Honor, we wanted to make was to

12   talk about the discussion of some of the parties in their

13   papers regarding UG -- "UG" being the U and the G -- and how

14   that's calculated under the at-risk performance payment

15   programs, and what the -- and whether there has been any change

16   in how the company approaches that.

17        And the answer to that question, Your Honor, is:

18   There has been no substantive change.  There has been a

19   methodological change, and that change occurred, not in

20   connection with the third supplement; it occurred in connection

21   with the prior supplement, as we worked out the methodology of

22   giving credence to Your Honor's orders with the creditors'

23   committee.

24        And originally, Your Honor, for the original AIP

25   program for the first period of time, and then for the first

1   supplement -- and I'm now referring to a document that is

2   Exhibit 31, and this comes from a presentation to the

3   creditors' committee's subcommittee -- compensation

4   subcommittee back earlier this year.

5          The company had used a calculation -- there was

6   actually a sheet that was agreed to by the creditors' committee

7   of how we'd actually do the calculation.  Because what's

8   happened in each of these periods is we've sat down, as I think

9   Your Honor would expect us to, with our program, with how we're

10  going to approach this, with the payment payout curves; we've

11  negotiated them, we've negotiated how to approach the

12  calculation for these targets.  And then we actually sit down,

13  the financial advisors sit down and they work out a specific

14  methodology, which is agreed to before we get to the end of the

15  period, on how we're going to deal with these issues.

16         And so in the original periods, there was a

17  methodology, you can see, had a reduction (away from

18  microphone) -- I'll say less impact about a UG, or impact of

19  UG.  And it also had additions of OPEC expense, subtraction for

20  OPEC payments, same for ordered comp, same for disability, same

21  for FAS-112, and for some other issues that were needed to get

22  into a number that was, in the view of the company and the

23  committee, eliminating the U and G from any benefit -- the

24  benefit or the burden of those from the calculations in this

25  program.

1          The reason it was done this way, Your Honor, the

2   testimony indicates and our papers indicate that it was done

3   this way originally, is the business plans -- or rather the

4   targets that were used in the first two periods, which covered

5   2006, Your Honor will recall were based on the steady-state

6   plan.  The steady-state plan had no transformation baked into

7   the plan; and, therefore, in terms of when the targets were

8   set, they were set based on a steady state that didn't assume

9   any transformation.  And as we went through those periods of

10  time, if there was any transformation that occurred, it was

11  simply backed out; it wasn't in the plan, easy to measure if it

12  wasn't there, we'll eliminate it.

13         With respect to last year -- last period, Period 3,

14  the third period here, the company's AIP was based on, as Your

15  Honor would expect, the preliminary business plan.  The

16  preliminary business plan is based on a partially transformed

17  state because the company is going through its transformation.

18  So that there's lots of things built into the plan when the

19  particular target is set.

20         And the agreement with the creditors' committee was to

21  say, look, if you get benefits from anything that goes on with

22  General Motors, anything that goes on with the unions, all

23  right, that allows this number to vary positively or

24  negatively, it ought to be eliminated, because it's the

25  variance that will cause you to actually move towards a number

1   that you can be paid for.

2           And so this particular chart, the chart on the right-

3   hand side, was the methodology that was agreed to with the

4   creditors' committee and the subcommittee on the U and G

5   adjustments that would be included, how they would be dealt

6   with, how the calculation would go in place.  There were some

7   adjustments that were excluded, and there was -- this tote

8   sheet, if you will, was the calculation that was agreed to

9   between the creditors' committee and the company for the third

10  performance period.

11          If you look at Exhibit --

12      THE COURT:  Let me make sure I understand that.

13          MR. BUTLER:  Yes.

14          THE COURT:  The business plan upon which the incentive

15  plan was premised did have projections in it for savings?

16          MR. BUTLER:  Yeah.  The business plan had in it

17  projections for all the things that were currently going on; it

18  was a partially transformed state.

19          THE COURT:  Including labor and GM?

20          MR. BUTLER:  Yes.

21          THE COURT:  So what was excluded was anything on top

22  of that?

23          MR. BUTLER:  What was excluded was anything that could

24  --

25          THE COURT:  Or below it.

1        MR. BUTLER:  What was excluded was anything that could

2   change that, that could change the -- so if the number -- if

3   you had a business plan saying that we're going to make ten

4   dollars on this plan, all right; if, all of a sudden, you make

5   fifteen dollars because you've been able to extract benefits --

6        THE COURT:  Because you were successful in negotiating

7   with GM, then --

8        MR. BUTLER:  Right.  That five bucks comes out.

9        THE COURT:  Okay.

10       MR. BUTLER:  You can't use that, because you're using

11  the variances you accomplish --

12       THE COURT:  But there was a baseline prediction of

13  what was reasonable to expect.

14       MR. BUTLER:  Right.  Right.  But that baseline

15  prediction, Your Honor, doesn't in any way -- let me just take

16  a step back -- arithmetically, logically, however you want to

17  approach it, it doesn't -- it can't possibly influence what the

18  payment would have been to executives.  And the reason for that

19  is you can say, well, let me go through this artificial process

20  of everything that's in the business plan somehow segregated

21  from all of the assumptions, anything relating to U or G.  That

22  simply would have meant that the base, the four forty-three or

23  whatever the number might have been, would have been moved

24  downward by 200 million or $100 million.  It didn't affect --

25  and you'd start at that baseline.

1           The issue that was important, at least to the

2   committee as they went through this with us, was that, when the

3   baseline was set, it's whether or not you execute that

4   business.  I mean, the company expects -- our stakeholders

5   expect us to execute our transformation plan.  What they wanted

6   to avoid -- and I'd simply point out to you that, you know, the

7   unions sit, not only on the creditors' committee, but one of

8   the objectors sits on the compensation subcommittee -- wants --

9   you know, basically, what we want to make sure of is that, as

10  we execute that plan, we not use the things we're negotiating

11  to improve it, so that we get -- perform above the plan and

12  earn money off of it; that we not use that as a basis on which

13  to get compensation.  That was the point.

14          THE COURT:  Okay.

15          MR. BUTLER:  And so we went through this up front.  I

16  mean, this is dated March 1st.  Your Honor may recall when we

17  came into the court, I think it was March 15th or March 22nd,

18  for the hearing, this was negotiated in advance with the

19  committee because we all wanted -- and by the way, I think both

20  parties wanted it, not just us -- I think the committees wanted

21  to make sure there was a clear understanding of how we would

22  approach this.

23          THE COURT:  Okay.

24          MR. BUTLER:  That they wouldn't sort of, after the

25  fact, not understand it.

1          THE COURT:  Okay.

2          MR. BUTLER:  Your Honor, when we -- the next exhibit

3    that we have, in terms of how this was calculated, was this

4    very calculation; the calculation described on Debtors' Exhibit

5    31.  This calculation -- if you look at Debtors' Exhibit 32,

6    this very calculation; same things, if you match it up against

7    Exhibit 31, this was reported to the statutory committees on

8    August 9th at the statutory committee meeting, on Page 34 of

9    that report.  And if you look down, you'll see the net U and G

10   adjustments were a 4.7-million-dollar reduction, in terms of

11   the actual net-net amount.

12         But like all nets -- and Your Honor, we're -- you

13   know, a lot of us in here are business folks, and Your Honor

14   from a prior life knows, you know, in negotiating covenants,

15   you know, having a net number doesn't necessarily mean there

16   aren't big pluses and big minuses.  This was actually the net

17   number.

18         If you actually look at the calculation provided to

19   the statutory committees on the same day, set forth on Exhibit

20   33, and it was at Page 35 of the committee book, if you look at

21   that, what you see, if you look at the box boxed in "All

22   Divisions," you'll find that the negative-$4.7 million net

23   adjustment on Exhibit 32 is, in fact, the difference between

24   853 million, 853.5 OIBITDAR, and the OIBITDAR-UG of 849.9.  And

25   you can see all the line items that were used and the pluses

1    and minuses that went through in the calculations as they were

2    calculated division by division.  So this was done and

3    presented to the committees.  Every single division, we had to

4    go through and make all of the U and G adjustments, to go

5    through to get down to the net numbers.  And this was presented

6    to the committees.

7           And this calculation, which had been approved in

8    format back in March, the actual payouts were approved, and the

9    payouts were made this summer.  This program, this approach,

10   this methodology is the precise methodology that we're talking

11   about using in the third supplement that is before the Court

12   today.

