# Exhibit A

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 04-67597 |
| | ) | |
| INTERMET CORPORATION, et al., | ) | Chapter 11 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable Marci B. McIvor |

---

## OMNIBUS OBJECTION OF INTERMET CORPORATION AND TOOL PRODUCTS, INC. TO APPLICATIONS FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES FILED BY: (A) SULLIVAN PRECISION COMPONENTS, INC., AND (B) ENGINEERED PRECISION COMPONENTS, INC.

Intermet Corporation ("Intermet") and Tool Products, Inc. ("Tool Products" and together with Intermet, the "Objecting Parties"), by their attorneys, Foley & Lardner LLP, submit this omnibus objection (the "Objection") to the Applications for Allowance and Payment of Administrative Expenses (each an "Application" and together the "Applications") filed by Sullivan Precision Components, Inc. ("Sullivan") and Engineered Precision Components, Inc. ("Engineered" and together with Sullivan, the "Claimants").

### INTRODUCTION

Neither of the Claimants are entitled to administrative expense priority for their alleged claims because neither can satisfy the requirements of 11 U.S.C. § 503(b). They cannot demonstrate that the commissions for which they seek priority arose from transactions with Intermet or Tool Products as debtors-in-possession, and cannot establish that such commissions directly and substantially benefited the Objecting Parties' estates. In fact, neither Engineered nor Sullivan have cited any evidence which might suggest that either of them actually provided post-petition services to the Objecting Parties.

To the contrary, the Claimants' claims are based entirely on unpaid "termination payments" contemplated by liquidated damages provisions in expired contracts (the "Termination Claims"), which both Claimants have already alleged and admitted (by filing Proofs of Claim) constitute pre-petition, unsecured, non-priority claims. Notably, neither Claimant cites a single case supporting its new and inconsistent position that the Termination Claims are entitled to priority.

If the Claimants' admissions against interest were not enough, Sullivan's Application appears to be frivolous. Sullivan filed a lawsuit against Intermet two days before its bankruptcy filing alleging that "[o]n or about March 5, 2004 [more than six months before the petition date in these cases (the "Petition Date")], defendant [Intermet] terminated the Contract on the alleged grounds that plaintiff refused to sign a new Manufacturer's Representative Agreement."[1] Yet Sullivan now falsely and inconsistently alleges that Intermet "decided post-petition not to enter into a new agreement." Sullivan Application at 3.[2]

In the end, both of the Applications appear to be more of an afterthought—and a last-chance effort to elevate the Claimants' priority—than a genuine attempt to collect unpaid post-Petition Date debts. For these reasons and others discussed below, both of the Applications must be denied.

---

[1] Intermet was improperly named the defendant in the lawsuit. Sullivan was a party to a contract with Tool Products, not Intermet.

[2] The Objecting Parties reserve their rights to seek sanctions against the Claimants and/or their counsel for their conduct in connection with the Applications, including, but not limited to, the fees and costs associated with responding to the Applications.

2

## BACKGROUND

### Facts As To Sullivan

From 1987 to 2004, Tool Products utilized Sullivan as one of its sales representatives. On January 1, 1999, Tool Products entered into a Manufacturer's Representative Agreement with Sullivan (the "Sullivan Agreement") by which Tool Products appointed Sullivan one of its sales representatives to solicit orders for the sale of certain products in particular geographic territories. The initial term of the Sullivan Agreement was one (1) year, but the parties contemplated that they might enter into a new agreement following expiration of the initial term.

Tool Products and Sullivan extended the Sullivan Agreement, with occasional modifications, four (4) times until March 31, 2003. See exhibits to Sullivan Application. Although the Sullivan Agreement expired on March 31, 2003, thereafter Tool Products continued to pay Sullivan and Sullivan continued to act as Tool Products' sales representative. By letter dated June 25, 2003, Tool Products offered to enter into a new agreement with Sullivan. See Exhibit A. Sullivan never responded to the June 25 letter, but the parties continued to perform under the Sullivan Agreement then in existence until March 5, 2004, at which point Tool Products initiated a termination of the Sullivan Agreement on the basis that Sullivan had elected not to enter into a new agreement and because Sullivan had not satisfactorily performed its obligations under the Sullivan Agreement. See Exhibit B. Sullivan did not provide any services to Tool Products following March 2004, nor did Tool Products continue to pay Sullivan.[3]

---

[3] Sullivan has alleged that Tool Products made one payment during the first month after termination in March 2004. See Sullivan Complaint discussed below. That allegation is under investigation, but even if true, such an overpayment should be credited against Sullivan's legitimate pre-petition claims, if any.

