IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

       I, Elizabeth Adam, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

       On November 26, 2007, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via overnight delivery:

       Debtors' Objection to Intermet Corporation's Motion for Payment of Administrative Expense Claim (Docket No. 11075) [a copy of which is attached hereto as Exhibit B]

Dated: November 28, 2007

                            */s/ Elizabeth Adam*
                          Elizabeth Adam

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 28th day of November, 2007, by Elizabeth Adam, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:     */s/ Vanessa R. Quiñones*

Commission Expires:   *3/20/11*

# EXHIBIT A

Delphi Corporation
Response Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Silvinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

11/27/2007 3:45 PM
Response Service List 070530

Delphi Corporation
Special Parties

| Company | Contact | Address1 | City | State | Zip |
|---|---|---|---|---|---|
| Foley & Lardner LLP | David G. Dragich | 500 Woodward Ave., Suite 2700 | Detroit | MI | 48226 |

# EXHIBIT B

**Hearing Date And Time: November 29, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (IL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :       Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :       Case No. 05-44481 (RDD)
                                          :
                        Debtor.           :       (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO INTERMET CORPORATION'S MOTION
FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

including Delphi Automotive Systems LLC ("DAS LLC"), debtors and debtors-in-possession in

the above-captioned cases (collectively, the "Debtors"), hereby object (the "Objection") to

Intermet Corporation's Motion For Payment Of Administrative Expense Claim Pursuant To 11

U.S.C. §§ 503(a), 503(b), And 507(a)(2) (Docket No. 10874) (the "Motion") and respectfully

represent as follows:

<u>Preliminary Statement</u>

1.      The Motion has no merit.  Intermet Corporation ("Intermet") asserts the

right to a payment of an administrative expense claim, but fails to address the legal standard for

payment of such a claim in the Second Circuit: a claim arising out of a postpetition transaction

between the creditor and the debtor, which is allowable only to the extent that the consideration

supporting the claimant's right to payment was both supplied to and beneficial to the debtor's

estate in the operation of its business.  On the contrary, a claim based on a liability that was

contemplated prepetition and memorialized in a prepetition contract cannot be treated as an

administrative expense.

2.      Intermet's alleged claim does not arise from a transaction entered into with

a debtor-in-possession.  Instead, a prepetition agreement between Intermet and DAS LLC

expressly contemplated the refund that Intermet seeks to recover as an administrative expense

here.  Moreover, Intermet, in previous public filings as its own debtor-in-possession, refuted the

position it is currently advocating here with respect to the right of a prepetition contract

counterparty to receive an administrative expense claim for damages contemplated prepetition.

3.      Because the contractual relationship between the parties arose prepetition

and the consideration given by Intermet under the agreement was provided to DAS LLC

prepetition, Intermet is not entitled to an administrative expense claim, and the Motion must be

2

denied. Intermet's claim is nothing more than a prepetition contingent claim, which, as described below, has been waived and released by Intermet and is otherwise barred.

Background

4.        On December 12, 2003, DAS LLC and Intermet entered into a letter agreement (the "Agreement") under which Intermet agreed to provide an advance rebate of $600,000 to DAS LLC in consideration for future sales of the GMT-900 front steering knuckles. See Motion, Exhibit A. DAS LLC agreed under the Agreement to purchase a minimum of 750,000 sets of steering knuckles per year for five years or 100% of DAS LLC's sourced volume, whichever was greater. Contemplating that DAS LLC might not satisfy the minimum purchase requirement, the Agreement provides that if DAS LLC did not purchase the minimum amount, DAS LLC would refund the advance rebate proportionally to the shortfall based on the minimum quantity (the "Refund").

5.        Over the life of the Agreement, including prepetition years, DAS LLC did not meet the minimum purchase amount. DAS LLC, however, has not provided any formal notice that the Agreement has been terminated.[1] Although Intermet asserts that the Agreement has been terminated by virtue of the Expedited Motion for Orders Under 11 U.S.C. §363 and Fed. R. Bankr. P. 2002, 6004, and 9014 (A) (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form and Manner of Sale Notices, and (IV) Setting Sale Hearing Date and (B) Authorizing and Approving Sale by Delphi Automotive Systems LLC and Delphi Technologies, Inc. of Certain Equipment and Other Assets Primarily Used in Debtors' Saginaw Chassis Business Free and Clear of Liens ("Saginaw Chassis Asset Sale Motion"), that

---

[1]    The annual shortfall on which Intermet relies in the Motion as the basis for the refund first occurred in 2004. See Motion, Exhibit C. Intermet's argument for administrative expense priority is predicated not on when the Agreement was made, or even when the shortfall occurred, but when Intermet decided to send a letter demanding payment.

3

proposed sale includes equipment only.  DAS LLC does not intend to assign contracts as a part

of that proposed sale and the rights and obligations of DAS LLC and Intermet under the

Agreement will remain unaltered.[2]  Intermet now seeks to recover $417,200.00 of the

$600,000.00 advance rebate paid in 2003 due to DAS LLC's failure to meet the minimum

purchase requirement over the life of the Agreement.  Despite having no contractual right to

make such a demand, Intermet in a letter dated October 19, 2007 demanded payment of the

Refund within ten days.[3]  By the Motion, Intermet asks the court to allow an administrative claim

in the amount of $417,200.00, which represents the proportional shortfall contemplated under the

prepetition Agreement between DAS LLC and Intermet.

Argument

A.    <u>Intermet Is Not Entitled To An Administrative Expense Claim Under Section 503 Of The
Bankruptcy Code</u>

6.    Intermet's claim for the Refund does not qualify under section 503(b)(1)(A)

of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the

"Bankruptcy Code"), for administrative expense priority.  Section 503(b)(1)(A) provides:

> (b)  After notice and a hearing, there shall be allowed, administrative expenses,
> other than claims allowed under section 502(f) of this title, including –
> (1)(A)  the actual, necessary costs and expenses of preserving the estate . . .

