1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION, ET AL,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 16, 2007

19              1:10 PM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4         Attorneys for Delphi Corporation

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR., ESQ.

9          JOHN K. LYONS, ESQ.

10         RON E. MEISLER, ESQ.

11         ALBERT L. HOGAN, III, ESQ.

12         LISA B. DIAZ, ESQ.

13

14

15   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

16         Attorneys for Delphi Corporation

17         Four Times Square

18         New York, NY 10036

19

20   BY:   KAYALYN A. MARAFIOTI

21         THOMAS J. MATZ

22

23

24

25

3

1   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

2         Attorneys for Official Committee of Equity Holders

3         One New York Plaza

4         New York, NY 10004

5

6   BY:   BONNIE K. STEINGART, LLP

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9   OFFICE OF THE UNITED STATES TRUSTEE

10        33 Whitehall Street

11        21st Floor

12        New York, NY 10004

13

14  BY:   ANDREW VELEZ-RIVERA, ESQ.

15

16

17  KIRKPATRICK & LOCKHART, PRESTON GATES ELLIS, LLP

18        Attorneys for Wilmington Trust Company,

19          Indentured Trustee

20        599 Lexington Avenue

21        New York, NY 10022

22

23  BY:   EDWARD M. FOX, ESQ.

24

25

4

1   WHITE & CASE LLP

2         Attorneys for Appaloosa and Harbingers Plan Investors

3         1155 Avenue of the Americas

4         New York, NY  10036

5

6   BY:   GERARD UZZI, ESQ.

7

8

9   LATHAM & WATKINS LLP

10        Attorneys for the Creditors' Committee

11        885 Third Avenue

12        Suite 1000

13        New York, NY 10022

14

15  BY:   MARK A. BROUDE, ESQ.

16

17

18  SIMPSON THACHER & BARTLETT, LLP

19        Attorneys for JP Morgan

20        425 Lexington Avenue

21        New York, NY 10017

22

23  BY:   KENNETH S. ZIMAN, ESQ.

24

25

5

1    GOODWIN PROCTOR LLP

2          Attorneys for Caspian Capital,

3                CastleRigg Master Investment,

4                Davidson Kempner Capital Management,

5                Elliott Associates,

6                Numeric Corporate Research and Asset Advisors,

7                Sailfish Capital Partners and White Box Advisors

8          599 Lexington Avenue

9          New York, NY 10022

10

11   BY:   ALLAN S. BRILLIAN, ESQ.

12

13   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP

14          Attorneys for Trade Committee

15          1633 Broadway

16          New York, NY 10019

17

18   BY:   ADAM L. SHIFF, ESQ.

19

20

21

22

23

24

25

6

1   MAYER BROWN LLP

2         Attorneys for Bank of America

3         1675 Broadway

4         New York, NY 10019

5

6   BY:   JEFFREY G. TOUGAS, ESQ.

7

8

9   BROWN RUDNICK BERLACK ISRAELS

10        Attorneys for Goldman Sachs

11        7 Times Square

12        New York, NY 10036

13

14  BY:   GWENDOLEN D. LONG, ESQ.

15

16

17  TOGUT, SEGAL & SEGAL LLP

18        One Penn Plaza

19        New York, NY 10119

20

21  BY:   TALLY WIENER, ESQ.

22

23  ALSO PRESENT:

24        ROBERT MOTHERSHEAD, Pro Se

25        (TELEPHONICALLY)

7

1                    P R O C E E D I N G S

2          THE COURT:  Okay.  This is Delphi Corporation.

3          MR. LYONS:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. LYONS:  John Lyons on behalf of the debtors.  And

6    I have here with me today Mr. Matz, Ms. Diaz from Skadden.

7    Then we have Karen Kraft, Dean Unrue and Janine Deluca at

8    Delphi and the claims team.

9          THE COURT:  Great.

10         MR. LYONS:  Your Honor, as is standard I would like

11   to take you through the agenda and various settlements.  I

12   believe we have one potential matter that's contested, so why

13   don't I move through the uncontested matters.

14         THE COURT:  Okay.

15         MR. LYONS:  First, Your Honor, on the agenda we have,

16   at item number 1, we have the claim objection regarding the

17   claim of Cherry GmbH.  Your Honor, that matter involves a

18   claim.  First of all, a general unsecured non-priority claim in

19   the amount of 936,000 dollars and change.  A general unsecured

20   non-priority cancellation claim in the amount of 3.4 million

21   dollars and change and a reclamation demand in the amount of

22   300,000 dollars, approximately, for a total -- aggregate total

23   of 4.7 million approximately.

24         THE COURT:  Cancellation meaning cancellation of an

25   order or something like that.

8

1          MR. LYONS:  Yes, cancellation of a purchase order.

2          THE COURT:  Okay.  All right.

3          MR. LYONS:  The parties have agreed to -- to settle

4   the claim for an allowed general, unsecured non-priority claim

5   in the amount of 1,138,762.48 against DASS LLC.  The claim at

6   Cherry GmbH has agreed to waive the cancellation claim in its

7   entirety.

8          THE COURT:  Okay.

9          MR. LYONS:  However, the claimant does want to

10  reserve the right, pursuant to 503(b) to seek administrative

11  priority status for 161,000 dollars and change, of the claim,

12  to the extent it is a valid reclamation claim.  Of course, as

13  we do with all these, we reserve all of our global defenses as

14  well.

15         THE COURT:  Right.

16         MR. LYONS:  The next item on the agenda, and this is

17  a matter that -- that our co-counsel, Togut Segal, handled is

18  the claim of Bank of America NA as assignee of Olin

19  Corporation.  We have reached a settlement agreement with Bank

20  of America.

