# EXHIBIT B

**THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT**

TRW Integrated Chassis Systems LLC, a Delaware limited liability company ("<u>Purchaser</u>"), Delphi Automotive Systems LLC, a Delaware limited liability company ("<u>Delphi</u>") and Delphi Technologies, Inc., a Delaware corporation ("<u>DTI</u>") enter into this Third Amendment to Asset Purchase Agreement on November ___, 2007 (this "<u>Amendment</u>").

**BACKGROUND**

A.   Purchaser, Delphi and DTI are parties to an Asset Purchase Agreement dated September 17, 2007 (as amended from time-to-time, the "<u>APA</u>").  Capitalized terms not defined in this Amendment have the meanings given in the APA and references to "Sections" in this Amendment are intended to refer to sections of the APA.

B.   The Parties have agreed to amend the APA as set forth in this Amendment.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, and covenants contained in this Amendment and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

**TERMS AND CONDITIONS**

1.   <u>Definitions</u>.

A.   The indicated definitions in the APA are amended to read as follows:

"**Canadian Agreement**" means that certain Asset Purchase Agreement dated September 17, 2007 between Delphi Canada and Purchaser, which Canadian Agreement has been terminated by Purchaser.  Certain Schedules to the Canadian Agreement are incorporated into the APA as provided in this Amendment.

"**Canadian Assets**" means the Acquired Assets as that term is defined in the Canadian Agreement. For certainty, as used in this Agreement, the term Acquired Assets includes the Canadian Assets and certain Schedules to the APA are amended to include the Canadian Assets as provided in this Amendment.

"**Other Product Facilities**" means Delphi's facility located in Spring Hill, Tennessee where certain Non-Saginaw Assets (as defined in <u>Section 1.3.A</u> below) are currently located.

B.   The following definitions are added to the APA:

"**Leased Hourly Employees**" has the meaning set forth in Section 4.2.

"**Oshawa Expense Reimbursement Amount**" means an amount equal to Delphi's documented out of pocket costs and expenses incurred in relocating the portion of the Canadian Assets identified on Schedule OO and related Tooling from Oshawa, Ontario Canada and installing and re-qualifying such assets and Tooling at the Leased Premises pursuant to a budget approved in writing by Purchaser. Unless otherwise agreed in writing by Purchaser, the maximum Oshawa Expense Reimbursement Amount is $517,000.00.

2. Deletions.    Sections 9.1.E, 9.1.F, 9.1.G and 11.7 are deleted.

3. Schedule Amendments.

   A. Schedule M to the APA is amended to add the Canadian Assets and such Amended Schedule M is attached hereto.

   B. Schedule P-1 to the APA is amended to add the Products described on Schedule P-1 to the Canadian Agreement and such amended Schedule P-1 is attached hereto.

   C. Schedule 1.3.A to the APA (Schedule of Removal of Non-Saginaw Assets) is replaced by Schedule 1.3.A to this Amendment.

   D. Schedule 3.4 to the APA (Purchase Price Allocation) is replaced by Schedule 3.4 to this Amendment.

   E. Schedule 8.1 to the APA (certain persons with Knowledge) is replaced by Schedule 8.1 to this Amendment.

4. New Schedules.

   A. Schedule OO to this Amendment is added as a new Schedule OO to the APA.

   B. Schedule 4.2.N to this Amendment is added as a new Schedule 4.2.N to the APA.

   C. Schedule 4.2.N-1 to this Amendment is added as a new Schedule 4.2.N-1 to the APA.

   D. Schedule 4.2.N-2 to this Amendment is added as a new Schedule 4.2.N-2 to the APA.

5. Acquired Assets Transaction.    Section 1.1 is amended in its entirety to read as follows:

2

"Upon the terms and subject to the conditions set forth in this Agreement at Closing (unless otherwise expressly provided in this Agreement or the Ancillary Agreements) Delphi will sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser will purchase, accept and acquire from the Delphi, the Acquired Assets free and clear of all Liens, except for liens that are referenced in Section 8.1(C)."

6. <u>New Section</u>. The following is added as <u>Section 1.10</u> of the APA:

"Prior to the Closing Date, Delphi will acquire the Canadian Assets identified on <u>Schedule OO</u> from Delphi Canada, relocate and install, and re-qualify the Canadian Assets at the Leased Premises. Purchaser shall have the right to monitor all removal, installation and re-qualification activities related to such Canadian Assets. With respect to the Canadian Assets not identified on <u>Schedule OO</u>, Delphi will remove such Canadian Assets from the Delphi's facility in Oshawa, Ontario Canada and deliver them to Purchaser at the Leased Premises on such dates and at such times as are mutually agreeable to the Parties but in any event on or before March 31, 2008. Delphi will acquire the Canadian Assets not identified on <u>Schedule OO</u> prior to their delivery to Purchaser and title to and risk of loss in respect of such Canadian Assets will remain in Delphi Canada or Delphi until such delivery. Purchaser shall have the right to monitor all removal activities related to such Canadian Assets."

