TOGUT, SEGAL & SEGAL LLP,          **HEARING DATE:**          **February 26, 2008**
Conflicts Counsel for              **HEARING TIME:**                    **10:00 A.M.**
 Debtors and Debtors in Possession **OBJECTION DEADLINE:**    **February 19, 2008**
One Penn Plaza, Suite 3335
New York, NY  10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                          :
In re                                     :          Chapter 11
                                          :
    DELPHI CORPORATION, *et al.*,         :          Case No. 05-44481 (RDD)
                                          :
                         Debtors.         :          (Jointly Administered)
                                          :
-------------------------------------------------------------X

**SIXTH APPLICATION OF TOGUT, SEGAL & SEGAL LLP FOR AN
ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES RENDERED
AS CONFLICTS COUNSEL FOR THE DEBTORS FOR THE PERIOD JUNE 1, 2007
THROUGH SEPTEMBER 30, 2007 AND FOR REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        Togut, Segal & Segal LLP ("TS&S" or "Applicant"), as conflicts counsel for

Delphi Corporation ("Delphi") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors"), respectfully makes this application (the "Sixth

Application") for an allowance of interim compensation for professional services

rendered during the period of June 1, 2007 through and including September 30, 2007

(the "Sixth Interim Period"), and for reimbursement of expenses incurred in connection

with such services.  In support of this Application, TS&S states:

<u>**PRELIMINARY STATEMENT**</u>

        During the Sixth Interim Period, TS&S expended considerable effort to

assist the Debtors in the identification, investigation and preservation of potential

avoidance claims.  TS&S worked closely with the Debtors and their other retained

professionals to develop and execute a work plan to preserve avoidance claims and to obtain Bankruptcy Court approval of procedures to govern avoidance claims.  TS&S commenced nearly 750 adversary proceedings, under seal and in accordance with this Court's Order, and obtained tolling agreements from various parties, all to preserve avoidance claims in favor of the estate totaling more than $2.6 billion.  All of this was accomplished during the Sixth Interim Period.

During the Sixth Interim Period, Applicant also helped the Debtors to resolve objections to proofs of claim and achieved settlements that reduced claims by more than $129.6 million.

TS&S also continued to provide other legal services to assist the Debtors including, without limitation, the settlement of setoff claims which were asserted by customers and vendors who sought to withhold payments due to the Debtors.  As part of Applicant's efforts to resolve these claims during the Sixth Interim Period, Applicant helped the Debtors to identify and collect approximately $1.5 million of trade accounts receivable that were being withheld by setoff claimants above the amount of their allowable setoff claims.  Since the Initial Filing Date (defined below), Applicant has helped the Debtors to collect more than $34.5 million of excess trade accounts receivable from setoff claimants and to settle more than $219.1 million of setoff claims.

In addition, and as more fully described below, TS&S continued to assist the Debtors with:  (i) the enforcement of pre-petition supply agreements to ensure continued deliveries of product for the Debtors' "just in time" inventory system and (ii) the resolution of disputes with certain vendors which demanded post-petition payment on account of pre-petition obligations.

## I.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

1.    This Application is made pursuant to section 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of Bankruptcy Procedure, and the November 4, 2005 Order of the Court establishing procedures for compensation and reimbursement of professionals, as amended (the "Administrative Fee Order"), for an allowance of interim compensation for services rendered to the Debtors during the Sixth Interim Period in the amount of $1,070,689, and for reimbursement of expenses in the amount of $6,996.27.

2.    TS&S attorneys and paraprofessionals expended a total of 2,453.2 hours during the Sixth Interim Period.  A schedule setting forth the number of hours expended by the firm's partners, counsel, associates and paraprofessionals, their respective hourly rates, and the year in which each attorney was admitted to practice is attached as Exhibit "1."  A schedule specifying the type of expenses for which TS&S is seeking reimbursement and the total amount of each category is attached as Exhibit "2." To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Sixth Interim Period, but are not processed until after the date of this Application, TS&S reserves the right to request additional compensation and reimbursement in a future application.

3.    TS&S maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated detailed itemization of the expenses incurred, have been filed electronically with the Clerk of the Bankruptcy Court for the Southern District of New York (the "Court") as a

3

supplement to this Application and furnished to the service parties who are identified in the Administrative Order.

4.    On April 26, 2006, TS&S filed its first application (the "First Application") for an award of interim compensation in the amount of $789,874 and reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").

5.    On July 27, 2006, TS&S filed its second application (the "Second Application") for an award of interim compensation in the amount of $1,045,443.50 and reimbursement of expenses of $13,940.08 for the period of February 1, 2006 through and including May 31, 2006 (the "Second Interim Period").

6.    On December 5, 2006, TS&S filed its third application (the "Third Application," together with the First Application and the Second Application, the "Prior Applications") for an award of interim compensation in the amount of $776,175.50 and reimbursement of expenses of $4,879.63 for the period of June 1, 2006 through and including September 30, 2006 (the "Third Interim Period," together with the First Interim Period and the Second Interim Period, the "Prior Interim Periods").  Pursuant to an Order of the Court dated December 11, 2006, the hearing to consider the Prior Applications was scheduled for February 15, 2007.

7.    Pursuant to Orders dated February 15, 2007, TS&S was awarded: (i) $781,058 for legal fees and $14,531.15 for reimbursement of expenses requested in the First Application;  (ii) $1,036,627.50 for legal fees and $13,940.08 for reimbursement of expenses requested in the Second Application;  and (iii) $767,359.50 for legal fees and $4,879.63 for reimbursement of expenses requested in the Third Application.

