McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 – Telephone
(212) 609-6921 – Facsimile
Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc.,
and Automodular Assemblies (Ohio) Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| | : Chapter 11 |
| | : |
| In re: | : Case Nos. 05-44481 (RDD) |
| | : (Jointly Administered) |
| DELPHI CORPORATION | : |
| INC., et al. | : |
| | : |
| | : |
| Debtors. | : |
| | : |

---

**AFFIDAVIT IN SUPPORT OF MOTION OF AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND MOTION TO ALLOW AND DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

---

### AFFIDAVIT OF CHRISTOPHER DELL

| | | |
|---|---|---|
| PROVINCE OF ONTARIO | ) | |
| | ) | ss: |
| TOWN OF WHITBY | ) | |

The undersigned, Christopher Dell, by and on behalf of Automodular Assemblies Inc.

and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular

Assemblies (Ohio) Inc. (collectively, "Automodular" or "Movant"), does hereby state under oath

the following:

1.      I am employed by Automodular as the Vice President, Business Development and

am competent to testify about matters described below upon personal knowledge.

MEI 6941704v.1
MEI 6945738v.1

2.      As part of my duties at Automodular, I am responsible for the negotiation,
maintenance and ongoing administration of all commercial contracts of Automodular
Corporation and its subsidiaries.

3.      In or about March 2004, Automodular Assemblies (Ohio) Inc. and Delphi
Automotive Systems LLC ("Delphi" or Debtor") entered into a contract (hereinafter the "U.S.
Contract") whereby Automodular agreed to provide services to Delphi as specified amongst
other items, in purchase orders and work orders. A copy of the U.S. Contract is attached as
Exhibit A.[1]

4.      As of the Petition Date, no less than $147,306.27 was owed by the Debtors under
the U.S. Contract.

5.      Pursuant to the U.S. Contract, Delphi was to pay Automodular for work
performed at the Lordstown assembly plant, which produces the GMX001 Chevrolet Cobalt and
GMX001 Pontiac Pursuit/G4/G5. Per the U.S. Contract, Delphi could order certain changes in
the amount or extent of the work provided. Effective July 17, 2006, the following changes were
made by Delphi under the scope of production: (1) shifts were reduced from 3 shifts to 2 shifts;
and (2) there was an increase line rate from 54 net jobs per hour to 63 net jobs per hour. On July
19, 2006, Automodular provided Delphi with documentation of the changes. Automodular also
provided the per unit cost of production under its contract to sub-assemble and sequence
compressor radiator fan modules for Delphi for installation on the vehicles and requested an
equitable price adjustment. Pursuant to the U.S. Contract, Delphi was required to negotiate in
good faith for a price adjustment as necessitated by the change in scope. However, despite

---

[1] Tec-Mar Distribution Services, Inc. also had a contract with Delphi for the provision of services (the "Tec-Mar
Contract"). The Tec-Mar Contract has been terminated. However, as of the petition date, a total of $79,722.35 was
owed under the Tec-Mar Contract.

MEl 6941704v.1
MEl 6945738v.1

numerous efforts by Automodular to meet and confer over the price adjustments, Delphi has

refused to comply with its obligations under the U.S. Contract.

6.    As a result of the ongoing dispute, additional amounts have accrued that remain

unpaid. As of September 30, 2007, no less than $625,132.73 was due and owing from the

Debtor for post-petition goods and services provided by Automodular under the U.S. Contract.

Additional costs for goods and services continue to accrue on a daily basis.

7.    A spreadsheet showing the amounts owed is attached hereto as Exhibit B.

8.    In addition to the U.S. Contract, Automodular Assemblies Inc. contracted with

Delphi under a Long Term Contract, as recently amended in June 2005 (the "Ontario Contract"

and collectively with the U.S. Contract, the "Contracts"). A copy of the Ontario Contract is

attached hereto as Exhibit C. Pursuant to the Ontario Contract, Delphi would contract with

General Motors of Canada ("GM") for the supply and installation of various car parts. In turn,

Delphi contracted with Automodular for Automodular's sub-assembly and sequencing services

of condensers, radiators and fan modules, which were ultimately installed in GM vehicles.

9.    The Ontario Contract provided a schedule setting out estimated yearly volumes

required by Delphi for installations and related prices. Automodular agreed to these prices only

with respect to the volumes set out in the schedule attached to the contract.

