**Hearing Date: February 26, 2008**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
　　　　　　　　　　　　　　　　　　　　　:
　　　　In re　　　　　　　　　　　　　　:　Chapter 11
　　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　　　:　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　(Jointly Administered)
　　　　　　　　Debtors.　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SIXTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SIXTH SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | June 1, 2007 through September 30, 2007 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$15,387,189** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$837,950** |
| Voluntary Reductions: | |
|    Monthly Fee Statements: | **$1,756,253** |
|    Sixth Fee Application: | **$57,146** |
| Total Voluntary Reductions: | **$1,813,399** |
| Additional Fee Correction: | **$12,865** |
| Total Voluntary Reduction and Fee Correction: | **$1,826,264** |

This is an/(a): _____X_____Interim _____Final Application.

Aggregate Amounts Paid to Date: **$62,323,629**[1]

---

[1]  Upon payment of the remaining amounts payable for the months covered by this interim application, Skadden will have received payments to date in the aggregate amount of $72,793,650.

## PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 ($9,187,586.67) | $622,420 ($622,420) |
| Second | 07/31/06 | 02/01/06 – 05/31/06 | $11,310,231 ($11,296,897.67) | $825,854 ($825,854) |
| Third | 11/30/06 | 06/01/06 – 09/30/06 | $10,025,538 ($10,012,204.66) | $848,232 ($848,232) |
| Fourth | 03/30/07 | 10/01/06 – 01/31/07 | $12,820,504 ($12,820,504) | $708,096 ($708,096) |
| Fifth | 07/31/07 | 02/01/07 – 05/31/07 | $12,589,501 ($12,589,501) | $678,644 ($678,644) |

TIME SUMMARY TO SIXTH INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
JUNE 1, 2007 – SEPTEMBER 30, 2007

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Butler, Jr., John (Jack) Wm. | 1980 | $801 | 1,187.5 | $950,661 |
| Cochran, Eric L. | 1987 | $845 | 750.0 | $633,755 |
| Hogan, III, Albert L. | 1997 | $668 | 807.6 | $539,780 |
| Marafioti, Kayalyn A. | 1980 | $830 | 639.2 | $530,536 |
| Panagakis, George N. | 1990 | $766 | 670.4 | $513,379 |
| Lyons, John K. | 1989 | $706 | 670.6 | $473,685 |
| Meisler, Ron E. | 1999 | $606 | 776.2 | $470,705 |
| Furfaro, John P. | 1981 | $810 | 272.6 | $220,806 |
| Hiestand, N. Lynn | 1981 | $816 | 190.8 | $155,620 |
| Berlin, Kenneth | 1974 | $810 | 131.2 | $106,272 |
| Berke, Jay S. | 1972 | $810 | 107.1 | $86,751 |
| Gross, Cliff | 1989 | $830 | 87.0 | $72,210 |
| Leff, Neil M. | 1981 | $830 | 70.7 | $58,681 |
| Frishman, Lawrence D. | 1989 | $810 | 24.6 | $19,926 |
| Saggese, Nick P. | 1980 | $875 | 14.1 | $12,338 |
| Brewster, Jody J. | 1983 | $775 | 13.8 | $10,695 |
| Noel, Gregg A. | 1982 | $845 | 11.0 | $9,296 |
| **Partner Total** | | **$757** | **6,424.4** | **$4,865,096** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $625 | 779.1 | $486,949 |
| Ramlo, Kurt | 1993 | $620 | 692.4 | $429,633 |
| MacDonald, F. Neil | 1997 | $570 | 382.7 | $218,130 |
| Garner, Lee P. | 1995 | $609 | 201.6 | $122,875 |
| Gasaway, Michelle | 1998 | $625 | 177.5 | $110,940 |
| Amodeo, John A. | 1977 | $625 | 106.6 | $66,626 |
| Sensenbrenner, Eric B. | 1996 | $625 | 81.9 | $51,189 |
| Ko, Jonathan B. | 1998 | $595 | 19.3 | $11,484 |
| Schneider, David A. | 1986 | $595 | 12.3 | $7,319 |
| Daniels, Steven J. | 1996 | $595 | 11.5 | $6,843 |
| **Counsel Total** | | **$613** | **2,464.9** | **$1,511,988** |

---

[2]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.  On September 1, 2007, Skadden modified its standard bundled hourly rates in accordance with firm policies for periodic rate adjustments as disclosed on Skadden's Retention Application (as defined below) and the supporting declaration attached thereto. Skadden has notified the Delphi Fee Review Committee (as defined below) of these changes in the standard bundled hourly rate schedule and, as an accommodation to the Debtors, those rate changes were made effective as of October 1, 2007.

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|---|---|---|---|---|
| **ASSOCIATES** | | | | |
| Ganitsky, Daniel I. | 2001 | $585 | 868.1 | $507,841 |
| Hardin, Adlai S. | 1998 | $585 | 857.2 | $501,467 |
| Wharton, Joseph N. | 1998 | $528 | 928.1 | $490,030 |
| Stuart, Nathan L. | 2002 | $480 | 1,019.2 | $488,817 |
| Fern, Brian M. | 1996 | $556 | 824.5 | $458,105 |
| Connors, Christopher P. | 1999 | $574 | 699.8 | $401,487 |
| Ogunsanya, Gregory O. | 2004 | $495 | 738.0 | $365,311 |
| Grant, T. Kellan | 2000 | $467 | 720.5 | $336,144 |
| Campanario, Nick D. | 2002 | $523 | 633.7 | $331,178 |
| Diaz, Lisa B. | 2006 | $360 | 884.6 | $318,280 |
| Hill, Laverne F. | 2005 | $388 | 806.5 | $312,722 |
| Houston, Brent M. | 2003 | $435 | 697.2 | $303,287 |
| Perl, Michael W. | 2004 | $427 | 704.5 | $300,611 |
| Howe, Eric J. | 2005 | $380 | 742.2 | $282,283 |
| Samole, Rena M. | 2000 | $562 | 499.8 | $280,898 |
| Herriott, Allison V. | 2004 | $435 | 615.4 | $267,707 |
| Gartner, Matthew | 2006 | $353 | 749.3 | $264,530 |
| Halper, Adam | 2005 | $390 | 671.7 | $261,963 |
| Platt, Sarah J. | 2006 | $353 | 687.7 | $242,697 |
| Kohut, Ronald D. | 2004 | $470 | 502.9 | $236,363 |
| Kaloudis, Denise | 2003 | $495 | 464.3 | $229,830 |
| Van Gelder, Amy | 2003 | $452 | 432.4 | $195,498 |
| Kahn, Melissa T. | 2003 | $470 | 408.7 | $192,089 |
| Bolton, Ian S. | 2005 | $379 | 498.4 | $188,742 |
| Suber, Karen M. | 2007 | $355 | 388.2 | $137,815 |
| Guzzardo, John | 2004 | $435 | 272.9 | $118,715 |
| Feinberg, Aaron S. | 2002 | $535 | 195.8 | $104,754 |
| Park, Young M. | 2001 | $542 | 133.5 | $72,349 |
| De Elizalde, Dolores | 2003 | $495 | 126.0 | $62,370 |
| Arkuss, Brett | 2007 | $355 | 165.8 | $58,860 |
| Ketchens, Jason P. | 2000 | $513 | 56.1 | $28,788 |
| Pilkington, Christian | Foreign (1999) | $585 | 48.6 | $28,432 |
| Garcia, Kara R. | 2003 | $495 | 56.7 | $28,067 |
| Boden Adams, Julie | 2005 | $435 | 54.3 | $23,621 |
| Louko, Tero | 2000 | $585 | 25.0 | $14,625 |
| Duncomb, Brandon M.* | 2007 | $315 | 45.8 | $14,427 |
| Jjingo, M. Janine | 2006 | $390 | 34.5 | $13,455 |
| Schockett, Paul | 2006 | $390 | 26.6 | $10,374 |
| Belin, Rita Sinkfield | 1996 | $585 | 17.7 | $10,355 |
| Horstmann, Britta | 2005 | $390 | 23.4 | $9,126 |
| Tullson, Carl T.* | 2007 | $315 | 26.9 | $8,474 |
| Phillips, Karen E. | 2001 | $495 | 13.8 | $6,831 |
| Malone, Elizabeth A. | 2002 | $495 | 12.4 | $6,138 |
| **Associate Total** | | **$463** | **18,378.7** | **$8,515,456** |

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|---|---|---|---|---|
| **PARAPROFESSIONALS** | | | | |
| Demma, Jeffrey | N/A | $250 | 579.7 | $144,925 |
| Zsoldos, Andrew F. | N/A | $190 | 580.2 | $110,238 |
| Klimek, Marsha V. | N/A | $250 | 262.4 | $65,600 |
| Chavali, Aruna | N/A | $160 | 387.2 | $61,952 |
| Shrago, Rebecca | N/A | $160 | 204.2 | $32,672 |
| Worscheck, Toby M. | N/A | $80 | 235.3 | $18,824 |
| Rivera, Maira | N/A | $80 | 153.2 | $12,256 |
| Gilchrist, Julie M. | N/A | $250 | 29.3 | $7,325 |
| Roman, Joseph J. | N/A | $80 | 72.0 | $5,760 |
| Kim, Anne S. | N/A | $160 | 31.1 | $4,976 |
| Donnelly, Neal P. | N/A | $225 | 21.4 | $4,816 |
| Nowicki, John A. | N/A | $250 | 18.1 | $4,525 |
| Robinson, Susan J. | N/A | $190 | 23.6 | $4,484 |
| Bower, Julie | N/A | $160 | 24.4 | $3,904 |
| Woodfield, Joseph | N/A | $160 | 24.3 | $3,888 |
| Angelica, Christopher L. | N/A | $160 | 23.5 | $3,760 |
| Seacor, Kirsten L. | N/A | $190 | 13.6 | $2,584 |
| Zylich, A. Kaitlin | N/A | $160 | 13.5 | $2,160 |
| **Paraprofessional Total** | | **$183** | **2,697.0** | **$494,649** |
| **TOTAL ALL PROFESSIONALS** | | | **29,965.0** | **$15,387,189** |
| This summary excludes voluntary fee reductions of $1,684,077, of which $1,626,931 was reduced on the monthly statements and $57,146[3] is an additional accommodation made to this Interim Application. | | | | |

\* These timekeepers are "Law Clerks." Law Clerks are law school graduates who have not yet been admitted to practice. For purposes of billing statistics, law clerks are included with associates. However, the Law Clerks were admitted to practice in November 2007, after the Application Period.

---

[3]  In accordance with Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995, Skadden has identified those entries within Exhibits D-1 through D-32 for which accommodations are being provided pursuant to this Interim Application.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
JUNE 1, 2007 – SEPTEMBER 30, 2007

| Activities | Hours | Fees |
|---|---|---|
| Claims Administration (General) | 7,252.6 | $3,282,362 (21.3%) |
| Reorganization Plan / Plan Sponsors | 5,332.7 | $2,925,360 (19.0%) |
| Customer Matters (GM) | 2,762.7 | $1,602,592 (10.4%) |
| Disclosure Statement / Voting Issues | 2,054.5 | $1,074,612 (7.0%) |
| Asset Dispositions (General) | 1,782.9 | $984,907 (6.4%) |
| Employee Matters (Labor Unions) | 1,595.5 | $975,028 (6.3%) |
| Case Administration | 1,572.8 | $532,746 (3.5%) |
| Litigation (Insurance Recovery) | 760.7 | $483,475 (3.1%) |
| Nonworking Travel Time | 1,186.3 | $372,449 (2.4%) |
| Employee Matters (General) | 537.6 | $340,268 (2.2%) |
| Asset Analysis and Recovery | 514.2 | $319,999 (2.1%) |
| General Corporate Advice | 519.2 | $312,176 (2.0%) |
| Tax Matters | 469.5 | $290,727 (1.9%) |
| Global Subsidiaries (Non-U.S.) | 414.8 | $271,417 (1.8%) |
| Retention / Fee Matters (SASM&F) | 536.7 | $214,878 (1.4%) |
| Retention / Fee Matters / Objections (Others) | 477.7 | $195,538 (1.3%) |
| Environmental Matters | 282.0 | $184,183 (1.2%) |
| Creditor Meetings / Statutory Committees | 329.4 | $161,985 (1.1%) |
| Rights Offering | 198.8 | $127,644 (0.8%) |
| Employee Matters (Pension) | 189.6 | $121,920 (0.8%) |
| Supplier Matters | 312.0 | $117,731 (0.8%) |
| Business Operations / Strategic Planning | 136.8 | $101,423 (0.7%) |
| Automatic Stay (Relief Actions) | 210.8 | $100,396 (0.7%) |
| Customer Matters (Reviews / Investigations) | 121.8 | $68,731 (0.4%) |
| Reports and Schedules | 75.3 | $46,758 (0.3%) |
| Financing (DIP and Emergence) | 74.2 | $45,574 (0.3%) |
| Claims Administration (Reclamation/Trust Funds) | 61.8 | $36,780 (0.2%) |
| Executory Contracts (Personalty) | 74.3 | $34,465 (0.2%) |
| Leases (Real Property) | 52.8 | $24,542 (0.2%) |
| Intellectual Property | 28.7 | $14,028 (0.1%) |

| Activities | Hours | Fees |
|---|---|---|
| Litigation (General) | 26.7 | $12,356 (0.1%) |
| Liquidation / Feasibility | 19.6 | $10,139 (0.1%) |
| **Total** | **29,965.0** | **$15,387,189** |

**Hearing Date: February 26, 2008**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                              :
       In re                     :     Chapter 11
                              :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                              :
                              :     (Jointly Administered)
           Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SIXTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SIXTH SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession (collectively, the "Debtors") in the above-captioned cases (the

"Reorganization Cases"), submits this sixth interim application (the "Interim Application")

seeking interim allowance and payment of compensation and reimbursement of expenses under 11

U.S.C. §§ 330 and 331 for the period from June 1, 2007 through September 30, 2007 (the

"Application Period").  Skadden submits this Interim Application for (a) allowance of

compensation for professional services rendered by Skadden to the Debtors and (b) reimbursement

of actual and necessary charges and disbursements incurred by Skadden in the rendition of

required professional services on behalf of the Debtors.  In support of this Interim Application,

Skadden represents as follows:

<u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee

of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee

appointed an official committee of equity holders (the "Equity Committee," and together with the

Creditors' Committee, the "Statutory Committees").

3.      On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

2

9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of

Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9264) (the "Disclosure Statement").  The Court commenced the hearing on the Disclosure

Statement and related solicitation procedures motion on October 3, 2007 and has scheduled the

hearing to continue on December 6, 2007.  Three orders with respect thereto were entered by this

Court on October 9, 2007 (Docket No. 10497), October 19, 2007 (Docket No. 10662), and

November 7, 2007 (Docket No. 10864).  The Debtors filed notices of potential amendments to the

Disclosure Statement and/or certain appendices thereto on October 29, 2007 (Docket No. 10759),

November 14, 2007 (Docket No. 10932), and November 16, 2007 (Docket No. 10964).  No order

approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

    4.    This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

    5.    The statutory predicates for the relief requested herein are sections 330 and

331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule

2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules").  This Interim Application has been prepared in

accordance with the Amended Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995 (the

"Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28

C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines,

the "Guidelines").  Pursuant to the Local Guidelines, a certification regarding compliance with

the Guidelines is attached hereto as Exhibit A.

<div align="center">Retention Of Skadden</div>

6.      Upon the commencement of the Reorganization Cases, the Debtors applied

to this Court for an order approving the retention of Skadden as their principal restructuring and

bankruptcy counsel (the "Retention Application") to perform legal services under a general

retainer that was necessary to enable the Debtors to faithfully execute their duties as

debtors-in-possession.  On November 4, 2005, this Court entered an order (the "Retention

Order")[4] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in

the Retention Application.[5]

7.      In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  Certain charges and disbursements are not

charged separately under the bundled rate structure as described in the Retention Application.

Other than an arrangement between Skadden and its members, there is no agreement or

understanding between Skadden and any person for the sharing of compensation to be received

for services rendered in this case.

---

[4]     A copy of the Retention Application, the supporting declaration, and the Retention Order are attached collectively hereto as Exhibit B.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.

[5]     The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.

Fee Procedures And Monthly Fee Statements

8.      On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was

subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986),

May 5, 2006 (Docket No. 3630), July 12, 2006 (Docket No. 4545), October 13, 2006 (Docket No.

5310), and December 11, 2006 (Docket No. 6145) (collectively and together with the Initial

Interim Compensation Order, the "Interim Compensation Order").

9.      To monitor costs to the Debtors' estates and avoid duplicative efforts in the

review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of the Fee Review Committee to

review, comment on, and, if necessary, object to the various fee applications filed in these

Reorganization Cases.  As stated above, on May 5, 2006, this Court authorized the establishment

of the Fee Review Committee and approved the Fee Review Protocol.  On August 17, 2006, this

Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc.

("LCC") as fee a analyst to assist the Fee Review Committee (Docket No. 4959).

10.     Pursuant to paragraphs 2(a), 2(j), and 7 of the Interim Compensation Order,

as supplemented, and the Fee Review Protocol, Skadden is submitting this Interim Application to

the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the

Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition

credit facility, and the members of the Fee Review Committee and its fee auditors.

Overview Of Delphi Corporation

11.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[6]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[7]

12.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

13.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of

---

[6]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[7]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

<u>Events Leading To The Chapter 11 Filing</u>

14.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[8] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

15.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

16.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

---

[8]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

<div align="center">The Debtors' Transformation Plan</div>

17.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[9] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[10] second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

---

[9]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"), and UBS Securities LLC ("UBS")) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors").  Under the Delphi-Appaloosa EPCA, the New Plan Investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.  On October 29, 2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).  In addition, on November 14, 2007, the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA.  A hearing on the motion and the additional proposed amendments is scheduled for December 6, 2007.

[10]    As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

and labor costs and to ascertain GM's business commitment to the Company;[11] third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and make

the necessary manufacturing alignment with their new focus;[12] fourth, transforming their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint;[13] and fifth, devising a workable

solution to their current pension situation.[14]

---

[11]    On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global
Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's
comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The GSA and
MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29
and November 14, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of
such amendments will be considered in connection with the confirmation of the Plan.

[12]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize
the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors
sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and
catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their
Saltillo, Mexico brake plant business and the manufacturing equipment and test development equipment at the
chassis facility in Saginaw, Michigan, and of bid procedures related to the upcoming sale of substantially all
assets used in their interiors and closures businesses. In addition, as announced publicly, the Debtors anticipate
selling additional non-core assets, including, without limitation, their steering business.

[13]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages. The Company's revised operating structure consists of its four core business segments: Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors
obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into
Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The
Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable,
accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes
and significantly reduce SG&A expenses as part of their transformation plan.

[14]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of
those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1,
2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried
Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified the conditional funding
waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a
plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.
On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees
Plan for the September 30, 2007 pension plan year. On October 25, 2007, this Court granted the Debtors' motion
for authority to perform under the terms of that waiver. On October 4, 2007, the IRS, at Delphi's request, further
modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most
recent waiver.

Significant Events During The Application Period

18.    Throughout these Reorganization Cases, the Debtors, with the assistance of
Skadden, have sought to achieve the goals as set forth in their transformation plan.  The
Application Period represents a milestone period for the Debtors because during such time, the
Debtors completed three of the five tenets of the Debtors' transformation plan, which has also
facilitated, in part, the formulation of the Debtors' plan of reorganization – another milestone
achieved during this Application Period.  Specifically, during the Application Period, the
Debtors, with Skadden's assistance:  (a) finalized agreements with Delphi's U.S. labor unions, (b)
concluded negotiations and documented a comprehensive settlement with GM, and (c) devised a
workable solution to the Debtors' pension situation by entering into waivers with the IRS.  In
addition, the Debtors also made significant progress in streamlining their product portfolio by
divesting certain product lines that have been identified as "non-core."  In addition to the Debtors'
success related to their transformation plan, during the Application Period, the Debtors entered
into the Delphi-Appaloosa EPCA and filed the Plan and related Disclosure Statement.  Finally,
the Debtors continued to make significant progress in the claims reconciliation process, which is
necessary to satisfy a provision of the Debtors' proposed plan and the Delphi-Appaloosa EPCA.

