**Hearing Date And Time: December 20, 2007 at 10:00 a.m.**
**Objection Deadline: December 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
      In re                          :     Chapter 11
                                  :
DELPHI CORPORATION, et al.,         :     Case No. 05-44481 (RDD)
                                  :
                                  :     (Jointly Administered)
                  Debtors.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("FIFTH § 1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,
debtors and debtors-in-possession in the above-captioned cases (collectively, the
"Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C.
§ 1121(d) further extending the Debtors' exclusive periods within which to file and solicit
acceptances of a plan of reorganization, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in
this Court for reorganization relief under chapter 11 of title 11 of the United States Code,
11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue
to operate their businesses and manage their properties as debtors-in-possession under
Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration
of these cases.

2.    No trustee or examiner has been appointed in these cases.  On
October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an
official committee of unsecured creditors (the "Creditors' Committee").  On April 28,
2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity
Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In
Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To
Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And

2

Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement").  The Court

commenced the hearing on the Disclosure Statement and related solicitation procedures

motion on October 3, 2007 and has scheduled the hearing to continue on December 6,

2007.  Three orders with respect thereto were entered by this Court on October 9, 2007

(Docket No. 10497), October 19, 2007 (Docket No. 10662), and November 7, 2007

(Docket No. 10864).  The Debtors filed notices of potential amendments to the Disclosure

Statement and/or certain appendices thereto on October 29, 2007 (Docket No. 10759),

November 14, 2007 (Docket No. 10932), and November 16, 2007 (Docket No. 10964).

No order approving the Disclosure Statement or confirming the Plan has yet been entered

by this Court.

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is

a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein is

section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the

"Company") as of December 31, 2006 had global net sales of $26.4 billion and global

assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked

as the fifth largest public company business reorganization in terms of revenues and the

---

[1]      The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on
February 27, 2007.

thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[2]

       7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

       8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

5

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S.

businesses to complete its transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

12.      On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first,

modifying the Company's labor agreements to create a competitive arena in which to

conduct business;[5] second, concluding their negotiations with GM to finalize GM's

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support
agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity
purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising
a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital
Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as
well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P.  Under the Delphi-
Appaloosa EPCA, the new plan investors agreed to invest up to $2.55 billion in preferred and common
equity in the reorganized Delphi to support the Company's transformation plan and plan of
reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.  On October 29,
2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the
Delphi-Appaloosa EPCA (Docket No. 10760).  In addition, on November 14, 2007, the Debtors filed
certain additional proposed amendments to the Delphi-Appaloosa EPCA.  A hearing on the motion and
the additional proposed amendments is scheduled for December 6, 2007.

[5]    As of August 29, 2007, this Court has entered the following orders approving settlements between
Delphi and each of its U.S. labor unions:
•    International Union, United Automobile, Aerospace, and Agricultural Implement Workers of
America        (Docket No. 8693);
•    International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-
Communication          Workers of America (Docket No. 9106);
•    International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die
Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals
832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
•    United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service
Workers        International Union and USW Local 87L (Docket No. 9169).
On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice
Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing
rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No.
9221).

financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and fifth, devising a workable solution to their current pension situation.[9]

---

[6]  On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29 and November 14, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[7]  In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business and the manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan, and of bid procedures related to the upcoming sale of substantially all assets used in their interiors and closures businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering business.

[8]  As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]  To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement

E.       The Debtors' Plan Of Reorganization

13.      By filing the Plan and related Disclosure Statement, the Debtors

reached another key milestone in their chapter 11 cases.  Attached as exhibits to the Plan

are two agreements, the GSA and the MRA, which provide for a comprehensive settlement

with GM.  Both agreements are subject to this Court's approval as part of the confirmation

process.  Potential amendments to the Plan and Disclosure Statement were filed on

October 19, 2007, November 14, 2007, and November 16, 2007 and additional potential

amendments are expected to be filed before the hearing on the Debtors' solicitation

procedures and Disclosure Statement resumes on December 6, 2007.  Currently, the

Debtors continue to expect that they will emerge from chapter 11 during the first quarter of

2008.

14.      Upon the conclusion of the reorganization process, the Debtors

expect to emerge as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver high-quality

products to its customers globally.  Additionally, the Company will preserve and continue

the strategic growth of its non-U.S. operations and maintain its prominence as the world's

premier auto supplier.

