UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

   In re                               :       Chapter 11

DELPHI CORPORATION, et al.,       :       Case No. 05-44481 (RDD)

                         Debtors.  :       (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AUTHORIZING EMPLOYMENT AND RETENTION OF DOWNER & COMPANY, LLC
AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO
<u>DEBTORS NUNC PRO TUNC TO AUGUST 27, 2007</u>

("DOWNER RETENTION APPLICATION")

       Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for entry of an order under 11 U.S.C. §§ 327(a) and 328 authorizing the employment and retention of Downer & Company, LLC ("Downer") as financial advisor and investment banker to the Debtors, effective <u>nunc pro tunc</u> to August 27, 2007. In support of this Application, the Debtors submit the

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Declaration And Statement Of Arthur G. Gottlieb, a Managing Director at Downer (the "Gottlieb Declaration"), sworn to on October 26, 2007. In further support of this Application, the Debtors respectfully represent as follows:

Background

A.     The Chapter 11 Filings

1.     On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.     No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.     On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264) (the "Disclosure Statement"). The Court commenced the hearing on the Disclosure Statement and related solicitation procedures motion on October 3, 2007 and has scheduled the hearing to continue on December 6, 2007. Three orders with respect thereto were entered by this Court on October 9, 2007 (Docket No. 10497), October 19, 2007 (Docket No. 10662), and November 7, 2007 (Docket No. 10864). The Debtors filed notices of potential amendments to

the Disclosure Statement and/or certain appendices thereto on October 29, 2007 (Docket No. 10759), November 14, 2007 (Docket No. 10932), and November 16, 2007 (Docket No. 10964). No order approving the Disclosure Statement or confirming the Plan has yet been entered by this Court.

4.   This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.   The statutory predicates for the relief requested herein are sections 327(a) and 328 of the Bankruptcy Code.

B.   Current Business Operations Of The Debtors

6.   Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Court.[3]

7.   The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the

---

[2]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[3]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.   Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

9.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred

---

[4]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[5] first, modifying the

---

[5] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement. On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill

*(cont'd)*

5

Company's labor agreements to create a competitive arena in which to conduct business;[6] second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[7] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[8] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive

_____
*(cont'd from previous page)*
    Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. Under the Delphi-Appaloosa EPCA, the new plan investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007. On October 29, 2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760). In addition, on November 14, 2007, the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA. A hearing on the motion and the additional proposed amendments is scheduled for December 6, 2007.

[6] As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[7] On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29 and November 14, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[8] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, and their brake hose and catalyst businesses. The Debtors also obtained court approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business and the manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan, and of bid procedures related to the upcoming sale of substantially all assets used in their interiors and closures businesses. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering business.

and aligned with its product portfolio and manufacturing footprint;[9] and fifth, devising a workable solution to their current pension situation.[10]

E.        The Debtors' Plan Of Reorganization

           13.      By filing the Plan and related Disclosure Statement, the Debtors reached another key milestone in their chapter 11 cases. Attached as exhibits to the Plan are two agreements, the GSA and the MRA, which provide for a comprehensive settlement with GM. Both agreements are subject to this Court's approval as part of the confirmation process. Potential amendments to the Plan and Disclosure Statement were filed on October 19, 2007, November 14, 2007, and November 16, 2007 and additional potential amendments are expected to be filed before the hearing on the Debtors' solicitation procedures and Disclosure Statement resumes on December 6, 2007. Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

---

[9] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[10] To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively. On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year. On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver. On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

7

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.     By this Application, the Debtors seek to employ and retain Downer as financial advisor and investment banker with regard to the divestiture or other strategic alternatives relating to the Debtors' power products business, as further described herein, effective as of August 27, 2007. Accordingly, the Debtors respectfully request the entry of an order under sections 327(a) and 328 of the Bankruptcy Code authorizing the employment and retention of Downer as financial advisor and investment banker pursuant to the letter agreement dated October 26, 2007, a copy of which is attached hereto as Exhibit 1 (the "Engagement Letter").

