## EXHIBIT A

Disclosure Statement changed pages, blacklined to show proposed changes since
November 16, 2007



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
In re                                                     :       Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :       Case No. 05-44481 (RDD)
                                                          :
                                                          :       (Jointly Administered)
                                                          :
            Debtors.                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<div align="center">

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND**
**CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION**

</div>

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan L. Stuart (NS 7872)

                             Of Counsel

SKADDEN, ARPS, SLATE, MEAGHER                DELPHI CORPORATION
   & FLOM LLP                             5725 Delphi Drive
Four Times Square                            Troy, Michigan 48098
New York, New York 10036                  David M. Sherbin
Kayalyn A. Marafioti (KM 9632)               Sean P. Corcoran
Thomas J. Matz (TM 5986)                    Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
       ~~November 29~~December 6, 2007

<div style="border:1px solid black; padding:10px;" align="center">

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**
**ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY**
**COURT HAS APPROVED THIS DISCLOSURE STATEMENT.  THIS DISCLOSURE**
**STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN**
**APPROVED BY THE COURT.**

</div>

<div align="right">

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

</div>

## EXECUTIVE SUMMARY

On October 8 and 14, 2005, Delphi Corporation ("Delphi" or the "Company") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to treat claims against, and shareholder interests in, such a debtor company. A plan of reorganization must be voted on by holders of claims and interests and then must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is ~~how~~ necessary for a debtor ~~emerges~~ to emerge from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 6 Plan") and on ~~November~~ December ●, 2007, the Debtors filed their First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan").

The purpose of this Disclosure Statement is to provide to the holders of Claims against, and Interests in, the Debtors adequate information to make an informed judgment about the Plan, which is annexed to this document as Appendix A.

~~The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the~~ This Disclosure Statement contains, among other things, descriptions and summaries of provisions of Delphi's Plan. ~~All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Plan, unless otherwise noted.~~

~~This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan~~, which is being proposed by Delphi Corporation and 41 of its direct and indirect United States subsidiaries and affiliates, debtors and debtors- in- possession, which filed petitions for chapter 11 relief on October 8 and October 14, 2005 (as applicable, the "Petition Date") with the United States Bankruptcy Court for the Southern District of New York.

Certain of Delphi's U.S. affiliates are not debtors in these chapter 11 cases (the "Chapter 11 Cases") and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside of the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions. These non-Debtor affiliates are not necessarily affected by the Plan to the same extent as are Delphi and the Affiliate Debtors. Certain provisions of the Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified. Such modifications, however, will not have a material effect on the distributions contemplated by the Plan.

Notice ~~of Further~~ Of Proposed Amendments
~~November 16~~ December 3, 2007

## A copy A.    Description Of Organization Of This Disclosure Statement And The Plan

The Disclosure Statement is divided into this executive summary and an additional 17 sections, each of the which is sub-divided further under descriptive headings to aid in the understanding of the information contained herein.  The introduction and executive summary contain a general overview of the Debtors, their transformation plan, business plan, financing arrangements, and proposed plan of reorganization.  The executive summary is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and Appendices to the Disclosure Statement, including the Plan.  The Plan is annexed hereto as Appendix A.  Historical financial results of the Company are attached hereto as Appendix B. Financial projections for the reorganized company for the fiscal years 2007 through 2011 are attached hereto as Appendix C.  An analysis of the total enterprise value of Reorganized Delphi is attached hereto as Appendix D.  Liquidation analyses showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached hereto as Appendix E.

attached to the Disclosure Statement as Appendix A.  All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Plan, unless otherwise noted.

Sections I and II of this Disclosure Statement explain the chapter 11 process and provide an overview of voting procedures to accept or reject the Plan.  Section III describes the Debtors' businesses, relationships with customers and suppliers, and current management.  Section IV provides information about Delphi's historical operations, the events leading to Delphi's chapter 11 filing, and Delphi's capital structure before it sought chapter 11 relief.  To provide additional information about Delphi's financial performance, historical financial results of the Company are attached to this Disclosure Statement as Appendix B.

Section V of this Disclosure Statement explains Delphi's transformation plan and the actions taken and settlements achieved by Delphi during its reorganization while under chapter 11 protection, including, among other things, an explanation of Delphi's labor settlement agreements and the terms of Delphi's global settlement with GM.  Section V also contains information about adjustments to the Debtors' product portfolio, cost structure, including its salaried employee compensation program, and pension funding situation.

Section VI of this Disclosure Statement describes Delphi's business plan, including the development of the business plan for 2007-2011 and a summary of the Company's outlook from the business plan.  The full financial projections for the reorganized company for the fiscal years 2007 through 2011 are attached to this Disclosure Statement as Appendix C.

Section VII of this Disclosure Statement contains information regarding the plan investors, the investment agreement, rights offerings, and exit financing arrangements.  Section VIII provides an overview of major events that have occurred during the Chapter 11 Cases, including a description of various orders entered by the Bankruptcy Court, the appointment of statutory committees, the financing used, and sales of assets.  This section also describes the claims process and the Debtors' progress in reconciling claims.

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

Section IX of this Disclosure Statement contains a summary of the Plan, including, among other things, an explanation of the potential substantive consolidation of certain Debtors, the treatment of claims and interests under the Plan, and the releases and exculpations provided by the Plan to the Debtors and certain third parties.  Section X describes general considerations and risk factors to be evaluated in conjunction with the description of the Debtors' businesses, business plan, and proposed plan of reorganization.  Sections XI and XII provide information on securities law matters and federal income tax consequences of distributions to be made under the Plan.

Section XIII of this Disclosure Statement discusses certain bankruptcy law principles that the Bankruptcy Court Debtors must meet for the Plan to be confirmed by the Bankruptcy Court, including that the Plan is feasible and meets the "best interests" test set forth in the Bankruptcy Code.  This section also addresses the valuation of the Reorganized Debtors and an analysis of the hypothetical liquidation of the Debtors performed in conjunction with the formation of the Plan.  An analysis of the total enterprise value of Reorganized Delphi is attached to this Disclosure Statement as Appendix D.  Liquidation analyses showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached as Appendix E.

Finally, Sections XIV-XVII of this Disclosure Statement explain, among other things, the process by which confirmation of the Plan may occur, conditions to confirmation and consummation of the Plan and the Effective Date, voting requirements, and details about the confirmation hearing.

Creditors and shareholders may vote to accept or reject the Plan, which must also be approved by the Bankruptcy Court before Delphi can consummate the Plan.  The Plan is the document that effectuates, among other things, distributions to creditors and shareholders, Delphi's settlement with GM, and the releases of certain parties.

**B.**      **Business Overview**

Delphi is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Delphi is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Technology developed and products manufactured by Delphi are changing the way drivers interact with their vehicles.  Delphi is a leader in the breadth and depth of technology to help make cars and trucks smarter, safer, and better.  The Company supplies products to nearly every major global automotive original equipment manufacturer, and in 2006, sales to several of the major global original equipment manufacturers ("OEMs"), including General Motors Corporation ("GM"), Ford Motor Company, DaimlerChrysler Corporation, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company each exceeded $750 million.  The revenue share for 2006 and the first six months of 2007 for customers other than GM— Delphi's former parent and largest customer— were 56% and 59%, respectively.

Since its separation from GM in 1999, Delphi has sought to diversify its customer base by taking advantage of its technological and manufacturing core competencies.  Delphi has entered and continues to pursue additional opportunities in adjacent markets such as

**~~D~~E.     Business Plan**

The Debtors' substantial progress on their Transformation Plan provides the foundation for the Company's 2007-2011 business plan (the "Business Plan").  When developing the Business Plan, Delphi considered the impact that elements of the Transformation Plan would have on its operations, including the transformation of its hourly workforce, Delphi's relationship with its largest customer, GM, the impact of changes in Delphi's production portfolio and manufacturing footprint, cost reductions achieved as a result of the SG&A restructuring, and pension funding strategies with the Internal Revenue Service (the "IRS") and the Pension Benefit Guaranty Corporation (the "PBGC").

Delphi's financial projections for 2007-2011 are attached ~~hereto~~ to this Disclosure Statement as Appendix C.  The Business Plan projects that in 2008, revenue will decline as Delphi continues to exit certain of its product lines as part of the portfolio transformation.  As a result of revised volume production forecasts for GM North America ("GMNA") by Delphi and Global Insight ("GI/DRI") (formerly known as Data Resources, Inc.), an industry expert that publishes reports on vehicle production forecasts, as well as the revised capital structure of the reorganized company necessitated by the recent dislocation in the capital markets, Delphi has revised its Business Plan.  Although the revised Business Plan calls for a further decline in revenue in 2008, the revised Business Plan projects that revenue will increase in 2008-2011 by a compound annual growth rate of 6.3%.  In the final years of the Business Plan, it is expected that margins will expand to industry-competitive levels as Delphi expands its current business lines and grows into new markets.

The Business Plan demonstrates that a significant amount of cash will be spent in connection with restructuring activities.  Each division has contemplated a significant number of restructuring activities, the scope, timing, and cost of which were included in the Business Plan and affect the forecast.  As a result of the restructuring, the Business Plan financials also reflect expected cost savings in manufacturing, that are the product of the labor transformation and global restructuring initiatives.  As manufacturing and engineering operations are migrated from high cost to low cost locations, savings are generated, resulting in Delphi's belief that it will be well positioned to meet customer expectations and achieve competitive margins.  Beyond the impact of these manufacturing cost initiatives, further savings in material costs are expected to be realized through engineering activities, supplier price reductions, and the continued shift in the supplier footprint to lower cost locations following Delphi's own manufacturing footprint migration. The resulting transformation and growth results in a plan under which Delphi continues to expand its revenue expectations in Asia, Europe, and South America while expecting revenue declines in North America.

**~~E~~F.     Plan Investor And Exit Financing**

~~————~~To support the Company's Transformation Plan and Business Plan, in December 2006 the Debtors entered into an Equity Purchase and Commitment Agreement (the "Investment Agreement") with Plan Investors led by A-D Acquisition Holdings, LLC, an affiliate of Appaloosa Management L.P. ("Appaloosa").  On the terms and subject to the conditions of the Investment Agreement, as amended, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized

Delphi.  In addition, the Investment Agreement will provide for a $1.575 billion Discount Rights Offering (as described below) that will be made available to Delphi's unsecured creditors , and the Section 510(b) Note, Equity, ERISA Claimants.

————In addition to the proceeds from the Investment Agreement and the Discount Rights Offering, the Company will need to obtain funded debt to emerge from chapter 11 successfully.  Initially, the Company sought financing of $7.1 billion in funded debt and a $1.6 billion asset-based revolving loan.  Because of the dynamics of the capital markets that began in the third quarter of 2007, however, the Debtors reduced proposed debt levels under the Plan by $1.9 billion to facilitate an emergence financing package that could be executed under existing market conditions.  Based on recent improvements in the capital markets, including the leveraged loan market, the Debtors, after consultation with the Creditors' Committee, the Plan Investors, and GM, plan to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first-lien funded financing (possibly in conjunction with the extension of their debtor-in-possession financing facility), and second-lien funded financing in the amount of $1.5 billion, of which up to $750 million will be placed with GM.  The Debtors have entered into a "commercially reasonable best efforts" engagement with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. to arrange a syndicate of lenders to provide the exit financing arrangements.  Despite the Debtors' pre-filing conversations with the Creditors' Committee, on On November 1416, 2007, the Creditors' Committee filed an objection Bankruptcy Court approved the terms of this engagement and authorized the Debtors to enter into the Debtors' motion to approve the proposed exit financing arrangements.underlying exit financing transactions when completed.

**F.    Summary Of Changes To The Plan**

**G.    Events Impacting Reorganization**

The Debtors believe the recoveries afforded to all stakeholders under the Plan are the best recoveries available.  The potential amendmentsrecoveries afforded to certain stakeholders under the Plan, as reflected in the chart below and in the discussion are derived from and related to Delphi's settlement with GM, which settlement is a necessary and essential component of the Debtors' reorganization.  Although the currency received by certain stakeholders has changed since the Debtors initially filed the September 6 Planthroughout this Disclosure Statement, reflect current market conditions, commensurate changes to the Company's emergence capital structure and form of Plan currency contemplated for stakeholder distributions, an effective reduction of less than five percent in Plan value to reflect macroeconomic and industry conditions and uncertainties, and reductions in stakeholder distributions to some junior creditors, the Plan continues to provide for full recoveries for unsecured creditors at Plan value and fair consideration for holders of Existing Common Stock, and interest holders.  Further, the potential amendments reflect changes to conformis supported by GM, the Plan to the requirements to the Proposed Investment Agreement Amendment (as defined below) to obtain their endorsement of Investors, and the Statutory Committees.  Delphi believes any further delay in emerging from chapter 11 may lead to degradation of its total enterprise value and a corresponding reduction in Plan recoveries through, for example, the Company's settlements with GM and Delphi's U.S. labor unions,diminution of customer and supplier support, increased financing costs due to

DS-xii

continued costs of operating under chapter 11 protection, and the ~~Business~~inability of the Company to fully complete its Transformation Plan~~, and related agreements.~~

