## EXHIBIT B

Joint Plan Of Reorganization (Appendix A to the Disclosure Statement) changed pages,
blacklined to show proposed changes since November 14, 2007

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                  :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
### DELPHI CORPORATION AND CERTAIN AFFILIATES,
### DEBTORS AND DEBTORS-IN-POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Toll Free: (800) 718-5305
International: (248) 813-2698
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan L. Stuart (NS 7872)

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
(248) 813-2000
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated: ~~November 29~~December 6, 2007
     New York, New York

## EXHIBITS

| | |
|---|---|
| **Exhibit 7.3** | **Restructuring Transactions Notice** |
| **Exhibit 7.4(a)** | **Certificate Of Incorporation For Reorganized Delphi** |
| **Exhibit 7.4(b)** | **Bylaws Of Reorganized Delphi** |
| **Exhibit 7.8** | **Management Compensation Plan** |
| **Exhibit 7.11** | **Investment Agreement** |
| **Exhibit 7.14** | **Exit Financing Engagement Letter And Term Sheet** |
| **Exhibit 7.16(a)** | **Summary Of Terms Of New Common Stock** |
| **Exhibit 7.16(b)** | **Registration Rights Agreement** |
| **Exhibit 7.17(a)** | **Summary Of Terms Of Series A and B New Preferred Stock** |
| **Exhibit 7.18(a)** | **~~Five~~Seven-Year Warrant Agreement** |
| **Exhibit 7.18(b)** | **Six-Month Warrant Agreement** |
| **Exhibit 7.18(c)** | **Ten-Year Warrant Agreement** |
| **Exhibit 7.19(a)** | **Securities Settlement Stipulation** |
| **Exhibit 7.19(b)** | **ERISA Settlement Stipulation** |
| **Exhibit 7.19(c)** | **Insurance Settlement Stipulation** |
| **Exhibit 7. 20(a)** | **Delphi-GM Global Settlement Agreement** |
| **Exhibit 7. 20(b)** | **Delphi-GM Master Restructuring Agreement** |
| | |
| **Exhibit 7. 21(a)** | **UAW 1113/1114 Settlement Approval Order** |
| | Exhibit 1    UAW-Delphi-GM Memorandum of Understanding |
| **Exhibit 7. 21(b)** | **IUE-CWA 1113/1114 Settlement Approval Order** |
| | Exhibit 1    IUE-CWA Memorandum Of Understanding |
| **Exhibit 7. 21(c)** | **USW 1113/1114 Settlement Approval Order** |
| | Exhibit 1    USW Home Avenue Memorandum Of Understanding |
| | Exhibit 2    USW Vandalia Memorandum Of Understanding |
| **Exhibit 7. 21(d)** | **IUOE, IBEW, And IAM 1113/1114 Settlement Agreement Order** |
| | Exhibit 1    IUOE Local 832S Memorandum Of Understanding |

x

## INTRODUCTION

Delphi Corporation and certain of its direct and indirect subsidiaries, debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 Cases, hereby propose this joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors.  Capitalized terms used herein shall have the meanings ascribed to them in Article I.B. of this Plan.

The subsidiaries of Delphi incorporated outside of the United States are not the subject of the Chapter 11 Cases.

These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The distributions to be made to holders of Claims and Interests are set forth herein.

This Plan provides for the substantive consolidation of certain of the Estates, but only for the purposes of voting and making distributions to holders of Claims and Interests under this Plan.  Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a holder of a Claim or Interest until the Disclosure Statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Interests.  The Disclosure Statement relating to this Plan was approved by the Bankruptcy Court on NovemberDecember ●, 2007, and has been distributed simultaneously with this Plan to all parties whose votes are being solicited.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, and certain related matters including, among other things, the securities to be issued under this Plan.  ALL HOLDERS OF CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, each of the Debtors expressly reserves its respective rights to alter, amend, modify, revoke, or withdraw this Plan with respect to such Debtor, one or more times, prior to this Plan's substantial consummation.

A complete list of the Debtors is set forth below.  The list identifies each Debtor by its case number in these Chapter 11 Cases.

**1.60** **"Disclosure Statement"** means the written disclosure statement (including all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.61** **"Discount Oversubscription Right"** means a right to subscribe for shares of New Common Stock not otherwise purchased by the exercise of Discount Rights pursuant to the Discount Rights Offering as detailed, and at the price per share set forth, in Article 7.15(a)) of this Plan.

**1.62** **"Discount Right"** means a Right issued pursuant to the Discount Rights Offering.

**1.63** **"Discount Rights Offering"** means the offer and sale by Reorganized Delphi pursuant to an SEC registered rights offering whereby Discount Rights Offering Eligible Holders shall be offered, on a proportionate basis, the Right to purchase in the aggregate up to 41,026,310309 shares of New Common Stock, in exchange for a Cash payment equal to $38.39 per share of New Common Stock.

**1.64** **"Discount Rights Offering Eligible Holders"** means holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims on the Rights Offering Record Date or transferees receiving such holders' Discount Rights.

**1.65** **"Disputed Claim" or "Disputed Interest"** means a Claim or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

**1.66** **"Distribution Date"** means the date, selected by the Reorganized Debtors, upon which distributions to holders of Allowed Claims and Allowed Interests entitled to receive distributions under this Plan shall commence; provided, however, that the Distribution Date shall occur as soon as reasonably practicable after the Effective Date, but in any event no later than 30 days after the Effective Date.

**1.67** **"Distribution Reserve"** means, as applicable, one or more reserves of New Common Stock, New Warrants, or Oversubscription Cash, for distribution to holders of Allowed Claims or Allowed Interests in the Chapter 11 Cases to be reserved pending allowance of Disputed Claims or Disputed Interests in accordance with Article 9.8 of this Plan.

**1.68** **"Effective Date"** means the Business Day determined by the Debtors on which all conditions to the consummation of this Plan set forth in Article 12.2 of this Plan have been either satisfied or waived as provided in Article 12.3 of this Plan and the day upon which this Plan is substantially consummated.

**1.69** **"Employee-Related Obligation"** means a Claim of an employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for wages, salary, commissions, or benefits and (i) for which the filing of a proof of claim was not required by

1.81    **"Existing Securities"** means, collectively, the Senior Notes, the Subordinated Notes, and the Existing Common Stock.

