Hearing Date:  December 6, 2007 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
    In re                                 :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' (I) OMNIBUS REPLY TO OBJECTIONS TO DISCLOSURE
STATEMENT AND POTENTIAL DISCLOSURE STATEMENT AMENDMENTS
AND (II) RESPONSE TO EMERGENCY MOTION TO ADJOURN HEARING
AND FIX NEW OBJECTION DEADLINE

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries

and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"),

hereby submit this omnibus reply (the "Reply") to the objections filed on October 26, 2007,

November 2, 2007, and November 21, 2007 by various parties objecting to the Motion For Order

Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, And Procedures For

Temporary Allowance Of Certain Claims, (III) Hearing Date To Consider Confirmation Of Plan,

(IV) Procedures For Filing Objections To Plan, (V) Solicitation Procedures For Voting On Plan,

(VI) Cure Claim Procedures, (VII) Procedures For Resolving Disputes Relating To Postpetition

Interest, And (VIII) Reclamation Claim Procedures (Docket No. 9266) (the "Motion" or the

"Solicitation Procedures Motion"), which was filed by the Debtors on September 6, 2007, and

also in response to the Emergency Motion Of The Official Committee Of Equity Security

Holders Of Delphi Corporation To Adjourn The Hearing On, And Fix A New Time To Object

To, (A) The Debtors' Motion For Order Approving (I) Disclosure Statement, (II) Record Date,

Voting Deadline, And Procedures For Temporary Allowance Of Certain Claims, (III) Hearing

Date To Consider Confirmation Of Plan, (IV) Procedures For Filing Objections To Plan,

(V) Solicitation Procedures For Voting On Plan, (VI) Cure Claim Procedures, (VII) Procedures

For Resolving Disputes Relating To Postpetition Interest, And (VIII) Reclamation Claim

Procedures And (B) The Debtors' Expedited Motion For Order Under 11 U.S.C. §§ 105(A),

363(B), 503(B), And 507(A) Authorizing And Approving Amendment To Delphi-Appaloosa

Equity Purchase And Commitment Agreement (Docket No. 10795) (the "Adjournment Motion"),

which was filed on November 2, 2007 and to which the Law Debenture Trust Company of New

York, as indenture trustee, filed a joinder (Docket No. 11161) on November 29, 2007.

2

Preliminary Statement

1.       Since filing these chapter 11 cases in October 2005, the Debtors have strived to transform their business in a way that maximizes value for the benefit of all stakeholders.  Now, after substantially achieving all their transformation goals, and with nothing more material to gain from the chapter 11 reorganization process, the Debtors have proposed a Plan and a Disclosure Statement that embody the products of these efforts, and which provide for meaningful recoveries for all their stakeholders, including equity security holders.[1]  The official committee of unsecured creditors (the "Creditors' Committee") and the official committee of equity security holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees") support the Plan.  This is a remarkable result.

2.       In fact, two months after these cases were commenced, the Debtors concluded that they were likely to be, at that time, hopelessly insolvent given the current status of their business and the structural and competitive disadvantages under which they were operating.  To enable Delphi to return to stable, profitable business operations, the Company outlined the five key tenets of its transformation plan in March 2006.  The Debtors believed that they needed to (a) modify their labor agreements to create a competitive arena in which to conduct business, (b) conclude their negotiations with General Motors Corporation ("GM") to finalize GM's financial support for Delphi's legacy and labor costs and to ascertain GM's business commitment to the Company, (c) streamline their product portfolio to capitalize on their technology and market strengths, and align their manufacturing capabilities with this new focus, (d) transform their salaried workforce to ensure that the Company's organizational and cost

---

[1]       Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed to them in the Disclosure Statement.

3

structure is competitive and aligned with its product portfolio and manufacturing footprint, and (e) devise a workable solution to their current pension situation.

3.        While working toward implementing that transformation, in the summer of 2006 the Debtors entered into discussions with the Statutory Committees and GM concerning the manner in which a reorganization framework could be established to facilitate and capitalize on the Debtors' transformation.  A fundamental agreement between the Creditors' Committee and GM that was reached in these discussions was that general unsecured creditors would receive a distribution equal to the principal amount of their claims plus accrued interest (including postpetition interest) at a negotiated plan value, or as it has come to be described, a "par plus accrued recovery at Plan value."  A necessary consequence of this agreement was that, to achieve this recovery, GM would in the end be a major source of funding for the Debtors' reorganization Plan.  Indeed, it is now the case that GM estimates its obligations to Delphi will cost in excess of $7.5 billion.  Without this funding, par plus accrued at Plan value would not exist.

4.        Even with GM's support, the Debtors, the Statutory Committees and GM further concluded in the framework discussions that the best way to maximize stakeholder recoveries was to seek a second major source of funding for the estates.  Thus, in the second half of 2006, the Debtors engaged in a process to identify and negotiate with potential plan investors that could provide a substantial investment in exchange for a stake in the reorganized business going forward.  This process led to the investment agreements with plan investors approved by this Court in January 2007 and August 2007.[2]  Under the August 2007 Investment Agreement, the Plan Investors would infuse up to $2.55 billion to fund the Debtors' reorganization Plan.

---

[2]        See Order Authorizing And Approving the Equity Purchase And Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And Plan Framework Support

*(cont'd)*

5.      When the Debtors filed their Plan on September 6, 2007, they had

substantially achieved the goals of the transformation plan.  Apart from the structural and

business improvements the Debtors had achieved, they had reached agreement with their six U.S.

labor unions and reached a Global Settlement Agreement with GM.  One facet of the GM

settlement is that any plan of reorganization implementing the GM settlement must be approved

by GM.  This requirement in effect permits GM to ensure that any plan of reorganization is

largely a consensual plan.

6.      During the time in which the transformation was achieved, the Debtors

were also successful in maintaining critical customer and supplier confidence, and had been

operating the enterprise at levels that exceeded those even before the chapter 11 filing.

7.      All of these reasons made possible the provision of par plus accrued

recovery at Plan value for all unsecured creditors and a direct recovery for existing stockholders

under the September 6 Plan.  Nonetheless, without the two major sources of Plan funding—GM

and the Plan Investors—these recoveries could not have been offered.  But through the

September 6 Plan, the Debtors would have been able to preserve and create sufficient value to

achieve this extraordinary result.  Now, the Debtors are convinced that remaining in chapter 11

presents the very real risk that the value of their business enterprise will decrease.

8.      When filed on September 6, the Plan contemplated that the Debtors would

obtain $7.1 billion in financing and funded debt.  Unfortunately, the Debtors learned after

September 6 that debt funding at this level would not be possible because of the severe

---

*(cont'd from previous page)*

Agreement Pursuant To Sections 105(a), 363(b), And 1125(e) Of The Bankruptcy Code, dated January 12,
2007 (Docket No. 6588) and Order Authorizing And Approving Delphi-Appaloosa Equity Purchase And
Commitment Agreement Pursuant To 11 U.S.C §§ 105(a), 363(b), 503(b), And 507(a), dated August 2,
2007 (Docket No. 8856).

dislocations in the capital markets.[3]  In addition, Dephi learned that an independent, third-party

forecasting service had predicted a material decrease in GM North America production volumes.

These events led the Plan Investors to seek an adjustment to the buy-in price for their investment

in Reorganized Delphi.  Seeking to maintain the value of the estates, the Debtors engaged in

discussions with the Statutory Committees, the Plan Investors, and GM.  Those discussions led

to the Debtors' negotiation with the Creditors' Committee, the Plan Investors, and GM of a

proposed Investment Agreement amendment and the filing of proposed amendments to the Plan

on October 29, 2007.  Those changes still provided for a par plus accrued recovery at Plan value

for unsecured claims (other than TOPrS), but resulted in decreased recoveries for stockholders.

