EXHIBIT E

Additional Proposed Blacklined Changed Pages To Disclosure Statement
(Marked To Show Proposed Changes Since December 3, 2007)

# DELPHI

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
        In re                           :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
                                              :
        Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND
## CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan L. Stuart (NS 7872)

SKADDEN, ARPS, SLATE, MEAGHER               Of Counsel
   & FLOM LLP                         DELPHI CORPORATION
Four Times Square                        5725 Delphi Drive
New York, New York 10036              Troy, Michigan 48098
Kayalyn A. Marafioti (KM 9632)          David M. Sherbin
Thomas J. Matz (TM 5986)               Sean P. Corcoran
                                    Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated: New York, New York
       December 6, 2007

---

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY
COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN
APPROVED BY THE COURT.**

---

Notice Of Proposed Amendments
December 35, 2007

Delphi.  In addition, the Investment Agreement will provide for a $1.575 billion Discount Rights
Offering (as described below) that will be made available to Delphi's unsecured creditors, and
the holders of Section 510(b) Note, Claims, Section 510(b) Equity, Claims, and Section 510(b)
ERISA Claimants Claims.

In addition to the proceeds from the Investment Agreement and the Discount Rights
Offering, the Company will need to obtain funded debt to emerge from chapter 11 successfully.
Initially, the Company sought financing of $7.1 billion in funded debt and a $1.6 billion asset-
based revolving loan.  Because of the dynamics of the capital markets that began in the third
quarter of 2007, however, the Debtors reduced proposed debt levels under the Plan by $1.9
billion to facilitate an emergence financing package that could be executed under existing market
conditions.  Based on recent improvements in the capital markets, including the leveraged loan
market, the Debtors, after consultation with the Creditors' Committee, the Plan Investors, and
GM, plan to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7
billion of first-lien funded financing, and second-lien funded financing in the amount of $1.5
billion, of which up to $750 million will be placed with GM.  The Debtors have entered into a
"commercially reasonable best efforts" engagement with JPMorgan Securities Inc., JPMorgan
Chase Bank, N.A., and Citigroup Global Markets Inc. to arrange a syndicate of lenders to
provide the exit financing arrangements.  On November 16, 2007, the Bankruptcy Court
approved the terms of this engagement and authorized the Debtors to enter into the underlying
exit financing transactions when completed.

## G.    Events Impacting Reorganization

The Debtors believe the recoveries afforded to all stakeholders under the Plan are the best
recoveries available.  The recoveries afforded to certain stakeholders under the Plan are derived
from and related to Delphi's settlement with GM, which settlement is a necessary and essential
component of the Debtors' reorganization.  Although the currency received by certain
stakeholders has changed since the Debtors initially filed the September 6 Plan, the Plan
continues to provide for full recoveries for unsecured creditors at Plan value and fair
consideration for holders of Existing Common Stock, and is supported by GM, the Plan Investors,
and the Statutory Committees.  Delphi believes any further delay in emerging from chapter 11
may lead to degradation of its total enterprise value and a corresponding reduction in Plan
recoveries through, for example, the diminution of customer and supplier support, increased
financing costs due to continued costs of operating under chapter 11 protection, and the inability
of the Company to fully complete its Transformation Plan.  The potential for future reductions in
Plan recoveries is highlighted by a review of certain event risks, as set forth below, that will arise
if Delphi's emergence from chapter 11 is delayed beyond the first quarter of 2008.

in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors and equity holders will be maximized by the reorganization of the Debtors as contemplated by the Plan.

The Plan is the culmination of Delphi's Transformation Plan within the chapter 11 context.  Delphi has determined that it has achieved those aspects of its Transformation Plan for which the chapter 11 reorganization process was necessary.  The Plan incorporates the settlements that Delphi reached with critical stakeholders in these reorganization cases.  The Debtors, all of the Debtors' principal U.S. labor unions, GM, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA) are all parties to settlements with the Debtors which, together with the Investment Agreement, allow for various recoveries under the Plan.  In particular, the Debtors' settlement with GM, which is essential to the Plan, provides significant consideration to Delphi, which allows Delphi to provide distributions to other stakeholders that would be impossible to deliver without the settlement.  Recoveries under the Plan, which are premised upon and in substantial part are derived from the GM settlement, consist of distributions of equity in Reorganized Delphi, rights to purchase equity in Reorganized Delphi, and warrants to purchase equity in Reorganized Delphi.  The New Common Stock in Reorganized Delphi that will be distributed under the Plan will be valued at $59.61 per share.  The value of the New Common Stock, for Plan distribution purposes, is within a range that Rothschild Inc. ("Rothschild"), the Debtors' investment banker and financial advisor, believes is a reasonable valuation for a company such as Reorganized Delphi.

The Plan, which is supported by GM, the Plan Investors**,** and the Statutory Committees, provides distributions to all of Delphi's stakeholders.  Specifically, holders of General Unsecured Claims (with the exception of the TOPrS, as discussed below), including holders of claims based on the Debtors' debt securities and trade claims, will receive 100% of the value of their claims (and applicable postpetition interest through the earlier of January 31, 2008 and the Confirmation Date) through a distribution of New Common Stock of Reorganized Delphi and transferable subscription rights to participate in a discount rights offering to acquire shares of New Common Stock ~~(with the exception of the TOPrS, as discussed below)~~.  The distributions to holders of General Unsecured Claims, with certain exceptions, will be based on the allowed amount of the holders' claims plus accrued interest during the pendency of the Chapter 11 Cases.  The recovery for holders of General Unsecured Claims (other than holders of TOPrS, as discussed below) will amount, in the aggregate, to the principal amount of such holders' claims plus accrued postpetition interest at negotiated Plan value, a "par plus accrued recovery at Plan value."  In satisfaction of the subordination provisions of the subordinated notes issued in connection with trust preferred securities issued in 2003 by Delphi Trust I and Delphi Trust II (the "TOPrS"), holders of TOPrS claims will receive ~~an allowed claim of~~ a distribution equal to $379 million at Plan Equity Value, which amounts to a 90% recovery of ~~the face amount of the TOPrS claims plus~~principal and accrued prepetition interest on ~~the allowed amount~~such TOPrS claims.

Under the terms of the Plan and the settlement agreement between the Debtors and GM, GM will receive approximately $2.6 billion in consideration, consisting of  cash, a second lien note, and junior preferred convertible stock on account of certain of its claims against the Debtors.  GM will also receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock.  In partial exchange for the

consideration distributed to GM under the Plan, GM will provide Delphi with labor subsidies, certain ongoing, post-bankruptcy revenue commitments, and other consideration. GM's contributions to Delphi's Plan, and the settlement of GM's claims against the Debtors, constitute a substantial source of funds that allow distributions to be made to certain of the Debtors' stakeholders. Without the GM settlement, those distributions could not be made.

Subject to the approval of settlements in the Bankruptcy Court and the District Court presiding over the matter, and under the terms of the Plan, certain lead plaintiffs in a multi-district securities class action litigation will receive, on behalf of themselves and the class they represent, shares of New Common Stock of Reorganized Delphi and transferable subscription rights to participate in the discount rights offering in the same proportion as Plan distributions to general unsecured creditors. The resolution of this litigation is critical to the Debtors' reorganization to eliminate the significant risks and costs associated with litigating complex actions under federal securities laws and ERISA and related derivative actions in which plaintiffs have alleged damages in excess of $1 billion.

In addition, holders of existing Delphi common stock will receive a direct distribution of New Common Stock, a distribution of non-transferable subscription rights to purchase shares of New Common Stock of Reorganized Delphi through a par value rights offering and freely transferable warrants exercisable for six months, seven years, and ten years following the Debtors' emergence from chapter 11 to purchase shares of New Common Stock of Reorganized Delphi. If a holder of Existing Common Stock is to receive fractional shares of warrants, such holder will have the option of electing whether to receive the fractional shares of warrants or to receive a cash distribution generated by the sale of an aggregate amount of fractional warrants. The proceeds generated from the sale of the six-month Warrants will be allocated in the following order: first, to redeem any shares of "Series C" New Preferred Stock distributed to GM; second, to redeem the GM Note(s); and third, to be used by Reorganized Delphi for general corporate purposes, as provided in Article 7.18(b) of the Plan. The proceeds generated from the sale of the seven-year and ten-year warrants will be used by Reorganized Delphi for general corporate purposes.

## 2.    *Valuation Of The Reorganized Debtors And Distributions Under The Plan*

The distributions discussed above are the product of extensive negotiations among the Debtors, GM, the Plan Investors, the Creditors' Committee, and the Equity Committee. As described in more detail in this Disclosure Statement, achieving a "par plus accrued" recovery for holders of unsecured claims was a fundamental building block of the discussions among the Debtors, GM, and the Creditors' Committee. Holders of Delphi's existing common stock are able to receive a distribution, in large part, on account of the Debtors' settlement with GM and the Plan Investors' contributions to the Debtors' restructuring.

Because the proposed distributions under the Plan are in the form of equity in the reorganized company, an agreement on the enterprise value of Reorganized Delphi was essential to achieving the desired recoveries for the Creditors' Committee and the desired investment opportunities for the Plan Investors. In connection with the formation of the Plan and the Debtors' discussions with GM, the Plan Investors, the Creditors' Committee, and the Equity Committee, the Debtors' investment banker and financial advisor, Rothschild, performed a

valuation of the Reorganized Debtors as a going concern and of the New Common Stock based on information and financial projections provided by the Debtors. Rothschild estimated the total enterprise value of Reorganized Delphi to range between $11.2 billion and $14.1 billion, with a midpoint of approximately $12.7 billion, as of December 31, 2007, as discussed more fully in the Valuation Analysis attached to this Disclosure Statement as <u>Appendix D</u>. The implied potential price per share (assuming full conversion of New Preferred Stock) based on the implied distributable reorganized equity value ranges from $44.~~70~~50 to $65.~~78~~50 per share, with a midpoint of $55.~~27~~03. The Debtors, GM, the Plan Investors, and the Creditors' Committee agreed that for Plan purposes the total enterprise value of the Reorganized Debtors would be assumed to be $13.3 billion, a value that falls within the range of Rothschild's estimated total enterprise value.

The amount of equity available for equity distributions under the Plan is determined by taking the Debtors' assumed total enterprise value ($13.3 billion) and subtracting (a) the estimated amount of pro forma net debt to be incurred by the Reorganized Debtors ($5.2 billion) and (b) the value attributable to the seven-year and ten-year warrants to be distributed to holders of existing common stock under the Plan ($0.3 billion). This calculation results in a distributable equity value of $7.8 billion, or $59.61 per share of New Common Stock based on 131,266,407 shares (assuming full conversion of the New Preferred Stock) issued and outstanding as of the Effective Date (the "Plan Equity Value"). The Plan Equity Value of $59.61 per share is within the per share range of Rothschild's valuation, and is above the midpoint of Rothschild's valuation. The range of values based on Rothschild's valuation range is as follows:

| | Low End | Midpoint | Plan Value | High End |
|---|---|---|---|---|
| Total Enterprise Value | $11.2 billion | $12.7 billion | **$13.3 billion** | $14.1 billion |
| Less Estimated Pro Forma Debt | ($5.2 billion) | ($5.2 billion) | **($5.2 billion)** | ($5.2 billion) |
| Less Seven- And Ten-Year Warrants | (0.2 billion) | (0.2 billion) | **(0.3 billion)** | (0.3 billion) |
| Reorganized Equity Value | $5.8 billion | $7.2 billion | **$7.8 billion** | $8.6 billion |
| Shares Outstanding (Assuming Conversion Of New Preferred Stock) | 131,266,407 | 131,266,407 | **131,266,407** | 131,266,407 |
| Implied Price Per Share | $44.50 | $55.03 | **$59.61** | $65.50 |
| Implied Percent Of Par Plus Accrued Recovery For Holders Of General Unsecured Claims | 64.3% | 89.2% | **100%** | 113.9% |

As noted above, the distributions to be made under the Plan are based on the Plan Equity Value of $59.61 per share of New Common Stock, although there is no guaranty that the trading value of the New Common Stock will fully or immediately reflect the intrinsic value of the Reorganized Debtors. The valuation of the Reorganized Debtors and the New Common Stock

**Considered.**  **The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

      *3.*      *Rights Offerings*

As noted above, certain recoveries under the Plan are premised on the participation in Rights Offerings that will be conducted after confirmation of the Plan and after a registration statement is declared effective by the SEC.  Holders of general unsecured claims and securities litigation claims will have the ability to purchase, through the exercise of transferable rights, 41,026,309 shares of the New Common Stock of Reorganized Delphi at a price per share of $38.39, which is at a 35.6% discount to Plan Equity Value of $59.61.  The discount price at which the Discount Rights will be exercisable was negotiated among the Debtors, the Plan Investors, and certain stakeholders, and is within a discount range used for rights offerings in other chapter 11 bankruptcy cases.  The Discount Rights Offering will include oversubscription rights, which will allow holders of Discount Rights that have exercised the rights the opportunity to purchase any New Common Stock that is not subscribed by other holders of Discount Rights.  If holders of Discount Rights and Discount Oversubscription Rights do not fully subscribe for the New Common Stock available in the Discount Rights Offering, the Plan Investors will purchase any remaining shares of New Common Stock at a price of $38.39 per share.

Please note that the Discount Rights to purchase New Common Stock of Reorganized Delphi will expire twenty days after the date on which the Discount Rights are distributed.  The Debtors anticipate that the distribution will take place no more than four Business Days after the Bankruptcy Court confirms the Plan.  Accordingly, holders of Discount Rights should act promptly in exercising or selling their Discount Rights.  If holders of Discount Rights wish to exercise their rights, they should carefully read and follow all of the instructions that are in the rights exercise form that they will receive soon after the Plan is confirmed by the Bankruptcy Court.  If holders of Discount Rights are considering selling their rights, they should contact a securities broker as soon as possible (even before the Plan is confirmed).

Holders of Delphi's existing common stock (as of the Confirmation Hearing Date) will receive their pro rata portion of non-transferable subscription rights to purchase 21,680,996 shares of New Common Stock of Reorganized Delphi at a price per share of $59.61 (at Plan Equity Value) (the "Par Value Rights Offering").  The Par Value Rights will be issued only to those individuals who are holders of Delphi's common stock as of the close of business on the date when the Confirmation Hearing commences.  The proceeds of the Par Value Rights Offering will be retained by the Debtors, if necessary, to satisfy certain liquidity requirements under their financing arrangements, or will be distributed to certain creditors in place of equity securities of Reorganized Delphi as set forth in the Plan.  To facilitate the Debtors' implementation of the Par Value Rights Offering, Appaloosa has agreed to make shares of New Common Stock that are otherwise distributable to it under the Plan available for purchase in the Par Value Rights Offering.  Appaloosa has further agreed (together with the other Plan Investors, if any, that have agreed not to participate in the Par Value Rights Offering) that it will not participate in the Par Value Rights Offering and the Par Value Rights that would otherwise be distributed to such parties pursuant to the Par Value Rights Offering by virtue of their current common stock holdings will be distributed to the other holders of Existing Common Stock.

Current stockholders of Delphi who may receive, but do not desire to exercise, their non-transferable Par Value Rights can sell their existing shares of Delphi common stock subject to applicable law and realize value by selling their shares.  Sale of shares prior to the date the Confirmation Hearing commences will effectively also result in the sale of the Par Value Rights and the right to receive New Common Stock and New Warrants on account of such shares in accordance with the Plan.  Neither Delphi nor its Board of Directors makes any recommendation with respect to any exercise or sale of shares of common stock.  See Section VII.C. – Rights Offerings for additional information regarding the Rights Offerings.

## 4.    *Confirmation And Consummation Of The Plan*

Although the Debtors need only establish that the stakeholders will receive at least as much under the proposed Plan as in a liquidation under chapter 7 of the Bankruptcy Code, the Debtors believe that the recoveries provided by the Plan will be significantly better than those realized through a liquidation.  Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the valuation analysis prepared by the Debtors' investment banker and financial advisor, Rothschild, and the liquidation analysis prepared by the Company with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc., the Debtors believe that the value of the Estates of the Debtors is significantly greater in the proposed reorganization than in a liquidation.

The Debtors believe that the Plan meets the requirements for confirmation under the Bankruptcy Code and applicable law.  Nonetheless, certain parties have alleged the following issues that may impact the confirmability of the Plan:

- Certain creditors claim that the Plan's treatment of TOPrS claims differently from other general unsecured claims may render the Plan unconfirmable.

- Certain creditors believe that the inclusion of the TOPrS claims within Class C (General Unsecured Claims) may be impermissible.

- Certain creditors claim that the Plan's provision that no payment of postpetition interest may be made on disputed claims pending dispute resolution may render the Plan unconfirmable.

- Certain stakeholders believe that the Plan impermissibly pays senior creditors more than 100% and that payment of postpetition interest to senior creditors is improper.

- Certain stakeholders believe that the Plan does not satisfy the "fair and equitable" or absolute priority requirements of the Bankruptcy Code because certain junior creditors and interest holders are to receive distributions.

- Certain stakeholders believe that the third-party releases provided by the Plan are overbroad and violate applicable law.

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims include claims arising as a result of trade claims (other than GM's claims, which are treated below), claims arising from the Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases.  Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  Under the Plan, holders of Allowed General Unsecured Claims (except for holders of TOPrS claims, who will receive such consideration equal to 90% of such holders' Allowed General Unsecured Claim, without accrued postpetition interest) shall receive New Common Stock and Discount Rights equal to 100% of such holders' Allowed General Unsecured Claim plus applicable Postpetition Interest.  The distribution of New Common Stock to holders of General Unsecured Claims will equal 77.3% of such holders' Allowed General Unsecured Claim, and the remaining 22.7% of such claim will be satisfied through the pro rata distribution of Discount Rights.  The distribution of New Common Stock and Discount Rights will be subject to certain rounding provisions.<br><br>**Estimated Amount Of Allowed Claims:**<br>**$3.260 billion to $3.690 billion plus applicable accrued postpetition interest in the amount of $397 million**<br><br>**Estimated Percentage Recovery:**<br><br>**100% of principal and applicable accrued postpetition interest through the earlier of the Confirmation Date or January 31, 2008, based on a distribution of New Common Stock at Plan Equity Value plus full participation in the Discount Rights Offering**<br><br>**The TOPrS subordination provision provisions will be deemed satisfied pursuant to the Plan, which will provide a recovery of 90% of the principal and accrued prepetition interest, but not accrued postpetition interest, to holders of TOPrS claims.** |

Notice Of Proposed Amendments
December 35, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The Plan serves as a motion to approve those agreements.  Under the Plan, for good and valuable consideration provided by GM under the Delphi-GM Definitive Documents, and in full settlement and satisfaction of the GM Claims, GM will receive all consideration set forth in the Delphi-GM Definitive Documents, including, without limitation, (1) $1.073 billion (in liquidation amount) in junior preferred securities, (2) $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms, (3) retention of the GM Surviving Claims as provided for in section 4.03 of the Settlement Agreement, (4) the effectuation of the IRC Section 414(l) assumption as provided for in section 2.03 of the Settlement Agreement, and (5) the releases as provided for in sections 3.01, 4.02, and 4.03 of the Settlement Agreement.<br><br>**Amount Of Allowed Claim:**        **Agreed Compromise**<br>**Estimated Percentage Recovery:**   **Agreed Compromise** |

Notice Of Proposed Amendments
December 35, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation pending in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes and TOPrS for damages or rescission in connection with the purchase or sale of those securities.  Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Note Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Note Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Note Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:**<br>**Allocated share of $179 million Allowed Claim**<br><br>**Estimated Percentage Recovery:**<br>**Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim based on a distribution of New Common Stock at Plan Equity Value plus full participation in the Discount Rights Offering** |

| Class Description | Treatment Under Plan |
|---|---|
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business. Under the Plan, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated, except that Intercompany Claims among Debtors that will be substantively consolidated as a Debtor group will be eliminated. The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized Delphi and will not affect distributions to other creditors under the Plan.<br><br>**Estimated Amount Of Claims:**     **N/A**<br>**Estimated Percentage Recovery:**    **N/A** |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date. Each Holder of ~~Delphi's~~ an allowed interest with respect to Existing Common Stock will receive a pro rata distribution of ~~direct distribution of 469,720~~(i) 461,552 shares of New Common Stock~~,~~ having an aggregate Plan Equity Value of $27.5 million, (ii) freely transferable six-month warrants to purchase an additional $1.0 billion of New Common Stock of Reorganized Delphi at an 9.0% premium to Plan Equity Value, (iii) freely transferable seven-year warrants to purchase 6,908,758 shares of New Common Stock of Reorganized Delphi (which comprises 5% of the fully diluted shares of Reorganized Delphi) at a 20.7% premium to Plan Equity Value, (iv) freely transferable ten-year warrants to purchase 2,819,901 shares of New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted shares of Reorganized Delphi) at Plan Equity Value, and (v) non-transferable par value rights to purchase up to 21,680,996 shares of the New Common Stock of Reorganized Delphi at Plan Equity Value.<br><br>**Estimated Recovery:**            **$~~288~~348 Million** |

~~Notice Of Proposed Amendments~~
December ~~3~~5, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) Equity Claims arise from the securities actions consolidated in the MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Equity Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Equity Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Equity Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims. <br><br>**Estimated Recovery:** <br>**Allocated share of $179 million Allowed Claim** <br><br>**Estimated Percentage Recovery:** <br>**Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim based on a distribution of New Common Stock at Plan Equity Value plus full participation in the Discount Rights Offering** |

Notice Of Proposed Amendments
December 35, 2007

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund a portion of the ERISA Settlement, which will be distributed ~~according to~~ in accordance with the ~~plan of allocation~~ ERISA Settlement approved by the MDL Court.<br><br>**Estimated Recovery:**<br>~~Allocated share of~~ $24.5 million Allowed Claim<br><br>**Estimated Percentage Recovery:**<br>**Agreed compromise which amounts to 100% recovery of principal amount of Allowed Claim based on a distribution of New Common Stock at Plan Equity Value plus full participation in the Discount Rights Offering** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Plan on account of such Other Interests.<br><br>**Percentage Recovery:          0%** |
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Plan, interests in affiliate Debtors will not be impaired or cancelled by the Plan.<br><br>**Estimated Amount Of Interests:    N/A**<br>**Estimated Percentage Recovery:    N/A** |

THE DEBTORS , THE CREDITORS' COMMITTEE, AND THE EQUITY COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS **STRONGLY RECOMMENDS** THAT YOU VOTE TO **ACCEPT** THE PLAN.  THE CREDITORS' COMMITTEE AND THE EQUITY COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

THE CREDITORS' COMMITTEE HAS ENCLOSED A LETTER TO ALL HOLDERS OF GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS, TO PROVIDE INFORMATION REGARDING THE PLAN.  THE COMMITTEE HAS ENCLOSED THAT LETTER TO HELP ALL GENERAL UNSECURED CREDITORS UNDERSTAND THE PLAN.  THE COMMITTEE STRONGLY RECOMMENDS YOU READ THAT LETTER CAREFULLY BEFORE YOU VOTE.

Settlement Agreement and the Restructuring Agreement is critical to the successful implementation of the Debtors' Transformation Plan and is also vitally important to GM.

The discussions between the Debtors and GM that ultimately led to the terms set forth in the Settlement Agreement and the Restructuring Agreement began shortly after the Debtors filed the GM Contract Rejection Motion.  As part of a joint effort to avoid litigation related to the GM Contract Rejection Motion, during the spring and summer of 2006, the Debtors and GM developed the framework for GM's contributions to the Debtors in support of the Transformation Plan and the guiding tenets for strengthening the parties' business relationship to achieve mutually beneficial commercial and strategic objectives, which are reflected in the Settlement Agreement and the Restructuring Agreement.

The Debtors' discussions with GM continued intermittently through April 2007.  By May 2007, the parties had agreed on the broad outlines of the Settlement Agreement and the Restructuring Agreement.  Throughout the summer of 2007, working groups of specialists in various subject matter areas together with senior management from the Debtors and GM developed comprehensive approaches for addressing a wide range of matters, including the resolution of issues related to the Debtors' pension and retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM, the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for certain ongoing commercial agreements. The parties exchanged initial drafts of various sections of the Settlement Agreement and the Restructuring Agreement in July 2007 and negotiated specific terms and conditions over the succeeding six weeks.  Both the Settlement Agreement and the Restructuring Agreement were substantially complete by the end of August 2007.

The Settlement Agreement addresses primarily those matters for which the Debtors and GM have agreed upon resolutions that can be implemented in the short term.  Accordingly, most obligations set forth in the Settlement Agreement are to be performed upon, or as soon as reasonably practicable after, the occurrence of the Effective Date of the Debtors' Plan.  By contrast, resolution of most of the matters addressed in the Restructuring Agreement shall require a significantly longer period that shall extend for a number of years after confirmation of the Plan.  The principal material terms of the Settlement Agreement and the Restructuring Agreement are described below.  In this section, terms not otherwise defined have the meanings set forth in the Settlement Agreement and Restructuring Agreement, as appropriate.

The Debtors believe the Settlement Agreement and the Restructuring Agreement serve the best interests of their Estates and creditors.  Together, these agreements shall permit the Debtors to implement the Transformation Plan with material support and broad cooperation from their largest customer.  Likewise, the agreements shall allow GM to manage the effects of its largest supplier's transformation on GM's supply chain and operations.  The Settlement Agreement and Restructuring Agreement were amended on December 5, 2007.

(a)    Global Settlement Agreement

The Settlement Agreement is intended to resolve outstanding issues among the Debtors and GM that have arisen or may arise before the Effective Date.  It addresses, among other

- GM shall reimburse Delphi for the USW Retirement Incentives actually paid by Delphi pursuant to certain provisions in the USW MOU-Home Avenue and Attachment C thereto; and

- In resolution of certain claims asserted by the USW, and without any acknowledgement by either GM or Delphi of those claims, GM agreed in the USW MOU – Home Avenue to pay the amount of $9 million to the VEBA described in the USW MOU – Home Avenue.

The Settlement Agreement also provides that Delphi shall continue to provide monthly wage payments, active employment benefits, and active health care to PRP participants pursuant to the USW MOU – Home Avenue.  GM shall have no obligation to reimburse Delphi for providing this level of active health care to the USW PRP participants.

(iii)    Releases And Claims Treatment

In partial consideration for the promises and agreements made by the Debtors and GM pursuant to the Settlement Agreement, the Restructuring Agreement, the Plan, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, and the Warranty Settlement Agreement, and subject to the provisions described below, the Settlement Agreement sets forth certain terms to resolve claims in existence as of the Effective Date that each of the Delphi-Related Parties or Delphi Affiliate Parties, on the one hand, and the GM-Related Parties, on the other hand, have or may have against each other, and that each of the Additional Releasing Parties, the UAW Releasing Parties, the IUE-CWA Releasing Parties, the USW Releasing Parties, the IAM Releasing Parties, the IBEW Releasing Parties, the IUOE Releasing Parties, and the Non-Represented Employees Releasing Parties have or may have against the GM-Related Parties.

(1)    Releases

Pursuant to Article IV of the Settlement Agreement:

- ~~The~~ **Pursuant to confirmation of a chapter 11 plan, the GM Related Parties shall receive broad, global releases from the Delphi Related Parties, the Delphi Affiliate Parties, and the Additional Releasing Parties; and**

- **The Delphi Related Parties and the Delphi Affiliate Parties shall receive broad, global releases from the GM Related Parties.**

- **Pursuant to the Settlement Agreement, "Additional Releasing Parties" means (i) creditors of any of the Debtors and current and former holders of equity interests in Delphi, (ii) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (iv) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (v) the DIP Agent in its capacity as such, (vi) the DIP Lenders solely in their capacities as such, (vii) all**

DS-72

The initial target grant of equity under the Long-Term Incentive Plan will be awarded for executives in Bands A through C in stock options, restricted stock units, cash, or a combination thereof and for Bands D and above, including DSB Members, one-half in restricted stock units and the other half in stock options. Further, one-half of the restricted stock units and options awarded will be time-vested and one-half will be performance-vested. The initial target grant will cover an 18-month period during which no further awards will be made (other than for an executive's promotion). For certain executives, the initial target grant of equity will be supplemented with an additional one-time grant of equity awards to maintain the executives' overall compensation levels at the median of competitive market practice considering the modifications being made to the supplemental retirement plans (as discussed under the New SERP and Salaried Retirement Equalization Savings Program sections below). The estimated lifetime total value of the supplemental grants is expected to be approximately $11.5 million. The aggregate long-term incentive opportunity, on an annualized basis, for all DSB Members and executives in Bands A through F is estimated to be approximately $80 million. This amount represents the total estimated value of the service-vested equity awards and performance-based equity awards, assuming target performance levels are achieved. As agreed to between Delphi and ADAH, the long-term incentive plan assumes that ~~10~~8% of the available shares of Delphi's fully diluted common stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity. The initial target grant of equity that will be made as of the Effective Date is expected to constitute approximately 3% of the available shares of Delphi's fully diluted common stock.

(v)     Chapter 11 Effective Date Executive Payments

As part of the overall total compensation program approved in 2005 by the Compensation Committee for DSB Members and in Bands A through F, the Company determined that long-term incentive performance opportunities should be paid on the Effective Date of the Plan in an amount equivalent to approximately 80% of an individual employee's 2004 long-term incentive performance target (as subsequently adjusted in some cases by the Compensation Committee) for a period equivalent to 18 months even if the chapter 11 reorganization took longer than 18 months to complete. (The Debtors currently estimate the period from the Filing Date to the Effective Date to be approximately 28 months.)

During the Chapter 11 Cases, certain outstanding long-term incentive awards that were granted prepetition with postpetition vesting cycles were thereafter cancelled and executives were not awarded any new grants during the postpetition period. In addition, the Debtors determined during the Chapter 11 Cases not to seek separate approval by the Bankruptcy Court for this element of the salaried executive compensation program but to instead incorporate the program into the Plan as part of the Plan confirmation process. The Company also expects to make an Effective Date payment to the Company's Executive Chairman (who does not participate in this or any other incentive compensation program) as determined by the Compensation Committee prior to the Effective Date.

Pursuant to Emergence Date performance payment program, cash payments made on the Effective Date would generally be equivalent to one-third of the annualized value of an executive's prepetition awards that were cancelled and the awards not granted during the

Notice Of Proposed Amendments
December ~~3~~5, 2007

Pursuant to the Par Value Rights Offering, Delphi's common stockholders at the Rights Offering Record Date will receive non-transferable Rights to purchase up to 21,680,996 shares (valued at Plan Equity Value of approximately $1.3 billion) of New Common Stock of Reorganized Delphi at an exercise price of $59.61, the negotiated Plan value of New Common Stock.  Of the Rights distributed in the Par Value Rights Offering, 648,745 represent shares that would otherwise be distributable to Appaloosa and 6,772,899 represent shares that would otherwise be distributable to the UAW, the IUE-CWA, the USW, and the holders of General Unsecured Claims.

The Plan Investors have committed, on the terms and subject to the conditions of the Investment Agreement, to purchase any shares of New Common Stock that were offered through the Discount Rights Offering to eligible holders, but whose rights were not properly exercised in the initial offering or through the exercise of oversubscription rights. In the event that no Discount Rights are exercised, the Plan Investors, through this backstop commitment, would purchase all of the unsubscribed shares for approximately $1.575 billion.

### 1.    Eligibility For Participation In Rights Offerings

Each holder of a General Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, and Section 510(b) ERISA Claim, as of the Rights Offering Record Date, or transferees receiving such holder's Discount Rights, will be entitled to participate in the Discount Rights Offering.  The Discount Rights will be freely transferable.

Each holder of Existing Common Stock as of the Rights Offering Record Date will be entitled to participate in the Par Value Rights Offering. The Rights Offering Record Date will be the date on which the Confirmation Hearing commences.

### 2.    Issuance Of Rights

The Rights will be issued after (i) the Bankruptcy Court has confirmed the Debtors' Plan and (ii) the SEC declares a registration statement for the Rights Offerings effective. Existing Common Stock holders that hold their shares through a brokerage account, bank, or other nominee will not receive an actual rights certificate. If a holder wishes to obtain a separate rights certificate, the holder should promptly contact its broker, bank, or other nominee and request a separate rights certificate. It will not be necessary to have a physical rights certificate to elect to exercise Rights.

In the Discount Rights Offering, holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims on the Rights Offering Record Date will receive Rights to purchase 41,026,309 shares of New Common Stock. Discount Rights will be transferable. The Rights will entitle holders to purchase New Common Stock for $38.39 per share.

In the Par Value Rights Offering, holders of Existing Common Stock on the Rights Offering Record Date will receive Rights to purchase up to 21,680,996 shares in the aggregate of New Common Stock (valued at Plan Equity Value of approximately $1.3 billion), at an exercise price of $59.61 per share.  Par Value Rights will not be transferable.

Notice Of Proposed Amendments
December 35, 2007

### 3.        Rights Offering Period

The Rights Offerings will commence when the Rights are distributed following confirmation of the Plan and effectiveness of a registration statement, and conclude approximately ~~30~~20 days later. After the Rights expire, any and all unexercised Rights will automatically terminate without further notice or order of the Bankruptcy Court, and any purported exercise of any such unexercised Rights by any Person will be null and void.

### 4.        Exercise Of Rights

The Rights Offering documents will set forth in detail how to exercise the Rights and such procedures should be carefully followed.

### 5.        Alternatives To Exercising The Rights

To realize value from the Rights Offerings, as alternatives to exercising the Rights, holders of the Rights may (i) in the case of Par Value Rights Offering, sell their shares of Existing Common Stock prior to the commencement of the Confirmation Hearing or (ii) in the case of the Discount Rights Offering, sell their Rights to participate in the Discount Rights Offering.

(a)        Sale Of Shares

In advance of the commencement of the Confirmation Hearing, a holder of Existing Common Stock may sell its shares. If a holder sold its shares prior to the Rights Offering Record Date, the buyer would be entitled to receive the Rights to participate in the Par Value Rights Offering.  In addition, by selling its shares prior to the Rights Offering Record Date, a shareholder would also be selling its entitlement to participate in the distribution to shareholders of New Common Stock and New Warrants contemplated by Article 5.7 of the Plan.

(b)        Sale Of Rights

Discount Rights will be transferable. Therefore, as an alternative to exercising the Rights, holders may sell the Discount Rights to third parties. Any such transfer of Discount Rights must be made sufficiently in advance of the expiration date of the Discount Rights Offering to comply with settlement procedures applicable to sales of securities. If trading in the Discount Rights is initiated, such trading can be expected to be on a customary basis in accordance with normal settlement procedures. Trades effected in Discount Rights will be required to be settled within three trading days after the trade date. A purchase and sale of Discount Rights that is effected on the date that is two days prior to the expiration date of the Discount Rights Offering would be required to be settled not later than the time the Discount Rights will have expired (or, if the holder uses guaranteed delivery procedures, not later than 5:00 p.m., New York City time, on the third business day after the expiration date). Therefore, if Discount Rights are purchased on or after the date that is two days prior to the expiration date and the holder does not properly comply with guaranteed delivery procedures, such Discount Rights may be received after they have already expired and will be of no value.

Notice Of Proposed Amendments
December ~~3~~5, 2007

November 13, 2007.  On November 13, 2007, the MDL Court conducted the fairness hearing and took the matter under advisement.

On September 7, 2007, the Debtors filed a motion seeking Bankruptcy Court approval of the MDL Settlements.  The motion was originally scheduled to be heard on September 27, 2007, but after consultation with a number of stakeholders, including counsel for the MDL plaintiffs and Creditors' Committee, the Debtors determined to use a two-step bifurcated approval process for the MDL Settlements in the Bankruptcy Court.  As the first step in the process, the Debtors sought and received preliminary approval of the MDL Settlements, including without limitation, class certification, and solicitation mechanics, at the October 25, 2007 omnibus hearing.  The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

On December 4, 2007, the MDL Court conducted a hearing to evaluate certain proposed modifications to the settlement as to the securities class.  All counsel for the Lead Plaintiffs in the securities class, as well as several of the Lead Plaintiffs themselves, took part in the hearing and expressed their agreement with the proposed modifications.  At the conclusion of the hearing, the MDL Court preliminarily approved the modifications, subject to entertaining any objections that might be raised after a reasonable notice to the securities class, such notice to be accomplished as prescribed by the MDL Court.

Under the terms of the MDL Settlements, which require the approval of both the MDL Court and the Bankruptcy Court, the Lead Plaintiffs and the ERISA Action plaintiffs will receive claims/interests that will be satisfied through the Debtors' Plan.  The Lead Plaintiffs will be granted a single Allowed Claim/Interest in the face amount of $179 million (which was reduced from an earlier agreed amount of $204 million in consideration of the Debtors' agreement to cooperate with monetization of these claims by the Lead Plaintiffs as discussed below).  The Lead Plaintiffs' $179 million Allowed Claim will be classified in both the Section 510(b) Note Claim and Section 510(b) Equity Claim classes pursuant to the terms of the Securities Settlement.  The Lead Plaintiffs' claim/interest will be satisfied through consideration in the same form, ratio, and treatment as what will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  If any class member opts out of the Securities Settlement, and ultimately receives an allowed claim in the Debtors' Chapter 11 Cases, the amount received by the holder of an allowed opt-out claim will be deducted from the amount used to satisfy the Lead Plaintiffs in the Securities Settlement.  A distribution made to a holder of an allowed opt-out claim will be in the same Plan currency as that distributed on account of the Securities Settlement.  The Debtors will object to any claims filed by members of the class in the Securities Action or individuals who opt out of the Securities Settlements in the Bankruptcy Court, and will seek to have such claims disallowed and/or expunged.  The ERISA Settlement is structured similarly to the Securities

Settlement.  The ERISA Plaintiffs' claim/interest will be allowed in the amount of $24.5 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  Unlike the Securities Settlement, the ERISA Plaintiffs are not entitled, and thus will not be able, to opt out of their settlement.

In addition to the proceeds from the claims in the Chapter 11 Cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds up to $88.6 million, including the remainder of any insurance proceeds (which proceeds could otherwise be used by directors and officers in connection with non-indemnifiable claims) that are not used by the eight former directors and officers as permitted in the MDL Settlements (as discussed further below), the amount of $15 million constituting a third party payment to the Debtors in connection with the Securities Settlement which the Debtors have agreed to redirect to the disbursing agent appointed by the MDL Court in partial monetization of the original agreed claim against the Debtors agreed to pursuant to the Securities Settlement, and a distribution of $1.5 million from certain underwriters named as defendants in the MDL proceedings.  The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million.  The additional proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements.  The insurance proceeds are being held in escrow accounts pursuant to the MDL Settlements and subject to the direction of the MDL Court.

In addition to the redirection of third party reimbursementspayment discussed above to facilitate monetization of claims the Allowed Claim agreed to by the Debtors pursuant to the Securities Settlement, the Debtors and the Lead Plaintiffs have agreed to support the entry of orders of the Bankruptcy Court and/or the MDL Court, as necessary and applicable, to authorize the Lead Plaintiffs on behalf of the class in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will to have the right to exercise the Discount Rights by delivering to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and , (ii) the number of shares of New Common Stock that the Lead Plaintiffs are purchasing through the Discount Rights Offering, and (iii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectivenessEffective Date of the Securities Settlement (as defined in the Securities Settlement), the amount of the rights offering exercise price in connection with the number of shares of New Common Stock purchased through the Discount Rights Offering forby the Lead Plaintiffs on behalf of the securities class (collectively, the "MDL Group").  In the event such notice is timely delivered, the Lead Plaintiffs shall cause to be released and/or transferred to Delphi, subsequent to the effectivenessEffective Date of the Securities Settlement, both (i) the cash proceeds obtained from parties (other than Delphi) to the Securities Settlement (which proceeds have already been received and escrowed pursuant to the terms of the Securities Settlement) up to an amount equal to the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the New Common Stock purchased pursuant to the Discount Rights Offering and (ii) if the amount delivered pursuant to clause (i) above does not fully cover the rights offering exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock that the Lead Plaintiffs on behalf of the class are to receive as an Allowed Claim on account of the Section 510(b) Note Claims and Section 510(b) Equity Claims pursuant to the terms of the Securities Settlement to

cover such shortfall (collectively, the "Relevant Consideration").  Notwithstanding anything to the contrary contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for of New Common Stock purchased by the MDL Group in connection with the Discount Rights Offering.

Pursuant to the MDL Settlements, none of the settling defendants in the MDL Actions admit any wrongdoing whatsoever and the MDL Settlements will in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the settling defendants with respect to any claim of any fault or liability or wrongdoing or damage whatsoever, or an infirmity in the defenses that the settling defendants have asserted or would assert in the MDL Actions.

(ii)    Indemnification Of Directors And Officers

In connection with the acts giving rise to the Multidistrict Litigation, certain current and former directors and officers of Delphi were named as defendants in various actions.  To the extent that current or former directors and officers of Delphi were to incur expenses in connection with defending, or were to be found liable for, the asserted causes of action, Delphi would be required under its certificate of incorporation and bylaws to indemnify those directors and officers for their liabilities to the fullest extent permissible under the Delaware General Corporation Law.  Delphi maintains insurance for its obligation to indemnify directors and officers.

With respect to the Demand regarding derivative actions against certain current and former directors and officers, a special committee (the "Special Committee") of the Board of Directors was established to determine whether the Company should pursue certain causes of action alleged in the Demand or any future demand for derivative action against certain current and former directors and officers.  The Special Committee, with the assistance of independent legal counsel, conducted an independent investigation of the allegations, including a thorough review of the prior investigative material gathered by the Audit Committee regarding related accounting matters and subsequent interviews of various individuals, including certain of the named defendants.  On August 7, 2007, the Special Committee of the Board of Directors determined that the Company would not pursue the actions alleged in the Demand against the current and former directors and officers.

Through the Company's waiver of any claims that it may have against certain current and former directors and officers, the Company's insurance providers have no contingent liability on account of these actions.  In connection with the Bankruptcy Court's approval of the MDL Settlements, all directors and officers who are insureds under the policies at issue will be barred from asserting any further claims against the policies.  In addition, in connection with the MDL Settlements, underwriters, Delphi's insurers, and certain directors and officers agreed to release claims against Delphi based on the MDL and certain government investigations.  In return, Delphi agreed to release claims against the directors and officers based on the same potential causes of action.  Thus, the waiver of the causes of action against certain current and former

### 1.    Settlements Embodied In The Plan

The foundation of Delphi's restructuring and the Plan is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes.  The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, and the MDL Plaintiffs (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries of the various holders of claims and interests under the Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests.  The Debtors also believe that the recoveries provided to holders of Claims and Interests under the Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements.  The Settlements among the Settlement Negotiation Parties have paved the way for the Plan, which will enable maximum distributions to all of the holders of Claims and Interests, without the cost and delay of litigation.  The Debtors believe that without GM's support embodied in the Settlement Agreement between Delphi and GM, the recoveries of "par plus accrued" at Plan value for the Debtors' unsecured creditors and the distributions to Delphi's existing equity holders would not be possible.  Without the resolution of the GM Claims and Defenses and the substantial contributions made by GM under the Settlement Agreement between Delphi and GM, the Debtors continue to believe they would be "hopelessly insolvent" (as the Debtors disclosed in December 2005), and unable to provide meaningful distributions to junior stakeholders or a par plus accrued at Plan value recovery for holders of unsecured claims.  It is the Debtors' belief that much of the value that is provided to junior stakeholders on account of their claims and interests is related to and derived from Delphi's settlement with GM.

The Equity Committee actively participated in the various negotiations leading to the Settlements.  As previously discussed, certain events and market factors affecting Plan distributions and the Debtors' businesses led to continued discussions among certain of the Settlement Negotiation Parties after the filing of the September 6 Plan. As a result of those discussions, which led to diminished distributions to the holders of Existing Common Stock, the Equity Committee now disagrees with and may oppose the terms of certain of the Settlements.

The claims and disputes being resolved by the Settlements include, among others:

- Delphi's potential claims and causes of action against GM, the Statutory Committees' request to prosecute such claims, and the resolution of GM's proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor unions.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Plan.

### (b)    Classes Of Claims That Are Impaired

(i)    Class C (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor.  The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, a TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, Secured Claim, Flow-Through Claim, GM Claim, Section 510(b) Note Claim, Intercompany Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

Holders of Allowed General Unsecured Claims will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, New Common Stock and Discount Rights equal to 100% of the allowed amount of 100% of Face Amount of such holders' Allowed General Unsecured Claims plus applicable Postpetition Interest, in the ratio described below.  Except as otherwise provided in and subject to Articles 7.15(b), 9.8, and 11.10 of the Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim and after giving effect to Article 11.10 of the Plan, each holder of an Allowed General Unsecured Claim will receive the number of shares of New Common Stock (at Plan Equity Value, as defined below) equal to 77.3% of the Face Amount of such Claim (including any applicable Postpetition Interest), except that in each case fractional shares of New Common Stock will not be distributed to holders of Allowed General Unsecured Claims, and all such fractional shares will be rounded, and distributions will be made, in accordance with Article 9.10 of the Plan.  The Plan Equity Value is equal to the Debtors' total enterprise value of $13.3 billion, less net debt and warrant value of approximately $5.45 billion, which results in a distributable equity value of $7.8 billion, or $59.61 per share of New Common Stock based on 131,266,407 shares issued and outstanding (assuming full conversion of the New Preferred Stock) as of the Effective Date.

In satisfaction of the remaining portion of each holders' General Unsecured Claim (after accounting for the distribution to take place pursuant to the description above), on the commencement date of the Discount Rights Offering and pursuant to the Registration Statement and Article 7.15(a) of the Plan, each Discount Rights Offering Eligible Holder will receive such holder's Pro Rata share (based upon the total amountFace Amount of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims eligible to participate in the Discount Rights offering pursuant to Article 7.15(a) of the Plan) of transferable Discount Rights.  In addition, (i) pursuant to the Discount Rights Offering, each Exercising Creditor will receive the opportunity to exercise its Pro Rata portion (with respect to

all Exercising Creditors) of Discount Oversubscription Rights and (ii) each Non-exercising Creditor will receive, on the first Periodic Distribution Date occurring after the later of (a) the date when the Non-exercising Creditor's General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a the Non-exercising Creditor's General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, such holder's Pro Rata portion (with respect to all Non-exercising Creditors) of the Oversubscription Cash.

(1)    Satisfaction Of TOPrS' Subordination Provisions

The Indenture with respect to the Trust Preferred Securities, or TOPrS, dated as of October 28, 2003 (the "TOPrS Indenture"), provides that the TOPrS are subordinated to "Senior Debt." "Senior Debt" is defined as any obligation of Delphi Corporation to its creditors other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the TOPrS, (ii) obligations evidenced by the TOPrS, and (iii) obligations that are expressly stated in the terms of the TOPrS (or in the TOPrS Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 of the TOPrS  Indenture with respect to such TOPrS) not to be Senior Debt.  In this regard, Delphi covenanted in the TOPrS Indenture that the TOPrS are subordinate and junior in right of payment to all Senior Debt to the extent provided therein, and each holder of the TOPrS covenanted and agreed to the subordination therein provided.

Article 17.01 of the TOPrS Indenture also provides that, in the event that ~~the Corporation~~Delphi shall default on any Senior Debt, no payments shall be made on account of the TOPrS until such default is cured, waived, or shall cease to exist and, in the event of a bankruptcy proceeding all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property (other than securities of ~~the Corporation~~Delphi or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the TOPrS, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) which would otherwise (but for subordination) be payable or deliverable in respect of the TOPrS  shall be paid or delivered directly to the Holders of Senior Debt until all Senior Debt shall have been paid in full.  This subordination provision essentially provides that, should any payment be made to the TOPrS holders prior to payment in full of Senior Debt (except for certain securities as set forth above), those assets paid shall be held in trust for and turned over to the Senior Debt holders.

The TOPrS Indenture provides that Senior Debt shall not be deemed to have been paid in full unless the holders thereof receive cash, securities, or other property equal to the amount of such Senior Debt then outstanding.  Once Senior Debt is paid in full, the holders of the TOPrS are subrogated to Senior Debt's rights to receive further distributions.

Under the Plan, Senior Debt is to be paid in full and the subordination provisions of the TOPrS Indenture are accordingly deemed satisfied.  Moreover, the distributions afforded to the

which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor affiliate will be Reinstated.

(v)    Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

As described below, holders of Allowed Interests pertaining to Existing Common Stock will receive direct a distribution of 469,720(i) 461,552 shares of New Common Stock, having a Plan Equity Value of $27.5 million, (ii) Par Value Rights exercisable at Plan Equity Value, (iii) Seven-Year Warrants exercisable at a 20.7% premium to the Plan Equity Value, (iv) Six-Month Warrants exercisable at a 9.0% premium to the Plan Equity Value, and (v) Ten-Year Warrants exercisable at Plan Equity Value.

On the Effective Date, the Existing Common Stock will be cancelled.  On the Distribution Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Interest pertaining to the Existing Common Stock will receive in exchange for such Interest its Pro Rata distribution of direct distribution of 469,720(i) 461,552 shares of New Common Stock, (ii) Seven-Year Warrants,  (iii) Six-Month Warrants, and (iv) Ten-Year Warrants.  On the commencement date of the Par Value Rights Offering and pursuant to the Registration Statement and Article 7.15(b) of the Plan, each holder of an Allowed Interest pertaining to the Existing Common Stock as of the Rights Offerings Record Date will receive its Pro Rata portion of non-transferable Par Value Rights to purchase 21,680,996 shares of New Common Stock pursuant to the Par Value Rights Offering; except that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering may not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock.

The Equity Committee has reserved its right to assert claims in the Chapter 11 Cases solely within the equity class with respect to the allocation of distributions among existing equity holders, based on facts and circumstances in these cases.

(vi)    Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims.  "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

Notice Of Proposed Amendments
December 35, 2007

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court..  If any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, however, then the holder of such Allowed Section 510(b) Opt Out Equity Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights as is distributed to holders of General Unsecured Claims; it being understood that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(vii)    Class H (Section 510(b) ERISA Claims).

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement.

(viii)    Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

**F.    Means For Implementation Of The Plan**

*1.    Continued Corporate Existence*

Subject to the Restructuring Transactions contemplated by the Plan, each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or

(iii)    Distribution Of New Common Stock

All New Common Stock issued in connection with the exercise of Discount Rights and Discount Oversubscription Rights pursuant to the Discount Rights Offering will be issued on the Effective Date and will be distributed to holders of Rights who have exercised the Rights on, or as soon as reasonably practicable after, the Distribution Date.

(iv)    Exercise Of Discount Rights By Lead Plaintiffs

Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as necessary and applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise the Discount Rights by delivering to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and, (ii) the number of shares of New Common Stock that the Lead Plaintiffs are purchasing through the Discount Rights Offering, and (iii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness Effective Date of the Securities Settlement (as defined in the Securities Settlement), the amount of the rights offering exercise price in connection with the number of shares of New Common Stock purchased through the Discount Rights Offering for by the Lead Plaintiffs on behalf of the securities class (collectively, the "MDL Group").  In the event such notice is timely delivered, the Lead Plaintiffs shall cause to be released and/or transferred to Delphi, subsequent to the effectiveness Effective Date of the Securities Settlement, both (i) the cash proceeds obtained from parties (other than Delphi) to the Securities Settlement (which proceeds have already been received and escrowed pursuant to the terms of the Securities Settlement) up to an amount equal to the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the New Common Stock purchased pursuant to the Discount Rights Offering and (ii) if the amount delivered pursuant to clause (i) above does not fully cover the rights offering exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock that the Lead Plaintiffs on behalf of the class are to receive as an Allowed Claim on account of the Section 510(b) Note Claims and Section 510(b) Equity Claims pursuant to the terms of the Securities Settlement to cover such shortfall (collectively, the "Relevant Consideration").  Notwithstanding anything to the contrary contained herein, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for of the New Common Stock purchased by the MDL Group in connection with the Discount Rights Offering.

(b)    Par Value Rights Offering

(i)    New Common Stock Offered In Par Value Rights Offering

Through the Par Value Rights Offering, 21,680,996 shares of New Common Stock will be made available for subscription to holders of Existing Common Stock.  Of the 21,680,996 shares of New Common Stock made available through the Par Value Rights Offering, 7,421,644 shares of the New Common Stock will consist of New Common Stock otherwise distributable to

Notice Of Proposed Amendments
December 3 5, 2007

the following groups of holders of Claims in the following amounts (in each case at $59.61 per share): (a) 648,745 shares of New Common Stock otherwise distributable to Appaloosa, (b) all of the New Common Stock distributable to the UAW, IUE-CWA, and USW (the "Contributing Unions") based on such unions' Allowed Claims, and (c) an amount of New Common Stock otherwise distributable to holders of Claims in Classes 1C through 12C as a whole (excluding the otherwise distributable New Common Stock referred to in clauses (a) and (b)) which is equal to the difference between 7,421,644 shares of New Common Stock and the sum of the number of shares of New Common Stock referred to in clause (a) and (b) (the "Contributing Creditors").

        (ii)     Eligibility For Participation In Par Value Rights Offering

Pursuant to the Registration Statement, and under the terms of Article 5.7 of the Plan, Delphi will commence a Par Value Rights Offering pursuant to which each holder of Existing Common Stock on the Rights Offering Record Date will be offered the opportunity to purchase its Pro Rata portion of 21,680,996 shares of New Common Stock, in exchange for a Cash payment equal to $59.61 per share of New Common Stock; except that Appaloosa and the other Plan Investors, if any, which have agreed to not participate in the Par Value Rights Offering will not participate in the Par Value Rights Offering and Par Value Rights that would otherwise be distributed to Appaloosa and such other Plan Investors will be instead distributed to the other holders of Existing Common Stock.

        (iii)    Use Of Par Value Rights Offering Proceeds

Proceeds, if any, generated by the Par Value Rights Offering will be allocated in the following order:

- First, up to $850 million, to satisfy the amount, if any, by which the Liquidity Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement) is less than $3.189 billion (after giving effect to any Excess Amount (as defined in Exhibit F to the Delphi-GM Global Settlement Agreement));

- Second, up to $850 million less the amount, if any allocated pursuant to the first allocation described above, to satisfy the shortfall, if any, required to satisfy the condition set forth in the third sentence of section 9(a)(xxvii) of the Investment Agreement;

- Third, to satisfy the Allowed Claims of the Contributing Unions, on a Pro Rata basis among the Contributing Unions, based upon the number of shares of New Common Stock contributed by each Contributing Union to the Par Value Rights Offering as described in Article 7.15(b)(i) of the Plan; provided, however, that the distribution of proceeds from the Par Value Rights Offering pursuant to this clause will decrease the number of shares of New Common Stock otherwise distributable to the Contributing Unions pursuant to Article 5.3 of the Plan on a Pro Rata basis based upon the number of shares of New Common Stock contributed to the Par Value Rights Offering by the Contributing Unions as described in Article 7.15(b)(i) of the Plan;

1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the Seven-Year Warrants will be used by Reorganized Delphi for general corporate purposes.

(b)    Six-Month Warrants

On the Effective Date, Reorganized Delphi will authorize, and no later than the Distribution Date Reorganized Delphi shall issue, and deliver the Six-Month Warrants, pursuant to the terms of the Six-Month Warrant Agreement attached to the Plan as Exhibit 7.18(b), to purchase up to $1 billion of shares New Common Stock of Reorganized Delphi at a strike price of $65.00 per share (a 9.0% premium to the Plan Equity Value).  The issuance of the Six-Month Warrants and the New Common Stock underlying the Six-Month Warrants will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the Six-Month Warrants will be allocated in the following order:  first, to redeem any shares of "Series C" New Preferred Stock distributed to GM, if any shares remain outstanding, at the preferred liquidation preference value as defined in Exhibit G to the Delphi-GM Global Settlement Agreement; second, to redeem the GM Note(s), at par including accrued and unpaid interest; third, to be used by Reorganized Delphi for general corporate purposes.

(c)    Ten-Year Warrants

On the Effective Date, Reorganized Delphi will authorize, and no later than the Distribution Date Reorganized Delphi shall is required to issue, and deliver the Ten-Year Warrants, pursuant to the terms of the Ten-Year Warrant Agreement attached to the Plan as Exhibit 7.18(c), for 2,819,901 shares of New Common Stock of Reorganized Delphi (which comprises 2% of the fully diluted New Common Stock) at a strike price of $59.61 per share.  The issuance of the Ten-Year Warrants and the New Common Stock underlying the Ten-Year Warrants must be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  The proceeds generated from the exercise of the Ten-Year Warrants will be used by Reorganized Delphi for general corporate purposes.

### 18.    MDL Settlements

The MDL Settlements are subject to final consideration by the Bankruptcy Court at the Confirmation Hearing on the Debtors' Plan, following the Bankruptcy Court's consideration of certain objections that may be filed by any of the "Potential Objectors" (that is, (i) the Official Committee of Unsecured Creditors, (ii) the United States Department of Labor, (iii) Wilmington Trust Company, as indenture trustee, (iv) the Ad Hoc Committee of Trade Creditors, (v) Davidson Kempner Capital Management LLC, SPCP Group, LLC, Castlerigg Master Investments Ltd., Elliott Associates, L.P., and CR Intrinsic Investors, LLC, and (vi) the Equity Committee) by the deadline for filing objections to the confirmation of the Plan.

(a)    Securities Settlement

Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the Securities Settlement, a copy of which is attached to

the Plan as Exhibit 7.19(a), becomes a Final Order, Reorganized Delphi will, in accordance with the Securities Settlement, distribute the New Common Stock and Discount Rights described in Articles 5.5 and 5.8 of the Plan to the disbursing agent appointed by the MDL Court.  Such distribution shall be made in accordance with any order entered by the MDL Court which modifies distributions under the Securities Settlement on a non-material basis in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court.  Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as necessary and applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise the Discount Rights by delivering to deliver to Delphi a notice during the pendency of the rights offering for the Discount Rights stating that (i) the Lead Plaintiffs elect to participate in the rights offering for the Discount Rights and , (ii) the number of shares of New Common Stock that the Lead Plaintiffs are purchasing through the Discount Rights Offering, and (iii) the Lead Plaintiffs elect to reimburse Delphi, subsequent to the effectiveness of the Securities Settlement, the amount of the rights offering exercise price in connection with the number of shares of New Common Stock purchased through the Discount Rights Offering for the Lead Plaintiffs on behalf of the securities class as described more particularly in Article 7.15(a)(iv) of the Plan.  Notwithstanding anything contained hereinthe foregoing, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the Discount Rights Offering.

(b)    ERISA Settlement

Upon the later of the Effective Date or the date the last order, as between the Bankruptcy Court and the MDL Court, approving the ERISA Settlement, a copy of which is attached to the Plan as Exhibit 7.19(b), becomes a Final Order, Reorganized Delphi will, in accordance with the ERISA Settlement, distribute the New Common Stock and Discount Rights described in Articles 5.9 of the Plan to the disbursing agent appointed by the MDL Court.

(c)    Insurance Settlement

In connection with the Securities Settlement and the ERISA Settlement, Delphi, certain defendants in the MDL Actions, and Delphi's insurers entered into the Insurance Settlement, a copy of which is attached to the Plan as Exhibit 7.19(c).

### 19.    GM Settlement

The Plan constitutes a request to authorize and approve the (a) Settlement Agreement, attached to the Plan as Exhibit 7.20(a), that will resolve the GM Claims, and (b) the Restructuring Agreement, attached to the Plan as Exhibit 7.20(b), that will set forth the continuing obligations of GM and Delphi, which will become effective on the Effective Date, subject to the terms contained therein.  Each of the Settlement Agreement and Restructuring Agreement are incorporated by reference into this Plan in their entirety.  In that regard, the Settlement Agreement and Restructuring Agreement address issues specifically relating to the

Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1 on or before the Confirmation Date.

### 2.    *Payments Related To Assumption Of Executory Contracts And Unexpired Leases*

#### (a)    Material Supply Agreements

Any monetary amounts by which each Material Supply Agreement to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure, and will be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent that Cure has not already been agreed to between the Debtor party to the agreement and the non-Debtor party, the Debtors or Reorganized Debtors will provide each party whose Material Supply Agreement is being assumed or assumed and assigned pursuant to the Plan, in accordance with the Cure procedures established under the Solicitation Procedures Order, with a notice that will provide:  (i) the contract or lease being assumed or assumed and assigned; (ii) the name of the proposed assignee, if any; (iii) the proposed cure amount (the "Cure Amount Claim"), if any, that the applicable Debtor or Reorganized Debtor believes it (or its assignee) would be obligated to pay in connection with such assumptions; (iv) an election for the payment terms of the Cure Amount Claim, and (v) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Claim Amount (the "Cure Amount Notice").  The Cure Amount Notice will be in substantially the form approved by the Bankruptcy Court under the Solicitation Procedures Order and will be served on each non-Debtor party or parties to a Material Supply Agreement.  If the non-Debtor party does not timely respond to the Cure Amount Notice, the Cure Amount Claim will be paid in New Common Stock and Discount Rights in the same proportion as that received by holders of Allowed General Unsecured Claims on or as soon as reasonably practicable after the Effective Date.  If the non-Debtor party responds to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order and the non-Debtor party asserts a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (z) any other matter pertaining to assumptions, Cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.  If there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a final order establishing a Cure amount in excess of that provided by the Debtors.  The Creditors' Committee shall be provided access to information regarding the Debtors' proposed Cure Claim payments above a threshold amount to be reasonably agreed upon by the Creditors' Committee and the Debtors, after which the Creditors' Committee may object to a proposed Cure Claim payment; provided, however, that any unreasonable unresolved objection shall be determined by the Bankruptcy Court after notice and hearing.

### 3. *Rejection Damages Bar Date*

If the rejection by the Debtors (pursuant to the Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry notice of the Confirmation Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

### 4. *Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases*

In connection with their efforts related to divestiture transactions, the Debtors may seek entry of an order that, among other things, approves the assumption and assignment of certain executory contracts or unexpired leases to the buyer of a certain business or product line. The Debtors, however, would not consummate the assumption of such contracts and leases until the earlier of the closing of the related divestiture transaction or the Effective Date. Thus, the Plan provides that in the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor(s) does not assume and assign such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption shall be consummated pursuant to Article VIII of the Plan and service of notice and any cure payments owed to a non-Debtor counterparty under such contracts and leases shall be made pursuant to Article 8.2 of the Plan and (b) a Debtor(s) shall be permitted to assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order. Because the assumption may be consummated in connection with either the closing of the divestiture transaction or the Plan, the Debtors would provide each non-Debtor counterparty under the applicable contracts and leases with both a cure notice in connection with the divestiture transaction and the Cure Amount Notice. If the closing of the divestiture transaction occurs before the Effective Date, then the Cure Amount Claim would be paid in cash. If the closing of the divestiture transaction occurs after the Effective Date, then the Cure Amount Claim would be paid with the currency provided under the Plan.

## H. Provisions Governing Distributions

### 1. *Time Of Distributions*

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Plan will be made on a Periodic Distribution Date.

### 2. *No Interest On Disputed Claims*

Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in

and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim or an Allowed Interest in such liquidated amount and satisfied in accordance with the Plan.  The Plan will not constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

(e)    Claims Bar Date

Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Article 8.3 of this Plan for the filing of such claims, or (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to Article 10.5 of this Plan, shall not be recognized, or recorded on the claims register, by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, and the Debtors', Reorganized Debtors', and other parties in interest's rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

7.    *Delivery Of Distributions*

(a)    Allowed Claims

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

(b)    Allowed Interests

For the purpose of making distributions (other than the Rights) to holders of Allowed Interests pertaining to Existing Common Stock, the transfer ledger in respect of the Existing Common Stock in Delphi will be closed as of the close of business on the Effective Date, and the Disbursing Agent and its respective agents will be entitled to recognize and deal for all purposes with only those holders of record stated on the transfer ledger maintained by the stock transfer agent for the Existing Common Stock in Delphi as of the close of business on the Effective Date.

(c)      Undeliverable Distributions

If any distribution to a holder of a Claim or Interest is returned as undeliverable, no further distributions to such holder of such Claim or Interest will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim or Interest, at which time all missed distributions will be made to such holder of the Claim or Interest without interest. Amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors until such distributions are claimed.  The Debtors will make reasonable efforts to locate holders of undeliverable distributions.  All claims for undeliverable distributions must be made on or before the later to occur of (i) the ~~second~~first anniversary of the Effective Date or (ii) six months after such holder's Claim or Interest becomes an Allowed Claim or an Allowed Interest, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

**8.      *Procedures For Treating And Resolving Disputed And Contingent Claims And Interests***

(a)      No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest.  All objections to Claims or Interests must be filed on or before the Claims Objection Deadline.

(b)      Distribution Reserve

The Debtors will establish one or more Distribution Reserves of New Common Stock, New Warrants, Oversubscription Cash, and Cash raised by the Par Value Rights Offering for the purpose of effectuating distributions to holders of Disputed Claims or Disputed Interests pending the allowance or disallowance of such claims or interests in accordance with the Plan.

(i)      Distribution Reserve Related To New Common Stock And New Warrants Distributed Pursuant To The Plan

The Debtors or the Disbursing Agent will establish a reserve to hold the New Common Stock and New Warrants that would otherwise be distributed to holders of Disputed Claims or Disputed Interests based on the amounts of such Claims or Interests estimated by the Bankruptcy Court or agreed to by the holder of such Claim or Interest and the Debtors.

(ii)      Distribution Reserve For Oversubscription Cash

The Debtors or Disbursing Agent will establish a Distribution Reserve for the Oversubscription Cash.  The Distribution Reserve will be equal to the Pro Rata portion of the

DS-214

No Section 510(b) Opt Out Claim will be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution that would have been otherwise distributed under the Plan solely from the applicable portion of the Securities Settlement.  In no event will any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim will ultimately become an Allowed Claim or regardless of whether sufficient New Common Stock or Discount Rights remain available for distribution at the time such Claim is Allowed.

### 10.    *Fractional Securities*

Payments of fractions of shares of New Common Stock or New Warrantsto holders of General Unsecured Claims will not be made.  Fractional shares of New Common Stock or New Warrants that would otherwise be distributed under the Plan will be rounded to the nearest whole number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number of shares and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number of shares.

In lieu of a distribution of fractional shares of New Common Stock and New Warrants, such fractional shares of New Common Stock and New Warrants will be aggregated and sold, and the Cash generated by such sale will be distributed pro rata to holders of Existing Common Stock.  Notwithstanding the foregoing, a holder of Existing Common Stock may elect to receive a distribution of fractional warrants in lieu of cash, provided, however, that a fractional warrant will not be exercisable unless it is aggregated with other fractional warrants so as to permit the exercise for one whole share as more fully described in the agreements governing the New Warrants.

### I.    **Allowance And Payment Of Certain Administrative Claims**

### 1.    *DIP Facility Claims*

(a)    <u>DIP Facility Revolver Claims</u>

On the Effective Date, the DIP Facility Revolver Claim will be allowed in an amount to be agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date.

(b)    <u>DIP Facility First Priority Term Claim</u>

On the Effective Date, the principal amount of the DIP Facility First Priority Term Claim will be allowed in an amount agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP

an Indenture Trustee has delivered notice that its prepetition fees and expenses are less than the amounts set forth on Exhibit 10.4 of the Plan or absent any such objection, the Indenture Trustees' invoice for its fees and expenses will be paid by the Debtors or Reorganized Debtors, as applicable, on the Effective Date, or as soon thereafter as practicable, without need to file an application for the payment of its fees and without need for further order of the Bankruptcy Court.

Law Debenture Trust Company of New York as indenture trustee ("Law Debenture") contends that the Plan does not provide for payment of Law Debenture's postpetition fees and expenses (which at present total approximately $1.2 million and which continue to accrue), and that it will be required to assert its "charging lien" against distributions reserved for TOPrS and, in turn, compelled to hold for a period of time and ultimately liquidate a portion of the TOPrS' distribution of Reorganized Delphi stock to satisfy those outstanding fees and expenses.

### 5. Other Administrative Claims

All other requests for payment of an Administrative Claim (other than as set forth in the Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached to the Plan as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than 45 days after the Effective Date. Any request for payment of an Administrative Claim pursuant to the Plan that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors. The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 60 days after the Administrative Claims Bar Date unless such objection period is extended by the Bankruptcy Court, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business.

### J. Effect Of The Plan On Claims And Interests

### 1. Revesting Of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) will revest in each of the Debtors which owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders. As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

## X.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

Every holder of a Claim against or Interest in a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors.  Certain Claims and Interests may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  The recapitalization of the Debtors realizes the going concern value of the Debtors for the holders of Claims and Interests.  Moreover, reorganization of the Debtors' business and operations under the proposed Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of its customers and suppliers.

### B.    Certain Bankruptcy Considerations

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan.  If a liquidation or protracted and litigated reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.  See Appendix E attached to this Disclosure Statement for liquidation analyses of the Debtors, showing hypothetical chapter 7 liquidation scenarios.

Prior to and during the hearing on this Disclosure Statement, several parties interposed objections related to the confirmability of the Debtors' Plan.  The objections were filed with the Bankruptcy Court and can be reviewed by accessing the Bankruptcy Court's docket or the Debtors' Legal Information Website, www.delphidocket.com.  The parties that filed these objections include the Creditors' Committee, the Equity Committee, the Ad Hoc Committee of Trade Creditors, Wilmington Trust Company as indenture trustee, Law Debenture Trust Company of New York as indenture trustee, and an ad hoc group of bondholders (the "Objectors").

The Debtors believe these objections are without merit and, to the extent that the Objectors press these objections at the Confirmation Hearing and agreement is not reached with the Objectors prior to the Confirmation Hearing, the Debtors believe that they will prevail on these issues at confirmation.  The summary below is meant only to provide a general overview of the objections raised by certain of the Objectors.  Certain of the Objectors have alleged the issues summarized below and may continue to prosecute the following objections:

- The Plan allegedly treats claims in the same class differently and is unfairly discriminatory.  In particular, certain Objectors claim that the Plan's proposed treatment of TOPrS claims is differentdifferently from other general unsecured claims.

Notice Of Proposed Amendments
December 35, 2007

- ~~The fact that the Plan does not provide for payment of~~ – holders of TOPrS claims will receive a recovery of 90% of the principal plus accrued prepetition interest, and no accrued postpetition interest, although general unsecured claims receive 100% of the principal, accrued prepetition interest, and accrued postpetition interest – may render the Plan unconfirmable.

- The fact that the Plan does not provide for payment of postpetition interest on disputed claims pending dispute resolution allegedly may render the Plan unconfirmable.

- Classification of certain claims under the Plan is allegedly improper.  In particular, certain Objectors believe the inclusion of the TOPrS claims within Class C (General Unsecured Claims) may be impermissible.

- The Plan allegedly does not satisfy the "fair and equitable" or absolute priority requirements of the Bankruptcy Code because holders of TOPrS claims will not receive payment in full, while certain junior creditors and interest holders receive distributions.

- The third-party releases provided by the Plan are alleged to be overbroad and violate applicable law.

- The substantive consolidation that may be effected by the Plan is alleged to be unsupportable by applicable law or the facts of these Chapter 11 Cases.

### C.    Business Factors And Competitive Conditions

#### 1.    *The Cyclical Nature Of Automotive Sales And Production Can Adversely Affect Delphi's Business*

Delphi's business is directly related to automotive sales and automotive vehicle production by its customers. Automotive sales and production are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences as well as changes in interest rate levels, consumer confidence, and fuel costs. In addition, automotive sales and production can be affected by labor relations issues, regulatory requirements, trade agreements, and other factors. Any significant economic decline that results in a reduction in automotive sales and production by Delphi's customers will have a material adverse effect on the Company's business, results of operations, and financial condition.

Delphi's sales are also affected by inventory levels and OEM's production levels. Delphi cannot predict when OEMs will decide either to build or reduce inventory levels or whether new inventory levels will approximate historical inventory levels. This may result in variability in the Company's sales and financial condition. Uncertainty regarding inventory levels may be exacerbated by favorable consumer financing programs initiated by OEMs which may accelerate sales that otherwise would occur in future periods. Delphi also has historically experienced sales

indebtedness may be required.  Any such deferred interest expense would be attributed to the New Common Stock and Discount Rights received in exchange for the Claim, and would be treated as interest paid or accrued in the year in which the New Common Stock and Discount Rights are disposed.

### 3.    *Existing Common Stockholders*

A holder of Delphi's Existing Common Stock that receives New Common Stock pursuant to the Plan will not recognize income, gain, deduction, or loss on the receipt of New Common Stock, Rights, and New Warrants.  A holder's adjusted tax basis in its Existing Common Stock should be allocated among the New Common Stock, Rights, and New Warrants based upon the relative fair market values thereof.  The holding period for the New Common Stock, Rights, and New Warrants will include the holder's holding period for the Existing Common Stock.

A holder of Delphi's Existing Common Stock that does not receive New Common Stock pursuant to the Plan (for example, due to the fact that payments of fractions of shares of New Common Stock will not be made to holders of Existing Common Stock) generally will recognize capital gain or loss (subject to the wash sale rules discussed below) on the receipt of Par Value Rights in the Par Value Rights Offerings and any New Warrants issued in the Plan in an amount equal to the difference between the fair market value of the Par Value Rights and New Warrants, if any, received and the holder's adjusted tax basis in the Existing Common Stock exchanged for such Par Value Rights and New Warrants.  Such capital gain or loss will be long-term capital gain or loss if the holding period for the Existing Common Stock exchanged for the Par Value Rights and New Warrants exceeds one year at the time the Par Value Rights and New Warrants are distributed.  Capital gains of non-corporate holders may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.  Holders are urged to consult their own tax advisors regarding such limitations.  The holder's tax basis in the Par Value Rights and New Warrants, if any, will be equal to the fair market value of the Par Value Rights and New Warrants at the time the Par Value Rights and New Warrants are received.  The holding period for the Par Value Rights and New Warrants, if any, will commence on the day after the date of receipt.

To the extent a loss would otherwise be recognizable on the exchange, such loss may be deferred under the "wash sale" rules of the Code. The wash sale rules provide for the disallowance of a loss on the sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the holder acquired, or has entered into a contract or option to acquire, "substantially identical" stock or securities. If the Existing Common Stock and the New Common Stock receivable upon exercise of the Par Value Rights and New Warrants are considered substantially identical and the exchange of Existing Common Stock for Par Value Rights and New Warrants results in a loss to the holder, such loss may be disallowed and added to the tax basis of the Par Value Rights and New Warrants received. The extent to which such loss would be disallowed is unclear. Holders of Existing Common Stock are urged to consult their own tax advisors regarding how the "wash sale" rules apply to them in light of their particular circumstances.

- All conditions to effectiveness in the Delphi-GM Definitive Documents must have been satisfied or waived in accordance with the terms of the Delphi-GM Definitive Documents.  (Article 12.2(j) of the Plan.)

## C.    Waiver Of Conditions To Confirmation And Consummation Of The Plan

The conditions set forth in Articles 12.1(a), 12.2(c), and 12.2(e) of the Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing; provided, however that in connection with the satisfaction or waiver of the condition set forth in Article 12.2(e) of the Plan, no material modification of the Investment Agreement, the Delphi-GM Definitive Documents and the exhibits to each such ~~agreements~~agreement (except Exhibits B and C to the Investment Agreement) that ~~have~~ has a material adverse effect on the recoveries of unsecured creditors may be made without the consent of the Creditors' Committee and the respective non-Debtor counterparty to the agreement.  Article 12.2(i) of the Plan may be waived jointly by the Debtors and Appaloosa (as lead Plan Investor), provided, however that no waiver of Article 12.2(i) of the Plan shall be effective unless notice is first given to the Creditors' Committee; provided further, however, that such waiver shall be effective upon the earlier of (i) the Creditors' Committee's consent and (ii) 12:00 noon New York time on the third Business Day after the notice is given to the Creditors' Committee unless the Creditors' Committee has provided written notice pursuant to Article 14.8 of the Plan that the Creditors' Committee has voted affirmatively to object to the effectiveness of the waiver solely on the basis that the recoveries of unsecured creditors would be materially adversely affected if the waiver were implemented (and in such case the waiver shall not become effective unless the Bankruptcy Court thereafter determines that the effectiveness of the waiver would not materially adversely affect unsecured creditors' recoveries).  No other condition set forth in Articles 12.1 and 12.2 of the Plan may be waived.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## D.    Retention Of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among others, the following matters:

(a)    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

(b)    to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;