EXHIBIT I

<u>Cumulative Blackline Of Appendix B To Disclosure Statement</u>
<u>(Marked To Show All Changes Since September 6, 2007)</u>

# APPENDIX B

# HISTORICAL FINANCIAL RESULTS

## APPENDIX B-1

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-K For The Year Ended December 31, 2006,
Filed February 27, 2007

Effective January 1, 2007, **Delphi** modified its methodology for allocating certain United States employee historical pension, postretirement benefit and workers' compensation benefit costs to the segments to directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions.  Pursuant to the requirements of Financial Accounting Standard No. 131, "Disclosures about Segments of an Enterprise and Related Information," Delphi reported operating data for its reporting segments for the years ended December 31, 2006, 2005, and 2004 reflecting the modified cost allocation in its Current Report on Form 8-K filed September 5, 2007.  Refer to Appendix B-3 for the modified Segment Reporting footnote filed on the aforementioned Form 8-K.

## MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

Under the supervision and with the participation of our management, including our Chief Executive Officer (the "CEO") and Chief Financial Officer (the "CFO"), we have evaluated the effectiveness of design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this report.  Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective as of December 31, 2006.  The basis for this determination was that, as discussed below, we have identified material weaknesses in our internal control over financial reporting, which we view as an integral part of our disclosure controls and procedures.

Management is responsible for establishing and maintaining adequate internal control over financial reporting.  Internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) includes those policies and procedures that:  (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP"), and that receipts and expenditures of  the Company are being made only in accordance with authorizations of management and directors of the Company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management assessed our internal control over financial reporting as of December 31, 2006, the end of our fiscal year.  Management based its assessment on the criteria set forth in the *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of annual or interim financial statements will not be prevented or detected. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management's 2006 assessment identified the following material weaknesses. Ongoing remediation plans to address these material weaknesses are described in the section "Ongoing Remediation Activities" of Item 9A. "Controls and Procedures" in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006.
.

- **Contract Administration** – We failed to design and implement adequate policies and controls over the contract administration process in the areas of customer contracts and commercial arrangements to provide reasonable assurance that material contracts are adequately analyzed to determine the accounting implications, or to capture, analyze, and record the accounting impact of amendments to such contracts. As a result, it is possible that material misstatements related to accounts receivable, accounts payable, revenues, cost of goods sold, or selling, general and administrative and related disclosures could occur and not be prevented or detected.

- **Inventory Accounting Adjustments** – Our controls over inventory did not operate effectively at the North American operations of one of our operating segments. Specifically, controls (1) to determine that adjustments to inventory costs or quantities related to annual physical inventories are made in the appropriate period; and (2) to timely capture, analyze and record inventory manufacturing variances that may arise between standard and actual manufacturing cost did not operate with sufficient timeliness and precision to enable recognition of material adjustments to inventory balances in the proper period.  As a result, it is possible that material misstatements related to the carrying value of inventories, cost of goods sold and related disclosures could occur and not be prevented or detected.

- **Fixed Assets and Special Tools Accounting** – Our controls over fixed assets and special tools accounting did not operate effectively.  Specifically, controls over (1) the accumulation of appropriate costs and timely transfer of completed construction-work-in-progress and tooling projects to the fixed assets and special tools subsidiary ledgers and related accounts; (2) the proper amortization of special tools, pursuant to U.S. GAAP and corporate guidelines; and (3) the timely recording of disposals and interplant transfers related to fixed assets and special tools; did not operate effectively. As a result, it is possible that material misstatements related to fixed assets, depreciation and amortization expense and related disclosures could occur and not be prevented or detected.

- **Demographic Data** – We did not maintain adequate controls over records of employee and retiree demographic information used in determining certain employee benefits liabilities.  As a result, it is possible that material misstatements related to pension and other postemployment benefits liabilities, related costs and relevant disclosures could occur and not be prevented or detected.

Management has discussed the material weaknesses described above and related corrective actions with the Company's Audit Committee.  Our independent registered public accounting firm, Ernst & Young LLP ("Ernst & Young"), has audited management's assessment of our internal control over financial reporting.  Ernst & Young has issued an attestation report, which is included in Item 8. Financial Statements and Supplementary Data – Report of Independent Registered Public Accounting Firm of Delphi's Annual Report on Form 10-K for the year ended December 31, 2006.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in millions, except per share amounts) | | |
| Net sales: | | | |
| General Motors and affiliates | $ 11,636 | $ 12,860 | $ 15,417 |
| Other customers | 14,756 | 14,087 | 13,205 |
| Total net sales | 26,392 | 26,947 | 28,622 |
| Operating expenses: | | | |
| Cost of sales, excluding items listed below | 25,416 | 25,701 | 25,989 |
| U.S. employee special attrition program charges (Note 16) | 2,955 | — | — |
| Depreciation and amortization | 1,079 | 1,150 | 1,144 |
| Long-lived asset impairment charges (Note 9) | 215 | 233 | 326 |
| Goodwill impairment charges (Note 10) | — | 390 | 46 |
| Selling, general and administrative | 1,585 | 1,644 | 1,599 |
| Total operating expenses | 31,250 | 29,118 | 29,104 |
| Operating loss | (4,858) | (2,171) | (482) |
| Interest expense (Contractual interest expense for 2006 and 2005 was $577 million and $356 million, respectively) (Note 14) | (429) | (318) | (232) |
| Other income (expense), net (Note 19) | 38 | 50 | (8) |
| Loss before reorganization items, income taxes, minority interest, equity income and cumulative effect of accounting change | (5,249) | (2,439) | (722) |
| Reorganization items (Note 3) | (92) | (3) | — |
| Loss before income taxes, minority interest, equity income and cumulative effect of accounting change | (5,341) | (2,442) | (722) |
| Income tax (expense) benefit | (136) | 55 | (4,143) |
| Loss before minority interest, equity income and cumulative effect of accounting change | (5,477) | (2,387) | (4,865) |
| Minority interest, net of tax | (37) | (24) | (39) |
| Equity income, net of tax | 47 | 71 | 86 |
| Loss before cumulative effect of accounting change | (5,467) | (2,340) | (4,818) |
| Cumulative effect of accounting change, net of tax (Notes 1 and 20) | 3 | (17) | — |
| Net loss | $ (5,464) | $ (2,357) | $ (4,818) |
| Basic and diluted loss per share | | | |
| Before cumulative effect of accounting change | $ (9.74) | $ (4.18) | $ (8.59) |
| Cumulative effect of accounting change | 0.01 | (0.03) | — |
| Basic and diluted loss per share | $ (9.73) | $ (4.21) | $ (8.59) |
| Dividends declared per share | $ — | $ 0.045 | $ 0.280 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, | |
| --- | ---: | ---: |
| | **2006** | **2005** |
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,667 | $ 2,221 |
| Restricted cash | 146 | 36 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 2,078 | 1,920 |
| Other | 2,691 | 2,975 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 1,598 | 1,350 |
| Finished goods | 577 | 524 |
| Deferred income taxes (Note 8) | 68 | 51 |
| Other current assets | 390 | 477 |
| Total current assets | 9,215 | 9,554 |
| | | |
| Long-term assets: | | |
| Property, net (Note 9) | 4,695 | 5,108 |
| Investments in affiliates | 417 | 418 |
| Deferred income taxes (Note 8) | 96 | 59 |
| Goodwill (Note 10) | 378 | 363 |
| Other intangible assets, net | 51 | 54 |
| Pension intangible assets (Note 17) | — | 891 |
| Other | 540 | 576 |
| Total long-term assets | 6,177 | 7,469 |
| | | |
| Total assets | $ 15,392 | $ 17,023 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| | | |
| Current liabilities: | | |
| Notes payable, current portion of long-term debt, and debt in default (Note 14) | $ 3,089 | $ 3,117 |
| Debtor-in-possession financing (Note 14) | 250 | — |
| Accounts payable | 2,820 | 2,494 |
| Accrued liabilities (Note 11) | 2,211 | 1,192 |
| Total current liabilities | 8,370 | 6,803 |
| | | |
| Long-term liabilities: | | |
| Debtor-in-possession financing and long-term debt (Note 14) | 49 | 273 |
| Employee benefit plan obligations (Note 17) | 550 | 310 |
| Other (Note 11) | 859 | 651 |
| Total long-term liabilities | 1,458 | 1,234 |
| | | |
| Liabilities subject to compromise (Note 13) | 17,416 | 15,074 |
| | | |
| Total liabilities | 27,244 | 23,111 |
| | | |
| Commitments and contingencies (Note 18) | | |
| | | |
| Minority interest | 203 | 157 |
| | | |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2006 and 2005 | 6 | 6 |
| Additional paid-in capital | 2,769 | 2,744 |
| Accumulated deficit | (11,893) | (6,429) |
| | | |
| Accumulated other comprehensive income (loss): | | |
| Employee benefit plans (Note 17) | (3,041) | (2,395) |
| Other | 156 | (119) |
| Total accumulated other comprehensive income (loss) | (2,885) | (2,514) |
| | | |
| Treasury stock, at cost (3.2 million shares in 2006 and 2005) | (52) | (52) |
| Total stockholders' deficit | (12,055) | (6,245) |
| Total liabilities and stockholders' deficit | $ 15,392 | $ 17,023 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2006** | **2005** | **2004** |
| | | (in millions) | |
| Cash flows from operating activities: | | | |
| Net loss | $(5,464) | $(2,357) | $(4,818) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Depreciation and amortization | 1,079 | 1,150 | 1,144 |
| Long-lived asset impairment charges | 215 | 233 | 326 |
| Goodwill impairment charges | — | 390 | 46 |
| Deferred income taxes | (55) | (142) | 4,315 |
| Employee and product line charges | — | — | 192 |
| Pension and other postretirement benefit expenses | 1,515 | 1,543 | 1,408 |
| Equity income | (47) | (71) | (86) |
| Reorganization items | 92 | 3 | — |
| U.S. employee special attrition program charges | 2,955 | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable and retained interests in receivables, net | 87 | 127 | 83 |
| Inventories, net | (274) | 25 | (142) |
| Other current assets | (79) | 232 | (158) |
| Accounts payable | 434 | (163) | 367 |
| Employee and product line obligations | — | (64) | (296) |
| Accrued and other long-term liabilities | 421 | 169 | (148) |
| Other, net | 46 | (50) | 137 |
| U.S. employee special attrition program payments, net of reimbursement by GM | (249) | — | — |
| Pension contributions | (305) | (691) | (672) |
| Other postretirement benefit payments | (262) | (186) | (173) |
| (Payments) receipts for reorganization items, net | (66) | 6 | — |
| Net cash provided by operating activities | 43 | 154 | 1,525 |
| | | | |
| Cash flows from investing activities: | | | |
| Capital expenditures | (721) | (1,183) | (967) |
| Proceeds from sale of property | 72 | 71 | 53 |
| Cost of acquisitions, net of cash acquired | (5) | — | (61) |
| Proceeds from sale of non-U.S. trade bank notes | 173 | 152 | 65 |
| Proceeds from divestitures | 24 | 245 | — |
| Increase in restricted cash | (105) | (36) | — |
| Other, net | 8 | (43) | 92 |
| Net cash used in investing activities | (554) | (794) | (818) |
| | | | |
| Cash flows from financing activities: | | | |
| Repayment of debt securities | — | — | (500) |
| Net proceeds from term loan facility | — | 983 | — |
| Repayments of borrowings under term loan facility | — | (12) | — |
| Proceeds from revolving credit facility, net | 2 | 1,484 | — |
| Net proceeds from debtor-in-possession facility | — | 218 | — |
| (Repayments) proceeds under cash overdraft | (29) | 29 | — |
| Net repayments under other agreements | (69) | (630) | (7) |
| Dividend payments | — | (64) | (157) |
| Issuance of treasury stock | — | — | 2 |
| Other, net | (26) | (56) | (23) |
| Net cash (used in) provided by financing activities | (122) | 1,952 | (685) |
| | | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 79 | (41) | 49 |
| | | | |
| (Decrease) increase in cash and cash equivalents | (554) | 1,271 | 71 |
| Cash and cash equivalents at beginning of year | 2,221 | 950 | 879 |
| Cash and cash equivalents at end of year | $1,667 | $2,221 | $ 950 |

See notes to consolidated financial statements.

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT) AND CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS

| | Common Stock Shares | Common Stock Amount | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss Employee Benefit Plans | Other | Total | Treasury Stock | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2003** | 565 | $ 6 | $ 2,729 | $ 928 | $ (2,006) | $ (136) | $(2,142) | $ (75) | $ 1,446 |
| Net loss | — | — | — | (4,818) | — | — | — | — | (4,818) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 339 | 339 | — | 339 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | 51 | 51 | — | 51 |
| Minimum pension liability adjustment, net of tax | — | — | — | — | (501) | — | (501) | — | (501) |
| Total comprehensive loss | | | | | | | | | (4,929) |
| Share-based compensation expense, net of shares issued | — | — | 1 | — | — | — | — | 14 | 15 |
| Dividends | — | — | — | (157) | — | — | — | — | (157) |
| **Balance at December 31, 2004** | 565 | 6 | 2,730 | (4,047) | (2,507) | 254 | (2,253) | (61) | (3,625) |
| Net loss | — | — | — | (2,357) | — | — | — | — | (2,357) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | (299) | (299) | — | (299) |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | (74) | (74) | — | (74) |
| Minimum pension liability adjustment, net of tax | — | — | — | — | 112 | — | 112 | — | 112 |
| Total comprehensive loss | | | | | | | | | (2,618) |
| Share-based compensation expense, net of shares issued | — | — | 14 | — | — | — | — | 9 | 23 |
| Dividends | — | — | — | (25) | — | — | — | — | (25) |
| **Balance at December 31, 2005** | 565 | 6 | 2,744 | (6,429) | (2,395) | (119) | (2,514) | (52) | (6,245) |
| Net loss | — | — | — | (5,464) | — | — | — | — | (5,464) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 231 | 231 | — | 231 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | 44 | 44 | — | 44 |
| Minimum pension liability adjustment, net of tax | — | — | — | — | 1,281 | — | 1,281 | — | 1,281 |
| Total comprehensive loss | | | | | | | | | (3,908) |
| Adoption of FASB Statement No. 158 | — | — | 25 | — | (1,927) | — | (1,927) | — | (1,927) |
| Share-based compensation expense | — | — | 25 | — | — | — | — | — | 25 |
| **Balance at December 31, 2006** | 565 | $ 6 | $ 2,769 | $(11,893) | $ (3,041) (a) | $ 156 (b) | $(2,885) | $ (52) | $(12,055) |

(a) Accumulated Other Comprehensive Loss –Employee Benefit Plans includes a loss for pension, postretirement and postemployment liabilities of $3,041 million, net of a $1,213 million tax effect.

(b) Accumulated Other Comprehensive Loss –Other includes a gain of $100 million within currency translation adjustments and other, and a gain of $56 million within net change in unrecognized gain on derivative instruments.

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. SIGNIFICANT ACCOUNTING POLICIES

*Nature of Operations*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets. Delphi is continuing to diversify its customer base and geographic markets.

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Court and are not subject to the requirements of the Bankruptcy Code. (Refer to Note 2. Chapter 11 Transformation Plan and Chapter 11 Bankruptcy)

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations in the years ended December 31, 2006 and 2005. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi adopted SOP 90-7 effective on October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to reduce wage and benefit costs and liabilities during the bankruptcy process; (iv) to return to profitability; (v) to generate sufficient cash flow from operations; and (vi) to obtain financing sources to meet the Company's future obligations. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, a plan of reorganization could materially change the amounts and classifications reported in the consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

*Contractual Interest Expense*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During 2006, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset

impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, worker's compensation accruals and healthcare accruals.  Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Revenue Recognition*—Delphi's revenue recognition policy requires the recognition of sales when there is evidence of a sales agreement, the delivery of goods has occurred, the sales price is fixed or determinable and the collectibility of revenue is reasonably assured.  Delphi generally records sales upon shipment of product to customers and transfer of title under standard commercial terms.  In addition, if Delphi enters into retroactive price adjustments with its customers, these reductions to revenue are recorded when they are determined to be probable and estimable.  From time to time, Delphi may enter into pricing agreements with its customers that provide for price reductions that are conditional upon achieving certain joint cost saving targets.  In December 2004, Delphi entered into such an agreement with GM whereby Delphi committed to 2005 annual price reductions on GM's annual purchase value with Delphi.  In return for this commitment, GM agreed, among other things, to accelerate its cooperation with certain sourcing and cost reduction initiatives of mutual benefit to the two companies and to source certain business to Delphi. In the fourth quarter of 2005, GM reimbursed Delphi for $35 million of the price reductions, which occurred earlier in 2005 for which GM did not meet its corresponding commitment to Delphi.  This payment was received prior to December 31, 2005 and was recognized as revenue upon receipt.

Sales incentives and allowances are recognized as a reduction to revenue at the time of the related sale.  In addition, from time to time Delphi makes payments to customers in conjunction with ongoing and future business.  Delphi recognizes these payments to customers as a reduction to revenue at the time Delphi commits to make these payments.

Shipping and handling fees billed to customers are included in net sales, while costs of shipping and handling are included in cost of sales.

*Research and Development*—Delphi incurs costs in connection with research and development programs that are expected to contribute to future earnings.  Such costs are charged against income as incurred.  Research and development expenses (including engineering) were $2.1 billion, $2.2 billion, and $2.1 billion for the years ended December 31, 2006, 2005, and 2004, respectively.

*Cash and Cash Equivalents*—Cash and cash equivalents are defined as short-term, highly liquid investments with original maturities of 90 days or less.

*Marketable Securities*—Delphi generally holds marketable securities with maturities of 90 days or less, which are classified as cash and cash equivalents for financial statement purposes.  Delphi also has securities that are held for a period longer than 90 days.  Debt securities are classified as held-to-maturity, and accordingly are recorded at cost in Delphi's consolidated financial statements.  Equity securities are classified as available-for-sale and are recorded in the consolidated financial statements at market value with changes in market value included in other comprehensive income ("OCI").  At December 31, 2006 and 2005, Delphi had available-for-sale securities with a cost basis of $5 million and $5 million, respectively, and a carrying value of $6 million and $10 million, respectively.  In the event that the Company's debt or equity securities experience an other than temporary impairment in value, such impairment is recognized as a loss in the Statement of Operations.

*Restricted Cash*— Delphi has restricted cash balances the majority of which represent cash for use for the pre-retirement portion of the U.S. employee special attrition program, refer to Note 16. U.S. Employee Special Attrition Program.  Also included in restricted cash are balances on deposit at financial institutions that have issued letters of credit in favor of Delphi**.**

*Accounts Receivable*—Delphi enters into agreements to sell its accounts receivable.  Since the agreements allow Delphi to maintain effective control over the receivable, these various accounts receivable factoring facilities were accounted for as short-term debt at December 31, 2005 and 2006.  The Company generally does not require collateral related to its trade accounts receivable.  The allowance for doubtful accounts is established based upon analysis of trade receivables for known collectibility issues and the aging of the trade receivables at the end of each period.  As of December 31, 2006 and 2005, the allowance for doubtful accounts was $152 million and $129 million, respectively.  The Company exchanges certain amounts of accounts receivable for bank notes with original maturities greater than 90 days.  The collection of such notes are reflected in the investing activities in the consolidated statement of cash flows.

*Inventories*— Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs.  Generator core inventories have historically been valued primarily at the core acquisition cost.  In the third quarter of 2005, given the changing market for remanufactured generators and general competitive conditions for generator products, the Company reduced the carrying value of generator core inventories by $24 million to zero.

From time to time, Delphi may receive payments from suppliers.  Delphi recognizes these payments from suppliers as a reduction of the cost of the material acquired during the period to which the payments relate.  In some instances, supplier rebates are received in conjunction with or concurrent with the negotiation of future purchase agreements and these amounts are amortized over the prospective agreement period.

*Property*—Property, plant and equipment, including internally-developed internal use software, is recorded at cost. Major improvements that materially extend the useful life of property are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. Depreciation is provided based on the estimated useful lives of groups of property generally using an accelerated method, which accumulates depreciation of approximately two-thirds of the depreciable cost during the first half of the estimated useful lives, or using straight-line methods. Leasehold improvements are amortized over the period of the lease or the life of the property, whichever is shorter, with the amortization applied directly to the asset account.

*Special Tools*— Special tools balances represent Delphi-owned tools, dies, jigs and other items used in the manufacture of customer components. At December 31, 2006 and 2005 the special tools balance was $537 million and $633 million, respectively, included within the property, net line item in the consolidated balance sheet. Special tools also includes pre-production tooling costs related to customer-owned tools for which the customer has provided a non-cancelable right to use to the tool. Delphi-owned special tools balances are amortized over the expected life of the special tool or the life of the related vehicle program, whichever is shorter. The unreimbursed costs incurred related to customer-owned special tools that are not subject to reimbursement are capitalized and amortized over a three year period. Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

*Valuation of Long-Lived Assets*—Delphi periodically evaluates the carrying value of long-lived assets held for use, including intangible assets, when events or circumstances warrant such a review. The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or from appraisals performed by valuation experts. Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets. Refer to Note 9. Property, Net.

*Intangible Assets*—Delphi has definite-lived intangible assets of approximately $51 million and $54 million as of December 31, 2006 and 2005, respectively. In general, these intangible assets are being amortized over their useful lives, normally 3-17 years. During 2005, Delphi evaluated for impairment certain intangible assets that had been recorded in conjunction with previous acquisitions. In 2005, based on the current fair value of these intangible assets, Delphi recognized an impairment of $6 million related to intangible assets, related to the Powertrain Systems segment and the Product and Service Solutions business within the Corporate and Other segment.

*Goodwill*— In accordance with Statement of Financial Accounting Standard ("SFAS") No. 142, "Goodwill and Other Intangible Assets," Delphi reviews the recoverability of goodwill at least annually as of May 31 and any time business conditions indicate a potential change in recoverability. Refer to Note 10. Goodwill.

*Environmental Liabilities*—Delphi recognizes environmental remediation liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental remediation is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental remediation liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites. In future periods, new laws or regulations, advances in remediation technologies and additional information about the ultimate remediation methodology to be used could significantly change Delphi's estimates. Refer to Note 18. Commitments and Contingencies.

*Warranty*—Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi estimates of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims. Refer to Note 12. Warranties.

*Asset Retirement Obligations*—On January 1, 2003, Delphi adopted SFAS No. 143, *Accounting for Asset Retirement Obligations*, which requires the fair value of an asset retirement obligation to be recognized in the period in which it is incurred. On December 31, 2005, Delphi adopted FASB Interpretation 47 ("FIN 47"), *Accounting for Conditional Asset Retirement Obligations, an interpretation of SFAS No. 143*. FIN 47 clarifies that the term conditional asset retirement obligation as used in SFAS No. 143, refers to a legal obligation to perform an asset retirement activity in which the timing and/or method of settlement are conditional on a future event. FIN 47 also clarifies that an entity is required to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if fair value can be reasonably estimated. The accounting for FIN 47 uses the same methodology as SFAS No. 143. When a new liability is recorded, an entity will capitalize the costs of the liability by increasing the carrying amount of the related long-lived asset. The liability is accreted to its present value each period, and the capitalized cost is depreciated over the useful life of the related asset. Upon settlement of the liability, an entity settles the obligation for its recorded amount or incurs a gain or loss upon settlement.

9

As a result of adopting FIN 47 on December 31, 2005, Delphi identified conditional retirement obligations primarily related to asbestos abatement at certain of its sites.  To a lesser extent, Delphi also has conditional retirement obligations at certain sites related to the removal of storage tanks and polychlorinated biphenyl ("PCB") disposal costs.  Delphi recorded assets of $2 million with offsetting accumulated depreciation of $2 million, and an asset retirement obligation liability of $17 million.  In 2005, Delphi also recorded a cumulative effect charge against earnings of $17 million, after-tax.

If Delphi had applied FIN 47 to prior periods, Delphi would have recorded asset retirement obligations of $16  million and charges against earnings of $2 million as of and for the year ended December 31, 2004.

A reconciliation of the asset retirement obligations for 2005 and 2006 is as follows:

|  | (in millions) |
| --- | --- |
| Asset retirement obligations at January 1, 2005 | $ — |
| Accretion | — |
| Liabilities incurred (primarily adoption of FIN 47) | 17 |
| Liabilities settled | — |
| Asset retirement obligations at December 31, 2005 | $ 17 |
| Accretion | 2 |
| Liabilities incurred | — |
| Liabilities settled/adjustments | (3) |
| Asset retirement obligations at December 31, 2006 | $ 16 |

The impact on loss per common share (both basic and diluted) in each of 2004 and 2005 would have been less than $0.01 per share.

***Annual Incentive Plan***— On February 17, 2006, the Court entered a final order (the "AIP Order") granting the Debtors' motion to implement a short-term annual incentive plan (the "AIP") for the period commencing on January 1, 2006 and continuing through June 30, 2006.  The AIP provides the opportunity for incentive payments to executives provided that specified corporate and divisional financial targets are met.  Such targets are based on Delphi's earnings and divisional operating income (which for Delphi are each of its reporting segments) before interest, taxes, depreciation, amortization, and restructuring costs, but exclude earnings generated from agreements related to Delphi's transformation reached with Delphi's labor unions or GM, such as the special attrition programs, refer to Note 16. U.S. Employee Special Attrition Program.  The amounts paid to individual executives may be adjusted either upward or downward based upon individual levels of performance subject to certain maximums.  In addition, under some circumstances, individual executives may not be entitled to receive or retain incentive compensation.  For more information regarding the AIP Order refer to Delphi's Current Report on Form 8-K filed on February 23, 2006.  An annual incentive plan mirroring the AIP applies to approximately 100 individuals holding executive positions at non-Debtor subsidiaries of Delphi.  Additionally, Delphi has a similar incentive plan for U.S. salaried employees.

On July 21, 2006, the Court entered a final order (the "Supplemental AIP Order") authorizing the Debtors to continue the AIP for the six-month period from July 1, 2006 through December 31, 2006 (the "Second Performance Period"), under substantially the same terms and conditions outlined in the AIP Order, with new corporate and divisional targets based on the Debtors' forecasted financial results for the Second Performance Period.  In addition, the Supplemental AIP Order provides for certain adjustments in determining whether Delphi has achieved its corporate financial targets for the Second Performance Period, to be reasonably determined by the Official Committee of Unsecured Creditors, to Delphi's corporate targets based upon net savings realized on account of transformation costs.  The AIP for the Second Performance Period provides a target opportunity for incentive payments to U.S. executives of approximately $20 million, provided Delphi achieves the court-approved performance targets for the Second Performance Period.

For the year ended December 31, 2006, Delphi recorded expense of $167 million, related to executive and U.S. salaried employee incentive plans.  Delphi paid $100 million in the third quarter of 2006 for the period from January 1, 2006 to June 30, 2006.  In conjunction with the February 17, 2006 approval of the AIP, certain incentive compensation plans previously in place for Delphi executives were cancelled resulting in the reduction of expense of approximately $21 million for incentive compensation in the first quarter of 2006.  The AIP for the Second Performance Period will be paid by the end of the first quarter of 2007.

***Postemployment Benefits***— Delphi accrues for costs associated with postemployment benefits provided to inactive employees throughout the duration of their employment.  Delphi uses future production estimates combined with workforce geographic and demographic data to develop projections of time frames and related expense for postemployment benefits.  For purposes of accounting for postemployment benefits, inactive employees represent those employees who have been other than temporarily idled.  Delphi considers all idled employees in excess of approximately 10% of the total workforce at a facility to be other than temporarily idled.  As a result of the U.S. employee special attrition programs, Delphi determined that certain previously recorded accruals for postemployment benefits, representing the future cash expenditures expected during the period between the idling of affected employees and the time when such employees are redeployed, retire, or otherwise terminate their employment, were no longer necessary and accordingly Delphi reduced

such accruals by $108 million during 2006, which was recorded in cost of sales. At December 31, 2006 and 2005, the liability for postemployment benefits of other than temporarily idled employees was $1 million and $148 million, respectively.

Delphi also accrues for costs associated with extended disability benefits for its employees. Discounting of the future extended-disability expenditures is based on the nature of the obligation and the timing of the expected benefit payments. At December 31, 2006 and 2005, the short-term extended-disability liability balance of $27 million and $27 million, respectively, was included in accrued liabilities in the accompanying consolidated balance sheets. The long-term extended-disability liability balance included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2006 and 2005 was $95 million and $226 million, respectively, calculated with a discount rate of 5.70% and 5.50%, respectively. As a result of the adoption of SFAS No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R),"* Delphi recognized a net actuarial gain in accumulated OCI. The impact of the adjustment was an increase in accumulated OCI and a decrease in the long-term liability of $67 million at December 31, 2006. In addition, as a result of the U.S. special attrition program, Delphi recognized a curtailment gain of $59 million during 2006.

*Employee Termination Benefits and Other Exit Costs*— Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are accrued when incurred. Delphi incurred expenses related to these actions of $299 million and $154 million included in cost of sales for the years ended December 31, 2006 and 2005, respectively.

*Worker's Compensation Benefits*—Delphi's worker's compensation benefit accruals are actuarially determined and are subject to the existing worker's compensation laws that can vary by state. Accruals for worker's compensation benefits represent the discounted future cash expenditures expected during the period between the incidents necessitating the employees to be idled and the time when such employees are eligible for retirement or otherwise terminate their employment. The discount rate at December 31, 2006 and 2005 was 5.80% and 5.50%, respectively based on analyzing the results of matching high quality fixed income investments rated AA- or higher by Standard and Poor's and the regular and above median Citigroup Pension Discount Curve, with expected benefit cash flows. At December 31, 2006 and 2005, the short-term worker's compensation liability balance included in accrued liabilities in the accompanying consolidated balance sheets was $77 million and $86 million, respectively. The long-term worker's compensation liability balance included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2006 and 2005 was $282 million and $224 million, respectively. The increase in the liability balance as of December 31, 2006 is a result of increased claim severity and accruals for claims incurred but not reported, offset by an increase in the discount rate.

*Foreign Currency Translation*—Assets and liabilities of non-U.S. subsidiaries are translated to U.S. dollars at end-of-period currency exchange rates. The consolidated Statements of Operations of non-U.S. subsidiaries are translated to U.S. dollars at average-period currency exchange rates. The effect of translation for non-U.S. subsidiaries is generally reported in OCI. The effect of remeasurement of assets and liabilities of non-U.S. subsidiaries that use the U.S. dollar as their functional currency is primarily included in cost of goods sold. Also included in cost of goods sold are gains and losses arising from transactions denominated in a currency other than the functional currency of a particular entity. Net transaction gains and losses, as described above, decreased cost of sales by $44 million in 2006, and increased cost of sales by $53 million and $51 million in 2005 and 2004, respectively.

*Derivative Financial Instruments*— SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended, which requires that all derivative instruments be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.

Delphi manages its exposure to fluctuations in currency exchange rates, interest rates and certain commodity prices by entering into a variety of forward contracts and swaps with various counterparties. Such financial exposures are managed in accordance with Delphi's policies and procedures. Delphi does not enter into derivative transactions for speculative or trading purposes.

As part of the hedging program approval process, Delphi identifies the specific financial risk which the derivative transaction will minimize, the appropriate hedging instrument to be used to reduce the risk and the correlation between the financial risk and the hedging instrument. Purchase orders, letters of intent, capital planning forecasts and historical data are used as the basis for determining the anticipated values of the transactions to be hedged. Delphi does not enter into derivative transactions that do not have a high correlation with the underlying financial risk. The hedge positions entered into by Delphi, as well as the correlation between the transaction risks and the hedging instruments, are reviewed on an ongoing basis.

11

Foreign exchange forward and option contracts are accounted for as hedges of firm or forecasted foreign currency commitments to the extent they are designated and assessed as highly effective. All other foreign exchange contracts are marked to market on a current basis. Commodity swaps and options are accounted for as hedges of firm or anticipated commodity purchase contracts to the extent they are designated and assessed effective. All other commodity derivative contracts that are not designated as hedges are either marked to market on a current basis or are exempted from mark to market accounting as normal purchases. At December 31, 2006 and 2005, Delphi's exposure to movements in interest rates was not hedged with derivative instruments.

*Common Stock and Preferred Stock*—Delphi currently has one class of common stock outstanding. There are 1,350 million shares of common stock authorized, of which 561,781,590 were outstanding (565,025,907 shares issued less 3,244,317 shares held as treasury stock) at both December 31, 2006 and 2005. Holders of Delphi common stock are entitled to one vote per share with respect to each matter presented to its shareholders on which the holders of common stock are entitled to vote. Delphi did not pay dividends in 2006, paid $0.115 per share in 2005, of which $0.07 was declared in 2004 but was paid in 2005, and $0.28 per share in 2004. There are no cumulative voting rights. As of December 31, 2006, Delphi has no issued and outstanding preferred stock.

*Retention Payments*— During the first quarter of 2005, a retention program for U.S. salaried employees and executives as well as international executives was implemented (the "Q1 2005 Retention Program"). Under the terms of the program, U.S. salaried employees, other than executives, received retention payments totaling approximately $13 million in the first quarter of 2005 and executives other than those executive officers subject to the reporting obligations of Section 16 of the Securities Exchange Act of 1934 (the "reporting officers") received payments totaling approximately $5 million in the third quarter of 2005 that related to the first of three installment payments under the plan. The cost associated with the retention program payments attributable to all U.S. salaried employees, including executives other than the reporting officers, was being recognized over the related service period. However, based upon a change in Delphi's intention with respect to enforcing the retention agreements for U.S. employees, including executives other than the reporting officers, the remaining unamortized balance for these employees was expensed in the fourth quarter of 2005. Additionally, under the Q1 2005 Retention Program, the reporting officers were to receive payment of an award in four equal installments over a two-year period. The first installment was paid in the third quarter of 2005 totaling approximately $0.6 million. On February 17, 2006, as part of the Courts' approval of portions of the AIP, the company cancelled the outstanding installments of the retention awards.

*Recently Issued Accounting Pronouncements*— In June 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation 48 ("FIN 48"), *"Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109."* FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with FASB Statement No. 109, *"Accounting for Income Taxes."* FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement disclosure of tax positions taken or expected to be taken in a tax return. The evaluation of a tax position is a two-step process. The first step requires an entity to determine whether it is more likely than not that a tax position will be sustained upon examination based on the technical merits of the position. The second step requires an entity to recognize in the financial statements each tax position that meets the more likely than not criteria, measured at the largest amount of benefit that has a greater than fifty percent likelihood of being realized. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. Delphi is required to adopt the new guidance when recognizing its uncertain tax positions at the beginning of its fiscal year January 1, 2007. The impact of initially applying FIN 48 will be recognized as a cumulative effect adjustment to the opening balance of retained earnings. Delphi is currently in the process of determining the cumulative effect of adopting FIN 48.

In September 2006, the SEC released Staff Accounting Bulletin No. 108 ("SAB 108") on quantifying financial statement misstatements. SAB 108 provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. SAB 108 was issued to address diversity in practice by issuers when quantifying financial statement misstatements and the potential for current practice to fail to consider the accumulation of significant amounts on the balance sheet. SAB 108 is effective for fiscal years ending after November 15, 2006. The adoption of SAB 108 did not have an impact on Delphi.

In September 2006, the FASB issued Statement of Financial Accounting Standard No. 157 ("SFAS 157"), *"Fair Value Measurements."* The statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles ("GAAP"), and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. The statement defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Delphi is currently evaluating the requirements of SFAS 157. Delphi expects to be required to use the new definition of fair value upon adoption of SFAS 157 as of January 1, 2008 and apply the disclosure requirements of SFAS 157 for Delphi's 2008 financial statements.

In September 2006, the FASB issued SFAS No. 158 ("SFAS 158"), *"Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)."* SFAS 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its

statement of financial position, and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. This Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 31, 2008. The requirement to recognize the funded status of a benefit plan and the disclosure requirements was effective for Delphi at December 31, 2006. See Note 17. Pension and Other Postretirement Benefits and Postemployment Benefits above for more information regarding Delphi's postretirement benefits and the impact of adopting SFAS 158. The requirement to measure plan assets and benefit obligations as of the date of the employer's fiscal year-end statement of financial position is effective for Delphi at the end of fiscal year 2008.

In February 2007, the FASB issued Statement of Financial Accounting Standard No. 159 ("SFAS 159"), *"The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115."* SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. The statement also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi is currently evaluating the requirements of SFAS 159, and has not yet determined the impact on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On March 31, 2006, Delphi announced its transformation plan. As part of the transformation plan, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, which it is seeking to sell or wind-down. The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe. Non-core product lines, announced on March 31, 2006, include brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. With the exception of catalysts with approximately $260 million of 2006 net sales, which is included in the Powertrain Systems segment, and the Steering segment with approximately $2.6 billion of 2006 net sales, these non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 21. Segment Reporting. The Company continually evaluates its product portfolio and could retain or exit certain businesses depending on market forces or cost structure changes. In connection with the Company's ongoing evaluation, the Company has recently decided that power products no longer fits within its future product portfolio. Therefore, effective November 1, 2006, responsibility for the power products business line has been moved to Delphi's Automotive Holdings Group and it is considered a non-core product line. The Company intends to sell or wind-down non-core product lines and manufacturing sites. These product lines and manufacturing sites were not classified as held for sale in the current period as the court approval process required by the Bankruptcy Code is not complete and other held for sale criteria of SFAS No. 144 ("SFAS No. 144"), "*Accounting for the impairment or Disposal of Long-Lived Assets,*" were not met as of December 31, 2006.

Also on March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits. A hearing on the section 1113 and 1114 motion commenced in May 2006 and continued into June. Since that time, the hearing on the 1113 and 1114 motion has been adjourned on several occasions with periodic chambers conferences being conducted in the interim to provide the Court with updates regarding the status of negotiations to consensually resolve the section 1113 and 1114 motion. Further proceedings on the motion are currently suspended until further order of the Court, provided, however, that the Court will promptly conduct a chambers conference within five business days of the termination of either the Equity Purchase and Commitment Agreement ("EPCA") entered into on January 18, 2007 or the Plan Framework Support Agreement entered into on December 18, 2006 and amendment and supplement thereto entered into on January 18, 2007 (collectively, the "PSA") both described in further detail below, to set a hearing date on the motion as may be then requested by the Debtors. Representatives of certain unions whose labor agreements are subject to the motion, including the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Industrial Division of the Communication Workers of America, AFL-CIO, CLC ("IUE-CWA"), have indicated that they received strike authorization and may call for a strike in the event that certain of the Debtors' labor agreements are rejected pursuant to the Debtors' pending motion. Discussions with the Debtors' stakeholders, including the unions and GM, are ongoing; the goal of which is to reach a consensual resolution, but the parties have not yet reached comprehensive agreements.

Also on March 31, 2006, the Debtors filed a motion with the Court seeking authority to reject certain customer contracts with GM under section 365 of the Bankruptcy Code. The initial GM contract rejection motion covers approximately half of the North American annual purchase volume revenue from GM. The hearing on the motion was scheduled to commence on September 28, 2006, but was adjourned on several occasions with periodic chambers conferences being conducted in the interim to provide the Court with updates regarding the status of negotiations to consensually resolve the motion. Further proceedings on the motion are currently suspended until

further order of the Court, provided, however, that the Court will promptly conduct a chambers conference within five business days of the termination of the EPCA or the PSA to determine an appropriate schedule with respect to any hearing on the motion, as may then be requested by the Debtors.  On March 31, 2006, the Company also delivered a letter to GM initiating a process to reset the terms and conditions of more than 400 commercial agreements that expired between October 1, 2005 and March 31, 2006.  To date, the Company has not unilaterally revised the terms and conditions on which it has been providing interim supply of parts to GM in connection with the expired contracts or filed additional contract rejection motions.  As with our labor unions, Delphi remains committed to reaching consensual resolution with GM on this and several issues pertaining to the Company's transformation plan.

As part of a comprehensive restructuring plan to improve overall competitiveness, the Debtors recognize the need to reduce selling, general and administrative costs, both to size these costs with the rationalized product portfolio and to increase overall competitiveness.  This includes realigning certain salaried benefit programs.  In addition, once the Debtors emerge from chapter 11, as part of the transformation plan, the Debtors will need to fund their U.S. defined benefit pension plans.  The Debtors have identified cost saving opportunities along with the planned portfolio and product rationalizations and expect to reduce their salaried workforce using existing salaried separation pay programs and by taking advantage of attrition.  In addition, in order to retain existing U.S. defined benefit pension plans for both hourly and salaried workers, the Debtors' and Delphi's Board of Directors are considering freezing those plans and adopting or modifying existing defined contribution plans to include flexibility for both direct Company contributions and Company-matching employee contributions.  At the same time, salaried health care plans were restructured to implement increased employee cost sharing.

There can be no assurances, however, that the Debtors will be successful in achieving their objectives.  The Debtors' ability to achieve their objectives is conditioned, in most instances, on the approval of the Court, and the support of their stakeholders, including GM, and the Debtors' labor unions.  The cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the plan are finalized in accordance with SFAS No. 88, "*Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits*," SFAS No. 112 "*Employers' Accounting for Postretirement Benefits*," SFAS No. 144 "*Accounting for the Impairment or Disposal of Long-Lived Assets*," or SFAS No. 146 "*Accounting for Costs Associated with Exit or Disposal Activities*," as applicable.  Costs recorded in 2006 related to the transformation plan include U.S. employee special attrition program charges of $2,955 million (see Note 16. U.S. Employee Special Attrition Programs), impairments of long-lived assets of $215 million (see Note 9. Property, Net) and employee termination benefits and other exits costs of $44 million related to the Automotive Holdings Group and Steering segments.

Under section 362 of the Bankruptcy Code, actions to collect most of the Debtors' prepetition liabilities, including payments owing to vendors in respect of goods furnished and services provided prior to the Petition Date, are automatically stayed and other contractual obligations of the Debtors generally may not be enforced.  Shortly after the Petition Date, the Debtors began notifying all known actual or potential creditors of the Debtors for the purpose of identifying all prepetition claims against the Debtors.  The Chapter 11 Filings triggered defaults on substantially all debt obligations of the Debtors.  The stay provisions of section 362 of the Bankruptcy Code, however, also apply to actions to collect prepetition indebtedness or to exercise control over the property of the Debtors' estate in respect of such defaults.  The rights and ultimate payments by the Debtors under prepetition obligations will be addressed in any plan of reorganization and may be substantially altered.  This could result in unsecured claims being compromised at less, and possibly substantially less, than 100% of their face value.  For additional information, refer to Note 13. Liabilities Subject to Compromise.

Section 365 of the Bankruptcy Code permits the Debtors to assume, assume and assign, or reject certain prepetition executory contracts (including unexpired leases), subject to the approval of the Court and certain other conditions.  Rejection constitutes a court-authorized breach of the contract in question and, subject to certain exceptions, relieves the Debtors of future obligations under such contract but creates a deemed prepetition claim for damages caused by such breach or rejection.  Parties whose contracts are rejected may file claims against the rejecting Debtor for damages.  Generally, the assumption, or assumption and assignment, of an executory contract requires the Debtors to cure all prior defaults under such executory contract and to provide adequate assurance of future performance.  In this regard, Delphi expects that additional liabilities subject to compromise and resolution in the chapter 11 cases may arise as a result of damage claims created by the Debtors' rejection of executory contracts.  Conversely, Delphi would expect that the assumption of certain executory contracts may convert existing liabilities shown as subject to compromise to liabilities not subject to compromise.  Due to the uncertain nature of many of the potential claims, Delphi is unable to project the magnitude of such claims with any degree of certainty at this time.

On December 18, 2006, Delphi entered into the PSA with Cerberus Capital Management, L.P. ("Cerberus"), Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS") and GM, which outlines a framework plan of reorganization, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues and the corporate governance of reorganized Delphi. The PSA, as well as the economics and structure of the plan framework itself, is expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM. In addition, the PSA describes plan terms related to the terms of the preferred stock to be issued under the plan, the establishment of a joint claims oversight committee, certain corporate governance provisions, and certain conditions precedent to plan effectiveness.  On January 12, 2007, the Bankruptcy Court granted Delphi's motion seeking authority to enter into the PSA and further authorized Delphi to accept an

investment proposal from affiliates of Cerberus, Appaloosa and Harbinger (the "Investor Affiliates"), as well as Merrill and UBS (together with the Investor Affiliates and Merrill, the "Plan Investors"), under the terms of the EPCA, pursuant to which the Plan Investors would invest up to $3.4 billion in reorganized Delphi. The EPCA was entered into on January 18, 2007, and amended the same day.

Under the terms and subject to the conditions of the EPCA, the Plan Investors will commit to purchase $1.2 billion of convertible preferred stock and approximately $200 million of common stock in the reorganized Company. The Plan Investors have also agreed to back-stop the rights offering described in the EPCA, the completion of which is a condition to the consummation of the transactions described in the EPCA and Delphi's emergence from reorganization. Pursuant to the rights offering Delphi will distribute certain rights to its existing shareholders to acquire new common stock in the reorganized Company subject to the effectiveness of a registration statement to be filed with the SEC, approval of the Court and satisfaction of other terms and conditions set forth in the EPCA. The rights, which would be transferable by the original eligible holders, would permit holders to purchase their pro rata share of new common stock in the reorganized Company at a discount to the anticipated reorganization business enterprise value of the Company. Under the terms of the EPCA, the Plan Investors will commit to purchase the number of shares that are offered, but not exercised, through the rights offering to eligible holders. In the event no other shareholders exercise the rights, the Plan Investors would purchase all of the unsubscribed shares for an amount no greater than approximately $2.0 billion. Altogether, the Plan Investors could invest up to $3.4 billion in the reorganized company.

In addition, the Plan Investors' commitments under the EPCA are subject to the completion of due diligence to the satisfaction of the Plan Investors in their sole discretion, satisfaction or waiver of numerous other conditions, including Delphi's achievement of consensual agreements with its U.S. labor unions and GM that are acceptable to an affiliate of Cerberus and an affiliate of Appaloosa in their sole discretion, and the non-exercise by either Delphi or the Plan Investors of certain termination rights, all of which are more fully described in the EPCA. The EPCA may also be terminated by the Company or the Plan Investors prior to the consummation of the transactions contemplated by the EPCA upon the occurrence of certain events set forth in the EPCA. One of those events has occurred given that the Company and its subsidiaries did not on or prior to January 31, 2007 enter into: (a) tentative labor agreements between the Company and its applicable subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC, on the other hand; or (b) a settlement agreement with GM. As a result, an affiliate of Cerberus, an affiliate of Appaloosa or the Company may terminate the EPCA by giving notice on or before February 28, 2007. If neither the Plan Investors nor the Company gives notice terminating the EPCA on or before February 28, 2007, in the event of certain terminations of the EPCA pursuant to the terms thereof, the Company may be obligated to pay the Plan Investors $100 million in connection with an alternative investment transaction as described in the immediately following paragraph.

In exchange for the Plan Investors' commitment to purchase approximately $200 million of common stock and the unsubscribed shares in the rights offering, Delphi will pay a commitment fee of $55 million and certain transaction expenses. In exchange for the Plan Investors' commitment to purchase $1.2 billion of convertible preferred stock, Delphi will pay a commitment fee of $21 million. The commitment fees are payable in installments, with the first $10 million payable upon expiration or earlier waiver by the Plan Investors of their due diligence termination right set forth in the EPCA or an expiration of its terms, an additional $28 million payable when the Plan Investors approve a settlement of certain claims asserted by or against GM in the Company's reorganization cases, and the remaining $38 million payable upon the Court's approval of the Company's disclosure statement for a plan of reorganization as outlined in the PSA (the "Disclosure Statement Approval Date"). The Company is required to pay the Plan Investors $100 million if (a) the EPCA is terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdraws its recommendation of the transaction or the Company willfully breaches the EPCA, and within the next twenty four months thereafter, the Company then agrees to an alternative investment transaction. The Company also has agreed to pay out-of-pocket costs and expenses reasonably incurred by the Plan Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. In no event, however, shall the Company's aggregate liability under the EPCA, including any liability for willful breach, exceed $100 million on or prior to the Disclosure Statement Approval Date, or $250 million thereafter.

The EPCA and the PSA also include certain corporate governance provisions for the reorganized Delphi. The reorganized Delphi would be governed by a 12 member Board of Directors, two of whom would be an Executive Chairman and a Chief Executive Officer ("CEO") and President. As part of the new corporate governance structure, the current Delphi board of directors along with the Plan Investors both anticipate and agree that Rodney O'Neal would continue as CEO and president of the reorganized Delphi.

In addition, the EPCA provides that a five member selection committee, consisting of Delphi's Board of Director lead independent director, John Opie, a representative of each of Delphi's two statutory committees, and a representative of each of Delphi's two lead Plan Investors — Cerberus and Appaloosa — would select the company's post-emergence Executive Chairman as well as four independent directors (one of whom may be from Delphi's current board of directors). Cerberus and Appaloosa must both concur in the selection of the Executive Chairman, but do not vote on the four independent directors. In addition, Cerberus and Appaloosa will each appoint three of the remaining six members of the new board of directors. The new board of directors must satisfy all applicable SEC and exchange independence requirements. Executive compensation for the reorganized company must be on market terms, must be reasonably acceptable to the Plan Investors, and the overall executive compensation plan design must be described in the Company's disclosure statement and incorporated into the plan of reorganization.

The parties to the PSA acknowledge that Delphi and GM presently intend to pursue agreements, to be documented in Delphi's reorganization plan, the order confirming the reorganization plan and/or the documents related to Delphi's settlement with GM, as applicable, concerning, among other matters: (a) triggering of the GM guarantees with respect to certain benefit obligations that Delphi has to certain of its unionized workers; (b) assumption by GM of certain postretirement health and life insurance obligations for certain Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by the transfer to the GM Hourly-Rate Employees Pension Plan, pursuant to a transaction governed by Section 414(l) of the Internal Revenue Code of 1986, as amended, of certain of Delphi's pension obligations in exchange for a note to be paid in full in cash within ten days following the effective date of the Plan; (d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e) GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs; (g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j)  Delphi's support for GM's efforts to re-source products purchased by GM; (k) licensing of Delphi's intellectual property to GM or for its benefit; (l) treatment of the environmental matters agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between Delphi and GM. The parties to the PSA agreed to negotiate in good faith all of the documents and transactions described above, however, the parties to the PSA acknowledged that no party has any obligation to enter into any such documents or consummate any such transactions.

The plan framework described in the PSA, which is predicated in part upon Delphi's business plan and resolution of the GM issues, outlines the potential recoveries to Delphi's stakeholders:

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- Trade and other unsecured claims and unsecured funded debt claims would be satisfied in full with $810 million of common stock (18 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and the balance in cash. The framework requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion, excluding all allowed accrued postpetition interest thereon, and that the amount of cash and common stock distributed will be reduced proportionately by the amount that allowed trade and other unsecured claims are less than $1.7 billion.

- In exchange for GM's financial contribution to Delphi's transformation plan, and in satisfaction of GM's claims against Delphi, GM would receive 7 million of a total of 135.3 million shares of common stock in the reorganized Delphi, $2.63 billion in cash, and an unconditional release of any alleged estate claims against GM. In addition, as with other customers, certain GM claims would flow through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business.

- All subordinated debt claims would be allowed and satisfied with $450 million of common stock (10 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share and the balance in cash.

- Holders of existing equity securities in Delphi would receive $135 million of common stock (3 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and rights to purchase 56.7 million shares of common stock in the reorganized Delphi for $1.984 billion at a deemed exercise price of $35 per share (subject to the rights offering becoming effective and other conditions).

- The PSA also reaffirms Delphi's earlier commitment to the preservation of the vested benefits of the salaried and hourly defined benefit pension plans and will include an arrangement to fund approximately $3.5 billion of pension obligations. Between $1.5 billion and $2.0 billion of this amount may be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law. GM will receive a note in the amount of such assignment on market terms that will be paid in full within ten days following the effective date of the reorganization plan. Through this funding, Delphi will make up required contributions to the pension plans that were not made in full during the chapter 11 cases.

The PSA will be terminated if the EPCA is terminated. In addition, after April 1, 2007, any party to the PSA can terminate the PSA for any reason or no reason by delivering a notice of termination to the other parties to the PSA; provided, however, that neither Delphi nor the Plan Investors can exercise such right after the Court approves Delphi's disclosure statement with respect to the plan of reorganization. Nevertheless, Delphi believes that the agreements that are the basis for the PSA provide Delphi with a platform to complete the transactions contemplated therein and promptly conclude these chapter 11 cases.

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Year Ended December 31, 2006 | October 8, 2005 to December 31, 2005 |
|---|---|---|
|  | (in millions) | |
| Net sales: | | |
| General Motors and affiliates | $ 9,915 | $ 2,482 |
| Other customers | 6,651 | 1,717 |
| Affiliate non-Debtor affiliates | 604 | 131 |
| Total net sales | 17,170 | 4,330 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 17,528 | 4,238 |
| U.S. employee special attrition program charges | 2,955 | — |
| Depreciation and amortization | 660 | 178 |
| Long-lived asset impairment charges | 145 | 96 |
| Goodwill impairment charges | — | 140 |
| Selling, general and administrative | 1,083 | 259 |
| Total operating expenses | 22,371 | 4,911 |
| | | |
| Operating loss | (5,201) | (581) |
| Interest expense (contractual interest expense for the year ended December 31, 2006 and the period October 8 to December 31, 2005 was $526 million and $118 million, respectively) | (378) | (80) |
| Other (expense) income, net | (11) | 8 |
| Loss before reorganization items, income tax benefit, equity income, and cumulative effect of accounting change | (5,590) | (653) |
| Reorganization items, net | (70) | 1 |
| Loss before income tax benefit, equity income, and cumulative effect of accounting change | (5,660) | (652) |
| Income tax (expense) benefit | (1) | 30 |
| Loss before equity income, and cumulative effect of accounting change | (5,661) | (622) |
| Equity income from non-consolidated affiliates, net of tax | 40 | 24 |
| Equity income (loss) from non-Debtor affiliates, net of tax | 154 | (213) |
| Loss before cumulative effect of accounting change | (5,467) | (811) |
| Cumulative effect of accounting change | 3 | (15) |
| | | |
| Net loss | $ (5,464) | $ (826) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | December 31, | |
|---|---:|---:|
|  | **2006** | **2005** |
|  | *(in millions)* | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 376 | $ 1,361 |
| Restricted cash | 107 | — |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,739 | 1,654 |
| Other third parties | 906 | 1,428 |
| Non-Debtor affiliates | 328 | 287 |
| Notes receivable from non-Debtor affiliates | 346 | 349 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 938 | 820 |
| Finished goods | 263 | 286 |
| Other current assets | 290 | 354 |
| Total current assets | 5,293 | 6,539 |
| Long-term assets: | | |
| Property, net | 2,240 | 2,743 |
| Investments in affiliates | 366 | 356 |
| Investments in non-Debtor affiliates | 3,273 | 3,131 |
| Goodwill | 152 | 139 |
| Other intangible assets, net | 36 | 42 |
| Pension intangible assets | — | 871 |
| Other | 344 | 319 |
| Total long-term assets | 6,411 | 7,601 |
| Total assets | $ 11,704 | $ 14,140 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Notes payable and secured debt in default | $ 2,492 | $ 2,519 |
| Debtor-in-possession financing | 250 | — |
| Accounts payable | 1,108 | 1,027 |
| Accounts payable to non-Debtor affiliates | 434 | 486 |
| Accrued liabilities | 1,250 | 410 |
| Total current liabilities | 5,534 | 4,442 |
| Debtor-in-possession financing | — | 250 |
| Employee benefit plan obligations and other | 737 | 550 |
| Total long-term liabilities | 737 | 800 |
| Liabilities subject to compromise | 17,488 | 15,143 |
| Total liabilities | 23,759 | 20,385 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (12,055) | (6,245) |
| Total liabilities and stockholders' deficit | $ 11,704 | $ 14,140 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Year ended December 31, 2006 | October 8, 2005 to December 31, 2005 |
|---|---|---|
|  | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash (used in) provided by operating activities | $ (572) | $ 657 |
| Cash flows from investing activities: | | |
| Capital expenditures | (288) | (90) |
| Proceeds from sale of property | 23 | 1 |
| Increase in restricted cash | (102) | — |
| Other, net | (7) | (33) |
| Net cash used in investing activities | (374) | (122) |
| Cash flows from financing activities: | | |
| Proceeds from debtor-in-possession facility, net | — | 218 |
| Proceeds from prepetition secured revolving credit facility, net | 2 | 1 |
| (Repayments) proceeds under cash overdraft | (29) | 29 |
| Repayments of borrowings under other debt agreements | (12) | (2) |
| Net cash (used in) provided by financing activities | (39) | 246 |
| (Decrease) increase in cash and cash equivalents | (985) | 781 |
| Cash and cash equivalents at beginning of period | 1,361 | 580 |
| Cash and cash equivalents at end of period | $ 376 | $ 1,361 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business to be separately disclosed. Delphi's reorganization items consist of the following:

|  | Year Ended December 31, 2006 | October 8, 2005 to December 31, 2005 |
|---|---|---|
|  | (in millions) | |
| Professional fees directly related to reorganization | $ 150 | $ 28 |
| Interest income | (55) | (11) |
| Gain on settlement of prepetition liabilities | (3) | (8) |
| Other | — | (6) |
| Total Reorganization Items | $ 92 | $ 3 |

In 2006 and from October 8 to December 31, 2005, reorganization items resulted in approximately $64 million and $6 million, respectively, of cash received entirely related to interest income. Cash paid for professional fees was approximately $122 million during 2006 and was not significant during 2005. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions.

## 4. WEIGHTED AVERAGE SHARES AND DIVIDENDS

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in 2006, 2005, and 2004 the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
|  |  | (in thousands) |  |
| Weighted average basic and diluted shares outstanding ................................................ | 561,782 | 560,045 | 560,905 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
|  |  | (in thousands) |  |
| Anti-dilutive securities ............................. | 75,848 | 84,808 | 91,115 |

On September 8, 2005, the Board of Directors announced the elimination of Delphi's quarterly dividend on Delphi common stock. In addition, the Refinanced DIP Credit Facility and the Amended DIP Credit Facility include a negative covenant, which prohibit the payment of dividends by the Company. The Company does not expect to pay dividends prior to emergence.

## 5. EMPLOYEE AND PRODUCT LINE LIABILITY

In the fourth quarter of 2004, Delphi recorded charges primarily related to the recoverability of certain of Delphi's U.S. legacy plant and employee cost structure. Included in these charges were postemployment obligations and other exit costs. The employee charges were principally necessitated by the substantial decline during the second half of 2004 in Delphi's U.S. profitability, especially at impaired sites, combined with the budget business plan outlook for such sites and product lines. The postemployment obligations include estimated costs for other than temporarily idled employees, primarily at U.S. sites being consolidated, throughout the duration of their contractual employment. In the third quarter of 2005, the accrued liabilities for postemployment obligations included in the employee and product line liability were transferred to the postemployement benefits liability included in accrued liabilities and other long-term liabilities in the accompanying consolidated balance sheet (Refer to Note 11. Liabilities).

During 2004, Delphi achieved the restructuring plans approved by its Board of Directors in the third quarter of 2003 to reduce its hourly and salaried workforce by approximately 9,675 employees. These plans entailed workforce reductions through a variety of methods including regular attrition and retirements, and voluntary and involuntary separations, as applicable. Under certain elements of the plans, the UAW hourly employees may return ("flowback") to GM. As required under U.S. GAAP, Delphi records the costs associated with the flowback to GM as the employees accept the offer to exit Delphi. In conjunction with such plans, Delphi recorded charges for employee costs of $86 million in 2004, which is included in cost of sales. No charges were recorded in conjunction with these plans during 2006 and 2005. Total charges of approximately $746 million (pre-tax) were recorded related to these initiatives during 2003 and 2004.

The following is a summary of the activity in the employee and product line liability related to the above plans:

| Employee and Product Line Liability | Employee Costs | Exit Costs | Total |
|---|---|---|---|
| | | (in millions) | |
| Balance at January 1, 2004 | $ 246 | $ 5 | $ 251 |
| Charges during 2004 | 180 | 14 | 194 (a) |
| Usage during 2004 | (302) | (1) | (303)(b) |
| Less: reversal of 2003 charges | — | (2) | (2) |
| Balance at December 31, 2004 | $ 124 | $ 16 | $ 140 |
| Usage during 2005 | (59) | (5) | (64) |
| Transfer to postemployment benefits | (61) | — | (61)(c) |
| Balance at December 31, 2005 | $ 4 | $ 11 | $ 15 |
| Usage during 2006 | — | (1) | (1) |
| Balance at December 31, 2006 | $ 4 | $ 10 | $ 14 (d) |

(a) Amount includes $81 million of contractual postemployment liabilities associated with other than temporarily idled employees recorded in the fourth quarter of 2004. In 2005, the remaining balance from these liabilities was transferred to accrued liabilities and other long-term liabilities in the accompanying consolidated balance sheet see note (e) below.

(b) The $303 million of usage in 2004 includes $7 million of non-cash special termination pension and postretirement benefits for the year ended December 31, 2004.

(c) $61 million of contractual postemployment liabilities associated with other than temporarily idled employees transferred from employee and product line liability to the postemployment benefits liability included accrued liabilities and other long-term liabilities in the accompanying consolidated balance sheet (Refer to Note 11. Liabilities).

(d) Included in liabilities subject to compromise in the accompanying consolidated balance sheet.

During 2005 and 2004, Delphi paid $64 million and $296 million, respectively, related to employee and product line restructuring plans announced in the third quarter of 2003 and in the fourth quarter of 2004, as shown on its consolidated statement of cash flows. The remainder of the $14 million employee and product line liability balance shown in the table may be subject to compromise or other treatment under the Debtors plan of reorganization.

## 6. ACQUISITIONS AND DIVESTITURES

### Global Battery Product Line Sale

On June 30, 2005, Delphi reached final agreement to sell its global battery product line, with the exception of two U.S. operations, to Johnson Controls Inc. ("JCI") for approximately $203 million. The transaction, comprised of net assets totaling approximately $171 million, including approximately $8 million of cash, closed July 1, 2005. On September 29, 2005, a final purchase price adjustment was agreed to by JCI and Delphi and as a result, JCI paid additional proceeds of approximately $12 million to Delphi. In connection with the transaction, Delphi entered into a contract manufacturing supply arrangement, becoming a Tier II supplier to JCI, and began supplying batteries from its two U.S. plants to JCI for a transition period ending on or before November 30, 2007. The receipt of the $215 million cash purchase price was not contingent upon completion of future events.

The business sold generated approximately $463 million annually in consolidated revenues. Delphi recognized a gain on the sale of the battery business of $44 million in 2005. In addition, valuation adjustments of $24 million were recorded, reducing the carrying value of the retained assets of the battery product line. Of the $24 million, $4 million was recorded in cost of sales, $2 million was recorded in selling, general and administrative, and $18 million was recorded in depreciation and amortization expense.

In conjunction with the sale of its battery business, Delphi entered into an agreement with GM, its principal battery customer, under which Delphi could receive up to $30 million through 2008 if certain performance criteria are met. Delphi received $11 million in cash in 2005 related to this agreement, approximately $7 million of which was recognized as a reduction of cost of sales and the remaining approximately $4 million which was recorded as deferred income as it relates to price reductions over the next three years.

Delphi's 2005 sale to JCI of its global battery product line, with the exception of two U.S. operations, contemplated a future possible transfer of certain of the operating assets of Delphi's New Brunswick, New Jersey manufacturing facility (the "New Brunswick Facility"), which was one of the remaining U.S. plants supplying batteries to JCI under a manufacturing supply agreement. In connection with the anticipated transfer of its New Brunswick operations to JCI, on May 25, 2006, Delphi entered into an agreement with the IUE-CWA and its Local 416, which included an attrition plan with respect to the hourly employees of the New Brunswick Facility (the "Attrition Plan"). On August 1, 2006, Delphi sold JCI certain assets related to the New Brunswick Facility free and clear of liens, claims, and encumbrances in exchange for JCI's payment to Delphi of $1 plus approximately $4 million for certain inventory, and Delphi implemented the Attrition Plan. Pursuant to the May 2006 agreement, Delphi agreed to the continuation and transition of supply of battery products to JCI from Delphi's remaining U.S. battery manufacturing facility located in Fitzgerald, Georgia ("Fitzgerald") pursuant to a component supply

agreement entered into in connection with the initial sale in 2005. The sale of the New Brunswick Facility resulted in a loss of approximately $1 million, which was recorded in cost of sales.  JCI paid Delphi approximately $13 million to reimburse Delphi for a significant portion of the amounts to be spent under the Attrition Plan, which was recorded as a reduction to U.S. employee special attrition program charges.

In August 2006, Delphi received approximately $10 million related to the 2005 agreement between Delphi and GM, $6 million was recognized as a reduction of costs, with approximately $4 million recorded as a reduction of cost of sales and approximately $2 million recorded as a reduction to U.S. employee special attrition program charges. Approximately $4 million was recorded as deferred income as it relates to price reductions over the next two years. Delphi anticipates receiving continued economic support from GM related to future price reductions on batteries produced at Fitzgerald and the transition of battery supply from Fitzgerald to JCI.

The results of operations as well as the gain on sale of Delphi's global battery product line was not significant to the consolidated financial statements in any period presented.

### Other Acquisitions and Divestitures

In the second quarter 2006, Delphi's Thermal Systems division made an additional investment in Shanghai Delphi Automotive Air Conditioning Co. ("SDAAC") for approximately $14 million, which increased its equity ownership interest in SDAAC from 34 percent to 50 percent.  SDAAC's annual revenues for 2005 were approximately $133 million.  In the third quarter of 2006 Delphi obtained a controlling management interest in SDAAC and began consolidating the entity.  Prior to obtaining a controlling management interest, the entity was accounted for using the equity method.

Also in the third quarter of 2006, Delphi's Electronics and Safety division sold certain of its assets in MobileAria, a consolidated entity, which resulted in a gain of $7 million which has been recognized as a reduction of cost of sales.

## 7.  ASSET SECURITIZATIONS

U.S. Program

Prior to the initial Chapter 11 Filings, Delphi maintained a revolving accounts receivable securitization program in the U.S. ("U.S. Facility Program").  The U.S. Facility Program was terminated as a result of the initial Chapter 11 Filings on October 8, 2005.  The U.S. Facility Program had been amended in March 2005 to allow Delphi to maintain effective control over the receivables such that effective March 2005, this program, which was previously accounted for as the sale of receivables, was accounted for as a secured borrowing.  The U.S. Facility Program had a borrowing limit of $730 million prior to the Chapter 11 Filings.

European Program

The Chapter 11 Filings triggered early termination events under the European accounts receivables securitization program (the "European Program").  On October 28, 2005, Delphi and the institutions sponsoring the European Program entered into a preliminary agreement, which was finalized on November 18, 2005 (the "Agreement"), permitting continued use of the European Program despite the occurrence of early termination events.  The early termination events included Delphi's failure to satisfy the consolidated leverage ratio at September 30, 2005 and defaults related to its voluntary filing for reorganization relief under the Bankruptcy Code. The Agreement allows for continued use of the European Program and incorporates amendments resulting from the Agreement, including revised financial covenants and pricing.  The program was extended on December 21, 2006 with a revised expiration date of December 20, 2007.  The renewed program has an availability of €178 million ($234 million at December 31, 2006 currency exchange rates) and £12 million ($24 million at December 31, 2006 currency exchange rates).

Accounts receivable transferred under this program are accounted for as short-term debt.  As of December 31, 2006 and 2005, outstanding borrowings under this program were approximately $122 million and $149 million, respectively.

## 8. INCOME TAXES

Loss before income taxes, minority interest, equity income, and cumulative effect of accounting change for U.S. and non-U.S. operations was as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
|  | (in millions) | | |
| U.S. loss | $(5,697) | $(2,538) | $(1,450) |
| Non-U.S. income | 315 | 49 | 681 |
| Subtotal before impact of minority interest and cumulative effect of accounting change | (5,382) | (2,489) | (769) |
| Cumulative effect of an accounting change | (3) | 17 | — |
| Minority interest, primarily non-U.S. | 44 | 30 | 47 |
| Total | $(5,341) | $(2,442) | $  (722) |

The provision (benefit) for income taxes is comprised of:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
|  | (in millions) | | |
| Current income tax (benefit) expense, net: |  |  |  |
| U.S. federal | $   _ | $  (67) | $ (277) |
| Non-U.S. | 130 | 85 | 132 |
| U.S. state and local | (17) | — | (5) |
| Total current income tax expense (benefit) | 113 | 18 | (150) |
| Deferred income tax (benefit) expense, net: |  |  |  |
| U.S. federal | (2) | (11) | 4,051 |
| Non-U.S. | 18 | (66) | 38 |
| U.S. state and local | — | — | 197 |
| Total deferred income tax expense (benefit) | 16 | (77) | 4,286 |
| Investment tax credits | (1) | (2) | (1) |
| Subtotal before impact of minority interest | 128 | (61) | 4,135 |
| Income tax provision related to minority interest | 8 | 6 | 8 |
| Income tax expense (benefit) | $  136 | $  (55) | $4,143 |

Cash paid for income taxes, primarily non-U.S., was $159 million, $113 million and $119 million in 2006, 2005 and 2004, respectively.

A reconciliation of the provision (benefit) for income taxes compared with the amounts at the U.S. federal statutory rate was:

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | (in millions) | |
| Tax at U.S. federal statutory income tax rate | $ (1,868) | $ (881) | $ (269) |
| U.S. state and local income taxes | (53) | — | (9) |
| Impact of change in state and local effective rate | — | — | 37 |
| Non-U.S. income taxed at other rates | (147) | (22) | (69) |
| Change in valuation allowance | 2,284 | 938 | 4,677 |
| Research and experimentation credits, gross | (48) | (49) | (57) |
| Other tax credit and deduction carryforwards | (1) | — | (30) |
| Provision-to-return adjustments | (53) | — | (23) |
| Various nondeductible expenses | 11 | 10 | 12 |
| U.S. tax on unremitted earnings of non-U.S. subsidiaries | 15 | 36 | 76 |
| Residual tax on non-U.S. earnings remitted from joint ventures | — | 5 | 5 |
| U.S. tax on non-U.S. located branches | — | 1 | 1 |
| Employee stock option plan payments | — | (2) | (4) |
| Professional bankruptcy fees | 42 | — | — |
| Reversal of income tax reserves due to completion of pre-spin tax audits | — | (12) | (165) |
| Reversal of income tax reserves due to completion of U.S. federal income tax audits for post-Separation 1999 and 2000 | — | — | (12) |
| Other changes in tax reserves (1) | (26) | (14) | (20) |
| Medicare reimbursement | (23) | (30) | (22) |
| Unrealized gains/losses included in other comprehensive income | — | (42) | 12 |
| Other adjustments | (5) | 1 | (5) |
| Subtotal before impact of minority interest | 128 | (61) | 4,135 |
| Minority interest | 8 | 6 | 8 |
| Total income tax provision (benefit) | $ 136 | $ (55) | $ 4,143 |

(1) The reduction in the 2006 tax reserves relates primarily to the anticipated resolution of certain state tax matters.

Delphi accounts for income taxes and the related accounts under the liability method. Deferred income tax assets and liabilities for 2006 and 2005 reflect the impact of temporary differences between amounts of assets and liabilities for financial reporting purposes and the bases of such assets and liabilities as measured by tax laws. Significant components of Delphi's deferred tax assets and liabilities are as follows:

| | December 31, | | | |
| | 2006 | | 2005 | |
| | (in millions) | | | |
| | Deferred Tax Assets | Deferred Tax Liabilities | Deferred Tax Assets | Deferred Tax Liabilities |
|---|---|---|---|---|
| Other postretirement benefits | $ 3,701 | $ — | $ 2,812 | $ — |
| Pension benefits | 1,548 | — | 1,031 | 1 |
| Other employee benefits | 524 | 5 | 302 | 22 |
| Depreciation | 100 | 222 | 282 | 313 |
| Tax on unremitted profits | — | 64 | — | 36 |
| Net operating loss carryforwards | 641 | — | 272 | — |
| General business credit carryforwards | 393 | — | 344 | — |
| R&D capitalization | 1,541 | — | 1,083 | — |
| Other U.S | 442 | 87 | 322 | 145 |
| Other non-U.S. | 329 | 232 | 125 | 71 |
| Total | 9,219 | 610 | 6,573 | 588 |
| Valuation allowances | (8,471) | — | (5,891) | — |
| Total deferred taxes | $ 748 | $ 610 | $ 682 | $ 588 |

Delphi has deferred tax assets for net operating loss ("NOL") carryforwards of $641 million, net of a valuation allowance of $605 million. This amount relates to U.S. and non-U.S. tax jurisdictions with expiration dates ranging from one year to indefinite. Delphi has elected with respect to 2005 and certain prior years, and expects to elect when it files its 2006 U.S. consolidated tax return, to capitalize U.S. research and development ("R&D") expenditures for tax purposes. The effect of this capitalization is to substantially reduce the deferred tax asset with respect to U.S. NOL carryforwards and to create a deferred tax asset for capitalized R&D expenditures, which will be amortized and deducted over a period of ten years, beginning in the year of capitalization. Delphi has recorded a deferred tax asset of $393 million, subject to a full valuation allowance, for the general business credit carryforwards, which expire in 2019 through 2026.

Dividends from non-U.S. affiliates remitted during 2005 were approximately $1.3 billion, plus gross-up for associated foreign tax credits of approximately $0.5 billion.  As discussed above, in order to avoid creating potentially unusable foreign tax credit carryforwards, Delphi capitalized R&D expenditures pursuant to Section 59(e) of the Internal Revenue Code, thus reducing net operating losses and permitting current use of foreign tax credits to offset tax on the dividend income.

Realization of the net deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carryforwards. Valuation allowances are provided against deferred tax assets when, based on all available evidence, it is considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods.  Due to Delphi's recent history of U.S. losses, in 2004 Delphi determined that it could no longer support realization of such amounts under SFAS No. 109, *Accounting for Income Taxes*.

Accordingly, Delphi recorded a valuation allowance on the U.S. deferred tax assets of $4,731 million as of December 31, 2004, an additional $893 million and $2,396 million as of as of December 31, 2005 and 2006, respectively.  Delphi continues to maintain the underlying tax benefits to offset future taxable income and to monitor the need for a valuation allowance based on the profitability of its U.S. operations.

Due to continued losses in Spain, Portugal, Romania and France, in 2006, Delphi determined that it was no longer more likely than not that the deferred tax assets in these jurisdictions will be realized, and accordingly, Delphi recorded a valuation allowance of $40 million.   Other increases in valuation allowances for non-U.S. net deferred tax assets, were recorded in the amount of $144 million and $51 million for the years ended December 31, 2006 and 2005, respectively.  The change in the valuation allowances are follows:

|  | 2006 |
|---|---|
|  | (in millions) |
| Balance at January 1, | $ 5,891 |
| Net additions: |  |
| United States |  |
| U.S. tax provision | 2,263 |
| Changes in OCI taxes | 133 |
| Europe | 184 |
| Balance at December 31, | $ 8,471 |

Provisions are made for estimated U.S. and non-U.S. income taxes, less available tax credits and deductions, which may be incurred on the remittance of Delphi's share of subsidiaries' undistributed cumulative earnings that are not deemed to be indefinitely reinvested. U.S. income taxes have not been provided on approximately $1.4 billion of cumulative undistributed earnings of non-U.S. subsidiaries as of December 31, 2006, as such amounts are deemed to be indefinitely reinvested.  It is not practicable to calculate the unrecognized tax provision on these earnings to the extent not indefinitely reinvested.

In addition, Delphi currently experiences tax credits and holidays in various non-U.S. jurisdictions with expiration dates from 2006 through indefinite.  The income tax benefits attributable to these tax credits and holidays are approximately $17 million ($0.03 per share) for 2006, $26 million ($0.05 per share) for 2005 and $47 million ($0.08 per share) for 2004.

Delphi provides accruals for tax contingencies in accordance with SFAS No. 5, Accounting for Contingencies.  Annual tax provisions include amounts that may result from examination of prior year non-U.S., U.S., state and local tax returns, as well as customs audits. Delphi has open tax years from primarily 2000 – 2006 with various significant taxing jurisdictions including the U.S., Mexico, Germany, France and Brazil.   These open years contain matters that could be subject to differing interpretations of applicable tax law and regulations as they relate to the amount, timing or inclusion of revenue and expense or the sustainability of income tax credits for a given audit cycle.  Delphi has established a liability of $82 million and $98 million as of December 31, 2006 and 2005, respectively, for tax contingencies where the amount of loss is probable and reasonably estimable.  The amount of the liability is based upon Delphi's best estimate given the Company's history with similar matters and interpretations of current laws and regulations.

## 9. PROPERTY, NET

Property, net consisted of:

| | Estimated Useful Lives (Years) | December 31, 2006 | 2005 |
|---|---|---|---|
| | | (in millions) | |
| Land | — | $  137 | $  131 |
| Land and leasehold improvements | 3-31 | 264 | 269 |
| Buildings | 29-40 | 1,911 | 1,925 |
| Machinery, equipment, and tooling | 3-27 | 8,240 | 8,742 |
| Furniture and office equipment | 3-15 | 701 | 661 |
| Construction in progress | — | 238 | 245 |
| Total | | 11,491 | 11,973 |
| Less: accumulated depreciation and amortization | | (6,796) | (6,865) |
| Total property, net | | $  4,695 | $  5,108 |

In 2005, Delphi exercised its options to purchase certain of the Company's leased property. As a result, in the second quarter of 2005 Delphi completed the purchase of its Troy, Michigan headquarters property and two manufacturing facilities in Alabama for approximately $103 million, including approximately $2 million of fees and other costs. Additionally, in the third quarter of 2005 Delphi completed the purchase of a facility in Vienna, Ohio for approximately $28 million. As of December 31, 2005, these properties were included in the net property balance on the consolidated balance sheet. Prior to the purchase, these leases were accounted for as operating leases. Assets financed by capital leases are included in the table above and subject to depreciation and amortization expense.

In accordance with SFAS No. 144, Delphi evaluates the recoverability of certain long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Asset impairment charges related to the valuation of long-lived assets held for use were recorded in the amounts of approximately $215 million, $233 million, and $326 million in 2006, 2005, and 2004, respectively. The following table summarizes the long-lived asset impairment charges recorded for the years ended December 31, 2006, 2005 and 2004:

| Segment | 2006 | 2005 | 2004 |
|---|---|---|---|
| | | (in millions) | |
| Electronics & Safety | $    4 | $    5 | $    3 |
| Powertrain Systems | 12 | 9 | 2 |
| Electrical/Electronic Architecture | 1 | 35 | 11 |
| Thermal Systems | 11 | 23 | — |
| Steering | 26 | 34 | 2 |
| Automotive Holdings Group | 161 | 127 | 308 |
| Corporate and Other | — | — | — |
| Total | $  215 | $  233 | $  326 |

As a result of entering into the PSA in the fourth quarter of 2006, Delphi has been able to identify and develop plans to exit non-core businesses through sale or wind-down. These plans represent Delphi's intent but continue to be subject to various approvals by the Company's stakeholders. During the fourth quarter of 2006, Delphi also completed its 2007 to 2012 business plan which comprehends these exit plans. The finalization of the business plan as well as the ability to more definitely develop plans to exit non-core businesses, as discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, provided indicators for potential impairment in the fourth quarter. Additionally, reduced profitability at certain sites and product lines resulting from flattening revenue together with higher commodity costs was also considered. Cash flows are estimated using internal budgets based on recent and forecasted sales data, independent automotive production volume estimates and customer commitments. Changes in the economic or operating conditions or factors arising through execution of the transformation plan or the reorganization could impact these estimates and assumptions and could result in additional impairment of long-lived assets.

Delphi tested the recoverability of the long-lived assets by comparing the estimated undiscounted future cash flows against the carrying values of assets. Specifically, Delphi tested certain long-lived assets, primarily property, plant, and equipment, for each plant site with indicators of impairment. In accordance with SFAS 144, where the carrying value of the assets exceeded the undiscounted estimated future cash flows at that site, long-lived asset impairment charges were recognized for the amount that the carrying value exceeded fair value, which was determined by applying various valuation techniques including discounted cash flow analysis, replacement cost and orderly liquidation value depending on the circumstances of the product line(s) supporting the long-lived assets.

## 10. GOODWILL

At December 31, 2006 and 2005, Delphi's goodwill balance was approximately $378 million and $363 million respectively. Approximately $138 million of goodwill is tax deductible through amortization.

The change in carrying amount of goodwill for the year ended December 31, 2006 and 2005 is as follows:

|  | 2006 | 2005 |
|---|---|---|
|  | **(in millions)** | |
| Balance at January 1, | $ 363 | $ 798 |
| Acquisitions | — | — |
| Impairment | — | (390) |
| Other (primarily currency translation) | 15 | (45) |
| Balance at December 31, | $ 378 (a) | $ 363 (b) |

    (a)   $161 million in Electrical/Electronic Architecture, $143 million in Electronics & Safety and $74 million in Other
    (b)   $167 million in Electrical/Electronic Architecture, $125 million in Electronics & Safety and $71 million in Other

In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*, Delphi reviews the recoverability of goodwill at least annually on May 31 and any other time business conditions indicate a potential change in recoverability. As more fully described in Note 9. Property, Net, Delphi experienced deteriorated financial performance resulting in substantial net losses in 2005. As a result, Delphi has lowered expectations for future performance absent the ability to complete a transformation plan through its reorganization under chapter 11 of the Bankruptcy Code. The deterioration of Delphi's U.S. financial performance, combined with an unfavorable outlook absent completion of a successful U.S. reorganization, was an indicator for potential impairment. The Company recorded no goodwill impairment charges in 2006 and approximately $390 million of goodwill impairment charges during 2005, of which $368 million related to the Powertrain Systems segment and $22 million related to the Automotive Holdings Group segment. In conjunction with the realignment of the Company's business operations effective July 1, 2006, Delphi evaluated reported goodwill for indicators of impairment and concluded no indicators were present.

Delphi determined the goodwill impairment charges by comparing the carrying value of each of its reporting units to the fair value of the reporting unit. In determining fair value of reporting units, Delphi utilized discounted cash flow analysis consistent with that used in the Company's SFAS No. 144 impairment analysis evaluating the recoverability of certain long-lived assets noted in Note 9. Property, Net. In accordance with SFAS No. 142, where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized. The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill. The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the calculated fair value of goodwill for the reporting unit. Delphi's reporting units for purposes of SFAS No. 142 are global businesses focused on product families. The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in the U.S., as previously described.

## 11. LIABILITIES

Accrued liabilities consisted of the following:

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
|  | **(in millions)** | |
| Payroll related obligations | $ 268 | $ 223 |
| Employee benefits, including current pension obligations | 216 | 162 |
| Accrued income taxes | 142 | 190 |
| Taxes other than income | 144 | 128 |
| Warranty obligations | 214 | 117 |
| U.S. Employee Special Attrition Program | 626 | — |
| Manufacturing rationalization | 154 | 4 |
| Other | 447 | 368 |
| Total | $ 2,211 | $ 1,192 |

Other long-term liabilities consisted of the following:

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |

|  | (in millions) | |
| --- | --- | --- |
| Employee benefits | $ 282 | $ 223 |
| Environmental | 116 | 41 |
| U.S. Employee Special Attrition Program | 204 | — |
| Extended disability benefits | 95 | 226 |
| Other | 162 | 161 |
| Total | $ 859 | $ 651 |

## 12. WARRANTIES

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the years ended December 31, 2006 and 2005:

|  | December 31, | |
| --- | --- | --- |
|  | 2006 | 2005 |
|  | (in millions) | |
| Accrual balance at beginning of year | $ 312 | $ 274 |
| Provision for estimated warranties accrued during the year | 207 | 200 |
| Settlements made during the year (in cash or in kind) | (140) | (154) |
| Foreign currency translation | 9 | (8) |
| Accrual balance at end of year | $ 388 | $ 312 |

Approximately $214 million and $117 million of the warranty accrual balance as of December 31, 2006 and 2005, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $174 million and $195 million of the warranty accrual balance as of December 31, 2006 and 2005, respectively, is included in liabilities subject to compromise. Refer to Note 13. Liabilities Subject to Compromise. The increase in the accrual balance at December 31, 2006 is primarily due to specific claims accrued for in the Thermal Systems and Powertrain Systems segments. Refer to Note 18. Commitments and Contingencies, Ordinary Business Litigation.

## 13. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, the Debtors may reject prepetition executory contracts and unexpired leases with respect to the Debtors' operations, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. To date, the Debtors' received approximately 16,500 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim received to scheduled liabilities and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $37 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. The Debtors believe that many of these claims are duplicative, based on contingencies that have not occurred, or are otherwise overstated, and are therefore invalid. As a result, the Debtors believe that the aggregate amount of claims filed with the Court will likely exceed the amount that ultimately will be allowed by the Court. As of February 5, 2007, the Debtors have filed five omnibus claims objections that objected to claims on procedural grounds and four omnibus claims objections that objected to claims on substantive grounds. Pursuant to these claims objections the Debtors have objected to approximately 10,700 proofs of claim which asserted approximately $9 billion in aggregate liquidated amounts plus additional unliquidated amounts. To date, the Court has entered orders disallowing approximately 7,400 of those claims, which orders reduced the amount of asserted claims by approximately $8 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Debtors anticipate that additional proofs of claim will be the

subject of future objections as such proofs of claim are reconciled. The determination of how liabilities will ultimately be settled and treated cannot be made until the Court approves a chapter 11 plan of reorganization. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to the Court's order.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities Subject to Compromise consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| | (in millions) | |
| Pension obligations | $ 4,257 | $ 3,578 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,109 | 7,331 |
| Debt and notes payable | 2,054 | 2,062 |
| Accounts payable | 754 | 916 |
| Junior subordinated notes due to Delphi Trust I and II (1) | — | 403 |
| Junior subordinated notes due 2033 (1) | 391 | — |
| Postemployment benefits for other than temporarily idled employees | 1 | 148 |
| Prepetition warranty obligation | 174 | 195 |
| GM claim for U.S. employee special attrition program | 315 | — |
| Training fund | 131 | 147 |
| Other | 230 | 294 |
| Total Liabilities Subject to Compromise | $ 17,416 | $ 15,074 |

(1) In conjunction with the liquidation of the Trusts on November 14, 2006, the interests of Delphi Trust I and Delphi Trust II in the junior subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.

The increase in Liabilities Subject to Compromise as of December 31, 2006 is primarily due to the increase in pension and postretirement obligations due to the curtailment charges in 2006. The increase in liabilities subject to compromise resulting from the pension and postretirement obligations was offset by a decrease in accounts payable due to settlement of claims and a reduction of accruals for postemployment benefits for other than temporarily idled employees as a result of the special attrition programs. Refer to Note 11. Liabilities.

Delphi reviewed its estimates of future costs associated with other than temporarily idled employees and recorded an additional $103 million of contractual costs for U.S. employees in cost of sales in 2005. Total accruals for postemployment benefits for other than temporarily idled employees are $1 million and $148 million as of December 31, 2006 and 2005, respectively, and are included in liabilities subject to compromise in the accompanying consolidated balance sheet. As a result of the special attrition programs, Delphi determined that certain previously recorded accruals for postemployment benefits, representing the future cash expenditures expected during the period between the idling of affected employees and the time when such employees are redeployed, retire, or otherwise terminate their employment, were no longer necessary and accordingly Delphi reduced such accruals by $108 million during 2006, which was recorded in cost of sales.

**14. DEBT**

Due to the Chapter 11 Filings (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy), prepetition long-term debt of the Debtors has been reclassified to the caption Liabilities Subject to Compromise (Refer to Note 13. Liabilities Subject to Compromise) on the consolidated balance sheet. The following is a summary of Long-Term Debt, including current maturities, and unsecured long-term debt included in Liabilities Subject to Compromise as of December 31, 2006 and 2005:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2006** | | **2005** | |
| | **Subject to Compromise** | **Debt** | **Subject to Compromise** | **Debt** |
| 6.55%, unsecured notes, due 2006 | $  500 (a)(b)(c) | $  — | $ 500 (a)(b)(c) | $  — |
| 6.50%, unsecured notes, due 2009 | 498 (a)(b)(c) | — | 498 (a)(b)(c) | — |
| 6.50%, unsecured notes, due 2013 | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| 7.125%, debentures, due 2029 | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| Junior subordinated notes due 2033 (d) | 391 (a)(b)(c) | — | — | — |
| DIP term loan | — | 250 | — | 250 |
| Prepetition term loan facility | — | 985 (b)(c) | — | 984 (b)(c) |
| Prepetition revolving credit facility | — | 1,507 (b)(c) | — | 1,506 (b)(c) |
| European securitization program | — | 122 | — | 149 |
| Accounts receivable factoring | — | 409 | — | 365 |
| Capital leases and other | 70 (c) | 115 | 78 (c) | 136 |
| Total debt | $2,445 | 3,388 | $2,062 | 3,390 |
| Less: current portion | | (3,339) | | (3,117) |
| Long-term debt | | $    49 | | $   273 |

(a) Pursuant to the requirements of SOP 90-7 as of the Chapter 11 Filings, deferred financing fees related to prepetition debt are no longer being amortized and have been included as an adjustment to the net carrying value of the related prepetition debt at December 31, 2005.

(b) Debt in default at December 31, 2006 and 2005.

(c) The Chapter 11 Filings triggered defaults on substantially all debt and certain lease obligations.

(d) In conjunction with the liquidation of the Trusts on November 14, 2006, the interests of Delphi Trust I and Delphi Trust II in the junior subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.

The stay of proceedings provisions of section 362 of the Bankruptcy Code apply to actions to collect prepetition indebtedness or to exercise control over the property of the Debtors' estate in respect of such defaults. The rights of and ultimate payments by the Debtors under prepetition obligations will be addressed in any plan of reorganization and may be substantially altered. This could result in unsecured claims being compromised at less, and possibly substantially less, than 100% of their face value.

Secured Debt

*Debtor-In-Possession Facilities*

On October 14, 2005, Delphi entered into a Revolving Credit, Term Loan and Guaranty Agreement (the "DIP Credit Facility"), as amended by the First Amendment to the DIP Credit Facility, dated October 27, 2005, and further amended and restated by the Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated November 21, 2005 and as further amended by the First Amendment to Amended and Restated Credit Agreement and Amended and Restated Security and Pledge Agreement dated as of February 3, 2006, the Second Amendment to Amended and Restated Credit Agreement dated as of April 13, 2006, the Third Amendment to Amended and Restated Credit Agreement dated May 26, 2006, the Fourth Amendment to Amended and Restated Credit Agreement dated June 19, 2006, the Fifth Amendment to Amended and Restated Credit Agreement dated August 10, 2006 and the Sixth Amendment to Amended and Restated Credit Agreement dated November 13, 2006 (the "Amended DIP Credit Facility") to borrow up to $2.0 billion from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. is the administrative agent (the "Administrative Agent") and Citicorp USA, Inc., is the syndication agent (together with the Administrative Agent, the "Agents"). The Amended DIP Credit Facility consists of a $1.75 billion revolving facility and a $250 million term loan facility (collectively, the "Amended DIP Loans"). The Amended DIP Credit Facility carries an interest rate at the option of Delphi of either (i) the Administrative Agent's Alternate Base Rate (as defined in the Amended DIP Credit Facility) plus 1.75% or (ii) 2.75% above the Eurodollar base rate, which is the London Interbank Borrowing Rate ("LIBOR"). The LIBOR interest rate period can be set at a one-, three- or six-month period as selected by Delphi in accordance with the terms of the Amended DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Amended DIP Loans. The Amended DIP Credit Facility will expire on the earlier of October 8, 2007 or the date of the substantial

consummation of a reorganization plan that is confirmed pursuant to an order of the Court. Borrowings under the Amended DIP Credit Facility are pre-payable at Delphi's option without premium or penalty.

On October 28, 2005, the Court granted, on a final basis, the Debtors' motion for approval of the DIP financing order. The DIP financing order granted final approval of the DIP Credit Facility, as amended at the time, final approval of an adequate protection package for the prepetition credit facilities (as described below) and the Debtors' access to $2.0 billion in DIP financing subject to the terms and conditions set forth in the DIP financing documents, as amended. The adequate protection package for the prepetition credit facilities included, among other things: (i) an agreement by Delphi to pay accrued interest on the loans under the prepetition credit facilities on a monthly basis, (ii) the right of Delphi to pay this interest based on LIBOR, although any lender may require that interest on its loans be based on the alternative base rate if such lender waives all claims for interest at the default rate and any prepayment penalties that may arise under the prepetition credit facilities and (iii) an agreement by Delphi to replace approximately $90 million of letters of credit outstanding under the prepetition credit facilities with letters of credit to be issued under the Amended DIP Credit Facility. The proceeds of the DIP financing together with cash generated from daily operations and cash on hand were used to fund postpetition operating expenses, including supplier obligations and employee wages, salaries and benefits.

As of November 21, 2005, the Amended DIP Credit Facility $250 million term loan was funded. As of December 31, 2006, there were no amounts outstanding under the Amended DIP Credit Facility revolving facility, but the Company had approximately $92 million in letters of credit outstanding under the Amended DIP Credit Facility revolving facility as of that date.

The Amended DIP Credit Facility provided the lenders with a first lien on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is only pledging 65% of the stock of its first tier non-U.S. subsidiaries) and further provided that amounts borrowed under the Amended DIP Credit Facility would be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession. The amount outstanding at any one time was limited by a borrowing base computation as described in the Amended DIP Credit Facility. The borrowing base computation exceeded the Amended DIP Credit Facility availability at December 31, 2006. Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion. The Amended DIP Credit Facility included affirmative, negative and financial covenants that imposed restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. So long as the Facility Availability Amount (as defined in the Amended DIP Credit Facility) was equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets did not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors to the Amended DIP Credit Facility).

The covenants required Delphi to, among other things, (i) maintain a monthly cumulative minimum global earnings before interest, taxes, depreciation, amortization, and restructuring costs ("Global EBITDAR"), as defined in the Amended DIP Credit Facility, for each period beginning on January 1, 2006 and ending on the last day of each fiscal month through November 30, 2006, as described in the Amended DIP Credit Facility, and (ii) maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on October 31, 2007 at the levels set forth in the Amended DIP Credit Facility. The Amended DIP Credit Facility contained certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended DIP Credit Facility, interest on all outstanding amounts was payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Amended DIP Credit Facility covenants as of December 31, 2006. The foregoing description of the Amended DIP Credit Facility is a general description only and is qualified in its entirety by reference to the Amended DIP Credit Facility, a copy of which was previously filed with the SEC.

On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion to refinance both its $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 21, 2005 (as amended, the "Amended DIP Credit Facility") and the approximately $2.5 billion outstanding on its $2.825 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility"). On January 9, 2007, Delphi entered into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximately $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan" and, together with the Revolving Facility and the Tranche B Term Loan, the "Facility").

The Refinanced DIP Credit Facility carries an interest rate at the option of Delphi of either the Administrative Agent's Alternate Base Rate plus (i), with respect to Tranche A borrowings, 1.50%, (ii) with respect to Tranche B borrowings, 1.25%, and (iii) with respect to Tranche C borrowings, 1.75%, or LIBOR plus (x), with respect to Tranche A borrowings, 2.50%, (y) with respect to Tranche B borrowings, 2.25%, and (z) with respect to Tranche C borrowings, 2.75%. The interest rate period can be set at a one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility. The

Refinanced DIP Credit Facility will expire on the earlier of December 31, 2007 and the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court.  Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is only pledging 65% of the stock of its first tier non-U.S. subsidiaries) and further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession.

The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility.  Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).

The Refinanced DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.  So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets do not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi to, among other things, maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on November 30, 2007, at the levels set forth in the Refinanced DIP Credit Facility.

The Refinanced DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.  The foregoing description of the Refinanced DIP Credit Facility is a general description only and is qualified in its entirety by reference to the Refinanced DIP Credit Facility, a copy of which was previously filed with the SEC.

Concurrent with the entry into the Refinanced DIP Credit Facility, the Amended DIP Credit Facility and the Prepetition Facility were terminated.  The proceeds of the Tranche B Term Loan and Tranche C Term Loan were used to extinguish amounts outstanding under the Amended DIP Credit Facility and the Prepetition Facility.  Delphi incurred no early termination penalties in connection with the termination of these agreements.

*Prepetition Facilities*

As of December 31, 2006, approximately $2.5 billion was outstanding under the Prepetition Facility, consisting of approximately $1.5 billion under the Revolving Facility and approximately $1.0 billion under the Term Loan.  Additionally, as of December 31, 2006, there were no letters of credit outstanding under the Prepetition Facility.

Delphi's filing for chapter 11 was an event of default under the Prepetition Facility.  At hearings held in October 2005, the Court approved certain of the Debtors' "first day" motions, including approval of an adequate protection package for Delphi's approximately $2.5 billion outstanding prepetition secured indebtedness under the Prepetition Facility.  The adequate protection package included, among other things: (i) an agreement by Delphi to accrued interest on the Prepetition Facility loans on a monthly basis, (ii) the right of Delphi to pay this interest at a rate equal to LIBOR plus 6.50% per annum on the Term Loans and 5.00% on the Revolving Loans, although each lender had the right to require, and each lender subsequently did require, that interest on its loans be based at a rate equal to the Alternative Base Rate plus 5.50% per annum on the Term Loans and 4.00% on the Revolving Loans by waiving all such lender's claims under the Prepetition Facility for interest at the default rate and any prepayment penalties and (iii) an agreement by Delphi to replace approximately $90 million of letters of credit outstanding under the Prepetition Facility.

On January 9, 2007, Delphi repaid the Prepetition Facility in full with the proceeds of the Tranche C or Term Loan C of the Refinanced DIP Credit Facility and, accordingly, the adequate protection package for the Prepetition Facility ceased to be in effect.

Unsecured Debt

Delphi had outstanding publicly held unsecured term debt securities totaling approximately $2.0 billion.  The unsecured debt included $500 million of securities bearing interest at 6.55% that matured on June 15, 2006 with interest payable semi-annually on June 15 and December 15 of each year.  The next maturity of $500 million of securities was due on May 1, 2009 and bears interest at 6.50% with interest payable semi-annually on May 1 and November 1 of each year.  Thereafter, Delphi had $500 million of securities bearing interest at 6.50% maturing on August 15, 2013 with interest payable semi-annually on February 15 and August 15 of each year, and $500 million

of securities bearing interest at 7.125% maturing on May 1, 2029 with interest payable semi-annually on May 1 and November 1 of each year.  None of the debt securities had sinking fund requirements.  The securities were all redeemable, in whole or in part, at the option of Delphi.  At December 31, 2006 and 2005, these securities were included in Liabilities Subject to Compromise.

As of December 31, 2006 and 2005, Delphi also had other debt outstanding and capital lease obligations of approximately $185 million ($70 million of which is included in Liabilities Subject to Compromise) and $214 million ($78 million of which is included in Liabilities Subject to Compromise), respectively.  The balances include capital lease obligations and debt issued by certain international subsidiaries.

## Other Financing

Delphi also maintains various accounts receivable factoring facilities in Europe that are accounted for as short-term debt.  These uncommitted factoring facilities are available through various financial institutions.  As of December 31, 2006 and 2005, Delphi had $409 million and $365 million, respectively, outstanding under these accounts receivable factoring facilities.

Cash paid for interest totaled $426 million, $272 million and $245 million in 2006, 2005 and 2004, respectively.

In accordance with SOP 90-7, effective October 8, 2005, the Company ceased accruing interest expense on its outstanding unsecured prepetition debt classified as subject to compromise.  The Company's contractual interest not accrued or paid in 2006 and 2005 was $148 million and $38 million, respectively.  In accordance with the Court-approved first day motion, the Company continues to accrue and pay the contractual interest on the secured credit facilities.

The principal maturities of debt, net of applicable discount and issuance costs, and the minimum capital lease obligations not subject to compromise for the five years subsequent to 2006 are as follows:

| Year | Debt and Capital Lease Obligations (in millions) |
|---|---|
| 2007 | $ 3,339(a) |
| 2008 | 26 |
| 2009 | 3 |
| 2010 | 4 |
| 2011 | 3 |
| Thereafter | 13 |
| Total | $ 3,388 |

(a)  For purposes of the Debt and Capital Lease Obligations, debt for which the Company is currently in default and has not classified as liabilities subject to compromise has been classified as current; however, repayment is stayed pending a plan of reorganization in the chapter 11 cases.

## 15. JUNIOR SUBORDINATED NOTES

Delphi has outstanding junior subordinated debt with an aggregate principal value of $400 million.  The junior subordinated debt is represented by two global notes held by the Depository Trust Company or its nominee.  The first junior subordinated note, with an aggregate principal value of $250 million, bears interest at 8.25% per year and matures on November 15, 2033.  The second junior subordinated note bears interest at a fixed rate through November 15, 2008 and at an adjustable rate thereafter until it matures on November 15, 2033.  Delphi originally issued these notes to Delphi Trust I and Delphi Trust II, respectively, both of which were Delphi subsidiaries.  As discussed in Note 14. Debt, Delphi's chapter 11 filing constituted an "early termination event" pursuant to which both trusts were required to be dissolved in accordance with their respective trust declarations.  On November 14, 2006, both trusts were terminated.  In connection with the terminations, the interests of Delphi Trust I and Delphi Trust II in the subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.

Pursuant to the requirements of SOP 90-7, as of the Chapter 11 Filings, deferred financing fees related the Trusts were no longer being amortized and had been included as an adjustment of their net carrying value at December 31, 2005.

## Delphi Trust I

In October 2003, Delphi Trust I ("Trust I"), a subsidiary of Delphi, issued 10,000,000 shares of 8 ¼% Cumulative Trust Preferred Securities, with a liquidation amount of $25 per trust preferred security and an aggregate liquidation preference amount of $250 million.  The sole assets of Trust I were $257 million of aggregate principal amount of Delphi junior subordinated notes due 2033 (the "Trust I notes"), also bearing interest at 8 ¼%.  Trust I was obligated to pay cumulative cash distributions at an annual rate equal to 8 ¼% of the

liquidation amount on the preferred securities. Under the terms of the operative trust documents, Delphi had the ability to defer interest payments on the Trust I notes at any time for up to 20 consecutive quarterly periods and had done so since July 15, 2005. As a result of Delphi's deferral in making interest payments, Trust I also deferred payment on preferred distributions. Additional distributions would, however, accumulate on the deferred distributions at an annual rate equal to 8 ¼% compounded quarterly. In addition, Delphi had the ability to redeem the Trust I notes in whole or in part, at any time on or after October 15, 2008 at 100% of their principal amount, plus accrued and unpaid interest. Delphi also had the right to redeem the Trust I notes, if an adverse tax consequence occurred. Under section 362 of the Bankruptcy Code, however, payments on account of prepetition obligations, or redemption of securities, were automatically stayed. Absent an order of the Court, substantially all prepetition obligations of Delphi are subject to settlement under a plan of reorganization.

**Delphi Trust II**

In November 2003, Delphi Trust II ("Trust II"), a subsidiary of Delphi, issued 150,000 shares of Adjustable Rate Trust Preferred Securities with a five-year initial rate of 6.197%, a liquidation amount of $1,000 per trust preferred security and an aggregate liquidation preference amount of $150 million. The sole assets of Trust II were $155 million aggregate principal amount of Delphi junior subordinated notes due 2033 (the "Trust II notes") with interest terms matching those of the preferred securities. Trust II was obligated to pay cumulative cash distributions at an annual rate equal to 6.197% of the liquidation amount during the initial fixed rate period (which is through November 15, 2008) on the preferred securities. Under the terms of the operative trust documents, Delphi had the ability to defer interest payments on the Trust II notes at any time for up to five years at a time and had done so since May 15, 2005. As a result of Delphi's deferral in making interest payments, Trust II also deferred payment on preferred distributions. Additional distributions would, however, accumulate on the deferred distributions at the applicable distribution rate. In addition, Delphi had the ability to redeem the Trust II notes in whole, but not in part, at any time on or after November 15, 2008 at 100% of their principal amount, plus accrued and unpaid interest. Delphi had the right to redeem the Trust II notes in whole, but not in part, if an adverse tax consequence occurred. Under section 362 of the Bankruptcy Code, however, payments on account of prepetition obligations, or redemption of securities, were automatically stayed. Absent an order of the Court, substantially all prepetition obligations of Delphi are subject to settlement under a plan of reorganization.

**Delphi Guarantees**

Delphi irrevocably and unconditionally guaranteed that if a payment on the notes was made to Trust I or Trust II, but for any reason, Trust I or Trust II did not make the corresponding distribution or redemption payment to the holders of the preferred securities, then Delphi would make payments directly to the holders. This guarantee did not cover payments when the trusts did not have sufficient funds to make payments to the holders such as when Delphi was not making interest payments on the notes. As previously disclosed, on November 14, 2006, the Trusts assets were liquidated and the holders of the trust preferred securities surrendered its securities in exchange for a pro rata share of the Trusts' respective junior subordinated notes issued by Delphi, and thereby Delphi become directly obligated to the Trusts' respective beneficiaries.

**Accounting Treatment**

Delphi determined that both Trust I and Trust II were considered variable interest entities, of which Delphi was not the primary beneficiary. As a result, although both Trust I and Trust II were 100% owned by Delphi, the Company did not consolidate them into its financial statements. However, the Trust I and Trust II notes were reflected as liabilities subject to compromise on the consolidated balance sheet and the related contractual interest due was not recognized in accordance with the provisions of SOP 90-7. If Trust I and Trust II had been consolidated by Delphi, its other long term assets and debt would each have been $12 million less as of December 31, 2005 but there would have been no significant impact on interest expense for the year ended December 31, 2005. There would have been no impact if Trust I and Trust II were consolidated at December 31, 2006.

## 16. U.S. EMPLOYEE SPECIAL ATTRITION PROGRAM

On March 22, 2006, Delphi, GM and the UAW agreed on a special attrition program (the "UAW Special Attrition Program"), and on May 12, 2006, the Court entered the final order approving Delphi's entry into the program with certain modifications. The UAW Special Attrition Program offered, among other things, certain eligible Delphi U.S. hourly employees represented by the UAW normal and early voluntary retirements with a $35,000 lump sum incentive payment. The lump sum incentive payments are being paid by Delphi and reimbursed by GM. The program also provided a pre-retirement program under which employees with at least 27 and fewer than 30 years of credited service are granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they would be eligible to retire without additional incentives. In addition, employees who elected to participate in the UAW Special Attrition Program were eligible to retire as employees of Delphi or flowback to GM and retire. On June 5, 2006, Delphi, GM, and the UAW agreed on a supplemental agreement (the "UAW Supplemental Agreement") that expanded the UAW Special Attrition Program to include a pre-retirement program for employees with 26 years of credited service and provided buyout payments which, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000. GM has agreed to reimburse Delphi for one-half of these buyout payments and in exchange will receive an allowed prepetition general unsecured claim.

The UAW Supplemental Agreement was approved by the Court on June 29, 2006 and on July 7, 2006, the Court entered the order approving the motion (collectively, the UAW Special Attrition Program and UAW Supplemental Agreement are referred to herein as the "UAW Attrition Programs"). Approximately 21,800 U.S. hourly employees represented by the UAW were eligible for buyout payments, with approximately 14,700 of those employees eligible to participate in the retirement and pre-retirement programs. On September 26, 2006, Delphi announced the final results of the UAW Special Attrition Program and that approximately 12,400 Delphi employees, representing approximately 84% of the retirement-eligible UAW workforce, elected to retire by January 1, 2007. Approximately 1,400 UAW employees elected the buyout option.

On June 16, 2006, Delphi, GM and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the UAW Attrition Programs. The lump sum incentive payments of $35,000 per eligible employee and one-half of the $40,000 to $140,000 buyout payments are being paid by Delphi and reimbursed by GM. GM will receive an allowed prepetition general unsecured claim equal to the amount it reimburses Delphi for the buyout payments. The IUE-CWA special attrition program (the "IUE-CWA Special Attrition Program") was approved by the Court on June 29, 2006, and on July 7, 2006, the Court entered the order approving the motion. Approximately 7,500 U.S. hourly employees represented by the IUE-CWA were eligible for buyout payments, with approximately 3,200 of those employees eligible to participate in the retirement and pre-retirement programs. On August 18, 2006, Delphi announced the final results of the IUE-CWA special hourly attrition plan and that approximately 6,200 Delphi employees, representing approximately 82% of the eligible IUE-CWA workforce, elected an attrition option within the program provisions. Of these employees, approximately 2,500 employees elected to retire by January 1, 2007 and approximately 3,700 employees elected the buyout option.

Although during 2006 many traditional U.S. hourly employees elected to leave the Company, Delphi replaced a portion of such employees with either temporary replacements or hourly employees hired under the Company's 2004 Supplemental Wage Agreement which provides for more competitive wages and benefits.

Delphi recorded special termination benefit charges of approximately $1,117 million for the year ended December 31, 2006, for the pre-retirement and buyout portions of the cost of the U.S. employee special attrition programs. Since GM will receive an allowed prepetition general unsecured claim for its 50% share of the financial responsibility of the buyout payments, Delphi expensed 100% of the buyout payments. In addition, Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1,897 million and a credit of $59 million due to a curtailment gain related to extended disability benefits for the year ended December 31, 2006. All the aforementioned amounts were included in U.S. employee special attrition program charges.

The following table represents the movement in the U.S. Employee Special Attrition Program liability for 2006:

| U.S. Employee Special Attrition Program Liability | Special Termination Benefit (in millions) |
|---|---|
| Balance at December 31, 2005 | $  — |
| U.S. employee special attrition program charges | 1,117 |
| Lump sum incentive obligation | 363 |
| Payments | (654) |
| Other | 4 |
| Balance at December 31, 2006 | $  830 |

The following table details changes in the GM Accounts Receivable balance attributable to the U.S. Employee Special Attrition Program for 2006, recorded in General Motors and affiliates accounts receivable at December 31, 2006:

| U.S. Employee Special Attrition Program- GM Accounts Receivable | (in millions) |
|---|---|
| Balance at December 31, 2005 | $  — |
| GM Obligation | 677 |
| Receipts from GM | (405) |
| Balance at December 31, 2006 | $  272 |

## 17. PENSION AND OTHER POSTRETIREMENT BENEFITS

Pension plans covering unionized employees in the U.S. generally provide benefits of negotiated stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The benefits provided by the plans covering U.S. salaried employees are generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are unfunded. Such plans are based on targeted wage replacement percentages. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit

pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded.

Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such other postretirement benefit plans was not significant to Delphi. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans were $38 million and $30 million as of December 31, 2006 and 2005, respectively, and have been recorded based on the vested benefit obligation.

In September 2006, the FASB issued SFAS No. 158 ("SFAS 158"), "*Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R).*" SFAS 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position, and to recognize changes in that funded status through comprehensive income in the year in which the changes occur. Each overfunded plan is recognized as an asset and each underfunded plan is recognized as a liability. Unrecognized prior service costs or credits, net actuarial gains or losses and net transition obligations as well as subsequent changes in the funded status are recognized as a component of accumulated comprehensive loss in stockholders' equity. Additional minimum pension liabilities and related intangible assets are derecognized upon adoption of the new standard. This Statement also requires an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. The requirement to recognize the funded status of a benefit plan and the disclosure requirements are effective for Delphi at the end of fiscal year 2006 and the requirement to measure plan assets and benefit obligations as of the date of the employer's fiscal year-end statement of financial position is effective for Delphi at the end of fiscal year 2008. The following table summarizes the impact of the initial adoption of SFAS 158 as of December 31, 2006 for pension and postretirement obligations:

| Balance Sheet Accounts | December 31, 2006 Prior to SFAS 158 Adjustment | SFAS 158 Adjustment Increase/ (Decrease) (in millions) | December 31, 2006 After SFAS 158 Adjustment |
|---|---|---|---|
| Pension intangible assets.................................... | $    375 | $   (375)(a) | $    — |
| Noncurrent deferred tax assets......................... | $     41 | $    55 (b) | $     96 |
| Pension liabilities............................................. | $    358 | $   185 (c) | $   543 |
| Liabilities subject to compromise- pension...... | $ 3,890 | $   367 (c) | $ 4,257 |
| Liabilities subject to compromise- postretirement ................................................. | $ 8,034 | $ 1,122 (d) | $ 9,156 |
| Accumulated other comprehensive loss (net of tax)............................................................ | $(1,114) | $(1,994) (e) | $(3,108) |

a)  All unamortized prior service cost adjustments were classified to accumulated OCI.

b)  The tax effect of adjustments recorded to accumulated OCI related to countries that have deferred tax assets that do not have full valuation allowances.

c)  The recorded liability represents the amount by which the plan is underfunded by comparing the projected benefit obligation ("PBO") to the plan assets.

d)  All unamortized actuarial adjustments are now recorded in accumulated OCI.

e)  The impact to accumulated OCI (net of tax) for the adoption of SFAS 158 also includes amounts related to postemployment benefits which are discussed in Note 1. Significant Accounting Policies and are not included in the amount shown above.

The 2006 and 2005 amounts shown below reflect the defined benefit pension and other postretirement benefit obligations for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above.

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. Plans | | Primary Non-U.S. Plans | | | |
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Benefit obligation at beginning of year | $ 13,764 | $ 12,872 | $ 1,306 | $ 1,197 | $ 9,589 | $ 9,605 |
| Service cost | 268 | 292 | 42 | 34 | 171 | 179 |
| Interest cost | 793 | 724 | 66 | 65 | 561 | 542 |
| Plan participants' contributions | 6 | 6 | 5 | 4 | 3 | — |
| Actuarial losses (gains) | (696) | 416 | 70 | 147 | (1,617) | 1,252 |
| Benefits paid | (732) | (539) | (59) | (59) | (229) | (182) |
| Special termination benefits | — | 2 | 20 | 13 | — | 3 |
| Flowback payments to GM | — | — | — | — | — | (54) |
| Flow in receipts from GM | — | — | — | — | — | 5 |
| Flowback net liability reclass | — | — | — | — | 944 | (944) |
| Payments made to divested divisions | — | — | — | — | — | (4) |
| Impact of settlements | — | — | 14 | — | — | — |
| Impact of curtailments | 1,518 | — | — | — | (349) | — |
| Plan amendments and other | (11) | (9) | 4 | 36 | (18) | (813) |
| Exchange rate movements | — | — | 167 | (131) | — | — |
| Benefit obligation at end of year | $ 14,910 | $ 13,764 | $ 1,635 | $ 1,306 | $ 9,055 | $ 9,589 |
| | | | | | | |
| Change in plan assets: | | | | | | |
| Fair value of plan assets at beginning of year | $ 9,712 | $ 8,526 | $ 799 | $ 730 | $ — | $ — |
| Actual return on plan assets | 1,493 | 1,083 | 110 | 140 | — | — |
| Delphi contributions | 243 | 635 | 62 | 62 | 226 | 182 |
| Plan participants' contributions | 6 | 6 | 5 | 4 | 3 | — |
| Benefits paid | (732) | (539) | (59) | (59) | (229) | (182) |
| Exchange rate movements | — | — | 108 | (78) | — | — |
| Other | — | 1 | — | — | — | — |
| Fair value of plan assets at end of year | $ 10,722 | $ 9,712 | $ 1,025 | $ 799 | $ — | $ — |
| | | | | | | |
| Underfunded status | $ (4,188) | $ (4,052) | $ (610) | $ (507) | $ (9,055) | $ (9,589) |
| | | | | | | |
| Amounts recognized in the consolidated balance sheets consist of: | | | | | | |
| Noncurrent prepaid assets | $ — | $ — | $ 2 | $ 110 | $ — | $ — |
| Pension intangible assets | — | 867 | — | 22 | — | — |
| Other noncurrent assets (flow-in receivable) | — | — | — | — | 101 | — |
| Current liabilities | — | — | (11) | (12) | — | — |
| Noncurrent liabilities | — | — | (532) | (290) | — | — |
| Liabilities subject to compromise | (4,188) | (3,536) | (69) | (42) | (9,156) | (6,351) |
| Total | $ (4,188) | $ (2,669) | $ (610) | $ (212) | $ (9,055) | $ (6,351) |
| | | | | | | |
| Amounts recognized in other comprehensive income consist of (pre-tax): | | | | | | |
| Actuarial loss | $ 2,261 | | $ 545 | | $ 1,822 | |
| Prior service cost (credit) | 353 | | 34 | | (700) | |
| Net transition obligation | — | | 6 | | — | |
| Total | $ 2,614 | $ 3,306 | $ 585 | $ 207 | $ 1,122 | $ — |

As of December 31, 2005, the U.S. plans also included unrecognized actuarial losses and prior service costs of $3,821 million and $868 million, respectively, resulting in a net $637 million prepaid benefit cost. For the non-U.S., the December 31, 2005 plans also included unrecognized actuarial losses, prior service costs and transition obligations of $460 million, $35 million and $7 million, respectively, resulting in a net $5 million accrued benefit cost. As of December 31, 2005, the other postretirement benefit plans also

included unrecognized actuarial losses and prior service gains of $4,044 million and $806 million, respectively, resulting in a net $6,351 accrued benefit cost.

The projected benefit obligation ("PBO"), accumulated benefit obligation ("ABO"), and fair value of plan assets for pension plans with accumulated benefit obligations in excess of plan assets and with plan assets in excess of accumulated benefit obligations are as follows:

|  | U.S. Plans | | Primary Non-U.S. Plans | |
|  | 2006 | 2005 | 2006 | 2005 |
| | (in millions) | | | |
| | Plans with ABO in Excess of Plan Assets | | | |
| PBO ....................................................... | $14,910 | $13,764 | $ 1,559 | $ 831 |
| ABO ....................................................... | 14,531 | 13,248 | 1,340 | 753 |
| Fair value of plan assets at end of year.. | 10,722 | 9,712 | 947 | 416 |
| | Plans with Plan Assets in Excess of ABO | | | |
| PBO ....................................................... | $ — | $ — | $ 76 | $ 475 |
| ABO ....................................................... | — | — | 69 | 365 |
| Fair value of plan assets at end of year.. | — | — | 78 | 383 |
| | Total | | | |
| PBO ....................................................... | $14,910 | $13,764 | $ 1,635 | $ 1,306 |
| ABO ....................................................... | 14,531 | 13,248 | 1,409 | 1,118 |
| Fair value of plan assets at end of year.. | 10,722 | 9,712 | 1,025 | 799 |

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to post-bankruptcy-petition service. During 2006, Delphi contributed $243 million to its U.S. pension plans, representing the portion of the pension contribution attributable to services rendered by employees of the Debtors in the plan year ended September 30, 2006. Under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), a minimum funding payment of approximately $1.2 billion to the U.S. pension plans was due in 2006.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The underfunded amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the Internal Revenue Service in the amount of approximately $17 million. The penalty has been recorded in liabilities subject to compromise in 2006. The unpaid portion of the minimum funding payments remains payable as a claim against Delphi and will be determined in Delphi's plan of reorganization with other claims. Delphi has appointed an independent fiduciary for all of its tax-qualified defined benefit pension plans who is charged with pursuing claims on behalf of the plans to recover minimum funding contributions. On December 12, 2006, Delphi applied to the IRS for waivers of the minimum funding standard under section 412(d) of the Code for Delphi's two primary pension plans for the plan year ended September 30, 2006.

Although Delphi's 2007 minimum funding requirement is approximately $2.8 billion under current legislation and plan design, Delphi is in chapter 11 and its 2007 contributions to the U.S. pension plans prior to emergence will be limited to approximately $220 million, representing the normal service cost. Upon emergence from chapter 11, which is anticipated to be in 2007, the Company will be required to meet its past due funding obligations. These obligations will be the amount of the minimum funding requirement contributions that would have been due, less the amount of the normal service cost contributions actually paid to the pensions plus interest. The 2007 contributions to the non-U.S. pension plans will be approximately $38 million.

Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

| | Pension Benefits U.S. Plans | | | Non-U.S. Plans | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| | | | | (in millions) | | | | | |
| Service cost ............................ | $ 268 | $ 292 | $ 284 | $ 42 | $ 34 | $ 29 | $ 171 | $ 179 | $ 176 |
| Interest cost ............................ | 793 | 724 | 699 | 66 | 65 | 56 | 561 | 542 | 498 |
| Expected return on plan assets ............ | (820) | (787) | (722) | (69) | (61) | (58) | — | — | — |
| Special termination benefits ................ | — | 2 | 7 | 20 | 13 | 19 | — | 3 | 2 |
| Curtailment loss (gain)-PBO ................ | 1,518 | — | — | — | — | — | (349) | — | — |
| Curtailment loss- prior service costs .... | 397 | — | — | — | — | — | 329 | — | — |
| Amortization of transition amount ....... | — | — | — | 1 | 1 | 1 | — | — | — |
| Amortization of prior service costs .... | 107 | 140 | 139 | 3 | 3 | 3 | (99) | (56) | (5) |
| Amortization of actuarial losses .......... | 192 | 211 | 142 | 26 | 31 | 17 | 255 | 207 | 121 |
| Net periodic benefit cost .................. | $ 2,455 | $ 582 | $ 549 | $ 89 | $ 86 | $ 67 | $ 868 | $ 875 | $ 792 |

Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1.9 billion in 2006 in the U.S. employee special attrition program charges line item of the statement of operations for UAW- and IUE-CWA-represented hourly employees who elected to participate in the U.S. employee special attrition programs discussed in Note 16. U.S. Employee Special Attrition Program.

The estimated actuarial loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated OCI into net periodic benefit cost in 2007 are $136 million and $60 million, respectively. The estimated actuarial loss and prior service credit for the other defined benefit postretirement plans that will be amortized from OCI into net periodic benefit cost in 2007 are $76 million and $93 million, respectively.

Experience gains and losses, as well as the effects of changes in actuarial assumptions and plan provisions are amortized over the average future service period of employees.

The principal assumptions used to determine the pension and other postretirement expense and the actuarial value of the projected benefit obligation for the U.S. and non-U.S. pension plan and postretirement plans were:

**Assumptions used to determine benefit obligations at December 31:**

| | Pension Benefits U.S. Plans | | Non-U.S. Plans | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 |
| Weighted-average discount rate ........... | 5.90% | 5.50% | 4.96% | 4.91% | 6.10% | 5.50% |
| Weighted-average rate of increase in compensation levels ...................... | 4.12% | 3.99% | 3.67% | 3.45% | 3.94% | 3.99% |

**Assumptions used to determine net expense for years ended December 31:**

| | Pension Benefits U.S. Plans | | | Non-U.S. Plans | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Weighted-average discount rate .......... | 5.50% | 5.75% | 6.25% | 4.91% | 5.67% | 5.71% | 5.50% | 6.00% | 6.25% |
| Weighted-average rate of increase in compensation levels ...................... | 3.99% | 3.99% | 3.99% | 3.45% | 3.48% | 3.32% | 3.99% | 3.98% | 3.99% |
| Expected long-term rate of return on plan assets...................................... | 8.75% | 9.00% | 9.00% | 8.20% | 8.25% | 8.23% | N/A | N/A | N/A |

In 2006 and 2005, Delphi selected discount rates based on analyzing the results of matching high quality fixed income investments rated AA- or higher by Standard and Poor's and the regular and above median Citigroup Pension Discount Curve, with expected benefit cash flows. Since high quality bonds in sufficient quantity and with appropriate maturities are not available for all years when benefit cash flows are expected to be paid, hypothetical bonds were imputed based on combinations of existing bonds, and interpolation and

extrapolation reflecting current and past yield trends. The pension discount rate determined on that basis increased from 5.50% for 2005 to 5.90% for 2006. This 40 basis point increase in the discount rate decreased the underfunded status of the U.S. pension plans by approximately $0.7 billion. The other postretirement benefits discount rate determined on that basis increased from 5.50% for 2005 to 6.10% for 2006. This 60 basis point increase in the discount rate decreased the underfunded status of the U.S. postretirement plans by approximately $0.6 billion. Delphi selected discount rates for its non-U.S. plans based on analyzing the yields of high quality fixed income investments.

For 2006 expense, Delphi assumed a U.S. long-term asset rate of return of 8.75%. In developing the 8.75% expected long-term rate of return assumption, Delphi evaluated input from its third party pension plan asset manager, including a review of asset class return expectations and long-term inflation assumptions. Delphi also considered its post-spin off and GM's pre-spinoff historical 15-year compounded return, which was consistent with its long-term rate of return assumption. The primary non-U.S. plans conduct similar studies in conjunction with local actuaries and asset managers. While the studies give appropriate consideration to recent fund performance and historical returns, the assumptions are primarily long-term, prospective rates.

Delphi's U.S. pension expense for 2007 is determined at the end of December 2006. For purposes of analysis, the following table highlights the sensitivity of the Company's U.S. pension obligations and expense to changes in assumptions:

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point (bp) decrease in discount rate | + $20 - 30 Million | + $0.4 Billion |
| 25 bp increase in discount rate | - $20 - 30 Million | - $0.4 Billion |
| 25 bp decrease in long-term return on assets | + $20 - 30 Million | — |
| 25 bp increase in long-term return on assets | - $20 - 30 Million | — |

The above sensitivities reflect the effect of changing one assumption at a time. It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear. The above sensitivities also assume no changes to the pension plan design and no major restructuring programs.

Delphi's pension plan asset allocation at December 31, 2006 and 2005, and target allocation for 2007 are as follows:

| Asset Category | Percentage of Plan Assets at December 31, | | | | Target Allocation U.S. Plans |
|---|---|---|---|---|---|
| | U.S. Plans | | Non-U.S. Plans | | |
| | 2006 | 2005 | 2006 | 2005 | 2007 |
| Equity Securities | 64% | 67% | 60% | 63% | 64% |
| Fixed Income | 25% | 26% | 25% | 23% | 25% |
| Real Estate | 7% | 6% | 14% | 13% | 7% |
| Other | 4% | 1% | 1% | 1% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% |

Delphi invests in a diversified portfolio consisting of an array of asset classes that attempts to maximize returns while minimizing volatility. These asset classes include U.S. domestic equities, developed market equities, emerging market equities, private equity, global high quality and high yield fixed income, real estate, and absolute return strategies.

Agreements relating to union matters allow for some of Delphi's hourly employees in the U.S. being provided with certain opportunities to transfer to GM as appropriate job openings become available at GM and GM employees in the U.S. had similar opportunities to transfer to the Company but those opportunities are currently suspended. If such a transfer occurs, in general, both Delphi and GM will be responsible for pension payments, which in total reflect such employee's entire eligible years of service. Allocation of responsibility between Delphi and GM will be on a pro-rata basis depending on the length of service at each company (although service at Delphi includes service with GM prior to Delphi's separation from GM). There will be no transfer of pension assets or liabilities between GM and Delphi with respect to such employees that transfer between the two companies. The company to which the employee transfers will be responsible for the related other postretirement obligation. An agreement with GM provides for a mechanism for determining a cash settlement amount for other postretirement obligations associated with employees that transfer between GM and Delphi. The consolidated balance sheet includes approximately $3.1 billion and $1.0 billion as of December 31, 2006 and December 31, 2005, respectively, of postretirement obligations classified as liabilities subject to compromise reflecting an accumulated postretirement benefit obligation for benefits payable to GM for employees that transferred from Delphi to GM. Due to the Chapter 11 Filings, the Company has not made any payments in 2006 to settle this obligation. Historically the postretirement benefits Delphi provided to its retirees were substantially the same as the postretirement benefits GM provided to its retirees. Effective March 31, 2006, however, the U.S. District Court for the Eastern District of Michigan approved GM's tentative settlement agreement with the UAW related to reductions in hourly retiree health care. As a result, as of December 31, 2006, Delphi's liability due to GM for employees that transferred from Delphi to GM

has been reduced by approximately $1.0 billion and a corresponding reduction in the unamortized actuarial loss has been recorded for the estimated reduction in the related liability.  Additionally, a $0.1 billion receivable for the cash settlement amount due from GM for postretirement obligations associated with employees transferring from GM to Delphi has been classified as an other long-term asset.

| | Delphi Hourly | Payable to GM | Delphi Salaried | Total |
|---|---|---|---|---|
| | **Other Postretirement Benefits** (in millions) | | | |
| Benefit obligation at December 31, 2005............ | $ 8,428 | $     — | $ 1,161 | $ 9,589 |
| Flowback liability reclassification.................... | — | 1,027 | — | 1,027 |
| Flow-in receivable reclassification................... | (83) | — | — | (83) |
| Service cost ...................................................... | 150 | — | 21 | 171 |
| Interest cost ..................................................... | 422 | 77 | 62 | 561 |
| Plan participants' contributions....................... | 3 | — | — | 3 |
| Actuarial gains ................................................. | (542) | (908) | (167) | (1,617) |
| Benefits paid .................................................... | (192) | — | (37) | (229) |
| Transfer of participants to GM........................ | (2,929) | 2,929 | — | — |
| Impact of curtailment ...................................... | (349) | — | — | (349) |
| Plan amendments and other.............................. | — | (4) | (14) | (18) |
| Benefit obligation at December 31, 2006............ | $ 4,908 | $ 3,121 | $ 1,026 | $ 9,055 |

    Cash settlement between Delphi and GM with respect to this payable and receivable is scheduled to occur at the time the employees are actuarially determined to retire.  In accordance with Delphi's Separation Agreement with GM, Delphi estimated its liability will average $380 million per year (flowbacks) over the next five years to GM, and it will receive an average of $9 million per year from GM associated with employees who have transferred to Delphi.  In addition to this, Delphi also has a final net settlement liability of approximately $1.2 billion due in 2014.  These payments will not be made to GM while Delphi is in bankruptcy because these are liabilities subject to compromise.

    The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

| | Projected Pension Benefit Payments | | Projected Postretirement Benefit Payments (including flowbacks to GM) Pre-Medicare | Projected Medicare Subsidy Receipts |
|---|---|---|---|---|
| | U.S. Plans | Non-U.S. Plans | | |
| | (in millions) | | | |
| 2007 | $ 1,020 | $    53 | $    364 | $    (10) |
| 2008 | 1,077 | 56 | 837 | (25) |
| 2009 | 1,129 | 60 | 824 | (28) |
| 2010 | 1,148 | 63 | 821 | (31) |
| 2011 | 1,145 | 68 | 769 | (33) |
| 2012 - 2016 | 5,635 | 417 | 3,985 | (231) |

    Delphi's annual measurement date for the U.S., France, Luxembourg, Mexico and Portugal pension plans and other postretirement life insurance benefits is December 31 and for the UK and Germany pension plans and other postretirement health benefits is September 30. For postretirement plan measurement purposes, Delphi assumed an average 10% initial annual rate of increase in the per capita cost of covered health care benefits.  The rate was assumed to decrease on a gradual basis through 2011, to the ultimate weighted-average trend rate of 5%.

    Effective March 1, 2005, Delphi amended its health care benefits plan for salaried retirees.  Under this plan amendment effective January 1, 2007, the Company reduced its obligations to current salaried active employees, all current salaried retirees and surviving spouses who are retired and are eligible for Medicare coverage.  Based on a March 1, 2005 remeasurement date, the impact of this amendment was a decrease in the postretirement liability of $0.8 billion and a decrease in 2005 expense of $72 million.  As SFAS No. 106 "Employers' Accounting for Postretirement Benefits Other than Pensions" requires a one-quarter lag from the remeasurement date before applying the effects of the plan amendment, income statement recognition of the plan amendment began in June, 2005.

    As required by U.S. GAAP, Delphi's postretirement expense for 2007 is determined at the 2006 measurement date.  For purposes of analysis, the following table highlights the sensitivity of the Company's postretirement obligations and expense to changes in assumptions:

| | Impact on | Impact on |
|---|---|---|
| **Change in Assumption** | **Postretirement** | **Postretirement Benefit** |

| | Expense | Obligation |
|---|---|---|
| 25 bp decrease in discount rate | +$15 - 25 Million | + $0.25 - 0.3 Billion |
| 25 bp increase in discount rate | -$15 - 25 Million | - $0.25 - 0.3 Billion |

For analytical purposes only, the following table presents the impact that changes in the Company's health care trend rate would have on its postretirement liability and postretirement service and interest cost (in millions):

| % Change | Impact on Service & Interest Cost | Impact on Postretirement Benefit Obligation |
|---|---|---|
| + 1% | $ 116 | $ 1,102 |
| -1 % | $ (89) | $ (923) |

The above sensitivities reflect the effect of changing one assumption at a time.  It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear.  The above sensitivities also assume no changes to the postretirement plan design and no major restructuring programs.

Delphi also sponsors defined contribution plans for certain U.S. hourly and salaried employees.  Delphi's expense related to the contributions for these plans was $8 million, $9 million and $25 million for 2006, 2005 and 2004, respectively.  The decrease in the expense in 2005 from 2004 was due to the termination of matching contributions by the Company for the salaried savings plans.

## 18. COMMITMENTS AND CONTINGENCIES

### Regulatory Actions and Other Matters

As previously disclosed, Delphi has been the subject of an ongoing investigation by the U.S. Securities and Exchange Commission ("SEC") involving Delphi's accounting for and the adequacy of disclosures for a number of transactions dating from Delphi's separation from GM in 1999 (the "Separation").  On October 30, 2006, the SEC commenced and simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws, which concluded the SEC's investigation of Delphi.  Under the agreement approved by the SEC, Delphi agreed, without admitting or denying any wrongdoing, to be enjoined from future violations of the securities laws.  The SEC did not impose civil monetary penalties against Delphi.  On December 11, 2006 the Court entered an order approving Delphi's settlement with the SEC.  The SEC's investigation continues as to certain individuals previously employed by Delphi.  As previously disclosed, the Department of Justice is also investigating these matters.  Delphi continues to fully cooperate with the government in providing relevant information with respect to these matters.

### Shareholder Lawsuits

The Company, along with Delphi Trust I & Delphi Trust II (subsidiaries of Delphi which issued trust preferred securities), current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits that were filed beginning in March 2005 following the Company's announced intention to restate certain of its financial statements.

On December 12, 2005, the Judicial Panel on Multidistrict Litigation entered an order transferring each of the related federal actions to the United States District Court for the Eastern District of Michigan for coordinated or consolidated pretrial proceedings (the "Multidistrict Litigation").

The lawsuits transferred fall into three categories.  One group of class action lawsuits, which are purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under the Employee Retirement Income Security Act of 1974, as amended (the "ERISA Actions").  Plaintiffs in the ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA.  On October 21, 2005, the ERISA Actions were consolidated before one judge in the United States District Court for the Eastern District of Michigan.  The ERISA Actions were subsequently transferred to the Multidistrict Litigation.  On March 3, 2006, plaintiffs filed a consolidated class action complaint (the "Amended ERISA Action") with a class period of May 28, 1999 to November 1, 2005.  The Company, which was previously named as a defendant in the ERISA Actions, was not named as a defendant in the Amended ERISA Action.  The plaintiffs are not currently asserting claims against or seeking relief from the Company in the Amended ERISA Action due to the Company's Chapter 11 Filings, but have stated that they plan to proceed with claims against the Company in the ongoing bankruptcy cases, and will seek to name the Company as a defendant in the Amended ERISA Action if the bankruptcy stay is modified or lifted to permit such action.  The defendants have filed a motion to dismiss the Amended ERISA Action.  No hearing on the motions to dismiss has yet been scheduled.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 23, 2005, these securities actions were consolidated before one judge in the United States District Court for the Southern District of New York. On September 30, 2005, the Court-appointed lead plaintiffs filed a consolidated class action complaint (the "Amended Securities Action") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Amended Securities Action names several additional defendants, including Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The securities actions consolidated in the Southern District of New York (and a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I) were subsequently transferred to the Eastern District of Michigan as part of the Multidistrict Litigation. The action is stayed against the Company pursuant to the Bankruptcy Code, but is continuing against the other defendants. The defendants have filed motions to dismiss the Amended Securities Action. No hearing on the motions to dismiss has yet been scheduled. On November 30, 2006, the plaintiffs filed a motion seeking leave to file an amended securities fraud complaint. The defendants filed their responses on December 15, 2006, and the plaintiffs filed their reply on January 2, 2007. The U.S. District Court for the Eastern District of Michigan has not yet ruled on this motion. On February 15, 2007, the Court partially granted the plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act (PSLRA) of 1995 allowing the plaintiffs to obtain certain discovery from the defendants.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions"). A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court (Oakland County Circuit Court in Pontiac, Michigan). These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. The federal cases were consolidated with the securities and ERISA class actions before Judge Rosen in the Eastern District of Michigan, described above. Following the filing on October 8, 2005, of the Debtors' petitions for reorganization relief under chapter 11 of the U.S. Bankruptcy Code, all the derivative cases were administratively closed.

In addition, the Company received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers of the Company made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties. The Company has appointed a committee of the Board of Directors to consider the shareholder demand which is still investigating the matter.

Due to the preliminary nature of these lawsuits, the Company is not able to predict with certainty the outcome of this litigation or the Company's potential exposure related thereto. In addition, under section 362 of the U.S. Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities of the debtor are subject to settlement under a plan of reorganization. Because any recovery on allowed prepetition claims is subject to a confirmed plan of reorganization, the ultimate distribution with respect to allowed claims is not presently ascertainable. Delphi maintains directors and officers insurance providing coverage for losses incurred by the Company of up to $100 million, subject to a $10 million deductible. Delphi recorded a reserve in the amount of the deductible and net of related payments has an $8 million liability recorded as of December 31, 2006. The Company cannot assure the extent of coverage or that the impact of any loss not covered by insurance or applicable reserves would not be material. Delphi's insurance policy contains a standard exclusion provision that may apply should there be a judgment or final adjudication that establishes a deliberate criminal or deliberate fraudulent act was committed by a past, present or future Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer or General Counsel. If individuals in these positions are adjudicated to have committed a deliberate fraud, it is possible that a portion or all of the claims under the insurance policy could be excluded from coverage.

Under section 362 of the U.S. Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities of the debtor are subject to settlement under a plan of reorganization.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. For a discussion of matters relating to compliance with laws for the protection of the environment, refer to Item 1. Business – Environmental Compliance in this Annual report on Form 10-K.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont City Landfill Site located in Tremont, Ohio, which is alleged to involve ground water contamination. In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site, which is expected to be

completed during 2007. Delphi continues to believe that a reasonable outcome of the investigative study is capping and future monitoring of this site, which would substantially limit future remediation costs. Delphi has included an estimate of its share of the potential costs of such a remedy plus the cost to complete the investigation in its overall reserve estimate. Because the scope of the investigation and the extent of the required remediation are still being determined, it is possible that the final resolution of this matter may require that Delphi make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of its existing reserves. Delphi will continue to re-assess any potential remediation costs and, as appropriate its overall environmental reserves as the investigation proceeds.

As of December 31, 2006 and December 31, 2005, Delphi's reserve for environmental investigation and remediation was approximately $118 million and $51 million, respectively, including approximately $3 million within liabilities subject to compromise at December 31, 2006 and December 31, 2005. The amounts recorded take into account fact that GM retained the environmental liability for certain inactive sites as part of the Separation. The increase in reserve levels at December 31, 2006, as compared to December 31, 2005, reflects the results of environmental investigations completed during 2006. Delphi's transformation plan contemplates significant restructuring activity in the U.S., including the sale or closure of numerous facilities. As part of developing and evaluating various restructuring alternatives, environmental assessments that included identification of areas of interest, soil and groundwater testing, risk assessment and identification of remediation issues were performed at nearly all major U.S. facilities. These assessments identified previously unknown conditions and led to new information that allowed Delphi to further update its estimate of required remediation for previously identified conditions requiring an adjustment to its environmental reserve of approximately $70 million in 2006. The additional reserves are primarily related to 35 facilities and are comprised of investigation, remediation and operation and maintenance of the remedy, including postremediation monitoring costs. Addressing contamination at these sites is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent Delphi's best estimate of the cost to complete such actions. Delphi believes that its December 31, 2006 accruals will be adequate to cover the estimated liability for its exposure in respect to such matters and that these costs will be incurred over the next 20 years. However, as Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. Delphi cannot ensure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of its current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations and financial condition could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At December 31, 2006, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $115 million.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements. However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates. Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility. Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof. On May 3, 2006, GM notified Delphi and its unsecured creditors committee that GM was seeking to exercise set off rights in the amount of approximately $67 million, alleging that catalytic converters supplied by Delphi's Powertrain Systems segment to GM for certain 2001 and 2002 vehicle platforms did not conform to specifications. Delphi disputes the amount of GM's claims and therefore its right to set off amounts against future payments. In July 2006, the parties agreed to submit the dispute to binding arbitration in accordance with the Court's final order approving the Company's DIP credit facility. The binding arbitration is scheduled for May 2007.

During the third quarter of 2006, Delphi began experiencing quality issues regarding parts that were purchased from one of Delphi's affiliated suppliers and subsequently established warranty reserves to cover the cost of various repairs that may be implemented. Delphi is actively negotiating with the customer most affected by the issue as well as the affiliated supplier to determine if any portion of the liability is recoverable.

Patent license negotiations are ongoing with Denso in connection with variable valve timing technology. Delphi expects that these negotiations will be concluded on commercially reasonable terms and in accordance with ordinary industry practices such that resolution of this matter will not have a material impact on Delphi's financial position. However, Delphi can give no assurances that those negotiations will be successful.

Litigation is subject to many uncertainties, and the outcome of individual litigated matters is not predictable with assurance. After discussions with counsel, it is the opinion of Delphi that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

**Operating Leases**

Rental expense totaled $162 million, $184 million and $192 million for the years ended December 31, 2006, 2005 and 2004, respectively. As of December 31, 2006, Delphi had minimum lease commitments under noncancelable operating leases totaling $416 million, which become due as follows:

| Year | Minimum Future Operating Lease Commitments (in millions) |
|---|---|
| 2007 | $ 112 |
| 2008 | 90 |
| 2009 | 61 |
| 2010 | 47 |
| 2011 | 43 |
| Thereafter | 63 |
| Total | $ 416 |

**Concentrations of Risk**

The Company's business is labor intensive and utilizes a large number of unionized employees. A strike or other form of significant work disruption by the unions would likely have an adverse effect on the Company's ability to operate its business. The majority of Delphi's U.S. hourly workforce is represented by two unions, the UAW (approximately 86%) and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Industrial Division of the Communication Workers of America, AFL-CIO, CLC ("IUE-CWA") (approximately 9%). The Delphi-UAW National Labor Agreement and the Delphi-IUE-CWA National Labor Agreement expire in September 2007 and November 2007, respectively.

**19. OTHER INCOME (EXPENSE), NET**

Other income (expense), net included:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | (in millions) | | |
| Interest income | $ 51 | $ 43 | $ 24 |
| Other, net | (13) | 7 | (32) |
| Other income (expense), net | $ 38 | $ 50 | $ (8) |

**20. SHARE-BASED COMPENSATION**

Delphi's share-based compensation programs include stock options, restricted stock units, and stock appreciation rights ("SAR"). The Company adopted SFAS No. 123 (Revised 2004), "*Share-Based Payments*" ("SFAS No. 123(R)"), effective January 1, 2006 using the modified-prospective method. This method does not require prior period amounts to be restated to reflect the adoption of SFAS No. 123(R). SFAS No. 123(R) requires compensation cost to be recognized for equity or liability instruments based on the grant-date fair value, with expense recognized over the periods that an employee provides service in exchange for the award. In conjunction with the adoption of SFAS No. 123(R), the Company evaluated the impact of a change in its prior accounting for forfeitures for restricted stock units. SFAS No. 123(R) requires the Company to estimate forfeitures at the grant date, while prior to the adoption of SFAS No. 123(R), the Company accounted for forfeitures as they occurred. The adjustment is a benefit of $3 million (there is no income tax effect due to the fact Delphi has a full valuation allowance for all of its U.S. net deferred tax assets) and has been presented separately as a cumulative effect of change in accounting principle in the financial statements. In addition, while the Company will recognize compensation cost for newly issued equity or liability instruments over the periods that an employee provides service in exchange for the award, the Company will continue to follow a nominal vesting approach for all awards issued prior to the adoption of SFAS No. 123(R). As a result of the adoption of SFAS No. 123(R), approximately $9 million of compensation cost was recognized during 2006 for stock options.

Prior to the adoption of SFAS No. 123(R), the Company accounted for share-based compensation using the intrinsic value method in accordance with APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations.  Stock options granted during 2004 and 2003 were exercisable at prices equal to the fair market value of Delphi common stock on the dates the options were granted, accordingly, no compensation expense was recognized in 2005 for stock options.  If Delphi accounted for all share-based compensation using the fair value recognition provisions of SFAS No.123(R) and related amendments prior to December 31, 2005, its net loss and basic and diluted loss per share would have been as follows:

| | Year Ended December 31, | |
| | 2005 | 2004 |
| | (in millions, except per share amounts) | |
|---|---|---|
| Net loss, as reported | $  (2,357) | $  (4,818) |
| Add: Stock-based compensation expense recognized, net of related tax effects | 24 | 11 |
| Less: Total stock-based employee compensation expense determined under fair value method for all awards, net of related tax effects | (37) | (23) |
| Pro forma net loss | $  (2,370) | $  (4,830) |
| Loss per share: | | |
| Basic and diluted – as reported | $  (4.21) | $  (8.59) |
| Basic and diluted– pro forma | $  (4.23) | $  (8.61) |

### Share-Based Compensation Plans

Options generally vest over three years and expire ten years from the grant date.  Stock options granted during 2004 and 2003 were exercisable at prices equal to the fair market value of Delphi common stock on the dates the options were granted; accordingly, no compensation expense was recognized for the stock options granted in those periods.  During 2003, Delphi completed a self-tender for certain employee stock options having an exercise price in excess of $17 per share.  The offer enabled employees to exchange each stock option for a cash-settled stock appreciation right ("SAR") having an equivalent strike price, term and conditions to exercise as the surrendered option.

Delphi has no intention during bankruptcy to deliver approximately 22 million shares of stock for future grants under its Long Term Incentive Plan ("LTIP").  As a result, as of December 31, 2005, there were no shares available for future grants of options or restricted stock units.  In addition, to date, Delphi has not issued common stock for any option that was granted but unvested at the time of the Chapter 11 Filings that subsequently vested.  However, as events occur in connection with the reorganization cases, including in connection with the Plan Framework Support Agreement and the Equity Purchase and Commitment Agreement described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, Delphi may in the future consider delivering common stock for restricted stock units which vested during prior periods.

A summary of activity for the Company's stock options is as follows:

| | Stock Options (a) (in thousands) | Weighted Average Exercise Price |
|---|---|---|
| Outstanding as of January 1, 2006 | 84,565 | $13.72 |
| Granted | — | $ N/A |
| Exercised | — | $ N/A |
| Forfeited | (8,717) | $14.97 |
| Outstanding as of December 31, 2006 | 75,848 | $13.58 |
| Options exercisable December 31, 2006 | 73,802 | $13.68 |

(a) Includes options that were granted and unvested at the time of the Chapter 11 Filings on October 8, 2005.  The Company cancelled future grants of stock-based compensation under its long term incentive plan and will not issue any shares of common stock pursuant to previously granted awards that had not vested prior to the commencement of reorganization cases.

The following is a summary of the range of weighted average remaining lives of options outstanding and exercisable as of December 31, 2006:

**Approved by Stockholders**

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $8.43-$10.00 | 10,440 | 6.3 | $ 8.43 | 10,440 | $ 8.43 |
| $10.01-$20.00 | 45,493 | 3.9 | $ 13.48 | 43,447 | $ 13.64 |
| $20.01-$20.64 | 68 | 2.0 | $ 20.64 | 68 | $ 20.64 |
| | 56,001 | | $ 12.55 | 53,955 | $ 12.64 |

**Other Plans**

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $9.55-$10.00 | 1 | 1.0 | $ 9.55 | 1 | $ 9.55 |
| $10.01-$20.00 | 17,649 | 2.6 | $ 15.97 | 17,649 | $ 15.97 |
| $20.01-$24.76 | 2,197 | 2.0 | $ 20.64 | 2,197 | $ 20.64 |
| | 19,847 | | $ 16.48 | 19,847 | $ 16.48 |

*Restricted Stock Units*

A summary of activity for the Company's restricted stock units is as follows:

| | Restricted Stock Units (in thousands) | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non-vested at January 1, 2006 | 10,027 | $ 8.68 |
| Vested | (1,249) | $ 8.68 |
| Forfeited | (722) | $ 8.65 |
| Non-vested at December 31, 2006 | 8,056 | $ 8.69 |

One third of the restricted stock units granted in 2003 vested during the three months ended June 30, 2006. To date, Delphi has not issued common stock associated with restricted stock units granted but unvested at the time of the Chapter 11 Filings that subsequently vested. However, as events occur in connection with the reorganization cases, including in connection with the Plan Framework Support Agreement and the Equity Purchase and Commitment Agreement described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, Delphi may in the future consider delivering common stock for restricted stock units which vested during prior periods. The total fair value of restricted stock units vested, including those that vested and were not delivered, through retirement during 2005 was approximately $11 million. As of December 31, 2006, there was approximately $29 million of unrecognized compensation cost related to non-vested restricted stock units, which will be recognized over a weighted average period of 3.6 years.

## 21. SEGMENT REPORTING

Effective July 1, 2006, Delphi realigned its business operations to focus its product portfolio on core technologies for which Delphi believes it has significant competitive and technological advantages. Delphi's revised operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as two additional segments, Steering and Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's six reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, and power electronics, as well as advanced development of software and silicon.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Steering, which includes steering, halfshaft and column technology.

48

- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to U.S. employee special attrition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Significant Accounting Policies, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Included below are sales and operating data for Delphi's segments for the years ended December 31, 2006, 2005, and 2004 as well as balance sheet data for the periods ended December 31, 2006, 2005 and 2004.  The 2005 and 2004 data has been reclassified to conform to the current segment alignment.

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|---|
| **2006:** | | | | *(in millions)* | | | | |
| Net sales to GM and affiliates ... | $ 1,423 | $ 1,430 | $ 1,667 | $ 1,772 | $ 1,596 | $ 3,139 | $ 609 | $ 11,636 |
| Net sales to other customers ...... | 3,249 | 842 | 3,220 | 3,420 | 866 | 2,088 | 1,071 | 14,756 |
| Inter-segment net sales............... | 227 | 115 | 331 | 173 | 130 | 408 | (1,384) | — |
| Total net sales...................... | $ 4,899 | $ 2,387 | $ 5,218 | $ 5,365 | $ 2,592 | $ 5,635 | $ 296 | $ 26,392 |
| Depreciation & Amortization .... | $ 266 | $ 66 | $ 255 | $ 175 | $ 98 | $ 136 | $ 83 | $ 1,079 |
| Long-lived asset impairment charges ................................. | $ 4 | $ 11 | $ 12 | $ 1 | $ 26 | $ 161 | $ — | $ 215 |
| Goodwill impairment charges..... | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Operating (loss) income (b) ....... | $ 197 | $ (236) | $ (240) | $ (267) | $ (356) | $ (1,168) | $ (2,788) | $ (4,858) |
| Equity income ........................ | $ 6 | $ (11) | $ 10 | $ 18 | $ 6 | $ 19 | $ (1) | $ 47 |
| Minority Interest ..................... | $ (6) | $ 9 | $ (28) | $ (17) | $ (2) | $ (1) | $ 8 | $ (37) |
| **2005:** | | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,634 | $ 1,519 | $ 1,924 | $ 1,910 | $ 1,637 | $ 3,426 | $ 810 | $ 12,860 |
| Net sales to other customers ...... | 3,207 | 717 | 2,976 | 3,195 | 850 | 1,771 | 1,371 | 14,087 |
| Inter-segment net sales............... | 279 | 105 | 410 | 205 | 125 | 495 | (1,619) | — |
| Total net sales...................... | $ 5,120 | $ 2,341 | $ 5,310 | $ 5,310 | $ 2,612 | $ 5,692 | $ 562 | $ 26,947 |
| Depreciation & Amortization .... | $ 285 | $ 87 | $ 266 | $ 157 | $ 113 | $ 164 | $ 78 | $ 1,150 |
| Long-lived asset impairment charges ................................. | $ 5 | $ 23 | $ 9 | $ 35 | $ 34 | $ 127 | $ — | $ 233 |
| Goodwill impairment charges..... | $ — | $ — | $ 368 | $ — | $ — | $ 22 | $ — | $ 390 |
| Operating (loss) income (c) ....... | $ 177 | $ (146) | $ (558) | $ 127 | $ (374) | $ (1,374) | $ (23) | $ (2,171) |
| Equity income ........................ | $ 3 | $ 13 | $ 20 | $ 16 | $ 5 | $ 13 | $ 1 | $ 71 |
| Minority Interest ..................... | $ (3) | $ 7 | $ (21) | $ (7) | $ (2) | $ (2) | $ 4 | $ (24) |
| **2004:** | | | | | | | | |
| Net sales to GM and affiliates ... | $ 2,128 | $ 1,569 | $ 2,521 | $ 2,158 | $ 1,977 | $ 4,087 | $ 977 | $ 15,417 |
| Net sales to other customers ...... | 2,819 | 666 | 3,119 | 3,158 | 813 | 1,406 | 1,224 | 13,205 |
| Inter-segment net sales............... | 375 | 117 | 499 | 204 | 106 | 641 | (1,942) | — |
| Total net sales...................... | $ 5,322 | $ 2,352 | $ 6,139 | $ 5,520 | $ 2,896 | $ 6,134 | $ 259 | $ 28,622 |
| Depreciation & Amortization .... | $ 254 | $ 78 | $ 251 | $ 177 | $ 125 | $ 195 | $ 64 | $ 1,144 |
| Long-lived asset impairment charges ................................. | $ 3 | $ — | $ 2 | $ 11 | $ 2 | $ 308 | $ — | $ 326 |
| Goodwill impairment charges..... | $ — | $ 30 | $ — | $ — | $ 16 | $ — | $ — | $ 46 |
| Operating (loss) income (d) ....... | $ 325 | $ (76) | $ 170 | $ 269 | $ (134) | $ (1,081) | $ 45 | $ (482) |
| Equity income ........................ | $ 2 | $ 12 | $ 44 | $ 19 | $ 4 | $ 2 | $ 3 | $ 86 |
| Minority Interest ..................... | $ (2) | $ (2) | $ (21) | $ (16) | $ (2) | $ (5) | $ 9 | $ (39) |

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **Balance as of:** | | | | | | | | |
| December 31, 2006 | | | | | | | | |
| Investment in affiliates | $ 46 | $ 76 | $ 54 | $ 163 | $ 9 | $ 62 | $ 7 | $ 417 |
| Goodwill | $ 143 | $ — | $ — | $ 161 | $ — | $ — | $ 74 | $ 378 |
| Capital expenditures | $ 181 | $ 25 | $ 158 | $ 182 | $ 85 | $ 65 | $ 25 | $ 721 |
| Segment assets | $ 3,664 | $ 1,163 | $ 3,677 | $ 3,822 | $ 1,276 | $ 1,975 | $ (185) | $ 15,392 |
| December 31, 2005 | | | | | | | | |
| Investment in affiliates | $ 35 | $ 113 | $ 45 | $ 150 | $ 2 | $ 55 | $ 18 | $ 418 |
| Goodwill | $ 125 | $ — | $ — | $ 167 | $ — | $ — | $ 71 | $ 363 |
| Capital expenditures | $ 282 | $ 37 | $ 227 | $ 206 | $ 109 | $ 180 | $ 142 | $ 1,183 |
| Segment assets | $ 3,449 | $ 1,229 | $ 3,347 | $ 3,494 | $ 1,132 | $ 2,192 | $ 2,180 | $ 17,023 |
| December 31, 2004 | | | | | | | | |
| Investment in affiliates | $ 52 | $ 123 | $ 110 | $ 143 | $ (2) | $ 52 | $ 18 | $ 496 |
| Goodwill | $ 143 | $ 30 | $ 397 | $ 160 | $ 16 | $ 24 | $ 28 | $ 798 |
| Capital expenditures | $ 249 | $ 70 | $ 224 | $ 148 | $ 66 | $ 157 | $ 53 | $ 967 |
| Segment assets | $ 3,654 | $ 1,252 | $ 3,914 | $ 3,665 | $ 1,102 | $ 2,663 | $ 309 | $ 16,559 |

(a)  Corporate and Other includes the elimination of inter-segment transactions and charges related to U.S. employee special attrition programs in the amount of $2,955 million (Refer to Note 16. U.S. Employee Special Attrition Program).  Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

(b)  Includes charges recorded in 2006 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $22 million for Electronics & Safety, $84 million for Thermal Systems, $69 million for Powertrain Systems, $83 million for Electrical/Electronic Architecture, $50 million for Steering, $195 million for Automotive Holdings Group and $11 million for Corporate and Other.

(c)  Includes charges recorded in 2005 related to long-lived asset and goodwill impairments, contractual costs of other than temporarily idled employees and costs associated with employee termination benefits and other exit costs with $19 million for Electronics & Safety, $40 million for Thermal Systems, $412 million for Powertrain Systems, $98 million for Electrical/Electronic Architecture, $38 million for Steering, $270 million for Automotive Holdings Group and $9 million for Corporate and Other.

(d)  Includes charges recorded in 2004 related to long-lived asset and goodwill impairments and other charges with $19 million for Electronics & Safety, $41 million for Thermal Systems, $38 million for Powertrain Systems, $71 million for Electrical/Electronic Architecture, $31 million for Steering, $476 million for Automotive Holdings Group and $10 million for Corporate and Other.

Information concerning principal geographic areas is set forth below.  Net sales data reflects the manufacturing location and is for the years ended December 31.  Net property data is as of December 31.

| | Year Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2006** | | | | **2005** | | | | **2004** | | | |
| | **Net Sales** | | | | **Net Sales** | | | | **Net Sales** | | | |
| (dollars in millions) | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property |
| North America | $10,165 | $ 6,754 | $16,919 | $ 2,498 | $11,445 | $ 6,827 | $18,272 | $ 2,999 | $13,724 | $ 5,909 | $19,633 | $ 3,439 |
| Europe, Middle East, & Africa | 1,010 | 5,812 | 6,822 | 1,642 | 967 | 5,733 | 6,700 | 1,607 | 1,286 | 6,020 | 7,306 | 1,998 |
| Asia Pacific | 82 | 1,838 | 1,920 | 408 | 90 | 1,213 | 1,303 | 363 | 97 | 1,001 | 1,098 | 376 |
| South America | 379 | 352 | 731 | 147 | 358 | 314 | 672 | 139 | 310 | 275 | 585 | 133 |
| Total | $11,636 | $14,756 | $26,392 | $ 4,695 | $12,860 | $14,087 | $26,947 | $ 5,108 | $15,417 | $13,205 | $28,622 | $ 5,946 |

## 22. FAIR VALUE OF FINANCIAL INSTRUMENTS, DERIVATIVES AND HEDGING ACTIVITIES

Delphi's financial instruments include its Amended DIP Credit Facility, prepetition Revolving Credit Facility, prepetition Term Loan, unsecured notes, junior subordinated notes, and other financing instruments.  The fair value of these financial instruments is based on quoted market prices for instruments with public market data or the current book value for instruments without a quoted public market price.  As of December 31, 2006 and 2005, the total of these financial instruments was recorded at $5.2 billion and $5.3 billion, respectively, and had estimated fair values of $5.5 billion and $4.0 billion, respectively.  For all other financial instruments recorded at December 31, 2006 and 2005, fair value approximates book value.

SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended ("SFAS 133") requires that all derivative instruments be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.  The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates.

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting for most transactions. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi does not hold or issue derivative financial instruments for trading purposes.

Delphi has foreign currency exchange exposure from buying and selling in currencies other than the local currencies of its operating units. The primary purpose of the Company's foreign currency hedging activities is to manage the volatility associated with forecasted foreign currency purchases and sales. Principal currencies hedged include the British pound, Chinese yuan (renminbi), Euro, Mexican peso, and Polish zloty. Delphi primarily utilizes forward exchange contracts with maturities of less than 24 months, which qualify as cash flow hedges.

Delphi has exposure to the prices of commodities in the procurement of certain raw materials. The primary purpose of the Company's commodity price hedging activities is to manage the volatility associated with these forecasted inventory purchases. Delphi primarily utilizes swaps with maturities of less than 24 months, which qualify as cash flow hedges. These instruments are intended to offset the effect of changes in commodity prices on forecasted inventory purchases.

Delphi did not have any interest rate instruments outstanding at December 31, 2006 or 2005.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of December 31, 2006 and 2005 are as follows:

|  | December 31, 2006 | December 31, 2005 |
|---|---|---|
|  | (in millions) | |
| Current assets | $   73 | $   5 |
| Non-current assets | 3 | 2 |
| Total assets | $   76 | $   7 |
| Current liabilities | $   61 | $   8 |
| Non-current liabilities | — | — |
| Total liabilities | $   61 | $   8 |

The fair value of financial instruments recorded as assets increased from December 31, 2005 to December 31, 2006 primarily due to favorable forward rates Mexican peso forward contracts. The fair value of financial instruments recorded as liabilities increased from December 31, 2005 to December 31, 2006 primarily due to Euro foreign currency hedges put in place at unfavorable rates, unfavorable secondary aluminum forward contracts, and unfavorable natural gas forward contracts.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in OCI as of December 31, 2006, were $56 million pre-tax. Of this pre-tax total, a gain of approximately $55 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $2 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Net gains of $12 million after tax and pre-tax and $86 million after-tax ($91 million pre-tax) were included in OCI as of December 31, 2005 and 2004, respectively. Cash flow hedges are discontinued when it is probable that the original forecasted transactions will not occur. The amount included in cost of sales related to hedge ineffectiveness was $7 million for the year ended December 31, 2006 and was not significant for the year ended December 31, 2005. The amount included in cost of sales related to the time value of options was not significant in 2006, 2005, and 2004. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was $14 million in 2006.

## 23. SUBSEQUENT EVENTS

Events have occurred subsequent to December 31, 2006 that, although they do not impact the reported balances or results of operations as of that date, are material to the Company's ongoing operations.  These events are listed below.

### Plan Framework Support Agreement and Equity Purchase and Commitment Agreement

On December 18, 2006, Delphi entered into a Plan Framework Support Agreement and on January 18, 2007 an amendment and supplement thereto (collectively, the "PSA") with Cerberus, Appaloosa, Harbinger, Merrill, UBS and GM, which outlines a framework plan of reorganization. On January 12, 2007, the Court granted Delphi's motion seeking authority to enter into the PSA and further authorized Delphi to accept the investment proposal from the Plan Investors under the terms the EPCA which Delphi entered into on January 18, 2007, as more fully described in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

### Replacement Postpetition Financing

On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing and on January 9, 2007, Delphi entered into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders, as more fully described in Note 14. Debt.

### Manufacturing Facility Closure

In February 2007, Delphi's Spanish subsidiary announced the planned closure of a chassis and steering products manufacturing facility in Cadiz, Spain.  The facility has approximately 1,600 employees.  Delphi's Spanish subsidiary is exploring all strategic options to contain the costs associated with such closure.  Delphi has not recognized any significant amounts related to this planned closure as of year end.  However, based on the February 2007 announcement Delphi could incur costs for closure based upon the outcome of negotiations with the unions representing the affected employees.

## 24. QUARTERLY DATA (UNAUDITED)

| | **Three Months Ended** | | | | |
|---|---|---|---|---|---|
| | **March 31,** | **June 30,** | **Sept. 30,** | **Dec. 31,** | **Total** |
| | | (in millions, except per share amounts) | | | |
| **2006** | | | | | |
| Net sales | $ 6,973 | $ 6,995 | $ 6,008 | $ 6,416 | $26,392 |
| Cost of sales | 6,559 | 6,543 | 6,083 | 6,231 | 25,416 |
| Gross profit (loss) | $ 414 | $ 452 | $ (75) | $ 185 | $ 976 |
| | | | | | |
| Operating loss | $ (232) | $(2,112) (1) | $(1,787) (2) | $ (727) (3) | $(4,858) (1)(2)(3) |
| | | | | | |
| Loss before cumulative effect of accounting change | $ (366) | $ (2,275) (1) | $(1,973) (2) | $ (853) (3) | $(5,467) (1)(2)(3) |
| Cumulative effect of accounting change | 3 | — | — | — | 3 |
| Net loss | $ (363) | $ (2,275) (1) | $(1,973) (2) | $ (853) (3) | $(5,464) (1)(2)(3) |
| | | | | | |
| Basic and diluted loss per share before cumulative effect of accounting change | $ (0.66) | $ (4.05) | $ (3.51) | $ (1.52) | $ (9.74) |
| Cumulative effect of accounting change | 0.01 | — | — | — | 0.01 |
| Basic and diluted loss per share | $ (0.65) | $ (4.05) | $ (3.51) | $ (1.52) | $ (9.73) |
| | | | | | |
| Cash dividends declared per share | $ 0.000 | $ 0.000 | $ 0.000 | $ 0.000 | $ 0.000 |
| | | | | | |
| Common stock price | | | | | |
| High | $ 1.02 | $ 1.99 | $ 1.88 | $ 3.92 | $ 3.92 |
| Low | $ 0.03 | $ 0.60 | $ 1.07 | $ 1.35 | $ 0.03 |
| **2005** | | | | | |
| Net sales | $ 6,862 | $ 7,023 | $ 6,283 | $ 6,779 | $26,947 |
| Cost of sales | 6,500 | 6,606 | 6,221 | 6,374 | 25,701 |
| Gross profit | $ 362 | $ 417 | $ 62 | $ 405 | $ 1,246 |
| | | | | | |
| Operating loss | $ (324) | $ (284) | $ (693) (4) | $ (870) (5) | $(2,171) (4)(5) |
| | | | | | |
| Loss before cumulative effect of accounting change | $ (403) | $ (338) | $ (788) (4) | $ (811) (5) | $(2,340) (4)(5) |
| Cumulative effect of accounting change | — | — | — | (17) | (17) |
| Net loss | $ (403) | $ (338) | $ (788) (4) | $ (828) (5) | $(2,357) (4)(5) |
| | | | | | |
| Basic and diluted loss per share before cumulative effect of accounting change | $ (0.73) | $ (0.60) | $ (1.40) | $ (1.45) | $ (4.18) |
| Cumulative effect of accounting change | — | — | — | (0.03) | (0.03) |
| Basic and diluted loss per share | $ (0.73) | $ (0.60) | $ (1.40) | $ (1.48) | $ (4.21) |
| | | | | | |
| Cash dividends declared per share | $ 0.030 | $ 0.015 | $ 0.000 | $ 0.000 | $ 0.045 |
| | | | | | |
| Common stock price | | | | | |
| High | $ 9.07 | $ 5.40 | $ 6.68 | $ 2.99 | $ 9.07 |
| Low | $ 4.15 | $ 3.20 | $ 2.42 | $ 0.23 | $ 0.23 |

(1) Includes U.S. employee special attrition program charges of $1,905 million recorded in the second quarter 2006.

(2) Includes U.S. employee special attrition program charges of $1,043 million and long-lived asset impairment charges of $15 million pre-tax in the third quarter 2006.

(3) Includes U.S. employee special attrition program charges of $7 million and long-lived asset impairment charges of $200 million pre-tax recorded in the fourth quarter 2006.

(4) Includes long-lived asset impairment charges of $40 million pre-tax recorded in the third quarter 2005.

(5) Includes long-lived asset impairment charges of $193 million pre-tax, goodwill impairment charges of $390 million pre-tax and $6 million pre-tax of impairments related to intangible assets (included in depreciation and amortization expense) recorded in the fourth quarter 2005.

**APPENDIX B-2**

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter Ended ~~June 30, 2007,~~
~~Filed August 8, 2007~~ September 30, 2007

## PART I. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### DELPHI CORPORATION
### (DEBTOR-IN-POSSESSION)
### CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (in millions, except per share amounts) | | | |
| Net sales: | | | | |
| General Motors and affiliates | $ 2,626 | $ 2,598 | $ 8,302 | $ 8,884 |
| Other customers | 3,595 | 3,410 | 11,615 | 11,092 |
| Total net sales | 6,221 | 6,008 | 19,917 | 19,976 |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 5,972 | 6,083 | 18,835 | 19,185 |
| U.S. employee workforce transition program charges | 244 | 1,043 | 238 | 2,948 |
| Depreciation and amortization | 232 | 262 | 736 | 804 |
| Long-lived asset impairment charges | 23 | 15 | 222 | 15 |
| Selling, general and administrative | 408 | 392 | 1,218 | 1,155 |
| Securities & ERISA litigation charge | 21 | — | 353 | — |
| Total operating expenses | 6,900 | 7,795 | 21,602 | 24,107 |
| Operating loss | (679) | (1,787) | (1,685) | (4,131) |
| Interest expense (contractual interest expense for the three and nine months ended September 30, 2007 was $118 million and $360 million, respectively, and for the three and nine months ended September 30, 2006 was $150 million and $434 million, respectively) | (454) | (116) | (630) | (319) |
| Loss on extinguishment of debt | — | — | (23) | — |
| Other income, net | 22 | 8 | 60 | 31 |
| Loss before reorganization items, income taxes, minority interest, equity income, and cumulative effect of accounting change | (1,111) | (1,895) | (2,278) | (4,419) |
| Reorganization items | (39) | (25) | (120) | (58) |
| Loss before income taxes, minority interest, equity income, and cumulative effect of accounting change | (1,150) | (1,920) | (2,398) | (4,477) |
| Income tax expense | (17) | (46) | (123) | (137) |
| Loss before minority interest, equity income, and cumulative effect of accounting change | (1,167) | (1,966) | (2,521) | (4,614) |
| Minority interest, net of tax | (12) | (4) | (38) | (28) |
| Equity income (loss), net of tax | 10 | (3) | 36 | 28 |
| Loss before cumulative effect of accounting change | (1,169) | (1,973) | (2,523) | (4,614) |
| Cumulative effect of accounting change, net of tax | — | — | — | 3 |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |
| Basic and diluted loss per share: | | | | |
| Before cumulative effect of accounting change | $ (2.08) | $ (3.51) | $ (4.49) | $ (8.22) |
| Cumulative effect of accounting change | — | — | — | 0.01 |
| Basic and diluted loss per share | $ (2.08) | $ (3.51) | $ (4.49) | $ (8.21) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, 2007 (Unaudited) | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,433 | $ 1,667 |
| Restricted cash | 180 | 146 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,959 | 2,078 |
| Other customers | 3,000 | 2,691 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 1,586 | 1,598 |
| Finished goods | 631 | 577 |
| Other current assets | 633 | 458 |
| Total current assets | 9,422 | 9,215 |
| Long-term assets: | | |
| Property, net | 4,289 | 4,695 |
| Investments in affiliates | 428 | 417 |
| Goodwill | 391 | 378 |
| Other intangible assets, net | 43 | 51 |
| Other | 868 | 636 |
| Total long-term assets | 6,019 | 6,177 |
| Total assets | $ 15,441 | $ 15,392 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt | $ 3,966 | $ 3,339 |
| Accounts payable | 3,083 | 2,820 |
| Accrued liabilities | 2,395 | 2,211 |
| Total current liabilities | 9,444 | 8,370 |
| Long-Term liabilities: | | |
| Other long-term debt | 37 | 49 |
| Employee benefit plan obligations | 601 | 550 |
| Other | 1,355 | 859 |
| Total long-term liabilities | 1,993 | 1,458 |
| Liabilities subject to compromise | 16,914 | 17,416 |
| Total liabilities | 28,351 | 27,244 |
| Minority interest | 209 | 203 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2007 and 2006 | 6 | 6 |
| Additional paid-in capital | 2,781 | 2,769 |
| Accumulated deficit | (14,434) | (11,893) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans | (1,855) | (3,041) |
| Other | 435 | 156 |
| Total accumulated other comprehensive loss | (1,420) | (2,885) |
| Treasury stock, at cost (3.2 million shares in 2007 and 2006) | (52) | (52) |
| Total stockholders' deficit | (13,119) | (12,055) |
| Total liabilities and stockholders' deficit | $ 15,441 | $ 15,392 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| **Cash flows from operating activities:** | | |
| Net loss | $(2,523) | $(4,611) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 736 | 804 |
| Long-lived asset impairment charges | 222 | 15 |
| Deferred income taxes | — | 23 |
| Pension and other postretirement benefit expenses | 795 | 1,189 |
| Equity income | (36) | (28) |
| Reorganization items | 120 | 58 |
| U.S. employee workforce transition program charges | 238 | 2,948 |
| Loss on extinguishment of debt | 23 | — |
| Securities & ERISA litigation charge | 353 | — |
| Loss on liquidation/deconsolidation of investment | 79 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (752) | (415) |
| Inventories, net | (125) | (319) |
| Other assets | (11) | (91) |
| Accounts payable | 368 | 445 |
| Accrued and other long-term liabilities | 697 | 256 |
| Other, net | 36 | 55 |
| U.S. employee workforce transition program payments | (571) | (326) |
| U.S. employee workforce transition program reimbursement by GM | 265 | 215 |
| Pension contributions | (230) | (219) |
| Other postretirement benefit payments | (149) | (182) |
| Net payments for reorganization items | (91) | (39) |
| Net cash used in operating activities | (556) | (222) |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | (483) | (606) |
| Proceeds from sale of property | 37 | 53 |
| Proceeds from sale of non-U.S. trade bank notes | 150 | 130 |
| Increase in restricted cash | (30) | (110) |
| Proceeds from divestitures | 71 | 24 |
| Other, net | (4) | (6) |
| Net cash used in investing activities | (259) | (515) |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost | 2,739 | — |
| Repayments of borrowings under debtor-in-possession facility | (250) | — |
| Repayments of borrowings under prepetition term loan facility | (988) | — |
| (Repayments) borrowings under prepetition revolving credit facility | (1,508) | 2 |
| Net borrowings under refinanced debtor-in-possession facility | 480 | — |
| Net borrowings (repayments) under other debt agreements | 77 | (27) |
| Repayments under cash overdraft | — | (29) |
| Dividends paid to minority partners | (45) | (16) |
| Other, net | — | (3) |
| Net cash provided by (used in) financing activities | 505 | (73) |
| | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 76 | 32 |
| | | |
| Decrease in cash and cash equivalents | (234) | (778) |
| Cash and cash equivalents at beginning of period | 1,667 | 2,221 |
| Cash and cash equivalents at end of period | $ 1,433 | $ 1,443 |

See notes to consolidated financial statements.

3

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Unaudited)**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | **2007** | **2006** | **2007** | **2006** |
|  | (in millions) | | | |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |
| Other comprehensive income: | | | | |
| Currency translation adjustments, net of tax | 71 | 42 | 217 | 128 |
| Net change in unrecognized gain on derivative instruments, net of tax | 9 | 66 | 62 | 68 |
| Employee benefit plans adjustment, net of tax | 1,191 | (284) | 1,186 | 575 |
| Other comprehensive income (loss) | 1,271 | (176) | 1,465 | 771 |
| Comprehensive income (loss) | $   102 | $(2,149) | $(1,058) | $(3,840) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. BASIS OF PRESENTATION

*General*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, engine management systems, safety components, thermal management systems and other transportation components. Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code. However, Delphi's Board of Directors authorized Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L ("DASE"), to file a petition for Concurso, or bankruptcy, under Spanish law, exclusively for that entity. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations beginning in the quarter ended December 31, 2005. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi adopted SOP 90-7 effective on October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to reduce wage and benefit costs and liabilities during the bankruptcy process; (iv) to return to profitability; (v) to generate sufficient cash flow from operations; and (vi) to obtain financing sources to meet the Company's future obligations. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. A confirmed plan of reorganization could materially change the amounts and

classifications reported in the consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim. During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi shall be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through December 31, 2007. During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims. The accrued interest payable of $369 million is included in accrued liabilities on the accompanying balance sheet. This estimate is based on numerous factual and legal assumptions. Absent developments that alter Delphi's view of the likelihood of amounts that may be paid under the Plan to holders of allowed unsecured claims, Delphi expects to accrue interest on such unsecured claims in future periods, to the extent required under applicable law. Such interest will be discharged at the emergence date under the provisions of plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During the third quarter and first nine months of 2007, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, worker's compensation and healthcare. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Valuation of Long-Lived Assets*—Delphi periodically evaluates the carrying value of long-lived assets held for use including intangible assets, when events or circumstances warrant such a review. The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or from appraisals performed by valuation experts. Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced by the cost of disposing of the assets. During the third quarter and first nine months of 2007, Delphi recorded impairment charges of $23 million and $222 million, respectively, related to long-lived assets. Refer to Note 6. Long-Lived Asset Impairment for more information.

*Valuation Allowance for Deferred Tax Assets* — Realization of deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carryforwards. Valuation allowances are provided against deferred tax assets when, based on all available evidence, it is considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods. In the third quarter of 2006, Delphi recorded valuation allowances of $36 million for the net deferred tax assets of certain non-U.S. operations, primarily operations in Spain, Portugal and Romania. Delphi determined based on historical losses and expected future taxable income (loss) that it was no longer more likely than not that these net deferred tax assets would be realized. During the third quarter of 2007, Delphi reduced the valuation allowance by net $11 million, for deferred tax assets of certain non-US operations, primarily operations in Poland, offset by increases in Germany and Mexico.

*Postemployment Benefits*— Delphi accrues for costs associated with postemployment benefits provided to inactive employees throughout the duration of their employment. Delphi uses future production estimates combined with workforce geographic and demographic data to develop projections of time frames and related expense for postemployment benefits. For purposes of accounting for postemployment benefits, inactive employees represent those employees who have been other than temporarily idled. Delphi considers all idled employees in excess of approximately 10% of the total workforce at a facility to be other than temporarily idled. During the second quarter of 2006, the Company entered into special attrition programs for certain union-represented U.S. hourly employees that significantly decreased the future cash expenditures expected during the period between the idling of the affected employees and the time when such employees were redeployed, retired, or otherwise terminated their employment. As a result, Delphi determined that certain previously recorded accruals were no longer necessary and accordingly Delphi reduced such accruals by $4 million and $107 million for the three and nine months ended September 30, 2006, respectively, which were recorded in cost of sales.

*Employee Termination Benefits and Other Exit Costs*—Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower its operating costs. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are accrued when incurred. Delphi incurred expenses related to these actions of $112 million and $51 million for the three months ended September 30, 2007 and 2006, of which $108 million and $51 million, respectively, were included in cost of sales, and $4 million was included in selling, general and administrative expenses for the three months ended September 30, 2007. During the nine months ended September 30, 2007 and 2006 Delphi incurred expenses related to these actions of $532 million and $186 million, of which $503 million and $186 million, respectively, were included in cost of sales, and $29 million was included in selling, general and administrative expenses for the nine months ended September 30, 2007. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for employee termination benefits and other exit costs related to non-core product lines included in the amount above and refer to Note 12. U.S. Employee Workforce Transition Programs for employee termination benefits and other exit costs related to the 2007 U.S. labor agreements.

*Share-Based Compensation*— Delphi's stock-based compensation programs include stock options, restricted stock units, and stock appreciation rights. The Company adopted the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standards No. 123 (Revised 2004), *"Share-Based Payments"* ("SFAS 123(R)"), effective January 1, 2006 using the modified-prospective method. SFAS 123(R) requires compensation cost to be recognized for equity or liability instruments based on the grant-date fair value, with expense recognized over the periods that an employee provides service in exchange for the award and requires the Company to estimate forfeitures at the grant date. In addition, while the Company will recognize compensation cost for newly issued equity or liability instruments over the periods that an employee provides service in exchange for the award, the Company will continue to follow a nominal vesting approach for all awards issued prior to the adoption of SFAS 123(R). Total share-based compensation cost was $5 million and $11 million for the three months ended September 30, 2007 and 2006, respectively, and $12 million and $20 million for the nine months ended September 30, 2007 and 2006, respectively.

*Recently Issued Accounting Pronouncements*— In June 2006, the FASB issued FASB Interpretation 48 ("FIN 48"), *"Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109."* FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with FASB Statement No. 109, *"Accounting for Income Taxes."* Delphi adopted FIN 48 effective January 1, 2007. The impact of initially applying FIN 48 was recognized as a cumulative effect adjustment increasing the January 1, 2007 opening balance of accumulated deficit by $18 million. Refer to Note 5. Income Taxes for more information regarding the impact of adopting FIN 48.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *"Fair Value Measurements."* SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Delphi is currently evaluating the requirements of SFAS 157, and has not yet determined the impact on its financial statements. Delphi expects to use the new definition of fair value upon adoption of SFAS 157 as of January 1, 2008 and apply the disclosure requirements of SFAS 157 for Delphi's 2008 financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *"Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)."* SFAS 158 requires, among other things, an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Delphi currently measures the funded status of certain of its plans, primarily the U.S. other postretirement benefit plans, as of September 30 of each year. Delphi expects to adopt the measurement date provisions of SFAS 158 as of January 1, 2008. Delphi is currently evaluating the requirements of the measurement date provisions of SFAS 158 and has not yet determined the impact on its financial statements.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *"The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115."* SFAS 159 permits

entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi is currently evaluating the requirements of SFAS 159, and has not yet determined the impact on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On September 6, 2007 Delphi filed its proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outline Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. At a Court hearing on September 27, 2007, Delphi stated that the current dynamics of the capital markets prompted Delphi to consider whether amendments to the Plan filed on September 6 might be necessary. Delphi commenced its Disclosure Statement hearing on October 3, 2007, and after resolving certain objections, requested that the hearing be continued to October 25, 2007. On October 19, 2007, the Court granted Delphi's request to further continue the hearing on the adequacy of the Disclosure Statement to November 8, 2007. The adjournment of the hearing allowed Delphi to continue to negotiate potential amendments to the Plan filed on September 6 with key stakeholders. On October 29, 2007, Delphi filed a notice of potential amendments to the Plan and Disclosure Statement filed on September 6 (the "Potential Amendments") and the hearing was scheduled to recommence on November 8, 2007. On November 5, 2007, Delphi asked the Court to adjourn until later in November the hearing on its Disclosure Statement, including the Potential Amendments and amendments to the Equity Purchase and Commitment Agreement ("EPCA") between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus") and Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), which are described in more detail below (the "Proposed EPCA Amendment"). Delphi sought adjournment while it continues discussing the Potential Amendments with its statutory committees, both of whom have filed objections to the Potential Amendments, and other stakeholders. In addition, Delphi did not believe that all of the conditions to the execution of the Proposed EPCA Amendment would be satisfied prior to the commencement of the scheduled November 8, 2007 Court hearing. In their proposal letter dated October 29, 2007 submitted by a supermajority of the Investors (the "Proposal Letter"), such Investors expressly conditioned their agreement to execute the Proposed EPCA Amendment on (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors. If any of the conditions set forth in the Proposal Letter are not satisfied or waived, the Investors will not be obligated to execute the Proposed EPCA Amendment. Delphi cannot provide any assurances as to whether or when the Proposed EPCA Amendment will be executed and, if it in fact is executed, whether there will be additional amendments than those described below. Delphi continues its transformation activities, including ongoing discussion with its relationship banks regarding an emergence financing package that can be executed under existing market conditions, with the goal of emergence from chapter 11 as soon as practical. Currently, Delphi expects to emerge during the first quarter of 2008, however, no assurances can be provided that the emergence date will not be delayed.

### Proposed Plan of Reorganization and Transformation Plan

On March 31, 2006, Delphi announced its transformation plan centered around five key elements, each of which is also addressed in its proposed Plan and the series of settlement agreements it embodies. The progress on each element is discussed below.

<u>Labor</u> - Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements have already become effective, while other portions will not become effective until the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial and other matters between Delphi and GM and substantial consummation of the Plan as confirmed by the Court which incorporates, approves and is

consistent with the terms of each agreement.

These U.S. labor settlement agreements include those with the:

- UAW, dated June 22, 2007;
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"), dated August 5, 2007;
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78 ("IAM"), dated July 31, 2007;
- International Brotherhood of Electrical Workers and its Local 663 ("IBEW") relating to Delphi Electronics and Safety, dated July 31, 2007;
- IBEW relating to Delphi's Powertrain division, dated July 31, 2007;
- International Union of Operating Engineers ("IUOE") Local 18S, dated August 1, 2007;
- IUOE Local 101S, dated August 1, 2007;
- IUOE Local 832S, dated August 1, 2007;
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local Union 87L (together, the "USW") relating to Delphi's operations at Home Avenue, dated August 16, 2007; and
- USW relating to Delphi's operations at Vandalia, dated August 16, 2007.

Subject to these settlement agreements, the existing collective bargaining agreements:

- were modified and extended to September 14, 2011 for the UAW, the IAM, the IBEW, the IUOE Local 18S, the IUOE Local 832S, and the USW;

- were modified and extended to October 12, 2011 for the IUE-CWA; and

- were terminated and superseded for the IUOE Local 101S by the settlement agreement for the IUOE Local 101S.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

During the third quarter of 2007, approximately 725 employees eligible to participate in the attrition programs encompassed in the workforce transition programs elected to leave Delphi and Delphi recorded $67 million in U.S. employee workforce transition program charges. Amortization expense related to the buy-down payments encompassed in the workforce transition programs of $2 million was recorded in U.S. employee workforce transition program charges. Additionally, hourly pension curtailment charges of $59 million were recorded in U.S. employee workforce transition program charges. The hourly pension curtailment charges are discussed further in Note 13. Pension and Other Postretirement Benefits. Costs related to severance payments for employees at sites that will be sold or wound down were recorded in the amount of $48 million in cost of sales. Refer to Note 12 U.S. Employee Workforce Transition Programs for more information.

<u>GM</u> - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

On March 31, 2006, the Debtors filed a motion with the Court seeking authority to reject certain customer contracts with GM under section 365 of the Bankruptcy Code. On the same date, Delphi delivered a letter to GM initiating a process to reset the terms and conditions of more than 400 commercial agreements that expired between October 1, 2005 and March 31, 2006.

- The initial GM contract rejection motion covered approximately half of the North American annual purchase volume revenue from GM.

- The hearing on the motion was initially scheduled to commence on September 28, 2006 but has been adjourned on multiple occasions to enable the parties to concentrate their resources and activities on discussions aimed at achieving a consensual resolution, and additional proceedings on the motion are currently suspended until further order of the Court. In the interim, periodic chambers conferences have been conducted to provide the Court with updates regarding the status of negotiations to consensually resolve the motions.

Delphi and GM have entered into comprehensive settlement agreements consisting of a Global Settlement Agreement, as amended (the "GSA") and a Master Restructuring Agreement, as amended (the "MRA").  The accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA.  The net results of these agreements will be a material reduction in Delphi's liabilities related to the workforce transition programs.  Delphi will not account for the impact of the GSA or the MRA until the conditions of the agreements are satisfied, which will likely occur at emergence.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter.  By contrast, resolution of most of the matters addressed in the MRA will require a significantly longer period that will extend for a number of years after confirmation of the Plan.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Plan, including payment of amounts to settle GM claims as outlined below.

- Upon approval of the GSA and MRA as part of the Plan confirmation process, the Debtors anticipate seeking a withdrawal without prejudice of their motions filed under section 365 of the Bankruptcy Code.

The GSA is intended to resolve outstanding issues among Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term.  On October 29, 2007, Delphi and GM agreed to certain amendments to the GSA (the "GSA Amendment").  The GSA Amendment provides that instead of Delphi paying GM $2.7 billion in cash as had originally been agreed, on the effective date of the Plan, subject to certain surviving claims in the GSA and in satisfaction of various GM claims, Delphi would pay GM (i) $1.5 billion in a combination of at least $750 million in cash and a second lien note; and (ii) $1.2 billion in junior preferred convertible stock.  The GSA Amendment contains a provision that (i) if the Proposed EPCA Amendment in the form filed with the Court on October 29, 2007 has not been signed by Delphi and the Investors on or before November 17, 2007, the GSA Amendment is terminable by either Delphi or GM upon delivery of written notice to the other, and (ii) upon such written notice, the GSA Amendment becomes null and void as if it had never been entered into by Delphi and GM.  As noted above, Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM.  Upon delivery of written notice by either Delphi or GM to the other after November 17, 2007, the GSA Amendment would become null and void and the GSA will continue in force without giving regard to the GSA Amendment.  At this time GM and Delphi are continuing discussions.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will make significant contributions to cover costs associated with certain post-retirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as possible following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly Pension Plan, as set forth in the union term sheets;

- Shortly after the effective date of the Plan, GM will receive a subordinated interest bearing note from Delphi in the amount of $1.5 billion to be paid within 10 days of its issuance;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11.  The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing

labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour at specified manufacturing facilities;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

Portfolio - Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. Effective November 1, 2006, in connection with the Company's continuous evaluation of its product portfolio, it decided that power products no longer fit within its future product portfolio and that business line was moved to Delphi's Automotive Holdings Group. With the exception of the catalyst product line with $249 million of year-to-date 2007 net sales included in the Powertrain Systems segment, and the Steering segment with $2,053 million of year-to-date 2007 net sales, these non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 16. Segment Reporting.

Throughout 2007, Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

- During the third quarter of 2007, Delphi closed on the sales of assets related to its catalyst and brake hose product lines and obtained the Court's approval for the sale of substantially all of the assets of their Saltillo, Mexico brake plant business, refer to Note 4. Acquisitions and Divestitures to the consolidated financial statements for more information.

- Although the Company intends to sell or wind-down its remaining non-core product lines and manufacturing sites, these product lines and manufacturing sites were not classified as held for sale in the current period because the court approval process required by the Bankruptcy Code is not complete and other held for sale criteria of SFAS No. 144 ("SFAS 144"), "Accounting for the Impairment or Disposal of Long-Lived Assets," were not met as of September 30, 2007.

Costs recorded in the three and nine months ended September 30, 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets recorded as a component of long-lived asset impairment charges of $20 million and $217 million, respectively, and employee termination benefits and other exit costs of $66 million and $373 million, respectively (of which $65 million and $370 million were recorded as a component of cost of sales and $1 million and $3 million were recorded as a component of selling, general and administrative expenses). Included in employee termination benefits and other exit costs for the nine months ended September 30, 2007 were $268 million recorded as a component of cost of sales related to a manufacturing facility in Cadiz, Spain discussed below.

Cost Structure - Transform Delphi's salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services and information technology outsourcing activities, reduction in the global salaried workforce by taking advantage of attrition and

using salaried separation plans, and realignment of the salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, Delphi does not expect to realize substantial savings until 2009 and beyond.

   Pensions - Devise a workable solution to Delphi's current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM. On March 9, 2007, Delphi received approval from the IRS to change the asset valuation method for purposes of funding for the Hourly and Salaried Plans for plan years beginning on and after October 1, 2005. The new asset valuation method uses fair market value as permitted in the U.S. Internal Revenue Code (the "IRC"). On May 29, 2007, Delphi, acting pursuant to the Court's authority, secured from the IRS a favorable ruling regarding the transfer of unfunded liabilities from its Hourly Plan to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. On July 13, 2007, the IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver. The 2007 Hourly Plan Waiver is necessary to make the transfer of hourly pension obligations to the GM plan economically efficient by avoiding redundant cash contributions that would result in a projected overfunding of the Hourly Plan. On October 4, 2007, the IRS further modified the 2006 Waivers at Delphi's request by making confirming amendments to the 2006 Waivers, as modified on July 13, 2007. The amendments modify the conditions to the 2006 Waivers so that they are generally consistent with the conditions to the 2007 Hourly Plan Waiver. The conditional funding waivers will permit Delphi to defer funding contributions due under ERISA and the IRC until after Delphi emerges from chapter 11.

The pertinent terms of the 2006 Waivers, as modified, are:

- No later than December 31, 2007, the Company must file a plan of reorganization with the Court providing for the continuation of the Hourly and Salaried Plans and compliance with the conditions of the waiver. The Company has satisfied this condition.

- The effective date of the Company's plan of reorganization must occur no later than February 29, 2008.

- Effective June 16, 2007, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $100 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan, which letters of credit will expire once Delphi satisfies the contribution requirements described below which must be satisfied within five days following the Company's emergence from chapter 11.

With respect to the 2006 Waiver for the Hourly Plan:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company either (1) effects a transfer under IRC § 414(l) to a GM plan, (2) makes cash contributions to the Hourly Plan, or (3) makes a combination thereof that reduces the net unfunded liabilities of the Hourly Plan by at least $1.5 billion as determined on a basis in accordance with FASB Statement No. 87, *Employers' Accounting for Pensions.*

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes a contribution equal to approximately $575 million. The Company must also deposit into escrow an amount equal to approximately $200 million.

- Not later than five months after the effective date of the Company's plan of reorganization, the Company calculates and contributes from the escrow account and, if necessary, from general Company assets the amount sufficient to result in a funded current liability percentage as of the effective date of the Company's plan of reorganization that is the same funded current liability percentage that would have existed as of the effective date of the Company's plan of reorganization if (a) the funding waiver had not been granted, (b) the § 414(l) transfer had not occurred, and (c) a

contribution was made on the effective date of the Company's emergence equal to the accumulated ERISA funding deficiency as of September 30, 2007.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes $20 million for the plan year ended September 30, 2007, which includes a full settlement of the potential excise tax claims for the accumulated funding deficiencies for the Hourly and Salary Plans related to the plan year ended September 30, 2005, and which amount cannot be taken into account for purposes of the calculation in the immediately preceding paragraph.

.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company reimburses the PBGC for outside consulting fees incurred in reviewing the Company's funding waiver request in an amount not to exceed $2 million.

- The Company makes contributions to the Hourly Plan in amounts sufficient to meet the minimum funding standard for the Hourly Plan for the plan year ended September 30, 2007, by June 15, 2008.

With respect to the 2006 Waiver for the Salaried Plan:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company makes contributions to the Salaried Plan for the year ended September 30, 2007 equal to the lesser of (i) the amount necessary to maintain a credit balance in the funding standard account of the Salaried Plan as of September 30, 2007, not less than the outstanding balance of the amortization base with respect to the waived amount that is established and maintained under IRC § 412(b)(2), or (ii) the full funding limitation for the plan year ended September 30, 2007.

- Certain funding requirements are met with regard to post emergence plan years.

With respect to the 2007 Hourly Plan Waiver:

- Not later than five days after the effective date of the Company's plan of reorganization, the Company effects a transfer under section 414(1) of the IRC of $1.5 billion in net unfunded liabilities under the Hourly Plan to an overfunded GM plan.

- Not later than five days after the effective date of the Company's plan of reorganization, the Company contributes $20 million to the Hourly Plan (in addition to the $20 million contributions described in the conditions of the 2006 Waiver for the Hourly Plan).

- Other provisions related to treatment of contributions that may create a credit balance.

- No effect on the PBGC's right to hold the $100 million letter of credit with respect to the 2006 Waivers. Certain funding requirements are met with regard to post emergence plan years.

The Company has represented that it intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from bankruptcy protection. If the Company's plan of reorganization becomes effective later than February 29, 2008, the Company will seek an extension of the waiver terms with the IRS and the PBGC.

The conditional waivers described above contemplate that two large payments related to the Company's qualified defined benefit pension plans will be made upon emergence from bankruptcy. The first payment will be a contribution directly to the Hourly and Salaried Plans as described above, and is estimated to be approximately $1.25 billion with approximately $1.05 billion in plan contributions and approximately $200 million into escrow. Delphi expects that the majority of the escrow ultimately will be contributed to the Hourly and Salaried Plans based on true-up calculations. The second payment will be effected through an IRC § 414(l) transfer of $1.5 billion of Hourly Plan net unfunded liabilities to a GM hourly pension plan. Delphi and GM have agreed to the IRC § 414(l) transfer of $1.5 billion of net unfunded liability to GM's hourly plan, in exchange for a note given to GM by Delphi in the amount of $1.5 billion to be paid off by Delphi within ten days. The foregoing description of the pension funding plan is a summary only and is qualified in its entirety by the terms of the waivers and the orders of the Court.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the labor section, Delphi intends to freeze the Salaried Plan effective upon emergence. The freeze of this plan became probable in the third quarter resulting in curtailment charges of $116 million. Refer to Note 13. Pension and Other Postretirement Benefits for more information.

Other Elements of Proposed Plan of Reorganization

The Disclosure Statement and Plan include detailed information regarding the treatment of claims and interests and an outline of the EPCA and rights offering. Delphi's Plan filed on September 6 was based upon a series of global settlements and compromises that involved every major constituency of Delphi and its affiliated Debtors' reorganization cases, including Delphi's principal U.S. labor unions, GM, the official committee of unsecured creditors (the "Creditors' Committee") and the official committee of equity security holders (the "Equity Committee") appointed in Delphi's chapter 11 cases, and the lead plaintiffs in certain securities and Employee Retirement Income Security Act ("ERISA") multidistrict litigation (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA). As discussed in the Disclosure Statement, Delphi's Plan filed on September 6 contemplated, among other things, obtaining up to $7.5 billion in funded debt and a $1.6 billion asset-based revolving loan to finance Delphi's emergence from chapter 11.

The Plan filed on September 6 provided for a recovery through a distribution of reorganized Delphi common stock and cash. General unsecured creditors were to receive the principal amount of their claims plus accrued interest at a negotiated plan value. Other classes of creditors and interests were to receive agreed upon distributions. Under the Plan filed on September 6, GM was to receive a $2.7 billion cash distribution in satisfaction of certain of its claims against Delphi. As part of the settlement of the Securities and ERISA litigation discussed further in Bankruptcy Related Litigation, distributions were to be made using Plan currency in the same form, ratio and treatment as that which will be used to satisfy the holders of general unsecured claims. The allowed claims and interests of the settling Securities and Litigation claimants total approximately $25 million for the ERISA plan class and a total of $204 million for the debt securities class and the common stock securities class. The Plan filed on September 6 contemplated that rights offerings featuring transferable and non-transferable rights would be made to holders of Delphi's existing common stock. The rights offerings were to occur after the Court had confirmed Delphi's Plan and the registration statement filed with the SEC had been declared effective. Under the Plan filed on September 6, holders of existing Delphi common stock were also to receive a distribution of shares of reorganized Delphi and five-year warrants exercisable to purchase shares of reorganized Delphi.

At a Court hearing on September 27, 2007, Delphi stated that the dynamics of the capital markets prompted Delphi to consider whether amendments to its Plan filed on September 6 might be necessary. On October 29, 2007 Delphi filed a notice containing the Potential Amendments to the Plan and Disclosure Statement.

The Potential Amendments are supported by GM and a supermajority of the Investors. Delphi has been advised by the Equity Committee that it will no longer support Delphi's Plan if amended to reduce recoveries to common stockholders as contemplated in the Potential Amendments. On November 2, 2007 the Equity Committee filed objections to the Disclosure Statement and Plan and sought an adjournment of the continued Disclosure Statement hearing. In addition, the Creditors' Committee, certain holders of senior notes, the senior notes indenture trustee, and the lead plaintiffs in the Securities Litigation filed objections to the Disclosure Statement and the Potential Amendments.

The Potential Amendments contemplate an approximate $2 billion reduction in Delphi's net debt at emergence. Delphi plans to move forward with an asset-based revolving loan in the amount of $1.6 billion, $3.7 billion of first lien-funded financing, and second-lien funded financing in the amount of $1.5 billion. Further, the Potential Amendments reflect reductions in stakeholder distributions to some junior creditors and interest holders required to obtain consensus among the Creditors' Committee, the Investors (as defined below), and settling parties, and changes required by the Investors to obtain endorsement of the Plan and Disclosure Statement, Delphi's settlement with GM and Delphi's U.S. labor unions, Delphi's emergence business plan, and related agreements.

The Potential Amendments include the following changes to the Investors' direct investment and certain stakeholder recoveries:

| Party | Plan | Potential Amendment |
|---|---|---|
| **Plan Investors** | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.75 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $12.80 billion<br>- Purchase $175 million of new common stock of reorganized Delphi at an assumed enterprise value of $12.8 billion | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.80 billion<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $11.80 billion<br>- Purchase $175 million of new common stock of reorganized Delphi at an assumed enterprise value of $11.8 billion |

14

| Party | Plan | Potential Amendment |
|---|---|---|
| **GM** | **Recovery of $2.7 billion**<br>- $2.7 billion in Cash | **Recovery of $2.7 billion**<br>- $750 million in Cash<br>- $750 million in a second lien note<br>- $1.2 billion in junior convertible preferred stock |
| **Unsecured Creditors** | **Par plus accrued recovery at Plan value of $13.9 billion**<br>- 80% in new common stock of reorganized Delphi valued at $45 per share<br>- 20% in Cash | **Par plus accrued recovery at Plan value of $13.0 billion**<br>- 92.4% in new common stock of reorganized Delphi valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **Delphi Trust I and Delphi Trust II Preferred Securities** | **Par plus accrued recovery at Plan value of $13.9 billion**<br>- 100% in new common stock of reorganized Delphi valued at $45 per share | **Par  only recovery at Plan value of $13.0 billion**<br>- 92.4% in new common stock of reorganized Delphi valued at $41.58 per share<br>- 7.6% through pro rata participation in the Discount Rights Offering at $34.98 per share |
| **Existing Common Stockholders** | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of new common stock of reorganized Delphi at a purchase price of $45.00 per share | **Par Value Rights**<br>- Right to acquire approximately 12,711,111 shares of new common stock of reorganized Delphi at a purchase price of $41.58 per share |
| | **Warrants**<br>- Warrants to acquire an additional 5% of new common stock of reorganized Delphi at $45.00 per share exercisable for five years after emergence | **Warrants**<br>- Warrants to acquire $1.0 billion of new common stock of reorganized Delphi at $45.00 per share exercisable for six months after emergence |
| | **Direct Distribution**<br>- 1,476,000 shares of new common stock of reorganized Delphi | **No provision for Direct Distribution** |
| | **Discount Rights**<br>- Right to purchase 40,845,016 shares of new common stock of reorganized Delphi at a purchase price of $38.56 per share | **No provision for participation in Discount Rights Offering** |

The Potential Amendments do not affect the treatment of holders of claims arising from the Securities and ERISA litigation discussed further in Bankruptcy Related Litigation.  Under the Potential Amendments, such claim holders will receive distributions using Plan currency in the same form, ratio, and treatment as that which will be used to satisfy the holders of general unsecured claims.

Pursuant to an order entered by the Court on June 29, 2007, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended to and including December 31, 2007, and the Debtors' exclusivity period for soliciting acceptances of the Plan was extended to and including February 29, 2008.

<u>Equity Purchase and Commitment Agreement</u>

Delphi was party to (i) a Plan Framework Support Agreement (the "PSA") with Cerberus Capital Management, L.P. ("Cerberus"), Appaloosa, Harbinger, Merrill, UBS and GM, which outlined a framework for the Plan, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues and the corporate governance of reorganized Delphi, and (ii) an Equity Purchase and Commitment Agreement (the "Terminated EPCA") with affiliates of Cerberus, Appaloosa and Harbinger (the "Investor Affiliates"), as well as Merrill and UBS, pursuant to which these investors would invest up to $3.4 billion in reorganized Delphi.  Both the PSA and the

Terminated EPCA were subject to a number of conditions, including Delphi reaching consensual agreements with its U.S. labor unions and GM.

On April 19, 2007, Delphi announced that it anticipated negotiating changes to the Terminated EPCA and the PSA and that it did not expect that Cerberus would continue as a plan investor.  On July 7, 2007, pursuant to Section 12(g) of the Terminated EPCA, Delphi sent a termination notice of the Terminated EPCA to the other parties to the Terminated EPCA. As a result of the termination of the Terminated EPCA, a Termination Event (as defined in the PSA) occurred, and all obligations of the parties to the PSA under the PSA were immediately terminated and were of no further force and effect.  Delphi incurred no fees under the Terminated EPCA as a result of this termination.  On July 9, 2007, Delphi announced that it formally had terminated the Terminated EPCA and PSA and that it expected to enter into new framework agreements later in July.  Delphi also announced that these developments were not expected to prevent Delphi from filing the Plan and related documents with the Court prior to the current expiration of the company's exclusivity period or emerging from chapter 11 reorganization this year.

On July 18, 2007, Delphi announced that the Investors had submitted a proposal letter to Delphi to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan announced on March 31, 2006 and its Plan, on the terms and subject to the conditions contained in the form of equity purchase and commitment agreement attached to their proposal.  On August 2, 2007, the Court granted the Company's motion for an order authorizing and approving the EPCA, and on August 3, 2007 the Investors and the Company executed the EPCA.  On October 30, 2007, the Debtors announced they filed with the Court a motion seeking approval of the Proposed EPCA Amendment. The Proposed EPCA Amendment, has been agreed to by Appaloosa and a supermajority of the Investors; however, as noted above, the execution of the Proposed EPCA Amendment is subject to the satisfaction of various conditions set forth in the Proposal Letter, including (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors. As noted above, Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM.  Absent satisfaction or waiver of the conditions set forth in the Proposal Letter, the Investors will not be obligated to execute the Proposed EPCA Amendment, and absent execution of the Proposed EPCA Amendment, the GSA Amendment may be voidable by either GM or Delphi.

Under the terms and subject to the conditions of the EPCA, the Investors will commit to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, the Investors will commit to purchasing any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that will be made available to existing common stockholders (or to unsecured creditors under the terms of the Proposed EPCA Amendment, if such amendment is executed) subject to approval of the Court and satisfaction of other terms and conditions. The rights offering would commence following confirmation of the Company's Plan and conclude 30 days thereafter, prior to the Company's emergence from Chapter 11 reorganization.  Altogether, the Investors could invest up to $2.55 billion in the reorganized Company.

The EPCA is subject to the satisfaction or waiver of numerous conditions, including the condition that Appaloosa is reasonably satisfied with the terms of certain material transaction documents, including the Plan and disclosure statement, confirmation order, business plan, certain constituent documents, and labor agreements to the extent the terms thereof would have an impact on the Investors' proposed investment in the Company.  With respect to a settlement with GM, Appaloosa must also be satisfied in its reasonable discretion taking into account whether the GM settlement has a material impact on the Investors' proposed investment in the Company and other relevant factors.  There also must not have occurred any material strike or material labor stoppage or slowdown involving certain labor unions, including the UAW, at either Delphi or GM or any of their respective subsidiaries; or any strike, labor stoppage or slowdown involving certain labor unions, including the UAW, either at Ford Motor Company or Chrysler Group or at any of their respective subsidiaries that would have a material impact on the Investors' proposed investment in Delphi.  As noted below, several of these conditions will be modified pursuant to the Proposed EPCA Amendment, if such amendment is executed.

Delphi can terminate the EPCA in certain circumstances, including: subject to certain exceptions, if the Company agrees to engage in an alternative transaction or any time on or after March 31, 2008 if the Plan has not become effective.  An affiliate of Appaloosa can terminate the EPCA, including: at any time on or after March 31, 2008, if the Plan has not become effective; if the Company has changed its recommendation or approval of the transactions contemplated by the EPCA, the Plan terms or the settlement with GM in a manner adverse to the Investors or approved or recommended an alternative transaction; or if the Company has entered into any agreement, or taken any action to seek Court approval relating to any plan, proposal, offer or transaction, that is inconsistent with the EPCA, the Plan terms, the settlement with GM or the Plan.  In the event of certain terminations of the EPCA pursuant to the terms thereof, the Company may be obligated to pay the Investors $83 million plus certain transaction expenses in connection with an alternative investment transaction as described in the immediately following paragraph.

In exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company will pay an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company will pay an aggregate commitment fee of $18 million.  In addition, the Company will pay an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA.  The commitment and arrangement fees paid in installments, as follows: $14 million was paid during the third quarter of 2007 on the first business day following the first date that the approval order is issued by the Court, $21 million was paid during the third quarter of 2007 on the date that the disclosure statement was filed, and $29 million is to be paid on the first business day following the entry of an order by the Court approving the disclosure statement.  The Company is required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA is terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdraws its recommendation of the transaction or the Company willfully breaches the EPCA, and within the next 24 months thereafter, the Company then agrees to an alternative investment transaction.  The Company also has agreed to pay out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA.  In no event, however, shall the Company's aggregate liability under the EPCA, including any liability for willful breach, exceed $100 million on or prior to the Disclosure Statement Approval Date, or $250 million thereafter.

The EPCA also includes certain corporate governance provisions for the reorganized Company, each of which has been incorporated into Delphi's proposed Plan, which governance provisions would be unchanged by the Proposed EPCA Amendment.  The reorganized Company would be governed initially by a nine-member, classified Board of Directors consisting of the Company's Chief Executive Officer and President ("CEO"), and Executive Chairman, three members nominated by Appaloosa, three members nominated by the statutory creditors' committee, and one member nominated by the co-lead investor representative on a search committee with the approval of either the Company or the statutory creditors' committee.  As part of the new corporate governance structure, the current Company's Board of Directors along with the Investors, mutually recognized that Rodney O'Neal would continue as CEO of the reorganized Company.  Subject to certain conditions, six of the nine directors would be required to be independent from the reorganized Company under applicable exchange rules and independent of the Investors.

A five-member search committee will select the Company's post-emergence Executive Chairman, have veto rights over all directors nominated by the Investors and statutory committees, and appoint initial directors to the committees of the Company's Board of Directors. The search committee consists of John D. Opie, the Company's Board of Directors' lead independent director, a representative of each of the Company's two statutory committees and a representative from Appaloosa and one of the other co-investors (other than UBS, Goldman and Merrill).  Appaloosa, through its proposed preferred stock ownership, would have certain veto rights regarding extraordinary corporate actions such as change of control transactions and acquisitions or investments in excess of $250 million in any twelve-month period after issuance of the preferred stock

Executive compensation for the reorganized company must be on market terms, must be reasonably satisfactory to Appaloosa, and the overall executive compensation plan design must be described in the Company's disclosure statement and incorporated into the Plan.  The foregoing description of the EPCA does not purport to be complete and is qualified in its entirety by reference to the EPCA, which is filed as an exhibit to the quarterly report, for the quarter ended June 30, 2007.

The Proposed EPCA Amendment if executed, would revise a number of provisions in the EPCA to reflect events and developments since August 3, 2007 including those relating to Court approvals in connection with the Proposed EPCA Amendment; delivery of a revised and supplemented disclosure letter by the Company; delivery of a revised business plan by the Company;  updates and revisions to representations and warranties; agreements with principal labor unions; and the execution and amendment of the GSA and MRA.  The Proposed EPCA Amendment if executed, would amend provisions of the EPCA relating to the discount rights offering (including the replacement of existing common stockholders with unsecured creditors and the provision of over-subscription rights); and to reflect the issuance of Series C Preferred Stock to be issued to GM.

The Proposed EPCA Amendment if executed, would remove or narrow the scope of certain conditions to closing, including: the no-strike conditions, to include only strikes that occur after October 29, 2007; the capitalization condition to reduce the net debt required for the Company on the closing date; and to exclude from the condition relating to the approval of material investment documents, numerous documents which have already been delivered by the Company to the Investors such as the Plan, the disclosure statement, the MRA and GSA and the business plan.  However, certain conditions to closing would be added by the Proposed EPCA Amendment, if such amendment is executed, such as those requiring: release and exculpation of each Investor as set forth in the Proposed EPCA Amendment; that the Company will have undrawn availability of $1.4 billion including a letter of credit carve out of at least $100 million; that the Company shall have demonstrated and certificated, to the reasonable satisfaction of ADAH, that its pro forma interest expense during 2008 on the Company's indebtedness will not exceed $575 million; that certain PBGC liens are withdrawn; and that the aggregate amount of trade and unsecured claims be no more than $1.45 billion (subject to certain waivers and exclusions).

There can be no assurances that the Debtors will be successful in achieving their objectives and as discussed above, Delphi cannot provide any assurances as to whether or when the Proposed EPCA Amendment will be executed and, if in fact is executed, whether there will be further changes in addition to those described herein. The Debtors' ability to achieve their objectives is conditioned, in most instances, on the approval of the Court and the support of their stakeholders, including GM and the Debtors' labor unions. In accordance with U.S. GAAP, the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Plan, such as the U.S. labor agreements, the GSA, and the MRA become effective. The Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from bankruptcy, among others. Such adjustments will have a material impact on Delphi's financial statements.

**DASE Liquidation**

Delphi's Chapter 11 Filings related solely to its U.S. operations because Delphi's operations outside the United States generally are profitable and have positive cash flow. Nevertheless, Delphi has been seeking and will continue to seek to optimize its manufacturing footprint to lower its overall cost structure by focusing on strategic product lines where it has significant competitive and technological advantages and selling or winding down non-core product lines. In particular, in February 2007, Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain. The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006. The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity. In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso, which provides DASE support by managing the process of closing the Puerto Real site in Cadiz, Spain in accordance with applicable Spanish law. The Spanish court subsequently appointed three receivers of DASE (the "DASE Receivers"). During the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to the separation allowance with the unions representing the affected employees. On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million (then approximately $161 million) for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan"). Delphi concluded that it was in its best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million (then approximately $14 million) for the purpose of funding payment of the claims of DASE's other creditors.

As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of the DASE Receivers, Delphi no longer possesses effective control over DASE and has de-consolidated the financial results of DASE effective April 2007. The total year-to-date expense through September 30, 2007 associated with the exit of the Puerto Real site in Cadiz, Spain is approximately $268 million, of which $61 million was recorded in the first quarter of 2007 ($30 million in the Steering segment and $31 million in the Automotive Holdings segment) and approximately $207 million was recorded in the second quarter 2007 ($77 million in the Steering segment and $130 million in the Automotive Holdings segment) as a component of cost of sales.

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements. During the three and nine months ended September 30, 2007, the Debtors received approximately $47 million and $77 million ,

respectively, of dividends from non-debtor allied affiliates which are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in Other income (expense), net.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim.  During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi shall be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through December 31, 2007.  During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims.  The accrued interest payable of $369 million is included in accrued liabilities on the accompanying balance sheet

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi.  The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $321 million and were recorded as a wage asset and liability.  At September 30, 2007, $88 million was recorded in other current assets and $231 million was recorded in other long-term assets in the accompanying balance sheet, net of $2 million of amortization expense recorded in the third quarter of 2007.  Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| | (in millions) | | | |
| Net sales | $ 3,681 | $ 3,883 | $11,862 | $13,236 |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 3,809 | 4,239 | 12,047 | 13,496 |
| U.S. employee workforce transition program charges | 244 | 1,043 | 238 | 2,948 |
| Depreciation and amortization | 125 | 166 | 422 | 497 |
| Long-lived asset impairment charges | 17 | — | 212 | — |
| Selling, general and administrative | 270 | 260 | 791 | 787 |
| Securities & ERISA litigation charge | 21 | — | 353 | — |
| Total operating expenses | 4,486 | 5,708 | 14,063 | 17,728 |
| Operating loss | (805) | (1,825) | (2,201) | (4,492) |
| Interest expense (contractual interest expense for the three and nine months ended September 30, 2007 was $108 million and $326 million, respectively, and for the three and nine months ended September 30, 2006 was $137 million and $397 million, respectively) | (444) | (105) | (596) | (283) |
| Loss on extinguishment of debt | — | — | (23) | — |
| Other income (expense), net | 50 | (4) | 84 | (8) |
| Loss before reorganization items, income taxes, equity income, and cumulative effect of accounting change | (1,199) | (1,934) | (2,736) | (4,783) |
| Reorganization items | (32) | (17) | (98) | (42) |
| Loss before income tax expense, equity income, and cumulative effect of accounting change | (1,231) | (1,951) | (2,834) | (4,825) |
| Income tax (expense) benefit | (4) | 6 | (28) | — |
| Loss before equity income and cumulative effect of accounting change | (1,235) | (1,945) | (2,862) | (4,825) |
| Equity income (loss) from non-consolidated affiliates, net of tax | 8 | (5) | 30 | 21 |
| Equity income (loss) from non-Debtor affiliates, net of tax | 58 | (23) | 309 | 190 |
| Loss before cumulative effect of accounting change | (1,169) | (1,973) | (2,523) | (4,614) |
| Cumulative effect of accounting change | — | — | — | 3 |
| Net loss | $(1,169) | $(1,973) | $(2,523) | $(4,611) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | September 30, 2007 (Unaudited) | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 107 | $ 376 |
| Restricted cash | 123 | 107 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,628 | 1,739 |
| Other third parties | 885 | 906 |
| Non-Debtor affiliates | 258 | 328 |
| Notes receivable from non-Debtor affiliates | 289 | 346 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 854 | 938 |
| Finished goods | 260 | 263 |
| Other current assets | 408 | 290 |
| Total current assets | 4,812 | 5,293 |
| Long-term assets: | | |
| Property, net | 1,784 | 2,240 |
| Investments in affiliates | 372 | 366 |
| Investments in non-Debtor affiliates | 4,026 | 3,273 |
| Goodwill | 152 | 152 |
| Other intangible assets, net | 27 | 36 |
| Other | 546 | 344 |
| Total long-term assets | 6,907 | 6,411 |
| Total assets | $ 11,719 | $ 11,704 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $ 3,226 | $ 2,742 |
| Notes payable to non-Debtor affiliates | 65 | — |
| Accounts payable | 1,266 | 1,108 |
| Accounts payable to non-Debtor affiliates | 707 | 434 |
| Accrued liabilities | 1,446 | 1,250 |
| Total current liabilities not subject to compromise | 6,710 | 5,534 |
| Long-term liabilities not subject to compromise: | | |
| Employee benefit plan obligations and other | 1,136 | 737 |
| Liabilities subject to compromise | 16,992 | 17,488 |
| Total liabilities | 24,838 | 23,759 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (13,119) | (12,055) |
| Total liabilities and stockholders' deficit | $ 11,719 | $ 11,704 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (682) | $ (582) |
| Cash flows from investing activities: | | |
| Capital expenditures | (171) | (229) |
| Proceeds from sale of property | 13 | 23 |
| Proceeds from divestitures | 62 | — |
| Increase in restricted cash | (12) | (101) |
| Other, net | (10) | (22) |
| Net cash used in investing activities | (118) | (329) |
| Cash flows from financing activities: | | |
| Proceeds from refinanced debtor-in-possession facility | 2,739 | — |
| Repayments of borrowings under debtor-in-possession facility | (250) | — |
| (Repayments of) proceeds from prepetition revolving credit facility, net | (1,508) | 2 |
| Repayments of borrowings under prepetition term loan facility | (988) | — |
| Net borrowings under refinanced debtor-in-possession facility | 480 | — |
| Repayments under cash overdraft | — | (29) |
| Repayments of borrowings under other debt agreements | (7) | (9) |
| Net proceeds from borrowings from Non-Debtor affiliates | 65 | — |
| Net cash provided by (used in) financing activities | 531 | (36) |
| Decrease in cash and cash equivalents | (269) | (947) |
| Cash and cash equivalents at beginning of period | 376 | 1,361 |
| Cash and cash equivalents at end of period | $ 107 | $ 414 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed.  The Debtors' reorganization items consist of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| | (in millions) | | | |
| Professional fees directly related to reorganization | $ 41 | $ 41 | $ 128 | $ 108 |
| Interest income | (2) | (16) | (8) | (47) |
| Gain on settlement of prepetition liabilities | — | — | — | (3) |
| Total Reorganization Items | $ 39 | $ 25 | $ 120 | $ 58 |

For the nine months ended September 30, 2007 and 2006, reorganization items resulted in $9 million and $53 million, respectively, of cash received entirely related to interest income and $100 million and $84 million, respectively, of cash paid for professional fees.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Company's debtor-in-possession credit facilities (both the one in effect during the nine months ended September 30, 2006 and the refinanced credit facility currently in effect) and prepetition credit facility, the unions, and other professional fees directly related to the reorganization.

## 4. ACQUISITIONS AND DIVESTITURES

### Catalyst Product Line Sale

On June 5, 2007, Delphi entered into an agreement with Belgium-based Umicore and certain of its affiliates (collectively, "Umicore") for the sale of Delphi's global original equipment and aftermarket catalyst business (the "Catalyst Business") which is included in Delphi's Powertrain Systems segment for a purchase price of $56 million, subject to adjustments. The Catalyst Business revenues were $260 million in 2006 and $249 million for the nine month period ended September 30, 2007. On August 8, 2007, in accordance with bidding procedures approved by the Court, Delphi conducted an auction and selected Umicore as the successful bidder with a revised purchase price of $75 million. On August 16, 2007, Delphi received approval from the Court to proceed with the sale of the Catalyst Business to Umicore and the assets of the Catalyst Business were deemed held for sale in accordance with SFAS 144. As discussed in Note 6. Long-Lived Asset Impairment, the carrying value of certain of the assets of the Catalyst Business were previously impaired and adjusted to their fair value under the "held for use" provision of SFAS 144. On September 28, 2007, Delphi closed on the sale of the Catalyst Business to Umicore for approximately $67 million which included certain post-closing working capital adjustments. Delphi recorded the loss of $30 million on the sale of the Catalyst Business in cost of sales in the third quarter of 2007.

### Global Battery Product Line Sale

On June 30, 2005, Delphi reached final agreement to sell its global battery product line, with the exception of two U.S. operations, to Johnson Controls Inc. ("JCI"). Delphi's 2005 sale of its global battery product line, with the exception of the two U.S. operations, to JCI contemplated a future possible transfer of certain of the operating assets of Delphi's New Brunswick, New Jersey manufacturing facility (the "New Brunswick Facility"), which was one of the remaining U.S. plants supplying batteries to JCI under a manufacturing supply agreement. In connection with the anticipated transfer of its New Brunswick operations to JCI, on May 25, 2006, Delphi entered into an agreement with the IUE-CWA and its Local 416, which included an attrition plan with respect to the hourly employees of the New Brunswick Facility (the "Attrition Plan"). On August 1, 2006, Delphi sold JCI certain assets related to the New Brunswick Facility free and clear of liens, claims, and encumbrances in exchange for JCI's payment to Delphi of $1 plus approximately $4 million for certain inventory, and Delphi implemented the Attrition Plan. Pursuant to the May 2006 agreement, Delphi agreed to the continuation and transition of supply of battery products to JCI from Delphi's remaining U.S. battery manufacturing facility located in Fitzgerald, Georgia ("Fitzgerald") pursuant to a component supply agreement entered into in connection with the initial sale in 2005. The sale of the New Brunswick Facility resulted in a loss of approximately $1 million, which was recorded in cost of sales. JCI paid Delphi approximately $13 million to reimburse Delphi for a significant portion of the amounts to be spent under the Attrition Plan, which was recorded as a reduction to U.S. employee workforce transition program charges.

In August 2006, Delphi received approximately $10 million as agreed upon in the 2005 agreement between Delphi and GM, the principal battery customer, which was executed in connection with the sale of Delphi's global battery business. $6 million was recognized as a reduction of costs, with approximately $4 million recorded as a reduction of cost of sales and approximately $2 million recorded as a reduction to U.S. employee workforce transition program charges. Approximately $4 million was recorded as deferred income as it related to future price reductions on batteries produced at Fitzgerald and the transition of battery supply from Fitzgerald to JCI.

On June 29, 2007, Delphi ceased production at Fitzgerald, the remaining U.S. battery manufacturing facility, and closed the facility in July 2007. The 2005 agreement between Delphi and GM, the principal battery customer, stipulated payment of $6 million to Delphi upon completion of the transition of the supply of battery products to JCI. Delphi received this $6 million payment in August 2007, which was recorded as a reduction to cost of sales in the third quarter of 2007.

### Other Acquisitions and Divestitures

On September 28, 2007, Delphi closed on the sale of substantially all of the assets exclusively used in the brake hose product line produced at one of Delphi's manufacturing sites located in Dayton, Ohio (the "Brake Hose Business"). The sales price for the Brake Hose Business was $10 million and the sale resulted in a gain of $2 million, which was recorded as a reduction to cost of sales in the third quarter of 2007. On July 19, 2007, Delphi received approval from the Court to proceed with the sale of certain assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") for $15 million. The sale of the Mexico Brake Plant Business closed on October 1, 2007. The Brake Hose Business and the Mexico Brake Plant Business aggregate revenues were $280 million in 2006 and $179 million for the nine month period ended September 30, 2007. Delphi expects the gain or loss on sale of the Mexico Brake Plant Business will not significantly impact Delphi's results of operations in the fourth quarter of 2007.

In the second quarter 2006, Delphi's Thermal Systems division made an additional investment in Shanghai Delphi Automotive Air Conditioning Co. ("SDAAC") for approximately $14 million, which increased its equity ownership interest in SDAAC from 34 percent to 50 percent.  SDAAC's annual revenues for 2005 were approximately $133 million.  In the third quarter of 2006, Delphi obtained a controlling management interest in SDAAC and began consolidating the entity.  Prior to obtaining a controlling management interest, the entity was accounted for using the equity method.

Also in the third quarter of 2006, Delphi's Electronics and Safety division sold certain of its assets in MobileAria, a consolidated entity, which resulted in a gain of $7 million which was recognized as a reduction of cost of sales.

The results of operations associated with the acquisitions and divestitures and the gain or loss on the divestitures were not significant to the consolidated financial statements in any period presented.

## 5. INCOME TAXES

Effective January 1, 2007, Delphi adopted the provisions of FIN 48.  FIN 48 prescribes a recognition threshold and measurement attribute for the accounting and financial statement disclosure of tax positions taken or expected to be taken in a tax return.  The evaluation of a tax position is a two-step process.  The first step requires an entity to determine whether it is more likely than not that a tax position will be sustained upon examination based on the technical merits of the position.  The second step requires an entity to recognize in the financial statements each tax position that meets the more likely than not criteria, measured at the largest amount of benefit that has a greater than fifty percent likelihood of being realized.  FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

As a result of the adoption of FIN 48 as of January 1, 2007, Delphi recognized an $18 million increase, primarily in its long-term liabilities, with a corresponding increase to its accumulated deficit.  As of the adoption date, Delphi had recorded liabilities for unrecognized tax benefits of $95 million (including interest and penalties of $25 million) of which $71 million, if recognized, would impact the effective tax rate.  Delphi recognizes interest and penalties accrued related to unrecognized tax benefits in tax expense.

Delphi considers it is reasonably possible that approximately $10 million of unrecognized tax benefits could be recognized over the next twelve months due to expiring statutes of limitations in various foreign jurisdictions which may be offset in whole or in part by the results of various income tax examinations.

Delphi files U.S. and state income tax returns as well as income tax returns in several foreign jurisdictions.  Foreign taxing jurisdictions significant to Delphi include China, Mexico, Germany, France and Brazil.  In the U.S., federal income tax returns for years prior to 2006 have been effectively settled.  The examination of Delphi's 2006 U.S. federal tax return is expected to be completed during 2007. With respect to foreign taxing jurisdictions significant to Delphi, Delphi's affiliates are no longer subject to income tax examinations by foreign tax authorities for years before 2000. In addition, open tax years related to various states remain subject to examination but are not considered to be material.

In the third quarter of 2006, Delphi recorded valuation allowances of $36 million for the net deferred tax assets of certain non-U.S. operations, primarily operations in Spain, Portugal and Romania.  Delphi determined based on historical losses and expected future taxable income (loss) that it was no longer more likely than not that these net deferred tax assets would be realized.  During the third quarter of 2007, Delphi reduced the valuation allowance by net $11 million, for deferred tax assets of certain non-US operations, primarily operations in Poland, offset by increases in Germany and Mexico.

## 6. LONG-LIVED ASSET IMPAIRMENT

In accordance with SFAS 144, Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets.  Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets.  The fair value of the assets was determined based on the "held for use" classification in accordance with SFAS 144.  Delphi may incur significant impairment charges or losses on divestitures upon these assets being classified as "held for sale."

As previously disclosed, Delphi's Steering segment has been identified as a non-core product line, and Delphi is negotiating the disposition and sale of this business.  Due to various factors, including the current Court proceedings, long-lived assets of Delphi's Steering segment are accounted for as held-for-use under the provisions of SFAS 144.

Based on the ongoing sale and labor negotiations during March 2007, previous estimates of sale proceeds were reduced. Based on this development Delphi determined that an indicator of impairment was present for its Steering segment U.S. long-lived assets. Delphi tested the recoverability of the Steering segment U.S. long-lived assets by comparing the estimated undiscounted future cash flows from its use and anticipated disposition of those assets to their carrying value. Based on its recoverability assessment, Delphi determined that the carrying value of its Steering assets at its U.S. sites exceeded the undiscounted estimated future cash flows at those sites. Accordingly, Delphi determined the fair value of its held-for-use long-lived assets at those sites by applying various valuation techniques, including discounted cash flow analysis, replacement cost and orderly liquidation value. As a result of its fair value assessment, Delphi recognized asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering segment of $152 million in the first quarter of 2007, which reduced the carrying value of the Steering segment long-lived assets to $380 million.

Delphi's Sandusky, Ohio facility wheel bearing business in the Automotive Holdings Group segment ("Sandusky") was identified as a non-core product line, and Delphi is negotiating the disposition and sale of this business. In June 2007, Delphi reassessed its estimated net proceeds from disposition based on an agreement with GM to provide funding for the necessary capital investment for new programs awarded to Sandusky and to share in subsequent sales proceeds. Based on the new business award, incremental investment requirement, and the proceeds sharing agreement with GM, there was a change in expected future cash flows and a reduction in the amount of expected proceeds anticipated from a sale causing an indication of impairment. Based on testing methodology similar to that used for the Steering segment described above, Delphi determined that the carrying value of its Sandusky facility exceeded the undiscounted estimated future cash flows and consequently recognized an impairment charge of $26 million related to the valuation of long-lived assets held-for-use in the second quarter of 2007. This charge reduced the carrying value of the Sandusky site to approximately $70 million as of June 30, 2007.

In addition, Delphi recognized $7 million of long-lived asset impairment for the Catalyst Business in the Powertrain Systems segment in the second quarter of 2007, which was caused by a deterioration in the estimated future cash flows through the expected sale date. The Catalyst Business was sold during the third quarter of 2007, refer to Note 4. Acquisitions and Divestitures.

During the third quarter of 2007, Delphi recognized $13 million of long-lived asset impairment related to two plants in Delphi's Automotive Holdings segment. These impairments were caused by a deterioration in the expected net proceeds resulting from the use and ultimate sale of these assets.

Delphi recognized $10 million and $24 million of other long-lived asset impairment charges for operations in various segments in the three and nine months ended September 30, 2007. The total long-lived asset impairment charges for the three and nine months ended September 30, 2007 were $23 million and $222 million, respectively. Refer to Note 16. Segment Reporting for long-lived asset impairment by segment.

## 7. WEIGHTED AVERAGE SHARES

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in the nine months ended September 30, 2007 and 2006, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in thousands) | | | |
| Weighted average shares outstanding | 561,782 | 561,782 | 561,782 | 561,782 |
| Effect of dilutive securities | — | — | — | — |
| Diluted shares outstanding | 561,782 | 561,782 | 561,782 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in thousands) | | | |
| Anti-dilutive securities | 68,873 | 77,826 | 68,873 | 77,826 |

## 8. LIABILITIES

Accrued liabilities consisted of the following:

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Payroll related obligations | $ 288 | $ 268 |
| Employee benefits, including current pension obligations | 167 | 216 |
| Accrued income taxes | 167 | 142 |
| Taxes other than income | 180 | 144 |
| Warranty obligations (Note 9) | 253 | 214 |
| U.S. Employee Workforce Transition Program Charges (Note 12) | 320 | 626 |
| Manufacturing plant rationalization | 195 | 154 |
| Interest (Note 1) | 383 | 29 |
| Other | 442 | 418 |
| Total | $2,395 | $2,211 |

Other long-term liabilities consisted of the following:

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Employee benefits | $ 303 | $ 282 |
| Environmental | 120 | 116 |
| U.S. Employee Workforce Transition Program Charges (Note 12) | 298 | 204 |
| Extended disability benefits | 102 | 95 |
| Warranty obligations (Note 9) | 316 | — |
| Other | 216 | 162 |
| Total | $1,355 | $ 859 |

## 9. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the nine months ended September 30, 2007:

| | September 30, 2007 |
|---|---|
| | (in millions) |
| Accrual balance at beginning of year | $ 388 |
| Provision for estimated warranties | 264 |
| Settlements made during the period (in cash or in kind) | (88) |
| Foreign currency translation and other | 5 |
| Accrual balance at end of period | $ 569 |

Approximately $253 million and $214 million of the warranty accrual balance as of September 30, 2007 and December 31, 2006, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $316 million of the warranty accrual balance as of September 30, 2007 is included in other long-term liabilities and approximately $174 million of the warranty accrual balance as of December 31, 2006 is included in liabilities subject to compromise (refer to Note 10. Liabilities Subject to Compromise). During the third quarter of 2007 with the filing of Delphi's Plan on September 6, 2007, Delphi determined that the warranty claims previously included in liabilities subject to compromise would be resolved in the ordinary course of business outside of the Court and were therefore not subject to compromise, including

amounts that were addressed in the warranty settlement agreement reached with GM discussed further in Note 17. Commitments and Contingencies, Ordinary Business Litigation.  During the second quarter of 2007, Delphi recorded an increase to warranty reserves in the amount of $91 million for a range of specific GM warranty claims, primarily in the Automotive Holdings Group and Powertrain Systems segments.  Of the $264 million provision for estimated warranties reflected above, approximately $124 million was recorded during the third quarter of 2007 which included a $93 million increase to warranty reserves for specific warranty claims related to the Powertrain Systems segment.

## 10. LIABILITIES SUBJECT TO COMPROMISE

    As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' Plan.  Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy.  Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals.

    The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, the Debtors may reject prepetition executory contracts and unexpired leases with respect to the Debtors' operations, with the approval of the Court.  Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise.  The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases.  To date, the Debtors have received approximately 16,700 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $37 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.  As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. The Debtors believe that many of these claims are duplicative, based on contingencies that have not occurred, or are otherwise overstated, and are therefore invalid.  As a result, the Debtors believe that the aggregate amount of claims filed with the Court will likely exceed the amount that ultimately will be allowed by the Court.  As of September 30, 2007 the Debtors have filed twenty-one omnibus claims objections that objected to claims on procedural or substantive grounds.  Pursuant to these claims objections, the Debtors have objected to approximately 13,400 proofs of claim which asserted approximately $10.4 billion in aggregate liquidated amounts plus additional unliquidated amounts.  To date, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,400 of those claims, which orders reduced the amount of asserted claims by approximately $9.6 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order modifying approximately 3,000 claims reducing the aggregate amounts asserted on those claims from $476 million to $410 million, which amounts are subject to further objection by the Debtors at a later date on any basis.  The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled.  The determination of how liabilities will ultimately be settled and treated cannot be made until the Court approves a chapter 11 plan of reorganization.  In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete.  Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.  Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

    Liabilities subject to compromise consist of the following:

|  | September 30, 2007 | December 31, 2006 |
| --- | --- | --- |
|  | (in millions) | |
| Pension obligations (Note 13) | $    3,323 | $    4,257 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,410 | 9,109 |
| Debt and notes payable | 2,046 | 2,054 |
| Accounts payable | 751 | 754 |
| Junior subordinated notes due 2033 | 391 | 391 |
| Prepetition warranty obligation (Note 9) | — | 174 |
| GM claim for U.S. employee workforce transition programs | 312 | 315 |
| Securities & ERISA litigation liability (Note 17) | 361 | 8 |

| | | |
|---|---|---|
| Other ............................................................................................... | 320 | 354 |
| Total Liabilities Subject to Compromise ............................................. | $ 16,914 | $ 17,416 |

Pursuant to the Plan filed on September 6, 2007, warranty and environmental claims were determined to be settled in the ordinary course of business and are no longer subject to compromise. Such amounts were reclassified from liabilities subject to compromise to accrued liabilities and other long-term liabilities during the third quarter of 2007. Refer to Note 8. Liabilities.

## 11. DEBT

On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion. On January 9, 2007, Delphi refinanced its prepetition and postpetition credit facilities obligations by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan", and together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan"). The Refinanced DIP Credit Facility was obtained to refinance both the $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 21, 2005 (as amended, the "Amended DIP Credit Facility") and the approximate $2.5 billion outstanding on its $2.8 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility"). The Refinanced DIP Credit Facility will expire on the earlier of December 31, 2007 and the date of the substantial consummation of a reorganized plan that is confirmed pursuant to an order of the Court. As noted below, Delphi is discussing an amendment with its lenders to extend the term of the facility.

The Refinanced DIP Credit Facility carries an interest rate at the option of Delphi of either the Administrative Agent's Alternate Base Rate plus (i) with respect to Tranche A borrowings, 1.50%, (ii) with respect to Tranche B borrowings, 1.25%, or (iii) with respect to Tranche C borrowings, 1.75%, or the London Interbank Borrowing Rate ("LIBOR"), plus (x) with respect to Tranche A borrowings, 2.50%, (y) with respect to Tranche B borrowings, 2.25%, and (z) with respect to Tranche C borrowings, 2.75%. The interest rate period can be set at a two-week or one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility. Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of January 9, 2007, both the Refinanced DIP Credit Facility $250 million Tranche B Term Loan and approximately $2.5 billion Tranche C Term Loan were funded. As of September 30, 2007, total available liquidity under the Refinanced DIP Credit Facility was approximately $850 million. Also as of September 30, 2007, there was $480 million outstanding under the Revolving Facility and the Company had $263 million in letters of credit outstanding under the Revolving Facility as of that date, including $150 million related to the letters of credit provided to the PBGC discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is only pledging 65% of the stock of its first-tier non-U.S. subsidiaries) and further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession.

The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Refinanced DIP Credit Facility commitment at September 30, 2007. Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).

The Refinanced DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets do not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on November 30, 2007, at the levels set forth in the Refinanced DIP Credit Facility.

The Refinanced DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Refinanced DIP Credit Facility covenants at September 30, 2007.

On March 29, 2007, Delphi entered into the First Amendment to the Refinanced DIP Credit Facility (the "First Amendment"). The First Amendment provides for an amended definition of Global EBITDAR, the addition of a two-week LIBOR interest election option and amended monthly Global EBITDAR covenant levels. The amended definition of Global EBITDAR provides for the removal of cash payment limits in respect of restructuring costs from the definition.

On September 27, 2007, Delphi entered into the Second Amendment to the Refinanced DIP Credit Facility (the "Second Amendment"). The Second Amendment provides for an extension of the expiration date of any Letter of Credit (as defined in the Refinanced DIP Credit Facility) issued on behalf of Delphi or any of its subsidiaries to the earlier of (i) one year after the date of the issuance of such Letter of Credit (or any renewal or extension thereof) and (ii) 365 days after the Maturity Date (as defined in the Refinanced DIP Credit Facility; such 365th day being the "LC Outside Date"). As originally drafted, clause (ii) of the Refinanced DIP Credit Facility provided for expiration of a Letter of Credit 180 days after the Maturity Date. The amendment also provides certain collateral security mechanisms to ensure Delphi's reimbursement of obligations in connection with the renewal or extension of any Letter of Credit beyond the LC Outside Date.

Delphi is currently working with the Administrative Agent (as defined in the Refinanced DIP Credit Facility) and the Required Lenders (as defined in the Refinanced DIP Credit Facility) under the Refinanced DIP Credit Facility to enter into a third amendment to the Refinanced DIP Credit Facility. By such amendment, Delphi seeks to extend the facility until June 30, 2008 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court, with the ability to further extend the maturity to September 30, 2008 under certain conditions. Delphi expects that the amendment will become effective in November 2007.

Concurrent with the entry into the Refinanced DIP Credit Facility, the Amended DIP Credit Facility and the Prepetition Facility were terminated. The proceeds of the Tranche B Term Loan and Tranche C Term Loan were used to extinguish amounts outstanding under the Amended DIP Credit Facility and the Prepetition Facility. Delphi incurred no early termination penalties in connection with the termination of these agreements. However, as a result of the changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $25 million of unamortized debt issuance and discount costs related to the Amended DIP Credit Facility and Prepetition Facility in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt as these fees relate to the refinancing of the term loans and $2 million was recognized as interest expense as these fees relate to the refinancing of the revolving credit facility. Refer to Note 14. Debt, to the consolidated financial statements in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006 for additional information on the Amended DIP Credit Facility.

## 12. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

### 2007 Workforce Transition Programs

On June 22, 2007, Delphi, GM, and the UAW signed the UAW settlement agreement which included a workforce transition program for eligible UAW employees (the "UAW Workforce Transition Program"). Included in the UAW Workforce Transition Program is an attrition program similar to the U.S. employee special attrition programs offered in June 2006. The attrition program in the UAW Workforce Transition Program offers certain eligible Delphi employees the following options: (i) normal and early voluntary retirements with a lump sum incentive payment of $35,000, (ii) a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service are granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments which, depending on the amount of seniority or credited service, range from $70,000 to $140,000. The UAW Workforce Transition Program also offers the following options: (i) flowback rights to eligible Delphi employees as of the date of the filing of Delphi's bankruptcy petition who do not elect the attrition options, including a relocation allowance of up to $67,000 in certain circumstances when plants cease production, (ii) buy-down payments totaling up to $105,000 for eligible traditional employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iii) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (iv) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to September 14, 2011.

On August 5, 2007, Delphi, GM and the IUE-CWA signed the IUE-CWA settlement agreement, which included a workforce transition program for eligible IUE-CWA employees (the "IUE-CWA Workforce Transition Program") and included an attrition program similar to the 2006 U.S. employee special attrition programs. The attrition program in the IUE-CWA Workforce Transition Program is similar to the attrition program included in the UAW Workforce Transition Program except that the buyout payments based on seniority or credited service range from $40,000 to $140,000. The IUE-CWA Workforce Transition Program also offers the following options: (i) special employee placement opportunities with GM for eligible Delphi employees who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (ii) provision of buy-down payments totaling up to $125,000 for eligible employees who do not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA settlement agreement, and (iii) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to October 12, 2011.

On July 31 and August 1, 2007, Delphi and GM signed settlement agreements with the IAM, IBEW, IUOE Local 18S, IUOE Local 101S, and IUOE Local 832S (collectively the "Splinter Unions"). With the exception of the IUOE Local 101S Agreement, these Splinter Union settlement agreements included workforce transition programs (the "Splinter Unions Workforce Transition Program") and included attrition programs similar to the attrition program included in the IUE-CWA Workforce Transition Program. The Splinter Unions Workforce Transition Program also offers options of buy-down payments totaling up to $10,000 for eligible employees or severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011.

On August 16, 2007, Delphi, GM and the USW signed the USW settlement agreements, which included certain workforce transition options for eligible USW employees at the Home Avenue and Vandalia operations similar to certain options presented in the IUE-CWA Workforce Transition Program.

As of September 30, 2007, approximately 310 of the 3,700 eligible UAW-represented employees, approximately 190 of the 1,300 eligible IUE-CWA-represented employees, approximately 165 of the 800 eligible USW-represented employees, and approximately 60 of the 100 eligible Splinter Union-represented employees elected to participate in the attrition programs. Delphi recorded charges for the attrition programs of approximately $67 million in U.S. employee workforce transition program charges during the third quarter of 2007. These charges are included in the U.S. employee workforce transition program liability included in current liabilities in the consolidated balance sheet. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $321 million and were recorded as a wage asset and liability. At September 30, 2007, of which $88 million was recorded in Other current assets and $231 million was recorded in Other long-term assets in the accompanying balance sheet, net of $2 million of amortization expense recorded in the third quarter of 2007. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts*", the wage asset will be amortized over the life of the union workforce transition programs. The corresponding wage liability will be reduced as buy-down payments are made. Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of September 30, 2007. GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions. Therefore, as of September 30, 2007, Delphi has recorded a receivable from GM in the amount of $2 million. Pension curtailment charges related to the Delphi Hourly-Rate Employee' Pension Plan of $59 million resulted from the workforce transition programs and were recorded in U.S. employee workforce transition program charges, along with $116 million of pension curtailment losses related to the Delphi Retirement Program for Salaried Employees. The hourly and salaried pension curtailment charges are discussed further in Note 13. Pension and Other Postretirement Benefits. Finally, costs related to severance payments and supplemental unemployment benefits for U.S. employees at sites that will be sold or wound down in accordance with the workforce transition programs were recorded in the amount of $48 million in cost of sales.

**2006 Attrition Programs**

On March 22, 2006, Delphi, GM and the UAW agreed on a special attrition program (the "UAW Special Attrition Program"), and on May 12, 2006, the Court entered the final order approving Delphi's entry into the program with certain modifications. Delphi, GM, and the UAW agreed on a supplemental agreement on June 5, 2006 (the "UAW Supplemental Agreement") to the UAW Special Attrition Program which was approved by the Court by order entered on July 7, 2006 approving the motion (collectively, the UAW Special Attrition Program and UAW Supplemental Agreement are referred to herein as the "UAW Attrition Programs"). The UAW Attrition Programs offered, among other things, certain eligible Delphi U.S. hourly employees represented by the UAW normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The programs also provided a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service were granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they would be eligible to retire without additional incentives. The programs also provided buyout payments which, depending on the amount of seniority or credited service, ranged from $70,000 to $140,000.

GM has agreed to reimburse Delphi for one-half of these buyout payments and in exchange will receive an allowed prepetition general unsecured claim. In addition, employees who elected to participate in the UAW Attrition Programs were eligible to retire as employees of Delphi or flow back to GM and retire. During 2006, approximately 10,000 employees elected to flow back to GM and retire. Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for the actual costs of providing such coverage. As of September 30, 2007, Delphi's receivable from GM for these costs was $5 million.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the UAW Attrition Programs. The lump sum incentive payments of $35,000 per eligible employee and one-half of the $40,000 to $140,000 buyout payments are being paid by Delphi and reimbursed by GM. GM will receive an allowed prepetition general unsecured claim equal to the amount it reimburses Delphi for the buyout payments. The IUE-CWA special attrition program (the "IUE-CWA Special Attrition Program") was approved by the Court by order entered on July 7, 2006.

As discussed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2006, Delphi recorded special termination benefit charges of approximately $1,117 million during the year ended December 31, 2006, for the pre-retirement and buyout portions of the cost of the U.S. employee workforce transition programs. Since GM will receive an allowed prepetition general unsecured claim for its 50% share of the financial responsibility of the buyout payments, Delphi expensed 100% of the buyout payments. During the first quarter of 2007, Delphi reversed $6 million of termination benefit charges due to a change in estimate.

The following table represents the changes in the U.S. employee workforce transition program liability during the nine months ended September 30, 2007:

| U.S. Employee Workforce Transition Program Liability | Special Termination Benefit (in millions) |
|---|---|
| Balance at December 31, 2006 | $    830 |
| U.S. employee workforce transition program charges | 61 |
| Lump sum incentive obligation | 2 |
| Payments | (571) |
| Pension and other postretirement benefits (Note 13) | (39) |
| Other | 14 |
| Balance at September 30, 2007 | $    297 |

Approximately $205 million and $92 million of the U.S. employee workforce transition program liability is included in accrued liabilities and other long-term liabilities, respectively, in the consolidated balance sheet as of September 30, 2007.

The following table details changes in the GM accounts receivable balance attributable to the U.S. employee workforce transition programs during the nine months ended September 30, 2007, recorded in General Motors and affiliates accounts receivable in the accompanying consolidated balance sheet at September 30, 2007:

| U.S. Employee Workforce Transition Program - GM Accounts Receivable | (in millions) |
|---|---|
| Balance at December 31, 2006 | $    272 |
| Amount reimbursable from GM | 2 |
| Receipts from GM | (265) |
| Other | (7) |
| Balance at September 30, 2007 | $    2 |

## 13. PENSION AND OTHER POSTRETIREMENT BENEFITS

Pension plans sponsored by the Debtors covering unionized employees in the U.S. generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The Debtors also sponsor defined benefit pension plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code.

Additionally, the Debtors sponsor other defined benefit plans that provide postretirement medical, dental, vision, and life insurance to certain hourly and salaried employees and eligible dependents in the U.S.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three- and nine-month periods ended September 30, 2007 and 2006 for salaried and hourly employees.  The settlements recorded in the nine months ended September 30, 2007 were primarily due to renegotiated labor contracts for two facilities in Mexico.  Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | | | (in millions) | | | |
|  | | | Three Months Ended September 30, | | | |
|  | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
| Service cost (a) | $ 42 | $ 60 | $ 12 | $ 11 | $ 20 | $ 46 |
| Interest cost | 212 | 211 | 20 | 17 | 135 | 139 |
| Expected return on plan assets | (216) | (204) | (20) | (16) | — | — |
| Settlements | — | — | 8 | 1 | — | — |
| Curtailment loss/(gain) | 170 | 397 | — | — | (2) | (13) |
| Amortization of prior service costs | 13 | 27 | 1 | 1 | (24) | (25) |
| Amortization of actuarial losses | 18 | 33 | 8 | 6 | 19 | 78 |
| Net periodic benefit cost | $ 239 | $ 524 | $ 29 | $ 20 | $ 148 | $ 225 |

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | | | (in millions) | | | |
|  | | | Nine Months Ended September 30, | | | |
|  | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
| Service cost (a) | $ 137 | $ 207 | $ 35 | $ 31 | $ 62 | $ 136 |
| Interest cost | 637 | 581 | 60 | 48 | 406 | 425 |
| Expected return on plan assets | (648) | (614) | (60) | (48) | — | — |
| Settlements | — | — | 41 | 1 | — | — |
| Curtailment loss/(gain) | 170 | 1,917 | 5 | — | (2) | (20) |
| Amortization of prior service costs | 41 | 92 | 3 | 3 | (74) | (74) |
| Amortization of actuarial losses | 69 | 148 | 25 | 19 | 57 | 234 |
| Net periodic benefit cost | $ 406 | $2,331 | $109 | $ 54 | $ 449 | $ 701 |

(a)  Includes $11 million and $39 million for the three and nine months ended September 30, 2007, respectively,  and $18 million and $21 million for the three and nine months ended September 30, 2006, of costs related to pre-retirement participants of the U.S. employee workforce transition program accrued in 2006.

During the three months ended September 30, 2007, Delphi recorded pension curtailment losses of approximately $175 million in U.S. employee workforce transition program charges of which $59 million related to the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and $116 million related to the Delphi Retirement Program for Salaried Employees (the "Salaried Plan").  The curtailment losses were recorded to recognize the effect of employees who elected to participate in the workforce transition programs and the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried and certain hourly employees on emergence from bankruptcy.  In addition, Delphi recorded pension and other postretirement benefit curtailment gains related to the divestiture of the Catalyst business.  During the nine months ended September 30, 2007, Delphi recorded pension curtailment losses of approximately $175 million in U.S. employee workforce transition program charges.  In addition, the nine months ended September 30, 2007 included pension and other postretirement benefit curtailment gains related to the divestiture of the Catalyst business and $5 million pension curtailment losses recorded during the second quarter of 2007 related to a non-U.S. entity.  During the three and nine months ended September 30, 2006, Delphi recorded net pension curtailment charges of approximately $384 million and $1,897 million, respectively, in U.S. employee workforce transition program charges for UAW-, IUE-CWA-, and USW-represented hourly employees who elected to participate in the Special Attrition Program.  Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

In conjunction with the curtailment losses discussed above and the significant amendments to the U.S. hourly and salaried pension plans and the hourly retiree health care plan, the obligations for these plans were remeasured as of August 31, 2007, the point at which the changes in benefits were probable and the impacts of the curtailments were reasonably estimable.   The $175 million pension curtailment and remeasurement resulted in a decrease of approximately $900 million in the accrued benefit liability and an increase to other comprehensive income of $1.1 billion.  Delphi will not recognize the impacts of the hourly retiree health care plan remeasurement and curtailment until three months subsequent to the remeasurement date due to the fact that this plan's annual measurement date is September 30 versus December 31.  The amounts shown below reflect the defined benefit pension obligations for the U.S. Hourly Plan and Salaried Plan as of the August 31, 2007 remeasurement.

|  | U.S. Pension Benefits Plans (in millions) |
| --- | --- |
| Change in benefit obligation: | |
| Benefit obligation at beginning of year | $  14,558 |
| Expense | 672 |
| Benefits paid | (676) |
| Impact of curtailments, remeasurement and other | (838) |
| Benefit obligation at August 31, 2007 | $  13,716 |
| | |
| Change in plan assets: | |
| Fair value of plan assets at beginning of year | $  10,653 |
| Actual return on plan assets | 630 |
| Delphi contributions | 150 |
| Benefits paid | (676) |
| Fair value of plan assets at August 31, 2007 | $  10,757 |
| | |
| Underfunded status | $  (2,959) |
| Unamortized actuarial loss | 1,237 |
| Unamortized prior service cost | 157 |
| Net amount recognized in consolidated balance sheets | $  (1,565) |
| | |
| Amounts recognized in the consolidated balance sheets consist of: | |
| Accrued benefit liability | $  (2,959) |
| Accumulated other comprehensive income (pre-tax) | 1,394 |
| Net amount recognized | $  (1,565) |

Delphi selected discount rates based on analyzing the results of matching high quality fixed income investments rated AA- or higher by Standard and Poor's and the regular and above median Citigroup Pension Discount Curve, with expected benefit cash flows.  Since high quality bonds in sufficient quantity and with appropriate maturities are not available for all years when benefit cash flows are expected to be paid, hypothetical bonds were imputed based on combinations of existing bonds, and interpolation and extrapolation reflecting current and past yield trends.  The pension discount rate determined on that basis increased from 5.90% as of December 31, 2006 to 6.30% as of August 31, 2007.  Other assumptions utilized for the August 31, 2007 remeasurement such as asset rate of return and increase in compensation levels were consistent with the December 31, 2006 valuation.

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings.  During the nine months ended September 30, 2007, Delphi contributed approximately $154 million to its U.S. pension plans related to services rendered during the fourth quarter of 2006, first quarter of 2007, and second quarter of 2007.  On October 11, 2007, Delphi contributed approximately $49 million to its U.S. pension plans related to services rendered during the third quarter of 2007.  Under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), a minimum funding payment of approximately $1,100 million to the U.S. pension plans was due in the first nine months of 2007 and a minimum funding payment of approximately $113 million to the U.S. pension plans was due in October 2007.

Delphi has been in discussions with the Internal Revenue Service ("IRS") and the PBGC regarding the funding of the Hourly Plan and the Salaried Plan upon emergence from chapter 11.  These discussions have culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash

contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The under-contributed amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the IRS in the amount of approximately $17 million. The penalty was recorded in liabilities subject to compromise in 2006. Given the receipt of the funding waivers described above, it is no longer probable that Delphi will ultimately pay this penalty and therefore Delphi reversed the liability of $19 million (including $2 million of accrued interest) and recognized the funding commitment of up to $4 million to the PBGC in the second quarter of 2007. During the three and nine months ended September 30, 2007, the unpaid portion of the minimum funding payments remains payable as a claim against Delphi and will be determined in Delphi's Plan along with other claims. Delphi has appointed an independent fiduciary for all of its tax-qualified defined benefit pension plans who is charged with pursuing claims on behalf of the plans to recover minimum funding contributions.

Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom and were under-funded by $610 million as of December 31, 2006. In addition, Delphi has unfunded defined benefit plans in Korea, Italy and Turkey for which amounts are payable to employees immediately upon separation.

## 14. DERIVATIVES AND HEDGING ACTIVITIES

SFAS No. 133, "*Accounting for Derivative Instruments and Hedging Activities,*" as amended ("SFAS 133") requires that all derivative instruments be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria. The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates.

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi does not hold or issue derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of September 30, 2007 and December 31, 2006 are as follows:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (in millions) | |
| Current assets | $ 90 | $ 73 |
| Non-current assets | 25 | 3 |
| Total assets | $ 115 | $ 76 |
| Current liabilities | $ 37 | $ 61 |
| Non-current liabilities | — | — |
| Total liabilities | $ 37 | $ 61 |

The fair value of financial instruments recorded as assets increased from December 31, 2006 to September 30, 2007 primarily due to the increase in copper rates and favorable foreign currency trades involving the Mexican Peso and U.S. Dollar as well as favorable foreign currency trades involving the Turkish Lira and the Euro. The fair value of financial instruments recorded as liabilities decreased from December 31, 2006 to September 30, 2007 primarily due to increases in copper and natural gas forward rates and the maturity of unfavorable foreign currency intercompany loan hedges.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in other comprehensive income ("OCI"), to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in OCI as of September 30, 2007, were $118 million pre-tax. Of this pre-tax total, a gain of approximately $85 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $34 million is expected to be included in cost of

sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was approximately $1 million for the nine months ended September 30, 2007 and was approximately $7 million for the nine months ended September 30, 2006. The amount included in cost of sales related to the time value of options was not significant in the nine months ended September 30, 2007 and 2006. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was less than $1 million for the nine months ended September 30, 2007 and $11 million for the nine months ended September 30, 2006.

## 15. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | | (in millions) | | |
| Interest income | $ 19 | $ 12 | $ 51 | $ 35 |
| Other, net | 3 | (4) | 9 | (4) |
| Other income (expense), net | $ 22 | $ 8 | $ 60 | $ 31 |

## 16. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as two additional segments, Steering and Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's six reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, and power electronics, as well as advanced development of software and silicon.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronic controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Steering, which includes steering, halfshaft and column technology.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to the U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices. Corporate allocations are recorded within the operating segment results based on budgeted amounts and any variances to budget (gains or losses) are recognized in the Corporate and Other segment as these variances to corporate expenses are not included in segment performance measurements.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Effective January 1, 2007, Delphi modified its methodology for allocating certain U.S. employee historical pension, postretirement benefit and workers' compensation benefit costs to the segments to directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions.  Specifically, certain portions of U.S. employee historical pension, postretirement and workers' compensation benefit costs are now being allocated to Corporate and Other as opposed to the previous practice of allocating the majority of these costs to all reporting segments.  The reporting segment results shown below reflect expense related to the estimated service cost portion only of the U.S. pension, postretirement and workers' compensation benefit plans for their respective workforces.

Included below are sales and operating data for Delphi's reporting segments for the three and nine months ended September 30, 2007 and 2006.

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **For the Three Months Ended**: | | | | | | | | |
| September 30, 2007 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 345 | $ 321 | $ 404 | $ 423 | $ 402 | $ 617 | $ 114 | $ 2,626 |
| Net sales to other customers....... | 736 | 224 | 784 | 955 | 231 | 403 | 262 | 3,595 |
| Inter-segment net sales .............. | 65 | 24 | 105 | 36 | 13 | 89 | (332) | — |
| Total net sales ...................... | $ 1,146 | $ 569 | $ 1,293 | $ 1,414 | $ 646 | $ 1,109 | $ 44 | $ 6,221 |
| Depreciation & Amortization ..... | $ 60 | $ 16 | $ 63 | $ 41 | $ 16 | $ 16 | $ 20 | $ 232 |
| Long-lived asset impairment charges................................... | $ — | $ — | $ 1 | $ 2 | $ 7 | $ 13 | $ — | $ 23 |
| Operating income (loss)............. | $ 32 | $ (9) | $ (194) | $ (23) | $ 23 | $ (73) | $ (435) | $ (679) |
| Equity income (loss).................. | $ — | $ 1 | $ 4 | $ 4 | $ 1 | $ (1) | $ 1 | $ 10 |
| Minority interest ....................... | $ (1) | $ (2) | $ (5) | $ (5) | $ — | $ (1) | $ 2 | $ (12) |
| September 30, 2006 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 327 | $ 320 | $ 368 | $ 388 | $ 347 | $ 709 | $ 139 | $ 2,598 |
| Net sales to other customers....... | 745 | 206 | 733 | 808 | 197 | 469 | 252 | 3,410 |
| Inter-segment net sales .............. | 46 | 24 | 100 | 41 | 29 | 96 | (336) | — |
| Total net sales ...................... | $ 1,118 | $ 550 | $ 1,201 | $ 1,237 | $ 573 | $ 1,274 | $ 55 | $ 6,008 |
| Depreciation & Amortization ..... | $ 70 | $ 15 | $ 56 | $ 43 | $ 26 | $ 30 | $ 22 | $ 262 |
| Long-lived asset impairment charges................................... | $ — | $ — | $ 12 | $ 1 | $ 2 | $ — | $ — | $ 15 |
| Operating income (loss)............. | $ 27 | $ (70) | $ (85) | $ (82) | $ (49) | $ (157) | $ (1,371) | $ (1,787) |
| Equity income (loss).................. | $ 3 | $ (16) | $ — | $ 2 | $ 2 | $ 6 | $ — | $ (3) |
| Minority interest ....................... | $ (1) | $ 2 | $ (4) | $ (4) | $ — | $ (1) | $ 4 | $ (4) |

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **For the Nine Months Ended:** | | | | | | | | |
| September 30, 2007 | | | | | | | | |
| Net sales to GM and affiliates .... | $ 1,091 | $ 997 | $ 1,243 | $ 1,326 | $ 1,264 | $ 2,045 | $ 336 | $ 8,302 |
| Net sales to other customers ....... | 2,413 | 692 | 2,645 | 2,956 | 749 | 1,377 | 783 | 11,615 |
| Inter-segment net sales .............. | 192 | 82 | 315 | 134 | 40 | 287 | (1,050) | — |
| Total net sales ..................... | $ 3,696 | $ 1,771 | $ 4,203 | $ 4,416 | $ 2,053 | $ 3,709 | $ 69 | $ 19,917 |
| Depreciation & Amortization ..... | $ 196 | $ 47 | $ 197 | $ 127 | $ 46 | $ 61 | $ 62 | $ 736 |
| Long-lived asset impairment charges.......................................... | $ 1 | $ — | $ 10 | $ 3 | $ 166 | $ 42 | $ — | $ 222 |
| Operating income (loss)............. | $ 153 | $ 26 | $ (219) | $ 16 | $ (147) | $ (388) | $ (1,126) | $ (1,685) |
| Equity income ............................ | $ — | $ 4 | $ 12 | $ 11 | $ 6 | $ 2 | $ 1 | $ 36 |
| Minority interest ....................... | $ (2) | $ (2) | $ (21) | $ (18) | $ (1) | $ (2) | $ 8 | $ (38) |
| September 30, 2006 | | | | | | | | |
| Net sales to GM and affiliates .... | 1,058 | 1,095 | 1,305 | 1,332 | 1,212 | 2,414 | 468 | 8,884 |
| Net sales to other customers ....... | 2,459 | 620 | 2,384 | 2,561 | 662 | 1,601 | 805 | 11,092 |
| Inter-segment net sales .............. | 175 | 92 | 269 | 130 | 92 | 317 | (1,075) | — |
| Total net sales ..................... | $ 3,692 | $ 1,807 | $ 3,958 | $ 4,023 | $ 1,966 | $ 4,332 | $ 198 | $ 19,976 |
| Depreciation & Amortization ..... | $ 199 | $ 52 | $ 185 | $ 127 | $ 75 | $ 100 | $ 66 | $ 804 |
| Long-lived asset impairment charges.......................................... | $ — | $ — | $ 12 | $ 1 | $ 2 | $ — | $ — | $ 15 |
| Operating income (loss)............. | $ 228 | $ (44) | $ (47) | $ (21) | $ (96) | $ (397) | $ (3,754) | $ (4,131) |
| Equity income (loss).................. | $ 5 | $ (14) | $ 7 | $ 12 | $ 4 | $ 13 | $ 1 | $ 28 |
| Minority interest ....................... | $ (3) | $ 3 | $ (21) | $ (12) | $ (1) | $ (1) | $ 7 | $ (28) |

## 17. COMMITMENTS AND CONTINGENCIES

### Bankruptcy Related Litigation

For information on Delphi's reorganization cases, including adjourned motions filed by Delphi under sections 1113, 1114, and 365 of the Bankruptcy Code, refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy.

As previously disclosed, Wilmington Trust Company ("Wilmington Trust"), as indenture trustee to the Debtors' senior notes and debentures, has filed notices of appeal from the orders approving the UAW Supplemental Agreement, the UAW Special Attrition Program, and the IUE-CWA Special Attrition Program. The appeals have been placed in suspense. Wilmington Trust was required to file a brief with respect to its appeal of the UAW Supplemental Agreement by September 15, 2007, and Wilmington Trust is required to file a brief with respect to its appeal of the UAW Special Attrition Program by December 31, 2007. In addition, on May 7 and July 19, 2007, the federal district court held status hearings regarding the Wilmington Trust appeal with respect to the IUE-CWA Special Attrition Program. Pursuant to an order entered following the status conference on July 19, 2007, briefing remains suspended. The next status conference on the UAW Supplemental Agreement and the IUE-CWA Special Attrition Program is scheduled for December 4, 2007. Delphi does not expect the resolution of the appeals to have a material impact on its financial statements.

### Shareholder Lawsuits

As previously disclosed, the Company, along with Delphi Trust I and Delphi Trust II (subsidiaries of Delphi which issued trust preferred securities), current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits that were filed beginning in March 2005 following the Company's announced intention to restate certain of its financial statements. On December 12, 2005, the Judicial Panel on Multidistrict Litigation entered an order transferring the lawsuits to consolidated proceedings (the "Multidistrict Litigation" or "MDL") before the U.S. District Court for the Eastern District of Michigan (the "U.S. District Court"). On July 11, 2007, the U.S. District Court appointed the Honorable Layn R. Phillips, former United States District Judge, as a special master for settlement discussions. Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the MDL proceedings were able to reach an agreement with the lead plaintiffs in the Securities Actions as defined below (the "Lead Plaintiffs") and the named plaintiffs in the Amended ERISA Action as defined below (the "ERISA Plaintiffs") resulting in a $361 million settlement of the Multidistrict Litigation (the "MDL Settlements"). On September 5, 2007 the U.S. District Court entered an order preliminarily certifying the class and approving the settlement and scheduled the matter for a fairness hearing on November 13, 2007. On October 25, 2007 the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA (the "ERISA Actions"). Plaintiffs in the ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA. The ERISA Actions were subsequently transferred to the Multidistrict Litigation. On March 3, 2006, plaintiffs filed a consolidated class action complaint (the "Amended ERISA Action") with a class period of May 28, 1999 to November 1, 2005. The Company, which was previously named as a defendant in the ERISA Actions, was not named as a defendant in the Amended ERISA Action due to the Chapter 11 Filings, but the plaintiffs have stated that they plan to proceed with claims against the Company in the ongoing bankruptcy cases, and will seek to name the Company as a defendant in the Amended ERISA Action if the bankruptcy stay is modified or lifted to permit such action. As of June 12, 2006, the parties' pleadings on defendants' motions to dismiss the Amended ERISA Action were filed and are awaiting the Court's ruling. On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the lead plaintiffs and other parties in the case. On October 25, 2007, as part of its order preliminarily approving the MDL Settlements, the Court lifted the automatic stay as to the discovery provided to the plaintiffs.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 30, 2005, the court-appointed lead plaintiffs filed a consolidated class action complaint (the "Securities Actions") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Securities Actions name several additional defendants, including Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The

Securities Actions consolidated in the United States District Court for Southern District of New York (and a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I) were subsequently transferred to the United States District Court for Eastern District of Michigan as part of the Multidistrict Litigation. The action is stayed against the Company pursuant to the Bankruptcy Code, but is continuing against the other defendants. As of June 12, 2006, the parties' pleadings on defendants' motions to dismiss the Amended Securities Action were filed and are awaiting the Court's ruling. As of January 2, 2007, the parties' pleadings on plaintiffs' motion seeking leave to file an amended securities fraud complaint were filed and are awaiting the Court's ruling. On February 15, 2007, the United States District Court for Eastern District of Michigan partially granted the plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the plaintiffs to obtain certain discovery from the defendants. On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the lead plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions"). A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court (Oakland County Circuit Court in Pontiac, Michigan). These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. The federal cases were consolidated with the securities and ERISA class actions in the U.S. District Court for the Eastern District of Michigan. Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the derivative cases were administratively closed.

The following is a summary of the principal terms of the MDL Settlements as they relate to the Company and its affiliates and related parties and is qualified in its entirety by reference to the complete agreements submitted to the Court for approval and which were filed as exhibits to the Company's Current Report on Form 8-K dated September 5, 2007.

Under the terms of the MDL Settlements, the Lead Plaintiffs and the ERISA Plaintiffs will receive claims that will be satisfied through Delphi's final Plan as confirmed by the Court. The Lead Plaintiffs will be granted a single allowed claim in the face amount of $204 million, which will be satisfied by Delphi providing $204 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the settlement reached with the Lead Plaintiffs. Delphi will object to any claims filed by opt out plaintiffs in the Court, and will seek to have such claims expunged. The settlement with the ERISA Plaintiffs is structured similarly to the settlement reached with the Lead Plaintiffs. The ERISA Plaintiffs' claim will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as used to pay holders of general unsecured claims under the Plan. Unlike the settlement reached with the Lead Plaintiffs, the ERISA Plaintiffs will not be able to opt out of their settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases. The ERISA Plaintiffs will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Settlement amounts from insurers and underwriters were placed in escrow in September 2007 pending Court approval. Delphi has separately agreed with a third party for reimbursement of $15 million as consideration for the releases described below.

The MDL Settlements include a dismissal with prejudice of the ERISA and securities cases and a full release as to certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties. The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand. As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL settlement, as of September 30, 2007, Delphi has a liability of $361 million recorded for this matter. The expense for this matter is $21 million and $353 million for the three and nine months ended September 30, 2007,

respectively.  As previously disclosed, Delphi maintains directors and officers insurance providing coverage for losses incurred by the Company of up to $100 million, subject to a $10 million deductible.  Delphi's insurance coverage contains a standard exclusion provision that may apply should there be a judgment or final adjudication that establishes a deliberate criminal or deliberate fraudulent act was committed by a past, present or future Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer or General Counsel.  Delphi had previously recorded an initial reserve in the amount of its $10 million insurance deductible, and net of related payments, had an $8 million liability recorded as of December 31, 2006 as at such date no other amount was deemed probable and estimable.  As discussed above, in conjunction with the MDL settlement, Delphi expects to receive recoveries of $148 million for the settlement amounts from insurers, underwriters and third-party reimbursements.  As of September 30, 2007 none of these recoveries have been recorded because the MDL Settlements are pending Court approval.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate.  Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under Delphi's Plan.  (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements.  However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates.  Additionally, in connection with the separation from GM in 1999 (the "Separation"), Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility.  Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

As previously disclosed, GM alleged that catalytic converters supplied by Delphi's Powertrain Systems segment to GM for certain 2001 and 2002 vehicle platforms did not conform to specifications.  In July 2006, the parties agreed to submit the dispute to binding arbitration.  In May 2007 GM informed Delphi that it has experienced higher than normal warranty claims with certain 2003-2005 vehicle models due to instrument clusters supplied by Delphi's Automotive Holdings Group segment.  In June 2007, Delphi reached a tentative agreement with GM to resolve these claims along with certain other known warranty matters.  Based on the tentative agreement, Delphi recorded $91 million of additional warranty expense in cost of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain segments.  On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving these and certain other known warranty matters.  Under the terms of the Warranty Settlement Agreement, Delphi will pay GM an estimated $199 million, comprised of approximately $127 million to be paid in cash over time as noted below, and up to approximately $72 million to be paid in the form of delivery by Delphi to GM of replacement product.  The Warranty Settlement Agreement settles all outstanding warranty claims and issues related to any component or assembly supplied by Delphi to GM, which as of August 10, 2007 are (a) known by GM, subject to certain specified exceptions, (b) believed by GM to be Delphi's responsibility in whole or in part, and (c) in GM's normal investigation process, or which should have been within that process, but were withheld for the purpose of pursuing a claim against Delphi.  Included in the settlement are all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases ("GM's Proof of Claim").

In addition, the Warranty Settlement Agreement limits Delphi's liability related to certain other warranty claims that have become known by GM on or after June 5, 2007, and generally prohibits both GM and Delphi from initiating actions against the other related to any warranty claims settled in the agreement.  In accordance with the Warranty Settlement Agreement, Delphi's claims agent has reduced the liquidated component relating to warranty claims contained in GM's Proof of Claim by $530,081,671, which includes, among other things, those personal injury claims asserted in GM's Proof of Claim that relate to warranty claims settled in the agreement, and has expunged with prejudice the unliquidated component relating to warranty claims asserted in GM's Proof of Claim.  Pursuant to the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007, (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million, or GM believed the claim would exceed $1 million, (iii) the claim is in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed or reasonably should have believed that Delphi had some responsibility for the claim.

41

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from bankruptcy. As a result, GM will set off these payments against the amounts then payable to Delphi by GM. Because Delphi has elected to defer these payments, GM will receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts are paid by Delphi or set off against amounts payable by GM.

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in the third quarter of 2007.

During the third quarter of 2006, Delphi's Thermal Systems segment began experiencing quality issues regarding parts that were purchased from one of Delphi's affiliated suppliers and subsequently established warranty reserves of $59 million to cover the cost of various repairs that may be implemented. Delphi is actively negotiating with the affiliated supplier to determine if any portion of the liability is recoverable.

Patent license negotiations are ongoing with Denso Corporation in connection with variable valve timing technology. Delphi expects that these negotiations will be concluded on commercially reasonable terms and in accordance with ordinary industry practices such that resolution of this matter will not have a material impact on Delphi's financial position. However, Delphi can give no assurances that those negotiations will be successful.

Litigation is subject to many uncertainties, and the outcome of individual litigated matters cannot be predicted with assurance. After discussions with counsel, it is the opinion of Delphi that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally. Although it is Delphi's intent to comply with all such requirements and regulations, it cannot provide assurance that it is at all times in compliance. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. Although such expenditures were not material during the past three years, Delphi is preparing to spend $11 million to install pollution control equipment on coal-fired boilers at its Saginaw, Michigan Steering Division facility, to meet U.S. and State of Michigan air emission regulations. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not be material.

Delphi recognizes environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multiparty sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remediation methodology to be used could significantly change Delphi's estimates.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a PRP in proceedings at various sites, including the Tremont City Barrel Fill Site located in Tremont City, Ohio. In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site. The Remedial Investigation has been completed, and an Alternatives Array Document has been finalized. A Feasibility Study and Record of Decision are expected to be completed in 2008. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, it appears that the State of Ohio will oppose that remedy. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of September 30, 2007, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase to $20 million in excess of its existing reserves. Delphi will continue to re-assess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

Delphi is in various stages of investigation and cleanup at its manufacturing facilities where contamination has been discovered.  As previously disclosed in its Annual Report on Form 10-K for the year ended December 31, 2006, Delphi completed a number of environmental investigations during 2006 as it continues to pursue its transformation plan, which contemplates significant restructuring activity, including the sale or closure of numerous facilities.  These assessments identified previously unknown conditions and led to new information that allowed Delphi to update its estimate of required remediation for previously identified conditions and resulted in Delphi recording an adjustment to its environmental reserves. As Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified and as known conditions are further delineated.  Delphi cannot ensure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of current reserves.  In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

As of September 30, 2007 and December 31, 2006, Delphi's reserve for environmental investigation and remediation was $120 million and $118 million, respectively.  As of December 31, 2006, $3 million of the reserve was recorded in liabilities subject to compromise.  The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the Separation.

**Other**

As mentioned above, Delphi continues to pursue its transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities.  As such, Delphi continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity.  These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

## 18. SUBSEQUENT EVENTS

The events described below have occurred subsequent to September 30, 2007 and are material to the Company's ongoing operations but have no effect on the reported balances or results of operations for the quarterly period ended September 30, 2007.  These events are listed below.

On February 20, 2007, Delphi announced that it had signed a non-binding term sheet with the Renco Group, Inc. for the sale of its interiors and closures product line. On October 15, 2007, Delphi and certain of its affiliates entered into a Master Sale and Purchase Agreement with Inteva Products, LLC and certain of its affiliates (the "Interiors and Closures Agreement") for the sale of substantially all of the assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business. Concurrently, the Debtors filed a motion requesting a hearing on October 25, 2007 to approve bidding procedures in connection with the sale. On October 26, 2007, the Bankruptcy Court approved those bidding procedures (the "Interiors and Closures Bidding Procedures Order"). It is anticipated that a hearing to approve the sale will be held on December 20, 2007. The effectiveness of the Interiors and Closures Agreement is subject to the competitive bidding process approved in the Interiors and Closures Bidding Procedures Order, including a potential auction, and Court approval.

Delphi is currently seeking to extend the Refinanced DIP Credit Facility until June 30, 2008 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court, with the ability to further extend the maturity to September 30, 2008 under certain conditions.  Delphi expects that the amendment will become effective in November 2007.  Refer to Note 11. Debt for more information.

On October 30, 2007, the Debtors announced they filed with the Court a motion seeking approval of a proposed amendment to the EPCA to be entered into by the Investors (the "Proposed EPCA Amendment"). The Proposed EPCA Amendment, has been agreed to by Appaloosa and a supermajority of the Investors. However, the execution of the Proposed EPCA Amendment is subject to the satisfaction of various conditions set forth in a proposal letter dated October 29, 2007 (the "Proposal Letter"), including (i) Delphi delivering an acceptable financing letter to the Investors, (ii) the Investors having to be satisfied with this Form 10-Q and (iii) an Investor having executed a written commitment to the Proposal Letter to the same extent as the other Investors.  Delphi can not provide any assurances as to whether or when the Proposed EPCA Amendment will be executed by Delphi and the Investors prior to the GSA Amendment becoming terminable and if in fact it is executed, whether there will be additional amendments other than those described and whether any such changes would be acceptable to GM.  If in fact any of the conditions set forth in the Proposal Letter are not satisfied the Investors will not be obligated to execute the Proposed EPCA Amendment.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy.

**APPENDIX B-3**

Restated Segment Reporting footnote from the Delphi Corporation Form 10-K for the period
ended December 31, 2006, reflecting modified United States employee historical pension,
postretirement benefit, and workers' compensation benefit costs allocation

## 21. SEGMENT REPORTING

Effective July 1, 2006, Delphi realigned its business operations to focus its product portfolio on core technologies for which Delphi believes it has significant competitive and technological advantages. Delphi's revised operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as two additional segments, Steering and Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's six reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, and power electronics, as well as advanced development of software and silicon.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Steering, which includes steering, halfshaft and column technology.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to U.S. employee special attrition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Significant Accounting Policies, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Effective January 1, 2007, Delphi modified its methodology for allocating certain U.S. employee historical pension, postretirement benefit and workers' compensation benefit costs to the segments to directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions. Specifically, certain U.S. employee historical pension, postretirement and workers' compensation benefit costs are now being reported in the Corporate and Other segment as opposed to the previous practice of allocating these costs to other reporting segments. The reporting segment results shown below reflect expense related to current service cost of the pension and postretirement benefit plans for their respective workforces for all periods, and adjusted workers' compensation expense for 2006.

Included below are sales and operating data for Delphi's reporting segments for the years ended December 31, 2006, 2005, and 2004 as well as balance sheet data as of December 31, 2006, 2005 and 2004.

3

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|---|
| **2006:** | | | | (in millions) | | | | |
| Net sales to GM and affiliates.... | $ 1,423 | $ 1,430 | $ 1,667 | $ 1,772 | $ 1,596 | $ 3,139 | $ 609 | $ 11,636 |
| Net sales to other customers ...... | 3,249 | 842 | 3,220 | 3,420 | 866 | 2,088 | 1,071 | 14,756 |
| Inter-segment net sales............... | 227 | 115 | 331 | 173 | 130 | 408 | (1,384) | |
| Total net sales ............... | $ 4,899 | $ 2,387 | $ 5,218 | $ 5,365 | $ 2,592 | $ 5,635 | $ 296 | $ 26,392 |
| Depreciation & Amortization...... | $ 266 | $ 66 | $ 255 | $ 175 | $ 98 | $ 136 | $ 83 | $ 1,079 |
| Long-lived asset impairment charges ........................................ | $ 4 | $ 11 | $ 12 | $ 1 | $ — | $ 26 | $ 161 | $ 215 |
| Goodwill impairment charges ...... | $ — | $ — | $ — | $ — | $ — | $ — | | $ — |
| Operating income (loss) (b) ...... | 252 | (109) | (47) | (110) | (127) | (688) | (4,029) | (4,858) |
| Equity income......................... | $ 6 | $ (11) | $ 10 | $ 18 | $ 6 | $ 19 | $ (1) | $ 47 |
| Minority Interest ..................... | $ (6) | $ 9 | $ (28) | $ (17) | $ (2) | $ (1) | $ 8 | $ (37) |
| **2005:** | | | | | | | | |
| Net sales to GM and affiliates.... | $ 1,634 | $ 1,519 | $ 1,924 | $ 1,910 | $ 1,637 | $ 3,426 | $ 810 | $ 12,860 |
| Net sales to other customers ...... | 3,207 | 717 | 2,976 | 3,195 | 850 | 1,771 | 1,371 | 14,087 |
| Inter-segment net sales............... | 279 | 105 | 410 | 205 | 125 | 495 | (1,619) | — |
| Total net sales ............... | $ 5,120 | $ 2,341 | $ 5,310 | $ 5,310 | $ 2,612 | $ 5,692 | $ 562 | $ 26,947 |
| Depreciation & Amortization...... | $ 285 | $ 87 | $ 266 | $ 157 | $ 113 | $ 164 | $ 78 | $ 1,150 |
| Long-lived asset impairment charges ........................................ | $ 5 | $ 23 | $ 9 | $ 35 | $ 34 | $ 127 | $ — | $ 233 |
| Goodwill impairment charges ...... | $ — | $ — | $ 368 | $ — | $ — | $ 22 | $ — | $ 390 |
| Operating income (loss) (c)....... | 228 | (57) | (406) | 248 | (215) | (1,027) | (942) | (2,171) |
| Equity income......................... | $ 3 | $ 13 | $ 20 | $ 16 | $ 5 | $ 13 | $ 1 | $ 71 |
| Minority Interest ..................... | $ (3) | $ 7 | $ (21) | $ (7) | $ (2) | $ (2) | $ 4 | $ (24) |
| **2004:** | | | | | | | | |
| Net sales to GM and affiliates.... | $ 2,128 | $ 1,569 | $ 2,521 | $ 2,158 | $ 1,977 | $ 4,087 | $ 977 | $ 15,417 |
| Net sales to other customers ...... | 2,819 | 666 | 3,119 | 3,158 | 813 | 1,406 | 1,224 | 13,205 |
| Inter-segment net sales............... | 375 | 117 | 499 | 204 | 106 | 641 | (1,942) | |
| Total net sales ............... | $ 5,322 | $ 2,352 | $ 6,139 | $ 5,520 | $ 2,896 | $ 6,134 | $ 259 | $ 28,622 |
| Depreciation & Amortization...... | $ 254 | $ 78 | $ 251 | $ 177 | $ 125 | $ 195 | $ 64 | $ 1,144 |
| Long-lived asset impairment charges ........................................ | $ 3 | $ — | $ 2 | $ 11 | $ 2 | $ 308 | $ — | $ 326 |
| Goodwill impairment charges ...... | $ — | $ 30 | $ — | $ — | $ 16 | $ — | $ — | $ 46 |
| Operating (loss) income (d) ...... | 382 | 6 | 318 | 387 | 14 | (763) | (826) | (482) |
| Equity income......................... | $ 2 | $ 12 | $ 44 | $ 19 | $ 4 | $ 2 | $ 3 | $ 86 |
| Minority Interest ..................... | $ (2) | $ (2) | $ (21) | $ (7) | $ (2) | $ (5) | $ 9 | $ (39) |

| | Electronics and Safety | Thermal Systems | Powertrain Systems | Electrical/ Electronic Architecture | Steering | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|---|
| **Balance as of:** | | | | (in millions) | | | | |
| **December 31, 2006** | | | | | | | | |
| Investment in affiliates............... | $ 46 | $ 76 | $ 54 | $ 163 | $ 9 | $ 62 | $ 7 | $ 417 |
| Goodwill................................... | $ 143 | $ — | $ — | $ 161 | $ — | $ — | $ 74 | $ 378 |
| Capital expenditures ................... | $ 181 | $ 25 | $ 158 | $ 182 | $ 85 | $ 65 | $ 25 | $ 721 |
| Segment assets........................... | $ 3,664 | $ 1,163 | $ 3,677 | $ 3,822 | $ 1,276 | $ 1,975 | $ (185) | $ 15,392 |
| **December 31, 2005** | | | | | | | | |
| Investment in affiliates............... | $ 35 | $ 113 | $ 45 | $ 150 | $ 2 | $ 55 | $ 18 | $ 418 |
| Goodwill................................... | $ 125 | $ — | $ — | $ 167 | $ — | $ — | $ 71 | $ 363 |
| Capital expenditures ................... | $ 282 | $ 37 | $ 227 | $ 206 | $ 109 | $ 180 | $ 142 | $ 1,183 |
| Segment assets........................... | $ 3,449 | $ 1,229 | $ 3,347 | $ 3,494 | $ 1,132 | $ 2,192 | $ 2,180 | $ 17,023 |
| **December 31, 2004** | | | | | | | | |
| Investment in affiliates............... | $ 52 | $ 123 | $ 110 | $ 143 | $ (2) | $ 52 | $ 18 | $ 496 |
| Goodwill................................... | $ 143 | $ 30 | $ 397 | $ 160 | $ 16 | $ 24 | $ 28 | $ 798 |
| Capital expenditures ................... | $ 249 | $ 70 | $ 224 | $ 148 | $ 66 | $ 157 | $ 53 | $ 967 |
| Segment assets........................... | $ 3,654 | $ 1,252 | $ 3,914 | $ 3,665 | $ 1,102 | $ 2,663 | $ 309 | $ 16,559 |

(a)  Corporate and Other includes the elimination of inter-segment transactions and charges related to U.S. employee special attrition programs in the amount of $2,955 million (Refer to Note 16. U.S. Employee Special Attrition Program).  Additionally, Corporate and Other includes the Product

and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

(b) Includes charges recorded in 2006 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $22 million for Electronics & Safety, $84 million for Thermal Systems, $69 million for Powertrain Systems, $83 million for Electrical/Electronic Architecture, $50 million for Steering, $195 million for Automotive Holdings Group and $11 million for Corporate and Other.

(c) Includes charges recorded in 2005 related to long-lived asset and goodwill impairments, contractual costs of other than temporarily idled employees and costs associated with employee termination benefits and other exit costs with $19 million for Electronics & Safety, $40 million for Thermal Systems, $412 million for Powertrain Systems, $98 million for Electrical/Electronic Architecture, $38 million for Steering, $270 million for Automotive Holdings Group and $9 million for Corporate and Other.

(d) Includes charges recorded in 2004 related to long-lived asset and goodwill impairments and other charges with $19 million for Electronics & Safety, $41 million for Thermal Systems, $38 million for Powertrain Systems, $71 million for Electrical/Electronic Architecture, $31 million for Steering, $476 million for Automotive Holdings Group and $10 million for Corporate and Other.

Information concerning principal geographic areas is set forth below. Net sales data reflects the manufacturing location and is for the years ended December 31. Net property data is as of December 31.

| | Year Ended December 31, | | | | | | | | | | | |
| | 2006 | | | | 2005 | | | | 2004 | | | |
| | Net Sales | | | | Net Sales | | | | Net Sales | | | |
| (dollars in millions) | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North America | $10,165 | $ 6,754 | $16,919 | $ 2,498 | $ 11,445 | $ 6,827 | $ 18,272 | $ 2,999 | $ 13,724 | $ 5,909 | $ 19,633 | $ 3,439 |
| Europe, Middle East, & Africa | 1,010 | 5,812 | 6,822 | 1,642 | 967 | 5,733 | 6,700 | 1,607 | 1,286 | 6,020 | 7,306 | 1,998 |
| Asia Pacific | 82 | 1,838 | 1,920 | 408 | 90 | 1,213 | 1,303 | 363 | 97 | 1,001 | 1,098 | 376 |
| South America | 379 | 352 | 731 | 147 | 358 | 314 | 672 | 139 | 310 | 275 | 585 | 133 |
| Total | $11,636 | $14,756 | $26,392 | $ 4,695 | $12,860 | $14,087 | $26,947 | $ 5,108 | $15,417 | $13,205 | $28,622 | $ 5,946 |