**Bidding Procedures Hearing Date And Time: December 20, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: December 17, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time: February 21, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline: February 14, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -      x
                                                      :
        In re                                          :      Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :      Case No. 05-44481 (RDD)
                                                      :
                                                      :      (Jointly Administered)
              Debtors.                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  - -      x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P.
2002, 6004, 6006, AND 9014 (A)(I) APPROVING BIDDING PROCEDURES, (II) GRANTING
CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES,
AND (IV) SETTING SALE HEARING DATE, (B) AUTHORIZING AND APPROVING (I) SALE
OF CERTAIN OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL ASSETS PRIMARILY USED
IN DEBTORS' STEERING AND HALFSHAFT BUSINESS FREE AND CLEAR OF LIENS, CLAIMS,
AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES, AND (C)
AUTHORIZING AND APPROVING TRANSACTION FACILITATION AGREEMENT

("STEERING SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing"), (b) authorizing and approving (i) the sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets comprising substantially all the assets primarily used in the Selling Debtor Entities' steering and halfshaft business  (the "Acquired Assets") and the Sale Securities[1] (together with the Acquired Assets, the "Purchased Assets") to the Buyers or the Successful Bidder (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Pre-Petition Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Post-Petition Contracts," and collectively with the Pre-Petition Contracts, the "Assumed and Assigned Contracts") to the Buyers or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyers or the Successful Bidder, as the case may be, and (c) authorizing and approving the Transaction Facilitation Agreement between Delphi and General Motors Corporation ("GM").  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement (as defined in paragraph 18 below).

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan") (Docket No. 11386) and the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Disclosure Statement") (Docket No. 11388). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).

4.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

5.     The statutory predicates for the relief requested herein are sections 363,

365, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

6.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Court.[3]

7.     The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

4

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

---

[4]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

5

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas:[5] first, modifying the

---

[5]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P.  Under the Delphi-Appaloosa EPCA, the new plan investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.  On October 29, 2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).  In addition, on November 14, 2007, December 3, 2007, and December 5, 2007,  the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA.  On December 10, 2007, this Court entered an order granting the motion and approving the proposed amendments (Docket No. 11382).

Company's labor agreements to create a competitive arena in which to conduct business;[6]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[7]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[8] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[9] and

fifth, devising a workable solution to their current pension situation.[10]

---

[6]    As of August 29, 2007, this Court has entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[7]    On September 6, 2007, Delphi announced that it entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29, November 14, December 3, and December 5, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[8]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors have sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, their brake hose and catalyst businesses, and their Saltillo, Mexico brake plant business, as well as their manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan. The Debtors also received court approval for bid procedures related to the upcoming sale of substantially all assets used in their interiors and closures businesses.

[9]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics

E.    The Debtors' Plan Of Reorganization

13.    By filing the Plan and related Disclosure Statement, the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including GM.  Attached as exhibits to the Plan are two agreements, the GSA and the MRA, which provide for a comprehensive settlement with GM.  Both agreements are subject to this Court's approval as part of the confirmation process.  This Court has scheduled a hearing to consider confirmation of the Plan to commence on January 17, 2008.  Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

14.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

---

and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[10]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

<u>Relief Requested</u>

15.    By this Motion, Delphi and the selling Debtor entities described in the

agreement (the "Selling Debtor Entities")[11] seek approval for the sale of the Steering Business to

Steering Solutions Corporation ("Steering Solutions") and certain of its affiliates (the

"Buyers"),[12] subject to additional competitive bidding pursuant to the proposed Bidding

Procedures.  To effect the sale, the Selling Debtor Entities seek two types of relief.  First, at the

omnibus hearing to be held on December 20, 2007, the Selling Debtor Entities will seek entry of

an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order")

approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided

to the Buyers pursuant to the master sale and purchase agreement and as described more fully

herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing to

be held on February 21, 2008, the Selling Debtor Entities will seek entry of an order substantially

in the form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving

the Sale to the Buyers or the Successful Bidder, as the case may be, including, without limitation,

the assumption and assignment of the Assumed and Assigned Contracts to the Buyers, and the

assumption by the Buyers of the Assumed Liabilities.  To the extent that the Selling Debtor

Entities do not receive additional Qualified Bids (as defined below), the Selling Debtor Entities

---

[11]    Under the Agreement (as defined in paragraph 18 below), the Selling Debtor Entities include Delphi, Delphi
Automotive Systems LLC, Delphi China LLC, Delphi Automotive Systems (Holding), Inc. ("DASHI"), and
Delphi Technologies, Inc.  Certain assets would be sold under the Agreement or under ancillary agreements by
non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.  The Selling Debtor
Entities and the selling non-Debtor affiliates are collectively referred to as the "Sellers."  For purposes of
convenience, reference to the "Sellers" herein (including in all exhibits) means, as the context requires, (i) the
Selling Debtor Entities to the extent such reference implicates assets of the Selling Debtor Entities or (ii) non-
Debtor affiliates to the extent such reference implicates assets of the non-Debtor affiliates.  Moreover, for
convenience, use of the term "Selling Debtor Entities" means, as the context requires, the specific Debtor entity
undertaking the transaction(s) referenced to the extent such transaction affects the assets of such entity.

[12]    This Motion will refer to Steering Solutions, together with any affiliates it identifies in Schedule 1 of the
Agreement, as the "Buyers," or to any of them individually as a "Buyer."

reserve the right, at their election, to seek an earlier Sale Hearing (the "Earlier Sale Hearing");
provided, however, that if the Selling Debtor Entities seek approval of the Sale at the Earlier Sale
Hearing, the Selling Debtors would serve those parties receiving notice of the Sale under
paragraphs 48, 49, and 84 with a notice of the Earlier Sale Hearing on or before 20 days prior to
the Earlier Sale Hearing and allow any such party to file an objection to the Sale no later than
seven days prior to the Earlier Sale Hearing in accordance with the Case Management Order (as
defined below).

Basis For Relief

16.     The Company has stated that to achieve the necessary cost savings and
operational effectiveness in its transformation plan, it must streamline its product portfolio to
capitalize on its world-class technology and market strengths and make the necessary
manufacturing realignment consistent with its new focus.  As part of the Company's
transformation plan, the Company identified the Steering Business as one of its non-core
businesses subject to disposition.

17.     Accordingly, following extensive marketing efforts, on December 10,
2007, the Sellers and the Buyers entered into a Master Sale and Purchase Agreement, a copy of
which is attached hereto as Exhibit D (the "Agreement").  The Agreement contemplates a global
divestiture of the Company's Steering Business to the Buyers.  The Sellers would receive
approximately $447 million worth of consideration under the proposed transactions (the
"Transaction Value"), comprised of approximately $190 million in Assumed Liabilities and
estimated restructuring costs.[13]  In addition, GM would provide the Selling Debtor Entities $257
million under the Transaction Facilitation Agreement (as defined below) among Delphi and GM.

---

[13]   Some of these restructuring costs would otherwise have been borne by GM under the MRA when the MRA
becomes effective.

Finally, GM would be responsible for certain additional expenses, in an amount estimated to be

up to $65 million, which expenses would otherwise be Delphi's obligations under the Agreement.

The divestiture, as memorialized in the Agreement, contemplates that certain of the assets will be

sold by non-Debtor affiliates of Delphi.  The transactions to be undertaken by the Delphi non-

Debtor affiliates, although memorialized in the Agreement and the attachments thereto, are

generally not the subject of this Motion because those entities are not under the supervision of

this Court.  The discussion in this Motion is generally (but not exclusively) limited to

transactions to be undertaken by the Selling Debtor Entities, which require this Court's approval.

F.      The Steering Business

        18.      The Steering Business is a global leader in the design and manufacture of

steering and driveline systems and components for automotive vehicle manufacturers and

adjacent markets.  The Steering Business operates 22 manufacturing plants in 15 locations

worldwide, five regional systems engineering centers, and 11 local customer support centers.

Throughout its distinguished 100-year history, the Steering Business has consistently been an

industry leader in introducing new steering technologies, products, systems, and manufacturing

processes.  The Steering Business has a history of industry-leading innovations, including the

first tilt-wheel steering column and energy-absorbing steering column.  Its "wheel-to-wheel"

steering system capabilities include steering columns, intermediate shafts, steering gears,

steering pumps, steering hoses, electric power steering systems, halfshaft assemblies, and

propeller shaft joints.

        19.      The Steering Business employs approximately 9,700 individuals globally,

approximately 5,625 of whom work in the U.S.  Its customer base includes major domestic,

transnational, and international OEMs, such as GM, Fiat, Ford, DaimlerChrysler, and Chevy.  In

2006, the Steering Business generated $2.53 billion in revenues.[14]

G.    Factors Leading To The Sale

        20.    Although the Company believes that the Steering Business is

fundamentally strong, the Steering Business does not fit within the Company's anticipated

product portfolio under its transformation plan.  In particular, the Company has determined, after

an intensive product portfolio review, that the Steering Business is outside the primary focus of

the Company's growth and long-term strategic goals.

        21.    The Company believes, however, that as a standalone business, the

Steering Business could become more profitable and competitive.  The Company has therefore

determined that the value of the Steering Business would be maximized through its divestiture.

The Company, including the Selling Debtor Entities, will carefully manage the transition of the

Steering Business and the Sale will be completed in coordination with the Company's customers,

employees, unions, and other stakeholders to avoid any disruption to its customers and its world-

class level of service.

        22.    The Company has actively marketed the Steering Business for more than

one-and-a-half years.  As part of the process, the Company, with the assistance of its investment

banker, Rothschild Inc, contacted approximately ninety potential buyers and executed

confidentiality agreements with approximately thirty potential buyers.  These parties were

provided access to information about the Steering Business through a well-organized and

thorough offering and diligence process.  Based on the proposals received, Debtors selected

certain parties to conduct further detailed due diligence, including through an electronic data

---

[14]    The Steering Business' 2006 revenues are based on unaudited internal financial reports which have been
       normalized for certain non-recurring items.

12

room that was updated regularly during the sale process, management presentations, and

substantial onsite diligence meetings with key personnel of the Steering Business.

23.    The Sellers evaluated the terms and benefits of the proposals, as well as

the benefits of other alternatives to divesting the Steering Business.  In their business judgment,

the Sellers concluded that the proposal from the Buyers, which formed the basis of the

Agreement, offered the most advantageous terms and the greatest economic benefit.  This

decision was based in part on the Sellers' ability to maximize the value of the business line as a

going concern and their belief that the Buyers would continue to provide quality products and

service to the Company's customers, many of whom buy other products from Delphi.  Indeed,

both GM and the UAW appear to support the Sellers' sale of the Steering Business to the Buyers.

Steering Solutions is an affiliate of Platinum Equity, LLC ("Platinum").  Platinum is a global

firm specializing in the merger, acquisition, and operation of companies that provide services

and solutions to customers in a broad range of business markets, including information

technology, telecommunications, logistics, manufacturing, and entertainment distribution.  Since

its founding in 1995, Platinum has acquired more than 75 businesses with more than $23 billion

in aggregate annual revenue at the time of acquisition.

H.    The Agreement

24.    Pursuant to the Agreement, the Selling Debtor Entities would (i) sell the

Purchased Assets owned by the Selling Debtor Entities free and clear of any Interests and/or

Claims,[15] except for Permitted Encumbrances as defined in the Agreement, in consideration for

---

[15]    "Interests and/or Claims" means any and all liens, claims, interests, and Encumbrances of any type whatsoever,
whenever and however arising (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or
unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed,
contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material,
disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 cases,
and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise

13

the amount of proceeds paid by GM to Delphi under the TFA (as defined below), less any

portion paid by Delphi to the non-Debtors Sellers, and Buyers assumption of the Assumed

Liabilities and (ii) assume (if applicable) and assign the Assumed and Assigned Contracts to the

Buyers.

25.    The significant terms of the Agreement are summarized as follows:[16]

(a)    General Terms.  The Buyers would acquire the Purchased Assets, which
comprise substantially all of the assets primarily used by the Steering Business through a
combination of asset and share sales (other than the certain assets have been excluded), including
accounts receivable, real property, personal property, inventory, contracts that relate to the
Steering Business, administrative assets, permits, certain intellectual property, technical
documentation, prepaid expenses, deposits, advances, warranties and claims relating to the
Steering Business, certain motor vehicles, certain insurance policies, and goodwill as a going
concern and other intangible properties.

(b)    Bankruptcy Court Approval.  The Sale would be subject to approval by
this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    Documentation.  The Sale would be effected pursuant to the Agreement
and related documentation.[17]  At or prior to the closing, certain of the Sellers and certain of the
Buyers would enter into, among others, the following ancillary agreements (collectively, the
"Ancillary Agreements"): (i) certain agreements related to the Buyers' use of foreign, non-Debtor
real property, (ii) certain agreements governing the transfer of intellectual property from the
Sellers to the Buyers, (iii) certain stock and asset transfer agreements, (iv) an escrow agreement,
(v) a transition services agreement, (vi) a bill of sale, and (vii) certain assignment and
assumption agreements.

(d)    Deposit Escrow.  No later than the business day following entry of the
Bidding Procedures Order on this Court's docket, the Buyers would deliver to the escrow agent
$9.5 million that would be held as an earnest money deposit (such amount, together with the
interest accrued thereon prior to closing, the "Deposit Amount").  Upon closing, the escrow

---

arising under doctrines of successor liability), including, but not limited to those (i) that purport to give to any
party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling
Debtor Entities' or the Buyers' interest in the Purchased Assets, or any similar rights, and (ii) relating to taxes
arising under or out of, in connection with, or in any way relating to the operation of the Steering Business prior
to the Closing Date, including the transfer of the Purchased Assets to the Buyers.

[16]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of
the Agreement control.  Although the terms and conditions are generally the same for all the Sellers, the
summaries in this Motion refer generally to the Selling Debtor Entities and not the non-Debtor Sellers.

[17]    Copies of the schedules to the Agreement and the Ancillary Documents (as defined below) are available upon
request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show
that they would be affected by the relief requested in this Motion.

agent would return the Deposit Amount to the Buyers. Upon termination of the Agreement because of a material breach of the Buyers, the Sellers would be entitled to receive the Deposit Amount. If the Agreement is terminated for any other reason, the Deposit Amount would be returned to the Buyers.

        (e)    <u>Representations And Warranties</u>. Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale and the Purchased Assets and the Buyers would provide representations and warranties generally standard in a transaction of this type. Except as specifically provided for in the Agreement, the representations and warranties of the Selling Debtor Entities and the Buyers will not survive the closing of the Sale.

        (f)    <u>Covenants</u>. Except as otherwise disclosed in the Agreement, between the date of signing of the Agreement and the Closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyers (which consent would not be unreasonably withheld): (i) split, combine, or reclassify any capital stock or other equity interests or purchase or sell any capital stock or other equity interests of any of the Sale Company or JV Company (as defined in the Agreement) or grant or make any option, subscription, warrant, call, commitment, or agreement of any character in respect of any such capital stock or other equity interests; <u>provided</u>, <u>however</u>, that this would not limit the ability of any Sale Company or any JV Company to pay cash dividends or distributions to Delphi and any of its affiliates, (ii) sell or otherwise dispose of the Purchased Assets having an aggregate value exceeding $500,000, excluding sales made in the ordinary course of business, (iii) merge or consolidate any Sale Company or JV Company with or into any other person or enter into any agreement requiring any such merger or consolidation, (iv) acquire assets or commit to capital expenditures with an aggregate value exceeding $1 million, excluding acquisitions of assets or capital expenditures made in the ordinary course of business in accordance with the Steering Business's budgeted capital expenditures, (v) (A) in the case of Sale Companies, incur, assume, or guarantee any debt obligations in excess of $1 million or voluntarily purchase, cancel, prepay, or otherwise provide for a complete or partial discharge in advance of a scheduled payment date with respect to any material debt obligations, excluding intercompany debt obligations that are repaid on or before closing, and (B) otherwise incur, assume, or guarantee any debt obligation that would become an Assumed Liability, (v) incur any encumbrance, other than the Permitted Encumbrances, (vi) increase the cash compensation or grant the right to receive any severance, termination, or retention pay of the Transferred U.S. Employees other than: (A) in the ordinary course of business, or (B) as required by any other agreement, (vii) enter into or amend any employee benefit plan, the consequence of which would be to increase any liability to be assumed by Buyers, (viii) enter into any new transaction with an affiliate of the Sellers, (vi) settle any proceeding in excess of $2.5 million with respect to an Assumed Liability, except for an amount less than or equal to that reserved on the reference balance sheet in respect of such settled proceeding, (x) hire any individual with a base salary in excess of $150,000 per annum, (xi) with respect to the Steering Business, make any material election relating to taxes (except in a manner consistent with past practice) or settle or compromise any material tax liability or amend any material tax return, (xii) make any material change in the accounting methods or practices followed by the Steering Business (other than such changes as are: (A) required by law, (B) made in conformance with GAAP, or (C) required in connection with the preparation of the historical financial statements), (xii) enter into any

partnership or joint venture agreement between any of the Sellers and any other person, (xiv) enter into, terminate, or make any material amendment to a material contract (excluding collective bargaining agreements) other than in the ordinary course of business, (xv) amend any organizational document of the Sellers or the JV Companies, (xvi) make any material change in its methods of management, marketing, accounting, or operating or practices relating to payments, (xvii) fail to maintain insurance in a manner consistent with Sellers' past practice, or (xviii) agree or commit to do any of the foregoing.

(g)    KDAC. After the execution of the Agreement, the Sellers would use commercially reasonable efforts to prepare for the sale of DASHI's 50% interest in Korea Delphi Automotive Systems Corporation's ("KDAC") business relating to the Steering Business ("KDAC Steering") and satisfy the following conditions: (i) completion of KDAC Steering's split-off from KDAC as a separate legal entity containing all of the assets and liabilities of KDAC Steering through a corporate split process whereby the shareholding ratio of the existing KDAC shareholders remains unchanged in the newly formed KDAC Steering legal entity and (ii) receipt of consents from the other shareholders of KDAC Steering permitting DASHI to sell its 50% interest in KDAC Steering (the "KDAC Shareholder Consent").

(h)    Indemnification. The Sellers would indemnify the Buyers for (i) damages related to those liabilities and assets retained by the Sellers at closing and (ii) a breach of any agreement or covenant of the Sellers in the Agreement.  As for the retained liabilities, the Sellers indemnification obligations for certain items would be limited as follows:  (i) product warranty liability (72 months following the closing), (ii) certain environmental liability (96 months following the closing), and (iii) general, automotive, and product liability (36 months following the closing).

(i)    Closing Conditions.  In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters, the obligation of the Buyers to close the Sale would be subject to the satisfaction of the following conditions: (i) the substantial completion of certain separation activities, (ii) the accuracy of the Buyers' and the Sellers' representations and warranties, except as would not be reasonably expected to have a material adverse effect, (iii) the Sellers and the Buyers would have performed and complied in all material respects with all agreements and obligations required by the Agreement to be performed or complied with prior to the closing, (iv) the Sellers' and the Buyers' delivering of the Ancillary Agreements, (v) the Buyers' entering into certain agreements with outsourced service providers, and (vi) no occurrence of a material adverse effect (as defined in the Agreement).

(j)    Termination. The Agreement could be terminated in the following circumstances (by a party which is not in breach of the Agreement): (i) upon mutual written consent of the Sellers and the Buyers, (ii) by either the Sellers or the Buyers if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity other than this Court, (iii) by either the Sellers or the Buyers if the Selling Debtor Entities consummate an alternative transaction, (iv) by either the Sellers or the Buyers if the closing has not occurred within 180 days after entry of the Sale Approval Order, (v) by either the Sellers or the Buyers, if this Court has not entered a Sale Approval Order that is a final order on or before 90 days after the date of the Agreement, (vi) within ten business days, by the Buyers if a material adverse effect has occurred and continuing, and not reasonably capable of being cured within 90

16

days after entry of the Sale Approval Order (vii) by the Buyers, if the Buyers become an Alternative Bidder but the Selling Debtor Entities fail to consummate the transaction with the Successful Bidder within 90 days of entry of the Sale Approval Order, (viii) by the Buyers, upon written notice to the Sellers, if the Sellers have breached the Agreement and such breach is (A) not cured within 30 days or (A) incapable of being cured by the Sellers, (ix) by the Buyers, if the Sellers enter into an agreement or understanding for an alternative transaction for the Steering Business other than a Successful Bidder at the Auction where the Buyers are the Alternate Bidder; (x) by the Buyers, if the Sellers (A) seek or support, or fail to oppose, a competing bid for the Steering Business or (B) execute an agreement or understanding with respect to an Alternative Transaction (in each case, except in connection with the Qualified Bids at the Auction, or regarding a Successful Bidder at the Auction where the Buyers are the Alternate Bidder), (xi) by the Buyers, if this Court determines that the Sale of the Steering Business can only be approved through a plan of reorganization, unless the Buyers can purchase the Steering Business on substantially the same terms as the Agreement and the plan of reorganization is confirmed within 120 days of the Agreement, (xii) by the Buyers, if the Steering Business is sold in connection with a closure, liquidation, or wind-down, and (xiii) by the Sellers, upon written notice to the Sellers, if the Buyers have breached the Agreement and such breach is (A) not cured within 30 days or (B) is incapable of being cured by the Buyers.

(k)     Break-up Fee.  Subject to this Court's approval and certain exceptions, the Sellers would be required to pay a break-up fee to the Buyers in the amount of $6 million, which amounts to approximately 1.34% of the Transaction Value (the "Break-Up Fee"), if (i) the Sellers or the Buyers terminate the Agreement for the Sellers to consummate an alternative transaction for the sale of the Steering Business, (ii) if the Buyers terminate the Agreement because the Sellers enter into an agreement or understanding for an alternative transaction for the Steering Business other than regarding a Successful Bidder at the Auction where the Buyers are the Alternate Bidder, (iii) the Buyers terminate the Agreement because the Sellers (A) seek or support, or fail to oppose, a competing bid for the Steering Business or (B) execute an agreement or understanding with respect to an alternative transaction (in each case, except in connection with Qualified Bid in the Auction process or regarding a Successful Bidder at the Auction where Buyer Parent is the Alternate Bidder), or (iv) the Buyers, as an Alternate Bidder, terminate the Agreement because the Sellers fail to consummate an alternative transaction with a Successful Bidder within 90 days of entry of the Sale Approval Order; provided, however, that the Break-Up Fee would be payable only upon consummation of an alternative transaction for the Steering Business.

(l)     Expense Reimbursement.  Subject to this Court's approval, provided that the Buyers are not in material breach of the Agreement, the Sellers would be required to reimburse (i) all of the Buyers' reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement (but not to exceed the amount of the Break-Up Fee) if the Break-Up Fee is not paid or (ii) up to $2 million, if the Break-Up Fee is paid.

(m)     Transfer Taxes.  The Sellers and the Buyers would use commercially reasonable efforts and cooperate in good faith to exempt the sales, conveyances, assignments, transfers and deliveries to be made to the Buyers under the Agreement from any transfer, documentary, sales, use, registration, recording, stamp, value-added, and other such taxes

17

(including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("Transfer Taxes") as may be payable in connection with the Sale under section 1146 of the Bankruptcy Code.  In the event that an exemption(s) is unavailable, such Transfer Taxes would be borne by the party upon whom the applicable law regulation or custom of the jurisdiction imposes the obligation to pay or, where no law, regulation or custom exists would be paid by the Buyers.

I.      Preliminary Payment Allocation By Delphi To Non-Debtor Sellers

26.    As noted above, some of the Purchased Assets are being sold by certain non-Debtor affiliates.  The Buyers are interested in purchasing the global Steering Business, and not merely the portion of the Steering Business owned by the Selling Debtor Entities.  Thus, to divest the U.S. portion of the Steering Business, the Company, in its business judgment, determined that it was in the Company's best interest for the foreign-non-Debtor Sellers to divest their assets related to the Steering Business.  To effectuate the sale, the Selling Debtor Entities must compensate the non-Debtor Sellers for the fair market value of their portion of the Purchased Assets.  The Sellers calculated the fair market value of the non-Debtor Sellers' assets based on a discounted cash flow analysis and/or net book value.  The proposed payments by the Selling Debtor Entities to the Non-Debtor Sellers are reflected in the chart attached hereto as Exhibit E.  The proposed payments for those assets valued based on net book value will be adjusted to reflect actual net book value at date of sale.

27.    Additionally, $10 million (the "KDAC Amount") of value is allocable to DASHI's 50% interest in KDAC Steering (the "KDAC Shares"). The sale of the KDAC Shares to the Buyers, however, is subject to KDAC Shareholder Consent and other necessary approvals. The Selling Debtor Entities and the Buyers understand and agree that the sale of the KDAC Shares would likely occur after closing of the Sale.  Accordingly, the Agreement provides that $10 million would be paid to the Buyers, if the Selling Debtor Entities are unable to sell the KDAC Shares within nine months of closing.

18

J.        Workforce Provisions

28.        As of the Closing, the Buyers would offer employment to substantially all of the Selling Debtor Entities' U.S. (which includes employees on layoff) and non-U.S. employees.  U.S. salaried employees would be employed on terms that provide salary and benefit packages substantially comparable in the aggregate to those in place with the Selling Debtor Entities immediately prior to closing.  For U.S. salaried employees who accept the Buyers' offer of employment, the Buyers would maintain the requisite level of compensation and benefits for a minimum of one year from the closing; provided, however, that in instances in which the level of compensation or benefits of any transferred U.S. salaried employee is governed by a contract containing a different duration period, the Buyers would abide by the terms of such contract; and provided further that the Buyers would be permitted (but not required) to reduce or modify employment terms of the transferred U.S. salaried employees consistent with any across-the-board modifications made by the Selling Debtor Entities to the terms of similarly situated salaried employees of the Selling Debtor Entities during the one-year period following the closing.  The terms and conditions of employment for the transferred U.S. salaried employees that are designated as hourly employees and represented by a union would be as determined by the applicable collective bargaining agreement.

29.        The significant terms of the Agreement, with respect to U.S. hourly or U.S. salaried employees, as applicable, are as follows:[18]

(a)        Collective Bargaining Agreements.  The Buyers would assume the terms and conditions of all of the Selling Debtor Entities' applicable collective bargaining agreements, as may be modified prior to closing.  The Buyers would recognize the seniority status of

---

[18]    Potential bidders should note that Section 6.6 of the Agreement addresses, among other things, the terms and conditions of employment of UAW-represented employees, and these issues remain subject to the parties' rights and obligations related to bargaining with the UAW.

Transferred U.S. Employees who are employed in accordance with a collective bargaining agreement for all purposes of continued employment with the Buyers.

(b)    Inactive Employees.  Employees of the Selling Debtor Entities who are not active employees as of the closing (the "Inactive Employees") due to e.g., illness, short-term disability, sick leave, family medical leave, or other approved leave of absence would remain the Selling Debtor Entities' responsibility until such employee commences employment with the Buyers.  Employees of the Selling Debtor Entities on layoff status are not Inactive Employees for purposes of the Agreement.  Inactive Employees may return to work for the Buyers under the terms and conditions described in the Agreement for Transferred U.S. Employees if such return occurs within 12 months of the closing, or later if required by law.

(c)    Employee Benefit Plans. The Buyers would recognize the pre-closing credited and length of service for the Transferred U.S. Employees of the Sellers for eligibility and vesting purposes.  Subject to applicable law, the Sellers would recognize a Transferred U.S. Employee's post-closing service with Buyer (and its affiliates that were within "controlled group" as defined under ERISA and the Internal Revenue Code) for purposes of pension vesting, eligibility, and early retirement subsidies.  In no case, however, would credited or length of service be recognized under the Agreement if such recognition would cause a duplication of compensation or benefits as between the Sellers and the Buyers.  The Transferred U.S. Employees' participation and eligibility for benefits under the Buyers' benefits plans would commence as of the Closing or as soon thereafter as practicable.

(d)    Severance.  The Buyers would assume all obligations and liabilities relating to any claims for severance and terminations payments or benefits by the Transferred U.S. Employees arising from (i) the transactions contemplated under the Agreement or (ii) any action taken by the Buyers after Closing, including terminating or reducing the compensation of any Transferred U.S. Employee after Closing.

K.    Approval Of The Bidding Procedures

30.    The Sale of the Purchased Assets would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Steering Business for the benefit of the Sellers, including the Selling Debtor Entities and their estates, their stakeholders, and other interested parties.

31.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any

subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and

this Court's approval thereof.  The following overbid provisions and related Bidding Procedures

are designed to compensate the Buyers for their efforts and agreements to date and to facilitate a

full and fair process (the "Bidding Process").  The Bidding Process is designed to maximize the

value of the Purchased Assets for the benefit of the Selling Debtor Entities' creditors,

stakeholders, and estates.

   32.  The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in

relevant part, as follows:[19]

   (a)  <u>"As Is, Where Is"</u>:  The Purchased Assets would be sold on an "as is,
where is" basis and without representations or warranties of any kind, nature, or description
except as set forth in the Agreement or the purchase agreement of a Successful Bidder.

   (b)  <u>Participation Requirements</u>:  To ensure that only bidders with financial
ability and a serious interest in the purchase of the Purchased Assets participate in the Bidding
Process, the Bidding Procedures provide for certain requirements for a potential bidder to
become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and substance
satisfactory to the Sellers, (ii) providing the Sellers with certain financial assurances as to such
bidders ability to close a transaction, and (iii) submitting a preliminary proposal reflecting (A)
the purchase price range, (B) any Purchased Assets expected to be excluded, (C) the structure
and financing of the transaction, (D) any anticipated regulatory approvals, (E) the anticipated
time frame and any anticipated impediments to obtaining such approvals, (F) any additional
conditions to closing the potential bidder may wish to impose, and (G) the nature and extent of
any due diligence the potential bidder may wish to conduct and the date by which such diligence
would be completed.

   (c)  <u>Due Diligence</u>:  All Qualified Bidders would be afforded an opportunity to
participate in the diligence process.  The Sellers would coordinate the diligence process and
provide due diligence access and additional information as reasonably requested by any
Qualified Bidders.  Due diligence would not continue after the Bid Deadline (as defined below).

   (d)  <u>Bid Deadline</u>:  All bids would have to be received from Qualified Bidders
not later than 11:00 a.m. (prevailing Eastern time) on January 18, 2008 (the "Bid Deadline").
The Sellers could extend the Bid Deadline once or successively, but would not be obligated to do
so; <u>provided</u>, <u>however</u>, for any such extension beyond February 1, 2008, the Sellers would obtain

---

[19] In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary
have the meanings ascribed to them in the Bidding Procedures or the Agreement.

written consent for such extension from Steering Solutions, which consent would not be unreasonably withheld.

        (e)    <u>Bid Requirements</u>:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit of $9.5 million, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

        (f)    <u>Qualified Bids</u>: To be deemed a "Qualified Bid," a bid would be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Sellers than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value equal or greater than the Preliminary Purchase Price reflected in the Agreement, plus the Assumed Liabilities, plus the amount of the Break-Up Fee and Expense Reimbursement, plus $1 million, (iv) not be conditioned on bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, (vi) include a commitment to consummate the purchase of the Purchased Assets within not more than 15 days after entry of a Bankruptcy Court order approving such purchase, and (vii) be on terms acceptable to GM, as provided in any agreement between GM and Delphi which facilitates the transactions contemplated in the Agreement.  A Qualified Bid would be valued based on factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of the Buyers will be referred to as a "Subsequent Bid."  As soon as reasonably practicable following receipt of each Qualified Bid, the Sellers would deliver complete copies of all items and information enumerated above to counsel for the Equity Committee.  The Sellers also would provide the UAW with notice of all Qualified Bidders and their contact information.

        (g)    <u>Conduct Of Auction</u>: If the Sellers receive at least one Qualified Bid in addition to that of the Buyers, they would conduct an auction (the "Auction") of the Purchased Assets at 10:00 a.m. (prevailing Eastern time) on or before January 28, 2008, or such later time or other place as the Sellers notify all Qualified Bidders who have submitted Qualified Bids, with the Buyers' consent not to be unreasonably withheld (but in no event later than the second business day prior to the Sale Hearing), in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least three business days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Sellers, GM, and the UAW whether it intends to participate in the Auction and at least two business days prior to the Auction, the Sellers would provide such bidders with copies of the Qualified Bid which the Sellers then believe would be the highest or otherwise best offer for the Purchased Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $1 million, and conclude after each Qualified Bidder has had the opportunity to submit one or more additional Subsequent Bids.

(h)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Sellers, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder"), as well as identifying the Alternate Bidder.  The Sellers would sell the Purchased Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the Sale Hearing.

(i)    Sale Hearing:  The Selling Debtor Entities request that the Sale Hearing be scheduled for February 21, 2008 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled by the Sellers without notice other than by an announcement of the adjourned date at the Sale Hearing, only if (a) such extension would enable the Sellers to comply with the time requirements of the Agreement or (b) the Buyers are not the Successful Bidder at the Auction.  In all other instances, the Sale Hearing may only be adjourned upon written consent of the Buyers, which consent would not be unreasonably withheld.  To the extent that the Selling Debtor Entities do not receive additional Qualified Bids, the Selling Debtor Entities reserve the right, at their election, to seek the Earlier Sale Hearing; provided, however, that if the Selling Debtor Entities seek approval of the Sale at the Earlier Sale Hearing, the Selling Debtors would serve those parties receiving notice of the Sale under paragraphs 48, 49, and 84 with a notice of the Earlier Sale Hearing on or before 20 days prior to the Earlier Sale Hearing and allow any such party to file an objection to the Sale no later than seven days prior to the Earlier Sale Hearing in accordance with the Case Management Orders (as defined below).  If no Qualified Bids other than that of the Buyers is received, the Sellers would proceed with the sale of the Purchased Assets to the Buyers, pursuant to the terms of the Agreement, as it may be modified by the Sale Approval Order, following entry of such order.  If the Sellers receive additional Qualified Bids, then at the Sale Hearing, the Selling Debtor Entities could seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Sellers unless and until approved by this Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Sellers would be permitted to effectuate a sale to the Alternate Bidder without further order of this Court.

(j)    Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of the Successful Bidder, such Successful Bidder would forfeit its good faith deposit and such deposit would irrevocably become property of the Sellers.  On the Return Date, the Sellers would return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(k)    Reservation Of Rights:  The Sellers, after consultation with the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time, any bid (other than the Buyers' initial bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the

23

Sellers, including the Selling Debtor Entities, their estates, and their stakeholders as determined by the Selling Debtor Entities in their sole discretion.

L.      Transaction Facilitation Agreement

33.      Under the MRA, which is subject to this Court's approval under the Plan confirmation process, GM committed, among other things, to pay Delphi on the later of January 2, 2008 or the effective date of the Plan an amount equal to "the lesser of (x) $210 million and (y) 66.6% of the estimated Net Working Capital associated with the Global Steering Business as of December 31, 2007," subject to various adjustments (the "Steering Advance").  MRA § 4.04(g)(i).

34.      To induce Delphi to proceed with a sale of the Steering Business on terms set forth in the Agreement, GM, which has committed under the MRA to pay Delphi the Steering Advance, regardless of whether Delphi sells the Steering Business, was amenable to increasing the consideration to Delphi in connection with the sale of the Steering Business.  As a result, on December 10, 2007, GM and Delphi entered into that certain Transaction Facilitation Agreement, a copy of which is attached hereto as Exhibit F (the "TFA").  The Debtors seek approval of the TFA under the Sale Approval Order.  The significant terms of the TFA are as follows:

(a)      Termination.  The TFA would automatically terminate upon any termination of the Agreement, other than in connection with the sale of the Steering Business to a Successful Bidder under the Bidding Procedures.  If the TFA is terminated, all of the terms of the MRA that would otherwise be amended by the TFA would be deemed to have been in full force and effect on the effective date of the MRA, and Delphi and GM would perform their respective obligations thereunder.

(b)      Consent Of Purchase Price And Identity Of Buyer.  The MRA provides GM the right to consent to the identity of any buyer of the Steering Business and to the amount of proceeds to be paid upon the sale of the Steering Business if such proceeds are less than the net working capital associated with the Steering Business.  MRA § 4.05(a).  Under the TFA, GM retains such consent rights.

24

(c)    GM Payment.  If the closing of the Sale (the "Closing Date") occurs
before the effective date of the MRA, the TFA provides that GM would pay to Delphi: (i) $257
million on the Closing Date; (ii) the fees payable to Delphi's investment banker, Rothschild, Inc.,
in the amount of $5 million within one business day after the Closing Date; (iii) an expense
reimbursement of up to $10 million related to "Day 2" information technology separation costs;
and (iv) a one-time working capital normalization payment of $30 million within one business
day of Delphi making a related one-time working capital normalization payment of $30 million
to the Buyers.  If the Closing Date occurs after the effective date of the MRA, GM's payment
obligations remain unchanged, except that of the $257 million payment described above, GM
would pay $210 million of such amount on the effective date of the MRA and the remaining $47
million on the Closing Date.  Additionally, if Delphi does not sell the Buyers its interest in
KDAC Steering within nine months of the Closing Date, then GM would reimburse Delphi $10
million, provided that Delphi makes a related $10 million payment to the Buyers under the terms
of the Agreement.  If Delphi sells its interest in KDAC Steering to the Buyers within the
requisite time, GM would reimburse Delphi an amount up to $20 million for the amount of
KDAC Steering debt assumed by Buyer, and for which Delphi reimburses the Buyer.

(d)    Delphi Payment.  To the extent that the Auction results in increased
proceeds for the sale of the Steering Business in excess of the Break-Up Fee and Expense
Reimbursement paid by Delphi to the Buyers, the TFA provides that Delphi would reimburse
GM in full for certain of the payments described above (the "GM Reimbursement").  If a
Successful Bid exceeds the Break-Up Fee, the Expense Reimbursement, and the GM
Reimbursement, then the TFA provides that such additional proceeds would be paid 66.66% to
GM, with the remaining balance retained by Delphi.

M.    Bid Protections

35.    At various times over the course of the past year, the Buyers have

expended considerable time, money, and energy pursuing the purchase of the Steering Business.

The Agreement is the culmination of these efforts.  The Buyers have engaged in extended arm's

length and good faith negotiations regarding a possible sale.  The Buyers are not "insiders" of

any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

36.    In recognition of this expenditure of time, energy, and resources, the

Selling Debtor Entities have agreed to provide certain bid protections to the Buyers (the "Bid

Protections").  Specifically, the Agreement provides for, and the Selling Debtor Entities

respectfully request that this Court approve, a break-up fee payable by the Sellers to the Buyers

in the amount of $6 million, or 1.34% of the Transaction Value, if the Agreement is terminated

under certain termination provisions, the Selling Debtor Entities consummates an Alternative

Transaction, and the Buyers are not in breach of the Agreement or the Bidding Procedures.  The

Selling Debtor Entities' obligation to pay the Bid Protections, as provided by the Agreement,

would survive termination of the Agreement and, until paid, would constitute a superpriority

administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority

over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the

Bankruptcy Code.

       37.     In addition, the Selling Debtor Entities respectfully request this Court's

approval of the term in the Agreement providing reimbursement of the Buyers' reasonable, actual

out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the

Agreement in an amount not to exceed (i) $2,000,000 if a Break-Up Fee is paid or (ii) the

amount of the Break-Up Fee if the Break-Up Fee is not paid.

       38.     If the Buyers actually receive the Break-Up Fee and/or Expense

Reimbursement, then such Break-Up Fee or Expense Reimbursement would be the sole and

exclusive remedy of the Buyers, whether at law or in equity, for any breach by Delphi or any of

its affiliates of the terms and conditions of the Agreement; provided, however, that the Buyers

would retain their rights and remedies under the Deposit Escrow Agreement and the portion of

the agreement governing the return of the Deposit Amount.

       39.     The Bid Protections were a material inducement for, and a condition of,

the Buyers' entry into the Agreement.  The Sellers believe that the Bid Protections are fair and

reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation

undertaken by the Buyer in connection with the Sale, (b) the significant amount of known

Assumed Liabilities being assumed by the Buyers under the Agreement, and (c) the fact that the

Buyers' efforts have increased the chances that the Sellers would receive the highest or otherwise best offer for the Purchased Assets.

40.     The Buyers are unwilling to commit to hold open the offer to purchase the Purchased Assets under the terms of the Agreement without the approval of the Bid Protections and the Bidding Procedures Order.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Sellers would lose the opportunity to obtain what they believe to be the highest and best offer for the Purchased Assets.

41.     Moreover, payment of the Break-Up Fee would not diminish the Selling Debtor Entities' estates.  The Sellers would not expect to pay the Break-Up Fee unless they do so to accept an alternative Successful Bid, which must exceed the price offered by the Buyers by an amount sufficient to pay the Break-Up Fee.  The Expense Reimbursement is a necessary cost of obtaining a binding commitment from the Buyers for the sale of the Steering Business.  The Selling Debtor Entities thus request that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

N.     Assumption And Assignment Of Contracts

42.     The Selling Debtor Entities seek authority under section 365 of the Bankruptcy Code to assume and assign the Pre-Petition Contracts to the Buyers or the Successful Bidder, as the case may be.  The approximate cost to cure the Pre-Petition Contracts is estimated at $32.09 million.

43.     With respect to the Pre-Petition Contracts, at least 20 days prior to the Sale Hearing, the Selling Debtor Entities propose to serve on each non-Debtor party to an Assigned Contract a cure notice substantially in the form attached hereto as Exhibit G (the "Cure Notice").  The Cure Notice would state, with respect to the Pre-Petition Contracts, the cure amount that the Selling Debtor Entities believe is necessary to assume such contract or lease

27

pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and would notify each

party that such party's lease or contract would be assumed and assigned to the Buyers to be

identified at the conclusion of the Auction.  In addition, such Cure Amounts would be listed on a

schedule to the Sale Approval Order.  In connection with the proposed Sale, the Selling Debtor

Entities also seek authority under section 363 of the Bankruptcy Code to assign the Post-Petition

Contracts to the Buyers or the Successful Bidder, as the case may be.  There are no past due

obligations under the Post-Petition Contracts.

     44.   The Debtors propose that any objection to the Cure Amount would be

required to be filed within ten days of the date of the Cure Notice and served as set forth in the

Cure Notice.  Any objection to the Cure Amount would be required to state with specificity what

cure amount the party to the Pre-Petition Contract believes is required, including appropriate

documentation thereof.  If no objection is timely received, the Cure Amount set forth in the Cure

Notice would be controlling notwithstanding anything to the contrary in any Pre-Petition

Contract or other document, and the non-Debtor party to the Pre-Petition Contract would be

forever barred from asserting any other claims against the Selling Debtor Entities, the Buyers, or

the Successful Bidder (as appropriate) or the property of any of them, as to such Pre-Petition

Contract.  The Selling Debtor Entities would pay all Cure Amounts as agreed to by the Selling

Debtor Entities and the contract counter-party, or, absent such agreement, by order of the Court

in the time and manner specified by the Sale Approval Order.  Notwithstanding any contested

Cure Amount, the Assumed and Assigned Contracts would be assumed and assigned to the

Buyer at the closing.

     45.   In the event, however, that the Debtors emerge from these chapter 11

cases (the "Emergence Date") prior to the closing of the Sale, then the Pre-Petition Contracts

would be assumed pursuant to the Debtors' Plan. See Plan § 8.1. Under such a scenario, the

Selling Debtor Entities would still seek to assign the Pre-Petition Contracts under the Sale

Approval Order. The Debtors would be obligated to send two sets of cure notices to parties to

the Pre-Petition Contracts: (a) the Cure Notice, as discussed above, and (b) a cure notice sent in

connection with the Plan (the "Plan Cure Notice"). The Debtors would serve the Plan Cure

Notice in a time and manner specified under the Plan. In addition to the Cure Amount described

above, the Cure Notice would also advise the parties that the Cure Amount will be paid in cash

as soon as practicable after closing. The Plan Cure Notice, on the other hand, would allow the

counterparties to affirmatively elect to receive cash as payment of the Cure Amount or to receive

plan currency in satisfaction of the Cure Amount as contemplated under the Plan (the "Plan Cure

Notice Election"). If the closing of the Sale occurs before the Emergence Date, then the Cure

Amount would be paid in cash. If the closing occurs after the Emergence Date, then the Plan

Cure Notice Election would control and the Cure Notice would become moot.

46.        In addition, at least 20 days prior to the Sale Hearing, the Selling

Debtor Entities propose to serve on each non-Debtor party to an Assumed and Assigned Contract

a notice substantially in the form attached hereto as Exhibit H (the "Buyers

Assumption/Assignment Notice"). The Buyers Assumption/Assignment Notice would identify

the Buyers as the parties that would be assigned all of the Selling Debtor Entities' right, title, and

interest in the Assumed and Assigned Contracts, subject to completion of the bidding process

provided under the Bidding Procedures.[20] Non-Debtor parties to any Pre-Petition Contract

would be required to file an objection to the assumption and/or assignment of the Pre-Petition

---

[20]    The Selling Debtor Entities propose to serve the Purchaser Assumption/Assignment Notice and the Qualified
Bidder Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the Post-
Petition Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of
assignment.

Contract within ten days of service of the Buyers Assumption/Assignment Notice, and such

parties would be required to state, with specificity, the legal and factual basis of their objection,

unless otherwise ordered by this Court.

47.    At least 20 days prior to the Sale Hearing or on the business day following

the Bid Deadline, whichever is later, the Selling Debtor Entities propose to send a notice (the

"Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as

Exhibit I, to each non-Debtor party to an Assumed and Assigned Contract identifying any

Qualified Bidders as potential parties to which the Assumed and Assigned Contracts would be

assigned.  The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor

Entities the ability to address promptly any adequate assurance issues that contract parties may

have with any of the Qualified Bidders. Non-Debtor counterparties to any Pre-Petition Contract

would be required to file an objection to the assumption and/or assignment of the Pre-Petition

Contract within ten days from the service of the Qualified Bidder Assumption/Assignment

Notice, and such parties would be required to state, with specificity, the legal and factual basis of

its objection, unless otherwise ordered by this Court.

O.    Notice Of Sale Hearing

48.    Within seven days after entry of the Bidding Procedures Order (the

"Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the

Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the

Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the Office of the United

States Trustee for the Southern District of New York, (ii) counsel for the Buyers, (iii) counsel for

the official committee of unsecured creditors appointed in these chapter 11 cases, (iv) counsel for

the official committee of equity security holders appointed in these chapter 11 cases, (v) counsel

for the agent under the Debtors' postpetition credit facility, (vi) all entities known to have

30

expressed an interest in a transaction with respect to the Purchased Assets during the past 12

months,[21] (vii) all entities known to have asserted any lien, claim, interest, or Encumbrance in or

upon the Purchased Assets, (viii) all federal, state, and local regulatory or taxing authorities or

recording offices, including but not limited to environmental regulatory authorities, which have a

reasonably known interest in the relief requested by the Motion, (ix) all counter-parties to the

Assumed and Assigned Contracts, (x) the United States Attorney's office, (xi) the United States

Department of Justice, (xii) the Securities and Exchange Commission, (xiii) the Internal Revenue

Service, (xiv) all entities on the Master Service List (as defined by the Supplemental Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures (Docket No. 2883), as amended from time to time (collectively, the

"Case Management Orders")), (xv) counsel to GM, (xvi) counsel to the International Union,

United Automobile, Aerospace and Agricultural Works of America and its Local Unions

Number 699 (Saginaw) and Number 2195 (Athens), (xvii) all other labor unions representing the

Business' hourly employees, and (xviii) any pension fund or multiemployer pension plan to

which the Debtors have made contributions on account of employees of the Business..

P.    Publication Notice

49.    The Selling Debtor Entities also propose pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d) that publication a notice of the Sale in a form substantially similar to the

form annexed hereto as Exhibit J, in the Wall Street Journal (International Edition), the New

York Times, and the Detroit Free Press by the Mailing Date or as soon as practicable thereafter,

---

[21]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

be deemed proper notice to any other interested parties whose identities are unknown to the

Sellers.

Applicable Authority

Q.    Approval Of Bidding Procedures

50.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del.

1991).

51.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's section 363(b) motion is

a "summary proceeding," intended merely as a means "to efficiently review the . . . debtor's

decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the

time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-99.

52.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

32

company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply to

raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections."  Lionel Corp., 722 F.2d at 1071.

53.    As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be "so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74,

80 (Bankr. D. Mass. 2001) (citations omitted).

54.    As set forth above, the Sellers have sound business justifications for

pursuing a sale process at this time.  Although the Sellers believe that the Steering Business is

fundamentally strong, the Steering Business does not fit the Debtors' anticipated product

portfolio under their transformation plan.  Thus, the Debtors have determined that the Steering

Business's value would be maximized through its divestiture.  Moreover, delaying the sale of the

Purchased Assets may result in the erosion of the Steering Business's value.  Accordingly, there

is a sound business purpose for pursuing the sale process promptly and in accordance with the

Bidding Procedures.

55.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may

be reluctant to make an offer because it knows that even if it reaches agreement with the debtor,

its offer will be subject to a higher bid by another party.  Pre-approved bidding procedures

address these concerns by assuring initial bidders that any auction procedure would be

reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures also reflects sound business judgment.

R.    Approval Of The Bid Protections

56.    Bidding incentives encourage potential bidders to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule. In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it."); United States Trustee v. Bethlehem Steel Corp., (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL 21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it"). One court, explaining the force of the business judgment rule in this context, stated "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large."  Integrated Resources, 147 B.R. at 660.

57.    This district has established a three-part test for determining when to permit bidding incentives.  Id. at 657-58. The three questions for a court to consider when assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage,

bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price."
Id. at 657.

58.       Here, the Selling Debtor Entities seek authority to utilize the Bidding

Process and Bid Protections in the event that the Buyers are not ultimately the Successful Bidder

or must increase the Buyers' bid price to become the Successful Bidder.  The Bid Protections are

fair and reasonable in amount, particularly in view of the significant effort, time, and resources

invested by the Buyers and the risk to the Buyers of being used as a stalking horse.  The Break-

Up Fee is $6 million, which represents approximately 1.34% of the Transaction Value (after

taking into account the Assumed Liabilities and cash proceeds under the TFA).  The Break-Up

Fee not only constitutes a fair and reasonable percentage of a proposed value of the Sale to the

Sellers but also customary for similar transactions of this type in the bankruptcy context.  See,

e.g., In re Safety-Kleen Corp., Case No. 00-2303 (Bankr. D. Del. 2002) (approving $7 million

break-up fee, which was 15.1% of cash payment but only 2.2% of transaction value, which took

into account assumed liabilities); In re Stone & Webster, Inc., Case No. 00-02142 (Bankr. D.

Del. 2000) (approving $10 million break-up fee, which was 6.1% of cash and share payment but

only 1.8% of transaction value, which took into account assumed liabilities).  Furthermore, the

amount of the proposed Break-Up Fee is within the range of break-up fees that courts have found

to be fair and reasonable. See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (Bankr.

S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale

agreement); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. 2004) (approving 3%

break-up fee if debtor closed superior transaction); In re Genuity Inc., Case No. 02-43558

(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved alternative transaction);

In re PSINet, Inc., Case No. 01-13213 (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in

event that seller consummated transaction with alternative bidder); In re Teligent, Inc., Case No.

01-12974 (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25%

depending on value of alternative transaction).  Additionally, the Buyers have agreed that, in the

event that they would otherwise be entitled to receive both the Break-Up Fee and the Expense

Reimbursement under the Agreement, the Expense Reimbursement would be capped at $2

million, which together with the Break-Up Fee a maximum $8 million payment under the Bid

Protections.

        59.      The Selling Debtor Entities submit that the Bidding Procedures and the

Bid Protections have encouraged competitive bidding because the Buyers would not have

entered into the Agreement without such provisions.  The Bidding Procedures and the Bid

Protections have thus induced a bid that otherwise would not have been made.  Finally, the mere

existence of the Bidding Procedures and Bid Protections permits the Sellers to insist that

competing bids be materially higher or otherwise better than the Agreement, which would

produce a clear benefit to the Selling Debtor Entities, their estates, and their stakeholders.

S.      Sale Of The Purchased Assets Free And
        Clear Of Liens, Claims, Encumbrances, And Interests

        60.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

      (1)      applicable nonbankruptcy law permits sale of such property free and clear
            of such interest;

      (2)      such entity consents;

      (3)      such interest is a lien and the price at which such property is sold is greater
            than the aggregate value of all liens on such property;

      (4)      such interest is in bona fide dispute; or

      (5)      such entity could be compelled in a legal or equitable proceeding, to
            accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

61.     Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor

Entities to sell the Purchased Assets free and clear of all liens, claims (including successor

liability claims), and encumbrances, other than the Permitted Encumbrances.[22]  See, e.g., In re

Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27,

2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims

achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, In re

Trans World Airlines, Inc., 332 F.3d 283 (3d Cir. 2003).  This Court and other courts in the

Second Circuit have approved sale approval orders authorizing the sale of assets free and clear of

all interests and claims, including successor liability claims.  See In re Refco, Inc., Case No. 05-

60006 (Nov. 15, 2006) (authorizing certain debtors to sell customer lists free and clear of

interests and claims, including successor liability claims); In re Refco, Inc., Case No. 05-60006

(Nov. 14, 2005) (authorizing debtors to sell the regulated commodities futures merchant business

free and clear of interests and claims, including successor liability claims); In re PSINet Inc.,

Case No. 01-13213 (Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of

liens and claims, including claims otherwise arising under doctrines of successor liability).

Because the Buyers are not successors to the Sellers, successor liability claims should not follow

the Purchased Assets.

62.     Excluding Permitted Encumbrances, each lien, claim, or encumbrance that

is not the result of an assumed liability satisfies at least one of the five conditions of section

363(f), and the Selling Debtor Entities submit that any such lien, claim, or encumbrance would

---

[22]    As a result of intense negotiations, certain liabilities will be assumed by the Buyers or the Successful Bidder, as
the case may be.

be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and

defenses that the Selling Debtor Entities may possess with respect thereto.  Accordingly, except

for the liens resulting from the Assumed Liabilities or the Permitted Encumbrances, the Selling

Debtor Entities request that the Purchased Assets be transferred to the Successful Bidder(s), free

and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances to

attach to the proceeds of the Sale of the Purchased Assets.

63.    Other courts, concluding that Bankruptcy Code section 363(f) does not

empower them to convey assets free and clear of claims, have nevertheless found that

Bankruptcy Code section 105(a) provides such authority.  See Volvo White Truck Corp. v.

Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D.

Ohio 1987) (stating that absence of specific authority to sell assets free and clear of claims poses

no impediment to such sale, as such authority is implicit in court's equitable powers when

necessary to carry out the provisions of title 11).

T.    The Buyers Are Good Faith Purchasers Pursuant To
       Section 363(m) Of The Bankruptcy Code And The Transaction
       Contemplated By The Agreement Should Carry The
       Protections Of Section 363(n) Of The Bankruptcy Code

64.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b)
or (c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

good faith of a purchaser is shown by the integrity of his conduct during the
course of the sale proceedings; where there is a lack of such integrity, a good
faith finding may not be made.  A purchaser's good faith is lost by "fraud,

38

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390(2d Cir. 1997) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc. v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

65.    Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

66.    The Selling Debtor Entities submit, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.  Indeed, these negotiations have continued, on and off, for approximately one year.  Moreover, to the extent that the Purchased Assets are sold to a Successful Bidder, it will be because of a well planned competitive process pursuant to the Bidding Procedures.  As a result of the foregoing, the Selling Debtor Entities request that this Court make a finding that the Purchase Price to be paid by the Buyers, along with the Assumed Liabilities and restructuring costs, coupled with the proceeds paid by GM to Delphi under the TFA, constitutes reasonably equivalent value and fair consideration under any applicable law.

67.    Throughout the negotiations, the Buyers have at all times acted in good faith.  Moreover, if the Purchased Assets are sold to a Successful Bidder, it would be because of

a well planned competitive process and intense negotiations at arm's length to be conducted at

the Auction.  The Selling Debtor Entities, therefore, request that this Court make a finding that

the Buyers or the Successful Bidder, as the case may be, have purchased the Purchased Assets

and assumed the Assumed and Assigned Contracts and Assumed Liabilities in good faith within

the meaning of section 363(m) of the Bankruptcy Code.  Because a key element of a good faith

finding is that the Buyers' successful bid is not the product of fraud or collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders, the Selling Debtor Entities further request that this Court make a finding that the

transactions contemplated by the Agreement are not avoidable under section 363(n) of the

Bankruptcy Code.

U.    Relief From Transfer Taxes Under Section 1146(c) Of The Bankruptcy Code

68.    Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or

exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax

or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers

pursuant to a sale outside of, but in furtherance of effectuating a reorganization plan.  See City of

New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir. 1985)

(holding that when transfer is necessary to consummation of plan, transfer is "under a plan"

within meaning of section 1146(c)); In re United Press Int'l, Inc., No. 91 B 13955, 1992 Bankr.

LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (holding that section 1146(c) exemption

applied to section 363 sale in instance in which it found "the value of the Debtor's assets . . .

likely to deteriorate [during] time necessary to . . . confirm a plan"); In re Beulah Church of God

In Christ Jesus, Inc., 316 B.R. 41, 50-51 (Bankr. S.D.N.Y 2004) (stating that determination of

applicability of section 1146(c) exemption depends on whether transfers are in view of, and

40

integral to chapter 11 plan that is subsequently confirmed); <u>City of New York v. Smoss Enters.</u>

<u>Corp.</u> (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that section

1146(c) was designed to reach transfer of assets, on which "plan hinged and which the court had

to approve prior to the confirmation").

69.    As set forth above, as part of their transformation plan, the Selling Debtor

Entities have identified non-core product lines, including the Steering Business, that do not fit

into the Company's future strategic framework, and have planned to sell or wind down these

product lines.  Section 7.30 of the Plan contemplates the Debtors' selling assets outside the Plan,

but obtaining relief as if such divestitures were part of the Plan.  Thus, this sale process may

continue after a plan has already been filed, which would squarely satisfy <u>Beaulah Church</u>.  <u>See</u>

<u>Beulah Church</u>, 316 B.R. at 50-51. In light of the foregoing, the Selling Debtor Entities submit

that the Sale should be exempt under section 1146(c) of the Bankruptcy Code from any stamp,

transfer, sales, recording, or similar taxes.

V.    <u>The Assumption And Assignment Of The Assumed And Assigned Contracts</u>

70.    Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the
debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such
contract or lease is provided, whether or not there has been a
default in such contract or lease.

11 U.S.C. § 365(f)(2).

71.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

41

11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements

for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1)    If there has been a default in an executory contract or unexpired
> lease of the debtor, the trustee may not assume such contract or lease
> unless, at the time of the assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly
> cure, such default;
>
> (B)    compensates, or provides adequate assurance that the trustee will
> promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

72.    Courts give the phrase "adequate assurance of future performance" a

"practical, pragmatic construction."  EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp.

(In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d

Cir. 1993) (presence of adequate assurance should be "determined under the facts of each

particular case"; see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983)

(holding that adequate assurance was furnished on two separate grounds).  Courts have

consistently held that the phrase does not require total assurances.  See In re Natco Indus., Inc.,

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor

will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla.

1994) (although no single solution will satisfy every case, the required assurance will fall

"considerably short of an absolute guaranty of performance").  In fact, adequate assurance has

been provided by demonstrating the Buyers' financial health and experience in managing the

type of enterprise or property assigned.  See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr.

42

S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of

lease from debtor had financial resources and had expressed willingness to devote sufficient

funding to business to give it strong likelihood of succeeding).

73.    To the extent that any defaults exist under any prepetition executory

contract or unexpired lease that is to be assumed and assigned in connection with the sale of the

Purchased Assets or any portion thereof, the Selling Debtor Entities would cure any such default.

As set forth above, since its founding in 1995, Platinum has acquired more than 75 businesses

with more than $23 billion in aggregate annual revenue at the time of acquisition.  Upon Closing,

it is expected that the Buyers will have the financial resources to perform under the Assumed and

Assigned Contracts.  Moreover, if necessary, the Selling Debtor Entities will adduce facts at the

Sale Hearing demonstrating the financial wherewithal of the Buyers or the Successful Bidder, as

the case may be, their experience in the industry, and their willingness and ability to perform

under the contracts to be assumed and assigned to them.

74.    The Sale Hearing therefore will provide this Court and other parties-in-

interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyers or the

Successful Bidder(s) to provide adequate assurance of future performance under the contracts to

be assumed.  This Court therefore should have a sufficient basis to authorize the Selling Debtor

Entities to assume and assign the Assumed and Assigned Contracts as set forth in the Agreement.

W.    Approval Of The Transaction Facilitation Agreement

75.    The Sellers have authority to enter the TFA, as described above, under

section 363(b)(1) of the Bankruptcy Code.  As noted above, Bankruptcy Code section 363(b)(1)

permits a debtor-in-possession to use property of the estate "other than in the ordinary course of

business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the

ordinary course of business may be authorized if the debtor demonstrates a sound business

justification for it.  See In re Lionel Corp., 722 F.2d at 1071 (business judgment rule requires

finding that good business reason exists to grant debtor's application under section 363(b)).

76.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company.'" In re Integrated Res., 147 B.R. at 656.  Thereafter, "[p]arties opposing the proposed

exercise of a debtor's business judgment have the burden of rebutting the presumption of

validity."  Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an

objection. Rather, an objector "is required to produce some evidence respecting its objections."

Lionel Corp., 722 F.2d at 1071.

77.    Here, the Debtors have a sound business judgment to enter into the TFA.

As set forth above, under the TFA, GM would pay to Delphi (i) $257 million ($47 million of

which is conditioned on the closing of the sale); (ii) the fees payable to Delphi's investment

banker, Rothschild, Inc., in the amount of $5 million within one business day after the Closing

Date; (iii) an expense reimbursement of up to $10 million related to "Day 2" information

technology separation costs; (iv) a one-time working capital normalization payment of $30

million within one business day of Delphi's making a related one-time working capital

normalization payment of $30 million to the Buyers, and (v) either (a) up to $20 million for the

debt transferred to the Buyers for KDAC Steering, or (b) in the event Delphi does not sell the

Buyers its interest in KDAC Steering within nine months of the closing, then GM would

reimburse Delphi $10 million provided that Delphi makes a related $10 million payment to the

Buyers under the terms of the Agreement..  Delphi would reimburse GM for these payments,

excluding $257 million in (i) above, which would not be reimbursed if the Bidding Procedures

results in an purchase price for the Steering Business increased sufficiently to cover such reimbursement.

78.     Additionally, approval of the TFA is being sought in connection with the Sale Approval Order, whereas the Debtors are seeking approval of the MRA as part of the plan confirmation process.  If the TFA is terminated, all of the terms of the MRA that would otherwise be amended by the TFA would be deemed to have been in full force and effect on the effective date of the MRA, and Delphi and GM would perform their respective obligations thereunder.

79.     In their business judgment, the Sellers concluded that the TFA offers the most advantageous terms in facilitating the Sale of the Steering Business.  Specifically, the additional payments by GM to the Selling Debtor Entities under the TFA provide sufficient incentive for the Selling Debtor Entities to sell the Steering Business at this time.  Thus, the Selling Debtor Entities submit that their entry into the TFA reflects sound business judgment.

X.     Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

80.     Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

81.     Courts in this district have waived these ten-day stays upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will grant waivers when doing so is important to the Debtor's financial health.  See In re Second

Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving

ten-day stay because "time was of the essence"); In re Decora Industries, Inc., No. 00-4459, 2002

WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate

closing is required to remedy Debtors' precarious financial and business position. Accordingly,

the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

   82. The Debtors expect to continue to market the Steering Business to

prospective buyers immediately after the Court enters the Bidding Procedures Order.  During this

time, however, Bankruptcy Rule 6004(g) would preclude the Buyers from receiving the

protections afforded by the Bidding Protections.  In recognition of the time and effort expended

by the Buyers in connection the Sale and to reduce the Buyers' risk that the Sellers might obtain

a higher and better offer for the Steering Business during those ten days, the Buyers should

receive the protections afforded by the Bid Protections.  The Debtors, therefore respectfully

request that the Bidding Procedures Order include a waiver of the ten-day stay provided under

Bankruptcy Rule 6004(g).

   83. Because the Debtors have demonstrated a need requiring the immediate

effectiveness of the Bidding Procedures Order, this Court should exercise its authority under

Bankruptcy Rule 6004(g) and waive the ten-day stay as it otherwise would apply to the Bidding

Procedures Order.

Notice Of Motion

   84. Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R.

Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain

Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No.

2883), and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R.

Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain

Notice, Case Management, And Administrative Procedures, entered October 19, 2007 (Docket

No. 10661).  Specifically, the Selling Debtor Entities have provided notice of this Motion on the

Master Service List (as defined in the Supplemental Case Management Order), each party who

filed a notice of appearance or request for documents in accordance with Bankruptcy Rule 2002,

and all entities known to have expressed an interest in a transaction with respect to the Purchased

Assets during the past 14 months.  Further, after entry of the Bidding Procedures Order, notice

with respect to the Motion and Sale would be provided in accordance with the Notice Procedures

described herein.  In addition, the Debtors have complied with the Supplemental Case

Management Order with respect to the filing of this Motion and the need for expedited relief.[23]

In light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

85.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Selling Debtor Entities respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York

be deemed satisfied.

---

[23]  The Debtors have noticed this Motion for the omnibus hearing on December 20, 2007.  In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been
informed that the Creditors' Committee has consented to this Motion being heard on December 20, 2007.
Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until December
17, 2007 to file an objection to entry of the Bidding Procedures Order.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale of the Purchased Assets free and clear of liens, claims, and encumbrances to the Buyers or to the Successful Bidder, (ii) the assumption and assignment of the Assumed and Assigned Contracts to the Buyers or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Buyers or the Successful Bidder, (c) approving the TFA, and (d) granting them such other and further relief as is just.

Dated:        New York, New York
              December 10, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     John K. Lyons (JL 4951)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                         - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession