EXECUTION COPY

## TRANSACTION FACILITATION AGREEMENT

This Transaction Facilitation Agreement (the "Agreement"), dated as of December 10, 2007, is entered into between Delphi Corporation, a Delaware corporation ("Delphi") and General Motors Corporation ("GM"), a Delaware corporation.

### RECITALS

A. Delphi and Steering Solutions Corporation ("Steering Solutions") are the parties to a Master Sale and Purchase Agreement, dated approximately the date hereof ("Original MSA"), relating to the sale and purchase of the Combined Business (as defined in the MSA) (the "Transaction"). Under the competitive bidding process provided for in the MSA, Delphi may enter into an MSA ("Successor MSA") with a bidder other than Steering Solutions that is approved in writing by GM and provides the highest or otherwise best offer for the sale and purchase the Combined Business ("Successful Bidder"). References in this Agreement to (a) the "MSA" shall be deemed to refer to the Original MSA or any Successor MSA, as applicable, and (b) the "Buyer" shall be deemed to refer to Steering Solutions or any Successful Bidder

B. Delphi has previously delivered to GM drafts of the Original MSA and has delivered to GM the final version of the Original MSA.

C. Delphi and GM are the parties to a Master Restructuring Agreement, dated September 6, 2007, as amended (the "MRA"), pursuant to which GM made certain commitments to Delphi with respect to, among other things, recoveries of working capital in connection with the sale of certain businesses, including the Global Steering Business (as defined in the MRA), and Delphi granted GM certain approval rights with respect to the purchase price and identity of the buyer in connection with the sale of the Global Steering Business.

D. GM has agreed to provide certain commitments and accommodations in accordance with this Agreement in order to induce Delphi to enter into the MSA with Buyer.

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, Delphi and GM (the "Parties") agree as follows:

### TERMS AND CONDITIONS

1. **Condition to Effectiveness and Termination**. This Agreement will become effective upon the entry of a final non-appealable order entered by the United States Bankruptcy Court for the Southern District of New York approving this Agreement. This Agreement shall automatically terminate upon any termination of the MSA other than in connection with a sale of the Combined Business pursuant to a Successor MSA. Notwithstanding anything herein to the contrary, if this Agreement is terminated, all of the terms of the MRA that would otherwise be amended by this Agreement will be deemed to have been in full force and effect on the effective date of the MRA and the parties will perform their respective obligations thereunder.

2. **Consent of Purchase Price and Identity of Buyer**. GM consents to (a) Steering Solutions and its affiliates as the purchaser(s) in connection with the Transaction and (b)

the amount of the proceeds to be paid under the MSA in connection with the Transaction. The terms of this Agreement shall apply with respect to an alternative bidder other than Steering Solutions only in the event that GM has consented to the identity of such bidder and the terms of the applicable Successor MSA.

3. **GM Payment**. GM will pay to Delphi the amounts set forth in Sections 3.1 and 3.2 below and when paid, such payments will be made in full and final satisfaction of GM's obligations under Section 4.04(f) and 4.04(g) of the MRA:

   3.1  Either of the following:

   (A)  If the closing of the Transaction ("Closing Date") occurs on or before the effective date of the MRA:

   (1)  GM will pay to Delphi on the date of the Closing Date $257 million;

   (2)  GM will pay to Delphi within one (1) business day after the Closing Date the fees payable to Delphi's investment bank, Rothchild, Inc. in connection with the Transaction in the amount of $5 million;

   (3)  GM will pay to Delphi "Day 2" information technology separation costs that are either (i) incurred by the Buyer and reimbursed to the Buyer by Delphi or (ii) incurred by Delphi in connection with the Transaction; provided, however, the aggregate amount to be paid by GM on account of (i) and (ii) above shall not exceed $10 million. GM will pay the amounts due to Delphi under clause (i) no later than one (1) business day after Delphi pays such amounts Buyer. GM will pay the amounts due under clause (ii) within ten (10) business days of receipt of invoices and reasonable documentation evidencing Delphi's payment or evidencing such expenses, but not prior to the Closing Date; and

   (4)  Within one (1) business day after Delphi pays Buyer the one time working capital normalization payment of $30 million, GM will reimburse Delphi $30 million for such payment.

   (B)  If the Closing of the Transaction has not occurred on or before the effective date of the MRA:

   (1)  On the effective date of the MRA, GM will advance to Delphi (as an advance deposit against its accounts payable to Delphi and its U.S. and Mexican affiliates) $210 million (the "Initial Advance"). Upon the Closing Date, the Initial Advance shall cease to be an advance deposit and will be retained by Delphi;

   (2)  On the Closing Date, GM will pay to Delphi $47 million;

2

    (3)    Within one (1) business day after the Closing Date, GM will pay to Delphi the fees payable to Delphi's investment bank, Rothchild, Inc. in connection with the Transaction in the amount of $5 million;

    (4)    GM will pay to Delphi "Day 2" information technology separation costs that are either (i) incurred by the Buyer and reimbursed to the Buyer by Delphi or (ii) incurred by Delphi in connection with the Transaction; provided, however, the aggregate amount to be paid by GM on account of (i) and (ii) above shall not exceed $10 million. GM will pay the amounts due to Delphi under clause (i) no later than one (1) business day after Delphi pays such amounts Buyer. GM will pay the amounts due under clause (ii) within ten (10) business days of receipt of invoices and reasonable documentation evidencing Delphi's payment or evidencing such expenses, but not prior to the Closing Date; and

    (5)    Within one (1) business day after Delphi pays Buyer the one time working capital normalization payment of $30 million, GM will reimburse Delphi $30 million for such payment.

3.2    Either of the following:

    (A)    In the event Delphi does not sell its 50% interest in KDAC Steering (as defined in the MSA) to Buyer within nine (9) months of the Closing Date and as a result of Delphi not transferring its interest in KDAC Steering, Delphi makes a $10 million payment to Buyer, GM will reimburse Delphi for such $10 million payment upon receipt from Delphi of an invoice and reasonable documentation evidencing such payment. Delphi will provide GM with reasonable advance notice of the date on which it intends to make such payment to Buyer. Within one (1) business day after Delphi makes such $10 million payment to Buyer, GM will make such $10 million payment to Delphi.

    (B)    In the event Delphi transfers its interest in KDAC Steering to Buyer within nine (9) months of the Closing Date, GM will reimburse Delphi for the amount of KDAC Steering debt assumed by Buyer that Delphi reimburses Buyer upon receipt from Delphi of an invoice, reasonable evidence of such payment, and reasonable supporting documentation of the calculation of the amount of KDAC Steering debt assumed by Buyer; provided, however, in no event will GM's obligation under this Section 3.2(B) exceed $20 million.

3.3    The reimbursements set forth in Section 3.1 are subject only to actual payment of such amounts by Delphi and the submission by Delphi of appropriate invoices and reasonable documentation evidencing such payments.

3.4    Delphi agrees in good faith to minimize the apportionment of debt to KDAC Steering as between KDAC Steering and the other KDAC businesses consistent

3

with the approach taken to develop the reference balance sheet with Buyer under the MSA, unless otherwise required by local law, governmental authorities or contract counter-parties, and GM agrees with respect to Section 3.2 above, not to contest the calculation or amount of the KDAC Steering debt assumed with the exception of math errors.

4. **Delphi Payment**.

    4.1    Following the Closing Date, to the extent there are Increased Proceeds in excess of the Break-Up Fee and Expense Reimbursement paid by Delphi to Steering Solutions under the Original MSA (the "Surplus Proceeds"), such amount will be paid, in order of precedence, as follows:

        (A)    To the extent GM has paid any amount under (i) Sections 3.1(A)(2), (3), and (4), (ii) Sections 3.1(B)(3), (4) and (5) or (iii) Sections 3.2(A) or 3.2(B) (collectively, the "GM Reimbursement Sections"), Delphi will first reimburse to GM the amount paid by GM under the GM Reimbursement Sections within three (3) business days of receipt of such Surplus Proceeds.

        (B)    After giving effect to Section 4.1(A) above, to the extent any of GM's obligations under the GM Reimbursement Sections have not yet been paid or have not yet become due, the balance of such Surplus Proceeds will be credited against such GM obligations at the time such payments become due.

        (C)    After giving effect to Section 4.1(A) and 4.1(B) above and after GM's obligations under the GM Reimbursement Sections have been fulfilled, any remaining Surplus Proceeds will be paid 66.66% to GM and the balance retained by Delphi.

    4.2    For purposes hereof:

        (A)    "Increased Proceeds" means the sum of the Joint Venture Amount, plus the amount received by Delphi (including amounts received through any permissible net adjustment made by Buyer under the MSA) on account of the Brownfield Tax Credit Amount (as defined in the MSA), plus the Increased Purchase Price Amount.

        (B)    "Joint Venture Amount" means if the Proposed Joint Venture (as defined in the MSA) is formed, $47 million (net of any reasonable out-of-pocket expenses incurred by Delphi in connection with the evaluation or formation of the Proposed Joint Venture).

        (C)    The "Increased Purchase Price Amount" means any increase in the Purchase Price (as defined in the MSA) in a Qualified Bid (as defined in the MSA) as compared to the Original MSA.

4

5. **Amendment to MSA**. Delphi will not amend, waive or modify any provision of the Original MSA or any schedules thereto in a manner that affects GM's payment obligations to Delphi or Delphi's payment obligations to GM under this Agreement without prior written consent of GM.

6. **Agreement Continues**. At such time as the effective date of the MRA has occurred, the terms and provisions of this Agreement amend, add to and constitute a part of the MRA and this Agreement and the MRA shall be read together as one document, it being understood that this Agreement shall be effective regardless of the effectiveness of the MRA. Except as expressly modified and amended by the terms of this Agreement, all of the terms and conditions of the MRA will be in full force and effect on the effective date of the MRA. If there is any conflict between the terms of this Agreement and the terms of the MRA, the terms of this Agreement govern and control.

7. **MISCELLANEOUS**

    7.1 Governing Law; Jurisdiction; Venue. This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees that the Bankruptcy Court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; provided, however, that after the second anniversary of the Effective Date of the MRA, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement; and provided further that the jurisdiction of the Bankruptcy Court over all matters related to this Agreement shall terminate upon the fourth anniversary of the Effective Date of the MRA. Each Party further agrees to waive any objection based on forum non conveniens.

    7.2 Dispute Resolution. In the event a dispute arises among the Parties under this Agreement, such dispute shall be resolved in accordance with Section 7.11 of the MRA, which shall, for the purposes of disputes arising under this Agreement, be deemed to be effective as of the date of this Agreement.

    7.3 Negotiations Not Admissible. Pursuant to Rule 408 of the Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating hereto are not admissible into evidence in any proceeding; provided, however, that this Agreement may be admissible in a proceeding to enforce the terms of this Agreement.

    7.4 Representations and Warranties of Delphi and GM. Each Party represents and warrants to the other Party that the following statements, as applicable to it, are true, correct, and complete as of the date of this Agreement:

        (A) It is duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite corporate power and

5

     authority to enter into this Agreement and to perform its obligations hereunder;

  (B) The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part; <u>provided</u>, <u>however</u>, that Delphi's authority to enter into this Agreement is subject to Bankruptcy Court approval;

  (C) This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with the terms hereof; and

  (D) The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any current provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

7.5 <u>Waiver; Modification; Amendment</u>.  Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, or supplemented unless such modification, waiver, amendment, or supplement is in writing and has been signed by each Party.  No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

7.6 <u>Binding Effect; Assignments</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, and representatives.  Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be sold, assigned, or otherwise transferred by any Party without the prior written consent of the other Parties.

7.7 <u>Third Party Beneficiaries</u>.  Nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.

7.8 <u>On-Going Setoff Provisions</u>.  Notwithstanding anything to the contrary contained in this Agreement or the MRA, the terms and conditions of Section 7.01 of the MRA shall control the Parties' payment obligations under this Agreement.

7.9 <u>Notices</u>.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with

6

confirmation) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

    If to Delphi, to:

    Delphi Corporation
    5725 Delphi Drive
    Troy, Michigan 48098
    Att'n:  [John Arle
           Steve Daniels]
           Sean P. Corcoran, Esq.

    If to GM, to:

    General Motors Corporation
    767 Fifth Avenue
    14th Floor
    New York, New York  10153
    Att'n:  Director, New Business Development

    and

    General Motors Corporation
    300 GM Renaissance Center
    Detroit, Michigan  48265
    Att'n:  General Counsel

or to such other place and with such other copies as either Party may designate as to itself by written notice to the other Party. Rejection, any refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

7.10    <u>Waiver of Right to Trial by Jury</u>. Each Party waives any right to trial by jury in any proceeding arising under or related to this Agreement.

7.11    <u>Service of Process</u>. Each Party irrevocably consents to the service of process in any legal proceeding arising out of this Agreement by receipt of mailed copies thereof by national courier service or certified United States mail, postage prepaid, return receipt requested, to its applicable registered agent. The foregoing, however, shall not limit the right of a Party to effect service of process on the other Party by any other legally available method.

7.12    <u>Interpretation</u>.

    (A)    In the event of any conflict between this Agreement and the MRA, the provisions of this Agreement shall govern.

    (B)    All references to "$" and dollars shall refer to United States currency.

7

7.13  Expenses.  Notwithstanding anything else contained in this Agreement or the MRA, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation and performance of the transactions contemplated hereby.

7.14  Entire Agreement; Parties' Intentions; Construction.  This Agreement and the MRA constitute the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether oral or written, with respect to such subject matter.  The attachments and exhibits attached hereto are an integral part of this Agreement and are hereby incorporated into this Agreement and made a part hereof as if set forth in full herein.  This Agreement is the product of negotiations between the Parties and represents the Parties' intentions.  In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less favorably to any Party.

7.15  Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nonetheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

7.16  Headings.  The headings of the paragraphs of this Agreement are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

7.17  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Electronic delivery of an executed signature page of this Agreement shall be effective as delivery of a manually executed signature page of this Agreement.

**[Remainder of the page left intentionally blank.]**

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**

By: _/s/ JDSheehan_____
Name: JOHN D. SHEEHAN
Title: VP & CRO.

**GENERAL MOTORS CORPORATION**

By: _____
Name: _____
Title: _____

DETROIT.2894250.4

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**

By:_____
    Name:_____
    Title:_____

**GENERAL MOTORS CORPORATION**

By: *[signature]*
    Name: *Frederick A. Henderson*
    Title: *Vice Chairman & CFO*

DETROIT.2894250.4

9