1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                November 29, 2007

                10:08 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2     HEARING re Expedited Motion for Orders Under U.S.C. Section 363

3     and Fed. R. Bankr. P. 2002, 6004 and 9014; (A)(i)Approving

4     Bidding Procedures; (ii)Granting Certain Bid Protections;

5     (iii)Approving Form and Manner of Sale Notices; and (iv)Setting

6     Sale Hearing Date; and (B)Authorizing and Approving Sale by

7     Delphi Automotive Systems LLC and Delphi Technologies, Inc. of

8     Certain Equipment and Other Assets Primarily Used in Debtor's

9     Saginaw Chassis Business Free and Clear of Liens

10

11    HEARING re Motion of Verizon Services Corp. for Payment of

12    Administrative Expense Claim Pursuant to MobileAria Sale Order

13

14    HEARING re Twenty-second Omnibus Claims Objection Pursuant to

15    11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 to Certain

16    (A)Duplicate or Amended Claims; (B)Equity Claims;

17    (C)Insufficiently Documented Claims; (D)Claims Not Reflected on

18    Debtors' Books and Records; (E)Untimely Claims; and (F)Claims

19    Subject to Modification, Tax Claims Subject to Modification,

20    Modified Claims Asserting Reclamation, Claims Subject to

21    Modification that are Subject to Prior Orders and Modified

22    Claims Asserting Reclamation that are Subject to Prior Orders

23

24

25    Transcribed by:  Lisa Bar-Leib

3

A P P E A R A N C E S :


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

        Attorneys for Debtor

        333 West Wacker Drive

        Chicago, IL 60606


BY:    JOHN WM. BUTLER, JR.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

        Attorneys for Debtor

        Four Times Square

        New York, NY 10036


BY:    KAYALYN A. MARAFIOTI, ESQ.


TOGUT, SEGAL & SEGAL, LLP

        Attorneys for Debtor

        One Penn Plaza

        Suite 3335

        New York, NY 10119


BY:    NEIL BERGER, ESQ.

4

1   HONIGMAN MILLER SCHWARTZ & COHN LLP

2        Attorneys for TRW Automotive

3        2290 First National Building

4        660 Woodward Avenue

5        Detroit, MI 48226

6

7   BY:   DONALD F. BATY, ESQ.

8        (TELEPHONICALLY)

9

10  ARNELL GOLDEN GREGORY LLP

11       Attorneys for Verizon Services Corp.

12       171 17th Street, NW

13       Suite 2100

14       Atlanta, GA 30363

15

16  BY:   DARRYL S. LADDIN, ESQ.

17

18  FOLEY & LARDNER LLP

19       Attorneys for Intermet Corporation

20       One Detroit Center

21       500 Woodward Avenue

22       Suite 2700

23       Detroit, MI 48226

24

25  BY:   DAVID G. DRAGICH, ESQ.

5

LATHAM & WATKINS LLP

    53rd at Third

    885 Third Avenue

    New York, NY 10022


BY:   MICHAEL RIELA, ESQ.


FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

    One New York Plaza

    New York, NY 10004


BY:   RICHARD J. SLIVINSKI, ESQ.

6

P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  Okay.  Delphi

3   Corporation?

4          MR. BUTLER:  Your Honor, good morning.  Jack Butler

5   and Kayalyn Marafioti from Skadden Arps here on behalf of the

6   debtors for their twenty-fifth omnibus hearing.  We have filed

7   and served a proposed agenda and we propose to move to the

8   agenda in that order.

9          THE COURT:  That's fine.

10          MR. BUTLER:  Your Honor, relating to the first three

11   matters on the agenda, agenda item matter number 1, is

12   solicitation and procedures motion at docket number 9266.

13   Matter number 2, which is the proposed amendment to the --

14   excuse me.  Number 2 is actually the adjournment motion by the

15   equity committee at docket number 10795.  And matter number 3,

16   which is the Delphi Appaloosa investment agreement amendment

17   motion, at docket number 10760.  Based on a chambers conference

18   held yesterday, which all of the objectors to those motions

19   participated, those matters have been adjourned for hearing

20   until 10 a.m. on December 6th.  We've filed-- made this notice

21   on this agenda and filed this publicly and served it on the

22   2002 list as well as the masters service list.

23          THE COURT:  Okay.  That's fine.

24          MR. BUTLER:  Matter number 4 on the agenda, Your

25   Honor, is the debtor's motion for a default judgment against

7

1   Mr. Furukawa.

2          MR. BERGER:  Good morning, Judge.  Neil Berger --

3          THE COURT:  Good morning.

4          MR. BERGER:  -- Togut, Segal and Segal.  Your Honor,

5   we served a counterclaim, a claim for affirmative relief

6   against Furukawa.  The debtors applied for a default judgment.

7   Furukawa responded.  We have been actively engaged with

8   Furukawa's new counsel.  We hope in the next couple of days to

9   submit a discovery stipulation and order to Your Honor to move

10  to the substantive matters.  This matter is being adjourned to

11  the December 11th hearing.  Hopefully, it's a place hold, Your

12  Honor, and we can get to real discovery and get to the

13  (indiscernible) of the matter.

14         THE COURT:  Okay.  That's fine.

15         MR. BUTLER:  Your Honor, matter number 5 is the

16  Saginaw Chassis asset sale motion.  This is the sale hearing.

17  The motion was filed at docket number 9368.  Your Honor

18  previously approved the bidding procedures and bid protection

19  order at docket 10958.  Under that order, this matter was to

20  come for hearing either today or next month depending on

21  whether alternative bids were received.  No bids were received

22  by the bid deadline and therefore pursuant to Your Honor's

23  prior order, this is now ripe for consideration by the Court in

24  terms of the sale.

25         THE COURT:  Okay.

8

1          MR. BUTLER:  Your Honor, this motion which we

2    presented earlier to you at our last omnibus hearing deals with

3    the sale of the Saginaw Chassis assets free and clear of all

4    liens for approximate consideration of 42.6 million dollars.

5    Your Honor may recall from the prior hearing that a portion of

6    that is allocated to assets and another portion is allocated to

7    general assets.  And another portion is allocated to inventory.

8    And a final portion element of it is reimbursement of expenses

9    because the Canadian assets are now being -- we're required --

10   company transaction are now being relocated by the debtors for

11   the purchaser's benefit.

12          There is, Your Honor, in connection with this, an

13   evidentiary index.  Very briefly, the debtor's declaration is

14   Exhibit 1.  The agreements, including all the amendments are

15   Exhibits 2 and 3.  The court documents relating to this sale

16   are Exhibits 4 through 11 and all the appropriate service

17   notices are Exhibits 12 through 14.  I'd like to move those

18   matters into evidence.

19          THE COURT:  Okay.  Any objection to that?  All right.

20   Those are admitted.

21   (Debtor's Exhibit 1, debtor's declaration in connection with

22   Saginaw Chassis asset sale motion, was hereby received into

23   evidence, as of this date.)

24   (Debtor's Exhibits 2, 3, Saginaw Chassis asset sale motion

25   agreements, including all amendments, were hereby received into

9

1    evidence, as of this date.)

2    (Debtor's Exhibits 4-11, court documents relating to Saginaw

3    Chassis asset sale, were hereby received into evidence, as of

4    this date.)

5    (Debtor's Exhibit 12-14, all service notices relating to

6    Saginaw Chassis asset sale, were hereby received into evidence,

7    as of this date.)

8             MR. BUTLER:  And Mr. Sheehan's available for cross-

9    examination or for any questions the Court may have.

10            THE COURT:  Okay.  Well, I saw no objections to the

11   relief and I've reviewed the declaration as well as the

12   agreement and I don't have any questions.

13            MR. BUTLER:  Okay.  Thank you, Your Honor.  Your

14   Honor, the only other items I would indicate for the record in

15   addition to the evidentiary record is that I just do want to

16   say that Delphi has had discussions with the UAW regarding

17   their review of this agreement.  There was a concern with

18   respect to a specific provision of the agreement, Section 9.1.C

19   of the agreement, that the debtors could waive the purchaser's

20   requirement to assume the obligation of the collective

21   bargaining agreements as a condition of closing.  We've given

22   assurances to the UAW that Delphi would not waive this

23   condition to closing without first obtaining the UAW's

24   concurrence.

25            THE COURT:  Okay.

10

1          MR. BUTLER:  That was the element of our discussions

2   with them.  I just wanted to say that on the record.

3          Otherwise, Your Honor, unless you have any questions,

4   we would present the matter for Your Honor's review based on

5   the papers and the other --

6          THE COURT:  When is the closing expected to occur?

7          MR. BUTLER:  I think, Your Honor, promptly after the

8   order becomes final.

9          MR. BALY (TELEPHONICALLY):  Your Honor, --

10          MR. BUTLER:  January 2nd is the actual date, Your

11   Honor.  Sorry.

12          THE COURT:  Okay.  I think we have counsel for the

13   purchaser on the phone.

14          MR. BATY (TELEPHONICALLY):  Yes.  I'm sorry, Your

15   Honor.  Again, Donald Baty on behalf of TRW (indiscernible)

16   Systems.  The agreement is set to close on January 2nd.

17          THE COURT:  Okay.  And people here are not in

18   agreement with you.  All right.  And as I recall, that was one

19   of the reasons to have this heard today so that could occur.

20          MR. BUTLER:  Yeah.  And actually, Your Honor, even

21   though what I had said at the last hearing, this, as Your Honor

22   I think is aware, this particular transaction has been a long

23   time baking and it really focused around resolving matters with

24   General Motors in terms of the supply agreement.  And there

25   was, I think, on the purchaser a justifiable desire that once

11

1   that agreement finally was achieved that they wanted the

2   certainty of knowing they can proceed with this transaction.

3   So even though the closing may actually be closing on January

4   2nd, the commitment we made to the purchaser when we presented

5   the original bidding procedures motion was that if there -- was

6   to bifurcate the process in such a way that if there were no

7   competitive offers made -- which is not, by the way, Your

8   Honor, a complete surprise to the company because this

9   disposition does relate and the value is associated, among

10  other things, with the supply agreement with General Motors and

11  the sale -- and the union agreement so that ultimately it's not

12  a complete surprise that given the fact there's been an

13  agreement with General Motors and the purchaser here that they

14  would be the successful purchaser.

15          THE COURT:  Right.  Okay.  Does anyone else have

16  anything to say on this motion?  All right.  I will approve the

17  motion then under Sections 363(b) and (f).

18          MR. BUTLER:  Thank you, Your Honor.  And you're free

19  to stay on the phone, sir, but if you want to you, you can ring

20  off.

21          MR. BATY (TELEPHONICALLY):  Thank you.

22          THE COURT:  Okay.

23          MR. BUTLER:  Your Honor, matter number 6 is the

24  Verizon administrative expense motion claim at docket number

25  9596 and Mr. Berger has also handled this matter for Delphi.

12

1          THE COURT:  Okay.

2          MR. LADDIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. LADDIN:  Daryl Laddin of Arnall Golden & Gregory

5    on behalf of Verizon Services Corporation.  We are here today

6    on the motion of Verizon seeking payment for the sum of 479,000

7    dollars.  We view this today, Your Honor, as a status

8    conference or scheduling conference --

9          THE COURT:  Can you say that number again?

10          MR. LADDIN:  $479,532.61.

11          THE COURT:  And that's a lesser number than the

12   numbers in your papers but that's because of credits you've

13   received or amounts you've received?

14          MR. LADDIN:  Yeah.  Your Honor may recall from the

15   sale hearing and the sale order that was entered that the

16   amount that was reserved for potential, quote unquote, Schedule

17   3 disputes was 700,000 dollars.  The actual damages that have

18   been incurred are over 800,000 dollars but Verizon has also

19   been paid over 200,000 dollars.  So while we would like to seek

20   the full 800,000 dollars that Verizon has lost, what we're

21   entitled to seek, we believe, under the sale order is only the

22   479,000 which is, again, the difference between 700,000 and

23   what Verizon was in fact paid for these, quote unquote,

24   Schedule 3 disputes.

25          THE COURT:  Okay.  And I'll ask Mr. Berger this but

13

1    my understanding was that the debtor contends that at least

2    some of those payments were mistaken and you may want them

3    back?

4              MR. BERGER:  Yes, Judge.

5              THE COURT:  So if that's the case, you're seeking

6    more than -- you're disputing the right to have those --

7    whatever payments the debtor wants back, you're disputing the

8    right to get those back, too?

9              MR. LADDIN:  That is absolutely right and --

10             THE COURT:  Okay.

11             MR. LADDIN:  -- you know, I will note while that

12   would be the equivalent of a compulsory counterclaim, they've

13   only, quote unquote, reserved their rights to seek to recover

14   that money.  They haven't actually asked the Court -- they

15   haven't filed the equivalent of the counterclaim which I think

16   obviously they would need to do in this proceeding in order to

17   get that money back.

18             The -- I can go into some of the factual detail if

19   Your Honor would like.  Obviously the motion was fairly

20   detailed itself as well as the reply that we filed.

21             THE COURT:  Okay.  I think I really only have one

22   question which is on the issue of the main dispute, which is

23   can you identify to me any contractual provision that supports

24   your claim?

25             MR. LADDIN:  There are two points with respect to

14

1  that, Your Honor.  First, what MobileAria contends in its

2  factual recitations is a disagreement with Verizon over what

3  the specifications were that Verizon provided to MobileAria.

4  And MobilAria contends in its declaration that it followed

5  Verizon's specifications.  The contract itself provides in

6  Section 18, and this is in our papers, that "MobileAria

7  recognizes that the product and services which are to be

8  provided under this agreement are vital to Verizon and must be

9  delivered and installed without interruption, delay, cessation

10 or limitation and in full compliance with the scheduled

11 development dates" -- excuse me -- "developmental dates and

12 requirements set forth in the orders and performed in full

13 compliance with the specifications."  They contend that they

14 did comply with those specifications --

15         THE COURT:  Well, where are the specifications

16 designated?

17         MR. LADDIN:  The specifications, Your Honor, is a

18 defined term in the agreement.  First of all, there are the

19 orders.  It has to comply with the requirements set forth in

20 the Order's, capital O, defined term and comply with the,

21 capital S, Specifications.  "An Order is a purchase order" --

22 and this is in the definition section -- "An Order is a

23 purchase order or other written communication and/or electronic

24 transmission the customer may deliver to supplier for the

25 purchase of product and/or service."  And Specifications is

15

1   defined to mean -- lower case -- "specifications for the

2   product or services set forth in an order as well as suppliers'

3   then current published specifications and documentation and

4   applicable industry and governmental requirements."  Here, a

5   fundamental specification that was communicated to MobileAria

6   in writing in the order submitted and also in -- at the outset

7   of this contract and before the contract was entered into was

8   that these units needed to stay within two megs of usage.  That

9   was what had been provided to Verizon by its prior supplier,

10  which was At Road.  It was a fundamental cost component that

11  was in fact provided.

12            THE COURT:  Do you have any order that says that?

13            MR. LADDIN:  All of the orders will indicate whether

14  they're going to be activated under the two meg plan or under

15  an unlimited plan.  So, yes, the orders will provide that.

16            Secondly, the fundamental --

17            THE COURT:  That's a different point, I think.

18            MR. LADDIN:  Well, they have to comply with the

19  speci --

20            THE COURT:  Whether they're activated under one plan

21  or another is separate from saying that they cannot exceed two

22  megs.

23            MR. LADDIN:  Well, the specification is you have to

24  comply with two megs.  The specification is for a two-meg plan

25  and it says you've got to meet the specifications.  It's two

16

1   megs.  And this was a -- this was a fundamental issue from

2   Verizon's perspective.  This was --

3            THE COURT:  Why doesn't it appear anywhere in the

4   agreement then?

5            MR. LADDIN:  Pardon?

6            THE COURT:  Why doesn't it appear anywhere in the

7   agreement then?

8            MR. LADDIN:  Because -- Your Honor, because it was --

9   first of all, because it was such a given that it was --

10            THE COURT:  This is about a 100-page agreement.

11            MR. LADDIN:  That's true.  That's true.  But, Your

12   Honor, the fundamental principle of contract law --

13            THE COURT:  Is there anyone who's saying this besides

14   you?

15            MR. LADDIN:  I'm sorry?

16            THE COURT:  Is there any employee affidavit, any

17   factual indication of this at all?

18            MR. LADDIN:  Yes.  Absolutely, Your Honor.

19            THE COURT:  Where?

20            MR. LADDIN:  I realize that they raise the issue in

21   their surreply which is something that's not permitted under

22   the rules and was outside the agreement on briefing between

23   myself and counsel.  But --

24            THE COURT:  I would have come up with the same point

25   because I usually review proofs of claim for the documentation

17

1   in support.

2           MR. LADDIN:  Your Honor, there is no question that at

3   an evidentiary hearing that I will have a witness here who will

4   testify to that.

5           THE COURT:  But I'm talking about a piece of paper, a

6   contract.

7           MR. LADDIN:  The order --

8           THE COURT:  Do you have anything that specifies a cap

9   on the megahertz in writing?

10          MR. LADDIN:  There are communications between the

11  clients with respect to the two megs.  And --

12          But the second point, Your Honor -- and I realize

13  Your Honor is focused on this issue.  But the second point is

14  that the fundamental principle of contract law is to force the

15  intent of the parties.  And there's nothing in this contract

16  that says that MobileAria can apply a pig in a poke.

17  Effectively, what their argument is is that they could provide

18  a product that had a million megs of usage which would be

19  ridiculous.  But that is where that argument leads and it's

20  what leads them to claim what the specifications were that were

21  provided by Verizon.  And the law in New York, as elsewhere, is

22  pretty clear on contract interpretation.  It says that

23  extrinsic evidence that shows a latent ambiguity and what the

24  parties intended is admissible.  And it's also a fundamental

25  principle of contract law that when a contract is either

18

1   ambiguous, incomplete -- and granted, there's no question, Your

2   Honor, that specific term isn't in here.

3        THE COURT:  Which term?

4        MR. LADDIN:  Within this written document.  "Where a

5   contract is ambiguous or incomplete or uncertain as to the

6   intention of the parties, the Court is to consider extrinsic

7   evidence as to the surrounding matters and circumstances

8   including the additional terms that were not included in the

9   writing in order to determine the intent."

10        Now, I can --

11        THE COURT:  Well, but again, I think you're hanging

12   your hat -- and having read through the agreement, I think it

13   is the only place to hang it, on the definition of the word

14   "specifications"?  And that says "shall mean specifications for

15   the product" -- by the way, there's nothing in the description

16   of the product that specifies, as far as I can see, a cap on

17   megahertz.  Well -- or of the service.  And that's including in

18   the exhibits to the agreement, Exhibits B and G and the like.

19        "As set forth in an order".  So that's a -- an order

20   is defined in paragraph 8, as well as in the Defined Terms, and

21   it says "as well as suppliers', then current published,

22   specifications and documentation and applicable industry and

23   government requirements."

24        So I don't see why I should be listening to any

25   parole evidence on this.  There's the orders and, although

19

1    you're not relying on it, published specifications and

2    documentation of the supplier.

3              MR. LADDIN:  "An order is a purchase order or other

4    written communication delivered to the supplier."

5              THE COURT:  Right.

6              MR. LADDIN:  That would be extrinsic evidence that's

7    outside the four corners of this document.

8              THE COURT:  Well, no.  It's incor -- but where -- but

9    I don't see the order.  Where's the order?

10             MR. LADDIN:  We don't have them here today.  This

11   isn't an evidentiary hearing.  We had agreed with counsel --

12             THE COURT:  But this is a document.  It's just a

13   document.  It's part of the contract.

14             MR. LADDIN:  An order -- orders were submitted

15   subsequent to execution of this document.

16             THE COURT:  Right.

17             MR. LADDIN:  Okay.

18             THE COURT:  Do the orders specify that there's a cap

19   on the megahertz?

20             MR. LADDIN:  I believe that the orders state -- and I

21   don't have the orders with me so I cannot say precisely what

22   those orders state.  But my understanding is --

23             THE COURT:  Well, I'm not -- that doesn't cut it.

24             MR. LADDIN:  What I've been told is --

25             THE COURT:  That doesn't cut it either.

20

1           MR. LADDIN:  What they state, Your Honor, is --

2           THE COURT:  But you don't know.

3           MR. LADDIN:  They state that --

4           THE COURT:  And it's not before me.

5           MR. LADDIN:  But, Your Honor --

6           THE COURT:  I'm going to give you one more chance on

7    this because I don't like motions for reargument and rehearing.

8    This motion is woefully short of any factual support.  But for

9    this argument about specifications, the major claim would be

10   subject to dismissal on the papers because there's nothing in

11   the contract that gives you a right to this except for this

12   definition of specifications.  I'll hear from Mr. Berger but my

13   inclination is to have you adjourn this so that you can make a

14   real motion with the real documents attached as you would to a

15   proof of claim.  And a real affidavit from a real client that

16   lays out the elements of the other claim.  And so we're not

17   spent here just sort of speculating and the debtor doesn't have

18   to go through a discovery process before you've established the

19   elemental basis for asserting a claim in a bankruptcy court.

20   Which is not some lawyer saying I've been told this, that and

21   the other thing but a client saying this is what happened,

22   under oath, and submitting the agreement that supports it.

23          MR. LADDIN:  And, Your Honor, if we do go through the

24   extra briefing that Your Honor is --

25          THE COURT:  It's not briefing.

21

1        MR. LADDIN:  Motion.  Excuse me.

2        THE COURT:  It's not briefing.  I don't want to hear

3   from lawyers.

4        MR. LADDIN:  Understood.

5        THE COURT:  I want the claim.

6        MR. LADDIN:  Understood.  Additional file.  We will

7   also include in there the law with respect to the extrinsic

8   evidence that the Court can and should --

9        THE COURT:  I'll give you the law right now 'cause I

10  have it and I'll cite it to you.  All right?  In fact, you can

11  look at it.  But let me hear from Mr. Berger first.

12       MR. BERGER:  Briefly, Your Honor -- sorry.

13       THE COURT:  We all have a cold, I see.

14       MR. BERGER:  I have to be brief.  We appreciate and

15  embrace Your Honor's observations.  We've asked the same

16  questions.  I don't need law.  I need documents.  If there's

17  definitive documents and we can look at them and research them,

18  we will.  What I'd ask Your Honor is that the motion either be

19  withdrawn without prejudice or denied without prejudice and a

20  new document filed that we can respond to.

21       THE COURT:  Well, I think that you would need to have

22  a suitable time to respond to the proof of claim.

23       MR. BERGER:  Yes.

24       THE COURT:  My hope is, if there is a proof of claim,

25  that actually -- a proof of administrative claim, that actually

22

1    sets forth the factual basis, you will be able to reconcile it

2    and negotiate as you have with ninety-nine percent of all the

3    other claims filed and, frankly, with everyone except for

4    basically pro se claimants, some of whom have wanted to appear

5    in court.

6         MR. BERGER:  We commit to Your Honor that if we get

7    that information, we will look at it and we will negotiate with

8    counsel business to business people as well.

9         THE COURT:  Okay.  Now as far as contract

10   interpretation, "Under the law of New York, a written contract

11   is to be interpreted so as to give effect to the intention of

12   the parties expressed in the unequivocal language they've

13   employed."  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d

14   Cir. 1992)  "Under New York law, if a contract is unambiguous

15   on its face, its proper construction is a question of law."

16   Metropolitan Life Insurance Company v. RJR Nabisco, Inc., 906

17   F.2d 884, 889 (2d Cir. 1990)  "The Court should not look beyond

18   the confines of the contract to extrinsic evidence if its

19   relevant provisions are plain and unambiguous."  W.W.W.

20   Associates, Inc. v. Giancontieri, 77 NY2d 157, 162 (1990)

21   "When parties set down their agreement in a clear complete

22   document, their writing should be enforced according to its

23   terms."  Vermont Teddy Bear Company, Inc. v. 538 Madison Realty

24   Co., 1 NY3d 470, 475 (2004)  "This is particularly appropriate

25   if the contract was negotiated between sophisticated counsel

23

1   business people negotiating at arms length."  (Id.)  In such

2   circumstances, "Courts should be extremely reluctant to

3   interpret an agreement as impliedly stating something which the

4   parties have neglected to specifically include.  Hence, Courts

5   may not, by construction, add or excise terms nor distort the

6   meaning of those used and thereby make a new contract for the

7   parties under the guise of interpreting the writing."  (Id.)

8   See also Wallace v. 600 Partners Co., 86 NY2d 543, 548 (1995).

9   "Given the terms of the contract, their plain meaning, a Court

10  should find contractual provisions ambiguous only if they are

11  reasonably susceptible to more than one interpretation by

12  reference to the contract alone."  Krumme v. Westpoint Stevens,

13  Inc., 238 F.3d 133, 139 (2d Cir. 2000); Burger King Corporation

14  v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990).

15  "Contract language is unambiguous if it has a definite and

16  precise meaning unattended by danger of misconception in the

17  purport of the contract itself and concerning which there is no

18  reasonable basis for a difference of opinion."  Metropolitan

19  Life Insurance v. RJR Nabisco, 906 F.2d 889  "Language whose

20  meaning is otherwise plain is not ambiguous merely because the

21  parties urge different interpretations in the litigation.

22  (Id.)  See also Lee v. BSB Greenwich Mortgage L.P., 267 F.3d

23  172, 179 (2d Cir. 2001).  "Any ambiguity in a contract must

24  emanate from the language used in the contract rather than from

25  one party's subjective perception of the terms."

24

1          Consequently, I believe your contract which, again,

2     is fifty some pages with an additional -- roughly fifty pages

3     of single-spaced specifications and exhibits must be read as

4     written.  And that one should particularly follow the following

5     quote from Vermont Teddy Bear at 476:  "The logic of the

6     proposition that a term is clearly contrary to a party's

7     financial interest does not justify judicial insertion of a

8     contract term."  See also Rowe v. Great Atlantic and Pacific

9     Tea Co., 46 NY2d 62, 72 (1978).  "Courts should be extremely

10    reluctant to interpret an agreement as impliedly stating

11    something the parties have neglected to specifically include.

12    Such lack of foresight does not create rights or obligations."

13          So again, I really think the focus is on the order or

14    the orders and what they say.  And in that regard, I note that

15    the integration provision in paragraph 55 cross-referenced

16    paragraphs 8 and 13 and put limitations -- or recognized

17    limitations in those paragraphs on orders that amend the

18    agreement.  So I think it's clear to me that the parties very

19    carefully documented this transaction and I agree with you that

20    they left room for the order concept.  But the order better be

21    pretty clear as far as what it states if you're going to still

22    pursue this contention that DASLC obligated itself -- I'm not -

23    - I'm sorry -- MobileAria obligated itself to cap the

24    megahertz.  It may have been good business for it recognizing

25    that it replaced someone and it itself could be replaced to try

25

1    to make Verizon happy.  But that's different than saying that

2    it's bound by a contract.  It's one thing to have a happy

3    customer who will renew that contract in the future.  It's

4    another thing for that customer to say you breached my

5    contract.

6            So anyway, I don't think we need to hear anymore on

7    this because it's really a question of establishing at least a

8    basis for going forward with the claim in the first place.  You

9    know, there's a lot of law on this in the context of secured

10   creditors asserting claims against consumers where Courts

11   require affidavits and the documents.  It's the same here.  You

12   really need to do that.  So I'm going to give you -- when is

13   the next omnibus day?

14           MR. BUTLER:  December 20th, Your Honor.

15           THE COURT:  And when's the one after that?

16           MR. BUTLER:  January 25th -- 25th, I believe.

17           THE COURT:  All right.  The debtor's response date

18   should be ten days -- should be January 15th -- that's a

19   weekday.  Yeah, that's a Tuesday.  So the hearing on this would

20   be the twenty-fifth omnibus day.  And you should file your

21   amended proof of claim by December 17th which is a Monday.

22           MR. LADDIN:  That's what day of the week?  I don't

23   have my --

24           THE COURT:  Monday.  And serve it on Mr. Berger.

25           MR. LADDIN:  We will do that.

1          THE COURT:  Okay.  Thank you.

2          MR. LADDIN:  Thank you, Your Honor.

3          MR. BERGER:  Thank you, Judge.

4          THE COURT:  And obviously, that will cover the other

5   elements of the claim, too.  If there's some support for the

6   contentions about the trucks not being there or being there --

7   you know, the issue about -- the other two elements of the

8   claim --

9          MR. LADDIN:  Yeah.

10          THE COURT:  I need an affidavit that says that's in

11   fact the case.

12          MR. LADDIN:  No, that's fine, Your Honor.  It clearly

13   is.  Those are factual disputes and we'll set that out in more

14   detail.

15          THE COURT:  Okay.  And my guess is, if there is such

16   an affidavit with backup, Mr. Berger will be speaking with you

17   about those elements of the claim and in all likelihood the

18   hearing on that element of it will be adjourned either to

19   independently reconcile them in an informal way or for you all

20   to have a discovery schedule because there's no sense on having

21   a hearing on a non-evidentiary basis if there actually is an

22   evidentiary issue.

23          MR. LADDIN:  That's right.  With respect to timing,

24   could we have until the 18th, Your Honor, the Tuesday?

25          THE COURT:  That's fine.

27

1      MR. LADDIN:  Okay.  Thank you.

2      THE COURT:  But since we're getting near the

3  holidays, by 4 on the 18th.

4      MR. LADDIN:  That's fine.  Thank you.

5      THE COURT:  Okay.

6      MR. BUTLER:  Your Honor, the next matter on the

7  agenda is matter number 7.  It's the twenty-second omnibus

8  claim objections filed by the debtor at docket number 10738.

9  As in the past, Your Honor, we have received various responses

10  and we have also in this particular case -- elected to withdraw

11  two of the objections that we had originally filed.

12      There were 131 proofs of claim on the objection on

13  various procedural and substantive bases.  There are two

14  objections that the debtors have chosen to withdraw.  One is

15  with respect to the claims filed by UniSeal.  And the other one

16  is with respect to the claim filed by Contrain (ph.) Funds, LLC

17  or Airmark.

18      The Airmark -- the Contrain Airmark -- our claim

19  number is 10389 and we have agreed to withdraw that because

20  Contrain has agreed to actually withdraw it in a separate

21  stipulation.  So that's how that's been resolved.

22      And with respect to the UniSeal claim, that's claim

23  number 1916, and that -- we're withdrawing that because that's

24  been involved -- taken up in some respects in our caps dealing,

25  dealing with suppliers and caps order, and we will be filing in

28

1    our twenty-fourth omnibus claims objection a motion to modify

2    that claim consistent with the caps agreement.  So we've taken

3    that off of this particular omnibus objection.

4           That leaves, Your Honor, 129 proofs of claim.  There

5    are thirty-two proofs of claim for which we've received

6    responses.  This is different than what we filed in our omnibus

7    reply yesterday.  We received additional response overnight and

8    consistent with our understanding with the Court, when we

9    receive response, even if it's not timely, we still take it off

10   of this track and put it into the claims track.  So that means

11   there are thirty-two proofs of claims that should be adjourned

12   pursuant to the responses.  That leaves ninety-seven proofs of

13   claim to address at this hearing.

14          The responses that we are adjourning into the claims

15   track, there are actually thirty responses covering the thirty-

16   two proofs of claim.  And those assert liquidated claims for

17   approximately forty-three and a half million dollars.  The

18   ninety-seven claims we're dealing with at this hearing asserted

19   liquidated claims of approximately 28.9 million.  Of that,

20   we're asking Your Honor today to expunge thirty-eight of those

21   claims with an asserted amount of approximately 1.7 million.

22   And with respect to the other fifty-nine claims that assert

23   approximately 27.2 million dollars for the claims, we're asking

24   to modify those claims on various bases, including modifying

25   the identity of the debtor and the class and the amount of the

29

1    claim and in some cases reducing the asserted amount of the

2    claims.  That would, if Your Honor grants the relief requested,

3    reduce those claims to nineteen million dollars in the

4    aggregate or an approximate aggregate reduction of 8.2 million.

5            So again, as in prior matters, Your Honor, when we've

6    dealt with the omnibus objections at omnibus hearings, we're

7    asking Your Honor today for relief as to the ninety-seven

8    proofs of claim as to which no objections have been received

9    and to move the thirty-two proofs of claim into the claims

10   track and then we'll have the other two objections that we will

11   have withdrawn, as I've described on the record.

12           THE COURT:  Okay.  And as to the ones that are

13   covered by the order, each of those parties got the individual

14   notice contemplated by the claims procedure?

15           MR. BUTLER:  Yes.  We've been doing the

16   particularized notice, Your Honor.  And we will also, if Your

17   Honor grants the relief requested, send out particularized

18   notice as to the relief received.

19           THE COURT:  Okay.  All right.  Does anyone want to

20   address this omnibus motion?  All right.  I'll grant the

21   omnibus motion as modified as sought on the record and as

22   reflected in the modified order to either disallow or modify

23   the treatment of those claims by claimants who have not opposed

24   the relief sought.  And that's based not only on their lack of

25   an objection but also the statements regarding those claims in

30

1   the motion.  So you can submit that order.

2          MR. BUTLER:  Thank you, Your Honor.  Your Honor, one

3   other matter with respect to claims, just on this record, and

4   that is I did want to indicate to the Court that the debtors

5   have been studying very carefully amended Bankruptcy Rule 3007

6   which I think one can adduce, although it's not specifically

7   stated, I think one can adduce this to be applied to all

8   pending cases as of December 1, 2007 because the amended

9   bankruptcy rules don't provide anything to the contrary, unlike

10  the BAPCA implementation procedures.  And so we're assuming

11  they're applicable to this case.  And there are, under the

12  amended Rule, there is a specific authorization for debtors to

13  seek relief from the Court or to seek guidance from the Court

14  on the implementation of that Rule as to the particular case.

15  And as with other bankruptcy rules, there's always the ability

16  of the company to ask the Court to reconcile the requirements

17  of the rules as to the administration of the rule in the

18  particular case.

19          So I wanted Your Honor to know that we're going to be

20  filing a motion to amend our claims procedures order on Friday

21  to be heard at the December 20th hearing date to ask Your Honor

22  for guidance on reconciling amended Bankruptcy Rule 3007

23  against our current claims procedure order in this case.

24          THE COURT:  Okay.  I mean, I could tell you that my -

25  - the underlying point of that Rule is to give claimants notice

31

1    and adequate notice.  And, frankly, I think what you're doing,

2    as far as the particularized notices, is more than the rule

3    requires.  But I'm happy to hear that motion.

4            MR. BUTLER:  Your Honor, I'm actually hopeful that

5    Your Honor, when we file the motion at the end of the day, that

6    we will be able to continue our current procedures.  Because we

7    think they are with Your Honor early on in this case one in

8    particularized notice and we've been doing that.  So I think

9    that we probably far see the amended Rule.  But the point for

10   us is we simply didn't want to have an ambiguity in this record

11   and then have all of a sudden objections based on --

12           THE COURT:  No, I understand that.

13           MR. BUTLER:  -- noncompliance of the rules.  So --

14           THE COURT:  I understand that.  That's fine.

15           MR. BUTLER:  So we will be filing that on Friday for

16   consideration.

17           THE COURT:  Okay.  In other words, I think you can

18   still have omnibus objections as long as people get

19   particularized notice.

20           MR. BUTLER:  Thank you, Your Honor, for that

21   guidance.

22           THE COURT:  Okay.

23           MR. BUTLER:  Your Honor, the last matter on today's

24   agenda, now moving as matter number 8, this is Internet

25   Corporation's motion for payment of administrative expenses.

32

1    There are a small number of exhibits before I cede the podium

2    to Mr. Dragich for their argument.  There are a small number of

3    exhibits that I believe there's no objection to in terms of

4    being put into the record which was Exhibit 1 is Intermet's

5    motion for payment of the administrative expense claim and the

6    various exhibits.  Exhibit 2 is our objection with the various

7    evidentiary exhibits, the contracts and so forth, the

8    settlement agreements.  And then the prior joint stipulation

9    between the parties that Your Honor signed at docket number

10   9696.  But seeing as this argument in part relates up to the

11   documents between the parties, we wanted to move those matters

12   into evidence.  There is no objection, I believe.

13          THE COURT:  No opposition?

14          MR. DRAGICH:  No objection, Your Honor.

15          THE COURT:  Okay.  Can I start with a point the

16   debtors raised towards the end of their objection that I don't

17   think you've had a chance to respond to, which is why isn't

18   this claim barred by the settlement agreement from August?

19          MR. DRAGICH:  Your Honor, for the record, David

20   Dragich from Foley & Lardner on behalf of Intermet Corporation.

21   In response to your question, the claim -- Intermet's claim,

22   whatever its character, whether it's administrative or a pre-

23   petition claim, is not barred or waived as a consequence of the

24   settlement agreement.  Your Honor, if we turn to the debtor's

25   objection in paragraph 14, it recites the language of the

33

1   settlement agreement.  And the very last three lines, let's

2   say, it provides that the debtors release or waive the claims

3   arising out of events, causes, acts, statements or omissions --

4           THE COURT:  Well, you left --

5           MR. DRAGICH:  -- which occurred before --

6           THE COURT:  You left out some language.  The release

7   says "The releasing parties" -- which would include Intermet --

8   "further release and waive any right to assert any other claim,

9   cause of action, demand or liability of every kind and nature

10  whatsoever, including those arising under contract statute or

11  common law whether or not known or suspected at this time which

12  relate to the claim in which the releasing parties have, ever

13  had or hereafter shall have against the debtors based upon

14  arising out of, related to or by reason of any event, cause,

15  thing, act, statement or omission occurring before the petition

16  date."  And I'm assuming what the debtors contend is that this

17  is at least related to the 2003 contract since that's what

18  gives rise the right to a rebate -- refund, a refund of the

19  rebate.  I mean, I understand.  If it said -- but the word

20  "related to" is pretty broad.

21          MR. DRAGICH:  Well, Your Honor, it depends.  I agree

22  that it's broad.  But it says related to or by any reason of

23  any event, cause, thing or omission occurring -- it relates to

24  those acts or omissions before -- that occurred before the

25  petition date.  It's our position, Your Honor, that the act or

34

1    the omission, Delphi's failure and cessation of ordering parts

2    from Intermet, was a post-petition act not one --

3              THE COURT:  But isn't the "thing" -- you know, they

4    use that word "thing", too.  Isn't the "thing" the contract?

5              MR. DRAGICH:  The contract is what defines the

6    parties' obligation but the breach or the termination -- it's

7    our view was the post-petition -- arose from the post-petition

8    conduct of the debtor.

9              THE COURT:  And it has no relation to the "thing" --

10   to the contract?

11             MR. DRAGICH:  Well, it's an obligation of the

12   contract so, yes.

13             THE COURT:  So it relates to it.

14             MR. DRAGICH:  We're reading -- Intermet and the

15   debtors read the clause differently, Your Honor.

16             THE COURT:  Okay.

17             MR. DRAGICH:  And that is that it's our view the

18   "related to" is not relates to the contract.  It relates to the

19   act or omission.  And if it's the act or omission that we're

20   addressing, that's the post-petition omission by the debtor to

21   order the steering knuckles under the supply agreement from

22   Intermet.

23             THE COURT:  Okay.

24             MR. DRAGICH:  Your Honor seems relatively familiar

25   with the background.  Would you like a brief recitation of some

35

1    of the underlying facts, Your Honor, that are not in dispute?

2         THE COURT:  Well, let me just -- only one point.  And

3    it goes back to the settlement agreement again.  What is the

4    relation of this rebate agreement to the claim that was filed?

5    Was the rebate agreement related to the provision of the

6    products and services that were covered by the claim?

7         MR. DRAGICH:  I don't recall, Your Honor.  I can't

8    answer that as I sit here -- stand here.

9         THE COURT:  Okay.  Okay.  All right.

10        MR. DRAGICH:  Your Honor, what -- the factual issues

11   are largely agreed to between the parties as far as entry into

12   the supply agreement, entry into the rebate agreement and what

13   the rebate requires of the parties.  So I won't repeat those

14   here.  What the parties have agreed to do with respect to the

15   claim, if Your Honor allows the claim, whether it be

16   administrative or pre-petition, the amount of that claim has

17   not yet been reconciled.  The debtor has not said outright that

18   there is no claim -- or no claim.  Whether it should be allowed

19   or not is a separate issue.  But the parties have agreed that

20   if Your Honor grants a claim, whether it be administrative or

21   pre-petition, that an evidentiary hearing be scheduled for the

22   next omnibus hearing to determine what that amount is.

23        THE COURT:  Okay.

24        MR. DRAGICH:  Your Honor, what we request is that the

25   Court allow an administrative claim pursuant to the obligations

36

1    of the rebate agreement.  Intermet views this as a post-

2    petition administrative claim because it arose solely because

3    of the debtors' post-petition conduct, its termination of the

4    supply agreement.  Your Honor approved a sale today regard the

5    Saginaw Chassis asset sale motion.  And that sale sold

6    substantially all of the assets that the debtor used in

7    supplying General Motors pursuant to the GMT 900 program.

8    Intermet in turn supplied Delphi pursuant to that program.  So

9    if Delphi is no longer supplying at all as a result of that

10   sale, there has been a termination of the contract that in 2007

11   September, just a couple months ago, at that time, the debtors

12   ceased ordering parts from Intermet.  But for two years --

13            THE COURT:  Well, see, you're not saying they've

14   actually formally terminated but they're in anticipatory breach

15   in essence?

16            MR. DRAGICH:  We believe, Your Honor, they've

17   terminated by their conduct.  And we've sent them ---

18            THE COURT:  At a minimum it would be anticipatory

19   breach, I guess.

20            MR. DRAGICH:  Which we've given a notice pursuant to

21   our letter prior to this motion.  The motion itself could be

22   deemed a notice of termination as a consequence of that breach.

23   They clearly, Your Honor, are not going to be ordering

24   additional parts from Intermet.  They no longer supply pursuant

25   to that program.

37

1        The purpose behind this concept, Your Honor, under

2   503 of the Code is to encourage parties to continue to do

3   business with the debtor on a post-petition basis.  This

4   section assumes that if the debtor commits a post-petition

5   breach as part of that ongoing relationship, the nondebtor

6   party will be protected.  It will be protected because it will

7   be awarded a resulting administrative claim.  That's what

8   Intermet requests today, Your Honor.

9        THE COURT:  How does this further that policy?

10       MR. DRAGICH:  Your Honor, for two years

11  post-petition -- so almost two years.  From October 2005 until

12  September 2007, Intermet performed under that contract.  That

13  entire contract, when viewed in total, imposed upon the debtor

14  the obligation if it didn't order the minimum requirements to

15  refund that advanced rebate that was previously paid by

16  Intermet.  That was a central component of the contract.

17  Intermet relied on all terms of the contract in providing a

18  benefit to the debtor for almost two years during the

19  bankruptcy proceeding.

20       THE COURT:  How's that different from the pension

21  years in McFarland's Race Elevator?  They worked for the debtor

22  post-petition.

23       MR. DRAGICH:  But, Your Honor, as --

24       THE COURT:  But --

25       MR. DRAGICH:  I'm sorry.

38

1      THE COURT:  -- the Court said that the consideration

2  for the particular claim that was asserted to be an

3  administrative claim was provided pre-petition.

4      MR. DRAGICH:  Can you repeat your question, Your

5  Honor.  I'm not sure I followed that.

6      THE COURT:  Well, those people worked post-petition.

7  And they were paid for their post-petition work.  And they were

8  paid for their -- the portion of their post-petition pension

9  that came due post-petition for the post-petition work.  But

10  the second circuit said the claim based on pre-petition

11  consideration, even though it accrued post-petition, was a pre-

12  petition claim.  And even though they were working post-

13  petition.  They were under a contract that covered the whole --

14  you know, pre- and post-petition period.  But the Court said

15  this consideration they already provided by their hours worked

16  pre-petition.  Therefore it's a pre-petition claim.

17      MR. DRAGICH:  I think the situation here is different

18  though, Your Honor, because in this instance Intermet has

19  provided value to the debtor post-petition in the form of

20  continuing its supply.

21      THE COURT:  They were working.  I mean, there's

22  nothing more valuable than having an employee show up at the

23  office and do his or her job.

24      MR. DRAGICH:  Agreed, Your Honor.  And they were paid

25  for that labor.  Like Intermet was paid for the goods that it

39

1    shipped.  However, the difference is, Your Honor, is that here

2    we're dealing with a commercial contract.  And all of the

3    commercial terms are relevant as far as inducing the parties to

4    act.  In this instance, Intermet assumed and performed the

5    contract on the basis that the debtor would return performance.

6    Meaning, they were only willing to assume the risk of

7    continuing supply if the debtor would then also perform its

8    obligation if it didn't fulfill the minimum requirements.

9            THE COURT:  Did Intermet move to compel assumption or

10    rejection of the contract?

11            MR. DRAGICH:  It didn't, Your Honor, because -- nor

12    did the debtor reject the contract.  If the debtor truly wanted

13    to relieve itself of the obligations within the rebate

14    agreement or the underlying supply agreement, it could have

15    rejected the contract.  It didn't do that.  It simply --

16            THE COURT:  It didn't assume it, though, either, did

17    it?

18            MR. DRAGICH:  No, Your Honor.  By its conduct, it

19    breached the contract and in our view terminated.  The whole

20    purpose of the contract is now gone, Your Honor, because the

21    debtor no longer supplies General Motors pursuant to that

22    program.  So there would be no business purpose for the debtor

23    to assume a contract that it's not performing.

24            Just moving to one other issue raised in the debtors'

25    objection, Your Honor, I think I've addressed our view on the

40

1    waiver issue pursuant to the settlement agreement.  I'd also --

2    the debtor also argues in the objection that Intermet somehow

3    waived its claim by failing to file a proof of claim.  The

4    debtor contends that Intermet had merely a contingent claim.

5    If Your Honor accepted that view, every party in this case,

6    every nondebtor party to an executory contract would have to

7    file a proof of claim irrespective of whether there's been a

8    pre-petition breach.  Surely that's not a requirement that the

9    Court would impose on each and every nondebtor party to a

10   contract.  At the time of the filing, at the time of the bar

11   date, there had been no termination of the contract and

12   therefore Intermet would not have reason to file a claim.  So

13   for that reason, Your Honor, Intermet believes it had not

14   waived the claim in any way as far as failing to file a proof

15   of claim because it wasn't required to.  And second, the

16   settlement agreement does not constitute a waiver because it

17   deals solely with acts or omissions of the debtor giving rise

18   to a claim that were pre-petition.  And it's our view that the

19   acts that gave rise to the claim in this instance were post-

20   petition.  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. BUTLER:  Your Honor, I only have a couple of

23   observations.  The first observation is that I understand Mr.

24   Dragich's need to argue what he does which this -- and he

25   relies in looking at Exhibit 2-B, the settlement agreement, and

41

1   at the relevant paragraph there that Your Honor discussed on

2   the record with him.  And he relies on the words before the

3   petition date which is a concession as we're concerned that

4   if -- that he's saying all these acts occurred after the

5   petition date and somehow were not related because I think it's

6   a concession by Intermet that if in fact it was before the

7   petition date, they are barred by the settlement agreement and

8   they did not file any other proof of claim.  The proof of claim

9   that has -- so they're either barred by the bar date order or

10  they're barred by their own signature on a settlement

11  agreement.

12          THE COURT:  Well, I don't see how they'd be barred by

13  the bar date order because the bar date order gives a -- you

14  haven't rejected this contract yet.

15          MR. BUTLER:  Right.  Your Honor -- that's correct,

16  Your Honor, but the reality is that if people have specific

17  claims, for example, I mean -- and I know the facts are in

18  dispute here and I think that among the facts that are not in

19  dispute just so the record indicates, Your Honor, the 417,200

20  dollars is, I think -- the debtors would concede the

21  appropriate calculation under the contract.  But that relates

22  to -- the vast majority of that relates to transactions that

23  occurred in the pre-petition period.  And Intermet knows that

24  as well.

25          THE COURT:  Well, that's -- I'm sorry.  That's why I

42

1    asked -- I didn't ask this correctly.  This rebate agreement is

2    just -- there's this one-page agreement.  Is it incorporated in

3    some other executory contract where they were supposed to be

4    providing this knuckle?

5              MR. BUTLER:  No.  As I understand it, Your Honor, the

6    rebate agreement was part of the original undertaking back in

7    200 -- I think it's 2003, if I remember the exact date.

8              THE COURT:  I'm not sure it matters.  It goes to the

9    bar date issue.  If it's part and parcel of an agreement that's

10   still executory and hasn't been rejected, then I think they

11   have more time to file a proof of claim.  If it's a stand alone

12   document, I think you're probably right, that they were

13   obligated to file a proof of claim because a big portion of it

14   is pre-petition.  And liquidated.

15             MR. BUTLER:  Yes, Your Honor.

16             THE COURT:  But it's just not clear to me whether it

17   is part of -- whether it's a stand alone agreement or whether

18   it's actually a rider to or an exhibit to or incorporated in an

19   ongoing agreement.

20             MR. BUTLER:  Your Honor, I mean, they haven't -- this

21   is their proof of claim, their motion.  I mean, I know the

22   facts -- the facts of the case are it is a stand alone

23   agreement.  It relates to the transaction.  It relates to it.

24             THE COURT:  Well, that's a separate issue about

25   whether --

43

1       MR. BUTLER:  I know, but that's the point.  And --

2       THE COURT:  Yeah.

3       MR. BUTLER:  And that's sort of observation number

4   one.  Your Honor, observation number two is that Intermet knows

5   the law here.  They know the law applicable to this and it's

6   not what they just argued before Your Honor.  They understand

7   Ace Elevator, Your Honor's case.  They understand second

8   circuit law and they understand that administrative priority

9   claims require that the claim arise out of a post-petition

10  transaction on the part of the debtor and be allowable only to

11  the extent that the consideration supporting the claim is right

12  to payment was both supplied to and beneficial to the debtors'

13  estate and the operation of its business from the Ace Elevator

14  Company case.  And the reason we know that is because they

15  themselves -- Intermet Corporation was a debtor itself in

16  Chapter 11.  That is exactly the lines they used in fighting

17  all of the administrative claims in their case.  And we filed

18  an example of that, which is now before Your Honor as Exhibit

19  2-A, the Intermet objection -- their omnibus objection to

20  claims in their case that was filed.  So Intermet knows the

21  law.

22      THE COURT:  Do you know, did they win on that one?

23      MR. BUTLER:  Yeah.  I have no idea what the outcome

24  was.

25      THE COURT:  Okay.  I mean, because if they did, you

44

1    may have a judicial estoppel point.  Otherwise --

2            MR. BUTLER:  But it states -- well, it's their

3    position.  It's not -- I don't know what their judgm -- whether

4    the judge agreed.

5            THE COURT:  No, I know.

6            MR. BUTLER:  It certainly indicates what their view

7    is.

8            THE COURT:  It's the difference between shrugging

9    your shoulders and say well, I felt that one day but I feel it

10   different today and actually being estopped as a legal matter.

11           MR. BUTLER:  Yeah.  I haven't gone through the -- and

12   sought what the order was.  My -- I suspect in fact that they

13   did win it but we certainly could find out, Your Honor.

14           THE COURT:  Okay.

15           MR. BUTLER:  But that's certainly -- Intermet knows

16   the issue.  And then finally, whether or not they themselves

17   were judicially estopped based on that position they've taken

18   in their cases, the fact is they can't -- this claim can't

19   survive as an administrative claim under the law here in the

20   second circuit and in this district.

21           THE COURT:  Okay.

22           MR. BUTLER:  There is no question here that this did

23   not arise out of a pre-petition transaction.  We agree with Mr.

24   Dragich the facts are the facts and they've been indicated

25   here.  This was a December 12th, 2003 letter agreement.  The

45

1    rebate was advanced at that time.  The majority of the

2    production here occurred in 2004 and 2005 prior to the Chapter

3    11 being filed.  There was never an attempt by them to seek

4    assumption of the contracts.  Other parties have.  Your Honor

5    knows there is a contract assumption procedures process here in

6    this case that suppliers insisted on.  They never availed

7    themselves of any of those issues.  And while it's true the

8    debtors have not terminated this contract, this contract may

9    well to the extent that it has no benefit to the estate be

10   rejected and then the rejection would be considered under the

11   Bankruptcy Code a pre-petition rejection not an administrative

12   act.  There is no administrative act here.

13         And I just don't see either under the case law

14   applicable in this district or under the actual facts of this

15   case or given the failure of Intermet to protect any interest

16   it might have with respect to the executory contract in this

17   case for the last two and a half years to come in and now say

18   oh, well, it can't be a pre-petition claim so now it's got to

19   be administrative because that's the only way we can win is

20   something, Your Honor, that the Court should dispose of.  Thank

21   you.

22         THE COURT:  Okay.

23         MR. DRAGICH:  Your Honor, may I address --

24         THE COURT:  Yeah.  You could stay there if you're --

25   that's fine.

46

1          MR. DRAGICH:  Okay.  Thank you, Your Honor.  Just

2  with respect to the pleading that the debtors attached that

3  Intermet filed in its own case, Your Honor, I don't think we

4  have a disagreement as to what the law says.  And I think we

5  accurately cited it in our papers in our case.

6          THE COURT:  I'm not going to hold it against you.

7          MR. DRAGICH:  Well, Your Honor, I'd like to just

8  explain, Your Honor, our position on that because I think it

9  bears responding to the debtors' remarks.

10          If the debtor engages in a post-petition act that

11  causes the nondebtor party damages, it's our position that the

12  creditor is entitled to an administrative claim.  If the

13  nondebtor party provides value to the debtor post-petition and

14  the debtor accepts that benefit, we believe that the nondebtor

15  party is entitled to administrative claim.  That's what our

16  papers say.

17          How you apply the facts of the situation in the

18  Intermet case and here is the issue where we disagree.  In that

19  case, Your Honor, just very briefly, there were services

20  rendered by sales representatives pre-petition.  And the

21  argument in that case by the representatives was that the

22  debtor, Intermet in that case, post-petition failure to renew a

23  contract gave rise to administrative claims.  So we're talking

24  about totally different facts, Your Honor, and that's why we

25  believe the cases are not on the same issue.

47

1          THE COURT:  But this -- you have to admit this is not

2   a tort, right?  They didn't burn down Intermet's building, as

3   I'm reading in Brown.  The wrong here is a breach of a

4   contract, isn't it?

5          MR. DRAGICH:  Agreed, Your Honor.  Post-petition

6   breach is our view.

7          THE COURT:  Well, all right.  Of a contract that

8   hasn't been assumed.

9          MR. DRAGICH:  Correct, Your Honor.  We believe it's

10  been terminated by the debtors' conduct.

11         THE COURT:  All right.  Okay.  All right.  Intermet

12  Corporation seeks allowance as an administrative claim of its

13  right to a refund under a 2003(e) pre-petition agreement with

14  Delphi Automotive Services -- Systems, excuse me, LLC, DAS LLC.

15  As is clear from the claim and from oral argument, that claim

16  is premised upon the alleged post-petition breach of that

17  agreement.  The agreement has not been assumed by DAS LLC nor

18  rejected.  However, Intermet contends that with the sale, which

19  I've approved today, of the Saginaw Michigan operation, DAS LLC

20  is at least an anticipatory breach of the agreement and that it

21  is no longer capable of being performed further without their

22  being a refund owed under it.

23         It appears from Exhibit C to the motion for

24  administrative expense payment that a large portion of the

25  refund is attributable to pre-petition conduct of DAS LLC in

48

1    addition to being based upon a pre-petition agreement.

2           As was noted at oral argument, although it was

3    asserted that this element of the agreement was important to

4    Intermet, Intermet has never moved in this case to compel

5    assumption or assignment of the -- I'm sorry, assumption or

6    rejection of the agreement under the procedures previously

7    adopted by the Court for such requests.

8           The debtor objects to the administrative expense

9    claim on two main grounds, at least the two grounds that I'm

10   going to focus on.  The first, is that the administrative

11   expense claim is barred as having been released by Intermet

12   pursuant to a settlement agreement that it entered into in

13   August of this year with Delphi Corporation on behalf of itself

14   and certain of its U.S. affiliates, including DAS LLC.  In that

15   agreement, the releasing parties, which include Intermet,

16   agreed upon the allowed amount of a large claim that had been

17   failed by Intermet, roughly 3.7 million dollars, as a pre-

18   petition general unsecured claim.  And then provided for a

19   further release and waiver of any right "to assert any other

20   claim, cause of action, demand or liability of any kind and

21   nature whatsoever including those arising under contract,

22   statute or common law, whether or not known or suspected at

23   this time which relate to the claim that was settled and which

24   the releasing parties have, ever had or hereafter shall have

25   against the debtors based upon arising out of, related to or by

49

1     reason of any event, cause, thing, act, statement or omission

2     occurring before the petition date."

3            I think two points are worth noting in respect of

4     this release.  First, it is a release not only of claims, which

5     may be susceptible to a somewhat narrow definition but might

6     not apply to administrative expense claims.  But also releases

7     the right to assert any liability of any kind or nature

8     whatsoever including those arising under statute.  And of

9     course, the basis for asserting an administrative expense is

10    under Section 503(b) of the Bankruptcy Code.

11           Second, as discussed at oral argument, the release is

12    broadly written to apply to any such rights that Intermet may

13    have or hereafter shall have by recognizing rights arising in

14    the future, i.e., during the post-petition period.  Arising out

15    of, based upon or related to by reason of any event, cause of

16    action, thing, act statement or omission occurring before the

17    petition date.

18           Intermet contends it can get out of this release or

19    that this release doesn't cover its administrative expense

20    claim because the administrative expense arises post-petition.

21    However, it is very clearly related to and by reason of a pre-

22    petition thing, the defining agreement, that gives rise to the

23    right to the refund, which is the 2003 contract.  And it is at

24    a minimum related to that agreement since that's how the

25    calculation of the claim is made based upon the terms of the

50

1  rebate agreement or the refund provided for in the 2003

2  agreement.

3         So I conclude, based on a reading of the settlement

4  agreement, that Intermet has released this claim -- or this

5  administrative expense claim.

6         I will, however, address the other argument that the

7  debtor made here in opposition to the administrative expense

8  claim which is that even if the administrative expense claim

9  had not been released, it would not be entitled to

10  administrative expense treatment.  I believe that that argument

11  is correct.  The law on what constitutes an administrative

12  expense is quite clear in the second circuit and the parties

13  essentially acknowledge that with one exception that I should

14  deal with first.  The cases cited first and foremost by

15  Intermet are cases involving post-petition torts or other

16  wrongful activity separate and apart from the breach of the

17  contract.  And those cases, i.e., Reading Company v. Brown, 391

18  U.S. 471 (1968) and Pennsylvania Department of Environmental

19  Resources v. Tri-State Clinical Labs, Inc., 178 F.3d 685 (3d

20  Cir. 1999), therefore, really are not applicable here.  The

21  Courts in those cases were dealing with the problems of

22  permitting a debtor to commit a tort or other wrongful activity

23  other than the breach of a contract post-petition.  And having

24  that -- the victim of that wrongful activity nevertheless

25  compensated in so-called tiny bankruptcy dollars.  And

51

1    obviously for the correct and good reasons concluded that that

2    would not be proper and therefore provide for an administrative

3    claim for such wrongful activity.

4            Here, however, the right as claimed by Intermet to

5    have its breach claim treated as an administrative expense is

6    determined by those cases that deal with the rights of parties

7    to unassumed and unrejected executory contracts to assert a

8    claim for administrative expense treatment.  And those cases

9    are clear that the claimant has a tough burden to sustain its

10   right to priority treatment under Section 503(b) which provides

11   for administrative expense priority for the actual necessary

12   cost and expenses of preserving the estate.  As the Supreme

13   Court stated in Howard Delivery Service, Inc. v. Zurich

14   American Insurance Co., 126 Supreme Court 2105 (2006), "to give

15   priority to a claimant not clearly entitled thereto is not only

16   inconsistent with the policy of equality of distribution, it

17   dilutes the value of the priority for those creditors that

18   Congress intended to prefer."

19           Given that well-established principle, the Courts in

20   this circuit have set forth a test for the allowance of an

21   administrative expense claim including on behalf of a party to

22   an unassumed and unrejected executory contract.  That party

23   must demonstrate, one, that its claim arose from a transaction

24   with or on account of consideration furnished to the debtor-in-

25   possession; and, two, the transaction or consideration directly

52

1    benefited the debtor-in-possession.  And the reference to the

2    debtor-in-possession there is key.  It's not the debtor, i.e.,

3    the pre-petition debtor but the post-petition debtor.  Here,

4    the transaction was with the pre-petition debtor under the 2003

5    contract and, more importantly, the consideration provided the

6    600,000 dollars was provided pre-petition.  Therefore, there

7    was no inducement by the debtor-in-possession in return for

8    that consideration.

9         The fact that it is alleged at least that Intermet

10   continued to provide the steering knuckle sets post-petition is

11   no different to my mind than the fact that the employees of Ace

12   Elevator or McFarlands continued to work post-petition.  The

13   particular claim that they were asserting and that Intermet is

14   asserting is premised upon the provision of pre-petition

15   consideration under a pre-petition agreement.  And

16   consequently, under the law of this circuit, and I believe

17   everywhere else would be therefore treated as a pre-petition

18   claim if it were not waived.  See generally In re Patient

19   Education Media, Inc., 221 B.R. 97 (Bankr. S.D.N.Y. 1998) which

20   I believe is the most favorable case to a claimant in

21   Intermet's position but clearly under the reasoning of Judge

22   Bernstein in that case, would not accord the administrative

23   expense status to someone in Intermet's position.  See also In

24   re Ace Elevator, 347 B.R. 473 (Bankr. S.D.N.Y. 2006) and the

25   cases cited therein including specifically Trustees of

53

1    Amalgamated Insurance Fund v. McFarlands, Inc., 79 F.2d 98 (2d

2    Cir. 1986).

3            So, for those separate and independent reasons, each

4    of which would justify denial of the motion, I'll deny the

5    motion.  So, Mr. Butler, you can submit an order to that

6    effect.

7            MR. BUTLER:  Yes, Your Honor, we will.  Your Honor,

8    that completes the matters set for the omnibus agenda today.

9            THE COURT:  Okay.  Thank you.  Let's hope we all get

10   over our colds.

11           MR. BERGER:  Yes, Your Honor.

12           (Whereupon these proceedings were concluded at 11:30

13   a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

54

# I N D E X

## E X I B I T S

| DEBTORS' | DESCRIPTION | ID. | EV. |
|---|---|---|---|
| 1 | Debtor's Declaration in support of Saginaw Chassis asset sale motion settlement | | |
| 2-3 | Agreements, including amendments, in connection with Saginaw Chassis asset sale motion | 31 | 31 |
| 4-11 | Court documents relating to Saginaw Chassis asset sale | | |
| 12-14 | All service notices relating to sale | 31 | 32 |
| 1 | Intermet's motion for payment of administrative claims | 34 | 4 |
| 2 | Debtor's objection to Intermet's motion plus evidentiary exhibits | 35 | 6 |
| 3 | Prior joint stipulation | 35 | 8 |

55

**I N D E X, CONT'D**

**R U L I N G S**

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Saginaw Chassis asset sale motion granted | | |
| Twenty-second omnibus claim objection granted pursuant to modified agreement | 32 | 20 |
| Motion of Intermet Corporation for payment of administrative expenses denied | 53 | 3 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

56

1

2                               **C E R T I F I C A T I O N**

3

4      I Lisa Bar-Leib, court-approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8

9                                              November 30, 2007

10     Signature of Transcriber              Date

11

12     Lisa Bar-Leib

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25