practices. Supplier shall retain and make available upon request such records for a period of five (5) years from the date of final shipment of Product or rendering of Services covered by this Agreement.

(b)    <u>Monthly Purchase Report</u>. When requested by Customer, Supplier shall, for all Orders placed directly with Supplier, provide Customer a monthly purchase report by ordering location, listing Product and Service purchased under this Agreement, including description, part number, quantities shipped, and associated list and net prices.

(c)    <u>Disputed Amounts</u>. Supplier agrees to provide reasonable supporting documentation concerning any disputed amount(s) within twenty (20) days after Customer or its Affiliates provides written notification of the dispute to the Supplier.

(d)    <u>Audit</u>. Customer and Supplier shall mutually agree upon an independent auditor who, at Customer's option and Customer's expense, shall audit Supplier's records of Supplier's transactions with its other commercial customers (provided the identity of such other commercial customers shall not be disclosed to Customer) for verification of Supplier's compliance with all provisions of this Agreement. Supplier shall be responsible for all audit/verification expenses only if the audit reveals that there is a deficiency or violation of Section 8 entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT" and section 7.2 entitled "MOST FAVORED CUSTOMER." At Customer's request, the independent auditor shall have access to the Supplier's records no more than two (2) times per year, (unless Customer has reason to believe that Supplier has not complied with all provisions of the Agreement), for purposes of audit during normal business hours during the term of this Agreement and during the respective periods in which Supplier is required to maintain such records. The accuracy of Supplier's billing shall be determined from the results of such audits.

(e)    <u>Minority, Woman owned, Disabled and Vietnam Era Veteran Business Enterprises (MWDVBE) Utilization</u>. With respect to the Supplier's Compliance (as the Primary Supplier) with Minority, Woman-owned, Disabled and Vietnam era Veteran Business Enterprises (MWDVBE) Utilization, Supplier must submit the Prime Supplier Quarterly Reports as described on the website and submit them via the website at http://www.verizon.com/diversity/Suppliers to Customer on a quarterly basis ten (10) business days following the end of each quarter. In addition, Supplier (as the Primary Supplier) agrees to provide opportunities for MWDVBE in accordance with ATTACHMENT F-1 hereof, entitled "PRIMARY SUPPLIER CONTRACT COMPLIANCE", of EXHIBIT F hereof, entitled "PRIMARY SUPPLIER COMPLIANCE WITH MINORITY, WOMAN-OWNED, DISABLED AND VIETNAM ERA VETERAN BUSINESS ENTERPRISES (MWDVBE) UTILIZATION".

(f)    <u>Additional Reports.</u> In addition to the various reports required of the Supplier elsewhere in this Agreement, Supplier will provide the following report:

> Supplier shall maintain a record of all No Trouble Founds ("NTFs") which permits tracking of NTFs to assure that any Product that has been categorized as an NTF for the third time is not returned to Customer for future deployment. Supplier shall also publish these results in a monthly summary report and forward such reports to Corporate Sourcing's SPL (Sourcing Process Leader), VERIZON, at the address designated in the NOTICES provision of this Agreement. Fees of fifty dollars ($50) for NTFs shall apply as described in Section 2 paragraph (b) of Exhibit D, entitled PURCHASE FOR INTERNAL USE- WARRANTY AND PRODUCT SUPPORT.

## 11.    DOCUMENTATION, SUPPLIER'S SPECIFICATIONS, INFORMATION, RECORDKEEPING AND DISCLOSURE

(a)    <u>Documentation.</u> Supplier agrees to furnish all Documentation that Supplier provides to its customers in the normal course of business that is required for or incident to Customer's use and operation of the Products and Services, including but not limited to the items set forth or otherwise identified in EXHIBIT B-1 hereof, entitled "DETAILED DESCRIPTION OF PRODUCT AND SERVICES", and the terms and conditions stated within this Agreement, for the System, Products and Services

MobileAria, Inc.
C0505851

purchased hereunder, and any succeeding changes thereto, at no additional charge    Supplier    shall be responsible for updating the Documentation to incorporate subsequent updates and changes to System or Product or Services. Customer shall provide Supplier with a list of persons and organizations of Customer, to whom the updates shall be provided. The updates and any subsequent changes shall contain a Supplier identification reference number and date of issue to facilitate administration. Such subsequent changes and updates shall be provided within a reasonable time of their respective effective dates, at no charge to Customer.

Supplier grants Customer the right to make copies of Documentation furnished under this Agreement for the exclusive internal use of Customer. If any Documentation that is to be copied bears a copyright or proprietary notice, Customer shall reproduce the copyright or proprietary notice on all copies. Notwithstanding the preceding reference to proprietary markings, Supplier shall not provide Customer with any proprietary information unless previously agreed to in advance in writing.

On a continuing basis, Supplier shall provide, at no charge to Customer, Installation Alerts and Broadcast Warnings, Product Change Notices, Engineering Change Notices, and documentation for changes to Product, non-conformance to Specifications, service affecting items, acceptance failures, and installation issues. Such of the above referenced documents necessary to support Products shall be provided by Supplier during Acceptance, Warranty Period, post-Warranty maintenance and for Customer for as long as the technology survives.

(b)    Supplier's Specifications and Drawings. Supplier's standard commercial and/or technical Specifications (including drawings) or other applicable documentation, provided hereunder and listed in EXHIBIT B-1: DETAILED DESCRIPTION OF PRODUCT AND SERVICES, shall be considered a part of the REQUIREMENTS DOCUMENTS.

(c)    Periodic Reports. Supplier agrees to render on a monthly basis, at no charge to Customer and in formats acceptable to Customer, unless otherwise mutually agreed upon or specified below, the following reports (by way of example and not limitation):

1. Actual or Potential Event Reports
2. Repair & Replacement Reports
3. Reliability and Quality Measurements Product Performance Reports
4. Summary Product Troubles Reports
5. Monthly Custom Product Development Reports
6. Software Development Tracking Reports
7. Monthly Quality Performance Reports
8. Quarterly Diversified Supplier Subcontracting and Second Tier Reports
9. Diversified Supplier (MWDVBE) Utilization Reports
10. NTF (No Trouble Found) Summary Reports
11. Summary of Technical Support Calls
12. Monthly Shipment and Order Reports
13. Data Delivery Discrepancy Report

## 12.    ELECTRONIC PURCHASING

(a)    Electronic Data Interchange. Within the first year of the Agreement, Supplier, shall, with best commercially reasonable efforts participate with Customer in the development of an electronic data interchange (EDI) for the communication of Orders, acknowledgements, subsequent invoicing or other data that may be communicated between Customer and Supplier. Supplier further agrees to the terms and conditions as set forth in EXHIBIT E-1 hereof entitled "ELECTRONIC DATA INTERCHANGE (EDI), of EXHIBIT E hereof, entitled "ELECTRONIC PURCHASING", for the transmission of such electronically communicated data.

MobileAria, Inc.
C0505851

13. **PRECEDENCE OF DOCUMENTS**

(a)     <u>Orders</u>.  All quotations, Orders, acknowledgements, and invoices issued pursuant to this Agreement shall be subject to the provisions contained in this Agreement.  The terms and conditions of this Agreement will control over any conflicting or inconsistent terms contained in any quotation, Order, acknowledgement or invoice.  Unless Supplier's rejection is forwarded to Customer within ten (10) days of receipt of the Order, the following provisions, as they relate to the Product ordered pursuant to a particular Order, can be changed by language contained in that Order: (i) the quantity, (ii) packaging instructions, (iii) shipping instructions, or (iv) delivery date.

(b)     <u>No Modifications</u>.  Except for the changes enumerated in Section 13 (a) (i-iv) above, no modification to this Agreement or additional terms contained in any quotation, Order acknowledgement, or invoice shall be valid without the prior written approval of the authorized representatives of the parties.

14. **DELIVERY**

**1) Freight Terms**
Shipping charges for the Product are to be billed to United Parcel Service (UPS), Account Number W29-A35.  Copies of account transactions are to be sent to the designated representative at each Customer Market Area as listed in Exhibit C entitled "VERIZON MARKET AREAS".  If the Parties can not take advantage of the UPS process as set forth above, the parties shall meet and mutually agree on a different freight terms.

**14.1   OTHER SHIPPING REQUIREMENTS**

(a)     Supplier shall ship Purchase Orders (POs) complete unless directed otherwise by Customer.  If the Supplier does not ship the order complete, Customer shall charge the Supplier back for the additional freight incurred by deducting the freight amount from Supplier's material invoices.

(b)     Unless instructed otherwise by Customer, Supplier shall, for PO's placed, (i) see that all subordinate documents bear Customer's PO number; (ii) enclose a packing list with each shipment and when more than one package is shipped, identify the one containing the packing list; (iii) mark Customer's PO number on all packages and shipping papers; (iv) render invoices showing Customer's PO number; (v) render separate invoices for each shipment or PO; (vi) forward shipping notices with invoices; (vii) invoice Customer by mailing or otherwise transmitting invoices, bills, and notices to the billing address on the PO; and (viii) make available a bill of lading upon request.  PO numbers are required to facilitate prompt and correct shipment.  All PO numbers for each shipment must be given to the carrier.

(c)     If applicable, delivery intervals for Product shall be specified in EXHIBIT B-3 hereof entitled DELIVERY INTERVAL".  Standard delivery intervals begin from the date of Supplier's receipt of Customer's Order.

(d)     Supplier shall ship Product to Customer within (i) the delivery intervals specified in EXHIBIT B-3 entitled "DELVERY INTERVAL" (if applicable), or (ii) as otherwise provided by Supplier to Customer in a firm price quotation, purchase order acknowledgement or other written means.  If Supplier fails to meet a delivery date, Customer may require an expedited delivery, with any additional costs to be borne by Supplier, or Customer may cancel all or part of the Order in accordance with Section 8 of this Agreement entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGMENT."  If Product is delivered ahead of the delivery date, Customer may withhold payment for Product until after the specified delivery date or may place Product in storage, at Supplier's expense, until the specified delivery date.

(e)    In no event will Customer be liable for Premium shipping modes unless previously authorized by the Customer or its Transportation Management Operations (TMO) Premium shipments made without authorization will result in charge-backs to the Supplier. Shipping and routing instructions may be altered, as mutually agreed upon in writing, by Supplier and Customer. If requested by Customer, Supplier agrees to substantiate such charges by providing Customer with the original freight bill or a copy thereof.

(f)    Product shall be packaged for shipment, consistent with all applicable laws, at no additional charge, in commercially suitable containers, , that provide protection against damage during the shipment, handling and storage of the Product in reasonably dry, unheated quarters.

## 15.    BILL OF SALE

Supplier shall, upon request and after payment by Customer, execute and deliver to Customer a bill of sale or similar document evidencing conveyance of Product, free and clear of all liens, security interests and encumbrances.

## 16.    INSPECTION AND ACCEPTANCE OF PRODUCT AND SERVICES

(a)    Acceptance. If Supplier or its Agent is to perform installation of Product, the installation of the Product shall be performed in accordance with the mutually agreed on schedule as revised monthly by the parties. Product shall be accepted after Customer verifies Product performance in accordance with Supplier's advertised or published specifications or other mutually agreed upon specifications for such Product. Such acceptance testing shall take place no later than on the fifteenth (15th) day after installation of the Product is complete or fifteen (15) days after vehicle utilization whichever comes first, but no later than thirty (30) days from installation. Unless Customer notifies Supplier in writing within the Acceptance Period that the Product fails to meet the agreed upon acceptance criteria and such notice contains a detailed description of the nonconformance, the Product shall be deemed accepted. If Product fails to meet the agreed upon acceptance criteria, Supplier shall have thirty (30) days to correct all deficiencies, unless otherwise mutually agreed. If, after the cure period, Product still fails to perform, Customer shall have the right to reject Product and request deinstallation by Supplier at Supplier's expenses in order to return Product to Supplier at Supplier's expense. Any amounts paid to Supplier by Customer shall be refunded to Customer within thirty (30) days after return of Product. The purchase price for such Product shall also be credited against any volumes under this Agreement within the applicable Market Area.

(b) Quality Control. Customer's right to inspect and test pursuant to EXHIBIT H entitled "QUALITY STANDARDS, PROCEDURES AND COMPLAINTS" does not relieve Supplier from its testing, inspection and quality control obligations. All nonconforming Products that are repaired shall be reinspected, including applicable tests. Time used by Supplier to correct nonconformities and for Supplier to retest nonconforming Products shall extend Customer's allowable time for acceptance or rejection by one (1) business day for each day used by Supplier to correct such nonconformities.

## 17.    PRODUCT AND SOFTWARE WARRANTIES, SERVICES AND SUPPORT

(a) Warranties. Supplier shall provide warranties as set forth in EXHIBIT D hereof, entitled "PURCHASE FOR INTERNAL USE - WARRANTY AND PRODUCT SUPPORT."

(b) Defects. Supplier warrants that it will disclose all potential or actual product defects in accordance with EXHIBIT D-2 hereof, entitled "DISCLOSURE OF POTENTIAL DEFECTS."

(c) Disclaimer.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR EXHIBIT D hereof, entitled "PURCHASE FOR INTERNAL USE – WARRANTY AND PRODUCT SUPPORT," THE SUPPLIER HEREBY DISCLAIMS ALL EXPRESS, IMPLIED AND STATUTORY WARRANTIES REGARDING THE PRODUCTS, THE SERVICES AND THE SYSTEM, INCLUDING BUT

NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT OF ANY THIRD PARTY RIGHTS, AND THE FOREGOING DISCLAIMERS SHALL NOT AFFECT THE SUPPLIER'S INDEMNIFICATION OBLIGATIONS AS SET FORTH IN THIS AGREEMENT.

### 18. SUPPLIER COMPREHENSIVE RESPONSIBILITIES FOR OVERALL PERFORMANCE

Supplier represents, warrants and agrees that it has the full and final responsibility, duty and obligation to provide, perform, deliver and install, as set forth in the Scope of Work in EXHIBIT G, entitled" SCOPE OF WORK", the Product and Services as well as any ancillary services, facilities, and equipment, set forth in any Order(s) issued by Customer and accepted by Supplier pursuant to this Agreement and further Supplier agrees and acknowledges:

1. that it recognizes that the Product and Services which are to be provided under this Agreement are vital to Customer and must be delivered and installed without interruption, delay, cessation or limitation and in full compliance with the scheduled developmental dates, and requirements set forth in the Order(s), and perform in full compliance with the Specifications; and that in the event of any conflict or contention of whatever type or character between a Customer's Order(s) for Product and Services and any order by a third party, Supplier shall fulfill, the Customer's Order(s) on a commercially reasonable, fair and non-discriminatory basis in relation to third party Order(s); provided that Supplier acknowledges that any failure to provide Customer's Order in compliance with the terms of this Agreement is a breach in accordance with Section 41, entitled "TERMINATION" of the Agreement;

2. that Supplier has and will maintain an organization staffed by optimally useful number(s) of qualified personnel, including "the pilot team" who, where applicable, shall be identified in EXHIBIT B-3 hereof, entitled "DELIVERY INTERVAL", in a subsection entitled KEY PERSONNEL, with the knowledge, skill and resources optimally useful to perform and complete the Scope of Work in Exhibit G and that there are and will be, no impediments to, or commitments legal, contractual or otherwise which impede Supplier's timely performance and completion of the work or its capacity or capability to do so;

3. that should Supplier fail in its performance beyond the cures and remedies in this Agreement, the cost, and expense required to re-procure the Products and Services, and the time lost and the revenue income and profit jeopardized could be substantial and material;

4. that any such failure in Supplier's full performance under this Agreement may under the circumstances set forth in this Agreement constitute a Default by Supplier and give rise to an obligation to pay money damages and such other and additional relief or remedy as may be set forth in this Agreement or permitted at law or in equity, should any of the foregoing events occur.

### 19. CHANGES TO HARDWARE OR SOFTWARE/PRODUCT CHANGE NOTICES ("PCNS")

Supplier shall notify Customer in writing of any changes to Product and Services in accordance with the appropriate specification procedures in this Agreement. In addition the following provisions shall apply:

Supplier shall propose a schedule for the application of these changes at all Product locations, which schedule must be mutually agreed upon with Customer prior to implementation.

If Supplier develops a Method Of Procedure (MOP) for the change, the MOP shall be provided to Customer with the PCN. Any related engineering complaint number shall be included on the PCN form.

If Customer disagrees with the nature of, or with the classification which Supplier assigns to, a change in Product or Services, Customer shall have the right to escalate the matter for review, reclassification, and

resolution to higher levels of management within Customer and Supplier in accordance with section 45, entitled "DISPUTE RESOLUTION OF THIS AGREEMENT".

Class A designation shall mean (and apply to) changes that are required to correct a product deficiency. Class AC changes are those that would otherwise be classified as Class A changes, but have only a "Limited Application" or "Conditional Application". Supplier shall provide all changed Product for Class A and AC changes for as long as technically feasible at no charge to Customer. Where Supplier installed the Product subject to the Class A and AC change, Supplier will supply such change Product and installation labor without charge. Where Customer and/or its agent has installed Product, Supplier will supply such change to Product without charge and will reimburse or credit Customer for its labor to implement or execute corrective action for a change for as long as technically feasible  Supplier shall supply relevant Documentation to Customer for all Class A and AC changes.

Documentation changes, required to satisfy Supplier's obligations to provide Class A and AC changes to PRODUCT as specified herein, shall be provided by Supplier at no charge to Customer.

The Class B designation shall mean (and apply to) changes that are made to incorporate improvements in the design of existing products that result in better operation, improved testing and maintenance, longer life, service improvements, cost reductions, and/or addition of new features. The Class D designation shall mean (and apply to) changes that incorporate minoe new features and design improvements that do not affect the existing functionality or interchangeability of a Product, or that involve other minor improvements to service, testing, or other capabilities. For those changes classified as "B" or "D", Supplier shall notify Customer in writing one hundred and twenty (120) days prior to the effective date of such change to be made in the Product furnished under an Order.

For Class B changes, Supplier shall first notify Customer of the exact nature of the change. Details of the proposed implementation procedure for Product which is being or will be manufactured shall be discussed with Customer within the notification time periods stated in the first section above. Customer shall, at its option, determine if Product previously shipped shall be replaced or modified. Should such replacement or modifications be deemed necessary, Supplier shall make arrangements for the necessary Product replacement or modification at prices and schedules to be mutually agreed upon with Customer prior to implementation.

In the event that Customer does not desire any such change, Customer shall notify Supplier in writing within sixty (60) days from the date of receipt of notification of change and Supplier shall not furnish any such changed Product to Customer pursuant to any Orders. Customer may extend the sixty (60) day period if Customer is unable to respond within such period.

Supplier shall notify Customer in writing when implementation of each change has been completed at all affected locations.

Supplier shall reimburse Customer for all mutually agreed to costs incurred by Customer due to insufficient or incorrect instructions and/or Documentation provided in connection with changes to Products, only if the instructions and/or Documentation are mutually determined by Customers, acting in good faith, to be insufficient or incorrect.

All correspondence relating to changes to Product shall be sent to the following individuals or their successors as appointed by Customers:

| | |
|---|---|
| Margaret Sheppard | Boris Elman |
| Specialist- Operations | Technical Manager- System Analysis & Programming |
| 741 Zeckendorf Blvd.-Room R617 | 40 Sylvan Road- Room 4-129 |
| Garden City, NY 11530 | Waltham, MA 02451 |
| (516) 832-3614 | (781) 718-4117 |
| margaret.l.sheppard@verizon.com | boris.elman@verizon.com |

MobileAria, Inc.
C0505851

## 20. TECHNOLOGICAL OR SPECIFICATION CHANGE/PRODUCT DELETION/ SUBSTITUTION

(a)   Supplier shall give Customer advance written notice as soon as Supplier has official release, of any technological or specification change, software/firmware revision, Product deletion or manufacturer discontinuance or other event that would significantly impact Product operation, interchangeability with existing Product, appearance, warranty, life cycle or Verizon engineering/quality approvals of any Product. Supplier shall, at the time of notification, provide Customer with (i) a Product change number; (ii) a description of such change; (iii) the reason for change; (iv) a description of the impact of such change upon reliability, Specifications, or form, fit or function; (v) proposed price impact (if any); and (vi) proposed effective date for such change and recommended implementation schedule. Supplier will also continue to provide Customer with maintenance service, repair service and parts for Hardware and Software, for a period of three (3) years after such event or the period described in Section 24 entitled "CONTINUING AVAILABILITY", whichever is greater.

(b)   If the parties fail to reach agreement on any such change in Product to be made by Supplier, then, in addition to all other rights and remedies at law or in equity or otherwise, Customer shall, at no cost or liability, have the right to terminate all pending Orders for Product affected by such change.

(c)   Supplier may discontinue the availability of Product at any time, in accordance with Section 24 entitled "CONTINUING AVAILABILITY", but shall accept Orders for discontinued Product for a period of one (1) year after the effective date of discontinuation.

(d)   Supplier agrees that if the required one hundred twenty (120) days' prior written notice is not provided, Supplier shall accept, at Customer's option, a Product exchange or return for all Product in Customer's inventory on the effective date of the change. Any Product returned must be unused, undamaged and in the original carton and may be returned, at Customer's option, for one hundred percent (100%) credit of the price paid or an equal dollar value exchange for any other Product offered under this Agreement.

## 21. UNSATISFACTORY CONDITION SITUATIONS

(a)   Response Times. If at any time during normal operation Customer encounters an unsatisfactory condition as set forth below in the Product, Supplier agrees to meet the following time frames for resolving the condition. An Unsatisfactory Condition Report (UCR) formally documents a condition in writing. The UCR is also used to track, report and verify the condition.

(b)   A Priority One. A priority one (1) UCR reflects a condition in the sole discretion of Customer which endangers public or employee safety; degrades the ability to track, collect, or produce revenue; causes major degradation of service; or degrades the basic functionality of telecommunication service or its support systems by degrading Customer's ability to provide day-to-day services to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority one (1) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within thirty (30) days of such written notification from Customer.

(c)   A Priority Two. A priority two (2) UCR reflects a condition that potentially degrades the ability to track, collect, or produce revenue; could potentially result in a major degradation of service; could degrade the basic functionality of telecommunication service or its support systems by degrading Customer's capability to provide day-to-day services to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority two (2) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within ninety (90) days of notification.

(d)   A Priority Three. A priority three (3) UCR reflects a condition that could adversely affect normal maintenance and/or administration of Service; could adversely degrade the basic functionality of telecommunication service or its support systems by Customer's capability to provide day-to-day services

MobileAria, Inc.
C0505851

to its Customers. Within fifteen (15) days of receipt of written notification from Customer of a priority three (3) UCR, Supplier shall acknowledge receipt thereof in writing and confirm or deny in writing the existence of the conditions stated in the UCR. Supplier must provide a permanent resolution within one hundred eighty (180) days of notification.

(e)     The Permanent Resolution. The term "permanent resolution" shall mean a correction to an unsatisfactory condition in the form of a new or revised hardware or software module, hardware modification kit, software patch and/or revised operating or maintenance procedures that are acceptable to Customer. Corrections that are temporary in nature, such as work-around procedures, certain types of hardware modifications or software patches, shall require (i) a final version of the correction to be included in the next formal version/ modification/ release of Product provided to Customer or (ii) written Customer acceptance of an alternative. In either (i) or (ii), Supplier will provide a schedule for implementation of the final version of the correction, upgrade, or change, as applicable and Customer shall indicate selection of the workaround selected in writing. On an exception basis, Customer may agree to an extension of the time frames specified in paragraph a, b or c, and the Supplier is then bound by the newly agreed upon date.

(f)     Discussion. Supplier has the option to discuss the UCR condition statement with the Customer (e.g., whether condition exists within stated performance specification verses a design change) or query a priority level assignment. However, Supplier shall notify Customer in writing within five (5) days of the determination of a UCR if it chooses to discuss the UCR with Customer, but the time lines are in no way affected by this query or discussion, unless the priority is eventually modified by Customer or the UCR is withdrawn.

## 22.  PRODUCT CHANGES

(a) Changes. If, after Product has been shipped to Customer, Supplier issues changes affecting Product and such change is identified as necessary for the Product to continue to meet Supplier's published Specifications or design criteria (Mandatory Engineering Change), including an identified correction of a deficiency as a result of a UCR (refer to the Section entitled "UNSATISFACTORY CONDITION SITUATIONS"), Supplier shall provide prompt notification of required changes to Customer's Network Services Group (NSG) I & M Process Assurance- Service Delivery and/or testing organization(s) at the address provided to Supplier for such purpose. Supplier shall, at Supplier's expense, be responsible for costs for all Mandatory Engineering Changes and installation of such changes whether implemented by Supplier or Customer for a period of five (5) years beyond the applicable Product warranty period (as defined in EXHIBIT D entitled "PURCHASE FOR INTERNAL USE – PRODUCT AND SERVICE WARRANTY AND PRODUCT SUPPORT"), provided Product has been maintained during this period at current revision levels and subject to any payment of the recurring monthly fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES".

(b) Implementation. If Customer and Supplier ascertain that Product, or a part thereof, subject to such a change is readily returnable, Customer or Customer's agent or contractor shall remove, at Supplier's expense, and return such Product or part to Supplier's designated repair or manufacturing facility and Supplier, at Supplier's expense, shall implement such changes and return such changed Product or part to Customer's designated location. If removal of Product to be returned to Supplier for modification would create an out-of-service condition, Supplier shall first discuss with Customer and make suitable arrangements to provide replacement Product to prevent an out-of-service condition from occurring.

(c) Inventory. Any Product maintained in Customer's inventory subject to such a change shall be returned to Supplier's designated repair or manufacturing facility to implement changes and shall be returned to Customer's stocking location at Supplier's expense. If such changes in Customer's opinion create an adverse impact on the Product warranty, then Supplier shall accept at Customer's option, a Product exchange or return for all unchanged Product in Customer's inventory.

(d) Notice of Changes. All change notifications provided by Supplier to Customer shall contain the following information:

MobileAria, Inc.
C0505851

1.  Description of change;
2.  Reason for change;
3.  Impact on Customer service (i.e., outages, system downtime);
4.  Price impact, if known;
5.  Effective date of changes; and
6.  Implementation schedule of change.

(e)     Customer Requested Changes. Customer may request the Supplier to make changes to or enhance the Product. Upon Supplier's receipt of a written document describing in detail the changes requested by Customer, Supplier shall respond in writing to Customer within thirty (30) days. If Supplier agrees to undertake such modifications for Customer, the response shall identify a date for the proposed implementation schedule and cost for such changes to Product will be provided by the Supplier. And this Agreement will be amended accordingly.

### 23.    EXTRAORDINARY SUPPORT

In addition to the provisions for repair or replacement of Products set forth in EXHIBIT D, hereof, entitled "PURCHASE FOR INTERNAL USE- WARRANTY AND PRODUCT SUPPORT", Supplier agrees if any natural or other disaster or emergency causes an out of service condition, Supplier shall use commercially reasonable effort to locate or provide (i.e. procure or manufacture) and ship to Customer replacement Product, and make available necessary manpower within five (5) business days of verbal notification by Customer to an authorized representative of Supplier.

Such emergency support shall be available twenty-four (24) hours, seven (7) days a week for the duration of emergency, during the term of this Agreement, and for a period of five (5) years after the expiration of this Agreement or survival of the technology, whichever is less, subject to the payment of any recurring service fee specified in EXHIBIT B-2 entitled "PRODUCT AND SERVICES PRICES". The Supplier shall have a pager service, with a representative returning the call within thirty (30) minutes of the page.

Charges for replacement Products and Services shall be at the prices contained in EXHIBIT B-2, hereof, entitled "PRICES FOR PRODUCTS AND SERVICES", for the term of this Agreement. This clause shall not be construed to require Supplier to maintain any inventories whatsoever nor maintain any position of readiness to perform in the future nor require breach of Supplier's contractual obligations to third parties.

### 24.    CONTINUING AVAILABILITY

(a)     <u>Notice and Continuing Availability</u>. Subject to the terms and conditions of this Section, Supplier agrees to offer for sale functionally equivalent or superior maintenance, support, replacement and repair parts for Hardware ordered pursuant to this Agreement for as long as the technology survives commencing from Supplier's last shipment of such Product to Customer. In addition, subject to the terms and conditions of this Section, Supplier agrees to provide Software support for maintenance, replacement or updates as long as the technology survives. Notwithstanding the forgoing under this Paragraph, Supplier shall also give Customer one (1) year prior written notice of the discontinuance of the sale of maintenance, replacement and/or repair parts of Hardware, in order to allow Customer to make purchases during this period to fulfill its requirements; provided, however, that each such purchase shall not exceed the average purchases over the immediately preceding calendar quarter. Charges for support Services provided pursuant to this paragraph shall be mutually agreed upon at time of discontinuance notice.

(b)     <u>Additional Support And Third Party Provision Of Support</u>. After Supplier has fulfilled its obligations for post discontinuance Support, if for any other reason Supplier is unable to provide such Product. Supplier shall, if requested by Customer, endeavor to arrange for a third party to continue to furnish the discontinued maintenance, replacement and repair parts to Customer. In the event Supplier is not requested, or, if requested, is unable to find a third party to furnish such maintenance or replacement or repair of Product to Customer, which is acceptable to Customer, Supplier shall upon request by Customer, provide Customer with existing technical information and rights to the extent Supplier has such

MobileAria, Inc.
C0505851

rights including source code, and documentation, at a mutually agreed charge (if any), sufficient for Customer to manufacture or have manufactured the Product and maintain, modify and upgrade, the Software. The remedy set forth in this subsection (b) shall not relieve Supplier of any additional liability or obligation arising from Supplier's failure to comply with the terms of subsection (a) hereof.

(c)    Technical Information. Supplier shall protect against the loss or damage of the existing technical information required for the manufacture of the discontinued Product with the same degree of care that Supplier uses to protect its own valuable technical information. In addition, Supplier shall advise Customer in writing at least six (6) months in advance of its decision to discontinue maintenance of any technical information, so that Customer may acquire its own or develop such technical information in accordance with the provisions of this section.

The technical information includes, by example and not by way of limitation: (a) manufacturing drawings and specifications of raw materials and components comprising such Products; (b) manufacturing drawings and specifications covering special tooling and the operation thereof; (c) a detailed list of all commercially available Products and components purchased by the Supplier on the open market disclosing the part number, name, and location of the Supplier and price lists for the purchase thereof and (d) Source Code and Documentation.

## 25.    TRAINING

Supplier will provide unlimited on-demand access to a recorded flash training session to Customer. Live web ex sessions may be scheduled as necessary and as determined by Customer. Customer will make best efforts to ensure that its personnel view the recorded flash sessions before requesting any live sessions. On-site training provided by Supplier is available at Customer's request as needed at a rate of twelve hundred ($1200.00) dollars per day, prorated for partial days. Supplier agrees to train Customer's trainer at Supplier's facility free of charge, upon Customer request. Such a request should not be made more than twice a year.

The training, training equipment and instructional DOCUMENTATION furnished by Supplier under this Agreement, shall be developed and furnished in accordance with the requirements, formats and procedures set forth in EXHIBIT D-6 hereto entitled "TRAINING TERMS"; provided that Customer acknowledges and agrees that any such DOCUMENTATION shall be furnished in electronic format only. Customer shall have the right to reproduce such instructional DOCUMENTATION at no charge solely for internal use.

## 26.    INFORMATION AND INTELLECTUAL PROPERTY

(a)    Information Defined. The term "Information" includes: programs and related documentation; specifications, drawings, models, technical and business data and plans; works of authorship and other creative works; and ideas, knowledge and know-how. Information may be transmitted in writing (or other tangible form) or orally.

(b)    Supplier Confidential Information. Supplier will not provide to Customer any confidential information. Confidential information will be clearly marked "Confidential" and shall only be sent to the Verizon Core Pilot Team (IT, Sourcing, Network Operations), labeled or otherwise designated as proprietary or confidential) and shall be considered by Customer to be confidential or proprietary information of Supplier. Customer will return such information to Supplier (or destroy it), upon termination of the Agreement or at Supplier's earlier request. Unless such information was previously known to Customer free of any obligation to keep it confidential or is made public by Supplier or a third party without breach of any agreement, Customer will keep the information confidential and use it only in performing this Agreement.

(c)    Customer Information. Information that Customer furnishes to Supplier or that Supplier otherwise comes into contact with under this Agreement will remain Customer's property. Supplier will return such

MobileAria, Inc.
C0505851

Information to Customer upon termination of the Agreement or at Customer's earlier request. Unless such Information was previously known to Supplier free of any obligation to keep it confidential or is made public by Customer or a third party without breach of any agreement, Supplier will keep the Information confidential and use it only in performing this Agreement.

(d)     Work Product. The entire right, title and interest in all edits, original inventions and works of authorship created by Supplier, or on Supplier's behalf, for Customer hereunder shall be transferred to and vested in Customer, exclusive of any Supplier owned intellectual property rights in any Supplier owned software existing prior to the Effective Date of this Agreement and transferred to Customer hereunder which shall remain the property of Supplier. All such works shall be considered to be made for hire. Supplier agrees to provide documentation and to sign all documents prepared or supplied by Customer which Customer believes are necessary to ensure the conveyance of all such right, title and interest, including patent, trademark and copyright, to Customer. Notwithstanding the foregoing, the parties agree that the following shall not be considered works for hire under this Section and Supplier shall own all right, title and interest in and to the following: (i) the Product, and any modifications or improvements thereto, (except to the extent of Product incorporating any Customer proprietary Information which shall be considered a work for hire) and (ii) any modifications, improvements, developments, original inventions and works of authorship created by Supplier or on Supplier's behalf unrelated to the Product (except to the extent of Product incorporating any Customer proprietary Information which shall be considered a work for hire), including for example and without limitation, developments related to least congested channel algorithms and algorithms for wide area augmentation systems.

(e)     No Supplier Licenses. Customer does not grant Supplier any license, express or implied, under any patent, copyright, trademark, trade secret or otherwise, except for the sole purposes of Supplier's performance of this Agreement.

(f)     Publicity And Disclosure

   1.     Supplier shall not provide copies of this Agreement, or otherwise disclose the terms of this Agreement, to any third party without the prior written consent of Customer; provided, however, that Supplier may, without obtaining Customer's consent, provide copies or make disclosures to prospective customers of the business of Supplier or of any Affiliate; or for the purpose of obtaining third party financing; and any regulatory or judicial body requesting such information.

   2.     Customer will not approve issuance of a press release to announce this or other agreements in which the Supplier is providing Products or Services to Customer, other than in exceptional situations where Customer determines that a release would significantly benefit Customer and has indicated such to Supplier in writing. The Supplier shall not, without Customer's prior written approval, release any advertising, sales promotion, press releases and other publicity matters relating to the Product furnished or the Service performed pursuant to this Agreement, when Customer's respective name or mark is mentioned or language from which the connection of said name or mark may be inferred or implied. Customer may withhold approval in its sole discretion.

## 27.    CUSTOMER'S PROPERTY AND TOOLING

(a)     Customer Ownership. Title to and the right to immediate possession of any property, including patterns, tools, molds, jigs, dies, information provided in tangible form or made for Supplier's performance under this Agreement, and any other equipment or material, furnished to Supplier or paid for by Customer shall vest in Customer. Supplier may not furnish any articles made there from to any other party without the prior written consent of Customer. Supplier shall keep adequate records of such property and Supplier will safely store, protect, preserve, repair and maintain such property at Supplier's expense.

MobileAria, Inc.
C0505851

(b)     <u>Customer Disclaimer of Warranties.</u>  If Customer allows Supplier to use any of Customer's tools or equipment, such tools and equipment are supplied to Supplier "AS-IS" with no warranties whatsoever. CUSTOMER EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  It is Supplier's responsibility to inspect the tools and equipment to assure that they are safe and fit for their intended purposes.  Subject to the provisions of Section 35 below, Supplier shall indemnify and hold Customer, as well as any Customer Affiliate, harmless against any claims, demands and liabilities that result from Supplier's use of such tools and equipment, including, but not limited to, any claims, demands and liabilities resulting from defects or other failures of the tools and equipment, the inadequacy of a tool or equipment for a particular task or the failure to properly use any tool or equipment.

## 28.    COMPLIANCE WITH LAWS

(a)     Supplier shall comply with the provisions of all applicable federal, state, county and local laws, ordinances, regulations and codes (including procurement of required permits or certificates) in manufacturing, assembling, selling and providing Product and Services and in performing its other obligations under this Agreement, including, but not limited to, the standards promulgated under the Occupational Safety and Health Act, Executive Order 11246, as amended, Section 503 of the Vocational Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Immigration Reform and Control Act of 1986, the Civil Rights Acts of 1964 and 1991, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and all rules and regulations relative to these Acts and other applicable equal employment opportunity laws, rules and regulations, which are expressly incorporated herein by reference. Irrespective of whether a specification is furnished, if Product or containers furnished are required to be constructed, packaged, labeled, or registered in a prescribed manner, Supplier shall comply with applicable federal, state or local laws.  Subject to the provisions of Section 35(e) below, Supplier shall indemnify Customer against all claims, loss or damage sustained because of its noncompliance.

(b)     If any persons furnished under the Agreement by Supplier have a disability as defined in the Americans with Disabilities Act, 42 U.S.C.A. 12101 et seq. (the ADA), Supplier shall, where required by Title I of the ADA and at its sole expense, provide "reasonable accommodations" that may be required under Title I of the ADA including, but not limited to, "auxiliary aids and services" to make aural, visual materials or interpreters available to individuals furnished by Supplier with impairments so that such individuals are able to perform the essential functions of the job they are contracted to perform.  Subject to the provisions of Section 35 below, Supplier further agrees to indemnify and defend Customer for any losses, fines, reasonable attorney fees, or other penalties that may be incurred or assessed upon Customer due to Supplier's failure to comply with the provisions of the Title I of the ADA with respect to the persons furnished by Supplier.

(c)     Product furnished shall comply, to the extent applicable, with the requirements of the Federal Communications Commission's Rules and Regulations, as may be amended, including those sections concerning the labeling of such Product and the suppression of radiation to specified levels.  If the Product generates interference harmful to radio communications, and such Product was installed in accordance with such Rules and Regulations, then Supplier shall provide to Customer methods of suppressing the interference.  If the interference cannot be reasonably suppressed, Supplier shall accept return of the Product, refund to Customer the price paid for the Product and bear all mutually agreed to expenses for removal and shipment of such Product.  Nothing herein shall be deemed to diminish or otherwise limit Supplier's obligations under the "Warranty" provisions of this Agreement herein or any other rights or remedies available to Customer, whether at law or in equity.

(d)     When Product furnished under this Agreement is subject to registration under Part 68 of the Federal Communications Commission's Rules and Regulations as they may be amended from time to time ("Part 68"), Supplier warrants that such Product furnished under this Agreement is registered under and complies with Part 68 including, but not limited to, all labeling and customer instruction requirements unless such Product is furnished as part of a technical field trial or unless the Product is provided for

MobileAria, Inc.
C0505851