services not covered or exempt under Part 68. Supplier agrees to defend and hold Customer harmless from any liability, claim or demand (including the costs, expenses and reasonable attorney's fees on account thereof) that may arise out of Supplier's non-compliance with Part 68. Customer agrees to promptly notify Supplier of any liability, claim or demand against Customer for which Supplier is responsible under this clause and gives Supplier full opportunity and authority to assume the defense, including appeals, and to settle such liability, claims and demands, provided that if Customer reasonably believes that Supplier is not adequately handling such defense or settlement, Customer reserves the right to assume the defense or settlement.

(e)    Radio Frequency Energy Standards. Product furnished hereunder shall, at time of shipment, comply to the extent applicable with the requirements of Subpart J of Part 15 of the Federal Communications Commission's Rules and Regulations, as they may be amended from time to time, including those Sections concerning the labeling of such Product and the suppression of radio frequency and electro-magnetic radiation to the specified levels. Should the Product during use fail to meet relevant parts of the FCC Rules and Regulations for spurious emission and interference to radio communications, Supplier shall provide to Customer information relating to methods of suppressing such interference. In the event such interference cannot reasonably be suppressed, then all remedies as provided in Exhibit D, entitled "PURCHASE FOR INTERNAL USE – WARRANTY AND PRODUCT SUPPORT" shall apply. Supplier agrees to defend and hold Customer harmless from any liability, claim or demand (including the costs, expenses and reasonable attorney's fees on account thereof) that may arise out of Supplier's non-compliance with Part 68. Customer agrees to promptly notify Supplier of any liability, claim or demand against Customer for which Supplier is responsible under this clause and gives Supplier full opportunity and authority to assume the defense, including appeals, and to settle such liability, claims and demands, provided that if Customer reasonably believes that Supplier is not adequately handling such defense or settlement, Customer reserves the right to assume the defense or settlement.

## 29.    FORCE MAJEURE

(a)    Force Majeure. Except for a party's payment obligations, neither party shall be responsible for any delay or failure in performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, embargo, government requirement, civil or military authority, acts of God, terrorism, strikes, slowdowns, picketing, boycotts, or any other circumstances beyond its reasonable control and not involving any fault or negligence of the party affected ("Condition"). If any such Condition occurs, the party delayed or unable to perform ("delayed party") shall give written notice to the other party within five (5) business days of the originally schedule performance date. If such Condition remains at the end of thirty (30) days, the party affected by the other's delay or inability to perform ("affected party") may elect to (i) terminate such Order or part thereof, or (ii) suspend such Order for the duration of the Condition, and if Customer is the suspending party, buy elsewhere comparable material to that to be sold under such Order, and apply to any commitment the purchase price of such purchase, and require the delayed party to resume performance of such Order once the Condition ceases, with an option in the affected party to extend the period of this Agreement up to the length of time the Condition endured.

(b)    Notices. Unless written notice is otherwise given to the delayed party by the affected party within sixty (60) days after the affected party is notified of the Condition, (a)(ii) above shall be deemed selected.

## 30.    ASSIGNMENT

(a)    No Supplier Assignment. Except in connection with a merger, consolidation, reorganization or sale of all or substantially all of Supplier's assets, Supplier may not assign any right or interest under this Agreement or Order issued pursuant to this Agreement (excepting moneys due or to become due) or delegate any work or other obligation owed by Supplier under this Agreement without first obtaining the written permission of Customer, which permission shall not be unreasonably withheld. Any attempted assignment or delegation in contravention of this section shall be void and ineffective. Any assignment of money shall be void and ineffective to the extent that: (1) Supplier fails to provide Customer at least thirty (30) days prior written notice of such assignment; or (2) such assignment attempts to impose upon

Customer obligations to the assignee in addition to the payment of such monies, or preclude Customer from dealing solely and directly with Supplier in all matters pertaining to the Agreement including, but not limited to, the negotiation of amendments or the settlement of charges due.

(b)     <u>Customer Assignment.</u>  Customer may freely assign all or part of this Agreement.

## 31.    TRANSFER OF CONTROL AND SEPARATE ENTITY

In the event that control of Supplier should transfer through acquisition or merger with a competitor of Customer (a "Competitor Acquisition"), Customer shall have a right to terminate this Agreement. Supplier shall notify Customer at the earliest possible time of possibility of acceptance by Supplier of the Competitor Acquisition and Customer may:

(a)     Request that Supplier insures that the System functionalities and Services contracted hereunder will be provided by Supplier's separate legal entity from the Customer's competitor, with all Supplier parties providing the System and Services separated from the operation of the competitor. Supplier shall safeguard all information from the Customer's Competitor the same way Supplier safeguards them from any other party. In the event that Supplier refuses or is unable to partition the System and Services as required herein, Customer shall have the right to terminate the Agreement and request return of its Information from Supplier.

(b)     Customer shall determine in its sole discretion if the party acquiring control of Supplier deems to be Customer's competitor.

## 32.    DISASTER RECOVERY PLAN

Supplier agrees to develop and maintain a Disaster Recovery Plan with respect to the Software, Data transmission and Hardware, which are critical to the provisioning of Products and Services under this Agreement. The specific details of such Disaster Recovery Plan shall be made available to Customer, if requested, in writing upon execution of this Agreement.

## 33.    TAXES

(a)     The Supplier and Customer acknowledge and agree that it is their mutual objective and intent to legally minimize, to the extent feasible, the aggregate Federal, state or local tax with respect to the products or related services being purchased under this Agreement.

(b)     With respect to any Products or Services under this Agreement, if any Federal, state or local tax excluding any tax levied on property or income (a "Tax") is required by applicable law to be collected from Customer by Supplier, then (i) Supplier will bill, as a separately stated item, Customer for such Tax, (ii) Customer will timely remit such Tax to Supplier, and (iii) Supplier will timely remit such collected Tax to the applicable taxing authority.

(c)     If either Party is audited by a taxing authority or other governmental entity the other Party agrees to reasonably cooperate with the Party being audited in order to respond to any audit inquiries in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

(d)     If applicable law places the responsibility on Supplier to collect a Tax from Customer and Supplier fails to do so, Customer will not be responsible for any interest or penalties associated with Supplier's failure to collect such Tax. Furthermore, Supplier shall not bill a Tax to Customer on products or services under this Agreement which is, by law, not taxable.

(e)     If an exemption procedure is available, such as a resale exemption certificate, and Customer complies with such procedure, then Supplier will not bill or collect such Tax during the effective period of the exemption.

MobileAria, Inc.
C0505851

(f)      Customer's Order may provide Supplier additional tax instruction as allowed by law including, but not limited to, Customer's self accrual and payment of taxes, temporary storage, research and development and/or other special jurisdictional exemptions.

(g)      Supplier will be responsible for personal property or ad valorem taxes on property owned by Supplier and Customer will be responsible for such taxes on property owned by Customer. Each Party is responsible for properly reporting owned property and neither Party will be responsible for either reporting or paying personal property or ad valorem taxes owed by the other Party.

## 34.    PLANT AND WORK RULES AND RIGHT OF ACCESS

(a)      The respective agents and employees of the parties, while on the premises of the other, shall comply with all plant rules, regulations and company standards for security, including (when required by U. S. government regulations) submission of satisfactory clearance from U. S. Department of Defense and other federal authorities concerned.

(b)      Each party shall permit reasonable access during normal working hours to its facilities in connection with the work. Reasonable prior notice shall be given when access is required.

(c)      If Supplier is given access, whether on-site or through remote facilities, to any Customer computer or electronic data storage system in order for Supplier to accomplish the work called for in this Agreement, Supplier shall limit such access and use solely to perform work within the scope of this Agreement and shall not access or attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to accomplish the work required under this Agreement. Supplier shall limit such access to those of its employees who are qualified and required, subject to Customer requiring written authorization, to have such access in connection with this Agreement, and shall strictly follow all Customer's security rules and procedures for use of Customer's electronic resources. All user identification numbers and passwords disclosed to Supplier and any information obtained by Supplier as a result of Supplier's access to and use of Customer's computer and electronic data storage systems shall be deemed to be, and shall be treated as, Customer Information under applicable provisions of this Agreement. Supplier agrees to cooperate with Customer in the investigation of any apparent unauthorized access by Supplier to Customer's computer or electronic data storage systems or unauthorized release of Information by Supplier.

(d)      Supplier is responsible for ensuring that all of Supplier's employees, agents, subcontractors or other persons furnished by Supplier: (1) comply with all plant rules, regulations, and security procedures; and (2) work in harmony with all others working on the property of Customer and its Affiliates. If Supplier installs any products on the premises of Customer or its Affiliate, Supplier shall be responsible for promptly removing all packaging materials and debris. Supplier may not bring any toxic or hazardous materials onto any premises of Customer or its Affiliates without the permission of Customer, and Supplier shall be responsible for removing any such toxic or hazardous materials in accordance with all relevant laws, Section entitled "NO HAZARDOUS PRODUCTS AND COMPONENTS" and any additional requirements of Customer.

## 35.    INDEMNIFICATION

(a)      <u>Indemnification by Supplier</u>. Subject to Section 35(e) below, Supplier shall defend, indemnify and hold harmless Customer, its parents, subsidiaries and affiliates, and its and their respective directors, officers, partners, employees, agents, successors and assigns ("Customer Indemnified Parties"), from any claims, demands, lawsuits, damages, liabilities, judgments and settlements of every kind ("Claims"), that may be made: (i) by anyone for injuries (including death) to persons or damage to property, including theft, resulting in whole or in part from the acts or omissions of Supplier or those persons furnished by Supplier, including its subcontractors (if any); (ii) by persons furnished by Supplier and its subcontractors (if any) under worker's compensation or similar acts, (iii) by anyone in connection with or based upon Products or Services provided by Supplier and its subcontractors (if any) or contemplated by this

MobileAria, Inc.
C0505851

Agreement; and (iv) under any federal securities laws or under any other statute, at common law or otherwise arising out of or in connection with the performance by Supplier contemplated by this Agreement or any information obtained in connection with such performance (including breaches of Supplier's confidentiality obligations hereunder). The forgoing indemnification shall apply whether Supplier or a Customer Indemnified Party defends such Claim and whether the Claim arises out of the sole acts or omissions of the Supplier (and/or any subcontractor of Supplier), and/or jointly with any Customer Indemnified Party. Supplier shall also bind its subcontractors (if any) to similarly indemnify, hold harmless and defend the Customer Indemnified Parties.

(b)  Indemnification by Customer. Subject to Section 35(e) below, entitled, "Notices" Customer shall defend, indemnify and hold harmless Supplier, its parents, subsidiaries and affiliates, and its and their respective directors, officers, partners, employees, agents, successors, and assigns ("Supplier Indemnified Parties"), from any claims, demands, lawsuits, damages, liabilities, judgments, and settlements of every kind ("Claims"), that may be made: (i) as set forth in section 37 (b) below, entitled, "Verizon Infringement Indemnification" (ii)  under any statute, at common law or otherwise arising out of or in connection with Customer's performance of its obligations as contemplated by this Agreement or any Information provided by Customer in connection with such performance (including breaches of Customer's confidentiality obligations hereunder); or (iii) as a result of Customer's use of the System in a manner not authorized by Supplier in the Specifications, or Documentation; or (iv) negligence, misconduct or fault of Customer in the performance of its obligations under this Agreement (for Claims due to the joint negligence, misconduct or fault of the Parties, section 35 (c) entitled "Claims of Joint Fault" apply).

(c) Claims of Joint Fault. If a Claim is the result of the joint negligence, joint misconduct, or joint fault of the Supplier and Customer, in such case, the amount of the Claim for which the Indemnified Party is entitled to indemnification shall be limited to that portion of such Claim that is attributable to the negligence, misconduct or other fault of the Indemnifying Party.

(d) No Limitations. The obligations of this provision are in addition to Supplier's obligation to provide insurance (pursuant to Section 36 entitled "INSURANCE"), and shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by Supplier under the Worker's Compensation Acts, Longshoremen and Harborworker's Act, Disability Benefits Act or any other employee benefit act.

(e) Notices. Customer Indemnified Party and Supplier Indemnified Party are individually referred to as "Indemnified Party". The foregoing indemnification obligations of the party having the indemnity obligations hereunder (the "Indemnifying Party"), are conditional upon the following: (i) the Indemnified Party will provide the Indemnifying Party with written notice of any written Claim covered by this indemnification and will cooperate with the Indemnifying Party in connection with the Indemnifying Party's evaluation of such claim; (iii) the Indemnifying Party shall defend any Indemnified Party, at the Indemnified Party's request, against any Claim promptly after receipt of such request; (iii) the Indemnifying Party shall assume the defense of such Claim with counsel reasonably satisfactory to the Indemnified Party, and (iv) an Indemnified Party shall not settle or  compromise any such Claim or consent to the entry of judgment without the prior written consent of the Indemnifying Party and without an unconditional release of all Claims by each claimant or plaintiff in favor of the Indemnifying Party.

## 36.    INSURANCE

(a)      Limit Requirements. Supplier shall secure and maintain at its expense during the term of this Agreement (i) Commercial General Liability Insurance (including, but not limited to, premises-operations, broad form property damage, products/completed operations, contractual liability, independent contractors, personal injury) with limits of at least $2,000,000, combined single limit for each occurrence. (Limits may be satisfied with primary and/or excess coverage.) (ii) Commercial Automobile Liability with limits of at least $2,000,000, combined single limit for each occurrence. (Limit may be reduced to $1,000,000 if contract does not require Supplier to use vehicles to deliver products or perform services.)

MobileAria, Inc.
C0505851

(iii) Workers' Compensation insurance as required by Statute, and Employer's Liability insurance with limits of not less than $1,000,000 per occurrence.

(b)    Additional Requirements. The insurer must be licensed to do business in the state in which the work is performed and must have Bests Rating "AX" or better.  Supplier shall deliver a certificate of insurance on which VERIZON Communications Inc., its subsidiaries and affiliates and named company Verizon Services Corp., are included as additional insureds with reference to (i) above.  Certificates of insurance must be provided prior to any work being performed and must be kept in force during the term of this Agreement.  It is also agreed that Supplier's policy is primary.

(c)    No Subrogation.  Supplier shall waive its rights of subrogation against Customer for Workers' Compensation claims. Supplier shall, prior to rendering such Services, furnish to the address specified in Notices provision of this Agreement, certificates or evidence of the foregoing insurance indicating the amount and nature of such coverage, the expiration date of each policy, and stating that no material change or cancellation of any such policy shall be effective unless thirty (30) days' prior written notice is given to Customer.  Supplier shall have the option, when permitted by law, to self-insure any or all of the foregoing risks.

(d)    No Limitation.  Supplier is responsible for determining whether the above minimum insurance coverages are adequate to protect its interests.  The above coverages do not constitute limitations upon Supplier's liability.

(e)    Endorsements.  The policies referred to above shall contain an endorsement naming Verizon as an Additional Insured and eliminating and removing any exclusion of liability for i) injury, including bodily injury and death, to an employee of the insured or of Customer or ii) any obligation of the insured to indemnify, hold harmless, defend or otherwise make contribution to Customer because of damage arising out of injury, including bodily injury and death, to an employee of Customer.

(f)    Self-Insure. Should Supplier elect to self-insure, in lieu of Certificates of Insurance as stipulated in this section Supplier shall provide to Customer: (i) the self-insurance registration identification number assigned by each state in which Supplier desires to provide Services to Customer or manufactures Product; (ii) a letter of certification from Supplier's insurance carrier or self- insurance administrator that Supplier is self-insured for the coverages and amounts as stipulated in this Agreement, including that Customer is an additional insured and shall be indemnified and saved harmless from all claims, suits, and liabilities as set forth within this Agreement; and (iii) a notification of the states in which Supplier is provided coverage under its self-insurance.

## 37.    INFRINGEMENT

(a) Supplier Infringement Indemnification. Supplier shall indemnify, defend and hold harmless Customer Indemnified Parties from all Claims arising from or relating to any actual or alleged infringement or misappropriation of any issued United States patent, United States trademark, United States copyright or any actual or alleged violation of any other intellectual property rights arising from or in connection with the Products provided or the Services performed under this Agreement.  Notwithstanding anything to the contrary contained in this Agreement (including, but not limited to, Section 35 entitled "INDEMNIFICATION" and Section 36 entitled "INSURANCE"), the provisions of this Section 37 entitled "INFRINGEMENT" shall govern the rights of Customer Indemnified Parties for Claims of infringement, misappropriation or violation of intellectual property rights.  Supplier shall have no obligation under this Section 37(a) if the Claim is caused by, or results from: (1) Customer's combination or use of the Product with software, services, or products developed by Customer or third parties, which combination or use is not authorized by Supplier, (2) modification of the Product by anyone other than Supplier (and which modification is not authorized by Supplier), if such Claim would have been avoided by use of the unmodified Product, (3) Customer's continued allegedly infringing activity after having been notified thereof or after having been provided modifications that would have avoided the infringement, (4) Customer's use of the Product in a manner not in accordance with this Agreement, (5) Customer's failure

to abide by all applicable laws, rules, regulations and orders that affect the Product, (for which Customer has been notified by Supplier), or (6) Supplier's compliance with Customer's requirements, specifications or designs and those Customer requirements, specifications or designs are solely responsible for the Claim.

(b) Verizon Infringement Indemnification. Customer shall indemnify, defend and hold harmless Supplier Indemnified Parties from all Claims arising from or relating to any actual or alleged infringement or misappropriation of any issued United States patent, United States trademark, United States copyright or any actual or alleged violation of any other intellectual property rights arising from or in connection with (1) Customer's combination or use of the Product with software, services, or products developed by Customer or third parties, which combination or use is not authorized by Supplier, (2) modification of the Product by anyone other than Supplier (and which modification is not authorized by Supplier), if such Claim would have been avoided by the use of the unmodified Product, (3) Customer's continued allegedly infringing activity after being notified thereof, or after being provided modifications that would have avoided the alleged infringement, (4) Customer's use of the Product in a manner not in accordance with this Agreement, (5) Customer's failure to abide by all applicable laws, rules, regulations, and orders that affect the Product, (for which Customer has been notified by Supplier), or (6) Supplier's compliance with Customer's requirements, specifications or designs and those Customer requirements, specifications and designs are solely responsible for the Claim. Notwithstanding anything to the contrary contained in this Agreement (including, but not limited to, Section 35 entitled "INDEMNIFICATION"), the provisions of this Section 35 entitled "INFRINGEMENT" shall govern the rights of Supplier Indemnified Parties for Claims of infringement, misappropriation or violation of intellectual property rights.

(c) Procedures. The procedures set forth in Section 35(e) entitled "INDEMNIFICATION" shall apply in the case of any Claims of infringement, misappropriation or violation of intellectual property rights for which indemnification will be sought.

Without limitation of Section 35 entitled "INDEMNIFICATION", if the sale or use of the Products or Services is enjoined, Supplier shall, at Customer's option and Supplier's expense, either:

1. Procure for Customer the right to use the Products or Services;
2. Replace the Products or Services with equivalent, non-infringing Products or Services;
3. Modify the Products or Services so they become non-infringing; or
4. Remove the Products or Services and refund the purchase price, including transportation, installation, removal and other incidental charges.

## 38.    LIMITATION OF LIABILITY

IN NO EVENT SHALL SUPPLIER OR CUSTOMER BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOST SAVINGS, OR DAMAGES ARISING FROM LOSS OF USE, LOSS OF CONTENT, OR LOSS OF DATA, REGARDLESS OF THE LEGAL THEORY ON WHICH SUCH DAMAGES MAY BE BASED (INCLUDING NEGLIGENCE), AND EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER ANY REMEDY SET FORTH IN THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.

EXCEPT FOR CLAIMS DUE TO PERSONAL INJURY, DEATH, PROPERTY DAMAGES AND INDEMNITY CLAIMS UNDER SECTION 35 ENTITLED "INDEMNIFICATION" OR SECTION 37 ENTITLED "INFRINGEMENT", OR VIOLATION OF REGARDING CONFIDENTIAL INFORMATION UNDER SECTION 26, WHERE EACH PARTY HAS A DUTY TO INDEMNIFY, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER UNDER THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL AMOUNTS PAID OR PAYABLE BY CUSTOMER TO SUPPLIER.

**39.    ESCROW AGREEMENT**

Supplier agrees to execute an ESCROW AGREEMENT for the for the purpose of safeguarding Source Codes and Technical Information (as defined below) pertaining to Products.

The ESCROW AGREEMENT shall be executed within sixty (60) days from the effective date of this AGREEMENT. The provisions of the ESCROW AGREEMENT, when executed, and as it may be from time to time amended, shall be incorporated herein by reference.  Supplier hereby agrees to deliver to a mutually acceptable Escrow Agent or Agents (hereafter "AGENTS"), a package of technical information (hereafter referred to as "Technical Information") relating to the System, Product and Software utilized under this Agreement and any improvements or subsequent modifications thereto (to the extent that Customer is entitled to receive them under this Agreement) and any special tooling used in the manufacture thereof, and the operation, maintenance and repair thereof in sufficient detail so that Customer can make, have made, operate, maintain, use and repair such System and Products; provided, however, that to the extent any of the foregoing is not owned by Supplier or Supplier does not have the right to place the Technical Information into escrow and grant a license to Customer, Supplier shall obtain such right and license from the necessary third party in the name of the Customer. This Agreement is expressly conditioned upon and subject to the execution of the aforementioned ESCROW AGREEMENT within sixty (60) days from the date of execution of this AGREEMENT.  Supplier shall bear costs and expenses charged by the AGENTS in connection with the ESCROW AGREEMENTS.

(B)   The Technical Information to be delivered to the AGENTS includes: schematics, PCB files and gerbers, bill of materials and supplier details, manufacturing and testing documentation, source code of Software, PC Software for factory test software and design documentation, and a list of all commercially available parts and components purchased by Supplier and readily available on the open market disclosing the part number, name and location of the provider, and current list price for the purchase thereof as of the date of initial deposit into escrow.  The Technical Information shall be organized if applicable into subparts as follows:

    a.    SYSTEM organization ("family tree") drawings

    b.    functional block diagram drawings

    c.    detailed schematic diagrams

    d.    detailed logic diagrams

    e.    printed circuit card master drawings

    f.    printed circuit card assembly drawings

    g.    Mechanical piece-part drawings

    h.    mechanical and electrical parts list, including source suppliers

    i.    equipment wire lists

    j.    equipment assembly drawings

    k.    detailed descriptions of special test equipment

    l.    detailed test processes

    m.    detailed test specifications

n.    software and firmware program documentation, including source code tapes

o.    special tooling

p.    manufacturing assembly aid documentation

q.    circuit descriptions

r.    technical specifications

s.    physical design criteria

t.    software source codes

(C)    The Technical Information to be placed in escrow shall be reviewed for the correctness and completeness of content and information accuracy by Supplier's designated representatives.    Upon completion of such review the representatives shall verify in writing, that the package contains sufficient correct Technical Information for the purposes stated herein.

(D)    During the term of this AGREEMENT, Supplier agrees to update the Technical Information placed in escrow at least once every six (6) months so that the manufacturing, installation and testing information will conform to the System, Product and Services supplied to Customer at any corresponding time period. Changed Technical Information shall be added to that previously in escrow at the time of the change and shall be clearly marked to indicate the serial numbers of the first Product or tools, or the operating, installing and testing specifications and procedures, into which the change will have been introduced. During the term of the ESCROW AGREEMENTS no material shall be removed or withdrawn from the package unless it has been superseded by an update.

(E)    Supplier agrees to review and verify all updates and changes to the Technical Information in the manner set forth in paragraph (C) of this clause entitled "ESCROW AGREEMENTS". Prior to submission to the AGENTS, Supplier's representatives shall verify in writing the accuracy and completeness of such updates and changes as outlined in the ESCROW AGREEMENT. Such verification shall be made at minimum every six (6) months whether or not any updates or changes to the Technical Information are made during such six (6) month interval.

Notwithstanding any prior approvals of Customer and/or any of their agents or any certificates filed by Supplier, in the event the Technical Information delivered by the AGENTS in accordance with the terms of the ESCROW AGREEMENT is, in any way, insufficiently complete or adequate to enable Customer to use the same for the purposes stated herein, Supplier agrees to furnish directly to AGENTS any or all Technical Information as required to made the Technical Information Package sufficient and complete.

(F)    At any time following delivery to Customer of the Technical Information by the AGENT, the Technical Information therein shall solely be used by Customer to make, have made, and/or use Product and Services of the type purchased under this Agreement to keep the installed System operational, including replacement of all or any part of such Product as may be required.

(G)    In the event that Customer use of the Technical Information within the scope hereof would involve the manufacture, use or practice of any invention covered by any United States or foreign Patent owned by or controlled at any time by Supplier, or by Supplier's parent company, successors, subsidiaries or assigns, then upon Customer being vested with the right to immediate possession and use of the Technical Information , Customer shall have a personal, nontransferable, non-exclusive royalty-free license under any such patents to make, have made and use any and all such inventions insofar as they are embodied in the System or Product or relate to or concern the performance of any aspect of this

MobileAria, Inc.
C0505851

clause of this Agreement. Customer acknowledges that the Technical Information contains Supplier's copyrights, proprietary data and trade secrets. Customer shall use reasonable care to keep such Technical Information as delivered to Customer by the AGENT confidential and shall in no case use less care than it uses to keep confidential its own confidential information of like nature; provided that Customer shall have the right to disclose such Technical Information so delivered to those of its employees, agents, suppliers and subcontractors who have a need to have access to such Technical Information on a "need to know" basis for the purposes of exercising Customer's rights under the Escrow Agreement. Customer's right to copy such Technical Information shall be limited to the amount of copying reasonably necessary to carry out the purposes set forth in this clause. Customer will insure that such other suppliers or manufacturers use the Technical Information only within the scope hereof and maintain the confidentiality thereof.

The ESCROW AGREEMENT shall incorporate the foregoing terms, provided that such terms may, to the extent agreed by the parties, be modified by the ESCROW AGREEMENT. In addition to the foregoing terms, the ESCROW AGREEMENT shall provide that, prior to any delivery of any of the Technical Information as a result of a default by Supplier, Supplier shall have a cure period for such default as mutually agreed on by both parties in the ESCROW AGREEMENT.

## 40.    RELATIONSHIP OF PARTIES

(a)    <u>Supplier's Relationship</u>. In providing any Services under this Agreement, Supplier is acting solely as an independent contractor and not as an agent of any other party. Persons furnished by the respective parties shall be solely the employees or agents of such parties, respectively, and shall be under the sole and exclusive direction and control of such parties. They shall not be considered employees of the other party for any purpose. Each party shall be responsible for compliance with all laws, rules and regulations involving its respective employees or agents, including (but not limited to) employment of labor, hours of labor, health and safety, working conditions and payment of wages. Each party shall also be responsible, respectively, for payment of taxes, including federal, state, and municipal taxes, chargeable or assessed with respect to its employees or agents, such as social security, unemployment, worker's compensation, disability insurance and federal and state income tax withholding. Neither party undertakes by this Agreement or otherwise to perform or discharge any liability or obligation of the other party, whether regulatory or contractual, or to assume any responsibility whatsoever for the conduct of the business or operations of the other party. Nothing contained in this Agreement is intended to give rise to a partnership or joint venture between the parties or to impose upon the parties any of the duties or responsibilities of partners or joint venturers.

(b)    <u>Customer's Contractors</u>. Customer reserves the right to enlist contractors for engineering, installation or maintenance services with respect to Supplier's Products.

(c)    <u>Subcontractors</u>. Supplier may subcontract any portion of the work to be performed hereunder (for example, including but unlimited to installation and maintenance Services); provided, however, Supplier shall remain liable to Customer under this Agreement for performance of its subcontractors.

## 41.    TERMINATION

(i)    <u>(a) Without Cause</u>. Customer may terminate this Agreement without cause, effective immediately, due to Regulatory or legal action not caused by Supplier or upon one hundred eighty (180) days prior written notice to Supplier. Termination shall not affect any Order placed, any subordinate agreement executed prior to the date of termination, or any fully paid up license granted to Customer. Upon termination of this Agreement without cause, Customer shall not be liable to Supplier, either for compensation or for damages of any kind or character whatsoever, whether on account of the loss by Supplier of present or prospective profits on sales or anticipated sales, or expenditures, investments or commitments made in connection with the establishment, development or maintenance of Supplier's business, or on account of any other cause or thing whatsoever. The termination shall not prejudice the rights or liabilities of the parties with respect to Product sold, or any indebtedness then owing by either

party to the other. <u>For Insolvency, Court Action, or Assignment</u>. Either party may terminate this Agreement, effective immediately, without liability for said termination, upon written notice to the other party, if any of the following events occur:

1.  The other files a voluntary petition in bankruptcy;
2.  The other is adjudged bankrupt;
3.  A court assumes jurisdiction of the assets of the other under a federal reorganization act;
4.  A trustee or receiver is appointed by a court for all or a substantial portion of the assets of the other;
5.  The other becomes insolvent or suspends its business;
6.  The other makes an assignment of its assets for the benefit of its creditors, except as required in the ordinary course of business;

(a)    <u>Material Breach</u>. Subject to subsection (d) below, either party may terminate this Agreement for a material breach or default of any of the terms, conditions or covenants of this Agreement by the other, provided that such termination may be made only following the expiration of a thirty (30) day period during which the other party has failed to cure such breach after having been given written notice of such breach.

(b)    <u>Termination by Supplier for Non-Payment</u>:  Supplier may terminate this Agreement, or cancel an Order(s) for non-payment of the purchase price and then only if after thirty (30) days of receipt of written notice of non-payment in accordance with Section 46, entitled "NOTICES", Customer fails to pay such purchase price and thereupon Supplier issues its written notice of default and Customer fails to pay such purchase price within ten (10) business days of receipt of such notice of default.  In no way shall such termination act to impair Customer's right, title and interest to the Product purchased hereunder, its rights under Section 6, entitled "SOFTWARE LICENSE" for Software licenses which have been purchased hereunder, and under Section 26, entitled "INFORMATION AND INTELLECTUAL PROPERTY" and under and Section 37, entitled "INFRINGEMENT."

## 42.    PERFORMANCE REMEDIES

In the event of Supplier's failure to perform any of its obligation under the Agreement, Customer in addition to and independent of all other rights and remedies at law or in equity, shall have available a full set of remedies as set forth in this Agreement.  Such remedies shall include pre-default remedies under Sections 17, entitled "PRODUCT AND SOFTWARE WARRANTIES, SERVICES AND SUPPORT", Section 43, entitled "WORKAROUND", and EXHIBIT I, entitled "CRITICAL MILESTONES AND PERFORMANCE COMPENSATION PAYMENTS (which a Court of competent jurisdiction may deem to consider towards mitigation of damages). Further, Customer reserves the right, at its option, to place Supplier in default for any material failure to perform and proceed in accordance with Section 41, entitled "TERMINATION".  In the event Customer chooses to terminate this Agreement for Supplier's default, it may, at its option, choose to terminate the Agreement, demand refund of the full purchase price paid to date, and/or impose liability upon Supplier for all costs and expenses arising out of Supplier's default including, but not limited to, excess cost of re-procurement, subject to the limitation of liability of section 38, entitled "LIMITATION OF LIABILITY."

## 43.    WORKAROUND

In the event Supplier fails to furnish a Product or provide a Service  that conforms to  Specifications and Customer determines that Supplier's failure to deliver a conforming Product or perform such Service will cause Customer to incur incremental costs, including operational costs,  then Customer, in addition to and independent of all other rights and remedies at law or in equity or as provided in this Agreement, may notify Supplier in writing, in accordance with  Section entitled "NOTICES", that a workaround condition exists. Supplier shall be liable under this section for such substantiated incremental costs, including, but not limited to, substantiated operational costs, engineering, installation, labor by Customer or its agents and other substitute service-related costs and substitute equipment, incurred by Customer, which costs

would not otherwise have been expended to provide or acquire functionality equivalent to that that would have been available had Supplier provided a Product or Service that conformed to the Specifications.

In addition, Supplier and Customer shall promptly participate in the joint preparation of a workaround plan to resolve the problem. Customer, however, shall have final approval of the workaround plan to be performed.

## 44. POST TERMINATION/NON-RENEWAL

In the event of any termination or non-renewal of this Agreement, Supplier shall assist and cooperate in all reasonable ways with Customer and any replacement provider in the transition to a replacement provider. Such assistance shall include, but not be limited to, the delivery to Customer of any technical information or Documentation and Customer's information, and shall be provided in accordance with the provisions of subsection 8 (h) hereof entitled "CHANGE ORDER", including provisions for the payment of additional fees for any additional work.

## 45. DISPUTE RESOLUTION

(a)    Nature of Dispute Resolution. The parties desire to resolve certain disputes, controversies and claims arising out of this Agreement without litigation. Accordingly, except in the case of (i) a dispute, controversy or claim relating to a breach or alleged breach on the part of either party of the provisions of Section 26 entitled "INFORMATION AND INTELLECTUAL PROPERTY", (ii) a suit, action or proceeding to compel Supplier to comply with its obligations to indemnify Customer pursuant to this Agreement or (iii) a suit, action or proceeding to compel either party to comply with the dispute resolution procedures set forth in this Section 45 entitled "DISPUTE RESOLUTION", the parties agree to use the following alternative procedure. The term "Dispute" means any dispute, controversy or claim to be resolved in accordance with the dispute resolution procedure specified in this Section entitled "DISPUTE RESOLUTION."

(b)    Procedure. At the written request of a party, each party shall appoint a knowledgeable, responsible representative to meet and negotiate in good faith to resolve any Dispute arising under this Agreement.    The parties intend that these negotiations be conducted by non-lawyer, business representatives. The discussions shall be left to the discretion of the representatives. Upon agreement, the representatives may utilize other alternative dispute resolution procedures such as mediation to assist in the negotiations. Discussions and correspondence among the representatives for purposes of these negotiations shall be treated as confidential information developed for purposes of settlement, shall be exempt from discovery and production, and shall not be admissible in any lawsuit without the concurrence of all parties. Documents identified in or provided with such communications, which are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted in evidence in the lawsuit.

(c)    Remedies At Law or Equity. If the negotiations do not resolve the Dispute within sixty (60) days of the initial written request, the parties may pursue their available remedies in law or equity.

## 46. NOTICES

(a)    Notices (with the exception of price change notifications pursuant to Section 7 entitled, PRICE AND TERMS OF PAYMENT, concerning this Agreement shall be in writing and shall be given or made by means of telegram, facsimile transmission, certified or registered mail, express mail or other overnight delivery service, or hand delivery, proper postage or other charges paid and addressed or directed to the respective parties as follows. A notice that is sent by facsimile shall also be sent by one of the other means set out in this subsection.

MobileAria, Inc.
C0505851

To Supplier:

> Mobile Aria, Inc.
> 800 W. El Camino Real- Suite 240
> Mountain View, CA  94040
> Tom Wainwright
> 650-237-4455
> twainwright@mobilearia.com

To Customer:

> Verizon Services Corp.
> 240 East 38th Street
> New York, NY  10016
> Attn: Philip Melone
> 212-338-7025
> Philip.j.melone@verizon.com

And to the Affiliate that placed the Order if different than Verizon Services Corp.

(b)    Notices for change by Supplier in ownership, change in name of firm, or change in mailing address must be given by Supplier by mailing to Customer within thirty (30) days of such change. Notices for change in ownership must include the names of all new owners or officers, registered agent for service of process and state of incorporation or organization.

## 47.    NO HAZARDOUS PRODUCTS AND COMPONENTS

(a)    Supplier's Representations. Supplier represents that each Product furnished by Supplier is safe for all intended uses, is nontoxic and presents no abnormal hazards to persons or the environment. Supplier agrees to notify Customer in writing and to supply an appropriate Material Safety Data Sheet (MSDS) to Verizon Services Corp., Integrated Technical Services Division, 221 E 37th Street, 4th Floor, New York, New York 10016 as well as to the ship-to point, if any Product or component thereof is toxic or hazardous under any Federal, state or local law or if the Product is capable of constituting a hazard. Supplier represents that Products display all reasonable notices and warnings of foreseeable hazards. Supplier further represents that if any Products or containers would be or could be classified as hazardous or otherwise regulated waste at the end of its useful life, Supplier has advised Customer in writing and provided Customer with proper disposal instructions.

(b)    Notices. Supplier shall immediately notify Customer by telephone (followed by written confirmation within twenty-four hours) if Product purchased or materials used fail to comply with applicable safety rules or standards of the United States Consumer Product Safety Commission or the Environmental Protection Agency or contain a defect that presents a foreseeable risk to the public health or injury to the public or the environment, whether by itself or when used by Customer for its intended purpose.

(c) Shipping and Routing Instructions. Supplier shall comply with EXHIBIT D entitled "HAZARDOUS MATERIALS REGULATIONS".

## 48.    GOVERNMENT CONTRACT PROVISIONS

If an Order contains a notation that Product or Service is intended for use under a government contract, it shall be subject to the then current government contract provisions printed on or attached to such Order.

**49.    QUALITY**

Supplier shall follow the requirements and procedures in EXHIBIT H1, hereof entitled "QUALITY STANDARDS, PROCEDURES AND COMPLAINTS." In respect to Products ordered by Customer.

**50.    NONWAIVER**

Either party's failure to enforce any of the provisions of this Agreement or any Order, or to exercise any option, shall not be construed as a waiver of such provisions, rights, or options, or affect the validity of this Agreement or any Order.

**51.    SEVERABILITY**

If any of the provisions of this Agreement shall be invalid or unenforceable, then such invalidity or unenforceability shall not invalidate or render unenforceable the entire Agreement. The entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of Supplier and Customer shall be construed and enforced accordingly.

**52.    SECTION HEADINGS**

The headings of the sections are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

**53.    SURVIVAL OF OBLIGATIONS**

Customer's and Supplier's obligations under this Agreement, which by their nature would continue beyond the termination, cancellation or expiration of this Agreement, shall survive termination, cancellation or expiration of this Agreement, including but not limited to, obligations to indemnify, insure and maintain confidentiality, and continued availability of Product support and warranty provisions set forth in EXHIBIT D entitled "PURCHASE FOR INTERNAL USE- PRODUCT AND SERVICE WARRANTY AND PRODUCT SUPPORT".

**54.    CHOICE OF LAW AND JURISDICTION**

The validity, interpretation and performance of this Agreement shall be governed by the procedural and substantive laws of the state of New York without regard to conflicts of laws. All actions under this Agreement shall be brought in a court of competent subject matter jurisdiction in the county of New York in the state of New York and both parties agree to accept the personal jurisdiction of such court. Supplier also agrees to submit, at Customer's option, to the jurisdiction of any court in the United States wherein an action is commenced against Customer based on a claim for which Supplier has indemnified Customer hereunder.

The application of the U. N. Convention on Contracts for the International Sale of Goods is specifically excluded from this Agreement.

**55.    ENTIRE AGREEMENT**

This Agreement together with its exhibits and attachments constitutes the entire agreement between the parties and cancels all contemporaneous or prior agreements, whether written or oral, with respect to the subject matter of this Agreement. Except as provided in Section 13, entitled "PRECEDENCE OF DOCUMENTS", and Section 8 entitled "PURCHASE ORDERS; CANCELLATION OF PURCHASE ORDERS; REVOCATION OF ACKNOWLEDGEMENT", no modifications shall be made to this Agreement unless in writing and signed by authorized representatives of the parties.

**56.    SIGNATURES**

Each party represents that it has executed this Agreement through its authorized representative.

CUSTOMER:                                           SUPPLIER:

Verizon Services Corp.                              MobileAria, Inc.

_George S. Dowell_                                  _Charles L. Goad_
(Signature)                                         (Signature)

GEORGE S. DOWELL                                    CHARLES L. GOAD
(Printed Name)                                      (Printed Name)

VP - SUPPLY CHAIN SERVICES                          PRESIDENT
(Title)                                             (Title)

6/6/05                                              June 2, 2005
(Date)                                              (Date)

MobileAria, Inc.
C0505851

EXHIBIT A

AFFILIATES VERIZON WEST (FORMER GTE AFFILIATES)

Left Intentionally Blank

MobileAria, Inc.
C0505851

EXHIBIT B

COMPONENTS OF PRODUCTS AND SERVICES

- ATTACHMENT  B-1 DETAILED DESCRIPTION OF PRODUCTS AND SERVICES

- ATTACHMENT  B-2 PRICES

- ATTACHMENT B-3 DELIVERY INTERVAL

EXHIBIT B

To Agreement No. C0505851

COMPONENTS OF PRODUCTS AND SERVICES


ATTACHMENT  B-1 DETAILED DESCRIPTION OF PRODUCTS AND SERVICES

## 1)    Hardware

**Mobile Aria Vehicle Tracking and Control Unit (VTCU)**

Each Hardware unit shall consist of the following major components:

- a. Telemetry collection unit including GPS receiver, digital cellular radio (EVDO), 10BaseT Ethernet port
- b. Roof-mounted antenna array for GPS satellite signal reception, digital cellular communication
- c. Vehicle power cable(s)
- d. Antenna cables
- e. Mounting hardware for all relevant components

Additional optional components of the VTCU

1. 802.11b radio
2. Roof-mounted antenna array for 802.11b communication
3. ID badge proximity reader (Either the HID MiniProx or HID PCProx reader)
4. Badge reader cabling
5. Separate Ethernet jack for extending the built-in Ethernet port based on vehicle installation requirements.


## 2)    Software

**Java Messaging Server (JMS) Software for Customer Use (Client Software) /Interface**

Customer data centers require continuous feed from Supplier's Network Operations Center ("NOC") of events and messages generated by the Hardware units that are installed on Customer's vehicles.  Supplier shall make available to Customer a JMS client software to be installed at Customer data centers to accept incoming messages from vehicles in the field.  These events and messages must be:

- Transmitted to at least four (4) separate Verizon environments consisting of parallel operating clients, with data consistency among the four environments.

- Transmitted to Customer reliably and securely

- Delivered with guarantee and tracking of events/messages.

- Automatically stored and delivered, at a later point, if Customer data centers clients temporarily are unable to receive messages/events for any reason (automatic queue replay).
- The ability to handle bursts of events/messages at a given point in time.
- Re-tramsmission of already delivered messages/events, with manual intervention (manual queue replay)

**Operating System Software**

Each unit of Hardware includes embedded Windows CE operating system software and other proprietary Supplier drivers and applications.

**3)      Services**

**Application Service Provider (ASP) Service**

ASP Service includes Web Portal and Data Feed as described below:

a) Web Portal

Supplier shall provide a web portal to handle:

a. Customer Account(s) Management
b. Hardware to vehicle assignment during installation and maintenance
c. Field Service Requests (SR)
d. Landmark administration
e. Vehicle positions and VTCU pinging
f. Enable/Disable/Configure WiFi Access Point
g. Enable/Disable/Configure firewall
h. Over the Air Programming (OTAP) changes to units in the field

b) Data Feed

Date feed coming from the vehicles in the field to Customers Datacenter.  Data Feed service includes:

a. Data Collection from VTCU
b. Monitoring of the health of network connectivity between Supplier and Carrier data centers
c. Data process control and management
d. Reverse geocoding of latitude and longitude into street addresses
e. Identification and delivery of Landmarks
f. End-to-end data flow proactive monitoring and alerting
g. Support of multiple data interfaces (queues) with ability to manage each data queue independently
h. Support of all required interface infrastructure upgrades , including Data Base, Operating Systems (OS), JMS, Security upgrades
i. Maintain high throughput data interface capability per Customer requirements
j. Documentation

4)    **Technical Support**

Technical Support will be provided to the Customer in accordance with the terms of Section 8 of Exhibit D.  Technical Support will be the main point of contact for specific vehicle issues in the field.    Customer Support is provided through either of the following:

1.  Phone call to Customer Support
2.  Email to Customer Support
3.  Self-help application via Internet

a)    **Engineering IT Support**

1.  Support shall be provided Twenty-four (24) hours a day, seven (7) days a week

2. Supplier shall provide proactive Monitor the ASP services.

Engineering IT Support Personnel and Responsibilities

| Title | Role | Support Responsibility |
|---|---|---|
| Technical Account Manager Cell phone # e-mail address | • Primary technical contact, liaison with engineering • Track status, obtain resources, escalate issues • Manage issues through entire lifecycle (ex. incident->bug) • Incident patterns identification and analysis | • Priority 1 |
| IT Director Cell phone # e-mail address | • Manage and direct all application and database development, maintenance, and support activities. • Track status, obtain resources, escalate issues • Manage IT resources | • Priority 1 and 2 |
| Engineering Production Support Staff Cell phone # e-mail address | • Support and maintain IT and system resources | • Priority 1, 2 and 3 |

Responsibilities

| Supplier | Customer |
|---|---|
| • Provide maintenance, monitoring, repair and upgrades for all system | • Provide assistance, as needed, to |

| | |
|---|---|
| components as needed<br><br>• Maintain appropriate personnel to perform system activities<br><br>• Provide an ongoing updated list of primary and backup contacts | resolve incidents<br><br>• Provide an ongoing updated list of primary and backup contacts<br><br>• Report incidents by using mutually agreed on system |

b)    Request Priority

| Priority | Description | Response | Updates | Communication |
|---|---|---|---|---|
| 1 | Critical request<br>• Crucial loss of system functionality<br>• Inability to perform critical business activities | Immediate | Hourly | Phone<br>Email<br>Self-service web |
| 2 | Urgent request<br>• Serious loss of system functionality<br>• Degradation of business activities<br>• Urgent scheduled requests | Within 4 hours or as needed | Every 4 hours | Phone<br>Email<br>Self-service web |
| 3 | Normal request<br>• Desirable functionality improvement<br>• Scheduled requests | Within 1 business day | Every day or as needed | Email<br>Self-service web |

c)    Proactive Monitoring

| Supplier Data Center Services | Supplier Applications |
|---|---|
| Systems<br><br>• Network<br><br>• Servers<br><br>• Database<br><br>• Storage<br><br>• Backup<br><br>Parameters | Systems<br><br>• Applications<br><br>• Telcontar Engine<br><br>• JMS Queues<br><br>• Vehicle Tracking & Control Unit (VTCU)<br><br>Parameters<br><br>• Basic Server metrics |

| | |
|---|---|
| • SNMP<br><br>• Process Monitoring<br><br>• Log scrapping<br><br>• Oracle Monitoring<br><br>• Custom scripts | • Process monitoring<br><br>• Oracle Monitoring<br><br>• Custom Scripts using simulators and dedicated devices |

d)      VTCU Monitoring by Supplier

| Parameter | Description |
|---|---|
| Heartbeat (alive signal) | No heartbeat for 24 hours triggers an alert |
| GPS data | Invalid data triggers alert<br>• Date<br>• Time<br>• Longitude and/or latitude<br>• Reverse-geocoded addresses |
| Sequence number | Gaps in messages trigger alert |
| Pings | More than 10 pings within 24 hours |
| Date and time of incident | Used for trend analysis |
| Device ID | Used for device identification |
| Truck ID | Used for truck identification |
| Device location | Used for device identification and trend analysis |

Supplier shall generate Exception report daily

Supplier shall generate Weekly Reports  to be analyzed by Supplier Technical Account Manager every Friday

- Incidents sorted by region

- Number of incidents by type

- Incident sorted by type


e)      **On-site Support**

On-site support will be provided in accordance with the terms of Section 9 of Exhibit D.

**5)**     **Strategic Account Management by Supplier**

**Supplier shall make available the following support personnel to customer:**

Personnel:

Account Manager

Dedicated Team:

- Back-up Account Manager

- Technical Account Manager

- Customer Support Manager

- Field Support

Executive Sponsor:

Additional personnel made available during deployment:

- 2 Supplier Operations Project Managers

- 2 Project Managers from Supplier's Installation Agent- An installation agent is hired by the Supplier to perform the installation of the VTCUs.


Roles of Account Management Team:

- Account Manager

  - Dedicated Single Point of Contact

  - Monthly and Quarterly reporting

  - Evaluate evolving business needs with Customer

- Technical Account Manager

  - Liaison to Supplier's Engineering and Customer

  - Analysis and resolution of escalated technical issues

- Customer Support Manager

  - Monitor and resolve trouble tickets on Customer Support System

  - Monitor proactively device status and JMS interface

  - Manage Supplier call center team

Reports by Account Management Team:

In addition to the reports described in Engineering IT Support above, the Account Team will provide the following reports:

During deployment phase:

- Daily Updates during deployment via portal

- Weekly updates with Customer project team

Post deployment:

- Weekly updates with Customer project team

- Monthly meeting with Customer project team

- Quarterly Executive Review

**Installation Services**

a. Installation services will be provided for the installation of Hardware in vehicles onsite

b. Customer shall provide the configuration options for each vehicle prior to installation

c. Customer shall provide access to the vehicle(s) on specific date and time as specified in rollout schedule.  Any supplemental installation visits resulting from non-availability of Customer vehicles will generate an additional charge to Customer.

d. Customer will provide site and vehicle access after hours for a minimum of ten (10) hours, up to six (6) days a week. The six (6) days are Monday through Saturday.

   Supplier will schedule Installation two (2) to four (4) weeks prior to install date. Supplier will confirm with local contact. Supplier will give confirmation one day prior to installation date. Vehicles will be arranged together in one area at the garage or yard keys will be available.

e. De-installation services includes: Removal of existing unit and antenna in vehicle only.  Cabling will not be removed.  Hardware will be given to Local Garage Manager.