UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
In the Matter of:

DELPHI CORPORATION, ET. AL                    Case No.
                                              05-44481(RDD)


                    Debtors.


- - - - - - - - - - - - - - - x

                    United States Bankruptcy Court
                    One Bowling Green
                    New York, New York

                    December 7, 2007
                    10:20 AM

B E F O R E:
HON. ROBERT D. DRAIN
U.S. BANKRUPTCY JUDGE


MODIFIED BENCH RULING ON Expedited Motion for Order Under

11 U.S.C. Sections 105(a), 363(b), 503(b), and 507(a)

Authorizing and Approving Amendment to Delphi-Appaloosa

Equity Purchase and Commitment Agreement


Transcribed By:  Lisa Bar-Leib

A P P E A R A N C E S:

SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

      Attorneys for Debtors

      333 West Wacker Drive

      Chicago, IL 60606


BY:    JOHN WM. BUTLER, JR., ESQ.

      RON E. MEISLER, ESQ.

      ALBERT L. HOGAN III, ESQ.


SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

      Attorneys for Debtors

      Four Times Square

      New York, NY 10036


BY:    KAYALYN A. MARAFIOTI, ESQ.


LATHAM & WATKINS, LLP

      Attorneys for Official Committee of Unsecured

      Creditors

      885 Third Avenue

      New York, NY 10022

BY:    ROBERT J. ROSENBERG, ESQ.

      MARK A. BROUDE, ESQ.

2

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

    Attorneys for Official Committee Equity Security

    Holders

    One New York Plaza

    New York, NY 10004


BY:   VIVEK MELWANI, ESQ.

    DEBRA M. TORRES, ESQ.


GOODWIN PROCTER, LLP

    Attorneys for the Ad Hoc Committee of Bondholders

    599 Lexington Avenue

    New York, NY 10022


BY:   ALLAN S. BRILLIANT, ESQ.


GOODWIN PROCTER, LLP

    Attorneys for the Ad Hoc Committee of Bondholders

    901 New York Avenue, N.W.

    Washington, D.C. 20001


BY:   JOHN MOUSTAKAS, ESQ.

    MICHAEL K. ISENMAN, ESQ.

WHITE & CASE, LLP

Attorneys for Appaloosa Management and Harbinger
Capital

1155 Avenue of the Americas

New York, New York 10036


BY:    THOMAS E. LAURIA, ESQ.

DOUGLAS P. BAUMSTEIN, ESQ.

GERARD UZZI, ESQ.


WEIL, GOTSHAL & MANGES LLP

Attorneys for General Motors

767 Fifth Avenue

New York, New York 10153


BY:    JEFFREY L. TANENBAUM, ESQ.

MICHAEL P. KESSLER, ESQ.


LOWENSTEIN SANDLER PC

Attorneys for Lead Plaintiff

65 Livingston Avenue

Roseland, NJ 07068

BY:    MICHAEL S. ETKIN, ESQ.

S. JASON TEELE, ESQ.

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

    Attorneys for Wilmington Trust Company,

    as Indentured Trustee

    599 Lexington Avenue

    New York, NY 10022


BY:    EDWARD M. FOX, ESQ.


GREGORY P. JOSEPH LAW OFFICES, LLC

    Attorney for Equity Committee

    805 Third Avenue

    New York, NY 10022


BY:    GREGORY P. JOSEPH, ESQ.


KASOWITZ BENSON TORRES & FRIEDMAN LLP

    Attorneys for Trade Committee

    1633 Broadway

    New York, NY 10019


BY:    DAVID S. ROSNER, ESQ.

    DANIEL N. ZINMAN, ESQ.

    MICHAEL M. FAY, ESQ.

HAYNES AND BOONE, LLP

      Attorneys for Highland Capital Management

      153 East 53rd Street

      Suite 4900

      New York, NY 10022


BY:   JUDITH ELKIN, ESQ.


UNITED STATES DEPARTMENT OF JUSTICE

      Office of the United States Trustee

      33 Whitehall Street

      21st Floor

      New York, NY 10004


BY:   ALICIA M. LEONHARD, ESQ.

P R O C E E D I N G S

THE COURT:  Please be seated.  We're back on the
record in Delphi Corporation.  I have before me presently
the debtors' motion for approval of their entry into the
Delphi-Appaloosa investment agreement amendment, or, in the
terms that have been used throughout this hearing, the
December 3 proposed amendment to the EPCA, E-P-C-A,
agreement that was entered into between the debtors, on the
one hand, and a group of plan investors led by Appaloosa,
on the other, in July of this year and approved by order of
the Court on August 2, 2007.

The motion, I believe as originally contemplated
by the debtors, was one that was modified during the course
of November and December to reflect ongoing negotiations
among the debtors and their key constituents over the terms
of the proposed amendment.  That is, it was originally
filed seeking approval of a somewhat different amendment.
That request resulted in the filing of numerous objections,
including by both of the official statutory committees --
the creditors' committee and the equity committee.  The
debtors and those parties, as well as the plan investors,
engaged in continued negotiations at the same time that
they also conducted, along with other objectors, a
litigation discovery process.  The negotiations resulted in

7

the withdrawal of substantially all of the objections to
the motion in light of the amendments to the proposed
amendment that were agreed to on December 3, 2007 and that
are currently before the Court.  Discovery proceeded,
however, because there were two remaining objections.  And
in light of those objections, the Court held an evidentiary
hearing yesterday over the course of the entire day in
which I heard four witnesses in support of the motion and,
as well, accepted into evidence and considered numerous
exhibits agreed to, as far as admissibility is concerned,
by the debtors and the two objectors.

        The motion seeks approval by the Court because it
involves an action out of the ordinary course under section
363(b) of the Bankruptcy Code.  The consequence of the
debtors' entry into the amendment to the EPCA is, among
other things, that the debtors would continue to be
obligated in respect of certain payment covenants, as well
as an alternative transaction fee under certain
circumstances.  And, in a more general sense, the amendment
to the EPCA forms the basis for, along with a number of
other settlements -- including the debtors' settlement with
GM and agreements with various unions -- the Chapter 11
plan that has been filed and for which the debtors are
seeking approval of a disclosure statement, which is also

on today for my consideration.

The standard for consideration of a motion under Section 363(b) is one that I've addressed previously in these cases.  Generally speaking, the court must consider whether the transaction for which the debtor seeks approval is supported by good business reasons, or good business judgment.  As set forth by the Second Circuit in In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993), cert. dismissed, 511 U.S. 1026 (1994), the court has a responsibility to exercise business judgment in respect of transactions sought to be approved out of the ordinary course.  I believe that the court has this role in light of the fact that the debtor is in a bankruptcy case and formally beholden to numerous constituents under the supervision of the court.  As observed by Judge Garaufis in the Eastern District, under this rule, "the trustee [in this case the debtor-in-possession] and the Court in a bankruptcy proceeding must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor."  Frostbaum v. Ochs, 277 B.R. 470, 475 (E.D.N.Y. 2002) (emphasis added).

I guess it's true that any bankruptcy case is a "misfortune."  However, the Court approaches some debtors and the parties approach some debtors with a great deal

more skepticism than others.  It is my experience with

these debtors, as well as my conclusion as a result of

yesterday's evidentiary hearing, that these debtors -- from

their board through their senior management -- and

certainly their professionals, take their responsibilities

as debtors and debtors-in-possession with the utmost

seriousness and have conducted themselves accordingly.

But, nevertheless, in a bankruptcy context, unlike a non-

bankruptcy context, actions out of the ordinary course are

noticed for court approval with the opportunity to object

and have a hearing.  And the court takes into account in

addition to the normal review of the business judgment of a

debtor, which I'll discuss in a moment, the views of other

constituents who are presumably -- and I believe here this

is at least the case with a number of the constituents --

intimately familiar with the debtor's business and

reorganization efforts.  That is, of course, particularly

true of the views of official statutory committees who have

fiduciary responsibilities to their constituents: here, the

official creditors' committee, which acts as a fiduciary

for all unsecured creditors, and the official equity

committee, which acts as a fiduciary for all equity

holders.

          In addition, the Second Circuit has been clear

10

that in a bankruptcy case, even where the committees may be

silent, the Court needs to consider -- and I believe this

is separate and apart from the non-bankruptcy application

of the business judgment test -- that the debtors are

undertaking the proposed action as an exercise of their own

independent good business judgment and that they are not

simply adhering to the demands of a particular constituency

or party in interest, which might include, for example in

this case, the plan investors or GM or one of the other

parties who did not object to the motion as originally

filed.  See In re Lionel Corp., 722 F.2d 1063 (2d Cir.

1983).

Now, that being said, it is also clear that

neither the Second Circuit nor Congress intended bankruptcy

judges in presiding over a motion for approval of an action

out of the ordinary course to delve into the minutia of a

debtor's business judgment.  And that is particularly the

case, again, where creditor and other interested party

sentiment either supports the requested relief or does not

oppose it.  Indeed, I believe that a good measure of the

state court business judgment test applies in bankruptcy

cases, as set forth in In re Integrated Resources, Inc.,

147 B.R. 650, 657-56 (S.D.N.Y. 1992), by then District

Judge Mukasey and additionally, and I think quite cogently,

by Judge Gerber in In re Global Crossing, Ltd., 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003), in which he considered an analogous situation where an original plan investor deal or acquisition had fallen through for various reasons and was asked to consider the advisability of the alternative, or the new direction proposed to be taken by the debtor.

As Judge Mukasey articulated it, the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company. The business judgment rule's presumption shields corporate decision makers and their decisions from judicial second guessing when the following elements were present:  (1) a business decision; (2) disinterestedness; (3) due care; (4) good faith; and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.  Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity.  In re Integrated Resources, Inc., 147 B.R. at 656.

Thus, generally a court will assess, itself, the merits or fairness of business decisions only when a transaction involves a predominantly interested board with

12

financial interests in the transaction adverse to the
corporation.  Moreover, the appropriate test is the "entire
fairness" of a transaction, rather than the business
judgment rule, only "in the face of illicit manipulation"
of a board's deliberative processes by self-interested
corporate fiduciaries.  Id. at 658.  Of course, there is a
wrinkle in or a variation in that standard when it becomes
clear that a company is for sale and a takeover becomes
inevitable, in which the directors are obligated to secure
a maximum value for those to whom they are fiduciaries.
Id.  And, as Judge Mukasey further notes in Integrated
Resources, in a bankruptcy case, a board's fiduciary duties
extend beyond the shareholders to all creditors, as well.
Again, as Judge Mukasey prefaces his analysis of the
business judgment rule, these business judgment rule
principles have "vitality by analogy" in Chapter 11.  Id.
at 656.  And I agree -- that's a very apt description
because, obviously, Chapter 11 lends a unique context to a
board's deliberations; and, the court, as I said before,
must be particularly concerned that the board has taken
into account that bankruptcy context, including the
legitimate views of the debtor's constituents, and if it
doesn't, then the court obviously will pay close attention
to them.

13

As far as the facts are established before me, as
I noted before, by order dated August 2, 2007, I approved
the EPCA that is still currently in effect and that formed
the basis for a consensual plan that the debtors filed in
early September as contemplated by the EPCA.  That plan
provided for distributions to the debtors' creditors and
shareholders that had the support of both official
committees and, at least at that stage, apparently the
support of every other party-in-interest (at least there
was no vociferous objection).  The building block or basis
for that plan, or a critical building block or basis for
that plan, was the July EPCA, in that it provided for,
among other things, an aggregate potential cash investment
of 2.55 billion dollars by a group of plan investors in
return for a stake in the debtors' reorganized equity.

It was not (and it is not today as it is proposed
to be amended) a "takeover" plan.  While the plan investors
and, in particular, Appaloosa will clearly play an
important role in the reorganized debtors under the
proposed transaction, the plan investors will not control
the debtors and a substantial portion of the debtors'
equity under the modified agreement will be going to the
debtors' unsecured creditors, with a right to participate
in that equity under various forms of conditional

14

consideration -- warrants and the like -- by the debtors'

existing shareholders.  Nevertheless, the debtors engaged

in a process that I considered at the hearing in July in

connection with the EPCA whereby they tested the market;

and one potential competing investor, or lead investor,

Highland Capital, did significant due diligence and made a

proposal at that time which the board considered and which

was a data point for the parties and the Court when the

original EPCA was approved.  It was the board's

determination, and ultimately my determination, that the

EPCA was the highest and best proposed transaction.

         At that time, while it was obvious to one who

took the time to read the EPCA that it contained numerous

conditions, no party highlighted to the Court that those

conditions were incapable of being met or even reasonably

incapable of being met.  However, shortly after the Court's

approval of the EPCA, it became clear to the parties, and

in one of the periodic conferences before the Court the

debtor informed the Court, that the debtors had concluded

that it would be substantially or seriously difficult for

the debtors to raise all of the proposed exit financing

upon which the Chapter 11 plan that was attached in outline

form to the EPCA was premised.  And it has subsequently

appeared that the debtors will not be able to raise, in

light of the substantially changed condition of the capital
markets starting in the summer of 2007, approximately a
billion nine hundred million of exit financing that had
been contemplated by that original plan.

Before turning to the merits of the debtors'
deliberative process in reaction to this change in the
capital markets, I should also note that in August, if not
before, but certainly at that time, it appeared clear to
me, and I believe to anyone who was knowledgeable about
these debtors, that they had achieved all -- I would go so
far as to say all -- but at least substantially all -- of
their so-called "Chapter 11 transformation goals."  This is
an important fact to keep in mind when considering the
debtors' exercise of their business judgment in respect of
the motion before me because of the effect of continued
delay and uncertainty in a context where the debtors had
otherwise succeeded in bringing their cases to a point of
conclusion.

Some companies file Chapter 11 simply to reset
their capital structure.  They're, for one reason or
another, overburdened with debt, but they do not believe
their business needs to fundamentally change.  The uses of
Chapter 11 for that type of company are clear, and although
the negotiations over the amount of the adjustment to the

capital structure may be difficult and sometimes rancorous,
it's a process that is fairly easily achievable except for
the pain that various lawyers and professionals go through
in their negotiations.

These debtors have used Chapter 11 not only for
that purpose but also, frankly, for almost every other
purpose that Congress contemplated Chapter 11 could be used
for.  That's because their business, they recognized,
needed fundamental restructuring.  Appropriately,
therefore, they developed a business plan with professional
advice of very high quality.  They vetted that business
plan with their constituents and began the process, a
painful one, of dealing not only with their financial
creditors but with their employees and other constituents
that often ride through bankruptcy cases unscathed.

As I've said in other hearings, given the
difficulty of that process, overlaid with the very complex
issues described at length in the disclosure statement
regarding the relationship between General Motors and these
debtors and, of course, the fundamental issue that all
Chapter 11 debtors deal with, which is the appropriate
capital structure on emergence, this process was akin to
three or four-dimensional chess.  Nevertheless, the debtors
had managed by August of 2007 (and certainly have managed

17

by today) to achieve results in each of the categories that
they originally intended to achieve.  They've reached
agreements with their unions.  They reached a comprehensive
agreement with GM.  They have addressed the transformation
of their business, including the footprint of that
business.  And they have also, in a comprehensive way,
addressed the claims against their estate.

I've said that the debtors have achieved this,
and obviously the debtors took the lead in that process,
but it was clearly not an achievement simply by the
debtors.  It was clearly a collective effort that has
reflected, for example, a very sophisticated and
responsible level of analysis by the debtors' unions and a
very sophisticated, high level and responsible analysis by
GM.  It appears to me -- although, again, the context for
my remarks is a motion under Section 363(b), which is
ultimately just a summary proceeding -- that it also
reflected a very sophisticated and responsible analysis by
the two official committees, which realized that in a case
of this kind the parties need to be mindful, among other
things, of the requirements of Section 1113 of the Code
that before any coerced agreement with the unions can be
approved by the Court, the Court must assess whether all
parties, all creditors, the debtor and anyone else

affected, are treated fairly, and find that the balance of
equities clearly favors modification of the collective
bargaining agreement.  I believe that the analysis by the
committees also took into account the extremely complex
role that GM plays in the reorganization of these debtors
in terms of being a customer, a creditor and a potential
source of recovery -- one where GM logically would not want
to make the types of agreements and concessions it would
most optimally make for the benefit of the estate unless it
got a comprehensive release for those types of potential
claims. And finally, as is the case with many large
corporate debtors, but which I believe is clearly the case
here, the two committees acted in a sophisticated and
responsible way in recognition that the exact, pinpoint
valuation of such a set of businesses is a fantasy and that
valuation ultimately in this context, particularly given
the other two points that I just made, is one that is well
premised upon a negotiation, based on, of course, economic
reality but that ultimately reflects a willingness by all
of the parties to live with what they believe is a fair
enterprise value in light of the entire context.

        The debtors' efforts also resulted in an
agreement regarding the future of their pension plans, and
in complimenting the other parties, the unions, GM, the

committees, I should not have omitted the PBGC and the IRS.
In my experience, although it goes back too long and I'm
probably comparing, perhaps, apples and oranges, these
agencies have shown a very welcome level of sophistication
that didn't always exist in past bankruptcy cases.

Many of the foregoing agreements, however, were
premised on these debtors emerging from chapter 11 in the
first quarter of the 2008.  If the debtors do not do so,
they will, at a minimum, have to negotiate waivers of the
deadlines -- such as with the IRS and PBGC – or at least
face renewed uncertainty over key agreements, such as with
GM and the UAW, a prospect that would also send a troubling
message to other constituents -- not only creditors and
shareholders, but also to customers, managers, and
employees.  However, that prospect seemed quite remote when
the Court approved the EPCA in early August 2007.

Anyway, that was the state of play when it became
clear to the debtors and to the other parties that the
debtors in all likelihood would not be able to raise
approximately two billion dollars of the financing upon
which the Chapter 11 plan was premised.  The plan itself
clearly would need to be renegotiated, therefore, at least
based upon the numbers that the Court heard yesterday from
Mr. Butler; i.e., there was not sufficient cash in the

debtors to make up that shortfall and still provide for the
cash distributions to GM and the unsecured creditors that
the September 6, 2007 plan contemplated.  When you don't
have cash and you can't raise debt, the solution is to
provide equity, and of course that would affect the other
parties, as well, particularly the shareholders, but also,
perhaps the prospective plan investors.

What was not clear immediately, at least to the
Court, was whether this situation necessarily required a
major renegotiation of the EPCA.  The debtors, knowing the
effect of uncertainty on their reorganization process and
potentially on their business (and I should have noted
previously that while the debtors have been implementing
their transformation plan, they appeared to have
successfully continued to provide the types of service and
products to their customers that they did pre-bankruptcy
and indeed have maintained customer support and loyalty),
knowing that basically every constituent in the case was
looking for a conclusion to the case that was ripe to be
achieved and would be discomfited by a change of direction
in that process -- concluded that they should pursue not
only renegotiation of the plan but also, in light of their
assessment of the plan investors' position, renegotiation
of the EPCA as well -- although it appears to me that they

21

kept their litigation options open.  It also appears clear

to me that the other parties felt that they should pursue

renegotiation of the EPCA, as well, although they, too,

were careful to keep their litigation options open.

To me, having reviewed the EPCA, that general

approach seems to have been clearly correct.  One can

review the document and as a legal matter conclude that it

was by no means a foregone conclusion that the plan

investors could use the developments in the financial

markets and the necessary modification of the plan as a

basis for walking, and that their position on the plan

might well constitute an anticipatory breach -- that is, if

the plan investors balked at going forward with a plan that

simply changed the equity percentages between the creditors

and the shareholders without materially affecting the plan

investors' own economics.  In support of such a view, one

could point to the express exclusions from the material

adverse change provision of the agreement that excluded

changes in the financial markets and the automotive markets

of Delphi's customers.

One could also point to the language of the

agreement that referred to a Chapter 11 plan "consistent"

with the plan outline attached, which would include,

arguably, one that was consistent with the underlying

economics of the proposal as far as the plan investors were concerned; i.e., if other constituents were prepared to change their consideration without any material change to the economics of the plan investors, how would the plan be "inconsistent" as far as the plan investors were concerned? And one could also point to, as Mr. Tepper did the other day in his testimony, commitments by plan funders to use their reasonable best efforts to move forward.

In addition to those legal issues, it also is clear to me, as I said before, that at the July hearings on approval of the EPCA, the prospect of a substantial change in the capital markets greatly restricting credit was not raised. I do not know whether, in fact, any members of the plan investor group nevertheless knew that the capital markets were changing or at least had made substantial bets that such changes in the debt markets in fact would happen. That is something that in a nonconsensual litigation context clearly would have been explored. And, of course, even if as a legal matter it would not have consequences, it would clearly have had consequences as a reputational matter if in fact it proved to be the case that plan investors had made such contemporaneous bets in other contexts and yet were using the downturn in the financial markets as an opportunity to seek unmerited concessions in

a renegotiation of the EPCA.

On the other hand, in reviewing the EPCA agreement, as Mr. Tepper outlined in his testimony yesterday, there are various provisions that would argue that the agreement (a) could conceivably still work and thus would not presently be terminable and, therefore, the debtors would be held in place through its March 31, 2008 termination date; (b) that the debtors' inability to raise the exit financing and deliver the plan in the format attached to the EPCA would mean the debtors' default; and, ultimately, (c) that the cost, if there were a breach, to the plan investors, and the recovery by the debtors, would be capped at a hundred million dollars.  And of course, the plan investors have made no concession that they have breached anything.  So that rather small sum in the overall context would have been the grand prize if the debtors successfully pursued a litigation approach.

In addition, the parties -- first and foremost the debtors -- needed to consider their alternatives.  As I noted before, it appears clear to me that even with the receipt by the creditors of stock instead of cash, a large investment by a third party would be necessary to achieve the fundamental goals that the debtors had put in place in respect of their reorganization -- including the GM

24

settlement, the resolution of their pension plan issues and
the other uses of cash that their business and plan
requires.  And given the nature of the capital markets,
given the absence of any other bidder in the original
process than Highland, and given the very fundamental
common sense assessment that any new third party would take
advantage of the debtors' present condition and of course
would be even more free to do so as not confronted with the
legal and reputational issues that would serve to rein in
the plan investors under the EPCA, it would appear that
unless the debtors pursued a reasonable renegotiation of
the EPCA, they would be taking a leap into the dark.

        Now as far as the issue of business judgment is
concerned, although I've laid out that analysis on my own,
the debtors clearly went through the proper process of
reaching those conclusions.  The evidence is clear to that
effect.  They understood the pressures they were under.  I
do not believe, in contrast to Lionel, that they simply
gave in or buckled under.  They shared this analysis with
their committees and their constituents, as well.  I should
note, although it comes up in a different context, an
observation in this regard by Judge Gerber in Adelphia,
which is quoted approvingly by Judge Kaplan, District Judge
Kaplan, at 337 B.R. 475 (S.D.N.Y. 2006): where coercion

                        25

results from differences in bargaining power as a
consequence of law or fact that is what one calls leverage,
and it can't be ignored.

        Consequently, to keep the EPCA alive, and it
appears to me also to proceed in good faith with their DIP
financing and their exit financing efforts, the debtors
proposed an amendment to the EPCA in November that had been
agreed to, they thought, by all of the plan investors. One
of those plan investors apparently chose not to agree to
it, however, at least in the first instance. As Mr.
Sheehan's e-mail to the board -- Exhibit 44 -- candidly
recognized, that agreement was one that the statutory
committees would have a real problem with, to put it
mildly, particularly the equity committee. And indeed,
that's what happened. Frankly, the Court had a real
problem with it also. In particular, the Court had a
problem with the fact that the plan investor group wasn't
able, apparently, to stay together even over that
agreement. And, frankly, because that particular plan
investor, whether it's true or not, I don't know, had at
the same time been touting in the media how it had been
astute in recognizing the incipient credit crunch and
therefore had profited from it: not a good fact, either as
a legal or reputational matter for walking from an

agreement for the same reason.

In any event, given the objections by almost
every constituent in the case, including the two fiduciary
committees, I concluded, notwithstanding the debtors' view
that this case could not take the pressure, that all of the
parties -- including the plan investors, all of them --
should realize that I took these objections seriously and
that if they could not be resolved, frankly, all the
parties, including the plan investors, were warned that
there would be serious consequences.

I don't view that warning as a market test, but I
do view it as a reality check.  In light of that, the
parties went back and continued their negotiations.  Those
negotiations, as I said at the beginning, culminated in the
December 3 EPCA amendment, the one that's before me now,
and it has led to -- or they have led to, the withdrawal of
the objections by the two official committees, with the
caveat stated on the record yesterday by the equity
committee, and the withdrawal of all of the other
objections except by an ad hoc bondholder group and the
bondholders' indenture trustee.

I take seriously the fact that the committees
have withdrawn their objections.  I understand that, just
as no one is happy with the bankruptcy case to begin with,

27

the changed circumstances resulting from the changes in the
capital markets are not a happy event to anyone.  But I
accept the two committees' analysis and the debtors'
analysis that the December 3rd amendment is an amendment
made in light of real leverage, not artificial leverage,
considering all of the factors, both legal and
reputational, and that it is not an instance of
overreaching.  I do not believe (I don't believe the
evidence shows this) that the alternatives would result in
greater maximization of value for creditors and interest
holders.  I do not see a viable alternative without a third
party investment.  There may be some dispute about how much
would be needed, but clearly a large amount would be needed
to make the current plan work.  More importantly, the
effect, after the debtors have achieved what they have
achieved in Chapter 11, of delaying the Chapter 11 process
would be serious.  There would be direct costs, obviously.
Mr. Sheehan testified that the direct out-of-pocket costs
of the Chapter 11 case alone, in terms of professional
fees, is roughly ten to twelve million a month.  He also
testified that the cost of another pension waiver could
well be at least the amount of the twenty million dollars
that the PBGC/IRS extracted in connection with the waiver
that's in effect through February 29th.

In any event, it doesn't take much to see that
the cost of getting other waivers or extensions also would
be direct and tangible.  And I assume that if one did
indeed change course, took a litigation approach, sought a
declaration that there had been an anticipatory breach of
the EPCA, for example, it would take at least six months to
be in a position to propose a Chapter 11 plan again, if
then.  So the direct costs to me seem roughly in the
hundred million dollar range.  That's leaving aside the
indirect costs that Mr. Sheehan also testified to, which
are, frankly, unquantifiable, but they all have to do with
the notion of going out to the world and telling your
customers and your other constituents that we're going to
have to update the business plan, resume negotiations with
GM and potentially also resume negotiations with the unions
-- setting aside the issue of trying to find a group of
plan investors who would be providing better terms than the
current ones -- after everyone had come to the conclusion
that all of the difficult issues had been resolved.  I
think weighing those costs, direct and indirect, and having
gone through the exercise where I believe, at least I hope,
I and others had impressed upon the plan investors the full
adverse potential consequences to them of not reaching
agreement with the two committees, that the present

amendment before the Court properly reflects a fully
informed, arms-length negotiation and is not an overreach.

Notwithstanding that analysis, there have been
two remaining objections to the December 3 EPCA amendment.
One is by the indenture trustee for the senior bonds.  The
indenture trustee is well represented, but I say that with
an appreciation that one of the aspects of representing an
indenture trustee is that one needs to look out for the
interests of a fiduciary whose beneficiaries don't
necessarily all speak their minds or give direction.
That's particularly true in today's litigious environment
where indenture trustees can be sued for doing nothing,
even where one can argue that doing nothing is the right
thing.

The other objection is by a group of senior
bondholders who in their present iteration hold roughly six
hundred million dollars of the senior bond issue, which is
substantially larger than that amount.

I have addressed already, I believe, the general
good business reasons for entering into the December 3 EPCA
amendment, so I won't go through those again in response to
one of the objectors' objections, which is that there are
not good business reasons for entering into it.  I will
address, however, other objections that I've not

specifically covered thus far.

The first is, although it really is not stated in
the pleadings and was merely suggested during the hearing,
that the process by which the debtors and the committees
analyzed the facts and legal issues was tainted by the fact
that the current plan, as would, I believe, any plan that
would ultimately be approved in the case, but the current
plan, in any event, includes in it recognition that a
portion of the reorganized equity will be reserved for
allocation to management on a going forward basis after
emergence from bankruptcy.  They also note that the company
intends, as set forth in the disclosure statement, to seek
approval of post-emergence bonuses for certain management.
I believe the contention would be, although, again, this
was not articulated in writing or even in oral argument,
that management was therefore unduly biased in favor of
getting this process over with.  I do not believe that was
the case, based on Mr. Sheehan's testimony and my analysis
of the objective merits of the decision to go forward with
the December 3 EPCA amendment.  I also accept Mr. Miller's
testimony, which is corroborated by the general record of
this case, that these debtors have a very active and
responsible board, with active independent directors, and
that the board has taken a lead in all phases of the

31

debtors' analysis of a plan investment.   There's no secret

regarding the proposed reservation of equity to be

distributed as an incentive post-reorganization.   And the

disclosure statement certainly makes no secret of the

debtors' intention to propose emergence bonuses, either.

Nothing surreptitious.

     In any event, the debtors' two official

committees obviously don't have that "bias" problem: they

don't get emergence bonuses, and yet they've made the

analysis that they have made.   Even were I to conclude that

there was some effect on the process of the proposed

treatment of management, which I very clearly do not, I

think that the Committees' analysis would override any such

argument.

     It's also contended by the objectors that the

plan investors have impermissibly chilled the ability of

the debtors to consider alternative transactions.   That is

based upon an agreement among the plan investors and their

sources of financing to use their best efforts to proceed

with the EPCA.   That agreement was not a secret, either,

however, and, frankly, it seems to me inherent in any

agreement where you have more than one party proposing to

provide financing.   In this light, it's somewhat ironic

that another objection or one of the other objections to

this EPCA amendment is that it has too much conditionality
or optionality.  I believe that if you did not have the
type of investor lock-up that you have, you would of course
have that type of conditionality here.  I also accept Mr.
Tepper's general notion that there are plenty of other
parties out there with a lot of money if they want to come
to the table and that these "lock-up" agreements which keep
these particular plan investors at the table, the lock-up
agreements, do not preclude those others from coming in --
except, of course, under the circumstances that I had
previously approved, that is, contingent upon the debtors'
payment of an alternative transaction fee under the
circumstances where that type of fee would be earned.  The
evidence shows at least that the only use of a lock-up here
was not to keep a plan investor or a source of funding from
providing a better deal for the estate but, rather, as a
threat to keep one of the plan investors from walking off
the reservation and endangering the deal.

        It's also contended -- and, frankly, having
reread all three iterations of the ad hoc bondholder
group's objections, I believe this is the main focus of
those objections -- it certainly was the only focus of the
initial objection which was, of course, to a worse
amendment -- that the plan upon which the EPCA is premised

unfairly, and, it is alleged, in an unconfirmable way,
arrogates value to a subordinated debt group.  Frankly, I
don't really blame the objectors, who also are well
represented, for raising this objection.  It seems to me,
and I believe it probably seemed to them, that it was their
last best relatively free, or painless,  chance to object
to a feature of the plan that, in isolation, they don't
like -- that is, the treatment of the so-called TOPrS, T-O-
P-R-S, bondholders holding approximately 400 million of
bonds.  Those bonds are subordinate to senior debt.  The
evidence shows that that senior debt is somewhere in the
range of three to three and a half billion dollars and
would include the 600 million held by the ad hoc bondholder
group.

         If it were the case, obviously, that this EPCA,
for which the debtor is paying a price in terms of fees and
a potential alternative transaction fee, was premised upon
a plan that either was unconfirmable or, in my view, was
unduly susceptible to being rejected by voting creditors, I
would understand and agree with the objectors' argument.
Obviously, under those circumstances, something would have
to give to render the plan likely of confirmation before I
would approve the EPCA amendments.

         I don't think that's what the treatment of the

                              34

TOPrS under this plan constitutes, however.  As I noted
earlier, this is a heavily negotiated plan.  It's premised
upon a number of important negotiations.  The agreements
with the unions were negotiated in a backdrop of sections
1113 and 1114 of the Bankruptcy Code which, as I quoted
earlier, requires an assessment of the fairness of the plan
to all parties vis a vis the unions.  It was also
negotiated and is premised upon a complex agreement with GM
where GM is going to want, as anyone would want, a release
from everyone at Delphi and every Delphi constituent.  And
finally, it is one where you have a debtor that is
difficult to value, leading to the committees' agreements
to support the Plan.

    We all know that under the Bankruptcy Code,
Congress gave the ability to a senior class to waive its
priority rights through a plan vote.  Under these
circumstances, particularly going through the analysis I'm
about to go through, I believe that would be the rational,
businesslike choice of senior creditors here.  Thankfully,
according to the Second Circuit in Orion, my view is not a
guarantee.  4 F.3d at 1099.  But it's my firm belief.

    I went through one mathematical example of that
analysis yesterday, based upon Rothschild's midpoint
valuation, assuming for the moment that voters act as

economic animals and will obviously test a negotiated plan
value.  Everyone paid a lot of money to Rothschild,
collectively, through Rothschild's fees being paid out of
the estate, to come to that valuation, and obviously it
will be tested, but the committees have their experts and
they have reached their negotiated result.  So Rothschild's
valuation is a reasonably good data point.  And based on my
analysis from yesterday, and I won't repeat it again, I
believe a rational voter holding senior debt considering
the recovery that he or she or its institution would get
under the plan and the risks of a reduced recovery if they
killed the plan, would vote in favor of it.  And I don't
believe that's coercion.  I believe that is a recognition
of all the parties' leverage under the facts of this case.

        However, it was also stated to me that based upon
recent short-term trading values, the senior debt is
trading lower than the trading value that is implied by
Rothschild's valuation (although just a few months ago it
was trading substantially higher than Rothschild's midpoint
valuation).  I've noted that trading values also are a data
point for valuation but a dangerous one, as evidenced, I
believe, by the incredible trading price fluctuations shown
on the exhibit with which we began this trial and numerous
past experiences where people bought and sold distressed

debt in an environment where not only business information
but also legal arbitrage plays a role in sometimes thinly
traded markets.  This results in instances where some
people make enormous profits, including when they buy from
supposed fiduciaries who supposedly have a great interest
in protecting value.  (And I'll give you one brief example,
which is the sale of the Executive Life portfolio by the
insurance commissioner of California where one single
element of that sale not only paid back the entire sale
price but set the purchaser on the course of making an
enormous fortune.)

        Given my own experience with trading in
distressed debt, therefore, I approach it with some
skepticism as an accurate market reflection.  However, let
us presume for the moment that the true value of the
distributions to senior unsecured creditors is fifty cents
on the dollar, roughly the current trading price.  The
principal amount of the TOPrS debt is 400 million.
Distribution under that presumed value would be 200
million.  I am assuming that before they would agree to the
third party release in the plan, which I believe is
critical for the GM settlement, the TOPrS creditors would
require keeping some portion of that distribution, and not
having it passed to senior creditors.  And I believe that

any of the members of the objecting ad hoc bondholders
group, if they were in that position, know that they would
do the same.  So that 200 million dollar distribution could
not all be transferred to the senior debt and have this
plan still be confirmable, in my view.  Let's assume half
of it was passed on, so that three to 3.5 billion dollars
of senior debt, in my view, would be likely to get
something between a hundred and something less than two
hundred million dollars from the TOPrS class, although I
think a hundred million is a lot closer to the value they'd
get on the trading value assumption that was posited to me.
As I noted before, however, the direct cost of jettisoning
the EPCA and taking a new approach -- before considering
any effects on the business or any transaction risks
associated with seeking to enter into a new investment
transaction with currently uncommitted third parties -- in
my view, is a hundred million dollars.  Why would you make
that trade?  I don't see it.

        Now the senior bondholders might say well, we
wouldn't be sharing all that pain.  We wouldn't be taking
it all.  We'd be sharing it with every other constituent.
Having been responsible for that pain, however, I would
expect them to go to every meeting in person, as opposed to
asking their poor lawyer to do that, if they were going to

make that "share the pain" demand of, say, for example, the

unions, GM or trade creditors after having killed the plan.

Even then, I doubt they'd get a favorable response.

Now as far as the objecting bondholders'

"technical objections" to plan confirmation are concerned,

I'll address those issues also at the disclosure statement

hearing. But I believe, for purposes of this present

proceeding that the "technical" plan objections raised by

the ad hoc group, as opposed to the economic analysis that

I just went through, are all objections that go to drafting

and not treatment. The focus, I believe, should be on

treatment, and that's the analysis I've gone through. I do

not, therefore, believe that this aspect of the plan is one

that renders the EPCA illusory or unduly conditional. I

believe it reflects in large measure rights that as a

practical matter, perhaps not as a legal matter but as a

practical matter -- although also perhaps as a legal matter

because valuation is still to be determined in the future

if there's a contest over valuation -- that the holders of

TOPrS have, just as the shareholders have, rights and

arguments that they may raise in response to senior

creditors' arguments. And, frankly, I saw no objection

from the ad hoc bondholder group to the treatment of the

shareholders, who also are subordinate. In other words, I

believe that the "technical objections" to the Plan raised

by the objectors are not, at this stage, so meritorious as

to necessarily preclude confirmation of the plan.  The

plan, as I noted, may well be accepted by the requisite

percentage and number of senior creditors; the plan also

may be amended to move the TOPrS, without changing their

treatment or the senior creditors' treatment, into their

own class; and, as a factual matter, the debtors may

succeed in showing that the senior creditors are being paid

in full under the plan.

        Finally, the objectors contend that the EPCA

amendment is a de facto Chapter 11 plan that should not be

approved now without going through voting and all of the

other steps that are required before confirmation of a

Chapter 11 plan.  I have previously dealt with this point

in connection with the earlier iterations of the EPCA and

will do so here only briefly because my rationale was set

forth previously, and I believe it's the law of the case.

This is not the type of transaction that constitutes an

impermissible sub rosa plan of reorganization.  This is a

building block, an important one, to achieving a confirmed

Chapter 11 plan.  And without such building blocks, without

such sales, without such agreements with unions, without

such settlements, generally -- although the GM settlement

is one that's in the plan because it does call for the

creditors' and shareholders' release, which, I think, is

the main reason it's in the plan -- most plans can't get

done.  That distinction was made well by Judge Gropper in

In re Tower Automotive, Inc., 342 B.R. 158 (Bankr. S.D.N.Y.

2006), aff'd 241 F.R.D. 162 (S.D.N.Y. 2006), and I don't

need, I believe, to amplify on it much more.

As there, here the EPCA does not direct, but, in

fact, is conditioned upon, voting on a plan.  I suppose

those plan investors who also hold debtor securities will

vote in favor of the plan.  I believe there'd be serious

consequences if they didn't.  But that's a matter of their

agreement.  No other creditor is bound in any way, directly

or indirectly, by contract to vote on this plan.  And as I

said, they are free to go through the analysis that I just

went through but reach a contrary result and vote "no."

The last point that I want to address was a point

raised not only by the two objectors but also by the

official unsecured creditors' committee.  It deals with a

provision of the proposed EPCA amendment that creates, as a

condition to the plan investors going forward with their

investment, that their be a cap of 585 million dollars on

interest expense in connection with the exit financing.

The committee is concerned, given the volatility in the

41

credit markets, that that cap is too low.  They have

suggested one that is roughly forty million dollars higher.

I suggested yesterday that the plan investors seriously

consider increasing the size of that cap.  The ultimate

point made by the bondholder group and the indenture

trustee and in this instance by the creditors' committee is

one that I believe frankly everyone in this room, including

the plan investors, would agree with, which is that we do

not want to go through this exercise again.  No one wants

to re-negotiate the EPCA again.  And so I had urged the

plan investors to consider increasing that cap in light of

that perceived risk.

Indeed, going through this process again would be

particularly onerous given that it is likely that, in one

form or another, the disclosure statement will be going out

shortly.  Notice will be posted in publications all over

the country.  Hundreds of thousands of people will be

voting on this plan.  And the world will be perceiving that

this plan is going forward premised upon an investment by

the plan investors.  I understood Mr. Tepper's answer to me

about this point on the stand, and, frankly, although I'm

not a mind reader, I don't view Mr. Tepper, himself, as

particularly opposing the request I made.  But it was

reported to me this morning that the investor group as a

whole, which apparently requires unanimity, did not agree
to the request.  I appreciate the difficulty that Mr.
Tepper had in holding together his group and, frankly, I
believe earlier it required me to do something I normally
don't do to help him keep control of the group.  I have to
ask myself, then, whether the refusal to agree to the
creditors' committee's request is sufficient to override
the other considerations, which are strong, in favor of
going forward with the proposed transaction.

        In that regard, let me observe two or three
things.  First, I believe that the debtors do have, as
stated by Mr. Resnick, some flexibility in dealing with
their post-reorganization interest expense.  Secondly, I
believe that the actual economic effect of the type of
increase, if it occurs, that the committee is concerned
about upon the plan investors' investment would indeed be
minimal, as Mr. Resnick testified.  Thirdly, as I said
before, when a financial institution that expects to
continue to be able to negotiate transactions refuses to do
so in such a highly public context where hundreds of
thousands of people have relied on them acting in good
faith, I believe, ultimately, that if in fact the condition
is exceeded in the range that Mr. Rosenberg was proposing,
that it would be incumbent for both legal and reputational

43

reasons for the plan investors to respond to that situation in good faith with a reasonable concession.

I make that observation partly from my own experience as a judge.  There are investors out there who have a bad reputation, which they may deserve, who go into every deal with a strike against them even though they have lots of cash -- and that's because it's perceived that at the end of the day their handshake won't be trusted and that they won't deal in good faith as a business person would expect.

Frankly, I believe that Appaloosa's response to this whole set of circumstances doesn't put them in that category at all.  I don't believe Mr. Tepper was blowing smoke at me yesterday when he said a handshake is a handshake, a deal is a deal.  Given that and given that I believe all of the other plan investors want to continue to fall in the category where you don't have a strike against you whenever you come into court and say we want to bid for this company or we want to bid against those people, that they will deal in good faith if in fact the debtors don't have room to manage this interest expense condition.

Consequently, I will approve the debtors' entry into the December 3 EPCA amendment.

The last point I should address is the debtors'

44

request for a waiver of the ten-day stay under Bankruptcy

Rule 6004.  That stay was, I believe, put in place to

prevent debtors and purchasers from rendering appeals moot

by promptly closing after bankruptcy court approval of a

transaction.  That's clearly not going to happen here.  The

closing of this EPCA is not going to happen for a number of

weeks.  So I believe, particularly in light of there not

being any objection to the request, that the debtors are

not here circumventing the purpose for which the Rule was

enacted.  Rather, they are, however, in an environment

where not everyone is particularly savvy about Bankruptcy

Code processes and procedures and where it is important to

them to reassure all their constituents that they are on a

path to complete the process that I said they had basically

completed, but for the plan, in September, that they have

what they can refer to as a final order not subject to a

statutory stay.  So in light of that, I will authorize the

waiver of the 6004(g) stay.

I don't know if you have a current version of the

order on this, but since I gave what for me is

unfortunately too long a ruling, I'm not sure you need much

of an order other than the basic findings and a reference

to the Court's bench ruling which, as I always do, I

reserve the right to read over to see what I did to myself

in giving an oral ruling and what sometimes, not always,

even the best court reporters do to what you say.  So

obviously my ruling won't change, but I reserve the right

to correct my grammar, citations, whatever.  But it seems

to me that the order should be pretty simple here.

MR. BUTLER:  Your Honor, I think we do have a

form of order that's been circulated to the parties.  It

was an exhibit to the record yesterday.  And we'll double

check it during a break and submit it to Your Honor.

THE COURT:  All right.  All right.  Now the other

matter that's on is the disclosure statement hearing.

MR. BUTLER:  Yes.

THE COURT:  Do you want to move right ahead with

that?  Do you have any parties to talk to about that?  Or -

-

MR. BUTLER:  I think what I'd like to do is we

could just take a very brief recess of ten minutes or so

and try to get set up --

THE COURT:  All right.  I'll be back at 12.

MR. BUTLER:  Thank you.