## DECLARATION OF MICHAEL DeSALVIO IN SUPPORT OF HENKEL CLAIMS

I, Michael DeSalvio, state and declare as follows:

1. I am a Business Controller at Henkel Corporation. I am duly authorized to make this Declaration on behalf of the Henkel. I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of Henkel and from working with Delphi's systems on prior account reconciliations. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

2. Henkel Corporation has been a long time supplier to the Debtors for specialty materials used in various automotive electronics applications.

3. Supplying materials to Delphi was generally managed under 3 year supply agreements. The supply agreements were heavily negotiated and contained Henkel's terms and conditions, not the Debtors standard terms and conditions. Henkel never agreed to be bound by the Debtors terms and conditions and the Debtors conduct was contrary to their standard terms and conditions. Attached hereto as Exhibit "A" is a copy of the supply agreements between Henkel and the Debtors that govern the parties relationship with respect to the Claims.

4. The Debtors' Procurement Group was US based and was divided into two divisions ("E&C" and "E&S"), each managed separately. The particular supply agreement would define materials and pricing. In order to obtain product from Henkel, Debtors would begin the process by issuing purchase orders ("POs") to Henkel for the materials. Debtors would next submit releases against these PO's for specific materials and quantities. Henkel would manufacture and ship product accordingly. Shipments to Debtor required advance shipping notification, effectively obtain permission to ship. As was customary in the parties relationship,

WM\7767\4

invoices were never physically produced to Delphi in connection with this process. Rather, the invoices resided at all times in Henkel's possession.

5. In connection with the shipment process, delivery notes (Shippers) are generated at the time of shipment. This paperwork is used to authorize the Shipping Department to ship the product according to the instructions provided on the shipper. This is a critical document to Delphi because it must include Delphi's ASN barcode. The product is then prepared for physical shipment and the delivery note serves as the shipping paperwork and goes to the customer and Delphi's carrier per Delphi requirements. It is also used for Henkel's Shipping personnel to enter the shipment into SAP. This transaction causes the inventory to be reduced and is also the trigger for the invoicing program, a nightly batch process, to generate and print related invoices and to record all necessary G/L transactions. Accordingly, the fact that invoices reside on Henkel's computer system means that the product was shipped to Delphi. In addition, Henkel's systems and processes are continually monitored and audited for accuracy and completeness from both internal and external auditors. Further, inventory accuracy (i.e., on-hand quantities) is confirmed through regular cycle counts. Physical shipments are also validated against customer complaints and internal and external audits. It is my understanding that Henkel's external auditors performed full-scope audits during the years of 1998-2006, including shipping processes with no exceptions noted. Henkel's accounting practice within SAP of delivery note to physical shipment to invoice generation proved to be a very accurate process as evidenced by Delphi on a prior account reconciliation of a similar nature, where Delphi had disputed many product receipts.

6. In connection with this process, Debtors used their own freight carriers so materials always shipped title transferring at Henkel's dock. Generally materials shipped

followed a three point shipping pattern. For example, from Henkel's Olean NY facility, product would go to a Delphi Freight Consolidator in New York. From there, materials were generally shipped to locations in Texas, generally El Paso or Brownsville, pending further consolidation efforts by Delphi. Finally, materials were shipped into Mexico to the Debtors' production facilities in Torrreon.

7. In early 2005, Henkel entered into contract negotiations with Delphi concerning the next three year supply agreement. It was at this time that Henkel and Delphi decided to undertake a reconciliation with respect to delinquent receivables due and owing Henkel. Matt Glover, Head of NA Procurement, assigned a team headed by Sylvia Jones from the E&C Division to work through the reconciliation of Henkel's receivable. The Delphi team responsible for the reconciliation included, Larry Gavin, Matthew Glover, Sylvia Jones, Larry Sears, Colin Stedevan, Marilyn Trappe, Dave Kronoshek, Amy Mikiciuk, Anel Zuniga, and Jeff Schaepen and was under the overall management direction of Darrell Blackburn,.

8. The reconciliation process was a very detailed three to four month process which involved both Henkel and the Debtors researching transactions, on a transaction by transaction basis. Several hundred transactions were closely scrutinized, particularly where the Delphi production facility had not entered any material receipts into Delphi's system. During the process it was discovered that many shipments had, in fact been received and consumed in Mexico, without the production facility showing any receipts. This can only be accomplished with inventory adjustments, essentially showing found materials on-hand.

9. In connection with this reconciliation, Henkel initially asserted that the receivable due and owing Henkel was approximately $530,000.00. At the conclusion of this reconciliation process, the Debtors agreed with Henkel that the net receivables due and owing Henkel was

-3-

approximately $514,000.00.  While Henkel wanted to continue the reconciliation process with respect to the claims, the parties were unable to complete the entire reconciliation process due to the commencement of the Debtors' bankruptcy cases.  It is my belief that had the parties completed the reconciliation process with respect to the claims, Henkel's claims would have been allowed at a similar percentage as the prior reconciliation.  My belief is based, in part, on the fact that the claims arise under similar circumstances and there are no facts which vary from the previous reconciliation.

        10.     Based on the results of this recent reconciliation process, my review of Henkel's books and records, the shipping and audit process described above, and my review of the claims, I believe that the claims asserted by Henkel are due and owing Henkel and in the amounts set forth in the claims.  Further, because (a) the Debtors were required to notify Henkel within 30 days of receipt of product or be deemed to have accepted product and (b) the parties course of conduct varied from the Debtors' standard terms and conditions, I disagree with the positions taken by the Debtors in their Statement of Disputed Issues.  Significantly, throughout the entire time that Henkel supplied product to the Debtors, I am not aware of any customer complaints that alleged Henkel failed to ship materials to Delphi locations.  This would be a high profile event since Henkel is a sole-source supplier and the potential for customer line down situations could occur.

     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

     Executed on December 20, 2007.

                               /s/ Michael DeSalvio
                               **Michael DeSalvio**