McDERMOTT WILL & EMERY LLP
Steven P. Handler (IL# 1115847)
Peter A. Clark (IL# 6203985)
Monica M. Quinn (IL# 6287146)
227 West Monroe Street
Chicago, Illinois  60606
Telephone:  (312) 372-2000
Facsimile:  (312) 984-7700

Gary Ravert, Esq. (NY# GR-3091)
340 Madison Avenue
New York, New York  10017-4613
Telephone:  212.547.5400
Fax:  212.547.5444

Counsel for Temic Automotive of North America, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Delphi Corporation, et al., | Case No. 05-44481 (RDD) |
| Debtors. | Jointly Administered |

**CLAIMANT'S SUPPLEMENTAL RESPONSE TO DEBTORS' STATEMENT OF
DISPUTED ISSUES REGARDING PROOF OF CLAIM NUMBER 8391
(MOTOROLA, INC./ TEMIC AUTOMOTIVE OF NORTH AMERICA, INC)**

## INTRODUCTION

This dispute involves Delphi Corporation LLC ("Delphi") cancelling a program undertaken specifically for Delphi's exclusive use.  In late 2002, Motorola, Inc. ("Motorola") and Delphi entered into a long-term contract (the "Contract"), under which Delphi agreed to purchase all of their production requirements and service requirements for the Quadrasteer program from Motorola through 2011 and 2027, respectively.  Quadrasteer was a 4-wheel steering technology option developed for General Motors' full-size pickups and SUVs.   In early 2005, Delphi cancelled the Quadrasteer program with Motorola.  As expected, Motorola had

already spent millions of dollars on the project in engineering, tooling, and other overhead costs and also faced the prospect of losing millions of dollars in lost profits from the project cancellation.

As the UCC provides, evidence regarding course of dealing and trade usage is relevant to interpret and supplement the terms of the Contract. Under the course of dealing between Motorola and Delphi and the trade usage in the automobile industry, cancellation claims are recoverable in these circumstances. The recoverable cancellation charges include sunken costs for engineering, tooling, lost-profits, other out-of-pocket expenses and a reasonable markup on these costs to cover overhead. Claim Number 8391 seeks recovery of such cancellation costs.

Delphi claims that because it acted in good faith at all times and only cancelled the project with Motorola because General Motors cancelled the project with Delphi that it should not have to pay Motorola any money for prematurely cancelling the project. However, course of dealing and trade usage explain the meaning of the Contract and supplement its terms, thereby becoming a part of the Contract. Course of dealing and trade usage demonstrate that Delphi is liable for cancellation charges. Hence whether it acted in good or bad faith is of no matter.

## FACTUAL BACKGROUND

The affidavits and documents submitted herewith demonstrate the following:

1.      On November 1, 2002, Delphi and Motorola entered into an exclusive, long-term contract, pursuant to which Delphi agreed to purchase all of their production and service requirements for the Quadrasteer program from Motorola. (Contract, attached to Proof of Claim as Exhibit 1).

2.  Quadrasteer was a 4-wheel steering technology option developed for General Motors' full-size pickups and SUVs. (Nowicki Aff. ¶ 1, attached hereto as Exhibit 1; Quint Aff. ¶ 1, attached hereto as Exhibit 2).

3.  The term of the Contract was "thru calendar year 2011 for OEM production [and] thru calendar year 2027 for 15-year service requirement." (Proof of Claim Ex. 1, Contract, ¶ 2).

4.  In the executed Contract, Motorola specifically objected to Delphi's terms and conditions and instead provided its own terms and conditions to govern the Contract. However, at some point, Delphi inserted hand-written language into the contract, objecting to the use of Motorola's terms and conditions. (Proof of Claim Ex. 1, Contract, unnumbered last paragraph). Motorola did not agree to Delphi's objection to use of their terms and conditions.[1] (Ex. 1, Nowicki Aff. ¶ 2; Ex. 2, Quint Aff. ¶ 2).

5.  Following execution, both parties began to perform under the Contract, despite the conflicting terms and conditions. (Ex. 1, Nowicki Aff. ¶ 3; Ex. 2, Quint Aff. ¶ 3). This joint performance was not unusual, as Motorola had begun contract performance on other major automotive projects despite a battle of forms. (Ex. 1, Nowicki Aff. ¶ 14; Ex. 2, Quint Aff. ¶ 14).

6.  The course of dealings between Motorola and Delphi and the trade usage in the automotive industry was that if a project like the one covered by the Contract is prematurely cancelled, the supplier, here Motorola, would seek to recover its sunken costs for engineering, tooling, lost-profits, other out-of-pocket expenses and a reasonable markup on these costs to cover overhead. (Ex. 1, Nowicki Aff. ¶¶ 12, 15; Ex. 2, Quint Aff. ¶¶ 12, 15). The course of dealing and trade usage explain the meaning of the Contract and supplement its terms, thereby becoming a part of the Contract.

---

[1] The battle of forms between Motorola and Delphi was typical of the course of dealings between the parties and trade usage in the automobile industry. (Nowicki Aff. ¶¶ 10, 14; Ex. 2, Quint Aff. ¶¶ 10, 14).

3

7.    In negotiating contracts with Delphi, such as the Contract, the standard course of dealing would include Delphi issuing a Request for Proposal ("RFP") for Motorola to use in formulating its bid. This RFP would contain a description of the product, use, term of contract, volume forecasts and specifications, among other things. (Ex. 1, Nowicki Aff. ¶ 11; Ex. 2, Quint Aff. ¶ 11).

8.    In general, a volume forecast in an RFP will typically contain minimum and maximum contract requirements and is relied upon heavily by the supplier in developing its pricing. The supplier will then develop its pricing model based upon the volume forecast and allow for a variance. When the volume goes beyond its allotted variance, the established pricing is unreliable. For instance, if volume drops more than its allotted variance, the supplier must increase its per-part price because the output of product will not be profitable based upon the prior volume forecast and duration of the contract. In developing pricing quotes, volume forecasts are critical in accounting for the supplier's start-up costs, engineering costs, tooling costs and profitability. The investment related to developing and producing a product is amortized into the price over the expected sales volume. Thus, if the expected sales volume is reduced, the per-unit amortization of the fixed-costs would increase, resulting in a higher price. (Ex. 1, Nowicki Aff. ¶ 16; Ex. 2, Quint Aff. ¶ 16). In this case, Delphi's volume forecasts were reduced on numerous occasions, prompting Motorola to respond with price increases. (Ex. 1, Nowicki Aff. ¶ 6; Ex. 2, Quint Aff. ¶ 6).

9.    The Quadrasteer program was new technology developed by Motorola exclusively for Delphi. Delphi owns the technology. Consequently, since Delphi chose not to purchase the Quadrasteer components Motorola developed, Motorola could not sell the

4

components to any other purchaser rendering them essentially worthless.[2] (Ex. 1, Nowicki Aff. ¶ 4; Ex. 2, Quint Aff. ¶ 4).

    10.    On January 28, 2005, Adrian Schaffer and Chris Moran from Motorola met with Beverly Gaskin and Jeff McInerney from Delphi to discuss the cancellation of the Quadrasteer program. (Ex. 1, Nowicki Aff. ¶ 7; Ex. 2, Quint Aff. ¶ 7; *See* February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached hereto as Exhibit 3). During that meeting, Delphi directed Motorola to stop dedicating resources to the program and to stop weekly hardware and software meetings. (Ex. 1, Nowicki Aff. ¶ 7; Ex. 2, Quint Aff. ¶ 7; *See* Ex. 3: February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin).

    11.    A direction to stop developing product, to dedicate resources elsewhere, and to stop weekly meetings indicates a project is cancelled. (Ex. 1, Nowicki Aff. ¶ 17; Ex. 2, Quint Aff. ¶ 17; *See* Ex. 3: February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin; *See* March 21, 2005 letter from Beverly Gaskin to Adrian Schaffer, attached hereto as Exhibit 4; *See* May 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached hereto as Exhibit 5).

    12.    On October 8, 2005, Delphi filed a voluntary petition for relief under Chapter 11 of Title 11 of the United State Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

    13.    After Delphi filed its voluntary petition for relief, Motorola sold the division involved in this action to Temic Automotive of North America, Inc. ("Temic"). On August 4, 2006, Motorola and Temic filed a Notice of Transfer of Claim pursuant to Bankruptcy Rule 3001(e)(2) and disclosed that Motorola had transferred "all of its right, title, interest, claims and

---

[2] While Motorola is unable to sell the Quadrasteer components to any buyer other than Delphi, Delphi, as owner of the technology, could sell the components to another end user. In May, 2003, Delphi and Motorola explored the possibility of developing Quadrasteer components which Delphi would in turn sell to Nissan. (Nowicki Aff. ¶ 9; Ex. 2, Quint Aff. ¶ 9).

causes of action in and to, or arising under or in connection with" certain claims filed against Delphi, including Claim Number 8391, to Claimant. For the purposes of this response, "Claimant" shall be used to identify Temic, the current holder of Claim 8391.

14.    Delphi remains in possession of its property and continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

**ARGUMENT**

I.    **Delphi Cancelled Its Contract with Motorola**

15.    Delphi asserts that it did not cancel the Contract with Motorola. (Debtors' Statement ¶ 7). Instead, Delphi claims that General Motors, to whom the Quadrasteer components would eventually be sold, delayed the commencement of the program from 2006 to 2007 (Debtors' Statement ¶ 8), which delayed its purchase of any requirements. This is simply incorrect.

16.    On February 3, 2005, Motorola's Adrian Schaffer sent Delphi's Beverly Gaskin a letter confirming that, based on their discussions on January 28, 2005, Delphi had cancelled the Quadrasteer program. The letter confirmed the January 28 conversation that Delphi instructed Motorola to redeploy the internal resources previously devoted to Quadrasteer to other programs, including cancelling weekly meetings about the project. The letter verified that Motorola interpreted Delphi's statements and actions as a formal cancellation of the program and that all activities related to the delivery of the Quadrasteer program were discontinued as of January 28, 2005. Motorola requested that Delphi respond within 24 hours if it did not view the letter as the official cancellation notification of the program. (Ex. 3: February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin).

6

17.     On March 9, 2005, Motorola sent a letter to Delphi quantifying its cancellation costs. (March 9, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached hereto as Exhibit 6).

18.     It was not until March 21, 2005, more than six weeks after Motorola's February 3, 2005 letter, that Delphi chose to respond to that letter confirming the cancellation of the Quadrasteer program. In the March 21, 2005 letter, Delphi stated that Motorola should discontinue their internal resources on the project, but that Delphi "did not state that this program was cancelled." (Ex. 4, March 21, 2005 letter from Beverly Gaskin to Adrian Schaffer).

19.     The fact that Delphi directed Motorola to discontinue their internal resources on the project and to stop weekly project meetings demonstrates that the program was indeed cancelled. (Ex. 1, Nowicki Aff. ¶ 17; Ex. 2, Quint Aff. ¶ 17). The cancellation was clear, despite the fact that Delphi refused to acknowledge the cancellation in writing.

20.     Further, news articles as early as March 1, 2005 confirm that General Motors discontinued the Quadrasteer program by the end of the 2005 model year, thus eliminating any need for Delphi to continue the program. ("Quadrasteer Off Course", attached hereto as Exhibit 7).

21.     In line with the course of dealing between Motorola and Delphi and the trade usage in the industry, Motorola prepared a cancellation claim and submitted it to Delphi. (Ex. 1, Nowicki Aff. ¶¶ 7, 8, 12, 13, 15; Ex. 2, Quint Aff. ¶¶ 7, 8, 12, 13, 15; Ex. 6, March 9, 2005 letter from Adrian Schaffer to Beverly Gaskin).

**II.     A Contract Was Formed, With Relevant UCC Provisions Applying As Appropriate**

22.     In the executed version of the Contract, Motorola specifically objected to Delphi's terms and conditions governing the Contract by inserting the following:

7

> Motorola objects to Delphi's Terms and Conditions and will supply product on the terms and conditions set forth in Motorola's enclosed Terms of Sale. It is expressly made conditional on assent to those terms and conditions, whether assent is in writing or by conduct. Acceptance of this Response or payment for products shall constitute such assent.

(Proof of Claim Ex. 1, Contract, unnumbered last paragraph).

23. At some point, Delphi struck through the last two sentences of Motorola's proposal and inserted the hand-written language: "Delphi does not agree to Motorola's terms + conditions." (*Id.*; Ex. 1, Nowicki Aff. ¶ 2; Ex. 2, Quint Aff. ¶ 2).

24. Motorola did not agree with Delphi's rejection of its terms and conditions. (Ex. 1, Nowicki Aff. ¶ 2; Ex. 2, Quint Aff. ¶ 2).

25. Both Illinois and Michigan have adopted the relevant contract formation provisions of the Uniform Commercial Code ("UCC"), which state:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) the offer expressly limits acceptance to the terms of the offer;
> > (b) they materially alter it; or
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such a case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

810 Ill. Comp. Stat. 5/2-207; Mich. Comp. Laws Ann. § 440.2207.

26. Motorola clearly objected to the use of Delphi's terms and conditions, and instead required that its own terms and conditions be used. The contract further stated "It is expressly

8

made conditional on assent to [Motorola's] terms and conditions, whether assent is in writing or by conduct. Acceptance of this Response or payment for products shall constitute such assent." This language constitutes a conditional acceptance under Michigan law, which requires such an acceptance to clearly reveal that the party is unwilling to proceed unless the other party assents to the additional terms. *Challenge Machinery Company v. Mattison Machine Works*, 359 N.W.2d 232, 235 (Mich. App. 1984).

27. Delphi's strike through the last two sentences inserted by Motorola and insertion that "Delphi does not agree to Motorola's terms and conditions" demonstrated their objection to the use of Motorola's Terms.

28. Because both parties began to perform under the contract, pursuant to UCC provision 2-207(3), the parties entered into a valid contract based on their conduct. Neither party's requested terms and conditions will apply in full. Rather, to the extent that the terms and conditions are consistent, they will apply, but to the extent that the terms and conditions are inconsistent, the gap-filling provisions of the UCC will govern. 810 Ill. Comp. Stat. 5/2-207; Mich. Comp. Laws Ann. § 440.2207.

29. Because the terms and conditions concerning recovery upon cancellation conflict, neither party's language governing recovery upon cancellation will apply and the Court will rely on the gap-filling provisions as necessary to replace conflicting terms. (Motorola Conditions of Sale § (4)(c), attached to Proof of Claim as Exhibit 1; Delphi General Terms and Conditions § 11, attached hereto as Exhibit 8).

### III. Course of Dealing and Industry Practice Demonstrate that Cancellation Charges Are Available Under the Contract

30. Based on Illinois' and Michigan's codifications of the UCC, even an integrated final agreement between parties may be explained or supplemented by the parties' course of

9

dealing or usage of trade or by course of performance.  810 Ill. Comp. Stat. 5/2-202(a); Mich. Comp. Laws Ann. § 440.2202(a).

31.     This provision's official comments reject the notion that such evidence can only be introduced when the contract is ambiguous.  *Id*. cmt. n. 1; *See also Michigan Bean Co. v. Senn*, 93 Mich. App. 440, 447 (Mich. Ct. App. 1979).  The comments also make the following clarification:

> [Contracts] are to be read on the *assumption* that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased.  *Unless carefully negated* they have become an element of the meaning of the words used.  Similarly, the course of actual performance by the parties is considered *the best indication* of what they intended the writing to mean.

*Id*. cmt. n. 2 (emphases supplied).

32.     Course of dealing, usage of trade, and course of performance are defined by the UCC as:

> Course of Dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions or other conduct.  810 Ill. Comp. Stat. 5/1-205(1); Mich. Comp. Laws Ann. § 440.1205(1).
>
> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question…  810 Ill. Comp. Stat. 5/1-205(2); Mich. Comp. Laws Ann. § 440.1205(2).
>
> Where the sales contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.  810 Ill. Comp. Stat. 5/2-208(1); Mich. Comp. Laws Ann. § 440.2208(1).

33.     The course of dealings between Motorola and Delphi and the trade usage in the automotive industry was that if a project like the one covered by the Contract is later cancelled,

the supplier, here Motorola, would seek to recover its sunken costs for engineering, tooling, lost-profits, other out-of-pocket expenses, and a reasonable markup on these costs to cover overhead. (Ex. 1, Nowicki Aff. ¶¶ 8, 12, 13, 15; Ex. 2, Quint Aff. ¶¶ 8, 12, 13, 15). The course of dealing and trade usage explain the meaning of the Contract and supplement its terms, thereby becoming a part of the Contract, pursuant to UCC section 2-202. 810 Ill. Comp. Stat. 5/2-202(a); Mich. Comp. Laws Ann. § 440.2202(a).

34.   Motorola expended millions of dollars in preparation costs to make the Quadrasteer program viable. These costs included engineering costs of $4,152,864 and capital costs of $708,088.[3]

35.   Because Motorola was engaged in exclusive dealings with Delphi for the development and sale of the Quadrasteer components, Delphi had an obligation to use its best efforts to promote the sale of the components or resell the product. *Tigg v. Dow Corning Corp.*, 962 F.2d 1119, 1125 (3rd. Cir. 1992); 810 Ill. Comp. Stat. 5/2-306(2); Mich. Comp. Laws Ann. § 440.2306(2). This best efforts requirements is codified in the UCC as adopted by both Michigan and Illinois. 810 Ill. Comp. Stat. 5/2-306(2); Mich. Comp. Laws Ann. § 440.2306(2). Moreover, because Delphi owned the technology, Motorola could not sell the Quadrasteer components or technology to any other buyer, making it essentially worthless. (Ex. 1, Nowicki Aff. ¶¶ 4, 8; Ex. 2, Quint Aff. ¶¶ 4, 8).

36.   Early cancellation claims are common in the auto industry. Motorola expected and Delphi knew early cancellation claims would be brought if Delphi cancelled the Contract. (Ex. 1, Nowicki Aff. ¶¶ 8, 19; Ex. 2, Quint Aff. ¶¶ 8, 19).

---

[3] More information supporting the calculation of these costs and Motorola's lost profits is attached hereto as Exhibit 9. Given the voluminous and confidential nature of these calculations and supporting documentation, Claimant will supply all further documents upon request and with appropriate confidentiality protections in place.

11

37.     Therefore, evidence of the parties' history of cancellation claims is relevant under UCC section 2-202(a) to interpret and supplement the terms of the Contract.[4]  *See* 810 Ill. Comp. Stat. 5/2-202(a); Mich. Comp. Laws Ann. § 440.2202(a).  Such course of dealing and trade usage require Delphi to pay cancellation claims to Claimant in the amount of $8,385,154.

### IV.    Delphi Incorrectly Claims Its Only Duty Under the Contract is to Act in Good Faith

38.     Delphi claims that they are under no obligation to pay cancellation charges to Claimant because the UCC allows a buyer in a requirements contract to have a good faith reason for demanding no goods from the seller, and therefore may not be in breach of that contract by ordering none. (Debtors' Statement, ¶ 11).  Delphi argues that, because General Motors was the cause of their not purchasing Quadrasteer components from Motorola, they proceeded in good faith at all times.[5]  (Debtors' Statement, ¶ 12).

39.     This UCC provision is not applicable here, because the Contract incorporates Motorola's and Delphi's course of dealing and trade usage of the automobile industry.  It is clear under course of dealing and trade usage that Delphi does not get a free pass.  Even the principles of equity would not support Delphi's position.  Course of dealing and trade usage are particularly applicable here where the Contract involved was a long-term, exclusive contract and millions of dollars were spent long before the project was in full production.  Motorola could not sell its

---

[4] Applying the gap-filling remedies provisions of UCC sections 2703 and 2708, Claimant is entitled to recover engineering, tooling, lost-profits, other out-of-pocket expenses and a reasonable markup on these costs to cover overhead.  Because the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages is not sufficient to put the seller in as good a position as if Delphi had performed on the contract, then the appropriate measure of damages is the profit, including reasonable overhead, which the seller would have made from full performance by Delphi, together with any incidental damages, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.  810 Ill. Comp. Stat. 5/2-703; Mich. Comp. Laws Ann. § 2703.  Because Motorola could not sell Delphi's Quadrasteer technology to any other purchaser, there are no proceeds from resale.  Therefore, under the UCC remedies provisions, Claimant would also be entitled to the full measure of the cancellation claim:  $8,385,154.

[5] Delphi also argues that it pursued the Quadrasteer program with other automotive manufacturers, such as Nissan, while Motorola and Delphi were still performing under the Contract. (*See* Debtors' Statement ¶¶ 9-10).  That is of no matter.  The program on which the Contract was based was unilaterally cancelled by Delphi.  Whether the two companies were attempting to negotiate contracts for similar programs is irrelevant.

12

product to any other buyer. Delphi knew a large amount of money would be expended in getting the project off the ground. It further knew that it would share the risk with Motorola and be responsible for paying cancellation charges if it cancelled the project prematurely. Despite this knowledge, Delphi prematurely cancelled the project with Motorola. Therefore, Delphi is responsible to pay Claimant $8,385,154 consisting of: (a) engineering costs of $4,152,864; (b) capital costs of $708,088; and (c) lost profits of $3,524,201.

## RESERVATION OF RIGHTS

40. This Supplemental Response to Debtors' Statement of Disputed Issues is submitted by Claimant pursuant to paragraph 9(e) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, and 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (Docket No. 6089) (the "Claims Objections Procedures Order"). Motorola reserves all rights, remedies, interests, priorities, protections, claims, counterclaims, defenses, setoffs, and recoupments, consistent with the Claims Objections Procedures Order and pursuant to sections 503, 507, 510, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code.

WHEREFORE the Claimant respectfully requests that this Court enter an order allowing claim number 8391 in full as submitted.

Dated:  December 20, 2007

        Respectfully submitted,

        McDERMOTT WILL & EMERY LLP
        *Attorneys for Temic Automotive of North America, Inc.*

        _____s/Gary O. Ravert_____
        Gary O. Ravert
        340 Madison Avenue
        New York, New York  10017-4613
        Telephone:  212.547.5400
        Fax:  212.547.5444
        Email: gravert@mwe.com

        Steven P. Handler
        Peter A. Clark
        Monica M. Quinn
        227 West Monroe Street
        Chicago, Illinois 60606-5096
        Telephone:  312.372.2000
        Facsimile:  312.984.7700
        Email: shandler@mwe.com
                pclark@mwe.com
                mquinn@mwe.com

McDERMOTT WILL & EMERY LLP
Steven P. Handler (IL# 1115847)
Peter A. Clark (IL# 6203985)
Monica M. Quinn (IL# 6287146)
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

Gary Ravert, Esq. (NY# GR-3091)
340 Madison Avenue
New York, New York 10017-4613
Telephone: 212.547.5400
Fax: 212.547.5444

Counsel for Temic Automotive of North America, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Delphi Corporation, et al., | Case No. 05-44481 (RDD) |
| Debtors. | Jointly Administered |

## CERTIFICATE OF SERVICE

I, Gary O. Ravert, an attorney, hereby certify that I electronically filed **Claimant's Supplemental Response To Debtors' Statement Of Disputed Issues Regarding Proof Of Claim Number 8391,** and **Appendix of Supporting Affidavits and Exhibits** with the Clerk of Court on December 20, 2007 using the Court's CM/ECF system, which will automatically send e-mail notification of upon all Filing Users. Further, I served hard copies of each of the preceding documents, via Federal Express Delivery on December 20, 2007, upon the following:

Delphi Corporation
Att'n: General Counsel
5725 Delphi Drive
Troy, MI 48098

Skadden, Arps, Slate, Meagher & Flom LLP
Att'n: John Wm. Butler, Jr., John K. Lyons,
Randall G. Reese
333 W. Wacker Drive, Suite 2100
Chicago, IL 60606

_____s/Gary O. Ravert_____

CHI99 4914430-2.076532.0011