McDERMOTT WILL & EMERY LLP
Steven P. Handler (IL# 1115847)
Peter A. Clark (IL# 6203985)
Monica M. Quinn (IL# 6287146)
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

Gary Ravert, Esq. (NY# GR-3091)
340 Madison Avenue
New York, New York 10017-4613
Telephone: 212.547.5400
Fax: 212.547.5444

Counsel for Temic Automotive of North America, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                       )
In re:                                 )    Chapter 11
                                       )
Delphi Corporation, et al.,            )    Case No. 05-44481 (RDD)
                      Debtors.         )
                                       )    Jointly Administered
                                       )
_____)

**APPENDIX OF SUPPORTING AFFIDAVITS AND EXHIBITS TO
CLAIMANT'S SUPPLEMENTAL RESPONSE TO DEBTORS' STATEMENT OF
DISPUTED ISSUES REGARDING PROOF OF CLAIM NUMBER 8391
(MOTOROLA, INC./ TEMIC AUTOMOTIVE OF NORTH AMERICA, INC)**

Ex. 1:  Affidavit of Darrin Nowicki

Ex. 2:  Affidavit of Mark Quint

Ex. 3:  February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin

Ex. 4:  March 21, 2005 letter from Beverly Gaskin to Adrian Schaffer

Ex. 5:  May 3, 2005 letter from Adrian Schaffer to Beverly Gaskin

Ex. 6:  March 9, 2005 letter from Adrian Schaffer to Beverly Gaskin

Ex. 7:  "Quadrasteer Off Course"

Ex. 8:  Delphi General Terms and Conditions § 11

Ex. 9:  Calculation of Motorola's Engineering Costs, Capital Costs and Lost Profits

# EXHIBIT 1

McDERMOTT WILL & EMERY LLP
Steven P. Handler (IL# 1115847)
Peter A. Clark (IL# 6203985)
Monica M. Quinn (IL# 6287146)
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

Gary Ravert, Esq. (NY# GR-3091)
340 Madison Avenue
New York, New York 10017-4613
Telephone: 212.547.5400
Fax: 212.547.5444

Counsel for Temic Automotive of North America, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, et al., | ) | Case No. 05-44481 (RDD) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**AFFIDAVIT OF DARRIN NOWICKI IN SUPPORT OF CLAIMANT'S**
**SUPPLEMENTAL RESPONSE TO DEBTORS' STATEMENT OF**
**DISPUTED ISSUES REGARDING PROOF OF CLAIM NUMBER 8391**

| | | |
|---|---|---|
| STATE OF ILLINOIS | ) | |
| | ) | SS: |
| COUNTY OF LAKE | ) | |

I, Darrin Nowicki, being duly sworn, hereby state as follows:

I submit this affidavit (the "**Nowicki Affidavit**") on behalf of Temic Automotive of

North America, Inc ("Temic" or "Claimant") in support of the Claimant's Supplemental

Response to Debtors' Statement of Disputed Issues Regarding Proof of Claim Number 8391

("Supplemental Response").

I am currently employed by Temic Automotive of North America, Inc. ("Temic"). I have
been employed by Temic since July 3, 2006. Prior to that I was employed by Motorola, Inc.
which owned the business that currently is owned by Temic. I began working for Motorola, Inc.
on October 30, 1990. I have approximately 17 years of experience working in the automobile
industry in supplying various Tier I and Tier II automobile suppliers with parts designed and
manufactured by Temic and Motorola. Temic, formerly Motorola, has worked with most of the
major automobile manufacturers throughout the world including, but not limited to, Ford,
General Motors, Chrysler, Mercedes Benz, Honda, BMW as well as Tier I and Tier II suppliers
such as Delphi, Cummins, TRW, and Visteon. My job duties while working for Motorola and
now Temic include:

- 1990 – 1997: <u>Electrical Engineer/Team Leader</u>- I was responsible for developing
  engine control products to meet customer specifications and ensure designs met
  cost targets.

- 1997 – 2001: <u>Program Manager</u>- I led cross-functional teams to develop engine
  control products for Chrysler and GM. Responsibilities included ensuring product
  met all financial, quality, and timing objectives. One of key main interfaces to
  customer. Handled all customer change requests, developed quotations, and
  managed P&L for products in production.

- 12/2001 – 8/2007: <u>Product Manager</u>- I was responsible for meeting all financial,
  quality, and customer satisfaction objectives for GM Powertrain Products. I led a
  global team of engineering resources for the successful development and launch
  of multiple products for GM. Directed Engineering, Sales, Manufacturing, and
  Finance functional areas to develop sales strategies and quote responses in pursuit

of growing the GMPT business. Approved all quotes as developed by Program Managers and Sales.

My current position is Director of the North American Electric Drives Business Unit. I have served in that role since September 2006. In that role, I am responsible for directing all functional areas to develop products and strategies to grow the North American Electric Drives Business Unit. Additionally, I manage quality and financial aspects of the existing Delphi Electric Power Steering business.

During my work experience at Motorola and now Temic, I have gained extensive knowledge and information about the automobile industry. This knowledge includes unique design requirements of the automotive environment, quality system requirements, pricing models, cancellation of projects, procuring new contracts, terms and conditions of various customers throughout the world.

As a Director of the Electric Drives Business Unit, I am allowed access to the business records of the company and company personnel. During the course of my investigation into the present claim involving Delphi and Quadrasteer, I have reviewed several documents, e-mails and had conversations with numerous employees who are also familiar with the auto industry and our policies, procedures and history of dealing with Delphi as well as our other customers.

During my 17 years of working in the automobile industry I have become familiar with most if not all of our policies and procedures in negotiating with customers in the automobile industry. I am very knowledgeable on supplier contracts and the process of procuring and executing contracts given my experience. In preparing and reviewing dozens of quotations, I have been exposed to the terms and conditions of numerous customers, and how our company

has chosen to respond to them. I have first-hand knowledge of how cancelled projects are handled in the industry.

Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, upon information supplied to me by other employees of Temic Automotive of North America, Inc, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Claimant's operations and the automobile industry in general. If called as a witness, I could and would testify to the facts set forth in this affidavit. I am authorized to submit this affidavit.

### Contract Negotiations, Performance and Cancellation

1.     On November 1, 2002, Delphi and Motorola entered into an exclusive, long-term contract (the "Contract"), pursuant to which Delphi agreed to purchase all of their production and service requirements for the Quadrasteer program from Motorola. Quadrasteer was a 4-wheel steering technology option developed for General Motors' full-size pickups and SUVs.

2.     In the executed Contract, Motorola specifically objected to Delphi's terms and conditions and insisted that its own terms and conditions to govern the Contract. Instead, Delphi inserted hand-written language into the contract, objecting to the use of Motorola's terms and conditions. Motorola did not agree to Delphi's objection to use of their terms and conditions.

3.     After the Contract was executed, both Motorola and Delphi began to perform under the Contract, despite their disagreement on which terms and conditions would apply.

4.     The Quadrasteer program was new technology developed by Motorola exclusively for Delphi. Delphi owned the technology. Therefore when Delphi chose not to purchase the Quadrasteer components Motorola developed, Motorola could not sell the components or technology to any other purchaser, making it essentially worthless.

4

5.    The Contract included volume forecasts which Motorola relied upon to set pricing.

6.    Delphi's volume forecasts were reduced on numerous occasions, prompting Motorola to respond with price increases. The investment related to developing and producing a product is amortized into the price over the expected sales volume. Thus, if the expected sales volume is reduced, the per-unit amortization of the fixed-costs would increase, resulting in a higher price. The price increase here was necessary to account for decreased volume to capture engineering costs, tooling costs, profitability and overhead costs that had already been expended by Motorola in developing the components, all of which are standard in these contracts.

7.    On January 28, 2005, Adrian Schaffer and Chris Moran from Motorola met with Beverly Gaskin and Jeff McInerney from Delphi to discuss the cancellation of the Quadrasteer program. During that meeting, Delphi directed Motorola to stop dedicating resources to the program and to stop weekly hardware and software meetings. After Delphi cancelled the project, Motorola prepared a cancellation claim and submitted it to Delphi.

8.    Motorola expected and Delphi knew early cancellation claims would be brought if Delphi cancelled the Contract. Delphi is aware that Motorola would have no other way to recover their engineering, tooling, and overhead costs, as well as lost-profits absent cancellation claims, as Delphi owns the Quadrasteer technology. Therefore, Motorola would be unable to sell the Quadrasteer components it developed to any other buyer.

9.    While Motorola is unable to sell the Quadrasteer components to any buyer other than Delphi, Delphi, as owner of the technology, could sell the components to another end user. In May, 2003, Delphi and Motorola explored the possibility of developing Quadrasteer components which Delphi would in turn sell to Nissan.

5

**Motorola's Course of Dealings with Delphi**

10.     The battle of forms between Motorola and Delphi was typical of the course of dealings between the parties.

11.     In negotiating long-term requirements contracts with Delphi, such as the Contract, the standard course of dealing would include Delphi issuing a Request for Proposal ("RFP") for Motorola to use in formulating its bid.  This RFP would contain a description of the product, use, term of contract, volume forecasts and specifications, among other things.

12.     The course of dealings between Motorola and Delphi was that if a project like the one covered by the Contract is later cancelled, Motorola, would seek to recover its sunken costs for engineering, tooling, lost-profits other out-of-pocket expenses, and a reasonable markup on these costs to cover overhead.  Motorola could recover these costs through payment of cancellation charges, through productivity relief, or by being awarded a new project or program from Delphi which would make up for the sunken costs.

13.     In past projects between Motorola and Delphi, if Delphi would prematurely cancel a project, Motorola would prepare a cancellation claim and submit it to Delphi.

**Trade Usage in the Automotive Industry**

14.     The battle of forms is typical in the automobile industry.   It was standard practice for Motorola to begin contract performance with major automotive projects despite a battle of forms.

15.     The trade usage in the automotive industry was that if a project like the one covered by the Contract is later cancelled, the supplier would seek to recover its sunken costs for

engineering, tooling, lost-profits and other out-of-pocket expenses through a cancellation claim. Cancellation claims are resolved in variety of ways in the automobile industry: through payment of cancellation charges, through productivity relief, or by awarding a new project or program to the party whose contract was cancelled.

16.     In general, a volume forecast in an RFP will typically contain minimum and maximum contract requirements and is relied upon heavily by the supplier in developing its pricing. The supplier will then develop its pricing model based upon the volume forecast and allow for a variance. When the volume goes beyond its allotted variance, the established pricing is unreliable. For instance, if volume drops more than its allotted variance, the supplier must increase its per-part price because the output of product will not be profitable based upon the prior volume forecast and duration of the contract. In developing pricing quotes, volume forecasts are critical in accounting for the supplier's start-up costs, engineering costs, tooling costs and profitability. The investment related to developing and producing a product is amortized into the price over the expected sales volume. Thus, if the expected sales volume is reduced, the per-unit amortization of the fixed-costs would increase, resulting in a higher price.

17.     A direction to stop developing product, to dedicate resources elsewhere, and to stop weekly meetings indicates a project is cancelled.

18.     Typically in the automotive industry, if a buyer prematurely cancels a long-term requirements contract, the supplier will prepare and submit a cancellation claim to the buyer.

19.     Early cancellation claims are a norm in the auto industry.

**Authentication Statement**

All documents submitted as Exhibits to the Supplemental Response as listed below are true and correct copes thereof. All documents other than the newspaper article "Quadrasteer Off

7

Course" which was not created by a Motorola or Temic employee, were created by the regularly conducted activity as a regular practice at or near the time identified on the document by a person involved with the subject matter of the document, and kept in the regular course of business. Further, the documents attached as Exhibit 9 calculating Motorola's engineering, tooling, lost-profits, other out-of-pocket expenses and a reasonable markup on these costs to cover overhead are accurate representations of Claimant's damages for Delphi's premature cancellation of the Contract.

- Contract, attached to Proof of Claim as Exhibit 1;

- Contract Attachment A, attached to Proof of Claim as Exhibit 1;

- Delphi General Terms and Conditions § 11, attached to Supplemental Response as Exhibit 8;

- February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 3;

- March 9, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 6;

- March 21, 2005 letter from Beverly Gaskin to Adrian Schaffer, attached to Supplemental Response as Exhibit 4;

- May 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 5; and

- "Quadrasteer Off Course", attached to Supplemental Response as Exhibit 7.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on this *18* day of December, 2007 at *DEER PARK*, Illinois.

_Darrin Nowicki_
Darrin Nowicki
Director of North American Electric Drives
Business Unit
Temic Automotive of North America, Inc.

Sworn to and subscribed before me a Notary Public for the State of Illinois, Lake County, this *18th* day of December, 2007.

_Rowena I. Radtke_
Notary Public, State of Illinois

Commission Expires
*9/25/2010*

ROWENA I. RADTKE
MY COMMISSION EXPIRES
SEPTEMBER 25, 2010
NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

# EXHIBIT 2

McDERMOTT WILL & EMERY LLP
Steven P. Handler (IL# 1115847)
Peter A. Clark (IL# 6203985)
Monica M. Quinn (IL# 6287146)
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700

Gary Ravert, Esq. (NY# GR-3091)
340 Madison Avenue
New York, New York 10017-4613
Telephone: 212.547.5400
Fax: 212.547.5444

Counsel for Temic Automotive of North America, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Delphi Corporation, et al., | ) | Case No. 05-44481 (RDD) |
| Debtors. | ) |  |
|  | ) | Jointly Administered |
|  | ) |  |

**AFFIDAVIT OF MARK QUINT IN SUPPORT OF CLAIMANT'S**
**SUPPLEMENTAL RESPONSE TO DEBTORS' STATEMENT OF**
**DISPUTED ISSUES REGARDING PROOF OF CLAIM NUMBER 8391**

|  |  |  |
|---|---|---|
| STATE OF ILLINOIS | ) | |
|  | ) | SS: |
| COUNTY OF LAKE | ) | |

I, Mark Quint, being duly sworn, hereby state as follows:

I submit this affidavit (the "**Quint Affidavit**") on behalf of Temic Automotive of North

America, Inc ("Temic" or "Claimant") in support of the Claimant's Supplemental Response to

Debtors' Statement of Disputed Issues Regarding Proof of Claim Number 8391 ("Supplemental

Response").

During my 14 years of working in the automobile industry I have become familiar with most if not all of our policies and procedures in negotiating with customers in the automobile industry. I am very knowledgeable on supplier contracts and the process of procuring contracts given my experience leading the chassis business as product manager. During my tenure, we pursued several new businesses with Tier I suppliers to the automotive industry.

Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, upon information supplied to me by other employees of Temic Automotive of North America, Inc, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Claimant's operations and the automobile industry in general. If called as a witness, I could and would testify to the facts set forth in this affidavit. I am authorized to submit this affidavit.

### Contract Negotiations, Performance and Cancellation

1.      On November 1, 2002, Delphi and Motorola entered into an exclusive, long-term contract (the "Contract"), pursuant to which Delphi agreed to purchase all of their production and service requirements for the Quadrasteer program from Motorola. Quadrasteer was a 4-wheel steering technology option developed for General Motors' full-size pickups and SUVs.

2.      In the executed Contract, Motorola specifically objected to Delphi's terms and conditions and insisted that its own terms and conditions to govern the Contract. Instead, Delphi inserted hand-written language into the contract, objecting to the use of Motorola's terms and conditions. Motorola did not agree to Delphi's objection to use of their terms and conditions.

3.      After the Contract was executed, both Motorola and Delphi began to perform under the Contract, despite their disagreement on which terms and conditions would apply.

4.    The Quadrasteer program was new technology developed by Motorola exclusively for Delphi. Delphi owned the technology. Therefore when Delphi chose not to purchase the Quadrasteer components Motorola developed, Motorola could not sell the components or technology to any other purchaser, making it essentially worthless.

5.    The Contract included volume forecasts which Motorola relied upon to set pricing.

6.    Delphi's volume forecasts were reduced on numerous occasions, prompting Motorola to respond with price increases. The investment related to developing and producing a product is amortized into the price over the expected sales volume. Thus, if the expected sales volume is reduced, the per-unit amortization of the fixed-costs would increase, resulting in a higher price. The price increase here was necessary to account for decreased volume to capture engineering costs, tooling costs, profitability and overhead costs that had already been expended by Motorola in developing the components, all of which are standard in these contracts.

7.    On January 28, 2005, Adrian Schaffer and Chris Moran from Motorola met with Beverly Gaskin and Jeff McInerney from Delphi to discuss the cancellation of the Quadrasteer program. During that meeting, Delphi directed Motorola to stop dedicating resources to the program and to stop weekly hardware and software meetings. After Delphi cancelled the project, Motorola prepared a cancellation claim and submitted it to Delphi.

8.    Motorola expected and Delphi knew early cancellation claims would be brought if Delphi cancelled the Contract. Delphi is aware that Motorola would have no other way to recover their engineering, tooling, and overhead costs, as well as lost-profits absent cancellation claims, as Delphi owns the Quadrasteer technology. Therefore, Motorola would be unable to sell the Quadrasteer components it developed to any other buyer.

4

9.      While Motorola is unable to sell the Quadrasteer components to any buyer other than Delphi, Delphi, as owner of the technology, could sell the components to another end user. In May, 2003, Delphi and Motorola explored the possibility of developing Quadrasteer components which Delphi would in turn sell to Nissan.

## Motorola's Course of Dealings with Delphi

10.      The battle of forms between Motorola and Delphi was typical of the course of dealings between the parties.

11.      In negotiating long-term requirements contracts with Delphi, such as the Contract, the standard course of dealing would include Delphi issuing a Request for Proposal ("RFP") for Motorola to use in formulating its bid.  This RFP would contain a description of the product, use, term of contract, volume forecasts and specifications, among other things.

12.      The course of dealings between Motorola and Delphi was that if a project like the one covered by the Contract is later cancelled, Motorola, would seek to recover its sunken costs for engineering, tooling, lost-profits other out-of-pocket expenses, and a reasonable markup on these costs to cover overhead.  Motorola could recover these costs through payment of cancellation charges, through productivity relief, or by being awarded a new project or program from Delphi which would make up for the sunken costs.

13.      In past projects between Motorola and Delphi, if Delphi would prematurely cancel a project, Motorola would prepare a cancellation claim and submit it to Delphi.

## Trade Usage in the Automotive Industry

14.      The battle of forms is typical in the automobile industry.   It was standard practice for Motorola to begin contract performance with major automotive projects despite a battle of forms.

5

15.    The trade usage in the automotive industry was that if a project like the one covered by the Contract is later cancelled, the supplier would seek to recover its sunken costs for engineering, tooling, lost-profits and other out-of-pocket expenses through a cancellation claim. Cancellation claims are resolved in variety of ways in the automobile industry:  through payment of cancellation charges, through productivity relief, or by awarding a new project or program to the party whose contract was cancelled.

16.    In general, a volume forecast in an RFP will typically contain minimum and maximum contract requirements and is relied upon heavily by the supplier in developing its pricing.  The supplier will then develop its pricing model based upon the volume forecast and allow for a variance.  When the volume goes beyond its allotted variance, the established pricing is unreliable.  For instance, if volume drops more than its allotted variance, the supplier must increase its per-part price because the output of product will not be profitable based upon the prior volume forecast and duration of the contract.  In developing pricing quotes, volume forecasts are critical in accounting for the supplier's start-up costs, engineering costs, tooling costs and profitability.  The investment related to developing and producing a product is amortized into the price over the expected sales volume.  Thus, if the expected sales volume is reduced, the per-unit amortization of the fixed-costs would increase, resulting in a higher price.

17.    A direction to stop developing product, to dedicate resources elsewhere, and to stop weekly meetings indicates a project is cancelled.

18.    Typically in the automotive industry, if a buyer prematurely cancels a long-term requirements contract, the supplier will prepare and submit a cancellation claim to the buyer.

19.    Early cancellation claims are a norm in the auto industry.

**Authentication Statement**

All documents submitted as Exhibits to the Supplemental Response as listed below are true and correct copes thereof.  All documents other than the newspaper article "Quadrasteer Off Course" which was not created by a Motorola or Temic employee, were created by the regularly conducted activity as a regular practice at or near the time identified on the document by a person involved with the subject matter of the document, and kept in the regular course of business.  Further, the documents attached as Exhibit 9 calculating Motorola's engineering, tooling, lost-profits, other out-of-pocket expenses and a reasonable markup on these costs to cover overhead are accurate representations of Claimant's damages for Delphi's premature cancellation of the Contract.

- Contract, attached to Proof of Claim as Exhibit 1;

- Contract Attachment A, attached to Proof of Claim as Exhibit 1;

- Delphi General Terms and Conditions § 11, attached to Supplemental Response as Exhibit 8;

- February 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 3;

- March 9, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 6;

- March 21, 2005 letter from Beverly Gaskin to Adrian Schaffer, attached to Supplemental Response as Exhibit 4;

- May 3, 2005 letter from Adrian Schaffer to Beverly Gaskin, attached to Supplemental Response as Exhibit 5; and

- "Quadrasteer Off Course", attached to Supplemental Response as Exhibit 7.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Executed on this _18_ day of December, 2007 at _Deer Park_ Illinois.

Mark Quint
Engineering Director of Continental
Powertrain North America
Temic Automotive of North America, Inc.

Sworn to and subscribed before me a Notary Public for the State of Illinois, Lake County, this _18th_ day of December, 2007.

Notary Public, State of Illinois

ROWENA I. RADTKE
OFFICIAL SEAL
MY COMMISSION EXPIRES
SEPTEMBER 25, 2010

Commission Expires
_9/25/2010_

# EXHIBIT 3

 **MOTOROLA**

February 3, 2005

Beverly Gaskin
Director of Purchasing
Saginaw Steering Systems
3900 Holland Road
Saginaw, MI 48601-9494

Re:  GMT900 QuadraSteer Cancellation

Dear Beverly,

I would like to thank you for the opportunity to meet with you last week Friday January 28th, 2005.  I want to make sure that I capture the nature of our discussion regarding Delphi's position relative to the GMT900 QuadraSteer program.

Per our discussion, Delphi informed Motorola verbally that the GMT900 QuadraSteer program was cancelled indefinitely.  In addition, Delphi has redeployed their internal resources to other programs.  This is demonstrated by the indefinite cancellation of the Hardware and Software PDT weekly meetings.

Based on this verbal communication and Delphi's instruction of the PDT activities, Motorola will receive this position as formal notification for the cancellation of the GMT900 QuadraSteer program.  Therefore, as of Friday January 28th, 2005 Motorola will discontinue all activities relating to the delivery of the GMT900 QuadraSteer program.

In the event that Delphi does not view this document as official cancellation notification of the GMT900 QuadraSteer program, Motorola will provide Delphi with a 24 hour window to submit a formal cancellation notice on their letterhead.

Again, thank you for the opportunity to discuss our relationship strategy as well as this particular issue.  If you have any questions, please give me a call.

Regards,

Adrian P. Schaffer
Director Tier One Sales

Cc:  Mark Quint
     Chris Moran
     Anna Albejar
     Jim Vanderpoel
     Ted Seegher, Delphi Engineering

**Motorola, Inc.**, Automotive Communications and Electronic Systems
17101 Corporate Drive, Farmington Hills, MI 48331  Tel (248) 324-9400

# EXHIBIT 4

# DELPHI

TO:        Adrian Schaffer

FROM:      Beverly Gaskin

DATE:      3/21/05

RE:        GMT 900 Quadrasteer Program Suspension

I am in receipt of your letter-dated 03Feb05 and wish to clarify that I did not state this program was cancelled nor did I agree to Motorola's unilateral deadline for response.

I do agree that Motorola should discontinue their internal resources on this project. Please understand that one of the major causes for our customer removing this option at this time was the Motorola price increase. We were disappointed in Motorola's unsolicited quotes and unsubstantiated cost increases during the course of this project.

Delphi has calculated the GMT 900 Quadrasteer program cost and strongly feels that the portion Motorola should be responsible for is 11.3M USD, for the reasons explained in the above paragraph. If you want to discuss this further please contact Jay Londhe to set up a meeting.

Delphi still feels this steer by wire technology is valuable and needed in this industry, consequently we are continuing to pursue other customers and application for this technology.

Sincerely,

Beverly Gaskin
Director of Purchasing – Delphi Saginaw

Cc.
Jay Londhe
Betty Vanhove

# EXHIBIT 5

 **MOTOROLA**

May 3, 2005

Delphi Corporation
Attn: Beverly Gaskin
Director of Purchasing – Delphi Saginaw
3900 Holland Road
Saginaw, MI 48601

Subject: Quadrasteer program

Dear Bev,

We have reviewed your letter dated March 21, 2005, regarding the Quadrasteer program and are unclear as to Delphi's position regarding the cancellation of the GMT900 Quadrasteer Program. Delphi communicated verbally that GM had cancelled the GMT900 Quadrasteer program and based on this feedback, we considered the GMT900 Quadrasteer Program cancelled and thus prepared a cancellation claim that included all of the incurred development costs associated with supporting the program.

In our letter dated March 9, 2005, Motorola informed Delphi that our cancellation claim was $8.3M. The summarized claim is based on the Long Term Contract("LTC"). The LTC is a requirements contract that obligates Delphi to purchase its entire requirements of GMT900 Quadrasteer controllers from Motorola. Program cancellation is not addressed in the LTC; however, Motorola's Terms of Sale, which were incorporated by reference in Section 10 of the LTC do cover termination of the agreement. Motorola has met its obligations under the LTC and therefore is entitled to compensation. See Attachment A for further detail discussion.

Attachment B includes a summary of the engineering effort incurred, our cost of capital invested in the program, and our expected lost profits.

I would like to schedule a meeting to resolve this issue. If we are unable to review a clear plan for closure within the next two weeks, we will expect your participation with mediation. Please provide me with several dates that fit within your schedule.

Best Regards,

Adrian Schaffer
Director Tier One Sales

*Motorola, Inc.*, Automotive Communications and Electronic Systems
4101 Corporate Drive, Farmington Hills, MI 48331 Tel: (248) 324-9400

 **MOTOROLA**

## ATTACHMENT A

## CONTRACT CLAIM

Attachment B sets forth a summary of our claim broken down into engineering effort incurred, our cost of capital invested in the program, and our expected lost profits.

The summarized claim is based on the Long Term Contract signed on November 1, 2002 (the "LTC"). The LTC is a requirements contract, which means that Delphi committed to purchase its entire requirements of GMT900 Quadrasteer controllers from Motorola. The term of the LTC runs until the end of 2011, this means that Motorola made its investments for the long term. The price is based on volume as stated in Section 3 of the LTC and Appendix C. Motorola generated several quotes in-line with requested volumes scenarios from Delphi throughout the development stage of the program (Refer to Attachment B). With GM's cancellation of the GMT900 Quadrasteer program there is no realistic possibility that volumes will ever reach the level that was forecasted in the LTC. At no time did Motorola fail to perform its obligations under the LTC, nor did Motorola ever state its intention to do so. There is nothing wrong with trying to amend a contract when it becomes obvious that all of the business assumptions that originally underlie the contract have changed.

The issue of program cancellation is not addressed in the LTC; however, Motorola's Terms of Sale, which were incorporated by reference in Section 10 of the LTC, do cover termination of the agreement. Section 4 of the Motorola Terms of Sale provides that if Delphi terminates the agreement Delphi will be responsible for "Motorola's incurred costs, committed costs and a reasonable contract profit."

It is unclear to what extent Delphi's terms are incorporated into the LTC, since they would only apply to individual orders. The LTC clearly states that Motorola objects to the Delphi terms, though a handwritten, unsigned comment also appears to reject the Motorola terms. Section 11 of Delphi's terms also allow Motorola to collect damages for termination of an order, though the calculation of damages might be different.

Section 12 h. of the Motorola Terms of Sale provides that the parties will submit any claim or dispute to non-binding mediation before initiating any former legal process.

*Motorola, Inc.,* Automotive Communications and Electronic Systems
21010 Corporate Drive, Farmington Hills, MI 48331 Tel (248) 524-9100



## Attachment B



Delphi Q-Steer Lifetime Volume Quote Trend

| | LTC (Lifetime) - 180K / 7 Years Nov '02 | CR 083480-01 (Nissan Only) Jun '03 | CR 082908-01 (GMT900 Only) Jun '03 | CR 084944-00 (GMT900 & Nissan) | CR 086421-01 (GMT900 & Nissan) | Motorola Requote (GMT900 Only) Nov '04 |
|---|---|---|---|---|---|---|
| ☐ Quote Scenario 1 | 1,260,000 | 20,000 | 467,500 | 382,000 | 322,500 | 237,000 |
| ■ Quote Scenario 2 | - | 60,000 | 1,025,000 | 768,000 | 373,000 | |

Motorola Assumed Nissan Volume Was Incremental To "LTC" GMT900 Volume

| | |
|---|---|
| Total Engineering | $4,152,864 |
| Cost Of Capital | $708,088 |
| Lost Profits/ SG&A | $3,524,201 |
| Total Claim | $8,385,154 |

**Motorola, Inc.,** Automotive Communications and Electronic Systems
1301 Corporate Drive, Farmington Hills, MI 48331 Tel. (248) 324-9400

# EXHIBIT 6

 **MOTOROLA**

March 9th, 2005

Beverly Gaskin
Director of Purchasing
Saginaw Steering Systems
3900 Holland Road
Saginaw, MI 48601-9494

Subject: GMT900 QuadraSteer Cancellation

Dear Beverly,

On February 3rd, Motorola forwarded a letter concerning your verbal communication outlining that the GMT900 QuadraSteer Program was cancelled. Based on the non-response, it is now understood that both Delphi and Motorola accept the letter as the official document confirming cancellation of the GMT900 QuadraSteer Program.

Based on receiving official cancellation, Motorola has compiled the costs incurred for development of this program that require reimbursement. Motorola calculated the QuadraSteer Program cancellation costs to be $8.3M. I would like to schedule a meeting with you to discuss this within the next 2 weeks. Please let me know your availability so that I may plan accordingly.

I look forward to sitting with you over the next several weeks to close this issue.

Regards,

Adrian Schaffer
Director Tier One Sales

cc:   Ana Albejar
      Chris Moran
      Mark Quint

# EXHIBIT 7

05-44481-rdd   Doc 11567-1   Filed 12/20/07   Entered 12/20/07 17:51:05   Appendix of
Supporting Affidavits and Exhibits   Pg 31 of 48
Quadrasteer Off Course
Page 1 of 3




PRINT THIS
Powered by Clickability

## Quadrasteer Off Course

By Tom Murphy and Brian Corbett
Ward's AutoWorld, Mar 1, 2005 12:00 PM

General Motors Corp. will discontinue its Quadrasteer 4-wheel steering technology as an option on fullsize pickups and SUVs by the end of the '05 model year, *Ward's* learns, and the feature will not appear on the next-generation GMT900 fullsize vehicles, which begin production next year.

Quadrasteer, developed by Delphi Corp., was an expensive option that was extremely popular with a small number of buyers but was not profitable.

ADVERTISEMENT



The phaseout begins this spring with the GMC Yukon XL and Chevy Suburban three-quarter-ton SUVs, which will free up space at GM's Arlington, TX, assembly plant as it tools up for production of GMT900 vehicles.

GM also will drop Quadrasteer from its GMC Sierra and Chevy Silverado half-ton extended-cab pickups and Sierra and Silverado heavy-duty crew cab pickups. GM purchased a fixed number of axles equipped with Quadrasteer. Once they are gone, GM will sell no more vehicles with the feature.

In 2004, GM sold a mere 5,502 vehicles equipped with Quadrasteer — most of them Sierra half-ton pickups, according to *Ward's* data.

05-44481-rdd   Doc 11567-1   Filed 12/20/07   Entered 12/20/07 17:51:05   Appendix of Quadrasteer Off Course Supporting Affidavits and Exhibits   Pg 32 of 48

Page 2 of 3

Data indicates penetration rates for Quadrasteer on the Chevy and GMC vehicles were 0.9% in 2002, 2.1% in 2003 and 1.4% in 2004.

Web chat rooms make it evident Quadrasteer, which Delphi first delivered to GM in 2002, has established a cult-like following.

The technology, which provides compact car maneuverability in a fullsize pickup, is proving popular with owners because it takes the fear out of tight parking spots. It also is helpful for hauling trailers.

Within Delphi, Quadrasteer's future appears in question, although the supplier has attempted to sell the technology to other auto makers as well.

Delphi has dispersed the engineers who worked on Quadrasteer at a facility in Saginaw, MI, although the supplier hopes to reassemble the team in the event new customers emerge.

GM dealers say they have been hearing for more than a year that Quadrasteer was being discontinued, causing many to stop offering the option to buyers.

One dealer tells *Ward's* that Quadrasteer will be available on a handful of vehicles only for another month as a "last hurrah."

However, the GMC dealer says he has no plans to order more Quadrasteer-equipped vehicles, because those he had earlier were difficult to sell.

GM previously has admitted it botched the rollout of Quadrasteer with exorbitant pricing. It initially was packaged priced at about $7,000 with a host of other features.

In 2003, the price came down to $4,495, and a $2,000 rebate eventually was offered, as well. Quadrasteer remained packaged with other features.

In 2004, the option price fell further to $1,995, with no rebates. Many dealers, according to consumer chat rooms, were unaware of the price cuts and dissuaded buyers from the feature, saying it was too expensive.

### Percent Quadrasteer Production and Sales of Available Models

>

| Model | 2002 CY Sales | 2003 CY Sales | 2004 CYTD Sales |
|---|---|---|---|
| Sierra | 2.8 | 5.0 | 3.4 |
| Yukon XL | 2.4 | 16.1 | 17.8 |
| Silverado | 0.3 | 1.0 | 0.5 |
| Suburban | 0.8 | 8.5 | 6.2 |
| Total | 0.9 | 2.1 | 1.4 |

At a 2003 automotive conference in Traverse City, MI, Gary Cowger, president of GM North America, took responsibility for Quadrasteer's rollout.

05-44481-rdd   Doc 11567-1   Filed 12/20/07   Entered 12/20/07 17:51:05   Appendix of
Supporting Affidavits and Exhibits   Pg 33 of 48
Quadrasteer Off Course

Page 3 of 3

"Quadrasteer was our problem," he said at the time, as GM was repackaging it at a lower price. "It didn't get the kind of penetration we expected."

The failure of Quadrasteer marks the second time in less than three years GM has discontinued a groundbreaking technology following lackluster interest from consumers. In September 2003, GM confirmed to *Ward's* it was dropping its Pro-Tec composite pickup box after only two years of production.

While Quadrasteer and Pro-Tec did not have any performance shortcomings and provided significant benefits to consumers, the technologies were high priced and difficult to market.

© 2007 Penton Media, Inc. All rights reserved.

**Find this article at:**
http://www.wardsautoworld.com/ar/auto_quadrasteer_off_course/index.html

☐ Check the box to include the list of links referenced in the article.

© 2007 Penton Media, Inc. All rights reserved.

# EXHIBIT 8



## GENERAL TERMS AND CONDITIONS

> *Delphi seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 <u>Shipping.</u> Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 <u>Billing.</u> Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 <u>Delivery Schedules.</u> Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of

**Revised June 24, 1999**

the essence with respect to all delivery schedules Buyer establishes.  Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules.  Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules.  If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4   <u>Premium Shipments</u>.  If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.  Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3.  SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4.  QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time.  Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.  Seller reserves the right to edit audited documents to protect other customers.

## 5.  NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the

**Revised June 24, 1999**

non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, and (b) be of good material and workmanship (except for any materials supplied by Buyer to Seller under bailment or otherwise).

7.2 <u>Date and Time Processing</u>. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 <u>Warranty Period</u>. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

**Revised June 24, 1999**

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive

Revised June 24, 1999

termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.   Such technical information will not be subject to any use or disclosure restrictions.   Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3   Repair and Rebuild.   Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4   Computer Programs and Written Works.   All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.   To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1    Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services except to the extent such infringement results from Buyer's specifications.

13.2   Activities on Buyer's Premises.   Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3   Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether

**Revised June 24, 1999**

such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation or by improper handling or storage by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.   With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests.   The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.   The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option  to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment <u>less</u> any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1   <u>Bailment of Property</u>.   All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis.   To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.   To the extent that this Contract provides that Seller will obtain any specific items

Revised June 24, 1999

of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  <u>Seller's Duties with Respect to Buyer's Property</u>.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  <u>Return of Buyer's Property</u>.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.  Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  <u>Disclaimer of Warranties</u>.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any

**Revised June 24, 1999**

loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.  Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18.  SERVICE AND REPLACEMENT PARTS

During the term of  this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19.  REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20.  CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer.  Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements.  Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).  Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21.  SETOFF AND RECOVERY

**Revised June 24, 1999**

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

**Revised June 24, 1999**

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT 9

## COST of CAPITAL CALCULATION

| | 2002 | 2003 | 2004 | JAN-05 | TOTAL |
|---|---|---|---|---|---|
| Total Expenses Per Year from Claim | $ 156,485.00 | $ 1,686,240.62 | $ 2,140,768.12 | $ 169,365.05 | $ 4,152,858.79 |
| Calculate Cost of Capital for funding project using 8.5% | $708,088.15 | | | | |

## LOST PROFITS CALCULATION

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Expected Sales | $ 17,616,600.00 | $ 17,088,102.00 | $ 16,575,458.94 | $ 16,078,195.17 | $ 15,595,849.32 | $ 15,127,973.84 |
| Expected Contribution Margin (Profits & Overhead) | $ 1,506,683.49 | $ 1,872,723.00 | $ 1,872,521.03 | $ 2,054,727.75 | $ 1,962,543.06 | $ 1,879,246.53 |
| *Expected Contribution Margin Profit % of Sales* | *8.6%* | *11.0%* | *11.3%* | *12.8%* | *12.6%* | *12.4%* |

Calculate NPV of Expected Contribution Margin using discount rate of 8.5%        $ 8,385,148.63

Less Total Claim amount (Expenses)        $ 4,152,858.79

Less Cost of Capital added to Claim        **$708,088.15**

Lost Profits to include in Claim        **$3,524,201.69**

Confidential Proprietary

## Delphi Quadrasteer Claim

| | 2002 | 2003 | 2004 | Jan-05 | TOTAL |
|---|---|---|---|---|---|
| Engineering Payroll - MF429 | $ 39,989.00 | $ 263,541.00 | $ 675,570.00 | $ 51,552.00 | |
| Engineering Fringes (Taxes and Grp Ins) - MF429 | $ | $ 61,311.00 | $ 177,257.00 | $ 20,415.00 | |
| Engineering - Contract Labor and Professional Svcs - MF429 | $ 16,806.00 | $ - | $ 10,080.00 | | |
| Allocated Engineering - MF473 Delphi Chassis Software (MF553 in 2005) | | $ 514,571.10 | $ 559,141.13 | $ 57,570.37 | |
| Allocated Engineering - MF473 Delphi Chassis Software Admin | | $ 44,473.48 | $ 49,704.73 | | |
| Allocated Engineering - MF547 Software Test | | $ 49,460.19 | $ 196,608.85 | $ 29,904.64 | |
| **Total Payroll & Fringes** | **$ 56,795** | **$ 933,357** | **$ 1,668,362** | **$ 159,442** | **$ 2,817,955** |
| Travel, Meals & Entertainment | $ 2,730 | $ 6,750 | $ 29,986 | $ 198 | |
| Equipment Rental | $ 524 | $ 2,658 | $ 9,493 | $ 470 | |
| Misc General Expenses | $ 207 | $ 21 | $ 325 | | |
| Freight/PPI/Courier | $ 117 | $ 1,248 | $ 3,173 | $ 150 | |
| Subscriptions & Prof Dues | $ - | $ - | $ 80 | | |
| Business Meetings & Conferences | $ - | $ - | $ 844 | | |
| Software Purchases External | $ - | $ - | $ 1,995 | | |
| Computer Services | $ - | $ 9,059 | $ 22,051 | $ 2,417 | |
| Professional Consultants | $ - | $ - | $ 44,550 | | |
| Office & Paper Supplies | $ - | $ 958 | $ 5,382 | | |
| Vehicle Expense | $ 788 | $ 1,140 | $ 1,878 | | |
| Training | $ - | $ 14,250 | $ 26,446 | | |
| Telephone Charges | $ 56 | $ 798 | $ 5,956 | $ 296 | |
| Facility Costs | $ - | $ 615 | $ 22 | | |
| Prizes and Awards | $ - | $ 1,650 | $ 5,302 | $ 150 | |
| **Total Miscellaneous Dedicated Costs** | **$ 4,422** | **$ 39,147** | **$ 157,483** | **$ 3,681** | **$ 204,733** |
| Tooling, Non-Capital Assets | $ 17,996 | $ 18,894 | $ 11,683 | $ - | |
| Capital Equipment | | $ 448,953 | | | |
| **Total Tooling & Equipment Expense** | **$ 17,996** | **$ 467,847** | **$ 11,683** | **$ -** | **$ 497,526** |
| Material and Sample Manufacturing Expenses | $ 89,147 | $ 278,090 | $ 306,684 | $ 6,242 | |
| NRE & Sample income paid for by Delphi | $ (11,875) | $ (32,200) | $ (25,675) | | |
| Sample income not yet billed to Delphi | | | $ 17,981 | | |
| Sample income not yet billed for 17 units shipped in Nov 04 | | | $ 4,250 | | |
| **Total NRE Material** | **$ 77,272** | **$ 245,890** | **$ 303,240** | **$ 6,242** | **$ 632,644** |
| **Total Engineering Expenses** | **$ 156,485** | **$ 1,686,241** | **$ 2,140,768** | **$ 169,365** | **$ 4,152,859** |

Quadrasteer Cancellation Claim

Material & Sample Manufacturing Expense Breakdown

| | | 2002 | 2003 | 2004 | 2005 | Total | |
|---|---|---|---|---|---|---|---|
| A | PRODUCTION SUPPLIES | $ 1,173.00 | $ 7,018.00 | $ 47,771.00 | $ 50.00 | $ 56,012 | Supplies related to building protos |
| B | ENGR MATERIAL | $ 41,866.00 | $ 102,117.00 | $ 143,110.00 | $ 247.00 | $ 287,340 | Material related to prototypes |
| C | Services Transferred | $ 46,108.00 | $ 168,955.00 | $ 115,803.00 | $ 5,945.00 | $ 336,811 | Costs from Elma to build prototypes |
| | | $ 89,147.00 | $ 278,090.00 | $ 306,684.00 | $6,242.00 | | |