**Thomas M. Kennedy (TK-0993)**
**Susan Jennik (SJ-4607)**
**KENNEDY, JENNIK & MURRAY, P.C.**
**113 University Place**
**New York, NY 10003**
**(212) 358-1500**

**Hearing Date: January 17, 2008**
**Hearing Time: 10 am**

**Attorneys for International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Communications Workers of America ("IUE-CWA")**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 11** |
| **In re DELPHI CORPORATION, *et al.*,** | ) | |
| | ) | **05-44481 (RDD)** |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

# PRELIMINARY LIMITED OBJECTION OF IUE-CWA TO DEBTORS' PROPOSED MANAGEMENT COMPENSATION PLAN AND SALARIED EMPLOYEE COMPENSATION PROGRAM

The International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA"), by and through its counsel, hereby submits this preliminary objection to the Management Compensation Plan ("MCP") set forth in Article VII and Exhibit 7.8 of the Debtors' First Amended Joint Plan of Reorganization ("POR"), and to the Salaried Employee Compensation Program ("SECP")[1] described in the Debtors' First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession

---

[1]Together, the Management Compensation Plan and Salaried Employee Compensation Program ("MCP/SECP").

("Disclosure Statement"). The IUE-CWA does not otherwise oppose confirmation of the POR.

## Background

On October 13, 2005, Debtors filed their Motion For Order Under §§ 105 and 363 Authorizing The Debtors To Implement A Key Employee Compensation Program ("KECP Motion") (Docket No. 213). This proposal included enhanced income to Debtors' management during the Chapter 11 process through the implementation of an annual incentive program ("AIP"). Thus, through the duration of the Chapter 11 cases, Debtors' management employees have continued to receive their salaries and benefits as well as overly generous performance awards through the AIP. During the same period, Delphi's union members have made deep and irreversible sacrifices to ensure the survival of the companies.

The KECP Motion also included a forward looking proposal to grant, upon emergence from Chapter 11, an emergence bonus plan consisting of both cash and equity. The actual proposed program was set forth in the October 8, 2005 report entitled Key Employee Compensation Programs prepared by Watson Wyatt ("10/8/05 WW KECP report"), attached as Exhibit 1 of the KECP Motion.[2] The KECP had three parts: the annual incentive program, an emergence bonus plan, and a prepetition severance plan. The current proposed MCP/SECP contains similar elements, with a short-term incentive plan ("STIP"), long-term incentive plan ("LTIP"), and a Chapter 11 Effective Date Executive Payment program (formerly the Emergence Cash Plan).

---

[2]*See* footnote 5 in KECP Motion ("The actual terms of the [KECP] set forth in <u>Exhibit 1</u> to the order shall control.")

The AIP is the only part of the KECP which has been approved by the Court. Debtors acknowledge that the longer term elements of the originally proposed compensation program, i.e., cash payments on the Effective Date and long-term equity grants for post-emergence periods, were deferred to the plan confirmation process. Disclosure Statement at DS-104-105. Thus, Debtors are estopped from arguing that the initial proposal established reliance interests which would justify inequitable and excessive executive compensation.

Debtors may not establish binding plan elements before the creation and introduction of the POR. Motions made under 11 U.S.C. § 363 are not available "to short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a proposed transaction." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986). *Sub rosa* plans are inappropriate because they dictate plan terms without the consent of affected parties. *See In re Tower Automotive, Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), *aff'd*, 241 F.R.D. 162 (S.D.N.Y. Dec. 15, 2006). The Debtors' proposal for emergence cash and equity grants in the initial KECP Motion - which was never granted by the Court - can not now be used to dictate terms to the Court or the creditors.

It is now the appropriate moment for the Court to determine whether the Debtors' proposal regarding executive compensation is equitable. The Court should itself assess the merits and fairness of this management proposal in which the corporation's executives have direct financial interests. *In re Integrated Resources*, 147 BR 650, 657 (Bankr. S.D.N.Y. 1992). In the context of proposed payments to corporate insiders, "good faith" is a necessary element of inquiry. 2C Bankr. Service L.Ed (September 2005) § 20:119 and cases cited therein; *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997).

"The purpose of the Key Employee Compensation Program is to retain and incentivize Covered Employees . . . during the Debtors' restructuring period." KECP Motion, ¶ 15. These purposes have been met through the implementation of the AIPs. The proposed MCP/SECP is an unreasonable transfer of wealth directly from the creditors, and at the expense of the workers, and in its current form it is manifestly inequitable.

The proposed MCP/SECP is not a *fait accompli*; this bank has not yet been held up. The Court should independently weigh the equity of delivering to the executives a platinum compensation plan where the survival of the companies is due to the sacrifices of its workers. While the intitial KECP proposal was overreaching and greeted with scorn[3], the final proposed MCP/SECP, rather than recognizing the need and equity of a shared sacrifice, includes new provisions causing it to be even more inequitable. The proposed MCP/SECP should be rejected in its current form.

Preliminary Objections

There are several material changes between what was proposed in the 10/8/05 WW KECP report and what is now being proposed in the MCP/SECP. None of these alterations are in line with the Debtors' compensation theory which sets as its second and third goals to "[l]ink the majority of the total compensation opportunity to performance-based incentives, . . . and the creation of sustainable shareholder value consistent with Delphi's long-term strategic goals [and]

---

[3] "It's not every day that investors can view the contortions performed by compensation consultants trying to justify the monster executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched." Morgenson, Gretchen, "Oohs and Ahs At Delphi's Circus," *New York Times Sunday Business*, November 13, 2005, Section 3, pp 1 and 4, 2005 WLNR 18334017.

4

[a]lign executives' interests with those of shareholders by making stock-based incentives a core element of our executives' compensation . . . ." Exhibit 7.8 to POR, MCP at 1; Disclosure Statement at DS-94.

**Long-Term Incentive Plan**

<u>Value of Equity Award</u>

The initial KECP proposed that 10% of the equity of Reorganized Delphi be allocated for executive compensation, with three quarters of that used for the initial emergence equity grants and one quarter reserved for future grants. 10/8/05 WW KECP report at 23. In what may be seen, mistakenly, as an exercise in restraint, the proposed MCP/SECP calls for a mere 8% of the equity of the emergent company to be allocated to management's renumeration.[4] The true picture of executive greed emerges by comparing the initial assumed Total Equity Value ("TEV") of $4 billion (10/8/05 WW KECP report at 22), to the Reorganized Delphi TEV of $13.3 billion, and Distributable Equity Value ("DEV") of $7.8 billion. Disclosure Statement at DS-xvi.

Using the method employed in the original 10/8/05 WW KECP report to assess the value of 10% of a $4 billion company at $400 million, it is apparent that management is now demanding equity worth $624 million. While the proposed MCP/SECP appears to be scaling back its attempted equity grab from 10% to 8%, in fact the value of the equity flowing to management under this proposal has increased more than 50% from the expectations expressed in the initial proposal. 10/8/05 WW KECP report at 23.

---

[4]The proposed MCP/SECP would deliver to management an initial equity grant of 3% and set aside a further 5% of the equity of the company exclusively for management's future renumeration.

Delphi's management was retained and incentivized with the expectation that they would participate in an emergent grant of $300 million worth of equity, with a reserved pool of $100 million worth of equity. 10/8/05 WW KECP report at 23. The total monetary value of any equity grants or reserves should not exceed what Debtors earlier asserted was "fair and reasonable". See proposed Order Authorizing Debtors To Implement A Key Employee Compensation Program ("KECP Order") at 2, ¶ B, attached to KECP Motion.

The billions of dollars in increased value in Reorganized Delphi are a direct result of the new labor agreements, through which thousands of good jobs have been given up and wages and benefits for the remaining jobs have been slashed. While the working men and women of Delphi have united to sacrifice their livelihoods for the future success of the companies, these burdens were not borne so that the management could enjoy a massive equity windfall.

Form of Equity

The initial KECP proposed that each executive's equity award be provided one third in restricted stock or units and two thirds in stock options. 10/8/05 WW KECP report at 22. The proposed MCP/SECP calls for the equity award to the highest level executives and Delphi Strategy Board ("DSB") members to be made one half in restricted stock or units and one half in stock options, and some now unspecified combination of stock options, restricted stock units and cash to the rest of management. Disclosure Statement at DS-98, ¶ 4. Increasing the up-front award conflicts with the professed compensation goals, meant to guide and justify this compensation, of creating sustainable shareholder value over the long-term. This is a move in the wrong direction as it would result in greater immediate executive compensation while

6

diminishing concern for future shareholder gains.

### Strike Price

The strike price of these options are not specified in the plan materials. The initial KECP stated that "each option's strike price will be set based on the mid-point of the valuation range in any disclosure statement approved by the Court". 10/8/05 WW KECP report at 22. The share price at the mid-point of the valuation range is $55.61, below the Plan Equity Value ("PEV") which values each share at $59.61 on the effective date. Disclosure Statement at DS-xvi. Thus, management could buy shares at a discount. Such a result violates the provision of the plan requiring that "the exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant . . . ". Disclosure Statement at DS-97.

The strike price of the stock options should be set at the high end of the Rothschild valuation. Disclosure Statement at DS-xvi. A strike price of $65.60 ensures that management is incentivized to create long-term sustainable growth in the company, therefore making the whole painful Chapter 11 process, where the working men and women of Delphi made substantial long-term sacrifices for the benefit of the company, worthwhile.

### Vesting

The initial KECP proposed that each executive's equity award vest over four years, with one quarter vesting on the effective date and one quarter on each subsequent annual anniversary. 10/8/05 WW KECP report at 2. Vesting requirements are necessary to determine the value of an

equity award - both its monetary value to the individual executive and whether it will serve as an effective tool to align management and long-term shareholder interests. Unfortunately, these rules are not specified in the plan materials. However, a report from Watson Wyatt on August 17, 2007 entitled Executive Compensation Program Design ("8/17/07 WW ECPD report") (filed under seal) provides that vesting will be in equal installments over a three year period. 8/17/07 WW ECPD report at 16 (DPH-2EAA 0007435). The reduction of the vesting period from four to three years is an unjustified benefit for management that is not in the interests of the creditors or shareholders.

## Chapter 11 Effective Date Executive Payments

### Cash Bonuses

The proposed MCP/SECP includes a substantial cash component of $78 million granted to Debtors' executives. Disclosure Statement at DS-99. The inclusion of a significant cash recovery upon emergence, in addition to the cash awards Delphi's management have already received for their performance over the petition period through the generous AIPs, is unjustified. The granting of cash bonuses contrasts with the recoveries offered to general unsecured creditors, who have been forced to accept recoveries limited to equity without a cash component.

Since the willingness of union members to accept dramatically lower wages and benefits is the fundamental change in circumstances that allows Debtors to emerge from Chapter 11, the cash bonuses are direct transfers of money from the Debtors' hourly employees to management. This outcome is unjust and inequitable.

Covered Employees

It is not clear that the proposed cash awards are limited to U.S. executives. The first "key feature" of the emergence cash component of the initial KECP was that "[t]he participants would all be U.S. executives . . . approximately 486 employees.". 10/8/05 WW KECP report at 12. There is no such restriction in the Chapter 11 Effective Date Executive Payments. The program is described as being part of the compensation for DSB members and executives in Bands A through F. Disclosure Statement at DS-99. In the proposed MCP, "[e]xecutives" is defined as "[t]he combined [DSB] and non-DSB executives, approximately 560 executives"; "[n]on-DSB executives" is defined in pertinent part as "[a]pproximately 535 global executives . . . compris[ing] Bands A-F. . . .". Again, it is only the 8/17/07 WW ECPD report that mentions that the plan contemplates having 450 participants, from which an inference can be drawn that the beneficiaries are the U.S executives only. 8/17/07 WW ECPD report at 27 (DPH-2EAA 0007446). But that inference is not sufficient as a limitation in the program to U.S. based executives.

**Short-Term Incentive Program**

The STIP, valued at $46 million, is overly generous, particularly when taken as part of the whole compensation package. Disclosure Statement at DS-97. There are insufficient details in the plan materials to understand the true extent of the munificence which will undoubtedly be received by the management of Delphi for doing their jobs. We note that the only proposed limits border on absurd, e.g. "awards are limited to an annual individual maximum of $7.5 million". Exhibit 7.8 to POR, MCP, one page Summary of STIP. Additionally, while the

proposal states that target awards and performance levels will be determined "before the commencement of or within the first 25% of the performance period", the history of the petition period AIPs is one of easily reachable goals set late in the period. If this pattern continues the power of the STIP to incentivize management to stretch performance and grow shareholder value will be considerably diminished.

Dated: New York, New York
December 21, 2007

>Respectfully Submitted,
>
>KENNEDY, JENNIK & MURRAY, P.C.
>Counsel for IUE-CWA
>
>By: _____
>Thomas M. Kennedy (TK 0993)
>Susan M. Jennik (SJ 4607)
>113 University Place
>New York, NY 10003
>(212) 358-1500