1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


        Debtor.


- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            December 6, 2007

            10:28 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1   MOTION of the Equity Security Holders To Adjourn Disclosure

2   Statement Hearing and Equity Purchase and Commitment Agreement

3   Hearing

4

5   EXPEDITED MOTION for Order Under 11 U.S.C. Sections 105(a),

6   363(b), 503(b), and 507(a) Authorizing and Approving Amendment

7   to Delphi-Appaloosa Equity Purchase and Commitment Agreement

8

9   MOTION For Order Approving (I) Disclosure Statement, (II)

10  Record Date, Voting Deadline, and Procedures for Temporary

11  Allowance of Certain Claims, (III) Hearing Date to Consider

12  Confirmation of Plan, (IV) Procedures For Filing Objections to

13  Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure

14  Claim Procedures, (VII) Procedures for Resolving disputes

15  Relates to Post-Petition Interest, and (VIII) Reclamation Claim

16  Procedures.

17

18

19

20

21

22

23

24  Transcribed By:  Esther Accardi

25

3

```
1    A P P E A R A N C E S :

2    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

3         Attorneys for Debtor

4         333 West Wacker Drive

5         Chicago, Illinois 60606

6

7    BY:   JOHN Wm. BUTLER, JR., ESQ.

8         AL HOGAN, ESQ.

9

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Debtor

13        Four Times Square

14        New York, New York 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18

19   U.S. DEPARTMENT OF JUSTICE

20   OFFICE OF THE U.S. TRUSTEE

21        33 Whitehall Street

22        New York, New York 10004

23

24   BY:   ALICIA M. LEONHARD, ESQ.

25
```

4

1   GOODWIN PROCTER, LLP

2       Attorneys for the Bondholders

3       901 New York Avenue, N.W.

4       Washington, D.C. 20001

5

6   BY:   ALLAN BRILLIANT, ESQ.

7       JOHN MOUSTAKAS, ESQ.

8       MICHAEL K. ISENMAN, ESQ.

9

10

11   LATHAM & WATKINS, LLP

12       Attorneys for Unsecured Creditors' Committee

13       885 Third Avenue

14       New York, New York 10022

15

16   BY:   ROBERT ROSENBERG, ESQ.

17       MARK A. BROUDE, ESQ.

18

19

20   GREGORY P. JOSEPH LAW OFFICES, LLC

21       Attorney for Equity Committee

22       805 Third Avenue

23       New York, New York 10022

24

25   BY:   GREGORY P. JOSEPH, ESQ.

5

1   WHITE & CASE, LLP

2        Attorneys for Appaloosa Management

3         and Harbinger Capital

4        1155 Avenue of the Americas

5        New York, New York 10036

6

7   BY:   THOMAS E. LAURIA, ESQ.

8         DOUGLAS P. BAUMSTEIN, ESQ.

9         GERARD UZZI, ESQ.

10

11

12   WEIL GOTSHAL & MANGES, LLP

13        Attorneys for General Motors

14        767 Fifth Avenue

15        New York, New York 10153

16

17   BY:   JEFFREY L. TANENBAUM, ESQ.

18         MICHAEL KESSLER, ESQ.

19

20

21

22

23

24

25

6

1    LOWENSTEIN SANDLER, P.C.

2          Attorneys for Lead Plaintiff

3          1251 Avenue of the Americas

4          New York, New York 10020

5

6    BY:    MICHAEL S. ETKIN, ESQ.

7          S. JASON TEELE, ESQ.

8

9

10    KIRKPARTICK & LOCKHART PRESTON GATES ELLIS, LLP

11          Attorneys for Wilmington Trust Company

12           As Indentured Trustee

13          599 Lexington Avenue

14          New York, New York 10022

15

16    BY:    EDWARD M. FOX, ESQ.

17

18

19    FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP

20          Attorneys for Equity Committee

21          One New York Plaza

22          New York, New York 10004

23

24    BY:    DEBRA TORRES, ESQ.

25

7

1    KASOWITZ BENSON TORRES & FRIEDMAN, LLP

2         Attorneys for Trade Committee

3         1633 Broadway

4         New York, New York 10019

5

6    BY:   DAVID S. ROSNER, ESQ.

7          DANIEL N. ZINMAN, ESQ.

8          MICHAEL FAY, ESQ.

9

10

11   JUDY ELKIN, ESQ.

12   Attorney for Highland

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1          P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right.  I'm sure

3      you've been told this already but there is an overflow

4      courtroom with the sound system so you can hear.  And for those

5      of you who are standing who don't particularly expect to be

6      speaking, that may be more comfortable for you.  But otherwise

7      you can stay where you are.  Okay.  Delphi Corporation.

8              MR. BUTLER:  Your Honor, good morning.  Jack Butler,

9      Kayalyn Marafioti, and Al Hogan from Skadden here on behalf of

10     Delphi Corporation for this off omnibus hearing.  Your Honor,

11     we have filed, in accordance to the case management order, the

12     agenda for today's hearing.  There are three matters on the

13     agenda, we propose to proceed in the order of the agenda.

14             THE COURT:  Okay.  That's fine.

15             MR. BUTLER:  Your Honor, the first matter on the

16     agenda is matter number 1, is the motion of the equity security

17     holders committee to adjourn the disclosure statement hearing

18     and equity purchase and commitment agreement hearings, filed at

19     docket number 10795.  And we filed our response last evening to

20     that.  I'm please to report, and I'll be talking more about

21     this in a few minutes, that the equity committee is withdrawing

22     that motion.  I would, Your Honor, point on the record that

23     there was a joinder filed, on an untimely basis, to that motion

24     by Law Debenture Trust Company of New York, at docket number

25     11161.  I'm advised that no one is appearing on behalf of Law

9

1   Debenture today and our understanding from discussions with

2   them last evening is that they are satisfied with changes that

3   have been made.  But all I want to represent to the Court that

4   there's no one in the courtroom here today.  In addition,

5   Brandes Investment Partners LP filed a statement in support of

6   the motion, that has now been withdrawn, that statement was

7   filed at docket number 10807.  And Mr. Bernie (ph.) from Thalen

8   (ph.) is here representing Brandes.

9              THE COURT:  Okay.  All right.  So we should move to

10  the next agenda item.

11             MR. BUTLER:  Thank you, Your Honor.  The next matter

12  on the agenda, matter number 2, is the Delphi-Appaloosa

13  investment agreement amendment motion, filed at docket number

14  10760.  Your Honor, I'd like to -- first, if I may summarize

15  where we are in terms of discussions with respect to the

16  various objections that have been filed.

17             THE COURT:  Okay.

18             MR. BUTLER:  The majority of the objections, Your

19  Honor, have been resolved.  I'll just walk down the list.  The

20  objection filed by the securities lead plaintiffs, at docket

21  10796 is resolved, indeed withdrawn.  Mr. Etkin is here on

22  behalf of the securities lead plaintiffs and can confirm that

23  to the Court.

24             MR. ETKIN:  That's correct, Your Honor.

25             THE COURT:  Okay.

10

1          MR. BUTLER:  The next objection I want to deal with,

2     Your Honor, is the objection filed by the IUE-CWA, at docket

3     number 11013.  Similarly, Mr. Kennedy is here on behalf of the

4     IUE-CWA and they are not pursuing that objection at today's

5     hearing and are prepared to withdraw it.  And Mr. Kennedy can

6     confirm that on the record.

7          MR. KENNEDY:  That is correct, Your Honor.

8          THE COURT:  Okay.

9          MR. BUTLER:  The next objection I'd like to address

10    is the objection of the ad hoc trade committee, at docket

11    number 11042.  We have reached a settlement with the ad hoc

12    trade committee that I believe has the concurrence of the

13    creditors' committee, participated in negotiating that

14    resolution and Mr. Rosner is here from Kasowitz on behalf of

15    the ad hoc trade committee.  Essentially, Your Honor, and I'll

16    just read into the record, our understanding with them.  "This

17    is in full and final settlement of any and all objections of

18    the ad hoc trade committee to the disclosure and plan

19    confirmation process, including without limitation, the

20    disclosure statement, the proposed investment agreement

21    amendment and the plan of reorganization, including plan

22    confirmation matters.  Unless subsequent to this settlement the

23    debtors' propose a material modification to the plan that has a

24    material adverse affect on the treatment of general unsecured

25    creditors under the plan.  The two things we have agreed to do

11

1   with respect to the ad hoc trade committee, is first we've

2   agreed to use commercially reasonable efforts to reconcile, and

3   if agreed, allow on or before the confirmation date trade

4   claims held by members of the ad hoc trade committee.  They're

5   identified by both, holder and claim number, conforming to the

6   official claims register in these Chapter 11 cases, in writing

7   to the debtors by no later than December 10, 2007."  And given

8   where we are, Your Honor, in the claims administration process

9   we don't view that to be an undue burden on the estates.

10              THE COURT:  Okay.

11              MR. BUTLER:  The second item is, we have

12  previously -- Your Honor had previously approved that provision

13  that would have reimbursed up to 750,000 dollars of reasonable

14  and documented professional fees and expenses for the

15  committee.  That cap contained in the prior order would be

16  increased to 1.5 million.

17              THE COURT:  And that's subject to application?

18              MR. BUTLER:  Yes.  I believe that ultimately we've

19  agreed to that.

20              MR. ROSNER:  David Rosner, Your Honor.  Actually, we

21  didn't discuss that.  I thought our understanding was that

22  would be it.  So obviously --

23              THE COURT:  I'm going to have to review it obviously.

24  The committee and the debtor can agree not to object to it, but

25  I'm going to have to review it.

12

1          MR. ROSNER:  Okay.  And I believe that's the answer,

2     Your Honor.

3          THE COURT:  Okay.  And on the first point, is this a

4     review process that you're agreeing to do on an expedited basis

5     or are you going -- you're not agreeing to allow all their

6     claims just as filed, are you?

7          MR. BUTLER:  No.  We're agreeing to reconcile the

8     claims.  As Your Honor knows, from the claims protract process

9     1, we have reconciled substantially all of the trade claims of

10    this case at this point.  They want to make sure that to the

11    extent that we haven't reconciled their claims they want them

12    reconciled.  And if agreed, meaning that we agree with them and

13    they agree with us to our reconciliation, that they would --

14    that we would then put those on for allowance.

15         THE COURT:  Okay.  All right.

16         MR. ROSNER:  Your Honor, the issue here is -- to be

17    brief, is that give a twenty-day period in which to exercise or

18    transfer of rights is a very short time frame.  The

19    reconciliation process is key to members of our committee and a

20    key component to (indiscernible - not speaking near a

21    microphone)

22         THE COURT:  Okay.

23         MR. ROSNER:  I think Mr. Butler was accurate before.

24         THE COURT:  Very well.

25         MR. BUTLER:  And, Your Honor, we have reviewed that

13

1    settlement with the unsecured creditors' committee who I

2    believe also support the settlement.  Mr. Rosenberg, is that

3    correct?

4         MR. ROSENBERG:  That's correct, Your Honor.

5         THE COURT:  Okay.

6         MR. BRILLIANT:  Your Honor, Allan Brilliant on behalf

7    of certain bondholders that filed some objections in connection

8    with the matter.  We learned about the settlement with the ad

9    hoc trade committee just a few moments ago.  We obviously

10   reserve all our rights to object to the fee application when it

11   occurs.  And our understanding is that if Your Honor is not

12   approving the settlement from the standpoint of increasing the

13   cap at this point but instead just agreeing with debtor and the

14   creditors' committee reserve -- agree not to object.

15        THE COURT:  That's right.  And before anyone else

16   stands up, no one has to reserve any rights.  They're reserved.

17        MR. BRILLIANT:  Thank you, Your Honor.

18        THE COURT:  Okay.

19        MR. BUTLER:  Your Honor, the next objections that I'd

20   like to address are the objections of the official committee of

21   unsecured creditors.  They have filed three objections in this

22   case at docket numbers 10805, 11037 and 11290.  The first of

23   those two objections which were comprehensive in their scope,

24   objections at docket numbers 10805 and 11037 had been settled

25   between the creditors' committee and the debtors, and are to be

14

1   deemed withdrawn.  The limited objection filed solely on the

2   issue of the interest rate cap provision of the EPCA that --

3   that was the only subject of objection docketed at number

4   11290, that would go forward but all other objections to the

5   creditors' committee are deemed settled and withdrawn.  I'd

6   like Mr. Rosenberg to confirm that I got it correct.

7              MR. ROSENBERG:  That is correct, Your Honor.

8              MR. BUTLER:  The next item, Your Honor, I'd like to

9   move to is the equity committee who's filed two comprehensive

10  objections at docket number 10799 and 11032.  The equity

11  committee, as Your Honor may have gleaned from the notice of

12  filing, that the debtors filed on December 3rd as part of our

13  notice filing, agreed to settle the case with the debtors and

14  move forward consensually based on a reservation of rights with

15  respect to certain intraclass matters that were -- they thought

16  were important to reserve rights that they may have at war or

17  otherwise with respect to those matters.  From the debtors'

18  perspective we've had discussions with the plan investors who

19  similarly want to reserve -- to the extent those reservation of

20  rights for the equity committee are directed towards them, in

21  any way.  They want to, of course, reserve their legal,

22  equitable and contractual rights and also make sure that

23  they're not prejudice under the EPCA, which is being considered

24  today, should Your Honor grant the debtors' application and

25  enter the EPCA order.  And we have -- I discussed both of those

15

1    competing concerns with representatives of the equity committee

2    and of the plan investors in detail.  They have left it to me

3    to make a statement on the record and Mr. Lauria is speaking

4    for the plan investors, Mr. Joseph is speaking as special

5    counsel for the equity committee, will correct me if I haven't

6    gotten it wrong, both what I have just said into the record and

7    what I'm about to say.

8           As part of this understanding it has been mutually

9    agreed that the attempt to implement that reservation of rights

10   matter through a change to Section 1.9 of the plan should be

11   withdrawn, and the debtors have agreed to withdraw the

12   modification that was submitted this week with respect to

13   Section 1.9, which was the definitions section.  And the equity

14   committees also agreed not to seek that provision going

15   forward.  There is also no prejudice to -- to be no prejudice

16   by this reservation of rights.  As I indicated to the legal,

17   equitable or contractual rights of the plan investors including

18   specifically those rights bargained for under the EPCA, should

19   the investment agreement be approved by Your Honor.

20          We have also agreed to submit for Your Honor's

21   consideration a paragraph in the disclosure statement order,

22   not in the investment agreement order.  That reads as follows:

23   "The reservation or rights made by counsel to the equity

24   committee on the record of the hearing, and that will now be

25   the reservations as made by the reservation of rights as

16

1  announced on the record by the debtors at the hearing, held on

2  December 6, 2007, regarding the equity committees' reservation

3  of rights, to assert claims, interest, defenses, offsets

4  against any noteholders of equity in these Chapter 11 cases,

5  solely within class 1G-1, with respect to the allocation of

6  plan consideration among holders -- existing holders" -- strike

7  that.  "Among holders of existing common stock based on the

8  facts and circumstances in these Chapter 11 cases.  And the

9  reciprocal reservation of rights made on the record in

10  connection with the plan investors, with respect to all of

11  their rights reserved -- excuse me, with respect to the rights

12  reserved by the equity committee on the record of the hearing

13  of the same date on incorporated herein, and all such rights

14  are reserved in all respects."

15       The point here is that both sides fully reserve their

16  rights on these matters.  They are not to be prejudicial in any

17  way to the investment agreement, or the contractual, legal and

18  equitable rights that are preserved by both parties in the

19  reciprocal reservation of rights.  And I will pause for a

20  moment and ask Mr. Joseph first to confirm that I have said it

21  correctly with respect to the equity committee.

22       MR. JOSEPH:  Your Honor, Gregory Joseph of the equity

23  committee.  That is accurate.

24       THE COURT:  Okay.

25       MR. BUTLER:  And then I'd like to ask now -- pause

17

1   and ask Mr. Lauria on behalf of the plan investors whether I

2   made the statement correctly?

3             MR. LAURIA:  Your Honor, I've been authorized to

4   represent on behalf of all of the claim investors that that

5   statement is correct and we agree to it.

6             THE COURT:  Okay.

7             MR. BUTLER:  And, Your Honor, I also would like Mr.

8   Lauria to confirm and other plan investors represented by

9   counsel, here in Court, if they disagree to confirm that all of

10  the execution pages of the bid letter in connection with the --

11  with respect to the EPCA are now executed and will be available

12  and released to the debtors at the conclusion of the hearing

13  assuming the order's approved.

14            MR. LAURIA:  Your Honor, that is correct.  Subject to

15  of course just confirming that the language is removed from

16  Section 1.9, and an order acceptable to the parties is entered

17  by the Court.  We're prepared first to deliver our executed bid

18  letters and subject to receiving the order to enter into the

19  amended EPCA.

20            THE COURT:  Okay.

21            MR. ROSENBERG:  May I, Mr. Butler, just a slight

22  clarification.  I was hearing this for the first time, Your

23  Honor, and it was clear to me what the equity committee was

24  preserving in your statement.  It was not clear to me what the

25  investors were preserving.  Am I correct in assuming that what

18

1    it is preserving relates only to equity holders in trusses?

2            MR. BUTLER:  This issue is all related -- this entire

3    discussion is related to intra class equity issues with respect

4    to -- as holders of equity.

5            MR. ROSENBERG:  So that's true with respect to the

6    investors as well?

7            MR. BUTLER:  Yes.  But, for example, and so -- Your

8    Honor, was clear on this.  I'll give an illustration to make

9    sure people are clear on this.  The investment agreement

10   provides, assuming it's approved by the Court and the effective

11   date of the plan occurs, provides for certain exculpation

12   releases and other matters --

13           MR. ROSENBERG:  This is precisely where I was going.

14           MR. BUTLER:  -- which will be preserved.

15           MR. ROSENBERG:  Okay.

16           MR. BUTLER:  This is not a backdoor tact on what has

17   been bargained for.  But, for example, and we discussed this

18   with the equity committee at great length, the exculpations

19   property exclude, as the U.S. Trustee would want us to, for

20   example -- by way of example, willful misconduct.  And so to

21   the extent that there are matters that are excluded from the

22   coverage of those documents and the equity committee chooses to

23   pursue those matters, their rights are fully preserved, the

24   rights of the plan investors, whatever they may be, you know,

25   contractual, legal, equitable or otherwise to defend against

19

1   those, is fully preserved.  This is a full, complete,

2   reciprocal reservation of rights.

3           MR. ROSENBERG:  I ask again, this is not -- am I

4   correct that this is not intended to create some kind of

5   exception or codicil, vis-a-vis the exculpation as drafted and

6   agreed upon vis-a-vis the creditors' committee?

7           MR. BUTLER:  That is absolutely correct.

8           MR. ROSENBERG:  Thank you.

9           THE COURT:  Vis-a-vis the creditors' committee or

10  anyone else?

11          MR. BUTLER:  That is absolutely correct, Your Honor.

12          THE COURT:  Okay.

13          MR. BUTLER:  This is not an amendment, codicil, or

14  anything else to the investment agreement.

15          THE COURT:  Okay.

16          MR. BUTLER:  That is precisely the point the plan

17  investors wanted us to make and that the equity committee has

18  agreed to.

19          MR. ROSENBERG:  Thank you.

20          THE COURT:  Okay.

21          MR. BUTLER:  Anyone else?  Your Honor, based on that

22  understanding the -- I also would like to address, as I

23  indicated, the objections of the equity committee at, again,

24  docket numbers 10799 and 11032.  And I'm please to announce,

25  here on the record, the equity committee is prepared to

20

 1   withdraw those objections and support entry of the investment

 2   agreed order.  And I would ask Ms. Torres if she would confirm

 3   that.

 4           MS. TORRES:  We do confirm that, Your Honor.  In

 5   light of the consideration that's being offered to the equity

 6   committee under the plan we're in support of the plan and the

 7   third party release therein.

 8           THE COURT:  Okay.  Thank you.

 9           MR. BUTLER:  Your Honor, I believe that leaves for

10   prosecution today only the objections of the various

11   bondholders.  There's the bondholders group represented by

12   Goodwin Procter, who's filed three objections, at docket number

13   10800, 11036 and 11286.  There is the objection of Wilmington

14   Trust Company Indentured Trustee at docket number 11040.  There

15   is the objection of Highland Capital that was filed, we would

16   argue, on an untimely basis at docket number 11292.  And of

17   course, the one non-bondholder objection, the creditors'

18   committee limited objection on the interest rate cap at docket

19   number 11286.

20           THE COURT:  Okay.  Why don't I hear from those

21   parties then?

22           MR. BUTLER:  Your Honor, we're not -- we're not

23   intending to make an opening statement today in terms of the

24   merits.  We do have an evidentiary case to put in.  In that

25   regard, I would point out there are some time constraints with

21

1    witnesses and we'd like to proceed as soon as we can with

2    witness testimony.

3              THE COURT:  I've read the objections.  I guess,

4    I'm -- because of the nature of this process, as Mr. Butler

5    said, from Wilmington Trust and the ad hoc bondholder group,

6    there's more than one objection.  And what I'd like to hear

7    from you all, and just briefly, is what is extent in your

8    objections?

9              MR. BRILLIANT:  Sure.  Your Honor, all of our

10   objections, you know -- Allan Brilliant on behalf of Caspian

11   Capital Advisors, Castlerigg Master Investments, Davidson

12   Kempner Capital, Elliott Associates, L.P., Everest Capital

13   Ltd., Nomura Corporate Research & Asset Management Inc.,

14   Northeast Investors Trust, Sailfish Capital Partners and White

15   box Advisors, LLC.  Your Honor, all of our objections, you

16   know, continue to be effective.

17             THE COURT:  Okay.

18             MR. BRILLIANT:  Your Honor, we were not able to

19   resolve any of our objections.

20             THE COURT:  Okay.  Is that case for you also, Mr.

21   Fox?

22             MR. FOX:  Yes, Your Honor.

23             THE COURT:  Okay.  So -- I'm sorry, you still have

24   your seat, no one's taking it.  Let me hear from the debtors

25   then on their case in favor of the entry of the EPCA.

22

1        MR. BUTLER:  Your Honor, one matter I do want to

2   point out on the record is that there is this continuing

3   dialogue with Mr. Brilliant and his firm about who they

4   represent and what it constitutes.  But I would point out here

5   that it doesn't seem to me that they can have these matters

6   both ways.  They assert that they don't represent a bondholders

7   committee, ad hoc or otherwise, and therefore they represent

8   only specific creditors.  But at each hearing they changed they

9   composition of who those creditors are.  And so, for example,

10  at this hearing they filed a supplemental objection yesterday

11  which was to be only a supplemental objection as it relates to

12  people who are already in the process.  And they added Everest

13  Capital Ltd. and Northeast Investors Trust, and then added a

14  footnote that said -- footnote number 1 in their latest

15  objection that says they join in and adopt the supplemental and

16  restated objections that they're originally parties thereto,

17  the prior objections.  I understand when a committee puts

18  forward an objection how the membership of the committee swings

19  and people file statements.  I don't understand how people who

20  are not in this process who have missed objection deadlines,

21  who have not participated or able to show up the day before a

22  hearing and say I have the same rights as everybody who has

23  followed the rules.  So I just -- I say that for the record,

24  I'm not --

25        THE COURT:  There are at least some people in this

23

1    group who have been there from the beginning.

2            MR. BUTLER:  There have been.  There are certainly

3    some, Caspian being one of them who, I think, has been there

4    from the beginning.

5            THE COURT:  Okay.  All right.  Essentially, I'm

6    hearing from them then.

7            MR. BUTLER:  Can I have one moment, Your Honor?

8            THE COURT:  Sure.

9            MR. BUTLER:  Your Honor, I've just been advised, just

10   so the record is clear, that the objection by Highland Capital

11   Management L.P. we know is filed as an objection to the EPCA at

12   11292.  Insofar as that is an objection to the EPCA, it's to be

13   deemed withdrawn.

14           THE COURT:  Well, I took it more as a data point

15   anyway.

16           MS. ELKIN:  Your Honor, Judy Elkin for Highland.  It

17   was just rolled up into the objection to the disclosure

18   statement.  And to the extent the Court is hearing the EPCA

19   motion separately from the disclosure statement we would be

20   discussing it as part of the disclosure statement.

21           THE COURT:  Okay.  That's fine.

22           MS. ELKIN:  Thank you, Your Honor.

23           MR. BUTLER:  Your Honor, in our normal presentation

24   we would go through the exhibits and deal with exhibit issues

25   now and get those into the record.  In light of the exigency of

24

1    the scheduling of some of the witnesses, what I'd like to do,

2    if I can, is move directly to the presentation of David

3    Resnick, which is Exhibits 3 and 4 in the joint exhibit index.

4    These are both marked highly confidential.  And these were the

5    declarations dated November 2, 2007 and November 21, 2007,

6    pursuant to which Mr. Resnick was deposed by certain of the

7    objectors for a period in somewhere in excess of six hours,

8    back a few Sundays ago.  And I'd like to present him for -- I'd

9    like to move the admission of those declarations, but I'd like

10   to present him for cross examination by the parties and any

11   questions the Court may have.

12             THE COURT:  Okay.

13             MR. ISENMAN:  Michael Isenman from Goodwin Procter

14   for the bondholders represented by Goodwin Procter.  I kind of

15   missed from this document that we'll do at cross that we did

16   have some objections to some of the -- to part of the

17   declaration.  And those objections were not resolved with

18   respect to the admissibility, we ask that be heard before.

19             THE COURT:  Okay.  What's the nature of the

20   objection?

21             MR. ISENMAN:  Your Honor, to make this easier we

22   have -- if I may approach for one moment?  What I believe we

23   did is we highlighted portions of the declarations that we

24   objected to and provided the basis -- provided that to the

25   debtors.  And just as an aid to the Court I'd like to provide

1    it to the Court.

2              THE COURT:  Okay.

3              MR. BUTLER:  Your Honor, that was provided to us

4    minutes ago.

5              THE COURT:  Well, it's okay.  I would ask him to read

6    the section anyway so -- you can hand it up.

7              MR. ISENMAN:  And, Your Honor, just to correct the

8    record, we did provide this to the debtors late last night.

9              THE COURT:  Okay.

10             MR. ISENMAN:  I apologize, Your Honor, I think I

11   might have handed up my copy of my handwritten notes.

12             THE COURT:  I don't have that.

13             MR. ISENMAN:  At any rate, Your Honor, there are two

14   declarations being -- as I understand, being submitted for Mr.

15   Resnick.  And we have certain -- there are certain objections

16   we have on the basis of hearsay or no show of personal

17   knowledge.  We don't object to its admission as an expert

18   opinion, we simply object to it's admission for the proof of

19   the matter asserted and where there's not been a showing that

20   he actually does have personal knowledge of it.  So, for

21   example, I'm looking at his -- let's call it the declaration of

22   David Resnick as opposed to first supplemental Declaration of

23   David Resnick.  And for example, paragraph 12 of the

24   declaration of David Resnick, we object to on the basis of Rule

25   802, hearsay.

26

1            THE COURT:  I'm sorry.  You have given me a first

2    supplemental and a revised first supplemental.

3            MR. ISENMAN:  Did I?  Are these not -- I apologize,

4    Your Honor.

5            THE COURT:  Okay.  All right, now I have it.  Okay.

6            MR. ISENMAN:  So now -- Your Honor, I'm looking at

7    the declaration of David Resnick.

8            THE COURT:  Well, why don't we go through these in

9    order?

10           MR. ISENMAN:  That's fine.  So, Your Honor, if we go

11   through them in order we have no objections to the first eleven

12   paragraphs.  Paragraph 12, which is on page 7 of that

13   declaration, Your Honor, we object to on hearsay grounds.  Do

14   you want something -- do you want argument, Your Honor, or --

15           THE COURT:  I'm reading it.

16           MR. ISENMAN:  Okay.

17           THE COURT:  Do you object to it being submitted on

18   the basis that this is the debtors' investment banker's

19   understanding as to what has occurred?

20           MR. ISENMAN:  And, Your Honor, we don't have an

21   objection to it being admitted on that basis.

22           THE COURT:  All right.  Is the case for all of these

23   hearsay objections?

24           MR. ISENMAN:  Yes, Your Honor.

25           THE COURT:  All right.  Okay.

27

1          MR. ISENMAN:  Paragraph 13, we object that Mr.

2     Resnick does not have personal knowledge.

3          THE COURT:  Well, what's the basis for that

4     contention?  He's not been talking to his client?

5          MR. ISENMAN:  Well, Your Honor, I guess to the extent

6     that he's talked -- if it's an understanding, again, we don't

7     object to it.  We're just objecting that he is not -- he can't

8     testify as to its truth.

9          THE COURT:  Well, I don't understand that.  It says

10    the "debtors also considered whether to initiate contacts with

11    other potential plan investors."  I mean, have you asked him

12    whether he knows this based on his personal knowledge?

13         MR. ISENMAN:  Your Honor, maybe we could defer this

14    objection until cross?

15         THE COURT:  Why don't we defer it to cross?

16         MR. ISENMAN:  Okay.  Thank you, Your Honor.

17         THE COURT:  All right.

18         MR. ISENMAN:  And with that in mind, Your Honor,

19    maybe it makes sense for all of our 602, you know, personal

20    knowledge objections to defer those.

21         THE COURT:  Okay.

22         MR. ISENMAN:  With respect to paragraph 19, we have

23    objected to it on the grounds that this is an opinion, but it's

24    not an opinion within the scope of what he's an expert on.  It

25    simply characterizes what the EPCA amendment does.

28

1          THE COURT:  So the agreement speaks for itself on

2     this.

3          MR. ISENMAN:  Exactly, Your Honor.

4          THE COURT:  It certainly reflects the debtors'

5     understanding of what the agreement says.

6          MR. ISENMAN:  And again, Your Honor, we don't object

7     to it admitted on the basis of what the debtors' understanding

8     is, we simply object to its characterizing a document that does

9     speak for itself.

10          THE COURT:  Okay.

11          MR. ISENMAN:  And I believe, that takes care of that

12     declaration, Your Honor, with the understanding that --

13          THE COURT:  Okay.  So the same would apply to

14     paragraph 20 also.

15          MR. ISENMAN:  That's right.  And then we have the

16     first supplemental declaration, Your Honor, against of Mr.

17     Resnick.  And I believe the same arguments apply but the first

18     paragraph that we object to is paragraph 3.

19          THE COURT:  All right.  All of these paragraphs have

20     a hearsay objection to them.  And again, assuming that the

21     debtors are introducing this for what the debtors' understand

22     to be the state of play, vis-a-vis their various constituents

23     and negotiating adversaries, you don't object to that?  It's

24     just as to whether that's actually the truth?

25          MR. ISENMAN:  That's correct, Your Honor.

29

1          THE COURT:  Okay.  The difference between trying to

2    read Appaloosa's mind and knowing it's mind.  In other words --

3          MR. ISENMAN:  That's correct, Your Honor.

4          THE COURT:  Okay.  All right.  And then, should we

5    deal with the 602 point also at cross then?

6          MR. ISENMAN:  I think that's probably the right way

7    to approach here, Your Honor.

8          THE COURT:  Okay.

9          MR. ISENMAN:  And I believe that takes care of all

10   our objections to these two declarations.  Thank you.

11         THE COURT:  All right.

12         MR. FOX:  Your Honor, if I may?  Edward Fox from

13   Kirkpatrick & Lockhart, Preston Gates Ellis, LLP on behalf of

14   Wilmington Trust Company Indentured Trustee.  With respect to

15   these two declarations, Your Honor, there are various

16   discussions of settlement discussions throughout them.  We have

17   no objection to them provided that the fact that somebody may

18   have -- that there may be an indication that -- that a party

19   may have agreed for instance to a certain valuation or a

20   certain deal is only used to process of how the negotiations

21   played out, as opposed to try to bind any party later that they

22   may have now agreed to a particular valuation for instance or

23   something of that nature.

24         The other point, there is also valuation analysis

25   here.  The purpose of today's hearing is not to go through

30

1    valuation analysis as it would be in the confirmation hearing.

2    And on that point, we just reserve rights to address that at

3    confirmation if we so desire.

4            THE COURT:  Well, I'm not sure what that means, the

5    last point.  I mean, to some extent the issues overlapped, to a

6    large extent they don't.  But I may well consider valuation

7    testimony today, it's possible.

8            MR. FOX:  Well, then, the -- we'll deal with it then

9    if we have to.

10           THE COURT:  Okay.  All right.

11           MR. FOX:  But for purposes of the EPCA amendment, not

12   for purposes of confirmation.

13           THE COURT:  Right.  Of course.

14           MR. BUTLER:  Your Honor, we have no issue -- the

15   debtors have no issue to Mr. Fox's statement, it's about four

16   way.

17           THE COURT:  Okay.  All right.  With those caveats and

18   for the purposes outline a moment ago, I'll admit Mr. Resnick's

19   declarations subject to the right of the objectors to cross

20   examine him.

21   (Declarations of David Resnick were hereby received as Debtors'

22   Exhibits 1 and 2 for identification, as of this date.)

23           MR. BUTLER:  Your Honor, then we make Mr. Resnick

24   available for cross examination.

25           THE COURT: Okay.

31

1        (Witness is sworn)

2            THE COURT:  For the record, can you spell your name.

3            THE WITNESS:  Yes.  It's David Resnick, R-E-S-N-I-C-

4    K.

5            THE COURT:  You can go ahead.

6            MR. MOUSTAKAS:  If I can take a moment to organize my

7    podium.

8    CROSS EXAMINATION BY

9    MR. MOUSTAKAS:

10   Q.   Good morning.

11   A.   Good morning.

12           MR. MOUSTAKAS:  Let me -- Mr. Isenman reminds me of

13   my request to insure there are not other witnesses present.  I

14   would like to invoke the rule on witnesses at this point.  I

15   don't know that there are other witnesses here.

16           THE COURT:  There are but they're also the client.

17           MR. MOUSTAKAS:  Well, with the exception of corporate

18   representative, which I assume is entitled to be here --

19           THE COURT:  Okay.  I'm not sure there are -- are

20   there any others?

21           MR. BUTLER:  The only one -- Mr. Tepper is not in the

22   courtroom, he will be called a little bit later, he's not

23   present in the courtroom today.

24           THE COURT:  Okay.

25           MR. BUTLER:  Mr. Miller and Mr. Sheehan, our chairman

32

1    and our chief restructuring officer, are present in the

2    courtroom.

3              THE COURT:  Okay.  All right.

4    BY MR. MOUSTAKAS:

5    Q.   If you would turn around -- I want to begin by asking you

6    to grab Exhibit 108?  And I think it's going to be in the

7    binders behind you.

8              THE COURT:  What volume is that?

9              THE WITNESS:  It's volume VII, Roman numeral VII.

10   Q.   You've got that in front of you?

11   A.   Yes.

12   Q.   Do you recognize this document, sir?

13   A.   Yes.

14   Q.   Now, how is it that you recognize it?

15   A.   This is an exhibit that Rothschild worked with Skadden to

16   prepare for this hearing.

17   Q.   Okay.  So when you say Rothschild worked with Skadden to

18   prepare, who at Rothschild worked with Skadden to prepare it?

19   A.   My more technologically adept colleagues.

20   Q.   And who are they?

21   A.   Mr. Wang, Mr. Shaw.

22   Q.   And whose idea was it for this demonstrative to be

23   created?

24   A.   My understand is one of the Skadden attorneys thought it

25   would be a good one-page compilation of information that we had

33

1    on other exhibits, so we could show everything on one page.

2    Q.    Okay.  And what role, if any, did you play in either the

3    schematic of this exhibit or its creation?

4    A.    The discussion of the exhibit generally and reviewing how

5    the information would be presented.

6    Q.    And what do you understand this exhibit to depict, what is

7    it showing us?

8    A.    The exhibit shows as I mention on one page a number of key

9    elements of relating to the process of the case and

10   Rothschild's valuation as presented to the board.  And the

11   various plans and plan amendments that the debtor filed as well

12   as the trading prices of the company's bonds and trust

13   preferred securities.

14   Q.    Okay.  And what do you understand the sort of -- if I

15   could speak colloquially, what's the bottom line of this?  What

16   are you trying to show?  What is Rothschild trying to show in

17   this document -- in this demonstrative?

18   A.    I think it's just a compilation of a number of key facts.

19   And showing that we have a view on the value of the final

20   reorganization that's based on very traditional and well

21   recognized metrics that investment bankers use to value

22   companies emerging from Chapter 11.  And as I think as everyone

23   knows that shifted slightly as the company adjusted its

24   business plan prior to the filing of the amended plan, dated

25   October 29th.  And it also gives a perspective of another

34

1    single data point that some parties use to look at and consider

2    for valuation which is the trading price of the company's

3    existing securities.  And as I said, we try to reflect all of

4    that on one page.

5    Q.   Okay.  And so there's an historical component of this and

6    then I take it there's sort of an analytical component of this,

7    is that fair to say?

8    A.   I'm not sure what you mean by historical component.

9    Q.   Let me ask it in a more straight-forward fashion.  Is this

10   chart attempting to chart the trading price of the bonds and

11   the toppers to get an implied total enterprise valuation of a

12   company, does it do that among other things?

13   A.   Well, that's -- as I mentioned that is one way to look at

14   value where the securities are trading in the market.  And we

15   reflect that on this page.

16   Q.   And so it shows the implied total enterprise value versus

17   Rothschild's valuation range prepared in the various valuation

18   analysis that we talked about at your deposition in connection

19   with the plan, isn't that right?

20   A.   Yes.

21   Q.   Now, for example, for the plan of reorganization if you

22   look at the line showing the plan of reorganization having been

23   filed on September 6, 2007, with respect to that, first of all,

24   as a preliminary matter, you had a range of valuation between

25   11.4 billion and 13.9 billion, is that correct?

35

1    A.    The -- yes.  As reflected on this page I think the range

2    was from 11.4 to 14.4, actually.

3    Q.    Okay.  Right, thank you.  So that's represented by those

4    red dotted lines essentially in the middle of the chart, right?

5    A.    Correct.

6    Q.    Okay.  And on September 6, 2007 there was an implied total

7    enterprise value of approximately 12,750,000 is that correct?

8    A.    I'm not sure I understand what you mean by an implied

9    total enterprise value.

10   Q.    Sure.  Do me a favor, can you identify a vertical line

11   that describes the date on which the plan of reorganization was

12   filed, that 9/6/07 date?  Do you see that on the chart?

13   A.    Yes.

14   Q.    Okay.  And if you use that as one of your axis and you

15   look at the total enterprise value on the vertical axis and you

16   run that across does that tell us that the chart is plotting an

17   implied total enterprise value at 12,750,000,000?

18   A.    I think what it says that if you want to rely on a trading

19   price of the company's securities in the market at that date,

20   the total enterprise value that their current trading price

21   would imply is, as you said, approximately 12.75 billion, at

22   that single date.

23   Q.    At that snapshot?

24   A.    At that snapshot.

25   Q.    Okay.  And by September 11th, based on -- again, based on

36

1    the trading price of the senior notes the implied total

2    enterprise value had dropped to 11.4 billion, is that fair to

3    say?

4    A.    I'm sorry, at what date?

5    Q.    September 11?

6    A.    In September 11th --

7    Q.    You see that that's one of the dates on the horizontal

8    axis on the bottom?

9    A.    Yes.

10   Q.    Okay.

11   A.    That's correct.

12   Q.    Okay.

13   A.    11.5, somewhere in that range.

14   Q.    Okay.   Okay.   Fine.   So -- and perhaps I should have done

15   this a little bit earlier, the ocher, the gold line, is what?

16   A.    The average trading price of the trust preferred

17   securities.

18   Q.    And you sometimes hear those referred to as the toppers,

19   right?

20   A.    Yes.

21   Q.    And the black line -- not the vertical lines, obviously,

22   the -- what's that?

23   A.    The average trading price of the bonds.

24   Q.    And as you said before the red dotted lines are the range

25   from your valuation, correct?

37

1   A.   Yes.  As of August 27th.

2   Q.   Right.  And since we're going through and describing

3   what's on the chart let's just finish up.  Underneath the 14.4

4   billion your high valuation, the top of the range, there's a

5   dotted line beneath that, fainter dotted line gray, of 13.9,

6   and that represents the total enterprise value that was

7   selected in your analysis as the basis for making certain

8   determinations, is that fair to say?

9   A.   I wouldn't say it was selected in our analysis.  It was a

10  number that was intensely negotiated among the stakeholders in

11  the case as the total enterprise value around which they would

12  construct a consensual plan of reorganization.  And we used

13  that data point for this analysis.

14  Q.   But it was in an -- it was an assumed -- it was an assumed

15  total enterprise valuation.  In other words it was backed

16  into -- it was the number that got the creditors a hundred

17  percent recovery, correct?

18  A.   I would say it was the number that all the stakeholders

19  agreed would be the basis for a total enterprise value around

20  which they would construct a consensual plan of reorganization.

21  Q.   And that was because it was the number that would show a

22  hundred percent recovery on the bonds held by our clients,

23  correct?

24  A.   That was the number that the unsecured creditors'

25  committee -- at which the unsecured creditors' committee would

38

1   receive par plus accrued interest, which was a very important

2   aspect of their agreement to this plan.

3   Q.   Okay.  Now, to the right of those two dotted lines, in

4   between them, sort of dissecting them is a green dotted line,

5   what is that describing?

6   A.   Well the top of the line is the high-end of the range of

7   our revised valuation that accompanies the October 29, '07 plan

8   amendment.  And then the green line below is the lower end of

9   the range.

10  Q.   Great.  So that's 11 -- the range of 11.2 to 14.1, right?

11  A.   Yes.

12  Q.   Okay.  And then there are -- it looks like three more

13  dotted lines that come in between your high and low -- your

14  updated high and low, and what are those?  They're dated 10/29,

15  11/14 and 12/3 '07.

16  A.   Those lines represent the total enterprise value around

17  which the stakeholders renegotiated the plan, and on October

18  29th agreed to file a plan amendment using a thirteen billion

19  TEV as the basis for a consensual agreement -- actually, did

20  not have the full support of the equity committee.  And then at

21  11/14, 13.4 billion which did not have the support of the

22  committees.  And then recently on December 3rd, at 13.3 billion

23  which now has the support after extensive negotiation among the

24  parties of the official committee of creditors and the equity

25  committee, plan investors of General Motors, and the debtor.

39

1    Q.    Okay.   Thank you.   That was helpful.   Now, you've talked

2    about the fact that the chart, among other things, tracks the

3    price of the bonds and expresses a way in which we can

4    understand based on those prices the total enterprise value of

5    the enterprise.   And you've actually --

6              MR. BUTLER:   Objection, Your Honor.   He's beginning

7    to testify.   I don't think that's what Mr. Resnick said at all.

8              THE COURT:   Sustained.

9              MR. MOUSTAKAS:   Let me see if I can ask it again.

10   Q.    Using the line that you described as the average price of

11   the bonds, I thought you testified, did you not, earlier that

12   an implied total enterprise value can be derived from that

13   graph, at any moment in time along the axis, is that right?

14   A.    I said you could calculate a data point, that data point

15   at a specific date, yes.

16   Q.    And as graphically represented on the chart, by going

17   across to the vertical axis -- I can never remember the X

18   axis -- the vertical axis to the X axis?

19   A.    Yes.

20   Q.    So you can sort of run a course on the line of the X axis

21   to a particular date and find the implied total enterprise

22   value relating to the bonds, correct?

23   A.    Reflected by the trading price of bond.   I think earlier

24   you said it reflects the total enterprise value of the company.

25   Q.    If I did, I apologize, that was unintentional.   So you've

40

1   actually taken this chart just through December 4th, just

2   through two days ago, correct?

3   A.   Correct.

4   Q.   And that is the announcement of this latest series of

5   revisions, correct?

6   A.   Correct.

7   Q.   Okay.  And do you recall what the trading price was on the

8   4th of December -- I'm sorry of the bonds?

9   A.   My recollection was it was -- they were on average around

10  fifty-nine.  You know, we tracked that, I don't know if that's

11  in one of the exhibits, but that would be my guess.

12  Q.   Without attempting to get too detailed, graphically we see

13  that there's a precipitous decline based on the bond prices on

14  your graph, am I right about that?

15  A.   There is a decline, yes.

16  Q.   Okay.  Well, there's a reason that I used an adjective,

17  right.  It was in my question because I want you to react to

18  it.  So when I said precipitous decline, you can say no, I

19  don't think it was precipitous.  But I want you to react to

20  that part of the question.  So looking at the trend as a whole

21  you would agree with me that that is one of the three or four

22  most significant declines in a short time on this graph,

23  correct?

24  A.   It is.  It is among the larger declines on this graph, but

25  the trading prices as you can see, and frankly if we would have

41

1   taken this exhibit back further from the beginning of the case,

2   I think what would be clear, and what's often typical in the

3   trade prices of distress securities, in my experience, is that

4   they are tremendously volatile.

5   Q.   But we don't know what that looks like because that's not

6   what we got in front of us, right?  We've got in front of us

7   Exhibit 108, right?

8   A.   Correct.

9   Q.   Okay.  Good.  So if one were to buy senior bonds in the

10  fifties, I think it's lower than fifty-nine, but if that's your

11  testimony that can be verified, the senior noteholders are

12  receiving par plus accrued and -- and under the plan we assume

13  that the senior noteholders are going to be receiving par plus

14  accrued in stocks and rights, that means if the debtors confirm

15  a plan under a current time limit one could more than double

16  their money in approximately ninety days, is that correct?  If

17  you follow the logic of this out?

18  A.   I'm not -- I'm not sure I would make the same statement

19  that you would.  What I would say is that if someone does a

20  traditional valuation of Delphi looking at its longer term --

21  the technical term is fully distributed value, and believe

22  using different methodologies, the valuation is somewhere

23  within our range that that range is reasonable.  If you buy

24  those bonds in the high fifties, at some point, you will

25  receive a very significant return on those bonds.  I disagree,

42

1   it may not be within ninety days but at some point you could

2   receive an attractive return.  I think people would certainly

3   consider that just as they consider buying bonds not long after

4   the company filed when they were trading at significant

5   discounts as well.

6   Q.   I do want to ask you something, because -- have you

7   read -- have you had an occasion to read the debtors' omnibus

8   reply to objections to Delphi-Appaloosa investment agreement

9   amendment motion in response to equity committees emergency

10  motion to adjourn the hearing.  Have you read that?

11  A.   No, I have not.

12  Q.   You went to the University of Chicago Business School?

13  A.   Yes.

14  Q.   You said something about sort of longer term view.  I want

15  to understand with respect to all the valuation

16  methodologies -- and I know I'm getting ahead of myself but

17  bear with me.  With respect to all the valuation methodologies

18  that you used in conducting your valuation analysis and your

19  updated valuation analysis, I presume we'll talk about a little

20  later, all of those methodologies have some way or another of

21  taking into account long-term value, correct?

22  A.   Some more than others.

23  Q.   So you're projecting out and then just bringing back and

24  discounting it in the DCF, right?

25  A.   Right.  But I would say certain of those methodologies do

43

1   not reflect long-term value as much as the others.  Such as the

2   trading price of comparable companies reflect the value as of a

3   certain date, just like the trading prices of Delphi's bonds

4   do, whereas a discounted cash flow analysis will fully reflect

5   future value because you look at company's projections and

6   discount them back to the future.  The comparable company

7   analysis of transactions in the industry has some reflection of

8   longer-term value because it's the value in which comparable

9   companies were acquired which the third party paid value for

10  and you assume that they want to realize a return on that.  So

11  that has some reflection of future value as well.

12  Q.   I think you can set that aside for now.  Let's turn to the

13  revised plan.

14            THE COURT:  The revised what?

15            MR. MOUSTAKAS:  I'm sorry.  The revised plan.

16  Q.   I guess I want to talk about the -- your --

17            MR. MOUSTAKAS:  Let me strike that.

18  Q.   I want to talk about your valuation analysis, go back to

19  the chart momentarily.  Your valuation analysis --

20            MR. MOUSTAKAS:  The Court's indulgence?

21  Q.   Your most recent valuation analysis.  That's the updated

22  valuation analysis, okay.  You testified I think earlier that

23  your range was 11.2 to 14.1, is that right?

24  A.   Yes.

25  Q.   Okay.  And you derived a midpoint of 12.7 in the updated

44

1    valuation analysis, is that right?

2    A.    Well, that just is the arithmetic midpoint.

3    Q.    Right.  We talked about that before.  Now, you would agree

4    with me that if one used under your updated valuation analysis

5    leaving aside a question about whether a new valuation, a new

6    comparable should be used, leaving that aside for the moment.

7    Based solely on the valuation as you did at the updated

8    valuation as you did, if you use a midpoint of 12.7 billion

9    dollars the senior noteholders would not get a 100 percent

10   recovery, isn't that correct?

11   A.    They would not receive a par plus accrued recovery they'd

12   get approximately 100 percent of par.

13   Q.    And what percent of par plus accrued?

14   A.    Some discounted par.  I just don't remember exactly what

15   the number is.

16   Q.    Going into the high eighties?

17   A.    Probably high eighties, that would be my guess.

18   Q.    So I want to compare apples to apples here.  So I want to

19   just understand why you said 100 percent of par.  You will

20   agree with me that the one thing that has not changed in any of

21   these analyses is that the senior noteholders are going to get

22   par plus accrued, right?

23   A.    Under a negotiated TEV used among the parties to reach

24   agreement on a plan.

25   Q.    Maybe I need further edification, and it's probably highly

45

1    likely, but as a matter of how the estate will make

2    distributions or how folks will recover, I understood that it

3    was always the case that the goal of the debtors was for the

4    senior noteholders to receive par plus accrued, is that correct

5    or not correct?

6    A.    I wouldn't describe it as the goal of the debtors.  This

7    plan reflects a settlement, a very complex and extensively

8    negotiated settlement.  And the creditors can speak for

9    themselves about their goals.  They represented themselves very

10   well, very forcefully.  And part of the agreement was using a

11   TEV within a reasonable valuation range where unsecured

12   creditors would receive at that selected value used, because

13   you have to pick a point to complete your financial analysis.

14   And at that point within the range they would receive a par

15   plus accrued recovery.

16   Q.    Okay.  So the people at Skadden, you see, they produced

17   boxes and boxes of documents.  And I looked at some of those

18   documents.  And those documents typically showed all kinds of

19   term sheets and plans, and you'll agree with me that everything

20   that seemed to be published talked about par plus accrued,

21   right, for the bondholders?

22   A.    That was a consistent position that they've taken in these

23   negotiations.

24   Q.    Okay.  So I'm going to ask you, for the rest of your

25   testimony, whenever you talk about the senior bondholders to

46

1   talk about par plus accrued and to talk about the numerical

2   values in relation to that consistent theme.  In other words,

3   its confusing to me for you to say a 100 percent of par if

4   we're always talking about par plus accrued.  So not 100

5   percent of the expected or the -- this plan proffers to this

6   Court, does it not, that the senior noteholders that negotiate

7   a TEV will be paid in full, yes?

8   A.   Will receive a par plus accrued recovery.

9   Q.   Right.  And they won't be short?

10  A.   I think what I said was fairly clear.

11  Q.   Okay.  But I'm asking another question.

12  A.   I don't know what you mean by short.

13  Q.   Okay.  Fair enough.  Let me explain what I mean by short.

14  That it won't be ninety-nine percent, ninety-eight percent,

15  ninety-three percent, it will be 100 percent, right?

16  A.   The calculation of their recovery based on their claims at

17  the negotiated TEV is exactly par plus accrued.

18  Q.   And that's important that there's a consequence, if you

19  understand, that flow from a representation to the Court that a

20  particular class of creditors has been satisfied fully.  Do you

21  have an understanding about that or do you not have an

22  understanding?

23  A.   Generally, yes.

24  Q.   Okay.  Now, when we were talking at your deposition about

25  the various valuation methodologies you testified, that one of

47

1    the things that you look at in preparing a valuation report is

2    the share price of companies that are comparable to the

3    business lines of Delphi.  For one of the three methodologies

4    that you chose to use, correct?

5    A.   Yes.

6    Q.   Okay.  And you said that you follow the share prices of

7    these comparable companies on a pretty regular basis, do you

8    recall that testimony?

9    A.   Yes.

10   Q.   Okay.  And just so that it's very clear, when we talk

11   about comparable companies we're talking about you're comparing

12   comparable companies to divisions within Delphi, not to Delphi

13   as a whole?

14   A.   Generally, yes.

15   Q.   Okay.  And that was something that you chose to do to try

16   to get a better tale or metric, is that right?

17   A.   Yes.

18   Q.   Now, you also testified, I think, that as a general

19   matter, depending on the magnitude, if comparable stocks fall

20   the valuation based on that methodology would obviously yield a

21   lower enterprise value, right?

22   A.   Generally, yes.

23   Q.   Okay.  So when you say generally tell me the way in

24   which -- or tell the Court the ways in which it wouldn't do

25   that?

48

1    THE COURT:  Are you getting somewhere with this.

2   This seems to me you can make this point at oral argument.  I

3   got your point.

4    MR. MOUSTAKAS:  Okay.  Thanks, Your Honor.

5   Q.   Well, just let me close out this whole line.  It's fair to

6   say that you haven't conducted that analysis and haven't

7   determined what impact the market's current condition has on

8   your valuation, correct?

9   A.   Correct.

10  Q.   But you suspect it would show a decline in value, correct?

11  A.   I think I testified that we watch regularly and I'll take

12  the comparable companies, and they are down some over the past

13  period from when we followed the last plan amendment.  But we

14  have not updated the analysis.

15  Q.   But you suspect that if you did it, it would show a

16  decline, correct?

17    MR. BUTLER:  Objection.  Asked and answered.

18    THE COURT:  Sustained.

19  Q.   Now, in your declaration you say that while the debtors

20  didn't take any affirmative steps to reach out to other

21  potential plan investors you also didn't receive any proposals

22  from investors, isn't that right?

23  A.   At the time of my deposition that was true.  But

24  subsequent to the deposition that's not true.

25  Q.   Oh, I actually wasn't going there.  Yeah, but that's

49

1    right.  So tell the Court about that.

2    A.   Approximately -- I don't remember the exact date but I

3    think it was before last weekend, Mr. Miller, the CEO received

4    a call which he informed me and other members of the advisory

5    team and management of -- from, the representative of Lehman

6    Brothers, who represented a group of investors, one of whom was

7    very familiar with the company, Highland Capital.  That they

8    said they had a plan that they would like to present to the

9    board and they were going to share that with the unsecured

10   creditors' committee.  Mr. Miller encouraged them to do so,

11   mentioned when we had a board meeting that was upcoming, and if

12   necessary to reach out to the debtors' professionals,

13   consistent with how we've handled those inquiries in the past.

14   Q.   And did I say that there was a reference to Mr. Dagel

15   giving some information about a potential proposal as well?

16   A.   I know that Mr. Dagel also had knowledge of this proposal,

17   had reviewed it, and my understanding is the creditors'

18   committee received a presentation on the proposal and took

19   action not to move forward with that proposal.

20   Q.   Is that a different proposal than then Lehman Brothers

21   Group?

22   A.   No.  I believe that is the Lehman Brothers Group proposal.

23   Q.   You said that the debtor was very familiar with Highland

24   and that's because Highland had been interested some time back

25   in participating in the debtors' plan of reorganization,

50

1    correct?

2    A.    I'd say a little more strongly that Highland has spent

3    significant time, doing diligence, working with the debtor and

4    submitted a competing proposal that was very close in value in

5    terms to the current planned investor proposal.  And ultimately

6    after considerable back and forth the board selected the plan

7    investors to move forward with and that agreement was approved

8    by the Court in August.

9    Q.    Sure.  And when in October the amended EPCA expired by its

10   own terms and negotiations with the plan investors, led by

11   Appaloosa, were showing that a considerable increase in

12   discounts and value was going to need to go to the plan

13   investors, did you, in your capacity as an advisor to the

14   company, to the debtors, did you contact Highland?

15   A.    We did not contact Highland at that time.  My colleague,

16   Mr. Shaw, actually had a contact from the representative of

17   Lehman Brothers, who has been working with Highland, wanting to

18   get an understanding of what was going on and represented to

19   Mr. Shaw they were not, at that time, prepared to move forward

20   with a competing proposal but might have an interest in

21   providing some exit financing and wanted to keep a dialogue

22   open.

23   Q.    You didn't have those conversations, did you?

24   A.    I did not.

25   Q.    So it's fair to say that -- and it was -- did you mention

51

1   in your deposition Ripperwood, Ripperwell, or something like

2   that?

3   A.   Rippelwood.

4   Q.   Rippelwood.  They had been interested as well, right?

5   A.   Yes.  They were one of the parties interested back around

6   the end of last year.

7   Q.   Okay.  And you didn't contact them, correct.

8   A.   Correct.

9   Q.   I know that these questions might come across as

10   accusatory, I don't mean them to be, so let me try to show you

11   that by asking you this question.  Was there a perception among

12   the board or the management that this course of communicating

13   interest in competing proposals was somewhat perilous in light

14   of certain penalties in the EPCA?

15   A.   I'm not sure I understand the question.

16   Q.   Sure.  There are certain breakup fees that get triggered

17   by various conduct that the company engages incorrect?

18   A.   Yes.

19   Q.   Okay.  Were those -- did those play a role in decisions

20   about whether to solicit interest from competing or potentially

21   rival plan investors?  Let me clarify, in the time period from

22   let's say October 29th to November 14th?

23   A.   They were a consideration, but in my view -- the board has

24   been acutely sensitive from the beginning of this case to its

25   fiduciary obligations to all its stakeholders.  And I think the

52

1   board took into account where Delphi was in its reorganization

2   process.  And it was particularly sensitive to the fact that

3   each individual stakeholder wanted to receive the highest

4   possible recovery, that's natural and that's why they're each

5   individually represented.  But the debtors' obligation was to

6   maximize the value of the estate.  And I think the board was

7   very sensitive to many of the risks that the debtor would face

8   and potentially to maximizing value, its principal obligation

9   in a Chapter 11 if there was delay.  And I think the board's

10  concerns was if there were other parties out there that hadn't

11  done diligence, that would allow us to go beyond a period of

12  time where risk would increase, such as with the PBGC, it's

13  unions, or with General Motors, they were also considerations

14  that they had to weigh carefully along with issues, such as a

15  breakup fee.  And I think they did that and they did that

16  extensively, and thoughtfully in reaching their business

17  judgment in going ahead.

18  Q.   The risks that you're talking about with respect to the

19  pensions and the unions and GM, those were risks that

20  throughout the process had to be managed by the board, correct?

21  A.   Yes.  And were managed to the point where there were

22  agreements with deadlines that expired, with the PBGC at the

23  end of February, with the unions at the end of March, with GM

24  at the end of March.  Not to mention issues that the debtors

25  are always concerned about when its had a Chapter 11 of this

53

1   length with its customers and its employees.

2   Q.   But it's fair to say that you testified that there were

3   not imminent customer issues as you investigated, there were

4   not imminent key employee issues implicated by delayed

5   emergence, correct?

6   A.   Imminent as defined as something that I might be aware of.

7   Q.   Okay.  But you were in a position of advising the company

8   on all of these matters.  And so I take it you were familiar

9   with most of these issues pretty thoroughly, right?

10  A.   Some.  But I think I mention in my deposition the heads of

11  the divisions were much more sensitive to customer issues.  And

12  I had understood from discussions that they were concerned.

13  Generally, the company's been in Chapter 11 a long time, was

14  close to emerging, had achieved all of the goals it set out at

15  the beginning of the Chapter 11, and customers were concerned

16  when would it emerge, when would Delphi emerge.

17  Q.   Right.  And you testified just a moment ago that there

18  were deadlines that were coming up, and those were something

19  that caused them concerned, correct?

20  A.   Yes.

21  Q.   But there had been deadlines in the past that had been

22  renegotiated, correct?

23  A.   Different ones, but yes.

24  Q.   Were there deadlines in the past with respect to pensions

25  that got moved or renegotiated?

54

1    A.    There were some agreements reached with the PBGC during

2    the case, I don't know remember if they were deadlines or just

3    statutory issues the company had to address.

4    Q.    Okay.  But its fair to say that in this process of

5    exercising business judgment and therefore considering all the

6    factors that go into the hopper, let's say, it's fair to say

7    that one of the things that didn't happen is the board didn't

8    go out to those constituencies and say, hey, listen we're

9    thinking about delay, will you give us a pass.  That wasn't

10   something that you sort of investigated, that's fair to say,

11   right?

12   A.    I think the board appreciated that these agreements with

13   GM, with the unions, took an extensive period of time to reach.

14   They were complex, highly contentious issues, and very balanced

15   nuance settlements.  And once you spent the time and the effort

16   to reach them, to reopen the box to move them, I think in the

17   board's judgment, in my judgment, reflects considerable risks.

18   And the board would need to waive out carefully, which I

19   believe it did.

20   Q.    Okay.  You probably were in the Court for a preliminary

21   discussion about the admissibility of certain aspects of your

22   declaration, based on personal knowledge, at this point I do

23   want to ask you a question that sort of gets to that.  You said

24   during your testimony a couple of times, and you certainly said

25   just now, that you think that the board has a view or other, is

55

1    that because you made a recommendation to the board that they

2    followed and you infer from that that they have that view?

3    A.    I'm not sure about the specific case you're referring to.

4    Q.    Okay.  You just said that I think the board -- when I

5    asked you a question about whether the board considered the

6    possibility of staying in Chapter 11 long enough, and the

7    implication was to look at other investor possibilities, you

8    said you think that they considered that but didn't think it

9    was a wise thing to do.  And I guess what I want to do is try

10   to understand the basis for you saying you think that that was

11   their view.  Was it because they told you or was it because you

12   made a recommendation that they followed, you follow me?

13   A.    I understand.  I made that statement on the basis of

14   participating in board meetings or conference calls.  I think

15   I've attended probably every one, maybe with one or two

16   exceptions.  And the board addresses these issues in discussion

17   somewhat vigorously.  And the question of staying in Chapter 11

18   longer was certainly raised in several of these conversations

19   and discussed with the board.

20   Q.    Okay.  I want to get to -- let's go straight to the

21   valuation and what you know about the valuation that the board

22   made of the restated amended EPCA.  And I think when I use

23   restated amended EPCA, I think people have been talking about

24   the November 14th amendment, do you have that understanding as

25   well?

56

1    A.   If that's how you'd like to refer to it, I just think its

2    simpler to use the date, November 14th.

3    Q.   Okay.  So let's do that.  Now, we've established that

4    Rothschild didn't reach out to solicit interest for -- or to

5    solicit competing offers.  And one of the things that I think

6    you said at your deposition was that this was a very public

7    bankruptcy and there were -- basically people knew where to

8    find us, right?

9    A.   Yes.  And in the past our experience was people have

10   reached out to us.  And I think people knew that we engaged

11   with them readily, we thought they were credible and had the

12   financial wherewithal to be helpful in this case.

13   Q.   But investment bankers are often hired to do this very

14   process, to find people who might be interested in making the

15   investment, right?

16   A.   Which is what we did at the beginning of the case when we

17   first started the plan investor process.

18   Q.   Did you personally, in giving advice to the board, see or

19   understand a watershed event having taken place after the

20   October 29th amendment couldn't be executed?

21   A.   I'm not sure what you mean by watershed event.

22   Q.   In other words, did you come to -- we've talked a little

23   bit earlier about whether you came to understand that in order

24   to close a deal in which the Appaloosa plan investors were

25   going to be involved you're going to have to transfer

57

1    significantly more value than you had been anticipating in

2    earlier versions of the plan in the EPCA, is that right?

3    A.    Yes.

4    Q.    So given that sort of however exponentially you want to

5    describe it, that change, the size of that change, the

6    significance of that change, did you see that as a watershed

7    event that might trigger your role as the finder, going out and

8    getting people who are interested in light of the facts that

9    the landscape could change significantly in light of what these

10   plan investors were looking for?

11   A.    In my view, I've done restructuring work for almost twenty

12   years, that this is a very complicated case.  And one lesson

13   that I've learned is in cases such as Delphi which are complex

14   multivariable equations, to keep all the pieces exactly where

15   they are is a tremendous challenge.  And those pieces sometimes

16   fall out of place.  I think it's happened a number of times in

17   this case and the parties have worked very hard to bring them

18   back.  When you take a case like Delphi and you add on top of

19   that some of the most volatile financial markets that we've

20   seen in some time that adds additional uncertainty.  So my view

21   was that this was another challenge we had to deal with.  I

22   think we understood some of what was happening and that with

23   some time we could work and bring the deal back to essentially

24   what was agreed.  And I think with some help from the Court,

25   after the hearing on the 14th, we were able to do that fairly

58

1   effectively.

2   Q.   Okay.  You were talking about sort of the pieces moving.

3   Is it fair to say, in your experience doing restructuring for

4   twenty-three years that there has to be almost necessarily a

5   bias in favor of the status quo because it doesn't upset those

6   various pieces and there's a cost associated in upsetting of

7   those various pieces, is that fair to say?

8   A.   Absolutely not.  And that wasn't what I was inferring.

9   I'm saying that having the experience of doing restructuring

10  work a long time gives you a sense of perspective in context to

11  make the important judgment and to advise you client on when

12  you might truly have a watershed event and need to change

13  course, which sometimes happen.  It's a challenge, similar to

14  other challenges, that you just need to work perhaps a bit

15  harder to try to resolve, given where you are in the case.

16  Q.   So without me trying to draw any inferences from what you

17  said, you didn't view this as a -- you didn't view this as a

18  watershed even having taken place?

19  A.   I thought it was a challenge that with hard work among the

20  parties we could try to resolve.

21  Q.   But not a watershed event?

22       THE COURT:  You don't have to answer that.

23  A.   Okay.

24  Q.   Now, I want to ask you a little bit about, we talked about

25  this a little bit at your deposition, fairness opinions.

59

1   You're familiar with fairness opinions in your work as an

2   investment banker, correct?

3   A.    Yes.

4   Q.    Okay.  And can you, for the record, concisely say what a

5   fairness opinion is?

6   A.    In my experience in a merger and acquisition transaction

7   for public companies, most often, boards of directors often

8   request an opinion from an investment banker stating that the

9   transaction that the board would accept is fair from a

10  financial point of view, which is a technical term, but that's

11  what the fairness opinion states based on work that the

12  investment banker has done looking at the terms of the

13  transaction.

14  Q.    So when you say it's a technical term, it's not the same

15  thing reasonable?  Fair in financial terms is not necessarily

16  the same as saying reasonable, is that fair to say?

17  A.    My point is just that fair is a term that bankers use in

18  opinions to mean it's always described as fair from a financial

19  point of view, it's not a general view of fair.  That's it's a

20  good think for one group versus another.  Like my son would say

21  that play was -- the umpire called was not fair, it's very

22  different.  Or a creditor in a bankruptcy says I don't like

23  this recovery, it's not fair.

24  Q.    So is the consequence of saying that a transaction is fair

25  that you're recommending that it be done?

60

1   A.   No.   The board asked for an opinion again on the financial

2   terms.   And the board makes the judgment whether or not to go

3   forward with the transaction.

4   Q.   You didn't do a fairness opinion in connection with your

5   work for the debtors in this case, correct?

6   A.   No.   Investment bankers don't, in my experience, do

7   fairness opinions in Chapter 11 cases because stakeholders have

8   a vote and there's also a judgment that addresses issues before

9   the Court that relate to major issues of value.

10  Q.   Right.   But you've been very clear about the board's

11  responsibilities during Chapter 11 proceedings.   And you don't

12  mean by what you just said about the existence of the Court to

13  judge fairness to suggest, I want the record to be clear.   You

14  don't mean to suggest that the board has a relaxed burden in

15  terms of making its own determinations about what's reasonable

16  and fair for the constituents that it has to be loyal to and

17  exercise it's fiduciary obligations in favor of, right?

18        MR. BUTLER:   Objection.   He's asking now for a legal

19  conclusion about the fiduciary responsibilities for the board

20  of directors, Your Honor.

21        MR. MOUSTAKAS:   This witness has already testified

22  about the board --

23        THE COURT:   I just don't know where you're going.

24        MR. MOUSTAKAS:   Yeah.   I guess I'm trying to

25  understand, Your Honor, if I might just make my proffer, I'm

61

1    trying to understand what obligation the board is having so

2    that I can understand and evaluate the information that he

3    provided.  And specifically, what I'm trying to develop, I

4    think quite obviously, you know, whether he made an assessment

5    of the fairness of this as investment bankers would do in

6    another context.

7              THE COURT:  He already said he didn't provide a

8    fairness opinion.

9              MR. MOUSTAKAS:  But I'm hoping to follow-up on that

10   for a moment.  Let me see if I can -- I'll move on.

11             THE COURT:  Why don't you ask him what he did instead

12   of making false distinctions.  All right.  I've never seen a

13   fairness opinion in a case like this for the reasons Mr.

14   Resnick testified.  So let's talk about what's real as opposed

15   to what you think might lead to a Perry Mason moment.

16             MR. MOUSTAKAS:  Yeah.  I can assure you, Judge, I'm

17   not looking for a Perry Mason moment.

18             THE COURT:  Well, then get on with it.

19             MR. MOUSTAKAS:  Okay.

20   BY MR. MOUSTAKAS:

21   Q.   Did you think that the reason -- did you recommend the

22   offer on the basis of it being reasonable?

23             MR. BUTLER:  Objection, vague, which offer.

24             MR. MOUSTAKAS:  The offer we've been talking about.

25             THE COURT:  Which one is that the December 3rd one

62

1    before the Court.  The one before the Court, that's the only

2    one I'm considering.

3            MR. MOUSTAKAS:  Your Honor, I don't mean to be

4    impertinent.  I understood from debtors' pleading that they

5    were putting on evidence about the business judgment with

6    respect to the November --

7            THE COURT:  No.  That's not before me today.

8            MR. MOUSTAKAS:  I understand.

9            THE COURT:  Let's get on with it, just do what's

10   before me.  I'm going to take a five-minute recess.  Maybe you

11   can talk with Mr. Brilliant about what's before the Court in

12   the manner of bankruptcy law.  I'll be back in five minutes.

13       (Recess from 11:56 a.m. to 12:04 p.m.)

14       (Audio starts mid-sentence)

15   A.   Presentation to the board in connection with the November

16   14th proposal.

17   Q.   Okay.  You remember -- you say extensive.  I just want to

18   see if I can refresh your recollection.  You testified that

19   your presentation to the board was fifteen minutes, do you

20   remember that?

21   A.   Yes.  But we --

22   Q.   And you remember that you couldn't remember any questions

23   that were asked by the board about that proposal, about that

24   EPCA?

25   A.   I don't recall.

63

Q.   Okay.  Did you ever advise the board about the rate of
return that the plan investors enjoyed with respect to the
November 14th restated amendments?

A.   And how do you define rate of return?

Q.   How do you define rate of return, sir?

A.   Well, rate of return -- my definition of rate of return
would be based on the price at which a party is investing in
this case and the equity or the preferred A or B, what is the
return that they expect to receive over a period of time that
they would hold the security, based on an assumed exit date,
price or valuation at that date of exit.  And you calculate
that back and you get an internal rate of return.

Q.   And did you make an assessment of what the plan investors
would expect to receive and -- let me just start with that
question?

A.   Because we didn't necessarily know their full investment
price and we didn't know, because we don't represent the plan
investors, how long they might necessarily hold the security
and what assumptions they might use for the exit valuation,
what multiple they would expect to exit out for example.

Q.   What -- did you consider doing it but found that you had
insufficient data to do it, or was it that you didn't consider
doing it?

A.   It was an issue discussed but I think generally people are
aware that private equity funds, hedge funds, investing capital

64

1    expect rates of return that reflect the risk of their

2    investment.  And because we spoke to a number of parties during

3    this process, and particularly with Highland in the summer,

4    where the proposals were essentially on top of one another,

5    that we were getting a very good sense that plan investors were

6    expecting similar returns for going forward and putting new

7    capital into Delphi.

8    Q.    But the deal that you would have been comparing -- you

9    said on top of.  The deal that you would have been comparing

10   Appaloosa's deal to the Highland deal, that was much earlier --

11   much earlier and different values, correct?

12   A.    Yes.

13   Q.    So you don't have a comparator of any sort for the

14   November 14th restated amendments, correct?

15   A.    Yes.

16   Q.    Okay.  And you didn't give the board any advice about the

17   reasonableness of the preferred stock prices, those discounts,

18   did you?  I'm just focusing on that right now, so answer that

19   question.

20   A.    This is at November 14th?

21   Q.    Correct.

22   A.    For the November 14th proposal?

23   Q.          Correct.  We discussed the preferred stock discounts.

24   I think it was clear in the presentation that we distributed to

25   the board that they were higher than October 29 or September

65

1   6th, because we've consistently compared any amendment to all

2   previous amendments or the plan that was filed on the 6th.  And

3   pointed out the differences, and the rational why, and how the

4   company tried to negotiate those discounts lower but was where

5   we ultimately reached agreement on the November 14th plan.

6   Q.   Okay.  When I use the term lockups do you have an

7   understanding what that means?

8   A.   Yes.

9   Q.   Okay.  And so it's fair to say that the Appaloosa plan

10  investors had a number of devices to limit who could talk and

11  what they could say without triggering some penalties, is that

12  fair to say?

13  A.   Generally, yes.

14  Q.   Okay.  And so you came to understand that there was a plan

15  investor agreement that committed co-plan investors not to take

16  any steps that would be viewed antagonistic to the current

17  plan, correct, at any time?

18  A.   Generally.  But as I said at my deposition I did not see

19  those agreements.

20  Q.   Okay.  And you understood that there was also an

21  additional investor agreement that had a similar effect,

22  correct?

23  A.   Yes.

24  Q.   Okay.  And you understood that there was a provision of

25  the EPCA that related to changes of recommendation that had the

66

1   potential consequence of triggering an alternate transaction

2   fee, correct?

3   A.   Yes.

4   Q.   And you came to understand that Appaloosa did not take

5   those provisions lightly and that it was fairly aggressive in

6   enforcing them, correct?

7   A.   I think I understood that they had negotiated certain

8   provisions and they were going to insist that parties who

9   signed those contracts abide by the terms of the agreement.

10  Q.   I take it that you saw a number -- for example --

11          MR. MOUSTAKAS:  Strike that.

12  Q.   Focusing for a moment on restrictions that were imposed on

13  the debtors, you understood from review of certain e-mails that

14  debtor' counsel, Mr. Butler, and Mr. Sheehan, the Chief

15  Restructuring Officer, had communications with Mr. Tepper and

16  with Appaloosa concerning the ability to talk to other

17  stakeholders in order to fix the problem that arose when

18  Goldman refused to sign the October 29th agreement, correct?

19  A.   Generally.

20  Q.   Okay.  So I guess to be clear about it Appaloosa made it

21  sort of difficult to talk to the same parties, you know, that

22  you were dealing with consistently on this plan and wanted to

23  have sort of a case by case discretion to decide whether to put

24  conversations in the so called Safe Harbor, are you familiar

25  with that?

67

1    A.    I've heard that --

2              MR. BUTLER:  Objection.  There's two questions there.

3    And I just want to make sure he's a question about the Safe

4    Harbor or asking questions of the prior question.

5              THE COURT:  Why don't you break them up.

6              MR. MOUSTAKAS:  Sure.

7    Q.    When I use the term Safe Harbor, it's someone else's term,

8    but you understand what we're referring to in this case when we

9    talk about Safe Harbor?

10   A.    I think so.

11   Q.    That certain conversations, by agreement of the parties

12   won't trigger one of these penalties, correct?

13   A.    Yes.

14   Q.    Okay.  And you understood that Appaloosa was rigid about

15   requiring that agreements, with respect to these conversations,

16   happened before parties that have been dealing with one another

17   for quite a long time have conversations about ways in which

18   the terms could be negotiated or fixed to result in a new

19   amendment, correct?

20   A.    I don't know if I would use the word rigid.  I think they

21   insisted that the parties act according to the terms of the

22   agreement they had signed.

23   Q.    Okay.  I want to just go back because I just recall when

24   you were talking about the board a little bit earlier before we

25   moved into this -- these lockups.  You said there was

68

1    discussion -- I thought you said there was discussion about

2    rates of return.  What was the discussion?  Were members asking

3    what the rate of return was for Appaloosa investors?

4    A.    I don't recall.

5    Q.    Okay.  You don't recall that.

6    A.    You ask the question and I'm not sure if I recall board

7    members.

8    Q.    So when you said discussions were had when we're talking

9    about whether a presentation of the internal rate of return or

10   any other kind of return were made to the board, you said at

11   some point think there were discussions about rates of return,

12   do you remember saying that?

13   A.    Yes.

14   Q.    Okay.  What were those discussions?

15   A.    Those discussions occurred early in the process when the

16   company decided to go out and speak with parties about becoming

17   plan of investors.  The board wanted to understand what would

18   be the basis, parties would put new capital into the company,

19   what were the expected returns, how would they -- how expensive

20   would that capital be and how it would affect the process.  I

21   think what I said was at the board meeting relating to the

22   November 14th amendment we discussed with board members, and

23   parties asked questions regarding the discounts, that existed

24   on preferred A and preferred B stock.

25   Q.    Now, do you recall --

69

1          MR. MOUSTAKAS:  Strike that.

2   Q.    Did Mr. Tepper and Mr. Boland ever have occasion to tell

3   you that they would not proceed with the August 3rd EPCA?

4   A.    I don't remember them saying that.

5   Q.    Okay.  Do you remember testifying at a deposition on

6   November 25, 2007?

7   A.    Yes.

8          MR. MOUSTAKAS:  The Court's indulgence?

9   Q.    If you can grab from behind you, sir, Exhibit Number 182?

10  Let me know when you've got that.

11  A.    Do you know what volume it's in?

12  Q.    I'm afraid that I don't.  I understand that the volumes

13  might have shifted, I apologize for that.  The debtors may know

14  that.

15         THE COURT:  What volume is it?

16         THE WITNESS:  It's in orange, Volume III.  The orange

17  one at the top.

18         MR. MOUSTAKAS:  And it's 182, Your Honor.

19  A.    Okay.  I have it.

20  Q.    All right.  Let's wait for the Court to get it.  And now,

21  if you would turn to page --

22         THE COURT:  Page what?

23         MR. MOUSTAKAS:  20.  I'm sorry, yeah.

24  A.    Page 20?

25  Q.    Yes.  Line 22.

70

1   "Q.   In paragraph 12 of your November 2nd affidavit the first

2   sentence says as a result of the revised BBP projection,

3   including the reduced GM volume forecasts and the deterioration

4   of market conditions, the plan investors informed Delphi that

5   they were unwilling to proceed with their investment under the

6   terms of the Delphi-Appaloosa EPCA."

7   Q.   Did I read that correctly?

8   A.   Yes.

9   Q.   And you understand the reference to the Delphi-Appaloosa

10  EPCA to be the August 3 EPCA?

11  A.   Yes.

12  Q.   Okay.  And you answered yes, that's right, right?

13  A.   Yes.

14  Q.   And then, you see the next question asks:

15  "Q.  Now, who told you that the plan investors would not

16  perceive?"

17  Q.   Did I read that question correctly?

18  A.   Yes.

19  Q.   And you answered that question.  And why don't you read

20  your answer into the record?

21  A.   "Mr. Tepper and Mr. Boland."

22  Q.   Okay.  So does that refresh your recollection that you

23  actually at a time, previous to today, testified that you

24  learned that the plan investors would not go forward on the

25  August 3rd EPCA from Mr. Tepper and Mr. Boland, who I take it

71

1   are principals at Appaloosa?

2   A.   Yes.

3   Q.   Okay.  Now --

4        MR. MOUSTAKAS:  I'm sorry, Your Honor.  I'm skipping

5   ahead to move, I'm trying to cut out a bunch of stuff.  If

6   you'd give me a moment?

7   Q.   Now, notwithstanding the fact that Mr. Tepper and Mr.

8   Boland informed you that because of these factors they would

9   not be able to proceed -- the plan investors would not be able

10  to proceed with funding the plan pursuant to the August 3rd

11  EPCA.  Let's take that as a backdrop to the next question.

12  What I just said is correct, right?

13  A.   Yes, that's correct.

14  Q.   So flash forward to early November after there's been a

15  determination that Goldman cannot proceed on the October 29th

16  amendments, okay.  Now, after that happens do you recall that

17  Appaloosa files a Form 13B with the SEC?

18  A.   I don't recall.

19  Q.   Okay.  Were you aware that Appaloosa made a public

20  statement that -- concerning the expiration of the October 29th

21  amendments?

22  A.   Yes.

23  Q.   Okay.  And shortly after that you're also aware that a

24  determination was made at the debtors to issues a press

25  release, correct?

72

1   A.   Correct.

2   Q.   And that press release described, among other things, what

3   happened with respect to the October 29th amendments, correct?

4   A.   Yes.

5   Q.   And it also said that -- indicated that the August 3 EPCA

6   was still in force and effect, correct?

7   A.   Yes.  Because certain conditions, in their view, they did

8   not believe had been satisfied.

9   Q.   And some of those conditions were historical, they weren't

10  going debt satisfied, they're related to historical events,

11  correct?

12  A.   I believe they related to the ability of the plan

13  investors as was set forth in the original agreement to review

14  the settlements with general motors, a new business plan which

15  the debtors provided, and also had required their reasonable

16  approval on terms of financing.

17  Q.   Okay.  So you would agree with me that one consequence of

18  announcing publicly that the August 3 EPCA was still in force

19  and effect would be to depress -- potentially depress interest

20  in potential rivals?  In other words, it would be less likely

21  that someone would see the debtor potentially in place, is that

22  fair?

23  A.   I don't agree with that.

24  Q.   Do you agree with one possible consequence of making this

25  announcement that the EPCA was still in place and the parties

73

1    were operating under it?  Do you agree that one consequence

2    from that was that the lock up provisions that we've described,

3    both with respect to the plan investors the additional

4    investors with respect to Delphi itself -- that the debtors

5    themselves could do and say those remained in effect, didn't

6    they?

7    A.    My understanding is the lockup increments would remain in

8    effect for some period even if the EPCA was terminated.

9    Q.    And what was that period?

10   A.    I don't recall.

11   Q.    So you don't know if it was a short period or long period?

12   A.    I just don't remember what the period is.

13   Q.    And one consequence of announcing that the EPCA was still

14   in force and effect was that people looking inside, looking

15   from the outside would understand, reasonably understand that

16   Appaloosa still had the inside track with respect to funding

17   the plan of reorganization, correct?

18   A.    Well, the agreement has certain provisions in it that

19   would require, as is customary, a breakup fee to be paid if the

20   debtor changed its recommendations.  And the board retained its

21   fiduciary obligation if there were any better proposals to

22   pursue them.  So I think what existed is somewhat consistent

23   with what you see in most large complicated deals where party

24   invest considerable time, effort and resources to negotiate.

25   Q.    Between October 29th and November 14th the debtor didn't

74

1   do anything to indicate to the market that it had an interest

2   in receiving competing proposals, correct?

3   A.   Other than it's action during the pendency of this case,

4   where it has responded to parties, and when, in the beginning,

5   it went out and solicited interest.

6   Q.   Right.  Let me try to say this in a different way and

7   maybe short circuit a lot of this.  I'm want you to try to

8   compare two scenarios.  One scenario is the October 29th

9   amendments are dead and the market learns that the August 3rd

10  EPCA is a dead letter, it doesn't exist, it's been terminated.

11  Let's take the easiest thing, it's been terminated.  When you

12  compare that to the state of affairs that actually happened in

13  this case, which was that the company went out and said to the

14  market, hey, we're still operating under an EPCA, we're going

15  forward on the August 3rd EPCA, you would agree with me that as

16  between those two things the former, which is saying the EPCA

17  is terminated or no longer vital would have the effect of

18  increasing interest and among people who might be interested in

19  contesting Appaloosa's role as the plan investor, fair?

20  A.   I'm not so sure I would agree with that.  Because I think

21  what you're trying to do is look in isolation at one particular

22  variable in a very complicated case.  And one of the benefits

23  of  having the EPCA remain in place is a signal to customers,

24  employees, the market that while there are issues with the

25  original EPCA there are parties in place that remain interested

75

1    in providing capital and the parties are trying to address the

2    conditions that couldn't be satisfied in some negotiated way,

3    fairly typical.  To toss that out the window has implications.

4    And I think the board carefully considered that and the risks

5    inherent in that.  Parties could approach the debtor if there

6    was interest and I think the debtor has always indicated a

7    willingness to look at those proposals.  It did so as recently

8    as a week ago.  And nothing that exists right now stopped a

9    party from coming to the debtor, the debtor having discussions,

10   the creditors' committee having discussions and engaging.

11   Q.   Let me ask you this.  Do you think the obligation of the

12   board to become more or less aggressive without seek additional

13   proposals modulates depending on the strength of the proposal

14   that is in front of it, that's trying to execute on?  In other

15   words, if you have a really good proposal you've got a lower

16   obligation because you're acting reasonably as opposed to

17   having a very poor proposal your obligation sort of ratchets

18   up, is that fair to say?

19   A.   I think the obligation of the board is --

20   Q.   I'm sorry, I just want you to answer my question.  You'll

21   be able on redirect to say other things.  But I do want an

22   answer to that question if you might.

23   A.   I just don't think it's that simple.

24   Q.   Okay.  So when you isolate that one variable, and I asked

25   you about that one variable, are you willing to give me an

76

1   answer or you can say I'm not willing to give you an answer,

2   that's fine?

3   A.   I just don't think in a case of this complexity you can

4   look at it that simply.

5   Q.   Okay.  Why don't you -- why don't you turn -- I'm sorry,

6   again, I'm hoping it's volume III of the highly confidential

7   documents, but I don't know that it is.  Exhibit 151, if you

8   can just turn to that?

9            MR. BUTLER:  While you're doing that I just have a

10  question.  We've been at this almost a couple of hours.  Mr.

11  Resnick does have some scheduling conflicts.  I'm just

12  wondering if counsel --

13           MR. MOUSTAKAS:  I don't think I have more than five

14  minutes.

15           MR. BUTLER:  Okay.

16  Q.   Let me know when you've got that in front of you, sir?

17  A.   1 to 51?

18  Q.   1 to 51.

19  A.   It's an e-mail?

20  Q.   It is.

21           MR. MOUSTAKAS:  Your Honor, do you have that?

22           THE COURT:  Yes.

23           MR. MOUSTAKAS:  Okay.

24  Q.   Why don't you read from the e-mail from Norma Courio

25  (ph.), are you familiar with that person?

77

1   A.   Yes.

2   Q.   Who is Norma Courio?

3   A.   She's one of the senior bankers at JPMorgan involved with

4   their DIP and exit financing practice.

5   Q.   So can you read the e-mail?

6   A.   "I guess it depends on what is meant by the word

7   constructively" --

8   Q.   I'm sorry.  You understand that the e-mail from Norma

9   Courio is the first e-mail even though it appears below the

10   first e-mail?  You see based on the dates and times?

11   A.   So -- I'm sorry, what e-mail are you asking me to read?

12   Q.   The one that says from Norma Courio.

13   A.   Okay.  To John Sheehan?

14   Q.   Yeah, you've got it.

15   A.   Okay.  "John, will do.  Is it okay for us to say that

16   Appaloosa is still working constructively with you to revise

17   the deal?  Norma."

18   Q.   And now would you read the e-mail response from Mr.

19   Sheehan?

20   A.   "Spread the word, Delphi's EPCA has not been terminated.

21   John."

22   Q.   Okay.  Again, I'm sorry, I wasn't clear enough.  That is

23   not the responsive e-mail, the responsive e-mail is the e-mail

24   on top.  So when I say responsive I mean the e-mail in which

25   Sheehan responds to Courio, not Courio responded to Sheehan's

78

1    first e-mail.  So if you could read the top e-mail, it starts

2    with I guess?

3    A.    The one I started to read?

4    Q.    Right.

5    A.    "I guess it depends upon what is meant by the word

6    'constructively.'  They're the only game in town in a financial

7    market that can only be characterized as fragile.  They have

8    established terms under which they are willing to invest.

9    They're expensive and GM will have to come to our conclusion

10   that we have no choice.  The statutory committees will hate it

11   but it is where we are."

12   Q.    Let me ask you a question about that portion of the e-

13   mail.  First of all, have you ever seen this e-mail before?

14   A.    No.

15   Q.    Are you familiar with that sentiment coming out of Mr.

16   Sheehan?

17   A.    I think he was reflecting how he felt at that time, I

18   assume.  You can ask him.

19   Q.    And that's on November 9th, right?

20   A.    Yes.

21   Q.    Okay.  Now, we talked about the fact that there was this

22   EPCA -- the August EPCA, and you'll agree with me that there

23   was essentially, just as the ink was drying Appaloosa raised

24   the question of modifying the EPCA, isn't that fair to say?

25   A.    I don't think that's fair to say.

79

1    Q.    Okay.  So you don't think that there's an August 3rd

2    letter from Appaloosa that talks about making modifications to

3    the EPCA that had just been entered?  You don't think that

4    that's the case, is that your testimony?

5    A.    My recollection is that around the time -- I couldn't

6    remember the exact date, Appaloosa received some of the

7    documents that they needed to review to address the conditions

8    that existed.  The GM settlement agreement, the revised

9    business plan, and the debtors' proposal on how it would

10   arrange exit financing.  And my recollection is after reviewing

11   those items Appaloosa came back, and I think I testified in my

12   deposition and said, they had concerns about moving forward

13   with the original EPCA.

14   Q.    All right.  So you remember there was a September 10th,

15   two or three page memo that laid out all the sort of open

16   issues from Appaloosa's perspective, you remember that?

17   A.    Not offhand.  I know there was correspondence or e-mails

18   back and forth --

19   Q.    But you don't remember anything from early August that

20   indicated they were looking to make modifications, is that your

21   testimony?

22   A.    I don't recall.

23   Q.    Okay.  But you have testified that it became clear that

24   there were conditions that were not going to be satisfied as a

25   result that the August 3rd EPCA was not going to get -- was not

80

1    going to become operative, right?

2    A.    Unless the parties agreed to changes.

3    Q.    Okay.  And so they tried to do that and that was the

4    October 29th amendments.  And those had some conditionality

5    which came to pass and caused that set of amendments to expire

6    as well, correct?

7    A.    Yes.

8    Q.    And so as a practical matter, in early November, you kind

9    of had to iterations that both failed.  It was true that as a

10   technical matter August 3rd was still in place but that wasn't

11   going to be the EPCA that you were going forward on without

12   changes, correct?

13   A.    I think the issue on November 14th was not having support

14   of the other stakeholders and that's what we went back to

15   address.

16   Q.    Right.  Because it was easy to have the plan investors

17   support, because as Mr. Sheehan reflected in that e-mail we

18   just read they were very expensive and were getting very

19   expensive terms, right?  So of course, they didn't complain,

20   right?

21   A.    They were getting terms that were negotiated among

22   themselves, GM and Delphi.

23   Q.    Do you not agree that those were expensive terms?  Do you

24   know agree with Mr. Sheehan's characterization that they're

25   very expensive or that they're expensive?

81

1   A.    I think that we said and I believe I testified that we

2   thought the discounts were very high compared to what was

3   agreed in October 29th.  And we tried to negotiate to reduce

4   them.

5   Q.    Are you aware that even in the November 14th EPCA and

6   presumably in the newest amendments, there are additional

7   conditionality with respect to interest rate caps, is that

8   correct?

9   A.    Yes.

10  Q.    You understand -- and you understand that was an issue for

11  the unsecured creditors' committee, correct?

12  A.    Yes.

13  Q.    And you understand that that CAP is 585 million dollars,

14  correct?

15  A.    Correct.

16  Q.    And you understand that a number of banks have come back

17  and said -- have expressed annual interest expenses that

18  reflect the use of flex, that take the costs over 585, correct?

19  A.    I haven't seen any particular presentation --

20  Q.    Okay.

21  A.    -- of --

22  Q.    If you'd get Exhibit 37?

23  A.    Confidential or not?

24  Q.    I bet it is.  And within that document I'm going to direct

25  your attention -- you can look at --

82

1   A.   I don't --

2   Q.   I'm sorry.

3            THE COURT:   It's volume I

4   A.   What was the exhibit number?

5   Q.   It was 37.  Volume 1 of the orange tab.

6   A.   Okay.

7   Q.   I'm sorry, I don't seem to have it.  If you would turn to

8   page -- the page marked with the Bates stamped number

9   DPH2EAA0000224, so ending in 224, that's the easiest way to say

10  that?

11  A.   Okay.

12  Q.   You found that?

13  A.   Yes.

14  Q.   And that's entitled Exit Financing Lender Matrix, right?

15  A.   Yes.

16  Q.   And do you understand -- you can look back at the first

17  page of this, but do you understand that this was part of a

18  proposal to the board or a pres -- I'm sorry, a presentation to

19  the board?

20  A.   Yes.  On October 24th.

21  Q.   Okay.  And turning your attention to the line 1, 2, 3, --

22  maybe four or five lines from the bottom, my eyes are really

23  not seeing this, but I think I remember the numbers well

24  enough.  There's a line of total interest with flex, do you see

25  that line?

83

1    A.    Yes.

2    Q.    And do you see with respect -- and do you see at the top,

3    along the top, there are various lenders, can you see that?

4    A.    Yes.

5    Q.    And do you see that the first lender -- I can't read it,

6    it's blacked out on my Xerox copy, they're at -- is that 647.7?

7    A.    It's hard for me to read as well.  But it looks that way.

8    Q.    Okay.  And if you go across the next one is 38.4 or

9    something to that -- if you just sort of scan across you'll

10   notice that the majority of these indicate interest expenses

11   beyond the cap that has been set in the most recent EPCAs, is

12   that fair to say?

13   A.    That's what the numbers say.

14   Q.    And that is a concern that some -- certain constituencies

15   have had, correct?

16   A.    Yes.  But these numbers also, I think it's worth noting,

17   bill in the full flex, this was in October proposal, I'm

18   familiar with it now.  I thought you met currently as of recent

19   discussions.  And the lenders agreed to go out with a best

20   efforts underwriting at slightly different terms than what's

21   reflected in the full flex numbers here.

22   Q.    Right.  Am I right to understand in layman's terms full

23   flex basically means giving them flexibility up to this amount

24   to try to indicate the financing, right?

25   A.    Well, in this case it reflected flex that I think the

84

1    lenders would say was much broader than what they would

2    normally use given the volatility of the markets.  And that's

3    one of the reasons why the debtors decided not to go forward

4    with a committed deal, because the flex was so wide.  None of

5    the lenders wanted to take a risk in today's market to give a

6    more traditional commitment with much narrower flex.  So what

7    we were evaluating here was very wide flex.

8    Q.    Okay.  Is it fair to say that the cap is set -- who set

9    the cap?

10   A.    I believe that was negotiated among the plan investors,

11   the company, with some input from some of the other

12   stakeholders.

13   Q.    When you use the term negotiate is it fair to infer into

14   that that comment by -- or the implication and comment by Mr.

15   Sheehan that the negotiating position of the debtors is

16   diminished?

17   A.    I think it depends on -- you have to look at the issue

18   here.  I think all stakeholders did have some alignment of

19   interest to have leverage at certain levels when the company

20   exited bankruptcy and interest expense that would fit into a

21   reasonable amount, such that the operating performance of the

22   company post-reorganization could cover that interest expense.

23   So some people who weren't going to hold equity might be more

24   flexible.  But in this case the unsecured creditors, the equity

25   committee, the plan investors all were going to be having

85

1   substantial stakes in the company through their equity

2   ownership.  And therefore it would be sensitive to how much

3   interest and how much debt the company would carry.

4   Q.   Right.  And I guess I wasn't trying to focus on why

5   someone might want to do that.  But you'd agree with me that

6   Appaloosa had a big hand in determining what that cap ought to

7   be, correct?

8   A.   Yes.  They had certainly a significant voice in that

9   discussion.  Right.

10   Q.   And do you know what the unsecured creditors wanted the

11   cap to be?

12   A.   At what time?

13   Q.   Most recently.  There was an objection today, wasn't

14   there?

15   A.   Yes.

16   Q.   What's that pending objection ask for?

17   A.   It's higher than the current amount.  I just don't

18   remember the exact number.

19   Q.   Does 625 sound in the ballpark?

20   A.   That's sounds right.

21   Q.   And are you aware of whether -- are you aware of whether

22   some interest expense calculations with respect to the most

23   recent amendments has been generated that shows hypothetical

24   total interest expenses with respect to JPM and Citibank in the

25   case of -- that exceed the 585 million dollar cap, are you

86

1    familiar with anything like that?

2    A.    I haven't seen --

3    Q.    So you haven't been paying attention to the sort of

4    interest rate cap issue in more recently?

5    A.    I don't think that's what I said.  I said I haven't seen

6    your exhibit.  I didn't say I haven't been paying attention to

7    it.

8    Q.    Okay.  Well, let me ask you are you familiar with the

9    rates at which there is an expectation funding exit financing

10   to take place?

11   A.    Yes.

12   Q.    And are you familiar with the fact that some of those

13   estimates show annual interest expense exceeding the cap of

14   585?

15   A.    At the current time, yes.

16   Q.    Okay.  And if interest rates get worse, it will even be

17   worse, right?

18   A.    That's correct.

19   Q.    So -- and you understand that the consequence of that is

20   that when that happens Appaloosa will again be entitled to try

21   to renegotiate the EPCA, correct?

22   A.    Will have a condition that might not be satisfied and

23   they'd have to waive or the company would assess it's cash flow

24   and determine how much it has to borrow.  That's obviously

25   another way to come within a cap, is to borrow less.

87

1   Q.   Right.  But that didn't work with respect to the August

2   3rd EPCA, right, because there's 7.1 billion and we're going to

3   out and get 5.2, and don't you recall that Appaloosa's position

4   was condition failed, we get to get out, you remember that?

5   A.   Right.  But the -- the issue here is over the -- meaning

6   the interest expense cap not the aggregate amount of debt

7   borrowed.

8   Q.   Fair enough.  But you agree with me that if the interest

9   expense is exceeded Appaloosa will be able to walk away from

10  its obligation to fund the plan, correct.

11  A.   I know the condition on the EPCA wouldn't be satisfied and

12  then we'd have to have a discussion about on what basis

13  might they be willing to waive that condition.

14  Q.   No.  I understand that but --

15          THE COURT:  You don't need to ask again.

16          MR. MOUSTAKAS:  Thank you.  Thank you, Your Honor.

17  If I may just consult with my colleagues one moment, I think

18  I'm done.

19          THE COURT:  Okay.

20          MR. MOUSTAKAS:  Your Honor, I'm through.

21          THE COURT:  Okay.  Do you have any questions, Mr.

22  Fox?

23          MR. FOX:  Yes, just very few, Your Honor.

24          THE COURT:  Okay.

25          MR. FOX:  Before I do that I just wanted to confirm

88

1    on the record that there's no objection to the admission of Mr.

2    Resnick's deposition transcript which is 182.

3              THE COURT:  I thought all these exhibits in the

4    binder were agreed to.  The admissibility was agreed to.

5              MR. MOUSTAKAS:  No.  We didn't object to those --

6              MR. FOX:  I just want to be sure there's no objection

7    and I could just ask very few questions.

8              THE COURT:  Okay.

9              MR. BUTLER:  Your Honor, at some point before I close

10   the record we'll go through the exhibits.

11             THE COURT:  All right.

12             THE WITNESS:  Is that in the confidential?

13             MR. FOX:  No, you don't have to look at it.

14             THE WITNESS:  Thank you.

15             MR. FOX:  I just want to let you leave.

16             THE WITNESS:  Appreciate it.

17   CROSS EXAMINATION BY

18   MR. FOX:

19   Q.   Mr. Resnick, at the outset of your cross examination you

20   talked a little about the chart that was marked as Exhibit 108,

21   you don't have to look at it I just want to remind you of it.

22   And you made reference to trading prices in the market being an

23   element of value, do you recall that?

24   A.   An indicator of value.

25   Q.   An indicator of value.  Okay.  Now, you understand that

89

1    Delphi has two million dollars worth of senior debt

2    outstanding?

3    A.    Yes.

4    Q.    Now, if you look at the prices of the senior debt in the

5    market what sort of indication are they going to give of value?

6    A.    At a particular point in time you can use those prices to

7    imply -- I mentioned earlier, the enterprise value based on

8    looking at the recovery those stakeholders would receive under

9    the plan of reorganization.

10   Q.    Now, if all other things being equal you divert -- and if

11   the enterprise value does not change, if you divert some of the

12   enterprise value away from the bondholders recovery to some

13   other area of the capital structure, and assuming the market is

14   aware of that -- of that proposal, you would expect that the

15   bond prices would drop, correct?

16   A.    When you say if you divert some of the -- I'm not sure I

17   understand what the enterprise value is, what you're referring

18   to?

19   Q.    If you have an EPCA on August 2 which provides for a

20   certain amount of value to the plan investors, and then

21   thereafter you have to increase the amount of value that is

22   going to be provided to those investors in order to get them to

23   continue to make the same amount of monetary contribution to

24   the debtors, you'd be diverting -- you'd be taking some

25   additional enterprise value that might otherwise be available

90

1    to pay the senior debt and be diverted out to the plan

2    investors, you understand that?

3    A.    I understand the question but I think it's a little apple

4    and oranges.  As you know, this plan was based on an agreed

5    total enterprise value and that's -- that drove parties'

6    recovery.  So I'm not sure I understand what you're taking away

7    and from whom and under what -- what's your constant view of

8    enterprise value.

9    Q.    Well, the intrinsic enterprise value doesn't change

10   because the parties all agree that it's a different number

11   today than it was yesterday, correct?

12   A.    Right.

13   Q.    And the market place -- investors in the market place

14   aren't party to this agreement as to what the enterprise value

15   is, correct?

16   A.    Right.

17   Q.    So they're trading based on what they believe is the

18   intrinsic value rather than what they believe is a negotiated

19   value, correct?

20   A.    Well, they're trading on what they believe the value is.

21   I'm not sure I understand what you mean by intrinsic value.

22   They are trading because they have a need to buy or sell for

23   whatever reason.  They need to.

24   Q.    They're trading on their perception of the value -- of the

25   enterprise value of the company, rather than what the

91

1    creditors' committee and the debtors may have agreed is the

2    value of the company, correct?

3    A.    Right.   Their desire -- they just need to raise cash and

4    they have to sell a bond.   Sometimes that's why people trade.

5    Q.    But assuming that they didn't have that problem, assuming

6    that they're trading solely based on their perceived value of

7    the company, if some portion of the enterprise value is -- or

8    some additional portion of the enterprise value is now being

9    promised to some other part of the capital structure, be it the

10   MDL plaintiffs or be it the subordinated debt or be it an

11   additional amount of value going to Appaloosa in return for its

12   cash contribution, you would anticipate if the market's aware

13   of that, that bondholders -- or that people in the marketplace

14   would pay less for the bonds once they hear about that and they

15   would have been willing to pay before that transaction is

16   proposed assuming no other changes?

17   A.    Or no other reason why they might trade.

18   Q.    Okay.   And assuming all the reasons why they might trade,

19   exactly?

20   A.    That might be the case but you would have expected then

21   the bonds to have gone up after the December 3rd agreement was

22   filed, because we took value away from some of the parties you

23   mentioned and gave it back to other people and the bonds didn't

24   trade up, which you would expect would occur under your

25   hypothetical.

92

1    Q.    Assuming, though, the marketplace agreed with your

2    analysis as to the change in valuation, correct?

3    A.    But we didn't change your valuation.

4    Q.    The change --

5              MR. FOX:  All right.  I'll strike that.

6    Q.    Are you aware that after the September 6th -- or

7    immediately after the September 6th -- immediately after the

8    plan was filed on September 6th that the senior debt was

9    trading at about ninety-five?

10   A.    Sounds about --

11             THE COURT:  Mr. Resnick, who has more information

12   about this company, the creditors' committee, the equity

13   committee or people trading in the marketplace without having

14   signed confidentiality agreements?

15             THE WITNESS:  The creditors' committee and equity

16   committee, General Motors, by far, Your Honor.

17             THE COURT:  I think you can make all the arguments

18   you want about the market, whatever that is.  Let me just ask

19   Mr. Resnick on the data here, is there any indication on this

20   exhibit how heavily traded these securities are?

21             THE WITNESS:  We do not have the volume data all in

22   there, Your Honor.

23             THE COURT:  Is there any indication -- does this

24   reflect shorts?

25             THE WITNESS:  It certainly could.  That was my point

93

1   to Mr. Fox earlier.

2        THE COURT:  No, but does it --

3        THE WITNESS:  Oh, does it reflect --

4        THE COURT:  Does trading price reflect shorts?

5        THE WITNESS:  I'm not sure, Your Honor.  It's a

6   compilation of trading prices that we get from various sources.

7        THE COURT:  Okay.

8        MR. FOX:  Just one more question, Your Honor.

9   BY MR. FOX:

10  Q.   Do you know what the value -- what the senior debt was

11  trading at yesterday?

12  A.   I think I mentioned in the high fifties.

13  Q.   Thank you.

14       THE COURT:  Any redirect?

15       MR. BUTLER:  We have no redirect, Your Honor.

16       THE COURT:  Mr. Resnick, I have a question.  On the

17  interest rate cap issue or the interest expense cap issue, that

18  you spent some time talking about, do you have any sense what

19  the economic effect on the equity the reorganized securities --

20  the reorganized equity would be of an increase of the interest

21  rate expense to the number that the creditors' committee has

22  suggested would be appropriate?

23       THE WITNESS:  The differential, Your Honor, between

24  625 and 585 of both annual interest expense for a company this

25  size is relatively small.

94

1        THE COURT:  On the effect -- on the value of the

2   equity.

3        THE WITNESS:  It will theoretically have some impact

4   because debt -- well, the debt would be the same, the interest

5   expense will be slightly higher, it will make the company's

6   cash flow a bit less because of more interest expense.  So

7   theoretically it should have some small impact, but that

8   differential I don't think is that huge.

9        THE COURT:  Is that like in the range of one or two

10  percent or is it in the range of ten and fifteen percent?

11       THE WITNESS:  I think closer to the one to two

12  percent.  The concern is over given the automotive industry

13  prospects for next year.  Parties would rather have less

14  interest expense and more cash flow.

15       THE COURT:  The two lead parties who have undertaken

16  their best efforts to raise the financing, neither of those

17  parties are involved in the EPCA, are they?

18       THE WITNESS:  My understanding, Your Honor, is that

19  some part of JPMorgan is a participant in some portion of the

20  plan investor group, because --

21       THE COURT:  What do you view as the risk that either

22  through that relationship or just through general market

23  relationships that the perspective lenders might have with the

24  perspective investors, the EPCA investors, that they could

25  artificially create a default, if you will, on this issue in

95

1    connection with the financing?

2           THE WITNESS:  I wouldn't view that as a very high

3    risk.  I mean, the parties are sophisticated.  I think we have

4    a number of people in this case that understand the financial

5    markets and watch them closely.  I mean, the Chair of the

6    creditors' committee and his firm are very significant

7    financial institution and knowledgeable about the markets.  And

8    I think people have a pretty good sense of where the market is.

9           THE COURT:  Okay.  Any other questions?  All right,

10   you can step down.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. BUTLER:  Your Honor, may Mr. Resnick be excused?

13          THE COURT:  Yes.

14          MR. BUTLER:  Thank you.  Your Honor, the other

15   logistic issue that we were going to take out -- but present

16   now would be Mr. Tepper's testimony.  I don't know what the

17   Court wants to do with lunch, is it possible to take that

18   before lunch, or does the Court want to take lunch now.  What's

19   your pleasure?

20          THE COURT:  As far as cross examining Mr. Tepper, how

21   long do you think that would be?

22          MR. BRILLIANT:  I think an hour.

23          THE COURT:  All right.  I'll break for lunch now.

24   But before we begin, and particularly in light of the questions

25   that have been asked regarding trading prices and the like, I

96

1    have determined that it's incumbent upon the group, represented

2    by Goodwin Procter, to represent to me the aggregate holdings

3    that they hold, whether they have any shorts and the degrees --

4    I'm sorry, the places in the capital structure where those

5    holdings are -- in the aggregate.

6              MR. BRILLIANT:  Your Honor, we have filed 2019

7    statement where we have given to the trading history of our

8    clients and what they own all across the capital structure of

9    the company.

10             THE COURT:  Okay.  Good.  All right.  So we'll come

11   back at a quarter of 2.

12             MR. BUTLER:  Thank you, Your Honor.

13        (Recess from 12:57 p.m. to 1:53 p.m.)

14             THE COURT:  Okay.  We're back on the record in

15   Delphi.  And I believe you were going to call Mr. Tepper.

16             MR. BUTLER:  Yes, Your Honor.  Good afternoon, Jack

17   Butler again, from Skadden on behalf of the debtors at this

18   omnibus hearing -- not omnibus hearing, regarding the EPCA and

19   disclosure statement.  Your Honor, the declaration that we now

20   seek to move into evidence is Exhibit 203 in the joint binders.

21   This is the declaration of David Tepper, who we would present

22   to the Court for cross examination and questions by the Court.

23             THE COURT:  Okay.

24             MR. BUTLER:  Exhibit 203, this is highly

25   confidential, it would be in the orange labeled binder,

1   probably number 4.

2            THE COURT:  Okay.  Is there any objection to the

3   admission of this declaration as Mr. Tepper's direct?  Okay.

4   All right.  Does anyone wish to cross examine Mr. Tepper?

5   Okay.  Come up, please, to the witness stand.

6   (Declarations of David Tepper was hereby received as Debtors'

7   Exhibit 3 and 4 for identification, as of this date.)

8        (Witness is sworn)

9            THE COURT:  For the record, will you spell you name?

10           THE WITNESS:  Spell?  David, D-A-V-I-D, Allen,

11  Tepper, T-E-P-P-E-R.

12           THE COURT:  Okay.  Thank you.  Okay.  You can go

13  ahead.

14           MR. MOUSTAKAS:  Thank you, Your Honor.

15  CROSS EXAMINATION BY

16  MR. MOUSTAKAS:

17  Q.   Good afternoon, sir.

18  A.   Good afternoon.

19  Q.   Appaloosa owns -- let me start by saying from time to time

20  I may say you and when I say you it's obvious I mean Appaloosa.

21  And when I may say Appaloosa what I mean is the plan investors.

22  So if you have a question about my usage please stop me and

23  I'll try to be as precise as possible.  I won't use ABAH, I'll

24  use Appaloosa for that, okay.

25  A.   Okay.

98

1   Q.   Appaloosa owns about twenty-five percent of the toppers

2   outstanding, correct?

3   A.   Yep.

4   Q.   And when I say that we mean by the Delphi trust at issue,

5   right?

6   A.   Yes.

7   Q.   And you understand that those toppers are contractually

8   subordinated to the senior notes, correct?

9   A.   Yes.

10  Q.   Appaloosa also owns, or has an equity position in Delphi,

11  isn't that correct?

12  A.   Yes.

13  Q.   Do you know what percentage of the outstanding equity

14  Appaloosa currently holds?

15  A.   Not exactly.

16  Q.   Roughly?

17  A.   Nine percent -- eight/nine or ten percent, something of

18  that sort.

19  Q.   Appaloosa also holds senior notes, correct?

20  A.   Yes.

21  Q.   And that's at about four/four and a half percent, correct?

22  A.   Yes.

23  Q.   Now, in connection with the November 4 restated amendments

24  to the EPCA do you have in your head a rough number for what

25  Appaloosa's equity position would be in the post-emergence

99

1   Delphi?

2           MR. BUTLER:  Objection.  Counsel, referred to a

3   November 4 --

4           MR. MOUSTAKAS:  4 -- I'm sorry.  I stand corrected

5   14th stated amended -- restated amended.

6   A.   You asking a dollar amount or are you asking in

7   percentage?

8   Q.   Percentage?

9   A.   I suspect it depends if we get hit by the backstop or not.

10  Q.   Assuming you don't get hit by the backstop?

11  A.   Assuming that we don't get hit by the backstop, I guess --

12  and you mean -- how do you want me to treat the warrants that

13  we'll be getting?

14  Q.   Well, I guess tell me with or without?

15  A.   So assuming nothing -- I guess if we get hit by the

16  backstop I guess we'll probably be about fifteen percent or

17  something in that sort.  I haven't really calculated to tell

18  you the truth.

19  Q.   Okay.  All right.  Well, then let's move on if you haven't

20  calculated it closely.  In addition to Appaloosa you have five

21  other -- there are five other co-plan investors who are funding

22  the proposed plan -- plan of reorganization for the debtors,

23  correct?

24  A.   Yes.

25  Q.   And those are Pardes, Harbinger, Goldman, UBS and Merrill

100

1    Lynch, correct?

2    A.    Yes.

3    Q.    And does Pardes own or hold any toppers?

4    A.    I believe they do.

5    Q.    And Harbinger holds toppers, correct?

6    A.    I believe they do, I'm not sure.  I don't know run their

7    fund.

8    Q.    I'm sorry?

9    A.    I don't run the fund, but, yeah, I believe they do.

10   Q.    And Goldman?

11   A.    I'm not quite sure, I think they might.  But I'm not quite

12   sure.

13   Q.    Okay.  And what about UBS and Merrill Lynch?

14   A.    I don't believe they do.

15   Q.    Okay.  You don't believe, you guess, or either?

16   A.    I don't believe and I'm not sure.

17   Q.    Together with the other co-plan investors who do own

18   toppers is it fair to say that together you have something in

19   the neighborhood of fifty percent of all the toppers

20   outstanding?

21   A.    I don't know the exact number, it's more than twenty-five,

22   it's less than 100 percent, that I'm sure of.

23   Q.    Okay.

24   A.    But it's probably something close to that number I would

25   say.

101

1    Q.    Close to fifty?

2    A.    Forty/fifty percent, something like that.

3    Q.    So would it be fair range to say between forty and sixty

4    or between forty and fifty?

5    A.    I really don't have the information but I know they own

6    toppers, I know they have around a certain number, I don't know

7    the exact number.

8    Q.    Just since I messed up the record, so your testimony is

9    between forty and fifty?

10   A.    Yes.  I have not real idea but I think it's like that.

11   Q.    Okay.

12   A.    It's not something we had a conversation about, to tell

13   you the truth.

14   Q.    Now, you just previously acknowledged contractual

15   subordination of the toppers to the senior notes.  I want to

16   ask you a question about that.

17   Q.    You understand that in the EPCA there is a provision that

18   calls for the waiver of that contractual subrogation provision,

19   correct?

20   A.    Yes.

21   Q.    And do you have an understanding of who it is that has to

22   act in order to affect that waiver?  Is it only the people --

23   is it only the people holding the interests to which that

24   priority relates?

25   A.    I -- I don't understand the question.

102

1    Q.    Sure.  Let me try it a different way.  So there's going to

2    be a waiver, do you know who affects the waiver?  Is there a

3    vote?

4    A.    Are you saying a vote on the plan?  I don't understand

5    your question.  I mean, the people can vote on the plan or not

6    vote on the plan and it's in the plan, is that what you mean?

7    Q.    Well, let me see if I can't isolate the variable I want to

8    ask you about.  It's your testimony that, sort of, your upper

9    no vote on the plan determines how you vote on the waiver of

10   the subrogation provision, correct?

11   A.    I don't understand what you're saying.

12          THE COURT:  You mean subordination, right?

13          MR. BUTLER:  Yes, I'm sorry, I said subrogation, I

14   mean subordination, correct.  I'm sorry, Your Honor.

15          THE WITNESS:  Can you repeat the question, please.

16          MR. BUTLER:  Sure.  Sure.

17   Q.    So you understand that the EPCA has a provision that calls

18   for the waiver of the contractual subordination provision,

19   correct?

20   A.    You know, I don't know this provision as such, okay.  I

21   know that the way we structured -- how we structured the plan.

22   And the plan was structured as a par plus approved plan and it

23   was a big -- as I told you last week or two weeks ago, there's

24   a big compromise, the plan.  So I'm not -- to tell you the

25   truth, I'm not aware of the specific provision.  So if you have

1    the specific provision you can show it to me, I'll look at it.

2    But I don't know it --

3    Q.    Okay.

4    A.    -- exactly as -- as you say it.

5    Q.    Okay.  Let me ask you to turn to Exhibit 31 and that's

6    going to be behind -- well, you're going to be helped.  Did I

7    say that's in non-confidential volume 6 -- does he have that.

8    A.    Okay.

9    Q.    And if you turn to page 64 or to section 11.10.  Let me

10    know when you've gotten there, sir.

11    A.    Sixty-four, 11.10.

12    Q.    Yeah, page 64 and that section --

13    A.    All right.

14    Q.    11.10.  Do you see where it says subordination rights?

15    A.    Yes.

16    Q.    Okay.  And it provides that "All claims against the

17    debtors and all rights and claims between or among holders of

18    claims relating, in any matter whatsoever, to distribution on

19    account of claims against or interest in the debtors based upon

20    any claims, claims of subordination rights whether asserted or

21    unasserted, legal or equitable shall be deemed satisfied by

22    distributions under the plan to holders of claims having such

23    subordinated rights.  And such subordinated rights shall be

24    deemed waived, released, discharged and terminated as of the

25    effective date."  Did I accurately read the first sentence of

104

1    that provision?

2    A.    It was a long sentence, but I think so.

3    Q.        Okay.  And do you understand that to be saying that

4    any subordination rights that a senior party holds will be

5    deemed to be -- deemed to be waived by operation of the

6    agreements that relate to the EPCA -- that arise out of the

7    EPCA?

8              MR. BUTLER:  Objection, calls for legal conclusion.

9              UNIDENTIFIED ATTORNEY:  I guess understanding is very

10   important, Your Honor.

11             THE COURT:  Well, it speaks for itself.  I --

12             UNIDENTIED ATTORNEY:  I need to know if he

13   understands it so I can ask him --

14             THE COURT:  Do you understand the sentence?

15             THE WITNESS:  Yeah, I understand the sentence.

16             THE COURT:  Okay.

17             THE WITNESS:  I understand the basis of how we made

18   the deal.

19             THE COURT:  All right.

20   Q.    So you understand that as a result of approval of the

21   plan, after a vote, that no one will have cause to complain

22   that they had a senior position that was not enforced, correct?

23   A.    That -- that I understand.

24   Q.    Okay.

25   A.    Okay.

1    Q.    And is that right?  Is that your understanding of it?

2    A.    Sure.  But I mean, you're asking -- this --

3    Q.    That's okay.

4    A.    -- about a specific provision that I never saw before

5    because we have a general -- we have a general understanding in

6    this plan.

7    Q.    You have lawyers who draft that language for you, right?

8    A.    Yeah.

9    Q.    But you knew that that's what you wanted to accomplish,

10   correct?

11   A.    We knew, as I said to you last week, that this is a big

12   compromises plan and there's a lot of things that had to happen

13   in here, that's one of them.  I mean there's substantive

14   consolidation issues.  It's just very complicated.  It's just

15   not that easy but yeah, sure.

16   Q.        So, when you testified last week or week and half,

17   whenever it was, that you would not fund a plan that didn't

18   waive those contractual subordination rights, correct.

19           MR. BUTLER:  Objection, Your Honor, that's not what

20   this provision says.  I mean, just so the record's clear, the

21   provision -- you made a point of reading the provision into the

22   record --

23           THE COURT:  Why don't you just say they would not --

24   not -- that would not be consistent with the language you just

25   read?

106

1  Q.         Well, let me ask it a different way so that we can

2  try to save time.  You would agree with me that you testified

3  at your deposition -- let's forget this language for the

4  moment, you'd agree that you testified at your deposition that

5  you would not fund a plan that did not provide for the waiver

6  of any contractual subordination rights, do you recall that

7  testimony?

8             UNIDENTIFIED ATTORNEY:  Objection -- objection, Your

9  Honor, that's not proper impeachment.  Anything that would

10 happen in the deposition, unless it's admitted, is hearsay.  If

11 he has a question about what will and won't fund and it's

12 relevant he can ask it now.

13            MR. MOUSTAKAS:  Number 1 --

14            THE COURT:  Do you want to refresh his recollection?

15 I don't think you've asked him that question yet.

16            MR. MOUSTAKAS:  I was following the Court's

17 admonition and really trying to move quickly.

18            THE COURT:  I understand.  But I --

19            MR. MOUSTAKAS:  That's fine.

20            THE COURT:  This is a long time to lay a foundation

21 for a question that, at least where I think you're going to be

22 going is perfectly obvious.  So -- but go ahead.

23            MR. MOUSTAKAS:  Okay.

24 Q.   Would you fund a plan that did not contain --

25            MR. MOUSTAKAS:  Strike that.

107

1   Q.   Would you fund this plan if it did not contain a waiver of

2   contractual subordination rights?

3   A.   I would not fund a plan that didn't have the sufficient

4   compromises by everybody that was involved to get this thing

5   done.

6   Q.   But -- and I appreciate that answer and I think the Court

7   understands that answer but I do want you to answer

8   specifically --

9   A.   If it -- my belief is it wouldn't get done unless you had

10  that in there.

11  Q.   Okay.

12  A.   Okay.  If that helps you.

13  Q.   That does help.  Now, you -- you were involved in

14  receiving proposals with respect to the recoveries of various

15  classes of creditors of the debtors, correct, in connection

16  with your role as the plan administrator?

17  A.   Sure.

18  Q.   And it's fair to say that over time, and we talked about

19  this a little bit at your deposition, over time there were

20  numerous proposals, some of which were made by GM, some of

21  which were made by the creditors, some of which were made by

22  the debtors that called for the toppers to receive less than

23  par, do you recall that?

24  A.   Yeah.

25  Q.   And originally it had been your view, had it not, that the

1   toppers were entitled to parity with, for example, the trade

2   creditors, do you remember that?

3   A.    Well, this again is a settlement case.  So you're

4   basically making a settlement, you know, with GM and other

5   parties in here, you know, basically everybody has a right to,

6   theoretically, equitably subordinate GM, everybody does.  So

7   you basically need a settlement with all the parties.

8        Our view was and is that the trade, if we do a different

9   type of plan, is really impaired.  We'd impress that and, you

10  know, as I said before we let the subordinated debt get

11  impaired.  That's, you know, whether that's right or wrong is

12  something different.  And we did believe that because we think

13  that the trade, if it wasn't consolidated, would be drastically

14  impaired we thought there should be some sort of balance

15  between the trade and the sub-debt for giving up things in the

16  case which didn't happen.  So be it.

17  Q.    Now --

18  A.    And -- and all that was struck to try to get this thing

19  done.

20  Q.    The indentured trustee for the trust -- that issued the

21  trust, the toppers -- did not play an active role in the

22  negotiation over the toppers recoveries, fair to say?

23  A.    Yes.

24  Q.    But you did play an active role in the negotiations over

25  the toppers' recoveries, correct?

109

1   A.   We were involved in formulating the total plan.  So the

2   toppers are one aspect of that plan that we were concerned

3   about.  And we were concerned about all major aspects of the

4   plan.  The toppers are major aspects so we were concerned about

5   it, sure.

6   Q.   But you wouldn't be surprised that when Judge Drain looks

7   at the exhibits in this case and sees David Tepper's responses

8   to proposals that there would be a significantly higher volume

9   of responses talking about how the toppers should be treated

10  then how any other class would be treated, correct?

11  A.   I think there probably was as many about how the trade was

12  treated.

13  Q.   But that was inter-related in your mind.

14  A.   Yeah, that was definitely inter-related.  So yeah, I think

15  that's -- but, you know, you really have -- I don't know if

16  that's true.  I mean we had a lot to say about how GM was

17  treated too.  I mean every time we talked about the toppers,

18  ever time we talked about the trade we talked about GM.  It

19  wasn't in isolation that we talked about the toppers.  I

20  mean -- I mean I would have to say that the biggest

21  conversations -- if you're asking me the question where were

22  the biggest conversation we had; it was absolutely GM, without

23  doubt and without question.  If you're asking me if the hundred

24  of illustrative -- how do you say this in New York,

25  illustrative?  Pittsburgh, sorry about that.

1          THE COURT:  Mr. Tepper, I think you can say it

2     however you want.

3          THE WITNESS:  Well, it's illustrative in Pittsburgh

4     so -- I mean there's just -- it was like one a day or two a

5     day.  So I mean -- I mean, it's in the tens and twenties if

6     it's not in the hundreds of different scenarios.  And certainly

7     there were topper scenarios that were less than that, as there

8     were, and we put them out ourselves, trade scenarios.  So, I

9     mean, there's a lot of scenarios in this case.

10    Q.    Generally speaking, earlier on, let's say sort of around

11    the time of -- before November, even before October 29th, you

12    had originally advocated for par plus accrued for the toppers,

13    correct?

14    A.    Yes.

15    Q.    And there came a time where you pulled back from that and

16    gave up on the accrued -- the post-petition interest in going

17    back and forth, correct?

18    A.    Yes.

19    Q.    And you indicated during a lot of these back and forth e-

20    mail conversations that it was your view that if you -- if the

21    toppers were to give up on accrued, they shouldn't have to take

22    it on the chin a second time by being held out of any rights

23    offering at a discount?  For example there were some occasions

24    on which there would be a percentage of the equity that you

25    could buy in at a discounted rate.  You felt, like, when there

1   was that opportunity for participation if the toppers had

2   already given something up, they shouldn't be asked to give up

3   again something else, right?

4   A.   Exactly.  The exact conversation in this particular one

5   time -- or this one -- a hundred illustrative scenarios that

6   you're speaking of that I believe you're referring to was

7   basically that if the toppers are at par the next give up

8   should be trade.  That's what really was the background of that

9   conversation.  And, you know, anything that came out of that.

10  That was the purpose of it.  That the toppers gave, the trade

11  should give.

12  Q.   And when the November 14th restated, amended EPCA was

13  submitted it provided for the toppers to receive par -- a

14  hundred percent of par and pre-petition interest and

15  participation rights, correct?

16  A.   Yeah.  I believe that's right, yes.

17  Q.   And it's fair to say that that was, essentially, once you

18  had compromised with respect to post-petition interest to, sort

19  of, a line in the sand that had been drawn, at least during

20  that portion of the negotiations, is that fair to say?

21  A.   The belief was that if the toppers give -- if that's what

22  you're asking, I'll tell you.  I'll answer the question again.

23  Q.   That's what we're doing.

24  A.   It's the same answer.  If the toppers gave, the trade

25  should give next.

112

1    Q.   And so if the trade didn't give --

2    A.   Didn't believe the toppers should give.

3    Q.   Right.  So if the trade didn't give you felt the toppers

4    should stick at --

5    A.   Yeah.

6    Q.   -- just giving up the post-petition interest?

7    A.   Yeah.

8    Q.   And in an effort to, sort of, move a little more quickly

9    through this, at any time I refer to something and you feel

10   like you need to see it you can see it, but do you have a

11   recollection that you got a -- I think we might have talked

12   about this -- that you got a proposal, at some point, from the

13   debtors and that -- I think it's the proposal you were just

14   talking about where you thought that you ought to get

15   participation rights if you had given up the accrued.  And you

16   said, "Not commenting on the Pref A, but if the toppers are

17   getting only par they should participate in rights, the trade

18   should not.  I looked for support on this and it's hard to

19   swallow otherwise."  Is that, essentially, the conversation --

20   I'm sorry, the e-mail you're talking about?

21           MR. BUTLER:  Your Honor, if I could interrupt --

22   object.  If counsel could just refer to the Exhibit numbers so

23   we'd have some sense of what's being discussed on the record

24   would be helpful.

25           MR. MOUSTAKAS:  Sure.  Sure, I can do that.

113

1  Exhibit 160.

2  Q.    Mr. Tepper, let me know when you've got that in front of

3  you.  Are you ready?

4  A.    Yeah.

5  Q.    Okay.  Now you see on the bottom of the page there's an

6  e-mail from John Sheehan who is the chief restructuring officer

7  of the debtors', correct?

8  A.    Yup.

9  Q.    And he's writing --

10  A.    The chief restructuring officer.

11  Q.    Officer, yeah.

12  A.    Yeah.

13  Q.    And he's writing an e-mail to you and a woman at GM,

14  Michelle Scherr (ph.), do you see that?

15  A.    Uh-huh.

16  Q.    And it is attaching what's described as a proposed

17  compromise to get the support of the UCC while keeping the

18  equity at the level of value previously provided in an earlier

19  exchange, do you see that?

20  A.    Okay.

21  Q.    Do you see that?

22  A.    Yeah.

23  Q.    Okay.  And now let me take you back a step to Exhibit 148.

24  A.    Is this it?

25  Q.    And tell me, because there's a little confusion about

114

1  this, in the bottom right-hand corner, what's the Bates number,

2  the last four digits of the Bates number?

3  A.   1587.

4  Q.   Okay.  Good.  So you see that at the bottom of this first

5  page is the same e-mail to David and Michelle from John --

6  A.   Uh-huh.

7  Q.   -- saying, among other things, that a proposed compromise

8  is being attached, correct?

9  A.   Yeah.

10  Q.   And you can feel free to --

11  A.   Is it attached?

12  Q.   Okay.  So go to the next page.  You see that -- is that

13  Bates 1580?

14  A.    1581.

15  Q.   Okay.

16  A.   1580, yeah, the next page.

17  Q.   And then 1581, right?

18  A.   Yeah.

19  Q.   So the proposal is entitled Revised Illustrative terms for

20  discussion 10/12/07, do you see that?  That's at 1581.

21  A.   I'm sorry, what are you asking?

22  Q.   Do you see that?

23  A.   What did you ask?  I'm sorry, can you repeat the question?

24  Q.   I'm asking you to go to the third page of this exhibit,

25  which is at page -- ends with 1581 --

115

1   A.   Okay.

2   Q.   -- to see that there was an attachment and this is what

3   the attachment purports to be.

4   A.   Okay.

5   Q.   Okay.  Do you see that?

6   A.   Yeah.

7   Q.   Okay.

8   A.   Okay.

9   Q.   So the other version we were looking at -- you understand

10   that there have been productions from various sources, the

11   other production didn't have the attachment.  So this

12   attachment -- I'm sorry, this exhibit shows what was attached

13   and it shows a proposal is attached and I want to ask you,

14   then, to go back to 160 to understand that -- and feel free to

15   look back at 148 if you need to.

16   A.   Okay.

17   Q.   But when you are -- when say I'm not commenting on the

18   Pref A, but if the toppers are only getting par they should

19   participate in rights, that whole sentence, that you're

20   reacting to the proposal that appears at 148?

21            UNIDENTIFIED ATTORNEY:  Your Honor, objection.  The

22   witness -- I mean, I'm sorry, the question assumes that it's

23   the same attachment.  I don't think there's a foundation for

24   that and it's built into the question.

25            MR. MOUSTAKAS:  I'll represent to the Court that this

1    is an exhibit that was put on the exhibit list by the debtor.

2           THE COURT:  I'll overrule the objection.

3    Q.   Okay.  So going back to 160 --

4    A.   Yeah.

5    Q.   -- all I want to focus on there's -- this isn't going to

6    be terribly involved, is your response and the consistency of

7    that response between your testimony earlier, that you

8    remembered an occasion at which you were saying well look if

9    we're giving up this, the trade's got to give up that, right?

10   A.   Uh-huh.  Yup.

11   Q.   and this is what you were talking about, right?

12   A.   I know that on the -- I'm just -- you know, because

13   there's fluid conversations that may be going in between so I

14   know what I'm referring to on Exhibit 160.  I don't know if

15   there's some conversation between --

16   Q.   Okay.  Well, let's do it this way.

17   A.   -- to the Exhibit 148.

18          THE COURT:  Wait, are you just trying to get him to

19   agree to what he already agreed to?

20          MR. MOUSTAKAS:  No, Your Honor.

21          THE COURT:  That he said that he made these

22   proposals?

23          MR. MOUSTAKAS:  Well, I -- the language is what's

24   important to me.  It's the language that's on that e-mail is

25   what's important to me, Your Honor.

1          THE COURT:  Is there -- is there an objection to the

2     admissibility of this document?

3          MR. BUTLER:  Your Honor, Exhibit 148 there is a

4     pending objection, Your Honor; it was an FRE 408 objection of

5     ours.  This was a document produced by the debtors in

6     discovery, as Your Honor knows, a 408 is a fine discovery for

7     these purposes.  We produced it.  148 was actually designated

8     by the bondholders, not by the debtors.  And it is, you know,

9     our view is it's being both used here at trial and has been

10    intended for use by them for, I think, improper purposes.

11    They're trying to get into the settlement discussions that were

12    going on.  These are settlement discussions under 408.

13         THE COURT:  But --

14         MR. BUTLER:  And that would be our objection, Your

15    Honor.

16         THE COURT:  All your trying to show, aren't you, is

17    that Mr. Tepper is making various proposals --

18         MR. MOUSTAKAS:  Correct.

19         THE COURT:  -- on behalf of the toppers?

20         MR. MOUSTAKAS:  And he's reacting -- that's correct.

21    You're exactly right.

22         THE COURT:  So --

23         MR. MOUSTAKAS:  And if the Court has that, I'll move

24    on.

25         THE COURT:  I -- that's fine.  I -- I -- it'll be

1      admitted for that purpose.

2              MR. MOUSTAKAS:  Okay.

3              THE COURT:  But let me ask you, Mr. Tepper, and

4      partly I've been wanting to say this so I'll say it.  When you

5      -- when you make these proposals, are you wearing your toppers'

6      hat?  Were you acting as a toppers' holder or are you, sort of,

7      acting as the broker for the deal?  You seem to suggest that

8      you're acting as a broker for the deal to make everyone

9      satisfied.

10             THE WITNESS:  Well, I have a belief that the

11     toppers -- the people that had toppers in my plan investors,

12     you know -- look, it's a complicated question because I have a

13     fiduciary responsibility to my investors.  And I have some

14     responsibility to get a deal done here, I believe.  So I have

15     two different fiduciary responsibilities as do other people

16     here.  I don't believe that I could have brought along plan

17     investors -- other plan investors and I thought there were

18     people outside that have the toppers that would have -- I was

19     going to say a fit if -- if they didn't get what was -- what I

20     believed was the right treatment.

21             THE COURT:  Now why is that?

22             THE WITNESS:  Because we believe that the trade is

23     drastically impaired.  And that this was a big compromise

24     already to let them not get impaired in this plan.

25             THE COURT:  Okay.

119

1        MR. MOUSTAKAS:  Thank you, Your Honor.

2    Q.    All right.  Well, let me skip ahead significantly and ask

3    you to now turn to Exhibit 185, Mr. Tepper.  And that's going

4    to be in highly confidential exhibits volume 3.

5    A.    Okay.

6    Q.    And all I want to get out of this document, just so you

7    know and you're welcome to read as much of it as you need to

8    read, relates to -- first of all, identifying the parties.

9    This is an e-mail string between Appaloosa's lawyer and the

10   lawyer for the unsecured creditors committee, correct?

11   A.    Lawyer to Rosenberg that looks right.

12   Q.    Okay.  And this is in a time period when it's become clear

13   to the plan investors that the August 3rd EPCA is ineffectual,

14   that certain conditions are not going to be met and the parties

15   are negotiating with one another to come up with what, I think,

16   results in the -- ultimately in the October 29th amendments.

17   So I want to direct your attention to a statement by your

18   lawyer merely saying that the parties have also been discussing

19   the treatment of trade -- I'm sorry, second paragraph, I

20   misspoke.  I understand that there has been quite a bit of

21   dialogue regarding the treatment of the trust preferreds.

22   Mr. Lauria says to Mr. Rosenberg, your client, meaning the

23   creditors, posited an eighty to ninety percent recovery and

24   mine is of the view that par is as low as is feasible, given

25   the recoveries of the MDL on the equity."  Do you see that?

120

1   A.   I'm sorry, where are you referring to, what paragraph or

2   what are you --

3   Q.   Sure.  The second paragraph of the second e-mail on the

4   page.  The first e-mail is a one-liner.  The second e-mail is

5   from Mr. Lauria to Mr. Rosenberg.  And in the second paragraph

6   --

7   A.   Okay.  I see that.

8   Q.   Okay.  And did I read that correct?

9   A.   Do you want to read it again, because I didn't hear you

10  read it?

11  Q.   Sure.  "I understand" -- this is Mr. Lauria talking to

12  Mr. Rosenberg or writing to Mr. Rosenberg.  "I understand that

13  there's been quite a bit of dialogue regarding the treatment of

14  the trust preferreds.  Your client has posited an eighty to

15  ninety percent recovery and mine is of the view that par is as

16  low as is feasible, given the recoveries of the MDL and the

17  equity."  Did I read that correct?

18  A.   Yes.

19  Q.   Okay.  And does this accurately reflect where your

20  thinking was at this time?  And before you answer that, let me

21  give you an easier question.  Do you agree that there had

22  been -- that Mr. Lauria is correctly identifying that there had

23  been quite a bit of dialogue regarding the treatment of the

24  trust preferreds involving the creditors on one side and you on

25  the other?

121

1    A.    I don't believe that's correct.

2    Q.    Okay.

3    A.    I believe that the UCC, and I could stand corrected, but I

4    believe that the UCC discussed this in detail among themselves.

5    And this is a very difficult issue for that committee.  I don't

6    believe it's just me bring it to them and them not discussing

7    what their own fiduciary responsibility is to all parties that

8    they should be representing.  So I have to believe that's

9    correct, what I just said, I think you would too, right?

10   Q.    Well, I guess I'm asking a very narrow question about

11   whether you were engaged in discussions with the UCC about the

12   trust preferreds.  Let's forget for a moment about the

13   percentages.

14   A.    Okay.  You said it differently the first time.  So what

15   are you asking now?

16   Q.    I'm trying to pear it down.

17   A.    Okay.

18   Q.    Sure.  You'll agree with me that Mr. Lauria is correctly

19   communicating to Mr. Rosenberg that you've been involved in

20   discussions, quite a bit of dialogue, regarding the treatment

21   of the trust preferreds, that's true?

22          THE COURT:  He just answered that.

23          MR. MOUSTAKAS:  Then I'm sorry, I --

24          THE COURT:  He said the you there, he thought, meant

25   you the committee internally have been in those discussions.

122

1        THE WITNESS:  Well, I'm assuming they were in those

2   discussions.

3        THE COURT:  If you want to ask him generally was the

4   topic also discussed between Appaloosa and the committee, is

5   that -- is that where you're going?

6        MR. MOUSTAKAS:  Yes.

7        THE COURT:  Was the topic also discussed between

8   Appaloosa and the committee?

9        THE WITNESS:  Yes, as was -- yes, as was all things

10  discussed with the UCC.  I mean, its one part of a -- of a

11  total plan.

12  Q.   And finally, with respect to this, this represents the

13  position that you had described earlier which was that par was

14  as low as was feasible at the time, correct?  From the

15  perspective of the toppers, correct?

16  A.   Yes, I believe that's right.

17  Q.   Okay.  Okay.  Are you familiar with the reasonable best

18  efforts clause in the EPCAs?

19  A.   Reasonable best efforts to try to get the deal done by

20  both parties?

21  Q.   Correct.

22  A.   Yeah.

23  Q.   That each investor shall use it's reasonable best effort

24  to take all actions and do all things reasonably necessary,

25  proper or advisable on its part -- on it's part of this

1   agreement and applicable laws to cooperate with the company and

2   to consummate and make effective the transactions --

3   A.   I -- I generally know -- I'm trying -- you have to use my

4   reasonable best efforts.  I don't know the exact language but

5   yes.

6   Q.   And you have understood that language to say to other co-

7   claim investors hey, that means we're working on this plan.

8   You don't go start working on some other plan because you're

9   committed to doing this plan, correct?

10  A.   Yes.

11  Q.   And you're familiar with the fact that there was also a

12  plan investor agreement, an agreement not with the debtor but

13  an agreement among the plan investors that talked about -- that

14  governed the relationship among them, correct?

15  A.   The additional investor agreement, is that what you're --

16  Q.   No, I'm sorry, the plan investor agreement.

17  A.   The plan investor, yes.

18  Q.   Okay.  You're familiar that it's a letter --

19  A.   Yeah.

20  Q.   -- on July 18th.  And you'd agree with me that that

21  basically prohibits the plan investors, directly or indirectly,

22  from initiating, soliciting, knowingly cooperating or knowingly

23  encouraging any inquiries or making any proposal or offer that

24  constitutes or could be reasonably expected to lead to an

25  alternative transaction, do you remember that?

124

1        MR. FOX:  Your Honor, if counsel wants the witness to

2   confirm the precise, contractual language of the article he

3   ought to put it in front of him or just make a representation

4   of the report and move on.

5        MR. MOUSTAKAS:  I'm asking, generally, if he

6   understands that there is a provision in the plan investors'

7   agreement that was drafted by Appaloosa that essentially

8   commits all the plan investors to do a number of things that

9   are inconsistent with alternate transactions.  That are -- that

10  keep people bound together or as is colloquially referred to as

11  locked up.

12       THE WITNESS:  I understand that when I gave my word

13  to somebody and shake somebody's hand I have a deal, I have a

14  deal.  That's what I understand.  And that -- that language

15  basically says that, as I understand it.

16  Q.   And they have -- and they have obligations coming back to

17  you as well?

18  A.   Yeah, sure.

19  Q.   And those obligations relate to the idea of loyalty,

20  correct?

21  A.   Sure.

22  Q.   And that everyone has a similar purpose in trying to

23  execute this transaction, correct?

24  A.   Yes.

25  Q.   And that you're not to go out on your own and try to

1   negotiate or talk about things that could lead to other

2   transactions, correct?

3   A.    Not exactly.

4   Q.    Okay.  Tell me about that.

5   A.    We don't prohibit people from talking.

6   Q.    Okay.  Well let's do this; Goldman Sachs is a co-plan

7   investor, correct?

8   A.    Yes.

9   Q.    And there came a time when Goldman Sachs was unable to

10  agree to the October 29 amendments to the EPCA, correct?

11  A.    That they didn't agree.

12  Q.    They did not, they didn't sign.

13  A.    Yeah.  Can you just -- unable, I mean, that's -- can you

14  ask that question again because that wasn't the right question?

15  Q.    Absolutely.  I can absolutely ask it again.  There came a

16  time when some amendments were negotiated to the EPCA resulting

17  in what people call the October 29 amended EPCA and it was

18  contingent upon Goldman signing, correct?

19  A.    Yes.

20  Q.    Okay.  And several days later it came to -- several days

21  later Goldman did not sign, did not execute the agreement,

22  correct?

23  A.    Yes.

24  Q.    And on is own terms the agreement expired, correct?

25  A.    Yes.

126

1   Q.   Okay.  It came to your attention, at some point

2   thereafter, that Goldman was talking to GM, correct?

3   A.   Yes.

4   Q.   And -- and not only that GM -- that Goldman was talking to

5   GM but surreptitiously talking to GM, right?

6   A.   Yes.

7   Q.   In other words, Goldman didn't say to Appaloosa, who was

8   essentially the first among equals in this plan investor group,

9   I'm going to go talk to GM, right they never did that?

10  A.   They can talk to whoever they want to.

11  Q.   But they didn't disclose to you that they had done that?

12  A.   No, they didn't.

13  Q.   Okay.

14  A.   Which they should do but they didn't.

15  Q.   And you felt they should do that, correct?

16  A.   It wasn't prohibited to talk to people but yeah, I kind of

17  think they should have.

18  Q.   Okay.  And there, sort of, is on par with that a similar

19  kind of understanding with respect to the debtor -- the

20  debtors' and their representatives that -- and that's referred

21  to often in the documents as safe harbor discussions or 408

22  discussions.  Do you know what I'm talking about when I refer

23  to those concepts?

24  A.   Yeah, you took the documents out of those safe harbor

25  discussions before.

127

1    Q.    Okay.

2    A.    Those are the ones where you're talking about the toppers,

3    which I thought were under safe harbor.

4    Q.    Okay.  So, when you -- we'll come back to this but you'll

5    agree with me that with respect to Delphi and its agents and

6    representatives, it's your expectation that they ought not to

7    be talking about alternatives or modifications to the plan

8    without having you know about that, without having the plan

9    investors know about that.  And in fact there was a provision

10   by which those communications can be sanctioned -- can be --

11   A.    I would expect, if do a deal with somebody they're my

12   partner in my deal.  They're not trying to negotiate another

13   deal, that's what I would expect.

14   Q.    Okay.  And that's why it's important for you to

15   distinguish between talking, which is permissible --

16   A.    More or less.

17   Q.    -- and something other than talking, right?

18   A.    Yeah.

19   Q.    And so you're view is that talking becomes -- so

20   supporting another transaction or advocating another

21   transaction, that is prohibited, right?

22   A.    Yes.

23   Q.    And you understand and believe that the line between those

24   two things isn't always easy to discern, is that fair to say?

25   A.    Well, I mean, talking -- people can talk.  People -- you

128

1    can't stop people from talking.  People are in the deal or

2    they're not in the deal.  I mean, this is basic human -- you

3    make a handshake, you make a deal, you've got a deal.  You try

4    to do another deal; you try to do another deal.

5    Q.    Right.

6    A.    You try to make another handshake, somebody can't make

7    another handshake.  I mean --

8    Q.    So it's your view that you can't stop people from talking

9    but if people are trying, generally, to harm the deal --

10   materially harm the deal in some way, whether it's advocating

11   or supporting it, that would be a problem, right?

12   A.    Yes.

13   Q.    Okay.  And so that's the distinction -- one of the

14   distinctions, right?

15   A.    Yes.

16   Q.    Okay.  And the reason you hesitated is because there is

17   something short of actually trying to do material harm that you

18   would also think we should be prohibited, right?

19   A.    Well, there's a -- there's a fine line --

20   Q.    That part of it.

21   A.    -- okay.  If that's what you're trying to get out of me

22   somehow.  There's a fine line in there someplace between

23   somebody being mischievous, which some people in your

24   committee -- on your ad hoc committee, I believe, were

25   mischievous and actually advocating another deal.  And we just

1   -- we knew people were being mischievous on your committee and

2   we didn't stop it.

3   Q.   Okay.

4   A.   We warned them, you just better stop and being mischievous

5   but we didn't tell them, you know, not to, you know, to do

6   another deal.  So --

7   Q.   Right.

8   A.   But we warned them that there's a line here that we're not

9   going to let them cross.

10  Q.   Sure.  And so -- with all this learning, let's go back to

11  Goldman.  And let me ask you to turn to Exhibit 191, and that's

12  in, I'm told, the most recent volume of the highly confidential

13  documents.

14       Now, you've testified that you can't stop people from

15  talking but you can stop them with these agreements that we've

16  been talking about.  You can stop them from being mischievous

17  or doing harm, correct?

18  A.   Yes.

19            MR. FOX:  Asked and answered, Your Honor.

20            THE COURT:  Okay.  It's all right.

21  Q.   So now, do -- you drafted this letter on November 8, 2007,

22  correct?

23  A.   Yes.

24  Q.   And it's to Don Mullen, a representative of the Goldman

25  Sachs entity, right?

130

1   A.   Yup.

2   Q.   And turning to the second paragraph, you accuse -- let me

3   stop for a minute.  We were talking earlier about conversations

4   that you learned Goldman was having with GM, correct?

5   A.   I'm sorry, say that again, please.

6   Q.   Sure.  We were talking about the fact that after

7   Goldman -- that Goldman's involvement in the accession to the

8   October 29th amendment to the EPCA were conditional or

9   contingent and at some point they didn't come through.  And

10  that during the time -- well, let me ask you, was it during the

11  time that they were deciding whether or not they were going to

12  execute that they talked to GM, as far as you know?

13  A.    It was such a run-on sentence, do you want to try again

14  and hit me?

15  Q.   Sure.  I could use a grammarian.  Let me ask it to you

16  this way, you agree with me that there was a time at which the

17  other plan investors were waiting for Goldman to decide whether

18  or not it was going to be in the October 29th deal, correct?

19  A.   Yes.

20  Q.   Okay.  And I don't know how many days that was, but it was

21  a number of days, right?

22  A.   Yeah, I guess.  I --

23  Q.   And were you lobbying it during that time?  Were you

24  talking to the people at Goldman to find out if they were going

25  to get in the deal or not?

131

1    A.    Yes.

2    Q.    Okay.  And at some point you testified, you found out that

3    the people at Goldman or someone at Goldman had been talking to

4    GM behind your back essentially, correct?

5    A.    Yes.

6    Q.    Okay.  And what I'm asking now is, do you think that that

7    was during the time you were waiting to hear about whether they

8    were going to execute or after they decided they weren't going

9    to join the deal?

10   A.    I don't know.

11   Q.    Okay.  You don't know.  So let me ask you, turning to the

12   second paragraph of this letter you see you say you were

13   dismayed to learn, you say, that "Goldman had been working

14   surreptitiously and in breach of its obligations under the

15   EPCA, which remains in full force and effect at this time, to

16   strike an alternative deal with General Motors that would be

17   unacceptable to us.  News of such deal, when combined with the

18   significant negative impact and Goldman's failure to support

19   the amendment would likely have had an even more devastating

20   impact on Delphi's securities and negated the possibility of

21   any agreement among the parties, regarding the terms of

22   Delphi's exit from Chapter 11."

23          Did I read that accurately?

24   A.    Yes.

25   Q.    Okay.  So did -- I take it you believed, when you wrote

132

1    this letter, that Goldman had been working surreptitiously and

2    in breach of obligations it had to you and the other plan

3    investors, correct?

4    A.    Yes.

5    Q.    Okay.  You also say that one of the ways in which the EPCA

6    is violated is that Goldman was obligated to use its reasonable

7    best efforts to take all actions and do all things reasonably

8    necessary, proper and advisable to consummate and make

9    effective the transactions contemplated by the EPCA?

10   A.    Where are you reading, please?

11   Q.    I'm sorry, now in the next paragraph.  Talk about run-on

12   sentences, I'll read it to you.  "Goldman's actions to pursue

13   an alternative transaction with GM were not authorized by

14   Appaloosa and plainly violated the EPCA which, among other

15   things, obligates Goldman to use its reasonable best effort to

16   take all actions and do all things reasonably necessary, proper

17   and advisable to consummate and make effective the transactions

18   contemplated by the EPCA and therefore prohibits Goldman from

19   unilaterally engaging in, continuing or otherwise participating

20   in any negotiations regarding any alternate transaction."

21             MR. BUTLER:  Objection.

22   Q.    Did I read that correct?

23   A.       Yeah.

24             MR. BUTLER:   I have an -- I stated an objection.

25   Your Honor, I have no clue where this is headed.  I don't know

1   whether Goldman --

2          THE COURT:  Well, no.  I'll let him go a little bit

3   further.  Well let me -- let me ask you this question, maybe

4   this'll cut it short.  To your knowledge, do you know what

5   Goldman and GM were talking about?

6          THE WITNESS:  Yeah.

7          THE COURT:  To your knowledge, was that an

8   improvement as far as the creditors and estate were concerned

9   on the October 28 transaction or something else?

10         THE WITNESS:  It would have been -- I'm trying to

11  remember exactly what date.  I believe it would have been an

12  improvement.  It would have been -- it would have put a taint

13  on the deal.  I don't know if it would have changed it that

14  much in some respects but it -- it would have, in a way, just

15  made it really difficult to get things done.

16         THE COURT:  Did Goldman not sign -- to your

17  knowledge, did Goldman not sign the October 29 deal or 28 deal

18  because it thought that deal was too rich for the investors?

19         THE WITNESS:  They were one of the investors, so.  I

20  don't understand.

21         THE COURT:  Well, the one -- I'm sorry, the one they

22  refused to sign -- the one they didn't sign.

23         THE WITNESS:  They didn't think it was rich enough

24  for them, is that what you mean?

25         THE COURT:  Did they -- did they sign that because

134

1   they thought it was too rich for the -- did they not sign it

2   because they thought it was too rich for the plan investors?

3            THE WITNESS:  Oh no, they thought they were going to

4   lose money.

5            THE COURT:  Okay.

6   Q.   Okay.  And if you could explain to the Judge, all of the

7   plan investors had different interests and had different

8   obligations and didn't have a similar burden with respect to

9   the ways in which the various rights were distributed, correct?

10  Let me ask it a different way, they had a bigger obligation to

11  fund the backstop then other plan investors, correct?

12  A.   Yes.  Yes.

13  Q.   And they were worried about the backstop kicking in,

14  correct?

15  A.   Yes.

16  Q.   Okay.  The other people had less backstop obligations so

17  they didn't have that worry, correct?

18  A.   No.  No, they did have that worry.

19           THE COURT:  I'm actually, now, considering Mr.

20  Butler's objection.  Unless you're -- unless you're trying to

21  lay the foundation that Appaloosa was using the lockup to kill

22  a higher and better deal for the debtor, I don't think this is

23  worth pursuing.

24           MR. MOUSTAKAS:  I can approach.  I'd like to not say

25  in open court where I'm going with reasonable questions of the

135

1   letter that this gentleman drafted.

2           THE COURT:  Well, if you're going in that direction

3   I'll let you do it.

4   Q.   Did -- when you answered the Judge's question that it

5   would be a taint on the deal, is that because --

6   A.   They didn't have -- they didn't -- I didn't find out about

7   their deal till after this deal was dead, okay.  And I didn't

8   find out about the conversations till after this deal was dead.

9   And so to answer your question better, I didn't know about it

10  before the deadline had passed.

11          THE COURT:  Okay.

12          THE WITNESS:  I found out about it once the deadline

13  had passed and that's, you know, if that helps you or --

14  Q.   And so the taint wasn't that it treated creditors less

15  favorably, the taint was it caused you not to trust one of your

16  plan investors, correct?

17  A.   It would -- first off, it couldn't happen because we were

18  passed the deadline in general.  But if the -- if they had

19  brought it up earlier, which they couldn't have done because

20  they can't have the negotiations with them by themselves, they

21  can't do that.  But if there plan was, in fact, there it would

22  have cast a -- we thought of the way they were structuring the

23  deal.

24  Q.   All right.  Let me ask --

25  A.   For the -- over the whole plan and the way things would be

1   viewed.  Which it ultimately did anyways, okay.  I mean, it had

2   that result and that -- effectively in any case.

3   Q.    Do you remember testifying at your deposition that you

4   didn't know what those conversations were about between GM and

5   Goldman, do you remember that?

6   A.    I know what the last plan was.  I don't know their

7   conversations.

8   Q.    Okay.  So can you articulate whether --

9   A.    And I didn't hear that directly, I heard that second hand.

10  Q.    Right.  Can you articulate the way in which -- let me ask

11  it this way.  Is it your position that if Goldman went to GM

12  and said, I can't fund -- I can't be obligated on this whole

13  backstop, are you willing to take up some of the backstop in

14  exchange for something else and that something else didn't hurt

15  Appaloosa or any other plan investor, that that's a still -- a

16  prohibited transaction, irrespective of whether it harms the

17  deal in any way because it's surreptitious and it keeps you out

18  of the loop?

19  A.    It hurt the plan investors.

20          MR. FOX:  Wait -- wait.

21          THE COURT:  There's an objection.

22          MR. FOX:  Objection, it's an irrelevant hypothetical.

23          MR. MOUSTAKAS:  There are number, Your Honor -- if

24  the Court doesn't want me to approach I'll tell you in open

25  court.  There are a number of provisions in this EPCA and in

1    the enforcement that have the effect of locking people up,

2    preventing people from talking to one another.  The debtor has

3    complained, and we can show you the e-mails, that these rules

4    have been applied so rigidly that they have to ask for

5    permission to talk amongst themselves.  And one of our themes

6    is going to be, and I think it's pretty clear, that this was a

7    way in which Appaloosa locked down and kept people from coming

8    to what would have been, you know, a more optimal deal for --

9    for the stakeholders.  And it goes to the hard of it.  So I

10   can't see how it's irrelevant and I can't understand, for the

11   life of me, why I'm not entitled to ask.  But now I have to

12   ask, having disclosed in open court --

13          THE COURT:  Well, the -- I guess, the agreement

14   speaks for itself and the letter speaks for itself.  I'm more

15   interested in how they've actually conducted themselves.  So

16   I -- I -- given that you said you only had an hour, I'm not

17   going to let you get in a lot of hypothetical questions.

18   Q.   Did -- have you ever talked about threatening to sue

19   Goldman over this violation?

20          THE COURT:  It's right here.  It's in the letter.  He

21   threatened to sue them in the letter.  He said they're in

22   breach.  Okay?

23          MR. MOUSTAKAS:  I'll move on, Your Honor.

24   Q.   Now, the EPCA also has, in addition to penalties for

25   engaging in an alternate transaction, it also has a provision

138

1    that relates to changes of recommendation, correct?

2    A.    Yeah, I believe it does.    Yeah.

3    Q.    And the parties take this -- let me ask you whether you

4    have seen the brief filed last night in this case, for the

5    reply brief by the debtors?

6    A.    No.

7    Q.    Would it surprise you that in that brief, and footnoted in

8    that brief, the debtors have a caveat that says nothing we say

9    here should be construed to be a change of recommendation?    In

10   other words, that they are concerned about triggering the

11   change of recommendation provision in the EPCA.

12          MR. FOX:    Objection.    Any inference about the

13   debtors' concern, based on the debtors' submission, is not a

14   proper subject of (indiscernible) to the witness.

15          MR. MOUSTAKAS:    Your Honor, I --

16          THE COURT:    Are you prepared to waive the change of

17   recommendation provisions of the EPCA?

18          THE WITNESS:    No.

19          THE COURT:    Okay.    I think you can move on.

20   Q.    Now, after Goldman refused to join in the October 29th

21   amended EPCA, the plan investors announced or maybe Appaloosa

22   announced to the market that the amendment had expired by its

23   own terms, correct?

24   A.    Yes.

25   Q.    You didn't indicate, however, that the August 3rd EPCA was

139

1   likewise no longer in effect, correct?

2          THE COURT:  I'm sorry, did you did or didn't.

3          MR. MOUSTAKAS:  Did not.

4          THE COURT:  Did not.

5          THE WITNESS:  It's still in effect.

6   Q.   It's still in effect.  What do you mean when you say it's

7   still in effect?

8   A.   It's still in effect.

9   Q.   In what respect is it still in effect?

10  A.   That it's still in effect.  I mean, I don't know --

11  Q.   Tell me, practically, what that means.

12  A.   If the terms and conditions can be met by all parties, all

13  the plan investors are still going to do the deal, it's still

14  in effect.

15  Q.   Okay.  But you have said, if the company can meet the reps

16  and conditions under the EPCA, yes.  But they can't, do you

17  remember saying that?

18  A.   Yeah.  That -- well, look its closing conditions.  Right

19  now, given the way the world is, it looks highly unlikely that

20  they can.  And certainly we could have just sat on our hands

21  and not try to do anything else or any other plan.  And maybe

22  that would have been much smarter.  But we wanted to try to

23  bring this company out of bankruptcy.  So maybe I'm an idiot

24  for trying to do that but that's what we tried to do.

25  Q.   But in -- but in the interim, the successive plans --

140

1   well, the November 14th amendment -- restated amendments have

2   caused greater value and greater discounts to flow to the plan

3   investors.  I mean, that's obvious, correct?

4   A.    I'm sorry.  I'm sorry.  Say again your question.

5   Q.    Sure.  You say that you could have sat on your hands but

6   instead you tried to create greater value, correct?

7   A.    No, I didn't say that.

8   Q.    Okay.

9   A.    I said I could have sat on my hands and let -- you know,

10  we would be here till March 31st with nothing else.

11  Q.    But one consequence of not sitting on your hands and

12  continuing to negotiate was -- resulted in the November 14th

13  restated amendments which transferred significantly more value

14  to the plan investors, correct?

15  A.    There was a change in conditions and that plan reflected

16  change of the general market conditions.  And certainly

17  anybody, I believe that it wasn't changed so somebody else

18  could put a higher plan out.  I think that's still there, is

19  that correct?

20  Q.    Say that again?

21  A.    Can't somebody else plan higher and they'll pay us a

22  breakup fee that's not that much money, is that right?  I think

23  it's still right.

24  Q.    So it's your position that --

25          MR. MOUSTAKAS:  Strike that.

1    A.   It's my position that if there's a higher bid, somebody

2    should bid.

3    Q.   Right.

4    A.   And they have every right to bid and I'm sure the Court

5    will take the higher bid.  That's my -- that's what we --

6    that's the deal.

7    Q.   Okay.  But that's not my question.  It's very difficult to

8    get --

9    A.   Well, it's the answer.

10   Q.   I understand that that's how you operate, but no.  I want

11   to have you focus on the question that I'm asking.  You'll

12   agree with me that as a result of a number of provisions that

13   make it difficult for anybody to talk to other people, it's

14   less like that you'll be able to talk to someone without

15   incurring a fee, correct?

16   A.   What?

17   Q.   You just said -- perhaps I misunderstood you.  I thought

18   that you just said that a higher bidder could come in and

19   win -- win the role as plan investor, correct?

20   A.   Sure.

21   Q.   Okay.

22   A.   I think that's right.

23   Q.   Right.  But it's -- the lockups we've talking about make

24   that harder because they prohibit a large universe of people,

25   the plan investors, additional investors, the affiliates of the

142

1    additional investors and the Delphi -- well it's the debtors'

2    representatives and agents from talking about anything that

3    could be construed as an alternate transaction without

4    incurring a fee, correct?

5    A.    I think that's so ridiculous, what you just said, I don't

6    know how to answer it.  Because you're saying that we locked up

7    the market when there's such a small group in here versus a

8    whole larger markup -- the whole larger market.  You have a

9    million different large hedge funds.  There's no large hedge

10   fund -- largest hedge funds, there's not one locked up here,

11   the large private equity funds, there's not one locked up in

12   here.  Ninety -- eighty, ninety percent of the commercial

13   banks, ninety-five percent of the commercial banks --

14   investment banks in the world, they're not locked up in this

15   thing.  So we're locking up, I don't know, one percent of the

16   capital of the world, maybe a half percent.  So ninety-nine and

17   a half percent, and I'm making these -- I don't know these

18   numbers exactly maybe ninety percent, it may be ninety-nine and

19   a half percent, of the capital world is up there to plan

20   this -- to do this deal if they want to do this deal and, you

21   know, they can.  That's the facts.

22   Q.    So the lockups don't make it less likely that people will

23   be able to -- let me ask it this way --

24   A.    It makes it less likely -- the people that are in our deal

25   are in our deal.  We don't lockup the world.

143

1  Q.   The lockups certainly make it more difficult for Delphi,

2  without incurring a fee, to solicit interest, correct?

3  A.   Sure.

4  Q.   Okay.  So let me come back to the question that I was

5  asking you before with respect to the vitality of the

6  August 3rd EPCA.  There were a number of conditions that you've

7  already articulated and can go over all of them, but there

8  numerous conditions that were not bet and that you believe

9  cannot be met, correct?

10 A.   Again, okay, you say they cannot be met but my

11 understanding is that these conditions have to be met on

12 closing.  I could be wrong, I'm not a lawyer, but that's my

13 understanding.  We didn't have closing.  We can wait to the

14 close.  Not close the deal because they can't make the

15 conditions or we can try to do another deal.  I mean, that's

16 where we are.

17 Q.   Right.  So one of the things that you are hoping -- that

18 could happen is DRI could write a new report and say we made a

19 mistake actually, our forecast was wrong, we've got a different

20 forecast and GM is going to be selling cars all over the world

21 in far higher volumes then ever before, is that the kind of

22 thing that you're talking about that could happen?

23 A.   Sure that could happen.  I don't know --

24 Q.   So how many of those kinds of things would have to happen

25 in order for you to fund this EPCA, to fund a plan under this

144

1    EPCA, the original EPCA?  How many conditions that you

2    currently believe are not satisfied would have to be satisfied

3    in order for you to scrap this deal in which the plan investors

4    get a lot more money and come back to the August 2nd or 3rd

5    EPCA?

6    A.   Well, either we're making this new deal or not making this

7    new deal and we can sit on the new deal -- on the old deal.  If

8    you, you know -- I mean, we can sit on the old deal if that's

9    what people would want us to do.

10   Q.   Sure.

11   A.   I don't understand your question.

12   Q.   I'm trying to see if I can understand the assessment that

13   might have been made about the likelihood that those conditions

14   would get through.

15   A.   Okay.

16   Q.   Okay.  So let's start with there are numerous conditions

17   that are unfulfilled, correct?

18   A.   Again, my understanding is you have to wait till the

19   closing.  There's numerous conditions that we don't believe can

20   be filled at closing and I think that's correct.

21   Q.   Which conditions do you think cannot be --

22   A.   We don't believe that the capitalization conditions can be

23   fulfilled at closing.  We have -- and that condition being the

24   main condition that we don't believe will be fulfilled.

25   There's the GM settlement which we believe there has to be an

1    adjustment that we have issues with.  The business plan --

2    Q.    Let me stop you right there.  I want to ask you about

3    that.  Were you aware, as the GM settlement was being

4    negotiated, of those negotiations in any way?

5    A.    Yeah.

6    Q.    Okay.  And was the -- were the debtors aware of the number

7    that their settlement needed to come in to satisfy the plan

8    investors?

9    A.    I think we all had an understanding, yeah.

10   Q.    And when the negotiations were taking that number above

11   the cap, was there ever an occasion to say hey, you know,

12   you're going to miss a condition, you're going to blow a

13   condition?

14   A.    You're making the assumption that we're in here running

15   this company which we are not.  We were not in active

16   negotiations with GM.  We get report after the fact.  We can

17   only go and see what's after the fact.

18   Q.    Before -- when negotiations were ongoing, did the plan

19   investors indicate to the debtors that they had an expectation

20   that a settlement would take place that would not exceed the

21   cap?

22   A.    Sure.

23   Q.    Okay.  So you're disappointed when it exceeded the cap,

24   correct?

25   A.    Wouldn't you be?

146

1    Q.    I would be.

2    A.    Yeah, good.

3    Q.    The DRI reports another thing that's, sort of, now

4    historically happened.  It caused -- it forecasted downturn in

5    the market for the cars that Delphi products go into at a level

6    of forty, forty-five percent, right?  Delphi's biggest customer

7    is GM, right?

8    A.    Yeah.

9    Q.    Okay.  Forty-five percent of its sales are to GM,

10   something around there, forty, forty-five?

11   A.    Well, you're talking about current sales or -- I mean,

12   what's your question?  I mean currently, after the bankruptcy?

13   Q.    Why don't we stick with --

14   A.    Currently, more or less?

15   Q.    Why don't we stick with it's the biggest customer?  Why

16   don't we stick with that?

17   A.    It's its biggest customer, that's safe, sure.

18   Q.    Let's stick with that.  Let's stick with that.  And you've

19   identified a report by an analyst that -- of expectation of

20   downturns in demand for GM cars during a certain time period to

21   be a factor that causes the business plan to be, essentially,

22   in breach or, you know, it says that the business plan won't

23   meet -- one condition in the business plan will not be met,

24   correct, about volumes?

25   A.    No.

1          MR. BUTLER: Objection.

2     Q.   All right, explain.

3          THE COURT:  The basis of the objection?

4          MR. ISENMAN:  It's not that a condition of the

5     business plan won't be met, it's a condition of the EPCA based

6     on changes -- it's just a -- he's just using wrong language so

7     I'm noting it.

8     Q.   The EPCA requires that the business plan be fulfilled on

9     the terms that you've approved it at, correct?

10    A.   Sure.

11    Q.   Okay.  So you understand when I say that the condition

12    hasn't been fulfilled we're talking about the condition that is

13    incorporated through the EPCA but it's a business plan

14    representation?

15    A.   The business plan representation basically, yeah.

16    Q.   So let me just ask you -- you're a very straightforward

17    man so let me ask you in a very straightforward way, in your

18    heart of hearts you think that there is no chance that all of

19    the conditions to closing could possibly take place and allow

20    you to fund the plan of reorganization under the August 3rd

21    EPCA, correct?

22    A.   I believe it would be very, very, very difficult for the

23    conditions to be met and that's why we went into negotiations

24    on a new deal.

25    Q.   Okay.  Now, you had -- you heard some testimony, perhaps,

1   if you came in about the interest rate cap, are you familiar

2   with that issue?

3            MR. ISENMAN:  Objection, the witness did not here the

4   testimony, he was not in the room.

5            THE COURT:  Yeah, he wasn't -- he wasn't in here.

6            MR. MOUSTAKAS:  I thought he said something earlier

7   about having been in the room.  I misunderstood.

8   Q.   The -- you've -- the plan investors have imposed, as of

9   the November 14th amendments, an interest cap -- a cap on

10  interest expenses, correct?

11  A.   Yes.

12  Q.   And that cap is 585 million dollars, correct?

13  A.   Yes.

14  Q.   And you understand that under the current circumstances

15  the annual interest for, I guess, 2008 could exceed 585

16  million, correct?

17  A.   You mean on the pro forma basis, the way we have it

18  defined, that's what you mean?

19  Q.   Yeah.

20  A.   That's what you mean?

21  Q.   Why don't you answer it that way first?

22  A.   What's your question again, then?  Can you just restate

23  your question again?

24  Q.   Let me see if I can make this more straightforward.  You

25  recognize there's a risk that that condition will not be met in

149

1   the current market, correct?

2   A.   Yes.

3   Q.   And if that's not met, you'll be entitled to either waive

4   the condition, right?  That's one thing you could do, right?

5   A.   We can't do it alone; all the plan investors have to vote

6   as a group.

7   Q.   As a group, so that's one option?

8   A.   Yes.

9   Q.   A second option is, you could walk away from the

10  transaction entirely, correct?

11  A.   I'm sorry, the second --

12  Q.   Walk away from the transaction --

13  A.   If the condition's not met?

14  Q.   Correct.

15  A.   Yes.

16  Q.   and if that happened, the debtors would still be liable

17  for a breakup fee, correct, because the conditions --

18  A.   I don't -- I don't believe that's correct.  If they did

19  another deal, you're saying?

20  Q.   Within a certain amount of time, right.

21  A.   Before March 31st?  I shouldn't ask the questions, I

22  should answer them.  Why don't you ask the question --

23  Q.   Is that your answer?  Is that your answer, that they

24  would --

25  A.   I don't know what you're asking because I'm -- why don't

150

1    you ask the questions and I'll answer the questions.

2            THE COURT:  Why don't we look at the agreement on

3    this one?

4            MR. MOUSTAKAS:  Sure.  Sure.

5            THE COURT:  I don't think Mr. Tepper really knows.

6            MR. MOUSTAKAS:  That's fine.

7    Q.   And the third thing is you could renegotiate yet again,

8    correct?  Renegotiate new terms, correct?

9    A.   We could.

10   Q.   Okay.

11           MR. MOUSTAKAS:  The Court's indulgence, I think I'm

12   just about done.

13   Q.   Now, in order to decide whether, in the first instance, to

14   become a plan investor and become interested in this investment

15   opportunity, you had to make some assessment of the value of

16   the enterprise, correct?

17   A.   Yes.

18   Q.   And what form did that take?  What kind of analysis did

19   you do?

20   A.   You know, typical type analysis.  We tried to do cash flow

21   analysis and, you know, different -- different ways of doing

22   the analysis.

23   Q.   Okay.  Did you do an internal rate of return analysis?

24   A.   Well we typically do it that way, but yeah I'm sure it was

25   part of our thought process.

151

1   Q.   Okay.  And in connection with running the numbers

2   associated with the various articulations or the various

3   iterations of these illustrations, is it something you would

4   typically run through some kind of model to figure out whether

5   the deal is getting better or worse for you?

6   A.   I don't think like that on a daily basis or, you know, the

7   way you're talking about it, no.

8   Q.   Okay.  How frequently would you do that?

9   A.   Not that frequently.

10  Q.   Okay.  More than once a month?

11  A.   No.

12  Q.   Okay.  How many times did you do it?  For every EPCA did

13  you do it?

14  A.   I don't know.  I mean, this is -- this two years.  I don't

15  know.

16          MR. BUTLER:  I'm just going to admit a minute.  If

17  you want expert testimony you've got to go through expert

18  procedure.  Under Rule 45 this is non-party.  You're not

19  entitled to unretained expert if you need them.  It's totally

20  irrelevant what -- what the witness' proprietary modeling is or

21  isn't with respect to this matter.  It's not what the Court

22  needs to decide with respect to the amended EPCA.

23          MR. MOUSTAKAS:  Your Honor, one of the -- as I

24  understand it, one of the things that the Court is --

25          THE COURT:  No, I'll -- I'll overrule the objection.

152

1          MR. MOUSTAKAS:  So --

2          THE COURT:  But -- let me just ask this and I think

3     this is where you're going.  Is -- in terms of the return to

4     the plan investors, and recognizing the -- the change in

5     circumstances that you've cited for the reason that the deal

6     was amended, is the return higher on a net basis or lower than

7     the original EPCA?

8          THE WITNESS:  The return is -- when we'll look at an

9     investment we'll look at other opportunities in the market at

10    the time, that's how we do it.  And at the time when we thought

11    this investment was to what it is now its lower, the return is

12    lower.

13         THE COURT:  Meaning, you could make more money

14    elsewhere?

15         THE WITNESS:  Yes.

16         MR. MOUSTAKAS:  Well I'd like to ask as a follow-up

17    question the question I was --

18         THE COURT:  NO, that's fine.  I just thought that was

19    where you're going --

20         MR. MOUSTAKAS:  Right.

21         THE COURT:  -- and we could save some time.

22         MR. MOUSTAKAS:  Right.

23    Q.   Comparing the August -- the return on the August 2nd EPCA

24    to the -- to the November 14th EPCA, the return is greater for

25    your irrespective of other opportunities, comparing those two

153

1    things to one another is more lucrative, correct?

2    A.    I'm sorry; ask the question again, please.

3    Q.    Sure.  Analyzing it from the perspective that I want you

4    to analyze it from, which is comparing the rate of return on

5    the -- on the August 3rd EPCA to the rate of return associated

6    with the November 14th EPCA, if that went through, which is

7    more lucrative to the plan investors?  Or let's start with

8    Appaloosa.

9    A.    Well you can -- yeah, I was going to say you better ask me

10   because I don't know what the other guys -- how they're setting

11   up their books.

12   Q.    Right.

13   A.    But for me, I would set up a book and I would hedge, in

14   some respect, this transaction.  And giving what values were at

15   the time, it might have been more lucrative on August 3rd.

16   And, you know, the transaction itself could have screwed me up.

17   Just on how I'd set up -- you know, how I'd set up the

18   portfolio.  So, that's the answer.

19   Q.    Okay.  And what if you didn't -- what if you didn't hedge?

20   What if you just compared the rates of return on both of them,

21   apples to apples, without any alterations, without hedging --

22            MR. ISENMAN:  Objection.  Objection, Your Honor.

23   Q.    Same answer?

24            MR. ISENMAN:  Objection, Your Honor.  He's looking to

25   see what the numbers are under the amended EPCA.  If he's

154

1  looking for internal analyses and internal rates of return then

2  he's got his answer.

3          THE COURT:  I think that's fair.  I think you can

4  make that point at oral argument.

5          MR. MOUSTAKAS:  Okay.

6  Q.   You'd agree with me that you understand that Rothschild

7  did a valuation analysis and an updated valuation analysis for

8  the debtors, correct?

9  A.   Uh-huh.

10 Q.   And you understand that the assumption that the senior

11 noteholders recover a hundred percent of par plus accrued is

12 based on a negotiated total enterprise value, correct?

13 A.   Uh-huh.

14 Q.   Can you say yes?

15         THE COURT:  Yeah, you say yes or no.

16 A.   Yes.

17 Q.   And you would agree with me that if one uses the midpoint

18 of the updated valuation analysis, which is lower than the

19 negotiated TEV, you would not yield a value that gave you a

20 hundred percent of par plus accrued, correct?

21 A.   Is that the way the math works?

22 Q.   I'm asking you?

23 A.   I'm -- so I don't know the numbers so I'm asking -- I

24 don't know the number exactly.  Do you have to tell me the

25 numbers exactly?

155

1    Q.   You understand, generally speaking --

2    A.   And I'll do the math for you if you need it.

3    Q.   You understand, generally speaking, that the negotiated

4    total enterprise value is higher than the midpoint of the

5    valuation methodology that was -- that resulted from three

6    valuation methodologies that Rothschild undertook, do you

7    understand that?

8    A.   I believe that's so.

9    Q.   And so if you assume that the senior noteholders recover a

10   hundred percent of par plus accrued at the negotiated TEV, they

11   recover less than a hundred percent at the midpoint, which is a

12   smaller number than the negotiated TEV, correct?

13   A.   That's the math.  Yes, if that's the math I agree with the

14   math.

15   Q.   Has that been in your -- have you given thought to that

16   fact?

17   A.   No.

18   Q.   And you haven't given though to that fact because your

19   view is this is a settlement and people have to take --

20   everybody's got to take some pain, right?

21   A.   My -- the view is that, you know, it's very hard to value

22   everything right now in the marketplace.  It's just really hard

23   and that's a fact.  That I also think is a fact, there's

24   incredible volatility out there which is one of the reasons

25   we're here.  So, you know -- thank you -- thanks.

156

1   Q.   Earlier you used the term mischievous actions, when you

2   refer to mischievous actions by some of my clients you were

3   referring to the hiring of Goodwin Proctor, my law firm?

4   A.   No, not exactly, no.

5   Q.   Okay.

6   A.   In some --

7   Q.   You tempted me by saying not exactly, of course.  What is

8   it then?

9   A.   Well, I mean, it's kind of funny for somebody to be an

10   additional investor then be a party, as somebody objecting to

11   the plan that they're an additional investor to, so that's kind

12   of a funny thing.  But that in itself I wouldn't just classify

13   as mischievous on its own.  Talking to different people, you

14   know, about different things in the marketplace, that I would

15   refer to as mischievous.  Is this a violation strictly?  No.

16   And that's why it's mischievous.

17   Q.   There was one aspect of your testimony at deposition I

18   just wanted to understand.

19        MR. MOUSTAKAS:  Strike that.  I think I'm -- I think

20   I'm through with the witness.  Thank you.

21        THE COURT:  Okay.  Does anyone else have --

22        MR. FOX:  Your Honor, it's not my intention to cross

23   examine Mr. Tepper because we designated his deposition

24   transcript to be admitted into evidence.  There's been no

25   objection to it, I just want to confirm that there is no

157

1    objection and I don't have any questions for the witness.

2            THE COURT:  Is there any objection to that?

3            MR. FOX:  No objection, Your Honor.

4            THE COURT:  Okay.  I had a question.  Mr. Tepper, you

5    answered a couple of questions earlier about the condition in

6    the December 3rd EPCA that interest expense be a certain dollar

7    amount, are you aware of the creditors committee limited

8    objection on that point?

9            THE WITNESS:  I've heard something about it; I don't

10   know the exact objection.

11           THE COURT:  They -- they believe it should be

12   another, roughly, eighty million, am I right on that?

13           MR. ISENMAN:  Forty-five.

14           THE COURT:  Forty-five million, excuse me.

15           MR. ISENMAN:  Forty, sorry.

16           THE COURT:  Forty.  Were the interest expense at that

17   level, what would be the downside effect on the equity, the

18   reorganization equity that --

19           THE WITNESS:  Well we, initially set the interest

20   expense -- it was because of what the initial bank feedback

21   was, that it should be under 600 million, is what I believe

22   that feedback was from the banks in this deal.  And we had

23   originally talked about 560 before and then we raised it to

24   575.  And this last deal we went back and pushed people to get

25   to 585 so this -- as far as history of it is concerned.  I

1   guess our view is that it becomes -- the interest burden

2   becomes to high given the incredible uncertainty we have in the

3   next year or two, number one.  And because of that high

4   uncertainty, it has an oversize effect on the equity, because

5   you can jeopardize -- you know, if I think about one thing at

6   night it's whether -- whether there's too much debt here and

7   too much interest to begin with.  And it concerns me.

8          THE COURT:  Well, the unsecured creditors are getting

9   equity now too; they're not getting any cash.  I would

10  understand their argument -- I'd be a lot less sympathetic to

11  their argument if they were getting cash because they would be

12  loading the debt on the company but they're getting the equity.

13  And that raises the concern in my mind that there's -- there's,

14  perhaps, more option value in that condition then there is

15  downside that the plan investors are protecting against.

16         THE WITNESS:  Well, if you -- if you -- you know,

17  look I -- I guess if you want to say that, you know, every ten

18  million of additional interest expense is so moldable on the

19  value of the business, decrease of the value of the business,

20  you could go that way strictly.  But the question is, in this

21  environment of uncertain economic conditions it just becomes a

22  little bit more, in my view.  So, you know, whether it's, you

23  know, 400 million, 500 million, 600 million, 700 million, eight

24  hundred million, in that ballpark of difference, that would be

25  the difference, you know, to the value of the company.

159

1          THE COURT:  Have you considered --

2          THE WITNESS:  And I think that -- I don't know if

3     that answers your question.

4          THE COURT:  Have you considered limiting the cap on

5     damages for breach of the agreement with regard to this

6     condition?

7          THE WITNESS:  We have considered everything.  We --

8     it was very difficult to get people to move the condition to

9     585 and it was very difficult to keep people -- keep other plan

10    investors in this current agreement.  So, we have talked to

11    different people, including ourselves, and we think given

12    the -- and I understand you're worried about the one side

13    option, we're concerned about, you know, tying up so much money

14    when there's so much opportunities in the marketplace right now

15    that we know we're going to buy.  So I think that there's a

16    great belief that -- there's some belief by some parties that

17    it would be better to fee up the money, to not do this deal,

18    and to free it up for other opportunities in the marketplace

19    right now because it is a very hard marketplace.  So I don't

20    think people would agree to it.

21         THE COURT:  Okay.  Any more questions?

22         MR. BUTLER:  Your Honor I have --

23         THE COURT:  You have a question?  Okay.

24    REDIRECT EXAMINATION BY

25    MR. BUTLER:

160

1   Q.   Mr. Tepper, when did you first get involved in the Delphi

2   transaction?

3   A.   It's so long ago.  I guess over two years ago, around

4   there.

5   Q.   When did you make your first investment in Delphi?

6   A.   Sometime -- sometime over two years ago.

7   Q.   Was it before or after the debtors filed Chapter 11?

8   A.   Before.

9   Q.   And do you -- can you -- can you report any approximate

10  idea of the number of hours you personally have expended in

11  negotiations and meetings on trying to assist the debtors in

12  moving this plan forward?

13  A.   Can I get paid an hourly rate if I do?

14  Q.   I'd just like you -- if you could answer the question to

15  the best of your ability.

16  A.   I don't know.  Before the last couple weeks, we were

17  trying to limit a little bit more.  I would say, probably,

18  twenty percent of my (indiscernible, cough) every week.

19  Q.   So is it your testimony --

20  A.   For the last two years.

21  Q.   So is it your testimony that approximately twenty percent

22  of your --

23  A.   Something like that.

24  Q.   -- activity?

25  A.   Yeah.

161

Q.   How typical is that in the investments you make?  I mean,
Appaloosa is known as a fund that makes lots of opportunistic
investments, how much --

A.   It's a ridiculous amount of time for us.  Too much time.
I mean, oversized amount of time.

Q.   My question to you, and my last question sir, is the
question of why.  Why did you invest this level of personal
time and commitment in working with Delphi?

A.   I just asked my wife that question last night.  So, I
don't know.  I guess at some point, you know, its -- I guess we
made a deal.  We're trying to figure out how to get this deal
done.  We have some relationship with the parties in the case.
We'd like to see this thing come out of bankruptcy if we can.
We have fiduciary responsibilities to a lot of different people
and our own investors so we can't every violate that.  But in
the fact that, and the same thing I said before, you know, you
make a handshake you make a handshake, it's what it is.  That's
why.  I don't know -- I don't know how else to say that.

Q.   Thank you, Mr. Tepper

     THE COURT:  Okay.  You can step down.

     THE WITNESS:  Thanks.

     MR. BUTLER:  Your Honor, the debtors' next witness
would be its chief restructuring officer, John D. Sheehan.  We
have Exhibits 1 and 2 of the joint index have been designated
as Mr. Sheehan's declarations.  And I would like to move to

1    enter those declarations into evidence, subject to cross

2    examination here at the hearing.

3            MR. ISENMAN:  Your Honor, Michael Isenman, Goodwin

4    Proctor for certain bondholders.  We -- at the time we were

5    required to required to, sometime last week, we made certain

6    objections to the two declarations.  We've resolved some of

7    them.  There are some that remain.  And as I did with respect

8    to Mr. Resnick, I ask that I be able to hand up --

9            THE COURT:  I think I -- I think I already have them.

10   I think you gave them --

11           MR. ISENMAN:  Did I give them to you?

12           THE COURT:  Yeah.

13           MR. ISENMAN:  That's it.

14           THE COURT:  All right.  Have you given them to Mr.

15   Butler?

16           MR. ISENMAN:  He has a set.  I can give him another

17   set.

18           MR. BUTLER:  That's okay.

19           MR. ISENMAN:  And again, Your Honor, just for the

20   record in case there's any confusion, these rejections were

21   given to them last week.  The only thing that was given to them

22   last night was this visual aid.

23           THE COURT:  Okay.

24           MR. ISENMAN: And again -- and Your Honor, just to --

25           THE COURT:  So should we start with the declaration?

163

1          MR. ISENMAN:  That would be --

2          THE COURT:  The first one?

3          MR. ISENMAN:  That would be great, Your Honor.

4          THE COURT:  Okay.

5          MR. ISENMAN:  Again, there's a number of places, Your

6    Honor, where we are objecting on the basis of hearsay or no

7    personal knowledge.  And again, so long as the testimony is

8    only coming in to show Mr. Sheehan's understanding, we don't

9    object to it.

10         THE COURT:  Okay.  Well, and as far as personal

11   knowledge, I mean, he is -- he has been, to my knowledge, very

12   intimately involved with a number of aspects of this case.  So

13   he might have personal knowledge and I think that's something

14   you can bring out on cross, whether he does or doesn't.

15         MR. ISENMAN:  That's -- and in fact, Your Honor,

16   sorry -- I apologize.

17         THE COURT:  Okay.  No, there are a couple -- I don't

18   know does that take care of all -- no, let me see here.  Does

19   that take care of all of them in the first declaration?

20         MR. ISENMAN:  Let's -- I believe -- I believe in the

21   first there is -- we did object, in paragraph 31 on page 10 on

22   the -- our objection was that this was an inadmissible lay

23   opinion.  Just -- it's just the first sentence of paragraph 31.

24         MR. BUTLER:  Your Honor, this is a business judgment

25   case.

164

1      THE COURT:  Well he's --

2      MR. BUTLER:  And this represents the judgment of the

3  chief restructuring officer of the company.

4      THE COURT:  I don't -- right, I don't think this is

5  necessarily an expert opinion.  This is something of someone

6  who's been advised by experts who's -- also I'm assuming has

7  been advised on the debtors' efforts to raise exit financing,

8  you know the matrixes that were brought out earlier.  So I'll

9  overrule that one.

10      MR. ISENMAN:  Okay.  Your Honor, perhaps we should

11  move on to the first supplemental.

12      THE COURT:  Okay.

13      MR. ISENMAN:  It's actually the revised first

14  supplemental declaration.

15      THE COURT:  Right.

16      MR. ISENMAN:  And again, Your Honor, I think it's the

17  same types of objections.  We don't object to the hearsay to

18  show what Mr. Sheehan's understanding was, we object to it for

19  the truth of the matter asserted.

20      THE COURT:  Okay.

21      MR. ISENMAN:  In addition, Your Honor, in the

22  revised -- the revised supplemental declaration, there are a

23  number of paragraphs that purports to describe what the EPCA

24  amendment accomplished, what it did.  And so our objection

25  there, Your Honor, of course is simply that it's -- the

165

1    documents speaks for itself.

2          THE COURT:  Well, which paragraph are you referring

3    to?

4          MR. ISENMAN:  Paragraphs 16, 17, 18, 19, 20.

5          THE COURT:  Well, I don't think 16 is objectionable

6    on that basis.  I mean, I have a black line, you have a black

7    line, we can all see what the changes are.  Are you contending

8    that this is somehow an inaccurate description?

9          MR. ISENMAN:  Your Honor, we were only contending

10   that the document speaks for itself.  It's --

11         THE COURT:  But this is -- this is the -- the chief

12   restructuring officer showing his knowledge of the document and

13   what he considered.  So I think it's admissible.  You can --

14   you can cross examine him on whether he omitted something but I

15   don't think that's -- I'll overrule that objection.

16         MR. ISENMAN:  Okay.

17         THE COURT:  Same -- same for 18 and 19.  So I think

18   that covers them.

19         MR. ISENMAN:  I think it does, Your Honor.  Thank

20   you.

21         THE COURT:  Okay.  Okay.  Did you have objections to

22   the --

23         MR. FOX:  Your Honor, with respect to the two Sheehan

24   declarations, I just have the -- the same point with respect to

25   settlement discussions as with Mr. Resnick's deposition.

1          THE COURT:  That they're not -- no one's being bound

2     by what he's saying.

3          MR. FOX:  Or they can't be used against somebody for

4     that purpose, Your Honor.

5          THE COURT:  Well they're -- they're -- it's merely --

6     as I take it the purpose for which Mr. Sheehan describes

7     settlement discussions is to show the process by which the

8     company evalu -- came to and then evaluated the merits of --

9          MR. FOX:  Yes, that --

10          THE COURT:  -- the EPCA.

11          MR. ISENMAN:  That's right, and for that purpose we

12     have no objection.

13     (Declarations of Mr. Sheehan were hereby received as Joint

14     Exhibits 1 through 2 for identification, as of this date.)

15          THE COURT:  Okay.  All right.  So on -- with those --

16     on that basis and with those understandings the declarations

17     will be admitted.

18          MR. BUTLER:  Thank you.

19          MR. ISENMAN:  Okay.  Where'd he go?  Oh, okay.  I

20     thought you were hiding for a second.  All right.  Could you

21     take the stand, please?

22        (Witness is sworn)

23          THE COURT:  And just for the record, could you spell

24     your name?

25          THE WITNESS:  John, J-O-H-N, Sheehan, S-H-E-E-H-A-N.

167

1          MR. ISENMAN:  And Your Honor, just one preliminary

2   matter that I'll save Mr. Fox the trouble, Mr. Sheehan's

3   deposition transcript is Exhibit 181 and I understand there's

4   not an objection to its admission.

5          THE COURT:  Okay.  Is that true?

6          MR. BUTLER:  That's correct.

7          THE COURT:  All right.

8          MR. ISENMAN:  So with that in mind, I will try to

9   keep this as brief as I can.

10          THE COURT:  Okay.

11   CROSS EXAMINATION BY

12   MR. ISENMAN:

13   Q.   Mr. Sheehan, nice to see you again.

14   A.   Nice to see you, Mike.

15   Q.   All right.  Now, you've submitted two declarations in

16   connection with today's hearing, correct?

17   A.   Yes, sir.

18   Q.   And those are Exhibits 1 and 2 in this case.  Perhaps it

19   would be helpful for you to confirm that that is the case.

20   Mr. Sheehan, do you have Exhibits 1 and 2 in front of you?

21   A.   I do.

22   Q.   Okay.  And Exhibit 1 is -- is your declaration that's

23   dated November 2nd, correct?

24   A.   That is correct.

25   Q.   And Exhibit 2 is your declaration that is dated

168

1    November 21st, correct?

2    A.    That's -- that's correct.

3    Q.    And you understand that today's hearing is with respect to

4    what we can call the December 3rd EPCA?

5    A.    I do.

6    Q.    Okay.  And it's fair to say that neither of the two

7    declarations that have been submitted as your direct testimony

8    addresses the December 3rd EPCA, correct?

9    A.    They were both executed before December 3rd, yes.

10   Q.    Okay.

11   A.    So --

12   Q.    And you did not execute another declaration in connection

13   with the December 3rd EPCA, right?

14   A.    I did not.

15   Q.    Okay.  And you understood that because you didn't execute

16   a new declaration, you would not be subject to a deposition in

17   connection with today's hearing, correct?

18   A.    I don't know that that's correct.

19   Q.    Did you think that you would be deposed anyway?

20   A.    I leave the question of when I get deposed by whom to the

21   myriad of lawyers in this case.

22   Q.    Fair enough.  And certainly there are plenty of them.  So,

23   in other words you submitted there's been no deposition, no

24   declaration, you've submitted no testimony with respect to the

25   December 3rd EPCA?

169

1   A.   That's correct.

2   Q.   Okay.  Now to your understanding, Mr. Sheehan, the plan

3   investors had approval rights with respect to the plan and the

4   disclosure statements that are filed, correct?

5   A.   That is correct.

6   Q.   And again, to your understanding, changing the treatment

7   under the EPCA for toppers or trops, they're the same thing,

8   right?

9   A.   Yes.

10  Q.   Do you understand in changing the treatment under the EPCA

11  for toppers required the consent of the plan investors,

12  correct?

13  A.   Yes.

14  Q.   Okay.  And I'd like to direct your attention to

15  Exhibit 143.

16          MR. ISENMAN:  And actually, if I could have the

17  debtors' help in identifying which volume that is in.

18          MR. BUTLER:  Orange volume 3.

19          MR. ISENMAN:  Thank you.  And Your Honor, I believe

20  I'm going to probably get an objection in a second.  This is

21  a -- its part of the settlement negotiations.  I'm not seeking

22  to have it admitted to show some kind of concession or -- or

23  admission of liability.  That's not the reason why I'm

24  directing Mr. Sheehan's attention to this document.

25          THE COURT:  Okay.  Which document is it again?

170

1          MR. ISENMAN:  It's 143.

2          THE COURT:  All right.

3    Q.   Mr. Sheehan, do you have 143 in front of you?

4    A.   Yes, I do.

5    Q.   And you recognize this document?

6    A.   Generally, yes.

7    Q.   And you understand that it's a proposal for amendments to

8    the plan of reorganization submitted by Appaloosa, correct?

9    A.    There -- it says at the top of it Appaloosa proposal,

10   Delphi POR Amendments Appaloosa Proposal.  There's no date on

11   it or any other indication that it was submitted by Appaloosa.

12   And I would note that on page 2 it says, confirm with

13   Appaloosa/GM.  So, I am not really able to confirm that to you.

14   Q.   I'll tell you what, let's -- fair enough.  Let's take a

15   look for a moment, instead, at Exhibit 146 which ought to be in

16   the same volume that you're in right now.

17   A.   Uh-huh.

18   Q.   Do you have Exhibit 146 in front of you?

19   A.   Yes, I do.

20   Q.   Okay.  And this one does have a date on it, right?

21   A.   Yes, it does.

22   Q.   Do you recognize this document?

23   A.   I'm more familiar with this document, yes.

24   Q.   Okay.  Good, let's go through this document then.  And

25   this -- this is your -- to your understanding, this was

171

1  Appaloosa's comments on the debtors' proposed plan of

2  reorganization amendment, is that right?

3  A.   That's what indicated at the top of the first page, yes.

4  Q.   And you have no reason to doubt that, right?

5  A.   I have no reason to doubt that.

6  Q.   Okay.  And if you look at the bottom of page one, are you

7  there?

8  A.   Ye, sir.

9  Q.   Okay.  And you see it says -- it has certain language --

10 it says beginning "For toppers, combination of direct share

11 issuance and participation" and continues from there, do you

12 see that?

13 A.   Yes, sir.

14 Q.   Okay.  And there's certain language that is underlined,

15 right?

16 A.   Yes, sir.

17 Q.   And there's certain language that is struck out?

18 A.   Yes, sir.

19 Q.   And it's your understanding that this is Appaloosa's

20 proposal to add certain language and delete certain other

21 language from this part of this provision, correct?

22 A.   That's correct.  It was a technical change that they were

23 making, yes.

24 Q.   And this, what you call a technical change was -- it was a

25 change to how holders of toppers would be treated, correct?

172

1    A.    I -- I call it a technical change because of the fact that

2    when the document was distributed to them it described it in

3    terms of a percentage and they were changing it into pure

4    dollar values.  So the number 496 is now comprised of -- of two

5    pieces 426 plus seventy million.

6    Q.    Okay.  So if you turn to the next page, because this is a

7    carryover paragraph, right?

8    A.    Yes, sir.

9    Q.    Okay.  You see that the number 78.4 is struck out -- 78.4

10   percent in the first line, do you see that?

11   A.    Yes, sir.

12   Q.    And the second line it says 92.5 percent, that's been

13   added?

14   A.    Yes, sir.

15   Q.    So that's not just a technical change, right?

16   A.    I guess I'm not sure exactly what the 92.5 represents.  I

17   haven't studied this in a while.  But the -- I guess I'm not

18   sure; I'd have to study it first to understand it better.

19   Q.    Well, let's just go back to my question.  This is a change

20   being proposed by Appaloosa with respect to toppers, correct?

21   A.    Yes, sir.

22   Q.    Okay.  And beyond that the document speaks for itself,

23   right?

24   A.    That's correct.

25   Q.    If you could -- you can put that document to the side.  If

173

1   you can look at what's been marked as Exhibit 44.

2   A.   To the side meaning you're coming back to it?

3   Q.   I'm not going to come back to it.

4          THE COURT:  That volume is that in?

5          MR. MOUSTAKAS:  I apologize, Your Honor.

6          MR. BUTLER:  It's orange --

7          MR. ISENMAN:  Volume 2 of Orange.

8          MR. BUTLER:  Orange 3.

9          MR. ISENMAN:  Three, I'm sorry.

10         MR. BUTLER:  I can't read right, Your Honor, orange

11  2, excuse me.

12         MR. ISENMAN:  Yes, it is 3.

13         MR. BUTLER:  Orange volume 2, Judge.

14         THE COURT:  I'm sorry, what was the Exhibit number?

15         MR. ISENMAN:  Exhibit 44, Your Honor.

16  Q.   Mr. Sheehan, do you have Exhibit 44 in front of you?

17  A.   Yes, sir.

18  Q.   Okay.  And you recognize this document?

19  A.   Yes, I do.

20  Q.   Okay.  And this is an e-mail sent on your behalf to the

21  board on October 14th, right?

22  A.   That's correct.

23  Q.   Okay.  And you've -- had you had a chance to familiarize

24  yourself again with the contents of this e-mail?

25  A.   I haven't read the whole thing but I'm familiar with it, I

174

1    wrote it.

2    Q.    Okay.  Now, Mr. Sheehan, it's fair to say that by October

3    14th it was clear to you that the plan and investors, among

4    others, were using the disruption in capital markets to re-

5    leverage or renegotiate their economic positions, correct?

6    A.    I don't think I -- I identified any particular party.  I

7    think what I wrote was that our key stakeholders have used the

8    disruption in the capital markets, combined with the material

9    declines and projected future North American production volumes

10   and the general uncertainties in the automotive sector re-

11   leverage, renegotiate their economic positions vis-a-vis other

12   stakeholders in the deal.

13   Q.    Okay.  And I appreciate that.  And -- but you were

14   including in that the plan investors, correct?  And when you

15   referred to the key stakeholders you were referring,

16   specifically, among others to the plan investors, right?

17   A.    Among others.

18   Q.    But you -- that's a yes?

19   A.    It's a yes with respect to the plan investors; I'm not

20   limiting it to them.

21   Q.    Understood.  If you turn back to Exhibit 1, which is your

22   declaration, your first declaration.

23   A.    You're done with this one?

24   Q.    I am.  Do you have Exhibit 1 in front of you?

25   A.    Yes, I do.

175

1    Q.   Okay.  Thanks.  If you could turn to paragraph 43, it's on

2    page 14?  Do you see that paragraph?

3    A.   Yes, sir.

4    Q.   Okay.  So just to summarize, you recognized -- you

5    recognized, Mr. Sheehan, that when Delphi filed this disclosure

6    statement and plan that the plan investors --

7            THE COURT:  It's okay.  Well, we're trying to make

8    everyone cooler so -- maybe one of you gentleman in the back

9    can raise the window in the back, just don't fall out.  Thanks.

10   Okay.  You can go ahead, I'm sorry.

11   Q.   Mr. Sheehan, can you see okay now?

12   A.   Yes, I can.  Thank you very much.

13   Q.   Good.  Turning back to paragraph 43, you recognize that

14   when Delphi filed the disclosure statement and plan the plan

15   investors maintained approval rights with respect to the

16   disclosure statement and plan, correct?

17   A.   That's correct.

18   Q.   Okay.  And that provided them with a right not to follow

19   through on the transaction, correct?

20   A.   That is correct.

21   Q.   And as of the second half of September, Appaloosa was

22   quite clear that it would not move forward under the original

23   terms of the August 2nd EPCA, correct?

24   A.   That's correct.

25   Q.   Okay.  Mr. Sheehan, do you -- you never took any

176

1    affirmative steps to find other equity investors in the

2    marketplace that were willing to make an (indiscernible, cough)

3    in Delphi in a higher assumed TEV then what the plan investors

4    offered, correct?

5    A.    Are you speaking about a particular point in this case?

6    Q.    Well, since the August 2nd EPCA.

7    A.    Your question is whether, since August 2nd, I've actively

8    looked for other plan investors?

9    Q.    That's right.

10   A.    I think Mr. Resnick testified this morning about the fact

11   that we had not done so.

12   Q.    And you're agreeing with that?

13   A.    I agree with Mr. Resnick's testimony.  Yes, I do.

14   Q.    Okay.  Now I believe that one of the things is apparent

15   from your declaration is that you believed that delaying the

16   company's emergence from bankruptcy could harm the company,

17   correct?

18   A.    I had said that, yes.

19   Q.    But you've never actually calculated how much harm a delay

20   of several months would actually cause, correct?

21   A.    I think, in my deposition with you, I provided you an

22   example.  And that example was that this company wins or

23   secures, I'll use a better word, secures over two billion

24   dollars of new business a month at double digit EBIDA, you

25   know, margins.  And I can't tell you when our customers are

177

1   going to begin to become concerned about the fact that this

2   company is in Chapter 11.  We have been exceedingly successful

3   at continuing to have the support of our customers, and we

4   really appreciate that from them.  We only need to lose a

5   month's worth of business and we would lose two to four hundred

6   million dollars of value that would come to us in terms of

7   earnings from that business.  So we -- we believe that we've

8   achieved everything we can in Chapter 11 and we've restructured

9   our labor agreements, we've restructured -- we've reached a

10  settlement agreement with General Motors.  We have waivers from

11  the PBGC and the IRS that we're very appreciative of.  And from

12  our perspective it's time to -- to get out before those things

13  start to fall apart.

14          MR. ISENMAN:  Your Honor, can I ask the Court to

15  admonish the witness to actually answer the question that I

16  asked.

17          THE COURT:  I think he was saying that it's

18  incalculable.

19          MR. ISENMAN:  And that's --

20  Q.   Is that correct, Mr. Sheehan, its incalculable?

21  A.   I think I provided you the same answer that I did in my

22  deposition.

23  Q.   Well --

24  A.   I don't know if it's incalculable.  What I can tell you is

25  this company earned -- books two billion dollars of business a

178

1    month, that's a lot of business.  So I'll calculate that if I

2    lose one months worth of business, that's 400 million dollars

3    of profit to this company.  That will effect the valuation of

4    this company.

5    Q.   Okay.  Since you've referred several times to my -- to

6    your deposition, why don't we turn there for a second.  And

7    that's Exhibit 181 is the transcript of your deposition.  Do

8    you have Exhibit 181, your transcript?

9    A.   I do.

10   Q.   And this is the transcript of -- of the deposition that

11   was taken of you a couple of weeks ago?

12   A.   That's correct.

13   Q.   Okay.  And you've seen this before, right?

14   A.   Yes, I have.

15   Q.   If you could turn with me to page 193.  Could you please

16   let me know when you're there?

17   A.   I'm on page 193.

18   Q.   At the very, very bottom of page 193 it says -- it's a

19   question.  It says, "During the prior questioning you said that

20   permitting the EPCA to expire would have a devastating effect

21   on the company," correct?  And your answer was, according to

22   the transcription here, "uh-huh."  Do you see that?

23   A.   I do.

24   Q.   Okay.  And then the very next question that I believe I

25   asked you was, "have you quantified that devastating effects

1   that you believe will happen?"  And then there's, I believe,

2   some -- something similar to what you just testified to, right?

3   A.   There's the same reference that I just made in court here.

4   Q.   And then if you go with me to Page 195, are you there?

5   A.   Yes, sir.

6   Q.   I'm sorry, bear with me for one moment, Mr. Sheehan.  I'm

7   sorry, I actually was referring to the wrong place and I

8   apologize.  If you turn, actually, to the next page, 196, do

9   you see where I said, starting on line 14.  The question was,

10  "I understand you don't want to find out, you also have not

11  calculated it, correct?"  And your answer was, "correct",

12  right?

13  A.   That's correct.

14  Q.   Okay.

15  A.   Because --

16  Q.   You have not calculated it?

17  A.   Right.  The line of questioning here has been exactly

18  what's on pages 193, 94, 95 and 96.  It's exactly the same.

19  Q.   I understand.  The only answer I was trying to get was you

20  haven't calculated it.  That was my first question, that's all

21  I'm after here.

22  A.   Right.  I would only point out that paragraph or page 195

23  says the same thing I just said a few minutes ago.

24  Q.   Okay.  Now, the plan investors made a proposal to you on

25  November 6, correct?  The first week of November.

180

1   A.   Yes, I know what you're referring to.

2   Q.   Okay.  And you viewed the proposal that the plan investors

3   made at that time as a take it or leave it proposal, correct?

4   A.   That's what I have testified to, correct.

5   Q.   And you understood that if you did not take that proposal

6   that the plan investors were prepared to let the EPCA expire,

7   correct?

8   A.   The -- the -- at that point in time -- there's not a lot

9   of proposals there.  I don't know about necessarily allow the

10  EPCA to expire.

11  Q.   Okay.  I'll tell you what, let's -- if you turn to page

12  203 of your -- of your deposition --

13  A.   Uh-huh.

14  Q.   You see in -- are you on page 203?

15  A.   Yes, I am.

16  Q.   Okay.  Do you see the question that begins on -- on line

17  5?  It says, "And if they weren't prepared to move forward with

18  their investment that meant that they were prepared to let the

19  EPCA expire?"  Do you see that?

20  A.   Yes, I do.

21  Q.   And the they in that sentence is referring to the plan

22  investors, right?

23  A.   That's correct.

24  Q.   And your answer was, presumably, right?

25  A.   Correct.

1    Q.    and then the very next question was, "Was that your

2    understanding?"  And your answer was "I think that's correct,

3    yes," right?

4    A.    I see that.

5    Q.    Okay.  Is it fair to say that at various times during this

6    process you have -- and I'm saying just, in fact, just since

7    August 3rd, that you felt that you haven't had a whole lot of

8    leverage with respect to the plan investors, correct?

9    A.    I think that the challenges -- the dislocation that's

10    taken place in the capital markets has -- has been -- caused

11    this to be a difficult process and I would agree with your

12    assessment.

13    Q.    Okay.  Could you turn to Exhibit 151?  Please let me know

14    when you have Exhibit 151 in front of you?

15    A.    I have it.  I have it.

16    Q.    Mr. Sheehan, do you have Exhibit 151 in front of you?

17    A.    I do.

18    Q.    Okay.  And do you recognize this document?

19    A.    I do.

20    Q.    For the record, could you just identify it?

21    A.    This is an e-mail that I -- or it's a -- it's a series of

22    e-mail correspondence that I had with a representative from

23    JPMorgan.

24    Q.    Okay.  And the representative from JPMorgan was

25    Ms. Norma Courio, is that correct?

182

1    A.    Yes, sir.

2    Q.    And is it fair to say that at the time you wrote this e-

3    mail it was your intention to be truthful?

4    A.    I believe I'm always truthful.

5    Q.    Including in this case, of course?

6    A.    Including in this case.

7    Q.    Okay.  And I apologize, I'm not trying to insult you in

8    any way, I'm just trying to jump through some evidentiary

9    hoops.

10    A.    I am always truthful, I promise you.

11    Q.    I'm glad to hear it.  And if you look at the top of

12    Exhibit 151 there's -- the first e-mail in the string is

13    something that you authored, right?

14    A.    You -- you define first how, from the top or the bottom?

15    I apologize.

16    Q.    Fair point.  I was simply referring to on the page.

17    A.    On this page --

18    Q.    So --

19    A.    On this page the top -- the first e-mail is one that I

20    authored, yes it is.

21    Q.    Okay.  And you wrote to Ms. Courio -- I'm going to start

22    with the second sentence if that's okay.

23    A.    Sure.

24    Q.    "They are the only game in town in a financial market that

25    can only be characterized as fragile.  They have established

183

1   terms under which they are willing to invest.  They are

2   expensive and GM will have to come to our conclusion that we

3   have no choice."  Did I read that correctly?

4   A.   You did.

5   Q.   Okay.  And the they that is being referred to in the

6   quotation that I just read is the plan investors?

7   A.   Yes, sir.

8   Q.   Okay.  And I'll try to make this quick, Mr. Sheehan.  Your

9   investment banker, Rothschild, and specifically Mr. Resnick,

10  prepared a valuation of the company, correct?

11  A.   Yes, sir.

12  Q.   And that valuation had a range of values, right?

13  A.   Yes, sir.

14  Q.   And they were -- and it was -- it was Rothschild opining

15  that the value of the company fell somewhere within this range

16  of values but they couldn't say exactly where, correct?

17  A.   Correct.

18  Q.   Okay.  For purposes of each of the -- of the EPCAs, since

19  August 2nd, including the one today, there's an assumed TEV for

20  purposes of the plan investor's buy-in, right?

21  A.   That's correct.

22  Q.   And for each of the EPCAs regeneration that assumed TEV

23  has been substantially below the range of values of the TEV

24  that Rothschild provided to the company, correct?

25  A.   I don't think that's necessarily correct as it relates to

1   the October 29th amendment.  The series B preferred in the

2   October 29th amendment was -- buy-in was at 11.8 billion

3   dollars which, I believe, does fall into the Rothschild range.

4   Q.   Okay.  And so -- fair enough.  And since then, that has no

5   longer been the case, right?

6   A.   It's not the case today.

7   Q.   It's not the case today.  It wasn't the case with the

8   November 14th EPCA either?

9   A.   No, sir.

10  Q.   It was substantially below the range that -- that

11  Rothschild said was the -- the range of values of the company,

12  correct?

13  A.   That is a correct statement.

14  Q.   Okay.  Mr. Sheehan, when -- when Delphi emerges from

15  bankruptcy you expect to remain with the company, right?

16  A.   I would hope so.

17  Q.   And you expect that upon emergence Appaloosa is likely to

18  have a big role with the company, correct?

19  A.   I don't know how you define a big role.  They are entitled

20  to three members to our board of directors.

21  Q.   Uh-huh.

22  A.   You know the terms under the EPCA so I won't repeat them.

23  Q.   Okay.  So they will have substantial board representation.

24  They will hold a significant equity stake, fair?

25  A.   They will hold a substantial equity stake, that's correct.

185

1    Q.    Okay.  And when the company does emerge from bankruptcy

2    you, as a member of senior management, will be eligible to

3    receive a bonus, correct?

4    A.    That would be -- that would be the -- what's in the plan,

5    yes.

6    Q.    Right.  And -- and you cannot receive that bonus until the

7    company does emerge from bankruptcy, correct?

8    A.    That is the way the plan is structured.

9    Q.    Okay.

10            MR. ISENMAN:  Your Honor, the Court's indulgence just

11   for one moment.

12            THE COURT:  Okay.

13            MR. ISENMAN:  Your Honor, I have no more questions

14   for this witness.  Thank you.

15            THE COURT:  Okay.  Mr. Fox, you're going to point to

16   the deposition?

17            MR. FOX:  I have no questions.

18            THE COURT:  Okay.  Any redirect?

19            MR. BUTLER:  Briefly, Your Honor.

20   REDIRECT EXAMINATION BY

21   MR. BUTLER:

22   Q.    Mr. Sheehan, during your cross examination you were asked

23   about event risks that you -- that the company considered, do

24   you recall that question and your answers?

25   A.    Yes, I do.

186

1    Q.    As chief restructuring officer of the company, did you

2    ever try to compile a list of event risks that were important

3    to you as the chief restructuring officer?

4    A.    We -- we had -- we have considered the various event risks

5    and we have outlined them in a -- in a timeline that we refer

6    to, I would say, almost weekly in conjunction with our

7    manage -- weekly management meetings on our restructuring.

8    Q.    Have you made presentations considering event risks to

9    anyone other than senior management?

10    A.    We also present that to our statutory -- we've included it

11    in the statutory committee book and reviewed it with our

12    statutory committees at our monthly statutory committee

13    meeting.

14    Q.    I'd like for you to turn, please, to Exhibit 102.  It

15    should be in one of the orange books, I believe.  I'll also put

16    a blowup up here for you so you can see it.  Is Exhibit 102 the

17    event risks that you shared with the statutory committees?

18    A.    Yes, this is a copy of the November 20th -- a page out of

19    the November 20th statutory committee book.

20    Q.    All right.  And briefly, sir, in your own words looking at

21    these event risks would you pick out the two most significant

22    ones, in your judgment, that the company faces?

23    A.    The -- the -- the first one is the -- on February 29th we

24    have -- we've negotiated with the IRS and the PBGC to funding

25    waivers which would expire -- do currently expire on February

187

1    29th.  And have been -- have provided us with -- the IRS and

2    the PBGC have been very constructive with us in working for a

3    plan to fund our pension plans.  If we go past February 29th

4    we're going to have to -- we're going to have to deal with --

5    with renegotiation of those agreements.  That's the first date.

6         The second is on March 31st.  And on March 31st there's a

7    whole mess of things that occur, including that the UAW

8    no-strike clause expires, the Appaloosa EPCA terminates and the

9    GM agreements also would -- or GM may terminate the global

10   settlement agreement and that date.

11   Q.   If any one of those three items that you've just

12   identified in fact occurred, in your judgment what would be the

13   impact on the company?

14   A.   You know, we -- as I -- as I was describing in my

15   testimony a few moments ago, we've been exceedingly lucky or --

16   maybe I shouldn't say it's luck.  You know, I think we've

17   worked really hard to keep the support of our customers, our

18   suppliers, our employees for that matter.  And we -- we

19   strongly believe, we've talked about it very -- with all of our

20   stakeholders that to the extent that we lose the support of our

21   customers -- I talked about two billion dollars a month of new

22   business.  If our suppliers lose confidence in our ability to

23   make payments to them and shorten payment terms, the impact on

24   our liquidity if we lose employee talent.  So we -- we don't

25   know exactly when but we believe strongly that if this company,

188

1    having achieved what it's achieved, can't now exit and goes

2    into a -- a protracted process, that we run the risk of a

3    degradation in value of the enterprise.

4    Q.   You testified just now that with respect to the first risk

5    you identified, which was the expiry of the PBGC waivers at the

6    end of February, that the PBGC has been very constructive in

7    negotiating with the company, is that -- do I have that right?

8    A.   Absolutely.

9    Q.   Why shouldn't the Court simply assume, Mr. Sheehan, that,

10   you know, the PBGC will rubber stamp an additional extension

11   then if they've been so constructive?

12   A.   You know, I -- I haven't yet tried to do that.  There has

13   been a fair -- fairly significant change in the leadership of

14   the PBGC.  So I -- I do need to work with a different set of --

15   of individuals at the PBGC and -- and I think the IRS is -- has

16   been consistent.  But I think also with the PBGC they're --

17   while they have been constructive, they have had asks each

18   time.  They don't give away those waivers for free and if -- if

19   we are going past February 29th we're going past February 29th

20   because we haven't been able to emerge.  And accordingly, there

21   will be, I would expect, I'm not trying to give them any more

22   leverage, but, you know, I would expect there would be an ask.

23   Q.   Have the PBGC taken any action in these cases in the last

24   ninety days with respect to protecting their interests in

25   matters before the Court?

189

1    A.    In conjunction with our DIP tenor extension motion they

2    did seek to -- what's the right word -- protect their liens or

3    perfect liens or to protect the position of the plans by --

4    with liens on assets.

5    Q.    Any other transactions before the Court, in connection

6    with the debtors' activities within the last ninety days that

7    you can recall?

8    A.    Not that I'm recalling off the top of my head.

9    Q.    Okay.  In your first declaration, in which you were asked

10   questions in cross examination, would you -- that declaration

11   discussed the exercise of the debtors' business judgment up

12   through the October 29th EPCA, is that correct?

13   A.    that's correct.

14   Q.    And just so we're clear, when we talk about EPCAs, how

15   many EPCAs have there been in this case?

16   A.    There was the December 2006 EPCA, then the July 2007 EPCA

17   and then the October 29th amendment.

18   Q.    And that's just an amendment, is that correct?

19   A.    That's an amendment, that's correct.

20   Q.    And each of the amendments on October 29th, November 14th

21   and December 3rd are proposed amendments to the EPCA, is that

22   correct?

23   A.    That's correct.

24   Q.    You were asked about some e-mails with Ms. Courio at

25   Exhibit 151 and in big type letters at the bottom there's a --

190

1   of that e-mail which you were not asked about on Exhibit 151,

2   was the EPCA still in effect, or something to that effect.  Why

3   did you send that e-mail to Ms. Courio?

4   A.   I appreciate your asking me that.  We -- we launched the

5   DIP tenor extension on the back of the October 29th EPCA

6   amendment.  And, you know, it was -- it's absolutely critical

7   to -- it was critical, at that time, for this company to extend

8   the tenor of that DIP.  The DIP expired -- was to expire on

9   December 31.  And to the extent that -- and so our -- our, if

10  you will, strategy had been to launch the tenor extension of

11  the consensual agreement of October 29th to allow for execution

12  on the DIP tenor extension.  Which, as I said, is -- is

13  absolutely critical to this estate.

14       What I was trying to do with my e-mail to Norma was to

15  make it clear that -- because there was significant

16  consternation in the financial market among our DIP lenders

17  that the EPCA was terminated.  There was a lot of, if you will,

18  that was what the talk in the financial community was, and what

19  I wanted to make sure was that, because it's important that you

20  appreciate that Norma is our DIP relationship manager.  She is

21  responsible for the DIP not for exit financing.  And the

22  intention here was to assist JPMorgan in getting our DIP

23  extended.

24  Q.   Was there a precipitating event insofar as you know that

25  caused the market buzz, if you will, to increase about the

1    termination of the EPCA?

2          MR. ISENMAN:  Your Honor, I think this does exceed

3    the scope of my direct examination -- I'm sorry, my cross

4    examination.

5          MR. BUTLER:  He asked specifically about this

6    exhibit.

7          THE COURT:  I think he's entitled to ask about the

8    exhibit.

9    A.    The -- on the -- on Thursday, November 8th the plan

10   investors filed a -- I believe it was a 13(d) if I recall

11   properly but at least a public disclosure that caused some

12   concern that perhaps the EPCA had been terminated.

13   Q.    Did you receive any calls from anyone after 13(d) was

14   filed?

15   A.    Yes.  Yes, I did.

16   Q.    From whom?

17   A.    A number of them from -- from -- well from JPMorgan, from

18   Citi Group, from, if my recollection is proper, other investors

19   in our DIP.

20   Q.    Was there any correlation between those phone calls and

21   the press release the company issued the next day that was

22   previously asked about in this case?

23   A.    They're directly correlated.

24   Q.    I'd like to turn now, briefly if we could, to another

25   exhibit that you were asked about, which is Exhibit 44, one of

192

1    your memos to the board of directors.  Is it typical -- I'm

2    sorry; I'll wait for you to get it.  This is Exhibit 44, it is

3    in orange 2.

4              MR. ISENMAN:  Orange 2?

5              MR. BUTLER:  Orange volume 2.

6              THE WITNESS:  Sorry.  Go ahead.

7    Q.   Is it typical, Mr. Sheehan, for you to send these types of

8    communications to the board of directors?

9    A.   I send them quite regularly.  It's a methodology that

10   we've used or a process that we've used within the company to

11   talk with our board in between board meetings about what's

12   going on in our Chapter 11 process.

13   Q.   Why do you provide these communications?

14   A.   The board of directors is quite interested in knowing

15   what's going on and rather than trying to convene the entire

16   group, which is -- you know, in a formal way, it's a way for me

17   to informally keep them up to date on what's going on.

18   Q.   Now, Mr. Isenman, he asked you in this, about the third

19   paragraph I believe, and he read part of that into the record.

20   And the sentence in which you were talking about the re-

21   leveraging of things, when you were communicating this --

22   the -- this new development you start out with the word

23   unfortunately in that sentence, the sentence he focused you on.

24   Why were you telling the board of directors -- why did you

25   choose to use the word unfortunately in that communication?

1    A.    Well, I think it was unfortunate in that it was

2    creating -- it was creating a challenge to be able to

3    reconstitute the -- the consensual agreement that we had

4    reached on September 6th.  And hence it was unfortunate.

5    Q.    Now the objectors were only concerned about your reference

6    in that paragraph to plan investors, but you referenced other

7    parties did you not?

8    A.    I did.

9    Q.    And who are those parties?

10   A.    The -- the next sentence included the creditors committee,

11   the plan investors is what I wrote.

12   Q.    and in the same paragraph you also said that they are

13   abandoning the philosophy of a settlement case for an absolute

14   priority case, what did you mean by that in your communication

15   to the board?

16   A.    That -- that parties to the -- that the stakeholders

17   were -- whereas -- whereas we had treated, if you will, the

18   subordinated debt the MDL -- the subordinated debt and MDL

19   consistent with the unsecured creditors and had settled with

20   equity that we were receiving significant input that parties,

21   such as subordinated debt, the equity MDL, the plaintiffs had

22   to be impaired in this case as was called for by the absolute

23   priority rule under bankruptcy law.  That a -- a higher -- a

24   lower party -- I think it says, basically, that a lower party

25   in the capital structure can't receive a distribution until

194

1    that higher party has been satisfied.

2    Q.    As the company's chief restructuring officer, have you

3    ever thought of this case as an absolute priority case?

4    A.    No, sir.

5    Q.    And why is that?

6    A.    Because it -- it starts with the premise that General

7    Motors has made significant financial contributions to this

8    case in order to allow the company to emerge from Chapter 11.

9    And the distributions that are available to these other parties

10   that we're discussing is a direct result of General Motors

11   subordinating its -- I don't know if subordinating is the right

12   word, but receiving a less of a recovery then it would

13   otherwise be -- perhaps be entitled to.

14   Q.    In your direct examination you were asked a number of

15   questions about the company's business judgment with specific

16   reference to paragraph 43, among others, of your initial

17   declarations marked Joint Exhibit 1.  Do you recall those

18   questions and answers?

19   A.    Yes, sir.

20   Q.    During the period from October 29th to the present, did

21   you have an occasion to give consideration to the factors that

22   should go into the company's business judgment as it thought

23   about the EPCA?

24        MR. ISENMAN:  Objection, Your Honor.  I certainly

25   didn't get into this in my cross examination.

1        MR. BUTLER:  He opened the door with business

2   judgment, Your Honor, in the affidavit.

3        MR. ISENMAN:  Your Honor, with respect I don't think

4   I ever used the words business judgment.

5        MR. BUTLER:  I think you talked about paragraph 43 in

6   that section, which is all about business judgment in the

7   declaration.  I mean, this is a business judgment case.  And

8   this is what he talked about.  Forty-three was -- of the

9   business judgment issues.

10        MR. ISENMAN:  Your Honor, I -- I think I asked -- I

11   called his attention to a sentence in paragraph 43; I don't

12   think I asked him about his business judgment.

13        THE COURT:  Well, you did ask him about quantifying

14   the downside of further delay.

15        MR. ISENMAN:  I did ask him about that, Your Honor,

16   that's right.

17        THE COURT:  Okay.  So --

18        MR. BUTLER:  I'm just trying to explore the elements.

19   I thought the cross examination was trying to attest to, among

20   other things, the business judgment of the debtors with respect

21   to this transaction.

22        THE COURT:  Well --

23        MR. BUTLER:  And that's what I was trying to talk

24   about.

25        THE COURT:  He asked him about Mr. Sheehan's and the

1   debtors' assessment of the plan investors rights under the EPCA

2   and the right to terminate eventually.  And he asked him about

3   the down side of letting that process ensue.  If that's the

4   area you're getting into, I think you can -- you can respond --

5   you can ask him questions on that.

6          MR. BUTLER:  Well, we covered the event risk, Your

7   Honor.  I've been trying to extend this.  I mean, I can --

8          THE COURT:  All right.

9          MR. BUTLER:  -- I can argue the rest of it in oral

10  argument.

11         THE COURT:  Okay.

12  Q.   The last area of questioning, Mr. Sheehan, I want to go

13  over with you is on direct examination you were asked about why

14  you didn't file a lengthy supplemental declaration with respect

15  to the changes made over the last couple of days, do you recall

16  those questions?

17  A.   I do.

18  Q.   Okay.  Is -- did you have any intention as to whether your

19  testimony in the first and second affidavits would be

20  applicable to this -- this hearing today?  The first two

21  declarations, all the things you've said in those declarations,

22  do you intend them to apply today?

23  A.   Well the -- the business judgment that I made or have been

24  making during the last months is the -- the same business

25  judgment I had to make in reaching the EPCA amendment on

197

1   December 3rd.

2   Q.   And is there any element of your testimony in those

3   declarations that you would like to withdraw as it relates to

4   this hearing today?

5   A.   No, sir.

6   Q.   Okay.

7          MR. BUTLER:   I have no further questions, Your Honor.

8          THE COURT:   Okay.  Let me just --

9          MR. ISENMAN:   Your Honor, I have some very brief re-

10  cross.

11         THE COURT:   All right.  Fine.

12  RECROSS EXAMINATION BY

13  MR. ISENMAN:

14  Q.   Mr. Sheehan, just to clear up one thing that I believe Mr.

15  Butler said, I didn't ask you about whether you had filed a

16  lengthy supplemental declaration, I asked you if you filed any

17  declaration, correct?

18         THE COURT:   We know he didn't.

19         MR. ISENMAN:   Okay.

20  Q.   If you could turn back to --

21         MR. ISENMAN:   Strike that.

22  Q.   You discussed, just now with Mr. Butler, three events that

23  you were particularly concerned about, correct?

24  A.   Yes, sir.

25  Q.   And one of them was whether the PBGC would further extend

198

1   its waiver?

2   A.   Yes, sir.

3   Q.   And the second one was whether or not the unions would

4   waive -- help me out here --

5   A.   It's not really a waive.  It's that come March 31st, if we

6   have not been able to -- let's just say emerge from Chapter 11,

7   then they will -- there will be the event risk that they would

8   be able to strike.

9   Q.   Okay.

10  A.   And then the -- go ahead, sorry.

11  Q.   And the third one was something having to do with GM,

12  right?

13  A.   The GM settlement agreement would be terminable at that

14  point in time.

15  Q.   Okay.  Now, it's correct, is it not, that you have not

16  actually asked PBGC whether they would be willing to further

17  extend their waiver, correct?

18  A.   That is correct.

19  Q.   Okay.  And you have not, at this point, asked the unions

20  whether they would waive their -- their -- this ability to

21  strike, correct?

22  A.   That's correct.

23  Q.   And you have not asked GM whether it would waive its

24  termination rights, correct?

25  A.   No, I haven't.

199

1    Q.    Okay.  Thanks.

2    A.    Sorry.

3    Q.    You were responding correct, right?

4    A.    I responded correct.  I was also looking over to see, you

5    know, maybe I'd get one.  I apologize, sorry.

6    Q.    That's fine.  The -- Mr. Butler also asked you some

7    further questions about Exhibit 151, maybe you could get that

8    back in front of you?  Okay.  Do you have 151 in front of you?

9    A.    I do.

10   Q.    Okay.  And Mr. Butler asked you, in particular, about a

11   sentence that appears about three quarters of the way down.  It

12   says, "Spread the word, Delphi's EPCA has not been terminated."

13   A.    Correct.

14   Q.    Okay.  And so your intention was to make clear that the

15   August 2nd EPCA was still in effect, correct?

16   A.    Absolutely.  Norma -- what I did is I forwarded the press

17   release that we had issued at 9 o'clock that morning and my e-

18   mail to Norma where I forwarded it.  My exact words were,

19   spread the word, Delphi's EPCA has not been terminated.  Point

20   being that our DIP lenders did not need to be concerned and

21   they could still move forward with signing their amendment

22   pages.

23   Q.    Right.  But as you previously testified, you knew at that

24   time that the plan investors were not willing to move forward

25   on the August 2nd EPCA, true?

200

1   A.   That was my testimony, correct.

2   Q.   Okay.  And if you would just quickly turn with me to

3   Exhibit 761.

4   A.   761?

5   Q.   Which is in the third binder -- oh, I'm sorry, 161.

6   A.   161?

7   Q.   Yes.

8   A.   I have 161 in front of me.

9   Q.   In my binder it actually says 761, but that was my

10  mistake, 161.

11  A.   I have 161 in front of me.

12  Q.   And this is a -- another e-mail sent on your behalf to the

13  board of directors, correct?

14  A.   That's correct.  It's an e-mail that I drafted for our

15  board.

16  Q.   Okay.  And it's -- it was sent on November 11th, correct?

17  A.   Yes, sir.

18  Q.   Okay.  And if you turn to the second page of that?

19  A.   Yes, sir.

20  Q.   Okay.  And it -- do you see the first full paragraph?

21       MR. ISENMAN:  The Court's indulgence.

22  Q.   Do you see that first full paragraph?

23  A.   Yeah, I do.

24  Q.   Okay.  And it says, "As I communicated to you on Friday

25  morning, Appaloosa filed a required SEC filing on Thursday

201

1   evening which disclosed that the EPCA amendments would not

2   become effective because the Appaloosa filing was interpreted

3   in the market as an announcement that the EPCA itself may have

4   been terminated.  Delphi issued a press release on Friday

5   confirming the continued effectiveness of the Appaloosa EPCA

6   and the new timetable approved by Judge Drain."  Did I read

7   that correctly?

8   A.   Yes, sir.

9        MR. ISENMAN:  The Court's indulgence.

10  Q.   And Mr. Sheehan, just to continue in that paragraph, it

11  says -- see the sentence that begins with nevertheless?

12  A.   I do see that sentence.

13  Q.   Okay.  It says, "Nevertheless there was continued

14  deterioration in Delphi's debt securities pricing throughout

15  last week, which has created increased concern by our

16  stakeholders as to whether Delphi can successfully emerge from

17  Chapter 11 in the near term."  Did I read that correctly?

18  A.   You did.

19  Q.   So --

20       MR. ISENMAN:  Your Honor, I think I have nothing

21  further.

22       THE COURT:  Okay.  Well, that last bit was certainly

23  cryptic but maybe you'll explain to me your intentions at oral

24  argument for raising that point, whatever it was worth.

25       I have a question; you were here for Mr. Tepper's

202

1    examination weren't you?

2             THE WITNESS:  Yes, I was.

3             THE COURT:  You heard him say, and I confess this was

4    news to me, that one of the members of the Goodwin Proctor

5    group had been a plan investor?

6             THE WITNESS:  There is a member --

7             THE COURT:  Is that right?

8             THE WITNESS:  Yeah, I'm generally aware of that.

9    Yes, sir.

10            THE COURT:  What member is that?

11            THE WITNESS:  I believe that -- I believe they go by

12   initials in the Goodwin Proctor but I'll refer to them by their

13   street name which is Silver Point Capital.

14            THE COURT:  And when did they opt out?

15            THE WITNESS:  Opt out?

16            THE COURT:  Do you remember when they -- when they no

17   longer were a plan investor?

18            THE WITNESS:  They are still a plan investor.

19            THE COURT:  They still are?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Under this agreement?

22            THE WITNESS:  To -- they're an -- they're an

23   additional investor.  There are three -- there's Appaloosa

24   itself and then there are the five co-investors.  There are

25   then the additional investors, Your Honor.  And at least -- so

1    I don't know every additional investor.  I am aware, from both

2    discussions with Silver Point themselves as well as with other

3    parties -- peer -- just other parties that they're an

4    additional investor.  That's all I can say about that.

5            THE COURT:  And they object to their own agreement?

6            THE WITNESS:  This has been a very strange case.

7            MR. BRILLIANT:  Your Honor, Silver Point is not an

8    objector on this agreement.  And the -- that that they're a

9    backstopper as an additional investor is disclosed in the

10   2019 --

11           THE COURT:  So -- I'm sorry, so they're not a member?

12           MR. BRILLIANT:  they're additional investors.

13           THE COURT:  No, but they're not a member of your

14   client group?

15           MR. BRILLIANT:  They are not an objector in

16   connection with this motion.  They -- they objected to the MDL,

17   they did not object to the disclosure statement or to the EPCA

18   motion.

19           THE COURT:  Okay.  All right.  You can step down.

20           MR. BUTLER:  Your Honor, I wonder if it would be

21   appropriate to take a brief recess.

22           THE COURT:  All right, you have one more witness.

23           MR. BUTLER:  We have one more witness.

24           THE COURT:  All right.  Are there any other

25   witnesses?  Okay.  I'll be back in a little over five minutes.

204

1          (Recess from 4:32 p.m. to 4:43 p.m.)

2              THE COURT:  We're back on the record in Delphi.  Mr.

3      Sheehan, I apologize.  I realized I had two questions I wanted

4      to ask you.  You're still under oath.

5              THE WITNESS:  I appreciate that.

6              THE COURT:  You were asked during your examination

7      about the possibility of getting a waiver from the PBGC at the

8      end of February or before the end of February when you would

9      need one.  With respect to the last waiver, was there a waiver

10     charge or waiver fee required by the PBGC?

11             THE WITNESS:  Yes, there was.

12             THE COURT:  Do you remember the amount of that?

13             THE WITNESS:  The agreement I reached with the PBGC

14     and the IRS, to be clear, the IRS actually grants the waivers

15     but the PBGC does most of the negotiations with me, was that I

16     would be required at the time of emergence from Chapter 11 to

17     contribute into the plans an additional twenty million dollars

18     over and above that that is otherwise due.

19             THE COURT:  As the company's chief restructuring

20     officer, do you generally keep an eye on the direct costs of

21     the Chapter 11 case; i.e., the professional's cost?

22             THE WITNESS:  I do, as both the chief restructuring

23     officer and as a member of the fee committee in this case, sir.

24             THE COURT:  Do you have an estimate of the average

25     monthly direct costs of the case?

205

1          THE WITNESS:  The average monthly direct costs of the

2     case is between twelve and fifteen million dollars a month.

3          THE COURT:  Okay.  All right.  Anyone want to examine

4     Mr. Sheehan on those questions or his answers?  Okay.  You can

5     step down.

6          MR. BUTLER:  Your Honor, the debtors' final witness

7     in support of its direct case is that of Robert S. Miller, Jr.

8     or Steve Miller, the company's Executive Chairman.  Mr. Miller

9     has filed a two -- prepared and signed two declarations in this

10    case.  They are set forth, marked highly confidential, at joint

11    exhibits 5 and 6.  I'd now like to move those declarations into

12    evidence subject to cross examination.

13         THE COURT:  Okay.

14         MR. ISENMAN:  Your Honor, we have similar objections

15    to the prior ones.  They are again simply that we object to

16    information that is hearsay being admitted for the truth of the

17    matter asserted but do not object to its admission to show Mr.

18    Miller's own state of mind.  And I can again hand those up to

19    the Court if that will be helpful.

20         THE COURT:  All right.  Is that the only basis for

21    your objections?

22         MR. ISENMAN:  In a few places, Your Honor, Mr. Miller

23    characterizes the EPCA as Mr. Sheehan did.  But, again, that

24    just goes to his understanding of it not --

25         THE COURT:  Okay.  So as long as the affidavit --

206

1    affidavits are admitted as evidence of his or the board's

2    understanding of the facts including the EPCA, there's no

3    objection.

4             MR. ISENMAN:  That's correct, Your Honor.

5             THE COURT:  Okay.  I'll admit it on that basis.  Or

6    admit them on that basis.

7    (Declarations of Steve Miller were hereby received as Debtors'

8    Exhibit 5 and 6 for identification, as of this date.)

9             THE COURT:  Okay.  Then, you want to cross examine,

10   Mr. Miller?

11            MR. ISENMAN:  I would like to, yes, Your Honor.

12       (Witness is sworn)

13            THE COURT:  Okay.  You can go ahead.

14   CROSS EXAMINATION BY

15   MR. ISENMAN:

16   Q.   Mr. Miller, you have been present throughout the hearing

17   today, correct?

18   A.   Yes.

19   Q.   And you've been present for each of the prior witnesses'

20   testimony, correct?

21   A.   That is correct.

22   Q.   I will ask you some questions that I asked Mr. Sheehan as

23   well, you submitted two declarations which are dated, I believe

24   November 2nd and November 21st, correct?

25   A.   Correct.

207

1   Q.   And you have not submitted a supplemental declaration with

2   respect to the December 3rd EPCA, correct?

3   A.   That is correct.

4   Q.   And you were deposed, I believe, last week, but you have

5   not been deposed since the filing of the December 3rd EPCA,

6   correct?

7   A.   That is correct.

8   Q.   Mr. Miller, since the August 2nd EPCA was signed you have

9   not authorized anyone to go out to the market and see if there

10  was any other potential equity investor, correct?

11  A.   Correct.

12  Q.   And when the October EPCA was terminated Delphi announced

13  to the market that the August EPCA was still in force,

14  corrected?

15  A.   Correct.

16  Q.   And, at the time that you announced that the August 2nd

17  EPCA was still in force, you knew the plan investors were not

18  willing to proceed with the August EPCA, correct?

19  A.   We knew that implementing the August EPCA was impractical

20  at that time, yes.

21  Q.   And you did not announce to the market that proceeding

22  with the August 2nd EPCA was impractical, correct?

23  A.   Correct.

24  Q.   Now, Delphi never made any attempt to enforce the terms of

25  the August 2nd EPCA against the plan investors, correct?

208

1  A.   One of the conditions to implementing the August EPCA was

2  to raise the financing contemplated in that EPCA.  Because of

3  the changes in the capital markets and the investigations we

4  did following that EPCA we did not believe that seeking

5  enforcement would be effective and the maximum possible

6  recovery would be limited.

7  Q.   So the answer is you never did attempt to enforce the

8  terms of it, correct?

9  A.   We continued in discussions to find a resolution that

10  would work rather than contemplating litigation for things that

11  wouldn't work.

12  Q.   Great, thank you.

13        MR. ISENMAN:  Your Honor, the Court's indulgence for

14  just one moment.

15  Q.   Now, under the current version, the December 3rd EPCA,

16  there's a condition on closing concerning and interest expense

17  cap, correct?

18  A.   That is correct.

19  Q.   And am I right that first became a condition under the

20  August 29th EPCA?

21  A.   Frankly, I've forgotten when it first became a condition.

22  Q.   But that's something that was added after the August 2nd

23  EPCA, we can agree on that, right?

24  A.   I believe that to be correct.

25  Q.   And the effect of that new condition has been to shift the

209

1    risk of future fluctuations in interest rate from the plan

2    investors to the company, correct?

3    A.    On that -- yes, on that narrow precise issue there's been

4    a transfer of risk by virtue of the inclusion of an interest

5    rate cap as a condition.

6    Q.    Okay.  So that means that depending on what happens with

7    interest rates it may very well be that this condition means

8    that the plan investors are not going to need to close on this

9    December 3rd EPCA, and in that case they might be able to

10   renegotiate further concessions from Delphi, correct?

11   A.    We certainly would have wished for an absence of the cap

12   or a higher looser cap.  We negotiated strongly, argued

13   strongly for it, but at the end of the day we had to vote on

14   that which was presented to us, not that which we wished we

15   could have.

16   Q.    So you don't disagree with what I said?

17   A.    I forgot everything you said but I didn't find anything

18   that I wouldn't agree on.

19   Q.    Should I repeat it?

20         THE COURT:  No.

21   A.    No.

22   Q.    I guess its unanimous then.  Now, Delphi believed that it

23   could not unilaterally terminate the EPCA, correct?

24   A.    We believed there were serious -- we were advised there

25   were serious legal problematic issues if we were to attempt

1    unilateral termination of the EPCA, yes.

2    Q.    So, even in the situation where the plan investors refused

3    to proceed under the terms of the EPCA it simply let -- were

4    willing to let it expire at the end of March, the company still

5    couldn't walk away, to your understanding, without incurring

6    liability, correct?

7    A.    Our understanding is that it would have been very

8    problematic.  We were in this period of time unable to raise

9    the contemplated financing imbedded in the original EPCA.  And,

10   yes, one of the alternatives would be just to let it expire.

11   But as has previously been testified here passage of time is

12   our enemy and we did not choose that path.

13   Q.    And the liability that you were concerned about, that you

14   just referred to in your previous answer, and if the company

15   were to walk away from the August 2nd EPCA numbers, among other

16   things, the alternative transaction fee?

17   A.    Well, that was a minor concern.  The major concern is

18   losing the investor group we had before us knowing that we

19   required an investor group in order to get out of Chapter 11.

20   And I repeat, we feel extreme pressure to get this done on as

21   timely a basis as we can, and we were unwilling to take the

22   risk of a prolonged process.

23   Q.    Understood.  Under the most recent iteration, the December

24   3rd EPCA, the assumed TEV that's used to calculate the plan

25   investors buy-in that's something less than eleven billion,

211

1    correct?

2    A.    You mean, the discounted TEV at which the investors can

3    buy in, yes.

4    Q.    That's what I'm referring to, yes.  That was under eleven

5    billion?

6    A.    Yes.

7    Q.    And that's -- you're familiar with the Rothschild range of

8    values --

9    A.    Yes.

10   Q.    -- for the company?  And at below eleven billion that's

11   significantly below Rothschild's range of values for Delphi,

12   correct?

13   A.    You're correct.

14   Q.    And it's fair to say, although the company did not have

15   to --

16            MR. ISENMAN:  Strike that.

17   Q.    It's fair to say that the company didn't have a choice of

18   putting in some different number with respect to the assumed

19   TEV other than the one that was agreed to?

20   A.    The buy-in TEV was the product of heavy multi-lateral

21   negotiation.  This is where it ended up.  We were told that

22   this is the offer, it's not going to be moved further, and the

23   choice we therefore presented to our board was to proceed with

24   this offer or stop this process and try to go on down some

25   other path.  We included in the discussion was an assessment

212

1   made by the board, as advised by our advisors and our own

2   thinking, as to whether the offer on the table represented

3   market.   This has been a very transparent process and we have

4   not seen other investors arise to the surface, except for a

5   rumored transaction that came to the surface about a week ago.

6   Q.   So the company did not feel that it had any ability use a

7   different number then the assume TEV that was used for the

8   separate third EPCA, right?

9   A.   The TEV number that is in there was heavily negotiated

10  along with scores of other terms and conditions in this entire

11  agreement.   And we eventually got to today where we have the

12  support of the statutory committees, General Motors, and the

13  plan investors and this is the best deal that we know of.

14  Again, the board was not asked to vote on whether they would

15  wish for something else, they were asked to vote on whether to

16  take what is in front of us or delay the process of emergence.

17  Q.   And, you were present before when I asked Mr. Sheehan

18  whether anyone had actually quantified the amount of delaying

19  emergence?   You were present for that, right?

20  A.   Yes.

21  Q.   And Mr. Sheehan explained various concerns he had about

22  delay.

23  A.   Yeah.

24  Q.   But did -- tell us that no one had actually calculated the

25  actual costs, do you recall that testimony?

213

1   A.    I recall the testimony I don't recall that he gave you an

2   actual by example calculation.  But this is a judgment call.

3   I've been chairman of this outfit for about thirty months, been

4   through a lot, been worried about event risk all through this

5   Chapter 11 process.  And, in fact, our failure to emerge

6   according to our original plan by July 31st resulted in a macro

7   economic event risk hitting us which is why we're here having

8   this discussion today.  I wish we had gotten out when the times

9   were good, when we could have raised the money that was

10  contemplated in the original EPCA.  We didn't get there, we got

11  hit by an event risk.  And you're asking me to -- how could

12  someone six months ago have quantified this risk, I don't know.

13  And therefore, I don't know how to quantify the next event

14  risk.  The event risks that were pointed out here include, what

15  about the PBGC, why didn't we go ask them.  I know what would

16  happen if I would go ask them, they'll say come back at the end

17  of February and we'll make a judgment then as to what we would

18  need.  And the same would go for General Motors, I would guess,

19  and for the unions, I would guess.  They will wait until time's

20  up before agreeing prematurely to waive those conditions.  And

21  even going to them will be fighting, because it says we're

22  worried about not getting out on time.  We have focused on

23  trying to get out as quickly as we can.  We're hoping to get

24  out by the end of February.  Now, you can admonish me for going

25  beyond the question.

214

1  Q.   It's not my position to admonish you, Mr. Miller.  I will

2  point out I think my question was, do you recall that

3  testimony?

4  A.   Yes.

5  Q.   And I appreciate what you just said but just to verify it,

6  as of today the company has not requested, to your knowledge,

7  further extension from the PBGC, right?

8  A.   That is correct.

9  Q.   And as of today it's not your understanding that the

10  unions actually have a right to strike on March 31, 2008 if the

11  company hasn't emerged from bankruptcy, correct?

12  A.   Correct.

13  Q.   And none -- GM, as of today, has not informed the company

14  that it will cease doing business with the company if it hasn't

15  emerged from bankruptcy as of March 31st, correct?

16  A.   That is correct.

17  Q.   And Toyota has not informed the company that it will cease

18  doing business with the company if it hasn't emerged from

19  bankruptcy by March 31st, correct?

20  A.   During that brief twenty-four hour period between the

21  Appaloosa filing and the time we put out a press release we got

22  inquiries into our sales people and into our president,

23  enquiring about what that meant.  Because our customers were

24  very concerned.  And part of the reason we were putting out the

25  press release was to calm our customers down.  We also had a

215

1   big impact on the banks with whom we were trying to get our DIP

2   loan extension, which was also critical to us.  But the

3   fragility of the confidence in our company is something that

4   any of our stakeholders had better take into account when they

5   calculate whether they want to impose a delay on this process

6   or let us get this done.

7   Q.   And Toyota has not told you --

8        THE COURT:  I think you should move on.

9        MR. ISENMAN:  Okay.  Thank you, Your Honor.

10  Q.   You were present for Mr. Tepper's testimony?

11  A.   Yes.

12  Q.   And you heard his testimony about Appaloosa's holdings in

13  various securities issues by Delphi, right?

14  A.   Yes.

15  Q.   So it's fair to say, you already knew this, that Appaloosa

16  is deeply indebted in the company's capital structure, right?

17  A.   Correct.

18  Q.   Okay.  And it's your view that if the company were to try

19  an alternative financing arrangement using different plan

20  investors that the company would have to confront the

21  possibility that Appaloosa would use its position as deeply

22  imbedded in the capital structure to frustrate any new plan

23  investor, correct?

24  A.   I do not know how Mr. Tepper would vote if confronted with

25  a plan or reorganization that included other plan investors.

216

1    My guess is he would vote on his self-interest regardless of

2    whatever he might say in advance of that.  We cannot know that

3    until we get there.  The alternate plan investors who

4    approached us last week but never actually delivered a

5    proposal, and in fact, somewhat dismissed the risk of adverse

6    vote by Tepper, on the basis that his holdings were

7    concentrated in the more junior securities.

8    Q.   Okay.  I apologize, I'm not sure whether you answered my

9    question or not.

10   A.   I'm sorry, I tend to wander off.

11          THE COURT:  I heard it.

12          THE WITNESS:  Okay.  Thank you.

13   Q.   Let me refer you, if I may, to Exhibit 176.  Mr. Miller,

14   do you have 176 in front of you?

15   A.   Yes, I do.

16   Q.   And is this an e-mail from you to Mr. Yaku?

17   A.   Yes.

18   Q.   Who is the chairman of the equity committee?

19   A.   That is correct.

20   Q.   Okay.  And this was the e-mail that was sent on October

21   30th?

22   A.   That is correct.

23   Q.   And again, I don't want to insult you, but at the time you

24   sent this e-mail it was your intention to be truthful, correct?

25   A.   That is correct.

217

1   Q.   And in the third paragraph of your e-mail --

2   A.   Yes.

3   Q.   -- it begins "at the same time."

4   A.   Correct.

5   Q.   You see that, it says "at the same time you must recognize

6   that Delphi cannot propose plan recoveries that are not

7   supported by our plan investors in the investment agreement, or

8   by GM in the GM settlement agreements," you see that?

9   A.   Correct.

10  Q.   And that was your statement to Mr. Yaku?

11  A.   Yes.

12  Q.   And in affect it is your view that Delphi could not

13  propose a plan recovery that's not supported by the plan

14  investors?

15  A.   Right.

16  Q.   Is it the board's practice to circulate draft minutes

17  sometime following each board meeting before they're adopted by

18  the board, correct?

19  A.   That is correct.

20  Q.   And it's your practice to review those draft minutes,

21  correct?

22  A.   Yes.

23  Q.   And, you generally have found --

24       MR. ISENMAN:  Strike that.

25  Q.   There's never been an instance where you have found

218

1    something material that was omitted from those minutes,

2    correct?

3    A.    That is correct.

4    Q.    You never said wait a second, we discussed this as well,

5    make sure you add that to the minutes?

6    A.    I do not recall such a manner.

7    Q.    So it's your view that the minutes accurately describe

8    what occurred at board meetings, correct?

9    A.    That is true.  Our board meetings are attended by a number

10    of professionals, all of whom poured carefully over the minutes

11    before they are sent around for review by the board members.

12    Therefore, it's not surprising to me that I don't find things

13    they omitted.

14    Q.    So if something of import occurred at a board meeting you

15    would expect it to be in the minutes, correct?

16    A.    If everything that happened in every board meeting were to

17    be in the minutes, you know, there wouldn't be enough room in

18    this courthouse to truck in all the minutes.  So I can't say

19    there might not be something that someone regarded as important

20    that didn't get mentioned.  But by and large, our professional

21    do the best job they can, including our in-house counsel, of

22    making sure the board minutes best reflect those things that in

23    the debtors' eyes are critical to the decisions made by the

24    board.

25    Q.    And you have worked very hard in connection with this

219

1    bankruptcy, right?

2    A.    Well, I think so.

3    Q.    And you have foregone a fair amount of income that you

4    could have acquired otherwise had you been doing something

5    else, right?

6    A.    I believe that's fair.

7    Q.    And at the time that Delphi does emerge from bankruptcy,

8    at that point, you will be eligible to receive a well-deserved

9    cash bonus, correct?

10   A.    The board is considering including me in the emergence

11   cash program.  I have no plans to stay with the company beyond

12   that therefore would be ineligible for any of the ongoing

13   salary or equity awards that might ensure.

14   Q.    Right.  But you would be eligible for a cash bonus?

15   A.    Well, that's up to the board.  I have no entitlement and

16   really have not had any meaningful discussion as to what it

17   might be.

18            MR. ISENMAN:  The Court's indulgence, Your Honor, I

19   think I'm almost done.

20   Q.    Mr. Miller, you mentioned that you do not intend to be

21   with the company after emergence from bankruptcy but it's your

22   expectation that a number of members of senior management will

23   continue with the company when it emerges, correct?

24   A.    That is my expectation and my hope.

25   Q.    Okay.  And you mentioned that, although you would at most

1    be eligible to receive some sort of cash reward, there is other

2    compensation arrangements contemplated for senior management

3    and staying on, right?

4    A.    Correct.

5    Q.    And that compensation includes, among other things,

6    restricted stock units, correct?

7    A.    Correct.

8    Q.    So under this senior management could be awarded

9    restricted stock units?

10   A.    Yes.

11   Q.    Mr. Miller, I appreciate it.

12            MR. ISENMAN:  Your Honor, I have no more questions

13   for this witness.

14            THE COURT:  Okay.  Mr. Fox?  Any redirect?

15            MR. BUTLER:  Your Honor, we have no redirect.

16            THE COURT:  Okay.  Mr. Miller, you just answered a

17   number of questions about the potential awards of emergence

18   bonuses and/or going forward --

19            THE WITNESS:  Yes.

20            THE COURT:  -- and executive compensation, to your

21   knowledge as a member of the board, did either of those

22   eventualities affect the board's deliberation in respect of the

23   EPCA amendment?

24            THE WITNESS:  I have absolutely no evidence that any

25   of the prospective post-emergence equity arrangements or the

221

1    emergence cash arrangements or any of that, which has been in

2    our plan since October of 2005, have any impact on the

3    immediate discussions with the plan investors.  We have at all

4    times had this process controlled by our board of directors,

5    not by management, and as advised by professional compensation

6    experts and we will be involved in discussions with our

7    creditors' committee going forward as to the appropriateness to

8    the overall amounts that are to be awarded.  As you well know,

9    we compete in the marketplace when we buy steel, when we buy

10   other goods that come into our factories.  And we also compete

11   in the marketplace for executive talent.  With your concurrence

12   and at times greatly done, you supported the notion of having

13   incentive compensation for our management group here.  That

14   helped me, helped us keep our management group in tact.  The

15   company, as you know has on all of its operating metrics beaten

16   its budgets, beaten its prior years, and performed the best

17   levels in this company's history.  And the reason we're having

18   a big discussion here in this courthouse about how to share the

19   value that's been created, is because value was created.  It's

20   perfectly reasonable and logical that the new owners of the

21   business going forward will want to have a retained and

22   motivated management group.  And that will be subject to a

23   market test, testified to by professional outsiders, and done

24   at consultation with the creditors' committee.

25            THE COURT:  Okay.  Anyone want to ask --

222

1          THE WITNESS:  I realize I went way beyond your

2     questions, sir.

3          THE COURT:  Okay.  Does anyone want to ask Mr. Miller

4     anything about that question or answer?  Okay.  You can step

5     down, sir.

6          THE WITNESS:  Thank you.

7          THE COURT:  Okay.  So do the parties want to address

8     the exhibits now?

9          MR. BUTLER:  Yes, Your Honor.

10         MR. BRILLIANT:  Your Honor, can I have thirty seconds

11    to sort of gather my --

12         THE COURT:  Sure.  It will take Mr. Butler thirty

13    seconds to get rolling, so --

14         MR. BRILLIANT:  Thank you, Your Honor.

15         MR. BUTLER:  Your Honor, I believe there have been

16    211 exhibits that have been designated jointly by the parties

17    in this case.  Exhibits 1 through 6, which had been subject to

18    objection, I think have now all been admitted.

19         THE COURT:  Those are the declarations, right?

20         MR. BUTLER:  Those are the declarations, Your Honor.

21    Exhibits 7 through 10, which are the Delphi-Appaloosa

22    investment documents.  Exhibit 11 through 16, which are the

23    superseded first amendment documents.  Exhibit 17 through 21,

24    which were the superseded restated documents.  Exhibits 22

25    through 27, which are the global settlement agreement master

1    restructuring agreement with General Motors.  Exhibits 28

2    through 33, which are documents in connection with the joint

3    plan.  Exhibits 34 through 41, which are materials presented to

4    Delphi's board of directors.

5            MR. ISENMAN:  Your Honor, may I interrupt for a

6    moment?  We had a number of objections to some of these.

7    Parties met and conferred, and my understanding that with

8    respect to 34 through 41 the resolution of the parties was that

9    we withdrew those objections, which were on hearsay grounds,

10   provided that they were admitted not for the truth of the

11   matter asserted but merely to show what information was

12   provided to the board.

13           MR. BUTLER:  Let me take this one so that the record

14   can be clear then, Your Honor.  Let me simply move the

15   admissions of document 7 through 33, to which that objection

16   doesn't apply and I'll address the next group.

17           MR. FOX:  That same objection applies to 29, which is

18   the September 6th disclosure statement, which is not to be

19   admitted for the truth of the matters asserted.

20           THE COURT:  Okay.

21   (Delphi-Appaloosa Investment Documents were hereby received as

22   Debtors' Exhibits 7 through 10 for identification, as of this

23   date.)

24   (Superseded First Amendment Documents were hereby received as

25   Debtors' Exhibits 11 through 16 for identification, as of this

1    date.)

2    (Superseded Restated Documents were hereby received as Debtors'

3    Exhibits 17 through 21 for identification, as of this date.)

4    (Global Settlement Agreement Master Restructuring Agreement

5    With GM were hereby received as Debtors' Exhibits 22 through 27

6    for identification, as of this date.)

7    (Documents in Connection With the Joint Plan were hereby

8    received as Debtors' Exhibits 28 through 33 for identification,

9    as of this date.)

10            MR. BUTLER:  So now, I'm going to Exhibits 34 through

11   41 which were the materials presented to Delphi's board of

12   directors as well as Exhibits 42 through 49 which were other

13   communications of Delphi's board of directors.  We move their

14   admission.  We agree that they're not admitted for the truth of

15   the matter asserted but rather as communications or

16   presentation to the board, when they board understood while it

17   deliberated.

18            THE COURT:  Okay.  So they'll be admitted on that

19   basis.

20   (Material Presented to Delphi's Board of Directors were hereby

21   received as Debtors' Exhibits 34 through 41 for identification,

22   as of this date.)

23   (Communications of Delphi's Board of Directors were hereby

24   received as Debtors' Exhibits 43 through 49 for identification,

25   as of this date.)

225

1          MR. FOX:  Your Honor, 45 and 49 there was no

2     objection.

3          THE COURT:  Well, they're admitted.

4          MR. FOX:  Okay.  But without the hearsay.

5          THE COURT:  Without the hearsay.

6          MR. BUTLER:  The next set of exhibits we address are

7     Exhibits 51 through 54.  These are presentations that were

8     presented to the joint meetings of the Delphi statutory

9     committees.  And there have been objections I think lodged to

10    those, I don't know who wants to present those.  We certainly

11    can argue that they've been admitted in prior hearings of this

12    Court.

13         MR. ISENMAN:  I may be mistaken about this, Your

14    Honor, but I was under the impression that we resolved this one

15    as well.

16         MR. BUTLER:  If we haven't

17         THE COURT:  On the same grounds that --

18         MR. ISENMAN:  Same grounds, Your Honor.

19         THE COURT:  Fine.

20         MR. BUTLER:  That's fine.  That's good -- so 51

21    through 54 would come in?

22         MR. ISENMAN:  Mr. Butler, isn't it 50 to 54?

23    (Presentation to Joint Meeting of Delphi Statutory Committee

24    were hereby received as Debtors' Exhibits 50 through 54 for

25    identification, as of this date.)

226

1          MR. BUTLER:  50 to 54, sorry.  The next group of

2     documents are minutes of meetings held by the board of

3     directors.  This is item 55 through 61.  And there was also --

4     I thought the bondholders had objections here as to hearsay and

5     inadmissible?  Are you okay with these coming in?

6          MR. ISENMAN:  55 through 61 we resolved the hearsay

7     objection, I believe.  We agreed that this was simply a --

8     (Board Minutes were hereby received as Debtors' Exhibits 55

9     through 61 for identification, as of this date.)

10         THE COURT:  Memorial of what the board considered?

11         MR. ISENMAN:  Correct, Your Honor.  We had a

12    different issue with respect to these board minutes, and that

13    was that there are a substantial number of redactions in the

14    board minutes.  We asked for a privilege log, initially we were

15    told that the things had been redacted, most of them are not

16    relevant to the issues at hand.  And at about midnight last

17    night we received a privilege log, and we appreciate that,

18    better late than never.  That privileged log disclosed, Your

19    Honor, that in fact virtually everything that had been redacted

20    was highly relevant.  It was redacted apparently on privilege

21    grounds but it was things that apparently the -- that the board

22    relied upon.  And I think that you make reference in, I

23    believe, paragraph 23 of their reply to -- they're relying on

24    some of this.  So it's our view that it should not come in in

25    this redacted state, it's going to come in under the rule of

1    completeness, Rule 106, it ought to come in in unredacted form.

2    Particularly, if the company is asserting that -- that is was

3    relying upon advice of counsel.

4              MR. BUTLER:  Your Honor, I actually believe that the

5    matters were either privileged.  The matters -- the

6    presentations that I make to the board are, in fact, privileged

7    and not subject I think to invasion of the privilege.  And with

8    respect to the other elements of those minutes I believe that

9    there are many things that are considered at board meetings

10   other than EPCA amendments.  And those matters have been

11   redacted from the production.

12             MR. ISENMAN:  Your Honor, if I could be heard very

13   briefly on that?  The issue for us is that the debtor is

14   attempting to use the privilege as sort of a shield.  They're

15   saying we're relying on our lawyers for this.  But they're also

16   trying to protect it from disclosure and that's -- I don't

17   think that's appropriate.

18             THE COURT:  Well, it's not particularly meaningful to

19   me simply to hear that lawyers told them that, in their

20   judgment, as a legal matter appropriate to proceed as the board

21   did, since I don't know what the basis of that was.  And if

22   that's all the debtor is saying I think that they're not --

23   they're not sufficiently using it as a sword against you.  I'm

24   sure at oral argument I will hear legal analysis from both

25   sides on the relevant issues, and that's what I'm going to

228

1    focus on.

2            MR. BUTLER:  So, Your Honor, that would be -- and I

3    don't think there's any objection to the draft of 62 and 63, so

4    I believe that means all the minutes come in.

5    (Draft minutes were hereby received as Debtors' Exhibits 62

6    through 63 for identification, as of this date.)

7            MR. BUTLER:  So we're up now to document 64, Exhibit

8    64.  Exhibit 64 through 67 -- or through 68 were the various

9    lists of scenarios and evaluations prepared by Rothschild.  And

10   I believe that there's now no pending objection to those.

11           MR. ISENMAN:  Again, Your Honor, as long these are

12   coming in for information considered by the board and not for

13   the truth of the matter asserted, we don't have an objection.

14   That I believe was what the agreement was that we reached with

15   the debtors.

16           MR. BUTLER:  That's correct.  They are what they are.

17           THE COURT:  All right.  That's fine.  But can you

18   bring me up to date.  Has the Goodwin Procter group signed

19   their confidentiality agreements, no shop, no trade agreements?

20   (Various Lists of Scenarios and Evaluations Prepared by

21   Rothschild were hereby received as Debtors' Exhibits 64 through

22   68 for identification, as of this date.)

23           MR. BUTLER:  No, they have not.

24           THE COURT:  So this was just reviewed by the lawyers?

25           MR. BUTLER:  The production in this matter was

229

1    covered by a protective order.  Because the discovery matters

2    were covered by a protective order and they reviewed, I

3    believe, professionals only by the Goodwin Procter firm.  And

4    no, the other MDA was not executed.

5            THE COURT:  Okay.

6            MR. ISENMAN:  That's correct, Your Honor.  There's

7    material that -- loose material the debtors have designated as

8    highly confidential and materials that were so designated were

9    attorney's eyes only.

10           THE COURT:  Okay.

11           MR. BUTLER:  The next group of documents, Your Honor,

12   are news releases and SEC filings, documents 69 through 89.  I

13   believe there's no pending objection to these matters as well.

14           MR. ISENMAN:  Again, the agreement was it doesn't

15   come in for the truth of matter asserted, it simply comes in

16   for what it is.

17           THE COURT:  Okay.

18   (News Releases and SEC Filings were hereby received as Debtors'

19   Exhibits 69 through 89 for identification, as of this date.)

20           MR. BUTLER:  In terms of other documents, Your Honor,

21   there were miscellaneous other documents, Exhibits 90 through

22   97 and 101.  I believe there's no pending objection.  Just for

23   the record, Exhibits 98 through 100 were withdrawn.

24           THE COURT:  Okay.

25           MR. ISENMAN:  And, again, Your Honor, I believe with

230

1   respect to 90 and 91 there was a hearsay objection which

2   resolved on the basis that didn't come in -- for the truth of

3   the matter asserted.

4          THE COURT:  All right.  So those two are admitted.

5   (Miscellaneous Documents were hereby received as Debtors'

6   Exhibits 90 through 91 for identification, as of this date.)

7          MR. ISENMAN:  Both 96 and 97, the same thing is true.

8   (Miscellaneous Documents were hereby received as Debtors'

9   Exhibits 96 through 97 for identification, as of this date.)

10         THE COURT:  Okay.

11         MR. BUTLER:  The next group of exhibits, Your Honor,

12  are documents 102 through 109.  These are demonstratives by the

13  debtors.  And I believe there's no objection pending on

14  Exhibits 102 and 105 -- through 105.  And there may be

15  outstanding objections on 106 through 109.

16         MR. BRILLIANT:  I guess I'll address 109, Your Honor.

17         MR. BUTLER:  Before you do that, do I have it right

18  102 through 105 come in.

19         MR. BRILLIANT:  That's right.

20         THE COURT:  Okay.

21         MR. BUTLER:  And there are pending objections on 106

22  through 109, is that right?

23         MR. BRILLIANT:  102 through 105, it's just the

24  standard -- because it comes from the board material, again, if

25  it doesn't come in for the truth of the matter asserted but as

231

1    a demonstrative, we don't object.  109 as I recall is ERISA

2    transactions that did not close during a particular time

3    period, with no description of why they didn't close.

4    Demonstrative evidence demonstrates something that was brought

5    for the testimony, it doesn't qualify as demonstrative

6    evidence.  One of the bedrock requirements in order to show the

7    fact finder demonstrative evidence, fairness and accuracy.

8    There's no basis for asserting that.  It wasn't like when we

9    had Mr. Resnick on the stand and we were able to talk to him

10   about a draft that he put together to understand it.

11             THE COURT:  I'm sorry.  So he didn't testify as to

12   this exhibit in his deposition?

13             MR. BRILLIANT:  That's correct.

14             THE COURT:  Okay.

15             MR. BRILLIANT:  This was generated after the

16   deposition.  And it is a -- basically a bar graph that just

17   shows by value the number of deals -- I don't have it in front

18   of me, I'm sure Mr. Butler can show it to you.  But, I mean, I

19   think the critical thing I remember here is demonstrative

20   evidence has to aid the fact finder by demonstrating something

21   in the testimony or demonstrating something in the evidence.

22   And obviously there's no -- you know, it's not like some chart

23   where you're summarizing lots of disparate things and trying to

24   make it an are to reopen.

25             THE COURT:  Well, is there testimony as to this?

232

1          MR. BRILLIANT:  No.

2          THE COURT:  Well, then I don't think it could come

3     in.  I mean -- I'm not going to admit it.

4          MR. BUTLER:  As to 106 through 108?

5          MR. ISENMAN:  Your Honor, 106 through 108 suffer from

6     the same problem in that they are charts that there's no

7     testimony about.  My understanding is that they were generated

8     by Rothschild --

9          THE COURT:  What volume do they appear in?

10          MR. BUTLER:  I'll put them up, Your Honor.  I'll

11     start with 108, Your Honor, which I think you've seen before in

12     this courtroom.

13          THE COURT:  If we had an hour of cross examination on

14     this exhibit and now you're objecting to it?

15          MR. BRILLIANT:  Your Honor, it's just arguments, my

16     apologies.  The other ones, however --

17          MR. BUTLER:  There was also testimony about the

18     trading, this formulation is the same thing, the trading of

19     these numbers and whatever go in there.  During the course of

20     your cross examination you spent a half hour on trading -- you

21     were talking about intrinsic value --

22          THE COURT:  But the issue is -- at least, Mr. Resnick

23     was able to testify as to this document that's being held up by

24     your associate.  The other one, I don't know where it comes

25     from, how it was prepared, etcetera.  As you could also tell

233

1   from my questioning and reaction, short-term trading history to

2   my mind is a minor data point at best.

3            MR. BUTLER:  Your Honor, we'll stick with 109.

4            THE COURT:  Okay.  Then you have the sources and

5   uses.

6            MR. BUTLER:  Yes.  These are sources and uses that I

7   gather they're objecting to as well.  Are you still objecting

8   to sources and uses?

9            MR. ISENMAN:  Well, actually, if counsel would just

10  tell us --

11           THE COURT:  What is the source of the sources and

12  uses?

13           MR. BUTLER:  These were slides prepared by Rothschild

14  using a pro forma sources and uses of emergence.  And the -- I

15  think this was produced -- this previously was produced under

16  the scheduling order on Monday, November 26th.

17           MR. ISENMAN:  Which, Your Honor, was after the date

18  Mr. Resnick was --

19           MR. BUTLER:  Right.  He was asked to be deposed on

20  Sunday, he was deposed on Sunday.

21           MR. ISENMAN:  And, Your Honor, I'm not sure Mr.

22  Butler has stated whether or not we were provided the

23  underlying source stat that went into this chart.

24           THE COURT:  well, Mr. Butler, you're going to engage

25  in oral argument, right?

234

1          MR. BUTLER:  I am.

2          THE COURT:  I imagine as the lead counsel for the

3   debtor that you're quite familiar with these numbers --

4          MR. BUTLER:  I am, Your Honor.

5          THE COURT:  -- and planning for confirmation?

6          MR. BUTLER:  Yes, Your Honor.

7          THE COURT:  So you can walk me through them at oral

8   argument.

9          MR. BUTLER:  Okay.  Now, moving on to the next

10  exhibits.  There were some court documents scheduling

11  procedures of the orders at 110 through 113 and there was no

12  objection as to those.  There were a series of other documents,

13  114 -- against court documents, 114 through 127.  I believe the

14  only objection there is an objection by the equity committee,

15  which I don't think is pursuing their objection, which had to

16  do with -- if I'm write, there are no other objections from the

17  equity committee, I think that's right.  So I think those come

18  in, Your Honor, uncontested.

19          THE COURT:  All right.  They're admitted.

20  (Court Scheduling Procedures were hereby received as Debtors'

21  Exhibits 110 through 113 for identification, as of this date.)

22  (Documents Against Court Documents were hereby received as

23  Debtors' Exhibits 114 through 127 for identification, as of

24  this date.)

25          MR. BUTLER:  Exhibits 128 and 129 were reversed, so

235

1   there's nothing there for that.  Then the following documents

2   were identified by the objectors, starting with -- these are

3   Exhibits 130 through 201.  And these are a series,

4   predominately, of e-mails and other documents.  The -- and our

5   objection, we've objected to about half of these documents,

6   Your Honor, based on FRE 408, and the fact that this is --

7   these contain confidential settlement discussions concerning

8   the plan or EPCA terms that were covered by the privilege.

9   They were certainly not intended by the parties to be

10  introduced by a court hearing.  I gather that the bondholders

11  view is that 408 is inapplicable here and --

12          THE COURT:  Well, what are they being offered for?

13  Just to show the process of deliberation.

14          MR. ISENMAN:  Your Honor, that's correct.  They're

15  not being offered --

16          THE COURT:  To show the validity of the underlying

17  proposals or settlement or the like.

18          MR. ISENMAN:  That's accurate, Your Honor.

19          THE COURT:  Mr. Fox's point about the other documents

20  that he object to earlier on that.  To make it clear that the

21  same point applied.

22          MR. FOX:  That's right.  The same argument.

23          THE COURT:  I think on that basis they could come in.

24  (E-Mails and Other Documents were hereby received as Debtors'

25  Exhibits 130 through 201 for identification, as of this date.)

236

1        MR. BUTLER:   I understand, Your Honor.  And then

2  finally, Your Honor, 203 through 211 are additional documents

3  designated by the debtors, and which no objections have been

4  lodged.

5        THE COURT:  All right.

6  (Additional Documents Designated by Debtors were hereby

7  received as Debtors' Exhibits 203 through 211 for

8  identification, as of this date.)

9        MR. BUTLER:  And that will complete all of the

10  documents.

11        THE COURT:  So those are admitted.

12        MR. ISENMAN:  Your Honor, there was one other

13  document that we served upon -- it was a demonstrative that we

14  served upon the debtors last night.  And I spoke with Mr. Hogan

15  briefly and he was going to get back to me.

16        MR. BUTLER:  I should have designated that was a

17  demonstrative, 211 is the exhibit you're referring to.

18        MR. ISENMAN:  This one?

19        MR. BUTLER:  Correct.

20        THE COURT:  So is there an issue with its

21  admissibility?

22        MR. BUTLER:  No.  It's being admitted for

23  demonstrative purposes only.

24        THE COURT:  Okay.

25        MR. ISENMAN:  Thank you.

237

1           THE COURT:  Okay.  Why don't I hear oral argument

2    then, briefly.

3           MR. ISENMAN:  Your Honor, can we have a five-minute

4    bring, or it could be a one-minute break, I need to use the

5    men's room.

6           THE COURT:  I'll give you five.

7           MR. ISENMAN:  Thank you, Your Honor.

8        (Recess from 5:35 p.m. to 5:49 p.m.)

9           THE COURT:  Please be seated.  Okay.  We're back on

10   the record in Delphi and the factual record of the hearing on

11   the debtors' motion for approval of their entry into the

12   amended EPCA, the December 3rd EPCA amendment.  And I'll hear

13   from Mr. Butler first.

14          MR. BUTLER:  Thank you, Your Honor.

15          Your Honor, we'll make our closing argument and

16   reserve some time to respond, if we may, at the end to the

17   objectors presentations.

18          THE COURT:  Okay.

19          MR. BUTLER:  Your Honor, during the month of

20   September I made a number of statements to the Court.  Some of

21   which have been repeated in the objectors' papers in this

22   hearing and others which have been repeated in the disclosure

23   statement objections.  When I indicated to Your Honor that the

24   company, in light of the turbulent capital markets, was seeking

25   to make, what I called then and still believe, were going to be

1   laser purchased amendments to its overall transaction in order

2   to be able to develop a market clearing transaction was the

3   phrase I think I used time and again.  A market clearing

4   transaction that we would be able to use to emerge from

5   Chapter 11 at a time when the company believed and testimony --

6   there's undisputed testimony -- unrebutted testimony in this

7   record that indicates that the debtors believe that they have

8   achieved all that they can in Chapter 11 and that they need to

9   emerge to maintain and maximize shareholder value or

10   stakeholder value and they need to be able to do that now as

11   opposed to later and that there is a view of the debtors which

12   has not been controverted by any party, that the risk to

13   stakeholder value of remaining in Chapter 11 is, in the

14   debtors' judgment, an unacceptable risk.

15        The -- since that time the debtors have been engaged

16   in a series of discussions that have been described, I think

17   adequately in the direct testimony and adequately in all of the

18   exhibits and including all of the e-mail -- including many of

19   the e-mails identified by the objectors.  And I hope that Your

20   Honor will be able to take the opportunity to look at some of

21   the communications that are -- that have been identified as the

22   objectors' exhibits involving the board and management and

23   third parties.

24        I believe, and I think the record demonstrates that

25   the corporate governance in this case has been world class.

239

1   That in fact the board of directors of this company and

2   management have exercised at all times their responsibilities

3   to maximize stakeholder value and to take those steps

4   necessary.  I think I have described this often to people as an

5   obligation to bake and serve.  You have to bake a pie and you

6   have to serve it.  And if you're sitting as the debtor in

7   possession, your job is to bake the best and biggest pie you

8   can and you keep it in the oven.  And if you get it out on time

9   you try to serve it in a way that everybody will get -- will be

10  satisfied understanding that all you have is one pie, not one

11  and a half pies or five pies.

12           And it is inevitable, when you create a really good

13  pie that smells really great, that everybody wants as much of

14  it as they can possibly eat.  And that has been what these last

15  three months has been all about.  And it has been -- it has

16  been made more difficult by the fact that the pie, in some

17  people's view, isn't smelling as great right now as it was

18  smelling back in August and early September.  And the reason

19  for that, of course, if the turbulent capital markets.

20           It is the company's view, I believe, the

21  creditors' committee, in their papers, have conceded and

22  they're now not objecting but their papers go to the point that

23  the intrinsic value in this Chapter 11 case has not

24  fundamentally changed.  Mr. Dagel's letters to the board, which

25  are in evidence now, make very clear that Mr. Dagel, who chairs

240

1    the creditors' committee and who is associated with one of the

2    largest funds in this country, believes that the debtors have

3    done all that they could do to create value in these cases.

4    His letter is very clear in the fact that the creditors'

5    committee takes no issue, and that he takes no issue, with the

6    creation of value, the baking of the pie by the debtors.

7            What we have been trying to achieve, in a capital

8    market situation, where we could not raise 7.1 billion dollars

9    in funded debt was to sort out how to eliminate a couple of

10   billion dollars in cash and all of the intricate trades that

11   had been made, in what the testimony here is very clear.

12   You've heard Mr. Miller, you've heard Mr. Sheehan, you've heard

13   Mr. Resnick testify, you heard Mr. Tepper testify that from day

14   one this has been a compromise case.  This has been a case

15   that's built on a settlement.  The value here is created, not

16   because this is an absolute priority case.  Not because we are

17   simply able to have a lot of value we can distribute to people

18   but because we have been able to enter into a series of

19   settlements.

20           A number with labor that took us a year and a half

21   that were difficult and protracted and that represented the

22   sacrifices of a lot of people in order to be able to create the

23   opportunity to enter into a meaningful settlement with

24   General Motors.  There is, you know, General Motors has been

25   portrayed in this case in lots of different ways.  And it is

241

1   by, no question, it is the 400 pound, the 6,000 pound, whatever

2   weight you want to give it, it is the big gorilla here.  It is

3   former parent.  It is the largest customer.  And it has a

4   series of very complex commercial relationships that bring

5   value to people if managed properly.  And if not managed

6   properly can, candidly, take value away.  And this entire

7   negotiation with General Motors for the last several years has

8   been a negotiation on how to, if you will, rationalize the

9   legacy relationships and the future relationships in a way that

10  would be productive for General Motors and productive for

11  Delphi and the balance of its stakeholders.

12          But make no mistake, without the ten billion dollars

13  plus that comes from the plan investors and from General

14  Motors, there is no pie here to serve.  And the rest of this is

15  irrelevant.  And ultimately, while people can, and there was

16  much cross examination to Mr. Sheehan and Mr. Miller.  Do you

17  mean to tell me, Mr. Miller, you know, the -- you had do what

18  the -- GM and the plan investors said you had to do.  You had

19  to have their support?  Mr. Sheehan, you have to have their

20  support, the questions went.  And the answer is yes.  Because

21  the reality is, there is something called a GM settlement

22  agreement, a global settlement agreement, a master structure

23  agreement that are admitted into evidence.  And the investment

24  agreement that was admitted -- that was approved on August 2nd

25  has been admitted into evidence.  Both of which require that

242

1    the company's plan of reorganization and disclosure statement

2    and other constituent documents be acceptable to the people who

3    are putting ten billion dollars plus into the company.

4        THE COURT:  Well, we did not admit into evidence your

5    demonstrative pro forma sources and uses at emergence.  But on

6    this point, as to the necessity of the plan investor cash, I'd

7    like you to discuss a little more about that under the 12/3/07

8    amended plan of reorganization which reflects the EPCA

9    amendment that is before me today.

10       And again, the question is can that -- can the

11   company emerge under such a plan without the cash of --

12   provided for under the amended EPCA.

13       MR. BUTLER:  Your Honor the -- Exhibit 106 had two

14   pages to it, 106(a) and 106(b).

15       THE COURT:  Right.

16       MR. BUTLER:  106(a) was the pro forma sources and

17   uses at emergence back on the September 6th plan.  It was the

18   one that imagined it.

19       THE COURT:  That had the extra financing in it.

20       MR. BUTLER:  That we would be able to raise 7.1

21   billion in cash, which meant that we had, overall, 10.3 billion

22   dollars worth of cash and that we would -- you know, those

23   would be our cash sources and we would also be able to raise

24   those non-cash areas of value by restating that secured --

25   other transactions so that we would have sources of over eleven

243

1    billion dollars which we would be able to use.  For, among

2    other things, take care of pension.

3              THE COURT:  Okay.

4              MR. BUTLER:  And I'm not going to spend a lot of time

5    at this hearing talking about the five tenets of our

6    transformation plan.  But from the beginning this company has

7    sought to be able to construct a solution for pensions that

8    would allow our hourly and salaried pension programs to be

9    frozen but retained and benefits paid as opposed to turning

10   them over to the government.  That costs a lot of money.

11             THE COURT:  No, I understand.  You -- I mean, I think

12   you could turn to -- to the second page of it because --

13             MR. BUTLER:  All right.  The second page of it, and

14   by the way I think it's important to note that the pro forma

15   sources and uses at emergence are essentially the same under

16   each of the amendments.  And one thing I wanted to say in my

17   argument here, Your Honor, and I'm going to divert -- I want to

18   talk to divesture for one moment and talk about two principle

19   points I think are important.

20             One is, there have only been two EPCAs in this case.

21   One was the EPCA which served on Appaloosa which was terminated

22   by the debtors.  Not as was suggested in some questioning, on

23   its own terms but the debtors, when they had the opportunity to

24   exercise a unilateral right of termination and thought it was

25   in the interest of the estate to do so in July of this year,

244

1    terminated that EPCA.  And they entered into the EPCA with --

2    or the investment agreement with Appaloosa in mid-July.

3            THE COURT:  That got both committees' support.

4            MR. BUTLER:  That got both committees' support and

5    that everybody -- and led to the September 6th filing of the

6    plan.

7            A plan of reorganization that -- so there is, you

8    know, fairness in the world here, you only have to look at the

9    plan and disclosure statement that was filed on September 6th

10   and read the disclosure that the plan -- or read the press

11   release, which is in evidence as well.  The press release was

12   issued to indicate that the company -- that the plan investors,

13   excuse me, had reserved their rights, under the investment

14   agreement, on the labor agreements, General Motors agreement,

15   the business plan, the disclosure letters, the disclosure

16   statements, the plan they reserved those rights when we filed

17   them.

18           The committees, the company, we were all on notice.

19   We all understood that when we filed that, that we were going

20   to have that kind of situation to deal with because when we

21   signed the EPCA, the investment agreement, on July 18th -- mid

22   July, it was July 18th I think, it was a couple of days before

23   the leverage markets closed in this country for pretty much the

24   balance of the summer.  July 20th is the night most of us

25   remember.  We came back to work and the world was different.

245

1          And ultimately that's -- we've been dealing with

2      those issues all the way through.

3          THE COURT:  Well, that cuts both ways.  But I

4      understand your point.

5          MR. BUTLER:  Also, I just think the record needs to

6      be clear, there's only been two EPCAs.  What we're talking

7      about here in this pro forma are amendments to the EPCA that

8      have been proposed, not a new EPCA.  And that's really

9      important because it's something that people fail to ignore --

10     excuse me, fail to pay attention to, which is Exhibits 131 and

11     132 in this case, which are the co-investor agreements and the

12     additional investor agreements.

13         I urge Your Honor to look at those agreements and the

14     provisions in them because while the objectors would have you

15     point to the lockup provisions in those agreements, the other

16     pieces of those agreements are that unless -- for the most

17     part, unless the EPCA is terminated the additional investors

18     can't walk away from their syndicated piece.

19         So what happened is when we, the company, exercise

20     our business judgment and unilaterally terminated the EPCA in

21     mid-July -- in early July -- the Appaloosa service EPCA, all of

22     the syndication in connection with that blew up.  It all

23     disappeared.  Everybody was released.  And when we did the next

24     EPCA in mid-July, Appaloosa had to go back and bring all of

25     that back together in the co-investor agreements and additional

246

1    investor agreements that were publicly filed by them as they

2    were -- the form of those agreements publicly filed with the

3    SEC as they went forward.

4              And the point is, that when you -- you heard

5    testimony from Mr. Miller about the board's concern that

6    terminating this EPCA, even if we could do it which we don't

7    have the right to do now under the EPCA.  But even if we did,

8    it would release that entire syndicate.  At the moment that

9    syndicate is tied in to the existing EPCA, all right.  And

10   we've had the ability to negotiate with Appaloosa on many of

11   the points and with the other five co-investors on some of the

12   points.  And the decisions they make bind the rest of the

13   syndicate.

14             It's not a point to be overlooked, Your Honor,

15   because in terms of actually making an investment in this

16   company, maintaining the syndicate, all right, it's been a

17   point that's been extremely important to Mr. Tepper, it's been

18   extremely important to Mr. Miller and Mr. Sheehan.  And so when

19   you look at this, it's not multiple EPCAs it is the investment

20   agreement since mid-July.  And when you look at the pro-forma

21   sources and uses, when we realized you could not get 7.1

22   billion, and we went through a process.  We've identified, Your

23   Honor and we had the exit financing hearing, and we've been

24   through this, we found out we could only get 5.2 billion.  And

25   oh, by the way, we really needed to have General Motors pick up

247

1    part of that piece and agree to fund it.

2            But all of a sudden the sources of cash dropped from

3    11.1 -- a little over eleven billion down to 9.1 billion.  That

4    necessarily meant that the uses had to be re-jiggered.  What

5    happened?  Couldn't change our pensions, still needed 1.2

6    billion there.  In order to be able to complete the General

7    Motors transaction, remember they have in the settlement a

8    414(l) transaction where they take part of our pension assets

9    and liabilities over to their pension and we, in fact, give

10   them a note and we've agreed to pay that note off.  That

11   1.5 billion dollar has to be paid.  That's a very important

12   transaction to us, a very important transaction to

13   General Motors and an integral part of the GM settlement.  So

14   that doesn't change.  Paying off the revolver and the DIP term

15   loans, that doesn't change.  Still have to pay off your DIP no

16   matter what.

17           So what -- what changed?  Well, we went to the

18   unsecured creditors.  We said that 697 million dollars that was

19   going to go to the unsecured creditors and the trade creditors,

20   we don't have money for that any more.  The twenty percent, or

21   so, of cash that had to -- had to change from September 6th to

22   these other transactions.

23           The other thing that had to happen is that when you

24   looked at some of the other payments we've been trying to go

25   through and work through those, obviously, but the other big

248

1    thing is we went to GM and said, you know, for all the things

2    you've done for us we promise to pay 2.7 billion in cash, which

3    you've told us constantly is a substantial discount of what we

4    really owe you, guess what, we can't.  And General Motors, in

5    my view, as one of the principle negotiators, General Motors

6    has acted as responsibly as anyone could in looking at what has

7    occurred.  Now, they're not simply -- no one in this courtroom

8    is in the business of gifting things to the debtor.  But the

9    fact of the matter is, they have materially changed their

10   transaction.  And they have agreed to support this

11   reorganization in a -- in what we believe and we will

12   demonstrate in another hearing, is a settlement case.  They

13   have agreed to essentially fund this case even more by reducing

14   the 2.7 billion to what is now a payment of 750 million

15   dollars.  So that a tremendous amount of the cash that went out

16   in sources and uses was directly General Motors saying that

17   we'll take less now and take other forms of currency.

18           Of course, as they took other forms of currency and

19   as the transaction began to change, and you can see that the

20   non-cash uses increased because they're taking a second lien

21   note of 750 million and so all of a sudden you have 1.5 billion

22   of non-cash uses as opposed to 825 million.  But if you took

23   away here 2.55 billion dollars of -- of plan investor money,

24   take it away, cash is not available, I don't know, maybe

25   someone else in this courtroom has a great idea.  But I will

1    just point out nobody's come to the debtor with a better idea.

2         THE COURT:  In other words, after those cash uses you

3    don't have anything remotely close to 2.5 billion of access

4    cash.

5         MR. BUTLER:  Absolutely not.  What we have in terms

6    of access cash is the cash that would normally -- the plan

7    investors and we would normally expect would be in the company

8    which I believe is well under a billion dollars on a normalized

9    basis.

10        So when you look at this, Your Honor, the fact of the

11   matter is my view of the world, as the company's lead

12   restructuring counsel, which back on September 6th the plan

13   investors or a plan investor was optional in my view.  That is

14   it was optional in the sense that we probably could have sorted

15   out, you know, how to solve the problem and internally fund the

16   plan.  That would require General Motors making some of the

17   concessions they ultimately made.  But once --

18        THE COURT:  Assuming the capital markets were what

19   they were like back then.

20        MR. BUTLER:  Exactly.  And what they were like all

21   spring and early summer.  That's what the assumption was.  But

22   once -- once the capital markets went south in August and

23   people all thought that maybe folks would go out to the

24   Hamptons and come back in a better mood on Labor Day and it

25   didn't happen.  And it's been getting, you know -- and there

1  was a little window in the -- things got a little better in the

2  middle of the fall and now it's gotten worse again.

3           The fact of the matter is that when you look at it,

4  what maybe optional, maybe there was an opportunity for a self-

5  funded plan here.  There's no any testimony here, none put in

6  by the objectors, that suggests there's any possibility of

7  doing a self-funded plan here.  And not a single self-funded

8  plan proposal has been presented to the debtors.  In fact, the

9  testimony was no other proposal has been presented.

10          And oh, by the way, the Highland led group which is

11  represented in court today and who filed an objection which is

12  now being prosecuted for today, that group -- they're not

13  hindered by the lockups.  They told -- the testimony was that

14  they told -- Mr. Miller testified they were going to present

15  him with a proposal, they didn't.  Maybe they will.  But not as

16  we sit here today.

17          THE COURT:  Well, now, you said earlier and I believe

18  one of your witnesses said that the debtors were precluded from

19  terminating the agreement.  That's not entirely true.  You can

20  terminate there's just a cost to doing it.

21          MR. BUTLER:  Well, we could breach the agreement,

22  Your Honor.  I mean the fact of the matter is -- and that's why

23  the (indiscernible, coughing) from our perspective and we'll

24  talk about corporate governance in just a few minutes, the

25  bookends that the board of directors had in mind, what

251

1    Mr. Miller has testified to, I believe, in his declaration

2    directly, the bookends we talked about was, you know -- you --

3    if there's a termination event here, if this thing blows up,

4    and, you know, and we go to war with Appaloosa, somebody is

5    going to probably pay a hundred million dollars.  Either we're

6    going to be able to convince you, who is probably going to have

7    to make that decision, that they -- that they intentionally

8    breached, in which case their damages are limited at a hundred

9    million dollars.  Or they will be able to convince you that we

10   breached and it's not an alternative transaction capped at

11   eighty some odd million it's a breach under the agreements and

12   it's actionable at a hundred million.

13            So the bookends are, if we get into a war with these

14   plan investors that somebody is going to pay, probably, a

15   hundred million dollars.  We'll figure out over the next couple

16   of years who that is, and in the meantime we will not have any

17   plan investors to negotiate with and the syndicate -- the

18   syndicate established in Exhibits 131 and 132 are released.

19   And they're released in what the company has testified to,

20   Mr. Sheehan testified and Mr. Miller testified to and

21   Mr. Resnick testified, particularly as the company's investment

22   banker, are the most turbulent markets in memory.  And

23   Mr. Tepper testified about the volatility of the market and the

24   impact on price.  That -- those are the factors people consider

25   -- the debtors considered in thinking about the business

252

1    judgment to be exercised here.

2            THE COURT:  While -- while we're going through the

3    cash sources and uses, what is the -- leave aside GM for the

4    moment.  What is the current estimated amount of senior debt

5    claims?  Now, I'm not talking about the senior notes, I'm

6    talking about all debt that would be senior under the toppers'

7    agreement.

8            MR. BUTLER:  You're asking about the trade claims and

9    the -- and the bondholder claims?

10           THE COURT:  Yeah.

11           MR. BUTLER:  That number, Your Honor, there's

12   about -- I'm going to look back and make sure -- I'm sure

13   between Mr. Sheehan and Mr. Dagel who are both sitting next to

14   each other, they both jumped up.  It's about three and a half

15   billion, right?  So about three and a half billion.

16           THE COURT:  Okay.

17           MR. BUTLER:  Your Honor, the next point that I'd like

18   to make here, and these were admitted into evidence, and

19   there's two ways of looking at this.  You can look at it

20   through Exhibit 104 which has four pieces to it, A, B, C and D.

21   Or Your Honor can look at it --

22           THE COURT:  I'm sorry, is that principle or is that

23   principle and interest?

24           MR. BUTLER:  That would be accrued interest as well.

25           THE COURT:  And interest.

253

1          MR. BUTLER:  About two billion dollars worth of

2    bonds, I think, without the interest and then accrued on top of

3    that and there's 1. -- there's a cap of 1.45 billion dollars of

4    other claims which excludes post-petition interest under the

5    plan.

6          Your Honor, this next part -- there's -- if Your

7    Honor can follow this either in Exhibit 104, which were

8    admitted into evidence, or Exhibit 126, also admitted, Exhibit

9    E to that is a chart we -- the company put together that shows

10   the differences between the September 6 plan, the 11/14 plan

11   and the December 3rd plan.  And what I really wanted to focus

12   on here, it's the same arrangement, and this is the -- when

13   Mr. Tepper testified about the illustrative scenarios flying

14   back and forth it was basically this format with lots of

15   different formulations plugged into it that was used as the

16   basis for negotiations between the statutory committees,

17   General Motors, the plan investors and the company.  And this

18   was the economic analysis, 104(a) was the economic analysis

19   that related to the September 6th plan.  This was the one --

20   this, sort of, takes the pro forma sources and uses I've talked

21   to you about, expresses it in a different way because what it

22   basically does is show the recoveries down here.  It shows what

23   happens to the rights offering and the plan investor buy-ins up

24   top.  It shows the amount of debt there would be, the 7. --

25   excuse me the equity before it goes down after the issuance,

254

1   the net equity of 5.8 billion.  It shows the net debt that

2   would be here, the pension payments and so forth.  And then it

3   shows in the lower part of it the recoveries assuming

4   conversion of the warrants.  And here you see the September 6th

5   economic analysis 104(a) supports the pro forma sources and

6   uses that would have matched that also at 106(a).  And you can

7   see that GM got 2.7 billion, the unsecured got twenty percent

8   cash, more or less.  And the rest was an equity grant, no

9   participation of the rights offering.  The trust preferred also

10  got par plus accrued and equity received a series of grants,

11  including the rights offering, the discount rights offering

12  which belonged to them at the time for 470 million dollars.

13  And that was the EPCA. This capitalization up in this upper

14  left-hand corner and this plan, was the plan of the August 2nd

15  EPCA embraced.  It is the plan that was referred to in the EPCA

16  when we, you know, that was ultimately in the Exhibit B which

17  were the plan terms then because then the plan terms didn't

18  actually have a document.  And ultimately it was what was

19  agreed to, subject to the reservation of rights purported in

20  the plan and disclosure statement at the time this was filed on

21  September 6th.

22          If you look at 104(b) on October 29th, what happened

23  between September 6th and October 29th in negotiating, and

24  Your Honor has a full process description in all of these

25  exhibits, was that the October 29th transaction was again a

1    transaction dealing with what would the plan investors and

2    General Motors agree to do to the company.  What would they

3    tolerate given the changes in the capital markets?  And in this

4    case, what would the creditors' committee agree to?  The

5    creditors committee had agreed to this formulation.  The equity

6    committee went to war.  People talk about October 29th as

7    having been the solution.  It was a solution for half of the

8    capital structure.  It was a declaration of war for the rest of

9    the capital structure.  It was, in fact, the creditors, a

10   judgment they're entitled to make, saying given the changes in

11   the ships, given the loss of the two billion dollars, given our

12   loss of value, we are no longer comfortable of having a

13   recovery on a par plus accrued basis at the TEV we negotiated.

14   Because I should have mentioned maybe back in 2006, it was in

15   the testimony and in the evidence.  Going all the way back to

16   2006, the way that the -- the framework for all these plans,

17   decided before Appaloosa was even at the table, before there

18   was a plan investor, there was General Motors and the

19   committees and the company that were at the table and there was

20   a decision made in the summer of 2006 where the plan

21   investors -- excuse me, strike that.

22          The creditors committee and the General Motors came

23   out of a conference room at our office, you know, arm in arm

24   saying we're going to have par plus accrued.  It's going to be

25   based on forty-five dollars a share, enterprise value.  And

256

1    that's what we're going to do.  We're going to build this case

2    around that.  And then we found plan investors to support that.

3    And that's been the framework of this because that was the

4    settlement.  That was the handshake.  And the moment they

5    walked out of the conference room, and I'm not going to

6    embarrass Mr. Dagel who's sitting here now maybe because he

7    wasn't so happy with me at the time, we basically at that point

8    said to him if that's -- if -- you know, if -- you think you're

9    paid par plus accrued what are the other people getting in the

10   deal.  And that's what led to the September 6th transaction and

11   the EPCA.

12           On October 29th when the world changed, what we

13   announced what, and the objectors have entered into evidence

14   designated, for example, Mr. Miller's letter to

15   Mr. Yaku, the chairman of the equity committee whose committee

16   went ballistic when basically this was announced, and they were

17   getting -- instead of getting 470 million dollars in value

18   attributable to them they were getting sixty-nine.  And that

19   was in the declaration born October 29th.  People sometimes

20   think that this was a -- you know, everyone was happy with this

21   EPCA.  The fact of the matter is that people were not.  This

22   was the one that ultimately Goldman didn't sign up to, in terms

23   of the amendment.  But the fact of the matter is, they were the

24   only people that were very unhappy with it.

25           But this transaction, when we had the two billion

1     less in cash, all of a sudden General Motors is taking now --

2     trying to take a billion and a half in cash and 1.1 in equity,

3     sort of 2.6 billion.  They had already reduced what they're

4     going to take in total under the plan.  Unsecured have now

5     taken the rights offering from equity and they're doing their

6     transaction now where they're getting rights offering -- a

7     small amount rights offering and a lot of equity.  Trust

8     preferred are now getting part and equity is, sort of, getting

9     nothing.  This deal -- this deal terminated.  This deal Goldman

10    never signed up.  This transaction never came to be.

11            When this transaction never came to be, the fact is

12    and the record indicates and the evidence indicates that people

13    got together again and tried to negotiate.  But when the

14    company believed, and there was at the point of this, and there

15    was -- and Mr. Miller testified in his declaration and was

16    questioned about the business judgment that was used.

17            And let me just take a moment and talk about the

18    business judgment before I got and talk about what happened in

19    these amendments.  This has been admitted into evidence.  Its

20    Exhibit 103(a), (b) and (c).  And this is taken from a

21    statutory committee book.  It first was in a board room where

22    Mr. Miller and Mr. Sheehan and others went through a decision

23    tree thinking about how -- what they should do in light of the

24    October 29th EPCA amendment having not been able to be

25    realized.  And they looked at six basic factors.  And this is

258

1    now in the evidentiary record.  They looked at DIP financing,

2    they looked at exit financing because the company's DIP

3    financing was expiring in December of this year they needed to

4    get exit financing.  They looked at the EPCA and they also

5    looked in 106(b).  They looked at -- excuse me 103(b), I'm

6    using the wrong number -- 103(b).  They re-examined the GM

7    settlements, the transformation plan had been offered since

8    March 31st of 2006 and an overall plan of reorganization.

9         And they looked at judgments, as boards are supposed

10   to do.  And on each of these things they said, well we need DIP

11   financing to proceed.  There are risks associated with it.

12   There are risks associated if we defer.  And ultimately the

13   board decided to proceed.

14        They looked at exit financing and said, gee, if we're

15   going to have exit financing we have to have an EPCA deal and a

16   plan or should we delay emergence?  They examined those

17   factors.  They looked at the risks.  They decided to proceed.

18        The EPCA, the equity investment, same thing.  They

19   said hey, if we amend it and try to keep moving forward even

20   though the October 29th deal didn't go on, there is certainty

21   of execution that is required.  There's going to be a

22   renegotiation delay.  We've got this -- there's potential for

23   alternative transaction fees.  If we somehow figure out how to

24   terminate it, mutuality is required and there's all kinds of

25   other reactions.  The company evaluated them and decided to

1    amend.

2          GM settlements, the board said should we go back to

3    GM, rip up our settlement agreement and start over or should we

4    try to maintain the GM settlements in some way.  And they voted

5    to maintain thinking about these factors.  This is coming right

6    out of the board books, right out of the statutory committee

7    books.  Because as has been the case in this Chapter 11, the

8    board thinks about these issues and then the board and

9    management share these issues with our statutory committees.

10   And so this entire decision tree was shared with both the

11   equity committee and the creditors committee.

12         They looked at the transformation plan.  They said

13   should we take a step back and change it.  And the view was,

14   and Mr. Dagel confirmed it in his letter to the board of

15   directors, creditors believe the transformation is essentially

16   working and is supported.  And so they decided to maintain it.

17         And then finally, from a plan of reorganization

18   perspective, they said should we look at -- continue par plus

19   accrued, which is what GM and the creditors have told us for a

20   year we should be doing, you know, or should we move to some

21   sort of a pot plan arrangement.  And what would that mean and

22   what would it mean to timing, and they looked at the factors

23   and they decided to maintain par plus accrued.  A decision they

24   consulted with the committees on and the committees endorsed

25   and indicated they should do.

260

1       So when they reached these decisions, right, 103(c)

2   admitted into evidence says is once you made those decisions

3   the board said what should we do.  And these were actually the

4   boxes and the numbers and the colors and the charts that the

5   board looked at and went through and thought about.  And they

6   said well then we need to amend the EPCA.  And if we amend the

7   EPCA, you know, we need to think about the direct investment

8   piece and the rights offering backstop, that's the preferred

9   and the rights offering.  And, you know, what should the

10  amounts be and the prices.  And who should they be and what

11  should the structure be.  And that will go forward in the

12  potential plan amendment to the board who had not been happy,

13  as you saw in the evidence and management not being happy in

14  Mr. Sheehan's memo to the board about how some parties were

15  trying to turn this into an absolute priority case as opposed

16  to a settlement case.  The board said to do this we need a

17  reasonable equity settlement.  There has to be something here

18  we can do that will bring people together and on board.  And

19  that was the decision.  That was the decision the board made.

20  And that's what led, ultimately, to the -- what are now the now

21  infamous November 14th amendments.

22       The November 14th amendments, at that time, were

23  amendments that the company had and you saw the e-mail traffic,

24  it's in evidence now.  The objectors designated it.  Which

25  basically -- when the November 14th amendment was -- the

261

1   company recognized that the creditors and the equity committee

2   would hate this, people would hate this proposal.  But again,

3   the company did what it did all along and what the evidence

4   supports.  The company went through and -- and examined who

5   they needed -- the support they needed to move forward, what

6   was executable and confirmable.  And they believed that what

7   they needed to do to be able to execute was have plan investor

8   and General Motors support, which this plan had.  Which changed

9   the structure here.  I'm not, obviously, going to go into it.

10  It -- the plan investors improved their position here.  Some of

11  the other party's positions were improved.  But ultimately this

12  is what we put out on the November 14th amendment.  It was

13  uniformly disliked by our committees.  It was not exactly

14  winning any -- while it wasn't directly before the Court it

15  didn't win any merit badges from this Court either.  But what

16  it did do was force the parties back together to talk.  And

17  when you look at the December 3 amendment, the truth of the

18  matter is -- and you examine it and I know the objectors are

19  going to make a big deal on how the December 3 is so

20  dramatically different then everything else.

21          And I urge Your Honor to look at Exhibit 126 where we

22  go through the differences.  And actually what happened here,

23  more or less, is that Mr. Tepper, to demonstrate, in his mind,

24  leadership and to send a message to this Court and others who

25  had criticized him, basically said I will take my rights

262

1    offering on the A -- my plan investor A, my Pref A.  I'll take

2    it back up to where it was.  I just want to have issuance of

3    it.  Yes, was the coupon increased by a hundred basis points?

4    Yes.  Initially was the conversion priced increased until the

5    creditors' committee said not on our watch?  Yes.  But it went

6    back down to what it had been, all right.  And that was their

7    give-up.  And General Motors, once again as they have done

8    every time they've been called on to do in this case where they

9    had to make the difference to move the case forward because

10   this is a settlement case.  General Motors basically reduced

11   their -- their recovery in the aggregate and they moved around

12   the form of their recovery by giving away their recovery to

13   junior classes to be able to make this to happen.  And that's

14   what brought these amendments to pass and brought the support

15   of both the committees.

16          So Your Honor, when you look at this -- the history

17   here, the issue before the Court obviously is, you know, did

18   the board of directors and has the company and, frankly because

19   I've come to be schooled by Your Honor about this Court's view

20   of business judgment, and does this Court in its own

21   independent exercise of -- of judgment as the Second Circuit

22   requires the Court to do, what's the right answer here.  And

23   the one thing I like about Your Honor's decision, the one thing

24   that I like about it is it requires the judges in this district

25   to walk in the shoes of the board.  And when you walk in the

1   shoes of the board you need to consider the hand and the cards

2   that the board is dealt.  As Mr. Miller testified, we get to

3   vote on what's before us not what we would like it to be.

4        These are not aspirational decisions.  These are

5   decisions based on how do we maintain in the reality of the

6   circumstances the value for stakeholders against these event

7   risks, against all of the preponderance of the issues in the

8   case.  And so, Your Honor, the give-ups -- the grand give ups

9   which always happens in, sort of, the last round.  What were

10  the grand give-ups?  Equity agreed to give -- to basically take

11  warrant value.  The creditors agreed to increase the TEV at

12  which they were comfortable recommending to their stakeholders

13  that a par plus accrued recovery was achievable slightly, based

14  on all of the circumstances and sorting out what they believe

15  was the appropriate recommendation.

16       THE COURT:  You mean they increased the value

17  slightly not that it's slightly achievable.

18       MR. BUTLER:  Excuse me?

19       THE COURT:  You mean they increased the value

20  slightly, not that it's slightly achievable.

21       MR. BUTLER:  No, no.  Increased -- yes, increased it

22  by about 105, 120 million dollars (indiscernible) something

23  like that.  Slightly over thirteen billion.  Agreed that

24  purposes of evaluating this they would look at warrant value

25  given to the equity differently than it looked at other things

264

1    because clearly some of those warrants are struck at very high

2    dollar amounts which, if those are achievable, everybody here

3    will be very happy in terms of the recovery for everybody.

4           And so the creditors -- the creditors made an

5    assessment about that.  General Motors gave up direct recovery

6    for other parties.  And it was those, basically, three parties.

7    The committee sitting around with General Motors and the plan

8    investors wanted to give back as well.  They created but not --

9    these are not dramatic changes.  I mean, to the extent people

10   want to say December 3rd was dramatic, I'm not going to come

11   here and say this was a watershed event.  It's a watershed

12   event that we have people in agreement.  It was not -- except

13   for the -- some of the bondholders.  But it was not a watershed

14   event in the sense that everybody gave up around the table in

15   order to make this possible.  It's the -- what Mr. Resnick

16   testified is that multi-dimensional, multi-variable equation

17   trying to make sure that you keep everything in place so that

18   you have a pie to serve.

19          It is the company's business judgment, Mr. Miller was

20   impassioned in his -- in his views in this court and I

21   understand why.  It is -- he certainly represented the views of

22   the board of directors of this company, at least at the

23   meetings I've been in, when he testified here today.  Which is

24   -- one of the things the company is concerned about is that pie

25   in the oven we're trying to serve.  If it stays in much longer

265

1   at 350 degrees, there may not be a pie that looks anything like

2   what people want to eat now.  And so ultimately, Your Honor, at

3   the end of the day, from the company's perspective this is a

4   case about business judgment.

5           The company stands before Your Honor understanding

6   that you have to apply your own brand of business judgment as

7   it relates to this.  And you have to sort through whether this

8   makes sense under all of the circumstances.

9           I do want to point out two other closing arguments --

10  closing items here and then I'll defer to others.  First, the

11  suggestion in the objector's papers that this motion seeks the

12  Court approval of a plan of reorganization, which Your Honor

13  has twice rejected in these cases so far, should be dispensed

14  of simply by reading section 9(a)(VII) of the investment

15  agreement which basically provides that the obligations are

16  subject to the Court's entry of a final confirmation order

17  approving the plan among other conditions.  And that our

18  obligation to issue and sell the common stock and preferred

19  stock is subject to that same condition.  The reality is that

20  the EPCA conditions are premised on Your Honor's confirmation

21  of a plan not the other way around.

22          I also would ask Your Honor that if Your Honor is

23  prepared to grant the relief here, that Your Honor honor the

24  waiver of the ten day stay that we've requested under Rule

25  6004(g).  No party who is currently before you objecting --

1    objected to that in their papers.  Only the equity committee

2    did and they are now on side with the company and supportive of

3    moving this case forward as expeditiously as possible.

4           The item that I'll come back and speak of in more

5    detail after Mr. Rosenberg's had a chance to say a few words

6    about it is the issue of the interest rate condition.

7    Obviously it's the sole thing the committee wanted to come and

8    address the Court with separately.  And I'll talk more about

9    the business judgment related to that and the record that was

10   made in connection with that after deferring to Mr. Rosenberg's

11   argument.

12          THE COURT:  As a practical matter, what does the

13   6004(g) waiver get you?  I mean, wouldn't you be proceeding

14   anyway with the disclosure statement hearing?  And if I

15   approved the disclosure statement, voting on a plan and --

16          MR. BUTLER:  I think what it gives us, Your Honor, is

17   the opportunity to say in the plan and disclosure that we send

18   out that we have an approval -- we have a final order in

19   connection with an approval of our investment agreement.  And I

20   think that's important.  We need to bring certainty, to the

21   extent we can, in very uncertain times to this case.  The

22   company believes that we should be on a, you know --

23          THE COURT:  But --

24          MR. BUTLER:  It's no different, Your Honor, then when

25   you approved it on August 2nd, in terms of the 6004(g) waiver.

267

1        THE COURT:  Yes and no.  There were things that you

2   all needed to do as a mechanical matter at that time, including

3   going out and raising the money, which is already going on.

4   And I understand that aspect of it but, I mean, even if 6004(g)

5   is waived, there could still be an appeal.

6        MR. BUTLER:  I -- no, I understand that, Your Honor.

7        THE COURT:  So I -- it -- I would understand if it

8   pertained to the ability to raise exit financing or the like

9   but if its just to be able to say --

10       MR. BUTLER:  Well, Your Honor --

11       THE COURT:  -- something besides that the Court has

12  approved the agreement in an order entered on X date, I'm not

13  quite sure, as a practical matter, what the --

14       MR. BUTLER:  Well, Your Honor, we are in the process,

15  as you know, we have two things we have to do.  We have to put

16  out our disclosure statement and plan, assuming the disclosure

17  statement is approved in a form acceptable to Your Honor in a

18  subsequent hearing following this.  And secondly, we are in the

19  process, based on the authority Your Honor gave us back in --

20  on November 16th of moving forward with the exit financing.

21  And the exit financing packages right now, obviously, you know

22  once again, the calendar is not our friend.

23       We are raising exit financing not only in the

24  turbulent market but at the end of the year.  And as a result

25  were in the process of implementing an appropriate strategy to

1    address that with our lead banks in doing that.  But they

2    will -- that does involve making presentations at which I think

3    this issue would be very relevant.

4             THE COURT:  Okay.

5             MR. BUTLER:  Thank you, Your Honor.

6             THE COURT:  Okay.  Thank you.

7             MR. ROSENBERG:  May I, Your Honor.

8             THE COURT:  Yes.

9             MR. ROSENBERG:  Your Honor, I think that it's fair to

10   say that the committee find itself in an extremely difficult

11   position.  I agree with some of what Mr. Butler said.  I

12   disagree with a number of the details but for better or worse

13   the committee firmly agrees with the bottom line testimony of

14   Mr. Miller and Mr. Sheehan, and as emphasized by Mr. Butler,

15   that this plan however imperfect, however undesirable, however

16   contrary to what the committee's expectations were a mere few

17   months ago, is far better then the alternative of delay,

18   uncertainty and what that might or might not result in at the

19   end of the day, because as has been emphasized over and over

20   again today, no viable committed alternative has been put

21   forward.

22            The other piece of that is that we do feel that we

23   have negotiated this to death, as hard as we possibly could to

24   obtain the best possible deal within the parameters of what

25   we're dealing with.  Aspirationally, I wish those weren't the

269

1    parameters but they are.  That brings me to the EPCA, which is

2    the subject of what we're talking about today.

3              The equity purchase commitment agreement.

4    Unfortunately, Your Honor, what we have learned the very hard

5    way over the last eleven months or so is that this EPCA, equity

6    purchase, is neither a commitment nor an agreement.  What it is

7    is a one-way option.  A one-way option for the Appaloosa -- for

8    Appaloosa and it's co-investors to go forward if it decides it

9    wants to.

10             THE COURT:  All right.  That's overstating it.

11             MR. ROSENBERG:  Perhaps.  I suggest -- I suggest to

12   Your Honor that it may not be.  You heard -- we put -- we put

13   in the papers -- you heard a lot of testimony today about the

14   state of the markets, how they've gotten worse over the last

15   couple of weeks, not better.  And I suggest to you that the

16   risk of not meeting the 585 million dollar number is extremely

17   high.

18             Now, let's not, again, assume that this is free from

19   the perspective of the debtor and the stakeholders.  If the

20   Court approves the EPCA amendment today and the Court approves

21   the disclosure statement, I assume tomorrow, unless were

22   staying here until midnight, Your Honor hasn't said.

23             THE COURT:  No.

24             MR. ROSENBERG:  I'm so grateful to hear that.

25             THE COURT:  Is it -- cutting through it, isn't there

270

1    a cost to --

2            MR. ROSENBERG:  That's where I was going, Your Honor.

3            THE COURT:  -- the change you're proposing?

4            MR. ROSENBERG:  The cost -- the cost of --

5            THE COURT:  To get the change you're proposing?

6            MR. ROSENBERG:  To get the change I'm proposing?

7            THE COURT:  Yeah.

8            MR. ROSENBERG:  We won't know unless this Court

9    orders it.  What we do know is not getting the change will cost

10   twenty-eight million dollars tomorrow, okay.  A delay,

11   potentially, given the debtors position about its legal rights

12   and obligations until March 31, while we're all sitting around

13   notwithstanding that the investment -- the interest commitment

14   cannot be met, 82.5 million dollars as an alternate transaction

15   fee.  And as Your Honor heard today at great length, a lockup

16   of investors who might be prepared to do a different

17   transaction not only through March 31, that's the co-investor

18   money.

19           THE COURT:  But these are the same investors you say

20   want to preserve as much optionality as possible.  I mean, I

21   understand --

22           MR. ROSENBERG:  Your Honor, there are two different

23   issues here, okay.  There is Appaloosa who brilliantly

24   negotiated this optionality.  There are all the other investors

25   who might be willing to do a different deal but, as Mr. Tepper

271

1   suggested, there are any number of unlocked up parties.  And

2   the last time he made that speech he rattled off about twenty

3   such parties as to who they were.  So, there are investors, you

4   could do a different transaction.  But the price is either 82.5

5   million dollars or waiting until, at least, March 31st.

6          So, therefore --

7          THE COURT:  Well, let's explore that a minute.

8          MR. ROSENBERG:  Okay.

9          THE COURT:  I appreciate that everyone, focusing on

10  what happened over the last couple months, poured over the

11  legal options under the EPCA agreement and what could happen.

12         MR. ROSENBERG:  Uh-huh.

13         THE COURT:  And obviously the cap on damages is an

14  extremely relevant legal point that I'm sure everyone

15  considered and it's referred to in the debtors' response.  That

16  being said, I heard the testimony from Mr. Resnick and I tend

17  to agree with that that while there is some quantifiable effect

18  of a higher interest cost, it's fairly small.  I am still of

19  the belief that each of the institutions that is signed up to

20  the EPCA is a real institution that wants to engage in business

21  in the future, engage in transactions in the future.  And in

22  fact that they can't do deals unless they have the trust of the

23  people across the table from them.  And the idea that they

24  would ultimately hold you all up in a way that would be

25  materially greater than the effect of such an interest cost on

272

1  them would have real consequences to them.  And I would not

2  hesitate, as you know from the last three weeks, to explore

3  those events in great detail.

4          So there is a consequence in jerking people around.

5  And frankly, that goes beyond the document.  But the document

6  itself has obligations in it to work to preserve the

7  transaction.  And I have, before me, the testimony that this

8  isn't Mr. Tepper's point and that it's all of his investor's

9  point.  His testimony was, in essence, like this is hurting a

10  group of cats.  And I think there's probably some truth to that

11  given what happened with Goldman.  So there is a risk in

12  leaving that question mark out there, as well as one, which

13  you've pointed out rightfully so, of agreeing to it.

14          MR. ROSENBERG:  Your Honor --

15          THE COURT:  Which is which cats will decide to walk

16  off the table.

17          MR. ROSENBERG:  Your Honor, obviously you're right.

18  There are risks both ways.  I suggest to this Court that in our

19  judgment the risk is much less telling Appaloosa today to get

20  its investors on board for this transaction with a modification

21  either of this cap or alternatively what happens if the cap

22  isn't met.  For example, you could say that you would approve

23  the transaction only if within ten days of the production of

24  the final numbers they either waive or terminate without a fee,

25  so that we have an opportunity to move on with life.

273

1          THE COURT:  But I guess, on that point, there's --

2   there's no -- on this condition it's -- the company has a -- at

3   some -- I was always of the view that you wouldn't have to wait

4   to the 31st of March and that you could call an anticipatory

5   breach.

6          MR. ROSENBERG:  Well, Your Honor, I share that view.

7   However, the debtor apparently has not either shared or been

8   willing to --

9          THE COURT:  Well, I don't know if that's the case.  I

10  think they just -- they just wanted to protect what they had

11  knowing that others would raise the issue.

12         MR. ROSENBERG:  Well, we raised it, Your Honor, I

13  assure you.  The problem is that where that takes you is a

14  litigation over a long period of time, not unlike what Mr.

15  Butler was suggesting, you know.  In six months you may have an

16  answer and somebody may owe somebody else money but in the

17  meantime you're floundering.  And that is not a desirable

18  result.  And this construct puts into Appaloosa's hand the sole

19  ability to create that result.

20         THE COURT:  But let me -- let me make sure I

21  understand this aspect of the deal too.  You do not have to

22  have as much debt here as you have, do you?

23         MR. ROSENBERG:  Well, I think the business -- under

24  the present construct, yes.  This is the debt under the sources

25  and uses which is required to fund this plan and for the

274

1    working capital that the business plan requires.  You'd have to

2    renegotiate the plan.  Exactly, Your Honor, what I'm

3    suggesting.

4            THE COURT:  Well, you wouldn't -- you wouldn't,

5    necessarily, have to do that with Appaloosa though.

6            MR. ROSENBERG:  Well, Your Honor, as Mr. Butler

7    pointed out, nobody else has come forward.  We have discussed

8    from time to time a stand-alone plan with GM --

9            THE COURT:  No, I'm not -- I'm talking about --

10   Mr. Resnick's testimony was that on this interest cost point,

11   and it hasn't been quantified so I'm not sure what the effect

12   is of, say, having 500 million dollars less debt or a hundred

13   million dollars less debt, how that effects your margin -- your

14   cushion.

15           MR. ROSENBERG:  Uh-huh.  Well, two points about that

16   Your Honor.  One is, you know, if -- if the parties believe

17   that this is a temporary, however long that means, market

18   dislocation which will return to normal at some point, you

19   know, and an appropriately negotiated loan agreement with

20   appropriate pre-payment provisions to renegotiate and lower the

21   rates, you know, as eminently appropriate.

22           THE COURT:  Well, why can't you value the interest

23   rate cost on that basis?

24           MR. ROSENBERG:  You can do anything you want, Your

25   Honor.  All I'm looking for is to have a little leeway to not

275

1   have Appaloosa hold us up --

2           THE COURT:  But doesn't -- the condition doesn't

3   permit you to do that?

4           MR. ROSENBERG:  No.  No, it doesn't.  Mr. Butler, are

5   you confirming that?

6           MR. BUTLER:  No, I'm not confirming that.  I think

7   there are -- the condition -- there's a condition that we have

8   that we have to meet.  And ultimately we either meet it or we

9   determine there's other ways in which we can comply with it and

10  we sit down and sort that out.  And I -- you know, that's why

11  you have the testimony from Mr. Sheehan you have.  That the

12  company believed -- we would love, as you know, to have the

13  number you have -- we would like.  Because we're not -- we're

14  in violent agreement with you but that's not what we were able

15  to negotiate.  Mr. Miller testified to, you know, we -- we

16  voted on what we had and I'm -- and not what we aspired.

17          MR. ROSENBERG:  Well, and I appreciate that.  I

18  understand that and that's why I'm asking for the Judge's help

19  in getting us the proper result here.

20          THE COURT:  Well, it seems to me unless some other

21  party is willing to make some concession to the plan investors

22  in return for that adjustment it's too big a risk.

23          MR. ROSENBERG:  Well --

24          THE COURT:  I mean, they negotiated an adjustment,

25  for example, based on the amount of unsecured claims to a

276

1    hundred and -- you know, they had a sliding scale above that

2    and that has been criticized.  But there was obviously a

3    reason -- there was obviously a reason for doing that.  People

4    were concerned that maybe that cap was too low.  So there is an

5    ability, I suppose, to negotiate that.  But --

6               MR. ROSENBERG: There's ability to negotiate if the

7    other party is willing to negotiate.

8               THE COURT:  Right.

9               MR. ROSENBERG:  And that hasn't happened.  I assure

10   you we've tried.  We've gotten the best deal we feel we

11   possibly can.

12              THE COURT:  All right.

13              MR. ROSENBERG:  And I think we've improved the deal

14   in a number of respects over what the debtor presented us with

15   a week ago or ten days ago, whenever it was.

16              MR. BUTLER:  The committee has been very

17   constructive.

18              MR. ROSENBERG:  But I -- you know, I'm prepared to

19   represent to this Court that without your help we've gone as

20   far as we can and we are left with the risk that one more time

21   there is an out here.  A -- a major out that results in either

22   a walk-away or a serious renegotiation back to square one.  And

23   that's all I'm asking Your Honor to take into consideration and

24   to help us to try to avoid.

25              THE COURT:  Okay.

277

1          MR. ROSENBERG:  There simply isn't enough leeway in

2   that number.

3          THE COURT:  Okay.

4          MR. ROSENBERG:  Thank you.

5          MR. BRILLIANT:  My turn, Your Honor?

6          THE COURT:  Unless the equity committee wants to say

7   anything.  Your turn.

8          MR. BRILLIANT:  For the record, Allan Brilliant on

9   behalf of certain bondholders, Your Honor.

10         You know, like Mr. Rosenberg, you know, we believe as

11  well, you know, that the -- I guess what we're referring to as

12  the December 3rd EPCA is just another in a long series of

13  options that the plan investors hoped -- hope to get here.

14         As -- Your Honor, I'm going to go through a bunch of

15  exhibits very quickly, given how late it is in the day.  But if

16  you look at Exhibit 38, Your Honor, on page DPH-2EAA 0000388,

17  the document, you know, states it's an equity purchase

18  commitment agreement waiver letter.  Since August 3, 2007, the

19  investors in the company have been exploring with each other

20  possible modifications to the EPCA and certain related

21  transaction documents which modifications are documented by the

22  documents attached to that certain proposal letter dated the

23  date hereof.

24         Your Honor, you know, it's very apparent from the --

25  from the written record, all of which is in evidence, that the

1    day after Your Honor approved the EPCA that negotiations

2    started almost immediately, the very next day, to modify the

3    agreements.  You know, the -- what we have here with the plan

4    investors are very aggressive investors who negotiated a very

5    onerous document that is highly favorable to them, that gives

6    them the ability to walk at almost any time if the debtors have

7    to do anything that is not completely within the four corners

8    of the document.  Any adjustment on the plan of reorganization

9    is subject to their consent.

10            THE COURT:  Do you really believe that?

11            MR. BRILLIANT:  Your Honor, I mean --

12            THE COURT:  Did your clients own the debt when this

13    agreement was up for approval in August?

14            MR. BRILLIANT:  Some of them did.  I believe that

15    most of them did, Your Honor, yes.

16            THE COURT:  Okay.

17            MR. BRILLIANT:  And, you know, the August EPCA, as

18    Your Honor knows, had a plan which was going to provide cash

19    and common stock to the senior noteholders, you know, not the

20    seventy-five percent in common stock and approximately twenty-

21    five percent in rights at a level which is substantially higher

22    than the real market value of the stock.  At that point in time

23    we were involved in a very different situation.  But yes --

24            THE COURT:  The same outs.

25            MR. BRILLIANT:  Excuse me, Your Honor?

279

1          THE COURT:  You're referring -- the outs you were

2     referring to were the ones in that agreement.

3          MR. BRILLIANT:  Yes, Your Honor.  And Your Honor is

4     right, we didn't object to it at that point in time but we're

5     now at a situation, Your Honor, where having had the experience

6     since August of dealing with these investors we find ourselves

7     now, after having to renegotiate this document in a way which

8     has been very favorable to them and not very favorable to the

9     estate, that I agree with Mr. Rosenberg, we should learn from

10    what has happened in the past here.  Although, Your Honor --

11         THE COURT:  What is your alternative?

12         MR. BRILLIANT:  Your Honor, at this point in time we

13    believe that if the debtors made an effort to go into the

14    marketplace that they would be able to either find a

15    replacement investor or be able to do a stand-alone plan where

16    the bondholders and other creditors of the estate would

17    potentially put in some money or backstop themselves, you know,

18    a rights offering to enable the company to emerge from

19    bankruptcy.  But because of the --

20         THE COURT:  Where's the evidence of that?

21         MR. BRILLIANT:  Your Honor, there is no evidence in

22    the record of it but I'm answering, Your Honor's, you know,

23    question.

24         THE COURT:  I know but you said you believed this

25    could happen.

1          MR. BRILLIANT:  Your Honor, I think that the -- the

2     evidence, though, is pretty clear here that the debtors have

3     made no effort to go into the marketplace and find another

4     investor, out of fear in some respects that the current plan

5     investors would use the discussions or the search with other

6     parties as a reason to terminate the agreement under a

7     modification of the recommendation provision in the agreement.

8     And the debtors have not gone out and done that.  And although

9     the debtors would say -- have said to Your Honor that the fact

10    that no one else came forward is evidence that there is no

11    better deal in the marketplace.  But Your Honor, we don't

12    believe that that is, in fact, any evidence at all that the

13    Appaloosa deal has been locked up.  The debtors had signed to

14    it.  They were not out looking for other proposals.  They never

15    gave the impression in the marketplace generally that there

16    were other proposals -- that they would consider other

17    proposals.  And consequently, nobody -- nobody, you know, came

18    in.  But that doesn't necessarily mean that nobody else was

19    interested.

20          But, you know, the -- the -- Your Honor there's --

21    the deal that you're being asked to approve today is illusory

22    in several respects.  One is, the closing condition that

23    Mr. Rosenberg has also objected to, which would enable the plan

24    investors to walk if the pro forma interest rate can't be met.

25    And the second is that the plan of reorganization that is

281

1   required to be prosecuted here is non-confirmable.  It requires

2   that the debtors classify --

3           THE COURT:  What is the amount of the toppers debt?

4           MR. BRILLIANT:  Excuse me, Your Honor?

5           THE COURT:  What is the amount of the toppers claim?

6           MR. BRILLIANT:  You know, they now purport to be

7   reducing it but it's approximately 400 million dollars of face

8   amount.  Your Honor, you asked Mr. Butler what the total amount

9   of the senior debt was.  I believe Mr. Butler gave you an

10  erroneous answer.  He gave you the total amount of the -- of

11  the debt that they would consider to be senior if you

12  substantively consolidated certain of the entities.  Actually,

13  the toppers were issued by Delphi Corporation and are senior --

14  I'm sorry; are subordinate to all of the debt at Delphi

15  Corporation.  That is the -- the senior notes --

16          THE COURT:  What is that amount?

17          MR. BRILLIANT:  I'm sorry; excuse me Your Honor?

18          THE COURT:  What is that amount?

19          MR. BRILLIANT:  Your Honor, they don't disclose it in

20  their disclosure statement.

21          THE COURT:  Well, what do you think it is?

22          MR. BRILLIANT:  Excuse me?

23          THE COURT:  What do you think it is?

24          MR. BRILLIANT:  It's the -- you know, it's the --

25  it's a little bit confusing because we don't know how much of

282

1   it might be, you know, guaranteed or (indiscernible) certain of

2   the debt exists but substantially less than three billion

3   dollars.

4               THE COURT:  How -- how much?

5               MR. BRILLIANT:  I would think it's the two billion

6   dollars of notes plus -- you know, Your Honor I would only be

7   speculating but, you know, hundreds -- plus the interest plus

8   hundreds of millions of dollars but not, you know, not another

9   billion dollars.

10              THE COURT:  So you'd say about two and a half?

11              MR. BRILLIANT:  That's probably right, Your Honor.

12  But I'm just -- I'm just speculating.

13              THE COURT:  Including post-petition -- including

14  post-petition interest?

15              MR. BRILLIANT:  Well, it's -- there's two billion

16  dollars of bonds and, I think, almost 400 million dollars in

17  post-petition interest.  So I think it's significantly more

18  than that at this point, Your Honor.

19              But in any event, Your Honor, the -- you know the

20  plan --

21              THE COURT:  Well, let's go through the math then, for

22  a second.  I take it that your argument that the plan is not

23  confirmable is based upon the senior debt voting against the

24  plan because they're not being paid in full?

25              MR. BRILLIANT:  Well --

283

1      THE COURT:  Let's leave aside the classification of

2  points for the moment.

3      MR. BRILLIANT:  Yes, Your Honor.

4      THE COURT:  All right.  Then let me -- let me just

5  follow up on that.

6      MR. BRILLIANT:  Sure.

7      THE COURT:  From Mr. Resnick's testimony at -- not

8  the negotiated plan value but at the midpoint of Rothschild's

9  valuation, which apparently a lot of people thought was too low

10  when they bought their debt, based on the chart that was given

11  to me and by the 2019 statement your clients filed.  A hundred

12  percent of principal gets paid, is that fair?

13      MR. BRILLIANT:  At the midpoint?

14      THE COURT:  Yes.

15      MR. BRILLIANT:  Yes, Your Honor.  Actually, I have a

16  demonstrative chart --

17      THE COURT:  Well, let me just -- you can see if I'm

18  wrong on this.  And that basically eighty-eight to ninety

19  percent of principal and interest gets paid at the midpoint and

20  you are premising your argument, I gather, that the holders of,

21  let's just round it at three billion dollars of debt, will vote

22  against the plan jeopardizing their recovery of a hundred

23  percent of their principal claim and a sizeable portion of

24  their post-petition interest claim at the midpoint of

25  Rothschild's valuation.  A valuation lower than what supposedly

284

1    the most knowledgeable group of those holders bought their

2    claims at, in return for the opportunity in a chaotic

3    environment to suck another ten percent of value out for post-

4    petition interest from the 400 million dollar toppers claim.

5    Does that sound like a rational vote to you?

6             MR. BRILLIANT:  Your Honor, you're making

7    assumptions.

8             THE COURT:  No, I'm asking you.  Correct whatever

9    assumptions I made.

10            MR. BRILLIANT:  Your Honor, I don't believe those are

11   the facts.

12            THE COURT:  Well, tell me where they are.

13            MR. BRILLIANT:  Okay.  Can I show you this

14   demonstrative chart which has been admitted into evidence?

15            THE COURT:  Just go through it.

16            MR. BRILLIANT:  Okay.

17            THE COURT:  It's simple numbers.

18            MR. BRILLIANT:  Sure, Your Honor.  The first thing

19   is, and I know Your Honor doesn't believe in trading values.

20   And I could tell that Your Honor looked at the --

21            THE COURT:  I believe in them to some extent.

22            MR. BRILLIANT:  Okay.

23            THE COURT:  I wonder what the people that bought

24   believing a sixteen billion dollar valuation believe in them.

25            MR. BRILLIANT:  Well, Your Honor --

285

1              THE COURT:  I also have real questions about the

2    nature of this market.  There's no evidence as to how actively

3    traded it was or what information those who are trading

4    possessed or what mistaken beliefs they were under at the time

5    that they bought it, as far as the course of the bankruptcy

6    case or what shorts they held.

7              MR. BRILLIANT:  Right.

8              THE COURT:  but let's leave that aside.

9              MR. BRILLIANT:  Okay.  Your Honor, first thing on the

10   issue of shorts, I'd like to make it very clear --

11             THE COURT:  I just --

12             MR. BRILLIANT:  If you had looked at our 2019 you'd

13   see that --

14             THE COURT:  No, I'm not talking about your --

15             MR. BRILLIANT:  -- you'd see that we don't -- we

16   don't have any.

17             THE COURT:  I'm not talking about your clients.  I'm

18   talking in the market generally.

19             MR. BRILLIANT:  Okay.

20             THE COURT:  But I'm just focusing on the midpoint of

21   the valuation range.

22             MR. BRILLIANT:  Okay.  Now first of all, Your Honor,

23   if you look at the disclosure statement, the midpoint valuation

24   of Rothschild is not the recovery that the holders will get.

25   The holders --

286

1          THE COURT:  That's not the question I posed to you.

2          MR. BRILLIANT:  I understand, Your Honor.  But I want

3     you to -- I want Your Honor to --

4          THE COURT:  No, I want you to answer my question.

5          MR. BRILLIANT:  Sure.

6          THE COURT:  I want to know why a rational business

7     person would risk blowing up recovery of a hundred percent of

8     their principal claim at the midpoint of Rothschild's plan

9     valuation and, what I gather, about seventy percent of their

10    post-petition interest claim, in order to have the chance in a

11    chaotic environment where everyone is negotiating with everyone

12    else again, at a cost of twelve million dollars a month of just

13    the cost of the case, to get some additional recovery out of

14    the sub-debt class.

15         MR. BRILLIANT:  Right.  Your Honor, if in fact the

16    Rothschild midpoint valuation was the distribution, you may be

17    right.  But it's not.  And if Your Honor would let me explain,

18    you know -- you know, several things.

19         First of all, the Rothschild valuation expressly says

20    that it's not subject to --

21         THE COURT:  I know it's not the distribution.  At the

22    distribution level -- let me correct this.  Mr. Fox, very -- as

23    he frequently does, I thought got, sort of, got to the heart of

24    your argument by saying in his -- his disclosure statement

25    amendment that if, in fact, one substituted Rothschild's

287

1    midpoint for the plan value that that would be the recovery, do

2    you disagree with that?

3            MR. BRILLIANT:  Yes, Your Honor.

4            THE COURT:  You do?

5            MR. BRILLIANT:  I do.  And if I can explain,

6    Your Honor.

7            THE COURT:  Okay.  Okay.

8            MR. BRILLIANT:  First of all, I'd like to give

9    Your Honor our demonstrative chart so you can see the ranges.

10   Your Honor, in order to realize the midpoint of the Rothschild

11   valuation, first of all they'd have to be right.  But let's

12   just set that aside for a second.

13           The second thing is, the Rothschild valuation is

14   before any dilution for the restricted stock that will be

15   issued, you know, pursuant to the plan which also will reduce,

16   you know, the valuations, you know -- you know, here.  And then

17   the second issue is, Your Honor, is that the distributions are

18   not entirely in stock but instead in order to reach this

19   midpoint valuation, each of the investors would have to invest

20   about forty percent of the amount that they're -- of the par

21   amount of their claims in new stock in order to get a value of

22   stock which would, you know, equal this amount.

23           So it's not just that somebody's going to give you,

24   you know, cash equal to the midpoint of the Rothschild

25   valuation or even common stock equal to the Rothschild midpoint

1   valuation but the investors would have to pay forty percent of

2   the amount they're owed in order to have stock which would be,

3   you know, somewhere in the ballpark of, assuming that

4   Rothschild is right about the valuation as to -- as to where it

5   would be.  But the -- you know, and I know Your Honor doesn't

6   necessarily, you know, take a lot of credence in market trading

7   but the reality is the implied value of the company, based upon

8   the current trading prices of both series of notes, both the

9   trups and the senior notes is below the Rothschild low point.

10            THE COURT:  And you don't think that has anything to

11  do with the uncertainty about the EPCA?

12            MR. BRILLIANT:  No, Your Honor, I don't.  You know,

13  in fact Your Honor, one would have thought that with the

14  official creditors' committee and the equity committee being on

15  board if -- that there would have been more certainty and the

16  stock price -- the bond price would have gone up.

17            THE COURT:  You know, I'm going to cut this short.

18  Mr. Brilliant, your clients can vote however they want.  And

19  I'm going to leave it at that.

20            MR. BRILLIANT:  Your Honor, you know, it sounds like

21  Your Honor made up your mind --

22            THE COURT:   I made up my mind on that issue.

23            MR. BRILLIANT:  Okay.  And I'm not going -- you know,

24  and I'm not going to belabor this.  All I would ask, you know,

25  we come back tomorrow that we have an opportunity to convince

289

1    you with respect to the classification --

2              THE COURT:  I have some things to say about

3    classification.  But ultimately, I am -- I think, fairly

4    perplexed, given what I've heard today, at your client's

5    position.  And I'll leave it at that.

6              MR. BRILLIANT:  Okay.  I take it Your Honor --

7              THE COURT:  Well, that was just to your point that

8    the plan is not confirmable.  I don't know if you had other

9    arguments about --

10             MR. BRILLIANT:  Oh, I do, Your Honor.  I thought you

11   were telling me that you decided.

12             THE COURT:  No, I have -- my perplexity goes to what

13   your clients hope to achieve in respect of their senior

14   rights --

15             MR. BRILLIANT:  Okay.

16             THE COURT:  -- given this plan.

17             MR. BRILLIANT:  right.  Well, Your Honor, we -- you

18   know the --

19             THE COURT:  Not on your arguments on the EPCA, so you

20   can continue with those.

21             MR. BRILLIANT:  Thank you, Your Honor.  I'd like to

22   say just one more thing and then I'll move on.  You know, and

23   I'm sure Your Honor understands this.  I think we have a

24   fundamental, you know, disagreement about value.  And that's

25   really what it comes, you know, down to.  If it was a small

290

1  disagreement then, I think, the logic that Your Honor, you know

2  propounds, you know, might be relevant.  But it's not a small,

3  you know, disagreement.  It's not a ten or twenty point

4  disagreement it's a significant, you know, disagreement.

5  The -- I know Your Honor doesn't view bond prices as being all

6  that meaningful.

7          THE COURT:  Well, if we have that disagreement about

8  value, then I guess your clients are schizophrenic because they

9  have that disagreement with themselves since they bought in at

10  a value, in many cases, above Rothschild's high end value.

11          MR. BRILLIANT:  At points in time, when the market

12  was different, when the macro-economic conditions were

13  different, when the expectation of General Motors production

14  for the future was different, when the expectation of a

15  possible recession was different.  Yes, Your Honor, they made

16  some mistakes.  I think they understand that.  And I think what

17  they're trying to do, as best they can, is to, you know,

18  maximize, you know, their investment based upon, you know,

19  their rights as creditors -- as senior holders in the

20  bankruptcy case.

21          THE COURT:  Well, if that's what they're doing,

22  that's fine.

23          MR. BRILLIANT:  I'm sorry, I couldn't hear you, sir.

24          THE COURT:  They're entitled to try do that however

25  they want to do it, I suppose.

1      MR. BRILLIANT:  Yeah.  Well, you know, Your Honor,

2  from a, you know, a business judgment perspective, I think we

3  all agree that the O'Ryan, you know, applies.  That Your Honor

4  has to substitute your own business judgment here for the

5  judgment of the board of directors, giving appropriate due

6  deference to the board as Your Honor deems to be appropriate.

7  You know, our sense here, Your Honor, like Mr. Rosenberg, is

8  that, you know, given, you know, the historical relationship

9  with the plan investors and the onerous conditions that would

10  be contained in the, you know, amended December 3rd --

11      THE COURT:  Well, can we go to that?  Mr. Rosenberg

12  identified one onerous condition.  And I -- as I said to

13  Mr. Tepper, I am concerned about the optionality inherent in

14  that decision and whether -- whether it accurately reflects a

15  business concern.  Are there others?

16      MR. BRILLIANT:  We see others, Your Honor.  If Your

17  Honor were to rule tomorrow on plan classification, that would

18  give them a walk right.

19      THE COURT:  Why is that -- I don't understand that.

20  If the treatment is the same but they're in a different class,

21  you think that gives them a walk right?

22      MR. BRILLIANT:  Yes, Your Honor.  I mean it's --

23      THE COURT:  ON what basis?

24      MR. BRILLIANT:  They have to approve any --

25      THE COURT:  Doesn't it refer to treatment as opposed

292

1    to classification?

2              MR. BRILLIANT:  The plan is now substituted for the

3    plan framework agreement.  And any modifications to that -- to

4    the plan has to --

5              THE COURT:  Even if there's not a modification to the

6    economics?  You just simply move the toppers into a different

7    class?

8              MR. BRILLIANT:  Yes, Your Honor.

9              THE COURT:  You really believe that?

10             MR. BRILLIANT:  I do believe that, Your Honor.

11             THE COURT:  Well, I don't know -- you have Mr.

12   Lauria.  You better ask your client that because I don't think

13   that's right.  You don't have to do it now, you can do it

14   overnight.

15             MR. BRILLIANT:  Thank you, Your Honor.

16             THE COURT:  Because I read it as said treatment not

17   the plan.

18             MR. BRILLIANT:  Well, you know, I don't think anybody

19   would want to -- would want to find out, Your Honor.

20             THE COURT:  Well, I would rule on that very quickly.

21             MR. BRILLIANT:  And the -- you know, and any changes

22   to the inter-credit agreement as well, which is part of the,

23   you know, the plan or the way it's treated under the plan or --

24             THE COURT:  I'm sorry; the inter-creditor agreement?

25             MR. BRILLIANT:  The way that the subordination

1   agreement, you know, is waived under the plan, if there were

2   to, you know, to be any.  Obviously if Your Honor --

3              THE COURT:  You mean the treatment of the toppers?

4              MR. BRILLIANT:  Yes, Your Honor.  I mean,

5   historically, as I'm sure Your Honor knows, senior debt and

6   junior debt are classified, you know, separately.  And it's the

7   vote of the senior debt which would, you know, cause the, you

8   know, the waiver of the -- of the subordination agreement.  Or

9   alternatively, you know, the debtors, you know, could seek to,

10  you know, prove that as a matter of fact that the senior class

11  is being paid in full.  You know, here under this plan they

12  don't purport to do either, they would purport to have them,

13  you know, vote in the same class and they don't require, you

14  know, a fact finding of payment in full for the, you know, for

15  the waiver of the inter-creditor agreement.  You know, because

16  of that and the requirement under the Bankruptcy Code that the

17  inter-creditor agreement, you know, be enforced the, you know,

18  the -- you know, the plan, you know, as it's currently, you

19  know, drafted.  And obviously if Your Honor orders it to be

20  changed.  But as it's currently drafted it's just not

21  confirmable.

22              You know, in addition, Your Honor, the -- you know,

23  we believe that the, you know, we believe that the testimony

24  was pretty clear that Mr. Tepper used his position as a plan

25  investor --

294

1          THE COURT:  So is that -- are those the conditions?

2     I'm still focusing on the conditions.

3          MR. BRILLIANT:  Yes, Your Honor.  Those are -- those

4     are -- I mean there's other things that have been, you know,

5     discussed here today.  The fact that the debtors, you now, are

6     limited in the ability to have conversations with other

7     parties.  Mr. Rosenberg, pointed out and we agree, you know,

8     the lockups with other creditors, you know, make things, you

9     know, very difficult with respect to -- I think the testimony

10    was pretty clear with respect to, you know, the Goldman, you

11    know, Sachs issue.  Now it's hard to have, you know, any

12    sympathy for Goldman Sachs given that they had, you know, not

13    gone forward with the October 29th deal which --

14         THE COURT:  It says to me that, in other words, the

15    lockup was a good thing there.

16         MR. BRILLIANT:  Excuse me, Your Honor?

17         THE COURT:  It sounds to me, in other words, the

18    lockup was a good thing there.

19         MR. BRILLIANT:  No, Your Honor.

20         THE COURT:  If -- if it was going to exert pressure

21    on someone who was going to walk from the deal, not because

22    they wanted to propose a better deal but because they thought

23    the deal was not good enough for them.

24         MR. BRILLIANT:  I think, you know, they found the

25    deal wasn't good enough for them but they were precluded from

295

1   having conversations with other parties in interest to try to

2   find something that may have been better for everyone.

3           THE COURT:  Is there any evidence that that's what

4   they were up to?

5           MR. BRILLIANT:  I guess, Your Honor, there's -- the

6   only evidence is that, from the documents, is that they wanted

7   to talk to GM about the possibility of, you know, of

8   reconfiguring the backstop.

9           THE COURT:  Okay.

10          MR. BRILLIANT:  The -- Your Honor, you know, the

11  company, you know, here has, you know, put so much, you know,

12  emphasis on trying to, you know, emerge from bankruptcy

13  expeditiously that, you know, that they, you know, are willing

14  to overlook, you know, the fact that, you know, there are

15  inherent risks in going forward, you know, with a plan, you

16  know, that's not, you know, supported, you know, by, you know,

17  all of its creditor constituencies.  Obviously it's a lot

18  easier, you know, to, you know, to cram down rather than to,

19  you know, to, you know, cram up.

20          But, you know, I understand, you know, Your Honor's

21  view that ultimately if the disclosure statement goes out, you

22  know, the bondholders, you know, will make, you know, their

23  decision.  And I think Your Honor, you know, if you, you know,

24  were to approve the EPCA which we, you know, we, you know,

25  don't support because we think its -- in the long run it's

1   holding back the ability of the company, you know, to emerge

2   from bankruptcy.  When, you know, the plan was put into place

3   at a point in time when the expectation was that there was

4   enough value to pay all the creditors, you know, in full and

5   leave something for equity.  As valuations change, the capital

6   market has changed.  The inability of the company to borrow

7   cash rather than trying to, you know, start from a, you know,

8   fresh, you know, perspective based on value.  As Mr. Resnick

9   testified, they tried to just keep as many things in place and

10  just saw through other things.  But the reality is that the

11  plan they came up with was very much, you know, different, you

12  know, especially, you know, for, you know, the senior creditors

13  who are no longer getting cash and no longer getting the

14  remainder of their distributions just in stock but now getting

15  a large portion through the rights offering.  And, you know, we

16  believe that going forward, at this point, with this plan with

17  this EPCA in the long run will lengthen the time of stay in

18  bankruptcy because it'll force the senior noteholders to have

19  to exercise, you know, their vote, you know, to have the plan,

20  you know, not go forward which in the long run will, you know,

21  delay the confirmation of the plan.

22          THE COURT:  I guess that's their choice.

23          MR. BRILLIANT:  That's --

24          THE COURT:  This economic beast.

25          MR. BRILLIANT:  That's right, Your Honor.  The -- you

297

1    know, the last thing, you know, I'm going to do Your Honor is

2    just focus a little bit on the EPCA itself and the -- we gave

3    you a chart which has been stipulated to, you know, by the

4    debtors.  The November 14th EPCA, which was, you know, vilified

5    by all the parties in the case at the -- at the midpoints

6    provided sixty-two of -- 87.1 percent to the general unsecured.

7    The December 3rd EPCA --

8            THE COURT:  Wait.  I'm sorry.  One percent of what?

9            MR. BRILLIANT:  Of par plus accrued.

10           THE COURT:  On what basis?

11           MR. BRILLIANT:  The Rothschild midpoint.  And the

12   current EPCA, according to the disclosure statement that was

13   filed on Monday by the debtors would provide 89.2 percent at

14   the Rothschild midpoint.  It's an increase of 2.1 percent.

15   That's the only --

16           THE COURT:  Of par plus accrued?

17           MR. BRILLIANT:  Yes, Your Honor.

18           THE COURT:  Okay.

19           MR. BRILLIANT:  2.1 percent, that's the change for

20   the general unsecured creditors under the plan at the

21   Rothschild midpoint from November 14th to December 3rd.  There

22   were some other -- so this, you know -- this is basically, you

23   know, the same deal with the investor group.  The only changes

24   as Mr. Butler, you know, pointed out was a slight change in the

25   Pref A conversion price and an even smaller change, a fifty

298

1    million dollar change in the Pref B, which were counteracted by

2    an increase in the dividend rate.  The real give-ups, since

3    November 14th, have come from General Motors which agreed to

4    take 137 -- I think it's 137 million dollars less, you know,

5    twenty-seven million dollars -- I guess it was 127 million --

6    twenty-seven million dollars of which was given to the equity.

7    And effectively a hundred million dollars to the -- you know,

8    to the creditors.

9            THE COURT:  Do you think that's still going to be

10   there if the EPCA amendment is not approved, because of your

11   client's objection?

12           MR. BRILLIANT:  Yes, Your Honor.

13           THE COURT:  You do?

14           MR. BRILLIANT:  Yes, Your Honor.

15           THE COURT:  You think your clients are going to stake

16   their year-end bonuses on that?

17           MR. BRILLIANT:  Your Honor, they didn't send me here

18   and aren't paying me here if --

19           THE COURT:  Well, let's -- let's focus on that.  Your

20   clients have not signed any confidentiality agreements that

21   give them access --

22           MR. BRILLIANT:  That's right, Your Honor.

23           THE COURT:  -- to the information that the two

24   committees had access to?

25           MR. BRILLIANT:  That's right, Your Honor.  And Your

1   Honor had asked Mr. Butler where I had signed a confidentiality

2   agreement --

3          THE COURT:  No, I know -- I know you have but there

4   is a difference between a businessman and a lawyer.

5          MR. BRILLIANT:  Right.  Well, actually we are subject

6   to the protective order.

7          THE COURT:  I know.  I know you --

8          MR. BRILLIANT:  And we did not sign a confidentiality

9   agreement because the confidentiality agreement --

10         THE COURT:  But you're not making business decisions

11  for your clients.

12         MR. BRILLIANT:  That's right, Your Honor.

13         THE COURT:  You don't have a -- your 2009 says you do

14  not have a power of attorney to make business decisions for

15  your clients.

16         MR. BRILLIANT:  That's right, Your Honor.  I think,

17  one thing Your Honor, you know -- should note here --

18         THE COURT:  I will keep an open mind for tomorrow,

19  but I can tell you that I am not of the view that you can turn

20  an enterprise like this around over the issue that you've

21  identified.

22         MR. BRILLIANT:  Which --

23         THE COURT:  And I think a reasonable businessperson

24  would understand that.  Now maybe I'm going to be proven

25  wrong --

300

1           MR. BRILLIANT:  Your Honor, I guess --

2           THE COURT:  -- maybe they will vote no and then

3    they'll have to explain to their investors and their managers

4    why and that'll be their choice.  Just as the representatives

5    of the unions had to make hard choices, and they made them, and

6    GM has, the creditors' committee have, they've all made choices

7    to the people for whom they're fiduciaries based on the best

8    information they had.

9           MR. BRILLIANT:  Your Honor, one thing I would point

10   out here, and obviously Your Honor is aware of this, you know,

11   because the debtors have their disclosure statement on file,

12   there is a lot of information in the marketplace.  We don't

13   believe there's enough but to the extent that Your Honor

14   approves the EPCA today, as I said with respect to the

15   classification and other issues, we would like to see, you

16   know, those resolved and favorably to us and a fair disclosure

17   statement go out so people can vote on a fair disclosure

18   statement.  But there is a business plan, there are financial

19   projections, there is a lot of information --

20          THE COURT:  I understand.

21          MR. BRILLIANT:  -- in the marketplace.  This is not a

22   situation where you have a private company --

23          THE COURT:  And they haven't voted yet either.

24          MR. BRILLIANT:  That's right, Your Honor.

25          THE COURT:  Okay.

1     MR. BRILLIANT:  Thank you, Your Honor.

2     THE COURT:  Okay.  By the way is it their view that

3 the concession by GM, as a senior creditor, would go to their

4 benefit or to the topper's benefit?

5     MR. BRILLIANT:  Well, it can't go to the topper's

6 benefit Your Honor.  You know, the toppers are contractually

7 subordinate as it -- as it relates to the senior notes, the

8 toppers -- any distribution they would get they would have to

9 turn over by virtue of -- of contract.

10     THE COURT:  Okay.

11     MR. BRILLIANT:  So that's -- that's not an issue.

12     THE COURT:  Okay.

13     MR. BRILLIANT:  There's this issue of -- of

14 substantive consolidation and whether or not senior holders who

15 have contractual, you know, subordination rights with the

16 toppers should be classified, you know, with OPCO creditors who

17 do not have that basis and who aren't even creditors of the --

18     THE COURT:  So it's your client's view that if GM is

19 willing to make a concession to the toppers for a consensual

20 plan, your clients take the benefit of that?

21     MR. BRILLIANT:  That's -- that's the law, Your Honor.

22     THE COURT:  Okay.  All right.  Mr. Fox?

23     MR. FOX:  Your Honor, I'm not sure there's much else

24 to cover at this point.

25     THE COURT:  Okay.

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                516-608-2400

302

1          MR. FOX:  And I know the hour is late.  I would

2    certainly be happy to answer any of your questions that you may

3    still have.  I would say this, it seems to me that in some

4    sense we're balancing a set of event risks that are on the --

5    on the debtors' --

6          THE COURT:  You persuaded that guy to hang up.

7          MR. FOX:  And he gave up a long time ago and forgot

8    things.  The series of event risks based on -- on the issues

9    that the debtors identified.  There also seems to be a series

10   of event risks that, for instance, committee counsel has

11   identified.

12         THE COURT:  Well, there's one big one.

13         MR. FOX:  Well that -- yes, that's right.  And as

14   well as event risks, as you will, really plan risks and I can't

15   begin to predict how people will vote or not or where this

16   goes.  I mean, as you get down the road to a confirmation

17   hearing, I mean, you're right that the recovery based on the

18   midpoint valuation even, you know, is a fairly high recovery.

19   On the other hand I, for one, have trouble reconciling that

20   with what's been happening in the market with respect to the

21   trading values.  Not because I'm suggesting that there's, you

22   know -- that the Rothschild valuation is wrong, for instance.

23   I'm not suggesting that.  But there seems to be a perception in

24   the market among bondholders that seems to be very different.

25   And to what effect that has, I don't know.

303

1          THE COURT:  Have you ever sat in on these guys

2     talking to each other?

3          MR. FOX:  Which guys?

4          THE COURT:  These traders?

5          MR. FOX:  No, well --

6          THE COURT:  They can get themselves pretty fired up.

7          MR. FOX:  Oh, yeah.  They go all the way one way and

8     then they go all the way the other way.

9          THE COURT:  They can.  And sometimes they're not even

10    sure why and sometimes they are sure why, because they think it

11    may have short-term effect on things.

12         MR. FOX:  I understand.  But I mean, at this point,

13    there is -- you know, there have been plans and drafts and

14    draft disclosure statements filed that presumably people are

15    aware of.  They seem to have an effect when they get filed.

16    And in other, I would say, more typical situations one tends to

17    see the, you know, that prices will tend to move up towards

18    what is an anticipated valuation as opposed to moving away from

19    it.  I can't reconcile what's happening here.

20         In terms of the capital structure and the issues at

21    confirmation there is, in a sense, two ways to go.  One is to

22    say, okay, well we substantively consolidate everything, which

23    is what the plan -- the debtors' plan provides, and then take

24    value from the toppers to give to senior creditors, both debt

25    and trade creditors and try to make them a little more whole.

304

1              Mr. Tepper's view, which may not necessarily be the

2    wrong view, of a different way to go is not to substantively

3    consolidate so that the value of Delphi Corp., which relies

4    heavily on the offshore entities, is kept for the Delphi Corp.

5    creditors which is, primarily, the senior debt, the

6    subordinated debt, the claims, at this point, of the UAW at 140

7    million and the IUE at 125 or twenty-six million.  And maybe

8    there's some trade claims that are asserting themselves with

9    Delphi Corp.  And then question what the value is of DASS LLC

10   and then the trade creditors at that level.

11             Now, Mr. Tepper argues that that's the way it should

12   go.  That the DASS LLC entities are, you know, completely under

13   water and -- and, you know, they wouldn't be getting anything

14   but for substantive consolidation argument, the basis for which

15   is not entirely clear here.  Which is -- but simply -- the

16   point is, it's another way to look at how this all works out.

17             THE COURT:  But how many -- how many deals would you

18   have to renegotiate to do that?

19             MR. FOX:  Hard to say.

20             MR. ROSENBERG:  Many, many.

21             THE COURT:  Including collective bargaining

22   agreements?

23             MR. FOX:  No.

24             THE COURT:  If you're really talking about a

25   separation of these companies?

305

1          MR. FOX:  No, I don't think you're necessarily

2    talking about a separation.  I mean, there could always be a

3    contribution down to in effect buy back those entities.  It --

4    it clearly is complicated but the point is that there's an

5    event risk there, if you will, with respect to the plan.

6    That's the two sides of the coin, as we say.

7          THE COURT:  Well, I will say this, the people that

8    often get themselves fired up on the trading desks, eventually

9    do make an economic analysis most of the time.

10          MR. FOX:  We shall see.

11          THE COURT:  We shall see.

12          MR. FOX:  Thank you, Your Honor.

13          THE COURT:  All right.  I -- it's late.  I'm going to

14    rule tomorrow morning but I do have a real concern about the

15    committee's point -- the creditors' committee's point.  I don't

16    think, frankly, that Appaloosa and its co-investors really want

17    to go through this exercise again.  I doubt Mr. Tepper does.

18    He's -- he was pretty frank.

19          If it turns out as there is a chance that the

20    interest cost condition is tripped over by a -- a -- something

21    that's reasonably foreseeable today, I don't frequently get on

22    my high horse but, it will happen again.  And I just don't

23    think the parties really want that to happen and they probably

24    don't want to go into the confirmation process with that

25    hanging over the market and it seems to me that it is something

1    that the plan investors should discuss overnight with the

2    committee's representative so that there's a reasonable

3    compromise, so that we don't have to run the risk of going

4    through that exercise again.

5           And it seems to me, if we're talking about roughly a

6    forty million dollar interest cost difference, the compromise

7    should be mostly on the plan investors' part, at least based on

8    what I heard today as far as the actual economic effect of

9    that -- that result.  To my mind, that's ultimately more of a

10   win/win scenario then coming back and going through this

11   exercise, including the cost of the last two weeks, which is

12   what would happen and perhaps in spades, since the plan would

13   have gone out for a vote by then, if in fact that condition

14   is -- is triggered.  It just seems to me that it's -- this is

15   something that people of the sophistication of the plan

16   investor group should understand.  And frankly, I think it's

17   the type of responsible point that the committee's right to

18   raise at this time.  It's not a wish list type of point or a --

19   using Mr. Butler's metaphor, a request for a super-duper pie.

20          So I -- I -- as you can tell from my remarks,

21   otherwise believe that the debtors' motion should be granted

22   and I'll give a full ruling on that tomorrow.  But I'm

23   reluctant to do so given this optionality because, as --

24   there's one thing I really do agree with Mr. Brilliant on,

25   which is no one wants to go through this twice.  So I'm going

1   to resume tomorrow at 10 and I'd like you to report to me then,

2   at the beginning of the hearing.  In fact, you can report to me

3   before then if you want to contact my chambers on this point.

4   And then I'll -- I'll issue my ruling and we'll proceed to the

5   disclosure statement hearing.

6           MR. BUTLER:  Thank you, Judge.

7           MR. ROSENBERG:  Thank you, Your Honor.

8           THE COURT:  The only thing I have on for tomorrow is

9   Delphi so if you want you can leave your boxes here.  I don't

10  think you can leave them in any other courtroom, probably have

11  them brought in here.

12          (Proceedings concluded at 7:31 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

308

### I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| David Resnick | Mr. Moustakas | 31 |
| David Resnick | Mr. Fox | 88 |
| David Tepper | Mr. Moustakas | 97 |
| David Tepper | Mr. Butler | 159 |
| John Sheehan | Mr. Isenman | 167, 197 |
| John Sheehan | Mr. Butler | 185 |
| Robert S. Miller | Mr. Isenman | 206 |


### E X H I B I T S

| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| 1 and 2 | Declaration of David Resnick | 30 |
| 3 and 4 | Declarations of David Tepper | 97 |
| 5 and 6 | Declarations of Robert Miller | 206 |
| 7 through 10 | Delphi-Appaloosa Investment Documents | 223 |
| 11 through 16 | Superseded First Amendment Document | 224 |
| 17 through 21 | Superseded Restated Documents | 224 |
| 22 through 27 | Global Settlement Agreement Master Restructuring Agreement With GM | 224 |

309

**I N D E X**

(continued)

**E X H I B I T S**

| DEBTORS' | DESCRIPTION | PAGE |
|----------|-------------|------|
| 28 through 33 | Documents in Connection With the Joint Plan | 224 |
| 34 through 41 | Material Presented to Delphi's Board of Directors | 224 |
| 43 through 49 | Communications of Delphi's Board of Directors | 224 |
| 50 through 54 | Presentation to Joint Meeting of Delphi Statutory Committee | 225 |
| 55 through 61 | Board Minutes | 226 |
| 62 through 63 | Draft Minutes | 228 |
| 64 through 68 | Various Lists of Scenarios and Evaluations Prepared by Rothschild | 228 |
| 69 through 89 | News Releases and SEC Filings | 229 |
| 90 through 91 | Miscellaneous Documents | 230 |
| 96 through 97 | Miscellaneous Documents | 236 |
| 110 through 113 | Court Scheduling Procedures | 236 |
| 114 through 127 | Documents Against Court Documents | 234 |
| 130 through 201 | E-Mails and Other Documents | 234 |
| 203 through 211 | Additional Documents Designated by Debtors | 230 |

310

1

2                          **I N D E X**

3                         (continued)

4                     **E X H I B I T S**

5    **JOINT'S**              **DESCRIPTION**                    **PAGE**

6    **1 through 2     Declarations of Mr. Sheehan      166**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

311

**C E R T I F I C A T I O N**

I, Esther Accardi, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____ December 10, 2007
Signature of Transcriber                    Date

Esther Accardi
typed or printed name