**Hearing Date And Time: January 17, 2008 at 10:00 a.m.**
**Objection Deadline: January 11, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c)
ESTIMATING OR PROVISIONALLY ALLOWING CERTAIN UNRECONCILED
CLAIMS SOLELY FOR PURPOSES OF ADMINISTRATION OF
<u>DISCOUNT RIGHTS OFFERING</u>

("RIGHTS OFFERING ESTIMATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order estimating or provisionally allowing certain unreconciled claims solely for the purposes of administering the Discount Rights Offering,[1] and respectfully represent as follows:

## Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.   On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan

---

[1]   Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the Plan (as defined below).

2

Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan") (Docket No. 11386) and the First Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement") (Docket No. 11388).  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).

    4.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    5.  The statutory predicates for the relief requested herein are sections 105(a) and 502(c) of the Bankruptcy Code.

B.  <u>Current Business Operations Of The Debtors</u>

    6.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

7. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8. Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[3] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.     Events Leading To The Chapter 11 Filing

9.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

10.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the

---

[4]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     <u>The Debtors' Transformation Plan</u>

        12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[5] first, modifying the Company's labor agreements to create a competitive arena in which to conduct business;[6] second, concluding their negotiations with GM to finalize GM's

---

[5] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement. On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. Under the Delphi-Appaloosa EPCA, the new plan investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007. On October 29, 2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760). In addition, on November 14, 2007, December 3, 2007, and December 5, 2007, the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA. On December 10, 2007, this Court entered an order granting the motion and approving the proposed amendments (Docket No. 11382).

[6] As of August 29, 2007, this Court had entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for an order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

financial support for the Debtors' legacy and labor costs and to ascertan GM's business commitment to the Company;[7] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[8] fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint;[9] and fifth, devising a workable solution to their current pension situation.[10]

---

[7] On September 6, 2007, Delphi announced that it had entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM. The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29, November 14, December 3, December 5, and December 10, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[8] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors have sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, their brake hose and catalyst businesses, and their Saltillo, Mexico brake plant business, as well as their manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan. The Debtors also received court approval to sell substantially all of the assets used in their interiors and closures businesses (subject to certain cure disputes) and for bid procedures related to the upcoming sale of substantially all assets used in their steering and halfshaft business.

[9] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, which will be transitioned as part of the Company's transformation plan: Steering (for which bidding procedures were approved on December 20, 2007) and Automotive Holdings Group. To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[10] To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans"). On July 13, 2007, the IRS modified

7

E.   The Debtors' Plan Of Reorganization

13.   By filing the Plan and related Disclosure Statement, the Debtors reached another key milestone in their chapter 11 cases.  The Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including GM.  Attached as exhibits to the Plan are two agreements, the GSA and the MRA, which provide for a comprehensive settlement with GM.  Both agreements are subject to this Court's approval as part of the confirmation process.  This Court has scheduled a hearing to consider confirmation of the Plan to commence on January 17, 2008.  Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

14.   Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

---

the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively. On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year. On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver. On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

Relief Requested

15.     Pursuant to the Plan, Discount Rights (as defined herein) are to be distributed on a pro rata basis to holders of allowed claims in class C (General Unsecured Claims) under the Plan.[11]  Article 7.15(a)(i) of the Plan provides in pertinent part that "[i]f a Claim of a Discount Rights Offering Eligible Holder is not Allowed or otherwise reconciled by the Debtors by the date of commencement of the Confirmation Hearing, such Claim shall be temporarily allowed, solely for purposes of participation in the Discount Rights Offering, in the amount so estimated by the Bankruptcy Court or agreed to by the holder of the claim and the Debtors."  To make a pro rata distribution of the Discount Rights in compliance with Article 7.15(a)(i) of the Plan, it is necessary to estimate or temporarily allow any claims that have not been allowed, disallowed, or reconciled (the "Unreconciled Claims") prior to the commencement of the Discount Rights Offering.  Although the vast majority of claims against the Debtors have been allowed or reconciled, there remain a number of Unreconciled Claims (including unliquidated or partially unliquidated claims) that will need to be estimated or provisionally allowed for purposes of making the appropriate calculations for a pro rata distribution of the Discount Rights.  By this Motion, and in accordance with Article 7.15(a)(i) of the Plan, the Debtors seek the provisional allowance or estimation of Unreconciled Claims, solely for purposes of distributing the Discount Rights, in the amounts set forth on Exhibit 1 attached hereto.[12]

---

[11]    The Discount Rights will also be distributed pro rata to the class representatives of Class E (Section 510(b) Note Claims), G-2 (Section 510(b) Equity Claims), and H (Section 510(b) ERISA Claims).

[12]    Concurrently with service of this Motion, the Debtors will also serve individualized notices to the affected claimants, substantially in the form of Exhibit 2 attached hereto.  To the extent a party does not receive an individualized notice, such party's claim either has already been reconciled or such party will not receive Discount Rights for one of the reasons stated in paragraph 18 below.  For certain

9

16. To the extent that the parties listed on <u>Exhibit 1</u> (or certain other holders of reconciled claims not subject to this Motion) will receive contract cure payments in cash, and those amounts are reconciled prior to the commencement of the Discount Rights Offering, the amount at which such claimants are entitled to participate in the Discount Rights Offering will be correspondingly reduced. Also reflected on <u>Exhibit 1</u> are certain holders of Supplemental Executive Retirement Program ("SERP") claims for which the holder has not yet filed a proof of claim,[13] but for whom the Debtors will schedule an actuarially determined SERP claim prior to the confirmation hearing so that these claimants are able to participate in the Discount Rights Offering.

17. The Debtors also propose that, should the provisional allowance or estimation results in a particular claimant's receiving more Discount Rights than such claimant should have received based on the ultimate allowed amount of such claim and such rights are transferred or exercised (the "Excess Discount Rights"), then, in the Reorganized Debtors' sole discretion, (a) an amount of New Common Stock (at Plan value) equivalent to the value of the Excess Discount Rights (at Plan value) (the "Discount Rights Value") will be withheld from the ultimate distribution to such claimant or (b) such claimant will be required to remit payment to the Reorganized Debtors in an amount equal to the value of the Excess Discount Rights. This process will effectively implement Article 7.15(a)(i) of the Plan and ensure that ultimate recovery values of claimants with

---

unreconciled claims with respect to which the Debtors' estimate is not materially divergent from the claimant's most recent proposal for reconciling the claim or not materially divergent from the asserted amount of the claim, the Debtors have elected to avoid litigation expense and delay and will distribute Discount Rights on the basis of the claimant's most recent proposal or the asserted amount, as applicable.

[13] The Court's bar date order entered on April 12, 2006 did not require SERP claimants to file proofs of claim related to SERP.

10

Unreconciled Claims will be the same as those of claimants with allowed claims without the need to wait for every claim to be allowed before distributing the Discount Rights.

18.     This Motion does not seek estimation or temporary allowance of certain claims which, while filed as general unsecured claims, will not be entitled to distributions as general unsecured claims.  Claims not subject to the Motion include Flow-Through Claims, which are not impaired under the Plan (and whose holders received a notice of unimpaired status with their Solicitation Packages), and certain other unsecured claims that will be expunged or otherwise resolved on or shortly after the Effective Date of the Plan, or that have been or will be satisfied pursuant to other orders of the Court. Examples of such claims are (a) claims of individual union members that are subsumed by the union settlement agreements and will accordingly be expunged on the Effective Date of the Plan and (b) the claims of the Pension Benefit Guaranty Corporation, which will be expunged when the Debtors meet their pension obligations on or shortly after the Effective Date of the Plan.

Basis For Relief

19.     The Plan provides that each holder of an Allowed General Unsecured Claim will receive (i) the number of shares of New Common Stock (at Plan Equity Value) equal to 77.3% of the Face Amount of such Allowed Claim and (ii) the entitlement to participate in the Discount Rights Offering.  The Discount Rights Offering will be conducted after confirmation of the Plan and after a registration statement is declared effective by the SEC, but before the Effective Date of the Plan.  Through the Discount Rights Offering, holders of general unsecured claims and securities litigation

claims will have the ability to purchase, through the exercise of transferable rights, their pro rata portion of 41,026,309 shares of the New Common Stock of Reorganized Delphi at a price per share of $38.39, which is a 35.6% discount to Plan Equity Value of $59.61 (the "Discount Rights"). The Discount Rights Offering will include oversubscription rights, which will allow holders of Discount Rights that have exercised the rights the opportunity to purchase any New Common Stock that is not subscribed by other holders of Discount Rights (the "Discount Oversubscription Rights"). If holders of Discount Rights and Discount Oversubscription Rights do not fully subscribe for the New Common Stock available in the Discount Rights Offering, the Plan Investors will purchase any remaining shares of New Common Stock at a price of $38.39 per share. The Debtors anticipate that the Discount Rights Offering will commence shortly after the Court confirms the Debtors' Plan and the registration statement becomes effective, and it will accordingly be necessary to distribute the Discount Rights at that time.

20.     For purposes of distributing Discount Rights on a pro rata basis, the Plan includes disputed claims in connection with such allocation.[14] Because the Claims of certain Discount Rights Offering Eligible Holders (as defined in the Plan) have not been reconciled (including unliquidated[15] and partially unliquidated claims), and such Claims will likely remain unreconciled as of the Confirmation Hearing Date, the Plan requires that such claims be estimated or provisionally allowed, solely for purposes of administering the

---

[14]   In pertinent part, Article 1.159 of the Plan defines Pro Rata as "(a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise."

[15]   Unliquidated claims previously estimated at $0 by the Court's order entered on September 28, 2007 (Docket No. 9685) will not participate in the Discount Rights Offering.

Discount Rights Offering. Accordingly, the Debtors seek entry of an order estimating or provisionally allowing the remaining Unreconciled Claims solely for the purposes of the Discount Rights Offering and in an amount set forth on <u>Exhibit 1</u> attached hereto. The estimation amounts set forth in the individualized notices sent to Unreconciled Claim holders reflect the Debtors' analysis of the documentation attached to these claims, as well as the Debtors' experience in negotiating settlements of, or litigating, similar claims. The proposed estimation amounts set forth on <u>Exhibit 1</u> hereto do not represent and should not be construed as the Debtors' estimate of probable liability on any Unreconciled Claim, nor do they constitute an admission or other evidence of liability upon such claim.

21.     The Debtors also request that, to the extent that such provisional allowance or estimation results in a particular claimant receiving Excess Discount Rights, then, in the Reorganized Debtors' sole discretion, (a) an amount of New Common Stock (at Plan value) equivalent to the Discount Rights Value will be withheld from the ultimate distribution to such claimant or (b) such claimant will be required to remit payment to the Reorganized Debtors in an amount equal to the value of the Excess Discount Rights. Because the Discount Rights will be allocated to holders of Unreconciled Claims before these claims can be finally reconciled, this procedure is necessary to ensure that the Debtors and other creditors are not harmed in the event that a holder of an Unreconciled Claim receives more value through the Discount Rights Offering it is ultimately entitled to once the claim is reconciled.

22.     The Debtors further propose that, to the extent the holders of Unreconciled Claims and the Debtors reach agreement on these claims or their proper Discount Rights Offering participation amount prior to the entry of an order confirming the

Plan, such holders be entitled to participate in the Discount Rights Offering at the agreed amount with corresponding Discount Oversubscription Rights. In particular, several claims that were filed as secured claims or claims with other priority status, but which the Debtors assert should be reclassified as general unsecured claims, are included on <u>Exhibit 1</u> in the amount of $0 because as currently classified they are not entitled to participate in the Discount Rights Offering under the Plan. Should these claimants agree to reclassify their claims as general unsecured claims prior to the entry of an order confirming the Plan, these claimants would likewise be entitled to participate in the Discount Rights Offering at the agreed amount with corresponding Discount Oversubscription Rights.

Applicable Authority

23.     There is ample authority for the Court to estimate and temporarily allow the Unreconciled Claims for purposes of enabling the Debtors to administer the Discount Rights Offering. Indeed, section 502(c) of the Bankruptcy Code provides that the Court shall estimate for purpose of allowance "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Although section 502(c) provides that a court shall estimate claims for purposes of "allowance," courts have used section 502(c) to estimate claims for more limited purposes, such as determining the amount to be placed in a reserve fund. <u>See, e.g.</u>, <u>In re Jacom Computer Servs., Inc.</u>, 280 B.R. 570, 573 (Bankr. S.D.N.Y. 2002) (ordering estimation of disputed claims for establishing appropriate reserve); <u>In re Drexel Burnham Lambert Group, Inc.</u>, 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (estimating disputed claims for reserve purposes). Here, the Debtors' reorganization Plan

14

cannot become effective unless the Discount Rights Offering is efficiently administered in accordance with Article 7.15(a)(i) of the Plan.  The Debtors cannot achieve this goal unless the Unreconciled Claims are estimated and provisionally allowed, solely for purposes of allocating Discount Rights and administering the Discount Rights Offering.  Accordingly, the Motion should be granted to prevent undue delay in the administration of the Debtors' chapter 11 cases and the effectiveness of the Plan.

24.     A court may authorize the estimation of a claim using "whatever method is best suited to the circumstances" of a particular case and recognizing that absolute certainty is not possible.  Addison v. Langston (In re Brints Cotton Mktg., Inc.), 737 F.2d 1338, 1341 (5th Cir. 1984) (citation omitted).  Although the Court is bound by the legal rules that govern the ultimate value of the claim, it has wide discretion in establishing the method to be used to arrive at an estimate of a claim or a group of claims. Id.  See also Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982) (estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"); In re Windsor Plumbing Supply Co., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims); In re Baldwin-United Corp., 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985) (estimation "does not require that a bankruptcy judge be clairvoyant").

25.     Courts in this district and others have approved similar (and indeed more expansive) procedures through which a debtor is authorized to conduct a rights offering.  See e.g., In re XO Commc'ns, Inc., Case No. 02-12947 (Bankr. S.D.N.Y. Sep. 4, 2003) (court entered order estimating maximum amount of certain disputed claims solely for purposes of implementing rights offering pursuant to plan); In re Northwest

15

Corporation, et al., Case No. 05-17930 (Bankr. S.D.N.Y. Mar. 30, 2007) (approving rights offering procedures); In re Loral Space & Commc'ns Ltd., Case No. 03-41710 (Bankr. S.D.N.Y. Jun. 3, 2005) (same); see also In re Owens Corning, et al., Case No. 00-03837 (Bankr. D. Del. Jul. 11, 2006) (same); Atlas Air Worldwide holdings, Inc., et al., Case No. 04-10792 (S.D. Fla. June 8, 2004) (same).

26.     Additionally, section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Courts' discretion in choosing the process for estimating claims ranges from conducting summary trials (Baldwin, 55 B.R. at 899), to reviewing written submissions of proposed facts in the absence of a hearing (Windsor, 170 B.R. at 517), to taking the matter under advisement to review of the pleadings and briefs after a hearing (Lane, 68 B.R. at 613). Whatever procedure a bankruptcy court chooses to estimate a claim, it must be consistent with the chapter 11 policy that a "reorganization must be accomplished quickly and efficiently." Bittner, 691 F.2d at 137. Because the estimation of the Unreconciled Claims is required to administer the Discount Rights Offering and to implement the Debtors' Plan, as described above, the relief sought herein also is appropriate pursuant to section 105(a) of the Bankruptcy Code.

## Notice

27.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 19, 2007 (Docket No. 10661). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

28.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) estimating and provisionally allowing the unreconciled claims in the amounts identified on <u>Exhibit 1</u> attached hereto, solely for the purpose of participation in the Discount Rights Offering, and (b) granting the Debtors such other further relief as is just.

Dated:    New York, New York
December 28, 2007

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:   /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et</u> <u>al.</u>,
  Debtors and Debtors-in-Possession