Exhibit 7.8

Supplement To Management Compensation Plan

All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-
Possession (Docket No. 11386) (as subsequently modified or amended, the "Plan"),
including, without limitation, Article 14.3, under which the Debtors have reserved the right
to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the
Bankruptcy Code at any time prior to the Confirmation Date.

## Supplement To Management Compensation Plan

On December 28, 2007, the compensation committee of the Debtors' board of directors formally ratified the Management Compensation Plan, which is described on pp. DS-92 through DS-107 of the Disclosure Statement, at Section 7.8 of the Plan, in the materials previously appended as Exhibit 7.8 to the Plan, and in this exhibit supplement. During its deliberations, the compensation committee determined that the Management Compensation Plan constituted competitive market terms based on the advice of the committee's independent outside compensation advisor, Watson Wyatt Worldwide, Inc. Accordingly, the compensation committee also adopted Watson Wyatt's final report dated December 28, 2007 captioned *Executive Compensation Program Design – Revised After Consultation With Plan Investors And Statutory Committees.*

In connection with its ratification and approval of the Management Compensation Plan, the compensation committee also considered several other matters including (a) two discrete items in the Management Compensation Plan that Watson Wyatt was unable to benchmark as market competitive, (b) proposed forms of executive employment agreement and change in control agreement for the Debtors' chief executive officer as agreed to between Appaloosa and the Debtors' chief executive officer, and (c) the reasonable and appropriate amounts of cash emergence performance payments for the Debtors' executive chairman of the board and chief executive officer based on rationale developed by the compensation committee and also based on competitive benchmarking data reported by Watson Wyatt in its final report dated December 28, 2007 captioned *Emergence Cash Performance Payments for Executive COB and CEO.*

With respect to the two discrete items in the Management Compensation Plan that Watson Wyatt was unable to benchmark as market competitive involving the aggregate long-term incentive opportunity for executives in Bands A through F and the potential reinstatement of the Supplemental Life Benefits Program Coverage for executive retirees of the Debtors, the compensation committee determined to modify the Management Compensation Plan to reduce the aggregate long-term incentive opportunity awarded on the Effective Date for the eighteen month period subsequent to the Effective Date for executives in Bands A through F by $24 million. The compensation committee also reaffirmed that the Supplemental Life Benefits Program coverage will be provided only to the Debtors' active executives. Upon an active executive's retirement, the supplemental life benefit coverage will cease on the date immediately preceding retirement and the executive will be given a one-time opportunity to elect an amount of optional life insurance to replace all or a portion of part I of the supplemental life benefit coverage that ceases. Proof of good health will be required.

With respect to the proposed forms of executive employment agreement and change in control agreement for the Debtors' chief executive officer as agreed to between Appaloosa and the Debtors' chief executive officer, the compensation committee adopted and approved such agreements in the forms set forth in Schedule 1 and Schedule 2 to this exhibit supplement.

With respect to the reasonable and appropriate amount of cash emergence performance payments for the Debtors' executive chairman of the board and chief executive officer based on rationale developed by the compensation committee and also based on competitive

1

benchmarking data reported by Watson Wyatt in its final report dated December 28, 2007
captioned *Emergence Cash Performance Payments for Executive COB and CEO*, the
compensation committee determined that the amount provided for in the employment agreement
for the chief executive officer in Schedule 1 to this exhibit supplement (i.e., $5.3 million) was
reasonable and that the reasonable amount of the performance payment to be made to the
executive chairman of the board is $8.3 million. In addition to competitive benchmarking
information provided by Watson Wyatt, the compensation committee considered various
additional rationale including, but not limited to, the length and complexity of the restructuring,
the leadership of the two executives in working together and on behalf of the Delphi and its
stakeholders throughout the restructuring, Delphi's operational performance since 2005 including
the successful management of customer and supplier relationships and the above-plan booking of
forward business over the duration of the company's five year business plan, the successful
formulation and implementation of the company's five-part transformation plan, the level of
recoveries anticipated for creditors and shareholders under the Plan, and the waiver of
approximately $7.3 million in aggregate compensation by the two executives during the
pendency of the Chapter 11 Cases.

As a result of these determinations, the aggregate long-term incentive opportunity, on an
annualized basis, for all DSB Members and executives in Bands A through F is estimated to be
approximately $68 million (rather than approximately $80 million as previously disclosed on
DS-99 of the Disclosure Statement), and the aggregate Chapter 11 Effective Date Executive
Payments are estimated to be approximately $37 million on an annualized basis for the duration
of the Chapter 11 Cases (or approximately $87 million in the aggregate) (rather than $34 and $78
million, respectively, as previously disclosed on DS-99 of the Disclosure Statement).

Exhibit 7.8

Supplement To Management Compensation Plan

Schedule 1

All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-
Possession (Docket No. 11386) (as subsequently modified or amended, the "Plan"),
including, without limitation, Article 14.3, under which the Debtors have reserved the right
to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the
Bankruptcy Code at any time prior to the Confirmation Date.

## EMPLOYMENT AGREEMENT

AGREEMENT, dated February ____, 2008, by and between Delphi Corporation, a Delaware corporation (the "Company"), and Rodney O'Neal (the "Executive").

WHEREAS, the Company considers it to be in the best interests of its stockholders to continue the employment of the Executive;

WHEREAS, the Company wishes to secure the employment of the Executive pursuant to the terms and conditions set forth in this Agreement and the Executive desires to be employed by the Company pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the Company and the Executive agree as follows:

1. <u>Employment</u>. The Company hereby agrees to employ the Executive, and the Executive hereby accepts such employment, on the terms and conditions hereinafter set forth.

2. <u>Term</u>. The Executive's employment with the Company pursuant to this Agreement will commence upon the consummation of the Company's Plan of Reorganization (the "Plan of Reorganization") under Chapter 11 of the United States Bankruptcy Code (the "Effective Date") and will end on December 31, 2010, unless earlier terminated as provided herein. Notwithstanding the foregoing, commencing on January 1, 2011 and each January 1 thereafter (each, an "Extension Effective Date"), the term of this Agreement shall be extended, without further action by the Company or the Executive, for successive periods of twelve months each, unless either party shall have given 120 days advance written notice to the other party, in the manner set forth in Section 14 below, prior to the Extension Effective Date in question, that the term of this Agreement that is in effect at the time such written notice is given is not to be extended or further extended, as the case may be (the period during which this Agreement is effective being referred to as the "Term").

3. <u>Position and Duties</u>. During the Term, the Executive shall serve as Chief Executive Officer and President of the Company and shall be nominated for re-election to the Board of Directors of the Company (the "Board"). During the Term, the Executive shall be the senior most executive officer of the Company (provided that the appointment of a separate Executive Chairman of the Company shall not be a violation of this provision), reporting directly to the Board and/or any Executive Chairman of the Board, with the duties, responsibilities, authority and obligations customarily assigned to the individual serving in such position. The Executive agrees to devote all of his working time and efforts to the performance of his duties for the Company, provided, however, that Executive may engage in managing his personal investments, acting or continuing to

Page 1 of 18

act as a member of civic or charitable boards or being involved in educational, civic and charitable activities, or acting or continuing to act as a member of the corporate or advisory boards identified by you in writing prior to the Effective Date, in each case to the extent that such activities do not violate Executive's obligations under Section 12 hereof or interfere with the services to be rendered by Executive hereunder.

4. Place of Performance. In connection with the Executive's employment by the Company, the Executive shall be based at the Company's World Headquarters in Troy, Michigan, except for travel necessary in connection with the requirements of the Executive's position; provided, however, that in connection with the relocation of the Company's World Headquarters, the Executive's place of performance may be changed to the new location of the World Headquarters.

5. Compensation and Related Matters.

(a) Base Salary. As compensation for the performance by the Executive of his or her obligations hereunder, during the Term, the Company shall pay the Executive a base salary at an annual rate equal to One Million Five Hundred Thousand Dollars ($1,500,000). Base salary shall be payable in accordance with the Company's customary payroll practices for executives, as in effect from time to time. The Board shall conduct an annual review of the base salary and may increase such base salary in its discretion. Once increased, base salary shall not thereafter be decreased, except pursuant to across-the-board salary reductions similarly affecting other Company executives and then only to the extent such reductions do not cause the base salary to fall below One Million Three Hundred Thousand Dollars ($1,300,000). The term "Base Salary" shall refer to the annual base salary as in effect from time to time. For purposes of this Agreement, "similarly situated executives" shall mean the Company's senior executive officers.

(b) Annual Incentive Compensation. During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such discretionary annual (or such shorter period) incentive compensation plans as may be authorized from time to time by the Board; which plans shall provide an opportunity to earn an annual incentive, at target (the "Target Performance Payment"), of not less than 125% of the Base Salary as in effect at the beginning of such annual period.

(c) Long-Term Incentive Compensation. During the Term, the Executive shall be eligible, commencing in 2009, to participate at a level comparable to similarly situated executives of the Company, but reflective of Executive's position, in such long-term compensation arrangements as may be authorized from time to time by the Board; which long term compensation arrangements shall provide for grants at an annual rate of not less than 445% of the Base Salary as in effect at the beginning of such annual period. One-half of the value of such annual grants shall be made in the form of stock options or stock appreciation rights and one-half of the value in the form of restricted stock or restricted stock units, and the exercise or vesting of one-half of the

Page 2 of 18

value of such annual grants shall be based on time, and the exercise or vesting of one-half of the value of such annual grants shall be based on performance.

(d)     Expenses. The Company shall promptly reimburse the Executive for all reasonable business expenses incurred during the Term by the Executive in performing his or her duties hereunder provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company. The Company shall pay the Executive's reasonable attorneys' fees and expenses incurred in connection with the preparation and negotiation of this Agreement (upon the Company's receipt of documentation therefore).

(e)     Other Benefits. During the Term, the Executive shall be entitled to participate in all of the employee benefit plans and arrangements made available by the Company to its similarly situated executives, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements. Without limiting the generality of the foregoing and notwithstanding anything in Section 9, below, to the contrary, during the Term and thereafter the Executive shall be entitled to participate in (1) the Company's frozen defined benefit Supplemental Executive Retirement Program (the "DB SERP") in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof and (2) the Company's defined contribution Supplemental Executive Retirement Program (the "DC SERP") in accordance with its terms as in effect from time to time.

(f)     Emergence Awards. On or promptly after the Effective Date, the Company will pay Executive a lump sum cash emergence performance payment of $5.3 million and award to Executive long-term incentive compensation opportunities with a value of $10 million. Such long-term incentive opportunities shall be made in restricted stock or restricted stock units, with a value of $5 million (based on the Plan Equity Value (as defined in the Plan of Reorganization)) and in stock options with an exercise price equal to the Plan Equity Value per share and a total value of $5 million (based on an assumed value of one option equivalent to 0.40 shares of common stock at Plan Equity Value per share). The vesting, valuation and other terms of such awards shall be on the same basis as the emergence awards made to similarly situated executives. Such awards shall be subject to approval by the Board of Directors (or the Compensation Committee thereof) of the Debtor in Possession and subject to the provisions of the Plan of Reorganization.

6.  Offices. The Executive agrees to serve without additional compensation, if elected or appointed thereto, as a director of the Company or any parent or subsidiaries of the Company, as a member of any committees of the board of directors of any such entity, and in one or more executive positions of any of the Company's subsidiaries, provided that the Executive is indemnified for serving in any and all such capacities on a basis no less favorable than is currently provided to any other director of the Company or any of its subsidiaries, or any such executive position, as the case may be.

7. <u>Termination</u>. The Executive's employment hereunder may be terminated as follows:

(a) <u>Death</u>. The Executive's employment hereunder shall terminate upon his death.

(b) <u>Cause</u>. The Company may terminate the Executive's employment hereunder for Cause. The occurrence of any of the following, as reasonably determined by the Company, shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period:

(i) willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination;

(ii) the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or <u>nolo contendere</u> plea);

(iii) the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or

(iv) any material breach by the Executive of this Agreement.

(c) <u>Good Reason</u>. The Executive may terminate his employment hereunder for "Good Reason" upon the occurrence, without the written consent of the Executive, of an event constituting a material breach of this Agreement (including a failure of a successor to assume this Agreement in accordance with Section 13 hereof) by the Company that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason, including but not limited to:

(1) a material demotion or diminution in the Executive's title, responsibility or authority, or the assignment to the Executive of any duties materially inconsistent with the Executive's position (including titles and relationships), authority, duties or responsibilities, in each case as contemplated by Section 3 hereof, or any other action by the Company which results in substantial adverse alteration

Page 4 of 18

in such position, authority, duties, or responsibilities, or the failure to elect or to re-elect the Executive to the Board, or the removal of the Executive from the Board; provided, however, that the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 7(c)(1);

(2) a material reduction by the Company in the Executive's Base Salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company described in Section 5(a);

(3) a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions based upon market rates as reasonably determined by the Board which reductions affect all similarly situated executives of the Company;

(4) the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment set forth in Section 4 hereof or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations or (ii) the relocation of the Company's World Headquarters as described in Section 4 hereof; or

(5) the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due.

The foregoing to the contrary notwithstanding, Executive acknowledges that certain actions may be taken to reconfigure, discontinue or reduce the size of the Delphi Strategy Board (or any similar or successor designation of Company senior executive officers) after the Effective Date and that such actions shall not, in the absence of additional circumstances described in clause (1), constitute Good Reason.

(d)     Without Cause by the Company; Without Good Reason by the Executive. The Company may terminate the Executive's employment hereunder at

any time without Cause in accordance with Section 8. The Executive may terminate the Executive's employment voluntarily for any reason or no reason at any time in accordance with Section 8.

8. Termination Procedure.

(a) Notice of Termination. Any termination of the Executive's employment by the Company or by the Executive (other than termination pursuant to Section 7(a)) shall be communicated by a written notice ("Notice of Termination") to the other party hereto in accordance with Section 14.

(b) Date of Termination. The "Date of Termination" shall mean (i) if the Executive's employment is terminated by the Executive's death, the date of his death, (ii) if the Executive's employment is terminated by the Company for Cause, the date specified in the Notice of Termination and (iii) if the Executive's employment is terminated under any circumstances other than those described in clause (i) or (ii) immediately preceding, the date specified in the Notice of Termination (which shall not be less than sixty (60) days, nor more than ninety (90) days, respectively, from the date such Notice of Termination is given.

(c) Resignation from Board. Upon termination of his employment with the Company under any circumstances, the Executive shall resign from the Board.

9. Compensation upon Termination

(a) Death. If the Executive's employment is terminated by reason of the Executive's death, the Company shall have no further obligations to the Executive under this Agreement and the Executive's benefits shall be determined under the Company's retirement, insurance and other benefit and compensation plans or programs then in effect in accordance with the terms of such plans and programs.

(b) By Company without Cause or by the Executive for Good Reason. If during the Employment Period the Executive's employment is terminated by the Company other than for Cause or by the Executive for Good Reason, the Company shall:

(i) continue to pay and otherwise provide to the Executive, during any notice period (in accordance with Section 8), all compensation, base salary and previously earned but unpaid incentive compensation (e.g., pro-rata) if any, and shall continue to allow the Executive to participate in any benefit plans in accordance with the terms of such plans;

(ii) pay to the Executive any accrued unused vacation pay;

Page 6 of 18

(iii) pay to the Executive, in lieu of benefits under any severance plan or policy of the Company, an amount equal to 1.5 multiplied by the sum of (A) the Executive's highest Base Salary in effect during the one (1) year period ending as of the Date of Termination plus (B) the Executive's annual Target Performance Payment as required to be in effect pursuant to Section 5(b) for the year in which the Date of Termination occurs (determined without regard to any reduction in Base Salary which occurred during the one (1) year period ending as of the Date of Termination and annualized in the event the performance payment plan in which the Executive then participates is based on a period less than one (1) year). Such amount shall be paid in a lump sum within seven (7) business days of the Date of Termination;

(iv) pay to the Executive a lump sum amount, in cash, equal to the excess, if any, of the Executive's total account balance in the DC Pension Plan (as defined below) over the portion of the Executive's account balance in the DC Pension Plan that is vested as of the Date of Termination. For purposes of this section, "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits; and

(v) (i) accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-based equity or equity-based awards held by the Executive as of the Date of Termination and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of the Date of Termination to remain exercisable for a period of one year following the Date of Termination (but in no event beyond the remainder of its term), and (ii) any unvested performance-based equity or equity-based awards held by Executive as of the Date of Termination (and scheduled for performance measurement within the same performance year in which the Date of Termination occurs) shall remain outstanding and shall become vested and restrictions shall lapse pursuant to the terms and conditions thereof as if Executive's employment continued through the end of the performance year in which the Date of Termination occurs. Each vested performance-based stock option and stock appreciation right held by Executive as of the Date of Termination shall remain exercisable for a period of one year following the Date of Termination and each performance-based stock option and stock appreciation right that becomes vested under clause (ii) above shall remain exercisable for a period from the date such option or stock appreciation right vests until the later of (x) thirty (30) days following notice to the Executive of such vesting, or (y) one (1) year following the Date of Termination (but, in each case, in no event beyond the remainder of its term).

All amounts payable under this Section 9(b) shall be paid (in the case of subsections (ii) and (iv)) or commence to be paid (in the case of subsections (i) and (iii)),

as applicable, as soon as practicable following the Executive's termination of
employment; provided that if the period during which the Executive is legally entitled to
consider the terms of the release required under Section 11 hereof expires in the calendar
year following the calendar year in which such termination of employment occurs
(whether or not the Executive waives some or all of such period), then the amounts
payable under this Section 9(b) shall be paid or commence to be paid on the later of
January 2 of such later year or the date on which such amounts would otherwise have
been paid under this agreement without regard to this sentence. Notwithstanding the
foregoing, payment of all amounts payable under this Section 9(b) shall be delayed, if
necessary, until the Executive has incurred a separation from service under Section 409A
of the Internal Revenue Code of 1986, as amended (the "Code").

          (c)     By Company for Cause or by the Executive other than for
Good Reason. If the Executive's employment shall be terminated by the Company for
Cause or by the Executive other than for Good Reason, the Company shall pay the
Executive his Base Salary (at the rate in effect at the time Notice of Termination is given)
through the Date of Termination, and the Company shall have no additional obligations
to the Executive under this Agreement except as set forth in Section 9(d).

          (d)     Compensation Upon any Termination. Following any
termination of the Executive's employment, the Company shall pay the Executive all
amounts, if any, to which the Executive is entitled as of the Date of Termination under
any compensation plan or benefit plan or program of the Company, at the time such
payments are due in accordance with the terms of such plans or programs.

          (e)     Return of Company Property. The Executive agrees that
following the termination of the Executive's employment for any reason, or at any time
prior to the Executive's termination upon the request of the Company, he or she shall
return all property of the Company, its parent, subsidiaries, affiliates and any divisions
thereof, which is then in or thereafter comes into his possession, including, but not
limited to, any Confidential Information (as defined below) or Intellectual Property (as
defined below), or any other documents, contracts, agreements, plans, photographs,
projections, books, notes, records, electronically stored data and all copies, excerpts or
summaries of the foregoing, as well as any automobile or other materials or equipment
supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to
the Executive, if any.

          (f)     Forfeiture of Benefits; Requirement for a Release.
Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits,
other than as required by Section 9(d), shall (1) cease as of the date the Executive
breaches any of the provisions of Section 12, and (2) be conditioned on the Executive
signing a general release of claims in favor of the Company and its affiliates, which is
satisfactory to the Company, and the expiration of any revocation period provided for in
such release; provided that such release shall not require Executive to release any rights
under Section 9(b) of this Agreement or any of the plans, programs and arrangements
referred to herein or in which Executive participates, including but not limited to, rights

05-44481-rdd   Doc 11608-4   Filed 12/28/07   Entered 12/28/07 23:49:08   Attachment
D   Pg 13 of 44

to indemnification or advancement of expenses. In addition, in the event the Executive breaches any of the provisions of Section 12 herein, the Executive shall repay the Company any amounts previously paid to the Executive under Section 9(b)(iii) and (iv) as of the date the Executive breaches any of the provisions of Section 12 (reduced by an amount equal to the total such payments divided by eighteen (18), which the Executive acknowledges is adequate consideration for the general release provided pursuant to the immediately preceding sentence) multiplied by a fraction, the numerator being the number of days remaining in the Restriction Period (as defined in Section 12(c)(ii)) from the date of breach and the denominator being the number of days in the Restriction Period. Such repayment shall be made within ten (10) days of notice from the Company.

10. Disability. If the Executive becomes "disabled" (within the meaning of the applicable disability plan, program or arrangement of the Company, as in effect from time to time), the Executive shall be entitled to such benefits as may be provided under such plan, policy or arrangement, but shall not be entitled to any payments under Section 9(b) hereof (unless the Executive returns to active employment and becomes entitled to such payments as a result of a subsequent termination of the Executive's active employment).

11. Mitigation. The Executive shall not be required to mitigate the amount of any payment provided for the Executive hereunder by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for the Executive hereunder be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

12. Confidentiality; Intellectual Property; Non-Competition Requirement; etc. In recognition of the compensation to be paid to the Executive pursuant to Sections 5 and 9 of this Agreement, the Executive agrees to be bound by the provisions of this Section 12 (the "Restrictive Covenants"). The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

      (a)    Confidentiality.

      (i)    The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including, but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its

Page 9 of 18

customers; the products and services provided or offered by the Company to
customers or potential customers and the manner in which such services are
performed or to be performed; the product and/or service needs of actual or
prospective customers; pricing and cost information; information concerning the
development, engineering, design, specifications, acquisition or disposition of
products and/or services of the Company; unique and/or proprietary computer
equipment, programs, software and source codes, licensing information, personnel
information, vendor information, marketing plans and techniques, forecasts, and
other trade secrets ("Confidential Information"); (B) the direct and indirect
disclosure of any such Confidential Information would place the Company at a
competitive disadvantage and would do damage, monetary or otherwise, to the
Company's business; and (C) the engaging by the Executive in any of the
activities prohibited by this Section 12(a) may constitute misappropriation and/or
improper use of trade secrets in violation of the Michigan Uniform Trade Secrets
Act, as well as a violation of this Agreement.

(ii)     During the Employment Period and at all times
thereafter, the Executive shall not, directly or indirectly, whether individually, as
a director, stockholder, owner, partner, employee, consultant, principal or agent of
any business, or in any other capacity, publish or make known, disclose, furnish,
reproduce, make available, or utilize any of the Confidential Information without
the prior express written approval of an officer of the Company, other than in the
proper performance of the duties contemplated herein, unless and until such
Confidential Information is or shall become general public knowledge through no
fault of the Executive.

(iii)     In the event that the Executive is required by law to
disclose any Confidential Information, the Executive agrees to give the Company
prompt advance written notice thereof and to provide the Company with
reasonable assistance in obtaining an order to protect the Confidential Information
from public disclosure.

(iv)     The failure to mark any Confidential Information as
confidential shall not affect its status as Confidential Information under this
Agreement.

(b)     Intellectual Property.

(i)     The Executive hereby assigns to the Company or its
designees, without further consideration and free and clear of any lien or
encumbrance, the Executive's entire right, title and interest (within the United
States and all foreign jurisdictions), to any and all inventions, discoveries,
improvements, developments, works of authorship, concepts, ideas, plans,
specifications, software, formulas, databases, designees, processes and
contributions to Confidential Information created, conceived, developed or
reduced to practice by the Executive (alone or with others) during the

Page 10 of 18

Employment Period which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product"). Any Work Product which falls within the definition of "work made for hire", as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company. The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product. For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

(ii)     The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product. If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product. Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being coupled with an interest.

(c)     Non-Competition.

(i)     The Executive acknowledges and agrees that: (A) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (B) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(ii)     During the Employment Period and for a period of eighteen (18) months (the "Restriction Period") following the termination of the

Page 11 of 18

Executive's employment for any reason, and provided that the Company has made or is making the payments, if any, required under Section 9(b), subject to Section 9(f), the Executive shall not engage in Competition (as defined below) with the Company.

(iii)     For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; provided, however, it shall not be a violation of this Section 12(c) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other material business which the Company engages in, or has taken steps (as evidenced by the amounts expended or investment by the Company or actions by the Board of Directors) to become engaged in, at the time of the Executive's termination.

(d)     Non-Solicitation; Non-Interference.  During the Employment Period and for a period of eighteen (18) months following the termination of the Executive's employment for any reason the Executive agrees that he or she will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)     solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(ii)     solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

(iii)     solicit the employment or services of, or hire or engage, any person who was known by Executive to be employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(iv)    otherwise interfere with the business or accounts of
the Company, including, but not limited to, with respect to any relationship or
agreement between the Company and any vendor or supplier.

(e)    Injunctive Relief; Indemnity of Company. The Executive
agrees that any breach or threatened breach of subsections (a), (b), (c) or (d) of this
Section 12 would result in irreparable injury and damage to the Company for which an
award of money to the Company would not be an adequate remedy. The Executive
therefore also agrees that in the event of said breach or any reasonable threat of breach,
the Company shall be entitled to seek an immediate injunction and restraining order to
prevent such breach and/or threatened breach and/or continued breach by the Executive
and/or any and all persons and/or entities acting for and/or with the Executive. The terms
of this paragraph shall not prevent the Company from pursuing any other available
remedies for any breach or threatened breach hereof, including, but not limited to,
remedies available under this Agreement and the recovery of damages. The Executive
and the Company further agree that the provisions of this Section 12 are reasonable.

(f)    Definition of Company: For purposes of this Section 12,
the "Company," as used above, shall be construed to include the Company and its parent,
subsidiaries and affiliates, including, without limitation, any divisions managed or
supervised by the Executive.

(g)    Survival: The provisions of this Section 12 survive the
termination of Executive's employment with the Company, regardless of the reason for
such termination, for the duration expressly stated in any such provision or, if no duration
is stated, then indefinitely.

13. Assignment; Successors. This Agreement and all rights hereunder are
personal to the Executive and may not, unless otherwise specifically permitted herein, be
assigned by the Executive. If the Executive should die while any amounts would still be
payable to the Executive hereunder if the Executive had continued to live, all such
amounts unless otherwise provided herein, shall be paid in accordance with the terms of
this Agreement to the Executive's devisee, legatee, or other designee or, if there be no
such designee, to the Executive's estate. The Company will require any and all
successors (whether direct or indirect, by purchase, merger, consolidation or otherwise)
to all or substantially all of the business and/or assets of the Company to expressly
assume and agree to perform this Agreement in the same manner and to the same extent
that the Company would be required to perform it if no such succession had taken place.
As used in this Agreement, "Company" shall mean the Company as herein before defined
and any successor to its business and/or assets as aforesaid which executes and delivers
the agreement provided for in this Section 13 or which otherwise becomes bound by all
the terms and provisions of this Agreement by operation of law.

14. Notice. For the purposes of this Agreement, notices, demands and all
other communications provided for in this Agreement shall be in writing and shall be
deemed to have been duly given when delivered or (unless otherwise specified) mailed

Page 13 of 18

by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive, at the Executive's most recent address shown in the records of the Company; and

If to the Company:

Delphi Corporation
5725 Delphi Drive
Troy Michigan 48098
Attention: General Counsel

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

15. Miscellaneous. No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the Executive and such officer of the Company as may be specifically designated by its Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement. This Agreement is not intended and shall not be construed to confer any rights or remedies upon any other person or entity, other than the parties hereto.

16. No Duplication of Benefits. Nothing in this Agreement shall be construed in a manner that would result in a duplication of benefits to the Executive.

17. Taxes.

(a)    Any amounts payable pursuant to this Agreement shall be subject to applicable withholdings.

(b)    Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Corporation (within the meaning of Code Section 409A) or (ii) the Executive's date of death. During the six month waiting period, such amounts payable will accumulate without interest and be paid as soon as possible.

18.    Arbitration. In the event of any controversy, dispute or claim arising out of or related to this Agreement or Executive's employment by the Company,

Page 14 of 18

the parties shall negotiate in good faith in an attempt to reach a mutually acceptable settlement of such dispute. If negotiations in good faith do not result in a settlement of any such controversy, dispute or claim, it shall, except as otherwise provided for herein be finally settled by expedited arbitration conducted by a single arbitrator selected as hereinafter provided (the "Arbitrator") in accordance with the National Rules of the American Arbitration Association ("National Rules"), subject to the following (the parties hereby agreeing that, notwithstanding the provisions of Rule 1 of the National Rules, in the event that there is a conflict between the provisions of the National Rules and the provisions of this Agreement, the provisions of this Agreement shall control):

(a)     The Arbitrator shall be determined from a list of names of five impartial arbitrators each of whom shall be an attorney experienced in arbitration matters concerning executive employment disputes, supplied by the AAA chosen by Executive and the Company each in turn striking a name from the list until one name remains (with the Company being the first to strike a name).

(b)     Each party in the arbitration shall bear one-half of the fees and expenses of the Arbitrator and each party shall bear its own legal fees and expenses incurred in connection with such arbitration.

(c)     The Arbitrator shall determine whether and to what extent any party shall be entitled to damages under this Agreement; provided that no party shall be entitled to punitive or consequential damages (including, in the case of the Company, any claim for alleged lost profits or other damages that would have been avoided had Executive remained an employee), and each party waives all such rights, if any.

(d)     The Arbitrator shall not have the power to add to nor modify any of the terms or conditions of this Agreement. The Arbitrator's decision shall not go beyond what is necessary for the interpretation and application of the provision(s) of this Agreement in respect of the issue before the Arbitrator. The Arbitrator shall not substitute his or her judgment for that of the parties in the exercise of rights granted or retained by this Agreement. The Arbitrator's award or other permitted remedy, if any, and the decision shall be based upon the issue as drafted and submitted by the respective parties and the relevant and competent evidence adduced at the hearing.

(e)     The Arbitrator shall have the authority to award any remedy or relief (including provisional remedies and relief) that a court of competent jurisdiction could order or grant. The Arbitrator's written decision shall be rendered within sixty days of the closing of the hearing. The decision reached by the Arbitrator shall be final and binding upon the parties as to the matter in dispute. To the extent that the relief or remedy granted by the Arbitrator is relief or remedy on which a court could enter judgment, a judgment upon the award rendered by the Arbitrator shall be entered in any court having jurisdiction thereof (unless in the case of an award of damages, the full amount of the award is paid within 10 days of its determination by the Arbitrator). Otherwise, the award shall be binding on the parties in connection with their continuing

Page 15 of 18

performances of this Agreement and, in any subsequent arbitral or judicial proceedings
between the parties.

(f)    The arbitration shall take place in Detroit, Michigan.

(g)    The arbitration and all filing, testimony, documents and
information relating to or presented during the arbitration proceeding shall be disclosed
exclusively for the purpose of facilitating the arbitration process and in any court
proceeding relating to the arbitration, and for no other purpose, and shall be deemed to be
information subject to the confidentiality provisions of this Agreement.

(h)    The parties shall continue performing their respective
obligations under this Agreement notwithstanding the existence of a dispute while the
dispute is being resolved unless and until such obligations are terminated or expire in
accordance with the provisions hereof.

(i)    The parties may obtain a pre-hearing exchange of
information including depositions, interrogatories, production of documents, exchange of
summaries of testimony or exchange of statements of position, and the Arbitrator shall
limit such disclosure to avoid unnecessary burden to the parties and shall schedule
promptly all discovery and other procedural steps and otherwise assume case
management initiative and control to effect an efficient and expeditious resolution of the
dispute. At any oral hearing of evidence in connection with an arbitration proceeding,
each party and its counsel shall have the right to examine its witness and to cross-
examine the witnesses of the other party. No testimony of any witness, or any evidence,
shall be introduced by affidavit, except as the parties otherwise agree in writing.

19.    Directors and Officers Liability Coverage; Indemnification.
Executive shall be entitled to coverage under such directors and officers liability
insurance policies maintained from time to time by the Company or any subsidiary, or
any indemnification agreements entered into by the Company or any subsidiary with its
directors or similarly situated executives, for the benefit of its directors and officers. The
Company shall indemnify and hold Executive harmless, to the fullest extent permitted by
the laws of the State of Delaware, from and against all costs, charges and expenses
(including reasonable attorneys' fees), and shall provide for the advancement of
reasonable attorneys' fees and expenses incurred or sustained in connection with any
action, suit or proceeding to which the Executive or his legal representatives may be
made a party by reason of the Executive's being or having been a director, officer or
employee of the Company, any subsidiary, or any of their respective affiliates or
employee benefit plans. Executive's request for advancement of reasonable attorneys'
fees and expenses pursuant to the preceding sentence shall be subject to the Company's
receipt of documentation therefor that is reasonably acceptable to the Board and include
an undertaking by Executive to repay the amount of such advance if it shall ultimately be
determined that Executive is not entitled to be indemnified against such fees and
expenses. The provisions of this Section 19 shall not be deemed exclusive of any other
rights to which the Executive seeking indemnification may have under any by-law,

agreement, vote of stockholders or directors, or otherwise. The provisions of this Section 19 shall survive the termination of Executive's employment or service as a director for any reason.

20. Validity; Severability. In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby. Moreover, without limiting the generality of the foregoing, if any one or more of the provisions contained in this agreement shall be held to be unreasonable or unenforceable in any respect, including excessively broad as to duration, scope, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.

21. Governing Law; Consent to Jurisdiction. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles. The parties hereby irrevocably consent and submit to the jurisdiction of the federal and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

22. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

23. Entire Agreement. This Agreement sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes all prior agreements, promises, understandings, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto; and any prior agreement of the parties hereto in respect of the subject matter contained herein is hereby terminated and cancelled including but not limited to the Employment Agreement entered into between the Company and the Executive dated as of October 5, 2005, as amended; provided, however, that this Agreement shall not supersede the Change in Control Agreement entered into with the Company on [   ], 2007; and provided further that if the Executive becomes entitled to payments and benefits under the Change in Control Agreement as a result of his termination of employment, he shall not be entitled to receive any payments or benefits under Section 9(b) of this Agreement. Except as noted above, the compensation and benefits payable to the Executive under Section 9 of this Agreement shall be in lieu of any other severance benefits to which the Executive may otherwise be entitled upon the Executive's termination of employment under any severance plan, program, policy or arrangement of the Company or any of its subsidiaries or affiliates.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date below.

Delphi Corporation

By:_____
    Name:
    Title:

Date:_____

_____
Rodney O'Neal

Exhibit 7.8

Supplement To Management Compensation Plan

Schedule 2

All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (as subsequently modified or amended, the "Plan"), including, without limitation, Article 14.3, under which the Debtors have reserved the right to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.

## CHANGE IN CONTROL AGREEMENT

THIS AGREEMENT, dated February ____, 2008, is made by and between Delphi Corporation, a Delaware corporation (the "Company"), and Rodney O'Neal (the "Executive").

WHEREAS, the Company considers it to be in the best interests of its stockholders to continue the employment of the Executive; and

WHEREAS, the Board recognizes that the possibility of a Change in Control exists and that such possibility, and the uncertainty and questions which it may raise among the Company's senior executives, may result in the departure or distraction of management personnel to the detriment of the Company and its stockholders; and

WHEREAS, the Board has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of the Company's senior executives, including the Executive, to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a Change in Control;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Company and the Executive hereby agree as follows:

1. <u>Defined Terms</u>.  The definitions of capitalized terms used in this Agreement are provided in the last Section hereof to the extent not otherwise defined herein.

2. <u>Term of Agreement</u>.  The Term of this Agreement shall commence on the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code and shall continue in effect through December 31, 2009; provided, however, that commencing on January 1, 2009 and each January 1 thereafter, the Term shall automatically be extended for one additional year unless, not later than September 30 of the preceding year, the Company or the Executive shall have given notice not to extend the Term; and <u>further</u> <u>provided,</u> <u>however,</u> that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than twenty-four (24) months beyond the month in which such Change in Control occurred.

3. <u>Compensation Other Than Severance Payments</u>

3.1    Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits

payable to the Executive under the terms of any compensation or benefit plan, program or arrangement maintained by the Company during such period (other than any disability plan), until the Executive's employment is terminated by the Company for Disability.

3.2    If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason.

3.3    If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due. Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason. Without limiting the generality of the foregoing and notwithstanding anything in Section 4, below, to the contrary, during the Term and upon the Executive's termination of employment for any reason following a Change in Control and during the Term, the Executive shall be entitled to participate in the DB SERP in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof.

4.    Severance Payments Upon Termination of Employment Following a Change in Control.

4.1    Subject to Section 4.2 hereof, if the Executive's employment is terminated during the Term following a Change in Control, other than (a) by the Company for Cause, (b) by reason of death or Disability, or (c) by the Executive without Good Reason, then, the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 4.1 ("Severance Payments") and Section 4.2, in addition to any payments and benefits to which the Executive is entitled under Section 3 hereof. For all purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control and such termination was at the request or direction of a Person who has entered into an agreement with the Company the

consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (provided, however, that such Change in Control referred to in clause (i), (ii) or (iii), as applicable, actually occurs). Notwithstanding the foregoing, payment of all amounts payable under this Section 4.1 shall be delayed, if necessary, until the Executive has incurred a separation from service under Code Section 409A.

(A)    In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive, the Company shall pay to the Executive a lump sum severance payment, in cash, equal to three (3) times the sum of (i) the Executive's base salary as in effect immediately prior to the Date of Termination or, if higher, in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason or at any time during the one (1) year period ending as of the Date of Termination, and (ii) the Executive's target annual incentive compensation under any incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination or, if higher, the fiscal year in which occurs the first event or circumstance constituting Good Reason (in each case determined without regard to any reduction in base salary which occurred during the one (1) year period ending as of the Date of Termination). Notwithstanding anything to the contrary, if the Change in Control event does not constitute a change in ownership or effective control of the Company or a change in ownership of a substantial portion of the assets of the Company under Code Section 409A, then an amount equal to the amount that would have been paid under the Executive's Employment Agreement upon a termination other than for cause (as defined in the Employment Agreement) or by the Executive for good reason (as defined in the Employment Agreement) had a Change in Control not occurred, shall be paid in installments for an eighteen (18) month period commencing on the first day of the month next following the Date of Termination and the remaining amounts payable under this clause (A) shall be paid in lump sum.

(B)    For the thirty-six (36) month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents life, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater after-tax cost to the Executive than the after-tax cost to the Executive immediately prior to such date or occurrence. Benefits otherwise receivable by the Executive pursuant to this Section 4.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive during the thirty-six (36) month period following the Executive's termination of employment (and any such

benefits received by or made available to the Executive shall be reported to the
Company by the Executive); provided, however, that the Company shall reimburse
the Executive for the excess, if any, of the after-tax cost of such benefits to the
Executive over such cost immediately prior to the Date of Termination or, if more
favorable to the Executive, the first occurrence of an event or circumstance
constituting Good Reason. If the Severance Payments shall be decreased pursuant to
Section 4.2 hereof, and the Section 4.1(B) benefits which remain payable after the
application of Section 4.2 hereof are thereafter reduced pursuant to the immediately
preceding sentence, the Company shall, no later than five (5) business days
following such reduction, pay to the Executive the least of (i) the amount of the
decrease made in the Severance Payments pursuant to Section 4.2 hereof, (ii) the
amount of the subsequent reduction in these Section 4.1(B) benefits, or (iii) the
maximum amount which can be paid to the Executive without being, or causing any
other payment to be, nondeductible by reason of section 280G of the Code.

(C)    Notwithstanding any provision of any annual or long
term cash incentive plan to the contrary, the Company shall pay to the Executive a
lump sum amount, in cash, equal to the sum of (i) any unpaid incentive
compensation which has been allocated or awarded to the Executive for a completed
fiscal year or other measuring period preceding the Date of Termination under any
such plan and which, as of the Date of Termination, is contingent only upon the
continued employment of the Executive to a subsequent date and (ii) a pro rata
portion to the Date of Termination of the aggregate value of all contingent, cash
incentive compensation awards to the Executive for all then uncompleted periods
under any such plan, calculated as to each such award by multiplying the award that
the Executive would have earned on the last day of the performance award period,
assuming the achievement, at the target level, of the individual and corporate
performance goals established with respect to such award, by the fraction obtained
by dividing the number of full months and any fractional portion of a month during
such performance award period through the Date of Termination by the total number
of months contained in such performance award period.

(D)    In addition to the benefits to which the Executive is
entitled under each DC Pension Plan, the Company shall pay the Executive a lump
sum amount, in cash, equal to the amount that would have been contributed thereto
or allocated thereunder by the Company on the Executive's behalf in respect of the
three (3) years immediately following the Date of Termination, determined (i) as if
the Executive made the maximum permissible contributions thereto during such
period, (ii) as if the Executive earned compensation during such period at a rate
equal to the Executive's compensation (as defined in the DC Pension Plan) during
the twelve (12) months immediately preceding the Date of Termination or, if higher,
during the twelve (12) months immediately prior to the first occurrence of an event
or circumstance constituting Good Reason determined, in each case, without regard
to any reduction in base salary during such twelve (12) month period, and (iii)
without regard to any amendment to the DC Pension Plan made subsequent to a
Change in Control, which amendment adversely affects in any manner the
computation of benefits thereunder.

(E)     The Company shall provide the Executive with reasonable outplacement services suitable to the Executive's position for a period of one year or, if earlier, until the first acceptance by the Executive of an offer of employment.

4.2     (A)     Whether or not the Executive becomes entitled to the Severance Payments, if any payment or benefit received or to be received by the Executive (including any payment or benefit received or to be received in connection with a Change in Control or the termination of the Executive's employment, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject (in whole or part) to the Excise Tax, then, subject to the provisions of subsection (B) of this Section 4.2, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and Excise Tax upon the Gross-Up Payment, and after taking into account the phase out of itemized deductions and personal exemptions attributable to the Gross-Up Payment, shall be equal to the Total Payments. For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of this Section 4.2), net of the maximum reduction in federal income tax which could be obtained from deduction of such state and local taxes.

(B)     In the event that, after giving effect to any redeterminations described in subsection (D) of this Section 4.2, the aggregate Total Payments do not equal or exceed 110% of the Safe Harbor Amount (as defined below), then subsection (A) of this Section 4.2 shall not apply and the cash Severance Payments shall first be reduced (if necessary, to zero), and the noncash Severance Benefits shall thereafter be reduced (if necessary, to zero) to the extent necessary so that no portion of the Total Payments is subject to the Excise Tax; provided, however, that the Executive may elect to have the noncash Severance Payments reduced (or eliminated) prior to any reduction of the cash Severance Payments. "Safe Harbor Amount" means the greatest pre-tax amount of Total Payments that could be paid to the Executive without causing the Executive to become liable for any Excise Tax in connection therewith.

(C)     For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" within the meaning of section 280G(b)(2) of the Code, unless in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such other payments or benefits (in whole or in

part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered, within the meaning of section 280G(b)(4)(B) of the Code, in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code. Prior to the payment date set forth in Section 4.3 hereof, the Company shall provide the Executive with its calculation of the amounts referred to in this Section 4.2(C) and such supporting materials as are reasonably necessary for the Executive to evaluate the Company's calculations. If the Executive disputes the Company's calculations (in whole or in part), the reasonable opinion of Tax Counsel with respect to the matter in dispute shall prevail.

(D)     In the event that (i) amounts are paid to the Executive pursuant to subsection (A) of this Section 4.2, (ii) the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, and (iii) after giving effect to such redetermination, the Severance Payments are to be reduced pursuant to subsection (B) of this Section 4.2, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in (i) no portion of the Total Payments being subject to the Excise Tax and (ii) a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes) plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code. In the event that (x) the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the termination of the Executive's employment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment) and (y) after giving effect to such redetermination, the Severance Payments should not have been reduced pursuant to subsection (B) of this Section 4.2, the Company shall make an additional Gross-Up Payment in respect of such excess and in respect of any portion of the Excise Tax with respect to which the Company had not previously made a Gross-Up Payment (plus any interest, penalties or additions payable by the Executive with respect to such excess and such portion) within five (5) business days following the time that the amount of such excess is finally determined.

4.3     The payments provided in subsections (A), (C) and (D) of Section 4.1 hereof and in Section 4.2 hereof shall be made not later than the fifth business day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of Section 4.2 hereof); provided, however, that in no event shall payments

be made later than the end of the Executive's taxable year following the taxable year in which the Executive remits the related Excise Tax; provided, further, that if the amounts of such payments, and the limitation on such payments set forth in Section 4.2 hereof, cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Executive (or, in the case of payments under Section 4.2 hereof, in accordance with Section 4.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder (or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination. At the time that payments are made under this Agreement, the Company shall provide the Executive with a written statement setting forth the manner in which such payments were calculated and the basis for such calculations including, without limitation, any opinions or other advice the Company has received from Tax Counsel, the Auditor or other advisors or consultants (and any such opinions or advice which are in writing shall be attached to the statement).

4.4     The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement, or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder. Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require; provided, however, that in no event shall payments be made later than the last day of the Executive's taxable year following the taxable year in which the fee or expense was incurred. Notwithstanding the foregoing, in the event that the Executive does not prevail on at least one material issue in the relevant dispute or other proceeding, the Executive shall repay any amount previously paid by the Company pursuant to this Section 4.4 in respect of such dispute or other proceeding within ten (10) days of the final resolution thereof.

4.5     Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Company (within the meaning of Code Section 409A) or (ii) the Executive's date of death. During the six month waiting period, such amounts payable will accumulate with interest (at 120% of the rate provided in Code Section 1274(b)(2)(B)) and be paid as soon as possible.

4.6     Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits, other than as required by Section 3.2 and Section 3.3, shall (1) cease as of the date the Executive breaches any of the provisions of Section

5 and (2) be conditioned on the Executive signing a general release of claims in favor of the Company and its affiliates, which is satisfactory to the Company, and the expiration of any revocation period provided for in such release. In addition, in the event the Executive breaches any of the provisions of Section 5 herein, Executive shall repay the Company an amount equal to the payments made under Section 4.1(A) herein (reduced by an amount equal to the total such payments divided by thirty-six (36), which the Executive acknowledges is adequate consideration for the general release provided pursuant to clause (2) of the immediately preceding sentence) multiplied by a fraction, the numerator being the number of days remaining in the Restriction Period from the date of breach and the denominator being the number of days in the Restriction Period. Such repayment shall be made within ten (10) days of notice from the Company.

4A. Vesting of Equity and Equity-Based Awards. If the Executive is employed by the Company through the date of a Change in Control:

(A) The Company shall accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-vested equity or equity-based awards held by the Executive as of such Change in Control and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of such Change in Control to remain exercisable for a period of one (1) year following such Change in Control (but in no event beyond the remainder of its term).

(B) If such Change in Control constitutes a Sale of the Company in which the Company's investors as of the Effective Date realize a net internal rate of return ("IRR") on their equity investment in the Company (using a cost basis equal to Plan Equity Value per share (as defined in the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code)) of at least 10%, assuming full vesting of all outstanding Company stock and stock options, the Company shall accelerate the vesting and cause the restrictions to lapse on all then-outstanding unvested or restricted performance-vested equity or equity-based awards held by the Executive as of such Sale of the Company and permit each performance-vested stock option to acquire common stock of the Company and each performance-vested stock appreciation right held by the Executive as of such Sale of the Company to remain exercisable for a period of one (1) year following such Sale of the Company (but in no event beyond the remainder of its term). The Board or its compensation committee shall, in its discretion, adjust such IRR threshold at least every three years following the Effective Date, (i) with respect to awards granted after the date of such adjustment, or (ii) to appropriately reflect the effects of any mergers, acquisitions, recapitalizations or other corporate transactions involving the Company.

5. Restrictive Covenants. In recognition of the compensation to be paid to the Executive pursuant to Sections 3, 4 and 4A of this Agreement, and Section 5 of the Employment Agreement, the Executive agrees to be bound by the provisions of this Section 5 (the "Restrictive Covenants"). The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

5.1     Return of Company Property. The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he or she shall return all property of the Company, its parent, subsidiaries, affiliates and any divisions thereof, which is then in or thereafter comes into his or her possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to the Executive, if any.

5.2     Confidentiality.

(A)     The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his or her employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including , but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its customers; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; unique and/or proprietary computer equipment, programs, software and source codes, licensing information, personnel information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("Confidential Information"); (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (C) the engaging by the Executive in any of the activities prohibited by this Section 5.2(A) may constitute misappropriation and/or improper use of trade secrets in violation of the Michigan Uniform Trade Secrets Act, as well as a violation of this Agreement.

(B)     During the Term and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director,

stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of an officer of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(C)     In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(D)     The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

    5.3     Intellectual Property.

(A)     The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions), to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Term which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product"). Any Work Product which falls within the definition of "work made for hire", as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company. The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product. For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

(B)     The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product. If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and

Page 10 of 21

shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product. Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being coupled with an interest.

5.4     Non-Competition.

(A)     The Executive acknowledges and agrees that: (1) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (2) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(B)     During the period of the Executive's employment with the Company and for a period of eighteen (18) months (the "Restriction Period") following the termination of the Executive's employment for any reason, and provided that the Company is making the payments, if any, required under Section 4.1(A), subject to Section 4.6, the Executive shall not engage in Competition (as defined below) with the Company.

(C)     For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; provided, however, it shall not be a violation of this Section 5.4(C) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other material business which the Company engages in, or has taken steps (as evidenced by the amounts expended or investment by the Company or actions by the Board of Directors) to become engaged in, at the time of the Executive's termination.

5.5    Non-Solicitation; Non-Interference. During the period of the Executive's employment with the Company and for a period of eighteen (18) months following the termination of the Executive's employment for any reason the Executive agrees that he will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(A)    solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(B)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

(C)    solicit the employment or services of, or hire or engage, any person who was known by Executive to be employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(D)    otherwise interfere with the business or accounts of the Company, including, but not limited to, with respect to any relationship or agreement between the Company and any vendor or supplier.

5.6    Injunctive Relief; Indemnity of Company. The Executive agrees that any breach or threatened breach of Sections 5.2, 5.3, 5.4 or 5.5 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy. The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive. The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages. The Executive and the Company further agree that the provisions of this Section 5 are reasonable. The Executive agrees to indemnity and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive.

5.7    Definition of Company: For purposes of this Section 5, the "Company," as used above, shall be construed to include the Company and its parent, subsidiaries and affiliates, including, without limitation, any divisions managed or supervised by the Executive.

5.8     Survival:  The provisions of this Section 5 survive the
termination of Executive's employment with the Company, regardless of the reason
for such termination, for the duration expressly stated in any such provision or, if no
duration is stated, then indefinitely.

6.   Termination Procedures and Compensation During Dispute.

6.1     Notice of Termination.  After a Change in Control and during
the Term, any purported termination of the Executive's employment (other than by
reason of death) shall be communicated by written Notice of Termination from one
party hereto to the other party hereto in accordance with Section 9 hereof.  For
purposes of this Agreement, a "Notice of Termination" shall mean a notice which
shall indicate the specific termination provision in this Agreement relied upon and
shall set forth in reasonable detail the facts and circumstances claimed to provide a
basis for termination of the Executive's employment under the provision so
indicated.  A purported termination of the Executive's employment by the Company
for Cause shall not be treated as a termination for Cause hereunder unless, within
thirty (30) days following the Company's delivery of a Notice of Termination for
Cause, the Company provides the Executive with a copy of a resolution duly adopted
by the affirmative vote of not less than a majority of the entire membership of the
Board at a meeting of the Board which was called and held for the purpose of
considering such termination (after reasonable notice to the Executive and a
reasonable opportunity for the Executive, together with the Executive's counsel, to be
heard before the Board) finding that, in the opinion of the Board, the Executive was
guilty of conduct constituting Cause and specifying the particulars thereof in detail.

6.2     Date of Termination.  "Date of Termination," with respect to
any purported termination of the Executive's employment after a Change in Control
and during the Term, shall mean (i) if the Executive's employment is terminated for
Disability, thirty (30) days after Notice of Termination is given (provided that the
Executive shall not have returned to the full-time performance of the Executive's
duties during such thirty (30) day period), and (ii) if the Executive's employment is
terminated for any other reason, the date specified in the Notice of Termination
(which shall not be less than thirty (30) days nor more than sixty (60) days,
respectively, from the date such Notice of Termination is given).

6.3     Compensation During Dispute.  With respect to any
termination of the Executive's employment during the Term and following a Change
in Control, if within fifteen (15) days after any Notice of Termination is given, or, if
later, prior to the Date of Termination, the party receiving such Notice of
Termination notifies the other party that a dispute exists concerning the termination,
the Company shall continue to pay the Executive the full compensation in effect
when the notice giving rise to the dispute was given (including, but not limited to,
salary) and continue the Executive as a participant in all compensation, benefit and
insurance plans in which the Executive was participating when the notice giving rise
to the dispute was given, until the earlier of (i) the date on which the Term ends or
(ii) the date on which the dispute is finally resolved, either by mutual written
agreement of the parties or by a final judgment, order or decree of an arbitrator or a

Page 13 of 21

court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that this Section 6.3 shall be applicable in the event of a notice of dispute given by the Executive only if such notice is given in good faith and the Executive pursues the resolution of such dispute with reasonable diligence. Amounts paid under this Section 6.3 are not in addition to other amounts due under this Agreement and shall be offset against and reduce any amounts otherwise due under Section 4.1 hereof.

7. No Mitigation. The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to Section 3 or 4 hereof. Further, except as specifically provided in Section 4.1(B) hereof, no payment or benefit provided for in this Agreement shall be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

8. Successors; Binding Agreement.

8.1 In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

8.2 This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

9. Notices. For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States registered mail, return receipt requested, postage prepaid, addressed, if to the Executive, to the address inserted below the Executive's signature on the final page hereof and, if to the Company, to the address set forth below, or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon actual receipt:

To the Company:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan  48098

Attention: General Counsel

10. Miscellaneous.  No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer as may be specifically designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or of any lack of compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement supersedes any other agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof which have been made by either party including but not limited to the Change in Control Agreement entered into between the Company and the Executive dated as of February [  ], 2000; provided, however, that this Agreement shall supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company only in the event that the Executive's employment with the Company is terminated on or following a Change in Control, by the Company other than for Cause or by the Executive for Good Reason; and provided, further, that prior to a Change in Control, this Agreement shall not affect or supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company or the termination thereof prior to a Change in Control. All references to sections of the Exchange Act or the Code shall be deemed also to refer to any successor provisions to such sections. Any payments provided for hereunder shall be paid net of any applicable withholding required under federal, state or local law and any additional withholding to which the Executive has agreed. The obligations of the Company and the Executive under this Agreement which by their nature may require either partial or total performance after the expiration of the Term (including, without limitation, those under Sections 4, 5 and 6 hereof) shall survive such expiration.

11. Validity.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

12. Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

13. Settlement of Disputes; Claims.

13.1    All claims by the Executive for benefits under this Agreement shall be directed to and determined by the Board and shall be in writing. Any denial

Page 15 of 21

by the Board of a claim for benefits under this Agreement shall be delivered to the Executive in writing and shall set forth the specific reasons for the denial and the specific provisions of this Agreement relied upon. The Board shall afford a reasonable opportunity to the Executive for a review of the decision denying a claim and shall further allow the Executive to appeal to the Board a decision of the Board within sixty (60) days after notification by the Board that the Executive's claim has been denied.

13.2    The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles. The parties hereby irrevocably consent and submit to the jurisdiction of the federal and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

14. Definitions. For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Auditor" shall have the meaning set forth in Section 4.2 hereof.

(C)    "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)    "Beneficial Owner" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

(E)    "Board" shall mean the Board of Directors of the Company.

(F)    "Cause" for termination by the Company of the Executive's employment shall mean (I) willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination; (II) the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or nolo contendere plea); (III) the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or (IV) any material breach by the Executive of this Agreement. The occurrence of any of the foregoing shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period.

(G)    A "Change in Control" shall be deemed to have occurred if the event set forth in any one of the following paragraphs shall have occurred:

(I)    any Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities beneficially owned by such Person any securities acquired directly from the Company or its Affiliates) representing more than 50% of the combined voting power of the Company's then outstanding securities, excluding any Person who becomes such a Beneficial Owner in connection with a transaction described in clause (i) of paragraph (III) below;

(II)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the date hereof or whose appointment, election or nomination for election was previously so approved or recommended;

(III)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation or other entity, other than (i) a merger or consolidation which results in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation or (ii) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities Beneficially Owned by such Person any securities acquired directly from the Company or its Affiliates) representing 25% or more of the combined voting power of the Company's then outstanding securities; or

(IV)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities

> of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to have occurred by virtue of (i) the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, including, but not limited to, the issuance of the Company's Series A-1 Preferred Stock, Series A-2 Preferred Stock, and Series B Preferred Stock (the "Preferred Stock"), (ii) the consummation of any of the transactions contemplated by [insert appropriate reference to the purchase agreement, Company charter or other documentation setting forth the terms of the preferred stock and other corporate governance provisions] including, but not limited to, the conversion of the Preferred Stock into common stock of the Company and the conversion of Series B Preferred Stock into Series A-1 Preferred Stock or Series A-2 Preferred Stock, or (iii) the consummation of any transaction or series of integrated transactions immediately following which the record holders of the common stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions.

(H)    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(I)    "Company" shall mean Delphi Corporation and, except in determining under Section 14(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(J)    "DB SERP" shall mean the Company's frozen defined benefit Supplemental Executive Retirement Program.

(K)    "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits.

(L)    "Date of Termination" shall have the meaning set forth in Section 6.2 hereof.

(M)    "Disability" shall be deemed the reason for the termination by the Company of the Executive's employment, if, as a result of the Executive's incapacity due to physical or mental illness, the Executive shall have been absent from the full-time performance of the Executive's duties with the Company for a period of six (6) consecutive months, the Company shall have given the Executive a Notice of Termination for Disability, and, within thirty (30) days

Page 18 of 21

after such Notice of Termination is given, the Executive shall not have returned to the full-time performance of the Executive's duties.

(N)     "Employment Agreement" shall mean the employment agreement entered into by and between the Company and the Executive.

(O)     "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(P)     "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code.

(Q)     "Executive" shall mean the individual named in the first paragraph of this Agreement.

(R)     "Good Reason" for termination by the Executive of the Executive's employment shall mean the occurrence after any Change in Control, or prior to a Change in Control under the circumstances described in clauses (ii) and (iii) of the second sentence of Section 4.1 hereof (provided, however, that a Change in Control actually occurs), without the written consent of the Executive, of any of the following events that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason:

(I)     a material demotion or diminution in the Executive's title, responsibility or authority, or the assignment to the Executive of any duties materially inconsistent with the Executive's position (including titles and relationships), authority, duties or responsibilities, in each case as contemplated by Section 3 of the Employment Agreement, or any other action by the Company which results in substantial adverse alteration in such position, authority, duties, or responsibilities, or the failure to elect or to re-elect the Executive to the Board, or the removal of the Executive from the Board; provided, however, that the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 14(R)(I);

(II)     a reduction by the Company in the Executive's base salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company described in the Employment Agreement;

(III)     a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions similarly affecting all executives of the Company described in Section 7(c)(3) of the Employment Agreement;

Page 19 of 21

(IV)      the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment as of immediately prior to such relocation or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations, (ii) the relocation of the Company's World Headquarters as described in Section 4 of the Employment Agreement;

(V)      the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due; or

(VI)      a failure of a successor to assume this Agreement in accordance with Section 8.1 of this Agreement.

Any termination by the Executive of his employment during the 30-day period commencing on the first anniversary of the occurrence of a Change in Control shall be deemed to be for Good Reason for all purposes of this Agreement.

(S)      "Gross-Up Payment" shall have the meaning set forth in Section 4.2 hereof.

(T)      "Notice of Termination" shall have the meaning set forth in Section 6.1 hereof.

(U)      "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(V)      "Sale of the Company" shall mean any transaction or series of transactions (whether structured as a stock sale, merger, consolidation, reorganization, asset sale or otherwise), which results in the sale or transfer of (i) beneficial ownership of more than 50% of the Company's then-outstanding shares of capital stock(determined based on fair market value), or (ii) all or substantially all of the assets of the Company and its subsidiaries taken as a whole (determined based on fair market value), in each case, other than to a Person, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale or transfer.

(W)   "Severance Payments" shall have the meaning set forth in Section 4.1 hereof.

(X)   "Term" shall mean the period of time described in Section 2 hereof (including any extension, continuation or termination described therein).

(Y)   "Total Payments" shall mean those payments so described in Section 4.2 hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

DELPHI CORPORATION

By:_____

Name:

Title:

_____

RODNEY O'NEAL

Address:

_____

_____

_____

(Please print carefully)

Page 21 of 21