# EXHIBIT A

# EXHIBIT A

## DISTRIBUTION AGREEMENT

This Distribution Agreement ( "Agreement") is entered into as of 19 December, 2002 (the "Effective Date") between Delco Electronics Corporation, a Delaware Corporation ("Delco") and a subsidiary of Delphi Corporation, with a principal place of business at One Corporate Center, P.O. Box 9004, Kokomo, IN 46904-9004 and The Brix Group Incorporated, a Subchapter S Corporation, acting by and through its Pana-Pacific Division, with a principal place of business at 541 Division Street, Campbell, CA 95008-6921 ("Pana-Pacific"). Pana-Pacific and Delco are individually referred to as a "Party" and collectively as the "Parties".

Pana-Pacific and Delco agree as follows:

1.    **Term**. This Agreement will be in effect for an initial term of three (3) years and shall become effective on the Effective Date. On or before the first (1st) anniversary date of the Effective Date, the Parties will meet and decide whether or not to mutually terminate this Agreement pursuant to Section 25(b) hereof. If the Parties decide not to terminate this Agreement on such first (1st) anniversary date meeting, then thereafter, this Agreement shall automatically be renewed for three(3) year intervals on the third (3rd) anniversary date of the Effective Date unless earlier terminated pursuant to Section 25 (a) or Section 25(b) hereof.

2.    **Products**. As used in this Agreement, the term "Exclusive Products" means the products, materials, parts and accessories listed in **Exhibit 1** hereof and used for vehicles listed in Paragraph 4(a) hereof .Delco may from time to time add Exclusive Products which are subject to this Agreement by preparing and submitting to Pana-Pacific a written amendment to **Exhibit 1**. As used in this Agreement, the term "Non-Exclusive Products" means the products, materials, parts and accessories for heavy duty Trucks listed in **Exhibit 2** attached to this Agreement. Delco may from time to time add or delete Non-Exclusive Products which are subject to this Agreement by preparing and submitting to Pana-Pacific a written amendment to **Exhibit 2**. Hereinafter, Exclusive Products and Non-Exclusive Products are collectively referred to as "Products".

3.    **Independent Contractor**. Pana-Pacific agrees to act as the exclusive, independent distributor which purchases Exclusive Products for resale and to act as a non-exclusive independent distributor which purchases Non-Exclusive Products. The terms for maintenance of Pana-Pacific's rights to be the exclusive distributor of Exclusive Products are listed in **Exhibit 3.** This Agreement does not establish any agency, commercial agency, employment, joint venture or other business relationship between Pana-Pacific and Delco other than that of an independent distributor. Pana-Pacific shall have sole control over the manner and means of performing its obligations under this Agreement and shall act on its own behalf and on its own account.



1

4.    **Account Responsibility and Sales Territory**.

(a)    Pana-Pacific may sell Products under this Agreement only to the following customers located in the contiguous United States, Canada and Mexico (the "Territory"):
    (1)    Truck original equipment manufacturers (OEMs), Truck dealers, Truck fleets and Truck travel centers
    (2)    Off road vehicle OEMs
    (3)    Bus manufacturers
    (4)    RV manufacturers
    (5)    Marine manufacturers
In the context of this Paragraph 4(a), "Trucks" means class three (3) through eight (8) Trucks inclusive.  "Off road vehicle" includes, without limitation, construction vehicles, agricultural vehicles and  such. Pana-Pacific will not sell Products to any other customers in the Territory or to any customer located outside of the Territory without first obtaining Delco's prior written consent. Notwithstanding the terms of this Paragraph 4(a), Pana-Pacific may continue to fulfil obligations undertaken with suppliers or customers prior to the Effective Date.  However, once such existing obligations are fulfilled, Pana-Pacific will not assume new obligations with customers or suppliers that are not consistent with the terms of this Paragraph 4 (a) unless directed to do so by a Pana-Pacific customer.

(b)    Pana-Pacific is obliged to conform to reasonably required testing specifications and procedures provided in writing by Delco to Pana-Pacific for Products sold by Pana-Pacific to their customers.  Delco will provide at no charge to Pana-Pacific, all tooling, fixtures and software necessary to accomplish such required testing.

5.    **Pricing**.

(a)    The purchase prices to be paid by Pana-Pacific for each of the Products are specified in a sales agreement (the "Sales Agreement") entered into concurrently with this Agreement by the Parties. Pricing of Products is based upon packaging and shipment in standard quantities specified in such Sales Agreement Delco may amend the Price Schedule for Products  from time to time by giving Pana-Pacific thirty (30) days prior written notice.  The new prices will be applicable to all orders placed after the effective date of the price change.

(b)    Price Protection --If such price change is a price decrease for a Product, Pana-Pacific will receive a price protection credit equal to the amount of the price decrease for each such affected Product ("Affected Product") that was delivered to Pana-Pacific by Delco less than sixty (60) days prior to the effective date of such price decrease and which remains in  Pana-Pacific's inventory on the effective date of such price decrease. When submitting a claim to Delco for a credit claim under this Paragraph 5(b) Pana-Pacific will submit the model numbers and serial numbers of such Affected Products to Delco.

2

Account credit to Pana-Pacific will be in the amount of the difference between the original selling price of such Affected Product, less the new selling price, times the lesser of the number of Affected Products purchased by Pana-Pacific during the prior sixty (60) calendar days or the number of Affected Products in Pana-Pacific's inventory on the effective date of the price change. Account credit will be issued by Delco to Pana-Pacific within thirty (30) calendar days from receipt of a claim from Pana-Pacific and such account credit will be applied to the Pana-Pacific's accounts receivable account at Delco. All Pana-Pacific claims for price protection must be submitted to Delco within thirty (30) business days from the effective date of the price change. Such claims received by Delco after that date will be rejected.

(c)   <u>Price Protection for SDARS and Integrated SDARS Receivers Only</u>:  Market conditions for SDARS receivers may change rapidly due to technology changes. Accordingly; price reduction requests by Pana-Pacific for SDARS and integrated SDARS receivers will be approved or disapproved by Delco within ten (10) days of such request. If such price reduction request is approved, such SDARS or integrated SDARS receiver is an "Affected SDAR Receiver"  To ensure that Pana-Pacific's customers do not incur a loss due to their continued purchasing of Affected SDARS Receiver, Delco will offer price protection to Pana-Pacific as well as Pana-Pacific's customers, in the form of account credit for such Affected SDARS Receivers..  All Affected SDARS Receivers in Pana-Pacific's or in Pana-Pacific's customer's inventory on the effective date of such price decrease, will be eligible for credit, up to the quantity of those same models (on a model-for-model basis) purchased by Pana-Pacific from Delco within the prior sixty (60) calendar days. In the event that part or all of such quantity of Affected SDAR Receivers is in Pana-Pacific's customer's inventory  Pana-Pacific will provide their customer price protection for sixty (60) days from the date Pana-Pacific purchased such Affected SDARS Receivers from Delco. The amount of such credit will be calculated and credited in the same manner set forth in Paragraph 5(b) hereof.

(d)   Pana-Pacific is eligible to receive certain incentives for meeting agreed-upon Sales Targets for the sale of Products during calendar year 2003. The method for determining the amount of such incentives (if any) are set forth in **Exhibit 4** hereof. Such Sales Targets and incentives will be renegotiated by the Parties for each calendar year following 2003.

6.   **Orders**.

(a)   Pana-Pacific will provide to Delco the following forecasts and commitments:
  (1)   No later than the end of the third (3rd) calendar quarter of each year, a forecast of Pana-Pacific's total requirements for Products during the following full calendar year.
  (2)   A monthly five (5) month rolling forecast of Product purchases by month.
  (3)   A monthly one (1) month firm order for Products issued one (1) month in advance.

3

(b)    Pana-Pacific will purchase Products by submitting purchase orders to Delco. All orders submitted to Delco by Pana-Pacific will be considered firm orders. Delco will use commercially reasonable efforts to ship each order according to Pana-Pacific's purchase order requirements. Delco may elect to reject, or partially reject, any order for capacity, insufficient lead time or any of the circumstances recited in Paragraph 18 hereof. Any order which has been received by Delco can only be canceled, terminated or modified by Pana-Pacific upon payment of Delco's reasonable charges incurred by reason of such cancellation, termination or modification. Once a purchase order is accepted by Delco, if Delco is unable to meet the delivery schedule for any such purchase order, Delco will notify Pana-Pacific as soon as commercially practical. Delco will be responsible for the payment of all additional charges for expedited shipping of Products in the case of such missed deliveries.

7.    **Payment**.

(a)    Unless otherwise agreed upon in writing, payment will be made in full by Pana-Pacific in US dollars according to payment terms of net sixty (60) days.

(b)    Delco agrees to accept Pana-Pacific's check as mode of payment and Pana-Pacific agrees that it will remit such check to Delco at such time that such check is in Delco's lock box within the required sixty (60) day payment period.

(c)    So long as Pana-Pacific is current on all of its payments and obligations under this Agreement, the Sales Agreement and any related purchase order, Delco will extend purchase credit to Pana-Pacific provided, however, that Delco may, at any time, reduce or eliminate such purchase credit, suspend performance of any order, require payment in cash, require shorter payment terms, require cash in advance of orders or deliveries and/or require other security or assurance of payment satisfactory to Delco if Delco reasonably determines that the financial condition of Pana-Pacific or other reasonable grounds for insecurity warrant such action.

(d)    Late payments will bear interest at a rate equal to two and a half percent (2.5%) per month.

8.    **Delivery.**  Unless otherwise agreed to in writing, all Products will be sold FOB the ship points specified in the Sales Agreement . Title to Products will pass to Pana-Pacific upon receipt at such FOB point. Delco shall endeavor to deliver the Products within the time limits, if any, specified by Pana-Pacific. Except for charges related to expedited shipping of Products as specified in Paragraph 6 hereof, Delco will not be directly or indirectly liable for any damages arising from late deliveries caused by delays in the production and/or transport or other reasons beyond the reasonable control of Delco.

9.    **Packaging.**  Delco will pack in bulk packaging in standard quantities and mark the Products according to Delco's standard procedures for domestic and/or export shipments. Except as otherwise agreed in writing, Delco will not be obligated to provide special packaging and/or private or custom labeling.

10. **Obligations of Pana-Pacific.**

(a) Pana-Pacific shall assume responsibility for fulfilling Delco's sales contracts for the sales of Products that are being transferred to Pana-Pacific under this Agreement and that are in effect as of the Effective Date. Pana-Pacific will conform to the terms and conditions of such existing sales contracts and shall use commercially reasonable efforts to maintain the current level of sales of Products to the customers issuing such contracts and will similarly use commercially reasonable efforts to meet agreed-upon Sales Targets for New Business.

(b) Pana-Pacific shall use commercially reasonable efforts to promote and efficiently sell the Products, such as prominently displaying Products in Pana-Pacific's catalogs. Pana-Pacific will monitor the activities of its employees, agents, distributors, subcontractors and wholesalers, if any, by means of frequent contacts and meetings and shall be directly responsible for their activities.

(c) Pana-Pacific shall comply with the reasonable recommendations and directions received from Delco, particularly with respect to warranties, trading policies and customers. Pana-Pacific shall participate in periodic meetings of the Delphi Corporate Commercial Vehicle Team and shall provide to Delco sales forecasts and reports on a periodic basis, as Delco may reasonably request.

(d) Pana-Pacific shall promptly inform Delco of any claim or complaint received from Pana-Pacific's customers with respect to the Products.

(e) In the case of disputes with Pana-Pacific's customers on issues concerning personal injury, death or property damage allegedly caused by the Products or any other issue which is likely to have a direct influence on the interests of Delco, Pana-Pacific shall promptly notify Delco and submit a detailed report thereon. Pana-Pacific will not settle any such disputes without Delco's prior written consent.

(f) Pana-Pacific shall maintain an adequate stock of the Products in order to meet its customer demand.

11. **Warranty.**

(a) Delco's standard form of Limited Consumer Warranty for Products is attached hereto as **Exhibit 5**. Such warranty may be revised by Delco from time to time for any or all Products. Pana-Pacific is not authorized to offer any warranties to its customers on behalf of Delco that are additional or inconsistent with the latest Limited Consumer Warranty provided by Delco for such Product, and Delco will not be liable or responsible in the event that Pana-Pacific does offer any additional or inconsistent warranties to its customers.

5



(b)     Delco will be responsible for the costs of one hundred percent (100%) of warranty claims for Products, less units identified as "customer complaint not verified", under the terms of existing OEM purchase agreements for Products that are transferred to Pana-Pacific under this Agreement. Delco's warranty responsibility for Products sold under new business arrangements will be quoted by Delco to Pana-Pacific on a part number by part number basis.

(c)     NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE MADE IN FAVOR OF PANA-PACIFIC WITH RESPECT TO THE PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH OTHER WARRANTIES ARE HEREBY DISCLAIMED.

12.   **Limitation of Liability.** IN NO EVENT WILL DELPHI BE LIABLE FOR SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, LOSS OF REVENUE OR CLAIMS OF PANA-PACIFIC'S CUSTOMERS, WHETHER BASED ON CONTRACT, TORT (INCLUDING STRICT LIABILITY OR NEGLIGENCE), OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

13.   **Product Changes.** Delco shall use reasonable efforts to notify Pana-Pacific at least ninety (90) days in advance of any significant changes in the design or specifications of any Products or of any decision to discontinue any Products. Delco will have no liability to Pana-Pacific for any costs, lost profits or other damages resulting from any design or specification change or discontinuance. Any changes to the Sales Agreement, including but not by way of limitation, new products, new part numbers, new prices, new unit volumes and such will be documented in a Product Change Evaluation (PCE) document and not implemented until such PCE is approved.

14.   **Advertising and Marketing.**

(a)     Pana-Pacific will not use Delco's name, trademarks or logos except in accordance with Delco's approved formats and standards as defined in **Exhibit 6** hereof and will not undertake any specific marketing or promotional activities or campaign that may portray Delco or the Products in any inappropriate or unfavorable manner.

(b)     Delco will make funds available annually for an advertising and promotion program as described in **Exhibit 7** hereof. Such funds for calendar year 2003 will be in the amount of two percent (2%) of total sales by Pana-Pacific under this Agreement up to a maximum of one million U.S. dollars (USD 1,000,000). Payment of such funds to Pana-Pacific will be by the last business day of each month and will be paid based upon marketing or promotional activities jointly conducted by Pana-Pacific and Delco in the previous calendar month, net of the marketing or promotional costs incurred directly by Delco in the same period of time. In participating with such advertising and promotion programs, Pana-Pacific will conform to the requirements of Paragraph 16(a) hereof.

6



(c)     Delco has the right to audit at reasonable intervals Pana-Pacific's use of the funds provided for such advertising and promotion programs. Such audits may include, without limitation, examination of invoices, copies of advertisements and creative works and the like.

(d)     Delco may choose, at its sole discretion, to fund displays and the development and production of branded collateral materials if new distribution channels, such as truck distributors, marine sales, bus sales and such, are entered by Pana-Pacific.

15.    **Internet Guidelines**.  Products may not be displayed upon the Internet without prior written approval of Delco.  Such approval by Delco will not be unreasonably withheld or delayed.  Sale of Products over the Internet or by any type of mail order means without prior written approval of Delco is expressly forbidden. Any sales of Products on the Internet or by any type of mail order means without prior written approval by Delco will be grounds for immediate termination of this Agreement under Section 25 hereof.

16.    **Delco Logos, Trademarks and Service Marks**.

(a)     Pana-Pacific acknowledges that Delco owns the various names, logos, trademarks and service marks which are associated and used in connection with the Products, packaging, manuals, instructions, installation guides, and promotional materials of any kind.  Pana-Pacific will consult with Delco in advance about the display or use of any such names, logos, trademarks and service marks and seek Delco's written approval for such display or use.  Such approval will not be unreasonably withheld or delayed by Delco.

(b)     Pana-Pacific is granted the non-exclusive right of displaying such names, logos, trademarks and service marks in connection with the sale of the Products, provided, however, that Pana-Pacific will discontinue the display or use of any such names, logos, trademarks and service marks when reasonably requested to do so by Delco.

17.    **Compliance with Laws**. Pana-Pacific will obtain all necessary licenses and permits and will comply with all applicable national, state, local and foreign laws, ordinances, regulations and rules for the performance of its responsibilities and obligations under this Agreement.

18.    **Force Majeure.**  Any delay or failure of Delco or Pana-Pacific to perform its obligations under this Agreement, other than a failure to make payments, will be excused to the extent that it is caused by an event or occurrence beyond such Party's reasonable control. By way of example and not by way of limitation, such events or occurrences include acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, equipment or transportation, or court injunction or order.



7

19. **Assignment.** This Agreement and any rights herein granted may not be assigned, except to a wholly-owned subsidiary of a Party or to a company which is an Affiliate of a party, without prior written consent of the other party. Such consent will not be unreasonably withheld or delayed. In the context of this Section 19, an "Affiliate" means a corporation, company, or other entity: (1) more than 49% of whose outstanding shares or securities (representing the right to vote for the election of directors or other such managing authority) are, now or hereafter, owned, controlled or under common control, directly or indirectly by or with a party hereto, but such corporation, company, or other entity shall be considered to be an Affiliate only so long as such ownership or control or common control exists; or (2) which does not have outstanding shares or securities, as may be the case with a partnership, joint venture, or unincorporated association, but more than 49% of whose ownership interest representing the right to make the decisions for such corporation, company, or other entity is, now or hereafter, owned, controlled or under common control, directly or indirectly by or with a party hereto, but such corporation, company, or other entity shall be considered to be an Affiliate only so long as such ownership or control or common control exists. For the purpose of this Agreement, Delco Electronics Corporation and each of its Affiliates shall be an Affiliate of Delphi Corporation.

20. **Governing Law.** This Agreement will be governed by and construed according to the laws of the United States of America and the State of Michigan (the "Jurisdiction") as such laws apply to contracts between residents of the Jurisdiction that are to be performed entirely within the Jurisdiction, specifically excluding application of the UN Convention on Contracts for International Sales of Goods. Courts in the Jurisdiction shall possess exclusive jurisdiction over any actions to enforce or construe this Agreement and the Parties agree to submit to the jurisdiction of such courts.

21. **Dispute Resolution.**

   (a)   The Parties will endeavor to amicably resolve any dispute arising out of this Agreement within thirty (30) days of receipt of notice of such dispute. If the Parties are unable to resolve such dispute within such thirty (30) day period, then they will refer the dispute to their respective senior management, who will, during the thirty (30) day period following such referral, review the dispute and attempt to negotiate a mutually acceptable resolution.

   (b)   Any claim, controversy or dispute between the Parties, that is unable to be resolved by Senior Management, shall then be resolved by arbitration. A single arbitrator engaged in the practice of law shall conduct the arbitration under the then current rules of the American Arbitration Association. The single arbitrator will be picked in the following manner: a) three (3) names of potential arbitrators shall be randomly picked from a local list of available arbitrators provided by the American Arbitration Association b) each Party to the dispute shall vote for two (2) of the three (3) potential arbitrators c) the potential arbitrator with the most votes shall be the arbitrator for the dispute. If the chosen arbitrator is not available, this process shall be repeated until an available arbitrator is picked. The Federal Arbitration Act, 9 U.S.C., sec. 1-15, not state law, shall govern the

8

arbitrability of all claims. The arbitrator shall only have the authority to award compensatory damages, and shall not have the authority to award punitive or other noncompensatory damages. The award of the arbitrator shall be rendered in writing within fifteen (15) days of the completion of the arbitration hearing unless the Parties mutually agree to extend or shorten the period. The arbitration shall occur in New York, NY. Each side shall bear its own costs for the arbitration, and each Party shall pay for one-half of the expense of the arbitrator.

22.  **Amendments.** This Agreement supersedes all previous agreements, oral or written, between Pana-Pacific and Delco with respect to the subject matter hereof. Except as specifically provided in this Agreement with respect to amendment or modification of Exhibits hereto, no amendment or modification to this Agreement will be binding upon either Party unless it is in writing and is signed by both Parties.

23.  **Severability.** If any provision of this Agreement will be held to be void, illegal, or unenforceable under any statute, regulation, ordinance, executive order, or other rule of law, then (i) that provision will be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule; (ii) the Parties will replace any such void, illegal or unenforceable provision with a valid, legal and enforceable provision, which corresponds as far as possible to the spirit and purpose of the void, illegal or unenforceable provision, and (iii) the remaining provisions hereof will remain in effect.

24.  **No Implied Waivers.** The failure of either Party at any time to require performance by the other Party of any provision hereof will in no way affect the full right to require such performance at any time thereafter; nor will the waiver by either Party of a breach of any provision hereof constitute a waiver of any succeeding breach of the same or any other such provision nor constitute a waiver of the provision itself.

25.  **Termination.**

(a)  A Party may immediately terminate this Agreement by giving written notice of termination to the other Party if any of the following events occurs with respect to the other Party:

(i)  the other Party fails to satisfy any of its monetary obligations under this Agreement (or any purchase order relating to the purchase of Products) and fails to cure such breach, default, or delay within thirty (30) days after receipt of written notice by the other Party of such failure;

(ii)  the other Party breaches, defaults or delays in performance of its non-monetary obligations under this Agreement (or any purchase order relating to the purchase of Products) and fails to cure such breach, default or delay within ninety (90) days after receipt of written notice by the other Party of such breach, default or delay;



9

(iii)    the other Party is the subject of an administrative measure instituted by competent authorities such as the revocation of a license for business or an injunction suspending business;

(iv)    the other Party becomes insolvent or a petition for bankruptcy, reorganization, corporate rehabilitation or composition is filed against or on behalf of the Party or any event similar thereto occurs;

(v)    a provisional attachment, provisional injunction, compulsory execution or any other disposition similar thereto is made by any third Party against all or substantially all of the assets of the other Party;

(vi)    the other Party goes into dissolution or consolidates or merges with any other company;

(vii)    A violation of the provisions of Articles 4, 7(a), 7(c), 10(a), 10(b), 10(c), 10(d), 11(a), 14(a), 15 or 16(a) hereof.

A Party who terminates this Agreement in accordance with Section 25(a) or 25(b) will have no obligation to pay to the other Party any cancellation charge, fee, penalty or other compensation, except as provided in Section 25(c).

(b)    The Parties may mutually agree in writing to terminate this Agreement for any reason.

(c)    In the event this Agreement is terminated for any reason, Pana-Pacific and Delco will work together in good faith to minimize the negative financial impact of such termination on both Parties. In this regard, the Parties will attempt to "wind down" Delco's procurement of raw materials and Delco's rate and mix of the manufacture of Products so that after such termination Delco is left with the smallest quantities of raw materials and work in process and the largest number of finished goods consistent with the need to enable Pana-Pacific to meet their existing obligations for the supply of Products to their customers without interruption.

26.    **Terms and Conditions**.  The terms and conditions of this Agreement apply to all purchases of Products by Pana-Pacific during the term of this Agreement In the event of an inconsistency between the terms of this Agreement and the terms of any purchase order for Products issued to Delco by Pana-Pacific during the term of this Agreement, the terms of this Agreement shall prevail.

27.    **Entire Agreement.**  This Agreement contains the entire agreement between the Parties and supersedes any prior understandings or agreements between them respecting the subject matter of this Agreement.



10

**IN WITNESS WHEREOF,** both Parties have caused their duly authorized representatives to sign this Agreement.

**Delco Electronics Corporation**

By: _Beth Edgerton_

Name: _Beth Edgerton_

Title: _General Director, Sales and Marketing_

Date: _12/19/02_

**The Brix Group, Incorporated
Pana-Pacific Division**

By: _____

Name: _Harvey (or Brix)_

Title: _Chairman_

Date: _12-24-2002_



11

**EXHIBIT  1**

**EXCLUSIVE PRODUCTS**

**Products**

1.   Radio Head Units
2.   SDARS Antennas
3.   Audio amplifiers
4.   CD changers
5.   Rear seat audio/video
6.   Remote audio controls
7.   SDARS Receivers
8.   Speakers

12

**EXHIBIT 2**

**NON-EXCLUSIVE PRODUCTS**

**Products**

1.  Truck PC
2.  Truck PC Peripherals
3.  Telematics
4.  Remote Keyless Entry
5.  Back Up Aid



13

## EXHIBIT 3

## CONDITIONS FOR MAINTENANCE OF EXCLUSIVITY

In Section 3 hereof, Delco grants Pana-Pacific the right to be the exclusive distributor for the Exclusive Products listed in Exhibit 1 hereof. This grant of exclusivity is conditioned upon Pana-Pacific achieving and maintaining the following minimum percentage replacement of non-Delco radio head units currently sold by Pana-Pacific to Truck customers by Delco-supplied radio head units. Percent achievement of such replacement sales will be jointly determined retroactively for a particular calendar year by Pana-Pacific and Delco within thirty (30) days of the conclusion of such particular calendar year. If Pana-Pacific fails to achieve the minimum percentage replacement for such calendar year, Delco may at its sole discretion, immediately revoke Pana-Pacific's exclusive distribution rights for all of the Products listed in **Exhibit 1**. In such case, such Pana-Pacific distribution rights for the Products listed in **Exhibit 1** will thereafter be non-exclusive.

### PERCENT OF NON-DELCO RADIO HEAD UNITS REPLACED

| Calendar Year | Target Penetration | Minimum Penetration |
|---|---|---|
| 2003 | 35 % | 30% |
| 2004 | 72% | 60% |
| 2005 and thereafter | 90% | 80% |



**EXHIBIT 4**

## SALES INCENTIVE SCHEDULE FOR CALENDAR YEAR 2003

### Definitions

"Transferred Business" means existing radio receiver sales agreements (including existing SDARS receiver and peripheral electronics sales agreements) transferred to Pana-Pacific by Delphi under this Agreement.   The baseline sales dollar amounts of this Transferred Business is the sales dollar amount of Transferred Business in the Sales Agreement on the Effective Date.

"New Business" means sales that are incremental to the Transferred Business baseline sales dollar amount, excluding TruckPCs.

"Sales Target" means the target sales dollar amount of New Business and the target unit sales of TruckPC established for Calendar Year 2003.  The Sales Target is **$30,000,000** in New Business Revenue <u>and</u> **6500** TruckPCs units for 2003.

"Incentive Payment" means the amount to be paid to Pana-Pacific based on achievement of incentive objectives.  Such payment is due and payable to Pana-Pacific by the last business day of January, 2004.

A.  Truck PC Volume and New Business Revenue Incentive Payment

Unit pricing for DEA-100 model base cassette units and uplevel CD units sold for New Business will be adjusted in the Sales Agreement to $119.83 and $198.57 respectively.

Truck PC base pricing will be set at $1295 per unit with an additional low-volume premium of $177 added to the first 2650 units.  Only the base price will be subject to Price Protection defined in section 5(b), not the low-volume premium.

| Qty | Sale Price | |
|---|---|---|
| 1 to 2650 | $1472 | ($1295 + $177) |
| 2651 and up | $1295 | |

If both the New Business revenue ($30,000,000) and Truck PC volume (6500 units) elements of the Sales Target are met during calendar year 2003, then an Incentive Payment of $469,000 (2650 x $177) will be paid to Pana-Pacific.



## EXHIBIT 4 *(Continued)*

If Pana-Pacific fails to order a minimum volume of 2650 Truck PC sales during 2003, then the difference in volume between the actual Truck PC unit sales volume and the 2650-unit minimum volume multiplied by the low-volume premium of $177 per unit will be refunded by Pana-Pacific to Delphi.  Such payment is due and payable to Delphi by the last business day of January, 2004.

## SPECIAL INCENTIVE FOR TRUCKPC SALES

Pana-Pacific will be given an additional rebate incentive based on Pana-Pacific's total purchases of TruckPCs (the "Special Incentive") per the following schedule  in Calendar Year 2003.  If earned, such Special Incentive will be due and payable to Pana-Pacific by the last business day of January, 2004.   Total base purchases of Truck PC will be calculated using the base price of $1295 per unit multiplied by shipped volume, excluding all low-volume pricing premiums.  Special Incentive is calculated by the rebate percentage at the achieved quantity level multiplied by the total base purchases at that level.

| Truck PC quantity | Special Incentive on Truck PC base purchases |
|---|---|
| 6500 to 8499 units | 0.5 % Special Incentive |
| 8500 to 9999 units | 0.75% Special Incentive |
| 10,000 to 12,999 units | 1.5% Special Incentive |
| 13,000 or more units | 2.5% Special Incentive |



**EXHIBIT 5**

**<u>LIMITED WARRANTY</u>**

Delco Automotive Systems LLC ("Delco") warrants the consumer electronics product sold by Delco (the "Product") to be free of defects in workmanship and materials, subject to the following conditions.

The duration of Delco's warranty on the Product is limited to one (1) year from the date of sale/installation in the original consumer's vehicle as entered on the Warranty Registration card.

**Other Terms**

No other express warranties are made with respect to the Product.

This warranty is not transferable and applies only to the original consumer purchaser of the Product.

Delco will, as its sole obligation under this warranty, replace or repair the Product if it does not conform to this warranty. Delco will not be responsible for any cost (including labor) to remove and install the Product or to restore a vehicle to its proper operating condition. UNDER NO CIRCUMSTANCES WILL DELPHI BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES UNDER THIS WARRANTY OR ANY IMPLIED WARRANTIES.

Delco will not be responsible for damage resulting from any (i) deviation from Delco's application recommendations as printed in Delco's catalog or any packaging, labels or instructions provided with the Product, (ii) installation of the Product in a manner which is inconsistent with Delco's written installation instructions or accepted industry standards, (iii) alteration or modification of the Product, (iv) misuse, (v) neglect, (vi) abuse, (vii) accident, (viii) normal wear and tear, (ix) other improper application, installation or operation of the Product.

This warranty does not apply to any Product which is installed in vehicles used for racing, public service, security or government use.

*How You (the Customer) Can Get Service*

To obtain warranty service, you must return the defective Product with your original receipt to the original place of purchase. If further clarification or additional information is required, you may call Delco at: 1-866-227-9071.

## EXHIBIT 5 (Continued)

*How State Law Relates to the Warranty*

Some states and provinces do not allow limitations on how long implied warranties last, or the exclusion or limitation of incidental or consequential damages. So the above limitations or exclusions may not apply to you. This warranty gives you specific legal rights. You may also have other rights that may vary from state to state.

NO PERSON IS AUTHORIZED BY DELPHI TO MODIFY OR ADD TO THIS LIMITED WARRANTY.

18

## EXHIBIT 6

## <u>TRADEMARK, LOGO AND SERVICE MARK GUIDELINES</u>

In order to maintain the valuable goodwill associated with Delco's trademarks, logos and service marks ("Delco Marks") Pana-Pacific will make commercially reasonable efforts to avoid causing damage to Delco goodwill and/or Delco Marks by its actions or inactions.

Prior to distribution or sale of Products contained in packaging of any kind, Pana-Pacific agrees to furnish to Delco adequate samples of the packages, containers and/or wrapping and labeling materials used in association with the Products for Delco's prior written approval. Delco shall have the right to disapprove of the sale of Products in such packages, containers, wrapping and/or labeling materials if, in Delco's reasonable opinion, they fail to comply with the reasonable quality and use standards established by Delco.   After written approval by Delco of the packages, containers and/or wrapping and labeling materials and so long as they remain at a standard of quality equally as high as that of the sample made available for Delco's inspection, Delco shall not withdraw its approval.

Pana-Pacific agrees to furnish Delco with samples of all proposed advertising, brochures, marketing and promotional materials, documentation and technical materials and all other written materials utilizing Delco Marks prior to publication or other disclosure of such materials.  Pana-Pacific agrees to make any modifications or corrections to the materials as reasonably specified by Delco.

If at any time the packaging or promotional materials referenced in the previous two paragraphs do not substantially equal the standard of quality as the samples submitted for Delco's prior approval, Delco shall have the right to require Pana-Pacific to discontinue the use of the Delco Marks, unless modification satisfactory to Delco is made within a time frame from notice of disapproval that is also satisfactory to Delco.

Delco Marks have fixed styles and their use is regulated by a set of standards developed by Delco.   Such standards are set forth in this Exhibit 6.  No change may be made to Delco Marks by Pana-Pacific without written permission from Delco.  Delco may, from time to time, make modifications to Delco Marks. Pana-Pacific agrees to incorporate such changes into the packaging and/or promotional materials incorporating Delco Marks within a reasonable time, as mutually agreed upon by the Parties.



# Corporate Logo                                    Section 2

The Corporate Logo is the key visual element used to represent Delphi. It is, therefore, imperative to guide and control its use in all applications in a consistent manner.

The intent of this section is to provide basic graphic standards to ensure consistent and effective reproduction of the Corporate Logo. Adhering to these standards will preserve the value and integrity of the Corporate Logo, which is the cornerstone of the Identity Program.

Questions regarding the Corporate Logo should be directed to the Delphi Corporate Standards Committee. (See page 1.4.1.)

**Effective March, 2002:**
Delphi's long-term branding strategy is represented by a dual brand identity system. This will enable Delphi to enjoy continued growth and expansion beyond the automotive industry. The Delphi Strategy Board approved this new dual brand identity system. It is comprised of two alternative, but related logos that allow Delphi to serve different markets more effectively.

The new Corporate Logo is the dominant logo of the company and should be used in all corporate communications (i.e. press release, financial). It is also the only acceptable logo for all Delphi Competencies for OEM targeted (business-to-business) communications.

*New Corporate Logo*



The old Corporate Logo (previously referred to as Wordmark) must be replaced with the new Corporate Logo at the next convenient opportunity. The use of the old Corporate Logo, shown below, must be discontinued immediately.

*Old Corporate Logo*



The Retail/Consumer Logo (previously referred to as Wordmark) is the only acceptable logo for all Competencies targeted for retailer and business-to-consumer communications.

*Retail/Consumer Logo*





---

**Delphi Corporate Logo Standards**

# Corporate Logo

2.1.1

The Corporate Logo must be used to represent Delphi as a company and in communications that would be categorized as business-to-business sales where the Delphi components are integrated into a final product comprised of both Delphi and non-Delphi components and sold to the consumer market by the original equipment manufacturer.

The Corporate Logo should be treated as artwork. Although it appears to be composed of 6 letters, the Corporate Logo is actually stylized typographic artwork that is not available as any typeface. The Corporate Logo should always be considered a single graphic unit. **Do not revise the letterspacing or spatial relationship of the six elements (letters) that compose the Corporate Logo.**

The Corporate Logo must be used in English at all times and in all regions, regardless of the language format. The corporate name "Delphi" is globally recognized in its English form and must not be translated when using the Corporate Logo. See page 2.1.2 for further logo usage standards.

Electronic artwork of the Corporate Logo can be downloaded, in various formats, from the Apollo intranet website and may also be obtained from the Librarian / Reproduction Art Supplier. (See page 1.5.1.)

*Corporate Logo*



The Retail/Consumer Logo can only be used to represent Delphi Product & Service Solutions Competencies in communications that would be categorized as business-to-consumer sales where the Delphi components are marketed to companies that will in turn market and sell the Delphi components to consumers under the Delphi Product & Service Solutions brand.

The Retail/Consumer Logo may be used in conjunction with the Corporate Logo as long as the standards for both the Corporate Logo and the Retail/Consumer Logo are strictly adhered to. See page 2.1.2 for further logo usage standards.

Questions regarding the Retail/Consumer Logo should be directed to the Director of Product & Service Solutions Brand Management. (See page 1.4.1.)

**See Section 13 for complete Product & Service Solutions identity standards.**

*Retail/Consumer Logo*



**Delphi Corporate Logo Standards**

Revised June 2002

# Single and Dual Logo Usage

**2.1.2**

It is critical to the success of the Delphi long-term branding strategy that the following standards be followed at all times. Failure to follow these standards will confuse our customers and dilute the strength of the Delphi Brand, weakening our position in the global marketplace. **Any** questions regarding logo usage must be directed to the Delphi Corporate Standards Committee. (See page 1.4.1.)

### Delphi Corporate Logo Usage

**The Delphi Corporate Logo is the only logo that can be used for business-to-business (OEM) targeted communications.** This logo must be used alone in all business-to-business, OEM, general corporate, investor and institution communications. Color Standards defined in this section must be strictly adhered to. The "DELPHI" logo must never be used in editorial body copy or as the legal company name.

*Corporate Logo*



### Retail/Consumer Logo Usage

**The Retail/Consumer Logo must only be used for business-to-consumer and retail customer targeted communications or to brand retail products and services including packaging and collateral/promotional materials.** Retail/Consumer Logo Standards defined in section 13 must be strictly adhered to. The Retail/Consumer Logo must never be used in editorial body copy or as the legal company name.

*Retail/Consumer Logo*



### Dual Logo Usage

Use of both the Delphi Corporate Logo and the Retail/Consumer Logo is strictly limited to communications where both business unit customers are being targeted or promoted. The Corporate Logo should only be used as an endorsement/signature when used with the Retail/Consumer logo and should never be used in retail-driven communications. The Corporate Logo should be the dominate logo unless the specific media event or execution is heavily targeted towards the retail customer (e.g., APPEX, NASCAR). If using both logos, each logo must visually appear to be separate from the other with each logo having its own place and space in all communications. At no time will both logos be allowed to appear as one graphic element. Questions regarding dual logo usage should be directed to the Branding Manager. (See page 1.4.1.)

*Unacceptable Dual Logo Usage*
*Logos must not appear as one graphic element*





---

**Delphi Corporate Logo Standards**

# Reproduction Guidelines

2.2.1

The minimum size that the Corporate Logo may be used is .5" (12.6mm) width.
Width is defined as the space from the beginning of the left edge of the "D" to the
right edge of the "I".

*Minimum size*                    *All color applications*



.5"
12.6mm

The Corporate Logo must be free of any other graphic elements. The objective is to
draw attention to the Corporate Logo by providing a sufficient amount of open
space around it.

The minimum amount of open space required between the Corporate Logo and all
other graphic elements is indicated below by the dotted line. All typography,
photography, illustrations or trim edge of the printed page must be outside this
space. (Exceptions to this rule are found on pages titled "Background and Reverse
Color Usage".)

*Minimum open space
required around the
Corporate Logo*



The height of the "D" in "DELPHI" defines the minimum open space required
around the Corporate Logo: one height of the "D" defines the space above and
below the Corporate Logo; one and one-half the height of the "D" defines the space
left and right of the Corporate Logo. The Corporate Logo, in any size, must adhere
to this standard.

Illustrated below is an example of an improper application of the Corporate Logo.

*Unacceptable*          *No other elements may
appear within the minimum
open space required around
the Corporate Logo*



Minimum open space outline



**Delphi Corporate Logo Standards**

Revised June 2002

# Color Control                                                    2.2.2

The consistent and controlled use of Delphi's established colors is a visual
extension and reinforcement of the Corporate Logo.

Illustrated below are the **only** color options for the Corporate Logo. Since print
applications of color vary depending on paper finish, stock, printing equipment
and inks, printers and suppliers should visually match the corporate colors subject
to designer approval.

*Color application*

Black —— 

*Four-color process / CMYK*

Cyan = 0
Magenta = 0
Yellow = 0
Black = 100



*Computer on-screen
applications / RGB*

0 - 225 RGB Scale Range
Red = 0
Green = 0
Blue = 0

*Creative applications*

Blind embossing may be used to create a special graphic effect. All other creative
applications such as metallic inks and foil stamping must be approved by the
Delphi Corporate Standards Committee. (See page 1.4.1.)

# Background & Reverse Color Usage                    2.2.3

In order to establish consistent Corporate Logo recognition it is required that when possible, the Corporate Logo be reproduced as shown on page 2.2.1.

The positive version of the Corporate Logo may appear on a colored or textured background no darker than the equivalent of 40% on the gray scale. Heavy patterns or textures must be avoided.

Gray scale example:



| White | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | Black |

*Acceptable applications*





When it is not possible to print the positive version of the Corporate Logo as shown on page 2.2.1, it is acceptable to utilize the Corporate Logo in reverse. However, the background must be sufficiently dark to ensure proper contrast for the Corporate Logo. Background colors must be equivalent to at least 60% on the gray scale. Heavy patterns or textures must be avoided.

Gray scale example:



| White | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | Black |

*Acceptable applications*



*Note: Although reverse applications are permitted, it is required that whenever possible the positive version of the Corporate Logo appear as shown on page 2.2.1.*

*Any use of the reversed logo must be approved by the Delphi Corporate Standards Committee. (See page 1.4.1.)*



**Delphi Corporate Logo Standards**

Revised June 2002

# Unacceptable
# Corporate Logo and Color Usage

**2.2.4**

Illustrated below are examples of unacceptable Corporate Logo configurations. Only approved electronic and reproduction artwork, downloaded from the Apollo intranet website or ordered from the Librarian/Reproduction Art Supplier (See page 1.5.2.) may be used for reproduction of the Corporate Logo.

| | | |
|---|---|---|
| *Unacceptable* | *Do not typeset the Corporate Name.* |  |
| *Unacceptable* | *Do not distort the Corporate Logo.* |  |
| *Unacceptable* | *Do not use the old Corporate Logo.* |  |
| *Unacceptable* | *Do not revise the spatial relationship of the six key elements.* |  |

Illustrated below are examples of unacceptable color versions of the Corporate Logo.

| | | |
|---|---|---|
| *Unacceptable* | *Do not print the Corporate Logo in any other color than the approved options. (See page 2.2.2.)* |  |
| *Unacceptable* | *Do not print the Corporate Logo in any color combination other than the approved options. (See page 2.2.2.)* |  |
| *Unacceptable* | *Do not reverse the Corporate Logo in a color value less than 60% on the gray scale.* |  |
| *Unacceptable* | *Do not print the Corporate Logo on a background with a color value greater than 40% on the gray scale.* | |

**Delphi Corporate Logo Standards**

# Competency Descriptor Color Control

**2.3.1**

**Competency Descriptors may only be used as specifically shown throughout this manual.** Do not use Competency Descriptors on banners, flags or promotional merchandise. Questions regarding the usage of Competency Descriptors should be directed to the Delphi Branding Manager. (See page 1.4.1.)

Consistent Color usage of the Competency Descriptor is required to to establish visual recognition and relationship to the Delphi Corporate Logo.

The Competency Descriptor (if used) must be either Delphi Red 485 (preferred), Black (for one color applications), or White (for reverse applications).

*Preferred*

Black

Delphi Red 485
(In lieu of Delphi Red 485,
you may use pantone 485)

Other approved substitutes:
Four Color Process
Cyan = 0
Magenta = 100
Yellow = 91
Black = 0

0 - 225 RGB  Scale Range
Red = 226
Green = 0
Blue = 26



*One-Color application*

Black



*Reverse application*



**Delphi Corporate Logo Standards**

Revised June 2003

# Supporting Typography

2.4.1

The consistent use of a family of typefaces in all communications materials strengthens the overall Identity System.

Two highly-legible type families have been chosen to complement the Corporate Logo. All type styles and weights within these type families can be used.

*Adobe Univers* and *Adobe Univers Condensed* are the recommended sans-serif typefaces for signage, stationery, business forms and small-point type applications. These typefaces may also be used in all printed or electronic communications.

Shown below are some examples of the *Adobe Univers* typographic family, other type styles within this type family may also be used.

*Adobe Univers 55 Regular*

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890

*Adobe Univers 55 Oblique*

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890*

*Adobe Univers 65 Bold*

**Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890**

*Adobe Univers 65 Bold Oblique*

***Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890***

*Adobe Univers 75 Black*

**Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn
Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz
1234567890**

*Adobe Univers 75 Black Oblique*

***Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn
Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz
1234567890***



# Supporting Typography

**2.4.2**

Shown below are some examples of the *Adobe Univers Condensed* typographic
family, other type styles within this type family may also be used.

**Adobe Univers Condensed 47
Light**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv
Ww Xx Yy Zz  1234567890

**Adobe Univers Condensed 47
Light Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv
Ww Xx Yy Zz  1234567890*

**Adobe Univers Condensed 57
Regular**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt
Uu Vv Ww Xx Yy Zz  1234567890

**Adobe Univers Condensed 57
Regular Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt
Uu Vv Ww Xx Yy Zz  1234567890*

**Adobe Univers Condensed 67
Bold**

**Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt
Uu Vv Ww Xx Yy Zz  1234567890**

**Adobe Univers Condensed 67
Bold Oblique**

***Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt
Uu Vv Ww Xx Yy Zz  1234567890***

*Arial*, also a sans-serif typeface, may be used for internal forms and memos.

Shown below are some examples of the *Arial* typographic family, other type styles
within this type family may also be used.

**Arial Regular**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq
Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890

**Arial Regular Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq
Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890*

**Arial Bold**

**Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890**

**Arial Bold Oblique**

***Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp
Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz  1234567890***

# Supporting Typography

**2.4.3**

*Adobe Minion* is the recommended serif typeface for marketing communications materials.

Shown below are some examples of the *Adobe Minion* typographic family, other type styles within this type family may also be used.

**Adobe Minion Regular**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890

**Adobe Minion Regular Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890*

**Adobe Minion Semibold**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890

**Adobe Minion Semibold Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890*

**Adobe Minion Bold**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890

**Adobe Minion Bold Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890*

**Adobe Minion Black**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890

**Adobe Minion Display Regular**

Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890

**Adobe Minion Display Oblique**

*Aa Bb Cc Dd Ee Ff Gg Hh Ii Jj Kk Ll Mm Nn Oo Pp Qq Rr Ss Tt Uu Vv Ww Xx Yy Zz 1234567890*

These typographic samples were set on a Macintosh system using *Adobe* typefaces. *Univers* and *Minion* were selected for their classic appearance and readability. Careful consideration should be given to letter and line spacing to enhance legibility.

*Univers* and *Minion* may be used together in printed materials (e.g., *Minion Black* as headline copy and *Univers 55* as body copy).

## EXHIBIT 7

## <u>COOPERATIVE ADVERTISING PROGRAM</u>

Delco will offer Pana-Pacific funds, credits or other incentives in support of Pana-Pacific's advertising of Products, according to the terms of Section 14 hereof (the "Cooperative Advertising Program"). Any Pana-Pacific advertising for which Pana-Pacific has received or seeks funds, credits or other incentives from Delco pursuant to the Cooperative Advertising Program may not refer to any Product price less than the Delco minimum advertised price ("MAP") set by Delco for each Product (if any). MAP for each Product shall be specified in the Price Schedules provided by Delco to Pana-Pacific from time to time. From time to time Delco may offer additional discounts on Products. Pana-Pacific may not offer for sale any Product at a price lower than the MAP. Conversely, Pana-Pacific may set selling prices above the MAP within a distribution channel but such selling prices will not be set commercially unreasonably high for the Product and the target market. Any adjustment to MAP will be specified in writing by Delco and will be supplied to Pana-Pacific in advance.
"Pana-Pacific Advertising" refers to Product advertising, other than in store advertising and promotions, including, but not limited to, advertising in any media, TV, radio, newsprint, direct mail, billboard or other promotional material.

Pana-Pacific's advertising Products below MAP in advertisements for which Pana-Pacific has received or seeks funds, credits or other incentives from Delco as described above shall be considered in breach of MAP terms and will not be entitled to receive any market development funds, volume incentive rebate credits, co-operative advertising funds or any other incentive program credit for the calendar quarter in which the advertisement breaching MAP terms took place.

