# EXHIBIT B

# EXHIBIT B

# REPRESENTATIVE AGREEMENT

This Representative Agreement ("Agreement") is entered and effective as of October 7 2003 (the "Effective Date") by and between MobileAria, Inc. ("Company"), with its principal place of business at 800 W El Camino Real, Mountain View, CA 94040 and The Brix Group dba Pana-Pacific ("Representative"), with its principal place of business at 80 Van Ness Avenue, Fresno, CA 93721.

## BACKGROUND

A.   Company develops and markets telematics software services for the commercial vehicle and passenger vehicle markets.

B.   Representative is in the business of marketing and sales of electronic products to the transportation industry.

C.   Company desires Representative to market and support its services to third parties and Representative desire to provide such marketing services on behalf of Company.

In consideration of the covenants and conditions contained in this Agreement, Representative and Company agree as follows:

## AGREEMENT

1.   **DEFINITIONS.**

    1.1   **"Company Marks"** means all Company trademarks, service marks, trade names, domain names, logos and other words or symbols identifying the Company Services, Company or Company's business, listed in Exhibit D attached hereto.

    1.2   **"Company Services"** means those telematics services offered by Company from time to time. The Company Services offered as of the Effective Date are those services as further described in Exhibit A attached hereto.

    1.3   **"Customer"** means an individual or entity in the Territory, other than a House Account or Special Account that subscribes to Company Services for use in its regular course of such customer's business and not for resale.

    1.4   **"Enabled Vehicle"** means a designated vehicle owned or leased by Customer for which Company has activated an account for the provision of the Company Services.

    1.5   **"End User Agreement"** means Company's then-current applicable end user terms and conditions of sale and license for the Company Services, subject to revision by Company from time to time.

    1.6   **"House Account"** means an account: (a) which is the sole responsibility of Company's direct sales force; (b) from which Representative may not solicit or take orders for the sale of the Company Services; and (c) for which no commissions are payable to Representative. The current House Accounts as of the Effective Date are listed in Exhibit F attached hereto. Company has the absolute right to designate (or remove) certain additional customer accounts as House Accounts at any time during the term of this Agreement upon thirty (30) days written notice to Representative. Upon such notice, the additional House Accounts so designated shall be deemed added to (or removed from) the list set forth on Exhibit F.

    1.7   **"Leased Products"** means Products that a Customer obtains on a lease-basis from a third-party lessor, where Representative is deemed the vendor of such Products for purposes of the applicable lease.

    1.8   **"Products"** means third party hardware products, peripherals and accessories that are necessary for the Customer to use the Company Services, together with related documentation, and other related materials, if any, that Representative shall be required to obtain directly from the applicable third party suppliers.

Gray Cary\PA\10323676.2
2101644-900100

1.9     "**Representative Marks**" means Representative's trademarks, service marks, trade names, domain names, logos and other words identifying Representative or the Products all of which are described on <u>Exhibit D</u> attached hereto.

1.10    "**Special Accounts**" means an account governed by the following circumstances: Representative and Company acknowledge that special situations may arise with certain accounts that require unique considerations with respect to Company Services price, sales efforts, terms and conditions, servicing and the like. The current Special Accounts in the Territory at the time of execution of this Agreement are listed in <u>Exhibit F</u>. Any subsequent designation of a "Special Account" shall be by mutual written agreement between Company and Representative. Neither Company nor Representative can change a "Customer" designation to a "Special Account" designation without mutual written agreement from both parties.

1.11    "**Territory**" shall mean the geographic territory, market segment and/or named accounts set forth on <u>Exhibit E</u> attached hereto.

2.      **APPOINTMENT.**

Company hereby appoints Representative, and Representative hereby accepts such appointment, as a non-exclusive sales representative of its Company Services to Customers and potential Customers in the Territory. Representative shall have the right during the term of this Agreement to represent to the public that it is an authorized independent sales representative of Company for the Company Services only. Company has the absolute right to conduct promotional and sales efforts either within or outside the Territory; provided, however, that such sales efforts shall not relieve Company of its obligation to pay commissions to Representative in accordance with this Agreement. Nothing contained in this Agreement shall prohibit Company from considering and/or entering into a sales representative relationship with any other person or organization at any point in time. Company has the absolute right to contact any of the Customers or potential Customers in the Territory at any time, with or without notice to Representative.

3.      **REPRESENTATIVE'S ROLES.**

3.1     *Sales Training.* Representative shall retain, and Company will train Representative salespersons in the enrollment of Customers, the operation of the Company Services and the sale of the Products in accordance with Section 9.3 ("Training").

3.2     *Customer Solicitation.* Representative shall use its best efforts to introduce, promote the sale of, solicit and obtain orders for Company Services from Customers in the Territory in accordance with the terms of this Agreement. Representative shall solicit Customers by using the most current versions of End User Agreements, price plan brochures, forms and related material (the "Service Forms"), and shall comply with all of Company procedures and practices for solicitation of, presentations to, and enrollment of Customers, as Representative is apprised of from time to time and which may be amended from time to time. Representative may not modify the terms and conditions of the Service Forms.

3.3     *Customer Base Expansion.* Representative shall expand the Customer base of business for Company and otherwise use its best efforts to promote demand for Company Services in the Territory on Company's behalf. Representative will devote as much time, attention and skill as may be necessary to properly conduct such activities, and shall at all times faithfully, honestly and diligently perform its obligations hereunder.

3.4     *Customer Satisfaction.* For each Customer that Company refers to Representative for Products, Representative agrees that it shall fulfill its obligations to each such Customer in accordance with the terms and conditions of the agreement between Representative and each such Customer with respect to the Products (including by way of example only, warranty and support obligations).

3.5     *Expenditures.* Representative shall bear the entire cost and expense of conducting all of its activities under this Agreement including by way of example only, (a) maintaining its own office space and facilities; (b) maintaining a competent and adequately trained, skilled and motivated sales organization for the sale of Company Services in the Territory; and (c) preparing advertising and marketing materials for the promotion of the Company Services in the Territory.

3.6     *Copies of all quotations.* Representative shall provide Company with a copy of all quotations made, negotiated, transmitted or in any way handled by Representative regarding sale of the Company Services in the Territory.

3.7  **Credit Information.**  Representative shall furnish Company with any information which Representative may have from time to time relating to the credit standing of any of the Customers and potential Customers. Representative shall also furnish Company with credit references when requested and assist Company in the collection of overdue accounts upon Company's written request.

3.8  **Leasing Terms.**  If and when a Customer elects to obtain Leased Products for use with the Company Services, Representative agrees that the third-party leasor shall be entitled to assign to Customer and Customer shall be entitled to have the benefit of any and all of Representative's warranties, service agreement and indemnities, if any, with respect to the Leased Products that Representative customarily offers all of its other customers for the Products.

4.  **SALES & MARKETING.**

4.1  **Executive Committee.**  The parties agree to form an executive committee (the "Executive Committee"), which shall meet from time to time upon request of either party, but in no event less often than at least once per month in person or by telephone in order to discuss the following issues: (i) marketing and sales efforts by the parties; (ii) future roadmap and Company Services planning (including without limitation, material changes and discontinuance of any Company Services) and Representative Service; (iii) technical issues including, without limitation, coordination and implementation of technical requirements for the Company Services; (iv) commercial-related issues; and (v) Wireless Carrier CMRS and telematics services certification issues. The first meeting of the Executive Committee will take place within thirty (30) days of the Effective Date. Each party shall appoint one (1) member of the Executive Committee (an "Executive Committee Member"), who will be the primary point of contact and responsible party for issues relating to this Agreement. Such Executive Committee Member may be substituted from time to time at the sole discretion of the appointing party upon written notice to the other party.

4.2  **Marketing Materials.**  Representative shall be responsible for preparing and producing its own advertising and marketing materials for the Company Services. Prior to initial circulation or display of any such advertising and/or marketing materials, such materials must be approved in writing by Company.

(a)  **Company Provided Samples.**  Company will provide Representative with a reasonable quantity of Company's Sales Form, pricing information and technical data related to the Company Services, to the extent Company makes such materials generally available to its customers. Company grants Representative a royalty-free, non-exclusive, non-transferable worldwide license to reproduce and distribute such materials in connection with Representative's promotion of the Company Services under this Agreement. Representative may not modify any such materials without Company's prior written approval.

(b)  **Company Provided Sales Tools.**  Company agrees to provide sufficient sales tools to Representative to allow Representative to adequately represent Company Services to Customers. Sales tools include the following items: sales power point presentation, portal access, End User Agreements, non-disclosure forms, requirements checklist, updated pricing sheets for all applicable communication plans (Orbcomm, Sprint, WiFi), account activation forms, account set-up checklist, and ROI worksheet. Company agrees to provide all stated materials to Representative within forty five (45) days of Effective Date of this Agreement (or such other period mutually agreed by the parties).

4.3  **Cooperation.**  Each party agrees to work towards creating mutually agreed upon opportunities to promote the other through tradeshows and other promotional opportunities.

(a)  **Joint Press Release.**  The parties will agree on one (1) or more joint press releases to be issued upon execution of this Agreement. Subject to the foregoing, neither party may issue a press release referring to this Agreement or the relationship created hereunder without the prior written approval of the other party, which approval will not be unreasonably withheld.

(b)  **Links.**  Each party will include and maintain one (1) or more links to the other party's web site. Such link(s) will: (i) display the trademarks of the other party licensed under this Agreement and (ii) be prominently located on the page(s) of such party's web site promoting the Company Services.

(c)  **Roles and Responsibilities.**  In addition to that set forth in this Agreement, the parties agree that in order to offer the Company Services to Customers, each party shall be responsible for certain tasks during the overall sales and implementation process, as such are generally outlined in Exhibit C attached hereto.

Gray Cary\PA\10323676.2
2101644-900100

4.4     *License To Company Marks.* Company hereby grants to Representative a non-exclusive, non transferable and restricted license to use the Company Marks (i) in all marketing, materials related to the Company Services within the Territory; and (ii) in connection with the link(s) pursuant to Section 4.3(b) ("Links"). Use of the Company Marks shall comply with Company's then-current trademark usage guidelines. All use and associated goodwill of the Company Marks shall inure to Company's benefit. Representative shall suspend use of the Company Marks if Company reasonably determines Representative is improperly using the Company Marks until Representative has taken the steps Company may reasonably require to correct the deficiencies. Representative agrees not to obtain or attempt to obtain by any manner whatsoever any right, title or interest in or to any of the Company Marks, domain name or any confusingly similar mark. Any use of the Company Marks beyond the scope of this Section shall constitute infringement and material breach. Company may, from time to time, request in writing specimens of marketing material that reference the Company Services, Company or the Company Marks, to assess the level of consistency and quality of use of the respective trademark and to ensure that Representative maintains the consistency and quality of the Company Marks throughout the term of this Agreement.

4.5     *License To Representative Marks.* Representative hereby grants to Company a non-exclusive, non transferable and restricted license to use the Representative Marks (i) in all advertising and marketing materials related to Representative's status as an authorized sales representative of the Company Services within the Territory; (ii) refer Customers to Representative for the sale of Products; and (iii) in connection with the link(s) pursuant to Section 4.3(b) ("Links"). Use of the Representative Marks shall comply with Representative's then-current trademark usage guidelines. All use and associated goodwill of the Representative Marks shall inure to Representative's benefit. Company shall suspend use of the Representative Marks if Representative reasonably determines Company is improperly using the Representative Marks until Company has taken the steps Representative may reasonably require to correct the deficiencies. Company agrees not to obtain or attempt to obtain by any manner whatsoever any right, title or interest in or to any of the Representative Marks, domain name or any confusingly similar mark. Any use of the Representative Marks beyond the scope of this Section shall constitute infringement and material breach. Representative may, from time to time, request in writing specimens of advertising or marketing material that reference the Representative or the Representative Marks, to assess the level of consistency and quality of use of the respective trademark and to ensure that Company maintains the consistency and quality of the Representative Marks throughout the term of this Agreement.

4.6     *Cooperation and Follow-Up.* Representative shall cooperate with and assist Company in sales promotion efforts within the Territory. Whenever requested by Company, Representative shall follow up on sales correspondence between Company and any Customer or prospective Customer of Company Services within the Territory. Company agrees to provide reasonable sales and technical support training to Representative's staff during the initial ninety (90) days of this Agreement, at times, dates and locations mutually agreed by the parties.

5.      **TERMS OF SALE AND ORDERING.**

5.1     *Quotations.* Company may change or withdraw any quotation made by it (or by Representative on its behalf) at any time without notifying or obtaining the prior consent of Representative, and Representative shall not be entitled to receive any compensation by reason of any such change or withdrawal. Notwithstanding the foregoing, Company shall not have the right to change a quotation once such quotation has been provided to a Customer or potential Customer. If and when Company desires to make a change a quotation, Company agrees to get Representative's consent for any such change, with such consent not to be unreasonably withheld or delayed.

5.2     *Prices.* The initial pricing ("Initial Pricing") for the Company Services as of the Effective Date is set forth in Exhibit A. All sales shall be at Company's then-current price and terms, and Company shall have the absolute right, in its sole discretion, to establish, change, alter or amend such prices and other terms and conditions of sale from time to time as it deems necessary or appropriate.

5.3     *Orders.* All orders for Company Services hereunder must be in writing and issued directly by the Customer to Company. If Representative inadvertently receives orders for Company Services directly from Customers, Representative shall promptly forward those orders to Company along with all such information in Representative's possession, custody or control as may be helpful or necessary to Company in evaluating the desirability of accepting such orders. Representative acknowledges and agrees that all orders are subject to acceptance by Company.

5.4     *Terms of Sale.* Customers shall be required to execute Company's standard End User Agreement as a condition of receiving the Company Services.

Gray Cary\PA\10323676.2
2101644-900100

5.5  **Changes in Terms of Sale, Etc.**  Representative shall not make any changes in Company's quotations or terms of sale, nor make any allowances or adjustments in accounts of any Company Services.

5.6  **Refusal of Orders.**  Company may refuse any order or other business originating within or outside the Territory, either for lack of credit of the Customer or for any other reason, which, in Company's sole judgment, are reasonable grounds for such refusal.

5.7  **Discontinuance.**  Company agrees to notify Representative in writing not less than ninety (90) days in advance of the discontinuance of any Company Services. Company will also make a good faith effort to advise Representative of any discontinuance of any Company Services as soon as the matter of discontinuance is raised by the Executive Committee (as defined in Section 4.1 ("Executive Committee")).

5.8  **Forecasts.**  By the fifteenth (15th) day of each calendar quarter, Representative agrees to provide a non-binding forecast to Company which shall include the number of Company Services that Representative reasonably anticipates to purchase in the following quarter.

5.9  **Minimum Commitments.**  Notwithstanding anything to the contrary herein, Representative agrees to a three (3) year volume commitment forecast as listed in Exhibit B attached hereto.

5.10  **Company Referrals.**  Company may refer Customers to Representative for the sale of Products by Representative to such Customers. The terms and conditions of any such sale shall be solely between Representative and the applicable Customer. Representative agrees to notify Company in writing not less than ninety (90) days in advance of the discontinuance of any Products. Representative will also make a good faith effort to advise Company of any discontinuance of any Products as soon as the matter of discontinuance is raised by the Executive Committee.

6.  **COMPENSATION.**

6.1  **Commissions Payable to Representative.**  If and when Company enters into a written, legally binding agreement with a Customer for the Company Services, where such Customer was referred to Company by Representative, Representative shall accrue a commission for the sale of Company Services to Customers in the Territory at the rates and on the frequency set forth in Exhibit B attached hereto.

6.2  **Payment of Commissions to Representative.**  With respect to the commissions accrued and calculated in accordance with Section 6.1 ("Commissions Payable to Representative"), such commissions shall be payable on the following schedule: semi-annual basis in the first (1st) year of this Agreement, quarterly basis in the second (2nd) year of this Agreement and on a monthly basis in the third (3rd) year or any renewal term of this Agreement. If and when commissions reach $10,000 or more on a monthly basis for a period of three (3) consecutive months, then the commissions shall be adjusted to monthly payments for the duration of this Agreement.

6.3  **Other Commission Provisions Applicable to Representative.**

(a)  **No Other Compensation.**  Representative's sole source of compensation for rendering services on Company's behalf pursuant to this Agreement shall be the commissions payable pursuant hereto. Representative shall have no right to receive any other compensation from Company for services rendered as an authorized Company sales representative or to receive reimbursement of any expenses or other costs incurred by Representative in connection therewith.

(b)  **Adjustments.**  There shall be deducted by Company from any present or future commissions earned by, owed to or later accruing to Representative, an amount equal to previously paid commissions (or a portion thereof) received by Representative for any cancelled Company Services. This deduction from or charge against any present or future commissions shall be made in the calendar month immediately following the event giving rise to the need for the deduction from or charge against present or future commissions. Adjustments shall be applied against any commission payments due and payable pursuant to Section 6.2 ("Payment of Commissions to Representative"). In the event that no commissions are earned by Representative within sixty (60) days of the event giving rise to the need for the deduction from or charge against present or future commissions (the "Grace Period"), then, notwithstanding anything to the contrary in this Section, Representative shall reimburse Company for the full amount of such deduction or charge within thirty (30) days of the end of the Grace Period.

SG

(c) *House Accounts.* Representative shall not be entitled to receive any compensation for sales made to designated House Accounts.

(d) *Special Accounts.* Compensation for sales made to Special Accounts shall be mutually agreed by the parties in writing.

6.4 *Commissions Payable to Company.* If and when Representative enters into a written, legally binding agreement with a Customer for the Products, where such Customer was referred to Representative by Company, Company shall accrue a commission for the sale of such Products to Customers at the rates set forth in Exhibit B attached hereto.

6.5 *Payment of Commissions to Company.* With respect to the commissions accrued and calculated in accordance with Section 6.4 ("Commissions Payable to Company"), such commissions shall be payable on the following schedule: semi-annual basis in the first (1st) year of this Agreement, quarterly basis in the second (2nd) year of this Agreement and on a monthly basis in the third (3rd) year or any renewal term of this Agreement. If and when commissions reach $10,000 or more on a monthly basis for a period of three (3) consecutive months, then the commissions shall be adjusted to monthly payments for the duration of this Agreement.

6.6 *No Other Compensation to Company.* Except as provided otherwise in Section 6.4 ("Commissions Payable to Company"), Company shall have no right to receive any compensation from Representative for the referral to Representative of Customers for Products or to receive reimbursement of any expenses or other costs incurred by Company in connection therewith.

6.7 *Commissions Upon Expiration or Termination.* Upon the termination of this Agreement, commission to Representative shall immediately cease, however if Representative continues to "actively service" a Customer as per the terms and quality levels of this Agreement, as determined by MobileAria in its discretion, Company shall pay commissions for those Customer accounts.

6.8 *Taxes.* Commissions paid by one party to the other do not include taxes or other applicable fees or charges. Each party receiving payments from the other party shall be solely responsible for payment of any and all such taxes applicable to such payments.

7. **PROPRIETARY RIGHTS.**

7.1 *Proprietary Rights of Company.* Ownership and all rights, title and interest in and to any patents, copyrights, trade secrets, trademarks, trade names, service marks or any other proprietary rights relating to any Company Services, the Portal (as defined in Section 7.2 below) and Sales Forms are and shall remain solely in Company, its licensors and/or suppliers. If Representative acquires any rights, title or interest in any of the foregoing, it shall assign and hereby does assign all such rights, title and interest. Representative will promptly inform Company of any alleged infringement of Company proprietary rights.

7.2 *Account and Password Protection.* Company agrees to grant Representative a limited right to access Company's "OSD" web portal (the "Portal") for the sole purpose of fulfilling its obligations under this Agreement, including by way of example, sending information to Company regarding a prospective order. Representative shall be entirely responsible for maintaining the confidentiality of its passwords issued by Company for such access. Representative agrees to use its best efforts to prevent any third party from obtaining its passwords, and Representative agrees to inform Company immediately if a password is lost, stolen or disclosed to an unauthorized third party and of any actual or potential unauthorized access to a password or to the Portal. Representative shall be solely responsible for any and all activities made under Representative's account, including any fees that may be incurred under Representative's password-protected account. Representative agrees to comply with the procedures specified by Company from time to time regarding obtaining and updating passwords to the Portal.

7.3 *Proprietary Rights of Representative.* Ownership and all rights, title and interest in and to any patents, copyrights, trade secrets, trademarks, trade names, service marks or any other proprietary rights relating to any Products are and shall remain solely in Representative, its licensors and/or suppliers. Company will promptly inform Representative of any alleged infringement of Representative proprietary rights.

7.4 *No Transfer.* Except for any licenses that are expressly granted by this Agreement, nothing in this Agreement or any course of dealing between the parties will be deemed to create a sale, lease, transfer, conveyance,

license, or other right of use from either party to the other of any intellectual property rights, whether by estoppel, implication or otherwise.

8. **CONFIDENTIALITY.**

8.1 *Definition.* In the course of this Agreement, each party may disclose to the other party information relating to its business and Company Services that it considers confidential and/or proprietary nature ("Confidential Information"). Such Confidential Information may include, but is not limited to, Company Services (whether existing or in the future), Company Services roadmaps, technical information, trade secrets, know-how, inventions, techniques, processes, programs, schematics, software source documents, data, pricing and discount schedules, Customer lists (both prospective and current Customers), financial information, sales and marketing plans and any other non-public information accessible via the Portal.

8.2 *Obligations.* Each party shall keep and hold the Confidential Information of the other party in the strictest confidence, and shall not use such Confidential Information for any purpose, other than what may be reasonably necessary for the performance of its duties to this Agreement, without the prior written consent of the disclosing party. Each party shall only disclose the Confidential Information of the other party to those of its employees or contractors with a need to know such information for the purposes of this Agreement and that have executed appropriate written agreements containing terms and conditions no less protective of the disclosing party's Confidential Information than the terms and conditions contained herein. At a minimum, each party agrees that it will treat all Confidential Information with the same degree of care as it accords to its own Confidential Information of the same and similar nature, but in no event will a party use less than reasonable care. Each party will notify the other party in writing of any misuse or misappropriation of such Confidential Information of the other party that may come to its attention. The rights and obligations of this Agreement shall be confidential to the parties and neither party may disclose any information concerning the contents hereof except as necessary to enforce its rights hereunder, or to its business, financial and legal advisors. Notwithstanding anything to the contrary herein, either party, however, may disclose the existence of this Agreement, the name of the other party, and the general nature of the relationship.

8.3 *Exclusions.* Notwithstanding anything to the contrary herein, the restrictions set forth in this Section shall not apply to information that: (i) was independently developed by the receiving party without any use of or reference to the disclosing party's Confidential Information; (ii) becomes known to the receiving party, without restriction, from a third party who had a right to disclose it without confidentiality obligations; (iii) was in the public domain at the time it was disclosed or becomes in the public domain without breach by the receiving party of this Section; or (iv) was rightfully known to the receiving party, without restriction, at the time of disclosure. A disclosure of the other party's Confidential Information that is required in response to the valid and binding order of a court or other governmental body shall not be deemed a breach of this Section; provided that the receiving party shall (a) immediately notify the disclosing party in writing in order that the disclosing party may obtain a protective order requiring the disclosing party's Confidential Information be used only for which the order was issued; and (b) use reasonable efforts to have such information be treated as confidential and under seal, unless such disclosure is necessary to establish the rights or enforce obligations under this Agreement.

9. **WARRANTIES AND TRAINING.**

9.1 *End User Warranties.* Representative shall have no right or authority, express or implied, directly or indirectly, to alter, enlarge or limit the representations or guarantees expressly contained in Company's most current written Company Services warranty as distributed by Company with the applicable Company Services. Company may, in its sole discretion, amend the Company Services warranty from time to time, and the Company Services warranty as amended will become a part of the Agreement for purposes of this paragraph after Company has delivered a copy of it to Representative.

9.2 *No Warranties.* NO WARRANTY OF ANY NATURE, EXPRESS, IMPLIED OR STATUTORY, AS TO ANY COMPANY SERVICES, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND/OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS, SHALL RUN FROM ONE PARTY TO THE OTHER PARTY UNDER ANY CIRCUMSTANCE.

9.3 *Training.* Within thirty (30) days of the Effective Date of this Agreement, Company agrees to provide employees of Representative at Representative's option, with twenty-four (24) hours of training regarding how to activate and use the Company Services and technical sales of the Company Services (the "Training"). Thereafter, Company agrees to provide a minimum of sixteen (16) hours of Training every six (6) months upon mutually agreed to times. All training shall take place at Company's facilities, unless the parties mutually agree otherwise in writing. Upon completion of each Training, Company agrees to provide each participant in such Training

Gray Cary\PA\10323676.2
2101644-900100

with a certificate indicating such participant completed such Training, describing the Training provided and the date on which the Training was completed. Within thirty (30) days of the Effective Date of this Agreement and from time to time thereafter, Company further agrees to provide Representative with any documentation pertaining to how to activate and use the Company Services and technical sales of the Company Services. All travel and living expenses of Representative employees are the responsibility of Representative; all costs of providing training materials for Representative employees attending such training will be the responsibility of Company. All travel and living expenses, if any, of Company employees (or Company's independent contractors), will be the responsibility of Company.

10. **INDEMNIFICATION.**

10.1 *Company Indemnity Obligations.* Company shall defend, indemnify and hold Representative harmless against any and all damages, costs, liabilities, expenses (including reasonable attorneys' fees) and settlement amounts incurred in connection with any suit, claim, or action by any third party alleging that the Company Services infringe any Unites States patent or copyright or that Company misappropriated a trade secret in the development thereof. Company's obligation to indemnify hereunder is subject to Representative (i) giving Company prompt written notice of any such claim; (ii) giving Company sole control over the defense and settlement of any such claim; (iii) providing full cooperation for the defense of any such claim, at Company's expense; and (iv) not entering into any settlement or compromise of any such claim without Company's prior written approval. **This Section 10.1 states Company's sole and exclusive liability and Representative's sole and exclusive remedy with respect to the claims described in this Section.**

10.2 *Representative Indemnity Obligations.* Representative agrees to indemnify and hold harmless Company from any claim or damages (including reasonable attorney's fees) made against Company, its officers, directors, employees and agents, as a result of negligence, misrepresentation, or error or omission on the part of Representative or the representatives of Representative. Representative shall be solely responsible for any claims, warranties or representations made by Representative or Representative's employees or agents which differ from the warranty provided by Company directly to the Customer or relating to any claim made by Representative that conflicts with the scope of the warranties set forth in the End User Agreement.

11. **LIMITATION OF LIABILITY.**

EXCEPT FOR A BREACH OF SECTION 8 ("CONFIDENTIALITY") OR OBLIGATIONS ARISING UNDER SECTION 10 ("INDEMNIFICATION"), IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR REVENUE OR BUSINESS, OR FOR ANY PUNITIVE, SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, UNDER ANY CAUSE OF ACTION, WHETHER FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. THIS LIMITATION WILL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN. COMPANY'S TOTAL LIABILITY TO REPRESENTATIVE HEREUNDER, UNDER THEORIES OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, SHALL BE LIMITED TO THE AMOUNTS PAID OR PAYABLE (WHICHEVER IS GREATER) BY COMPANY TO REPRESENTATIVE UNDER THIS AGREEMENT.

12. **TERM AND TERMINATION.**

12.1 *Term.* This Agreement will be in effect for an initial term of three (3) years and shall become effective on the Effective Date and shall automatically renew for additional one (1) year periods, unless terminated earlier in accordance with the terms of this Agreement.

12.2 *Termination With Cause.* Either party may terminate this Agreement upon any material breach or default of the other party, which has not been cured within thirty (30) days after written notice, unless otherwise mutually agreed by the parties in writing. In addition, if a party ("Insolvent Party") becomes insolvent or is placed in receivership or upon the commencement by or against such Insolvent Party of bankruptcy proceedings or any other proceedings for the settlement of such Insolvent Party's debts, or upon such Insolvent Party making of an assignment for the benefit of creditors, or upon commencement of any act or action concerning such Insolvent Party's dissolution or liquidation, the other party may terminate this Agreement immediately by giving Insolvent Party written notice of termination; provided, that the foregoing shall not prejudice the rights of the parties pursuant to 11 U.S.C. Section 365(n).

12.3 *Termination Without Cause.* Company may terminate this Agreement at any time and for any reason, without penalty, upon ninety (90) days written notice to the other party.

12.4    **Effect of Termination.** Upon the expiration or termination of this Agreement for any reason:

(a)    Representative shall cease acting as Company's authorized sales representative and using the Company Marks;

(b)    Each party shall disable the links to the other party's web site and Company shall disable Representative's access to the Portal;

(c)    All licenses granted by either party hereunder shall terminate;

(d)    Each party shall return the Confidential Information of the other party or certify its destruction, subject to the receiving party's right to retain one (1) copy of any written document in the files of its law department or outside legal counsel for record purposes only;

(e)    Promptly upon the termination of this Agreement, Representative shall turn over to Company all Confidential Information and all other Company information and material, including, without limitation, all samples, pamphlets, catalogs, booklets and other technical advertising data and literature concerning Company and/or its Company Services, and all copies thereof, in the possession, custody or control of Representative;

(f)    Each party shall pay the other party any and all payment obligations owed to the other party within the time period such payments would otherwise be due and payable; and

(g)    Company's acceptance of any order after the termination of this Agreement shall not be construed as a renewal or extension of this Agreement, or as a waiver of the right to terminate or of any other matter or right. Company shall have the right after the termination of this Agreement to deal with, solicit orders from, any and all persons or entities, including Customers or potential Customers who dealt with or placed orders through Representative, without any liability of any kind to Representative.

12.5    **Survival.** The provisions of 6.7 ("Commissions Upon Expiration or Termination"), 6.8 ("Taxes"), 7 ("Proprietary Rights"), 8 ("Confidentiality"), 9.1 ("End User Warranties"), 9.2 ("No Warranties"), 10 ("Indemnification"), 11 ("Limitation of Liability"), 12.4 ("Effect of Termination"), 12.5 ("Survival") and 13 ("General Terms") of this Agreement shall survive the termination or expiration of this Agreement for any reason.

13.    **GENERAL TERMS.**

13.1    **Noninterference with Business.** During the term of this Agreement, Representative will not accept work, enter into a contract or accept an obligation inconsistent or incompatible with Representative's obligations, or the scope of services to be rendered for Company, under this Agreement. Representative warrants that, to the best of Representative's knowledge, there is no other existing contract or duty on Representative's parts that conflicts with or is inconsistent with this Agreement. Representative agrees to indemnify Company from any and all loss or liability incurred by reason of the alleged breach by Representative of any services agreement with any third party. During this Agreement, and for a period of one (1) year immediately following the termination or expiration of this Agreement, Representative agrees not to solicit or induce any Customer to terminate or breach a contractual or other relationship with Company.

13.2    **Assignment.** Neither party shall have the right to assign this Agreement or delegate its duties hereunder without the prior written consent of the other party, with such consent not to be unreasonably withheld. Notwithstanding the foregoing, either party may, without the written consent of the other party (but with written notice), assign this Agreement, in whole or in part, in connection with a corporate reorganization, consolidation, merger or sale of all or substantially all of its assets. Subject to the foregoing, this Agreement shall be binding upon the heirs, successors, and assigns of the parties.

13.3    **Choice of Law.** This Agreement will be governed by the laws of the State of California as applied to agreements entered into and to be performed entirely within California between California residents. The United Nations Convention on Contracts for the International Sale of Goods (1980 and any amendments thereto) is specifically excluded from application to this Agreement.

13.4    **Notices.** All notices or reports permitted or required under this Agreement shall be in writing and shall be delivered by personal delivery, telegram, telex, telecopier, facsimile transmission, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery, or upon acknowledgment of receipt

of electronic transmission, and addressed to the party to whom notice is given to as follows (or such other address as either party may specify in writing):

    If to Company, to:
    Karl Mehta
    MobileAria, Inc.
    800 West El Camino Real, Suite 240
    Mountain View, CA 94040
    Attn:    Karl Mehta
    Fax:    (650) 937-1078
    With Copy to: General Counsel

    If to Representative, to:
    Deborah Cameron
    The Brix Group dba Pana-Pacific
    80 Van Ness Avenue,
    Fresno, CA 93721
    Attn:    John Trenberth
    Fax:    559.266.1368

    13.5    **Severability.** In the event that any provision of this Agreement shall be unenforceable or invalid under any applicable law or be so held by applicable court decision, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole, and, in such event, such provision shall be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions.

    13.6    **Waiver.** The failure of either party to require performance by the other party of any provision hereof shall not affect the full right to require such performance at any time thereafter; nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself. To be effective, a waiver must be expressly stated in writing and be signed by the party making such waiver.

    13.7    **Import/Export.** The parties will not knowingly export or re-export, directly or indirectly, any technical data (as defined by the U.S. Export Administration Regulations), supplied under this Agreement to a destination to which such export or re-export is restricted or prohibited by U.S. or non-U.S. law without obtaining prior authorization from the U.S. Department of Commerce and other competent government authorities to the extent required by those laws; or export or re-export directly or indirectly, any direct Company Services of such technical data, including software, to a destination to which such export or re-export is restricted or prohibited by U.S. or non-U.S. law without obtaining prior authorization from the U.S. Department of Commerce and other competent government authorities to the extent required by those laws.

    13.8    **Independent Contractor.** Representative is and at all times shall be an independent contractor in all matters relating to this Agreement. Representative and its employees are not agents of Company for any purposes and have no power or authority to bind or commit Company in any way. Representative and its employees are not and shall not act as employees of Company for any purpose, or under any other laws or regulations which would or might impute any obligation or liability to Company by reason of any employment relationship. Representative shall not enter into any agreement, contract or arrangement with any government or government representative or with any other person, firm, corporation, entity or enterprise imposing any legal obligation or liability of any kind on Company.

    13.9    **Injunctive Relief.** It is expressly agreed that a material breach of this Agreement may cause irreparable harm to Company or Representative and that a remedy at law may be inadequate. Therefore, in addition to any and all remedies available at law, either Representative or Company (as applicable) shall be entitled to seek an injunction or other equitable remedies in all legal proceedings in the event of any threatened or actual violation of any or all of the above provisions.

    13.10    **Headings.** The section headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or extent of such section or in any way affect such section.

    13.11    **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Gray Cary\PA\10323676.2
2101644-900100

13.12  **Entire Agreement; Modifications; Waiver.**  This Agreement, including the attached Exhibits, completely and exclusively states the entire agreement of the parties as of the Effective Date hereof regarding its subject matter. It supersedes, and its terms govern, all prior or contemporaneous proposals, agreements, or other communications between the parties, oral or written, regarding such subject matter. This Agreement shall not be modified except by a subsequently dated written amendment signed on behalf of Representative and Company by their duly authorized representatives. Any modifications to this Agreement shall be in a writing signed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their respective officers hereunto duly authorized.

MobileAria, Inc.

By: _____

Printed name: SACHAL GIDUANI

Title: PRESIDENT

The Brix Group DBA Pana-Pacific

By: _____

Printed name: Harry G. Brix

Title: Chairman

Gray Cary\PA\10323676.2
2101644-900100

## EXHIBIT A

### COMPANY COMPANY SERVICES & PRICING

**BASIC - $30/vehicle/month**
- Fleet tracking
- Trip information (includes automated messaging and automated arrival/departure notification)
- DOT driver logs
- Vehicle diagnostics-ECSM messages and Diagnostic Scripts
- Pre/post trip inspection (on-board)
- Fuel tax (with automated state-line crossing)
- Driver performance reports
- Driver authentication
- Over-the-air programming
- Personalized web-based portal, customer/technical support, 24x7 hosting

**ENHANCED - $40/vehicle/month**
- GeoWave (Dynamic Geo-fence) OR External email
- Dynamic ETA (Estimated Time of Arrival)
- Enhanced vehicle diagnostics-ECM and Diagnostic Scripts
- Traffic alerts
- Weather alerts
- All basic applications

**PREMIUM - $50/vehicle/month**
- TruckSecure*
- Directions
- External email OR Geo-Wave
- All enhanced applications

**Notes:**
- TruckSecure: Emergency event charge is $65/call, excluding charges from PSAP/Local Authorities
- MobileAria Activation Charge: $20 per vehicle – one time fee.
- Installation and Training Pricing. Available upon request.
- Leasing option available upon request.
- All prices and application configurations are subject to change.
- Customized packages are available upon request.
- All prices set forth in this exhibit exclude any applicable taxes.

**Airtime Service (not included):**
Terrestrial Cellular – CDMA 1 xRTT Sprint PCS: $5/vehicle/mo, 250Kb peak, 250 Kb non-peak Satellite – Orbcomm: See Orbcomm Price Plan 802.11b: Available upon request
Least Cost Routing: Available upon request
Wireless Carrier Activation Charges – Not Included

* The parties will agree on a standard set of terms and conditions that shall govern any sale of TruckSecure Services.

Gray Cary\PA\10323676 2
2101644-900100

## EXHIBIT B

### COMMISSIONS, VOLUME COMMITMENTS AND RESOURCE COMMITMENTS

**A.    COMMISSIONS**

**1.    COMPANY SERVICES:**

For marketing Company Services to Customers, where Company elects to enter into a legally binding agreement with such Customer, Representative will earn the following commissions only so long as such agreement with the Customer remains in effect in accordance with the schedule(s) set forth below. For purposes of clarification, in the event Company enters into such an agreement, thereby triggering the right of Representative to earn commissions, such commissions shall (a) be calculated on a month-by-month basis; (b) only accrue on a month-by-month basis and (c) only be due and payable as Company receives the applicable fees from the Customer for each month.

(i)    Standard Commission:

| Company Services Package | Commission |
| --- | --- |
| Basic | 6% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |
| Enhanced | 10% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |
| Premium | 10% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |

(ii)    Supplemental Commission:

Notwithstanding anything to the contrary in the Agreement, Representative may offer the Company Services to a potential Customer at a price greater than Company's then-current standard monthly fee, at increased prices mutually agreed by the parties in writing.

If Representative sells Company Services at the increased price, then both Representative and Company will share an equal 50%/50% of the incremental amount above the Company standard monthly fee. Company shall then retain fifty percent (50%) of such fees and shall remit Representative's share of such fees in accordance with the same terms and conditions applicable to standard commissions. For purpose of clarification, regardless of whether or not volume commitments are met, Company shall pay Representative the supplemental commission.

For purposes of clarification, Representative shall earn the standard commission on the standard monthly fee (as such commission is described in (i) above) and shall earn the supplemental commission equal to fifty percent (50%) only on those fees that exceed the standard monthly fee.

(iii)    Adjusted Commission:

If Representative fails to meet the applicable sales volume commitment (as described in Section B below) prior to the expiration of the then-current year of the Agreement (an "Adjustment Year"), then Company shall recalculate and retroactively adjust the commissions otherwise earned by Representative during the Adjustment Year based upon the following commission structure (the "Adjusted Commission"):

| Company Services Package | Commission |
| --- | --- |
| Basic | 0% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |
| Enhanced | 1% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |
| Premium | 3% of the standard monthly fee charged by Company to the Customer for the Company Services for each Enabled Vehicle |

Gray Cary\PA\10323676.2
2101644-900100

Upon calculation of such adjustment, Company shall have the option to either (a) issue an invoice to Representative for an amount equal to the difference between the actual commissions paid by Company to Representative during the Adjustment Year and the Adjusted Commission (the "Over Payment") or (b) offset the Over Payment against commissions that Representative earns during the duration of the Agreement until such time that the amount of such Over Payment reaches zero dollars ($0.00), at which time, Company shall commence the payment of commissions to Representative in accordance with the Agreement. Company shall retain the right to issue an invoice for the Over Payment or offset fees owed by Company to Representative, if any, upon any expiration or termination of the Agreement.

2.  **Accessories & Peripherals:**

For selling Accessories and Peripherals, Company will earn a seven percent (7%) commissions for the invoiced amount of each Product sold by Representative to a Customer, less freight, transportation or other delivery charges. If the Representative fails to meet the applicable sales volume commitment, Representative will pay ten 10% commissions for the invoiced amount.

B.  **SALES VOLUME COMMITMENT**

The above listed commissions are earned by Representative for the following annual target volumes of service activated vehicles

| Year: | Volume : |
|---|---|
| 2003 | 1,000 or more Enabled Vehicles |
| 2004 | 26,500 or more Enabled Vehicles |
| 2005 | 60,000 or more Enabled Vehicles |
| 2006 | 60,000 or more Enabled Vehicle |

Gray Cary\PA\10323676.2
2101644-900100

**EXHIBIT C**

ROLES AND RESPONSIBILITIES

## Roles and Responsibilities

| # | Tasks | DE | MA | PP |
|---|---|---|---|---|
| 1 | Sales & customer planning | | | R |
| 2 | Forecasting | | | R |
| 3 | Lead generation | | | R |
| 4 | Customer contact, call process | | | R |
| 5 | Sales presentation (Executive, Sales Rep, Technical) | | | R |
| 6 | Sales lead follow-up | | | R |
| 7 | Tracking sales leads | | | R |
| 8 | Sales collateral (TruckPC, Software, Pana Process) | | | R |
| 9 | Article/Advertisement placement | | | R |
| 10 | Exhibits/Demos/Pilots and associated Hardware & peripherals | | | R |
| 11 | Determine customer requirements (technical, business, etc) | | S | R |
| 12 | Generate system requirements | | S | R |
| 13 | Generate hardware configurations for TPC, brackets, cables, etc | S | | R |
| 14 | Generate initial hardware configuration pick-list for Modems | | R | S |
| 15 | Test and validate new peripherals and system configurations | | R | |
| 16 | Issue specification and quote to customer | | | R |
| 17 | Win the business (program plan, approval cycle) | | | R |
| 18 | Program management (plan, review cycle) | S | S | R |
| 19 | Dist. fills out Service Order Activation Form (SOAF) on OSD Portal | | | R |
| 20 | OSD Portal sends hardware spec (e.g. modem) to Distributor | | R | |
| 21 | OSD Portal sends modem provisioning request to Carrier OSS | | R | |
| 22 | OSD Portal routes apps, billing, account info inside MobileAria | | R | |
| 23 | Carrier OSS sends provisioning details to OSD Portal | | R | |
| 24 | Provisioning platform generates records/entries | | R | |
| 25 | Order hardware (approval cycle, order process) | | | R |
| 26 | Tracking order against P.O. | | | R |
| 27 | Hardware received at Distributor | | | R |
| 28 | MobileAria software sent to Distributor (or downloaded from Portal) | | R | |
| 29 | Activate appropriate MobileAria applications via OTAP | | R | |
| 30 | Activate customer account in MobileAria systems | | R | |
| 31 | Network activation | | R | |
| 32 | Create vehicle install kits | | | R |
| 33 | Perform system test (TPC, Peripherals, & software) | | | R |
| 34 | Ship kits to customer install location | | | R |
| 35 | Generate hardware installation procedures | | | R |
| 36 | Generate software install procedures | | R | |

ROLES & RESPONSIBILITIES (CONT.)

### Roles and Responsibilities

| # | Tasks | DE | MA | PP |
|---|---|---|---|---|
| 37 | Maintain hardware installation procedures/documentation | | | R |
| 38 | Maintain software installation procedures/documentation | | | R |
| 39 | Create an installation schedule for each order | | | R |
| 40 | Coordinate install at customer site | | | R |
| 41 | Install hardware at customer (software already installed at Dist.) | | | R |
| 42 | Certify customer as "certified Truck PC installer" | | | R |
| 43 | Activate device ID | | | R |
| 44 | End-to-end system check (hardware, software, portal, connection) | | R | |
| 45 | Provide installation technical support | | | R |
| 46 | Perform in-vehicle testing | | | R |
| 47 | Peform training for drivers, fleet mgrs, etc | | | R |
| 48 | Customer acceptance | | | R |
| 49 | Notify billing module & intiate customer support | | | R |
| 50 | Setup billing module | | | R |
| 51 | Customer backend system integration | | R | |
| 52 | Vehicle goes live | | R | |
| 53 | Configuration management - per installation | | | R |
| 54 | Hardware billing | | R | |
| 55 | Software & Communications billing | | | R |
| 56 | Provide end user tech support - Tier 1 | | R | |
| 57 | Truck PC and hardware peripheral tech support - Tier 2 | | R | |
| 58 | Truck PC technical support - Tier 3 | R | | R |
| 59 | Develop diagnostic tools for installation | | R | |
| 60 | Repair ticket process (open, assign, track, close, report, QA, etc) | | | R |
| 61 | Warranty process (RMA, etc) | | | R |
| 62 | Maintain Delphi source code for Truck PC | R | R | |

Responsible=R    Support=S

EXHIBIT D

LICENSED TRADEMARKS

A.   **MOBILEARIA MARKS**

# MobileAria

# Fleet by MobileAria

# TruckSecure

B.   **REPRESENTATIVE MARKS**



**EXHIBIT E**

**TERRITORY**

United States, Canada, Mexico

# EXHIBIT F

### HOUSE ACCOUNTS AND SPECIAL ACCOUNTS

HOUSE ACCOUNTS: BP

SPECIAL ACCOUNTS: AIRGAS, INC. (VOLUMES TO COUNT TOWARDS SALES QUOTA, NO COMMISSIONS)