TAFT STETTINIUS & HOLLISTER LLP   **Hearing Date and Time: January 31, 2008 at 10:00 a.m.**
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45240
Timothy J. Hurley (OH Bar #0006458)
hurley@taftlaw.com
Richard L. Ferrell (OH Bar #0063176)
ferrell@taftlaw.com
 (513) 381-2838 (Telephone)
(513) 381-0205 (Fax)

Attorneys for United States Steel Corporation

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Case No. 05-44481 |
| | : | |
| DELPHI CORPORATION, et al. | : | |
| | : | |
| Debtors. | : | |
| | : | |

**AFFIDAVIT OF ARNE S. JAHN IN SUPPORT OF
UNITED STATES STEEL CORPORATION'S SUPPLEMENTAL RESPONSE
TO DEBTORS' NINETEENTH OMNIBUS OBJECTION (SUBSTANTIVE)
PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007
TO CERTAIN (A) INSUFFICIENTLY DOCUMENTED CLAIMS, (B) CLAIMS
NOT REFLECTED ON DEBTORS' BOOKS AND RECORDS, (C) UNTIMELY
CLAIM, AND (D) CLAIMS SUBJECT TO MODIFICATION, TAX CLAIMS
SUBJECT TO MODIFICATION, MODIFIED CLAIMS ASSERTING
RECLAMATION, AND CONSENSUALLY MODIFIED AND REDUCED CLAIMS
<u>(UNITED STATES STEEL CORP./SPCP GROUP L.L.C. CLAIM NO. 8657)</u>**


| | | |
|---|---|---|
| STATE OF PENNSYLVANIA | ) | |
| | ) | SS: |
| COUNTY OF ALLEGEHENY | ) | |

Arne S. Jahn, being first duly cautioned and sworn, states of his personal knowledge as follows:

{W1162795.2}

1. I am over 21 years of age, and I am a resident of Allegeheny County, Pennsylvania. I have been employed by United States Steel Corporation ("U.S. Steel") since June, 2004, first as a Corporate Finance Manager and, since August, 2006, as a Credit Manager. As a Credit Manager, my responsibilities include assessing the credit risk presented by U.S. Steel's customers and prospective customers, collection of cash due to U.S. Steel, and application of cash received by U.S. Steel to the appropriate customers and transactions. Through my employment with U.S. Steel, I have learned the processes and procedures used by U.S. Steel in its regular business activities to receive customer orders for steel products, to sell and ship steel in fulfillment of customer orders, to invoice customers for steel sold to them, and to receive customers' payments for steel sold to them. I have also learned U.S. Steel's regular practices for recording these transactions. I have specifically learned the procedures followed by U.S. Steel in its regular business activities with Delphi Corporation and its subsidiaries and affiliates (collectively "Delphi"), and of the records which it was the regular practice of U.S. Steel to make in order to record its transactions with Delphi.

2. When U.S. Steel received an order for steel from Delphi, the U.S. Steel personnel receiving that order enter the facts of the order in U.S. Steel's computerized records under one of the customer accounts assigned to Delphi as part of U.S. Steel's regular business practices. The facts of the order recorded include the types and quantities of steel ordered by Delphi, the destination to which Delphi wanted that steel shipped, and the purchase order under which the

steel was being ordered (from which the base price for the steel can be determined).  When the steel to fulfill a particular order was manufactured and shipped, U.S. Steel personnel as part of U.S. Steel's regular business practices added that information to the computerized records to show that the order had been filled.  Information added to U.S. Steel's records at this time included the quantity of steel shipped, the identification numbers assigned to the particular steel products by U.S. Steel, the shipping destination, the name of the carrier transporting the shipment, and a "shipper number" which identifies the particular vehicle on which particular steel was loaded for shipment.  It was the regular business practice of U.S. Steel to use this recorded information to generate an invoice to be issued to Delphi requesting payment for each steel order.

   3. Except for stock transfers which are discussed below, the time at which U.S. Steel issued an invoice to Delphi for a particular steel order depended upon the shipping destination of the order.  Invoices for orders shipped to Delphi facilities were issued at the time the shipment left U.S. Steel's premises.  Many orders received from Delphi came with instructions to ship the steel to another Delphi vendor to be incorporated into products that vendor was fabricating for Delphi.  These vendors were referred to as "processors."  Invoices for steel shipped to a processor were regularly issued to Delphi when the processor notified U.S. Steel that it had begun fabrication using that steel.  At the time an invoice was issued, the U.S. Steel personnel responsible for invoicing entered the fact that the invoice had been issued and other information about the invoice into U.S. Steel's computerized business records as part of U.S. Steel's regular

business practices.  With respect to steel shipped to a third-party processor at Delphi's direction, the fact that an invoice was issued indicates that the processor had received and was using the steel.  It is the regular practice of U.S. Steel to retain copies of the invoices issued to its customers for steel sold as part of U.S. Steel's regular business activities.

    4.    U.S. Steel invoices direct U.S. Steel's customers to make payment, or "remit to," a U.S. Steel lockbox address.  U.S. Steel invoices also instruct the customer to "please refer to the above invoice no. in your remittance," and each U.S. Steel invoice has a unique number which appears on the invoice form immediately above that instruction.  Invoice numbers may also be included in the information which accompanies a payment made to U.S. Steel by a customer electronically.  When a payment was received that identified a particular invoice number, U.S. Steel accounts receivable personnel as part of U.S. Steel's regular business practices made an entry in the computerized records pertaining to that customer showing that the particular invoice was paid.  When a payment was received from a customer that did not identify the number of the invoice being paid, U.S. Steel personnel typically contacted the customer to identify the invoice which the customer intended to pay and, once that information was received from the customer, U.S. Steel personnel then recorded the payment pay as part of U.S. Steel's regular business practices in U.S. Steel's computerized records against the invoice which the customer intended to.  It was and is the regular practice of U.S. Steel to maintain invoice and payment records as described in this paragraph and paragraph 3 above in order to know whether steel ordered by

a customer had been shipped, whether the customer had been invoiced for that steel, and whether U.S. Steel had been paid for that steel. U.S. Steel did, and does, rely on these records to conduct its business. These regular business practices of U.S. Steel were followed in its transactions with Delphi, and the issuance of invoices to Delphi and the receipt of payments from Delphi were regularly recorded by the processes I have described.

5. Attached hereto as Exhibit A is a report generated from the computerized records of U.S. Steel's sales of steel to Delphi that are regularly created and used by U.S. Steel as described in paragraphs 3 and 4 above. This report lists the invoices issued to Delphi for which payment had not been received by U.S. Steel as of the date of Delphi's bankruptcy filing. Attached hereto collectively as Exhibit B are true and complete copies of the invoices issued by U.S. Steel listed in Exhibit A. The total amount of payment due to U.S. Steel that has not been paid as of the date of Delphi's bankruptcy filing as reflected in these invoices is $ 399,548.67.

6. Five of the invoices listed on Exhibit A and contained in Exhibit B are for sales of steel to Delphi involving an external stock transfer. These are the invoices bearing invoice numbers 161-864765, 161-864766, 161-864770, 161-867798, and 161-875035. An external stock transfer occurs when U.S. Steel ships steel to a processor but there is unexpected delay in the processor's use of that steel. U.S. Steel invoiced Delphi for steel that was subject to an external stock transfer because the steel had been delivered to Delphi's processors and was in Delphi's custody. Invoices numbers 161-864765, 161-864766, 161-

864770, and 161-867798 document the fact that the steel described in the invoice had been received by Delphi's processors by recording the processor load number, which is a tracking number assigned by the processor and communicated to U.S. Steel and others to enable communication about particular steel in the processor's possession.  It is the regular practice of U.S. Steel to record processor load numbers when they are received in the computerized records of U.S. Steel pertaining to the particular steel order.  Invoice numbers 161-864765, 161-864766, and 161-864770 record processor load number 657234, assigned by Precision Strip, Inc. in Tipp City, Ohio.  Invoice number 161-867798 records processor load number 657706, assigned by Precision Strip, Inc. in Tipp City, Ohio.  Invoice number 161-875035 does not record a processor load number.  However, attached hereto as Exhibit H is a copy of shipping document of the type regularly generated and recorded by U.S. Steel as part of its regular business activity showing that steel bearing the same warehouse master coil numbers and heat numbers as the steel described in Invoice number 161-875035 was shipped to Worthington Steel Company in Porter, Indiana on January 11, 2005.  Also included in Exhibit H is a copy of a "Steel Receiving Report" which U.S. Steel received from Worthington Steel Company stating that steel bearing the same master coil and heat numbers was received by them on January 11, 2005.  Invoice number 161-875035 records a shipping date for this steel of February 16, 2005.  Based upon the shipping documents attached hereto as Exhibit H, I believe that date was erroneously recorded and that the steel described in Invoice Number 161-875035 was shipped to Delphi's processor on

January 11, 2005.  Importantly, the processor's shipping documents contain master coil and heat numbers which match U.S. Steel's invoiced master coil and heat numbers for the steel involved.

      7.    U.S. Steel does not use its own trucks and drivers to deliver steel to its customers.  Rather, such deliveries are made by a common carrier, which may be hired either by U.S. Steel or by U.S. Steel's customer.   Thus, no U.S. Steel personnel are typically present when steel is delivered to a destination as designated by U.S. Steel's customer, and U.S. Steel has no control over whether the carrier obtains documentation acknowledging receipt of a specific delivery. U.S. Steel routinely invoiced Delphi without documentary proof of delivery and Delphi paid U.S. Steel for the steel delivered without such documentation.  I understand that Delphi has disputed that it owes U.S. Steel for the steel reflected in certain of the invoices listed in Exhibit A for the reason that Delphi does not have documentary proof of delivery.  For the purpose of assisting Delphi in completing delivery information potentially missing from its records, I undertook a further review of those invoices and have obtained information from the carriers confirming delivery as to the following invoices:

| Invoice No. | Invoice Date | Invoice Amt. | POD response |
|---|---|---|---|
| 161-02824T | 3/6/01 | 9915.86 | POD attached (Exhibit C) |
| 161-04394T | 5/26/01 | 10498.67 | unavailable (age) |
| 161-051980 | 4/28/05 | 14624.80 | POD attached (Exhibit D) |
| 161-051981 | 4/28/05 | 17223.96 | POD attached (Exhibit D) |
| 161-051982 | 4/28/05 | 19381.48 | POD attached (Exhibit D) |
| 161-184150 | 6/4/02 | 10486.50 | unavailable (age) |
| 161-184151 | 6/4/02 | 7147.50 | unavailable (age) |
| 161-227158 | 9/16/02 | 10579.00 | unavailable (age) |
| 161-227159 | 9/16/02 | 5583.00 | unavailable (age) |
| 161-343136 | 7/1/03 | 7920.05 | unavailable (age) |
| 161-507594 | 9/10/04 | 7484.40 | e-mail attached (Exhibit E) |

| | | | |
|---|---|---|---|
| 161-507595 | 9/10/04 | 9315.20 | e-mail attached (Exhibit E) |
| 161-507596 | 9/10/04 | 8888.96 | e-mail attached (Exhibit E) |
| 161-539847 | 12/7/04 | 14374.26 | e-mail attached (Exhibit E) |
| 161-539848 | 12/7/04 | 7952.04 | e-mail attached (Exhibit E) |
| 161-757118 | 4/3/01 | 9442.71 | POD attached (Exhibit F) |
| 161-778190 | 6/21/01 | 4756.88 | POD attached (Exhibit G) |
| 161-864765 | 12/28/04 | 2941.36 | stock transfer |
| 161-864766 | 12/28/04 | 12771.71 | stock transfer |
| 161-864770 | 12/28/04 | 4498.87 | stock transfer |
| 161-867798 | 1/14/05 | 15690.54 | stock transfer |
| 161-873412 | 7/29/02 | 1908.28 | unavailable (age) |
| 161-875035 | 2/16/05 | 13030.54 | stock transfer |

True and complete copies of the documentation of delivery which I have obtained are attached hereto as the exhibits identified in the foregoing table. In some instances identified above, I have been informed by the carrier that the carrier no longer maintains records confirming delivery of particular shipments. The invoices for which I was unable to obtain confirmation of delivery from the shipper are identified above with the description "unavailable (age)." However, Invoice Number 161-04394T records processor load number 611942 assigned by Precision Strip in Tipp City, Ohio. Invoice number 161-873412 records processor load number 625889 assigned by Precision Strip in Tipp City, Ohio. As stated above, U.S. Steel records the processor load numbers that are communicated to it by the processors when the processors receive a particular shipment of steel.

8. The business records of U.S. Steel do not reflect that Eagle Steel, or any other third-party vendors, made payments to U.S. Steel on the account of Delphi. U.S. Steel did not authorize Delphi to make payment to any third-party vendors for steel that U.S. Steel sold to Delphi. Such a practice would be contrary to the instructions contained in U.S. Steel's invoices, attached hereto as Exhibit B, directing that payment be remitted directly to U.S. Steel. Additionally,

there are business reasons why U.S. Steel would not, and did not, agree that Delphi should pay a third-party for steel sold by U.S. Steel to Delphi. Among those reasons is the fact that it is more difficult for U.S. Steel to credit a payment made by a third-party to the correct customer invoice, and the fact that such a practice places on U.S. Steel the risk that the third-party, with whom U.S. Steel has no customer relationship, may receive payment from U.S. Steel's customer for steel sold by U.S. Steel, but fail to remit that payment to U.S. Steel. Delphi paid the majority of invoices issued to it by U.S. Steel, and did so by payment directly to U.S. Steel. There is no reason known to U.S. Steel why Delphi's payment for any invoices should have been routed through one of Delphi's processors, and U.S. Steel did not agree to such a procedure.

9. Invoice number 161-20736T, which is among the unpaid invoices in Exhibit B, contains a raw materials surcharge of $ 1,076.55. This charge is assessed in accordance with U.S. Steel's announced pricing policies when U.S. Steel's cost of raw materials required to produce particular steel increased by more than a set amount between the time that the price for steel is agreed to with the customer and the time that U.S. Steel actually manufactures the steel. Surcharges of this nature are a standard steel industry practice due to the extreme volatility of price for certain materials required to produce steel and the fact that there is frequently a substantial delay between the time that U.S. Steel and its customer agree on a price for particular steel and the time that the customer directs that the steel be produced and delivered. A raw materials

{W1162795.2}                                       9

surcharge is not uncommon, and Delphi paid other invoices containing such a surcharge without objection.

10.     Invoice number 170-431827, which is among the unpaid invoices in Exhibit B, reflects a credit against freight charges in the amount of $ 11.91.  I do not know the reason for this specific credit.  However, it is frequently the case that the customer relies on U.S. Steel to hire a carrier to deliver steel to the customer.  In accordance with its announced policies, U.S. Steel regularly includes the cost it incurs for shipment of steel to its customers in the invoiced charges to the customer, and Delphi paid other invoices that included freight charges without objection

Further Affiant Sayeth Naught.

/s/ Arne S. Jahn
Arne S. Jahn

Sworn to and subscribed in my presence this 4th day of January, 2008.

/s/ Lisa Stewart
Notary Public

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a copy of the foregoing was served, via electronic mail, overnight mail (next business day) or facsimile on this 4th day of January, 2008 on the following:

| | |
|---|---|
| Delphi Corporation<br>Attn: General Counsel<br>5725 Delphi Drive<br>Troy, MI  48098 | Skadden, Arps, Slate, Meager & Flom LLP<br>Attn: John Wm. Butler, Jr.<br>jbutler@skadden.com<br>Attn:  Lisa Diaz<br>ldiaz@skadden.com<br>Attn:  Melissa Kahn<br>mkahn@skadden.com |
| Togut, Segal & Segal, LLP<br>Attn:  Neil Berger<br>nberger@teamtogut.com<br>Attn: Tally Wiener<br>twiener@teamtogut.com | |
| David Kennedy, Esq.<br>david.kennedy2@usdoj.gov | |

/s/Richard L. Ferrell