Hearing Date & Time: January 10, 2008 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
        In re                         :    Chapter 11
                                      :
DELPHI CORPORATION, et al.,           :    Case No. 05-44481 (RDD)
                                      :
                Debtors.              :    (Jointly Administered)
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' AMENDED SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 1279 (NU-TECH PLASTICS ENGINEERING, INC.)

("AMENDED SUPPLEMENTAL REPLY – NU-TECH PLASTICS ENGINEERING, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Amended Supplemental Reply With Respect To Proof Of Claim No. 1279

(Nu-Tech Plastics Engineering, Inc.) pursuant to paragraph 9(f)(iv) of the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices

And Procedures Governing Objections To Claims (Docket No. 6089), dated December 6, 2006.

<u>Preliminary Statement</u>

1.       Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") supplied parts to General

Motors Corporation ("GM") and Delphi Automotive Systems LLC ("DAS") until December 1,

1999, when it sold substantially all of its assets to another supplier, Rapid Product Technologies,

L.L.C. ("RPT").  The parts included a fuel reservoir with part number 25160694 (the "Part").

GM issued purchase orders for the Part in November 1997 (the "November 1997 Purchase

Order") and June 1998 (the "June 1998 Purchase Order"), and it reissued the second purchase

order using a form generated by its new purchasing system in August 1998 (the "August 1998

Purchase Order").  These purchase orders were issued <u>before</u> DAS existed; DAS was not formed

as a limited liability company until September 1998.  DAS issued its first purchase order for the

Part in May 1999 (the "May 1999 Purchase Order").  DAS did not place orders throughout the

term of the May 1999 Purchase Order because, as Nu-Tech knew, GM had agreed to withdraw

production from Nu-Tech as part of its settlement of a major work stoppage in the summer of

1998.  In accordance with that settlement, the tools needed to make the Part were removed from

Nu-Tech's plant at some point in late 1998 or 1999.

2.       Although Nu-Tech now claims that DAS breached the Part-related

purchase orders, resulting in damages of more than $15.1 million, there is no written evidence of

Nu-Tech complaining about DAS's performance until December 2002, when it sued GM and DAS in Michigan state court (the "Michigan Action"). Nu-Tech's contract theory in the Michigan Action, and the basis for its proof of claim here, is that DAS breached the purchase orders by failing to order its requirements from Nu-Tech in 1999 and 2000. This theory fails on three grounds:

- <u>First</u>, Nu-Tech sold its purchase orders and the right to sue for any alleged breach of those contracts to RPT effective December 1, 1999. Accordingly, Nu-Tech was not the real party in interest when it brought the Michigan Action. And although Nu-Tech attempted to reacquire the right to sue by entering into an assignment with RPT in March 2005, that assignment was ineffective because it was executed after the statute of limitations expired.

- <u>Second</u>, DAS cannot be held responsible for any breach of the November 1997 Purchase Order, the June 1998 Purchase Order, or the August 1998 Purchase Order because DAS was not a party to those contracts; indeed, DAS did not exist when GM issued those contracts. Nu-Tech sued GM for breaching its contracts in the Michigan Action and it has since settled with GM. There is no basis for Nu-Tech's continued pursuit of those same claims against DAS.

- <u>Third</u>, assuming for the sake of argument that DAS breached a Part-related contract, Nu-Tech cannot recover damages because it did not take any steps to mitigate its losses.

     3.     In addition to its contract claim, Nu-Tech asserts a promissory-estoppel claim, arguing that DAS broke a promise to award Nu-Tech new business to replace the lost Part business. But like Nu-Tech's contract claim, this claim fails because Nu-Tech sold it to RPT effective December 1, 1999. This claim also fails on the merits for the following reasons:

- <u>First</u>, Nu-Tech has submitted a declaration from Trenia Patrick, a former Delphi buyer who is now assisting Nu-Tech in this litigation, establishing that the promise, if made at all, was made by GM, not DAS.[1]

- <u>Second</u>, only a clear and definite promise qualifies for enforcement, but Nu-Tech cannot identify the person who made the promise, when the promise was made (other than the vague assertion that it was sometime in the fall of 1998), or any of the material terms of the proposed agreement.

---

[1]    Ms. Patrick refused to assist Delphi in this litigation because Delphi would not agree to her request for remuneration in exchange for her cooperation; but she made no such demand of Nu-Tech.

- **Third**, Nu-Tech did not take any action in reliance on the alleged promise, nor would any such action have been reasonable given Nu-Tech's knowledge that DAS awarded new business by issuing a purchase order, not by casual conversation as Nu-Tech alleges.

- **Fourth**, the May 1999 Purchase Order incorporated an integration clause, rendering Nu-Tech's reliance on the pre-contractual promise unreasonable as a matter of law.

- **Fifth**, enforcement of the promise is not necessary to avoid injustice, but rather would provide Nu-Tech's current owner, John G. Cooper, with a windfall.  The bulk of the damages Nu-Tech seeks for this claim are based on lease payments made by Nu-Tech to companies owned or controlled by Mr. Cooper.  If DAS reimburses Nu-Tech for those payments, the money will go to Mr. Cooper again, this time as the owner of Nu-Tech.

## Background

A.    The November 1997 Purchase Order.

4.    Nu-Tech received its first purchase order for the Part in November 1997, a copy of which is attached to this brief as Exhibit A.  The heading of the November 1997 Purchase Order identifies "General Motors Corporation" and the GM operating segment responsible for the Part at that time, "Automotive Components Group Worldwide."  (Id. at 1.) The parties agree that the November 1997 Purchase Order was issued by GM.  (See Exhibit Q ¶ 4; Patrick Aff. ¶ 11.)  As it relates to the Part, the November 1997 Purchase Order was a factory-assist contract.  (Exhibit A at 1.)  Under a factory-assist contract, the buyer agrees to purchase a certain percentage of its requirements for the goods covered by the contract, but only to the extent that the buyer cannot satisfy its requirements through its own production of the goods.  (See Patrick Aff. ¶ 12.)  The term of the November 1997 Purchase Order as to the Part was November 11, 1997 through July 31, 1998.  (Exhibit A at 10.)  Nu-Tech is not seeking any damages under the November 1997 Purchase Order.

B.      The June 1998 Purchase Order.

5.      In June 1998, near the end of the term of the November 1997 Purchase Order, Nu-Tech received its second purchase order for the Part, a copy of which is attached to this brief as Exhibit B.  Like the November 1997 Purchase Order, the heading of the June 1998 Purchase Order identifies "General Motors Corporation" and GM's "Automotive Components Group Worldwide" operating segment (id. at 1), and the parties agree that the June 1998 Purchase Order was issued by GM (see Exhibit Q ¶ 5; Cooper Dec. ¶ 9; Patrick Aff. ¶¶ 6, 16). The June 1998 Purchase Order was a requirements contract under which GM agreed to purchase 100% of its requirements for the Part.  (Exhibit B at 1, 9; Cooper Dec. ¶ 9; Patrick Aff. ¶ 19.)  Its term began on August 1, 1998 – the day after the November 1997 Purchase Order expired – and ended on July 31, 1999.  (Exhibit B at 9.)  Again, this purchase order was issued by GM at a time when DAS did not exist.[2]

C.      GM's New Purchasing System And The August 1998 Purchase Order.

6.      The format of the November 1997 Purchase Order and the June 1998 Purchase Order was essentially the same because GM generated both purchase orders using a purchasing system known as PPS.  (See Exhibit Q ¶ 5.)  Shortly after it issued the June 1998 Purchase Order, GM transitioned from PPS to a new purchasing system known as GPS.  (Id.)  In August 1998, GM reissued the June 1998 Purchase Order using the new GPS purchasing system. (Id. ¶¶ 5-6.)  A copy of the reissued purchase order is attached to this brief as Exhibit C. Although different in form, the essential terms of the August 1998 Purchase Order were the same as those set forth in the June 1998 Purchase Order – GM agreed to purchase 100% of its requirements for the Part from August 1, 1998 through July 31, 1999.  (See Exhibit B at 1, 9; Exhibit C at 1-2.)

---

[2]      Automotive Components Group Worldwide was an unincorporated business unit of GM.

D.   The August 1998 Purchase Order Was An Agreement Between Nu-Tech And GM.

7.      Nu-Tech's position is that the August 1998 Purchase Order was an agreement between Nu-Tech and DAS.  (See Cooper Dec. ¶ 12; Patrick Aff. ¶ 24.)  This position is based on Nu-Tech's confusion regarding basic facts about DAS and the timing of GM's spin-off of its parts business.  With respect to the spin-off, the affidavit of Nu-Tech's witness Ms. Patrick states that "Delphi Automotive Systems was spun off by General Motors" in "approximately March, 1998," and that the August 1998 Purchase Order was issued "[w]hen Delphi was spun off by General Motors."  (Patrick Aff. ¶¶ 2, 24.)  Similarly, Mr. Cooper, the current owner of Nu-Tech, gave the following testimony at his deposition in December 2007:

Q:      You believe that in August of 1998 Delphi had already separated from
         GM; is that right?

A:      That's what I believe, yes.

(Exhibit P at 114:10-114:12.)  In fact, however, the spin-off did not occur until 1999.  (Exhibit Q ¶ 6.)[3]

8.      As for DAS, Nu-Tech ignores the distinction between Delphi Automotive Systems and DAS – i.e., Delphi Automotive Systems LLC.  Delphi Automotive Systems, an unincorporated business unit of GM, was the GM operating segment responsible for the Part as of August 1998.  Thus, whereas the headings of the November 1997 Purchase Order and the June 1998 Purchase Order identified "General Motors Corporation" and "Automotive Components Group Worldwide," the heading of the August 1998 Purchase Order identified "GM Corporation" and "Delphi Automotive Systems."  (See Exhibit A at 1; Exhibit B at 1; Exhibit C at 1.)  By contrast, DAS, the entity against which Nu-Tech asserts its breach-of-contract claim, is

---

[3]      The specific events comprising the spin-off were detailed in GM's and Delphi's public filings with the United States Securities and Exchange Commission, examples of which are attached to this brief as Exhibit J and Exhibit K.

a Delaware limited liability company that was not formed until September 16, 1998, nearly one

month after GM issued the August 1998 Purchase Order.[4]  (Exhibit L.)

       E.       <u>GM Agreed To Produce The Part Itself To Settle A Work Stoppage.</u>

       9.       In the summer of 1998, one of GM's labor unions stopped work at two

plants in Flint, Michigan.  (Exhibit M; Exhibit Q ¶ 7.)  As part of its agreement with the union

settling the work stoppage, GM agreed to produce the Part itself.  (Exhibit Q ¶ 7.)  At his

deposition, Mr. Cooper acknowledged that GM informed Nu-Tech of this decision in August,

September, or October 1998, and that he understood Nu-Tech would lose the Part business as a

result of GM's settlement of the work stoppage.  (Exhibit P at 27:17-28:12, 29:7-31:13.)  Nu-

Tech did not complain in writing about the loss of this business until it sued GM and DAS in

December 2002.  (See Exhibit Q ¶ 10.)

       F.       <u>The May 1999 Purchase Order And The Statute Of Limitations.</u>

       10.       On May 3, 1999, DAS issued its first Part-related purchase order to Nu-

Tech in the form of an amendment to the August 1998 Purchase Order, a copy of which is

attached to this brief as Exhibit D.  (Exhibit Q ¶ 8.)  Unlike the headings of the previous

purchase orders, all of which identified GM, the heading of the May 1999 Purchase Order

identified "Delphi Automotive Systems LLC" and "Delphi Automotive Systems."  (Exhibit D at

1.)  The May 1999 Purchase Order substituted DAS as the buyer and extended the term of the

agreement through December 31, 2000, but otherwise left intact the essential terms of the August

1998 Purchase Order.  (Id.; Exhibit Q at 8.)

       11.       The May 1999 Purchase Order was the last purchase order Nu-Tech

received for the Part.  Thus, the statute of limitations for any claim that DAS breached a Part-

---

[4]    The assets and liabilities of the Delphi business sector were not transferred from GM to DAS until January 1,
1999.  Before that date, GM conducted the business of Delphi through various divisions and subsidiaries.

related purchase order began to run no later than December 31, 2000, the final day of the term of

the May 1999 Purchase Order.  The applicable limitations period was four years.  <u>See</u> Mich.

Comp. Laws § 440.2725(1) (providing that "[a]n action for breach of any contract for sale must

be commenced within 4 years after the cause of action has accrued").

       G.    <u>The Part-Related Tools Were Removed From Nu-Tech's Plant And Nu-Tech
Stopped Receiving Orders For The Part In 1999.</u>

       12.    In late 1998 or at some point in 1999, GM or DAS removed from Nu-

Tech's plant two tools needed to produce the Part.  From that point forward, Nu-Tech did not

receive any orders for the Part.  Although Nu-Tech's damages calculation assumes that the orders

stopped on December 31, 1998, Mr. Cooper testified at his deposition that Nu-Tech continued to

run the tools and produce the Part into 1999.  (<u>Exhibit P</u> at 51:12-52:14, 66:6-66:14.)

       H.    <u>Nu-Tech Sells Its Assets To RPT In January 2000.</u>

       13.    In September 1999, Nu-Tech was placed in Delphi's troubled-supplier

program based on its poor financial condition, and soon after that it began discussions with

potential acquirers.  (<u>Exhibit Q</u> ¶ 9; <u>Exhibit S</u> ¶ 4.)  In December 1999, Nu-Tech and RPT

entered into a preliminary Memorandum and Agreement Regarding Purchase and Sale of Assets

(the "Preliminary Asset Sale Agreement").  (<u>Exhibit G</u>.)  The Preliminary Asset Sale Agreement

contemplated that Nu-Tech and RPT would execute a definitive agreement for the sale of Nu-

Tech's assets, and that RPT would take over the operation of Nu-Tech's business effective

December 1, 1999.  (<u>Id.</u> at 2.)  RPT and Nu-Tech executed a definitive agreement – the Final

Agreement:  Purchase and Sale of Business Assets (the "Definitive Asset Sale Agreement") – on

January 13 and 14, 2000, respectively, with an effective date of December 1, 1999.  (<u>Exhibit H</u> at

1, 21.)

       14.    In paragraph 1.1 of the Definitive Agreement, Nu-Tech agreed to "sell,

assign, convey, transfer, set over, and deliver" to RPT "all of the assets, rights, and interests of

every conceivable kind or character whatsoever, whether tangible or intangible, that on [December 1, 1999,] were owned by [Nu-Tech] or in which [Nu-Tech] ha[d] an interest of any kind." [5]  (Id. art. I, ¶ 1.1.)  The assigned assets included, "without limitation," Nu-Tech's "existing customer purchase orders," "contracts and service agreements," and "contracts and service records relating to sales." [6]  (Id. art. I, ¶ 1.1(c), (f)-(g).)

I.    DAS Transferred The Part Business To RPT In The January 2000 Purchase Order.

15.    On January 15, 2000 – the day after Nu-Tech executed the Definitive Asset Sale Agreement – DAS issued an amended purchase order, a copy of which is attached to this brief as Exhibit E, that substituted RPT as the seller of the Part  The January 2000 Purchase Order was consistent with the Asset Sale Agreement in that it recognized that Nu-Tech had sold its purchase orders, including its purchase orders for the Part, to RPT.

J.    Nu-Tech's Action Against GM And DAS In Michigan State Court.

16.    In December 2002, Nu-Tech commenced an action against GM and DAS in Michigan state court (the "Michigan Action").  A copy of Nu-Tech's complaint is attached to this brief as Exhibit T.  Nu-Tech's allegations in the Michigan Action were essentially the same as its allegations here, with the exception that GM was also named as having breached purchase orders and broken promises of replacement business.  (See id.)  The Michigan Action was on the verge of trial when it was stayed as to DAS as a result of these cases, and Nu-Tech later settled with GM.

---

[5]    As Mr. Cooper acknowledged at a deposition in November 2004, Nu-Tech "ceased to exist" from an operating standpoint as a result of the asset sale.  (Exhibit O at 30:17-31:4.)

[6]    As discussed in detail in Part I.B below, Nu-Tech attempted to reacquire its purchase orders and related causes of action by entering into a subsequent agreement with RPT in March 2005, but that agreement is of no effect because it was executed after the applicable statutes of limitations expired.

K.    The Head Of Nu-Tech Believed The Michigan Action Was Meritless.

17.    In March 2005, John W. Mailey – the president, chief executive officer, and majority shareholder of Nu-Tech during the events giving rise to Nu-Tech's allegations – prepared an affidavit, a copy of which is attached to this brief as Exhibit N.  Mr. Mailey is now deceased.[7]  In his affidavit, Mr. Mailey explained his view that "Delphi had a right at any time to take back its tooling and manufacture [the Part] in Delphi's Flint manufacturing plant," and that "Delphi fulfilled all the terms and obligations of the purchase orders issued by Delphi to Nu-Tech for [the Part]."  (Id. ¶¶ 5, 9.)  Furthermore, according to Mr. Mailey, "Delphi at no time prior to the sale of Nu-Tech to [RPT] made any promise of additional business and Nu-Tech did not rely upon any promise of additional business."  (Id. ¶ 12.)  Mr. Mailey's view of Nu-Tech's claims was that they "were completely lacking in merit."  (Id. ¶ 15.)

Argument

I.    Nu-Tech's Contract Theory Is Without Merit.

A.    Nu-Tech Sold Its Part-Related Contracts And Contract Claims To RPT.

18.    Again, under paragraph 1.1 of the Definitive Asset Sale Agreement, Nu-Tech agreed to "sell, assign, convey, transfer, set over, and deliver" to RPT "all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on [December 1, 1999,] were owned by [Nu-Tech] or in which [Nu-Tech] ha[d] an interest of any kind."  (Exhibit H art. I, ¶ 1.1.)  The assigned assets included, "without limitation," Nu-Tech's "existing customer purchase orders," "contracts and service agreements," and "contracts and service records relating to sales."  (Id. art. I, ¶ 1.1(c), (f)-(g).)  There is no question that the May 1999 Purchase Order, as well as the earlier Part-related agreements issued

---

[7]    The Debtors provided Nu-Tech with notice of its intent to offer Mr. Mailey's affidavit pursuant to Fed. R. Evid. 807 in August 2007, and DAS earlier provided Nu-Tech with a similar notice under Michigan state court rules. (See Exhibit U; Exhibit V.)

by GM, were included in the sale.  Indeed, the day after Nu-Tech executed the Definitive Asset

Sale Agreement, DAS issued the January 2000 Purchase Order naming RPT as the new seller.

(See Exhibit E.)

19.    Furthermore, any claims arising out of the May 1999 Purchase Order and

the earlier Part-related agreements issued by GM were also covered by the plain language of

these provisions.  The Michigan Uniform Commercial Code – Sales, Mich. Comp. Laws ch. 440,

art. 2 (the "UCC"), confirms that "an assignment of 'the contract' . . . or an assignment in similar

general terms is an assignment of rights" arising under that contract.[8]  Id. § 440.2210(5); accord

FDIC v. Cuvrell (In re F & T Contractors, Inc.), 17 B.R. 966, 987 (Bankr. E.D. Mich. 1982)

(stating that "[t]he law in Michigan has a long and consistent history of cases which hold that an

assignment of a contract constitutes an assignment of the rights thereof"), rev'd on other grounds,

718 F.2d 171 (6th Cir. 1983).

20.    In arguing that it did not assign its contract claim to RPT, Nu-Tech notes

that the general terms and conditions applicable to the May 1999 Purchase Order (the "Terms

and Conditions") provided that Nu-Tech "may not assign or delegate its obligations under this

contract without Buyer's [DAS's] prior written consent," and that DAS did not provide its prior

written consent.  (Exhibit F § 27.)  This argument misconstrues the legal effect of the non-

assignment provision.  The plain language of the provision is limited to an assignment or

delegation of "obligations," and does not address an assignment of rights.  This is important

under the UCC because a non-assignment provision generally will not be read as prohibiting the

assignment of rights unless it contains specific language on that point.  See Mich. Comp. Laws

§ 440.2210(4) (stating that "a prohibition of assignment of 'the contract' is to be construed as

---

[8]    The general terms and conditions applicable to the Part-related contracts contain a Michigan choice-of-law
clause.  (See Exhibit F § 29.)

barring only the delegation to the assignee of the assignor's performance"); accord In re Jackson, 311 B.R. 195, 201 (Bankr. W.D. Mich. 2004) (explaining that non-assignment provisions are interpreted "narrowly, as barring only the delegation of duties, and not necessarily as precluding the assignment of rights").

21.     Furthermore, under the UCC, the "right to damages for breach of [a] whole contract . . . can be assigned despite agreement otherwise." Mich. Comp. Laws § 440.2210(2) (emphasis added). Thus, even if the non-assignment provision did bar an assignment of rights in general, it did not apply to the specific right to damages for breach of the May 1999 Purchase Order or the other Part-related purchase orders. Finally, even assuming that Nu-Tech's assignment did violate the non-assignment provision, that violation "'does not render the assignment ineffective'" under Michigan law, but rather gives DAS a right to damages for breach of the provision. Suggs ex rel. Posner v. Gen. Am. Life Ins. Co., No. 05-60023, 2006 WL 1109270, at *6 (E.D. Mich. Apr. 24, 2006) (quoting Restatement (Second) of Contracts § 322(2)(b) (1981)).

22.     Nu-Tech also argues that its contract claim was covered by the Definitive Asset Sale Agreement's definition of "Excluded Assets," which encompassed "those assets not specifically or by inference included" in the sold assets. (Exhibit H art I, ¶ 1.4(d).) The Definitive Asset Sale Agreement's listing of sold assets, however, did specifically include Nu-Tech's "purchase orders" and "contracts." (Id. ¶ 1.1(c), (f)-(g).) Nu-Tech's sale of the contracts necessarily included the right to sue for breach because that right is one that arises from the contracts. See Mich. Comp. Laws § 440.2210(5); F & T Contractors, 17 B.R. at 987.

23.     The fact that Nu-Tech transferred its contracts and any contract claims it had to RPT under the Definitive Asset Sale Agreement is dispositive. In Michigan courts and federal courts alike, the real party in interest must assert the cause of action. See Mich. Ct. R.

201(B) ("An action must be prosecuted in the name of the real party in interest . . . ."); Fed. R.

Civ. P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest.").

Under Michigan law, a real party in interest "is one who is vested with the right of action on a

given claim." Miller v. Chapman Contracting, 730 N.W.2d 462, 464 (Mich. 2007); Moses, Inc.

v. SEMCOG, 716 N.W.2d 278, 287 (Mich. Ct. App. 2005).[9] When a claim is assigned from one

person to another, the real party in interest is the assignee – in this case, RPT. See Jewel Constr.

Co. v. Genoak Constr. Co., Docket No. 268070, 2006 WL 2924528, at *3 (Mich. Ct. App. Oct.

12, 2006) (concluding that assignee "was the real party in interest"); DeJong v. B. F. Goodrich,

Inc., 292 N.W.2d 157, 160 (Mich. Ct. App. 1980) (explaining that an "assignee of [a] cause of

action . . . is the real party in interest and suit must be brought in its name").

      B.    Nu-Tech Did Not Reacquire The Contract Claim Within The Limitations
           Period.[10]

      24.    The limitations period applicable to Nu-Tech's contract claim expired no

later than December 31, 2004.[11] Approximately three months later, in March 2005, Nu-Tech and

---

[9]    All of the Part-related contracts are governed by Michigan law, and this Court must look to Michigan law "to
determine whether [Nu-Tech] properly possesses the right of action that it asserts in this case." Stichting Ter
Behartiging Van De Belangen Van Oudaandeel-Houders In Het Kapitaal Van Saybolt B.V. v. Schreiber, 407
F.3d 34, 49 (2d Cir. 2005).

[10]   Nu-Tech argues that DAS is barred from raising this issue based on the Michigan trial court's decision denying
DAS's summary-disposition motion in the Michigan Action. That is incorrect. The Michigan court's decision
was not a final judgment under Michigan law, which controls this issue because bankruptcy courts "must give
preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged
would do so." Kelleran v. Andrijevic, 825 F.2d 692, 694 (2d Cir. 1987). A decision denying "a motion for
summary disposition [is] interlocutory in nature," and res judicata therefore "does not apply" to those decisions.
Ind. Ins. Co. v. Auto-Owners Ins. Co., 680 N.W.2d 466, 471 n.8 (Mich. Ct. App. 2004). Furthermore, a
decision is "final" only when "all appeals have been exhausted or when the time available for an appeal has
passed." Leahy v. Orion Twp., 711 N.W.2d 438, 441 (Mich. Ct. App. 2006) (per curiam). DAS did not have
the right to appeal until the Michigan court issued a final judgment. That never happened because DAS filed its
voluntary petition with this Court shortly before the action was scheduled to go to trial. As a result, DAS never
exhausted its appeal rights with respect to the Michigan court's decision, nor did the time for appealing the
decision pass.

[11]   Under the UCC, "[a]n action for breach of any contract for sale must be commenced within 4 years after the
cause of action has accrued." Mich. Comp. Laws § 440.2725(1). "A cause of action accrues" under this
provision "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Id.
§ 440.2725(2). In this case, any breach of contract by DAS occurred no later than December 31, 2000, when

*(cont'd)*

13

RPT entered into an Acknowledgment and Assignment Agreement (the "Assignment Agreement") providing that:

> In the event it is ever determined by anyone that Nu-Tech in fact did transfer any cause of action it possessed against General Motors and/or Delphi Corporation to [RPT] as part of the Asset Purchase Agreement, [RPT] hereby assigns all of its rights, title and interest in and to said cause of action back to Nu-Tech.

(DAS Ex. I § 2.)  Although Nu-Tech argues that this provision cured any real-party-in-interest defect that existed when it filed the Michigan Action in December 2002, this argument fails for two reasons.[12]

25.    First, the provision applies only to claims against GM and Delphi, and is triggered only by a determination that Nu-Tech transferred those claims under the "Asset Purchase Agreement," which is defined as the "Memorandum and Agreement Regarding Purchase and Sale of Assets dated December 1, 1999" – i.e., the Preliminary Asset Sale Agreement.  (Exhibit I at 1 & § 2.)  What DAS seeks is a determination that Nu-Tech transferred its causes of action under paragraph 1.1 of the Definitive Asset Sale Agreement.  And the causes of action at issue here are against DAS, a legal entity that is separate from Delphi.  Accordingly, the Assignment Agreement is of no help to Nu-Tech here.

26.    Even more damaging to Nu-Tech's argument is the well-established principle that an "assignee stands in the shoes of the assignor and acquires the same rights as the

---

*(cont'd from previous page)*
the May 1999 Purchase Order expired, and the four-year limitations period therefore expired no later than December 31, 2004.

[12]    Nu-Tech also cites a provision in the Assignment Agreement providing that the Definitive Asset Sale Agreement did not cover Nu-Tech's alleged claims against Delphi.  (Exhibit I § 1.)  The meaning of the Definitive Asset Sale Agreement, however, must be determined based on its clear and unambiguous language, not on the parties' revisionist explanations of what they intended.  See Harbor Park Market, Inc. v. Gronda, Nos. 267207, 267288, 2007 WL 3119755, at *1 n.3 (Mich. Ct. App. Oct. 25, 2007) (stating that when a contract "is unambiguous, [a] party's understanding of what was intended by the language is irrelevant to determining what the language actually says"); Zurich Ins. Co. v. CCR & Co., 576 N.W.2d 392, 395 ("This court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definitive meaning.").

assignor possessed."  First of Am. Bank v. Thompson, 552 N.W.2d 516, 520 (Mich. Ct. App. 1996); accord 3333 Centerpoint Parkway Invs. Ltd. P'ship v. Forster, No. 265727, 2006 WL 785369, at *1 (Mich. Ct. App. Mar. 28, 2006) (per curiam) ("Causes of action are generally freely assignable and the assignee acquires the rights and stands in the shoes of the assignor."). As such, the assignee "is subject to the same defenses . . . , including the statute of limitations, as the [assignor] would have been."  First of Am. Bank, 552 N.W.2d at 521.  The discussion of assignments in the Restatement (Second) of Contracts includes an illustration of this point, explaining that when A assigns a right to C, "C's right is barred by the Statute of Limitations when A's right would have been."  Restatement (Second) of Contracts § 363 cmt. b., illus. 3 (1981).  Because the statute of limitations would have prevented RPT from suing DAS in March 2005, RPT's attempted assignment in March 2005 cannot be construed as reviving those barred claims.

C.    Nu-Tech's Filing Of The Michigan Action Did Not Toll The Statute Of Limitations.

27.    Nu-Tech argues that the filing of its complaint in the Michigan Action tolled the statute of limitations.  Although Mich. Comp. Laws § 600.5856(a) establishes a general rule that the filing of a complaint tolls the statute of limitations, that rule does not apply when, as here, the complaint is filed by a plaintiff who is not the real party in interest.

28.    The Michigan Court of Appeals addressed this very issue last year in 3333 Centerpoint Parkway Investments Limited Partnership v. Forster, No. 265727, 2006 WL 785369 (Mich. Ct. App. Mar. 28, 2006) (per curiam).  The plaintiffs in that case filed their complaint in March 2004, before the six-year statute of limitations expired.  Id. at *1.  In October 2004, after the statute of limitations expired, the plaintiffs acquired the claims they had asserted in their complaint by entering into an assignment agreement with a third party.  Id. at *2.  The court held

15

that the assigned claims were time-barred, and it explicitly rejected the contention that the filing

of the plaintiffs' complaint in March 2004 tolled the statute of limitations, stating:

> By the time [the third party] assigned [its] rights to any claims . . . , more than six
> years had passed since those claims had accrued.  Plaintiffs' filing their complaint
> <u>could not have tolled the limitations period as to those claims</u>, because plaintiffs
> had not yet "stepped into [the third party's] shoes" [as assignees] at that time.

<u>Id.</u> (emphasis added).

29.    The Michigan Court of Appeals dealt with the same issue and reached the

same result in <u>Cotter v. Britt</u>, No. 274776, 2007 WL 1576386 (Mich. Ct. App. May 31, 2007)

(per curiam), a medical-malpractice action brought on behalf of a minor.  The plaintiff in <u>Cotter</u>

filed her complaint before the applicable limitations period expired, but she was not the real

party in interest at the time of the filing because she had not been appointed the minor's next

friend, as required by Michigan law.  <u>Id.</u> at *1-2.  That appointment did not happen until after the

limitations period expired.  <u>Id.</u> at *1.  The plaintiff, relying on Mich. Comp. Laws § 600.5856(a),

argued that she tolled the statute of limitations by filing her complaint.  <u>Id.</u> at *3.  The court

rejected that argument, explaining that "<u>the filing of a complaint does not necessarily toll the</u>

<u>statute of limitations</u>."  <u>Id.</u> (emphasis added)  Because the plaintiff did not become the minor's

next friend and the real party in interest before the limitations period expired, the court

concluded that "the filing of the complaint did not toll the applicable statute of limitations."  <u>Id.</u>

30.    The sequence of events presented here matches the pattern in <u>Forster</u> and

<u>Cotter</u> in every respect – a plaintiff who was not the real party in interest filed a complaint, then

the statute of limitations expired, then the plaintiff acquired the right to bring the claims asserted

in the complaint (in <u>Forster</u> and this case, through an assignment by a third party; in <u>Cotter</u>,

through an appointment as next friend).  <u>Forster</u> and <u>Cotter</u> leave no doubt that, under these

circumstances, the plaintiff's filing of the complaint does not toll the statute of limitations.

31.    The cases cited by Nu-Tech in support of its position – <u>George Morris</u>

Cruises v. Irwin Yacht & Marine Corp., 478 N.W.2d 693 (Mich. Ct. App. 1991), and Thomas v.

Costa, No. 235031, 2003 WL 460222 (Mich. Ct. App. Feb. 21, 2003) – do not suggest a different

outcome, as those cases deal with an entirely different situation.  Unlike Nu-Tech and the

plaintiffs in Forster and Cotter, the plaintiffs in George Morris Cruises and Thomas were real

parties in interest when they filed their complaints but they did not have the legal capacity to sue

because of some failure to comply with the technical requirements of state law.[13]  See Leite v.

Dow Chem. Co., 478 N.W.2d 892, 892 (Mich. 1992) (explaining that "the real-party-in-interest

[defense] is not the same as the legal-capacity-to-sue defense").  Furthermore, neither George

Morris Cruises nor Thomas says a word about statutes of limitations or the concept of tolling.

Accordingly, those cases provide no support for Nu-Tech's argument that the statute of

limitations is tolled when a complaint is filed by a plaintiff who is not the real party in interest.[14]

       32.      Approaching the issue from a slightly different angle, the Michigan

Supreme Court held last year in Miller that a plaintiff cannot cure a real-party-in-interest defect

by substituting the real party in interest as the named plaintiff "after the expiration of the period

of limitations."  730 N.W.2d at 465.  Thus, if Nu-Tech had tried to substitute RPT as the plaintiff

---

[13]    In George Morris Cruises, the problem was that the plaintiffs had failed "to file a certificate of copartnership before bringing suit."  478 N.W.2d at 698-99.  In Thomas, the plaintiffs were corporations that lacked the legal capacity to sue because they did not have certificates of good standing when they filed their action.  2003 WL 460222, at *9-10.

[14]    Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774 (Fed. Cir. 1993), an intellectual-property case, explains the negative implications of permitting plaintiffs to cure real-party-in-interest defects after filing an action:

> As a general matter, parties should possess rights before seeking to have them vindicated in court.  Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue.  Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent.  Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation.  Inevitably, delay and expense would be the order of the day.

Id. at 780.

in the Michigan Action in March 2005, there is no question that its attempt would have been rejected under <u>Miller</u>.  Although Nu-Tech argues that the result should be different in this case, there is no reason to differentiate between a belated attempt to substitute the real party in interest (as in <u>Miller</u>) and a belated attempt involving an assignment (the situation here).

33.    In sum, Nu-Tech sold its contract claim to RPT effective December 1, 1999, and did not reacquire the claim before the statute of limitations expired at the end of December 2004.  Accordingly, Nu-Tech's contract claim should be disallowed and expunged in its entirety.

D.    <u>DAS Was Not A Party To The June 1998 Purchase Order Or The August 1998 Purchase Order.</u>

34.    Nu-Tech argues that it is entitled to damages on its contract claim from January 1, 1999, through December 31, 2000, even though DAS did not issue the May 1999 Purchase Order until May 3, 1999.  From January 1, 1999, until May 3, 1999, the operative agreement was the August 1998 Purchase Order issued by GM.  Thus, even if one assumes that Nu-Tech did not transfer its claim to RPT or that there was a valid reassignment of the claim to Nu-Tech, DAS cannot be held responsible for any breach of the August 1998 Purchase Order because it was not a party to that contract.  There is no risk that an alleged wrong will go unpunished here, because Nu-Tech sued GM in the Michigan Action and has since settled with GM for an undisclosed amount.

35.    Nu-Tech's counterargument is based on the declaration of Ms. Patrick, a former Delphi employee who is now cooperating with Nu-Tech.  Ms. Patrick asserts that the August 1998 Purchase Order constituted an "assumption" by DAS of the June 1998 Purchase Order.  (Patrick Aff. ¶¶ 24, 29.)  According to Ms. Patrick, DAS issued the August 1998 Purchase Order in August 1998 when "Delphi was spun off by General Motors."  (<u>Id.</u> ¶ 24.)  In fact, however, the spin-off was not completed until late May <u>1999</u>; indeed, DAS itself did not

18

even exist until September 1998, one month <u>after</u> GM issued the August 1998 GM PO.  (<u>Exhibit</u>

<u>L</u>; <u>Exhibit Q</u> ¶ 6.)  Moreover, as explained in the declaration of Tina Weber, Ms. Patrick's

supervisor in August 1998, the August 1998 Purchase Order was merely a reissue of the June

1998 Purchase Order using GM's new purchasing system, and did not represent an assumption of

the June 1998 Purchase Order by DAS.  (<u>Exhibit Q</u> ¶¶ 5-6.)

        E.     <u>Nu-Tech Failed To Mitigate Its Damages.</u>

        36.     Under Michigan law, when a person has breached a contract or committed

some "other legal wrong against another, it is incumbent upon the latter to use such means as are

reasonable to under the circumstances to avoid or minimize the damages.  The person wronged

cannot recover for any item of damage that which could thus have been avoided." <u>Complete</u>

<u>Auto & Truck Parts, Inc. v. City of Flint</u>, No. 268485, 2007 1934792, at *2 (Mich. Ct. App. Jul.

3, 2007) (quoting <u>Shiffer v. Bd. of Educ. of Gibraltar Sch. Dist.</u>, 224 N.W.2d 255, 258 (Mich.

1974)).  In this case, it is undisputed that Nu-Tech knew in August, September, or October 1998

that it was going to lose the Part business as a result of GM's settlement of the work stoppage.

(<u>See</u> <u>Exhibit P</u> at 27:17-28:12, 29:7-31:13.)  Yet Nu-Tech took no steps to mitigate its losses at

any point during its two-year damages period, and in fact did not raise any issue with DAS's

performance in writing during that period.  Instead it remained inactive month after month as it

allegedly incurred losses of nearly $15.1 million, a figure that exceeds Nu-Tech's entire gross

revenue for 1998.  The mitigation principle prohibits Nu-Tech from "capitalizing on a breach or

exploiting a breaching defendant for a windfall" in this manner.  <u>Charter Twp. of Marquette v.</u>

<u>City of Marquette</u>, No. 268535, 2006 WL 3500896, at *7 (Mich. Ct. App. Dec. 5, 2006).

II.     <u>Nu-Tech's Promissory-Estoppel Theory Is Also Without Merit.</u>

        37.     Nu-Tech's promissory-estoppel claim is based on a vague promise

allegedly made by DAS concerning an award of new business to Nu-Tech.  As a threshold matter,

this claim fails for the same reasons set forth in Part I.A above – by selling "all of [its] assets, rights, and interests of every conceivable kind or character whatsoever" under the Definitive Asset Sale Agreement (Exhibit H art. I, ¶ 1.1), Nu-Tech assigned its claim to RPT, and Nu-Tech's attempt to regain possession of the claim in March 2005 is invalid under Michigan law because the applicable statute of limitations had already expired.[15]  In addition, the claim fails on the merits.

38.     Michigan courts have made clear that "promissory estoppel must be cautiously applied, and only where the facts are unquestionable and the wrong to be prevented undoubted."  Booker v. City of Detroit, 650 N.W.2d 680, 685 (Mich. Ct. App. 2002) (internal quotation marks omitted here and throughout), rev'd in part on other grounds, 668 N.W.2d 623 (Mich. 2003); Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). To maintain this claim, Nu-Tech must establish that (1) DAS made a promise, (2) DAS reasonably should have expected the promise to cause Nu-Tech to act in a definite and substantial manner, (3) Nu-Tech did in fact rely on the promise by acting in accordance with its terms, and (4) the promise must be enforced to avoid injustice.  Crown Tech. Park v. D&N Bank, FSB, 619 N.W.2d 66, 71 (Mich. Ct. App. 2000); Novak, 599 N.W.2d at 552.  None of these elements are satisfied here.

---

[15]   A promissory-estoppel claim accrues when the alleged promise is broken, Alliance Assocs., L.C. v. Alliance Shippers, Inc., No. 265101, 2006 WL 1506687, at *4 (Mich. Ct. App. June 1, 2006) (per curiam), which in this case occurred no later than the end of 1998, when the tools needed to make the Part were removed from Nu-Tech's plant and Nu-Tech did not receive any replacement business.  The limitations period applicable to such claims is generally six years from the date of accrual, Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 643 (Mich. 1977), but where the alleged promise is akin to an agreement governed by the UCC, as in this case, the UCC's four-year period is a better fit.  Thus, the limitations period for Nu-Tech's claim expired either at the end of 2004 or the end of 2002, in either case before Nu-Tech entered into the Assignment Agreement with RPT in March 2005.

A.    <u>DAS Did Not Make The Promise.</u>

39.    The most obvious problem is that DAS did not make the alleged promise. At his deposition in the Michigan Action, Mr. Cooper testified that Ms. Patrick made the promise to him in the fall of 1998.  (<u>Exhibit O</u> at 42:2-42:15.)  But Ms. Patrick swears that Mr. Cooper is wrong.  In her declaration, Ms. Patrick stated that she was "not personally aware of such a promise."  (Patrick Aff. ¶ 38.)  She also stated that Mr. Cooper had told her "that <u>General</u> <u>Motors</u> had promised to provide to Nu-Tech a replacement part."[16]  (<u>Id.</u> (emphasis added).)  Because the declaration of Nu-Tech's own witness establishes that Ms. Patrick did not make the alleged promise, and that the alleged promise (if it was made at all) came from GM, Nu-Tech cannot sustain its claim against DAS.  <u>See</u> <u>Capital 1 Commercial Group, Inc. v. Tortora</u>, No. 2006-075550-CZ, 2007 WL 1485865, at *3 (Mich. Ct. App. May 22, 2007) (per curiam) (rejecting promissory-estoppel claim when plaintiff failed to show that "defendant made a promise, verbally or in writing"); <u>Jungslager v. Lampe</u>, No. 264441, 2006 WL 335836, at *3 (Mich. Ct. App. Feb. 14, 2006) (per curiam) (rejecting claim when plaintiffs failed to "present anything showing a specific promise by defendant").

B.    <u>The Promise Was Not Clear And Definite.</u>

40.    The promise of new business alleged by Nu-Tech is too vague to be enforced.  "The sine qua non of the theory of promissory estoppel is that the promise be clear and definite."  <u>Derderian v. Genesys Health Care Sys.</u>, 689 N.W.2d 145, 157 (Mich. Ct. App. 2004); <u>accord</u> <u>First Sec. Sav. Bank v. Aitken</u>, 573 N.W.2d 307, 317 (Mich. Ct. App. 1997) ("Promissory estoppel requires an actual, clear, and definite promise.").  Under this principle, "when material terms of the agreement are lacking, the degree of certainty necessary in a promise is absent."

---

[16]    Ms. Patrick's recollection is consistent with that of John W. Mailey, the head of Nu-Tech during the relevant period, who stated in his affidavit in the Michigan Action that DAS "at no time prior to the sale of Nu-Tech to Rapid Product Technologies, LLC made any promise of additional business."  (<u>Exhibit N</u> ¶ 12.)

Kleiman v. Johnson, No. 219117, 2000 WL 33417403, at *2 (Mich. Ct. App. June 30, 2000) (per curiam); Tomaski v. SRW, Inc., No. 190978, 1997 WL 33343340, at *3 (Mich. Ct. App. Oct. 3, 1997) (per curiam).

41.    In Swartzenberg v. Swartzenberg (In re Swartzenberg), No. 196677, 1997 WL 33344999 (Mich Ct. App. June 24, 1997) (per curiam), for example, the defendant's promise to financially support the plaintiff "was not a clear and definite promise" because "[n]o terms of the support were specified, i.e., the amount of monetary support [the plaintiff] was to receive, the payment schedule, and the method of payment." Id. at *3. And in Sales Engineering, Inc. v. Collins & Aikman Plastics, Inc., No. 251348, 2005 WL 415674 (Mich. Ct. App. Feb. 22, 2005) (per curiam), an alleged promise that the plaintiff would receive commissions for its sales of automotive parts to GM was not clear and definite because the plaintiff "failed to specify which of [the] two defendants made the promise or which parts program the promise related to." Id. at *5.

42.    In this case, Nu-Tech's ambiguous description of the alleged promise reveals only that the new business would involve a price and volume "similar" to that reflected in the June 1998 GM PO and the August 1998 GM PO, and that the promise was made at some point in the "fall of 1998."[17]   (Cooper Dec. ¶ 19; Exhibit O at 42:2-42:15.)  Nu-Tech cannot state with specificity the part that was to be covered by the award or any of the material terms regarding price, volume, or duration.  Nor can it identify with any reasonable degree of particularity when the promise was made or, in light of Ms. Patrick's declaration, who made the promise.  This missing information makes the alleged promise insufficiently clear and definite under Michigan law.

---

[17]    Nu-Tech also contends that it "believed" the new award would be for part number 25180510 (Cooper Dec. ¶ 19), but it does not assert that that part, or any other part for that matter, was mentioned in the alleged promise.

C.     Nu-Tech Did Not Reasonably Rely On The Promise.

43.     Nu-Tech's reliance theory is set forth in Mr. Cooper's declaration, which
states that Nu-Tech relied on GM's past practice "of substituting one part for another . . . ,
Delphi's promises of a replacement part, the [May 1999 Purchase Order], the process of testing a
new tool for production of [another] reservoir part . . . , [and] the mentorship relationship
between Nu-Tech and Delphi/General Motors" by "retaining the machines, staff and facilities it
would need to run the promised replacement part."  (Cooper Dec. ¶ 20.)

44.     On its face, Mr. Cooper's declaration shows that Nu-Tech's actions were
not taken in reliance on the alleged promise of a replacement part, but rather were based on a
combination of factors that included GM's business practices, Nu-Tech's internal testing process,
the May 1999 Purchase Order (which was issued several months after the alleged promise), and
Nu-Tech's relationship with Delphi and GM.  Indeed, Nu-Tech does not assert that the alleged
promise, standing alone, would have resulted in the actions it took, or that Nu-Tech would have
behaved any differently if the alleged promise had not been made.

45.     Moreover, although Nu-Tech claims it retained machines and buildings in
reliance on the alleged promise, the record shows that Nu-Tech entered into leases covering
those machines and buildings with companies owned or controlled by Mr. Cooper before the
alleged promise was made in the fall of 1998.[18]  To state the obvious:  "To establish that plaintiff
relied on the purported promise, the alleged reliance cannot precede the promise."  Formicola v.
CBS Corp., No. 227881, 2002 WL 1963780, at *2 (Mich. Ct. App. Aug. 23, 2002) (per curiam);
accord Marrero v. McDonnell Douglas Capital Corp., 505 N.W.2d 275, 278 (Mich. Ct. App.
1993) (per curiam) (explaining that plaintiff who cited post-promise actions in an effort to

---

[18]     A summary of Nu-Tech's leases prepared by DAS's damages expert in 1999 shows that Nu-Tech entered into its
building leases no later than September 1, 1998 (Exhibit S at Ex. IV) and into its equipment leases no later than
October 7, 1998 (id. at Ex. V).

establish reliance had "inverted the sequence of events necessary to establish promissory estoppel").  Furthermore, under the leases, which did not grant Nu-Tech a termination right, Nu-Tech was obligated to make payments well beyond December 31, 1999, the end of the damages period proposed by Nu-Tech with respect to this claim.  (See Exhibit S at Exs. IV & V.)  Because Nu-Tech already had a duty to make the payments, it cannot claim that the payments resulted from its reliance on the alleged promise.

46.    With respect to Nu-Tech's assertion that it retained staff in reliance on the alleged promise, it is not clear from Mr. Cooper's declaration when those workers were hired, making it difficult to ascertain whether they joined Nu-Tech before or after the promise.  In addition, it is highly unlikely that those workers, who were supposedly hired to produce the replacement part, were allowed to stay on the payroll and remain idle throughout calendar year 1999, as Nu-Tech alleges.[19]  If Nu-Tech did allow that to happen, its behavior was unreasonable; it should have terminated the employees or reassigned them to other duties when Nu-Tech did not receive the new business.

47.    Finally, Nu-Tech's reliance on the alleged promise was unreasonable given that DAS's standard practice, both in general and as to Nu-Tech, was to award new business through a process that required potential suppliers to submit bids, followed by DAS reviewing the bids, selecting a supplier, and then issuing a purchase order.  As Mr. Cooper testified at his deposition in the Michigan Action, Nu-Tech was well aware of this procedure. (Exhibit O at 23:16-24:3.)  Given Nu-Tech's understanding of the bid procedure and its knowledge of the fact that DAS did not commit to new business until it issued a purchase order, its reliance on any naked promise of new business was unreasonable.

---

[19]    Nu-Tech is seeking more than $460,000 in wages and associated taxes on account of these workers.

D.    Nu-Tech's Reliance Was Unreasonable As A Matter Of Law.

48.    As explained in Ms. Patrick's declaration, the May 1999 Purchase Order

was subject to the Term and Conditions.  (Patrick Aff. ¶ 29.)  The Terms and Conditions

included an integration clause providing, "This contract, together with the attachments, exhibits

supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire

agreement between Seller and Buyer with respect to the matters contained in this contract and

supersedes all prior oral or written representations and agreements."  (Exhibit F ¶ 31.)

49.    The promise alleged by Nu-Tech – i.e., that Nu-Tech would receive an

award for a new part as a substitute for the Part – is related to and in direct conflict with the May

1999 Purchase Order, which essentially provides that Nu-Tech would remain the supplier of the

Part.  Nu-Tech's reliance on the earlier promise was therefore unreasonable as a matter of law

from the date of the May 1999 Purchase Order forward.  See N. Warehousing, Inc. v. State Dep't

of Educ., 714 N.W.2d 287, 289 (Mich. 2006) ("Promissory estoppel requires reasonable reliance

on the part of the party asserting estoppel.  Reliance on pre-contractual representations is

unreasonable as a matter of law when the contract contains an integration clause."); Able

Demolition, Inc. v. City of Pontiac, No. 273295, 2007 WL 1464616, at *4 n.4 (Mich. Ct. App.

May 17, 2007) (per curiam) ("Furthermore, the contract contains an integration clause and,

therefore, it would have been unreasonable as a matter of law for [plaintiff] to rely on any

outside representations to support a promissory estoppel claim.").

E.    Enforcing The Promise Is Not Necessary To Avoid Injustice.

50.    Under Michigan law, Nu-Tech must demonstrate that enforcing the

alleged promise is "necessary to avoid injustice."  Crown Tech. Park, 619 N.W.2d at 71; Novak,

599 N.W.2d at 552.  There is no danger of injustice in this case.  Instead, enforcing the promise

and awarding Nu-Tech the damages it seeks would result in a windfall for Mr. Cooper.  In 1999,

Nu-Tech made monthly lease payments to entities owned or controlled by Mr. Cooper or to Mr. Cooper himself under the equipment and building leases described above.  Nu-Tech now seeks to recover those lease payments, which would again flow to Mr. Cooper in his capacity as the sole owner of Nu-Tech.  The equitable doctrine of promissory estoppel should not be applied when doing so would provide a double recovery.

III.     Nu-Tech's Damages Report Significantly Overstates Nu-Tech's Alleged Loss.

51.     According to the damages report submitted by Nu-Tech's damages witness, Gary Leeman (the "Nu-Tech Report"), Nu-Tech suffered an aggregate loss of $15,126,582.  This calculation includes $8,545,014 in lost income from January 1, 1999, through December 31, 2000, lost business value of $5,698,181 in connection with Nu-Tech's asset sale effective December 1, 1999, and excess costs of $883,387 related to payments under building and equipment leases and wage-related payments in calendar year 1999.  The Nu-Tech Report substantially overstates Nu-Tech's losses.

A.     Nu-Tech's Lost Income Does Not Exceed $742,949.

52.     The Nu-Tech Report's calculation of lost income assumes a damages period of January 1, 1999, through December 31, 2000.  This period starts too early and ends too late.  As explained above, from January 1, 1999, through May 2, 1999, the operative agreement was the June 1998 Purchase Order between Nu-Tech and GM.  And on January 14, 2000, Nu-Tech executed the Definitive Asset Sale Agreement and sold the May 1999 Purchase Order and any related causes of action to RPT.  Thus, neither the period before May 3, 1999 (when DAS issued the May 1999 Purchase Order) nor the period after January 14, 2000 (when Nu-Tech executed the Definitive Asset Sale Agreement) should be included in any damages calculation.

53.     In addition, as explained in Mr. Francis's damages report, the Nu-Tech Report's lost-income analysis includes three flawed assumptions that result in an inflated

calculation:  (i) it is based on an incorrect assumption regarding the number of parts required by

DAS, (ii) it takes into account the financial performance of non-core aspects of Nu-Tech's

business that should not be included in a lost-income analysis,[20] and (iii) it ignores income taxes.

(Exhibit S ¶¶ 6-9.)  As demonstrated in Mr. Francis's report, if one focuses on the appropriate

damages period, corrects the Nu-Tech Report's three flawed assumptions, and otherwise adopts

the Nu-Tech's Reports assumptions and methodology, Nu-Tech's lost income was limited to

$742,949.  (Id. ¶ 10 & Exs. I-II.)

> B.    Nu-Tech Cannot Recover Damages For Lost Business Value.

54.    The starting point for the Nu-Tech Report's estimation of lost business

value is its flawed calculation of lost income.  The calculation essentially multiplies Nu-Tech's

supposed lost after-tax income in calendar year 1999 by a capitalization rate of 3.91, then

subtracts the lost pre-tax income for 1999 and the consideration Nu-Tech received from RPT

effective December 1, 1999.  Nu-Tech is legally barred from recovering any damages under this

measure under American Anodco, Inc. v. Reynolds Metal Co., 743 F.2d 417 (6th Cir. 1984).

55.    In that case, a jury awarded the plaintiff-seller damages for "loss of

earnings" and "loss of business value" after finding that the defendant-buyer had breached a

requirements contract.  Id. at 423.  The plaintiff-seller calculated its lost business value by

capitalizing its lost earnings.  Id.  The Sixth Circuit, applying Michigan law, overturned this

portion of the damages award, stating:

> [L]ike any item of damages, loss of profits may only be recovered once.
> [Plaintiff-seller's calculation] set the loss of future profits from the breach
> at $739,269.  The removal of these same profits . . . caused the reduction
> in value of the business when capitalized by the [plaintiff-seller's]
> accountant.  Where the loss of profits and loss of value are intertwined, as

---

[20]    For example, Mr. Cooper testified that Nu-Tech's Division 2 processed paperwork to allow Mr. Cooper to pass
his separate conveyor business through Nu-Tech so that the conveyor business could meet customers'
requirements for working with minority-owned businesses.  (Exhibit P at 97:9-99:20.)

> they are here, and the loss of value is based on loss of future profits, to
> allow both would be to permit a double recovery.

Id. at 424.  Like the plaintiff-seller in American Anodco, Nu-Tech has presented a calculation of

lost business value that is intertwined with and based on its calculation of lost income arising

from DAS's alleged failure to perform under a requirements contract.  Accordingly, allowing Nu-

Tech to recover any damages based on lost business value would provide it with an improper

double recovery.

56.    Nu-Tech has not suffered any damages under this measure in any event.

As explained in Mr. Francis's damages report, the Nu-Tech Report's calculation of $5,698,181 in

lost value is inflated because (i) it is based on the Nu-Tech Report's flawed calculation of lost

income, (ii) the basis for the calculation should be free cash flow rather than net income because

free cash flow is recognized as a better approximation of value, and (iii) the calculation should

use a discount rate rather than a capitalization multiplier because the May 1999 DAS PO was for

a limited duration.  (Exhibit S ¶¶ 6, 13-15.)  Correcting these deficiencies results in an estimated

lost business value of $1,239,089 based on free cash flow for all of 1999.  (Id. ¶ 15 & Ex. III.)  If

Nu-Tech's lost income and the sale price it obtained from RPT are subtracted from this figure, as

they are in the Nu-Tech Report, the calculation drops below zero.[21]

57.    Moreover, Nu-Tech should not recover any damages under a lost-

business-value measure because that would provide Nu-Tech with multiple forms of recovery for

the same alleged harm based on conflicting theories.  (Id. ¶ 16.)  The lost-income calculation

discussed above is designed to provide to Nu-Tech the income it would have earned if it had

produced 100% of DAS's requirements for the Part in 1999 and 2000.  (Id.)  By contrast, the

theory underlying the calculation of lost business value is that Rapid (or another buyer) would

---

[21]    As calculated in the Nu-Tech Report, the sale price alone was more than $1.2 million.

have paid more for Nu-Tech's assets in January 2000 if Nu-Tech had produced 100% of DAS's

requirements in 1999 and Rapid expected that DAS would continue to order 100% of its

requirements from Rapid following the asset sale.  (<u>Id.</u>)  These two hypotheticals cannot coexist

– Nu-Tech could produce the Part and earn the income in 1999 and 2000, or Nu-Tech could

produce the Part in 1999 and then sell its assets for a higher price in January 2000, but not both.

(<u>Id.</u>)  Accordingly, it would be inappropriate to allow Nu-Tech to recover damages based on lost

income <u>and</u> damages based on lost business value.  (<u>Id.</u>)

        C.      <u>Nu-Tech's Calculation Of Excess Costs Is Overstated.</u>

        58.      According to the Nu-Tech Report, DAS's conduct resulted in Nu-Tech

incurring excess costs of $883,387 in 1999.  These costs comprise lease payments under two

building leases and two equipment leases between Nu-Tech and Mr. Cooper or entities owned or

controlled by Mr. Cooper, as well as wage-related payments.  These costs should be taken into

account only to the extent that Nu-Tech was unable to use the buildings, equipment, and labor

for other purposes.  Nu-Tech has not made any attempt to establish that that was the case.

Instead, it asks the Court to assume that the buildings, equipment, and workers were left to

collect cobwebs throughout all of 1999, which seems unlikely at best.

        59.      Moreover, based on an analysis undertaken by BBK, Ltd. in 1999 as part

of its assistance to Nu-Tech under Delphi's troubled-supplier program, the building and

equipment leases executed by Nu-Tech and Mr. Cooper called for payments that were

significantly above market rates for comparable buildings and equipment.  (<u>Id.</u> ¶¶ 6, 17-20.)

With respect to the building leases, for example, BBK estimated that Nu-Tech paid

approximately $11.99 per square foot under the lease for one building, and approximately $10.00

per square foot and under the lease for the other.  By contrast, BBK's market research showed

that the market rate at that time was in the range of $4.00 to $5.00 per square foot.  (<u>Id.</u> ¶ 18.)

Thus, whereas Nu-Tech made aggregate lease payments of $278,670 for those two buildings in 1999, at market rates the aggregate payments would have been somewhere between $103,500 and $129,375.  (Id.)  This analysis suggests that Nu-Tech's leases with Mr. Cooper were negotiated at a distance short of arm's length, and heightens the concerns about providing Mr. Cooper with a windfall recovery as explained in Part II.E above.

60.    The Nu-Tech Report includes in its excess-costs calculation $461,709 in wage-related payments in calendar year 1999, comprising $394,185 in wages, $34,097 in payroll taxes, and $33,427 in health-insurance payments.  (Id. ¶ 21.)  As reflected in the operating payroll and expenses portion of the Nu-Tech Report's lost-income calculation for 1999, those wage-related payments constituted variable costs – i.e., costs that changed directly with Nu-Tech's production of the Part.[22]  (Id.)  If Nu-Tech did not produce the Part in 1999 (as the Nu-Tech Report assumes), then Nu-Tech did not or should not have incurred those costs in 1999.  (Id.)  It is therefore inappropriate to include the wage-related payments as excess costs.  (Id.)

---

[22]    This was confirmed by Mr. Cooper at his deposition when he testified that the workers who had been hired to produce the Part were either laid off or reassigned within "a couple weeks at the most" of Nu-Tech's loss of the Part business.  (Exhibit P at 99:22-100:11.)

<u>Conclusion</u>

WHEREFORE, the Debtors respectfully request that this Court disallow and expunge the Claim and grant the Debtors such other and further relief as is just.

DATE: New York, New York
      January 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By: <u>s/ John Wm. Butler, Jr.</u>
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Albert L. Hogan, III (AH 8807)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: <u>s/ Kayalyn A. Marafioti</u>
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et</u> <u>al.</u>,
 Debtors and Debtors-in-Possession