# EXHIBIT H

**Final**

# AGREEMENT
## PURCHASE AND SALE OF BUSINESS ASSETS

This Agreement ("Agreement") is made on December 1st, 1999, ("Effective Date") between:

**Seller:**   **NUTECH PLASTICS ENGINEERING, INC.**
          **Grand Blanc, Michigan ("Seller")**

**Lessor:**   **ABX LEASING, LTD., a Michigan Corporation ("Lessor")**

**Landlord:**  **JOHN COOPER, with respect to Lennon Road Facility and Embury Road Facility; and JOHNNY GLEN COOPER, with respect to the Baldwin Road Facility (collectively, the "Landlord")**

and

**Purchaser:** **RAPID PRODUCT TECHNOLOGIES, L.L.C.**
          **3511 Auburn Road, Auburn Hills, MI 48326 ("Purchaser").**

All collectively referred to herein as the "Parties".

## RECITALS

This agreement is made with reference to the following facts and circumstances, all of which are true and are incorporated into the agreement of the parties:

A.   The Parties previously entered into that certain Memorandum and Agreement which is attached as Exhibit A regarding the sale and purchase of the Assets and the ABX machines and the leasing of the locations (the "Memo"). The purpose of this Agreement is to supplement and complete the terms and conditions of the Memo in a definitive fashion.

B.   Seller owns and operates a certain plastic injecting molding business ("Business") with three leased facilities (all as described on Schedule A) situated in or around Grand Blanc, Michigan (the "Locations"), operated under the name of Nutech Plastics Engineering, Inc. at the Location.

C.   Lessor owns all right, title and interest in certain Injection Molding Machines and CNC Machines with appraised value at $2,800,000, all as more particularly described on Schedule B (the "ABX Machines"). Lessor currently leases the ABX

030047-000778

JAN 18 2000 16:17 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074      P.03/23

01/14/00   14:19 FAX                                                    ☑003/023

Machines to Seller, but has agreed to sell them to Purchaser pursuant to the Memo and this Definitive Agreement, all as more particularly set forth in the ABX Agreement attached hereto as Exhibit C.

   D.   Landlord owns the real estate and Buildings which comprise the Locations. Landlord currently leases the Locations to Seller, but has agreed to lease the Locations to Purchaser upon the terms and conditions contained in Schedule A of Exhibit A attached hereto.

   E.   The Parties have entered into the agreements outlined in the Memo which include the purchase by Purchaser and the sale by Seller of a part or all of the assets used in connection with the Business. Further, as a part of the sale, Seller agreed it shall assign to Purchaser all of its rights, but not obligations, associated with the ABX Machines and the Locations; and Lessor and Landlord have agreed to sell the ABX Machines and lease the Locations, respectively, to Purchaser.

   F.   The Purchaser took over operation of the Seller's Business effective December 1, 1999, despite the fact that the Definitive Agreements have not been signed.

   G.   Seller desires to sell, and Purchaser desires to purchase, Seller's interest in the "Purchased Assets," as defined in paragraph 1.1. used in connection with the Business.

   H.   John Cooper and John Mailey, the Seller's Shareholders (collectively, the "Shareholder"), will derive a substantial economic benefit from Purchaser's purchase of the Purchased Assets from Seller. In exchange, Shareholder agrees to make certain representations, warranties, covenants, Guarantees and indemnifications only as specifically set forth in this Agreement. In addition, Seller and Shareholder agree not to compete with Purchaser in the conduct of the Business, as provided in a non-competition agreement described in paragraph 1.2 ("Non-Competition Agreement"), as a condition of Purchaser's purchase of the Purchased Assets from Seller. Further, a Personal Guaranty regarding the performance of Seller's and Shareholder's representations warranties, covenants, and indemnifications concerning the title to and the transferability of the Purchased Assets as set forth in Section 7.5 of this Agreement shall be executed at the Closing by John Cooper ("Guaranty" and "Guarantor," respectively).   A copy of the Guaranty is attached as Exhibit H.

   **NOW, THEREFORE,** the parties agree as follows:

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4                    2

030047-000779

JAN 18 2000 16:18 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074        P.04/23

01/14/00  14:20 FAX                                                          ☑004/023

## AGREEMENT

## ARTICLE I.  AGREEMENT TO PURCHASE AND SELL

1.1    <u>Assets Purchased and Sold</u>. At the Closing, Purchaser shall buy and Seller shall sell, assign, convey, transfer, set over, and deliver (by Warranty Bill of Sale or other appropriate instrument of transfer) to Purchaser all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Effective Date were owned by Seller or in which Seller has an interest of any kind (the "Purchased Assets"). These include, without limitation, the following, except for those assets specifically identified in paragraph 1.4 ("Excluded Assets"):

(a)    <u>Trade Fixtures Machinery and Equipment</u>. All removable trade fixtures, machinery and equipment as defined in the Michigan Uniform Commercial Code, Act. No. 174 of the Michigan Public Acts of 1962, as amended ("UCC"). All as more particularly described on Exhibit 1.1(a) (the "Machinery and Equipment").

(b)    <u>Trade Names and Secrets</u>. All patents, logos, slogans, trademarks, copyrights, know-how, processes, trade secrets, formulas, inventions, telephone numbers, telephone listings, computer programs, software programs, software and technical libraries, engineering data, electronic databases, drawings, license agreements, and all other intellectual and proprietary information, property, and related applications or licenses used in connection with the Business whether or not held in the name of an Individual Shareholder ("Trade Secrets"). With regard to the Patents, any and all filings which Seller possesses shall be delivered at Closing. The Trade secrets shall include, but not be limited to, the Patents attached hereto as Exhibit 1.1(b).

(c)    <u>Purchase Orders</u>. Any existing customer purchase orders, requests for quotation or bid and any other customer solicitation that have not been completed before the Closing ("Purchase Orders").

(d)    <u>Customer List and Miscellaneous Records</u>. Any records, files, lists, or other tangible assets that pertain to Seller's Business, including records that pertain to any of the following: Seller's customers, suppliers, advertising, promotional material, sales, services, delivery, or operations, except those items required to be retained by law, inclusive of accounting records and returns ("Customer List and Miscellaneous Records"). Seller and Shareholder shall have access to such Records as is necessary to defend suit, prepare governmental

X:\JJO\CLIENTS\STRATECH\NUTECH\ASSETPUR.4        3

030047-000780

filings and other like matters upon reasonable notice, but shall not use such information for commercial exploitation.

(e) <u>Remote Assets</u>. All assets located off-site of Seller's Location or in the possession of others but owned by or used in connection with the Business ("Remote Assets"). Seller shall deliver to Purchaser at the Closing the situs of the Remote Assets and the situs of the person or entity in possession or control of them.

(f) <u>Contracts</u>. All contracts and service agreements ("Contracts"). Seller shall deliver these to Purchaser at the Closing.

(g) <u>Sales Contracts and Service Records</u>. All contracts and service records relating to sales, services, or leasing relating to the Business ("Sales Contracts/Service Records"). Seller shall deliver these to Purchaser at the Closing.

(h) <u>Goodwill</u>. The goodwill, telephone and fax numbers, yellow-page advertisements, and Seller's right to use the registered name Nu-Tech Plastics Engineering, Inc. and all related names and derivations ("Goodwill").

1.2 <u>Covenant Not to Compete</u>. Seller and Seller Shareholders shall not establish, engage in, or become interested in, directly or indirectly, as an owner, partner, agent, shareholder, employee, independent contractor, consultant, or otherwise, within a radius of 100 miles from the Location, any Plastic Injection Molding Business, trade, or occupation for a period of two years after the latter of the Closing Date or the termination of a shareholder's employment with Purchaser. At the Closing, Seller and Seller's Shareholder shall execute an agreement relating to this provision, which shall be in the form attached as Exhibit 1.2 ("Covenant" or "Non-Competition Agreement").

1.3 <u>Leases: Assignment</u>.

(a) <u>Real Estate Lease: Leasehold Improvements</u>. Seller agrees to assign to Purchaser a Lease and Leasehold Improvements pertaining to the Locations, excepting those Leasehold Improvements owned by Landlord. The Leases are described in Exhibit A.

(b) <u>Miscellaneous Leases</u>. Seller agrees to assign to Purchaser miscellaneous leases used in connection with the operation of the Business ("Personal Property Leases").

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4          4

030047-000781

JAN 18 2000 16:18 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074          P.06/23
01/14/00   14:21 FAX                                                            ☑006/023

1.4    Excluded Assets. Except as set forth in this provision, this Agreement contemplates the purchase and sale, inclusive of assignments, of the Purchased Assets. However, it specifically excludes Seller's:

(a)    cash, cash equivalents, and investments not relating to the operation of the Business;

(b)    books of account, trade, intercompany and other accounts receivable attributable to services rendered prior to the Effective Date, prepaid expenses, prepaid taxes, credit-plan reserves, lease deposits (except that deposits pertaining to any leases being assigned by Seller shall also be assigned), claims for refunds of federal and states income taxes and deferred tax credits;

(c)    Shareholder's miscellaneous items of personal property and possessions that are not and have not been a part of the operation of the Business; and

(d)    those assets not specifically or by inference included in the above paragraphs or the attached exhibits.

These items shall be known as the "Excluded Assets."

With respect to any Excluded Assets, unless otherwise agreed to in writing, Seller, at Seller's expense, shall remove the Excluded Assets from the Locations as soon as possible after the Closing Date but in no event later than ten (10) days after the Closing. If Seller fails to comply with these provisions, Purchaser, without any liability, may dispose of these items at Seller's expense or make such other arrangement as Purchaser may determine to be appropriate.

1.5    Liabilities Assumed and Excluded

(a)    Assumed Liabilities. Purchaser shall not assume any liability of Seller in connection with the purchase of the Assets unless specifically assumed in this Agreement and the Exhibits ("Assumed Liabilities").

(b)    Excluded Liabilities. Except for the Assumed Liabilities, Purchaser does not assume, nor shall Purchaser be obligated for, any other liabilities or responsibilities whatsoever of Seller or of the Business as conducted by Seller through the Closing Date, inclusive of obligations or liabilities resulting from Seller's total or partial withdrawal from any pension, profit-sharing, or retirement plan ("Excluded Liabilities").

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4                5

## ARTICLE II.  PURCHASE PRICE

2.1    Purchase Price; Allocation of Assets. The purchase price for the Purchased Assets, including the Covenant, is $825,000 plus the Final Inventory Purchase Price calculated as of December 1, 1999 ("Purchase Price"). The Purchase Price is allocated in the manner set forth in Exhibit 2.1.

2.2    Tax purposes. The Parties agree (a) to be bound by the allocation of assets in paragraph 2.1 for all federal, state, and local income tax purposes and (b) to file Internal Revenue Service Form 8594 (or other forms required by law) in accordance with the allocation of assets in paragraph 2.1. A copy of the completed form 8594 is attached hereto as Exhibit 2.2.

## ARTICLE III.  TERMS OF PAYMENT

3.1    Deposit. When the Parties executed the Memo, Purchaser deposited with Seller the sum of $825,000.00, which shall be applied toward the Purchase Price at closing.

3.2    Payment. The Purchase Price shall be paid as follows:

(a)    Initial Payment. $825,000.00 is acknowledged as paid to Seller in immediately available funds ("Initial Payment") as payment on the Purchase Price at the signing of the Memo; $525,000 of which was wire transferred to Michigan National Bank as payment in full to the Bank as a secured creditor and the balance of $300,000 was paid to Seller, directly.

## ARTICLE IV.  INVENTORY AND ACCOUNTS RECEIVABLE

4.1    Inventory. In addition to the purchase and sale of the Purchased Assets, Seller agrees to sell, and Purchaser agrees to purchase, the Inventory of Seller specified on Exhibit 4.1 (the "Purchased Inventory"). The Parties further agree as follows:

(a)    Purchase and Sale of Inventory. An inventory of all Purchased Inventory dated as of December 1, 1999 shall be attached to Exhibit 2.1, and Seller shall sell, transfer, and deliver to Purchaser all of the Purchased Inventory on the Closing Date.

(b)    Method of Taking Inventory. The Seller shall conduct the inventory referred to in 4.1(a) and Buyer shall verify the same on or before Closing.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4

6

030047-000783

(c)    **Final Inventory Purchase Price; Payment Terms.** The Final Inventory Purchase Price was determined to be Three Hundred Ninety Thousand Seven Hundred Seventy-Four and 70/100's ($390,774.70) Dollars, which shall be paid pursuant to the terms of a Promissory Note which is attached hereto as Exhibit 4.1(c).

4.2    **Accounts Receivable.** All accounts receivable for transactions occurring before the Effective Date (December 1st) shall remain the property of Seller regardless of any payment to Purchaser. If Purchaser receives payment for any accounts receivable existing as of the Effective Date, Purchaser shall forward the payment directly to Seller.

## ARTICLE V.  ADJUSTMENTS.

At the Closing, the following shall be adjusted or apportioned and, to the extent practicable, all prorations shall be computed and paid at the Closing. To the extent this is not practicable, all prorations shall be computed and paid as soon as practicable after the Closing.

5.1    **Taxes on Purchased Assets.** Purchaser shall pay all taxes and assessments, extraordinary as well as ordinary, that may be levied on any Purchased Assets where those taxes become due after the Closing Date and arise from Purchaser's actions after the Closing; provided, however, that Seller shall pay for all taxes on Purchased Assets where those taxes arise from Seller's ownership or operation of the Business on or before the Closing and that are due on, before, or after the Closing Date. Current personal property taxes shall be prorated and adjusted between the Parties as of the Closing Date on a due-date basis, except taxes that are paid in advance.

5.2    **Miscellaneous Business Taxes.** Seller shall pay in full all social security, sales, use, withholding, and single-business taxes for all years up to and including the last completed tax year and for all quarters for the current tax year immediately preceding the Closing Date, regardless of when payment of such amounts is due.

5.3    **Miscellaneous.** Adjustments shall be made for payroll, any other prepaid items, and any other unspecified unpaid taxes.

5.4    **Transfer Fees; Sales Taxes.** Purchaser shall pay all transfer fees and applicable sales taxes (excluding Seller's income and other, similar taxes) that arise under or on account of the purchase and sale of the Purchased Assets.

5.5    **Timing of Adjustment.** Except as otherwise provided in this Agreement, the net amount of any of the adjustments set forth in Section 5 of this Agreement shall be, to the extent practicable, either an increase or a decrease in the payments to be made at the Closing.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4

7

030047-000784

## ARTICLE VI.

### (Reserved)

## ARTICLE VII. SELLER'S REPRESENTATIONS, COVENANTS, AND WARRANTIES

Seller and Shareholders (with respect to the latter only Sections 7.1, 7.2 and 7.5), represent, covenant, and warrant the following to be true:

7.1   Seller's Status. Seller is a corporation organized, validly existing, and in good standing under the laws of the State of Michigan. Seller is properly authorized, according to its Articles, By-laws, and adopted Resolution, to enter into and carry out the transactions contemplated by this Agreement. Seller has not in the last five (5) years used or assumed any other name in connection with the conduct of the Business. A certified copy of Seller's Articles of Incorporation and any amendments, a Certificate of Good Standing, and a copy of Seller's Bylaws and Resolution shall be furnished at Closing.

7.2   Authority. After their execution, this Agreement and all instruments necessary to carry out the transactions contemplated by this Agreement ("Related Documents") will be legal, valid, and binding obligations of each signatory party to all such instruments acting on behalf of Seller.

7.3   Financial Statements. The financial statements concerning Seller's Business as of the fiscal year preceding the Effective Date, together with any subsequently prepared financial statements supplied by Seller to Purchaser, (a) fairly present Seller's financial position as of the respective dates indicated and the results of operations, retained earnings, and changes in Seller's financial position for the periods indicated and (b) have been prepared in accordance with generally accepted accounting principles as modified by Seller's standard accounting practices.

7.4   Absence of Undisclosed Liabilities. Notwithstanding anything contained in this Agreement to the contrary, except to the extent reserved or reflected in Seller's financial statements and disclosed to Purchaser, as of such dates Seller had no known liabilities or obligations. Seller represents that it does not know or have reasonable grounds to know of any basis for the assertion against Seller, as of such dates and as of the Closing Date, of any liability of any nature or in any amount not fully reflected or reserved against in the financial statements.

7.5   Title to Properties. Seller has good and marketable title to all of the Purchased Assets, including those reflected in Seller's financial statements, subject to no mortgage, pledge, lien, encumbrance, security interest, or charge, except for the following:

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4              8

030047-000785

recorded liens which shall be removed and released at or before Closing. Further, except as set forth in this paragraph, there are no imperfections of title that would affect the marketability of title of the Purchased Assets. John Cooper, hereby, individually and unconditionally guarantees this representation and agrees to indemnify and hold Purchaser harmless from any and all damages arising out of a breach of this representation.

7.6    Seller's Name. Seller agrees that from and after the Closing Date, Purchaser shall have the right to use in or in connection with the conduct of any business (whether carried on by Purchaser directly or through any affiliate) (a) the name of the Business ("Name") and/or (b) any part or portion of the Name, either alone or in combination with one or more other words. Seller warrants to Purchaser that it has taken all necessary action to protect the Name in the State of Michigan and agrees to take or cause to be taken any and all steps or actions that shall be or become permissible, proper, or convenient to enable or permit Purchaser to use the Name, or any portion of the Name, either alone or in combination with one or more other words, except as presently restricted. It is contemplated that on or as soon as practicable after the Closing Date, Seller will terminate Seller's interest in the Name. After the Closing Date, Seller agrees that it will not use, either directly or indirectly; the Name, either alone or in combination with one or more other words, in or in connection with any business, activities, or operations that Seller directly or indirectly may carry on or conduct.

7.7    Status of Contracts. Seller has complied with all the provisions of contracts described in this Agreement and of all other contracts and commitments to which Seller is a party. Further, other than those contracts or agreements specifically described in this Agreement, Seller has no contract or commitment extending beyond the Closing Date.

7.8    Insurance. All Seller's assets are and will be adequately insured against fire and casualty up to the Closing Date.

7.9    Taxes; MESC Liabilities; Tax Returns and Audits

(a)    Taxes. Through the Closing Date, Seller will fully pay when due all personal property and other taxes of any nature assessed against Seller and/or the Purchased Assets. Without limiting the generality of the foregoing, Seller will have paid or provided for all federal, state, county, and local taxes (including, without limitation, income, corporate franchise, single-business, stamp, transfer, sales and use, employee withholding, and ad valorem taxes) due and payable by Seller on or before the Closing Date, including any unemployment tax liability and any deficit balance in Seller's Michigan Employment Security Commission ("MESC") account.

030047-000786

(b) <u>Tax Returns; Audits</u>. Seller has, and as of the Closing Date will have, filed all taxes and reports Seller is required to file pursuant to the operation of the Business with all such taxing authorities, including MESC. Seller does not have any outstanding or unsatisfied deficiency assessments with respect to any taxes, and there are no current audits or investigations by or disputes with any authority with respect to any taxes.

(c) <u>No dispute</u>. Seller is not involved in any dispute with any tax authority about the amount of taxes due, nor has it received any notice of any deficiency, audit, or other indication of deficiency from any tax authority that has not been disclosed to the Parties to this Agreement.

7.10    <u>Licenses and Permits</u>. Seller presently possesses, and will continue to possess at the Closing Date, all governmental licenses, permits, certificates of inspection, other authorizations, filings, and registrations that are necessary for Seller to own and operate the Business as presently conducted.

7.11    <u>Litigation or Insolvency Proceedings</u>

(a) <u>Litigation</u>. There are no actions, suits, claims, investigations, or legal, administrative, or arbitration proceedings pending or, to the best of Seller's or Shareholder's knowledge, threatened or likely to be asserted against Seller and relating to the Purchased Assets, this Agreement, or the related transactions, before any court, governmental agency or other body, including any quasi-judicial or administrative forum. No judgment, order, writ, injunction, decree, or other similar command of any court or governmental agency or body has been entered against or served on Seller or on any individual Shareholder, except: The following two Judgments; Bench Tech for 5,000; and American Commodities for 50,000, the payment for which Seller has made appropriate reserves.

(b) <u>Insolvency Proceedings</u>. Seller is not involved in any proceeding (i) by or against it in any court under the Bankruptcy Code or any state or federal insolvency or debtor's relief act or (ii) for the appointment of a trustee, receiver, liquidator, assignee, or other similar official for Seller or Seller's property.

7.12    <u>Labor Relations -- Employees</u>:

(a) <u>Collective Bargaining Agreements</u>. There are no collective bargaining agreements currently in effect between Seller and labor unions or organizations representing any of Seller's employees. There does not

030047-000787

now exist, and neither any union nor the National Labor Relations Board has made a formal or informal request to Seller to institute, collective bargaining or an employee election.

(b)    <u>Termination of Employees</u>. As of the Closing Date, Seller will terminate all employees and will pay to all employees all wages, salaries, commissions, bonuses, benefit-plan contributions, and other compensation owing. Purchaser may, in its discretion, reemploy some or all of the employees on the day after the Closing Date. After this Agreement is executed, Seller and Purchaser shall jointly announce the Agreement to Seller's employees and shall cooperate so that Seller's notices of termination and any offers of employment by Purchaser are delivered simultaneously so that appropriate management representatives can explain the termination and any offers of employment to the employees.

(c)    <u>Employment Regulations Compliance</u>. With respect to employment matters, Seller acknowledges that:

(i)    Seller is in compliance with all applicable federal, state, and local laws and regulations regarding employment and employment practices, terms and conditions of employment, and wages and hours.

(ii)    There are no unfair labor practice complaints against Seller pending before the National Labor Relations Board, and no such complaints have been threatened.

(iii)    There is no strike or labor dispute, slowdown, or stoppage actually in progress or threatened against Seller.

(iv)    No grievance or arbitration proceedings are pending and no such claims have been asserted.

(v)    Purchaser shall not incur any liability or obligation of any kind arising out of Seller's employment of or termination of Seller's employees nor for any other claim by any of Seller's employees arising out of any employment relationship with Seller.

X:\JD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4        11

    (d)    **Exclusion of Employee Benefits.** Seller acknowledges that:

        (i)    Purchaser does not assume any of Seller's employee benefits, unless such employee benefits are specifically assumed as Assumed Liabilities.

        (ii)    Purchaser shall have no obligation to provide employee benefits other than any benefits Purchaser, in its sole discretion, agrees to provide to its employees.

    7.13   **Environmental Matters.** To the best of Seller's knowledge, there is no Hazardous Material in, on, or under the Location where the Business is conducted. In addition, there are no presently pending or threatened administrative or enforcement actions, investigations, compliance orders, claims, demands, actions, or litigation based on environmental laws or regulations or otherwise related to the presence of Hazardous Material in, on, or under the premises on which the Business is conducted. Seller makes no other environmental representations or warranties. For purposes of this paragraph, the term "Hazardous Material" means any toxic or hazardous waste or substance (including, without limitation, asbestos and petroleum products) that is regulated by applicable local, state, or federal environmental laws or regulations.

    7.14   **Conduct of Business.** From the date of the most recent financial statements Seller has delivered to Purchaser to the Effective Date, Seller's Business has been (and until the Closing Date shall be) open and conducted by Seller in a normal and regular manner. Furthermore, Seller has not:

    (a)    amended its Articles of Incorporation or Bylaws;

    (b)    issued or declared any dividend or other distribution or payment with respect to Seller's corporate shares;

    (c)    entered into any contract or commitment extending beyond the Closing, except normal commitments made in the ordinary course of business;

    (d)    modified the compensation or benefits payable to or to become payable by Seller to any officer, employee, or agent;

    (e)    encumbered any Purchased Assets;

    (f)    experienced any adverse change or any material damage, destruction, or loss affecting its Purchased Assets or the Business; or

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4      12

030047-000789

7.15  <u>Condition of Purchased Assets</u>. The following representations are made with respect to the Purchased Assets:

    (a)    The Purchased Assets are presently operating and have been regularly maintained and will be in the same working condition as they are now on the Closing Date.

    (b)    There are no known outstanding citations issued under the Occupational Safety and Health Act ("OSHA") or under the Americans with Disabilities Act ("ADA") by any health, building, or other governmental agency having jurisdiction over the operation of the Purchased Assets or the Business.

7.16  <u>No Violation or Breach</u>. To the best of Seller's knowledge, the performance of this Agreement will not be in violation of any laws, statutes, local ordinances, state or federal regulations, court or administrative orders or rulings, nor is the performance of this Agreement in violation of any loan document's conditions or restrictions in effect for secured or unsecured financing.

7.17  <u>ERISA Plans</u>. Seller has no employee benefit plans that are subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

7.18  <u>Full Disclosure</u>. Neither this Agreement nor any other information furnished to Purchaser in connection with the transactions contemplated by this Agreement contain any untrue statement of a material fact or fail to state a material fact necessary to make these statements not misleading in the light of the circumstances under which they were made.

7.19  <u>Competitors</u>. Neither Seller nor any individual Shareholder has any direct or indirect interest in any person or entity engaged or involved in any business that is competitive with the Business

7.20  <u>Directors, Officers, and Shareholder</u>. The names of Seller's officers, directors, resident agent, and Shareholder are set forth in Exhibit 7.20.

7.21  <u>Patents</u>.  All patents being transferred are valid, enforceable and defendable against any claim of infringement.

7.22  <u>Broker's or Finder's Fees</u>. No agent, broker, investment banker, person, or firm acting on behalf of Seller is or will be entitled to any broker's or finder's fees or any other commission or similar fee from either of the Parties, directly or indirectly, in connection with the sale of the assets contemplated in this Agreement, except: NONE.

030047-000790

7.23    Reliance. Seller makes these representations and warranties with the knowledge and expectation that Purchaser is placing complete reliance on them.

## ARTICLE VIII.    PURCHASER'S REPRESENTATIONS AND WARRANTIES.

Purchaser represents, covenants, and warrants the following to be true:

8.1    Purchaser's Status. Purchaser is a Michigan limited liability company organized, validly existing, and in good standing under the laws of the State of Michigan. Purchaser is properly authorized, according to its Operating Agreement, and adopted Resolution, to enter into and carry out the transactions contemplated by this Agreement. On Seller's request, Purchaser shall provide certification of these matters.

8.2    Authority. After their execution, this Agreement and all instruments necessary to carry out the transactions contemplated by this Agreement ("Related Documents") will be legal, valid, and binding obligations of each signatory party to all such instruments acting on behalf of Purchaser.

8.3    Litigation. There are no actions, suits, or proceedings pending or, to Purchaser's knowledge, threatened or likely to be asserted against Purchaser, before any court, administrative agency, or other body. No judgment, order, writ, injunction, decree, or other similar command of any court or governmental agency concerning this Agreement or the related transactions has been entered against or served on Purchaser.

8.4    Broker's or Finder's Fees. No agent, broker, investment banker, person, or firm acting on behalf of Purchaser is or will be entitled to any broker's or finder's fees or any other commission or similar fee from either of the Parties, directly or indirectly, in connection with the sale of the assets contemplated in this Agreement, except: NONE.

8.5    Reliance. Purchaser makes the foregoing representations and warranties with the knowledge and expectation that Seller is placing complete reliance on them.

8.6    Lease/Purchase of ABX Machines. Purchaser agrees to Lease the ABX Machines according to the terms of the ABX Machine Lease which is being entered into contemporaneous herewith. Furthermore, Purchaser shall have the right (and the obligation in the event Lessor establishes that Lessor has the right and ability to transfer absolute title to all but not less than all of the ABX Machines free from all encumbrances) to purchase the ABX Machines for the total inclusive amount of Two Million Eight Hundred Thousand ($2,800,000.00) Dollars, which sum shall be due and payable in immediately available funds no later than June 30, 2000. Upon and in exchange for such payment, Lessor shall deliver to Purchaser a Warranty Bill of Sale conveying good and marketable title to the ABX Machines to Purchaser.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4                14

## ARTICLE IX.  PRE-CLOSING ACTIONS
## AND MISCELLANEOUS COVENANTS.

From the Effective Date until the Closing:

9.1    Purchaser's Access. Seller shall permit Purchaser and Purchaser's representatives to make a full business, financial, accounting, and legal review of Seller's Business, tax returns, and the Purchased Assets to the extent Purchaser deems necessary. Seller shall take all reasonable steps necessary to cooperate with Purchaser in undertaking the review. Except as set forth in this Agreement or as agreed to by the Parties, no such investigation by Purchaser or Purchaser's representatives shall affect the representations and warranties of Seller or Purchaser's reliance on them.

9.2    Purchaser's Due Diligence Review

(a)    Review Period. Purchaser shall have until the Closing Date (the "Review Period") to conduct the inspection and review specified in paragraph 9.1.

(b)    Ongoing Duty to Provide Information. Seller's duty to provide information to Purchaser shall continue through the Closing, even if the Review Period has ended.

9.3    Accuracy of Representations and Warranties and Satisfaction of Conditions. Seller will immediately advise Purchaser in writing if (a) any of Seller's representations or warranties are untrue or incorrect in any material respect or (b) Seller becomes aware of the occurrence of any event or any state of facts that would result in any of the representations and warranties of Seller being untrue or incorrect if Seller were then making them. Seller will not take any action, or omit to take any action, that would result in any of Seller's representations and warranties set forth in this Agreement being untrue or incorrect as of the Closing Date. Seller will use Seller's best efforts to cause all conditions within Seller's control that are set forth in this Agreement to be satisfied as promptly as practicable under the circumstances.

## ARTICLE X. CONDITIONS PRECEDENT TO
## PURCHASER'S OBLIGATIONS AT CLOSING.

Purchaser's obligation to perform this Agreement at the Closing is subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived in writing by Purchaser:

10.1    Accuracy of Representations and Warranties. Seller's representations and warranties contained in this Agreement and the information in all related documents, including, but not limited to, any exhibits to this Agreement provided or executed or any

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4        15

document made pursuant to this Agreement ("Related Documents"), shall be true and correct at the Closing Date as though such representations and warranties were being made on that date. Further, on Purchaser's request, Seller shall deliver to Purchaser a certificate certifying that, as of the Closing Date, all of Seller's Representations and Warranties contained in this Agreement are true and correct.

10.2   Performance of Covenants. Unless otherwise agreed or waived, by the Closing Date Seller shall have in all respects performed and complied with all covenants, agreements, and conditions that this Agreement and all Related Documents require to be performed or complied with. Seller and Shareholder shall properly execute and deliver the Covenant.

10.3   Lien Search. Purchaser shall have received UCC searches in form and content satisfactory to Purchaser.

10.4   Closing Documents, Instruments of Transfer, Etc. At the Closing, Purchaser shall have received the following:

(a)   A bill of sale in a form sufficient to warrant and effectively transfer the Purchased Assets to Purchaser with good title, free and clear of all encumbrances.

(b)   Acknowledgment of Seller's ownership of Remote Assets by each party in possession of such assets, free of any claims, setoffs, or charges, and acknowledgment of the transfer of the Remote Assets to Purchaser.

(c)   Resolutions of Seller's Shareholder and Board of Directors approving and authorizing this Agreement and the transactions contemplated hereby, and identifying the officer or officers authorized to execute all documents.

(d)   Evidence that all of Seller's non-Shareholder employees have been terminated.

10.5   State of Michigan Certificate regarding Tax Returns. Seller shall have applied for a certificate from the Revenue Commissioner of the State of Michigan showing that Seller has filed all tax returns and reports required to be filed before Closing and that it has paid all taxes due pursuant to Section 27a of Act No. 58 of the Michigan Public Acts of 1986, MCLA 205.27a, MSA 7.657(27a).

10.6   Key Management Employee. Purchaser, at Purchaser's option, shall have entered into any employment agreement with non-Shareholder key employees on terms and conditions that are reasonably satisfactory to Purchaser.

030047-000793

10.7    Due Diligence Satisfaction. Purchaser shall be satisfied, in Purchaser's sole discretion, with the results of Purchaser's due diligence review, including the inspection and valuation of the Purchased Assets.

10.8    MESC Form 1027. Purchaser shall have received MESC Form 1027 from Seller in the time and manner required by law. Purchaser shall have two days following Purchaser's receipt of MESC Form 1027 to agree to be bound by terms of this Agreement, regardless of any other rights of review granted to Purchaser under this Agreement.

10.9    No Litigation. No action, suit, or other proceeding seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, seeking to obtain damages with respect to the consummation, or involving a claim that consummation of this Agreement violates any law, decree, or regulation shall be threatened or pending before any court, governmental authority, or other lawful body. No other material adverse actions or proceedings shall have been instituted or threatened against Seller or the Business.

10.10   Fire or Other Casualty; Risk of Loss

(a)     Seller's Assumption of Risk. Up until the time of the Closing and except as set forth in this Agreement, Seller assumes all risks of destruction, loss, or damage due to any casualty, including any liability arising out of ownership of the subject matter of this Agreement.

(b)     Insurance. In the event of a casualty to or malfunction of any of the Purchased Assets prior to Closing, Seller's insurance shall be applied toward repair or replacement of the property, and any liability of Purchaser shall be limited to damages in excess of any insurance proceeds received by Seller or Purchaser and applied toward the repair or replacement of the property. Seller shall expeditiously file a claim with its insurance carrier on notice of any casualty or malfunction that is covered by insurance.

(c)     Damage to Seller's Property. If the subject matter of this Agreement is materially damaged at any time before the Closing and the damage cannot reasonably be repaired on payment of the sums available by insurance settlement or from any sums to be paid by Purchaser to Seller at the Closing, Purchaser, at Purchaser's option, shall have the right to terminate this Agreement. On giving notice of such an election, Purchaser shall receive a refund of any deposit in full

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4                17

termination of its rights under this Agreement. This paragraph shall not apply if the damage is caused by Purchaser's negligence.

10.11 Possession. Purchaser shall have received operating control and possession of all of the Purchased Assets.

## ARTICLE XI.  CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS AT CLOSING.

Seller's obligations to perform this Agreement at the Closing are subject to satisfaction at or before the Closing of the following conditions, unless Seller waives those conditions in writing.

11.1 Representations and Warranties. Purchaser's representations and warranties set forth in this Agreement shall be true and correct in all material respects as though made on and as of the Closing Date.

11.2 Purchaser's Performance Obligations. Purchaser shall have performed all obligations under this Agreement before Closing.

11.3 Closing Documentation. Seller shall have received the following payment and documents:

(a)    the required Initial Payment;

(b)    all other instruments and documents that this Agreement reasonably requires Purchaser to deliver to Seller, and such other instruments and documents as Seller shall reasonably request that are not inconsistent with the provisions of this Agreement.

(c)    the Promissory Note covering the Inventory Purchase Price;

(d)    the ABX Machine Lease; and

(e)    the real estate Leases for the Locations.

11.4 Tax Identification. At the Closing, each party shall provide evidence of its tax identification number and complete Internal Revenue Service Form W-9.

## ARTICLE XII.  CONFIDENTIALITY.

Purchaser acknowledges that, pursuant to its right to inspect Seller's books, records, and other documents and material, Purchaser may become privy to confidential information of Seller and that communication of such confidential information to third

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4         18

030047-000795

parties (whether or not Seller authorizes such communication) could injure Seller's business if this transaction is not completed. Purchaser agrees to take reasonable steps to ensure that confidential information it obtains about Seller shall remain confidential and shall not be disclosed or revealed to outside sources. Purchaser further agrees not to solicit any of Seller's customers disclosed in such confidential information. As used in this Agreement, *confidential information* includes information ordinarily known only to Seller's personnel and information such as customer lists, supplier lists, trade secrets, channels of distribution, pricing policies and records, inventory records, and other information normally understood to be confidential or designated as such by Seller.

## ARTICLE XIII.  NOTICES.

All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been given if delivered or mailed first-class, postage-paid, to Seller, if the communication is to Seller, at Seller's address given in this Agreement or, if the communication is to Purchaser, to Purchaser at Purchaser's address given in this Agreement, or to any other address that Purchaser or Seller designates in writing.

## ARTICLE XIV.  INDEMNIFICATION.

14.1  <u>Indemnification by Seller and Shareholder</u>. Seller (and to the extent specifically stated herein in Sections 7.1, 7.2 and 7.5, Shareholder, individually) shall defend, indemnify, and hold harmless Purchaser and its agents, employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses, penalties, and damages (including reasonable legal fees) in connection with or resulting from:

(a)  all of Seller's debts, liabilities, and obligations, whether accrued, absolute, contingent, known, unknown, or otherwise;

(b)  any inaccuracy in any of Seller's representations, or Seller's breach of any warranty, contained in this Agreement or the Non-Competition Agreement; and

(c)  Seller's failure to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition Seller is to perform or observe under this Agreement or the Non-Competition Agreement.

14.2  <u>Indemnification by Purchaser</u>. Purchaser shall defend, indemnify, and hold harmless Seller and its agents, employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses,

030047-000796

penalties, and damages (including reasonable legal fees) in connection with or resulting from:

    (a)    all of Purchaser's debts, liabilities, and obligations, whether accrued, absolute, contingent, known, unknown, or otherwise;

    (b)    any inaccuracy in any of Purchaser's representations, or Purchaser's breach of any warranty, contained in this Agreement; and

    (c)    Purchaser's failure to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition Purchaser is to perform or observe under this Agreement.

## ARTICLE XV.  REMEDIES ON BREACH

    Purchaser shall be entitled to specifically enforce any and all provisions of this Agreement or the Memo.

## ARTICLE XVI.  CLOSING

    16.1    Effective Date of the Closing. The effective date of the Closing shall be the date of the Closing ("Closing Date"); however, the Parties may complete the execution of documents on any date no later than the Closing Date.

    16.2    Closing Location. The Closing shall be held on the Closing Date at the offices of Purchasers Counsel; Cox, Hodgman & Giarmarco, P.C., 201 West Big Beaver Road, Fifth Floor, Troy MI 48084 at 10:00 AM or at any other location that the Parties agree.

## ARTICLE XVII.  MISCELLANEOUS

    17.1    Amendment. This Agreement shall not be amended, altered, or terminated except by a writing executed by each party.

    17.2    Choice of Law. This Agreement shall be governed in all respects by the laws of the State of Michigan.

    17.3    Headings. The paragraph headings used in this Agreement are included solely for convenience.

    17.4    Entire agreement. This Agreement sets forth the entire understanding of the Parties and, except for the Memo, which this Agreement supplements and completes, this Agreement supersedes and replaces any oral or written agreement(s) relating to this subject matter that the Parties entered into before the date of this Agreement.

030047-000797

JAN 18 2000 16:24 FR DELPHI E. POWER1846 NG 810 257 8016 TO 812488132074    P.22/23
01/14/00    11:58    ☎810 257 2299    FAB ENG    ☎002

JAN. -14' 00(FRI) 11:24    SHEPPERLY, SILVERMAN    TEL:248 539 1355    P. 003
01'14/00    FRI 11:07 FAX 248 528 2773    COX HODGMAN    ☎002
JAN-14-2000 07:24 FROM:    TO:248 528 2773    P.002
01/13/00    18:50 FAX 248 528 2773    COX HODGMAN GIA    P.802-604

17.5    Waiver. The waiver by any party of any breach or breaches of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of any provision of this Agreement.

17.6    Binding effect. This Agreement, inclusive of its terms and provisions, shall survive the Closing and shall be binding on, inure to the benefit of, and be enforceable by the respective heirs, legal representatives, successors, and assigns of the Parties.

17.7    Construction of Agreement. Each Party and its legal counsel have reviewed and revised this Agreement, and each party and its legal counsel have had equal opportunity for input into this Agreement. Neither Party nor their respective legal counsel shall be construed to be the drafter or primary drafter of this Agreement. If there are any disputes regarding the construction of this Agreement or any of its provisions, ambiguities or questions of interpretation shall not be construed more in favor of one Party than the other; rather, questions of interpretation shall be construed equally as to each Party.

17.8    Counterparts. This Agreement may be signed in counterparts by the parties and such signatures shall be binding upon each party as if signed in person and simultaneously. In addition, facsimile signatures shall be treated as originals.

Purchaser and Seller have executed this Agreement on the dates set forth below, to be effective as of the Effective Date.

SELLER:

NU-TECH PLASTICS ENGINEERING, INC.

Dated: _1 . 14 . 00_    By: _____

Its: _Pres. & CEO_

PURCHASER:

RAPID PRODUCT TECHNOLOGIES, L.L.C.

Dated: _____    By: _____ 1/13/00
                              Manu Bhatia, CEO

Dated: _____    And By: _____
                              Miguel Linares, President
                              01/13/00

X:\JD\CLIENTS\STRATECH\NUTECH\ASSETPUR4

21

JAN 18 2000 16:24 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074    P.23/23
01/14/00   11:58   ☎810 257 2299    FAB ENG    Ⓩ003
JAN. -14'00(FRI) 11:25   SHEPFERLY, SILVERMAN    TEL:248 539 1355    P. 004
01 14/00   FRI 11:07 FAX 248 528 2773    COX HODGMAN    Ⓩ003
JAN-14-2000 07:24 FROM:.
01/13/00   16:55 FAX 248 528 2773    TO:248 528 2773    P.003-005

## WARRANTY BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, NU-TECH PLASTICS ENGINEERING, INC., a Michigan Corporation ("Seller"), hereby sells to RAPID PRODUCT TECHNOLOGIES, L.L.C., a Limited Liability Company ("Purchaser"), all right, title and interest in and to all Purchased Assets, as more particularly defined in the Memorandum and Agreement and the Asset Purchase Agreement by and between Seller and Purchaser (collectively, the "Agreement"), dated as of December 1, 1999.

With the exception of the 4-1500 Ton HPM injection Molding Machines, the title to which may be encumbered by General Motors. Seller warrants and agrees that the Purchased Assets are delivered to the Purchaser free of all lawful claims and encumbrances of any nature whatsoever. This Bill of Sale shall be binding upon the Seller, the Shareholders and its successors and assigns.

This Bill of Sale shall be effective as of this 1st day of December, 1999.

NU-TECH PLASTICS ENGINEERING, INC.

By: _____

Its: _____

ACKNOWLEDGED AND ACCEPTED:

RAPID PRODUCT TECHNOLOGIES,
L.L.C.

By: _____ 01/13/00
Manu Bhatia, CEO

And
By: _____ 01/13/00
Miguel Linares, President

X:\JJG\CLIENTS\STRATECH\NUTECH\BILLSALE.2

030047-000799