SCHWARTZ LAW FIRM, P.C.
Jay A. Schwartz (P45268)
37887 West Twelve Mile Rd., Suite A
Farmington Hills, MI  48331
(248) 553-9400

Counsel for Nu-Tech Plastics Engineering, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**CLAIMANT NU-TECH PLASTICS ENGINEERING, INC.'S**

**AMENDED SUPPLEMENTAL RESPONSE  (CLAIM NO. 1279)**

For its Amended Supplemental Response, Nu-Tech states:

**SYNOPSIS**

This is not a typical claims-objection hearing in Delphi's bankruptcy case.  The ultra-abbreviated claims-objection process is the culmination of a Michigan state-court lawsuit that Nu-Tech Plastics Engineering, Inc. (Nu-Tech) filed against Delphi and GM in 2002.  Nu-Tech sued to recover for two main things:  (1) Delphi's ongoing breach of an exclusive requirements contract that began January 1, 1999, when Delphi repossessed the tools that Nu-Tech needed to make the part that its contract with Delphi required Nu-Tech to produce; and (2) promises and assurances that Nu-Tech had received that Delphi would provide a replacement part for Nu-Tech to manufacture.  This lawsuit was on the eve of trial when Delphi filed its chapter 11 petition.

Throughout the course of this extensive litigation, Delphi has raised technical, legal defenses to Nu-Tech's claims.  The defense on which Delphi primarily relied in Michigan state court has proven to be untenable.

1

In Michigan, Delphi asserted that Nu-Tech's contract with Delphi was a "factory assist" contract, which required Nu-Tech to only produce all parts than Delphi did not, rather than 100% of Delphi's requirements.  Yet, the contract at issue says "Requirements Contract" on each page, and states that it is for 100% of Delphi's needs unlike an earlier contract for the same part, which was explicitly labeled "Factory Assist."  In addition to this flaw, discovery in this case has revealed that the contract could not have been a "factory assist" contract because GM had no factory to assist:  according to Debtor's own witness, GM's program purchasing manager James Weber, GM never made the part in-house.[1]  This fact also shows that Debtor's consistent explanation for repossessing the tools — union concessions/in-house production — an explanation that Debtor has repeated through years of litigation, is suspect, at best.

In Michigan, Delphi also asserted that Nu-Tech was not the real party in interest to assert its claims, because Nu-Tech had sold these claims to Rapid Product Technologies (RPT) as part of a forced fire sale and assignment of Nu-Tech's assets.  The Michigan state court not only rejected Delphi's suggestion that Nu-Tech was not the real party in interest by ruling that Nu-Tech did continually own its claims against GM/Delphi, but after briefing and oral argument, the Michigan state court nearly granted judgment in favor of Nu-Tech as to liability on Nu-Tech's breach of contract claim.[2]  The Michigan Court of Appeals refused to even hear Delphi's Application for Leave to Appeal the trial-court's ruling on Delphi's real-party in interest argument.[3]

Delphi has taken advantage of the claims-objection procedure to "re-tool" its defense by asserting new (and equally strained) technical, legal defenses never before raised.  Delphi now

---

[1] Exhibit A, Deposition of James Weber, pages 6-9 and Exhibits A and B to J. Weber Declaration.
[2] Exhibit B, Transcript of hearing on Motion for Summary Disposition especially pp. 55-57, and Exhibit C, Order Denying Defendants' Motion for Summary Disposition.
[3] Exhibit D, Denial of Application for Leave to Appeal.

primarily argues that (1) the statute of limitations expired as a result of the RPT sale because Nu-Tech did not continually hold its claims; and (2) Delphi is not a proper defendant for any loss suffered by Nu-Tech before May 3, 1999 because Delphi did not exist as a company separate from General Motors prior to this date.  Delphi's statute-of-limitations defense ignores not only Michigan's unambiguous tolling statute, but the Michigan trial-court's rejection of Delphi's claim that Nu-Tech is not the real party in interest, and the intent of both RPT and Nu-Tech. Delphi's completely new "No Delphi" defense ignores the following evidence:

- the state-court admissions of Delphi's state-court counsel that both of the last two Delphi-Nu-Tech Purchase Orders (the Blanket Purchase Orders bearing the N580000B designation) were ***Delphi contracts.***[4]

- GM's 1998 SEC filings and the Corporate Records filings for the State of Delaware which demonstrate that "Delphi Automotive Systems, Inc." was incorporated in June, 1998 and that several other "Delphi" entities existed in 1998 and much earlier.[5]

- GM's public statement that GM contributed to Delphi the assets <u>and liabilities</u> of what was formerly GM's Delphi division <u>including</u> the Nu-Tech Purchase Orders, and GM's assertion that Delphi is liable for Nu-Tech related liabilities on January 1, 1999.[6]

- Delphi's spin-off was announced in August, 1998 the very same month in which Delphi issued to Nu-Tech a new purchase order for the part.[7]

- The plain language of the May 1999, post-Delphi-spin-off, Nu-Tech-Delphi purchase order.

- Delphi never formally terminated its requirements contract with Nu-Tech.

---

[4] Exhibit E, Delphi's Brief in Support of Motion for Summary Disposition, 2/28/05 at p. 3.  That statement acts as an admission *Michigan Health Care, Inc. v. Flagg Industries, Inc*., 67 Mich.App. 125, 130, 240 N.W.2d 295, 297 (1976).

[5] See Exhibits F and G, Public records, Corporate Records & Business Registrations, State of Delaware and General Motors Corporation's 10-K filings for March 20, 1997, March 20, 1998 and March 10, 1999 all identifying numerous corporate Delphi entities whose shares were wholly owned by General Motors.

[6] Exhibit H,  March 8, 2007 letter from GM to Delphi.

[7] Exhibit I, Delphi Automotive 10-K filing December 28, 1998 and Exhibit J, GM press release April 12, 1999.

- Delphi admittedly complied with the termination notice requirements with respect to other contracts.[8]

- The fact that not one of Delphi's witnesses can support this new-found defense.

Both of Delphi's new defenses, especially the "No Delphi" defense that Delphi first asserted five years after Nu-Tech sued, are also arguably barred by equitable estoppel, which prohibits a party from maintaining silence on a dispositive issue until such time as the opposing party has no timely opportunity to correct any deficiency. *Penny v. ABA Pharmaceutical Co*. (On Remand), 203 Mich.App. 178, 183, 511 N.W.2d 896 (1993).

Whether old or new, none of Delphi's technical defenses can explain one fact that should be undisputed because it appears on the face of the last contract between Nu-Tech and Delphi: in May 1999, after GM had spun off Delphi into a separate stand-alone entity, and after Delphi had repossessed the part-making tools it had given to Nu-Tech, Delphi extended Nu-Tech's contract to produce the same part.  Delphi admits that this contract was issued by the independent, stand-alone Delphi.  It is for 100% of the part.  It applies retroactively to August 1998, when Delphi argues that it was not a separate entity.  And it extends through December of 2000.

This contract is further evidence that, regardless of any formalities, Delphi ultimately assumed liability for the requirements contract.  And, in conjunction with Delphi's mentorship relationship with Nu-Tech and Deplhi's practice of amending standing purchase orders to include new parts, this contract is tangible evidence of both Delphi's post-repossession promises that Delphi made to Nu-Tech and the reasonableness of Nu-Tech's reliance on those promises.

---

[8] Exhibit 8 to Patrick Affidavit.

While Delphi's defenses are technical, its motives in repossessing Nu-Tech's tools are plain: in anticipation of its pending spin-off, Delphi decided to appropriate Nu-Tech's profits for itself. As a business decision, this may have been rational. But it should not be cost-free.

## FACTS

Nu-Tech was a minority-owned, injection-mold-plastics manufacturer in its infancy that supplied parts to General Motors (GM) and Debtor Delphi Automotive Systems (Delphi).[9]  In 1997, GM/Delphi accepted Nu-Tech, which had been formed in 1995, into a GM/Delphi mentorship program, through which GM and Delphi provided substantial business, financial and other assistance to Nu-Tech.[10]  This assistance included obtaining purchase orders and developing business plans, providing, at little or no charge, the tooling required to make the parts ordered and free raw materials.[11]

As a result of this assistance, during its first two years in business, Nu-Tech was manufacturing millions of dollars worth of parts and selling them to GM/Delphi.[12]  The key part produced by Nu-Tech and sold to Delphi was part number 25160694 (the "Part" or "Part 0694"), which is a fuel pump reservoir for what was then one of GM's hottest-selling trucks, the S-10.[13]  Nu-Tech's production of Part 0694 and other parts was governed by a series of contracts.  For convenience, these contracts are summarized in the chart below:

---

[9] Cooper Declaration, p. 2
[10] Patrick Affidavit, pp. 2-3
[11] *Id.*  No witness for Debtor disputes that these benefits were afforded to Nu-Tech.
[12] Cooper Declaration pp. 1-2
[13] Patrick Affidavit p. 3

| Date | Purch. Ord. # | Type | Shorthand Name | Period Covered |
|------|---------------|------|----------------|----------------|
| 11/05/97 | 8C934 | Factory Assist | Amended Initial Contract adding part 0694 | 11/17/97-7/31/98[14] |
| 6/23/98 | 9C941 | Requirements | Requirements Contract | 8/01/98-7/31/99 |
| 8/17/98 | N580000B | Requirements | Delphi Assumption of 9C941 | 8/1/98-7/31/99 |
| 05/03/99 | N58000B | Requirements | Extension Requirements Contract | 8/1/98-12/31/2000 |

The details of these various contracts and their relationship to and difference with each other are described below.

**The Contracts**

GM issued the Initial Contract to Nu-Tech when the GM/Delphi/Nu-Tech relationship began.[15]  This purchase order was for a number of different parts.  Each page of the Initial Contract expressly states that it is a "factory assist" contract, meaning that Nu-Tech was to supply all parts identified in the P.O. *other than those GM itself produced in house*.[16]

On November 5, 1997, GM amended the Initial Contract to add Part 0694.[17]  This Amended Initial Contract again contained the "factory assist" language on each page.  The amendment was effective on 11/17/97 and the expiration date for part 0694 was 7/31/98.[18]

In March, 1998, as the Amended Contract's July 1998 expiration date approached, Nu-Tech submitted a bid to Delphi to produce a number of parts for Delphi, including Part 0694.[19]  Instead of amending the Amended Contract to reflect this production, Delphi issued a new purchase order — the Requirements Contract (P.O. 9C941) — to Nu-Tech which included part

---

[14] Dates are only the period that the contract covered for the production of Part 0694.

[15] Patrick Affidavit, p. 3, Exhibit 1 to Patrick Affidavit, Cooper Declaration, p. 2

[16] Patrick Affidavit, pp. 2-3 and Exhibit 1 thereto, Cooper Declaration, p. 7

[17] Exhibit 1 to Patrick Affidavit, Patrick Affidavit, pp. 2-3 and Cooper Declaration, p. 7

[18] Patrick Affidavit, p. 3 and Exhibit 1 thereto at pp. 1 and 10, Cooper Declaration, p. 7

[19] Cooper Declaration, pp.2-3,  and Exhibit 1 thereto; Patrick Affidavit, p. 3 and Exhibit 5 thereto

0694.[20]   The Requirements Contract, however, *did **not** contain the "factory assist" language*.
Like all GM purchase orders, the Requirements Contract included General Terms and Conditions
which, in relevant part, required the buyer to provide written notice to Nu-Tech if the contract
was to be terminated for any reason other than Nu-Tech's breach of contract.[21]

Unlike the prior P.O., each page of the Requirements Contracts clearly states that it is a
"Requirements Contract."[22]  By law, the term "requirements contract" means that the buyer **must**
buy from the seller, and the seller must produce and sell to the buyer, **all** of the product necessary
to fulfill the buyer's requirements during the contract term.[23]  In Michigan, requirements
contracts are defined and governed by Michigan's Uniform Commercial Code.  MCL 440.2306
defines a "requirements contract" as one which "measures the quantity by the…requirements of
the buyer" and covers the "*actual... requirements as may occur in good faith…*"  Two federal
cases have addressed this UCC code section under Michigan law.  In *Advanced Plastics Corp.* v.
*White Consolidated Industries, Inc.,* 828 F. Supp. 484 (E.D. Mich 1993) the court differentiated
between a true requirements contract for 100% of the buyer's need for a product and a contract
in which the buyer leaves open its option to purchase only some of its needs from that seller.   In
*Tigg Corp.* v. *Dow Corning Corp.,* 962 F.2d 1119 (3rd Cir. 1992) the court explained that, under
MCLA 440.2306, the buyer owes the seller the duty to buy, in good faith, **all** of the buyer's
requirements for the part.

---

[20] Patrick Affidavit, p. 4 and Exhibit 2 thereto, Cooper Declaration, p. 3
[21] Patrick Affidavit, pp. 3 and 6 and Exhibit 4 thereto
[22] Exhibit 2 to Patrick Affidavit
[23] See *Propane Indus., Inc.* v. *General Motors Corp.,* 429 F. Supp. 214 (W.D. Mo. 1977);
*General Motors Corp.* v. *Paramount Metal Products Co.,* 90 F. Supp. 2d 861 (E.D. Mich 2000);
*Precision Rubber Products Corp.* v. *George McCarthy, Inc.,*  872 F.2d 187 (6th Cir. 1989) and
*Metal One America, Inc.* v. *Center Mfg., Inc***.,**  2005 WL 1657128 (W.D. Mich 2005) attached
hereto as Exhibit K.

The Requirements Contract expressly states that the buyer must order <u>100%</u> of its requirements for Part 0694 from Nu-Tech for the Requirement Contract's effective dates, *to wit* August 1, 1998, through July 31, 1999.  Under the column "Apprx % of Bus." for Part 0694, GM typed "100%".[24]  The contract's express terms also required Nu-Tech to be able to produce up to 14,000 parts 0694 *per day*.[25]  To assist with production, GM gave Nu-Tech its (GM's) tools for placement into the two large injection molding machines which Nu-Tech had leased for the sole purpose of producing part 0694.[26]  Because it was part of the GM/Delphi mentorship program, Nu-Tech was not charged for the use of these tools or for the cost of the raw material (resin) used to produce the part.[27]  In 1998, Nu-Tech produced over 750,000 parts 0694 at the contract price of $1.86 per piece, operating the 2 injection mold machines for 22 hours per day and 16+ hours per day. [28]  Nu-Tech's profit margin was enormous, $1 per part produced, as was the production volume.

**<u>The Breach</u>**

Facing a labor strike in the summer of 1998, GM and Delphi turned to Nu-Tech for assistance.  Additional purchase orders were issued. Nu-Tech bought additional equipment, hired additional staff and worked around the clock to assist GM and Delphi, its mentors, in their time of need. The production of part 0694 was not affected by the strike as is borne out by Nu-Tech's production data.[29] Nu-Tech's performance during the strike was extraordinary enough to warrant thank you letters from both GM's Vice President and Group Executive of Worldwide Purchasing

---

[24]  Patrick Affidavit p. 5 and Exhibit 2 thereto p. 9.  Tina Weber conceded this point. Exhibit L pp. 11-12.
[25] Patrick Affidavit p. 5.  Tina Weber admitted this as well. Exhibit L p. 13
[26] Patrick Affidavit, p. 6 and Exhibits 9 and 10 thereto, Cooper Declaration, p. 4
[27] Cooper Declaration, p. 4, Patrick Affidavit, p. 3 and Exhibit 6 thereto
[28] Cooper Declaration, p. 4
[29] Cooper Declaration, p. 8

and Delphi's Director of Purchasing.[30]  Bolstered by the GM/Delphi revenues, primarily from part 0694, Nu-Tech expanded its operations and increased its other business as a result of its expanded capabilities.[31]

In August 1998, with the spin-off of Delphi just announced and the incorporation of Delphi Automotive Systems having been accomplished 2 months earlier, Delphi assumed P.O. 9C941 from GM and issued Line Item Detail to Standard Blanket Order N580000B for part number 0694, dated 8/17/98, to accomplish the transfer of the P.O. for that part to Delphi as buyer.[32]  Debtor's witness, Tina Weber, acknowledged during her recent deposition that the terms and conditions of P.O. 9C941, including the effective dates, price per piece and production capacity requirements, were unchanged and Delphi's line item detail contains no indication that it amended P.O. 9C941 other than to change the payment terms and the buyer's identity:

> Q.  If the general terms and conditions -- the Exhibit 4 to the Patrick declaration -- had not been changed by that point, would you assume that those would have carried over to the May 3rd, '99 contract?
> A    If there was not a change they would have carried over; correct.
>  Q    If there was a change would there be any record at Delphi that the general terms and conditions not only had changed but had been mailed out to suppliers?
> A    There should be a record on it.  I'm not aware of it.
> Q    That's not something you would have handled anyway; correct?
> A    It would have went through legal.
> Q    We said earlier that the terms and conditions of PO 9C941 carried through to amendment number 000 of the blanket contract number other than as noted on the document?
>  A    And if there was a change.
>  Q    And if there was a change in the general terms.  Is it then fair to say that the terms and conditions of purchase order 9C941 also carried over to the amendment 001 with the same disclaimers?
> A    Same disclaimers.[33]

---

[30] Cooper Declaration, p. 8 and Exhibits 5 and 6 thereto
[31] Cooper Declaration, p. 4
[32] Patrick Affidavit, p. 5 and Exhibit 3 thereto, Cooper Declaration, pp. 3-4
[33] Exhibit L, Tina Weber Deposition, pp. 23-26: Weber denies that the August 17, 1998 blanket order was a Delphi order because, according to what she *has been told*, Delphi had not yet been spun off by General Motors.  However, Weber also admitted that she has no idea when the spin

The application of those General Terms and Conditions is further demonstrated by the fact that, also in August, 1998, Delphi, *not General Motors*, used the termination provision of the General Terms and Conditions applicable to GM/Delphi purchase orders, to terminate correctly some of the "spot buy" contracts which had been issued to Nu-Tech as strike protection. Nu-Tech continued to mass produce part 0694, and **Delphi** continued to pay Nu-Tech for those produced parts through the end of 1998.[34]

In the winter of 1998, the labor union again launched a strike, and Delphi again turned to Nu-Tech for help, issuing to Nu-Tech a specific "strike protection" purchase order for a limited number of parts, not including 0694, for a limited period.[35] Nu-Tech again stepped up and helped its mentor.  But this time, in settling the strike, according to Tina Weber, GM promised the union that **GM** would bring production of part 0694 back in house for 1999.[36]

On 12/31/98, the last tool needed to produce part 0694 was taken from Nu-Tech.[37] *However, not only did Delphi fail to comply with its own General Term and Condition 13 which required it to give Nu-Tech* **written notice** *if it intended to terminate P.O. 9C941 for part 0694, on May 3, 1999, Delphi* **<u>extended</u>** *the contract for that part through December, 2000.*[38]

---

off was completed or what Delphi's contractual powers were before May, 1999.  Weber admits that the May 3, 1999 Amendment to the August, 1998 blanket order is a Delphi order. *Id.* The Terms and Conditions are Exhibit 8 to the Patrick Affidavit.

[34] Cooper Declaration, pp. 3-4 and Exhibit 3 thereto

[35] Patrick Affidavit, pp. 5-6 and Exhibit 12 thereto, Cooper Declaration, p. 8

[36] Declaration of Tina Weber at ¶7

[37] Cooper Declaration.

[38] Patrick Affidavit, pp. 5-6 and Exhibits 4 and 7 thereto, Cooper Declaration, p. 5.   General Motors had also promised to leave the second tool with Nu-Tech until June, 1999, a promise breached on December 31, 1998.  Cooper Declaration, p. 5 and Exhibit 2 thereto.

After removal of the tools for part 0694, Delphi continued to promise Nu-Tech either a resumption of the production of that part or a replacement part at similar volumes and pricing.[39] Knowing that GM/Delphi had a practice of simply amending existing purchase orders to add new parts and relying on its mentors' promises of a replacement part, Nu-Tech, with the full knowledge of Delphi, continued to lease the equipment needed to produce fuel pump reservoirs and the employees to actually produce them.[40] Throughout 1999, Delphi failed to order part 0694 from Nu-Tech, in a continuing breach of contract, but still did not provide any written termination notice.[41] Delphi also failed to provide the replacement part, breaking its promise to Nu-Tech and causing Nu-Tech's ultimate demise.[42]

After its initial contract breach, Delphi caused more harm to Nu-Tech, ultimately destroying it, by promising Nu-Tech that it would order another part at similar volume to replace 0694.[43] That promise induced Nu-tech's reliance in the form of maintaining the necessary overhead (buildings, injection molding machines, staff, etc.) in anticipation of the replacement part.[44] Delphi never terminated the purchase order (P.O.) for 0694 and never notified Nu-Tech that no amendment to that P.O. adding a different part would be forthcoming.[45] Ultimately, as a direct result of Delphi's breach of contract and unfulfilled promises for a replacement part, in September 1999, Delphi placed Nu-Tech in a work-out, hiring BBK, LLC to run its operations until a buyer could be found.[46] On 12/31/99, RPT purchased most of Nu-Tech's assets.[47] *By that time, Nu-Tech*

---

[39] Cooper Declaration, pp. 5-6
[40] Cooper Declaration, pp. 5-6, Exhibit M, Troubled Supplier Memorandum from Delphi dated September, 1999.
[41] Cooper Declaration, pp. 5-6
[42] Cooper Declaration, pp. 5-6, Patrick Affidavit, p.7.
[43] Cooper Declaration, p. 5.
[44] Id. at p. 6.
[45] Id. at p. 5.
[46] Cooper Declaration, pp. 6-7, Exhibit M.

*had suffered devastating losses and a consequent significant reduction in its value which BBK, in a document submitted to Delphi, attributed primarily to Delphi pulling part 0694 from Nu-Tech to produce it in-house in order to appease the labor unions.*[48] On December 1, 1999, Nu-Tech was forced to sell most of its assets at a fire-sale to Rapid Product Technologies, LLC (RPT). [49]

In 2002, Nu-Tech sued GM and Delphi in Michigan state court.[50] GM settled with Nu-Tech.[51] Delphi, on the eve of trial, filed its bankruptcy petition thereby staying the state court action. Nu-Tech then filed Claim No. 1279 (Claim) in this proceeding.

Debtor's Amended Statement of Disputed Issues sets forth only two defenses to Nu-Tech's Claim: (1) that Delphi did not breach the requirements contract (despite failing to order the parts from Nu-Tech and failing to provide Nu-Tech with the written termination notice mandated by P.O. 0694's terms and conditions) and (2) that the suit in the Michigan court is time barred. Debtor's Supplemental Reply, however, abandoned the first of these defenses entirely. Now, seven years after the fact and four years after suit was initially filed, Delphi has re-tooled its defenses altogether. The remaining defenses to the contract claim are (1) that Delphi did not exist in August of 1998 and, therefore, cannot be liable for breach of the August 17, 1998 contract, (2) Nu-Tech was not a real party in interest when the Michigan suit was filed and has, consequently, no timely claim against Delphi, and (3) that Nu-Tech, which was forced to sell its assets after going through a work-out sponsored by Delphi, failed to mitigate its damages. None of the defenses has merit.

---

[47] Cooper Declaration, Exhibit N, Agreement Purchase and Sale of Business Assets.

[48] Exhibit M, Cooper Declaration, pp. 6-7 and Exhibit 4 thereto, Amended Leeman Declaration.

[49] Id. at pp. 6-7 and Exhibit N.

[50] Exhibit O.

[51] There is a confidentiality provision in the settlement agreement. Nu-tech has requested GM's permission to disclose the agreement to Delphi. GM has agreed provided Nu-Tech and Delphi stipulate that it will be shown in camera or under other circumstances that prevent its public disclosure. Nu-Tech has agreed. Debtor has not.

# ARGUMENT

## I.    DEBTOR BREACHED ITS REQUIREMENTS CONTRACT WITH NU-TECH BY FAILING TO ORDER PART 0694 FROM NU-TECH

P.O. 9C941, issued by GM on 6/23/98, assumed by Delphi two months later, and extended by Delphi in May 1999, is, by its express terms, a requirements contract and not a factory assist contract.  GM drafted the P.O. and specifically typed the phrase "Requirements Contract" on nearly every page.[52]   Under the column "Apprx % of Bus." for part 0694, GM typed "100%".[53]  Nu-Tech was contractually required to be able to produce 14,000 parts 0694 per day.  Had GM and Delphi desired P.O. 9C941 to be a "factory assist" contract, they would have included the same language which had been included in the first purchase order, P.O. 8C934 *to wit* "This revision to add part number 25160694 to Contract.  Plan 02 Factory Assist".[54]   The removal and absence of the words "Factory Assist" and the inclusion of the words "Requirements Contract" throughout P.O. 9C941 should be dispositive. The contract language is clear and unambiguous. Accordingly, only the document itself, not parol evidence as to what the parties intended when they signed it (as Delphi would like this Court to consider), may be considered when determining liability.[55]

---

[52]    Patrick Affidavit, pp. 4-7 and Exhibit 2 thereto pp. 1-8

[53]    Patrick Affidavit p. 5 and Exhibit 2 thereto p. 9

[54]  Patrick Affidavit, p. 6 and Exhibit 1 thereto p. 1.  Likewise, Delphi's claim that the order for part 0694 was a strike protection contract or a spot buy contract is belied by the actual spot buy and strike protection contracts Exhibits 11 and 12 to Patrick Affidavit as well Cooper Declaration, p. 3

[55]  Where a contract is unambiguous, the terms speak for themselves and parol evidence as to the parties' intent or meaning is neither admissible nor substantive evidence to contradict the express terms of the documents. *Wilkie* v. *Auto-Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776  (2003); *Orr* v. *Schmidt, Ellis & Associates, Inc.*, 28 Mich.App. 176; 184 N.W.2d 329 (1970). *Meagher* v. *Wayne State University*, 222 Mich.App. 700, 722; 565 N.W.2d 451 (1997) and *UAW-GM Human Resource Center* v. *KSL Recreation Corp*., 228 Mich. App. 486, 492; 579 N.W.2d 411 (1998). Moreover, Delphi's own pleadings assert that the contract documents contain an integration clause and form the entire scope of the obligations and rights of the parties.  See

It appears from Debtor's Supplemental Reply that it has abandoned entirely its initial claim that the contract was not breached.  In fact, no mention of the terms of the contract or the Terms and Conditions attendant thereto, are made in the Reply and, in its recent responses to requests for admissions, Debtor admits that all three documents, P.O. 9C941, and both Delphi contracts were requirements contracts.[56]  That term is defined by Michigan law rendering any opinion Debtor may have as to its meaning, irrelevant.

A.    Debtor is liable for the breach of the August, 17, 1998 purchase order as well as the May 3, 1999 purchase order.

Having all but admitted that the contract was breached, Delphi, nearly five years after the initial suit was filed, contradicted an admission made by its counsel in the Michigan proceeding[57] and asserted, for the first time in its Supplemental Reply to this Court, that it could not have been a party to the August 17, 1998 purchase order, despite the fact that the order is on Delphi Automotive Systems' masthead.  This outrageous position is based on an argument that Delphi Automotive Systems did not exist until the spin off from General Motors was complete in May of 1999.  That Delphi is misrepresenting the fact is demonstrated by its own SEC filings and press releases as well as those of General Motors.[58]

Delphi Energy & Engine Management was a distinct corporate entity beginning in 1983.[59]  General Motors owned the majority of shares in it along with numerous other entities

---

Exhibit P. And, in the event that the Court were interested in parol evidence, John Cooper (one of Nu-Tech's owners) *and the GM/Delphi buyer who entered into this contract* have both testified that P.O. 9C941 was intended as a requirements contract, obligating Nu-Tech to produce 100% of GM's requirements for part 0694. Patrick Affidavit, pp. 2, 4 and 5; Cooper Declaration, pp. 2-3.  Finally, Delphi's Answers to Requests for Admission, dated December 26, 2007 admit that all three purchase orders were requirements contracts. Exhibit Q.

[56] Id.

[57] Exhibit E.

[58] Exhibits R, I, and J.

[59] Exhibit F.

which ended up as part of the Debtor, Delphi Automotive Systems, LLC. Delphi Automotive

Systems, Inc., a Delaware corporation, was listed by March, 1997 as a wholly owned subsidiary

of General Motors on GM's 10-K filed with the Securities and Exchange Commission.[60]  On

**June 19, 1998**, Delphi Automotive Systems, Inc. was incorporated in Delaware, more that two

months *before* the August 17, 1998 purchase order bearing its name was issued to Nu-Tech.[61]

According to General Motors' own press release and 8-K filing with the SEC, the decision to

spin Delphi off, that is to divest GM of the ownership of Delphi's stock, was made on

August 3, 1998.[62]  Yet, Delphi would like this Court to believe that it is pure coincidence that, in

August, 1998, the purchase order bearing Delphi's insignia, was actually issued *by General

Motors* which, according to Delphi, merely switched to a different computer system for

purchasing and that system shift is the only reason for the re-issuance of a purchase order that

was not even 2 months old and which states, as its "reason for amendment" "New Contract Line

Item." Hogwash.

Here, in General Motors' own words is Delphi's glorious history including its $28.5

billion in 1998 sales:

> In 1991, GM established Delphi (then called Automotive Components Group
> Worldwide) as a separate business sector within GM, with the objective of
> improving its competitiveness and increasing its business through penetration of
> new markets. In 1995, GM renamed the business sector "Delphi Automotive
> Systems" **in order to establish its separate identity in the automotive parts
> industry.** GM began publicly disclosing separate financial data for Delphi in
> March of 1997. In late 1997, in connection with GM's spin-off of its defense
> electronics business, GM transferred Delco Electronics to Delphi in order to
> integrate more closely Delco's expertise in electronics with Delphi's capabilities
> in automotive components and systems.

---

[60] Exhibit G.
[61] Exhibit F.
[62] Exhibits J and R.

In late 1998, Delphi was incorporated in Delaware and, **effective Jan. 1, 1999,** **GM contributed to Delphi the assets <u>and liabilities</u> Delphi now carries on its automotive components and systems business.**

Delphi, based in Troy, Mich., is the world's largest and most diversified supplier of automotive components, systems and modules. **In 1998, Delphi reported annual revenues of approximately $28.5 billion** and a net loss of approximately $93 million. Delphi's net income totaled $820 million, when adjusted to exclude the unfavorable impact of special items and work stoppages.

Delphi became a leader in the global automotive parts industry by capitalizing on the extensive experience it has gained as **the principal supplier of automotive parts to GM**. Delphi has an expansive global presence, with a network of 168 wholly owned and leased manufacturing sites, 27 technical centers, 51 customer service centers and sales activity offices, and 40 joint ventures or other strategic alliances in 36 countries. Delphi employs approximately 198,000 people globally and has regional headquarters located in Paris, Tokyo, and Sao Paulo. [Emphasis added]

Not only did Delphi exist in August, 1998, it was generating billions of dollars in sales. Even more interesting is the fact that, in 1998, $5.8 billion of those sales were generated from the Delphi division which <u>manufactured fuel management systems</u> according to Delphi's December 31, 1998 10-K.[63] By <u>January 1, 1999</u>, General Motors had contributed all of the assets <u>and liabilities</u> which would ultimately belong to Debtor to Delphi making Delphi liable on the contracts from that date forward. [64] Moreover, Debtor admits that the May 3, 1999 purchase order is its own. Interesting since, following Debtor's logic, the spin-off from General Motors was not fully realized until May **28**, 1999, after Delphi admittedly issued the *amendment* to N580000B. It strains credulity that Delphi could amend, in May 1999 a purchase order to which it was not a party.

---

[63] Exhibit I.

[64] Id. Note that there was no breach of the contract until January 1, 1999 when Delphi stopped ordering any parts from Nu-Tech under the requirements contract.

16

Delphi began producing part 0694, by the millions, for General Motors in 1999 after having taken the tools from Nu-Tech, the company Delphi was still supposedly mentoring.  For 5 years, Delphi claimed that it had no data regarding the production or use of that part by General Motors in 1999 and 2000 despite repeated requests by Nu-Tech so that it (Nu-Tech's) expert could accurately calculate its damages.[65]    Miraculously, however, James Weber, a General Motors purchaser, was recently able to print 529 pages of documents showing more than 2 million assemblies per year purchased by General Motors which contained part 0694; **Delphi** was paid for the vast majority of those assemblies in 1999 and 2000.[66] James Weber also testified, on December 21, 2007, that *General Motors did **not** produce a single part 0694 in 1999 or 2000* proving that the "settlement of the strike" excuse was blatantly false. [67]   Not only did Delphi enter into contracts in 1998 and 1999, it, affirmatively extended the contract to Nu-Tech five months after taking the tooling and induced Nu-Tech to stay "ramped up" to produce a part Delphi stole from Nu-Tech and produced itself while never bothering to exercise its own termination notice requirements to at least let Nu-Tech know that the part production was never coming back to Nu-Tech.  Amazingly, to this day, neither Delphi nor General Motors at Delphi's request, has produced the data which James Weber *admits exists* which would establish exactly how many vehicles containing part 0694 were manufactured in 1999 and 2000 and neither will provide the information as to what entities specifically produced that part specifically.  One thing is certain, it wasn't Nu-Tech.

Delphi also asserts that the August 1998 Blanket Order was *General Motors'* contract even though the GM Purchase Orders in the past all had General Motors' name on them in the

---

[65] Exhibit S.

[66] J. Weber Declaration and Exhibits thereto.

[67] Exhibit A, J. Weber Deposition pp. 6-9.

top left hand corner, unlike the 8/17/98 Blanket P.O. which has, in very large print, the words "DELPHI AUTOMOTIVE SYSTEMS" on the first page as do each of the later contracts to which DAS admits being the buyer.  Moreover GM had issued just 6 weeks earlier the actual General Motors P.O. for the same part for the same term.   The August 1998 document, which DAS now claims was a GM contract, not a Delphi contract, also says, in the "reason for amendment" section "New Contract Line Item" not something like "re-issue under new purchasing system".  Why would GM call the mere restatement of a 6 week old purchase order a "new contract line item"?  The answer is simple.  Delphi is not being truthful.  As its Michigan counsel admitted and as Trenia Patrick, DAS's former senior buyer avers, the August 1998 Line Item Detail is Delphi's contract with Nu-Tech and GM was *Delphi's* ultimate customer.

Moreover, the May 1999 document, which DAS admits liability under, is not only identical in form to the document DAS disclaims, but it is expressly noted to be an *amendment* of the contract DAS now says wasn't its contract.  The May 1999 contract also states, in the "reason for amendment" section, only "expiration date extended."[68]  It also carries the very same contract number as the August 1998 contract.  Finally and critically, the May 3, 1999 document states, as its first line in unequivocal words "This Line Item *is effective from 1-Aug-1998* to 31-Dec-2000."(emphasis added).

Tina Weber, the only one of Debtor's witnesses to testify regarding the contracts has no information as to Delphi's corporate history, capacity to contract, actual contracts or the details of any of the purchase orders at issue.[69]  Her explanation for why Delphi admittedly extended the

---

[68] Of course, following DAS' argument, this extension which DAS admits it issued, was for a non-existent contract on a product everyone allegedly knew GM couldn't buy from outside sources to a company which, according to DAS, had lacked the ability to produce the part for 5 months because DAS had confiscated the tools which would have permitted such manufacture.

[69] Exhibit L at pp. 10, 13-17.

term of a requirements contract that Delphi had already breached and continued thereafter to

breach was:

> Q    Do you know -- well, first of all, have you been told that at the end of 1998 the
> tools necessary to manufacture that part were removed from Nu-Tech's premises by
> Delphi or GM?
>
> A    I knew that they no longer had the tools.  I didn't know whether they were removed,
> given.
>
> Q    Do you have any idea then why GM or Delphi would have issued a new purchase
> order or an extension of the existing  purchase order in '99?
>
> A    All I can do is make a guess.  It was either an error or it was to burn inventory that
> was there or to get some parts.
>
> Q    Okay.
>
> A    That could be my only understanding how a purchase order could ever be issued
> without the supplier having the capability to build the part.
>
> Q    Because at least as of May '99 -- the last purchase order is Exhibit D to your
> declaration.  That's May of '99 and it extends the contract through December 31, 2000?
>
> A    Correct.
>
> Q    And it was issued after Nu-Tech no longer had the tools?
>
> A    Correct, I don't know if that was a buyer error or another issue.

The bottom line is that Delphi, whether by mistake or design, issued two purchase orders to Nu-

Tech which, had Delphi not breached the terms of the orders, would have resulted in millions of

dollars in sales to Nu-Tech.  Delphi breached the contract and failed to order a single part 0694

from Nu-Tech from January 1999 forward though millions of units of that part were required by

General Motors and produced by Delphi and other suppliers in 1999 and 2000 despite the

exclusive contract issued to Nu-Tech and repeatedly renewed by Delphi. Delphi is liable to Nu-

Tech for breach of the purchase orders.

## II.    NU-TECH IS ENTITLED TO DAMAGES UNDER ITS PROMISSORY ESTOPPEL CLAIM.

The elements of a promissory estoppel claim under Michigan law are:  (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided.[70]  In *State Bank of Standish* v. *Curry,*[71] the Michigan Supreme Court reversed the grant of summary disposition in favor of the bank which had promised to loan money to the defendants in the future.  The court first set forth that the purpose of the doctrine of promissory estoppel is "to protect the ability of individuals to trust promises in circumstances where trust is essential." It then established the definition of a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." No actual contract is necessary to a claim of promissory estoppel, according to the Court.

Nu-Tech's promissory estoppel claim, as described by Mr. Cooper, is based on Delphi's promise to substitute a different part for part 0694 the need for which would be similar in volume to part 0694 (a discernible quantity per Delphi's forecast)[72] and which would continue for a specific duration, until December 2000.  Accordingly, Delphi's promise was clear and definite and contained the terms of duration and quantity.  Likewise, the promise was clearly for a long term contract requiring the production of millions of parts. It was not a "spot buy" contract such as the one actually given to Nu-Tech for a small order of a prototype part.

---

[70] *Ardt* v. *Titan Insurance Co.,* 233 Mich.App. 685 (1999).

[71] 442 Mich. 76 (1993).

[72] Exhibits 5 and 6 to Patrick Affidavit, Cooper Declaration at p. 3 and Exhibit 1 thereto.

Not only did Delphi know that pulling part 0694 in house in breach of Nu-Tech's contract caused tremendous financial losses to Nu-Tech, it then made matters worse by inducing Nu-Tech to rely on promises of resumption of production of part 0694 or a replacement part. Delphi unequivocally promised Nu-Tech that Delphi would, not might, order a replacement for part 0694, similar in type and quantity to part 0694 and for the same contract duration, until December, 2000.[73]

Delphi knew that such a promise would and, in fact, did induce Nu-Tech to keep its machinery, tooling and staff in place in order to comply with the expected contract terms and produce the 4 millions parts Delphi projected that it would need. Nu-Tech had very good reason, beyond the simple commercial relationship of buyer/seller, to rely on Delphi's promise; GM/Delphi were Nu-Tech's mentors and had promised and engaged in a course of conduct the goal of which was to keep Nu-Tech profitable and in business.[74] GM/Delphi had established a position of trust with Nu-Tech as result of this special relationship. Moreover, GM and Delphi had previously ordered new parts by simply amending existing P.O.'s to list new parts with all of the other terms remaining constant.

DAS relies heavily on the affidavit of John Mailey, now deceased, a former part owner of Nu-Tech, in defense of its claims. On August 7, 2007, Debtor first notified Claimant, Nu-Tech, that Debtor intended to use two completely inadmissible documents, the March 1, 2005 Affidavit of John Mailey, and a transcript of a purported December 8, 2004 telephone conversation between Mailey and Debtor's Michigan counsel, in support of Debtor's objection to Nu-Tech's Claim. Debtor did not raise the use of this evidence during the meet and confer. Mailey, died on July 12, 2006, more than a year before the Meet and Confer was held on June 1, 2007. Nu-Tech

[73] Cooper Declaration, pp. 5-6.
[74] Exhibit M, Cooper Declaration, pp. 5-6, Patrick Affidavit, p. 2

requests that the Court refuse to consider the Mailey Affidavit and transcript for for two reasons, (1) Mailey cannot appear for cross-examination at the Claims Objection Hearing and, accordingly, his Affidavit cannot be used pursuant to paragraph 9(f) of the Procedure Order and (2) both documents are inadmissible hearsay.

Clearly, as Mailey is not longer with us, Debtor cannot satisfy paragraph 9(f). Moreover, Debtor should not be able to circumvent the terms of the order by mislabeling the Mailey testimony as "exhibits" in overt disobedience to both the spirit and the letter of this Court's order.

Debtor's reliance on FRE 807 is misplaced. FRE 804 is the applicable rule. FRE 804 permits admission of the prior *testimony* of a decedent under exception (b)(4). However, the testimony has to have been given at a hearing or in a deposition when the party against whom the testimony is offered "had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination." Clearly, the testimony urged by Debtor does not fit within the rule. Even if FRE 807, the catch-all provision, did apply, it would not provide support for the use of the Mailey testimony here. FRE 807 requires that, before hearsay statements of a deceased witness can be admitted, they must have "equivalent circumstantial guarantees of trustworthiness" as the statements forming the exceptions under 803 and 804 **and** must be (1) offered as evidence of a material fact, (2) more probative than any other evidence which the proponent can procure through reasonable efforts. Additionally, the general purposes of the rules and the interest of justice must be best served by admission of the statements.

As has been pointed out by numerous federal courts, aptly summarized in 31A C.J.S. Evidence § 338:

> "Exposed to all the infirmities mentioned in the preceding section and to the further objection that it is impossible, in most cases, to convict the witness of

> perjury if his testimony is willfully false, testimony as to the oral statements of
> deceased persons is therefore regarded as the weakest kind of evidence and
> subjected to the closest scrutiny…The courts consider with suspicion, or lend a
> reluctant ear to, statements as to what a deceased person may have said, especially
> when corroboration is lacking." [75]

The Mailey statements should be disregarded in their entirety.

Nu-Tech, in reliance on its mentors' promise of replacement part, maintained its full operating capacity at great expense to Nu-Tech. Such reliance included keeping facilities which Nu-Tech had leased, keeping machinery needed to produce the promised part, keeping employees needed to run the machinery and other expenses.[76] As a matter of justice, Nu-Tech's losses should be laid at the feet of the entity which caused the unnecessary expense, Delphi. It strung Nu-Tech along for months on end despite Delphi's knowledge of Nu-Tech's deteriorating financial condition and its obligation to Delphi to maintain high operating capacity in anticipation of the new part. Had Delphi kept its promise, Nu-Tech would have had over $1,700,000 in additional sales in 1999, more than enough to keep it operating and certainly enough to have avoided the fire sale of its assets which Delphi brokered.[77]

## III.    NU-TECH'S CLAIMS ARE NOT TIME BARRED

Delphi's argument that (a) Nu-Tech sold its right to sue Delphi to RPT as part of the 12/1/99 Nu-Tech/RPT asset purchase transaction, and (b) the statute of limitations had run by the time NuTech reacquired this right in March 2005 (when, in response to Delphi's motion to

---

[75] See also *Gibbs-Alfano* v. *Ossining Boat & Canoe Club* 86. F.Supp.2d 382 (S.D.N.Y. 2000), *Sternhagen* v. *Dow Company*, 108 F.Supp.2d 1113, 1119 (C. MT 1999), *Brown* v. *Philip Morris Inc.*, 228 F.Supp.2d 506 (D NJ 2002) which also warns that the residual exception be sparingly invoked and *Stolarczyk* v. *Senator Int'l Freight Forwarding, LLC*, 376 F.Supp.2d 834 (ND IL 2005)

[76] Cooper Declaration at p. 6. Also, as noted above and demonstrated by the attached documents, GM's requirements contracts obligated Nu-Tech to maintain extremely high operating capacities.

[77] Amended Leeman Declaration and all exhibits thereto.

dismiss, Nu-Tech and RPT entered into an Acknowledgment and Assignment of Claims agreement[78]) fails for any of three reasons: (1) although both Nu-Tech and RPT and agree that that they did not intend to transfer Nu-Tech's causes of action against Delphi to RPT, Delphi's continually pending claim against NuTech tolled the statute of limitations under the clear and unambiguous provisions of Michigan's tolling statute; (2) Nu-Tech did not transfer its right to sue Delphi as part of the Nu-Tech/RPT transaction; (3) the Michigan state court has already rejected this defense.

        a.      <u>NuTech's continually-pending suit against Delphi tolled all applicable statutes of limitation</u>.

Nu-Tech sued Delphi in 2002. Several years after the complaint was filed and during the pendency of the litigation (which is critical for statute of limitation tolling purposes), Delphi filed a motion claiming that Nu-Tech was not the real party in interest because it had transferred the cause of action to RPT as part of the asset sale transaction. Upon receipt of the motion and before filing a response, Nu-Tech and RPT signed an Acknowledgment and Assignment Agreement wherein the parties agreed that Nu-Tech's cause of action against Delphi had not been transferred as part of the asset sale but, in the event anyone believed to the contrary, RPT assigned the cause of action back to Nu-Tech.[79]  Nu-Tech presented the Acknowledgment and

---

[78] Exhibit T.

[79] Id. DAS argues that the Acknowledgment and Assignment addresses only the initial document which memorialized the Asset Purchase between RPT and Nu-Tech, not the "Definitive Agreement" and, somehow, that any cause of action which any outsider to the agreement believed was transferred in the first agreement only was assigned back to Nu-Tech via the Assignment. However, the two documents between Nu-Tech and RPT constitute an integrated whole as is reflected by the clause in the later document, the "Definitive Agreement" which states at §17.4 that the later document "supplements and completes" the Memorandum to which the Acknowledgment & Assignment refers but does not supercede the Memorandum. Neither document makes any reference to the transfer of causes of action, and it is not reasonable to assume that any implicit sale of such contingencies was included in the later agreement but not the initial Memorandum. Moreover, the Acknowledgment and Assignment states that "**RPT**

Assignment Agreement to the Court in response to Delphi's motion to dismiss. The trial court denied Delphi's motion and the Michigan Court of Appeals declined Delphi's application for interlocutory appeal on this issue.

Debtor does not suggest that Nu-Tech's claims were untimely in 2002 when NuTech filed and served its Complaint against Delphi. This apparent concession is fatal to Delphi's defense. Michigan's tolling statute tolls a statute of limitations from the time that a defendant is served with a filed complaint or a court otherwise acquires jurisdiction over a defendant:

> The statutes of limitations or repose are tolled in any of the following circumstances:
>
> (a)    At the time complaint is filed, if a copy of the summons and complaint are served on the defendant within the time set forth in the Supreme Court rules.
> (b)    At the time jurisdiction over the defendant is otherwise acquired.

M.C.L. § 600.5856; M.S.A. § 27A.5856.[80]

This statute is clear and unambiguous. The Michigan Supreme Court has held that "[i]f a statute's language is clear and unambiguous, we assume that Legislature intended its plain meaning and we enforce the statute as written."[81] The words of a statute provide the most reliable evidence of its intent. No further judicial construction is required or permitted.[82] Thus, the statute of limitations as to all of Nu-Tech's claims against Delphi had been tolled since 2002, when Nu-Tech filed and served its Complaint against Delphi.

---

**hereby assigns all of its rights, title and interest**" in causes of action against GM or Delphi back to Nu-Tech.

[80] Exhibit U.

[81] *City of South Haven* v *Van Buren County Bd. of Comm.* 478 Mich. 518, 528, 734 N.W.2d 533, 539 (2007) quoting *Parkwood Ltd. Dividend Housing Association* v *State Housing Dev. Auth.* 468 Mich. 763, 772, 664 N.W.2d 185 (2003).

[82] *Sun Valley Foods Co.* v *Ward* 460 Mich 230, 236, 596 N.W.2d 119 (1999).

Michigan courts have enforced the clear and unambiguous meaning of its tolling statute. The statute does not make tolling contingent on whether a court has jurisdiction over a party or whether a plaintiff is a real party in interest.   As statute of limitation is tolled *even if the Court did not have jurisdiction over the claims when they were first filed.*[83]    As a result, all statutes of limitation on NuTech's claims against Deplhi were tolled since 2002 regardless of whether NuTech was the real party in interest before it allegedly "reacquired" its right to sue Delphi in 2005.

This statutorily-required result does not violate the real party in interest rule.  This rule "protects a defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action."[84]   Delphi is not being harassed by multiple suits.  Nu-Tech is the only party who has sued Delphi with respect to Nu-Tech's claims.  And Delphi has had the ability to (and in fact has) fully defended and protected its rights against Nu-Tech's suit from its inception.  If a "defendant's rights are fully protected in the litigation, he cannot complain [about a real party in interest]": "so long as the final judgment, when and if obtained, is a full, final and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party, the defendant is not harmed."[85]

The cases on which Debtor bases its non-tolling assertion do not address Michigan's tolling statute.   *Miller v Chapman* merely applied the established Michigan rule that the "misnomer" rule does not apply to cause an amendment that adds a completely new and independent party to a complaint to relate back to the date of the original complaint.

---

[83] *Hoekstra* v *Bose* 253 Mich. App. 460, 655 N.W.2d 298 (2002) (Motorist's proper filing and service of a summons and complaint in Illinois Court commenced tolling of statute of limitations period on his personal injury claim even though the Illinois Court ultimately dismissed the complaint and did not acquire jurisdiction over the claim).  Exhibit V.

[84] *Kearns* v *Michigan Iron and Coke Company,* 340 Mich 577, 581 (1954).

[85] *Id.*

In *Miller*, Buddy Miller was injured in an auto accident.  He later filed a Chapter 7 bankruptcy petition.  When the auto accident lawsuit was filed, Buddy Miller, not his bankruptcy trustee, was named as plaintiff.  Defendants' answer to the complaint notified Plaintiff that the wrong Plaintiff had been named.  After the statute of limitations expired, Defendant filed a motion to dismiss arguing that Plaintiff's bankruptcy trustee, not Plaintiff, was the real party in interest.  Plaintiff responded by filing a motion to amend the complaint to list the bankruptcy trustee as the Plaintiff to correct a misnomer.  The trial court denied the motion, holding that the bankruptcy trustee would be a new party, that the statute of limitations had expired, and that under the applicable Michigan Court Rules, MCR 2.118(D), an amended pleading can not relate back to the original pleading if it adds new parties.   The Court of Appeals and Supreme Court affirmed.

*Miller* is inapplicable to the case at hand.  It does not address — in fact, it does not even mention — statute of limitation tolling.  And it does not analyze what occurs when a party who initiated a lawsuit, and has always been the same party Plaintiff, is assigned a claim against the same party that it has always been suing.  *Miller* only addresses the interplay between the addition of a new party Plaintiff and the statute of limitations for amendment pleading purposes. Nu-Tech has never sought to add a new party to this case and has not sought to amend its pleadings.  Further, unlike the Defendant in *Miller*, Delphi did not timely notify Plaintiff that it believed Plaintiff was not the real party interest due to the RPT sale.  The issue was not raised until 2005, after the case has been litigated for three years.  Had Delphi timely notified Plaintiff of its "concern", Nu-Tech and RPT would have signed the Acknowledgment and Assignment Agreement long before any limitation period would have expired absent the tolling statute.

The other decision on which Delphi relies, *3333 Centerpoint Parkway Investments Ltd. Partnership v. Forster,* 2006 WL 785369 (Mich.App.) is an unpublished decision that does not have precedential value under Michigan law.[86]  Nor is *Centerpoint* persuasive.  Delphi suggests that this non-precedent stands for the proposition that correction of a weakness in standing after the running of the limitations period does not preserve a claim.  But *Centerpoint* actually held that the pendency of a different, earlier lawsuit between different parties, which had been completely resolved before the filing of the suit in question, did not serve to toll the limitations period during which the second suit by a completely different plaintiff could be filed.

The Plaintiffs in *Centerpoint* owned and contracted with Olympic Corporation to act as the general contractor to build two hotels.  Defendants Brian Forster and Daniel Steffes were individual officers of Olympic.  Olympic sub-contracted with D & M Industries who performed the work and did not get paid.  D & M sued Olympic and Forster for breach of contract and prevailed.  D & M thereafter assigned to Plaintiff 3333 Centerpoint Parkway Investments any claims it had against Forster and Steffes for violation of the Michigan Builders Trust Fund Act.  On October 15, 2004, Centerpoint sued Forster and Steffes for violating of the Michigan Builders' Trust Fund Act ("MBTFA") and fraud.  The claims were based, in part, on a May 20, 1998 letter suggesting funds had been diverted.   The Court dismissed the case on statute of limitation grounds finding: (a) the assignment was a nullity because D & M already prevailed in prior litigation against the Defendants and (b) the six year statute of limitations for fraud had expired.  Centerpoint tried to avoid this finding by claiming that the statute of limitations should be tolled because of the prior D & M litigation.  The Court rejected that argument because that

---

[86]Michigan Court Rule 7.215(C)(1).

case had already been adjudicated on the merits.  It was not pending when the new case was filed.

Here, there has never been more than one suit and there has never been any plaintiff other than Nu-Tech.  Debtor fails to present this Court with a single Michigan case that holds that the clear and unambiguous language of Michigan's tolling statute would not apply when the parties to the pending litigation never change.

B.    Nu-Tech's did not sell its claims against Delphi to RPT.

Nu-Tech would still be able to assert its claims against Deplhi even if the statute of limitations on these claims had not been tolled, because Nu-Tech did *not* sell its right to sue Delphi to as part of the 12/1/99 RPT transaction.

An assignment is not valid unless "a perfected transaction between the parties which is intended to vest in the assignee a present right in the thing assigned."[87]  Nu-Tech and RPT both agree that Nu-Tech did not intend to assign its causes of action against Delphi to RPT.  And RPT has never claimed an interest in this case or its proceeds.

The text of the Asset Sale Agreement[88] also supports non-assignment.  Section 1.1 provides that Purchaser is selling its rights and interests in all of its assets ("Purchased Assets") "except for those assets specifically identified in paragraph 1.4 ("Excluded Assets")" and then identifies the categories of assets being transferred (trade fixtures, machinery, equipment, trade names and secrets, purchase orders, customer list and miscellaneous records, remote assets, contracts, sales contracts and service records and goodwill).  Thereafter, Section 1.4, Excluded Assets, states:  "Except as set forth in this provision, this Agreement contemplates the purchase

---

[87] *Id.* at 241.
[88] Nu-Tech and RPT signed a Memorandum and Agreement Regarding Purchase and sale of Assets on 12/1/99, which was replaced and superceded by the Final Agreement Purchase and Sale of Business Assets signed on 1/14/00.  Exhibit W.

and sale, inclusive of assignments, of the Purchased Assets. However, it specifically excludes Seller's: . . . (d) those assets not specifically or by inference included in the above paragraphs or attached exhibits.  Nu-Tech's potential causes of action are not specifically or by inference referenced in any paragraph in the agreement or in any of the attached exhibits.  Accordingly, the language of the agreement indicates that Nu-Tech's causes of action are excluded.  While Delphi would like to ignore subsection (d), contracts under Michigan law must be "construed so as to give effect to every word or phrase as far as practicable."[89]

At worst, there is an ambiguity in the Asset Purchase Agreement on this issue.  A contract is ambiguous when two provisions irreconcilably conflict with each other[90] or when a term is equally susceptible to more than a single meaning.[91]  On the one hand, Section 1.1 is a broad statement indicating Purchaser is acquiring all assets, rights and interest of every conceivable kind or character, except for the Excluded Assets, including without limitation those identified in sub-paragraphs (a) – (h).  On the other, Section 1.4(d) is an equally broad statement indicating that the Excluded Assets include all assets not specifically or by inference included in the above paragraphs or the attached exhibits.  The provisions Where an ambiguity exists, extrinsic evidence may be utilized to evidence the intent of the parties and the construction of the contract.[92]  Nu-Tech and RPT, the only two parties to the transaction, both maintain that Nu-Tech's causes of action against Delphi were not transferred as part of the asset sale.[93]  Delphi possesses no evidence to the contrary.

---

[89] *Hunter* v *Pearl Assurance Co., Ltd.* 292 Mich. 543, 545, 291 N.W.58 (1940) *quoting Mondou* v *Lincoln Mut. Cas. Co.,* 283 Mich. 353, 358-359, 278 N.W. 94 (1938).
[90] *Klapp* v *United Ins. Group Agency, Inc.* 468 Mich. 459, 467, 663 N.W.2d 447 (2003).
[91] *Lansing Mayor* v *Pub. Serv. Comm.* 470 Mich. 154, 166, 680 N.W.2d 840 (2004)
[92] *Goodwin, Inc.* v *Orson E. Coe Pontiac, Inc.* 392 Mich. 195, 209-210, 220 N.W.2d664 (1974).
[93] Exhibit T, Acknowledgment and Assignment Agreement.

C.    <u>The Michigan Court has already rejected this defense</u>.

Nu-Tech sued GM and Delphi in Genesee County Circuit Court, Michigan in 2002 alleging breach of contract and promissory estoppel.[94]    In 2005, the Defendants filed a motion to dismiss claiming that Nu-Tech did not own the right to sue (i.e. was not a real party in interest) because it had transferred said right to RPT as part of the 12/1/99 asset purchase agreement. After full briefing and oral argument, the transcript of which is attached hereto, the trial court denied the motion and held that Nu-Tech was a proper plaintiff with standing to sue both parties on both claims.[95]    Delphi filed an application for interlocutory appeal on this issue with the Michigan Court of Appeals, which application was denied on August 5, 2005.[96]    Although this Court is not barred from revisiting this issue, NuTech believes the decision of the trial court, which had overseen NuTech's claims for three years, is entitled to appropriate consideration and deference.

## IV.    NU-TECH HAS SUFFERED DAMAGES AS A PROXIMATE RESULT OF DELPHI'S BREACHES

In Exhibit M, Delphi and GM acknowledged that the loss of production of part 0694 was the primary cause of Nu-Tech's demise.    This admission stands in stark contrast to Debtor's current position that Nu-Tech's problems were caused by internal "mis-management".    Delphi not only believed that Nu-Tech was a going concern in mid 1998 when the P.O. in question was issued, but it was fully aware of the fact that Nu-Tech's dire financial straits at the end of 1999

---

[94] See Exhibit O.    Delphi filed multiple responsive pleadings the last of which was its Second Amended Answer attached hereto as Exhibit P.
[95] See Exhibit B, transcript of oral argument of Defendant's Motion for Summary Disposition dated March 24, 2005 and Exhibit C , April 7, 2005 Order Denying Defendant's Motion.
[96] See Exhibit D.

were entirely the fault of Delphi for breaching the contract with Nu-Tech for part 0694.[97]

Delphi's internal memoranda acknowledge that Nu-Tech was suffering gravely due to its "over-expansion" *in order to meet Defendants' production needs* and that Nu-Tech's "decline [was]

largely attributable to Delphi's in-sourcing of part [6094].[98] These same documents establish that

Delphi's breach of the contract resulted in a "critical loss of revenue" to Nu-Tech which is

further confirmed by the Affidavit of Trenia Patrick.  Delphi should not be permitted to rely on

the severe financial losses it wrought as a result of its unconscionable breach of contract and Nu-

Tech's reasonable reliance on Delphi's unfulfilled promises of new business as a defense against

its own unlawful behavior.

Nu-Tech is entitled to damages for the breach of contract in accordance with MCL

440.2708.  That section of Michigan's Uniform Commercial Code, governing contracts for the

sale of specialty goods, specifically calls for the payment of expectation damages and incidental

damages caused by the breach less the credit for savings in production costs to the seller.[99] Nu-

Tech's expert, Gary Leeman, relying on financial data from Nu-Tech, its accountants, Delphi

and BBK, has rendered an opinion setting forth the basis for his damages calculation as well as

the amount of damages occasioned by Delphi's breach of contract and breach of promise.[100]  Nu-

Tech's loss of income (lost profits) caused by Delphi's breach of contract to order all parts 0694

required by General Motors until December 2000 is $8,688,918.00.[101]

---

[97] Exhibit M.

[98] Id.

[99] *Great Northern Packaging* v. *General Tire & Rubber Co.,* 154 Mich. App. 777 (1987)

[100] Amended Leeman Declaration and Exhibits thereto.  Also note that, despite repeated requests, Delphi failed to produce any actual production data for vehicles using the 0694 part after Delphi's breach of the contract. See Exhibit S.

[101] Amended Leeman Declaration and Exhibit 12 thereto.

In determining the volume of lost sales, Leeman relied on published data from CSM as to GM's production of vehicles containing part 0694. Such reliance on an outside source was necessitated by Delphi's repeated assertions that production data by part did not exist.[102] Interestingly, Debtor's witness, James Weber, a General Motors Program Purchasing Manager, admitted 3 weeks ago that such data is indeed maintained by General Motors in its Global Product Description System but the date he ordered to be assembled from that program was neither produced to Nu-Tech nor attached to his Declaration submitted to this Court as support for Delphi's claim that the production numbers for the part were much lower than Leeman's number.[103] To this day, Delphi has not been able to provide any data as to how many GM vehicles produced in 1999 and 2000 contained part 0694, nor has Delphi been able to identify how many parts 0694 were made or purchased by Delphi or General Motors during the operative period.

Nu-Tech's loss of business value, an element of damage which is recoverable under both the breach of contract and breach of promise claims, is $5,811,911.00.[104] Contrary to Delphi's assertion, Leeman did not "double dip" by including the lost profits in his calculation of lost business value as he explains in his attached Amended Declaration.[105] In fact, Leeman took pains to assure that there was no duplication of *any* of the damages. Additionally, Nu-Tech

---

[102] See Exhibit S.

[103] Exhibit A, J. Weber deposition at pp. 5 and 10.

[104] The damages calculation does not duplicate the damages because they would be recoverable under two different causes of action. Rather, the amount claimed is simply the total amount of loss of business value.

[105] The case relied on by Delphi in its argument that lost business value is not recoverable, *American Anodco,Inc. v. Reynolds Metal Co.*, 743 F.2d. 417 ( 6th Cir. 1984) in fact merely holds that a plaintiff is not entitled to duplicative recovery of lost profits under both a lost business value analysis and a lost profits analysis. The case in not applicable here where such duplication has not occurred.

incurred $811,435.00 in excess costs, an element of damage to which Nu-Tech is entitled under either theory.[106] The total amount of Nu-Tech's damages is $15,312,264.00.[107]

Delphi's expert, Keith Francis has not performed any analysis or calculation of what he believes to be the actual damages under his preferred methodology. His only opposing value is based on his erroneous assumptions of the volume of sales/production of part 0694.

In addition to the above stated damages, under Michigan law, Nu-Tech, if it prevails, would be entitled to statutory pre-judgment interest. Pursuant to MCL 600.6013, a prevailing party is entitled to interest from the date of filing of the complaint (December 30, 2002 for this matter) to the date of entry of the judgment at rates calculated at six-month intervals as set forth in Exhibit X and compounded annually. The award of pre-judgment interest is mandatory. Based on Leeman's calculations, Nu-Tech is entitled to $4,070,305.94 in pre-judgment interest bringing the total amount of Nu-Tech's damages to $19,413,056.34.

A.    Nu-Tech did not fail to mitigate its damages

Delphi has recently invented this defense which is based on the premise that the Court should permit Delphi to profit from its breach of the contract. Essentially, Delphi argues that Nu-Tech should have taken some unspecified steps to cut its losses as soon as Delphi wrongfully retrieved the second tool necessary to produce the parts. However, the termination provisions of the General Terms and Conditions are pertinent to Debtor's mitigation argument. Standard terms and conditions accompany GM purchase orders. Section 13 of those terms and conditions, again drafted by GM and adopted by Delphi, require the buyer to give *written notice* to Nu-Tech if the

---

[106] Amended Leeman Declaration and Exhibit 12 thereto.
[107] Id.

buyer wishes to terminate the contract.[108] After written notice of a termination, Nu-Tech would

have had certain remedies.[109] Not only did Delphi fail to provide Nu-Tech with written notice

that it was terminating the P.O. at issue, *it extended the purchase order for that part specifically*

*to December 2000 effective May 3, 1999.*[110]    Delphi clearly knew of notice of termination

requirement. In fact, in August, 1998 Delphi complied with the notice provision in terminating a

different order with Nu-Tech unrelated to this litigation. [111]

Moreover, Delphi conveniently forgets that the contract which remained in full force and

which had been extended to December 2000 **mandated** that Nu-Tech maintain its capacity to

produce 14,000 parts 0694 per day.

Respectfully submitted,

SCHWARTZ LAW FIRM, P.C.


By: __/s/_ Jay A. Schwartz_____
    Jay A. Schwartz (P45268)
    Attorney for Claimant Nu-Tech Plastics
        Engineering, Inc.
    37887 West Twelve Mile Road, Suite A
    Farmington Hills, Michigan 48331
    (248) 553-9400
    jschwartz@schwartzlawfirmpc.com

Dated: January 7, 2008

---

[108] Tina Weber acknowledged that, unless new Terms and Conditions were created after the March, 1998 version which admittedly applied to P.O. 9C941, those Terms and Conditions also applied to the Delphi contracts. Exhibit L, T. Weber deposition at pp. 23-24
[109] Patrick Affidavit, pp. 2 and 6 and Exhibit 4 thereto at paragraph 13
[110] Cooper Declaration, p. 5
[111]  Patrick Affidavit at p. 6 and Exhibit 8 thereto, Cooper Declaration, p.5