# EXHIBIT B

STATE OF MICHIGAN
IN THE 7TH CIRCUIT COURT (COUNTY OF GENESEE)

NU-TECH PLASTICS ENGINEERING, INC.,

    Plaintiff,

    vs                    Case No. 02-75335-CK

GENERAL MOTORS CORPORATION, et al.,

    Defendants.

_____/

DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

BEFORE THE HONORABLE ROBERT M. RANSOM, CIRCUIT JUDGE

FLINT, MICHIGAN – THURSDAY, MARCH 24, 2005

APPEARANCES:

For the Plaintiff:    JAY A. SCHWARTZ P45268
                        Attorney at Law
                        37887 W. 12 Mile Road, Suite A
                        Farmington Hills, Michigan 48831
                        (248) 553-9400

For the Defendant:
A.T. LIPPERT JR P16714          JOSEPH E. PAPELIAN P26582
Attorney for GM                 Attorney for Delphi
4800 Fashion Square Blvd       5725 Delphi Drive
Plaza North, Suite 410         Troy, Michigan 48098
Saginaw, Michigan 48604       (248) 813-2535
(989) 792-2552

Recorded by:        Via Video Recorder

Transcribed by:      Shelie Robinson CER 6913
                    Certified Electronic Recorder
                    (810) 424-4454

## TABLE OF CONTENTS

EXHIBITS:

None

WITNESSES:

None

```
 1                        Flint, Michigan

 2                 Thursday, March 24, 2005 - 9:56 a.m.

 3                 (All parties present)

 4                 THE COURT:  The Court will proceed in the

 5        matter of Nu-Tech Plastic Engineering, Inc. versus

 6        General Motors Corporation, et al., file number 02-

 7        75335-CK.  This matter is before the Court on

 8        defendant's motion for summary disposition.

 9                     Mr. Lippert, you may address the Court.

10                     MR. LIPPERT: Thank you, Your Honor.

11                     While we were waiting, Mr. Schwartz and I

12        were just having a nice conversation about England.

13        So, we made good use of the time, Judge.

14                     With the Court's permission, I have prepared

15        an exhibit list which is only on part of the exhibits

16        that may eventually be used if this case goes to

17        trial, and I intend it only as a roadmap, and I will

18        give Your Honor a copy.  And also I have marked some

19        of the exhibits that I'll be talking about in my

20        motion.  Mr. Schwartz also has all of these.  And with

21        permission I will give these to Mr. Allen.

22                     THE COURT: Okay.  Thank you.

23                     MR. LIPPERT: It helps me sometimes if things

24        are highlighted a little bit, especially where there

25        are so many documents.
```

3

1                    The motion that the defendant --

2                    THE COURT: Let me ask you --

3                    MR. LIPPERT: Yes, sir.

4                    THE COURT: -- preliminarily, how much time

5            do you need to argue this, Mr. Lippert?

6                    MR. LIPPERT: Judge, I have tried to detail

7            my motion as much as I could possibly think to detail

8            it in writing, and I don't plan to read to the Court.

9                    THE COURT: Okay.

10                   MR. LIPPERT: In fact, if you would prefer, I

11           would simply answer questions. But I can give you

12           just a short 10 minute statements or less.

13                   THE COURT: Okay.

14                   Mr. Schwartz?

15                   MR. SCHWARTZ: Same thing. I think my brief

16           was pretty detailed. There some things -- there was a

17           reply brief filed, but I haven't had a chance to

18           respond to that and I want to address it today. But I

19           think that I can make my presentation to you in 15

20           minutes.

21                   THE COURT: Fine.

22                   Mr. Lippert, you may begin.

23                   MR. LIPPERT: Thank you, Your Honor.

24                   The motions, Your Honor -- or the motion

25           that I have made has multiple aspects to it. But the

4

1        one I would like to talk about first is the standing,

2        a proper party to bring this lawsuit.  Nu-Tech was a

3        corporation that was organized in about 1995.  At that

4        time the majority shareholder was Mr. John Mailey, an

5        Afro-American, who became the majority minority

6        shareholder, a somewhat confusing term.  But Mr.

7        Mailey remained the majority shareholder up until

8        December -- up to and including December of 1999, when

9        Nu-Tech was sold to Rapid Products Technology, another

10       corporation.

11              After that date, there was a transfer of Mr.

12       Mailey's stock to Mr. Cooper for reasons that I don't

13       think we need to bother the Court with, but at that

14       time Mr. Cooper became the majority shareholder, and

15       the sole owner of Nu-Tech, and this lawsuit was

16       brought by Mr. Cooper for Nu-Tech, which, of course,

17       he would have a right to do.

18              I do not know, Judge, whether -- at the time

19       the lawsuit was filed, whether Mr. Cooper was the sole

20       shareholder.  I haven't been able to figure that out.

21       The date of the transaction is a bit vague, and on my

22       inquiry with Mr. Cooper, I have never gotten an answer

23       to that that satisfies me.  So, I cannot tell you when

24       he became the majority shareholder, except to say it

25       is agreed and undisputed that it was after the sale of

                                5

1          Nu-Tech -- of Nu-Tech assets was made to Rapid in

2          December of 1999.

3                    We have filed the affidavit of Mr. Mailey

4          who says that while he was the majority shareholder of

5          the corporation, it was his well founded belief that

6          there were no claims that could be made against Delphi

7          based either upon the breach of contract claim, which

8          is asserted in the plaintiff's complaint, or the

9          promissory estoppel claim.  The basis for that was,

10         and it's stated in his affidavit, that Delphi had

11         performed all of the conditions under the contract and

12         there was no breach.

13                    Also, he says that Delphi had fulfilled all

14         of its promises, if any, made to Nu-Tech, and there

15         was -- and is no claim for promissory estoppel.  My

16         argument with respect to that, Judge, is rather

17         straightforward.  If the owner of a corporation

18         believes there is the lawsuit at the time the cause of

19         action arose, or the alleged cause of action arose,

20         how can there be a later revived cause of action?  If

21         Mr. Cooper is the minority shareholder and thought

22         there were claims or causes of action, his rights

23         would be against Mr. Mailey, the majority shareholder,

24         to say you're not protecting my rights as a minority

25         shareholder to bring these actions and do so.  That

                                   6

1          would have been another kind of lawsuit, and the

2          result of that would have been to either bring the

3          lawsuits or not. But you don't do what was done in

4          this case, sell the corporate assets, and then say,

5          by the way, we have preserved something in the nature

6          of the two causes of action.

7                    Now, we come by the argument that the

8          transfer of assets was made because that's apparent

9          from the two sales of purchase agreements that were

10         signed by Mr. Cooper on behalf of Nu-Tech and by Mr.

11         Mailey on behalf of -- or Mr. Cooper, excuse me, on

12         behalf of the companies that were leasing equipment to

13         Nu-Tech, and also signed by Mr. Mailey and by Rapid.

14         These contracts were prepared by Nu-Tech's counsel and

15         were eventually executed, as I say, on December 1999.

16                   The contracts are clear and unambiguous.

17         Mr. Schwartz agrees with that in his brief.

18         Therefore, you should look within the four corners of

19         those agreements as to what they say. I don't think

20         there is any dispute, as I read Mr. Schwartz's answer,

21         that there was an asset transfer, and that causes of

22         action would be assets.

23                   As I understand, and he can certainly speak

24         for himself, but if there is a dispute on that, then I

25         say, Judge, just simply look to the agreements

1        themselves, and they say all assets, tangible and

2        intangible, and there is a long list.  And in the

3        reply brief that I have filed, I cited those cases

4        that say all means all.  There's no equivocation on

5        that.

6              Mr. Schwartz does say though, however, that

7        there were excluded assets in those contracts, and the

8        excluded assets are -- the excluded assets include

9        accounts receivable, which they do, and that accounts

10       receivable are -- that these causes of actions were

11       accounts receivable.  Well, I would say, Judge, that

12       would come as a great surprise to accountants, to IRS

13       examiners, to Judges who look at wrongful death cases

14       to see that those wrongful death claims filed in

15       -- Probate Court are accounts receivable, and not causes

16       of action.  When those probate proceedings are opened,

17       they are listed as causes of action and not accounts

18       receivable.

19             Once more, Judge, the Delphi Exhibit C,

20       which is one of the 1999 sale purchase agreements, in

21       article 1.4B, defines accounts receivable as this,

22       accounts receivable attributable to services rendered.

23       That's the definition in the four corners of the

24       contract.  That does not say causes of action.  It

25       says accounts receivable attributed to services

8

1       rendered.   This business sold -- or manufactured and

2       sold products to what -- to 18 different customers

3       that I've been able to count.   On the accounts

4       receivable statement prepared by BBK, and on there it

5       shows those customers and the accounts receivable

6       collectible from those customers on that Exhibit.

7       That's the record kept in the ordinary course of

8       business and submitted as part of this motion.

9              Also, we have the records of Daig and Daig,

10      and Mr. John Daig, an accountant, was deposed.  Those

11      records have been verified.   In Mr. Daig's records, it

12      shows accounts receivable owing from Delphi and lists

13      the $253,000 or $250,000, or some figure like that.

14      It does not include contingent assets of claims or

15      causes of action.  And at the time those documents

16      were created, Judge, they would have been claims and

17      -- if there were valid claims to be made against them.

18              So, the argument is, Judge, straightforward

19      that the transaction in December of 1999, when Nu-Tech

20      sold its assets to Rapid Technology, carried with it

21      any claims and causes of action.

22              Now, interestingly, the plaintiff has filed

23      in response a document which purports to be a

24      memorandum and assignment of assets.  It's -- the

25      person signing that does not identify it on the

9

1        document for Rapid Technology.  I see that signature,

2        and I'm not a handwriting specialist, is the same as

3        the gentleman or the person who signed the Rapid

4        Technology agreement at the time of the sale.  He is

5        on a witness list that was filed some months after the

6        time for filing witnesses was closed, but we can

7        handle that matter later I suppose, if we have to.

8             It's an interesting document for this

9        reason, number one, Judge, it's not an affidavit, and

10       therefore doesn't meet the requirements of the court

11       rule for responding to a motion for summary

12       disposition, and I've covered that in my reply brief

13       of what those requirements are.  Number two, it's not

14       a record kept in the ordinary course of business of

15       Nu-tech or Rapid Technology, and therefore meeting the

16       hearsay or falling within the hearsay objection of the

17       Michigan Rules of Evidence.

18             So, for two reasons, Judge, it should not be

19       considered.  But if it is considered, I would like to

20       point out two things.  There appears to be a tacit

21       resignation in that document that the assets, that is

22       to say the two causes of action, were transferred.

23       And it goes on to say then that if they -- if you do

24       find the Court -- this Court finds that those assets

25       were transferred by virtue of the December 1999

10

1     agreements, then by virtue of this document made March

2     8, 2005, we, Rapid Tech, send it all back to Nu-Tech

3     and Mr. Cooper so that he can have a cause of action

4     on them.

5          Well, I cited the court rule, Judge, and the

6     cases that deal specifically with the amendment of

7     pleadings.  You cannot amend a pleading to add a new

8     party.  The new party -- so, we have this situation

9     occurring.

10         The assets are transferred to Nu-Tech.  Nu-

11    Tech has no right to bring this pending cause of

12    action.  Period.

13         If there is a reassignment of that claim

14    back to Nu-Tech or those two claims back to Nu-Tech by

15    virtue of that March 8, 2005 agreement, then if Nu-

16    Tech wants to bring their cause of action, it should

17    be brought as Nu-Tech, assignee of Rapid Technology,

18    Inc., under date of agreement March 8, 2005.  And if

19    that lawsuit is filed, then we will deal with that one

20    on its own merits down the road sometime in the

21    future.

22         However, the document is not sufficient to

23    breathe vitality back into a lawsuit where the party

24    bringing it had no standing to bring it in the first

25    instance.

11

1           The second part of the motion, Judge, has to

2       do with the contracts which are alleged to be

3       breached.  Again, Mr. Mailey, the majority

4       shareholder, has said in his affidavit, there was no

5       breach of contract.  Delphi, which had various

6       agreements for parts, I think 10 different parts were

7       being produced by Nu-Tech for Delphi, he said they

8       fulfilled all of the terms and conditions of all of

9       those contracts.  However, plaintiff has isolated out

10      two agreements by virtue of their interrogatory

11      responses which they say are applicable.  One of those

12      agreements very clearly expired by its own terms.  The

13      second agreement, Judge, was thereafter amended after

14      it was initially issued, and it expired by its own

15      terms December 31, 2000, again, by amendment.

16          However -- and on this Exhibit list I've

17      given you, Judge, I don't want to read them all off.

18      You will find that the first one -- the one that is --

19      the first one that expired is 9C941.  This is the one

20      that Mr. Schwartz says in his brief that I didn't tell

21      you about because probably I was afraid if I told you

22      about it my argument would be moot.  I had no such

23      fear, Judge.  I didn't put it in there because it's

24      not pertinent or relevant.  It expired -- it was for

25      the 1999 model year.  It expired July 31, 1999 and was

12

1            not renewed.

2                        Now, the second purchase order for the same

3            part, 06948, and that is purchase order AC934, the

4            factory assist contract issued to Nu-Tech was amended,

5            and I've listened those various amendments.  We also

6            show with our Exhibit G that Nu-Tech shipped parts

7·           ·against those amendments, and those are the long

8            detailed sheets that are the payment records.  I have

9            not included all of those because it's a two inch

10           stack, but I just took a period of them which I think

11           are representative up through December of 1999 showing

· 12         those payments under that amendment, which is 580000B

13           to show that payments were actually made.  It takes

14           the dispute out of that.

15                        Now, the argument is made by the plaintiff '

16           again, well, Delphi never terminated the agreement as

17           they were obliged to do in writing.  I want to make it

18           clear, Judge, it was never the intent of Delphi to

19           terminate the agreement with Nu-Tech.  It was the

20           intent of Delphi to keep that agreement in place.

21           They did, in fact, keep it in place.  And when the

22           sale was made to Rapid, a new purchase order amendment

23           was issued to Rapid for part 0694, continuing that

24           agreement until it was later terminated, and I put in

25           the brief that last document, which is Delphi

                                    13

1           amendment 003 issued January 15, 2000, where it says

2           right on the face of it canceled, and that's how they

3           do it.

4                 Now, why would Delphi give Nu-Tech a

5           purchase order for a part -- a requirements contract

6           and then not order against it?  Well, these contracts,

7           whether they are factory assist, which 8C934 was, or a

8           requirements contract, are all contracts that Delphi

9           puts in place so that they can buy whatever parts they

10          require.  That testimony was obtained from Mr.

11          Blackburn, Judge.  It is undisputed.

12                Also, Mr. Schwartz says we'll read the

13          agreements, you could read the contracts themselves

14          within the four corners of the contract, and it will

15          tell you what the requirements are.  It does.  On the

16          bottom of the agreement it says we will ship -- we

17          will give you releases, terms that Delphi uses, and

18          then you will manufacture and ship against those

19          releases.  You have told us -- Nu-Tech, you have told

20          Delphi you can make up to 16,000 parts a day.

21          Plaintiff would like you to read that as meaning,

22          well, they're going to buy 16,000 parts.  That doesn't

23          mean that at all.  It means that if we need up to

24          16,000 parts, you can produce that many parts for us,

25          but we will tell you how many we need based upon our

                              14

1          own customer requirements from Chrysler, Ford, Toyota,

2          General Motors, whoever else that are buying that

3          product created to produce by Delphi for their

4          customers.  And, as I say, Mr. Blackburn's testimony

5          on that point is refuted.

6                   I might add at this point, Judge, that there

7          are no affidavits provided by the plaintiff in

8          response to anything that the defendant has asserted

9          by means of these affidavits.  And the rule is very

10          clear as I read it, you just don't come in on an

11          answer to a (C)(10) motion and say, well, read our

12          pleadings, Judge, and listen to my argument, and

13          hopefully on the basis of what I tell you, you may

14          find a fact question.  I think that's always the hope

15          of people who don't have a basis for a response.

16                   With respect to the promissory estoppel,

17          Judge, we have outlined the law which I think more

18          than elaborate detail of what the requirements are for

19          a promissory estoppel claim.  Also, it must be shown

20          that the plaintiff has a legal entitlement -- or an

21          equitable entitlement to this essentially equitable

22          relief.

23                   The first requirement -- and we have no

24          disagreement apparently on the laws as I read Mr.

25          Schwartz's brief.  The first requirement is there must

15

1    be a promise.  This promise, Judge, so-called is set

2    out on page 10 of defendant's brief.  And Mr. Cooper

3    has testified that pretty much at the end of the

4    production of 06941, when Delphi wanted to take its

5    tools back, which it had an absolute right to do, it

6    could make the part in-house or it could send the

7    tooling to other companies for its use and

8    convenience, or whatever, or it quit making the part,

9    but they had a right to do that, and I don't think

10   there's any dispute about that.  But he says pretty

11   much in at the end, when this 0694 -- when they wanted

12   to take these tools back, we were told we were going

13   to get a replacement for that job.  And then I'm

14   skipping over a little bit.

15          It says, who would have said that to you?

16   I'm going to say probably Trainer.  Well, Trainer

17   Patrick (phonetic) was a buyer for Delphi.

18          When would that have been?  Probably in the

19   fall of '98.

20          Had you had other discussions with Delphi

21   where they said they're going to be bidding out parts

22   and we will put you on the bidder's list?  We were on

23   the bidder's list all of the time.  And Mr. Cooper --

24   and that's the promise, Judge.  There was a

25   conversation somewhere down the road we may give you

1           more replacement parts.

2                     Now, on that story, Mr. Mailey again, who

3           was the owner at the time, the majority shareholder,

4           says, they did give us parts.  And I think two things,

5           number one, you cannot read -- number -- what I have

6           cited here, we're probably going to send you some

7           parts, as a promise.  Also, Mr. Cooper understood that

8           if parts were going to come to -- or new business was

9           going to come to Nu-Tech, that Nu-Tech because it was

10          first on a bidder's list, number two, that they would

11          receive a request for quotation from Delphi with

12          respect to a part, that request for quotation would be

13          considered by Nu-Tech.  Nu-Tech would then bid on it,

14          on that part, and if that was a successful bidder, if

15          it could prove to Delphi's satisfaction that it could

16          make the part, make it in the quantities, and make it

17          at the price that Delphi required, then a contract

18          would be issued.

19                     So, you cannot stand in one place and say

20          the person told me they would give me some more parts

21          or give us some replacement parts, and treat that as a

22          promise where it is well known to you, the person who

23          needs to rely on that promise, that that promise can

24          only be fulfilled if there are other requirements met,

25          and that is that Delphi needs the parts, that Delphi

17

1        issues the request for quotation, that Nu-Tech bids on

2        that quote -- or request for quotation, and then that

3        Nu-Tech is the low bidder on that quote.  It simply

4        does not meet the requirements of promissory estoppel.

5                So, with respect to that claim, Judge, I

6        would summarize and say, first, it went with all of

7        the assets if it never existed in the first place.

8        Secondly, there was never any claim.  Mr. Mailey, the

9        owner, says there was never any claim based upon

10       promises that would arise to the requirements of a

11       promissory estoppel claim.  That is unanswered by

12       affidavit or by any other means.  And, third, that on

13       the face of it, the undisputed testimony shows that it

14       is not a promise, and, number two, that that sketchy

15       language, no matter how you look at it, is not

16       something upon Mr. Cooper could have relied as the

17       minority shareholder, a person essentially just simply

18       working in the company, to -- basically for promissory

19       estoppel.

20               I hope I didn't talk past my time, Judge.

21       If I did, I apologize.

22               THE COURT: I have a couple of questions.

23               MR. LIPPERT: Yes, sir.

24               THE COURT: You're bringing motion under

25       (C)(8) and (C)(10), is that correct?

18

1          MR. LIPPERT: Yeah.  (C) (10), Judge, is --

2     let me back up a little bit.  With the promissory

3     estoppel claim, it looks to me -- as I read the very

4     simple elements of the plaintiff's complaint, it looks

5     to me like a representation claim -- a

6     misrepresentation claim, and as a matter of law --

7          THE COURT: My question has to do with --

8          MR. LIPPERT: Yes.

9          THE COURT: -- first, the (C) (8) motion,

10    where is the complaint defective?  What are you

11    maintaining entitles you to a (C) (8) summary

12    disposition?

13         MR. LIPPERT: It does not state a cause of

14    action for promissory estoppel.  It does not express

15    the elements.  And that's the limit of the (C) (8),

16    Judge.  All the rest of it that I'm raising is

17    (C) (10).  And I further state in that motion that you

18    can't plead misrepresentation and then put the caption

19    on it -- and it's captioned -- that count is captioned

20    promissory estoppel, and change the nature of the

21    cause of action.

22         It's a tough line to draw, you know, Judge,

23    and the only way I can see to raise it, by way of a

24    (C) (8) motion, is to say is that really what it

25    purports to be?  But if you look past that, and say,

                              19

1          well, I give them the benefit of the doubt, he states

2          the cause of action for promissory estoppel, it does

3          not meet -- it still doesn't pass mustard for the

4          other reasons that I have stated.

5                    The breach of contract claims are not (C)(8)

6          motions, and nothing else in my brief is directed to

7          that, Judge.  They are all (C)(10), undisputed

8          material facts as presented by the defendant establish

9          that there is no breach of contract claim and no

10         promissory estoppel claim.

11                    I've also -- just to further clarify a

12         little bit, I made the argument with respect to the

13         economic loss doctrine, which Mr. Schwartz has

14         answered, Judge, and that's because I read the

15         promissory estoppel claim as a misrepresentation

16         claim.  I maybe didn't say that clearly enough in my

17         brief.  But if you find, Judge, as a matter of law

18         that the promissary estoppel claim is properly

19         alleged, and therefore no (C)(8) motion grant is

20         applicable, you may ignore the economic loss doctrine

21         argument, because they are tied together.

22                    I, frankly, Judge, have trouble when I see

23         those allegations, promissory estoppel and

24         misrepresentation, which side of the line it falls on.

25         You read the cases, and I don't really see a bright

20

1          line between them.  At least I don't see it, maybe

2          other people do.

3                    THE COURT: Mr. Lippert, I may have some more

4          questions for you, but right now I'm going to turn to

5          Mr. Schwartz.

6                    MR. LIPPERT: Thank you, sir.

7                    MR. SCHWARTZ:  Your Honor, can I use your

8          blackboard?

9                    THE COURT: Yes.

10                    MR. SCHWARTZ:  Only for part of it, because

11         I just want -- I want to make sure we are all on the

12         same page on the contract part of it.  I will bring it

13         out here.  I just want to get to the contract part.  I

14         want to make sure we know --

15                    THE COURT: There's two sides to that

16         blackboard.

17                    MR. SCHWARTZ:  Do you want me to save this

18         side for whatever you're using?

19                    Good morning, Your Honor.

20                    THE COURT: Good morning.

21                    MR. SCHWARTZ:  I will address the standing

22         issue first, and then I want the blackboard because I

23         want to talk about the contract.

24                    But the standing issue I think is a major

25         red herring that has come up here at kind of at the

                              21

1           last second.  I would first suggest to you, Your

2       Honor, if someone wants to file a motion for summary

3           disposition as to standing, it's MCR 2.116(C)(5) that

4           should be filed.  That hasn't been done here.  Okay.

5           This is a (C)(8) (C)(10) motion.  So, I don't think

6           it's been properly pled.

7               But let's assume that it did, if you want to

8           get to the substance of whether there is standing or

9           not.  Mr. Lippert doesn't cite any law to suggest that

10          a party who maybe didn't have standing when a

11          complaint was filed, but then remedies whatever that

12          defect was before it's brought to the Court's

13          attention, that the complaint is defective, that you

14          have to dismiss it and start all over again, the

15          things that he is suggesting for you to do.  And

16          either -- I think you couldn't find any law because

17          that isn't the law.  As a matter of fact, there is

18          case law that says when you don't have standing

19          initially, when you file the complaint, but you cure

20          that defect before the Court rules on it, there's not

21          a problem with standing.

22              The case I would cite -- I would cite you to

23          two cases.  The most recent of which is an unpublished

24          case, but relies on a published case, but the most

25          recent of which was a 2003 case.  May I approach with

22

1          a copy of it, Your Honor?

2                    THE COURT: Have you given it to Mr. --

3                    MR. SCHWARTZ:  I will give it to Mr.

4          Lippert.

5                    This is all in the reply brief that I didn't

6          have a chance to answer in writing, or I would have

7          addressed it before.

8                    THE COURT: Okay.

9                    MR. SCHWARTZ:  In this case, Your Honor,

10         Thomas versus Costa, what happened was, it involves a

11         corporation and some shareholders who were suing, and

12         there was an -- there was an issue raised by -- at the

13         trial level that the corporation at the time the

14         lawsuit was filed was dissolved.  It wasn't in good

15         standing with the State of Michigan, and that was

16         true.  It didn't have standing under the corporate

17         laws in the State of Michigan when the complaint was

18         filed.  The case went forward, and before motions for

19         summary disposition were filed, they went and they

20         cured that defect, and became a corporation in good

21         standing in Michigan.  The trial Court, in granting

22         the motion for summary disposition, said you didn't

23         have standing when the case was filed.  The appellate

24         Court said the trial Court erred on that issue.  They

25         affirmed them for other reasons.  But what the Court

                              23

1        of Appeals -- this is a 2003 case -- said is that the

2        trial Court erred in granting the motion for summary

3        disposition because the plaintiff was able to correct

4        the defective filings which led to their improper

5        standing before the Court issued its rulings on the

6        summary disposition motion, and you can read this case

7        when you get it, Your Honor.

8                 This case relies on another case, a

9        published case, called George Morris Cruises versus

10       Irwin Yacht Marine Corporation, 191 Mich App 409.

11       Again, Your Honor, can I approach with a copy of that?

12                THE COURT: You may.

13                MR. SCHWARTZ:  What is interesting about

14       this case, Your Honor, is it goes even further than

15       the case I just cited to you.  This is a partnership

16       case.  And at the time -- he will appreciate that

17       greatly.  So, thank you.

18                 At the time -- in this case it was a

19       partnership, they did not file a certificate of co-

20       partnership at the time the complaint was filed.  So,

21       in response to the complaint, the defendant filed a

22       motion for summary disposition.  No standing.  You

23       weren't a property partnership in Michigan.  The trial

24       Court granted the motion for summary disposition.  And

25       what the clever plaintiffs then went and did is they

                              24

1          went and registered the certificate between the date

2          the trial Court granted the summary disposition motion

3          and the order of dismissal.

4                    So, the motion had already been granted by

5          the Court, and they went to try to correct it before

6          the order -- before the case was officially dismissed.

7          The trial Court said, nice try, but it's been

8          dismissed.  You didn't have standing when the

9          complaint was filed.  And the appellate Court, in this

10         case it's published, said, they corrected the defect.

11         They corrected the defect before the dismissal.  They

12         got standing.  They can go ahead with the cause of

13         action.  And that's what the law is in Michigan.

14                   So, the assignment that we presented to you,

15         that you have as Exhibit B, the assignment I read a

16         little differently than Mr. Lippert, it says that --

17         and this is between Nu-Tech and RPT.  It says that at

18         the time of that asset purchase transaction back in

19         '99, neither one of us ever intended that any cause of

20         action was being transferred as part of that.  If

21         anybody wants to try and asks what the two parties

22         thought, that wasn't our intention.  But if this Court

23         somehow reads that document to say that is what

24         happened, we're giving it back to Nu-Tech.

25                   So, as I stand here in front of you, Your

                                  25

1          Honor, Nu-Tech possesses the cause of action.   They

2    have standing to pursue the claim.   And it -- and with

3    respect to the issue about Mr. Mailey and Mr. Cooper,

4    there is no question that Mr. Cooper is the 100

5    percent shareholder.

6               So that the Court is aware, you've heard

7    about Mr. Mailey and his affidavit, the reason he has

8    now turned on Mr. Cooper, it's a matter of public

9    record with this Court, there has been litigation

10   between these two gentlemen.   Mr. Cooper has a

11   judgment against Mr. Mailey for one half of a $1

12   million.   That's why Mr. Mailey now is not going to

13   cooperate with Nu-Tech, or with Mr. Cooper, or with

14   anything else that he is doing.   That is a matter of

15   public record.

16               And just -- I will just address -- so, I

17   think on its face this is a red herring.   We've got

18   the cause of action.   If the Court wanted to get into

19   the intent because it thought that the transaction

20   back in '99 was ambiguous, the reason why that

21   transaction I argue is ambiguous is because it says

22   that we're selling all of the assets, and it lists the

23   assets, and what it says is you get everything except

24   what is excluded.   Then you go down to what the

25   excluded assets are, and the excluded assets says the

26

1        things that are excluded are the things that aren't

2        specifically listed as assets in the agreement.

3                    So, so the two provisions point at another

4        without defining whether a cause of action is being

5        transferred.  When you look at the assets themselves,

6        they don't list causes of action.  They list other

7        things, but not that.

8                    So, I think the transaction on its face,

9        that transaction is ambiguous just because of the way

10       it is written.  You have both parties to the

11       transaction saying it was never our intent that the

12       cause of action was being transferred, and in the

13       event the Court thinks, well, no, I think the

14       agreement on its face it was, you now have the

15       assignment going back.

16                   So, I think the standing is a red herring.

17       Nu-Tech has standing as we sit here to proceed to

18       trial.

19                   Now, with respect to the contracts, and the

20       reason I wanted the blackboard is because I just want

21       the Court to understand the contracts and the one that

22       is at issue.  The first contract, which they attach to

23       their brief, is the one that was signed in November of

24       '97, and it's the 8C934.  That contract, if you look

25       on -- and the way you have to read this, Your Honor,

27

 1          if you look at the very -- first, in that looking on

 2          the first page, we know it's a requirements contract.

 3          That's a term of art legally.  And I will address that

 4          in a moment.  So, I'm not -- the fact that Mr.

 5          Blackburn may testify a certain way, or my client may

 6          testify as to what they think it is, that's a legal

 7          term of art, and it has legal connotations, regardless

 8          of what anybody else may think.  This is a

 9          requirements contract.  It's signed November 17th, '97,

10          that's on the first page.  You have to -- and at the

11          beginning it talks about the part number.  But the

12          important page, if you look, is the very last page of

13          this document.

14                 THE COURT: What exhibit are we dealing with?

15                 MR. SCHWARTZ:  This was attached to your

16          brief, Mr. Lippert.

17                 MR. LIPPERT: Plaintiff's -- excuse me,

18          Judge.  Defendant's Exhibit A.

19                 MR. SCHWARTZ:  Defendant's Exhibit A.  And I

20          have another copy if the Court doesn't have it in

21          front of it.

22                 If you turn to the very last page, it says

23          some important things.  It identifies the part number,

24          the 06 -- if you can look at the last four numbers,

25          the 0694, that's what Mr. Lippert and I have referred

1          to as the 0694.  You look under -- all the way down to

2          the date effectiveness, because this is when the

3          contract is going to run, and it makes it clear that

4          the contract starts from November of '97 and it

5          expires July 31st, 1998.  And it talks about a drawing

6          date number, the drawn was 3796.  So, that's the drawn

7          that was submitted that led to this requirements

8          contract.

9                    I think the evidence is clear, and I don't

10         think we're disputing this, that this was the first of

11         this type of contract between General Motors and Nu-

12         Tech.  It was a factory assist contract which we see

13         on the first page, and that is important.  It says on

14         it on the very first page, factory assist.  It's on

15         the second line right under -- right under where they

16         are adding this part number.  And the reason for that,

17         as Mr. Lippert I think accurately represents, is there

18         was -- GM was doing some of this in-house.  They

19         wanted Nu-Tech to help produce this part on their own,

20         because they were mentoring Nu-Tech, and I attached

21         that as exhibit, I think Exhibit D.  GM was trying to

22         grow this business.  Mr. Mailey is an African-

23         American.  He was a 51 percent owner.  Mr. Cooper was

24         a 49 percent owner.  Mr. Cooper owned another company

25         here in Flint, a company called Fabricating Engineers.

                              29

1        It was at one time one of the largest conveyor belt

2        manufacturer companies in the world.  GM was happy to

3        put these two gentlemen together.  They wanted to

4        increase their minority business.  And Nu-Tech, in

5        fact, did grow with GM's help.  At one point they were

6        up to about 70 to 75 employees.  So, they gave them

7        this part, a temporary part, that was the first

8        contract.

9             Then in March of 1998, this is an exhibit

10       Mr. Lippert has seen.  I did not attach this to my

11       brief, and I know it's been produced in this case.  I

12       would just like to approach the Court so you

13       understand the chronology of this.

14            With the contract expiring in July of 1988,

15       Nu-Tech submitted a quote for a number of parts.  I've

16       handed you this March 5th, 1998 letter.  The very first

17       part number is the 2560694, and again they are quoting

18       the price of $1.86, and different volumes they're

19       going to run -- that they would like to run if Delphi

20       would give them a contract.

21            What occurs next is the purchase order that

22       I think is at issue and will be an issue in front of

23       the jury in this case, Your Honor, and that is the

24       purchase order that is 9C941.  This is Exhibit A to

25       plaintiff's response brief, and when you compare it

30

1          with the prior one, you'll see the differences.   The

2          9C941, this is my Exhibit A, if you look at the first

3          page of it, Your Honor, it indicates that this is

4          issued June of 1998.  So, this is issued about a month

5          before the prior one expires, about two months after

6          you saw the quote.  It's called again a requirements

7          contract.  This is on page one, and again that is a

8          legal term of art under the UCC.  You will notice that

9          the factory assist language that we saw in the first

10         contract is now gone because GM had now made the

11         decision that we're going to let Nu-Tech manufacture

12         this part under a requirements contract, meaning they

13         are going to get all of the requirements that we have

14         for this part, Nu-Tech is going to manufacture it for

15         us.  That's what a requirements contract is.  And

16         again I'm going to talk about the law in a minute.

17              If you now -- that's on the first page.  Of

18         significance, Your Honor, if we now turn to last page,

19         similar to what we did before -- I'm sorry, the second

20         to the last page, the second to the last page, it

21         lists the different parts that are included as part of

22         this purchase order.  At the very bottom is the

23         25160694, that same part, and we can see it's the same

24         price.  But now you look at the effective date.  They

25         have now extended the contract beginning August 1st,

                                31

1          '98. So, this is a PO. Remember, the prior one ended

2          July 31st. So, now we're onto a new purchase order

3          that's going to begin the following day, August 1st,

4          1998, and it will expire July of 1999.

5                    And then next -- the very last category, the

6          drawing date is now 3/17/98, that is a week after the

7          quote that I handed you a minute ago, which shows you

8          the drawn was off of this quote that led to this

9          purchase order. So, we know it's not the same drawn

10         as the earlier one.

11                   This contract goes into effect. It goes

12         into effect we know in June of '98. This is right

13         before GM had a strike in the summer of 1998, and GM

14         as part of growing the business with Nu-Tech is giving

15         them this additional work. If you look at -- I gave

16         you, Your Honor, and I won't pull it out again --

17         Exhibit D, the mentoring arrangement. This is an

18         internal GM document that explains how they think Nu-

19         Tech is going to grow because they are giving them

20         this type of work, along with some other parts. It

21         wasn't just on this part. But this is the purchase

22         order that's in dispute.

23                   The next contractual thing that happens is

24         that GM spins off Delphi, and Delphi takes over

25         servicing this contract. I have, --- we have a -- the

                                   32

1          first amendment, and this is in attention again to Mr.

2          Lippert's brief and I don't have the exhibit in front

3          of me, it is the -- it's the amendment -- the first

4          amendment on August 1st.

5                    Do you remember which exhibit that is, Mr.

6          Lippert?

7                    MR. LIPPERT: A.

8                    MR. SCHWARTZ: A?

9                    MR. LIPPERT: Part of A.

10                   MR. SCHWARTZ:  Okay.  Part of A.

11                   If you look at that -- because it's

12         important that you understand that amendment.  All

13         right.  If you look in the upper -- if you look in the

14         upper right hand corner of this amendment, because the

15         question becomes is this amending this factory assist

16         one, or this amending the purchase order that's in

17         place?  That's where Mr. Lippert and I are disagreeing

18         with what we have submitted to you.  How you can tell

19         on the face of the document which one it is amending,

20         in the upper right hand corner, this amendment is

21         issued August 17th, 1998.

22                   THE COURT: What exhibit are we on now?

23                   MR. SCHWARTZ:  This is Mr. Lippert's Exhibit

24         A.

25                   MR. LIPPERT: Judge, I confused things I'm

33

1       afraid a little bit.  I should have put A1, A2, A3.

2                    I put the series of contracts that relate to

3       that part.  All of it is Exhibit A, along with the

4       terms and conditions.  So, you will find the order

5       there -- the purchase order -- the GM purchase order,

6       and then the Delphi amendments, and then the last item

7       is the terms and conditions which would amend

8       applicable to the amendment issued after September of

9       1999.

10                   MR. SCHWARTZ:  Do you want another copy of

11      it?

12                   LAW CLERK:  You might want to approach just

13      to make sure that you're looking at the same thing

14      he's looking at.

15                   MR. SCHWARTZ:  Okay.  It's marked August

16      17th, of '98.  Mr. Lippert can show him.  It should be

17      the one dated August 17th.

18                   MR. LIPPERT:  (Inaudible).  Then I put a

19      piece of paper in.  That's the first one, then they

20      sort of follow.

21                   MR. SCHWARTZ:  Yes.  That's the one I'm now

22      talking about.

23                   MR. LIPPERT:  Then that's two pages, and then

24      the next amendment is down --

25                   MR. SCHWARTZ:  Yeah.  I'm going to talk

34

1          about two amendments, Judge, and I think they're both

2          in order.  I think Mr. Lippert is correct.

3                      This first amendment, Your Honor, if you

4          look in the upper right hand corner -- I hope it

5          printed out in yours like what I have -- it shows that

6          this amendment was issued on August 17th, '98.  Now, if

7          you look at these contracts, Your Honor, the only

8          contract that is in play at that point is the 9C941.

9          The prior one had expired July 31st.  There is nothing

10         to extend at that point.  There is nothing to change

11         at that point because that one is already done.

12                     So, it's issued August 17th, 1998.  And all

13         this amendment did, Your Honor, was change this from

14         GM to Delphi.  And how we know that this isn't an

15         extension of the first contract, the way Delphi is

16         suggesting, if you look under the amendment reason,

17         Your Honor, they list on this amendment that the

18         reason this is a new contract line item.  It doesn't

19         say it's extended anything, or nothing like that, and

20         I'll show you why that -- why that makes a difference

21         in a moment.  If you also see the amendment number in

22         the upper right hand corner underneath the date, it's

23         amendment number 000, because it's not amending

24         anything.  It's just putting this on Delphi paper.

25         That's my suggestion, and I think that's a fair

1          reading of this document.

2                    If we now turn -- and this is for the 0694

3          part, and all of the other -- everything else stays

4          the same.  There's nothing else different from the

5          9C941.  That's the first amendment.  And it mirrors

6          the date of contract, August 1st, of '98 through July

7          31st, 1989.

8                    If we then turn to the second amendment,

9          Your Honor, which I think is the next one in Mr.

10         Lippert's package, what I think is of most

11         significance -- if you look at the amendment reason

12         for the second amendment, amendment number two, it

13         says expiration date extended.

14                    So, unlike the first amendment, this one

15         explains what it is doing.  We are now extending the

16         expiration date.  If amendment one was extending the

17         factory assist contract, it would have said that, at

18         least if we're going to take Delphi at their word of

19         how they draft contracts.  This is their form

20         contract.  We didn't draft this.  What this contract

21         did, Your Honor, it extended the expiration date, this

22         amendment now until December 31st, 2000.

23                    So, unlike the prior one which just mirrored

24         the 9C941 that is at issue, it's now extended it from

25         August 1st, '98 through December of 2000.  They

36

1          extended it for another year and a half.  And this one

2          was issued in May of 1999.

3                    The last thing I'll say about this, and then

4          I will go back into my brief is at the time they

5          issued this one, Your Honor, this is May of 1999, this

6          is after they pulled their tools, they being Delphi,

7          and started causing all of this catastrophic harm to

8          Nu-Tech.  Our promissory estoppel claim is you told us

9          to stay afloat, to keep up all of this overhead

10         because you're sending another part, you were either

11         going to give us back this one, or another part,

12         that's what Mr. Cooper testified to.  We tried to stay

13         afloat.  You are our mentor.  You're telling us that.

14         And, in fact, you're giving us a contract -- you are

15         extending our contract another year.  You are staying

16         contractually obligated to us on this contract that

17         was really what was keeping our business going and

18         growing our business.  This is independent proof of

19         the promissory estoppel of what we're being told in

20         May of 1999.

21                   So, these are the contracts at issue, Your

22         Honor.  I think it's clear, if you look at the

23         contracts.  The purchase order 9C941, that's the

24         contract that we're alleging was breached.  It's not

25         the factory assist contract.  And then it's amended.

37

1              Now, what does a requirement contract mean?

2        Mr. Lippert suggests that that just means we will give

3        you what we want to give you, something to that

4        effect, and I'm not quoting him as eloquently as he

5        speaks.  But the -- a requirements contract, Your

6        Honor, is defined by the UCC, and I presented to you

7        case law that explains what it is.  And this is the

8        Tigg (phonetic) case that I attached, 962 F 2ND 1119,

9        and I think that's important, Your Honor, because that

10       case dealt with jury instructions.  When dealing with

11       a requirements contract, there's an argument over the

12       type of jury instruction that was read to the jury --

13       that was given to the jury.

14              MCL 440.2306 states, that's the law on

15       requirements contract, that the seller, meaning Nu-

16       Tech, must satisfy the buyer's actual requirements as

17       they occur in good faith.  The other thing that we

18       know, Your Honor, and I won't go back to it, but if

19       you look again at the 9C941, the last page, there is a

20       column that talks about what percent of the business

21       of GM's we are going to do for this part, and on that

22       page it says we are being given 100 percent of their

23       business for that part.

24              The reason why I think that is significant,

25       Your Honor, I also cited you the Advanced Plastics

38

```
 1          case, another case talking about requirements
 2          contract.  That case explains that you can have
 3          nonexclusive requirements contracts.  There are
 4          certain types of language that you need to include in
 5          your contract if you want to make it nonexclusive, but
 6          they potentially exist.  That's not -- we don't have
 7          that case here.
 8                    We have a requirements contract for 100
 9          percent of the business.  So, what that means to the
10          seller, like Nu-Tech, is you must be prepared to
11          handle 100 percent of GM and Delphi's production needs
12          for that part.  We know in this case factually, and I
13          don't think it's in dispute, that we were producing
14          100 percent up until the time in late 1998, early 1999
15          -- GM settles their strike, and as part of their
16          strike, they decide, we're taking our tools back from
17          Nu-Tech and we're going to deal with this part in-
18          house.
19                    They are not suggesting to you, Your Honor,
20          that they didn't need to produce this part anymore.
21          They're not suggesting to you that they went out to
22          some other source to have the part manufactured
23          because that isn't the case.  They continue to
24          manufacture the part.  They did it in-house.  But
25          under MCL 440.2306, they can't do that.  That's what
```

39

1        requirements contracts are.  And they're harsh

2        contracts for sellers like my client, because they've

3        got to be prepared to meet 100 percent of the needs as

4        they are notified of it, and that's what didn't happen

5        here.

6               In reading Mr. Lippert's reply brief, I

7        really think Your Honor can grant partial summary

8        disposition to Nu-Tech on liability on its breach of

9        contract claim under 2.116(I)(2), because Mr. Lippert

10       concedes that had Delphi wanted to terminate the 9C941

11       contract, they had to do it in writing.  He concedes

12       they didn't do that in writing.  There is no argument

13       that the parts were not being -- became produced in-

14       house and not at Nu-Tech.  That's a breach of a

15       requirements contract.  Period.

16               We differ on the damages significantly, and

17       I don't think you could rule on that.  But I think

18       based on his reply brief and the documents you've been

19       given -- I heard Mr. Lippert say we don't have

20       affidavits.  You've got these documents.  This is the

21       evidence, and that's what we're required to give to

22       you under MCR 2.116(C)(10) legally.  Legally, I think

23       you can enter a motion for partial summary disposition

24       on the breach of contract claim as to liability

25       against GM and Delphi because they broke the

1      requirements contract clearly.  I don't think there is

2      any issue of fact as to that.

3              The Tigg case also says, Your Honor, that if

4      you want to breach, you have to do it in good faith,

5      which is a jury question.  And GM just says we did it

6      to do want we wanted to do internally to deal with our

7      labor issues in settling the strike.  That's the

8      contract claim that we have, Your Honor.  And, you

9      know, we may differ as to damages.  And Mr. Lippert

10     argued in his brief, well, we later went and we sold

11     our company to RPT afterwards in December of '99.

12     That's all true, because after they broke the

13     contract, they told us -- and this gets into the

14     promissory estoppel -- they told Mr. Cooper, hey,

15     we're going to get your replacement part.  We're your

16     mentor.  We know what we did.  We're going to get you

17     a different part.  Keep the operations going.  My

18     client did.

19              You see in May of 1999 they issued a second

20     amendment to the 0694 contract, extending it another

21     year, the requirements contract, meaning, you better

22     be able to deal with all of our -- 100 percent of our

23     volume.  We did.  By September -- and in 1998, Your

24     Honor, I produced to you our tax returns.  We made a

25     half of a million dollars in profit in that year, the

41

1       year that we had this contract in place, in 1998.  You

2       have that as one of our exhibits.

3               By 19 -- once they pull these tools, they

4       killed the business.  And Delphi knew they killed the

5       business, and by that I mean -- I attached, Your

6       Honor, as my Exhibit G, internal memoranda that Delphi

7       produced in September -- well, let me back up of what

8       happened here.

9               September of 1999, Delphi sees that Nu-Tech

10      is in trouble and Nu-Tech is not going to make it as a

11      (inaudible).  They bring in a company, BBK, to see if

12      they can solve the issues, so at least Delphi and GM

13      aren't hurt.  They help facilitate our fire sale of

14      our assets.  But in looking at their internal

15      memoranda,  they admit that what was catastrophic to

16      my client's company was when they broke this contract,

17      when they decided to bring the tools in-house.

18      Catastrophic, their words.  They were aware.  Delphi's

19      legal referenced in one of their memos, well, we

20      haven't heard yet whether they're going to sue us, and

21      that's Mr. Schwartz's words, paraphrasing.  They knew

22      this was a legal -- potential legal problem for what

23      they did, and that's also attached as my Exhibit G.

24              THE COURT: When did they do that?

25              MR. SCHWARTZ:  They took -- there was two --

42

1          what happened, Your Honor, when they first gave us the
2          factory assist, they gave us two of their tools.  They
3          put it into our plant.  And I have both of the
4          consignment orders.  One came in December of '97 and
5          one I think was January of '98, or maybe it was
6          November of '97 and December, about a month apart.
7          They put two tools in our plant, and we started
8          churning out the 0694.
9                    After they settle the strike, in August,
10         September of '98, as part of the settlement they
11         decide we're taking the tools back, and we're going to
12         produce this part in-house, and I don't think there's
13         a dispute that that's what happened.  They took the
14         first tool back in either September or October of '98.
15         And if you look at our production numbers, they got
16         cut in half.  The second tool they take back in
17         January of 1999, and that's when we're no longer
18         producing 0694.  At that point we're told we're going
19         to get a replacement part, or in May of 1999 they
20         extend the contract.  We're told maybe you're going to
21         get the part back.  Keep up your overhead.  Keep up
22         your 70 employees, and all this plant space that
23         you've taken on, all of the new equipment you bought.
24         That's factually what happened.  And once those tools
25         were gone, we couldn't manufacture the part anymore,

43

1        and they didn't give us any -- they didn't give us any

2        more orders.

3               As it relates to the promissory estoppel

4        claim, Your Honor, this is where I differ from Mr.

5        Lippert.  There is a difference between a fraud claim

6        and a promissory estoppel claim.  Fraud means that I

7        know a current fact, and I lied to you about that

8        current fact, and you relied upon that lie to your

9        detriment.  That's a fraudulent misrepresentation

10       claim.  That's not what we pled in the complaint.

11              The complaint was promissory estoppel.  If

12       Delphi was -- or didn't understand our claim -- I

13       think your question from the bench was about this C8,

14       and Mr. Lippert suggested he just didn't understand

15       it.  They have a very easy remedy under the court

16       rules, you file a motion for a definite statement if

17       you don't understand it.  We list -- I mean, we

18       labeled what the claim was, and I think we've clearly

19       pled promissory estoppel on its -- according to what

20       we need to, as far as the elements go.

21              THE COURT: Point me to the elements in count

22       two.

23              MR. SCHWARTZ:  I do not have my complaint in

24       front of me.

25              MR. LIPPERT: I can give you one.

44

1            (Inaudible).

2                       MR. SCHWARTZ: You know, wait a second.  Wait

3            a second.  I do have it.  I do have it.  I have my

4            trial book.  I'm looking at my exhibits.  Let me just

5            see -- okay.  I do have it, Your Honor.

6                       MR. LIPPERT: You've got it?

7                       MR. SCHWARTZ:  Yeah.

8                       These were misrepresentations that they made

9            --

10                      MR. LIPPERT: Just a minute.  Just a minute.

11           Do you want me to pull mine out, Judge?

12                      MR. SCHWARTZ:  I'm sorry.

13                      THE COURT: No.  I have it.

14                      MR. LIPPERT: I beg your pardon?

15                      THE COURT: I have -- I'm looking at the

16           complaint.

17                      MR. LIPPERT:  I see.

18                      MR. SCHWARTZ: Okay.

19                      THE COURT: Count two.

20                      MR. SCHWARTZ:  Correct.

21                      In paragraph 12 we talked about -- we

22           identify the promises that were given to us, the

23           current promises of what we needed to do because of

24           them taking back the tool.  We indicated that we think

25           that they were false, or at least they were made

                              45

1    recklessly with the intent that we should rely on it.

2    We did rely on it, in paragraph 14, and we suffered

3    damages because of it.

4         Under the Schmidt case that I cited in my

5    brief, those are the elements for promissory estoppel.

6    A promise -- that a promise (inaudible) should have

7    reasonably been expected to induce action, which, in

8    fact, produced reliance, which led to damages.

9         So, I believe it's pled in the complaint.

10   It was -- we've gone through discovery.  Mr. Lippert

11   has taken discovery on this issue.  We've presented

12   evidence that supports that, if you look at the -- if

13   you look at the facts in the light most favorable to

14   us, i.e. Mr. Cooper's testimony, the amendment that

15   happened in 1999, you've got evidence of the promise,

16   what we did in reliance upon the promise, and the harm

17   that we have suffered.

18        I think all of those facts are in front of

19   you, all the evidence is in front of you.  We've pled

20   it.  We've gone through discovery on it, and the

21   evidence is in front of you.  If the Court thought the

22   way that it is pled is not clear enough, you can -- I

23   don't have my court rules in front of me -- the

24   pleadings are -- can be amended to conform to the

25   evidence at any time, even if the case is submitted to

46

1        the jury.  Again, I don't have the court rule in front

2        of me, but I know there's a rule that states that the

3        evidence that is presented -- the pleadings can be

4        modified to conform to the evidence that has been

5        presented.  This issue -- this case is three years

6        old, Your Honor, and we've been in front of you ready

7        for trial twice.  This isn't anything knew.  This

8        isn't any surprise.  Mr. Lippert's done his discovery

9        on these claims.  He asked the plaintiffs point blank,

10       that's why you've got the deposition testimony of Mr.

11       Cooper.  And I believe that claim has been pled.

12             THE COURT: Okay.

13             MR. SCHWARTZ:  The damages are a little bit

14       different than the contract.

15             That was the other thing they argued in the

16       brief, that we're just being duplicative, and it's

17       not, Your Honor.  These are two separate things that

18       we're arguing.  The contract breach is 9C941.  The

19       promissory estoppel is what happens after they

20       breached that caused this additional harm.

21             THE COURT: Thank you, Mr. Schwartz.

22             MR. SCHWARTZ:  Thank you, Your Honor.

23             MR. LIPPERT: Mr. Schwartz has given you

24       plaintiff's Exhibit 5, the March 8th letter.  There is

25       no follow up to that, Judge.  As to whether Delphi

 1      received it, acted on it, issued an order respecting

 2      that document.  So, I don't know why it's before the

 3      Court.  But it can't lead us in any direction, I would

 4      submit.

 5                  Secondly, Your Honor, Mr. Schwartz says that

 6      my motion with respect to Nu-Tech not being the proper

 7      party does not have legal standing, is inappropriately

 8      brought, that I should have brought it under another

 9      section that says that the party -- excuse me -- is

10      not the proper party in interest is how I brought it.

11      That's a bit confusing, Judge.  Before I filed the

12      motion, I did the research that deals with that

13      subject, and when company -- or excuse me -- if a

14      lawsuit is brought by a person on behalf of a minor

15      and does not have that representative capacity

16      established in law, they do not have legal standing to

17      bring the claim.

18                  The two cases cited by Mr. Schwartz have to

19      do -- the one with a corporation, that it was not in

20      existence, and, because it was not in existence, did

21      not have -- did not become a legal person, therefore

22      could not bring a lawsuit.  However, the cases -- and,

23      unfortunately, I did not foresee this issue, Judge, or

24      I would have brought the cases, make a very clear

25      distinction that the kind of motion that I have filed

48

1        is that they are not a proper party in interest.   It

2        doesn't have to do with Nu-tech not being a

3        corporation.

4                Interestingly, Judge, right at this time,

5        Nu-Tech is not in good standing in the State of

6        Michigan.  So, the case that's cited by Mr. Schwartz,

7        if Nu-Tech had been disenfranchised, then, of course,

8        I would base my motion upon that it does not have

9        legal standing to bring it.  When I checked this week

10       to see what their standing was with the Michigan

11       Corporation Security Commission, they haven't been in

12       good standing now for a year.  However, that does not

13       preclude it from maintaining an action, or it does not

14       preclude it from being sued, if it ought to be sued as

15       a defendant.

16               So, if there is any thought given by the

17       Court for finding that I have not cited the proper

18       court rule for bringing that motion, I would ask that

19       I be given a short opportunity, Judge, next week to

20       give you those cases that I have on my desk.

21               THE COURT: Mr. Lippert, did General Motors

22       breach the requirements contract?

23               MR. LIPPERT: No, sir.

24               He would like you to believe that the

25       requirements contract means that you will buy 100

                                49

1          percent of our capacity, or everything you need.   I

2          will give you a simple example, Judge.   I run a

3          trucking company, and I'm going to do cross country

4          trucking, and I'm going to do north to south trucking.

5          So, I go and -- I have 10 trucks.   So, I go to fuel

6          suppliers across the country, and I say to those fuel

7          suppliers, I have 10 trucks.   They all use 1000

8          gallons, or 500 gallons of gasoline.   It doesn't

9          matter.   So, I say they may stop at your truck stop on

10         a given day, they may come one at a time or they may

11         come 10 at a time.   I want to know that you have the

12         capacity to meet my requirements to fill those trucks

13         if we stop, and, if we do, we will pay you a $1.86 a

14         gallon.   And the trunk stop says we can't do that, or

15         they say, yes, we can do that.   Then I give them a

16         requirements contract.

17               Now, it's undisputed in this case, Judge, if

18         there is ambiguity, and Mr. Schwartz seems to be

19         raising the ambiguity now that he wants to avoid -- if

20         there is ambiguity, Judge, read what Mr. Blackburn

21         said.

22               THE COURT: I'm not following what you said,

23         or what you are saying.   Are you --

24               MR. LIPPERT: Yes.

25               THE COURT: -- let's forget the

                               50

1          hypotheticals.    And let's deal with the facts in this

2          case.

3                    MR. LIPPERT: Okay.

4                    THE COURT: Did you -- did General Motors

5          give Nu-Tech all of the business?

6                    MR. LIPPERT: No.  They were making them in-

7          house too, Judge.  They had three sets of tools, and

8          they put two sets of tools over at Nu-Tech at

9          different times.

10                   THE COURT: Now, are you saying that that was

11         the circumstance when they entered into this contract

12         for November, '97?

13                   MR. LIPPERT: Yes, sir.  They had three sets

14         of tools.

15                   THE COURT: So, throughout all of the dates

16         that pertain here, do I understand that General Motors

17         was producing some of these parts, as well as Nu-Tech?

18                   MR. LIPPERT: They may have, Judge, or they

19         may not have been.  It depended upon what their needs

20         were, what the requirements were.  If they couldn't

21         get enough parts from Nu-Tech with their capacity that

22         was specified, they had the right -- excuse me -- to

23         make those parts in-house, or they had the right to

24         put the tooling down the street, if they wanted to do

25         so.

1          THE COURT: So, why did they call it a

2     requirements contract?

3          MR. LIPPERT: It's a term of art used, Judge,

4     to say that these are our requirements.  This is how

5     many parts we need.  We need from you possibly up to

6     16,000 parts a day.  Do you have the capacity?  And

7     Nu-Tech says, yes, we have the capacity.  So, they

8     issue a purchase order, or an amendment saying you may

9     be called upon to produce 16,000 parts.  But as Mr.

10    Blackburn says and as Mr. Mailey says in his

11    affidavit, both of which are unanswered by anybody

12    except Mr. Schwartz, Judge, both of those people, both

13    of those witnesses under oath have said it means they

14    get what they want against a release, depending upon

15    their business needs, and it can be 10, it can be

16    none, or it could be 10,000.  That's undisputed,

17    Judge, except by Mr. Schwartz.

18          Now --

19          THE COURT: Gentlemen, thank you.  I'm going

20    to leave the bench here for a few minutes, and I will

21    be back either with a decision or some direction, one

22    or the other.

23          MR. LIPPERT: Thank you, sir.

24          THE CLERK: All rise.

25          (At 11:08 a.m., court recessed)

52

1          (At 11:28 a.m., court reconvened)

2                    THE COURT: Mr. Lippert, I have another

3     question for you.  I'm looking at plaintiff's Exhibit

4     A, I'm sure it's in yours as well, which is the

5     purchase order for 9C941.

6                    MR. LIPPERT: Yes, sir.

7                    THE COURT: And on the first page, it's

8     titled requirements contract.  See where I'm

9     referring?

10                   MR. LIPPERT: Yes.

11                   THE COURT: Then go to the last two pages of

12    the purchase order, and right in the middle, where it

13    says approximate percentage of business, and there is

14    a column that shows 100 percent for these items.

15                   MR. LIPPERT: Yes.

16                   THE COURT: Now, tell me what that means in

17    the context of your argument.

18                   MR. LIPPERT: It means this, Judge, that

19    that's -- the 8C934, Exhibit A, is the factory assist.

20    You have to read the first page.  Can I come up and

21    show you?

22                   THE COURT: Well, let's talk about it in the

23    context of --

24                   MR. LIPPERT:  Of the 100 percent?

25                   THE COURT:  The plaintiff says we made a

53

1    deal that General Motors was going to buy everything

2    from us. You're saying, well, no, that's not true.

3    We had some tooling and we're -- General Motors may be

4    doing this along with you. How do you reconcile that

5    with this contract language?

6                    MR. LIPPERT: It's 100 percent of what they

7    need on a factory assist basis, as Mr. Blackburn says

8    and Mr. Mailey says in their depositions, Judge -- or

9    in their sworn testimony, 100 percent.

10                    And the only thing contradicting that, as I

11    said before, is Mr. Schwartz, who would like you to

12    believe that that means we will buy 100 percent of

13    your production, and that's not what it means.

14                    Judge, if General Motors didn't have

15    customers buying those parts that are incorporated in

16    with the other product, they wouldn't need anything,

17    and that's why they write them as requirements. We

18    will buy our -- what we require, or our production

19    needs on a factory assist basis.

20                    THE COURT: Okay.

21                    I'm --

22                    MR. LIPPERT: I was fearful, Judge, that

23    there might be confusion about that. That's why I

24    have Mr. Blackburn's testimony and Mr. Mailey's

25    testimony, which Mr. Schwartz says, please, ignore,

54

1     because these are unambiguous.  Well, we seem to be

2     struggling with them.

3              So, as I put in my brief, I'm saying they're

4     saying what I believe they say on their face, and that

5     seems to be in dispute here.

6              THE COURT: Well, I'm prepared to make some

7     decisions here.

8              First of all, I'm going to address the

9     defendant's motion for summary disposition pursuant to

10    MCR 2.116(C)(8), that motion tests the sufficiency of

11    the pleadings, and in that context the Court looks

12    exclusively at the plaintiff's complaint.  And the

13    complaint is very brief, to the point, and I find it

14    alleges a cause of action for breach of contract, as

15    well as a cause of action for promissory estoppel.

16    And the Court relies on Schmidt versus Bretzlaff, 208

17    Mich App 376, to establish the elements of promissory

18    estoppel.

19             In referencing plaintiff's Exhibit A, which

20    is the purchase order 9C941, which labels this a

21    requirements contract, references a purchase order to

22    supply 100 percent of the business, I find that, at

23    worst, the plaintiff has established a genuine issue

24    of fact, at best, plaintiff may be entitled to summary

25    disposition on the issue of liability, and, frankly, I

1   have a little trouble with understanding the concept

2   of a "requirements" contract which doesn't mean that

3   you provide 100 percent of the product.

4          So, what I'm going to do at this point is

5   I'm going to give Mr. Lippert and the defendants an

6   opportunity to provide a supplemental memorandum or

7   brief to the Court with the exhibits attached that

8   create a genuine issue of fact here.  In other words,

9   to persuade the Court as to why summary disposition

10   should not enter in favor of plaintiff pursuant to

11   2.116(I)(2).

12          And, Mr. Lippert, how much time do you need

13   to do that?

14          MR. LIPPERT: Could I have 10 days, Judge?

15          THE COURT: Certainly.

16          MR. LIPPERT: I'm going away for the weekend.

17          THE COURT: Well, why don't you make it easy

18   on yourself?  Let's -- how is two weeks?

19          MR. LIPPERT: Two weeks?  That would be

20   great.

21          MR. SCHWARTZ:  Do we have a chance to reply

22   at all or (inaudible)?

23          THE COURT: No, I'm --

24          MR. SCHWARTZ:  You'll notify us if you want

25   us to respond to it?

1          THE COURT: I will notify you if I want

2     further argument.

3          At this point, your respective 10 minute

4     arguments, which expanded into over an hour, and these

5     materials, convinced me that I've got everything that

6     there is on this subject.  And I think -- well, I will

7     ask Mr. Lippert to submit an order that denies the

8     motion for summary disposition pursuant to (8),  that

9     denies the motion for summary disposition pursuant to

10    (10), and I am going to defer ruling at this point on

11    summary disposition for plaintiffs pursuant to

12    116(I)(2).

13         Thank you, gentlemen.  The Court is in

14    recess.

15         MR. LIPPERT: Judge, on the other issues that

16    were raised, are you deferring ruling on those also?

17         THE COURT: Pardon me?

18         MR. LIPPERT: I say on the other issues, the

19    causes of actions, (inaudible)?

20         THE COURT: The standing, the transfer --

21         MR. LIPPERT: You are deferring on that,

22    Judge?

23         THE COURT: No.  I'm denying those motions --

24         MR. SCHWARTZ:  Thank, Your Honor.

25         THE COURT: -- on the legal authority that

                           57

1          was cited by the plaintiff.

2                    MR. LIPPERT: May I submit, Judge, a

3          supplemental on that issue?  A brief?

4                    THE COURT: All I want is the liability

5          issue.

6                    MR. SCHWARTZ:  Thank you, Your Honor.

7                    (At 11:39 a.m., proceedings concluded)

8          Tape No. 03/24/05   11:39 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7            STATE OF MICHIGAN      )
 8            COUNTY OF GENESEE      )
 9
10            I, Shelie Robinson, do hereby certify that this
11      transcript, consisting of 59 pages, is a complete,
12      true and correct transcript to the best of my ability
13      of the videotaped proceedings taken in this case on
14      Thursday, March 24, 2005, before the Honorable Robert
15      M. Ransom, Circuit Judge.
16
17      May 25, 2005
18                               SHELIE ROBINSON CER 6913
19                               Circuit Courthouse
20                               900 S. Saginaw Street
21                               Flint, Michigan 48502
22                               (810) 424-4454
23
24
25
```