# EXHIBIT I

# Delphi Corp · 10-K · For 12/31/98

**Filed On 3/17/99  ·  SEC File 1-14787  ·  Accession Number 1072342-99-6**

[Find]   [                    ] in [this filing.  ▼] Show [docs searched ▼] and [every "hit".  ▼]

Help...  *Wildcards:* **?** (any letter), ***** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere)
"(&)" (near

| As Of | Filer | Filing | On/For/As | Docs |
|-------|-------|--------|-----------|------|
| 3/17/99 | Delphi Corp | 10-K | 12/31/98 | 8:. |

## Annual Report  ·  Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | P. |
|------------------|-------------|-----|
| 1: 10-K | Year-End Report | |
| 2: EX-4 | Instruments Defining Rights of Security Holders | |
| 3: EX-10 | Material Contracts | |
| 4: EX-10 | Material Contracts | |
| 5: EX-12 | Statement Re: Computation of Ratios | |
| 6: EX-21 | Subsidiaries of the Registrant | |
| 7: EX-23 | Consents of Experts and Counsel | |
| 8: EX-27 | Financial Data Schedule 1998 | |

## 10-K  ·  Year-End Report
### Document Table of Contents

| *Page* | (sequential) | (alphabetic) | Top |
|--------|--------------|--------------|-----|
| 1 | 1st Page | • Alternative Formats (RTF, XML, et al.) | |
| 2 | Item 1. Business | • Aftermarket | |
| " | VMs | • Aftermarket Sales | |
| " | Strategy | • Ancillary Agreements | |
| " | Improve Operating Performance | • Annual Incentive Plan | |
| " | Intellectual Property | • Arrangements between GM and Delphi | |
| " | Electronics & Mobile Communication | | |
| " | Safety, Thermal & Electrical | | |

Architecture
" Dynamics & Propulsion
" Customers
" Total Sales
" Awarded Business
" Supply Agreement
" Aftermarket
" Arrangements between GM and
   Delphi
" Separation Agreement
" Ancillary Agreements
" IPO and Distribution Agreement
" Cooperation on Tax Matters
" Registration Rights Agreement
" Use of GM's Tooling
" Aftermarket Sales
" Employee Matters
" Employee benefits
" Real Estate and Environmental
" Warranty Matters
" International Agreements
" Item 2. Properties
" Item 3. Legal Proceedings
" Item 4. Submission of Matters to a
   Vote of Security Holders
" Item 5. Market for Registrant's
   Common Equity and Related
   Stockholder Matters
" Item 6. Selected Financial Data
" Item 7. Management's Discussion and
   Analysis of Financial Condition and
   Results of Operations
" Separation
" Results of Operations
" Special Items and Work Stoppages
" 1998
" 1997
" 1996
" Net sales
" Operating (loss)income
" Interest expense
" Other income, net
" Net (loss) income

• Awarded Business
• Business
• Cash Flows
• Change in Control Agreements
• Changes in and Disagreements with
  Accountants on Accounting and
  Financial Disclosure
• Classified Plan
• Cooperation on Tax Matters
• Customers
• Deferred income taxes
• Delphi
• Dynamics & Propulsion
• Electronics & Mobile
  Communication
• Employee benefits
• Employee Matters
• Equity (deficit)
• Executive Compensation
• Exercises of Stock Options
• EXHIBITS, FINANCIAL
  STATEMENT SCHEDULES, AND
  REPORTS ON FORM 8-K Page No
• Extension of Payment Terms
• Financial Statements
• Founders Grants
• Grants of Stock Options
• Improve Operating Performance
• Incentive Plans
• Intellectual Property
• Interest expense
• International Agreements
• Investing Activities
• IPO and Distribution Agreement
• Legal Proceedings
• Liquidity and Capital Resources
• Long Term Incentive Plan Awards
• Management
• Management's Discussion and
  Analysis of Financial Condition and
  Results of Operations
• Market for Registrant's Common
  Equity and Related Stockholder
  Matters

05-44481-rdd    Doc 11757-9    Filed 01/07/08    Entered 01/07/08 20:33:17    Exhibit I
Page 3 of 160

"  Net income
"  Liquidity and Capital Resources
"  Extension of Payment Terms
"  Cash Flows
"  Investing Activities
"  Our Other Postretirement Employee
   Benefits and Underfunded Pension
   Obligations
"  Deferred income taxes
"  Item 7a. Quantitative and Qualitative
   Disclosures About Market Risks
"  Item 8. Financial Statements
"  Equity (deficit)
"  Item 9. Changes in and Disagreements
   with Accountants on Accounting and
   Financial Disclosure
"  Items 10 Through 13. Management
"  Delphi
"  Executive Compensation
"  Grants of Stock Options
"  Exercises of Stock Options
"  Long Term Incentive Plan Awards
"  Change in Control Agreements
"  Incentive Plans
"  Founders Grants
"  Substitute Awards
"  Stock Incentive Plan
"  Annual Incentive Plan
"  Performance Achievement Plan
"  Classified Plan
"  Item 14. EXHIBITS, FINANCIAL
   STATEMENT SCHEDULES, AND
   REPORTS ON FORM 8-K Page No

• Net income
• Net (loss) income
• Net sales
• Operating (loss)income
• Other income, net
• Our Other Postretirement Employee
  Benefits and Underfunded Pension
  Obligations
• Performance Achievement Plan
• Properties
• Quantitative and Qualitative
  Disclosures About Market Risks
• Real Estate and Environmental
• Registration Rights Agreement
• Results of Operations
• Safety, Thermal & Electrical
  Architecture
• Selected Financial Data
• Separation
• Separation Agreement
• Special Items and Work Stoppages
• Stock Incentive Plan
• Strategy
• Submission of Matters to a Vote of
  Security Holders
• Substitute Awards
• Supply Agreement
• Total Sales
• Use of GM's Tooling
• VMs
• Warranty Matters
• 1996
• 1997
• 1998

| 10-K | 1st "Page" of 2 | TOC | Top | Previous | Next | Bottom | Just 1st |
|------|------------------|-----|-----|----------|------|--------|----------|

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549-1004

### FORM 10-K

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURITIES
ACT OF 1934

For the fiscal year ended December 31, 1998

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (D) OF THE SECURIT
EXCHANGE ACT OF 1934

For the transition period from _____ to _____ .

Commission file No. 1-14787

### DELPHI AUTOMOTIVE SYSTEMS CORPORATION
(Exact name of registrant as specified in its charter)

Delaware                                    38-3430473
(state or other jurisdiction of            (IRS employer
incorporation or organization)             identification number

5725 Delphi Drive, Troy, Michigan          48098
(address of principal executive offices)   (zip code)

Registrant's telephone number, including area code (248) 813-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of each exchange on which regis |
|---------------------|--------------------------------------|
| Common Stock, $0.01 par value per share | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed
required to be filed by Section 13 or 15(d) of the Securities and E
of 1934 during the preceding 12 months (or for such shorter peri
registrant was required to file such reports), and (2) has been subj
filing requirements for the past 90 days. Yes___. No__X__. We became
such filing requirements on February 4, 1999 and have filed all requi
since that date.

Indicate by check mark if disclosure of delinquent filers pursuant

of Regulation S-K is not contained  herein,  and will not be contain·
best of registrant's  knowledge,  in definitive proxy or information
incorporated by reference in Part III of this Form 10-K or any amendm·
Form 10-K. [ ]

As of March 1, 1999, the aggregate market value of the registran·
Stock,  par value $ 0.01 per share,  held by nonaffliates of the req
about $1.9  billion.  The closing  price of the Common Stock on March
reported  on the New York Stock  Exchange  was $18.69 per share.  As ·
1999,  the number of shares  outstanding  of the registrant's  Commo:
565 million shares.

1

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

### INDEX AND CROSS REFERENCE

Part I

Item 1.  Business                                                        3

Item 2.  Properties                                                      3

Item 3.  Legal Proceedings                                               3

Item 4.  Submission of Matters to a Vote of Security Holders             3

Part II

Item 5.  Market for Registrant's Common Equity and Related
         Stockholder Matters                                             3

Item 6.  Selected Financial Data                                         4

Item 7.  Management's Discussion and Analysis of Financial
         Condition and Results of Operations                            4.

Item 7a. Quantitative and Qualitative Disclosures About
         Market Risks                                                    5

Item 8.  Financial Statements                                            5

Item 9.  Changes in and Disagreements with Accountants on
         Accounting and Financial Disclosure

Part III

Items 10. Management: Includes Directors, Executive Officers and Ke·

- 13.    Employees of Delphi, Executive Compensation, Security
         Ownership and Certain Relationships and Related
         Transactions                                              8

                               Part IV

   Item 14.  Exhibits, Financial Statement Schedule, and Reports
             on Form 8-K

                               2

| 10-K | Last "Page" of 2 | TOC | 1st | Previous | Next | Bottom | Just 2nd |

**PART I**

### DELPHI AUTOMOTIVE SYSTEMS CORPORATION

**ITEM 1.    Business**

History of Delphi. Delphi Automotive Systems Corporation ("D incorporated in Delaware in late 1998. Before 1991, our business wa by many separate automotive parts operations which General Motors ("GM" or "General Motors") had acquired over time. These opera generally managed independently from each other within the GM organi 1991, General Motors organized its components businesses into the Components Group. GM's stated objective was to improve the competit these operations and then, based on this improved competitive positio: its business through penetration of new markets. Since that time transformed our business from a North America-based, captive compone to GM into a global supplier of components, integrated systems and mo wide range of customers. In 1995, the group was given the nai Automotive Systems" in order to establish its separate identi automotive parts industry.

In late 1997, in connection with the spin-off by GM of i electronics business, GM transferred Delco Electronics Corporati Electronics") to us in order to more closely integrate Delco E expertise in electronics with our capabilities in automotive com systems. Our Electronics & Mobile Communication product sector cons operations of Delco Electronics. From 1986 through 1997, Delco Elec been operated by GM's Hughes Electronics Corporation subsidiary. January 1, 1999, General Motors transferred or agreed to transfer used in our business to our company and our subsidiaries, and subsidiaries have assumed, or agreed to assume, pay, perform, s discharge, the related liabilities.

In February, we completed an initial public offering (the "I million shares of our $0.01 par value common stock ("Common Stoc represents about 17.7% of our outstanding Common Stock. GM current remaining 82.3% of our outstanding Common Stock. GM has announc currently plans to complete its divestiture of Delphi later distributing all of its shares of our Common Stock to the holders of common stock (the "Distribution"). GM currently expects to accoi Distribution through a:

o Split-Off--such as an exchange offer by GM in which holders of common stock would be invited to tender their shares in exchange of our Common Stock; or

o Spin-Off--a pro rata distribution by GM of its shares of our C

to holders of GM's $1-2/3 common stock; or

o Combined Split-Off/Spin-Off--some combination of the above transact

GM has the sole discretion to determine the timing, structure an of the Distribution. We have agreed to cooperate with GM in all complete the divestiture because we believe that our complete separat will enhance our ability to pursue our business strategy. GM has private letter ruling from the IRS to the effect that its distribut shares of our Common Stock to the holders of its $1-2/3 common sto tax-free to GM and its stockholders for U.S. federal income tax However, GM is not obligated to complete the divestiture and we ca: you as to whether or when it will occur.

Overview. Delphi is the world's largest and most diversified components, integrated systems and modules to the automotive industry net sales of $28.5 billion. We have become a leader in the global parts industry by capitalizing on the extensive experience we have ga principal supplier of automotive parts to General Motors, the worl manufacturer of automotive vehicles. We are primarily a *"Tier 1"* supp means that we generally provide our products directly to automoti manufacturers (*"VMs"*). We also sell our products to the worldwide for replacement parts and to non-VM customers.

Several years ago, we began to transform our company fr America-based, captive component supplier to GM into a global s components, integrated systems and modules for a wide range of custom sell our products to every major manufacturer of light vehicles in Since 1993, our sales to customers other than GM have grown from 13.3

3

total sales to 21.4% in 1998 (although our sales to GM were r result of work stoppages at certain GM and Delphi locations in the Un during 1998). For this purpose, our total sales include all sales by which we own a minority interest.

We have also established an expansive global presence, with a manufacturing sites, technical centers, sales offices and joint ventu in every major region of the world. About 60% of our employees and square footage, about 30% of our wholly owned and leased manufactu were located outside the United States and Canada as of December 31, 30% of our total 1998 sales were derived from products manufacture· located outside the United States and Canada.

Through our experience with General Motors, we have developed a so: understanding of the design, engineering, manufacture and operat aspects of the automotive vehicle. We have both extensive technical e: a broad range of product lines and strong systems integration ski enable us to provide comprehensive, systems-based solutions for our

We believe that we are one of the leading Tier 1 suppliers in
focused product areas. We operate our business along three major prod
which work closely together to coordinate our product development an
efforts. Our three product sectors are: Electronics & Mobile Com
which includes our automotive electronics and audio and communicatio
Safety, Thermal & Electrical Architecture, which includes our interi
and power and signal distribution products; and Dynamics & Propuls
includes our energy and engine management, chassis and steering pro
Note 14 to our consolidated financial statements included elsewh
report for additional information.

Industry

    General. Our industry generally provides components, systems, sub
modules to VMs for the manufacture of new vehicles, as well
aftermarket for use as replacement parts for current production
vehicles.

    Today, suppliers offer their component products to VMs individua
as in a variety of more fully engineered forms, such as modules and s

    o *"Modules"* are groups of component parts arranged in clos
      proximity to each other within a vehicle, which are often assem
      supplier and shipped to the VM for installation in a vehicle
    Modular instrument panels, cockpit modules and door modules are ex

    o *"Systems"* and *"subsystems"* are groups of component parts located
      the vehicle which operate together to provide a specific vehicle
    Braking systems, electrical systems and steering systems are examples

    Historically, many large VMs have operated internal divisions t
wide range of component parts for their vehicles. However, vehicle ma
have recently moved towards a competitive sourcing process for automo
including increased purchases from independent suppliers, as
lower-priced and/or higher-technology products. These indepen
suppliers, which often have lower cost structures than in-house
operations, have become an important part of the automotive parts ind
captive suppliers no longer provide their products exclusively to t
**VM.**

Our industry is generally divided into several groups or *"tiers:"*

    o *"Tier 1"* suppliers such as Delphi sell their products princip
      directly and often offer a broad range of product capabilities,
    design, engineering and assembly services.

    o *"Tier 2"* suppliers sell their products principally to Tier 1 sup
      then combine these parts into their own product offerings. Sma
    suppliers are sometimes referred to as *"Tier 3"* suppliers.

Industry Trends. Five key trends have been reshaping the automotive p
industry over the past several years:

o Increased Emphasis on Systems and Modules Sourcing. In order
the vehicle design and assembly processes and reduce their
increasingly look to their suppliers to provide fully
pre-assembled combinations of components rather than individual
By offering sophisticated systems and modules rather than
components, Tier 1 suppliers have assumed many of the design, e:
research and development and assembly functions traditionally per

4

**VMs.** In addition, suppliers now often manufacture and ship comp
to the general location of a VM's assembly line and then pro
assembly of systems and modules.

o Globalization of Suppliers. The globalization of VMs, which r
broader global market for vehicle sales and the desire of VMs
vehicle production in low-cost markets, has driven the globa
suppliers as they follow their customers. In order to serv
markets in a more cost effective manner, many VMs are turnin
vehicle platforms such as *"world cars,"* which typically are desi
location but produced and sold in many different geographic mar
the world. Suppliers for a specific world car are often require
to provide their services in all global locations where that
manufactured.

o Increasing Electronic Content. We believe that the electronic
vehicles has been increasing and will continue to increase in
This increase in electronic content is largely driven by cont
often increasingly stringent, regulatory standards for automotiv
and safety as well as consumer demand for increased vehicle perf
functionality at lower cost. Electronics integration, which
refers to replacing mechanical with electronic components and
of mechanical and electrical functions within the vehicle, al
achieve substantial reduction in the weight and complexity of
vehicles, resulting in easier assembly, enhanced fuel economy
emissions control and better vehicle performance. Electronic con
significantly among vehicle models, with higher-end vehicles :
sophisticated and extensive electronic controls and systems. As
particularly in more developed markets such as North America
seek more competitively-priced ride and handling performanc
security, communications, convenience, entertainm
environment-friendly options in vehicles, such as air bags, key
global positioning systems, audio systems and advanced emiss
systems, Delphi believes that electronic content per vehicle wi
to increase but will remain subject to technology-driven price d
pricing pressures from VMs.

o Ongoing Industry Consolidation. The worldwide automotive parts
    consolidating as suppliers seek to achieve operating synergi·
    business combinations, shift production to locations with mo
    local work rules and practices, acquire complementary technolog
    stronger customer relationships and follow their customers as ·
    globally. The need for suppliers to provide VMs with single-poi·
    of integrated systems and modules on a global basis has h·
    industry consolidation. Furthermore, the cost focus of most ma
    forced suppliers to reduce their prices, both in the initi·
    process and throughout the term of the <u>contract</u>. Consequently, a
    viability depends upon its continuing ability to maintain a·
    operating margins by reducing costs and improving producti·
    ongoing basis, including by achieving economies of sca
consolidation.

o Shorter Product Development Cycles. Suppliers are under pressu
    to respond more quickly with new designs and product innovation
    to support rapidly changing consumer tastes and regulatory re·
    Vehicle demand in North America has shifted from cars to light
    vans over the last several years, requiring suppliers to mo·
    operations to focus on parts for these vehicles. In North A·
    Europe, consumers have been increasingly seeking vehicles
    lower-cost ride and handling performance, safety, security, comm·
    convenience and entertainment options, such as global positioni·
    air conditioning, anti-lock brakes, air bags, power steering, ke·
    and advanced emissions control systems. In developing countries
    economic improvements are made, demand has increased for sma
    expensive vehicles that satisfy basic transportation needs. Ad·
    increasingly stringent government regulations regarding vehicle
    environmental standards, such as those mandating the use of air·
vehicles and emissions standards, are driving new product development

## Strategy

The key elements of our business strategy are to supply our cus·
high-quality, innovative components, systems and modules; to exce·
customers' expectations while building new relationships; to leverage
presence to meet our customers' needs; to improve our operating perfo·
to complete strategic acquisitions, joint ventures and alliances. Ea·
elements is discussed more fully below:

Supply High-Quality, Innovative Components, Systems and Modules.
that the current industry trend towards increased system and module
VMs creates a substantial competitive advantage for <u>our company</u>. We b·
our extensive operating history as a vertically integrated supp
world's largest VM provides us with the electronics integration
technical expertise, breadth of product offerings and manufacturing s·
to compete successfully on a system and module basis while continuing

5

high-quality components. We have developed significant systems capabi
number of key product areas, including power and propulsion systems
handling systems, passenger environment systems, and control and co
systems. We also have substantial in-house electronics integration ca
We coordinate our product development and marketing efforts across
product groups and sectors.

By building on our electronics integration expertise, our systems
capabilities and the breadth of our product offerings, we are working
high-quality product offerings which will provide our customers with
to offer consumers enhanced vehicle control, superior occupant
collision avoidance systems, onboard communications systems, advanced
engine management systems, advanced electrical and electroni
architecture and passenger entertainment and convenience features at
prices.

Exceed Existing Customers' Expectations while Building New Rel.
We are pursuing increased business with customers other than GM-Nor
and we believe that our principal opportunity for future earnings gro
increased sales to these customers. Although we intend to pursue n
with GM and expect to continue to be a principal supplier to GM and i
America operations for a significant period of time, our strategy
growing our business across a more diversified customer base, thereb
less dependent on the volume of vehicles produced by GM-North America

Our goal has been and continues to be to increase our tota
customers other than GM-North America to at least 50% of our total s.
end of 2002. We caution you, however, that this goal is a "*forw
statement*" that may turn out not to be attainable. We cannot g
assurance that we will achieve this goal, including within the t
indicated. In establishing and measuring our progress towards ach
goal, we include in "*total sales*" all of the sales from minority joi
and other investments even though these sales are not reflected in o
reported in our consolidated financial statements included elsewh
report. On this basis, in 1998, 62.2% of our total sales were t
America and 37.8% of our total sales were to other customers, as
73.7% and 26.3% of our total sales, respectively, in 1993. Exclu
minority joint venture sales, the percentages for GM-North America ar

We believe that, as an independent company no longer owned
Motors, we will have significant opportunities to expand our business
VMs around the world. We believe that our status as a part
historically been a major impediment to the expansion of our bus
customers other than GM, as other VMs have shown varying degrees of
to source extensively from a supplier owned by a major competitor.

Our focus on customer satisfaction, as demonstrated by our
leadership, product quality, cost control and customer responsiveness
us well as we strive to increase our sales to customers other tha

America.  This focus also enhances our ability to execute our bus
GM-North America.  In order to better serve our customers, our
marketing personnel are organized into 25 dedicated customer servic
of which work with customers other than GM.  Each of our major cu
served by its own team which has responsibility for satisfying that
needs.  Each team is lead by one of our managers and functions as a s
of contact within the company to represent the interests of th
throughout our organization.  These teams are supported by our
manufacturing facilities and engineering and technical resources worl

     Leverage Global Presence.  We can provide significant man
engineering, technical and other support to our customers in every m
in which they operate.  We believe that our geographic presence is
broadest in the industry.  As of December 31, 1998, we had 168 wholl
leased manufacturing sites, 27 technical centers, 51 customer serv
and sales activity offices and 40 joint ventures or other strategic a
36 countries on six continents. We are continuously evaluating and en
engineering and technical resources, which currently include o
engineers, scientists and technicians, to provide an efficient, custo
global network of engineering and technology customer centers that
will better serve our customers around the world.

     We believe that we are particularly well positioned as VMs tur
vehicle platforms, such as world cars, that are manufactured
numerous markets around the world. Since we have manufacturing sites
every major region around the world, we are often able to capitali
world car opportunities to gain access to new customers. Delphi
supplies parts for a number of global vehicle platforms. In addition,
that our global presence also provides us opportunities by allowing u

                                    6

leverage sales to a customer in one location or for one product in
other locations and for other products.

     From 1992 to 1998, the percentage, based on square footage, of
owned and leased manufacturing sites located outside the United
Canada has increased from about 20% to about 30%, reflecting the gl
of our VM customers.  During the same period, the percentage of ou
located outside the United States and Canada has increased from a
about 60%.  About 30% of our total 1998 sales were derived fro
manufactured at sites located outside the United States and Canada. S
Properties" for additional information on our facilities and capabili

     We also have a large number of joint ventures and other
partnerships in various locations throughout the world, with the lar
located in the Asia/Pacific region, including China and Korea.
ventures and other investments as of December 31, 1998 are show
geographic region:

Delphis 10-K    Pg 15 of 61

```
            United States/Canada............................     5
            Europe/Middle East/Africa.......................     8
            Mexico/South America............................     8
            Asia/Pacific....................................    19
                                                               --
            Total...........................................    40
                                                               ==
```

For financial  information  regarding the principal geographic areas
operate,  see Note 14 to the consolidated financial statements include
in this report.

    **Improve  Operating  Performance.**  We have developed,  and are im
initiatives to improve our operating performance.  Operational improv
enabled Delphi to achieve  significant cost reductions and improve  p
in the face of an  increasingly  aggressive  cost focus by most  majo
continued ability to realize operating performance  improvements is i
our ability to achieve our business objective. Although we have made
progress in  implementing  the initiatives  described  below, we beli
many cases the full impact of these  initiatives has not yet been rea
primary initiatives to improve operating performance are:

    o  Delphi Manufacturing System. In 1997, we developed and began the
       implementing  the  Delphi  Manufacturing  System throughout
       operations  which involves  reorganizing  the  workplace and im
       production  process in order to maximize manufacturing  flexibili
       total  manufacturing  costs and achieve  lean  production.  Under
       Manufacturing  System,  traditional  manufacturing  production
       replaced by more  flexible  manufacturing  cells  which  focus on
       one-piece  production flow rather than traditional batch process
       flexible  manufacturing  cells typically  consist  of clusters of
       manufacturing  operations and efficient  work stations,  with th
       placed centrally within each cellular configuration to increase
       availability.  This cell design provides  flexibility by varying
       of operations each operator performs.  The Delphi  Manufacturing
       allowed us to improve our product  quality  and be more  respons
       changing needs of our customers.  We believe that continued  imp
       of the  Delphi  Manufacturing  System will  allow us  to  imp
       manufacturing  productivity,  increase our daily inventory turns
our production lead times.

    o  Structural Cost Reductions. We continuously seek to achieve savi
       reducing our structural  costs.  Structural costs generally  con
       fixed costs,  including our selling,  general and administrativ
       commercial  costs,  engineering  costs and labor  and other ma
       costs.  We expect to continue to reduce our  structural  costs
       through infrastructure improvements,  such as combining operatio
       possible to reduce our  overhead,  administrative  and related
       eliminate  redundancies.  Separately,  in connection with
       integration of Delco Electronics into our operations,  we expect

http://www.secinfo.com/d1zn6p.69.htm                              1/4/2008

additional structural cost savings. We also seek to reduce our
costs by implementing a unified, common approach to operations
our global facilities, including a common organizational and
structure, application of the Delphi Manufacturing System at
manufacturing plants, common training programs and a common
metrics for measuring actual performance in comparison to commo:
and goals.

o Global Sourcing. We use global sourcing in order to obtain the :
for our direct and indirect materials, machinery and equ
services. Global sourcing is a competitive bidding pro·
prospective suppliers located throughout the world. Our purchas
is organized by commodity groups for each major region of th·
focuses on advance, long-term sourcing through long-term o
contracts. In order to ensure a consistent high-quality supply o
services, we utilize common systems, policies and procedures
company, including a common supplier quality improvement proce
our size, we believe we have sufficient scale and purchasing
enable us to continue to secure significant volume discounts
separation from GM. On average, since 1993, we have reduced our ma·

7

costs by about 3% to 4% per year based on a year-to-year ac·
comparison, excluding Delco Electronics, which was not integrat·
operations until December 1997.

o Labor Relations. We emphasize the sharing of relevant inform,
our international and local union leadership worldwide and w·
the unions to jointly develop local work rules and practices.
have been a part of GM, the national labor agreements negoti,
with the unions have applied to our workforce in the United
Canada. We believe that, as a fully independent company w
over our own labor relations after the Distribution, we woul·
right to negotiate regarding our own national and local labor
directly with the unions representing our employees. We belie·
complete separation from General Motors will enable us, ove,
increase our competitiveness by establishing local work
practices more consistent with those generally prevaili:
automotive parts industry. However, we cannot assure you as
the extent to which we will be able to achieve these benefits.

o Product Portfolio Management. We have implemented a portfolio
process designed to streamline and focus our product po
facilitate our emphasis on comprehensive, integrated sy
solutions for customers. Under this process, our management.
evaluates all of our company's product lines in order to analy
product supports our overall vision and strategic objectives.
Delco Electronics, we streamlined our portfolio as a resul·
process to about 151 product lines in 1998, down from about 2

Our current product portfolio includes about 190 product
reflects the integration of 30 product lines from Delco Ele
well as new product development activities. We expect to c
review and refine our product portfolio in light of indust
with an emphasis on integrated systems and modules as well
featuring electronics integration.

o  Fix/Sell/Close Process. We have adopted a *"fix/sell/close"*
improve our cost competitiveness. Under this process, we
global operations and investments, including our joint ventu
ongoing basis to identify operations or investments not pe
desired levels. These operations or investments are pla
category to be fixed, sold or closed. With input from o
management then develops a specific plan to deal with each
in a timely manner. With respect to many of our operations
America, both our local and international unions have coope
management in initiatives to improve the viability of our
As operations are improved or eliminated, they are remove
category. Since 1995, this process, together with the product
process described above, has resulted in the closing
consolidation of over 50 operations worldwide as wel
substantial improvement of many other operations. We will
monitor our operations and investments and we believe
ongoing process will continue to improve our cost competitive
future. However, our ability to eliminate product lines, cl
and divest businesses is subject to certain restrictio
Supply Agreement with General Motors as described elsewher
report.

Complete Strategic Acquisitions, Joint Ventures and Alliances. W
participate actively in the industry trend towards consolidation
strategic acquisitions and alliances in order to complement or fill
existing product portfolio, enhance our design and manufacturing ca
improve our geographic presence in selected areas and increase our ac
customers. We will be restricted from executing certain types of t
without GM's consent for a period of time following the IPO
Distribution as a result of covenants arising from our separation
described elsewhere in this report. In addition, we are bound f
periods of time by certain covenants not to compete which we enter
connection with some of our past divestitures. We do not believe
restrictions will materially impair our ability to execute thi
strategy.

While we currently believe that we will be able to successfully
business strategies outlined above, we cannot assure you in this r
ability to execute each of the business strategies discussed above is
numerous risks and uncertainties, including those described elsewh
report and in our other filings with the Securities and Exchange
including our registration statement on Form S-1, dated Februa
(Registration No. 333-67333).

Research and Development

We have substantial technical and vehicle integration expertise
of our  extensive  operating  history as the  in-house  supplier to
largest  VM. We were the first  supplier  to  produce a number of new
including the first electric self-starter, in-dash radio, turn signal
converter,  airbag, tilt steering column,  independent  front-wheel
energy-absorbing  steering  column,  electric  power sliding door and
child  safety  seat.  More  recently,  we were the  first  supplier
brake-by-wire  systems and  computer-controlled  engine management sy
result, we have developed a comprehensive knowledge of the design,  e
manufacture and operation of all aspects of the automotive vehicle.

8

We believe that our engineering and technical expertise,  togeth
emphasis on  continuing  research and  development,  allows us to use
technologies, materials and processes to solve problems for our custo
bring new, innovative products to market. Delphi maintains technical
centers in every major  region of the world to  develop  and  provid
products, processes and manufacturing support for all of our manufact
and to provide our  customers  with local  engineering  capabilities
development  on a global  basis.  As of  December 31, 1998, we employe
15,000 engineers,  scientists and technicians  around the world. We c
evaluate and enhance our engineering  and technical  resources and ar
considering  plans to  reorganize our  worldwide  engineering  and
resources into a more efficient, customer-focused global network.

We believe that continued research and development  activities a
to maintaining our leadership  position in the industry.  Our total e
for research,  development  and engineering  activities were $1.4 bil
billion and $1.6 billion in 1998, 1997 and 1996,  respectively.  As a
have  introduced  over 50 new  products  and processes  during each
several years.

## Intellectual Property

We have generated a large number of patents and trademarks in th
of our business.  Under our separation arrangements with GM, generall
we own the  patents,  patent applications  and records of  inventio
primarily  related to  components  produced or sold by us and any oth
that would be more valuable to us than to GM. Accordingly, GM has tra
us  full  or  partial  ownership  of  about  2,800 patents,  640  U
applications and 620 records of invention as well as the  correspondi
patent and patent applications.  In addition,  we and GM have agreed
certain of our  existing  patents to each  other.  While we believe
patents, inventions and licenses are, in the aggregate, important to
of our business, none is individually considered material to our busi

Although we do not rely on material *"patent-protected"* techn·
ability to continue to generate technological innovations is importan·
our long-term success as well as the competitiveness of our business.
on innovation is evidenced by the 586 patents relating to our busi:
have been recorded in recent years. We intend to continue to activ·
technological innovation.

GM has transferred to us ownership of about 1,170 trademark re·
and applications, including about 70 in the United States, a
unregistered trademarks. Our trademarks include the following: E
FOREWARN(TM), Freedom(TM), Gold Dot(TM), INTELLEK(TM), M·
QUADRASTEER(TM) and TRAXXAR(TM).

Products and Competition

We believe that we have the largest and most diversified po
products in the industry. Our product offerings are organized in th
sectors: Electronics & Mobile Communication; Safety, Thermal &
Architecture; and Dynamics & Propulsion. For more information on ·
sectors, see Note 14 to the consolidated financial statements include·
in this report.

We conduct our business in a highly competitive industry.
automotive parts industry principally involves the supply of componen·
and modules to VMs for the manufacture of new vehicles, to other su:
use in their product offerings and to the aftermarket for use as
parts for older vehicles. Although the overall number of our compe·
decreased due to ongoing industry consolidation, the automotive par·
remains extremely competitive. VMs rigorously evaluate suppliers on t:
product quality, price competitiveness, reliability and timeliness o
product design capability, technical expertise and development capab·
product innovation, leanness of facilities, operational flexibility
service and overall management. Some of our competitors have subst·
and scale and some have lower cost structures, particularly lower :
structures, than <u>our company</u>.

Our overall product portfolio is extremely broad by industry
Very few other Tier 1 suppliers compete across the full range of o:
areas. However, we do face significant competition across all t:
principal product sectors from each of the following major Tier 1
Robert Bosch GmbH, Denso Inc. and Visteon Automotive Systems, a u:
Motor Company. Our product sector offerings and principal compe·
summarized below:

9

**Electronics & Mobile Communication.** Our Electronics & Mobile ·Co:
product sector accounted for $4.6 billion, or 16.1%, of our 1998
excluding certain inter-sector sales which we eliminate for p·
determining our total consolidated net sales. This sector is one of ·

global providers of automotive electronics products. The sector al
wide variety of audio and communication systems for the vehicle. The
electronics capabilities of this sector are utilized in connection w
the product offerings of our two other product sectors to produc
subsystems and modules designed to enhance vehicle safety, comfort, s
efficiency. Our principal competitors in the Electronics & Mobile Co
product sector include the following: Denso Inc., Siemens AG, Robert
Mannesman VDO AG and Motorola, Inc. Our principal electronics
communication product lines include the following:

| Product Line | Description |
| --- | --- |
| Audio Systems | Audio systems and components ranging fro to integrated compact disc players, includ Monsoon(R) Audio System. |
| Communication Systems | Communication and information systems, incl the EyeCue(R) head up display system and m multimedia. |
| Advanced Controllers | Microprocessor-based engine management co and anti-lock brake controllers. |
| Powertrain and Engine Control Modules | Modules designed to optimize engine and transmission performance. |
| Collision Warning Systems | FOREWARN(R) collision warning systems are microwave-based forward, rear and side object detection systems which present warning s drivers in a wide range of formats and warnin levels. |
| Security Systems | Products include sounders, inclination senso glass breakage sensors, remote key actuation products and vehicle immobilization produ of which are sold under the TEXALARM(R) brand |
| Safety Systems | Products include frontal inside airbag c occupant positioning, adaptive restraints and roll-over sensing. |

**Safety, Thermal & Electrical Architecture.** Our Safety, Thermal &
Architecture product sector accounted for $11.1 billion, or 39.0%,
net sales, excluding inter-sector sales. This sector offers a wi
products relating to the vehicle interior as well as the expertise t
them into individual vehicle designs to simplify manufacturer as
enhance vehicle marketability. The sector also offers thermal
including powertrain cooling systems and climate control systems
global mandates for alternative refrigerant capabilities. The secto
global leader in the production of wiring harnesses and conn
electrical power and signal distribution. Our principal competit
Safety, Thermal & Electrical Architecture product sector include the
Yazaki Corp., Valeo SA, Autoliv Inc., Denso Inc. and TRW Inc.

   o Interior Products. These products accounted for $3.3 billion, o
     the Safety, Thermal & Electrical Architecture product sector

sales, excluding inter-sector sales. Our principal interior pr
include the following:

| Product Line | Description |
| --- | --- |
| Safety/Airbag Systems | Airbag systems and modules and adaptive re technologies, including driver and passe modules, side airbag modules and integr wheels. |
| Door Modules | Integrated door hardware systems with various features of power and signal distribution, and security, heating, ventilation and air conditioning ("HVAC"), electronic control and interior trim systems. |
| Power Product Systems | Systems include power sliding doors, power liftgates and power decklids. |
| Modular Cockpits | Fully integrated interior systems, featuring electrical/electronic systems, structure a systems, steering systems, thermal systems an entertainment and safety systems. |

10

o Thermal Products.  These products accounted for $2.7 billion,  o
the Safety, Thermal & Electrical Architecture product sector
sales, excluding inter-sector sales. Our principal thermal pr
include the following:

| Product Line | Description |
| --- | --- |
| Thermal Management Systems | Systems designed to optimize total vehicl management functions, maintain passenger co and powertrain cooling in all climates conditions. |
| Climate Control Systems | Systems which include HVAC modules, compre and condensors and are designed to maintain passenger comfort in all climates and weather conditions. |
| HVAC Systems and Modules | HVAC systems and modules regulate airflow, temperature, humidity and air direction evaporators, lightweight aluminum heater cor blower motor fans and compressors. |
| Powertrain Cooling Systems | Systems designed to optimize powertrain various driving conditions, including radia fans and hoses. |
| Front End Modules | Modules feature a single-part concept, resu in reduced product weight and size and higher system performance at lower cost. |

o Power and Signal Distribution Products.  These products account

billion, or 46.0%, of the Safety, Thermal & Electrical Architect
sector's 1998 net sales, excluding inter-sector sales.  Our prin
and signal distribution product lines include the following:

| Product Line | Description |
| --- | --- |
| Electrical/Electronic ("E/E") Systems Centers | Products and services relating to E/E sy and production, including E/E centers designe in a variety of configurations and tailo customer-specific applications. |
| Connection Systems | Wiring connection systems with current-carry capacity ranging from signal-level to over amps, including the GT Connection System variety of fiberoptic data network and point-to-point connection systems. |
| Electronic Products | Electronic products featuring micro-proc designs with custom integrated circuits and analog/digital/microcomputer/mixed design capabilities. |
| Advanced Data Communication Systems | Products include an optical star coupler, wh distributes data in real time via plasti fiber throughout an expandable network; and customized multiplex systems and components. |
| Fiber Optic Lighting Systems | DELight(TM) fiber optic lighting systems ut centrally located light sources to provi throughout the vehicle. |
| Ignition Wiring Systems | Ignition wiring systems and components. |
| Sensors | Temperature sensors and multifunction sen integrate electronics into the packaging. these sensors are sold under the brand name INTELLEK(TM). |
| Switch Products | Pushbutton switches, elastomer switches incorporating integrated electronics and miscellaneous specialty switches. |

11

**Dynamics & Propulsion.** Our Dynamics & Propulsion product sector ac
$12.8 billion, or 44.9%, of our 1998 net sales, excluding inter-se
This sector offers a wide range of energy and engine management syste
to optimize engine performance and emissions control through ma
vehicle air intake, fuel delivery, combustion and exhaust after-trea
sector also offers all major chassis control systems--steering
suspension and engine, with a focus on providing superior ride a
performance, high reliability, reduced mass and improved fuel effic
sector's steering products feature vehicle control and driveline t
and advanced electronic controls to improve performance. Our
competitors in the Dynamics & Propulsion product sector include the
Robert Bosch GmbH, LucasVarity PLC, NSK Ltd., Siemens AG and TRW Inc.

o Energy and Engine Management Products. These products account·
billion, or 45.3%, of the Dynamics & Propulsion product sector
sales, excluding inter-sector sales. Our principal energy
management product lines include the following:

| Product Line | Description |
| --- | --- |
| Air/Fuel Management | Subsystems measure, control, manage and deli· a combustible mixture of fuel and air to the combustion chamber. |
| Energy Storage and Conversion | The generator and battery comprise the prin· electrical system in the vehicle. The ? stores energy for transfer to the starter d· engine start-up; once the engine is runni· generator supplies the vehicle's electri· requirements. Among other products, we sell batteries into the aftermarket under the ? described under "--_Customers--Aftermarket._" |
| Valve Train | Systems manage engine timing and performance improve fuel economy, reduce emissions and increase torque and power. |
| Exhaust After-Treatment | Subsystems carry gas away from the engine an· removes harmful chemical compounds through catalytic reaction of contaminants. |
| Sensors and Solenoids | Sensors, including our INTELLEK(TM) brand monitor conditions such as presence, speed an· chemical content within the vehicle. So actuators that control mechanical moveme: flow of fluids within the vehicle. |
| Ignition | Subsystems provide spark energy for combustio· initiation of the air/fuel mixture. Coils, electronics, wires/boots and spark plugs g· and deliver a high voltage charge to the chamber. |
| Fuel Handling | Subsystems contain and deliver fuel to t: architecture and control evaporative emissio· |
| Controls | Subsystems consist of the electronic con· and related software and algorithms which are customized to meet VM needs. |
| Advanced Propulsion Systems | New propulsion technologies include different vehicle system approaches--from powertrain integration to advanced electro-chemica engines. |

12

o Chassis Products. These products accounted for $3.8 billion, o the Dynamics & Propulsion product sector's 1998 net sales, inter-sector sales. Our principal chassis product lines i:

following:

| Product Line | Description |
| --- | --- |
| Intelligent Chassis Control Systems | TRAXXAR(TM) vehicle stability enhancement s integrates all major chassis control systems--steering, braking, suspension and powertrain. GALILEO(TM)intelligent brak control system combines power assist, anti-l braking functions traction control and tunabl pedal feel in a modular design. |
| Advanced Ride Control Suspension Systems | Manual Selectable Ride System is a controlle suspension system designed with two in driver-selectable levels of damping. Con Variable Real-Time Damping System provid modal control with continuously variable independent damping control at each corner. |
| Chassis Systems and Modules | Systems and modules include complete whe modules, chassis corner modules, brake corner modules, damper modules and bearings. |
| Brake Systems | Anti-lock brake systems feature solenoid and can accommodate traction control, variabl effort steering and other vehicle enhancemen |
| Suspension and Brake Components | Components include calipers, rotors, drum cylinders, boosters, drum brake assemblies absorbers and leveling height sensors. |

o   Steering Products.  These products accounted for $3.2 billion,
    of the Dynamics & Propulsion  product sector's 1998 net sales,
  inter-sector sales.  Our principal steering product lines include
following:

| Product Line | Description |
| --- | --- |
| Steering Systems | Steering components and fully  integrated Components include hydraulic pumps, steer and steering hoses. |
| Columns and Intermediate Shafts | Steering columns, including TILT WHEEL(TM), LUXURY-TILT(TM) power adjustable wheel funct and  manual tilt and telescope.  Interme offerings include cardan joint, flexible pot-style joint, spline shaft and concentric isolator. |
| Driveline Systems | Halfshafts that transmit the power of th engine to the wheels.  Integrated halfsh in a wide variety of joint types and sizes. |
| Fuel Efficiency and Performance Steering Systems | E-STEER(TM) Electric Power Steering is and all-electric, engine independent system space efficiency, environmental compatibil |

                    fuel efficiency.
                    E-H-STEER(TM) Electro-Hydraulic Power Steerin
                    features optional variable-assist steering.
                    QUADRASTEER(TM) Four Wheel Steering features
                         short turning radius, enhanced control a:
                         handling. MAGNASTEER(TM) Magnetic Variab
                         Steering features variable effort power st

                              13

**Customers**

     General. We currently sell our products to all of the major VM
expect our business with customers other than GM to increase over ti
expect that GM will remain our largest customer by far for a signific
of time due to the long-term nature of sales <u>contracts</u> in our ind
strong customer-supplier relationship with GM and the new supply a
entered into with GM in January 1999 in connection with our separati
(the "<u>*Supply Agreement*</u>") (See "--<u>*Arrangements between GM and Del*</u>
<u>*Agreement*</u>"). We supply parts to each regional sector of GM's
Operations, including its automotive operations in the United States,
Mexico (*"GM-North America"*), and to GM's automotive operations thr
rest of the world (*"GM-International"*). In addition, we sell our prod
worldwide aftermarket for replacement parts. Currently, most of our
sales are to GM's Service Parts Operations (*"GM-SPO"*) for d
principally to the North American aftermarket.

     The following table shows how our total sales were derived for
last three years. The percentages for 1998 were affected by work s
certain GM and Delphi locations in the United States in June and July

|                          | **Total Sales** Year Ended December 31, | | |
|--------------------------|------|------|------|
| Customer                 | 1998 | 1997 | 1996 |
| --------                 | ---- | ---- | ---- |
| GM-North America........ | 62.2% | 65.4% | 66.6% |
| GM-International........  | 11.0 | 11.2 | 11.7 |
| **GM-SPO**............... | **5.4** | **5.1** | **5.2** |
|                          | ---- | ---- | ---- |
| Total GM...............   | 78.6 | 81.7 | 83.5 |
| Other Customers......... | 21.4 | 18.3 | 16.5 |
|                          | ---- | ---- | ---- |
|                          | 100.0% | 100.0% | 100.0% |
|                          | ===== | ===== | ===== |

     For purposes of the foregoing table, "<u>*total sales*</u>" include all o
from joint ventures and other investments in which we own a minorit:
even though these sales are not reflected in our sales as repor

consolidated financial statements included elsewhere in this report.
we have historically tracked our sales by customer for internal   pu
include our minority joint venture sales for this purpose  because,
things,  they principally relate to our joint ventures outside the Un
where  we  frequently  have  significant    influence  over  product
technology and customer  relationships but do not own more than 50%.
more than 50% of these joint  ventures,  in most cases,  we would  in
sales in our consolidated  sales. In addition,  many of these joint v
our technologies.  If we did not include these sales, the percentage
above for GM would be higher.

**Awarded Business.**  We have a substantial base of awarded busines
including business with GM-North America under arrangements that are
the Supply Agreement. We track as *"awarded business"* the future sa
have a strong expectation of realizing based on various types of VM a
and various  assumptions we make regarding,  among other things,  the
volume of vehicle production,  option mix and product pricing. On tha
believe that we currently have a solid foundation of awarded business
to grow our company. We cannot assure you, however, that we will in f.
any specific amount of awarded  business because it remains in all ca
to a number of important risks and uncertainties. We currently estima
from our  existing  awarded  business to be about $28 billion for 199
$22 billion for 2003. The amount of our awarded  business  declines o
the  vehicle  programs  in  which  we are  currently  participating
eventually terminate.  However,  particularly in the later years, we
we will be awarded additional business from GM and other customers.

Sales to General Motors.  In 1992,  General Motors  launche
reorganization of its automotive  business to streamline its business
and  downsize  its  North  American  automotive  operations.  At that
announced  its  intention  to begin  filling its  procurement  needs
basis. GM strives through this global sourcing strategy to le
purchasing  power by sourcing  its  products  on a global  basis and
competition for its business  among its  suppliers  on the basis o
service,  technology  and price.  Pursuant to this  initiative,  GM h.
suppliers  worldwide with the opportunity to bid for GM-North  Americ.
historically  sourced  with us. As a result,  our  share  of  GM-North
automotive parts requirements has declined since 1992.

14

We believe that we are and will continue to be able to compete
for GM-North America  business because of the high quality of our pro
ongoing cost reduction efforts and our product and technological inno
a principal supplier to GM, we periodically have discussions with GM
its  future  vehicle  programs  and our  long-term  technology  a:
development.  Although we have no commitments to GM in this regard, w
continue these  discussions for some period of time after our separat
based on our strong  customer-supplier  relationship.  However, we do
portion of GM-North America's  automotive parts requirements which we

the prices we charge to GM-North America to continue to decline ov
several years. As a result, we also expect that our total sales
decline over the next several years. Through our strategy of a
pursuing increased business with customers other than GM-Nort
including additional sales to GM-International, however, we will
mitigate these effects and increase our total sales.

We have historically supplied a lower percentage of GM-International'
automotive parts requirements than the percentage of parts we have
GM-North America. Until the last several years, we were operated
captive, North America-based supplier to GM's North American operat
result, we did not focus heavily on our global business opportunities
those with GM-International. We also did not have the global presence
effectively for GM-International business. As noted above, we have su
expanded our global presence over the last several years and intend
to compete for additional GM-International business.

**Supply Agreement**. The Supply Agreement we have entered into w
Motors in connection with our separation provides that all existing
between General Motors and <u>our company</u> as of <u>January 1, 1999</u> will
remain in effect, including the pricing, duration and purchase orde
conditions. However, the timing of payments from GM to us under th
<u>contracts</u> will change. The Supply Agreement provides us with certai
provide on competitive terms the first replacement cycle of all produ
in the United States and Canada which we were providing to GM as of
<u>1999</u>, provided that GM sources such replacement programs prior to
<u>2002</u> and we are competitive in terms of design, quality, price,
technology as these factors relate to all aspects of bid packages
submitted by other suppliers. For more information regarding the t
Supply Agreement, see "--<u>Arrangements Between GM and Delphi</u>--<u>Supply A</u>

Other VMs. Although General Motors is by far our largest custo
business with all of the other major VMs worldwide. Our top five VI
other than GM are DaimslerChrysler, Toyota, Fiat, Volkswagen, and R
combined sales to these customers accounted for about 8% of our tot
sales, and our top ten VM customers other than GM accounted for about
total 1998 net sales. In determining these percentages, we have n
sales of entities in which we have a minority interest.

Substantially all of our existing <u>contracts</u> with these non-GM
which we entered into while we were a business sector of GM, require
of the customer in order to assign or transfer the <u>contract</u>.
discussions with all of our major non-GM customers regarding our sepa
GM and our intent to continue to perform under these existing <u>contra</u>
the extremely large number of existing <u>contracts</u> with our non-GM cu
the positive feedback received during discussions with our ma
customers, we do not currently intend either to seek consents from
into new <u>contracts</u> with these customers in connection with our sepa
GM. Based on these discussions, we do not believe that our separati
will adversely affect our business with these customers. However,

assure you in this regard.

**Aftermarket.** We sell products to the worldwide aftermarket as parts for current production and older vehicles. In 1998, our revenues of $2.1 billion represented 7.2% of our total net sales. W sell most of these products into the North American afterma arrangements with GM-SPO, the principal aftermarket sales organiza GM-SPO distributes replacement parts to the aftermarket primarily automobile dealerships and independent distributors, including distributors and direct retailers. Outside North America, we princ into the aftermarket through independent distributors.

Under the terms of our separation from GM, we and GM have ag subject to certain exceptions, GM-SPO will be the exclusive distrib products into the U.S. aftermarket and we will be the exclusive these products to GM-SPO through at least December 31, 2000. GM-SPO markets our products under a number of brand names, including . Freedom(R) and Voyager(R). In connection with our separation from agreed with GM-SPO to split the ownership of these aftermarket bran owns the ACDelco brand and any AC and Delco derivatives and formative as described further under *"Arrangements Between Delphi a. Motors--Intellectual Property,"* we have been granted a perpetual, royalty-free license to use the trade name *"Delco Electronics* trademarks *"DELCO"* and *"DELCO ELECTRONICS"* in connection with cer products as well as a worldwide license to use the trademarks *"AC," "AC Delco"* until January 1, 2000. We own the Freedom brand, although use the brand in the United States until the expiration of our arrang GM-SPO. GM-SPO will own the Voyager battery brand, but may onl: batteries it purchases from us. For more information about these ar see *"--Arrangements Between GM and Delphi --Aftermarket Sales."*

15

We have historically derived our principal aftermarket revenues relationship with GM-SPO. We believe that there exist opportunities our revenues from sales in the aftermarket and augment the *"Del_ presence in the aftermarket over time by establishing new supply re with various participants along the aftermarket distribution channel. that our ability to sell products developed for the VM market to . customers can reduce the impact of adverse changes in demand for ne With respect to the aftermarket in the United States, we intend to . sell products through GM-SPO until the expiration of the t. arrangements described above. Outside the United States, we are focusing on the aftermarket business in Europe and South America.

We believe that incremental aftermarket sales opportunities will b to us following our complete separation from GM. However, growth in competitive aftermarket business will take time to achieve in l significant investment in an aftermarket distribution infrastructu required.

Non-VM Customers. We are also diversifying by supplying cert
products, including connection systems, flex-circuits wiring, inst
and map sensors, to new customer areas, such as the aerospace, mot
computer industries. Our non-VM customers include Boeing
Harley-Davidson Inc. and Silicon Graphics Inc. We are also
relationships with Tandem Computers Inc., Storage Technologies
Technologies Inc. These non-VM sales accounted for only a nominal am
total 1998 net sales. We believe that opportunities exist to increas
in this area and we intend to continue to work to expand our sale
customers.

Variability in Delphi's Business

There are a number of factors that contribute to variability in ou
The variability can produce significant fluctuations in sales and ea
quarter to quarter, and in some cases from year to year. The prima
that affect variability are summarized below.

Automotive Industry. Almost all of our business is directly
automotive sales and production by our customers, which are highly c
depend on general economic conditions and other factors, includin
spending and preferences. Any significant reduction in automotive pro
sales by our customers would have a material adverse effect on our bu

Regional. We have substantial operations in every major region o
and economic conditions in these regions often differ. The recen
downturn in Asia and in Brazil and other regions of Latin America,
Mexico, has led to reductions in demand for automobiles and compone
those areas and has had an adverse effect on our financial results
the extent that these conditions continue to worsen, or spread to oth
particularly in the United States, our business will continue to b
affected.

Seasonal. Our business is moderately seasonal as our primary Nor
customers historically halt operations for about two weeks in July an
week in December. In addition, third quarter automotive pro
traditionally lower as new models enter production. Accordingly,
fourth quarter results may reflect these trends.

Purchasing

We purchase various raw materials for use in our manufacturing pro
principal raw materials we purchase include platinum group metal
aluminum, steel, lead and resins. All of these raw materials,
platinum group metals we use to produce our catalytic converters, ar
from numerous sources. Currently, all of the platinum group met
Delphi for catalytic converters produced for GM are purchased by
from suppliers of these metals which are located principally in Russi
Africa. In light of the potential political instability in these ar

maintains a three to four month  inventory  of  platinum  group  meta
purchases the platinum group metals it uses in catalytic converters m
for its customers other than GM directly from suppliers.

  We have not  experienced any shortages of raw materials or other p
normally do not carry  inventories  of raw  materials  or  finished
excess  of  those  reasonably  required  to meet  our  production  an
schedules, except for the three to four month supply of platinum grou

                              16

Environmental Compliance

     We are subject to the  requirements of federal,  state,  local
environmental  and occupational  safety and health laws  and  regulati
include laws regulating air emissions,  water discharge and waste man
have an environmental  management  structure  designed to facilitate
our compliance with these requirements.  We cannot assure you, howeve
are at all times in compliance with all such requirements. Although w
and will  continue  to make  capital  and  other  expenditures  to  c
environmental  requirements,  we do not expect capital or other expen
environmental  compliance  to  be  material  in  1999  or  2000.  En
requirements  are  complex,  change  frequently  and have  tended to
stringent over time.  Accordingly,  we cannot assure you that these r
will not change or become  more  stringent  in the future in a manner
have a material adverse effect on our business.

     We are also subject to  environmental  laws requiring  the  investi
cleanup  of  environmental  contamination.  We  are  in  various
investigation and cleanup at our  manufacturing  sites where  contam
been  alleged.  As of December 31, 1998,  Delphi had recorded a reser
$20 million for such environmental  investigation and cleanup.  We ca
you that our  environmental  cleanup costs  and  liabilities  will not
amount of our current reserve.

     We have entered into certain  arrangements  with General Motors re
allocation of environmental  liabilities relating to our business as
separation  from  General  Motors.  For more  information,  see  "--A
Between GM and Delphi --Real Estate and Environmental."

**Arrangements Between GM and Delphi**

     The  separation  of Delphi from General  Motors and the  transact
undertaken  in  connection  therewith  are  being  effected  pursuant
Separation Agreement,  dated  December 22, 1998,  to which Delphi
Motors are parties (as amended from time to time, the  "Separation A
In addition,  we have entered into certain ancillary agreements cont
the  Separation  Agreement  (collectively,  as  amended  from time to
"Ancillary Agreements")  and certain  other  agreements  which  gove
interim and ongoing  relationships  between us and GM. The Ancillary

include, among others, agreements relating to the IPO and the Distrib
sale of products to GM, employee matters, tax matters, intellectual
real estate and environmental matters, product liability and the p
certain interim services.  The Ancillary Agreements also require us t
with GM in all respects to complete the Distribution and p
registration rights for GM in the event the Distribution is not comp
completed without GM divesting itself of all of its Delphi Common Sto

Certain international, intellectual property and real prope
relating primarily to the business of Delphi are still held b
affiliates, pending receipt of consents or approvals or satisfacti
applicable requirements necessary for the transfer of such assets to
do not believe that these assets and operations are, individually
aggregate, material to our company.  However, the information inclu
report, including our consolidated financial statements, assumes the
of all such transactions. See "--*International Agreements*." In additi
information technology assets relating primarily to our business are
by GM or its affiliates, pending receipt of consents necessary for t
of such assets to Delphi, or may be retained by GM if consents to the
cannot be obtained.  Also, certain assets and liabilities relating t
working under collective bargaining agreements will be transferred t
connection with the Distribution. Capitalized terms which we use in t
but do not otherwise define below or elsewhere herein have their
meanings as set forth in the Separation Agreement.

All of these agreements were made in the context of a parent
relationship and were negotiated in the overall context of our sepa
GM. The terms of these agreements may be more or less favorable to
they had been negotiated with unaffiliated third parties.

We have set forth below a summary description of the Separation
and certain of the Ancillary Agreements. This description, which sum
material terms of such agreements, does not purport to be compl
qualified in its entirety by reference to the full text of such
Certain of these agreements, including the Separation Agreement,
Distribution Agreement and the Registration Rights Agreement,
Agreement, the Business Relationship Agreement, the U.S. Employ
Agreement and certain tax allocation agreements have been filed as
this report and are incorporated by reference.

17

**Separation Agreement.** The Separation Agreement, which became e
January 1, 1999, sets forth our agreements with GM with respect to th
corporate transactions required to effect the transfers of
assumptions of liabilities necessary to separate our company from GM
other agreements governing our relationship thereafter.

Transfer of Assets and Assumption of Liabilities. General
transferred, or agreed to transfer, or to cause its subsid

representatives to transfer, the Delphi Assets to our compa:
subsidiaries, and we and our subsidiaries have assumed, or agreed
and have agreed to pay, perform, satisfy and discharge on a timel:
Delphi Liabilities in accordance with their respective terms.
expressly set forth in the Separation Agreement or in any
Agreement, GM has not made any representation or warranty with res:
Delphi Asset and the Delphi Assets are being transferred on an "a
is" basis.

Transition Services.  The Separation Agreement provides that if ·
any services that GM, or its affiliates or their suppliers, were p
us immediately prior to January 1, 1999 and any of such services i
provided to us pursuant to any of the Ancillary Agreements,  GM a·
our written request, to use its reasonable best efforts to pr·
service to us until  January 1, 2000.  GM is not required to p
service which GM would not be legally  permitted to provide to a t:
We must use all  commercially  reasonable  efforts to obtain  any
services provided pursuant to this provision of the Separation Agr·
a source  other  than GM before  January 1, 2000.  If we cannot  o:
transition  service from a source other than GM and such service i
to operate the Delphi  Automotive  Systems Business in substantial
manner as it was conducted  immediately before January 1, 1999, GM
to provide  such  transition  service to us for an  additional  pe
exceed six months.

For the majority of the transition. services  provided to us by ·
to the  Separation  Agreement and for services  provided to us by GM :
the  Ancillary  Agreements,  we must  pay GM on or prior  to the  fif·
following  receipt of an invoice:

(1) in the case of any transition  service provided pursuant to the
Agreement or pursuant to an Ancillary  Agreement in which a pay:
or formula has not been set forth,  an amount  equal to
historically  allocated  to our business for such services as of
1999,  adjusted to reflect  any  changes in the  nature,  cost ·
services  provided; provided that,  if no cost has histori·
allocated to us for such service, then we shall pay to GM:

(a) that portion of the total costs borne by GM which GM would have
allocated to Delphi under its internal allocation formula; plus

(b) any direct user charges provided for in clause (a) above; plus

(c) any other reasonable charges necessary to make GM whole for the
provision of such services; or

(2) in the case of any service to be provided pursuant to an Ancillary
Agreement in which a payment amount or formula has been set forth, ·
amount owed pursuant to the terms of such Ancillary Agreement.

If we make payment later than the forty-fifth day after
receive an invoice, we must pay interest on the amount due based o:
Rate. For any such services that are provided to us directl:
parties, we will pay such third party directly where such direct
permissible. These payment provisions do not apply to services pro·
pursuant to any real estate leases, any health care services purs·
Employee Matters Agreement, and certain other agreements. In addit
responsible for providing certain transitional services to GM with
certain businesses retained by GM.

**Ancillary Agreements.** Except with respect to the provisions
payment for transition services described above, to the exte:
Ancillary Agreement expressly addresses any matters address·
Separation Agreement, the terms and conditions of the Ancillary
will govern the rights and obligations of the parties regarding su·
We must use all commercially reasonable efforts to obtain servic·
to us by GM under the terms of those Ancillary Agreements relating to

18

transition services from a source other than GM. Certain of the
Agreements provide that the transition service may be extended
termination of the transition periods provided for therein and we ·
after the Distribution we would negotiate with GM at arm's lengt:
of any such extension, including fair market value pricing f·
services.

Indemnification. We have agreed to indemnify, defend and hol·
General Motors and each of its subsidiaries and their
successors-in-interest, and each of their respective past a:
representatives against any losses, claims, damages, liabilities
arising, whether prior to or after the Contribution Date, o·
connection with the Delphi Liabilities and/or our conduct of our b·
affairs after the Contribution Date. Certain of the Ancillary
provide for indemnification between us and GM relating to the s·
such agreements. The Separation Agreement and certain of the
Agreements specify certain procedures with respect to claims
subject to indemnification and related matters.

Claims and Litigation. The Separation Agreement provide
allocation of the liability between us and GM for certain ·
litigation relating to or arising out of the Delphi Automoti·
Business.

o Product Liability. GM has retained responsibility for a
liability actions relating to products we manufactured prior to
1999 and sold or otherwise supplied to GM either before or after
Responsibility for product liability actions relating to :
manufacture on or after January 1, 1999 and sell to GM shall be
in accordance with the agreements for such sales. We will be

for liability relating to all products we sold at any time or future to customers other than GM. In connection therewit indemnify GM against, and reimburse GM for costs associated claims for which we are liable, and GM will indemnify us ag. reimburse us for costs associated with, the claims for w. retained liability.

o General Litigation. With respect to general litigation clai assumed the liability for all new claims related to the Delphi Systems Business and for certain specified claims. GM has agree certain other specified claims at our expense and GM has re liability for certain other specified claims. In connection the will indemnify GM against, and reimburse GM for costs associate claims for which we are liable, and GM will indemnify us ag. reimburse us for costs associated with, the claims for w. retained liability.

o Employment-Related Claims. We have assumed the liability specified employment-related claims and we will indemnify GM . such claims and reimburse GM for any legal or other expenses incurred by GM in connection with such claims. Certain other related claims will be jointly defended by us and GM. We have responsibility for employment related claims regarding all Delph and Delphi Terminated Employees whether incurred before o Contribution Date. We will mutually determine with GM how new c be treated. However, U.S. claims for pension and welfare ben salaried employees who retire on or before the Contribution Date employees who retire on or before October 1, 1999 will responsibility of GM.

We have agreed with GM to cooperate with each other in the def and all claims covered by these provisions of the Separation Agreemen

Insurance. The Separation Agreement provides that during beginning on the Contribution Date and ending on the earlier of the completion of the Distribution or the first anniversa Contribution Date (the "Insurance Transition Period"), GM shall, certain conditions and exceptions, maintain policies of insurance for the benefit of Delphi or any of its affiliates, directors, other covered parties, which are comparable to those generally ma GM. The Separation Agreement sets forth procedures we must asserting claims, reimbursing GM for premium expenses and other related matters during the Insurance Transition Period. Fol expiration of the Insurance Transition Period, except as prov Separation Agreement, we will be responsible for obtaining and our own insurance programs.

Dispute Resolution. The Separation Agreement contains prov govern, except as provided in any Ancillary Agreement, the re disputes, controversies or claims that may arise between us a

Separation Agreement provides that the parties will use all c
reasonable efforts to settle all disputes arising in connectio
Separation Agreement without resorting to mediation, arbi
otherwise. If these efforts are not successful, any party may
dispute for non-binding mediation by delivering notice to the oth
the dispute and expressly requesting mediation of the dispute.
mediation, the parties disagree regarding the mediator's recommend
dispute will be submitted to binding arbitration in accordance wit

19

of the Separation Agreement. The Separation Agreement contains pro
the selection of a three-arbitrator panel to act by majority v
conduct of the arbitration hearing, including certain limitat
discovery rights of the parties. We and GM have agreed that all
other matters related to the Supply Agreement and certain o
Ancillary Agreements are exempt from the dispute resolution
established in the Separation Agreement.

    Certain Definitions Relating to the Separation Agreement. Set fo
are certain defined terms contained in the Separation Agreement:

*"Contribution Date"* means <u>January 1, 1999</u>.

    *"Delphi Assets"* means all of GM's right, title and interest in
assets, excluding cash and cash equivalents, that:

    (1) except as set forth on a schedule to the Separation Agree
        otherwise provided in the Separation Agreement or in an
        Agreement, are reflected in the Delphi Financial Statemen
        disposed of by GM after the date thereof and before the C
        Date, including assets written off or expensed but still use
        which Delphi can demonstrate to GM's reasonable satisfactio
for by the Delphi Automotive Systems Sector of GM; or

    (2) are to be transferred pursuant to Section 2.01(c) of the
        Agreement, which relates to assets relating to certain in
operations; or

    (3) are acquired by the Delphi Automotive Systems Business aft
        of the Delphi Financial Statements and would be reflec
        financial statements of Delphi as of the Contribution D
        financial statements were prepared using the same accounting
under which the Delphi Financial Statements were prepared; or

    (4) are expressly provided by the Separation Agreement or an
Agreement to be transferred to Delphi; or

    (5) are listed on the schedule to the Separation Agreement that
the facilities to be transferred to Delphi; or

(6) except as otherwise provided in an Ancillary Agreement or ot
agreement of the parties, are used exclusively by the Delphi
Systems Business as of the Contribution Date;

provided, unless the parties otherwise expressly agree,
accounting principles under which the Delphi Financial State
prepared would have required any asset described in the clause (
be reflected in the Delphi Financial Statements as of the date the
such asset shall be included in the *Delphi Assets* only if so reflec

*"Delphi Automotive Systems Business"* means the business condu
Delphi Automotive Systems business sector of General Motors at any
before the Contribution Date, including:

(1) all business operations whose financial performance is r
the Delphi Financial Statements;

(2) all business operations initiated or acquired by the Delphi
Systems business sector of GM after the date of the Delphi
Statements; and

(3) all business operations that were conducted at any time in
the Delphi Automotive Systems business sector of GM
predecessor of such business sector, including, without limi
GM Automotive Components Group, but were discontinued or
prior to the date of the Delphi Financial Statements oth
transfer or disposition to any other business sector of GM.

*"Delphi Financial Statements"* means the consolidated financial
and the notes thereto of Delphi for the nine months ended <u>September</u>
set forth in the registration statement relating to our IPO as amen
<u>December 22, 1998</u>, the date of the Separation Agreement. Such
statements are substantially similar to the financial statements for
included in the prospectus dated <u>February 4, 1999</u> related to the IPO
which is on file with the Commission.

*"Delphi Liabilities"* means all of the Liabilities of General Mot

20

(1) except as otherwise set forth on a schedule to the Separation
or as otherwise provided in the Separation Agreement or in a:
Agreement, are reflected in the Delphi Financial Statements
outstanding at the Contribution Date; or

(2) are to be transferred pursuant to Section 2.01(c) of the
Agreement, which relates to assets relating to certain in
operations; or

(3) arise in connection with the Delphi Automotive Systems Bus
the date of the Delphi Financial Statements and would be r-
financial statements of Delphi as of the Contribution D.
financial statements were prepared using the same accounting
under which the Delphi Financial Statements were prepared; or

(4) are expressly provided by the Separation Agreement or an
Agreement to be transferred to and assumed by Delphi; or

(5) except as otherwise provided in an Ancillary Agreement or ot
agreement between the parties, are related to or arise o
connection with the Delphi Assets; or

(6) except as otherwise provided in an Ancillary Agreement or ot
agreement of the parties, are related to or arose ou
connection with the Delphi Automotive Systems Business, incl-
not limited to the covenants not to compete entered into by '
the Contribution Date set forth on a schedule to the
Agreement, whether before or after the date of the Delphi
Statements;

provided, unless the parties otherwise expressly agree,
accounting principles under which the Delphi Financial State
prepared would have required any liabilities described in clause (
be reflected in the Delphi Financial Statements as of the date the
such liabilities shall be considered to be *"Delphi Liabilities"*
reflected.

*"Liabilities"* means any and all debts, liabilities,
assurances, commitments and obligations, whether fixed, con-
absolute, asserted or unasserted, matured or unmatured, liq
unliquidated, accrued or not accrued, known or unknown, due or to
whenever or however arising, including, without limitation, whet
out of any contract or tort based on negligence or strict liab
whether or not the same would be required by generally accepted
principles to be reflected in financial statements or disclosed i
thereto.

**IPO and Distribution Agreement.** We have entered into an Init
Offering and Distribution Agreement (as amended from time to tim
*and Distribution Agreement"*) with GM which governs our respective
duties with respect to the IPO and the Distribution, and sets fo
covenants we have agreed to for various periods following the
Distribution. Although GM has announced that it currently plans
the Distribution, and we have agreed to cooperate with GM in all
complete the Distribution, it is not obligated to do so. We cannot
as to whether or when the Distribution will occur.

**The Distribution.** We have agreed that we will cooperate wit
respects to accomplish the Distribution and, at GM's direction, pr-

all actions necessary or desirable to effect the Distribution, in
registration under the Securities Act of 1933, as amended (the
Act"), of GM's shares of our capital stock. General Motors h
discretion to determine whether to proceed with all or pa
Distribution and all terms of the Distribution, including the form
and terms of any transaction(s) and/or offering(s) to effect the D
and the timing of and conditions to the consummation of the Distri
the event that GM determines that it no longer intends to proce
complete the Distribution, GM must provide us notice to such ef
such notification, GM's rights and our obligations under the R
Rights Agreement described below become immediately effective.

Preservation of the Tax-Free Status of the Distribution. Gen
intends for the Distribution to qualify as a tax-free distribu
Section 355 of the Code to GM and its stockholders. On January 1
received from the IRS a private letter ruling (the "IRS Rulin
effect. In connection with GM's request for the IRS Ruling, we m
representations and warranties to GM regarding our company and ou
We have also agreed to certain covenants in the IPO and D
Agreement intended to preserve the tax-free status of the Distributio

21

may take any action otherwise prohibited by these covenants onl
determined, in its sole and absolute discretion, that such actio
jeopardize the tax-free status of the Distribution. See "--Coopera
Matters." Certain of these covenants are described in greater detail

o Stock Issuance. Prior to the completion of the Distributio
agreed not to issue or agree to issue shares of our capital
amount that would result in GM owning less than 80% of the tota
voting power of all outstanding shares of our voting stock and/o
80% of any other class and/or series of Delphi capital stock. Th
will not prohibit us from issuing stock options and restricted s
to our employees so long as we repurchase sufficient shares of
stock prior to the date when such options and awards become exe
ensure that GM's ownership remains at or higher than 80% and GM
our procedures to comply with this covenant.

o Certain Acquisition Transactions. Until two years after the co
the Distribution, or, if GM determines not to complete the Di
the last date on which GM distributed any Delphi common stock in
with the Distribution, we have agreed not to enter into or
transaction or series of transactions which would result in
persons acquiring or having the right to acquire shares of o
stock that would comprise 50% or more of either the va
outstanding shares of our capital stock or the total combined v
of our outstanding voting stock.

o Continuation of Active Trade or Business. Until two years

completion of the Distribution, or, if GM determines not to c
Distribution, the last date on which GM distributed any Delphi c
in connection with the Distribution, we have agreed to continue
the active trade or business, within the meaning of Section
Code, of our company as we conduct it immediately prior to the
of the Distribution. During such time, we have agreed not to:

    o liquidate, dispose of or otherwise discontinue the cond
      portion of our active trade or business with a value in exc
  billion; or

    o dispose of any business or assets that would cause our co
      operated in a manner inconsistent in any material respec
      business purposes for the Distribution as described to the
  counsel in connection with GM's request for the IRS Ruling.

    Also, until two years after the completion of the Distri
have agreed not to liquidate, dispose of, or otherwise disco
conduct of any portion of the active trade or business of our
such liquidation, disposition or discontinuance would breach t
described below regarding our continuity of business.

    o Continuity of Business. Until two years after the complet
Distribution, or, if GM determines not to complete the Distrib
last date on which GM distributed any Delphi common stock in
with the Distribution, we have agreed that:

o we will not voluntarily dissolve or liquidate; and

    o except in the ordinary course of business, neither we nor
      direct or indirect subsidiaries will sell, transfer, or
      dispose of or agree to dispose of assets, including any
      capital stock of our subsidiaries, that, in the aggregate,
  more than:

  (x) 60% of our gross assets; or

    (y) 60% of the consolidated gross assets of us and our subsidia

    For this purpose, we are not deemed to directly or indirectly
subsidiary unless we own, directly or indirectly, shares constituting

    o 80% or more of the total combined voting power of all outstan
of voting stock of such subsidiary; and

22

    o80% or more of the total number of outstanding shares of ea
series of capital stock of such subsidiary other than voting stock.

oDischarge of Intracompany Debt. Prior to the first date on distributes any Delphi common stock in connection with the Distri have agreed to fully discharge and satisfy all debt that we owe G purpose, debt does not include payables arising in the ordinar business. Until two years after the completion of the Distributi GM determines not to complete the Distribution, the last date distributed any Delphi common stock in connection with the Distri will not be able to have any such indebtedness with GM.

In the event that GM notifies us that it no longer intends with or complete the Distribution and GM has not yet distributed Delphi common stock, these covenants to preserve the tax-free st. Distribution will terminate.

Other Covenants Regarding Tax Treatment of the Transaction Motors intends the transfer of assets and liabilities from GM to as contemplated by the Separation Agreement (the "Contribution") as a reorganization under Section 368(a)(1)(D) of the C Reorganization"). Until two years after the completion of the Di we have agreed not to take, or permit any of our <u>subsidiaries</u> to actions or enter into any transaction or series of transactions th reasonably likely to jeopardize the tax-free status of the Dist the qualification of the Contribution as a D Reorganization, in action or transaction that would be reasonably likely to be incons any representation made to the IRS or tax counsel. We may take that would otherwise violate this covenant only if GM has determin sole and absolute discretion, that such action or transaction jeopardize the tax-free status of the Distribution or the qualif the Contribution as a D Reorganization.

**Cooperation on Tax Matters.** We and GM have agreed to certain with respect to the tax-related covenants in the IPO and D Agreement. We are required to notify GM if we desire to take prohibited by the tax-related covenants described above. notification, if GM determines that such action might jeopardize t status of the Distribution or the qualification of the Contribu Reorganization, GM has agreed to elect either to:

o use all commercially reasonable efforts to obtain a priv ruling from the IRS or a tax opinion that would permit us desired action, and we have agreed to cooperate in connectio efforts; or

o provide all reasonable cooperation to us in connection obtaining such an IRS ruling or tax opinion.

In either case, GM has agreed to bear its reasonable costs and obtaining such an IRS ruling or tax opinion.

Indemnification for Tax Liabilities. We have generally agreed t

GM and its affiliates  against any and all tax-related  losses inc
in  connection  with any  proposed  tax  assessment  or tax  contro
respect to the  Distribution or the  Contribution to the extent ca
breach by us of any of our  representations,  warranties or covena
the IPO and Distribution Agreement.  This  indemnification does n
actions which GM permits us to take as a result of a determination
tax-related covenants as described above.

    Other  Delphi  Covenants.  General  Motors  currently  owns a
portion of our common stock. As a result, GM will continue to incl
"subsidiary" for various financial reporting,  accounting and othe
Accordingly,  we have agreed to certain covenants in the IPO and D
Agreement. Certain of these covenants are described below:

    o  Covenants  Regarding  the  Incurrence  of  Debt.  So  long
      significant stockholder of our company, the amount of our indeb
      borrowed money will affect GM's financial  position.  Thus, we
'to certain limitations on our ability to incur debt:

    o For so long  as GM  continues  to own at  least  50% of our
      common stock, without GM's prior written consent, which it may
      its sole and absolute discretion,  we will not, and will not pe
our subsidiaries to:

        o create,  incur, assume or suffer to exist any Indebtedne
          of an  aggregate of $5.0 billion  outstanding  at any time;
          however,  that we may make an  acquisition  as a result  of
          Indebtedness would exceed $5.0 billion so long as both a
          target has an FFO to Debt  Ratio of at least 20% and our  I
          after  giving  effect  to  the  acquisition,  including
          duplication,  any  Indebtedness  incurred  in  connection
          acquisition and any  indebtedness of the acquisition targe
          become our Indebtedness as a result of such acquisition,  w
      greater than $6.0 billion; and

                              23

        o  consummate,  or  agree  to  consummate,  any  acquisiti
          acquisition  target with an FFO to Debt Ratio less than 20%
      Adjusted Indebtedness would not exceed $5.0 billion.

    For purposes of these  covenants,  the following  terms have th
meanings:

    "Adjusted Indebtedness"  means, with respect to  any proposed a
the sum of:

        (1) our  Indebtedness  immediately  after  giving  effec
            acquisition,  including,  without  duplication,  any  I
            incurred in connection with the acquisition and any  inde

the acquisition target that will become our Indebtedness
of such acquisition; and

(2) the amount by which the number described in clause
definition of *"FFO to Debt Ratio"* would need to be reduc
for the acquisition target's FFO to Debt Ratio to be equal

*"Indebtedness"* means the sum of:

(1) the aggregate principal amount of our and our <u>subsidiar</u>
long-term and short-term liabilities for borrowed money
capitalized leases, as determined for purposes of our c
financial statements; and

(2) the aggregate amount attributable to all factoring or sec
of receivables and other financial assets by us and our s
in excess of $1.2 billion.

*"FFO to Debt Ratio"* means, for any acquisition target, as of
prior to the proposed acquisition, the percentage determined b

(1) the sum of such acquisition target's net income plus d
and amortization for the last four full fiscal qu
determined for purposes of its consolidated financial sta

(2) the additional Indebtedness that would be incurred in
with such proposed acquisition, including any indebted
acquisition target that will become our Indebtedness as
such proposed acquisition.

o Other Covenants. For so long as GM continues to own at least
outstanding common stock, we have agreed that:

owe will not, without GM's prior written consent, which it m
in its sole and absolute discretion, take any action which has
of limiting GM's ability to freely sell, pledge or otherwise
shares of our common stock or limiting the legal rights of or
benefit to GM as a Delphi stockholder in a manner not app
Delphi stockholders generally; this means that, among other
will not, without GM's prior written consent, which it may
its sole and absolute discretion, alter our Rights Plan, or an
stockholder rights plan, in a manner that would result in GM'
of our common stock causing the rights to detach or become exerc

owe will not, without GM's prior written consent, which it m
in its sole and absolute discretion, issue any shares of comm
any rights, warrants or options to acquire our common stock
giving effect to such issuance GM would own less than 50%
outstanding shares of our common stock; and

oto the extent that GM is a party to, or enters into, any agree
provide that certain actions of GM's subsidiaries may result
in breach or default under such agreements,  and we have been
the existence of such  agreements,  we will not take any actio
result in GM being in breach or default under any such agreement.

o  Financial  Information.  We  have  agreed that,  for so lo
required to consolidate  our results of operations and financial

24

account  for its  investment  in our company,  we will  provide
financial information regarding our company and our subsidiaries;
copies of all quarterly and annual  financial information  and ot
and documents we intend to file with the SEC prior to such  filing
as final  copies  upon  filing;  provide GM with  copies of our  b
financial projections, as well as the opportunity to meet with our
to discuss such budgets and projections; consult with GM regarding
and  content of  earnings  releases;  and  cooperate  fully,  and
accountants to cooperate fully,  with GM in connection with any of
filings. This covenant is subject to appropriate  confidentiality
to protect the confidentiality commitments we have made to our custom

o Auditors and Audits;  Annual  Statements and Accounting.  We
that, for so long as GM is required to consolidate  our results of
and financial position or account for its investment in our compan
not change our auditors without GM's prior written consent, which
unreasonably  withheld,  and will use our best efforts to enable o
to complete their audit of our financial  statements such that the
their  opinion the same date that they date their  opinion on GM's
statements; provide to GM and its auditors all information require
meet  its  schedule  for  the  filing  and  distribution  of  its
statements;  make available to GM and its auditors work papers rel
annual  audit of our company as well as access to the  personnel
the annual audit and our  subsidiaries'  books and records so that
auditors may conduct reasonable audits relating to our financial
adhere to certain specified accounting standards; and notify and c
GM regarding any changes to our accounting  principles;  and make
to our accounting estimates and principles requested by GM.

We have  generally  agreed to indemnify  General Motors and its
against  all  liabilities  arising  out  of  any  incorrect,  ina
incomplete  financial and other  information we provide to GM purs
terms of the IPO and Distribution Agreement.

Indemnification  Relating  to  the IPO and the  Distribution
generally agreed to indemnify  General Motors and its affiliates
liabilities arising out of any  material  untrue  statements  and
in any and all registration  statements, information statements  a
documents filed with the SEC in connection with the IPO and the Di

However, our indemnification of GM does not apply to information General Motors, excluding information relating to Delphi. GM has agre indemnify us for this information.

Expenses. GM has generally agreed to pay all costs and expense to the IPO and the Distribution. We will, however, pay for the expenses of our financial, legal, accounting and other adviser incurred in connection with the Distribution. We will also internal costs and expenses.

**Registration Rights Agreement.** As noted above, General announced its current plan to divest itself of ownership of our st the Distribution and we have agreed to cooperate with GM in all complete the Distribution. In the event that GM does not dives all of its shares of Delphi common stock in the Distribution, GI freely sell all of such shares without registration under the Secu Accordingly, we have entered into a Registration Rights Agreement from time to time, the *"Registration Rights Agreement"*) with GM to (or any other person to whom GM has transferred our shares) wi registration rights relating to the shares of our common stoc holds. These registration rights generally become effective at su any, as GM informs us that it no longer intends to proceed with the Distribution.

**Demand Registrations.** Under the agreement, GM may request r (each, a *"Demand Registration"*) under the Securities Act of portion of our shares covered by the Registration Rights Agree will be obligated to register such shares as requested by GM.

oTerms of Each Offering. General Motors will designate the te offering effected pursuant to a Demand Registration, which m form, including:

(1) an underwritten public offering;

(2) a shelf registration;

(3) a registration in connection with the distribution of, of or offer to exchange, shares of our common stock to debt or equity securities of GM, a subsidiary or affili. or any other person; or

(4) a distribution in connection with the registration subsidiary or affiliate thereof of securities convert exercisable for or otherwise related to such shares of stock.

25

Except for an offering described in clauses (3) and (4) a

Demand Registration must meet a certain minimum aggregat offering price.

oTiming of Demand Registrations. We are not required to u Demand Registration within 90 days of the effective date of Demand Registration, other than a Demand Registration that w as a shelf registration. Also, we have the right to postpone or effectiveness of any Demand Registration for up to 90 day reasonable judgment of our General Counsel such registra reasonably be expected to have a material adverse effect on a proposal or plans by our company to engage in certain transactions; provided, however, that we may exercise this once in any 12-month period.

oPiggyback Registrations. The Registration Rights Agreement al for certain "piggyback" registration rights for General Motors we propose to register any of our securities under the Securit ourselves or others, subject to certain customary exception provide prompt notice to GM and include in such registration of our stock which GM requests to be included (each, a Registration"). In certain circumstances, General Motors right to reasonably object to our selection of any investmen and manager(s) in connection with a Piggyback Registration.

The Registration Rights Agreement sets forth customary r procedures, including a covenant by us to make available our senior for road show presentations. All registration expenses incurred in with the Registration Rights Agreement, including all filing fees expenses of compliance with securities and/or blue sky laws, financi expenses, fees and disbursements of custodians, transfer agents, exch and/or information agents, and fees and disbursements of counsel for and all independent certified public accountants, underwriters, discounts and commissions, and other persons retained by us will be In addition, we must reimburse GM for the fees and disbursements of counsel as well as out-of-pocket expenses incurred in connection wit registration. The Registration Rights Agreement also contains indemnification and contribution provisions by us for the benefit Motors and any underwriters and by General Motors for the benefit of underwriters with respect to information provided by GM.

**Supply Agreement.** We have entered into a Component Supply Agreem (as amended from time to time, the "Supply Agreement") which we b provide us with a substantial base of future business with GM-North A into the next decade. GM currently sources a significant amo automotive parts requirements from us pursuant to certain existing commitments. Except as described below, the Supply Agreement bet Delphi provides that all existing contracts as of January 1, 1999 wil remain in effect, including the pricing, duration and purchase orde conditions. The Supply Agreement also provides that, subject exceptions as described below, we have the right to provide on compet

the first  replacement  cycle of all product  programs  in the United
Canada  which we were  providing to GM as of January 1, 1999,  provid
sources such  replacement  cycle  business  prior to  January 1, 2002.
these programs will cover specific vehicle models introduced from 199
the next  decade.  We will  also  have the  opportunity  to bid on ot:
business on the same basis as other suppliers.

Our ability to realize  revenues  on all GM business,  includin
awarded pursuant to existing contracts,  is in all cases subject to a
factors,  including the volume and option mix of vehicles  actually
GM. The Supply Agreement  provides that General Motors has the right
business with us to other  suppliers in the event that we are not com
terms of quality,  service, design and technology. In addition, GM ha
at all  times  to adopt  new  technology,  whether  or not  such tec:
available  through  us. If we are unable to  provide  the new  techno
equivalent  technology  acceptable to GM on a  competitive  basis,  GM
move the business from us to another supplier.

Existing Contracts.  Under the terms of the  Supply  Agreement,
provided below, all existing contractual  commitments between us and 
to the purchase and supply of motor vehicle-related components and sy
January 1, 1999 will generally remain in effect, including the existi
duration and purchase  order  terms and conditions.  This  include
contracts  under which we have not yet begun to supply  products.  Al
contracts are subject to the volume and option mix of vehicles actual
by General Motors and other factors.

Under the terms of the Supply  Agreement,  Delphi and General 
agreed to honor all "nomination letters" in place as of  Janua
regardless of whether formal purchase orders or other contractual
have been issued with respect to such business.  Nomination lette
letters from General Motors informing a supplier that it has b
specific business to supply a product for a particular vehicle p
light of the long product development cycles in the automotive
General Motors typically issues its nomination letters and other n

26

commitments  about three years in advance of actual production of
program.  These nomination letters commit GM, subject to certain
to source products for a particular vehicle program from a supplie
if GM determines for any reason not to proceed with the vehic
covered by a nomination letter, it is under no obligation to suc:
Also, as with other purchase arrangements,  nomination letters do :
any minimum purchase and are subject to actual production  volumes
competitiveness and other factors.

Payment Terms.  Until  recently,  most of our existing contra
required payment by GM in the month  following  GM's receipt of o
Except as described below,  payment terms on all existing contract

modified by the Supply Agreement to generally require payment fr
under such contracts on the second day of the second month followi
of shipment by Delphi. For more information regarding the impa
modified payment terms on our financial condition, see "M
_Discussion_ _and_ _Analysis_ _of_ _Financial_ _Condition_ _and_ _R_
_Operations--Liquidity and Capital Resources--Extension of Payment_
modified payment terms became effective on January 1, 1999 and al
future contracts with GM. These modified payment terms are consi
the new payment terms that GM is currently in the process of intr
its other suppliers.

The Supply Agreement also provides that certain contracts
purchases of parts for Saturn vehicle models will retain the
methodology currently in place, which generally provides that
only for the actual amount of product used rather than the amount
delivered. Also, certain existing contracts relating to purcha
international automotive operations will retain the existing payment

Our Ability to Secure Certain Next Generation Business. '
Agreement is intended to provide us the opportunity to capture
business that replaces current GM business over the next seve
Through December 31, 2001, we will have the ability to se
competitive purchase order terms the first replacement cycle of
programs in the United States and Canada which we were providing
Motors as of January 1, 1999, and certain other product programs a
below. Thus, we will have the opportunity to match competitive
other suppliers on the next generation of the product programs we
GM in the United States and Canada as of January 1, 1999, prov
programs are sourced by GM prior to January 1, 2002. However,
utilize this ability to secure next generation business, w
competitive in terms of design, quality, price, service and techno
suppliers' bids to provide particular products may include offe
reductions to GM on other current or future products, and GM ma
Supply Agreement consider the economic effect of such package p
assessing our competitiveness.

As noted above, General Motors generally sources its product
three years in advance of the start of production for each vehicl
Since many of these contractual commitments cover a significant
time due to the duration of many vehicle programs of about fi
years, depending on the vehicle model, we expect that this abilit
next generation business, together with our existing contracts and
letters, will provide us with the opportunity to maintain
business with GM well into the next decade.

Our ability to secure next generation business as described ab
is sometimes referred to as a "right of last refusal," includes pr
the United States and Canada of common global vehicle platforms to
that we can provide or execute designs that comply with the requir
function specifications determined by GM, as well as production i

vehicles intended for sale in the United States or Canada;  provi
all cases such programs must meet all of the other necessary
including that such programs were programs in the United States
which we were providing to GM as of <u>January 1, 1999</u>. Other than a
immediately above,  our ability to secure next generation busine
apply to any programs of GM's international automotive operatio:
vehicle production in Mexico.

The Supply Agreement also expressly provides that GM wi
responsible under any circumstances for any supplemental or c
payments to us in the event that we fail to exercise our abilit:
any next generation business or if we cannot provide our pro
competitive basis.

New Business. All new business awarded to us by General Mot
governed by the specific terms of the <u>contracts</u> under which such n
is awarded. Other than with respect to next generation business a
above, if we elect to bid for GM business, we will do so on the sa
all other suppliers. General Motors will award any such business
discretion.

27

GM's Right to Re-Source. Consistent with GM's <u>contracts</u>
suppliers, the Supply Agreement provides General Motors the
re-source its business with us in the event that we are not comp
terms of quality, service, design and technology. Competitiveness
by demonstrable product and performance levels available to GM
suppliers. The term *"re-sourcing"* refers to the process of movi:
business from Delphi to another supplier.

In the event that we are non-competitive with respect to a
product, General Motors is required to notify us of
non-competitiveness and provide us with a reasonable period of
which to correct any such non-competitiveness before GM may re-
business. With respect to non-competitiveness in terms of q
service, the parties will follow GM's Supplier Quality Improvemen
which is also known as the *"16-Step Process"*, in order to identify
quality and service problems. With respect to non-competitiveness
design and technology, the parties will work together to identify
solutions and GM will be permitted to re-source the business on
efforts are unsuccessful within a reasonable period of time.

GM's Right to Adopt New Technologies. The Supply Agreement perm
Motors at all times to adopt new technology, whether or not a:
technology is available through us. In the event that GM wishes t
a technological change to a product covered by a then existing co:
us, we have a right of last refusal to implement the new techno
equivalent technology acceptable to GM and continue production
remaining term of the existing contractual commitment. If we ar

provide the new technology or equivalent technology on a competit
General Motors is free to re-source the business to another
Disputes regarding new technology under this process will be re
senior engineer from each of GM and Delphi plus a third-party
mutually acceptable to both sides.

Technical Information. Consistent with general practice
industry, we have agreed under the Supply Agreement to cooperate
share with GM technical information about the products we suppl
their manufacture, without restriction as to use.

**Use of GM's Tooling.** We will not use tooling to produce product
customers if such tooling is used to produce products for GM;
however, that we will be allowed to continue the use of such too
extent necessary to satisfy <u>contracts</u> with other customers where
has been used for this purpose before <u>January 1, 1999</u> and for ex
such <u>contracts</u>. We have agreed not to use tooling owned by GM
against GM-SPO in the aftermarket.

Delphi Plant Closures and Product Eliminations. In the ev
propose to close a plant or eliminate a product line, we must k
Motors informed on a timely basis of our decision-making process
faith reasonably consider modifying our plans in order to accom
timing requirements with respect to re-sourcing the business. Ad
the Supply Agreement provides that in the event of an extension of
by General Motors of an existing product, which is covered by a co
a fixed term, beyond the term of the original anticipated pro
General Motors has the right to require us to continue production
that product to GM for a reasonable period of time on commercially
terms to be negotiated between the parties.

Delphi Divestitures. In the event that we propose to divest a b
must keep General Motors informed on a timely basis of our deci
process and in good faith reasonably consider GM's input and conc
our selection of a qualified buyer, existing <u>contracts</u> with GM
the business being sold may be assigned to the buyer upon GM's pr
consent, which will not be unreasonably withheld. In such case
Motors will negotiate a new supply agreement with the buyer
contain substantially the same terms as our existing arrange
General Motors with respect to the business being sold. Any devia
the terms of the existing arrangements, including with respect to
be mutually agreed upon by us and GM. During the term of th
<u>contract</u>, Delphi and General Motors have agreed to dedicate
resources and efforts to ensure that General Motors receives
levels of quality, service, delivery, price and technology.

Service Parts. The Supply Agreement also applies to servic
provide to General Motors for sale to GM-authorized dealers wor
general, unless otherwise provided in our existing <u>contracts</u> w
unit pricing on service parts that are not *"past model"* will cont

prices charged to General Motors until three years after such se
go past model. The term *"past model"* refers to parts which
vehicle models which are no longer in production. Thereafter, unit
such service parts will be negotiated between the parties.

28

Quality Improvement. In order to facilitate quality improv
Supply Agreement provides that we will participate in all GM suppl
and development programs. General Motors is entitled to require us
reasonable increased quality standards. All increased quality
established by General Motors must be comparable to then existin
standards.

Termination. Unless terminated in accordance with its terms,
Agreement will remain in effect as long as any existing agree
effect, including any extensions of any such existing agreeme:
Delphi or General Motors may terminate the Supply Agreement for:

o material breach by the other party;

o insolvency or bankruptcy of the other party; or

oattachment, embargo or expropriation of a significant por
other party's assets necessary in order for that party to :
obligations under the Supply Agreement.

In addition, General Motors can terminate the Supply Agreement if:

o35% or more of our company becomes owned or controlled, d
indirectly, by a competitor of General Motors in the b
manufacturing automotive vehicles; or

oall of the underlying contracts governed by the Supply Agree
subject to termination or cancellation pursuant to their terms.

Underlying contracts become subject to termination or cancell
as the result of a variety of factors, such as our non-compe
cause, expiration and, in some cases, termination for c
Termination for convenience means GM can terminate the contract
for any reason. The majority of underlying contracts having term
convenience provisions are shorter-term purchase orders. Thi
terminate for convenience could be exercised by GM in connectio:
change in control of Delphi. Certain change in control transact
also give GM the right to terminate underlying contracts pursu
provisions prohibiting us from assigning our contracts to another ent

In the event that a competitor of GM in the business of ma:
automotive vehicles acquires, directly or indirectly, a significa:
in our company, we must provide GM with reasonable assurances t:

use our best efforts to preserve the confidentiality of all
relating to products supplied to General Motors and GM vehicle progra...

Termination of the Supply Agreement would be likely to have
adverse effect on our company.

Dispute Resolution. The Supply Agreement provides that all ...
other matters related to the Supply Agreement will be exempt from
resolution process set forth in the Separation Agreement or i...
agreement related to the transactions contemplated therein.

**Aftermarket Sales.** We are currently party to a Business R...
Agreement (as modified and as amended from time to time, the
*Relationship Agreement*") with GM-SPO regarding aftermarket sales in
States. This agreement does not, however, cover the service parts
General Motors pursuant to the Supply Agreement for sale to GM
dealers and distributors. The Business Relationship Agreement becomes
termination by either party on or after December 31, 1999 upon twe
prior notice to the other party. This means the Business Relationship
cannot be terminated any earlier than December 31, 2000. Until su...
return for certain royalties and fees it pays to us, GM-SPO genera...
right to act as the exclusive distributor of our aftermarket parts in
States. The pricing under the Business Relationship Agreement
benchmarked in an effort to ensure market based pricing with
ACDelco(R) branded products. Pursuant to an Aftermarket Agreement ...
January 1, 1999, the payment terms between us and GM-SPO are being ...
that GM-SPO will pay us on the second day of the second month fol...
shipment of a product. Under the Business Relationship Agreement, if
the market price for a particular aftermarket product, GM-SPO mu...
aftermarket product from us. Alternatively, we may choose not to meet
price for a particular aftermarket product and cease supplying such
the aftermarket in the United States. Until January 1, 2001, we are o...
offer all new technology with respect to aftermarket products to ...
non-exclusive basis, under terms no less favorable than those

29

offered to our other customers. Following the termination of th...
Relationship Agreement, we may begin distributing our own produ...
aftermarket in the United States.

Outside the United States, we distribute our own aftermarke...
independently of General Motors and, with certain exceptions
batteries, we are free to seek any aftermarket sales opportunities.

We have agreed with GM-SPO to split the ownership of current
brands. As a result, we own the Freedom(R) brand, but may not use t...
the United States until after the expiration of the Business R...
Agreement; GM-SPO owns the ACDelco(R) brand and any AC and Delco deri...
formatives; and GM-SPO owns the Voyager(R) battery brand, but may onl...

batteries sourced from us.  There will be a transition period for licensees to wind down our use of the brands owned by GM or brand Delphi but currently used by GM.

Purchasing. We have entered into agreements with GM pursuant to wh continue to purchase productive materials under existing contract entered into by General Motors on our behalf, until those contracts e: agreements provide that we are entitled to continue to use the systems currently used by GM's purchasing organization until such establish our own purchasing system, which we estimate will not tak five years. In addition, in certain international operations, we may operate in a shared purchasing arrangement with GM for up to five yea

**Employee Matters.** We have entered into several agreements (colle amended from time to time, the *"Employee Matters Agreements"*) allocate responsibility and liability for certain employee relate However, GM is obligated to bargain in good faith with the unions r our hourly employees regarding the effects of the separation of Del on their members.  As a result, the understandings between us and GM the effect of the separation on our hourly employees represented by be affected by negotiations with the unions representing these employ advised us that it intends to work with such unions in this regard. T Matters Agreements generally provide for the following:

Employee Transfers. As of January 1, 1999, all GM salaried active and inactive, who are employees in our operations were tra: Delphi. GM U.S. hourly employees, active and inactive, who are e: our operations were transferred to Delphi as of January 1, 19 remain under the applicable national collective bargaining agre incorporated employee benefit plans, until the Distribution. Ho transfer of salaried and hourly employees at certain of our in operations, and of certain related pension and employee benefits not take place until the receipt of consents or approvals or the s. of other applicable requirements. For all U.S. salaried employees on or before January 1, 1999, GM is retaining responsibility obligations and for other postretirement employee benefit obligations, consisting primarily of retiree medical obligations. discussions with certain of the unions that represent the GM hourl: transferred to us regarding the effect of the separation on the For information regarding these discussions, *"-- Strategy--Improv Performance--Labor Relations."* With regard to our hourly employ employees of divested Delphi units, GM generally will retain pos benefit obligations for U.S. hourly employees who retire on or bef 1, 1999. We have reached agreements with the UAW and the IUE to t: We anticipate that we will assume OPEB obligations and pension for such employees who retire after October 1, 1999.

As between GM and Delphi, the allocation of these obligation made based on certain estimated levels of employee retiremen October 1, 1999 based on historical experience and conditions

Delphi's separation from GM. We have agreed with GM to recal·
allocation of these liabilities based on the actual level of ret
or before <u>October 1, 1999</u>. Accordingly, if and to the extent th·
than the assumed number of employees retire on or before <u>October</u>
would be required to make a payment to GM. Depending on the amoun·
payment, if any, it could have a material adverse effect on our
liquidity. Similarly, if and to the extent that fewer than the ass·
of employees retire on or before <u>October 1, 1999</u>, GM would be
make a payment to us. The amount of postretirement benefits varie
to time, depending on factors such as discount rate, asse·
contributions and other factors. As of <u>December 31, 1998</u>, Delphi
and hourly OPEB obligation was about $4.6 billion and the hourly
pension obligation was about $2.1 billion.

   Certain Flow-Back Rights. It is anticipated that the union disc·
result in some of our hourly employees in the United States bein·

30

with certain opportunities to transfer to GM as appropriate j·
become available at GM and GM employees in the United States havi·
opportunities to transfer to <u>our company</u> to the extent job openi·
available at <u>our company</u>. In general, if an employee transfer
company to GM and then retires from GM, or transfers from GM to ·
and retires from <u>our company</u>, both <u>our company</u> and GM will be resp·
pension payments which in total reflect such employee's enti
service. Responsibility for such pension payments will generally b·
between the companies based on such employee's entire pre-t
post-transfer service, respectively. In the case of employees t
from Delphi to GM, pre-transfer service will include service with ·
our separation from GM and thus will be reflected in the port
pension payments we must bear. It is not currently anticipated
will be any transfer of pension assets or liabilities between us ·
respect to such employees that transfer between our companies.

   With respect to OPEB obligations for such transferring empl·
company to which an employee transfers will provide the OPEB b·
such employee. We have entered into an agreement with GM which pro·
mechanism for determining a cash settlement amount for OPEB ·
associated with employees that transfer between <u>our company</u> and GM
year. Pursuant to this agreement, upon identification of the em:
transferred between GM and <u>our company</u> during the past year, an
analysis will be done to determine an estimated pattern of
cessation, including from retirement, death, or voluntary termi:
such employees. This estimated pattern of employment cessation wil
the timing of payments due between us and GM for the empl·
transferred between our companies in a given year.

   Separate actuarial analysis will be done for employees transf·
<u>our company</u> to GM and from GM to <u>our company</u>. The actuarial assump·

used in valuing the OPEB obligations  associated with transferring
will be based on  those  used in conjunction  with the  receiving
annual OPEB  valuation  for the given period.  The liability  with
such  transferring  employees  will be retained by <u>the company</u> fro
employee  transferred until the cash settlement with respect there
made,  upon which  such  liability  will be recognized by <u>the compa</u>
the employee transferred.

**Employee Benefits.**  We have established or will establish our ow
and employee benefit plans, which generally will be the same as GM'
and  employee benefit plans.  Our U.S. salaried employees began pa
in these plans on <u>January 1, 1999</u>  and our U.S. hourly employees wil
participating in these plans at the time of the Distribution.

Our plans  generally will  assume  all  liabilities  under  GM
employees assigned to us. Certain pension assets funding pension
will be transferred  from trusts and other funding  vehicles  asso
GM's plans to the corresponding trusts for our plans.

General  Motors Stock Awards.  In connection  with the  comple
Distribution,  awards (collectively,  *"GM Awards"*) held by our empl
such date under GM's  incentive  and variable pay plans will be re
awards under our incentive and variable pay plans.  With certain
GM Awards held by  individuals  employed by General  Motors as of
the completion of the  Distribution and by individuals who have re
to replacement of such GM Award, will remain  outstanding as GM Aw
an appropriate revaluation to reflect the Distribution.

In the case of GM Awards consisting of stock options,  such awa
replaced with options to acquire a number of shares of our common
to the number of shares of GM $1-2/3 common stock subject to such
of the date of the  completion of the  Distribution,  multiplied b
described below,  rounded  down to the nearest  whole  share.  Th
exercise  price of such  converted  award will  equal the per shar
price of such GM Award divided by the Ratio.

In the case of  awards  under the GM  Performance  Achievement
unvested  installments of final  awards which  are in the form o
common stock or GM Class H common  stock,  will be  converted  int
Delphi  common  stock using a ratio  similar to the one  described
converting  GM Awards  consisting of stock  options  into options
shares of Delphi's common stock.

The *"Ratio"* means the amount determined by dividing:

othe  average  of the daily high and low per share  prices of th
common stock,  or the Class H common stock if Class H common s
are being converted,  as reported in The Wall Street Journal,
three trading days ending on a date of record established by t
of Directors in connection with the Distribution; by the

SEC Info 1-K-44481-hidCorp-DQ00-K1-7B7r92/Filed 01/07/08  Entered 01/07/08 20:33:17 Pa Exhibit 1 60
Delphis 10-K    Pg 55 of 61

31

othe average  of the daily  high and low per  share  prices of
common stock, as reported  by  The  Wall  Street  Journal, for
trading days commencing on the day after such date of record.

Shares of Delphi's  Common Stock Subject to Substitute  Awards.
possible at this time to specify how many shares of our common  st
subject to  substitute  awards for GM Awards. We expect  that som
consisting of stock options held by our employees will be exercise
Awards will vest and other GM Awards  could be granted,  prior to
the completion of the  Distribution.  In addition,  the remaining
unexercised  options  pursuant to GM Awards will be replaced  with
acquire shares of our common stock by reference to the Ratio,  whi
be known until the time of the Distribution. Our stockholders,  ar
likely to experience  some  dilutive  impact  from  the  abov
adjustments.

As of February 2, 1999,  our employees held about  4,416,000  s
$1-2/3 common stock subject to options pursuant to GM Awards, abou
of which were exercisable as of  February 2, 1999.  If the
determined using the $89.44 per share  closing price of the GM $1
stock on  February 2, 1999,  as  reported in The Wall Street  Jour
offering price of $17.00 per share of our common stock,  the foreg
of shares of GM $1-2/3 common  stock  subject to GM stock  option
replaced with options on about  23,231,000  shares of our common s
February 2, 1999,  there were less than 5,600  shares of GM's Cla
stock subject to GM Awards held by our employees  which will be re
awards of our common stock.

Tax Matters.  We have entered into two income tax allocation  agre
GM to govern the  allocation of U.S.  income tax  liabilities  and t
agreements  with respect to certain other tax matters.  The first ta
agreement is effective from the Contribution Date until such time as
be a member of the General Motors  consolidated group. The second tax
agreement,  which supersedes and replaces the first  agreement,  is e
the day after we cease to be a member of the General Motors  consolid
Under the Code, we would cease to be a member of the  General Motors c
group upon the completion of the Distribution or if GM owns less than
outstanding capital stock. The first tax allocation  agreement is onl
from January 1, 1999 until tax  deconsolidation.  Unless  otherwise
provisions described below are contained in both agreements.

GM generally will pay all  income  taxes  attributable  to  Delp
subsidiaries  for tax  periods  before  the  Contribution  Date.  For
during which we are a member of the General Motors consolidated gro
calculate  our tax  liability  as if we were a  separate  affiliated
corporations filing a consolidated  return, but we will pay our calcu
to General  Motors,  which will then file a consolidated or combined

the appropriate tax authorities. There may be certain U.S. sta
jurisdictions in which we will file a separate income tax return, n
or consolidated with GM, for tax periods before tax deconsolidatio
circumstance, we would file the income tax return with the appro
authorities, and pay the tax directly to the tax authority. Ta
generated by our company for tax periods before tax deconsolidation
our tax liability, but not below zero, and we will not be compensat
benefits generated by our company and used by the General Motors c
group. Except for tax elections, which are defined for purposes of
taxes as the treatment of items in tax returns and filings, that
adverse impact on the General Motors consolidated group or tax ele
must be made by the parent corporation of a consolidated grou
determine all tax elections for tax periods during which we are a mei
GM consolidated group. We will prepare and file all tax returns,
income taxes due with respect to all tax returns required to be file
all tax periods after we cease to be a member of the GM consolidate
for U.S. state or local jurisdictions in which our return is not
consolidated with GM's return.

GM is responsible for most U.S. tax adjustments related to Del
periods prior to tax deconsolidation, other than adjustments relat
Electronics, which previously had been a separate entity in the Gen
consolidated group, or related to certain tax elections made by
addition, we and GM have agreed to cooperate in any tax audits, lit
appeals that involve, directly or indirectly, periods prior to the t
cease to be a member of the General Motors consolidated group. We
agreed to indemnify each other for tax liabilities resulting from the
cooperate in such audits, litigation or appeals, and for any tax
resulting from the failure to maintain adequate records. The
allocation agreement also provides that with respect to our foreign
may be required to indemnify General Motors in certain situation
receive a refund of foreign tax related to a tax period pri
deconsolidation and GM's foreign tax credit is reduced as a re
refund. With a few exceptions, Delphi's subsidiaries outside the Un
will generally be responsible for foreign tax adjustments relating
businesses for all periods prior to the Contribution Date.

32

**Intellectual Property**. We have entered into agreements with GM to
division and transfer of certain intellectual property. Pursuan
agreements, General Motors has assigned, or agreed to transfer,
patents, patent applications and invention records that are primarily
components produced or sold by us and any other patents that are mo
to us than to General Motors. Accordingly, GM has transferred to
partial ownership of about 2,800 patents, 640 U.S. patent applicati
records of invention as well as the corresponding foreign patent
applications. We have agreed with GM to enter into royalty-free cro
for certain intellectual property and we believe that the aggregate
the cross-licenses are about equal. We have also agreed with GM that

can collect reasonable royalties or damages under certain paten
other's suppliers with whom the other does not have or extend an exis
commitment. Also, GM has transferred to us ownership of about 1,170
registrations and applications, about 70 of which are U.S. and the
which are foreign, as well as unregistered trademarks. Cer
intellectual property agreements relating to our business have been
to us, and with respect to intellectual property agreements entered i:
benefit of both parties, GM will use reasonable efforts to have us ma
such agreements.

We have entered into agreements with GM that place restrictions on
certain technologies. For example: GM will have a right of first
limited exclusivity for certain OnStar-related vehicle information
technology; each party is restricted from disclosing certain powertra
control, collision avoidance and other software algorithms to th
without the consent of the other party; and General Motors will retai
of certain fuel cell propulsion system and related technologies,
will have the right to supply a minimum of 25% of the volume of comp
GM's first two major vehicle programs to utilize the fuel cell
provided we can meet certain conditions, including competitive be:
quality, service and price.

There are certain restrictions on our use of some of the trademark
been assigned to us. In addition, certain trademarks and trade name
licensed, rather than transferred, to us, and there are restricti
geographical territory, duration and/or scope of our use of suc:
trademarks and trade names. Our Delco Electronics subsidiary has a
worldwide, royalty-free license to use the trade name "Delco Elect
the trademarks "DELCO" and "DELCO ELECTRONICS" in connection with sev
business units, but we must wind down our use of that trade nam
trademarks to include only automotive audio products by January 1, 20
a worldwide license to use the trademarks "AC," "DELCO" and "AC Del
must wind down all use of these marks, including such use by our
distributors by January 1, 2000. This license is royalty-free, except
certain circumstances relating to joint ventures and third-party re
that have been assigned to us, we may be required to pay GM a royalty

**Real Estate and Environmental.** We have entered into agreements
executed certain instruments to assign or sub-lease GM's real estat
related to the Delphi Automotive Systems Business, consisting of bot:
leased property, between our companies as follows:

oWith respect to the facilities that were owned by GM and us
connection with our business, such facilities have been transfe
company.

oWith respect to facilities owned by GM and used by both GM an
leasing to us the portion of such facilities which we use. Such
generally for a term of three years and the rent thereunder a:
prevailing market rates.

oWith respect to facilities that were leased by GM and use
connection with our business, GM has assigned such leases to us.
these assignments, we have assumed all of GM's obligations
assigned lease and agreed to indemnify GM against all obligatio:
under such leases after their assignment.

oWith respect to facilities leased by GM and used by both GM and
sub-leased to us the portion of such facilities which we
sub-leases are generally for the then remaining term of GM's lea
facilities, less one day, and the rent thereunder shall generall:
occupancy cost per square foot payable under GM's lease for such fa

oGM has also assigned to us its interest in the facilities he
ventures in which GM was a party and which facilities we utilize

Under the lease and sub-lease arrangements described above, the
retain responsibility for releases of hazardous materials at the faci

33

the closing of the real estate transactions and for certain
environmental non-compliance matters relating to pre-closing opera
lessee will be responsible for releases of hazardous materials at t:
after the closing and for all other environmental non-compliance mat
the lease term.

With respect to the facilities transferred to us, we have a
operating costs thereof and applicable financial and environmental re
respect thereto. With respect to facilities that are not transfer
including all facilities closed or sold prior to January 1, 1999, Gen
has retained all operating costs thereof and applicable fin.
environmental reserves with respect thereto, whether or not such faci
previously used by Delphi.

Pursuant to the separation arrangements between our company and
be responsible for environmental liabilities at the GM facilities t:
transferred to us, including all facilities closed or sold prior to
1999, except that we will be responsible for any environmental lia:
such facilities that we cause after January 1, 1999. We will be resp
environmental liabilities at the facilities that are transferred to
that GM will be responsible for any environmental liabilities at such
that GM causes after January 1, 1999.

In addition, with respect to liability for offsite waste disposa
retain responsibility for sites where GM's liability is known or al
to January 1, 1999, except that we will be responsible for any was
contributes to these sites after January 1, 1999. We will not, h
responsible for any contributions to these sites from the facilities
to us that occurred prior to January 1, 1999. At other waste dispo

GM's and Delphi's respective liability will be allocated based on e.
respective contribution of wastes to such sites. In particular, GM'
will be based on contributions from the facilities it retains an
facility owned or operated by GM, except the facilities transfer
Delphi's liability will be based on contributions from the
transferred to us and any other facility owned or operated by Delphi.

Tooling, Containers and Dunnage. We have entered into agreements
allocate the ownership of tooling, containers and dunnage. GM and
each own the tooling that was reflected on their respective balance s.
January 1, 1999. The term *tooling* refers to all tools, jigs, die
fixtures, molds, patterns and similar items necessary for the pr
automotive parts. We will not use tooling to produce products
customers if such tooling is used to produce products for GM; provide
that we will be allowed to continue the use of such tooling to
necessary to satisfy existing contracts, and extensions of such contr.
we have previously used such tooling to produce products for other
For more information, see *"--Supply Agreement--Use of GM's Tooling."*

Containers and dunnage used for the transportation of our produc
facilities to GM facilities or other Tier 1 suppliers to GM will
General Motors. The term *"dunnage"* refers to the materials, such .
wrappings and other loose materials, used to protect automotive p.
shipment. We will own containers and dunnage used for the transporta
products within our facilities. Finally, we will own containers and d
for the transportation of products between us and our suppliers.

**Warranty Matters.** Our warranty responsibility for products
General Motors under existing contractual arrangements will be gove
terms and conditions of those contracts. Generally, those terms and
provide that Delphi expressly warrants to GM that all goods and servi.
by the contract will conform to the specifications, drawings,
descriptions furnished to or by General Motors, and will be mercha.
good material and workmanship and free from defect. In additi.
acknowledges that it knows of GM's intended use for the products an
warrants that the products have been selected, designed, manuf.
assembled based on GM's stated use and will be fit and sufficie.
purposes intended by General Motors.

We have agreed with GM pursuant to the Supply Agreement to work
good faith to reduce warranty costs, including through participa
warranty programs. In addition, the Supply Agreement provides that o
responsibility for products supplied under new contracts will be gove.
terms and conditions negotiated between the parties in those contract

Interim Services. The Ancillary Agreements provide that General
furnish us with a number of interim services, which services will g
provided to us at cost. In addition to any services discussed a.
services include, among others:

ocertain  treasury,  accounting,  which  includes  accounts  p
receivable, tax, travel, customs and payroll services;

34

ocertain  information  systems  services,  including  financial,  e
environmental,  human  resources,  manufacturing,  communication
logistics, purchasing and warranty and service systems;

. oa variety of  employee-related  administrative  support services,
human resource planning and employee placement and medical services;

o certain legal services;

o certain audit services; and

omanaged  access  to  proving  grounds,  test  facilities,  re
development and engineering  centers and the services provided at
by General Motors personnel.

These agreements were made in the context of a parent-subsidiary r
and were negotiated in the overall context of our separation from GM.
charged to us under these agreements may be higher or lower than the :
may be charged by  unaffiliated  third  parties  for  similar  servic
services  provided may not be the same,  in scope and level,  as thos
before our separation from GM.  .

**International Agreements.** We have entered into a series of agreeme:
similar  to  those  discussed  above with respect to those Delphi  Asse
outside  the  United  States.  · In most  countries,  GM's  vehicle  and
businesses  are operated by separate  legal  entities.  In such  coun
entities that operate the  components  business will be  transferred
Where  certain  facilities  or  functions  are  shared  by such  sepa
entities,  the  shared  functions  or  facilities  will  generally be s
accordance  with  the  principles  set  forth  in  the  corresponding
Agreement  in the United  States.  In those  countries  in which the ·
components  businesses are owned by one legal entity,  new entities h
will be formed in order to separate the Delphi business from the GM b

Agreements  have been or will be entered into in each of the count
operations  are to be  transferred  to Delphi.  Although the agreemen
countries have or will have different terms than the Ancillary Agreem
United States,  in general they are or will be similar in scope to th
Agreements.  Certain international assets relating primarily to our b
still be held by General Motors or its affiliates following the Offer
receipt  of  consents  or  approvals  or  satisfaction  of  other
requirements  necessary for the transfer of such assets to Delphi.  T
and  operations  are not,  individually  or in the  aggregate,  mater
company. For example,  certain assets and operations located in Brazi
and Canada are subject to such restrictions.  However,  the informati

in this report regarding <u>our company</u> and our facilities and
including the information set forth in the "*Item 1. Business*" sect
consolidated financial statements presented elsewhere in this repor
and gives effect to the completion of these transactions.

35

Employees; Union Representation

As of <u>December 31, 1998</u>, excluding our joint ventures and other i
we employed 197,568 persons, including 32,896 salaried employees
hourly employees. Of our hourly employees, about 93% are represented
unions, including the UAW, the IUE and the USW. The UAW is our larg
representing about 28% of our unionized employees. Our union repres
major region as of <u>December 31, 1998</u> is indicated in the table below:

Union Representation

| Region | Number of Unions | Number of Employees |
|---|---|---|
| United States | | |
| UAW.......... | 1 | 43,150 |
| IUE.......... | 1 | 15,837 |
| USW.......... | 1 | 1,403 |
| Other unions. | 3 | 250 |
| Total United States. | 6 | 60,640 |
| Canada........ | 2 | 957 |
| Mexico........ | 6 | 58,758 |
| Europe........ | 32 | 27,715 |
| South America.. | 5 | 5,265 |
| Asia/Pacific... | 2 | 637 |
| Total..... | 53 | 153,972 |

The national collective bargaining agreements negotiated by
unions currently apply to our workforce. GM's national agreement w
expires in September 1999, GM's national agreement with the IUE
November 1999 and GM's national agreement with the USW expires in
2002. We will assume the terms of the existing collective bargaining
for our employees in connection with the Distribution.

The percentage of our employees located outside the United States
has increased from about 38% in 1992 to about 60% in 1998. We expe
percentage of our employee population located outside the United
Canada will continue to increase over time as we continue to
operations globally.