Counsel for Nu-Tech Plastics Engineering
SCHWARTZ LAW FIRM, P.C.
Jay A. Schwartz (P45268)
37887 West Twelve Mile Road, Suite A
Farmington Hills, Michigan 48331
(248) 553-9400

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re | Chapter 11 |
|---|---|
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) (Jointly Administered) |
| Debtors. | |

## AMENDED DECLARATION OF GARY LEEMAN

Under penalty of perjury, I, Gary Leeman, do solemnly swear to the following facts of which I have personal knowledge and to which I will testify if called:

1. I am a Certified Public Accountant licensed in the State of Michigan.

2. I am accredited in Business Valuation and I am also a Certified Management Consultant. My curriculum vitae is attached as Exhibit 14.

3. I have been providing Forensic Accounting Services since 1978.

4. I was engaged by Jay A. Schwartz, Esq. of the Schwartz Law Firm P.C. to determine the amount of damages, if any Nu-Tech Plastics Engineering, Inc. incurred.

5. Procedures and Findings:

    A. I read the Plaintiff's Complaint which indicated the ending point of the damage period – December 31, 2000. It also provided background data.

    B. I Read the Standard Blanket Contract prepared by Delphi. The base selling price of $1.86 per unit was established. Any lost sales

would be computed at $1.86 per unit not produced per the contract terms.

C. I reviewed the independently prepared income tax returns for Nu-Tech for the years 1996 through 1998 attached hereto as Exhibit 1, Nu-Tech's Statement of Revenue Expenses and Retained Earnings for 1997 and 1998 (attached hereto as Exhibit 2), Nu-Tech's 1998 Monthly Sales by Product for 1998 (attached hereto as Exhibit 3), Nu-Tech's 1998 Statement of Income (attached hereto as Exhibit 4), Nu-Tech's 1998 and 1999 Balance Sheet (attached hereto as Exhibits 5 and 6), Nu-Tech's 1998 Cost of Sales (attached hereto as Exhibit 7), Nu-Tech's Summary of Lease Payments (attached hereto as Exhibit 8). Based upon my review I learned:

1. 1996 and 1997 were not representative years.

2. Controllable and non controllable costs needed further classification as fixed or variable.

3. Payroll also needed further determination of fixed or variable.

4. Determination of fixed or variable costs was necessary because a variable cost takes place when a sale is made. Fixed costs within a relevant range remain the same.

D. I determined the estimated basis for each variable expense and fixed expense.

1. Variable expense at a percentage of sales.

2. Fixed expenses as an amount per year.

E. I isolated Delphi revenues and costs related to Delphi based upon the outside C.P.A.'s financial statement data.

F. The aforementioned provided sufficient relevant information regarding the relationship between the factors included in Nu-tech's financial statements. However, to determine any projected losses the information on lost production (lost sales) for the contract period in question was necessary.

G. I requested legal counsel to obtain production information from the defendants. The defendants never provided the information. A visit to the office of BBK resulted in insufficient relevant information. I contacted CSM. CSM maintains worldwide

production data for the automotive industry. CSM is widely depended upon. I have previously utilized its data. I obtained the automotive production data from them for the years 1998 – 2002. Representatives of Nu-Tech identified to me the vehicles using the part 0694. I now had the number of unsold parts to be multiplied by $1.86 per unit to determine the lost sales which is set forth in Exhibit 9 a true copy of the CSM data and Exhibit 10 a true copy of the summary I prepared based upon my review of the CSM data.

H. I then applied my findings of the relationship of costs, be they variable or fixed, to the amount of lost sales.

I. The first item I addressed was determining the amount of lost income suffered by Nu-Tech due to the lost ability to produce part 0694. To determine the loss of income, I needed to know the total amount of lost sales and then subtract from that the anticipated costs related to the production of part 0694 related to the lost sales.

J. To determine the costs, I first had to determine the nature of the costs appearing in the 1998 financial statements. The costs included in the financial statements were in two categories, variable and fixed. In general variable expenses are incurred when an item is produced. If there is no item being produced, the assumption is that there is no variable expense. For Example, if a factory worker is on the line producing a part, that workers salary will be a variable cost. If there is no part being produced, there is no need for the worker and therefore no variable cost.

K. I identified all of the variable costs being incurred by Nu-Tech and determined their estimated percentage as it related to the $1.86 selling price for each part produced. The fixed costs are those expenses which will be incurred whether or not there is any production activity. This includes such items as rent. The variable and fixed expenses as determined are then subtracted from the estimated revenues to determine the amount of lost income. This was done for both 1999 and 2000.

L. The analysis performed included only that income as it related to part 0694 and only the costs related to that part in determining Nu-Tech's damages. A review of my analysis provided during my deposition testimony will indicate that no revenues or costs of sale items for anything other than the 0694 part related to Delphi were included in my calculations. I have reviewed the Declaration of Keith Francis. In regards to Mr. Francis' critique of my analysis, Francis erroneously states that sales and costs associated with Nu-Tech Division 2 as well as those associated with Tooling are

included in my report. Those items were **not** included in my calculation.

M.    The lost sales amounted to the $1.86 per the contract times the production of automobiles for 1999 and 2000 using the contract part based upon the CSM data. In order to obtain the production levels, I contacted CSM Worldwide which accumulates that data for the automotive industry based on data provided to it by the automotive companies. CSM Worldwide provides the total production of each vehicle type produced by GM for the years 1998-2002. Recognizing that all GM vehicles did not contain part 0694, I then requested from John Cooper the models which contained that part. He identified those models. Afterward, I was able to take total production of models using the 0694 part and then was able to multiply the sales price by the number of units of production to determine the amount of sales Nu-Tech could be expected for the years 1998-2000. The selling price utilized was determined from the contract information and purchase orders for part 0694 provided to me.

N.    I calculated that lost sales for 1999 were $5,848,445, for 2000 lost sales were $5,611,114 for a total loss of sales in the amount of $11,459,559. See Exhibit 11, a true copy of my calculations of lost sales.

O.    Two additional items still required recognition in determining the loss of income. These items were the additional rent expenses specific to Delphi part "0694" for:

1.    Equipment Rental.

2.    Building Rental.

P.    The additional equipment rental was based upon equipment leased for the production of part "60694" I reviewed two equipment lease agreements and one amendment to equipment lease agreement. Each agreement was with ABX Leasing.

1.    Agreement for Cincinnati Elektra ES 550 - 6 plus tilt table plus 1 MFCH – 300 plus one GT-8 Loader     10,249.36 per month

Additional Cincinnati Elecktra ES 550     10,310.03 per month

|  |  |  |
|---|---|---|
|  | 2. | The additional fixed asset Equipment Expense was $ 493,425.00 for two years |

Q. The additional building rental expense was based upon adding space rented the production of part "0694". I reviewed two lease agreements.

    1.    One lease was for space rented at 4068 Baldwin Road, Building B. The lease was between Air Design, L.C. and Nu-Tech. Base rent was $9,993.33 per month or $119,920 per year. 40% of the rent (the percentage of the building used in connection with part 0694) is $47,968.00 per year.

    2.    The second rent was for space rented at 8024 Embury Road. 50% of space was used in connection with part 0694. Base rent for 50% of the space is $55,045.00 per year.

R. It was also necessary to allocate a portion of the fixed expenses to Delphi. The fixed expenses allocated to Delphi were 27.52% of the total fixed expenses before equipment and building rent. The allocated percentage is based upon the ratio of Delphi sales to total sales in 1998 (1,592,520 fixed expenses x 27.52%). The allocated fixed expenses were $438,261 per year shown with the enclosed schedule.

S. The resulting loss of income (profit) was $8,688,918.00 for 1999 and 2000 combined as set forth in Exhibit 12.

T. The estimated lost value of the business represents the loss of income adjusted for excess expenses capitalized at a rate of 3.91 times after tax earnings. The capitalization amount was determined by the build up method based upon risk free rates, large company earnings rates, small company return and the specific company risk rate less any anticipated growth rate. Available rates are published by Ibbotson and Associates. The Company provides detailed analyses of historical market yields. The lost value of the business is reduced by the amount already included in the loss of income and the amount of the January 11, 2000 sale of the business. The net loss from the sale of the business as originally determined was $684,870. The loss from the sale of business assuming no Delphi costs in cost of sales was $5,811,911. Neither amount includes any loss of income figure as a duplication. See Exhibit 12 a true copy of my schedules based upon information provided demonstrating damages to Nu-Tech and Exhibit 13,

        Closing Statement Regarding Purchase of Assets of Nu-Tech Plastics Engineering, Inc. by Rapid Product Technologies, LLC.

U.    This methodology was used in lieu of a discounted cash flow due to the fact that there would be no future uneven cash flows because Nu-Tech had been sold and, therefore, there were no future periods to consider for any potential uneven cash flow. The discounted cash flow methodology, or free cash flow that Francis used is most often applied when there is an anticipated fluctuation in the future cash flow of the company being analyzed. The utilization of free cash flow is a matter of choice and not related to any standard.

V.    To determine the estimate lost value of the business using capitalization of earnings method, I had to review the loss of income I had previously calculated for 1999. Due to the fact that the capitalization rates are based on after-tax income, I then computed the estimated income taxes for the loss of income. The net result from subtracting the income taxes from loss of income was the amount then utilized for determining total lost value of business based upon the aforementioned factors. This calculation is demonstrated on my schedule as the estimated lost value of business.

W.    The capitalization rate I used was 3.91 because using the following categories and related rates: Risk free rate, equity risk premium, risk premium for size of business, from Ibbotson Associates. I then estimated the specific company risk less Nu-tech's estimated long term earnings growth.

X.    By multiplying the annual loss of net income by the capitalization rate, one obtains the estimated lost value of business. From that estimate, however, two items had to be subtracted for the Nu-Tech analysis: one is deducting the 1999 loss of income to avoid the double dip, and the second deduction was the sales price paid by RPT.

Y.    Lost value of business is determined on a going-concern basis which, but for Delphi's cancellation of the contract, Nu-Tech would have been. Mr. Francis' opinions indicated in his deposition as to the value of business, is based on the assumption Nu-Tech would have had no new business and also takes into consideration his time spent at Nu-Tech managing Nu-Tech's cash flow while NuTech was nearing extinction.

Z.    Excess costs include:

1. Excess building rental paid in 1999:

2. Excess equipment rental paid in 1999.

3. Excess wages and related payroll taxes, and health insurance.

AA. The excess building rent is based upon the 1999 base rents for 40% of the lease cost at 4068 Baldwin Road Building B and 50% of the lease cost for 8024 Embury Road. The excess equipment rental is based upon the equipment leases previously discussed in this affidavit. The lease costs were previously handled as a fixed expense and as such were shown as reducing loss of income. Here, the excess cost as having been incurred, is considered as a separate damage amount. These amounts are shown on the excess cost schedule.

BB. The excess wages represent the estimated wages that would not have been incurred based upon the historical sales and wages – other that being 6.74% of sales according to the books and records of the company as adjusted by the outside C.P.A. firm. The wages have related to it the employer portion of payroll taxes and the estimated cost of health insurance to the employees. These amounts are shown on the excess cost schedule.

CC. The determination of the excess building rental was based upon documentation provided to me which included lease agreements between Nu-Tech and its landlord. Allocation of the rates indicated in the leases was based upon representations from Mr. Cooper as to the allocation of the usage of the property. This is specifically true for the excess rent paid for 50% of the 8024 Embury location which was used in relation to part 0694 and 30-40% portion of the Baldwin Road warehouse used to store the materials for part 0694.

DD. The excess costs for the machinery and equipment is based upon a combination of the lease agreement for the first E550 machine used to make part 0694 and a second E550 machine also used for production of that part. No lease agreement was located for the second E550 machine, however, based upon information provided by Mr. Cooper as to the purchase date of the second machine and the closeness of cost between the two machines, I was able by using internal schedules of costs from Nu-Tech to determine the estimate rental cost of the second machine.

EE. My initial analysis of excess cost was based on information which I was told was later amended. Specifically, two of the pieces of equipment I originally included were not used for the part, and have been eliminated from the calculation.

FF. I also learned that one of the real property locations, Lennon Road, was not used for part 0694 and that only 40% of the Baldwin Road facility and 50% the 8024 Embury Road location were used in connection with part 0694. Accordingly, those calculations have been revised to reflect the most recent evidence provided to me.

GG. No damages are included for expert fees.

HH. No damages are included for legal fees.

II. No damages are included for opportunity costs.

JJ. Pre-judgment interest calculated according to Michigan law is set forth in Exhibit 15 and totals $4,070,305.94 through January 10, 2008.

6. If called to testify I would testify to the statements in this affidavit.

Gary Leeman, C.P.A., A.B.V., C.M.C.

Subscribed and sworn before me this
5th day of January, 2008.

WENDY L. JONES, Notary Public
Wayne County, Michigan
My Commission Expires: 7/18/11
Acting in Oakland County, Michigan