EXECUTION COPY

LIGHTSOURCE FORMATION AGREEMENT

AMONG

GENERAL MOTORS CORPORATION,

LIGHTSOURCE PARENT CORPORATION

AND

PEP GUIDE, LLC

Dated as of September 29, 1998

## TABLE OF CONTENTS

Page

1.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.    ASSET EXCHANGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      2.1.    Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              2.1.1.    Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              2.1.2               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              2.1.3.              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.1.4.              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2.2.    Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2.3.    Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.3.1.    GM Bailed Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.3.2.    Personnel and Medical Records . . . . . . . . . . . . . . . . . . 10
              2.3.3.    Third-Party Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.3.4.    Certain Current Assets . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.3.5.    Certain Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
              2.3.6.    Product Evaluation Vehicles; Pooled Vehicles . . . . . . 11
              2.3.7.    Tax Refunds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
              2.3.8.    Intangibles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
              2.3.9.    Other Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
              2.3.10.   Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
              2.3.11.   Certain Environmental, Privileged and Proprietary Documents . . . . . . 11
      2.4.    Post-Closing Asset Deliveries . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      2.5.    Nonassignable Permits and Contracts . . . . . . . . . . . . . . . . . . . . . 12
              2.5.1.    Nonassignability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
              2.5.2.    Efforts to Obtain Consents and Waivers . . . . . . . . . . . 12
              2.5.3.    If Waivers or Consents Cannot be Obtained . . . . . . . . 12
              2.5.4.    Obligation of Newco to Perform . . . . . . . . . . . . . . . . . 13

3.    ASSET AMOUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      3.1.    Asset Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      3.2.    Preparation of Closing Inventory Statement . . . . . . . . . . . . . . . 13
      3.3.    Asset Amount Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      3.4.    Prorations, Adjustments of Expenses Following the Closing . . . . . . 15
              3.4.1.    Prorations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
              3.4.2.    Further Assurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
              3.4.3.    Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              3.4.4.    Prosecution of Claims . . . . . . . . . . . . . . . . . . . . . . . . . 16
      3.5.    Supplementary Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.    ASSUMPTION OF LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5.    REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . 18
      5.1.    Representations and Warranties of GM . . . . . . . . . . . . . . . . . . . . 18
              5.1.1.    Organization; Standing . . . . . . . . . . . . . . . . . . . . . . . . 18
              5.1.2.    Authority; Binding Effect . . . . . . . . . . . . . . . . . . . . . . 18
              5.1.3.    Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              5.1.4.    Sufficiency of Acquired Assets . . . . . . . . . . . . . . . . . . 19
              5.1.5.    Personal Property; Third-Party Bailed Assets . . . . . . . 19
              5.1.6.    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              5.1.7.    Intellectual Property Rights . . . . . . . . . . . . . . . . . . . . . 20
              5.1.8.    Compliance with Laws; Permits . . . . . . . . . . . . . . . . . 21
              5.1.9.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
              5.1.10.   No Consents Required; Absence of Conflicting Agreements . . . . . . . 21

Page

7.    REAL ESTATE MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.1.    Conveyance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.2.    Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.3.    Land Surveys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

8.    CONDITIONS TO CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    8.1.    Conditions to Obligations of PEP Guide and Newco . . . . . . . . . . . . . . . . 54
        8.1.1.    Accuracy of Representations and Warranties . . . . . . . . . . . . . . . 54
        8.1.2.    Performance of Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
        8.1.3.    No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
        8.1.4.    Consents to Assignment of Certain Contracts . . . . . . . . . . . . . . 54
        8.1.5.    Ancillary Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        8.1.6.    Material Adverse Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        8.1.7.    Agreement with Lender. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        8.1.8.    Lender Acknowledgment and Security Agreement . . . . . . . . . . . 55
        8.1.9.    Missing Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    8.2.    Conditions to Obligations of GM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        8.2.1.    Accuracy of Representations and Warranties . . . . . . . . . . . . . . . 55
        8.2.2.    Performance of Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        8.2.3.    No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        8.2.4.    Certain Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        8.2.5.    Salaried Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        8.2.6.    Agreement with Lender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        8.2.7.    Lender Acknowledgment and Security Agreement . . . . . . . . . . . 56

9.    ENVIRONMENTAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    9.1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        9.1.1.    Adverse Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        9.1.2.    Anderson Plating Operations . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        9.1.3.    Chlorinated Solvent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        9.1.4.    Clean Closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        9.1.5.    Environmental Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        9.1.6.    Environmental Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        9.1.7.    Governmental Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        9.1.8.    Hazardous Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        9.1.9.    Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        9.1.10.   Monroe Press Pit Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        9.1.11.   Non-Compliance Matter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        9.1.12.   Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    9.2.    Environmental Assessments and Compliance Audits . . . . . . . . . . . . . . . . 59
        9.2.1.    Environmental Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . 59
        9.2.2.    Pre-Closing Environmental Assessments . . . . . . . . . . . . . . . . . . 59
        9.2.3.    Pre-Closing Environmental Compliance Audits . . . . . . . . . . . . . 59
    9.3.    GM Remediation and Corrective Action . . . . . . . . . . . . . . . . . . . . . . . . . 60
        9.3.1.    GM Remediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        9.3.2.    Remedial Action Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        9.3.3.    Remedial Action Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        9.3.4.    PCBs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        9.3.5.    ACM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        9.3.6.    GM Compliance Action Plans . . . . . . . . . . . . . . . . . . . . . . . . . 61
        9.3.7.    No Other Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        9.3.8.    Non-Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        9.3.9.    Newco's Review Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Page

9.14.5. Notices ............................................................ 76

10. CLOSING ............................................................... 77
    10.1. The Closing ..................................................... 77
    10.2. Asset Exchanges ................................................. 77
    10.3. Additional Documents and Papers ................................ 79

11. CERTAIN ADDITIONAL COVENANTS ......................................... 79
    11.1. Operation of the Business ...................................... 79
    11.2. Further Assurances ............................................. 79
    11.3. Reasonable Access .............................................. 79
    11.4. Transition Services and Arrangements ........................... 80
    11.5. Books and Records .............................................. 82
    11.6. Technical Documentation ........................................ 82
    11.7. Payment and Collections ........................................ 83
    11.8. Non-Competition ................................................ 83
    11.9. Subsequent Financial Statements ................................ 84
    11.10. Injunctions/Orders ............................................ 84
    11.11. Supplements to Schedules ...................................... 84
    11.12. Confidentiality ............................................... 85
    11.13. Intellectual Property Licenses ................................ 85
        11.13.1. Licenses to Newco ....................................... 85
        11.13.2. Licenses to GM .......................................... 85
        11.13.3. Sublicense to Newco ..................................... 86
    11.14. Pre-Emptive Right ............................................. 86
    11.15. Management Dilution ........................................... 86
    11.16. Capital Contribution .......................................... 86
    11.17. Warrants ...................................................... 87
        11.17.1. Issuance ................................................ 87
        11.17.2. Form .................................................... 87
        11.17.3. Exercise ................................................ 87
        11.17.4. Transfer Restrictions ................................... 87
        11.17.5. Registration Rights ..................................... 87
        11.17.6. Other Terms ............................................. 87
    11.18. Put Rights .................................................... 88

12. INDEMNIFICATION ...................................................... 88
    12.1. Survival ....................................................... 88
    12.2. Indemnification ................................................ 89
        12.2.1. Indemnification Provisions for Benefit of Newco ......... 89
        12.2.2. Indemnification Provisions for Benefit of GM ............ 89
    12.3. Indemnification Procedure as to Third-Party Claims ............. 90
    12.4. Exclusive Remedy ............................................... 90
    12.5. Dispute Resolution ............................................. 91

13. TERMINATION .......................................................... 91
    13.1. Termination .................................................... 91
    13.2. Effect of Termination .......................................... 92

14. MISCELLANEOUS ........................................................ 92
    14.1. Bulk Sales Laws ................................................ 92
    14.2. Notices ........................................................ 92
    14.3. Assignment ..................................................... 93
    14.4. Pledge to Lenders .............................................. 94

# TABLE OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Component Supply Agreement | Exhibit A |
| GM Note | Exhibit B |
| Right of Access Agreement | Exhibit C |
| Shareholders and Registration Rights Agreement | Exhibit D |
| Warrants Certificate | Exhibit E |
| Environmental Confidentiality Agreement | Exhibit 9.2.1 |
| Form of License or Sublicense | Exhibit 11.13.1 |
| | |
| Certain Acquired Assets | Schedule 2.1.1A |
| Pre-existing Agreements | Schedule 2.1.1B |
| GM Bailed Assets | Schedule 2.3.1 |
| Third Party Assets | Schedule 2.3.3 |
| Excluded Contracts | Schedule 2.3.5 |
| Other Assets | Schedule 2.3.9 |
| Nonassignable Contracts | Schedule 2.5.1A |
| Contracts Requiring Consents | Schedule 2.5.1B |
| Liens on Personal Property and Inventory | Schedule 5.1.5A |
| Personal Property | Schedule 5.1.5B |
| Bailed Personal Property | Schedule 5.1.5D |
| Litigation | Schedule 5.1.6A |
| Material Litigation | Schedule 5.1.6B |
| Product Liability Claims | Schedule 5.1.6C |
| Intellectual Property | Schedule 5.1.7A |
| Claims Against Intellectual Property | Schedule 5.1.7B |
| Licenses Requiring Consents | Schedule 5.1.7C |
| Permits | Schedule 5.1.8 |
| Compliance with Laws | Schedule 5.1.8A |
| Certain Permits in Default | Schedule 5.1.8B |
| Certain Other Permits in Default | Schedule 5.1.8C |
| Financial Statements | Schedule 5.1.11A |
| Reconciliation | Schedule 5.1.11B |
| Liabilities | Schedule 5.1.12 |
| Material Contracts | Schedule 5.1.13A |
| Contracts in Default | Schedule 5.1.13B |
| Contracts to be Assigned | Schedule 5.1.13D |
| Required Permits | Schedule 5.1.14 |
| Owned Real Estate and Anderson, Indiana Real Estate | Schedule 5.1.15A |
| Leased Real Estate | Schedule 5.1.15B |
| Government Notices | Schedule 5.1.15E |
| Impairment of Utilities | Schedule 5.1.15G |
| Changes in Business | Schedule 5.1.17 |
| ERISA | Schedule 5.1.18 |
| Labor Relations and Employment | Schedule 5.1.19A |
| Current Products | Schedule 5.1.21 |
| Year 2000 | Schedule 5.1.22 |
| Hourly Employees | Schedule 6.1A |
| Salaried Employees | Schedule 6.1B |
| SUB Fund | Schedule 6.13 |

# LIGHTSOURCE FORMATION AGREEMENT

LIGHTSOURCE FORMATION AGREEMENT dated as of September 29, 1998, among General Motors Corporation, a Delaware corporation ("GM"), Lightsource Parent Corporation, a Delaware corporation ("Newco"), and PEP Guide, LLC, a Delaware limited liability company ("PEP Guide").

## WITNESSETH

1.      GM and PEP Guide have caused Newco to be incorporated and will each transfer certain assets to it in exchange for Newco securities and payments on the terms and subject to the conditions set forth in this Agreement.

2.      In furtherance of the foregoing, (a) GM will contribute the Business (as defined below) and the GM Note (as defined below) to Newco, or one or more designees of Newco, and (b) PEP Guide will contribute $15,000,000 cash, subject to adjustment as provided herein, to Newco.

3.      In exchange (a) GM will receive $15,000,000 cash, subject to adjustment as provided herein, 50 shares of Series A Senior Preferred Stock, 5 shares of Series A Preference Stock (as defined below), 5 shares of Series B Preference Stock (as defined below), 375,000 shares of Class B Common Stock (as defined below) and certain Warrants (as defined below) issued by Newco to GM from time to time, and (b) PEP Guide will receive 50 shares of Series A Senior Preferred Stock (as defined below) and 375,000 shares of Class A Common Stock (as defined below).

4.      The Parties also desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW THEREFORE, in consideration of the premises, mutual promises, representations, warranties, and covenants contained in this Agreement, the Parties agree:

1.   DEFINITIONS.

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in the Sections to which they pertain):

"1997 Financial Statements" has the meaning set forth in Section 5.1.11.

"Acquired Assets" means the assets referred to in Section 2.1.

"Administrative Assets" means books, records and other administrative assets of every kind and nature, wherever located, including, price lists, correspondence, mailing lists, lists of customers and potential customers, vendor lists, production data, sales materials and records, market studies, penetration data, and other market information, sales and marketing plans, programs and strategies, sales, costs and other financial data, purchasing materials and records, personnel records of employees, billing records, accounting records (including documentation supporting all amounts and disclosures included in the 1997 Financial Statements), other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints, and plant layouts, including trade secrets, know-how, show-how, designs and proprietary commercial information, methods, practices,

"Class A Common Stock" means the voting Class A common stock, par value $1.00, of Newco.

"Class B Common Stock" means the non-voting Class B common stock, par value $1.00, of Newco.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" means the date of Closing.

"Closing Inventory Amount" has the meaning set forth in Section 3.2.

"Closing Inventory Statement" has the meaning set forth in Section 3.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Component Supply Agreement" means the Component Supply Agreement between GM and Newco in the form of Exhibit A hereto to be entered into at the Closing pursuant to Article 10.

"Confidentiality Agreement" has the meaning set forth in Section 11.3.

"Consent" has the meaning set forth in Section 5.1.10B.

"Consolidated EBITDA" means, for any Person, for any period, an amount equal to the sum of (i) Consolidated Net Income for such period, plus (ii) the provision for taxes for such period based on income or profits to the extent such income or profits were included in computing Consolidated Net Income and any provision for taxes utilized in computing net loss under clause (i) hereof, plus (iii) Consolidated Interest Expense for such period, plus (iv) depreciation for such period, plus (v) amortization for such period (including the amortization of deferred financing costs and expenses), minus, (vi) to the extent added in computing Consolidated Net Income, all non-cash gains for such period, minus, (vii) management fees to Palladium and (viii) $500,000 on a monthly basis, all for such Person and its subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense" for any period means the total interest expense of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP for such period.

"Consolidated Net Income" for any period means the net income from continuing operations (after taxes) of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP, excluding the effect of extraordinary or non-recurring cash gains or cash losses (as such gains or losses are determined in accordance with GAAP) for such period.

"Contracts" means, purchase orders, sales agreements, service contracts, distribution agreements, quotations and bids, leases, license agreements, product warranty, technical assistance or service agreements, and other commitments, agreements, and undertakings entered into by GM or any of its Affiliates with respect to the Business or any of the Acquired Assets, including the Listed Contracts, in each case other than such as constitute Intellectual Property.

"GM's knowledge" or "to the knowledge of GM" means actual knowledge of GM employees who, in the Ordinary Course of Business, would be expected to know or have reason to know, after reasonable inquiry, information called for by the particular subject matter identified.

"Governmental Authority" means any court, agency, or commission, or other governmental entity, authority or instrumentality, whether federal, state, local, or foreign, for all purposes other than Article 9.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hourly Participants" has the meaning set forth in Section 6.6.1.

"Hourly Returned Employee" has the meaning set forth in Section 6.3A.

"Hourly Transferred Employees" has the meaning set forth in Section 6.1A.

"Improvements" means buildings, fixtures, and other improvements.

"including" means including without limitation.

"Intellectual Property" means intellectual and similar intangible personal property and rights of every kind and nature, including United States and foreign (i) patents and patent applications, inventions, invention disclosures, which may or may not form the basis of patent applications, and shop rights, (ii) trademarks, service marks and trade names (including trademarks and trade names associated with the name "Guide") and all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent & Trademark Office, any state of the United States or any other Governmental Authority, all goodwill symbolized thereby or associated therewith and all extensions and renewals thereof, (iii) copyrights (including all copyrights, whether registered or unregistered, copyright registrations and applications to register copyrights), (iv) Software, (v) Technical Documentation and (vi) licenses and rights with respect to any of the foregoing or property of like nature, including, but not limited to, confidentiality agreements, invention assignments or agreements, non-competition agreements with current or former employees of the Business or third parties, and other intellectual property agreements relating to the Business.

"Intellectual Property Licenses" has the meaning set forth in Section 11.13.

"Intended Return Date" has the meaning set forth in Section 6.3C.

"Inventory" means inventory, including raw materials, work-in-process, finished products, supplies and spare parts of the Business, wherever located (but not at the Rimir, Mexico plant), and reflected as assets on the books and records of the Business.

"Laws" means, for all purposes other than Article 9 hereof, laws, statutes, ordinances, codes, standards, rules, administrative rulings, judgments, orders, decrees, or regulations of any Governmental Authority.

"Lien" means any lien, charge, claim, pledge, covenant, security interest, conditional sale agreement or other title retention agreement, lease, tenancy, right of occupancy, mortgage, restriction, reservation, reversion, license, easement, security agreement, option, covenant,

"Party" or "Parties" means Newco, PEP Guide and/or GM.

"PEP Guide" means PEP Guide, LLC, a Delaware limited liability company.

"Permits" means permits, concessions, grants, franchises, licenses, consents, certificates, orders, and other authorizations and approvals of any Governmental Authority necessary for the conduct of the Business as currently conducted or the ownership of the Acquired Assets, other than Environmental Permits and other than those relating to the formation and/or qualification to do business of the corporate entity operating the Business.

"Permitted Exceptions" means, with respect to the Owned Real Estate and the Anderson, Indiana Real Estate: (a) liens for any current real estate or ad valorem taxes or assessments not yet due and payable or being contested in good faith by appropriate proceedings; (b) inchoate mechanic's, materialmen's, laborer's, and carrier's liens and other similar inchoate liens arising by operation of Law in the Ordinary Course of Business for obligations which are not due and payable and which will be paid or discharged in the Ordinary Course of Business; (c) matters disclosed in the Survey on the date hereof; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Owned Real Estate; (e) zoning ordinances; and (f) those Liens listed in Schedule 5.1.15E.

"Person" means any individual, corporation, organization, partnership, joint venture, trust, firm, association (whether or not Incorporated), Governmental Authority or other entity.

"Personal Property" means tangible personal property (other than Inventory) of the Business, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures, and other tangible personal property, wherever located.

"Pre-October 1, 1999 Retirees" has the meaning set forth in Section 6.6.1(f)

"Pre-October 1, 1999 Returned Employees" has the meaning set forth in Section 6.6.1(g).

"Prime Rate" means the rate of interest from time to time announced publicly by Citibank, N.A. at its offices in New York, New York as the prime rate.

"Products" means those automotive components, including forward and signal lights and related components, as manufactured, assembled, designed, processed, marketed, offered for sale, sold, imported, installed or serviced by, or in the conduct of, the Business on or immediately prior to the Closing Date.

"REA" means the Retirement Equity Act.

"Real Estate" means real property and interests in real property including Improvements.

"Real Property" means the Anderson Plant and the Monroe Plant.

"Right of Access Agreement" means the Right of Access Agreement between GM and Newco in the form of Exhibit C hereto to be entered into at the Closing pursuant to Article 10.

"Salaried Participants" has the meaning set forth in Section 6.6.2.

"Transfer Documents" means such bills of sale, assignments, and other good and sufficient instruments of transfer, including (i) a covenant or limited warranty deed warranting against grantor's acts to the Owned Real Estate and (ii) assignments with respect to the Intellectual Property included in the Acquired Assets, in each case, in form and substance reasonably satisfactory to PEP Guide and its counsel providing for the contribution to Newco of title to the Acquired Assets as provided in this Agreement and as PEP Guide may reasonably request.

"Transferred Employees" has the meaning set forth in Section 6.1A.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and/or its Local Unions 1977 and 662.

"UAW Agreement" means the collective bargaining agreement executed between the UAW and GM, effective November 18, 1996 to September 14, 1999, including all supplemental and local agreements and memoranda of understanding.

"Valuation Date" has the meaning set forth in Section 6.6.4(d).

"WARN Act" means Worker Adjustment and Retraining Notification Act of 1988.

"Warrants" has the meaning assigned to such term in Section 11.17.1.

"Warrants Certificate" means the Warrants Certificate in the form of Exhibit E hereto.

"$" or "U.S. $" or "dollars" means the lawful currency of the United States.

2.    ASSET EXCHANGES.

   2.1.    Asset Exchanges.

      2.1.1.  Asset Exchanges. At Closing GM shall (i) lease the Anderson, Indiana Real Estate to Newco (or Newco's designee(s)) pursuant to the Anderson, Indiana Lease free and clear of any and all Liens except Permitted Exceptions, and (ii) contribute to Newco (or Newco's designee(s)) free and clear of any and all Liens, except Permitted Exceptions, the following assets and properties, wherever located, together with all of the right, title and interest of GM and its Affiliates therein (collectively, the "Acquired Assets"): (A) Owned Real Estate, (B) Inventory, (C) to the extent used or held for use primarily in the Business, Personal Property including the equipment listed on Schedule 2.1.1A (including all property, plant or equipment located at the Monroe Plant or the Anderson Plant, whether or not paid for, and whether or not an obligation is due or recordable as a liability under GAAP), Intellectual Property and Administrative Assets,  (D) to the extent used or held for use significantly in the Business, Contracts, Permits, Environmental Permits, subject to and in accordance with Article 9, together with any and all goodwill, rights, claims, rights of setoff, deposits and rights of recovery relating thereto, and (E) the GM Note, subject, in each case, to Section 2.3. and in the case of Intellectual Property, further subject to the pre-existing agreements and rights of joint owners identified in Schedule 2.1.1B.

      2.1.2   At Closing PEP Guide shall contribute to Newco the Cash Amount.

### 2.3.5.  Certain Contracts.

Contracts or commitments for the borrowing or lending of money, lines of credit, or guarantees of indebtedness; credit cards issued to or through GM; letters of credit, performance or payment bonds, or guarantees of performance; contracts or commitments with any investment banker, financial advisor, finder, or broker (collectively, "Excluded Contracts").  Schedule 2.3.5 sets forth a list of all Excluded Contracts that Newco will be required to replace in order to conduct the Business as currently conducted.

### 2.3.6.  Product Evaluation Vehicles, Pooled Vehicles.

Any vehicles assigned pursuant to GM's "Product Evaluation Program" and pooled vehicles.

### 2.3.7.  Tax Refunds.

Any refund of Taxes, or claim for refund of Taxes, of any kind relating to any period prior to the Closing Date.

### 2.3.8.  Intangibles.

All Intellectual Property other than items included in the Acquired Assets; provided, however, that Newco and its Affiliates may continue to sell or dispose of any existing inventories or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or any of its Affiliates, to third parties for a period of 18 months after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith; and provided further, that Newco may sell any existing or future inventories, whether of Products or otherwise, or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or its Affiliates (other than trademarks, service marks, trade names or corporate names involving the word "Delphi" or its symbols), to GM or any such Affiliate without limitation.

### 2.3.9.  Other Assets.

All of the Inventory that shall have been transferred or disposed of by GM prior to Closing in the Ordinary Course of Business, and the other assets listed on or prior to the date hereof in Schedule 2.3.9.

### 2.3.10.  Real Estate.

Fee title to the Anderson, Indiana Real Estate.

### 2.3.11.  Certain Environmental, Privileged and Proprietary Documents.

Certain privileged environmental documents of GM that are the subject of the representation in Section 9.9.6 hereof.

### 2.4.  Post-Closing Asset Deliveries.

Should GM and Newco reasonably determine after the Closing that any Acquired Assets are still in the possession of GM or any of its Affiliates, GM shall or shall cause such Affiliates to promptly deliver any and all such Acquired Assets to Newco, at GM's sole cost and expense.  Should GM and

13

### 2.5.4. Obligation of Newco to Perform.

To the extent that Newco is provided the benefits, pursuant to Section 2.5.3, of any such Permit or Contract or license or right, Newco shall perform, on behalf of GM, for the benefit of the issuer thereof or the other party or parties thereto the obligations of GM thereunder or in connection therewith, but only to the extent that (i) such action by Newco would not result in any material default thereunder or in connection therewith, and (ii) such obligation would have been a liability assumed by Newco pursuant to Article 4 but for the non-assignability or non-transferability thereof, and if Newco shall fail to perform in any material respect as required herein, GM, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied.

## 3.    ASSET AMOUNT.

### 3.1.    Asset Amount.

A.  The amount of the Acquired Assets (the "Asset Amount") is $39,750,582 minus the amount, if any, by which the Closing Inventory Amount, as finally determined pursuant to Section 3.2, is less than (or plus the amount, if any, by which the Closing Inventory Amount is more than) the Targeted Inventory Amount.

B.  At least five business days, but in no event more than 12 business days, prior to the Closing Date, GM shall provide to PEP Guide and Newco its good faith estimate of the amount of the Inventory as of the Closing Date, which estimate shall be certified in writing by an appropriate officer of GM (the "Estimated Inventory Amount").

C.  The term "Cash Amount" means one-half of (x) $29,750,582 cash minus (y) the amount, if any, by which the Estimated Inventory Amount is less than the Targeted Inventory Amount.

### 3.2.    Preparation of Closing Inventory Statement.

A.  Within 90 days after the Closing, GM shall deliver to Newco, at GM's sole cost and expense, a statement (the "Closing Inventory Statement") setting forth the amount of Inventory existing at the Closing Date, consisting of the book value of the Inventory on a FIFO basis less the $500,000 of "tool crib" Inventory and, if present on the Closing Date, $2,000,000 of service parts that have not been sold since January 1, 1997 (the "Closing Inventory Amount"), accompanied by an audit report of Deloitte & Touche LLP or other independent public accountants of recognized national standing stating that (i) they have audited the Closing Inventory Statement in accordance with generally accepted auditing standards and (ii) in their opinion, the Closing Inventory Statement has been prepared in accordance with GAAP consistently applied with the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis.  It is understood that, in applying GAAP, all accounting methods, policies, practices, procedures, classifications, judgments or estimation methodologies shall be consistent with those used to prepare the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis, but only if and to the extent that they are not inconsistent with GAAP and without any leeway for materiality. Contemporaneously, GM shall deliver to Newco a schedule setting forth a calculation of the Asset Amount and the amount of any payment or note to be made or issued, and by whom, pursuant to Section 3.3.

3.4.    Prorations, Adjustments of Expenses Following the Closing.

3.4.1.  Prorations.

(i)  To the extent that GM makes any payment with respect to the Business prior to, on or following the Closing Date with respect to any item listed in any of clauses (ii)(a) through (e) below relating to any period following the Closing Date, Newco shall reimburse GM that portion of such payment relating to such period following the Closing Date, and

(ii)  To the extent PEP Guide or Newco makes any payment relating to the Business following the Closing Date with respect to any item listed in any of the clauses (a) through (e) below relating to any period on or prior to the Closing Date, GM shall reimburse PEP Guide or Newco that portion of such payment relating to such period on or before the Closing Date, in each case for the following:

(a) personal property, real property and other ad valorem Taxes.

(b) water, wastewater treatment and sewer charges, and any other assessments payable with respect to the Owned Real Estate or the Anderson, Indiana Real Estate, together with Taxes thereon.

(c) electric, fuel, gas, telephone and other utility charges.

(d) reimbursable employee business expenses.

(e) payments and charges, including rentals and other charges under leases, due pursuant to any Contracts (other than pursuant to collective bargaining agreements or Benefit Plans) or Permits or licenses or rights with respect to Intellectual Property, in each case, to which GM is a party or is obligated and which are being assumed by Newco pursuant to this Agreement.

In connection with the foregoing, at the Closing GM shall deliver to PEP Guide and Newco a list of all outstanding bills and invoices for, and setting forth the amount of, Taxes, water, sewer, and other assessments, and electric, fuel, gas, and other utility charges due within 30 days following the Closing, where the failure to pay such amounts within such thirty-day period will result in interest, penalties and/or late charges in excess of $5,000 individually.

3.4.2.  Further Assurance.

A.  To the extent that after Closing, GM, on the one hand, or Newco, on the other hand, receives any bills or invoices for any of the items listed in this Section 3.4 or similar items, relating to both pre-Closing and post-Closing periods, such Party shall within 10 business days send a copy of any such bills or invoices to the other Party.

B.  If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for reimbursement of all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 3.4.3.

GM shall pay to Newco the total amount by which Consolidated EBITDA for such period is less than $7,800,000.

If the Closing Date is after October 1, 1998 and on or before October 31, 1998, and if Consolidated EBITDA of the Business for the period from November 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $30,000 less than $2,100,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $2,100,000.

If the Closing Date is after November 1, 1998 and on or before November 30, 1998, and if Consolidated EBITDA of the Business for the period from December 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $10,000 less than $700,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $700,000.

The "Supplementary Payment" shall be any such amount refunded to Newco together with simple interest at the Prime Rate from the Closing Date through and including the date of payment.

C. Subject to Section 3.5D, GM shall pay Newco the Supplementary Payment within five business days of Newco's delivery to GM of the Stub Period Financial statements and the Supplementary Payment Statement, pursuant to Section 3.5A, by wire transfer in U.S. dollars in immediately available funds to an account designated by Newco.

D. In the event that GM is in disagreement with the calculation of Consolidated EBITDA or the Supplementary Payment set forth on the Supplementary Payment Statement, and in the event that such disagreement exceeds, in either case, $50,000, GM shall, within 30 business days after receipt of the Supplementary Payment Statement, the accompanying Stub Period Financial Statements and, if requested, the Stub Period Working Papers, notify Newco of such disagreement(s). If Newco and GM shall not have resolved all such disagreements within 20 business days immediately following notice thereof by GM, both GM and Newco shall immediately refer those items of disagreement to a three-member dispute resolution panel. The panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for resolution of the disagreements, including a requirement that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision of the dispute resolution panel shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Resolution of the matters in dispute shall be made as soon as practicable in accordance with this Agreement. Any costs and fees of such dispute resolution panel shall be shared equally by GM and Newco. Each of the Parties agrees that neither it nor any of its Affiliates will initiate other legal action with respect to the Supplementary Payment Statement or the calculation of Consolidated EBITDA or the Supplementary Payment unless and until such efforts have been unsuccessful in resolving the disagreements for at least 60 days after a written notice of disagreement was delivered to Newco with respect to such matter.

4.    ASSUMPTION OF LIABILITIES.

From and after the Closing Date, Newco shall assume and shall pay, perform and discharge, subject to the provisions of Article 6, the obligations of GM with respect to the Business to be paid, performed or discharged after the Closing Date under the Contracts and Permits and licenses and rights with respect to Intellectual Property, in each case, included in the Acquired Assets and assigned to Newco pursuant to this Agreement, and for goods ordered by GM or its Affiliates prior

### 5.1.3. Qualification.

GM is duly qualified or licensed and in good standing as a corporation duly authorized to do business in the states of Indiana and Louisiana, which are the only jurisdictions where the nature of the Business as currently conducted, or the ownership, lease or operation of the Acquired Assets, makes such qualification or license necessary.

### 5.1.4. Sufficiency of Acquired Assets.

The Acquired Assets, together with (A) the Intellectual Property rights to be licensed or sublicensed on or prior to the Closing Date pursuant to the Intellectual Property Licenses, (B) the services and contracts to be provided or administered by GM or its Affiliates pursuant to Section 2.5 and (C) the Excluded Assets other than intangibles as described in Section 2.3.8 constitute all properties, assets, agreements, licenses and services necessary for the conduct of the Business as currently conducted.

### 5.1.5. Personal Property; Third-Party Bailed Assets.

A. GM has good and valid title to the Personal Property and Inventory included in the Acquired Assets and the Excluded Assets, free and clear of any and all Liens, except those set forth in Schedule 5.1.5A, none of which, individually or in the aggregate, interferes in any material respect with the current use by the Business of the assets to which they relate.

B. To GM's knowledge, Schedule 5.1.5B sets forth a list of all machinery, equipment and capitalized tools as of August 31, 1998, and a description of substantially all other tangible personal property, in each case, included in the Acquired Assets. The Personal Property which is required for the conduct of the Business as currently conducted included in the Acquired Assets and the GM Bailed Assets are in good working order and repair with the exception of such assets that need repair or replacement in the Ordinary Course of Business.

C. The Inventory is in good condition and is usable and of merchantable quality, except to the extent reserved in the books and records of GM with respect to the Business. All finished goods included in the Inventory are of appropriate quantity and quality and saleable in the Ordinary Course of Business. All machinery and equipment spare parts are useable in the ordinary course of business. All raw materials, work-in-process, and finished goods Inventory are of such quality as to meet or exceed GM's "in house" quality control standards and any applicable quality control standards of any Governmental Authority. All Inventory disposed of by GM since December 31, 1997 has been sold in the Ordinary Course of Business.

D. To GM's knowledge, Schedule 5.1.5D sets forth a list of the equipment, special tools or tooling, dies, molds, patterns, jigs, gauges and production fixtures and special material handling equipment in the possession of the Business and which is provided to the Business on a bailment basis by the customers identified in Schedule 5.1.5D (other than GM and its Affiliates).

### 5.1.6. Litigation.

Except as set forth in Schedule 5.1.6A, there is no claim, action, suit, proceeding, investigation or inquiry by or before any Governmental Authority or arbitration tribunal, whether at law or in equity, pending or, to GM's knowledge, threatened by or against GM or any of its Affiliates with respect to, or affecting, (i) the Business or (ii) any of the Acquired Assets, or (iii) which challenges or otherwise questions this Agreement or any of the Ancillary Agreements, or any action taken or to

license and, except as set forth in Schedule 5.1.7C, has obtained the Consent of the licensor where necessary.

D.  The Intellectual Property included in the Acquired Assets, together with (i) the Intellectual Property to be licensed or sublicensed at or prior to the Closing pursuant to the Intellectual Property Licenses and (ii) the Intellectual Property, including Software, to be used by GM, its Affiliates or EDS in providing the services pursuant to Section 11.4, constitute all Intellectual Property necessary for the conduct by Newco (or Newco's designee(s)) of the Business as currently conducted.  Except as set forth in Schedule 5.1.7B, GM has no knowledge of any claim or potential contingent claim that the conduct of the Business by Newco (or Newco's designee(s)) as currently conducted would infringe any patent or intellectual property right of any third party.  None of the intangibles described in Section 2.3.8 and included in the Excluded Assets is used or held for use primarily in the Business.

### 5.1.8.  Compliance with Laws; Permits.

Except as set forth in Schedule 5.1.8A, GM has been since December 31, 1997, and is, and the Business and the Acquired Assets have been since December 31, 1997, and are, in compliance in all material respects with all Permits and all Laws applicable to the Acquired Assets or the conduct of the Business. GM possesses all such Permits, each of which is listed in Schedule 5.1.8. Except as set forth in Schedule 5.1.8B, each such Permit is in full force and effect, and there is no claim, action, suit, proceeding, investigation, or inquiry pending or, to GM's knowledge, threatened, that has resulted or is reasonably likely to result in the revocation, cancelation or suspension, or any materially adverse modification, of any such Permit. Since December 31, 1997, GM has not received from any Governmental Authority any notice alleging any conflict, default or violation, or revocation, cancelation or modification, of any such Permit, or any violation of any Law applicable to the Business or any of the Acquired Assets, except as set forth in Schedule 5.1.8C.

### 5.1.9.  Brokers.

GM has employed no finder, broker, agent, or other intermediary in connection with the negotiation or consummation of this Agreement, any Ancillary Agreement, or any of the transactions contemplated hereby or thereby, other than Morgan Stanley & Co. Incorporated, which is acting for GM and whose fees and expenses will be paid by GM.

### 5.1.10.  No Consents Required; Absence of Conflicting Agreements.

A.  The execution and delivery by GM of this Agreement and the Ancillary Agreements to which GM is a party do not, and the performance by GM of this Agreement and the Ancillary Agreements to which GM is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-Laws, in each case as currently in effect, of GM, (ii) conflict with or violate any Law applicable to GM, the Business or any of the Acquired Assets or by or to which GM, the Business or any of the Acquired Assets is bound or subject, (iii) result in a violation of or conflict with or constitute a default under, or result in the revocation, cancelation or modification of, any Permit or (iv) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, or result in the creation of a Lien on any of the Acquired Assets under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which GM is a party or by or to which GM, the Business or any of the Acquired Assets is bound or subject.

involving any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less without any penalty or liability to GM;

(ii)    contract or commitment for the purchase, sale or lease (other than contracts listed under clause (iv)(b) below) of tangible or intangible personal property pursuant to purchase orders which (a) contain no additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1 and (b) other than with respect to direct material purchases (i.e., the purchase of materials incorporated into the Products), involve any receipt or expenditure by GM of more than $250,000 per annum (together, "Standard Purchase Orders");

(iii)    contract to obtain services involving any expenditure by GM of more than $250,000;

(iv)    contract for the sale or lease of, or warranty relating to, the Products or the furnishing of services of the Business that (a) contains additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1, or (b) involves any receipt to or expenditure by GM of more $250,000 per annum and which is not terminable by GM upon notice of 30 days or less;

(v)    sales agency, sales representative, broker, distributor, or similar contract, agreement or arrangement which cannot be canceled by GM without penalty or payment of any premium upon notice of 30 days or less;

(vi)    joint venture, joint research or development, joint financing, teaming or partnership contract or arrangement or other agreement involving sharing of profits or revenues;

(vii)    guarantee, performance bond, surety, indemnification, letter of credit or similar commitments relating to the performance of any obligation by any Person other than GM in respect of the Business;

(viii)    agreement, arrangement, contract or other commitment, including any covenant not to compete or other restrictive covenant, which purports to limit in any respect the manner, or the localities, in which GM or Newco is entitled to conduct all or any portion of the Business or own or operate any of the Acquired Assets;

(ix)    employment contract, stay, completion bonus or severance agreement with any employee of GM with respect to the Business;

(x)    plans, contracts or agreements pursuant to which GM, with respect to the Business, has any obligation to the Persons listed in Schedule 6.1A and Schedule 6.1B; Employee Pension Benefit Plans and Employee Welfare Benefit Plans relating to the Business which are sponsored by or contributed to by GM (the "Benefit Plans"); or agreements with any labor union or other representative of employees connected with the Business (including local agreements, amendments, supplements, letters, and memoranda of understanding of any kind); or

(xi)    contract or commitment relating to the Business and not otherwise referred to above, regardless of whether made in the Ordinary Course of Business, that involves any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less.

E. Except for Permitted Exceptions and as set forth in Schedule 5.1.15E, there are no variances, special exceptions, easements or agreements pertaining to the Owned Real Estate or the Anderson, Indiana Real Estate imposed by, or granted by or entered into by GM, with or enforceable by any Governmental Authority. Except as set forth in Schedule 5.1.15E, no written notice from any Governmental Authority has been received by GM requiring or calling attention to the need for any work, repair, construction, alteration or installation on, or in connection with, the Owned Real Estate or the Anderson, Indiana Real Estate.

F. No certificate of occupancy or any equivalent thereof of any jurisdiction is required for the conduct of the Business as currently conducted by GM on any Owned Real Estate or the Anderson, Indiana Real Estate.

G. All of the Owned Real Estate and the Anderson, Indiana Real Estate have access and connections to sanitary sewer, water, electricity, gas, telephone and all other utilities needed to conduct the Business, and, to the knowledge of GM, other than as provided in Schedule 5.1.15G, there is no existing fact or condition which, individually or in the aggregate, is reasonably likely to result in termination of any such access or connection.

H. To the knowledge of GM, no fact or condition exists which would prohibit existing rights of access to and from the Owned Real Estate or the Anderson, Indiana Real Estate from and to public highways and roads, and GM has not received written notice of any pending or threatened restriction or denial, whether from a Governmental Authority or any other Person, upon such ingress or egress.

I. GM has not received any written notice of any pending or threatened condemnation or eminent domain proceeding with respect to the Owned Real Estate or the Anderson, Indiana Real Estate.

J. Neither the Owned Real Estate nor the Anderson, Indiana Real Estate is subject to any right of first refusal or right or option to purchase or right of first refusal or right or option to lease or acquire any interest therein.

### 5.1.16. Tax Matters.

A. GM has duly and timely filed with the appropriate federal, state, local, and foreign authorities or governmental agencies, all Tax Returns required to be filed with respect to the Business and has paid all Taxes due and owing except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

B. GM has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee working within the Business, except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

C. GM is not a party to any Tax allocation or sharing agreement, except as provided in Section 3.4.1 of this Agreement, under which PEP Guide, Newco or the Acquired Assets could be subject to Tax or other liability after the Closing.

D. GM is not a party to, or subject to, any safe harbor leases or sale/leaseback transactions with respect to any of the Acquired Assets.

employees of GM is represented by any labor organization and GM has not received notice of any current union organizing petition to the NLRB from other employees of the Business, nor has GM received notice of any NLRB procedure concerning representation of such employees; (v) there are no written personnel policies, rules or procedures with respect to the terms of employment of employees of the Business; (vi) GM is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours of work and occupational safety and health; (vii) there is no unfair labor practice charge or complaint against GM pending or, to the knowledge of GM, threatened before the NLRB or any similar Governmental Authority; (viii) there is no grievance arising out of any collective bargaining agreement or other grievance procedure which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair materially the ability of Newco to conduct the Business after the Closing as presently conducted; (ix) there is no charge with respect to or relating to GM pending before the Equal Employment Opportunity Commission or any other agency responsible for the prevention of unlawful employment practices which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted; (x) GM has not received any written notice of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation or other inquiry with respect to or relating to GM, and no such investigation or other inquiry is in progress; and (xi) there is no claim, action, suit, proceeding, investigation or inquiry pending or, to the knowledge of GM, threatened in any forum by or on behalf of any present or former employee of the Business, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any Law governing employment or the termination thereof or other discriminatory, wrongful or tortuous conduct in connection with the employment relationship, which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted.

B.  Since December 31, 1997, with respect to the Business and the Acquired Assets, GM has not effectuated (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Business; or (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of the Business; nor has the Business been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state or local law. None of the Business' employees has suffered an "employment loss" (as defined in the WARN Act) during the previous six months.

### 5.1.20. No Misleading Statements.

Neither this Agreement (including the Schedules and Exhibits hereto), or the certificates delivered pursuant to the terms hereof, nor any document or writing delivered by GM at the Closing in connection herewith, contains any untrue statement of a material fact or omits or fails to state any material fact necessary to make the statements contained herein or therein not misleading.

### 5.2.1.  Corporate Data.

Each of Newco and PEP Guide is a corporation or company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation and has the requisite corporate or company power and corporate or company authority to own, lease and operate its properties and assets.

### 5.2.2.  Corporate Power, Due Authorization.

Each of Newco and PEP Guide has the requisite corporate or company power and corporate or company authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of, and consummation of the transactions contemplated by, this Agreement and the Ancillary Agreements to which each of Newco and PEP Guide is a party have been duly authorized by all necessary corporate or company action on the part of Newco or PEP Guide, as a party thereto, and no other corporate or company action or proceeding on the part of Newco or PEP Guide is required to authorize the execution, delivery and performance by it of, or consummation of the transactions contemplated by, this Agreement or any Ancillary Agreement to which it is party.  This Agreement has been duly executed and delivered by PEP Guide and is, and the Ancillary Agreements to which Newco or PEP Guide is a party will be when executed and delivered, valid and binding obligations of Newco and PEP Guide, as a party thereto, enforceable against it in accordance with their respective terms.

### 5.2.3.  No Consent Required.

No Consent of any Governmental Authority or any other Person is required in connection with the execution, delivery, and performance by Newco or PEP Guide of this Agreement or the Ancillary Agreements to which it is a party, or the consummation by Newco or PEP Guide of the transactions contemplated hereby and thereby, except any filing under the HSR Act, if such filing is required.

### 5.2.4.  Absence of Conflicting Agreements.

The execution and delivery by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party does not, and the performance by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-laws or Certificate of Formation or operating agreement, in each case as currently in effect, of Newco or PEP Guide, (ii) conflict with or violate any Law applicable to Newco or PEP Guide or by or to which Newco or PEP Guide is bound or subject, or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which Newco or PEP Guide is a party or by or to which Newco or PEP Guide is bound or subject.

for purposes of this Agreement. Hourly Transferred Employees and Salaried Transferred Employees will be collectively referred to herein as "Transferred Employees".

B. At Closing, hourly employees and salaried employees, in each case, who are identified on Schedule 6.1A or 6.1B, as applicable, and are on leave, including disability leave (whether or not any applicable waiting period relating to such disability leave is then satisfied) (each an "Hourly Leave Employee" or "Salaried Leave Employee" and, collectively, a "GM Leave Employee"), shall remain employed by GM. GM Leave Employees, however, will commence employment with Newco upon their return to work in accordance with termination of leave eligibility and, at such time, become Transferred Employees. Any disagreement between GM and Newco regarding termination of disability leave status will be submitted to a binding third party medical arbiter (selected by mutual agreement of GM and Newco). Cost of such arbitration shall be shared equally.

GM hourly and salaried employees who are absent at Closing due to illness or injury and, prior to reporting to work at Newco, subsequently go on a sick leave of absence for the same condition will be treated as GM Leave Employees. GM hourly and salaried employees who are absent at Closing and return to work shortly thereafter without going on an approved leave will become Transferred Employees at Closing and report to work at Newco when able or available.

C. Except as provided in Section 6.21, Newco agrees that it will not knowingly hire, without the prior written consent of GM (which consent shall not unreasonably be withheld), on a regular, contract or other basis, any employee who was employed on a salaried basis and who broke credited service with GM or any of its Affiliates within 18 months prior to Closing.

D. Newco will provide written notice to GM whenever a Transferred Employee retires or otherwise breaks seniority or length of service with Newco.

E. GM shall retain all liability (including, but not limited to, the requirements of the WARN Act and Section 4980B of the Code and any related rules and regulations) relating to any employee of GM or its Affiliates who is not and never was a Transferred Employee.

F. Prior to Closing, GM shall use its best efforts to reduce to zero the number of employees in the GM JOBS Program associated with the Monroe Plant and the Anderson Plant.

6.2. <u>Special Provisions Relating to Hourly Employees.</u>

A. Effective as of the Closing, Newco will assume the UAW Agreement, Supplements and Exhibits, as required by Document 91 of the UAW Agreement.

B. Newco will maintain or cause to be maintained for the benefit of the Hourly Transferred Employees such employee benefit and pension plans as required by the UAW Agreement. Newco agrees to assume the GM seniority status of Hourly Transferred Employees for all purposes under the UAW Agreement. GM agrees to continue GM seniority accumulation for Hourly Transferred Employees pursuant to the provisions of the UAW Agreement applicable to laid off employees.

C. GM will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of or the Transferred Employees at the Monroe Plant and the Anderson Plant. Newco will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of, or the employees at the Monroe Plant and the Anderson Plant.

dollars in immediately available funds by the 10th day of each month to an account designated by GM; provided that Newco shall pay a minimum of $12,000 for each such returned Hourly Transferred Employee regardless of the number of months remaining in the Return Period. In no event shall there be any payment by Newco for attrition at Newco or its Affiliates, including retirement, death, termination, voluntary severance or voluntary return.

C. At Closing, Newco will provide GM with a status report outlining the expected monthly flow of employees back to GM (specifying the number of employees within each employee classification), and Newco will promptly provide GM with, from time to time, any changes to this status report in excess of 50 employees. Newco will further provide GM with written notice prior to returning any Hourly Transferred Employees to employment with GM pursuant to Sections 6.3B or 6.3D (the "Newco Return Notice"). The Newco Return Notice shall specify the number of employees which Newco will return to GM, the plant (i.e., Monroe Plant or Anderson Plant) from which such employees will be returned, the number of employees in each classification, and the date on which Newco will return such employees to GM; provided, however, that the date of return of the employees to GM shall be no less than 30 days from the date on which such notice is delivered to GM, and names and social security numbers of such employees shall be provided to GM prior to the expiration of this thirty-day period. As used in this Agreement, the term "Intended Return Date" shall mean the date on which Newco will return employees to GM as specified in the Newco Return Notice. This written notice shall be provided to the director of the GM National Employee Placement Center, Room 9-128, 3044 West Grand Boulevard, Detroit, MI 48202. Notwithstanding the foregoing, in the event that GM notifies Newco that it has an accelerated need for employees which varies from the status report, Newco will use its reasonable efforts to accommodate GM's needs.

D. If any Hourly Leave Employee commences active employment with Newco at either the Monroe Plant or Anderson Plant at a time that the number of Hourly Transferred Employees exceeds the Business Target Number, Newco shall have the right but not the obligation to immediately return one Hourly Transferred Employee from the respective plant to employment with GM in accordance with procedures set forth in Section 6.3B. On the date of such employee's return to employment with GM, such employee will cease to be a Transferred Employee and will become an Hourly Returned Employee.

E. Any employment reductions which Newco seeks to make beyond the Business Target Number will be handled by Newco consistent with applicable labor agreements. Except as provided otherwise in Sections 6.6 and 6.7, Newco shall be solely responsible for the costs associated with such reductions.

F. If before the fifth anniversary of the Closing Date, Newco determines to increase employment levels at the Monroe Plant or the Anderson Plant to fulfill supply agreements between Newco and GM that are in existence at the Closing Date, Newco shall offer to rehire former employees from the Anderson Plant or Monroe Plant, as applicable, on the basis of seniority if any such employees remain in GM's JOBS Program (after application of the separation incentive payments/relocation efforts in accordance with Section 6.3B) or layoff. Any such employee hired by Newco shall, upon such hiring become an Hourly Transferred Employee. If no such employees remain in GM's JOBS Program, Newco may hire new employees.

6.4. Payment of Wages and Benefits of Hourly Transferred Employees.

A. In accordance with Section 6.19, GM will be responsible for the payment of all wages and benefits of Hourly Transferred Employee relating to, or earned during, any period ending on or prior

Section 6.4D. Newco will not be entitled to simultaneously seek reimbursement under 6.4B, 6.4C or 6.4D for the same employees.

6.5.    Special Provisions Relating to Salaried Employees.

Newco will provide each Salaried Transferred Employee with salary, vacation entitlement, and employee benefit plans and programs (excluding, however, investment features of savings plans, plans and programs limiting coverage to executives, GM's equity plans, and as otherwise provided herein) which are in the aggregate substantially comparable to those provided by GM immediately prior to the Closing, until at least October 1, 1999. Except as otherwise provided in Sections 6.6 and 6.7, Newco will recognize a Salaried Transferred Employee's service with GM for all purposes. Notwithstanding the foregoing, (i) nothing in this Agreement shall be construed to require that Newco employ any Salaried Transferred Employee for any specific length of time and (ii) nothing in this Agreement shall require any Salaried Transferred Employee to be anything other than an "at will" employee of Newco.

6.6.    Retirement Program and Pension Plans.

6.6.1.    Hourly Employees.

Newco will establish or cause to be established, effective at Closing, a new defined benefit pension plan (the "Newco Hourly Pension Plan") covering the Hourly Transferred Employees which, in accordance with this Agreement and Newco's obligation to assume the UAW Agreement, will duplicate the terms and benefits provided to Hourly Transferred Employees under the GM Hourly-Rate Employees Pension Plan (the "GM Hourly Pension Plan"), a copy of which has been provided to Newco and PEP Guide. For purposes of the Anderson Plant, Newco will also duplicate the terms and benefits of the GM Hourly Pension Plan through October 1, 2002, including any changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement. Effective at Closing, Hourly Transferred Employees who were participants in the GM Hourly Pension Plan at Closing (the "Hourly Participants"), shall become participants in the Newco Hourly Pension Plan. The Newco Hourly Pension Plan shall provide for the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with the UAW so requires. GM will amend the GM Hourly Pension Plan to provide the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with UAW so requires. For purposes of this Section 6.6.1, the term "credited service" shall have the meaning set forth in the UAW Agreement. For purposes of Section 6.6.1, credited service at both GM and Newco shall be taken into account by both GM and Newco for purposes of determining eligibility for benefits under the GM Hourly Pension Plan and Newco Hourly Pension Plan, respectively. Following Closing, Transferred Hourly Employees will accrue credited service in the Newco Hourly Pension Plan and will not accrue additional credited service in the GM Hourly Pension Plan except as specifically provided in Sections 6.6.1(f), (g) and (j). Hourly Returned Employees will accrue credited service in the GM Hourly Pension Plan beginning on the date they return to employment with GM and will not accrue additional credited service thereafter in the Newco Hourly Pension Plan.

(a)    With respect to any Hourly Participant who retires from Newco on or after age 62:

(i)    The Newco Hourly Pension Plan will pay such Hourly Participant a benefit which equals the applicable basic benefit rate (as set forth in the Newco Hourly Pension Plan) as

Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with GM. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan.

(d)    With respect to any Hourly Participant who retires from Newco upon total and permanent disability (by agreement between Newco and GM):

(i)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, unreduced for age and (B) an amount equal to the temporary supplement, as determined under the Newco Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced for age.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, unreduced for age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the temporary supplement, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement and taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced for age.

(e)    The Newco Hourly Pension Plan will recognize for participation and vesting, but not for accrual purposes, credited service accrued by Hourly Participants under the GM Hourly Pension Plan as of Closing. In addition, the Newco Hourly Pension Plan will recognize for accrual purposes credited service previously accrued under the GM Hourly Pension Plan for any Hourly Participant who is not vested under the GM Hourly Pension Plan at Closing ("Special Unvested Participant"). Anything in this Agreement to the contrary notwithstanding, Special Unvested Participants shall receive no benefit under the GM Hourly Pension Plan and shall receive a benefit under the Newco Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1 (a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, GM shall direct the trustees of the GM Hourly Pension Plan to transfer, in cash, from the trust under the GM Hourly Pension Plan to the trust under the Newco Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(c).

(f)    The GM Hourly Pension Plan shall recognize, for accrual, vesting and eligibility purposes, credited service accumulated under the Newco Hourly Pension Plan for any Hourly Participants who (i) retire under the Newco Hourly Pension Plan on a normal, early voluntary, or

(i)      With respect to any Hourly Participant who retires from GM on or after age 62:

(A)      The Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit.

(B)      The GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit.

(ii)      With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with 30 or more total years of credited service with GM and Newco:

(A)      Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement to which such Hourly Participant would be entitled using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced by age.

(B)      Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement, as determined under the GM Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced by age.

(iii)      With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with less than 30 total years of credited service with GM and Newco:

(A)      Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with Newco. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(B)      Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, as determined under the GM