under the GM Hourly Pension Plan also shall break such Returned Employee's service under the Newco Hourly Pension Plan with entitlement only to a deferred vested retirement at the benefit levels in effect under the Newco Hourly Pension Plan as of the break of service from GM.

(m)    To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the Newco Hourly Pension Plan shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis. To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the GM Hourly Pension Plan shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis.

### 6.6.2.  Salaried Employees.

Newco will establish or cause to be established, effective as of the date of the Closing, a new retirement program (which may include a defined contribution plan) (the "Newco Salaried Retirement Program") which shall provide benefits necessary to ensure compliance by Newco with Section 6.5 of this Agreement. Effective at Closing, Salaried Transferred Employees (the "Salaried Participants") who were participants of the GM Retirement Program for Salaried Employees (the "GM Salaried Retirement Program") at Closing shall become participants in the Newco Salaried Retirement Program. For purposes of this Section 6.6.2, the term "credited service" shall have the meaning set forth in the GM Salaried Retirement Program.

(a)    The Newco Salaried Retirement Program shall contain the following provisions:

(i)    The Newco Salaried Retirement Program shall recognize, for participation and vesting, but not for accrual purposes, all credited service accrued by Salaried Participants under the GM Salaried Retirement Program as of Closing. In addition, Newco shall assume complete responsibility for all retirement benefits owed to Salaried Transferred Employees who are not vested on the Closing Date under the GM Salaried Retirement Program ("Special Unvested Participant") and Newco's Salaried Retirement Program will recognize for benefit accrual purposes credited service accrued under the GM Salaried Retirement Program as of the Closing.

(ii)    In the case of any Salaried Participant who has at least 30 years of credited service under the GM Salaried Retirement Program at Closing, upon such Salaried Participant's retirement from Newco, Newco or the Newco Salaried Retirement Program shall pay such Salaried Participant, in addition to any other applicable amount, an amount equal to the early retirement or other supplement, as determined under the GM Salaried Retirement Program, multiplied by the Newco Service Fraction.

(iii)    To the extent permitted under the applicable law, all benefit payments to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis. Newco shall be responsible for making any payments required by this Section 6.6.2(a) if the Newco Salaried Retirement Program does not contain provisions calling for such payments.

(b)    GM shall amend the GM Salaried Retirement Program to provide Salaried Participants the following as of Closing:

(i)    All Salaried Participants who are vested under the GM Salaried Retirement Program at Closing and retire from Newco, who when taking into account GM and Newco credited service could retire under the GM Salaried Retirement Program, on a normal, early voluntary, or total and permanent disability basis (approved by GM) shall be entitled to payment from the GM

Participant's average monthly base salary as of Closing increased by 3% per year as described in subsection (iv) above through the date of such Salaried Participant's break in service.

(vi)    Any benefits payable from the GM Salaried Retirement Program under subsections (i), (ii) and (iii) shall be based on provisions applicable to other GM salaried retirees, including any increase in benefit rates based on the Salaried Participant's years of credited service under the GM Salaried Retirement Program.

(c)    To the extent permitted by applicable law, all benefits to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis. To the extent permitted by applicable law, all benefit payments to any Salaried Participant under the GM Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis; provided that GM shall not discontinue benefits provided to a former salaried employee that Newco is permitted to hire under Section 6.21.

(d)    With respect to a Salaried Special Unvested Participant covered under Section 6.6.2(a)(i), the amount to be transferred in accordance with Section 6.6.4 shall be the present value of each employee's accrued benefit as of the Closing Date using the benefit rate at the closing date and assumption for determining the minimum lump sum distribution under rules of the Internal Revenue Service for qualified plans.

### 6.6.3.    Other Plan Provisions.

Newco and GM acknowledge that neither they nor their respective pension plans or retirement programs shall be required to recognize any grants of additional age or additional credited service given to Salaried Participants or Hourly Participants by the other party and/or their respective pension plans or retirement programs for any reason. Except as otherwise provided in this Agreement, nothing herein shall be construed to limit GM's or Newco's right to amend the GM Hourly Pension Plan, GM Salaried Retirement Program, Newco Salaried Retirement Program or Newco Hourly Pension Plan (provided that any such amendment or termination is in compliance with Section 411(d)(6) of the Code) to eliminate all or a portion of any supplement or subsidy otherwise payable under their respective plans.

### 6.6.4.    Transfer of Liabilities and Assets.

(a)    With respect to each Pre-October 1, 1999 Retiree, the amount to be transferred in accordance with 6.6.1(f) will be calculated as follows. First, the monthly benefits which each such retiree would have received from the Newco Hourly Pension Plan had the employee remained in the Newco Hourly Pension Plan (including Newco's Basic Benefit, and if applicable, Newco's retirement supplement in accordance with Sections 6.6.1(a), (b), (c) and (d)) will be determined based on applicable benefit rates under the Newco Hourly Pension Plan as of the Valuation Date. Second, the present value of such benefit payments to each such retiree shall be calculated using the SFAS 87 assumptions (e.g., discount rates, mortality assumptions, etc.) set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expenses for the fiscal year prior to the year in which the Valuation Date occurs. To this amount will be added any pension payments actually made by GM to each such retiree, multiplied by the Newco Service Fraction for such retiree, plus interest at GM's SFAS 87 interest rate to the Valuation Date. The amount to be transferred with respect to each Pre-October 1, 1999 Retiree, regardless of whether the employee is alive on the date of the valuation, shall equal such sum.

supporting documentation from GM, that he disagrees with the GM actuary then, first GM and Newco shall negotiate, in good faith, to resolve such dispute, and if unable to come to an agreement, then GM and Newco shall agree upon and engage an impartial actuary, who shall be entitled to the privileges and immunities of an arbitrator, to resolve any disagreement and whose determination as to any, such disagreement (if not contrary, to ERISA) shall be conclusive, final and binding. **The parties shall share equally all costs and fees of such impartial actuary. Thereafter, Newco and GM shall cooperate to file as soon as reasonably possible all documents, including Forms 5310A, which may be legally required to effect the liability and asset transfer. The transfer shall take place on the 31st day following such filing. In any case, the amount transferred shall include interest at GM's SFAS 87 discount rate from the Valuation Date to the date of transfer.**

(g)     The pension plan that is the transferee of assets transferred in accordance with this Section 6.6.4 shall assume all liabilities for all accrued benefits under the transferor plan in respect of the participants to whom such transfer relates, and the transferor plan shall be relieved of all liabilities for such benefits. GM and Newco shall provide each other with such records and information as may be necessary or appropriate to carry out their obligations under this Section 6.6, and they shall cooperate in the filing of documents required by the transfer of assets and liabilities described herein. Notwithstanding anything contained herein to the contrary, no such transfer shall take place until the 31st day following the filing of all required Forms 5310-A in connection therewith.

### 6.6.5.  Amendment or Termination of Newco Plans.

In the event the Newco Salaried Retirement Program or Newco Hourly Pension Plan is terminated, provides for or is amended to provide for a cap on credited service or other restriction on the further accumulation of credited service by Salaried Participants or Hourly Participants, respectively, the credited service with Newco recognized for, where applicable, accrual, eligibility, or calculation of the portion of any applicable early retirement or other supplement under the GM Salaried Retirement Program or GM Hourly Pension Plan, respectively, shall include the total years of credited service taken into account under the Newco Salaried Retirement Program or Newco Hourly Pension Plan, as applicable, plus any additional service with Newco that would have been accumulated under the Newco Salaried Retirement Program or Newco Hourly Pension Plan under the terms of the GM Salaried Retirement Program and GM Hourly Pension Plan in effect at Closing, had the Newco Salaried Retirement Program or Newco Hourly Pension Plan not been amended to provide for a cap or been so terminated or amended. Newco shall provide GM, upon request, with information relating to the credited service accrued by any Salaried Participant under the Newco Salaried Retirement Program.

### 6.7.  Health Care and Life and Disability Benefits Programs, Special Benefit.

### 6.7.1.  Health Care and Life and Disability Benefit Programs.

A.     Except as provided in Section 6.17, Newco shall establish a health care and life and disability benefits program, consistent with B and C below, to provide coverage for all Transferred Employees for claims incurred after Closing. Such health care and life and disability program shall not contain any exclusion or limitation with respect to pre-existing conditions (except for any exclusions or limitations not satisfied immediately prior to the Closing) of Transferred Employees. In the case of Hourly Transferred Employees, the programs shall satisfy in full the terms of the UAW Agreement and for purposes of the Anderson Plant, shall satisfy the full terms through October 1, 2002, including changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement.

and receive employer provided postretirement health care and life insurance benefits over total years of service at both Newco and GM to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, Newco will reimburse GM on a pro rata basis based on years of service at Newco after the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, Newco will reimburse GM annually for the cost of the post-retirement health care and life insurance coverage provided to such Salaried Transferred Employee multiplied by the Newco Service Fraction. With respect to post-retirement health care and life insurance coverage provided to Transferred Employees pursuant to Section 6.7.1D, GM will reimburse Newco annually for a portion of the cost of such programs allocated on the following basis: (i) with respect to Hourly Transferred Employees, GM will reimburse Newco on a pro rata basis, based on years of service at GM and Newco to the Closing Date to the date the Transferred Employee is first eligible to retire and receive such post-retirement health care and life insurance benefits over total years of service at both GM and Newco to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, GM will reimburse Newco on a pro rata basis based on years of service at GM and Newco to the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, GM will reimburse Newco annually for the cost of the post-retirement health care and life insurance coverage provided to such Salaries Transferred Employee multiplied by the GM Service Fraction. Notwithstanding the foregoing, in the case of Hourly Transferred Employees who retire on a Mutual Retirement or Salaried Transferred Employees who retire on an Incentive Retirement GM's pro rata reimbursement shall not begin until such Transferred Employees otherwise would have been eligible to retire with employer provided post-retirement health care and life insurance coverage. For purposes of this paragraph, "30 and Out" means retirement after 30 or more years of service with GM and Newco, and "Age 55 with 85 Points" means retirement after age 55 with a combined age and service with GM and Newco equal to at least 85.

F.    Newco will be responsible for any incremental health care and life and disability benefits costs (i.e. in excess of the proration assuming the employee retires at the earliest retirement age) associated with any early retirement incentive programs offered by Newco.

### 6.7.2.  Special Benefit.

With respect to any Hourly Participant or Salaried Participant or such Hourly Participant's or Salaried Participant's spouse who would have become entitled to receive a Special Benefit (as defined in the GM Hourly Pension Plan or GM Salaried Retirement Program, as applicable) had such Hourly or Salaried Participant remained employed at GM during the period of time he or she was employed by Newco:

### 6.8.    Amendment or Termination of Benefit Plans.

Except as otherwise provided in this Article 6, nothing herein shall prejudice the right of Newco or GM to amend or terminate any of its plans, programs, policies or arrangements applicable to any Transferred Employee following the Closing.

### 6.9.    Employee Information, Cooperation in Establishing Newco Benefit Plans.

A.    GM and Newco will each provide the other any relevant information with respect to any Transferred Employee's employment with and compensation from GM or Newco, or rights or benefits under any employee benefit plan which either Party may reasonably request including, without limitation, all direct deposit authorizations provided by any Transferred Employee.

B.    Newco will establish Employee Welfare Benefit Plans, in accordance with the applicable laws, for the Transferred Employees on a timely basis so that such plans will be in effect on Closing. In accordance with the transition services arrangement between GM and Newco, for a period of time after Closing, GM shall administer the Employee Welfare Benefit Plans of Newco. With respect to each such Employee Welfare Benefit Plan, Newco will make all appropriate governmental filings and establish an ERISA benefits claim appeal process (and GM shall provide information relevant to administering such appeal process).

### 6.10.    Grievances.

GM has disclosed to PEP Guide and Newco (or will disclose prior to the Closing) all pending and, to the knowledge of GM, threatened labor grievances and arbitration proceedings which relate to the Business. Prior to the Closing, GM will disclose all labor grievances and arbitration proceedings which relate to the Business which remain unresolved on the Closing Date. GM and Newco will address (i) grievances open as of the date of the Closing and (ii) grievances filed after the date of the Closing relating to an event, occurrence or cause of action arising prior to Closing which affect or relate to the rights of GM or Newco under this Agreement and (iii) grievances filed after Closing relating solely to GM's actions or omissions which prevent an Hourly Transferred Employee from becoming an Hourly Returned Employee or commencing work with GM (collectively, the "Grievances") as set forth below. Newco and GM will cooperate in the defense of the Grievances. Newco will not settle any of the Grievances without GM's consent, if such settlement will result in liability for GM. Such consent will not be unreasonably withheld. GM will not settle any of the Grievances without Newco's consent if such settlement will result in liability for Newco or would require Newco to perform any act, including reinstatement or job assignment or would create any precedent. Such consent will not be unreasonably withheld. If the seniority of a grievant is reinstated as a result of the disposition of a Grievance or a court or administrative order, Newco will reinstate the grievant as if the grievant had been an Hourly Transferred Employee as of the date of the Closing and, in such case, if at the time of such reinstatement the number of employees at the Monroe Plant and Anderson Plant exceed the Business Target Number, as applicable, Newco may immediately return one Hourly Transferred Employee from one of the Plants to employment with GM. In general, for Hourly Transferred Employee who have been continuously employed, back pay liability for all Grievances will be allocated to GM. In general, for employees who become Hourly Transferred Employees because they are reinstated through the grievance procedure, back pay liability will be allocated to GM. The Parties will discuss treatment of Grievances involving unusual circumstances. If Newco withholds consent to a settlement of a Grievance recommended by GM or elects to continue to defend the Grievance jointly with GM, then Newco shall be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such

### 6.16.  Tuition Reimbursement Expenses.

GM shall be responsible for payment of all tuition reimbursement expenses which are properly payable under the Tuition Assistance Plan for Salaried Transferred Employees for classes commenced or approved prior to Closing. Tuition reimbursement expenses with respect to Salaried Transferred Employees will be paid by Newco's tuition assistance plan for classes which commence on or after Closing and which have not been approved prior to Closing.

### 6.17.  Workers' Compensation.

A.      Notwithstanding any applicable state law, GM shall be responsible for (i) workers' compensation claims of Transferred Employees based on injuries or illnesses which arose out of and in the course of employment with GM or Newco on or prior to Closing, regardless of when such claim is made and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with GM on or after the date such employee returned to employment with GM.

B.      Notwithstanding any applicable state law, Newco will be responsible for (i) workers' compensation claims of Transferred Employees based on injuries and illnesses which arise out of and in the course of employment with Newco after Closing, regardless of whether such injury or illness is the same or similar to a prior injury or illness for which a workers' compensation claim was made on or prior to Closing and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with Newco prior to the date such employee returned to employment with GM, regardless of when such claim is made.

C.      Notwithstanding any applicable state law, (i) with respect to workers' compensation claims of Transferred Employees based on injuries and illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with GM or Newco on or prior to Closing and employment with Newco after the Closing, GM shall be responsible for any such claims filed on or prior to the first anniversary of the Closing Date and Newco shall be responsible for any such claims filed after the first anniversary of the Closing Date and (ii) with respect to workers' compensation claims of Returned Employees based on injuries or illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with Newco prior to the date such employee returned to employment with GM and employment with GM following such date, Newco shall be responsible for such claims filed on or prior to the date 90 calendar days immediately following the date such employee returned to employment with GM, and GM shall be responsible for any such claims filed thereafter.

D.      With regard to workers' compensation claims for which GM retains responsibility and which involve the payment of lost-time workers' compensation benefits for any GM Leave Employee, Newco will make reasonable efforts consistent with the provisions of the UAW Agreement, the applicable local agreement, and the applicable law, to place such employee in suitable employment. In the event GM and Newco disagree as to any workers' compensation claimant's ability to return to work, both GM and Newco will submit the disagreement to a binding third party medical arbitrator (selected by mutual agreement of Newco and GM). The cost of such arbitrator shall be shared equally by Newco and GM. GM and Newco shall cooperate in good faith to administer the allocation of the workers' compensation benefits provided for in this Section 6.17.

6.20.    Approval of Communications.

Where formal communications by GM to GM's employees or Transferred Employees, the public or governmental representatives are contemplated relating to Newco's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by PEP Guide. Notwithstanding the foregoing, it is specifically agreed that GM shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit Newco to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by GM expand the specific and limited obligations of Newco set forth herein.

Where formal communications by Newco to GM employees, Transferred Employees, the public or governmental representatives are contemplated relating to GM's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by GM. Notwithstanding the foregoing, it is specifically agreed that Newco shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit GM to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by Newco expand the specific and limited obligations of GM set forth herein.

6.21.    Rehiring of Employees.

Newco may offer employment to, and employ, up to 40 former salaried employees of GM who terminated with GM from the 18th month before the Closing Date through the Closing Date.

7.    REAL ESTATE MATTERS.

7.1.    Conveyance.

With respect to the Owned Real Estate, GM will at the Closing execute and deliver to Newco (or Newco's designee(s)) covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate in recordable form sufficient to vest in Newco (or Newco's designee(s)) good, marketable and insurable fee simple title to such Owned Real Estate, subject only to the Permitted Exceptions.  Notwithstanding any provision of applicable Law to the contrary, the representations, warranties and covenants contained in this Agreement with respect to the Owned Real Estate shall survive the delivery and acceptance of any deed required pursuant to the immediately preceding sentence, shall not be merged into any such deed and shall survive the Closing in accordance with Section 12.1 of this Agreement.

7.2.    Title.

GM will deliver to PEP Guide and Newco in form and substance satisfactory to them, a commitment for Form B 1992 ALTA Owner's Title Insurance Policies with respect to each of the Monroe Plant and the Anderson Plant issued by title insurer(s) approved by PEP Guide, and will deliver copies of each exception to title referred to therein. The title commitment charges, including charges for title abstract and examination, shall be paid by Newco.

### 8.1.5.  Ancillary Agreements.

Each of the Ancillary Agreements to which GM or any of its Affiliates is a party (A) shall have been duly executed and delivered by such of GM and its Affiliates as are parties thereto, (B) shall be in full force and effect, and (C) shall be the valid and binding obligation of such of GM and its Affiliates as are parties thereto.

### 8.1.6.  Material Adverse Effect.

Except as set forth in Schedule 8.1.6, during the period commencing on the date of this Agreement through and including the Closing Date, there shall not have occurred any condition, event, circumstance, change or effect that, individually or in the aggregate, has had or is reasonably likely to have any Material Adverse Effect, other than such as shall have resulted from general economic conditions or conditions affecting the automobile industry generally, including any decline in sales in the North American vehicle markets.

### 8.1.7.  Agreement with Lender.

GM and the lender to Newco, or Newco's subsidiaries, shall have entered into arrangements which are satisfactory to PEP Guide, and such lender shall be prepared to fund working capital loans of at least $30,000,000 to Newco or Newco's subsidiaries.

### 8.1.8.  Lender Acknowledgment and Security Agreement.

The agreement entered into by GM, Newco and the lender to Newco, or Newco's subsidiaries, referenced in Section 8.2.7 and providing for the exercise of GM's rights pursuant to the Right of Access Agreement, shall be satisfactory to PEP Guide and shall not reduce the loan availability, increase the costs or otherwise adversely affect the economic terms to Newco, or Newco's subsidiaries, of incurring financing from such lender.

### 8.1.9.  Missing Items.

If at the date of execution of this Agreement, any Exhibit or Schedule was omitted or incomplete, then the missing item(s) shall be promptly furnished and shall be subject to the satisfaction of Newco and PEP Guide.

### 8.2.  Conditions to Obligations of GM.

The obligations of GM to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived, to the extent permitted by applicable Law, in whole or in part by GM).

### 8.2.1.  Accuracy of Representations and Warranties.

The representations and warranties of PEP Guide and Newco set forth in this Agreement or in any certificate or document called for in this Agreement which are qualified as to materiality shall be true and correct in all respects, and such representations and warranties as are not so qualified shall be true and correct in all material respects, as of the date when made and at and as of the Closing as though made on such date.

Section 9.12.4 (Notification); and (c) treble (or other multiple) damages mandated by statute except to the extent recoverable under CERCLA or state CERCLA equivalent statutes.

### 9.1.2. Anderson Plating Operations.

"Anderson Plating Operations" means the metal plating operations as conducted at the Anderson Plant as of the Closing Date, including any equipment, piping and appurtenances used in connection with such operations and not used in connection with any other manufacturing operations at the Anderson Plant.

### 9.1.3. Chlorinated Solvent.

"Chlorinated Solvent" means any chemical product containing chlorinated hydrocarbons or an organic solvent, including, without limitation, methylene chloride, carbon tetrachloride, chlorobenzene(s), trichloroethane, trichloroethene, tetrachloroethane, and tetrachloroethene, but not including any chemical compound consisting of less than 1% of such chlorine-containing organic solvent(s).

### 9.1.4. Clean Closure.

An Environmental Condition will be "Clean Closed", when GM can establish the following:

(a)    no Hazardous Material is present at a level which exceeds the highest of: (i) natural background as determined in accordance with sound and accepted scientific and engineering literature, judgment and practice; (ii) the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority; and (iii) the level determined by a site-specific risk assessment and approved by any Governmental Authority, if applicable Environmental Law requires such approval; and

(b)    the closure is approved in writing by the Governmental Authority if applicable Environmental Law requires such approval.

### 9.1.5. Environmental Condition.

"Environmental Condition" means the presence of any Hazardous Material in the soils, surface water, or ground water on or under the Real Property in concentrations above the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority. The presence of any Hazardous Material in or on any of the Acquired Assets or the buildings (including fixtures, appurtenances or equipment) is not considered an Environmental Condition. If no appropriate remediation standard is specified under applicable Environmental Laws, the remediation standard shall be established using recognized risk assessment methodologies as set forth in Section 9.3.3 (Remedial Action Factors).

### 9.1.6. Environmental Laws.

"Environmental Laws" means all applicable federal, state and local laws, ordinances, regulations, final orders and final judgments, which have been duly enacted or promulgated and which are legally enforceable concerning the subject of the introduction, emission, discharge or release of any Hazardous Material into the air, soil or surface or ground water; the transportation, storage,

independent violation of Environmental Law may constitute a Non-Compliance Matter. By way of example but not limitation, the following, if present, shall not be considered Non-Compliance Matters: (a) the presence of Hazardous Materials in either active or inactive piping or sewers, including any suggestion that such presence constitutes improper storage or disposal of wastes; and (b) the presence of Hazardous Materials on the roof of any building resulting from air borne emissions over time. By way of further example but not limitation, the following, if present, shall be considered Non-Compliance Matters: (i) the storage of hazardous waste in improperly labeled drums or in any containers for a time that exceeds the applicable RCRA time period.

### 9.1.12. Release.

"Release" means any spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leak, pumping, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration into or through the environment (as defined under CERCLA) of any Hazardous Material, including any exacerbation or aggravation thereof, and the movement or migration, gradual or otherwise, of any Hazardous Material through or in the air, soil, surface water, ground water, or land surface or subsurface strata or formation.

### 9.2. Environmental Assessments and Compliance Audits.

### 9.2.1. Environmental Confidentiality.

GM and PEP Guide entered into the Environmental Confidentiality Agreement, as extended, attached to this Agreement as Exhibit 9.2.1. The Environmental Confidentiality Agreement will expire on the Closing Date, unless otherwise modified or extended by agreement between GM and PEP Guide.

### 9.2.2. Pre-Closing Environmental Assessments.

GM's consultants conducted environmental assessments of the Real Property and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "GM Environmental Assessments"). GM has delivered final copies of all GM Environmental Assessments to Newco and PEP Guide. Schedule 9.2.2A lists the GM Environmental Assessments delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental assessments of the Real Property, and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "Newco and PEP Guide Environmental Assessments"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Environmental Assessments to GM. Schedule 9.2.2B lists the Newco and PEP Guide Environmental Assessments delivered to GM.

### 9.2.3. Pre-Closing Environmental Compliance Audits.

GM's consultants conducted an environmental compliance audit of the Business operations at each facility and prepared final compliance audit reports (the "GM Compliance Audit Reports"). GM has delivered final copies of all GM Compliance Audit Reports to Newco and PEP Guide. Schedule 9.2.3A lists the GM Compliance Audit Reports delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental compliance audit of the Business operations and prepared final compliance audit reports (the "Newco and PEP Guide Compliance Audits"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Compliance Audits to GM. Schedule 9.2.3B lists the Newco and PEP Guide Compliance Audit Reports delivered to GM.

### 9.3.4.  PCBs.

The Acquired Assets and the Real Property may contain transformers, capacitors, or other equipment with polychlorinated biphenyl ("PCBs") dielectric fluid or other PCB materials. GM will remediate PCB contamination that exceeds the levels set forth in 40 CFR 761.125(c)(3)(iii) (1996), and that is identified pursuant to Section 9.3.1(a) (GM Remediation). GM will remediate the affected area consistent with the PCB Spill Cleanup Policy set forth at 40 CFR Part 761, Subpart G (1996). GM will also, at its option, repair and retrofill, or replace, any leaking transformer or capacitor, if Newco: (a) provides written notice to GM of the leaking transformer or capacitor within 180 days after the Closing Date; (b) demonstrates that the PCB transformer or PCB capacitor was leaking on the Closing Date; and (c) provides to GM all related environmental sampling and analytical data associated with the PCB transformer or PCB capacitor.

### 9.3.5.  ACM.

The Acquired Assets and the buildings on the Real Property may contain asbestos-containing material (collectively "ACM"). GM has conducted asbestos surveys in accordance with generally accepted engineering standards. The surveys, to the extent practicable, identified any exposed, damaged and friable ACM in the Acquired Assets and the Buildings on the Real Property. GM has provided written reports of its ACM surveys (the "ACM Reports") to Newco and PEP Guide before the Closing Date. GM, at its sole cost, will repair, encapsulate or replace the exposed, damaged and friable ACM identified in the ACM Reports.

### 9.3.6.  GM Compliance Action Plans.

GM will develop and implement compliance action plans to correct the following Non-Compliance Matters:

(a)      the Non-Compliance Matters listed on Schedule 9.3.6;

(b)      Non-Compliance Matters that existed on the Closing Date, but only if: (i) Newco notifies GM in writing of the Non-Compliance Matter and the surrounding facts and circumstances within 12 months after the Closing Date; and (ii) either 1) Newco notifies GM of the Non-Compliance Matter within six months after the Closing Date and GM is unable to demonstrate that the Non-Compliance Matter(s) did not exist on the Closing Date; or 2) Newco notifies GM of the Non-Compliance Matter more than six months, but within 12 months after the Closing Date and Newco is able to demonstrate that the Non-Compliance Matter existed on the Closing Date. If either of these conditions is not satisfied, GM will have no remediation, defense, or indemnification obligations with respect to such Non-Compliance Matter(s).

### 9.3.7.  No Other Obligation.

Except as expressly described in this Article 9, GM has no remediation, defense or indemnification obligations for any other Environmental Conditions or Non-Compliance Matters.

### 9.3.8.  Non-Interference.

In implementing any remedial action or compliance action required under this Article 9, and subject to Sections 9.3.9 (Newco's Review Period) and 9.3.10 (Modification Based on Newco's Input), or in exercising any right of access, GM will use its best efforts to avoid any unreasonable interference

Environmental Condition. After GM completes Clean Closure of an Environmental Condition at the Monroe Plant, Newco will be solely responsible and liable for claims asserted by a Governmental Authority with respect to such Environmental Condition, and Newco will defend and indemnify GM in accordance with Section 9.11.2 (Newco's Defense and Indemnification Obligations). Clean Closure will not affect GM's indemnity obligations with respect to private third party claims for personal injury or property damage caused by the underlying Environmental Condition or GM's remediation activities.

(b)    Anderson Plant. Once an Environmental Condition at the Anderson Plant is Clean Closed, Newco shall not degrade or disrupt the Clean Closed area in a manner that affects the Clean Closed status. Clean Closure of an Environmental Condition at the Anderson Plant, however, will not affect GM's indemnity obligations with respect to such Environmental Condition.

### 9.3.13. Newco's Obligations.

Newco will cooperate and assist GM in implementing remedial action and compliance action plans in accordance with Section 9.10.3 (Newco's Obligations in Connection with GM's Remedial Actions).

### 9.3.14 Monroe Inspection

The Louisiana Department of Environmental Quality ("LDEQ") conducted an inspection of the Monroe Plant on September 8, 9, 1998 (the "September Inspection"). If the LDEQ issues an inspection report for the September Inspection within 12 months of the Closing Date, then any Non-Compliance Matters identified in the inspection report will be included in Schedule 9.3.6, but only if Newco meets the other requirements set forth in Section 9.3.6(b). If the LDEQ issues an inspection report for the September Inspection more than 12 months after the Closing Date, then GM will work with LDEQ to resolve any notices of violation identified in the inspection report (including payment of fines), but only if (a) the notice of violation is based solely and exclusively on the September Inspection and not on any subsequent or follow-up inspection after the Closing Date, and (b) the notice of violation relates only to activity or operations of the plant up to, and including the dates of the September Inspection. Any notice of violation not meeting these criteria will be dealt with as otherwise provided under this Article 9. Notwithstanding the foregoing, this Section 9.3.14 does not, directly or indirectly, extend, toll, or nullify the notice period in Section 9.3.6(b).

### 9.4.    Access.

### 9.4.1.   GM Access.

After the Closing Date and upon reasonable notice to Newco, GM and its representatives may enter the Real Property and have access to the Acquired Assets to:

(a)    conduct remedial action or compliance action under Section 9.3 (GM Remediation and Corrective Action);

(b)    perform its obligations or exercise its rights under this Article 9;

(c)    investigate or remediate an environmental matter pertaining to an adjacent GM facility;

### 9.5.3. Removal of Improvements.

With respect to any building, structure or other improvement which: (a) is located above an Environmental Condition for which GM has some responsibility under this Article 9; and (b) was identified as a barrier, institutional control, or engineering control of such Environmental Condition in a Remedial Action Plan prepared by GM, and subject to review and comment by Newco under Section 9.3.9 (Newco's Review Period), if Newco demolishes, removes or otherwise renders less effective as a barrier, institutional control, or engineering control such a building, structure or other improvement, then Newco will, at its sole cost, repair or replace the building, structure or other improvement with a barrier or other institutional control or engineering control with protective capabilities equivalent to those of the original building, structure or other improvement. If Newco fails to repair or replace the building, structure or other improvement, GM shall be relieved of any further remediation, defense or indemnity obligation with respect to such Environmental Condition. Newco will exercise due care during demolition, removal, and construction so as not to exacerbate, aggravate, contribute or add to any Environmental Condition existing as of the Closing Date.

### 9.5.4. Specific Restrictions.

Newco will not use Chlorinated Solvents in the operation of the Business, use of the Acquired Assets, or use of the Real Property, except for use of the materials (or their chemical equivalent) set forth in Schedule 9.5.4.

### 9.5.5. Notice Filing.

After reasonable notice to Newco, and subject to Section 9.3.10 (Modification Based on Newco's Input), GM may file any notice or other instrument: (a) required by any current or future Environmental Law for any remedial or compliance action by GM under this Article 9, (b) necessary to implement any deed restriction or other institutional control authorized to be imposed under this Article 9; or (c) necessary to prohibit the demolition or removal of any Building, structure or other improvement located on the Real Property. An instrument filed under this Section 9.5.5 (Notice Filing) must permit Newco to remove the building, structure or other improvement in accordance with Section 9.5.3 (Removal of Improvements).

### 9.6.    Transition - Permits/Environmental Committee.

### 9.6.1. Environmental Permits.

As of the date of this Agreement, GM holds and is in material compliance with the permits, licenses, and authorizations listed in Schedule 9.6.1 (the "Environmental Permits"). GM represents and warrants that as of the date of this Agreement, no action is pending to revoke any of the Environmental Permits. GM has received no written notice from a Governmental Authority that such Governmental Authority intends to deny, or require GM to modify substantially, any of the Environmental Permits.

### 9.6.2. Transfer.

At Closing, GM will transfer to Newco the Environmental Permits listed on Schedule 9.6.1A - permits which can be transferred to Newco as a matter of law. Schedule 9.6.1B lists Environmental Permits which cannot be transferred to Newco as a matter of law or which cannot be transferred before Closing. Schedule 9.6.1C lists Environmental Permits that will not be transferred to Newco by GM, and will remain with GM as permittee, or will be closed by GM. GM will cooperate with

any wastes, including but not limited to hazardous wastes, resulting from PEP Guide's and Newco's Pre-Closing investigation(s) of the Real Property and Acquired Assets.

### 9.7.2. Post-Closing Waste Management.

Newco will obtain new RCRA and TSCA generator identification numbers for hazardous waste and PCBs. Newco is not allowed to use any generator identification numbers issued to GM for the Real Property. Newco will be responsible for all wastes, including but not limited to hazardous wastes, generated or accumulated by Newco after the Closing at the Real Property.

### 9.7.3. No Arrangement for Disposal.

GM, Newco and PEP Guide acknowledge that the transactions contemplated by this Agreement are not intended, nor will be deemed to be, an arrangement for treatment, storage or disposal of any of the Acquired Assets or any substances or materials contained on the Real Property, and Newco and PEP Guide will not assert any claim or cause of action against GM based on the transactions hereunder.

### 9.8. Environmental Management System.

Within 18 months of the Closing Date, Newco must develop and implement an environmental management system ("EMS") for the operation of the Business. Newco shall implement this EMS so long as GM has any outstanding indemnity obligation under this Article 9. At a minimum, the EMS must have the following elements: a written environmental policy; analysis of the environmental impact of the business; environmental objectives; detailed environmental operations and procedures; clear lines of responsibility and accountability for supervision of environmental matters; worker training; a program for regular auditing (at least every two years) of compliance with Environmental Laws, using generally accepted protocols; and management review of overall environmental performance.

### 9.9. GM's Representations and Warranties.

In addition to GM's representations and warranties in Section 9.6.1 (Environmental Permits), to GM's Knowledge, GM represents and warrants that, as of the date of this Agreement:

### 9.9.1. No Actions.

Except as set forth on Schedule 9.9.1, there is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter, existing or threatened, relating to the Business, the Acquired Assets or the Real Property under any Environmental Law which, as of the Closing Date, has not been cured, resolved or paid, as the case may be.

### 9.9.2. No Notices.

Except as set forth on Schedule 9.9.2, GM has not received from any Governmental Authority any written request for information, notice of claim, demand or notification that GM is or may be potentially responsible for the investigation or cleanup of any Release or any threatened Release at any of the Real Property.

in order to assist GM in obtaining Clean Closure of Environmental Conditions identified in Section 9.3.1 (GM Remediation), provided that such controls are consistent with the current industrial use of the Real Property, and are not required to be modified or amended pursuant to Section 9.3.10 (Modification Based on Newco's Input);

(c)    take other actions that are reasonably necessary and appropriate to allow GM to implement any remedial action or compliance action plan, including, without limitation, restricting public access to the Real Property and maintaining equipment or material installed by GM in connection with a remedial action plan or compliance action plan;

(d)    exercise due care so as not to adversely affect the installation, operation, or maintenance of any action, measure or remedy existing or taken at the Real Property before the Closing Date or later under any remedial action or compliance action plan;

(e)    provide GM access to services, including potable water, electric and telephone utilities, security and wastewater treatment or conveyance facilities, in connection with GM's post-closing activities on the Real Property. GM will pay the costs for the services it uses, or reimburse Newco upon receipt of a detailed invoice, as appropriate under the circumstances;

(f)    perform the Environmental Management activities in accordance with Section 9.8 (Environmental Management System); and

(g)    use its best efforts to discontinue the Anderson Plating Operations as soon as practicable, but in no event later than December 31, 1999, and shall refrain from conducting any further plating operations during the remainder of the term of the Anderson, Indiana Lease. For purposes of this Section 9.10.3(g), "best efforts" shall mean fulfilling outstanding orders for part numbers set forth on Schedule 9.10.3 as quickly as practicable, and entering into no further contracts for other parts which would require the continuation of the Anderson Plating Operations.

9.10.4.  Equipment Decommissioning – Anderson Plant.

(a)    Newco will be responsible for decommissioning and removing any equipment at the Anderson Plant that Newco brings into the Anderson Plant after the Closing Date. Newco will also be responsible for decommissioning any equipment it moves or removes from the Anderson Plant, including equipment it intends to dispose of through scrap sale or otherwise. Decommissioning will be up to the point of connection to building utilities. As to any equipment that Newco moves within or removes from the Anderson Plant, Newco shall ensure that the equipment area is left in a condition that is safe for workers and in conformance with plant safety procedures and housekeeping practices. Newco will not remove any associated parts from any equipment that it abandons.

(b)    Newco will notify GM in writing of its intent to abandon any equipment in place at least 30 days prior to abandonment. GM shall provide to Newco any comments GM may have with respect to the proposed abandonment within 15 business days after receipt of Newco's notice. Any equipment to be abandoned in place will be idled by Newco in accordance with a mutually agreed upon tag-out/lock-out/sign-off procedure. Except as specifically provided in this Section 9.10.4 (Equipment Decommissioning -- Anderson Plant), Newco will have no other decommissioning responsibility for the buildings, fixtures, appurtenances or equipment at the Anderson Plant.

9.10.5.  Equipment Decommissioning – Monroe Plant.

9.11.   Defense and Indemnification Obligations.

9.11.1.   GM's Defense and Indemnification Obligations.

Subject to Sections 9.3.12 (Clean Closure) and 9.11.3 (Apportionment) GM will indemnify and defend Newco Indemnitees from and against any and all Adverse Consequences to which they may be subjected as a result of a claim based upon any of the following:

(a)   Monroe Plant

(1)    Any claim by or on behalf of a Governmental Authority (including "citizen suits") seeking compliance with an Environmental Law or recovery of fines, penalties or other statutory sanctions or impositions, if the claim (i) pertains to an Environmental Condition (other than the Monroe Press Pit Area) or Non-Compliance Matter for which GM has responsibility under Section 9.3 (GM Remediation and Corrective Action) that has not been remedied or eliminated, and (ii) the claim is asserted within 36 months after the Closing Date;

(2)    Environmental Conditions identified from the Monroe Press Pit Area, if the claim is asserted on or before the tenth anniversary of the Closing Date;

(3)    Any off-site treatment, off-site transportation, off-site storage or off-site disposal of any Hazardous Material generated by GM at the Monroe Plant before the Closing Date;

(4)    Any personal injury or property damage to a third party (including any Newco employee) or to Newco's property, and any claim by a Governmental Authority for violations of Environmental Laws, but in any such case, only to the extent caused by GM's acts or omissions during its Post-Closing access to the Acquired Assets or the Real Property pursuant to Section 9.4.1 (GM Access), and only if the claim is asserted within 36 months after such act or omission; and

(5)    Any private third party claim for personal injury or property damage to the extent that it is alleged that such injury or property damage was caused by Hazardous Materials existing at Closing at the Monroe Plant if the claim is asserted within 84 months after the Closing Date. GM will indemnify and defend Newco under this subSection (5) until GM can demonstrate that Newco is responsible for at least a portion of the claim. At such time, Newco will assume its own defense and GM's indemnity obligation with respect to the specific claim will end.

(b)   Anderson Plant

(1)    Any Environmental Condition associated with the Anderson Plant, unless GM can demonstrate that the Environmental Condition was caused by Newco during the Anderson, Indiana Lease Term as such phrase is defined in Section 1.1 of the Anderson Lease;

(2)    Any claim arising from the presence of any Hazardous Material(s) in or on any building (including fixtures, appurtenances or equipment) located in or comprising any part of the Anderson Plant, unless GM can demonstrate that such presence of Hazardous Materials was caused by Newco during the Anderson, Indiana Lease term other than the presence of Hazardous Materials in or on equipment abandoned in compliance with Section 9.10.4 (Equipment Decommissioning -- Anderson Plant).

### 9.11.4. Third-Party Claims.

Neither Newco nor GM will initiate any action with any third party, including any Governmental Authority, which could reasonably be expected to lead to a claim against the other Party unless the action is a disclosure in accordance with Section 9.12.3 (Disclosures). Upon a disclosure under Section 9.12.3 (Disclosures), each Party is entitled to pursue any actions reasonably necessary in connection with the claim. If either Party, in performance of this Article 9, remediates or incurs costs or damages from a condition for which a third party may be responsible or liable, the Parties will cooperate in pursuing any claim for recovery of costs and damages against the responsible third party. Cooperation includes but is not limited to a Party acting as the real party in interest and assigning any rights or causes of action against any third party relating to a claim or the proceeds of a claim to the other Party.

### 9.12. Confidentiality.

### 9.12.1. Environmental Confidentiality Agreement.

This Agreement supersedes the terms and conditions of the Environmental Confidentiality Agreement except for any accrued claims, including but not limited to, accrued claims against third parties who have signed the Environmental Confidentiality Agreement acknowledgment.

### 9.12.2. Confidentiality Obligations.

Except as provided in Section 9.12.3 (Disclosures), no Party will disclose to any third party the following:

    (a)    environmental information, including reports, provided under the Environmental Confidentiality Agreement or this Agreement;

    (b)    information concerning remediation or compliance actions under this Article 9,

    (c)    information concerning investigations, inspections, or audits performed under this Article 9,

### 9.12.3. Disclosures.

Subject to Section 9.12.4 (Notification) any Party may:

    (a)    comply with any Environmental Law that requires disclosure of information about the environmental condition of the Business, the Real Property, or the Acquired Assets;

    (b)    comply with any requirements under applicable laws, regulations, ordinances, rules, orders, codes or permits, to disclose information about the environmental condition of the Business, the Real Property or the Acquired Assets;

    (c)    respond to a Governmental Authority's legally authorized request for information during an on-site inspection of the Acquired Assets or the Real Property but any request for supplementary information will be referred to the Party with primary responsibility under this Article 9;

### 9.14. Miscellaneous.

#### 9.14.1. Designation of Representatives.

Newco and GM will designate, by written notice to the other, a contact person who will be primarily responsible for coordinating and managing that Party's activities and responsibilities under this Article 9.

#### 9.14.2. Exclusivity.

Except as provided in other Articles of this Agreement, (a) this Article 9 will exclusively govern all matters related to current and future Environmental Laws and the environmental condition and compliance status of the Acquired Assets, the Real Property and the Business; (b) the rights and obligations provided in this Article 9 contain the exclusive remedies of the Parties with respect to environmental matters and will be in lieu of, and not in addition to, all other remedies which may exist at law, in equity or under any other contract or agreement and the Parties may not assert any claim with respect to any environmental matter against the other which is not authorized in this Article 9; (c) the Parties hereby expressly waive any and all remedies or causes of action with respect to environmental matters that each might otherwise have against the other, but that are not authorized under this Article 9; and (d) all of the representations, warranties, covenants, agreements and indemnities set forth in this Agreement, or any other agreement between the Parties with respect to the transactions contemplated by this Agreement, other than those specifically set forth in this Article 9 will be deemed to exclude all matters relating to the environmental condition of the Acquired Assets and the Real Property or compliance of the Acquired Assets, the Real Property and the Business with current and future Environmental Laws. The Parties reserve the right to seek injunctive or other relief to the extent available under the law for any breach of this Article 9 and any damage or cost recovery in respect of the breach in any dispute resolution or other proceeding regarding any breach under Section 9.13 (Dispute Resolution) or otherwise will, except as otherwise set forth in Section 9.13 (Dispute Resolution), be limited to the Adverse Consequences caused by the breach.

#### 9.14.3. Covenant Not to Sue.

Except for breaches of this Article 9 by the other Party, and except for actions by GM against Newco based on common law or statutory contribution or joint-tortfeasor principles in furtherance of Section 9.11.1(a)(5), or actions by Newco against GM based on common law or statutory contribution or joint tortfeasor principles after the expiration of the GM indemnity set forth in Section 9.11.1(a)(5), each of GM and Newco (and PEP Guide) covenants not to sue the other Party for any Environmental Matter relating to the Business (a) for which the other Party has no defense or indemnity obligation under this Article 9; or (b) for which the other Party's defense and indemnification obligations under this Article 9 have expired under contract (including this Agreement), current or future Environmental Laws, other laws, or the common law or in equity. In addition, except for matters reserved under Section 9.3.12 (Clean Closure), Newco covenants not to sue GM for any Environmental Matter which has been Clean Closed under Section 9.3.12 (Clean Closure). If a claim has been asserted before the expiration of an applicable time period, the other Party's obligation to defend and indemnify will continue for that claim. Nothing in this Article 9, will affect the Parties' rights and causes of action arising under Section 14.3 (Assignment).

Attn: Marcos Rodriquez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Jeffrey A. Smith
Fax: (212) 765-0979

10.    CLOSING.

   10.1.    The Closing.

The closing (the "Closing") of the transactions contemplated hereby shall take place jointly at the offices of Cravath, Swaine & Moore, in New York, New York and GM Legal Staff in Detroit, Michigan on October 30, 1998, or on such other date or at such other time as GM and PEP Guide may agree in writing.

   10.2.    Asset Exchanges.

At Closing the following transactions shall occur in the order set forth below:

   10.2.1.    The transactions described in Section 2.1.1 shall be consummated as provided therein, and the following documents (in proper form for recording where appropriate) shall be prepared, executed and delivered by the applicable Parties:

   A.    Anderson, Indiana Lease

   B.    Memorandum of the Anderson, Indiana Lease

   C.    Intellectual Property Licenses

   D.    GM Note

   E.    Assignments for the Permits and Contracts.

   F.    Covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate.

   G.    Appropriate receipts.

   H.    All other appropriate Transfer Documents necessary to provide for the contribution to Newco (or Newco's designee(s)) of title to Acquired Assets, free and clear of any and all Liens, except the Permitted Exceptions.

### 10.3.  Additional Documents and Papers.

GM, PEP Guide or Newco shall deliver all other documents and papers reasonably requested by the other Party to effect the transactions contemplated hereby.

## 11.    CERTAIN ADDITIONAL COVENANTS.

### 11.1.  Operation of the Business.

Except as otherwise provided herein or as mutually agreed by GM and PEP Guide, and subject to any changes that may be required as the result of changes in applicable Laws which become effective after the date hereof, from and after the date hereof until the Closing, GM shall operate the Business only in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date hereof through the Closing, unless otherwise consented to by PEP Guide in writing, GM shall: (A) (i) cause the Acquired Assets to be maintained and kept in normal condition, repair and working order as on the date of this Agreement (normal wear and tear excepted); (ii) perform in all material respects all of its obligations under all Contracts and not amend or, in any material respect, modify any provision of any Listed Contract included in the Acquired Assets; (iii) keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; (iv) use its reasonable best efforts to maintain and preserve its business organization intact; (v) maintain the goodwill of the Business; and (vi) promptly advise PEP Guide and Newco of any change, event or circumstance which has had, or is reasonably likely to have, a Material Adverse Effect; and (B) (i) not take any action or permit any action within GM's reasonable control that would render any of GM's representations and warranties hereunder inaccurate at any time after the date hereof through and including the Closing Date; (ii) not take or permit any action reasonably expected to result in the imposition of a Lien on any of the Acquired Assets; (iii) not sell, transfer, assign, lease, pledge or otherwise encumber any of the Acquired Assets, other than the sale of Inventory in the Ordinary Course of Business and the sale or disposition of the assets listed in Schedule 2.3.9; (iv) not increase in any manner the compensation, severance or termination pay of, or pay, loan or provide any additional benefit to, employees of the Business (except as required by any agreements entered into, or retirement programs established prior to the date hereof, in each case as set forth in Schedule 5.1.13A or by the UAW Agreement); (v) not enter into any contract, commitment or transaction relating to the Acquired Assets or the Business, or any related series of such contracts, commitments or transactions, involving expenditures in excess of $250,000 per annum; or (vi) agree to do any of the foregoing.

### 11.2.  Further Assurances.

If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as another Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

### 11.3.  Reasonable Access.

Until the Closing, GM shall provide each of PEP Guide and Newco and its respective advisors, accountants, attorneys and other representatives at such times, and in such manner, as is reasonable and as not to interfere with normal operations of the Business (i) reasonable access during normal business hours to all personnel, offices, facilities, properties and books and records of GM with respect to the Business and the Acquired Assets, and (ii) such of the financial and operating data and

conversion, and other costs relating to Newco's implementation of its own systems to handle transition services, and (iv) all costs incurred by GM and Newco to facilitate Newco's discontinuation or transfer to any new system different from that which was provided on the Closing Date (other than for changes to systems implemented by GM, in which event, Newco will be responsible only for its own costs). Newco shall pay to GM any amounts invoiced hereunder on the 25th day of the month following receipt of the invoice.

(d)     GM agrees to provide the Transition Services that PEP Guide or Newco requests GM to provide in a manner consistent with the provision of such services to its own facilities and GM does not warrant the efficiency, quality or effectiveness of such services to Newco. Notwithstanding Article 12 of this Agreement, GM shall be indemnified against, and defended and held harmless by Newco and for any Losses, damages, or expenses incurred by GM in connection with any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to the provision of the Transition Services that PEP Guide or Newco requests GM to provide and provided by GM, and any actions taken by GM in connection therewith, except to the extent that such claim, investigation, audit, action, cause of action or suit arose from the gross negligence, recklessness or intentional malfeasance of GM.

(e)     If GM discontinues, materially modifies or materially changes any system providing services to its own facilities, GM may also discontinue, modify or change such system provided to Newco in relation to the Transition Services upon six months written notice to Newco. GM agrees to negotiate in good faith with Newco in an effort to minimize any disruption of such discontinuance, modification or change on Newco and/or GM.

11.4.2.     From and after the Closing, GM shall cooperate in good faith in assisting Newco in establishing separate and independent services to replace the Transition Services.

11.4.3.     If a Party is requested by another party to this Agreement, or, with proper authorization, on behalf of another Party undertakes, to make payments or advance funds on behalf of such other Party to facilitate the orderly consummation of the transition contemplated by this Section 11.4, the Party on whose behalf such payments are made shall reimburse the Party making such payments within 3 Business Days of receipt of appropriate documentation with respect to the payments. Interest at a rate of 10% per annum will be charged on any late payments.

11.4.4.     Other than with respect to claims by Newco or any Newco Indemnitee against GM or any of its Affiliates, Newco shall from time to time, at the reasonable request of GM, cooperate with GM in providing GM, to the extent possible through Newco employees formerly employed by GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Newco for all of its reasonable out-of-pocket costs incurred in connection with providing such services.

11.4.5.     Newco may terminate any or all of the Transition Services provided to Newco by GM at any time upon a minimum of 30 days' notice to GM, such that termination would be effective on the last day of the month next following the month in which notice is given.

11.4.6.     All data provided by GM hereunder shall be in the form used by the service provider of GM before the Closing Date. Unless furnished to the service provider by Newco, all media upon which the data is stored is and shall remain the property of such service provider. Special reports and other nonconforming data requests will be provided only if GM and

it shall first give 90 days' prior written notice to GM, and GM shall have the right, at GM's option and expense, upon prior written notice given to Newco within such ninety-day period, to take possession of such Technical Documentation within 180 days after the date of the notice hereunder.

11.7.    Payment and Collections.

A.    GM shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Newco after Closing, and Newco shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of GM after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, GM or Newco, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.

B.    GM shall exercise its best efforts to promptly forward to Newco any bills or other payables that GM receives on behalf of Newco.

11.8.    Non-Competition.

11.8.1 For a period of six years after the Closing Date, neither GM, any of its Affiliates nor any current part of Delphi Automotive will (i) hire away any executive officer of Newco or (ii), directly or indirectly, whether by ownership, control, management, operation or financing, compete within North America with Newco, the Business or their respective successors in the manufacture, or sale to original equipment manufacturers (or subcontractors thereto) for production use, of Products listed in Schedule 11.8.1 ("Competitive Business"); provided, however, that the restrictions contained in this Section 11.8.1 will not prohibit in any way (A) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which acquired Person, division or unit is not primarily engaged in a Competitive Business, provided that GM will not and does not obtain from such Competitive Business any of the products theretofore sourced from Newco or its subsidiaries, provided further that GM will take all reasonable steps, promptly after such acquisition or merger, but in no event later than six months thereafter, subject to Section 11.8.2, to offer for sale such portion of such Person, division or unit as constitutes a Competitive Business, (B) the acquisition by GM, directly or indirectly, of an ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than $5 million in annual revenues of such Person, division or unit, (C) the acquisition by GM, directly or indirectly, of a non-controlling ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than 15% of the operating revenues of such Person, division or unit, (D) the acquisition by GM, directly or indirectly, of less than 5% of the publicly traded stock of any Person engaged in a Competitive Business, (E) subject to compliance by GM and its Affiliates with their respective obligations under the Component Supply Agreement, the sale by GM of any product incorporating a Product made by a Competitive Business, (F) financing activities of General Motors Acceptance Corporation and its subsidiaries in its ordinary course of business, (G) the operations of the Sung San Company, Ltd., in the event that GM's interest in Sung San is not acquired by Newco, and (H) consistent with the Right of Access Agreement and the then generally applicable GM troubled supplier practices, direct or indirect activities of GM to advise, operate, manage or finance a troubled supplier of GM or its Affiliates in order to maintain approximately existing levels of production from such supplier for production requirements of GM and its Affiliates.

85

otherwise disclosed as of the date of this Agreement or shall have any other effect on the rights, obligations or interests of the Parties, unless PEP Guide specifically agrees thereto in writing.

### 11.12.  Confidentiality.

GM shall, and shall cause its Affiliates, and its and their respective officers, directors, employees and agents, to keep confidential all information relating to the Business and the Acquired Assets and not use such information except as contemplated by this Agreement, except (A) as may be required by applicable Law and then only after prior consultation with Newco, (B) that GM will not be subject to the obligations of this Section 11.12 with respect to such information that:   (a) is or becomes known publicly through no fault of GM; or (b) was already known to GM at the time of disclosure; or (c) is learned by GM from a third party under no obligation of confidentiality, or (d) is independently developed by an employee, agent, or consultant of GM without any use of or reliance on disclosures hereunder; or (e) is approved for release by written authorization of Newco, and (C) subject to Section 11.8, with respect to such of the Technical Documentation as is not included in the Acquired Assets.  The standard of care imposed on GM and its Affiliates for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by GM to protect its own information of such nature.

### 11.13.  Intellectual Property Licenses.

#### 11.13.1.  Licenses to Newco.

At the Closing, GM or its Affiliates shall grant to Newco a non-exclusive, irrevocable, perpetual, (other than with respect to trademarks and tradenames not included in the Acquired Assets) royalty-free license or sublicense substantially similar in form and substance to Exhibit 11.13.1 to use such Intellectual Property owned or sublicensable on a royalty-free basis by GM or its Affiliates and used in the Business but not included in the Acquired Assets, including for the purpose of manufacturing, assembling, designing, processing, marketing, offering for sale, selling, importing, installing and servicing the Products.  Should GM or Newco reasonably determine after Closing th. items necessary for the conduct of the Business as currently conducted have not been included in such license or sublicense, GM shall grant to Newco a license or sublicense of such items.  For the purposes of this Section 11.13.1, items necessary for the conduct of the Business shall include those items that have been used, or are reasonably expected to be used, in the conduct of the Business as of the date of this Agreement.

#### 11.13.2.  Licenses to GM.

A.      Newco will grant back to GM a non-exclusive, irrevocable, perpetual, royalty-free license, including the right to sublicense its Affiliates, to use all Intellectual Property included in the Acquired Assets (except for trademarks, service marks and trade names included in the Acquired Assets) for (i) products other than products within the Business and (ii) vehicle lighting already awarded to another supplier prior to the date of this Agreement.

B.      Newco will also grant back to GM a limited, non-exclusive, irrevocable, fully-paid right and license to grant sublicenses only to GM suppliers or other parties to whom GM has already granted by written agreement as of the date of this Agreement a license to use, only for the term of such written agreements without renewals or extensions of same, the Intellectual Property included in the Acquired Assets for lighting for past model vehicles sold by GM or its Affiliates so long as such written agreement contains in force and effect provisions that GM will take appropriate steps to

11.17.  Warrants.

11.17.1.  Issuance.

At the beginning of each 12-month period indicated below, Newco shall issue to GM warrants (the "Warrants") to purchase shares of Class B Common Stock. Such number of shares and exercise price shall be subject to adjustment on the terms set forth in Section 4 of the Warrants Certificate. Warrants issued at the beginning of a given period shall correspond to the Payments (as defined in the GM Note) scheduled to be made during such period, on a pro rata basis, in accordance with the terms of the GM Note. The number of Warrants to be issued in connection with each 12-month period of Payments and the aggregate exercise prices are set forth in the table below:

| Period Beginning | Number of Warrants | Aggregate Exercise Price |
|---|---|---|
| October 1, 1998 .......... | 25,000 | $200,000 |
| October 1, 1999 .......... | 25,000 | $200,000 |
| October 1, 2000 .......... | 25,000 | $200,000 |
| October 1, 2001 .......... | 25,000 | $200,000 |
| October 1, 2002 .......... | 25,000 | $200,000 |
| Total | 125,000 | $1,000,000 |

11.17.2.  Form.

The Warrants shall be issued pursuant to a certificate in the form of the Warrants Certificate, which certificate indicates the number of Warrants being issued thereby.

11.17.3.  Exercise.

Any exercise of Warrants must be done in compliance with the terms of Article I of the Warrants Certificate and the holder thereof must complete the Exercise Form attached thereto.

11.17.4.  Transfer Restrictions.

The Warrants shall be subject to the transfer restrictions indicated on the face of the Warrants Certificate and in Section 5 thereof and those set forth in Article III of the Shareholders and Registration Rights Agreement.

11.17.5.  Registration Rights.

GM shall have the right to register the Class B Common Stock underlying any Warrants issued to it on the terms set forth in Article IV of the Shareholders and Registration Rights Agreement.

11.17.6.  Other Terms.

The Warrants shall be governed in all other respects by the terms of the Warrants Certificate and the Shareholders and Registration Rights Agreement, as applicable.

on the date the survival period terminates with respect to any representation or warranty, GM, on the one hand, or PEP Guide or Newco, on the other hand, shall have notified the other of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, then such representation or warranty that is the basis for such claim shall continue to survive as to that claim and shall remain a basis for indemnity until such claim is finally resolved. All of the covenants of each of the Parties set forth in this Agreement shall survive the Closing and continue in full force and effect according to their respective terms.

### 12.2. Indemnification.

#### 12.2.1. Indemnification Provisions for Benefit of Newco.

**A.**    Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, GM shall indemnify, hold harmless and defend Newco and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "Newco Indemnitee" and, collectively, the "Newco Indemnitees"), from and against all demands, claims, actions or causes of action, assessments, losses, damages, diminution in value, liabilities, costs and expenses (including interest and penalties and reasonable expenses of investigation and attorneys' fees (collectively, "Losses")) to the extent arising out of or related to: (i) any breach of any representation or warranty of GM contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of GM set forth in this Agreement; (iii) any failure of GM to pay, perform or discharge any liabilities or obligations of GM (other than (a) the Assumed Liabilities and (b) to the extent that such payment, performance or discharge constitutes an obligation of Newco under Article 6 or 9); or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets on or prior to the Closing Date; provided, however, that GM shall not be liable for Losses pursuant to clause (i) of this Section 12.2.1A unless a claim therefor has been made within the applicable survival period set forth in Section 12.1 and until the amount of all Losses (other than those arising out of or related to any breach of the representations and warranties as to which there shall not be any deductible set forth in Section 5.1.1, 5.1.2, 5.1.3, 5.1.5A, 5.1.7B(i), 5.1.9, 5.1.10 (with respect to Consents of Governmental Authorities only), 5.1.15A (but only with respect to the second sentence thereof) or 5.1.16) in the aggregate exceeds $250,000, after which point GM will be obligated to indemnify Newco Indemnitees from and against all Losses in excess of such amount. For purposes of calculating the amount of any Losses with respect to any of the Acquired Assets, "Losses" shall include the full replacement cost of such Acquired Assets.

**B.**    The Newco Indemnitees' rights under each of clauses (i), (ii), (iii) and (iv) of Section 12.2.1A shall be independent of each other; provided that, the Newco Indemnitees may not recover more than once for a particular indemnifiable Loss.

#### 12.2.2. Indemnification Provisions for Benefit of GM.

**A.**    Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, Newco shall indemnify, hold harmless and defend GM and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "GM Indemnitee" and, collectively, the "GM Indemnitees") from and against all Losses to the extent arising out of or related to: (i) any breach of any representation or warranty of Newco contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of Newco set forth in this Agreement; (iii) any failure of Newco to pay, perform or discharge any of the Assumed Liabilities; or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets by Newco after the Closing Date; provided,

Inventory Amount or the Closing Inventory Statement, Section 3.2, or in the case of any dispute as to Consolidated EBITDA, Section 3.5. Nothing contained herein, however, shall limit the rights of a Party to pursue any claim of fraud or to seek and obtain any and all equitable remedies, including injunctive relief to specifically enforce the other Party's obligations hereunder.

12.5.    Dispute Resolution.

In the event of any dispute between GM and Newco relating to indemnification of any Loss pursuant to Section 12.2, other than with respect to third-party Claims (which shall be handled in the manner set forth in Section 12.3) or matters relating to Article 9 of this Agreement (which shall first be addressed as set forth in Section 9.13 of this Agreement), the Parties shall use all reasonable best efforts to resolve such dispute at an appropriate business level within their respective business organizations. In the event such efforts fail, such dispute shall be submitted to a three-member dispute resolution panel. On a case-by-case basis, the panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for submission of the dispute, including that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Each Party agrees that neither it nor any of its Affiliates will seek to enforce the indemnification provisions of this Article 12 as to any such matter unless and until such efforts have been unsuccessful in resolving the dispute within 60 days after a written claim for indemnification was made with respect to such matter; provided, however, that such restriction shall be inapplicable (i) to the extent that such delay is reasonably likely to prejudice in any material respect the rights of the Party seeking indemnification and (ii) to any action or petition seeking equitable relief. Settlement offers and any non-binding decision of such panel made in connection with any dispute resolution procedure pursuant to this Section 12.5 shall be deemed confidential and not admissible for any purpose in any litigation in which the Parties may be involved among or between themselves or with third parties, unless the Parties otherwise agree.

13.    TERMINATION.

13.1.    Termination.

This Agreement may be terminated by giving written notice prior to the Closing as follows:

(a)    by mutual written agreement of GM, Newco and PEP Guide;

(b)    by GM, Newco or PEP Guide, if there shall be any order that is final and non-appealable preventing the consummation of the transactions contemplated hereby or by any Ancillary Agreement and the Party seeking to terminate the Agreement pursuant to this Section 13.1(b) has complied in all respects with its obligations under Section 11.10 hereof;

(c)    by Newco or PEP Guide, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of PEP Guide, Newco or any of their respective Affiliates;

(d)    by GM, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of GM or any of its Affiliates;

767 Fifth Avenue
New York, NY 10153
Attn: Treasurer
Fax: (212) 418-3623

with a copy to:

General Motors Legal Staff
New Center One Building
3031 W. Grand Boulevard
Detroit, MI 48202
Attn: E. Christopher Johnson
Fax: (313) 974-0373

If to PEP Guide or to Newco:

Lightsource Parent Corporation
2915 Pendleton Avenue
Anderson, IN 46016
Attn: Chief Financial Officer
Fax: (765) 641-5087

with a copy to:

Palladium Equity Partners, LLC
Rockefeller Center
1270 Avenue of the Americas
Suite 2200
New York, NY 10020
Attn: Marcos Rodriguez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Melvin Bedrick
Fax: (212) 474-3700

if any Party shall have designated a different addressee by notice, then to the last addressee so designated, and _provided further_, that, notwithstanding the foregoing, any notice given with respect to the designation of a different addressee shall be deemed to have been given when received.

14.3.   Assignment.

This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns, but no rights, interests or obligations of any Party herein may be assigned without the prior written consent of the other, which shall not be unreasonably withheld or delayed; _provided, however_, that no assignment of this Agreement or any

14.6.    Waiver.

At any time, GM and PEP Guide may (a) extend the time for the performance of any of the obligations or other acts of another Party to this Agreement, (b) waive any inaccuracies in the representations and warranties of another Party to this Agreement contained herein or in any document delivered pursuant hereto and (c) waive compliance by another Party to this Agreement with any of the agreements or conditions contained herein.  Any such extension or waiver shall be valid only if set forth in a written instrument signed by the Party sought to be bound thereby. Waiver by GM or PEP Guide of any such inaccuracies or of a failure to comply with any provision of this Agreement shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other inaccuracy of, or failure to comply with, any provision of this Agreement.

14.7.    Failure or Delay Not Waiver, Remedies Cumulative.

No failure or delay on the part of any Party in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any inaccuracy or breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.  Except as set forth in Section 12.4, all rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

14.8.    Specific Performance.

Each of the Parties acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause GM, on the one hand, and PEP Guide and Newco, on the other hand, irreparable harm. Accordingly, each of the Parties also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, GM, Newco or PEP Guide, as applicable, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to such party, whether at law or in equity.  Notwithstanding the foregoing, in the event that any of the Acquired Assets is destroyed or suffers material damage as the result of an act of God or other event beyond the reasonable control of GM prior to the Closing Date, GM shall have no obligation hereunder to replace such Acquired Asset, but GM shall pay over to Newco the replacement value of such destroyed or damaged property; provided, however, that this provision is not intended to restrict or otherwise limit the respective rights of (A) GM under Section 3.1 (with respect to the Asset Amount) or (B) PEP Guide and Newco under Article 8 (with respect to conditions to closing) or Article 13 (with respect to termination of this Agreement).

14.9.    Amendment.

This Agreement may only be terminated or amended in a writing executed and delivered by duly authorized representatives or officers each of the Parties.

14.10.    Expenses.

Except as otherwise expressly provided in this Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

for any such action, suit or proceeding. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby in the courts referred to above, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

### 14.16. Public Announcements.

GM and PEP Guide will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by applicable Law and then only after such prior consultation.

### 14.17. Sales or Transfer Taxes.

Notwithstanding anything in this Agreement to the contrary, all sales, documentary, stamp, use, transfer, gross receipts, filing, conveyance, recording, and other similar Taxes and fees, including all applicable real estate transfer Taxes, intellectual property filing and recording fees and excluding any taxes based on or measured by income including the Indiana Gross Income Tax imposed by I.C. 6-2.1-1 et seq. (collectively, "Transfer Taxes"), arising out of or in connection with the transactions consummated pursuant to the Agreement shall be borne equally by GM and Newco. The Party which has primary responsibility under applicable Law for the payment of any particular Transfer Tax shall prepare and file the relevant Tax Return, and notify the other Party in writing of the Transfer Taxes shown on such Tax Return and the manner in which such Transfer Taxes were calculated, and such other party shall reimburse the filing Party for the amount of such Transfer Taxes to be borne by such other party by wire transfer of immediately available funds or check within five days after receipt of such notice.

### 14.18. Other Tax Matters.

GM and Newco shall cooperate in connection with (i) the preparation or filing of any Tax Return, tax election, Tax consent or certification, or any claim for a Tax refund, (ii) any determination of liability for Taxes, and (iii) any audit, examination, or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes direct access to accounting, engineering and contracting personnel during normal business hours, and in a manner so as not to interfere with the normal business operations of GM or Newco. With respect to each Acquired Asset, GM shall provide to Newco, (a) before the Closing Date, its reasonable estimate of the tax basis of such Asset as of December 31, 1997 on the books of GM and, if the asset is depreciable for tax purposes, information concerning GM's tax depreciation of such Asset to the extent relevant to Newco's tax reporting with respect to such Asset, and (b) within 90 days after the Closing Date, definitive information of this type as shown on the books of GM. Information obtained pursuant to this Section 14.18 shall be kept confidential by GM in accordance with Section 11.12 and by Newco in accordance with the Confidentiality Agreement.

### 14.19. Solely Corporate Obligations.

No recourse for any payment under this Agreement or any Ancillary Document, nor for any claim based hereon or thereon or otherwise in respect hereof or thereof, and no recourse under or upon any obligation, covenant or agreement of PEP Guide or Newco in this Agreement or any Ancillary Document, or because of the creation of any indebtedness represented hereby or thereby, shall be

IN WITNESS WHEREOF, the Parties have caused this Lightsource Formation Agreement to be executed by their duly authorized officers as of the date and year first set forth above.

GENERAL MOTORS CORPORATION

By: *Fred J Bellar*

Name: FRED J. BELLAR III

Title: Director Ventures + Business Development

PEP GUIDE, LLC

By: PEP Guide Management, LLC, its Managing Member

By: Marcos A. Rodriguez, its Managing Member

LIGHTSOURCE PARENT CORPORATION

By: *Adam R Kae*

Name: ADAM R. KAER

Title: VICE President