# Exhibit E

# Savvy Claims Purchasers Must Avoid Pitfalls

**Contributing Editors:**
*Carrianne Basler*
*AlixPartners, LLP; Chicago*
cbasler@alixpartners.com

*Michelle Campbell*
*White & Case LLP; Los Angeles[1]*
mcampbell@whitecase.com

An increasing amount of distressed investment capital in the market has led to the participation in bankruptcy cases by third-party purchasers of claims and interests. Claims-trading in chapter 11 is nothing new. Holders of claims who are not in the business of investing and speculating on the outcome of chapter 11 cases are usually willing to sell their claims at a discount. But increased claims-purchasing activity at all levels of the capital structure has introduced some new players into the process and paved the way for the development of new guidelines. This article focuses on the types of claims being purchased, identifies procedural and substantive pitfalls associated with the process, and proposes guidelines for managing some of the pitfalls.

## Types of Investors


*Carrianne Basler*

Investors buy different types or classes of claims and interests within a company's capital structure to facilitate their goal of maximizing profits or owning an asset or equity stake in the reorganized company. Type 1 investors (typically hedge funds or private investors looking to avoid the risks associated with the equity market) purchase claims or debt securities with an eye toward owning an equity stake in the reorganized entity. Type 2 investors buy unsecured trade or bank debt at a discount, hoping for a recovery that exceeds the purchase price. Type 3 investors include other types of investors who buy claims to facilitate standing as a party-in-interest in particular proceedings, such as asset sales.

## Pitfalls for Type 1 Investors

The goal of a Type 1 investor is to own a substantial equity stake in the

---
[1] Any views or opinions expressed in this article are not necessarily the views or opinions of White & Case, LLP and AlixPartners, LLP.

### About the Authors

*Carrianne Basler is a director with AlixPartners, specializing in case-management activities, claims resolution and post-emergence plan administration. Michelle Campbell is a member of White & Case, LLP's Financial Restructuring and Insolvency Group and specializes in chapter 11 reorganizations with a focus on developing and implementing strategies for litigating and resolving claims and avoidance actions. Readers of this column are encouraged to e-mail the authors your published and nonpublished claims-related decisions and orders.*

reorganized entity. There is significant competition within the Type 1 investing arena. These parties purchase subordinated debt securities at a substantial discount. Type 1 investors are active participants in cases, working aggressively toward a plan structure that includes a debt-for-equity swap. Type 1 investors who want a piece of the reorganized company may try to avoid the risk of reinstatement or nonequity plan currency by taking an active role in the case as a secured creditor or serving on the committee of unsecured creditors.

There are some pitfalls associated with this kind of activity. First, it is hard for Type 1 investors to obtain positions on committees (even though investments can be made post-petition) unless the debt is purchased pre-petition because committees are typically established at the beginning of the chapter 11 case. While the Office of the U.S. Trustee (UST) may substitute committee members throughout the case, there are no guarantees that the UST would add a Type 1 investor to a committee mid-case, particularly if a Type 1 investor is already currently serving on the committee. (Type 1 investors often try to overcome this challenge by establishing *ad hoc* committees during the plan formulation process). While the composition of the committee has been left to the discretion of the UST, some courts have cautioned that the interests of the estate are not always served when committee members transition in and out as the debt trades hands.


*Michelle Campbell*

Second, committee members owe fiduciary duties to their constituencies. The most common possible breach of fiduciary duty by a Type 1 investor committee member is trading in the debtor's securities. Committee members are entitled to confidential information throughout the chapter 11 cases, which is why courts often issue "blocking" or "screening" orders directing that committee members may not share confidential information with members of the organization who are trading in the debtor's securities.

Type 1 investors should consider some important issues before purchasing debt securities and becoming involved in a chapter 11 case. Not all bond issuances are alike. Depending on the secured or unsecured nature of the bond, a debtor may reinstate the debt or include a plan provision to pay back the issuance with the proceeds of exit financing. While this would provide the investors with a recovery, it would be limited to the face amount of the issuance plus accrued and unpaid interest at best, and would likely not result in the investor receiving a significant equity stake in the reorganized company.

In addition, debtors frequently request trading limitations on large debtholders to preserve potential net operating losses (NOLs) to offset against future tax liabilities of the reorganized company. Courts have helped debtors safeguard NOLs by establishing procedures to monitor ownership changes through claims trading. Some courts are willing to issue claims-trading injunctions (to the extent trading exceeds a given dollar amount) to protect the debtor's ability to rely on Internal Revenue Code §382 as a way to protect NOL carry-forwards.

## Pitfalls for Type 2 and 3 Investors

Type 2 investors purchase private debt, such as bank or trade debt, to receive higher recoveries under the plan, hopefully including post-petition interest. To ensure such higher recoveries, purchasers of private debt often buy enough claims to secure blocking positions within their class. A creditor will have a blocking position within a class if it holds more than 1/2 in number and 2/3 in amount of the allowed claims in the class. Type 3 investors typically purchase small blocks of trade debt, with the goal of establishing standing as parties-in-interest to participate in particular proceedings.

Type 2 and 3 investors should consider a number of issues before purchasing claims. Purchasers of private debt claims must conduct appropriate due diligence to ensure that the claims are not vulnerable to disallowance, subordination or reduction based on the existence of an avoidable transfer. Some common red-flag situations that could signal vulnerability of a claim include:

• *The claim is not consistent with the debtor's books and records*. To avoid this problem, purchasers should verify that the target claims appear on the debtor's schedules of assets or liabilities (Schedule D for secured claims and Schedule F for unsecured claims). Claims that do not appear on either Schedule D or F (or are scheduled as disputed, contingent or unliquidated) should be red-flagged for further analysis. If the schedules have not been made available by the debtors due to extensions of the filing deadline, purchasers may consider pressing the claimant to reach a stipulation with the debtor providing for the allowance of the claim and a waiver of chapter 5 actions.

• *The holder of the claim committed misconduct either related or unrelated to the claim*. Purchasers should be aware of the recent decision in Enron's chapter 11 case holding that claims sold to third parties are subject to equitable subordination under §510(c) of the Bankruptcy Code, even the third party had no knowledge of the claimant's wrongful conduct.[2] A claim may be subordinated under §510(c) if the claimant engaged in misconduct that resulted in injury to creditors or conferred an unfair advantage on the claimant.[3] Purchasers of bank debt must be aware that courts may follow the *Enron* decision and hold that purchasers of claims step into the shoes of the claimant vis-a-vis pre-petition conduct, even where there is no wrongdoing on the part of the purchaser. Purchasers must investigate the claimant's pre-petition dealings with the debtor and carefully draft indemnification language in their agreements with sellers, as will be discussed in more detail below.

• *The holder of the claim received an avoidable pre-petition transfer from the debtor*. Purchasers of both bank and trade debt should pay attention to yet another *Enron* decision holding that purchased claims can be disallowed under §502(d) of the Code if the original claimant fails to turn over an avoidable transfer.[4] Section 502(d) authorizes a court to disallow or reduce a claim to the extent the claimant has not turned over property subject to an avoidable transfer. Note that the *Enron* court rejected the claim purchaser's argument that the application of §502(d) would impose an unjust penalty on innocent claims transferees who are not liable for avoidable transfers. Again, purchasers must review the

---

[2] See Enron Corp. v. Avenue Special Situations Fund II (In re Enron Corp., 01-16034 (AJG)), 2005 WL 3074189 (Bankr. S.D.N.Y. Nov. 17, 2005). See, also, Hollander, Evan C. and Mintz, Douglas S., "Claim Traders Beware: Your Acquisition May Come with Unwanted Baggage," 18 BNA's Bankruptcy Law Reporter No. 5, 122 (Feb. 2, 2006).

[3] See Benjamin v. Diamond (In re Mobile Steel Co), 563 F.2d 692 (5th Cir. 1977).

[4] See Enron Corp. v. Avenue Special Situations Fund II (In re Enron Corp., 01-16034 (AJG)), 2006 WL 832674 (Bankr S.D.N.Y. March 31, 2006).

*continued on page 73*



1.800.327.3664
WWW.GCGREORGSERVICES.COM

# Claims Chat: Savvy Claims Purchasers Must Avoid Pitfalls
from page 27

debtor's pre-petition transactions and assess whether the seller/claimant received an avoidable transfer. Claimants attempting to purchase a blocking position or a large claim within a particular class may want to consult outside counsel or financial advisors to aid in this assessment. At a minimum, purchasers should review the debtor's SEC filings to identify any obvious pre-petition transactions that could give rise to an avoidance action and compile a list of the debtor's likely targets.

• *The claim is based on an executory contract that is assumed under a plan.* Parties to executory contracts and unexpired leases often file "protective" rejection-damages claims, anticipating that the debtor may reject the contract. Claims traders who buy these protective rejection damage claims may have a rude awakening if the debtor assumes the contract or lease under the reorganization plan. Pursuant to §365(b)(1)(A) of the Code, a debtor must cure pre-petition defaults before it can assume a contract or lease. A cure is not a payment on account of a rejection-damages claim; it is a payment to a contract counterparty to facilitate the debtor's ongoing performance under the contract. Under those circumstances, there is no rejection-damages claim, and the debtor can successfully move to disallow any rejection-damage claim. Thus, absent some arrangement among the three parties, the debtor will pay the cure amount to the contract counterparty, not the purchaser of the rejection-damages claim. The problem becomes even stickier if the plan provides for full satisfaction of unsecured claims, with pre-petition interest. Naturally, the purchaser would hope to receive a distribution on account of the rejection-damages claim in accordance with the plan treatment. It is incumbent upon the purchaser to contract around this potential problem. To the extent possible, purchasers should identify and avoid buying protective claims. If the claimant believes that the debtor will likely reject a contract, creating a rejection-damages claim, the purchaser may require the claimant to compel the debtor to assume or reject the executory contract or lease. In connection with any agreed rejection, the parties could fix the rejection-damages claim and agree to releases of chapter 5 actions.

• *The claim can be satisfied at any time during the case.* Debtors are not permitted to satisfy most pre-petition claims outside of a plan or without court order. The 2005 amendments to the Code afford some enhanced rights for creditors that could result in the post-petition satisfaction of the following types of claims: critical vendors, reclamation, utilities, lessors, employees, taxing authorities and certain financial contracts. While this is good news for those creditors, the ability to satisfy these claims could be used as a tactic by the debtor to eliminate high-maintenance creditors that are participating aggressively in the case. To avoid the problem of being eliminated, purchasers of blocks of claims should own a diverse portfolio of claims, including some that have been previously discussed and also some traditional pre-petition trade claims that can only be paid under a plan.

• *The claim has already been sold to another investor.* When dealing with unsophisticated vendors, it is not uncommon for those vendors to inadvertently (or intentionally) sell their valid claim to more than one investor. It is the responsibility of the investor to ensure that the transfer is properly recorded on the debtor's claims register. Often the first transfer to be recorded is deemed the "valid" transfer, regardless of the date the transfer agreement was executed. It is the investor's responsibility—not the debtor or claims agent's responsibility—to identify and resolve this issue.

## Tips for Purchasers of Claims

• *Draft solid contracts and work with counsel to continuously modify contract provisions as the case law develops.* Although little case law is available to guide claims purchasers, the trend is to place the burden on the claimant and purchaser to contract around the issues described above. Purchasers should not expect much sympathy from the bankruptcy court with respect to ambiguous contract provisions; purchasers must draft rock-solid contracts that include, at a minimum: (1) broad indemnification provisions that take into account the problems described above; (2) the ability to unwind the transaction if the claim is subordinated under §510(c) of the Code, reduced under §502(d) of the Code or disallowed upon the debtor's assumption of an executory contract or unexpired lease upon which a protective rejection-damage claim was based; and (3) open access to the claimant's books and records to enable the purchaser to compile evidence to put on a case in response to a claim objection. Parties who regularly purchase claims should consult with counsel and modify contract provisions as the case law develops.

• *Develop internal guidelines and devote appropriate resources to conducting due diligence before purchasing*

continued on page 74

### Red-Flag Claims
### Claims that Should Be Carefully Analyzed Before Purchasing

1. Protective claims filed by (1) taxing authorities or (2) landlords or counterparties to executory contracts based on anticipated rejection damages
2. Proofs of claim based on equity interests
3. Unscheduled claims
4. Claims scheduled as disputed, contingent or unliquidated
5. Litigation claims, particularly class action or personal injury
6. Employee claims
7. Claims filed by parties who may be subject to a preference or other voidable transfer
8. Claims filed by an insider or any party appearing on Question 3b of the debtor's Statement of Financial Affairs
9. Claims filed by counterparties to large sales or acquisitions that occurred within 4-6 years before the petition date
10. Any claim that can be satisfied during case

# Claims Chat: Savvy Claims Purchasers Must Avoid Pitfalls
from page 73

*claims*. Purchasers of large blocks of claims must develop internal guidelines for conducting due diligence. The claims described above and set forth in the Red-Flag Claims chart should be carefully scrutinized in accordance with specified criteria.

- Follow the Federal Rules of Bankruptcy Procedure and any rules set by the court in connection with the transfer of claims. Although Rule 3001(e) of the Federal Rules of Bankruptcy Procedure no longer requires court approval of a claim transfer, courts often establish procedures governing certain types of trades. As discussed above, parties purchasing large blocks of claims should be aware of any court orders restricting trade, such as an NOL order described above. Parties should also comply with any additional procedures for recording transfers of claims that would typically be included in the order establishing a bar date for filing proofs of claim.

With the multitude of players and the frequency of multiple transfers, valid transfers are often not properly recorded on the claims register. The reasons for this are manifold: An intervening transfer document was not filed, multiple transfer documents were filed together and not all were noted to be separate transfers, or human error. While these issues can be corrected through discussions with a claims agent, if not timely corrected, it can impact voting or even distributions in certain cases. If the transfer is not accurately recorded as of a voting or distribution record date, a purchaser may not have the right to vote or even receive a distribution.

## Conclusion

While buying distressed debt may be a very lucrative practice, it is not one to be entered into without the appropriate due diligence and recognition of risk. An investor must also diligently follow the case and the claims register to monitor their investment and respond appropriately to any issues that may arise regarding that investment. ■

# On the Edge: Involuntary Terminations of Pension Plans
from page 37

(2)(A), as a matter concerning estate administration.[21] Thereafter, the bankruptcy court entered a final order retroactively terminating the plan and finding that the PBGC had established that termination of the plan was necessary in order to avoid any unreasonable increase in liability to the fund that it administered.[22] ALPA and URPBPA filed notices of appeal.

On cross-appeal, the PBGC raised three issues: (1) the district court erred in referring the termination proceeding to the bankruptcy court,[23] (2) the bankruptcy court erred in finding that the termination was a core proceeding, and (3) the bankruptcy court erred by holding a *de novo* trial. The bankruptcy court dismissed the PBGC's cross-appeal because it was untimely. However, because the core/non-core issue was jurisdictional, the district court nevertheless addressed it.

The district court held that the termination proceeding filed by PBGC pursuant to Title IV of ERISA was a non-core proceeding based on its findings that (1) the PBGC brought the proceeding against United as the plan administrator, not as the debtor in the pending bankruptcy; (2) the PBGC's right to initiate the termination of the Pilots Plan arose exclusively from Title IV of ERISA, not the Bankruptcy Code, and the right to bring the termination proceeding exists outside the Bankruptcy Code and can arise outside the context of a bankruptcy case; and (3) the termination proceeding neither invokes a substantive right provided by Title 11 nor, by its nature, could it arise only in the context of a bankruptcy case.

United argued that the involuntary termination proceeding was a core proceeding because whether and when the pension plan was terminated affected PBGC's claim in United's bankruptcy for pension plan underfunding; therefore, the termination proceeding affected the administration of the estate and/or the debtor-creditor relationship. The district court rejected this contention, holding that the mere fact that a proceeding may ultimately affect the size of the estate does not mandate that the proceeding is a core proceeding.[24]

The district court further noted that any additional effect on the debtor-creditor relationship is tenuous, as the termination proceeding was brought by PBGC in its role as the federal agency that enforces Title IV of ERISA, not in the role of a creditor. In addition, the district court stated that while the termination proceeding may ultimately affect United's bankruptcy case, it does not concern the administration of the estate or involve estate assets within the meaning of §157(b)(2) of the Code, because pension plan assets are not part of the bankruptcy estate.[25]

## Practical Implications

If an involuntary termination proceeding filed by the PBGC pursuant to Title IV of ERISA is deemed to be a non-core proceeding when the law is settled, then a bankruptcy court cannot issue a final judgment in that proceeding. Rather, a bankruptcy court will be limited to submitting proposed findings of fact and conclusions of law to the district court, as required by §157(c)(1). Further, the district court will not apply a deferential standard of review to the bankruptcy court's findings of fact (as is the case of a "core" proceeding) but will engage in *de novo* review.

This is significant as a practical matter because there are a number of issues that arise in an involuntary termination proceeding that impact a debtor's bankruptcy case. Most important is the establishment of the date of plan

---

[21] *In re UAL Corp.*, 333 B.R. 802 (Bankr. N.D. Ill. 2005).

[22] *In re UAL Corp.*, 332 B.R. 858 (Bankr. N.D. Ill. 2005).

[23] Prior to this case, the PBGC had been uniformly successful with its argument that it is improper for a district court to refer an involuntary termination proceeding to a bankruptcy court pursuant to 28 U.S.C. §157(a). *See, e.g., In re United Air Lines Inc., et. al*, Opening Brief of Appellee/Cross-Appellant Pension Benefit Guaranty Corp. at pg. 12 (filed 12/22/2005). The PBGC contends that by referring involuntary termination actions to bankruptcy judges, the PBGC's ability to implement its statutory mission could be "significantly hampered." *See Id.* For instance, in *United*, it took nearly a year from the date the PBGC filed the termination action for the bankruptcy court to decree the pension plan terminated. *See Id.* The PBGC argued that this termination should have been a routine matter. *See Id.*

[24] 337 B.R. at 910.

[25] *Id.*