1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET. AL


      Debtors.


- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          December 7, 2007

          10:20 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion of the Equity Security Holders to Adjourn

3   Disclosure Statement Hearing and Equity Purchase and Commitment

4   Agreement Hearing

5

6   HEARING re Expedited Motion for Order Under 11 U.S.C. Sections

7   105(a), 363(b), 503(b), and 507(a) Authorizing and Approving

8   Amendment to Delphi-Appaloosa Equity Purchase and Commitment

9   Agreement

10

11  HEARING re Motion For Order Approving (i)Disclosure Statement;

12  (ii)Record Date, Voting Deadline, and Procedures for Temporary

13  Allowance of Certain Claims; (iii)Hearing Date to Consider

14  Confirmation of Plan; (iv)Procedures For Filing Objections to

15  the Plan; (v)Solicitation Procedures for Voting on Plan;

16  (vi)Cure Claim Procedures; (vii) Procedures for Resolving

17  Disputes Relating to Post-Petition Interest; and (viii)

18  Reclamation Claim Procedures.

19

20

21

22

23

24

25  Transcribed By:  Lisa Bar-Leib

3

1

2   A P P E A R A N C E S:

3   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8   BY:   JOHN WM. BUTLER, JR., ESQ.

9         RON E. MEISLER, ESQ.

10        ALBERT L. HOGAN III, ESQ.

11

12  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

13        Attorneys for Debtors

14        Four Times Square

15        New York, NY 10036

16

17  BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19  LATHAM & WATKINS, LLP

20        Attorneys for Official Committee of Unsecured Creditors

21        885 Third Avenue

22        New York, NY 10022

23

24  BY:   ROBERT J. ROSENBERG, ESQ.

25        MARK A. BROUDE, ESQ.

4

1

2    FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

3         Attorneys for Official Committee Equity Security Holders

4         One New York Plaza

5         New York, NY 10004

6

7    BY:   VIVEK MELWANI, ESQ.

8          DEBRA M. TORRES, ESQ.

9

10   GOODWIN PROCTER, LLP

11        Attorneys for the Ad Hoc Committee of Bondholders

12        599 Lexington Avenue

13        New York, NY 10022

14

15   BY:   ALLAN S. BRILLIANT, ESQ.

16

17   GOODWIN PROCTER, LLP

18        Attorneys for the Ad Hoc Committee of Bondholders

19        901 New York Avenue, N.W.

20        Washington, D.C. 20001

21

22   BY:   JOHN MOUSTAKAS, ESQ.

23        MICHAEL K. ISENMAN, ESQ.

24

25

5

1

2  WHITE & CASE, LLP

3        Attorneys for Appaloosa Management and Harbinger Capital

4        1155 Avenue of the Americas

5        New York, New York 10036

6

7  BY:    THOMAS E. LAURIA, ESQ.

8         DOUGLAS P. BAUMSTEIN, ESQ.

9         GERARD UZZI, ESQ.

10

11  WEIL, GOTSHAL & MANGES LLP

12        Attorneys for General Motors

13        767 Fifth Avenue

14        New York, New York 10153

15

16  BY:    JEFFREY L. TANENBAUM, ESQ.

17         MICHAEL P. KESSLER, ESQ.

18

19  LOWENSTEIN SANDLER PC

20        Attorneys for Lead Plaintiff

21        65 Livingston Avenue

22        Roseland, NJ 07068

23

24  BY:    MICHAEL S. ETKIN, ESQ.

25         S. JASON TEELE, ESQ.

6

1

2    KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

3         Attorneys for Wilmington Trust Company

4          as Indentured Trustee

5         599 Lexington Avenue

6         New York, NY 10022

7

8    BY:   EDWARD M. FOX, ESQ.

9

10   GREGORY P. JOSEPH LAW OFFICES, LLC

11        Attorney for Equity Committee

12        805 Third Avenue

13        New York, NY 10022

14

15   BY:   GREGORY P. JOSEPH, ESQ.

16

17   KASOWITZ BENSON TORRES & FRIEDMAN LLP

18        Attorneys for Trade Committee

19        1633 Broadway

20        New York, NY 10019

21

22   BY:   DAVID S. ROSNER, ESQ.

23        DANIEL N. ZINMAN, ESQ.

24        MICHAEL M. FAY, ESQ.

25

7

1

2  HAYNES AND BOONE, LLP

3       Attorneys for Highland Capital Management

4       153 East 53rd Street

5       Suite 4900

6       New York, NY 10022

7

8  BY:   JUDITH ELKIN, ESQ.

9

10  UNITED STATES DEPARTMENT OF JUSTICE

11       Office of the United States Trustee

12       33 Whitehall Street

13       21st Floor

14       New York, NY 10004

15

16  BY:   ALICIA M. LEONHARD, ESQ.

17

18

19

20

21

22

23

24

25

8

1          P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay.  We're back on

3     the record in Delphi Corporation.  I have before me presently

4     the debtors' motion for approval of their entry into the Delphi

5     Appaloosa investment agreement amendment or in the terms that

6     the people have been using throughout this hearing, the

7     December 3 proposed amendment to the EPCA, E-P-C-A, agreement

8     that was entered into between the debtors, on the one hand, and

9     a group of plan investors led by Appaloosa in July of this year

10    and approved by order of the Court on August 2nd, 2007.

11             The motion, I believe, as contemplated by the debtors

12    was one that was modified during the course of November and

13    December to reflect ongoing negotiations among the debtors and

14    their key constituents over the terms of the proposed

15    amendment.  That is, it was originally filed seeking approval

16    of a somewhat different amendment.  That request resulted in

17    the filing of numerous objections including by both of the two

18    official statutory committees, the creditors' committee and the

19    equity committee.  The debtors and those parties, as well as

20    the plan investors, engaged in continued negotiations at the

21    same time that they also conducted, along with other objectors,

22    a litigation discovery process.  The negotiations resulted in

23    the withdrawal of substantially all of the objections to the

24    motion in light of the amendments to the proposed amendment

25    that were agreed to on December 3rd and that are currently

9

1    before the Court.  Discovery proceeded, however, because there

2    were two remaining objections.  And in light of those

3    objections, the Court held an evidentiary hearing yesterday

4    over the course of the entire day which I heard four witnesses

5    in support of the motion and as well accepted into evidence and

6    considered numerous exhibits agreed to as far as admissibility

7    is concerned by the debtors and the two objectors.

8         The motion seeks approval by the Court because it is

9    an action out of the ordinary course under 363(b) of the

10   Bankruptcy Code.  The consequence of the debtors' entry into

11   the amendment to the EPCA is, among other things, that the

12   debtor would continue to be obligated in respect of certain

13   payment obligations as well as an alternative transaction fee

14   under certain circumstances.  And, in a more general sense, the

15   amendment to the EPCA forms the basis for, along with a number

16   of other settlements including the debtors' settlement with GM

17   and its agreements with its various unions for the Chapter 11

18   plan that has been filed and for which the debtor is seeking

19   approval of its disclosure statement, which is also on for

20   today for my consideration.

21        The standard for consideration of a motion under

22   Section 363(b) is one that I've addressed previously in these

23   cases.  Generally speaking, the Court must consider whether the

24   transaction for which the debtors seek approval is supported by

25   good business reasons and good business judgment.  As set forth

10

1   by the second circuit in In re Orion Pictures Corporation, 4

2   F.3d 1095 (2d Cir. 1993), cert. dismissed, 511 U.S. 1026

3   (1994), the Court has a responsibility to exercise business

4   judgment in respect of transactions sought to be approved out

5   of the ordinary course.  I believe that this is in light of the

6   fact that the debtor is in a bankruptcy case and formally

7   beholden to numerous constituents under the supervision of the

8   Court.  As observed by Judge Garaufis in the eastern district,

9   under this rule, the trustee, in this case the debtor-in-

10  possession, and the Court in a bankruptcy proceeding must

11  exercise their discretion fairly in the interest of all who

12  have had the misfortune of dealing with the debtor.  Frostbaum

13  v. Ochs, O-C-H-S, 277 B.R. 470, 475, (E.D.N.Y. 2002).

14          I guess it's true that any bankruptcy case is a

15  misfortune.  However, the Court approaches some debtors and the

16  parties approach some debtors with a great deal more skepticism

17  than others.  It is my experience with these debtors, as well

18  as my conclusion as to the result of yesterday's evidentiary

19  hearing, that these debtors from their board through their

20  senior management, and certainly their professionals, take

21  their responsibilities as debtors and debtors-in-possession

22  with the utmost seriousness and have conducted themselves

23  accordingly.  And nevertheless, in a bankruptcy context, unlike

24  a non-bankruptcy context, actions out of the ordinary course

25  are noticed up for approval with the opportunity to object and

11

1   have a hearing.  And the Court takes into account in addition

2   to the normal review of the business judgment of a debtor,

3   which I'll discuss in a moment, the views of other constituents

4   who are presumably -- and I believe here it is at least the

5   case with a number of the constituents -- intimately familiar

6   with the debtors' business and reorganization effort.  That is,

7   of course, particularly true of the views of official statutory

8   committees who have fiduciary responsibilities to their

9   constituents.  Here, the official creditors' committee which

10  acts as a fiduciary for all unsecured creditors and the

11  official equity committee which acts as a fiduciary for all

12  equity holders.

13          In addition, the second circuit has been clear that

14  in a bankruptcy case even where the committees may be silent,

15  the Court needs to consider -- and I believe this is separate

16  and apart from the state court -- application of the business

17  judgment test that the debtors are undertaking the proposed

18  action as an exercise of their own independent good business

19  judgment and that they are not simply adhering to the demands

20  of a particular constituency or party in interest, which might

21  include, for example in this case, the plan investors or GM or

22  one of the other parties who did not object originally to the

23  motion as originally filed.  See In re Lionel Corporation, 722

24  F.2d 1063 (2d Cir. 1983).

25          Now that being said, it is also clear to me that

1   neither the second circuit nor Congress intended bankruptcy

2   judges in presiding over a motion for approval of an action out

3   of the ordinary course to delve into the minutia of a debtors'

4   business judgment.  And that is particularly the case, again,

5   where creditor and other interested party sentiment is either

6   supporting the requested relief or does not oppose it.  Indeed,

7   I believe that a good measure of the state court business

8   judgment test applies in bankruptcy cases as set forth in In re

9   Integrated Resources, Inc., 147 B.R. 650, 657-656 (S.D.N.Y.) by

10  then District Judge Mukasey and additionally, and I think quite

11  cogently, by Judge Gerber in In re Global Crossing, Ltd., 295

12  B.R. 726, 742-743 (Bankr. S.D.N.Y. 2003) in which he considered

13  a quite analogous situation where an original plan investor

14  deal or acquisition had fallen through for various reasons and

15  was considering the advisability of the alternative or the new

16  direction proposed to be taken by the debtor.  As Judge Mukasey

17  articulated, the business judgment rule is a presumption that

18  in making a business decision, the directors of a corporation

19  acted on an informed basis, in good faith and in the honest

20  belief that the action taken was in the best interest of the

21  company.  The business judgment rule's presumption shields

22  corporate decision makers and their decisions from judicial

23  second guessing when the following elements were present:  (1)a

24  business decision; (2)disinterestedness; (3)due care; (4)good

25  faith; and (5)according to some Courts and commentators, no

13

1    abuse of discretion or waste of corporate assets.  Parties

2    opposing the proposed exercise of a debtors' business judgment

3    have the burden of rebutting the presumption of validity.

4           Thus, generally a Court will assess itself the merits

5    or fairness of business decisions only when a transaction is

6    one involving a predominantly interested board with financial

7    interests in the transaction adverse to the corporation.

8    Moreover, the appropriate test is the "entire fairness" of a

9    transaction rather than the business judgment rule only "in the

10   face of elicit manipulation" of a board's deliberative

11   processes by self-interested corporate fiduciaries.  Of course,

12   there is a wrinkle in or a variation in that standard when it

13   becomes clear that a company is for sale and a takeover becomes

14   inevitable.  Which the directors are obligated to secure a

15   maximum value for those to whom they are fiduciaries.  And as

16   Judge Mukasey further notes in Integrated Resources, in a

17   bankruptcy case, a board's fiduciary duties extend beyond the

18   shareholders to all creditors as well.  Again, as Judge Mukasey

19   prefaces his analysis of the business judgment rule, these

20   business judgment rule principles have "vitality by analogy" in

21   Chapter 11.  And I agree that's a very apt description of them

22   because obviously Chapter 11 lends a unique context to a

23   board's deliberations.  And a Court, as I said before, must be

24   particularly concerned that the board has taken into account

25   that context including the legitimate views of the debtors'

14

1    constituents.  And if it doesn't then the Court obviously will

2    pay close attention to them.

3          As far as the facts are established before me, as I

4    noted before, by order dated August 2nd, 2007, I approved the

5    EPCA that is still currently in effect and that formed the

6    basis for a consensual plan that the debtors filed in early

7    September as contemplated by the EPCA.  That plan provided for

8    distributions to the debtors' creditors and shareholders that

9    had the support of both official committees and at least at

10   that stage, apparently the support of every other party-in-

11   interest.  At least there was no vociferous objection.  The

12   building block or basis for that plan or a critical building

13   block or basis for that plan was the July EPCA in that it

14   provided for, among other things, an aggregate potential cash

15   investment of 2.55 billion dollars by a group of plan investors

16   in return for a stake in the debtors' reorganized equity.

17         It was not and it is not today as is proposed to be

18   amended a takeover plan.  While the plan investors and, in

19   particular, Appaloosa will clearly play an important role in

20   the reorganized debtors under the proposed transaction, the

21   plan investors will not control the debtors.  And a substantial

22   portion of the debtors' equity under the modified agreement

23   will be going to the debtors' unsecured creditors with a right

24   to participate in that equity under various forms of

25   conditional consideration, warrants and the like by the

15

1    debtors' existing shareholders.

2         Nevertheless, the debtors engaged in a process that I

3    considered at the hearing in July in connection with the EPCA

4    whereby they tested the market and one potential competing

5    investor, or lead investor, Highland Capital, did significant

6    due diligence and made a proposal at that time which the board

7    considered and which the board was a data point for the parties

8    and the Court when the original EPCA was approved.  It was the

9    board's determination and ultimately my determination that the

10   EPCA was the highest and best proposed transaction.  At that

11   time, while it was obvious to one who took the time to read the

12   EPCA that it contained numerous conditions, it was not

13   highlighted by any party to the Court that those conditions

14   were incapable of being met or even reasonably incapable of

15   being met.  However, shortly after the Court's approval of the

16   EPCA, it became clear to the parties and in one of the periodic

17   conferences before the Court, the debtor informed the Court

18   that the debtors had concluded that it would be substantially

19   or seriously difficult for the debtors to raise all of the

20   proposed exit financing upon which the Chapter 11 plan that was

21   attached in outline form to the EPCA was premised.  And it has

22   subsequently appeared that the debtor would not be able to

23   raise, in light of the substantially changed condition of the

24   capital markets starting in the summer of 2007, approximately a

25   billion nine of exit financing that had been contemplated by

16

1   that original plan.

2       I should note that in August, if not before, but

3   certainly at that time, it appeared clear to me and I believe

4   to anyone whose knowledgeable about these debtors that they

5   have achieved all -- I would go so far as to say all, at least

6   substantially all, but I would go even farther than that -- of

7   their so-called Chapter 11 transformation goals.  I believe

8   this is an important fact to keep in mind in considering the

9   debtors' exercise of their business judgment in respect of the

10  motion before me.

11      Some companies file Chapter 11 simply to rejigger

12  their capital structure.  They're, for one reason or another,

13  overburdened with debt but they do not believe their business

14  needs to fundamentally change.  The uses of Chapter 11 for that

15  type of company are clear and although the negotiations over

16  the amount of the adjustment to the capital structure may be

17  difficult and sometimes rancorous, it's a process that is

18  fairly easily achievable except for the pain that various

19  lawyers and professionals go to in their negotiations.

20      These debtors used Chapter 11 not only for that

21  purpose but also, frankly, for almost every other purpose that

22  Congress contemplated Chapter 11 could be used for.  That's

23  because their business, they recognized, needed fundamental

24  restructuring.  Appropriately, therefore, they developed a

25  business plan with professional advice of very high quality.

17

1   They vetted that business plan with their constituents and

2   began the process, a painful one, of dealing not only with

3   their financial creditors but with their employees and other

4   constituents that often ride through bankruptcy cases

5   unscathed.

6           As I've said in other hearings, given the difficulty

7   of that process overlaid with the very complex issues described

8   at length in the disclosure statement regarding the

9   relationship between General Motors and these debtors and, of

10  course, the fundamental issue that all Chapter 11 debtors deal

11  with which is the appropriate capital structure on emergence,

12  this process was akin to three or four-dimensional chess.

13  Nevertheless, the debtors had managed by August of 2007 and

14  certainly have managed by today to achieve results in each of

15  the categories that they originally intended to achieve.

16  They've reached agreements with their unions.  They reached a

17  comprehensive agreement with GM.  They have addressed the

18  transformation of their business including the footprint of

19  that business.  And they have also, in a comprehensive way,

20  addressed the claims against their estate.

21          I've been saying that the debtors have achieved this

22  and obviously the debtors took the lead in that process.  But

23  it was clearly not an achievement simply by the debtors.  It

24  reflected clearly a collective effort that has evidenced, for

25  example, a very sophisticated and responsible level of analysis

18

1    by the debtors' unions and a very sophisticated high level and

2    responsible analysis by GM.  It appears to me, although, again,

3    the context for my remarks is a motion under Section 363(b),

4    which is ultimately just a summary proceeding, that it also

5    reflected a very sophisticated and responsible analysis by the

6    two official committees which realized that in a case of this

7    kind where, among other things, the parties need to be mindful

8    of the requirements of Section 1113 of the Code that any

9    coerced agreement with the unions to be approved by the Court

10   must involve an assessment that all parties, all creditors, the

11   debtor and anyone else affected, are treated fairly.  And that

12   the balance of equities clearly favors modification of the

13   collective bargaining agreement.  I believe that the analysis

14   by the committees also took into account the extremely complex

15   role that GM plays in the reorganization of these debtors in

16   terms of a customer, a creditor and a potential source of

17   recovery.  One where GM logically would not want to make the

18   types of agreements and concessions it would most optimally

19   make for the benefit of the estate unless it got a

20   comprehensive release for those types of potential claims.

21          And finally, as is the case with many large corporate

22   debtors but I believe is clearly the case here, the two

23   committees acted in a sophisticated and responsible way in

24   recognition that the pinpoint valuation of such a set of

25   businesses is a fantasy and that valuation ultimately in this

19

1    context, particularly given the other two points that I just

2    made, is one that should be premised upon a negotiation based

3    on a course economic reality but that ultimately reflects a

4    willingness by all of the parties to live with what they

5    believe is fair in light of the entire context.

6         Anyway, that was the state of play when it became

7    clear to the debtors and to the other parties that the debtors

8    in all likelihood would not be able to raise approximately two

9    billion dollars of the financing upon which the Chapter 11 plan

10   was premised.  The plan itself clearly would need to be

11   renegotiated on that basis, at least based upon the numbers

12   that the Court heard yesterday from Mr. Butler, i.e., there was

13   not sufficient cash in the debtors to make up that shortfall

14   and still provide for the cash distributions to GM and the

15   unsecured creditors that the September 6 plan contemplated.

16   When you don't have cash and you can't raise debt, the solution

17   is to provide equity and of course that would affect the other

18   parties as well.

19        What was not clear immediately at least to the Court

20   is whether this situation necessarily required a renegotiation

21   of the EPCA or if it did to what extent it would need to be

22   renegotiated.  The debtors, knowing the effect of uncertainty

23   on their reorganization process and potentially on their

24   business -- and I should have noted previously that while the

25   debtors have been implementing their transformation plan, they

20

1   appeared to have successfully continued to provide the types of

2   service and products to their customers that they did pre-

3   bankruptcy and indeed have maintained customer support and

4   loyalty.  Therefore, the debtors, knowing that basically every

5   constituent in the case was looking for the conclusion of the

6   case that was ripe to be achieved would be discomfited by a

7   change of direction in that process, concluded that they should

8   pursue not only renegotiation of the plan but in light of their

9   assessment of the plan investors' position renegotiation of the

10  EPCA as well although it appears to me that they kept their

11  litigation options open.  It also appears clear to me that the

12  other parties felt that they should pursue renegotiation as

13  well although they, too, were careful to keep their litigation

14  options open.

15       To me, having reviewed the EPCA, that general

16  approach seems to me to have been clearly correct.  One can

17  review the document and as a legal matter conclude that it was

18  by no means a foregone conclusion that the plan investors could

19  use the developments in the financial markets and the necessary

20  modification of the plan as a basis for walking.  And that

21  their refusal to go forward might well constitute an

22  anticipatory breach, go forward with a plan, i.e., that simply

23  changed the equity percentages without materially affecting

24  their economics.  In support of such a view, one could point to

25  the express exclusions from the material adverse affects

21

1    provision of the agreements that excluded changes in the

2    financial markets and the markets dealing with Delphi's

3    customers.

4         One could point to the language of the agreement that

5    referred to a plan consistent with the plan attached which

6    would include, arguably, one that was consistent with the

7    underlying economics of the proposal as far as the plan

8    investors were concerned, i.e., if other constituents were

9    prepared to change their consideration without any material

10   change to the economics of the plan investors how would the

11   plan be inconsistent.  And one could point to, as Mr. Tepper

12   did the other day, commitments by plan funders to use their

13   reasonable best efforts to move forward.

14        In addition to those legal issues, it also is clear

15   to me, as I said before, that at the hearings on approval of

16   the EPCA, the prospect of a substantial change in the capital

17   markets restricting credit was not raised.  I do not know

18   whether in fact any members of the plan investor group

19   nevertheless knew that fact or at least had made substantial

20   bets that that in fact would happen.  That is something on a

21   nonconsensual basis that clearly would have been explored.

22   And, of course, even if as a legal matter it would not have

23   consequences, it would clearly have had consequences as a

24   reputational matter if in fact it proved to be the case the

25   plan investors had made such bets in other contexts and were

22

1   using the down turn in the financial markets as an opportunity

2   to seek unmerited concessions on a renegotiation.  On the other

3   hand, in reviewing the agreement, as Mr. Tepper outlined in his

4   testimony yesterday, there are various provisions that would

5   argue that the agreement (a)could conceivably still work and

6   therefore the debtors would be held in through its termination

7   day; (b)that the debtors' inability to raise the exit financing

8   and deliver the plan in the format attached to the EPCA would

9   be the debtors' default; and ultimately (c)that the cost if

10  there were a breach to the plan investors would be capped at a

11  hundred million dollars.  And of course, the plan investors

12  have made no concession that they have breached anything.  So

13  that's a rather small sum in the overall context would have

14  been the grand prize if the debtors pursued a litigation

15  approach.

16          In addition, the parties, first and foremost the

17  debtors, needed to consider their alternatives.  As I noted

18  before, it appears clear to me that even with the receipt by

19  the creditors of stock instead of cash, a large investment by a

20  third party would be necessary to achieve the fundamental goals

21  that the debtors had put in place in respect of their

22  reorganization including the GM settlement, the resolution of

23  their pension plan issue and the other uses of cash that their

24  business and plan requires.  And given the nature of the

25  capital markets, given the absence of any other bidder in the

23

1    original process than Highland and given the very fundamental

2    common sense assessment that any third party would take

3    advantage of the debtors' present condition and of course would

4    be even more free to do so if not confronted with the legal and

5    reputational issues that would serve to reign in the plan

6    investors under the EPCA, it would appear that unless the

7    debtors pursued a reasonable renegotiation of the EPCA, they

8    would be taking a leap into the dark.

9            Now as far as the business judgment is concerned,

10   although I've laid out that analysis on my own, the debtors

11   clearly went through the proper process of reaching those

12   conclusions.  The evidence is clear to that effect.  They

13   understood the pressures they were under.  I do not believe, in

14   contrast to Lionel, they simply gave in or buckled under.  They

15   shared this analysis with their committees and their

16   constituents as well.  I should note, although it comes up in a

17   different context, an observation in this regard by Judge

18   Gerber in the Adelphia, which is actually quoted approvingly by

19   Judge Kaplan, District Judge Kaplan, at 337 B.R. 475 (S.D.N.Y.

20   2006), where "coercion results from differences in bargaining

21   power as a consequence of law or fact".  That is aptly noted as

22   what one calls leverage and it can't be ignored.

23           Consequently, to keep the EPCA alive, and it appears

24   to me also to proceed in good faith with their DIP financing

25   and their exit financing efforts, the debtors proposed an

24

1    amended -- or an amendment to the EPCA in November that had

2    been agreed to, they thought, by all of the plan investors.

3    One of those plan investors apparently chose not to agree to

4    it, however, at least in the first instance.  As Mr. Sheehan's

5    e-mail to the board -- I believe it's Exhibit 44 -- candidly

6    recognized, that agreement was one that the statutory

7    committees would have a real problem with, to put it lightly,

8    particularly the equity committee.  And indeed, that's what

9    happened.  Frankly, the Court had a real problem with it also.

10   In particular, the Court had a problem with the fact that the

11   plan investor group wasn't able apparently to stay together

12   even over that agreement.  And frankly, because that particular

13   plan investor, whether it's true or not, I don't know, had at

14   the same time been touting in the media how it had been astute

15   in recognizing the insipient credit crunch and therefore had

16   profited from it.  Not a good fact either as a legal or

17   reputational matter for walking from an agreement for the same

18   reason.

19          In any event, given the objections by almost every

20   constituent in the case including the two fiduciary committees,

21   I concluded notwithstanding the debtors' view that this case

22   could not take the pressure that all of the parties, including

23   the plan investors but all of them, should realize that I took

24   these objections seriously and that if they could not be

25   resolved, frankly, all the parties including the plan investors

25

1   were warned that there would be serious consequences.

2           I don't view that as a market test but I do view that

3   as a reality check.  In light of that, the parties went back

4   and continued their negotiations.  Those negotiations, as I

5   said at the beginning, culminated in the December 3rd EPCA

6   amendment, the one that's before me now, and it has led to --

7   or have led to the withdrawal of the objections by the two

8   official committees with the caveat laid out on the record

9   yesterday by the equity committee and the withdrawal of all of

10  the other objections except the bondholder group and the

11  bondholders' indenture trustee.

12          I take seriously the fact that the committees have

13  withdrawn their objections.  I understand that as no one is

14  happy with the bankruptcy case to begin with, the change

15  circumstances resulting from the changes in the capital markets

16  are not a happy event to anyone.  But I accept the two

17  committees' analysis and the debtors' analysis that the

18  December 3rd amendment is an amendment made in light of real

19  leverage, not artificial leverage, considering all of the

20  factors, both legal and reputational and that it is not an

21  instance of overreaching.  I do not believe and I don't believe

22  the evidence shows this that the alternatives would result in

23  greater maximization of value for creditors and interest

24  holders.  I do not see a viable alternative without a third

25  party investment.  There may be some dispute about how much

26

1   would be needed but clearly a large amount would be needed to

2   make the current plan work.  More importantly, the effect after

3   the debtors have achieved what they have achieved in Chapter 11

4   of delaying the Chapter 11 process is -- would be serious.

5   There would be direct costs obviously.  Mr. Sheehan testified,

6   that the direct out-of-pocket costs of the Chapter 11 case

7   alone, in terms of professional fees, is roughly ten to twelve

8   million a month.  He also testified that the cost of another

9   waiver could well be at least the amount of the twenty million

10  dollars that the PBGC extracted in connection with this waiver

11  that's in effect through February 29th.

12          By the way, in complimenting the other parties, the

13  unions, GM, the committees, I should not have omitted the PBGC

14  and the IRS in terms of their sophistication in analyzing the

15  debtors' reorganization.  In my experience, although it goes

16  back probably too long and I'm comparing perhaps apples and

17  oranges, but it is a very welcome level of sophistication that

18  didn't always exist from those agencies in bankruptcy cases.

19          In any event, I imagine that the cost of getting

20  other waivers or extensions would be direct and tangible.  And

21  I could assume that if one did indeed change course, took a

22  litigation approach, sought a declaration if there had been an

23  anticipatory breach of the EPCA, for example, it would take at

24  least six months to be in a position to propose a Chapter 11

25  plan again, if that.  So the direct costs to me seem roughly in

27

1   the hundred million dollar range.  That's leaving aside the

2   indirect costs that Mr. Sheehan also testified to, which are,

3   frankly, unquantifiable but they all have to do with the notion

4   of going out to the world and telling your customers and your

5   constituents that we're going to have to update the business

6   plan, resume negotiations with GM and potentially also resume

7   negotiations with the unions setting aside the issue of trying

8   to find a group of plan investors who would be providing better

9   terms than the current ones.  I think weighing those costs,

10   direct and indirect, and having gone through the exercise where

11   I believe, at least I hope, it was impressed upon the plan

12   investors the full adverse potential consequences to them of

13   not reaching agreement with the two committees that the present

14   amendment before the Court properly reflects a fully informed

15   arms length negotiation and is not an overreach.

16       Notwithstanding that analysis, there have been two

17   remaining objections to the December 3 EPCA amendment.  One is

18   by the indenture trustee for the senior bonds.  The indenture

19   trustee is well represented but I say that with an appreciation

20   that one of the aspects of representing an indenture trustee is

21   that one needs to look out for the interests of a fiduciary

22   whose clients don't necessarily all speak their mind.  That's

23   particularly so in today's litigious environment where

24   indenture trustees for doing nothing even where one can argue

25   that doing nothing is the right thing.

28

1          The other objection is by a group of senior

2     bondholders who in their present iteration hold roughly six

3     hundred million dollars of the senior bond issue which is

4     substantially larger than that amount.

5          I have addressed already, I believe, the general good

6     business reasons for entering into the December 3 EPCA so I

7     won't go through those again in response to one of the

8     objectors' objections which is that there are not good business

9     reasons for entering into it.  I will address, however -- there

10    are other objections which I've not specifically addressed thus

11    far.

12         The first is, although it really is not stated in the

13    pleadings although there was a suggestion of it during the

14    trial that the process by which the debtors and the committees

15    analyzed the facts and legal issues was tainted by the fact

16    that the current plan as frankly, I believe, any plan that

17    would ultimately be proved in the case, but the current plan,

18    in any event, includes in it recognition that a portion of the

19    reorganized equity will be reserved for allocation to

20    management on a going forward basis after emergence from

21    bankruptcy.  They also note that the company intends, as set

22    forth in the disclosure statement, to seek approval of

23    emergence bonuses for certain management.  I believe the

24    contention would be although, again, this was not articulated

25    in writing, that that fact biased management in favor of

29

1   getting this process over with.  I do not believe that was the

2   case based on Mr. Sheehan's testimony and my analysis of the

3   merits of the decision to go forward with the December 3 EPCA.

4   I also accept Mr. Miller's testimony which is corroborated by

5   the general record of this case that these debtors have a very

6   active and responsible board with active independent directors

7   and that the board has taken a lead in all phases of the

8   debtors' analysis of a plan investment.  There's no secret

9   regarding the proposed reservation of equity to be distributed

10  as an incentive post reorganization.  And the disclosure

11  statement certainly makes no secret of the debtors' intention

12  to propose emergence bonuses.

13          The debtors' two official committees obviously don't

14  have that problem.  They don't get emergence bonuses and

15  they've made the analysis that they have made.  Even were I to

16  conclude that there was some effect on the process, which I

17  very clearly do not, I think that would override any such of an

18  argument.

19          It's also contended by the objectors that the plan

20  investors have impermissibly chilled the ability of the debtors

21  to consider alternative transactions.  That is based upon an

22  agreement among the plan investors and their sources of

23  financing to use their best efforts to proceed with the EPCA.

24  That agreement is not a secret and, frankly, it seems to me

25  inherent in any agreement where you have more than one party

30

1    providing financing.

2            It's somewhat ironic that the other objection or one

3    of the other objections to t his amendment is that it has too

4    much conditionality or optionality.  I believe that if you did

5    not have the type of investor lock-up that you had, you would

6    of course have that type of conditionality here.  I accept Mr.

7    Tepper's general notion that there are plenty of other parties

8    out there with a lot of money if they want to come to the table

9    and that these agreements which keep these people at the table,

10   the lock-up agreements, do not preclude those others from

11   coming in except, of course, under the circumstances that I had

12   previously approved contingent upon the debtors' payment of an

13   alternative transaction fee under the circumstances where that

14   type of fee would be earned.  The evidence shows at least that

15   the only use of a lock-up was not to keep a plan investor or

16   source of funding from providing a better deal for the estate

17   but rather as a threat to keep one of the plan investors from

18   walking off the reservation to hurt the deal.

19           It's also contended -- and, frankly, having reread

20   all three iterations of the ad hoc bondholder group objections,

21   I believe it's the main focus of those objections.  It

22   certainly was the only focus of the initial objection which

23   was, of course, to a worse amendment.  That the plan upon which

24   the EPCA is premised unfairly and it is alleged in an

25   unconfirmable way arrogates value to a subordinated debt group.

31

1    Frankly, I don't really blame the objectors for raising this

2    objection.  It seems to me and I believe it probably seemed to

3    them that it was their last best relatively free chance to

4    object to a future of the plan that they don't like.  That is,

5    the treatment of the so-called TOPrS, T-O-P-R-S, bondholders

6    holding approximately 400 million of bonds.  Those bonds are

7    subordinate to senior debt.  The evidence shows that that

8    senior debt is somewhere in the range of three to three and a

9    half billion dollars and would include the 600 million held by

10   the ad hoc group.  If it were the case, obviously, that this

11   EPCA, for which the debtor is paying a price in terms of fees

12   and potential alternative transaction fee, was premised upon a

13   plan that either was unconfirmable or, in my view, was unduly

14   susceptible to being rejecting by voting creditors, I would

15   understand and agree with the objectors' argument.  Obviously,

16   under those circumstances, something would have to give to

17   render the plan likely of confirmation.

18          I don't think that's what the treatment of the TOPrS

19   under this plan constitutes.  As I noted earlier, this is a

20   negotiated plan.  It's premised upon important negotiations.

21   The agreements with the unions were negotiated in a backdrop of

22   1113 of the Bankruptcy Code which, as I quoted earlier,

23   requires an assessment of the fairness of the plan to all

24   parties vis a vis the unions.  It was also negotiated and is

25   premised upon a complex agreement with GM where GM is going to

32

1   want, and anyone would want, a release from everyone at Delphi.

2   every constituent.  And finally, it is one where you have a

3   debtor that is difficult to value.

4           We all know that under the Bankruptcy Code, Congress

5   gave the ability of a senior class to waive its priority rights

6   through a plan vote.  Under these circumstances, particularly

7   going through the analysis I'm about to go through, I believe

8   that would be the rational businesslike choice of senior

9   creditors here.  Thankfully, according to the second circuit,

10  my view is not a guarantee.  I don't get paid enough for that.

11  But it's my firm belief.

12          I went through one mathematical example of that

13  yesterday based upon Rothschild's midpoint valuation, assuming

14  for the moment that voters act as economic animals and will

15  obviously test a negotiated plan value.  Everyone paid a lot of

16  money to Rothschild collectively through their fees being paid

17  out of the estate to come to that valuation and obviously it

18  will be tested.  But the committees have their experts and they

19  have reached their negotiated result.

20          So that's a good data point.  And based on my

21  analysis from yesterday, and I won't repeat it again, I believe

22  a rational voter holding senior debt considering the recovery

23  that he or she or its institution would get under the plan and

24  the risks of a reduced recovery if they killed the plan would

25  vote in favor of it.  And I don't believe that's coercion.  I

1   believe that is a recognition of all the parties' leverage

2   under the facts of this case.

3            However, it was also stated to me that based upon

4   recent short term trading values, the senior debt is trading

5   lower than Rothschild valuation although just a few months ago

6   it was trading substantially higher than Rothschild's midpoint

7   valuation.  I've noted that trading values are a data point for

8   valuation but a dangerous one as evidenced, I believe, by the

9   incredible fluctuations shown on the exhibit with which we

10  began this trial and numerous past experiences where people

11  bought and sold distressed debt in an environment where not

12  only business information but also legal arbitrage plays a role

13  in sometimes thinly traded markets.  This results in instances

14  where some people make enormous profits including when they buy

15  from supposed fiduciaries who have great interest in maximizing

16  value.  And I'll give you one brief example which is the sale

17  of the executive life portfolio by the insurance commissioner

18  of California where one single element of that sale not only

19  paid back the entire sale price but set the purchaser on the

20  course of an enormous fortune.

21           Given my own experience with trading in distressed

22  debt, therefore, I approach it with some skepticism as an

23  accurate market reflection.  However, let us presume for the

24  moment that the true value of the distributions to senior

25  unsecured creditors is fifty cents on the dollar.  The

34

1   principal amount of the TOPrS debt is 400 million.

2   Distribution under that presumed value would be 200 million.  I

3   am assuming that before they would agree to the third party

4   release in the plan, which I believe is critical for the GM

5   settlement, they would require distribution.  And I believe

6   that any of the objecting ad hoc bondholders, if they were in

7   that position, know that they would do the same.  So that 200

8   million dollar distribution could not all be transferred to the

9   senior debt and have this plan be confirmable in my view.

10  Let's assume half of it was so that three to 3.5 billion

11  dollars senior debt in my view would be likely to get something

12  between a hundred to two hundred million dollars although I

13  think a hundred is a lot closer of value on the assumption of

14  valuation that was posited to me.  As I noted before, the

15  direct cost of jettising the EPCA and taking a new approach

16  before considering any effects on the business or any

17  transaction risks of entering into a new transaction, in my

18  view, is a hundred million dollars.  Why would you make that

19  trade?  I don't see it.

20         Now the senior bondholders might say well, we

21  wouldn't be sharing all that pain.  We wouldn't be taking it

22  all.  We'd be sharing it with every other constituent.  I would

23  expect them to go to every meeting in person as opposed to

24  asking their poor lawyer to do that if they made that demand

25  of, say, for example, the unions, GM or trade creditors.

35

1          Now as far as the technical objection to plan

2   confirmation, I considered that issue and I'll address it at

3   the disclosure statement hearing.  But I believe the technical

4   objections raised as opposed to the economic analysis that I

5   just went through are all objections that go to drafting and

6   not treatment.  The focus, I believe, should be on treatment

7   and that's the analysis I've gone through.  I do not therefore

8   believe that this aspect of the plan is one that renders the

9   EPCA illusory or unduly conditional.  I believe it reflects in

10  large measure rights that as a practical matter, perhaps not as

11  a legal matter but as a practical matter, although also perhaps

12  as a legal matter 'cause valuation is still to be determined if

13  there's a contest over valuation, the TOPrS have just as the

14  shareholders have.  And, frankly, I saw no objection from the

15  ad hoc bondholder group to the treatment of the shareholders.

16          Finally, the objectors contend that the EPCA

17  amendment is a de facto Chapter 11 plan that should not be

18  approved now without going through voting and all of the other

19  steps that are required before confirmation of a Chapter 11

20  plan.  I have previously dealt with this point in connection

21  with the earlier iterations of the EPCA and will do so here

22  only briefly because I believe it's the law of the case and my

23  rationale was set forth previously.  This is not the type of

24  transaction that constitutes an impermissible sub rosa plan of

25  reorganization.  This is a building block, an important one, to

36

1    achieving a confirmed Chapter 11 plan.  And without such

2    building blocks, without such sales, without such agreements

3    with unions, without such settlements, generally -- although

4    the GM settlement is one that's in the plan because it does

5    call for the release, which, I think, is the main reason it's

6    in the plan -- most plans can't get done.  That distinction was

7    made well by Judge Gropper in In re Tower Automotive, Inc., 342

8    B.R. 158, aff'd 241 F.R.D. 162 (S.D.N.Y. 2006).  And I don't

9    need, I believe, to amplify on it more.

10            As there, here the EPCA does not direct but in fact

11   is conditioned upon voting on a plan.  I suppose those plan

12   investors who also hold debtor securities will vote in favor of

13   the plan.  I believe there'd be serious consequences if they

14   didn't.  But that's as a matter of their agreement.  No other

15   creditor is bound in any way, directly or indirectly, by

16   contract to vote on this plan.  And as I said, they are free to

17   go through the analysis that I just went through and reach a

18   contrary result.

19            The last point that I want to address was a point

20   raised not only by the two objectors but by the official

21   unsecured creditors' committee.  It deals with a provision of

22   the EPCA that creates as a condition to the plan investors

23   going forward with their investment that their be a cap of 585

24   million dollars on interest expense in connection with the exit

25   financing.  The committee has pointed out that it is concerned

37

1   given the volatility in the credit markets that that cap is too

2   low.  They have suggested one that is roughly forty million

3   dollars higher.  I suggested yesterday that the plan investors

4   seriously consider increasing the size of that cap.  The point

5   made by the bondholder group indenture trustee and here by the

6   creditors' committee is one that I believe frankly everyone in

7   this room, including the plan investors, would agree with,

8   which is that we do not want to go through this exercise again.

9   And so, I had urged the plan investors to consider increasing

10  that cap in light of that fact.

11        Indeed, going through this process again would be

12  particularly onerous given that it is likely that, in one form

13  or another, the disclosure statement will be going out shortly.

14  Notice will be posted in publications all over the country.

15  Hundreds of thousands of people will be voting on this plan.

16  And the world will be perceiving that this plan is going

17  forward premised upon an investment by the plan investors.  I

18  understood Mr. Tepper's answer to me and, frankly, though I'm

19  not a mind reader, I don't view Mr. Tepper as particularly

20  opposing the request I made.  But it was reported to me this

21  morning that the investor group as a whole, which apparently

22  requires unanimity, did not agree to the request.  I appreciate

23  the difficulty that Mr. Tepper had in holding together his

24  group and, frankly, I believe it required me to do something I

25  normally don't do to help him keep control of the group

38

1     earlier.  I have to ask myself whether the refusal to agree to

2     that request by the creditors' committee is sufficient to

3     override the other considerations, which are strong, in terms

4     of going forward the proposed transaction.

5              In that regard, let me observe two or three things.

6     First, I believe that the debtors do have, as stated by Mr.

7     Resnick, some flexibility in dealing with their post

8     reorganization interest expense.  Secondly, I believe that the

9     actual economic effect of the type of increase, if it occurs,

10    that the committee is concerned about upon the plan investors'

11    investment would indeed be minimal as Mr. Resnick testified.

12    Thirdly, as I said before, when a financial institution that

13    expects to continue to be able to negotiate transactions

14    refuses to do so in such a highly public context where hundreds

15    of thousands of people have relied on them acting in good

16    faith, I believe, ultimately that if in fact the condition is

17    exceeded in the range that Mr. Rosenberg was proposing that it

18    would be incumbent for both legal and reputational reasons for

19    the plan investors to respond to that situation in good faith

20    with a reasonable concession.

21             I make that observation partly from my own experience

22    as a judge.  There are investors out there who have a

23    reputation which I assume they deserve who go into every deal

24    with a strike against them even though they have lots of cash

25    and that's because it's perceived that at the end of the day

39

1    their handshake won't be trusted and that they won't deal in

2    good faith as a business person would expect.

3          Frankly, I believe that Appaloosa's response to this

4    whole set of circumstances doesn't put them in that category at

5    all.  I don't believe Mr. Tepper was blowing smoke at me

6    yesterday when he said a handshake is a handshake, a deal is a

7    deal.  Given that and given that I believe all of the other

8    plan investors want to continue to fall in the category where

9    you don't have a strike against you whenever you come into

10   court and say we want to bid for this company or we want to bid

11   against those people that they will deal in good faith if in

12   fact the debtors don't have room to manage this condition.

13         Consequently, I will approve the debtors' entry into

14   the amended EPCA agreement.

15         The last point I should address is the debtors'

16   request for a waiver of the ten-day stay under Bankruptcy Rule

17   6004.  That stay was, I believe, put in place to prevent

18   debtors and purchasers from rendering appeals moot by promptly

19   closing after bankruptcy court approval of a transaction.

20   That's clearly not going to happen here.  The closing of this

21   EPCA is not going to happen for a number of weeks.  So I

22   believe, particularly in light of any objection to the request,

23   that the debtors are not here circumventing the purpose for

24   which the Rule was enacted.  Rather, they are, however, in an

25   environment where not everyone is particularly savvy about

40

1    Bankruptcy Code processes and procedures and where it is

2    important to them to reassure all their constituents that they

3    are on a path to complete the process that I said they had

4    basically completed but for the plan in September that they

5    have what they can refer to as a final order not subject to a

6    statutory stay.  So in light of that, I will authorize the

7    waiver of the 6004(g) stay.

8            I don't know if you have a current version of the

9    order on this but since I gave what for me is unfortunately too

10   long a ruling, I'm not sure you need much of an order other

11   than the basic findings and a reference to the Court's bench

12   ruling which, as I always do, I reserve the right to read over

13   to see what I did to myself giving an oral ruling and what

14   sometimes, not always, even the best court reporters do to what

15   you should say.  So obviously my ruling won't change but I

16   reserve the right to correct my grammar, citation, whatever.

17   But it seems to me that the order should be pretty simple here.

18           MR. BUTLER:  Your Honor, I think we do have a form of

19   order that's been circulated to the parties.  It was an exhibit

20   to the record yesterday.  And we'll double check it during a

21   break and submit it to Your Honor.

22           THE COURT:  All right.  All right.  Now the other

23   matter that's on is the disclosure statement hearing.

24           MR. BUTLER:  Yes.

25           THE COURT:  Do you want to move right ahead with

41

1    that?  Do you have any parties to talk to about that?  Or --

2            MR. BUTLER:  I think what I'd like to do is we could

3    just take a very brief recess of ten minutes or so and try to

4    get set up --

5            THE COURT:  All right.  I'll be back at 12.

6            MR. BUTLER:  Thank you.

7            (Recess from 11:52 a.m. until 12:26 p.m.)

8            THE COURT:  All right.  We're back on the record in

9    Delphi Corporation.  We're up to the disclosure statement and

10   related solicitation procedures matters.

11           MR. BUTLER:  Your Honor, with respect to the omnibus

12   agenda -- non-omnibus agenda we filed for the hearing that

13   began yesterday and continuing today, this is item number 3 on

14   that agenda.  The solicitation procedures motion concludes the

15   relief seeking and approving the disclosure statement.  It's

16   filed at docket number 9266.

17           Your Honor, the debtors propose to give sort of a

18   summary where we think we are from the debtors' perspective.

19   And then seeing as the disclosure statement hearings are often

20   times largely, among other things, drafting sessions, we work

21   out language with the Court and language of the parties.  With

22   the Court's permission I was going to ask if the parties could

23   use the mikes at the tables.

24           THE COURT:  Yeah, that's fine.

25           MR. BUTLER:  So as not to have to jump up and down.

42

1           THE COURT:  That's fine.

2           MR. BUTLER:  As we go through.

3           THE COURT:  You could sit there if you want, if

4  you're going to be speaking.

5           MR. BUTLER:  So, Your Honor, just as we begin this

6  second day of the disclosure statement hearing, this relates to

7  the original plan filed at docket number 9263, and the

8  disclosure statement filed at docket number 9264.  The

9  disclosure statement hearing in these cases commenced on

10  October 3rd at which time Your Honor resolved a number of

11  objections that were then pending, by an order entered on

12  October 9th, at docket number 10497.  As we indicated at that

13  hearing, what the debtors intended to do is not file a

14  subsequent or iterative plans and disclosure statements but

15  rather to file, as we worked through them, a series of

16  potential amendments.  So we could get to this continuation of

17  the hearing and assuming that we can obtain Your Honor's

18  endorsement of a form of disclosure statement to go out, we

19  will in connection with that, and we submit the final form of

20  the solicitation order.  The debtors will file formally a first

21  amended plan, executed by the debtors and a first amended

22  disclosure statement, executed by the debtors in a form that

23  this Court is prepared to have solicited.

24           So everything up to this point of time has been a

25  series of amendments.  We have made three of them formally so

43

1    far.  As we've moved through the hearing we filed a series of

2    amendments to the Plan of disclosure statement on October 29,

3    2007, at docket number 10759.  We filed further amendments to

4    the disclosure statement, a appendices on November 14th, at

5    docket number 10932, and conforming amendments to the

6    disclosure statement on November 16th at docket number 10964.

7    And we filed a third round on December 3, 2007 at docket number

8    11220.  It certainly not a mistake that these were filed at

9    around the time and in connection with updating the GM

10   settlements and the investment agreement amendments because the

11   consent of both of those parties is required for these filings.

12            THE COURT:  Okay.  I have -- the one I've been

13   working off of is dated December 6th.

14            MR. BUTLER:  Correct.  I'm going to walk through that

15   to the -- walk through that.  And that is -- those are the

16   amendments that we filed.  And then on December 5th we filed,

17   in connection with our reply; we filed a series of additional

18   amendments at dockets number 11291 and 11295.  And that

19   included in that notice of filing, it included what the Court

20   wanted to do, which was a cumulative blackline back to

21   September 6th of the Plan and disclosure statement, and that is

22   dated, I believe, December 6th, in terms of the actual document

23   that's before the Court.

24            THE COURT:  Okay.

25            MR. BUTLER:  And it's that document that we propose

44

1    be the working draft, which I presumed the Court looked at as

2    we move forward.  But that's the history of the filings the

3    company has made -- the debtors have made in connection with

4    these matters.  As a result of that there have been a series of

5    objections that have been filed at various times here.  And

6    just to sort of summarize those objections before the Court

7    today, I'm not going to summarize the statements, but the

8    objectors before the Court today include Cheryl Carter, at

9    docket number 10792.  This is essentially a similar objection,

10   I won't say a duplicate objection, but it's a similar objection

11   that she lodged prior to the September -- the September 28th

12   disclosure statement objection deadlines, which Your Honor

13   overruled on the October 3rd disclosure statement hearing.

     This was a letter she sent to the Court on October 23, 2007.

15             There are -- and then in terms of the remaining --

16             THE COURT:  Could I -- let's -- given everything that

17   has to be done today -- is Ms. Carter here by any chance?  No.

18   It may get lost in the shuffle.  I reviewed it.  You're right,

19   it is essentially of what was filed before.  As I read it it

20   basically opposes the idea of Delphi being in bankruptcy and

21   for the same reasons that I overruled it before I would

22   overrule it now.

23             MR. BUTLER:  Thank you, Your Honor.  Your Honor, also

24   just procedurally so we can it someplace, the equity committee

25   did file a motion to continue the disclosure statement hearing

45

1    at docket number 10795, and that is not a motion that they're

2    pursuing at this time.  I want you just to confirm.

3               MR. JOSEPH:  That's correct, Your Honor.

4               THE COURT:  Okay.

5               MR. BUTLER:  Your Honor, I think that means that the

6    balance of objections have been filed by -- and there have been

7    objections filed, some of which I think, may have been

8    withdrawn, but we'll work through them.  The equity committee

9    has filed a series of objections at docket 10802, and at docket

10   11028.  They still may have particular comments to the

11   disclosure statement.  I think the balance of those objections

12   are not being pursued by they may certainly have some comments

13   as we walk through the day today.

14               Similarly, the creditors' committee filed a series of

15   objections at docket 10804, at docket 11034.  I also believe it

16   to be the case that the creditors' committee is not pursing

17   those objections as stated but may also have comments to -- as

18   matters are considered by the Court during the hearing today.

19               MR. ROSENBERG:  That is correct, Your Honor.

20               THE COURT:  Okay.

21               MR. BUTLER:  So the -- I also wanted to address the

22   objection filed by Law Debenture Trust Company at docket number

23   11017.  My understanding is that they are not present in Court

24   today and intending to pursue that objection, but I need to

25   confirm that here on the record this morning.

46

1          THE COURT:  Okay.  I'm sorry; they're the indentured

2    trustee for the TOPrS?

3          MR. BUTLER:  TOPrS, yes.

4          THE COURT:  Okay.  All right.  Well, no one is

5    standing up; I take it that they're not pursuing their

6    objection.

7          MR. BUTLER:  I think, Your Honor, what that boils

8    down to -- I should also address the ad hoc trade committee

9    objection at docket number 11049.  Similarly based on the

10   settlement that was announced on the record yesterday, I

11   understand the ad hoc trade committee is not here to pursue

12   that objection.

13         THE COURT:  Okay.  That, I think, Your Honor, brings

14   us back to the same -- with one addition, the basic same

15   players we had with respect to the EPCA.  There are objections

16   filed by Wilmington Trust, at docket number 10810.  And again,

17   at docket number 11048.  And there are objections filed -- a

18   series of objections filed by the ad hoc -- I call them

19   bondholders group or committee, the composition of which seems

20   to swing from time to time and even from objection to objection

21   in terms of which parties are joining in.  But those -- their

22   were, I think three objections filed one, at docket 10803, one

23   at docket 11005, and then there was a third supplemental

24   objection that was filed in connection on December 5th, came in

25   and we reviewed it, and we'll talk more about it, we may

47

1    actually move to strike under the sense there's not a single

2    thing raised in that objection that's based on anything that

3    was filed supplementally.  It seemed to be filed in order to --

4    from the debtors' perspective bootstrap Everest Capital Limited

5    and Northeast Investors Trust into the group of objectors.

6    Because there's nothing -- in fact, they basically concede in

7    paragraph 2 of the objection that none of the issues are

8    addressed by the most recent amendments to the disclosure

9    statement.  So they're still unhappy, and I understand that,

10   but I don't think there's anything new in that third

11   supplemental objection.

12           So we've got the ad hoc, bondholders group,

13   Wilmington Trust, and there was -- there were two objection,

14   protective objections filed by the lead plaintiffs at docket

15   number 10794, and at dockets 11022.  I think we've addressed

16   substantially all of their issues.  I don't know whether Mr.

17   Etkins intends to pursue anything further at this hearing but

18   he's I think here in the courtroom today.

19           MR. ETKINS:  Your Honor, just a couple of issues

20   remain outstand.

21           THE COURT:  Okay. And you're reserving your rights in

22   case someone wants to change what you've agreed to.

23           MR. ETKINS:  I'm sorry?

24           THE COURT:  Like Mr. Rosenberg and the equity

25   committee, you're reserving your rights to talk if someone

48

1    proposes changing language that you've agreed to.

2            MR. ETKINS:  Oh, surely, Your Honor.

3            THE COURT:  Okay.

4            MR. ETKINS:  There's just a couple of issues that

5    remain outstanding and we have not been able come to agreement.

6            THE COURT:  All right.

7            MR. BUTLER:  And, Your Honor, in addition to the

8    people who are regularly before you, I'd like to introduce the

9    Court to Gordon H. Stuart.  Mr. Stuart one of our colleagues

10   who has been the principal draft person of the Plan and

11   disclosure statement and is, you know, responsible -- I know

12   there are things people want to work on today, really I think

13   he's done a really good job of -- in a very difficult

14   situation.  He's here at counsels table and we're going to ask

15   him to sort of be the principal scribe of trying to take down

16   Your Honor's directions and of other people's so we can turn

17   this.

18           I will point out hopefully that we can resolve

19   matters today, in order to be able to maintain an emergence

20   timeline that would allow us to actually emerge in the middle

21   of the first quarter of 2008, we're shooting for the -- Your

22   Honor, if I should comment, you asked us to file a timeline, we

23   did file a timeline with dates and times on it, and we'll talk

24   about those in particular, but we're shooting to emerge, if we

25   can, towards the end of February, prior to the PBGC waivers

49

1   expiring.  Although, we've publicly stated that our goal is to

2   emerge by the end of the first quarter.  In order to do that we

3   need to commence solicitation the week of December 15th, and in

4   fact, very close to December 15th.  And in order to accomplish

5   that we will need to ask Your Honor to consider entering

6   disclosure statement approval order sort of not later than

7   Monday, which means we're assuming that we're going to get a

8   number of instructions today which we'll have to process over

9   the weekend and submit a package back to the Court which

10  we'll work over the weekend to do.  But our goal, if the

11  Court's inclined to -- inclined towards that time, our goal

12  would be to actually have an order entered in -- as early in

13  the day on Monday as the Court is reasonably prepared to

14  consider it, in order to get things to printers and the other

15  folks who have to help us.  I do have a specimen with me.  You

16  know, we're nothing if not optimistic, as debtors-in-

17  possession.  We are as you know in our solicitation motion

18  going to use some technology in trying to cut the cost of

19  solicitation here, so I have a -- I actually have the proof of

20  the CD rom in which all these materials hopefully we'll be able

21  to go as its distributed out.  The solicitation package will go

22  out to -- as Your Honor, has observed, many hundreds of

23  thousands of people, as we move forward to solicit under this

24  proposed disclosure statement and Plan.

25          Your Honor, that's just a backdrop of where we are in

50

1   terms of presenting it.  I think I would like to briefly

2   introduce, if we can, the exhibits, which I think there are no

3   objections.  The disclosure statement has the record before it.

4   There is no testimony today in connection with this.  There are

5   both -- there are primarily legal objections and then requests

6   to, I think, more or less -- I just need to get Your Honor's

7   comments, which we anticipate from a prior history.  But also

8   as typically in these matters the Court acts in some respects

9   as a referee on these last groups of comments that we need to

10  work through.  The evidentiary record here in terms of these

11  exhibits is really just a paper.  We want to make sure that the

12  disclosure statement has in place.

13          Your Honor's previously admitted Exhibits 1 through

14  20, which mostly were primarily related to notice.  And there

15  are a total set of exhibits here of, I believe, a total of

16  eighty-one exhibits.  The first twenty were previously

17  admitted.  And those were four volumes of exhibits dealing with

18  notice of over 550,000 parties.  And then we have the remaining

19  exhibits, primarily are scheduling orders, proposed amendments

20  to the Plan that have been filed, affidavits; notices of

21  service with respect to those matters, and the various

22  objections and motions and drafting that the company has done.

23  So I think there is no -- my understanding is there's no

24  objection to admission of Exhibits 1 through 81 in connection

25  with this hearing.

51

1          THE COURT:  Okay.

2          MR. BUTLER:  This just creates the record.

3          THE COURT:  Well, except for the affidavits of

4    service, it's basically matters of record anyway, but this puts

5    it in one record for this particular motion.  So that's fine.

6    They'll be admitted.

7    (Debtors' Exhibits 1 through 81, various documents relating to

8    this hearing, were hereby received into evidence, as of this

9    date.)

10          MR. BUTLER:  In terms of proceeding with the hearing,

11   Your Honor, I'd just ask the Court how you would like to

12   proceed.  There are -- I think the parties that have specific

13   requests, both legal and drafting.  And I did, by the way, I

14   apologize to counsel for Highland Capital that wasn't on my

15   list.  Highland Capital also filed an objection for this --

16   with respect to this matter.  And they have a proposed language

17   they want to add to the disclosure statement that the debtors

18   do not support.

19          THE COURT:  Okay.

20          MR. BUTLER:  So we'll have to deal with that issue.

21   And I apologize for not having mentioned their name as well.

22          THE COURT:  Well, I think probably what's most

23   efficient is for me to give you my comments, which are just

24   that, my comments.  And they are somewhat informed by the

25   objections, but not entirely.  And I know that in a couple of

52

1    places there will be the need to discuss a so-called plan

2    objection and that's really dealing with the Plan's treatment

3    of the senior debt and the TOPrS.  And what I'm going to ask

4    the parties on that point to do is listen to my comments and

5    then don't jump in immediately because there are some comments

6    up front that arguably you might want to jump in on this point.

7    But rather, there's a specific point where the disclosure

8    statement talks about confirmation -- particular confirmation

9    objections and I just think that's the best point to address

10   the issue.  And I appreciate its not a disclosure issue as much

11   as a plan issue and I'm going to treat it that way.  So let me

12   just go through my comments.

13          As I always do with disclosure statements I have some

14   comments that are just -- it's not worth spending the time to

15   talk about.  I mean, for example, you say that on page Roman

16   numerical IV of the Plan, the Bankruptcy Code allows the debtor

17   to sponsor a plan of reorganization, and I just changed that to

18   propose, because I think that's clearer to people.  But if

19   there are things like that I'm not going to -- I'm just going

20   to give you my mark-up on that.

21          MR. BUTLER:  Terrific, Your Honor, okay.

22          THE COURT:  Okay.  Most of my comments are in the

23   summary, and that reflects my experience that that's what

24   people read.  And so I'm going to go through that with you all,

25   and again, I'll give you the market.

53

1          If you go to Roman numeral IX, page DS Roman numeral

2     IX, and I'm working off the blackline, or actually the

3     bluelined version from December 6th.  Okay.  If you look in G,

4     events impacting reorganization, the second sentence there

5     says -- the third sentence, excuse me, it says, "Although the

6     currency received by certain stakeholders has changed since the

7     debtors initially filed the September 6th plan."  And then I

8     have added here, "in light of the debtors' inability to borrow

9     as much as exit financing as they had originally intended," and

10    then it continues.  "The Plan continues to provide for full

11    recoveries for unsecured creditors at" and then I've added "a

12    negotiated" and then it goes on "Plan" and I put in the word

13    "enterprise value" "in fair consideration for holders of

14    existing common stock and is supported by GM, the plan

15    investors and," and here, again, since I think a lot of people

16    just read the summary I've deleted the phrase "statutory

17    committees" and put in "both the official creditors' committee

18    and the official equity committee" which you also have as

19    defined terms.

20         What I suggest for those who have objections is after

21    I go through all this you can come back and say how you think

22    this doesn't work, and that goes for the debtors too.

23         If you go to 13, it says, "Certain creditors and

24    stakeholders do not agree with the debtors' assessment of event

25    risks."

54

1          MR. BUTLER:  I'm sorry, 13?

2          THE COURT:  I'm sorry, Roman numeral XIII, excuse me.

3          MR. BUTLER:  Right.  And our page number pagination

4   is slightly off here, I think, of the summary.

5          THE COURT:  Well, this is right above H, summary of

6   first amended plan.

7          MR. BUTLER:  Yes, thank you.

8          THE COURT:  Okay.  So it says "certain creditors and

9   stakeholders do not agree with" and I've said "certain

10  creditors and stakeholders have stated that they do not agree

11  with."  And then the next sentence says "the debtors however

12  believe that each event described above could have a

13  significant impact on the debtors' ability to successfully

14  reorganize."  And then I've added "if the Plan is not accepted

15  and confirmed."  So it says here "could impact on the debtors'

16  ability to successfully reorganize if the Plan is not accepted

17  and confirmed.  And that the absence of acceptance and

18  confirmation would at a minimum create substantial uncertainty

19  about the direction of the debtors' reorganization efforts, in

20  addition to materially increasing the cost of the debtors'

21  Chapter 11 cases."

22          Now, I know that there were certain objections as to

23  the event risk timeline.  I did not believe that statements

24  regarding the likelihood or lack of likelihood of getting

25  waivers or agreements should be in here.  But to the extent

55

1   something has been superseded by a new agreement, I think you

2   should take out whatever event has now been superseded by a new

3   agreement.

4          MR. BUTLER:  We'll present Mr. Fox with a revised

5   event risk timeline.  At least just to the boxes I think we're

6   in agreement -- I think we're in agreement on the boxes now.

7   I'm talking about the language.

8          MR. FOX:  There might be one or two.

9          THE COURT:  All right.

10         MR. FOX:  But otherwise I think we're better than

11  before.

12         THE COURT:  All right.  Okay.  Now, I guess the

13  other thing that we should do here is I guess you should put in

14  F on the top of Roman numeral XI, I didn't put this in, but in

15  light of this morning's ruling I think you should put in that

16  the Court has approved the amendment to the EPCA, in the

17  section dealing with plan investor and exit financing.

18         I'm not at all of the view necessarily that there

19  should be some footnote here about Highland.

20         MR. BUTLER:  All right.

21         THE COURT:  You have a lengthier discussion later

22  about the EPCA.

23         MR. BUTLER:  Yes.

24         THE COURT:  Then you should update that in light of

25  today's ruling.

56

1          MR. BUTLER:  We'll do that.

2          THE COURT:  I think you should say there that the

3     debtor, under appropriate circumstances, will continue to

4     consider alternatives from third parties.  And as received an

5     expression of interest from Highland Capital.

6          MR. BUTLER:  In fact, Your Honor, the debtors haven't

7     received it the creditors' committee has receives something.

8          THE COURT:  I would not that then.  Just that it's

9     been made.

10         MR. BUTLER:  Right.

11         THE COURT:  I thought about putting it here but given

12    that it's still an expression of interest in that state I --

13    the most you put in here, if you're going to put in anything

14    was that the debtor nevertheless is prepared to consider other

15    alternatives.  But I think its more appropriate in a lengthier

16    discussion of the ECPA that appears later.  So I don't think it

17    would be the update here.

18          All right.  On page Roman numeral XIV, that first

19    full paragraph says "the Plan is the culmination of Delphi's

20    transformation plan, within the Chapter 11 context.  Delphi has

21    determined that it has achieved those aspects of it's

22    transformation plan for which the Chapter 11 reorganization

23    process was necessary."  And then I would add this phrase, "in

24    that it is now time to emerge from Chapter 11 to fully

25    implement it."

57

1          Then if you go to the next paragraph before the last

2     sentence of that paragraph.  The prior sentence ends with a

3     "par plus accrued recovery at plan value."  You see that?

4          MR. BUTLER:  Yes.

5          THE COURT:  I have put in this language and I have

6     added language about the importance of a vote in a number of

7     place, because I believe that the vote is important here as a

8     legal matter on some of the issues that the Plan resolves.  And

9     I want to make sure people know that.  So I've added this

10    language.  "As discussed below, this Plan value, was negotiated

11    to enable the various settlements upon which the Plan is based.

12    People may differ about the exact valuation of an enterprise

13    like the debtors.  The debtors believe that the negotiated Plan

14    value is a reasonable basis for the Plan and the settlements

15    embodied in it.  Although the Plan was negotiated with the

16    statutory committees, GM and other parties, your vote on it is

17    extremely important.  Your vote will help to determine whether

18    the Court confirms and approves the Plan and the settlements in

19    it, including the following:  Involving certain subordinated

20    bonds, GM, and multi-district securities litigation."  And then

21    you pick up, and you might want to insert a new paragraph here,

22    because this starts about the TOPrS.  And it says "in

23    satisfaction of the subordination provisions."  I would say "in

24    recognition of and to satisfy the subordination provisions."

25         And then if you go to the next page 15, Roman numeral

58

1    XV, under the heading number 2, valuation.  The third line you

2    have a quote "par plus accrued" recovery.  I would just use the

3    same phrase you've been using which is "par plus accrued

4    recovery of plan value."

5            MR. BUTLER:  Your Honor, I know you don't want to

6    hear comments back, but just to say, on that particular phrase

7    would it make sense then for us to word search the document and

8    use that phrase globally?

9            THE COURT:  Well, I think you use it -- well, maybe

10   you don't.

11           MR. BUTLER:  I can double check it.

12           THE COURT:  Yeah, that's fine.  On the next page

13   Roman XVI, the carryover paragraph that ends with the phrase

14   "estimated total enterprise value," I know you say this in a

15   couple of places but I think it's important to emphasize.  I'd

16   add this sentence, "The actual common trading value of the

17   shares of the reorganized debtors may be higher or lower than

18   the 5961 plan equity value."

19           THE COURT:  I have not put in here anything more than

20   what you have in this chart, which has a percentage recovery

21   based on Rothschild's valuation.  I think that's sufficient.

22   But I just don't -- I don't think I missed anything on that.

23   But I do have a point later about these percentages.

24           And then on XVII, again, I put in here again, where

25   you state "certain creditors believed that the plan equity

59

1    value may be" I just put "have stated that they believe."  Just

2    that sort of a consistent change.  And you'll see that in the

3    mark-up.

4            Okay.  If you go to the next page Roman XVIII, under

5    the heading rights offering.  The third sentence after the

6    dollar figure I've added -- and I think this should be put in

7    bold.  "This right constitutes a substantial percentage of the

8    potential recovery by such creditors under the Plan, but it is

9    realizable only if properly exercised or sold."  Again, we're

10   talking about the discount rights here.  And then the next

11   paragraph that talks about that in more detail I think also

12   should be put in bold.  "Please note that" --

13           MR. BUTLER:  That entire paragraph?

14           THE COURT:  Yeah.  And then before the last sentence

15   of that paragraph I would add "even if you don't have the cash

16   to exercise your discount rights you may be able to sell them.

17   The actual sale price may be higher or lower than the discount

18   to plan value."

19           And then if you go to the bottom of that page with

20   the paragraph that begins "current stockholders of Delphi may

21   receive but do not desire to exercise may sell their shares,"

22   I'd put that in bold too, that whole paragraph.

23           MR. BUTLER:  That whole paragraph?

24           THE COURT:  Yeah.  Okay.  On the next page Roman IXX,

25   I hate to waste time on this but it's not a big point I guess.

60

1   At the beginning it says "although the debtors need only

2   establish that the stakeholders will receive at least as much

3   as under," I'd say after the word establish "under Section

4   1129(a)(7) of the Bankruptcy Code."  You'll probably have to,

5   you will have to establish other things besides that.

6           Now, in each of the list of confirmation -- potential

7   confirmation objections on this page I've substituted for the

8   word "believe," where it says "certain creditors believe" I've

9   put in the word "claim."

10          Now, I guess this is the part where I thought we

11  would talk about the classification and 1123(a)(4) issue on the

12  TOPrS.  Before we get to that, though, I want to alert you to

13  an issue that I have previously flagged in disclosure

14  statements.  And I generally, as you can tell, believe that

15  most Plan issues should be reserved for a vote.  Because people

16  have the ability to amend their rights as a class.  But I am

17  generally uncomfortable with that Plan provision that creates a

18  disputed claims reserve which can be interest earning, that

19  doesn't provide interest ultimately actually earned in that

20  reserve to the claimant if their claim is allowed.  I just

21  have -- I've always had a problem with that.

22          MR. BUTLER:  I'm just trying to understand the issue.

23  The disputed claim reserve earned interest, you'd expect the

24  interest to go to the claimant.  I understand that.

25          THE COURT:  On a pro rata basis.

61

1         MR. BUTLER:  But in this case the disputed claim

2   reserve is going to have equity in it.  I think.  I don't --

3         THE COURT:  Well --

4         MR. BUTLER:  I don't think there's any cash in the

5   reserve.

6         THE COURT:  But is there any fluctuation of that or

7   you just get the equity you're entitled to?

8         MR. BUTLER:  No.  The equity that's associated with

9   that, we're not marking the -- all of the shares have been

10  determined -- I mean, what --

11        THE COURT:  No one's going to be selling the equity.

12        MR. BUTLER:  Right.

13        THE COURT:  It's just going to stay as equity.

14        MR. BUTLER:  Exactly, Your Honor.  You see, what's

15  going to happen is once we run the rights offering, in the

16  period between the rights -- there will be confirmation.  Once

17  we run the rights offering there has to be a summon up

18  involving the committees and the plan investors.  We have to

19  make sure we got all the share counts correct.  And as we set

20  the -- what goes in at what place at closing.  But that's

21  why -- that's why the Plan investors have taken great effort

22  and the company has working with the committees to express

23  things in share counts, because the share count issue is

24  relevant.

25        THE COURT:  Okay.  Maybe you should say that then,

62

1    "Here disputed unsecured claims will be receiving the equity

2    that they would be entitled to."

3            MR. BUTLER:  All right.

4            THE COURT:  On this point.  Okay.  Now, let's focus

5    on the TOPrS for a second.  I read the parties' submissions on

6    the classification in 1129(a)(4) points, although they mostly

7    focus on classification.  And actually this goes back to a

8    question that I posed to Mr. Lauria yesterday.  And maybe I

9    have the answer for it.  As I read the disclosure statement,

10   the disclosure statement in all caps at one point reserves the

11   right to move people to other classes and -- notwithstanding

12   their vote, their counted in the class that their ultimately

13   allowed in.  I'm not focusing now on the treatment of the

14   TOPrS' claims, that's an issue that people can vote on as I

15   said this morning, but rather whether any particular one

16   creditor, for whatever reason, wants to object to the Plan,

17   could defeat the Plan by contending that it violates 1122's

18   classification scheme or 1123(a)(4).  I believe, generally,

19   that -- and I think Colliers takes this view, and certainly

20   cases that the debtors have cited take this view, that you can,

21   under the right circumstances, classify sub-debt and other

22   unsecured claims together.  However, there is a concern, which

23   Colliers expresses, and it's a legitimate concern that the vote

24   of the sub-debt holders shouldn't be able to carry the class,

25   since it's the votes of the seniors waving the subordination or

63

1    waving it to the extent that its not satisfied, that really

2    carries the day.  So it seemed to me, but I want to -- this is

3    important, to know that when you get the votes you can

4    segregate out who the TOPrS are and who the other are.

5                MR. BUTLER:  Your Honor, actually on that point, I

6    think I mentioned this to Mr. Brilliant earlier, we're actually

7    tabulating -- or maybe to Mr. Rosenberg, someone I spoke to

8    before the hearing.  We're actually tabulating -- we'll have

9    the ability to tabulate all of the people who vote by the kind

10   of claim they have.  That's also going to be true, I'm told, I

11   will double check, you'll correct me if I'm wrong, but I think

12   we're also able to do that by the debtor against which they

13   have filed the claims.  So that we will have available --

14               THE COURT:  That anticipated another question I was

15   going to --

16               MR. BUTLER:  From a data set perspective we will have

17   available to us the ability to slice and dice the data and the

18   voting report and preserve the issues that may be objected to

19   at the confirmation -- before the confirmation hearing with the

20   debtors obviously full reservation of rights of saying we think

21   we've done it right and we want to be able to prove that, but

22   we will have all that data.

23               THE COURT:  Now, it seems to me there is a remaining

24   concern that the fact that they are in one class I guess

25   arguably would somehow disillusion the seniors from voting

64

1   because they feel that maybe they might be outvoted.  But I can

2   tell you one of the reasons that I placed, in a number of

3   places, including in the section that discusses the TOPrS, that

4   your vote is important, is to emphasize to people that their

5   vote is important and that they really need to vote.  So I'm

6   not talking about the 1123(a)(4) issue yet.

7           MR. BUTLER:  Okay.

8           THE COURT:  I'm just talking about the 1122

9   classification issue.

10          MR. BRILLIANT:  Your Honor, I think they see it as

11  three different, you know, issues that are all combined.  It's

12  a 510(a) issue on the intercreditor as well as the --

13          THE COURT:  But that one I -- that's not -- that's

14  something that people really can't vote against.  I mean, they

15  can change their treatment under the Plan.

16          MR. BRILLIANT:  They can vote to change their

17  treatment.  But in order to vote to change your treatment you'd

18  have to be in the right class to do that.  So I see that three

19  issues -- you know, inter-delineated here, the 1123(a)(4) issue

20  with respect to the treatment of the TOPrS, the classification

21  claim, and the 510 issue, they're all tied up in my mind in

22  putting people in the right class so that the debtors can

23  accomplish, assuming they get the affirmative vote, what they

24  want to accomplish, which is to get the seniors to waive the

25  subordination --

65

1          THE COURT:  Well, let's just say that the debtors get

2      a vote since they can keep track, and intend to keep track, of

3      each vote by terms of the security owned or the claim, in case

4      of trade claims.  And it's a class vote where not only do a

5      requisite percentage of the TOPrS vote in favor but also a

6      record percentage of everybody else.  It seems to me, at that

7      point, to be a moot issue.

8          MR. BRILLIANT:  Your Honor, it may very well be, but

9      I think the issue is an issue of disclosure.  Which, at this

10     point in time, which is somebody who -- a senior creditor needs

11     to be told how he -- how can --

12         THE COURT:  Oh, I understand.

13         MR. BRILLIANT:  -- possibly waive his seniority.

14         THE COURT:  And we haven't gotten to it yet, but I

15     have a lot of language on that point.  That your vote is

16     important because if seniors don't waive these rights you may

17     have done something one way or another that will affect your

18     treatment.

19         MR. BRILLIANT:  I think that's the important thing,

20     Your Honor.

21         THE COURT:  All right.

22         MR. BRILLIANT:   And I don't know where you're going

23     and if Your Honor wants I'd be happy to wait.  But --

24         THE COURT:  Yeah, wait for the language then.  It

25     just seems to me that with that language, if in fact, it does

66

1   become an issue, if in fact the senior portion of this class

2   votes no, and the junior portion of it votes yes, or would

3   carry the class, then I think that one solution would be to

4   simply put them -- the seniors, recognizing that they voted no.

5   And your rights are preserved to say they voted no.

6           MR. BRILLIANT:  Your Honor, I don't know where you're

7   coming from on this, and I'm happy to wait, I do know what

8   Collier says and I have read the cases the debtors cited and I

9   don't believe that in a context of waiving seniority that --

10  you know, that those cases are applicable, you know, in a

11  classification.  And, you know, I do think that it would be --

12          THE COURT:  Okay.  We'll disagree about that one

13  but --

14          MR. BRILLIANT:  Well, maybe that we do, Your Honor,

15  but --

16          THE COURT:  Okay.

17          MR. BRILLIANT:  -- you know, at some point I would

18  like to be heard on the legal issues whenever it is that Your

19  Honor thinks it appropriate.

20          THE COURT:  Well, but it's not a legal issue.  I

21  mean, that's why I'm raising it now.  It seems to me if you

22  can -- if you know who's voting then the debtor can either fix

23  it or not, if you're right.

24          MR. BRILLIANT:  Then I think we do get to an issue,

25  and again, it may be that the language you're going to add is

67

1   going to --

2          THE COURT:  Well, yeah.  No, I understand that's

3   important.  You've got to make people know that their votes

4   important and why.

5          MR. BRILLIANT:  And how their votes are going to be

6   counted and how the debtors are going to consider their votes.

7   and if they don't like the Plan how it will be considered

8   and --

9          THE COURT:  Okay.

10          MR. BRILLIANT:  -- and how the Plan can be confirmed

11   over their vote.  All that needs to be disclosed.

12          THE COURT:  Well, we'll get to that language but I

13   understand that.  The other issue I want to raise is the

14   1123(a)(4) issues, which is the different treatment issue.

15          It seems to me that as a technical matter someone

16   would have a pretty good objection, as a technical matter, to

17   this Plan.  And even if the class -- the senior class -- the

18   senior group of this class voted yes, an individual creditor

19   could argue pretty cogently that the treatment under this Plan

20   is not simply implementing the subordination rights.  On the

21   other hand -- and therefore would be different treatment.  If

22   it was simply implementing the subordination rights, you could

23   say this class gets what they're entitled to get as an

24   unsecured creditor and then we are effectuating, as a

25   mechanical matter, the subordination.  But I don't think this

68

1   really does that because you're not -- you're specifying a

2   certain specific recovery as opposed --

3            MR. BUTLER:  I'm sorry, specific what?

4            THE COURT:  Recovery for the TOPrS.  Wait, let me

5   finish.  Ultimately, it seems to me, however, to be an academic

6   issue.  Because it seems to me that if someone does object on

7   that basis just to be a pain in the neck then you move it --

8   the same treatment, but you create a new class under 1127.  And

9   it seems to me to be a non-material modification.  All you're

10  doing is rectifying the different treatment by putting them in

11  a different class.  The different treatment point.

12           MR. BUTLER:  Two comments.  That's one of the reasons

13  we retained the right that you talked about in terms of making

14  those adjustments and disclosing it in the Plan.  Second of

15  all, the fact is, and one of the things we'll deal with at

16  confirmation which is why I really want to lineate Mr.

17  Brilliant's issues at confirmation not here after we know how

18  the votes go, among other things, and that is that, you know,

19  there are two or three different bases in which the company

20  will approach confirmation of this Plan.  The leading one is

21  going to the fact that this is a settlement case.  And the fact

22  of the matter is that their was -- the company's view is that

23  there was a negotiated amount of value, negotiated by the

24  creditors' committee, that basically said senior creditors were

25  going to get par plus accrued at a negotiated plan value.  And

69

1    that we were going to put enough in that class, allocate enough

2    value to that class, that there's a certain amount of value

3    that went to that class, it was enough to pay -- it was enough

4    to pay par plus accrued of plan value to the senior creditors

5    and the residual value that went to that class went to the

6    TOPrS.  It turns out that that residual value is ninety percent

7    of par --

8              THE COURT:  No, I know.  You're reserving your right

9    to do a -- the satisfied in full analysis --

10             MR. BUTLER:  Satisfied in full analysis of the value.

11             THE COURT:  -- not in planned value in true, you

12   know, investment banker testimony value.  But I did want to get

13   on the record my believe that it seemed to me that it was not

14   unduly risky to go out with such an approach.  Because at the

15   end of the day there's, as mechanical matter, you have the

16   ability and you told people under the Plan, this could happen.

17   You can simply create a new class and give them exactly the

18   same treatment.  And therefore, you'd get around the disparate

19   treatment.

20             MR. BUTLER:  Correct.  Which we've disclosed.

21             THE COURT:  Okay.  We'll get to the description of

22   why your votes important later on when we're talking about the

23   TOPrS.

24             MR. FOX:  Your Honor, the point about them both being

25   important, it may be useful ideally from my perspective, that

70

1    subclasses would be better than the single class for the idea

2    of moving them later.  But putting that aside, if it -- on the

3    perception issue and the issue you're talking about, it would

4    probably be helpful to indicate how the votes will be

5    recorded --

6                 THE COURT:  Yeah, I agree.

7                 MR. FOX:  -- as well.  So that not only saying your

8    votes important but that the Court will be told --

9                 THE COURT:  I agree.

10                MR. FOX:  -- how the seniors and how the subs are.

11                THE COURT:  All right.  And then again, that's in the

12   later discussion on the TOPrS.

13                MR. LAURIA:  Your Honor -- by the way, Tom Lauria for

14   Appaloosa.  If it's helpful, this is not an issue that we would

15   assert it is a breach of the EPCA --

16                THE COURT:  Okay.

17                MR. LAURIE:  -- because it's in the Plan we already

18   agreed to.

19                THE COURT:  Right.  And I should have known that

20   because I've just been reading it but I forgot about it.  So

21   you're right.  Okay.  In fact, there's an intro discussion, at

22   this point, on the next page.

23                MR. FOX:  Which page is that?

24                THE COURT:  Roman numeral XX.  Okay.  I would add a

25   bullet to the -- at the end of -- or not a new bullet just a

71

1  new paragraph, at the end of this list of bullet points on Plan

2  objections.  And it would say, "the merit of such objections to

3  the Plan's confirmation may depend on the vote on the Plan.

4  For example, as discussed in more detail below, a senior class

5  may vote under the Bankruptcy Code to permit a distribution to

6  a junior class or a group of creditors, even if the senior

7  class is not necessarily paid in full.  A senior class may do

8  this, for example, believing that such a compromise is

9  preferable to a litigation alternative or further delay or to

10 preserve a settlement, such as the GM settlement.  Thus, your

11 vote on the Plan, and it's proposed compromises, is important.

12 The Court will be apprised of the vote of creditors senior to

13 the TOPrS, for example."

14        MR. BUTLER:  And, Your Honor, just note, I was hoping

15 you were actually reading that, because we couldn't get it all

16 down, that there's a -- there will be a rider that we'll be

17 able to get from you on that.

18        THE COURT:  Although, my writing kind of sounds like

19 I just said it.  It looks like I just said it, excuse me.

20 Okay.

21        Going to page 23.  In the new language that was added

22 on the TOPrS, in the second line of that, where there's a

23 parenthetical that says "except for holders of TOPrS claims

24 who," and I would add "in satisfaction of their contractual

25 subordination," and then continue on.  And then I have two

72

1    notes here.  The first one appears in the summaries each time

2    you make a reference to the discount rights offering on these

3    summary pages that go on for the next two or three pages.  And

4    it says, "see page blank or section blank," whichever is easier

5    for you to do, "for the need to act promptly to take advantage

6    of the discount rights."  And then I believe you also should --

7    well, this is the question I have, I think it comes up here

8    first, yeah.  This was raised by some of the objections.  The

9    estimated percentage recovery here is a hundred percent, and

10   it's clear that it's on the Plan value.  I guess the question

11   is is this on a fully diluted basis, does this take into

12   account the reserve for the management -- you know, is it on a

13   fully diluted basis?  I guess that's my question.

14            MR. BUTLER:  The answer I believe and I'll ask Ms.

15   Shaw, this does not include the eight percent of management

16   comp which is --

17            THE COURT:  Which is across the board, it dilutes

18   everyone.

19            MR. BUTLER:  It's across everyone and it's going out

20   over time.  That --

21            THE COURT:  Okay.

22            MR. BUTLER:  -- whole package isn't being awarded in

23   emergence.

24            THE COURT:  Well, I think you should -- you can make

25   a note to that affect that that -- that it doesn't include that

73

1   which is across the board on all equity, including the Plan

2   investors, and is allocable over time by the board.

3            MR. BUTLER:  Where do you want me to put that.  I

4   don't want to put in everyone of these boxes.  I mean, is

5   that --

6            THE COURT:  Yeah.  I would put it in the discussion,

7   the fuller discussion of the unsecured's treatment when we get

8   to that.  And then my note to myself was whether there should,

9   however, be a note here on the variation on recovery based on

10  exceeding the allowed claims threshold, which some of the

11  objections go to.  My inclination is that that should be here,

12  particularly since you have a reference to estimated amount of

13  allowed claims.

14           MR. BUTLER:  We can --

15           THE COURT:  Just a footnote, saying the Plan

16  investment agreement provides that if the estimated allowed

17  claims are in excess --

18           MR. BUTLER:  You're talking about the anti-dilution

19  provision in the EPCA?

20           THE COURT:  Yes, the anti-dilution, yeah.

21           MR. BUTLER:  Got it.  We can do that.

22           MR. FOX:  Your Honor, can I just raise a question

23  about the dilution question that you raised?  I think the

24  question about the dilution in part is whether the outstanding

25  shares, which are in the chart on page 16, are net of the stock

74

1    being held out or not.  In other words, if the stock is being

2    satisfied today there's actually -- we're talking about a

3    finite amount then the percentage that may be doled out later

4    as being set aside now.  Or -- I mean, it's treasury shares, I

5    understand, but still I think that may make some difference.

6    That was part of the confusion.

7            MR. BUTLER:  Can I have a moment, Your Honor?

8            THE COURT:  Okay.

9            MR. BUTLER:  Your Honor, two points in this.  One,

10   the numbers come down from ten percent to eight percent, as

11   part of the negotiations, we didn't say much about it in the

12   EPCA hearing, but the numbers come down.  Number two, what is

13   normally done in these situations is it consists of  authorized

14   -- we calculate it on the authorized but not   issued --

15           THE COURT:  Right.

16           MR. BUTLER:  -- section of the stock.  There will be

17   presumably at confirmation, or shortly -- or at -- and affected

18   shortly thereafter certain equity awards that will be issued to

19   management if the Plan's approved and we get to the

20   confirmation on all those matters.  That's something south

21   of -- I think south of three percent, we haven't done --

22   finished the calculation yet and it depends on what happens at

23   the hearings.  But that -- that -- and, you know, so we're

24   talking about I think a relatively de minimis amount.

25           THE COURT:  I don't think that's what Mr. Fox is

75

1   going.  I think he wants to make sure that you haven't

2   allocated in the Plan a specific number of shares to go to the

3   unsecured creditors, right?  It's a percentage?

4         MR. BUTLER:  No, it's a share count.  At the end of

5   the day -- I mean, he knows it because he's part of the

6   creditors' committee.  I mean, all of these have been

7   translated into -- all of these issues have been translated

8   into shares.  Because that's been concluded in the EPCA, how

9   many shares they get, there's a share allocation table for

10  everything.

11        MR. FOX:  No, the answer on -- that it's outstanding

12  versus authorized resolved my question on that point.

13        THE COURT:  All right.  Okay.

14        MR. FOX:  What -- the other question on this point

15  though, with respect to the range of claims, is whether people

16  can get a hundred percent regardless if you're at one end of

17  the range or the other.  So that's a -- that's a different

18  issue but the same question.

19        I mean, if the -- aside from printing more stock,

20  which doesn't provide more value, if the claims come in at 3.2

21  billion that's going to make a difference then if they come in

22  at 3.6 billion.  So, there presumably then is a range of

23  recovery unless there's some other explanation.

24        MR. BUTLER:  Well, I think --

25        THE COURT:  Well, they say later that they're --

76

1    they're -- they're dollar number is down pretty low at this

2    point.  I mean, your range of claims that are in dispute -- is

3    it still this number?  Is it still a 430 million dollar number?

4              MR. BUTLER:  I don't have the claims folks in here.

5    I think it is accurate.

6              THE COURT:  Okay.

7              MR. FOX:  If you're -- if you're a hundred percent if

8    the claims are at 3.69 billion then we don't have to have the

9    conversation.  Otherwise there is a question there.

10             MR. BUTLER:  I think the -- the --

11             THE COURT:  I mean is this --

12             MR. BUTLER:  First off, I mean, and we disagree on

13   what disclosure we want to make.  I make two observations.

14   One, I actually don't think, in fact, but that doesn't mean we

15   don't need to disclose something, in fact we're going to have

16   this cap problem.  I think we're going to get in where we

17   needed to be.  We're close to that now and we're -- I think we

18   will by the --

19             THE COURT:  Well, you could say that in the note too.

20   But I think -- it's out there --

21             MR. BUTLER:  Right.

22             THE COURT:  -- and you might as well be upfront about

23   it.

24             MR. BUTLER:  Do you want to put it in here or

25   someplace else?

77

1         THE COURT:  I'd put a footnote here about it.

2         MR. BUTLER:  Okay.  All right.  So we should add it.

3         THE COURT:  And you can say that you believe we're

4    close to already being under the cap or something like that.

5         MR. BUTLER:  Okay.

6         THE COURT:  If that's what you believe on a good

7    faith basis.

8         MR. BUTLER:  So we should -- so what we should do is

9    mention the cap, reference claims administration section --

10   there's a whole section in here talking about claims.

11        THE COURT:  Right.

12        MR. BUTLER:  So we can reference the claims

13   administration section.  I also think we should reference 12.3

14   of the plan -- 12.2(i) and 12.3 of the plan because 12.2(i)

15   has, as a condition of the effective date that it can't be more

16   than 1.45 billion and 12.3(i) has a mechanism on how that can

17   be waived which involves the creditors' committee's

18   participation.  So I think if we're going to describe it we

19   should probably describe this.

20        THE COURT:  Just have a cross-reference to that.

21        THE COURT:  Okay.

22        MR. FOX:  I think that --

23        THE COURT:  But that -- okay, go ahead.

24        MR. FOX:  I think what Mr. Butler is saying, without

25   explicitly saying is that as long as the claims come in under

78

1    the cap it's a hundred percent -- a hundred percent recovery of

2    plan value.  Whether they come in at the low end of this range

3    at 3.2 or at the higher end of 3.6, is that right Mr. Butler?

4            MR. BUTLER:  I believe that's correct, yes.

5            THE COURT:  Well, maybe that's worth saying too?

6            MR. FOX:  Yeah, because otherwise it creates

7    confusion.

8            THE COURT:  I mean, I -- I could tell you my -- my --

9    my hypothetical reader for this is my mother who is a very

10   smart woman but she's not a business person and she's not a

11   lawyer and I think she would say well, is it a hundred percent

12   at 3.2 or a hundred percent at 3.6.  So, I think you should --

13   that answer is fine.

14           All right.  You all are probably thankful that I'm

15   flipping a lot of pages here.  All right.  There are two

16   related points here and they come up on pages that are quite

17   far apart.  On page 71 there's a discussion of the

18   consideration to be received by GM.

19           MR. BUTLER:  Were we -- page 71 you said, Your Honor?

20           THE COURT:  Right.  And this is the in section

21   dealing with the GM settlement.

22           MR. BUTLER:  Your Honor, can I -- just for a second,

23   just for clarity on the record.  Can I go back to what your

24   prior -- Your Honor's prior comments on -- because -- and Mr.

25   Fox's comments on XVIII -- or no, 23, excuse me, if that's all

79

1    right with Your Honor, just for a moment.

2              THE COURT:  Sure.

3              MR. BUTLER:  Because I -- as I understand it -- I was

4    just talking -- consulting with Mr. Shaw from Rothschild and I

5    think the point that Mr. Fox makes is a good one and we need to

6    figure out how exactly to do this.  The reality is that the par

7    plus accrued is at -- is at 1.465 -- 1.45 billion dollars,

8    right?  We've all negotiated that as the cap.  That's the basis

9    on which you get par plus accrued.

10             THE COURT:  Right.

11             MR. BUTLER:  And there's a range expressed in here

12   simply because it's the current range.

13             THE COURT:  Right.

14             MR. BUTLER:  And those two concepts are probably

15   inconsistent with each other.

16             THE COURT:  Well, but I think if you have the --

17   the -- I think it's okay to give the range of claims --

18             MR. BUTLER:  Okay.

19             THE COURT:  But if you have the footnote explaining

20   the cap and then you say that the debtors are, you know,

21   whatever you want to say confident or reasonably confident

22   based on the claims process to date, that the cap will not be

23   exceeded, if that is the case.  Then it would be a hundred

24   percent recovery.  I think that's fine.

25             MR. BUTLER:  All right.

80

1     THE COURT:  The implication then is if, for some

2  reason, it's not exceeded -- I mean, you're estimating a

3  hundred percent recovery and that's fair because that's your

4  belief.  But if it's exceeded for some reason it won't be a

5  hundred percent.

6     MR. BUTLER:  Right.

7     THE COURT:  So I think that's fine.  Okay.  I had

8  only one comment on the GM settlement discussion and -- and

9  frankly I felt that it laid out for the voting parties, other

10 than this comment, the information they would need at great

11 length and clearly.  My comment is that in addition to the

12 consideration to be received by GM in the settlement agreement

13 itself, I think an important element of the settlement, and

14 that's why it's, I think, in the plan.  And the folks at Weil

15 have been candid about this, is that not only is it so

16 significant that it's worth putting in the plan -- it should be

17 in the plan.  But also the plan provides for a release that

18 people are -- are voting on.  And I think you should have, and

19 maybe this is -- it probably is probably on seventy-one, in a

20 different paragraph on the consideration to be received by GM,

21 that even though it's not in the settlement except as the

22 settlement contemplates a plan with releases, as part of the

23 settlement under this plan GM is being released by creditors.

24    MR. BUTLER:  Your Honor, we certainly -- it's not

25 just creditors it's everybody.  And we should probably --

1  again, clearly state that it's in another section and we'll do

2  that.  In fact, I mean, to your point, Your Honor, there is and

3  maybe this is the appropriate place to say or maybe it's

4  somewhere we should say this, we tried to say it clearly but

5  maybe say it more clearly.  You know, GM is really bargained

6  for three major things here.  I mean, they have bargained for

7  the direct net consideration they're getting, which is less

8  then they thought it was going to be but that net

9  consideration.  They have bargained for a plan formulation that

10  is this plan, including the releases and they would say, as

11  they have said before, and peace.  Meaning they want peace,

12  which includes everybody in place and the releases.  And

13  they've also bargained for the debtors' performance obligations

14  under the agreements.  I mean, because our performance

15  obligations under the master restructuring agreement is an

16  essential element of the settlement.

17          THE COURT:  All right.  Well, the reason I was

18  highlighting this, and it goes to Mr. Brilliant's point, is

19  that I think to evaluate the treatment of the MDL group and the

20  TOPrS, among others, one of the things you need to take into

21  account is the release provided for in the plan to GM and

22  that's part of the give and take of the GM settlement, along --

23  obviously with the other factors.  But I think people need to

24  know about the importance of their vote in that context.  So

25  that's why I'm raising it.

82

1          And let me turn to the area that -- the first area

2     that, I guess, maybe this is directly relevant which is the

3     description of the MDL settlement and it ends at page 143.

4     This is -- this is the -- I only have a couple places like

5     this.  This is -- this is a place where I don't have language

6     for you because I don't -- I don't know the answer.

7          MR. BUTLER:  I'm sorry.  Where are you again, Your

8     Honor?  I'm sorry.

9          THE COURT:  At the end of the description of the MDL

10    settlement on page 143, right before the next new heading which

11    is heading number 4 which says maintaining relationships with

12    suppliers.

13         MR. BUTLER:  Uh-huh.

14         THE COURT:  And what I've written down here is that

15    you -- you should state here that under section 510(b) of the

16    Bankruptcy Code the -- either you accept this as a matter of

17    law or it is contended that -- it's up to you whichever one you

18    want to say, the claims of the plaintiffs in the MDL would be

19    subordinated to the -- to the debt claims or on a par with the

20    common stock claims -- the common stock interests, excuse me.

21    Notwithstanding that the plan provides for the treatment

22    described above and then state the rationale for that.  Why is

23    it in the interest of those parties who would be senior to

24    nevertheless vote in favor of a plan that would so provide?

25         This doesn't have to be an essay; I just think you

83

1    need to lay out the main reasons.  One of them that seemed

2    clear to me was the release of GM.  It's an element, since

3    these people are creditors and interest holders that GM is

4    bargaining for, as with for anyone else, and that they -- but

5    there may be other reasons, you know.  I don't want to presume

6    what they are and I'm sure Mr. Etkin and you can make a list of

7    them.

8              MR. BUTLER:  And just so we don't need to -- we don't

9    make it an essay, Your Honor, I'd be comfortable in expressing

10   that whether it's contended at or whatever, that the MDL claims

11   are junior to general unsecured claims.  That's a proposition

12   Mr. Rosenberg and I have been talking about and one on which we

13   both agree.  It is much fuzzier as to what they are below that

14   class.  Because remember there's debt securities claims here,

15   there's a risk --

16             THE COURT:  All right.  You can make it as a

17   contention, that's fine.

18             THE COURT:  There's ERISA, that's all I'm going to --

19             THE COURT:  But I do believe that people need to know

20   that by voting in favor of the plan they're resolving that

21   issue.  And I think you should tell them that.  And accepting

22   that, you know, whatever rights they would have to enforce

23   510(b), those are being dealt with by the treatment provided

24   for the MDL settlement under the plan.

25             MR. ETKIN:  Your Honor, obviously I'd like to have

84

1    some input into that --

2         THE COURT:  Well, I'm sure you would.

3         MR. ETKIN:  -- language.

4         THE COURT:  That's fine.

5         MR. ETKIN:  I mean, and Mr. Butler raised an

6    important point.  I mean, this class consists of purchasers of

7    senior debt, subordinated debt and stock --

8         THE COURT:  Okay.

9         MR. ETKIN:  -- and the treatment various under 510(b)

10   breach.

11        THE COURT:  That's fine.  And -- and to be fair, what

12   you -- what you all should do, after you work out this

13   language, is when you send it to chambers you should e-mail it

14   to the objectors and counsel for the two committees, GM, you

15   know the usual suspects.  Not settle it on them but when it's

16   worked out send it.  I have, a long time ago, agreed to do a

17   lecture on Monday morning.  So I won't focus on this till

18   Monday afternoon anyway.  So, you know, if someone thinks that

19   the language that Mr. Butler and Mr. Etkin, perhaps with the

20   input of Mr. Rosenberg, have come up with here, they can --

21   they can let me know, but you get the general idea.

22        MR. BUTLER:  And I suspect -- I know Mr. Etkin pretty

23   well and I suspect he'll help me this weekend, and our

24   colleagues this weekend on this point.  So I hopefully will get

25   it to you --

85

1    THE COURT:  I'm not telling you to, you know, a puff

2  selling piece.  This is -- you know, you've got to be --

3  particularly given the timing on this, which is that people

4  have, you know, half a day to review it, it should be an honest

5  -- you know, a pretty straightforward assessment.  And if -- if

6  there's some disagreement then couched in terms of the debtors'

7  belief or whatever.

8    MR. BUTLER:  And I think the -- and I think those

9  things are all contained in the motion for approval in any

10  event, so I don't think it's going to be very difficult.

11    THE COURT:  All right.

12    MR. BUTLER:  I get the point, we'll be happy to make

13  it.  And I think the point -- the relevant point, I think, that

14  again is that whatever these claims are, the contention would

15  be that they're junior to the general unsecured claims.

16    THE COURT:  And that the --

17    MR. BUTLER:  So that I don't think that we have to

18  argue that where they fall below that, they may fall in

19  different places, I'm not sure we have to get into that.

20    THE COURT:  And the vote of people who believe that

21  they would, under 510, be senior is a class in favor of the

22  plan would resolve those issues with this treatment.  And, you

23  know, I -- I would expect that you would explain to them why

24  you believe that's in their interest to do, in a brief list of

25  bullet points.

86

1          MR. BUTLER:  Will do, Your Honor.

2          THE COURT:  Okay.  All right.  Okay.  On page 165,

3     and again this is the -- you're talking about the settlements

4     embodied in the plan and the overall structure of the plan, I

5     would add this language again, your vote on the plan will help

6     to determine whether the settlements contained in the plan are

7     approved by the Court.  Thus an interest in -- in sections

8     described below -- I'm sorry -- thus, for example, where

9     creditors have the benefit of the subordination provision, as

10    with the TOPrS, or a statutory right under 510(b), their vote

11    in support of the plan would resolve those rights.  And the

12    Court will be, as I said earlier with Mr. Brilliant, the Court

13    will be apprised of the senior -- the senior votes.

14          Okay.  And then here you have a small section on the

15    plan investors investment, I guess you should just briefly

16    update that in light of today's hearing.  And this is probably

17    where you can put in that brief note where you actually say the

18    debtors are prepared to, nevertheless under appropriate

19    circumstances, consider alternative proposals and are aware of

20    one that had been made recently to the creditors' committee

21    that the committee is currently not pursuing or however you and

22    Mr. Rosenberg want to word that last bit.

23          MR. BUTLER:  I'll work out language with Mr.

24    Rosenberg.

25          THE COURT:  Okay.

87

1          MR. BUTLER:  I think both -- I think we're concerned

2     is, I think, also just -- with the equity committee, we're

3     prepared to put language in here that certainly emphasizes the

4     fact that all of us have fiduciary duties and we will continue

5     to exercise those duties as we have throughout the case, to

6     consider alternatives.

7          THE COURT:  Okay.  Unless Highland doesn't want to be

8     identified, and I didn't take that from their objection, I

9     think you should identify them.

10         MS. ELKIN:  Your Honor, we submitted some language to

11    the debtor which they're not totally happy with but we can work

12    on it with them.

13         THE COURT:  All right.  Well, I think, pretty much

14    what I said is sufficient.  I don't want the debtors to trip up

15    over or give anyone an argument that they have tripped up over

16    anything in the EPCA.

17         MS. ELKIN:  We understand completely.

18         THE COURT:  The debtors have to be careful about

19    that.  So as long as two points have been made clear, which is

20    that the debtors, under appropriate circumstances, will

21    consider alternative proposals and in fact have -- are aware

22    that one has been made to the creditors' committee by Highland.

23    I think that those are the two points to -- to make.

24         MS. ELKIN:  It was not, just for clarification, it

25    was not a Highland proposal.

88

1          THE COURT:  I'm sorry.

2          MS. ELKIN:  It was by led by Highland.

3          THE COURT:  I'm sorry, I'm using shorthand.  However

4   you all describe the makers of your proposal, if you want to

5   say Highland led or a group.

6          MS. ELKIN:  That's fine, Your Honor.

7          THE COURT:  Are you prepared to have Highland be

8   identified in the footnote?

9          MS. ELKIN:  I don't think Highland needs to be

10  identified.  They're just one --

11         THE COURT:  All right.  Then that's fine.

12         MS. ELKIN: -- one member of -- it's a group of

13  bondholders.

14         THE COURT:  Okay.  All right.

15         MR. ROSENBERG:  And you're on the -- do the fiduciary

16  duty of the committee presumably will be standard.  I doubt

17  if --

18         MR. BUTLER:  I mean, I think that's the point -- the

19  point that were focused on together, I believe, is that we will

20  review alternatives as fiduciaries and that we'll fulfill our

21  fiduciary responsibilities.

22         THE COURT:  That's fine.

23         MR. BUTLER:  That's our --

24         THE COURT:  That's fine.  And identifying that this

25  proposal by a group of bondholders has been made.

89

1          MR. BUTLER:  Right.  Yeah, I mean -- what we're

2    uncomfortable about from the debtors' perspective, Your Honor,

3    is that proposal was never made to the debtors.

4          THE COURT:  Well, I'm saying it's been -- it has been

5    aired with the committee --

6          MR. BUTLER:  Right.

7          THE COURT:  -- and you can say what action the

8    committee took on it.

9          MR. BUTLER:  Right.

10         THE COURT:  That's all you need to say.

11         MR. BUTLER:  Because I'm just -- I'm -- you know,

12   lots of people issued lots of proposals.

13         THE COURT:  That's all you need -- it has to be

14   accurate, that's all that happened.  Okay.  Now -- all right.

15   The other point where I have -- I don't have language for you

16   it's just a -- a concept but it's an important one, in your

17   discussion about substantive consolidation and I -- I don't

18   know if this is true.  And obviously if it's not true you can't

19   say it.  But I believe that, towards the bottom of page 168, in

20   the section that precedes the paragraph that begins as a result

21   of the substantive consolidation described above, so you're in

22   the paragraph that begins, "Taking these and other factors into

23   account, the debtors determine, on balance, the substantive

24   consolidation of the estates," etcetera, etcetera, is

25   appropriate.

90

1          MR. BUTLER:  Uh-huh.

2          THE COURT:  If you -- if you go before the last

3    sentence there, and this is -- again, if this is not accurate

4    you can't say it but this is my concern.  I would have language

5    something like this, creditors of certain of the propose

6    substantively consolidated debtors, and then you would identify

7    what those debtors were, might contend that their debtor has

8    the financial ability to pay them a higher or more certain

9    recovery then their recovery under the plan.  The debtors note,

10   however, that to achieve this result the plan and its funders

11   and investment mechanisms would have to be materially changed.

12         MR. BUTLER:  That statement is accurate and it's

13   accurate from the perspective of what holders of claims in the

14   deconsolidated Delphi Corporation estate have informed the

15   debtors.  And it is accurate from what the holders of claims

16   against the deconsolidated DASS LLC entity have asserted.

17         THE COURT:  All right.  So you should identify them.

18         MR. BUTLER:  Absolutely.

19         THE COURT:  And it seemed to me that you should

20   probably have a cross reference also to the substantive

21   consolidation and liquidation analysis, i.e. the substantive

22   and non-substantive analysis that's -- that's back there.

23         MR. BRILLIANT:  Your Honor, you know, I haven't been

24   interjecting on all the points but on this one I would like to

25   be heard.  You know, in addition to substantive consolidation

91

1    has an effect on voting as well.  The -- you know, depending on

2    the classification, and it sounds like Your Honor's not

3    intending to change the classification, you now have --

4            THE COURT:  Right.  I added a section on voting on

5    the next page, on page 169.  At the end of that page I'd start

6    a new paragraph.  That paragraph that's there at the end of the

7    page talks about substantive consolidation being considered at

8    the confirmation hearing if there's an objection.

9            And then I would add this paragraph; the Court will

10   be apprised of, and may consider, the voting results on a

11   company by company basis or debtor by debtor basis, however you

12   want to do it, as part of such hearing.  Thus, again, your vote

13   on the plan is important.

14           MR. BRILLIANT:  Your Honor, does it make sense there,

15   also, let people know that failure to object to the substantive

16   consolidation may effect their voting?

17           THE COURT:  I don't think so.  I mean, you -- I think

18   it's pretty clear, you either object or you don't.  I mean,

19   I -- maybe I'm missing your point.

20           MR. BUTLER:  Mr. Brilliant, we're not in the process

21   of soliciting objections.

22           MR. BRILLIANT:  No, no.  But I'm just saying that if

23   you don't -- if you don't object to substantive consolidation

24   then effectively you're potentially, you know, agreeing to have

25   somebody -- let's say for senior -- for my clients, for

92

1   instance, they're bondholders.  They're senior creditors at

2   the --

3          THE COURT:  I think people know that.  I mean, I

4   just -- I don't think you need to tell people -- that leaves

5   the impression that something else you don't object to, you

6   still have rights in respect of and I just -- I think -- one

7   thing that -- that everyone knows, including my mother, is that

8   if you want to be heard in Bankruptcy Court, if you don't like

9   something and you're willing to take the consequences of doing

10  that you object.  So I don't think you need to tell people

11  extra to object.

12         MR. BRILLIANT:  Your Honor, could we just -- while

13  we're on this paragraph, there is a point in here.  It says,

14  "If no objection to substantive consolidation is timely filed

15  by a holder of an impaired claim."  The indentured trustee may

16  or may not fit within that.  I mean, it should say party in

17  interest.

18         MR. BUTLER:  I don't know that -- I don't know that

19  the -- I mean, that's an issue -- I don't know that that's

20  right, actually.

21         MR. BRILLIANT:  Well --I --

22         MR. BUTLER:  Just like Mr. Fox, you don't get to vote

23  on the plan either.

24         MR. BRILLIANT:  Well, we don't get to vote, that's

25  right.

93

1          MR. BUTLER:  And I don't -- I don't know that you

2     get -- I think your rights at confirmation hearing are

3     different then they are at a --

4          THE COURT:  Well, why don't you say if no proper

5     objection is filed and leave out the holder issue?

6          MR. BUTLER:  All right.

7          MR. BRILLIANT:  Yeah, I don't want people to be

8     misled about what can or can't be done or who would do it.

9          MR. BUTLER:  Okay.  Got that.

10          THE COURT:  So you just strike out by any holder

11     affected by the plan.  Okay.  All right.  And actually this is

12     almost -- this is about it for me.

13          On page 176, and this is in the section dealing with

14     the TOPrS subordination provision.  Two comments, first is

15     a -- I guess this is up to the debtors.  I would -- I would

16     give them some leeway, particularly in light of the

17     conversation we had earlier about the GM settlement, somewhat

18     along the lines of the discussion on the MDL, to state in

19     greater detail their rationale for having this treatment for

20     the TOPrS as opposed to simply leaving it up to the people

21     getting -- leaving it up to the senior claims going against the

22     TOPrS to enforce their subordination rights.  But if you're

23     going to do that, again, you got to be -- you don't have to do

24     it.  I don't think you need to but if you're going to do it

25     you've got to be -- it can't be a puff piece.  Like with the

94

1    MDL bullet points, it has to be logical and reasonable and

2    accurate.

3            Whether or not you do that or not, I believe you need

4    to add, at the end of this discussion before the next heading

5    on post-petition interest, please see pages blank or section

6    blank, and this goes back to the summary, for discussion of the

7    negotiated plan value and the fact that the actual, trading

8    value of the distributions to holders of senior debt may be

9    less than (or greater than) plan value.  An affirmative vote on

10   the plan, by the holders of senior debt, could constitute

11   acceptance of the plan -- I'm sorry, of the plan's proposed

12   resolution of the TOPrS subordination provisions or provision.

13           MR. BUTLER:  Is it could accept or would accept,

14   would constitute?

15           THE COURT:  I put could.  And then I would add the

16   language that we've been adding, that the Court will be

17   apprised of the votes of the senior -- of the holders of the --

18   well, of the -- I'm sorry -- of the senior debt holders.  And

19   as a consequence, your vote is important.

20           MR. BUTLER:  And just for the record, Your Honor, our

21   intention here, throughout this, is to talk about the senior

22   unsecured -- you know, the general unsecured creditors, they're

23   senior -- because it's not just the noteholders, just to be

24   clear about that.

25           THE COURT:  Well, but I think the defined term --

95

1          MR. BUTLER:  The bondholders --

2          THE COURT:  The defined term senior debt is

3    everything.

4          MR. BUTLER:  Right.  Correct.

5          THE COURT:  Yeah, so you should be clear on that.

6          MR. BUTLER:  Yeah, I want to be clear on that.  It's

7    not just the bondholders.

8          MR. BUTLER:  Right.

9          MR. FOX:  Well, there is some dilution because of

10   substantive consolidation.

11         MR. BUTLER:  Well it's more than that.  There -- even

12   on a deconsolidated basis --

13         MR. FOX:  Yeah, I know --

14         MR. BUTLER:  -- there are other senior debt

15   holders --

16         MR. FOX:  I understand.

17         MR. BUTLER:  -- at Delphi other than the bondholders.

18         THE COURT:  All right.

19         MR. FOX:  I understand but there are --

20         THE COURT:  But again, you've defined senior debt, I

21   think, to include that.  And I've used that term, senior debt.

22         MR. BUTLER:  Got it.

23         MR. FOX:  The point simply is, Your Honor, though

24   that with substantive consolidation you, in effect, create more

25   senior debt that the TOPrS would give up to based -- because of

96

1   the definition.

2           MR. BUTLER:  Correct.  That is correct.

3           MR. BRILLIANT:  Your Honor, it's just --

4           THE COURT:  Well, I guess that's right.  Although

5   since it's in a plan where that doesn't happen you don't run

6   into that problem.

7           MR. BRILLIANT:  Your Honor, should this paragraph

8   that you're talking about be in the TOPrS section or the senior

9   debt section or should it be in both sections?

10          THE COURT:  I mean --

11          MR. BRILLIANT:  Or have it in one and cross

12  referenced in the other.

13          THE COURT:  I think I'd have it in the TOPrS section

14  because if you are a -- if you're a holder of senior debt

15  you're going to look to see what they're getting.

16          MR. BRILLIANT:  You might look to see what the senior

17  debt is getting and --

18          THE COURT:  I don't mind a cross reference in the

19  senior debt; in the description of the senior debt saying see a

20  cross reference.  No, you know what, it's all -- it's all

21  together.  I really think it's all together.  I think if you

22  know you're the beneficiary, as I imagine everyone does,

23  certainly -- certainly the senior bondholders must --

24          MR. ROSENBERG:  Well, some are more sophisticated

25  then others, Your Honor.

97

1          MR. BUTLER:  Well --

2          THE COURT:  But the summary talks about the TOPrS.  I

3   think people are alerted to this issue already by the summary

4   and the -- I think it's okay the way it is.  But if you -- if

5   you -- you know, if you just want to have a cross reference to

6   it that's fine, in the senior -- in the general unsecured

7   claims discussion just have a cross reference.

8          MR. BUTLER:  That's -- I mean, that's on page 175.

9   Its right -- it's easy to see.

10         THE COURT:  I understand.  It's -- they're right next

11  to each other.

12         MR. BUTLER:  So just -- is that optional for us to

13  consider, Your Honor, or is that being required?

14         THE COURT:  Well, this is -- this is actually not in

15  the section -- there is no section dealing with TOPrS.  This

16  section says satisfaction of TOPrS subordination provisions.

17         MR. BUTLER:  Right.  It's actually part of the --

18         THE COURT:  So this is really on the subordination --

19  I don't think you need it except in this particular section.

20  I'm pretty sure that those are all my comments.

21         I did have a couple comments on the solicitation

22  procedures order but those are my comments on the disclosure

23  statement.

24         MR. BUTLER:  Would it be okay then to go through and

25  figure out who else wants to raise comments --

98

1          THE COURT:  Yes.

2          MR. BUTLER:  -- on the disclosure statement?

3          THE COURT:  Yes.

4          MR. BUTLER:  So we can get -- we did, Your Honor,

5    exhibit 81, and I want to hand to hand it up to the Court so

6    you actually have it.  If I may step up, Your Honor?  Exhibit

7    81 represents some further black line changes that we went over

8    with Mr. Fox to deal with some of his objections.  They didn't

9    resolve all of his objections but I think he told me we were

10   making progress.  So we would be incorporating all of these

11   into the plan as well -- I mean into the disclosure statement

12   as well.  And I just wanted the Court to be apprised of it.

13         THE COURT:  Okay.  Let me just --

14         MR. BUTLER:  This was -- this is the one that

15   eliminates, you'll notice, some of the boxes have gone and

16   things like that.

17         THE COURT:  Okay.

18         MR. BUTLER:  Mr. Fox made other comments but I just

19   wanted to make sure for the record that --

20         THE COURT:  No, I -- I'm comfortable with that.  I --

21   it was clear to me, in reading his objection, that some of the

22   boxes should go.  Not the editorializing about what people

23   might or might do but just as a fact that they're superseded.

24   Let me look at the other ones.

25         MR. BUTLER:  So then the -- I guess the next step,

99

1   Your Honor, would be to take them in whatever order people want

2   to.  I think there are --

3           THE COURT:  Okay.

4           MR. BUTLER:  -- it's Mr. Brilliant and Mr. Fox and to

5   the extent Mr. Etkin or, I don't know whether Highland has

6   anything else they want to say today.  Those are -- those would

7   be the three or four people who, I think, are still in play.

8           THE COURT:  Is he still -- oh yeah, there he is.

9           MS. ELKIN:  I didn't merit a front seat.

10          THE COURT:  Well, you're also hiding -- it's Ms.

11  Elkin and Mr. Etkin, so --

12          MS. ELKIN:  Right.

13          THE COURT:  Okay.

14          MS. ELKIN:  Judy Elkin for Highland Capital.  Your

15  Honor, we will work with the debtor just to -- on the language

16  that the Court suggested --

17          THE COURT:  All right.

18          MS. ELKIN:  -- to the extent necessary.  With respect

19  to the other objections raised, I think based on the Court's

20  comments to the extent they're necessary we reserve them for

21  confirmation.  We won't pursue them right now.

22          THE COURT:  Okay.  That's fine.  And let me say it

23  for the record, the whole premise of not dealing with most

24  confirmation objections, except for the classification and

25  disparate treatment ones that I talked about as well as the

100

1    substantive consolidation ones, is that my view is those are

2    all properly raised at confirmation.  After a vote it may be

3    moot, it may be, at that time -- it clearly would be at that

4    time based on a particular record.  And therefore everyone's

5    rights to object to the plan are fully preserved and reserved.

6    And that goes, obviously also, for my -- it goes for the issues

7    that I did discuss which is substantive consolidation and

8    classification and -- and disparate treatment.

9             MR. BUTLER:  Your Honor, also on that, just on that

10   point if we could ask, we typically, in these circumstances,

11   ask the Court to also indicate though that while people's

12   rights are preserved, that to the extent someone wants to

13   continue this -- any objection that they made at the disclosure

14   statement hearing, this confirmation objection --

15            THE COURT:  Oh no, they've got to file an objection.

16            MR. BUTLER:  -- they need to refile it.

17            THE COURT:  Absolutely.  You've got to file your

18   objection.

19            MR. BUTLER:  -- as a confirmation objection at the

20   confirmation hearing.

21            THE COURT:  Sure.

22            MR. BUTLER:  Okay.  I just wanted to make sure the

23   record is clear --

24            THE COURT:  Absolutely.

25            MR. BUTLER:  -- clear on that.  Thank you, Your

101

1   Honor.

2          THE COURT:  Okay.

3          MR. BRILLIANT:  Your Honor, just a couple of things.

4   And I apologize, there's so many versions of this plan and the

5   black lines that I've been trying to follow along with you and

6   even my black line doesn't match up with some of the page

7   references.  So I'm going to do the best I can.

8          THE COURT:  You can sit in the witness box if you

9   want, I won't put you under oath.

10         MR. BUTLER:  But I will ask questions.

11         THE COURT:  It's okay.

12         MR. BUTLER:  Having a plaintiff's attorney in the

13  witness box is a rare opportunity.

14         THE COURT:  It might be a good thing though for

15  every -- every --

16         MR. ETKIN:  I still don't call myself a plaintiff's

17  attorney, as surprised as you might be at that.

18         Your Honor, just a few comments and it won't surprise

19  you that they really come into play only since we agreed to a

20  proposed modification of the settlement.

21         THE COURT:  Okay.

22         MR. ETKIN:  And that's reflected in the disclosure

23  statement and I think the few pages, the provisions that you

24  wanted us to add something to is where the modification is laid

25  out.

102

1        THE COURT:  Okay.  And remind me, where is that again

2    because I took off my yellow tag.

3        MR. ETKIN:  I think that's at --

4        MR. BUTLER:  Well, what's the section number?  Maybe

5    that hasn't changed.

6        MR. ETKIN:  It's at pages, on my draft -- well, I

7    actually do have the section number.  It's VIII, D(3), C(1).

8    Well the page, okay.  I'll try to give you the page.

9        THE COURT:  No, let me just -- just a second.

10       MR. ETKIN:  From my -- on my draft it starts at

11   around --

12       MR. BUTLER:  I think its page 139.

13       MR. ETKIN:  139.

14       MR. BUTLER:  Right.  And I think -- I still think it

15   is.

16       MR. ETKIN:  And goes through to 142.

17       THE COURT:  Okay.  Yeah.

18       MR. ETKIN:  And that -- and we've talked about the

19   language there and we're -- we're fine with that, Your Honor.

20   The debtor made a couple of changes that we requested in terms

21   of outlining what the -- what the agreed upon proposed

22   modification is.

23       THE COURT:  Right.

24       MR. ETKIN:  The issue that I had raised with the

25   debtor that's still outstanding relates to page -- let's see --

103

1    it's BS-177.  And it talks about -- it's the description of

2    Class E, which are the 510(b) note claims.

3              THE COURT:  Okay.

4              MR. ETKIN:  And only two comments there.  There was

5    originally language in that section, in the prior iterations of

6    the disclosure statement which is set forth, actually, in the

7    executive summary as well, that talks about the distribution

8    and the same proportion of new common stock and discount rights

9    that are made to holders of general unsecured claims.  That --

10   that reference found its way out of the December 3rd draft and

11   we wanted that back in because it's consistent with the

12   executive summary as well as the terms of the settlement

13   agreement.  So that's -- that's one comment there.

14             THE COURT:  Well, let's -- is there a reason?  Was

15   that just a typo or --

16             MR. BUTLER:  Well, I -- this is actually a black line

17   against the September -- this is against the September 6th

18   plan, right?  I mean, I'm not sure it was ever in -- in this

19   class treatment.  I think it was --

20             THE COURT:  Well, the -- at least the page I have is

21   the 510(b) equity claims --

22             MR. BUTLER:  All right.

23             THE COURT:  -- not the note claims.  And I though the

24   equity claims -- they don't -- they don't flow with the

25   unsecureds they flow with the --

104

1      MR. ETKIN:  It's really one claim, Your Honor, and

2  the treatment is the same with respect to the entire claim

3  that's been provided.

4      THE COURT:  Well, if that's what the settlement

5  provides, then it should be in.  I mean it's easy.

6      MR. ETKIN:  And I do think it was in a version and

7  it --

8      MR. BUTLER:  Your Honor, I'm sure I can --

9      THE COURT:  It's not in the --

10      MR. BRILLIANT:  It's in the equity --

11      THE COURT:  It's not in the black line but if it's

12  the same -- if it's in the term sheet --

13      MR. ETKIN:  It's in the settlement agreement.

14      THE COURT:  If it's in the settlement agreement then

15  you should just put it in, okay.

16      MR. BUTLER:  Okay, Your Honor.

17      MR. ETKIN:  And the second point there --

18      MR. BUTLER:  I just want to -- just -- I'm sorry.

19      MR. ETKIN:  Sure.

20      MR. BUTLER:  Just one moment.  I just wanted to

21  indicate that we should -- if we're going to make the

22  changes -- that change, if we're going to make it, ought to be

23  in all three classes, all right, the -- dealing with the 510(b)

24  note claims, the 510(b) equity claims and the 510(b) ERISA

25  claims because they're all three the same.  And it should be

105

1   reflected in the summary as well as in the body.

2           THE COURT: Okay.

3           MR. BUTLER:  I just want to make sure we got it on

4   the record and --

5           MR. ETKIN:  It's already in the executive summary,

6   that language.  So --

7           THE COURT:  Yeah, it is, actually.  I meant to say

8   that.

9           MR. BUTLER:  That's where I saw it.  But I just

10  wanted to say --

11          THE COURT:  Okay.

12          MR. ETKIN:  Yeah, and that's -- that's -- obviously

13  that's appropriate.

14          THE COURT:  All right.  But it should be -- when you

15  actually describe the treatment in more detail it should be

16  there.

17          MR. BUTLER:  Okay.  All right.

18          MR. ETKIN:  And also, with respect to that same

19  paragraph, Your Honor, we had suggested some language to the

20  debtor in terms of changing that around and that wasn't

21  accepted.  And then last night we provided or tried to provide

22  some compromise language.  And the point is, quite simply, that

23  there's -- there's reference to, in that paragraph now, as may

24  be modified on a non-material basis by the order of the MDL

25  court, that's talking about this deal, this modification that

106

1   we've agreed to and that's now before Judge Rosen.

2           THE COURT:  Right.

3           MR. ETKIN:  I think -- and it's described, as I said

4   previously, in that prior section, the four pages that describe

5   the settlement.  I think there needs to be some reference back

6   to those four pages, that provision that describes what that

7   modification is so we know that we're talking apples to apples.

8   So I just suggested that we just add, at the end of that

9   language that I just quoted, as described in Section VIII D(3)

10  C(1) --

11          MR. BUTLER:  And that was not --

12          MR. ETKIN:  -- of the disclosure statement.

13          MR. BUTLER:  that wasn't acceptable to us because the

14  treatment of the class ought to be what Judge Rosen orders in

15  the MDL case, is the -- because he's yet to enter these orders.

16  Whatever it is, I don't want to get trapped here that we have

17  out for -- for voting something that turns out that there's

18  any, you know, whatever the non-material modification finally

19  approved by Judge Rosen in that, which will have to have the

20  consent of the class plaintiffs, whatever that is, that's what

21  we're referencing in here.  And I wanted to make absolutely

22  sure that we didn't have any kind of a hiccup in the -- you

23  know, in between them.  So, I mean, this is -- this is -- it's

24  got to be non-material and it's got to be in connection with

25  the monetization of the distribution.  But I wasn't going to,

107

1   you know -- it seemed to me that the order that Judge Rosen has

2   yet to enter ought not be characterized by us other than by

3   those two descriptors.  That's why we did not accept the

4   comment.

5           MR. ETKIN:  Well, here's the problem, Your Honor.

6   What's been put on the record before Judge Rosen, what's been

7   described to him, what's been described now to you in the

8   context of the revisions to the disclosure statement is what

9   we've agreed to.

10          MR. BUTLER:  Right.

11          MR. ETKIN:  And that's what's going to be put in

12  front of Judge Rosen.

13          THE COURT:  I know but he's -- but -- A -- although

14  he's preliminary approved it, he hasn't finally approved it.

15          MR. ETKIN:  That's right.  He's provided for a

16  notice.

17          THE COURT:  And B, what you've agreed to also

18  contemplates, I guess, some flexibility on -- on changing it in

19  some regard, as he did before.

20          MR. ETKIN:  No.

21          THE COURT:  As was done before.

22          MR. ETKIN:  Done before in what context, Your Honor?

23          THE COURT:  The thing that's out now.

24          MR. ETKIN:  Well, yeah.  If -- if that comes to pass,

25  and we're -- we --

108

1          THE COURT:  I -- what Mr. Butler doesn't want to

2     leave the implication of is that the only change that can be

3     made is the one that --

4          MR. ETKIN:  Well, the only change that could be made

5     is the one that we agree to.

6          MR. BUTLER:  But my -- and I think that's always --

7          MR. ETKIN:  And that's the one we've agreed to.

8          MR. BUTLER:  But I think it's all has to do with

9     Judge Rosen.  I mean, the fact of the matter is let's -- for

10    the moment, I can't imagine this but let's for the moment

11    assume that the notice that's sent out by Judge Rosen -- by

12    Judge Rosen's order there is some issue that someone comes in

13    with --

14         THE COURT:  Let me cut through this.  I don't think

15    there's any implication in this language that you can be forced

16    into anything.

17         MR. BUTLER:  Right.

18         THE COURT:  And I think there would be an implication

19    that either Judge -- that the debtors are implying or I am

20    implying that either the debtors or Judge Rosen could be forced

21    into something.  And I don't want to do that.

22         MR. ETKIN:  Right.

23         THE COURT:  So, I think --

24         MR. ETKIN:  Which is why the nature of this is -- is

25    by virtue of agreement.

109

1        THE COURT:  No, no.  Because he's not agreeing to

2   anything, he's reviewing it.  And I don't want there to be --

3        MR. ETKIN:  Despite the agreement, exactly Your

4   Honor.  And it remains subject to his approval.

5        THE COURT:  I just -- I don't think -- I don't --

6   when I see this I don't see any implication that you -- that

7   your clients are going to be able to be bound to anything other

8   then what they agreed to.  So, I -- and clearly, as of today,

9   the only thing they have agreed to is what's out there.

10        MR. ETKIN:  That's right.

11        THE COURT:  So I think it's clear.  I really don't --

12   I don't think anyone would be confused by this.

13        MR. ETKIN:  Well, if that -- if that's your reading,

14   Your Honor, then I'm satisfied with that.

15        THE COURT:  Yeah, I -- I think that the alternative

16   would be to put some pressure on -- on the Judge Rosen,

17   frankly, and on the debtors that would be -- would be

18   confusing.

19        MR. ETKIN:  Well, I don't necessarily buy into that,

20   Your Honor.

21        THE COURT:  All right.

22        MR. ETKIN:  But the important thing is that the

23   modification is what we've agreed to.

24        THE COURT:  Yeah, and there's --

25        MR. ETKIN:  And it's nothing else.

110

1          THE COURT:  You have the ability to agree to non-

2     material other things, if you want to.

3          MR. ETKIN:  Well that's, again, up to Judge Rosen as

4     to --

5          THE COURT:  Right.  But you haven't yet.  So I think

6     that's clear.

7          MR. ETKIN:  That's right.  Okay.  That's fine,

8     Your Honor.  The only other change then, Your Honor, would

9     be -- I think it's on page 195, at least it starts there.  The

10    reference to Judge Rosen's order previously, in the disclosure

11    statement, has been the order of the MDL court with regard to

12    this --

13         THE COURT:  So you need to update this now, is that

14    what you're saying?

15         MR. ETKIN:  No, I just want this section to be

16    consistent with what's been said earlier.

17         THE COURT:  Okay.  So what is this?  This is 18(a) or

18    what --

19         MR. BUTLER:  Where are we?

20         MR. ETKIN:  18(a).

21         THE COURT:  Yeah.

22         MR. ETKIN:  That's right, Your Honor.  Previously

23    it's been described as the order, which is fine.  Here it's

24    changed to any order.  And I think it needs to be consistent

25    with the order that's presently before Judge Rosen regarding

111

1    this modification.  So I think the word any implies something

2    that, you know, we're obviously uncomfortable with and it's

3    inconsistent with how that's been described in prior sections,

4    the two sections that we've just talked about.  So I don't

5    think that that's a distinction without a difference.

6         MR. BUTLER:  I actually thought the word -- the

7    formulation of any was the proper formulation.  Because my view

8    is, the Judge has entered a preliminary order, he's entered a

9    final order, he's going to enter a final order.  It's more than

10   one order.  I mean -- again, this isn't trying to suggest that

11   orders can be entered that would be not acceptable to the lead

12   plaintiffs.  It's to make sure that we've got the proper

13   flexibility in this plan and disclosure statement as it's going

14   out for a vote so that the action can take place in the MDL

15   court, not here, on this topic.

16        MR. ETKIN:  Well, action can still take place in the

17   MDL court on this topic, without implying that there's going to

18   be a massive set of additional orders or more than the one

19   order that Judge Rosen is currently focused on, which is the

20   final order approving the settlement.  So that's -- that's our

21   point there, Your Honor.

22        We also have the other point that we just disposed

23   of, by virtue of your comments.  The only other thing --

24        THE COURT:  Well let me -- let me just focus on this.

25   Well, he hasn't entered the order yet, right?

112

1          MR. ETKIN:  He has not entered the final order yet.

2     And we did appear before him to advise him of the proposed

3     modification.

4          THE COURT:  Why don't you say such order as opposed

5     to any, just say such?

6          MR. ETKIN:  That's fine.

7          THE COURT:  Shall remain in accordance with such

8     order.

9          MR. ETKIN:  And those changes would just have to

10    carry over to corresponding provisions of the plan as well,

11    Your Honor.

12         THE COURT:  Okay.

13         MR. ETKIN:  And I did send an e-mail last night that

14    fought a couple of changes that weren't made to the plan that -

15    - but changes were made to the disclosure statement or to other

16    sections of the plan.  And I don't want to --

17         THE COURT:  I'm sorry, there were changes made to the

18    disclosure statement?

19         MR. ETKIN:  There were changes made to the disclosure

20    statement --

21         THE COURT:  But not yet to the plan?

22         MR. ETKIN:  -- and the plan.

23         THE COURT:  Oh, and the plan.

24         MR. ETKIN:  And the plan, to correspond to the

25    changes in the disclosure statement.

113

1          THE COURT:  Right.

2          MR. ETKIN:  But there were a couple of additional

3    changes that should have been made to correspond to changes

4    that have already been made.  I'd be happy --

5          THE COURT:  To the plan?

6          MR. ETKIN:  To the plan.  I'd be happy to go over

7    them.

8          THE COURT:  No, you can just go over them --

9          MR. ETKIN:  But I'm assuming that we can straighten

10   this thing out.

11         MR. BUTLER:  Only if they're corresponding changes,

12   Mr. Etkin.

13         MR. ETKIN:  That's --

14         MR. BUTLER:  I mean, if there are other -- because

15   there have been some suggestions you've made that we've not

16   accepted and I don't want to have this colloquy --

17         MR. ETKIN:  No, now -- well --

18         MR. BUTLER:  -- to suggest otherwise.

19         MR. ETKIN:  Well tell me, Jack, if you want me to go

20   over them now, I'll go over them in detail.

21         MR. BUTLER:  If they're corresponding -- look, if we

22   made a change in the disclosure statement and the same change

23   needs to be made in the plan, fine to do that.

24         THE COURT:  Or vice versa.  If you made it to the

25   plan and you haven't made it to the disclosure statement.

114

1          MR. BUTLER:  Or vice versa, that's right.  Exactly.

2     I'm happy to -- they should match.

3          THE COURT:  Just word for word or an accurate

4     summary.

5          MR. BUTLER:  Right.

6          THE COURT:  Okay.  That's fine.

7          MR. ETKIN:  The only thing that wasn't made before,

8     that you've just resolved Your Honor --

9          THE COURT:  Okay.

10         MR. ETKIN:  -- the change of the word any to such.

11         THE COURT:  Okay.

12         MR. ETKIN:  And that's -- that's in our e-mail as

13    well.

14         MR. BUTLER:  Fine.

15         MR. ETKIN:  But the others are -- are strictly

16    corresponding changes.

17         THE COURT:  Okay.

18         MR. ETKIN:  And we can go over them.  This is from

19    the e-mail I sent last night, Your Honor.

20         THE COURT:  Okay.

21         MR. ETKIN:  The only other point I raised, Your

22    Honor, that -- that I didn't actually supply language for was

23    the -- the redirection of the cash that's referred to as part

24    of the modification.

25         THE COURT:  This is to -- in order to exercise the

115

1    discount, right?

2            MR. ETKIN:  No, this is the fifteen million dollars.

3            THE COURT:  Oh, okay.

4            MR. ETKIN:  There's no mention of it at all in the

5    plan but there's no discussion in the disclosure statement of

6    when or how it's going to get paid.  And I think that --

7            MR. BUTLER:  And there's not going to be.  That'll be

8    dealt with in the settlement order with -- and Judge Drain

9    approves the plan.

10           THE COURT:  I mean, it just assumes it's going to be

11   there for it to do -- I didn't think that was a problem.

12           MR. BUTLER:  He hasn't approved the MDL settlement

13   yet.  When he approves it, that'll happen.

14           THE COURT:  Well, two judges haven't.

15           MR. BUTLER:  Right.  Correct.

16           MR. ETKIN:  Right.

17           THE COURT:  That's fine.  Okay.

18           MR. ETKIN:  That's it, Your Honor.

19           THE COURT:  All right.  Okay.

20           MR. FOX:  I was just going to ask if you wanted to

21   take a break, since it's almost 2:30.

22           THE COURT:  How much longer do --

23           MR. FOX:  Well, it may be -- to save a little time,

24   we can, sort of, like Mr. Etkin, I think we've got some things

25   that have been covered, some things are still floating around

116

1    on multiple pieces of paper.

2             THE COURT:  Well, I'm sorry, do you want to -- I

3    thought you -- you were pretty much resolved at this point

4    with --

5             MR. FOX:  Well, there's still some issues that I

6    think --

7             THE COURT:  Okay.

8             MR. FOX:  -- we'd like to discuss.

9             THE COURT:  Well, are those issues you want to talk

10   about or -- I mean, with the debtor or do you want to --

11            MR. FOX:  I think I need to talk to you about them.

12            THE COURT:  Okay.  Well let's do that for, at least,

13   ten or fifteen minutes.

14            MR. FOX:  Okay.

15            THE COURT:  Before taking a break.

16            MR. FOX:  I'm sorry?

17            THE COURT:  Before taking a break.

18            MR. FOX:  Well, I just thought it might be more

19   efficient if we took a break.

20            THE COURT:  Not really.

21            MR. FOX:  Okay.  No, that's fine.

22            MR. BRILLIANT:  Your Honor, if you're going to take a

23   break in ten or fifteen minutes, in any event, I'm happy to do

24   my issues and then Mr. Fox can talk during the break.

25            MR. FOX:  No, I don't need to talk to them.

1        THE COURT:  One of guys just go ahead now.

2        MR. FOX:  Your Honor, I think there's some minor

3    issues that I'll try to run through.  I think there are two,

4    kind of, more central issues; one particularly which goes back

5    to the whole concept of explaining to people the valuation

6    concept and so that they understand what they're getting here.

7    And the debtors made some effort in that regard but I had

8    suggested some further or a different or what I think is a

9    better way to do that.  What I'd like to do, if I could, is

10   step back a minute and explain to you why I think that's

11   important.

12       THE COURT:  No, I know it's important.

13       MR. FOX:  No, no, no.  But there -- there are a lot

14   of different ways that one can realize or lose value here.  And

15   it's not -- because of that, depending on how sophisticated or

16   unsophisticated one is, that may or may not be so evident.

17       You start from, you know, the Rothschild valuation of

18   between and eleven and fourteen and you have a midpoint

19   valuation.  And the debtors have put in a calculation now,

20   showing that the percentage recovery is based on that.  They

21   have not translated those recoveries in that chart into the

22   other chart of recoveries where they basically say you get a

23   hundred percent at plan value.  So yeah, I suppose somebody

24   could do the math.  My preference would be that you not put

25   individual or put holders in a position of having to figure

118

1    that out themselves.

2          THE COURT:  I think it's -- I think they're

3    adequately apprised of it at this point.  I -- I think that the

4    principle of what the plan is doing and what it's not doing is

5    clear.  And the chart is clear.  And I just don't want to keep

6    reiterating it to them.  I think it's -- I think it's clear as

7    it is.

8          MR. FOX:  Well, then I'll -- there's -- we'd also ask

9    the debtors, at least and they've not in the text put this in,

10   the -- as the issue came up in one of the comments Mr. Butler

11   made about making a general change throughout, to consistently

12   use the term, whether it's plan value or plan equity value or

13   something.  I think that would be helpful.

14         We had asked that the debtor make a change, the

15   very -- I think it was the very first time that that came up in

16   the executive summary on page DS-XI and to indicate right there

17   where it says plan value that that's a negotiated enterprise

18   value of --

19         THE COURT:  I put that in.  That's my language, in

20   negotiated plan enterprise value.

21         MR. FOX:  Oh, I'm sorry.

22         THE COURT:  You won that one.  Remember I said on

23   that conference call you had a lot of good comments.

24         MR. FOX:  Right although it doesn't indicate what the

25   number is --

119

1    THE COURT:  That's the next page.  That's, like, two

2    pages later.  It comes out.

3    MR. FOX:  Okay.

4    THE COURT:  You have the chart and everything.

5    MR. FOX:  On the event risks, I think we have taken

6    out some of those.  I think there're a few, though, that -- for

7    instance, the exclusive period to file a plan at December 31,

8    that's still in the chart.  There -- if this is -- if this

9    disclosure statement's approved, then the debtors' time to --

10   then we move on to their time to solicit acceptances.  And then

11   that one becomes basically irrelevant at that point for

12   purposes of this plan.

13   THE COURT:  I always extend -- I mean, if I were

14   representing a debtor, I would want to extend them both

15   forever.

16   MR. FOX:  Well the question -- this section was added

17   at the time that the creditors' committee stood up and said

18   we're not going to support what the debtors' doing.

19   THE COURT:  Right.

20   MR. FOX:  And it became --

21   THE COURT:  Wouldn't that -- but I think -- my view

22   is that if the plan were not to be confirmed, the case would

23   have that risk, because a lot of people would be tempted to

24   stand up and say the debtor couldn't do it, we want to do it

25   now.  So I think it's legitimate.  It's not -- you know, I

120

1    think for anyone whom -- where the exclusive period matters to

2    someone, and for a lot of people it doesn't really matter,

3    because they don't really know it, but I think for those to

4    whom it matters, I think it is -- it is a risk.  It's not as

5    big a risk as other things, but it's indicative of what would

6    happen if -- if the course changed -- the case changed

7    direction.

8            MR. FOX:  Okay.  And on the two risks at March 31,

9    both relating to the UAW, they're effectively the same --

10   they're part and parcel of the same thing.  And we suggest that

11   they be combined because they're not two different things that

12   are going to happen.  They get to that date and then they don't

13   meet the benefits, or if they change the benefits at that

14   point, the strike risk exists.

15           THE COURT:  But that --

16           MR. BUTLER:  They are two separate issues.

17           THE COURT:  -- but I think -- I think that explains

18   the risk and it's also -- I mean, my experience is that while

19   the UAW has been constructive, and as I said earlier today,

20   sophisticated.  They really know their rights.  And they, you

21   know, they know those contracts like the back of their hand.

22   So I think it's -- I think those are two important points.

23   And, you know, if Mr. Kennedy -- that date is important to the

24   unions --

25           MR. FOX:  No I --

121

1       THE COURT:  -- that have the benefit of that

2  guarantee.

3       MR. FOX:  -- I agree that that's the case.  The point

4  that I was trying to make was that the event, for purposes of

5  the effect on the debtors, for instance, or the recoveries --

6       THE COURT:  Well, but you know --

7       MR. FOX:  -- I know it's two separate things.

8       THE COURT:  -- I would identify them both.  I think

9  that it has -- even if they didn't strike, there's something I

10  would be worried about, because it affects the labor

11  relationship.  Because I know  they're worried about it, if in

12  fact the plan doesn't get confirmed.  I hope they're not unduly

13  worried, but I think that's an event risk of the plan not being

14  confirmed.

15       MR. FOX:  I think Mr. Butler alluded to it in the

16  places where he uses the claims range of 3.2 to 3.6, isn't that

17  right?  You alluded to the suggestion of just saying up to a

18  maximum of whatever the number is?  The range becomes confused.

19       MR. BUTLER:  Well, no.  What I agreed to do was in

20  the 3.2 to 3.6 range in the summary what we said was, I'm going

21  to drop the footnote of the explanatory paragraph that we

22  discussed on the record with the Judge.

23       THE COURT:  They have a range.  I think it's properly

24  inclusive.  They have a range, but then they say, even though

25  we -- we're not positive that we're going to be within the

122

1   range, this is where we think we are which leads to a hundred

2   percent recovery.  And I think -- I think that alerts people to

3   the fact that there might be some play in the joints, but that

4   the debtors -- I think it's okay.

5        MR. FOX:  Well the point that was -- I think, I could

6   be wrong, that as long as they don't exceed the upper limit,

7   that there's no impact on recoveries.  So if you put it --

8        THE COURT:  But don't you want to -- I think it's

9   fair to alert people that they might exceed the upper limit

10  based upon their -- they have a range.

11       MR. FOX:  -- I agree with that.  The range that's

12  listed, though, is within the upper limit.  My point is, in

13  fact --

14       THE COURT:  Is it?  I didn't know that.

15       MR. BUTLER:  The point you're making, which is an

16  academically correct point, but you're only looking at it one

17  way, which is typical, in the sense that you're looking if it

18  gets too high --

19       THE COURT:  Well, now, you know, I know we haven't

20  had lunch yet, but go on --

21       MR. BUTLER:  -- no, no, no.  But -- it's a range.

22  But if it gets too high, he's saying it may not be par plus

23  accrued recovery, but if it's at the low end, right, then it's

24  arguably --

25       MR. FOX:  No.

123

1          MR. BUTLER:  -- because the shares are allocated,

2     it's arguably slightly better.  I mean, that's how the -- I

3     mean, it's a settlement case.  It's not perfection because the

4     stock -- everything's been allocated.

5          MR. FOX:  I'm not -- no, I'm not arguing about that.

6          THE COURT:  I think it -- well, I think his point is

7     that, is it -- I didn't know this.  The range of claims,

8     whatever it -- if anything falls within that range, you're

9     under the cap?  Is that what your point is?

10         MR. FOX:  As long as you're under the cap you get a

11    hundred percent regardless of the range.  And I was confused

12    when I read it.

13         THE COURT:  All right.  Well, that's worth putting in

14    the note then, I guess --

15         MR. FOX:  That's really --

16         THE COURT:  -- that anything -- and hence --

17         MR. BUTLER:  I'm trying to understand the point --

18         THE COURT:  -- being within that range -- being

19    within that range also puts you within the --- you know, under

20    the cap.

21         MR. FOX:  The point is, creditors don't need to be

22    worried that their recovery is affected depending on the range

23    of claims, as long as the upper end of the range falls under

24    the cap.  Because somebody reading it, as I did when I read it,

25    could be -- could believe that depending on where the claims

124

1    fall within the range, even though it's under the cap, could

2    affect their recovery.

3            THE COURT:  Yeah.  You made -- I'm going to reverse

4    course here.  I think that if that range of claims is all -- no

5    matter whether you're at the top end or the bottom end, is --

6    leaves you under the cap, then you should probably say that in

7    your footnote.

8            MR. BUTLER:  Actually the cap is in the middle of

9    that range.

10           THE COURT:  Oh, all right.  Well, then that's -- then

11   you should say that.  Then you should say that.

12           MR. BUTLER:  Which was what I was doing to do.

13           THE COURT:  Okay.  That's fine.  All right.

14           MR. BUTLER:  Okay.  All right.  Then now --

15           THE COURT:  Okay.

16           MR. BUTLER:  -- right.

17           THE COURT:  So we were at the -- all right.  Fine.

18           MR. BUTLER:  That's what I'm saying, the cap is the

19   middle -- all right.  Exactly right.

20           THE COURT:  Okay.  All right.

21           MR. FOX:  Well, in that case, then, if --

22           THE COURT:  Then you should say it's in the middle --

23   midpoint of the range.  That's fine.

24           MR. FOX:  -- well, in that case, though, then I think

25   if we exceed the cap --

125

1           THE COURT:  No.  Then you -- then it's clear.

2   There's an adjustment.  You -- I don't think you need to spell

3   that out.  I think that's clear.

4           MR. FOX:  Well --

5           THE COURT:  As long as you give people the point

6   where the cap is in that range, then they can do the math in

7   their heads.

8           MR. FOX:  I'm not sure about that.  But the debtor

9   added language which I thought was in response to another

10  request we had, indicating that they don't think that they'll

11  exceed the cap.  I don't -- it seems inconsistent to say --

12          THE COURT:  No, you could -- I don't think -- I mean,

13  there's a range.  They haven't liquidated these claims yet.

14  But they can still give their judgment as to the likelihood of

15  what they'll be liquidated at.

16          MR. FOX:  Well, I would ask, I know Your Honor feels

17  otherwise, but I would nevertheless make the request that if

18  the debtor believes that the higher end of the range is above

19  the cap, that they indicate what the diminution and recovery

20  would be if that higher end of the range is reached.

21          THE COURT:  I don't think you need to do that.

22          MR. FOX:  The -- we talked about dilution, Your

23  Honor.  There are two issues that were not discussed.  One is

24  the effect of the emergence cash bonuses, which are different

25  than the equity set aside.  And I don't believe that -- it's

126

1   like eighty-something million dollars, I think.

2          MR. BUTLER:  It's not diluted.  That's a cash expense

3   rolled up into the cash part of the plan.

4          MR. FOX:  Okay.

5          THE COURT:  Okay.

6          MR. FOX:  Thanks.  And then I also -- it was my

7   understanding that even with the management compensation plan

8   that there's a three percent initial grant at emergence.

9          MR. BUTLER:  I didn't say that.  What I said earlier

10  was, when we were talking about this earlier on, I said that

11  there was an eight percent that would be issued -- that would

12  be authorized but not issued, and that some portion of that,

13  depending upon what the determinations are by the comp.

14  committee and the -- assuming the plan's confirmed and the

15  Court confirms the plan, there'll be some amount of awards

16  given in conjunction with that plan that's adopted.  Now, the

17  exact timing when those are issued, I suspect that they will be

18  at or around time -- the effective date.  I know that the --

19  some of those, for example, some of those are in the form of

20  RSUs.  Some are in the form of options.  Some of it will be --

21  which is still within the three percent. It's not like people

22  are going to get all of them as stock grants and be able to go

23  away.  And there's -- and as the plan investors had negotiated

24  it, half of them are performance-based over a three-year

25  period, so that, you know, it is not the case that people are

127

1   getting even a three percent grant that you can go walk away

2   with and this is the stock you have.

3          MR. FOX:  But if it's coming out of the finite amount

4   of stock at --

5          MR. BUTLER:  It's not coming out of the stock

6   allocated to the creditors.

7          MR. FOX:  -- but if it's -- no.  But if it's

8   outstanding at emergence or effectively at emergence, it's

9   diluted.  If it's creditors' shares --

10          THE COURT:  But if -- it's diluted across the board,

11   isn't it?

12          MR. FOX:  Well, nevertheless, if you're telling

13   creditors what they're getting but you don't take account of

14   something that's going to dilute them on day one, I --

15          MR. BUTLER:  I mean, there is disclosure in the thing

16   that there's --

17          THE COURT:  Yeah.  That's in the executive --

18          MR. BUTLER:  -- executive concept.

19          THE COURT:  -- the compensation section.

20          MR. FOX:  But it's not -- but it doesn't --

21          THE COURT:  I mean, I guess -- I'm not -- as long as

22   there's the note that we talked about saying that this, you

23   know, these are the issued shares and -- I'm not uncomfortable

24   about that.  The point of the -- if in fact the stock option

25   plan was coming out of a particular constituent's hide, I'd

128

1    think about it differently.  But it isn't.  And the theory of

2    it is that every shareholder benefits from it.

3           MR. FOX:  There's no question about that, Your Honor,

4    but I'm concerned about the effect that it has.  Even though

5    it's spread over everybody, some of that is the unsecured

6    creditors.

7           THE COURT:  I don't -- I don't think so.

8           MR. FOX:  The last point, Your Honor, the last main

9    point.  In the section on substantive consolidation, the

10   discussion of the factors to be considered and the statement

11   that the debtor has considered those factors and reached a

12   decision, but there's no -- there's no discussion whatsoever of

13   what the actual facts are on which the debtor made its

14   decision.  And we've asked for that, and the debtors declined

15   to do so.

16          THE COURT:  Well, that's why I told them to explain

17   who is -- which creditors might be affected and why,

18   notwithstanding that, they believe it's in the interest of

19   every creditor.

20          MR. FOX:  Well, I know I appreciated the fact that

21   Your Honor asked them to do that, but it wasn't -- but it

22   doesn't really give the creditors --

23          THE COURT:  This is -- this is for voting purposes?

24          MR. FOX:  Yes.

25          THE COURT:  If someone wants to object on the basis

1    that the plan provides for the substantive consolidation it

2    does provide for, I'm sure there'll be discovery and, you know,

3    a whole litigation festival.  And all of that stuff will be

4    developed at nauseum.

5         MR. FOX:  I didn't mean to turn it into that --

6         THE COURT:  No, I know.

7         MR. FOX:  -- what I meant to do was to give people

8    enough information so that they can decide for themselves that

9    they should accept or not accept the debtors' determination.

10        THE COURT:  But it -- but it's not a litigation -- I

11   guess the debtors are being pretty candid.  They're not asking

12   people to accept the plan because they think they will defeat

13   them in a contested substantive consolidation analysis.

14   They're asking them to accept the plan because they believe

15   that at the end of the day it's good for all their creditors.

16   If they could say that factually, then I think that's -- that's

17   their point.  I mean, that's -- it's not a litigation analysis.

18   It's a, you know, you benefit from this analysis.  And they

19   should identify who might, if there is some group, might not

20   benefit and why they nevertheless believe that it is to their

21   benefit.

22        MR. FOX:  No, I appreciate that.  But I think that

23   the point is that people ultimately have to decide for

24   themselves whether they want to vote yea or nay for something.

25   And so to the extent that the substantive consolidation

130

1    analysis factors into that, in a material way potentially, that

2    people should have some understanding of what the underlying

3    factors or so that they can decide, yeah, okay, if that's the

4    debtors' decision, that makes sense based on the facts they've

5    told me, and therefore I'll vote for it; as opposed to saying

6    well, okay, they say they -- they decided, but I don't know

7    why, so I don't --

8            THE COURT:  No, but I just said why.  And again, it's

9    not a Augie/Restivo -- it's not, you know, like the

10   nonsubstantive -- non -- twenty-five page nonsubstantive

11   consolidation opinion that lawyers give.  This is good for you.

12           MR. FOX:  Well, okay.

13           THE COURT:  I think there're two different points.

14   They're going to -- if someone objects, the debtors are going

15   to go through Augie/Restivo.  But their first point is, as a

16   matter of just business sense, it makes sense to do this.

17           MR. FOX:  No, and I appreciate that.  But as, you

18   know, we heard from Mr. Tepper, for instance, a TOPrS holder,

19   for instance, take the view that we'd be better off not

20   consolidating because it'll help my recovery at --

21           THE COURT:  But he's already -- but --

22           MR. FOX:  -- but he's got two issues that he has to

23   consider then.  One is what's the recovery going to be, which

24   you've addressed.  The other is, even if I think I have a

25   chance of -- or even if I think there's a material change in

131

1    our recovery, what are my chances of being able to be

2    successful in doing that.  And so that's why I say, to the

3    extent the debtor added some facts about what lies behind their

4    decision to do this, I think it actually is helpful to people

5    making a vote that maybe they should just go along with it

6    rather than not know.

7             THE COURT:  Well --

8             MR. FOX:  That's the point.

9             THE COURT:  -- I don't -- I guess, my experience is

10   that it's a big deal to mount a substantive consolidation

11   fight.  And I think if someone really is concerned about doing

12   that as opposed to how to vote on the plan, they're going to

13   come to -- they're going to come to Mr. Butler and probably to

14   Mr. Rosenberg, and maybe to you as counsel to their indentured

15   trustee, and say you know, what am I -- I think maybe I

16   benefited by not having substantive consolidation here, and I

17   want to mount a fight.  Should I -- you know, tell me why I

18   shouldn't.  That's what I would do.  No one should really count

19   on the estate paying their legal fees to challenge this plan.

20   I certainly understand the logic of -- I'm not talking about

21   you.  You have an indentured trustee lien and all that stuff.

22   But just the notion that, you know, creditors can just sort of

23   throw their hat in the ring to fight a plan, particularly

24   something like on substantive consolidation, which is a very

25   expensive proposition, and then think at the end of the day

1   they could be bought off by having their legal fees paid,

2   that's not how it works.  So I -- and again, this is not

3   directed at you.  I'm just looking at the benefit of laying

4   this out in more detail, and you know, I guess if the debtors

5   want to do it, they can, but it seemed to me that what they

6   needed to do was explain to people more clearly why they're

7   proposing it as an economic matter, and in particular why it's

8   good for those creditors who -- on a sort of an academic basis,

9   if you just look at the capital structure, would not benefit

10  from it, and why it's still good for them.  And that's what I

11  really wanted them to focus on.

12          MR. BUTLER:  And, you know, we're quite prepared to

13  do that.  We don't -- what we're not trying to do is disclose a

14  litigation case that hopefully will never have to be litigated.

15          THE COURT:  Okay.

16          MR. FOX:  Not asking, just to, you know.

17          MR. BUTLER:  That's what you're asking.

18          THE COURT:  Well, what you sa -- what, you know --

19  I'm sure you read in those opinions, once you start on that

20  road, you have disclosure, you end up with a twenty-five page

21  document.  I mean, that's -- City Bar Association is trying to

22  draft a model one, but it's still twenty pages, so.

23          MR. FOX:  Thank you, Your Honor.

24          THE COURT:  Okay.

25          MR. BRILLIANT:  Your Honor, I think you've already

133

1    overruled a number of the disclosure objections that we had

2    raised in our papers, and I'm not going to reiterate them.

3    There are, you know, a few things that -- that we had asked for

4    that haven't been addressed so far.

5              THE COURT:  Okay.

6              MR. BRILLIANT:  One of the issues that we perceive

7    here is that, to a large extent, I guess there's a large, I

8    guess, disagreement, or people have different perceptions about

9    valuation.  In disclosure statements, generally it's been my

10   experience, and I'm sure Your Honor's as well, having looked

11   at, you know, the Loral disclosure statement that sometimes you

12   get, like you do here, just, you know, three pages of

13   boilerplate analysis from the debtors' financial adviser on

14   valuation, and in other situations, like I said -- like I

15   mentioned, you know, Loral, some of the airline cases, you get

16   a much more fulsome, you know, disclosure about valuation, so

17   that, you know, people can look at it and get a better sense as

18   to what it was that the debtors' financial adviser did, and

19   then they can reach their own conclusion as to whether they

20   agree with value.

21             We had requested that the debtor provide a little bit

22   more than, like I said, it was pretty much just, you know,

23   boilerplate language that they did a valuation and these were,

24   you know, the ranges they came out to, and this is how it, you

25   know, it turns into, you know, share prices, so that we, you

134

1    know, creditors in general can get some sense as to whether

2    they agree with the -- you know, the -- you know, the

3    Rothschild numbers or other valuations.  I believe it's Exhibit

4    C, Your Honor.

5              THE COURT:  No, it's Appendix D.

6              MR. BRILLIANT:  D, Your Honor.

7              THE COURT:  Okay.

8              MR. BUTLER:  I think, Your Honor -- I think what

9    we're doing here, what the real issue here is, Mr. Brilliant,

10   in discovery, got a copy of the Rothschild valuation report,

11   which is very detailed, and indicates what the board

12   considered.  And he got it in discovery, although he's not

13   permitted under his protective order to share it with his

14   clients.  And the -- what we have in Exhibit D here -- Appendix

15   D here, and Mr. Shaw would indicate about having the

16   Rothschild, is the standard report that they have given in this

17   and other Chapter 11 cases when they are an investment banker

18   to the debtors.  We do not believe that it's appropriate or

19   necessary to put Rothschild's complete valuation report or a

20   further summary of it out into the marketplace, other than the

21   results.

22             MR. BRILLIANT:  Your Honor, this is not a desire on

23   my part to share the report with my clients, but instead to,

24   you know, have the disclosure statement contain, you know, what

25   I believe would be adequate information for people who are

135

1   voting on it.  As I said, I really do believe that at the end

2   of the day this is really about perceptions of value.  The

3   debtors have one perception; the marketplace currently has a

4   different perception; my clients have a third perception; and

5   at the end of the day, whether or not you think this is a fair

6   plan, depends upon what you think is the value of what you're

7   getting.  And, you know -- you know, right now it does say what

8   the low, the high end and the midpoint of the Rothschild range

9   is, but that's really all it says.  It doesn't dis -- you know,

10  and that they did, you know, typical -- you know, typical, you

11  know, analyses.  I don't even believe they give the date of

12  their -- of their report.  So to the extent that, you know,

13  somebody wanted to look in, you know, and reach a conclusion as

14  to whether things in the market had changed since then, it's

15  just very -- to say it's even bare bones, I think, Your Honor,

16  is an overstatement.  It's just a bunch of boilerplate language

17  that they did an analysis.

18          THE COURT:  Well, I -- I don't agree with that.  I

19  also don't agree with the notion that you would put in a full

20  valuation analysis.  It's fair to put the date of the --

21          MR. BRILLIANT:  I'm sorry, excuse me.

22          THE COURT:  -- it's fair to put the date of the

23  valuation in.  You should do that.

24          MR. BUTLER:  I thought it was in there.

25          MS. SPEAKER:  It says as of the 31st of December.

136

1          THE COURT:  Yeah.  I mean, it is --

2          MR. BRILLIANT:  Yeah, when they prepared it, Your

3  Honor, I mean it says it's as of 12/31 --

4          THE COURT:  Yeah --

5          MR. BRILLIANT:  -- but that's not --

6          THE COURT:  -- at least it should say, you know, when

7  it was last updated.

8          MR. BUTLER:  That date, Your Honor, I'm advised by

9  Ms. Shaw, is October 19, 2007.  We'll add a sentence that says

10 that.

11         THE COURT:  Okay.  You know, this is a public

12 company.  There's a lot of public reporting, and there's a lot

13 of -- a lot of disclosure in here already.  So I don't think

14 you need that.

15         MR. BRILLIANT:  Your Honor, with respect to one of

16 the other issues we had raised with respect to the TOPrS. We

17 had requested that the disclosure statement disclose that the

18 plan investors, you know, are holders of the TOPrS, and that

19 they had, you know, a role in negotiating the recoveries for

20 the TOPrS.  You know, we think that somebody, you know, voting

21 to determine whether or not they wanted to weigh their

22 seniority rights would like to know how the settlement was

23 arrived at, who it was negotiated with, and whatever influences

24 they would have.  I understand that Your honor ruled this

25 morning that it's just legitimate leverage, and that may be,

137

1    but it's still something that I think somebody would want to

2    know in voting on the plan.

3            THE COURT:  Well, I wasn't really addressing the

4    TOPrS when I talked about leverage.  But it's -- if I

5    understand it, we have disclosed it.

6            MR. BUTLER:  I thought it was disclosed that they

7    owned the various levels of debt securities.

8            MR. BRILLIANT:  It's not disclosed -- it says that

9    they own debt securities, it doesn't disclose what percentage

10   of the TOPrS they own or even -- I believe you just disclosed

11   the same as what's in their 2019.  They have 283 million

12   dollars of debt securities.  It doesn't say which ones they

13   are.

14           THE COURT:  All right.

15           MR. BRILLIANT:  Am I wrong about that?

16           MR. BUTLER:  No, it doesn't have the exact

17   percentages, because I think until the -- it does describe what

18   they own, but not how much they own.  That's right.

19           MR. BRILLIANT:  Does it say debt secu -- it says debt

20   security, but that doesn't -- did you guys change it?  Does it

21   no longer just say it?

22           MR. BUTLER:  I mean, we had -- the point is we have

23   information which has been shared discovery with Mr. Brilliant,

24   some of which, I think, was put on the record in the litigation

25   yesterday by Mr. Brilliant.

138

1    THE COURT:  Well, I don't think you need to give

2  percentages.  Because they could change.  But I do think it's

3  okay to say that the debtors are informed that the plan

4  investors own, whatever the number that was in there already --

5    MR. BUTLER:  All right.

6    THE COURT:  -- of the debtors' present debt.  And

7  that may include whatever has been listed on -- as a matter of

8  public record.

9    MR. BUTLER:  Yeah, I mean my point is --

10    THE COURT:  Not percentage, just what it is.

11    MR. BUTLER:  -- yeah --

12    THE COURT:  -- what different ones.  I don't

13  believe -- and I don't believe the record really reflects this,

14  that they played an undue role in negotiating the treatment for

15  the TOPrS.

16    MR. BUTLER:  Your Honor, I'm just trying to figure

17  out what we can disclose and not disclose.  Mr. Brilliant took

18  discovery, got that information, elicited some of that

19  information during the course of the hearing.  We have some of

20  the information that -- about that --

21    THE COURT:  Well, you can only disclose what has been

22  disclosed publicly.

23    MR. BUTLER:  -- right.  But it may not be complete,

24  what Mr. --

25    THE COURT:  No, I would say that you would have to

139

1   put a caveat around it.

2          MR. BUTLER:  Yeah.  Because -- because we have a non-

3   disclosure agreement, where they made certain disclosures to

4   us, but it's confidential.  We're not permitted to disclose it.

5          THE COURT:  No.  Just base it on what Mr. Teppler

6   said publicly.

7          MR. BUTLER:  Okay.

8          THE COURT:  And not percentages.  Just that they

9   hold -- various plan investors hold --

10         MR. BUTLER:  I don't know what was actually -- I may

11  have to come up with --

12         THE COURT:  I don't even -- I have in my notes.  I

13  mean, it was basically across the capital structure.  It was

14  senior debt, junior debt, stock --

15         MR. BUTLER:  Right.

16         THE COURT:  -- preferred stock.

17         MR. BUTLER:  Right.  They own across the capital

18  structure.  I just don't know what he relevant percentage --

19         THE COURT:  You don't -- no, but you don't have to

20  give the --

21         MR. BUTLER:  I don't have to give the amounts.

22         THE COURT:  No.

23         MR. BUTLER:  I just say -- okay.  Thank you, Your

24  Honor.

25         THE COURT:  I mean, the records show that none of it

140

1   was -- was a -- well just leave it at that.

2            MR. BRILLIANT:  Your Honor, like Mr. Fox, and I'm not

3   going to belabor this, but I also believe that in addition to

4   the summary, people look at the distribution chart.  And I

5   think that some kind of, you know, range of recovery should be

6   in the --

7            THE COURT:  But that's part of the summary.  I mean,

8   it's like one page after -- it's all -- that's the summary.

9   Those whole ten pages.

10           MR. BRILLIANT:  Right.  But I'm saying people won't

11  necessarily read, you know, the summary and the chart.  They

12  may just look at the chart.

13           THE COURT:  I don't -- you know what, on this one, I

14  don't think that's right.  I think this is too complicated to

15  just look at the chart.  And I think a reasonable person would

16  know that.

17           MR. BRILLIANT:  You --

18           THE COURT:  I mean, I read -- I -- it's easy to read,

19  and that's what I'd read.  And I think if you -- you're right.

20  A lot of people just turn to the chart normally.  With this

21  one, if I turn to the chart, I would decide, I think, pretty

22  quickly, given its use of the term nego -- you know, plan

23  value, and --

24           MR. BUTLER:  Your Honor, I point out the chart comes

25  before -- the plan value -- valuations all come before --

141

1       THE COURT:  Yeah.

2       MR. BUTLER:  -- the distribution charts do.  So it's

3   in the earlier part of the summary.

4       THE COURT:  Let me -- let me just look at this one

5   second.

6       (Pause)

7       THE COURT:  You know what, Mr. Butler, put a footnote

8   after the phrase "plan equity value" in the hundred percent --

9   where it says a hundred percent.  On a distribution of new

10  common stock at plan equity value, on the chart.

11      MR. BUTLER:  I'm looking for it.  Yes, Your Honor?

12      THE COURT:  Put a footnote there with a cross

13  reference to the pages of the summary that discuss that issue.

14      MR. BUTLER:  Is that true in every -- every -- just

15  in that -- I mean, that part appears throughout this chart.

16  I -- can I -- I was thinking, Your Honor, if you want to do it,

17  the other place if you want to --

18      THE COURT:  No, I would -- I think it's really key

19  for the --

20      MR. BUTLER:  -- the other place we could put it, Your

21  Honor, is at the top of page Romanette 22, which is the

22  introductory to the -- introduction to the charts.  And it has

23  a bunch of cautionary items in it already.  We could add a

24  sentence right there that makes reference.

25      THE COURT:  All right.

142

1          MR. BUTLER:  That way it's applicable to the entire

2     set of charts.

3          THE COURT:  That's fine.  Do that.

4          MR. BRILLIANT:  In there, Your Honor, the general

5     unsecured claims, which is all I really care about.

6          THE COURT:  Yeah, I know but --

7          MR. BUTLER:  The debtor cares about all of our

8     constituents, not just --

9          THE COURT:  Yeah.  I think you're right.  At the

10    start of the -- at the start of the chart section, you can put

11    that cross reference in.

12         MR. BRILLIANT:  The only people it really matters to

13    or who don't know about it are the general unsecured.  I think

14    everybody else --

15         THE COURT:  No, that's not true.  The shareholders

16    are voting.

17         MR. BRILLIANT:  The shareholders are -- are getting,

18    you know, small amounts of shares, but they're mostly getting

19    warrants.

20         THE COURT:  It means a lot to them, you know.  It's

21    like Danny Webster said about Dartmouth.  You know, it's a

22    small distribution but there are those who love it.  Or maybe

23    not.  They want to know.

24         MR. BRILLIANT:  Your Honor, we had requested in our

25    objection that the debtor give a little more description in

143

1   connection with the -- the exit financing.  Currently it is not

2   a condition to confirmation of the plan that they have exit

3   financing, but instead a condition of consummation of the plan.

4   Now, I don't know whether if they didn't have the financing

5   committed by the confirmation date whether Your Honor would

6   hold a confirmation hearing or not.  One thing we had asked

7   them to hold -- to disclose was that if they -- if the plan was

8   confirmed and the exit financing wasn't in place at that time,

9   that you know, there could be -- the debtor could be in a

10  situation where the plan was confirmed and didn't go effective

11  for a lengthy, you know, period of time.  You know, we hope

12  that that's not going to be the case, but there is not a

13  provision in the plan that it automatically terminates, or --

14          THE COURT:  But that's why they have the feasibility

15  requirement in the Bankruptcy Code.  So the plan's not going to

16  be confirmed unless it's feasible.  So I don't think they need

17  to get into that.  I don't -- that's too speculative a

18  scenario.

19          MR. BRILLIANT:  Well, Your Honor, obviously as I'm

20  sure you probably are aware, I'm a, you know, a little

21  disappointed in the -- Your Honor's ruling on the

22  classification and the, you know, subordination, but there's

23  nothing I can do about that --

24          THE COURT:  Well, let's be clear.  It's not a ruling

25  for purposes of objecting to the plan.  It's an articulation of

144

1    why I believe the plan should be able to go out for a vote,

2    notwithstanding the concerns you've raised on both

3    classification and disparate treatment.  And my view is that

4    the cost of setting the plan out and going down this path is

5    not outweighed by the ability of someone to come in, not a

6    class, but an individual creditor, and objection under 1122 and

7    under 1123(a)(4), on those bases, because I believe that

8    there's a reasonable chance that if such an objection were

9    sustainable, it could be fixed under 1127 based upon the way

10   the debtors are counting the votes and also based upon the

11   numerous disclosures in this document now, about the importance

12   of people voting.  So I'm not ruling, ultimately, on

13   confirmation today.  I'm just ruling that there's enough to let

14   it go out.

15           MR. BRILLIANT:  I understand, Your Honor.  But I

16   guess, you know, my view, which is not important here is that

17   the -- is that necessarily on this point, but that, you know,

18   under 1123(a)(4) in particular, you know, given, you know, that

19   there is disparate treatment for people in the same class, the

20   debtors are at least initially, you know, choose to, you know,

21   how they want to separate the claims with the expectation that

22   they could always reconfigure it later.  My concern is that it

23   be -- it's become -- it's just very confusing, you know, to,

24   you know, to people who are, you know, in a class and their

25   votes may be counted in connection with that class and also

145

1    maybe counted in a -- in a disparate way, you know, for

2    purposes of waiving the subordination agreement.  Although I

3    understand that the language that you -- that Your Honor has

4    directed be added will clarify that somewhat.  But it doesn't

5    really clarify it that much from the standpoint, you know, is

6    it a two-thirds and majority of people who are affected by the

7    subordination agreement in which that's going to be considered,

8    or -- it's just -- it's just completely, you know -- you know,

9    vague and --

10              THE COURT:  Wouldn't it tell you to vote -- if you

11   believed strongly on this issue, it doesn't matter whether --

12   what percentage it is, you yourself, better vote.  I don't -- I

13   don't -- I mean if you --

14              MR. BRILLIANT:  Well, I think that's right, Your

15   Honor.  But whether or not you want to, you know, vote and

16   challenge the plan or not vote or, you know, depends upon what

17   you think the rules of the road are.  And the disclosure

18   statement doesn't -- doesn't tell you.

19              THE COURT:  Well, I'm not -- I wouldn't tell them the

20   rules of the road anyway, because I believe there's a very open

21   issue on this.  You're relying on a 1980 Chapter 13 case from

22   the Western District of New York.

23              MR. BRILLIANT:  Your Honor, I believe I'm relying on

24   three Second Circuit Court decisions that predate the --

25              THE COURT:  Predate --

146

1          MR. BRILLIAN:  -- the Bankruptcy Code --

2          THE COURT:  -- exactly.  That predate the Bankruptcy

3    Code.

4          MR. BRILLIANT:  -- which -- and I think, Your

5    Honor --

6          THE COURT:  So there's an issue there.  Because the

7    debtors have cited a number of cases for their proposition, and

8    the leading commentator on bankruptcy supports them in large

9    measure.  So I'm not going to spell out the rules of the road.

10   And I'm not going to turn this into a confirmation objection.

11   I believe there's enough to let it go out for a vote, because I

12   think the vote is what counts.  And then a lot of this is more

13   performance art.  And so I've had enough of this point.

14         MR. BRILLIANT:  You know, I don't have any --

15   anything else that I want to --

16         THE COURT:  Okay.

17         MR. BRILLIANT:  -- raise orally, Your Honor.  You

18   have our pleadings.

19         THE COURT:  Okay.

20         MR. BUTLER:  Your Honor, could we take a brief recess

21   to -- so we can go back to the solicitation --

22         THE COURT:  Yeah.

23         MR. BUTLER:  -- that we have to sort of regroup.

24         THE COURT:  While you're doing that, my markup is

25   here, and someone should go and Xerox it.

1          MR. BUTLER:  Thank you.

2          MR. BRILLIANT:  Your Honor, I do have one more point.

3   It's not a disclosure point.  But I don't know what the

4   procedure's going to be.  One thing, by not dealing with the

5   classification and the voting issues up front is that the way

6   the debtors are proposing in their timeline is that the -- is

7   that the balloting report would be given, you know, filed and

8   disclosed the day before the confirmation hearing.  I don't

9   believe that, you know, that that's, you know, going to be, you

10  know, sufficient time.  I -- you know, if anybody wanted to

11  object and had, you know, these issues, obviously they could,

12  you know -- you know, raise the classification, you know -- you

13  know, issue, and raise the 1123 issue, but they're not going

14  to -- they're not going to know until, you know, if Your Honor

15  adopts their schedule, until really the day before as to how

16  the votes actually came out and how the debtor is slicing and

17  dicing them  or, you know, modifying the classification of

18  claims to deal with the issues.  I'm just concerned that it

19  doesn't provide, you know, sufficient -- sufficient notice.

20         MR. BUTLER:  Your Honor, perhaps we can discuss that

21  during the recess and maybe come back with a partial solution

22  for it.  I view the timeline as part of the solicitation

23  procedure's motion.

24         THE COURT:  Okay.

25         MR. BUTLER:  If we can deal with that at that time,

148

1    I'd appreciate it.

2            THE COURT:  Just while I'm thinking.  I -- right now

3    you proposed a ballot certification on January 16th?

4            MR. BUTLER:  Right, that's the -- right.  The

5    certification that comes in on the 16th in advance -- which

6    would date the final purchase.  I think the final is the day

7    before the confirmation hearing.  But that's not -- you know,

8    we will have provisional recording that, you know, you get the

9    provisional balloting, and that's the final certification by

10   the agent.  And I would certainly think we could share

11   provisional reports with people who filed objections on that

12   issue by the objection deadline.  So I mean, I think there's a

13   way to --

14           THE COURT:  All right.

15           MR. BUTLER:  -- parse this.  I mean, you know, as the

16   Court knows, when you -- you know, there's a final report, but

17   there are, you know, periodic reports we get.  And I'd like to

18   discuss that --

19           THE COURT:  All right.

20           MR. BUTLER:  -- if I could, during the recess.

21           THE COURT:  That's fine.

22           MR. BUTLER:  Thanks, Judge.

23           THE COURT:  Well, I don't know about you, but I'd

24   like to eat something.  So I'll be back at 4.

25           MR. BUTLER:  Four o'clock.  Thanks, Judge.

1    THE COURT:  And Karen, you can give them my markup.

2    Why don't you have them -- if they can't read it, maybe they

3    can talk to you about it.

4    MS. SPEAKER:  Do you want them to Xerox, or do you

5    want them to --

6    THE COURT:  Yeah.  They should make a Xerox of it.

7    Yeah, I guess.

8    (Recess from 3:06 p.m. until 4:04 p.m.)

9    THE COURT:  Please be seated.  Okay.  We're back on

10   the record in Delphi Corporation and I think -- are we at

11   the -- are we now dealing with the solicitation procedures and

12   timelines?

13   MR. BUTLER:  Yes, Your Honor.  Your Honor, also for

14   the record, appearing with me for this portion of the hearing

15   is my partner, Ron Meisler, who has been most directly involved

16   in the solicitation procedures matters in case the Court has

17   specific questions about timetables and in terms of working

18   with the solicitation agents.

19   With respect to the timeline, let me just sort of

20   give a sense -- we've talked -- I have talked to Mr. Brilliant

21   during the recess about providing -- what we agree to do is

22   provide objectors.  People who file objections by the objection

23   deadline who would like information regarding balloting can

24   contact us and we'll provide them with the same provisional

25   balloting information that we have.

150

1            THE COURT:  What's the proposed objection deadline

2    again?

3            MR. BUTLER:  Right now it's -- Your Honor, it's

4    proposed for January 11th.

5            THE COURT:  Okay.  Same day as the ballot deadline?

6            MR. BUTLER:  Correct.

7            THE COURT:  Okay.

8            MR. BUTLER:  And it's ten days before -- we tried

9    to -- and exhibit deadline is ten days before that.  We tried

10   to meet --

11           THE COURT:  Okay.

12           MR. BUTLER:  -- all the requirements Your Honor asked

13   us to.

14           THE COURT:  All right.

15           MR. BUTLER:  And what we were trying to do, Your

16   Honor, is among all the multi variable equations we have in

17   this case is actually try to emerge in the first quarter of the

18   year where 10Ks are being filed and there's rights offerings

19   being run and we have a lot of other regulations we have to

20   follow in terms of just trying to make sure we do everything

21   correctly.  You know, we're trying to shoot for an emergence,

22   if we can stay on the timetable, that would allow us to emerge

23   no later than February 28th and hopefully a few days prior to

24   that.  We're shooting, I think, for a little bit earlier than

25   that if it's possible during the month.  It just depends on a

151

1    variety of issues.  I mean, the point is I think, Your Honor,

2    for some sense, the actual closing of this transaction, the

3    corporate closing, will be fairly significant in terms of what

4    has to come together to actually emerge.  And the -- 'cause

5    that's when a number of the agreements with the six unions go

6    live and there's documentation associated with that, General

7    Motors, plus all the normal plan documentation and the

8    financing matter.  So it's just going to be a fairly complex

9    closing.

10             So we're trying to sort of keep on the schedule.  One

11   of the things we looked at in Your Honor's chambers -- have

12   given some different dates to look at in terms of things that

13   might be available on the Court calendar.  It seems to us that

14   if we try and shoot for the 17th and 18th -- it's a Thursday

15   and Friday and it's contiguous -- we're able to do that.  The

16   next sort of dates were the 18th and the 22nd.  The problem

17   from my perspective on that is I'm just trying to sort of be

18   mindful of the fact that we all have lives, too.  That would be

19   bookends on the three day holiday weekend.

20             THE COURT:  Right.

21             MR. BUTLER:  And to have a contested confirmation

22   hearing on both ends of that weekend just strikes me as -- and

23   planning for it that way.

24             THE COURT:  I'm looking at colleges that weekend.

25   So --

152

1           MR. BUTLER:  Yeah.

2           THE COURT:  Not for me but --

3           MR. BUTLER:  Yes.  Yeah, just planning it that way

4    just seemed to us --

5           THE COURT:  All right.

6           MR. BUTLER:  So we're trying to shoot for the 17th

7    and the 18th.  And in order to do that, this -- we have, I

8    think, talked with the -- over the course of the afternoon.  We

9    would need to be able to get all of the proofs of this to the

10   printers in final form by very early Tuesday morning.  So we'd

11   have to be done by late Monday which means, essentially, we

12   need to get Your Honor's order rendered by Monday to do that.

13   And then we -- I think the timetable then works although

14   everyone believes it's tight.  So I think this is the timetable

15   we have up here which is an exhibit to the hearing -- we have

16   up on the slide is what I think we're proposing.  I'm not sure

17   at this point that anybody has any objections to it but I'll

18   ask in terms of the timeline itself.

19           So I don't know if the Court has any of its own

20   concerns in terms of just the timing of matters.  This would

21   provide for a twenty-seven day solicitation period assuming

22   that it's mailed on the last day to mail and it goes through

23   the normal deadline.  That would be what is provided here.

24           THE COURT:  That's the period to the actual vote

25   date?

153

1        MR. BUTLER:  Yes.  That's the actual solicitation.

2   If we mailed it on the last day permitted to mail, there would

3   be twenty-seven days from that day to the day the final votes

4   were due.

5        MR. BRILLIANT:  Your Honor, the only issue we raise

6   with respect to the voting record date, which, I guess, now got

7   as November 26th, would typically be the date of entry of the

8   disclosure statement.

9        THE COURT:  Well, those were one of the questions I

10  had.  Why did you pick that date?  Does that tie in to what

11  your voting agents have told you?

12       MR. BUTLER:  Part of the problem has been to assemble

13  all of the information for voting.  At one point -- I think we

14  could have at one point updated it.  At this point, all of the

15  data is in the process of being pulled in order to be able to

16  solicit.  And that's been part of the problem.

17       THE COURT:  As of that date?

18       MR. BUTLER:  Yes, as of that date.  I mean, it's --

19  quite honestly, I'd love to say that there was magic to that

20  date.  We could have actually updated -- when the hearing moved

21  another few days, we actually could have moved it another few

22  days had we thought to do it.  I'll concede, Your Honor, that

23  we didn't do it at that point.  And now the solicitation dates

24  are pulling all the data in order to be able to commence the

25  execution of the solicitation.

154

1          THE COURT:  Well, it's reasonably close.

2          MR. BRILLIANT:  Okay.  I assume the main issue you

3    have is with respect to the equity not the debts?

4          MR. BUTLER:  Well, actually, no.  There's a variety

5    of issues in trying to get through -- certainly the equity is a

6    significant thing but not every bondholder is known to you or

7    known to the --

8          MR. BRILLIANT:  But those are the -- well, those are

9    the beneficial holders and they -- I mean --

10         MR. BUTLER:  Well, that's --

11         MR. BRILLIANT:  It's all going to be held in street

12   names.  So --

13         THE COURT:  Well, at least from my experience in

14   another case recently, the Allegiance case, these are things

15   that can be done overnight.  I'm comfortable with that date as

16   a record date.

17         MR. BUTLER:  Thank you.  Any other -- anyone have any

18   other issues on timeline unless the Court does?

19         THE COURT:  How do you propose to memorialize -- you

20   propose putting it in the order, just sharing the information

21   to objectors on voting?

22         MR. BUTLER:  I can certainly add that to the order.

23         THE COURT:  Okay.

24         MR. BUTLER:  We're happy to do it.

25         THE COURT:  All right.

1            MR. BUTLER:  That certainly was my understanding.

2       Mr. Brilliant, I'm happy to put it in the order.

3            THE COURT:  Okay.

4            MR. BUTLER:  Okay.  So we'll modify the order and

5       indicate that anyone who files an objection after -- as of the

6       objection filing date can give us notice and we'll provide

7       periodic outputs.

8            So I think, Your Honor, unless you have -- the rest

9       is whatever the Court's questions are.

10           THE COURT:  Yeah.  Well, I had two points on the

11      procedures.  Yeah.  First, I thought that subject obviously to

12      people's ability to seek a shorter period under the local rules

13      that people, in response to a claim objection, should have ten

14      days following the objection rather than seven to make their

15      3018 motion.  And I don't -- just thinking about the timing, I

16      don't think that that screws it up.  I don't think you're

17      expecting any -- okay.  And this is implicit but I put it in

18      the order -- I always do this.  The idea about debtors given

19      extension of the voting deadline, I put in subject to

20      necessary -- any necessary Court approval on that.  It's not

21      just a --

22           MR. BUTLER:  It's not our deadline.

23           THE COURT:  It's not an automatic.  And then the last

24      point I had was a question.  I don't think these provisions or

25      this provision was in the original motion or in the order.

1   Right at the end of the order, there's this paragraph Trading

2   in Delphi's Securities to the extent Delphi opens a trading

3   window for insiders to trade and Delphi's securities members of

4   the creditors' committee and equity committee will have the

5   same opportunity.  What --

6               MR. BUTLER:  I'm sorry.  This is paragraph -- I'm

7   sorry?

8               THE COURT:  Paragraph 45.  It's right next to the

9   last paragraph in the order.  And I just don't -- I don't know

10  where that's coming from and what's going on there with that

11  provision.

12              MR. BUTLER:  Oh.  Your Honor, the -- I will tell you.

13  I can explain what that provision is.  The window for trading

14  in these cases for the members of the fiduciary -- of the

15  equity committee and the creditors' committee and the window

16  for trading by insiders of the debtors has been closed, I

17  think, since October 2005.  Once the disclosure statement is

18  out and is approved by Your Honor as out, the question will be

19  whether there will be the opportunity for a window to be open.

20  This was a much more relevant discussion about two months ago

21  when we thought that there would be a timing between the third

22  quarter queue and the disclosure statement being at the same

23  time.

24              THE COURT:  When everything's public?

25              MR. BUTLER:  Everything's pub -- there's a window in

157

1    which everything's public.  And we had been contacted by

2    counsel for the committee saying that if in fact there was a

3    window open by the debtors -- and that's done by our general

4    counsel based on the reviewing of the securities laws.  If a

5    window is open, it's properly opened up.  The two statutory

6    committees want to make sure that it was opened up for their

7    members so that no one could claim that they were acting

8    improperly for the same period of time.  I think in reality,

9    Your Honor, given the way the timing is going, I suspect it's

10   going to be more difficult to open that window.  But that's the

11   reason it's in the order is at the request of the committees

12   and it was for that purpose.

13           THE COURT:  But also, I mean, the committees, they

14   have -- you know, they have different issues about different

15   constraints on trading.  The U.S. trustee has her view on the

16   duties of committees to trade and not trade.

17           MR. BUTLER:  Well, the question was only if in fact

18   there is a legitimate window open that is applicable to

19   insiders of the debtor based on the securities laws because

20   from a bankruptcy perspective, everything material -- assuming

21   Your Honor is (indiscernible), everything material that we have

22   for these matters is going to be out, you know, in terms of the

23   -- you know, for a moment.

24           THE COURT:  No.  My point's a little bit different,

25   which is separate and apart from the securities laws.  And I

158

1    know that -- I believe there are trading orders in place for

2    the committees.  Are there?

3              MR. BRILLIANT:  No.

4              THE COURT:  No, there are not.

5              MR. BUTLER:  No.

6              THE COURT:  So, I mean, separate and apart from the

7    securities laws, there are issues about committee members

8    trading.  And I guess I don't want this to be an implica -- if

9    you want to change this to say to the extent Delphi determines

10   to open a trading window for insiders to trade in Delphi's

11   securities, it will inform counsel for the committees of its

12   intention to do so, that's okay because then they can take

13   whatever appropriate steps they want to take with the U.S.

14   trustee or with the Court.

15             MR. MELWANI:  Yeah, I think, Your Honor -- Vivek

16   Melwani from the equity committee -- on behalf of the equity

17   committee.  For our guise, it was more an issue of getting the

18   protection of the company making the decision that in addition

19   to the disclosure statement order and the disclosure statement,

20   that there was no material information outside.

21             THE COURT:  Well --

22             MR. MELWANI:  I don't think it was their expectation

23   that people would stay on the committee.  And just to give a

24   specific example, there's at least two members of our committee

25   whose share count will result in them only being entitled to

159

1    fractional shares.  So if they want to realize --

2           THE COURT:  All right.  The way it's drafted, though,

3    it seems like -- you know, they shall have the opportunity to

4    trade suggests that they could stay on the committee and do

5    that.  Maybe the thing to do is to simply provide that you'll

6    give the committee members advance notice of your determination

7    to do so and your conclusion that it would be as a securities

8    law matter appropriate to do so, if you're willing to go that

9    far or whether you just want to give them advance notice.

10          MR. MELWANI:  I think I'd probably just give them

11   notice, Your Honor.

12          THE COURT:  All right.  Then just give them advance

13   notice.  And then you all can do whatever you think is

14   appropriate as far as seeking permission or your clients can

15   get off the committee, I suppose.

16          MR. MELWANI:  Okay.  Thank you, Your Honor.

17          MR. BUTLER:  Thank you, Judge.  Your Honor, if may

18   also, overnight we did make a -- and it was one of the last

19   exhibits for the day.  We did make -- add the reservation of

20   rights language.  If Your Honor wants to see that.

21          THE COURT:  I think I did -- I saw the blackline.

22          MR. BUTLER:  Okay.  That's all in --

23          THE COURT:  Okay.  All right.  The debtors have

24   sought and would have granted in one order, one proposed form

25   of order, an approval of their disclosure statement dated most

160

1   currently December 6th, 2007 as well as procedures for

2   solicitation of votes on the plan obviously scheduling the

3   hearing on confirmation of the plan and various deadlines in

4   connection therewith including the ballot deadline and the

5   objection deadline as well as for notices that trigger

6   procedures for resolving cure claim disputes in connection with

7   contracts to be assumed and assigned at or around confirmation

8   of the plan and procedures for reconciling and resolving

9   disputes relating to post-petition interests.

10          I have reviewed the objections to the disclosure

11  statement that were filed many of which have been withdrawn.

12  I've also reviewed the disclosure statement and plan myself in

13  light of the standard set forth in Section 1125 of the Code.

14  And at the hearing today I've given my comments on the

15  disclosure statement in the areas that I believe it must be

16  changed to provide adequate information to voters.  A number of

17  those comments reflect comments and objections made by various

18  parties in the case.  However, in other respects, having

19  considered those objections and in particular objections by the

20  continuing remaining objectants that I haven't yet ruled on,

21  Wilmington Trust, and the ad hoc group of bondholders, I have

22  overruled those objections for the reasons stated during the

23  course of the hearing.

24          First, generally speaking, that I believed they were,

25  to the extent I have not adopted them, overkill and/or unduly

161

1   putting in the debtors' document the objectors' litigation

2   positions or, in addition, that to the extent the objections

3   were arguing that the disclosure statement couldn't go out

4   because various features of the underlying plan rendered that

5   plan facially unconfirmable or likely not to be confirmed

6   unless it was argued the expense of seeking confirmation would

7   not be warranted.  I've overruled those objections based on my

8   conclusion that the plan is not facially unconfirmable or, in

9   the alternative, that the plan may be subject to modification

10  under 1127 of the Code in a relatively easy way given the

11  manner in which the debtors will be tabulating votes that the

12  plan should be indeed voted on and creditors should have the

13  choice and shareholders should have the choice whether to

14  assume or reject the plan in light of their analysis of the

15  effect of accepting the plan or, in the alternative, rejecting

16  the plan would have on their recovery.

17          Those changes that I've required are either

18  handwritten in a draft I've given the debtors after the

19  disclosure statement hearing or have, I believe, clearly been

20  set out on the record.  And I understand that the debtors will

21  be implementing those changes in a couple of places in

22  consultation with counsel for the MDL group and the creditors'

23  committee.  When they submit those changes and in blackline as

24  against the December 6th draft to chambers, they won't be

25  filing those changes with the Court but they will be copying

1   the objectors, the official committees, MDL counsel, GM's

2   counsel, plan investors' counsel, that is, Appaloosa's counsel,

3   unions' counsel and I guess will have the usual list of people

4   who have been copied in on the modifications as they've been

5   turned out over the last few weeks so that those parties can

6   review them to see if they're consistent with what was set out

7   on the record.  I'll review them also in all likelihood Monday

8   afternoon and we'll contact him, through my chambers, the

9   debtors' counsel about whether there needs to be any further

10   changes in light of any discrepancy between what I understood

11   and what was in the document.  And once I'm satisfied that the

12   changes have been made appropriately, then that document would

13   be filed.  That document, if it's consistent, as I said, with

14   the changes I've laid out, I believe contains adequate

15   information for purposes of 1125 of the Code and will therefore

16   properly be sent out pursuant to the solicitation procedures.

17        I've reviewed those procedures with a few minor

18   comments that I've described on the record which I've put into

19   the order.  Those procedures are fine and will be -- that order

20   will be entered when the disclosure statement is ready to be

21   approved.

22        Let me say that although the equity committee's

23   motion for an adjournment of the disclosure statement hearing

24   was withdrawn, I did consider when reviewing the disclosure

25   statement, that is, the December 6th one, whether there was a

163

1    good basis for suggesting that there should be further notice

2    of that document.  It's the normal practice in Chapter 11

3    cases, and particularly in large ones, for there to be a number

4    of changes to the disclosure statement after the notice period

5    required by the bankruptcy rules.  And the final document that

6    is approved often has considerable amount of blacklined changes

7    in it the theory being that Chapter 11 is, at least at this

8    stage, a process where there are frequent negotiations.  And

9    also, of course, that the process itself of approving a

10   disclosure statement requires sometimes additions to the

11   document based on what the parties in interest have to say

12   about it.  Because of that, I would normally only require

13   significant additional notice of a revision to a disclosure

14   statement if it significantly altered the underlying business

15   related information in the document since that is not a matter

16   that people are negotiating and can keep on track and on top

17   of.

18        I reviewed this document and the changes of that

19   nature are minimal and, I believe, clear.  No one has

20   questioned them.  And as a result I think that the notice here

21   of the amendments to the disclosure statement was adequate.

22        So, as I said, I will be reviewing the changes on

23   Monday and hope to be able to enter the order on Monday

24   afternoon.

25        MR. BUTLER:  Thank you very much, Your Honor.

164

1          THE COURT:  Okay.  Thank you.  This is a housekeeping

2    matter.  I don't know if you still have exhibits in the other

3    courtroom, 601, but I'd ask, particularly since it's a Friday,

4    if you could move those out, find out if anyone's fallen asleep

5    in there and wake them up and generally clean out Judge Peck's

6    courtroom.  Thank you.

7          (Whereupon these proceedings were concluded at 4:28

8    p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

165

1

2                            **I N D E X**

3

4                         **E X H I B I T S**

5    DEBTORS'           DESCRIPTION                    ID.      EVID.

6    Exhibits 1-81    Various documents related to           51, 8

7                     hearing

8

9                         **R U L I N G S**

10   DESCRIPTION                                  PAGE      LINE

11   Debtors' entry into amended EPCA agreement    39       14

12   approved

13

14   Debtors' request for a waiver of the 10-day    40       7

15   stay under Section 6004 of the Bankruptcy Code

16   approved

17

18   Cheryl Carter's objection to disclosure       44       23

19   statement overruled

20

21   Debtors' request for approval of the modified  54       23

22   disclosure statement as well as approval of the

23   solicitation procedures approved

24

25

166

# C E R T I F I C A T I O N

I Lisa Bar-Leib, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

                                        December 11, 2007

Signature of Transcriber              Date


Lisa Bar-Leib

typed or printed name