Hearing Date: January 17, 2008 at 10:00 a.m.
Objection Deadline: January 11, 2008 at 4:00 p.m.

Robyn J. Spalter, Esq.
General Counsel
Riverside Claims LLC
PO Box 626
Planetarium Station
New York, NY 10024-0540
Phone: (212) 501-0990
Fax: (212) 501-7088
e-mail: rspalter@regencap.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                    )
      In re                         ) Chapter 11
                                    )
DELPHI CORPORATION, et al.          )
                                    ) Case No. 05-44481 (RDD)
                                    )
             Debtors.               ) (Jointly Administered)

_____

**RIVERSIDE CLAIMS, LLC'S  OBJECTION TO CONFIRMATION
OF DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION**

NOW INTO COURT, through undersigned counsel, comes RIVERSIDE CLAIMS, LLC, a creditor, ("Riverside") and files this objection to confirmation of the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors, and Debtors-In-Possession (as amended, the "Plan") [Docket No. 11386], and respectfully states as follows:

**INTRODUCTION**

1.    Riverside is an unsecured creditor by virtue of its status as an assignee of the claims of approximately 30 of Delphi's trade creditors.

1

2.      Riverside objects to confirmation of the Plan based on several reasons.  First, the Plan violates §1129(a)(1) and §1122 by classifying the claims of Delphi Automotive Systems, LLC's ("DAS") creditors together with the holders of the Senior Notes (the "Noteholders"), whose debt is owed by Delphi Corporation, the parent ("Delphi Corp").  Second, the Plan violates §1129(b) in that the DAS creditors are not being paid in full, yet claims and interests junior to them are receiving payment.  Third, the Plan provides for deemed substantive consolidation which is detrimental to the creditors of DAS and does not meet the requirement for what is an extraordinary remedy.  Finally, Riverside asserts that the best interest test of §1129(a)(7) is not met at least with respect to the creditors of DAS.

## ARGUMENT

### I. The Plan Violates §1129(a)(1) and §1122 in that Claims Against Different Debtors are Classified Together

Section 1129(a)(1) requires that the Plan comply with all other sections of the Bankruptcy Code.  This Plan does not.  This Plan violates §1122.  Section 1122 states that a "plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  The Debtors' Plan places creditors of different Debtors in the same class, thus violating the mandate of §1122 that all the claims of a class have substantially similar rights to the debtor's assets.  *Drexel Burnham Lambert*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *see also, Northeast Dairy Cooperative*, 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987) (when analyzing a plan's classification scheme, emphasis is not upon the holder so much as it is on that which is held). By their very nature, creditors of different debtors have the right to look to different and distinct assets for the satisfaction of their

2

claims[1]. However, under the Debtors' Plan, this right is usurped by the improper classification of claims of different Debtors in one class.

In this case, the creditors of DAS have a right to look to and expect payment of their claims from the assets of DAS. Whereas the Noteholders by the terms of their own documents only have claims against Delphi Corp and thus look to Delphi Corp's assets for payment. But given the classification scheme employed by the Plan, the Noteholders are looking to DAS' assets, as well as Delphi Corp's for payment of their claim. This is what is intended to be avoided by proper classification. The improper classification results in the Plan not complying with all sections of the Bankruptcy Code as required by §1129(a)(1), thus it cannot be confirmed.

## II.   The Plan Does Not Pay DAS Unsecured Creditors in Full.

Even assuming that this Court determines that substantive consolidation is appropriate, the Plan still is flawed in that it does not comply with §1129(b). It does not provide for fair and equitable treatment; it violates the absolute priority rule.

The Plan alleges repeatedly that the General Unsecured Creditors are being paid in full plus interest. Apparently, the Debtors believe that if they say that these creditors are receiving "par plus accrual" and that was the concept behind the settlements which dictated the Plan, that it makes it so. Saying it and doing it are two completely different things. At best what the Debtor might be able to say is true, is that the Plan pays par at "Plan Value." What the Debtor seems to ignore is that the "Plan Value" is not a value that can be just backed into to serve a purpose. It is obvious that this is what has been done here as (i) the Plan Value is substantially above the

---

[1] This difference in the assets to which creditors may look for payment of their claims, also raises questions about the deemed substantive consolidation on which the Plan is premised.

3

midpoint of value that Debtors' own expert derived and (ii) the Plan Value has changed by hundreds of millions of dollars between the originally filed Plan and this third iteration which is now set for confirmation.

Even if the Court were to find that the paying unsecured creditors at Plan Value was the indubitable equivalent of being paid in full, the Plan still does not provide fair and equitable treatment. The fact that junior creditors and equity are receiving anything on account of their claims and interests before the senior unsecured creditors are paid in full with interest means that the Plan violates the absolute priority rule. In addition to contending that creditors are getting payment in full for their claims, Debtor also contends that it is paying interest. In order to pay claims in full, they are entitled to interest through the time payment is made to the creditors, yet that is not what the Plan provides. The Plan has a random cutoff date of January 31, 2008[2].

Based on the Debtor's expert, Rothschild, the midpoint valuation is lower than the Plan Value used in the Plan. Although the Debtor contends that the creditors are being paid 100%,

---

[2] Debtors' Plan calls for Postpetition interest to be paid either based on a contractual rate between the parties or if none, then at the Michigan Statutory Rate pursuant to Michigan Compiled Laws § 600.613 [sic] (actually the statute is §600.6013). Riverside, however, contends that Michigan is not the correct jurisdiction to use. Nor, do the Debtors explain their reason for determining that this is the appropriate jurisdiction. It is likely the one they chose to use because it was the lowest. Michigan is but one of many locations of the Debtors. However, there is only one location where the Debtors filed their bankruptcy petition—New York. The Debtors even say when discussing the postpetition interest that it would use the petition filing like the filing of a suit. Debtors chose to file their "suit" in New York. Therefore, Riverside contends that New York's judicial interest rate is what should be applicable. Pursuant to Article 50 *et seq.* and §5004 specifically, the rate of interest is 9%.

Even if Michigan's statutory rate is the appropriate jurisdiction's to use, the rate the Debtors asserts is what would be paid per the Michigan statute is inaccurate. Debtors assert that the proper interest rate is calculated as if the Petition Date were the date when the complaint had been filed under Michigan Law. Debtors assert that this amount is 4.845%. Yet, this is not what the Michigan statute provides. The statute actually says that for complaints filed after January 1, 1987, interest is calculated at 6-month intervals on January 1st and July 1st. The interest rate equals the rate paid on 5-year United States treasury notes plus 1%. The Michigan Courts maintain an interest rate chart showing the adjusted rate every six months.

The interest rate that the Debtors propose to use is only the rate for October 2005 through December 31, 2005. The rate since then has always been higher. Recognizing that calculating the interest based on 6 month intervals is difficult and certainly time consuming, it is reasonable that the weighted average be used. The weighted average from October 10, 2005 through January 31, 2008 (which Riverside does not agree is the proper end date, but it is what Debtors' Plan presently proposes) is 5.523%. If the Michigan Rate is determined to be the correct jurisdiction's rate to use, then this is the rate which should be used.

4

they are actually only getting, at best, an 89.2% recovery. The Plan uses a negotiated Plan Value of $13.3 billion, which is $600 million higher than Rothschild's $12.7 billion midpoint valuation, which valuation is in itself called into question.

It is also not a huge leap to assume that if the per share price based on the Plan Value is actually what the stock is expected to trade at, the Plan Investors would not have demanded that they be able to purchase their interest in the Debtors at nearly 40% off of Plan Value. In order for the treatment afforded unsecured creditors to be fair and equitable, if junior creditors or interest holders are receiving anything, the unsecured creditors must "receive or retain on account of such claim, property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. §1129(b). For this analysis it is instructive to note that the new money being invested by the Plan Investors is at a valuation significantly below Rothschild's midpoint valuation.

The Plan proposes to pay General Unsecured Creditors by two means. First, by distribution of shares of stock equal to 75.5% of all claims. Second, by allowing such creditors to participate in the Discount Rights Offering for the other 24.5% of the claims.

With respect to the first portion, in order for the stock distribution to be sufficient to pay 75.5% of the amount of unsecured creditors' claims, the Debtor must establish that as of the effective date, the stock will be worth 75.5% of such creditors' claims. As for the second portion, the Discount Rights Offering requires creditors to either sell their rights or exercise their rights by requiring them to invest significant new capital in the Debtors. Thus, to meet the requirement of §1129(b), the Debtor must establish that on the effective date, the rights will be equal to the remaining 24.5% of the claims, or that the stock which creditors can purchase as part of the Discount Rights Offerings is worth the 24.5% after deducting the amount the creditors have to advance to acquire the stock.

5

There is absolutely no evidence that the Debtor intends to or can prove these facts to be true. In fact, throughout the Disclosure Statement the Debtor repeats that the Plan Value very well may not be equal to the price of the Debtors' stock. Although the Debtors today cannot know the value of the stock as of the Effective Date, it can be determined by employing a look back period post confirmation and adjusting stock distributions based on the actual value of the stock. This look back concept has been employed in several mega bankruptcy cases. To do otherwise puts the risk of creditors not actually being paid in full to great. Unless the Plan provides creditors with property of a value as of the Effective Date in full payment of the claims, the Plan is not confirmable.

### III. The Plan calls for a Deemed Substantive Consolidation Which is Inappropriate in this Case.

Substantive consolidation is a drastic remedy that should only be used "sparingly." *Union Savings Bank v. Augie/Restivo Baking Co. Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1062 (2d Cir. 1970) and *Chemical Bank. N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *see also In re Owens Corning*, 419 F.3d 195, 208-09 (3d Cir. 2005) (noting a "nearly unanimous consensus that [substantive consolidation] is a remedy to be used 'sparingly'"). As such, a high threshold must be met for substantive consolidation to be allowed. In *Owens Corning*, the Third Circuit emphasized that

> …because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

*Owens Corning*, 419 F.3d at 211.

The Second Circuit stated that "… substantive consolidation 'is no mere instrument of procedural convenience…but a measure vitally affecting substantive rights'… to be used

6

'sparingly'." *Augie/Restivo,* 860 F.2d at 518. In order to obtain substantive consolidation, the Debtors must provide the Court with sufficient evidence as to

>   (i)     whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, … or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

*Id.* at 518.

The Debtors have provided no facts that support either of the two bases which both the Second and Third Circuits have stated are the only two bases upon which substantive consolidation can be approved. The *Owens Corning* court also stated that the Debtors must show that no stakeholders' rights would be impaired by substantive consolidation. 419 F.3d at 214. The Debtor has not established that stakeholders in each of the individual cases will be no worse under the "deemed" substantive consolidation schemes than they would be if their respective Debtor's case stands on it own.

Debtors' Disclosure Statement admits that the parent, Delphi Corp's assets consists solely of the ownership of the various subsidiaries and affiliates. The Disclosure Statement further sets forth that all of the IT/technology assets are owned by DAS. DAS also owns 13% of the entity which owns all of the foreign subsidiaries. The Noteholders are not creditors of DAS. As such, it is quite possible that if the assets of DAS, including its direct ownership of most of the US operating subsidiaries, are valued, the creditors of DAS may recover more than they will under the "deemed" substantive scenario upon which the Debtors' entire Plan is premised.

The proposed substantive consolidation unfairly and improperly favors the creditors of Delphi Corp, the parent, over the creditors of DAS. In a liquidation, the creditors of the Delphi Corp would likely receive nothing as Delphi Corp has very little assets. Thus it is clear that the DAS creditors rights will be impaired by the proposed substantive consolidation. As such the plan is not confirmable.

7

**IV.    The Plan does not Satisfy the Best Interest Test**

The best interest test of §1129(a)(7) requires that creditors

> receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

11 U.S.C. §1129(a)(7).

DAS has its own creditors. Its only shareholder is Delphi Corp. The Noteholders are not creditors of DAS. Delphi Corp. may have some of its own trade creditors, but it also has all of the Noteholders as unsecured creditors. Finally, Delphi Corp. has multitudes of public shareholders, some of which include the Plan Investors.

DAS' assets consist of direct or indirect ownership of technology and intellectual property which is used by all of the Delphi entities in their operations. DAS owns all the stock in the US operating subsidiaries. Finally, DAS owns a thirteen percent (13%) interest in DASHI which in turn owns all or substantially all of the non-US subsidiaries.

If there were no substantive consolidation and the cases were being liquidated, the assets of each debtor would be liquidated. The proceeds from such liquidations would then be used to pay that respective debtor's creditors. If the debtor's assets paid its creditors in full, then remaining amounts would be distributed to the shareholders of that debtor.

DAS would liquidate its assets, which would include any distribution it may have received on account of its ownership of other subsidiaries. These assets would then be used to pay DAS' unsecured creditors. If the assets are not sufficient to pay DAS' creditors in full then there is no further distribution from the DAS estate to any other entity or creditors. If, however, the assets are sufficient to pay DAS' creditors in full, then so long as DAS' creditors are paid in full plus interest, remaining assets would flow upward to Delphi Corp as the shareholder of

8

DAS. These distributions and Delphi's other assets would be liquidated. The liquidated assets would then be distributed to Delphi Corp's creditors, which would include the Noteholders. And, if all of the Delphi Corp creditors are paid in full with interest, then remaining assets would be distributed to the Delphi Corp. shareholders.

Therefore, in a liquidation scenario all of the value of the DAS assets must inure to the sole benefit of the DAS creditors (which does not include the Noteholders). It is impossible for creditors to know for sure whether or not DAS Assets are sufficient to pay its creditors in full, as the Debtors have not provided a liquidation analysis for DAS, individually. Similarly, there is no liquidation analysis for Delphi Corp either. Instead what the Debtor has provided are (i) a liquidation analysis with all the entities consolidated and (ii) multiple liquidation analyses which consolidate entities into the same groupings as called for in the Plan. There is no basis, nor need, for liquidation analyses along these lines. Since the best interest test has to be met by showing what a creditor would get in a Chapter 7 and there is no substantive consolidation in Chapter 7, what has been provided is useless information. What is needed and what may, in fact, establish that the best interest test has not been met is individual entity liquidation analyses.

Assuming that an argument is made that the consolidation on the analyses is correct, there are still major issues with the analyses as they exist. Looking at the Delphi-DAS Group the liquidation analyses has some problems. First, it does not appear that the assets include all of the technology assets of DAS. Second, and more problematic is the allocation of the DIP loan. At the very least the liquidation analyses should have allocated the DIP loan amongst the group in a way that results in the liability being allocated based on the assets of the various Debtors. But, in reality under a liquidation scenario, it is postulated by the Debtors that the foreign subsidiaries will be sold prior to the completion of the wind down process for the US operations. As such, when the proceeds from the sales are realized, these proceeds will be used to fully or partially

9

pay down the balance of the DIP loan. Thus, there will be little or no DIP loan to be paid from the liquidated assets of DAS.

Without proving that the Plan pays all creditors at least as much as they would receive in a liquidating Chapter 7, the Plan cannot be confirmed because it violates §1129(a)(7).

## WAIVER OF MEMORANDUM OF LAW

Because this Objection presents no novel issues of law and the authorities relied upon are set forth herein, Riverside respectfully requests that the Court waive the requirement of filing a separate memorandum of law in support of this Objection pursuant to L.B.R. 9013-1(b).

## BALLOT TABULATION

Riverside hereby requests that the Debtors provide, or cause to be provided, all balloting reports disclosing the interim and final tabulation of votes, as required by paragraph 38 of the Solicitation Procedures Order [Docket No. 11389].

## RESERVATION OF RIGHTS

Riverside expressly reserves the right to supplement or amend this objection, including, without limitation, upon the conclusion of discovery and prior to the Confirmation Hearing.

## CONCLUSION

For all of the foregoing reasons, the Confirmation of the Plan should not be granted.

RESPECTFULLY SUBMITTED,

  /s/   Robyn J. Spalter         
Robyn J. Spalter, Esq.
General Counsel
Riverside Claims LLC
PO Box 626
Planetarium Station
New York, NY 10024-0540
Phone: (212) 501-0990
Fax: (212) 501-7088
e-mail: rspalter@regencap.com