# EXHIBIT A – PART 2



Quadrasteer Long Term Agreement

Appendix A - Product and Product Specific Specifications

1. **2006 GMT-900**

   | Part Number | Description | Date | Revision |
   |---|---|---|---|
   | P/N SX077051 | QS Controller, Module | 06AU02 | 000 |
   | P/N PE086357 | Connector BM 150, 800 | 13SE00 | 003 |
   | P/N 26100182 | Spec, Control Module | 15JL02 | 01A |
   | P/N 26105315 | Spec, EMI / EMC | 21JL02 | 01A |
   | P/N SX074326 | Spec, Quadrasteer Software Requirements | 30JA02 | 01A |
   | P/N 26077687 | Spec, Control Module Software | 11OC00 | 01A |
   | P/N 26082248 | Spec, Controller Diagnostics | 10OC00 | 01A |
   | N/a | Closed Loop Pin-outs | 13AU02 | 000 |

   - **Assumptions: (Pricing in Appendix C is based on the following)**

     1. A $2 material cost was assumed for each connector. The controller price will be adjusted accordingly when pricing of intended connectors is made available.
     2. Short circuit resistors for motor protection are not included. Implementation would require an estimated unit price increase of $1.56.
     3. CAN chokes are not included. Should these components be required after vehicle EMC testing, the controller unit price will increase by $1.74.
     4. Flight Recorder is not included. Implementation would require an estimated unit price increase of $0.75.



Quadrasteer Long Term Agreement

Appendix B

Program Specific Key Dates:

1. 2006 GMT-900 Quadrasteer

   - Motorola First Sample Delivery          12/15/02
   - Delphi Final Software Specification     03/16/04
   - Delphi Calibration Freeze date          06/16/04
   - Final SW Sample Delivery                06/29/04
   - PV                                      11/02/04
   - PPAP  (Closed Loop)                     03/22/05
   - Run at Rate                             10/01/05
   - Supplier start of Production            01/01/06
   - Customer Start of Production            04/03/06
   - Alternate* Run at Rate                  04/01/05
   - Alternate* Supplier Start of Production 07/01/05
   - Alternate* Customer Start of Production 09/01/05

* Alternate dates: The alternate dates are required to enable Delphi to seek additional opportunities. Delivery on alternative dates shall only be required when Motorola is awarded additional business with such expectations. Stated here, they are only to indicate the timing commitment required for Delphi to obtain such business. Motorola shall provide adequate resources to meet such dates.

# DELPHI STEERING - MOTOROLA
## ATTACHMENT A - LONG TERM AGREEMENT

### PRODUCTION PRICING

| Part Number | Description | Estimated Annual Volume | Tool Capacity (based on 240 hrs/day) | Logistics Term | Discount | Currency | Year 1 Basement Cost | 1/1/2006 % RED | PRICE | 1/1/2007 % RED | PRICE | 1/1/2008 % RED | PRICE | 1/1/2009 % RED | PRICE | 1/1/2010 % RED | PRICE | 1/1/2011 % RED | PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S10077051 | CS Controller, Module | 150,000 | 150,000 | FOB Elma, NY | Expendable | USD | 195.09 | | 190.51 | | 186.74 | | 183.00 | | 180.83 | | 180.83 | | 179.17 |

**Volume Based Pricing**
| | Price |
|---|---|
| Total Volume 250,000 | $0.00 |
| Total Volume 400,000 | 181.35 |
| Total Volume 1,000,000 | 171.58 |

**Additional Options**
| | Price Impact |
|---|---|
| Extended Coverage | $0.10 |

*Options, if selected, must be subtracted from the piece price.*

**Annual percent reductions:**
Effective 1/1/2007, annual reductions will be implemented in 4% by August 3rd(current) ...
Effective 1/1/2007, annual reductions will become ...

### PROTOTYPE AND SAMPLE PRICING

| Part Number | Description | Currency | Tooling Cost | Sample Definition | Price |
|---|---|---|---|---|---|
| S10077051 | CS Controller, Module | USD | 60.00 | Mule | $1,250.00 |
| | | | | Alpha | $250.00 |
| | | | | Beta | $175.00 |
| | | | | Prototype | Production Price |
| | | | | PPAP/CAP | Production Price |

2002 11 01 QSteer LTA Appendix Guide

## MOTOROLA INTEGRATED ELECTRONICS SYSTEMS SECTOR
## AUTOMOTIVE COMMUNICATIONS AND ELECTRONIC SYSTEMS GROUP

### CONDITIONS OF SALE

(1) CONDITIONS OF SALE.

a. The following are the conditions of sale for all Products sold by the Automotive Communication and Electronic Systems Group of the Integrated Electronics Systems Sector of Motorola, Inc. (hereinafter "Motorola"). Any Motorola quotation or order acknowledgment is an offer subject to and expressly conditioned upon these Conditions of Sale, except to the extent otherwise stated or agreed by Motorola in writing. Any provisions, conditions, or terms contained in Buyer's purchase order that are in addition to or not consistent with Motorola's offer and these Conditions of Sale, are null and void and not binding on Motorola.

b. Unless Buyer is an authorized distributor of Motorola, Buyer agrees to limit its distribution of the Products purchased under this Agreement to the incorporation of said Products into a value added product which Buyer shall market under Buyer's name for sale, lease or rent to third parties in the regular course of Buyer's business. Buyer is responsible for the selection of each Product(s), its ability to achieve the results intended with other products, software and/or peripherals of Buyer's design, assembly, manufacture or purchase, and for the system performance of Buyer's value added product. Buyer also acknowledges that any technical support for Buyer's value added product shall be entirely Buyer's responsibility.

(2) PRICES, FORECASTS, INVOICES AND PAYMENT.

a. The price for each Product shall be in the form of a volume price schedule, attached as Attachment A. Unit prices invoiced to Buyer shall be based on Buyer's good faith estimate of its anticipated purchase volume for that year of production. If Buyer purchases for the year a quantity corresponding to a unit price different than the unit price at which it was invoiced, Buyer's contract unit price shall be retroactively adjusted accordingly and Buyer or Motorola, as the case may be, shall pay to the other party the difference between the amount invoiced and the amount due for the number of units actually shipped. This retroactive adjustment shall apply if the purchase quantity is reduced for any reason, including expiration or termination of this Agreement prior to the end of the contract term.

b. During the term of this Agreement, Buyer shall provide to Motorola a rolling twelve (12) month usage forecast at the beginning of each month. This forecast will include the number of units to be shipped and the "in-house" dates required by Buyer. Buyer shall provide an update to this forecast every month.

The quantities forecasted for the first thirty (30) days are fixed, and should be covered by an outstanding purchase order. Buyer will be financially responsible to Motorola for the entire purchase price for the fixed quantity. The forecasted quantities for the next three months cannot vary by more than ten percent (10%), and unless approved by Motorola, negative variance will be considered a cancelled order according to the terms of Paragraph 4 c.

Buyer's failure to provide such information on a timely basis may be considered cause by Motorola for excusable delivery delay.

c. Prices quoted are for the Product only, and do not include any amount for freight, insurance, fees, custom duties or Federal, State or Local excise, sales, use, service, occupation, gross income, property or similar taxes, all of which are the responsibility of Buyer. Shipping and handling charges shall be paid by Motorola and invoiced separately to Buyer. Motorola shall have the right to include taxes which may be applicable to the prices set forth herein in the event that Buyer does not supply to Motorola, prior to sale, appropriate sales, use and Federal excise exemption certificates.

d. Motorola reserves the right to change quoted prices and warranty if the quoted business assumptions change.

e. Invoices shall be due and payable thirty (30) days from the date of the invoice, without regard to other deliveries.

f. Motorola's offer is subject to Motorola's current credit policies and practices. Motorola reserves the right, in its sole discretion, to approve, disapprove, or change Buyer's credit limit or to impose credit terms, including without limitation the requirement that Buyer make full or partial advance payment. In the event of a complete or partial failure to pay, Motorola may, at its option, revoke any credit extended to Buyer, suspend all subsequent shipments under open purchase orders until Buyer's account is current, or offset such amount against any payments due or that become due from Motorola or its affiliates to Buyer including without limitation payment due Buyer.

g. Buyer grants to Motorola a security interest and right of possession in the Products until Buyer makes full payment. Buyer will cooperate in whatever manner necessary to assist Motorola in perfecting and recording such security interest.

(3) DELIVERY.

a. All shipments are made Ex-works, Incoterms 2000, Motorola's manufacturing location, freight collect. Title and risk of loss or damage to Products shall pass to Buyer at the place of delivery.

b. Delivery dates are best estimates only. Motorola reserves the right to make deliveries in installments and the contract shall be severable as to such installments. Delivery delay or default of any installment shall not relieve Buyer of its obligation to accept and pay for remaining deliveries.

The obligations of Motorola and Buyer under this Agreement shall be temporarily suspended in the event of external delays beyond the obligated party's reasonable control, and any failure to perform by that party as a result of any such interference or interruption shall not be deemed default. Performance may be suspended for the period of any such delay. The party whose performance is suspended shall notify in writing the other party within fifteen (15) days of such suspension.

In the event Motorola is unable to wholly or partially perform because of any cause beyond its control, Motorola may terminate any order without any liability to Buyer.

(4) TERMINATION.

a. Either party may terminate this Agreement if the other party fails to cure a breach of this Agreement within thirty

Rev. 5/22

(30) days after written notification to the breaching party of such breach.

b. Either party may terminate this Agreement for convenience upon sixty (60) days prior written notice to the other party.

c. If Motorola terminates this Agreement for default, or if Buyer terminates this Agreement for convenience, Buyer will pay to Motorola a cancellation charge consisting of Motorola's incurred costs, committed costs and a reasonable contract profit. Buyer may cancel an individual order by giving Motorola notice of such cancellation, which notice must be received by Motorola at least sixty (60) or more days prior to the scheduled shipping date of such order, otherwise Buyer will be responsible for a cancellation charge.

d. Nothing contained in this Agreement shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or to create any right to continue this Agreement on the same terms and conditions contained in it.

e. The terms and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties shall so survive the completion of performances and termination or expiration of this Agreement, including the making of any and all payments due under this Agreement.

(5) WARRANTY.

a. Development Products: Prototypes and other development Products are sold "AS IS" and without any warranty, express or implied.

b. Production Products: Production Products sold hereunder are warranted by Motorola to be free from defects in material and workmanship under normal use and operation and to conform to Motorola's specifications applicable at the time of shipment or, if appropriate, to Buyer's specifications previously accepted by Motorola in writing. This warranty is extended for a period of one (1) year from date of shipment to Buyer. Motorola's sole and exclusive obligation is to repair or replace, at its option, any Product sold hereunder with any defect warranted against, provided that Motorola receives written notice of the defect during the period of warranty and the defective Product is returned to Motorola at a location designated by Motorola. If Motorola determines that the Product conforms to this warranty, the Product will be returned at Buyer's expense. Motorola disclaims any and all liability for equipment not furnished by Motorola, which is attached to, or used in conjunction with, the Product and Motorola disclaims all liability for operation of the system of which such Product is a part. Motorola extends this warranty to Buyer only, and it is the complete warranty for Products manufactured by Motorola. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, ALL WARRANTIES EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXCLUDED. IN NO EVENT SHALL MOTOROLA BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR BREACH OF WARRANTY. This warranty shall not be enlarged and no obligation or liability shall arise out of Motorola's rendering of technical advice and/or assistance.

(6) LIMITATION OF LIABILITY.

a. No action shall be brought for any breach of this Agreement more than one (1) year after the accrual of such cause of action.

b. Motorola's total liability arising out of or related to this Agreement whether for breach of contract, warranty, Motorola's negligence, strict liability in tort or otherwise, is limited to the price of the particular Product sold hereunder with respect to which losses or damages are claimed. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES whatsoever arising out of, caused by or related in any way to the breach of any of its obligations under this Agreement, even if the party has been advised of the possibility of such damages. The parties expressly agree that the above limitation on damages is an allocation of risk constituting in part the consideration for this Agreement.

(7) PATENT AND COPYRIGHT INDEMNITY. Motorola agrees to defend, at its expense, any suit against Buyer based upon a claim that any Product or software furnished by Motorola to Buyer hereunder directly infringes any United States patent or copyright, and to pay costs and damages finally awarded in any such suit, provided that Motorola is notified promptly in writing of the suit and, at Motorola's request and its expense, is given control of the suit and all requested reasonable assistance for the defense of same. If the use or sale of the Product or software furnished hereunder is enjoined as a result of such suit, Motorola, at its option and at no expense to Buyer, shall obtain for Buyer the right to use and sell them, or shall substitute an equivalent thereof acceptable to Buyer and extend this indemnity thereto, or shall accept their return from Buyer's inventory and reimburse Buyer the purchase price therefor, less a reasonable charge for any wear and tear. This indemnity does not extend to any suit based upon alleged infringement of any patent or copyright by the combination of any Product or software furnished by Motorola with other elements added thereto by Buyer or third parties, nor does it extend to any alleged infringement arising out of compliance with Buyer-furnished specifications, designs, or instructions or use of Buyer-furnished components.

Buyer agrees that it will, upon request of Motorola, defend at Buyer's expense any infringement suit against Motorola arising out of either compliance with Buyer-furnished specifications, designs, or instructions, or use of Buyer-furnished components, and Buyer agrees to pay costs and damages finally awarded in any such suit, provided that Buyer is notified promptly of the suit and, at Buyer's request, is given control of such suit and all requested reasonable assistance for the defense of the same.

IN NO EVENT SHALL BUYER OR MOTOROLA BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM INFRINGEMENT OF PATENTS OR COPYRIGHTS.

(8) LICENSES.

a. The sale of the Products or software furnished hereunder does not convey any license by implication, estoppel or otherwise under any proprietary or patent rights of Motorola covering combinations of these Products or software with other elements. Unless otherwise agreed to in writing, Motorola retains title and all rights to inventions relating to the Product(s) covered by this Agreement. Except as specifically provided herein, this Agreement conveys no license to Buyer under any intellectual property rights of Motorola.

b. The Products Buyer purchases from Motorola may contain software in the form of firmware programs built into their circuitry. Buyer's purchase of that Product includes a non-exclusive license to use and sub-license the software only as part of the Product and only under the following conditions: (a) Motorola (or its supplier) retains all title and ownership to the software; (b) Buyer will only transfer possession of the

Rev. 3/02

software in conjunction with a transfer of Product; and (c) Buyer shall not remove any copyright notice or proprietary legend from the software, or use the software with any hardware except with the Motorola hardware product for which it is designed.

c.    Buyer acknowledges Motorola's claim that Motorola software, if any, and Products furnished hereunder contain valuable trade secrets of Motorola and, therefore, agrees that it will not translate, reverse engineer, decompile or disassemble or make any other unauthorized use of such Motorola software and Products. Since unauthorized use of such Motorola software and Products will greatly diminish the value of such trade secrets and cause irreparable harm to Motorola, Buyer agrees that Motorola, in addition to any other remedies it may have, shall be entitled to equitable relief to protect such trade secrets, including without limitation temporary and permanent injunctive relief without the proving of damage by Motorola.

d.    Buyer is not permitted to use the trademark Motorola or any other trademark or trade name owned by Motorola, except that Buyer may indicate that the Products sold to Buyer per this Agreement are "manufactured by Motorola, Inc." Any other use of a Motorola owned trademark or the name Motorola is not permitted, except with Motorola's prior written approval.

e.    If Buyer is any unit or agency of the U.S. Government or is a contractor which will or may supply the software to a unit or agency of the U.S. Government, Buyer agrees that Motorola software represents "Commercial Computer Software", that the Government's use of the software shall be subject to "Restricted Rights" and that (if Buyer is such a contractor) before the software is transferred, it shall be marked with the required restricted rights legend(s) as provided in the relevant governmental regulations.

(9)    CONFIDENTIAL INFORMATION. To the extent that protection of information or materials to be transferred pursuant to this Agreement is covered by an existing confidentiality agreement, the existing agreement shall apply. Otherwise, the following terms shall apply. Motorola may furnish to Buyer information and materials (Materials) identified as confidential or proprietary. Buyer may not disclose such Materials except to its employees who may require use of the Materials in the performance of their duties, and Buyer may use such Materials only as authorized by Motorola. Buyer's obligations with respect to such Materials shall continue for five (5) years after receipt of the Materials.

(10)    IMPORTATION AND EXPORTATION. Buyer shall comply with all applicable export control laws and shall not, directly or indirectly export, reexport, resell, ship, or divert any Product, Material, service, technical data, or software furnished hereunder to any person, entity, project, use, or country in violation of the laws or licensing requirements of the United States or any other appropriate national authority.

Buyer shall indemnify and hold Motorola harmless for any and all claims, demands, cost, fines, penalties, fees, expenses, or losses arising from Buyer's failure, intentional or unintentional, to comply with the foregoing paragraph.

(11)    COMPLIANCE. In the event that Buyer elects to sell Motorola's Products or services to the U.S. Government or any state, local or non-U.S. Government entity, or to a prime contractor or other subcontractor selling to such entities, Buyer does so solely at its own option and risk. Except as indicated in the paragraph below, Buyer remains exclusively responsible for compliance with all laws governing such sales and agrees not to obligate Motorola as a subcontractor or otherwise to such entities. Further, Motorola makes no representations, certifications or warranties whatsoever with respect to the ability of its goods, services, or prices to satisfy any such statutes or regulations.

Motorola agrees to comply with the following U.S. Governmental Federal Acquisition Regulations: FAR 52.203-6, FAR 52.203-9, FAR 52.203-10, FAR 252.203-7000, FAR 252.203-7001, FAR 52.222-21, FAR 52.222-22, FAR 52.222-24, FAR 52.222-26, FAR 52.222-28, FAR 52.222-36, FAR 52.222-37, FAR 52.222-38, FAR 52.223-2.

(12)    GENERAL.

a.    Buyer agrees that these Conditions of Sale are the exclusive statement of the terms and conditions of the agreement between the parties and that they supersede all proposals and other communications between the parties, oral or written, relating to the subject matter hereof.

b.    No modifications hereto shall be effective unless they are agreed upon in writing by both parties.

c.    The failure of either party to insist in any one or more instances upon the performance of any of the terms, covenants, or conditions in this Agreement or to exercise any right under this Agreement, shall not be construed as a waiver or relinquishment of the future performance of any such term, covenant, or condition or the future exercise of any such right.

d.    No right, interest or obligation in this Agreement may be assigned or delegated by either party without the written permission of the other party. This Agreement is binding upon and shall inure to the benefit of the parties and their respective successors.

e.    If any provision of this Agreement is contrary to, prohibited by or held invalid by any law, rule, order or regulation of any government or by the final determination of any State or Federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

f.    Section and paragraph headings used in this Agreement are for convenience only and are not to be deemed or construed to be part of this Agreement.

g.    This Agreement shall be governed and interpreted in accordance with the laws of the State of Illinois, without reference to principles of choice and conflicts of laws.

h.    The parties agree that any claim or dispute arising from this transaction will be submitted to non-binding mediation prior to initiation of any formal legal process.

Rev. 3/02