Hearing Date: January 17, 2008
Hearing Time: 10 am
Objection Deadline:  January 11, 2008 at 4 pm

Babette A. Ceccotti (BC 2690)
Peter D. DeChiara (PD 0719)
Robin H. Gise (RG 5592)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036-6976
(212) 563-4100

Attorneys for International Union, UAW

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| DELPHI CORPORATION, *et al.,* | ) | |
| | ) | Case No. 05-44481 (RDD) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OBJECTION OF UAW TO CONFIRMATION
## OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION

International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America ("UAW"), by its undersigned counsel, submits this objection to the

confirmation of Debtors' First Amended Joint Plan of Reorganization ("POR").  The sole basis

for the UAW's objection is the Management Compensation Plan ("MCP") that Delphi has

included in the POR.[1]  The MCP is set forth in Section 7.8 of, and Exhibit 7.8 to, the POR,

including the Supplement to Exhibit 7.8 filed December 28, 2007, and is further described in the

First Amended Disclosure Statement With Respect To First Amended Joint Plan Of

---

[1] Had Delphi filed a separate motion seeking approval of the MCP, the UAW would have
objected to the MCP separately.  However, Delphi included the MCP in the POR and insisted
that the UAW could only challenge the MCP through an objection to plan confirmation.

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession ("Disclosure Statement") [Docket No. 11388].

## PRELIMINARY STATEMENT

1.      Delphi's reorganization would not be possible without the enormous

sacrifices --in pay, benefits, jobs and job security -- made by its thousands of UAW-represented

employees and former employees.  As consideration for their deep concessions, Delphi pledged

in its settlement with the UAW that its executives would sacrifice in pay and benefits in a

manner equivalent to the sacrifice of the union workers.  The Court's order approving the

settlement required Delphi to abide by this pledge.

2.      The MCP, which would lavish cash and equity upon Delphi's

management, constitutes a profound breach of Delphi's commitment to equivalent sacrifice.

From the MCP's crown jewels -- an $8.3 million "performance payment" to executive chairman

Robert "Steve" Miller and a $5.3 million cash emergence payment to Delphi's Chief Executive

Officer -- to its details, including pension improvements such as a reduction from age 62 to 55

for vesting in the executives' supplemental retirement plan, the MCP is an unabashed attempt by

Delphi's managers to use the POR as an opportunity to enrich themselves.  On its most basic

level, the MCP is a massive transfer to senior management of wealth generated in large part by

the sacrifice of Delphi's rank-and-file workers.

3.      During the course of the Chapter 11 proceedings, Delphi's executives

have been more than adequately compensated for their work.  They have received their salaries

and full benefits.  On top of that, and over the unions' protests, they also received generous

annual incentive bonuses.  Now, Delphi seeks through the MCP to give the covered executives

an additional *$87 million* in cash upon emergence, as a reward just for having done their jobs

during the Chapter 11 case.  Such payment -- especially when combined with the 3% of

reorganized Delphi's equity that the executives would also receive upon emergence -- would

make it impossible to conclude that the executives have sacrificed, let alone sacrificed in a

manner equivalent to the UAW-represented employees.

4.       In total, upon emergence and thereafter, the MCP would hand over 8% of

reorganized Delphi's equity to about 581 of Delphi's senior executives.  By contrast, Delta Air

Lines, another large and sophisticated debtor that recently emerged from a Chapter 11

bankruptcy in this Court, transferred 2.4% of its equity to 1,200 executives.  The equity transfer

Delphi management now seeks would be significantly larger even than the equity transfer that

Debtors originally proposed in the 2005 Key Employee Compensation Program ("KECP"), since

the estimated value of the reorganized equity of Delphi has risen substantially since the estimate

in 2005.  How, then, is management sacrificing?

5.       Delphi claims that all it seeks is to compensate its executives at market

levels.  But the "peer" group of companies that Delphi selected as a measure of the market is

skewed by the inclusion of companies that are both larger and more successful than Delphi, that

operate in industries completely unrelated to the auto parts industry, and that do not compete

with Delphi either for the same talent pool or in the same geographic labor market.  But even if

Delphi were correct, that the MCP provides market-level compensation, that would mean that

Delphi's executives would be earning no less at Delphi than they would earn, on average,

anywhere else.  Where is the sacrifice?

6.       To be confirmed, a plan of reorganization must be fundamentally fair.

Courts have repeatedly read such a fundamental fairness principle into the "good faith"

requirement of Section 1129(a)(3) of the Bankruptcy Code.  Because the MCP violates Delphi's

equivalence-of-sacrifice commitment to the UAW (a commitment made binding by order of this

Court), the POR is not fundamentally fair to a major constituency in this case:  the rank-and-file

workers whose concessions made the reorganization possible.

　　　　　7.　　　Perhaps no group wants Delphi out of bankruptcy more than the UAW and

its members.  But by making the MCP part of the POR, Delphi has forced the UAW to object to

plan confirmation.  The UAW-represented workers did not sacrifice all that they did so that

management could give itself a windfall at the end of the case.

　　　　　8.　　　The UAW requests that the Court withhold approval of the POR until

Delphi removes the MCP from the POR.

## BACKGROUND

The UAW-Represented Employees Have Made Enormous Sacrifices
for Delphi's Reorganization, Sacrifices That Will Continue For Years To Come

　　　　　9.　　　Delphi's self-styled "labor transformation" has come about through the

enormous sacrifices made by its thousands of UAW-represented employees and former

employees.  In the June 22, 2007 UAW-Delphi-GM Memorandum of Understanding ("MOU"),

the UAW-represented employees agreed, among other things, to a drastic shrinkage of the hourly

workforce through the sale or transfer of seven Delphi plants and the winding down of ten

others.  *See* MOU, UAW Exhibit 1, at 2-4 (§B(2), (4)); Disclosure Statement, UAW Exhibit 2, at

DS-42.[2]  The union workers also agreed to a fundamental change in their benefit structure with

the freezing of Delphi's pension plan and the elimination or transfer to GM of other post-

employment benefits.  *See* MOU, UAW Exhibit 1, at 16-18 (§F); Disclosure Statement, UAW

Exhibit 2, at DS-42.  In addition, the UAW-represented employees sacrificed pay, agreeing to the

elimination of cost-of-living adjustments (COLA's), *see* MOU, UAW Exhibit 1, at 14

---

　　[2] "UAW Exhibit ____" refers to the exhibits, not designated confidential, contained in the
compilation "Exhibits In Support Of UAW Objection," which is filed herewith.

(§D(1)(c)); Disclosure Statement, UAW Exhibit 2, at DS-42; the discontinuance of certain

annual wage progressions, *see* MOU, UAW Exhibit 1, at 12-13 (§D(1)(a)); and a reduction in the

wage scales for new hires, *see id*. at 13-14 (§D(1)(b)).  Moreover, the UAW-represented

employees consented to the elimination of certain job security provisions in their collective

bargaining agreements.  *See* Disclosure Statement, UAW Exhibit 2, at DS-42.[3]

        10.    These sacrifices were not made solely for the duration of the Chapter 11

case.  The MOU itself lasts until September 2011.  *See* MOU, UAW Exhibit 1, at 1.  And the

concessions made by the UAW-represented workers will doubtlessly continue to impact their

lives for years to come.[4]

Delphi Management Pledged That It Would Bear
Sacrifices Equivalent To Those of The UAW-Represented Workers

        11.    As consideration for the substantial concessions of the UAW-represented

employees, Delphi agreed in the MOU to a term entitled "Equivalence of Sacrifice."  *See* MOU,

UAW Exhibit 1, at 20 (§I).  Under this provision,  Delphi committed itself

                to the principle of "equivalence of sacrifice" when establishing
                compensation and benefit levels for salaried employees and
                management, to ensure that sacrifices by UAW-represented
                employees are reflected in the pay and benefit practices of all non-
                represented employees.

*Id*.; *see also* Disclosure Statement, UAW Exhibit 2, at DS-45.  By its own terms, the MOU is a

"final, binding and conclusive commitment and agreement."  MOU, UAW Exhibit 1, at 21

(§(K)(1)).  Moreover, according to the Court's July 19, 2007 order approving it, *see* UAW

---

        [3] In addition to agreeing to substantial cuts in its collective bargaining agreements, the UAW
entered into attrition agreements with Delphi that facilitated Delphi's efforts to shed many of its
senior, higher-paid hourly employees.  *See* Disclosure Statement, UAW Exhibit 2, at DS-40-42.

        [4] The UAW and its members agreed to make these sacrifices not because they agreed with
Delphi's claim that their collective bargaining agreements were the source of Delphi's problems,
but to help Delphi remain viable in the face of serious troubles facing the auto parts industry.

Exhibit 3 [Docket No. 8693], the MOU -- including the "Equivalence of Sacrifice" clause -- "is

binding on the Debtors," *id.* ¶4, and requires them "to take all actions necessary or appropriate to

effectuate" it, *id.* ¶3.  Delphi management thus undertook a commitment, made binding by the

Court's approval order, to sacrifice in a manner equivalent to the sacrifice of the UAW-

represented employees.

Far From Sacrificing, Management Has Enjoyed Their Salary
And Benefits, Plus Generous Bonuses, Throughout The Chapter 11 Case

12.    At the outset of the Chapter 11 case -- and at virtually the same time that it

launched its aggressive Section 1113/1114 litigation to cut the hourly workers' pay and benefits

-- Delphi sought court authority, in the form of its proposed KECP, for generous rewards for its

senior management.  *See* KECP Motion, UAW Exhibit 4.  It claimed that a certain number of

executives had left the Company's employ in 2005 and that "the Company's risk of attrition"

was exacerbated by the bankruptcy.  *See id.* ¶18.  Moreover, Delphi emphasized the need to

make compensation for its executives competitive with other firms *in the auto parts industry*.

*See id.* ¶16 (referring to "the industry norm"); *see id.* ¶17 (referring to "automotive industry").

13.    The proposed KECP included an Annual Incentive Plan ("AIP") of

"annual bonuses," *id.* ¶27, and an Emergence Bonus Plan ("EBP") consisting of both a cash and

an equity component, *see id.* ¶28.  The equity component of the EBP would have provided the

covered executives with 10% of the equity of the reorganized company.  *See id.* ¶33.  At the

time, Delphi estimated that it would have an equity value upon emergence of $4 billion.  *See*

UAW Exhibit 5, at 22 (report of Watson Wyatt Worldwide, Inc. ("Watson Wyatt").

14.    After encountering intense opposition from the unions and others, Delphi

withdrew its proposal for the EBP, but the Court approved the AIP bonus program, subject to

review in each proposed half-year bonus period.  *See* Docket No. 2441 (Feb. 17, 2006).  Over

union objections, Delphi sought -- and received -- approval for each six-month installment of the

AIP program.  As a result, Delphi's executives have received not only their salaries and benefits

throughout the Chapter 11 case, but have also received bonuses.  *See* Exhibit 2 to Jan. 9, 2008

Declaration of Nick Bubnovich ("Bubnovich Dec."), Confidential UAW Exhibit 100, at 29. [5]

These AIP bonuses have been extremely generous:  $███ million spent by the Company on

executive bonuses in the first half of 2006, $███ million in the second half of 2006, and $███

million in the first half of 2007.  *See* UAW Confidential Exhibit 101.

Delphi Proposes A Management Compensation Plan
Richer Than The KECP It Originally Sought

15.    Delphi's proposed MCP would cover 21 top officers known as the Delphi

Strategy Board ("DSB") as well as about 560 other "Non-DSB" senior executives.  *See*

Disclosure Statement, UAW Exhibit 2, at DS-92.

16.    The MCP would include a Short-Term Incentive Plan ("STIP") that would

in effect continue the AIP program and that would allow for *individual* bonuses of up to $7.5

million per year.  *See* POR Exhibit 7.8, UAW Exhibit 6.  The cost of the STIP would be

approximately $46 million annually.  *See* Disclosure Statement, UAW Exhibit 2, at DS-97.

17.    Like the proposed but never implemented EBP in Delphi's KECP, the

MCP contains a proposed payout upon Delphi's emergence from Chapter 11.  Approximately

$87 million would be paid in cash.  *See* Supplement To Management Compensation Plan ("MCP

Supplement") [Docket No. 11608, Ex. D], UAW Exhibit 7, at 2.  (Originally, the cash payment

in the MCP was to be $78 million but Delphi recently increased it.  *See id*.)  According to

---

[5] "Confidential UAW Exhibit ____" refers to the exhibits contained in "Confidential
Exhibits In Support Of UAW Objection," a compilation of documents that Delphi produced and
designated as confidential.  Because these documents have been designated as confidential, the
UAW is not filing them in court.

Delphi, this $87 million cash payment is intended "to compensate executives for their

contributions during the Chapter 11 case." *See* Exhibit 2 to Confidential UAW Exhibit 100, at

29, 31.  Delphi's CEO, Rodney O'Neal, alone is to receive an emergence cash award of $5.3

million.  *See* MCP Supplement, UAW Exhibit 7, at 2.

18.     On top of the $87 million in cash emergence awards, Delphi proposes

giving Robert "Steve" Miller, its executive chairman of the board, a "performance payment" of

$8.3 million.  *See id.*[6]

19.     In addition to cash, the executives would also receive an emergence

payout of 3% of reorganized Delphi's equity.  *See* Disclosure Statement, UAW Exhibit 2, at DS-

99.

20.     The proposed 3% equity payout on emergence would be only the first

installment of  a larger equity transfer to the executives -- constituting the Long-Term Incentive

Plan ("LTIP") component of the MCP -- that would total 8% of reorganized Delphi's equity.  *See*

Disclosure Statement, UAW Exhibit 2, at DS-99.  DSB Members and non-DSB members in

Bands D and above would receive their equity grants half in restricted stock and half in stock

options.  *See* Disclosure Statement, UAW Exhibit 2, at DS-98.  Of the restricted stock, half

would vest contingent on the satisfaction of performance targets but the other half would vest

simply with the passage of time:  one-third per year over a short three-year vesting period.  *See

id.*; Exhibit 2 to Confidential UAW Exhibit 100, at 16.

---

[6] Miller's early confrontational attacks upon Delphi's unions and workers were a labor
relations disaster and significantly impeded the prospects for a negotiated  labor settlement .  *See,
e.g., Delphi Proposes Slash In Wages*, Washington Post, 2006 WLNR 5097789 (March 28,
2006) (noting that Miller "outraged" the UAW and other unions with proposals to slash wages to
$9.50 per hour and close unionized plants).

21.    The LTIP would limit *individuals* to an annual award of $10 million cash, 500,000 shares of restricted stock or 1 million stock options.  *See* POR Exhibit 7.8, UAW Exhibit 6.

22.    The MCP would also provide the executives with generous severance benefits.  Under the proposed employment agreements, executives terminated without cause would be entitled to 18 months' salary and bonus, *see* POR Exhibit 7.8, UAW Exhibit 6, and under the proposed change-in-control agreements, they would be entitled to severance of up to three times their salary and bonus, *see id*.  Making them particularly egregious, the agreements have "no-mitigation" clauses, clauses that would allow executives to keep their entire severance payments even if, immediately after leaving Delphi, they find a new job paying as well or better.  *See* POR Exhibit 7.8, UAW Exhibit 6 (¶7 to form change-in-control agreement and ¶11 to form employment agreement).[7]

23.    The MCP would also enhance existing retirement benefits.  For example, the age at which executives would vest under their defined benefit Supplemental Executive Retirement Program ("SERP") would be reduced from 62 to 55.  *See* POR Exhibit 7.8, UAW Exhibit 6; Exhibit 2 to Confidential UAW Exhibit 100, at 21.[8]

---

[7] Such "no-mitigation" clauses have the potential to turn severance pay from a protection against financial hardship following involuntary termination into a significant windfall for the departing executive.  *See In re U.S. Airways, Inc*., 329 B.R. 793, 801 (Bankr. E.D. Va. 2005); *In re Geneva Steel Co.*, 236 B.R. 770, 773-74 (Bankr. D. Utah 1999) (denying key employee retention plan because, among other things, it lacked a mitigation provision for severance payments).

[8] Watson Wyatt explained in a July 2007 email that ███████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████

24.     Finally, the MCP would provide various perks, including -- fittingly -- free financial planning services (for executives in Bands D and above), to help them manage all the money they are going to receive as a result of the MCP.  *See* Exhibit 2 to Confidential UAW Exhibit 100, at 11.

25.     Rather than present its management compensation scheme to the Court for review on a stand-alone basis, as it did when it proposed the 2005 KECP, Delphi incorporated the MCP into the POR.  *See, e.g.,* Disclosure Statement, UAW Exhibit 2, at DS-92 ("the [POR] constitutes a request to authorize and approve" the management compensation programs); *see also id*. (citing provisions of the Equity Purchase and Commitment Agreement ("EPCA") for Delphi to enter into employment agreements and "other compensation arrangements").  But Delphi's tactical use of the POR and the EPCA is merely its latest strategy for securing the generous rewards it has sought for management since the beginning of the case.  Delphi claims to incorporate the MCP as a "means for implementation of" its POR, *id*. at DS-180, DS-188,[9] but, in fact, it does not need the MCP -- with its emergence grants, equity transfers and other rewards -- to carry out its reorganization plan.  To the contrary, as a scheme to ensure that senior management emerges unscathed from a bankruptcy that profoundly impacted thousands of workers, the MCP will harm Delphi's prospects, by angering the hourly workforce and poisoning labor relations.

_____

[9] Under 11 U.S.C. Section 1123(a)(5), a plan shall "provide adequate means for the plan's implementation."  The Bankruptcy Code requires that a plan specify adequate means by which it will be implemented in order to prohibit debtors from proposing chapter 11 plans that are too speculative or indefinite.  *See In re Walker*, 165 B.R. 994, 1003-1004 (E.D. Va. 1994); *see also In re Briscoe Enterprises, Ltd.*, 138 B.R. 795, 807 (N.D. Tex. 1992) (a debtor must offer "more than speculation" about the plan's source of funding). The proposed MCP has no bearing on a Code requirement intended to protect creditors against plans that are merely visionary schemes or that otherwise represent a misuse of the Bankruptcy Code.  *See In re Walker*, 165 B.R. at 1003-4 (describing cases in which plans were denied confirmation under Section 1123(a)(5)).

**ARGUMENT:**

**THE MCP IS NOT FAIR TO THE UAW-REPRESENTED EMPLOYEES**

26.     A bankruptcy court may confirm a plan of reorganization only if the

debtor proves that the plan satisfies each of the requirements of Section 1129 of the Code, 29

U.S.C. §1129.  *See In re Fur Creations By Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y.

1995); *In re Texaco, Inc.*, 84 B.R. 889, 891 (Bankr. S.D.N.Y. 1988).

27.     Section 1129(a)(3) requires that a plan be "proposed in good faith."  11

U.S.C. §1129(a)(3).  This is not simply a test of the debtor's subjective state of mind; it requires

that the proposed plan be "'fundamentally fair.'"  *In re Tillotson*, 266 B.R. 565, 571 (Bankr.

W.D.N.Y. 2001); *see also Jorgensen v. Fed. Land Bank*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986)

(affirming denial of plan confirmation; holding that "good faith" standard requires "fundamental

fairness"); *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (denying confirmation

when, among other things, court was unable to conclude that plan was "imbued with

fundamental fairness"); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)

("'most important feature'" of "good faith standard" is "'inquiry into the 'fundamental fairness'

of the plan.'") (citation omitted).  Courts have found that management compensation

arrangements can be the fatal flaw in a plan that prevents its compliance with the "good faith"

requirement of Section 1129(a)(3).  *See, e.g., In re Bush Indus.*, 315 B.R. 292, 306 (Bankr.

W.D.N.Y. 2004) (debtor's unwarranted bonus to officer and director prevents finding that plan

satisfies "good faith" requirement); *Coram*, 271 B.R. at 235-37 (striking down plan due to

employment contract of debtors' CEO).

28.     Here, in determining whether the MCP is fundamentally fair, the court

should scrutinize it closely, since it is an arrangement between insiders and the debtors.  *See In

re Regensteiner Printing Co.*, 122 B.R. 323, 326 (N.D. Ill. 1990) (holding, in case where debtor

11

05-44481-rdd    Doc 11938    Filed 01/11/08    Entered 01/11/08 15:13:50    Main Document
Pg 12 of 31

sought management bonuses, that "[c]ourts must scrutinize transactions between insiders and the

debtor-in-possession to ensure that the transactions are fair to the estate and creditors"); *see also*

*In re Am. Plumbing & Mechanical, Inc.*, 323 B.R. 442, 463 (Bankr. W.D. Tex. 2005)

("appropriate to more closely scrutinize bonuses" to officers and directors; such insiders "bear

the burden of proof as to fairness of any such arrangements"); *see generally Pepper v. Litton*,

308 U.S. 295, 306 (1939) (dealings by insiders subject to "rigorous scrutiny" and a showing of

their "inherent fairness"); *In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997); *In re*

*Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).  Close scrutiny is

particularly warranted with management compensation plans because, as the court noted in *In re*

*U.S. Airways, Inc.*, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005), such plans "have something of a

shady reputation":

> All too often they have been used to lavishly reward -- at the
> expense of the creditor body -- the very executives whose bad
> decisions or lack of foresight were responsible for the debtor's
> financial plight.  But even where external circumstances rather
> than the executives are to blame, there is something inherently
> unseemly in the effort to insulate the executives from the financial
> risks all other stakeholders face in the bankruptcy process.

*Id.*

29.    In determining whether the POR is fundamentally fair so as to satisfy the

"good faith" requirement of Section 1129(a)(3), the Court should focus on whether

implementation of the MCP would be consistent with the equivalence-of-sacrifice principle.

This principle applies generally to court review of proposed management compensation plans.

*See U.S. Airways*, 329 B.R. at 799 (finding "the most compelling" objection to proposed

management compensation program "is that it represents a betrayal of the principle of 'shared

sacrifice'"); *see also In re Dana*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (noting that

proposed management compensation plan "may not accomplish the 'sharing the pain'

objective"); *In re Allied Holdings, Inc.*, 337 B.R. 716, 725 (Bankr. N.D. Ga. 2005) (in light of

concessions by unionized employees, "unfair" to give managers large bonuses on top of

salaries).

30.     While the principle of sharing sacrifice plays a role in any case involving a

proposed management compensation plan, its consideration must be front and center here

because of the "Equivalence of Sacrifice" clause in the MOU.  Delphi pledged in the MOU, as

consideration for the enormous concessions provided by the UAW-represented employees, that

the pay and benefits received by management would reflect the sacrifices of the union workers.

The Court, in its July 2007 order approving the MOU, required Delphi to abide by and effectuate

this pledge.  To allow Delphi to adopt a management compensation plan inconsistent with its

commitment to shared sacrifice would be fundamentally unfair to the UAW-represented

employees.  Indeed, it would be grotesquely unfair, since the wealth that would be lavished upon

management under the MCP was generated in large part by the workers' concessions.[10]

31.     At the September 27, 2007 hearing, in which the Court approved the latest

installment of the AIP program, the Court drew a distinction between short-term incentive

programs like the AIP program and long-term compensation programs, implying that courts are

---

[10] Breaking pledges with the UAW is something that Delphi executives have done on an
individual basis as well.  For example, during negotiations with the UAW during the Chapter 11
case, Delphi's lead labor negotiator made an offer to the UAW's President that he would promise
to resign from Delphi at the end of the case if that would help the parties reach an agreement.
The UAW's President accepted this offer.  But rather than resigning as promised, Delphi's lead
labor negotiator has chosen to remain with the company and is now seeking to enjoy the largess
of the MCP that the UAW's concessions made possible.

And, after promising the UAW that it would keep open its plant in Lockport, New York, the
president of Delphi's thermal systems division wrote to the workers there threatening that
Lockport's future was in jeopardy, after the workers voted to reject the MOU.  *See Local Jobs in
Jeopardy, President of Delphi Says*, Buffalo News, 2007 WLNR 12849889 (July 6, 2007).

far more willing to scrutinize the latter, *see* UAW Exhibit 8, at 118, since they "involve allocation of reorganization value; i.e., stock and stock options and the like," *id*. at 112.  When long-term compensation programs are involved, the Court explained, "[t]raditionally, that is where more of the value of the debtor goes to executives, and where *more of the value of the concessions made by the unions might go to executives*."  *Id*. at 121 (emphasis added). Accordingly, the Court concluded, a plan distributing substantial amounts of equity to management -- like the MCP would here -- must be "very closely tied" to and "supportable by" relevant evidence.  *Id*.  Here, for the reasons we discuss, the MCP cannot be supported.

I.      **IF THE MCP IS IMPLEMENTED, THE COVERED EXECUTIVES WILL NOT HAVE SACRIFICED DURING THE CHAPTER 11 CASE IN A MANNER EQUIVALENT TO THE UAW-REPRESENTED EMPLOYEES**

32.      During the Chapter 11 case, Delphi's executives received their salaries and benefits.  Exhibit 2 to Confidential UAW Exhibit 100, at 29.[11]  On top of their salary and benefits, the Delphi executives -- over the objection of the unions -- also received generous bonuses.  *Id*.  For each half-year period, the AIP bonuses paid by Delphi far exceeded plan targets, amounting to $███ million spent by Delphi in the first half of 2006, $███ million in the second half of 2006 and $███ million in the first half of 2007.  Confidential UAW Exhibit 101. In the recent Delta Air Lines Chapter 11, by contrast, management gave up *all* annual incentive payments during the course of the bankruptcy case.  *See* UAW Exhibit 9, at 5.  Having received salary, benefits and ample bonuses, Delphi's executives cannot be said to have sacrificed during

---

[11] The DSB executives may have voluntarily waived 10% of their salaries, but, according to Watson Wyatt, without this waiver, their base pay would be substantially *above* market (at an average of $███████, compared to what Watson Wyatt deemed the average market salary of $███████).  *See* Exhibit 2 to Confidential UAW Exhibit 100, at 12.  The waiver, which presumably could be rescinded at any time, simply puts the DSB executive salaries "at or near the [market] median."  *Id*. at 13.

the course of the Chapter 11 case, and, in any event, cannot be said to have sacrificed in a manner equivalent to the UAW-represented employees.

33.    But Delphi management thinks that it did not get enough.  Debtors now seek, upon emergence, to pay the executives an additional $87 million in cash (recently increased from $78 million), *see* MCP Supplement, UAW Exhibit 7, at 2, "to compensate" the executives "for their contributions during the Chapter 11 case," Exhibit 2 to Confidential UAW Exhibit 100, at 29, and also to give them upon emergence 3% of reorganized Delphi's equity, *see* Disclosure Statement, UAW Exhibit 2, at DS-99.  Delphi's CEO alone is to receive $5.3 million in cash. *See* MCP Supplement, UAW Exhibit 7, at 2**.**  (By contrast, Delta's CEO declined any equity or cash awards when his company recently emerged from Chapter 11.  *See* UAW Exhibit 9, *In re Delta Air Lines, Inc.*, Case No. 05-17923 (ASH) (Bankr. S.D.N.Y.) [Docket 5315], at 8). According to Watson Wyatt's analysis, the average emergence cash bonus for a CEO in Chapter 11 cases is about $1.4 million.  *See* Confidential UAW Exhibit 103, at DPH 4553.

34.    If the executives were to receive this additional cash and equity upon emergence, after having received their salaries and benefits plus generous bonuses, it would clearly be impossible to conclude that they sacrificed at all during the Chapter 11 case, let alone sacrificed in a manner equivalent to the sacrifice of the UAW-represented employees.[12]

35.    Delphi claims that the emergence cash payments would compensate the executives for 80% of the pre-petition long-term incentive payout they did not receive during the Chapter 11 case.  *See* Disclosure Statement, UAW Exhibit 2, at DS-99.  It argues that even with these cash payments, the executives would still have fallen below "competitive practice" during

---

[12] Also, giving so many executives so much cash immediately upon emergence would do nothing to align their interests with the long-term success of Delphi or give them an incentive to stay with the company.  Indeed, if they have opportunities for other employment, it would just allow them to leave early with a hefty paycheck in their pocket.

the Chapter 11 case. *See id*. The question here, however, is not whether the amount paid to the executives matches some standard of "competitive practice" as determined by Watson Wyatt; the issue is whether the executives have sacrificed in a manner equivalent to the UAW-represented employees, as required by the MOU and the Court's July 2007 order. Having received their pay and benefits, plus generous AIP bonuses, the receipt of $87 million in additional cash would mean that Delphi management will have been made substantially whole for any payments they did not receive as a result of the Chapter 11 case and thus will have failed to satisfy its pledge of equivalence-of-sacrifice. This is particularly so since the cash in hand the executives are getting is far more valuable than the long-term incentive opportunities they allegedly lost during the Chapter 11 case; compensation under the pre-petition long-term incentive opportunities would only have been paid contingent on the satisfaction of performance targets and would have been subject to a vesting period.

36.    Moreover, Delphi's argument about "competitive practice" ignores the fact that the executives would receive not just cash upon emergence, but also 3% of Delphi's equity. Delphi says that the cash emergence payout is compensation for the executives' work during the Chapter 11 case but the equity emergence payout is going-forward compensation, so should be considered separately. This attempted distinction will likely be lost on the executives (and the UAW-represented employees) who will simply see enormous value going into management's pockets when Delphi emerges from bankruptcy. When considered together, the $87 million in cash and 3% of equity paid at emergence would clearly put management at or above any measure of "competitive practice."

37.    The emergence payments are not only unfair but unnecessary. Delphi sought to justify the EBP in the 2005 KECP by citing the number of executives it had lost and

the increased "risk of attrition" posed by the Chapter 11 case.  *See* UAW Exhibit 4, at ¶18.  But

Delphi does not now claim, let alone cite evidence of, a heightened level of executive attrition or

increased risk of attrition.[13]  Indeed, the lack of evidence of a heightened quit rate suggests that

Delphi's executives are satisfied with the very comfortable amounts of compensation they

already have.  As Delphi's labor economist testified in the Section 1113 proceedings, "[w]orkers

who believe that they are paid more than they could get elsewhere in the economy generally stay

put."  March 30, 2006 Declaration and Expert Report [Docket No. 3046], at ¶34.[14]

      38.    Delphi will likely argue that the emergence payout to the executives is

necessary because the executives expected it and have relied upon receiving it.  This argument

must be rejected first because it would not be reasonable for the executives to have expected or

relied upon receiving the payout; such a payout has always been contingent upon court approval

and court approval has never been assured.  When the EBP was proposed in the 2005 KECP, it

was strongly opposed by the UAW and others, and was withdrawn.  Indeed, in October 2005,

Delphi held a telephone conference with its executives and told them that ███████████████

███████████████████████████████████ Confidential UAW Exhibit 104, at DPH

534.  It repeated this message at subsequent management meetings.  *See id.*  And it told

executives it hired ██████████████████████████████████ *See id.*

      39.    In addition, any expectation that Delphi's management may have of

receiving the money is an expectation that was created by Delphi's management, first when it

---

[13] In a July 2007 email, Craig Naylor, chair of Delphi's Compensation Committee, noted that
Delphi had ████████████████████████████████████████
Confidential UAW Exhibit 105, a fact which suggests that Delphi, even without the MCP, has
had no trouble attracting executive talent.

[14] Further lessening the need for big executive rewards is the fact that, given the troubled
state of the auto parts industry, Delphi's executives likely have far fewer opportunities to find
other employment in the industry than they once did.

proposed the EBP in the 2005 KECP and later when it proposed the MCP.  Delphi's

management cannot claim it has a right to a payment because, after having proposed it, it

expected it would get it.

40.    Finally, and perhaps most importantly, after Delphi management agreed

with the UAW to share equivalent sacrifice, the executives should have adjusted their

expectations.  Having committed to equivalence of sacrifice, the executives could not reasonably

expect to receive generous compensation packages on emergence from bankruptcy.

## II.    IF THE MCP IS IMPLEMENTED, THE EXECUTIVES WILL NOT SACRIFICE GOING FORWARD IN A MANNER EQUIVALENT TO THE UAW-REPRESENTED EMPLOYEES

41.    In addition to paying the executives millions extra just for having done

their jobs during the Chapter 11 case, the MCP would also provide them compensation going

forward.  Delphi claims that this compensation would be at market levels.  *See* Disclosure

Statement, UAW Exhibit 2, at DS-94.

42.    Even if it were true that the MCP would provide the executives with

market-level compensation, that would not be fair to the UAW-represented employees.  Paying

the executives market-level compensation means that they would be making as much at Delphi

as they would on average anywhere else.  They would be sacrificing nothing (except, of course,

*above*-market compensation).

### A.    Delphi Measures DSB Compensation On A Skewed "Peer" Group Of Companies

43.    But, in fact, there is no basis to conclude that the MCP would limit the

executives to market-level compensation.  In concluding that the MCP would give the DSB

executives market-level compensation, Delphi used a group of 18 "peer companies" as its

measure of the market.  *See* Disclosure Statement, UAW Exhibit 2, at DS-94.  But this "peer"

18

group is far from a fair representation of the market: it is stacked with solid, top-of-the-line companies -- PepsiCo, Kraft Foods, Honeywell, DuPont, Coca-Cola, 3M, International Paper -- that are not Delphi's "peers" in any sense.

44.    First, these companies are not in the auto parts industry, an increasingly competitive and still very troubled industry. In its motion supporting the 2005 KECP, Delphi stressed the need for its executive compensation to meet the "*industry* norm." UAW Exhibit 4, at ¶16 (emphasis added); *see also id*. at ¶17 (referring to "automotive industry"). Indeed, in its Section 1113 motion, Delphi sought a wage and benefit package for its unionized employees "equivalent to the wages and benefits prevailing at *other U.S.-based automotive parts suppliers*." Docket No. 3036, at 26 (emphasis added). Since Delphi claimed the need for executive compensation at the industry norm, and urged that pay and benefits of its unionized employees should be at industry levels, it makes no sense and is unfair to include companies in the "peer" group from the beverage, paper or other industries that have no connection to auto parts.

45.    These companies are also not comparable to Delphi in terms of financial performance. From 2005 to 2007, Delphi was bankrupt. PepsiCo, DuPont, Coca-Cola, etc., were not. To the contrary, these companies were solidly profitable, with an average 2005-2007 return on equity of 26%. *See* UAW Exhibit 10. The pay of their executives reflects the financial health of these companies.

46.    One might think that these companies were included in the "peer" group because, perhaps, despite being in different industries and having had different financial performances, they competed with Delphi for the same managerial talent or in the same geographic labor market. But Watson Wyatt's report, *see* Exhibit 2 to Confidential UAW Exhibit 100, at 33, shows that ████████. It clearly indicates that PepsiCo, DuPont, Coca-

Cola, *etc.* ███████████████████████████████████████████

███████    Indeed, Watson Wyatt's analysis indicates that the only reason these companies

were included ████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

47.    In support of its Section 1113 motion, Delphi told the Court how

important it was to peg salaries to those of competitors close in size; it explained that after its

spin-off from GM, when Delphi became a separate, smaller company, its pay for salaried

employees was "targeted at levels more closely approximating employees in companies whose

revenue, on average, more closely tracked Delphi's."  Docket No. 3036, at 65.  If revenue size

matters for defining the market, as Delphi told the Court in its Section 1113 motion, there is no

justification for including companies in the "peer" group that are substantially bigger than

Delphi, particularly when they are also more successful, operate in completely different

industries and do not compete with Delphi either in the same geographic labor market or for the

same talent pool.

48.    The inclusion of these companies in the "peer" group undermines Delphi's

conclusion that, with implementation of the MCP, the total compensation of the DSB executives

would be no more than at market levels.  It further shows that the MCP is unfair to the UAW-

represented employees.

B.    **Watson Wyatt Indicates That Non-DSB
Executives Would Enjoy Above-Market Compensation**

49.    According to Watson Wyatt, the MCP would make the compensation of
the non-DSB executives above market:  the average total direct compensation of the non-DSB
executives would be $██████, compared to $██████ for what Watson Wyatt deems to be
market level.  *See* Exhibit 5 to Confidential UAW Exhibit 100.  In particular, while the non-DSB
executives would have base salaries and long-term incentives opportunities roughly at market
levels, their short-term incentive opportunities would be approximately ███% above market.  *See
id.*  ($██████ for the non-DSB members versus $██████ for the market).  That the MCP would
put non-DSB compensation above market levels shows that these executives would not be
sacrificing going forward, in violation of the equivalence-of-sacrifice pledge.

III.    **THE AMOUNT OF EQUITY THAT WOULD BE TRANSFERRED
TO THE EXECUTIVES UNDER THE MCP WOULD BE INCONSISTENT
WITH DELPHI'S EQUIVALENCE-OF-SACRIFICE PLEDGE**

50.    The LTIP would transfer 8% of the equity of reorganized Delphi to the
approximately 581 covered executives.  As Delphi will have a reorganization equity value of
$7.8 billion, *see* Disclosure Statement, UAW Exhibit 2, at DS-xvi, the payout of equity under the
LTIP would be an enormous transfer of wealth to the executives, and would be flatly at odds
with the equivalence-of-sacrifice requirement.  This is particularly so since, as already noted, the
value of the equity being transferred to the executives comes to a large extent from the deep
concessions made by the UAW-represented employees and other unionized Delphi workers.

51.    By comparison, in the Delta Chapter 11 -- a recent case in this Court also
involving a major corporate employer -- the management compensation plan provided for a
transfer of 2.4% of Delta's equity to 1,200 Delta executives.  *See* UAW Exhibit 9, at 8.  In other

words, Delta's plan provided for a much smaller portion of the company's equity to be shared by a much larger group of managers.[15]

52.      The Delta example cannot be dismissed as a fluke or aberration.  By any standard, Delta Air Lines was a sophisticated debtor with sophisticated advisors.  And like Delphi, Delta operates in a competitive market.  It is no less concerned with attracting and retaining a successful management team than Delphi is.  The difference is that Delta's management was willing to accept reasonable sacrifice.  Delphi's management, despite its pledge to the UAW, is not.[16]

53.      But one need not look to other companies to see how the MCP would overcompensate the Delphi executives; one can look no further than Delphi's own 2005 proposed KECP.  In the KECP, Delphi proposed giving the executives 10% of reorganized Delphi's equity, assuming at the time that reorganized Delphi's equity would be worth $4 billion. *See* UAW Exhibit 5, at 22-23.  Delphi considered this proposed transfer to be "reasonable."  *See* UAW Exhibit 4 at ¶23.  If this transfer would have been reasonable, as Delphi told the Court in 2005, when the assumed reorganized equity of Delphi was worth $4 billion, what possible justification could there be for transferring 8% when the assumed reorganized equity value had nearly doubled, to $7.8 billion -- particularly when in the interim Delphi management agreed to sacrifice in a manner equivalent to the UAW-represented employees?

---

[15] While Delta's assumed reorganized equity value of $10 billion, *see* UAW Exhibit 9, at 3, was somewhat higher than Delphi's $7.8 billion, the value of the equity transfer to each executive at Delta would still be a fraction of what Delphi is proposing under the MCP.

[16] Judge Hardin of this Court praised Delta's management compensation plan, saying that "[i]n an era where there is enormous public concern over executive compensation, the leadership reflected in this company reflects precisely the opposite ethic as the kind of overcompensation that has attracted hostility in the press …."  UAW Exhibit 11, at 84-85.  The Delphi MCP constitutes exactly this type of "overcompensation."

54.    The MCP would also give the executives greater value than the KECP would have because it allows for a greater proportion of the equity to be transferred to them in the form of restricted stock, rather than stock options (the former having immediate value, with the latter only having value contingent upon the stock's market price).  The 2005 KECP would have limited the executives to receiving one-third of their equity payout in restricted stock; the rest would have been stock options.  *See* UAW Exhibit 4, at ¶32.  The MCP, by contrast, would give half of the equity payout in restricted stock to the DSB executives and to the non-DSB executives in Bands D and above.  *See* Disclosure Statement, UAW Exhibit 2, at DS-98; Exhibit 2 to Confidential UAW Exhibit 100, at DPH 172.  As for the rest of the executives, the MCP would impose no ceiling on the portion of equity distributed in restricted stock; that would be up to Delphi's board to determine.  *See id.*[17]

## IV.    APPROVAL OF THE MCP BY WATSON WYATT, THE COMPENSATION COMMITTEE OR OTHERS CANNOT SHIELD IT FROM COURT SCRUTINY

55.    Delphi claims that the MCP should pass muster because it was approved by, among others, Watson Wyatt and Delphi's Compensation Committee.  That a management compensation arrangement may have been blessed by outside advisors, however, does not shield it from judicial scrutiny.  *See, e.g., Coram*, 271 B.R. at 240 (debtors retaining financial advisory firm "'to sprinkle holy water on the situation'" does not cure problem with management compensation arrangement or evidence good faith).

---

[17] Making the award of large amounts of restricted stock even more egregious is the fact that half of it would vest simply upon the passage of time, under a short, three-year vesting period, without the requirement that the executives satisfy performance targets.  *See* Disclosure Statement, UAW Exhibit 2, at DS-98; Exhibit 2 to Confidential UAW Exhibit 100, at 16.  This would be so even though Wyatt Watson recognizes that ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

56.    There is no reason for the Court to defer to either Watson Wyatt or the

Compensation Committee when determining whether the POR is fundamentally fair.  First, there

is no evidence that Watson Wyatt or the Compensation Committee ever attempted to analyze the

question that is presently before the Court, namely, whether, with implementation of the MCP,

management would be sacrificing in a manner equivalent to the UAW-represented employees.

Indeed, in discovery, Delphi informed the UAW that it had no documents responsive to the

UAW's request for any "documents concerning an analysis of whether, with implementation of

the Management Compensation Plan, there will be equivalence of sacrifice between the

executives covered by it and the UAW-represented employees."

57.    Moreover, Watson Wyatt is in no position to provide an independent and

unbiased evaluation of the compensation of Delphi's management, because Delphi's

management provides Watson Wyatt with millions of dollars of business separate and apart from

Watson Wyatt's management compensation consulting services.  Since the inception of the

Chapter 11 case, Delphi has paid Watson Wyatt over $█ million in fees, only about █% of

which were for Watson Wyatt's management compensation consulting services.  *See*

Confidential UAW Exhibit 100, Bubnovich Dec. ¶9.[18]  Watson Wyatt has every incentive -- in

order to keep this enormous volume of business from Delphi -- to stay in management's favor,

by finding that a proposed compensation plan that enriches management is fair and reasonable.

*See* L. Bebchuk, J. Fried, D. Walker, *Managerial Power And Rent Extraction In The Design Of*

*Executive Compensation*, 69 U. CHI. L. Rev. 751, 772 (2002)  (finding that, to maintain their

business, compensation consultants "have a clear incentive to make recommendations favorable

to management.")

---

[18] Watson Wyatt bills Delphi a hefty $█ an hour for Bubnovich's services.  *See id*. ¶8.

58.    Indeed, a recent congressional report about leading compensation consultants -- including Wyatt Watson -- found "widespread" "conflicts of interest," since "[i]n many cases, the consultants who are advising on executive pay are simultaneously receiving millions of dollars from the corporate executives whose compensation they are supposed to assess."  U.S. House of Representatives, Committee On Oversight And Government Reform, Majority Staff, *Executive Pay: Conflicts of Interest Among Compensation Consultants* (Dec. 2007), UAW Exhibit 12, at 1; *see also* L. Bebchuk, J. Fried, *Executive Compensation As An Agency Problem* (2003),  UAW Exhibit 13, at 10 ( "Providing advice that hurts the CEO's pocketbook is hardly a way to enhance the consultant's chances of being hired in the future by this firm or, indeed, by any other firm.  Moreover, consulting firms often have other, larger assignments with the hiring company, which further increases their incentive to please the CEO."); *Gilded Paychecks: Troubling Conflicts, Outside Advice on Boss's Pay May Not Be So Independent*, N.Y. Times, 2006 WLNR 5998746 (April 10, 2006) (article questioning the independence of a compensation consulting firm that had a profitable business providing the client company with actuarial and other services; noting that the consulting firm's business was "maintained at the behest of the executives whose pay it recommends").

59.    Delphi's Compensation Committee is similarly lacking in objectivity. First, the members of the Compensation Committee are paid handsomely by Delphi.  In 2007, Craig Naylor, chair of the Compensation Committee, *see* Disclosure Statement, UAW Exhibit 2, at DS-93, was paid $150,000, while the other two committee members were each paid $140,000, *see* Confidential UAW Exhibit 107.  In 2007, Naylor also saw his deferred compensation plan at Delphi increase in value by $█████.  Confidential UAW Exhibit 108, at DPH 673.

60.    In May 2007, at a meeting chaired by Naylor, the Compensation

Committee agreed to increase the compensation of non-employee directors (*i.e.*, *their own*

*compensation*) by a remarkable ███% to $███████.   *See* Confidential UAW Exhibit 109, at 3.[19]

Clearly, these individuals enjoy lucrative positions with Delphi and, as evidenced by their giving

themselves a hefty pay raise, they are interested in the money they make.  To keep their

positions, they have every incentive to please those who run the Company.[20]

61.    Moreover, the members of the Compensation Committee are themselves

corporate executives.  *See* Disclosure Statement at DS16-19.  As such, they have a natural

sympathy for seeing executive compensation at elevated levels.  *See Gilded Paychecks*, N.Y.

Times, 2006 WLNR 5998746 at 4 (April 10, 2006.) ("Corporate boards are often composed of

other chief executives with an interest in keeping executive pay high").  In particular, as current

or future members of corporate management, they have a direct interest in seeing a rising

"market" in executive compensation.  Having them determine executive pay is a classic case of

the fox guarding the hen house.

62.    Thus, far from being independent and objective, Watson Wyatt and the

Compensation Committee are entities with an interest in providing Delphi's management with

---

[19] It even agreed, on top of that raise, to give Naylor, as chairman of the committee, an extra
$███████████████████████████  *See id.*

[20] As Professors Bebchuk and Fried explain:

> … the CEO has an incentive to throw an uncooperative director off
> the board (or not reappoint the director when his term expires).  In
> many cases, the CEO will have the power, through his
> relationships with other board members, to do so.  If the director is
> expelled or his directorship is not renewed, the director will lose
> his compensation and other economic and noneconomic benefits
> he gets from his board position, including prestige and business
> and social connections.

L. Bebchuk & J. Fried, *Managerial Power*, 69 U. CHI. L. Rev. at 770.

the compensation that management wants.  *See generally* L. Bebchuk, J. Fried, UAW Exhibit 13,

at 10 (noting that "[t]he combination of helpful compensation consultants and sympathetic

boards is partly responsible for the widely recognized 'ratcheting up' of executive salaries.")

63.    That other constituency groups have not objected to the MCP also does

not show that the POR is fair to the UAW-represented employees.  Non-objecting stakeholders

may believe the MCP is too rich, but, because they want the POR confirmed, have decided not to

fight it.  Or they simply may not care whether the POR is fair to the UAW-represented

employees.

64.    The Court, however, is required by Section 1129(a)(3) of the Code, and by

its July 2007 order approving the MOU, to evaluate the MCP in light of Delphi's equivalence-of-

sacrifice commitment.  For the reasons set forth above, the Court should find that the MCP

violates that commitment.

## V.    IN ADDITION, THE MCP WILL BE DESTRUCTIVE TO EMPLOYEE MORALE AND THUS HARMFUL TO DELPHI'S PROSPECTS

65.    Implementation of the MCP would not only be unfair, but destructive to

employee morale and thus harmful to Delphi's prospects.  To succeed, Delphi will have to rely

on the skill and effort of its workforce, the men and women who strive everyday in Delphi's

plants to produce high-quality, precision products in a cost-efficient manner.  By sharing their

sacrifices, management would have motivated this workforce.  By betraying a commitment to

shared sacrifice, management does the opposite.

66.    To succeed, Delphi also needs the support and cooperation of the UAW

and its other unions.  It would be counterproductive to implement a management compensation

program that poisons labor relations just as Delphi emerges from Chapter 11.  *See In re Geneva

Steel Co.*, 236 B.R. 770, 773 (Bankr. D. Utah 1999) (noting that adoption of management

bonuses "may jeopardize the continuing support of the [union] in [debtor's] reorganization
process").

67.    In its objection to the 2005 KECP, the UAW explained how news of the
proposed management compensation plan had provoked widespread anger and resentment
among Delphi's unionized workforce, especially since at the time Delphi was seeking significant
contract concessions from its workers.  *See* Nov. 22, 2005 Declaration of Steve Grandstaff
[Docket No. 1135, Attachment 1], at ¶5.  Now that the UAW settlement has been reached and
those concessions have become a reality, it would be particularly destructive to worker morale
and to union-management relations for those at the top of the corporate hierarchy to enrich
themselves with value generated by the concessions.  *See* UAW Exhibit 8, at 120 (the Court at
the Sept. 27, 2007 hearing noting "the inevitable anger that will be expressed by the unions and
the union workers" to the management compensation plan).

68.    United Air Lines provides a cautionary tale.  There, the management
compensation plan, including a super sized CEO payout, "outraged" the unionized workforce
that had given deep concessions towards the airline's reorganization.  *Union Chief Wants United
To Start Talks*, Chicago Tribune, 2007 WLNR 10154999 (May 31, 2007).  The payout to
executives caused United's unions, following United's emergence from bankruptcy, to unite in
protest, demanding that the company reopen their collective bargaining agreements and provide
them pay increases.  *See United Workers Join For Fight*, Chicago Tribune, 2007 WLNR
5833017 (March 28, 2007) (noting also that pilots at American Airlines were "angry" about an
incentive plan for senior management).[21]

---

[21] The *Chicago Tribune* quoted one analyst saying "CEOs need to be very, very cautious
about approving themselves bonuses when their workers have conceded so much …. These

69.     The Court explained at the September 27, 2007 AIP hearing that "in this case what is to be paid to executives has ramifications potentially to the business beyond simply the cost of those payments …. [A] key element of this case has been the renegotiation of the collective bargaining agreements with the debtors' six unions.  And given that context, it's very important to have a clear record … as to the bona fides or lack thereof of proposed payments to executives …."  UAW Exhibit 8, at 114-115.  The Court was entirely correct.  Here, the lack of good faith demonstrated by management in the MCP will have a negative impact on Delphi far beyond the cost of the plan's lavish spending.

## CONCLUSION

Two things have been clear from the beginning of this case:  Delphi's determination to base its reorganization on sacrifices by its hourly workers and its equally tenacious resolve, despite its commitment to the contrary, to insulate senior management from equivalent sacrifice -- indeed, from *any* sacrifice.  Fundamental fairness requires that the Court not confirm a plan of reorganization that includes the MCP.

Dated: January 11, 2008

---

[issues] have the potential to come back and really hurt your company."  2007 WLNR 5833017 (March 28, 2007).

  /s/ Peter D. DeChiara
Babette A. Ceccotti (BC 2690)
Peter D. DeChiara (PD 0719)
Robin H. Gise (RG 5592)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, NY  10036
(212) 563-4100

Daniel W. Sherrick
General Counsel
International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
(313) 926-5216

Attorneys for International Union, UAW

114407.doc

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 11, 2008 I caused a true and correct copy of the

**Objection of UAW to Confirmation of Debtors' First Amended Joint Plan of**

**Reorganization** to be duly served in accordance with the Solicitation Procedures Order [Docket

No. 11389] upon the following:

*Counsel For The Debtors*
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
Att'n: John Wm. Butler, Jr.
Att'n: George N. Panagakis
Att'n: Ron E. Meisler
Att'n: Nathan L. Stuart

and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Att'n: Kayalyn A. Marafioti
Att'n: Thomas J. Matz

United States Trustee
The Office of the United States Trustee
33 Whitehall Street, Suite 2100
New York, New York 10004
Att'n: Alicia M. Leonhard

*Counsel For The Creditors' Committee*
Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n: Robert J. Rosenberg
Att'n: Mitchell A. Seider
Att'n: Mark A. Broude

*Counsel For The Equity Committee*
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Att'n: Brad E. Scheler
Att'n: Bonnie K. Steingart
Att'n: Vivek Melwani

*Counsel For The Postpetition Lenders*
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10022
Att'n: Donald S. Bernstein
Att'n: Brian M. Resnick

*Counsel For A-D Acquisition Holdings, LLC*
White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900, Miami, Florida 33131
Att'n: Thomas E. Lauria
Att'n: Michael C. Shepherd

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Att'n: Gerard H. Uzzi
Att'n: Glenn M. Kurtz
Att'n: Douglas P. Baumstein

*Counsel for General Motors Corporation*
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Att'n: Jeffrey L Tanenbaum
Att'n: Michael P. Kessler
Att'n: Robert J. Lemons

 /s/ Robin H. Gise
Robin H. Gise

31