**Exhibit 1**

**UAW-DELPHI-GM
MEMORANDUM OF UNDERSTANDING
DELPHI RESTRUCTURING**

<u>**INTRODUCTION**</u>

The International Union, UAW, Delphi Corporation and General Motors Corporation ("the Parties") have discussed the challenges impacting Delphi and its UAW-represented operations.  As GM's largest supplier and the employer of thousands of UAW-represented employees, indirectly supporting tens of thousands of dependents, retirees and surviving spouses, the Parties have a critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations.  The Parties acknowledge that restructuring actions are necessary and commit to take specific actions to protect the needs of the Parties and their constituencies, continuing progress already made toward transforming Delphi's labor cost structure and ongoing business operations.

The UAW has already agreed to an attrition program pursuant to which thousands of employees at traditional Big Three wages and benefits took buy outs, flowbacks to GM, or retired, and the UAW waived Delphi obligations to hire thousands of new employees as a result of the departures caused by the attrition program.  The Parties have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee" (attached as Attachment B, hereinafter the "Term Sheet"), facilitating the freeze of Delphi's pension plan and the assumption of billions of dollars of OPEB liabilities by GM, thereby dramatically reducing Delphi's ongoing benefit costs and liabilities.

In addition to the above, to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules and staffing level issues, and to better position Delphi to retain existing business and attract new business, the Parties agree as follows on a two-party or three-party basis, as applicable, (the "Agreement") subject to ratification by the membership.

   A.  **DURATION**

       1.  This Agreement will continue until 11:59 p.m. on September 14, 2011.

       2.  Delphi and the UAW agree that the UAW-Delphi Supplemental Agreement dated April 29, 2004 (the "Supplemental Agreement") shall continue in full force and effect, as modified herein, for its stated duration, i.e. until 11:59 p.m. on September 14, 2011.  The 2003-2007

UAW-Delphi National Agreement, and including without limitation the supplemental agreements attached as exhibits thereto (the "National Agreement"), are hereby extended, as modified herein, until 11:59 p.m. on September 14, 2011.

3.  Delphi and the UAW agree that the current Local Agreements are extended until 11:59 p.m. on September 14, 2011, except as may be mutually modified by the local parties pursuant to Section E below, and as modified by this Agreement as modified by this Agreement and summarized in the matrix of modified and eliminated provisions in Attachment E hereto.

4.  The agreements comprising the UAW-Delphi collective bargaining agreements, national and local, following the date of this Agreement are set forth in Attachment E hereto.

## B.  SITE PLAN

The UAW and Delphi agree that Article 2 of the Supplemental Agreement, Document 13 and Document 91 of the National Agreement shall remain in effect through September 14, 2011, and are waived to the extent necessary to implement the site plans outlined below and as described in detail in Attachment A ("Site Plans").  GM and Delphi agree to implement the site plans as outlined below and described in detail in Attachment A.

1.  Sites to remain owned and operated by Delphi ("Keep Sites"):

    Kokomo
    Lockport
    Rochester
    Grand Rapids

2.  Sites to be held for divestiture as ongoing businesses by Delphi ("Sell Sites"):

    Saginaw Steering - Saginaw
    Sandusky
    Adrian
    Cottondale

The Parties agree that if divestiture of the Saginaw Steering – Saginaw, Sandusky and Adrian sites are not concluded (by December 31, 2008, for Sandusky and Adrian, and by December 31, 2010 for Saginaw), GM will cause the operations and all active and inactive bargaining unit employees to be transferred to employment with a third

party so that Delphi will have no further operational or employment responsibility for the site(s).  If the respective transfers will not be completed by the dates identified above, the Parties agree that prior to the required date, GM and the UAW will implement a solution such that Delphi will have no further responsibility for the operation of future production at the Saginaw, Sandusky and Adrian sites as identified above, nor will the bargaining unit employees remain as Delphi employees, but the terms and conditions of the current collective bargaining agreement will continue to apply to such employees.

3.  Footprint Sites

Flint East – Business operated by GM or provided by GM to a third party designated by GM will operate at a geographically proximate site, providing a total of approximately 1,000 jobs.  No later than December 31, 2008, the Parties agree that GM will cause the active and inactive bargaining unit employees at Flint – East to transfer to employment with a third party.  Delphi and the UAW will cooperate with the transfer.  If the transfers of the active and inactive bargaining unit employees will not be completed by this date, the Parties agree that prior to December 31, 2008 GM and the UAW will implement a solution such that Delphi will have no further responsibility for the operation of future production at the Flint East site, nor will the bargaining unit employees remain as Delphi employees.  If it remains necessary after December 31, 2008 for Delphi to complete the currently existing cluster programs through their OE expiration dates, Delphi would manage such programs using contracted need-to-run UAW labor from the third party or from other resources as specified by GM.  From time to time, commencing on October 1, 2007, as Delphi's need-to-run ("NTR") headcount declines, GM will cause the active and inactive bargaining unit employees to transfer to employment with a third party.  Delphi and the UAW will also cooperate with these transfers.  If new work is not available for these employees, then GM and the UAW will implement a solution such that these bargaining unit employees will no longer remain as Delphi employees.

Needmore Rd. – Business operated by GM or provided by GM to a third party will operate at a geographically proximate site designated by GM, providing a total of approximately 750 jobs. On the earlier of thirty (30) days following the end of OE production of current programs at Needmore Road (which is currently scheduled for June 30, 2008), or December 31, 2008, the Parties agree that GM will cause the active and inactive bargaining unit employees at Needmore Road to transfer to employment with a third party.  Delphi and the UAW will cooperate with the transfer.  If the transfer of all active and inactive bargaining unit employees will not be completed as described above, the Parties

agree that prior to the required date GM and the UAW will implement a
solution such that Delphi will have no further responsibility for the
operation of future production at the Needmore Rd. site, nor will the
bargaining unit employees remain as Delphi employees.

Saginaw Mfg. – Business provided by GM to a third party will operate
at the current site or another geographically proximate site designated
by GM, providing approximately 500 jobs. No later than December 31,
2008, the Parties agree that GM will cause the active and inactive
bargaining unit employees at Saginaw Manufacturing to transfer to
employment with a third party.  Delphi and the UAW will cooperate with
the transfer.  If the transfer of all active and inactive bargaining unit
employees to a third party is not completed by the date identified
above, GM and the UAW will, prior to the required date, implement a
solution such that Delphi will have no further responsibility for the
operation of future production at the Saginaw Mfg. site, nor will the
bargaining unit employees remain as Delphi employees.

4.  Sites to be wound down or consolidated by Delphi in accordance with
    Delphi's restructuring plan and timing ("Wind Down Sites"):

> Columbus
> Milwaukee PWT (E&C)
> Milwaukee E&S
> Coopersville
> Anderson
> Wichita Falls
> Fitzgerald
> Olathe
> Laurel
> Athens

## C. WORKFORCE TRANSITION

1.  <u>Current Employee Flowback</u>

    Employees on roll prior to October 8, 2005 ("Flowback-Eligible
    Employees") without a valid flowback application on file will be afforded
    a final opportunity to make application for flowback by October 1, 2007.

    Eligible Delphi employees hired prior to October 18, 1999 will receive
    closed plant treatment for purposes of job offers at GM plants.
    Employees from those plants who apply will have their seniority co-
    mingled with the seniority of GM employees who are eligible for closed
    plant treatment for purposes of job offers to GM openings in
    accordance with Appendix A.4 and 5 of the 2003 UAW-GM National

Agreement.  A $67,000 relocation allowance will be paid to otherwise eligible employees from AHG – Anderson, PT – Coopersville, AHG – Wichita Falls, AHG – Fitzgerald, AHG – Columbus (except MFD – Mansfield), PT – Milwaukee, E&S – Milwaukee, and Steering – Athens (except Spring Hill assembly plant) who flow at the time the plant ceases operations to a General Motors Extended Area Hire plant.  All other Flowback-eligible employees will be eligible for a relocation allowance in accordance with Paragraph (96a)(2)(a) of the 2003 UAW-Delphi National Agreement.

AHG-Columbus will be in the MFD-Mansfield plant Area Hire area and employees will be eligible for relocation allowance in accordance with Paragraph (96a)(2)(a) of the UAW-Delphi National Agreement.

Delphi – Athens will be placed in the General Motors Spring Hill area hire for purposes of placement.  Flowback opportunities to Spring Hill will be made available to 300 Traditional Delphi employees (defined in Section C.5.a below) or the number of Traditional employees remaining after the Delphi Special Attrition Program whichever is less. No relocation will be paid for the flowback.  The flowback opportunities will begin at the earlier of:

a)    March 1, 2009
b)    When layoffs begin at Athens
c)    Spring Hill needs people

Upon transfer to Spring Hill from Athens, if no jobs are available, the employee will be placed on layoff and then will be under the SUB and Job Security terms of the GM-UAW National Agreement.  No employee being transferred can take a job in the plant unless a job is available.  If there are surplus people at Spring Hill, the parties agree to look for ways to reduce the surplus including, but not limited to:

a)    A Special Attrition Program at Spring Hill
b)    Placement at other GM plants such as Bowling Green

As of the Effective Date of this Agreement (defined in Section K.1 below), Delphi employees who are otherwise eligible and who have an application on file will be eligible for flowback opportunities for the same length of time as the length of their seniority (time-for-time).

GM employees are no longer eligible for flowback to Delphi.

2.  <u>UAW-Delphi Employees Hired After October 18, 1999 and Prior to October 8, 2005 – Agreement between the Parties to offer job</u>

opportunities at GM

a. Employees will be offered the job opportunities at GM after the Appendix A Placement Process and the UAW-GM-Delphi Flowback Agreement have been exhausted.

b. Employees will be eligible for relocation allowance in accordance with Appendix A VI and Paragraphs (96a)(1), (2), (3), and (4) of the 2003 UAW-Delphi National Agreement.

c. Employees will acquire GM seniority on the date of hire at the new location and will receive a new plant seniority date that is the effective date of hire.  The new plant seniority date will also be the date used in the administration of Appendix A, Memorandum of Understanding – Employee Placement in the UAW-GM National Agreement.

d. Employees hired by GM will receive the same benefits treatment as other employees who transfer to GM under the UAW-GM-Delphi Flowback Agreement in accordance with the UAW-GM-Delphi Memorandum of Understanding, Benefit Plan Treatment dated September 30, 1999 as amended.

e. Initial vacation entitlement at GM will be the same as that at Delphi as of the date immediately prior to the transfer.

f. Employees will receive a wage rate in the same progression as they were in at Delphi and in accordance with Paragraph (98) of the UAW-GM National Agreement.

g. These employees will be SEL protected at GM unless noted otherwise.

3. Delphi to Delphi Transfers

Delphi employees (excluding temporary employees) covered by the Supplemental Agreement ("Supplemental Employees") with seniority as of the Effective Date of this Agreement, will have rights to other Delphi plants outside their own Area Hire area prior to permanent new hires and will be eligible for relocation allowance in accordance with Paragraph (96a)(2)(a).

4. Temporary Employees

It is mutually agreed between the parties that employees hired as temporary employees in UAW-Delphi plants  will be converted to

permanent employees on the Effective Date of this Agreement.  Such employees will receive credit for time worked as a temporary employee toward establishing a seniority date pursuant to Paragraph (57) of the UAW-Delphi National Agreement.  Employees who worked for Delphi as of January 1, 1999 or later, or employees who accepted an option under the GM or Delphi Special Attrition Programs, are not eligible to be converted to permanent status.  Employees hired July 2, 2007 and later will be hired as temporary employees under the provisions of Appendix A. X – Memorandum of Understanding Employee Placement-Section X-Vacation Replacements and Other Employees Hired for Temporary Work, subject to review of the National Parties.

5.  Transformation Program Options

Delphi and the UAW agree on the following Transformation Program options which will be offered at all Delphi sites.  The Retirement Incentives and Buy Out are subject to the terms of Attachment C, and are generally described below.

a.  Retirement Incentives – Traditional Employees

Retirement options will be provided for Delphi employees not covered by the Supplemental Agreement  to be effective no later than September 1, 2007 as described in Attachment C and summarized below:

1)  $35,000 for normal or early voluntary retirements

2)  50 & 10 Mutually Satisfactory Retirement (MSR)

3)  Pre-retirement program covering employees with at least 26 years of credited service but less than 30 years as of September 1, 2007

4)  These retiring employees will be considered to have flowed back to GM for purposes of retirement ("Check the Box") and be treated consistent with the Check the Box retirements under the UAW-GM-Delphi Special Attrition Program.

5)  Participation conditioned on release of claims

b.  Buy Out – Traditional Employees

1)  The amount of the Buy Out Payments shall be as follows, subject to release of claims:

     i. Traditional Employees with 10 or more years of seniority or credited service, whichever is greater, will be eligible for a Buy Out payment of $140,000

     ii. Traditional Employees with less than 10 years of seniority will be eligible for a Buy Out payment of $70,000

2) Buy Outs will be effective when the employee's services are no longer required, but in any event no later than September 15, 2007. Employees will sever all ties with GM and Delphi except for any vested pension benefits (as such no pension supplements are payable).

3) As necessary, employees who have accepted a Buy Out may be rehired as temporary employees to satisfy any operating needs. Any employee rehired as a temporary employee will not be eligible for any coverage or benefits under the Term Sheet. Further, any employee rehired as a temporary employee shall receive the starting wage rate applicable for a new temporary employee. Such temporary employees will not be eligible for any future attrition or Severance Payments.

c. <u>Buy Down – Traditional Employees</u>

1) Effective October 1, 2007 all Traditional Employees, both production and skilled trades, other than pre-retirement program participants, will become Supplemental Employees and will be covered by all provisions of the Supplemental Agreement.

2) Buy Down payments will be made to Traditional production employees as described below and will not exceed $105,000.

a) Traditional production employees on active status (including Protected Status, but excluding pre-retirement program participants), and Traditional production employees on temporary layoff as of October 1, 2007 will be eligible for the Buy Down payments.

b) The $105,000 Buy Down payment will be paid out in three (3) equal installments of $35,000, less applicable withholding, in the first pay ending after October 1, 2007, October 1, 2008, and October 1, 2009 provided the employee is on active status, receiving holiday pay, paid vacation, jury duty, military leave, or temporary layoff status on each of those three (3) dates. The October 1, 2008 and October 1, 2009 payments will be prorated based on the

number of pay periods worked and the rate of compensation in the preceding 52-week period.  Treatment of employees on disability or Workers' Compensation leave is in accordance with (d) and (e), below.

c)  Traditional production employees who are on a leave of absence other than Sickness and Accident (S&A), Extended Disability (EDB), and Workers Compensation on October 1, 2007 will be eligible for the first $35,000 payment, less applicable withholding, at the time they return to work if they return to work prior to October 1, 2008.  The two (2) subsequent payments will be pro-rated based on the number of pay periods worked during the year immediately prior to the October 1st date. Additionally, the two (2) subsequent payments also will be adjusted by time spent on disability during the year immediately prior to the October 1st date, as described in (e), below.

d)  Sickness & Accident (S&A) benefits, Extended Disability Benefits (EDB), health care, life insurance and other applicable benefits will be reduced on October 1, 2007 to Supplemental Agreement levels for Traditional Employees who are on disability or Workers' Compensation leave on October 1, 2007. Traditional production employees will be eligible to receive a $35,000 Buy Down payment on October 1, 2007.

e)  Traditional production employees who are eligible for Buy Down payments and who are on or commence a disability or Worker's Compensation leave on or after October 1, 2007, will be eligible for the 2nd and 3rd Buy Down payments pro-rated for the time they spent on disability or Worker's Compensation leave during the year immediately preceding the date of each subsequent Buy Down payment. The pro-rated amount that will be included in the Buy Down payment for the period spent on disability or Workers' Compensation leave will have the same percentage relationship to the full Buy Down amount as the employee's applicable Sickness & Accident or Extended Disability Benefit schedule of benefits has to their base hourly rate for the applicable periods of leave.

f)  Traditional Production employees on active status (including Protected Status, but excluding pre-retirement program participants), and Traditional production employees on temporary layoff as of October 1, 2007 who do not elect an

option as described in Attachment C will become Supplemental Employees and will be covered by all provisions of the Supplemental Agreement as described in Paragraph C.5.c. 1-2 e of this Buy Down section. Employees must sign a Conditions of Participation Release Form in order to receive the $35,000 lump sum payment.

g) Traditional production employees who are in a plant that is wound down on October 1, 2007 who do not elect an option under the Special Attrition Program – Transformation (Attachment C), will become Supplemental employees and will be covered by all provisions of the Supplemental Agreement as described in Paragraph C.5.c.1-2 e of this Buy Down section and will be placed on layoff effective October 1, 2007.  The employees will receive the October 1, 2007 $35,000 lump sum payment, less applicable withholding, if they sign the Conditions of Participation Release Form. These laid off employees will not be eligible for any future Buy Down payments, but can collect SUB, if otherwise eligible.

h) Traditional skilled trades employees who are on roll October 1, 2007 and receiving compensation will be eligible for a one time buy down payment of $10,000, less applicable withholding, in the first pay ending after October 1, 2007. Traditional skilled trades employees will have the COLA in effect as of the Effective Date of this Agreement frozen at that level through October 1, 2007.  Any Traditional skilled trades employees who are Bought Down and remain on roll will have such frozen COLA folded into their base rate effective October 1, 2007, and will thereafter be covered by the skilled trades wage and benefit provisions of the Supplemental Agreement.

i) Employees must sign a Conditions of Participation Release Form in order to receive the lump sum payments.

j) No further Buy Down payments will be payable to any employee who flows back to GM or severs their employment with Delphi.

3) In determining the wages and benefits for Traditional Employees who Buy Down to Supplemental Employee status, such employees will be given credit for time spent as a Delphi Traditional Employee at traditional wages and benefits (i.e., will

not be treated as new hires for purposes of applying
Supplemental Agreement wage and benefit schedules).

4) Traditional Employees electing a Buy Down will retain eligibility
for OPEB and pension benefit treatment under the Term Sheet
without regard to such election.

6. <u>Severance Payments</u>

Delphi and the UAW agree that any Supplemental or Temporary
Employees on the active employment rolls as of the Effective Date of
this Agreement at any "Keep," "Sell," "Footprint," or "Wind Down" sites
(excluding employees who previously received a Buy Out payment
from Delphi and were rehired as temporary employees), who are
permanently laid off prior to September 14, 2011, shall be eligible for a
lump sum severance payment equal to $1,500 for each month of
his/her combined service with Delphi and, in the case of sold facilities,
the new owner. The maximum amount of severance pay is $40,000,
less applicable withholdings. Employees must sign a Conditions of
Participation Release Form in order to receive the Severance
Payment. The Parties agree that employees who are separated will
sever all ties with GM and Delphi except for any vested pension
benefits (as such no pension supplements are payable), if any.

Employees who are on roll on the Effective Date of this Agreement
who are also eligible for Supplemental Employee Benefits (SUB) will
have their choice of SUB or the Severance Payment specified above
but will not be entitled to both.

Employees hired after the Effective Date of this Agreement who have 3
or more years of seniority at the time their services are no longer
required but prior to September 14, 2011 may elect a $40,000
severance payment or SUB as specified in the Supplemental
Agreement.

Permanent employees covered by the Supplemental Agreement
placed on indefinite layoff from the AHG- Fitzgerald plant after May 1,
2007 and prior to the Effective Date of this Agreement will be eligible
for the severance payment provided they sign the required Conditions
of Participation Release form.

7. Any problems with the implementation of this Transformation section
will be discussed by the National Parties in order to agree on an
equitable solution.

**D. MODIFICATIONS TO THE 2004 SUPPLEMENTAL AGREEMENT**

The UAW and Delphi agree to the following Supplemental Agreement modifications:

1. Wages

The UAW and Delphi agree that wages for Supplemental Employees, and for Traditional Employees who Buy Down will continue to be determined in accordance with the Supplemental Agreement except as modified below:

a. Wage Progression.  For production employees hired prior to the Effective Date of this Agreement, the 3% wage progression increases will be discontinued subject to the following:

(i)    Employees in groups A, B, or C (as defined in the Supplemental Agreement) hired before the Effective Date whose base hourly wage rate , as of the Effective Date, exceeds the respective group's 2007 Floor Rate as described below, will receive his/her next scheduled wage progression increase, as defined in the 2004 Supplemental Agreement, following the Effective Date, and will thereafter receive wage increases only as described in Section D.1.d below.  In the event such final wage progression increase occurs on or after December 31, 2007, it shall be adjusted upward to reflect the impact of any Wage Formula increase effective on that date, as described in Section D.1.d below.

(ii)   Employees in groups A, B, or C hired before the Effective Date whose base hourly wage rate , as of the Effective Date, is at or below the respective group's 2007 Floor Rate as described below will continue to receive scheduled wage progression increases as defined in the 2004 Supplemental Agreement, if any, required to bring such employee up to the respective group's 2007 Floor Rate.  Any employee who has not reached his/her respective Floor Rate through scheduled wage progression increases will be automatically moved to the Floor Rate effective December 31, 2007, and will thereafter receive wage increases only as described in D.1.d below.  Any wage increases described in D.1.d. below will be applied to an employee's base wage rate following application of any automatic increase up to his/her respective group's Floor Rate.    (The examples provided in Attachment F are provided for reference in the administration of this provision).

| Supplemental Wage Group | 2007 Floor Rate* |
|---|---|
| A | $16.23 |
| B | $15.30 |
| C | $14.50 |

*The Floor Rate will be adjusted at the beginning of each
year as described in Section D.1.d below.

(iii)  An employee in Group D ("Screw Machine Operator" and
"Screw Machine Operator – Trainee") hired before the
Effective Date whose base hourly rate , as of the Effective
Date of this Agreement, is at or below his/her first progression
step (i.e. $18.50) shall have his/her base rate increased to this
first progression step on such date, and increased further to
the second (and final) progression step of $19.50, effective
December 31, 2007.  The final progression step of $19.50
shall be the initial Floor Rate for Group D employees.
Thereafter, such employees will receive wage increases only
as described in Section D.1.d below, and consistent with the
methodology as described in D.1.a.(i) and (ii) above.

(iv)  Traditional Employees taking the Buy-Down to Supplemental
Employee status will be given credit in the wage progression
schedule for time as a Traditional Employee up to the current
wage maximum in each respective Supplemental Agreement
wage group and will thereafter be treated as described in
Section D.1.a.(i) above.

b.  Production Employee New Hire Rates

For all production employees hired after the Effective Date of this
Agreement, new hire rates shall be established at the greater of (a)
$14.00 per hour, or (b) 90% of the prevailing Floor Rate for the
respective classification.  As a temporary exception, employees
newly hired into classifications belonging to Wage Group A
between the Effective Date of this Agreement and December 31,
2007, will start at an initial hire rate of $14.42 per hour.  The wage
rate of employees hired under this temporary exception will be
adjusted to $14.61 effective December 31, 2007, and thereafter
proceed under the normal progression schedule as described
below based on his/her hire date.  Employees hired at the 90%
level will receive four wage progression increases, one every 26
weeks in an amount equal to 2.5% of the then-prevailing Floor
Rate, until reaching the Floor Rate for the relevant classification

over the course of 104 weeks.  Employees hired at the $14.00 rate will receive four wage progression increases, one every 26 weeks, in the amount necessary to achieve the then-prevailing Floor Rate over the course of 104 weeks in four proportional increases.  These proportional increases shall be equal to the difference between the then-prevailing Floor Rate for the classification and the employee's then-current rate multiplied by 25% for the first progression increase; 33% for the second; 50% for the third; and 100% for the fourth and final progression increase.  All new hires will also receive the wage increases described in Section D.1.d below.

c.  COLA

As of the Effective Date of this Agreement, Skilled Trades employees covered by the Supplemental Agreement will have all accrued COLA folded into their base rates.  Thereafter, future COLA adjustments shall be eliminated and replaced by Wage Formula increases as described in Section D.1.d below.  With respect to the January, 2008 Wage Formula increase, the applicable percentage adjustment shall be applied to each employee's base wage rate, including any applicable COLA folded in as of the Effective Date.   Supplemental Production Employees hired prior to the Effective Date, and on active status as of August 1, 2007, will be eligible to receive a one-time COLA make-up adjustment payment in the amount of $350 payable during the week of August 6, 2007.

d.  Wage Formula Increases

Effective with the Monday of the week that includes the first scheduled workday of 2008 (12/31/2007), 2009 (1/5/2009), 2010 1/4/2010 and 2011 (1/3/2011), the hourly wage rate for each production and Skilled Trades employee will be increased  by a percentage equal to the greater of (a) the annual percentage increase in average hourly earnings, excluding overtime, of employees in the Manufacturing sector (BLS Series CEU3000000033) or (b) the annual percentage increase in the All Items, Less Medical, CPI-W Index (1982-84=100), both as calculated for the 12 month period ending with the month of August prior to the respective increase date.  In the event a calculated increase exceeds 3.75%, wages will be increased by 3.75% and the parties will determine a mutually acceptable disposition of the excess, guided by the twin goals of enhancing UAW members' job and income security and the company's competitiveness.  In the event the wage formula generates a negative result, wages will not be reduced.  Instead, the negative result, up to a negative 3.75%,

would be used as a direct offset to the next subsequent formula
increase (and subsequent increases after that, if necessary, until
fully offset).  For example, if the formula produced a negative result
of 1.34% in one year followed by a 2.45% increase in the next year,
the adjusted increase in the second year would be a net 1.11%.
The engineering method of rounding will be adopted for all Wage
Formula calculations: to three decimal places for the Manufacturing
sector average hourly earnings component; to four decimal places
for the annual inflation component; to four decimal places for year-
to-year percentage changes for each of these components; and to
two decimal places for new base hourly wage rates following
application of a four decimal Wage Formula increase.

e.  Wage Formula Basis

In the event that either of the BLS Series data as referenced above
is eliminated, the parties will adopt a mutually agreeable successor
or replacement series for use in future calculations.  When
calculating a Wage Formula result for a current year, BLS data from
the preceding year's calculation will become the basis for the
current year formula and will not be changed to reflect subsequent
revisions in the published data, nor will a Wage Formula adjustment
for a prior year be changed as a result of subsequent revisions in
the underlying data.

2.  <u>Individual Retirement Plan and Personal Savings Plan</u>
Covered Employees under the Term Sheet (Attachment B) are not
eligible to participate in the Individual Retirement Plan provisions of the
Delphi pension plan or receive a company match to the Personal
Savings Plan for the period of time they are eligible to accrue credited
service in the GM pension plan in accordance with the Term Sheet.

3.  <u>Post Retirement Health Care Account</u>

Covered Employees who can attain eligibility to receive GM OPEB
under the Term Sheet (Attachment B) are not eligible to receive credits
in the Retiree Medical Account.

## E.  LOCAL NEGOTIATIONS

The UAW and Delphi agree that local negotiations regarding work rules
and other local agreement issues will be conducted on an expedited basis
immediately upon ratification of this Agreement, with the support and
assistance of the National Parties, at all "Keep", "Sell" and "Footprint" sites
(see Section B and Attachment A, D).  At facilities to be sold/transferred,
such local negotiations will involve the new owner.

### F. PENSION AND OPEB / BENEFIT GUARANTEE

1. The Parties have agreed to a Term Sheet with respect to the freezing of Delphi's pension plan, the cessation of Other Post Employment Benefits (OPEB) for Delphi employees and retirees and the consensual triggering of the GM-UAW Benefit Guarantee.  That agreement, the Term Sheet, is attached as Attachment B,  and is incorporated by reference herein.

2.

   a.  GM and the UAW agree that the period of time on or before which GM's obligations under sections b., c., d., and e. of the Benefit Guarantee Agreement between GM and the UAW, dated September 30, 1999 ("Benefit Guarantee"), may be triggered shall be extended to December 31, 2007 (and to March 31, 2008 if Delphi has commenced solicitation of acceptances of its chapter 11 plan of reorganization prior to December 31, 2007 but the plan has not been confirmed and substantially consummated or such later date as Delphi and GM shall agree to extend the Indemnification Agreement expiration in Section F.2.c)), provided, however that notwithstanding the foregoing or any other provision of this Agreement, this extension shall be without prejudice to any rights, defenses or claims of any Party with respect to the Benefit Guarantee.

   b.  Notwithstanding anything to the contrary in the Benefit Guarantee, this Agreement, or the Benefit Guarantee Term Sheet  (Attachment B), GM and the UAW hereby agree that if, at any time prior to the Effective Date, as defined in Attachment B  (including the event that such Effective Date never occurs):

   1) Delphi or its successor company(ies) terminates its pension plan covering the Covered Employees or ceases to provide on-going credited service for the Covered Employees working at Delphi or its successor company(ies), as applicable, section b. of the Benefit Guarantee will be triggered for such Covered Employees to whom such cessation or termination applies; or

   2) Delphi fails or refuses to provide post-retirement medical benefits to Covered Employees retired from Delphi with eligibility for such benefits prior to September 1, 2007, or Delphi reduces the level of post-retirement medical benefits for such Covered Employees below the level of benefits which GM is providing to its UAW-represented retirees, section c. of the Benefit Guarantee will be triggered for all such Covered Employees to whom such failure,

refusal or reduction applies, except for any Covered Employee who is a "check the box" retiree.

Any such triggering in this Section F.2.b. will be subject to all other terms and conditions of the Benefit Guarantee. All terms of this Section F.2.b (even any that have already become effective) will be superseded in their entirety by Attachment B if and when Attachment B becomes effective. Notwithstanding the foregoing or any other provision of this Agreement, any triggering of the Benefit Guarantee hereunder as between GM and the UAW shall be without prejudice to the rights, defenses or claims of any Party with respect to the Benefit Guarantee (including, without limitation, Delphi, which the UAW and GM acknowledge has neither agreed nor consented to the triggering of the Benefit Guarantee pursuant to this Agreement or otherwise), except as to GM regarding its agreement to trigger as specifically provided for in this section F.2.b.

c. Delphi and GM agree that the eighth anniversary date reference in paragraph L of the Agreement between Delphi and GM, with respect to the Benefit Guarantee, dated as of December 22, 1999 (the "Indemnification Agreement"), i.e. October 18, 2007, shall be extended to December 31, 2007 (and to March 31, 2008 if Delphi has commenced solicitation of acceptances of its chapter 11 plan of reorganization prior to December 31, 2007 but the plan has not been confirmed and substantially consummated or such later date as Delphi and GM shall mutually agree); provided, however that notwithstanding the foregoing or any other provision of this Agreement, this extension shall be subject to a full reservation of rights to challenge on any grounds the validity or enforceability of the Indemnity Agreement or any claim GM has made or may make in connection with the Indemnity Agreement, and GM expressly agrees and acknowledges that nothing herein shall be deemed to be, or shall be evidence of, any waiver of any defense Delphi has concerning the Indemnity Agreement or any claim there under or otherwise including defenses arising out or related to the triggering of the Benefit Guarantee under this Agreement without Delphi's approval or consent as an indemnitor under the Indemnity Agreement.

3.  Notwithstanding anything to the contrary in this Agreement or any other agreement between (a) the UAW and GM or (b) the UAW and Delphi, in the event that the Benefit Guarantee expires as described in Section F-2, and the Effective Date (as defined in the Benefit Guarantee Term Sheet (Attachment B)) has not occurred, and Delphi has unilaterally modified, terminated or in any way reduced or diminished any of the benefits covered by the Benefit Guarantee, the

UAW shall be immediately released from any obligations to refrain from striking and shall be allowed to call a strike against Delphi and/or GM on two days written notice. This limited right to strike will terminate on the Effective Date of Attachment B or as provided in a substitute agreement between the UAW, Delphi and GM.

## G.  INTENTIONALLY OMITTED

## H.  OTHER NATIONAL AND LOCAL AGREEMENT MODIFICATIONS

1.  <u>Hiring requirements</u>

The UAW and Delphi agree that all existing and future hiring obligations and all such provisions contained in the Existing Agreements as defined below in Section 7 are eliminated.

2.  <u>Transfer of Pension Assets and Liabilities – (414)(I)</u>

A transfer of pension assets and liabilities will occur as provided in the Term Sheet pursuant to Internal Revenue Code Section (414)(I).

3.  <u>Existing CHR/Legal Services</u>

The Parties agree as follows:

a.  As of October 1, 2007, all Delphi funding and participation in the Legal Services Plan (Attachment I to the 2003 UAW-Delphi National Agreement) and all programs associated with the UAW-GM Center for Human Resources (CHR) will be terminated. Discussions about any joint programs to be continued, and the method for their administration at the local level in the absence of the CHR, will be a matter of Local Negotiations.

b.  CHR joint training fund accruals will be addressed as specified in Section J, below.

c.  The CHR/Joint Training Funds New Allocation Agreement dated April 2, 2001 is terminated as of the Effective Date of this Agreement.

d.  Existing Legal Services fund (cash and accruals) will be reserved for the exclusive use of eligible participants or to pay administrative expenses incurred by the Plan until depleted.  Any excess (cash and accruals) will be addressed as specified in Section J below.

4. <u>Holiday Schedule</u>

Delphi and the UAW agree to adopt the same specified holidays as agreed to by General Motors and the UAW through September 14, 2011 (not including any paid Independence Week days except for the specified Independence Day holiday itself).

5. <u>Workers' Compensation Letter</u>

The Workers' Compensation letter agreement attached to the 2003 Delphi HRP will be subject to the same modifications that may be made to the Workers' Compensation letter agreement in the 2003 UAW – GM National Agreement as a result of 2007 National Negotiations between GM and the UAW.

6. <u>Temporary Employees</u>

The UAW and Delphi agree that temporary employees may be used to satisfy need-to-run requirements in plants that are considered "Wind Downs", "Sell" and "Footprint".  Temporary employees may be used in "Keep" sites to bridge any difficulties arising from the implementation of the attrition portion of this Agreement (Attachment C).  The use of temporary employees at any site for any reason is subject to the approval of the UAW-Delphi National Parties.

7. <u>Existing Agreements</u>

The UAW and Delphi agree that the Supplemental Agreement, the UAW-Delphi National Agreement dated September 18, 2003 and supplemental agreements attached as Exhibits thereto and UAW-Delphi Local Agreements (collectively the "Existing Agreements") are modified or eliminated to conform to the provisions of this Agreement, as listed in Attachment E.

8. <u>Document 13</u>

The UAW and Delphi agree that the Document 13 commitment in Article 2 of the Supplemental Agreement and Document 13 of the National Agreement shall remain in effect through and expire on September 14, 2011, and that both are waived to the extent necessary to implement the site plans outlined in Section B. and as described in detail in Attachment A ("Site Plans").

9. <u>Appendix L</u>

The UAW and Delphi agree that the terms of the existing Appendix L provisions of the 2003 UAW/Delphi National Agreement will be

applicable with the understanding that upon the conclusion of these
negotiations, the UAW-Delphi Joint National Sourcing Committee will
identify the proper variable wage and benefit cost elements to be
utilized in the Net Present Value Costing Methodology.

10. <u>GIS</u>

The UAW and Delphi agree that the Guaranteed Income Stream (GIS)
Program (Exhibit E to the 2003 UAW-Delphi National Agreement) will
be eliminated.

11. <u>AOL</u>

The UAW and Delphi agree that the Corporation-paid subsidy for AOL
will be discontinued.

## I.   EQUIVALENCE OF SACRIFICE

Delphi reaffirms its commitment to the principle of "equivalence of
sacrifice" when establishing compensation and benefit levels for salaried
employees and management, to ensure that sacrifices by UAW-
represented employees are reflected in the pay and benefit practices of all
non-represented employees.

Information provided by Delphi related to this matter will be in accordance
with the requirements of the Supplemental Agreement.

## J.   SETTLEMENT OF ALL EMPLOYEE, RETIREE, AND UNION
ASSERTED AND UNASSERTED CLAIMS

The Parties agree to the following in partial consideration for the UAW
entering into this Agreement and in consideration for the releases to be
provided pursuant to Section K.

1. Individual settlements pursuant to Transformation Program terms and
   conditions.

2. The UAW has asserted a claim against Delphi in the amount of $450
   million as a result of the modifications encompassed by this Agreement
   and various other UAW agreements during the course of Delphi's
   bankruptcy.  Although Delphi has not acknowledged this claim, GM
   has agreed to settle this claim by making a payment in the amount of
   $450 million, which the UAW has directed to be paid directly to the DC
   VEBA established pursuant to the settlement agreement approved by

the court in the case of Int'l Union, UAW, et. al. v. General Motors
Corp., Civil Action No. 05-73991.

3.  Delphi is current in its payment of Delphi-related CHR expenses and
    Legal Services through year end 2006 and to date in 2007.  In addition,
    on October 1, 2007, the UAW will receive payment for an allowed
    claim against Delphi in the amount of $140 million consisting of CHR
    existing accruals of $134 million and UAW-Delphi Legal Services Plan
    accruals of $6 million (adjusted by the difference between accruals and
    expenditures until the effective date of the plan of reorganization) in
    complete settlement of the UAW and the UAW-GM Center for Human
    Resources claims asserted as to CHR Joint Funds and the UAW-
    Delphi Legal Services Plan accruals and expenses.  The amount of
    $30 million will be directed to the UAW-GM Center for Human
    Resources and the balance will be paid directly to the DC VEBA
    established pursuant to the settlement agreement approved by the
    court in the case of Int'l Union, UAW, et. al. v. General Motors Corp.,
    Civil Action No. 05-73991.

4.  Excludes waiver of rights to vested pension benefits, workers
    compensation benefits, unemployment compensation benefits and
    pursuance of pending ordinary course grievances of employees
    remaining in the workforce.

5.  All other consideration and concessions provided by GM and Delphi
    under the terms of this Agreement and all attachments to this
    Agreement.

The Parties also acknowledge that (i) the consideration provided by GM
pursuant to this Agreement and all attachments to this Agreement
constitutes a substantial contribution to Delphi's plan of reorganization, (ii)
this contribution is necessary to the success of Delphi's plan of
reorganization, and (iii) GM would not have made this contribution without
obtaining the waivers and releases provided for herein.  The Parties
further acknowledge that nothing in the preceding sentence shall give rise
to or entitle GM to seek or be allowed any claim against or consideration
from any entity, including Delphi, other than as specifically approved by
the Bankruptcy Court as agreed to by Delphi and GM in a comprehensive
settlement agreement resolving the financial, commercial, and other
matters between them.

## K.  EFFECTIVE DATES AND BANKRUPTCY PROCEEDINGS

1.  Subject to its terms and conditions, this Agreement is a final, binding
    and conclusive commitment and agreement that will be effective on the
    later of entry of an Order by the U.S. Bankruptcy Court approving this
    Agreement that is satisfactory to the UAW, GM and Delphi (the

"Approval Order"), or the first Monday following receipt by Delphi of written notice of ratification from the UAW (the "Effective Date"). The ratification process will commence as soon as practical following the date of this Agreement. In connection with Delphi's prosecution of a motion to obtain entry of the Approval Order in the Bankruptcy Court, (a) Delphi shall use its best efforts to file a motion for approval of this Agreement in form and substance reasonably acceptable to the Parties to be heard not later than the first monthly omnibus hearing at which the motion can be considered under the case management orders entered in the Bankruptcy Court, (b) Delphi shall provide, to the extent reasonably practicable, both the UAW and GM with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by Delphi for filing with the bankruptcy court relating to court approval of this Agreement, and (c) the Parties shall support the approval of this Agreement in the Bankruptcy Court without condition, qualification or exception.

2.  The parties acknowledge that the following provisions of this Agreement will not become effective until all of the following events have occurred and as of the date when the last of such events shall have occurred:  (a) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them and (b) the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM:

    a.  The Benefit Guarantee Term Sheet (Attachment B)
    b.  Delphi pension freeze (Section F and Attachment B)
    c.  Cessation of Delphi OPEB (Section F and Attachment B)
    d.  414(l) transfer (Section H.2 and Attachment B)
    e.  Section J.2.

3.  The Parties agree that the order of the Bankruptcy Court approving this Agreement shall provide that any plan of reorganization consistent with this Agreement and any confirmation order entered into with respect to such plan shall include the following provisions:

    a)  On the effective date of such plan of reorganization, the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees or former employees of Delphi, waive and release and be deemed to have waived and released any and all claims of any nature, whether liquidated, unliquidated, contingent, non-

contingent, asserted or unasserted, existing and/or arising in the future against Delphi, its subsidiaries or affiliates, the Delphi HRP, the Delphi Health Care Program for Hourly Employees and the Delphi Life and Disability Benefits Program for Hourly Employees, GM, its subsidiaries or affiliates, the GM HRP, the GM Health Care Program for Hourly Employees and the GM Life and Disability Benefits Program for Hourly Employees, and the officers, directors, employees, fiduciaries, and agents of each, arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the UAW and between GM and the UAW related to such employees and the UAW-GM-Delphi Memorandum of Understanding Benefit Plan Treatment related to such employees (provided, however, that claims for benefits provided for or explicitly not waived under the provisions of this Agreement are not waived).

b)    A plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the plan of reorganization for the debtor) for the UAW released parties (which shall include the UAW and each of their current or former members, officers, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents and other representatives) with respect to any liability such person or entity may have in connection with or related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the plan of reorganization, the disclosure statement concerning the plan of reorganization, this Agreement or the Agreements on Attachment E hereto or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the plan of reorganization or any agreement between the UAW or Delphi, or any other act taken or omitted to be taken consistent with this Agreement in connection with the Delphi bankruptcy.

c)    This Agreement and the agreements referenced in Attachment E shall be assumed under 11 U.S.C. §365.

4.    The Parties agree that they will cause the UAW-GM Center for Human Resources to enter into a consent order in the Bankruptcy Court agreeing to the treatment of the CHR claim provided for in Section J of this Agreement.

5. Nothing contained herein shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the UAW and Delphi (except as provided for in Section K.3) or any commercial agreement between GM and Delphi, nor shall anything herein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.  The Parties further agree (and the Bankruptcy Court order shall also provide) that this Agreement is without prejudice to any interested party (including the parties to this Agreement and the statutory committees) in all other aspects of Delphi's Chapter 11 cases and that each Party to this Agreement reserves all rights not expressly waived herein.

6. Unless this Agreement is consummated following all required approvals, nothing herein shall bind any of the Parties nor shall the Agreement be admissible in any judicial or other proceeding on behalf of or against any Party.

The parties, by their duly authorized officers and representatives, agree accordingly this 22nd day of June 2007.

International Union, UAW    Delphi Corporation    General Motors Corporation

## Attachment A

### SITE PLANS

### <u>OVERVIEW</u>

- The following site documents describe GM's and Delphi's product program commitments to the sites (Keep, Sell and Footprint). At the Sell Sites, the Parties understand that the new owners' involvement and perspective will be needed as part of the process.
- General Motors will suspend all Sourcing on current products and new products (identified in Attachment A-1) at the Keep, Sell and Footprint Sites (after their transformation) for the life cycles of the identified engine programs, vehicle programs, warehousing, unitizing, trucking-related and component manufacturing.
- Program name changes will not alter the commitments made for the Keep Sell and Footprint Sites in this document. In the event a product program identified in Attachment A-1 is cancelled, discussions will be held between General Motors, Delphi and the UAW to find alternative solutions.
- Grand Rapids, Kokomo, Rochester and Lockport (the "Keep" Sites) will retain all current parts, including their current respective percentage of the total volume, through the life cycles of the identified engine and vehicle programs which they supply to General Motors.
- General Motors will award new work to the Keep Sites as identified in Attachment A-1, and Delphi will produce the associated products at the Keep Sites.
- Delphi will suspend all Sourcing relative to the above referenced current product programs manufactured for GM at the Keep sites, as well as the new products identified in Attachment A-1, through the life cycles of the engine and vehicle programs associated with these commodities. If a component in the above program awards causes the product to become uncompetitive, the local parties will meet to resolve the problem. If the local parties cannot reach resolution, the National Parties will provide assistance. If the parties are still unable to reach resolution, Appendix L will be utilized.
- A few GM products are dual sourced. If future volume reductions occur at the Keep, Sell and Footprint sites, GM and/or Delphi will maintain the previously identified volume percentage at the impacted locations.
- Revenue and jobs as identified in this document (including Attachment A-1) are based on current estimates of program volumes which are subject to change based on future market conditions and are not financial or volume guarantees.
- Investment and engineering figures are estimates based on the current understanding of program requirements which are subject to change based on future program revisions, and are not financial or volume guarantees.

## GRAND RAPIDS

## CURRENT STATE

- Booked revenue projected to increase from $174 million in 2007 to $195 million in 2011 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs starting in 2010-2012, including Cylinder Deactivation, Lash Adjusters, Lifter Guide Assemblies, and the 4.5 HO V-8 12mm HLA.  GM will commit these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional new product programs as they are released. The majority of the specific program replacement for incumbent work is beyond the GM program planning horizon at this time.

## DELPHI COMMITMENT
- Engineering and capital investment of approximately $22.5 million will be made by Delphi at the Grand Rapids facility as required to support the above-designated product programs.

# ROCHESTER

## CURRENT STATE

- Booked revenue projected to decrease from $583 million in 2007 to $343 million in 2011 (reference Attachment A-1).

## GM COMMITMENT

- GM will award the new product programs for Fuel Rails, IAFM's & IAM's, SIDI, LOMA and Canisters (Note: E85 injectors are included as part of the Fuel Rails/SIDI system). GM will commit these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional new product programs as they are released.

  o The most significant programs for the site are the GMPT SIDI programs for the next generation (Gen V) engines.

  o GM has confirmed that Delphi has demonstrated the technical capability to satisfy product requirements and compete for SIDI programs as future applications are identified.

## DELPHI COMMITMENT

- Engineering and capital investment of approximately $134 million will be made by Delphi at the Rochester facility as required to support the Gen V SIDI program.

## LOCKPORT

### CURRENT STATE

- Booked revenue projected to decline from $753 million in 2007 to $457 million in 2011 (reference Attachment A-1).

### GM COMMITMENT

- GM will award the new product programs for a variety of HVAC and Powertrain Cooling (PTC) products.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional product programs as they are released.

- The most significant future programs for the site are a large portion of the C3XX HVAC and PTC products.

### DELPHI COMMITMENT

- Engineering and capital investment of approximately $48 million will be made by Delphi at the Lockport facility as required to support the C3XX HVAC/PTC product programs.

## KOKOMO

### CURRENT STATE

- Booked revenue projected to decline from $666 million in 2007 to $310 million in 2012 (reference Attachment A-1).

### GM COMMITMENT

- GM will award the new product programs for a variety of powertrain and electronics related products.  GM is committing these product programs (for specific program details see the charts included in Attachment A-1), with the potential for additional product programs as they are released.

- The most significant future product programs for the site are:

  o  Gen V SIDI Engine Controllers.
  o  TEHCM Controllers (T-90, T-76).
  o  GM BAS+ APM/BPIM (electronics & system assembly).
  o  Crash sensing SDM.
  o  Note:  Delphi will relocate ECM/BCM from Milwaukee to Kokomo per the timing in the transition plan shared with the Union June 15, 2007.

- The basis of competition for manufacturing this electronics product line is generally dominated by low-cost non-U.S. manufacturers (favorable packing density logistics).  Therefore, it is critical for the future of the site that the parties work together to address this competitive challenge, including evaluation of ongoing wafer fabrication operations.

## SANDUSKY

### GENERAL

- Intent of all parties is to complete sale as soon as possible, but in any event by the end of 2008.
- Objective is to accomplish a sale of the Sandusky operation to a new owner who is committed to bearing manufacturing as an on-going business.
- The below defined commitments from GM and Delphi are contingent upon this business being sold to an acceptable buyer.
- Investment of an estimated $40 million in engineering and capital will be required to support the various Gen III Bearing programs.
- If the sale of the Sandusky site is not concluded by December 31, 2008, GM will cause the Sandusky operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.

### GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
  - GM has agreed to award new programs with annual volume estimated at approximately 6.0 million bearings, for product programs as follows:
    - N.A. Delta fronts and rears.
    - Theta Epsilon, Zeta.
    - N.A. Epsilon, Theta.
- GM has issued purchase orders for five years subject to the above stated conditions, i.e. a sale or transfer to a third party.
- GM has confirmed that Sandusky has demonstrated the technical capability to satisfy product requirements and compete for bearing program opportunities as future applications are identified.

### DELPHI COMMITMENT

- Support the sale of the business.
- Agree to asset sale as appropriate to support sale of Sandusky.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

### UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

# ADRIAN

## GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.
- If the sale of the Adrian site is not concluded by December 31, 2008, GM will cause the Adrian operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.
- GM will not impede the future site owner's efforts to attract non-GM business.

## GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
- Negotiate long-term supply agreement with buyer.
- GM will commit to similar levels of content for the C3XX instrument panel components as Adrian currently produces for the GMT 900 program.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale of the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

## SAGINAW STEERING - SAGINAW

### GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.
- If the sale of the Saginaw site is not concluded by December 31, 2010, GM will cause the Saginaw operations to be transferred as set forth in Section B.2 of this Memorandum of Understanding.

### GM COMMITMENT

- Support the sale of the business.
- Provide/award a book of business for extended period of time.
- Negotiate long-term supply agreement with buyer.
- GM will commit to product programs as described in Attachment A-1. These programs will remain in the Saginaw, Michigan site for the duration of the product life cycle.
- GM agrees to award to Saginaw, Michigan the C3XX front half shafts, rack & pinion gear, integral gear, steering columns and (if technical capability is demonstrated to GM Engineering satisfaction) steering pumps and rear half shafts.
- Based upon future product applications for the Electronic Power Steering (EPS), GM will award the C3XX EPS to the Saginaw, Michigan site if the technical and engineering capability of the organization is demonstrated to GM Engineering.
- In the event that it is determined that the technical specifications cannot be met, GM, the Company and the UAW will initiate discussions so that alternative job opportunities for future available product programs are identified that are within the technical capabilities of the Company.

### DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale of the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.
- Until the business is sold, or December 31, 2010, whichever is sooner, Delphi will operate the facility.

## <u>UAW COMMITMENT</u>

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.

## SAGINAW MFG. NEWCO

### GENERAL

- Intent of all parties is to complete transfer as soon as possible.
- Objective is to maintain presence in Saginaw County area
- Objective is to create a successful on-going business entity, operated by a third party, and provide jobs
- If the transfer of the Saginaw Manufacturing site is not concluded by December 31, 2008, the operations will be handled in accordance with Section B.3 of this Memorandum of Understanding.

### GM COMMITMENT

- GM will award new product programs as outlined in Attachment A-1, which includes brake corner machining and brake corner assembly.
- Grant Newco a ROLR for next generation replacement programs or next generation value-added assembly (VAA) opportunities as they are identified through the GM Product Development Process for the programs described above.
- GM will fund engineering design and development and start-up costs for Newco to enable a competitive piece price environment for long-term viability.
- The job opportunities described above will provide an initial commitment of 500 jobs.

### DELPHI COMMITMENT

- Support the transfer of the business.
- Agree to sale of assets as appropriate for transfer of Saginaw Mfg.
- Agree to support the transfer of work to the Saginaw area from other Delphi sites providing acceptable commercial terms and conditions can be reached between the parties (GM and Delphi).
- Consider facility lease proposals as appropriate with respect to the transfer process.
- Support transfer of hourly workforce.
- Until the transfer of the business is complete, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

### UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to implement the plan.

## **FLINT – EAST**

### **GENERAL**
- Objective is to maintain presence in Flint area.
- Objective over time is to bring new work into the area operated by a third party as an ongoing business entity and provide jobs as existing legacy work exits from the Flint-East site without successor program replacement.
- After December 31, 2008, Delphi will no longer have ongoing responsibility for the hourly employees, but will continue to own, operate and support the site through the end of current OE production at the site.
- After December 31, 2008, all remaining hourly employees will be handled in accordance with Section B.3 of this Memorandum of Understanding.
- Employees who become redundant after October 1, 2007 and prior to new work being available to the site, will be transferred to a third party and placed on layoff and, if eligible, will be paid unemployment benefits and applicable SUB.

### **GM COMMITMENT**
- GM will develop and implement a unitizing facility (or facilities) in the Flint area (to be named later) to be represented by Local 651 by transitioning certain work beginning January, 2008 that is currently contracted to third party packagers (230 jobs). This work will be staffed by current employees represented by Local 651, who will become GM employees at the wage and benefit levels as contained within the modified UAW-Delphi Supplemental Agreement.  Any issues, administrative details or the application of the modified Supplemental Agreement will be resolved by GM and the GM Department of the International Union, UAW.  This work is anticipated to be fully transitioned by July, 2008 and will remain through January 1, 2015.
- In addition, GM is prepared to commit this business on new and replacement service parts, not unitized by suppliers, for unitizing awards through the 2011 model year.
- GM also commits to provide 220 "trucking-related" jobs with ramp-up timing beginning no later than the fall of 2007 with the commitment level attained by July 2008.  Local 651 employees will be able to make application for these "trucking-related" jobs in conjunction with the selection process managed by Local 659 and the Company responsible for the "trucking-related" jobs.
- GM also commits to identify 550 additional job opportunities for Local 651, in addition to the work described above to provide 1,000 total jobs upon full implementation. In the event that a sufficient number of job opportunities are not identified by July 1, 2008, GM will allocate the C3XX cluster to replace the existing GMT 900 cluster work.  GM will also identify

additional replacement work to be placed in Flint – East to attain the committed employment level of 1,000 jobs by July 1, 2008.

## DELPHI COMMITMENT

- Support hourly workforce transformation.
- Provide approximately 350 instrument cluster jobs at the Flint – East site until the end of their respective program life cycles and/or in accordance with the transition plan.
- Additionally Delphi will support an initial complement of approximately 150 jobs related to GM service MRA's through the end of current OE cluster production.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to implement the transformation plan.

## NEEDMORE RD.

### GENERAL

- Objective is to maintain presence in Dayton area.
- Objective over time is to bring new work into the area as an on-going business entity and provide jobs.
- If the transfer of the Needmore Rd. site employees has not been completed within 30 days following the end of OE production (currently scheduled for June 30, 2008), or December 31, 2008, whichever is sooner, the employees will be transferred in accordance with Section B.3 of this Memorandum of Understanding.
- Employees who become redundant prior to new work being available to the site, will be transferred to a third party and placed on layoff and, if eligible, will be paid unemployment benefits and applicable SUB.

### GM COMMITMENT

- GM will develop and implement a warehousing facility (or facilities) in the Dayton area (location to be named later) to be represented by Local 696 by transitioning certain work beginning July, 2008 that is currently contracted to third party logistics providers (160 jobs). These employees will become GM employees at the wage and benefit levels as contained within the modified UAW-Delphi Supplemental Agreement. Any issues, administrative details or the application of the modified Supplemental Agreement will be resolved by GM and the GM Department of the International Union, UAW. This work is anticipated to be fully transitioned by March, 2009, and will remain through January 1, 2015.
- As new vehicle programs are launched, GM will commit service parts warehousing work for these vehicles through the 2011 model year.
- GM also commits to provide 140 "trucking-related" jobs with ramp-up timing beginning on or about September, 2008, with the commitment level attained by March, 2009.
- GM will transition IPC/CKD services from a current third party supplier, which currently employs approximately 250 employees beginning in July, 2008 with the commitment level attained by January, 2009.
- GM also commits, by March, 2008, to identify 200 additional job opportunities for Local 696, in addition to the work described above to provide 750 total jobs upon full implementation.

### DELPHI COMMITMENT

- Support the transfer of the hourly workforce.
- Delphi will manage the current existing programs through the end of production, or December 31, 2008, whichever is sooner.
- Until the transfer of the employees is complete, or December 31, 2008, whichever is sooner, Delphi will operate the facility.

**<u>UAW COMMITMENT</u>**

- Waive Document 13 of the National Agreement to the extent necessary to implement the transformation plan.

# COTTONDALE

## GENERAL

- Intent of all parties is to complete the divestiture as soon as possible and in any event by end of 2007.
- Objective is to accomplish a transfer of operations to a new owner as an on-going business.

## CURRENT STATE

- Booked revenue projected to decline from $324.7 million in 2007 to $101.5 million in 2011 (reference attached documents).
- New work opportunities at the Mercedes assembly plant include future cockpit programs (W-166, X-166 and W-251 NG).  This new business represents an annual revenue stream of approximately $320 million.  Winning this new business will be dependent upon the plant's ability to satisfy Mercedes' requirements in the areas of quality, technology and cost.
- The basis of competition for assembly of this product is generally dominated by low-cost U.S.-based assemblers.  Therefore, it is critical for the future of the plant that the parties work together to address this ongoing competitive challenge.

## DELPHI COMMITMENT

- Support the sale of the business.
- Agree to sale of assets as appropriate to support sale the business.
- Support hourly workforce transformation.
- Support the transition of technical expertise and resources.

## UAW COMMITMENT

- Waive Document 13 of the National Agreement to the extent necessary to complete the sale/transformation.
- Work with the new buyer to develop a competitive agreement that will support the plant in winning new business.

## Attachment A-1

UAW Site Revenue & Headcount Projections

Attached Separately

**Attachment B**

Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and
GM Consensual Triggering of Benefit Guarantee"

Attached Separately

**Attachment C**

Special Attrition Plan

Attached Separately

**Attachment D**

**COMPETITIVE OPERATING AGREEMENT FRAMEWORK**



<span style="color:red">Local Negotiations
Competitive Operating Agreement Framework</span>

**To improve plant competitiveness, promote operating viability and better position the plants to win new business, the following represents Delphi's and GM's view of critical elements for discussion during Local Negotiations at all Keep, Sell and Footprint sites.**

◆ Process
- Commence local negotiations at all Keep, Sell and Footprint Issue sites as promptly following ratification
- Conclude local COA negotiations within 60 days following ratification
- Wages and benefits not included in Local Negotiations

◆ Top Priority Local COA Issues:
- Effective utilization of workforce capabilities to achieve competitive direct to indirect ratios
  » Elimination of uncompetitive activities (direct and indirect): outsource/subcontract as required
- Flexibility to use skilled trades efficiently, focusing on direct support of production operations
  » Reduce skilled trades classifications (ultimately to Electrical, Mechanical)
  » No restrictions on combination of jobs or "right of access" (eliminate LODs)
  » Operate production equipment as required
- Flexibility to use production employees efficiently
  » Reduce production classifications to a minimum
  » No restrictions on combination of jobs
  » Enhancing production employee skills and utilizing them to their fullest capabilities (maintenance of tooling/equipment, changeovers, etc.)
- Reduce employee movement to protect quality of product and operating efficiencies
- Overtime
  » Resolve uncompetitive skilled trades Full Utilization restrictions
  » Simplify scheduling and equalization administration
- Attendance
  » Implement a local No Fault Attendance Program
  » FMLA Administration as allowed by law

◆ Eliminate prior agreements and practices that generate unnecessary operating costs
◆ The local parties will not be constrained in achieving a COA by existing agreements/past practices

*Delphi Confidential – Subject to Protective Order*

<span style="color:red">Industrial Relations</span>

**Attachment E**

List of Agreements

Attached Separately

**Attachment F**

## Illustrative Example of Wage Progression Scales

| Group A Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
| | | | | |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.85 | - | - | - | - |
| 6 Mth Progression #3 | 15.30 | - | - | - | - |
| Base As Of June 30, 2007 | 15.30 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | 0.46 | 0.43 | 0.43 | 0.43 | 0.42 |
| Revised Base | 15.76 | 14.85 | 14.85 | 14.85 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | 0.47 | 1.38 | 1.38 | 1.38 | 1.81 |
| Wages As Of December 30, 2007 | 16.23 | 16.23 | 16.23 | 16.23 | 16.23 |
| January 2008 Base With Accrued COLA | 16.23 | 16.23 | 16.23 | 16.23 | 16.23 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

| Group B Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
| | | | | |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.85 | - | - | - | - |
| 6 Mth Progression #3 | 15.30 | - | - | - | - |
| Base As Of June 30, 2007 | 15.30 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | - | 0.43 | 0.43 | 0.43 | 0.42 |
| Revised Base | 15.30 | 14.85 | 14.85 | 14.85 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | - | 0.45 | 0.45 | 0.45 | 0.88 |
| Wages As Of December 30, 2007 | 15.30 | 15.30 | 15.30 | 15.30 | 15.30 |
| January 2008 Base With Accrued COLA | 15.30 | 15.30 | 15.30 | 15.30 | 15.30 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

| Group C Hire Date | | | | |
|---|---|---|---|---|
| 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
| | | | | |

| | 7/1/05 | 8/1/06 | 10/1/06 | 11/1/06 | 2/1/07 |
|---|---|---|---|---|---|
| Initial Base | 14.00 | 14.00 | 14.00 | 14.00 | 14.00 |
| 6 Mth Progression #1 | 14.42 | 14.42 | 14.42 | 14.42 | - |
| 6 Mth Progression #2 | 14.50 | - | - | - | - |
| 6 Mth Progression #3 | 14.50 | - | - | - | - |
| Base As Of June 30, 2007 | 14.50 | 14.42 | 14.42 | 14.42 | 14.00 |
| Incremental Next Wage Progression | - | 0.08 | 0.08 | 0.08 | 0.42 |
| Revised Base | 14.50 | 14.50 | 14.50 | 14.50 | 14.42 |
| December 30, 2007 Incr. Conversion To Floor | - | - | - | - | 0.08 |
| Wages As Of December 30, 2007 | 14.50 | 14.50 | 14.50 | 14.50 | 14.50 |
| January 2008 Base With Accrued COLA | 14.50 | 14.50 | 14.50 | 14.50 | 14.50 |
| *Multiplied By Wage Formula %, Greater Of* | CPI-W / Mfg. Sector Earnings Change | | | | |
| *Equals* | Revised January Base | | | | |

Exhibit 2



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
|  |  |
| --- | --- |
| | : |
| In re | : Chapter 11 |
| | : |
| DELPHI CORPORATION, et al., | : Case No. 05-44481 (RDD) |
| | : |
| | : (Jointly Administered) |
| Debtors. | : |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)
Nathan L. Stuart (NS 7872)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
        December 10, 2007

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft

---

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

---



Delphi.  If a holder of Existing Common Stock is to receive fractional shares of warrants, such holder will have the option of electing whether to receive the fractional shares of warrants or to receive a cash distribution generated by the sale of an aggregate amount of fractional warrants. The proceeds generated from the sale of the six-month Warrants will be allocated in the following order:  first, to redeem any shares of "Series C" New Preferred Stock distributed to GM; second, to redeem the GM Note(s); and third, to be used by Reorganized Delphi for general corporate purposes, as provided in Article 7.18(b) of the Plan.  The proceeds generated from the sale of the seven-year and ten-year warrants will be used by Reorganized Delphi for general corporate purposes.

### 2.    Valuation Of The Reorganized Debtors And Distributions Under The Plan

The distributions discussed above are the product of extensive negotiations among the Debtors, GM, the Plan Investors, the Creditors' Committee, and the Equity Committee.  As described in more detail in this Disclosure Statement, achieving a "par plus accrued recovery at Plan value" for holders of unsecured claims was a fundamental building block of the discussions among the Debtors, GM, and the Creditors' Committee.  Holders of Delphi's existing common stock are able to receive a distribution, in large part, on account of the Debtors' settlement with GM.

Because the proposed distributions under the Plan are in the form of equity in the reorganized company, an agreement on the enterprise value of Reorganized Delphi was essential to achieving the desired recoveries for the Creditors' Committee and the desired investment opportunities for the Plan Investors.  In connection with the formation of the Plan and the Debtors' discussions with GM, the Plan Investors, the Creditors' Committee, and the Equity Committee, the Debtors' investment banker and financial advisor, Rothschild, performed a valuation of the Reorganized Debtors as a going concern and of the New Common Stock based on information and financial projections provided by the Debtors.  Rothschild estimated the total enterprise value of Reorganized Delphi to range between $11.2 billion and $14.1 billion, with a midpoint of approximately $12.7 billion, as of December 31, 2007, as discussed more fully in the Valuation Analysis attached to this Disclosure Statement as <u>Appendix D</u>.  The implied potential price per share (assuming full conversion of New Preferred Stock) based on the implied distributable reorganized equity value ranges from $44.50 to $65.50 per share, with a midpoint of $55.03.  The Debtors, GM, the Plan Investors, and the Creditors' Committee agreed that for Plan purposes the total enterprise value of the Reorganized Debtors would be assumed to be $13.3 billion, a value that falls within the range of Rothschild's estimated total enterprise value. The actual trading value of the shares of the Reorganized Debtor may be higher or lower than the $59.61 Plan Equity Value (as defined below).

The amount of equity available for equity distributions under the Plan is determined by taking the Debtors' assumed total enterprise value ($13.3 billion) and subtracting (a) the estimated amount of pro forma net debt to be incurred by the Reorganized Debtors ($5.2 billion) and (b) the value attributable to the seven-year and ten-year warrants to be distributed to holders of existing common stock under the Plan ($0.3 billion).  This calculation results in a distributable equity value of $7.8 billion, or $59.61 per share of New Common Stock based on 131,266,407 shares (assuming full conversion of the New Preferred Stock) issued and outstanding as of the Effective Date (the "Plan Equity Value").  The Plan Equity Value of $59.61 per share is within

the per share range of Rothschild's valuation, and is above the midpoint of Rothschild's valuation. The range of values based on Rothschild's valuation range is as follows:

| | Low End | Midpoint | Plan Value | High End |
|---|---|---|---|---|
| **Total Enterprise Value** | $11.2 billion | $12.7 billion | **$13.3 billion** | $14.1 billion |
| **Less Estimated Pro Forma Debt** | ($5.2 billion) | ($5.2 billion) | **($5.2 billion)** | ($5.2 billion) |
| **Less Seven- And Ten-Year Warrants** | (0.2 billion) | (0.2 billion) | **(0.3 billion)** | (0.3 billion) |
| **Reorganized Equity Value** | $5.8 billion | $7.2 billion | **$7.8 billion** | $8.6 billion |
| **Shares Outstanding (Assuming Conversion Of New Preferred Stock)** | 131,266,407 | 131,266,407 | **131,266,407** | 131,266,407 |
| **Implied Price Per Share** | $44.50 | $55.03 | **$59.61** | $65.50 |
| **Implied Percent Of Par Plus Accrued Recovery For Holders Of General Unsecured Claims** | 64.3% | 89.2% | **100%** | 113.9% |

As noted above, the distributions to be made under the Plan are based on the Plan Equity Value of $59.61 per share of New Common Stock, although there is no guaranty that the trading value of the New Common Stock will fully or immediately reflect the intrinsic value or agreed upon value of the Reorganized Debtors. The valuation of the Reorganized Debtors and the New Common Stock conducted by Rothschild was based on certain assumptions including, among other things, an assumption that the financial results projected for the Reorganized Debtors will be achieved in all material respects. No assurance can be given, however, that the projected results will be achieved. To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative. The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly-traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as Rothschild deemed necessary or appropriate. The Debtors and Rothschild believe that these valuation assumptions are reasonable.

In addition, beginning in late July 2007, the financial capital markets began to experience significant volatility, resulting in changing credit and market conditions. Although the Debtors and Rothschild believe that this volatility may have an impact on the market value of the Debtors' existing securities (such as the Senior Notes), the Debtors and Rothschild do not believe that the current market volatility should cause a fundamental shift in the Debtors' longer term intrinsic value. Should general economic conditions deteriorate, or financial and capital market dislocation persist, however, the value of the New Common Stock may ultimately be less than the Plan Equity Value.

(d)    Financially-Troubled Suppliers

Certain of Delphi's suppliers are, or from time to time become, financially troubled. Because of the just-in-time and sole-source supply methods that Delphi utilizes, Delphi must pay close attention to the financial health of its suppliers. As described above, the closure of one of Delphi's suppliers could have a near immediate impact on Delphi's ability to do business with its customers. With that in mind, dating back prior to Delphi's chapter 11 filing, Delphi has maintained a vendor rescue program under which it provides assistance to its financially troubled suppliers. This assistance takes many forms, but includes helping the supplier to (a) obtain sufficient financing to ensure the steady flow of raw materials necessary to manufacture the components ordered by Delphi, (b) honor its payroll obligations and other business expenses, and/or (c) restructure its operations so as to allow its businesses to continue to operate. By assisting these financially troubled suppliers, Delphi ensures that the flow of goods continues.

(e)    Cure Claims

To assume many of their supplier contracts, the Debtors will be required to cure arrearages under those contracts. In most reorganization cases, the usual process for curing contract defaults is to pay such default claims in cash upon assumption. In these cases, to allow holders of cure claims to participate in the treatment afforded to General Unsecured Creditors under the Plan, the Debtors intend to allow these holders to elect to receive either Cash or plan currency on account of their cure claims. Plan currency will include postpetition interest on terms consistent with the treatment to be provided to Allowed General Unsecured Claims. To effect this election, and as more fully outlined in the Solicitation Procedures Order, the Debtors will send the counterparties to their supply contracts a separate notice whereby, if they agree with the Debtors' stated Cure Amount Claim (the "Cure Amount Claim"), they may choose the treatment for their cure claim. In the event that these counterparties make no election, they will be given Plan Currency with Postpetition Interest on account of their cure claims.

## C.    Current Corporate Structure Of The Debtors

Delphi is incorporated in Delaware. It is the parent corporation of the 41 Affiliate Debtors in these jointly administered Chapter 11 Cases, as well as additional non-debtor affiliates. With the exception of one of Delphi's wholly-owned, indirect Spanish subsidiaries, none of Delphi's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile.

### 1.    Board Of Directors Of Delphi Corporation

Delphi's Board of Directors (the "Board of Directors" or the "Board") is comprised of 11 individuals, two of whom are also part of Delphi's management and the remaining nine of whom are independent directors. Five of the nine independent directors have joined Delphi's Board during the last two years. The Board of Directors of Delphi Corporation is comprised of the following persons.

| Name | Position | Term |
|------|----------|------|
| Robert S. Miller | Executive Chairman | Since 2005 |
| Rodney O'Neal | President & CEO | Since 2005 |
| John D. Opie | Lead Independent Director | Since 1999 |
| Oscar de Paula Bernardes Neto | Director | Since 1999 |
| Robert H. Brust | Director | Since 2001 |
| John D. Englar | Director | Since 2006 |
| David N. Farr | Director | Since 2002 |
| Raymond J. Milchovich | Director | Since 2005 |
| Craig G. Naylor | Director | Since 2005 |
| John H. Walker | Director | Since 2005 |
| Martin E. Welch | Director | Since 2006 |

*Mr. Miller* was named executive chairman of Delphi Corporation effective January 2007 after serving as chairman and chief executive officer of Delphi Corporation since July 2005. Prior to joining Delphi, Mr. Miller had been non-executive chairman of Federal-Mogul Corporation, a global automotive component supplier, from January 2004 until June 2005. Mr. Miller served in various positions with Federal-Mogul since 1993, including a previous term as non-executive chairman from January to October 2001, and three times in a transitional role as chief executive officer in 1996, again in 2000, and again from July 2004 until February 2005. From September 2001 until December 2003, Mr. Miller was the chairman and chief executive officer of Bethlehem Steel Corporation, a steel manufacturing company. Mr. Miller is also a director of United Airlines Corporation and Symantec Corporation.

*Mr. O'Neal* was named president and chief executive officer of Delphi Corporation effective January 2007. He was president and chief operating officer of Delphi Corporation from January 2005. Prior to that position, Mr. O'Neal served as president of Delphi's former Dynamics, Propulsion, and Thermal sector from January 2003 and as executive vice president and president of Delphi's former Safety, Thermal, and Electrical Architecture sector from January 2000. Mr. O'Neal is also a director of Goodyear Tire & Rubber Company and Sprint Nextel.

*Mr. Opie* is the former vice chairman of the board and executive officer of General Electric Company. He retired from General Electric and General Electric's board of directors in May 2000. He had been associated with General Electric Company since 1961 in numerous management positions, including vice president of the Lexan and Specialty Plastics Divisions, president of the Distribution Equipment Business Division, and president of General Electric Company's Lighting Business from 1986 to 1995. He also is a Life Trustee of Michigan Technological University. Mr. Opie is Lead Independent Director of Delphi's Board of Directors and throughout 2006 served on the Audit Committee, the Compensation and Executive Development Committee, and the Corporate Governance and Public Issues Committee of Delphi's Board of Directors. He currently serves on the Corporate Governance and Public Issues Committee of Delphi's Board of Directors.

*Mr. Bernardes* is the senior partner of LID Group and of Integra Associsoria Assessoria e Consultoria. He was chief executive officer of Bunge International from 1996 to 1999. Before joining Bunge, Mr. Bernardes was a senior partner with Booz Allen & Hamilton ("Booz Allen"),

an international consulting firm. He also has more than 15 years of consulting experience, including several projects related to the automotive industry in South America. Mr. Bernardes is currently a member of the Corporate Governance and Public Issues Committee of Delphi's Board of Directors, and throughout 2005 served as a member of the Audit Committee of Delphi's Board of Directors. He is also a member of the Advisory Board of Bunge Brasil, Booz Allen & Hamilton do Brasil, Alcoa Brasil, and Veirano Associados. Mr. Bernardes is also a director of Metalurgica Gerdau S.A., Gerdau S.A., Johnson Electric Holdings Ltd., Satipel S.A., RBS, Suzano Bahia Sul S.A., and Localiza Rent a Car, S.A.

*Mr. Brust* retired from his position as chief financial officer and executive vice president of Eastman Kodak Company effective February 2007, having served in that position since January 2000. Prior to joining Eastman Kodak Company, Mr. Brust was senior vice president and chief financial officer of Unisys Corporation. He joined Unisys Corporation in 1997, where he directed the company's financial organization, including treasury, control, tax, information systems, mergers and acquisitions, strategy, procurement, and investor relations. He is a member of the Conference Board Council of Financial Executives. Before joining Unisys Corporation, he spent 31 years at General Electric Company in various capacities, including as chief financial officer and controller of its plastics division. Mr. Brust is Chairman of the Audit Committee of Delphi's Board of Directors. Mr. Brust is also a director of Applied Materials, Inc. and Covidien, Ltd.

*Mr. Englar* has been an executive in residence for Duke University, Fuqua School of Business, in Durham, North Carolina since January 2004 and The Bryan School of Business of the University of North Carolina, Greensboro, North Carolina since January 2006. Until November 2003, Mr. Englar was senior vice president, corporate development and law with Burlington Industries, Inc. and also served as a Director of Burlington and chaired its Investment Committee. In his 25-year career with Burlington, he held several executive leadership positions including chief financial officer, strategic development officer, and general counsel. From 1972 to 1978, he was an attorney with Davis Polk & Wardwell in Paris and New York. He is a member of the Compensation and Executive Development Committee of Delphi's Board of Directors. He is also a member of the Duke CIBER Advisory Council.

*Mr. Farr* is the chairman, chief executive officer, and president of Emerson Electric Co., a diversified global technology company that provides products and services for a wide range of industries, commercial markets, and end-users, including consumers, having been named chief executive officer and president in October 2000 and elected to the additional position of chairman of the board in September 2004. He joined Emerson in 1981. Mr. Farr is a member of the Business Council and the Civic Progress Group of St. Louis, Missouri. He is also a member of the Municipal Theatre Association of St. Louis and a trustee of the Board of Trustees for the Boy Scouts Greater St. Louis Council. Mr. Farr is Chairman of the Corporate Governance and Public Issues Committee of Delphi's Board of Directors. Mr. Farr is also a director of Emerson Electric Co.

*Mr. Milchovich* is the chairman of the board and chief executive officer of Foster Wheeler Ltd., a publicly-traded global engineering and construction company serving energy-related markets and served as president, chairman, and chief executive officer until January 2007. Mr. Milchovich joined Foster Wheeler Ltd. in 2001. Previously he had been the president and

chief executive officer of Kaiser Aluminum Corp. from 1997 and became chairman of the board in 2000. Mr. Milchovich held various management positions with Kaiser Aluminum Corp. after joining the company in 1980. Mr. Milchovich is a member of the Compensation and Executive Development Committee of Delphi's Board of Directors. Mr. Milchovich is also a director of Foster Wheeler Ltd. and Nucor Corporation.

*Mr. Naylor* recently retired in December 2006 from E.I. du Pont de Nemours and Company, a science company offering a wide range of innovative products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel, where he served in various capacities since joining that company in 1970. He most recently served as group vice president, DuPont Electronic & Communication Technologies, having served in such capacity since March 2004. Prior to that position, Mr. Naylor served as group vice president, Asia Pacific from January 2004, as group vice president DuPont Performance Materials from 2002 to 2004, and as group vice president and general manager, Engineering Polymers, Fluoroproducts and Packaging & Industrial Polymers from 2000 to 2002. Mr. Naylor is Chairman of the Compensation and Executive Development Committee of Delphi's Board of Directors.

*Mr. Walker* served as president and chief executive officer of The Boler Company, which operates under the name Hendrickson International, from August 2003 until September 2006. Hendrickson International is a global independent provider of truck and trailer suspensions. From March 2000 to August 2003, he was chief operating officer, president, and chief executive officer for Weirton Steel Corp. Mr. Walker was also associated with the consulting firm McKinsey & Company in the mid 1980s. Mr. Walker is currently a member of the Audit Committee of Delphi's Board of Directors. Mr. Walker is also a director of United Airlines Corporation.

*Mr. Welch* is the executive vice president and chief financial officer of United Rentals, Inc., the largest equipment rental company in the world, having previously served as its interim chief financial officer from September 2005 until March 2006. Previously, Mr. Welch served as senior vice president and chief financial officer of Oxford Automotive, Inc., an automotive supply company, from May 2003 to January 2004. Mr. Welch served as director and business advisor to the private equity firm York Management Services from 2002 to 2005. Mr. Welch joined Kmart Corporation as chief financial officer in 1995 and served in that capacity until 2001. Mr. Welch is currently a member of the Audit Committee of Delphi's Board of Directors. Mr. Welch serves on the board of Northern Reflections Ltd., and he is a member of the Board of Trustees of the University of Detroit Mercy.

### 2. *Executive Management Of Delphi*

The following persons comprise the executive management of Delphi.

#### (a)    Corporate Officers

*Robert S. Miller, 65, Executive Chairman.* Mr. Miller was named executive chairman of Delphi Corporation effective January 2007. Mr. Miller served as chairman and chief executive

officer of Delphi Corporation effective July 2005. Additional information about Mr. Miller's background may be found in the Board of Directors section above.

*Rodney O'Neal, 54, President and Chief Executive Officer.* Mr. O'Neal was named president and chief executive officer of Delphi Corporation effective January 2007. He was president and chief operating officer of Delphi Corporation from January 2005. Additional information about Mr. O'Neal's background may be found in the Board of Directors section above.

*Robert J. Dellinger, 47, Executive Vice President and Chief Financial Officer.* Mr. Dellinger was named executive vice president and chief financial officer of Delphi Corporation effective October 2005. From June 2002 to September 2005, Mr. Dellinger served as executive vice president and chief financial officer of Sprint Corporation, a global communications company, where he also was executive vice president of finance from April 2002 to June 2002. Before joining Sprint, Mr. Dellinger served as president and chief executive officer of GE Frankona Re based in Munich, Germany with responsibility for the European operations of General Electric's Employers Reinsurance Corporation, a global reinsurer, from 2000 to 2002. From 2001 to 2002, he also served as president and chief executive officer of General Electric's Employers Reinsurance Corporation's Property and Casualty Reinsurance business in Europe and Asia. Mr. Dellinger serves on the board of directors of SIRVA, INC.

*Mark R. Weber, 59, Executive Vice President, Global Business Services.* Mr. Weber was named executive vice president of Global Business Services effective July 2006. Previously, Mr. Weber served as executive vice president, Operations, Human Resource Management and Corporate Affairs for Delphi since January 2000. He is the executive champion for Delphi's Harley-Davidson Customer Team.

*John D. Sheehan, 47, Vice President and Chief Restructuring Officer.* Mr. Sheehan was named vice president and chief restructuring officer for Delphi Corporation effective October 2005. Prior to holding that position he served as acting chief financial officer from March 2005. Mr. Sheehan also served as chief accounting officer and controller from July 2002 through July 2006. Previously, he was a partner at KPMG LLP from 1995. His experience at KPMG LLP included 20 years in a number of assignments in the United States, England, and Germany.

*David M. Sherbin, 48, Vice President, General Counsel and Chief Compliance Officer.* Mr. Sherbin was named vice president and general counsel for Delphi Corporation effective October 2005. He was appointed chief compliance officer in January 2006. Prior to his position at Delphi, Mr. Sherbin was vice president, general counsel, and secretary for Pulte Homes, Inc, a national homebuilder, from January 2005 through September 2005. Prior to joining Pulte Homes, Inc., he was senior vice president, general counsel, and secretary for Federal-Mogul Corporation, a global automotive component supplier, from April 2003 through December 2004 and vice president, deputy general counsel, and secretary from March 2001 through March 2003. Mr. Sherbin serves on the Board of Directors of the Michigan Center for Civic Education.

(b)    Division Presidents

*James A. Bertrand, 50, Vice President and President, Delphi Automotive Holdings Group.* Mr. Bertrand was named president of Delphi Automotive Holdings Group division, effective January 2004.  Prior to this position, Mr. Bertrand served a dual role as president of Delphi's Automotive Holdings Group division from January 2003 and president of Delphi's former Safety & Interior Systems division from January 2000.  He has been a vice president of Delphi since 1998.

*Guy C. Hachey, 52, Vice President and President, Delphi Powertrain Systems & President, Delphi Europe, Middle East & Africa*.  Mr. Hachey was named president of Delphi Powertrain Systems division and president for Delphi Europe, Middle East and Africa effective July 2006.  Previously he served as president of the former Delphi Energy & Chassis division effective January 2000.  He has been a vice president of Delphi since 1998.

*Francisco A. Ordonez, 57, Vice President and President, Delphi Product & Service Solutions*.  Mr. Ordonez was named vice president of Delphi Corporation and president of Delphi Product and Service Solutions division effective March 2002.  Prior to holding that position, he had been general manager of Product & Service Solutions division since October 1999. Mr. Ordonez serves on the Board of Directors of the Motor Equipment Manufacturers Association (MEMA).

*Jeffrey J. Owens, 52, Vice President and President, Delphi Electronics & Safety and President, Delphi Asia Pacific.*  Mr. Owens was named vice president of Delphi Corporation and president of Delphi Electronics and Safety division effective September 2001.  He also serves as president for Delphi Asia Pacific, effective July 2006.  Previously, Mr. Owens served as general director of Business Line Management effective October 2000.  Mr. Owens serves on the Engineering Advisory Board of Directors of Purdue University and the Central Indiana Corporate Partnership Board.

*Ronald M. Pirtle, 53, Vice President and President, Delphi Thermal Systems.*  Mr. Pirtle was named president of Delphi Thermal Systems division effective July 2006. Previously, he served as president of the former Delphi Thermal & Interior division effective January 2004. Prior to that, he had been president of the former Delphi Harrison Thermal Systems division from November 1998.  He has been a vice president of Delphi since 1998.  Mr. Pirtle serves on the Advisory Board of Focus Hope of Detroit.

*Robert J. Remenar, 52, Vice President and President, Delphi Steering.*  Mr. Remenar was named vice president of Delphi Corporation and president of Delphi Steering division effective April 2002.  Prior to holding that position, he had been the executive director of business lines for Delphi's former Energy & Chassis division since January 2000.

*James A. Spencer*, *54, Vice President and President, Delphi Packard Electrical/Electronic Architecture and President, Delphi South America and Mexico.*  Mr. Spencer was named vice president of Delphi Corporation and president of Delphi Packard Electric/Electronic Architecture division, formerly Packard Electric Systems division, effective

November 2000.  He also serves as president for Delphi South America and Mexico effective July 2006.

(c)    Other Delphi Strategy Board Members

*John P. Arle, 59, Vice President and Treasurer.*  Mr. Arle was named vice president of Delphi Corporation and treasurer in 2005. Previously he served as vice president in charge of corporate audit services from March 2002, and as vice president in charge of mergers, acquisitions, and planning since November 1998.

*Kevin M. Butler, 52, Vice President, Human Resource Management.*  Mr. Butler was named vice president of Delphi Corporation, Human Resource Management in January 2000. Previously, he was the general director of human resources for Delphi Delco Electronics Systems. Additionally, Mr. Butler serves as the executive champion for Delphi's Personnel Task Team.

*Choon T. Chon, 60, Vice President and President, Delphi Asia Pacific.*  Mr. Chon was named vice president of Delphi Corporation and president of Delphi Asia Pacific effective November 1, 2000.  He previously served as the general director of Delphi Interior Systems, with responsibility for operations in Asia-Pacific, and in 1999 became president of Delphi Korea. In addition, Mr. Chon serves as the strategic customer champion for Delphi's Toyota, Honda, Isuzu, and Nissan customer teams.

*Karen L. Healy, 53, Vice President, Corporate Affairs, Marketing and Operations Support Group.*  Ms. Healy was named vice president of Delphi Corporation, corporate affairs, marketing and operations support group effective January 1, 2000.  She previously served as executive director of communications for Delphi from June 1997, and vice president in charge of corporate affairs from November 1998.  Additionally, Ms. Healy serves as the executive champion for Delphi's Corporate Affairs Task Team and is the chairman of the Delphi Foundation.

*Sidney Johnson, 45, Vice President, Global Supply Management.*  Mr. Johnson was named vice president of Global Supply Management for Delphi Corporation effective February 17, 2006.  He previously served as Director, North America Purchasing for Delphi Packard Electric Systems from March 2002, and Director, Global Supply Management for Delphi Packard Electric Systems from September 2003.  Additionally, Mr. Johnson serves as the executive champion for DGSM Task Team.

*Mark C. Lorenz, 56, Vice President, Global Transformation Program.*  Mr. Lorenz is vice president, Global Transformation Program of Delphi Corporation.  In November 1998, Mr. Lorenz was elected as a vice president in charge of PC&L for Delphi.  Effective January 1, 2000, Mr. Lorenz was named vice president of Operations and Logistics for Delphi.

*F. Timothy Richards, 53, Vice President, Electronics Group.*  Mr. Richards is vice president, Electronics Group.  He previously served as Delphi Harrison Thermal Systems' European managing director.  He was named executive director of business lines for Delphi Energy & Chassis Systems in May 2002 and vice president, sales and marketing effective January 1, 2004.

*Brian D. Thelen, 43, Vice President, Corporate Audit Services*.  Mr. Thelen is the vice president, Corporate Audit Services for Delphi Corporation.  Mr. Thelen joined Delphi in February 2006, having previously worked for Waste Management, Inc. as its vice president of internal audit services.

*Bette M. Walker, 64, Vice President and Chief Information Officer*.  Ms. Walker is vice president and chief information officer for Delphi Corporation.  Ms. Walker has been with Delphi since 1997, when she joined the organization as the global chief information officer for the company's largest division, Delphi Energy & Chassis Systems.

## IV.    HISTORICAL OVERVIEW OF DELPHI

### A.    Heritage



### B.    The Separation From GM

For most of its history, GM itself manufactured a large proportion of the parts used in its vehicles.  In 1991, GM combined its parts manufacturing facilities into a single parts division, which was originally known as the Automotive Components Group and eventually renamed Delphi Automotive Systems.  This division produced parts primarily for GM and, to a lesser extent, other automakers.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  On January 1, 1999, GM transferred the assets, liabilities, manufacturing sites,

terms and subject to the conditions of which the Original Investors would invest up to $3.4 billion in reorganized Delphi.

The Framework Motion drew immediate objections from, among others, the Creditors' Committee and the Equity Committee, as well as the ad hoc trade committee.  In addition, on December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management L.P. ("Highland").  Due to the objections and the unsolicited proposal, the Debtors agreed to postpone the hearing on the Framework Motion from January 5 to January 11, 2007.  Through a series of negotiations spanning the Christmas and New Year holidays, the Debtors were able to clarify certain ambiguities in and make certain changes to the PSA and the Original EPCA.  As a result, the Creditors' Committee and the ad hoc trade committee withdrew their objections.  Ultimately, however, the hearing on the Framework Motion was contested by the Equity Committee and Highland and featured testimony from, among others, Delphi's Chairman and Chief Restructuring Officer.  On January 12, 2007, the Bankruptcy Court authorized the Debtors to enter into the Original EPCA and approved the PSA.  The Debtors entered into the Original EPCA on January 18, 2007.

The Debtors' entry into the Original EPCA and PSA, as described in more detail in Section VII – Plan Investor And Exit Financing below, marked a significant milestone in these Chapter 11 Cases.  In addition to providing a key equity component of the Debtors' exit financing, the entry into the Original EPCA and PSA allowed the Debtors to suspend the 1113/1114 Motion and the GM Contract Rejection Motion, which allowed the Debtors, the Unions, GM, and the Original Investors to focus on more productive discussions with the Unions and GM.  These discussions ultimately led to the consensual resolutions with the Unions and GM that laid the groundwork for the Debtors' emergence from chapter 11.

### E.    Labor Transformation

#### 1.    The 1113/1114 Motion

When it filed the 1113/1114 Motion, Delphi had approximately 47,400 employees in the United States, of whom approximately 33,100 were production and skilled employees, a majority of which were represented by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE at Delphi's manufacturing sites.  Of these employees, approximately 23,317 were represented by the UAW, approximately 8,514 were represented by the IUE-CWA, approximately 889 were represented by the USW, and approximately 124 were represented by the IAM, IBEW, and IUOE.

As outlined in more detail above in Section IV– Historical Overview Of Delphi, the costs associated with Delphi's collective bargaining agreements led Delphi to conclude that it must deal with the legacy labor costs as part of its restructuring.  After attempts to reach consensual agreements with its Unions were unsuccessful, the Debtors filed the 1113/1114 Motion.

#### 2.    The Attrition Programs

Notwithstanding the 1113/1114 Motion, throughout these cases, Delphi consistently communicated a clear message to its hourly workforce that it was committed to finding a consensual labor resolution.  An example of that commitment was Delphi's consensual reduction of the size of its hourly workforce through negotiated attrition programs, implemented with the

assistance of GM.  On March 22, 2006, Delphi, GM, and the UAW entered into a three-party agreement establishing a special attrition program (the "UAW Special Attrition Program"), under which certain eligible Delphi U.S. hourly employees represented by the UAW were offered normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The program also provided a pre-retirement program for employees with at least 27 and fewer than 30 years of credited service. In addition, employees who elected to participate were eligible to retire as employees of Delphi or to flow back to GM and retire.  On May 8 and 12, 2006, the Bankruptcy Court entered an order and an amended order, respectively, approving the UAW Special Attrition Program.  During late spring and early summer, Delphi and the UAW negotiated a supplemental agreement to the foregoing attrition program.  The UAW supplemental agreement expanded the UAW Special Attrition Program to include a pre-retirement program for employees with 26 years of credited service and provided buyouts for UAW-represented hourly employees.  The buyout payments, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000. GM agreed to reimburse Delphi for one-half of these buyout payments and in exchange received an allowed prepetition general unsecured claim.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program (the "IUE-CWA Special Attrition Program") that substantially mirrored the UAW Special Attrition Program, as later supplemented.  The cash cost of the lump sum incentive payments of $35,000 per eligible IUE-CWA-represented employee and one-half of the $40,000 to $140,000 buyout payments would be paid by Delphi and reimbursed by GM.  GM received an allowed prepetition general unsecured claim equal to the amount it reimbursed Delphi for the buyout payments.  On July 7, 2006, the Bankruptcy Court entered an order approving the IUE-CWA Special Attrition Program and the supplement to the UAW Special Attrition Program (Docket No. 4461).

Approximately 21,800 U.S. hourly employees represented by the UAW were eligible for buyout payments, with approximately 14,700 of those employees eligible to participate in the retirement and pre-retirement programs.  As of September 26, 2006, approximately 12,400 of Delphi's UAW-represented employees, representing approximately 84% of the retirement-eligible UAW workforce, opted to retire by January 1, 2007. Approximately 1,400 additional UAW-represented Delphi employees elected a buyout.

Approximately 7,500 U.S. hourly employees represented by the IUE-CWA were eligible for buyout payments, with approximately 3,200 of those employees eligible to participate in the retirement and pre-retirement programs.  As of August 18, 2006, approximately 6,200 IUE-CWA-represented Delphi employees, representing approximately 82% of the eligible IUE-CWA-represented workforce, opted to participate in the attrition program.  Although these special hourly attrition programs provided nearly two-thirds of Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a combination of retirement programs, attrition programs, and GM flowbacks, the attrition programs did not resolve the issues related to Delphi's uncompetitive labor agreements.

As a result, following the adjournment of the 1113/1114 Motion and throughout the subsequent months, Delphi, the Unions, and GM continued to negotiate in an attempt to modify

the Unions' collective bargaining agreements. In June, July, and August 2007, Delphi reached major milestones with the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE by entering into memoranda of understanding with these unions and GM as described more fully below. As a result of these settlement agreements, on September 4, 2007, the Bankruptcy Court entered an order withdrawing the 1113/1114 Motion without prejudice, subject to the Bankruptcy Court's prior settlement agreement approval orders.

### 3.    Labor Settlement Agreements

The labor settlements with Delphi's Unions provided certainty with respect to future labor costs and allowed Delphi to formulate this important aspect of its post-emergence business plan. The benefits of the various labor settlements are summarized briefly in the chart below, and more detailed terms of each settlement follow. In all cases, the summary of the settlement agreements set forth below is qualified entirely by and is subject to the actual terms and conditions of the respective settlement agreement. Capitalized terms used and not otherwise defined in those summaries set forth below have the meanings ascribed to them in the respective settlement agreements.

| Union | Non-Competitive Terms | Transformed Terms |
|-------|----------------------|-------------------|
| UAW | ▪ Delphi prohibited from disposing of many operations necessary for portfolio transformation<br>▪ Job security provisions that required retention of redundant employees<br>▪ Yearly percentage wage and COLA increases<br>▪ Unsustainable pension and OPEB obligations<br>▪ Numerous non-competitive programs and joint activities | ▪ Delphi will retain ownership and operations in four UAW facilities, seven facilities will be sold or transferred to a third party, and ten facilities will be closed—portfolio transformation achieved<br>▪ Job security provisions requiring retention of redundant employees eliminated<br>▪ Workforce transformation programs to eliminate high cost legacy wage, job and income security, and benefit levels and to balance manpower with ongoing manufacturing requirement<br>▪ Mandatory buy down to Tier II wage & benefit levels for any remaining legacy employees<br>▪ Yearly wage increases based on industry index; COLA eliminated<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ Participation in UAW-GM CHR and mandatory funding of joint programs discontinued |

compensation letter, temporary employees, Appendix L, GIS, AOL, and other matters described in Attachment E to the UAW Memorandum of Understanding;

- Local negotiations subject to mutual agreement regarding work rules and other local agreement issues will be conducted on an expedited basis;

- Delphi's commitment in the 2004 UAW-Delphi Supplemental Agreement to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management is reaffirmed;

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

- The UAW will receive an allowed prepetition claim in the amount of $140 million on account of the CHR and Legal Services claims as of April 1, 2007 (to be adjusted by the difference between accruals through October 1, 2007 and expenditures until the effective date of a plan of reorganization (the "Effective Date")) of which $30 million will be paid to the UAW-GM Center for Human Resources and the balance will be paid directly to the DC VEBA ("Defined Contribution Voluntary Employee Beneficiary Association") established pursuant to a settlement agreement approved by the court in the case of <u>International Union, UAW, et al. v. General Motors Corp.</u>, Civil Action No. 05-73991.

In connection with the UAW Memorandum of Understanding, Delphi and the UAW have also agreed that Delphi will pay as soon as reasonably practicable after the effective date of the UAW Settlement Agreement approximately (but in no event more than) $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier to the Debtors. The payments relate to an unfunded budget line for severance and vacation payments in connection with an Accommodation Agreement dated January 24, 2006 among Delphi, MPC, and certain third parties pursuant to which parts (including an inventory bank) were produced in February and March 2006. Delphi had previously disputed any contractual or other basis for these claims. Based on Delphi's participation in the Accommodation Agreement, its pro-rata apportionment of the claims would have been approximately $233,355. When MPC wound down and distributed the proceeds of its liquidation, Delphi received approximately $209,000 in reimbursement of payments made under the Accommodation Agreement; however, none of the severance or vacation payments to UAW-represented employees contemplated under the Accommodation Agreement were previously paid. These MPC-related payments are to be in full satisfaction of all claims against the Debtors arising or related to MPC and the Accommodation Agreement and the Debtors will receive full releases therefor, including from each payment recipient. In addition, all related claims filed in Delphi's Chapter 11 Cases will be expunged and released, including claim number 13270.

Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM

of unique, non-common systems, moving to common operating platforms, and running a streamlined shared service organization. This will help to ensure that the Debtors' organizational and cost structure is competitive following their emergence from chapter 11.

The outsourcing of certain IT and financial services has been conducted concurrently with the general realignment and reduction of the Debtors' salaried workforce. Part of this realignment was effected through Delphi's 2006 realignment of its business operations to focus its product portfolio on core technologies for which Delphi believes it has significant competitive and technological advantages. This realignment allowed the Debtors to improve processes and decrease administrative activities. As a result of these activities, the Debtors were able to reduce the number of salaried employees in 2006 by 7.4% from December 2005 levels. The current number of salaried employees is at a historic low for the Company.

### 2.    *Salaried Employee Compensation Program*

(a)    <u>Competitively Benchmarked Salaried Employee Compensation Program – Introduction – Compensation Committee Philosophy And Strategy Statement</u>

One of the fundamental tenets of the Company's transformation plan has been to become competitive in every aspect of its business including both hourly and salaried compensation programs. To meet that objective with respect to the Company's salaried employee compensation program, the Company has developed competitively benchmarked executive and non-executive compensation programs. For purposes of this section, "senior management" means those global employees in Bands A through F, which is comprised of about 560 such employees as well as the Delphi Strategy Board ("DSB"), which is comprised of Delphi's 21 top policy-making decision makers (each, a "DSB Member").

A competitively benchmarked salaried executive compensation program is also required under Section 9(a)(xxi) of the Investment Agreement, which provides that the Company "shall have entered into employment agreements and other compensation arrangements with senior management relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions, and other benefits on market terms (as determined by Delphi's Compensation Committee) based on the advice of Watson Wyatt Worldwide, Inc. ("Watson Wyatt") (an independent outside advisor to the Compensation Committee) and reasonably acceptable to ADAH." In September 2007, ADAH informed Delphi that the Company's salaried executive compensation program complied with the requirements of the Investment Agreement and was acceptable to ADAH. Delphi has also consulted with the Creditors' Committee regarding the competitively benchmarked compensation programs. The cash and emergence equity awards made on the Effective Date of the Plan must be on market terms (as determined by Watson Wyatt) and reasonably acceptable to the Creditors' Committee and ADAH. The Plan constitutes a request to authorize and approve the competitively benchmarked compensation programs.

These programs have been developed under the supervision of Delphi's Compensation Committee which consists of three independent directors who joined the Board of Directors within the last three years:

| Name | Position | Term On Board |
|---|---|---|
| Craig G. Naylor | Chairman of the Compensation Committee | Since 2005 |
| John D. Englar | Member of the Compensation Committee | Since 2006 |
| Raymond J. Milchovich | Member of the Compensation Committee | Since 2005 |

Since September, 2006, the Compensation Committee has met more than 20 times to thoroughly discuss, review, and refine the executive compensation and executive benefit programs. These programs require written employment and change in control agreements to be signed by each DSB Member and short-form agreements to be signed by the remainder of the Company's executives. These agreements are required to be signed and delivered to the Company by any executive who wishes to participate in the post-emergence salaried executive compensation program.

Among other matters, both the longer-form DSB agreements and the short-form agreements for other executives include voluntary waivers of claims against the Company as of the Effective Date by each executive with respect to all compensation and benefit related claims against the Company existing under prior programs. In the case of DSB members, these waivers will include waivers of the prepetition "Change in Control Agreements." As discussed below, the aggregate change in control liabilities arising under the prepetition Change in Control Agreements are potentially substantial. If all participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million. All Change in Control Agreements are listed on Plan Exhibit 8.1(a), and all such agreements will be rejected pursuant to the Plan. Accordingly, the Company's implementation of the new competitively benchmarked salaried executive compensation programs will not only fulfill the Company's transformation objective of achieving competitive salaried compensation programs but will also benefit the Company and its stakeholders by eliminating up to $257.5 million of potential prepetition claims from the Company's unsecured claims pool.

In designing the executive compensation components for Reorganized Delphi, the Compensation Committee is committed to delivering a total compensation program for salaried executive employees that supports Delphi's business and personnel strategies and aligns with the interests of Delphi's key stakeholders. In particular, the Compensation Committee believes that Delphi must provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involves developing and adjusting, in conjunction with the Compensation Committee's independent compensation consultant, a target pay structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assesses both total direct compensation, which is the sum of salary plus annual incentive opportunity plus long-term incentive opportunity, and total compensation, which includes other aspects of pay, including retirement benefits. Market total direct compensation comparisons for the members of the DSB were developed from proxy data from a comparable group of large, diversified companies, as well as

from manufacturing and auto industry survey data. Market total direct compensation comparisons for non-DSB executives were developed from survey data only.

Other material elements of the Compensation Committee's philosophy and strategy can be summarized as follows:

- Link the majority of the total compensation opportunities to performance-based incentives and the creation of shareholder value consistent with Delphi's long-term strategic goals
- Make stock-based incentives a core element of executives' compensation including stock holding requirements for senior executives
- Provide flexibility to recognize, differentiate, and reward individual performance

Exhibit 7.8 of the Plan includes the full compensation philosophy statement adopted by the Compensation Committee, summaries of the major elements of the post-emergence compensation program (described in summary below), and the form employment and change in control agreements to be executed by DSB members (although the Company anticipates that the employment agreements for the new post-Effective Date Executive Chairman, the President and Chief Executive Officer, and the Executive Vice President and Chief Financial Officer will also include terms and conditions customary for such agreements.) The documents included in Exhibit 7.8 of the Plan have been approved by ADAH under the Investment Agreement.

        (b)      <u>Competitively Benchmarked Salaried Employee Compensation Program – Summary Of Emergence Date Payments And The Post-Emergence Salaried Executive Compensation Program</u>

The following describes each component of the new compensation and benefit arrangements for senior management. The compensation and benefit arrangements have been structured based on market median: market for the DSB Members is determined by reference to 18 peer companies. The peer companies which represent a cross-section of companies similar to Delphi and/or with which Delphi competes for executive talent are TRW Automotive Holdings Corp., Visteon Corp., Parker-Hannifin Corp., Federal Mogul, BorgWarner Inc., Pepsico Inc., Kraft Foods Inc., Johnson Controls Inc., Honeywell International Inc., Best Buy Co Inc., Du Pont (E I) De Nemours, Coca-Cola Co., 3M Co., International Paper Co., Ratheon Co., Goodyear Tire & Rubber Co., Lear Corp. and Kimberly-Clark Corp. Market for Delphi employees in Bands A through F market is determined through the use of relevant survey data.

        (i)      Claims Release Process

For an executive who enters into a new employment, retirement, indemnification, and other agreement with the Debtors or Reorganized Debtors to obtain the benefits of such agreements, the executive must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements. As a condition to entering into new employment, change-in-control, indemnification, or other employment-related agreements and/or becoming eligible to participate in certain new compensation and benefit arrangements, including the new supplemental executive retirement program, certain employees must contractually waive and release any claims arising from prepetition commitments,

including pre-existing employment, change-in-control, indemnification, or any other employment-related agreements and/or benefits under certain compensation and benefit arrangements.  For non-DSB members, Delphi will enter into short-form agreements that will describe the Emergence Date and post-Emergence Date payments and compensation program benefits available to an executive and will also implement the claims waiver discussed herein.

(ii)    Executive Employment Agreements

For DSB Members, Delphi will enter into new employment agreements with each DSB Member that generally provide that the executive will serve in an executive position reasonably consistent with his or her current position and at the executive's current work location (although the executive can be relocated in connection with the relocation of his or her principal business unit).  The employment agreements will become effective on the consummation of the Plan and will continue through December 31, 2010.  The agreements will automatically renew each January 1st commencing on January 1, 2011 for additional one-year terms unless either party gives 60 days' advance written notice of non-renewal.  The executive will receive a base salary at an annual rate equal to his or her current salary, which will be subject to annual review and increase and which may not be reduced except pursuant to across-the-board salary reductions.  In addition, the executive will be eligible to participate in short-term incentive plans and long-term incentive plans at levels comparable to similarly situated executives and to participate in all employee benefit plans and arrangements made available by Delphi to similarly situated executives, including supplemental executive retirement programs.

An executive will be entitled to severance if Delphi terminates the executive's employment without "Cause" or the executive resigns for "Good Reason."  Under the employment agreement "Cause" includes any of the following actions (if not cured by the executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the employment agreement.    "Good Reason" under the terms of the employment agreement means an event constituting a material breach of the employment agreement and includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), or (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date.  For DSB members, the severance package that the executive will receive is:

- 18 months' base salary and 18 months' short term incentive target paid over an 18-month period;

- a lump sum cash payment of any unvested amounts credited to the executive's accounts under the Company's tax-qualified and/or nonqualified supplemental or excess defined contribution plans; and
- vesting acceleration on service-based equity awards.

Receipt of the foregoing severance is conditioned on the executive's execution of a release of claims in favor of Delphi and on the executive's compliance with a perpetual non-disclosure provision, an invention assignment provision, an 18-month non-competition provision and an 18-month non-solicitation provision (covering customers and employees). The aggregate amount of severance, if, in the unlikely event, all 441 U.S.-based DSB Members and executives in Bands A through F were terminated by the Company without Cause, is estimated to be approximately $125 million (the aggregate severance for the Company's non-U.S.-based employees has not been estimated).

(iii)    Short-Term Incentive Plan

The purpose of the Short-Term Incentive Plan is to motivate and reward performance and provide incentives based upon business metrics to those employees who contribute to the success of Delphi. Target award and required performance levels are established by the Compensation Committee before the commencement or within the first 25% of the performance period, including minimum and maximum award and performance levels. Assuming that the Effective Date occurs prior to March 1, 2008, the Compensation Committee of Reorganized Delphi will be establishing award and performance levels for the 2008 fiscal year and beyond. Awards are based on specified measures, including but not limited to return on assets, return on equity, working capital, total stockholder return, cash flow, net income, and earnings per share.

Final awards will be based on the performance achieved versus the goals established at the beginning of the period. The Compensation Committee may adjust the awards upward or downward. Although adjustments to the final performance award may be made based on individual performance, adjustments to awards issued to a "covered officer" (an individual whose compensation falls under section 162(m) of the Internal Revenue Code) may only be made to reduce, not increase, an award. No award to a "covered officer" will be paid unless the performance is certified by the Compensation Committee.

Receipt of an award is conditioned on continued employment with the Company. If before the end of any performance period an executive quits or is dismissed for cause, the executive will not be eligible to receive a final award. If employment terminates because of death, retirement, permanent disability, or other terminations approved by the Compensation Committee, the Compensation Committee may waive the requirement of continued employment and pay a reduced award based on a partial year's employment. On the effective date of any change in control, all awards will be paid on a pro-rata basis based on the greater of the target award or actual performance.

The Compensation Committee has the right to amend, modify, suspend, or terminate the Short-Term Incentive Plan although such actions may give rise to certain payment and other rights under executive employment agreements. Any such actions that would result in the Short-Term Incentive Plan becoming reduced in value or unavailable to its participants could result in

the departure of plan participants from the Company and could impair Delphi's ability to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. Stockholder approval, however, is required for certain amendments to preserve the exemption of awards granted under the Short-Term Incentive Plan from the limitations on deductibility of section 162(m) of the IRC. The aggregate annual short-term incentive opportunity for all DSB Members and executives in Bands A through F (approximately 560 executives worldwide) at target is estimated to be approximately $46 million.

(iv)    Long-Term Incentive Plan

The purpose of the Long-Term Incentive Plan is to provide incentive award programs to attract and retain exceptional employees, to align such employees with the long-term strategies of the Company, and to best align the employee interests with those of the Delphi's stockholders.

The Long-Term Incentive Plan allows for the grant of various awards, including stock options, stock appreciation rights ("SARs"), restricted stock, and restricted stock units. Options granted may be either non-qualified stock options or incentive stock options ("ISOs"). ISOs are intended to qualify as "incentive stock options" within the meaning of section 422 of the IRC. The exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant and the term of any SAR or option may not exceed ten years.

The Compensation Committee has the authority to determine the terms and conditions of exercise, including vesting and any additional Company or individual performance-based conditions, of all equity awards granted under the Long-Term Incentive Plan. Awards of stock options and SARs are limited to an annual individual maximum of 1,000,000 shares and awards of restricted stock and restricted stock units are limited to an annual individual maximum of 500,000 shares. The Long-Term Incentive Plan also provides for the grant of performance-based cash awards.

Performance levels are established by the Compensation Committee during the first 25% of the performance period. It is anticipated that the Compensation Committee of Reorganized Delphi will be establishing performance levels for the long-term incentive program. The Compensation Committee may adjust the awards upward or downward. (Adjustments to awards issued to a "covered officer" (as defined under section 162(m) of the IRC) may only be made to reduce, not increase, an award. No award to a "covered officer" will be paid unless the performance is certified by the Compensation Committee.) Generally, awards are cancelled when an employee quits or is dismissed for any reason before the first anniversary of the grant date. In the case of retirement more than one year after the grant date, an employee may retain his or her stock options and SARs until the earlier of their expiration date or five years from the employee's retirement date. Upon an employee's death or permanent disability more than one year after the grant date, the employee's options and SARs will remain outstanding until the earlier of their expiration date or three years from the date of the employee's death or permanent disability.

Awards of restricted stock and restricted stock units will vest immediately upon an employee's retirement, permanent disability, or death more than one year after the grant date, although cash performance awards may be pro-rated based on the number of eligible months the employee was employed over the total award period.  Any employee or former employee who engages in misconduct before the second anniversary of his or her termination of employment will be required to forfeit outstanding awards, forfeit the right to receive any future awards, and repay any amounts received in connection with previous awards, including any profits realized on the sale of company stock received pursuant to an award.

The Compensation Committee has the right to amend, modify, suspend or terminate the Long-Term Incentive Plan although such actions may give rise to certain payment and other rights under executive employment agreements.  Any such actions that would result in the Long-Term Incentive Plan becoming reduced in value or unavailable to its participants could result in the departure of plan participants from the Company and could impair Delphi's ability to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance.  Stockholder approval, however, is required to (i) increase the maximum number of shares of common stock for which awards may be granted, (ii) grant options or SARs at a discount, (iii) permit exercise of an option or SAR without full payment at the time of exercise, (iv) extend the exercise period of an option or a SAR, (v) make an award to non-employees, (vi) re-price any outstanding option or SAR or cancel and re-grant an option or SAR with a lower exercise price, (vii) increase the annual individual limit on cash awards, or (viii) grant any award after the Long-Term Incentive Plan's expiration date.  In the event of any merger, reorganization, consolidation, recapitalization, stock dividend, or other change in corporate structure affecting the Delphi's common stock, the Compensation Committee may adjust the share reserve, the individual award limits, or the number and exercise price of shares of common stock subject to outstanding awards granted under the Long-Term Incentive Plan.

Upon a change in control, all outstanding time-based equity awards will vest.  In addition, it is contemplated that any performance-based equity awards will vest upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.  Any performance-based cash awards will be paid on a pro-rata basis based on the greater of the target award and actual performance.  If upon a change in control the consideration paid to holders of shares of the Delphi's common stock is solely cash, the Compensation Committee may provide that each award will be cancelled in exchange for a cash payment.

The initial target grant of equity under the Long-Term Incentive Plan will be awarded for executives in Bands A through C in stock options, restricted stock units, cash, or a combination thereof and for Bands D and above, including DSB Members, one-half in restricted stock units and the other half in stock options.  Further, one-half of the restricted stock units and options awarded will be time-vested and one-half will be performance-vested.  The initial target grant will cover an 18-month period during which no further awards will be made (other than for an executive's promotion).  For certain executives, the initial target grant of equity will be supplemented with an additional one-time grant of equity awards to maintain the executives' overall compensation levels at the median of competitive market practice considering the

modifications being made to the supplemental retirement plans (as discussed under the New SERP and Salaried Retirement Equalization Savings Program sections below). The estimated lifetime total value of the supplemental grants is expected to be approximately $11.5 million. The aggregate long-term incentive opportunity, on an annualized basis, for all DSB Members and executives in Bands A through F is estimated to be approximately $80 million. This amount represents the total estimated value of the service-vested equity awards and performance-based equity awards, assuming target performance levels are achieved. As agreed to between Delphi and ADAH, the long-term incentive plan assumes that 8% of the available shares of Delphi's fully diluted common stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity. The initial target grant of equity that will be made as of the Effective Date is expected to constitute approximately 3% of the available shares of Delphi's fully diluted common stock.

(v)    Chapter 11 Effective Date Executive Payments

As part of the overall total compensation program approved in 2005 by the Compensation Committee for DSB Members and in Bands A through F, the Company determined that long-term incentive performance opportunities should be paid on the Effective Date of the Plan in an amount equivalent to approximately 80% of an individual employee's 2004 long-term incentive performance target (as subsequently adjusted in some cases by the Compensation Committee) for a period equivalent to 18 months even if the chapter 11 reorganization took longer than 18 months to complete. (The Debtors currently estimate the period from the Filing Date to the Effective Date to be approximately 28 months.)

During the Chapter 11 Cases, certain outstanding long-term incentive awards that were granted prepetition with postpetition vesting cycles were thereafter cancelled and executives were not awarded any new grants during the postpetition period. In addition, the Debtors determined during the Chapter 11 Cases not to seek separate approval by the Bankruptcy Court for this element of the salaried executive compensation program but to instead incorporate the program into the Plan as part of the Plan confirmation process. The Company also expects to make an Effective Date payment to the Company's Executive Chairman (who does not participate in this or any other incentive compensation program) as determined by the Compensation Committee prior to the Effective Date.

Pursuant to Emergence Date performance payment program, cash payments made on the Effective Date would generally be equivalent to one-third of the annualized value of an executive's prepetition awards that were cancelled and the awards not granted during the postpetition period (subject to adjustment by the Compensation Committee based on individual performance). The aggregate payments under this program are estimated to be approximately $34 million on an annualized basis for the duration of the Chapter 11 Cases (or approximately $78 million in the aggregate). Even with these cash payments, total executive compensation at Delphi for the duration of the Chapter 11 Cases will have fallen materially below competitive practice as demonstrated in the following charts:



(vi)    Retirement Program For Executives

A new Retirement Program for executives will be implemented, consisting of two parts: (1) a "New SERP," which consists of the traditional Supplemental Executive Retirement Program that will be frozen in early 2008 in connection with Delphi's emergence from chapter 11 and which applies to past service, and (2) the Salaried Retirement Equalization Savings Program, which is a new nonqualified defined contribution plan that will apply to future service.

(1)    Supplemental Executive Retirement Program

The Supplemental Executive Retirement Program (the "New SERP") will be an unfunded, nonqualified benefit plan. The New SERP is closed to new participants. To be eligible to receive a benefit under the New SERP, an executive employee must be a regular executive employee at retirement, and have at least ten years of service and be 55 years old at retirement. In addition, an executive employee otherwise eligible to participate in the New SERP will be entitled to a benefit under the New SERP if he or she is involuntarily separated from service without cause (or, if he or she has entered into an employment agreement with the Company, leaves for Good Reason) and has at least five years of service with the Company. In such cases, payment of the benefit will then be deferred until he or she is at least 55 years old. For a period of two years following separation from employment, any retired executive employee entitled to receive a benefit under the New SERP may not compete with the Company without the Company's consent.

Benefits under the New SERP are paid under either the Regular Formula or the Alternative Formula. The Regular Formula provides a benefit equal to 2% of the executive employee's average monthly base salary multiplied by the executive employee's total years of Delphi Retirement Program for Salaried Employees ("SRP") Part B and Part C service less the

sum of (i) the unreduced monthly SRP pension benefits to which the executive employee is entitled and (ii) 2% multiplied by the maximum allowable social security benefit multiplied by the total of the executive's SRP Part A and Part C service as of the Effective Date.    The Alternative Formula provides a benefit equal to 1.5% of the executive employee's average monthly base salary plus average monthly annual incentive compensation multiplied by the executive employee's total years of SRP Part B and Part C service (capped at 35 years) less the sum of (i) the unreduced monthly SRP benefits to which the executive employee is entitled and (ii) the maximum allowable social security benefit.    However calculated, benefit amounts will be reduced for early retirement before age 62.    Following the date of the freeze, no additional years of credited service, base salary increases, or incentive compensation awards will be used in the calculation of the benefit under the New SERP.

Benefits under the New SERP will be paid as a five-year annuity beginning on the later of (i) the first day of the month at least 15 days after the employee's separation from service and (ii) the first day of the first month following the employee's 55th birthday, except that any payment to a "specified employee" (as defined under section 409A of the Internal Revenue Code) will be delayed to the extent required thereunder.    Death benefits will be paid in a lump sum to the spouse and/or beneficiary of an executive employee who was eligible for benefits under the plan at the time of his or her death.    Benefits under the New SERP may be reduced by any amounts owed by the employee to the Company.

(2)    Salaried Retirement Equalization Savings Program

The Salaried Retirement Equalization Savings Program is a funded plan, prospectively replacing the pre-existing supplemental retirement programs and maintained primarily for the purpose of providing deferred compensation to certain executives, managers, and other highly compensated employees of the Company.    The purpose of the Salaried Retirement Equalization Savings Program is to supplement the Company's qualified defined contribution savings plan (currently known as the S-SPP) and allow Company nonelective contributions and matching contributions to be made into a nonqualified defined contribution savings plan in situations where legal limitations under the S-SPP have been reached.    A participant will vest in his or her employer and matching contributions as set forth in the adoption agreement.    A participant is always 100% vested in the amounts credited to his or her account that are attributable to participant deferrals.

Distributions from a participant's account will be made according to elections made or deemed made by the participant, except that distributions to "specified employees" (as defined under section 409A of the IRC) will not be made before a date that is six months after the specified employee's separation from service.    A participant may elect at least 12 months before a scheduled distribution event to delay the payment date for a minimum of five years from the original payment date, as well as to change the form of payment of any amounts subject to a deferral election.    A participant who experiences a separation from service before retirement will receive the vested amount credited to his or her account in a single lump sum.    Delphi also has the ability to delay payments due to a participant under the plan if Delphi reasonably anticipates that its deduction with respect to such payment would be limited or restricted under section 162(m) of the IRC or the employer reasonably anticipates that the payment will violate the terms of a loan agreement or other similar contract.

In the event of a change in control, the Company may terminate the plan and distribute all amounts credited to participant accounts within 30 days before or 12 months after the change of control (provided that all substantially similar arrangements are also terminated).  In the event of a change of control, the participant will receive the vested amount credited to his or her account in a lump sum.  The Company also may terminate the plan if all substantially similar arrangements are terminated, no payments (except required payments) are made within 12 months after termination, all payments are made within 24 months after termination, and Delphi does not adopt a new substantially similar arrangement within five years following termination.

(vii)    Change In Control Agreements

Effective on the Effective Date of the Plan, the Company will enter into new change in control agreements with each DSB Member.  Generally, "Change in Control" means (i) any person (or entity) is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities, (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who constitute the Board on the Effective Date with any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the directors then still in office who either were directors on the Effective Date or whose appointment, election, or nomination for election was previously so approved or recommended, (iii) a merger of the Company or any direct or indirect subsidiary of the Company with any other entity, other than a merger which results in the voting securities of the Company outstanding immediately prior to such merger continuing to represent more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (iv) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately before the sale.  "Change in Control" does not include consummation of the Plan of reorganization or transactions contemplated thereunder.

The change in control agreements generally provide:

- a lump sum cash payment equal to two to three times (based on the executive's position) the executive's base salary and target bonus;

- 24 to 36 months (based on the executive's position) of benefit continuation coverage for the executive and his or her dependents;

- a lump sum cash payment equal to the sum of (1) any unpaid cash incentive compensation allocated to the executive for completed fiscal years and (2) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (assuming performance at target levels);

DS-102

- a lump sum cash payment equal to the contributions that would have been made to any of the Company's tax-qualified and/or nonqualified supplemental or excess defined contribution plans on behalf of the executive in the two to three years (based on the executive's position) following the date of termination (assuming maximum contribution levels);

- outplacement services until the earlier of one year or the executive's acceptance of employment; and

- vesting acceleration of service-based equity awards and vesting acceleration of performance-based equity awards upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.

If any of these payments or benefits become subject to excise tax on "golden parachute" payments, the executive will be entitled to a gross-up payment (but only if the executive's total payments and benefits exceed 110% of the greatest pre-tax amount the executive could be paid without causing the executive to be liable for any excise taxes in connection with the gross-up payment).

Receipt of severance is conditioned on the executive's execution of a release of claims in favor of Delphi and on the executive's compliance with a perpetual non-disclosure provision, an invention assignment provision, a 12- to 18-month non-competition provision, and a 12- to 18-month non-solicitation provision (covering customers and employees). In addition, the Company is obligated to pay all of an executive's legal fees with respect to any good-faith dispute of any issue under the change in control agreement. Under the change in control agreement under discussion with the Company's chief executive officer, the chief executive officer will have the right to voluntarily terminate employment during the 30-day period beginning 12 months after the change in control and still receive all change-in-control related benefits under the agreement.

The change in control agreements will be effective on the consummation of the Plan and will continue through December 31, 2009. The agreements will automatically renew each January 1st commencing on January 1, 2009 for additional one-year terms unless notice of non-renewal is given by either party before September 30th of the preceding year. In addition, the change in control agreements will automatically renew for a two-year term upon the occurrence of a change in control.

(c)    Chapter 11 Salaried Employee Compensation Program – Summary Of Key Employee Compensation Program

The Debtors have implemented certain aspects of a key employee compensation program pursuant to which executive-level U.S. employees have the capability of receiving incentive-based compensation based on the Company's and individual performance. Upon commencement of the Debtors' Chapter 11 Cases, certain of the Debtors' salaried employees' compensation

programs were terminated, including the annual incentive program and long-term incentive program. The Debtors also cancelled a retention awards program enacted before the Petition Date. As a result, upon the Debtors' entry into chapter 11, the Debtors' U.S. executives total compensation opportunities decreased by approximately 50%, going from a total prepetition compensation plan composed of base salary, an annual incentive program, a long-term incentive program, and retention grants to a postpetition compensation package consisting solely of base salary.

The Debtors' chapter 11 key executive compensation program consisted of three primary parts: (i) a short-term at-risk performance payment compensation program, (ii) an emergence award plan that provided limited cash compensation in lieu of chapter 11 long-term incentives and an equity based award covering post-emergence long-term incentives for the 18-month period following the Effective Date, and (iii) a prepetition severance plan that was modified in the third quarter of 2005. The overall program was designed, in part, to replace some of the prepetition compensation programs for the Debtors' U.S. executives. The overall program was premised on the principle that the Company should provide market-competitive compensation opportunities designed to motivate its executive workforce to perform for the Debtors. Notably, Delphi's chapter 11 compensation program was different from traditional employee compensation and retention programs in at least two important ways. First, the current Executive Chairman (and former CEO) of Delphi opted not to participate in the program but is instead eligible for a discretionary performance payment, which will be determined separately by the Compensation Committee prior to the Effective Date. Second, Delphi's program had no "retention" payments ("pay to stay" vs. "pay for performance") within its design.

Indeed, the short-term at-risk incentive compensation programs ultimately proposed by the Debtors during the Chapter 11 Cases have incorporated six-month performance cycles, as opposed to the more traditional year-long periods, to closely monitor the Debtors' ongoing financial progress and to ensure that executive performance remains linked to the evolving demands of the Chapter 11 Cases. Additionally, even if the Debtors achieve their corporate and division-level performance targets, eligible employees also must maintain an acceptable level of personal achievement to qualify for the at-risk incentive compensation payments. Finally, the Debtors implemented an EBITDAR-based metric to evaluate the corporate-wide performance of the Debtors and agreed to extensive discretion of the Creditors' Committee in adjusting this metric in two of the chapter 11 performance periods. The Debtors also eliminated from their analysis various variances in performance (i.e., gains from the steady state business plan early in the Chapter 11 Cases and variances from the transformation business plan later in the Chapter 11 Cases) obtained during the applicable performance period as a result of agreements reached with GM and the Unions. By designing a short-term at-risk incentive compensation program in this manner, the Debtors sought to maximize the performance of their executives, which in turn, would increase the value of the Debtors' Estates.

During the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to implement the short-term elements of the compensation program. The longer term elements of the original chapter 11 compensation program (i.e., cash performance payments on the Effective Date and long-term equity incentive grants for post-emergence periods) were deferred to the plan confirmation process and are incorporated into the overall salaried executive compensation

program developed by the Compensation Committee and approved by ADAH under the Investment Agreement.

            (d)    <u>Summary Of Certain Material Prepetition Executive Compensation Programs</u>

            (i)    Supplemental Executive Retirement Program

Since the separation from GM, Delphi has had a Supplemental Executive Retirement Program (the "SERP") for certain employees. The SERP is a non-qualified plan under the IRC that is separate from, but is integrated with, the Delphi Retirement Program for Salaried Employees, a qualified pension plan under the IRC. Pursuant to the authority granted by that certain Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (i) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In the Ordinary Course; And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations (Docket No. 198), the Debtors have, throughout the course of the Chapter 11 Cases, continued to make monthly SERP payments to eligible retirees, limited to $5,000 per month per retiree. Pursuant to the Plan, however, the Debtors will (i) no longer honor their obligations under the SERP because the Debtors will reject, as of the Effective Date, or otherwise terminate the current SERP and (ii) implement a new Supplemental Executive Retirement Program with respect to current eligible employees (subject to the execution of a waiver of claims) which, in effect, (a) freezes the benefits under the SERP and modifies eligibility to the age of 55 years with ten years of service and (b) supplements the frozen SERP benefit with a new benefit under a separate plan. Accordingly, as of the effective date of the Plan, the Debtors will no longer make monthly SERP payments to retirees, and retirees will have 30 days after the effective date of the Plan to file a proof of claim for any claims arising under the SERP. Current eligible employees that were entitled to the SERP should not be penalized by the rejection, termination, and/or halting of benefits with respect to the SERP because these active employees should generally become eligible to participate in the New SERP.

Under the Plan, all persons holding or wishing to assert Claims arising out of the SERP, and whose SERP Claims vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form Number 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property. Any Claims arising out of SERP after the Effective Date will be disallowed in their entirety. Allowed SERP Claims will receive the treatment afforded to Allowed General Unsecured Claims under the Plan. Each such Allowed SERP Claim will receive a distribution on the earliest Distribution Date after such SERP Claim is allowed, if ever. For further details, including details regarding postpetition interest on General Unsecured Claims, see <u>Section IX.E – Treatment Of Claims And Interests Under The Plan</u> and <u>Section IX.H – Provisions Governing Distributions</u>.

(ii)    Change In Control Agreements

In early 2000, Delphi modified certain terms of its change in control agreements (collectively, the "Change in Control Agreements") with its officers that had been in existence since the Separation.    The Change in Control Agreements provide certain benefits to each participant (each, a "Participant") upon the occurrence of a change in control of Delphi and additional benefits if the employment of a Participant is terminated for certain reasons after a change in control.  A change in control is defined under the Change in Control Agreements to include (i) the acquisition by any person, other than Delphi or any subsidiary of Delphi, of beneficial ownership of 25% or more of the outstanding common stock of Delphi; (ii) certain changes in the composition of Delphi's board of directors; (iii) certain mergers, consolidations, and other reorganizations of Delphi in which Delphi is not the surviving corporation; (iv) any sale, lease, exchange, or other transfer of 50% or more of the assets of Delphi; or (v) a liquidation or dissolution of Delphi.

Pursuant to the Change in Control Agreements, Participants are entitled to certain payments and benefits upon the occurrence of a change in control, including the immediate vesting of all unvested options and restricted stock units, and the full funding of all of the Participant's "target awards" and any compensation previously deferred at the election of the Participant, together with accrued interest or earnings thereon.  Additional payments and benefits are payable to Participants who cease to be employed by Delphi during the three years following a change in control if (i) Delphi terminates the Participant's employment other than for "cause" (as defined therein); (ii) the Participant terminates his or her employment if, without his or her consent, (a) his or her salary and other compensation or benefits are reduced for reasons unrelated to Delphi's or the Participant's performance, (b) his or her responsibilities are negatively and materially changed, (c) he or she must relocate his or her work location or residence more than 25 miles from its location as of the date of the change in control, or (d) Delphi fails to offer him or her a comparable position after the change in control; or (iii) during the one-month period following the first anniversary of the change in control, the Participant ceases to be employed by Delphi for any reason other than for cause.

The aggregate change in control liabilities arising from these and other rights granted to Participants under the Change in Control Agreements are potentially substantial.  Executives continuing their employment with Delphi after the Effective Date of the Plan will be asked to waive benefits under the Change in Control Agreements and certain other programs in order to be eligible for Delphi's emergence compensation program and other related benefits. To the extent a Participant does not waive such benefits, the Company intends to challenge any asserted claims under the Change in Control Agreements.  If all Participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million.  All Change in Control agreements are listed on Plan Exhibit 8.1(a) to the Plan, and will be rejected pursuant to the Plan.

(iii)    Benefit Equalization Plan For Salaried Employees

The Benefit Equalization Plan for Salaried Employees ("BEP") is available to executives whose contribution and benefit levels in the Delphi Savings-Stock Purchase Program ("S-SPP") exceed certain limits under IRC Section 415. The BEP is not funded, and since October 2004,

contributions have been de minimis. Amounts contributed to the BEP are separately accounted for. Distributions under the BEP are expected to aggregate approximately $160,000 and will be distributed to approximately 141 participants with an average distribution of $1,120 and a maximum individual distribution of approximately $10,000. The BEP amounts will be distributed upon emergence, and the plan will be terminated.

## I.    Pension Transformation

As noted above, the final key tenet of the Transformation Plan is to devise a workable solution to the Debtors' current pension situation. Delphi maintains two separate defined benefit pension plans for employees, one for salaried workers (the "Salaried Plan") and one for hourly workers (the "Hourly Plan"). The Debtors' funding obligations under the U.S. pension plans are governed by the IRC and ERISA.

The Debtors' goal throughout these Chapter 11 Cases was to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current Hourly Plan and Salaried Plan as of the first of the month following the Effective Date. Despite the freeze, because of the size of the funding deficit, the Debtors needed to obtain relief from the IRS and the PBGC, to avoid a potential excise tax assessment and to effectuate the IRC Section 414(l) transfer of underfunded pension liabilities to the GM Hourly Plan.

The Debtors required relief from the IRS and the PBGC because the pension plans had an accumulated funding deficiency of approximately $117 million from the plan year ended September 30, 2005. Additionally, since the Petition Dates, the Debtors have been making only "normal cost" contributions to the pension plans, or contributions that reflect the amounts related to service provided by plan participants post-filing. These "normal cost" contributions are less than the minimum funding requirements established by the IRC and ERISA. The IRC imposes a 10% excise tax penalty on the amount of any resulting funding deficiency. Under the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.

Although the Debtors believe that they have defenses against such penalties, the Debtors sought a consensual resolution. Thus, as part of the solution to their pension issues, the Debtors negotiated with the IRS and the PBGC for conditional waivers of their minimum funding requirements under the Hourly Plan and Salaried Plan for the pension plan year ended September 30, 2006. By obtaining the waivers, the Debtors were able to delay their minimum funding requirements from June 15, 2007 to the expected effective date of their Plan of reorganization. The conditional waiver terms also included full settlement of the excise tax assessment for the pension plan year ended September 30, 2005. The Debtors reached an agreement on the terms of the waivers on May 1, 2007, and filed a motion for authority to perform under the terms of the waivers on May 11, 2007. The Court approved the motion on May 31, 2007.

The waivers were essential to the Debtors' resolution of their pension issues because they addressed an IRS excise tax assessment of approximately $17 million related to the funding deficiency for the plan year ended September 30, 2005, and prevented the IRS from asserting additional excise taxes related to funding deficiencies for that year and future pension plan years

that could have exceeded $1.4 billion in the aggregate. The waiver with respect to the Hourly Plan also will facilitate the transfer of $1.5 billion of the Debtors' unfunded pension obligations of the Hourly Plan to the GM Hourly Plan under IRC Section 414(l), which was a key component of the Plan Framework Support Agreement discussed in more detail in <u>Section VII.D – Plan Investors And Exit Financing</u> below. Under IRC Section 414(l), obligations in a pension plan can be transferred to another pension plan without negative tax implications if certain conditions are met. The IRC Section 414(l) transfer facilitates Delphi's resolution of its pension issues, significantly improves the security and funding of the Delphi pension plans, and is in the best interests of plan participants. The IRS issued a favorable ruling with respect to the IRC Section 414(l) transaction on May 29, 2007.

In exchange for the waivers, the Debtors agreed to bring their pension funding obligations up to date upon emergence from chapter 11, including an accelerated contribution to the Hourly Plan in the amount of $10 million for the plan year ending September 30, 2007 and a $10 million accelerated contribution to the Hourly Plan in settlement of any excise taxes that had already accrued. As security for their obligations under the waivers, the Debtors provided the PBGC with letters of credit in the amount of $100 million on account of the Hourly Plan and $50 million on account of the Salaried Plan. The Debtors intend to comply with the remaining terms of the waivers shortly following the effective date of the Plan of reorganization, at which time the letters of credit will be terminated.

On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to its pension plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.

On August 3, 2007, Delphi applied to the IRS and PBGC for a temporary waiver of its minimum funding obligations with respect to the Hourly Plan for the plan year ending September 30, 2007. The Debtors reached an agreement with the IRS and PBGC on the terms of such a conditional waiver on September 28, 2007. This second waiver is necessary to enable the IRC Section 414(l) transfer to be implemented in an economically efficient manner after September 30, 2007. Consistent with the waivers already granted with respect to the Hourly Plan and the Salaried Plan for the plan year ended September 30, 2006, the Debtors would stand by their commitment to bring their pension funding obligations up to date upon emergence from chapter 11. The Debtors filed a motion on October 5, 2007 for authority to perform under the second waiver. The Bankruptcy Court entered an order approving the motion on October 25, 2007.

On October 4, 2007, the IRS further modified the first set of conditional funding waivers, conforming the conditions to the first waivers so that they are generally consistent with the conditions to the second waiver.

As a result of the successful negotiation of the waivers and the IRC Section 414(l) transfer, Delphi's business plan provides that Delphi will be able to timely meet its pension obligations following emergence from chapter 11.

violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash, in the same proportion of the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims, as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution hereunder for distribution by the disbursing agent appointed by the MDL Court.  If any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, however, then the holder of such Allowed Section 510(b) Opt Out Equity Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; it being understood that with respect to any distribution made to a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(vii)    Class H (Section 510(b) ERISA Claims).

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement.

(viii)    Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

### F.    Means For Implementation Of The Plan

#### 1.    *Continued Corporate Existence*

Subject to the Restructuring Transactions contemplated by the Plan, each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law

### 7.    *Employment, Retirement, Indemnification, And Other Agreements And Incentive Compensation Programs*

The Debtors must enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors, officers, and employees who will continue in such capacities (or similar capacities) after the Effective Date, all as more fully stated on Exhibit 7.8 attached to the Plan; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described on Exhibit 7.8 to the Plan, may include equity, bonus, and other incentive plans as components of compensation to be paid to executives after the Effective Date (including a long-term incentive plan that assumes 8% of the available shares of Reorganized Delphi's fully diluted New Common Stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity awards).  The Cash and equity emergence awards issued on the Effective Date will be on market terms as determined by the Debtors' board of directors based on the advice of the independent outside advisor to the Compensation Committee, which determination must be reasonably acceptable, on an aggregate basis, to the Creditors' Committee and ADAH.

### 8.    *Procedures For Asserting SERP Claims*

All persons holding or wishing to assert Claims solely on the basis of further pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property.  Any Claims arising out of the SERP after the Effective Date will be disallowed in their entirety.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP and will implement a new supplemental executive retirement program with respect to current eligible employees (subject to the execution of a waiver of claims), all as more fully described on Exhibit 7.8.

### 9.    *Cancellation Of Existing Securities And Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan or as otherwise required in connection with any Cure, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Plan, will be cancelled; provided, however, that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of

Exhibit 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
     In re                              :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No. 05-44481 (RDD)
                                        :
             Debtors.         :    (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER UNDER 11 U.S.C  §§ 363, 1113, AND 1114
AND FED. R. BANKR. P. 6004 AND 9019 APPROVING MEMORANDUM OF
UNDERSTANDING AMONG UAW, DELPHI, AND GENERAL MOTORS CORPORATION
INCLUDING MODIFICATION OF UAW COLLECTIVE BARGAINING AGREEMENTS
<u>AND RETIREE WELFARE BENEFITS FOR CERTAIN UAW-REPRESENTED RETIREES</u>

("UAW 1113/1114 SETTLEMENT APPROVAL ORDER")

Upon the motion ("UAW 1113/1114 Settlement Approval Motion" or the

"Motion"), dated June 29, 2007, of Delphi Corporation ("Delphi") and certain of its subsidiaries

and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), for an order under 11 U.S.C. §§ 363, 1113, and 1114 of the Bankruptcy Code and

Fed. R. Bankr. P. 6004 and 9019 approving (i) a memorandum of understanding regarding

Delphi's restructuring entered into among the United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW"), Delphi, and General Motors Corporation ("GM"),

dated June 22, 2007 (with the attachments thereto, the "UAW Settlement Agreement" or the

"Memorandum of Understanding"), that (a) modifies, extends, or terminates provisions of the

existing collective bargaining agreements among Delphi, the UAW, and its various locals (the

"UAW CBAs"), and (b) provides that Delphi and GM will undertake certain financial obligations

to Delphi's UAW-represented employees and retirees to facilitate these modifications, (ii)



withdrawal without prejudice of the Debtors' Motion For Order Under 11 U.S.C. § 1113(c)

Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g)

Authorizing  Modification Of Retiree Welfare Benefits, dated March 31, 2006 (the "1113/1114

Motion") solely as it pertains to the UAW and approving the parties' settlement of the 1113/1114

Motion solely as it pertains to the UAW, and (iii) modification of retiree welfare benefits for

certain UAW-represented retirees of the Debtors, all as more fully set forth in the UAW

1113/1114 Settlement Approval Motion; and the Court having been advised by counsel to the

UAW that the UAW Settlement Agreement was ratified by the UAW membership as of June 28,

2007, such that the only remaining condition to the effectiveness of the UAW Settlement

Agreement pursuant to Section K.1 thereof is this Court's entry of an approval order satisfactory

in form and substance to the UAW, GM, and Delphi; and this Court having been advised by

counsel to the UAW, GM, and Delphi that the form and substance of this Order is satisfactory to

each of the UAW, GM, and Delphi as required by Section K.1 of the UAW Settlement

Agreement; and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it

appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and after due deliberation thereon; and good and sufficient cause

appearing therefor, it is hereby

     ORDERED, ADJUDGED, AND DECREED THAT:

     1.     The Motion is GRANTED.

     2.     The Debtors are hereby authorized to enter into the UAW Settlement

Agreement, a copy of which is attached hereto as Exhibit 1, and to implement the terms of such

UAW Settlement Agreement.

3.      Each of the signatories to the UAW Settlement Agreement (each such party, a "Signatory," and collectively, the "Signatories") is directed to take all actions necessary or appropriate to effectuate the terms of this order and the terms of the UAW Settlement Agreement, including, without limitation, any and all actions necessary or appropriate to such Signatory's implementation of and performance under the UAW Settlement Agreement.

4.      The UAW Settlement Agreement is binding on the Debtors, GM, and the UAW subject to its terms and constitutes a valid and binding amendment to the UAW CBAs with authorized representatives of all individuals who were or are in a bargaining unit represented by the UAW, as permitted by section 1113 of the Bankruptcy Code and the UAW CBAs as amended, or otherwise, and the UAW CBAs, in accordance with the UAW Settlement Agreement, are binding on the Debtors and the UAW.

5.      The UAW Settlement Agreement constitutes a valid and binding amendment to existing retiree health and welfare benefits, as permitted by section 1114 of the Bankruptcy Code, or otherwise.

6.      Notice of the UAW 1113/1114 Settlement Approval Motion was properly and timely served in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on October 26, 2006 (Docket No. 5418), the Supplemental Order Under 11 U.S.C. Sections 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on March 17, 2006 (Docket No. 2883), and by service upon (a) the UAW at 8000 East Jefferson, Detroit, Michigan 48214, (b) counsel to the UAW, Cohen, Weiss, and Simon LLP at

3

330 West 42nd Street, 25th Floor, New York, N.Y. 10036-6976, and (c) the active Delphi hourly

employees and hourly retirees who are represented by the UAW at their individual addresses,

pursuant to an informational form of notice, a copy of which was attached to the UAW

1113/1114 Settlement Approval Motion as <u>Exhibit 1</u>.

       7.     The Debtors are authorized to withdraw, without prejudice, their

1113/1114 Motion solely as it pertains to the UAW.  The 1113/1114 Motion is settled solely as it

pertains to the UAW.

       8.     As provided for in the Motion and with the consent of the UAW and

Delphi, Sections H.3 and J.3 of the UAW Settlement Agreement are clarified to provide for the

continuance of CHR accruals through October 1, 2007 and to provide that the UAW will receive

on the Effective Date an allowed prepetition general unsecured claim against Delphi in the

amount of $140 million consisting of UAW-GM Center for Human Resources ("CHR")  existing

accruals of $134 million and UAW-Delphi Legal Services Plan accruals of $6 million (such

allowed claim amount to be adjusted by the difference between accruals through October 1, 2007

and expenditures until the effective date of the Debtors' plan of reorganization (the "Delphi

Reorganization Plan")) in complete settlement of the UAW and the CHR claims asserted as to

CHR Joint Funds[1] and the UAW-Delphi Legal Services Plan accruals and expenses.  The

allowed claim provided for in this paragraph shall be paid pursuant to the plan of reorganization

following substantial consummation of a plan of reorganization.  The amount of $30 million will

be directed to the CHR and the balance will be paid directly to the DC VEBA established

pursuant to the settlement agreement approved by the court in the case of <u>International Union,</u>

<u>UAW, et al. v. General Motors Corp.</u>, Civil Action No. 05-73991.  Until the effective date of a

---

[1]     Capitalized terms used and not otherwise defined herein have the meanings ascribed to
them in the Memorandum of Understanding.

Delphi Reorganization Plan, Delphi shall continue to make CHR and Legal Service Plan

payments consistent with past practices in the ordinary course of business.

　　　　　9.　　　　As a condition precedent to the effectiveness of certain obligations of the

parties pursuant to Section K.2 of the UAW Settlement Agreement and as provided in Section

K.3 of the UAW Settlement Agreement, any Delphi Reorganization Plan that is consistent with

the UAW Settlement Agreement and any confirmation order entered into with respect to such

plan shall include the following provisions:

　　　　　　　　　(a)　　　　On the effective date of the Delphi Reorganization Plan, the UAW,
all employees and former employees of Delphi represented or
formerly represented by the UAW, and all persons or entities with
claims derived from or related to any relationship with such
employees or former employees of Delphi, shall waive and release
and be deemed to have waived and released any and all claims of
any nature, whether liquidated or unliquidated, contingent or
non-contingent, asserted or unasserted, existing and/or arising in
the future against Delphi, its subsidiaries, or affiliates, the Delphi
HRP, the Delphi Health Care Program for Hourly Employees and
the Delphi Life and Disability Benefits Program for Hourly
Employees, GM, its subsidiaries or affiliates, the GM HRP, the
GM Health Care Program for Hourly Employees and the GM Life
and Disability Benefits Program for Hourly Employees, and the
officers, directors, employees, fiduciaries, and agents of each,
arising directly or indirectly from or in any way related to any
obligations under the UAW CBAs and the collective bargaining
agreement between GM and the UAW related to such employees
and the UAW-GM-Delphi Memorandum of Understanding Benefit
Plan Treatment related to such employees (provided, however, that
claims for benefits provided for or explicitly not waived under the
provisions of the UAW Settlement Agreement are not waived; and
provided further that claims for workers' compensation benefits
against Delphi, its subsidiaries, or affiliates, are not waived).

　　　　　　　　　(b)　　　　A plan exculpation and release provision (which provision shall be
at least as comprehensive as the plan exculpation and release
provision under the Delphi Reorganization Plan) for the UAW
released parties (which shall include the UAW and each of their
current or former members, officers, committee members,
employees, advisors, attorneys, accountants, investment bankers,
consultants, agents, and other representatives) with respect to any
liability such person or entity may have in connection with or

5

related to the Delphi bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Delphi Reorganization Plan, the disclosure statement concerning the plan, the UAW Settlement Agreement, or the Agreements on Attachment E thereto, or any contract, employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the Delphi Reorganization Plan or any agreement between the UAW or Delphi, or any other act taken or omitted to be taken consistent with the UAW Settlement Agreement in connection with the Delphi bankruptcy.

(c)    The UAW Settlement Agreement and the agreements referenced in Attachment E thereof and listed on <u>Exhibit 2</u> attached hereto shall be assumed under 11 U.S.C. § 365.

10.    Nothing contained in the UAW Settlement Agreement shall constitute an assumption of any agreement described therein, including, without limitation, any UAW CBA (except as provided for in Section K.3 of the UAW Settlement Agreement) or any commercial agreement between GM and Delphi, nor shall anything therein be deemed to create an administrative or priority claim with respect to GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party. The UAW Settlement Agreement is without prejudice to any party-in-interest (including the parties to the UAW Settlement Agreement and the Debtors' statutory committees) in all other aspects of Delphi's chapter 11 cases, and each party to the UAW Settlement Agreement shall reserve all rights not expressly waived therein. Further, nothing in the Motion, the UAW Settlement Agreement, this Court's approval of such agreement, the performance of any obligation thereunder, or any other document shall prejudice any right or remedy of any Debtor against any other Debtor with respect to the allocation of Delphi's obligations under the UAW Settlement Agreement or claims asserted against, or payments by, Delphi thereunder, all of which rights are expressly preserved.

11.    In furtherance of the UAW Settlement Agreement, as soon as reasonably practicable after the Effective Date, Delphi shall pay approximately (but in no event more than) $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier which provided parts to Delphi pursuant to an accommodation agreement.  These MPC-related payments are to be in full satisfaction of all claims against the Debtors arising from or related to MPC, and the Debtors and their estates shall be released from any liability from MPC and its former UAW-represented employees with respect thereto.  In order to receive payment from Delphi pursuant to this paragraph, any payment recipient shall execute a complete release and discharge in favor of the Debtors; accordingly all claims filed in the Debtors' chapter 11 cases arising from or relating to the subject matter of severance and/or vacation claims by MPC employees or former employees are hereby expunged and released, including claim number 13270.

12.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation and performance of this order and the UAW Settlement Agreement, and over each of the Signatories in connection therewith, through the effective date of a plan of reorganization proposed by the Debtors and confirmed by this Court (and thereafter to the extent provided for in such reorganization plan); provided, however, that the Court's jurisdiction shall not extend to any bilateral agreements of the UAW and GM.

13.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, (a) this order shall take effect immediately upon its entry, (b) upon entry of this order, the Debtors are authorized to take any and all necessary actions to implement the terms of the UAW Settlement Agreement, including executing any amendments to existing collective bargaining agreements consistent in all material respects with

7

the UAW Settlement Agreement, and (c) the UAW Settlement Agreement shall become effective

upon entry of this order and, to the extent required, satisfaction of the conditions set forth in the

UAW Settlement Agreement; provided, however, that MPC's release of the parties as set forth in

paragraph 11 hereof shall be effective 10 days after service of this order upon MPC at its last

known address unless MPC files an objection to such release within such 10-day period.

   14. The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.


Dated: New York, New York
   July 19, 2007


     ____/s/ Robert D. Drain _____
     UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**UAW Settlement Agreement**

## Exhibit 2

**List of UAW-Delphi National and Local Collective Bargaining Agreements**

Exhibit 4

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
            In re                           :    Chapter 11
                                            :
DELPHI CORPORATION et al.,                  :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
                        Debtors.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MOTION FOR ORDER UNDER §§ 105 AND 363 AUTHORIZING THE DEBTORS
TO IMPLEMENT A KEY EMPLOYEE COMPENSATION PROGRAM

("KECP MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the
"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively,
the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 105(a)
and 363(b)(1) authorizing the Debtors to implement a key employee compensation program.  In
support of this Motion, the Debtors submit the Affidavit Of Robert S. Miller, Jr. In Support Of
Chapter 11 Petitions And First Day Orders, sworn to October 8, 2005.  In further support of this
Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8, 2005 (the "Petition Date"), each of the Debtors filed a
voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United
States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue
to operate their businesses and manage their properties as debtors-in-possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have moved this Court for an
order authorizing joint administration of these chapter 11 cases.

2.    No trustee, examiner, or creditors' committee has been appointed in the
Debtors' cases.

---

[1]    In addition to Delphi, the following entities are debtors in these related cases:  ASEC Manufacturing General
Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi
Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive
Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems
Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi
Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive
Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection
Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation,
Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc.,
Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems
Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi
NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc.,
Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty
Electronics, Inc., and Specialty Electronics International Ltd.

3.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.       The statutory predicate for the relief requested herein is sections 105(a) and

363(b)(1) of the Bankruptcy Code.

B.       Current Business Operations Of The Debtors

5.       With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1

billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of assets.

Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations

without supervision from the Bankruptcy Court, and will not be subject to the chapter 11

requirements of the U.S. Bankruptcy Code.

6.       Over the past century, the operations which are now owned by Delphi have

become a leading global technology innovator with significant engineering resources and

technical competencies in a variety of disciplines.  Today, the Company is arguably the single

largest global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology. The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly

every major global automotive original equipment manufacturer with 2004 sales to its former

parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of

---

[2]       The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and
its worldwide subsidiaries and affiliates.

3

Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.      Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of

4

the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated more than $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005. The Company experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion less in sales than during the same time period in calendar year 2004.[3]

11.    The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues and forward looking revenue requirements.  Having concluded that pre-filing discussions with its Unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

13.     Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve the Company's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

14.     Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

6

of its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Motion, the Debtors seek authority, under sections 105(a) and

363(b)(1) of the Bankruptcy Code, to implement a key employee compensation program (the "Key

Employee Compensation Program"), as described herein, and as more fully set forth in Exhibit 1 to

the Order.  The purpose of the Key Employee Compensation Program is to retain and incentivize

Covered Employees (as defined below) during the Debtors' restructuring period.

Basis For Relief

A.    Importance Of Covered Employees

16.    As a result of the Debtors' historical financial performance, many of the

company's incentive based compensation programs failed to provide salaried and executive

workforce with total compensation that is competitive with the industry norm.  As the Debtors

implement their transformation plan, it is imperative that the Debtors' key personnel are

appropriately incentivized to maximize the financial performance of the Debtors' operations.  The

alignment of an incentive program that tracks the Debtors' goals is crucial to the Debtors' ability to

navigate through this process and to emerge successfully from chapter 11.

17.    Moreover, because the Debtors' current salaried and executive total

compensation programs are not competitive in the automotive industry, over the last several

months following the arrival of Robert S. "Steve" Miller, Jr. as Chairman and Chief Executive

Officer, senior management, in consultation with the board of directors of Delphi, decided to

realign its executive compensation program to properly incentivize the Company's personnel who

7

are needed to implement the Company's transformation plan and maximize value for all stakeholders.[4]  This point has been particularly lucid as more that 25 executives have left the Company's employ since January 1, 2005.

18.    Further exacerbating the Company's risk of attrition, the commencement of a bankruptcy case heightens employee concerns regarding possible job loss, and often increases employee responsibilities, creates longer hours, and imposes other burdens as a result of an employer's status as a debtor-in-possession.   Thus, at a time when the Debtors most need the continued efforts and loyalty of Covered Employees, the Debtors must take proactive steps to ensure that mechanics are in place to allow their employees to remain loyal, despite potential opportunities with competitors or other employers who may be perceived as providing more stable employment opportunities.   In order to address these concerns, the Debtors designed a special incentive compensation program that aligns the interests of both program participants and the Debtors' stakeholders (the "Key Employee Compensation Program"), which program has been benchmarked against competitive practices in the industry.

B.    Development Of The Key Employee Compensation Program

19.    The Debtors, with input from certain financial advisors, compensation experts and legal advisors, including Watson Wyatt Worldwide ("Watson") and the Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), have evaluated their existing compensation structure and incentive plans and obtained input from their board and senior executives to identify Covered Employees and consider the appropriate incentive levels.

---

[4]    It should be noted that Mr. Miller has "opted out" of the KECP, continues as an employee "at will" without an employment agreement or severance plan, and is not entitled to any material compensation beyond base salary except as determined by the Board of Directors in connection with Mr. Miller's completion of his period of service as Chief Executive Officer.

20.    The Key Employee Compensation Program does not include a retention or stay component which differentiates it from other incentive programs and the issues raised in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA").  The primary reason for the elimination of a retention component and the inclusion of a fully developed exit plan is to focus the Debtors' approximately 486 executives (the "Covered Employees") on achieving certain benchmarks and encourage them to complete an efficient and successful reorganization.

21.    In developing the Key Employee Compensation Program, the Debtors considered specific incentive programs implemented by other companies in chapter 11, including, but not limited to, Federal Mogul and Hayes-Lemmerz, other automotive industry suppliers. Reviewing these and similar programs was helpful in developing a basis from which the Debtors could develop a plan suitable to their needs.  Based on their analysis of the various programs, the Debtors, with the assistance of Watson and Skadden, undertook the development of the Key Employee Compensation Program.

22.    The Debtors determined that they required a program that would not only incentivize Covered Employees to remain in the Debtors' employ during the chapter 11 cases, but which would also align their interests with the Debtors' stakeholders to encourage maximum effort and performance during the cases.  To achieve these goals, the Debtors created an overall incentive program that the Debtors believe incorporate the most effective components of the employee plans the Debtors reviewed.  Thereafter, the Debtors calculated the appropriate levels of compensation that would achieve the Debtors' goal of motivating Covered Employees at competitive rates while also being mindful of the duty to manage these estates in a fiscally responsible manner and maximize stakeholder recoveries.

23.    The Debtors began to develop the Key Employee Compensation Program over the past several months, and the Debtors worked directly with the Compensation Committee of the board of directors (the "Compensation Committee") and the Company's advisors to refine and finalize the Key Employee Compensation Program.  Specifically, the Debtors have crafted the Key Employee Compensation Program to ensure that the appropriate employees were included and were assigned levels of compensation designed to achieve the Debtors' desired goals.  Based on this analysis, the Debtors believe that (a) the Key Employee Compensation Program is reasonable and competitive against other plans approved in similar chapter 11 cases, (b) the value of the Key Employee Compensation Program to the eligible employees and the cost to the Debtors is consistent with other plans implemented by other chapter 11 companies of comparable size, and (c) the Key Employee Compensation Program strikes an appropriate balance between the employees' and the Debtors' concerns.

C.    <u>Summary Of The Key Employee Compensation Program</u>[5]

<u>Covered Employees</u>

24.    The proposed Key Employee Compensation Program covers the Debtors' executives.  In contrast to the plans of many other chapter 11 debtors, the Debtors' Key Employee Compensation Program does not cover the Debtors' chief executive officer, as Mr. Miller opted not to participate in this program and to be compensated at the discretion of the Compensation Committee, subject to approval of the full Board of Directors, as they deem appropriate at the end of his period of service as Chief Executive Officer based upon the merit of his performance.

25.    The proposed Key Employee Compensation Program is described in <u>Exhibit 1</u> attached to the Order.  As can be seen in <u>Exhibit 1</u>, the Key Employee Compensation

---

[5]    The description of the Key Employee Compensation Program is intended as a summary only.  The actual terms of the Key Employee Compensation Program set forth in <u>Exhibit 1</u> to the order shall control.

Program has two principal components and calls out a third program that the Company

implemented prepetition: (a) an annual incentive plan, (b) an emergence bonus plan, and (c) a

prepetition severance plan that was modified during the third quarter of 2005.  Noticeably absent

from Exhibit 1 is any form of retention plan.  The debtors are not going to make periodic payments

to employees to reward them merely for staying with the company.  In addition, the company has

determined to eliminate an unrelated retention plan, already approved by the Compensation

Committee of the Board of Directors in early 2005 and, the unvested, unfunded portion of the

Debtors' long-term incentive programs.  The Debtors believe that the program described herein

will serve in part to replace the former retention plan with a thoughtful program which will likely

create better opportunities for the Company and its Covered Employees.  Indeed, payments to

Covered Employees are tied to specific performance and emergence targets, and therefore are

geared so as to incentivize employees to work towards an early and successful emergence from

chapter 11.

> Annual Incentive Plan

26.     The annual incentive plan is designed to promote the Company's business

turnaround by conditioning payments on the Debtors' achievement of certain financial objectives.

Specifically, the plan was developed in order to encourage participants to increase the Debtors'

enterprise value, and thus increase value and returns for all stakeholders during the Debtors'

chapter 11 cases.  This particular component of the Key Employee Compensation Program is

designed to replace the Debtors' prepetition annual incentive program.  In doing so, the Debtors

have adopted a plan that is a fairly similar in concept to the prepetition plan, but with modifications

to certain of the components.  In particular, the performance targets track EBITDAR goals rather

than net earnings targets and the performance periods have been shortened to increase the incentive to meet the targeted goals. [6]

27.     Under the annual incentive plan, employees' eligibility to receive annual bonuses is dependent on whether the Debtors reach their projected business plan EBITDAR levels over performance periods, generally covering six months as well as an acceptable level of personal performance.  The EBITDAR levels for the first performance period, covering October 1, 2005 to June 30, 2006,[7] will be set before December 31, 2005, by the Compensation Committee, an independent committee of the Debtors' Board of Directors.  The second performance period will run from July 1, 2006 to December 31, 2006.  Six month performance periods will continue thereafter until the Debtors exit chapter 11.  Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except for the first performance period where the opportunity will be 75% of the prepetition annual plan opportunity) to reflect the shortened performance periods.

Emergence Bonus Plan

28.     As outlined in Exhibit 1, the Key Employee Compensation Program will afford eligible employees cash payments and, in some cases, available equity in the new company upon emergence from chapter 11 (the "Emergence Bonus Plan").  The cash component of the plan is payable to U.S. executives upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets (collectively, the "Effective Date").  In addition, if the Debtors achieve a successful reorganization, the equity component of the plan will allocate 10% of the equity in the reorganized company to Delphi's

---

[6]    As of the Petition Date, the non-executive Salaried Incentive Plan will also change to target EBITDAR goals.

[7]    The first period is the only nine-month period under the plan.  It was designated as such to capture the stub period of October 1 through December 31, 2005.

approximately 600 domestic and foreign executives.  The Emergence Bonus Plan is entirely new

and is designed to incentivize employees to achieve a successful restructuring and to remain loyal

to the Company even after emergence.  The Emergence Bonus Plan replaces the Debtors'

prepetition long-term incentive plan and compares favorably to the costs under the long-term

incentive plan.

29.    The cash component of the Emergence Bonus Plan is available only to U.S.

executives of the Company.  As mentioned, the Debtors' chief executive officer has opted out of

the plan.  Cash payments vary from 30% to 250% of a participant's salary, based on level of

responsibility in the Debtors' organization.  Payments under the cash component of the Emergence

Bonus Plan will be paid in one lump sum payment shortly after the Effective Date.

30.    Similar to other incentive programs, a participant who voluntarily

terminates employment (except in the case of a constructive termination) will <u>not</u> be eligible for

any payment under the program.  On the other hand, if a participant's employment is terminated

involuntarily, other than for cause, the participant will receive a pro rata payment[8] contingent upon

the occurrence of the Effective Date.  If a participant's opportunity to receive a payment is

prevented because his or her business unit is sold prior to the Effective Date, then that participant

would be entitled to a pro rata payment, also contingent upon the occurrence of the Effective Date.

Finally, any participant whose employment terminates because of death or disability would also be

entitled to a pro rata payment, contingent upon the occurrence of the Effective Date.

31.    In addition to a cash component, the Debtors have adopted an equity

component as part of its Emergence Bonus Plan which is designed to cover Delphi's non-U.S.

---

[8]    The pro rata payment would be equal to the former participant's opportunity multiplied by a fraction where the
numerator is the number of days from (a) the filing date or (b) such participant's hire date, whichever is later, until
the date his or her employment is terminated and the denominator is the number of days from the later of the (x)
filing date or (y) such party's hire date to the effective date.

13

executives as well, for a total of approximately 600 executives. This component is designed to maintain the Debtors' long-term compensation, enable recruitment of a "Best in Class" management team, motivate and reward high performance, and incentivize executives to remain working for the Debtors during this chapter 11 period.

32.    Under the equity component of the Emergence Bonus Plan, each executive's equity award is valued one-third in restricted stock and two-thirds in stock options. The Debtors propose that each option's strike price be set based on the mid-point of the valuation range in the disclosure statement accompanying the plan of reorganization approved by this Court. The particular amount of equity is based on the executive's level of responsibility with the Debtors. Equity awards will vest one-quarter (25%) at the Effective Date, with the balance vesting in equal increments on each of the first, second, and third anniversaries of the Effective Date. To the extent any eligible executive has left the Debtors prior to the Effective Date, the executive's allocation will be added to the reserve of awards available to employees who are promoted or newly hired.

33.    The Debtors intend to seek creditor agreement or court approval, pursuant to a plan of reorganization to set aside 10% of the equity in the reorganized entity for approximately 600 U.S. and foreign executives.[9] The Debtors believe that this amount of equity is reasonable and necessary to ensure that management continues working with and for the Debtors through and following the duration of the chapter 11. Moreover, the Debtors believe that setting aside this amount of equity for its executives falls squarely within the range of competitive practices and will further increase the Debtors' ability to attract and retain executives while also motivating executives to create value for all stakeholders during the chapter 11 process.

---

[9]    Equity awards will not be granted in the case of a sale of all or substantially all of the Debtors' assets.

Severance

34.     During any reorganization process, when employees may be laid off or terminated, it is often difficult to recruit new employees and retain current employees.  Severance plans can mitigate the anxiety felt by employees and provide employees with desired protection and security, typically in the form of salary continuation in the event employment is terminated by the company without cause.

35.     During the prepetition period, the Debtors maintained a severance program for its executives and officers as disclosed in further detail in Exhibit 1 and the "Human Capital Compensation Motion" filed contemporaneously herewith.[10]  In order to recruit and maintain employees, the Key Employee Compensation Program continues the Debtors' prepetition severance program.

36.     Pursuant to the Debtors' prepetition severance program, U.S. executives without employment agreements are entitled to severance benefits only upon termination if (a) the executive's employment was terminated involuntarily for any reason other than for "cause," or (b) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi's formal severance plan.  The severance payment under this program is made in a lump sum and consists of (x) all unused and accrued vacation time, (y) all accrued but unpaid compensation earned, and (z) a severance benefit.  As described in Exhibit 1, the severance benefits under the Debtor's prepetition severance program provide that upon separation, senior executives are eligible for payments of 12 months base pay plus an additional 12 month bonus target and non-senior executives receive 12 months base pay.  All such severance benefits are

---

[10]    Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, and 1108 (I) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course, And (III) Directing Banks to Honor Prepetition Checks For Payment of Prepetition Human Capital Obligations.

contingent upon the participant signing an agreement(s) that provides for the release of claims,
non-solicitation, non-compete, non-disclosure and non-disparagement.

37.    Finally, the Debtors' twenty-one U.S. officers, other than the chief
executive officer, each has an employment agreement that provides for such officer to receive,
upon a qualifying termination of employment, an amount equal to 1/12 of his or her annualized
compensation (salary plus annual target bonus) for 18 months.  In exchange for providing the
twenty-one officers with formal severance benefits in the event of termination, Delphi has
agreements in place that prevent the participant from (a) competing against the Company, (b)
disclosing Delphi's manufacturing methods, (c) soliciting Delphi employees to work at a new
organization, and (e) disparaging the organization and its employees.

<u>Applicable Authority</u>

38.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use
property of the estate "other than in the ordinary course of business" after notice and a hearing.  11
U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be
authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel Corp.</u>,
722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires a finding that a good business
reason exists to grant a debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>,
124 B.R. 169, 179 (Bankr. D. Del. 1991).  Once the debtor articulates a valid business justification,
"[t]he business judgment rule 'is a presumption that in making a business decision the directors of
a corporation acted on an informed basis, in good faith and in the honest belief that the action was
in the best interests of the company.'"  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656
(S.D.N.Y. 1992).

39.     Given the importance of the Debtors' employees to the Debtors' continued

operations and the ultimate success of these chapter 11 cases, this Court should approve the relief

requested herein.  The Debtors have determined that the costs associated with the adoption of the

Key Employee Compensation Program are more than justified by the benefits that are expected to

be realized by encouraging the Covered Employees to continue working for the Debtors and

vigorously assisting in the Debtors' restructuring efforts.  This is especially true in this case given

the fact that a substantial amount of the payments under the Key Employee Compensation

Program are conditioned on achievement of certain predetermined financial goals.[11]

40.     Moreover, approval of the Key Employee Compensation Program will

boost employee morale and forestall the loss of value that would be attendant to resignations

among the Covered Employees.  The proposed relief therefore will enable the Debtors to retain the

knowledge, experience and loyalty of the employees who are crucial to the Debtors' reorganization

efforts.  If these employees were to leave their current jobs at this stage in the Debtors' chapter 11

cases, it is virtually assured that the Debtors would not be able to attract replacement employees of

comparable quality, experience, knowledge and character.  Indeed, suitable new employees, even

if available, would not have in-depth and historical knowledge of the Debtors' business.  The time

and costs incurred, and the learning curve necessarily involved in hiring replacements for

employees, clearly outweighs the potential costs of payments made under the Key Employee

Compensation Program.

41.     In sum, the Debtors have determined in the exercise of their business

judgment that it is essential that the Covered Employees continue to focus their efforts on

---

[11]    Since the proposed Key Employee Compensation Program is needed to retain employees -- who are in turn
necessary for the preservation of the Debtors' estates -- the payment rights of the employees under the Program are
"actual, necessary costs and expenses of preserving the [Debtors'] estate[s]," and should be accorded 11 U.S.C. §
503(b)(1)(A) administrative expense status to the extent they become due.

supporting and maintaining the Debtors' reorganization efforts in the coming months.

Accordingly, the Debtors believe that granting the relief requested in this Motion is in the best

interests of the Debtors' estates, their creditors, and other interested parties and should be

approved.  See, e.g., In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994)

(holding that proposal to pay bonuses on confirmation of reorganization plan was exercise of

debtor's sound business judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)

(concluding that implementation of a critical employee retention plan was a proper exercise of

debtor's business judgment).

Notice

42.    Notice of this Motion has been provided by facsimile, electronic

transmission, overnight delivery, or hand delivery to (i) the Office of the United States Trustee, (ii)

the Debtors' 50 largest unsecured creditors, (iii) counsel for the agent under the Debtors'

prepetition credit facility, and (iv) counsel for the agent under the Debtors' proposed postpetition

credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

Memorandum Of Law

43.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing

of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that the Court enter an order, (i) authorizing the implementation of the Key Employee Compensation Program as described herein, and (ii) granting such other and further relief as is just and proper.

Dated:  New York, New York
October 13, 2005


SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (pro hac vice motion pending)
John K. Lyons
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession


19

Exhibit 5

## **EXHIBIT 1**



# Delphi Corporation

## Key Employee Compensation Programs

October 8, 2005

WWW.WATSONWYATT.COM

Watson Wyatt
*Worldwide*



# Table of Contents

| | Page |
|---|---|
| Executive Summary | 2 |
| Introduction and Background | 3 |
| Business Case | 4 |
| Revised Annual Incentive Plan | 9 |
| Emergence Bonus Plan | 11 |
| CEO Compensation | 27 |
| Pre-Petition Severance Program | 28 |





# Executive Summary

| Revised Incentive Plan | Emergence Cash Plan | Emergence Equity Plan | Severance Plan | CEO Compensation Program |
|---|---|---|---|---|
| | | | | |
| EBITDAR measure, to be set by Compensation Committeee by 12/31/05 | Cash payments equaling 30 to 250% of salary | Stock option and restricted stock awards for 595 U.S. and foreign executives | Top 21 executives have severance benefit of 18 months' salary + bonus | No participation in annual incentive plan or either emergence plan |
| Six month performance cycles, except that first cycle will run from October 1, 2005- June 30, 2006. | Payments made in a lump sum at the effective date | Awards vest 1/4 at the effective date and 1/4 on each subsequent annual anniversary | Next level of executives have benefit of 12 months' salary + bonus | No employment or severance contract |
| Current annual incentive opportunities remain in place, prorated to reflect each shorter cycle | Plan covers approximately 486 U.S. executives | Total amount of awards and reserve is 10% of the restructured company | Other executives receive a benefit of 12 months' salary | Eligible for a discretionary bonus at the end of his term as CEO |
| | $88 million cost is less than that incurred historically by Delphi for its long-term incentive plan and consistent with the cost incurred by other Ch. 11 companies for their retention plans | | Estimated severance cost is $30.5 million, assuming 30% involuntary termination. | |

2





# Introduction and Background

Delphi Corporation ("Delphi" or the "Company") has been engaged in discussions with its major unions and GM concerning consensual modifications to various agreements that Delphi previously entered into with such unions and GM.  Delphi had publicly acknowledged that if these discussions do not lead to the implementation of a restructuring plan that addressed its existing legacy liabilities and the resulting high cost of its U.S. operations, the Company will consider other strategic alternatives, including a  Chapter 11 reorganization. On October 8, 2005, Delphi filed its bankruptcy petition under Chapter 11.

Delphi has asked Watson Wyatt to assist in the design and implementation of incentive compensation programs that align the interests of both program participants and Company stakeholders and to benchmark such programs against competitive practice. All such programs are generally referred to as Delphi's "Key Employee Compensation Programs" or KECP.

3





# Business Case

- Delphi's current situation raises substantial concerns for all employees, including:
    - Downsizing and layoffs on the horizon
    - Possibility of sale/merger
    - No equity-based long term incentive opportunity for executives
    - Potential reduction in retirement benefits

4





# **Business Case**

- A company that is financially distressed or undergoing a significant restructuring has few means to positively affect an employee's "employment proposition"

- Employment proposition is defined as the mix of tangibles (compensation and benefits) and intangibles (employer's prospects, career path, work content, work relationships, work/life balance) offered by the employer which forms the basis for a particular employee's assessment of whether he or she wishes to remain employed by a particular company

- Despite the adverse affect on the overall employment proposition, Delphi must strive to retain its executives (Band A and above) who possess unique or critical knowledge of Delphi's businesses. Such institutional knowledge, which could not be readily replaced on the open market, is necessary not only to maintain Delphi's ongoing operations, but also to assure successful completion of the restructuring.

5





# Business Case

- In the case of these executives more so than other employees, their actual pay for 2005 will be substantially less than market. Actual pay for 2004 was also substantially less than market.

- This pay shortfall makes them more susceptible to switching jobs.

- It is also more costly and time consuming (and possibly more difficult) to find replacements for these executives if they leave, as evidenced by the following:

  - Signing bonuses:  Since July 1, 2005, Delphi has found it necessary to pay six figure signing bonuses to top executives and signing bonuses averaging nearly $20,000 for lower level executives.

  - Salaries to new hires are often higher than those of the prior incumbents.

  - Headhunter costs, some of which have been well into six figures, in retained searches

  - Executive turnover has increased almost 75% in the last 12 months.  In the critical finance function, turnover has more than doubled. Also, 60% of the executive quits have been identified as being future high potential individuals or successors to the positions held by their immediate supervisors.

6



# **Business Case**

After lengthy discussions involving the Compensation Committee, management, and Company advisors, the following decisions were made regarding compensation programs going forward.

– The existing retention program (adopted in February 2005) has been terminated.

– Awards made under the current Performance Achievement  Plan (PAP) have been cancelled except the award for the 2003-2005 performance cycle . (The first day motion provides that the earned award for the 2003-2005 cycle will be paid in early 2006.) Thus, awards made under the 2004-2006 and 2005-2007 cycles will be cancelled.

– The annual incentive plan (which will not pay any bonuses for the January 1-December 31, 2005 plan year) has been modified as follows:

- EBITDAR will become the performance measure
- Each performance period will be six months rather than 12 months

7





# **Business Case**

- An emergence bonus program has been adopted, with cash bonuses for all executives payable upon the "effective date" (defined below).

- The emergence bonus plan also includes a set aside of 10% of the equity of restructured Delphi for equity-based compensation awards to the executive team upon the company's emergence from bankruptcy.

- A pre-petition severance program has been adopted and is to be continued to provide for competitive severance benefits for the executive team.

Each of the KECPs is discussed on the following pages.

8





# Revised Annual Incentive Plan

- The current annual incentive plan adopted for calendar year 2005 is designed to pay bonuses based on the achievement of a net earnings target. Going forward, net earnings is not an appropriate performance measure, in part, because of the inability to forecast restructuring costs.

- The Company and its advisors agree that EBITDAR* is a more relevant measure. Also, to minimize forecasting concerns, particularly at the beginning of the Ch. 11 process, the Company has decided to measure EBITDAR over a six month period, rather than annually.

9    * Earnings before interest, taxes, depreciation, amortization, and restructuring costs.





# Revised Annual Incentive Plan

- The first performance period will cover October 1, 2005 to June 30, 2006.* The second performance period will therefore be July 1, 2006 to December 31, 2006. The six month performance periods will continue until Delphi exits Ch 11.

- Each participant's bonus opportunity for a performance period will equal one-half of his or her current annual plan opportunity (except that for the first performance period, the opportunity will be 75% of the annual plan opportunity).

- The EBITDAR goal for the first performance period will be set by the Compensation Committee before December 31, 2005.

- The six month cost of the Annual Incentive Plan is estimated at $21.5 million.

_____

*  The first period will be nine months, including the stub  period October 1 through December 31, 2005, which will ensure that the incentive period properly corresponds to the Ch. 11 period.

# Emergence Bonus Plan- Introduction

As part of the overall effort to motivate its executive team (Band A and above) through the restructuring process, management believes that an emergence bonus plan would support the company's business and people strategies.

The emergence plan would have two parts:

- A cash component, payable to participants upon either the effective date of the confirmation of the plan of reorganization or a sale of all or substantially all of the company's assets in one or more transactions (either event herein referred to as the "effective date")

- An equity component of 10% of the equity in the reorganized company

11



# Emergence Bonus Plan - Effective Date Cash Component

The key features of the cash component are:

- The participants would be all U.S. executives (except the CEO), approximately 486 employees.

-  Payment would be made in a lump sum as soon as possible after the effective date.

- The chart below summarizes the various participants' opportunities.

| Name | # | Average Salary | Cash Opportunity |
|------|---|---------|------------------|
| O'Neal | | $1,150,000 | $2,750,000 |
| Wohleen | | $890,000 | $2,175,000 |
| Dellinger | | $750,000 | $2,000,000 |
| Weber | | $700,000 | $1,975,000 |
| | | | |
| 18 Officers | 18 | $495,761 | $550,000- $1,100,000 |
| All Other Executives | 464 | $120,000- $450,000 | $50,000- $475,000 |
| | | | |
| Total | 486 | | **$87,925,000** |
| | | | |

12



# Emergence Bonus Plan- Effective Date Cash Component

- Similar to other incentive programs, a participant  whose employment is terminated voluntarily will not be eligible for any payment under the program. If the participant's employment is terminated involuntarily (and not for cause), he or she would receive a pro rata payment.* Payment would be deferred until the effective date.

- In the case of a participant whose business unit is sold prior to the effective date, then that participant would be entitled to a pro rata payment.* Payment also would be deferred until the effective date.

- Any participant whose employment terminated because of death or disability would be entitled to a pro rata payment. Payment would be deferred until the effective date.

_____

* The pro rated payment would be equal to the former participant's opportunity times a fraction, where the numerator is the number of days from the later of the filing date or such participant's hire date until the date employment terminated and the denominator is the number of days from the later of the filing date or such participant's hire date to the effective date.

13



# Emergence Bonus Plan - Effective Date Cash Component

- Typical market practice varies widely, but most companies have historically covered only a small number of executives (including the CEO).

- Importantly, participation and award size can be expected to increase in light of pending changes to the law regarding retention plans, as well as a debtors' continuing need to provide competitive compensation opportunities. Friedman's, which filed Ch.11 on 1/14/05 in the US Bankruptcy Court in Savannah, Georgia, provides an instructive example.

   (i) Friedman's "emergence cash plan" covers approximately 83 employees with opportunities ranging from 5 to 333% of salary.

   (ii) No retention plan in Friedman's

- Other relevant benchmarks

   (i) Both Hayes-Lemmerz and Federal Mogul (Detroit area OEM auto industry suppliers) had special incentive plans during their Ch.11 cases.

   (ii) Both plans were essentially based on value created during the Ch.11 case. Hayes covered 13 employees with uncapped opportunities and FM covered approximately 90 employees with annual opportunities ranging from 30-150% of salary.

14



# Emergence Bonus Plan- Effective Date Cash Component

We believe that the proposed cost of the cash component of the plan can be analyzed in two ways. One way would be to compare the cost to that incurred historically by Delphi under its long-term incentive compensation programs.

A second way is to compare the cost to the costs incurred by other Chapter 11 companies through their retention plans. The theory would be that such costs appropriately represent the amount that a company needs to expend to motivate and retain its employees and otherwise preserve the estate of the debtor.

15



## Emergence Bonus Plan- Effective Date Cash Component

The proposed cash plan also compares favorably with the cost incurred in prior years by Delphi to motivate and retain its executive group through the Company's long-term incentive awards. Because the cash plan will in all likelihood cover a period greater than one year, its cost should be adjusted or annualized for comparison purposes.

| Proposed Cash Cost | Prior Years' LTI Costs (in $ millions) | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| $87.9-- aggregate cost<br>$65.9-- 15 months' annualized<br>$58.6-- 18 months' annualized | $49.6* | $91.3 | $75.2 |

_____

\* Executive LTI awards in 2005 were reduced in consideration of the Company's adoption of a $21 million retention program for its executives

16



# Emergence Bonus Plan - Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's cash emergence bonus plan compares to the costs incurred by other large companies which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $6,384,806,500 | 0.062% | $4,002,959,500 | 0.063% |
| **Peer Group 50th Percentile** | $8,414,095,000 | 0.088% | $6,638,000,000 | 0.094% |
| **Peer Group 75th Percentile** | $21,092,500,000 | 0.209% | $21,273,000,000 | 0.570% |
| **Range** | $4.9B- $185 B | 0.01% - 0.48% | $894 M  -$61.7B | 0.019% - 1.054% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| *Percentile Rank* | *79%* | *81%--aggregate 75%--annualized* | *67%* | *71%--aggregate 59%--annualized* |

**Notes:**
Peer group comprised of the following 15 companies with revenues of $5B and above:
Enron, Worldcom, Kmart, Pacific Gas and Electric, UAL, US Airways, Conseco, Ameriserve, Winn-Dixie, Mirant, Montgomery Ward, MicroAge, Washington Group, Owens Corning, Bethlehem Steel

17



# Emergence Bonus Plan - Effective Date Cash Component

The following chart illustrates how the $87.9 million aggregate and $58.6 million annualized cost of Delphi's emergence bonus plan compares to the costs incurred by other companies of varying sizes which have put in place retention programs.

| | Revenues | Annual Cost as a Percentage of Revenues | Assets | Annual Cost as a Percentage of Assets |
|---|---|---|---|---|
| **Peer Group 25th Percentile** | $346,875,000 | 0.201% | $512,750,000 | 0.191% |
| **Peer Group 50th Percentile** | $1,100,000,000 | 0.425% | $1,500,582,000 | 0.433% |
| **Peer Group 75th Percentile** | $3,071,000,000 | 0.882% | $3,076,725,000 | 0.754% |
| **Range** | $120M- $185B | 0.01% - 915% | $28M  -$61.7B | 0.02% - 7.11% |
| **Delphi** | $28,622,000,000 | .31%--aggregate .20%--annualized | $16,593,000,000 | .53%--aggregate .35%--annualized |
| *Percentile Rank* | 96% | *38%--aggregate 26%--annualized* | 93% | *58%--aggregate 38%--annualized* |
| | | | | |
| **Notes:** | | | | |
| Peer group comprised of 120 retention plans from 117 companies | | | | |

18



# Emergence Bonus Plan - Effective Date Cash Component

Conclusion

- The proposed cash plan for participants addresses both the concerns of the employees and the needs of Delphi.  Ultimately, the proposed program helps to balance each participant's "employment proposition" thereby preserving Delphi's enterprise value during the restructuring period.

- The proposed cash plan is consistent with the scope, purposes, and cost of retention plans implemented by other Ch. 11 companies, as well as prior long term incentive arrangements implemented by the Company. Based on the analysis above, the cost of the program is within the range of competitive practice.

19





# Emergence Bonus Plan- Equity Component

In the absence of its ability to provide equity-based compensation to its executives and key employees during the Chapter 11 process, Delphi intends to include future equity awards as part of its emergence bonus plan. Such awards are critical to an organization for the following reasons:

i. Maintain the Company's compensation promise to its current employees;

ii. Enable recruitment of a Best In Class Management Team;

iii. Motivate and reward high performance; and

iv. Retain executives during a period of volatility, such as during Chapter 11.

20





# Emergence Bonus Plan- Equity Component

As part of its plan of reorganization, Delphi will propose that 10% of the equity in the reorganized entity be set aside for its executives (both U.S. and foreign, approximately 600 individuals).  Accordingly, the company intends to seek creditor agreement or court approval during the early stages of the Ch 11 process for such a set aside.

The company believes that 10% is reasonable as well as necessary to ensure the retention of its management team through and following the duration of the Ch 11 process. Note that the 10% is set aside for management only if the company is successfully reorganized and will not get paid or awarded in the case of a sale of all or substantially all of the company's assets.

21



# Emergence Bonus Plan- **Equity Component**

The Company further proposes that each executive's award is valued one-third in restricted stock (or units) and two-thirds in stock options. Each award will vest as follows:  25% will be vested at the effective date, with the balance vesting in equal increments on each of the one, two, and three year anniversaries of the effective date. Each option's strike price will be set based on the mid-point of the valuation range in any disclosure statement approved by the Court.

The chart on the next page assumes that at the time of the effective date Delphi's equity value will be $4 billion. To the extent any executive included is not an employee at the effective date, then his or her allocation would be added to the reserve.

22



# Emergence Bonus Plan- Equity Component

| Name | # | Average Salary | Stock Option Face Value | Restricted Stock Face Value | Gain per indiv if stock price Doubles | Triples |
|---|---|---|---|---|---|---|
| CEO TBD | | -- | $10,000,000 | $5,000,000 | $20,000,000 | $35,000,000 |
| O'Neal | | $1,150,000 | $5,000,000 | $2,500,000 | $10,000,000 | $17,500,000 |
| Wohleen | | $890,000 | $4,000,000 | $2,000,000 | $8,000,000 | $14,000,000 |
| Dellinger | | $750,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| Weber | | $700,000 | $3,000,000 | $1,500,000 | $6,000,000 | $10,500,000 |
| | | | | | | |
| 18 Officers | 18 | $495,761 | $1,000,000-$1,666,667 | $500,000-$833,333 | $2,000,000-$3,333,333 | $3,500,000-$5,833,333 |
| | | | | | | |
| All Other Executives | 572 | $120,000-$450,000 | $200,000 -$666,667 | $100,000-$333,333 | $400,000-$1,333,333 | $700,000-$2,333,333 |
| | 595 | | | | | |
| | | | **Estimated Award Value** | | $300,000,000 | |
| | | | **Estimated Reserve Value** | | $100,000,000 | |
| | | | **Total** | | $400,000,000 | |

**Note:  CEO awards are illustrative only. It is expected that any new CEO would separately negotiate his or her equity award package.**

23





# Emergence Bonus Plan- Equity Component

**Competitive Practice – General Industry**

One benchmark for the amount of equity that the Company proposes to set aside for compensatory purposes is potential equity dilution at peer companies. Summarized in the table below are equity dilution levels for companies in the S&P 500 Index and the Top 200 companies (based on revenues). Typically, companies intend to use the shares represented by the equity dilution over a three to five year period.  Competitive practice indicates that these companies have median equity dilution levels ranging from 13% to 16%.

| | Potential Equity Dilution | |
| --- | --- | --- |
| | **Median** | **Average** |
| S&P 500 Index (1) | 13.11% | -- |
| Top 200 Companies (3) | | 16.36% |

(1)  2005 Equilar, Inc
(2)  Equity Stake- The Top 200 Companies (Pearl Meyer and Partners)

24



# Emergence Bonus Plan- Equity Component

**Competitive Practice – Emerged Companies**

We also examined Watson Wyatt's database of approximately sixty companies which have emerged from Chapter 11 to determine competitive practice regarding the percentage of shares reserved by companies for the granting of long-term incentives after emergence from Chapter 11.  The database indicates that companies generally set aside between 10% and 13% of shares outstanding within one year following emergence.

|  | Shares Reserved as a Percent of Common Stock Outstanding |
| --- | --- |
| 25th Percentile | 10.0% |
| 50th Percentile | 11.1% |
| 75th Percentile | 12.7% |
| 90th Percentile | 17.9% |

25





# Emergence Bonus Plan- Equity Component

- The Company's proposed 10% equity set aside for its executive team is well within the range of competitive practice. Importantly, the knowledge among the executive team regarding their future equity stake should greatly enhance the Company's retention and recruitment efforts, as well as motivate the executives to create value for all stakeholders during the Chapter 11 process.

26





# CEO Compensation Program

The current CEO, Steve Miller, will not participate in the (i) six month incentive program, (ii) the emergence cash bonus plan, or (iii) the emergence equity program. Moreover, he is not covered by an employment or severance agreement. He is an at will employee, serving at the discretion of the Board of Directors.

The Compensation Committee, subject to approval of the full Board, reserves the right, however, to compensate Mr. Miller as it deems appropriate at the end of his period of service as CEO.

27





# Pre-Petition Severance Program- Background

Because of the uncertainties of the restructuring process, employees often fear that they will lose their jobs. This, coupled with the perceived risk of working for a company undergoing a substantial financial restructuring, may cause employees to seek other employment despite continuation of existing incentive plans or even implementation of inducements such as retention bonuses.

To reduce the likelihood of losing the company's key employees, a company that is attempting to restructure outside of Chapter 11 or has filed for protection under the bankruptcy laws will typically take the necessary actions to assure employees that if their jobs are eliminated, they will at least be compensated for deferring their job search.

28





## Pre-Petition Severance Program- Officers

- Twenty-one officers have an employment agreement that specifies a severance benefit of 18 months' salary + target bonus.

- Such an arrangement is important from the company's perspective because the employment agreements include non-compete prohibitions.

- Appropriate severance protection allows the officer group to focus on the restructuring job at hand without concern that they are simply at-will employees subject to below market separation treatment at the company's convenience.

29



# Pre-Petition Severance Program- Other Executives

Those U.S. executives without employment agreements are entitled to severance benefits only upon termination of employment if (i) the executive's employment is terminated involuntarily for any reason other than for "cause," or (ii) the executive's employment is terminated after a change in control for "good reason" as defined in the Delphi Corporation Severance Plan. The payment, which will be in a lump-sum, will consist of the following:

❑ All unused vacation time accrued as of the participant's termination of employment

❑ All accrued but unpaid compensation earned as of the participant's termination, and

30



# Pre-Petition Severance Program- Other Executives

❑ The following severance benefit:

| Employee Level | Approximate Number of U.S. Employees | Severance Benefit |
|---|---|---|
| Senior Management | 89 | 12 months' base+ target bonus |
| All Other Executives | 373 | 12 months' base |
| Non-Executive Salaried | 13,000 | Length of Service (max at 25 years= 12 months' salary) |

Last, payment of any severance benefit is contingent upon the participant signing a claim release, non-solicitation, non-compete, non-disclosure, and non-disparagement agreement with the Company.

31



# Pre-Petition Severance Program- Estimated Costs

The following table compares the estimated cost of severance to the Company under two different alternatives. The first analysis assumes all executives have their employment terminated involuntarily. The second analysis assumes approximately 30% of current US executives have their employment terminated involuntarily. (All costs are in $ millions.)

|  | All Terminated | 30% Terminated |
|---|---|---|
| **Employee Level** | | |
| Officers | $31.0 | $7.4 |
| Sr. Management | $35.4 | $6.5 |
| All Other Executives | $79.0 | $16.6 |
| | | |
| **Total** | **$145.5** | **$30.5** |

32



# Pre-Petition Severance Program- Competitive Data

Below is a summary of the severance benefits Chapter 11 companies have implemented for the senior management or top executives and other key employees.

## Other Companies' Programs – Chapter 11 Companies

| Senior Management and Executives | Other Key Employees |
|---|---|
| • For executives with contracts, they receive the balance due under the contract; typically 1-2X salary and target bonus. | • 1 week per year of service |
| | • Range of benefits generally equals 1-12 months' base salary |
| • For executives without contracts, the range of benefits generally equals 6-36 months' base salary, with median benefit equal to 18 months' base salary. | • Median benefit equal to 8 months' base salary. |

33



# Pre-Petition Severance Program- Competitive Data

The following table summarizes the median (i.e., 50th percentile) minimum and maximum number of weeks provided under non-Chapter 11 severance programs for industrial manufacturing companies, companies that employ more than 25,000 people, and Fortune 1000 companies.[1]  The information is broken out by employee level.  The footnotes at the bottom of the page detail the representative employees at each level.

| | Industrial Manufacturing | | More than 25,000 Employees | | Fortune 1000 Companies | |
| | Severance (weeks) | | Severance (weeks) | | Severance (weeks) | |
| Level | Min | Max | Min | Max | Min | Max |
|---|---|---|---|---|---|---|
| Sr.Executives[2] | 4 | 52 | 4 | 52 | 6 | 52 |
| Executives[3] | 4 | 26 | 4 | 39 | 4 | 52 |

(1) Source: Lee Hecht Harrison – Severance Benefits and Separation Benefits (2005)
(2) Represents EVP and SVP positions.
(3) Represents VP, Department Head, and Director positions.





# Pre-Petition Severance Program- Conclusion

The benefits under the Company's Severance Program for its officers and executives are within the range of competitive practice. Additionally, in exchange for providing the twenty-one officers with formal severance benefits in the event of termination, the Company has agreements in place that prevent the participant from (i) competing against the Company, (ii) disclosing Delphi's manufacturing methods, (iii) soliciting Delphi employees to work at a new organization, and (iv) disparaging the organization and its employees.

