Exhibit 6

Exhibit 7.8

Management Compensation Plan

**Compensation Committee Philosophy and Strategy**

**Delphi Corporation**
**Compensation Philosophy and Strategy**

The Compensation Committee of the Board (the "Committee") is committed to providing a total compensation program that supports Delphi's business and people strategies and aligns with the interests of Delphi's key stakeholders during the Chapter 11 and shareholders thereafter.

**Objectives.** The Committee's overall objectives regarding executive compensation can be summarized as follows:

- Provide a target total reward opportunity sufficient to attract and retain high-caliber executives (see the Definitions section below for an explanation of the various executive groups referred to herein) who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involves developing and adjusting, in conjunction with the Committee's independent compensation consultant, a target pay structure that provides median total direct compensation at planned levels of performance and total direct compensation above the median when Delphi achieves performance that exceeds plan. In this regard, the Committee assesses both total direct compensation, which is the sum of salary + annual incentive opportunity + long-term incentive opportunity, and total compensation, which includes other aspects of pay, including retirement benefits. Market total direct compensation comparisons for the members of the Delphi Strategy Board (DSB) are developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data. Market total direct compensation comparisons for non-DSB executives are developed from survey data only.

- Link the majority of the total compensation opportunity to performance-based incentives, annual financial and strategic goals, and the creation of sustainable shareholder value consistent with Delphi's long-term strategic goals.

- Align Delphi executives' interests with those of shareholders by making stock-based incentives a core element of our executives' compensation and requiring that they retain a meaningful amount of common stock during their tenure.

- Recognize the cyclical nature of Delphi's businesses and the need to manage for value throughout the business cycle.

- Provide flexibility to recognize, differentiate, and reward individual performance.

**Reward Philosophy.** The Committee believes the following items should be rewarded, and the Delphi compensation programs are customized to recognize company and individual performance and contribution regarding these items.

- Financial – financial goals established by the Board of Directors are primary indicators of whether the company and its business units are achieving their annual and long-term business strategies and objectives.

1

**Delphi Corporation**
**Compensation Philosophy and Strategy**

- Customer/Operational – customer important operating metrics are quality, delivery, product launch performance, as well as internal measures of efficiency such as manufacturing performance, engineering performance, safety performance, etc.

- People - Delphi's executives' leadership attributes, including development of people, ethical conduct, and development of a diverse workforce are periodically assessed and evaluated.

**Elements of Compensation.**  The Committee intends to structure an executive compensation program that consists primarily of the following integrated components, which together make up an executive's total compensation.

- Salary – The Committee intends to provide executives with salaries commensurate with their job responsibilities, experience, and performance, subject to the competitive marketplace.

- Annual Incentive – Awards under the annual plan provide a direct link between executive compensation and the annual performance of the company and each executive.  A target incentive pool will be created each year based on achievement of financial or operational metrics selected from time to time by the Board of Directors. Each executive will receive an award opportunity, with the award being earned based first on the company and division (if applicable) achieving specific financial goals and second on an assessment of the executive's performance for the year.  That assessment can result in the award being reduced to zero or increased to a specified maximum of an executive's target opportunity.

- Long-term Incentive – Awards under the long-term plan align the economic interest of executives and shareholders and are designed to encourage achievement of Delphi's long-term strategic objectives.  Each executive will receive a long-term incentive award opportunity each year consistent with competitive data, adjusted from time to time for his or her performance, leadership potential, and contribution, as well as changes in the competitive data.

  The Committee will determine the vesting criteria for each award, including the duration of the vesting period, whether the vesting is graded or cliff, whether vesting is conditioned upon achievement of performance goals or continued service only, etc.

  The Committee intends to use a variety of award vehicles, which could include stock options, stock appreciation rights, restricted stock or units, performance shares or units, cash awards, etc, as it deems appropriate from time to time.

  The Committee also intends to make long-term incentive awards at approximately the same time each year to  focus executives on the importance of creating long-term shareholder value.

- Employment and Change in Control Agreements – To retain and attract highly-qualified executives and to protect the Company's interests, the Committee believes that executive employment agreements are appropriate and that these objectives are achieved by offering each DSB member a competitive severance benefit in return for covenants not to compete and not to solicit.

**Delphi Corporation**
**Compensation Philosophy and Strategy**

The Committee also believes that separate change in control (CIC) agreements are appropriate. By entering into these CIC agreements before the occurrence of a CIC, the Committee expects each DSB member's full attention and dedication to shareholders' interests in the event any CIC is contemplated or occurs, and willingness to remain in his or her position until the completion of the CIC, even if it may mean the loss of his or her position.

- Retirement Benefits – Retirement benefits also fulfill an important role with the Committee's overall total compensation objectives because they provide a financial security component and promote retention. The Committee intends for Delphi's retirement programs, including the amount of benefits, to be competitive and for employees and executives to bear a portion of the responsibility for funding their retirement benefits.

- Perquisites – Perquisites and related benefits are consistent with the Committee's overall total compensation objectives because they ensure competitiveness at the top executive level. The Committee, however, believes that any perquisites should be modest, reasonable in terms of cost, and aligned with business needs.

**Performance Management**. Each executive's performance for the year is assessed under Delphi's performance system. The assessment affects any merit increases in salary, the payment of annual incentive awards, and the amount of any long-term incentive awards. Indicated below is the person, or persons, including the Compensation Committee, responsible for each executive's performance review:

- Executive Chairman – by the Compensation Committee, subject to the review and approval of the Board of Directors

- CEO – by the Compensation Committee, subject to the review and approval of the Board of Directors

- Each DSB Member – by the CEO, subject to the review and approval of the Compensation Committee

- Non-DSB Executives – by their direct supervisors, subject to the review and approval of the DSB officer to whom such executive ultimately reports. A non-DSB executive subject to Section 16 of the Securities Exchange Act of 1934 also has his or her compensation reviewed and approved (in the case of equity awards) by the Compensation Committee.

**Definitions**. Each of the key terms referred to above is defined as follows:

- Delphi Strategy Board (DSB) – Delphi's officer group (Vice Presidents and above), approximately 21 individuals, which includes the functional and staff heads of various Corporate functions

- Non-DSB executives - Approximately 535 global executives who are eligible for compensation under Delphi's Executive Compensation and Benefit programs. This group comprises Bands A-F under Delphi's compensation structure.

3

**Delphi Corporation**
**<u>Compensation Philosophy and Strategy</u>**

- Executives – The combined Delphi Strategy Board and non-DSB executives, approximately 560 executives

## Summary Of Management Compensation Plans

## Delphi Corporation Short-Term Incentive Plan

| | |
|---|---|
| *Authority, Delegation and Eligibility* | • administered by the Compensation Committee |
| | • the Compensation Committee may delegate its administrative authority to the CEO, the Delphi Strategy Board or any other committee or individual to determine individual award grants to employees who are not members of the Delphi Strategy Board and not Section 16 officers |
| | • only employees are eligible to receive awards under the plan |
| *Term* | • 10 years (effective on the consummation of the Company's Plan of Reorganization) |
| *Determination of the Annual Incentive Award* | • Annual target award and performance levels are established by the Compensation Committee before the commencement of or within the first 25% of the performance period (including minimum and maximum award performance levels) |
| | • Awards are based on specified financial measures, including return on assets, return on equity, total stockholder return, net income and earning per share. |
| | • The Committee may adjust performance levels upward or downward |
| *Determination and Payment of the Final Annual Incentive Award* | • final awards will be based on the performance achieved versus the goals established at the beginning of the period |
| | • adjustments to the final performance award may be made based on individual performance ("covered officer" adjustments may only be made to reduce, not increase, an award) |
| | • awards are limited to an annual individual maximum of $7.5 million per year |
| *Termination* | • if an employee quits or is dismissed for cause, the employee will not be eligible to receive a final award |
| | • if employment terminates due to death, retirement, permanent disability or other reason approved by the Committee, the Committee may pay a reduced award based on a partial year's employment |
| *Change in Control* | • on the effective date of a change in control, all awards will be paid on a pro-rata basis based on the greater of the target award or actual performance |
| *Amendments or Changes to Plan* | • the Committee has the right to amend, modify, suspend or terminate the plan |
| | • stockholder approval required for certain amendments to preserve the exemption under Section 162(m) of the Code |
| *Restatements* | • if the Company's financial results are materially restated, the Committee may require repayment of past awards; if restatement is due to fraud and the employee participated in the fraud, the employee must repay any amounts that would not have been paid based upon the restated results |

## Delphi Corporation Long-Term Incentive Plan

| | |
|---|---|
| *Authority, Delegation and Eligibility* | • administered by the Compensation Committee |
| | • the Compensation Committee may delegate its administrative authority to the CEO, the Delphi Strategy Board or any other committee or individual to determine individual award grants to employees who are not members of the Delphi Strategy Board and not Section 16 officers |
| | • only employees are eligible to receive awards under the plan |
| *Term* | • 10 years (effective on the consummation of the Company's Plan of Reorganization) |
| *Types of Awards* | • Options and SARS |
| | ○ the exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant |
| | ○ the term of any SAR or option may not exceed 10 years |
| | ○ options may be exercised by payment of cash, through delivery of previously acquired shares of the Company's common stock or a combination of cash and such previously acquired shares |
| | ○ participants may satisfy any withholding taxes in connection with the exercise of an option or SAR in cash or stock |
| | • restricted stock and restricted stock units |
| | • cash-based awards |
| | ○ Performance goals established prior to the granting of the award target and prior to the expiration of 25% of the specified performance period |
| | ○ awards to "covered officers" may only be adjusted to reduce, not increase, the award |
| | ○ no award will be paid to a "covered officer" unless the performance is certified by the Compensation Committee |
| *Annual Individual Limits* | • options or SARS: 1,000,000 shares |
| | • restricted stock or RSUs: 500,000 shares |
| | • cash awards: $10,000,000 |
| *Termination* | • Options and SARS |
| | ○ Generally, awards are cancelled when an employee terminates employment for any reason prior to first anniversary of grant date |
| | ○ upon retirement more than 1 year after grant, the award remains outstanding until the earlier of the expiration date or five years from the date of retirement |
| | ○ upon death or permanent disability more than one year after grant, the award remains outstanding until the earlier of the expiration date or three years from the date of death or permanent disability |

- restricted stock and restricted stock units

  o generally, awards are cancelled when an employee terminates employment for any reason prior to first anniversary of grant date

  o upon retirement, permanent disability or death ,more than 1 year after grant, the award will vest immediately

- cash-based awards

  o award must be outstanding for one year from the date of grant to remain outstanding upon eligible termination from the company

  o pro-rated based on the number of eligible months employed over the total award period

*Clawback Provision*

- any employee or former employee who engages in misconduct prior to the second anniversary of his or her termination of employment will be required to forfeit outstanding awards, forfeit the right to receive any future awards and repay any amounts received in connection with previous awards, including any profits realized on the sale of company stock received pursuant to an award.

*Transferability*

- awards granted under the plan may not be transferred other than by will or by the laws of descent and distribution

*Amendments or Changes to Plan*

The Committee may amend the plan in its discretion. However, stockholder approval is required to

- to increase the maximum number of shares of common stock for which awards may be granted

- grant options or SARS at a discount

- permit exercise of an option without full payment at the time of exercise

- extend the exercise period of an option or SAR

- make an award to non-employees

- reprice any outstanding option or grant an option with a lower exercise price

- increase the annual individual limit on cash awards

- grant any award after the plan's expiration date

*Adjustments or Changes in Capitalization*

- the Compensation Committee may adjust the individual award limits or the number and exercise price of shares of common stock subject to outstanding awards

*Change in Control*

- upon the occurrence of a change in control, all outstanding time-based equity awards will vest

- it is contemplated that award agreements will provide that performance-based equity awards will vest upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company, if certain targets relating to internal rate of return are achieved in connection with such sale. Any performance-based cash awards will be paid on a pro-rata basis based on the greater of the target award and actual performance.

- if consideration to shareholders in the change in control transaction is paid solely in cash, each award shall be cancelled in exchange for a payment equal to the excess of the per share consideration over the per share exercise price (if any), multiplied by the number of shares granted under the award

# Change In Control[1] Agreements

| | |
|---|---|
| *Term* | • effective on the consummation of the Company's Plan of Reorganization through December 31, 2009 |
| | • automatically renews each 1/1 commencing 1/1/2009 for additional one year term unless notice of non-renewal is given by either party before 9/30 of preceding year |
| | • automatically renews for 2 years upon the occurrence of a change in control |
| *Severance Benefits upon Termination without Cause[2] or Resignation for Good Reason[3]* | • lump sum cash payment equal to 2 to 3 times (based on the executive's position) the executive's base salary and target bonus |
| | • 24 to 36 months (based on the executive's position) of benefit continuation coverage for the executive and his/her dependents |
| | • lump sum cash payment equal to the sum of (i) any unpaid cash incentive |

---

[1]   Generally, "Change in Control" means (i) any person (or entity) is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities, (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who constitute the Board on the Effective Date with any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the directors then still in office who either were directors on the Effective Date or whose appointment, election or nomination for election was previously so approved or recommended, (iii) a merger of the Company or any direct or indirect subsidiary of the Company with any other entity, other than a merger which results in the voting securities of the Company outstanding immediately prior to such merger continuing to represent more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (iv) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately before the sale.  "Change in Control" does not include consummation of the Plan of Reorganization or transactions contemplated thereunder.

[2]   Under the CIC agreement, the term "Cause" includes any of the following actions (if not cured by the executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the agreement.

[3]   Under the CIC agreement, the term "Good Reason" includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date or (v) a failure of a successor to assume the agreement.  "Good Reason" also includes in the case of the CEO, any termination by him of his employment during the 30-day period commencing on the first anniversary of the Change in Control.

1

compensation allocated to executive for completed fiscal years and (ii) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (assuming performance at target levels)

- lump sum cash payment equal to the contributions that would have been made to any of the Company's tax-qualified supplemental or excess defined contribution plans on behalf of the executive in the 2 to 3 years (based on the executive's position) following the date of termination (assuming maximum contribution levels)

- outplacement services until the earlier of 1 year or the executive's acceptance of employment

- upon a change in control, vesting acceleration of service-based equity awards and vesting acceleration of performance-based equity awards upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale

*Gross Up*
- if any of the payments and/or benefits will be subject to excise tax on "golden parachute" payments, the executive shall be entitled to a gross up payment (but only if the executive's total payments and benefits exceeds 110% of the greatest pre-tax amount the executive could be paid without causing the executive to be liable for any excise taxes in connection with such payment)

*Legal Fees*
- the Company is obligated to pay all of executive's legal fees with respect to any good faith dispute of any issue under the CIC agreement

*Restrictive Covenants*
- the agreement includes perpetual non-disclosure and invention assignment covenants

**Executive Employment Agreements**

| | |
|---|---|
| *Term* | • effective on the consummation of the Company's Plan of Reorganization through December 31, 2010 |
| | • automatically renews each 1/1 commencing 1/1/2011 for additional one year term unless 60 days advanced written notice of non-renewal is given by either party |
| *Position and Duties* | • executive shall serve in an executive position reasonably consistent with his/her current position |
| *Place of Performance* | • current work location; but can be relocated in connection with relocation of Executive's principal business unit |
| *Compensation and Benefits* | • executive shall receive a base salary at an annual rate equal to his/her current salary |
| | o base salary is subject to annual review and increase |
| | o base salary may not be reduced except pursuant to across-the-board salary reductions |
| | • executive shall be eligible to participate in annual bonus plans at a level comparable to similarly situated executives |
| | • executive shall be eligible to participate in long-term incentive compensation plans at a level comparable to similarly situated executives |
| | • executive shall be eligible to participate in all employee benefit plans and arrangements made available by the Company to similarly-situated executives, including the defined benefit SERP |
| *Compensation upon Termination without Cause[4] or Resignation for Good Reason[5]* | • 18 months base salary and bonus (at target levels) paid over 18 months |
| | • lump sum cash payment of any unvested amounts credited to the executive's accounts under the Company's tax-qualified supplemental or excess defined contribution plans |
| | • vesting acceleration on all service-based equity awards |

---

[4]   Under the employment agreement, the term "Cause" includes any of the following actions (if not cured by the executive within ten business days of the receipt of written notice thereof ): (i) continued failure by the executive to satisfactorily perform his/her duties, (ii) willful misconduct or gross negligence, (iii) the commission of a felony or of a misdemeanor involving moral turpitude, (iv) the commission of an act involving dishonesty that results in harm to the Company, or (v) a material breach of the employment agreement.

[5]   Under the employment agreement, the term "Good Reason" means an event constituting a material breach of the employment agreement and includes: (i) the assignment to the executive either of duties materially inconsistent with his status or substantially adversely different in nature or status (but ceasing to be a publicly-held corporation will not constitute Good Reason), (ii) a reduction in the executive's base salary or a material reduction in the executive's incentive compensation (except for an across-the-board reduction affecting all executives), (iii) the relocation of the executive's principal place of employment more than 25 miles from its current location (unless the relocation is of the executive's business unit or is due to the executive's transfer to a position that the Company believes in good faith will enhance the executive's career opportunities), or (iv) the Company's failure to pay the executive any current or deferred compensation within seven days of its due date.

1

| | |
|---|---|
| *Release* | • receipt of severance is conditioned on executive executing a release of claims in favor of the Company |
| *Restrictive Covenants* | • receipt of severance is conditioned on executive's compliance with a perpetual non-disclosure provision, invention assignment provision, 18 month non-competition provision and a 18 month non-solicitation (customers and employees) provision |

## Supplemental Executive Retirement Program

| | |
|---|---|
| *Administration* | • the plan is administered by the Company |
| | • claims for benefits under the plan can be appealed to the Compensation Committee |
| *Effective Date* | • effective on the consummation of the Company's Plan of Reorganization |
| *Amendment, Modification, Suspension or Termination* | • the company may amend, modify, suspend or terminate the plan at any time |
| *Eligibility* | • to be eligible for a benefit, an executive employee must be (i) a regular executive employee at retirement, and (ii) have at least 10 years of service and be 55 years old at retirement. |
| | • an executive employee will be entitled to a benefit under the plan if he/she is involuntarily separated from service without cause (or with good reason if the executive employee has an employment agreement) and has at least 5 years of service and is at least 55 years old on the date he/she was involuntarily separated from service |
| | • the plan is closed to new participants |
| | • for a period of 2 years following separation from employment, any retired executive employee shall not compete with the Company without the Company's consent |
| *Regular Formula* | • 2% of average monthly base salary multiplied by the employee's total years of SRP Part B and Part C service less the sum of (i) the unreduced monthly SRP pension benefits to which the executive is entitled and (ii) 2% multiplied by the maximum allowable social security benefit multiplied by the total of the executive's SRP Part A and Part C service as of the effective date |
| *Alternative Formula* | • 1.5% of the average monthly base salary plus average monthly annual incentive compensation multiplied by the employee's total years of SRP Part B and Part C service (not to exceed 35) less the sum of (i) the unreduced monthly SRP benefits to which the executive is entitled and (ii) the maximum allowable social security benefit |
| *Amount of and Form of Distribution* | • the benefit under the plan will be paid as a 5-year monthly annuity |
| | • the amount of the payment will be reduced for early retirement prior to age 62 |
| *Payment of Benefits* | • benefit payment will commence on the later of (i) the 1st day of the month at least 15 days after the employee's separation from service or (ii) the 1st day of the 1st month following the employee's 55th birthday |
| | • any payment to a "specified employee" will be delayed 6 months |
| | • benefits under the plan may be reduced by any amounts owed by the employee to the Company (no greater than $5,000 in any calendar year) |
| *Death Benefits* | • death benefits will be paid in a lump sum to the spouse and/or beneficiary of an executive employee who was eligible for benefits under the plan at the time of his/her death |

## Salaried Retirement Equalization Savings Program

*Grandfathering of Amounts Not Subject to 409A*

- amounts deferred before 1/1/05 that were earned and vested on 12/31/04 are separately accounted for

*Participation*

- only directors and "management" or "highly compensated" employees may participate in the plan

*Deferral Agreement*

- a deferral agreement must be timely executed for each plan year for which the participant wishes to defer compensation

- a deferral agreement may only be changed or revoked during the period specified by the administrator

- a participant must elect a distribution event and a form of payment for the compensation subject to the deferral agreement and for any employer contributions that may be credited to the participants account in the plan year

- if a participant fails to execute a deferral election for a particular plan year, the participant will be deemed to have elected to receive a lump sum distribution upon separation of service

*Employer Contributions*

- the employer may credit a participant's account with such contributions as it shall specify

- the employer may credit a participant's account with a matching contribution

*Investment of Contributions*

- the amounts in a participant's account shall be treated as invested in the investment options designated by the administrator

- the amount in a participant's account will be adjusted for hypothetical investment earnings, expenses, gains or losses attributed to the investment options selected

*Right to Benefits*

- a participant will vest in his employer and matching contributions as set forth in the adoption agreement

- a participant is always 100% vested in the amounts credited to his/her account that are attributable to participant deferrals

*Distribution of Benefits*

- distributions will be made according to elections, made or deemed made by, the participant

- a participant may elect at least 12 months before a scheduled distribution event to delay the payment date for a minimum of 5 years from the original payment date, as well as to change the form of payment

- a participant who experiences a separation from service before retirement will receive the vested amount credited to his/her account in a single lump sum

- distributions to key employees will not be made before a date that is six months after the key employee's separation from service

- in the event of a change of control, the participant will receive the vested amount credited to his/her account in a lump sum

*Permissible Delays in Payment*

- an employer may delay a distribution if it reasonably anticipates that its deduction with respect to such payment would be limited or restricted under Section 162(m) of the Code or the employer reasonably anticipates that the payment will violate the terms of a loan agreement or other similar contract

*Amendment and Termination*

- the employer may terminate the plan and distribute all amounts credited to participant accounts within 30 days prior to or 12 months after a change of control (provided that all substantially similar arrangements are also terminated)

- the employer may terminate the plan if all substantially similar arrangements are terminated, no payments (except required payments )are made within 12 months of termination, all payments are made within 24 months of termination, and the employer does not adopt a new substantially similar arrangement within 5 years following termination

*Trust*

- the employer may establish a grantor trust to hold amounts contributed by the employer to correspond to amounts credited to participant accounts

*Administration*

- the administrator has the full power and responsibility to administer the plan

- any person who believes he/she is being denied any rights or benefits may file a claim with the administrator

**Form Of Change In Control Agreement**

CHANGE IN CONTROL AGREEMENT

THIS AGREEMENT, dated _____, 2007, is made by and between Delphi Corporation, a Delaware corporation (the "Company"), and _____ (the "Executive").

WHEREAS, the Company considers it essential to the best interests of its stockholders to foster the continued employment of members of the Delphi Strategy Board; and

WHEREAS, the Executive is a member of the Delphi Strategy Board; and

WHEREAS, the Board recognizes that the possibility of a Change in Control exists and that such possibility, and the uncertainty and questions which it may raise among members of the Delphi Strategy Board, may result in the departure or distraction of management personnel to the detriment of the Company and its stockholders; and

WHEREAS, the Board has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of members of the Delphi Strategy Board, including the Executive, to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a Change in Control;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Company and the Executive hereby agree as follows:

1.      Defined Terms.  The definitions of capitalized terms used in this Agreement are provided in the last Section hereof to the extent not otherwise defined herein.

2.      Term of Agreement.  The Term of this Agreement shall commence on the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code and shall continue in effect through December 31, 2009; provided, however, that commencing on January 1, 2009 and each January 1 thereafter, the Term shall automatically be extended for one additional year unless, not later than September 30 of the preceding year, the Company or the Executive shall have given notice not to extend the Term; and further provided, however, that if a Change in Control shall have occurred during the Term, the Term shall expire no earlier than [twenty-four (24) months][1] [twelve (12) months][2] beyond the month in which such Change in Control occurred.

3.      Compensation Other Than Severance Payments

3.1      Following a Change in Control and during the Term, during any period that the Executive fails to perform the Executive's full-time duties with the Company as a result of incapacity due to physical or mental illness, the Company shall pay the Executive's full salary to the Executive at the rate in effect at the commencement of any such period, together with all compensation and benefits payable to the Executive under the terms of any compensation or benefit plan, program or arrangement maintained by the Company during such period (other than any disability plan), until the Executive's employment is terminated by the Company for Disability.

3.2      If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay the Executive's full salary to the Executive through the Date of Termination at the rate in effect immediately prior to the Date of

---

[1] 3x employees
[2] 2x employees

Termination or, if higher, the rate in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, together with all compensation and benefits payable to the Executive through the Date of Termination under the terms of the Company's compensation and benefit plans, programs or arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason.

3.3    If the Executive's employment shall be terminated for any reason following a Change in Control and during the Term, the Company shall pay to the Executive the Executive's normal post-termination compensation and benefits as such payments become due.    Such post-termination compensation and benefits shall be determined under, and paid in accordance with, the Company's retirement, insurance and other compensation or benefit plans, programs and arrangements as in effect immediately prior to the Date of Termination or, if more favorable to the Executive, as in effect immediately prior to the occurrence of the first event or circumstance constituting Good Reason.    Without limiting the generality of the foregoing and notwithstanding anything in Section 4, below, to the contrary, during the Term and upon the Executive's termination of employment for any reason following a Change in Control and during the Term, the Executive shall be entitled to participate in the DB SERP in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof.

4.    Severance Payments Upon Termination of Employment Following a Change in Control.

4.1    Subject to Section 4.2 hereof, if the Executive's employment is terminated during the Term following a Change in Control, other than (a) by the Company for Cause, (b) by reason of death or Disability, or (c) by the Executive without Good Reason, then, the Company shall pay the Executive the amounts, and provide the Executive the benefits, described in this Section 4.1 ("Severance Payments") and Section 4.2, in addition to any payments and benefits to which the Executive is entitled under Section 3 hereof.    For all purposes of this Agreement, the Executive's employment shall be deemed to have been terminated following a Change in Control by the Company without Cause or by the Executive with Good Reason, if (i) the Executive's employment is terminated by the Company without Cause prior to a Change in Control and such termination was at the request or direction of a Person who has entered into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the Executive terminates his employment for Good Reason prior to a Change in Control and the circumstance or event which constitutes Good Reason occurs at the request or direction of such Person, or (iii) the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (provided, however, that such Change in Control referred to in clause (i), (ii) or (iii), as applicable, actually occurs).    Notwithstanding the foregoing, payment of all amounts payable under this Section 4.1 shall be delayed, if necessary, until the Executive has incurred a separation from service under Code Section 409A.

(A)    In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination and in lieu of any severance benefit otherwise payable to the Executive, the Company shall pay to the Executive a lump sum severance payment, in cash, equal to [    ][3] times the sum of (i) the Executive's base salary as in effect immediately prior to the Date of Termination or, if higher, in effect immediately prior to the first occurrence of an event or circumstance constituting Good Reason, and (ii) the Executive's target annual incentive compensation

---

[3] The relevant multiplier will range from two to three.

2

under any incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination or, if higher, the fiscal year in which occurs the first event or circumstance constituting Good Reason.  Notwithstanding anything to the contrary, if the Change in Control event does not constitute a change in ownership or effective control of the Company or a change in ownership of a substantial portion of the assets of the Company under Code Section 409A, then an amount equal to the amount that would have been paid under the Executive's Employment Agreement upon a termination other than for cause (as defined in the Employment Agreement) or by the Executive for good reason (as defined in the Employment Agreement) had a Change in Control not occurred, shall be paid in installments for an eighteen (18) month period commencing on the first day of the month next following the Date of Termination and the remaining amounts payable under this clause (A) shall be paid in lump sum.

(B)    For the [    ][4] month period immediately following the Date of Termination, the Company shall arrange to provide the Executive and his dependents life, accident and health insurance benefits substantially similar to those provided to the Executive and his dependents immediately prior to the Date of Termination or, if more favorable to the Executive, those provided to the Executive and his dependents immediately prior to the first occurrence of an event or circumstance constituting Good Reason, at no greater after-tax cost to the Executive than the after-tax cost to the Executive immediately prior to such date or occurrence.  Benefits otherwise receivable by the Executive pursuant to this Section 4.1(B) shall be reduced to the extent benefits of the same type are received by or made available to the Executive during the [    ] month period following the Executive's termination of employment (and any such benefits received by or made available to the Executive shall be reported to the Company by the Executive); provided, however, that the Company shall reimburse the Executive for the excess, if any, of the after-tax cost of such benefits to the Executive over such cost immediately prior to the Date of Termination or, if more favorable to the Executive, the first occurrence of an event or circumstance constituting Good Reason.  If the Severance Payments shall be decreased pursuant to Section 4.2 hereof, and the Section 4.1(B) benefits which remain payable after the application of Section 4.2 hereof are thereafter reduced pursuant to the immediately preceding sentence, the Company shall, no later than five (5) business days following such reduction, pay to the Executive the least of (i) the amount of the decrease made in the Severance Payments pursuant to Section 4.2 hereof, (ii) the amount of the subsequent reduction in these Section 4.1(B) benefits, or (iii) the maximum amount which can be paid to the Executive without being, or causing any other payment to be, nondeductible by reason of section 280G of the Code.

(C)    Notwithstanding any provision of any annual or long term cash incentive plan to the contrary, the Company shall pay to the Executive a lump sum amount, in cash, equal to the sum of (i) any unpaid incentive compensation which has been allocated or awarded to the Executive for a completed fiscal year or other measuring period preceding the Date of Termination under any such plan and which, as of the Date of Termination, is contingent only upon the continued employment of the Executive to a subsequent date and (ii) a pro rata portion to the Date of Termination of the aggregate value of all contingent, cash incentive compensation awards to the Executive for all then uncompleted periods under any such plan, calculated as to each such award by multiplying the award that the Executive would have earned on the last day of the performance award period, assuming the achievement, at the target level, of the individual and corporate performance goals established with respect to such award, by the fraction obtained by dividing the number of full months and any fractional portion of a month during such performance award period through the Date of Termination by the total number of months contained in such performance award period.

---

[4] The relevant period will range from twenty-four to thirty-six months and will correspond to the severance multiplier.

(D)    In addition to the benefits to which the Executive is entitled under each DC Pension Plan, the Company shall pay the Executive a lump sum amount, in cash, equal to the amount that would have been contributed thereto or allocated thereunder by the Company on the Executive's behalf in respect of the    [    ] [5] years immediately following the Date of Termination, determined (i) as if the Executive made the maximum permissible contributions thereto during such period, (ii) as if the Executive earned compensation during such period at a rate equal to the Executive's compensation (as defined in the DC Pension Plan) during the twelve (12) months immediately preceding the Date of Termination or, if higher, during the twelve (12) months immediately prior to the first occurrence of an event or circumstance constituting Good Reason, and (iii) without regard to any amendment to the DC Pension Plan made subsequent to a Change in Control, which amendment adversely affects in any manner the computation of benefits thereunder.

(E)    The Company shall provide the Executive with reasonable outplacement services suitable to the Executive's position for a period of one year or, if earlier, until the first acceptance by the Executive of an offer of employment.

4.2    (A)    Whether or not the Executive becomes entitled to the Severance Payments, if any payment or benefit received or to be received by the Executive (including any payment or benefit received or to be received in connection with a Change in Control or the termination of the Executive's employment, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement) (all such payments and benefits, excluding the Gross-Up Payment, being hereinafter referred to as the "Total Payments") will be subject (in whole or part) to the Excise Tax, then, subject to the provisions of subsection (B) of this Section 4.2, the Company shall pay to the Executive an additional amount (the "Gross-Up Payment") such that the net amount retained by the Executive, after deduction of any Excise Tax on the Total Payments and any federal, state and local income and employment taxes and Excise Tax upon the Gross-Up Payment, and after taking into account the phase out of itemized deductions and personal exemptions attributable to the Gross-Up Payment, shall be equal to the Total Payments. For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-up Payment is calculated for purposes of this Section 4.2), net of the maximum reduction in federal income tax which could be obtained from deduction of such state and local taxes.

(B)    In the event that, after giving effect to any redeterminations described in subsection (D) of this Section 4.2, the aggregate Total Payments do not equal or exceed 110% of the Safe Harbor Amount (as defined below), then subsection (A) of this Section 4.2 shall not apply and the cash Severance Payments shall first be reduced (if necessary, to zero), and the noncash Severance Benefits shall thereafter be reduced (if necessary, to zero) to the extent necessary so that no portion of the Total Payments is subject to the Excise Tax; provided, however, that the Executive may elect to have the noncash Severance Payments reduced (or eliminated) prior to any reduction of the cash Severance Payments. "Safe Harbor Amount" means the greatest pre-tax amount of Total Payments that could be paid to the Executive without causing the Executive to become liable for any Excise Tax in connection therewith.

---

[5] The relevant multiplier will range from two to three years and will correspond to the severance multiplier.

4

(C)    For purposes of determining whether any of the Total Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all of the Total Payments shall be treated as "parachute payments" within the meaning of section 280G(b)(2) of the Code, unless in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the Change in Control, the Company's independent auditor (the "Auditor"), such other payments or benefits (in whole or in part) do not constitute parachute payments, including by reason of section 280G(b)(4)(A) of the Code, (ii) all "excess parachute payments" within the meaning of section 280G(b)(l) of the Code shall be treated as subject to the Excise Tax unless, in the opinion of Tax Counsel, such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered, within the meaning of section 280G(b)(4)(B) of the Code, in excess of the Base Amount allocable to such reasonable compensation, or are otherwise not subject to the Excise Tax, and (iii) the value of any noncash benefits or any deferred payment or benefit shall be determined by the Auditor in accordance with the principles of sections 280G(d)(3) and (4) of the Code.  Prior to the payment date set forth in Section 4.3 hereof, the Company shall provide the Executive with its calculation of the amounts referred to in this Section 4.2(C) and such supporting materials as are reasonably necessary for the Executive to evaluate the Company's calculations.  If the Executive disputes the Company's calculations (in whole or in part), the reasonable opinion of Tax Counsel with respect to the matter in dispute shall prevail.

(D)    In the event that (i) amounts are paid to the Executive pursuant to subsection (A) of this Section 4.2, (ii) the Excise Tax is finally determined to be less than the amount taken into account hereunder in calculating the Gross-Up Payment, and (iii) after giving effect to such redetermination, the Severance Payments are to be reduced pursuant to subsection (B) of this Section 4.2, the Executive shall repay to the Company, within five (5) business days following the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus that portion of the Gross-Up Payment attributable to the Excise Tax and federal, state and local income and employment taxes imposed on the Gross-Up Payment being repaid by the Executive), to the extent that such repayment results in (i) no portion of the Total Payments being subject to the Excise Tax and (ii) a dollar-for-dollar reduction in the Executive's taxable income and wages for purposes of federal, state and local income and employment taxes) plus interest on the amount of such repayment at 120% of the rate provided in section 1274(b)(2)(B) of the Code.  In the event that (x) the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the termination of the Executive's employment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment) and (y) after giving effect to such redetermination, the Severance Payments should not have been reduced pursuant to subsection (B) of this Section 4.2, the Company shall make an additional Gross-Up Payment in respect of such excess and in respect of any portion of the Excise Tax with respect to which the Company had not previously made a Gross-Up Payment (plus any interest, penalties or additions payable by the Executive with respect to such excess and such portion) within five (5) business days following the time that the amount of such excess is finally determined.

4.3    The payments provided in subsections (A), (C) and (D) of Section 4.1 hereof and in Section 4.2 hereof shall be made not later than the fifth business day following the Date of Termination (or if there is no Date of Termination, then the date on which the Gross-Up Payment is calculated for purposes of Section 4.2 hereof); provided, however, that in no event shall payments be made later than the end of the Executive's taxable year following the taxable year in which the Executive remits the related Excise Tax; provided, further, that if the amounts of such payments, and the limitation on such payments set forth in Section 4.2 hereof, cannot be finally determined on or before such day, the Company shall pay to the Executive on such day an estimate, as determined in good faith by the Executive (or, in the case of payments under Section 4.2 hereof, in accordance with Section 4.2 hereof, of the minimum amount of such payments to which the Executive is clearly entitled and shall pay the remainder of such payments (together with interest on the unpaid remainder

(or on all such payments to the extent the Company fails to make such payments when due) at 120% of the rate provided in section 1274(b)(2)(B) of the Code) as soon as the amount thereof can be determined but in no event later than the thirtieth (30th) day after the Date of Termination.  At the time that payments are made under this Agreement, the Company shall provide the Executive with a written statement setting forth the manner in which such payments were calculated and the basis for such calculations including, without limitation, any opinions or other advice the Company has received from Tax Counsel, the Auditor or other advisors or consultants (and any such opinions or advice which are in writing shall be attached to the statement).

4.4    The Company also shall pay to the Executive all legal fees and expenses incurred by the Executive in disputing in good faith any issue hereunder relating to the termination of the Executive's employment, in seeking in good faith to obtain or enforce any benefit or right provided by this Agreement, or in connection with any tax audit or proceeding to the extent attributable to the application of section 4999 of the Code to any payment or benefit provided hereunder.  Such payments shall be made within five (5) business days after delivery of the Executive's written requests for payment accompanied with such evidence of fees and expenses incurred as the Company reasonably may require; provided, however, that in no event shall payments be made later than the last day of the Executive's taxable year following the taxable year in which the fee or expense was incurred.  Notwithstanding the foregoing, in the event that the Executive does not prevail on at least one material issue in the relevant dispute or other proceeding, the Executive shall repay any amount previously paid by the Company pursuant to this Section 4.4 in respect of such dispute or other proceeding within ten (10) days of the final resolution thereof.

4.5    Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Company (within the meaning of Code Section 409A) or (ii) the Executive's date of death.  During the six month waiting period, such amounts payable will accumulate with interest (at 120% of the rate provided in Code Section 1274(b)(2)(B)) and be paid as soon as possible.

4.6    Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits, other than as required by Section 3.2 and Section 3.3, shall (1) cease as of the date the Executive breaches any of the provisions of Section 5 and (2) be conditioned on the Executive signing a general release of claims in favor of the Company and its affiliates, which is satisfactory to the Company, and the expiration of any revocation period provided for in such release.  In addition, in the event the Executive breaches any of the provisions of Section 5 herein, Executive shall repay the Company an amount equal to the payments made under Section 4.1(A) herein (reduced by an amount equal to the total such payments divided by [   ],[6] which the Executive acknowledges is adequate consideration for the general release provided pursuant to clause (2) of the immediately preceding sentence) multiplied by a fraction, the numerator being the number of days remaining in the Restriction Period from the date of breach and the denominator being the number of days in the Restriction Period.  Such repayment shall be made within ten (10) days of notice from the Company.

4A.    Vesting of Equity and Equity-Based Awards.  If the Executive is employed by the Company through the date of a Change in Control:

(A)    The Company shall accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-vested equity or equity-based awards held by the

---

[6] Either twenty-four or thirty-six (corresponding to the severance multiplier).

Executive as of such Change in Control and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of such Change in Control to remain exercisable for a period of nine months following such Change in Control (but in no event beyond the remainder of its term).

(B)     If such Change in Control constitutes a Sale of the Company in which the Company's investors as of the Effective Date realize a net internal rate of return ("IRR") on their equity investment in the Company (using a cost basis equal to $45 per share) of at least 10%, assuming full vesting of all outstanding Company stock and stock options, the Company shall accelerate the vesting and cause the restrictions to lapse on all then-outstanding unvested or restricted performance-vested equity or equity-based awards held by the Executive as of such Sale of the Company and permit each performance-vested stock option to acquire common stock of the Company and each performance-vested stock appreciation right held by the Executive as of such Sale of the Company to remain exercisable for a period of six months following such Sale of the Company (but in no event beyond the remainder of its term). The Board or its compensation committee shall, in its discretion, adjust such IRR threshold at least every three years following the Effective Date, (i) with respect to awards granted after the date of such adjustment, or (ii) to appropriately reflect the effects of any mergers, acquisitions, recapitalizations or other corporate transactions involving the Company.

5.     Restrictive Covenants.   In recognition of the compensation to be paid to the Executive pursuant to Sections 3, 4 and 4A of this Agreement, and Section 5 of the Employment Agreement, the Executive agrees to be bound by the provisions of this Section 5 (the "Restrictive Covenants"). The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

5.1     Return of Company Property.   The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he or she shall return all property of the Company, its parent, subsidiaries, affiliates and any divisions thereof, which is then in or thereafter comes into his or her possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to the Executive, if any.

5.2     Confidentiality.

(A)     The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his or her employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including , but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored: the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its customers; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; unique and/or proprietary computer equipment, programs, software and source codes, licensing information, personnel information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("Confidential Information"); (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the

7

Company's business; and (C) the engaging by the Executive in any of the activities prohibited by this Section 5.2(A) may constitute misappropriation and/or improper use of trade secrets in violation of the Michigan Uniform Trade Secrets Act, as well as a violation of this Agreement.

(B)    During the Term and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of an officer of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(C)    In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(D)    The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

5.3    Intellectual Property.

(A)    The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions), to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Term which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product"). Any Work Product which falls within the definition of "work made for hire," as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company. The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product. The Executive agrees to immediately disclose to the Company all Work Product. For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

(B)    The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product. If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product. Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being

8

coupled with an interest.

5.4    Non-Competition.

(A)    The Executive acknowledges and agrees that: (1) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (2) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(B)    During the period of the Executive's employment with the Company and for a period of    [    ][7] months (the "Restriction Period") following the termination of the Executive's employment for any reason, and provided that the Company is making the payments, if any, required under Section 4.1(A), subject to Section 4.6, the Executive shall not engage in Competition (as defined below) with the Company.

(C)    For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; provided, however, it shall not be a violation of this Section 5.4(C) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other business which the Company engages in, or is preparing to become engaged in, at the time of the Executive's termination.

5.5    Non-Solicitation; Non-Interference.  During the period of the Executive's employment with the Company and for a period of [    ][8] months following the termination of the Executive's employment for any reason the Executive agrees that he will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(A)    solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(B)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

---

[7] The relevant period will be 12 or 18 months depending upon the Executive's severance period.

[8] The relevant period will be 12 or 18 months depending upon the Executive's severance period.

(C)    solicit the employment or services of, or hire or engage, any person who was employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(D)    otherwise interfere with the business or accounts of the Company, including, but not limited to, with respect to any relationship or agreement between the Company and any vendor or supplier.

5.6    <u>Injunctive Relief; Indemnity of Company</u>.  The Executive agrees that any breach or threatened breach of Sections 5.2, 5.3, 5.4 or 5.5 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy.  The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive.  The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages.  The Executive and the Company further agree that the provisions of this Section 5 are reasonable.  The Executive agrees to indemnity and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive.

5.7    <u>Definition of Company</u>:  For purposes of this Section 5, the "Company," as used above, shall be construed to include the Company and its parent, subsidiaries and affiliates, including, without limitation, any divisions managed or supervised by the Executive.

5.8    <u>Survival</u>:  The provisions of this Section 5 survive the termination of Executive's employment with the Company, regardless of the reason for such termination, for the duration expressly stated in any such provision or, if no duration is stated, then indefinitely.

6.    <u>Termination Procedures and Compensation During Dispute</u>.

6.1    <u>Notice of Termination</u>.  After a Change in Control and during the Term, any purported termination of the Executive's employment (other than by reason of death) shall be communicated by written Notice of Termination from one party hereto to the other party hereto in accordance with Section 9 hereof.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated.  A purported termination of the Executive's employment by the Company for Cause shall not be treated as a termination for Cause hereunder unless, within thirty (30) days following the Company's delivery of a Notice of Termination for Cause, the Company provides the Executive with a copy of a resolution duly adopted by the affirmative vote of not less than a majority of the entire membership of the Board at a meeting of the Board which was called and held for the purpose of considering such termination (after reasonable notice to the Executive and a reasonable opportunity for the Executive, together with the Executive's counsel, to be heard before the Board) finding that, in the opinion of the Board, the Executive was guilty of conduct constituting Cause and specifying the particulars thereof in detail.

6.2    <u>Date of Termination</u>.  "Date of Termination," with respect to any purported termination of the Executive's employment after a Change in Control and during the Term, shall mean (i) if the Executive's employment is terminated for Disability, thirty (30) days after Notice of Termination is given (provided that the Executive shall not have returned to the full-time performance

of the Executive's duties during such thirty (30) day period), and (ii) if the Executive's employment is terminated for any other reason, the date specified in the Notice of Termination (which shall not be less than thirty (30) days nor more than sixty (60) days, respectively, from the date such Notice of Termination is given).

6.3    Compensation During Dispute.  With respect to any termination of the Executive's employment during the Term and following a Change in Control, if within fifteen (15) days after any Notice of Termination is given, or, if later, prior to the Date of Termination, the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the Company shall continue to pay the Executive the full compensation in effect when the notice giving rise to the dispute was given (including, but not limited to, salary) and continue the Executive as a participant in all compensation, benefit and insurance plans in which the Executive was participating when the notice giving rise to the dispute was given, until the earlier of (i) the date on which the Term ends or (ii) the date on which the dispute is finally resolved, either by mutual written agreement of the parties or by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected); provided, however, that this Section 6.3 shall be applicable in the event of a notice of dispute given by the Executive only if such notice is given in good faith and the Executive pursues the resolution of such dispute with reasonable diligence. Amounts paid under this Section 6.3 are not in addition to other amounts due under this Agreement and shall be offset against and reduce any amounts otherwise due under Section 4.1 hereof.

7.    No Mitigation.  The Company agrees that, if the Executive's employment with the Company terminates during the Term, the Executive is not required to seek other employment or to attempt in any way to reduce any amounts payable to the Executive by the Company pursuant to Section 3 or 4 hereof. Further, except as specifically provided in Section 4.1(B) hereof, no payment or benefit provided for in this Agreement shall be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

8.    Successors; Binding Agreement.

8.1    In addition to any obligations imposed by law upon any successor to the Company, the Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

8.2    This Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the Executive shall die while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

9.    Notices.  For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States registered mail, return receipt requested, postage prepaid, addressed, if to the Executive, to the address inserted below the Executive's signature on the final page hereof and, if to the Company, to the address set forth below, or to such other address as either

party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon actual receipt:

To the Company:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan  48098

Attention: General Counsel

10.    Miscellaneous.  No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and such officer as may be specifically designated by the Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or of any lack of compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. This Agreement supersedes any other agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof which have been made by either party [including but not limited to the Change in Control Agreement entered into between the Company and the Executive dated as of [   ]]; provided, however, that this Agreement shall supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company only in the event that the Executive's employment with the Company is terminated on or following a Change in Control, by the Company other than for Cause or by the Executive for Good Reason; and provided, further, that prior to a Change in Control, this Agreement shall not affect or supersede any agreement setting forth the terms and conditions of the Executive's employment with the Company or the termination thereof prior to a Change in Control.  All references to sections of the Exchange Act or the Code shall be deemed also to refer to any successor provisions to such sections.  Any payments provided for hereunder shall be paid net of any applicable withholding required under federal, state or local law and any additional withholding to which the Executive has agreed.  The obligations of the Company and the Executive under this Agreement which by their nature may require either partial or total performance after the expiration of the Term (including, without limitation, those under Sections 4, 5 and 6 hereof) shall survive such expiration.

11.    Validity.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

12.    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

13.    Settlement of Disputes; Claims.
13.1    All claims by the Executive for benefits under this Agreement shall be directed to and determined by the Board and shall be in writing.  Any denial by the Board of a claim for benefits under this Agreement shall be delivered to the Executive in writing and shall set forth the specific reasons for the denial and the specific provisions of this Agreement relied upon.  The Board shall afford a reasonable opportunity to the Executive for a review of the decision denying a claim and shall further allow the Executive to appeal to the Board a decision of the Board within sixty (60) days after notification by the Board that the Executive's claim has been denied.
13.2    The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles.  The parties hereby irrevocably consent and submit to the jurisdiction of the federal

and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

14.    Definitions.  For purposes of this Agreement, the following terms shall have the meanings indicated below:

(A)    "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Exchange Act.

(B)    "Auditor" shall have the meaning set forth in Section 4.2 hereof.

(C)    "Base Amount" shall have the meaning set forth in section 280G(b)(3) of the Code.

(D)    "Beneficial Owner" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

(E)    "Board" shall mean the Board of Directors of the Company.

(F)    "Cause" for termination by the Company of the Executive's employment shall mean (I) continued failure by the Executive to satisfactorily perform his duties; (II) willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination; (III) the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or nolo contendere plea); (IV) the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or (V) any material breach by the Executive of this Agreement.  The occurrence of any of the foregoing shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period.

(G)    A "Change in Control" shall be deemed to have occurred if the event set forth in any one of the following paragraphs shall have occurred:

(I)    any Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities beneficially owned by such Person any securities acquired directly from the Company or its Affiliates) representing more than 50% of the combined voting power of the Company's then outstanding securities, excluding any Person who becomes such a Beneficial Owner in connection with a transaction described in clause (i) of paragraph (III) below;

(II)    the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the date hereof or whose

appointment, election or nomination for election was previously so approved or recommended;

(III)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation or other entity, other than (i) a merger or consolidation which results in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation or (ii) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities Beneficially Owned by such Person any securities acquired directly from the Company or its Affiliates) representing 25% or more of the combined voting power of the Company's then outstanding securities; or

(IV)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to have occurred by virtue of (i) the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, including, but not limited to, the issuance of the Company's Series A-1 Preferred Stock, Series A-2 Preferred Stock, and Series B Preferred Stock (the "Preferred Stock"), (ii) the consummation of any of the transactions contemplated by [insert appropriate reference to the purchase agreement, Company charter or other documentation setting forth the terms of the preferred stock and other corporate governance provisions] including, but not limited to, the conversion of the Preferred Stock into common stock of the Company and the conversion of Series B Preferred Stock into Series A-1 Preferred Stock or Series A-2 Preferred Stock, or (iii) the consummation of any transaction or series of integrated transactions immediately following which the record holders of the common stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions.

(H)    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(I)    "Company" shall mean Delphi Corporation and, except in determining under Section 14(G) hereof whether or not any Change in Control of the Company has occurred, shall include any successor to its business and/or assets which assumes and agrees to perform this Agreement by operation of law, or otherwise.

(J)    "DB SERP" shall mean the Company's frozen defined benefit Supplemental Executive Retirement Program.

(K)    "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan

or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits.

(L)     "Date of Termination" shall have the meaning set forth in Section 6.2 hereof.

(M)     "Disability" shall be deemed the reason for the termination by the Company of the Executive's employment, if, as a result of the Executive's incapacity due to physical or mental illness, the Executive shall have been absent from the full-time performance of the Executive's duties with the Company for a period of six (6) consecutive months, the Company shall have given the Executive a Notice of Termination for Disability, and, within thirty (30) days after such Notice of Termination is given, the Executive shall not have returned to the full-time performance of the Executive's duties.

(N)     "Employment Agreement" shall mean the employment agreement entered into by and between the Company and the Executive.

(O)     "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

(P)     "Excise Tax" shall mean any excise tax imposed under section 4999 of the Code.

(Q)     "Executive" shall mean the individual named in the first paragraph of this Agreement.

(R)     "Good Reason" for termination by the Executive of the Executive's employment shall mean the occurrence after any Change in Control, or prior to a Change in Control under the circumstances described in clauses (ii) and (iii) of the second sentence of Section 4.1 hereof (provided, however, that a Change in Control actually occurs), without the written consent of the Executive, of any of the following events that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason:

(I)     the assignment to the Executive of any duties materially inconsistent with the Executive's status as a senior officer of the Company or a substantial adverse alteration in the nature or status of the Executive's responsibilities; provided, however, that any such assignment or substantial adverse alteration that occurs merely as a result of the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 14(R)(I);

(II)     a reduction by the Company in the Executive's base salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company;

(III)     a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions similarly affecting all executives of the Company;

(IV)     the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment as of immediately prior to such relocation or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted

15

relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations, (ii) the relocation of the Executive's principal place of employment, in connection with the relocation of all or substantially all of the operations of the Executive's principal business unit, to the new location of such principal business unit or (iii) the relocation of the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences (provided that such transfer does not otherwise constitute Good Reason (including under clause (I) above));

(V)    the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due; or

(VI)    a failure of a successor to assume this Agreement in accordance with Section 8.1 of this Agreement.

[Any termination by the Executive of his employment during the 30-day period commencing on the first anniversary of the occurrence of a Change in Control shall be deemed to be for Good Reason for all purposes of this Agreement.][9]

(S)    "Gross-Up Payment" shall have the meaning set forth in Section 4.2 hereof.

(T)    "Notice of Termination" shall have the meaning set forth in Section 6.1 hereof.

(U)    "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(V)    "Sale of the Company" shall mean any transaction or series of transactions (whether structured as a stock sale, merger, consolidation, reorganization, asset sale or otherwise), which results in the sale or transfer of (i) beneficial ownership of  more than 50% of the Company's then-outstanding shares of capital stock(determined based on fair market value), or (ii) all or substantially all of the assets of the Company and its subsidiaries taken as a whole (determined based on fair market value), in each case, other than to a Person, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale or transfer.

(W)    "Severance Payments" shall have the meaning set forth in Section 4.1 hereof.

---

[9] CEO agreement only.

(X)        "Term" shall mean the period of time described in Section 2 hereof (including any extension, continuation or termination described therein).

(Y)        "Total Payments" shall mean those payments so described in Section 4.2 hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

DELPHI CORPORATION

By:_____

     Name:

     Title:

_____

EXECUTIVE

Address:

_____

_____

_____

(Please print carefully)

**Form Of Employment Agreement**

<u>EMPLOYMENT AGREEMENT</u>

AGREEMENT, dated [        ], 2007 by and between Delphi Corporation, a Delaware corporation (the "Company"), and [    ] (the "Executive").

WHEREAS, the Company considers it essential to the best interests of its stockholders to foster the continued employment of members of the Delphi Strategy Board;

WHEREAS, the Executive is a member of the Delphi Strategy Board;

WHEREAS, the Company wishes to secure the employment of the Executive pursuant to the terms and conditions set forth in this Agreement and the Executive desires to be employed by the Company pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the Company and the Executive agree as follows:

1.     <u>Employment</u>.  The Company hereby agrees to employ the Executive, and the Executive hereby accepts such employment, on the terms and conditions hereinafter set forth.

2.     <u>Term</u>.   The Executive's employment with the Company pursuant to this Agreement will commence upon the consummation of the Company's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (the "Effective Date") and will end on December 31, 2010, unless earlier terminated as provided herein.   Notwithstanding the foregoing, commencing on January 1, 2011 and each January 1 thereafter (each, an "Extension Effective Date"), the term of this Agreement shall be extended, without further action by the Company or the Executive, for successive periods of twelve months each, unless either party shall have given 60 days advance written notice to the other party, in the manner set forth in Section 14 below, prior to the Extension Effective Date in question, that the term of this Agreement that is in effect at the time such written notice is given is not to be extended or further extended, as the case may be (the period during which this Agreement is effective being referred to as the "Term").

3.     <u>Position and Duties</u>.  During the Term, the Executive shall serve in an executive position reasonably consistent with his or her current position with the Company or in such other position or positions with a level of duties and responsibilities consistent with the foregoing with the Company and/or its subsidiaries and affiliates as the Board may specify from time to time.   During the Term, the Executive shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the position or positions in which the Executive serves hereunder.  The Executive agrees to devote all of his or her working time and efforts to the performance of his or her duties for the Company.

4.     <u>Place of Performance</u>.  In connection with the Executive's employment by the Company, the Executive shall be based at the Company location or facility at which he or she is currently based, except for travel necessary in connection with the requirements of the Executive's position; provided, however, that in connection with the relocation of all or substantially all the operations of the Executive's principal business unit the Executive's place of performance may be changed to the new location or facility of such business unit; <u>provided</u> <u>further</u>, <u>however</u>, that the Company may relocate the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences.

5.     <u>Compensation and Related Matters</u>.

(a)     <u>Base Salary</u>.  As compensation for the performance by the Executive of his or her obligations hereunder, during the Term, the Company shall pay the Executive a base salary at an annual rate equal to the annual rate in effect on the date hereof.  Base salary shall be payable in accordance with the Company's customary payroll practices for executives, as in effect from time to time.  The Board may conduct an annual review of the base salary and may increase such base salary in its discretion.  Once increased, base salary shall not thereafter be decreased, except pursuant to across-the-board salary reductions similarly affecting other Company executives.  The term "Base Salary" shall refer to the annual base salary as in effect from time to time.

(b)    <u>Annual Incentive Compensation</u>.  During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such discretionary annual (or such shorter period) incentive compensation plans as may be authorized from time to time by the Board.

(c)    <u>Long-Term Incentive Compensation</u>.  During the Term, the Executive shall be eligible to participate, at a level comparable to similarly situated executives of the Company, in such long-term compensation arrangements as may be authorized from time to time by the Board.

(d)    <u>Expenses</u>.  The Company shall promptly reimburse the Executive for all reasonable business expenses incurred during the Term by the Executive in performing his or her duties hereunder provided that such expenses are incurred and accounted for in accordance with the policies and procedures established by the Company.

(e)    <u>Other Benefits</u>.  During the Term, the Executive shall be entitled to participate in all of the employee benefit plans and arrangements made available by the Company to its similarly situated executives, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.  Without limiting the generality of the foregoing and notwithstanding anything in Section 9, below, to the contrary, during the Term and thereafter the Executive shall be entitled to participate in (1) the Company's frozen defined benefit Supplemental Executive Retirement Program (the "DB SERP") in accordance with its terms as in effect on the date hereof, without regard to any amendment or termination of the DB SERP after the date hereof and (2) the Company's defined contribution Supplemental Executive Retirement Program in accordance with its terms as in effect from time to time.

6.    <u>Offices</u>.  The Executive agrees to serve without additional compensation, if elected or appointed thereto, as a director of the Company or any parent or subsidiaries of the Company, as a member of any committees of the board of directors of any such entity, and in one or more executive positions of any of the Company's subsidiaries, provided that the Executive is indemnified for serving in any and all such capacities on a basis no less favorable than is currently provided to any other director of the Company or any of its subsidiaries, or any such executive position, as the case may be.

7.    <u>Termination</u>.  The Executive's employment hereunder may be terminated as follows:

(a)    <u>Death</u>.  The Executive's employment hereunder shall terminate upon his death.

(b)    <u>Cause</u>.  The Company may terminate the Executive's employment hereunder for Cause.  The occurrence of any of the following, as reasonably determined by the Company, shall be a reason for Cause, provided that, if the Company determines that the circumstances constituting Cause are curable, then such circumstances shall not constitute Cause unless and until the Executive has been informed by the Company of the existence of Cause and given an opportunity of ten business days to cure, and such Cause remains uncured at the end of such ten-day period:

(i)    continued failure by the Executive to satisfactorily perform his duties;

(ii)    willful misconduct or gross negligence by the Executive in the performance of his duties hereunder, including insubordination;

(iii)    the Executive's commission of any felony or the Executive's commission of any misdemeanor involving moral turpitude (including entry of a guilty or <u>nolo contendere</u> plea);

(iv)    the Executive's commission of any act involving dishonesty that results in financial, reputational or other harm, monetary or otherwise, to the Company or its affiliates and subsidiaries, including but not limited to an act constituting misappropriation or embezzlement of the property of the Company or its parent, affiliates or subsidiaries, as determined in good faith by the Board; or

(v)    any material breach by the Executive of this Agreement.

2

(c)     <u>Good Reason</u>.     The Executive may terminate his employment hereunder for "Good Reason" upon the occurrence, without the written consent of the Executive, of an event constituting a material breach of this Agreement (including a failure of a successor to assume this Agreement in accordance with Section 13 hereof) by the Company that has not been fully cured within ten (10) business days after written notice thereof has been given by the Executive to the Company setting forth in sufficient detail the conduct or activities the Executive believes constitute grounds for Good Reason, including but not limited to:

    (1)     the assignment to the Executive of any duties materially inconsistent with the Executive's status as a senior officer of the Company or a substantial adverse alteration in the nature or status of the Executive's responsibilities; <u>provided</u>, <u>however</u>, that the Company's ceasing to be a publicly-held corporation shall not constitute Good Reason within the meaning of this Section 7(c)(1);

    (2)     a reduction by the Company in the Executive's Base Salary as in effect on the date hereof or as the same may be increased from time to time except for across-the-board salary reductions similarly affecting all executives of the Company;

    (3)     a material reduction in the Executive's incentive compensation opportunity or benefits, except for, in each case, across-the-board reductions similarly affecting all executives of the Company

    (4)     the relocation of the Executive's principal place of employment to a location more than 25 miles from the Executive's principal place of employment as of immediately prior to such relocation or the Company's requiring the Executive to be based anywhere other than such principal place of employment (or permitted relocation thereof) except for (i) required travel on the Company's business to an extent substantially consistent with the Executive's present business travel obligations, (ii) the relocation of the Executive's principal place of employment, in connection with the relocation of all or substantially all of the operations of the Executive's principal business unit, to the new location of such principal business unit or (iii) the relocation of the Executive's principal place of employment in connection with a transfer of the Executive to a new position that in the Company's reasonable, good faith belief, enhances the career opportunities of the Executive through additional responsibilities and management experiences (provided that such transfer does not otherwise constitute Good Reason (including under clause (1) above)); or

    (5)     the failure by the Company to pay to the Executive any portion of the Executive's current compensation or to pay to the Executive any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due.

(d)     <u>Without Cause by the Company; Without Good Reason by the Executive</u>. The Company may terminate the Executive's employment hereunder at any time without Cause in accordance with Section 8.   The Executive may terminate the Executive's employment voluntarily for any reason or no reason at any time in accordance with Section 8.

8.     <u>Termination Procedure</u>.

(a)     <u>Notice of Termination</u>.     Any termination of the Executive's employment by the Company or by the Executive (other than termination pursuant to Section 7(a)) shall be communicated by a written notice ("Notice of Termination") to the other party hereto in accordance with Section 14.

(b)      Date of Termination.  The "Date of Termination" shall mean (i) if the Executive's employment is terminated by the Executive's death, the date of his death, (ii) if the Executive's employment is terminated by the Company for Cause, the date specified in the Notice of Termination and (iii) if the Executive's employment is terminated under any circumstances other than those described in clause (i) or (ii) immediately preceding, the date specified in the Notice of Termination (which shall not be less than [sixty (60) days][1][thirty (30) days][2], nor more than ninety (90) days, respectively, from the date such Notice of Termination is given.

9.      Compensation upon Termination

(a)      Death.  If the Executive's employment is terminated by reason of the Executive's death, the Company shall have no further obligations to the Executive under this Agreement and the Executive's benefits shall be determined under the Company's retirement, insurance and other benefit and compensation plans or programs then in effect in accordance with the terms of such plans and programs.

(b)      By Company without Cause or by the Executive for Good Reason.  If during the Employment Period the Executive's employment is terminated by the Company other than for Cause or by the Executive for Good Reason, the Company shall:

(i)      continue to pay and otherwise provide to the Executive, during any notice period (in accordance with Section 8), all compensation, base salary and previously earned but unpaid incentive compensation (e.g., pro-rata) if any, and shall continue to allow the Executive to participate in any benefit plans in accordance with the terms of such plans;

(ii)      pay to the Executive any accrued unused vacation pay;

(iii)      pay to the Executive, in lieu of benefits under any severance plan or policy of the Company, an amount equal to the sum of the Executive's Base Salary as in effect as of the Date of Termination and the Executive's annual target incentive compensation as in effect for the year in which the Date of Termination occurs (annualized in the event the incentive compensation plan in which the Executive then participates is based on a period less than one year), divided by twelve (12). Such amount shall be paid monthly for an eighteen (18) month period commencing on the first day of the month next following the Date of Termination;

(iv)      pay to the Executive a lump sum amount, in cash, equal to the excess, if any, of the Executive's total account balance in the DC Pension Plan (as defined below) over the portion of the Executive's account balance in the DC Pension Plan that is vested as of the Date of Termination.  For purposes of this section, "DC Pension Plan" shall mean any tax-qualified, supplemental or excess defined contribution plan maintained by the Company and any other defined contribution plan or agreement entered into between the Executive and the Company which is designed to provide the Executive with supplemental retirement benefits; and

(v)      accelerate the vesting and cause the restrictions to lapse on all unvested or restricted time-vested equity or equity-based awards held by the Executive as of the Date of Termination and permit each time-vested stock option to acquire common stock of the Company and each time-vested stock appreciation right held by the Executive as of the Date of Termination to remain exercisable for a period of nine (9) months following the Date of Termination (but in no event beyond the remainder of its term).

All amounts payable under this Section 9(b) shall be paid (in the case of subsections (ii) and (iv)) or commence to be paid (in the case of subsections (i) and (iii)), as applicable, as soon as practicable following the Executive's termination of employment; provided that if the period during which the Executive is legally entitled to consider the terms of the release required under Section 11 hereof expires in the calendar year following the calendar year in which such termination of employment occurs

---

[1] 3x employees

[2] 2x employees

4

(whether or not the Executive waives some or all of such period), then the amounts payable under this Section 9(b) shall be paid or commence to be paid on the later of January 2 of such later year or the date on which such amounts would otherwise have been paid under this agreement without regard to this sentence. Notwithstanding the foregoing, payment of all amounts payable under this Section 9(b) shall be delayed, if necessary, until the Executive has incurred a separation from service under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code").

(c)     By Company for Cause or by the Executive other than for Good Reason.  If the Executive's employment shall be terminated by the Company for Cause or by the Executive other than for Good Reason, the Company shall pay the Executive his Base Salary (at the rate in effect at the time Notice of Termination is given) through the Date of Termination, and the Company shall have no additional obligations to the Executive under this Agreement except as set forth in Section 9(d).

(d)     Compensation Upon any Termination.  Following any termination of the Executive's employment, the Company shall pay the Executive all amounts, if any, to which the Executive is entitled as of the Date of Termination under any compensation plan or benefit plan or program of the Company, at the time such payments are due in accordance with the terms of such plans or programs.

(e)     Return of Company Property.  The Executive agrees that following the termination of the Executive's employment for any reason, or at any time prior to the Executive's termination upon the request of the Company, he or she shall return all property of the Company, its parent, subsidiaries, affiliates and any divisions thereof, which is then in or thereafter comes into his possession, including, but not limited to, any Confidential Information (as defined below) or Intellectual Property (as defined below), or any other documents, contracts, agreements, plans, photographs, projections, books, notes, records, electronically stored data and all copies, excerpts or summaries of the foregoing, as well as any automobile or other materials or equipment supplied by the Company, its parent, subsidiaries, affiliates and any divisions thereof to the Executive, if any.

(f)     Requirement for a Release.  Notwithstanding the foregoing, the Company's obligations to pay or provide any benefits, other than as required by Section 9(d), shall (1) cease as of the date the Executive breaches any of the provisions of Section 12, other than the first monthly payment due under Section 9(b)(iii), which the Executive acknowledges is adequate consideration for the general release provided pursuant to clause (2) of this sentence; and (2) be conditioned on the Executive signing a general release of claims in favor of the Company and its affiliates, which is satisfactory to the Company, and the expiration of any revocation period provided for in such release.

10.     Disability.  If the Executive becomes "disabled" (within the meaning of the applicable disability plan, program or arrangement of the Company, as in effect from time to time), the Executive shall be entitled to such benefits as may be provided under such plan, policy or arrangement, but shall not be entitled to any payments under Section 9(b) hereof (unless the Executive returns to active employment and becomes entitled to such payments as a result of a subsequent termination of the Executive's active employment).

11.     Mitigation.  The Executive shall not be required to mitigate the amount of any payment provided for the Executive hereunder by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for the Executive hereunder be reduced by any compensation earned by the Executive as the result of employment by another employer, by retirement benefits, by offset against any amount claimed to be owed by the Executive to the Company or otherwise, except for amounts actually owed by the Executive to the Company as of the Date of Termination.

12.     Confidentiality; Intellectual Property; Non-Competition Requirement; etc.  In recognition of the compensation to be paid to the Executive pursuant to Sections 5 and 9 of this Agreement, the Executive agrees to be bound by the provisions of this Section 12 (the "Restrictive Covenants").  The Restrictive Covenants will apply without regard to whether any termination or cessation of the Executive's employment is initiated by the Company or the Executive, and without regard to the reason for that termination or cessation.

(a)     Confidentiality.

(i)    The Executive acknowledges and agrees that: (A) the Executive holds a position of trust and confidence with the Company and that his employment by the Company will require that the Executive have access to and knowledge of valuable and sensitive information, material, and devices relating to the Company and/or its business, activities, products, services, customers and vendors, including, but not limited to, the following, regardless of the form in which the same is accessed, maintained or stored:  the identity of the Company's actual and prospective customers and their representatives; prior, current or future research or development activities of the Company and/or its customers; the products and services provided or offered by the Company to customers or potential customers and the manner in which such services are performed or to be performed; the product and/or service needs of actual or prospective customers; pricing and cost information; information concerning the development, engineering, design, specifications, acquisition or disposition of products and/or services of the Company; unique and/or proprietary computer equipment, programs, software and source codes, licensing information, personnel information, vendor information, marketing plans and techniques, forecasts, and other trade secrets ("Confidential Information"); (B) the direct and indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (C) the engaging by the Executive in any of the activities prohibited by this Section 12(a) may constitute misappropriation and/or improper use of trade secrets in violation of the Michigan Uniform Trade Secrets Act, as well as a violation of this Agreement.

(ii)    During the Employment Period and at all times thereafter, the Executive shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, consultant, principal or agent of any business, or in any other capacity, publish or make known, disclose, furnish, reproduce, make available, or utilize any of the Confidential Information without the prior express written approval of an officer of the Company, other than in the proper performance of the duties contemplated herein, unless and until such Confidential Information is or shall become general public knowledge through no fault of the Executive.

(iii)    In the event that the Executive is required by law to disclose any Confidential Information, the Executive agrees to give the Company prompt advance written notice thereof and to provide the Company with reasonable assistance in obtaining an order to protect the Confidential Information from public disclosure.

(iv)    The failure to mark any Confidential Information as confidential shall not affect its status as Confidential Information under this Agreement.

(b)    <u>Intellectual Property</u>.

(i)    The Executive hereby assigns to the Company or its designees, without further consideration and free and clear of any lien or encumbrance, the Executive's entire right, title and interest (within the United States and all foreign jurisdictions), to any and all inventions, discoveries, improvements, developments, works of authorship, concepts, ideas, plans, specifications, software, formulas, databases, designees, processes and contributions to Confidential Information created, conceived, developed or reduced to practice by the Executive (alone or with others) during the Employment Period which (A) are related to the Company's current or anticipated business, activities, products, or services, (B) result from any work performed by Executive for the Company, or (iii) are created, conceived, developed or reduced to practice with the use of Company property, including any and all Intellectual Property Rights (as defined below) therein ("Work Product").  Any Work Product which falls within the definition of "work made for hire", as such term is defined in the Copyright Act (17 U.S.C. Section 101), shall be considered a "work made for hire", the copyright in which vests initially and exclusively in the Company.  The Executive waives any rights to be attributed as the author of any Work Product and any "droit morale" (moral rights) in Work Product.  The Executive agrees to immediately disclose to the Company all Work Product.  For purposes of this Agreement, "Intellectual Property" shall mean any patent, copyright, trademark or service mark, trade secret, or any other proprietary rights protection legally available.

6

(ii)    The Executive agrees to execute and deliver any instruments or documents, and to do all other things reasonably requested by the Company in order to more fully vest the Company with all ownership rights in the Work Product.  If any Work Product is deemed by the Company to be patentable or otherwise registrable, the Executive shall assist the Company (at the Company's expense) in obtaining letters of patent or other applicable registration therein and shall execute all documents and do all things, including testifying (at the Company's expense) necessary or appropriate to apply for, prosecute, obtain, or enforce any Intellectual Property Right relating to any Work Product.  Should the Company be unable to secure the Executive's signature on any document deemed necessary to accomplish the foregoing, whether due to the Executive's disability or other reason, the Executive hereby irrevocably designates and appoints the Company and each of its duly authorized officers and agents as the Executive's agent and attorney-in-fact to act for and on the Executive's behalf and stead to take any of the actions required of Executive under the previous sentence, with the same effect as if executed and delivered by the Executive, such appointment being coupled with an interest.

(c)    Non-Competition.

(i)    The Executive acknowledges and agrees that:    (A) the Business (as defined below) is intensely competitive and conducted by the Company throughout the world; and (B) reasonable limits on the Executive's ability to engage in activities which are competitive with the Company are warranted in order to, among other things, reasonably protect trade secrets and proprietary information of the Company and to maintain and develop the Company's reputation, customer relationships, goodwill and overall status in the marketplace.

(ii)    During the Employment Period and for a period of eighteen (18) months following the termination of the Executive's employment for any reason, and provided that the Company is making the payments, if any, required under Section 9(b), subject to Section 9(f), the Executive shall not engage in Competition (as defined below) with the Company.

(iii)    For purposes of this Agreement, "Competition" by the Executive shall mean the Executive's engaging in, or otherwise directly or indirectly being employed by or acting as a consultant or lender to, or being a director, officer, employee, principal, agent, stockholder, member, owner or partner of, or permitting the Executive's name to be used in connection with the activities of any other business or organization anywhere in the world which competes, directly or indirectly, with the Company in the Business; provided, however, it shall not be a violation of this Section 12(c) for the Executive to become the registered or beneficial owner of up to three percent (3%) of any class of the capital stock of a corporation in Competition with the Company that is registered under the Securities Exchange Act of 1934, as amended, provided that the Executive does not otherwise participate in the business of such corporation.

For purposes of this Agreement, "Business" means the creation, development, manufacture, sale, promotion and distribution of vehicle electronics, transportation components, integrated systems and modules and other electronic technology and any other business which the Company engages in, or is preparing to become engaged in, at the time of the Executive's termination.

(d)    Non-Solicitation; Non-Interference.    During the Employment Period and for a period of eighteen (18) months following the termination of the Executive's employment for any reason the Executive agrees that he or she will not, directly or indirectly, for the Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)    solicit from any customer doing business with the Company as of the Executive's termination or within six (6) months prior to the Date of Termination, business of the same or of a similar nature to the Business;

(ii)    solicit from any known potential customer of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six (6) months prior to the Date of Termination;

7

(iii)    solicit the employment or services of, or hire or engage, any person who was employed or engaged by the Company as of the Date of Termination, or within 6 months thereof; or

(iv)    otherwise interfere with the business or accounts of the Company, including, but not limited to, with respect to any relationship or agreement between the Company and any vendor or supplier.

(e)    <u>Injunctive Relief; Indemnity of Company</u>.  The Executive agrees that any breach or threatened breach of subsections (a), (b), (c) or (d) of this Section 12 would result in irreparable injury and damage to the Company for which an award of money to the Company would not be an adequate remedy.  The Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to seek an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive.  The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages.  The Executive and the Company further agree that the provisions of this Section 12 are reasonable.  The Executive agrees to indemnify and hold harmless the Company from and against all reasonable expenses (including reasonable fees and disbursements of counsel) which may be incurred by the Company in connection with, or arising out of, any violation of this Agreement by the Executive.

(f)    <u>Definition of Company</u>:    For purposes of this Section 12, the "Company," as used above, shall be construed to include the Company and its parent, subsidiaries and affiliates, including, without limitation, any divisions managed or supervised by the Executive.

(g)    <u>Survival</u>:  The provisions of this Section 12 survive the termination of Executive's employment with the Company, regardless of the reason for such termination, for the duration expressly stated in any such provision or, if no duration is stated, then indefinitely.

13.    <u>Assignment; Successors</u>.  This Agreement and all rights hereunder are personal to the Executive and may not, unless otherwise specifically permitted herein, be assigned by the Executive.  If the Executive should die while any amounts would still be payable to the Executive hereunder if the Executive had continued to live, all such amounts unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, if there be no such designee, to the Executive's estate.  The Company will require any and all successors (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.    As used in this Agreement, "Company" shall mean the Company as herein before defined and any successor to its business and/or assets as aforesaid which executes and delivers the agreement provided for in this Section 13 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

14.    <u>Notice</u>.  For the purposes of this Agreement, notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive, at the Executive's most recent address shown in the records of the Company; and

If to the Company:

Delphi Corporation
5725 Delphi Drive
Troy Michigan 48098
Attention: General Counsel

8

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

15.    <u>Miscellaneous</u>.  No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the Executive and such officer of the Company as may be specifically designated by its Board.  No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.  No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement.  This Agreement is not intended and shall not be construed to confer any rights or remedies upon any other person or entity, other than the parties hereto.

16.    <u>No Duplication of Benefits</u>.  Nothing in this Agreement shall be construed in a manner that would result in a duplication of benefits to the Executive.

17.    <u>Taxes</u>.

(a)    Any amounts payable pursuant to this Agreement shall be subject to applicable withholdings.

(b)    Notwithstanding anything in this Agreement to the contrary, to the extent required by Section 409A, payment of the amounts payable under this Agreement shall commence no earlier than the earlier of (i) the first day of the first month commencing at least six (6) months following the Executive's separation from service with the Corporation (within the meaning of Code Section 409A) or (ii) the Executive's date of death.  During the six month waiting period, such amounts payable will accumulate without interest and be paid as soon as possible.

18.    <u>Validity; Severability</u>.  In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby.  Moreover, without limiting the generality of the foregoing, if any one or more of the provisions contained in this agreement shall be held to be unreasonable or unenforceable in any respect, including excessively broad as to duration, scope, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.

19.    <u>Governing Law; Consent to Jurisdiction</u>.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Michigan, without regard to its conflicts of law principles.  The parties hereby irrevocably consent and submit to the jurisdiction of the federal and state courts located within the state of Michigan in any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

20.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

21.    <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes all prior agreements, promises, understandings, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto; and any prior agreement of the parties hereto in respect of the subject matter contained herein is hereby terminated and cancelled [including but not limited to the Employment Agreement entered into between the Company and the Executive dated as of [    ]]; <u>provided</u>, <u>however</u>, that this Agreement shall not supersede the Change in Control Agreement entered into with the Company on [    ], 2007; and <u>provided</u> <u>further</u> that if the Executive becomes entitled to payments and benefits under the Change in Control Agreement as a result of his termination of employment, he shall not be entitled to receive any payments or benefits under Section 9(b) of this Agreement.  Except as noted above, the compensation and benefits payable to the Executive under Section 9 of this Agreement shall be in lieu of any other severance benefits to which the Executive may

otherwise be entitled upon the Executive's termination of employment under any severance plan, program, policy or arrangement of the Company or any of its subsidiaries or affiliates.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date below.

Delphi Corporation

By: _____

    Name:

    Title:

Date:_____

_____

Exhibit 7

Exhibit 7.8


Supplement To Management Compensation Plan


All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (as subsequently modified or amended, the "Plan"), including, without limitation, Article 14.3, under which the Debtors have reserved the right to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.

## Supplement To Management Compensation Plan

On December 28, 2007, the compensation committee of the Debtors' board of directors formally ratified the Management Compensation Plan, which is described on pp. DS-92 through DS-107 of the Disclosure Statement, at Section 7.8 of the Plan, in the materials previously appended as Exhibit 7.8 to the Plan, and in this exhibit supplement. During its deliberations, the compensation committee determined that the Management Compensation Plan constituted competitive market terms based on the advice of the committee's independent outside compensation advisor, Watson Wyatt Worldwide, Inc. Accordingly, the compensation committee also adopted Watson Wyatt's final report dated December 28, 2007 captioned *Executive Compensation Program Design – Revised After Consultation With Plan Investors And Statutory Committees.*

In connection with its ratification and approval of the Management Compensation Plan, the compensation committee also considered several other matters including (a) two discrete items in the Management Compensation Plan that Watson Wyatt was unable to benchmark as market competitive, (b) proposed forms of executive employment agreement and change in control agreement for the Debtors' chief executive officer as agreed to between Appaloosa and the Debtors' chief executive officer, and (c) the reasonable and appropriate amounts of cash emergence performance payments for the Debtors' executive chairman of the board and chief executive officer based on rationale developed by the compensation committee and also based on competitive benchmarking data reported by Watson Wyatt in its final report dated December 28, 2007 captioned *Emergence Cash Performance Payments for Executive COB and CEO.*

With respect to the two discrete items in the Management Compensation Plan that Watson Wyatt was unable to benchmark as market competitive involving the aggregate long-term incentive opportunity for executives in Bands A through F and the potential reinstatement of the Supplemental Life Benefits Program Coverage for executive retirees of the Debtors, the compensation committee determined to modify the Management Compensation Plan to reduce the aggregate long-term incentive opportunity awarded on the Effective Date for the eighteen month period subsequent to the Effective Date for executives in Bands A through F by $24 million. The compensation committee also reaffirmed that the Supplemental Life Benefits Program coverage will be provided only to the Debtors' active executives. Upon an active executive's retirement, the supplemental life benefit coverage will cease on the date immediately preceding retirement and the executive will be given a one-time opportunity to elect an amount of optional life insurance to replace all or a portion of part I of the supplemental life benefit coverage that ceases. Proof of good health will be required.

With respect to the proposed forms of executive employment agreement and change in control agreement for the Debtors' chief executive officer as agreed to between Appaloosa and the Debtors' chief executive officer, the compensation committee adopted and approved such agreements in the forms set forth in Schedule 1 and Schedule 2 to this exhibit supplement.

With respect to the reasonable and appropriate amount of cash emergence performance payments for the Debtors' executive chairman of the board and chief executive officer based on rationale developed by the compensation committee and also based on competitive

1

benchmarking data reported by Watson Wyatt in its final report dated December 28, 2007 captioned *Emergence Cash Performance Payments for Executive COB and CEO*, the compensation committee determined that the amount provided for in the employment agreement for the chief executive officer in Schedule 1 to this exhibit supplement (i.e., $5.3 million) was reasonable and that the reasonable amount of the performance payment to be made to the executive chairman of the board is $8.3 million. In addition to competitive benchmarking information provided by Watson Wyatt, the compensation committee considered various additional rationale including, but not limited to, the length and complexity of the restructuring, the leadership of the two executives in working together and on behalf of the Delphi and its stakeholders throughout the restructuring, Delphi's operational performance since 2005 including the successful management of customer and supplier relationships and the above-plan booking of forward business over the duration of the company's five year business plan, the successful formulation and implementation of the company's five-part transformation plan, the level of recoveries anticipated for creditors and shareholders under the Plan, and the waiver of approximately $7.3 million in aggregate compensation by the two executives during the pendency of the Chapter 11 Cases.

As a result of these determinations, the aggregate long-term incentive opportunity, on an annualized basis, for all DSB Members and executives in Bands A through F is estimated to be approximately $68 million (rather than approximately $80 million as previously disclosed on DS-99 of the Disclosure Statement), and the aggregate Chapter 11 Effective Date Executive Payments are estimated to be approximately $37 million on an annualized basis for the duration of the Chapter 11 Cases (or approximately $87 million in the aggregate) (rather than $34 and $78 million, respectively, as previously disclosed on DS-99 of the Disclosure Statement).

2

```
1                        UNITED STATES BANKRUPTCY COURT
                          SOUTHERN DISTRICT OF NEW YORK
2
                                       .  Chapter 11
3                                      .
                                       .  Case No. 05-44481 (RDD)
4    IN RE:                            .
                                       .  (Jointly Administered)
5    DELPHI CORPORATION, et al,        .
                                       .  New York, New York
6                                      .  Thursday, September 27, 2007
                                       .  10:25 a.m.
7                  Debtors.            .
     . . . . . . . . . . . . . . . . .
8
            TRANSCRIPT OF TWENTY-SECOND OMNIBUS HEARING
9             BEFORE THE HONORABLE ROBERT D. DRAIN
                  UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:          John Wm. Butler, Jr., Esq.
12                             Albert L. Hogan, III, Esq.
                               John K. Lyons, Esq.
13                             SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
14                             333 West Wacker Drive, Suite 2100
                               Chicago, Illinois 60606
15
                               Kayalyn A. Marafioti, Esq.
16                             SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
17                             Four Times Square
                               New York, New York 10036
18
     (Appearances continued.)
19
     Audio Operator:           Electronically Recorded
20                             by Kendra Harris, ECRO

21   Transcription Company:    Rand Reporting & Transcription, LLC
                               80 Broad Street, Fifth Floor
22                             New York, New York 10004
                               (212) 504-2919
23                             www.randreporting.com

24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

1  Mr. Bubnovich has testified, an integrated and market comped,

2  approach to compensation here, and that this is reasonable and

3  ordinary-course compensation.

4        I understand in the context of a Chapter 11 why we're

5  here in this.  But, you know, this isn't -- is an ordinary part

6  of how one compensates its salaried workforce.  And I would

7  simply say, Your Honor, we ask you to approve the program based

8  on the evidentiary record before the Court.

9        MR. DECHIARA:  Your Honor, if I may just say one thing

10  to respond to the suggestion that the UAW is doing -- is

11  opposing this motion for media purposes, or that our

12  presentation was intended as sound bytes --

13        THE COURT:  No, I don't think that's what Mr. Butler

14  was saying.  I think it is true that the media sometimes picks

15  up sound bites that are inaccurate, but I don't think that's

16  your goal.

17        MR. DECHIARA:  No, Your Honor.  Let me just point out

18  that at Paragraph 27 of the debtors' October 13th, 2005 motion

19  for the original KECP program, they refer to the AIP pay as,

20  quote, "bonuses."

21        And also in the Dana case at 358 B.R. at Page 583,

22  this Court referred to AIP, quote, "bonuses."

23        That's all.

24        THE COURT:  That's because it's not -- well, I think

25  that's because it's not salary.  I mean, again, if you're to be

1  paid salary, you have rights to it.  They can be adjusted under

2  difficult circumstances, but you have rights to it.  Bonuses,

3  their legal regime, I think, is a little different.

4        All right.  I have before me the debtors' motion for

5  approval of the continuation of its short-term at-risk

6  performance payment program, or "AIP," for the second half of

7  2007.

8        I should spend a moment on the standard by which I'm

9  considering the motion.  As I determined when first asked to

10  consider this type of relief in February of 2006, I determined

11  that it was a request to take an action out of the ordinary

12  course under Section 363(b) of the Bankruptcy Code; and under

13  the circumstances of this case, I continue to believe that.

14  But I also noted in February 2006, and I continue to believe,

15  two related things:

16        First, generally speaking, bankruptcy courts are

17  loathe to become involved in the compensation decisions made by

18  debtors-in-possession, particularly when those compensation

19  decisions do not apply to senior executives of the corporation

20  or involve allocations of reorganization value; i.e., stock and

21  stock options and the like, but more typical compensation

22  elements.

23        Second, where an element of compensation has been

24  followed and applied consistently over the course of a debtor's

25  existence, both pre- and post-bankruptcy, I believe it requires

1  less scrutiny and is more ordinary course.  And indeed, in the

2  Nelson Nutraceutical case that I mentioned earlier, which

3  appears at 369 B.R. 787 (Bankr. D. Del. 2007), Judge Sontchi

4  held, when asked to look at a program like this in insolation,

5  not as part of a larger compensation program that included

6  long-term compensation, like a stock option plan or bonus-on-

7  emergence type of payments, that a program that has been

8  consistently followed pursuant to the same types of criteria

9  over a lengthy period, both pre- and post-bankruptcy, was

10  indeed in the ordinary course of business under Section 363(c).

11  He, I think correctly, noted that in Judge Lifland's

12  decision in In Re Dana Corporation, 358 B.R. 567 (Bankr.

13  S.D.N.Y. 2006), Judge Lifland was of the same mind and only

14  reviewed this type of AIP program as being out of the ordinary

15  course in the context of his review of the entire package of

16  compensation that was being proposed by Dana, including

17  emergence or reorganization bonuses and the like.

18  Why, in light of those two cases, do I apply the

19  363(b) standard here?  I do it for two reasons:

20  The first is of less significance now -- in fact, of

21  far less significance than when I originally considered a

22  motion like this in February 2006.  That is that the base, or

23  the target number upon which the AIP is to be earned, is a

24  calculation that should be very carefully tied to the

25  fundamental calculations in any bankruptcy case, which are:

1    what is the business plan?  what are the cash flows?  what are

2    the reasonable targets for the business?

3          Certainly early in a bankruptcy case, if there's a

4    dispute as to those targets, and particularly where there are a

5    lot of contingencies, such as, in the case here, the ultimate

6    resolution of the many issues that the debtors had with GM and

7    the many issues they had with their unions, I think it's

8    important for parties-in-interest to have input on, or at least

9    an ability to review and object if they believe that the debtor

10   has not properly set, those targets.  As I said, I have less

11   concern about that point now that the case is much farther

12   along and contingencies are much narrowed.

13         And I believe further that, in the context of this

14   case, where there are two very active committees, as well as a

15   very focused plan sponsor, and six well represented unions that

16   have gone through the process of painfully renegotiating their

17   collective bargaining agreements, the fundamental economic

18   premises by which the debtor is forecasting its future have

19   been extremely, thoroughly vetted and tested by the parties;

20   and, therefore, that they are reliable.

21         The second reason that I believe in this context

22   363(b) should apply is the fact that, even more than in most

23   cases, in this case what is to be paid to executives has

24   ramifications potentially to the business beyond simply the

25   cost of those payments.  That is because the -- or a key

1   element of this case has been the renegotiation of the

2   collective bargaining agreements with the debtors' six unions.

3   And given that context, it's very important to have a clear

4   record, I believe, as to the bona fides or lack thereof of

5   proposed payments to executives, so that, if other constituents

6   in the case, and most particularly union workers, have concerns

7   or doubts or complaints about the relative treatment of

8   executives, those can be aired and considered in the light of

9   day, subject to submission of evidence and with as much

10  transparency as the bankruptcy court can give, so that the

11  support for those payments is there to see if a union worker or

12  executive wants to take the time to see whether there's support

13  available.  And that goes for the media, as well, to the extent

14  the media pays attention to these sorts of things.

15        So I've continued to apply Section 363(b) here.  And

16  as the parties, I think, all agree, in applying that section I

17  need to consider, first, in particular, given that this is a

18  request to use estate resources for executives, whether there

19  has been any unfairness in terms of the proposal's involving

20  insiders, or, to the contrary, whether the proposal has been

21  developed in a fair way, preferably by objective third parties

22  and with vetting by objective third parties.

23        Based upon the declaration of -- if I can find the

24  exhibit number -- Mr. Naylor, which appears at Exhibit No. 9, I

25  believe that, internally, the debtors had an appropriately

1    objective process, led by the independent board members

2    comprising the compensation committee and informed by third-

3    party professionals to develop the proposal that they made,

4    first to the creditors' committee, and then ultimately to the

5    Court.

6         Moreover, the creditors' committee has separately

7    continued to very closely and actively consider the at-risk

8    incentive program, both as a business matter with its

9    subcommittee of committee members, as well as through its

10   professionals, including its compensation consultant.

11        As I noted earlier, the creditors' committee is a

12   fiduciary for all the unsecured creditors.  It is very much not

13   a fiduciary for management in their ongoing compensation.  It's

14   not in the business of allocating resources outside of its own

15   constituency, and only would tend to do so if it saw a benefit

16   to the unsecured creditors as a whole.  So it seems to me to be

17   indisputable that there has been a fair and objective process

18   in making this proposal by third parties and not by the

19   executives themselves, on whose behalf the proposal is aimed.

20        Having made that determination, I need to determine

21   whether the debtor has appropriately used its business judgment

22   in making the proposal, and ultimately whether the proposal is

23   supported by good business reasons.

24        The general rationale for this aspect of a

25   compensation program for the salaried executive workforce of

1   the debtors is established by the record here.  The purpose of

2   this aspect of executive compensation is, again, a short-term

3   annual (but a decreed in this bankruptcy case semiannual)

4   incentive program, tied to reasonable forecasts of the short-

5   term performance of the business.

6          Historically, it comprises roughly fifteen or sixteen

7   percent of the executives' compensation.  If one looks at hard

8   salary and annual incentive, it's about forty percent.  The

9   aggregate amount of those two components is roughly fifty-three

10   percent of the executives' compensation.

11          The process of formulating the targets to trigger the

12   bonuses here, the short-term bonus payments, is one that I

13   believe is consistent with the debtors' prior practice,

14   although it is in fact, I believe, more rigorous.  This is, I

15   believe, attributable not only to the sensitivity to this topic

16   that I believe the debtor feels, but also the pragmatic self-

17   interest of the creditors' committee.

18          The process has been one, I find, that has been based

19   upon the debtors' underlying business plans for all purposes in

20   the case, as adjusted to set a higher target in consultation

21   with the creditors' committee, and to give the committee

22   further flexibility, up to $200 million, in case the committee

23   reasonably determines that, notwithstanding all of the

24   attention that the projection process has received in this

25   case, that the targets should be further adjusted in light of

1  actual performance, which the committee has done for the last

2  half of the year by increasing the targets by roughly $36

3  million in the aggregate.

4         So simply as a matter of reasonable business judgment

5  and setting reasonable targets, I conclude that this motion and

6  this aspect of compensation meets that test.

7         I also accept Mr. Bubnovich's declaration that this

8  type of annual incentive program, this short-term program, is

9  consistent with industry practice, and that, if it were not

10  approved, would lead to a lack of -- or an inability by Delphi

11  to remain competitive in the industry.

12         As I said at oral argument, I distinguish this program

13  from longer-term incentive programs.  I do not believe these

14  short-term programs are extraordinary bonus programs, but

15  rather that they are more in line with general ideas of

16  compensation and that the executives reasonably anticipate that

17  if they meet their targets, and if their performance is

18  satisfactory or above satisfactory, they will receive this

19  element of their compensation, as they have and their

20  colleagues have since Delphi's inception.

21         They do, however, face a risk that, if they do not

22  perform up to satisfactory standards, or if the debtors'

23  performance or their division's performance, at the divisional

24  level, fall below these reasonably satisfactory standards, that

25  they will not receive this compensation.  That's an important

1   tool, or those two things are important tools for Delphi and

2   for its various constituents.

3        I believe that the evidence and the hearing has also

4   clarified that the executives under this short-term, semiannual

5   incentive are not pocketing or expropriating the concessions

6   that the union workers have made.  The benefit of those

7   concessions will go not to the executives, but to the debtors,

8   to Delphi, to be distributed as is appropriate to Delphi's

9   constituents, which include the creditors, the shareholders,

10  the beneficiaries of the benefit plans and pension plans; and,

11  in terms of a stronger Delphi, the customers and the employees.

12       Indeed, as a result of the concessions made by the

13  union workers, the targets for the executives appear to me to

14  be harder to meet, rather than easier, in that they have

15  increased, and, further, that the committee has reserved the

16  right to adjust them further by up to $200 million in light of

17  actual results.

18       That leaves, I believe, the last objection made by the

19  unions, which I've considered very carefully, and which I'll

20  try to state as follows, although I think they've stated it

21  more clearly and more eloquently.

22       I view this semiannual, short-term incentive program,

23  as I indicated at the start of the hearing, as being very close

24  to ordinary course, particularly after the vetting process by

25  the committee and my own analysis, which indicates that the

1   targets are consistent with past practice and are reasonable.

2            Ms. Mehlsack said that, in essence, ordinary

3   expectations should not be given undue deference in this case

4   because her clients and the other unions' expectations have not

5   been fulfilled in the case, and that, therefore, there should

6   be additional sacrifice beyond what is reasonably ordinarily

7   expected by the executives.

8            That's a cogent argument.  I believe, however, that it

9   is not best made or not properly made in the context of this

10  particular proposal.  I say so for two reasons:

11           One is that, again, I accept that this proposal is a

12  critical element of keeping Delphi competitive in the area of

13  compensation in the industry.  And I believe, given the near

14  ordinary course nature of this element of compensation, and

15  frankly the fact that hundreds of people have been working

16  under the reasonable assumption that they would receive it,

17  that denying the motion would hurt Delphi and be fundamentally

18  unfair to those who have so worked.  I think that harm,

19  particularly in the light of this hearing's record, more than

20  offsets the inevitable anger that will be expressed by the

21  unions and the union workers.

22           Secondly, I believe that the real focus of the

23  argument is more properly made in considering the way that the

24  debtor goes about proposing the fourth element, the fourth

25  traditional element, of executive compensation:  long-term

1   incentives, which is not before me today.  Traditionally, that

2   is where more of the value of the debtor goes to executives,

3   and where more of the value of the concessions made by the

4   unions might go to executives.

5          And I would hope that the debtor and the committees

6   will keep that in mind when they consider emergence

7   compensation or rewards or longer-term incentives.  It seems to

8   me that that's where counsel's argument may have some real

9   force.  I'm not saying that the debtors will propose anything

10  that is necessarily going to be objectionable in that area, but

11  it seems to me that it needs to be very closely tied and

12  supportable by -- or tied to and supportable by -- evidence

13  that that type of program really is necessary to retain the

14  best executives you can to do the very difficult job that they

15  will be doing over the next several years.  And my hope is that

16  you'll agree upon a process on how to do that, as opposed to

17  something more fixed in stone.

18         But again, I do not view this particular proposal

19  before me as any sort of expropriation or as anything

20  particularly unfair, but rather something that traditionally

21  would be viewed as in the ordinary course and that has been

22  tested objectively by the debtors' own third-party processes,

23  by the committee and its advisors, and ultimately, on the

24  evidence, by me.

25         So, Mr. Butler, I guess you said you were going to

1    have a revised order that actually attaches your UG

2    calculation?

3              MR. BUTLER:  Yeah.  There's just a change in the

4    exhibit.  Your Honor, that was actually in the revised order,

5    but the wrong chart was attached.

6              THE COURT:  Exhibit.  Okay.

7              MR. BUTLER:  We just need to insert the correct

8    charts.

9              THE COURT:  So if you could submit that, that will get

10   entered.

11             MR. BUTLER:  We will, Your Honor.

12             THE COURT:  Okay.

13             MR. BUTLER:  Thank you, Your Honor.

14             Your Honor, that concludes the matters scheduled for

15   today's omnibus hearing.

16             THE COURT:  Okay.  Thank you.

17        (Proceedings concluded at 1:45 p.m.)

18                              *****

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter to the best of my knowledge and ability,

5   except where, as indicated, the Court has modified its bench

6   ruling.

7

8   _____     September 28, 2007

9   Coleen Rand, AAERT Cert. No. 341         (Draft)
    Certified Court Transcriptionist         October 3, 2007
10  Rand Reporting & Transcription, LLC      (Final)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 9

## SUMMARY OF
## EMERGENCE COMPENSATION PROGRAMS
## FOR DELTA AIR LINES, INC.

### I.    Overview

Throughout its bankruptcy, Delta has approached compensation differently than most other companies in Chapter 11, including other airlines. Difficult sacrifices and superior performance have been required from and delivered by all employees to address Delta's problems and position the Company to emerge from bankruptcy as a strong, healthy competitor and industry leader.

As part of its planning to emerge from bankruptcy, Delta and the Personnel & Compensation Committee of Delta's Board of Directors (the "P&C Committee") developed a comprehensive compensation program for Company employees around the world ("Compensation Program"). The P&C Committee, which consists entirely of independent directors, worked with its nationally recognized outside compensation specialists and with management to create the Compensation Program. Delta also consulted extensively with the Official Committee of Unsecured Creditors (the "Creditors' Committee") and their advisors, who have approved the Compensation Program. The Compensation Program is designed to meet the following objectives:

- Share with all employees the success that their hard work and sacrifice have created

- Begin the process of moving pay rates for all employees to industry standard levels and provide plans for employees to share in the Company's future success

- Incentivize talented employees to remain with the Company and to continue to produce superior results for Delta's stakeholders

- Align the interests of all 45,000 Delta employees with the Company's other stakeholders in achieving the Company's business plan and maximizing value

The Compensation Program consists of the Broad-Based Employee Compensation Program, the Management Compensation Program and the Board of Directors Compensation Program, which are described in Sections II-IV below.

The equity awards under the Compensation Program will be made pursuant to Delta's 2007 Performance Compensation Plan, a summary of which is filed as Exhibit 1.

## II.    The Broad-Based Employee Compensation Program

### A.    Background

Delta's employees are critical to the Company's future success. As Delta founder C. E. Woolman once said, "All airlines are the same. Only the people make them different." This acknowledgment of the significant role of Delta people is as true today as it was when Delta began passenger service in 1929.

Delta's pilots and flight dispatchers, who are covered by collective bargaining agreements, have fully participated in the pay cuts, benefit reductions and work rule changes that were essential to Delta's survival, recovery and planned emergence from bankruptcy as a strong, healthy competitor. Delta pilots and flight dispatchers will receive under those agreements the rewards from Delta's success that their sacrifices and contributions are making possible.

Delta's non-contract employees[1] have also fully participated in the painful sacrifices that were essential to Delta's survival, recovery and planned emergence from bankruptcy as a strong, healthy competitor. Over the last several years, the actions necessary to save the Company have resulted in the compensation and benefits of virtually all Delta employees being below industry standards. Despite these challenges, Delta's employees have provided superior performance during bankruptcy. For example, key customer service, operational and financial measures have improved dramatically.

- Safety remains Delta's highest priority. The Company was named the 2006 Occupational Industry Leader by the National Safety Council, the first airline to receive this recognition.

- Delta was ranked in the top two of all network carriers in overall customer service by J. D. Power and Associates in 2006.

- Delta began 124 new nonstop routes and added 41 destinations to its network in 2006, with 35 additional nonstop routes and 19 new destinations announced for 2007.

- Delta reported operating income of $58 million in 2006, a $2.1 billion improvement over 2005 and the Company's first annual operating profit since 2000.

In recognition of these achievements and sacrifices, to encourage continued excellence in performance, and to begin the process of moving Delta's non-contract employee compensation to industry standard levels, Delta is

---

[1] "Non-contract employees" means Delta employees who are not covered by a domestic collective bargaining agreement or by the Management Compensation Program.

implementing its Broad-Based Employee Compensation Program, commencing upon its emergence from Chapter 11.

### B.    Elements of the Broad-Based Employee Compensation Program

Delta's Broad-Based Employee Compensation Program will provide Delta's non-contract employees with substantial value shortly after Delta's planned emergence, which includes significant stock ownership and a cash lump sum payment.  The program also provides the potential for substantial future compensation under the profit sharing plan and the Shared Rewards program.  In addition, employees will receive an increase in base pay and new retirement benefits, as described below.[2]

**Stock Ownership:**  Within days of Delta's emergence from Chapter 11, the Company's approximately 39,000 non-contract employees will receive a total of 14 million shares of Delta common stock.  This award will represent 3.5% of the outstanding common stock and have an initial value of $350 million, assuming Delta has a $10 billion valuation at emergence.  Employees may, at their option, hold or sell these shares without restrictions.  We believe it is unprecedented for a company exiting Chapter 11 to issue a significant amount of stock to a broad-based group of employees in this fashion.

**Cash Lump Sum Payment:**  Shortly after emergence, non-contract employees will receive a cash lump sum payment representing 8% of their 2006 earnings.  We estimate these payments will have an aggregate value of approximately $130 million.

**Profit Sharing Plan:**  Delta's profit sharing plan provides that, for each year in which the Company has an annual pre-tax profit (as defined in the profit sharing plan), Delta will pay at least 15% of that profit to employees.  If the annual pre-tax profit is greater than $1.5 billion, Delta will pay 20% of the amount that exceeds $1.5 billion.  Unlike the profit sharing plans adopted by many other companies, Delta's plan pays out at the first dollar of profit instead of only after a specific profit target is met.  If Delta achieves its 2007 business plan financial goals, participants could receive a payment of between 5% and 6% of their 2007 earnings under this plan in early 2008.

**Shared Rewards Program:**  Delta's Shared Rewards program provides employees monthly incentives up to $100 for achieving operational goals relating to on-time performance, completion rate, and – new upon emergence – baggage

---

[2] For employees who are based outside the United States, the terms of the Broad-Based Employee Compensation Program will vary to be consistent with local practices.  All payments made to employees will be subject to withholding for income and FICA taxes.

handling performance. Last year, Delta paid about $32 million in Shared Rewards. We intend to continue to improve our operational performance in 2007. If Delta meets it 2007 business plan goals in these areas, each eligible employee could receive Shared Rewards payments of $700 for the year.

**Base Pay Increases:** Delta is committed to providing employees with an industry standard pay structure. While this will not happen at once, this summer, the Company will take the first step in this process by implementing a 4% top of scale increase in base pay for non-contract frontline employees. Increases will vary between the start rate and top of scale. With variable pay components such as profit sharing and Shared Rewards, we will be able to reach top tier pay levels with top tier performance.

**Retirement:** A new defined contribution benefit will provide ground employees and flight attendants the opportunity to receive up to 7% of their pay in contributions from Delta to their 401(k) account. 2% will be provided automatically to all employees and up to 5% more can be added as a dollar for dollar match when the employees contribute their own pay to their 401(k) account. This retirement benefit is in addition to benefits that have already been earned under the frozen defined benefit pension plan covering ground employees and flight attendants. Delta and its employees worked together to preserve this pension plan. Delta made a voluntary $50 million contribution to this plan on March 15, 2007, and expects its future contributions will average about $100 million per year for the next several years.

While each employee's individual circumstances will differ, for a top-of-scale employee whose 2006 earnings were, for example, $40,000, this could mean up to 50% more – or $20,000 – in pre-tax compensation over the next 12 to 14 months.

- A 4% pay increase would equal an increase of $1,600 per year

- Emergence stock award could have a value of approximately $9,500 (assumes a $10 billion valuation of Delta at emergence)

- The cash lump sum of 8% of 2006 earnings would equal a $3,200 payment upon emergence.

- Achieving 21 of the 36 possible operational metrics would bring $700 in Shared Rewards

- Delta's defined contribution plan payment could equal approximately $2,900 on the new base pay level (assuming the employee contributes at least 5% of his or her earnings to the plan)

- Achieving our financial plan would pay approximately $2,300 in profit sharing in 2008

4

Delta's pilots and flight dispatchers will participate in the profit sharing plan and
the Shared Rewards program.

## III.    The Management Compensation Program

The Management Compensation Program is intended to more closely link
pay to performance and align compensation with the long-term interests of
Delta's shareholders, to retain the best people we have, to attract new talent to the
Company when we need it and to establish transparent, well-defined performance
metrics for our leaders so we can continue to provide value to our shareholders,
our customers and our employees.  The P&C Committee worked with its
nationally recognized outside compensation specialists to design a program to
achieve these objectives, while ensuring there is strong alignment between
management and all other Delta employees on the factors that drive variable pay
opportunities and create shareholder value.  This philosophy is evidenced by the
terms of the Management Compensation Program, which has been approved by
the Creditors' Committee.

The Management Compensation Program will become effective upon
Delta's emergence from Chapter 11.  It consists of Management Equity Awards,
the 2007 Management Incentive Plan and the Officer and Director Severance
Plan, each of which is described below.

A substantial portion of the compensation being provided to management
will be at-risk and tied directly to Delta's and individual performance.  Unlike
non-contract employees, no officer or director-level employee[3] will receive any
unrestricted stock or cash lump sum payment under the Management
Compensation Program when Delta emerges from bankruptcy.  Moreover, Delta's
officers and directors will not receive across-the-board pay increases until non-
contract employees have reached industry standard pay.

A.    What Delta Has Done Differently

Delta management has fully shared in the sacrifices necessary to address
Delta's problems and position the Company to emerge from bankruptcy as a
strong, healthy competitor and industry leader.  Among other things:

- Officer salaries were reduced by 10% on January 1, 2005, and by an
  additional 15% (25% for Delta CEO Gerald Grinstein) on November 1,
  2005.  No officer has a salary greater than $382,500 per year.

- Officers have not received any annual incentive payments since 2003, or
  long-term incentive payments since 2004.

---

[3] The "director" title refers to the level of management immediately below the vice
president level, not to members of Delta's Board of Directors.

- Delta's outstanding stock options were cancelled in 2006.

Unlike many companies in Chapter 11, including Northwest Airlines Corporation and UAL Corporation, Delta in Chapter 11:

- Did not seek to implement a Key Employee Retention Program ("KERP")
- Did not seek employment contracts for executives
- Made no management incentive payments

The result is that Delta management compensation is, by any measure, far below industry standard levels and has been for some time.

As Judge Adlai S. Hardin, Jr. concluded during the hearing on Delta's proposal to implement a modest severance program on February 22, 2006, Delta's senior management has repeatedly made substantial sacrifices, both prior to and during the Company's Chapter 11 case, and is the lowest paid of the airlines with which Delta competes:

- "[T]he sacrifices have . . . applied throughout the company. Certainly from the highest levels, the CEO and the COO, in terms of the diminution of their compensation . . . these are people who are out there in the marketplace and can get other jobs. Their compensation has been greatly diminished, so also the compensation of the officer and director levels."
- "[T]here's also no question that the officer and director . . . component of Delta's employee constituencies have themselves made enormous sacrifices."
- "It's not contested that this group of employees is, by far, the lowest compensated of any of the similar airlines with which Delta competes."

The disparity between Delta's management compensation and average compensation for management in the airline and other industries is not sustainable. Among other things, (i) members of Delta's management team are being heavily recruited by companies both within and outside the airline industry, (ii) there has been substantial attrition of Delta executives during Chapter 11, and (iii) Delta's current ratio of officers and directors to total employees is the lowest among its peer airlines. Thus, a competitive post-emergence management compensation plan is essential for Delta to retain its proven and experienced management team and deliver superior value to stakeholders.

B.    Key Terms of the Management Equity Awards

The Management Equity Awards are designed to retain Delta's management team and to align their variable compensation opportunities with the creation of shareholder value and the variable compensation opportunities provided to all other Delta people. Accordingly, the same factors that determine

6

the value of the Management Equity Awards also determine the value of the common stock to be granted to non-contract employees. Moreover, a meaningful portion of the Management Equity Awards is conditioned on the occurrence of payments under the broad-based employee Profit Sharing Plan ("Profit Sharing Plan").

In connection with Delta's emergence from bankruptcy, Delta officers will receive restricted stock, stock options and performance shares. For officers, the Management Equity Awards will be provided 55% in restricted stock, 25% in stock options and 20% in performance shares. Directors will receive restricted stock and stock options, and management personnel below the director level who are covered by the Management Compensation Program will receive restricted stock. All of these equity grants are at-risk because their value is tied to and contingent on Delta's future performance. Management employees can realize value from these equity grants by continuing their employment with Delta and contributing to Delta's achieving its financial and other goals.

A summary of the Management Equity Awards follows. For additional information regarding the terms of these awards, please see the 2007 Performance Compensation Plan, including Appendix A thereto, which is filed as Exhibit 2.

- Restricted stock is common stock that may not be sold for a period of time ("Restriction") and that is subject to forfeiture in certain circumstances until the Restriction lapses. The Restriction will lapse (which means that the shares may then be sold) in three equal installments 6 months, 18 months and 30 months after Delta emerges from bankruptcy ("Emergence Date"), subject to continued employment.[4]

- A stock option is the right to purchase Delta common stock at a certain price per share ("Exercise Price") during a designated period. These options (i) will have an Exercise Price equal to the closing price of Delta common stock on the date the stock options are granted, (ii) become exercisable in three equal installments on the first, second and third anniversaries of the Emergence Date, subject to continued employment, and (iii) expire on the tenth anniversary of the Emergence Date.

- Performance shares are a long-term incentive opportunity payable in Delta common stock. The potential payout from these shares is contingent on (i) Delta's achieving certain financial goals (i.e., specified EBITDAR levels) in its business plan for the years ending December 31, 2007, 2008 and 2009 and (ii) the occurrence of a contemporaneous payout under the Profit Sharing Plan.

---

[4] The third installment of restricted stock can instead vest 18 months after the Emergence Date if, during the period beginning 6 months after the Emergence Date and ending 18 months after the Emergence Date, the aggregate market value of Delta's common stock is at least $14 billion for 10 consecutive trading days.

The Management Equity Awards will be granted to approximately 1,200 employees (officers, directors, and managers below the director level) and represent in the aggregate approximately 2.4% of Delta's value upon emergence from Chapter 11, or approximately $240 million, assuming a $10 billion valuation[5]. These awards are significantly lower than the management equity awards in other major bankruptcies in general, and in other major airline bankruptcies in particular.

For example, when it exited bankruptcy, UAL Corporation's equity emergence grants (i) to its five highest paid officers represented about 2% of UAL's value and (ii) to approximately 400 management employees represented about 8% of UAL's value. In contrast, Delta's top five officers are receiving 0.3% of Delta's value and the Company is covering approximately three times as many management employees with less than one-third of the equity. Moreover, in a study performed by the P&C Committee's outside compensation specialists, the median equity award to "management" (usually a much smaller group than Delta's 1,200 management employees) at companies emerging from bankruptcy in 2004 or later was 5.9% of the newly emerged company (more than double Delta's 2.4%) and the median percentage awarded to the top 5 officers was 3.2% (more than ten times Delta's 0.3%).

Delta CEO Gerald Grinstein has decided he will not participate in the Management Equity Awards, cash incentive or severance programs. Accordingly, Delta will not make any awards to Mr. Grinstein under these programs. Mr. Grinstein has requested that Delta instead consider using a portion of the value he might otherwise have received to help Delta people who experience hardship in their personal lives and to establish a scholarship fund for Delta people. At Mr. Grinstein's request, Delta, working with its employees, will establish two new charitable foundations that will fund hardship assistance programs and scholarships for Delta employees, retirees and their families.

C.    The 2007 Management Incentive Plan

The 2007 Management Incentive Plan ("MIP") is an annual cash incentive program. It closely links pay and performance by providing approximately 1,200 management employees with a compensation opportunity based on Delta's achieving key business plan goals in 2007. It also closely aligns the interests of Delta's management and other employees, since these goals are the same ones that drive payouts under the Profit Sharing Plan and Shared Rewards program.

---

[5] An additional 1.4% of the common stock of reorganized Delta will be reserved for long-term incentive plans, equity awards for the members of the Board of Directors of reorganized Delta, and equity awards for future hires that may be instituted in the future by the Board of Directors of reorganized Delta.

The P&C Committee established, and the Creditors' Committee approved, the performance measures and annual incentive opportunities for the MIP. For officers at or above the Senior Vice President level, incentive opportunities will be based 50% on the Company's financial performance and 50% on its operational performance. The financial goals are Delta's emergence from bankruptcy during 2007 and its pre-tax profit level for the year (pre-tax profit is the same measure used in the Profit Sharing Program). The operational objectives are the number of times in 2007 Delta meets the monthly targets in the Shared Rewards program as well as the on-time performance of Delta Connection carriers.

The target awards are two times base salary for Delta's COO and CFO, and one time base salary for its Executive Vice Presidents. Payouts under the 2007 MIP may range from zero to 50% higher than the target awards depending on the performance results achieved. Even if Delta meets some of its performance targets under the 2007 MIP, no payment will be made to any participant under those measures unless there is a payment for 2007 under the Profit Sharing Program.[6]

D.    Compensation Table

The table below shows for our Chief Executive Officer, our Chief Financial Officer, our Chief Operating Officer, and our next 2 most highly paid executive officers, their respective proposed salary level, target annual cash incentive award for 2007 under our MIP program, and stock options, restricted stock and performance awards (at the target level) to be granted in connection with emergence as part of the Management Equity Awards.

---

[6] For Vice Presidents and Directors, incentive opportunities will be based 1/3 on Delta's financial performance as discussed above, 1/3 on the operational objectives as discussed above and 1/3 on individual performance goals. For General Managers and Managers, incentive opportunities will be based entirely on individual performance goals. Just like with payments under the Shared Rewards program, payments for individual performance of participants below the Senior Vice President level are not conditioned on the occurrence of payments under the Profit Sharing Plan.

| Name | Title | Salary ($) | Target Cash Incentive ($) | Restricted Stock (Shares) | Options (Shares) | Performance Shares (Shares) |
|---|---|---|---|---|---|---|
| Gerald Grinstein | Chief Executive Officer | 337,500 | * | * | * | * |
| Edward Bastian | Chief Financial Officer | 382,500 | 765,000 | 184,800 | 142,900 | 67,200 |
| Jim Whitehurst | Chief Operating Officer | 382,500 | 765,000 | 184,800 | 142,900 | 67,200 |
| Joe Kolshak | Executive Vice President | 344,000 | 344,000 | 136,400 | 105,500 | 49,600 |
| Lee Macenczak | Executive Vice President | 344,000 | 344,000 | 136,400 | 105,500 | 49,600 |

\* Mr. Grinstein has voluntarily elected to not receive any cash incentive, restricted stock, options or performance share awards.

Assuming a $10 billion Delta valuation, the equity awards are estimated to have a "full grant date fair value" of $8.4 million each for Messrs. Bastian and Whitehurst, and $6.2 million each for Messrs. Kolshak and Macenczak. "Full grant date fair value" is the value that would be reported in a proxy filing for these awards. The actual value of these awards will depend on many factors, including the stock price at the time awards vest, whether or not performance goals are achieved and the possibility the awards may be forfeited. This total estimated value for Delta's top 5 officers (which will take three years to fully vest) is about one-third of what was received by the top 5 management employees of UAL upon its emergence from bankruptcy.

### E.    The 2007 Officer and Director Severance Plan

We have also updated our Officer and Director Severance Plan, which will provide severance benefits in the event that the employment of a covered officer or director is terminated by Delta for any reason other than for Cause (as defined in the plan) or, within the two year period after a Change in Control, the covered person resigns for Good Reason (as defined in the plan). Mr. Grinstein has voluntarily elected to not be covered by this Plan. A copy of this Plan is filed as Exhibit 3.

Under this Plan, the severance benefit is an amount equal to 6 to 12 months of annual base salary and target MIP. In the event of a covered termination after a Change in Control, it is an amount equal to two times annual base salary and target MIP for Executive Vice Presidents and above. In addition, the Plan provides for payments by the Company of certain post-employment medical and life insurance premiums, continuation of financial planning services and travel privileges, certain career transition services and, for a covered termination after a Change in Control, protection against the application of the Federal excise tax that relates to change in control payments.

In order to receive benefits under this Plan, a covered person must first sign an agreement that includes a release of claims in favor of Delta, and certain

10

non-competition, non-solicitation and non-recruitment agreements for the benefit of Delta.

      F.    <u>Other Benefits</u>

In addition to the compensation described above, Delta management will continue to participate in other benefit programs, including our medical, life insurance, disability, travel benefits program and 401(k) plans.

## IV.    <u>Board of Directors Compensation</u>

The Corporate Governance Committee of Delta's Board of Directors has worked with its outside compensation specialists and management, and with the Creditors' Committee, to develop a compensation program for the members of the Board of Directors of reorganized Delta. Members of our Board of Directors will receive a $40,000 annual cash retainer, payable quarterly, and an annual stock retainer of shares with a value of $40,000 payable once a year, with a one year vesting requirement except in cases of death, disability or a change in control. Board Members will also be entitled to certain travel privileges. Committee chairs will receive an additional $10,000 cash retainer, except for the chair of the Audit Committee, who will receive an additional $20,000. A non-executive Chairman of the Board will be paid an additional $125,000 annual cash retainer.

Exhibit 1

## Summary of 2007 Performance Compensation Plan Terms

The following summary describes the material terms of the 2007 Performance Compensation Plan (the "2007 Plan"), under which the Management Equity Awards, the equity awards under the Broad -Based Employee Compensation Program, and any equity awarded to members of Delta's Board of Directors will be made, and the 2007 Management Incentive Plan opportunities described above will be created.  This summary is not a complete description of all provisions of the 2007 Plan and is qualified in its entirety by reference to the actual 2007 Plan, which is filed as an exhibit hereto.

### A.   Authorized Shares

Subject to adjustment, up to 30,000,000 shares of our common stock will be available for awards to be granted under the 2007 Plan.  The Management Equity Awards and the Broad-Based stock grants to be made in connection with Delta's emergence from Chapter 11 will be made from this pool of shares.

No participant may receive under the 2007 Plan in any calendar year stock options and stock appreciation rights that relate to more than 2,000,000 shares of our common stock; restricted stock or restricted stock units that relate to more than 1,000,000 shares; or performance awards and other stock-based awards that relate to more than 1,500,000 shares.  In addition, the maximum amount that may be paid in cash to any participant in a calendar year for an annual cash incentive is $10 million and the maximum long-term cash incentive award is $10 million determined on an annualized basis.

Shares of common stock to be issued under the 2007 Plan may be made available from authorized but unissued common stock or common stock that we acquire.  If any shares of our common stock are covered by an award (other than a substitute award as defined below) that is cancelled, forfeited or otherwise terminates without the delivery of shares (including the number of shares surrendered or withheld in payment of any exercise or price of an award or taxes related to an award, other than shares underlying a stock appreciation right settled in stock to the extent the award is settled without the issuance of shares), then such shares will again be available for issuance under the 2007 Plan.

Shares of our common stock underlying substitute awards do not reduce the number of shares of our common stock available for delivery under the 2007 Plan.  A "substitute award" is any award granted in assumption of, or in substitution for, an outstanding award previously granted by a company acquired by us or with which we combine.

12

**B.    Administration**

The P&C Committee will administer the 2007 Plan and will have authority to select individuals to whom awards are granted, determine the types of awards and number of shares covered, and determine the terms and conditions of awards, including the applicable vesting schedule, the effect of termination of service and whether the award will be settled in cash, shares or a combination of the two.  The P&C Committee may delegate to one or more individuals or committees the authority to grant awards to participants who are not members of our board of directors or our executive officers.

**C.    Types of Awards**

The 2007 Plan provides for grants of incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock, restricted stock units, performance awards, including cash incentive awards, and other stock-based awards.

Stock Options.  The exercise price of an option (other than a substitute award) may not be less than the fair market value of a share of our common stock on the date of grant and each option will have a term to be determined by the Committee (not to exceed ten years).  Stock options will be exercisable at such time or times as determined by the P&C Committee.

Stock Appreciation Rights.  A stock appreciation right ("SAR") may be granted free-standing or in tandem with another award under the plan.  Upon exercise of a SAR, the holder of that SAR is entitled to receive the excess of the fair market value of the shares for which the right is exercised over the exercise price of the SAR.  The exercise price of a SAR (other than a substitute award) will not be less than the fair market value of a share of our common stock on the date of grant.

Restricted Stock/Restricted Stock Units.  Shares of restricted stock are shares of common stock subject to restrictions on transfer and a substantial risk of forfeiture.  A restricted stock unit consists of a contractual right denominated in shares of our common stock which represents the right to receive a share or the value of a share of common stock at a future date, subject to certain vesting and other restrictions.  Awards of restricted stock and restricted stock units will be subject to restrictions and such other terms and conditions as the P&C Committee may determine, which restrictions and such other terms and conditions may lapse separately or in combination at such time or times, in such installments or otherwise, as the P&C Committee may deem appropriate.

Performance Awards.  The 2007 Plan will provide that grants of performance awards, including cash-denominated awards, and (when determined

13

by the P&C Committee) options, restricted stock or other stock-based awards, may be made based upon, and subject to achieving, "performance objectives." Performance objectives with respect to those awards that are intended to qualify as "performance-based compensation" for purposes of Section 162(m) of the Internal Revenue Code are limited to specified levels of or improvements for us, our business units or affiliates of revenue per available seat mile; cost per available seat mile; total shareowner return; return on equity, assets, capital or investment; operating, pre-tax or net income levels expressed in either absolute dollars, earnings per share, or changes in the same; the market price of shares; economic or cash value added; capitalization; net or operating profit margin; revenues or revenue growth; expenses; cash flow; operating cash flow or liquidity; earnings before interest, taxes, depreciation, amortization and aircraft rent; results of employee or customer satisfaction surveys; and other measures of operational performance (including, without limitation, U.S. Department of Transportation performance ranking in operational areas), quality, safety, productivity or process improvement. Performance criteria may be measured on an absolute (e.g., plan or budget) or relative basis. Relative performance may be measured against a group of peer companies, a financial market index or other acceptable objectives and quantifiable indices. Except in the case of an award intended to qualify as "performance-based compensation" under Section 162(m) of the Internal Revenue Code, if the P&C Committee determines that a change in our business, operations, corporate structure or capital structure, or the manner in which we conduct our business, or other events or circumstances render the performance objectives unsuitable, the P&C Committee may modify the performance objectives or the related minimum acceptable level of achievement, in whole or in part, as the P&C Committee deems appropriate and equitable.

Other Awards.  The P&C Committee is authorized to grant other stock-based awards, either alone or in addition to other awards granted under the 2007 Plan. Other awards may be settled in shares, cash, awards granted under the plan or any other form of property as the P&C Committee determines.

### D.    Eligibility

Our employees, members of our board of directors, consultants and other advisors or service providers will be eligible to participate in the 2007 Plan.

## E.    Adjustments

The P&C Committee shall adjust the terms of any outstanding awards and the number of shares of common stock issuable under the 2007 Plan for any change in shares of our common stock resulting from a stock split, reverse stock split, stock dividend, spin-off, combination or reclassification of the common stock, or any other event that the P&C Committee determines affects our capitalization if it determines that an adjustment is appropriate in order to prevent enlargement or dilution of the benefits or potential benefits intended to be made available under the plan.

## F.    Termination of Employment and Change in Control

The P&C Committee has authority to determine the treatment of awards in connection with termination of a participant's employment and any transaction or transactions resulting in a change in control.  The Management Equity Awards provide that: (i) upon a termination of employment for cause, all unpaid awards will be forfeited; (ii) upon a voluntary quit, all unvested awards will be forfeited; (iii) upon a termination without cause, termination for good reason, death, disability or retirement, stock options, restricted stock and performance shares will vest in whole or on a pro-rata basis; and (iv) upon a change in control, all stock options, restricted stock and performance shares will vest, and participants will be protected against the application of the Federal excise tax that relates to change in control payments.

## G.    Duration of the 2007 Plan

The 2007 Plan is effective on the date of our emergence and no award may be granted under the plan on or after the tenth anniversary of the date of emergence.  However, unless otherwise expressly provided in the 2007 Plan or in an applicable award agreement, any award granted prior to such tenth anniversary may extend beyond such date, and the authority of the P&C Committee to administer the plan and to amend, suspend or terminate any such award, or to waive any conditions or rights under any such award, and the authority of our board to amend the plan, will extend beyond such date.

## H.    Amendment, Modification and Termination

Except as otherwise provided in an award agreement, our Board of Directors or the P&C Committee may from time to time suspend, discontinue, revise or amend the 2007 Plan and the P&C Committee may amend the terms of any award in any respect, provided that no such action will adversely impair or affect the rights of a holder of an outstanding award under the plan without the holder's consent, and no such action will be taken without shareowner approval, if required by the rules of the stock exchange on which our shares are traded.

15

Exhibit 10

**Management Compensation Comps**

*$ in millions*

| | | Return on Equity | | | | Annual Share Price Growth | | | '05-'07 Avg. Share Price |
|---|---|---|---|---|---|---|---|---|---|
| **Company** | **Revenues 2007[a]** | **2005** | **2006** | **2007[a]** | **Average** | **2005** | **2006** | **2007** | **Annual Growth Rate** |
| Pepsico | $37,698 | 29.4% | 38.1% | 38.6% | 35.4% | 13.2% | 5.9% | 21.3% | 13.3% |
| Kraft | 36,216 | 9.8% | 10.5% | 9.2% | 9.8% | (20.9%) | 26.7% | (8.6%) | (2.9%) |
| Honeywell | 33,590 | 14.2% | 20.3% | 23.9% | 19.5% | 5.2% | 21.4% | 36.1% | 20.2% |
| Dupont | 29,715 | 20.2% | 34.2% | 33.1% | 29.2% | (13.4%) | 14.6% | (9.5%) | (3.5%) |
| Coca Cola | 27,458 | 30.2% | 30.5% | 28.9% | 29.9% | (3.2%) | 19.7% | 27.2% | 13.8% |
| 3M | 24,038 | 30.3% | 37.8% | 40.3% | 36.1% | (5.6%) | 0.6% | 8.2% | 0.9% |
| International Paper | 21,373 | 8.2% | 15.7% | 42.3% | 22.1% | (20.0%) | 1.5% | (5.0%) | (8.3%) |
| **Mean:** | **$30,013** | **20.3%** | **26.7%** | **30.9%** | **26.0%** | **(6.4%)** | **12.9%** | **10.0%** | **4.8%** |
| **Median:** | **29,715** | **20.2%** | **30.5%** | **33.1%** | **29.2%** | **(5.6%)** | **14.6%** | **8.2%** | **0.9%** |

*Sources:*    *CapitalIQ and FactSet.*
(a)    Figures for last twelve months as of September 2007.

1                UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF NEW YORK
2                                    .
   IN RE:                           .   Case No. 05-17923 (ASH)
3                                    .
   DELTA AIR LINES, INC., et al, .   (Jointly Administered)
4                                    .
                                     .   New York, New York
5                                    .   Wednesday, April 25, 2007
                        Debtors.    .   2:31 p.m.
6    . . . . . . . . . . . . . . .

7                TRANSCRIPT OF CONFIRMATION HEARING
              BEFORE THE HONORABLE ADLAI S. HARDIN
8                 UNITED STATES BANKRUPTCY JUDGE

9    APPEARANCES:   (On the Record)

10   For the Debtors:            Marshall S. Huebner, Esq.
                                 DAVIS, POLK & WARDWELL
11                               450 Lexington Avenue
                                 New York, New York 10038
12
                                 Michael E. Wiles, Esq.
13                               Richard F. Hahn, Esq.
                                 DEBEVOISE & PLIMPTON, LLP
14                               919 Third Avenue
                                 New York, New York 10022
15
   For the Official Committee
16   of Unsecured Creditors:     David H. Botter, Esq.
                                 Lisa G. Beckerman, Esq.
17                               AKIN, GUMP, STRAUSS, HAUER
                                  & FELD, LLP
18                               590 Madison Avenue, 20th Floor
                                 New York, New York 10022
19   (Appearances continued)

20   Audio Operator:             Electronically Recorded
                                 by Court Personnel
21
   Transcription Company:        Rand Transcript Service, Inc.
22                               80 Broad Street, Fifth Floor
                                 New York, New York 10004
23                               (212) 504-2919
                                 www.randtranscript.com
24
   Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.

Court Decision                                                    84

1              The release is no more, nor less than that which is

2      necessary to, in effect, effectuate the settlement and to

3      preclude further litigation of precisely the same issues which

4      were resolved by the settlement agreement.  That is a very

5      narrow release; it does not implicate any of the concerns

6      reflected in the decision of the Second Circuit in the

7      Metromedia Fiber Network case, with which I am familiar.

8              So for the reasons that have been articulated in the

9      decision which I have issued today on the settlement agreement

10     and those expounded and articulated very comprehensively and

11     clearly by Mr. Huebner, I overrule all of the objections by the

12     five objecting bondholders to confirmation of the debtors'

13     plan, and I will sign the confirmation order as it has been or

14     will be tendered to me, including with respect to the stay

15     matter.

16             I want, myself, to add my voice to those of counsel in

17     expressing my enormous admiration for and great accolades to

18     the principals and the professionals who have brought about a

19     truly extraordinary result in this enormous Chapter 11 case.

20     This case, like all bankruptcy cases, all reorganization cases,

21     has required sacrifice by all of the constituencies:

22     Creditors, the personnel of the companies -- of the company and

23     the debtors, from the Chairman and CEO of Delta on down.

24             In an era where there is enormous public concern over

25     executive compensation, the leadership reflected in this

1   company reflects precisely the opposite ethic as the kind of

2   overcompensation that has attracted hostility in the press, and

3   I say that from the CEO on down.  It's hard to imagine any

4   finer leadership in terms of bringing about an extraordinary

5   result for all of the affected constituencies; that is, all

6   that could possibly have had a good result, obviously equity

7   could not.  Hard to imagine more effective leadership than the

8   leadership of this company, and that leadership has done so at

9   a great personal economic sacrifice.  Exceptional.

10          The professionals also have done simply an amazing,

11   amazing job.  When I gave that backhanded compliment that Mr.

12   Huebner referred to before about having made my job very dull,

13   I most assuredly meant it as a compliment.  I've never been in

14   a case, large or small, where there was the potential for such

15   controversy and where the resolution rate has been simply

16   astronomical.  It's extraordinary.  Needless to say, I'm

17   grateful.  Although I do love my job, and I love controversy.

18      (Laughter.)

19          THE COURT:  But it -- this case seems to be a paradigm

20   of the concept of consensus, which really is the basis for

21   Chapter 11 under our system of bankruptcy law, so bravo to all

22   concerned.

23          I will sign the order.

24          Is our business concluded?

25          MR. HUEBNER:  It is, Your Honor.  I took your remarks

Court Decision                                                    87

1          THE COURT:  Good day.  The Court is in recess.

2      (Proceedings concluded at 4:35 p.m.)

3                          * * * * *

4                       CERTIFICATION

5          I certify that the foregoing is a correct transcript from

6  the electronic sound recording of the proceedings in the above-

7  entitled matter to the best of my knowledge and ability.

8

9

10
                                              April 25, 2007
11  Coleen Rand, AAERT Cert. No. 341
    Certified Court Transcriptionist
12  Rand Transcript Service, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 12



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM
MAJORITY STAFF
DECEMBER 2007

# EXECUTIVE PAY:
# CONFLICTS OF INTEREST AMONG
# COMPENSATION CONSULTANTS

PREPARED FOR

CHAIRMAN HENRY A. WAXMAN

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................i

I.    INTRODUCTION AND METHODOLOGY .........................1

II.   FINDINGS ........................................................................3

    A.  Extent of Compensation Consultant Conflicts of Interest  ..............4

    B.  Disclosure of Compensation Consultant Conflicts of Interest ........5

    C.  Relationship Between Compensation Consultant Conflicts of
        Interest and Levels of CEO Pay  ........................................................6

    D.  Compliance with SEC Disclosure Rules ............................................7

    E.  The Position of the Compensation Consultants ..............................8

III.  CONCLUSION ..................................................................9

# EXECUTIVE SUMMARY

Corporate consultants can have a financial conflict of interest if they provide both executive compensation advice and other services to the same company. According to experts on corporate governance, consultants hired by corporate executives to administer employee benefit plans or to provide other services to a company may not be able to provide objective advice about the compensation of the executives who hire them. These experts have recommended that corporate boards should retain a compensation consultant that performs no other work for the company.

At the request of Rep. Henry A. Waxman, this report examines whether the compensation consultants hired by large publicly traded companies meet this standard of independence. The report is based on nonpublic information provided to the Committee by the leading compensation consultants in the United States. For each consultant, the Committee requested and received data on the value of the executive compensation services and other services provided to the 250 largest publicly traded companies as determined by *Fortune* magazine.

The report finds that compensation consultant conflicts of interest are widespread. Over 100 large publicly traded companies hired compensation consultants with substantial conflicts of interest in 2006. In many cases, the consultants who are advising on executive pay are simultaneously receiving millions of dollars from the corporate executives whose compensation they are supposed to assess.

Key findings in the report are:

- **Compensation consultant conflicts of interest are pervasive.** In 2006, at least 113 of the Fortune 250 companies received executive pay advice from consultants that were providing other services to the company.

- **The fees earned by compensation consultants for providing other services often far exceed those earned for advising on executive compensation.** In 2006, the consultants providing both executive compensation advice and other services to Fortune 250 companies were paid almost 11 times more for providing other services than they were paid for providing executive compensation advice. On average, the companies paid these consultants over $2.3 million for other services and less than $220,000 for executive compensation advice.

- **Some compensation consultants received over $10 million in 2006 to provide other services.** One Fortune 250 company paid a compensation consultant over $11 million for other services in 2006, over 70 times more than the company paid the consultant for executive compensation services. Another Fortune 250 company also paid a compensation consultant over $11 million for other services, over 50 times more than it paid the consultant for executive compensation advice.

- **Many Fortune 250 companies do not disclose their compensation consultants' conflicts of interest.**  In 2006, over two-thirds of the Fortune 250 companies that hired compensation consultants with conflicts of interest did not disclose the conflicts in their SEC filings.  In 30 instances, the companies informed shareholders that the compensation consultants were "independent" when in fact they were being paid to provide other services to the company.

- **There appears to be a correlation between the extent of a consultant's conflict of interest and the level of CEO pay.**  In 2006, the median CEO salary of the Fortune 250 companies that hired compensation consultants with the largest conflicts of interest was 67% higher than the median CEO salary of the companies that did not use conflicted consultants.  Over the period between 2002 and 2006, the Fortune 250 companies that hired compensation consultants with the largest conflicts increased CEO pay over twice as fast as the companies that did not use conflicted consultants.

The investigation also uncovered evidence that some Fortune 250 companies may not be disclosing the identity of all consultants hired to provide executive compensation advice.  Securities and Exchange Commission rules require publicly traded companies to disclose "any role of compensation consultants" in determining executive pay and to identify all such consultants, whether they advise management or the board.  The information obtained by the Committee from the compensation consultants indicates that in 2006, almost 100 Fortune 250 companies used executive compensation consultants that they did not disclose.  In some cases, the companies paid hundreds of thousands of dollars to undisclosed consultants for executive compensation services.  One explanation for these discrepancies may be that the compensation consultants used a different definition of executive compensation services in reporting to the Committee than the companies used in their SEC filings.

# I.    INTRODUCTION AND METHODOLOGY

Executive pay is rising rapidly.  The chief executive officers (CEOs) of the 250 largest U.S. companies, as identified by *Fortune* magazine, received an average of $18.8 million each in 2006, an increase of 38% in just one year.[1]  A decade ago, the aggregate pay of the top five executives at large U.S. companies amounted to about 5% of corporate profits.  By 2003, the share of corporate earnings paid to top executives had doubled to 10%.[2]  Many experts believe there is a growing disconnect between CEO pay and performance, as increases in executive pay cannot be explained by factors such as changes in firm size, profits, and industry classification.[3]  Analysts have observed that poorly performing CEOs sometimes receive exceptionally large pay packages.[4]

Dramatic increases in executive compensation have widened the gulf between CEO pay and the pay of the average worker.  In 1980, CEOs in the United States were paid 40 times the average worker.[5]  In 2006, the average Fortune 250 CEO was paid over 600 times the average worker.[6]  While CEO pay has soared, employees at the bottom of the pay scale have seen their real wages decline.  In real terms, the value of the new federal minimum wage, $5.85 per hour, is 13% below its value a decade ago.[7]

At the request of Rep. Henry A. Waxman, the Chairman of the Committee on Oversight and Government Reform, this report examines one possible cause of high CEO compensation:  the use of compensation consultants with conflicts of interest.

Large companies routinely retain compensation consultants to provide advice on executive pay, such as developing compensation peer groups, designing equity compensation plans, conducting compensation surveys, and analyzing the tax, accounting, and legal implications of specific pay packages.  These consultants can be retained by either the corporate board (typically, the compensation committee of the board) or management, and they may advise the board, management, or both on executive pay issues.  Whether retained by the board or management, these consultants can have a major impact on executive pay decisions.

According to experts on executive compensation, compensation consultants can have a conflict of interest if they provide other services to a company at the same

---

[1] *Big Paychecks,* Forbes (May 3, 2007).

[2] Lucian Bebchuk and Yaniv Grinstein, "The Growth of Executive Pay," Oxford Review of Economic Policy, Vol. 21, pp. 283-303 (2005).

[3] *Id.*

[4] *See, e.g.,* Lucian Bebchuk and Jesse Fried, Pay Without Performance:  The Unfulfilled Promise of Executive Compensation (2004); The Corporate Library, *Pay for Failure:  The Compensation Committees Responsible* (2006); The Corporate Library, *Pay for Failure II:  The Compensation Committees Responsible* (2007).

[5] Institute for Policy Studies and United for a Fair Economy, Executive Excess 2007:  The Staggering Social Cost of U.S. Business Leadership (Aug. 2007).

[6] In 2006, the average American worker earned $29,544. *Id.*

[7] The current minimum wage is $5.85 — adjusted for inflation, $4.49 in 1997 dollars.  The actual minimum wage in 1997 was $5.15.

time that they are providing executive compensation advice.[8]  The concern is that
the ability of consultants to provide independent, unbiased advice to directors
regarding the pay of senior executives can be compromised if the senior
executives are at the same time paying the compensation consultants to provide
other services to the company.  These other services can include a wide range of
activities, including employee benefit administration, human resource
management, and actuarial services.

Little information is currently available to the investing public to assess compensation
consultant conflicts of interest.  In August 2006, the Securities and Exchange
Commission (SEC) promulgated new rules on the disclosure of executive compensation
that for the first time require publicly traded companies to disclose the identity of their
compensation consultants and describe the nature of the consultant's assignment.[9]  These
rules do not, however, require companies to disclose whether the consultant has other
business relationships with the company or the fees received for providing executive pay
advice and other services.

To assess the extent of consultant conflicts of interest, Chairman Waxman wrote to
request nonpublic information from six leading compensation consultants:  Frederick W.
Cook & Company, Hewitt Associates, Mercer Human Resources Consulting, Pearl
Meyer & Partners, Towers Perrin, and Watson Wyatt.  For each consultant, the
Committee requested data on the value of the executive compensation consulting services
and any other services that the consultant provided to Fortune 250 companies from
January 1, 2002, through December 31, 2006.[10]  The compensation consultants were
asked to report to the Committee as executive compensation consulting fees any revenues
earned for work related to the compensation of the most senior executives of the
companies, including such services as devising equity compensation plans, designing
compensation peer groups, and providing pay survey data.  The consultants were asked to
report fees earned for services related to compensating employees other than senior
executives or for other work unrelated to compensation as "other" revenue.

Four of the consultants (Hewitt, Mercer, Towers Perrin, and Watson Wyatt) reported to
the Committee that they are diversified firms offering a variety of services to their
corporate clients.  The data the Committee received from these four consultants disclosed
how much they were paid in each year by each Fortune 250 company to provide
executive compensation services and how much they were paid to provide other services
for companies for whom the consultants provided both types of services between 2002
and 2006.  Because of limitations in how the consultants maintained their records, the
data did not indicate the precise nature of the financial arrangements between the

---

[8] The Conference Board, The Evolving Relationship Between Compensation Committees and
Consultants, 6, 15, (Jan. 2006).

[9] SEC, Final Rules on Executive Compensation and Related Party Disclosures, Items 402 (b) and
407 (e) of Regulation S-K (August 29, 2006).

[10] Letters from Chairman Henry A. Waxman to Frederick W. Cook & Company, Hewitt
Associates, Mercer Human Resources Consulting, Pearl Meyer & Partners, Towers Perrin, and
Watson Wyatt (May 8, 2007) (online at http://oversight.house.gov/story.asp?ID=1302).

consultants and the companies, such as who retained the consultants. It also did not indicate the precise services provided by the consultants.

Two of the consultants (Frederic W. Cook and Pearl Meyer) reported to the Committee that they are specialized firms that focus on executive and director compensation. Because they do not provide other services to their corporate clients, the data from these two consultants did not show conflicts of interest.

## II.   FINDINGS

Academic researchers and investors have raised concerns that the methods used by boards of directors to set CEO pay are flawed. In theory, executive pay should result from an arm's length negotiation in which executives bargain in their own self interest while corporate directors advocate the best interests of the company and its shareholders. In fact, studies suggest that rapidly rising executive pay results in part from management influence over the process by which executive pay is set.[11] Corporate directors themselves have recognized that executive compensation practices are problematic. In a recent survey of over 1,000 directors at large U.S. companies, 67% said that they believe boards are having difficulty controlling the size of CEO pay packages.[12]

One area of potential management influence on the executive pay process involves the use of compensation consultants that work for corporate management. Corporate governance experts recommend that corporate directors hire independent compensation consultants that are free of conflicts of interest and can provide objective advice regarding executive pay. A 2003 Blue Ribbon Panel of the National Association of Corporate Directors emphasized the importance of an independent compensation consultant and recommended that a truly independent consultant "should be hired by and report directly to the [compensation] committee, and should not be retained by the company in any other capacity."[13] In January 2006, the Conference Board, a leading business think tank, advised:

> When the compensation committee uses information and services from outside consultants, it must ensure that consultants are independent of management and provide objective, neutral advice to the committee. … The economics of the consultants' engagement for services is very important as an insight into independence. Any imbalance in fees generated by management versus fees generated on behalf of the committee should receive intense scrutiny.[14]

---

[11] Lucian Bebchuk and Jesse Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation (2004).

[12] Corporate Board Member and Pricewaterhouse Coopers, *What Directors Think: Annual Board of Directors Survey* (Oct. 2007).

[13] National Association of Corporate Directors, Executive Compensation and the Role of the Compensation Committee (Dec. 2003).

[14] The Conference Board, The Evolving Relationship Between Compensation Committees and Consultants, 6, 15, (Jan. 2006).

Similarly, the Business Roundtable states in its "Executive Compensation Principles" that "the compensation committee should have independent, experienced expertise available to provide advice on executive compensation arrangements and plans. The compensation committee should oversee consultants to ensure that they do not have conflicts that would limit their ability to provide independent advice."[15]

Despite these recommendations, this report finds that large publicly traded companies often retain consultants with significant conflicts of interest. In 2006, over 100 Fortune 250 companies relied on compensation consultants that had been hired by corporate management to provide other services to the company. In most cases, the amount the consultants earned providing executive compensation advice was a fraction of the amount they were paid to provide the other services. Often, the consultants who were advising on executive pay were simultaneously being paid millions of dollars by the corporate executives whose compensation they were supposed to evaluate.

## A.    Extent of Compensation Consultant Conflicts of Interest

In their SEC filings for 2006, 194 of the Fortune 250 companies disclosed retaining a compensation consultant to help set executive pay. Of these 194 companies, 179 disclosed hiring at least one of the compensation consultants examined in this report.

Among the 179 Fortune 250 companies that disclosed hiring one of the compensation consultants examined in this report, the use of compensation consultants with conflicts of interest was common. In 2006, 113 of these companies (63%) paid the same consultant to provide other services for the company in 2006.[16]

The fees these compensation consultants earned providing executive compensation advice were consistently small compared to the fees they received for providing other services. In 2006, the compensation consultants that provided both types of services to Fortune 250 companies received an average of $220,000 for executive compensation advice and $2.3 million for other services from each client company. For each dollar these consultants received for executive pay advice, they received almost $11 in payments for other services. Figure 1.

A compensation consultant's "fee ratio" is the ratio of the consultant's fees for other services to the consultant's fees for executive compensation advice. In 27 cases, these fee ratios exceeded 20 to 1 in 2006. In some cases, they were over 100 to 1.

One company, Johnson and Johnson, paid its compensation consultant over $11 million for other services in 2006 compared to approximately $160,000 for executive compensation advice, producing a fee ratio of over 70 to 1. Another company, Halliburton, also paid its compensation consultant over $11 million compared to approximately $210,000 for executive compensation advice, a fee ratio of over 50 to 1.

---

[15] The Business Roundtable, *Executive Compensation Principles* (2007).

[16] Companies that paid consultants a minimal fee — less than $10,000 for either executive compensation or other services — were not considered to have hired a conflicted consultant for purposes of this report.



FIGURE 1:  Fees for Other Services Are Much Larger Than Fees for Executive Pay Consulting Services

Twenty-five of the 113 Fortune 250 companies disclosed hiring multiple compensation consultants in 2006.  In at least nine of these cases, the additional compensation consultant did not provide other services to the company.  The retention of an independent compensation consultant in these cases could mitigate the influence of the conflicted consultant.  In at least five cases, the additional compensation consultant also had a conflict of interest.  The retention of a second consultant with a conflict of interest would not mitigate the conflict concern.[17]

## B.    Disclosure of Compensation Consultant Conflicts of Interest

Most of the 113 Fortune 250 companies that hired compensation consultants with conflicts of interest did not disclose these conflicts to public investors.  The existence of multiple business relationships with the compensation consultants was revealed in the SEC filings of only 33 of the 113 companies.  The remaining 80 companies did not disclose to investors that the executive pay advisor mentioned in its proxy statement did other work for the company.

In fact, 30 of the 113 companies identified their compensation consultant as "independent" in their proxy statements even though the information provided to the Committee showed that the consultant had been hired by the company to provide other services.  One company, Metlife, described its compensation consultant as "independent" in its SEC filings even though Metlife paid the consultant more than $7 million to

---

[17] In 11 cases, it could not be determined whether the additional consultant was independent or conflicted because the consultant was not one of the six consultants surveyed by the Committee.

provide other services to the company, according to the information received by the Committee. Another company, Pepsico described its consultant as "independent" in its SEC filings even though it paid the consultant over $6 million to provide other services to the company, according to the information received by the Committee.

### C.    Relationship Between Compensation Consultant Conflicts of Interest and Levels of CEO Pay

There appears to be a correlation between the retention of compensation consultants with significant conflicts of interest and levels of CEO pay.   The 25 Fortune 250 companies that used compensation consultants with the largest conflicts (as measured by fee ratios) paid their CEOs a median salary of $12.5 million in 2006.  This was 67% higher than the median salary of $7.5 million paid by Fortune 250 companies that did not report using consultants with conflicts of interest.[18]  Figure 2.



FIGURE 2:  Use of Compensation Consultants with Large Conflicts of Interest and CEO Pay

A similar but less pronounced trend is observed when the CEO salaries of all Fortune 250 companies that used compensation consultants with conflicts of interest are compared to the CEO salaries of Fortune 250 companies that did not use compensation consultants with conflicts of interest.  In 2006, the median CEO salary of the companies with conflicted consultants ($8.7 million) was higher than the median CEO salary of the companies that did not use conflicted consultants ($7.5 million).

_____

[18] CEO salary data was obtained from the Forbes magazine annual CEO compensation report. *See*, Forbes, *supra* note 1.  Companies that did not use one of the six compensation consultants surveyed by the Committee, companies for which CEO salary data was unavailable for 2006, or companies that did not file a proxy statement in 2006 were not included in this analysis.

The Committee obtained information on fee ratios from the surveyed compensation consultants for a five-year period from January 1, 2002, through December 31, 2006. Over this period, the median CEO salary increase of the 25 Fortune 250 companies that used compensation consultants with the largest conflicts of interest was 226%.  In comparison, the median CEO salary increase was less than half as much (105%) at the Fortune 250 companies that did not use conflicted compensation consultants.

These correlations between consultant conflicts of interest and levels of CEO pay suggest, but do not prove, a possible causal relationship.  Numerous factors beyond the use of compensation consultants with conflicts may affect CEO pay at Fortune 250 companies.  Among the companies included in this analysis, the companies that used compensation consultants with the highest fee ratios tended to be larger than the companies that did not use conflicted consultants, possibly explaining some of the pay differences.  More investigation is needed to confirm whether the correlations are significant and to assess whether an unrelated factor could be responsible for the relationships observed in the data.

### D.    Compliance with SEC Disclosure Rules

The regulations promulgated by the SEC in 2006 require that companies disclose "any role of compensation consultants in determining or recommending the amount or form of executive and director compensation" and identify such consultants.[19]  According to SEC guidance, companies must disclose all consultants that played a role in determining executive pay, not just the consultant advising the board or its compensation committee.[20]

The information the Committee received raises a question about whether the Fortune 250 companies are complying fully with this disclosure requirement.  In their SEC filings, 194 of the Fortune 250 companies disclosed retaining executive compensation consultants in 2006.  According to the information that the Committee received from the leading compensation consultants, however, an additional 13 Fortune 250 companies retained executive compensation consultants in 2006 but did not identify these consultants in their SEC filings.  Moreover, among the 194 Fortune 250 companies that reported retaining an executive compensation consultant in 2006, not all of the retained consultants may have been disclosed.  According to the information that the Committee received, almost 100 of the 194 companies failed to disclose a compensation consultant retained by the company.

Differences in definitions may be an explanation for discrepancies between the executive pay services reported to the SEC and those reported to the Committee.  The executive compensation services reflected in the consultants' submissions to the Committee could include a broader range of activities than those required by the SEC to be disclosed to shareholders.  If a company hired a consultant only to provide survey data on executive pay, for example, this work could have been reported by the consultant to the Committee

---

[19] SEC, Final Rules on Executive Compensation and Related Party Disclosures, Items 402 (b) and 407 (e) of Regulation S-K (August 29, 2006).

[20] *Id., see also,* SEC, Staff Interpretation:  Item 407 of Regulation S-K – Corporate Governance (March 13, 2007).

as executive compensation services, but the company may not have considered the consultant's work to involve "determining or recommending" the amount of executive pay under the SEC disclosure rules. Alternatively, although it appears inconsistent with the SEC guidance, a company may have disclosed in its SEC filings only the compensation consultants that provided services to the company board.

In some cases the compensation consultants that were not disclosed in SEC filings were paid large amounts for executive compensation services, according to the information reported to the Committee. In dozens of cases, compensation consultants reported to the Committee that they were paid over $100,000 in 2006 for executive compensation services that were not disclosed in SEC filings.

### E.    The Position of the Compensation Consultants

The four diversified compensation consultants surveyed by the Committee maintain that a consulting firm's ability to provide objective, independent advice regarding executive pay is not compromised simply because it provides other services to the company. The consultants have described a variety of policies and practices they have instituted to ensure that executive compensation consultants deliver unbiased advice.

Towers Perrin, in a letter to Chairman Waxman, listed several policies and procedures for ensuring the soundness and objectivity of its consulting advice. These include: (a) a code of conduct that articulates a commitment to providing impartial and objective services; (b) the designation of a senior consultant to review and resolve all potential conflicts of interest before an engagement proceeds; (c) review of significant executive pay recommendations by a senior consultant not on the consulting team performing the work; and (d) a policy precluding an individual who advises a company's board on executive pay from serving as the firm's relationship manager with the company, where the firm provides other services to the same company.[21]

Similarly, Hewitt stated:

> In the area of executive compensation counseling, Hewitt employs a number of safeguards and procedures to ensure independence. Over the last several years we have increasingly separated our executive compensation engagements from the engagements for our other services. These safeguards have evolved over time, and we adopt new ones as corporate governance and regulatory standards continue to change.[22]

The Committee did not investigate the internal practices in place within compensation consulting firms, such as efforts to separate executive pay consultants from the firm's other engagements with a client company. However, there is evidence to suggest that the lines between those providing executive compensation advice and those providing other services may not be as bright as the consultants described. Employment advertisements

---

[21] Letter from Mark V. Mactas, Towers Perrin, to Chairman Henry A. Waxman (June 26, 2007).

[22] Letter from Ilene S. Grant, Hewitt Associates, LLC, to Chairman Henry A. Waxman (May 25, 2007).

posted by some of the compensation consultants indicate that one responsibility of individuals hired to perform executive compensation services is "cross selling" other services to client companies.

For example, Towers Perrin, in a recent job posting for an executive compensation consultant, listed the following as job responsibilities:

- Cross selling consulting and other Towers Perrin services to existing and new clients

- Minimum revenue generation from all sources (i.e., not just executive compensation services) goal of $750 thousand in the first 12 months would be expected[23]

Similarly, a recent Mercer job posting for a senior executive compensation consultant identified the following as a job responsibility: "generating revenue through development of new client relationships, cross-selling to current clients and extension of current client engagements."[24]

## CONCLUSION

The information provided to the Committee represents the best — and only — comprehensive information currently available on the extent of conflicts of interest among executive compensation consultants. An analysis of this information shows that in 2006, over 100 Fortune 250 companies used compensation consultants that provided both executive compensation advice and other services to the company at the same. In many cases, the consultants hired to provide executive compensation advice were paid millions of dollars by the executives whose pay they were supposed to assess. The information provided to the Committee also shows that many of these conflicts of interest were not disclosed to the investing public in company SEC filings.

---

[23] Towers Perrin, Job Description for Executive Compensation Consultant, accessed from Towers Perrin web site on October 31, 2007 (available at http://careers.towersperrin.com/towers_career/).

[24] Mercer Human Resources Consulting, Job Description for Senior Executive Compensation Consultant, accessed from Mercer web site on October 30, 2007 (available at http://www.mercer.com/joiningmercer/home.jhtml?rl=&geographyid=-1).

ISSN 1045-6333

# HARVARD

*John M. Olin Center for Law, Economics, and Business*

Executive Compensation as
an Agency Problem

Lucian Arye Bebchuk and Jesse M. Fried

Discussion Paper No. 421

04/2003

As revised for publication in:
17 *Journal of Economic Perspectives* 71-92 (2003)

Harvard Law School
Cambridge, MA  02138

The Center for Law, Economics, and Business is supported by
a grant from the John M. Olin Foundation.

This paper can be downloaded without charge from:

The Harvard John M. Olin Discussion Paper Series:
http://www.law.harvard.edu/programs/olin_center/

The Social Science Research Network Electronic Paper Collection:
http://papers.ssrn.com/abstract_id=364220

This paper is also a discussion paper of the
John M. Olin Center's Program on Corporate Governance.

# Executive Compensation as an Agency Problem

Lucian Arye Bebchuk[*] and Jesse M. Fried[**]

Abstract

This paper provides an overview of the main theoretical elements and empirical underpinnings of a "managerial power" approach to executive compensation. Under this approach, the design of executive compensation is viewed not only as an instrument for addressing the agency problem between managers and shareholders but also as part of the agency problem itself. Boards of publicly traded companies with dispersed ownership, we argue, cannot be expected to bargain at arm's length with managers. As a result, managers wield substantial influence over their own pay arrangements, and they have an interest in reducing the saliency of the amount of their pay and the extent to which that pay is de-coupled from managers' performance. We show that the managerial power approach can explain many features of the executive compensation landscape, including ones that many researchers have long viewed as puzzling. Among other things, we discuss option plan design, stealth compensation, executive loans, payments to departing executives, retirement benefits, the use of compensation consultants, and the observed relationship between CEO power and pay. We also explain how managerial influence might lead to substantially inefficient arrangements that produce weak or even perverse incentives.

---

[*] William J. Friedman Professor of Law, Economics, and Finance, Harvard Law School, and Research Associate, National Bureau of Economic Research.

[**] Professor of Law, Boalt Hall School of Law, University of California at Berkeley.

We are grateful to Bradford Delong, Andrei Shleifer, Timothy Taylor, and Michael Waldman for many valuable suggestions. For financial support, we would like to thank the John M. Olin Center for Law, Economics, and Business (Bebchuk) and the Boalt Hall Fund and U.C. Berkeley Committee on Research (Fried). Because we are working on a book that seeks to provide a full account of the managerial power approach to executive compensation, any comments or reactions would be especially welcome and could be directed to bebchuk@law.havard.edu or friedj@law.berkeley.edu.
© 2003 Lucian Bebchuk and Jesse Fried. All rights reserved.

Executive compensation has long attracted a great deal of attention from financial economists. Indeed, the increase in academic papers on the subject of CEO compensation during the 1990s seems to have outpaced even the remarkable increase in CEO pay itself during this period (Murphy (1999)). Much research has focused on how executive compensation schemes can help alleviate the agency problem in publicly traded companies. To adequately understand the landscape of executive compensation, however, one must recognize that the design of compensation arrangements is also partly a product of this same agency problem.

## I. Alternative Approaches to Executive Compensation

Our focus in this paper is on publicly traded companies without a controlling shareholder. When ownership and management are separated in this way, managers might have substantial power. This recognition goes back, of course, to Berle and Means (1932) who observed that "[D]irectors, while in office, have almost complete discretion in management" (p. 139). Since Jensen and Meckling (1976), the problem of managerial power and discretion has been analyzed in modern finance as an "agency problem."

Managers may use their discretion to benefit themselves personally in a variety of ways (Shleifer and Vishny (1997)). For example, managers may engage in empire building (Jensen, (1974), Williamson (1964)). They may, as Jensen (1986) suggests, fail to distribute excess cash when the firm does not have profitable investment opportunities. Managers also may entrench themselves in their positions, making it difficult to oust them when they perform poorly (Shleifer and Vishny (1989)). Any discussion of executive compensation must proceed against the background of the fundamental agency problem afflicting management decisionmaking. There are two different views, however, on how the agency problem and executive compensation are linked.

Among financial economists, the dominant approach to the study of executive compensation views managers' pay arrangements as a (partial) *remedy* to the agency problem. Under this approach, which we label "the optimal contracting approach," boards are assumed to design compensation schemes to provide managers with efficient incentives to maximize shareholder value. Financial economists have done substantial work within this optimal contracting model in an effort to understand executive compensation practices. Recent surveys of this work include Murphy (1999)

1

and Core, Guay, and Larcker (2001). To some researchers working within the optimal contracting model, the main flaw with existing practices seems to be that, due to political limitations on how generously executives can be treated, compensation schemes are not sufficiently high-powered (Jensen and Murphy (1990)).

Another approach to studying executive compensation focuses on a different link between the agency problem and executive compensation. Under this approach, which we label the "managerial power approach," executive compensation is viewed not only as a potential instrument for addressing the agency problem – but also as *part* of the agency problem itself. As a number of researchers have recognized, some features of pay arrangements seem to reflect managerial rent-seeking rather than the provision of efficient incentives (e.g., Blanchard, Lopez-de-Silanes, and Shleifer, (1994), Yermack (1997), and Bertrand and Mullainathan (2001)). We seek to develop a full account of how managerial influence shapes the executive compensation landscape in a forthcoming book (Bebchuk and Fried (2004)) that builds substantially on a long article written jointly with David Walker (Bebchuk, Fried, and Walker (2002)).

Drawing on this work, we argue below that managerial power and rent extraction are likely to have an important influence on the design of compensation arrangements. Indeed, the managerial power approach can shed light on many significant features of the executive compensation landscape that have long been seen as puzzling by researchers working within the optimal contracting model. We also explain that managers' influence over their own pay might impose substantial costs on shareholders – beyond the amount of excess pay executives receive – by diluting and distorting managers' incentives and thereby hurting corporate performance.

Although the managerial power approach is conceptually quite different from the optimal contracting approach, we do not propose the former as a complete replacement for the latter. Compensation arrangements are likely to be shaped both by market forces, which push toward value-maximizing outcomes, and by managerial influence, which pushes toward departures from optimal outcomes in directions favorable to managers. The managerial power approach simply claims that these departures are substantial and that compensation practices thus cannot be adequately explained by optimal contracting alone.

## II. The Limitations of Optimal Contracting

The optimal contracting view recognizes that managers suffer from an agency problem and do not automatically seek to maximize shareholder value. Thus, providing managers with adequate incentives is important. Under the optimal contracting view, the board, working in shareholders' interest, attempts to cost-effectively provide such incentives to managers through their compensation packages.

Optimal compensation contracts could result either from effective arm's length bargaining between the board and the executives, or from market constraints that induce these parties to adopt such contracts even in the absence of arm's length bargaining. However, neither of these forces can be expected to prevent significant departures from arm's length outcomes.[1]

Just as there is no reason to presume that managers automatically seek to maximize shareholder value, there is no reason to expect *a priori* that directors will either. Indeed, an analysis of directors' incentives and circumstances suggests that directors' behavior is also subject to an agency problem. The director agency problem undermines the board's ability to effectively address the agency problems in the relationship between managers and shareholders.

Directors will generally wish to be re-appointed to the board. Average director compensation in the 200 largest US corporations was $152,626 in 2001 (Pearl Meyers and Partners (2002)). In the notorious Enron case, the directors were each paid $380,000 annually (Abelson (2001)). Besides an attractive salary, a directorship is also likely to provide prestige and valuable business and social connections. Thus, because of the important role CEO's play in re-nominating directors to the board, directors typically have an incentive to favor the CEO.

To be sure, in a world in which shareholders selected individual directors, directors might have an incentive to develop reputations as shareholder-serving. However, board elections are by slate, dissidents putting forward a competing slate confront substantial impediments, and such challenges are therefore exceedingly rare (Bebchuk and Kahan (1990). Typically, the director slate proposed by management is the only one offered.

---

[1] Shareholders could try to challenge undesirable pay arrangements in court. However, corporate law rules effectively prevent courts from reviewing compensation decisions. (Bebchuk, Fried, and Walker (2002), at 779-781).

The key to a board position is thus being placed on the company's slate. Because the CEO's influence over the board gives her significant influence over the nomination process, directors have an incentive to "go along" with the CEO's pay arrangement, a matter dear to the CEO's heart, at least as long as the compensation package remains within the range of what can be plausibly defended and justified.  In addition, because being on the company's slate is the key to being appointed, developing a reputation for haggling with the CEO over her compensation would hurt rather than help a director's chances of being invited to join other companies' boards. Yet another reason to favor the CEO is that the CEO can affect directors' compensation and perks.

Directors typically have only nominal equity interests in the firm (Baker, Jensen, and Murphy, 1988); Core, Holthausen, and Larcker,1999. Thus, even if a director did not place much value on a board seat, he would still have little personal motivation to fight the CEO, or other directors who wish to please the CEO, on compensation matters. Moreover, directors usually lack easy access to independent information and advice on compensation practices.

Finally, market forces are not sufficiently strong and fine-tuned to assure optimal contracting outcomes. Markets — including the market for corporate control, the market for capital, and the labor market for executives — impose *some* constraints on what directors will agree to and what managers will ask them to approve. An analysis of these markets, however, indicates that the constraints they impose are far from tight and permit substantial deviations from optimal contracting (Bebchuk, Fried, and Walker, 2002).

Consider, for example, the market for corporate control — the threat of a takeover. Firms frequently have substantial defenses against takeovers. For example, a majority of companies have a staggered board, which prevents a hostile acquirer from gaining control before two annual elections pass, and often enables incumbent managers to block hostile bids that are attractive to shareholders. To overcome incumbent opposition, a hostile bidder must be prepared to pay a substantial premium; during the second half of the 1990's, the average premium in hostile acquisitions was 40% (Bebchuk, Coates, and Subramanian (2002)). The disciplinary force of the market for corporate control is further weakened by the prevalence of golden parachute provisions, as well as by the acquisition-related benefits that target managers often are given to facilitate an acquisition. The market for corporate control thus leaves managers with considerable slack and ability to extract private benefits.

To be sure, the market for control might impose some costs on managers who are especially aggressive in extracting rents; we later note evidence that

CEO's of firms with stronger takeover protection get pay packages that are both larger and less performance sensitive. The important point is that the market for corporate control fails to impose tight constraints on executive compensation.

Some responses to our earlier work assumed that our analysis of the absence of arm's length bargaining did not apply to cases in which boards negotiate pay with a CEO candidate from outside the firm (see, e.g., Murphy, 2002). However, while such negotiations might be closer to the arm's length model than negotiations with an incumbent CEO, they still fall quite short of this benchmark. Among other things, directors negotiating with an outside CEO candidate know that after the candidate becomes CEO, she will have influence over their re-nomination to the board and over their compensation and perks. The directors will also wish to have good personal and working relationships with the person who is expected to become the firm's leader and a fellow board member. And while agreeing to a pay package that favors the outside CEO hire imposes little financial cost on the directors, any breakdown in the hiring negotiations, which might embarrass the directors and in any event force them to re-open the CEO selection process, would be personally costly to them. Finally, directors' limited time forces them to rely on information shaped and presented by the company's human resources staff and compensation consultants, all of whom have incentives to please the incoming CEO.

### III.  THE MANAGERIAL POWER APPROACH

The very reasons for questioning the ability of optimal contracting to adequately explain compensation practices suggest that executives have substantial influence over their own pay. In addition, these reasons suggest that the greater is managers' power, the greater is their ability to extract rents. There are limits to what directors will accept and what markets will permit, but these constraints do not prevent managers from obtaining arrangements more favorable than those obtainable under arm's length bargaining.

One important building block of the managerial power approach is that of "outrage" costs and constraints. The tightness of the constraints managers and directors confront depends, in part, on how much "outrage" a proposed arrangement is expected to generate among relevant outsiders. Outrage might cause embarrassment or reputational harm to directors and managers, and it might reduce shareholders' willingness to support incumbents in proxy

contests or takeover bids. The more outrage a compensation arrangement is expected to generate, the more reluctant directors will be to approve the arrangement, and the more hesitant managers will be to propose it in the first instance. Thus, whether a compensation arrangement that is favorable to executives but suboptimal for shareholders is adopted will depend on how it is perceived by outsiders.

There is evidence that the design of compensation arrangements is indeed influenced by how outsiders perceive them. Johnson, Porter, and Shackell (1997) find that CEO's of firms receiving negative media coverage of their compensation arrangements during 1992-94 subsequently received relatively small pay increases and had the pay-performance sensitivity of their compensation arrangements increased. Thomas and Martin (1999) find that, during the 1990s, CEO's of firms that were the target of shareholder resolutions criticizing executive pay had their annual compensation reduced over the following two years by an average of $2.7 million.

The potential significance of outsiders' perception of a CEO's compensation and of outrage costs explains the importance of yet another building block of the managerial power approach – "camouflage." To avoid or minimize outrage resulting from outsiders' recognizing the presence of rent extraction, managers have a substantial incentive to obscure and to try to legitimize—or, more generally, to camouflage—their extraction of rents. The strong desire to camouflage might lead to the adoption of inefficient compensation structures that hurt managerial incentives and firm performance. This concept of camouflage turns out to be quite useful in explaining many otherwise puzzling features of the executive compensation landscape.

The importance of how compensation arrangements are perceived means that, in the executive compensation area, the transparency of disclosure matters. Financial economists often focus on the role of disclosure in getting information incorporated into market pricing. It is widely believed that information can become reflected in stock prices as long as it is known and fully understood by a limited number of market professionals. In the executive compensation context, however, the ability of plan designers to choose arrangements that favor managers depends on how these arrangements are perceived by a much wider group of outsiders. As a result, the transparency and salience of disclosure can have a significant effect on CEO compensation.

Murphy (2002) and Hall and Murphy (this issue) argue that our approach cannot explain increases in managerial pay during the 1990s. In their

view, CEO power declined during this period. Given the strengthening of takeover defenses during the 90's, however, it is unclear whether CEO power diminished during this period. In any event, executive pay increases during the 1990's resulted not from changes in managerial power but rather from other factors, none of which is inconsistent with the managerial power approach.

First, seeking to make pay more sensitive to performance, regulators and shareholders encouraged the use of equity-based compensation. Taking advantage of this enthusiasm, executives used their influence to obtain substantial option pay without giving up corresponding amounts of their cash compensation. Furthermore, the options they received did not link pay tightly to the managers' own performance but rather enabled managers to reap windfalls from that part of the stock price increase that was due solely to market and sector trends beyond their control; as a result, managers were able to capture much larger gains than more cost-effective and efficient option plans would have provided. Second, because executive compensation has historically been correlated with market capitalization, the rising stock markets of the 1990s, which carried along with them even many poorly performing companies, provided a convenient justification at most firms for substantial pay increases. Third, market booms weaken outrage constraints; exuberant shareholders are less likely to scrutinize and resent generous pay arrangements, in the same way that the recent market declines have made shareholders more prone to do so.

### IV.  POWER AND CAMOUFLAGE AT WORK

We illustrate below the potential value of the managerial power approach by discussing four patterns and practices that can at least partly be explained by power and camouflage: the relationship between power and pay; the use of compensation consultants; stealth compensation; and gratuitous good-bye payments to departing executives.

### A.  Power-Pay Relationships

The managerial power approach predicts that pay will be higher and/or less sensitive to performance in firms in which managers have relatively more power. Other things being equal, managers would tend to have more power when: (i) the board is relatively weak or ineffectual; (ii) there is no large

outside shareholder; (iii) there are fewer institutional shareholders; or (iv) managers are protected by antitakeover arrangements. There is evidence indicating that each of these factors affects pay arrangements in the way predicted by the managerial power approach.

Executive compensation is higher *when the board is relatively weak or ineffectual* vis-à-vis the CEO. Core, Holthausen, and Larcker (1999 find that CEO compensation is higher under the following conditions: when the board is large, making it more difficult for directors to organize in opposition to the CEO; when more of the outside directors have been appointed by the CEO, which could cause them to feel gratitude or obligation to the CEO; and when outside directors serve on three or more boards, and thus more likely to be distracted. Also, CEO pay is 20-40% higher if the CEO is the chairman of the board (Cyert, Kang, and Kumar, 2002; Core, Holthausen, and Larcker, 1999). Finally, CEO pay is negatively related to the share ownership of the board's compensation committee; doubling the compensation committee ownership reduces non-salary compensation by 4-5% (Cyert, Kang, and Kumar, 2002).

The *presence of a large outside shareholder* is likely to result in closer monitoring (Shleifer and Vishny (1986)) and thus can be expected to reduce managers' influence over their compensation. Consistent with this observation, Cyert, Kang, and Kumar (2002) find a negative correlation between the equity ownership of the largest shareholder and the amount of CEO compensation; doubling the percentage ownership of the outside shareholder reduces non-salary compensation by 12-14%. Bertrand and Mullainathan (2000) find that CEO's in firms that lack a 5 percent (or larger) external shareholder tend to receive more "luck-based" pay – pay associated with profit increases that are entirely generated by external factors (e.g., changes in oil prices and exchange rates) rather than by managers' efforts. They also find that, in firms lacking large external shareholders, the cash compensation of CEO's is reduced less when their option-based compensation is increased. Relatedly, in an examination of S&P 500 firms during the period 1992-97, Benz, Kucher, and Stutzer (2001) find that a higher concentration of shareholders results in a significantly smaller number of options granted to top executives.

A *larger concentration of institutional shareholders* might result in greater monitoring and scrutiny of the CEO and the board. Examining CEO pay in almost 2000 firms during the period 1991-1997, Hartzell and Starks (2002) find that more concentrated institutional ownership leads to lower executive compensation. They also find that a larger institutional presence results in more performance-sensitive compensation. Examining CEO compensation in

the 200 largest companies during 1990-1994, David, Kochar and Levitas (1998) find that the effect of institutional shareholders on CEO pay depends on the types of relationships they have with the firm. They divide institutional shareholders into: (1) ones having no other business relationship with the firm and thus concerned only with the firm's share value ("pressure-resistant" institutions); and (2) ones having other business relationships with the firm (e.g., managing a pension fund) and are thus vulnerable to management pressure ("pressure-sensitive" institutions). As the managerial power approach predicts, CEO pay is negatively correlated with the presence of pressure-resistant institutional investors and positively correlated with the presence of pressure-sensitive ones.

The adoption of *antitakeover provisions* makes CEO's less vulnerable to a hostile takeover. Borokhovich, Brunarski and Parrino (1997), examining 129 firms that adopted anti-takeover provisions (such as a supermajority rule) during the period 1979-1987, find that CEO's of firms adopting such provisions enjoy above-market compensation before adoption of the anti-takeover provisions and that adoption of these provisions increases their excess compensation significantly. This pattern is not readily explainable by optimal contracting; indeed, if managers' jobs are more secure, shareholders should be able to pay managers a lower risk premium (Agrawal and Knoeber (1998)). In another study, Cheng, Nagar, and Rajan (2001) find that CEO's of Forbes 500 firms that became protected by state anti-takeover legislation enacted during the period 1984-1991 reduced their holdings of shares by an average of 15%, apparently because the shares were not as necessary for maintaining control. Optimal contracting might predict that a CEO protected by anti-takeover legislation would be required to buy more shares to restore her incentive to increase shareholder value.

## B.  Compensation Consultants

U.S. public companies typically employ outside consultants to provide advice about executive compensation (Bizjack, Lemmon, and Naveen (2000)). The use of consultants can be explained within the optimal-contracting framework on grounds that they supply useful information and contribute expertise on the design of compensation packages. But although compensation consultants might play a useful role, they also can help in camouflaging rents. The incentives of compensation consultants – and the evidence regarding their

use—suggest that these consultants are often used to justify executive pay rather than to optimize it.

Compensation consultants have strong incentives to use their discretion to benefit the CEO. The consultant is usually hired by the firm's human resources department, which is subordinate to the CEO. Providing advice that hurts the CEO's pocketbook is hardly a way to enhance the consultant's chances of being hired in the future by this firm or, indeed, by any other firm. Moreover, consulting firms often have other, larger assignments with the hiring company, which further increases their incentive to please the CEO (Crystal (1991)).

Pay consultants can favor the CEO by providing the types of compensation data that are most useful for justifying a high level of pay. For example, when firms do well, consultants argue that pay should reflect performance and should be higher than the average in the industry -- and certainly higher than that of CEO's who are doing poorly. In contrast, when firms do poorly, the consultants focus not on performance data but rather on peer group pay to argue that CEO compensation should be higher to reflect prevailing industry levels (Gillan (2001)).

After the compensation consultant has collected and presented the "relevant" comparative data, the board generally sets pay equal to or higher than the median CEO pay in the comparison group. Reviewing the reports of compensation committees in 100 large companies, Bizjack, Lemmon, and Naveen (2000) find that a large majority of them used peer groups in determining pay and set compensation at or above the fiftieth percentile of the peer group. The combination of helpful compensation consultants and sympathetic boards is partly responsible for the widely recognized "ratcheting up" of executive salaries (Murphy (1999), p. 2525).

After the board compensation approves the compensation package, firms use compensation consultants and their reports to justify executive compensation to shareholders. Examining S&P 500 companies during the period 1987-1992, Wade, Porac and Pollack (1997) find that companies that pay their CEO's larger base salaries, and firms with more concentrated and active outside ownership, are more likely to cite the use of surveys and consultants in justifying executive pay in their proxy reports to shareholders. This study also finds that, when accounting returns are high, firms emphasize the accounting returns and downplay market returns.

*C. Stealth Compensation*

As we document in Bebchuk and Fried (2003), firms use pay practices that make less transparent the total amount of executive compensation and the extent to which compensation is de-coupled from managers' own performance. Among the arrangements used by firms that camouflage the amount and the performance-insensitivity of compensation are pension plans, deferred compensation, and post-retirement perks and consulting contracts.

Most of the pension and deferred compensation benefits given to executives do not enjoy the large tax subsidy enjoyed by the standard retirement arrangements provided to other employees. In the case of executives, such arrangements largely shift tax liability from the executive to the firm in ways that sometimes even increase the joint tax liability of the two parties. The efficiency grounds for providing compensation through in-kind retirement perks and guaranteed post-retirement consulting fees are also far from clear. All of these arrangements, however, make pay less salient.

Among other things, under existing disclosure rules, firms do not have to place a dollar value on – and include in the firm's publicly filed compensation tables -- compensation provided to executives after they retire. Although the existence of executives' retirement arrangements must be noted in certain places in the firm's public filings, this disclosure is less salient because outsiders focus on the dollar amounts reported in the compensation tables. Indeed, the compensation table numbers are used by the ExecuComp database, which is the basis for much of the empirical work on executive compensation.

Another practice with camouflage benefits was the use of executive loans. While the Sarbanes-Oxley Act of 2002 now prohibits such loans, prior to the Act's adoption more than 75 percent of the 1,500 largest U.S. firms lent money to executives (King (2002)). It is not readily apparent that having firms (rather than banks) extend loans to executives – or that providing compensation in the form of favorable interest rates – is efficient. But loans are useful for reducing the saliency of managers' compensation.

To begin with, the implicit compensation provided by below-market-rate loans often does not appear in the compensation tables in the firm's annual filing. Firms are required by SEC rules to disclose in the tables, under the category of "other annual compensation," the difference between the interest actually paid on executive loans and "the market rate." However, the SEC has not defined "market rate," and firms have interpreted the term in a manner

that enabled them to exclude the value of large interest subsidies from the compensation tables.

For example, WorldCom did not report in its compensation tables any income to CEO Bernard Ebbers from the over $400 million of loans he received at an interest rate of 2.15 percent. Worldcom later explained that 2.15 percent was the "market rate" at which WorldCom was borrowing under one of its credit facilities. However, 2.15 percent was far below the more than 5 percent rate that Ebbers would have paid at that time in the market to borrow funds. With the existence and terms of the loans (but without any estimate of the value of the conferred benefits) buried in the disclosures of related-party transactions in the firm's public filings and not reflected in WorldCom's compensation tables, Ebbers' large benefits from the loan received no media attention and no outside scrutiny until WorldCom became involved in an accounting scandal.

Another manner in which loans provided camouflage was through the practice of loan forgiveness. Firms that gave executives a loan to buy a large amount of stock would often not demand repayment if the stock value fell below the amount due on the loan. As a result, the arrangement was similar to (but , it can be shown, often less tax efficient than) granting the executive an option to buy shares at a price equal to the amount owed on the loan. However, firms must include the value of option grants in the compensation tables for the year the grant is made. In contrast, when granting a loan that will likely be forgiven if the stock price drops, firms did need to include the option value of the arrangement in the compensation tables. If the stock price fell, the loan would often be forgiven at the time the executive left the company, when any resulting outrage was likely to have little impact on the executive personally. For example, George Shaheen, the Webvan CEO who resigned shortly before Webvan went bankrupt, had a $6.7 million loan forgiven in exchange for $150,000 of Webvan stock (Lublin, 2002).

*D.  Gratuitous Goodbye Payments*

In many cases, boards give departing CEO payments and benefits that are gratuitous -- not required under the terms of the CEO's compensation contract. Such gratuitous goodbye payments are common even when CEO's perform so poorly that their boards feel compelled to replace them.

Compensation contracts usually provide executives with generous severance arrangements even when they depart following dismal performance.

Such "soft landing" provisions provide executives with insurance against being fired due to poor performance. It is far from clear that these arrangements reflect optimal contracting; after all, such provisions reduce the difference in managerial payoffs between good and poor performance that firms spend so much money trying to create. Our focus, however, is on payments that go beyond the severance arrangements that are contractually specified.

For example, when Mattel CEO Jill Barad resigned under fire, the board forgave a $4.2 million loan, gave her an additional $3.3 million in cash to cover the taxes for forgiveness of another loan, and allowed her unvested options to vest automatically. These gratuitous benefits were in addition to the considerable benefits that she received under her employment agreement, which included a termination payment of $26.4 million and a stream of retirement benefits exceeding $700,000 per year.

It is not easy to reconcile such gratuitous payments with the arm's length, optimal contracting model. The board has the authority to fire the CEO and pay the CEO her contractual severance benefits. Thus, there is no need to "bribe" a poorly performing CEO to step down. In addition, the signal sent by the goodbye payment will, if anything, only weaken the incentive of the next CEO to perform.

The making of such gratuitous payments, however, is quite consistent with the existence of managerial influence over the board. Because of their relationship with the CEO, some directors might be unwilling to replace the existing CEO unless she is very generously treated. Other directors might be willing to replace the CEO in any event but prefer to accompany the move with a goodbye payment to reduce the discomfort they otherwise would feel in forcing out the CEO, or to make the difficult separation process more pleasant and less contentious. In all of these cases, directors' willingness to make gratuitous payments to the (poorly performing) CEO results from the CEO's relationship with the directors.

It is important to note that, taking managerial power *as given*, providing gratuitous payments to fired CEO's might be beneficial to shareholders in some instances. If many directors are loyal to the CEO, such payments might be necessary to assemble a board majority in favor of replacing him. In such a case, the practice would help shareholders when the CEO's departure is more beneficial to shareholders than the cost to them of the goodbye payment. For our purposes, however, what is important is that these gratuitous payments,

whether they are beneficial to shareholders or not, reflect the existence and significance of managerial influence.

## V. SUBOPTIMAL PAY STRUCTURES

*A. Pay Without Performance*

Optimal contracting arrangements might involve very large amounts of compensation  if such compensation is designed to provide managers with powerful incentives to increase shareholder value (Jensen and Murphy (1990)). The problem with current arrangements, however, is that the generous compensation provided executives is linked only weakly to managerial performance. This pay-performance disconnect is puzzling from an optimal contracting view.

The substantial part of compensation that is not equity-based has long been criticized as weakly linked to managerial performance. During the 1990s, there was no significant correlation between a CEO's salary and bonus and her firm's industry-adjusted performance (Murphy (1999)). In addition, there is evidence that cash compensation increases when firm profits rise for reasons that clearly have nothing to do with managers' efforts (Blanchard, Lopez-de-Silanes, and Shleifer (1994), Bertrand and Mullainathan (2001)). Furthermore, managers receive substantial non-equity compensation through arrangements that have received little attention from financial economists – such as pensions, deferred pay and loans – and this compensation is also insensitive to managers' own performance.

In light of the historically weak link between non-equity compensation and managers' performance, shareholders and regulators wishing to strengthen the connection between pay and performance have increasingly looked to, and encouraged, equity-based compensation. Unfortunately, however, managers have been able to use their influence to obtain option plans that appear to deviate substantially from optimal contracting in ways that favor managers.

 We should emphasize our strong support for equity-based compensation which in principle can provide managers with very desirable incentives. The devil, however, is in the details. Below we discuss several important features of existing option plans that make option pay less tightly linked to performance than would be beneficial for shareholders: the failure of option plans to filter out windfalls, the almost-uniform use of at-the-money

options, and the broad freedom given to managers to unload options and shares.

It might be asked why risk-averse managers would not use their influence to get higher cash salaries rather than options. Holding the expected value of additional compensation constant, managers would indeed prefer to take the cash. But managers seeking to increase their pay during the 1990's did not have a choice between additional compensation in the form of cash and additional compensation in the form of options with the same expected value. Rather, outsiders' enthusiasm about equity-based compensation enabled managers to obtain additional compensation in the form of options without offsetting reduction in cash compensation. Furthermore, the possible benefits from improved incentives provided defensible reasons for very large amounts of additional compensation. While Apple CEO Steve Jobs was recently able to obtain an option package worth over half a billion dollars, albeit with some outcry, cash compensation of this order of magnitude is (still) quite inconceivable. The fact that better-designed options could have provided much more cheaply the same incentives has not been sufficiently salient to make conventional plans patently unjustifiable.

*B. Option Plans that Fail to Filter Out "Windfalls"*

One widespread and persistent feature of stock option plans is that they fail to filter out stock price rises that are due to industry and general market trends and thus are completely unrelated to managers' own performance. With conventional options, when the market or sector rises substantially, even executives whose companies perform poorly relative to those of their peers can make large profits. Paying managers substantial compensation for stock price increases that have nothing to do with their own performance is difficult to explain under optimal contracting. The substantial amount currently spent on rewarding managers for market or sector rises could either be used to enhance incentives (for example, by giving managers a larger number of options linked more tightly to the managers' relative performance) or be saved with little weakening of incentives.

There are many different ways of designing what we call "reduced-windfall" option plans – plans that filter out all or some of the part of the stock price increase that is unrelated to managers' own performance. One approach discussed frequently by academics is linking the exercise price of the options to a market-wide index or a sector index (e.g., Rappaport (1999)). Another

strategy is to condition the "vesting" of options on the firm meeting specified performance targets. These targets can be linked to the stock price, earnings per share, or any other measure of firm performance.

When the exercise price of an indexed option is linked to market or sector averages, there is a substantial possibility that the manager will receive no payoff from the option plan. If this possibility were regarded as undesirable, reduced-windfall options could easily be designed to produce a high likelihood of payout. For example, the exercise price could be indexed not to changes in the industry or market average but rather to a somewhat lower benchmark – say, the stock price of the firm at the bottom 20th percentile of the industry or market. Under such an option plan, executives would have, on average, an 80 percent probability of outperforming the benchmark and receiving a payout. But executives would not profit, as they could under conventional plans, when their performance places them in the bottom 20th percentile.

Given the wide variety and potential benefits of reduced-windfall options, it is likely that for many firms it would be optimal in many firms to filter out at least some of the increase in the stock price that has nothing to do with the managers' own performance. Yet almost all U.S. firms use conventional stock options under which managers capture all of the increase in the stock price. In 2001, only about 5 percent of the 250 largest U.S. public firms used some form of reduced-windfall options (Levinsohn (2001)).

Financial economists have made substantial efforts to develop optimal-contracting explanations for why firms do not use reduced-windfall options. We survey the various explanations in our earlier work (Bebchuk, Fried, and Walker (2002), pp. 803-809) and conclude that none of them can adequately explain the widespread failure to screen out windfalls. From the perspective of managerial power, however, the failure to filter out general market or industry effects is not at all puzzling. Under this approach, compensation schemes are designed to benefit executives without being perceived as clearly unreasonable. Given that using conventional options will be legitimate and acceptable (after all, most firms use them), and that moving to indexing or any other form of reduced-windfall options is likely to be costly or inconvenient for managers, the lack of any real movement toward such options is consistent with the managerial power approach.

*C. At-the-Money Options*

Almost all stock options used to compensate executives are "at-the-money" -- that is, their exercise price is set to the grant-date market price (Murphy (1999), p. 2509). An optimally designed scheme would seek to provide risk-averse managers with cost-effective incentives to exert effort and make value-maximizing decisions. The optimal exercise price under such a scheme would depend on a multitude of factors that are likely to vary from executive to executive, from company to company, from industry to industry, and from time to time. Such factors might include the degree of managerial risk aversion (which in turn might be affected by the manager's age and wealth), the project choices available to the company, the volatility of the company's stock, the expected rate of inflation, and the length of the manager's contract, among other things. There is no reason to expect that "one size fits all" – that the same exercise price is optimal for all executives at all firms, in all industries, and at all times.

It is therefore highly unlikely that out-of-the-money options – options whose exercise price is above the current market price – are never optimal. Out-of-the-money options have a lower expected value than at-the-money options because they are less likely to pay off than at-the-money options, and when they do pay off the holder receives less value. Thus, for every dollar of expected value a firm can give an executive more out-of-the money options than at-the-money options. By giving more out-of-the money options, the firm can increase the reward to the manager for doing particularly well. Out-of-the-money options thus can offer much higher pay-for-performance sensitivity per dollar of expected value than conventional options (Hall, 1999). There is even evidence suggesting that giving managers out-of-the-money options rather than at-the-money-options would, on average, boost firm value  (Habib and Ljungqvist , (2000). The almost uniform use of at-the-money options is thus difficult to explain from an optimal contracting perspective. Indeed, economists working within optimal contracting have called this practice a "puzzle" (Hall, 1999), p. 43).

The near-uniform use of at-the-money options is not puzzling, however, when examined under the managerial power approach. All else equal, executives prefer a lower exercise price. Because at-the-money options might sometimes be optimal and are employed by almost all other firms, their use in any given case will not generate outrage. Therefore, there is little reason for plan designers to increase the exercise price above the grant-date market price.

Executives would be even better off, of course, if stock options were issued with an exercise price below the grant-date market price. However, such in-the-money options would create a salient windfall and might generate some outrage costs. Furthermore, in-the-money options would trigger a charge to accounting earnings, which might undermine a main excuse for not using indexed options or other reduced-windfall options — that the use of such options would hurt reported earnings. Because in-the-money options would be difficult or costly for plan designers to use, and at-the-money options are the most favorable to managers within the remaining range of possibilities, a uniform use of at-the-money options is consistent with the managerial power approach.

*D.  Managers' Freedom to Unwind Equity Incentives*

Another problem for the optimal contracting approach is managers' broad freedom to unload their options and shares. When managers unwind their equity incentives, restoring pay-performance sensitivity requires giving them new options or shares. Thus, such unwinding either (1) weakens managers' incentives or (2) forces the firm to give managers new equity incentives to restore incentives to the pre-unwinding level.

Although an executive becomes entitled to options once they have vested, the compensation contract could preclude the executive from "cashing out" the vested options – that is, from exercising the options and then selling the acquired shares – for a specified period after the vesting date. Such a limitation would maintain incentives for an additional period (beyond the vesting date) without requiring the firm  to grant new options to replace the ones cashed out.

To be sure, restricting executives' freedom to cash out vested equity instruments imposes on them liquidity and diversification costs that must be balanced against the incentive benefits of restricting unwinding. The efficient arrangement is thus likely to vary from case to case, depending on the executive's and firm's characteristics. But there is no reason to expect that optimal contracts would generally make the vesting date and the cash-out date identical.

In practice, however, the date on which options vest and the date on which they are exercisable are almost always the same. A minority of firms have created "target ownership plans" that require managers to hold a certain amount of shares, but the targets tend to be rather low, and there often appears

to be no penalty imposed for missing them (Core and Larcker (2002)). As a result of weak restrictions on unwinding, managers exercise many of their options well before the options expire, and sell almost all of the shares thereby acquired (Carpenter,1998; Ofek and Yermack,2000). Shares that are not sold after option exercise are often hedged or partially hedged in transactions that are not reported to the SEC (Bettis, Bizjack, and Lemmon,2001).

Managers also typically have freedom to determine the precise time of unwinding. Although trading on "material" inside information is illegal, the definition of materiality and the difficulties of enforcement are such that managers making selling decisions can use their superior knowledge about the firm with little fear of liability (Fried (1998)). As a result, managers are able to obtain abnormal returns trading in their firm's shares (Seyhun (1998)). It is far from clear, however, that enabling managers to make such profits is an efficient form of compensation.

Even assuming it is desirable to permit managers to unload shares at a certain stage in their contracts, it does not follow that executives should have absolute control over the exact timing of their sales. After all, liquidity or diversification needs are unlikely to arise unexpectedly one morning. Firms could require that sales be carried out gradually over a specified period, perhaps pursuant to a pre-arranged plan. Alternatively, firms could require executives to publicly disclose in advance their intended trades, which would reduce executives' ability to profit from their informational advantage (Fried,1998). Yet firms generally do not impose any such restrictions.

Because a firm can be held liable if it fails to take reasonable steps to prevent insider trading by its employees, a number of firms have adopted "trading windows" and "blackout periods" to restrict the times during the year when a manager can sell or buy shares (Bettis, Coles, and Lemmon,2000). However, many firms have not put such restrictions in place. And even in firms that have imposed such restrictions, managers who know undisclosed bad news during a trading window may use that trading opportunity to unwind a substantial amount of their holdings. Thus, executives retain the ability to dump shares before bad news becomes public. In one notorious case, Enron insiders sold hundreds of millions of shares before information about Enron's actual financial condition was released and the stock price collapsed.

Although managers' ability to unwind equity incentives early and to control the time of such unwinding cannot easily be explained under optimal contracting, it is quite consistent with the managerial power approach. Broad freedom to unload equity instruments provides managers with substantial

benefits that are not particularly conspicuous. The corresponding costs to shareholders from diluted incentives are also not salient. Furthermore, and perhaps most importantly, managers' unwinding of options and shares provides a convenient justification for frequently granting managers new equity-based incentives, thereby boosting their total compensation. Although a system of constant unwinding and replenishing incentives is more costly to shareholders than one that requires managers to hold options and shares for longer periods, it is obviously much better for managers.

*E. The "Perceived Cost" Explanation*

Murphy (2002) and Hall and Murphy (2003) put forward a "perceived cost" explanation for the use of conventional, at-the-money options. According to their explanation, executives and directors erroneously perceive conventional options to be "cheap" or even "nearly free to grant" because such options can be granted without any cash outlay and without reducing reported earnings.

We doubt that executives and their advisers cannot grasp the costs of conventional options to shareholders. Assuming that Hall and Murphy are correct in suggesting that managers believe that the stock market is influenced by accounting numbers rather than underlying economic reality, this would at most mean that executives believe that investors under-estimate or ignore the costs of options that are not expensed for accounting purposes – not that executives themselves fail to see the significant economic costs that conventional options impose on shareholders (whose ownership interest the options dilute).

One might even be skeptical that directors, many of whom are executives themselves, fail to understand the costs of options to shareholders. Indeed, if directors had so little financial sophistication, then the board-monitoring model of corporate governance is in even worse shape than our analysis suggests. Let us suppose, however, that directors have been oblivious to the true cost of conventional options. If so, such a misperception on the part of directors is best seen not as an alternative to the managerial power explanation but rather as one of the factors contributing to managers' ability to exert considerable influence over the terms of their pay.

As we discussed earlier, there are several reasons why boards cannot be expected to engage in arms' length negotiations with the CEO over executive compensation; and one of them is directors' lack of easy access to accurate,

unbiased information. To the extent directors in fact did misperceive the cost of options, such a misperception would simply be part of the informational problem that contributes to directors' willingness to approve sub-optimal arrangements. If directors were ignorant about such an important and widely discussed issue as the actual cost of options, they would likely be inadequately informed about other features of compensation arrangements.

In our view, inadequate information is only one of the factors, alongside inadequate incentives and others, that might lead directors to agree to pay arrangements that favor managers. For one thing, director's confusion over the cost of options cannot explain the systematic relationship between power and pay the efforts of managers to make compensation less salient that we discussed earlier. For many purposes, however, it does not matter whether directors' willingness to accept arrangements that favor executives is the result of conscious favoritism, honest misperceptions, inadequate incentives to exert effort, or some combination of these factors. The important thing is that directors do not adequately represent shareholders' interests in bargaining with managers over their pay, and that these pay arrangements consequently depart from the arm's length model in directions favorable to executives.

## VI. COSTS TO SHAREHOLDERS

What are the costs imposed on shareholders by managers' influence over their own pay? To begin with, there is the excess pay managers receive as a result of their power – the difference between what managers' influence enables them to obtain and what they would receive under an arm's length arrangement. Some might think that this problem is only symbolic, and that these rents have little effect on shareholders' bottom line. But a close look at the amounts involved indicates that they add up to much more than small. In 2000, CEO compensation was on average 7.89% of corporate profits in the firms making up the 1500-company ExecuComp dataset (Balsam (2002), p. 262).

Furthermore, and perhaps more importantly, managers' ability to influence their pay leads to compensation arrangements that generate worse incentives than those that    arm's length contracts would provide. Managers have an interest in compensation schemes that camouflage the extent of their rent extraction or that put less pressure on them to reduce slack. As a result, managerial influence might lead to the adoption of compensation arrangements that provide weak or even perverse incentives. In our view, the reduction in shareholder value caused by these inefficiencies, rather than the

excess rents captured by managers, could be the largest cost arising from managers' ability to influence their compensation.

To begin, compensation arrangements currently provide weaker incentives to reduce managerial slack and increase shareholder value than likely would be provided by arm's length arrangements. As explained, both the non-equity and equity components of managers' compensation are substantially more decoupled from managers' own performance than appearances might suggest. Shareholders thus might benefit substantially from the improved performance that a move toward optimal contracting arrangements could generate.

Prevailing practices not only fail to provide cost-effective incentives to reduce slack but also create perverse incentives. For one thing, they provide managers' incentives to change firm parameters in a way that would justify increases in pay. Consider, for example, the familiar problem of empire-building. It is commonly believed that the practice of granting options provides managers with incentives not to undertake acquisitions that are value-decreasing for shareholders. This is clearly the case, however, only in a static model in which all option grants are made before managers make acquisition decisions. In a dynamic model, managers considering an expansion decision that is somewhat value-decreasing for shareholders would have different incentives: While such an expansion would reduce the value of their current options, it may well raise their aggregate future compensation by an even greater amount because a larger firm size can be used to justify higher pay.

Furthermore, managers' broad freedom to unload equity incentives can produce substantial inefficiencies. Executives who expect to unload their shares or options have weaker incentives to exert efforts ex ante when the payoff is not going to be recognized by the market at the time they unwind their equity positions (Bar-Gill and Bebchuk, 2003a). Such executives also have incentives to misreport corporate performance and suppress bad news (Bar-Gill and Bebchuk, 2002). Indeed, such executives also have an incentive to choose projects that are less transparent or to reduce the transparency of existing projects (Bar-Gill and Bebchuk, 2003b). The efficiency costs of such distortions might exceed, possibly by a large margin, whatever liquidity or risk-bearing benefits executives obtain from being able to unload their options and shares at will.

## VII. CONCLUSION

There are good theoretical and empirical reasons for concluding that managerial power substantially affects the design of executive compensation in companies with a separation of ownership and control. Executive compensation can thus be fruitfully analyzed not only as an instrument for addressing the agency problem arising from the separation of ownership and control -- but also as part of the agency problem itself.

The conclusion that managerial power and rent extraction play an important role in executive compensation has significant implications for corporate governance, which we explore in our forthcoming book (Bebchuk and Fried, 2004). It is important to note, however, that this is an area in which widespread recognition of the problem might contribute to alleviating it. The extent to which managerial influence can move compensation arrangements away from optimal contracting outcomes depends on the extent to which market participants, especially institutional investors, recognize the problems we have discussed. Financial economists can thus make an important contribution to improving compensation arrangements by analyzing how current practices deviate from those suggested by optimal contracting. We hope that future studies of executive compensation will devote to the role of managerial power as much attention as the optimal contracting model has received.

# References

Abelson, Reid. 2001. "Enron Board Comes Under a Storm of Criticism." N.Y. Times, December 16, C4.

Agrawal, Anup and Charles R. Knoeber. 1998. "Managerial Compensation and the Threat of Takeover." *Journal of Financial Economics* 47:2, pp. 219-239.

Baker, George P., Michael C. Jensen, and Kevin J. Murphy. 1988. "Compensation and Incentives: Practice vs. Theory." *Journal of Finance* 63:3, pp. 593-616.

Balsam, Steven. 2002. *An Introduction to Executive Compensation* (Academic Press).

Bar-Gill, Oren and Lucian Bebchuk. 2002. "Misreporting Corporate Performance." Working Paper No. 400, Harvard Olin Center for Law, Economics, and Business, available at <http://www.ssrn.papers/abstact= 354141>.

Bar-Gill, Oren and Lucian Bebchuk. 2003a. "The Costs of Permitting Managers to Sell Shares." Mimeo, Harvard Law School.

Bar-Gill, Oren and Lucian Bebchuk. 2003b. "Corporate Transparency and Managerial Incentives." Mimeo, Harvard Law School.

Bebchuk, Lucian, John Coates IV and Guhan Subramanian. 2002. "The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy." *Stanford Law Review* 54, pp. 887-951.

Bebchuk, Lucian Arye and Jesse M. Fried. 2004. *Pay without Performance* (forthcoming, MIT Press).

Bebchuk, Lucian Arye and Jesse M. Fried. 2003. "Stealth Compensation." mimeo, Harvard Law School and Boalt Hall School of Law.

Bebchuk, Lucian Arye, Jesse M. Fried, and David I. Walker. 2002. "Managerial Power and Rent Extraction in the Design of Executive Compensation." *University of Chicago Law Review* 69:3, pp. 751-846.

Bebchuk, Lucian Arye, and Marcel Kahan. 1990. "A Framework for Analyzing Legal Policy Toward Proxy Contests." *California Law Review* 78, 1071-1136.

Benz, Matthias, Marcel Kucher, and Alois Stutzer. 2001. "Stock Options: The Managers' Blessing: Institutional Restrictions and Executive Compensation." Working Paper No. 61, University of Zurich Institute for Empirical Research in Economics.

Berle, Adolf A., Jr. and Gardiner C. Means. 1932. "The Modern Corporation and Private Property." (The Macmillan Company, New York).

Bertrand, Marianne and Sendhil Mullainathan. 2001. "Are CEO's Rewarded for Luck? The Ones Without Principals Are." *Quarterly Journal of Economics*, pp. 901-932.

Bettis, J. Carr, John M. Bizjak, and Michael L. Lemmon. 2001. "Managerial Ownership, Incentive Contracting, and the Use of Zero-Cost Collars and Equity Swaps by Corporate Insiders." *Journal of Financial and Quantitative Analysis* 36, pp. 345-70.

Bettis, J. Carr, Jeffrey L. Coles, and Michael L. Lemmon. 2000. "Corporate Policies Restricting Trading by Insiders." *Journal of Financial Economics* 57, pp. 191-xxx.

Bizjack, John M., Michael L. Lemmon, and Lalitha Naveen. 2000. "Has the Use of Peer Groups Contributed to Higher Levels of Executive Compensation?" Working Paper, Portland State University.

Blanchard, Olivier Jean, Florencio Lopez-de-Silanes, and Andrei Shleifer. 1994. "What do Firms do with Cash Windfalls?" *Journal of Financial Economics.* 36, pp. 337-360.

Borokhovich, Kenneth A., Kelly R. Brunarski, and Robert Parrino. 1997. "CEO Contracting and Anti-Takeover Amendments." *Journal of Finance* 52:4, pp. 1495-1517.

Carpenter, Jennifer N. 1998. "The Exercise and Valuation of Executive Stock Options." *Journal of Financial Economics* 48, pp. 127-158.

Cheng, Shjun, Venky Nagar, and Madhar V. Rajan. 2001. "Control Versus Risk in Stock-Based Incentives: Evidence from Antitakeover Regulation." Working Paper, University of Michigan Business School.

Core, John E., Robert W. Holthausen, and David E. Larcker. 1999. "Corporate Governance, Chief Executive Compensation, and Firm Performance." *Journal of Financial Economics* 51, pp. 371-406.

Core, John E., Wayne Guay, and David F. Larcker. 2001. "Executive Equity Compensation and Incentives: A Survey," Working Paper, Wharton School.

Core, John E.  and David Larcker 2002, "Performance Consequences of Mandatory Increases in Executive Stock Ownership." Working paper, Wharton School.

Crystal, Graef S. 1991. *In Search of Excess.* Norton.

Cyert, Richard, Sok-Hyon Kang, and Praveen Kumar. 2002. "Corporate Governance, Takeovers, and Top-Management Compensation: Theory and Evidence." *Management Science* 48:4, pp. 453-469.

David, Parthiban, Rahul Kochar, and Edward Levitas. 1998. "The Effect of Institutional Investors on the Level and Mix of CEO Compensation." *Academy of Management Journal* 41:2, pp. 200-208.

Fox, Justin. 2001. "The Amazing Stock Option Sleight of Hand." *Fortune* June 25, pp. 86-92.

Fried, Jesse M. 1998. "Reducing the Profitability of Corporate Insider Trading through Pre-trading Disclosure." *Southern California Law Review* 71:2, pp. 303-392.

Gillan, Stuart. 2001. "Has Pay for Performance Gone Awry: Views from a Corporate Governance Forum." *Research Dialogue.* TIAA CREF Institute. 68, pp. 1-16.

Habib, Michel A. and Alexander P. Ljungqvist. 2000. "Firm Value and Managerial Incentives." Working Paper, London Business School.

Hall, Brian J. 1999. "A Better Way to Pay CEO's?" in *Executive Compensation and Shareholder Value: Theory and Evidence.* Jennifer Carpenter and David Yermack, eds. Kluwer Academic, pp. 35-46.

Hall, Brian J. and Kevin J. Murphy. 2000. "Optimal Exercise Prices for Executive Stock Options." *American Economic Association Proceedings* 90, pp. 209-214.

Hall, Brian J. and Kevin J. Murphy. 2003. "The Trouble with Stock Options." *Journal of Economic Perspectives* (this issue).

Hallock, Kevin. 1997. "Reciprocally Interlocking Boards of Directors and Executive Compensation." *Journal of Financial and Quantitative Analysis* 32:3, pp. 331-334.

Hartzell, Jay C. and Laura T. Starks. 2002. "Institutional Investors and Executive Compensation." Working Paper, New York University Stern School of Business.

Jensen, Michael 1986. "Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers." *American Economic Review* 76, pp. 323-329.

Jensen, Michael, and William Meckling. 1976. "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure." *Journal of Financial Economics* 3, pp. 305-360.

Jensen, Michael, and Kevin Murphy. 1990. "Performance Pay and Top Management Incentives." *Journal of Political Economy* 98, pp. 225-263.

Johnson, Marilyn F., Susan Porter, and Margaret B. Shackell. 1997. "Stakeholder Pressure and the Structure of Executive Compensation." Working Paper, Michigan State University, University of Massachusetts at Amherst, Notre Dame.

King, Ralph. 2002. "Insider Loans: Everyone Was Doing It." *Business 2.0.* November.

Leonhardt, David. 2002. "It's Called a Loan, But It's Far Sweeter." New York Times, February 3, Section 3, Page 1.

Levinsohn, Alan. 2001. "A Garden of Stock Options Helps Harvest Talent." *Strategic Finance* 82, pp. 81-82.

Lublin, Joan. 2002. "As their Companies Crumbled, some CEO's Got Big-money Payouts." Wall Street Journal, Feb 26, p. B1.

Murphy, Kevin J. 1999. "Executive Compensation." in *Handbook of Labor Economics.* Orley Ashenfelter and David Card, eds. North Holland, pp. 2485-2563.

Murphy, Kevin J. 2002. "Explaining Executive Compensation: Managerial Power vs. the Perceived Cost of Stock Options." *University of Chicago Law Review* 69, pp. 847-869.

Pearl Meyers & Partners. 2002. *Executive Pay Trends: Looking Forward and Looking Back*.

Ofek, Eli and David Yermack. 2000. "Taking Stock: Equity-Based Compensation and the Evolution of Managerial Ownership." *Journal of Finance* 55:3, pp. 1367-1384.

Rappaport, Alfred. 1999. "New Thinking on How to Link Executive Pay with Performance." *Harvard Business Review* March-April, pp. 91-101.

Seyhun, H. Nejat. 1998. *Investment Intelligence from Insider Trading*, MIT Press.

Shleifer, Andrei and Robert W. Vishny. 1986 . "Large Shareholders and Corporate Control." *Journal of Political Economy* 94:3, pp. 461-88.

Shleifer, Andrei, and Robert Vishny. 1989. "Management Entrenchment: The Case of Manager-specific Investments." *Journal of Financial Economics* 25, pp. 123-140.

Shleifer, Andrei, and Robert Vishny. 1997. "A Survey of Corporate Governance." *Journal of Finance* 52, pp. 737-783.

Thomas, Randall S. and Kenneth J. Martin. 1999. "The Effect of Shareholder Proposals on Executive Compensation." *University of Cincinnati Law Review* 67, pp. 1021-1081.

Wade, James B., Joseph Porac, and Timothy Pollock. 1997. "Worth, Words, and the Justification of Executive Pay." *Journal of Organizational Behavior* 18, pp. 641-664.

Williamson, Oliver, 1964. *The Economics of Discretionary Behavior: Managerial Objectives in a Theory of the Firm* (Prentice Hall, Englewood Cliffs, N.J.).

Yermack, David. 1997. "Good Timing: CEO Stock Option Awards and Company News Announcements." *Journal of Finance* 52, pp. 449-476.