13          And if you actually look one step further, Your Honor,

14   in connection with the -- also negotiated with the committees -

15   - with the creditors' committee, rather, at Item 36.2 in Item

16   36, is there is actually -- as to each item -- there's two

17   pages to this, so I'm only going to put one up for illustration

18   purposes.  But there are two pages of this.

19          Originally back in the first half of 2007, as part of

20   that, when the company negotiated the math and the approach of

21   the calculations set forth on Exhibit 31, the company also

22   said, let's go down line item by line item and discuss the

23   various potential adjustments that are coming up, what's in the

24   budgeted business plan for, what the assumption was, and what

25   was in the five plus -- well, now in the five-plus-seven

1    forecast; that didn't exist back then -- what was in the budget

2    assumption, and what the current operating state was, and what

3    kind of adjustment ought to be made in order to give credence

4    to the U and the G adjustments.

5         This document, the document before the Court now,

6    which is listed as Exhibit 36, is the updated version of that.

7    This was also, by the way -- it doesn't have the fancy blue

8    borders because we didn't reproduce it from that source.  But

9    these pages were included in the same committee book, the joint

10   committee book, on August 9th, where again we went through each

11   of the items.  And in this case we showed the original business

12   plan assumption, the assumptions of the five-plus-seven

13   forecast and where the current operating state was, and the

14   potential adjustments that would be done in the calculation at

15   the end of the performance period.

16        And I go through this, Your Honor, to only demonstrate

17   to Your Honor the meticulous detail, level of detail that the

18   committee in its due diligence and the compensation

19   subcommittee went through with the company to make sure that

20   this U and G was not lost.  But obviously, I think it's -- it

21   ought to be, I think, apparent to anybody that there's a big

22   difference between trying to get the U and the G out of a --

23   out of a steady-state plan, where it's never in, and how you

24   might calculate that, and ultimately how you approach the

25   calculation in a transformation plan, where the transformation

1   is ongoing and some of which has been accomplished.  And so

2   this is intended to make sure that there are no issues there,

3   as -- you know, and that we have a clear road map, a specific

4   road map as to how we would go forward.

5           THE COURT:  So you're saying the same OIBITDAR of the

6   process is what's intended to be applied to this half of 2007?

7           MR. BUTLER:  Yes.  And to make it absolutely clear,

8   Your Honor, we've actually proposed in the amended order to

9   attach these charts that have been negotiated with the

10  creditors' committee.

11          THE COURT:  Okay.  Can I go back to Exhibit 35 --

12          MR. BUTLER:  Sure.

13          THE COURT:  -- which was the one you started with, I

14  think.

15          MR. BUTLER:  Sure.

16          THE COURT:  Well, after the pie charts.

17     (Counsel confer.)

18          THE COURT:  Does this -- does the increase in the

19  target have anything to do with the UG calculations at all?

20          MR. BUTLER:  Your Honor, not that I'm aware of because

21  the UG targets are set up in the -- but they are based on

22  performance.

23          THE COURT:  The second-half budget --

24          MR. BUTLER:  Right.

25          THE COURT:  -- the OIBITDAR budget of 298 million.

1          MR. BUTLER:  Right.

2          THE COURT:  That was based on the basic transformation

3    plan, right?

4          MR. BUTLER:  Correct.  This is the original

5    transformation plan.

6          THE COURT:  And now you've laid it on basically 150

7    million of additional OIBITDAR that has to be met.  Well, you

8    have the higher of, one or the other.

9          MR. BUTLER:  Right.

10         THE COURT:  But let's assume that this is the one.

11         Does that reflect any additional savings?  I mean, is

12   that in recognition of additional savings?  You know, is it on

13   top of the UG calculations that you just went through, or is

14   this totally separate?

15         MR. BUTLER:  No, Your Honor, this -- the corporate

16   target it was based on will be -- obviously, the five-plus-

17   seven --

18         THE COURT:  Uh-huh.

19         MR. BUTLER:  -- has in it five months of actual

20   performance, so it will be the actual performance for the pre-

21   performance period.

22         THE COURT:  Okay.

23         MR. BUTLER:  Plus the estimate of how the company will

24   expect to perform going forward, based on what people then

25   knew, relating to the company.  So it's driven on volume and

1   other assumptions.

2        THE COURT:  And what I'm asking is:  So does that

3   include -- is there still just one -- let me see if I can be

4   clear on this.  Particularly the target increase of another

5   roughly $50 million, does that include projections based upon

6   the GM -- you know, the actual performance under GM --

7        MR. BUTLER:  Well, what --

8        THE COURT:  -- and the union agreements?

9        MR. BUTLER:  Well, Your Honor, this -- we didn't have

10  any labor agreements or union agreements (away from

11  microphone.)

12       THE COURT:  Right.  But it's a projection based on

13  those.

14       MR. BUTLER:  Yes.  It was based on what the company --

15  the divisions expected to perform.

16       THE COURT:  So, in essence, not only is there a back-

17  out for the UG calculation, but you're also raising the bar

18  before you get -- before you hit the target, based on the

19  additional savings.

20       MR. BUTLER:  Right.  Yes, Your Honor.  Because this is

21  the --

22       THE COURT:  The additional projected savings.

23       MR. BUTLER:  Right.  This is -- the way in which this

24  process -- and it's important to point out here, and I think

25  Your Honor is aware of this, this budget process has nothing to

1   do with compensation; it's not driven for compensation

2   purposes.

3          THE COURT:  No, I understand.  But it reflects

4   projected savings that --

5          MR. BUTLER:  Right.  It reflects -- every division had

6   to -- with the five-plus-seven, had to base it on five months

7   of performance, and looking forward for the last seven months

8   of the year, had to look forward to all of the various things -

9   - volume, change in their business, anything they could

10  estimate -- and decide what their actual performance was going

11  to be for that period of time.

12         THE COURT:  Okay.

13         MR. BUTLER:  That's correct.  Okay.

14         THE COURT:  All right.  So, in other words, it's

15  harder to meet the target because of the projected savings.

16         MR. BUTLER:  Yeah.  Your Honor, it is -- I mean, I

17  don't want to overstate the point.  Remember, these are

18  operators at a division level.  They're estimating operational

19  performance.  And I mean, you'd almost have to bring every

20  single one of them in, and ask them how they determined their

21  forecast.  But their job here is to tell the CEO of the company

22  and the operating committee of the company and the board of

23  directors, all of whom this is reported to, how my division is

24  going to do towards the end of the year.  Most of this is

25  influenced by operational performance.

1          What I can't tell you is, at each division level --

2     because I certainly don't have those levels of detail available

3     to me, at least -- at each division level, when they're

4     forecasting future operational performance, what -- you know,

5     the factors -- all the factors that they're comprehending into

6     that.  You know, so I don't want to overstate the point.  But

7     they're supposed to look at all of the factors that will affect

8     their performance and tell us how they're going to be at the

9     end of the year.

10          THE COURT:  Okay.

11          MR. BUTLER:  That's how the five-plus-seven works.

12          THE COURT:  Okay.

13          MR. BUTLER:  Okay?

14          Your Honor, those are the key points that we wanted to

15    make, in terms of the support of this AIP, to answer any

16    questions the Court might have.  And we'll reserve the balance

17    of our time with respect to any comments or arguments the

18    objectors make.

19          THE COURT:  Can I assume that, under the logic of the

20    OIBITDAR-minus-UG formula, that at a point where the effect of

21    the GM and union settlements is actually known, you wouldn't

22    need it anymore because it doesn't -- it wouldn't serve the

23    purpose that it served earlier, which was to set a baseline,

24    based on anticipated performance, without factoring in, plus or

25    minus, actual performance?  You wouldn't need it in the future,

1   once you actually had experience in this area.

2          MR. BUTLER:  That's exactly the point, Your Honor.  In

3   a fully transformed -- or once all of -- once we have a fully

4   transformed plan, there won't be anything else to, if you will

5   -- any additional U or G coming in extraneously.  Remember,

6   originally, it was intended to eliminate the ability of the

7   management team during the course of the period to influence

8   their payments by affecting different outcomes with U and G

9   during the performance period.

10         THE COURT:  Those negotiations.  It was supposed to

11  make the negotiations neutral as to their compensation.

12         MR. BUTLER:  Correct.

13         THE COURT:  Okay.  Okay.

14     (Counsel confer.)

15         MR. DECHIARA:  Good afternoon, Your Honor.  Peter

16  Dechiara from Cohen, Weiss & Simon for the United Auto Workers.

17         The Court in its March 2007 order, held that the AIP

18  plan is out of the ordinary course of business and needs the

19  approval of the Court for each proposed continuation.  The

20  Court, of course, has approved prior extensions of the AIP

21  bonus program, but there are good reasons the Court should deny

22  the instant motion.

23         We heard Mr. Butler say just minutes ago that there's,

24  quote, "no new news here."  But, in fact, Your Honor, there is

25  new news.  First, since the Court approved the last AIP

1  extension in March, the UAW, Delphi, and GM, in June, reached a

2  global settlement in which the UAW-represented workforce gave

3  significant concessions in pay, benefits, jobs, and job

4  security, concessions that the workers will live under for

5  years to come.

6          As part of the consideration for those far-reaching

7  concessions, Delphi, in the settlement agreement, agreed to a

8  clause entitled, "Equivalence of Sacrifice."  And we saw that

9  clause on the demonstrative exhibit that Mr. Butler used.  The

10 clause says that Delphi agrees to, quote:

11          "The principle of equivalence of sacrifice when

12          establishing compensation and benefit levels for

13          salaried employees and management, to ensure that

14          sacrifices by UAW-represented employees are reflected

15          in the pay and benefit practices of all non-

16          represented employees."

17          This equivalence of sacrifice provision by its plain

18 terms requires that management's compensation reflect the

19 substantial and long-term sacrifices accepted by the UAW-

20 represented workforce in the June settlement.  At the very

21 least, the equivalence of sacrifice clause requires executives

22 to forego additional bonuses on top of their salary and

23 benefits for the brief remainder of this Chapter 11 case.

24          Now Delphi notes that there was a similar equivalence

25 of sacrifice clause that appeared in a pre-petition

1  supplemental agreement that Delphi and the UAW reached in 2004.

2  It argues that the existence of the clause in this supplemental

3  agreement means that the AIP bonus plan previously approved by

4  the Court does not violate the equivalence of sacrifice

5  principle.

6          This argument fails, first, because the UAW never

7  raised, and the Court never before addressed, whether the AIP

8  plan violated the equivalence of sacrifice language in its --

9          THE COURT:  But your main point is that the union

10  hadn't made any concessions at that point.

11          MR. DECHIARA:  That's absolutely right.

12          With the supplemental agreement were concessions only

13  as to new hire employees.  It was a very limited -- not to

14  minimize it, but it was a limited concessionary agreement.  It

15  did not affect the overall UAW-represented workforce.  The June

16  2007 settlement, by contrast, requires fundamental and long-

17  term sacrifice for the entire UAW-represented employee group.

18          Whatever may have been the case before June, now that

19  the massive UAW concessions have become a reality, additional

20  AIP bonuses would surely be at odds with the sacrifice of --

21  equivalence of sacrifice requirement in the June settlement.

22          Next, the motion should be denied because the debtors

23  have failed to establish that the proposed extension of the

24  bonus program is necessary to Delphi's reorganization.  Debtors

25  insist that the AIP program is not a retention program, and we

1   don't contend as a matter of law that it is, that it is a

2   retention program.

3          But it can't be disputed that in its original motion

4   for the KECP program, the debtors tried to justify the need for

5   the program by arguing that Delphi, at the beginning of the

6   Chapter 11 case, had serious concerns that executives would

7   quit or were, in fact, quitting out of fear of losing their

8   jobs in the bankruptcy.  In fact, Watson Wyatt argued in

9   support of the motion, quote:

10         "Delphi must strive to retain its executives."

11         Delphi also claimed that it desperately needed the

12  incumbent executives to help it achieve its transformation plan

13  goals.  Those justifications no longer apply.  We are fast-

14  approaching the end of this case.  Debtors seek a confirmation

15  hearing on their plan of reorganization in mid-November 2007,

16  and we heard Mr. Butler tell us this morning that the company

17  plans to emerge from bankruptcy by the first month of 2008.

18         Delphi has the building blocks of its transformation

19  plan in place, particularly settlements with its principle

20  labor unions and a comprehensive settlement with GM.  There is

21  no evidence that Delphi's executives will quit if the bonus

22  program is not continued for the remainder of the case.  And

23  since the buildings blocks of the transformation plan are

24  already in place, there is no indication that were some

25  executives to leave in the short time between now and Delphi's

1    emergence, that their departure would have any material impact

2    on the reorganization.

3           Now Delphi claims that the AIP bonuses are not needed

4    to keep the executives in their jobs, but are needed to make

5    sure they, quote, "remain motivated" -- that's Paragraph 14 of

6    their reply brief -- to help Delphi hit its business plan

7    targets.  This argument fails because there's simply no

8    evidence that the bonuses are needed, either to motivate the

9    executives or to help Delphi reach its targets.

10          Indeed, Delphi admits in its reply brief, which it

11   filed yesterday, that its executives have been working to

12   maximize Delphi's performance so far, in the second half of

13   2007, even without bonuses.  Let me --

14          THE COURT:  But can't we -- don't we all know that the

15   executives know that Delphi and -- that Delphi had committed to

16   continue the AIP for the second half of 2007, and was working

17   to set the targets with its compensation committee, and then

18   with the creditors' committee?  I mean, they've been working in

19   the expectation that there would be something like this,

20   haven't they?

21          MR. DECHIARA:  Well, Your Honor, of course, the IP

22   program is subject to the Court's approval.

23          THE COURT:  No, I understand that.  But, I mean, it

24   would seem to me that any employee is going to be more, rather

25   than less happy if they're told that you're not going to get

1  something because you've been working all this time in

2  expectation of it.

3        I mean, logically, I would be a lot angrier then than

4  if I was told, well, there's no assurance that you're going to

5  get anything and we're not even going to push for it.  I mean,

6  it just -- I don't accept the psychology of that.

7        MR. DECHIARA:  Your Honor, I would submit that the

8  happiness of the management executives of Delphi is not what

9  should drive whether there's an expenditure.

10        THE COURT:  Well, I'm using "happy" euphemistically

11  because I don't want to use a four-letter word.  But they would

12  be very unhappy.  And, frankly, I think they would resign under

13  that scenario.

14        MR. DECHIARA:  I have no doubt the executives will be

15  disappointed, or would be disappointed, if they did not get the

16  bonuses they're hoping to get.  But I also have no doubt --

17        THE COURT:  No, this is a separate point.  I'm saying

18  if that's the logic for them not getting the bonus, then I

19  would say, this whole system -- if I were an employee, this

20  whole system is ridiculous, I'm not going to be a part of it

21  because of that logic.

22        I'm not saying your other point, which is whether, you

23  know, they're necessary in the first place, the payment.  But

24  if the rationale that's given for eliminating the payment this

25  year is that, well, you've already worked, so we don't need you

1  for this year, I don't think that's a good one.  Let's just

2  leave it at that.

3      MR. DECHIARA:  No.  Your Honor, the logic I'm trying

4  to address is Delphi's logic saying, we need to pay these

5  people a bonus on top of their salary and benefit to motivate

6  them.  But, then -- and if I may just quote what the company

7  says in its -- in Paragraph 23 of its reply brief.  It says:

8          "Although the hearing scheduled in connection with the

9          third supplement is taking place during the course of

10         the performance period, the reality of the situation

11         is that the debtors' executive workforce has been

12         managing the debtors' business affairs continuously

13         during this period, with the sole objective of

14         maximizing enterprise value for all of the debtors'

15         stakeholders.  There is simply no basis for the

16         suggestion that executives have been waiting until

17         after this Court's approval of the third supplement to

18         begin to conduct itself --"

19     I guess it should say "themselves."

20         "-- with the best interests of the debtors' estates."

21     So I read that to suggest that these executives have

22 been working hard and doing their jobs, as they should, so far

23 in this half without the bonuses, and that there's no reason to

24 suggest -- excuse me -- that without the bonuses, the

25 executives, for the rest of 2007, would not do their jobs or

1    work any less hard for the benefit of the debtor and its

2    reorganization.

3         THE COURT:  I guess that's where I disagree with you.

4    I mean, you know that many states make it a crime to employ

5    people without the prospect of paying them.  Now this wouldn't

6    be a crime.  But there's a rationale behind those statutes, and

7    that is that people have worked in reasonable expectation of

8    something, and they're very unhappy when they don't get it.

9         MR. DECHIARA:  Your Honor, I won't belabor the point.

10   I'll move on.  I just would say that everyone knows, or should

11   know, that this program -- the Court has said that this program

12   must be approved each six months.

13        THE COURT:  I agree with that.

14        MR. DECHIARA:  Let me move on.  Regarding the EBITDAR

15   targets, I would just -- Mr. Butler spent a fair amount of time

16   talking about Exhibit 34, which shows historical performance.

17   I would just point out that for each half-year period, from the

18   first half of 2006 through the first half of 2007, Delphi has

19   exceeded its EBITDAR targets by wide margins.  In each half-

20   year, the company has paid out AIP bonuses far exceeding the

21   minimum bonus amounts.  And, for example, in the first half of

22   2007, the range of possible bonuses was from 20.1 million to

23   37.4 million, and Delphi paid out 35.1 million, or ninety-four

24   percent of the maximum amount.

25        So far from a truly at-risk bonus to reward

1    exceptionally good performance, the historical data shows that

2    the AIP bonuses have become nearly a sure thing.  Not that

3    you'll get the maximum for sure, but that there will be a

4    bonus.  And that it's become a virtually guaranteed addition to

5    the executive's compensation.

6           Delphi's continual refrain in its reply papers is that

7    everyone benefits if the company meets it EBITDAR targets.

8    And, of course, that's true.  But the question before the

9    Court, I would submit, is whether the estate needs to pay

10   bonuses to its executives on top of their salary and benefits

11   to reach those targets.  And I would suggest there's no

12   evidence to support that.

13          Another key reason to deny the motion is that Delphi

14   has indicated that it plans to provide its executives with

15   further payments in the management compensation plan that will

16   be part of its plan of reorganization.  So if the executives

17   need additional monetary rewards to be motivated to do their

18   jobs well, as Delphi seems to believe, the prospect of shortly

19   receiving the rewards that await them in the management

20   compensation plan certainly provides more than enough

21   incentive.

22          Delphi has not yet revealed how much it will seek to

23   give its executives in cash, stock, or other benefits in the

24   management compensation plan.  The company could seek to make

25   its executives whole for any losses in the compensation that

1  they've suffered in the bankruptcy.  Especially because the UAW

2  agreement requires equivalence of sacrifice, it would be

3  premature for the Court to permit additional bonuses now before

4  it knows how generously Delphi plans to reward its executives

5  in the management compensation plan.

6          For example, if the management compensation plan --

7          THE COURT:  No, but isn't that whole plan, again,

8  subject to review, if it's part of a plan?

9          MR. DECHIARA:  It is, Your Honor.  But let me -- if I

10  may state this example, maybe --

11          THE COURT:  I mean, isn't that fight -- but isn't that

12  a fight for another day?

13          MR. DECHIARA:  No, Your Honor.  It's not, Your Honor.

14  It's all a question of how much should the executives be paid.

15  For example, if the management --

16          THE COURT:  But I imagine you're familiar with the

17  Nellson Nutraceutical case that came down recently, or the Dana

18  case by Judge Lifland, or the --

19          MR. DECHIARA:  The Dana case I'm familiar with, Your

20  Honor.

21          THE COURT:  Okay.  In both of those cases, the courts

22  were concerned with the types of -- well, Dana in particular,

23  and then it was distinguished by Judge Sontchi in the Nellson

24  Nutraceutical case, where the court evaluated the plan that

25  you're saying is going to come down the road --

1          MR. DECHIARA:  Right.

2          THE COURT:  -- in light of the more ordinary benefits

3   that they were getting already.  And so it would seem to me

4   that maybe you've got it backwards, and that I couldn't

5   evaluate this program in light of something that's a

6   hypothetical at this point down the road, but I very clearly

7   could evaluate what's coming down the road in light of what the

8   executives already have.  I mean, it just seems to me you're

9   flipping it there.

10          MR. DECHIARA:  Well, Your Honor, if, let's say, for

11   example, the long-term -- the management compensation plan

12   seeks to make the executives whole for the long-term incentive

13   opportunity --

14          THE COURT:  Right.

15          MR. DECHIARA:  -- that chunk of the pie chart that

16   we've seen repeatedly.

17          THE COURT:  Right.

18          MR. DECHIARA:  And if the Court now continues the AIP

19   filling in the piece of the pie for the short-term opportunity

20   incentive, the end result, at the end of the day, at the end of

21   the case will be that management executives will not have

22   suffered -- will have been made whole.

23          THE COURT:  And I'm sure you and your colleagues will

24   be telling me that I shouldn't let that happen.

25          MR. DECHIARA:  Your Honor, absolutely.  We will

1    reserve the right to challenge whatever is in the management

2    compensation plan.

3         But what we're saying now is, especially given the

4    time frames that we're talking about, we're talking about very

5    tight time frames.  In fact, these AIP bonuses would not even

6    be paid until 2008, until almost certainly after Delphi emerges

7    from bankruptcy.  So it's all of a piece as we come towards the

8    end game of this bankruptcy case.  How much should the

9    management executives be compensated?  How much should they

10   sacrifice?  How much should they be made whole?  And it's all

11   of a piece.

12        And we submit that to decide this piece now, so close

13   to the end of this other big piece coming down the road, would

14   be premature.

15        THE COURT:  Well, let me explore that a little bit.

16   Granted that this second half of 2007 is subject to notice and

17   approval, it does seem to me to be in line with what Delphi has

18   done historically.  And it was previously approved, or similar

19   - a very similar approach has been approved previously in the

20   case, whereas the fourth leg of Delphi's historical

21   compensation structure has not ever been -- there's never been

22   a hearing on that.

23        Isn't it likely that an executive is reasonably

24   counting on something within this pool, whereas --

25        MR. DECHIARA:  I'm sorry.  I missed that last point,

1  Your Honor.

2      THE COURT:  Isn't an executive going to be reasonably

3  counting on something in this pool that's before me today,

4  whereas how much can you really be counting on anything in

5  terms of the long-term compensation?

6      For example, people do their budgeting process for

7  their expenses over the year.  And it just seems to me that in

8  terms of whether something is premature or not, what people are

9  reasonably counting on is something like this.  The long-term

10  program is something that they're not putting in the bank by

11  any means, and are waiting to see how it plays out in the case.

12      MR. DECHIARA:  Your Honor, I think there's a

13  fundamental tension between the view that these bonuses should

14  be paid because executives are expecting them or counting on

15  them or making their household budgets based on them, and what

16  the company has been repeatedly telling us, which is that these

17  are high hurdles, this is at-risk, this is not guaranteed, and

18  that this is a bonus.  And --

19      THE COURT:  I don't think they're saying -- I don't

20  think they've ever said these are high hurdles.  I think

21  they've said that this is an element of the executives

22  compensation tied to reasonable business projections.

23      MR. DECHIARA:  But the company has insisted they are

24  at-risk, they are not guaranteed.

25      THE COURT:  I agree with that because, among other

1   things, your supervisor could say, you didn't do a good job,

2   you're not getting anything.  It's not salary.  They can't sue

3   as regular wage employees could for not getting this.

4        MR. DECHIARA:  That I think enforces my point, Your

5   Honor, that there should not be these expectations by the

6   executives that they're going to get this.  And, clearly, the

7   Court should not give it to them based on any perception that

8   that expectation exists.

9        What should be driving this motion, in the UAW's view,

10  is whether there's equivalence of sacrifice.  I think it's

11  critical to keep in mind the rank and file.  The UAW workers in

12  the plants who have agreed through their union to the shutting

13  of numerous plants, the sale of numerous plants, the freezing

14  of their pension plan, the giving up of their COLA, the giving

15  up certain job security provisions.

16       The question I think that's critical is whether

17  there's equivalence of sacrifice as the company agreed in the

18  settlement agreement, and as the Court ordered in approving

19  that settlement agreement.  And I think that's the lens through

20  which this should be viewed.

21       Let me close with one last point, which is perhaps is

22  related for why the motion should be denied, and that's because

23  it would be bad for the morale of those unionized employees who

24  I just mentioned, and bad for labor relations at Delphi.

25       In its reply brief, Delphi says the bonuses will not,

1    quote, "jeopardize labor peace."  And we are certainly not

2    claiming that the bonus program is going to lead to strikes or

3    labor unrest.  But what we are claiming is that the bonuses,

4    coming on the heals of deep worker concessions, will buy this

5    company the ill will and resentment of its union workers.

6          And to succeed in the intensely competitive auto

7    supply business, Delphi needs workers in its plants willing to

8    do their best to work effectively and efficiently on behalf of

9    this company.  And that far from being necessary, management

10   bonuses that demoralize the rank and file is the last thing

11   that Delphi needs as it seeks to succeed after emerging from

12   bankruptcy.

13         THE COURT:  Okay.  Let me -- in terms of the

14   negotiation of the UAW agreement that was approved recently,

15   the debtor gave -- the debtor used as a base for those

16   negotiations the same business plan, right?  The same targets?

17         MR. DECHIARA:  Your Honor, I frankly don't have

18   knowledge on that.  I wasn't involved in the negotiations.

19         THE COURT:  But, I mean, is there any dispute with Mr.

20   Butler's statement that except to the extent that the target

21   has been increased, made harder to meet, as set forth in

22   Exhibit 35, the target was not separately formed for

23   compensation purposes, but is based on the same projections

24   that have been used in the negotiations with the constituents?

25         MR. DECHIARA:  Your Honor, let me answer that by

1    saying we don't dispute what Mr. Butler represented this

2    morning, that the targets for purposes of the AIP plan are not

3    different from the targets that are in the business plan.

4         As to what may or may not have been used in the labor

5    negotiations, A, I don't know, and, B, I don't think there's

6    anything in the record from any -- any evidence in the record

7    that indicates one way or another what may or may not have been

8    used.

9         THE COURT:  Okay.

10        MS. MEHLSACK:  I'm not sure if it's --

11        THE COURT:  It's afternoon.

12        MS. MEHLSACK:  -- it's good afternoon, Your Honor.

13        First, I want to thank Mr. Butler for his courtesy in

14   not objecting to the delay, the one-day delay in our filing.

15   Barbara Mehlsack.  I'm here for the operating engineers.  And

16   then, frankly, I don't know if Ms. Robbins is planning to speak

17   on behalf of the IBW and the IAM, and my remarks will be on

18   behalf of those unions, as well.

19        Your Honor said something a little while ago about the

20   reasonable expectation of these executives that they would be

21   getting a second-half AIP plan.  And I guess the issue of

22   reasonable expectations, Your Honor, goes to the fundamental

23   question of whether this second half plan is fair and

24   reasonable, as it is required to be under the standard that

25   Your Honor accepted for the last several plans, which is this

1    is an out-of-the-ordinary-course-of-business plan.

2         And when you talk about reasonable expectation, Your

3    Honor, it seems to me that you ought to consider that the

4    operating engineers employees, as with all the other union

5    employees, had a reasonable expectation over the many decades

6    of employment, first at GM and then at Delphi, of having a

7    certain level of job security and a certain level of

8    retirement, both income and health insurance.

9         When Delphi started out the 1113/1114 motion, they

10   made no bones about the fact that they did not believe that it

11   was their obligation to treat the unionized employees and the

12   management employees in the same fashion.  They were very clear

13   about their position that they believed that union employee

14   compensation exceeded competitive levels, and management level

15   compensation had not met competitive levels.

16        When you talk about competitiveness and whether or not

17   -- and Mr. Dechiara made the point, and Your Honor has

18   addressed, I think, the issue of how this plan, this short-term

19   plan is going to fit in with the long-term plan.  And it is --

20   for us to hear that there is an -- that Your Honor will be

21   addressing the relationship of the two plans does obviate --

22        THE COURT:  Well, it depends on whether anyone

23   objects.  But I -- maybe I -- I hope you all work it out.

24        MS. MEHLSACK:  But our concern, and the concern of our

25   members is --

1          THE COURT:  Or leave it up to a process, I mean, that

2     -- which is what people often do in these situations.  I'm

3     sorry to interrupt you.

4          MS. MEHLSACK:  But at the moment, Your Honor, our

5     concern was -- and Mr. Butler said thirty-six percent is being

6     left on the table for long-term.  And so these -- this

7     compensation package is not yet competitive.  But when we -- so

8     when we look at this short-term piece, however, this question

9     of reasonable expectation, when you look at a payout plan that

10    -- where the percentage of payout has increased in relation to

11    the amount of money on the table, Your Honor, we have to ask

12    whether or not the plan encompasses --

13         THE COURT:  I don't understand.  Hasn't it roughly

14    been fifteen or sixteen percent consistently?

15         MS. MEHLSACK:  Well, the actual -- the maximum -- the

16    first half of 2006 --

17         THE COURT:  No, I was focusing on the pie charts from

18    the historical experience and the current experience.

19         MS. MEHLSACK:  What I'm talking about, Your Honor, is

20    the actual KECP payout fund in relation to the maximum that

21    could be paid out, because it seems to me, Your Honor, when you

22    were discussing the question of whether the business plan and

23    the targets are those that -- they're not set specifically for

24    this incentive compensation plan, but the payout percentages

25    are.  And it seems to us that the question that needs to be

1    asked is maybe -- because there is no element, Your Honor, of

2    sacrifice -- from the unionized employees point of view,

3    there's no element of sacrifice in this plan.

4            As Your Honor said, the executives have an expectation

5    of a second half 2007 plan, and they're going to receive what

6    it is they expect.  From the unionized employees point of view

7    there were expectations based on the job security built into

8    their union agreements, the pension and health insurance built

9    into their union agreements.  Those expectations have been

10   defeated.

11           The difference that Delphi talked about at the

12   beginning of this case between management employees and union

13   employees, Delphi said in its first 1113/1114 papers, union

14   employees have the security of their agreements; management

15   employees don't.

16           Well, union employees have lost that security.  So

17   where is the fairness and reasonableness in this -- Your Honor

18   has addressed whether or not there should be a short-term

19   incentive compensation plan over the last three times we've

20   been in court on this issue.  And we understand the standards

21   that Your Honor has imposed.

22           The question we have is given -- and the timing issue

23   has been addressed.  But given what has occurred in terms of

24   the union agreements, is it fair and reasonable to have a

25   short-term compensation plan that, essentially, we believe is

1  not tough enough, Your Honor, because it's resulted in a --

2  virtually the entire amount of money on the table being paid

3  out.  It's resulted in targets that -- in actual performance

4  significantly above target performance.  And, Your Honor,

5  that's a good thing.  Obviously, it's a good thing.  And our

6  clients benefit from that.

7      But the question -- Mr. Butler went through an

8  analysis saying, we've toughened up this plan.  The question is

9  whether the payout percentages have been toughened up enough,

10  Your Honor, to make this a fair and reasonable plan.

11      Thank you, Your Honor.

12      THE COURT:  Okay, thanks.

13      Ms. Robbins, do you have anything to add to that?  I

14  thought it was -- you don't have to.  I thought it was well-

15  said, but --

16      MS. ROBBINS:  Your Honor, I was permitted to

17  participate by phone and make an appearance on condition that I

18  was not going to involve oral argument, and --

19      THE COURT:  Well, no.  That wasn't --

20      MS. ROBBINS:  And I could try to do that.

21      THE COURT:  No, no.  I never imposed that.  The

22  condition I impose is introducing evidence by phone because

23  that's usually, unless someone is truly out of the country,

24  just mechanically doesn't work.  So you can make argument, if

25  you want to.

1      But again, Ms. Mehlsack was very eloquent.  I don't

2  know if you need to.  But if you want to, you certainly can.

3      MS. ROBBINS:  There is a huge echo on this phone and I

4  will rely on Ms. Mehlsack and the other union counsels'

5  argument.

6      THE COURT:  All right.  That's fine.

7      MR. KENNEDY:  I have nothing further to add to -- by

8  the IUE-CWA.  Tom Kennedy, Your Honor.  I think the union

9  counsel presented our positions very well.

10      THE COURT:  Let me ask, though, just because I asked

11  this question of Mr. Dechiara, and he was frank in that he

12  didn't know the answer.  Either Ms. Mehlsack or Mr. Kennedy:

13  were the -- is it fair to say, as Mr. Butler did, that the

14  financial projections, business plan models that were provided

15  to the unions by -- or your clients -- I'm not going to

16  generalize -- to your clients by the debtor in connection with

17  the 1113/1114 negotiations the same ones that are the

18  foundation of these targets?

19      MR. KENNEDY:  Well, Your Honor, I was pretty involved

20  in the negotiations.  And the IUE members are, for the most

21  part, concentrated in the electronics -- excuse me, the

22  electrical and electronic architecture division.  That does

23  include other plants, however.  So it's very difficult for us

24  to have an apples-and-apples comparison.

25      I know, for instance, what the packet electronic

1   OIBITDAR and EBITDAR results were, and we did negotiate it with

2   those firmly in mind.  Because there are UAW plants put into

3   the divisional numbers that you see here, it's hard for me to

4   really understand whether they're accurate.  Frankly, in the

5   past, the company representations about figures have been true,

6   and I'm not in a position to say they're not.

7          I will say that just looking at the division that the

8   IUE represents the majority of the employees in, when this case

9   started, that was a negative OIBITDAR projection.  They're now

10  looking at a target of 183 million positive.

11         We've lost 4,000 jobs in that division that were

12  probably paying about $100,000 apiece, counting benefits, on

13  average.  That's a four-hundred-million-dollar swing.  It's

14  very difficult for us not to presume that the bettered

15  performance is not primarily a function of the reduction in

16  head count and the reduction in net compensation paid to those

17  employees.

18         Now I understand the company says that that is already

19  either baked into the numbers or will be, to the extent it

20  hasn't already occurred, be excluded on a dollar-for-dollar

21  basis.  I can't track that, Your Honor.  That's beyond my

22  financial ability to sort of go through on the numbers.

23         We do believe that given the what I'll call the

24  imminence of the buy-downs that are four days from now, and the

25  other factors represented by counsel, that this is an

1    appropriate moment to take a special look at whether this AIP

2    program has to be approved, just as the other ones were.

3    Things are different now.  The sacrifices had not been

4    implemented in the past.  They have been now.

5           In our view, it would be appropriate to deny this

6    motion.  But I think it would belabor the facts to repeat our

7    reasons.

8           MS. MEHLSACK:  Can I just -- Your Honor, we would --

9    one of the difficulties we had was our size.  And so it was

10   very difficult.  We were never able to get numbers that broke

11   out, obviously.

12          THE COURT:  Your issue was the same as Mr. Kennedy's,

13   except more so, because you --

14          MS. MEHLSACK:  Because we were so small.

15          THE COURT:  -- the union was smaller and you couldn't

16   --

17          MS. MEHLSACK:  That's right.  Although, Your Honor, we

18   would remind you that our position has always been that Delphi

19   never established that operating engineers' wages -- wage

20   levels were over-competitive levels.  That was not something

21   that they achieved in their 1113/1114 hearings.  To that

22   extent, we were able to break out certain numbers.  But beyond

23   that, we could not.

24          And, once again, Your Honor, we think that, you know,

25   a special scrutiny -- there are two sets of numbers here.

1   There are the assumptions and the projections, and then there's

2   the payout schedule.  And when you look at that, and we talked

3   to our members who are in the process of making very, very --

4   realistically, Your Honor, we have one plant that's closing, we

5   have one plant that's already closed, and then we have a third

6   plant where people are making decisions about whether to take

7   buyouts, buy-downs, very, very painful and difficult decisions.

8        We actually spent several days with Delphi trying to

9   negotiate explanations to people about what the consequences of

10  their choices would be.  And it wasn't easy.  And so we would

11  ask Your Honor to take a specially hard look at these paths,

12  and if you're not going to deny the plan, to maybe -- to

13  require Delphi and the creditors' committee to go back to the

14  drawing board when it comes to the level of the payouts.

15       Thank you, Your Honor.

16       THE COURT:  Well, it does seem to me -- and I

17  appreciate that there's never an employee situation, whether

18  it's a situation with a union or non-union workers where

19  someone else's gain is subject to criticism.  But it does seem

20  to me that the argument that, in shorthand, can be made as

21  follows doesn't really apply here.  In shorthand, if a worker

22  was informed that I approved this motion, I think a knee-jerk

23  reaction might be, "oh, I gave up that money and it's now being

24  taken by the executives."

25       That doesn't seem to me to be consistent with this

1    motion because the company is getting the savings, and the

2    company has a lot of constituents, including the workers who

3    are continuing in the benefit -- in their benefit plans, and

4    the pension plan -- and the customers and the creditors.

5           Indeed, the executives' targets are harder to meet

6    because the savings are built into the target.  So that sort of

7    red flag argument, I think, doesn't fly here.  What strikes me

8    as an argument that flies is that, you know, "I've given up

9    something, what are the executives giving up?"  I understand

10   that argument.

11          But it seems to me that this isn't an expropriation by

12   the executives of what the workers have conceded, because it's

13   not -- it doesn't work that way.  In fact, the target for the

14   executives to meet is higher because of what the workers have

15   conceded, assuming that the targets were appropriately

16   negotiated with, first, the compensation committee, and then,

17   secondly, and perhaps -- well, certainly equally importantly,

18   with the committee, which is not in the business of giving out

19   money to other constituents.

20          So I'll hear from Mr. Butler.  You all can react to

21   that observation, too, if you want to.  But that was what I at

22   least wanted you to hear before I gave a ruling in case you

23   wanted to respond to it.

24          MR. BUTLER:  Do you want me to --

25          THE COURT:  No, go ahead.

1      MR. BUTLER:  Your Honor, I just want to make a couple

2  of points.  One thing I should have made -- mentioned in my

3  presentation and oral argument that I expect I didn't point

4  out, and Mr. Rosenberg reminded me of it a few moments, and

5  that is that in the negotiations here, you can see that this

6  EBITDAR -- this all translates into a four-hundred-and-forty-

7  three-million-dollar corporate EBITDAR target.

8      The creditors' committee has reserved --

9      THE COURT:  You have your 200 million swing.

10      MR. BUTLER:  A two-hundred-million-dollar adjustment

11  to this bar in their discretion.  They've agreed to be

12  reasonable, but we've also agreed that their decision is not

13  subject to review.

14      So at the end of the day, the creditors' committee had

15  --

16      THE COURT:  Whatever that means when you have those

17  two conditions together.

18      MR. BUTLER:  I hope reasonable means reasonable.  And

19  we've agreed we're not coming into court to talk about it.

20      But the point is that they had -- and I'll just make

21  the point also, the committee has acted reasonably in this

22  case.  I mean, if you think about it, I think it was two

23  performance periods ago, the committee made a hundred-million-

24  dollar, I think, adjustment -- ability to adjust -- make an

25  adjustment.  And they made -- at the end of the day, they

1   investigated, they reviewed things, and they made a thirty-

2   seven-million-dollar adjustment, or something along those

3   lines, related to the jobs bank adjustment that they thought

4   should be adjusted out.

5        And so the committee made -- exercised its discretion

6   and made an adjustment, and reviewed it.  But it didn't

7   conclude that a hundred-million-dollar adjustment was

8   justified.  And we went through this negotiation which was at

9   the end of the day, included our chief executive officer and

10  the chairman of the creditors' committee.  The committee wanted

11  the opportunity to have a wide discretion here, in looking at

12  the corporate and not the OIBITDAR levels, but the corporate

13  chart in the event of new circumstances or changed

14  circumstances that's -- the criteria that's outlined in the

15  order.  And we agreed to that.

16       And there's been a lot of these items that go back and

17  forth on that.  I just want to make sure that was clear.

18       The other points -- point that I would really like to

19  make -- rebuttal here, is I do take issue, as you'd expect,

20  with the union representative's characterization of this being,

21  you know, a -- this being just all bonuses that are supposed to

22  be paid out for exceptionally good performance, and this is on

23  top of everything else.  As I think Your Honor knows, that's

24  not what our papers say, and that's not what the evidence is in

25  this case.

1       We all listened, and I understand the positions and I

2   understand, I think, probably even the motivations as to why

3   the unions come and make these arguments.  But I think at the

4   end of the day, the Court also needs to look at the only

5   evidence that's in the record, the uncontroverted evidence.

6       And the fact is that Mr. Bubnovich has talked about

7   this in terms of competitive market opportunities.  And the

8   reality is there is a competitive shortfall here right now for

9   over half the compensation.

10      You don't see the unions coming in here and saying

11  that their -- the union members are making half of what's

12  competitive for them, because they couldn't make that case.

13  They'd have a difficult time, frankly, making the case they're

14  being paid at market competitive wages.  The reality is they're

15  making what was negotiated, and we stand by our agreements with

16  them.  The reality is we entered into agreements with them

17  which we fully intend to go forward with, and go forward with

18  the unions, and we respect them.  And we respect the concerns

19  that they have as we move forward here.

20      But you can't translate those concerns into a blank

21  check that says that you don't pay your executives half of

22  their market opportunities.  I mean, that simply is something

23  that, ultimately, would be very, very detrimental to the

24  interests of this company.

25      So the first point is, just to go to the record, Mr.

1    Bubnovich's expert testimony is uncontroverted.  The business

2    justifications that Mr. Sheehan put forward are also

3    uncontroverted in the evidentiary record.  And the process of

4    how this was put about and the independent review of all this

5    by Mr. Naylor and the independent directors is also

6    uncontroverted.

7           You know, in terms of the -- again, and I understand

8    the UAW's equivalence of sacrifice argument to suggest that

9    that provision, which again, and I think they did concede

10   there's no new news in it, they're saying that because they've

11   entered into new agreements, that there is -- that it should be

12   interpreted differently, I gather, is the argument.  But the

13   equivalence of sacrifice argument that they make, there is --

14   you know, can't in any reasonable way be rationally interpreted

15   to say that parties should be deprived of fifty percent of the

16   competitive opportunities, or twenty-five percent of the

17   competitive opportunities as a result of a negotiated deal.

18          And I would point out that this is not -- the

19   circumstances we're in here now, and it took a lot of work from

20   all of us, and people worked together in good faith, you know,

21   there wasn't an 1113 and an 1114 decision that was made by this

22   Court that was adverse to the unions.  Quite to the contrary.

23   There were collectively bargained resolutions of the

24   differences between the parties.  And nowhere in those -- you

25   know, in those agreements was there an agreement that we would

1    not pay our executives what they should get competitively paid,

2    or that we would not go forward with these programs.  And, Your

3    Honor, I just don't think there's any basis to suggest to the

4    contrary.

5         The last point that I simply wanted to make here is

6    that it is, and Your Honor has reminded us in the past of this

7    as well, and I understand that for sound byte purposes people

8    want to call these bonuses and guaranteed bonuses.  These are

9    not bonuses.  That's not what we came and asked the Court for.

10   And I think if we -- if Your Honor asked Mr. Bubnovich he would

11   testify again that they're not bonuses.

12        These are elements, integrated elements of a

13   compensation package, and if you weren't going to have an at-

14   risk portion of the compensation package, the wages would be

15   twice as much.  They would be bigger.  All right?

16        The fact that you reduce someone's wages and you

17   reduce -- you know, and you move their compensation -- their

18   total compensation opportunities into an at-risk bucket, all

19   right, doesn't mean ultimately that, somehow, if they get paid

20   those, they're getting paid something, quote, "extra."  And I

21   know the sound bytes and the media reports are all that this is

22   a bonus and extra.  It is not.  It never has been.  The

23   testimony is uncontroverted in that respect.

24        This is an integrated element of compensation that has

25   been an historical part of Delphi's program, but is also, as

1  Mr. Bubnovich has testified, an integrated and market comped,

2  approach to compensation here, and that this is reasonable and

3  ordinary-course compensation.

4       I understand in the context of a Chapter 11 why we're

5  here in this.  But, you know, this isn't -- is an ordinary part

6  of how one compensates its salaried workforce.  And I would

7  simply say, Your Honor, we ask you to approve the program based

8  on the evidentiary record before the Court.

9       MR. DECHIARA:  Your Honor, if I may just say one thing

10  to respond to the suggestion that the UAW is doing -- is

11  opposing this motion for media purposes, or that our

12  presentation was intended as sound bytes --

13       THE COURT:  No, I don't think that's what Mr. Butler

14  was saying.  I think it is true that the media sometimes picks

15  up sound bites that are inaccurate, but I don't think that's

16  your goal.

17       MR. DECHIARA:  No, Your Honor.  Let me just point out

18  that at Paragraph 27 of the debtors' October 13th, 2005 motion

19  for the original KECP program, they refer to the AIP pay as,

20  quote, "bonuses."

21       And also in the _Dana_ case at 358 B.R. at Page 583,

22  this Court referred to AIP, quote, "bonuses."

23       That's all.

24       THE COURT:  That's because it's not -- well, I think

25  that's because it's not salary.  I mean, again, if you're to be

1  paid salary, you have rights to it.  They can be adjusted under

2  difficult circumstances, but you have rights to it.  Bonuses,

3  their legal regime, I think, is a little different.

4          All right.  I have before me the debtors' motion for

5  approval of the continuation of its short-term at-risk

6  performance payment program, or "AIP," for the second half of

7  2007.

8          I should spend a moment on the standard by which I'm

9  considering the motion.  As I determined when first asked to

10  consider this type of relief in February of 2006, I determined

11  that it was a request to take an action out of the ordinary

12  course under Section 363(b) of the Bankruptcy Code; and under

13  the circumstances of this case, I continue to believe that.

14  But I also noted in February 2006, and I continue to believe,

15  two related things:

16          First, generally speaking, bankruptcy courts are

17  loathe to become involved in the compensation decisions made by

18  debtors-in-possession, particularly when those compensation

19  decisions do not apply to senior executives of the corporation

20  or involve allocations of reorganization value; i.e., stock and

21  stock options and the like, but more typical compensation

22  elements.

23          Second, where an element of compensation has been

24  followed and applied consistently over the course of a debtor's

25  existence, both pre- and post-bankruptcy, I believe it requires

1   less scrutiny and is more ordinary course.  And indeed, in the

2   Nelson Nutraceutical case that I mentioned earlier, which

3   appears at 369 B.R. 787 (Bankr. D. Del. 2007), Judge Sontchi

4   held, when asked to look at a program like this in insolation,

5   not as part of a larger compensation program that included

6   long-term compensation, like a stock option plan or bonus-on-

7   emergence type of payments, that a program that has been

8   consistently followed pursuant to the same types of criteria

9   over a lengthy period, both pre- and post-bankruptcy, was

10  indeed in the ordinary course of business under Section 363(c).

11       He, I think correctly, noted that in Judge Lifland's

12  decision in In Re Dana Corporation, 358 B.R. 567 (Bankr.

13  S.D.N.Y. 2006), Judge Lifland was of the same mind and only

14  reviewed this type of AIP program as being out of the ordinary

15  course in the context of his review of the entire package of

16  compensation that was being proposed by Dana, including

17  emergence or reorganization bonuses and the like.

18       Why, in light of those two cases, do I apply the

19  363(b) standard here?  I do it for two reasons:

20       The first is of less significance now -- in fact, of

21  far less significance than when I originally considered a

22  motion like this in February 2006.  That is that the base, or

23  the target number upon which the AIP is to be earned, is a

24  calculation that should be very carefully tied to the

25  fundamental calculations in any bankruptcy case, which are:

1    what is the business plan?  what are the cash flows?  what are

2    the reasonable targets for the business?

3         Certainly early in a bankruptcy case, if there's a

4    dispute as to those targets, and particularly where there are a

5    lot of contingencies, such as, in the case here, the ultimate

6    resolution of the many issues that the debtors had with GM and

7    the many issues they had with their unions, I think it's

8    important for parties-in-interest to have input on, or at least

9    an ability to review and object if they believe that the debtor

10   has not properly set, those targets.  As I said, I have less

11   concern about that point now that the case is much farther

12   along and contingencies are much narrowed.

13        And I believe further that, in the context of this

14   case, where there are two very active committees, as well as a

15   very focused plan sponsor, and six well represented unions that

16   have gone through the process of painfully renegotiating their

17   collective bargaining agreements, the fundamental economic

18   premises by which the debtor is forecasting its future have

19   been extremely, thoroughly vetted and tested by the parties;

20   and, therefore, that they are reliable.

21        The second reason that I believe in this context

22   363(b) should apply is the fact that, even more than in most

23   cases, in this case what is to be paid to executives has

24   ramifications potentially to the business beyond simply the

25   cost of those payments.  That is because the -- or a key

1    element of this case has been the renegotiation of the

2    collective bargaining agreements with the debtors' six unions.

3    And given that context, it's very important to have a clear

4    record, I believe, as to the bona fides or lack thereof of

5    proposed payments to executives, so that, if other constituents

6    in the case, and most particularly union workers, have concerns

7    or doubts or complaints about the relative treatment of

8    executives, those can be aired and considered in the light of

9    day, subject to submission of evidence and with as much

10   transparency as the bankruptcy court can give, so that the

11   support for those payments is there to see if a union worker or

12   executive wants to take the time to see whether there's support

13   available.  And that goes for the media, as well, to the extent

14   the media pays attention to these sorts of things.

15        So I've continued to apply Section 363(b) here.  And

16   as the parties, I think, all agree, in applying that section I

17   need to consider, first, in particular, given that this is a

18   request to use estate resources for executives, whether there

19   has been any unfairness in terms of the proposal's involving

20   insiders, or, to the contrary, whether the proposal has been

21   developed in a fair way, preferably by objective third parties

22   and with vetting by objective third parties.

23        Based upon the declaration of -- if I can find the

24   exhibit number -- Mr. Naylor, which appears at Exhibit No. 9, I

25   believe that, internally, the debtors had an appropriately

1   objective process, led by the independent board members

2   comprising the compensation committee and informed by third-

3   party professionals to develop the proposal that they made,

4   first to the creditors' committee, and then ultimately to the

5   Court.

6         Moreover, the creditors' committee has separately

7   continued to very closely and actively consider the at-risk

8   incentive program, both as a business matter with its

9   subcommittee of committee members, as well as through its

10  professionals, including its compensation consultant.

11        As I noted earlier, the creditors' committee is a

12  fiduciary for all the unsecured creditors.  It is very much not

13  a fiduciary for management in their ongoing compensation.  It's

14  not in the business of allocating resources outside of its own

15  constituency, and only would tend to do so if it saw a benefit

16  to the unsecured creditors as a whole.  So it seems to me to be

17  indisputable that there has been a fair and objective process

18  in making this proposal by third parties and not by the

19  executives themselves, on whose behalf the proposal is aimed.

20        Having made that determination, I need to determine

21  whether the debtor has appropriately used its business judgment

22  in making the proposal, and ultimately whether the proposal is

23  supported by good business reasons.

24        The general rationale for this aspect of a

25  compensation program for the salaried executive workforce of

1  the debtors is established by the record here.  The purpose of

2  this aspect of executive compensation is, again, a short-term

3  annual (but a decreed in this bankruptcy case semiannual)

4  incentive program, tied to reasonable forecasts of the short-

5  term performance of the business.

6         Historically, it comprises roughly fifteen or sixteen

7  percent of the executives' compensation.  If one looks at hard

8  salary and annual incentive, it's about forty percent.  The

9  aggregate amount of those two components is roughly fifty-three

10 percent of the executives' compensation.

11        The process of formulating the targets to trigger the

12 bonuses here, the short-term bonus payments, is one that I

13 believe is consistent with the debtors' prior practice,

14 although it is in fact, I believe, more rigorous.  This is, I

15 believe, attributable not only to the sensitivity to this topic

16 that I believe the debtor feels, but also the pragmatic self-

17 interest of the creditors' committee.

18        The process has been one, I find, that has been based

19 upon the debtors' underlying business plans for all purposes in

20 the case, as adjusted to set a higher target in consultation

21 with the creditors' committee, and to give the committee

22 further flexibility, up to $200 million, in case the committee

23 reasonably determines that, notwithstanding all of the

24 attention that the projection process has received in this

25 case, that the targets should be further adjusted in light of

1   actual performance, which the committee has done for the last

2   half of the year by increasing the targets by roughly $36

3   million in the aggregate.

4          So simply as a matter of reasonable business judgment

5   and setting reasonable targets, I conclude that this motion and

6   this aspect of compensation meets that test.

7          I also accept Mr. Bubnovich's declaration that this

8   type of annual incentive program, this short-term program, is

9   consistent with industry practice, and that, if it were not

10   approved, would lead to a lack of -- or an inability by Delphi

11   to remain competitive in the industry.

12          As I said at oral argument, I distinguish this program

13   from longer-term incentive programs.  I do not believe these

14   short-term programs are extraordinary bonus programs, but

15   rather that they are more in line with general ideas of

16   compensation and that the executives reasonably anticipate that

17   if they meet their targets, and if their performance is

18   satisfactory or above satisfactory, they will receive this

19   element of their compensation, as they have and their

20   colleagues have since Delphi's inception.

21          They do, however, face a risk that, if they do not

22   perform up to satisfactory standards, or if the debtors'

23   performance or their division's performance, at the divisional

24   level, fall below these reasonably satisfactory standards, that

25   they will not receive this compensation.  That's an important

1    tool, or those two things are important tools for Delphi and

2    for its various constituents.

3         I believe that the evidence and the hearing has also

4    clarified that the executives under this short-term, semiannual

5    incentive are not pocketing or expropriating the concessions

6    that the union workers have made.  The benefit of those

7    concessions will go not to the executives, but to the debtors,

8    to Delphi, to be distributed as is appropriate to Delphi's

9    constituents, which include the creditors, the shareholders,

10   the beneficiaries of the benefit plans and pension plans; and,

11   in terms of a stronger Delphi, the customers and the employees.

12        Indeed, as a result of the concessions made by the

13   union workers, the targets for the executives appear to me to

14   be harder to meet, rather than easier, in that they have

15   increased, and, further, that the committee has reserved the

16   right to adjust them further by up to $200 million in light of

17   actual results.

18        That leaves, I believe, the last objection made by the

19   unions, which I've considered very carefully, and which I'll

20   try to state as follows, although I think they've stated it

21   more clearly and more eloquently.

22        I view this semiannual, short-term incentive program,

23   as I indicated at the start of the hearing, as being very close

24   to ordinary course, particularly after the vetting process by

25   the committee and my own analysis, which indicates that the

1   targets are consistent with past practice and are reasonable.

2          Ms. Mehlsack said that, in essence, ordinary

3   expectations should not be given undue deference in this case

4   because her clients and the other unions' expectations have not

5   been fulfilled in the case, and that, therefore, there should

6   be additional sacrifice beyond what is reasonably ordinarily

7   expected by the executives.

8          That's a cogent argument.  I believe, however, that it

9   is not best made or not properly made in the context of this

10  particular proposal.  I say so for two reasons:

11         One is that, again, I accept that this proposal is a

12  critical element of keeping Delphi competitive in the area of

13  compensation in the industry.  And I believe, given the near

14  ordinary course nature of this element of compensation, and

15  frankly the fact that hundreds of people have been working

16  under the reasonable assumption that they would receive it,

17  that denying the motion would hurt Delphi and be fundamentally

18  unfair to those who have so worked.  I think that harm,

19  particularly in the light of this hearing's record, more than

20  offsets the inevitable anger that will be expressed by the

21  unions and the union workers.

22         Secondly, I believe that the real focus of the

23  argument is more properly made in considering the way that the

24  debtor goes about proposing the fourth element, the fourth

25  traditional element, of executive compensation:  long-term

1   incentives, which is not before me today.  Traditionally, that

2   is where more of the value of the debtor goes to executives,

3   and where more of the value of the concessions made by the

4   unions might go to executives.

5           And I would hope that the debtor and the committees

6   will keep that in mind when they consider emergence

7   compensation or rewards or longer-term incentives.  It seems to

8   me that that's where counsel's argument may have some real

9   force.  I'm not saying that the debtors will propose anything

10  that is necessarily going to be objectionable in that area, but

11  it seems to me that it needs to be very closely tied and

12  supportable by -- or tied to and supportable by -- evidence

13  that that type of program really is necessary to retain the

14  best executives you can to do the very difficult job that they

15  will be doing over the next several years.  And my hope is that

16  you'll agree upon a process on how to do that, as opposed to

17  something more fixed in stone.

18          But again, I do not view this particular proposal

19  before me as any sort of expropriation or as anything

20  particularly unfair, but rather something that traditionally

21  would be viewed as in the ordinary course and that has been

22  tested objectively by the debtors' own third-party processes,

23  by the committee and its advisors, and ultimately, on the

24  evidence, by me.

25          So, Mr. Butler, I guess you said you were going to

1   have a revised order that actually attaches your UG

2   calculation?

3          MR. BUTLER:  Yeah.  There's just a change in the

4   exhibit.  Your Honor, that was actually in the revised order,

5   but the wrong chart was attached.

6          THE COURT:  Exhibit.  Okay.

7          MR. BUTLER:  We just need to insert the correct

8   charts.

9          THE COURT:  So if you could submit that, that will get

10  entered.

11         MR. BUTLER:  We will, Your Honor.

12         THE COURT:  Okay.

13         MR. BUTLER:  Thank you, Your Honor.

14         Your Honor, that concludes the matters scheduled for

15  today's omnibus hearing.

16         THE COURT:  Okay.  Thank you.

17     (Proceedings concluded at 1:45 p.m.)

18                              *****

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability, except where, as indicated, the Court has modified its bench ruling.

_____
Coleen Rand, AAERT Cert. No. 341
Certified Court Transcriptionist
Rand Reporting & Transcription, LLC

September 28, 2007
(Draft)
October 3, 2007
(Final)