3

## Facts As To Engineered

From 1981 to 2004, Intermet utilized Engineered as one of its sales representatives.  On June 25, 2003, Intermet entered into a Manufacturer's Representative Agreement with Engineered for a term expiring on December 31, 2004 (the "<u>Engineered Agreement</u>" and together with the Sullivan Agreement, the "<u>Sales Rep Agreements</u>") by which Intermet appointed Engineered one of its sales representatives to solicit orders for the sale of certain products in particular geographic territories.  Engineered provided services to Intermet until December 31, 2004, when the Engineered Agreement terminated.  The parties did not renew the Engineered Agreement or enter into any alternative arrangements.

Following the Petition Date, Intermet paid Engineered in full for all post-Petition Date services rendered, through December 31, 2004.  Engineered did not provide any services to Intermet after December 31, 2004, nor did Intermet continue to pay Engineered.

## Facts Common To Both Claimants

The Sales Rep Agreements contained very similar terms and conditions, particularly as they related to liquidated damages for termination.  Section 13 of both Sales Rep Agreements provided in pertinent part:

> In the event that Company unilaterally terminates this Agreement without cause pursuant to Section 12.c., or if Representative is entitled to a payment under this Section 13 following the termination of this Agreement as set forth in Section 11, the parties agree it would be impossible to adequately measure the damages incurred by Representative.  Therefore . . . the parties agree that Representative's damages in the event of such termination without cause shall be . . . [as further explained in the Sales Rep Agreements and exhibits D thereto].

Sullivan Agreement at 10-11; Engineered Agreement at 9-10.  Because both Claimants had been with their respective employers for more than ten (10) years, the termination payment due to either of them, if applicable, would have been 730 days, or two (2) years.

4

The Claimants were entitled to the termination payments if (a) Intermet or Tool Products terminated their respective Sales Rep Agreements without cause, or (b) if the parties did not enter into new agreements within thirty (30) days after expiration of any term, and (i) if Intermet or Tool Products elected not to enter into a new agreement with the respective Claimant, or (ii) if Intermet or Tool Products offered to enter into a new agreement with the respective Claimant under terms and conditions different from the Sales Rep Agreements and the Claimants elected not to enter into such new agreement.

**Post-Termination Activity By Sullivan**

After Tool Products initiated a termination of the Sullivan Agreement in March 2004, Sullivan eventually filed a lawsuit for, among other things, breach of contract. Sullivan filed its complaint against Intermet (improperly named as the defendant, instead of Tool Products) on September 27, 2004, a mere two days before the Petition Date (the "Sullivan Complaint").[4] See Exhibit C (the Sullivan Complaint is exhibit "c" to Sullivan's Proof of Claim). In the Sullivan Complaint, Sullivan alleged, among other things, that (a) the Sullivan Agreement "was renewed every year through January 28, 2003," (b) "on or about March 5, 2004, defendant terminated the Contract on the alleged grounds that plaintiff refused to sign a new Manufacturer's Representative Agreement," and (c) except for a single alleged payment during the first month after termination (April 2004) "defendant has ceased making any additional payments under the schedule contained in the Contract." Sullivan Complaint at 2-3.

On January 17, 2005, Sullivan filed a Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $297,458 and the priority amount of $4,650, for a total

---

[4] Since then, the action has been stayed by operation of 11 U.S.C. § 362, and will be permanently enjoined on the effective date of the Objecting Parties' plans of reorganization.

5

claim of $302,108.[5]  According to a cover letter submitted with the Proof of Claim by Sullivan's counsel at the time, the claim represented Sullivan's Termination Claim, the value of which was "reflected by the last two (2) years of Sullivan's commissions in its territory.  See Tab B, Commission payments in 2002 and 2003."  See Exhibit C.  Although Sullivan apparently believed that $4,650 of the Termination Claim constituted "wages, salaries, or commissions (up to $4,650), earned within 90 days before the [petition date pursuant to 11 U.S.C. § 507(a)(3)]," Sullivan's counsel explained that "the remaining amount of Sullivan's damages is listed under unsecured [non-priority]."  See Exhibit C.

Sullivan filed its Application (seeking the exact same amount it sought in the Proof of Claim, or $302,108) on September 16, 2005, a mere ten (10) days before the confirmation hearing was to begin, almost a full year after filing the Sullivan Complaint, and more than 9 months after filing its Proof of Claim.  Although Sullivan acknowledges that the Sullivan Agreement "has expired," Sullivan purposefully omits any reference to when it expired.[6] Sullivan Application at 2-3.  With this clever omission, Sullivan falsely alleges that Tool Products, as "Debtor-in-Possession," "decided post-petition not to enter into a new agreement," and wrongly seeks payment of Sullivan's Termination Claim as an administrative expense of Tool Products' estate.  Sullivan Application at 2-3.

---

[5] On the same day, Sullivan filed another Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $716,256 and an unsecured, priority claim in the amount of $4,650 for a total claim of $721,206.  According to Sullivan, the claims are not duplicative.

[6] The void left by this omission is highlighted by three facts: (1) counsel for Sullivan is also counsel for Engineered; (2) the Sullivan Application is virtually identical to the Engineered Application; and (3) the Engineered Application specifically identifies the date of expiration of the Engineered Agreement.

**Post-Termination Activity By Engineered**

On February 9, 2005, Engineered filed a Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $314,148.64. See Exhibit D. According to the claim summary attached thereto, the claim represents Engineered's Termination Claim and was "calculated based on commissions due for calendar year 2004 times two." Id.[7]

On September 16, 2005, Engineered filed its Application seeking administrative expense priority for the Termination Claim ($314,148.64) plus "post-petition commissions of $16,380.00." Engineered Application at 3. Engineered also asserts that Intermet, as "Debtor-in-Possession," made a "post-petition decision not to enter into a new agreement" with Engineered. Engineered Application at 2-3. Engineered does not explain why it is entitled to "post-petition commissions of $16,380.00," nor does it provide any documentary support for such a claim.

**DISCUSSION**

I.    **THE CLAIMANTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY**

Section 503(b) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b). The purpose of this section is to give third parties an incentive to provide the debtor with the goods and services necessary for a successful reorganization. See In re Jartran, 732 F.2d 584, 588 (7th Cir. 1984) (disallowing administrative expense request).

---

[7] Six days earlier, on February 3, 2005, Engineered filed another Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $83,522.47 and an unsecured priority claim in the amount of $4,650. According to Engineered, the claims are not duplicative.

7

Courts in the Sixth Circuit utilize the <u>Mammoth Mart</u> test to determine whether a claimant qualifies for administrative expense priority. <u>See</u> <u>In re White Motor Corp.</u>, 831 F.2d 106, 110 (6th Cir. 1987) (citing <u>In re Mammoth Mart, Inc.</u>, 536 F.2d 950 (1st Cir. 1976)). Under this test, a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession), and (2) directly and substantially benefited the estate. <u>See</u> <u>id.</u>

A creditor provides consideration to the debtor-in-possession only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. <u>See</u> <u>id.</u>; <u>Jartran</u>, 732 F.2d at 587-88. If, on the other hand, the inducement came from the debtor before the petition date, then consideration was given to the pre-bankruptcy entity—not the debtor-in-possession or its estate. <u>See</u> <u>White Motor</u>, 831 F.2d at 110.

The terms "actual" and "necessary" must be strictly construed to minimize administrative expense claims and ensure there is a real benefit to the estate. <u>See</u> <u>In re Enron Corp.</u>, 300 B.R. 201, 207 (Bankr. S.D.N.Y. 2003). "The focus on allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss." <u>Id.</u> Therefore, the Court must look to the actual benefit to the estate as opposed to the loss sustained by a creditor. <u>Id.</u> The Claimants have the burden of proving they are entitled to priority. <u>See</u> <u>id.</u>

Here the Claimants are not entitled to administrative expense priority because (i) they have already admitted that their Termination Claims are unsecured, non-priority claims that accrued prior to the Petition Date, (ii) any consideration the Claimants provided preceded the Petition Date, (iii) the Claimants did not provide "actual" or "necessary" services which benefited the Objecting Parties' bankruptcy estates, and (iv) any post-Petition Date value the

8

Claimants did provide was grossly disproportionate to the level and amount of priority they now seek.

A.    **The Claimants Have Admitted That Their Termination Claims Are Unsecured, Non-Priority Claims That Accrued Prior To The Petition Date**

As mentioned above, both of the Claimants filed Proofs of Claim alleging that their Termination Claims are unsecured, non-priority claims that accrued prior to the Petition Date.  In its Proof of Claim, Sullivan admits that its Termination Claim is calculated from commission payments during the years 2002 and 2003, and that Sullivan allegedly qualifies for the two (2) years of termination pay Sullivan seeks based on more than ten (10) years of pre-Petition Date services it provided.  Exhibit C.  Engineered also acknowledges that its Termination Claim is based upon pre-Petition Date services, although Engineered calculates the termination payment differently.  See Exhibit D (multiplying amount of commissions earned during last year of service times two).

Other than an alleged priority claim of $4,650, Sullivan's counsel admitted that "the remaining amount of Sullivan's damages is listed under unsecured [non-priority]." Exhibit C at 2. For its part, Engineered admitted that none of its Termination Claim was entitled to priority. See Exhibit D at 1.

Finally, Sullivan filed a pre-petition lawsuit in which it specifically alleged and admitted that the Sullivan Agreement had been renewed only until the year 2003, had been formally terminated in March 2004—more than six (6) months before the Petition Date—and that Tool Products stopped making payments in early 2004. See Exhibit C (the Sullivan Complaint is exhibit "c" to Sullivan's Proof of Claim).  The Court should take judicial notice of these admissions as compelling evidence that directly negates the Claimants' assertions in the Applications.

9

**B.**     **Any Consideration Provided By Claimants Preceded The Petition Date**

The Sales Rep Agreements are clear: the consideration for any termination payments due is the years of prior service provided by the Claimants.[8]   Without tenure, neither Sullivan nor Engineered would be entitled to a termination payment.  See exhibits D to Sales Rep Agreements (demonstrating that with one year of tenure or less, no termination payments are due).  Here the Sullivan Agreement was terminated more than six months before the Petition Date and by Sullivan's own admission, the parties did not enter into a new agreement within thirty (30) days thereafter.  See generally Applications.  Sullivan gave no consideration after the Petition Date because it had none to give.

Although the Engineered Agreement expired three months after the Petition Date, Intermet has already paid Engineered in full for post-Petition Date services.  But even if Engineered held a legitimate claim for unpaid post-Petition Date commissions (it does not), any termination payment could not have accrued based upon three months of post-Petition Date service.  Again, with one year of tenure or less, the parties did not contemplate or allow a termination payment; no termination commission would be due even if Intermet had induced Engineered to perform services after the Petition Date.  Therefore, Engineered must necessarily rely upon pre-Petition Date consideration to be eligible for any termination payment.

For decades, courts have held that commission or termination payments are not entitled to priority when the consideration given for those payments occurred prior to the bankruptcy filing.  In Denton & Anderson Co. v. Induction Heating Corp., 178 F.2d 841, 842-44 (2d Cir. 1949), the Court of Appeals for the Second Circuit held that a manufacturer's representative was not

---

[8] The Sales Rep Agreements also provide that the Claimants' release of certain claims and causes of action against the Objecting Parties constitutes part of the consideration for the termination payments.  Sales Rep Agreements at ¶ 13.b.

10

entitled to priority when the representative had secured pre-petition orders for the debtor's goods which the debtor had accepted, but not yet filled. Even though the debtor filled the orders and received payment from its customers after the petition date, the Court of Appeals held that the representative's claim was not a debt incurred (or a benefit provided) after the petition date and was therefore not entitled to priority. See id. at 843-44.

As the Claimants do here, the manufacturer's representative in Denton argued that the debtor-in-possession benefited from the representative's pre-petition efforts when such efforts proved fruitful after the petition date. See Sullivan Application at 3, Engineered Application at 3 ("[the debtor] has obtained the long term benefit of [the Claimants'] sales efforts without the corresponding obligation to pay commissions"); Denton, 178 F.2d at 844. Nevertheless, the Court of Appeals rejected that argument:

> We see nothing in appellant's contention that appellant should have a preferred claim because the debtor's estate was, by appellant's services, enriched when debtor, having filled the orders, was paid. The estate was no more enriched than it would have been had the debtor bought goods on credit before filing the arrangement and sold them afterwards; and no one would argue that the unpaid seller of such goods is entitled to more than a general claim.

Denton, 178 F.2d at 844. See also In re Dynacircuits, L.P., 143 B.R. 174, 176-78 (Bankr. N.D. Ill. 1992) (same) ("The fact that a creditor's right to payment depends on a post-petition contingency is irrelevant.");[9] In re HSD Venture, 178 B.R. 831, 836-37 (Bankr. S.D Ca. 1995) (denying administrative expense priority for real estate commissions on sales negotiated pre-petition, but which closed post-petition, despite brokers' post-petition efforts which directly

---

[9] For this reason, even if the Claimants were correct that the Objecting Parties had made "post-petition decision[s]" not to enter into new agreements, such a contingency was irrelevant. See Applications at 2-3. "Instead, the relevant time frame is when the acts occurred that gave rise to [the salesman's] contingent right to payment." Dynacircuits, 143 B.R. at 177. Here, as in Dynacircuits, those acts occurred prior to the Petition Date.

11

contributed to closing of sales); In re Worldcom, Inc., 308 B.R. 157, 167 (Bankr. S.D.N.Y. 2004) (denying administrative expense priority for residual commissions based upon percentage of amount the debtor billed to customers procured by sales agent before the bankruptcy).

In Mammoth Mart, the Court of Appeals for the First Circuit held that severance pay claims were not entitled to priority when no services were performed for the debtor-in-possession: "[b]ecause the amount of the severance pay claims depends upon the length of employment, the consideration supporting appellants' claims was the services performed for Mammoth Mart over the entire period of each appellant's employment. Since no part of their present claims arise from services performed for the debtor-in-possession, no portion of appellant's claims may receive . . . priority." 536 F.2d at 955.

In In re Commercial Financial Services, Inc., 246 F.3d 1291, 1292-96 (10th Cir. 2001), the Court of Appeals for the Tenth Circuit held that former employees seeking lump-sum termination payments contemplated by their pre-petition employment contracts were not entitled to priority when the debtor terminated their employment within a month after the bankruptcy filing. Cf. Enron, 300 B.R. at 208 (denying former employee's request for priority for termination payment despite post-petition services). The Court of Appeals found that the employees' claims neither arose from transactions with the debtor-in-possession nor benefited the debtor-in-possession. Id. at 1294-96. That the employees had continued to work (and had been paid) following the bankruptcy filing was irrelevant because "it is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." Id. at 1294 (quoting Mammoth Mart) (emphasis added).

12

In <u>Commercial Financial</u>, as here, the debtor-in-possession did not induce the employees' performance by promising to pay them the lump-sum amounts if they would continue to work post-petition. <u>Id.</u> at 1295. Nor, as here, was there any evidence to suggest that the employees' work for three post-petition weeks was consideration for the large lump-sum payments at issue; that work was consideration for the payment of salaries which the employees had received in full. <u>Id.</u>[10]

Each of these cases undermines the Claimants' belated attempts to obtain priority for their Termination Claims. Any consideration for the termination payments was clearly given prior to the Petition Date. The Claimants cannot convert ten years of pre-petition effort into a two-year post-petition claim based upon a moment-in-time decision not to enter into new agreements. This is true whether the Objecting Parties made the decision prior to, or after, the Petition Date.

**C.    The Claimants Did Not Provide "Actual" Or "Necessary" Services That Benefited The Objecting Parties' Estates**

As the Claimants themselves admit, the benefit obtained from Claimants' services, if any, is "the right to continue to do business with [] customers [procured by Claimants]." Applications at 3. However, any success achieved by the Claimants in procuring customers for the Objecting Parties constituted a benefit to the pre-Petition Date debtors, not the debtors-in-possession or their estates. Once the Claimants procured a customer, any future, post-Petition Date orders placed by those customers are benefits conferred by the customers themselves, not the Claimants. The Claimants' only involvement in any new post-Petition Date orders or payments

---

[10] Engineered does not provide any backup for its alleged claim for post-Petition Date commissions, and therefore fails to meet its burden of proof. As mentioned, Intermet disputes that any post-Petition Date commissions are outstanding.

13

from customers would stem entirely from the Claimants' initial, pre-Petition Date introduction of the customer to the relevant Objecting Party.

For purposes of § 503(b), the Court must examine the benefit conferred by the party seeking allowance of an administrative expense—not future benefits that might be conferred by a third party customer, such as payments on pre-existing orders or entirely new orders. Cf. Dynacircuits, 143 B.R. at 177 (finding no benefit conferred on debtor-in-possession where post-petition payments were made on pre-petition orders).

Moreover, there is no evidence that the consideration given for the termination payments (i.e. the requisite tenure and the releases set forth in Section 13.b. of the Sales Rep Agreements) was beneficial to the debtors-in-possession in the operation of their businesses. The mere fact that the Claimants worked for the Objecting Parties for more than ten (10) years prior to the bankruptcies does not by itself result in a tangible benefit to the bankruptcy estates. Nor is there any evidence that the releases had any beneficial impact on the estates. See, e.g., Commercial Financial, 246 F.3d at 1296 (finding no benefit to debtor-in-possession where consideration for lump-sum cash payments was employees' agreement to forego other employment opportunities).

Finally, a claim based entirely on a liquidated damages clause, as here, is insufficient to satisfy the "actual" and "necessary" requirements of the statute. See, e.g., In re America West Airlines, Inc., 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (denying priority for proposed break-up fee as liquidated damages) ("Liquidated damages cannot be paid as an administrative expense under 11 U.S.C. § 503 because section 503(b) only allows payment of administrative expense claims which are for "actual" expenses that were incurred that were also beneficial to a debtor's estate."). See also In re Hupp Industries, Inc., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992)

14

(same).  The Sales Rep Agreements clearly identify the termination payments as liquidated damages:

> In the event that Company unilaterally terminates this Agreement without cause . . . the parties agree it would be impossible to adequately measure the damages incurred by Representative. Therefore . . . the parties agree that Representative's damages . . . shall be fixed[.]  . . . Such payment is (i) agreed upon as compensation for the injury suffered by Representative as a result of such termination . . . .

Sales Rep Agreements at ¶ 13.  These liquidated damages are not in any way correlated to services actually (or necessarily) rendered for the Objecting Parties' estates, and cannot be compensated as such.

**D.     Any Post-Petition Date Value The Claimants Added Was Grossly Disproportionate To The Level And Amount Of Priority They Now Seek**

Any claim for administrative expense priority must be based upon the reasonable value of the post-petition services.  See 11 U.S.C. § 503(b)(1)(A); NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) (finding that where the debtor elects to continue to receive benefits from the other party to an executory contract, the debtor is obligated to pay only for the reasonable value of those services).  To allow two years' worth of commission payments to Engineered based upon three months of post-Petition Date service would be grossly disproportionate to the reasonable value of the post-petition services.  Clearly, the same would hold true for Sullivan, which stopped providing services more than six (6) months before the Petition Date.

This is particularly true considering that on September 23, 2005, the Objecting Parties filed a motion seeking to reject the Sales Rep Agreements to the extent that they are executory contracts.  As the plain language of the Sales Rep Agreements makes clear, the Termination Claims are more properly viewed as liquidated damages resulting from the termination (or

15

rejection) of the Sales Rep Agreements—not as part of the reasonable value of any post-petition services provided.

## CONCLUSION

In the eight months since they filed their Proofs of Claim (and in the year since Sullivan filed its lawsuit), the Claimants have done nothing to change their position that they are not entitled to priority for their Termination Claims. Now, a mere ten (10) days before the confirmation hearing, as time was running out to assert a priority, the Claimants take a self-serving, inconsistent position by putting forth a half-hearted argument for priority that is factually specious and legally insufficient. For all of the foregoing reasons, both of the Applications must be denied in their entirety.

Respectfully Submitted,

INTERMET CORPORATION and
TOOL PRODUCTS, INC.

DATE: October 3, 2005                    By: s/ Frank W. DiCastri

Judy A. O'Neill (P 32142)
Laura J. Eisele (P 42949)
Frank W. DiCastri
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100

16