11 U.S.C. § 503(b)(1)(A).  This Court has recognized that for a claim to receive administrative

expense priority under section 503(b)(1)(A) of the Bankruptcy Code, the claim must "(1) arise

---

[2]    Intermet alleges that the cessation of DAS LLC's orders constitutes termination.  A shortfall does not constitute
termination under the Agreement, as evidenced by the fact that the shortfall was the largest in 2004, and the
parties continued to perform under the Agreement.  According to Exhibit C to the Motion, DAS LLC ordered a
significant number of parts in 2007, and DAS LLC's obligations under the contract continue regardless of the
proposed sale of assets at the Saginaw facility.

[3]    Although Intermet asserts that the Debtors failed to respond to its October 19, 2007 demand for payment,
counsel for the Debtors contacted counsel for Intermet by telephone shortly after its receipt and rejected
Intermet's demand for payment of the Refund as an administrative expense claim.

4

out of a postpetition transaction between the creditor and the . . . debtor . . . and (2) be allowable only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor's estate in the operation of its business." In re A.C.E. Elevator Co., Inc., 347 B.R. 473, 480 (Bankr. S.D.N.Y. 2006) (Drain, B.J.). This Court has noted that "the claim will have a first priority only if the transaction giving rise to it occurred postpetition." Id. at 480 (quoting Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.3d 98, 101 (2d Cir. 1986)).

7.    When a liability is contemplated by the parties upon the signing of an agreement, even if a future occurrence is required to trigger that liability, the Second Circuit and lower courts in this circuit have found that resulting claims arise at the time of contract formation. See In re Manville Forest Products Corp., 209 F.3d 125, 129 (2d Cir. 2000); Pearl-Phil GMT (Far East) Ltd. v. The Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001) ("clear weight of case law in this Circuit . . . recognizes that contract-based bankruptcy claims arise at the time the contract is executed"); Cohen v. Drexel Burnham Lambert Group, Inc., 138 B.R. 687, 696 (Bankr. S.D.N.Y. 1992) ("Where the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition liability where the contract was executed prepetition."); In re Chateaugay, 102 B.R. 335, 351 (Bankr. S.D.N.Y. 1989) ("All claims against the debtor whether or not contingent or unliquidated, will be dealt with in the bankruptcy case."). The first requirement of section 503(b)(1)(A), therefore, cannot be met when a claim is based on a prepetition contract.

8.    The second requirement for a claim to receive administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code focuses on the consideration given under a contract. This Court has found that "administrative priority is not based simply on an obligation's due date, but, rather, depends on the date of the consideration underlying the claim."

5

A.C.E. Elevator Co. Inc., 347 B.R. at 481 (citing McFarlin's, 789 F.3d. at 101).  To qualify for administrative expense priority, the consideration must be given to the debtors or trustee.  Id. at 479.  Consideration provided prepetition, therefore, cannot form the basis for an administrative expense claim.

9.      Here, the Agreement was signed almost two years prior to the filing of these chapter 11 cases.  Additionally, Intermet's consideration, the advance rebate, was given at that same time 2003.  Intermet cannot, therefore, establish either of the requirements for an administrative expense claim under section 503(b)(1)(A) of the Bankruptcy Code.  Although the parties continued to operate under the Agreement postpetition, the only postpetition consideration provided by Intermet, i.e.,  the goods supplied, was paid for by DAS LLC in its ordinary course of business.[4]  Intermet's claim for the Refund cannot be given administrative priority simply because DAS LLC's shortfall continued postpetition.

10.     Intermet itself does not believe the position it is advocating.  Indeed, Intermet filed for chapter 11 protection on September 29, 2004 and remained a debtor-in-possession.  During its chapter 11 case, Intermet objected to various claimants' demands for administrative expense claims.  In one such objection,  a copy of which is attached hereto as Exhibit A, Intermet acknowledged that "[f]or decades, courts have held that commission or termination payments are not entitled to priority when the consideration given for those payments occurred prior to the bankruptcy filing." See Exhibit A at 10.[5]  Thus, following

---

[4]     According to the figures provided on  Exhibit C of the Motion, 29% of the shortfall arose in 2004, which was prepetition, and another 28% of the shortfall arose in 2005, nine months of which was prepetition.  So even if Intermet's argument were supported by the law, which it is not, that argument, that it is the Debtors' business activities that give rise to the claim of a Refund, is not supported by the facts, because a significant portion of the shortfall arose prepetition.

[5]     In its Omnibus Objection Of Intermet Corporation And Tool Products, Inc. To Applications For Allowance And Payment Of Administrative Expenses Filed By: (A) Sullivan Precision Components, Inc., And (B) Engineered

*(cont'd)*

Intermet's own argument, even if DAS LLC had expressly terminated the Agreement postpetition, the damages arising from such termination, which were contemplated prepetition, would not be entitled to priority. Additionally, despite having cited Second Circuit and other case law in its own chapter 11 case for the proposition that prepetition consideration cannot form the basis for an administrative expense claim, Intermet fails to cite any Second Circuit or Southern District of New York law in the Motion. Instead, the cases that Intermet cites in the Motion fail to address the crux of the issue, i.e., when a claim arises. Conveniently, the Motion focuses on "damages that arise from a debtor's postpetition action" without acknowledging that the law in the Second Circuit is that contingent contract claims expressly contemplated in such agreement arise at the time of contract formation, which in this case was prepetition. See Motion at 4. Moreover, Intermet does not dispute that the consideration underlying its alleged claim was provided prepetition to DAS LLC. Thus, the Motion should be denied.

B.      Intermet's Claim For The Refund Is A Prepetition Contingent Claim

11.      Because Intermet's claim for the Refund arises from a prepetition contract, it should be considered a prepetition claim. The Second Circuit has noted that the definition of a "claim" under the Bankruptcy Code is a broad one that includes contingent and unliquidated debts. See 11 U.S.C. § 101(5)(A); In re Manville, 209 F.3d at 128. The Second Circuit has "said that contingent claims refer to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the

_____

(cont'd from previous page)

Precision Components, Inc. (Bankr. E.D. Mich., Case No. 04-67597), Intermet cited one Second Circuit case and two cases from the Bankruptcy Court for the Southern District of New York. Intermet noted in that objection that the Second Circuit has held that "[e]ven though the debtor filled the orders and received payment from its customers after the petition date, . . . the representative's claim was not a debt incurred (or a benefit provided) after the petition date and was therefore not entitled to priority." Id. at 11, citing Denton & Anderson Co. v. Induction Heating Corp., 178 F.2d 841, 843-44 (2d Cir. 1949).

7

original relationship between the parties was created." In re Manville, 209 F.3d at 128-29,

(citing United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1003 (2d Cir. 1991)).

12.     The broad definition of a claim under the Bankruptcy Code "makes perfect

sense in light of the Code's design to provide for a comprehensive discharge of liabilities so that

the debtor may reorganize effectively." Pearl-Phil GMT, 266 B.R. at 581.  The Southern District

of New York has noted that "[i]f bankruptcy claims did not arise until breach, the debtor could

be faced with lingering liabilities well after reorganization." Id.

13.     Here, the Agreement was executed on December 12, 2003.  This

agreement defined the terms of the relationship between Delphi and Intermet, and it expressly

contemplated Delphi's potential failure to meet minimum quantity commitments.  Although the

right to payment may not have been fully enforceable until after the Petition Date, Intermet had a

contingent claim that arose at the time it entered into the Agreement.  Just as in Pearl-Phil GMT

(Far East) Ltd. v. The Caldor Corp., this "postpetition breach of a prepetition contract gives rise

only to a prepetition claim."  266 B.R. at 582.

C.     Intermet Waived And Is Barred From Asserting A Claim For The Refund

14.     Intermet has expressly released all prepetition claims against the Debtors

as a part of the settlement of its proofs of claim numbers 14107, 14489, and 15770 (the

"Settlement Agreement").  The Settlement Agreement states that Intermet:

> Release[s] and waive[s] any right to assert any other claim, cause of action,
> demand, or liability of every kind and nature whatsoever, including those arising
> under contract, statute, or common law, whether or not known or suspected at this
> time, which relate to the Claim and which the Releasing Parties have, ever had, or
> hereafter shall have against the Debtors based upon, arising out of, related to, or
> by reason of any event, cause, thing, act, statement, or omission occurring before
> the Petition Date.

Settlement Agreement, a copy of which is attached hereto as Exhibit B, at ¶ 1.

15.     Even if Intermet had not waived its right to assert a prepetition claim for the Refund, Intermet failed to file a proof of claim for its contingent claim related to the Refund prior to the July 31, 2006 bar date in these cases.  Because Intermet did not file a proof of claim asserting its contingent claim for the Refund, it is now barred from doing so by the Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) and Fed. R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order").  Thus, Intermet is precluded, both by the Settlement Agreement and the Bar Date Order, from asserting a prepetition claim for the Refund.

### Conclusion

16.     Intermet's contingent claim for the Refund arose at the time the parties entered into the Agreement, and Intermet gave DAS LLC consideration in the form of the advance rebate.  DAS LLC's failure to meet minimum purchase obligations was clearly contemplated under the prepetition Agreement.  The Refund, therefore, cannot form the basis of an administrative expense claim.  Accordingly, the Motion should be denied.

### Memorandum Of Law

17.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) denying the Motion and (b) granting them such other and further relief as is just.

Dated: New York, New York
       November 26, 2007

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:  /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  04-67597 |
| | ) | |
| INTERMET CORPORATION, et al., | ) | Chapter 11 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable Marci B. McIvor |

---

**OMNIBUS OBJECTION OF INTERMET CORPORATION AND TOOL PRODUCTS,
INC. TO APPLICATIONS FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSES FILED BY: (A) SULLIVAN PRECISION
COMPONENTS, INC., AND (B) ENGINEERED PRECISION COMPONENTS, INC.**

Intermet Corporation ("Intermet") and Tool Products, Inc. ("Tool Products" and together with Intermet, the "Objecting Parties"), by their attorneys, Foley & Lardner LLP, submit this omnibus objection (the "Objection") to the Applications for Allowance and Payment of Administrative Expenses (each an "Application" and together the "Applications") filed by Sullivan Precision Components, Inc. ("Sullivan") and Engineered Precision Components, Inc. ("Engineered" and together with Sullivan, the "Claimants").

## **INTRODUCTION**

Neither of the Claimants are entitled to administrative expense priority for their alleged claims because neither can satisfy the requirements of 11 U.S.C. § 503(b).  They cannot demonstrate that the commissions for which they seek priority arose from transactions with Intermet or Tool Products as debtors-in-possession, and cannot establish that such commissions directly and substantially benefited the Objecting Parties' estates.  In fact, neither Engineered nor Sullivan have cited any evidence which might suggest that either of them actually provided post-petition services to the Objecting Parties.

To the contrary, the Claimants' claims are based entirely on unpaid "termination payments" contemplated by liquidated damages provisions in expired contracts (the "Termination Claims"), which both Claimants have already alleged and admitted (by filing Proofs of Claim) constitute pre-petition, unsecured, non-priority claims.    Notably, neither Claimant cites a single case supporting its new and inconsistent position that the Termination Claims are entitled to priority.

If the Claimants' admissions against interest were not enough, Sullivan's Application appears to be frivolous.  Sullivan filed a lawsuit against Intermet two days before its bankruptcy filing alleging that "[o]n or about March 5, 2004 [more than six months before the petition date in these cases (the "Petition Date")], defendant [Intermet] terminated the Contract on the alleged grounds that plaintiff refused to sign a new Manufacturer's Representative Agreement."[1]  Yet Sullivan now falsely and inconsistently alleges that Intermet "decided post-petition not to enter into a new agreement."  Sullivan Application at 3.[2]

In the end, both of the Applications appear to be more of an afterthought—and a last-chance effort to elevate the Claimants' priority—than a genuine attempt to collect unpaid post-Petition Date debts.  For these reasons and others discussed below, both of the Applications must be denied.

---

[1] Intermet was improperly named the defendant in the lawsuit.  Sullivan was a party to a contract with Tool Products, not Intermet.

[2] The Objecting Parties reserve their rights to seek sanctions against the Claimants and/or their counsel for their conduct in connection with the Applications, including, but not limited to, the fees and costs associated with responding to the Applications.

2

## BACKGROUND

### Facts As To Sullivan

From 1987 to 2004, Tool Products utilized Sullivan as one of its sales representatives. On January 1, 1999, Tool Products entered into a Manufacturer's Representative Agreement with Sullivan (the "Sullivan Agreement") by which Tool Products appointed Sullivan one of its sales representatives to solicit orders for the sale of certain products in particular geographic territories. The initial term of the Sullivan Agreement was one (1) year, but the parties contemplated that they might enter into a new agreement following expiration of the initial term.

Tool Products and Sullivan extended the Sullivan Agreement, with occasional modifications, four (4) times until March 31, 2003. See exhibits to Sullivan Application. Although the Sullivan Agreement expired on March 31, 2003, thereafter Tool Products continued to pay Sullivan and Sullivan continued to act as Tool Products' sales representative. By letter dated June 25, 2003, Tool Products offered to enter into a new agreement with Sullivan. See Exhibit A. Sullivan never responded to the June 25 letter, but the parties continued to perform under the Sullivan Agreement then in existence until March 5, 2004, at which point Tool Products initiated a termination of the Sullivan Agreement on the basis that Sullivan had elected not to enter into a new agreement and because Sullivan had not satisfactorily performed its obligations under the Sullivan Agreement. See Exhibit B. Sullivan did not provide any services to Tool Products following March 2004, nor did Tool Products continue to pay Sullivan.[3]

---

[3] Sullivan has alleged that Tool Products made one payment during the first month after termination in March 2004. See Sullivan Complaint discussed below. That allegation is under investigation, but even if true, such an overpayment should be credited against Sullivan's legitimate pre-petition claims, if any.

3

**Facts As To Engineered**

From 1981 to 2004, Intermet utilized Engineered as one of its sales representatives. On June 25, 2003, Intermet entered into a Manufacturer's Representative Agreement with Engineered for a term expiring on December 31, 2004 (the "Engineered Agreement" and together with the Sullivan Agreement, the "Sales Rep Agreements") by which Intermet appointed Engineered one of its sales representatives to solicit orders for the sale of certain products in particular geographic territories. Engineered provided services to Intermet until December 31, 2004, when the Engineered Agreement terminated. The parties did not renew the Engineered Agreement or enter into any alternative arrangements.

Following the Petition Date, Intermet paid Engineered in full for all post-Petition Date services rendered, through December 31, 2004. Engineered did not provide any services to Intermet after December 31, 2004, nor did Intermet continue to pay Engineered.

**Facts Common To Both Claimants**

The Sales Rep Agreements contained very similar terms and conditions, particularly as they related to liquidated damages for termination. Section 13 of both Sales Rep Agreements provided in pertinent part:

> In the event that Company unilaterally terminates this Agreement without cause pursuant to Section 12.c., or if Representative is entitled to a payment under this Section 13 following the termination of this Agreement as set forth in Section 11, the parties agree it would be impossible to adequately measure the damages incurred by Representative. Therefore . . . the parties agree that Representative's damages in the event of such termination without cause shall be . . . [as further explained in the Sales Rep Agreements and exhibits D thereto].

Sullivan Agreement at 10-11; Engineered Agreement at 9-10. Because both Claimants had been with their respective employers for more than ten (10) years, the termination payment due to either of them, if applicable, would have been 730 days, or two (2) years.

4

The Claimants were entitled to the termination payments if (a) Intermet or Tool Products terminated their respective Sales Rep Agreements without cause, or (b) if the parties did not enter into new agreements within thirty (30) days after expiration of any term, and (i) if Intermet or Tool Products elected not to enter into a new agreement with the respective Claimant, or (ii) if Intermet or Tool Products offered to enter into a new agreement with the respective Claimant under terms and conditions different from the Sales Rep Agreements and the Claimants elected not to enter into such new agreement.

## Post-Termination Activity By Sullivan

After Tool Products initiated a termination of the Sullivan Agreement in March 2004, Sullivan eventually filed a lawsuit for, among other things, breach of contract. Sullivan filed its complaint against Intermet (improperly named as the defendant, instead of Tool Products) on September 27, 2004, a mere two days before the Petition Date (the "Sullivan Complaint").[4] See Exhibit C (the Sullivan Complaint is exhibit "c" to Sullivan's Proof of Claim). In the Sullivan Complaint, Sullivan alleged, among other things, that (a) the Sullivan Agreement "was renewed every year through January 28, 2003," (b) "on or about March 5, 2004, defendant terminated the Contract on the alleged grounds that plaintiff refused to sign a new Manufacturer's Representative Agreement," and (c) except for a single alleged payment during the first month after termination (April 2004) "defendant has ceased making any additional payments under the schedule contained in the Contract." Sullivan Complaint at 2-3.

On January 17, 2005, Sullivan filed a Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $297,458 and the priority amount of $4,650, for a total

---

[4] Since then, the action has been stayed by operation of 11 U.S.C. § 362, and will be permanently enjoined on the effective date of the Objecting Parties' plans of reorganization.

5

claim of $302,108.[5] According to a cover letter submitted with the Proof of Claim by Sullivan's

counsel at the time, the claim represented Sullivan's Termination Claim, the value of which was

"reflected by the last two (2) years of Sullivan's commissions in its territory. See Tab B,

Commission payments in 2002 and 2003." See Exhibit C. Although Sullivan apparently

believed that $4,650 of the Termination Claim constituted "wages, salaries, or commissions (up

to $4,650), earned within 90 days before the [petition date pursuant to 11 U.S.C. § 507(a)(3)],"

Sullivan's counsel explained that "the remaining amount of Sullivan's damages is listed under

unsecured [non-priority]." See Exhibit C.

Sullivan filed its Application (seeking the exact same amount it sought in the Proof of

Claim, or $302,108) on September 16, 2005, a mere ten (10) days before the confirmation

hearing was to begin, almost a full year after filing the Sullivan Complaint, and more than 9

months after filing its Proof of Claim. Although Sullivan acknowledges that the Sullivan

Agreement "has expired," Sullivan purposefully omits any reference to when it expired.[6]

Sullivan Application at 2-3. With this clever omission, Sullivan falsely alleges that Tool

Products, as "Debtor-in-Possession," "decided post-petition not to enter into a new agreement,"

and wrongly seeks payment of Sullivan's Termination Claim as an administrative expense of

Tool Products' estate. Sullivan Application at 2-3.

---

[5] On the same day, Sullivan filed another Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $716,256 and an unsecured, priority claim in the amount of $4,650 for a total claim of $721,206. According to Sullivan, the claims are not duplicative.

[6] The void left by this omission is highlighted by three facts: (1) counsel for Sullivan is also counsel for Engineered; (2) the Sullivan Application is virtually identical to the Engineered Application; and (3) the Engineered Application specifically identifies the date of expiration of the Engineered Agreement.

6

**Post-Termination Activity By Engineered**

On February 9, 2005, Engineered filed a Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $314,148.64. See Exhibit D. According to the claim summary attached thereto, the claim represents Engineered's Termination Claim and was "calculated based on commissions due for calendar year 2004 times two." Id.[7]

On September 16, 2005, Engineered filed its Application seeking administrative expense priority for the Termination Claim ($314,148.64) plus "post-petition commissions of $16,380.00." Engineered Application at 3. Engineered also asserts that Intermet, as "Debtor-in-Possession," made a "post-petition decision not to enter into a new agreement" with Engineered. Engineered Application at 2-3. Engineered does not explain why it is entitled to "post-petition commissions of $16,380.00," nor does it provide any documentary support for such a claim.

## DISCUSSION

## I.    THE CLAIMANTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY

Section 503(b) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b). The purpose of this section is to give third parties an incentive to provide the debtor with the goods and services necessary for a successful reorganization. See In re Jartran, 732 F.2d 584, 588 (7th Cir. 1984) (disallowing administrative expense request).

---

[7] Six days earlier, on February 3, 2005, Engineered filed another Proof of Claim asserting an unsecured, non-priority claim against Intermet in the amount of $83,522.47 and an unsecured priority claim in the amount of $4,650. According to Engineered, the claims are not duplicative.

Courts in the Sixth Circuit utilize the <u>Mammoth Mart</u> test to determine whether a claimant qualifies for administrative expense priority. <u>See</u> <u>In re White Motor Corp.</u>, 831 F.2d 106, 110 (6th Cir. 1987) (citing <u>In re Mammoth Mart, Inc.</u>, 536 F.2d 950 (1st Cir. 1976)). Under this test, a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession), and (2) directly and substantially benefited the estate. <u>See</u> <u>id.</u>

A creditor provides consideration to the debtor-in-possession only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. <u>See</u> <u>id.</u>; <u>Jartran</u>, 732 F.2d at 587-88. If, on the other hand, the inducement came from the debtor before the petition date, then consideration was given to the pre-bankruptcy entity—not the debtor-in-possession or its estate. <u>See</u> <u>White Motor</u>, 831 F.2d at 110.

The terms "actual" and "necessary" must be strictly construed to minimize administrative expense claims and ensure there is a real benefit to the estate. <u>See</u> <u>In re Enron Corp.</u>, 300 B.R. 201, 207 (Bankr. S.D.N.Y. 2003). "The focus on allowance of a priority is to prevent unjust enrichment of the estate, not to compensate the creditor for its loss." <u>Id.</u> Therefore, the Court must look to the actual benefit to the estate as opposed to the loss sustained by a creditor. <u>Id.</u> The Claimants have the burden of proving they are entitled to priority. <u>See</u> <u>id.</u>

Here the Claimants are not entitled to administrative expense priority because (i) they have already admitted that their Termination Claims are unsecured, non-priority claims that accrued prior to the Petition Date, (ii) any consideration the Claimants provided preceded the Petition Date, (iii) the Claimants did not provide "actual" or "necessary" services which benefited the Objecting Parties' bankruptcy estates, and (iv) any post-Petition Date value the

8

Claimants did provide was grossly disproportionate to the level and amount of priority they now seek.

A.    **The Claimants Have Admitted That Their Termination Claims Are Unsecured, Non-Priority Claims That Accrued Prior To The Petition Date**

As mentioned above, both of the Claimants filed Proofs of Claim alleging that their Termination Claims are unsecured, non-priority claims that accrued prior to the Petition Date. In its Proof of Claim, Sullivan admits that its Termination Claim is calculated from commission payments during the years 2002 and 2003, and that Sullivan allegedly qualifies for the two (2) years of termination pay Sullivan seeks based on more than ten (10) years of pre-Petition Date services it provided. Exhibit C. Engineered also acknowledges that its Termination Claim is based upon pre-Petition Date services, although Engineered calculates the termination payment differently. See Exhibit D (multiplying amount of commissions earned during last year of service times two).

Other than an alleged priority claim of $4,650, Sullivan's counsel admitted that "the remaining amount of Sullivan's damages is listed under unsecured [non-priority]." Exhibit C at 2. For its part, Engineered admitted that none of its Termination Claim was entitled to priority. See Exhibit D at 1.

Finally, Sullivan filed a pre-petition lawsuit in which it specifically alleged and admitted that the Sullivan Agreement had been renewed only until the year 2003, had been formally terminated in March 2004—more than six (6) months before the Petition Date—and that Tool Products stopped making payments in early 2004. See Exhibit C (the Sullivan Complaint is exhibit "c" to Sullivan's Proof of Claim). The Court should take judicial notice of these admissions as compelling evidence that directly negates the Claimants' assertions in the Applications.

9

**B.**    **Any Consideration Provided By Claimants Preceded The Petition Date**

The Sales Rep Agreements are clear: the consideration for any termination payments due is the years of prior service provided by the Claimants.[8] Without tenure, neither Sullivan nor Engineered would be entitled to a termination payment. See exhibits D to Sales Rep Agreements (demonstrating that with one year of tenure or less, no termination payments are due). Here the Sullivan Agreement was terminated more than six months before the Petition Date and by Sullivan's own admission, the parties did not enter into a new agreement within thirty (30) days thereafter. See generally Applications. Sullivan gave no consideration after the Petition Date because it had none to give.

Although the Engineered Agreement expired three months after the Petition Date, Internet has already paid Engineered in full for post-Petition Date services. But even if Engineered held a legitimate claim for unpaid post-Petition Date commissions (it does not), any termination payment could not have accrued based upon three months of post-Petition Date service. Again, with one year of tenure or less, the parties did not contemplate or allow a termination payment; no termination commission would be due even if Internet had induced Engineered to perform services after the Petition Date. Therefore, Engineered must necessarily rely upon pre-Petition Date consideration to be eligible for any termination payment.

For decades, courts have held that commission or termination payments are not entitled to priority when the consideration given for those payments occurred prior to the bankruptcy filing. In Denton & Anderson Co. v. Induction Heating Corp., 178 F.2d 841, 842-44 (2d Cir. 1949), the Court of Appeals for the Second Circuit held that a manufacturer's representative was not

---

[8] The Sales Rep Agreements also provide that the Claimants' release of certain claims and causes of action against the Objecting Parties constitutes part of the consideration for the termination payments. Sales Rep Agreements at ¶ 13.b.

10

entitled to priority when the representative had secured pre-petition orders for the debtor's goods which the debtor had accepted, but not yet filled. Even though the debtor filled the orders and received payment from its customers after the petition date, the Court of Appeals held that the representative's claim was not a debt incurred (or a benefit provided) after the petition date and was therefore not entitled to priority. See id. at 843-44.

As the Claimants do here, the manufacturer's representative in Denton argued that the debtor-in-possession benefited from the representative's pre-petition efforts when such efforts proved fruitful after the petition date. See Sullivan Application at 3, Engineered Application at 3 ("[the debtor] has obtained the long term benefit of [the Claimants'] sales efforts without the corresponding obligation to pay commissions"); Denton, 178 F.2d at 844. Nevertheless, the Court of Appeals rejected that argument:

> We see nothing in appellant's contention that appellant should have a preferred claim because the debtor's estate was, by appellant's services, enriched when debtor, having filled the orders, was paid. The estate was no more enriched than it would have been had the debtor bought goods on credit before filing the arrangement and sold them afterwards; and no one would argue that the unpaid seller of such goods is entitled to more than a general claim.

Denton, 178 F.2d at 844. See also In re Dynacircuits, L.P., 143 B.R. 174, 176-78 (Bankr. N.D. Ill. 1992) (same) ("The fact that a creditor's right to payment depends on a post-petition contingency is irrelevant.");[9] In re HSD Venture, 178 B.R. 831, 836-37 (Bankr. S.D Ca. 1995) (denying administrative expense priority for real estate commissions on sales negotiated pre-petition, but which closed post-petition, despite brokers' post-petition efforts which directly

---

[9] For this reason, even if the Claimants were correct that the Objecting Parties had made "post-petition decision[s]" not to enter into new agreements, such a contingency was irrelevant. See Applications at 2-3. "Instead, the relevant time frame is when the acts occurred that gave rise to [the salesman's] contingent right to payment." Dynacircuits, 143 B.R. at 177. Here, as in Dynacircuits, those acts occurred prior to the Petition Date.

11

contributed to closing of sales); In re Worldcom, Inc., 308 B.R. 157, 167 (Bankr. S.D.N.Y. 2004) (denying administrative expense priority for residual commissions based upon percentage of amount the debtor billed to customers procured by sales agent before the bankruptcy).

In Mammoth Mart, the Court of Appeals for the First Circuit held that severance pay claims were not entitled to priority when no services were performed for the debtor-in-possession: "[b]ecause the amount of the severance pay claims depends upon the length of employment, the consideration supporting appellants' claims was the services performed for Mammoth Mart over the entire period of each appellant's employment. Since no part of their present claims arise from services performed for the debtor-in-possession, no portion of appellant's claims may receive . . . priority." 536 F.2d at 955.

In In re Commercial Financial Services, Inc., 246 F.3d 1291, 1292-96 (10th Cir. 2001), the Court of Appeals for the Tenth Circuit held that former employees seeking lump-sum termination payments contemplated by their pre-petition employment contracts were not entitled to priority when the debtor terminated their employment within a month after the bankruptcy filing. Cf. Enron, 300 B.R. at 208 (denying former employee's request for priority for termination payment despite post-petition services). The Court of Appeals found that the employees' claims neither arose from transactions with the debtor-in-possession nor benefited the debtor-in-possession. Id. at 1294-96. That the employees had continued to work (and had been paid) following the bankruptcy filing was irrelevant because "it is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor— give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." Id. at 1294 (quoting Mammoth Mart) (emphasis added).

12

In <u>Commercial Financial</u>, as here, the debtor-in-possession did not induce the employees' performance by promising to pay them the lump-sum amounts if they would continue to work post-petition. <u>Id.</u> at 1295. Nor, as here, was there any evidence to suggest that the employees' work for three post-petition weeks was consideration for the large lump-sum payments at issue; that work was consideration for the payment of salaries which the employees had received in full. <u>Id.</u>[10]

Each of these cases undermines the Claimants' belated attempts to obtain priority for their Termination Claims. Any consideration for the termination payments was clearly given prior to the Petition Date. The Claimants cannot convert ten years of pre-petition effort into a two-year post-petition claim based upon a moment-in-time decision not to enter into new agreements. This is true whether the Objecting Parties made the decision prior to, or after, the Petition Date.

**C.    The Claimants Did Not Provide "Actual" Or "Necessary" Services That Benefited The Objecting Parties' Estates**

As the Claimants themselves admit, the benefit obtained from Claimants' services, if any, is "the right to continue to do business with [] customers [procured by Claimants]." Applications at 3. However, any success achieved by the Claimants in procuring customers for the Objecting Parties constituted a benefit to the pre-Petition Date debtors, not the debtors-in-possession or their estates. Once the Claimants procured a customer, any future, post-Petition Date orders placed by those customers are benefits conferred by the customers themselves, not the Claimants. The Claimants' only involvement in any new post-Petition Date orders or payments

---

[10] Engineered does not provide any backup for its alleged claim for post-Petition Date commissions, and therefore fails to meet its burden of proof. As mentioned, Intermet disputes that any post-Petition Date commissions are outstanding.

from customers would stem entirely from the Claimants' initial, pre-Petition Date introduction of the customer to the relevant Objecting Party.

For purposes of § 503(b), the Court must examine the benefit conferred by the party seeking allowance of an administrative expense—not future benefits that might be conferred by a third party customer, such as payments on pre-existing orders or entirely new orders. Cf. Dynacircuits, 143 B.R. at 177 (finding no benefit conferred on debtor-in-possession where post-petition payments were made on pre-petition orders).

Moreover, there is no evidence that the consideration given for the termination payments (i.e. the requisite tenure and the releases set forth in Section 13.b. of the Sales Rep Agreements) was beneficial to the debtors-in-possession in the operation of their businesses. The mere fact that the Claimants worked for the Objecting Parties for more than ten (10) years prior to the bankruptcies does not by itself result in a tangible benefit to the bankruptcy estates. Nor is there any evidence that the releases had any beneficial impact on the estates. See, e.g., Commercial Financial, 246 F.3d at 1296 (finding no benefit to debtor-in-possession where consideration for lump-sum cash payments was employees' agreement to forego other employment opportunities).

Finally, a claim based entirely on a liquidated damages clause, as here, is insufficient to satisfy the "actual" and "necessary" requirements of the statute. See, e.g., In re America West Airlines, Inc., 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (denying priority for proposed break-up fee as liquidated damages) ("Liquidated damages cannot be paid as an administrative expense under 11 U.S.C. § 503 because section 503(b) only allows payment of administrative expense claims which are for "actual" expenses that were incurred that were also beneficial to a debtor's estate."). See also In re Hupp Industries, Inc., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992)

14

(same).  The Sales Rep Agreements clearly identify the termination payments as liquidated damages:

> In the event that Company unilaterally terminates this Agreement without cause . . . the parties agree it would be impossible to adequately measure the damages incurred by Representative. Therefore . . . the parties agree that Representative's damages . . . shall be fixed[.] . . . Such payment is (i) agreed upon as compensation for the injury suffered by Representative as a result of such termination . . . .

Sales Rep Agreements at ¶ 13.  These liquidated damages are not in any way correlated to services actually (or necessarily) rendered for the Objecting Parties' estates, and cannot be compensated as such.

**D.    Any Post-Petition Date Value The Claimants Added Was Grossly Disproportionate To The Level And Amount Of Priority They Now Seek**

Any claim for administrative expense priority must be based upon the reasonable value of the post-petition services.  See 11 U.S.C. § 503(b)(1)(A); NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) (finding that where the debtor elects to continue to receive benefits from the other party to an executory contract, the debtor is obligated to pay only for the reasonable value of those services).  To allow two years' worth of commission payments to Engineered based upon three months of post-Petition Date service would be grossly disproportionate to the reasonable value of the post-petition services.  Clearly, the same would hold true for Sullivan, which stopped providing services more than six (6) months before the Petition Date.

This is particularly true considering that on September 23, 2005, the Objecting Parties filed a motion seeking to reject the Sales Rep Agreements to the extent that they are executory contracts.  As the plain language of the Sales Rep Agreements makes clear, the Termination Claims are more properly viewed as liquidated damages resulting from the termination (or

15

rejection) of the Sales Rep Agreements—not as part of the reasonable value of any post-petition services provided.

## CONCLUSION

In the eight months since they filed their Proofs of Claim (and in the year since Sullivan filed its lawsuit), the Claimants have done nothing to change their position that they are not entitled to priority for their Termination Claims. Now, a mere ten (10) days before the confirmation hearing, as time was running out to assert a priority, the Claimants take a self-serving, inconsistent position by putting forth a half-hearted argument for priority that is factually specious and legally insufficient. For all of the foregoing reasons, both of the Applications must be denied in their entirety.

Respectfully Submitted,

INTERMET CORPORATION and
TOOL PRODUCTS, INC.

DATE: October 3, 2005                    By: s/ Frank W. DiCastri

Judy A. O'Neill (P 32142)
Laura J. Eisele (P 42949)
Frank W. DiCastri
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100

16

# Exhibit B

## SETTLEMENT AGREEMENT

THIS AGREEMENT, dated as of August __, 2007 (this "Settlement Agreement"), is entered into by and between SPCP Group, L.L.C., as agent for Silver Point Capital Fund, L.P. and Silverpoint Capital Offshore Fund, Ltd., its successors and permitted assigns ("SPCP Group"), as assignee of Intermet Corporation and its wholly owned subsidiaries (collectively, "Intermet," and together with SPCP Group, the "Claimants"), and Delphi Automotive Systems LLC ("DAS LLC").

## RECITALS:

WHEREAS, on October 8, 2005 (the "Petition Date"), Delphi Corporation ("Delphi"), together with certain of its U.S. affiliates, including DAS LLC (collectively, the "Debtors"), filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Delphi Bankruptcy Court").

WHEREAS, on October 17, 2005, Intermet submitted a demand to the Debtors asserting a reclamation claim in the amount of $3,207,974.75 (the "Reclamation Demand").

WHEREAS, on July 31, 2006, SPCP Group filed proof of claim number 14489 ("Proof of Claim No. 14489") against DAS LLC, asserting an unsecured non-priority claim in the amount of $3,750,708.82 (the "Claim") arising from goods sold and services performed by Intermet prior to the Petition Date.

WHEREAS, on July 31, 2006, SPCP Group filed proof of claim number 14107 ("Proof of Claim No. 14107") against Delphi Electronics (Holding) LLC, asserting an unsecured non-priority claim in the amount of $3,750,708.82 arising from goods sold and services performed by Intermet prior to the Petition Date.

WHEREAS, on July 31, 2006, SPCP Group filed proof of claim number 15770 ("Proof of Claim No. 15770," and together with Proofs of Claim Nos. 14107 and 14489, the "Proofs of Claim") against Delphi, asserting an unsecured non-priority claim in the amount of $3,750,708.82 arising from goods sold and services performed by Intermet prior to the Petition Date.

WHEREAS, on  October 31, 2006, the Debtors objected to Proof of Claim No. 14489 pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. [5452] (the "Third Omnibus Claims Objection").

1

WHEREAS, on November 22, 2006, SPCP Group filed its Response And Objection Of SPCP Group, L.L.C., As Assignee Of Textron Fastening Systems Canada, Ltd., To Debtors' (I)Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed.R.Bankr.P. 3007 To Certain Claims (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5745) (the "First Response")

WHEREAS, on February 15, 2007, the Debtors objected to Proof of Claim Nos. 14107 and 15770 pursuant to the Debtors' Eighth Omnibus Objection (Procedural) Pursuant To 11 U.S.C. Section 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And Amended Claims, (B) Claims Duplicative Of Consolidated Trustee Claim, (C) Equity Claims, And (D) Protective Claims (Docket No. 69692) (the "Eighth Omnibus Claims Objection").

WHEREAS, on March 15, 2007 the Claimants filed the Response Of Internet Corporation And SPCP Group LLC As Assignee Of Internet Corporation To Debtors' Eighth Omnibus Objection (Procedural) Pursuant To 11 U.S.C. Section 502(B) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And Amended Claims, (B) Claim Duplicative Of Consolidated Trustee Claim, (C) Equity Claims, And (D) Protective Claims (Docket No. 7280) (together with the First Response, the "Responses").

WHEREAS, to resolve the Third and Eighth Omnibus Claims Objections with respect to the Proofs of Claim, DAS LLC and the Claimants have agreed to enter into this Settlement Agreement (the "Settlement Agreement").

WHEREAS, DAS LLC is authorized to enter into this Settlement Agreement without further Court approval or further notice, including that of the Delphi Bankruptcy Court, pursuant to that certain Amended And Restated Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 8401) entered by the Delphi Bankruptcy Court on June 26, 2007.

NOW THEREFORE, in consideration of the premises set forth above and by execution of this Settlement Agreement, DAS LLC and the Claimants agree as follows:

1. Allowed General Unsecured Non-Priority Claim And Waiver Of Rights. DAS LLC acknowledges and agrees that the Claim, as set forth in Proof of Claim No. 14489, shall be allowed against DAS LLC in the amount of Three Million Seven Hundred Thirty-Eight Thousand Seven Hundred Forty-Four Dollars and Ninety-Six Cents ($3,738,744.96). The Claim shall be treated as a prepetition general unsecured non-priority claim. The Claimants, on their behalf, and on behalf of each of their predecessors, successors, assigns, parents, subsidiaries, and affiliated companies, and each of their former, current, and future officers, directors, owners, employees, and other agents (the "Releasing Parties"), hereby acknowledge that the allowance of the Claim is in full satisfaction of the Claim and hereby waive any and all rights to assert, against any and all of the Debtors, that the Claim is anything but a prepetition general unsecured non-

2

priority claim. The Releasing Parties further release and waive any right to assert any other claim, cause of action, demand, or liability of every kind and nature whatsoever, including those arising under contract, statute, or common law, whether or not known or suspected at this time, which relate to the Claim and which the Releasing Parties have, ever had, or hereafter shall have against the Debtors based upon, arising out of, related to, or by reason of any event, cause, thing, act, statement, or omission occurring before the Petition Date.

2. <u>Disallowance And Expungement</u>. The Claimants acknowledge and agree that each of Proof of Claim Nos. 14107 and 15770 shall be disallowed and expunged in their entirety.

3. <u>Withdrawal Of Responses</u>. SPCP Group agrees that it shall withdraw the Responses to the Third and Eighth Omnibus Claims Objections with prejudice.

4. <u>Withdrawal Of Reclamation Demand</u>. The Claimants agree that they shall withdraw the Reclamation Demand with prejudice.

5. <u>Governing Law</u>. This Settlement Agreement shall be governed by, and construed and enforced in accordance with, as appropriate, the Bankruptcy Code and the laws of the State of Michigan, without regard to conflicts of law principles.

6. <u>Representations And Warranties</u>. The parties hereto acknowledge that they are executing this Settlement Agreement without reliance on any representations, warranties, or commitments other than those representations, warranties, and commitments expressly set forth in this Settlement Agreement.

7. <u>Entire Understanding</u>. This Settlement Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof. This Settlement Agreement may not be modified, altered, or amended except by an agreement in writing signed by the Debtors and the Claimants.

8. <u>No Party Deemed Drafter</u>. This Settlement Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by the Claimants and their counsel. Therefore, any ambiguous language in this Settlement Agreement shall not be construed against any particular party as the drafter of such language.

9. <u>Counterparts</u>. This Settlement Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Settlement Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Settlement Agreement.

3

**Accepted and agreed to by:**

Delphi Automotive Systems LLC

By: _____

Name: DENR ULMRUE

Title: DELPHI CLAIMS ADMUSTMAN

Dated: Sepl. 11, 2007

SPCP Group, L.L.C., as agent for Silver Point
Capital Fund, L.P. and Silverpoint Capital
Offshore Fund, Ltd., its successors and
permitted assigns

By: _____

Name:

Title:

Dated: _____, 2007

Intermet Corporation

By: _____

Name: JEFF MIHALIC

Title: PRES + CEO

Dated: AUG 30, 2007

4

**Accepted and agreed to by:**

Delphi Automotive Systems LLC

By: _____
Name:
Title:
Dated: _____ __, 2007

SPCP Group, L.L.C., as agent for Silver Point
Capital Fund, L.P. and Silverpoint Capital
Offshore Fund, Ltd., its successors and
permitted assigns

By: _____
Name:        Michael A. Gatto
Title:        Authorized Signatory
Dated: _____ __, 2007

Internet Corporation

By: _____
Name:
Title:
Dated: _____ __, 2007