21         Proof of claim 11660 was asserted by Olin and Bank of

22  America as the assignee in the amount of 10,605,000 dollars and

23  change against DASS LLC.  The claimant asserted that of this

24  amount 1.1 million dollars, approximately, was secured by a

25  right of setoff.  The parties have agreed to settle the claim

9

1    for an allowed general unsecured non-priority claim in the

2    amount of 9,153,420 dollars against DASS LLC.  Bank of America

3    is going to reserve right to seek reclamation for an

4    administrative priority claim in the amount of approximately

5    19,000 dollars.  And the stipulation also provides that Bank of

6    America is authorized to apply two cash in advance payments

7    that were made pre-petition towards satisfaction of open

8    invoices.  The total cash in advance payments were 3.2 million

9    dollars.  The company has confirmed that -- that from the cash

10   in advance dates that the debtors received deliveries of

11   product sufficient to cover those cash in advance payments

12   prior to the petition date.  So there's no pre or post issue

13   there in the debtor's view.

14           THE COURT:  Okay.  And -- B of A has that money as

15   opposed to Olin?

16           MR. LYONS:  Yes.  Well, you know, actually I'm not

17   sure how it worked out between the two parties.  I'm sure

18   when --

19           THE COURT:  But you're -- you're clear that you're

20   settling with the right party.

21           MR. LYONS:  We are settling -- yes, we are settling

22   with the right party.

23           THE COURT:  Okay.

24           MR. LYONS:  There's another 1.16 million that has not

25   yet been applied and they are going to apply it pursuant to the

10

1    terms of the stipulation.

2          THE COURT:  Okay.

3          MR. LYONS:  So that -- that is it for item number 2.

4    Item number 3 is the claim objection relating to ARC

5    Automotive.  This relates to proof of claim number 9151 which

6    was asserted in the amount of 1,073,000 dollars and change

7    against DASS LLC.  ARC asserted that part of that was entitled

8    to administrative expense priority as a reclamation claim.  The

9    parties have agreed to the settle the claim for 925,467 dollars

10   and forty cents against DASS LLC.  The claimant, like the

11   others, is going to reserve the right to seek administrative

12   priority status for 218,000 dollars, approximately, of the

13   claim as a valid reclamation claim subject, of course, to all

14   of our defenses.  And so that is it on item number 3.

15         THE COURT:  All right.

16         MR. LYONS:  Item number 4 is the claim of Timken US,

17   the Timken Company and SPCP Group L.L.C. as agent for the

18   Silver Point Capital Fund and Silver Point Capital Offshore

19   Fund.  We'll define these as Timken.  We've reached a

20   settlement with the Timken entities relating to proof of claim

21   number 11706 and 14319.  Claim number 11706 asserts a general

22   unsecured non-priority claim in the amount of 210,000 dollars,

23   approximately, and a secured claim in the amount of 25,000

24   dollars, approximately, against the debtors.

25         Proof of claim 14319 asserts a general unsecured non-

11

1    priority claim in the amount of, approximately, 2.8 million and

2    unsecured priority claim in the amount of, approximately, 1.8

3    million and a secured claim in the amount of 550,000 dollars,

4    approximately, against the debtors as a whole.

5            Proof of claim 11706 shall be allowed in favor of

6    SPCP as a general, unsecured non-priority claim in the amount

7    of 235,943 dollars and forty-nine cents against DASS LLC.  So

8    that takes care of proof of claim 11706.  And proof of claim

9    number 14319 shall be allowed in favor of SPC as a general

10   unsecured non-priority claim in the amount of 2,906,570 dollars

11   and seventy-four cents against DASS LLC.  So that resolves the

12   claim of the Timken entity group.

13           THE COURT:  Okay.

14           MR. LYONS:  Item number 5 on the agenda is the claim

15   of CSX Realty Development.  CSX asserted a general unsecured

16   claim in the amount of five million dollars for alleged damages

17   to CSX property in Ohio and Michigan.  The parties have agreed

18   to settle the claim for an allowed general unsecured non-

19   priority claim in the amount of 300,000 dollars against DASS

20   LLC.

21           THE COURT:  Okay.

22           MR. LYONS:  Item number 6 on the agenda is the claim

23   of Goldman Sachs Credit Partners LP, Siemans Financial

24   Services, Inc., and Siemans VDO Automotive SAS, and I'll

25   collectively refer to these parties as Siemans.  We've reached

12

1    a settlement with Siemans relating to proofs of claim number

2    2247 and 13981.

3            Proof of claim 2247 asserts a general, unsecured non-

4    priority claim in the amount of 9.3 million dollars,

5    approximately, against DASS LLC.  Proof of claim number 13981

6    asserts a general, unsecured claim of approximately 1.54

7    million against DASS LLC.  The parties have agreed to reduce

8    proof of claim number 2247, the 9.3 million dollar claim, by an

9    amount of 1,545,794 dollars and eighty-four cents.  In all

10   other respects proof of claim 2247 remains unchanged.  So the

11   claim, in essence is capped at 7.7 million dollars,

12   approximately.  The rest of that claim is still subject to an

13   ongoing claim objection.  And we may or may not be before

14   Your Honor to adjudicate that.

15           THE COURT:  Okay.

16           MR. LYONS:  Proof of claim number 13981 is allowed as

17   a general unsecured non-priority claim in the amount of

18   1,332,172 dollars and eighty-four cents against DASS LLC.  And

19   all distribution on account of this shall be made to GSCP.  And

20   we have a stipulation to that effect.  And that claim, also, is

21   being handled by Togut.

22           Item number 7 on the agenda is the claim of

23   Viasystems Group, Inc.  This relates to proof of claim number

24   12383.  Proof of claim 12383 asserts an unsecured, non-priority

25   claim in the amount of 762,104 dollars and eighty cents against

13

1    DASS LLC.  The parties have agreed that DASS LLC shall return

2    and pay to the claimant, in cash, the sum of 365,540 dollars as

3    a return of excessive debit recoupments.  The debtors had made

4    a debit recoupment post-petition when, in fact, we've -- the

5    debtors should not have.  They're reversing that and that --

6    that effects also the amount of the pre-petition claim.  So now

7    proof of claim number 12383 shall be disallowed and expunged in

8    its entirety.

9            THE COURT:  Okay.

10            MR. LYONS:  Item number 8 on the agenda is the claim

11    of ATS Ohio.  We've reached a settlement with ATS Ohio and it -

12    - and Longacre Master Fund Limited, it's assignee, relating to

13    proof of claim number 15671.  The claimant initially asserted

14    an unsecured non-priority claim for 1.6 million, approximately,

15    against DASS LLC.  We have agreed to settle it in that amount,

16    1, 621,059 dollars and thirty cents against DASS LLC.  So we

17    have a stipulation to that effect.

18            THE COURT:  Okay.

19            MR. LYONS:  Next claim, item number 9, the claim of

20    New York State Department of Taxation and Finance.  This

21    relates, in particular, to proofs of claims number 1440 and

22    9824.  The 1440 asserts a very large claim of four dollars and

23    ninety-eight cents and 192 dollars and eighty cents.  But proof

24    of claim number 9824 asserts a claim of -- a priority claim, of

25    twenty million dollars and change as well as an unsecured, non-

14

1    priority claim of 29,000 dollars.

2             Your Honor, this is actually a continuation of an

3    audit relating to use taxes.  As Your Honor may recall, way

4    back two years ago, you granted a first day order to allow the

5    debtors to pay sales and use taxes.  They've completed their

6    audit.  We're exercising our authority under that order to pay

7    six million -- approximately 6.1 million which we have already

8    paid actually, under that authority.  So as a result the claims

9    are going to be disallowed and expunged in their entirety.

10             THE COURT:  Okay.  So they've agreed?

11             MR. LYONS:  Yes.

12             THE COURT:  Okay.

13             MR. LYONS:  Yes, they have agreed.  That's all in the

14    stipulation.

15             Next claim on item number 10, Your Honor, is the

16    claim of Laura J. Marion.  We've reached a settlement with

17    Ms. Marion.  It relates to proof of claim 12219.  She asserted

18    an unliquidated claim against Delphi Corporation and the

19    parties have agreed that it should be disallowed and expunged

20    in its entirety.

21             THE COURT:  Okay.

22             MR. LYONS:  Item number 11, which is probably the

23    largest claim to date, is the claim of JPMorgan Chase.  This

24    relates to the pre-petition bank facility, Your Honor, when we

25    did put in the new take-out financing we did pay that off.  So

15

1   they're reducing proof of claim number 11047, which was 2.4

2   billion dollars and change and they are reducing that to zero.

3   However, they're preserving their rights for the

4   unliquidated -- their unliquidated indemnification claims which

5   was also authorized pursuant to the order back last January.

6   So that is still going to be preserved but the claim is now

7   reduced to zero.

8           THE COURT:  Okay.  So I'll -- I'll look forward to

9   seeing those stipulations.

10          MR. LYONS:  Yes, Your Honor.  We will hand them up,

11  per our custom, after the hearing.

12          THE COURT:  Okay.

13          MR. LYONS:  Next, Your Honor, we have -- we are to

14  the claim of Azimuth and Mothershead.  I believe Mr.

15  Mothershead is on the line.

16          THE COURT:  Is that right Mr. Mothershead?  Are you

17  on the phone?

18          MR. MOTHERSHEAD:  That is correct.

19          THE COURT:  Okay.

20          MR. LYONS:  Your Honor, I think there is an issue

21  here as to whether he received the various notices.  We do have

22  the affidavits of service and actually, Your Honor, and we're

23  waiting to get the actual delivery slips but we did serve all

24  of these pleadings by Federal Express overnight delivery.

25          THE COURT:  Well, I guess you're -- I don't know if

16

1    you -- did you see Mr. Mothershead's e-mail to chambers?

2         MR. LYONS:  I did, about half an hour ago.

3         THE COURT:  Okay.  As I -- as I read that, he

4    acknowledges receiving the notice of adjournment to today's

5    date but says that he didn't receive the response that -- the

6    supplemental reply, excuse me, dated November 6th.  I asked my

7    clerk to check the docket on that and -- and there is an

8    affidavit of service on the docket for the supplemental reply

9    by overnight delivery on November 6th.  And it's to 18530 Mack

10   Avenue, Cross Point Farms, Michigan 48236.  And there's --

11        MR. MOTHERSHEAD:  That is my business mailing

12   address, Your Honor.

13        THE COURT:  Okay.

14        MR. MOTHERSHEAD:  It is a forwarding service.

15        MR. LYONS:  And that is also the address on his proof

16   of claim form.

17        THE COURT:  Okay.

18        MR. LYONS:  Which I have a copy of if Your Honor

19   would like to review it.

20        THE COURT:  All right.  Which is the same address for

21   the notice of adjournment which was -- there's another

22   affidavit of service of that, for the notice of adjournment,

23   that went out on the 26th.

24        MR. MOTHERSHEAD:  Your Honor, I did receive notice of

25   the adjournment.  And as I stated in my e-mail, I

17

1   (indiscernible) and I have no excuse for (indiscernible) other

2   than my own failing eyesight.

3          THE COURT:  Okay.

4          MR. LYONS:  Your Honor, in addition, and this is a

5   letter -- maybe Mr. Mothershead can confirm it, but my

6   colleague Joe Orton also sent him a letter on October 10th

7   which went through the notices.  If there's any --

8          THE COURT:  No, he -- he acknowledged about the date

9   of this hearing.  Have you had a chance to read the

10  supplemental reply, Mr. Mothershead?

11         MR. MOTHERSHEAD:  Your Honor, I -- I received notice

12  from (indiscernible) in e-mail last night and I opened and

13  received that document, went to the Delphi docket, downloaded

14  that (indiscernible).  And I've been able to spend about forty-

15  five minutes looking at it.  But I did not -- had not seen or

16  was even aware of it until approximately 9 AM this morning.

17         THE COURT:  Okay.  Well, I spent a little less time

18  looking at, no offense.  I mean, one of the reasons I spent

19  less time looking at it is that it's clearly written.  So, you

20  know, I don't know, it doesn't seem to me that there are any

21  surprises in here.  The debtors' arguments are, I believe,

22  arguments in response to the contentions in the claim.  There's

23  no, sort of -- nothing, sort of, that comes out of left field

24  as far as I can see.  My -- my inclination, therefore, is to go

25  ahead with this hearing.  If it turns out, during the

18

1   discussion or during the hearing, that I feel that some point

2   hasn't been adequately addressed or Mr. Mothershead hasn't had

3   time to think about the issue, I'll -- you know, I may change

4   my mind and ask for some further submission or further hearing.

5   But at this point, I don't believe that there's a basis or a

6   reason for adjourning it.  This is something that obviously

7   Mr. Mothershead's been living with for a long time.  The proof

8   of claim lays out the arguments for going behind or over or

9   around the settlement agreement.  And again, as I said, I think

10  the debtors' reply or supplemental reply addresses those

11  arguments and doesn't raise any -- any, sort of, new additional

12  issue

13          MR. MOTHERSHEAD:  May I speak, Your Honor?

14          THE COURT:  Sure.

15          MR. MOTHERSHEAD:  I would generally have to agree

16  with you that I don't think there's anything that's directly

17  coming out of left field.  However, I do believe that there

18  are, and again this is on a very, very brief review of this

19  material, I do believe that there are some misstatements and

20  some issues of fact that here may need to be expanded upon

21  or -- or corrected.

22          THE COURT:  Okay.  Well, again, this is what's

23  referred to in the claims procedures order as a "sufficiency"

24  hearing.  So if I conclude that there are material disputed

25  facts, that is, facts that go to the essence of the claim and

19

1 that are disputed, then as far as this hearing is concerned you

2 would win and there would have to be an evidentiary hearing.

3 But I think I'd like to go through the argument to see whether,

4 in fact, there is something that's disputed that's -- that is

5 truly material in light of the -- the two issues.  And so let

6 me hear from counsel for the debtor first, and I may have some

7 questions for him.  And then I'll hear from you.  But again, as

8 I understand it, except as it may be relevant to the

9 enforceability of the settlement agreement, facts in existence

10 or facts dating from before the entry of the settlement

11 agreement are -- are irrelevant.

12    And I understand, generally, what was settled as part

13 of the settlement agreement.  And as I understand it, you have

14 two bases for contesting the enforceability of the settlement

15 agreement.  And it's those two issues that are at issue here.

16 If the debtor prevails and convinces me that those bases don't

17 fly then the settlement agreement governs.  If, on the other

18 hand, you convince me that there are open issues, then we go

19 back to the merits of the original claim that was ostensibly

20 settled in the agreement.  So I want to focus on the two

21 grounds asserted for claiming that the settlement agreement is

22 not enforceable.

23    So why don't I hear from the debtor on that?

24    MR. LYONS:  Sure, Your Honor.  You know, again, Mr. -

25 - putting aside the settlement agreement, which again was a

20

1    fully integrated contract with a general release which -- which

2    really did, you know, as Your Honor noted, clean up anything

3    that happened before that.  There was a general release and all

4    claims were released.  Mr. Mothershead was paid 19,500 dollars

5    in exchange for that.

6        Mr. Mothershead has two theories that somehow he was

7    defrauded into entering into that agreement.  You know, again,

8    Your Honor there is an integration clause that states that he

9    did not rely on any kinds of representations before he entered

10   into that agreement.  And, moreover, when you look through his

11   documents there is no false statement -- certainly no false

12   statement identified to any particular speaker, which

13   Mr. Mothershead relied upon in entering into this agreement.

14   Mr. Mothershead's fraud allegations really relate to the

15   supposed ongoing fraud that the debtors were allegedly trying

16   to cover up, Your Honor, that has no bearing on whether he was,

17   you know, duped into signing the settlement agreement.

18       He -- he gets close to that when he says, "well, the

19   debtors convinced me there was no fraud and therefore I was

20   defrauded into entering into this agreement."  Your Honor, that

21   makes no sense.  I mean, either he believed there was fraud or

22   he did not.  Why would he -- according to his theory Delphi

23   retaliated after he uncovered this -- this supposed activity

24   and therefore that's why he brought this claim.  So his

25   allegations of pinpointing a statement of material falsity and

21

1    relying on that, Your Honor, is just not in any of his papers.

2            So as a matter of law, he has not stated a reason --

3    he has not established fraud to be able to -- to get around the

4    clear language -- the clear and unambiguous language of the

5    release, especially in light of the integration clause.  So

6    that's the fraud count.

7            The other is that he was coerced into entering into

8    this agreement.  And his coercion, and again he's an officer of

9    a company.  So there's no allegation at all that the company

10   was somehow coerced into this.  So it really must relate to his

11   own personal -- his own personal estate.  And he alleges he was

12   coerced because the debtors knew he was defaulting on a

13   mortgage.  Michigan law is pretty clear, Your Honor, and we

14   cite it in our papers, that fear of financial ruin alone is

15   insufficient to establish economic arrest.

16           It must be established that the person applying the

17   coercion acted unlawfully -- and that's the Whirlpool case that

18   we cite, Your Honor.  We just don't think there are any

19   statements or allegations that would be able to establish

20   coercion under Michigan law that would give him a defense to

21   the clear and unambiguous settlement agreement.

22           Are there any other matters, Your Honor?  Those are

23   the two main points that -- that we saw in his various proofs

24   of claim and --

25           THE COURT:  Those -- those were the two issues that

22

1   I -- I identified.  But if there's something else,

2   Mr. Mothershead, you should -- you should let me know.  But

3   those were the two points that I thought your claim was based

4   on.

5            MR. MOTHERSHEAD:  And I thank you for giving me the

6   opportunity to speak.  I, again, not having the time to fully

7   understand everything that is written here by the debtors'

8   counsel, I can tell you that even on the one phrase, either Mr.

9   Butler says the lien there was fraud or he did not, I think

10  that the pathology that comes (indiscernible) language that

11  looks good on printed paper, but is not reflective of what's

12  happening nor the information that I received and that I have

13  documented in detail -- in a great amount of detail, in a

14  fifty-seven page affidavit.  Essentially, I did believe that

15  there's fraud.  I did not understand accounting rules nor the

16  accounting mechanisms that would have led, from what I thought,

17  being an observer, which was the manipulation of widespread and

18  ongoing manipulation of the floor inventory data to debtors'

19  income statement or balance sheet.  I couldn't figure that out.

20  I didn't understand it at the time.  I since have learned that

21  work that (indiscernible) are an expense to the company that's

22  attractive to the company.  And it's metered out on a first

23  (indiscernible) basis.  I did not know that at the time.  And

24  thus, my ability to (indiscernible) make changes to this data

25  that's provided by (indiscernible) on an ongoing basis could

23

1    not connect that materially to where it's going to end up at,

2    where is the money.

3         As to the fact that I was told that executives

4    (indiscernible) the CEO of the company believed that the debtor

5    was forty percent over capacity, and in rough terms we're

6    talking about approximately 500 million dollars of expense per

7    year, forty percent over capacity, and the numbers that I

8    (indiscernible) and that my client at Delphi was showing to me,

9    indicated that they were reporting ten percent.  And exerting

10   manipulation on the numbers to insure that that number did not

11   exceed ten percent.

12        THE COURT:  I guess the -- the point that I thought

13   the debtor was making there, and maybe I can restate it, is

14   that one element of fraud that needs to be shown, among

15   several, is that the claimant, you, acted in reliance upon the

16   false statement or misrepresentation.  And I guess that's where

17   I'm having a hard time understanding how -- and again, this is

18   a sufficiency hearing.

19        So I take, at its face, what you've asserted in the

20   claim noting, you know, that issue if you get beyond the

21   sufficiency hearing is something the debtor can contest.  But

22   here I'm looking at whether on the face of the claim the claim

23   can stand.  And my difficulty is seeing how, in negotiating the

24   settlement, you -- you relied on this.  It seems to me that if,

25   as your argument is, that if the debtor was concealing an

24

1   accounting practice that was unlawful, that may have

2   consequences for those who relied on the accounting practice--

3   and of course there's been multi-district litigation commenced

4   on that for a class that arguably relied on accounting errors

5   of the debtors -- but I don't see how that would have led you

6   to have settled your contract receivable with the debtor

7   differently.

8          MR. MOTHERSHEAD:  Your Honor, at the time that I was

9   going through this with the debtors I was under a great deal of

10  stress.  However, more specifically I was not aware of Chapter

11  4, section 5 of (indiscernible) nor the FFA 151, both of which,

12  effectively, forbid companies from under reporting --

13         THE COURT:  But how -- how would that have affected

14  your negotiation with the debtor on whether they owed you

15  150,000 dollars or 69,000 dollars?

16         MR. MOTHERSHEAD:  Certainly if I had known the fact

17  of the matter at the time that Delphi and its executives were,

18  at least according to public reports, had been confirmed were

19  committing inventory misrepresentations, which had been, to the

20  best of my knowledge, made public by the SEC, I would have

21  (indiscernible) to confirm what were very strong suspicions at

22  the time.  And I would have proceeded forward.

23         THE COURT:  In -- in what manner?

24         MR. MOTHERSHEAD:  I would not have settled.

25         THE COURT:  I guess, I don't understand -- how would

25

1   that information later affect your litigation against Delphi?

2          MR. MOTHERSHEAD:  I'm sorry, Your Honor, could you

3   repeat that?

4          THE COURT:  Sure.  I'm sorry.  Let me -- let me take

5   that.  You say you would not have settled; that means you would

6   have litigated with Delphi about the amount owing.  I mean,

7   that's the alternative to settling.  How would this information

8   have affected your litigation?

9          MR. MOTHERSHEAD:  Well, we would probably, quite

10  frankly, Your Honor, (indiscernible) even more difficult then

11  what I'm going through now because I would have had to have

12  proven two or three years in advance of the actual fact

13  (indiscernible) Delphi was, in fact, committing accounting

14  fraud.

15         THE COURT:  But I don't understand why that

16  contention affects your employment litigation?  Isn't that just

17  a separate issue?

18         MR. MOTHERSHEAD:  I'm sorry, Your Honor.  It's a

19  combination of having difficulty hearing you, there's a great

20  deal of buzz on the line.

21         THE COURT:  What I'm saying is, I don't see how an

22  allegation that Delphi was committing accounting fraud, on

23  the -- on the securities market, how that would affect your

24  contract litigation.

25         MR. MOTHERSHEAD:  Well, I would have had proof to

26

1   Delphi (indiscernible) sweep it under the carpet.

2           THE COURT:  But -- okay.  But -- but -- again, why

3   does that -- if I -- if I -- pretend for a second that I'm the

4   judge presiding over your litigation in State Court where you

5   say you're owed 150,000 dollars and Delphi says we've already

6   paid as much as we agreed to pay, if you said to me "and also,

7   Judge, they've committed accounting fraud on the securities

8   markets," what is your response to my statement that "that's

9   fine but you should be telling the SEC or the Michigan Attorney

10  General or, you know, filing a separate claim if you think

11  you've been damaged by that"?  I don't see how that affects, in

12  other words, the particular dispute that you had at the time.

13          MR. MOTHERSHEAD:  And again, I'm hearing the end of

14  your sentence.  (Indiscernible).

15          THE COURT:  All right.  Well, let me say it one more

16  time.

17          MR. MOTHERSHEAD:  Sorry, I'm having trouble hearing

18  you clearly, I'm sorry.

19          THE COURT:  All right.  Let me say it one more -- can

20  you hear better now?

21          MR. MOTHERSHEAD:  It's actually worse.

22          THE COURT:  It's worse now.  Can you -- how about

23  now?

24          MR. MOTHERSHEAD:  That's much better.

25          THE COURT:  All right.  That's where I was before, I

27

1    thought.  The -- the question I'm posing to you, and I'm posing

2    it to you in the form of a hypothetical.  Assume for the

3    moment, and by the way speak up if you can't hear me at any

4    time, don't let me go to the end before telling me.

5           Assume for the moment that you've not settled with

6    Delphi, that you're now in court in front of a State Court

7    judge and the dispute is whether Delphi owed you 150,000

8    dollars plus interest or whether Delphi doesn't owe you

9    anything, which is Delphi's position.  You tell the Court,

10   "Judge, I think that Delphi is committing accounting fraud and

11   that's affecting the securities markets."  What is your

12   response to the State Court judge's comment, which is "that's

13   interesting, but that's not what's before me.  You should go

14   talk to the SEC or the Michigan Attorney General, or, if you're

15   directly affected by the accounting fraud, a lawyer, about that

16   issue."

17          In other words, why is that point relevant to a

18   dispute over whether 150,000 dollars is owed, or nothing?

19          MR. MOTHERSHEAD:  I can only say, Your Honor, that in

20   that in that hypothetical situation, and the time

21   (indiscernible) towards supporting my claims for Delphi's

22   motivation to withhold payment from me and to extract a

23   confidentiality agreement from me that is unilateral and untime

24   limited and which effectively they were able to procure at a

25   cost of about ten cents on the dollar.  And essentially contain

28

1   my information in (indiscernible) disclosure and my further

2   discussions with my constituents for four years, that's what

3   they got out of it.

4           In the absence of that as a motivating factor, I

5   understand completely where you're going, is this really

6   related?  All I can tell you, sir, is that it was very related

7   at the time in that I brought the information to Delphi and

8   when it was brought to them I was immediately shown the door

9   and my bills were repudiated and my work was denegrated.  And

10  they were able to trickle along for four months after I first

11  presented my bill to them and left me in a very, very

12  diminished capacity.  So I -- but I do understand that, and I

13  guess this is the bottom line, they -- the question is, do they

14  owe me the fees or not?  I still believe they owe me the fees.

15  The question is whether I signed that agreement?  Yes, I did

16  sign that agreement.  And I know what the agreement says.

17  However, because I was not able to adequately articulate the

18  fraud or for (indiscernible), I was not able to provide any

19  compelling reason for why I thought they were perpetrating the

20  accounting misrepresentation, I didn't have -- I didn't have

21  leverage to negotiate a better settlement for myself.

22          THE COURT:  Well, but that's a different point.  I

23  don't think you're really relying on that, because if you did

24  use that type of leverage, obviously that would have been

25  improper.

29

1        MR. MOTHERSHEAD:  Yes, and I thought of that and I

2   did not try to do that.  That was part of the issue.  I felt I

3   could not go forward because I did not have proof.  I couldn't

4   understand the situation.  I very much understand the

5   situation --

6        THE COURT:  But well, what I'm saying is, I doubt and

7   I don't believe you really mean to say this, but I doubt you

8   would have gone forward and extracted more money out of Delphi

9   if you did have proof, because that would truly have been

10  wrongful.

11       MR. MOTHERSHEAD:  Well, I wouldn't go away.

12       THE COURT:  But you wouldn't have used that

13  information in a private way to collude with --

14       MR. MOTHERSHEAD:  No, I would not have.

15       THE COURT:  No, of course not.  Okay.  Why don't we

16  turn to the duress argument.

17       MR. MOTHERSHEAD:  (Indiscernible) duress argument.

18       THE COURT:  Well, the debtors' counsel dealt with the

19  fraud point and then he said that in Michigan, and this is the

20  law generally, but in Michigan duress or coercion is

21  recognized, but only in a limited way.  That is, the law

22  recognizes that parties who are negotiating agreements don't

23  literally sit across the table from each other, with exactly

24  the same amount of leverage.  One party may be wealthier than

25  another, one party may have more need for a product then the

30

1   other and that's all part of the process of negotiating an

2   agreement.  The area where someone is coerced or subject to

3   undue duress is where one party, in addition to having that

4   type of leverage, does something unlawful to the other party

5   that compels them to act.  For example, saying "if you don't

6   sign this agreement I'll break your knees," or "if you don't

7   sign this agreement I'll report you to the SEC," those sorts of

8   things.  And -- and --

9           MR. MOTHERSHEAD:  I think I can address that.

10          THE COURT:  Okay.

11          MR. MOTHERSHEAD:  I don't think I can address the

12  quoted Michigan law that fear of financial ruin alone is

13  (indiscernible).  I can't directly address that.  But what I do

14  believe is that this is (indiscernible), I was personally

15  threatened by people inside Delphi.  I was threatened by Delphi

16  purchasing that all of my leads were going to be back-billed to

17  me.  That Delphi was going to come after me from a legal

18  standpoint to get those fees back up if I proceeded with this

19  pattern.  I was told I would never work at Delphi again nor

20  to -- to the extent possible at General Motors.  And there were

21  extenuating circumstances, including the fact that I had been

22  put into a position where I had done a dramatic amount of work

23  (indiscernible) on the basis of prior course of conduct that

24  left me with no source of income and they knew it.  And whether

25  that's called financial ruin or not, I'm -- you know, I --

31

1   there's a lot of room for interpretation there.  However, I do

2   believe that the -- the fact that (indiscernible) threat, the

3   threat of back bill -- oh, at the same time to even put that

4   on, I had to go through an internal audit process at Delphi

5   that was purely manufactured in order to create additional

6   burden on me to back off of this issue.  And all of this was as

7   a result of my discussions with their attorneys and their --

8   some of their executive officers that they had material

9   inefficiencies, material weaknesses in their process related to

10  the control of their floor space inventory and that

11  (indiscernible) which was coming into law two months down the

12  road and which came into law about ten weeks after -- I'm

13  sorry, before I finally signed my settlement agreement.  I told

14  them that they have a (indiscernible) issue.  And as a result,

15  and I think it probably was happening (indiscernible), but as a

16  result of all this, that brought the full force of Delphi down

17  on top of my shoulders.

18          THE COURT:  Well, when you said physical threats,

19  what do you mean?

20          MR. MOTHERSHEAD:  One particular director inside of

21  Delphi in one very odd conversation told me how much he liked

22  guns, how much he liked shooting guns, how much he liked

23  shooting (indiscernible) and you've got to be careful because

24  things can happen to you.  And I didn't know how to take that.

25  But I can tell you that since that time I've done everything I

32

1   can to keep my personal address and phone numbers private and

2   have (indiscernible) try to go incognito as far as my personal

3   residential information.  I was concerned.  Did I really think

4   that this fellow (indiscernible) and Delphi (indiscernible),

5   I'm not sure.  But when someone says that to you these days --

6   you have to remember this is right after 9/11.  I took it

7   seriously.  So yes, there was -- there were issues beyond

8   financial issues.

9            THE COURT:  Okay.

10           MR. LYONS:  Your Honor, obviously none of this is

11   anywhere in any of his papers he's ever filed.

12           MR. MOTHERSHEAD:  That's not correct.

13           THE COURT:  Well, not the physical threat.  That's

14   not in there.  The economic point is in there.  The point about

15   leading me on to work more is in there, for several months.

16           MR. LYONS:  Again, that of course is before the

17   settlement agreement.

18           THE COURT:  Right.

19           MR. LYONS:  That's his theory.

20           THE COURT:  Right.

21           MR. LYONS:  Which, you know -- and our contention is

22   that's been released.

23           THE COURT:  Right.

24           MR. LYONS:  Your Honor, a couple of things.  I know

25   we don't have to address this now, this is a sufficiency

33

1    hearing, but obviously Delphi strongly contests all these

2    theories of fraud.  In fact, he did report them to the SEC and

3    OSHA and they found no reason to further proceed.  But that's

4    apart from the sufficiency hearing but I just want to be on

5    record.

6              THE COURT:  No, I understand.  And I've read the

7    letters attached to the -- not to the claim but to -- to

8    Mr. Mothershead's request to hold matter in abeyance.  And

9    frankly, the letters that were sent before the settlement was

10   entered into don't reference any of this.  But again, that's --

11   that's for another day.

12             Okay.  Do you have any other response?

13             MR. LYONS:  No, Your Honor, just to say, you know, in

14   looking at legal sufficiency, Your Honor, you know, applies the

15   law and determines whether the elements have been met by

16   reading, construing, obviously, in Azimuth's favor, the

17   contentions.  But, you know, for the papers and for the

18   argument today we do not believe that Azimuth has stated a

19   legally sufficient cause of action to basically vacate the

20   settlement agreement entered into by a very sophisticated

21   business person.

22             THE COURT:  Okay.  All right.  I have before me the

23   debtors' objection to the claim filed by Azimuth North America

24   LLC, who is in this hearing represented by a principal or its

25   principal, Mr. Mothershead.  The objection is premised upon a

34

1    settlement agreement that was entered into between the debtor

2    on the one hand and Azimuth and also Mr. Mothershead in his

3    individual capacity, I believe.  Let me just double check that.

4            MR. MOTHERSHEAD:  Yes, Your Honor.  That is correct.

5            THE COURT:  Okay.  Which Mr. Mothershead concedes, if

6    it were in fact binding, would dispose of this claim, in that

7    it includes a general release and the claim is premised upon

8    the very dispute that was the subject of the settlement

9    agreement, specifically, as well as, obviously, there being a

10   general release.  Mr. Mothershead's claim and his statement

11   seeking that the matter be held in abeyance, which was filed in

12   April and which I take to be a further statement in support of

13   the claim, raises two grounds for the unenforceability of the

14   settlement agreement.  The first is that Azimuth, through

15   Mr. Mothershead, was fraudulently induced by Delphi into

16   entering into the settlement agreement.  I conclude, as a

17   matter of law, in this sufficiency hearing where the standard

18   is akin to the standard for a motion to dismiss, that even were

19   the factual allegations in the claim, as amplified by the

20   additional filing by Mr. Mothershead, actually proven to be

21   true, that they would still not state a claim for fraudulent

22   inducement or misrepresentation.

23           The law on the elements of fraud or misrepresentation

24   is clear in Michigan, which governs this dispute.  And it's

25   essentially the same law throughout the country: in a claim,

35

1   that must be plead with particularity, under Rule 9(b) of the

2   Federal Rules, the claimant must show that (1) the defendants

3   made a material misrepresentation; (2) that it was false; (3)

4   that when the defendants made it the defendants knew that it

5   was made -- that it was false or made recklessly without

6   knowledge of its truth or falsity; (4) the defendants made it

7   with the intent that plaintiff would act upon it; (5) that

8   plaintiff acted in reliance upon it and (6) that plaintiff

9   suffered damages.

10          I conclude - and the colloquy with Mr. Mothershead on

11  the record today I think confirms it, that the alleged

12  misstatement or actually fraudulent omission here is not

13  something that plaintiff could have acted on in reliance.  The

14  alleged fraud or misstatement was that Delphi withheld that it

15  had engaged in fraudulent reporting or accounting practices.

16  Mr. Mothershead stated that if he had known of that statement,

17  or of that fact, he would not have entered into the settlement

18  agreement.  But it does not appear to me that it would have

19  been relevant at all to his claim for damages in that it is not

20  linked to that claim in any respect.  Clearly, he could not

21  argue that he would have entered into a better settlement

22  agreement, because that would have been a wrongful act in that

23  he would have been using what he would have learned in a

24  wrongful way to extract money from Delphi and not to report it

25  to the responsible authorities.

36

1        I note also that the claim itself and the backup does

2   not plead the alleged fraudulent communication or failure to

3   communicate with any particularity but that's really beside the

4   point, given the absence of any action in reliance on the

5   statement.

6        The other basis for contending that the settlement

7   agreement is not binding, or void, is that Mr. Mothershead was

8   allegedly coerced into entering into it.  Michigan law

9   recognizes that under certain limited circumstances a claim for

10  duress or coercion may lie to vitiate an agreement.  However,

11  it is clear under Michigan law that a claimant or a plaintiff

12  must prove that the unlawful act of another induced the

13  plaintiff to make a contract or perform some act under

14  circumstances that deprive him of his free will.  See Whirlpool

15  Corporation v Grigoleit Company, 2006 WL 1997402, at *3 (W.D.

16  Mich. July 13, 2006) (citing Hackley v. Hedley 8 N.W. 511, 512

17  -13 (Mich. 1881)).

18       The claim itself alleges economic factors that led

19  Mr. Mothershead to enter into the settlement agreement, i.e.,

20  that Delphi knew that he and his business were hard-pressed

21  financially and that Delphi had contributed to that fact by

22  asking him to work additional time -- the inference would be

23  that he would have been working for other parties or other

24  companies during that time -- without compensation.

25       I note that Mr. Mothershead is a sophisticated

37

1    business person.  He acknowledged that in the settlement

2    agreement; and the correspondence appended to his supplemental

3    papers also states in describing Azimuth "we are a small firm

4    with blue chip client credentials and experience."  I do not

5    believe that the use by Delphi of its knowledge, that Azimuth

6    and/or Mr. Mothershead were either financially strapped or that

7    Mr. Mothershead himself had health problems, which has not been

8    argued at oral argument but is asserted in the claim, would be

9    sufficient, under the law that I just quoted, to constitute

10   duress or coercion under Michigan law.

11          The agreement itself specified that it was settling

12   the claim that Mr. Mothershead had for not being paid for the

13   extra time that he contended Delphi had asked him to work, and

14   I do not believe that such an agreement bargained for between

15   sophisticated parties can subsequently be voided on the

16   allegation that one of the parties had, in fact, done exactly

17   what the agreement settled, i.e., caused the other party to

18   work on an uncompensated basis for several months.

19          So, based on the face of the claim, and the pleading

20   filed in supplement to that, I will grant the claim objection.

21          It has been alleged, at oral argument, that Mr.

22   Mothershead was physically threatened in -- in response to

23   which he entered into the settlement agreement.  Obviously a

24   physical threat that would constitute an unlawful act would

25   constitute duress or coercion under Michigan law.  I will not

38

1    accept, however, an unsworn oral representation over the phone

2    to that effect.

3          However, I would consider a motion for leave to amend

4    the proof of claim, which is obviously after the bar date, to

5    add or to amend the claim to assert such an unlawful threat.  I

6    note that filing a proof of claim is a serious act and there

7    needs to be a valid basis for it.  And that the legend at the

8    bottom of the proof of claim means something.  I also note that

9    I have denied, more than once in this case, motions to file

10   late claims or amendments to claim that added a new type of

11   claim.  So that's why I'm limiting my remarks to saying that

12   obviously Mr. Mothershead could make a motion to amend his

13   claim at this time on notice to the debtors.  And if he does

14   so, I'll consider it at that time.  But it would be limited to

15   a claim based on an allegation of physical coercion, because

16   I'm ruling today that, as filed, the claim does not sustain a

17   claim.

18         I don't know if that's entirely clear to you,

19   Mr. Mothershead.  I know you're not a lawyer, but let me

20   explain it in a little simpler terms.  You know that there was

21   a bar date set in this case by which claims had to be filed?

22         MR. MOTHERSHEAD:  I'm sorry, I'm having trouble

23   hearing you right as you -- if you could lean into the

24   microphone.

25         THE COURT:  All right.  Well, tell me if you can't

                                                                            39

1    hear me and I'll repeat what I just said.

2             MR. MOTHERSHEAD:  I can hear you great now.

3             THE COURT:  Okay.  The debtors obtained a bar date

4    order which required that all proofs of claim be submitted by a

5    specific date, which has long past.  You filed your claim,

6    apparently, within that date and that's why -- one of the

7    reasons I'm considering it today.  I have granted the debtors'

8    objection to your claim because, as filed, I conclude it does

9    not state a legally allowable claim.

10            At oral argument you made a contention that wasn't

11   stated in the claim that there were physical threats that

12   coerced you into signing the settlement agreement.  You have

13   the right to file a motion seeking to have the ability to file

14   an amended claim alleging those threats, if you believe that

15   they would give rise to a claim for coercion or duress that

16   would be sufficiently unlawful to void the settlement

17   agreement.  If you did that, the debtors would have the right

18   to object to that motion and say that it's too late.  And I

19   would decide that dispute.  But if you do decide to amend your

20   claim, that would be the only basis for it.  You can't say,

21   again, there was fraud or there was economic duress or some

22   other form of duress other than the physical duress that you've

23   identified and alleged orally.

24            MR. MOTHERSHEAD:  Excuse me, Your Honor.

25            THE COURT:  Yes.

40

1              MR. MOTHERSHEAD:  Do you mean that I would withdraw a

2      claim (indiscernible).

3              THE COURT:  No, no, your claims of -- the claim as

4      filed is disallowed because I've ruled that they don't state a

5      claim.

6              MR. MOTHERSHEAD:  Okay.

7              THE COURT:  But I'm not ruling on your physical

8      threat claim because it's really not before me in the proof of

9      claim you filed.  And I'm telling you, which I wouldn't do to a

10     lawyer because a lawyer would know this, but I'm telling you

11     there is a procedure under the Bankruptcy Code for filing a

12     request for an amended claim or a late claim and there are

13     defenses to that.  And if you want to pursue that there's a --

14     there's a, you know, process for doing that.  But the claim as

15     filed, for the reasons I've stated on the record, is

16     disallowed.  So the debtors' should submit an order to that

17     effect.

18             MR. MOTHERSHEAD:  Thank you, Your Honor.

19             THE COURT:  Okay.  Thank you. Okay.  Is there

20     anything else to be had -- heard?

21             MR. LYONS:  We were looking for the chart, Your

22     Honor, but that's the next hearing.

23             THE COURT:  the chart of --

24

25

41

1

2

3           (Continued on Next Page)

4           MR. LYONS:  Kind of, the update where we are.  So we

5   will -- that's all we have and we'll see you, I guess, December

6   6th.

7           THE COURT:  Okay.  Very well, thank you.

8           MR. LYONS:  Thank you, Your Honor.

9       (Proceedings concluded at 2:14 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

1
2
3
4
5

**I N D E X**

6
7

**RULINGS**

8

**Page**      **Line**

9

**Claim Objection**          **37**          **19**

10

**Granted**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43

1

2

3

4

5                              C E R T I F I C A T I O N

6

7      I, Pnina Eilberg, court approved transcriber, certify that the

8      foregoing is a correct transcript from the official electronic

9      sound recording of the proceedings in the above-entitled

10     matter, except where, as indicated, the Court has modified its

11     bench ruling.

12

13     _____ November 19, 2007

14     Signature of Transcriber              Date

15

16     Pnina Eilberg

17     typed or printed name

18

19

20

21

22

23

24

25