7. <u>No Compete Agreement</u>.

    A. Subsection 2.2.A(i)(z) is amended in its entirety to read as follows:

"(z) prohibit Delphi or its Affiliates from selling finished goods or work-in-process inventory existing as of the Closing Date or other inventory in connection with winding down in an orderly fashion operations at Other Product Facilities, Delphi Canada's facility in Oshawa, Ontario Canada, Delphi's facility located at Needmore Road in Dayton, Ohio, or any related supplier locations as reasonably determined by Delphi; or"

    B. The following is added as Subsection 2.2.A(i)(zz):

"(zz) prohibit Delphi or its Affiliates from selling (1) Products to its Customers to the extent that such Products are manufactured at Delphi Canada's facility in Oshawa, Ontario Canada using the Canadian Assets not identified on <u>Schedule OO</u> prior to the delivery of such Canadian Assets to Purchaser, or (2) finished goods or work in process inventory existing as of the date the Canadian Assets not identified on <u>Schedule OO</u> are delivered to Purchaser."

8. <u>Purchase Price Amendments</u>.

    A. <u>Section 3.1</u> is amended in its entirety to read as follows:

3

"Subject to the terms and conditions of this Agreement, the aggregate purchase price for the Acquired Assets will be the following amount (the "Purchase Price"): (i) Twenty-Seven Million Six Hundred Thousand Dollars ($27,600,000.00); plus (ii) the Inventory Value as of the Closing Date; plus (iii) the Saltillo Expense Reimbursement Amount; plus (iv) the Oshawa Expense Reimbursement Amount."

        B.        Section 3.2.B is amended in its entirety to read as follows:

"The following portion of the Purchase Price will be paid by Purchaser to Delphi on the Closing Date in cash by wire transfer to an account designated in writing by Delphi: (u) Twenty–Seven Million Six Hundred Thousand Dollars ($27,600,000) plus (v) the Saltillo Expense Reimbursement Amount plus (w) the Oshawa Expense Reimbursement Amount plus (x) 80% of the Parties' good faith estimate of the Inventory Value as of the Closing Date based on Schedule 3.2, which reflects Inventory Value as of the last day of June 2007 (the "Inventory Partial Payment") minus (y) the Deposit minus (z) the sum of all Pre-Closing Agreement Payments."

        9.        The first sentence of Section 4.2.B is amended in its entirety to read as follows:

"Effective at Closing and subject to the terms of Section 4.2.N below, Purchaser will commence the employment of all of the active hourly employees identified on Schedule 4.2.

        10.        New Section.  The following is added as Section 4.2.N of the APA:

"(i)  Schedule 4.2.N lists the active Hourly Employees who, as of the Closing Date, are or may become eligible for traditional pension benefits under the Delphi HRP (i.e., pension benefits other than cash balance benefits provided in accordance with the Individual Retirement Plan provisions of the Delphi HRP) and their union affiliation. Notwithstanding anything to the contrary in Section 4.2 of the APA, Delphi will continue to employ the Hourly Employees listed on Schedule 4.2.N and will lease such Hourly Employees (hereinafter, the "Leased Hourly Employees") to Purchaser pursuant to the terms hereof until such time as benefit accruals under the Delphi HRP are frozen in accordance with the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee" (i.e., Attachment B of the 2007 UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring dated June 22, 2007) ("Benefit Guarantee Term Sheet"), or such later date as shall be mutually agreed to by Delphi and Purchaser, but in no event later than forty-five days following the Freeze Date (as such term is defined in the Benefit Guarantee Term Sheet) unless the Parties mutually agree otherwise (the "Lease Period"). As soon as practicable following the Freeze Date, the Leased Hourly Employees shall commence employment with Purchaser in accordance with the terms of Section 4.2 of the APA. Nothing contained herein shall cause any inactive Leased Hourly Employee to become employed by

4

Purchaser prior to the date that such Leased Hourly Employee is ready to return to active employment in accordance with Delphi's leave policies and applicable collective bargaining agreement provisions, as provided by Section 4.2 of the APA.

(ii)    In the event that an Hourly Employee that is covered by the Benefit Guarantee Term Sheet is erroneously excluded from Schedule 4.2.N, such Hourly Employee shall be added to Schedule 4.2.N at the time such error is discovered and shall be subject to the terms of this Section 4.2.N.  Similarly, in the event that an Hourly Employee has been erroneously included on Schedule 4.2.N but such Hourly Employee is not covered by the Benefit Guaranty Term Sheet, is an inactive Hourly Employee or otherwise, such Hourly Employee shall be removed from Schedule 4.2.N at the time that such error is discovered and shall not be subject to the terms of this Section 4.2.N. Schedule 4.2.N will be updated as of the Business Day immediately preceding the Closing."

(iii)    The Leased Hourly Employees will be leased by Delphi to Purchaser in accordance with the following terms:

(1)  The Leased Hourly Employees will remain exclusively the employees of Delphi but will perform services for and as directed by Purchaser.  Purchaser will provide supervision, e.g. assign work, monitor quality, maintain discipline for the Leased Hourly Employees at Purchaser's sole cost. Delphi will maintain all appropriate employment records, pay the wages and benefits and, subject to Section 4.2.N(iii)(3), otherwise maintain responsibility as the employer for each Leased Hourly Employee in accordance with the applicable collective bargaining agreements and applicable law.

(2)  Purchaser acknowledges that the Leased Hourly Employees are employed in accordance with the applicable UAW-Delphi collective bargaining agreements.  As such, Purchaser agrees to recognize seniority rights and perform its supervisory duties in accordance with the terms of the applicable UAW-Delphi collective bargaining agreements.  In the event that a Leased Hourly Employee violates any shop rule or engages in conduct adverse to Purchaser's management or control of the Business, Purchaser may take appropriate disciplinary action consistent with the applicable collective bargaining agreements.  Purchaser will report such situations to Delphi in writing as soon as practicable.  Purchaser will administer the grievance procedure.  The costs associated with administering the grievance procedure and resolving any grievance arising from Purchaser's actions, supervision, management and control of the Leased Hourly employees or otherwise arising out of or in connection with Purchaser's operation of the Business will be paid by Purchaser.

(3) During the Lease Period, Delphi will maintain, administer, and pay the wages and benefits of the Leased Hourly Employees in accordance with the applicable UAW-Delphi collective bargaining agreements and applicable law.  Purchaser will reimburse Delphi for the following costs relating to the Leased Hourly Employees: all actual payroll costs and an agreed allocation for other costs as required by the collective bargaining agreements and in accordance with Schedule 4.2.N-1 attached hereto.  Delphi shall invoice Purchaser for such charges weekly or monthly, as

5

determined by Delphi, using the Leased Hourly Employee Invoice in the form attached hereto as <u>Schedule 4.2.N-2</u>.  Payment terms shall be MNS-2 from receipt of invoice.  In the case of any questions or dispute regarding the amount of any invoice, Delphi agrees to retain and to provide to Purchaser the requisite back-up data for each of the charges on the invoice in question including employment, payroll, accounting and other records supporting such charges.  Upon request, Delphi shall make available such back-up information to Purchaser who may audit any such information to confirm the amount of any disputed invoice.  In the event that the Parties agree that the invoiced amounts are not correct, the Parties agree to adjust any previously submitted invoice to properly reflect the correct charges and the Party owing the other Party funds for such adjustment shall promptly pay or refund such amounts.

Purchaser will be responsible for all other liabilities resulting from Purchaser's supervision, management and control of the Leased Hourly Employees during the Lease Period or arising out of or in connection with Purchaser's subsequent employment of Leased Hourly Employees.

(4)  Purchaser will operate the Business during the Lease Period such that the facility, equipment, processes, and procedures associated with the Leased Hourly Employees will continue to comply with all applicable government safety standards, rules, and regulations that were complied with immediately prior to Closing. This includes standards imposed under the collective bargaining agreements as applicable.  In the event Delphi is notified of concerns regarding Purchaser's compliance with these standards, Delphi will promptly so advise Purchaser; Delphi may then review and audit Purchaser's compliance with such standards, rules and regulations to the same extent that such standards, rules and regulations were complied with immediately before Closing.

(5)  If a workers' compensation claim is filed by a Leased Hourly Employee relating to an incident occurring during the Lease Period, Delphi will administer the claim and retain liability, if any. The Parties will provide reasonable notice to the other of the pendency of any such claim.

(6)  If an intentional tort claim is filed by a Leased Hourly Employee relating to Purchaser's supervision, management or control of such Leased Hourly Employee, Purchaser will defend the claim and, except to the extent that the Leased Hourly Employee is entitled to Workers' Compensation benefits, Purchaser will hold Delphi harmless; provided, however, that this provision will not apply to the extent such claims arise as a result of any act or omission by Delphi or Delphi's employees (other than Leased Hourly Employees).  The Parties will provide reasonable notice to the other of the pendency of any such claim.

(7)  Delphi will not be required to replace any Leased Hourly Employee who permanently ceases to provide services to Delphi for any reason.

(8)  Purchaser will defend, indemnify, and hold harmless Delphi, its past and present employees, agents, representatives, shareholders, directors, officers,

6

affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs) relating to claims of any Leased Hourly Employee relating to the act or omission of Purchaser with respect to Purchaser's supervision, management or control of such Leased Hourly Employee and the acts or omission of the Leased Hourly Employee as such acts or omissions relate to or arise in connection with Purchaser's supervision, management or control of the Leased Hourly Employee or operation of the Business after Closing.

(9) Delphi will defend, indemnify, and hold harmless Purchaser, its past and present employees, agents, representatives, shareholders, directors, officers, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs) relating to claims of any Leased Hourly Employee relating to the act or omission of Delphi; provided however that this obligation will not alter or in any way limit Purchaser's obligation to reimburse Delphi in accordance with this Section 4.2N.

11. <u>Warranties of Delphi</u>.  Section 8.1.C is amended in its entirety to read as follows:

"Delphi warrants that, as of the date of delivery of the Acquired Assets, Delphi will have good and marketable title to the Acquired Assets and the Acquired Assets will be sold, assigned, transferred or delivered, as the case may be, free and clear of any Lien, as permitted under Section 363(f) of the Bankruptcy Code, except for liens asserted by the Pension Benefit Guaranty Corporation (the "PBGC") against the Canadian Assets, which to Delphi's Knowledge, are not perfected (provided that any such lien against the Canadian Assets will be subject to the terms of <u>Section 11.5.A</u> of the APA)."

12. <u>Closing Date</u>.  The reference to January 2, 2007 (sic.) in <u>Section 10.1</u> is amended to read January 2, 2008.

13. <u>Indemnification</u>.    The following is added as subpart (iii) to <u>Section 11.5.A</u> and existing subpart (iii) is renumbered as subpart (iv):

"(iii) any Claims asserted against Purchaser or the Acquired Assets (including any of the Canadian Assets) as a result of or in respect of the liens asserted against the Canadian Assets by the PBGC;"

14. <u>Bankruptcy Actions</u>.

A. The reference to the Canadian Agreement in <u>Section 12.2.A</u> is deleted.

B. The reference to October 16, 2007 in <u>Section 12.2.C</u> (the Bid Deadline) is amended to read November 27, 2007.

7

      C.      The reference to October 23, 2007 in <u>Section 12.2.H</u> (the Auction date) is amended to read December 6, 2007.

      D.      The first sentence of <u>Section 12.2.J</u> is replaced with the following: "If (x) Delphi does not receive at least one (1) Qualified Bid in addition to this Agreement, the Sale Hearing will be held before the Honorable Judge Robert Drain on November 29, 2007 at 10:00 A.M. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York (the "<u>Bankruptcy Court</u>"), and (y) Delphi receives at least one (1) Qualified Bid in addition to this Agreement, the Sale Hearing will be held before the Honorable Judge Robert Drain on December 20, 2007 at 10:00 A.M. (prevailing Eastern Time) at the Bankruptcy Court; but the foregoing Sale Hearings may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the applicable Sale Hearing. Likewise, if Delphi receives at least one (1) Qualified Bid in addition to this Agreement, the objection deadline regarding the approval of the Successful Bidder will be December 13, 2007."

      E.      The references to December 15, 2007 in <u>Section 13.2.C</u> (deadline for entry of Sale Approval Order) are amended to read December 30, 2007.

15.    <u>General Terms</u>.

      A.      Except as amended hereby, all terms and conditions of the APA remain in full force and effect.

      B.      More than one counterpart of this Amendment may be executed by the Parties, and each fully executed counterpart will be deemed and original.

**TRW INTEGRATED CHASSIS SYSTEMS LLC**

By:_____

Print Name: _____

Its:_____

8

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____

Print Name: _____

Its:_____


**DELPHI TECHNOLOGIES, INC.**

By:_____

Print Name: _____

Its:_____

9