8.    Pursuant to an Order of the Court dated December 11, 2006, the Debtors were authorized to pay all amounts held back during the Prior Interim Periods

4

to applicants once they resolved objections and/or comments that were made to their respective fee applications by the Joint Fee Review Committee (the "Fee Committee") in this case.  TS&S reached such a resolution with the Fee Committee.

9.      On March 30, 2007, TS&S filed its fourth application (the "Fourth Application") for an award of interim compensation in the amount of $593,308 and reimbursement of expenses of $5,790.70 for the period of October 1, 2006 through and including January 31, 2007 (the "Fourth Interim Period").  Pursuant to an Order of the Court dated June 27, 2007, TS&S was awarded $566,308 for legal fees and $5,790.70 for reimbursement of expenses requested in the Fourth Application.[1]

10.     On July 31, 2007, TS&S filed its fifth application (the "Fifth Application") for an award of interim compensation in the amount of $804,365.50 and reimbursement of expenses of $7,223.62 for the period of February 1, 2007 through and including May 31, 2007 (the "Fifth Interim Period").  Pursuant to an Order of the Court dated October 29, 2007, TS&S was awarded $792,265.50 for legal fees and $6,160.62 for reimbursement of expenses requested in the Fifth Application.[2]

11.     Other than the payments made by the Debtors to TS&S for fees and expenses incurred during the Prior, Fourth, Fifth and Sixth Interim Periods pursuant to the Administrative Fee Order, as amended, and disclosed herein, TS&S has not received payment of compensation or reimbursement of expenses for services provided in this chapter 11 case.

---

[1]     The amount awarded by the Court reflects a voluntary reduction of $27,000 by TS&S after consultation with the Fee Committee.  Pursuant to the June 27, 2007 Order, holdbacks for the Fourth Interim Period are being released.

[2]     The amount awarded by the Court reflects a voluntary deduction of $10,163 by TS&S after consultation with the Fee Committee.  Pursuant to the October 29, 2007 Order, the Debtors are authorized to release holdbacks for the Fifth Interim Period.

12.     Pursuant to the Administrative Fee Order, TS&S submitted four (4) monthly invoices during the Sixth Interim Period:  (i) for June 1, 2007 through June 30, 2007 in the amounts of $185,255.50 for fees and $312.02 for expenses;  (ii) for July 1, 2007 through July 31, 2007 in the amounts of $279,371.00 for fees and $1,931.98 for expenses; (iii) for August 1, 2007 through August 31, 2007 in the amounts of $201,351.50 for fees and $1,006.39 for expenses;  and (iv) for September 1, 2007 through September 30, 2007 in the amounts of $404,891.00 for fees and $3,745.88 for expenses.

13.     As of the date hereof and in accordance with the Administrative Fee Order, TS&S has received payment from the Debtors representing 80% of its fees and 100% of its expenses during the Sixth Interim Period through and including the period of July 2007.  TS&S has not yet received any payments from the Debtors for fees and expenses for services rendered during August and September 2007.

14.     As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "3," all of the services rendered by TS&S during the case for which interim compensation is sought herein were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.     RETENTION OF TS&S[3]

15.     TS&S was retained by the Debtors just prior to the Initial Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is responsible for handling all bankruptcy-related matters where Skadden has an actual or

---

[3]     A description of the Debtors' business operations and the commencement of the Debtors' chapter 11 cases is contained in the First Application and other pleadings filed in this Court.

perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently handled by TS&S. TS&S has not received a retainer.

16.    By an Order dated November 4, 2005, the Debtors were authorized to retain TS&S on a final basis (Docket No. 1034).

17.    Since its retention and through the Sixth Interim Period, TS&S and Skadden have continued to carefully coordinate their efforts and their work is complementary.[4]

18.    All of the work summarized in this Sixth Application for which TS&S seeks interim compensation was performed efficiently, at the lowest cost to the Debtors' estates, and with minimal duplication of services in an effort to keep the administration expenses to a minimum. TS&S staffed its projects in a manner that would permit it to bill fewer hours than would have otherwise been possible.

## III.    SERVICES RENDERED BY TS&S DURING THE SIXTH INTERIM PERIOD

19.    All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and the Court is respectfully referred to those records for the details of all of the work performed.

20.    Prior to the filing of the Debtors' chapter 11 cases, the Debtors and Skadden determined that a clear division of litigation-related duties was necessary to avoid potential conflicts that might have arisen had Skadden had been responsible for the resolution of all such matters.

---

[4]    A description of TS&S' qualifications to provide services to the Debtors is set forth at length in the First Application, and that description is incorporated herein by reference.

21.     During the Sixth Interim Period, TS&S continued to take primary responsibility for representing the Debtors in the various matters, among others, that would not be addressed by Skadden including:

(a)     diligence, preparation of pleadings and preservation of avoidance claims pursuant to Chapter 5 of the Bankruptcy Code;

(b)     objections to those proofs of claim filed in the Debtors' cases where Skadden  conflicts were an issue or it was determined that TS&S was the better choice for that task;

(c)     motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and this Court's DIP Financing Orders dated October 28, 2005 and January 5, 2007 (together, the "DIP Orders");

(d)     motions and demands by parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

(e)     issues related to the Essential Supplier Motion (as defined below), including the resolution of Orders to Show Cause addressing payments made to non-conforming suppliers;

(f)     issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;  and

(g)     efforts to collect amounts due to the Debtors.

**A.     <u>Avoidance Claims</u>:**

22.     By the end of the Sixth Interim Period, the Debtors had made significant progress toward confirming a plan of reorganization.  During the Period, the framework for a plan proposed that all claims would be paid or satisfied in full through distributions of cash, common stock, or both.  Yet, there could not be a plan confirmation before the applicable statutes of limitation (the "Statue of Limitation") for

commencing Chapter 5 causes of action ("Chapter 5 Claims") would expire. Consistent with its fiduciary obligations, the Debtors needed to preserve their rights to pursue Chapter 5 claims but without disrupting the plan process.

23.    Avoiding Chapter 5 Claims for preferential transfers or fraudulent conveyances while confirmation of a Plan which would pay those creditors 100% of their claims would provide no benefit to the Debtors' estates because any party to be paid in full has a defense against the allegation that it received a preferential transfer and even if that creditor were required to return such transfer, that creditor would be entitled to a claim for the amount disgourged, which would then be paid in full under a plan, with no benefit whatsoever to the estate. While there would be no positive benefit to the estate, damage to the Debtors businesses could be done by antagonizing current creditor suppliers.

24.    The Debtors contemplate that their reorganization plan will waive or release most if not all avoidance causes of action. But until such a plan is actually confirmed by the Court, the Debtors have the fiduciary obligation to preserve their ability to pursue Chapter 5 Claims.

25.    The Debtors estimated that they had more than 11,000 potential preference claims arising from transfers of approximately $5.8 billion (before taking into account defenses such as transfers made in the ordinary course of business). The constructively fraudulent transfer reach-back period, made applicable by Bankruptcy Code section 544(b) and state law, is generally six years under Michigan and New York state law. Consequently, with a company of Delphi's size, there were literally hundreds of thousands of transactions that occurred during these constructively fraudulent transfer reach-back period. Under the Bankruptcy Code, the Debtors had until two years after the Petition Date to commence adversary proceedings to assert avoidance

causes of action, as well as to certain causes of action where the applicable Statutes of Limitation had been tolled by the Bankruptcy Code during the initial two years of these chapter 11 cases.

26.    Although the Debtors do not intend to actively prosecute avoidance actions based upon the current plan structure, as a precautionary measure, they had to preserve those actions in some manner, and they asked Applicant to assist in that endeavor.  Applicant worked with the Debtors to explore various alternatives to filing avoidance actions before the Statute of Limitations expired, such as executing tolling agreements with potential defendants.  The logistical challenges of circulating and executing agreements with such a large number of potential defendants, however, made that solution unworkable.  Consequently, the Debtors asked that Applicant work with its other retained professionals, including FTI Consulting, Inc., ("FTI"), to commence avoidance actions by the Debtors or to take other action to preserve certain the Chapter 5 Claims that the Debtors believed would have potential value to their estates.  Applicant worked with the Debtors and their other retained professionals to formulate a work plan for the investigation, diligence and preservation of the Chapter 5 claims.  In connection with those efforts, Applicant assisted the Debtors in the formulation of a motion (the "Procedures Motion") and proposed order to establish guidelines for the identification and diligence of Chapter 5 Claims, the abandonment of certain types of Chapter 5 Claims and for procedures governing the preservation of the Chapter 5 Claims.

27.    On August 16, 2007, this Court entered its Order:  (i) Authorizing Debtors to Enter Into Stipulations Tolling Statute of Limitations With Respect to Certain Claims, (ii) Authorizing Procedures to Identify Causes of Action That Should Be Preserved, and (iii)  Establishing Procedures for Certain Adversary Proceedings

10

Including Those Commenced by Debtors Under 11 U.S.C. §§ 541, 544, 545, 547, 548 or

553 (the "Avoidance Claims Procedures Order").

           28.     The Avoidance Claims Procedures Order provides, among other

things:

Tolling Agreement

- *Approval Of Form.*  The Court approved a form of stipulation, which, without further order of this Court, tolls the applicable statute of limitations for claims against certain parties with whom the Debtors entered into such stipulations.

- *Intercompany Tolling.*  The Court "deemed" all of the Debtors and affiliated non-Debtor affiliates either controlled by the Debtors or that had actual notice of the Procedures Motion to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

Approval Of Avoidance Evaluation Procedures And Authority To Abandon Claims

- *Preference Claims Below $250,000 In Value.*  The Court authorized the Debtors to abandon these preference actions.  To the extent that these actions were against insiders or involved persons or transactions associated with the SEC investigation of the Debtors, the Debtors were authorized to abandon those actions after notice to the Debtors' Statutory Committees.

- *Select Categories Of Preference Claims.*  The Court authorized the Debtors to abandon the following categories of preference actions:  (i) payments to  parties with a secured or priority interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee  business expenses, (vi) ordinary course wages, salaries, and benefits to  employees, (vii) payments required by a garnishment to satisfy third-party  judgments and obligations, (viii) contributions to charitable organizations,  (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers,  (xi) payments to the Debtors' insurance providers, and (xii) payments to the  Debtors' utilities.

- *Scope Of Fraudulent Transfer Review.*  The Court directed that for purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only have reviewed the

following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions, dividend distributions to 5% shareholders, and Delphi's financially troubled supplier program.

- *Additional Authority For Abandonment After Notice To Statutory Committees*. The Debtors were authorized to abandon, after notice to the Statutory Committees, and without further order of this Court or further notice under Bankruptcy Rule 6007, claims (i) with insignificant value, (ii) where litigation costs would likely exceed expected recovery, (ii) where the potential harm to businesses outweighs expected recovery, or (iv) where valid defenses exist.

## Commencement Of The Adversary Proceedings And Service Of Process

- *Deferral Of Issuance Of Summons*. The Clerk of Court was directed to defer issuing a summons after the filing of a complaint, unless and until the Debtors intend to pursue the claims in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period*. The Debtors have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint*. The Debtors are required to serve a copy of the Avoidance Claims Procedures Order upon each defendant in any adversary proceeding either if and when the Debtors serve process on the defendant or as soon thereafter as practicable.

## Stay Of Adversary Proceedings Until Service Of Process And Interim Sealing

- *Activity During The Stay*. During the stay, the Debtors may (i) amend their complaint, and (ii) after notice to the Statutory Committees, dismiss it.
- *Expiration Of The Stay*. The stay will continue until the earlier of (i) service of process and (ii) further order of this Court.

- *Filing Of The Complaints Under Interim Seal*. The Debtors were authorized to file under seal paper copies (with PDF copies on appropriate electronic media) of the complaints in the

adversary proceedings and to have the docket for such
proceedings likewise sealed.

29.    Applicant worked closely with the Debtors and Skadden to
develop a form of tolling agreement and reviewed that agreement with representatives
of the Debtors' Statutory Committees.

30.    Applicant worked closely with FTI to formulate methodologies for
the identification and investigation of potential Chapter 5 Claims. Moreover, Applicant
worked with the Debtors as that diligence process advanced. Applicant and FTI met
with the representatives of the Debtors' Statutory Committees to review the result of the
diligence that was conducted to identify Chapter 5 Claims and to outline steps that the
Debtors, with the assistance of Applicant, intended to take to preserve Chapter 5
Claims.

31.    During this process, Applicant was required to conduct factual and
legal research concerning various issues that were presented. When necessary,
Applicant made appropriate inquiry of representatives of the Debtors concerning
transactions that occurred during the avoidance reach-back periods.

32.    Applicant prepared forms of template complaints to preserve
preference claims and constructive fraudulent conveyance claims concerning, among
other things, mergers and acquisitions, and other transactions that occurred prior to the
Initial Filing Date.

33.    Pursuant to the Avoidance Claims Procedures Order, the Debtors
were authorized to preserve Chapter 5 Claims by commencing adversary proceedings
under seal. This procedure was necessary to avoid unnecessary disruption of
continuing business relationships with many of the potential defendants. Applicant

met and conferred with the Clerk of the Bankruptcy Court to make certain that the procedures which the Debtors sought to implement were acceptable to the Clerk.

34.    During the Sixth Interim Period and prior to the expiration of the Statute of Limitations, Applicant commenced nearly 750 adversary proceedings to preserve Avoidance Claims representing more than $2.6 billion.

35.    Moreover, TS&S obtained tolling agreements to toll the Statute of Limitations with various potential avoidance targets, including insiders of the Debtors and professionals.

**B.    Claims:**

    **1.    Overview**

36.    One of the important components of the framework to facilitate the Debtors' successful emergence is to reduce the aggregate of certain pre-petition claims to $1.45 billion or less.  As of January 31, 2007, more than 16,500 proofs of claim and scheduled liabilities sought liquidated and unliquidated amounts from the Debtors for amounts in excess of $1.7 billion.  Before and during the Sixth Interim Period, the Debtors asked TS&S to assist them and their other retained professionals in the claims objection and resolution process.

37.    During the Sixth Interim Period, TS&S helped resolve claims asserted by parties (a) with whom Skadden had a conflict and (b) with whom TS&S negotiated setoff and other settlements.  As part of that process, TS&S (i) regularly communicated with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reduce and expunge claims;  (ii) assisted in the claim objection/reconciliation process;  (iii) engaged in settlement negotiations with counsel for claimants;  (iv) prepared for possible litigation if settlement negotiations failed;  (v) conducted necessary legal and factual research regarding issues raised by claimants;

and (vi) participated in claims administration and strategy calls with the Debtors and Skadden to monitor developments in the claims process and to avoid duplication of services.

38.     TS&S assisted the Debtors and negotiated settlement agreements and Joint Stipulations and Agreed Orders with claimants to (a) disallow and expunge duplicative claims, (b) withdraw contingent, unliquidated and protective claims, (c) migrate claims asserted against incorrect debtors to appropriate debtor estates, and (d) reduce claims.  Applicant's efforts have resulted in the reduction of claims during Sixth Interim Period by approximately $129.6 million.

39.     Among the claims that Applicant caused to be withdrawn, expunged or reduced as a result of services provided by TS&S to the Debtors were claims (the "BofA Claims") that were filed against multiple Debtors by Bank of America, N.A. in the event of aircraft lease rejections, and which totaled more than $114.million.  Applicant negotiated and drafted a Joint Stipulation and Agreed Order pursuant to which the BofA Claims were withdrawn.  Applicant also prosecuted the Debtors' objection to the claim that was filed by Calsonic Kansei North America ("Calsonic") against Delphi Automotive Systems, LLC ("DAS LLC") in the amount of $3,867,106.33.  Applicant settled the objection to Calsonic's claim and it was disallowed and expunged in its entirety pursuant to a Joint Settlement Agreement and a Stipulation and Agreed Order that Applicant prepared.  Moreover, Applicant prosecuted the Debtors' objection to the claim that was filed by Means Industries Inc. ("Means") against Delphi in the amount of $1,243,150.59.  Applicant negotiated a resolution with Means pursuant to which its claim was reduced to $681,145.20 and Means returned $775,000 to DAS LLC.  All of those claim reductions were negotiated and achieved by TS&S with limited need for any Court intervention.

40.     To date, TS&S has submitted Joint Stipulations and Orders reducing or expunging claims filed against the Debtors by more than $147 million. Moreover, during the Sixth Interim Period, TS&S continued to assist the Debtors by negotiating additional Joint Stipulations and Orders that will be submitted for Court approval in subsequent fee periods.

**2.      Furukawa Litigation**

41.     In addition to assisting the Debtors with the resolution of pre-petition claims discussed above, TS&S also assisted the Debtors with their continued litigation concerning allowance of a proof of claim (the "Furukawa Claim") that was filed by Furukawa Electric North America APD and Furukawa Electric Co., Ltd. (jointly, "Furukawa") as an unsecured non-priority claim in the amount of $2,589,684.56 for alleged breach of contract damages (the "Furukawa Claim").

42.     The Debtors objected to the Furukawa Claim pursuant to the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, and (C) Claims Subject To Modification and (II) Motion to Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (the "Third Omnibus Claims Objection"), which was filed on October 31, 2006.

43.     Furukawa responded and objected to the Debtors' Third Omnibus Claims Objection on November 22, 2006.  In the Debtors' Statement of Disputed Issues for the Furukawa Claim dated March 16, 2007, the Debtors argued that not only should Furukawa's claim be disallowed and expunged, but that an Order be entered awarding contract damages to the Debtors based on Furukawa's conduct.

16

44.     Thereafter, on March 23, 2007, Furukawa filed its Motion (the "Stay Relief Motion") for an Order of:  (a) abstention pursuant to 28 U.S.C. 1334(c);  (b) relief from the automatic stay pursuant to § 362(d) of the Bankruptcy Code;  and (c) limiting the scope of the claim objection hearing.  Applicant prepared the Debtors' Objection to the Stay Relief Motion on April 13, 2007 and Furukawa replied on May 17, 2007.

45.     TS&S was required to research and prepare a Surreply to the Stay Relief Motion.  As part of that process, TS&S consulted with the Debtors' state court counsel in a related action that the Debtors brought prior to the Filing Date in Michigan. TS&S filed and served the Debtors' Surreply on July 11, 2007.

46.     TS&S appeared before this Court in opposition to the Stay Relief Motion on July 19, 2007, and at the conclusion of that hearing, the Court denied the Stay Relief Motion and authorized the Debtors to file a counterclaim against Furukawa in this Court.  On July 31, 2007, this Court entered its Order denying the Stay Relief Motion in its entirety.

47.     TS&S prepared a counterclaim against Furukawa, which was filed and served on September 26, 2007 (the "Counterclaim").  In the Counterclaim, the Debtors pleaded with particularity all of the factual allegations in support of their assertion that Furukawa breached its pre-petition contract with the Debtors and that Furukawa otherwise acted improperly regarding the contract, warranting an award in the Debtors' favor in excess of $20 million.

48.     Furukawa defaulted by failing to timely answer or otherwise responded to the Counterclaim.  Consistent with the Debtors' instructions, Applicant prepared, filed and served the Debtors' motion for an Order granting a default judgment against Furukawa.  Negotiations concerning that default application, and

discovery and trial protocol for the Debtors' objection to the Furukawa Claim, are ongoing.

###    3.    Siemens Litigation

49.    Applicant continued to assist the Debtors as they seek to reduce or expunge Proof of Claim number 2247, which was asserted by Siemens VDO Automotive SAS ("VDO") in the amount of $9,309,024.84 (the "Siemens Claim") on two separate grounds.  First, a portion of claim 2247, which was asserted in the amount of $1,545,794.84 for trade payables, was duplicative because VDO transferred that portion of the claim to Goldman Sachs Credit Partners, L.P. ("GSCP").  Despite the transfer, VDO would not agree to reduce the Siemens Claim unless the Debtors agreed to allow the claim in GSCP's hands.

50.    To avoid unnecessary litigation, the Debtors undertook a reconciliation and determined that the transferred claim should be allowed in the amount of $1,332,172.84.  Accordingly, Applicant, in consultation with the Debtors, negotiated an agreement pursuant to which the Siemens Claim was reduced by $1,545,794.84 and the transferred claim was allowed in GSCP's hands in the amount of $1,332,172.84.  Applicant drafted and negotiated a Joint Stipulation and Agreed Order and a Settlement Agreement which embodied the parties' compromise.  The Joint Stipulation and Agreed Order was entered by the Court after the conclusion of the Sixth Interim Period.

51.    Applicant continued to assist the Debtors in their attempt to reduce or expunge the remaining portion of the Siemens Claim, which seeks approximately $7.76 million as compensation for the Debtors' purported failure to order as many electronic control units ("ECUs") as VDO expected under a long-term requirements

contract.  Delphi denies that it ever agreed to pay, or is liable to pay, for ordering fewer ECUs than expected.  VDO disputes Delphi's contention.

52.     On September 4, 2007, after review of the relevant facts and extensive negotiations with VDO's counsel, Applicant served a Notice of Claims Objection Hearing to expedite the resolution of the Siemens Claim.  On September 11, 2007, Applicant also prepared and served the Debtors' Statement of Disputed Issues Regarding to the Siemens Claim.  Subsequently, Applicant negotiated a Stipulation with VDO pursuant to which:  VDO agreed to file a statement explaining the entire basis for its claim;  Delphi would move to expunge the claim;  and the parties each agreed to submit memoranda in support of or in opposition to the motion.  The Debtors and Siemens are proceeding with the briefing contemplated by the Stipulation.

53.     In the course of negotiating with opposing counsel, and in preparing to draft Delphi's motion, Applicant consulted frequently with the Debtors' purchasing executives and in-house counsel, analyzed the terms of the Debtors' contracts with VDO, reviewed the parties' communications, investigated the extent to which VDO had been compensated when the Debtors ordered ECUs under the parties' contract on a delayed schedule, and conducted legal research concerning the issues presented.

54.     The parties have been negotiating while they continue to litigate. Applicant represented the Debtors, in coordination with the Debtors' purchasing executives and in-house counsel, during a mediation on November 12 and 13, 2007 in Chicago.  Applicant has also represented Delphi in subsequent negotiations.  To date, the parties have not settled their dispute.  In accord with the parties' Stipulation, which the Court approved on October 19, 2007, the Debtors' motion is scheduled to be considered by the Court on December 6, 2007.

C.    **Setoff Issues:**

55.    As part of their negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Orders to enable the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in the DIP Orders, a supplier may seek to exercise a setoff right that arose during the Debtors' ordinary course of business without such assertion being subject to section 362 of the Bankruptcy Code.[5]  Setoffs that are subject to the DIP Orders may include claims arising out of, for example, pre-petition warranty and/or product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

56.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Official Committee of Unsecured Creditors (the "Committee") (with a copy to JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Administrative Agent for the Debtors).  If within ten business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a requested setoff, they may seek resolution of the matter through an agreed-upon mediator or the Court.  If the mediator cannot resolve the dispute within thirty days, the parties may submit the matter to binding arbitration.

57.    At the end of the Sixth Interim Period, 106 non-General Motors claimants had asserted one or more setoff claims.  The Debtors received eight new setoff

---

[5]        Nothing contained herein is meant to modify the provisions of the DIP Orders or any right or obligation of any party thereunder.

demands seeking approximately $1.36 million during the Sixth Interim Period, and TS&S continued to devote substantial time assisting the Debtors with the continued resolution of the setoff and/or recoupment requests.

58. During the Sixth Interim Period, Applicant worked with the Debtors and FTI to resolve ten setoff demands, which sought an aggregate of approximately $5.4 million. None of the resolutions that TS&S negotiated during the Sixth Interim Period required Court intervention, mediation or arbitration.

59. Moreover, Applicant assisted the Debtors in identifying setoff claimants who had been holding accounts payable for amounts exceeding their setoff demands. Applicant obtained agreements with those setoff claimants and facilitated the collection of approximately $1.5 million of accounts receivable[6], while preserving all of the Debtors' rights to challenge such claimants' setoff rights and to pursue additional accounts receivable claims.

60. To effectively resolve these setoff demands, TS&S continued to (i) regularly communicate with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reconcile the amounts of the receivables against the payables owed to the setoff claimants; (ii) assist in the claim objection/reconciliation process; (iii) develop strategies for responding to setoff motions and prepare for possible litigation if settlement negotiations failed; (iv) engage in negotiations with counsel for the setoff claimants; and (v) conduct necessary legal and factual research regarding issues raised in the motions and letter demands.

---

[6]    Since the Initial Filing Date, TS&S has assisted in the collection of approximately $34.5 million of accounts receivable from setoff claimants.

61.     TS&S also continued to work with the Debtors to ensure that mutuality existed to prevent setoffs.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, TS&S has conducted necessary forensic/factual and legal research.

62.     During the Sixth Interim Period, TS&S continued to have primary responsibility for all of the unresolved setoff claims that have been asserted pursuant to the DIP Orders, except those made by General Motors.  Recognizing the number and size of setoff demands made by vendors and the relationship that setoff claims have to other areas of the Debtors' cases (such as claims reconciliation), it has been necessary for the Debtors, TS&S, Skadden and FTI to continue to communicate with each other regularly to know the status of the setoff demands.  TS&S provides periodic status reports to the Debtors, FTI and Skadden concerning progress made in the resolution of setoff claims.

63.     Throughout the Sixth Interim Period, the Debtors, TS&S and FTI participated in weekly status calls with the Debtors to review pending setoff demands and to help coordinate the participants' efforts.  During these calls, among other things, the parties:  (i) discussed new demands that the Debtors received (including an analysis of the merits of each new demand);  (ii) monitored the status of the Debtors' and setoff claimant's exchange of information to reconcile the accounts;  (iii) analyzed the factual and legal issues implicated by the demands;  and (iv) developed uniform strategies on behalf of the Debtors regarding each of the demands.  These calls have proven essential in safeguarding the Debtors' interests because they have permitted TS&S to efficiently address the setoff demands without duplicating the efforts of Skadden or the Debtors.

64.     The services provided by TS&S to assist the Debtors in the resolution of setoff claims has been highly beneficial and efficient:  during the Sixth

22

Interim Period, ten claims seeking to setoff approximately $5.4 million against trade receivables were resolved and concluded, and the Debtors collected approximately $1.5 million of trade accounts receivable that were withheld by setoff claimants.

65.    As claim objections continue to be made by the Debtors, setoff demands continue to be asserted, and TS&S continues to assist the Debtors as they review, analyze and resolve setoff demands.

**D.    Automatic Stay Issues:**

66.    During the Sixth Interim Period, TS&S continued to share responsibility in addressing contested motions filed by parties-in-interest for relief from the Automatic Stay.  To resolve these requests, TS&S:  (i) had telephone conferences with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;  (ii) communicated with counsel for movants to discuss legal issues that were implicated by their clients' motions and attempted to negotiate consensual resolutions;  (iii) reviewed documents provided by the Debtors and counsel to the movants (e.g., term sheets, contracts, related pleadings, etc.);  and (iv) performed legal research, when necessary.

**E.    Injunction Issues:**

67.    During the Sixth Interim Period, Applicant continued to prepare pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened to stop shipping parts, despite enforceable "sole source" contracts with the Debtors.

68.    Generally, the Debtors contracted with their suppliers to purchase parts at a specific time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General

Terms and Conditions (the "Terms and Conditions") are incorporated into these
contracts.  The Terms and Conditions provide that if a supplier "commences any of the
work or services which are the subject of this Contract, [supplier] will be deemed to
have accepted this Contract and these General Terms and Conditions in their entirety
without modification."  The Terms and Conditions also contain the supplier's
acknowledgment that in the event of an actual, anticipatory or threatened breach of the
contract, the Debtors are entitled to specific performance and injunctive or other
equitable relief.

        69.     During the Sixth Interim Period, certain suppliers threatened to
stop shipping parts to the Debtors.  These suppliers asserted, among other things, that
the price increases in raw materials made it unprofitable for them to continue to meet
the Debtors' requirements.  The consequences of a supplier unilaterally stopping
shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities
would be forced to shut down within a matter of days after the missed shipment.
Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors'
OEM customers would likely be forced to halt production of their products on one or
more of their assembly lines.  A shutdown of even one assembly line of an OEM could
cause the manufacturer millions of dollars of damages which would be asserted against
the Debtors.

        70.     Consequently, when it was required, Applicant prepared
comprehensive pleadings against several suppliers that had threatened to stop
shipments.  These pleadings sought temporary, preliminary and permanent relief to:  (i)
enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-
petition requirements contracts between the suppliers and the Debtors;  and (ii) direct
the suppliers to continue to perform under those contracts.  For each supplier,

Applicant drafted a complaint, motion for a temporary restraining order, a
memorandum of law, and a proposed Order.  Applicant was prepared to file those
documents with the Court in the event that the Debtors were not able to negotiate
acceptable business solutions with their suppliers and in that regard, litigation support
was unavoidable.

71.    To date, the Debtors' negotiations with suppliers who threatened to
stop shipments, with assistance from Applicant, have been successful.  No injunction
pleadings have had to be filed, in part because the suppliers knew that the Debtors and
TS&S were prepared to seek expedited relief from this Court.

**F.    Accounts Receivable:**

72.    Throughout the Sixth Interim Period, Applicant continued to assist
the Debtors in their efforts to collect accounts receivable.

**i.    Aksys Adversary Proceeding:**

73.    Applicant commenced an adversary proceeding on behalf of
Delphi Medical Systems Colorado Corporation ("DMSCC") against Aksys (the "Aksys
Proceeding") to:  (a) compel the turnover and payment of $4,008,576.38 plus all interest
accrued thereon from June 5, 2006 pursuant to section 542(b) of the Bankruptcy Code;
and (b) disallow any claims in favor of Aksys in the Debtors' chapter 11 cases pursuant
to Bankruptcy Code section 502(d).

74.    Aksys demanded that, in accordance with its written agreement
with DMSCC, the issues raised in the Aksys Proceeding be decided pursuant to binding
arbitration at the American Arbitration Association in Chicago, Illinois.  Aksys also
demanded that DMSCC voluntarily dismiss the Aksys Proceeding.

75.    DMSCC agreed to the Aksys arbitration demand, but it did not
agree to dismiss the Aksys Proceeding.  The parties entered into a Stipulation, which

was "So Ordered" by the Court on October 24, 2006, and agreed to continue negotiations.

76.    In a series of conversations between the parties in late November and early December 2006, Aksys indicated to DMSCC that it was financially distressed and not able to pay the entire amount of the Receivable. Applicant sought and obtained financial disclosure from Aksys following the negotiation and execution of a confidentiality agreement governing the review and use of such documents, including the Committee's review of the documents provided by Askys.

77.    Ultimately, Aksys failed to participate in the selection of an arbitrator or otherwise engage in settlement negotiations. Consistent with the Court's October 24, 2006 Stipulation and Order, TS&S made written demand upon Aksys for an Answer in the Aksys Proceeding.

78.    Aksys failed to file and serve an Answer in the Aksys Proceeding and entered into an assignment for the benefit of creditors pursuant to the common law of the State of Delaware (the "Assignment for the Benefit of Creditors").

79.    Applicant prepared, filed and served a Notice of Proposed Order granting a default judgment, which was entered by the Court on July 18, 2007 in the amount of $4,008,576.38. Applicant prepared and filed a Proof of Claim in the Aksys Assignment for the Benefit of Creditors.

ii.    **Miscellaneous Accounts Receivable**

80.    During the Sixth Interim Period, the Debtors asked TS&S to assist them in the collection of accounts receivable from various customers and shippers. TS&S worked with the Debtors to review and analyze foundation documents and information in support of these accounts receivable claims, and prepared and sent demand letters to account debtors.

81.    TS&S engaged in telephone conferences with numerous parties from whom the Debtors sought payment, and participated in status calls and conferences with the Debtors regarding those negotiations.

G.    **Miscellaneous Matters Addressed by TS&S:**

82.    In addition to the matters discussed above, TS&S rendered services for, or on behalf of, the Debtors in connection with other miscellaneous matters during the Sixth Interim Period, such as:

(a)    reviewing various motions and other pleadings filed with the Court regarding case and project strategy;

(b)    participating in numerous (i) "task" and senior strategy calls;  and (ii) status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee;

(c)    attending omnibus hearings and addressing various matters at such hearings;

(d)    attending meetings with the Debtors and the statutory committees in these cases;

(e)    preparing and regularly updating status charts for Debtors regarding assorted matters;

(f)    conferring with Skadden regarding the delegation of responsibilities of certain matters to TS&S to ensure no duplication of effort between the two firms;  and

(g)    frequently communicating with various third parties, including the Court, the United States Trustee, the

27

Committee and individual creditors and other
parties-in-interest concerning the status, conduct and
administration of the Debtors' chapter 11 cases.

## IV.    THE COMPENSATION REQUESTED

83.    There are numerous factors to be considered by the Court in

determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*,

544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway*

*Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133

B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y.

1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

84.    The perspective from which an application for an allowance of

compensation should be viewed in a reorganization case was aptly stated by

Congressman Edwards on the floor of the House of Representatives on September 28,

1978, when he made the following statement in relation to section 330 of the Bankruptcy

Code:

> [B]ankruptcy legal services are entitled to command the
> same competency of counsel as other cases.  In that light, the
> policy of this section is to compensate attorneys and other
> professionals serving in a case under title 11 at the same rate
> as the attorney or other professional would be compensated
> for performing comparable services other than in a case
> under title 11.    Contrary language in the Senate report
> accompanying S.2266 is rejected, and *Massachusetts Mutual*
> *Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir.
> 1968) is overruled.    Notions of economy of the estate in
> fixing fees are outdated and have no place in a bankruptcy
> code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re*

*McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R.

13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public*

28

*Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988); *In re White Motor*

*Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

85.     In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

86.     As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case.  One could posit other situations or cases where a presumption of prior informed judgment might not be as strong.  Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost.  To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

*Drexel*, 133 B.R. at 20-21.

87.     The professional services rendered by TS&S have required expenditure of substantial time and effort.  During the Sixth Interim Period, TS&S professionals and paraprofessionals recorded 2,453.2 hours in providing the required professional services for which TS&S seeks compensation.

88.     Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of (i) the amount involved and the results achieved to date, (ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to perform properly the legal services, (iv) the preclusion of other employment on behalf of other clients, (v) the customary fee charged to a private client for the services rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours, (viii) the experience, reputation and ability of the attorneys rendering services, and (ix) the nature and length of the professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII); *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

89.     The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation.  It is well settled that the "lodestar method,"[7] as opposed to an application solely of the

_____

[7]     Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of
*(footnote continued on next page)*

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[8]
The Supreme Court, however, has clearly articulated that the "lodestar method" is
presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy
Code. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

90.     TS&S respectfully submits that application of the foregoing criteria
more than justifies the compensation requested in this Sixth Application. The
professional services rendered in these chapter 11 cases have been performed by
attorneys with broad expertise and high levels of skill in their practice areas or
specialty.

91.     At all times throughout the Sixth Interim Period, TS&S successfully
avoided expensive litigation by brokering reasonable settlements among the parties.
TS&S' efforts have therefore been of significant value to the Debtors and the creditors of
these estates.

92.     TS&S has not sought to burden this Court by setting forth all of the
services rendered to the Debtors and for the benefit of creditors. TS&S has reviewed all
of its office files which indicate numerous legal situations and problems resolved over
and above those detailed in this Sixth Application, and which are more fully

---

calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which
serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other
factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their
results obtained. *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[8]     *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware
Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987); *Pennsylvania v. Delaware Valley Citizens Counsel
for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*"); *United States Football League v. National
Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *Lindy Bros.
Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on
other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y.
1990); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

summarized in the time sheet entries annexed hereto and made a part hereof which were contemporaneously prepared when the services were rendered.

93.    TS&S has devoted 2,453.2 hours of actual recorded time during the Sixth Interim Period resulting in time charges of $1,070,869.

94.    Throughout the Sixth Interim Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

95.    In addition to the fees sought for legal services, TS&S has incurred $6,996.27 in out-of-pocket expenses during the Sixth Interim Period directly attributable to the representation of the Debtors.

96.    No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

97.    Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility; (vi) counsel for the agent under the Debtors' post-petition credit facility;  and (vii) the Fee Committee.

## V.    **CONCLUSION**

**WHEREFORE**, TS&S respectfully requests that this Sixth Application be granted and that it be awarded an allowance of $1,070,869 for legal services rendered to the Debtors during the Sixth Interim Period, and $6,996.27 for reimbursement of

expenses, and that the Debtors be authorized and directed to pay such amounts as may

be just and proper.

Dated:    New York, New York
          November 30, 2007

                              TOGUT, SEGAL & SEGAL LLP,
                              Conflicts Counsel for the Debtors
                              and Debtors in Possession
                              By:

                              _____ /s/ Albert Togut _____
                              ALBERT TOGUT (AT-9759)
                              NEIL BERGER (NB-3599)
                              Members of the Firm
                              One Penn Plaza, Suite 3335
                              New York, New York 10119
                              (212) 594-5000