10.    Delphi has failed to perform under the Ontario Contract in several ways,

including without limitation, failing to comply with (a) a foreign exchange adjustment clause; (b)

scope change items; and (c) requirements for payment of termination costs for discontinued

programs. By way of example, pursuant to the general terms and conditions incorporated into

the Ontario Contract, Delphi could require Automodular to implement changes to the

specifications of the goods or the scope of any work covered by the Contract, i.e., order a

3

"change in scope." Delphi was obligated to equitably determine any adjustment in price or

delivery schedules relating from such changes. If a disagreement arose, Delphi and

Automodular were obligated to work to resolve the disagreement in good faith.

11.    Beginning in January 2006 and continuing through November of 2006, Delphi

issued notices of change in scope. Automodular provided Delphi with documentation of the

changes in per unit cost of production and requested an equitable price adjustment to account for

the change in volume.

12.    Despite its contractual obligation to equitably address price changes as a result of

the change in scope of work and to work in good faith to resolve the pricing disagreement,

Delphi unilaterally refused to comply with any price adjustment. Furthermore, while Delphi

chose to ignore changes in scope that would result in a price increase, it unilaterally backcharged

Automodular $183,931 where the change in scope would result in a price decrease.

Automodular has continued to perform the work in accordance with its obligations.

13.    As of the Petition Date, no less than $322,249.11 was owed by the Debtors under

the Ontario Contract.

14.    As a result of the ongoing dispute, additional amounts have accrued that remain

unpaid. As of September 30, 2007, no less than $1,042,756.83 is due and owing from the Debtor

for post-petition goods and services provided by Automodular under the Ontario Contract.

Additional costs for goods and services continue to accrue on a daily basis. The price

adjustments made by Automodular reflect the fair market value for the services and goods

provided and are representative of the parties' business relationship for similar work.

MEl 6941704v.1
MEl 6945738v.1

15.    A spreadsheet showing the amounts owed is attached hereto as Exhibit D.

I AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING
STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND
BELIEF, FURTHER AFFIANT SAYETH NAUGHT.

_____
Christopher Dell
for and on behalf of Automodular Assemblies Inc.
and its wholly-owned subsidiaries Tec-Mar
Distribution Services, Inc., and Automodular
Assemblies (Ohio) Inc.

Sworn to before me and subscribed in my presence by the above named _____ this

_____ day of _____, 2007

Notary Public
My Commission
Expires:_____

MEI 6941704v.1
MEI 6945738v.1

# EXHIBIT A

# DELPHI

Delphi Thermal and Interior

Page 1 of 3

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

| | |
|---|---|
| PO Number | Date Issued |
| 550162897 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007 13:20:54 | |

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** ZMN2   **Currency:** USD

Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52423591 | J201 DELPHI T & I LOCKPORT |
| | CRFM-AZM-07 I.A. | |

PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423591 REPLACES 5241 7044. CUSTOMER PART NUMBER 25784002

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | 3,548.60 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.      Contact Address:

Phone: 716-439-2480

Fax:  716-439-2216

Date and Time Printed:  01-Jun-2007 13:20:54

# DELPHI

Delphi Thermal and Interior

Page  2  of 3

| | |
|---|---|
| AUTOMODULAR ASSEMBLIES (OH) INC.<br>1701 HENN PARKWAY<br>LORDSTOWN OH 48090 | **Requirements Contract**<br><br>PO Number        Date Issued<br>550162897        03-Apr-2007<br>Version<br>01-Jun-2007  13:20:54 |

| Item No. | Material No.<br>Description | Plant | | |
|---|---|---|---|---|

**Notes:**

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

# DELPHI

| AUTOMODULAR ASSEMBLIES (OH) INC.<br>1701 HENN PARKWAY<br>LORDSTOWN OH 48090 | **Requirements Contract** |  |
|---|---|---|
| | PO Number<br>550162897<br>Version<br>01-Jun-2007  13:20:54 | Date Issued<br>03-Apr-2007 |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|

**Notes Continued:**

Delphi Customer Specific Requirements  in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material.  Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

**********************************************************************************************************

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi.  Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Lading, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

# DELPHI *Replaces Part# 52402677*

Harrison Thermal Systems

Page 1 of 3

**Buyer:**

DELPHI
THERMAL & INTERIOR SYSTEMS
200 UPPER MOUNTAIN RD
LOCKPORT NY 14094

**Deliver to:**

*Please deliver to:*
    *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073758 | 04/22/2005 |
| Version | |
| 04/22/2005 14:44:20 | |

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** ZMN2    **Currency:** USD
Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52415045 | J201 DELPHI T & I LOCKPORT |
| | CRFM-ASR-06 | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 05/01/2005 | 12/31/2007 | USD | 3,548.60 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

Ca 08/22/05

**Notes:**

*******************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com. (by clicking on the "Suppliers" in the header.)

*******************************************************************
Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and

Purchasing Contact: Williams, E. A.

Phone: 716-439-2406

Fax: 716-439-3818

Contact Address:

# DELPHI

Harrison Thermal Systems

Page  2  of  3

| AUTOMODULAR ASSEMBLIES (OH) INC<br>1701 HEN PKY<br>LORDSTOWN OH 44481 | **Requirements Contract** | |
| --- | --- | --- |
| | PO Number<br>550073758<br>Version<br>04/22/2005 14:44:20 | Date Issued<br>04/22/2005 |

| Item No. | Material No.<br>Description | Plant |
| --- | --- | --- |

**Notes Continued:**

the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials, as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division when requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

1. Consignee agrees to maintain perpetual inventory records and retain records for at least 1 year. 2. Consignee agrees to submit by fax on a mutually agreed upon date, a monthly physical inventory indicating the month end balances by P/N or raw material code to the assigned material control consignment analyst. 3. Consignee agrees to verify that the seal is intact on those sealed truckload where the seal number is indicated on the Delphi Harrison Thermal Systems Bill of Lading. 4. Consignee agrees to verify the accuracy of the material identification and counts received from the Delphi Thermal Plant. Each Bill of Lading must be checked completely at time of receipt and Delphi Thermal Production Control notified immediately of any discrepancy. Consignee will correct information on Bill of Lading, sign, and date and fax copy to production control. 5. Consignee agrees to segregate Delphi Thermal material & provide adequate protection and insurance for Delphi Thermal inventory from loss or damage. 6. Consignee agrees to return all defective or damaged parts and scrap to Delphi Thermal unless alternate arrangements have been made with Delphi Thermal Purchasing. Those consignees who ship directly to Delphi Thermal customers on behalf of Delphi Thermal must send an "Advance Shipping Notice" via Electronic Data Interchange to Delphi Thermal. 7. If consignee is determined to be at fault for scrap, Delphi purchasing will charge back consignee. 8. Consignee will fax to Delphi material control consignment analyst copies of shipping paperwork when

# DELPHI

Harrison Thermal Systems

Page 3 of 3

| | |
|---|---|
| AUTOMODULAR ASSEMBLIES (OH) INC<br>1701 HEN PKY<br>LORDSTOWN OH 44481 | **Requirements Contract**<br><br>PO Number                    Date Issued<br>550073758                    04/22/2005<br>Version<br>04/22/2005 14:44:20 |

| Item No.   Material No.<br>Description | Plant |
|---|---|

**Notes Continued:**

shipping or receiving parts from other consignee locations. 9. Consignee agrees to allow Delphi scheduling and finance reps. the right to audit inventories as requested. 10. Consignee agrees to provide an annual certified (notarized) letter of physical inventory when Delphi Thermal conducts its annual physical inventory. 11. Tools provided for performance of an operation by consignee remain the property of Delphi Thermal unless otherwise noted. 12. Consignee agrees to ship material directly to Delphi Thermal customers if the physical flow warrants.

This replaces P/N 52402677. New CRFM for GMX-001 program. (Customer 22699885)(5604) DGSS Action Plan: 72473

*****************

# DELPHI

Harrison Thermal Systems

Page 1 of 2

| Buyer: | Requirements Contract | |
|---|---|---|
| DELPHI<br>HARRISON THERMAL SYSTEMS<br>200 UPPER MOUNTAIN RD<br>LOCKPORT NY 14094 | PO Number<br>550056014<br>Version<br>09/20/2004 11:32:42 | Date Issued<br>06/01/2004 |

**Deliver to:**

*Please deliver to:*
     *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No:  1014930
DUNS No:   147163542

Payment Terms:  ZMN2      Currency:  USD

Payment settled on 2nd, 2nd Month

Incoterms:   COL  Collect-FOB Ship Point

*Adjustment for purchased*
*TOC clip.*
*TD 9/21/04.*

| Item No. | Material No.<br>Description | Plant | | | | |
|---|---|---|---|---|---|---|
| 00010 | 52402677<br>CRFM-CFA-05 | J201 DELPHI THERMAL LOCKPORT | | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 06/01/2004 | 12/31/2004 | USD | 3,548.60 | 1,000 | PC |
| 01/01/2005 | 12/31/2005 | USD | 3,548.60 | 1,000 | PC |
| 01/01/2006 | 12/31/2006 | USD | 3,548.60 | 1,000 | PC |
| 01/01/2007 | 12/31/2007 | USD | 3,548.60 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.
*** *Condition record changed*

**Notes:**
GMX-001, GM Lordstown Assembly

*************************
Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information

Purchasing Contact: Williams, E. A.          Contact Address:

Phone:  716-439-2406

Fax:  716-439-3818

Date and Time Printed:   09/20/2004 11:32:42

# DELPHI

Harrison Thermal Systems

Page  2  of 2

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

PO Number
550056014
Version
09/20/2004 11:32:42

Date Issued
06/01/2004

| Item No. | Material No. Description | Plant |
|----------|--------------------------|-------|
|          |                          |       |

**Notes Continued:**

through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

**************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

**************************

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com. (by clicking on the "Suppliers" in the header).

**************************

# DELPHI

Delphi Thermal and Interior

Page 1 of 3

| Buyer: |
| --- |
| DELPHI AUTOMOTIVE SYSTEMS LLC<br>DELPHI THERMAL & INTERIOR DIV<br>1401 CROOKS ROAD<br>TROY MI 48084 |

**Requirements Contract**

| PO Number | Date Issued |
| --- | --- |
| 550162898 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007 13:22:08 | |

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

| Vendor No: | 1014930 |
| --- | --- |
| DUNS No: | 147163542 |

**Payment Terms:** ZMN2        **Currency:** USD

Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No.<br>Description | Plant |
| --- | --- | --- |
| 00010 | 52423592 | J201 DELPHI T & I LOCKPORT |
| | CRFM-AYN-07 I.A. | |

PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423592 REPLACES 52417045. CUSTOMER PART NUMBER 25784003

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
| --- | --- | --- | --- | --- | --- |
| 04-Apr-2007 | 01-Jan-2008 | USD | 3,421.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.

Phone: 716-439-2480

Fax: 716-439-2216

Contact Address:

Date and Time Printed: 01-Jun-2007 13:22:08

# DELPHI

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

## Requirements Contract

| | |
|---|---|
| PO Number | Date Issued |
| 550162898 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007  13:22:08 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes:**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other documents issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this Requirements (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the Internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

# DELPHI

Delphi Thermal and Interior

Page 3 of 3

| AUTOMODULAR ASSEMBLIES (OH) INC.<br>1701 HENN PARKWAY<br>LORDSTOWN OH 48090 | **Requirements Contract** | |
|---|---|---|
| | PO Number<br>550162898 | Date Issued<br>03-Apr-2007 |
| | Version<br>01-Jun-2007  13:22:08 | |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|

**Notes Continued**

Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
*************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

***********************************************************************************************************

***************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
***************

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

# DELPHI

Delphi Thermal and Interior

Page 1 of 3

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550162899 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007 13:22:50 | |

**Deliver to:**

*Please deliver to:*
    *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

Vendor No:  1014930
DUNS No:   147163542

**Payment Terms:  ZMN2**          **Currency:  USD**

Payment settled on 2nd, 2nd Month

**Incoterms:  FOB-FREIGHT COLLECT**

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52423593 RFM-AYP-07 | J201 DELPHI T & I LOCKPORT |

PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423593 REPLACES 52417049. CUSTOMER PART NUMBER 25784017

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | 3,548.60 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.
Phone:  716-439-2480
Fax:   716-439-2216

Contact Address:

Date and Time Printed:  01-Jun-2007 13:22:50

# DELPHI

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550162899 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007  13:22:50 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes:**

**********************************************************************************************

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

**********************************************************************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

**********************************************************************************************

Restricted, toxic, and hazardous materials – Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

**********************************************************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

**********************************************************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

**********************************************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

# DELPHI

Delphi Thermal and Interior

Page  3  of 3

| | |
|---|---|
| AUTOMODULAR ASSEMBLIES (OH) INC.<br>1701 HENN PARKWAY<br>LORDSTOWN OH 48090 | **Requirements Contract**<br><br>PO Number<br>550162899<br>Version<br>01-Jun-2007  13:22:50     Date Issued<br>03-Apr-2007 |

| Item No. | Material No.<br>Description | | Plant |
|---|---|---|---|

**Notes Continued**

Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Lading, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. These consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

DELPHI HARRISON PURCH  Fax 716-439-2216          Jun  1 2007 01:44pm  P001/003

# DELPHI

Delphi Thermal and Interior

Page  1  of  3

---

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Deliver to:**

*Please deliver to:*
    *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

| PO Number | | Date Issued |
|---|---|---|
| 550162900 | | 03-Apr-2007 |
| Version | | |
| 01-Jun-2007 13:23:34 | | |

Vendor No:  1014930
DUNS No:  147163542

**Payment Terms:  ZMN2            Currency:   USD**
Payment settled on 2nd, 2nd Month

**Incoterms:  FOB-FREIGHT COLLECT**

---

| Item No. | Material No. Description | Plant | | | |
|---|---|---|---|---|---|
| 00010 | 52423594 RFM-AYR-07 | J201 DELPHI T & I LOCKPORT | | | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | 3,431.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

*************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).
*************************************************************************

---

Purchasing Contact: McLean, D. L.
Phone:  716-439-2480
Fax:  716-439-2216

Contact Address:

Date and Time Printed:  01-Jun-2007 13:23:34

# DELPHI

_____ Delphi Thermal and Interior

Page  2  of  3

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550162900 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007  13:23:34 | |

| Item No. | Material No. | Plant |
|---|---|---|
| | Description | |

**Notes Continued:**

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

*********************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities.  If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

*********************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division.  Irreversible corrective action plans for these failures must be developed and implemented.  The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

*********************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI).  To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material.  EDI Certification will be conducted and coordinated by the EDI Competency organization.

An internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

*********************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements .  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

*********************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material.  Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

DELPHI HARRISON PURCH  Fax 716-439-2216          Jun  1 2007 01:45pm  P003/003

# DELPHI

Delphi Thermal and Interior

| AUTOMODULAR ASSEMBLIES (OH) INC.<br>1701 HENN PARKWAY<br>LORDSTOWN OH 48090 | Requirements Contract |
| --- | --- |

| PO Number<br>550162900<br>Version<br>01-Jun-2007  13:23:34 | Date Issued<br>03-Apr-2007 |
| --- | --- |

| Item No.  Material No.<br>Description | Plant |
| --- | --- |

**Notes Continued**

```
*****************************************************************************************************
******************
```
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
```
******************
```

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized) letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi.  Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst.  All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

# DELPHI *Replaces # 52402680.*

Delphi Thermal and Interior

Page 1 of 4

---

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073730 | 25-Apr-2005 |

Version
12-Dec-2006 16:41:15

**Deliver to:**

*Please deliver to:*
   *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** 2MN2    **Currency:** USD

Payment settled on 2nd, 2nd Month

**Incoterms:** FOB- FREIGHT COLLECT

---

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52415050 RFM-ASY-06 I.A. | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-May-2005 | 31-Dec-2006 | USD | 3,421.00 | 1,000 | PC |
| 01-Jan-2007 | 31-Dec-2007 | USD | 3,421.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

062706 Change Buyer Code
May 24, 2006: Buyer changed from Fred Clark to Doug McLean
************************************************************************************************
************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the

---

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

---

Date and Time Printed: 12-Dec-2006 16:41:15

# DELPHI

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550073730 | 25-Apr-2005 |
| Version | |
| 12-Dec-2006  16:41:15 | |

| Item No.   Material No.   Description | Plant |
|---|---|

## Notes Continued:

Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

*********************************************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

*********************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

*********************************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

*********************************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

*********************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

# DELPHI

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550073730 | 25-Apr-2005 |
| Version | |
| 12-Dec-2006  16:41:15 | |

| Item No.   Material No.<br>Description | Plant |
|---|---|

## Notes Continued

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material.  Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Delphi Consignment / Subcontracting:
1.  Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2.  Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3.  Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4.  Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5.  Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6.  Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7.  Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
     ). Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
 9.  If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10.  Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11.  Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12.  Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13.  These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements.  These terms may only be modified by a written contract amendment issued by Buyer.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Notwithstanding anything to the contrary contained in the Contract, the execution and/or delivery of this purchase order amendment is for the sole purpose of extending the term/expiration date of this purchase order and shall not be deemed to be an assumption or adoption of any agreement or a new post-petition contract.
The extended Contract shall be subject to assumption or rejection under Section 365 of the Bankruptcy Code and, in the event of rejection, any rejection claim shall be entitle to general unsecured non-priority pre-petition status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This replaces P/N 52402680.  (Cust 22699890)(57362)
New RFM for GMX-001 Program.

# DELPHI    Replaces 52402681

Delphi Thermal and Interior

Page  1  of  3

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073762 | 22-Apr-2005 |
| Version | |
| 12-Dec-2006  16:52:23 | |

**Deliver to:**

*Please deliver to:*
        *See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

| Vendor No:  1014930 |
|---|
| DUNS No:  147163542 |

| Payment Terms:  ZMN2 | Currency:  USD |
|---|---|
| Payment settled on 2nd, 2nd Month | |
| Incoterms:  FOB- FREIGHT COLLECT | |

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52415047 | J201 DELPHI T & I LOCKPORT |
| | CRFM-ASU-06 I.A. | |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-May-2005 | 31-Dec-2006 | USD | 3,548.60 | 1,000 | PC |
| 01-Jan-2007 | 31-Dec-2007 | USD | 3,548.60 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

062706 Change Buyer Code
May 24, 2006: Buyer changed from Fred Clark to Doug McLean
*********************************************************************************************************
*****************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the

Purchasing Contact: McLean, D. L.                    Contact Address:
Phone:  716-439-2480
Fax:  716-439-2216

# DELPHI

Delphi Thermal and Interior

Page 2 of 3

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

PO Number
550073762
Version
12-Dec-2006  16:52:23

Date Issued
22-Apr-2005

| Item No. | Material No. Description | Plant |
|----------|------------------------|-------|

**Notes Continued**

Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Restricted, toxic, and hazardous materials – Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

# DELPHI

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

## Requirements Contract

| | |
|---|---|
| PO Number | Date Issued |
| 550073762 | 22-Apr-2005 |
| Version | |
| 12-Dec-2006  16:52:23 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

## Notes Continued:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material.  Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Delphi Consignment / Subcontracting:
1.  Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2.  Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3.  Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4.  Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5.  Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6.  Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi.  Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7.  Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst.  All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8.  Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9.  If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements.  These terms may only be modified by a written contract amendment issued by Buyer.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Notwithstanding anything to the contrary contained in the Contract, the execution and/or delivery of this purchase order amendment is for the sole purpose of extending the term/expiration date of this purchase order and shall not be deemed to be an assumption or adoption of any agreement or a new post-petition contract.
The extended Contract shall be subject to assumption or rejection under Section 365 of the Bankruptcy Code and, in the event of rejection, any rejection claim shall be entitle to general unsecured non-priority pre-petition status.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This P/N replaces 52402681. (Customer 22699887) (57363). New CRFM for GMX-001 Program.  DGSS Action Plan: 72473
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# DELPHI

| Buyer: | Requirements Contract |
|---|---|
| DELPHI<br>THERMAL & INTERIOR SYSTEMS<br>200 UPPER MOUNTAIN RD<br>LOCKPORT NY 14094 | PO Number      Date Issued<br>550064260      12/08/2004<br>Version<br>06/09/2005 11:37:50 |

**Deliver to:**

*Please deliver to:*
**See Delivery Schedule**

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

| | |
|---|---|
| Vendor No: 1014930 | |
| DUNS No: 147163542 | |
| **Payment Terms:** ZMN2 | **Currency:** USD |
| Payment settled on 2nd, 2nd Month | |
| **Incoterms:** FOB- FREIGHT COLLECT | |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|
| 00010 | 52413078<br>ECFEM-APY-05 | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 12/08/2004 | 12/31/2010 | USD | 4,983.00 | 1,000 | PC |

This Requirement Contract is for 100% unless otherwise specified.

Co 08/09/05

**Notes:**
The customer part number is 15237362.
Tuner Coupe CRFM
Ship to GM Lordstown Assembly

******************

Purchasing Contact: Williams, E. A.                    Contact Address:

Phone: 716-439-2406

Fax: 716-439-3818

# DELPHI _____

Harrison Thermal Systems

Page  2 of 3

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550064260 | 12/08/2004 |
| Version | |
| 06/09/2005 11:37:50 | |

| Item No. | Material No. | Plant |
|---|---|---|
| | Description | |

---

**Notes Continued:**

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

1. Consignee agrees to maintain perpetual inventory records and retain records for at least 1 year. 2. Consignee agrees to submit by fax on a mutually agreed upon date, a monthly physical inventory indicating the month end balances by P/N or raw material code to the assigned material control consignment analyst. 3.

# DELPHI

Harrison Thermal Systems

Page  3  of 3

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

## Requirements Contract

| PO Number | Date Issued |
|---|---|
| 550064260 | 12/08/2004 |
| Version | |
| 06/09/2005 11:37:50 | |

| Item No. | Material No.<br>Description | Plant |
|---|---|---|

**Notes Continued:**

Consignee agrees to verify that the seal is intact on those sealed truckload where the seal number is indicated on the Delphi Harrison Thermal Systems Bill of Lading. 4. Consignee agrees to verify the accuracy of the material identification and counts received from the Delphi Thermal Plant. Each Bill of Lading must be checked completely at time of receipt and Delphi Thermal Production Control notified immediately of any discrepancy. Consignee will correct information on Bill of Lading, sign, and date and fax copy to production control. 5. Consignee agrees to segregate Delphi Thermal material & provide adequate protection and insurance for Delphi Thermal inventory from loss or damage. 6. Consignee agrees to return all defective or damaged parts and scrap to Delphi Thermal unless alternate arrangements have been made with Delphi Thermal Purchasing. Those consignees who ship directly to Delphi Thermal customers on behalf of Delphi Thermal must send an "Advance Shipping Notice" via Electronic Data Interchange to Delphi Thermal. 7. If consignee is determined to be at fault for scrap, Delphi purchasing will charge back consignee. 8. Consignee will fax to Delphi material control consignment analyst copies of shipping paperwork when shipping or receiving parts from other consignee locations. 9. Consignee agrees to allow Delphi scheduling and finance reps, the right to audit inventories as requested. 10. Consignee agrees to provide an annual certified (notarized) letter of physical inventory when Delphi Thermal conducts its annual physical inventory. 11. Tools provided for performance of an operation by consignee remain the property of Delphi Thermal unless otherwise noted. 12. Consignee agrees to ship material directly to Delphi Thermal customers if the physical flow warrants.
6/9/05 changed inco terms

# EXHIBIT B

Delphi - CRFM (OMX-601) Lordstown Ohio
Price Adjustments
September 01, 2004 to Sept 30, 2007
prepared by: Jessica Anthony 05-17-07

A) Adjustment for addition of TOC Clip
B) Adjustment for steel increase for screw purchased part from ITW medclet
C) Adjustment for change (shifts to 2 shifts)

# EXHIBIT C

# DELPHI AUTOMOTIVE SYSTEMS
## LONG TERM CONTRACT

### 1.    Purchase of Product

Automodular ("Seller") agrees to sell, and Delphi Automotive Systems LLC acting through its Delphi Thermal&Interior ("Buyer") agrees to purchase, approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Annual Tool Capacity |
|---|---|---|
| SEE EXHIBIT | A ATTACHED | 83 JOBS/HR |

### 2.    Term

With respect to each Product, the current model production term of this Contract is from CY 2005 beginning 01JUL05 through CY2010 ending 30JUN10.

### 3.    Prices

Subject to adjustment on account of savings initiatives implemented in accordance with Section 5 below, the per unit price of each Product is set forth below. All pricing is F.O.B. OSHAWA, ONTARIO,CANADA - TTOP.

| Year | Beginning | Price | UOM |
|---|---|---|---|
| SEE EXHIBIT A ATTACHED | | | |

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

Price is based on an exchange rate of 1.25. Effective first day of each quarter pricing will be adjusted to reflect the exchange rate as of that date. Bank of Nova

28/27/05  MON 14:46 FAX 1 517 327 9425    TSC MAR    Ⓩ002

Scotia USD exchange rate will be used as the basis for this adjustment.
Automodular reserves the right of setoff or recoupment against any amounts
owing to Delphi and its affiliates or subsidiaries.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product
remains competitive in terms of technology, design, service and quality with any
similar product available to Buyer. Following CY 01JUL06, Seller will also
assure that each Product remains competitive in terms of price with any similar
product available to Buyer. If, in the reasonable opinion of Buyer, a Product
does not remain competitive, Buyer, to the extent it is free to do so, will advise
Seller in writing of the area(s) in which a similar product is more competitive. If
(i) Seller does not, within ninety (90) days, present a plan to supply any Product
with comparable technology, design, quality, or, if applicable, price which is
reasonably determined by Delphi to be feasible or (ii) Seller fails to timely
implement and execute any such plan, Buyer may elect to purchase any similar
products available to Buyer without any liability to Seller under this Contract.

5.    **Savings Initiatives**

Buyer and Seller will work together to implement cost savings and productivity
improvements as outlined in the Creative Improvement Plan **(TO BE
DEVELOPED)** in order to reduce Seller's costs of supplying each Product.
Seller agrees to reduce the per unit price of each Product on account of any
savings in accordance with the Creative Improvement Plan.

In addition to the activities and initiatives set forth in the Creative Improvement
Plan, Seller agrees to work cooperatively with Buyer on Supplier Development
and Cost Management.

In terms of Supplier Development, Seller agrees to allow Buyer's Supplier
Development personnel to visit Seller's manufacturing operations to complete
lean manufacturing workshops and identify opportunities to improve the value
stream of Buyer's products. Seller will work cooperatively with Buyer's Supplier
Development personnel in documenting cost savings opportunities and possible
timing for implementation of these savings initiatives through the Creative
Improvement Plan or Buyer's Supplier Suggestion Program.

In terms of Cost Management, Seller agrees to provide detailed Cost
Breakdown Information as requested by Buyer. In addition, Seller agrees to
allow Buyer's Cost Management personnel to visit Seller's manufacturing
operations to fully develop a robust cost standard (i.e., an ideal cost structure)

06/27/05   MON 14:47 FAX 1 517 327 0426      TEC MAR                                                                    @003

for the Products.    Seller will provide the necessary resources (Finance, Engineering, Manufacturing, Management, Purchasing, etc.) and data to support Buyer's Cost Management Initiatives.    Seller and Buyer will work cooperatively to identify areas of cost reduction and Product and process improvements in order to close cost gaps and implement Product and process improvements so as to achieve actual costs that are in line with the applicable cost standard.

### 6.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end date of 01JUL06. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of 24JUN05.

Buyer:                                      Seller:

**Delphi Automotive Systems LLC**          **AUTOMODULAR**
acting through its Delphi Thermal&Interior

By: _Ca Williams_ 6/25/05                  By: _Winston R Ash_

Name: **Elizabeth A. Williams**            Name: _WINSTON R. ASH_

Title: **Buyer**                           Title: _VICE PRESIDENT_
                                                 6/27/05

AUG 19.48 FAX 1 517 327 0425    TEC NAR    ☒004

## EXHIBIT A

| AUTOMODULAR CREWs | ESTIMATED DEMAND | YEAR 1 7/2005 - 6/2006 | | YEAR 2 7/2006 - 6/2007 | | YEAR 3 7/2007 - 6/2008 | | YEAR 4 7/2008 - 6/2009 | | YEAR 5 7/2009 - 6/2010 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 52406063 | 143538 | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | |
| 52445806 | 143538 | 668,992 | $ | 668,992 | $ | 668,992 | $ | 668,992 | $ | 668,992 | $ | 3,344,960 |
| 62406399 | 143538 | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | |
| | | 668,892 | $ | 668,892 | $ | 668,892 | $ | 668,892 | $ | 668,892 | $ | 3,344,960 |
| 52410885 | 143538 | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | 4.6471 | | |
| | | 668,892 | $ | 668,892 | $ | 668,892 | $ | 668,892 | $ | 668,892 | $ | 3,344,960 |
| SERVICE => 52445809 | 100 | 36.0085 | | 36.0085 | | 36.0085 | | 36.0085 | | 36.0085 | | |
| | | 3,601 | $ | 3,601 | $ | 3,601 | $ | 3,601 | $ | 3,601 | $ | 18,003 |
| | | | | | | | | | | | | $ 13,395,842 |

NOTES:
TOTAL ESTIMATED DEMAND = 2460/DA
SERVICE ASSEMBLIES INCLUDE COST OF SERVICE PACK (~$30)
ALL PRICES ABOVE SUBJECT TO COST MODEL RESULTS AND SUBSEQUENT ADJUSTMENT
ALL PRICES ABOVE SUBJECT TO ADJUSTMENT FOR CURRENCY EXCHANGE (see LTA for details)

| | |
|---|---|
| 2460 | FX/DA |
| 205 | CU/YR |
| 575/00 | PC/N/YR |
| 4 | PN/s |
| 143538 | PC/PN |

LTA for AutomodVar assemblies
CMR 241,251
©227/2005

**Effective March 2004**

## DELPHI CORPORATION

## GENERAL TERMS AND CONDITIONS

### 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

### 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Taxes. Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer. Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges. Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4 Withholding of Taxes by Buyer. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

1

**Effective March 2004**

2.5  <u>Delivery Schedules</u>.  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract.  Time is of the essence with respect to all delivery schedules Buyer establishes.  Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules.  Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules.  If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6  <u>Premium Shipments</u>.  If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.  Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7  <u>Volume Forecasts</u>.  Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods.  Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections , are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time.  Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time.  Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

2

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense.  Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods.  Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter).  Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures.  During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract.  If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11.  Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Warranty Period</u>. In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise

3

**Effective March 2004**

expressly agreed in writing by an authorized employee of Buyer, end forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods. In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3   Remedies and Damages.  If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods.  Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4   Recalls.  Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8.  INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients.  Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9.  INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.  Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

4

**Effective March 2004**

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1 <u>Information Disclosed by Seller</u>. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2 <u>Waiver of Claims</u>. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3 <u>Repair and Rebuild</u>. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 <u>Software and Written Works</u>. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing

5

**Effective March 2004**

this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5  Development, Engineering And Consulting Services. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 13. INDEMNIFICATION

13.1  Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.  Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2  Activities on Buyer's Premises. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3  Product Liability . Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

6

**Effective March 2004**

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case less any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment. The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers. Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1 <u>Acquisition of Tooling and Materials</u>. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2 <u>Bailment of Buyer's Property</u>. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3 <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's

7

Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4 <u>Return of Buyer's Property</u>. Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5 <u>Disclaimer of Warranties</u>. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6 <u>Use of Buyer's Information</u>. Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer. Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer. "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

**18. SERVICE AND REPLACEMENT PARTS**

8

**Effective March 2004**

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1 Credits and Refunds. Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs-related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2 Customs-Trade Partnership Against Terrorism. To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by

9