A.    Completion Of Three Tenets Of Transformation Plan

19.    As described above, the Debtors identified five key tenets in their
transformation plan that needed to be addressed to return to stable, profitable business operations.
During the Application Period, the Debtors achieved three of these tenets.  The first was to
modify the Debtors' labor agreements to create a competitive arena in which to conduct business.
After extensive negotiations during the Application Period, Delphi, its Unions (as defined below),
and GM signed a series of settlement agreements or memoranda of understanding which, among

other things, settled the Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing

Rejection of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing

Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "1113 And 1114 Motion").

Specifically, during the Application Period, Delphi entered into, and this Court approved,

settlement agreements with all six of the Delphi's U.S. labor unions.  Among other things, as

authorized and approved by this Court, these agreements modify, extend, or terminate provisions

of the existing collective bargaining agreements among Delphi and its Unions and cover issues

such as site plans, workforce transition, legacy pension and other postretirement benefits

obligations, and other comprehensive transformational issues.  The settlement agreements enable

continued transformation to more competitive wage and benefit levels for the Debtors' U.S.

hourly employees, address capacity, divestiture, work rules, and staffing level issues.  These

changes better position Delphi to retain existing business and attract new business.  As a result of

the settlements achieved with the Unions, the 1113 And 1114 Motion previously filed on March

31, 2006 was withdrawn without prejudice, resolving more than one year of litigation.

        20.    The second tenet of the Debtors' transformation plan was achieved by

concluding negotiations with GM which finalized GM's financial support for the Debtors' legacy

and labor costs and memorialized GM's business commitment to the Company.  During the

Application Period, the Debtors continued their discussions and negotiations with GM regarding

GM's contributions towards, among other things, resolution of GM legacy issues and the overall

supplier/customer relationship between Delphi and GM.  Because Delphi is GM's single largest

supplier, resolution of these matters is also of vital importance to GM.

        21.    The Debtors and GM developed comprehensive approaches for addressing

a wide range of matters, including the resolution of issues related to the Debtors' pension and

retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM,

the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for

certain ongoing commercial agreements.  By the end of August 2007, the Debtors and GM had

resolved substantially all of theses outstanding issues.

22.    On September 6, 2007, the Debtors and GM reached a final agreement, the

resolution of which is incorporated in two definitive agreements: the Global Settlement

Agreement and Master Restructuring Agreement.[15]  On the same day, both agreements, together

with their respective accompanying exhibits, were filed with this Court as exhibits to the Plan.

The GSA addresses primarily those matters for which the Debtors and GM have agreed upon

resolutions that can be implemented in the short term.  The MRA is intended to govern certain

aspects of the Debtors' and GM's commercial relationship following the Debtors' emergence from

the Reorganization Cases and will require a significantly longer period of time to implement.

Both agreements are integral to the Debtors financial and commercial transformation, and both

are necessary components of the Plan.

23.    A third tenet of the Debtors' transformation plan that was achieved during

the Application Period was the formulation of a workable solution to the Company's pension

situation.  During the Application Period, the Debtors negotiated a second pension plan funding

waiver from the IRS for their hourly pension plan.  The two waivers, when combined with the

proposed transfer of certain pension assets and liabilities from Delphi's hourly pension plan to

GM's hourly pension plan under Internal Revenue Code Section 414(l) and Employee Retirement

Income Security Act of 1974, as amended ("ERISA") Section 208, adequate exit financing, and

---

[15]    The Debtors and GM subsequently modified the GSA and the MRA to reflect current market conditions and
related changes to the Company's emergence capital structure and the form of Plan currency contemplated for
stakeholder distributions.

adequate equity infusions, will enable the Debtors to achieve their stated goal of resolving

pension funding deficiencies upon emergence from chapter 11.  After the Application Period, the

Debtors received this Court's approval to comply with the terms of the waiver.

B.    The Revised Investment Agreement, Plan, And Disclosure Statement

                24.    Prior to the Application Period, the Debtors executed an equity purchase

and commitment agreement (the "Original EPCA") with affiliates Appaloosa, Cerberus Capital

Management, L.P., and Harbinger, as well as Merrill and UBS (collectively, the "Original

Investors"), and a plan framework support agreement (the "PSA," together with the Original

EPCA, and several ancillary instruments, the "Original Framework Agreements") with the

Original Investors and GM.  During the Application Period, the Debtors terminated the Original

EPCA and the PSA and negotiated and entered into new framework agreements with new plan

investors later in July 2007.

                25.    As part of this process, the Debtors evaluated two proposals for a new

equity purchase and commitment agreement.  One proposal was from Appaloosa and the other

was submitted by Highland Capital Management, L.P. ("Highland").  After lengthy discussions,

including separate in-person meetings with Appaloosa and its counsel and Highland and its

counsel, Delphi's Board of Directors (the "Board"), a special committee formed by the Board, and

certain Skadden personnel met on July 16, 17, and 18, 2007 to consider the two final proposals for

a new equity purchase and commitment agreement.

                26.    On July 18, Delphi announced that it had accepted the Delphi-Appaloosa

EPCA, the proposal put forth by a new plan investor group led by Appaloosa.  Under the

Delphi-Appaloosa EPCA, which was approved by this Court on August 2, 2007, the new plan

investors agreed to invest up to $2.55 billion in cash in exchange for preferred and common

13

equity in the reorganized Delphi to support the Company's transformation plan and plan of

reorganization. As a result of the Debtors' achievements during the Application Period, the

Debtors were able to formulate a proposed Plan and Disclosure Statement, which were filed with

this Court on September 6, 2007. The Plan was based upon a series of global settlements and

compromises that involve every major group of constituents in the Reorganization Cases,

including: Delphi, its principal U.S. labor unions, GM, the Statutory Committees, and the lead

plaintiffs in certain securities and ERISA multidistrict litigation.

27.    Despite the efforts of the Debtors and their constituents, after filing the Plan

on September 6, 2007, the Debtors were required to consider amendments to the Plan when the

Debtors concluded that severe dislocation in the capital markets could preclude the Debtors from

raising approximately $7.1 billion in funded debt to finance the Plan. During the Application

Period, the Debtors, with the assistance of Skadden, began negotiating and drafting potential

amendments to the Plan. Ultimately, on October 29, 2007, after the Application Period, the

Debtors filed a notice of proposed amendments to the Disclosure Statement and related Plan

incorporating certain changes to the Plan and Disclosure Statement. On November 14 and 16,

2007, the Debtors, with the assistance of Skadden, filed additional proposed changes to the Plan,

among other things, and the Disclosure Statement, respectively. In addition, in order to resolve

certain stakeholders' objections to the Plan, certain proposed changes to the Plan and Disclosure

Statement are expected to be filed prior to the December 6, 2007 contested hearing on the

Disclosure Statement.

C.    Claims Administration

28.    One of the conditions in both the Original Framework Agreements and the

Delphi-Appaloosa EPCA is that certain "trade and other unsecured claims" would not exceed

14

$1.7 billion.[16]  As of the end of the Application Period, the Debtors had received more than

16,700 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In

addition, the Debtors have compared proofs of claim received to scheduled liabilities and

determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the

aggregate, these proofs of claim and scheduled liabilities assert more than $37 billion in

liquidated amounts plus certain unliquidated amounts.

    29.  During the Application Period, the Debtors and their advisors have devoted

a significant amount of time to the claims resolution process.  As a result of these efforts, the

Debtors reduced their total claims pool during the Application Period by approximately $573

million.  Specifically, during the Application Period, the Debtors with the assistance of their

advisors (a) filed six omnibus claims objections which ultimately disallowed, expunged, or

reduced approximately 600 claims in the approximate amount of $443 million pursuant to orders

entered both during and after the Application Period, (b) consensually resolved 66 claims that had

been adjourned pursuant to the claims objection procedures approved by this Court (the "Claims

Procedures"), resulting in the entry of stipulated orders disallowing, expunging, or reducing the

claims in the approximate amount of $26 million, (c) consensually resolved five claims that had

been scheduled for a hearing, resulting in the entry of stipulated orders disallowing, expunging, or

reducing the claims in the approximate amount of $104 million, and (d) successfully defended

against two motions to file late claims, resulting in the withdrawal of one of those motions and,

after a contested hearing, the entry of an order denying the other motion.  In addition, during the

Application Period, the Debtors filed a motion to, among other things, estimate and set a

maximum cap amount on unliquidated claims solely for voting purposes and setting appropriate

---

[16] The Debtors' success during the claims reconciliation process resulted in their ability to agree to a reduced cap of
$1.45 billion under the Delphi-Appaloosa EPCA and yielded value for other stakeholders.

reserves under the plan of reorganization, which ultimately capped approximately 70 fully and partially unliquidated claims.  The granting of this motion is another step towards facilitating the Debtors ability to move to the final phase of these chapter 11 cases.

<div align="center">Requested Fees And Reimbursement Of Expenses</div>

30.    Skadden has been directly involved with advising the Debtors in substantially all aspects of their restructuring efforts.  As a result of its efforts during the Application Period, Skadden now seeks interim allowance of $15,387,189 in fees calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked on the Reorganization Cases, and $837,950 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Application Period.

31.    This Interim Application reflects (a) a voluntary reduction by Skadden in connection with each monthly statement in the aggregate amount of $1,626,931 with respect to fees (generally including the elimination from any matter of any timekeeper who recorded less than one hour in each monthly statement and the elimination of any timekeeper who in each monthly statement recorded less than $2,500 in the aggregate on all Delphi matters) and $129,322 with respect to charges and disbursements (including, among other things, certain reductions to in-firm food services utilized for various Delphi stakeholder meetings to comply with the Fee Review Committee's guidelines), (b) an additional voluntary reduction in the amount of $57,146 in connection with this Interim Application to reflect, among other things, the elimination of all fees related to (i) any timekeeper who billed fewer than ten total hours during the Application Period, (ii) any timekeeper who billed less than $1,000 during the Application Period, (iii) any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) the elimination of any matter to which fewer than ten hours were

<div align="center">16</div>

billed during the Application Period, and (c) an adjustment to reduce the proposed fees sought by

$12,865 to correct certain discrete billing matters related to five timekeepers.  Accordingly,

including the voluntary client accommodations in connection with each monthly statement,

Skadden is voluntarily reducing its fees by $1,684,077,[17] or approximately 9.9%, and its charges

and disbursements by $129,322, or approximately 13.4%, for a total reduction of $1,813,399 for

items that Skadden normally would bill its clients.[18]

        32.    In staffing this case, in budgeting and incurring charges and disbursements,

and in preparing and submitting this Interim Application, Skadden has been mindful of the need

to be efficient while providing appropriate and vigorous representation of the Debtors.  As

described in detail herein, Skadden believes that the requests made in this Interim Application

comply with this Court's standards in the context of the unique circumstances surrounding these

unusually large and complex cases.

<div align="center">Summary Of Services Rendered By<br>
<u>Skadden During The Application Period</u></div>

        33.    Throughout the Application Period, Skadden has worked closely with the

Debtors and their advisors to administer these estates and maximize the return for

parties-in-interest.  These services have been directed toward a myriad of tasks necessary to

achieve this result.  To meet the Debtors' needs, Skadden has provided multi-disciplinary services

on a daily basis, often working nights, weekends, and holidays.  Throughout this process, certain

---

[17]    This voluntary accommodation does not include the  $12,865 credit.

[18]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services
rendered.  The amounts requested are already reduced to reflect the client accommodations described herein.  To
the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client
accommodations and seek up to the full amount of fees and expenses actually incurred in connection with this
engagement.  Furthermore, Skadden reserves its right to recapture and seek allowance of all client
accommodations as part of its final fee application, including by way of illustration, $146,523 in fees incurred by
summer associates working on these cases during the Application Period, which were written off by the firm.

<div align="center">17</div>

of the principal Skadden attorneys working on the Reorganization Cases were required to devote the vast majority of their time to this matter, often to the exclusion of other clients. As a result of the efforts of the Debtors and their professionals, the Debtors continued to make substantial progress in evaluating their businesses and pursuing their transformation plan, by, among other things, negotiating and reaching consensual agreements with its U.S. labor unions and GM; negotiating, drafting, and filing the Plan; and continuing to reconcile claims asserted against the Debtors at an intense pace, all designed to facilitate the Debtors' goal of emerging from chapter 11 during the first quarter of 2008.

34.    At the commencement of the Reorganization Cases, Skadden created 45 different matter numbers or subject-matter categories (the "Matter Categories") to which its professionals assigned the time billed by them, all of which are related to the tasks performed by Skadden on behalf of the Debtors.[19]  Skadden has kept a contemporaneous record of the time spent rendering such services and, consistent with the Guidelines, separated tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary for the proper administration of the Reorganization Cases.

35.    Skadden devoted approximately <u>74.6%</u> of its time to the following seven matters, each of which was responsible for fees <u>in excess of $500,000</u> during the Application Period:  Claims Administration (General), Reorganization Plan/Plan Sponsors, Customer Matters (GM), Disclosure Statement/Voting Issues, Asset Dispositions (General), Employee Matters (Labor Unions), and Case Administration.

---

[19]    There are now 47 Matter Categories because Skadden added two additional matter categories since the Petition Date: Customer Matters (Review and Investigations) and Rights Offering.  <u>Exhibit C</u> contains a table of all matter numbers used by Skadden in these Reorganization Cases, as well as a description of certain business statistics of Skadden in these Reorganization Cases.

36.    Skadden devoted approximately <u>14.7%</u> of its time in the aggregate to the following seven matters, billings for each of which were <u>between $250,000 and $500,000</u> during the Application Period:  Litigation (Insurance Recovery), Nonworking Travel Time, Employee Matters (General), Asset Analysis And Recovery, General Corporate Advice, Tax Matters, and Global Subsidiaries (Non-U.S.).

37.    The remainder of time billed by Skadden (approximately <u>10.7%</u>) was devoted to the following nine matters, each of which accounted for <u>less than $250,000</u> during the Application Period:  Retention/Fee Matters (SASM&F), Retention/Fee Matters/Objections (Others), Environmental Matters, Creditor Meetings/Statutory Committees, Rights Offering, Employee Matters (Pension), Supplier Matters, Business Operations/Strategic Planning, and Automatic Stay (Relief Actions)Customer Matters (Reviews/Investigations), Reports And Schedules, Financing (DIP And Emergence), Claims Administration (Reclamation/Trust Funds), Executory Contracts (Personalty), Leases (Real Property), Intellectual Property, Litigation (General), and Liquidation/Feasibility.

<u>Matters Exceeding $500,000</u>

A.    <u>Claims Administration (General)</u>

38.    As of September 30, 2007, the Debtors had received more than 16,700 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim received to scheduled liabilities and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, these proofs of claim and scheduled liabilities assert more than $37 billion in liquidated amounts plus certain unliquidated amounts.

39.     Pursuant to section 12.2(f) of the Plan, a condition to consummation is that certain "trade and other unsecured claims" be reduced to $1.7 billion or less.  Accordingly, during the Application Period, the Debtors, with the assistance of Skadden and other professionals, devoted a significant amount of time to (i) identifying disputed proofs of claim, (ii) objecting to these proofs of claim pursuant to omnibus claims objections, (iii) presenting omnibus objections at omnibus hearings, and (iv) litigating and/or resolving contested claim objections.

40.     During the Application Period, the Debtors, with the assistance of Skadden and other professionals, continued their identification of numerous proofs of claim subject to objection on both procedural and substantive grounds and filed six omnibus claims objections. These six omnibus claims objections ultimately resulted in the entry of orders, both during and after the Application Period, disallowing, expunging, or reducing approximately 600 proofs of claim in the approximate amount of $443 million.

41.     Also during the Application Period, Skadden assisted the Debtors in working on many contested claims for which the applicable hearings had been adjourned pursuant to the Claims Procedures.  The Debtors, with the assistance of Skadden, were able to consensually resolve 66 of these claims without the need to notice them for further contested hearings, resulting in the entry of orders during the Application Period disallowing, expunging, or reducing the claims in the approximate amount of $26 million.

42.     Pursuant to the Claims Procedures, Skadden also assisted the Debtors during the Application Period in identifying six contested claims to be noticed for further contested hearings.  During the Application Period, Skadden continued to work on these six contested claims as well as approximately 15 additional claims that were already noticed prior to the Application Period for further contested hearings.  Skadden worked on resolving these claims

20

by (i) participating in multiple "meet and confer" discussions and mediations, (ii) engaging in

extensive negotiations leading to the ultimate resolution of a large number of the claims, and (iii)

litigating the remaining claims, each at different stages of the Claims Procedures.  This litigation

required drafting and responding to discovery requests, preparing witnesses, and drafting trial

briefs.  As a result of these services provided by Skadden, the Debtors were able to negotiate,

during the Application Period, the consensual resolution of five contested claims noticed for

further contested hearings.  The consensual resolution of these five claims resulted in the entry,

during the Application Period, of orders disallowing, expunging, or reducing the claims in the

approximate amount of $104 million.

   43.  In addition, during the Application Period, two claimants filed motions to

file proofs of claim after the bar date.  Skadden assisted the Debtors in objecting to these motions.

As a result, one of the claimants withdrew its motion with prejudice (Docket No. 9652), and after

a contested hearing during the Application Period, the other motion was denied, by an order of

this Court, which was entered after the Application Period (Docket No. 10410).

   44.  Finally, during the Application Period, Skadden assisted the Debtors in

their attempt to quantify the large amount of unliquidated claims by filing a motion to (i) estimate

and set a maximum cap amount on these claims solely for the purposes of distribution and voting

and (ii) establish certain expedited estimation procedures (Docket No. 9297).  Skadden further

assisted the Debtor in analyzing and resolving seven substantive objections to those estimation

procedures, which resulted in the entry of an order (Docket No. 9685) during the Application

Period capping 70 fully and partially unliquidated claims.

   45.  In connection with the foregoing services, Skadden expended 7,252.6 hours

during the Application Period for which Skadden seeks compensation of $3,282,362, or 21.3% of

the total compensation sought in this Interim Application.[20]  Detailed time entries of each

Skadden professional related to these services are attached hereto as <u>Exhibit D-1</u>.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Joseph N. Wharton | $565 | 703.3 | $397,365 |
| Christopher P. Connors | $585 | 562.2 | $328,887 |
| Lisa B. Diaz | $390 | 712.8 | $277,992 |
| John K. Lyons | $775 | 354.7 | $274,894 |
| Eric J. Howe | $390 | 691.5 | $269,685 |
| Laverne F. Hill | $390 | 512.1 | $199,719 |
| Amy Van Gelder | $470 | 389.1 | $182,877 |
| Sarah J. Platt | $355 | 510.0 | $181,050 |
| Michael W. Perl | $435 | 352.5 | $153,338 |
| Melissa T. Kahn | $470 | 313.7 | $147,439 |
| Albert L. Hogan III | $695 | 189.1 | $131,426 |
| Brent M. Houston | $435 | 279.0 | $121,366 |
| Nick D. Campanario | $535 | 173.4 | $92,770 |
| Matthew Gartner | $355 | 231.3 | $82,112 |
| Thomas J. Matz | $625 | 77.3 | $48,313 |
| Kurt Ramlo | $625 | 58.7 | $36,688 |
| John Guzzardo | $435 | 78.4 | $34,105 |
| Rena M. Samole | $565 | 60.3 | $34,071 |
| Kayalyn A. Marafioti | $830 | 39.7 | $32,951 |
| George N. Panagakis | $810 | 28.4 | $23,004 |
| Ron E. Meisler | $630 | 33.1 | $20,853 |
| Ian S. Bolton | $390 | 37.7 | $14,703 |
| Carl T. Tullson | $315 | 26.9 | $8,474 |
| John (Jack) Wm. Butler, Jr. | $875 | 8.3 | $7,263 |
| Brandon M. Duncomb | $315 | 15.0 | $4,725 |

---

[20]  This compares to $31,974, or 0.3%, $151,245, or 1.3%, $467,214, or 4.7%, $2,081,005, or 16.2%, and $3,336,137, or 26.5%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nathan L. Stuart | $495 | 3.6 | $1,782 |
| Allison V. Herriott | $435 | 3.2 | $1,392 |
| Paraprofessional Total | | 807.3 | $173,118 |
| **Total** | | **7,252.6** | **$3,282,362 (21.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$143,924** |

B.    Reorganization Plan/Plan Sponsors

46.    During the Application Period the Debtors, with the assistance of Skadden, made significant progress on several key matters in connection with their Plan as they continued on their path toward emergence from chapter 11. As discussed below, these accomplishments include, among other things, entering into the Delphi-Appaloosa EPCA following termination of the Original EPCA, and negotiating, documenting, and filing the Plan.

47.    In the summer of 2006, prior to the Application Period, Appaloosa and Harbinger, as significant stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring. Following several months of negotiations among Delphi, GM, the Statutory Committees, Appaloosa, Harbinger, and other potential investors, on December 18, 2006, the Debtors announced their execution of the Original Framework Agreements (including the PSA and the Original EPCA) with the Original Investors and GM. The PSA, as well as the economics and structure of the plan framework itself, were expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM. Both Delphi and the Original Investors were permitted to terminate the Original EPCA

23

(which would terminate the PSA) if consensual agreements were not reached with the Debtors' U.S. labor unions and GM that were acceptable to each party in their sole discretion.

48.    During May and June 2007, while continuing discussion with the Original Plan Investors regarding an agreement to modify the Original EPCA, as well as conducting discussions with alternative plan investors with respect to new equity purchase and commitment agreements, the Debtors, with the assistance of Skadden, also focused intensely on negotiations with their principal U.S. labor unions and GM.  During this time period, GM and the Debtors agreed on the documentation architecture for their settlement and restructuring agreements (details about these negotiations are discussed in other sections of this Interim Application).

49.    Despite many positive developments under the Original Framework Agreements, the Debtors, with the assistance of Skadden, determined that they would be unable reach definitive agreements with their various constituencies and investors that would allow the Original Framework Agreements to serve as a basis for the Debtors' plan of reorganization. Therefore, on July 7, 2007, the Debtors sent a termination notice of the Original EPCA to the Original EPCA counterparties, and as a result, all obligations of the Original Investors under the PSA were immediately terminated.  On July 9, 2007, the Debtors publicly disclosed that it had terminated the Original EPCA and the PSA.

50.    In addition, during the Application Period, while the Debtors were negotiating with Appaloosa, the Debtors received a proposal from Highland, which included a draft of a potential investment agreement from Highland.  The Debtors, with the assistance of Skadden, reviewed and evaluated the various draft proposals.  The Debtors, with the assistance of Skadden, actively continued discussions with both Appaloosa and Highland and kept their key stakeholders, including GM and the Statutory Committees, apprised of the plan investor

developments.  On July 16, 2007, the Board met to consider two proposals for a new equity

purchase and commitment agreement – one put forward by an investor group led by Appaloosa,

and the other proposed by Highland.  The Board met again on July 17 to consider the proposals.

The Board formed a special committee and delegated authority on behalf of the Company to the

special committee.

51.    After significant deliberations, on July 18, 2007, Delphi announced that it

had accepted the proposal submitted by the investor group lead by Appaloosa.  While the

negotiations were taking place, Skadden assisted the Debtors in drafting a motion requesting this

Court's approval of the proposal now referred to as the Delphi-Appaloosa EPCA.[21]  Under the

Delphi-Appaloosa EPCA, the investors agreed to invest up to $2.55 billion in cash to support the

Company's transformation plan and plan of reorganization in exchange for preferred and common

equity in the reorganized Delphi.  This Court approved the Delphi-Appaloosa EPCA on August 2,

2007.[22]

52.    In the weeks leading up to Highland's mid-July proposal, Highland engaged

in due diligence to consider whether to submit a formal proposal to enter into an investment

agreement with the Debtors.  In connection with Highland's due diligence efforts and in addition

to the business side diligence that commenced simultaneously, numerous attorneys for Highland

visited the data room (which had previously been established) in Troy, Michigan on various

occasions to review documents.  To facilitate this review process, Skadden professionals were on

site in Troy to prepare and update the data room and to coordinate with counsel to Highland to

---

[21]    Expedited Motion For Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment
Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) filed on July 18, 2007
("Delphi-Appaloosa Investment And Plan Framework Motion") (Docket No. 8673).

[22]    Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And Commitment Agreement Pursuant
To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) (Docket No. 8856).

ensure sufficient access to the appropriate documents.  Moreover, given the time sensitivity to the

diligence, Skadden assisted the Debtors in providing access to the data room beyond normal

business hours, including late night hours, and weekend access.  Following the on-site visits,

Skadden also assisted the Debtors in responding to numerous requests submitted by Highland for

copies of documents that were reviewed in the data room in Troy.  Throughout this process,

Skadden professionals participated in numerous conference calls and meetings between the

Debtors and counsel to Highland to facilitate a timely and efficient flow of information between

the parties.  Additionally, Skadden assisted the Debtors' in-house counsel in an attempt to find

additional responsive documents to certain supplemental diligence requests submitted by both

Appaloosa and Highland.

       53.    Also, during the Application Period, the Debtors, with the assistance of

Skadden, reviewed, and drafted several nondisclosure agreements, including amendments to

previously executed agreements, entered into with potential plan investors, such as Appaloosa

Highland, and other members of the New Plan Investors.

       54.    Moreover, throughout the Application Period, the Debtors, with the

assistance of Skadden, continued drafting and negotiating their plan of reorganization, including

researching various related legal issues.  After the Debtors formally entered into the

Delphi-Appaloosa EPCA, Skadden assisted the Debtors in updating and revising the draft plan of

reorganization in accordance with the terms of the Delphi-Appaloosa EPCA.  On September 6,

2007 – the same date that a settlement was executed with GM – the Debtors filed their Plan and

related Disclosure Statement with this Court.  The filing of the Plan and announced settlement

with GM were milestone events in the Reorganization Cases and were the result of many months

of extraordinary work and effort put forth by the Debtors and their professional advisors, including Skadden.

55.    To achieve these milestones, during the Application Period, Skadden participated in numerous meetings with representatives and key executives of the Debtors to coordinate the review of the Plan and related exhibits.  Additionally, Skadden assisted the Debtors and their financial advisors in evaluating dozens of proposed changes thereto.  In addition, Skadden worked closely with the Debtors, and representatives of the New Plan Investors, GM, and other key parties to coordinate and incorporate the various proposed changes to the Plan and related Disclosure Statement.

56.    After filing the Plan on September 6, 2007, the Debtors were required to consider amendments to the Plan when the Debtors concluded that severe dislocation in the capital markets could preclude the Debtors from raising approximately $7.1 billion in funded debt to finance the Plan.  Thereafter, the Debtors, with the assistance of Skadden, began negotiating, drafting, and researching potential amendments to the Plan and the effect such amendments would have on the various constituencies.  After the Application Period, on October 29, 2007, the Debtors filed a notice of potential amendments to the Disclosure Statement (Docket No. 10759).  On November 14, 2007, the Debtors filed a notice of further proposed amendments to certain appendices of the Disclosure Statement (Docket No. 10932).  On November 16, 2007, the Debtors filed a notice of further proposed amendments to the Disclosure Statement (Docket No. 10964).  In addition, in order to resolve certain stakeholders' objections to the Plan, certain proposed changes to the Plan and Disclosure Statement are expected to be filed prior to the December 6, 2007 contested hearing on the Disclosure Statement.

57.    Finally, in part due to the ongoing and lengthy nature of the discussions relating to the Original EPCA during the beginning of the Application Period, the Debtors concluded that is was necessary to file their fourth motion to extend the exclusive periods to file and solicit acceptances of a plan of reorganization (Docket No. 8273), which were scheduled to expire on July 31, 2007 and September 30, 2007, respectively. To allow the Debtors additional time to enter into agreements with their various U.S. labor unions and GM, as required under the Original EPCA, and to pursue and consider various proposed investment agreements, Skadden assisted the Debtors in seeking an extension of the exclusive periods to file and solicit acceptances of a plan of reorganization through and including December 31, 2007 and February 29, 2008, respectively. This Court entered an order approving the motion on June 29, 2007 (Docket No. 8490).

58.    In connection with the foregoing services, Skadden expended 5,332.7 hours during the Application Period for which Skadden seeks compensation of $2,925,360, or 19.0% of the total compensation sought in this Interim Application.[23] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-2. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nathan L. Stuart | $495 | 636.3 | $314,969 |
| Eric L. Cochran | $845 | 363.8 | $307,412 |
| George N. Panagakis | $810 | 338.2 | $273,942 |
| Daniel I. Ganitsky | $585 | 452.7 | $264,830 |
| John (Jack) Wm. Butler, Jr. | $875 | 266.2 | $232,927 |

[23] This compares to $14,195, or 0.2%, $20,728, or 0.2%, $820,818, or 8.2%, $4,147,192, or 32.3%, and $2,515,285, or 20.0%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Adam Halper | $390 | 572.6 | $223,314 |
| Ian S. Bolton | $390 | 379.8 | $148,122 |
| Kayalyn A. Marafioti | $830 | 157.6 | $130,808 |
| Thomas J. Matz | $625 | 158.0 | $98,751 |
| Adlai S. Hardin | $585 | 159.6 | $93,366 |
| Neil MacDonald | $595 | 127.6 | $75,923 |
| Albert L. Hogan III | $695 | 104.1 | $72,350 |
| Lee P. Garner | $625 | 110.0 | $68,750 |
| Michael W. Perl | $435 | 152.4 | $66,295 |
| Kellan Grant | $470 | 137.9 | $64,813 |
| Nick D. Campanario | $535 | 112.0 | $59,920 |
| John Guzzardo | $435 | 127.3 | $55,376 |
| Brett Arkuss | $355 | 139.3 | $49,452 |
| Matthew Gartner | $355 | 137.6 | $48,848 |
| Ron E. Meisler | $630 | 77.1 | $48,573 |
| Karen M. Suber | $355 | 79.5 | $28,224 |
| Kara R. Garcia | $495 | 56.7 | $28,067 |
| Allison V. Herriott | $435 | 57.9 | $25,188 |
| Melissa T. Kahn | $470 | 33.7 | $15,839 |
| Tero Louko | $585 | 25.0 | $14,625 |
| Kurt Ramlo | $625 | 20.6 | $12,875 |
| Rita Sinkfield Belin | $585 | 17.7 | $10,355 |
| Brent M. Houston | $435 | 22.5 | $9,788 |
| Britta Horstmann | $390 | 23.4 | $9,126 |
| Gregory O. Ogunsanya | $495 | 14.1 | $6,980 |
| Joseph N. Wharton | $565 | 10.5 | $5,933 |
| John K. Lyons | $775 | 7.4 | $5,735 |
| Sarah J. Platt | $355 | 9.4 | $3,337 |
| Michelle Gasaway | $625 | 4.3 | $2,688 |
| John P. Furfaro | $810 | 2.5 | $2,025 |
| Brian M. Fern | $565 | 2.5 | $1,413 |
| Rena M. Samole | $565 | 1.9 | $1,074 |

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Paraprofessional Total | | 233.0 | $43,347 |
| **Total** | | **5,332.7** | **$2,925,360 (19.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$175,376** |

C.    Customer Matters (GM)

59.    As in prior Application Periods, Skadden continued to assist the Debtors with various matters related to GM, the Debtors' largest customer and former parent. One of the key tenets of the Debtors' transformation plan consists of finalizing GM's financial support for the Debtors' legacy and labor costs and documenting GM's business commitment to the Company following the Debtors' emergence from chapter 11. Subject to confirmation and consummation of the Plan, this tenet was achieved during this Application Period.

60.    Although the Debtors filed a motion to reject certain unprofitable GM supply contracts (Docket No. 3033) (the "GM Contract Rejection Motion") in March 2006, as a result of the progress achieved in connection with the Original Framework Agreements, the Debtors sought, and this Court approved, an order suspending prosecution of the GM Contract Rejection Motion indefinitely, effective January 31, 2007 (Docket No. 6778). The suspension of the GM Contract Rejection Motion continued in effect throughout the Application Period while the Debtors, with the assistance of Skadden, continued to pursue a consensual resolution of various commercial and structural issues with GM.

61.    During this Application Period, both Delphi and GM devoted significant resources to negotiating the terms of a comprehensive settlement of existing disputes. Following extensive negotiations, the Debtors and GM have determined to settle various disputes and compromise certain claims as provided by two principal agreements: (a) the GSA and (b) the MRA. The GSA addresses primarily those matters for which the Debtors and GM have agreed

upon resolutions that can be implemented in the short term.  Accordingly, most obligations set

forth in the GSA are to be performed upon, or as soon as reasonably practicable after, the effective

date of the Debtors' Plan.  By contrast, resolution of most of the matters addressed in the MRA

will require a significantly longer period that will extend for a number of years after confirmation

of the Plan.  Both agreements are integral to the Debtors financial and commercial

transformation, and both are necessary components of the Debtors' Plan.

      62.     The discussions between the Debtors and GM that ultimately led to the

terms set forth in the GSA and the MRA began prior to the Petition Date and intensified after the

Debtors filed the GM Contract Rejection Motion.  As part of a joint effort to avoid litigation

related to the GM Contract Rejection Motion, during the spring and summer of 2006, the Debtors

and GM developed the framework for GM's contributions to the Debtors in support of the

Transformation Plan and the guiding tenets for strengthening the parties' business relationship to

achieve mutually beneficial commercial and strategic objectives, which are reflected in the GSA

and the MRA.

      63.     The Debtors' discussions with GM continued through April 2007.  By May

2007, the parties had agreed on the broad outlines of the GSA and the MRA.  Throughout the

Application Period, working groups of specialists in various subject matter areas together with

senior management of the Debtors and GM developed comprehensive approaches for addressing

a wide range of matters, including the resolution of issues related to the Debtors' pension and

retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM,

the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for

certain ongoing commercial agreements.  The parties exchanged initial drafts of various sections

of the GSA and the MRA in July 2007 and negotiated specific terms and conditions over the

succeeding six weeks.  Both the Settlement Agreement and the Restructuring Agreement were substantially complete by the end of August 2007.

64.    On September 6, 2007, the Debtors and GM reached a final agreement on the definitive terms of the GSA and MRA.  On the same day, both agreements, together with their respective accompanying exhibits, were filed with this Court as exhibits to the Debtors' Plan. Following the completion of the these negotiations and the filing of the two agreements with the Plan, the Debtors and GM have negotiated amendments to both documents.  These proposed amendments were filed after the Application Period on October 29 and November 14, 2007, together with additional proposed changes to the Plan.  Some of these proposed changes reflect developments that occurred subsequent to the filing of the original agreements, and others are technical or administrative.  Both agreements remain subject to this Court's approval as part of the confirmation process.

65.    Throughout this process, Skadden professionals provided extensive assistance to the Debtors in drafting and negotiating the settlement and restructuring agreements. Skadden attorneys from various disciplines attended and participated in numerous negotiating sessions with GM and its counsel.  Skadden attorneys also drafted, reviewed, and revised both agreements throughout the negotiation process.  Finally, Skadden attorneys prepared materials related to the agreements for the benefit of various constituencies, including the Board and the Statutory Committees.

66.    In addition, prior to the Application Period, on July 31, 2006, GM filed a proof of claim in the approximate amount of $530 million plus unliquidated amounts arising from GM warranty claims, and alleging that GM would incur additional costs over time.  During discussions with GM regarding the comprehensive settlement agreements that are incorporated

into the Plan, the parties expressed interest in resolving known warranty claims.  Accordingly, during the Application Period, the Debtors, with the assistance of Skadden, negotiated with GM to resolve these warranty claims.  During these negotiations, GM advised the Debtors that since July 31, 2006, the aggregate amount of the warranty claims had increased substantially from the amount originally asserted in GM's proof of claim.  After several months of negotiations, the Debtors, with the assistance of Skadden, agreed to settle all known outstanding GM warranty claims pursuant to a settlement agreement with GM.  In connection with the settlement agreement, Skadden assisted the Debtors in drafting and prosecuting a motion to approve the settlement agreement, which was approved by this Court, just after the Application Period, on October 2, 2007 (Docket No. 10408).

67.    Finally, during the Application Period, the Debtors, with the assistance of Skadden, filed a Motion seeking authority for Delphi and Delphi Technologies Inc., an affiliate Debtor, to enter into and perform their obligations under a license agreement with General Motors Global Technology Operations, Inc. and GM.  This Court granted the Debtors' motion to enter into the license agreement on October 3, 2007 (Docket No. 10429), just after the conclusion of the Application Period.

68.    In connection with the foregoing services, Skadden expended 2,762.7 hours during the Application Period for which Skadden seeks compensation of $1,602,592, or 10.4% of the total compensation sought in this Interim Application.[24]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-3.  A summary of

---

[24]    This compares to $458,182, or 5.0%, $1,789,803, or 15.8%, $1,699,180, or 16.9%, 80,818, or 0.6%, and $308,254, or 2.4%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Gregory O. Ogunsanya | $495 | 691.1 | $342,095 |
| Adlai S. Hardin | $585 | 564.3 | $330,117 |
| Eric L. Cochran | $845 | 297.9 | $251,726 |
| Daniel I. Ganitsky | $585 | 325.0 | $190,125 |
| John (Jack) Wm. Butler, Jr. | $875 | 146.3 | $128,014 |
| Rena M. Samole | $565 | 174.6 | $98,650 |
| Karen M. Suber | $355 | 240.0 | $85,201 |
| Kayalyn A. Marafioti | $830 | 68.5 | $56,855 |
| Ron E. Meisler | $630 | 58.2 | $36,666 |
| Laverne F. Hill | $390 | 59.5 | $23,205 |
| Thomas J. Matz | $625 | 31.0 | $19,376 |
| Brian M. Fern | $565 | 27.6 | $15,594 |
| Ronald D. Kohut | $470 | 9.7 | $4,559 |
| John Guzzardo | $435 | 7.3 | $3,176 |
| Allison V. Herriott | $435 | 5.3 | $2,306 |
| John P. Furfaro | $810 | 2.6 | $2,106 |
| Adam Halper | $390 | 3.5 | $1,365 |
| Lawrence D. Frishman | $810 | 1.6 | $1,296 |
| Brent M. Houston | $435 | 2.4 | $1,044 |
| M. Janine Jjingo | $390 | 2.6 | $1,014 |
| Paraprofessional Total | | 43.7 | $8,102 |
| **Total** | | **2,762.7** | **$1,602,592 (10.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$112,989** |

D.    Disclosure Statement / Voting Issues

69.    In connection with the development and preparation of the Debtors' Plan,

during the Application Period, Skadden devoted substantial time to the preparation of the

Debtors' Disclosure Statement, which was filed together with the Plan on September 6, 2007.

During the Application Period, Skadden consulted with the Debtors on a frequent basis to gather

34

and review the information necessary to ensure that the Disclosure Statement would include all factual and legal content necessary to satisfy the "adequate information" requirement of section 1125 of the Bankruptcy Code. Skadden attorneys were required to review, analyze, research, and prepare adequate disclosures of subjects, including, without limitation, (a) the Debtors' corporate structure and business operations, including historical company information and its prospective business plan, (b) the prepetition capital structure of the Debtors, (c) objectives achieved in the Debtors' transformation plan, (d) developments in the chapter 11 cases, (e) tax issues, (e) classification issues, (f) securities issues, and (g) notice issues.

70.    Although prior to the Application Period Skadden commenced drafting the Disclosure Statement, the majority of the work to date on the Disclosure Statement took place during the Application Period. Skadden drafted narrative to reflect significant accomplishments during the Application Period and prior periods, including settlements with Delphi's Unions and GM and the terms of the Delphi-Appaloosa EPCA. Moreover, Skadden continuously updated the Disclosure Statement to incorporate current events and to accurately reflect revisions to the proposed Plan as a result of negotiated changes. Throughout this period, Skadden worked closely with the Debtors' other retained professionals to incorporate their comments to the Disclosure Statement. Furthermore, throughout August 2007, Skadden circulated drafts of the Disclosure Statement to key stakeholders and conferred with those parties regarding their comments to the Disclosure Statement, which Skadden then reviewed and incorporated, as appropriate, into the documents.

71.    Also during the Application Period, the Debtors, with the assistance of Skadden professionals and the Debtors' balloting agents, continued to develop and review solicitation procedures to form the basis for soliciting votes on the Plan and addressing various

35

balloting and tabulation issues.  In that regard, Skadden drafted plan solicitation materials

including ballots and notices.  On September 6, 2007, with Skadden's assistance, the Debtors filed

their motion for proposed solicitation procedures with proposed solicitation documents attached.

72.    Following the September 6, 2007 filing of the Disclosure Statement and

Plan, Skadden professionals continued to confer with key stakeholders regarding the information

included in the Disclosure Statement and the form in which that information was presented.

Thus, during September 2007, Skadden continued to refine the Disclosure Statement, adjusting

the disclosure where necessary to incorporate the most relevant and recent information on the

topics covered therein.  This ongoing process of updating and refining the Disclosure Statement

has continued after the Application Period.

73.    In connection with the foregoing services, Skadden expended 2,054.5 hours

during the Application Period for which Skadden seeks compensation of $1,074,612, or 7.0% of

the total compensation sought in this Interim Application.[25]  Detailed time entries of each

Skadden professional related to these services are attached hereto as Exhibit D-4.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 307.5 | $144,525 |
| Allison V. Herriott | $435 | 300.8 | $130,849 |
| Nathan L. Stuart | $495 | 255.4 | $126,423 |
| Kurt Ramlo | $625 | 200.4 | $125,251 |
| George N. Panagakis | $810 | 122.8 | $99,468 |
| Matthew Gartner | $355 | 227.1 | $80,621 |
| Kayalyn A. Marafioti | $830 | 91.4 | $75,862 |

---

[25]    This compares to $62,694, or 0.5%, and $165,839, or 1.3%, of the total fees requested for this matter in Skadden's
Fourth, and Fifth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in
its First, Second, and Third Interim Fee Applications.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ron E. Meisler | $630 | 87.9 | $55,377 |
| John (Jack) Wm. Butler, Jr. | $875 | 41.8 | $36,576 |
| Michael W. Perl | $435 | 59.2 | $25,753 |
| Thomas J. Matz | $625 | 32.1 | $20,063 |
| Sarah J. Platt | $355 | 55.1 | $19,561 |
| Albert L. Hogan III | $695 | 22.3 | $15,499 |
| Ian S. Bolton | $390 | 31.6 | $12,324 |
| Adlai S. Hardin | $585 | 19.9 | $11,642 |
| Brent M. Houston | $435 | 25.0 | $10,875 |
| Neil MacDonald | $595 | 16.1 | $9,580 |
| Joseph N. Wharton | $565 | 16.3 | $9,210 |
| John P. Furfaro | $810 | 10.7 | $8,667 |
| Lee P. Garner | $625 | 10.4 | $6,500 |
| Nick D. Campanario | $535 | 11.7 | $6,260 |
| Rena M. Samole | $565 | 10.4 | $5,876 |
| John Guzzardo | $435 | 13.5 | $5,873 |
| Young M. Park | $565 | 8.7 | $4,916 |
| Karen M. Suber | $355 | 13.0 | $4,615 |
| Ronald D. Kohut | $470 | 7.7 | $3,619 |
| Denise Kaloudis | $495 | 6.6 | $3,267 |
| Brian M. Fern | $565 | 4.5 | $2,543 |
| Adam Halper | $390 | 6.0 | $2,340 |
| Eric J. Howe | $390 | 5.6 | $2,184 |
| Daniel I. Ganitsky | $585 | 2.3 | $1,346 |
| Paraprofessional Total | | 30.7 | $7,147 |
| **Total** | | **2,054.5** | **$1,074,612 (7.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$35,760** |

E.    Asset Dispositions (General)

        74.    The Debtors have stated that to achieve the necessary cost savings and

operational effectiveness envisioned in their transformation plan, they must streamline their

product portfolio to capitalize on their world-class technology and market strengths and make the

37

necessary manufacturing alignment with their new focus.  As part of this effort, the Debtors have

identified certain non-core product lines that do not fit into the Company's future strategic

framework and planned to sell or wind-down these product lines.  These non-core product lines

include Brake and Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules

and Latches, Ride Dynamics, Steering, and Wheel Bearings.  During the Application Period,

Skadden allocated significant resources to advising the Debtors with respect to various

contemplated divestitures of significant assets and began drafting, analyzing, and reviewing

various pleadings and purchase agreements in connection with the contemplated transactions.

       75.    As part of this process, prior to and during the Application Period, Skadden

advised the Debtors with respect to the sale of the Company's catalyst solutions business (the

"Catalyst Business") to Umicore.  Because the Catalyst Business does not fit within the Debtors'

anticipated product portfolio under their transformation plan, the Debtors, with the assistance of

their professional advisors, marketed and negotiated the sale of the Catalyst Business.

Accordingly, during the Application Period, Skadden worked with the Debtors to review,

analyze, and negotiate terms of a master sale and purchase agreement for the sale of the Catalyst

Business.  In connection with this transaction, Skadden drafted and filed a motion (the "Catalyst

Sale Motion") (Docket No. 8179) seeking approval of bidding procedures and certain bid

protections for Umicore as the stalking horse bidder in the sale of the Catalyst Business.  The

Catalyst Sale Motion also sought approval at a later date (following an auction, to the extent

conducted) of (a) the sale of the Catalyst Business to Umicore (subject to higher or otherwise

better bids) for $55.6 million and other consideration, (b) the assumption and assignment of

certain executory contracts and unexpired leases to Umicore or the successful bidder at auction,

as the case may be, and (c) the assumption of certain liabilities by Umicore or the successful

bidder.

76. During the Application Period, the Court entered an order establishing

bidding procedures for the sale of the Catalyst Business and approving certain bid protections for

Umicore (Docket No. 8436). Pursuant to the bidding procedures for the sale of the Catalyst

Business, qualified bidders were required to submit a bid for the Catalyst Business by the bid

deadline. The Debtors received one qualified bid, and as result, the Debtors, with the assistance

of Skadden and other professional advisors, held an auction on August 8, 2007. As a result of the

Debtors' effort, by the end of the auction, Umicore submitted a bid with a value $75 million – an

increase of approximately $19.4 million from the preliminary purchase price included in its

initial bid. The Debtors, with Skadden's assistance, conducted the auction and evaluated the

various bids submitted for the Catalyst Business. At the conclusion of the auction, the Debtors

with the assistance of Skadden, declared Umicore the successful bidder. Thereafter, at an

omnibus hearing held on August 16, 2007, the Court approved the sale of the Catalyst Business

to Umicore (Docket No. 9111). In addition, Skadden assisted the Debtors with drafting,

analyzing, and serving Cure Notices and Notice of Assumption and Assignment of Contracts in

connection with the divestiture of the Catalyst Business (Docket Nos. 8837, 8816, 8726, 8672,

8653, 8488, 8487, and 8180). At the end of the Application Period, on September 28, 2007, the

Debtors, with the assistance of Skadden, closed on the sale of the Catalyst Business to Umicore.

77. Similarly, during the Application Period, Skadden advised the Debtors with

respect to the sale of the Company's assets used in the brake and chassis modules product lines

manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") to

Robert Bosch LLC and Frenados Mexicanos S.A. de C.V. (together with Robert Bosch LLC,

"Bosch").  Accordingly, during the Application Period, Skadden worked with the Debtors to
review, analyze, and negotiate terms of an asset sale and purchase agreement for the sale of the
Mexico Brake Plant Business.  Additionally, Skadden drafted and filed a motion (the "Mexico
Brake Plant Sale Motion") (Docket No. 8249) seeking approval of bidding procedures and
certain bid protections for Bosch as the stalking horse bidder.  The Mexico Brake Plant Sale
Motion also sought approval at a later date (following an auction, to the extent conducted) of (a)
the sale of the Mexico Brake Plant Business to Bosch (subject to higher or otherwise better bids)
for $15.0 million and other consideration, (b) the assumption and assignment of certain
executory contracts and unexpired leases to Bosch or the successful bidder, as the case may be,
and (c) the assumption of certain liabilities by Bosch or the successful bidder.  During the
Application Period, the Court approved the bidding procedures and the bid protections.  The
Debtors selected the bid submitted by Bosch as the highest or otherwise best bid and, therefore,
no auction was conducted.  In addition, Skadden assisted the Debtors with drafting, analyzing,
and serving Cure Notices and Notice of Assumption and Assignment of Contracts in connection
with the divestiture of the Mexico Brake Plant Business (Docket Nos. 6485 and 6486).  At the
July 19, 2007, omnibus hearing, this Court approved the sale of the Mexico Brake Plant Business
to Bosch (Docket No. 8075).

       78.     In addition, during the Application Period, Skadden advised the Debtors
with respect to the sale of the Company's manufacturing equipment and test and development
equipment primarily used and located at DAS LLC's chassis facility in Saginaw, Michigan (the
"Saginaw Chassis Assets") to TRW Integrated Chassis Systems LLC ("TRW").  Skadden, among
other things, reviewed, analyzed, and negotiated terms of the applicable asset purchase
agreement and drafted and filed a motion (the "Saginaw Chassis Asset Sale Motion") seeking

approval of the bidding procedures and certain bid protections for TRW as the stalking horse

bidder (Docket No. 9368).  The Saginaw Chassis Asset Sale Motion also sought approval at a

later date of the sale of the Saginaw Chassis Assets to TRW for $27.6 million and other

consideration (totaling approximately $42 million), subject to a higher or otherwise better bid.

        79.    Similarly, during the Application Period, Skadden advised the Debtors with

respect to the sale of the Company's assets used in the cockpits and interior systems business and

integrated closure systems business (the "Interiors and Closures Businesses") to Inteva Products,

LLC ("Inteva").  Accordingly, during the Application Period, Skadden worked with the Debtors

to review, analyze and negotiate terms of an asset sale and purchase agreement for the sale of the

Interiors and Closures Businesses.  Additionally, Skadden drafted and, after the Application

Period, filed a motion (the "Interiors and Closures Businesses Sale Motion") (Docket No. 10606)

seeking approval of bid procedures and certain bid protections for Inteva as the stalking horse

bidder.  In the Interiors and Closures Businesses Sale Motion, the Debtors also sought approval at

a later date to (a) sell the Interiors and Closures Businesses to Inteva for $106 million and other

consideration (subject to higher or otherwise better bids), (b) assume and assign certain contracts

and unexpired leases to Inteva or the successful bidder, as the case may be, and (c) have Inteva or

the successful bidder assume certain liabilities.

        80.    Furthermore, during the Application Period, Skadden assisted the Debtors

with preparation for potential divestures of several other of the Debtors' non-core business lines,

including, among other things, the sale of Delphi's steering businesses.  Skadden worked with the

Debtors to assess various bids and term sheets, reviewed, analyzed, and drafted asset purchase

agreements, and began preparing pleadings, notices, and drafting proposed orders customary for

such transactions to be submitted for Court approval.  By the end of the Application Period and

the filing of this Fee Application, the Debtors were continuing to negotiate the terms of the steering business divestiture.

      81.    In connection with the foregoing services, Skadden expended 1,782.9 hours during the Application Period for which Skadden seeks compensation of $984,907, or 6.4% of the total compensation sought in this Interim Application.[26]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-5</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
| --- | --- | --- | --- |
| Brian M. Fern | $565 | 660.7 | $373,296 |
| Denise Kaloudis | $495 | 420.9 | $208,347 |
| Ron E. Meisler | $630 | 144.2 | $90,846 |
| John K. Lyons | $775 | 99.2 | $76,881 |
| Kellan Grant | $470 | 145.6 | $68,432 |
| N. Lynn Hiestand | $875 | 50.2 | $43,925 |
| Jason P. Ketchens | $565 | 45.8 | $25,878 |
| Kayalyn A. Marafioti | $830 | 26.9 | $22,327 |
| Rena M. Samole | $565 | 22.0 | $12,431 |
| Jonathan B. Ko | $595 | 19.3 | $11,484 |
| Christian Pilkington | $585 | 17.9 | $10,472 |
| John (Jack) Wm. Butler, Jr. | $875 | 10.7 | $9,363 |
| Michelle Gasaway | $625 | 8.1 | $5,063 |
| Nathan L. Stuart | $495 | 7.9 | $3,911 |
| Ronald D. Kohut | $470 | 8.3 | $3,901 |
| Thomas J. Matz | $625 | 2.4 | $1,500 |
| John P. Furfaro | $810 | 1.6 | $1,296 |

---

[26]    This compares to $117,199, or 1.3%, $375,042, or 3.3%, $554,644, or 5.5%, $492,762, or 3.8%, and $543,556, or 4.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| George N. Panagakis | $810 | 1.3 | $1,053 |
| Ian S. Bolton | $390 | 2.6 | $1,014 |
| Paraprofessional Total | | 87.3 | $13,487 |
| **Total** | | **1,782.9** | **$984,907 (6.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$66,361** |

F.    Employee Matters (Labor Unions)

82.    As of the Petition Dates, substantially all of the Debtors' approximately 34,750 hourly employees in the United States were represented by three principal unions – the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW").  The Debtors have master collective bargaining agreements with each of these three unions as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business specific.  The Debtors also have collective bargaining agreements with three other unions – the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE") covering approximately 135 employees (the six foregoing unions (the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE), together with their applicable locals, are collectively referred to herein as the "Unions").

83.    Modifying the Debtors' labor agreements was one of the key tenets of the Debtors' transformation plan.  To further this goal, on March 31, 2006, the Debtors filed the 1113 And 1114 Motion, but at the same time, the Debtors continued discussions with the Unions in an

effort to reach a consensual resolution of their labor matters. The Court later held a contested

hearing on the 1113 And 1114 Motion that was adjourned following completion of the Debtors'

direct case. The proceedings on the 1113 And 1114 Motion were subsequently suspended by this

Court on January 31, 2007, to facilitate a consensual resolution of the 1113 And 1114 Motion, a

result, which, as described below, has now been achieved. During the Application Period,

Skadden worked with the Debtors and other professionals to further the negotiations between the

Debtors and their Unions. Throughout the Application Period, Skadden worked closely (being

mindful not to duplicate efforts) with O'Melveny & Myers, LLP ("O'Melveny"), special labor

counsel retained by the Debtors, to advise with respect to the prosecution, continuance, and

ultimate suspension of the Debtors' 1113 And 1114 Motion.

        84.    Indeed, throughout the Application Period, the Debtors, with the assistance

of Skadden, continued to provide information to, and engage in discussions and negotiations

with, the Unions and the Debtors' stakeholders to resolve the labor matters forming the basis of

the 1113 And 1114 Motion. During the Application Period, Delphi, its Unions, and GM signed a

series of settlement agreements or memoranda of understanding which settled the 1113 And 1114

Motion. These agreements are a significant milestone in the Debtors' transformation and a major

step on the path towards emergence. Among other things, as approved by this Court, these

agreements also modify, extend or terminate provisions of the existing collective bargaining

agreements among Delphi and its Unions and address issues such as site plans, workforce

transition and legacy pension and other postretirement benefits obligations, as well as other

comprehensive transformational issues. Portions of these agreements have already become

effective, while other portions will not become effective until substantial consummation of the

Plan as confirmed by this Court which incorporates, approves and is consistent with the terms of each agreement.

85.    The settlement agreements signed during the Application Period include those with the UAW dated June 22, 2007; the IUE-CWA, dated August 5, 2007; the IAM and its District 10 and Tool and Die Makers Lodge 78, dated July 31, 2007; the IBEW and its Local 663 relating to Delphi Electronics and Safety, dated July 31, 2007; the IBEW and its Local 663 relating to Delphi's Powertrain division, dated July 31, 2007; the IUOE Local 18S, dated August 1, 2007; the IUOE Local 101S, dated August 1, 2007; the IUOE Local 832S, dated August 1, 2007; the USW and its Local Union 87L relating to Delphi's operations at Home Avenue, dated August 16, 2007; and the USW and its Local Union 87L relating to Delphi's operations at Vandalia, dated August 16, 2007.

86.    Each respective Union's settlement agreement was subject to this Court's approval as well as ratification by its respective Union's membership, except for the IUOE Local 101S agreement which did not require ratification because there were no active bargaining unit members at the Olathe IUOE Local 101S site.  Therefore, during the Application Period, Skadden (with the assistance of O'Melveny) drafted and prosecuted motions to approve the various settlement agreements with the Unions.  The UAW settlement agreement was approved by this Court on July 19, 2007 (Docket No. 8685) and ratified by the UAW as of June 28, 2007.  The IUE-CWA, IAM, IBEW, and IUOE settlement agreements were approved by this Court on August 16, 2007 (Docket Nos. 9106 and 9107) and were ratified as follows:  by the IUE-CWA as of August 20, 2007, the IAM and IBEW as of August 4, 2007, and by the IUOE (relating, respectively, to each of Local 832S and Local 18S) as of August 9 and August 10, 2007.  The

USW settlement agreements were approved by the Court on August 29, 2007, and were ratified

by the USW as of August 30, 2007 for Home Avenue and as of August 31, 2007 for Vandalia.

87.    Subject to these settlement agreements, the existing collective bargaining

agreements were modified and extended to September 14, 2011 for the UAW, the IAM, the

IBEW, the IUOE Local 18S, the IUOE Local 832S, and the USW; were modified and extended to

October 12, 2011 for the IUE-CWA; and were terminated and superseded for the IUOE Local

101S by the settlement agreement for the IUOE Local 101S.

88.    On September 4, 2007, this Court entered an order which withdrew the

1113 And 1114 Motion without prejudice, subject to this Court's prior settlement approval orders

pertaining to each of Delphi's Unions, as it relates to all parties and the intervening respondents.

See Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c)

Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of

Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) (Docket No. 9221).

89.    In connection with the foregoing services, Skadden expended 1,595.5 hours

during the Application Period for which Skadden seeks compensation of $975,028, or 6.3% of the

total compensation sought in this Interim Application.[27]   Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-6.   A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ronald D. Kohut | $470 | 440.0 | $206,800 |
| John P. Furfaro | $810 | 224.5 | $181,845 |

---

[27]   This compares to $414,991, or 4.5%, $2,590,790, or 22.9%, $1,387,983, or 13.8%, $180,964, or 1.4%, and
$192,231, or 1.5%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth
Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 140.2 | $122,675 |
| Thomas J. Matz | $625 | 187.8 | $117,377 |
| Kurt Ramlo | $625 | 124.9 | $78,063 |
| Jay S. Berke | $810 | 76.2 | $61,722 |
| Kayalyn A. Marafioti | $830 | 71.7 | $59,511 |
| Albert L. Hogan III | $695 | 39.8 | $27,661 |
| Neil MacDonald | $595 | 45.5 | $27,073 |
| Denise Kaloudis | $495 | 33.4 | $16,533 |
| Kellan Grant | $470 | 32.1 | $15,087 |
| Nick D. Campanario | $535 | 28.1 | $15,035 |
| Ron E. Meisler | $630 | 11.3 | $7,119 |
| Adlai S. Hardin | $585 | 11.5 | $6,728 |
| Nathan L. Stuart | $495 | 7.5 | $3,713 |
| Allison V. Herriott | $435 | 7.1 | $3,089 |
| Julie Boden Adams | $435 | 7.0 | $3,045 |
| George N. Panagakis | $810 | 2.1 | $1,701 |
| Eric L. Cochran | $845 | 1.9 | $1,606 |
| Daniel I. Ganitsky | $585 | 1.8 | $1,053 |
| Paraprofessional Total | | 101.1 | $17,592 |
| **Total** | | **1,595.5** | **$975,028 (6.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$64,739** |

G.    Case Administration

90.    During the Application Period , Skadden devoted time to, among other things, (a) general preparation for, and attendance at, court hearings, (b) general communications with creditors and other parties-in-interest, (c) general case administration, including duties pertaining to service of process, (d) general advice with respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

47

91.    Skadden devoted significant time preparing for and attending the omnibus and special hearings that this Court established.  The omnibus hearings have streamlined the administration of these Reorganization Cases by establishing a schedule known to all parties-in-interest for Court hearings and consolidating multiple matters in a single hearing, thus eliminating unnecessary time and expense spent appearing before the Court on numerous occasions each month regarding disparate matters.  Indeed, despite the fact that the Debtors are the largest manufacturing company ever to have sought reorganization relief, the Debtors have held only 25 omnibus hearings to date, including four omnibus hearings during the Application Period.[28]  At these four omnibus hearings, 35 discrete matters were heard.  This omnibus hearing schedule requires a carefully coordinated, but limited, team of Skadden attorneys to attend the hearings, to meet with numerous parties-in-interest who appear, and to resolve as many issues as possible without litigation.  In fact, it is not unusual for differences to be bridged at the courthouse just prior to the applicable hearing.  Indeed, the Debtors, with the assistance of Skadden and the Debtors' other professionals, have succeeded in presenting the great majority of these matters as uncontested or resolved.  But for the coordinated efforts of Skadden (as well as the Debtors' other retained professionals) in connection with these hearings, this simply would not be possible.  To date, there have been relatively few contested matters in these cases, and even fewer matters that actually required contested evidentiary hearings.  Following the hearings, Skadden occasionally modified proposed orders to comply with the Court's rulings and subsequently submit those orders to this Court for entry and docketing.

---

[28]    During the Application Period there were also four claims hearings, and two non-omnibus hearings, including the hearing on August 2, 2007 on the Delphi-Appaloosa Investment And Plan Framework Motion and the hearing on August 29, 2007 on a motion for approval of the USW settlement agreement.

92.    The internal coordination of motions, responses, objections, witnesses, exhibits, declarations, and other related matters requires close and careful attention by the entire Skadden team.  The omnibus hearing schedule established in these Reorganization Cases is designed to efficiently address nearly all matters arising in these cases but requires that multiple professionals and paraprofessionals assist with various functions with respect to each omnibus hearing.  For example, the monthly omnibus hearing agendas that Skadden prepares require significant attention by Skadden paraprofessionals.  Skadden attorneys are then requested to review and approve the particular matter(s) on the agenda for which they have principal responsibility to ensure that all relevant filings are properly reflected.

93.    Moreover, given the size and complexity of these Reorganization Cases, the Debtors and Skadden are presented with a unique set of challenges in administering the cases, tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining organization and control over a case that could quickly become disorganized if attention were not provided to case administration matters on a continual basis.  Thus, for instance, Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman Carson Consultants LLC ("KCC")), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating the various procedures and processes to aid in the administration of the Reorganization Cases, including a dedicated website (which required periodic updates to communicate significant events during these cases), telephone hotlines, and e-mail information sites to assist in responding to the numerous inquiries that this case has generated.  At the commencement of the Reorganization Cases, for example, the Debtors and Skadden established a telephone hotline that provides basic information to callers and allows them to leave voicemail messages to be returned

49

by an appropriate Skadden attorney.  During the Application Period, approximately 548 messages were submitted to the hotline.  In addition, numerous parties contacted Skadden directly with their inquires.  When necessary, Skadden researched responses to more complicated voicemail messages and otherwise responded to inquiries left directly on the hotline.  A considerable amount of time was devoted to these efforts.

94.    Skadden also estimates that it received hundreds of pieces of written correspondence during the Application Period, all of which were routed to appropriate professionals within Skadden and answered either orally or in writing.  Skadden necessarily devoted significant resources responding to these matters.  These efforts assured responsive answers to parties, ensured that the Debtors continued to conduct their affairs in accordance with the Bankruptcy Code and applicable nonbankruptcy law, and also assisted the Debtors and their estates by resolving numerous matters that might otherwise have resulted in pleadings filed with this Court.

95.    In addition to communications matters, various files were maintained by paraprofessionals that were critical to the ability of Skadden and others to promptly address issues that arose during the Application Period.  Skadden reviewed all pleadings and orders filed in the Reorganization Cases and worked with KCC to ensure that entities entitled to notice were kept informed of significant events in the Reorganization Cases.  The efficient management of administrative matters in a paper-intensive case of this size is a significant task.  Each week, the Debtors and Skadden are inundated with correspondence, documents, requests, pleadings, and other papers.  During the Application Period, approximately 2,261 items were docketed.  On average, at least 18 pleadings were filed and docketed each day (including weekends and

holidays) during the 122 days in the Application Period. As of September 30, 2007, approximately 10,396 items had been docketed.

96.    Given this volume of activity, Skadden maintained various procedures to create efficiencies in the management of the Reorganization Cases and to avoid unnecessary duplication of effort between its own professionals and its advisors. For instance, during the Application Period, Skadden kept detailed calendars of future events in the Reorganization Cases and maintained other planning tools to ensure that critical deadlines were met in these large and highly complex cases and that a specific professional was assigned principal responsibility for nearly each discrete task to be completed.

97.    Skadden is also required to devote substantial attention and resources to notice and related matters in these cases. As of the end of the Application Period, there were approximately 490 parties on the core service lists, including approximately 62 parties on the Master Service List,[29] and 428 parties who had filed a notice of appearance or request for notice in these cases (the "2002 List Parties"). Skadden, through its paraprofessionals, updates and maintains these lists to ensure proper notice by reviewing each notice of appearance and related pleading filed and updating the entities that firms represent as well as recording relevant addresses, reviewing all electronic and written correspondence to ensure that all lists are accurate, and reviewing all notices of appearance to minimize the chance that a party-in-interest is inadvertently excluded from a mailing.

98.    In connection with the foregoing services, Skadden expended 1,572.8 hours during the Application Period for which Skadden seeks compensation of $532,746, or 3.5% of the

---

[29]    The "Master Service List" is comprised of (a) the Debtors and their counsel, (b) the U.S. Trustee, (c) the members of and counsel for the Creditors' Committee and the Equity Committee, (d) counsel for the agent under the Debtors' former prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those parties which may be added to the Master Service List upon written request to the Debtors or as may be otherwise ordered by the Court for good and sufficient cause.

total compensation sought in this Interim Application.[30]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-7</u>.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ron E. Meisler | $630 | 133.1 | $83,853 |
| Laverne F. Hill | $390 | 203.9 | $79,521 |
| Thomas J. Matz | $625 | 103.6 | $64,751 |
| Kayalyn A. Marafioti | $830 | 49.0 | $40,670 |
| Adlai S. Hardin | $585 | 41.9 | $24,513 |
| Sarah J. Platt | $355 | 44.6 | $15,833 |
| Kurt Ramlo | $625 | 22.0 | $13,751 |
| John K. Lyons | $775 | 17.2 | $13,330 |
| Brian M. Fern | $565 | 20.2 | $11,414 |
| Allison V. Herriott | $435 | 22.3 | $9,701 |
| John (Jack) Wm. Butler, Jr. | $875 | 10.7 | $9,364 |
| Joseph N. Wharton | $565 | 10.5 | $5,934 |
| Albert L. Hogan III | $695 | 6.8 | $4,726 |
| Michael W. Perl | $435 | 7.6 | $3,306 |
| Ian S. Bolton | $390 | 5.3 | $2,067 |
| Kellan Grant | $470 | 3.1 | $1,457 |
| Rena M. Samole | $565 | 2.2 | $1,243 |
| Paraprofessional Total | | 868.8 | $147,312 |
| **Total** | | **1,572.8** | **$532,746 (3.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$139,940** |

---

[30]  This compares to $1,136,809, or 12.4%, $603,278, or 5.3%, $604,443, or 6.0%, $613,369, or 4.8%, and $628,123, or 5.0%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

<u>Matters Between $250,000 And $500,000</u>

H.    <u>Litigation (Insurance Recovery)</u>

99.    Before the commencement of these chapter 11 cases, Delphi, Delphi Trust I, Delphi Trust II, current and former directors of Delphi, certain current and former officers and employees of Delphi or its subsidiaries, and others were named as defendants in several lawsuits following Delphi's announced intention to restate certain of its financial statements (the "Multidistrict Litigation" or "MDL").  The Judicial Panel on Multidistrict Litigation entered an order transferring each of theses related federal actions to the United States District Court for the Eastern District of Michigan (the "Michigan District Court").  One group of class action lawsuits (the "Securities Litigation") alleges, among other things, that Delphi and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws with respect to the sale of both debt and equity securities.  A second group of class actions, which are purportedly brought on behalf of participants in certain of Delphi's and its subsidiaries' defined contribution employee benefit pension plans who invested in Delphi common stock (the "ERISA Actions"), is brought under ERISA.  The ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA.  Prior to the Application Period, the Debtors agreed to provide certain discovery to the lead plaintiffs in the Securities Litigation (the "Lead Plaintiffs") and the plaintiffs in the ERISA Actions.

100.    During the Application Period, on July 11, 2007, the United States District Court for the Eastern District of Michigan (the "District Court") appointed the Honorable Layn R. Phillips, former United States District Judge, as a special master for settlement discussions.  Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's

53

insurance carriers, and certain other defendants involved in the MDL proceedings, reached

agreements with the Lead Plaintiffs and the plaintiffs in the ERISA Action resulting in settlement

of the Multidistrict Litigation (the "MDL Settlement").  Throughout this process, Skadden assisted

the Debtors by participating in mediation sessions in New York and Detroit, some of which were

held at Skadden's New York offices, analyzing and providing advice to the Debtors concerning the

bankruptcy law and general legal implications of the MDL Settlement, and negotiating and

drafting portions of the agreements constituting the MDL Settlement.

       101.   On September 7, 2007, the Debtors filed a Motion For Order Approving

Multidistrict Litigation And Insurance Settlements (Docket No. 9296) (the "MDL And Insurance

Settlement Approval Motion") seeking this Court's approval of the MDL Settlement and related

matters.[31]  After the Application Period, this Court held a hearing on the MDL And Insurance

Settlement Approval Motion on October 25, 2007, and it entered an Order Preliminarily

Approving Multidistrict Litigation And Insurance Settlement (Docket No. 10746) on October 29,

2007.  Skadden assisted the Debtors by preparing the MDL And Insurance Settlement Approval

Motion, including the form of Order Approving Multidistrict Litigation And Insurance

Settlements attached thereto, and conducted discussions with a number of parties, including

the Lead Plaintiffs, the plaintiffs in the ERISA Action, and other parties to the MDL Settlement,

concerning the matters to be included in the MDL And Insurance Settlement Approval Motion

and the form of Order Approving Multidistrict Litigation And Insurance Settlements.

---

[31]   On October 19, 2007, after the Application Period, two objections to the MDL And Insurance Settlement
Approval Motion were filed: (i) an Objection By Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC;
Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; and SPCP Group, LLC To Motion By The
Debtors For Order Approving Multidistrict Litigation And Insurance (Docket No. 10687) and (ii) a Limited
Objection Of Castlerigg Master Investments Ltd; CR Intrinsic Investors, LLC; Davidson Kempner Capital
Management LLC; Elliot Associates, L.P.; And SPCP Group, LLC To Order Preliminarily Approving
Multidistrict Litigation And Insurance Settlement (Docket No. 10689).  The Debtors filed a Reply In Support Of
Motion For Order Approving Multidistrict Litigation And Insurance Settlements (Docket No. 10714) on October
24, 2007 (the "MDL And Insurance Settlement Approval Reply").

102.    In connection with the foregoing services, Skadden expended 760.7 hours during the Application Period for which Skadden seeks compensation of $483,475, or 3.1% of the total compensation sought in this Interim Application.[32]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-8</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
| --- | --- | --- | --- |
| Albert L. Hogan III | $695 | 274.9 | $191,057 |
| Nick D. Campanario | $535 | 233.5 | $124,923 |
| John (Jack) Wm. Butler, Jr. | $875 | 94.1 | $82,339 |
| Rena M. Samole | $565 | 44.8 | $25,313 |
| George N. Panagakis | $810 | 24.8 | $20,088 |
| Brandon M. Duncomb | $315 | 30.8 | $9,702 |
| Thomas J. Matz | $625 | 15.0 | $9,375 |
| Kellan Grant | $470 | 15.5 | $7,285 |
| Kurt Ramlo | $625 | 7.3 | $4,563 |
| Kayalyn A. Marafioti | $830 | 3.2 | $2,656 |
| Melissa T. Kahn | $470 | 4.6 | $2,162 |
| Ron E. Meisler | $630 | 2.4 | $1,512 |
| Brian M. Fern | $565 | 2.3 | $1,300 |
| Paraprofessional Total | | 7.5 | $1,200 |
| **Total** | | **760.7** | **$483,475 (3.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$14,355** |

I.    <u>Nonworking Travel Time</u>

103.    Because of the extensive breadth of services that Skadden is providing to the Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number of professionals from its worldwide organization including offices located primarily in

---

[32]    This compares to $83,523, or 0.9%, $280,759, or 2.2%, and $220,208, or 1.7%, of the total fees requested for this matter in Skadden's First, Fourth, and Fifth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in Skadden's Second and Third Interim Fee Applications.

Chicago, London, Los Angeles, New York, and Washington, D.C.  As this Court is aware, the

Debtors are headquartered in Troy, Michigan, members of the Statutory Committees are based in

several states across the United States, the Debtors' postpetition lenders are based in New York

City, Appaloosa is based in Chatham, New Jersey, and many of the Debtors' other primary

constituencies, including its largest U.S. union and GM, are based in Michigan.  As a

consequence of these disparate locations and the Debtors' expectation and determined need that

certain Skadden partners, counsel, associates, and paraprofessionals be on site in Michigan on a

regular basis as well as in other locations, including New York, for specific events, Skadden

professionals frequently must travel among these and other locations.  Among other things,

Skadden professionals travel to meet with the Board and senior management, creditor and equity

constituencies, plan investors, and to attend Court hearings.  Skadden's professionals who spend

time traveling, but not otherwise working, allocate their time to this billing category.

104.    Skadden expended 1,186.3 hours during the Application Period devoted to

nonworking travel time for which Skadden seeks compensation of $372,449, or 2.4% of the total

compensation sought in the Interim Application.[33]  This amount reflects an approximate

fifty-seven percent (57%)[34] reduction from Skadden's guideline hourly rates.  Detailed time

entries of each Skadden professional are attached hereto as Exhibit D-9.  A summary of the hours

expended and the corresponding dollar amount of the travel time for each professional is provided

in the following table:

---

[33]    This compares to $290,270, or 3.2%, $376,303, or 3.3%, $351,261, or 3.5%, $393,436, or 3.1%, and $413,181, or 3.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

[34]    This reduction is comprised of the following:  the elimination of approximately 261.9 hours of billed time during the Application Period as an additional accommodation to the Debtors, and thereafter, a fifty-percent (50%) reduction to the guideline hourly rates.  The eliminated time charges primarily related to extended travel time occasioned by weather and air traffic control delays.

| Name | Rate | Time | Amount |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $438 | 202.1 | $88,420 |
| John K. Lyons | $388 | 118.8 | $46,035 |
| Joseph N. Wharton | $283 | 121.6 | $34,352 |
| George N. Panagakis | $405 | 73.2 | $29,647 |
| Lisa B. Diaz | $195 | 137.0 | $26,716 |
| Albert L. Hogan III | $348 | 61.9 | $21,511 |
| Ron E. Meisler | $315 | 58.1 | $18,302 |
| Nathan L. Stuart | $248 | 63.4 | $15,692 |
| N. Lynn Hiestand | $437 | 25.9 | $11,331 |
| Neil MacDonald | $298 | 32.2 | $9,580 |
| Nick D. Campanario | $268 | 29.4 | $7,874 |
| Christopher P. Connors | $293 | 27.0 | $7,898 |
| Brian M. Fern | $282 | 27.4 | $7,740 |
| Amy Van Gelder | $235 | 32.9 | $7,733 |
| Eric J. Howe | $195 | 36.8 | $7,177 |
| Michael W. Perl | $218 | 26.9 | $5,851 |
| Ian S. Bolton | $195 | 28.9 | $5,637 |
| Kurt Ramlo | $313 | 10.0 | $3,125 |
| Lee P. Garner | $313 | 10.0 | $3,125 |
| Young M. Park | $282 | 10.9 | $3,079 |
| Jason P. Ketchens | $283 | 10.3 | $2,910 |
| Kellan Grant | $235 | 10.6 | $2,491 |
| Laverne F. Hill | $195 | 9.3 | $1,814 |
| Rena M. Samole | $283 | 5.3 | $1,498 |
| Matthew Gartner | $177 | 8.3 | $1,473 |
| Sarah J. Platt | $178 | 8.1 | $1,438 |
| **Total** | | **1,186.3** | **$372,449 (2.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$493,468** |

J.    Employee Matters (General)

105.    As of the Petition Dates, the Company employed approximately 180,000 employees worldwide, of whom 50,600 were employees in the United States at approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters.

Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition

Dates, and 96% of these are union-represented.  Outside the United States, the Company's foreign

entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing

sites and 20 technical centers in nearly 40 countries around the globe.

106.    During the Reorganization Cases, the Debtors have been attempting to

restructure the compensation programs of all of their employees so that the Debtors' programs

would be at market-competitive levels.  Among other human capital programs, Skadden, along

with the Debtors' other advisors, continue to advise the Debtors in connection with the Debtors'

reassessment of the employment proposition that the Company could offer its executive

workforce in light of current U.S. and marketplace economic realities.  The result of this

evaluation led to Skadden's drafting, prior to the Application Period (in 2005), of a motion to

implement a key employee compensation program (Docket No. 213) based on recommendations

made by the Debtors' outside compensation consultant (in consultation with the Creditors'

Committee) as adopted by the Compensation and Executive Development Committee of the

Board.

107.    During the Application Period, Skadden continued discussions with the

Creditors' Committee on issues related to both the at-risk emergence payment program and a

short-term at-risk performance incentive compensation program for the second half of 2007 that

would be substantially consistent with the programs designed for calendar year 2006 and for the

first half of 2007.  During the Application Period, Skadden took the lead role in drafting and

preparing the necessary filings to obtain this Court's approval of a short-term at-risk performance

payment program for the second half of 2007.  Objections to an at-risk emergence performance

payment program for the second half of 2007 were filed by the six unions representing hourly

employees working in the U.S. portion of Delphi's business operations.  On September 27, 2007,

this Court conducted an evidentiary hearing on the Debtors' request to restore a limited portion of

the at-risk compensation opportunities for the Debtors' executives for the second half of 2007.

Skadden prosecuted the Debtors' motion and successfully defended against the objections filed.

On October 3, 2007, the Court approved the Debtors' proposed order (Docket No. 10428).

108.    In connection with the foregoing services, Skadden expended 537.6 hours

during the Application Period for which Skadden seeks compensation of $340,268, or 2.2% of the

total compensation sought in this Interim Application.[35]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-10.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Neil MacDonald | $595 | 158.6 | $94,367 |
| Young M. Park | $565 | 113.9 | $64,354 |
| Neil M. Leff | $830 | 70.7 | $58,681 |
| John (Jack) Wm. Butler, Jr. | $875 | 40.1 | $35,089 |
| Albert L. Hogan III | $695 | 27.9 | $19,391 |
| Brian M. Fern | $565 | 25.8 | $14,577 |
| Nick D. Campanario | $535 | 24.8 | $13,268 |
| Kayalyn A. Marafioti | $830 | 11.2 | $9,296 |
| Karen E. Phillips | $495 | 13.8 | $6,831 |
| Rena M. Samole | $565 | 10.5 | $5,933 |
| Thomas J. Matz | $625 | 7.8 | $4,876 |
| John P. Furfaro | $810 | 4.7 | $3,807 |
| Eric J. Howe | $390 | 8.3 | $3,237 |
| Ron E. Meisler | $630 | 4.2 | $2,646 |

---

[35]    This compares to $879,786, or 9.6%, $359,097, or 3.2%, $308,544, or 3.1%, $127,626, or 1.0%, and $294,905, or 2.3%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Ronald D. Kohut | $470 | 3.6 | $1,692 |
| Paraprofessional Total | | 11.7 | $2,223 |
| **Total** | | **537.6** | **$340,268 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,686** |

K.    Asset Analysis And Recovery

109.    Under Bankruptcy Code sections 108(a)(2) and 546(a)(1)(A), the Debtors

had until two years after the entry of the order for relief to commence (i) avoidance and other

causes of action under chapter 5 of the Bankruptcy Code and (ii) various causes of action under

applicable bankruptcy and non-bankruptcy law for which the applicable statute of limitations, but

for the chapter 11 filings, would otherwise have expired (collectively, the "Adversary

Proceedings").  To preserve these causes of action, the Debtors arguably had to commence them

by October 8, 2007 or October 14, 2007, as applicable, or consensually toll the Debtors'

respective deadlines to file these actions.

110.    Complex chapter 11 cases such as the Debtors' can result in the filing of

thousands of Adversary Proceedings.  Simply identifying potential Adversary Proceedings

required a diligent review of tens of thousands of prepetition transactions by the Debtors and their

advisors.  The Debtors in these cases analyzed relevant financial information and payment

histories to identify those causes of action which they believe warranted preservation and which

might yield value to these estates.

111.    The Debtors, however, intend to emerge from chapter 11 under a

reorganization plan consistent with the framework attached to the Delphi-Appaloosa EPCA.

Under such a plan, most avoidance actions would remain unnecessary because all allowed claims

would be satisfied in full.  But because the statutory deadlines for filing the Adversary

Proceedings would pass before the Debtors emerge from chapter 11, the Debtors had to consider

60

in the exercise of their fiduciary duties to their stakeholders how to preserve the Adversary

Proceedings while seeking to emerge from chapter 11 under a plan in which most Adversary

Proceedings would remain unnecessary and later be dismissed.

112.    The Debtors thus before and continuing during the Application Period

examined permissible alternatives to filing the Adversary Proceedings before the statutory

deadlines and the Debtors developed proposed procedures to minimize any negative impact

arising from those Adversary Proceeding that would be filed.  Skadden played a principle role in

helping the Debtors develop a comprehensive strategy for preparing and filing the Adversary

Proceedings and, to the extent possible, effectively obviating any need to file Adversary

Proceedings by the statutory deadlines.

113.    Skadden coordinated with the Debtors and their other advisors to draft and

successfully prosecute a motion for an order authorizing the Debtors to enter into a form tolling

agreement with respect to avoidance and other causes of action, approving procedures to identify

those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon

certain actions, and establishing adversary proceeding procedures for preserving causes of action.

To prevent interference with the Debtors' valuable relationships with their contract parties, the

procedures permit the Debtors to file the actions under seal and extend the time for service of the

complaints.  While Skadden assumed the principal role with respect to designing the framework

of the procedures, the Debtors' co-counsel Togut, Segal & Segal LLP, took the lead role in

drafting and filing the Adversary Proceedings and tolling agreements.

114.    In connection with the foregoing services, Skadden expended 514.2 hours

during the Application Period for which Skadden seeks compensation of $319,999, or 2.1% of the

total compensation sought in this Interim Application.[36]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-11.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kurt Ramlo | $625 | 134.1 | $83,813 |
| Christopher P. Connors | $585 | 110.6 | $64,702 |
| George N. Panagakis | $810 | 69.4 | $56,214 |
| Albert L. Hogan III | $695 | 30.3 | $21,060 |
| Brent M. Houston | $435 | 42.8 | $18,619 |
| Nathan L. Stuart | $495 | 31.9 | $15,791 |
| John (Jack) Wm. Butler, Jr. | $875 | 14.8 | $12,951 |
| Nick D. Campanario | $535 | 20.8 | $11,128 |
| Kayalyn A. Marafioti | $830 | 13.2 | $10,956 |
| Rena M. Samole | $565 | 14.4 | $8,136 |
| Adlai S. Hardin | $585 | 10.3 | $6,026 |
| Thomas J. Matz | $625 | 6.2 | $3,875 |
| Melissa T. Kahn | $470 | 6.0 | $2,820 |
| Ron E. Meisler | $630 | 4.1 | $2,583 |
| Paraprofessional Total | | 5.3 | $1,325 |
| **Total** | | **514.2** | **$319,999 (2.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$19,651** |

L.    General Corporate Advice

115.    During the Application Period, Skadden attended meetings of the Board

and certain of the Board's standing committees.  Skadden assisted the Board and Delphi senior

management in part by preparing detailed analyses and other materials for distribution and

discussion.  Skadden also advised the Board and the Debtors' management (during these

---

[36]    This compares to $113,719, or 0.9%, of the total fees requested for this matter in Skadden's Fifth Interim Fee
Application.  Skadden did not request compensation for this matter in its First, Second, Third, and Fourth Interim
Fee Applications.

meetings, throughout the continuing negotiations regarding the plan of reorganization, and in the

course of the Debtors' daily operations) on corporate governance matters related to the plan of

reorganization generally.

116.   Also during the Application Period, Skadden advised the Debtors in

connection with the preparation of the Debtors' regulatory filings with the SEC.  Specifically,

during the Application Period, Skadden assisted with the preparation of approximately 20 Form

8-Ks, which are issued in connection with disclosure issues on matters such as material

agreements (such as the Delphi-Appaloosa EPCA), the Debtors' monthly operating reports, as

well as in connection with internal and external communication matters.  In addition, during the

Application Period, Skadden assisted the Debtors in preparing the Form 10-Q for the quarterly

period ended June 30, 2007, which was filed on August 8, 2007.

117.   In connection with the foregoing services, Skadden expended 519.2 hours

during the Application Period for which Skadden seeks compensation of $312,176, or 2.0% of the

total compensation sought in this Interim Application.[37]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-12</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 88.0 | $77,001 |
| Eric L. Cochran | $845 | 61.2 | $51,716 |
| Daniel I. Ganitsky | $585 | 73.2 | $42,823 |
| Adam Halper | $390 | 79.2 | $30,888 |
| Gregory O. Ogunsanya | $495 | 32.8 | $16,236 |

[37]   This compares to $340,687, or 3.7%, $249,312, or 2.2%, $161,208, or 1.6 %, $253,853, or 2.0%, and $475,902, or
3.8%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee
Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Karen M. Suber | $355 | 37.7 | $13,384 |
| Kayalyn A. Marafioti | $830 | 16.1 | $13,363 |
| Adlai S. Hardin | $585 | 22.4 | $13,104 |
| Michelle Gasaway | $625 | 16.4 | $10,250 |
| Brett Arkuss | $355 | 26.5 | $9,408 |
| Steven J. Daniels | $595 | 11.5 | $6,843 |
| Ronald D. Kohut | $470 | 12.5 | $5,875 |
| M. Janine Jjingo | $390 | 11.9 | $4,641 |
| Thomas J. Matz | $625 | 6.9 | $4,313 |
| Ron E. Meisler | $630 | 6.0 | $3,780 |
| Allison V. Herriott | $435 | 6.7 | $2,915 |
| Denise Kaloudis | $495 | 3.4 | $1,683 |
| Neil MacDonald | $595 | 2.7 | $1,607 |
| Kenneth Berlin | $810 | 1.5 | $1,215 |
| John Guzzardo | $435 | 2.6 | $1,131 |
| **Total** | | **519.2** | **$312,176 (2.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$27,941** |

M.    Tax Matters

118.    During the Application Period, Skadden continued analyzing certain

complex tax ramifications in connection with the Original Framework Agreements.  In particular,

Skadden professionals researched and analyzed the Debtors' ability to utilize certain favorable tax

rules available under section 382 of the Internal Revenue Code as they relate to various scenarios

proposed in the framework discussions and the Plan.  These issues include, among other things,

matters related to change-in-control and potential limitations on the uses of net operating losses

and other tax assets after emerging from chapter 11.  Also, during the Application Period,

Skadden analyzed the United States federal income tax consequences of the Plan to various

classes of Claimholders and prepared the tax disclosure contained in the Plan Disclosure

Statement and the Form S-1 in connection with the proposed Rights Offering.  Finally, Skadden

64

assisted the Debtors in analyzing and evaluating issues related to certain potential restructuring transactions.

119.    In connection with the foregoing services, Skadden expended 469.5 hours during the Application Period for which Skadden seeks compensation of $290,727, or 1.9% of the total compensation sought in this Interim Application.[38]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-13.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Aaron S. Feinberg | $535 | 195.8 | $104,754 |
| Cliff Gross | $830 | 87.0 | $72,210 |
| Eric B. Sensenbrenner | $625 | 81.9 | $51,189 |
| Kurt Ramlo | $625 | 25.9 | $16,188 |
| Jody J. Brewster | $775 | 13.8 | $10,695 |
| Paul Schockett | $390 | 26.6 | $10,374 |
| Kayalyn A. Marafioti | $830 | 10.5 | $8,715 |
| Ron E. Meisler | $630 | 11.9 | $7,497 |
| David A. Schneider | $595 | 12.3 | $7,319 |
| Melissa T. Kahn | $470 | 3.8 | $1,786 |
| **Total** | | **469.5** | **$290,727 (1.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$16,330** |

N.    Global Subsidiaries (Non-U.S.)

120.    During the Application Period, Skadden devoted time to advising the Company on matters relating to its non-U.S. global subsidiaries, including consideration of strategic alternatives in relation to its Spanish affiliate, DASE, which filed its "Concurso"

---

[38]    This compares to $932,086, or 10.1%, $82,775, or 0.7%, $319,866, or 3.2%, $417,360, or 3.3%, and $185,480, or 1.5%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

application (similar to a bankruptcy petition) in Spanish court on March 20, 2007, prior to the Application Period.

121.    During the Application Period, Skadden continued to work with the Debtors' Spanish counsel and advise the Company in reaching a settlement on a social plan for employees, including severance payments and layoff procedures, as required under Spanish law because of Delphi's closure of a Delphi plant in Cadiz, Spain, and the related layoff of employees.  On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million for a separation allowance of approximately 45 days of salary per year of service to each employee.  At that time, Delphi and Delphi Automotive Systems (Holding), Inc. ("DASHI") concluded that it was in their best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million for the purpose of funding payment of the claims of DASE's suppliers and other non-labor creditors.  Subsequently, during the Application Period, Skadden assisted the Debtors in drafting and filing a motion and related declarations on July 9, 2007, in support of the motion requesting authorization for DASHI to provide funds from certain global affiliates to DASE for these purposes.  This Court granted the motion approving the funding on July 19, 2007.  On July 31, 2007, the Spanish court approved the social plan. Throughout this period, Skadden liaised with the Statutory Committees, keeping them apprised of the transpiring events and responding to questions related to the DASE Concurso proceedings.  In addition, during the Application Period, Skadden assisted the Debtors in researching and evaluating a potential restructuring transaction motion in connection with certain global subsidiaries.

122.    In connection with the foregoing services, Skadden expended 414.8 hours during the Application Period for which Skadden seeks compensation of $271,417, or 1.8% of the total compensation sought in this Interim Application.[39]    Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-14.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| N. Lynn Hiestand | $875 | 114.7 | $100,364 |
| Rena M. Samole | $565 | 105.7 | $59,721 |
| Ron E. Meisler | $630 | 48.6 | $30,618 |
| Allison V. Herriott | $435 | 54.0 | $23,491 |
| Christian Pilkington | $585 | 30.7 | $17,960 |
| Brian M. Fern | $565 | 21.8 | $12,317 |
| John (Jack) Wm. Butler, Jr. | $875 | 12.1 | $10,588 |
| Albert L. Hogan III | $695 | 8.9 | $6,186 |
| Amy Van Gelder | $470 | 10.4 | $4,888 |
| Kayalyn A. Marafioti | $830 | 4.1 | $3,403 |
| Dolores De Elizalde | $495 | 3.8 | $1,881 |
| **Total** | | **414.8** | **$271,417 (1.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,543** |

Matters Under $250,000

O.    Retention/Fee Matters (SASM&F)

123.    Skadden is one of the largest law firms in the world, with more than 2,000 attorneys located in 22 offices in 11 countries.  Because of the number of the Debtors' business relationships and the number of Skadden's business clients, Skadden has been required to devote time since the commencement of the Reorganization Cases with respect to retention and fee

---

[39]    This compares to $330,534, or 3.6%, $205,234, or 1.8%, $32,906, or 0.3%, $46,676, or 0.4%, and $186,086, or 1.5%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

issues.  In particular, Skadden conducted an extensive relationship and disclosure search in

connection with being retained as Debtors' counsel.  In addition, as new parties have become

involved in aspects of these cases, Skadden has conducted supplementary disclosure searches and

has also periodically refreshed its searches to ensure the disclosure of new clients when

warranted.  When appropriate, Skadden prepares and files supplemental declarations disclosing

certain significant relationships that Skadden may have with a party-in-interest.  Pursuant to the

requirements of the Interim Compensation Order, Skadden prepares detailed monthly

compensation packages for distribution and is required to prepare and file interim fee applications

in accordance with the established procedures.  In addition, as discussed above, prior to the

Application Period, the Fee Review Committee retained LCC to serve as its fee analyst.  At the

end of the Application Period, LCC issued a summary report which included recommendations to

the Fee Review Committee on Skadden's Fifth Interim Fee Application.  Skadden professionals

began reviewing, analyzing, and reconciling the fee data and recommendations proposed by LCC

to effectively respond to the Fee Review Committee.

124.    In connection with the foregoing services, Skadden expended 536.7 hours

during the Application Period for which Skadden seeks compensation of $214,878, or 1.4% of the

total compensation sought in this Interim Application.[40]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-15</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

---

[40]    This compares to $58,023, or 0.6%, $191,088, or 1.7%, $134,152, or 1.3%, $284,463, or 2.2%, and $223,508, or
1.8%, of the total fees requested for this matter in Skadden's First, Second, Third , Fourth, and Fifth Interim Fee
Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Matthew Gartner | $355 | 145.0 | $51,476 |
| Brent M. Houston | $435 | 103.2 | $44,892 |
| Michael W. Perl | $435 | 93.6 | $40,716 |
| Sarah J. Platt | $355 | 50.3 | $17,857 |
| John (Jack) Wm. Butler, Jr. | $875 | 20.1 | $17,588 |
| Ron E. Meisler | $630 | 20.7 | $13,041 |
| Melissa T. Kahn | $470 | 13.4 | $6,298 |
| Kayalyn A. Marafioti | $830 | 4.7 | $3,901 |
| Kurt Ramlo | $625 | 2.6 | $1,625 |
| Thomas J. Matz | $625 | 2.0 | $1,250 |
| Paraprofessional Total | | 81.1 | $16,234 |
| **Total** | | **536.7** | **$214,878 (1.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$73,152** |

P.     Retention/Fee Matters/Objections (Others)

125.    Reorganization cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Application Period, the Debtors, with the assistance of Skadden, began the process of preparing additional retention and supplemental retention applications for other professional firms, which applications the Debtors filed during the Application Period.  Furthermore, during the Application Period, Skadden advised the Debtors regarding the retention, pursuant to the Order Under 11 U.S.C. §§ 327, 330, and 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Order") (Docket No. 883), of several ordinary course professionals who provide the Debtors with various non-restructuring legal and other professional services.

126.    In accordance with the requests of the U.S. Trustee, the Ordinary Course Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per month or $500,000 in the aggregate during these Reorganization Cases must be retained pursuant

69

to a formal retention application to receive future compensation from the Debtors. Accordingly, Skadden assisted in drafting the retention applications for Downer & Company LLC (the Debtors' financial advisor and investment banker with regard to the divestiture and other strategic alternatives relating to the Debtors' power products business), Dykema Gossett PLC (the Debtors' special counsel), KeyBanc Capital Markets Inc. (the Debtors' financial advisor and investment banker with regard to the divestiture and other strategic alternatives relating to the Debtors' bearings business), and Wilmer Cutler Pickering Hale & Dorr LLP (the Debtors' special counsel). Additionally, during the Application Period, this Court conducted a hearing to consider the interim fee applications of 38 professionals for the fourth interim fee period. Just prior to the hearing, at the Fee Review Committee's request and direction, Skadden coordinated with various professionals regarding the negotiation of certain fee accommodations. At the direction of this Court, Skadden drafted a proposed order, approving all interim fee applications (in the amounts recommended by the Fee Review Committee).

127. In connection with the foregoing services, Skadden expended 477.7 hours during the Application Period for which Skadden seeks compensation of $195,538, or 1.3% of the total compensation sought in this Interim Application. [41] Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-16</u>. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[41] This compares to $377,176, or 4.1%, $431,545, or 3.8%, $241,482, or 2.4%, $384,393, or 3.0%, and $280,261, or 2.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Dolores De Elizalde | $495 | 122.2 | $60,489 |
| Thomas J. Matz | $625 | 80.5 | $50,314 |
| Allison V. Herriott | $435 | 47.3 | $20,577 |
| Rena M. Samole | $565 | 35.1 | $19,832 |
| Melissa T. Kahn | $470 | 14.0 | $6,580 |
| Michael W. Perl | $435 | 6.4 | $2,785 |
| Kayalyn A. Marafioti | $830 | 2.2 | $1,826 |
| Kurt Ramlo | $625 | 1.6 | $1,000 |
| Paraprofessional Total | | 168.4 | $32,135 |
| **Total** | | **477.7** | **$195,538 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$23,954** |

Q.    Environmental Matters

128.    Throughout the Application Period, Skadden continued to assist the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Many of the U.S. plants that Delphi intends to wind down may present environmental concerns.  Therefore, Skadden assisted the Debtors in developing a strategy regarding possible alternatives for addressing these potential environmental liabilities in connection with emergence from chapter 11 and analyzing the legal issues that may arise from implementation of such strategies.  Furthermore, in connection with the ongoing claims review, Skadden has assisted the Debtors in analyzing various environmental claims that have been filed in these cases.  In particular, Skadden analyzed claims by neighboring property owner CSX Realty Development LLC alleging damages resulting from environmental contamination at a plant operated by the Debtors in Vandalia, Ohio.  In connection with the Debtors' opposition to those claims, Skadden assisted the Debtors in preparing and drafting memoranda and settlement agreements and participated in settlement negotiations with respect to those claims.  Skadden also assisted the Debtors in analyzing claims under an environmental indemnification agreement

71

entered into as part of a sale/leaseback transaction.  In addition, Skadden assisted the Debtors with

analysis and review of environmental conditions associated with the Debtors' properties in certain

states, and developed provisions for resolving potential environmental liabilities in connection

with possible property sales, lease rejections, or other transactional agreements.

129.    In connection with the foregoing services, Skadden expended 282.0 hours

during the Application Period for which Skadden seeks compensation of $184,183, or 1.2% of the

total compensation sought in this Interim Application.[42]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-17</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kenneth Berlin | $810 | 129.7 | $105,057 |
| John A. Amodeo | $625 | 106.6 | $66,626 |
| Elizabeth A. Malone | $495 | 12.4 | $6,138 |
| Ron E. Meisler | $630 | 2.2 | $1,386 |
| Paraprofessional Total | | 31.1 | $4,976 |
| **Total** | | **282.0** | **$184,183 (1.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$11,403** |

R.    <u>Creditor Meetings/Statutory Committees</u>

130.    Throughout the Application Period, Skadden regularly communicated with

the Creditors' Committee and the Equity Committee and their respective advisors regarding the

progress and status of the Reorganization Cases.  In addition to day-to-day communications,

during the Application Period, Skadden represented the Debtors at four formal meetings with the

Statutory Committees and their professional advisors.  The formal monthly meetings have

---

[42]    This compares to $163,396, or 1.8%, $140,142, or 1.2%, $129,158, or 1.3%, $211,507, or 1.6%, and $254,016, or 2.0%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

provided a forum for the Statutory Committees (including their members) to address general and

specific concerns.  These meetings have allowed the Debtors to keep the Statutory Committee

members and professionals informed as to upcoming issues, such as motions to be heard at the

monthly omnibus hearings, the status of the Debtors' transformation plan, development and

negotiations concerning the plan of reorganization, and actions to be undertaken in furtherance of

the transformation plan and plan of reorganization.  The Debtors believe that these efforts have

likely eliminated potential objections that the Statutory Committees might have filed to some of

the Debtors' motions by communicating and consulting with the Statutory Committees in advance

of filings and anticipated transactions, thus avoiding unnecessary litigation expenses.  Skadden

assisted the Debtors in preparing for these meetings, including assisting with the provision of

information and status reports.

   131.   In connection with the foregoing services, Skadden expended 329.4 hours

during the Application Period for which Skadden seeks compensation of $161,985, or 1.1% of the

total compensation sought in this Interim Application.[43]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-18</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Allison V. Herriott | $435 | 101.4 | $44,110 |
| John (Jack) Wm. Butler, Jr. | $875 | 29.8 | $26,076 |
| Ron E. Meisler | $630 | 33.6 | $21,168 |
| Kayalyn A. Marafioti | $830 | 23.1 | $19,173 |
| Thomas J. Matz | $625 | 27.9 | $17,438 |

[43]   This compares to $415,954, or 4.5%, $1,527,032, or 13.5%, $341,135, or 3.4%, $215,231, or 1.7%, and $258,775, or 2.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Lisa B. Diaz | $390 | 34.8 | $13,572 |
| Sarah J. Platt | $355 | 10.2 | $3,621 |
| Adlai S. Hardin | $585 | 5.1 | $2,984 |
| Karen M. Suber | $355 | 4.5 | $1,598 |
| Paraprofessional Total | | 59.0 | $12,245 |
| **Total** | | **329.4** | **$161,985 (1.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$26,718** |

S.    Rights Offering

132.    During the Application Period, in contemplation of a rights offering in connection with the Plan (the "Rights Offering"), the Debtors, with the assistance of Skadden, devoted time to the discussion and negotiation of revisions to the Rights Offering contemplated by the Delphi-Appaloosa EPCA with the New Plan Investors and the Statutory Committees. Skadden professionals also assisted the Debtors with respect to ongoing diligence in connection with the registration statement and dedicated time during the Application Period to revising the registration statement to reflect the agreed upon revisions to the Rights Offerings contemplated thereby and researching certain related issues, including tax and securities law issues.

133.    In connection with the foregoing services, Skadden expended 198.8 hours during the Application Period for which Skadden seeks compensation of $127,644, or 0.8% of the total compensation sought in this Interim Application.[44]   Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-19.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[44]    This compares to $444,341, or 3.5%, and $661,516, or 5.3%, of the total fees requested for this matter in Skadden's Fourth and Fifth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

| Name | Rate | Time | Amount |
|---|---|---|---|
| Michelle Gasaway | $625 | 148.7 | $92,939 |
| Nick P. Saggese | $875 | 14.1 | $12,338 |
| Gregg A. Noel | $845 | 11.0 | $9,296 |
| Adam Halper | $390 | 10.4 | $4,056 |
| Kayalyn A. Marafioti | $830 | 4.1 | $3,403 |
| Nathan L. Stuart | $495 | 5.9 | $2,921 |
| Daniel I. Ganitsky | $585 | 4.6 | $2,691 |
| **Total** | | **198.8** | **$127,644 (0.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$23,059** |

T.    Employee Matters (Pension)

134.    During the Application Period, Skadden continued to assist the Debtors in furtherance of another key tenet of the Debtors' transformation plan, devising a workable solution to the Debtors' pension situation.  Skadden assisted the Debtors in connection with bankruptcy and restructuring advice related to the Debtors' defined benefit pension plans covered by termination insurance programs administered by the PBGC.  During the Application Period, Skadden assisted the Debtors by researching and analyzing various issues in connection with the contemplated treatment of the pension plans and by analyzing various tax-related issues in connection with the pension funding obligations.  Skadden also worked with the Debtors in negotiating a second pension plan funding waiver from the IRS for their hourly pension plan. This waiver will enable the Debtors to achieve their stated goal of resolving pension funding deficiencies upon emergence from chapter 11.  Just after the Application Period, the Debtors, with the assistance of Skadden, filed a motion seeking this relief, and on October 26, 2007, the Debtors received this Court's approval to comply with the terms of the waiver (Docket No. 10726).

75

135.    In connection with the foregoing services, Skadden expended 189.6 hours during the Application Period for which Skadden seeks compensation of $121,920, or 0.8 % of the total compensation sought in this Interim Application.[45]    Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-20</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Jay S. Berke | $810 | 30.9 | $25,029 |
| Albert L. Hogan III | $695 | 34.3 | $23,839 |
| John P. Furfaro | $810 | 26.0 | $21,060 |
| Julie Boden Adams | $435 | 47.3 | $20,576 |
| Kayalyn A. Marafioti | $830 | 17.2 | $14,276 |
| Brian M. Fern | $565 | 12.7 | $7,176 |
| Ronald D. Kohut | $470 | 13.4 | $6,298 |
| Melissa T. Kahn | $470 | 7.8 | $3,666 |
| **Total** | | **189.6** | **$121,920 (0.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,756** |

U.    <u>Supplier Matters</u>

136.    During the Application Period, the Debtors continued to address supplier issues in accordance with various supplier-related "first day" orders that were approved by the Court early in these cases, as well as this Court's order, dated December 12, 2005 (Docket No. 1494) (the "SAAP Order"), granting the Debtors authority to assume agreements covering the supply of goods that the Debtors determine are critical to their ongoing business operations.  This required the Debtors, with the assistance of Skadden, to negotiate a significant number of agreements with multiple suppliers pursuant to those orders.  During the Application Period,

---

[45]    This compares to $58,190, or 0.5%, $28,202, or 0.3%, $77,033, or 0.6%, and $57,919, or 0.5%, of the total fees requested for this matter in Skadden's Second, Third, Fourth, and Fifth Interim Fee Applications, respectively. Skadden did not request any compensation for this matter in its First Interim Fee Application.

Skadden also devoted time to negotiations with suppliers regarding the extension or replacement

of expiring supply agreements, including use of the procedures established by the SAAP Order.

In addition, before the Application Period, Clarion Corporation of America ("Clarion") filed a

motion in this Court for payment of an administrative expense claim with respect to the same

allegations asserted in its previously filed complaint.  The Debtors, with the assistance of

Skadden, and Clarion engaged in formal mediation and negotiated a settlement agreement that

has been approved in accordance with the settlement procedures established by this Court.

137.   In connection with the foregoing services, Skadden expended 312.0 hours

during the Application Period for which Skadden seeks compensation of $117,731, or 0.8% of the

total compensation sought in this Interim Application.[46]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-21.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John K. Lyons | $775 | 62.5 | $48,439 |
| Kurt Ramlo | $625 | 39.8 | $24,876 |
| Joseph N. Wharton | $565 | 34.2 | $19,324 |
| Ron E. Meisler | $630 | 9.8 | $6,174 |
| Allison V. Herriott | $435 | 9.4 | $4,089 |
| Kayalyn A. Marafioti | $830 | 3.1 | $2,573 |
| Paraprofessional Total | | 153.2 | 12,256 |
| **Total** | | **312.0** | **$117,731 (0.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$18,905** |

---

[46]   This compares to $1,032,388, or 11.2%, $539,862, or 4.8%, $331,877, or 3.3%, $182,296, or 1.4%, and $396,217, or 3.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

V.    Business Operations/Strategic Planning

      138.    During the Application Period, Skadden professionals met regularly with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors to consider restructuring strategies and initiatives.  Among other matters, senior Skadden lawyers participated in weekly meetings at the Company's headquarters, including Delphi Transformation Committee meetings.  Skadden also participated in numerous strategy sessions, meetings, and calls to consider such major case issues as the Debtors' development of (a) their transformation plan, (b) their 2007-2011 preliminary restructuring business plan, (c) the plan-related discussions, and (d) various scenarios, considerations, and ramifications regarding the Reorganization Cases.  Furthermore, Skadden assisted the Debtors with respect to operational issues as they relate to these Reorganization Cases, including, without limitation, conducting negotiations with the Creditors' Committee and the Equity Committee.  In addition, Skadden advises the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct.  Skadden frequently advises the Debtors' management with respect to specific business questions posed by management that arise from events occurring in the Reorganization Cases.  Part of Skadden's advice in this regard involves the participation of Skadden professionals in periodic planning and strategy conferences with the Debtors' senior management team.

      139.    To assist the Debtors in continuing to perform their fiduciary duties, Skadden works with the Debtors in implementing procedures for the Debtors to operate their businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviews certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property, and other transactions to aid the Debtors in evaluating whether the contemplated transactions are

78

within the ordinary course of business or are outside the ordinary course of business and require Court approval.

140.    In connection with the foregoing services, Skadden expended 136.8 hours during the Application Period for which Skadden seeks compensation of $101,423, or 0.7% of the total compensation sought in this Interim Application.[47]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-22.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 48.8 | $42,701 |
| Eric L. Cochran | $845 | 25.2 | $21,295 |
| George N. Panagakis | $810 | 7.1 | $5,751 |
| Ron E. Meisler | $630 | 8.5 | $5,355 |
| Thomas J. Matz | $625 | 8.1 | $5,063 |
| Rena M. Samole | $565 | 8.5 | $4,803 |
| Daniel I. Ganitsky | $585 | 6.7 | $3,920 |
| Kayalyn A. Marafioti | $830 | 4.6 | $3,818 |
| Albert L. Hogan III | $695 | 3.0 | $2,085 |
| Nathan L. Stuart | $495 | 4.0 | $1,981 |
| Adlai S. Hardin | $585 | 2.8 | $1,638 |
| Kurt Ramlo | $625 | 1.7 | $1,063 |
| Paraprofessional Total | | 7.8 | $1,950 |
| **Total** | | **136.8** | **$101,423 (0.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$52,792** |

---

[47]    This compares to $258,753, or 2.8%, $192,132, or 1.7%, $304,824, or 3.0%, $188,290, or 1.5%, and $358,708, or 2.8%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

W.    Automatic Stay (Relief Actions)

141.    As of the Petition Dates, the Debtors were parties to more than 200 active

and threatened lawsuits.  Since the Petition Dates, the Debtors have received numerous requests,

including more than 50 motions that have been filed seeking modification of the stay under

section 362 of the Bankruptcy Code.  During the Application Period, Skadden continued to work

with the Debtors to reach consensual resolutions to these lift stay relief matters.  For example,

Skadden worked with the Debtors to resolve a lift-stay motion that was filed by Calsonic Kansei

North America ("Calsonic"), dated June 6, 2007 (Docket No. 8196).  Skadden assisted the

Debtors in analyzing Calsonic's right to stay relief to terminate a postpetition contract and

Calsonic's termination rights under the contract and nonbankruptcy law.  Similar issues were

addressed with respect to roughly a dozen other similar contracts with Calsonic.  The Debtors,

with the assistance of Skadden, reached a settlement, and on June 25, 2007, Calsonic withdrew its

motion thereby resolving the matters (Docket No. 8390).  Finally, Skadden continued to advise

the Debtors frequently regarding the application of the lift stay procedures approved by this

Court[48] to various claims, strategies for facilitating settlements thereunder, and proper

documentation of such settlements.

142.    In connection with the foregoing services, Skadden expended 210.8 hours

during the Application Period for which Skadden seeks compensation of $100,396, or 0.7% of the

---

[48]    Prior to the Application Period, Skadden professionals worked with the Debtors' legal department, other employees of the Debtors, and the Debtors' insurers to develop procedures for consensually modifying the automatic stay to permit cost-effective and timely liquidation and settlement of certain prepetition litigation claims that are covered under the Debtors' general, product, and automobile liability insurance policies.  This Court approved the implementation of the Lift Stay Procedures on June 26, 2006 (Docket No. 4366).

total compensation sought in this Interim Application.[49]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-23.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 171.7 | $74,691 |
| Kurt Ramlo | $625 | 31.5 | $19,688 |
| John K. Lyons | $775 | 5.3 | $4,108 |
| Kayalyn A. Marafioti | $830 | 2.3 | $1,909 |
| **Total** | | **210.8** | **$100,396 (0.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$23,573** |

X.    Customer Matters (Reviews/Investigations)

143.    Early in these cases, the Debtors listed unliquidated claims against GM in

their Statement of Financial Affairs and Schedules of Assets and Liabilities.  Prior to the

Application Period, the Creditors' Committee filed a motion seeking court authority to prosecute

certain claims and defenses belonging to the Debtors against GM and certain former officers of

Delphi on the Debtors' behalf (also known as the "STN Motion") (Docket No. 4718), to which the

Debtors filed a preliminary objection on August 4, 2006 (Docket No. 4859).  The Equity

Committee also filed an objection and set forth its views regarding potential claims and defenses

against GM (Docket No. 5070).  As of the end of the Application Period, the STN Motion was

adjourned to the October 25, 2007 omnibus hearing and has subsequently been suspended in

connection with the Debtors' entry into a tolling agreement with GM.  During and after the

Application Period, Skadden continued to evaluate potential claims and defenses against GM and

---

[49]    This compares to $64,079, or 0.7%, $140,233, or 1.2%, $356,684, or 3.6%, $248,725, or 1.9%, and $53,883, or
0.4%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee
Applications, respectively.

assisted the Debtors in negotiating and preparing a tolling agreement and a protective complaint to ensure preservation of the Debtors' potential claims and defenses against GM.

144.    In connection with the foregoing services, Skadden expended 121.8 hours during the Application Period for which Skadden seeks compensation of $68,731, or 0.4% of the total compensation sought in this Interim Application.[50]    Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-24</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
| --- | --- | --- | --- |
| Lee P. Garner | $625 | 71.2 | $44,500 |
| John Guzzardo | $435 | 43.8 | $19,054 |
| Albert L. Hogan III | $695 | 4.3 | $2,989 |
| John (Jack) Wm. Butler, Jr. | $875 | 2.5 | $2,188 |
| **Total** | | **121.8** | **$68,731 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,512** |

Y.    <u>Reports And Schedules</u>

145.    The Debtors are required to submit periodic Operating Reports which provide detailed information regarding the Debtors' assets, liabilities, and operations on a monthly basis.  During the Application Period, Skadden worked with the Debtors' finance and accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to review and file Monthly Operating Reports for the months of May, June, July, and August 2007.

146.    In connection with the foregoing services, Skadden expended 75.3 hours during the Application Period for which Skadden seeks compensation of $46,758, or 0.3% of the

---

[50]    This compares to $743,110, or 7.4%, $661,440, or 5.2%, and $66,985, or 0.5%, of the total fees requested for this matter in Skadden's Third, Fourth, and Fifth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its First and Second Interim Fee Applications.

total compensation sought in this Interim Application.[51]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-25.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Thomas J. Matz | $625 | 30.3 | $18,939 |
| Adlai S. Hardin | $585 | 19.4 | $11,349 |
| Kayalyn A. Marafioti | $830 | 10.5 | $8,715 |
| Ronald D. Kohut | $470 | 7.7 | $3,619 |
| Nathan L. Stuart | $495 | 3.3 | $1,634 |
| Ron E. Meisler | $630 | 2.3 | $1,449 |
| Daniel I. Ganitsky | $585 | 1.8 | $1,053 |
| **Total** | | **75.3** | **$46,758 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,798** |

Z.    Financing (DIP And Emergence)

147.    In the second quarter of 2007, the Debtors initiated an extensive canvass of

potential lenders to ascertain the best available terms and conditions for their exit financing

facility.  During the Application Period, Skadden, working with the Debtors' special counsel

Shearman & Sterling LLP ("Shearman") (being mindful not to duplicate efforts), assisted the

Debtors in: (i) creating a master term sheet of preferred terms and conditions for their exit

financing documentation and (ii) evaluating the responses of various lenders to the master term

sheet.  When it became evident that the Debtors would not be able to raise the aggregate amount

of funded debt previously anticipated, the Debtors, with the assistance of both Skadden and

Shearman, began discussions with potential lenders concerning "market-clearing" alternatives

---

[51]    This compares to $187,152, or 2.0%, $22,844, or 0.2%, $8,325, or 0.1%, $7,546, or 0.1%, and $14,268, or 0.1%,
of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee
Applications, respectively.

that would result in lower aggregate funded debt.  In addition, during the Application Period, the

Debtors began preliminary negotiations with respect to amending their DIP credit facility, and

began discussions with lenders' counsel to extend the term of the existing facility.[52]

148.    In connection with the foregoing services, Skadden expended 74.2 hours

during the Application Period for which Skadden seeks compensation of $45,574, or 0.3% of the

total compensation sought in this Interim Application.[53]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-26.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Lawrence D. Frishman | $810 | 23.0 | $18,630 |
| Kellan Grant | $470 | 17.9 | $8,413 |
| John (Jack) Wm. Butler, Jr. | $875 | 9.6 | $8,400 |
| M. Janine Jjingo | $390 | 20.0 | $7,800 |
| Ron E. Meisler | $630 | 3.7 | $2,331 |
| **Total** | | **74.2** | **$45,574 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,520** |

AA.    Claims Administration (Reclamation/Trust Funds)

149.    The Debtors received approximately 855 unique reclamation demands with

a total face amount of more than $285 million.  During the Application Period, Skadden

continued to work with the Debtors and their business advisors in negotiating the merit and

amount of outstanding reclamation claims with the holders of such claims.  As a result of

---

[52]    On November 16, 2007, after the Application Period, this Court entered an order which, among other things, extends the maturity of the current DIP credit facility to June 30, 2008.

[53]    This compares to, $296,608, or 3.2%, $20,973, or 0.2%, and $267,852, or 2.1%, of the total fees requested for this matter in Skadden's First, Second, and Fourth Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in its Third and Fifth Interim Fee Applications.

negotiations with reclamation claimants since the Petition Dates, 737 of the original 855

non-duplicate claims were resolved (either consensually or by default) as of September 30, 2007,

subject to the reservation of certain defenses.  To further the Debtors' goal of resolving

reclamation claims, during the Application Period, Skadden assisted the Debtors by researching

and analyzing certain defenses to priority treatment of reclamation claims.  On September 6,

2007, the Debtors, with the assistance of Skadden, filed a motion to amend the reclamation

procedures to resolve reclamation claims in conjunction with the Debtors' plan of reorganization.

Specifically, the Debtors sought authority to send an election notice to reclamation claimants

offering them the option to elect to have their reclamation claims treated under the Plan as if they

were general unsecured claims.  If reclamation claimants would elect to pursue priority treatment,

then after emergence from chapter 11, the Debtors would assert a defense against such priority

treatment based on the presence of the lien on the Debtors' assets held by the Debtors' prepetition

secured lenders.  On October 2, 2007, just after the Application Period, the Debtors received this

Court's approval to amend and restate the reclamation procedures (Docket No. 10409).

      150.   In connection with the foregoing services, Skadden expended 61.8 hours

during the Application Period for which Skadden seeks compensation of $36,780, or 0.2% of the

total compensation sought in this Interim Application.[54]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-27</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

---

[54]   This compares to $134,926, or 1.5%, $142,265, or 1.3%, $217,669, or 2.2%, and $10,623, or 0.1%, of the total
fees requested for this matter in Skadden's First, Second, Third, and Fourth Interim Fee Applications, respectively.
Skadden did not request compensation for this matter in its Fifth Interim Fee Application.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Joseph N. Wharton | $565 | 31.7 | $17,912 |
| Melissa T. Kahn | $470 | 11.7 | $5,499 |
| John K. Lyons | $775 | 5.5 | $4,263 |
| George N. Panagakis | $810 | 3.1 | $2,511 |
| Ron E. Meisler | $630 | 3.7 | $2,331 |
| Kayalyn A. Marafioti | $830 | 2.2 | $1,826 |
| Thomas J. Matz | $625 | 2.2 | $1,375 |
| Kurt Ramlo | $625 | 1.7 | $1,063 |
| **Total** | | **61.8** | **$36,780 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,391** |

BB.    Executory Contracts (Personalty)

151.    The Debtors estimate that, as of the Petition Dates, they were parties to 347,000 scheduled executory contracts and unexpired leases, which collectively involve billions of dollars of liabilities.  During the Application Period, Skadden participated in discussions with numerous representatives of the Debtors to coordinate the review of various executory contracts and, together with the Debtors' senior management and business advisors, to evaluate contracts and leases for assumption or rejection pursuant to the Plan.  In that regard, during the Application Period, Skadden researched various issues relating to assumption and rejection of executory contracts that may arise in connection with a Plan.  In addition, Skadden worked closely with business personnel and external representatives of the Debtors to facilitate a reconciliation of allegedly outstanding invoices with the Debtors' internal records to determine the Debtors' postpetition payment obligations.  Skadden also assisted the Debtors in seeking a resolution of an equipment purchase dispute with Comerica Leasing Corporation, including negotiation of a valuation procedure in an attempt to avoid costly litigation.  Finally, Skadden assisted the Debtors in negotiating a potential lease for the Debtors' fleet vehicles, including test automobiles and executive automobiles.

86

152.    In connection with the foregoing services, Skadden expended 74.3 hours during the Application Period for which Skadden seeks compensation of $34,465, or 0.2% of the total compensation sought in this Interim Application.[55]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-28.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 27.8 | $12,094 |
| Karen M. Suber | $355 | 13.5 | $4,793 |
| Kellan Grant | $470 | 10.0 | $4,700 |
| Ron E. Meisler | $630 | 7.4 | $4,662 |
| Michael W. Perl | $435 | 5.9 | $2,567 |
| Rena M. Samole | $565 | 4.1 | $2,317 |
| Kurt Ramlo | $625 | 2.8 | $1,750 |
| Brian M. Fern | $565 | 2.8 | $1,582 |
| **Total** | | **74.3** | **$34,465 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,441** |

CC.    Leases (Real Property)

153.    The Debtors are currently lessors or lessees with respect to approximately 80 real property leases.  During the Application Period, Skadden worked closely with the Debtors on matters related to such real property leases including (a) advising the Debtors regarding negotiating the renewal or amendments of certain leases, (b) reviewing proposed new leases and negotiating entry into certain new leases, (c) preparing and serving notices under the Order Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real Property Leases Without Further Court Approval, entered on January 6, 2006 (Docket No. 1777) for new

---

[55]    This compares to $153,055, or 1.7%, $38,078, or 0.3%, $69,027, or 0.7%, $50,562, or 0.4%, and $107,072, or 0.9%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

or renewed leases, and (d) assisting the Debtors with their decision-making process regarding the rejection of leases, including advising the Debtors regarding lease rejection claims and lease rejection strategies.  In addition, during the Application Period, Skadden assisted the Debtors in drafting and prosecuting a motion under 11 U.S.C. § 365(d)(4) to further extend the deadline by which the Debtors must assume or reject unexpired leases of nonresidential real property. Pursuant to an order entered by this Court on August 16, 2007 (Docket No. 9108), the deadline was extended from September 30, 2007, to the earlier of February 29, 2008 or the date on which the Court confirms a plan of reorganization in these chapter 11 cases.

154.    In connection with the foregoing services, Skadden expended 52.8 hours during the Application Period for which Skadden seeks compensation of $24,542, or 0.2% of the total compensation sought in this Interim Application.[56]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-29</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 24.5 | $11,515 |
| Laverne F. Hill | $390 | 21.7 | $8,463 |
| Kurt Ramlo | $625 | 2.9 | $1,813 |
| Kayalyn A. Marafioti | $830 | 2.1 | $1,743 |
| Ron E. Meisler | $630 | 1.6 | $1,008 |
| **Total** | | **52.8** | **$24,542 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,154** |

---

[56]    This compares to $143,190, or 1.6%,  $290,834, or 2.6%, $81,111, or 0.8%, $145,356, or 1.1%, and $133,549, or 1.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

DD.    Intellectual Property

155.    During the Application Period, Skadden provided legal advice regarding bankruptcy-related issues affecting the Debtors' intellectual property.  Specifically, Skadden performed a specialized review, including legal research and analysis, relating to a particular intellectual property license agreement and the potential options available to the Debtors related to such agreement under the Bankruptcy Code.  Skadden professionals also participated in conference calls with the Debtors to assist them with assessing how the applicable legal issues affect their business options under such license agreement.

156.    In connection with the foregoing services, Skadden expended 28.7 hours during the Application Period for which Skadden seeks compensation of $14,028, or 0.1% of the total compensation sought in this Interim Application.[57]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-30.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brian M. Fern | $565 | 16.2 | $9,153 |
| Ian S. Bolton | $390 | 12.5 | $4,875 |
| **Total** | | **28.7** | **$14,028 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$906** |

EE.    Litigation (General)

157.    During the Application Period, Skadden was required to devote resources to various litigation matters not within the purview of other billing categories.  Skadden assisted the

---

[57]    This compares to $143,190, or 1.6%,  $290,834, or 2.6%, $81,111, or 0.8%, $145,356, or 1.1%, and $133,549, or 1.1%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

Debtors in negotiations relating to some of the non-bankruptcy litigation matters. Pursuant to an order entered by this Court on August 16, 2007 (Docket No. 9108), the deadline to extend the period within which the Debtors may seek removal of certain actions from the Bankruptcy Court was extended from September 30, 2007, to and including the later of (i) February 29, 2008 and (ii) 30 days after entry of an order terminating the automatic stay with respect to the action.

158.    In connection with the foregoing services, Skadden expended 26.7 hours during the Application Period for which Skadden seeks compensation of $12,356, or 0.1% of the total compensation sought in this Interim Application.[58] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-31. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 22.8 | $9,918 |
| Kurt Ramlo | $625 | 3.9 | $2,438 |
| **Total** | | **26.7** | **$12,356 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,825** |

FF.    Liquidation/Feasibility

159.    During the Application Period, Skadden worked with the Debtors' financial advisors to provide legal advice in connection with preparation of a liquidation analysis, which was attached as an exhibit to the Disclosure Statement. As part of this work, Skadden conducted research regarding various feasibility issues to advise the Debtors on appropriate assumptions for any such analysis.

---

[58]    This compares to $21,112, or 0.2%, $33,598, or 0.3%, $11,076, or 0.1%, $37,702, or 0.3%, and $30,997, or 0.2%, of the total fees requested for this matter in Skadden's First, Second, Third, Fourth, and Fifth Interim Fee Applications, respectively.

160.    In connection with the foregoing services, Skadden expended 19.6 hours during the Application Period for which Skadden seeks compensation of $10,139, or 0.1% of the total compensation sought in this Interim Application.[59]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-32.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 15.8 | $7,426 |
| Ron E. Meisler | $630 | 2.5 | $1,575 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.3 | $1,138 |
| **Total** | | **19.6** | **$10,139 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,032** |

## Relief Requested

161.    Skadden has submitted monthly fee statements for the period from June 1, 2007 through September 30, 2007, and, in accordance with the Interim Compensation Order, now submits this Interim Application covering the Application Period.  Based on the firm's customary billing practices, the Debtors ordinarily would be billed a total of $17,071,266 for fees and $967,272 for charges and disbursements.  In keeping with Skadden's commitment to self-policing its fees, charges, and disbursements, and based on various accommodations to the Debtors, Skadden, as part of its monthly fee statements, voluntarily reduced its fees by $1,626,931, or approximately 9.5%, and its charges and disbursements by $129,322, or approximately 13.4%.

---

[59]    This compares to $64,538, or 0.5%, of the total fees requested for this matter in Skadden's Fifth Interim Fee Application.  Skadden did not seek compensation for this matter in its First, Second, Third, and Fourth Interim Fee Applications.

As a result, the actual amount billed to the Debtors was $15,457,200 for fees and $837,950 for charges and disbursements.

162.    Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Interim Application by $57,146 to reflect, among other accommodations, the elimination of (i) fees related to any timekeeper who billed fewer than ten total hours during the Application, (ii) fees related to any timekeeper who billed less than $1,000 during the Application Period, (iii) fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) fees related to any matter to which fewer than ten hours were billed during the Application Period.  As a result, the actual amount sought herein is $15,387,189 for fees.  This represents a total reduction with respect to fees, charges, and disbursements of $1,813,399, or approximately 10.1%, from those amounts that Skadden would customarily charge.

163.    The Interim Compensation Order provides that, when seeking interim compensation, professionals must submit monthly fee statements to the Debtors, counsel to the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition credit facility, and members of the Fee Review Committee.  Each person receiving a statement has at least 15 days after its receipt to review it.  If no objection to a monthly fee statement is made within 45 days after the end of the applicable billing period, the Debtors are authorized to pay 80% of the fees requested (with the remaining 20% of the fees requested referred to herein as the "Holdback") and 100% of the charges and disbursements requested.  Skadden has submitted monthly fee statements as described above for each of the months covered by the Application Period.

92

164.   Upon payment by Delphi for the amount owed to Skadden for the Application Period, Skadden will have received $12,365,760 on account of billed fees and $837,950 on account of billed charges and disbursements and will have accrued a Holdback in the amount of $3,091,440.[60]   After application of an additional client accommodation of $57,146, Skadden is requesting payment of f the Holdback in the amount of $3,091,440.

A.   Allowance Of Professional Fees

165.   During the Application Period, professionals at Skadden billed an aggregate of 29,965.0 hours reflected in this Interim Application working on matters concerning the Debtors' Reorganization Cases.[61]   Of such time spent, 6,424.4 hours were spent by partners, 2,464.9 hours were spent by counsel, 18,378.7 hours were spent by associates, and 2,697.0 hours were spent by legal assistants.   A summary showing the name and position of each such partner, counsel, associate, and legal assistant, together with that person's date of admission to the bar (as applicable), net hours during the Application Period, and blended hourly billing rate, is provided in the Summary of Services found at the beginning of this Interim Application.[62]

B.   Reimbursement Of Charges And Disbursements

166.   As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases.   The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court

---

[60]   Skadden's monthly statement for September was submitted on November 23, 2007.   Pursuant to the Interim Compensation Order, parties receiving the monthly statement have 15 days after receipt of such monthly statement to object to such statement.   Therefore, the objection deadline for the September monthly statement is December 10, 2007.

[61]   Skadden maintains records of the time it expended in the rendition of all professional services, which time records are made concurrently with the rendition of professional services.

[62]   In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics associated with the Reorganization Cases.

fees, travel expenses, postage, long distance telephone charges, computerized legal research,

investigative searches, and other charges customarily billed by law firms.  Certain charges and

disbursements are not separately charged for under the bundled rate structure as described in the

Engagement Agreement.

167.    Skadden has attempted to minimize the charges and disbursements

associated with the Debtors' Reorganization Cases, particularly for items such as reproduction

and delivery, which have been lowered as a result of the restricted service list and the ability to

serve the 2002 List Parties electronically, which Skadden proposed and this Court approved.

During the Application Period, Skadden disbursed the following sums for actual and necessary

charges and disbursements in the rendition of professional services in the Reorganization Cases,

and requests that it be reimbursed therefor:

<u>Charges And Disbursements Incurred</u>[63]

| | |
|---|---|
| Travel Expenses | $323,002 |
| Reproduction And Document Preparation | $311,761 |
| Computer Legal Research | $124,820 |
| Courier, Express Delivery, And Postage | $32,752 |
| Electronic Document Management | $14,863 |
| Telecommunications | $12,054 |
| Court Reporting | $11,544 |
| Outside Research | $6,976 |
| Filing/Court Fees | $178 |
| **TOTAL** | **$837,950** |

168.    The charges and disbursements listed above are reasonable and are

consistent with those incurred by other bankruptcy practitioners in other large, complex chapter

11 reorganization cases in this and other districts.  Moreover, Skadden believes that the unique

size and complexity of these cases, including the terms of this Court's case management order, as

---

[63]    The details relating to the charges and disbursements can be found in <u>Exhibits D-1</u> through <u>D-32</u> on a matter by
matter basis.

94

amended, which require, among other things, overnight delivery of most pleadings, warrant

reimbursement of the foregoing charges and disbursements.

<u>Reasonableness Of Fees, Charges, And Disbursements</u>

169.   Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary

services" rendered by the professional, plus "reimbursement for actual, necessary expenses." <u>See</u>

11 U.S.C. § 330(a)(1).  <u>See generally</u> <u>In re Cenargo Int'l</u>, 294 B.R. 571 (Bankr. S.D.N.Y. 2003);

<u>In re Child World, Inc.</u>, 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

170.   In determining the amount of "reasonable compensation," the Court must

consider the nature, extent, and value of the services, taking into account all the relevant factors,

including the time spent on such services, the rates charged for such services, whether the services

were necessary and beneficial, whether the services were performed in a reasonable amount of

time commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed, and whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

<u>See</u> 11 U.S.C. § 330(a)(3).

171.   In assessing attorneys' fees, courts use several different approaches.  The

Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method,

which is a determination as to the number of hours of service reasonably devoted to the case

multiplied by the attorney's reasonable rates.  <u>See</u> <u>Savoie v. Merchants Bank</u>, 166 F.3d 456, 460

(2d Cir. 1999) (applying lodestar approach to non-bankruptcy case); <u>Masterwear Corp. v. Angel</u>

<u>& Frankel, P.C.</u> (In re Masterwear Corp.), 233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When

applying the lodestar approach, courts in this district incorporate the familiar factors set forth in

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).[64]  See, e.g., Betancourt

v. Giuliani, 325 F. Supp. 2d 330, 332 n.3 (S.D.N.Y. 2004) ("In adjusting the lodestar, courts

generally consider the . . .  factors set forth in Johnson v. Georgia Highway Express, Inc."); Sucre

v. MIC Leasing Corp. (In re Sucre), 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998) ("To

determine the 'lodestar fee' the Court must make an initial objective determination as to the

number of hours reasonably expended and the reasonable hourly rate.  After multiplying the two,

the Court may adjust the product by a consideration of [the Johnson] factors." (citation omitted)).

        172.   In awarding attorneys' fees, courts will also consider whether the services

rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores,

Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. U.S. Trustee, 540 U.S. 526

(2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997); In re Drexel

Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court should

focus on what a reasonable lawyer would have done at the time and not invoke a hindsight

analysis.

> [I]t is important for a court to maintain "a sense of overall proportion," and not
> "become enmeshed in meticulous analysis of every detailed facet of the
> professional representation."  It is easy to speculate in retrospect that the work
> could have been done in less time or with fewer attorneys or with an associate
> rather than a partner.  On the other hand, it is also possible that [the debtor] would
> not have enjoyed the success it did had its counsel managed matters differently.

Boston & Maine Corp. v. Moore (In re Boston & Maine Corp.), 776 F.2d 2, 10 (1st Cir. 1985)

(citations omitted).

---

[64]   The twelve Johnson factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

173.    In accordance with the factors enumerated in 11 U.S.C. § 330 and

applicable case law, the amount requested herein by Skadden is fair and reasonable in light of (a)

the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization

Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations

imposed by the Reorganization Cases, (e) the nature and extent of the services rendered,

(f) Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the

cost of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

174.    As should be evident from the summary of Skadden's services as described

above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly

unique set of circumstances.  Unquestionably, these are large and complex cases.  The nature and

complexity of the Reorganization Cases has required Skadden to develop case management and

staffing solutions at every stage of the proceedings.  These tasks have been particularly complex

in light of the Debtors' widespread operations and the relative sophistication of other

parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors

by employing a streamlined case management structure that generally consists of relatively small,

core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of

duplicative or unnecessary work.

175.    Given the size of these Reorganization Cases and the number of matters that

continually need to be addressed simultaneously, there have been occasions when a number of

Skadden attorneys must be present and participate in the discussions and negotiations.  This is

particularly true of meetings with the Creditors' Committee and the Equity Committee and also

with respect to the monthly omnibus hearings.  Skadden believes that, as is evident from the

97

summaries contained in this Interim Application and the time entries attached hereto, it has

articulated specific reasons for attendance by multiple attorneys on such occasions.

D.      Experience Of Skadden

176.    The experience of Skadden also has benefited the estates.  Skadden is

among the largest firms and has one of the largest restructuring groups in the world.  As more

fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from

other practice areas have extensive knowledge and experience in dealing with the multitude of

fast-paced issues that arise in similar chapter 11 cases.  Accordingly, Skadden's depth of

experience in chapter 11 matters has ensured that a number of pressing matters could be

addressed promptly.  In addition, Skadden's commitment to monitoring the administrative

expenses of the estates, including its own legal fees, has been a constant element of its

representation of the Debtors.  Indeed, this emphasis has been manifested in Skadden's careful

review of its fees, charges, and disbursements and a voluntary client accommodation of

$1,813,399, including a voluntary aggregate accommodation of $1,756,253 on Skadden's

monthly fee statements and an additional $57,146 voluntary reduction on this Interim

Application.

E.      Comparable Services

177.    An award of compensation also must be based on the cost of comparable

services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures

charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed

clearly in its Retention Application, which this Court approved and to which none of the major

constituencies objected.  The amounts sought by Skadden are consistent with the fees, charges,

and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and

98

duration. Accordingly, the cost of comparable services supports the Interim Application, and the services performed during the Application Period more than warrant the allowance of compensation, particularly in view of the results achieved.

F.    Compliance With Guidelines

178.    Skadden believes that this Interim Application, together with the attachments hereto, substantially complies in all material respects with the Guidelines. The Debtors have paid all quarterly fees currently due and payable to the U.S. Trustee. To the extent that the Application does not comply in every respect with the requirements of such guidelines, Skadden respectfully requests a waiver for any such technical non-compliance.

Notice

179.    In compliance with the Sixth Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, entered by this Court on December 11, 2006 (Docket No. 6145), notice of the filing of this Interim Application will be provided to all parties who have filed a notice of appearance with the Clerk of this Court and requested notice of pleadings in these chapter 11 cases. In addition, the Interim Application in its entirety will be served on the following parties: (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: David M. Sherbin, Esq. and John D. Sheehan, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii) counsel for the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv) counsel for the Equity Committee, Fried, Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York 10004, Att'n: Bonnie Steingart, Esq., (v) counsel for the agent under the Debtors' former

prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York,

New York 10017, Att'n: Kenneth S. Ziman, Esq. and Robert H. Trust, Esq., (vi) counsel for the

agent under the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington

Avenue, New York, New York 10017, Att'n: Donald S. Bernstein, Esq. and Brian M. Resnick,

Esq., and (vii) the members of the Fee Review Committee and its advisor, Legal Cost Control,

Inc., 255 Kings Highway East, Haddonfield, New Jersey 08033, Att'n: John J. Marquess.  In light

of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

<u>Memorandum Of Law</u>

180.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing

of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $15,387,189 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $837,950, (b) authorize and direct the Debtors to pay to Skadden the amount of $3,091,440 to release the Holdback accrued during the Application Period, and (c) grant it such other and further relief as is just.

Dated: New York, New York
         November 30, 2007

<div style="margin-left: 50%">

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

            - and -


By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

</div>