---

Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified
the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by
which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31,
2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver
with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.
On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of
that waiver.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the
initial waivers so that they are generally consistent with the conditions to the most recent waiver.

8

15.      Although the Debtors have filed the Plan, the Debtors wish to extend the exclusive periods for filing and soliciting acceptance of a plan in the event that the Plan is not accepted by the requisite number of creditors and interest holders or is not ultimately confirmed by this Court.  The relief sought by the Debtors in this Motion does not represent any change of view from Delphi's expectation expressed in its November 14, 2007 press release that the Debtors expect to emerge from chapter 11 reorganization during the first quarter of 2008.

<u>Relief Requested</u>

16.      As set forth in the Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan (Docket No. 8490) entered by this Court on June 29, 2007, the Debtors have the exclusive right to file one or more reorganization plans through and including December 31, 2007 (the "Plan Proposal Period") and the exclusive right to solicit and obtain acceptances for those plans through and including February 29, 2008 (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods").

17.      By this Motion, the Debtors seek entry of an order further extending the Plan Proposal Period through and including March 31, 2008 and the Solicitation Period through and including May 31, 2008 without prejudice to the Debtors' right to seek further extensions of the Exclusive Periods.  Although the Debtors are requesting a three-month

extension,[10] the Debtors anticipate commencing solicitation of votes on the Plan as soon as

authorized by this Court and proceeding to obtain acceptances, confirmation, and

consummation of the Plan as soon as reasonably practicable.

<u>Basis For Relief</u>

18.    The Exclusive Periods are intended to afford chapter 11 debtors a

full and fair opportunity to rehabilitate their businesses and to negotiate and propose a

reorganization plan without the deterioration and disruption of their businesses that might

be caused by the filing of competing reorganization plans by non-debtor parties.  A further

extension of the Exclusive Periods is justified by the significant progress the Debtors have

made toward reorganization since they last sought an extension of the Exclusive Periods.

19.    The Debtors have worked diligently to develop and achieve a

reorganization plan, including comprehensive settlements with GM, Delphi's U.S. labor

unions, and other settling parties, in a timeframe that would allow the Debtors to emerge

from bankruptcy as quickly as possible.  That timeframe, however, was affected by severe

dislocations in the capital markets that began late in the second quarter of 2007 and that

have increased in severity during the third and fourth quarters of 2007.  This turbulence in

the capital markets is largely responsible for the potential amendments to the Plan and

Disclosure Statement filed by the Debtors and is the principal cause of the delay in the

Debtors' emergence from chapter 11 before the end of 2007.  This turbulence constitutes an

additional factor justifying a further extension of the Exclusive Periods.  The Debtors are

_____

[10]    The Debtors sought five- and six-month extensions in their first four motions to extend the Exclusive
Periods.

10

therefore seeking an extension of the Exclusive Periods to ensure sufficient time to complete the solicitation and confirmation processes in a timeframe that will allow them to emerge in the first quarter of 2008.

20.    The Debtors have accomplished numerous other tasks related to many different aspects of the case in an effort to emerge from chapter 11 protection.  In addition to the significant progress toward confirming a plan, the Debtors have substantially achieved the goals of their transformation plan by, among other things, negotiating amended collective bargaining agreements with their unions and comprehensive settlement and restructuring agreements with GM, continuing to divest non-core assets and businesses, and obtaining the second of two pension funding waivers from the Internal Revenue Service.  The Debtors' claims reconciliation process has continued to progress as the Debtors have now objected to approximately 13,500 of the 16,700 proofs of claim filed in these cases.  A detailed list of the Debtors' key accomplishments is discussed below.

21.    Other factors examined by bankruptcy courts support the Debtors' request to extend the Exclusive Periods.  The unresolved contingencies relating to fully committed exit financing, solicitation, and Plan confirmation and the size and complexity of the Debtors' cases also justify a further extension of the Exclusive Periods. Additionally, the Debtors' continued efforts to negotiate a resolution of the outstanding concerns of certain of their major constituencies evidence the fact that the Debtors have not used their exclusivity period to pressure stakeholders to submit to the Debtors' reorganization demands.  Instead, the Debtors have actively utilized this period to resolve

11

the remaining issues in good faith with their diverse constituencies.  Finally, the Debtors

are timely paying their bills, and have the ability to continue doing so.

      22.     The requested extension will permit the ongoing plan process to

continue in an orderly, efficient, and cost-effective manner, and will fulfill the fundamental

goal of chapter 11—to confirm and consummate a consensual plan of reorganization.

Therefore, the Debtors submit that under these circumstances the Debtors' requested

three-month extension is justified.

<u>Applicable Authority</u>

      23.     Section 1121(d) of the Bankruptcy Code permits the court to extend

a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective
> periods specified in subsections (b) and (c) of this section
> and after notice and a hearing, the court may for cause
> reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).  The court in <u>In re McLean Industries, Inc.</u>, 87 B.R. 830 (Bankr.

S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause"

to extend a debtor's Exclusive Periods:

    (a)    the existence of good faith progress toward reorganization;

    (b)    existence of an unresolved contingency;

    (c)    the size and complexity of the debtor's case;

    (d)    a finding that the debtor is not seeking to extend exclusivity
            to pressure creditors "to accede to [the Debtor's]
            reorganization demands"; and

    (e)    the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003)

(stating that not all factors "are relevant in every case" and court has discretion to "decide

which factors are relevant and give the appropriate weight to each").

        24.     In other cases of similar size and complexity to the Debtors' cases,

courts have extended the debtors' exclusivity rights to propose a plan of reorganization for

periods similar to those requested by the Debtors.  See, e.g., In re Kaiser Aluminum Corp.,

Case No. 02-10429 (Bankr. D. Del. 2002) (extensions of approximately 43 months); In re

UAL Corp., Case No. 02-B48141 (Bankr. N.D. Ill. 2002) (extensions of approximately

29 months); In re Bethlehem Steel, Case No. 01-15288 (BRL) (Bankr. S.D.N.Y. 2001)

(extensions of more than 17 months); In re Kmart Corp., Case No. 02-02474 (Bankr. N.D.

Ill. 2002) (extensions of more than 17 months); In re Delaco Co., Case No. 04-10899

(PCB) (Bankr. S.D.N.Y. 2004) (granting total extensions of approximately 16 months); In

re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2001) (extensions of

approximately 15 months).  In this case, based upon the preceding factors and in line with

other cases of similar size and complexity, sufficient cause exists for a three-month

extension of the Exclusive Periods for a total extension of 26 months.

F.     The Debtors Have Made Good-Faith Progress Toward Reorganization

        25.     An extension of a debtor's exclusive periods is justified by a debtor's

progress in resolving issues facing its creditors and estates.  McLean Indus., 87 B.R. at

834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors'

progress in these cases thus far is significant and compels a further extension of the

Exclusive Periods.

(i)       Plan And Disclosure Statement Filed

26.       The Debtors' good-faith progress towards reorganization is most convincingly demonstrated by the filing of the Plan and Disclosure Statement on September 6, 2007.  At least one court has noted that "cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan."  Gaines v. Perkins (In re Perkins), 71 B.R. 294, 299 (W.D. Tenn. 1987); see also In re Express One International, Inc., 194 B.R. 98 (Bankr. E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity based in part on debtors' filing of plan and disclosure statement and imminent hearing on disclosure statement).

27.       The Plan and related Disclosure Statement were the products of a series of intense negotiations involving the Debtors, the Plan investors, the Statutory Committees, and GM.  As a result of the turbulence in the capital markets, the Debtors have been required to negotiate potential amendments to the Plan and Disclosure Statement with certain stakeholders, which amendments were filed on October 29, November 14, and November 26, 2007, and to negotiate additional potential amendments which are expected to be filed before the December 6 hearing on the Disclosure Statement. All of these negotiated amendments represent the Debtors' continuing efforts to emerge from chapter 11 protection as quickly as possible so that they can maximize value for all their stakeholders.

28.       To ensure that exit financing is in place, the Debtors have obtained court approval to enter into engagement and fee letters with a lending group "to use commercially reasonable best efforts" to assemble a syndicate of lenders to provide exit

14

financing arrangements.  The Plan would require the Debtors to obtain exit financing to satisfy existing debtor-in-possession financing, make other payments required to be made on the Plan's effective date, and fund the Debtors' post-emergence operations.

29.    The Debtors are proceeding rapidly to obtain court approval of the Disclosure Statement at the hearing on December 6, 2007 so that they can solicit votes on the Plan and then seek its confirmation.  Denying the extension requested in this Motion could destabilize the plan confirmation process, risk unnecessary litigation, and delay the emergence of the Debtors from chapter 11 protection.

(ii)    Achievement Of Goals Of Transformation Plan

30.    The Debtors were able to file the Plan and Disclosure Statement only because they have substantially achieved the objectives of their Transformation Plan and are now poised to emerge from chapter 11.  The Debtors have reached key agreements with several key stakeholders.  For example, the Debtors have negotiated amended collective bargaining agreements with their Unions that should make Delphi more competitive in its U.S. operations.  In addition, the Debtors have entered into comprehensive settlement and restructuring agreements with GM, a key objective in these chapter 11 cases.

31.    The Debtors have made significant progress with respect to their product portfolio and manufacturing facility realignment.  The Debtors have made substantial progress in identifying and beginning to divest or wind down those facilities and business lines that are not within Delphi's future plans.  The Debtors have finalized the sale of the catalyst and the brake hose businesses, and obtained court approval of the sale

of assets primarily used in the Saginaw chassis business and bidding procedures to

facilitate the sale of the interiors and closures business which is expected to proceed at a

sale hearing before year's end.  In addition, the Debtors are implementing important cost

savings in their organizational cost structure and rationalization of their salaried workforce

to competitive levels that will allow them to emerge from chapter 11 much leaner and in a

better competitive position.

32.    The Debtors have received favorable pension funding waivers from

the IRS relating to freezing their pension plans which, when combined with the proposed

Plan transaction under Section 414(l) of the Internal Revenue Code and Section 208 of the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461

("ERISA"), and adequate exit financing and equity infusions, will allow Delphi to fund its

pension plans upon emergence from chapter 11.

33.    As a result of its progress in achieving the goals of its

Transformation Plan, Delphi has been able to formulate a business plan going forward that

will allow it to return to profitability.

(iii)    Claims Reconciliation

34.    One of the conditions in the Delphi-Appaloosa EPCA is that certain

"trade and other unsecured claims" may not exceed $1.45 billion.[11]  Although creditors

have filed more than 16,700 proofs of claim asserting approximately $37.0 billion in

liquidated amounts plus certain unliquidated amounts, the Debtors have made significant

---

[11]    In contrast, the "cap" for "trade and other unsecured claims" under the December 18, 2006 plan support
framework agreement was $1.7 billion.  The Debtors' success during the claims reconciliation process
resulted in their ability to agree to a reduced cap of $1.45 billion under the Delphi-Appaloosa EPCA and
yielded value for other stakeholders.

16

strides in the claims reconciliation process.  As of November 30, 2007, the Debtors have

objected to approximately 13,500 claims asserting nearly $10.4 billion (plus additional

unliquidated amounts) and this Court has granted relief with respect to approximately

$9.8 billion in asserted liquidated claims (plus additional unliquidated claims).

    (iv)    <u>Other Key Accomplishments</u>

35.    Including the foregoing, since the Debtors last sought an extension

of the Exclusivity Periods, the Debtors have also, among other things:

    (a)    entered into a memorandum of understanding with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, which was subsequently ratified by the union members and approved by this Court;

    (b)    entered into a memorandum of understanding with the International Association of Machinists and Aerospace Workers, which was subsequently ratified by the union members and approved by this Court;

    (c)    entered into a memorandum of understanding with the International Brotherhood of Electrical Workers, which was subsequently ratified by the union members and approved by this Court;

    (d)    entered into a memorandum of understanding with the International Union of Operating Engineers, which was subsequently ratified by the union members and approved by this Court;

    (e)    entered into a memorandum of understanding with the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America, which was subsequently ratified by the union members and approved by this Court;

    (f)    entered into a memorandum of understanding with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

17

which was subsequently ratified by the union members and approved by this Court;

(g)    signed definitive settlement and restructuring agreements with GM;

(h)    reached a settlement agreement, which the Court approved, with respect to warranty issues with GM;

(i)    reached a settlement agreement, which the Court approved, with respect to an intellectual property license agreement with GM;

(j)    gained court authority to continue the short term at-risk performance payment program;

(k)    gained court approval of the avoidance actions procedures motion and preserved approximately 750 avoidance actions by filing them under seal;

(l)    completed the sale of the catalyst and brake hose businesses;

(m)    substantially completed the closing on the sale of assets of Saltillo, Mexico brake plant business;

(n)    obtained court approval of the sale of assets used in the Saginaw chassis business;

(o)    gained court approval of bidding procedures for the sale of the interiors and closures business;

(p)    reached a settlement agreement, which this Court preliminarily approved, with respect to the multidistrict securities and ERISA litigation;

(q)    gained approval to perform under a second pension funding waiver issued by the Internal Revenue Service;

(r)    received court authorization for DASHI to complete an intercompany transfer of funds;

(s)    secured an extension of their debtor-in-possession financing facility to July 1, 2008;

(t)    received authorization to enter into exit facility engagement and fee letters;

18

(u)    filed seven omnibus claims objections; and

(v)    filed a motion to estimate unliquidated claims.

36.    In summary, the Debtors are making significant, good-faith progress toward their reorganization.

G.    Unresolved Contingencies Still Exist

37.    Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusivity periods.  Although the Debtors have filed their Plan and Disclosure Statement, they must still procure fully committed exit financing that will support implementation of the Plan when confirmed.  The tasks of securing such exit financing and obtaining confirmation of the Plan are significant for both their magnitude and complexity, and amply satisfy the contingency component described in the McLean test.

H.    These Cases Are Large And Complex

38.    The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods.  See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company granted extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan."). These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, and formulate a long-term business plan before commencing the plan of reorganization process.

19

39.     The Debtors' cases are indisputably large and the multi-lateral and multi-dimensional scope of actions that must be taken to address Delphi's restructuring requirements are exceedingly complex.  A review of certain basic statistics noted above in the Motion and in prior motions makes the foregoing conclusion self-evident.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the foregoing authorities.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the automobile industry (an industry which, as a whole, is in distress) affecting the Debtors' ability to formulate and execute a viable business plan.  The extension of the exclusive periods is necessary to continue progress in addressing these complexities.

I.     The Debtors Are Using Exclusivity For A Proper Purpose

40.     Courts have denied extensions of exclusive periods when plan negotiations among parties in interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties in interest.  See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981).  Here, the Debtors' request for an extension of the Exclusive Periods is not a negotiation tactic.  To the contrary, the Plan provides for full payment at Plan value to creditors and a distribution for equity holders.  In addition, the Debtors have proposed amendments to the Plan and Disclosure Statement to remedy the Debtors' inability to obtain the amount of exit financing originally sought in

20

conjunction with the Plan filed on September 6, 2007 and also to address particular concerns of certain of the Debtors' key constituencies.  The continuation of exclusivity would allow the Debtors to complete the prosecution of the Plan and emerge from chapter 11 protection as quickly as possible so that they can maximize value for all of their stakeholders.

J.      The Debtors Are Paying Their Bills As They Come Due

        41.     Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., Inc., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  The Debtors are paying their bills as they come due, including the statutory fees paid quarterly to the United States Trustee.  The Debtors recently obtained approval to extend the maturity date of their $4.5 billion debtor-in-possession financing facility to July 1, 2008, which provides additional comfort to creditors and other stakeholders that the Debtors will continue to meet their obligations as they come due.

K.      The Debtors Have Shown Cause To Further Extend The Exclusive Periods

        42.     As shown above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension.  There is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a termination of exclusivity for cause at any time under section 1121(d) of the Bankruptcy Code.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

21

<u>Notice</u>

43.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883),

and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R.

Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And

Certain Notice, Case Management, And Administrative Procedures, entered October 19,

2007 (Docket No. 10661).  In light of the nature of the relief requested, the Debtors submit

that no other or further notice is necessary.

<u>Memorandum Of Law</u>

44.    Because the legal points and authorities upon which this Motion

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the Debtors' exclusive periods (i) to file a plan of reorganization through and including March 31, 2008 and (ii) to solicit acceptance of a plan of reorganization through and including May 31, 2008 and (b) granting the Debtors such other further relief as is just.

Dated:    New York, New York
          November 30, 2007

                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM LLP

                            By:    /s/ John Wm. Butler, Jr.
                                  John Wm. Butler, Jr. (JB 4711)
                                  George N. Panagakis (GP 0770)
                                  Ron E. Meisler (RM 3026)
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 407-0700

                                        - and –

                            By:    /s/ Kayalyn A. Marafioti
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Delphi Corporation, et al.,
                             Debtors and Debtors-in-Possession

23