## Services To Be Rendered

16.     As set forth in the Engagement Letter, in connection with the formulation, analysis, negotiation, and implementation of the divestiture or other strategic alternatives relating to the Debtors' power products business involving the engineering, manufacturing, or selling of power sliding door systems, power liftgate (sometimes called power tailgate) systems, power deck lid systems, internal cinching latches, advanced development power cinching latches, and advanced development power cinching strikers (excluding in each case cinching latches and strikers being sold as part of the Debtors' latches and door modules product line) anywhere in the

8

world (collectively, the "Business"), the Debtors engaged Downer, subject to this Court's approval, to provide the following services:

(a) assist in the review and analysis of the assets and the operating and financial strategies of the Business;

(b) assist in the definition of objectives related to value and terms of divestiture;

(c) assist in the examination of the market for potential purchasers and identification of a universe of parties who should be contacted in relation to the proposed transaction;

(d) at the Debtors' direction, contact a priority list of parties agreed in common with the Debtors as part of a pre-marketing strategy;

(e) assist in the collection and analysis of information relevant to the market and the proposed transaction;

(f) prepare and review with the Debtors the valuation of the Business;

(g) prepare an information memorandum (the "Information Memorandum") relating to the Business and the proposed transaction;

(h) define procedures concerning the divestiture process at its different stages, and implementing them with the potential purchasers at the Debtors' direction and on its behalf;

(i) to the extent deemed desirable by the Debtors, coordinate any vendor due diligence exercise;

(j) prepare and distribute confidentiality agreements and appropriate descriptive selling materials (to include Information Memorandum, management presentations, and other documentation as may be required or appropriate);

(k) assist in the organization and coordination of dataroom(s), management presentations, and due diligence sessions;

(l) review, analyze, and advise on the value and terms of the offers received and on appropriate negotiating strategies in relation to the various potential purchasers in connection with the proposed transaction or other transactions;

(m) assist in the negotiation of binding contractual documentation in conjunction with the Debtors' legal advisors;

9

(n) advise and attend meetings of the Debtors' Board of Directors, creditor groups, official constituencies, and other interested parties, as the Debtors deem to be necessary or desirable;

(o) if requested, participate in hearings of this Court or such district or other bankruptcy courts as this Court may request and provide relevant testimony with respect to the matters described herein and issues arising with respect thereto in connection with any proposed plan of reorganization;

(p) assist the Debtors' internal and external counsel to enable such counsel to provide legal advice to the Debtors, as contemplated in the Engagement Letter; and

(q) render such other financial advisory and investment banking services as may be reasonably requested by the Debtors in connection with any of the foregoing.

## Qualifications Of Downer

17. Founded in 1975, Downer is a leading independent middle market advisory firm with offices in the United States and Europe. Between 2004 and September 30, 2007, Downer completed approximately 57 divestiture and acquisition transactions valued in the aggregate at over $3.5 billion. Downer serves both public and private clients and specializes in transaction sizes from $25 million to $500 million. Downer assists clients with all aspects of the transaction process, from valuation and marketing through contract negotiations and closing.

18. Downer is aware that the Debtors have submitted applications relating to the proposed retention and employment of additional investment banking and financial advisory professionals in connection with these chapter 11 cases. The services to be provided by Downer under the Engagement Letter are limited to the matters set forth therein, and will not duplicate the services of these or any other professional to the Debtors. Downer will make every effort to avoid duplicating the work performed by such other professionals retained by the Debtors.

19.     The services of Downer are necessary to enable the Debtors to maximize the value of their estates. The Debtors submit that Downer is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

Disinterestedness Of Professionals

20.     To the best of the Debtors' knowledge, information, and belief, Downer has no connection with, and holds no interests adverse to, the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, in the matters for which Downer is proposed to be retained, except as disclosed in the Gottlieb Declaration.

21.     To the best of the Debtors' knowledge, Downer is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code. The Gottlieb Declaration, executed on behalf of Downer in accordance with section 327(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), is filed contemporaneously herewith and incorporated herein by reference. The Debtors' knowledge, information, and belief regarding the matters set forth in this Application are based on, and made in reliance upon, the Gottlieb Declaration.

Professional Compensation

22.     The Engagement Letter contains the proposed terms of Downer's compensation. If this Application is approved, as compensation for the services rendered under the Engagement Letter, Downer will be entitled to receive the following fees:

(a)     Non-refundable work fees equal to $25,000 upon approval of this Application, $25,000 upon completion and delivery of the pre-marketing report, $25,000 upon receipt of the first round offers, and $25,000 upon receipt of the final offers in the form of a marked-up term sheet.

11

    (b)    A "Transaction Fee" equal to $600,000 plus 2.5% of the Transaction Value (as defined in the Engagement Letter) between $35 million and $45 million plus 3.25% of the Transaction Value in excess of $45 million.

    (c)    The Transaction Fee may be reduced by the total amount of work fees paid if certain conditions are met as defined in the Engagement Letter.

23.    The Debtors have also agreed to reimburse Downer periodically, upon request, and upon consummation of any of the transactions contemplated by the Engagement Letter, for all reasonable out-of-pocket expenses incurred in connection with the performance of its duties under the Engagement Letter, including transportation, telephone (minutes used only), lodging, meals, research, postage, courier services, and interest fees. Downer has agreed to comply with the Debtors' expense reimbursement guidelines.

24.    The Debtors and Downer acknowledge and agree that (a) the hours worked, (b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in each case, in connection with Downer's engagement, may be variable, and the Debtors and Downer have taken such factors into account in setting the fees under the Engagement Letter; <u>provided</u>, <u>however</u>, that with respect to the hours worked, Downer will devote whatever resources as are required to fulfill the purposes of its engagement on a timely basis.

25.    Downer will apply to this Court for compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the U.S. Trustee's guidelines for compensation and reimbursement of expenses, and any other applicable orders of this Court. Downer acknowledges that all compensation and reimbursements of expenses will be subject to this Court's review and approval after notice and a hearing.

26.     Consistent with its ordinary practice and the practice of financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, Downer does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals. The Debtors therefore request that Downer be excused from compliance with such requirements and that it be required only to maintain such time records in one-hour increments.

27.     The Debtors will pay all fees and expenses of Downer under the Engagement Letter as promptly as practicable in accordance with the terms thereof and the orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

28.     The Debtors believe that Downer's fees are fair and reasonable in light of industry practice and market rates both inside and outside of chapter 11 cases.

Termination

29.     The Engagement Letter may be terminated with or without cause by Downer or the Debtors at any time upon ten days prior written notice by the other party to that effect. Notwithstanding any such termination of the Engagement Letter, (a) the provisions of Section 3, Section 4, Section 5, and Section 6 will survive any such termination, (b) the Debtors will remain liable for Downer's reasonable out-of-pocket expenses incurred and fees earned up to the time of termination, and (c) if, within 12 months of the termination of the Letter Agreement, the Debtors enter into an agreement to effect a transaction proposed by the Letter Agreement, the Debtors will pay Downer the Net Transaction Fee (as defined in the Engagement Letter), save where termination is caused by breach of the Engagement Letter by Downer or if the Engagement Letter has been terminated by Downer without cause.

13

Indemnification

30.    As more fully described in the Engagement Letter, and pursuant to the terms of the proposed Order approving Downer's retention, if the Application is granted, the Debtors will indemnify and hold Downer harmless against liabilities arising out of or in connection with its retention by the Debtors, except that neither Downer nor any of its directors, partners, officers, agents, or employees, or any person acting at Downer's discretion will be indemnified if it is judicially determined that such person acted in bad faith or was guilty of negligence or willful misconduct, or materially breached a term of condition of the Engagement Letter.

31.    The Debtors and Downer believe that the indemnification provision are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in chapter 11 cases.  See In re Acterna Corp., Case No. 03-12837 (BRL) (Bankr. S.D.N.Y. June 24, 2003); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000), aff'd, 2000 WL 1800690 (S.D.N.Y. 2000); and Bodenstein v. Comdisco, Inc., 2002 U.S. Dist. LEXIS 17994 (N.D. Ill. 2002); see also United Artists Theater Co. v. Walton, 315 F.3d 217 (3d Cir. 2003).

Memorandum Of Law

32.  Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (i) approving the employment of Downer as the Debtors' financial advisor and investment banker nunc pro tunc to August 27, 2007 and (ii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         December 3, 2007

DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

By:   /s/ John D. Sheehan
      Name: John D. Sheehan
      Title: Vice President and Chief Restructuring Officer