~~The potential amendments include the following changes to the~~ . The potential for future reductions in Plan ~~Investors' direct investment and certain stakeholder~~ recoveries~~:~~

| | ~~Original Plan~~ ~~(09/06/2007)~~ | ~~Revised Potential Amendment~~ ~~(11/14/2007)~~ |
|---|---|---|
| ~~Net Funded Debt~~ | ~~$7.1 billion~~ | ~~$5.2 billion~~ |
| ~~Plan Equity Value~~ | ~~Total enterprise value of $13.9 billion, which after deducting net debt and warrant value results in distributable equity value of $6.6 billion (or approximately $45.00 per share based on approximately 147.6 million shares)~~ | ~~Total enterprise value of $13.4 billion, which after deducting net debt and warrant value results in distributable equity value of $8.1 billion (or approximately $61.72 per share based on approximately 131.3 million shares)~~ |
| ~~Plan Investors~~ | ~~Direct Investment~~ ~~• Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.75 billion (or 30.1% discount from Plan Equity Value)~~ ~~• Purchase $400 million of preferred stock convertible at an assumed enterprise value of $12.80 billion (or 14.3% discount from Plan Equity Value)~~ ~~• Purchase $175 million of New Common Stock at an assumed enterprise value of $12.80 billion (or 14.3% discount from Plan Equity Value)~~ | ~~Direct Investment~~ ~~• Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.25 billion (or 37.8% discount from Plan Equity Value)~~ ~~• Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.75 billion (or 31.6% discount from Plan Equity Value)~~ ~~• Purchase $175 million of New Common Stock at an assumed enterprise value of $10.25 billion (or 37.8% discount from Plan Equity Value)~~ |
| ~~GM~~ | ~~Recovery of $2.7 billion~~ ~~• $2.7 billion in Cash~~ | ~~Recovery of $2.6 billion at Plan value of $13.4 billion~~ ~~• At least $750 million in Cash~~ ~~• Up to $750 million in a second lien note~~ ~~• $1.1 billion in junior convertible preferred stock at Plan Value of $13.4 billion ($1.2 billion in liquidation value)~~ |
| ~~Unsecured Creditors~~ | ~~Par plus accrued recovery at Plan value of $13.9 billion~~ ~~• 80% in New Common Stock at Plan Equity Value~~ ~~• 20% in Cash~~ | ~~Par plus accrued recovery at Plan value of $13.4 billion~~ ~~• 75.5% in New Common Stock at Plan Equity Value~~ ~~• 24.5% through pro rata participation in the Discount Rights Offering at an assumed enterprise value of $10.25 billion (or 37.8% discount from Plan Equity Value)~~ |

| | Original Plan (09/06/2007) | Revised Potential Amendment (11/14/2007) |
|---|---|---|
| TOPrS | Par plus accrued recovery at Plan value of $13.9 billion<br>- 100% in New Common Stock at Plan Equity Value | Par only recovery at Plan value of $13.4 billion<br>- 75.5% in New Common Stock at Plan Equity Value<br>- 24.5% through pro rata participation in the Discount Rights Offering at at an assumed enterprise value of $10.25 billion (or 37.8% discount from Plan Equity Value) |
| Existing Common Stockholders | Par Value Rights<br>- Right to acquire approximately 12,711,111 shares of New Common Stock at a purchase price struck at Plan Equity Value | Par Value Rights<br>- Right to acquire approximately 20,770,345 shares of New Common Stock at a purchase price struck at Plan Equity Value |
| | Warrants<br>- Warrants to acquire an additional 5% of the fully diluted New Common Stock exercisable for five years after emergence struck at Plan Equity Value | Warrants<br>- Warrants to acquire 6,908,758 shares of New Common Stock (which comprises 5% of the fully diluted New Common Stock) exercisable for five years after emergence struck at 32.4% premium to Plan Equity Value<br>- Warrants to acquire $1.0 billion of New Common Stock exercisable for six months after emergence struck at 8.2% premium to Plan Equity Value |
| | Direct Distribution<br>- 1,476,000 shares of New Common Stock | No provision for Direct Distribution |
| | Participation in Discount Rights Offering<br>- Right to purchase 40,845,016 shares of New Common Stock at a purchase price of $38.56 per share | No provision for Participation in Discount Rights Offering |

The Debtors believe that the recoveries afforded to all stakeholders under the Plan are the best recoveries available. Although the currency received by certain stakeholders has changed since the Debtors initially filed the Plan on September 6, 2007, the Plan continues to provide for full recoveries for unsecured creditors at Plan value and fair consideration for holders of Existing Common Stock. Delphi believes that any further delay in emerging from chapter 11 may lead to degradation of its total enterprise value and a corresponding reduction in Plan recoveries. The potential for future reductions is highlighted by a review of certain event risks, as set forth below, that will arise if Delphi's emergence from chapter 11 is delayed beyond the first quarter of 2008, as shown below.

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

- **March 31, 2008**
  - ☐ <u>UAW MOU Event</u>. Conditional expiration of UAW MOU Extension of UAW-GM Benefit Guarantee – Extension of trigger date for certain obligations under the Benefit Guarantee Agreement between GM and the UAW dated September 30, 1999 to March 31, 2008, if Delphi has commenced solicitation of acceptances of its chapter 11 plan of reorganization prior to December 31, 2007 but the plan has not been confirmed and substantially consummated or such later date as Delphi and GM shall agree to extend the Indemnification Agreement expiration). <u>UAW MOU § F.2.a</u>
  - ☐ <u>UAW MOU Potential Right To Strike</u>. If the Benefit Guarantee expires under section F.2.a. of the UAW MOU, and the Plan has not been confirmed and substantially consummated, and Delphi has unilaterally modified, terminated, or in any way reduced or diminished any of the benefits covered by the Benefit Guarantee, the UAW shall be allowed to call a strike against Delphi and/or GM on two days' written notice. <u>UAW MOU § F.3</u>
  - ☐ <u>EPCA Termination Events</u>. ADAH may terminate if the Closing Date has not occurred by March 31, 2008. <u>EPCA § 12(d)(iii)</u>.  Delphi may terminate on or after March 31, 2008 provided that the Closing Date has not occurred by such date. <u>EPCA § 12(f)(iii)</u>
  - ☐ <u>GSA Termination Events</u>. GSA may be terminated by Delphi or GM if the EPCA has been terminated and the Plan Effective Date has not occurred. <u>GSA § 7.03(d)</u>. GSA may be terminated by GM if GM has not received a cash payment of $2.7 billion as set forth in the Plan by such date. <u>GSA § 7.03(e)</u>
- **April 30, 2008**
  - ☐ <u>GSA Termination Event</u>. If the EPCA has not been terminated by March 31, 2008, then the GSA may be terminated by Delphi or GM on the earlier of (i) termination of the EPCA and (ii) April 30, 2008. <u>GSA § 7.03(d)</u>
- **June 30, 2008**
  - ☐ <u>EPCA Termination Event</u>.  Limited Termination right under § 12(d) for Investors other than ADAH takes effect. <u>EPCA § 12(d)(vii)</u>
  - ☐ <u>DIP Termination Event</u>.  Termination Date of the DIP Replacement Financing Facility.  On June 30, 2008, all Loans and other obligations as defined in the agreement must be repaid in full
- **Other Issues**
  - ☐ Under the Union Memoranda of Understanding, certain provisions will not become effective until substantial consummation of the Debtors' plan of reorganization, including, among others, the transitioning of certain OPEB obligations to GM, the transfer of certain pension assets and liabilities under IRC Section 414(l), the freezing of certain pension obligations, and releases of Delphi by the Unions and Union-represented employees.  <u>UAW MOU § K.2</u>, <u>IUE-CWA MOU § H.2</u>, <u>USW MOUs § G.2</u>, <u>IAM, IBEW and IUOE MOUs § F.2</u> (<u>IUOE Local 101S MOU § E.2</u>)
  - ☐ Registration statements for the rights offering and resale shelf prospectus may not be able to go effective after February 14, 2008 until Delphi files its 2007 Form 10-K unless Delphi is able to file its 2007 Form 10-K on or prior to that date; if the rights offering is pending when the 2007 Form 10-K is filed, the rights offering may need to be extended
  - ☐ A delay in filing the S-1 may result in SEC review of the registration statement which could further delay Delphi's emergence from chapter 11

~~G~~Certain creditors and stakeholders do not agree with the Debtors' assessment of event risks affecting the Debtors' reorganization.  The Debtors, however, believe that each event described above could have a significant impact on the Debtors' ability to successfully reorganize.

## H.   Summary Of The First Amended Plan Of Reorganization

### *1.     Distributions Under The Plan*

Each of Delphi and its 41 Affiliate Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan provides for the substantive consolidation of certain of the Debtors' Estates for voting and distribution purposes only.  The Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  After careful review of the Debtors' current business operations, estimated recoveries

in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors and equity holders will be maximized by the reorganization of the Debtors as contemplated by the Plan.

The Plan is the culmination of Delphi's Transformation Plan within the chapter 11 context. Delphi has determined that it has achieved those aspects of its Transformation Plan for which the chapter 11 reorganization process was necessary. The Plan incorporates the settlements that Delphi reached with critical stakeholders in these reorganization cases. The Debtors, all of the Debtors' principal U.S. labor unions, GM, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA) are all parties to settlements with the Debtors which, together with the Investment Agreement, allow for various recoveries under the Plan. In particular, the Debtors' settlement with GM, which is essential to the Plan, provides significant consideration to Delphi, which allows Delphi to provide distributions to other stakeholders that would be impossible to deliver without the settlement. Recoveries under the Plan, which are premised upon and in substantial part are derived from the GM settlement, consist of distributions of equity in Reorganized Delphi, rights to purchase equity in Reorganized Delphi, and warrants to purchase equity in Reorganized Delphi. The New Common Stock in Reorganized Delphi that will be distributed under the Plan will be valued at $59.61.72 per share. The value of the New Common Stock, for Plan distribution purposes, is within a range that Rothschild Inc. ("Rothschild"), the Debtors' investment banker and financial advisor, believes is a reasonable valuation for a company such as Reorganized Delphi.

The Plan, which is supported by GM, the Plan Investors, and the Statutory Committees, provides distributions to all of Delphi's stakeholders. Specifically, through the Plan, holders of General Unsecured Claims (with the exception of the TOPrS, as discussed below), including holders of claims based on the Debtors' debt securities and trade claims, will receive 100% of the value of their claims (and applicable postpetition interest through the earlier of January 31, 2008 and the Confirmation Date) through a distribution of New Common Stock of Reorganized Delphi and transferable subscription rights to participate in a discount rights offering to acquire shares of New Common Stock (with the exception of the TOPrS, as discussed below). The distributions to holders of General Unsecured Claims, with certain exceptions, will be based on the allowed amount of the holders' claims plus accrued interest during the pendency of the Chapter 11 Cases. The recovery for holders of General Unsecured Claims (other than holders of TOPrS, as defineddiscussed below) will amount, in the aggregate, to the principal amount of such holders' claims plus accrued postpetition interest at negotiated Plan value, a "par plus accrued recovery at Plan value." Holders of claims arising fromIn satisfaction of the subordination provisions of the subordinated notes issued in connection with trust preferred securities issued in 2003 by Delphi Trust I and Delphi Trust II (the "TOPrS")-"), holders of TOPrS claims will receive an allowed claim of $421379 million, which includes accrued prepetition interest, but will not receive amounts to a distribution 90% recovery of the face amount of the TOPrS claims plus accrued prepetition interest on account of postpetition interest.

the allowed amount.

Under the terms of the Plan and the settlement agreement between the Debtors and GM, GM will receive approximately $2.6 billion in consideration, consisting of cash, a second lien

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

note, and junior preferred convertible stock on account of certain of its claims against the Debtors.  GM will also receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock.  In partial exchange for the consideration distributed to GM under the Plan, GM will provide Delphi with labor subsidies, certain ongoing, post-bankruptcy revenue commitments, and other consideration.  GM's contributions to Delphi's Plan, and the settlement of GM's claims against the Debtors, constitute a substantial source of funds that allow distributions to be made to certain of the Debtors' stakeholders.  Without the GM settlement, those distributions could not be made.

Subject to the approval of settlements in the Bankruptcy Court and the District Court presiding over the matter, and under the terms of the Plan, certain lead plaintiffs in a multi-district securities class action litigation will receive, on behalf of themselves and the class they represent, shares of New Common Stock of Reorganized Delphi and transferable subscription rights to participate in the discount rights offering in the same proportion as Plan distributions to general unsecured creditors.  The resolution of this litigation is critical to the Debtors' reorganization to eliminate the significant risks and costs associated with litigating complex actions under federal securities laws and ERISA and related derivative actions in which plaintiffs have alleged damages in excess of $1 billion.

In addition, holders of existing Delphi common stock will receive a direct distribution of New Common Stock, a distribution of subscription rights to purchase shares of New Common Stock of Reorganized Delphi through a par value rights offering, and warrants exercisable for six months following the Debtors' emergence from chapter 11 to purchase shares of New Common Stock of Reorganized Delphi, and warrants exercisable for five, seven years, and ten years following the Debtors' emergence from chapter 11 to purchase shares of New Common Stock of Reorganized Delphi.

As noted above, certain recoveries under the Plan are premised on the participation in Rights Offerings that will be conducted after confirmation of the Plan and a registration statement is declared effective by the SEC.  Holders of general unsecured claims and securities litigation claims will have the ability to purchase through the exercise of transferable rights, 41,026,310 shares of the New Common Stock of Reorganized Delphi at a price per share of $38.39, which is at a 37.8% discount to Plan equity value of $61.72 (the "Discount Rights Offering").  The Discount Rights Offering will include oversubscription rights, which will allow holders of Discount Rights that have exercised the opportunity to purchase any New Common Stock that was not subscribed  The proceeds generated from the sale of the six-month Warrants will be allocated in the following order:  first, to redeem any shares of "Series C" New Preferred Stock distributed to GM; second, to redeem the GM Note(s); and third, to be used by Reorganized Delphi for by other holders of Discount Rights.  If holders of Discount Rights and Discount Oversubscription Rights do not fully subscribe for the New Common Stock available in the Discount Rights Offering, the Plan Investors will purchase any remaining shares of New Common Stock at a price of $38.39 per share.

Holders of Delphi's existing common stock (as of the Confirmation Hearing Date) will receive their pro rata portion of non-transferable subscription rights to purchase 20,770,345 shares of New Common Stock general corporate purposes, as provided in Article 7.18(b) of Reorganized Delphi; at a price per share of $61.72 (which is the value of the New Common

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

~~Stock distributed under~~ the Plan ~~to~~ .  The proceeds generated from the sale of the seven-year and ten-year warrants will be used by Reorganized Delphi for general corporate purposes.

### *2.        Valuation Of The Reorganized Debtors And Distributions Under The Plan*

The distributions discussed above are the product of extensive negotiations among the Debtors, GM, the Plan Investors, the Creditors' Committee, and the Equity Committee.  As described in more detail in this Disclosure Statement, achieving a "par plus accrued" recovery for holders of ~~General Unsecured Claims) (the "Par Value Rights Offering").  The Par Value Rights will be issued only to those individuals who are holders of Delphi's common stock as of the close of business on the date when the Confirmation Hearing commences.  The proceeds of the Par Value Rights Offering will be retained by the Debtors, if necessary, to satisfy certain liquidity requirements under their financing arrangements, or will be distributed to certain creditors in place of equity securities of Reorganized Delphi.  Appaloosa (and any~~ unsecured claims was a fundamental building block of the discussions among the Debtors, GM, and the Creditors' Committee. Holders of Delphi's existing common stock are able to receive a distribution, in large part, on account of the Debtors' settlement with GM and the Plan Investors' contributions to the Debtors' restructuring.

Because the proposed distributions under the Plan are in the form of equity in the reorganized company, an agreement on the enterprise value of Reorganized Delphi was essential to achieving the desired recoveries for the Creditors' Committee and the desired investment opportunities for the Plan Investors.  In connection with the formation of the Plan and the Debtors' discussions with GM, the Plan Investors, the Creditors' Committee, and the Equity Committee, the Debtors' investment banker and financial advisor, Rothschild, performed a valuation of the Reorganized Debtors as a going concern and of the New Common Stock based on information and financial projections provided by the Debtors.  Rothschild estimated the total enterprise value of Reorganized Delphi to range between $11.2 billion and $14.1 billion, with a midpoint of approximately $12.7 billion, as of December 31, 2007, as discussed more fully in the Valuation Analysis attached to this Disclosure Statement as Appendix D.  The implied potential price per share (assuming full conversion of New Preferred Stock) based on the implied distributable reorganized equity value ranges from $44.70 to $65.78 per share, with a midpoint of $55.27.  The Debtors, GM, the Plan Investors, and the Creditors' Committee agreed that for Plan purposes the total enterprise value of the Reorganized Debtors would be assumed to be $13.3 billion, a value that falls within the range of Rothschild's estimated total enterprise value.

The amount of equity available for equity distributions under the Plan is determined by taking the Debtors' assumed total enterprise value ($13.3 billion) and subtracting (a) the estimated amount of pro forma net debt to be incurred by the Reorganized Debtors ($5.2 billion) and (b) the value attributable to the seven-year and ten-year warrants to be distributed to holders of existing common stock under the Plan ($.3 billion).  This calculation results in a distributable equity value of $7.8 billion, or $59.61 per share of New Common Stock based on 131,266,407 shares (assuming full conversion of the New Preferred Stock) issued and outstanding as of the Effective Date (the "Plan Equity Value").  The Plan Equity Value of $59.61 per share is within the per share range of Rothschild's valuation, and is above the midpoint of Rothschild's valuation.  The range of values based on Rothschild's valuation range is as follows:

| | Low End | Midpoint | Plan Value | High End |
|---|---|---|---|---|
| **Total Enterprise Value** | $11.2 billion | $12.7 billion | **$13.3 billion** | $14.1 billion |
| **Less Estimated Pro Forma Debt** | ($5.2 billion) | ($5.2 billion) | **($5.2 billion)** | ($5.2 billion) |
| **Less Seven- And Ten-Year Warrants** | (0.2 billion) | (0.2 billion) | **(0.3 billion)** | (0.3 billion) |
| **Reorganized Equity Value** | $5.8 billion | $7.2 billion | **$7.8 billion** | $8.6 billion |
| **Shares Outstanding (Assuming Conversion Of New Preferred Stock)** | 131,266,407 | 131,266,407 | **131,266,407** | 131,266,407 |
| **Implied Price Per Share** | $44.50 | $55.03 | **$59.61** | $65.50 |
| **Implied Percent Of Par Plus Accrued Recovery For Holders Of General Unsecured Claims** | 64.3% | 89.2% | **100%** | 113.9% |

As noted above, the distributions to be made under the Plan are based on the Plan Equity Value of $59.61 per share of New Common Stock, although there is no guaranty that the trading value of the New Common Stock will fully or immediately reflect the intrinsic value of the Reorganized Debtors.  The valuation of the Reorganized Debtors and the New Common Stock conducted by Rothschild was based on certain assumptions including, among other things, an assumption that the financial results projected for the Reorganized Debtors will be achieved in all material respects.  No assurance can be given, however, that the projected results will be achieved.  To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative. The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly-traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as Rothschild deemed necessary or appropriate.  The Debtors and Rothschild believe that these valuation assumptions are reasonable.

In addition, beginning in late July 2007, the financial capital markets began to experience significant volatility, resulting in changing credit and market conditions.  Although the Debtors and Rothschild believe that this volatility may have an impact on the market value of the Debtors' existing securities (such as the Senior Notes), the Debtors and Rothschild do not believe that the current market volatility should cause a fundamental shift in the Debtors' longer term intrinsic value.  Should general economic conditions deteriorate, or financial and capital market dislocation persist, however, the value of the New Common Stock may ultimately be less than the Plan Equity Value.

The Debtors, the Plan Investors, and the Creditors' Committee have evaluated the long term intrinsic value of the Reorganized Debtors and the current market volatility in negotiating

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

the discounts to Plan Equity Value applicable to the purchase of shares of New Common Stock in the Discount Rights Offering and New Preferred Stock by the Plan Investors. The Debtors believe that a balance has been achieved to allow stakeholders to achieve an equitable recovery while obtaining a necessary source of exit financing from the Plan Investors. To that end, shares of New Common Stock sold pursuant to the Discount Rights Offering (which is available to holders of unsecured claims and securities litigation claims) will be purchased at a 35.6% discount to the Plan Equity Value, shares of Series A Senior Convertible Preferred Stock ("Series A Preferred") sold to the Plan Investors will be purchased at a 29.2% discount to the Plan Equity Value, and shares of Series B Senior Convertible Preferred Stock ("Series B Preferred") sold to the Plan Investors will be purchased at a 28.6% discount to Plan Equity Value. The discounts to the Plan Equity Value applicable to the Discount Rights, the Series A Preferred, and the Series B Preferred are the results of extensive negotiations among the Debtors, the Plan Investors, the Creditors' Committee, and GM.

Holders of Claims and Interests voting on the Plan should carefully consider the potential range of value of the Reorganized Debtors when voting on the Plan. Certain creditors believe that the Debtors' Plan Equity Value may be greater than the actual value of the New Common Stock as may be determined by the Bankruptcy Court in connection with the Plan, which may impact the recoveries of holders of Claims and Interests.

**The foregoing valuation assumptions are not a prediction or reflection of post-confirmation trading prices of the New Common Stock or any other securities. Such securities may trade at substantially higher or lower prices because of a number of factors, including those discussed in Section X – General Considerations And Risk Factors To Be Considered. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

*3.        Rights Offerings*

As noted above, certain recoveries under the Plan are premised on the participation in Rights Offerings that will be conducted after confirmation of the Plan and after a registration statement is declared effective by the SEC. Holders of general unsecured claims and securities litigation claims will have the ability to purchase, through the exercise of transferable rights, 41,026,309 shares of the New Common Stock of Delphi at a price per share of $38.39, which is at a 35.6% discount to Plan Equity Value of $59.61. The discount price at which the Discount Rights will be exercisable was negotiated among the Debtors, the Plan Investors, and certain stakeholders, and is within a discount range used for rights offerings in other chapter 11 bankruptcy cases. The Discount Rights Offering will include oversubscription rights, which will allow holders of Discount Rights that have exercised the rights the opportunity to purchase any New Common Stock that is not subscribed by other holders of Discount Rights. If holders of Discount Rights and Discount Oversubscription Rights do not fully subscribe for the New Common Stock available in the Discount Rights Offering, the Plan Investors will purchase any remaining shares of New Common Stock at a price of $38.39 per share.

Holders of Delphi's existing common stock (as of the Confirmation Hearing Date) will receive their pro rata portion of non-transferable subscription rights to purchase 21,680,996 shares of New Common Stock of Reorganized Delphi at a price per share of $59.61 (at Plan

Equity Value) (the "Par Value Rights Offering").  The Par Value Rights will be issued only to those individuals who are holders of Delphi's common stock as of the close of business on the date when the Confirmation Hearing commences.  The proceeds of the Par Value Rights Offering will be retained by the Debtors, if necessary, to satisfy certain liquidity requirements under their financing arrangements, or will be distributed to certain creditors in place of equity securities of Reorganized Delphi as set forth in the Plan.  To facilitate the Debtors' implementation of the Par Value Rights Offering, Appaloosa has agreed to make shares of New Common Stock that are otherwise distributable to it under the Plan available for purchase in the Par Value Rights Offering.  Appaloosa has further agreed (together with the other Plan Investors that have agreed not to participate in the Par Value Rights Offering) that it will not participate in the Par Value Rights Offering and the Par Value Rights that would otherwise be distributed to such parties pursuant to the Par Value Rights Offering by virtue of their current common stock holdings will be distributed to the other holders of Existing Common Stock.

Current stockholders of Delphi who may receive, but do not desire to exercise, their non-transferable Par Value Rights can sell their existing shares of Delphi common stock subject to applicable law and realize value by selling their shares.  Sale of shares prior to the date the Confirmation Hearing commences will effectively also result in the sale of the Par Value Rights and the right to receive New Warrants.  Neither Delphi nor its Board of Directors makes any recommendation with respect to any exercise or sale of shares of common stock.  See Section VII.C. – Rights Offerings for additional information regarding the Rights Offerings.

### 4.        *Confirmation And Consummation Of The Plan*

Although the Debtors need only to establish that the stakeholders will receive at least as much under the proposed Plan as in a liquidation under chapter 7 of the Bankruptcy Code, the Debtors believe that the recoveries provided by the Plan will be significantly better than those realized through a liquidation.  Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the valuation analysis prepared by the Debtors' investment banker and financial advisor, Rothschild, and the liquidation analysis prepared by the Company with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc., the Debtors believe that the value of the Estates of the Debtors is significantly greater in the proposed reorganization than in a liquidation.

The Debtors believe that the Plan meets the requirements for confirmation under the Bankruptcy Code and applicable law.  Nonetheless, certain parties have alleged the following issues that may impact the confirmability of the Plan:

- Certain creditors claim that the Plan's treatment of TOPrS claims differently from other general unsecured claims may render the Plan unconfirmable.

- Certain creditors believe that the inclusion of the TOPrS claims within Class C (General Unsecured Claims) may be impermissible.

- Certain creditors claim that the Plan's provision that no payment of postpetition interest may be made on disputed claims pending dispute resolution may render the Plan unconfirmable.

- Certain stakeholders believe that the Plan impermissibly pays senior creditors more than 100% and that payment of postpetition interest to senior creditors is improper.

- Certain stakeholders believe that the Plan does not satisfy the "fair and equitable" or absolute priority requirements of the Bankruptcy Code because certain junior creditors and interest holders are to receive distributions.

- Certain stakeholders believe that the third-party releases provided by the Plan are overbroad and violate applicable law.

- Certain stakeholders believe that substantive consolidation that may be effected by the Plan may be unsupportable by applicable law or the facts of these Chapter 11 Cases.

- Certain creditors believe that the distributions to creditors are less than the Debtors have described because the valuation underlying these distributions is allegedly incorrect.  The valuation is discussed more fully above, in Section X – General Considerations And Risk Factors To Be Considered below, and in Appendix D – Valuation.

- Although there is absolutely no evidence of bad faith, certain creditors also question whether the Debtors can meet the good faith requirement at the confirmation hearing.

The effectiveness of the Plan, and thus the consummation of the Plan, is subject to a number of conditions precedent.  There can be no assurances that these conditions will be satisfied.  In addition, the Debtors have reserved the right to amend or modify the Plan as it applies to any of the Debtors.

**HI.    Summary Of Treatment Of Claims And Interests Under The Plan**

The Plan contains separate classes for holders of Claims against and Interests in the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.  The table below summarizes the treatment of certain administrative and priority claims and sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each category.

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

The table below summarizes the classification and treatment of the principal prepetition Claims and Interests under the Plan.  The classification and treatment for all Classes are described in more detail in <u>Section IX—Summary Of The Reorganization Plan</u>.  The table below also sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each Class based upon the Debtors' review of all proofs of claim and schedules not superseded by proofs of claim, and consideration of the provisions of the Plan that affect the allowance of certain Claims.

The Debtors' investment banker and financial advisor, Rothschild, performed a valuation of the Reorganized Debtors as a going concern and the New Common Stock based on information and financial projections provided by the Debtors.  Rothschild estimated the total enterprise value of Reorganized Delphi to range between $11.2 billion and $14.1 billion with a midpoint of approximately $12.7 billion as of December 31, 2007, as discussed more fully in the Valuation Analysis attached hereto as Appendix D.  For purposes of making distributions under the Plan, the equity value of the Reorganized Debtors to be distributed is equal to the Debtors' total enterprise value of $13.4 billion, less net debt and warrant value of approximately $5.3 billion, which results in a distributable equity value of $8.1 billion, or $61.72 per share of New Common Stock on 131,266,410 shares (assuming full conversion of the New Preferred Stock) issued and outstanding as of the Effective Date (the "Plan Equity Value").  Shares of New Common Stock sold pursuant to the Discount Rights Offering and the Series A Senior Convertible Preferred Stock sold to the Plan Investors will be purchased at a 37.8% discount to the Plan Equity Value.  Shares of Series B Senior Convertible Preferred Stock sold to the Plan Investors will be purchased at a 31.6% discount to Plan Equity Value.

The valuation of the Reorganized Debtors and the New Common Stock conducted by Rothschild was based on certain assumptions including, among other things, an assumption that the results projected for the Reorganized Debtors will be achieved in all material respects.  No assurance can be given, however, that the projected results will be achieved.  To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative.  The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly-traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as Rothschild deemed necessary or appropriate.  The Debtors and Rothschild believe that these valuation assumptions are reasonable.

**The foregoing valuation assumptions are not a prediction or reflection of post-confirmation trading prices of the New Common Stock or any other securities.  Such securities may trade at substantially higher or lower prices because of a number of factors, including those discussed in <u>Section X—General Considerations And Risk Factors To Be Considered</u>.  The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

In addition, for certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  For example, a counterparty to an executory contract that is assumed by the Debtors has the option of electing one of two cure treatments, which may change the amount of

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims include claims arising as a result of trade claims (other than GM's claims, which are treated below), claims arising from the Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases.  Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  ~~Under the Plan, general unsecured creditors will receive the number of shares of New Common Stock in Reorganized Delphi equal to 75.5% of their claims and the value of discount rights equal to 24.5% of their claims, subject to certain rounding provisions in the Plan.  The TOPrS subordination provision will be deemed satisfied pursuant to the Plan, which will provide a recovery of 100% of the principal and accrued prepetition interest to holders of TOPrS claims~~Under the Plan, holders of Allowed General Unsecured Claims shall receive New Common Stock and Discount Rights equal to 100% of such holders' Allowed General Unsecured Claim plus applicable Postpetition Interest.  The distribution of New Common Stock to holders of General Unsecured Claims will equal 77.3% of such holders' Allowed General Unsecured Claim, and the remaining 22.7% of such claim will be satisfied through the pro rata distribution of Discount Rights.  The distribution of New Common Stock and Discount Rights will be subject to certain rounding provisions.  **Estimated Amount Of Allowed Claims:** **$3.260 billion to $3.690 billion plus applicable accrued postpetition interest in the amount of $397 million** **Estimated Percentage Recovery:** **100% of principal and applicable accrued postpetition interest through the earlier of the Confirmation Date or January 31, 2008, based on a distribution of New Common Stock at Plan Equity Value plus full participation in the Discount Rights Offering** **The TOPrS subordination provision will be deemed satisfied pursuant to the Plan, which will provide a recovery of 90% of the principal and accrued prepetition interest, but not accrued postpetition interest, to holders of TOPrS claims.** |

| Class Description | Treatment Under Plan |
|---|---|
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The Plan serves as a motion to approve those agreements.  Under the Plan, for good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claims, GM will receive all consideration set forth in the Delphi-GM Definitive Documents, including, without limitation, (1) \$1.~~20~~073 billion (in liquidation amount) in junior preferred securities, (2) \$1.5 billion, of which at least \$750 million will be in Cash and the remainder will be in a second lien note with market terms, (3) retention of the GM Surviving Claims as provided for in section 4.03 of the Settlement Agreement, (4) the effectuation of the IRC Section 414(l) assumption as provided for in section 2.03 of the Settlement Agreement, and (5) the releases as provided for in sections 3.01, 4.02, and 4.03 of the Settlement Agreement.<br><br>**Amount Of Allowed Claim:**    **Agreed Compromise**<br>**Estimated Percentage Recovery:**   **Agreed Compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation pending in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes and TOPrS for damages or rescission in connection with the purchase or sale of those securities.  Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed  Claim valued at $~~204~~179 million. The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $~~204~~179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Note Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Note Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Note Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims. <br><br> **Estimated Recovery:** <br> **Allocated share of $~~204~~179 million Allowed Claim** <br><br> **Estimated Percentage Recovery:** <br> **Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan ~~value~~Equity Value** |

| Class Description | Treatment Under Plan |
|---|---|
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business.  Under the Plan, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated, except that Intercompany Claims among Debtors that will be substantively consolidated as a Debtor group will be eliminated. The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized Delphi and will not affect distributions to other creditors under the Plan.<br><br>**Estimated Amount Of Claims:**     **N/A**<br>**Estimated Percentage Recovery:**   **N/A** |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date.  Each Holder of Delphi's Existing Common Stock will receive a pro rata distribution of direct distribution of 469,720 shares of New Common Stock, six-month warrants to purchase an additional $1.0 billion of New Common Stock of Reorganized Delphi at an ~~8.2~~9.0% premium to Plan Equity Value, ~~five~~seven-year warrants to purchase 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted shares of Reorganized Delphi) at a ~~32.4~~20.7% premium to Plan Equity Value, ~~and non-transferable par value rights~~ten-year warrants to purchase ~~up to 20,770,345~~2,819,901 shares of ~~the~~ New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted shares of Reorganized Delphi) at Plan Equity Value, and non-transferable par value rights to purchase up to 21,680,996 shares of the New Common Stock of Reorganized Delphi at Plan Equity Value.<br><br>**Estimated Recovery:**                **$~~190~~348 Million** |

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) Equity Claims arise from the securities actions consolidated in the MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $~~204~~179 million. The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of ~~Cash and~~ New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $~~204~~179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court. If any holder of a Section 510(b) Equity Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then ~~such~~ the holder of the Allowed Section 510(b) Opt Out Equity Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Equity Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:**<br>**Allocated share of $~~204~~179 million Allowed Claim**<br><br>**Estimated Percentage Recovery:**<br>**Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan ~~value~~Equity Value** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund a portion of the ERISA Settlement, which will be distributed according to the plan of allocation approved by the MDL Court.<br><br>**Estimated Recovery:**<br>**Allocated share of $24.5 million Allowed Claim**<br><br>**Estimated Percentage Recovery:**<br>**Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim at Plan ~~value~~Equity Value** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Plan on account of such Other Interests.<br><br>**Percentage Recovery:          0%** |
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Plan, interests in affiliate Debtors will not be impaired or cancelled by the Plan.<br><br>**Estimated Amount Of Interests:     N/A**<br>**Estimated Percentage Recovery:     N/A** |

**THE DEBTORS _, THE CREDITORS' COMMITTEE, AND THE EQUITY COMMITTEE_ BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.  _THE CREDITORS' COMMITTEE AND THE EQUITY COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN._**

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

Since the commencement of these Chapter 11 Cases, the Debtors have continued to operate their businesses.  Despite a challenging environment, Delphi's financial performance during the pendency of these Chapter 11 Cases has met or exceeded its short-term financial projections.  In addition, the Company has not only maintained its important and vital relationships with its customers, which have been a component of its positive financial performance during these Chapter 11 Cases, but also has continued to book new business critical to its future.  Delphi's 2007 new business bookings have consistently increased during the year and are above Delphi's 2007 business plan target.

The Company attributes its ability to meet and exceed its financial projections, in part, to its adherence to a disciplined budgeting/forecasting process whereby the corporation's product business unit leaders, divisional heads and corporate staff heads are asked to "own" the commitments they make in the budget business plan, coupled with the dependence of executive incentive compensation on meeting those commitments.  In addition, the Company's revenue plans incorporated within its financial plans are developed with input from third party econometric forecasts to help ensure the validity of certain assumptions, particularly vehicle sales volumes inherent in Delphi's business plans. These bottom-up budget and forecast plans are also used to establish the targets against which the Debtors measure performance under the short-term at risk performance incentive programs that were approved by the Bankruptcy Court.  The compensation plans provide performance rewards only if the short-term financial performance targets are met or exceeded.  The Debtors' recent historical financial results are attached to this Disclosure Statement as Appendix B, although there can be no assurance that Delphi's performance to date during these Chapter 11 Cases is indicative of future performance.

The financial projections attached to this Disclosure Statement as Appendix C were prepared using the same process by which the Company prepared its short-term budget/forecast plans during the Chapter 11 Cases.  Delphi believes that the revenue targets included within these projections, which reflect a compound annual growth rate of 6.3% for 2008-2011, are achievable due to its ability during the pendency of its Chapter 11 Cases to not only maintain but grow and expand its customer relationships even in a challenging economic environment.  During the pendency of the Chapter 11 Cases, Delphi has and will continue to marshal all of its resources to deliver high-quality products to its customers globally.  Additionally, the Company has preserved and continues the strategic growth of its non-U.S. operations.

Upon the conclusion of the reorganization process, the Company expects to emerge as a stronger, more financially sound business and maintain their prominence as one of the world's premier auto suppliers.  In addition, Delphi anticipates that through its unwavering commitment to its customers, it will continue to win new business and achieve or exceed the financial projections and targets it has established.  However, there can be no assurances that this will be the case given the risks and uncertainties inherent in Delphi's business, see Section X—General Considerations And Risk Factors To Be Considered.

in any comprehensive resolution, the framework discussions on those issues ran in parallel with (and ultimately ahead of) discussions on a labor resolution.

### C.     The Framework Discussions

Very early in the framework discussions, GM and the Creditors' Committee were able to agree on creditor recoveries of "par plus accrued at Plan value," that is, payment of claims in full (with interest) with cash and common stock in the reorganized entity ("Reorganized Delphi") valued at a negotiated total enterprise value.  Although GM and the Creditors' Committee were able to reach agreement in a relatively short period of time regarding the level of potential recoveries for creditors, GM and the Creditors' Committee spent a significant amount of time discussing what a "par plus accrued at Plan value" recovery would mean in practice and how such a recovery could be accomplished.  The parties negotiated an agreed deemed value of the reorganized debtors' equity at $45.00 per share and an assumption of a trade and other unsecured claims base (with certain exclusions) of $1.7 billion, which would allow the reorganized Debtors' total enterprise value to fall within a range acceptable to the Debtors and the Creditors' Committee.  The discussions between GM and the Creditors' Committee did not contemplate a recovery for existing equity security holders.  The lack of distributions to the Debtors' existing equity security holders was consistent with the Debtors' belief, as announced in a Form 8-K filed on December 19, 2005, that it was highly unlikely that existing equity holders would receive any value in the Chapter 11 Cases on account of the equity securities of Delphi because the Debtors believed the parent holding company was hopelessly insolvent.  Nevertheless, by August 17, 2006, the Debtors viewed the progress made in the Framework Discussions as significant and informed the Bankruptcy Court that the parties to the 1113/1114 Motion had agreed to adjourn the motion to September 20, 2006.

In September 2006, the Equity Committee and Appaloosa were able to generate support among the various stakeholders for recoveries on behalf of equity security holders which would be realized, at least partially, through a Rights Offering.  To realize these potential recoveries, however, the framework discussions still needed to address the labor issues, the GM issues, and the business plan for the Company that would support these desired recoveries.  The Debtors and other stakeholders realized that the settlement of the Transformation Plan issues, and the GM claims in particular, would be necessary for any value to be distributed to junior stakeholders.  The Debtors, as well as the other participants in the framework discussions, also agreed that an outside plan investor in some form would be necessary to achieve the expected results.

An all-day negotiating session on November 16, 2006 was followed by an evening meeting of Delphi's Board of Directors, at which the Debtors selected A-D Acquisition Holdings, LLC, an affiliate of Appaloosa,  Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Cerberus Capital Management, L.P. ("Cerberus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch"), and UBS Securities LLC ("UBS") as potential plan investors (collectively, the "Original Investors") and decided that they would pursue earnest negotiation of definitive documents with the Original Investors to determine if there was a viable transaction that could be accomplished.  The Debtors' selection of Appaloosa and Cerberus was based, in part, on the potential financing in support of the Transformation Plan and reorganization plan that the investors were willing to undertake.  Cerberus was willing to purchase convertible

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

Also on March 31, 2006, Delphi delivered a letter to GM initiating a process to reset the terms and conditions of more than 400 commercial agreements that expired between October 1, 2005 and March 31, 2006.  The Company did not unilaterally revise the terms and conditions on which it has been supplying parts to GM under expired contracts or file additional contract rejection motions.  As with the Unions, throughout these Chapter 11 Cases the Debtors remained committed to reaching consensual resolution with GM on this and several issues pertaining to the Transformation Plan.

### 1.   Investigation Into GM Claims And Causes Of Action

In January 2006, the Debtors scheduled unliquidated claims against GM and reserved their rights to assert claims against GM in their Schedules of Assets and Liabilities and Statements of Financial Affairs.  Similarly, from the outset of the Chapter 11 Cases, the Debtors have been aware of certain defenses to claims that might be asserted by GM against the Debtors' Estates (collectively with the claims against GM, the "GM Claims and Defenses").  In addition, on July 31, 2006, GM and its affiliates filed a proof of claim (with additional attachments) against the Debtors' Estates, which stated a liquidated claim in the aggregate amount of $6 billion and also identified further purported significant unliquidated claims.  In its third quarter 2007 Form 10-Q filed on November 8, 2007, GM stated that its exact amount of claims could not be established (due in part to the contingent nature of many of its claims), but estimated the amount of its claims could be as much as $13 billion.

As part of the Debtors' Plan, the Debtors and GM have reached a consensual resolution of the GM Claims and Defenses, and, as more fully described below, as an integral part of the Plan and GM's participation and support of the Debtors' reorganization efforts, upon consummation of the Plan the Debtors will release and resolve the GM Claims and Defenses.  Without such a release and resolution, GM has advised the Debtors that it would not provide its substantial support for the Debtors' reorganization efforts.  The Debtors believe that without GM's support (and on a consensual basis), the recoveries of par plus accrued at Plan value for the Debtors' unsecured creditors and the distributions to Delphi's existing equity holders would not be possible.  Without the resolution of GM Claims and Defenses and the substantial contributions made by GM under the GM settlement agreement, the Debtors continue to believe they would be "hopelessly insolvent" (as the Debtors disclosed in December 2005) and unable to provide meaningful distributions to junior stakeholders or a "par plus accrued at Plan value" recovery for holders of unsecured claims.  Much of the value that is provided to junior stakeholders on account of their claims and interests is directly related to and derived from Delphi's settlement with GM.  Providing a meaningful distribution to all of Delphi's stakeholders was an important element of the settlement betwen Delphi and GM.

In addition, GM's continued support as a customer is critical to Delphi's business plan, and to initiate heavily contested litigation with GM could put future revenue at risk.  In determining to pursue the consensual resolution outlined in the Plan, the Debtors have analyzed the GM Claims and Defenses with substantial input from their Statutory Committees, and have considered weighed the relative strengths and weaknesses of the GM Claims and Defenses along with the risks of proceeding in a fashion adversarial to GM, against the substantial benefits contemplated by GM's participation in the Debtors' reorganization and transformation, and the

**Professionals, (viii) the Plan Investors, and (ix) with respect to each of the above-named persons or entities, and only in their aforementioned capacities, such person's or entity's Affiliates, current and former principals, officers, directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons or entities), in their capacities as such, but shall not include the Delphi-Related Parties, the Delphi Affiliate Parties, the UAW Releasing Parties, the IUE-CWA Releasing Parties, the USW Releasing Parties, the IAM Releasing Parties, the IBEW Releasing Parties, the IUOE Releasing Parties, and the Non-Represented Employees Releasing Parties.**

(2)     Surviving Claims

The releases provided for in the Settlement Agreement shall not apply to certain Surviving Claims as expressly set forth in the Settlement Agreement and identified as the Delphi Surviving Claims and the GM Surviving Claims.

(3)     Consideration To Be Received By GM

The Settlement Agreement provides that, on the Effective Date, and pursuant to the Plan, Delphi shall provide the following consideration to GM (collectively, and together with the releases to be provided to the GM Related Parties pursuant to the Settlement Agreement, the "Consideration"): (i) $1.5 billion in a combination of at least $750 million in cash and the remainder in a second lien note (the "GM Note") with the amount of such cash and the terms of the GM Note established as set forth in Exhibit F of the Settlement Agreement; provided, however, that terms other than those set forth in Exhibit F of the Settlement Agreement and the form of the GM Note must be satisfactory to GM to the extent that such terms (it being understood that none of the terms on Exhibit F of the Settlement Agreement may be changed without GM's written consent) or form would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement, and (ii) $1.~~20~~73 billion (as such amount may be reduced in accordance with the term of section 7.15(b) of the Plan) in junior preferred convertible stock with the terms set forth in Exhibit G of the Settlement Agreement; provided, however, that terms other than those set forth in Exhibit G of the Settlement Agreement and the form of the certificate of ~~designation~~designations of the junior preferred convertible stock must be satisfactory to GM to the extent that such terms (it being understood that none of the terms on Exhibit G of the Settlement Agreement may be changed without GM's written consent) or form would have a material impact on GM, on the benefits GM reasonably is expected to receive under the Plan (including, without limitation, GM's distributions thereunder), the Restructuring Agreement, or on the ability of the Debtors to fulfill any obligations to any GM-Related Parties under the Plan, the Restructuring Agreement, or any agreements assumed, reinstated, or ratified under the Restructuring Agreement.

performing these processes and improve productivity over time by reducing the number and type of unique, non-common systems, moving to common operating platforms, and running a streamlined shared service organization.  This will help to ensure that the Debtors' organizational and cost structure is competitive following their emergence from chapter 11.

The outsourcing of certain IT and financial services has been conducted concurrently with the general realignment and reduction of the Debtors' salaried workforce. Part of this realignment was effected through Delphi's 2006 realignment of its business operations to focus its product portfolio on core technologies for which Delphi believes it has significant competitive and technological advantages. This realignment allowed the Debtors to improve processes and decrease administrative activities.  As a result of these activities, the Debtors were able to reduce the number of salaried employees in 2006 by 7.4% from December 2005 levels.  The current number of salaried employees is at a historic low for the Company.

**2.    *Salaried Employee Compensation Program***

(a)    <u>Competitively Benchmarked Salaried Employee Compensation Program – Introduction – Compensation Committee Philosophy <s>and</s>And Strategy Statement</u>

One of the fundamental tenets of the Company's transformation plan has been to become competitive in every aspect of its business including both hourly and salaried compensation programs.  To meet that objective with respect to the Company's salaried employee compensation program, the Company has developed competitively benchmarked executive and non-executive compensation programs.  For purposes of this section, "senior management" means those global employees in Bands A through F, which is comprised of about 560 such employees as well as the Delphi Strategy Board ("DSB"). This group comprises about 560 such employees and the Delphi Strategy Board"), which is comprised of the a Delphi's 21 top policy-making decision makers (each, a "DSB Member").

A competitively benchmarked salaried executive compensation program is also required under Section 9(a)(xxi) of the Investment Agreement, which provides that the Company "shall have entered into employment agreements and other compensation arrangements with senior management relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions, and other benefits on market terms (as determined by Delphi's Compensation Committee) based on the advice of Watson Wyatt Worldwide, Inc. ("Watson Wyatt") (an independent outside advisor to the Compensation Committee) and reasonably acceptable to ADAH."  In September 2007, ADAH informed Delphi that the Company's salaried executive compensation program complied with the requirements of the Investment Agreement and was acceptable to ADAH.  While Delphi has also consulted with the Creditors' Committee regarding these the competitively benchmarked compensation programs as required by.  The cash and emergence equity awards made on the Effective Date of the Investment Agreement, Plan must be on market terms (as determined by Watson Wyatt) and reasonably acceptable to the Creditors' Committee is not required to approve or endorse these programs and has not done soADAH.  The Plan constitutes a request to authorize and approve the competitively benchmarked compensation programs.

<div style="text-align:center">DS-96</div>

The Investment Agreement is subject to the satisfaction or waiver of numerous conditions and the non-exercise by either Delphi or the Plan Investors of certain termination rights. The Investment Agreement also allows Appaloosa initially to designate three members, and the other Plan Investors initially (other than UBS, Goldman, Sachs & Co. and Merrill Lynch) to designate one member (with the approval of either Delphi or the Creditors' Committee), of Reorganized Delphi's Board of Directors. See Section IX.F – Means For Implementation Of The Plan. Finally, through ADAH's ownership of the Series A-1 Preferred Stock, ADAH has certain rights with respect to certain significant corporate transactions.  Reorganized Delphi will not be able to take any of the following actions unless (1) it has provided 20 business days' advance notice to the holders of the Series A-1 Preferred Stock and (2) Reorganized Delphi has not received an objection to the proposed action prior to the tenth business day after the holders received the notice:

- any action to liquidate Reorganized Delphi;

- any amendment of the Certificate of Incorporation or Bylaws that adversely affects the Series A Preferred Stock (including any expansion of the Board of Directors);

- at all times the Series A Preferred Stock is subject to the two-year transfer restriction described in the Investment Agreement;

  - a sale, transfer, or other disposition of all or substantially all of the assets of Reorganized Delphi and its subsidiaries, on a consolidated basis;

  - any merger or consolidation involving a change of control of Reorganized Delphi; or

  - any acquisition of or investment in any other Person having a value in excess of $250 million in any twelve-month period.

Rather than advancing a separate plan framework support agreement following the structure of the terminated PSA, the Investment Agreement itself outlines Delphi's proposed framework for a plan of reorganization, which includes distributions to be made to creditors (including allowed accrued interest) and shareholders, the treatment of GM's claims, and the corporate governance of the reorganized Company.

### 3.    *Amendment To The Investment Agreement*

On October 30, 2007, Delphi announced it filed with the Bankruptcy Court a motion seeking approval of a proposed amendment to the Investment Agreement.  Conditions to the effectiveness of the Investment Agreement amendment contained in the proposal letter were not satisfied, however, and the proposed amendment was not executed.  On November 14, 2007, Delphi announced it had reached a restated amendment to the Investment Agreement with the Plan Investors (the "November 14 Proposed Amendment").  The November 14 Proposed Amendment was not executed.  On or about December 3, 2007, Delphi filed the second restated amendment to the Investment Agreement with the Plan Investors (the "Proposed Investment Agreement Amendment").  Execution of the Proposed Investment Agreement Amendment is

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

subject to the satisfaction of various conditions set forth in a proposal letter, including Bankruptcy Court approval and Delphi not having received notice ~~by November 21, 2007~~ from ADAH that ~~this Disclosure Statement~~, under certain parameters set forth in a proposal letter, it is not reasonably ~~satisfactory to ADAH (it being understood that the inclusion in this Disclosure Statement of information with respect~~ satisfied with Delphi's proposed changes to ~~Delphi or its subsidiaries not previously disclosed to ADAH (other than immaterial and non-substantive information and information not adverse to the Plan Investors) shall be a reasonable basis to object)~~ the Plan or this Disclosure Statement.

The Proposed Investment Agreement Amendment, if executed, would revise a number of provisions in the Investment Agreement to reflect events and developments since August 3, 2007 including delivery of a revised and supplemented disclosure letter by Delphi, delivery of a revised business plan by Delphi, delivery of a best efforts financing letter, updates and revisions to representations and warranties, the Union Settlement Agreements, and the execution and amendment of the Settlement Agreement and Restructuring Agreement. The Proposed Investment Agreement Amendment would amend provisions of the Investment Agreement relating to the Discount Rights Offering (including the replacement of existing common stockholders with unsecured creditors and the provision of oversubscription rights) and reflect the issuance of Series C Preferred Stock to be issued to GM. In addition, the Proposed Investment Agreement Amendment no longer outlines Delphi's proposed framework for a plan of reorganization and, except for corporate governance matters, relies upon the Plan for that function.

The Proposed Investment Agreement Amendment, if executed, would remove or narrow the scope of certain conditions to closing to provide greater certainty to the consummation of the transaction, including the no-strike condition and the capitalization condition to reduce the net debt required for the Company on the closing date. In addition, the Proposed Investment Agreement Amendment would exclude from the condition relating to the approval of material investment documents, numerous documents which have already been delivered by Delphi to the Investors. Certain conditions to closing, however, would be added by the Proposed Investment Agreement Amendment, such as those requiring (a) that the Company have undrawn availability of $1.4 billion under the asset backed revolving loan facility (subject to certain exclusions) and (b) that scheduled PBGC liens be withdrawn.

## C.    Rights Offerings

The Company will conduct two Rights Offerings: the Discount Rights Offering and the Par Value Rights Offering. Pursuant to the Discount Rights Offering, holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims as of the date the Confirmation Hearing commences (the "Rights Offering Record Date"), or transferees receiving such holders' Discount Rights, will receive transferable Rights to purchase up to approximately 41,026,~~310~~309 shares of the New Common Stock of Reorganized Delphi at an exercise price of $38.39 per share, a ~~37.8~~35.6% discount to Plan Equity Value. The discount available in the Discount Rights Offering was negotiated among the Debtors, the Plan Investors, and various stakeholders, and is within the range of discounts for rights offerings in recent bankruptcy cases, which ranged from 5.2% to 69%. The holders of

General Unsecured Claims will also receive the right to purchase any unsubscribed Rights not otherwise exercised in the Discount Rights Offering at an exercise price of $38.64 per share, with the $.25 premium for exercise of oversubscription rights going to holders who did not elect to exercise or transfer their Discount Rights.

Pursuant to the Par Value Rights Offering, Delphi's common stockholders at the Rights Offering Record Date will receive non-transferable Rights to purchase up to 20,770,34521,680,996 shares (valued at approximately $1.3 billion) of New Common Stock of Reorganized Delphi at an exercise price of $59.61.72, the negotiated Plan value of New Common Stock.  Of the Rights distributed in the Par Value Rights Offering, 611,754648,745 represent shares that would otherwise be distributable to Appaloosa and 6,386,718772,899 represent shares that would otherwise be distributable to the UAW, the IUE-CWA, the USW, and the holders of General Unsecured Claims.

The Plan Investors have committed, on the terms and subject to the conditions of the Investment Agreement, to purchase any shares of New Common Stock that were offered through the Discount Rights Offering to eligible holders, but whose rights were not properly exercised in the initial offering or through the exercise of oversubscription rights. In the event that no Discount Rights are exercised, the Plan Investors, through this backstop commitment, would purchase all of the unsubscribed shares for approximately $1.575 billion.

### 1.   Eligibility For Participation In Rights Offerings

Each holder of a General Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, and Section 510(b) ERISA Claim, as of the Rights Offering Record Date, or transferees receiving such holder's Discount Rights, will be entitled to participate in the Discount Rights Offering. The Discount Rights will be freely transferable.

Each holder of Existing Common Stock as of the Rights Offering Record Date will be entitled to participate in the Par Value Rights Offering. The Rights Offering Record Date will be the date on which the Confirmation Hearing commences.

### 2.   Issuance Of Rights

The Rights will be issued after (i) the Bankruptcy Court has confirmed the Debtors' Plan and (ii) the SEC declares a registration statement for the Rights Offerings effective. Existing Common Stock holders that hold their shares through a brokerage account, or other nominee will not receive an actual rights certificate. If a holder wishes to obtain a separate rights certificate, the holder should promptly contact its broker, bank, or other nominee and request a separate rights certificate. It will not be necessary to have a physical rights certificate to elect to exercise Rights.

In the Discount Rights Offering, holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims on the Rights Offering Record Date will receive Rights to purchase 41,026,310309 shares of New Common Stock. Discount Rights will be transferable. The Rights will entitle holders to purchase New Common Stock for $38.39 per share.

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

In the Par Value Rights Offering, holders of Existing Common Stock on the Rights Offering Record Date will receive Rights to purchase up to ~~20,770,345~~21,680,996 shares in the aggregate of New Common Stock (valued at approximately $1.3 billion), at an exercise price of $59.61~~.72~~ per share.  Par Value Rights will not be transferable.

### 3.    *Rights Offering Period*

The Rights Offerings will commence when the Rights are distributed following confirmation of the Plan and effectiveness of a registration statement, and conclude approximately 30 days later. After the Rights expire, any and all unexercised Rights will automatically terminate without further notice or order of the Bankruptcy Court, and any purported exercise of any such unexercised Rights by any Person will be null and void.

### 4.    *Exercise Of Rights*

The Rights Offering documents will set forth in detail how to exercise the Rights and such procedures should be carefully followed.

### 5.    *Alternatives To Exercising The Rights*

To realize value from the Rights Offerings, as alternatives to exercising the Rights, holders of the Rights may (i) in the case of the Par Value Rights Offering, sell their shares of Existing Common Stock prior to the commencement of the Confirmation Hearing or (ii) in the case of the Discount Rights Offering, sell their Rights to participate in the Discount Rights Offering.

(a)    <u>Sale Of Shares</u>

In advance of the commencement of the Confirmation Hearing, a holder of Existing Common Stock may sell its shares. If a holder sold its shares prior to the Rights Offering Record Date, the buyer would be entitled to receive the Rights to participate in the Par Value Rights Offering.  In addition, by selling its shares prior to the Rights Offering Record Date, a shareholder would also be selling its entitlement to participate in the distribution to shareholders of New Warrants contemplated by Article 5.7 of the Plan.

(b)    <u>Sale Of Rights</u>

Discount Rights will be transferable. Therefore, as an alternative to exercising the Rights, holders may sell the Discount Rights to third parties. Any such transfer of Discount Rights must be made sufficiently in advance of the expiration date of the Discount Rights Offering to comply with settlement procedures applicable to sales of securities. If trading in the Discount Rights is initiated, such trading can be expected to be on a customary basis in accordance with normal settlement procedures. Trades effected in Discount Rights will be required to be settled within three trading days after the trade date. A purchase and sale of Discount Rights that is effected on the date that is two days prior to the expiration date of the Discount Rights Offering would be required to be settled not later than the time the Discount Rights will have expired (or, if the holder uses guaranteed delivery procedures, not later than 5:00 p.m., New York City time, on the

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

The second lien financing will have a maturity of 8 years, and at least $750 million of this facility will be raised from a third-party lender.  The remaining portion, up to $750 million, will be obtained by providing a note to GM which will have the same terms as the third-party financing.  The third-party lender will also have the right, through the Effective Date, to purchase up to $500 million of the financing evidenced by the note to GM at par value.  The amount of the second lien facility will be reduced by any financing obtained under the first lien facility in excess of $3.7 billion (the "Excess Amount"), with the portions of the loans provided by GM reduced, provided that the sum of (i) undrawn availability plus any open letters of credit up to $100 million pursuant to an asset-based revolving credit facility and (ii) Delphi's pro forma consolidated cash as of the Effective Date (excluding the Excess Amount and after giving pro forma effect to the $1.5 billion cash payment to GM in connection with the 414(l) transaction) (the "Liquidity Amount") is at least $3.189 billion.  In the event that the Liquidity Amount is less than $3.189 billion, then any Excess Amount shall be retained by Delphi up to the point that the amount of such Excess Amount retained plus the Liquidity Amount equals $3.189 billion and the remaining amount shall be paid to GM and the second lien financing will be reduced by such amount paid to GM as provided above.  GM will not have registration rights with respect to the GM Note.

Once the Debtors had determined the nature of the exit financing facility needed, they began discussions with potential lenders.  Potential lenders informed the Debtors that obtaining a firm commitment in the current market would require the Debtors to agree to accept a significantly greater degree of interest rate risk, or "flex," than would otherwise be necessary in a stable market.  In an effort to avoid the burden of increased interest rate flex, the Debtors began discussing potential arrangements that would require something less than an immediate firm commitment to lend from prospective financial institutions.

These discussions culminated in the Debtors' entry into an engagement letterthe Engagement Agreement with the Engagement Parties, and on November 6, 2007 the Debtors filed their Expedited Motion Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002, 6004, 9006, And 9007 For Order Authorizing Debtors' Entry Into Exit Facility Engagement And Fee Letters And Performance Thereunder (the "Exit Financing Motion").  The Debtors sought a hearing on the Exit Financing Motion on an expedited basis so that the Engagement Parties could take advantage of slightly improved conditions for borrowing and initiate syndication of the Exit Financing Arrangements at the earliest possibleappropriate time.  The Bankruptcy Court approved the Exit Financing Motion on November 16, 2007.  The Debtors are working with the Engagement Parties to complete the syndication contemplated under the Engagement Agreement prior to the Confirmation Date.

Under the Engagement Letter, the Engagement Parties agreed to use commercially reasonable "best efforts" to assemble a lending syndicate to provide the Exit Financing Arrangements, after which the Debtors will negotiate and enter into definitive credit documents with respect to the Exit Financing Arrangements.  Given the continued uncertainty in the capital markets when the Debtors entered into the Engagement Letter, proceeding on a "best efforts" basis instead of under a "commitment letter" was the more prudent course of action.  Under the Engagement Letter, until the Engagement Parties complete syndication and the Debtors agree to

November 13, 2007.  On November 13, 2007, the MDL Court conducted the fairness hearing and took the matter under advisement.

On September 7, 2007, the Debtors filed a motion seeking Bankruptcy Court approval of the MDL Settlements.  The motion was originally scheduled to be heard on September 27, 2007, but after consultation with a number of stakeholders, including counsel for the MDL plaintiffs and Creditors' Committee, the Debtors determined to use a two-step bifurcated approval process for the MDL Settlements in the Bankruptcy Court.  As the first step in the process, the Debtors sought and received preliminary approval of the MDL Settlements, including without limitation, class certification, and solicitation mechanics, at the October 25, 2007 omnibus hearing.  The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

Under the terms of the MDL Settlements, which require the approval of both the MDL Court and the Bankruptcy Court, the Lead Plaintiffs and the ERISA Action plaintiffs will receive claims/interests that will be satisfied through the Debtors' Plan.  The Lead Plaintiffs will be granted a single Allowed Claim/Interest in the face amount of $179 million (which was reduced from an earlier agreed amount of $204 million in consideration of the Debtors' agreement to cooperate with monetization of these claims by the Lead Plaintiffs as discussed below).  The Lead Plaintiffs' $204179 million Allowed Claim will be classified in both the Section 510(b) Note Claim and Section 510(b) Equity Claim classes based on the plan of allocation approved by the MDL Court pursuant to the terms of the Securities Settlement.  The Lead Plaintiffs' claim/interest will be satisfied through consideration in the same form, ratio, and treatment as what will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  If any class member opts out of the Securities Settlement, and ultimately receives an allowed claim in the Debtors' Chapter 11 Cases, the amount received by the holder of an allowed opt-out claim will be deducted from the amount used to satisfy the Lead Plaintiffs in the Securities Settlement.  A distribution made to a holder of an allowed opt-out claim will be in the same Plan currency as that distributed on account of the Securities Settlement.  The Debtors will object to any claims filed by members of the class in the Securities Action or individuals who opt out of the Securities Settlement Settlements in the Bankruptcy Court, and will seek to have such claims expunged.  The ERISA Settlement is structured similarly to the Securities Settlement.  The ERISA Plaintiffs' claim/interest will be allowed in the amount of $24.5 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  Unlike the Securities Settlement, the ERISA Plaintiffs are not entitled, and thus will not be able, to opt out of their settlement.

In addition to the proceeds from the claims in the Chapter 11 Cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds up to $88.6 million, including the

remainder of any insurance proceeds (which proceeds could otherwise be used by directors and officers in connection with non-indemnifiable claims) that are not used by the eight former directors and officers as permitted in the MDL Settlements (as discussed further below), the amount of $15 million constituting a third party payment to the Debtors in connection with the Securities Settlement which the Debtors have agreed to redirect to the disbursing agent appointed by the MDL Court in partial monetization of the original agreed claim against the Debtors agreed to pursuant to the Securities Settlement, and a distribution of $1.5 million from certain underwriters named as defendants in the MDL proceedings.  The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million.  The additional proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements.  The insurance proceeds are being held in escrow accounts pursuant to the MDL Settlements and subject to the direction of the MDL Court.

In addition to the redirection of third party reimbursements discussed above to facilitate monetization of claims agreed to by the Debtors pursuant to the Securities Settlement, the Debtors and the Lead Plaintiffs have agreed to support the entry of orders of the Bankruptcy Court and/or the MDL Court, as applicable, to authorize the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise Discount Rights by delivering to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and (ii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness of the Securities Settlement, the amount of the rights offering exercise price in connection with the Discount Rights Offering for the Lead Plaintiffs on behalf of the securities class (collectively, the "MDL Group").  In the event such notice is timely delivered, the Lead Plaintiffs shall cause to be released and/or transferred to Delphi, subsequent to the effectiveness of the Securities Settlement, both (i) the cash proceeds obtained from parties (other than Delphi) to the Securities Settlement (which proceeds have already been received and escrowed pursuant to terms of the Securities Settlement) up to an amount equal to the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering and (ii) if the amount delivered pursuant to clause (i) above does not fully cover the rights offering exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock that the Lead Plaintiffs are to receive as an Allowed Claim pursuant to the terms of the Securities Settlement to cover such shortfall (collectively, the "Relevant Consideration").  Notwithstanding anything contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

Pursuant to the MDL Settlements, none of the settling defendants in the MDL Actions admit any wrongdoing whatsoever and the MDL Settlements will in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the settling defendants with respect to any claim of any fault or liability or wrongdoing or damage whatsoever, or an infirmity in the defenses that the settling defendants have asserted or would assert in the MDL Actions.

manufacturing plant for approximately $15 million.  On June 15, 2007, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on July 19, 2007 to approve the sale.  On July 19, 2007, the Bankruptcy Court entered an order approving the sale of assets.  The parties intend to close the sale during the fourth quarter of 2007.

(h)    Saginaw Chassis Asset Sale

On September 17, 2007, DAS LLC and Delphi Technologies, Inc. entered into an Asset Purchase Agreement with TRW Integrated Chassis Systems LLC (as amended, the "Saginaw Chassis Agreement") for the sale of certain of the assets, including, without limitation, manufacturing equipment and test and development equipment primarily used and located at the Company's chassis facility in Saginaw, Michigan, for approximately $~~26.4~~42.6 million ~~and other consideration, including~~, comprised of approximately $27.6 million for the assets primarily used at the Saginaw chassis facility, approximately $15 million for useable and merchantable inventory existing as of the closing date, and up to $0.~~4~~9 million for out-of-pocket costs and expenses incurred in relocating manufacturing equipment and related tooling from Saltillo, Mexico.  ~~Delphi Canadia, Inc. also is selling assets located at a facility in~~ and Oshawa, Ontario, Canada ~~pursuant to an Asset Purchase Agreement, dated September 17, 2007, by and between Delphi Canada, Inc. and TRW Integrated Chassis Systems LLC, which is an agreement ancillary to the Saginaw Chassis Agreement~~.  Also on September 17, 2007, Delphi filed a motion with the Bankruptcy Court requesting approval of bidding procedures for the sale and requesting that a sale hearing be set.  The Bankruptcy Court approved bidding procedures in connection with the sale on November 16, 2007.  ~~The effectiveness of the Saginaw Chassis Agreement is subject to a competitive~~Delphi did not receive any other qualified bids under the bidding ~~process, including a potential auction, and~~procedures, and the sale was approved by the Bankruptcy Court ~~approval.~~on November 29, 2007.

## 6.    Real Property And Related Matters

Pursuant to a Bankruptcy Court order dated November 30, 2005, the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property was extended to June 7, 2007.  On April 13 and August 16, 2007, the Bankruptcy Court entered orders further extending the 365(d)(4) deadline.  The current deadline is the earlier of the date when a plan of reorganization in the Chapter 11 Cases is confirmed and February 29, 2008.

Separately, on March 27, 2007, the Bankruptcy Court entered an order authorizing the Debtors to effectuate a transaction that enabled the Debtors to consolidate, into one facility located in Auburn Hills, Michigan, six of their leased office and technical centers located in Michigan and Illinois and a portion of one owned site in Flint, Michigan.  The same order authorized the Debtors to reject certain leases for facilities that would be consolidated.  The consolidation of these facilities will enable the Debtors to create a consolidated footprint in Southeast Michigan that is closer to key customers and will generate net savings of over $100 million dollars over a ten-year period.

### 1.  Settlements Embodied In The Plan

The foundation of Delphi's restructuring and the Plan is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes.  The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, and the MDL Plaintiffs (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries of the various holders of claims and interests under the Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests.  The Debtors also believe that the recoveries provided to holders of Claims and Interests under the Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements.  The Settlements among the Settlement Negotiation Parties have paved the way for the Plan, which will enable maximum distributions to all of the holders of Claims and Interests, without the cost and delay of litigation.  The Debtors believe that without GM's support embodied in the Settlement Agreement between Delphi and GM, the recoveries of "par plus accrued" at Plan value for the Debtors' unsecured creditors and the distributions to Delphi's existing equity holders would not be possible.  Without the resolution of the GM Claims and Defenses and the substantial contributions made by GM under the Settlement Agreement between Delphi and GM, the Debtors continue to believe they would be "hopelessly insolvent" (as the Debtors disclosed in December 2005), and unable to provide meaningful distributions to junior stakeholders or a par plus accrued at Plan value recovery for holders of unsecured claims.  It is the Debtors' belief that much of the value that is provided to junior stakeholders on account of their claims and interests is related to and derived from Delphi's settlement with GM.

The Equity Committee actively participated in the various negotiations leading to the Settlements.  As previously discussed, certain events and market factors affecting Plan distributions and the Debtors' businesses led to continued discussions among certain of the Settlement Negotiation Parties after the filing of the September 6 Plan. As a result of those discussions, which led to diminished distributions to the holders of Existing Common Stock, the Equity Committee now disagrees with and may oppose the terms of certain of the Settlements.

The claims and disputes being resolved by the Settlements include, among others:

- Delphi's potential claims and causes of action against GM, the Statutory Committees' request to prosecute such claims, and the resolution of GM's proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor unions.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Plan.

### (b)   Classes Of Claims That Are Impaired

(i)      Class C (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor.  The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, a TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, Secured Claim, Flow-Through Claim, GM Claim, Section 510(b) Note Claim, Intercompany Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

Holders of Allowed General Unsecured Claims will receive New Common Stock and Discount Rights equal to the ~~value~~allowed amount of 100% of such holders' Allowed General Unsecured Claims plus applicable Postpetition Interest, in the ratio described below.  Except as otherwise provided in and subject to Articles 7.15(b), 9.8, and 11.10 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim and after giving effect to Article 11.10 of the Plan, each holder of an Allowed General Unsecured Claim will receive the number of shares of New Common Stock (at Plan Equity Value, as defined below) equal to ~~75.5~~77.3% of such Claim (including any applicable Postpetition Interest~~)~~), except~~,~~ that in each case fractional shares of New Common Stock will not be distributed to holders of Allowed General Unsecured Claims, and all such fractional shares will be rounded, and distributions will be made, in accordance with Article 9.10 of the Plan.  The Plan Equity Value is equal to the Debtors' total enterprise value of $13.4~~3~~ billion, less net debt and warrant value of approximately $5.3~~4~~ billion, which results in a distributable equity value of $7.8~~.1~~ billion, or $~~59.~~61.~~72~~ per share of New Common Stock based on 131,266,~~410~~407 shares issued and outstanding (assuming full conversion of the New Preferred Stock) as of the Effective Date.

~~――――~~In satisfaction of the remaining portion of each holders' General Unsecured Claim (after accounting for the distribution to take place pursuant to the description above), on the commencement date of the Discount Rights Offering and pursuant to the Registration Statement and Article 7.15(a) of the Plan, each Discount Rights Offering Eligible Holder will receive such holder's Pro Rata share (based upon the total amount of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims eligible to participate in the Discount Rights offering pursuant to Article 7.15(a) of the Plan) of transferable Discount Rights.  In addition, (i) pursuant to the Discount Rights Offering, each Exercising Creditor will receive the opportunity to exercise its Pro Rata portion (with respect to all Exercising Creditors) of Discount Oversubscription Rights and (ii) each Non-exercising Creditor will receive, on the first Periodic Distribution Date occurring after the later of (a) the date when

Notice ~~of Further~~Of Proposed Amendments
~~November 16~~December 3, 2007

the Non-exercising Creditor's General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a the Non-exercising Creditor's General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, such holder's Pro Rata portion (with respect to all Non-exercising Creditors) of the Oversubscription Cash.

(1)     Satisfaction Of TOPrS' Subordination Provision

The Indenture with respect to the Trust Preferred Securities, or TOPrS, dated as of October 28, 2003 (the "TOPrS Indenture"), provides that the TOPrS are subordinated to "Senior Debt." "Senior Debt" is defined as any obligation of Delphi Corporation to its creditors other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the TOPrS, (ii) obligations evidenced by the TOPrS, and (iii) obligations that are expressly stated in the terms of the TOPrS (or in the TOPrS Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 of the TOPrS Indenture with respect to such TOPrS) not to be Senior Debt. In this regard, Delphi covenanted in the TOPrS Indenture that the TOPrS are subordinate and junior in right of payment to all Senior Debt to the extent provided therein, and each holder of the TOPrS covenanted and agreed to the subordination therein provided.

Article 17.01 of the TOPrS Indenture also provides that, in the event that the Corporation shall default on any Senior Debt, no payments shall be made on account of the TOPrS until such default is cured, waived, or shall cease to exist and, in the event of a bankruptcy proceeding all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property (other than securities of the Corporation or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the TOPrS, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) which would otherwise (but for subordination) be payable or deliverable in respect of the TOPrS shall be paid or delivered directly to the Holders of Senior Debt until all Senior Debt shall have been paid in full. This subordination provision essentially provides that, should any payment be made to the TOPrS holders prior to payment in full of Senior Debt (except for certain securities as set forth above), those assets paid shall be held in trust for and turned over to the Senior Debt holders.

The TOPrS Indenture provides that Senior Debt shall not be deemed to have been paid in full unless the holders thereof receive cash, securities, or other property equal to the amount of such Senior Debt then outstanding. Once Senior Debt is paid in full, the holders of the TOPrS are subrogated to Senior Debt's rights to receive further distributions.

Under the Plan, Senior Debt is to be paid in full and the subordination provisions of the TOPrS Indenture are accordingly deemed satisfied. Moreover, the distributions afforded to the holders of TOPrS under the Plan comply with the subordination provisions because the TOPrS essentially receive the distributions remaining after other holders of claims in Class C (General

Unsecured Claims) are paid in full with postpetition interest (as required by the TOPrS Indenture).

(2)    Postpetition Interest

The Plan provides for the payment of postpetition interest on General Unsecured Claims at the applicable contractual non-default rate from the Petition Date through the earlier of the Confirmation Date or January 31, 2008 (and if there is no contract rate, at the Michigan Statutory Rate—that rate of interest provided for in Michigan Compiled Laws § 600.613 (4.845%), calculated as if the Petition Date were the date when the complaint had been filed under Michigan Law). The end date for the accrual of postpetition interest was originally negotiated among the Debtors, the Creditors' Committee, and the Plan Investors, and was incorporated into the Debtors' business plan and financial projections. In consultation with the Creditors' Committee, and as authorized by the Bankruptcy Court in the Solicitation Procedures Order, the Debtors have agreed to send a notice to the affected claimants as part of their Solicitation Package that sets forth this proposed treatment of interest and establishes a procedure by which affected claimants can submit their applicable contractual interest rate to the Debtors (the "Postpetition Interest Rate Determination Notice").

If a party receiving the Postpetition Interest Rate Determination Notice wishes to submit a contractual rate of interest to be paid on account of its claim, the party receiving the notice is required to return the Postpetition Interest Rate Determination Notice to the Voting Agent for General Unsecured Creditors (Kurtzman Carson Consultants) on or before [●], 2007 2008, the same date as the Voting Deadline. The Debtors will then review the Postpetition Interest Rate Determination Notice and, if they disagree with the interest rate requested, file an objection to the notice no later than 30 days after the Effective Date of the Plan. The dispute will then be resolved following the Effective Date of the Plan in accordance with the Debtors' general claim resolution procedures and as more fully described in the Plan.

(ii)    Class D (GM Claim).

Class D consists of the GM Claim that may exist against a particular Debtor. The phrase "GM Claim" means any Claim of GM, excluding any Claim arising as a result of the IRC Section 414(l) Transfer, all Flow-Through Claims of GM, and all other Claims and amounts to be treated in the normal course or arising, paid, or treated pursuant to the Delphi-GM Definitive Documents (including the "GM Surviving Claims" as defined in the Delphi-GM Global Settlement Agreement), but will otherwise include all claims asserted in GM's proof of claim.

As provided in Article 7.20, the Plan constitutes a request to authorize and approve the Restructuring Agreement and the Settlement Agreement. For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claims, GM will receive all consideration set forth in the Delphi-GM Definitive Documents (subject to the terms and conditions set forth in such documents), including, without limitation, (a) $1.2073 billion in liquidation preference (as such amount may be reduced in accordance with the terms of Article 7.15(b) of the Plan) in junior preferred convertible stock with the terms set forth in the Settlement Agreement; (b) $1.5 billion in a

combination of at least $750 million in Cash and the GM Note(s); (c) retention of the GM Surviving Claims (as defined in the Settlement Agreement) as provided for in section 4.03 of the Settlement Agreement; (d) the effectuation of the IRC Section 414(l) Transfer as provided for in section 2.03 of the Settlement Agreement; and (e) the releases as provided for in sections 4.01, 4.02 and 4.03 of the Settlement Agreement.

(iii)   Class E (Section 510(b) Note Claims).

Class E consists of all Section 510(b) Note Claims that may exist against a particular Debtor.  A "Section 510(b) Note Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Note Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Note Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement ~~in the same proportion~~ and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution ~~of New Common Stock and Discount Rights made to the holders of General Unsecured Claims (without application of the intercreditor settlement between~~hereunder for distribution by the ~~Senior Notes and~~disbursing agent appointed by the ~~TOPrS)~~MDL Court.  If any Section 510(b) Opt Out Note Claim ultimately becomes an Allowed Section 510(b) Opt Out Note Claim, however, then the holder of such Allowed Section 510(b) Opt Out Note Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; it being understood that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Note Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(iv)   Class F (Intercompany Claims).

Class F consists of all Intercompany Claims that may exist against a particular Debtor. An "Intercompany Claim" means a Claim by a Debtor, an Affiliate of a Debtor, or a non-Debtor Affiliate against another Debtor, Affiliate of a Debtor, or non-Debtor Affiliate.

Except as otherwise provided in Article 7.2 of the Plan, on the Effective Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, will not receive a distribution on the Effective Date and instead will either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in

which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor affiliate will be Reinstated.

(v)     Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

As described below, holders of Allowed Interests pertaining to Existing Common Stock will receive direct distribution of 469,720 shares of New Common Stock, Par Value Rights exercisable at Plan Equity Value, ~~Five~~Seven-Year Warrants exercisable at a ~~32.4~~20.7% premium to the Plan Equity Value, Six-Month Warrants exercisable at a 9.0% premium to the Plan Equity Value, and ~~Six-Month~~Ten-Year Warrants exercisable at ~~an 8.2% premium to the~~ Plan Equity Value.

On the Effective Date, the Existing Common Stock will be cancelled.  On the Distribution Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Interest pertaining to the Existing Common Stock will receive in exchange for such Interest its Pro Rata distribution of ~~Five~~direct distribution of 469,720 shares of New Common Stock, Seven-Year Warrants ~~and~~, Six-Month Warrants, and Ten-Year Warrants.  On the commencement date of the Par Value Rights Offering and pursuant to the Registration Statement and Article 7.15(b) of the Plan, each holder of an Allowed Interest pertaining to the Existing Common Stock as of the Rights Offerings Record Date will receive its Pro Rata portion of non-transferable Par Value Rights to purchase ~~20,770,345~~21,680,996 shares of New Common Stock pursuant to the Par Value Rights Offering; except that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering may not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock.

(vi)     Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims.  "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement ~~in the same proportion~~ and as may be modified on a non-material basis by

DS-183

the order of the MDL Court in furtherance of the monetization of the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims (without application of the intercreditor settlement between hereunder for distribution by the Senior Notes and disbursing agent appointed by the TOPrS).MDL Court..  If any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, then the holder of such Allowed Section 510(b) Opt Out Equity Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights as is distributed to holders of General Unsecured Claims; it being understood that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

<div style="text-align:center">(vii)    Class H (Section 510(b) ERISA Claims).</div>

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement.

<div style="text-align:center">(viii)    Class I (Other Interests).</div>

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

**F.**    **Means For Implementation Of The Plan**

*1.*    *Continued Corporate Existence*

Subject to the Restructuring Transactions contemplated by the Plan, each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated by the Plan and the Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  There are certain Affiliates

<div style="text-align:center">DS-184</div>

### 7.    *Employment, Retirement, Indemnification, And Other Agreements And Incentive Compensation Programs*

The Debtors must enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors, officers, and employees who will continue in such capacities (or similar capacities) after the Effective Date, all as more fully stated on Exhibit 7.8 attached to the Plan; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described on Exhibit 7.8 to the Plan, may include equity, bonus, and other incentive plans as components of compensation to be paid to executives after the Effective Date (including a long-term incentive plan that assumes 10% of the available shares of Reorganized Delphi's fully diluted New Common Stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity awards).  The Cash and equity emergence awards issued on the Effective Date will be on market terms as determined by the Debtors' board of directors based on the advice of the independent outside advisor to the Compensation Committee, which determination must be reasonably acceptable, on an aggregate basis, to the Creditors' Committee and ADAH.

### 8.    *Procedures For Asserting SERP Claims*

All persons holding or wishing to assert Claims solely on the basis of further pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property.  Any Claims arising out of the SERP after the Effective Date will be disallowed in their entirety.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP and will implement a new supplemental executive retirement program with respect to current eligible employees (subject to the execution of a waiver of claims), all as more fully described on Exhibit 7.8.

### 9.    *Cancellation Of Existing Securities And Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan or as otherwise required in connection with any Cure, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Plan, will be cancelled; provided, however, that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation

a funded senior secured first-lien term facility in an aggregate principal amount of $3.7 billion, and a funded senior secured second-lien term facility in amount of $1.5 billion, of which up to $750 million will be in the form of the GM Note(s), the terms of which are described in the exit financing engagement letter and term sheet attached to the Plan as Exhibit 7.14, as such term sheet may be amended, modified, or supplemented, to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations.  The Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Exit Financing Arrangements.  A more detailed discussion of the Exit Financing Facility is contained in <u>Section VII.D – Exit Financing</u> above.

### 14.    *Rights Offerings*

(a)    <u>Discount Rights Offering</u>

(i)    Eligibility For Participation In Discount Rights Offering

Pursuant to the Registration Statement, and under the terms of Article 5.3 of the Plan and the Investment Agreement, Delphi will commence a Discount Rights Offering to generate gross proceeds of up to $1.575 billion.  Discount Rights Offering Eligible Holders will be offered Discount Rights to purchase up to 41,026,~~310~~309 shares of New Common Stock, in exchange for a Cash payment equal to $38.39 per share of New Common Stock (a ~~37.8~~35.6% discount to the Plan Equity Value).  Rights will be distributed to the Discount Rights Offering Eligible Holders based on each Discount Rights Offering Eligible Holders' Pro Rata allocation of the Discount Rights.  If a Claim of the Discount Rights Offering Eligible Holder is not Allowed or otherwise reconciled by the Debtors by the date of commencement of the Confirmation Hearing, such Claim will be temporarily allowed, solely for purposes of participation in the Discount Rights Offering, in the amount so estimated by the Bankruptcy Court or agreed to by the holder of the claim and the Debtors.  Discount Rights distributed pursuant to the Discount Rights Offering will be transferable.

(ii)    Discount Oversubscription Rights

Under the terms of Article 5.3 of the Plan and consistent with the Investment Agreement, to the extent the Discount Rights Offering is not fully subscribed, Exercising Creditors will be eligible to exercise, at their discretion, Discount Oversubscription Rights to purchase shares of New Common Stock not otherwise purchased through the Discount Rights Offering in exchange for a Cash payment equal to $38.64 per share of New Common Stock for each Discount Oversubscription Right exercised.  To the extent the number of the Discount Oversubscription Rights subscribed for by Exercising Creditors is greater than the number of Discount Oversubscription Rights available, the Discount Oversubscription Rights will be available to Exercising Creditors (based upon such creditors' underlying claim~~s~~) on a Pro Rata basis (with respect to all Exercising Creditors) up to the amount of Discount Oversubscription Rights each Exercising Creditor has elected to exercise, until all Oversubscription Rights have been allocated.

(iii)    Distribution Of New Common Stock

All New Common Stock issued in connection with the exercise of Discount Rights and Discount Oversubscription Rights pursuant to the Discount Rights Offering will be issued on the Effective Date and will be distributed to holders of Rights who have exercised the Rights on, or as soon as reasonably practicable after, the Distribution Date.

(iv)    Exercise Of Discount Rights By Lead Plaintiffs

Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise Discount Rights by delivering to  Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and (ii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness of the Securities Settlement, the amount of the rights offering exercise price in connection with the Discount Rights Offering for the Lead Plaintiffs on behalf of the securities class (collectively, the "MDL Group").  In the event such notice is timely delivered, the Lead Plaintiffs shall cause to be released and/or transferred to Delphi, subsequent to the effectiveness of the Securities Settlement, both (i) the cash proceeds obtained from parties (other than Delphi) to the Securities Settlement (which proceeds have already been received and escrowed pursuant to terms of the Securities Settlement) up to an amount equal to the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering and (ii) if the amount delivered pursuant to clause (i) above does not fully cover the rights offering exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock that the Lead Plaintiffs are to receive as an Allowed Claim pursuant to the terms of the Securities Settlement to cover such shortfall (collectively, the "Relevant Consideration"). Notwithstanding anything contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

(b)    Par Value Rights Offering

(i)    ~~Eligibility For~~ New Common Stock Offered In Par Value Rights Offering

Through the Par Value Rights Offering, ~~20,770,345~~21,680,996 shares of New Common Stock will be made available for subscription to holders of Existing Common Stock.  Of the ~~20,770,345~~21,680,996 shares of New Common Stock made available through the Par Value Rights Offering, ~~6,998,472~~7,421,644 shares of the New Common Stock will consist of New Common Stock otherwise distributable to the following groups of holders of Claims in the following amounts (in each case at $~~59.~~61.72 per share):  (a) ~~611,754~~648,745 shares of New Common Stock otherwise distributable to Appaloosa, (b) all of the New Common Stock distributable to the UAW, IUE-CWA, and USW (the "Contributing Unions") based on such

unions' Allowed Claims, and (c) an amount of New Common Stock otherwise distributable to holders of Claims in Classes 1C through 12C as a whole (excluding the otherwise distributable New Common Stock referred to in clauses (a) and (b)) which is equal to the difference between 6,998,472 7,421,644 shares of New Common Stock and the sum of the number of shares of New Common Stock referred to in clause (a) and (b) (the "Contributing Creditors").

(ii)     Eligibility For Participation In Par Value Rights Offering

Pursuant to the Registration Statement, and under the terms of Article 5.7 of the Plan, Delphi will commence a Par Value Rights Offering pursuant to which each holder of Existing Common Stock on the Rights Offering Record Date will be offered the opportunity to purchase its Pro Rata portion of 20,770,345 21,680,996 shares of New Common Stock, in exchange for a Cash payment equal to $59.61 .72 per share of New Common Stock (which corresponds to an implied enterprise value of $13.4 billion); except that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering will not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock.

(iii)     Use Of Par Value Rights Offering Proceeds

Proceeds, if any, generated by the Par Value Rights Offering will be allocated in the following order:

- First, to satisfy the amount, if any, by which the Liquidity Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement) is less than $3.189 billion (after giving effect to any Excess Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement));

- Second, to satisfy the shortfall, if any, required to satisfy the condition set forth in the third sentence of section 9(a)(xxvii) of the Investment Agreement;

- Third, to satisfy the Allowed Claims of the Contributing Unions, on a Pro Rata basis among the Contributing Unions, based upon the number of shares of New Common Stock contributed by each Contributing Union to the Par Value Rights Offering as described in Article 7.15(b)(i) of the Plan; provided, however, that the distribution of proceeds from the Par Value Rights Offering pursuant to this clause will decrease the number of shares of New Common Stock otherwise distributable to the Contributing Unions pursuant to Article 5.3 of the Plan on a Pro Rata basis based upon the number of shares of New Common Stock contributed to the Par Value Rights Offering by the Contributing Unions as described in Article 7.15(b)(i) of the Plan;

- Fourth, up to $850 million less the amounts, if any, allocated pursuant to the first and second allocations described above, to GM as a Cash distribution, so as to reduce the number of shares of New Preferred Stock, at the price of $59.61 .72 per share, that would be distributed to GM pursuant to Article 5.4 of the Plan; and

Notice of Further Of Proposed Amendments
November 16 December 3, 2007

registration right to any and all 10% Holders, (ii) such demand registration right must not, in any way, conflict with the registration rights of GM or the Plan Investors, and (iii) 10% Holders will not receive piggyback registration rights, except with respect to a demand by another 10% Holder pursuant to this sentence.

(c)     Listing On Securities Exchange Or Quotation System

On the Effective Date, Delphi or Reorganized Delphi will use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on a major New York based exchange.  Persons receiving distributions of more than 5% of New Common Stock, by accepting such distributions, must have agreed to cooperate with Reorganized Delphi's reasonable requests to assist Reorganized Delphi in its efforts to list the New Common Stock on a national securities exchange quotation system.

### 16.     Issuance Of New Preferred Stock

Pursuant to the Investment Agreement, on the Effective Date, Reorganized Delphi will authorize, issue, and deliver the "Series A" and "Series B" New Preferred Stock in exchange for the contribution of the Plan Investors described in Article 7.11 of the Plan.  A summary of selected terms of the "Series A" and "Series B" New Preferred Stock is attached to the Plan as Exhibit 7.17(a).  The issuance and delivery of "Series A" and "Series B" New Preferred Stock will be in accordance with the terms of the Investment Agreement and Section 4(2) of the Securities Act.

Pursuant to the terms of the Delphi-GM Global Settlement Agreement, on the Effective Date, Reorganized Delphi will authorize, issue, and deliver the "Series C" New Preferred Stock to GM.  A summary of the terms of the "Series C" New Preferred Stock is attached as Exhibit G to the Delphi-GM Global Settlement Agreement.  The issuance and delivery of the "Series C" New Preferred Stock will be in accordance with the terms of the Delphi-GM Global Settlement Agreement and section 1145(a) of the Bankruptcy Code.

### 17.     New Warrants

(a)     ~~Five~~Seven-Year Warrants

On the Effective Date, Reorganized Delphi will authorize, and no later than the Distribution Date Reorganized Delphi shall issue, and deliver the ~~Five~~Seven-Year Warrants, pursuant to the terms of the ~~Five~~Seven-Year Warrant Agreement attached to the Plan as Exhibit 7.18(a), for 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted New Common Stock) at a strike price of $~~81.73~~71.93 per share (a ~~32.4~~20.7% premium to the Plan Equity Value).  The issuance of the ~~Five~~Seven-Year Warrants and the New Common Stock underlying the ~~Five~~Seven-Year Warrants will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the ~~Five~~Seven-Year Warrants will be used by Reorganized Delphi for general corporate purposes.

(b)    Six-Month Warrants

On the Effective Date, Reorganized Delphi will authorize, and no later than the Distribution Date Reorganized Delphi shall issue, and deliver the Six-Month Warrants, pursuant to the terms of the Six-Month Warrant Agreement attached to the Plan as Exhibit 7.18(b), to purchase up to $1 billion of shares New Common Stock of Reorganized Delphi at a strike price of $66.7965.00 per share (an 8.2a 9.0% premium to the Plan Equity Value). The issuance of the Six-Month Warrants and the New Common Stock underlying the Six-Month Warrants will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. The proceeds generated from the exercise of the Six-Month Warrants will be allocated in the following order: first, to redeem any shares of "Series C" New Preferred Stock distributed to GM, if any shares remain outstanding, at the preferred liquidation preference value as defined in Exhibit G to the Delphi-GM Global Settlement Agreement; second, to redeem the GM Note(s), at par including accrued and unpaid interest; third, to be used by Reorganized Delphi for general corporate purposes.

(c)    Ten-Year Warrants

On the Effective Date, Reorganized Delphi will authorize, and no later than the Distribution Date Reorganized Delphi shall issue, and deliver the Ten-Year Warrants, pursuant to the terms of the Ten-Year Warrant Agreement attached to the Plan as Exhibit 7.18(c), for 2,819,901 shares of New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted New Common Stock) at a strike price of $59.61 per share. The issuance of the Ten-Year Warrants and the New Common Stock underlying the Ten-Year Warrants must be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. The proceeds generated from the exercise of the Ten-Year Warrants will be used by Reorganized Delphi for general corporate purposes.

## 18.    MDL Settlements

The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

(a)    Securities Settlement

Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the Securities Settlement, a copy of which is attached to the Plan as Exhibit 7.19(a), becomes a Final Order, Reorganized Delphi will, in accordance with

the Securities Settlement, distribute the New Common Stock and Discount Rights described in Articles 5.5 and 5.8 of the Plan to the disbursing agent appointed by the MDL Court.  Such distribution shall be made in accordance with any order entered by the MDL Court which modifies distributions under the Securities Settlement on a non-material basis in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court.  Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise Discount Rights by delivering to deliver to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and (ii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness of the Securities Settlement, the amount of the rights offering exercise price in connection with the Discount Rights Offering for the Lead Plaintiffs on behalf of the securities class as described more particularly in Article 7.15(a)(iv) of the Plan. Notwithstanding anything contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

(b)    ERISA Settlement

–Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the ERISA Settlement, a copy of which is attached to the Plan as Exhibit 7.19(b), becomes a Final Order, Reorganized Delphi will, in accordance with the ERISA Settlement, distribute the New Common Stock and Discount Rights described in Articles 5.9 of the Plan to the disbursing agent appointed by the MDL Court.

(c)    Insurance Settlement

In connection with the Securities Settlement and the ERISA Settlement, Delphi, certain defendants in the MDL Actions, and Delphi's insurers entered into the Insurance Settlement, a copy of which is attached to the Plan as Exhibit 7.19(c).

## 19.  GM Settlement

The Plan constitutes a request to authorize and approve the (a) Settlement Agreement, attached to the Plan as Exhibit 7.20(a), that will resolve the GM Claims, and (b) the Restructuring Agreement, attached to the Plan as Exhibit 7.20(b), that will set forth the continuing obligations of GM and Delphi, which will become effective on the Effective Date, subject to the terms contained therein.  Each of the Settlement Agreement and Restructuring Agreement are incorporated by reference into this Plan in their entirety.  In that regard, the Settlement Agreement and Restructuring Agreement address issues specifically relating to the present and future relationship of Delphi, GM, and their Affiliates that are otherwise addressed in this Plan and as they are intended to relate to holders of other Claims and Interests.  For example, sections 4.01, 4.02, and 4.03 of the Settlement Agreement require that the Plan contain the

Agreement.  To the extent that Cure has not already been agreed to between the Debtor party to the agreement and the non-Debtor party, the Debtors or Reorganized Debtors will provide each party whose Material Supply Agreement is being assumed or assumed and assigned pursuant to the Plan, in accordance with the Cure procedures established under the Solicitation Procedures Order, with a notice that will provide:  (i) the contract or lease being assumed or assumed and assigned; (ii) the name of the proposed assignee, if any; (iii) the proposed cure amount (the "Cure Amount Claim"), if any, that the applicable Debtor or Reorganized Debtor believes it (or its assignee) would be obligated to pay in connection with such assumptions; (iv) an election for the payment terms of the Cure Amount Claim, and (v) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Claim Amount (the "Cure Amount Notice").  The Cure Amount Notice will be in substantially the form approved by the Bankruptcy Court under the Solicitation Procedures Order and will be served on each non-Debtor party or parties to a Material Supply Agreement.  If the non-Debtor party does not timely respond to the Cure Amount Notice, the Cure Amount Claim will be paid in New Common Stock and Discount Rights in the same proportion as that received by holders of Allowed General Unsecured Claims on or as soon as reasonably practicable after the Effective Date.  If the non-Debtor party responds to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order and the non-Debtor party asserts a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (z) any other matter pertaining to assumptions, Cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  If there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a final order establishing a Cure amount in excess of that provided by the Debtors.  The Creditors' Committee shall be provided access to proposed Cure Claim payments above a threshold amount to be reasonably agreed upon the Creditors' Committee and the Debtors, after which the Creditors' Committee may object to a proposed Cure Claim payment; provided, however, that any unreasonable objection shall be determined by the Bankruptcy Court after notice and hearing.

(b)    Other Executory Contracts And Other Unexpired Leases

The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed under the Plan which are or may be in default will be satisfied solely by Cure.  Any party to an Other Executory Contract or Other Unexpired Lease who wishes to assert that Cure shall be required as a condition to assumption must file and serve a proposed Cure Claim so as to be received by the Debtors or Reorganized Debtors, as applicable, and their counsel at the address set forth in Article 14.8 of the Plan within 45 days after entry of the Confirmation Order (the "Cure Claim Submission Deadline"), after which the Debtors or Reorganized Debtors, as the case may be, will have 45 days to file any objections thereto.  Should a party to an Other Executory Contract or Other Unexpired Lease not file a proposed Cure Claim by the Cure Claim Submission Deadline in accordance with the procedures set forth in the Plan, then any default then existing will be deemed cured as of the day following the Cure Claim Submission Deadline and such party will forever be barred from asserting against the Debtors or the Reorganized

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

**released under the Plan pursuant to Article 11.4 and Article 11.5 of the Plan; provided, that such releases and exculpations will not prohibit or impede the Debtors' ability to assert defenses or counterclaims in connection with or relating to the Original Agreement or the Original PSA.**

### 9. Setoffs

Subject to Article 11.13 of the Plan, the Debtors may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

### 10. Subordination Rights

All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, will be deemed satisfied by the distributions under the Plan to holders of Claims having such subordination rights. Such, and such subordination rights will be deemed waived, released, discharged, and terminated as of the Effective Date; provided, that the subordination rights of the holders of Senior Debt (as such term is defined in the Subordinated Notes Indenture) will be deemed satisfied through the distributions described in Article 5.3 of the Plan, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims will receive a distribution equal to 90% of the principal and accrued prepetition interest of the TOPrS. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.

Except as otherwise provided in the Plan (including any Plan Exhibits) or the Confirmation Order, the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will be modified to reflect such subordination. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions will be made on account of a Claim, subordinated pursuant to Article 11.910(b) unless the Claims senior to such subordinated Claims are satisfied in full.

### 11. Exculpation And Limitation Of Liability

**Subject to Article 11.13 of the Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the**

Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

### 13.    Exclusions And Limitations On Exculpation, Indemnification, And Releases

Notwithstanding anything in the Plan to the contrary, no provision of the Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, will modify, release, or otherwise limit the liability of any Person not specifically released under the Plan, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

### 14.    Injunction

**Subject to Article 11.13 of the Plan, the satisfaction, release, and discharge pursuant to Article XI of the Plan will act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## X.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

Every holder of a Claim against or Interest in a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims and Interests may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all. The recapitalization of the Debtors realizes the going concern value of the Debtors for the holders of Claims and Interests. Moreover, reorganization of the Debtors' business and operations under the proposed Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of its customers and suppliers.

### B.    Certain Bankruptcy Considerations

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan. If a liquidation or protracted and litigated reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

detriment of all stakeholders.  See Appendix E attached to this Disclosure Statement for a liquidation analysisanalyses of the Debtors, showing hypothetical chapter 7 liquidation scenarios.

Prior to and during the hearing on this Disclosure Statement, several parties interposed objections related to the confirmability of the Debtors' Plan.  The objections were filed with the Bankruptcy Court and can be reviewed by accessing the Bankruptcy Court's docket or the Debtors' Legal Information Website, www.delphidocket.com.  The parties that filed these objections include the Creditors' Committee, the Equity Committee, the Ad Hoc Committee of Trade Creditors, Wilmington Trust Company as indenture trustee, Law Debenture Trust Company of New York as indenture trustee, and an ad hoc group of bondholders (the "Objectors").

The Debtors believe these objections are without merit and, to the extent that the Objectors press these objections at the Confirmation Hearing and agreement is not reached with the Objectors prior to the Confirmation Hearing, the Debtors believe that they will prevail on these issues at confirmation.  The summary below is meant only to provide a general overview of the objections raised by certain of the Objectors.  Certain of the Objectors have alleged the issues summarized below and may continue to prosecute the following objections:

- The Plan allegedly treats claims in the same class differently and is unfairly discriminatory.  In particular, certain Objectors claim that the Plan's proposed treatment of TOPrS claims is different from other general unsecured claims.

- The fact that the Plan does not provide for payment of no postpetition interest on disputed claims pending dispute resolution allegedly may render the Plan unconfirmable.

- Classification of certain claims under the Plan is allegedly improper.  In particular, certain Objectors believe the inclusion of the TOPrS claims within Class C (General Unsecured Claims) may be impermissible.

- The Plan allegedly does not satisfy the "fair and equitable" or absolute priority requirements because certain junior creditors and interest holders receive distributions.

- The third-party releases provided by the Plan are alleged to be overbroad and violate applicable law.

- The substantive consolidation that may be effected by the Plan is alleged to be unsupportable by applicable law or the facts of these Chapter 11 Cases.

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007

of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Other Interests in Delphi are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Interests.  Such Classes therefore are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtors are seeking confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Classes, the Debtors believe that such Classes are being treated fairly and equitably under the Bankruptcy Code.  The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

## B.    Conditions To Confirmation And Consummation Of The Plan

### 1.    Conditions To Confirmation

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Article 12.3 of the Plan, as described in Section XIV.C. – Waiver Of Conditions To Confirmation And Consummation Of The Plan below:

- The Bankruptcy Court must have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance acceptable to the Debtors. (Article 12.1(a) of the Plan.)

- The Confirmation Order must be in form and substance acceptable to the Debtors, and the Plan Investors must be reasonably satisfied with the terms of the

DS-259

Confirmation Order to the extent that such terms would have a material impact on the Plan Investors' proposed investment in the Reorganized Debtors. (Article 12.1(b) of the Plan.)

2.    *Conditions To The Effective Date*

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Plan, as described in Section XIV.C. – Waiver Of Conditions To Confirmation And Consummation Of The Plan below:

- The Reorganized Debtors must have entered into the Exit Financing Arrangements and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof. (Article 12.2(a) of the Plan.)

- The Bankruptcy Court must have approved the settlement between the Debtors and GM as documented in the Delphi-GM Definitive Documents, the Delphi-GM Definitive Documents must have become effective in accordance with their terms, and GM must have received the consideration from Delphi pursuant to the terms of the Settlement Agreement. (Article 12.2(b) of the Plan.)

- The Bankruptcy Court must have entered one or more orders, which may include the Confirmation Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Plan. (Article 12.2(c) of the Plan.)

- The Confirmation Order must have been entered by the Bankruptcy Court and must be a Final Order, the Confirmation Date must have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code must may have been made, or, if made, may remain pending. (Article 12.2(d) of the Plan.)

- Each Exhibit, document, or agreement to be executed in connection with the Plan must be in form and substance reasonably acceptable to the Debtors. (Article 12.2(e) of the Plan.)

- The Bankruptcy Court must have entered one or more orders, which may be the Confirmation Order, approving the MDL Settlements. (Article 12.2(f) of the Plan.)

- The MDL Court must have entered one or more orders approving the MDL Settlements. (Article 12.2(g) of the Plan.)

- All conditions to the effectiveness of the Investment Agreement must have been satisfied or waived in accordance with the terms of the Investment Agreement. (Article 12.2(h) of the Plan.)

- The aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed must be have been allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.45 billion, excluding all applicable accrued Postpetition Interest thereon. (Article 12.2(i) of the Plan.)

- All conditions to effectiveness in the Delphi-GM Definitive Documents must have been satisfied or waived in accordance with the terms of the Delphi-GM Definitive Documents. (Article 12.2(j) of the Plan.)

### C.    Waiver Of Conditions To Confirmation And Consummation Of The Plan

The conditions set forth in Articles 12.1(a), 12.2(c), and 12.2(e) of the Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The conditions set forth; provided, however that in (i) Article 12.2(d) may be waived jointly byconnection with the Debtors, Appaloosa, and GM, provided, however, that satisfaction or waiver of the Confirmation Order has been entered bycondition set forth in Article 12.2(e) the Bankruptcy CourtPlan, no material modification of the Investment Agreement, the Delphi-GM Definitive Documents and the exhibits to each such agreements that have a material adverse effect on the recoveries of unsecured creditors may be made without the consent of the Creditors' Committee and (ii)the respective non-Debtor counterparty to the agreement.  Article 12.2(i) of the Plan may be waived jointly by the Debtors and Appaloosa (as lead Plan Investor);, provided, however, that no waiver of Article 12.2(i) willof the Plan shall be effective unless notice is first given to the Creditors' Committee; provided further, however, that such waiver willshall be effective upon the earlier of (i) the Creditors' Committee's consent and (ii) 12:00 noon New York time on the third Business Day after the notice is given to the Creditors' Committee unless the Creditors' Committee has provided written notice pursuant to Article 14.8 of the Plan that the Creditors' Committee has voted affirmatively to object to the effectiveness of the waiver solely on the basis that the recoveries of unsecured creditors would be materially adversely affected if the waiver waswere implemented (and in such case the waiver willshall not become effective unless the Bankruptcy Court thereafter determines that the effectiveness of the waiver would not materially adversely affect unsecured creditors' recoveries).  No other condition set forth in Articles 12.1 and 12.2 hereofof the Plan may be waived.  The failure of the Debtors to exercise any of the foregoing rights willshall not be deemed a waiver of any other rights, and each such right willshall be deemed an ongoing right, which may be asserted at any time.

### D.    Retention Of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among others, the following matters:

(a)    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and

Notice of FurtherOf Proposed Amendments
November 16December 3, 2007