1.82    **"Exit Financing Arrangements"** means the new financing arrangements pursuant to the terms of (a) the exit financing term sheets, as the same may be amended, modified, or supplemented from time to time, copies of which are attached hereto as Exhibit 7.14, and (b) any and all additional documents related thereto.

1.83    **"Face Amount"** means, (a) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount claimed by the holder of a Claim in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim (including applicable Postpetition Interest).

1.84    **"Final Order"** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

1.85    **"Five-Year Warrant Agreement"** means that certain warrant agreement governing the Five-Year Warrants to be issued by Reorganized Delphi, substantially in the form attached hereto as Exhibit 7.18(a).

1.86    **"Five-Year Warrants"** means the warrants to be issued on the Effective Date pursuant to the terms of the Five-Year Warrant Agreement to purchase 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted New Common Stock) at a strike price of $81.73 per share.

1.871.85    **"Flow-Through Claim"** means a claim arising from (a) an Ordinary Course Customer Obligation to a customer of Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (b) an Environmental Obligation (excluding those environmental obligations that were settled or capped during the Chapter 11 Cases (to the extent in excess of the capped amount)), (c) an Employee-Related Obligation (including worker compensation and unemployment compensation claims) asserted by an hourly employee that is not otherwise waived pursuant to the Union Settlement Agreements, (d) any Employee-Related Obligation asserted by a salaried, non-executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (e) any Employee-Related Obligation asserted by a salaried executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement and has entered into a new employment agreement as described in Article 7.8 of this Plan, and (f) litigation exposures and

members of management, directors, and other employees on and after the Effective Date, as set forth on Exhibit 7.8 hereto.

1.1301.128    "Material Supply Agreement" means any agreement to which any of the Debtors is a party and pursuant to which the Debtors purchase materials which are directly incorporated into one or more of the Debtors' products.

1.1311.129    "MDL Actions" means those certain actions consolidated in that certain multi-district litigation proceeding captioned In re Delphi Corporation Securities, Derivative & ERISA Litigation, MDL No. 1725 (GER), pending in the United States District Court for the Eastern District of Michigan, related to certain actions for damages arising from the purchase or sale of the Senior Notes, the TOPrS, the Subordinated Notes, or Existing Common Stock, for violations of the securities laws, for violations of ERISA, misrepresentations, or any similar Claims.

1.1321.130    "MDL Court" means the United States District Court for the Eastern District of Michigan.

1.131    "MDL Group" has the meaning ascribed to it in Article 7.15(a)(iv) of this Plan.

1.1331.132    "MDL Settlements" means, collectively, the ERISA Settlement, the Securities Settlement, and the Insurance Settlement.

1.1341.133    "Michigan Statutory Rate" means 4.845% as provided for in Michigan Compiled Laws § 600.6013(8), and shall be calculated on a non-compounding basis, commencing as of the Petition Date.

1.1351.134    "New Common Stock" means the shares of new common stock of Reorganized Delphi, authorized under Article 7.16 of the Plan and under the Certificate of Incorporation of Reorganized Delphi.

1.1361.135    "New Preferred Stock"  means the shares of preferred stock of Reorganized Delphi authorized under Article 7.17 of this Plan and under the Certificate of Incorporation of Reorganized Delphi.

1.1371.136    "New Warrants" means the FiveSeven-Year Warrants and, the Sixth-Month Warrants, and the Ten-Year Warrants.

1.1381.137    "Non-exercising Creditor" means a Discount Rights Offering Eligible Holder who does not exercise or transfer its Discount Rights.

1.1391.138    "Non-Represented Term Sheet" means the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees entered into between Delphi and GM, dated August 3, 2007.

1.1401.139    "OPEB" means other post-employment benefits obligations.

Notice of Further Proposed AmendmentsDelphi Board of Directors--Draft
November 14            December 2, 2007

~~1.141~~1.140    **"Ordinary Course Customer Obligation"** means any Claim of a customer to which Delphi supplies goods or services, which Claim arises from ordinary course customer/supplier obligations owing between Delphi and a customer including recall, product liability, and warranty obligations.

~~1.142~~1.141    **"Ordinary Course Professionals Order"** means the order entered by the Bankruptcy Court on November 4, 2005 authorizing the retention of professionals utilized by the Debtors in the ordinary course of business.

~~1.143~~1.142    **"Other Executory Contract"** means any executory contract, other than a Material Supply Agreement and Other Unexpired Lease, to which any of the Debtors is a party.

~~1.144~~1.143    **"Other Interests"** means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

~~1.145~~1.144    **"Other Unexpired Lease"** means any unexpired lease, other than a Material Supply Agreement and Other Executory Contract, to which any of the Debtors is a party.

~~1.146~~1.145    **"Oversubscription Cash"** means the product of (a) $0.25 and (b) the number of Discount Oversubscription Rights that have been exercised.

~~1.147~~1.146    **"Par Value Right"** means a Right issued pursuant to the Par Value Rights Offering.

~~1.148~~1.147    **"Par Value Rights Offering"** means the offer and sale by Reorganized Delphi pursuant to an SEC-registered rights offering whereby holders of Existing Common Stock on the Rights Offering Record Date shall be offered, on a proportionate basis, the opportunity to purchase in the aggregate up to ~~20,770,345~~21,680,996 shares of the New Common Stock in exchange for a Cash payment ~~of $~~equal to $59.~~61.72~~ per share of New Common Stock.

~~1.149~~1.148    **"PBGC"** means the Pension Benefit Guaranty Corporation.

~~1.150~~1.149    **"Periodic Distribution Date"** means, as applicable, (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date and (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date.

~~1.151~~1.150    **"Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

~~1.152~~1.151    **"Petition Date"** means, as applicable, (a) October 8, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date or (b) October 14, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date.

1.196    **"Seven-Year Warrant Agreement"** means that certain warrant agreement governing the Seven-Year Warrants to be issued by Reorganized Delphi, substantially in the form attached hereto as Exhibit 7.18(a).

1.197    **"Seven-Year Warrants"** means the warrants to be issued on the Effective Date pursuant to the terms of the Seven-Year Warrant Agreement to purchase 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted New Common Stock) at a strike price of $71.93 per share.

~~1.197~~1.198    **"Six-Month Warrant Agreement"** means that certain warrant agreement governing the Six-Month Warrants to be issued by Reorganized Delphi, substantially in the form attached hereto as Exhibit 7.18(b).

~~1.198~~1.199    **"Six-Month Warrants"** means the warrants to be issued on the Effective Date pursuant to the terms of the Six-Month Warrant Agreement to purchase up to $1.0 billion of New Common Stock in Reorganized Delphi at a strike price of $~~66.79~~65.00 per share.

~~1.199~~1.200    **"Solicitation Procedures Order"** means the order entered by the Bankruptcy Court on ~~November~~December ●, 2007 authorizing the procedures by which solicitation of votes on this Plan is to take place, among other matters.

~~1.200~~1.201    **"Specialty Electronics Debtors"** means, collectively, Specialty Electronics, Inc. and Specialty Electronics International Ltd., as substantively consolidated for Plan purposes.

~~1.201~~1.202    **"Statutory Committees"** means the Creditors' Committee and the Equity Committee.

~~1.202~~1.203    **"Subordinated Notes"** means those notes issued pursuant to the Subordinated Notes Indenture.

~~1.203~~1.204    **"Subordinated Notes Holder"** means a holder of Subordinated Notes.

~~1.204~~1.205    **"Subordinated Notes Indenture"** means that certain indenture for the subordinated debt securities between Delphi Corporation and Bank One Trust Company, N.A., as trustee indenture, dated as of October 28, 2003.

~~1.205~~1.206    **"Subordinated Notes Indenture Trustee"** means the trustee under the Subordinated Notes Indenture.

1.207    **"Ten-Year Warrant Agreement"** means that certain warrant agreement governing the Ten-Year Warrants to be issued by Reorganized Delphi, substantially in the form attached hereto as Exhibit 7.18(c).

1.208    **"Ten-Year Warrants"** means the warrants to be issued on the Effective Date pursuant to the terms of the Ten-Year Warrant Agreement to purchase 2,819,901 shares of

New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted New Common Stock) at a strike price of $59.61 per share.

1.206 **1.209** **"TOPrS"** means (a) those 8.25% Cumulative Trust Preferred Securities issued by Delphi Trust I and (b) those Adjustable Rate Trust Preferred Securities issued by Delphi Trust II.

1.207 **1.210** **"TOPrS Claim"** means a Claim of a Subordinated Notes Holder arising under or as a result of the Subordinated Notes.

1.208 **1.211** **"Trade and Other Unsecured Claims"** means all Cure Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and General Unsecured Claims, other than Senior Note Claims, TOPrS Claims, and any other Claim that, as listed as of August 3, 2007 in the claims register maintained by the Claims Agent, would have been classified in one of the foregoing Classes of Claims but has been or otherwise will be reclassified as an Administrative Claim, Priority Tax Claim, or Secured Claim for purposes of being treated under the Plan.

1.209 **1.212** **"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions, and other affiliated entities.

1.210 **1.213** **"UAW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on July 19, 2007 approving the UAW-Delphi-GM Memorandum of Understanding.

1.211 **1.214** **"UAW Benefit Guarantee"** means the benefit guarantee agreement between GM and the UAW, dated September 30, 1999.

1.212 **1.215** **"UAW Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the UAW-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the UAW regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the UAW Benefit Guarantee.

1.213 **1.216** **"UAW-Delphi-GM Memorandum of Understanding"** means that certain memorandum of understanding, dated June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007, among the UAW, Delphi, and GM, and all attachments and exhibits thereto and all UAW-Delphi collective bargaining agreements referenced therein as modified.

1.214 **1.217** **"Unimpaired"** means, with respect to a Claim, any Claim that is not Impaired.

1.215 **1.218** **"Union Settlement Agreements"** means, collectively, the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUE-CWA Benefit Guarantee Term Sheet,

Notice of Further Proposed AmendmentsDelphi Board of Directors--Draft
November 14December 2, 2007

**Class 1J through Class 12J**          (Interests in the Affiliate Debtors)

**4.2    Impaired Classes Of Claims And Interests.**  The following Classes of Claims and Interests are Impaired by the Plan:

| | |
|---|---|
| **Class 1C through Class 12C** | (General Unsecured Claims) |
| **Class 1D through Class 12D** | (GM Claim) |
| **Class 1E** | (Section 510(b) Note Claims) |
| **Class 1F through Class 12F** | (Intercompany Claims) |
| **Class 1G-1** | (Existing Common Stock) |
| **Class 1G-2** | (Section 510(b) Equity Claims) |
| **Class 1H, 8H** | (Section 510(b) ERISA Claims) |
| **Class 1I** | (Other Interests) |

# ARTICLE V

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

**5.1    Class 1A through Class 12A (Secured Claims).**  Except as otherwise provided in and subject to Article 9.8 of this Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim shall be satisfied in full in Cash or Reinstated. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied.  Notwithstanding the foregoing, any Claim arising as a result of a tax lien that would otherwise be a Secured Claim shall be paid in accordance with Article 2.2 of this Plan.

**5.2    Class 1B through Class 12B (Flow-Through Claims).**  The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, shall be unaltered by the Plan and shall be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which shall be fully preserved).  The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court.

**5.3    Class 1C through Class 12C (General Unsecured Claims).**  Pursuant to clauses (a) and (b) below, holders of Allowed General Unsecured Claims shall receive New Common Stock and Discount Rights equal to the ~~value~~allowed amount of 100% of such holders' Allowed General Unsecured Claims plus applicable Postpetition Interest, in the ratio described below.

~~Notice of Further Proposed Amendments~~Delphi Board of Directors--Draft
~~November 14~~            December 2, 2007

**(a)**    Except as otherwise provided in and subject to Articles 7.15(b), 9.8, and 11.10 of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, and after giving effect to Article 11.10 of this Plan, each holder of an Allowed General Unsecured Claim shall receive the number of shares of New Common Stock (at Plan Equity Value) equal to ~~75.5~~77.3% of such Claim (including any applicable Postpetition Interest~~)~~); provided, however, that in each case fractional shares of New Common Stock shall not be distributed to holders of Allowed General Unsecured Claims, and all such fractional shares shall be rounded, and distributions shall be made, in accordance with Article 9.10 of this Plan.  The Plan Equity Value is equal to the Debtors' total enterprise value of $13.~~4~~3 billion, less net debt and warrant value of approximately $5.~~3~~4 billion, which results in a distributable equity value of $~~7.8~~.1 billion, or $~~59~~.61.~~72~~ per share of New Common Stock based on 131,266,~~410~~407 shares issued and outstanding (assuming full conversion of the New Preferred Stock) as of the Effective Date (the "Plan Equity Value").

**(b)**    In satisfaction of the remaining portion of each holders' General Unsecured Claim (after accounting for the distributions to take place pursuant to clause (a)), on the commencement date of the Discount Rights Offering and pursuant to the Registration Statement and Article 7.15(a) of this Plan, each Discount Rights Offering Eligible Holder shall receive such holder's Pro Rata share (based upon the total amount of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims eligible to participate in the Discount Rights Offering pursuant to Article 7.15(a) of the Plan) of transferable Discount Rights.  In addition, (i) pursuant to the Discount Rights Offering, each Exercising Creditor ~~will~~shall receive the opportunity to exercise its Pro Rata portion (with respect to all Exercising Creditors) of Discount Oversubscription Rights and (ii) each Non-exercising Creditor ~~will~~shall receive, on the first Periodic Distribution Date occurring after the later of (a) the date when ~~the~~ such Non-exercising Creditor's General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when ~~a the~~ such Non-exercising Creditor's General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, such holder's Pro Rata portion (with respect to all Non-exercising Creditors) of the Oversubscription Cash.

**5.4    Class 1D through Class 12D (GM Claim).**  As provided in Article 7.20, this Plan constitutes a request to authorize and approve the Delphi-GM Master Restructuring Agreement ("RA") and the Delphi-GM Global Settlement Agreement ("GSA").  For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claim, GM shall receive all consideration set forth in the Delphi-GM Definitive Documents (subject to the terms and conditions set forth in such documents), including, without limitation, (a) $1.~~20~~73 billion in liquidation preference (as such amount may be reduced in accordance with the terms of Article 7.15(b) of the Plan) in junior preferred convertible stock with the terms set forth in the GSA; (b) $1.5 billion in a combination of at least $750 million in Cash and the GM Note(s); (c) retention of the GM Surviving Claims (as defined in the GSA) as provided for in section 4.03 of the GSA; (d) the effectuation of the IRC

Section 414(l) Transfer as provided for in section 2.03 of the GSA; and (e) the releases as provided for in sections 4.01, 4.02, and 4.03 of the GSA.

**5.5    Class 1E (Section 510(b) Note Claims)**.  In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent shall receive, on behalf of all holders of Section 510(b) Note Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Note Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court; provided, however, that if any Section 510(b) Opt Out Note Claim ultimately becomes an Allowed Section 510(b) Opt Out Note Claim, then the holder of such Allowed Section 510(b) Opt Out Note Claim shall receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; provided further, however, that with respect to any distribution made to or reserved for a holder of an Allowed Section 510(b) Opt Out Note Claim, the Securities Settlement shall be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim shall be entitled to receive.

**5.6    Class 1F through Class 13F (Intercompany Claims).**  Except as otherwise provided in Article 7.2 of this Plan, on the Effective Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, shall not receive a distribution on the Effective Date and instead shall either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor affiliate shall be Reinstated.

**5.7    Class 1G-1 (Existing Common Stock).**  Pursuant to clauses (a) and (b) below, holders of Allowed Interests pertaining to Existing Common Stock shall receive New Common Stock, Par Value Rights exercisable at the Plan Equity Value, ~~Five~~Seven-Year Warrants exercisable at a ~~32.4~~20.7% premium to the Plan Equity Value, Six-Month Warrants exercisable at a 9.0% premium to the Plan Equity Value, and ~~Six-Month~~Ten-Year Warrants exercisable at ~~an 8.2% premium to the~~ Plan Equity Value.

**(a)**    On the Effective Date, the Existing Common Stock shall be cancelled. On the Distribution Date, or as soon thereafter as is reasonable and practical, each holder of an Allowed Interest pertaining to the Existing Common Stock shall receive in exchange for such Interest its Pro Rata distribution of ~~Five~~469,720 shares of New Common Stock, Seven-Year Warrants ~~and~~, Six-Month Warrants, and Ten-Year Warrants.

**(b)** On the commencement date of the Par Value Rights Offering and pursuant to the Registration Statement and Article 7.15(b) of this Plan, each holder of an Allowed Interest pertaining to the Existing Common Stock as of the Rights Offerings Record Date shall receive its Pro Rata portion of non-transferable Par Value Rights to purchase 20,770,34521,680,996 shares of New Common Stock pursuant to the Par Value Rights Offering; provided, however, that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering shall not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors willshall be instead distributed to the other holders of Existing Common Stock.

**5.8    Class 1G-2 (Section 510(b) Equity Claims).** In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent shall receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court; provided, however, that if any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, then the holder of such Allowed Section 510(b) Opt Out Equity Claim shall receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; provided further, however, that with respect to any distribution made to or reserved for a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement shall be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim shall be entitled to receive.

**5.9    Class 1H and Class 8H (Section 510(b) ERISA Claims)**.  In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent shall receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement.

**5.10    Class 1I (Other Interests)**.  On the Effective Date, all Other Interests shall be deemed cancelled and the holders of Other Interests shall not receive or retain any property on account of such Other Interests under this Plan.

**5.11    Class 1J through Class 12J (Interests In Affiliate Debtors)**.  On the Effective Date, except as otherwise contemplated by the Restructuring Transactions, the holders of Interests in the Affiliate Debtors shall retain such Interests in the Affiliate Debtors under the Plan.

requirements of the relevant stock exchange on which it is expected the New Common Stock will be traded and (b) six directors who are independent from the Plan Investors; provided, however, that the requirements of this sentence may be waived by the unanimous consent of Delphi, Appaloosa, and the Creditors' Committee. Additionally, the Joint Investor Director must be independent from the Plan Investors.

      **(c)** **Classification Of Directors.** Directors initially shall be placed as set forth above in three classes. Directors in the first class shall have an initial term expiring at the annual meeting of stockholders to be held in 2009 (each, a "Class I Director"), directors in the second class shall have an initial term expiring at the annual meeting of stockholders to be held in 2010 (each, a "Class II Director"), and directors in the final class shall have an initial term expiring at the annual meeting of stockholders to be held in 2011 (each, a "Class III Director"). After the expiration of each initial term of each class of directors, the directors shall thereafter each have a one year term elected annually.

      **7.6** **Officers Of The Reorganized Debtors**. The existing senior officers of the Debtors in office on the Effective Date shall serve in their current capacities after the Effective Date (except for the Executive Chairman), subject to their employment contracts and subject to the authority of the boards of directors or similar governing bodies of the Reorganized Debtors.

      **7.7** **Directors And Officers Of Affiliate Debtors.** The existing directors and officers of the Affiliate Debtors shall continue to serve in their current capacities after the Effective Date, provided, however, that Reorganized Delphi reserves the right to identify new officers and members of the boards of directors or similar governing bodies of each such Affiliate Debtor at any time thereafter.

      **7.8** **Employment, Retirement, Indemnification, And Other Agreements, And Incentive Compensation Programs.** The Debtors shall enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors, officers, and employees who shall continue in such capacities (or similar capacities) after the Effective Date, all as more fully stated on Exhibit 7.8 attached hereto; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors. The Management Compensation Plan, as more fully described on Exhibit 7.8, may include equity, bonus, and other incentive plans as components of compensation to be paid to executives after the Effective Date (including a long-term incentive plan that assumes 10% of the available shares of Reorganized Delphi's fully diluted New Common Stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity awards). The Cash and equity emergence awards issued on the Effective Date shall be on market terms as determined by the Debtors' board of directors based on the advice of the independent outside advisor to the compensation committee of the Debtors' board of directors, which determination must be reasonably acceptable, on an aggregate basis, to the Creditors' Committee and Appaloosa.

to be utilized by the Reorganized Debtors to make Cash distributions as required under the Plan and for general working capital purposes.

**7.12    Sources of Cash For Plan Distributions**.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from the Exit Financing Arrangements, the Investment Agreement, the Rights Offerings, existing Cash balances, and the operations of the Debtors and the Reorganized Debtors.

**7.13    Establishment Of Cash Reserve.**  On the Effective Date, the Debtors shall fund the Cash Reserve in such amounts as determined by the Debtors to be necessary ~~in order~~ to make the required future payments to Administrative Claims, Priority Tax Claims, and as otherwise provided by this Plan.

**7.14    Post-Effective Date Financing.**  On the Effective Date, the Reorganized Debtors shall receive the proceeds of the Exit Financing Arrangements, which include an asset-backed revolving credit facility in an aggregate principal amount of $1.6 billion, a funded senior secured first-lien term facility in an aggregate principal amount of $3.7 billion, and a funded senior secured second-lien term facility in amount of $1.5 billion, of which up to $750 million will be in the form of the GM Note(s), the terms of which are described in the exit financing engagement letter and term sheet attached hereto as <u>Exhibit 7.14</u>, as such term sheet may be amended, modified, or supplemented, to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations.  The Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Exit Financing Arrangements.

**7.15    Rights Offerings.**

**(a)    Discount Rights Offering**

**(i)**    *Eligibility For Participation In Discount Rights Offering*.  Pursuant to the Registration Statement, and under the terms of <u>Article 5.3</u> of this Plan and the Investment Agreement, Delphi shall commence a Discount Rights Offering to generate gross proceeds of up to $1.575 billion.  Discount Rights Offering Eligible Holders shall be offered Discount Rights to purchase up to 41,026,~~310~~309 shares of New Common Stock, in exchange for a Cash payment equal to $38.39 per share of New Common Stock (a ~~37.8~~35.6% discount to the Plan Equity Value).  Discount Rights shall be distributed to the Discount Rights Offering Eligible Holders based on each Discount Rights Offering Eligible Holder's Pro Rata allocation of the Discount Rights.  If a Claim of a Discount Rights Offering Eligible Holder is not Allowed or otherwise reconciled by the Debtors by the date of commencement of the Confirmation Hearing, such Claim shall be temporarily allowed, solely for purposes of participation in the Discount Rights Offering, in the amount so estimated by the Bankruptcy Court or agreed to by the holder of the claim and the

41

Debtors.  Discount Rights distributed pursuant to the Discount Rights Offering shall be
freely transferable.

(ii)        *Discount Oversubscription Rights*.  Under the terms of Article 5.3
of this Plan and consistent with the Investment Agreement, to the extent the Discount
Rights Offering is not fully subscribed, Exercising Creditors shall be eligible to exercise, at
their discretion, Discount Oversubscription Rights to purchase shares of New Common
Stock not otherwise purchased through the Discount Rights Offering in exchange for a
Cash payment equal to $38.64 per share of New Common Stock for each Discount
Oversubscription Right exercised.  To the extent the number of the Discount
Oversubscription Rights subscribed for by Exercising Creditors is greater than the number
of Discount Oversubscription Rights available, the Discount Oversubscription Rights shall
be available to Exercising Creditors (based upon such creditors' underlying claim) on a Pro
Rata basis (with respect to all Exercising Creditors) up to the amount of Discount
Oversubscription Rights each Exercising Creditor has elected to exercise, until all
Oversubscription Rights have been allocated.

(iii)       *Distribution Of New Common Stock*.  All New Common Stock
issued in connection with the exercise of Discount Rights and Discount Oversubscription
Rights pursuant to the Discount Rights Offering shall be issued on the Effective Date and
shall be distributed to holders of Rights who have exercised the Rights on, or as soon as
reasonably practicable after, the Distribution Date.

(iv)       *Exercise Of Discount Rights By Lead Plaintiffs.* Pursuant to the
approval orders of the Bankruptcy Court and/or the MDL Court, as applicable, the Lead
Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the
Discount Rights at the time they are exercised, will have the right to exercise Discount
Rights by delivering to Delphi a notice during the pendency of the rights offering for the
Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering
for the Discount Rights and (ii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to
the effectiveness of the Securities Settlement, the amount of the rights offering exercise
price in connection with the Discount Rights Offering for the Lead Plaintiffs on behalf of
the securities class (collectively, the "MDL Group").  In the event such notice is timely
delivered, the Lead Plaintiffs shall cause to be released and/or transferred to Delphi,
subsequent to the effectiveness of the Securities Settlement, both (i) the cash proceeds
obtained from parties (other than Delphi) to the Securities Settlement (which proceeds
have already been received and escrowed pursuant to terms of the Securities Settlement) up
to an amount equal to the amount needed to reimburse Delphi for the rights offering
exercise price for the MDL Group in connection with the Discount Rights Offering and (ii)
if the amount delivered pursuant to clause (i) above does not fully cover the rights offering
exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock
that the Lead Plaintiffs are to receive as an Allowed Claim pursuant to the terms of the
Securities Settlement to cover such shortfall (collectively, the "Relevant Consideration").
Notwithstanding anything contained herein, no distribution of the New Common Stock

underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

**(b)    Par Value Rights Offering**.

**(i)**    *New Common Stock Offered In Par Value Rights Offering*.  Through the Par Value Rights Offering, ~~20,770,345~~21,680,996 shares of New Common Stock ~~will~~ shall be made available for subscription to holders of Existing Common Stock.  Of the ~~20,770,345~~21,680,996 shares of New Common Stock made available through the Par Value Rights Offering, ~~6,998,472~~7,421,644 shares of the New Common Stock shall consist of New Common Stock otherwise distributable to the following groups of holders of Claims in the following amounts (in each case at $~~59.~~61.~~72~~ per share):  (a) ~~611,754~~648,745 shares of New Common Stock otherwise distributable to Appaloosa, (b) all of the New Common Stock distributable to the UAW, IUE-CWA, and USW (the "Contributing Unions") based on such unions' Allowed Claims, and (c) an amount of New Common Stock otherwise distributable to holders of Claims in Classes 1C through 12C as a whole (excluding the otherwise distributable New Common Stock referred to in clauses (a) and (b)) which is equal to the difference between ~~6,998,472~~7,421,644 shares of New Common Stock and the sum of the number of shares of New Common Stock referred to in clause (a) and (b) (the "Contributing Creditors").

**(ii)**    *Eligibility For Participation In Par Value Rights Offering*.  Pursuant to the Registration Statement, and under the terms of Article 5.7 of this Plan, Delphi shall commence a Par Value Rights Offering pursuant to which each holder of Existing Common Stock on the Rights Offering Record Date shall be offered the opportunity to purchase their Pro Rata portion of ~~20,770,345~~21,680,996 shares of New Common Stock, in exchange for a Cash payment equal to $~~59.~~61.~~72~~ per share of New Common Stock ~~(which corresponds to an implied enterprise value of $13.4 billion)~~; provided, however, that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering shall not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors ~~will~~shall be instead distributed to the other holders of Existing Common Stock.

**(iii)**    *Use Of Par Value Rights Offering Proceeds*.  Proceeds, if any, generated by the Par Value Rights Offering shall be allocated in the following order:

(1)    First, to satisfy the amount, if any, by which the Liquidity Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement) is less than $3.189 billion (after giving effect to any Excess Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement));

43

(2)  <u>Second</u>, to satisfy the shortfall, if any, required to satisfy the condition set forth in the third sentence of section 9(a)(xxvii) of the Investment Agreement;

(3)  <u>Third</u>, to satisfy the Allowed Claims of the Contributing Unions, on a Pro Rata basis among the Contributing Unions, based upon the number of shares of New Common Stock contributed by each Contributing Union to the Par Value Rights Offering as described in <u>Article 7.15(b)(i)</u>, <u>provided</u>, <u>however</u>, that the distribution of proceeds from the Par Value Rights Offering pursuant to this clause (3) shall decrease the number of shares of New Common Stock otherwise distributable to the Contributing Unions pursuant to <u>Article 5.3</u> of this Plan on a Pro Rata basis based upon the number of shares of New Common Stock contributed to the Par Value Rights Offering by the Contributing Unions as described in <u>Article 7.15(b)(i)</u>;

(4)  <u>Fourth</u>, up to $850 million less the amounts, if any, allocated pursuant to clauses (1) and (2) above, to GM as a Cash distribution, so as to reduce the number of shares of New Preferred Stock, at the price of $59.61.72 per share, that would be distributed to GM pursuant to <u>Article 5.4</u> of the Plan; and

(5)  <u>Fifth</u>, to Appaloosa and the Contributing Creditors, on a Pro Rata basis among Appaloosa and the Contributing Creditors, based upon the number of shares of New Common Stock contributed beby Appaloosa and the Contributing Creditors to the Par Value Rights Offering as described in <u>Article 7.15(b)(i)</u>; <u>provided</u>, <u>however</u>, that the distribution of proceeds from the Par Value Rights Offering pursuant to this clause (5) shall decrease the number of shares of New Common Stock otherwise distributable to Appaloosa and the Contributing Creditors pursuant to <u>Article 5.3</u> of this Plan on a Pro Rata basis based upon the number of shares of New Common Stock contributed to the Par Value Rights Offering by Appaloosa and the Contributing Creditors as described in <u>Article 7.15(b)(i)</u>.

**(iv)**  *Distribution Of New Common Stock.*  All New Common Stock issued in connection with the exercise of Par Value Rights pursuant to the Par Value Rights Offerings shall be issued on the Effective Date and shall be distributed to holders of Rights who have exercised the Rights on, or as soon as reasonably practicable after, the Distribution Date.

### 7.16   Issuance Of New Common Stock.

**(a)**   **New Common Stock.**  On the Effective Date, Reorganized Delphi shall authorize shares of  New Common Stock in an amount to be determined on or before the date

**(b)**    Pursuant to the terms of the Delphi-GM Global Settlement Agreement, on the Effective Date, Reorganized Delphi shall authorize, issue, and deliver the "Series C" New Preferred Stock to GM.  A summary of the terms of the Series C New Preferred Stock is attached as Exhibit G to the Delphi-GM Global Settlement Agreement.  The issuance and delivery of the "Series C" New Preferred Stock shall be in accordance with the terms of the Delphi-GM Global Settlement Agreement and section 1145(a) of the Bankruptcy Code.

### 7.18    New Warrants.

**(a)**    ~~Five~~**Seven**-Year Warrants.  On the Effective Date, Reorganized Delphi shall authorize, and no later than the Distribution Date, Reorganized Delphi shall issue~~,~~ and deliver the ~~Five~~Seven-Year Warrants, pursuant to the terms of the ~~Five~~Seven-Year Warrant Agreement attached hereto as Exhibit 7.18(a), for 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted New Common Stock) at a strike price of $~~81.73~~71.93 per share (a ~~32.4~~20.7% premium to the Plan Equity Value).  The issuance of the ~~Five~~Seven-Year Warrants and the New Common Stock underlying the ~~Five~~Seven-Year Warrants shall be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the ~~Five~~Seven-Year Warrants ~~will~~shall be used by Reorganized Delphi for general corporate purposes.

**(b)**    Six-Month Warrants.  On the Effective Date, Reorganized Delphi shall authorize, and no later than the Distribution Date, Reorganized Delphi shall issue~~,~~ and deliver the Six-Month Warrants, pursuant to the terms of the Six-Month Warrant Agreement attached hereto as Exhibit 7.18(b), to purchase up to $1 billion of shares New Common Stock of Reorganized Delphi at a strike price of $~~66.79~~65.00 per share (an ~~8.2~~9.0% premium to the Plan Equity Value).  The issuance of the Six-Month Warrants and the New Common Stock underlying the Six-Month Warrants shall be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the Six-Month Warrants shall be allocated in the following order:  first, to redeem any shares of "Series C" New Preferred Stock distributed to GM, if any shares remain outstanding, at the preferred liquidation preference value as defined in Exhibit G to the Delphi-GM Global Settlement Agreement; second, to redeem the GM Note(s), at par including accrued and unpaid interest; third, to be used by Reorganized Delphi for general corporate purposes.

**(c)**    Ten-Year Warrants.  On the Effective Date, Reorganized Delphi shall authorize, and no later than the Distribution Date, Reorganized Delphi shall issue and deliver the Ten-Year Warrants, pursuant to the terms of the Ten-Year Warrant Agreement attached hereto as Exhibit 7.18(c), for 2,819,901 shares of New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted New Common Stock) at a strike price of $59.61 per share.  The issuance of the Ten-Year Warrants and the New Common Stock underlying the Ten-Year Warrants shall be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

The proceeds generated from the exercise of the Ten-Year Warrants shall be used by Reorganized Delphi for general corporate purposes.

### 7.19    MDL Settlements.

(a)    **Securities Settlement.**  Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the Securities Settlement, a copy of which is attached hereto as Exhibit 7.19(a), becomes a Final Order, Reorganized Delphi shall, in accordance with the Securities Settlement, distribute the New Common Stock and Discount Rights described in Articles 5.5 and 5.8 of this Plan to the disbursing agent appointed by the MDL Court.  Such distribution shall be made in accordance with any order entered by the MDL Court which modifies distributions under the Securities Settlement on a non-material basis in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court.  Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise Discount Rights by delivering to deliver to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and (ii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness of the Securities Settlement, the amount of the rights offering exercise price in connection with the Discount Rights Offering for the Lead Plaintiffs on behalf of the securities class as described more particularly in Article 7.15(a)(iv) hereof.  Notwithstanding anything contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

(b)    **ERISA Settlement.**  Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the ERISA Settlement, a copy of which is attached hereto as Exhibit 7.19(b), becomes a Final Order, Reorganized Delphi shall, in accordance with the ERISA Settlement, distribute the New Common Stock and Discount Rights described in Article 5.9 of this Plan to the disbursing agent appointed by the MDL Court.

(c)    **Insurance Settlement.**  In connection with the Securities Settlement and the ERISA Settlement, Delphi, certain defendants in the MDL Actions, and Delphi's insurers entered into the Insurance Settlement, a copy of which is attached hereto as Exhibit 7.19(c).

### 7.20    GM Settlement.  This Plan constitutes a request to authorize and approve the (a) Delphi-GM Global Settlement Agreement, attached hereto as Exhibit 7.20(a), that shall resolve the GM Claim, and (b) the Delphi-GM Master Restructuring Agreement, attached hereto

Effective Date or as soon thereafter as practicable, the Delphi HRP so as to freeze benefit accruals for future credited service in the Delphi HRP.

**(b)    Salaried Pension Freeze.**  In accordance with applicable law, the Reorganized Debtors shall amend, as of the first of the month following the Effective Date or as soon thereafter as practicable, the Delphi Retirement Program for Salaried Employees so as to freeze benefit accruals for future credited service in the Delphi Retirement Program for Salaried Employees.

**(c)    IRC Section 414(l) Transfer.**  The Debtors shall transfer certain net underfunded pension obligations to the GM HRP pursuant to the IRC Section 414(l) Transfer promptly after the Effective Date.  In conjunction with the IRC Section 414(l) Transfer, Reorganized Delphi shall deliver a note to GM as set forth in the Delphi-GM Definitive Documents.  The note shall be paid within ten days of the transfer date (as defined in the Delphi-GM Global Settlement Agreement).

**(d)    Pension Contribution Payment**.  No earlier than January 2, 2008, and no later than five days after the Effective Date, Reorganized Delphi shall contribute cash to the pension plansPension Plans (as defined below) sufficient to meet ERISA minimum funding contributions not covered by the IRC Section 414(l) Transfertransfer, and upon such contribution, replacement liens, if any, granted to the PBGC on assets owned by any Debtor shall be discharged. During the period between the Effective Date and the date such replacement liens are discharged, such replacement liens shall be junior and subordinate to the liens securing the Exit Financing Arrangements.

**(e)    PBGC.**  Pursuant to this Plan, and under the terms of the Union Settlement Agreements, as applicable, the following Debtors shall assume and continue the following plans, which shall be frozen on or before February 1, 2008:  (i) Delphi Corporation:  the Delphi Hourly Rate Employees Pension Plan and the Delphi Retirement Program for Salaried Employees; (ii) Delphi Mechatronic Systems, Inc.:  the Delphi Mechatronic Systems Retirement Program; (iii) ASEC Manufacturing:  the ASEC Manufacturing Retirement Program; and (iv) Packard-Hughes Interconnect Company:  the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan (collectively, the " Pension Plans").  Nothing in this Plan shall be construed as discharging, releasing, or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from any liability for minimum funding under 26 U.S.C. § 412 and 29 U.S.C. § 1082 or liability under 29 U.S.C. § 1362 with respect to the Pension Plans or the PBGC.  The PBGC and the Pension Plans shall not be enjoined or precluded from seeking to enforce such liability as a result of any provision of this Plan or the Confirmation Order.

**7.23    OPEB.**  Pursuant to this Plan, as of the Effective Date or as soon as practicable thereafter, and in accordance with the Union Settlement Agreements and applicable law and administrative requirements (the "Cessation Date"), Delphi shall cease to provide, offer,

Reorganized Debtors shall provide each party whose Material Supply Agreement is being assumed or assumed and assigned pursuant to the Plan, in accordance with the Cure procedures established under the Solicitation Procedures Order, with a notice that shall provide:  (i) the contract or lease being assumed or assumed and assigned; (ii) the name of the proposed assignee, if any; (iii) the proposed cure amount (the "Cure Amount Claim"), if any, that the applicable Debtor or Reorganized Debtor believes it (or its assignee) would be obligated to pay in connection with such assumptions; (iv) an election for the payment terms of the Cure Amount Claim; and (v) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Claim Amount (the "Cure Amount Notice").  The Cure Amount Notice shall be in substantially the form approved by the Court under the Solicitation Procedures Order and shall be served on each non-Debtor party or parties to a Material Supply Agreement.  If the non-Debtor party does not timely respond to the Cure Amount Notice, the Cure Amount Claim shall be paid in New Common Stock and Discount Rights in the same proportion as that received by holders of Allowed General Unsecured Claims on or as soon as reasonably practicable after the Effective Date.  If the non-Debtor party responds to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order and the non-Debtor party asserts a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (z) any other matter pertaining to assumptions, the Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right to reject the contract or lease for a period of five days after entry of a final order establishing a Cure amount in excess of that provided by the Debtors.  The Creditors' Committee shall be provided access to proposed Cure Claim payments above a threshold amount to be reasonably agreed upon the Creditors' Committee and the Debtors, after which the Creditors' Committee may object to a proposed Cure Claim payment; provided, however, that any unreasonable objection shall be determined by the Bankruptcy Court after notice and hearing.

   **(b)**  **Other Executory Contracts And Other Unexpired Leases.**  The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure.  Any party to an Other Executory Contract or Other Unexpired Lease who wishes to assert that Cure shall be required as a condition to assumption shall file and serve a proposed Cure Claim so as to be received by the Debtors or Reorganized Debtors, as applicable, and their counsel at the address set forth in Article 14.8 hereof within 45 days after entry of the Confirmation Order (the "Cure Claim Submission Deadline"), after which the Debtors or Reorganized Debtors, as the case may be, shall have 45 days to file any objections thereto.  Should a party to an Other Executory Contract or Other Unexpired Lease not file a proposed Cure Claim by the Cure Claim Submission Deadline in accordance with the procedures set forth herein, then any default then existing shall be deemed cured as of the day following the Cure Claim Submission Deadline and such party shall forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Confirmation Date.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate

against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date; provided, that the subordination rights of the holders of Senior Debt (as such term is defined in the Subordinated Notes Indenture) shall be deemed satisfied through the distributions described in Article 5.3, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims shall receive a distribution equal to 90% of the principal and accrued prepetition interest of the TOPrS. Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

        **(b)** Except as otherwise provided in the Plan (including any Plan Exhibits) or the Confirmation Order, the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination. Unless the Plan (including Plan Exhibits) or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this <u>Article 11.9</u>10(b) unless the Claims senior to such subordinated Claims are satisfied in full.

        **11.11  Exculpation And Limitation Of Liability.  Subject to <u>Article 11.13</u> of this Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such, GM, the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents, and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Plan Exhibits, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects shall be entitled to reasonably rely upon the advice**

**(j)**    All conditions to effectiveness in the Delphi-GM Definitive Documents shall have been satisfied or waived in accordance with the terms of the Delphi-GM Definitive Documents.

**12.3    Waiver Of Conditions To Confirmation Or Consummation.**  The conditions set forth in Articles 12.1(a), 12.2(c), and 12.2(e) hereof of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.  The conditions set forth ; provided, however that in (i) Article 12.2(d) may be waived jointly by connection with the Debtors, Appaloosa, and GM, provided, however, that satisfaction or waiver of the Confirmation Order has been entered by the Bankruptcy Court condition set forth in Article 12.2(e) of this Plan, no material modification of the Investment Agreement, the Delphi-GM Definitive Documents and the exhibits to each such agreements that have a material adverse effect on the recoveries of unsecured creditors may be made without the consent of the Creditors' Committee and (ii) the respective non-Debtor counterparty to the agreement.  Article 12.2(i) of this Plan may be waived jointly by the Debtors and Appaloosa (as lead Plan Investor);., provided, however that no waiver of Article 12.2(i) will of this Plan shall be effective unless notice is first given to the Creditors' Committee; provided further, however, that such waiver will shall be effective upon the earlier of (i) the Creditors' Committee's consent and (ii) 12:00 noon New York time on the third Business Day after the notice is given to the Creditors' Committee unless the Creditors' Committee has provided written notice pursuant to Article 14.8 of the this Plan that the Creditors' Committee has voted affirmatively to object to the effectiveness of the waiver solely on the basis that the recoveries of unsecured creditors would be materially adversely affected if the waiver was were implemented (and in such case the waiver shall not become effective unless the Bankruptcy Court thereafter determines that the effectiveness of the waiver would not materially adversely affect unsecured creditors' recoveries). No other condition set forth in Articles 12.1 and 12.2 hereof of this Plan may be waived.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XIII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan, including, among others, the following matters:

**(a)**    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

**14.12  Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of this Plan shall govern.

Dated:  ~~November 29~~December 6, 2007
Troy, Michigan

DELPHI CORPORATION AND THE AFFILIATE DEBTORS

By:_____
John D. Sheehan
Vice President, Chief Restructuring Officer