9.    Unfortunately, the proposed Investment Agreement amendments were

ultimately not accepted by all of the Plan Investors, and the proposed amendments terminated by

their own terms on November 6, 2007.  The Debtors continued to negotiate revisions to the

Investment Agreement and the Plan.  This time, the Debtors could reach agreement only with

GM and the Plan Investors—the two parties providing more than $10 billion to the Debtors'

reorganization—which led to the filing of the restated proposed Investment Agreement

amendment on November 14, 2007.  The restated proposed Plan still provided for a par plus

accrued recovery at Plan value for senior creditors, and provided for an increased recovery to the

stockholders, as compared to the October 29 amendments.

10.    The Debtors nevertheless continued their discussions with the Statutory

Committees, GM and the Plan Investors.  These discussions led to the December 3, 2007 filing

of the second restated proposed Investment Agreement and additional proposed amendments to

---

[3]    Although the markets had been closed for weeks, the Creditors' Committee's leadership supported filing of
the Plan and Disclosure Statement on September 6.

the Plan.  The proposed Plan still provides for par plus accrued recovery at Plan value for senior

creditors, but contains higher buy-in prices for the Plan Investors than under the November 14

amendments and includes a lower recovery for GM.  The changes were filed in furtherance of

settlement of differences by and among the Debtors, the Creditors' Committee, the Equity

Committee, GM and the Plan Investors.

           11.      Measured from where the Debtors first began, this is a remarkable result.

But in this case, it remains true that whatever the assessment of the level of the recoveries now

provided for, they would not be possible without the sources of funding for the Debtors' Plan.

With that funding in place, and with a Plan that the Debtors now believe is executable in the

current capital markets environment, the Debtors should move to emerge from chapter 11

protection as quickly as possible.  Unlike its short-term trading value, Delphi's intrinsic value has

not materially changed.  But this is not guaranteed to remain the case.

           12.      None of the Objections (as defined below) disputes that the Debtors have

achieved all that they can while under chapter 11 protection.  The outstanding Objections

overlook the economic reality that the dominant feature of the Debtors' Plan is that the labor and

GM settlements make it possible for Delphi's stakeholders to have any distribution at all.  The

Debtors believe that without the labor and GM settlements, the recoveries of par plus accrued at

Plan value for the Debtors' senior unsecured creditors and the distributions to Delphi's existing

equity holders would simply not be possible.

           13.      Thus, the pending Objections are really nothing more than attempts to

obtain negotiating leverage (and any such leverage is inconsistent with the settlements

represented by the additional proposed amendments to the Plan) in response to short-term market

value fluctuations.  Accordingly, the Debtors disagree that many of the Objections go to the issue

of the inadequacy of disclosure.  Nevertheless, the Debtors have agreed to provide additional

disclosure in certain instances, as described below.  The Disclosure Statement adequately

describes a settlement Plan based upon the Debtors' intrinsic enterprise value.  All stakeholders

should have an opportunity to consider that Plan.  The Objections should be overruled and the

Debtors should be permitted to begin soliciting votes on the Plan so that they may remain on

target to emerge from chapter 11 protection in the first quarter of 2008.[4]

Procedural Background

14.    In addition to the Motion, as set forth above, the Debtors filed with this

Court their Plan and Disclosure Statement on September 6, 2007.  Notices of the hearing with

respect to the Solicitation Procedures Motion and the adequacy of the Disclosure Statement were

mailed to more than 665,000 creditors, shareholders, and other parties-in-interest.  When the

hearing commenced on October 3, 2007, several potential objectors were granted additional time

to evaluate the Solicitation Procedures Motion and the Disclosure Statement.[5]  The Debtors also

advised this Court that certain amendments to the Plan and Disclosure Statement were being

considered by the Debtors in connection with exit financing and key stakeholder discussions (the

"Potential Amendments").  Several objections to the adequacy of the Disclosure Statement were

---

[4]    In accordance with the Third Supplemental Scheduling Order, as defined below, the Debtors attach as
<u>Exhibit A</u> a revised Plan solicitation timeline, which provides for a Plan exhibit filing date no later than ten
days before the proposed Plan voting and objection deadline.

[5]    The potential objectors were the Creditors' Committee, the Equity Committee, A-D Acquisition Holdings,
LLC (an affiliate of Appaloosa Management L.P.) as lead plan investor under the Plan, GM, an ad hoc
committee of trade creditors (the "Ad Hoc Trade Committee"), Wilmington Trust Company as indenture
trustee ("Wilmington Trust"), and a group of bondholders consisting of CR Intrinsic, DK Acquisition Co.,
Elliott Management Company,  Sandell Management Co., and Silverpoint Capital which are represented by
common counsel (the "Bondholder Group"), as well as the Lead Plaintiffs (but only to the extent of matters
raised in the Lead Plaintiffs' Response or any Potential Amendments) (collectively, the "Potential
Objectors").

either resolved, overruled, or withdrawn at the October 3, 2007 hearing, and the hearing was
continued to October 25, 2007.[6]

15.    After the October 3 hearing, discussions continued between the Debtors,
their stakeholders (including the Statutory Committees), the Plan Investors, and GM.  As noted
above, the discussions among the stakeholders were necessitated by, among other things, a
severe shift in the capital markets that forced the Debtors to review their proposed emergence
capital structure.  These discussions continued for several weeks in October, which led the
Debtors to request that the hearing on the Solicitation Procedures Motion and the adequacy of
the Disclosure Statement continue on November 8, 2007.  The Debtors advised this Court that
the intervening time would be used to pursue discussions with certain of the Potential Objectors
regarding the Potential Amendments, provide additional time for the Potential Objectors to
receive and evaluate the Potential Amendments, enable the Debtors to prepare motions to
approve amendments to the Debtors' Investment Agreement with the Plan Investors (the
"Amended Investment Agreement Approval Motion"), and give the Debtors time to obtain exit
financing arrangements.

16.    On October 19, this Court entered the Supplemental Order
(A) Establishing Revised Hearing Date And Related Procedures On Disclosure Statement And
Solicitation Procedures Motion And (B) Setting Hearing Date And Related Procedures For
Potential Motions Amending Investment Agreements And Approving Certain Exit Financing
Agreements (Docket No. 10662) (the "Supplemental Scheduling Order").  Under the terms of the
Supplemental Scheduling Order, the Debtors were required to use commercially reasonable

---

[6]    See Order (A) Disposing Of Certain Objections To Debtors' Disclosure Statement And Solicitation
Procedures Motion and (B) Setting Further Non-Omnibus Hearing Date And Related Procedures, dated
October 9, 2007 (Docket No. 9266).

efforts to file by October 29, 2007 a notice of the proposed changes to the Plan and Disclosure Statement, as well as certain appendices and exhibits.

17.    In compliance with the Supplemental Scheduling Order, the Debtors timely filed a notice of potential amendments to the Plan and Disclosure Statement on October 29, 2007.  That notice contained exhibits marked to show changes from prior versions of: (a) the Disclosure Statement, (b) the Plan (Appendix A to the Disclosure Statement), (c) the Historical Financial Results (Appendix B-2 to the Disclosure Statement), (d) the Financial Projections (Appendix C to the Disclosure Statement), (e) the Valuation Analysis (Appendix D to the Disclosure Statement), and (f) the Liquidation Analysis (Appendix E to the Disclosure Statement), as well as copies of: (g) the Management Compensation Plan to be included in Plan Exhibit 7.8, (h) an amendment to the Investment Agreement to be included in Plan Exhibit 7.11, (i) the list of executory contracts to be rejected and to be included in Plan Exhibit 8.1(a), (j) an amendment to the GM Global Settlement Agreement to be included in Plan Exhibit 7.20(a), and (k) an amendment to the Delphi-GM Master Restructuring Agreement (together with the Global Settlement Agreement, the "GM Settlement Agreements") to be included in Plan Exhibit 7.20(b).[7]

18.    To enable the Debtors to continue discussions with the Potential Objectors, the Debtors requested a further adjournment of the hearing on the Disclosure Statement.  The adjournment was also necessary to ensure that an amendment to the Investment

---

[7]    Objections (the "Initial Objections") to the Disclosure Statement were filed on or before November 2, 2007 by the Lead Plaintiffs, the Creditors' Committee, the Equity Committee, the Bondholder Group (now consisting of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; Davison Kempner Capital Management LLC; Elliott Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners, LLC; and Whitebox Advisors, LLC), and Wilmington Trust (the "Initial Objectors").  In addition, the Equity Committee filed the Adjournment Motion, an emergency motion seeking, among other things, to adjourn the hearing on the Disclosure Statement.  Brandes Investment Partners, L.P. also filed a statement in support of the Adjournment Motion (Docket No. 10807).

Agreement could be finalized before the hearing resumed.  On November 7, 2007, this Court

entered the Second Supplemental Order (A) Establishing Revised Hearing Date And Related

Procedures on Disclosure Statement And Solicitations Procedures Motion And (B) Setting

Hearing Date And Related Procedures For Motion To Amend Investment Agreement (Docket

No. 10864) (the "Second Supplemental Scheduling Order").  The Second Supplemental

Scheduling Order adjourned the hearing on the Solicitation Procedures Motion and Amended

Investment Agreement Approval Motion to November 29, 2007[8] and required the "Debtors . . .

[to] use commercially reasonable efforts to file a notice of any further proposed amendments to

the Plan and Disclosure Statement" by November 16, 2007.  The Second Supplemental

Scheduling Order also set a deadline for the Potential Objectors to file further objections to the

Disclosure Statement by no later than November 21, 2007.

                19.      In compliance with the Second Supplemental Scheduling Order, on

November 14, 2007 the Debtors filed the Notice Of Further Proposed Amendments To Certain

Appendices To Debtors' Disclosure Statement With Respect To Joint Plan of Reorganization Of

Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket

No. 10932).  Attached to the notice of amendments were exhibits marked to show changes to the

Debtors' Plan and related exhibits, including, among other things, the amendments to the

Investment Agreement to be included in Plan Exhibit 7.11, the redacted Engagement Letter

(including the Term Sheet appended thereto) with respect to the Debtors' Exit Financing

---

[8]      The adjournment of the hearings set forth in the Second Supplemental Scheduling Order was without
        prejudice to the rights of the Equity Committee to supplement the Adjournment Motion, or the rights of any
        party-in-interest to seek a further adjournment of the hearings in connection with any further proposed
        amendments to the Plan, the Disclosure Statement, Investment Agreement, and any documents related
        thereto, within the time provided for filing objections pursuant to paragraph 4 of the Second Supplemental
        Scheduling Order (i.e., November 21, 2007).  The Equity Committee has not supplemented the
        Adjournment Motion, and no party-in-interest has filed further documents in support of the Adjournment
        Motion under this reservation of rights (other than Law Debenture's November 29 joinder, as noted below).

Arrangements to be included in Plan Exhibit 7.14, the amendments to the GM Settlement

Agreements to be included in Plan Exhibit 7.20(a) and 7.20(b), respectively, updated third

quarter 2007 financial results to be included as Appendix B-2 to the Disclosure Statement, and

changed pages to the Valuation Analysis to be included as Appendix D to the Disclosure

Statement.  In addition, on November 16, 2007 the Debtors filed a notice of further proposed

amendments to their Disclosure Statement, which included certain pages marked to show

changes from the October 29, 2007 proposed amendment to the Disclosure Statement.[9]

20.    On November 21, 2007, the Lead Plaintiffs, the Creditors' Committee, the

Equity Committee, the Bondholder Group,[10] and Wilmington Trust each filed supplemental

objections to the Disclosure Statement and the Ad Hoc Trade Committee and the Law Debenture

Trust Company of New York ("Law Debenture") filed new objections (together with the Initial

Objections, the "Objections").

21.    The Debtors requested a further adjournment on November 28, 2007.  The

Court entered on November 30, 2007 the Third Supplemental Order (A) Establishing Revised

Hearing Date And Related Procedures on Disclosure Statement And Solicitations Procedures

Motion And (B) Setting Hearing Date And Related Procedures For Motion To Amend

Investment Agreement (Docket No. 11198) (the "Third Supplemental Scheduling Order").  The

Third Supplemental Scheduling Order continued the hearing on the Solicitation Procedures

Motion and Amended Investment Agreement Approval Motion to December 6, 2007.  The order

---

[9]    See Notice Of Further Proposed Amendments To Debtors' Disclosure Statement With Respect To Joint
Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors and Debtors-In-Possession
(Docket No. 10964).

[10]    Two different sets of creditors submitted the Bondholder Group's Initial Objection and the Objection filed
by the Bondholder Group on November 21, 2007.  Specifically, two additional creditors—CR Intrinsic
Investors and Nomura Corporate Research and Asset Management—were added to the November 21, 2007
Objection and another—Gradient Partners, L.P—was dropped from the group.

further provided, among other things, that the Debtors use commercially reasonable efforts to file

a notice of any further proposed amendments to the Plan and Disclosure Statement no later than

before December 3, 2007.

22.      In compliance with the Third Supplemental Scheduling Order, the Debtors

filed a notice of potential amendments to the Plan and Disclosure Statement on December 3,

2007 (Docket No. 11220).[11]  That notice contains exhibits marked to show changes from prior

versions of the Disclosure Statement, Plan (Appendix A to the Disclosure Statement), Investment

Agreement (Plan Exhibit 7.11), Delphi-GM Global Settlement Agreement (Plan Exhibit 7.20(a)),

and the Delphi-GM Master Restructuring Agreement (Plan Exhibit 7.20(b)).

23.      For the convenience of this Court and the recipients of this Reply, attached

hereto as Exhibit B is a chart summarizing the issues raised in the Objections, including the basis

of the Objection and the Debtors' response to the Objection.  Also attached, as Exhibit C, is a

chart that organizes the same information by Objector.  Exhibit B and Exhibit C provide detailed

responses to the Objections.  This Reply, therefore, does not repeat everything contained in those

exhibits, but instead highlights certain of the Objections.

24.      As set forth below, the Debtors have modified the Disclosure Statement in

an attempt to resolve disclosure issues on a consensual basis and update previously-reported

information.  In this regard, the following documents are attached hereto as Exhibits D

through L:

---

[11]      The December 3, 2007 notice of potential amendments provides that "(a) the Creditors' Committee has
reserved the right to pursue its objection at the approval hearing on December 6, 2007 with respect to Plan
Exhibit 7.11 as it relates to the amount of the cash interest rate cap established in Section 9(a)(xx) thereof
and (b) the Equity Committee has reserved its right to assert claims in the chapter 11 cases solely within the
equity class with respect to the allocation of Plan consideration among existing equity holders based on
facts and circumstances in these cases."  (Docket No. 11220 ¶ 6.)

- Proposed Solicitation Procedures Order, marked to show changes against version filed on September 6, 2007 (<u>Exhibit D</u>);

- Additional proposed blacklined changed pages to the Disclosure Statement, showing proposed changes since December 3, 2007 (<u>Exhibit E</u>);

- Additional proposed blacklined changed pages to the Plan, showing proposed changes since December 3, 2007 (<u>Exhibit F</u>);

- Cumulative blackline of the Disclosure Statement, marked to show all changes since September 6, 2007 (<u>Exhibit G</u>);

- Cumulative blackline of Appendix A to the Disclosure Statement (Plan Of Reorganization), marked to show all changes since September 6, 2007 (and any additional Plan exhibits) (<u>Exhibit H</u>);

- Cumulative blackline of Appendix B to the Disclosure Statement (Historical Financial Results), marked to show all changes since September 6, 2007 (<u>Exhibit I</u>);

- Cumulative blackline of Appendix C to the Disclosure Statement (Financial Projections), marked to show all changes since September 6, 2007 (<u>Exhibit J</u>);

- Cumulative blackline of Appendix D to the Disclosure Statement (Valuation), marked to show all changes since September 6, 2007 (<u>Exhibit K</u>); and

- Cumulative blackline of Appendix E to the Disclosure Statement (Liquidation Analysis), marked to show all changes since September 6, 2007 (<u>Exhibit L</u>).

<u>Reply To Disclosure Statement Objections</u>

A.    <u>Standard For Approval Of Adequacy Of Disclosure Statement</u>

25.    To be approved, a disclosure statement must provide "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125.  Most of the additional disclosures requested by the Objectors are beyond the scope of the "adequate information" requirement and appear to be relevant to the party

14

requesting disclosure for reasons other than providing a basis for an informed judgment about the Plan.

B.       The Disclosure Statement Contains Adequate Disclosure

          26.       Certain of the Objectors contend that the Disclosure Statement does not provide adequate disclosure regarding GM or the settlement reached with GM.[12]  The Disclosure Statement, however, contains more than 30 pages of discussion of GM's possible claims against the Debtors and the GM Settlement Agreements.  Moreover, the agreements with GM are appended to the Plan as exhibits, and the Liquidation Analysis attached as Exhibit E to the Disclosure Statement presents the Debtors' reasonable view that the return from any litigation against GM would be highly speculative.  The Debtors believe that the Disclosure Statement contains adequate discussion regarding GM and the GM settlement.

          27.       Similarly, various Objectors contend that the Disclosure Statement does not disclose the potential dilution of distributions to unsecured creditors if Trade And Other Unsecured Claims exceed $1.45 billion as contemplated in the Plan and restated Delphi-Appaloosa EPCA.  On the contrary, the Disclosure Statement contains a risk factor entitled "Potential Dilution Caused By Distribution Of New Common Stock With Respect To Trade And Other Unsecured Claims In Excess Of $1.45 Billion."

          28.       Various Objectors also assert that the Disclosure Statement does not adequately disclose information concerning the valuation of the Debtors or their investment banker's methodologies for assessing such valuations.  Appendix D to the Disclosure Statement,

---

[12]       The scheduling orders with respect to the Disclosure Statement required each objector to make a good-faith effort to include language which would satisfy its Objection.  Wilmington Trust Company, Law Debenture, and the Ad Hoc Trade Committee did not include any such language, which suggests that their Objections primarily relate to confirmation of the Plan rather than the adequacy of the Disclosure Statement.

however, includes a standard form of valuation prepared by the Debtors' investment banker and discloses the methodologies used.[13]

29.    Various Objectors also contend that the Disclosure Statement should ascribe the "actual" value as opposed to the "Plan" value of the stock and discount rights to be distributed under the Plan or that the discussion of recoveries should be based on dollar values at the midpoint of the range of the investment banker's valuation.  As noted above, the Plan arose out of a structure that provides for distributions based on settlements with GM and Delphi's U.S. labor unions.  Accordingly, the proposed distributions under the Plan were negotiated and are based on the notion of a "settlement" plan.  The Disclosure Statement adequately describes the valuation range determined by the Debtors' investment banker to caution voters that valuation is inherently uncertain and that by accepting the Plan, each class is receiving a distribution based on deemed Plan value.  Nevertheless, in response to Objections filed by Wilmington Trust and the Bondholder Group, the Debtors have revised and expanded the Disclosure Statement's Executive Summary to more fully describe, among other things, the range of values attributable to the New Common Stock.

C.    Agreed Changes To Disclosure Statement

30.    In accordance with customary practice and in an attempt to resolve disclosure issues on a consensual basis, the Debtors have revised certain portions of the Disclosure Statement to address certain of the Objections.  Additionally, in some instances, the Debtors modified the Disclosure Statement to update previously-reported information.  In this regard, the Debtors have added additional disclosure:

_____

[13]    Although Delphi has included valuation information in its Disclosure Statement, the required scope of valuation disclosure must be informed by section 1125(b), which provides that the "court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."  11 U.S.C. § 1125(b).

16

- regarding the organization of the Disclosure Statement to permit parties-in-interest easier access to relevant disclosure;

- regarding the subordination provision of the TOPrS;

- describing the range of potential recoveries to stakeholders, clarifying the differences between Plan Equity Value and total enterprise value, as well as the differences between market value and intrinsic value;

- that the value of the rights being offered in the Discount Rights Offering was negotiated, that discount rights offerings in recent bankruptcy cases have used discounts ranging from 5.2% to 69%, and that in establishing the discount under the Plan the Debtors sought to establish a market-clearing price to ensure that the Discount Rights Offering would provide value to participating creditors and facilitate the transferability of the rights;

- that payment of "par plus accrued at Plan value" to unsecured creditors has been a bedrock principle agreed to by GM and the Creditors' Committee during the framework discussions;

- that the end date for accrual of postpetition interest was negotiated, was included in the Debtors' business plan, and has been set as the earlier of the confirmation date and January 31, 2008;

- that recoveries to creditors pursuant to the Plan are based on the allowed amount of creditors' claims and not the market value of those claims;

- regarding the negotiation of the most recent amendment to the Investment Agreement;

- regarding the risks of continuing the chapter 11 cases and the Debtors' ability to survive as a going concern in chapter 11;

- regarding GM's estimate of the amount of its claims; and

- regarding the positions of various Objectors with respect to the Plan, and in some instances, the Debtors' responses to those positions.

In light of these changes, the Disclosure Statement is more than adequate to enable stakeholders in these cases to make an informed decision when voting on the Plan. Therefore, the Disclosure Statement, including the modifications described above, should be approved.

17

<u>Reply To Plan Objections</u>

31.     Several Objections at bottom are objections not to the adequacy of the information contained in the Disclosure Statement, but rather to certain provisions of the Plan. Such Objections are premature and should be deferred to the confirmation hearing.

32.     A disclosure statement hearing is not the time to consider the merits of a plan.  In fact, a disclosure statement that otherwise adequately describes the plan in question must be approved, unless "the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible.'"  <u>In re Phoenix Petroleum Co.</u>, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citation omitted).

33.     Therefore, unless a plan is "patently nonconfirmable," <u>In re Cardinal Congregate I</u>, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990), objections to the plan scheme may not be considered at a disclosure statement hearing.  The reason for this is simple: a disclosure statement hearing is meant to address disclosure issues, while a confirmation hearing is meant to address confirmability issues.  <u>See, e.g.</u>, <u>In re Copy Crafters Quickprint, Inc.</u>, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (concluding that issue of plan's confirmation is usually and appropriately reserved for confirmation).  If there is any doubt as to whether an issue poses an impediment to confirmation, then that matter should be heard at the confirmation hearing.  None of the Objections to the Debtors' Disclosure Statement, however, shows that it is impossible to confirm the Plan as written and accordingly the Objections should be overruled.  Set forth below is a brief discussion of certain of those issues, including an explanation as to why these are not disclosure statement points.

D.    Classification

34.    The Bondholder Group and Wilmington Trust assert that the Plan cannot

be confirmed because the TOPrS are improperly classified with other general unsecured claims.

They assert that the claims are dissimilar and will not receive the same treatment, that is, that the

TOPrS will not receive any postpetition interest whereas other general unsecured claims will.

35.    Classification of claims clearly constitutes a matter that pertains only to

confirmation and therefore is premature for consideration at a disclosure statement hearing.  See,

e.g., In re Sunshine Precious Metals, Inc. 142 B.R. 918, 920 (Bankr. D. Idaho 1992) (holding that

objection to disclosure statement based on plan's proposed classification of various bond issues

constitutes plan confirmation issue and does not render plan nonconfirmable as matter of law); In

re Cardinal, 121 B.R. at 764.

36.    Contractually subordinated unsecured claims may be placed in the same

class as senior and other unsecured claims.  Courts have noted that, under section 1122(a) of the

Bankruptcy Code, the "similarity of claims is not judged by comparing creditor claims inter se.

Rather, the question is whether the claims in a class have the same or similar legal status in

relation to assets of the debtor."  In re Frascella Enters., Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa.

2007) (citing In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995));

see also In re Union Fin. Servs. Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004)

("The fact that [creditor's] [c]laim is subordinated to other class members does not change the

fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), aff'd, 155 F.

App'x 940 (8th Cir. 2005); In re Eagle Bus Mfg., Inc., 134 B.R. 584, 595 (Bankr. S.D. Tex.

1991) ("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior

Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other

19

Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy

Code."), aff'd, 158 B.R. 421 (S.D. Tex. 1993); see also David L. Bleich, Chapter 11 Plans, 647

PLI/Comm 437, 519-20 (1993) (Senior and subordinated claims "belong in the same class since

they are 'substantially similar,' i.e., they have the same legal rights against the debtor's assets, the

subordination being only a private matter between them.").

E.      Treatment Of Claims In Same Class

             37.      The Plan's proposed treatment of the subordinated TOPrS and other

general unsecured claims is also consistent with section 1123(a)(4) of the Bankruptcy Code,

which requires that all members of a class receive the same treatment.  The Plan provides that all

general unsecured creditors, including holders of TOPrS, will receive New Common Stock and

Discount Rights.  The Plan also provides in essence that all unsecured creditors including TOPrS

are entitled to the same distribution from the Debtors' estates, but the Plan reallocates a portion

of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the

latter with postpetition interest.

             38.      Payment of postpetition interest to general unsecured creditors, but not to

TOPrS, is warranted because the TOPrS are contractually subordinated to the other creditors.  In

accordance with the subordination provisions of the intercreditor agreement that requires the

TOPrS' distributions to be used to satisfy senior creditors in full, including postpetition interest,

the Plan provides that general unsecured claims be paid in full, including postpetition interest,

and that the remainder be distributed to the TOPrS.  Section 1123(a)(4) of the Bankruptcy Code

permits a plan to give senior and subordinated creditors disparate distributions when the disparity

reflects the contractually-required reallocation to senior creditors of distributions that would

otherwise be delivered to junior creditors.  See In re Piece Goods Shops Co., L.P., 188 B.R. 778,

20

788 (Bankr. M.D.N.C. 1995) (allocation of subordinated creditors' distributions to senior creditors in same class did not violate section 1123(a)(4)). Thus, the Plan appropriately allocates postpetition interest that the Debtors could fairly and equitably pay to subordinated TOPrS (as discussed below) to the senior creditors in that same class.

F.      Postpetition Interest

        39.     Certain Objectors contend that senior unsecured creditors may not receive postpetition interest. The fundamental principle of the framework agreements was a par plus accrued recovery at Plan value for unsecured creditors. The Objectors' contention relates to the agreements embodied in the Plan, not to the adequacy of Disclosure Statement. In addition, case law holds that junior classes cannot complain at confirmation when senior classes receive postpetition interest on their claims. See In re Coram Healthcare Corp., 315 B.R. 321, 344-45 (Bankr. D. Del. 2004) (plan's payment of postpetition interest on claims is fair and equitable under section 1129(b)(1)).

G.      Settlement Of Claims Against GM

        40.     GM and its affiliates filed a proof of claim against the Debtors' Estates for $6 billion plus further purported significant unliquidated claims. As an integral part of the Debtors' Plan, the Debtors and GM reached a settlement respecting the GM claims. As set forth above, the Debtors believe that without the GM settlement agreement, the recoveries provided for under the Plan would not be possible. In addition, GM's continued support as a major customer of the Debtors is critical to Delphi's business plan. The alternative to settling with GM—initiating heavily contested litigation with a highly speculative recovery for the Debtors—will put at risk the Plan's proposed distributions to all the Debtors' stakeholders and thereafter the Debtors' reorganization.

41.    To the extent any of the Objectors contend that the GM Settlement

Agreements make the Plan unconfirmable, this contention constitutes a plan confirmation

objection, which clearly relates to dissatisfaction with the Debtors' settlement, not the adequacy

of the Disclosure Statement.  See 11 U.S.C. § 1123(b)(3) (permitting settlements to be

incorporated into plans).  In determining whether to approve a proposed settlement, courts

ascertain whether the proposed settlement is fair and equitable, reasonable, and in the best

interests of a debtor's estate.  See In re Granite Broad. Corp., 369 B.R. 120, 139 (Bankr.

S.D.N.Y. 2007) (applying Bankruptcy Rule 9019 factors to settlement included in reorganization

plan); Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),

478 F.3d 452, 461-65 (2d Cir. 2007) (setting forth same standard in non-plan context).  Applying

the foregoing standard, this Court will have ample basis, at confirmation, to consider and

approve the GM Settlement Agreements under section 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019.  Accordingly, this objection to the GM Settlement Agreements is

premature and should be overruled.

H.    Third-Party Releases

42.    Certain Objectors also contend that the limited third-party releases and

related injunction provisions contained in the Plan render the Plan unconfirmable.  This

Objection clearly relates to a matter that pertains only to confirmation and therefore is premature

for consideration at the hearing on the Disclosure Statement.  The Disclosure Statement

adequately describes the third-party releases and the contributions of those that would receive

them.  And based on those contributions, the third-party releases under the Plan are appropriate.

43.    As to the appropriateness of the releases, a majority of courts, including

the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-

22

parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v.

Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42

(2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham

Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006

Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns,

Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  Courts consider

several equitable factors in determining whether third-party releases are appropriate, including,

among other things, whether there is an identity of interests between the debtor and the third-

party; whether the non-debtor has contributed substantial consideration to the restructuring; and

whether the third-party releases and related injunction are necessary to further the restructuring.

See, e.g., Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203 (3d Cir. 2000); In re

Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002); In re Dow Corning Corp., 287

B.R. 396 (E.D. Mich. 2002).  Although courts have considered these and other factors, such

factors are not an exclusive list of considerations, nor are they a list of conjunctive requirements.

See, e.g., In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 935-36 (Bankr. W.D. Mo. 1994).

            44.      In these chapter 11 cases, the facts noted above support the granting of the

third-party releases and therefore such releases can be approved at confirmation.  For example,

the injunction provided by the release and related provisions is critical to this reorganization.

The Plan Investors and GM, whose settlements make Plan distributions possible, have both

required that the Debtors include such release provisions in the Plan.  The financing and other

contributions provided by these and other parties are essential and the reorganization embodied

in the Plan would be impossible without their involvement.  Additionally, it is vital for the

effectiveness of the Debtors' reorganization efforts that the released parties who continue to be

actively involved in this process will be free from suits arising from their contributions to the

Debtors' reorganization.

I.      Valuation

45.     Many of the Objectors' contentions regarding the unconfirmability of the

Plan are relevant when and only if the Plan does not receive the requisite consents of the various

classes.  For example, the Bondholder Group contends that senior unsecured creditors are not to

be paid in full under the Plan.  Such objections ignore the fact that soliciting votes on a plan of

reorganization is only the first step in the confirmation process in which, as here, the proponent

seeks the consent of all constituencies to a plan that involves the negotiation and compromise of

a multitude of complex and ever-changing issues.  Only after the votes are counted can it be

determined whether all the required consents have been obtained.  Thereafter, any remaining

objections can be addressed at the confirmation hearing.  As stated in In re Adelphia

Communications Corp., 368 B.R. 140 (Bankr. S.D.N.Y.), appeal dismissed, 367 B.R. 84

(S.D.N.Y. 2007),  a valuation objection concerning whether a party is given more than the value

of its claim is an issue arising under "1129(b) of the Code, which would prohibit payment of

more than par plus accrued."  Id. at 258.

46.     The Bondholder Group's contention depends on the value of the

consideration that the Debtors intend to distribute to unsecured creditors.  As noted above, the

Debtors have adequately disclosed the basis for their valuation of the New Common Stock and

the Discount Rights to be distributed to unsecured creditors.  A confirmation hearing is the

proper time for the Debtors to present evidence to support and prove their valuation analysis, and

for any party-in-interest with standing to test that valuation.

<u>Response To Motion To Adjourn And Re-Notice 650,000 Parties-In-Interest</u>

47.    As noted above, Law Debenture joined in the Adjournment Motion filed by the Equity Committee (who now supports the Plan and Disclosure Statement).[14]  For the reasons stated in the Debtors' response with respect to their Expedited Motion For Order Under 11 U.S.C. §§ 105(A), 363(B), 503(B), And 507(A) Authorizing And Approving Amendment To Delphi-Appaloosa Equity Purchase And Commitment Agreement, the Adjournment Motion should be denied.

48.    The Adjournment Motion should also be denied for the simple reason that re-noticing of the disclosure statement hearing is unnecessary and not required by the applicable rules.  Bankruptcy Rules 2002(b)(1), (d)(5) and 3017(a) require that a plan proponent give notice of the hearing to consider the adequacy of a disclosure statement and the deadline to file objections to all creditors, creditors' committees, indentures trustees, equity security holders, equity security holder committees, and other parties-in-interest.  At significant cost, the Debtors have done this, by mailing notice of the disclosure statement hearing to 665,000 creditors, equity security holders, and other parties in interest, as well as publishing notice of the hearing in newspapers distributed throughout the United States and in many other countries.

49.    The Disclosure Statement hearing commenced on October 3, 2007, and all parties-in-interest had notice of the hearing and therefore an opportunity to participate.  Those who did participate in the hearing learned that the hearing would be adjourned to allow for further discussions and amendment to the Plan and Disclosure Statement.  The Disclosure Statement hearing (although adjourned from time to time) has not concluded, and the

---

[14]    Brandes Investment Partners, L.P. filed a "statement" in support of the Adjournment Motion on November 2, 2007 (Docket No. 10807).

Adjournment Motion has provided no reason why a second notice of the same hearing is required.

50.    The Adjournment Motion also suggests that the nature and extent of the proposed amendments to the Plan and Disclosure Statement require re-noticing.  This assertion misapprehends the function of a disclosure statement hearing and notice thereof.  The disclosure statement process focuses solely on whether the proposed disclosure statement provides adequate information about the proposed plan.  It does not require the plan proponent to share the proposed plan and disclosure statement, or amendments thereto, with all parties-in-interest.  To the contrary, to discourage such "premature solicitation," the rules expressly prohibit a plan proponent from sending the proposed plan and disclosure statement to anyone other than "the debtor, any trustee or committee appointed under the Code, the Securities and Exchange Commission, and any party in interest who requests in writing a copy of the statement or plan." Fed. R. Bankr. P. 3017(a).  "This limitation on the mailing of the disclosure statement and plan is an appropriate assurance against tainting of the disclosure provisions of the [Bankruptcy] Code." 9 Collier, Bankruptcy ¶ 3017.01[2], at 3017-6 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. 2007).

51.    Thus, the Bankruptcy Rules plainly contemplate that, other than the key players, few parties will be involved in the disclosure statement hearing itself.[15]  This is consistent with the court's role in the hearing, which is to "stand[] in the shoes of all creditors in determining whether a disclosure statement contains 'adequate information.'"  In re Cramer, Inc.,

---

[15]    Indeed, of the 665,000 parties to whom the Debtors mailed hearing notices, only ten creditors contacted the noticing agent to request copies of the proposed disclosure statement and plan.  Although it not known precisely how many additional parties accessed the Disclosure Statement via www.delphidocket.com, it is known that as of December 3, 2007 the Disclosure Statement was accessed 2,739 times from a total of 372 unique Internet Protocol Provider addresses.

100 B.R. 63, 66 (Bankr. D. Kan. 1989).  In practice, courts have not required re-noticing of

amended disclosure statements that have not yet been approval by the court.  See In re Epic

Assocs. V, 62 B.R. 918, 920-22 (Bankr. E.D. Va. 1986) (declining to adjourn and reschedule

disclosure statement hearing even when "voluminous" modifications "made telling substantive

changes in the treatment of creditors under the [p]lan as well as expanded the information

contained in the [d]isclosure [s]tatement," which were filed on evening before hearing).[16]

      52.     Another factor taken into account by the Epic Associates court was the

exigencies of the Debtors' situation.  There, many of the financial institutions essential to the

reorganization plan were facing a regulatory deadline imposed by the Federal Home Loan Bank

Board.  Even if the federal agency extended the deadline, uncertainty involving three mortgage

insurers made it unclear whether the debtors could confirm the plan during the extension.  Id. at

921-22 & n.2.  Here, the Debtors also face a number of contingencies and deadlines.  For

example, the deadline for a plan's effective date under the two IRS pension funding waivers is

February 29, 2008.[17]  Whether the Debtors could negotiate further pension funding waivers with

the IRS on the same or any terms is not known.  And if further waivers could not be negotiated,

the Debtors could face up to $1.4 billion in potential excise tax claims.

---

[16]      The Adjournment Motion cites In re Cramer, 100 B.R. 63 (Bankr. D. Kan. 1989), in support of its
Objection.  Cramer, however, is distinguishable from Delphi's case.  In Cramer, after the court approved the
debtor's disclosure statement, the debtor made additional modifications and, without further court approval,
used the unapproved modified disclosure statement to solicit votes on its plan.  Id. at 64-65.  The court
required the debtor to re-notice the modified disclosure statement, noting the impropriety of using an
unapproved disclosure statement to solicit a plan, regardless of whether the modifications since approval
were deemed material or immaterial.  Id. at 66-67.

[17]      See Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 9019 Authorizing Delphi Corporation To (A)
Perform Under Pension Funding Waivers Issued By United States Internal Revenue Service And (B)
Provide Letters Of Credit To Pension Benefit Guaranty Corporation Thereunder, dated May 31, 2007
(Docket No. 8117) and Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 9019 Authorizing Delphi
Corporation To Perform Under Second Pension Funding Waiver Issued By United States Internal Revenue
Service, dated October 26, 2007 (Docket No. 10726).

53.    In addition, as modified by the UAW-GM-Delphi settlement agreement dated June 22, 2007, certain sections of the September 30, 1999 UAW-GM Benefit Guarantee agreement, under which GM provides protection of certain benefits for a period of time for certain former GM employees who became employees of Delphi (the "Benefit Guarantee Agreement"), expire on December 31, 2007, thereby triggering certain obligations of GM, which, in turn, might assert certain claims against the Debtors.  The settlement agreement between the Debtors, GM, and the UAW also extended certain sections of the Benefit Guarantee Agreement (including its trigger date) to March 31, 2008, conditioned on the Debtors' commencing solicitation of votes on a plan before December 31, 2007.  If the Benefit Guarantee Agreement expires, and the Plan has not been confirmed and substantially consummated, and Delphi has unilaterally modified, terminated, or in any reduced or diminished any of the benefits covered under the Benefit Guarantee Agreement, then the UAW is also authorized to call a strike against Delphi, GM, or both on two days' written notice.

54.    Under all of the circumstances, there is no justification for requiring the Debtors to send out to parties-in-interest another 665,000 notices of the continued hearing to approve the Disclosure Statement.

<u>Debtors' Summary Of Modifications To Solicitation Procedures Order</u>

55.    As further described below, the Solicitation Procedures Order[18] and exhibits were revised to reflect, among other things, comments received from certain parties-in-interest regarding the Solicitation Procedures Order and to clarify certain solicitation issues with

---

[18]    Unless otherwise defined herein, the capitalized terms in this section have the meanings ascribed to them in the Solicitation Procedures Motion or Plan (where appropriate).

28

regard to notice to certain parties and any potential effect of those procedures on those parties'

rights.

56.    A marked version of the Solicitation Procedures Order and exhibits

reflecting the modifications made to the form of proposed order and exhibits submitted with the

Solicitation Procedures Motion is attached hereto as Exhibit D.[19]

57.    The Debtors also made a number of stylistic and grammatical changes and

corrections to the Solicitation Procedures Order and the exhibits thereto and have generally

revised the solicitation dates provided therein to correspond with the proposed modified

solicitation schedule.  In addition, the Solicitation Procedures Order has been updated to include

various intervening orders entered by this Court with regard to the Disclosure Statement.  These

changes are apparent in the marked version of the document as noted above.  Additional changes

to the Solicitation Procedures Order are summarized below.

J.    Modifications To The Solicitation Procedures Order And Exhibits

58.    Proper Notice.  A new paragraph 2[20] has been added to the Solicitation

Procedures Order stating that the notice provided with respect to this Court's consideration of the

Solicitation Procedures Motion and the Disclosure Statement was proper and sufficient and that

no further notice is necessary.

59.    Record Date.  To provide the Debtors with an accurate list of holders of

claims and interests who are entitled to vote on the Plan, while providing sufficient time for the

Debtors and their agents to compile this list and transmit solicitation materials to the appropriate

---

[19]    A Summary of Revisions to Solicitations Documents also is attached hereto as Exhibit M.

[20]    Unless otherwise specified, the paragraph numbers referenced in this summary of modifications section
correspond to the paragraph numbers on the marked version of the Solicitation Procedures Order, a copy of
which is attached hereto as Exhibit D.

parties, the record date for determining the members of Classes C, D, E, G-1, G-2, and H (the

"Voting Classes") that are entitled to receive a Solicitation Package and vote on the Plan has

been changed from September 28, 2007 to November 26, 2007.  For ease of reference, the

definitions of each of the Voting Classes have been added in several footnotes to paragraph 7 of

the Solicitation Procedures Order.

        60.    <u>Solicitation Packages</u>.  The Debtors have made the following changes to

paragraph 8 with regard to the documents to be distributed as a part of the Solicitation Package:

(a) the Solicitation Procedures Order will be included in the CD-ROM rather than printed and

included separately,  (b) IRS form W-8BEN may also be provided as a part of the solicitation

package for certain non-US entities (as appropriate), and (c) IRS forms W-9 and W-8BEN will

be included solely at the discretion of the Debtors.

        61.    <u>Distribution To Non-U.S. Employees</u>.  To facilitate the distribution of

Solicitation Packages to non-U.S. holders of Class I claims or interests who are current or former

Delphi non-U.S. plant employees, the Debtors have added (a) a provision to paragraph 8 of the

Solicitation Procedures Order allowing plant managers at these non-U.S. plants to transmit the

appropriate materials to these parties and (b) a new paragraph 10 which authorizes the Debtors to

translate the Confirmation Hearing Notice and the Notice of Non-Voting Status into the

appropriate language for certain of the non-U.S. employees.

        62.    <u>MDL Claims</u>.  Language was added to paragraph 11 to ensure that certain

Multi-District Litigation-related claims are voted in accordance with the orders addressing those

claims.

        63.    <u>GM Revisions</u>.  After filing the Solicitation Procedures Order, the Debtors

received comments from GM regarding the proposed order and its various exhibits.   As a result,

the Debtors have added language to paragraph 18 and a provision to the end of paragraph A of

the findings seeking this Court's recognition that the Plan, Disclosure Statement, and

Confirmation Hearing Notice comply with Bankruptcy Rules 3016(c), 2002(c)(3) and (l), and

3017(f) by describing in specific and conspicuous language all acts to be enjoined and

identifying the persons and entities that would be subject to the injunction.  The Debtors have

also added provisions to paragraph 18 and to the end of paragraph 25 which allow the Debtors to

send a Confirmation Hearing Notice to those parties to whom notice of the proposed Plan

releases would not otherwise be transmitted through the Solicitation Package or other notice.

Further, certain paragraphs in the exhibits which also relate to the releases and injunctions have

been changed to bold typeface.  Paragraph 9 in the Confirmation Hearing Notice has also been

revised to clarify the scope of the injunction in the Plan.  Additionally, counsel for GM and

counsel for the Prepetition Lenders have been added as objection notice parties in Paragraph 6 of

the Solicitation Procedures Order, and, where appropriate, in the various exhibits.

      64.    <u>Publication</u>.  Additionally, to provide broader notice of the confirmation

hearing and releases and injunctions provided for in the Plan, the Debtors have added to

paragraph 18 a number of newspapers in which the Confirmation Hearing Notice will be

published.

      65.    <u>Disputed And Unliquidated Claims</u>.  The Debtors have added a provision

to paragraph 23 to address voting rights for any claimant whose claim or interest is subject to

both a pending objection and estimation under the Estimation Order.  This paragraph establishes

that holders of such claims and interests will be allowed to vote the amount set forth in the

Estimation Order, subject to any intervening orders of this Court.

31

66.    The Solicitation Procedures Order originally provided that holders of partially unliquidated claims would be entitled to vote the undisputed liquidated portion in full and that the unliquidated portion would be assigned a value of $1.00 for voting purposes.  To avoid unnecessary expense in reconciling the $1.00 voting amount, paragraphs 28 and 32 have been revised so that holders of partially unliquidated claims will be entitled to vote only in the amount of the liquidated portion of their claims.  This change will not have a material effect on the dollar amount of the votes of these parties.  For clarity, fully unliquidated claims will continue to vote in the amount of $1.00.  In addition, a sentence describing the classification of prepetition litigation claims has been moved from paragraph 33 to paragraph 32.

67.    Plan Exhibits And Disclosure Statement Appendices.  A change has been made to paragraph 36 to make clear that the Debtors will not serve the exhibits and schedules to the Plan and appendices to the Disclosure Statement upon any of the parties-in-interest in these cases, but rather that these documents will be available on the Delphi Legal Information Website and upon reasonable written request to the Debtors.

68.    Reclamation Procedures.  Since the filing of the Motion, this Court has entered an order establishing "Reclamation Claims Procedures" (which were also contained in paragraphs 38 and 39 of the proposed Solicitation Procedures Order).  The current paragraph 42 simply refers to the Reclamation Order to authorize the use of the Reclamation Election Notice and paragraph I has been removed from the findings.

69.    Notices To Union-Represented And Certain Non-Represented Employees And Former Employees.  In the Motion, the Debtors asked this Court to approve a series of specialized notices to current and former employees represented by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE and certain non-represented employees and former employees (the

32

"Specialized Notices").  The Specialized Notes were attached to the Motion and are similar to the

notices provided to current and former union-represented and certain non-represented employees

at the time the Debtors entered into the union settlement agreements and the non-represented

employee and retiree term sheet.

70.    Upon review of the Specialized Notices, the Debtors have corrected a

scrivener's error which incorrectly cited the injunction section of the Plan as Section 11.13

instead of Section 11.14 of the Plan.  Further, at the initial request of the UAW, and with the

approval of GM and the IUE-CWA, USW, IAM, IBEW, and IUOE, the Debtors have made

certain additional revisions to the Specialized Notices aimed to make reading and comprehension

of the Specialized Notices easier for their intended recipients.  For instance, certain descriptions

were summarized within the Specialized Notices regarding aspects of their respective unions'

settlement agreements that are currently effective.  Additional disclosure was also drafted into

the Specialized Notices to be completed upon the prospective approval of the Disclosure

Statement and establishment of a date for the confirmation hearing.

71.    A copy of the revised Specialized Notices proposed to be sent to

employees and former employees represented by the UAW, USW, IUE-CWA, IAM, IBEW, and

IUOE and the revised Specialized Notice proposed to be sent to certain non-represented

employees and former employees is attached hereto as part of Exhibit D (the proposed

Solicitation Procedures Order marked to show changes against version filed on September 6,

2007).

72.    Certification of Vote.  The Debtors have added a provision to the

Solicitation Procedures Order to address certification of acceptance or rejection of the Plan.

Specifically, the Debtors request a waiver of Local Bankruptcy Rule 3018-1, which requires a

plan proponent to certify to the court in writing the amount and number of allowed claims or

allowed interests of each class accepting or rejecting the plan at least five days before the hearing

on confirmation of a chapter 11 plan.  As set forth above, the Debtors face a number of

contingencies and deadlines that require the Debtors to emerge from chapter 11 by the end of

February.  To meet this deadline, the voting deadline with respect to the Plan must be January

11, 2008 (which is six days before the proposed January 17, 2007 Plan confirmation hearing);

the Voting Agents will need that time (that is, until January 16, 2007) to compile the voting

results.  In light of the exigencies of this situation, the Debtors respectfully request a waiver of

Local Bankruptcy Rule 3018(a) and seek authority to file the voting results at 4:00 p.m.

(prevailing Eastern time) the day before the Plan confirmation hearing.

K.      New Exhibits To The Solicitation Procedures Order

        73.      Class G-1 Registered Holder Ballot.  Because 180,000 registered holders

of common stock hold the stock in their own name (and not in street name), the Debtors seek

approval of a separate form of ballot for Class G-1 Existing Common Stock Claims that directs

the registered holder to submit his, her, or its executed  ballot directly to the Securities Voting

Agent.  This results in a somewhat simpler ballot for registered holders who hold stock in their

own names.

        74.      Notice To Parties Subject To Post-Solicitation Date Objection.  Should the

Debtors continue to object to claims after sending Solicitation Packages to the various parties

based upon their records as of the Record Date, holders of those claims would either not have

votes tabulated or would be entitled to have their vote tabulated only in the amount modified by

the objection.  To make clear that such claimholders have notice of the effect on their voting

rights to apprise such claimholder of the opportunity to case a provisional ballot under

Bankruptcy Rule 3018(a), and in compliance with Rule 3018-1(b) of the Local Bankruptcy Rules

for the United States Bankruptcy Court for the Southern District of New York, the Debtors seek

approval in paragraph 23 of a form of notice of a change in voting status to be sent to any holders

of claims or interests against which the Debtors file an objection after the Solicitation Date.

75.    Notice To Employees Regarding Multiple Solicitation Documents.

Because many of the Debtors' employees may have claims or interests in a number of different

classes, they will receive several different notices as a result of the solicitation process.  To assist

their employees in evaluating these materials, the Debtors seek approval in paragraph 38 of a

form of notice to be sent to these employees through internal channels which will generally

advise the employees of the reasons they are receiving each of the solicitation-related documents.

76.    Notice To Holders, Assignees, Transferees, And Purchasers Of Claims Of

Cure Procedures Established Under Solicitation Procedures Order.  As described in more detail

in the Motion, the Debtors propose to provide a Cure Amount Notice to the counterparties to the

Debtors' material supply agreements which the Debtors intend to assume under the Plan.  This

Cure Amount Notice will allow the counterparties to (a) disagree with the cure amount scheduled

for these agreements and (b) elect to receive plan currency on account of their cure claim in lieu

of cash.  Upon reviewing the claims register, it is apparent to the Debtors that many of these

counterparties have sold their claims arising under those agreements to other parties, and that the

purchasers' rights may be affected by the elections made by the counterparties on the Cure

Amount Notice.

77.    In paragraph 40 of the proposed order, the Debtors seek the authority to

provide notice to parties that may hold or may have purchased claims from those material supply

agreement counterparties who have been given a cure payment election pursuant to the Cure

Amount Notice.   Because such a holder or purchaser might claim that this election affects its rights, the Debtors wish to provide notice that the purchaser must contact the party from whom they purchased the claim to protect its rights.  The Debtors propose that this be the only notice the Debtors need provide to purchasers with respect to the cure and these purchasers will have no rights or recourse against the Debtors with respect to the cure.

78.    <u>Notice To Contract Counterparty With Multiple Addresses</u>.  Certain of the Debtors' counterparties to material supply agreements that the Debtors intend to assume or assume and assign have provided the Debtors with multiple addresses for notice with respect to the contracts.  To ensure that the appropriate person within each company may timely respond to the Cure Amount Notice, the Debtors seek the authority in paragraph 41 to provide a notice to company personnel at these other notice addresses informing them that the Cure Amount Notice has been sent to some other address at their company.

79.    To satisfy a request submitted by the Statutory Committees, the Debtors include a reservation in paragraph 44 that to the extent Delphi opens a trading window for insiders to trade in Delphi securities, members of the Creditors' Committee and Equity Committee will have the same opportunity to trade.

WHEREFORE, the Debtors respectfully request that this Court (a) overrule the

Objections, (b) deny the Adjournment Motion, (c) grant the Solicitation Procedures Motion and

approve the Disclosure Statement, (d) enter the revised proposed Solicitation Procedures Order,

and (e) grant the Debtors all such other and further relief as is just.

Dated:   New York, New York
         December 5, 2007

                                      SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP

                                      By:          /s/ John Wm. Butler, Jr.
                                           John Wm. Butler, Jr. (JB 4711)
                                           John K. Lyons (JL 4951)
                                           Albert L. Hogan, III (AH 8807)
                                           Ron E. Meisler (RM 3026)
                                      333 West Wacker Drive, Suite 2100
                                      Chicago, Illinois 60606
                                      (312) 407-0700

                                                  - and -

                                      By:          /s/ Kayalyn A. Marafioti
                                           Kayalyn A. Marafioti (KM 9632)
                                           Thomas J. Matz (TM 5986)
                                      Four Times Square
                                      New York, New York 10036
                                      (212) 735-3000

                                      Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession