**REDACTED PURSUANT TO PROTECTIVE ORDER**

GOODWIN PROCTER LLP
599 Lexington Avenue
New York, New York  10022
(212) 813-8800
Allan S. Brilliant (AB 8455)
abrilliant@goodwinprocter.com
Craig P. Druehl (CD 2657)
cdruehl@goodwinprocter.com
Meagan E. Costello (MC 0962)
mcostello@goodwinprocter.com

Hearing Date: January 17, 2008 at 10:00 a.m.
Objection Deadline:  January 11, 2008 at 4:00 p.m.

- and -

GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts  02109
(617) 570-1330
Gina Lynn Martin (GM 1324)
gmartin@goodwinprocter.com

Attorneys for Davidson Kempner
Capital Management LLC; Elliott
Associates, L.P.; Nomura Corporate
Research & Asset Management, Inc; Northeast
Investors Trust; and Whitebox Advisors, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------x

**MEMORANDUM OF LAW AND SUPPLEMENTAL OBJECTION OF DAVIDSON KEMPNER CAPITAL MANAGEMENT LLC; ELLIOTT ASSOCIATES, L.P.; NOMURA CORPORATE RESEARCH & ASSET MANAGEMENT, INC.; NORTHEAST INVESTORS TRUST; AND WHITEBOX ADVISORS, LLC TO CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN DEBTORS AND DEBTORS-IN-POSSESSION**

**Table of Contents**

Page

Preliminary Statement ................................................................................................ 1

Procedural Background .............................................................................................. 4

Facts Relevant to Confirmation ............................................................................... 10
    A.    The Negotiation of the Plan and the Parties Involved ............................. 10
    B.    Senior and Subordinated Claims............................................................. 16
    C.    Comparison of Investment Agreements, Plan Iterations and
          Recoveries Thereunder .......................................................................... 18
    D.    Valuation of the Debtors and the Evolution of Economic Events........... 21
    E.    Substantive Consolidation ...................................................................... 30

Summary of Argument .............................................................................................. 35

Argument ................................................................................................................... 40
    I.    The Plan Violates Sections 1122, 1123(a)(4) and 510(a) of the
        Bankruptcy Code and Thus, Cannot be Confirmed ................................. 40
        A.    The Senior Notes Require Separate Classification Because They
            Have Distinct Interests and Motivations.................................... 41
        B.    Having Classified the Senior Notes and the TOPrS Together,  the
            Disparate Distributions to Class IC Members Violates Section
            1123(a)(4) of the Bankruptcy Code ......................................... 49
        C.    The Favorable Treatment of the TOPrS ViolatesSection 510(a)  of
            the Bankruptcy Code................................................................. 50
        D.    The Plan is Fatally Flawed Because it Provides the Holders of the
            MDL Claims with a Recovery That is Pari Passu with Senior
            Creditors................................................................................... 51
    II.    The Plan Cannot Be Confirmed Because It Is Premised Upon the
        Impermissible Substantive Consolidation of the Delphi-DAS Debtors ............... 53
        E.    The Debtors Cannot Prove the Elements of Augie/Restivo as
            Required by the Binding Law of this Circuit............................. 56
        F.    Consolidation of Debtor Entities for "Voting and Distribution
            Purposes Only" Is Nothing More than Impermissible "Deemed
            Consolidation" and Must Be Denied ......................................... 65
    III.    The Plan Cannot be Crammed-Down On the Holders of the  Senior Notes
        Under Section 1129(b)(2) ..................................................................... 66
        A.    Payment of Senior Notes in the ReorganizedDelphi Stock Does not
            Amount to Payment in Full and Thus The Plan is Neither Fair Nor
            Equitable ................................................................................... 69
        B.    The Plan is Not Fair and Equitable Because Holders of Junior
            Claims and Interests are Receiving a Distribution of Estate  Assets
            Under the Plan........................................................................... 76

|  | C. | The GM Settlement Mandates Payments to Junior Stakeholders, In Violation of the Absolute Priority Rule | 78 |
|  | D. | Holders of Senior Notes Must beCompensated for the Step-Down in Priority | 81 |
|  | E. | There Are No Exceptions to the Absolute Priority Rule to Justify Distributions to Holders of Junior Claims and Interests | 85 |
|  | F. | The Plan Unfairly Discriminates Against the Holders of Senior Notes By Providing Different Recoveries to GM and the Flow-Through Claims | 89 |
| IV. |  | The Releases Granted to Non-Debtor Third PartiesUnder the Plan Do Not Satisfy the Metromedia Standard | 91 |
| V. |  | The Plan Cannot be Confirmed Because Violates Section 1129(a)(11) | 95 |
| VI. |  | The Disclosure Statement that Accompanied the Plan Did Not Contain Adequate Information | 97 |

Reservation Of Rights .......................................................................................................98

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura

Corporate Research & Asset Management, Inc; Northeast Investors Trust; and Whitebox

Advisors, LLC or any respective affiliates thereof or funds and accounts directly managed by

each of the foregoing (each, a "Senior Noteholder"), each in its individual capacity as a creditor

of Delphi Corporation (together with certain of its debtor affiliates and subsidiaries, collectively

the "Debtors"), by and through their counsel, Goodwin Procter LLP, as and for this

memorandum of law and supplemental objection (this "Objection") to the First Amended Joint

Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-

Possession [Docket No. 11386] (the "Plan"), respectfully state as follows:[1]

## Preliminary Statement

The Plan proposed by the Debtors would provide a windfall of hundreds of millions of

dollars to the Debtors' junior creditors and equity holders at the expense of the holders of the

Senior Notes, who would not receive anything close to payment in full.  Although the Debtors

have justified this departure from the absolute priority rule on the proposition that this is a

"settlement plan," they in fact did not include the holders of the Senior Notes in the settlement

discussions or the settlement agreement.

Assuming that the holders of the Senior Notes vote to reject the Plan – as we trust will

happen – the Plan cannot be confirmed.  The United States Supreme Court has repeatedly stated

that, under the Bankruptcy Code, "it is up to the creditors – and not the courts – to accept or

reject a reorganization plan which fails. . . to honor the absolute priority rule."  Norwest Bank

Worthington v. Ahlers, 485 U.S. 197, 207 (1988).   As the Ahlers Court emphasized in holding

---

[1]    Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Plan or
Disclosure Statement.

that a plan that violated the absolute priority rule was unconfirmable, "[t]he Court of appeals

may well have believed that petitioners or other unsecured creditors would be better off if

respondents' reorganization plan was confirmed.  But that determination is for the creditors to

make in the manner specified by the [Bankruptcy] Code." Id.; see also Bank of America Nat'l

Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434, 457 (1999) ("[O]ne

of the code's innovations [was] to narrow the occasions for courts to make valuation judgments,

as shown by its preference for the supramajoritarian class creditor voting scheme in §1126(c).")

(citation omitted).

   Here, as in Ahlers, "the principal creditors entitled to vote . . . objected to the proposed

reorganization.  This was their prerogative under the Code, and courts applying the Code must

effectuate their decision." 485 U.S. at 207.  Accordingly, the Plan cannot be confirmed.  And

while the reasons for rejection of the Plan by holders of the Senior Notes are irrelevant, there in

fact are ample good reasons.  Simply put, the Plan would provide windfalls to all of the other

stakeholders at the direct expense of the holders of the Senior Notes, including hundreds of

millions of dollars to subordinated creditors, MDL claimants, and old equity holders, billions of

dollars (and a release of claims for billions of dollars) to GM despite its responsibility for the

Debtors' bankruptcy, many millions of dollars to the Plan Investors, and millions more to the

Debtors' officers and directors.

   We anticipate that the Debtors will seek to evade the rejection of the Plan by holders of

the Senior Notes, both (1) by insisting that the Senior Notes should be classified for voting

purposes with holders of the TOPrS and with creditors of other Debtors, and (2) on cram-down

or related arguments.  These efforts to persuade the Court to override the fundamental right of

the holders of the Senior Notes to accept or reject the Plan, in contravention of <u>Ahlers</u>, are wholly meritless.

The Debtors' transparent effort to gerrymander and dilute the vote of the holders of the Senior Notes through the Plan's unlawful classification provisions must be rejected. The votes of the holders of the Senior Notes and holders of TOPrS cannot lawfully be counted together since the TOPrS are expressly subordinated to the Senior Notes; indeed, the Plan absurdly would allow the TOPrS to vote on the question of whether to waive the subordination of their own claims – an issue that is reserved to the holders of the Senior Notes. Nor can the votes of the holders of the Senior Notes be counted together with those cast by creditors of other Debtors. The Debtors cannot remotely satisfy the extraordinarily stringent standards for substantive consolidation set forth in <u>In re Augie/Restivo</u>, 860 F.2d 515 (2d Cir. 1988), and precedent makes clear that their invocation of "deemed" consolidation for voting and distribution purposes is not permitted under any circumstances over an objection.

Nor do lawful grounds exist for confirming the Plan over its considered rejection by the holders of the Senior Notes. The Plan cannot be crammed down because it would provide the holders of the Senior Notes with less than a full recovery while providing many millions of dollars of value to more junior creditors. The fact that the Senior Notes are not being repaid in full is evident from their current market price, from the valuation evidence that the Senior Noteholders will adduce at the Confirmation Hearing, and from the fact that even the vastly inflated Rothschild valuation does not, at its midpoint, imply a full recovery. Under these circumstances, the Plan's distribution of extensive value to more junior creditors violates the absolute priority rule, and no exceptions to that rule exist here.

3

Even in the unlikely event that a properly constituted class containing the Senior Notes Claims were to approve the Plan, it cannot be confirmed. First, section 510(b) of the Bankruptcy Code requires that distributions on account of certain securities fraud claims be subordinated to the Senior Notes Claims. The subordination created by section 510(b), was created by Congress, is mandatory, and cannot be waived through a class vote or overridden by order of this Court. Since it is indisputable that this provision is violated by the Plan, the Plan cannot be confirmed regardless of the vote. The same is true of the Plan's reliance on deemed substantive consolidation, which is impermissible over any objection, regardless of the votes cast on the Plan.

The bottom line is that if the Debtors want a "settlement plan" – one that does not follow the absolute priority rule – they would have to settle with the holders of the Senior Notes. But instead of doing so, the Debtors have settled with their other stakeholders at the expense of such holders. Because the terms of the resulting Plan are plainly unlawful absent the consent of the holders of the Senior Notes, and because the Debtors have not yet taken the steps necessary to earn that consent, the Plan cannot be confirmed.

## Procedural Background

1.     On October 8 and 14, 2005, each of the Debtors commenced these cases (the "Cases") under chapter 11 of title 11, United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"). The Cases have been consolidated for administrative purposes only, but have not been substantively consolidated.

2.     On July 18, 2007, the Debtors filed their Motion for Order Authorizing and Approving Delphi-Appaloosa Investment Equity Purchase and Commitment Agreement

4

Pursuant to 11 U.S.C. §§105(a), 363(b), 503(b), and 507(a), dated July 18, 2007 [Docket No. 8673] (the "Delphi-Appaloosa EPCA").

3.      On September 6, 2007, the Debtors filed the first versions of the Plan (the "Initial Plan") and Disclosure Statement (the "Initial Disclosure Statement") and the Motion for Order Approving (I) Disclosure Statement, (II) Record Date, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures (the "Disclosure Statement Approval Motion").

4.      On September 7, 2007, the Debtors' filed the Motion for Order Approving Multidistrict Litigation and Insurance Settlements [Docket No 9296].

5.      On October 3, 2007 the Debtors began the hearing to approve the Disclosure Statement before this Court. The hearing was continued to October 25, 2007 and was subsequently continued to November 8, 2007 pursuant to the Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitations Procedure Motion and (B) Setting Hearing Date and Related Procedures for Potential Motions Amending Investment Agreement and Approving Certain Exit Financing Agreements dated October 19, 2007 [Docket No. 10662].

6.      On October 19, 2007, certain of the Senior Noteholders filed the Objection By Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; And SPCP Group, LLC to Motion by the Debtors for Order Approving Multidistrict Litigation and Insurance Settlements [Docket No 10687] (the "MDL Objection").

7.    On October 29, 2007, the Debtors filed the Notice of Potential Amendments To

Debtors' Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi

Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and Certain Appendices

and Exhibits Related Thereto [Docket No. 10759].  Attached thereto as various exhibits were,

inter alia, (i) certain pages of the First Amended Disclosure Statement With Respect to First

Amended Joint Plan of Reorganization of Delphi Corporation and certain Affiliates, Debtors and

Debtors-In-Possession, (Exhibit A), reflecting changes to the Initial Disclosure Statement; (ii)

certain pages of the First Amended Joint Plan of Reorganization of Delphi Corporation and

Certain Affiliates, Debtors and Debtors-In-Possession (Exhibit B), reflecting changes to the

initial Plan; and (iii) a valuation analysis (Exhibit E).  Also on October 29, 2007, this Court

preliminarily approved the MDL Settlements for voting purposes only subject to final

consideration by the Court at the Confirmation Hearing.  See Order Preliminarily Approving

Multidistrict Litigation and Insurance Settlement [Docket No. 10746].

8.    On October 30, 2007, the Debtors filed the Expedited Motion for Order Under 11

U.S.C. sections 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to

Delphi-Appaloosa Equity Purchase and Commitment Agreement [Docket No. 10760].  Attached

thereto was the First Amendment to the Equity Purchase and Commitment Agreement.

9.    On November 2, 2007, certain of the Senior Noteholders filed the Objection of

Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; Davidson Kempner Capital

Management LLC; Elliott Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners,

LLC; and Whitebox Advisors, LLC to Motion to Approve (A) Proposed Disclosure Statement

With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates,

Debtors and Debtors-In-Possession, and (B) Motion for Order Approving (I) Disclosure

Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of

Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing

Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures,

(VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII)

Reclamation Claim Procedures [Docket No. 10803].

10.    On November 7, 2007, this Court entered the Second Supplemental Order (A)

Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and

Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Motion

to Amend Investment Agreement [Docket No. 10864], pursuant to which the Debtors were to use

commercially reasonable efforts to file notice of further amendments to, among other things, the

Plan and the Disclosure Statement on November 16, 2007.

11.    On November 14, 2007, the Debtors filed the Notice Of Further Proposed

Amendments To Certain Appendices To Debtors' Disclosure Statement With Respect To Joint

Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession [Docket No. 10932].  Attached thereto as various exhibits were, inter alia, (i) marked

changed pages to the First Amended Plan, along with the Restated First Amendment to the

Equity Purchase and Commitment Agreement ("Amended Investment Agreement"), and (ii)

marked changed pages to the valuation analysis (Exhibit C) (as amended, the "Rothschild

Valuation").

12.    On November 16, 2007, the Debtors filed the Notice Of Further Proposed

Amendments To Debtors' Disclosure Statement With Respect To Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession [Docket No.

7

10964]. Attached thereto as Exhibit A were marked changed pages to the First Amended Disclosure Statement.

13.     On November 21, 2007, certain of the Senior Bondholders filed the Supplemental Objection of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Gradient Partners, L.P.; Sailfish Capital Partners, LLC; and Whitebox Advisors, LLC to Motion to Approve (A) Proposed Disclosure Statement With Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, and (B) Motion for Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures [Docket No. 11045].

14.     On November 30, 2007, the Court entered the Third Supplemental Order (A) Establishing Revised Hearing Date and Related Procedures on Disclosure Statement and Solicitation Procedures Motion and (B) Setting Hearing Date and Related Procedures for Motion to Amend Investment Agreement [Docket No. 11198], pursuant to which the Debtors were to use commercially reasonable efforts to file a notice of any further proposed amendments to, among other things, the Plan and Disclosure Statement on December 3, 2007, and pursuant to which the hearing on the Disclosure Statement Approval Motion, was continued to December 6, 2007, and the hearing on the Expedited Motion For Order Under 11 U.S.C. Sections 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Amendment to Delphi-Appaloosa Equity Purchase and Commitment Agreement was adjourned to December 6, 2007.

8

15.    On December 5, 2007, the Debtors filed the Debtors' (1) Omnibus Reply to

Objections to Delphi-Appaloosa Investment Agreement Amendment Motion and (2) Response to

Equity Committee's Emergency Motion to Adjourn Hearing [Docket No. 11289] and the

Debtors' (I) Omnibus Reply to Objections to Disclosure Statement and Potential Disclosure

Statement Amendments and (II) Response to Emergency Motion to Adjourn Hearing and Fix

New Objection Deadline [Docket No 11291] (the "Debtors' Disclosure Statement Reply").

16.    At the December 6, 2007, the Court considered the approval of the Amended

Investment Agreement.  The hearing was continued to December 7, 2007, at which time the

Court also considered the approval of the Disclosure Statement.

17.    On December 10, 2007, the Court entered the Order Under 11 U.S.C. §§ 105(a),

363(b), 503(b), and 507(a) Authorizing and Approving Delphi-Appaloosa Equity Purchase and

Commitment Agreement Amendment [Docket No. 11382], and the Order Approving

(I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary

Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan,

(IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan,

(VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition

Interest, and (VIII) Reclamation Claim Procedures [Docket No. 11389].

18.    On December 14, 2007, the Preliminary Objection of Caspian Capital Advisors,

LLC; Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner

Capital Management LLC; Elliott Associates, L.P.; Everest Capital Limited; Nomura Corporate

Research & Asset Management, Inc.; Northeast Investors Trust; and Whitebox Advisors, LLC to

9

Confirmation of First Amended Joint Plan of Reorganization of Delphi Corporation and Certain

Affiliates, Debtors and Debtors-In-Possession [Docket No. 11471] was filed with this Court.[2]

**Facts Relevant to Confirmation**

A.            *The Negotiation of the Plan and the Parties Involved*

19.         The Debtors have touted the Plan (Hearing Ex. 1) as a "settlement plan" rather

than an absolute priority plan. Disclosure Statement (Hearing Ex. 2) at p. 141. Numerous

parties, each with conflicting interests to those of the holders of Senior Notes, were involved in

the negotiation of the Plan and the so-called "settlements" embodied therein, including the

Debtors, GM, the Plan Investors, the Creditors' Committee, the MDL Group and the Equity

Committee. Each of those parties is receiving benefits and recoveries in excess of their

entitlement under strict adherence to the Bankruptcy Code.

20.         The Plan Investors are comprised of A-D Acquisition Holdings, LLC—an

affiliate of Appaloosa Management L.P. ("Appaloosa"); Harbinger Del-Auto Investment

Company, Ltd.; Merrill Lynch; UBS; Goldman, Sachs & Co.; and Pardus DPH Holding LLC.

See Disclosure Statement (Hearing Ex. 2) at 118. The Plan Investors have entered into an

agreement to invest $975 million in Delphi in exchange for preferred and common stock. Id. at

119. Additionally, the Plan Investors have agreed to purchase any unsubscribed shares offered in

connection with a rights offering worth $1.575 billion. Id. Collectively, the Plan Investors hold

Existing Common Stock and both Senior Notes and Subordinated Notes. Id. The Plan Investors

hold a substantial and disproportionate amount of the outstanding Subordinated Notes—or

TOPrS—relative to other holders. See Transcript of EPCA Hearing Dated Dec. 6, 2007

(Hearing Ex. 3) at p. 101 (testimony of David Tepper, who negotiated the Plan on behalf of

---

[2]      The Preliminary Objection is hereby withdrawn by Caspian Capital Advisors, LLC; Castlerigg Master
Investments Ltd.; CR Intrinsic Investors, LLC; and Everest Capital Limited and remains in effect with respect
to the other Senior Noteholders.

Appaloosa, explaining that the Plan Investors hold "40/50 percent" of the TOPrS).  During the

negotiations on the Plan, David Tepper, from Appaloosa, used Appaloosa's leverage as a Plan

Investor to improve the treatment of the TOPrS at the expense of the Senior Notes.  Id. at 108-

109.

21.    The Plan Investors enjoy anti-dilution protection, which is triggered if the

aggregate amount of Trade and Other Unsecured Claims exceeds $1.45 billion.  See Disclosure

Statement (Hearing Ex. 2)at p. 236–37.  If the anti-dilution mechanism is triggered, the amount

of New Common Stock received by the holders of Senior Notes will be reduced, but the Plan

Investors' number of shares will remain constant.  Id.  The Plan Investors receive broad releases

under the Plan from all claimants who vote for the Plan or receive distributions thereunder.  See

Plan (Hearing Ex. 1) § 1.166.

22.    The Creditors' Committee is comprised of Capital Research and Management

Company, SABIC Innovative Plastics, Tyco Electronics Corporation, the IUE-CWA,

Wilmington Trust Company (as Indenture Trustee), and Freescale Semiconductor, Inc.  See

Amended Appointment of Committee of Unsecured Creditors [Docket No. 10397] (Hearing Ex.

4).  Capital Research and Management Company, the chair of the Creditors' Committee, holds

over 10% of the TOPrS issued by Delphi Trust I and 7 % of the remaining TOPrS in addition to

its holdings of the Senior Notes in principal amount of $500 million.  See Statement of Capital

Research and Management Company in Response to Motion of Law Debenture Trust Company

of New York Requesting an Order to Change the Membership of the Official Committee of

Unsecured Creditors [Docket No. 1686] (Hearing Ex. 5) at 1-2.  Thus, members of the Creditors'

Committee have conflicting and disabling interests with respect to important issues such as

substantive consolidation and subordination of the TOPrS.

11

23.    Prior to 1999, GM was the parent corporation of Delphi.  Upon separation, GM became Delphi's largest customer and remains so today ███████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████    See Disclosure Statement (Hearing Ex. 2) at p. 57 (stating that the Equity Committee analyzed the possible claims against GM and asserted that the claims' value could be as high as $26 billion); Motion for Order Authorizing the Official Committee of Unsecured Creditors to Prosecute the Debtors Claims and Defenses Against General Motors Corporation and Certain Former Officers of the Debtors [Docket No. 4718] (Hearing Ex. 7) (asking permission to assert claims worth "billions of dollars" on behalf of the Debtors against GM). However, as a result of the Plan's distributions to junior stakeholders, these parties have abandoned these claims for a distribution thereunder.

24.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



25.     The Global Settlement Agreement, which is incorporated into the Plan, provides

GM with broad releases from all constituencies, including the MDL Group and holders of

Existing Common Stock.  See GSA (Hearing Ex. 9) § 4.01(c); Plan (Hearing Ex. 1) §§ 5.5, 5.7-

5.9.  In addition to broad releases from all parties, under the Plan, GM will receive $1.073 billion

in junior preferred securities, a $1.5 billion note resulting from pension related issues (which will

be repaid shortly after emergence), an additional $1.5 billion, of which at least $750 million will

be in Cash and the remaining balance in a second lien note, and retention of certain claims.  See

Disclosure Statement (Hearing Ex. 2)  at p. xxv.

26.     The MDL Group filed a complaint against Delphi and its then senior

management, including John Sheehan, Delphi's Vice President and Chief Restructuring Officer,

alleging multiple accounting irregularities had occurred in Delphi's publicly filed financial

statements.  See, e.g., In re Delphi Corp. Securities Litigation, Dkt. No. 05-2637 (S.D.N.Y.) at

Consolidated Class Action Complaint (Hearing Ex. 10), filed on September 30, 2005 (the "MDL

Litigation")[3] Specifically, as to John Sheehan, the MDL Plaintiffs alleged that he had

knowledge of the accounting irregularities and knew that Delphi had "intentionally not recorded

receipt of high-dollar inventory supplies."[4] Id. at 198. As defendants in the MDL Actions, the

directors and officers of Delphi were subject to substantial personal liability. Additionally, both

the Securities and Exchange Commission (the "SEC") and the United States Department of

Justice initiated investigations into Delphi's conduct. See Disclosure Statement (Hearing Ex. 2)

at p. 134. According to the Disclosure Statement, the investigations continue as to certain

employees of Delphi. See id.

27.    The members of the MDL Group are holders of Section 510(b) Note Claims,

Section 510(b) Equity Claims, and Section 510(b) ERISA Claims (collectively, the "MDL

Claims") arising out of the MDL Litigation. The Debtors acknowledge that these claims are

subordinated to the Senior Notes by the operation of the Bankruptcy Code. See Disclosure

Statement (Hearing Ex. 2) at p. 141 ("The [MDL] Claims are more likely than not junior in

priority to unsubordinated general unsecured claims pursuant to section 510(b) of the Bankruptcy

Code."). Under the Plan, the holders of MDL Claims will receive distributions on an allowed

$203.5 million claim on a pari passu basis with holders of General Unsecured Claims, receiving

New Common Stock, Discount Rights, and/or Oversubscription Cash, in the same proportion of

the distribution of New Common Stock and Discount Rights made to the holders of General

Unsecured Claims. See Plan (Hearing Ex. 1) §§ 5.5, 5.8–5.9.

---

[3]    Similar allegations were made by the MDL ERISA Plaintiffs. See In re Delphi Corp. Securities, Derivative, and "ERISA" Litigation, Dkt. No. 05-01725 (E.D. Mich.) at Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act ("Hearing Ex. 11"), filed on March 3, 2006.

[4]    At the time of the conduct alleged in the complaint, John Sheehan was Delphi's Chief Accounting Officer and Controller.

14

28.    The defendants in the MDL Actions, including the directors and officers, are not making a monetary contribution to the MDL Settlements. Under the Plan, the directors and officers are released from all liability, including liability for gross negligence and unlawful misconduct. See Plan (Hearing Ex. 1) § 1.166. In addition, Delphi's indemnification obligations to such officers is assumed by the Reorganized Debtors. See Plan (Hearing Ex. 1) §11.12.

29.    The Plan provides that upon Delphi's emergence from bankruptcy, members of management will receive large cash bonuses, stock options, stock appreciation rights, change of control protection, retirement benefits, and other forms of compensation. See Plan (Hearing Ex. 1), Ex. 7.8. Delphi's Chairman of the Board and its Chief Executive Officer, for instance, are scheduled to receive $8.3 million and $5.3 million, respectively, upon emergence. See Plan (Hearing Ex. 1), Supplemental Ex. 7.8. In the aggregate, senior management can expect to receive $87 million in cash upon emergence. Id.

30.    The restricted stock issued to management will immediately dilute the value of the New Common Stock issued under the Plan. In addition, the options provided to management, if exercised, also dilute the value of New Common Stock issued to holders of Senior Notes among other claimants in the Cases. See Disclosure Statement (Hearing Ex. 2) at p. 236–37. The Debtors have estimated that this dilution would be 3% on the Effective Date and 8% over time. See Disclosure Statement (Hearing Ex. 2) at p. 99.

31.    Although junior in priority to all holders of Claims, under the Plan, holders of Existing Common Stock will receive New Common Stock, Par Value Rights exercisable at the Plan Equity Value, Seven-Year Warrants Six-Month Warrants, and Ten-Year Warrants. See Plan (Hearing Ex. 1) § 5.7.

15

B.                    *Senior and Subordinated Claims*

32.     The holders of Senior Notes are comprised of holders of notes issued pursuant the

Senior Notes Indenture.  As of the Petition Date, there are $2 billion of principal amount of

Senior Notes outstanding, consisting of (i) $500 million of the 6.55% notes due June 15, 2006,

(ii) $500 million of the 6.50% notes due May 1, 2009, (iii) $500 million of the 6.50% notes due

August 15, 2013, and (iv) $500 million of the 7.125% notes due May 1, 2029.  See Disclosure

Statement (Hearing Ex. 2) at p. 32.  As of January 31, 2008, the collective claims of the Senior

Notes, including pre and Postpetition Interest thereon, amount to approximately $2.37 billion.

As of January, 10 2008, the Senior Notes were trading at approximately $47, for a total value of

$ .9 billion.

33.     In the Disclosure Statement, the Debtors state that the holders of Senior Notes, as

well as all General Unsecured Creditors (other than TOPrS Claims), will be paid the full amount

of their allowed claim under the Plan at Plan Equity Value (including pre petition interest) plus

Postpetition Interest, receiving a combination of New Common Stock, equal to 77.3% of each

claim and Discount Rights, equal to 22.7% of each claim.  See Disclosure Statement (Hearing

Ex. 2) at p. xxiv.  However, at the recoveries implied by the current market prices for the Senior

Notes, holders will receive only $39.6 for every $100 of claims.  Further, holders of Senior Notes

have no incentive to exercise their Discount Rights because at the current market prices for the

Senior Notes, they could receive more shares of New Common Stock for less money by merely

purchasing additional Senior Notes on the open market at the current market price than they can

receive by exercising (i.e. purchasing at the "discount" to Plan Equity Value) the Discount

Rights associated with the Senior Notes they already own.

34.     TOPrS consist of notes issued under the Subordinated Notes Indenture.  As of the

Petition Date, $150 million of the 6.197% Subordinated Notes due November 15, 2033, and

16

$250 million of the 8.25% Subordinated Notes due October 15, 2033 were issued and

outstanding not including interest. See Disclosure Statement (Hearing Ex. 2) at p. 32. TOPrS

claims will be satisfied in the same manner as the Senior Notes. Id. The TOPrS claims,

however, will only receive such distributions in an amount equal to 90% of the total TOPrS

prepetition claims. Id.

35.     Under the terms of the Subordinated Notes Indenture, the TOPrS are expressly

subordinate to all senior debt of Delphi. See Subordinated Notes Indenture (Hearing Ex. 12) at

§ 17.01 ("In the event of any . . . bankruptcy . . . all Senior Debt (including any interest thereon

accruing after the commencement of any such proceedings) shall first be paid in full before any

payment or distribution, whether in cash, securities, or other property, shall be made to any

Holder of any of the Debt Securities or Coupons on account thereof."). In turn, Senior Debt is

defined to as "any obligation of [Delphi] Corporation to its creditors whether now outstanding or

subsequently incurred . . . ." Id. at § 1.01.

36.     The Subordinated Notes Indenture provides that the TOPrS subordination cannot

be waived. See Id. (Hearing Ex. 12) at § 17.01 ("Senior Debt shall continue to be Senior Debt

and entitled to the benefits of these subordination provisions irrespective of any amendment,

modification or waiver of any term of the Senior Debt or extension or renewal of the Senior

Debt.").

37.     Under the Plan, subordination of the TOPrS is waived under the following

provision:

> All Claims against the Debtors and all rights and claims between
> or among holders of Claims relating in any manner whatsoever to
> distributions on account of Claims against or Interests in the
> Debtors, based upon any claimed subordination rights, whether
> asserted or unasserted, legal or equitable, shall be deemed satisfied
> by the distributions under the Plan to holders of Claims having

17

such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date; provided, that the subordination rights of the holders of Senior Debt (as such term is defined in the Subordinated Notes Indenture) shall be deemed satisfied through the distributions described in Article 5.3, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims shall receive a distribution equal to 90% of the principal and accrued prepetition interest of the TOPrS. . .

Plan (Hearing Ex. 1) § 11.10(a).

38.    The TOPrS and Senior Notes are placed in the same class under the Plan, and the holders of TOPrS, under the Plan, may vote to waive the holders of Senior Notes' entitlement to subordination. See Plan (Hearing Ex. 1) § 5.3. Trade creditors, regardless of whether they hold claims against Delphi or certain of the other Debtor entities are also classified along with the TOPrS and Senior Notes. Id. Under the Plan, trade creditors of Debtor entities other than Delphi may also vote to waive the holders of Senior Notes' seniority rights. Id. That is, under the Plan, nearly all general unsecured creditors of all Debtors are permitted to vote on the enforcement of a right that only belongs to the Delphi creditors.

C.        *Comparison of Investment Agreements, Plan Iterations and Recoveries Thereunder*

39.    In December 2006, Delphi sought approval of the first iteration of the Investment Agreement (the "Cerberus EPCA"). See Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code [Docket No. 6179] (Hearing Ex. 13). The agreement called for a variety of investors, including Appaloosa and Cerberus Capital Management, L.P. ("Cerberus") to commit to purchase $220.5 million of

18

common stock and $1.2 billion of preferred shares in Reorganized Delphi, as well as any

unsubscribed shares offered in connection with a rights offering worth $1.984 billion.  See id. at

19-20. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

40.     In April 2007, the Debtors announced that Cerberus would no longer participate

in the Cerberus EPCA.  See Delphi Corp., Current Report (Form 8-K) (Hearing Ex. 15), at 2

(July 7, 2007) ("Delphi announced on April 19, 2007 that it did not expect that Cerberus would

continue as a plan investor.").  Delphi and Appaloosa reinitiated negotiations and by July 2007

they had arrived at a new agreement—the Delphi-Appaloosa EPCA.

41.     In July 2007, after Cerberus terminated the Cerberus EPCA, Delphi sought

approval of the Delphi-Appaloosa EPCA.  See Expedited Motion for Order Authorizing and

Approving Delphi-Appaloosa Equity Purchase and Commitment Agreement Pursuant to 11

U.S.C. §§ 105(a), 363(b), and 507(a) [Docket No. 8673] (Hearing Ex. 16).  The Delphi-

Appaloosa EPCA called for the Plan Investors to purchase $800 million of preferred stock and

$175 million of common stock, as well as any unsubscribed shares offered in connection with a rights offering worth approximately $1.575 billion. See id. at Ex. 1. Under the terms of the Delphi-Appaloosa EPCA, all allowed unsecured claims (including all allowed accrued interest) would be satisfied with $3.48 billion of common stock and the balance paid in cash. Id. GM would receive $2.7 billion in cash and retention of certain claims. Id. Holders of Existing Common Stock would receive 1,476,000 shares of common stock, as well as rights and warrants to purchase additional shares of common stock. Id.

42.    In September 2007, Delphi filed the first iterations of the Plan and Disclosure Statement. All claims were to be satisfied as set forth in the Delphi-Appaloosa EPCA. See Initial Disclosure Statement (Hearing Ex. 2) at pp. 154-58. Additionally, MDL Claims under the Plan would be allowed in a total amount of $204 million and satisfied in the same manner as General Unsecured Claims. Id. Between September and late November 2007, several revisions were made to Plan and the Delphi-Appaloosa EPCA. These changes altered the buy-in price for the Plan Investors, reflecting perceived changes in the economy. See, e.g., Notice of Further Proposed Amendments to Debtors' Disclosure Statement with Respect to Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession [Docket No. 10964] at Ex. A, p. xii-xiv (Hearing Ex. 17) (comparing the recoveries to holders of claims and interests and the Plan Investors' buy-in prices under the various iterations of the Plan). In late November, the Debtors filed the current Plan, Disclosure Statement and Investment Agreement, providing the recoveries described above.

43.    While recoveries for most claimants under the current Plan have been reduced by the lower buy-in prices of the Plan Investors and the change in value of Delphi, the recoveries afforded to holders of Senior Notes have disproportionately been affected, especially in

20

comparison to the distributions being given GM because GM's distribution is in cash, debt and

preferred stock, while the distribution on account of the Senior Notes is in Common Stock and

Discount Rights.  While the value of GM's distribution has gone down 16.6% of current market

prices from its proposed September distribution, the value of the distributions to the holders of

the Senior Notes has been reduced 68.8%.

D.         *Valuation of the Debtors and the Evolution of Economic Events*

44.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

45.     In the first quarter of 2007, however, the prior production estimates were revised.

GMNA reduced its production forecast for the first quarter of 2007 by 60,000 vehicles. Compare

General Motors, GMNA Production Estimates, Dec. 2006 (Hearing Ex. 19), available at

http://www.gm.com/corporate/investor_information/docs/sales_prod/06_12/schedule_1206.xls,

with General Motors, GMNA Production Estimates, March 2007 (Hearing Ex. 20), available at

http://www.gm.com/corporate/investor_information/docs/sales_prod/07_03/schedule_0703.xls.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

46.     ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ Soon

thereafter, Cerberus pulled out of its deal with Delphi.

    47.   ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

█████; see generally, Katie Merx, GM Profit May Mask Struggles to Come; Its North

American Division Loses $39 Million Despite Cuts, Detroit Free Press, (Hearing Ex. 23) Aug. 1,

2007 at 1. ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

48.

49.     Within days of the Debtors filing the Plan and Disclosure Statement in September

2007, it became clear that Delphi would have to revise its projections again.  See Disclosure

Statement (Hearing Ex. 2) at p. xvi-xvii (describing the general downturn in the economy); see

also Sarah A. Webster, Economic Fears to Pinch Auto Sales; Housing Woes a Big Factor,

Experts Say, Detroit Free Press, Sept. 4, 2007, (Hearing Ex. 25) at 1 ("When August auto sales

are reported today, they are expected to provide another sign that U.S. economic worries will

challenge the auto industry for months to come, putting pressure on carmakers for further

production cuts and profit-eating sales incentives.").

██████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

        51.     In December 2007, Delphi filed the final, and current, iterations of the Plan,

Disclosure Statement, and Investment agreement.  Based on the Business Plan's estimates and a

negotiated Total Enterprise Value of the Debtors of $13.3 billion, which is above the midpoint of

the Rothschild Valuation range—the Debtors still claim that unsecured creditors will be paid in

full.  See Disclosure Statement (Hearing Ex. 2) at pp. xvi, xxiv.

        52.     That so-called payment in full, however, is predicated entirely on the accuracy of

an estimation of Reorganized Delphi's worth as espoused by Rothschild and negotiated by those

involved in the formulation of the Plan.  The Rothschild Valuation is premised entirely on the

24

Debtors' financial projections as contained in the Business Plan as each of the three

methodologies is based on the projected future cash flow, rather than on the historical results of

Delphi's businesses.  See Rothschild Valuation (Hearing Ex. 28) at 1 ("Rothschild also assumed

that the Projections have been reasonably prepared on a basis reflecting the Debtors' best

estimates and judgment as to future operating and financial performance."). ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ The Rothschild Valuation purports to

value the Debtors on December 31, 2007, not on the Effective Date.  Id. at 2.   Additionally, the

Rothschild Valuation does not account for dilution for the stock issued under the Management

Compensation Plan or the issuance of any additional shares to the Plan Investors if the Debtors

underestimated the total amount of Allowed General Unsecured Claims.  See Rothschild

Valuation (Hearing Ex. 28) at p. 2█████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

53.    Aside from the propriety, or lack thereof, of the Rothschild Valuation, the Plan's

alleged full recovery for unsecured creditors does not account for the risks of stock ownership,

despite the Debtors' acknowledgement of the market risks of New Common Stock.  For

example, in their recently filed Registration Statement, the Debtors acknowledge all of the

uncertainty with the ownership of common stock:

> The market price of our common stock has been, and the market
> price of the common stock of reorganized Delphi is likely to
> continue to be, volatile, experiencing wide fluctuations in response
> to numerous factors, many of which are beyond our control.

Delphi Corporation, Securities Registration Statement (Form S-1/A) (Hearing Ex. 30) at 38

(December 12, 2007). The Debtors have also acknowledged that the price of the Discount Rights

has neither been tied to any specific value of the Debtors' assets nor does it guarantee that

creditors will actually be paid in full under the Plan:

> The exercise prices of the rights do not necessarily bear any
> relationship to the book value of our assets, past operations, cash
> flows, losses, financial condition or other common criteria used to
> value equity securities. The exercise prices of the rights should not
> be considered an indication of the actual value of reorganized
> Delphi or the shares of its common stock....We cannot assure you
> that the market price of the common stock of reorganized Delphi
> will not be below the exercise prices of the rights, or decline
> further below the exercise prices, after the closing of the rights
> offerings. If that occurs, you will suffer an immediate unrealized
> loss on those shares as a result. The exercise prices of the rights
> should not be considered an indication of the future trading price
> of the common stock of reorganized Delphi.

Id. at 34, 38.

54.    Since the creation of the Business Plan and the Rothschild Valuation upon which

the "100%" recovery to unsecured creditors is based, the outlook for the economy as a whole has

also worsened in a manner that directly impacts Delphi's future. See, e.g., Randall Smith, Credit

Woes Take Toll on Underwriting, Wall St. J., Jan. 2, 2008, at R18 (Hearing Ex. 31) (stating that

the volume of stock and bond sales has declined for the first time in five years in the wake of the

subprime crisis); Neil King Jr., et al., Oil Hits $100, Jolting Markets, Wall St. J., Jan. 3, 2008

(Hearing Ex. 32) (stating that record setting crude-oil futures and "[s]teep gasoline prices also

threaten America's long love affair with the automobile"); Rich Barrett, Steel Prices Expected to

Increase in 2008; Consumers Could See Higher Costs Passed On, Milwaukee J. Sentinel, Jan. 1,

2008, at D1 (Hearing Ex. 33) (reporting that the new year might usher in higher steel prices and

noting that steel is the "main component for many manufacturers, from automakers to washing-

machine companies"); David Roche, The Global Money Machine, Wall St. J., Dec. 14, 2007, at

A21(Hearing Ex. 34) (stating that the lack of global liquidity presents a likely "disastrous

outlook for the global economy and financial markets").

      55.     Since the creation of the Business Plan and the Rothschild Valuation, upon which

the espoused "100%" recovery to unsecured creditors is based, industry experts have again

revised and lowered future estimates for vehicle production in North America, as well as sales

forecasts.  See Rick Popely, U.S. Sales Forecasts at 10 year Lows, Chi. Trib., Dec. 24, 2007

(Hearing Ex. 35) (Noting that automobile analysts, CSM Worldwide, IRN Inc. and GI/DRI, all

expect sales in the United States to be at their lowest point in ten years); John D. Stoll and Neal

E. Boudette, December Slump in Vehicle Sales Augurs Ill for '08, Wall St. J., Jan. 4, 2008

(Hearing Ex. 36) (stating that Standard & Poor's had forecasted United States sales to drop to as

low as 15.5 million vehicles); CSM Worldwide, 2008 Outlook, Auto Sales to Hit Rock Bottom,

Dec. 13, 2007 (Hearing Ex. 37) (predicting that automobile production in North America would

only be 14.4 million in 2008), available at http://www.csmauto.com/press; A hint of what's to

come?; November suggests 2008 sales could be even worse, analysts predict, Grand Rapids

Press, Dec. 4, 2007, (Hearing Ex. 38)  at C1 (reporting that GM cut scheduled production for the

first quarter of 2008); Greg Keenen, Gloomy Year Forecast for Auto Production, Sales, Globe

and Mail, Dec. 14, 2007 (Hearing Ex. 39) (reporting that GI/DRI was forecasting total North

American production to be 14.37 million vehicles in 2008); Goldman Sachs, Report, <u>Americas:</u>

<u>Autos</u>, Jan. 9, 2008 (Hearing Ex. 40) ("We have lowered our 2008 and 2009 EPS estimates and

price targets across all our companies on the back of significantly pared-back sales and

production estimates for 2008 and 2009 given we are now factoring a US recession.  Our 2008

NA production forecast falls to 14.3 mn from 14.7 mn, our 2009 forecast to 14.7 mn from 15.5

mn."). [5]

     56.    ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

     57.    Further, as discussed above, the market prices of Delphi's debt securities have

dropped significantly since the creation of the final Business Plan and Rothschild Report, from

above $90 in October to 47 as of January  10, 2008.  ████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

██████████

     58.    Additionally, as a product of the recent agreement between GM and the UAW in

October, which eliminated the "jobs bank," GM's labor costs are more variable freeing it to keep

production in line with the current lower-market demand for vehicles.  <u>See</u> Sharon Terlep, <u>New</u>

deal, New layoffs for GM, Detroit News, Oct. 25, 2007 (Hearing Ex. 41) (explaining that the union deal allows GM to discontinue its past practice of "overproduc[ing] cars and trucks to keep plants running, a strategy that ultimately contributed to the glut of vehicles being sold at deep discounts and into rental fleets"). The same holds true for Ford, one of Delphi's other customers. See Bernard Simon, Ford Chief Pledges Return to Profit, Financial Times, Jan. 9, 2008 (Hearing Ex. 42) (stating that "Ford said on Tuesday night it would cut North American vehicle production however much is needed to return to profit next year" and that "[n]ew labour contracts negotiated last autumn give [Ford] more flexibility to cut costs by laying off workers and reducing production"). This new market reality renders projections of the Debtors future business loss predictable – especially if the United States is entering a consumer recession as forecast by many economists – as Delphi's primary customers will likely reduce production and thereby purchase fewer parts if consumers cut back on demand.

59.    Delphi's margins are also at risk during a recession or slowdown, as consumers may purchase smaller cars that have less expensive parts. Goldman Sachs, Analyst Report, Jan. 9, 2008 (Hearing Ex. 43) at 2

60.    Despite the industry consensus regarding reduced volumes, the economic challenges, and the new reality caused by the new labor agreements, Delphi has not revised its Business Plan, the projections contained therein, and Rothschild has not revised its valuation of Reorganized Delphi. In fact, ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████

E.             *Substantive Consolidation*

61.    The Plan contemplates substantive consolidation of the Debtors for voting and

distribution purposes only; however, the separate Debtor entities will continue in existence and,

in fact, intend to undertake the complex corporate restructuring transactions, where corporate

formalities will be followed in detail, in conjunction with emerging from chapter 11, but not

through substantive consolidation.  See Plan (Hearing Ex. 1), Ex. 7.3.

62.    The Debtors are organized as separate legal entities and have made such

separateness publicly known by publicly filing lists of all of its subsidiaries and the states of

incorporation or organization.  See, e.g., Delphi Corp., Annual Report (Form 10-K) (Hearing Ex.

45), at Ex. 21 (Feb. 27, 2007).  ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████ see also Cash Management Motion at ¶ 27 (Hearing Ex. 47)

("The Debtors' Integrated Cash Management System and other processes in place allow the

Debtors to track all obligations owing between related entities and ensure that all transactions

cleared through the Major Netting process are accounted for appropriately on each entity's

books.").

63.    ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

64.    The Debtors have also filed separate statements and schedules for each entity.

See, e.g., Bankr. S.D.N.Y. Docket No. 05-44640 at entries dated April 14, 2006 (Delphi

Automotive Systems, LLC, Amended and Restated Statement of Financial Affairs) (Hearing Ex.

30

49) and October 12, 2007 (Delphi Automotive Systems, LLC, Amendment to Schedules of
Assets and Liabilities) (Hearing Ex. 50)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

66.      While the Debtors point to consolidated financial statements as support for
substantive consolidation, such reliance is misplaced. ██████████████████████

█████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████

██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████



68.

██████████████████████████████████████████████████████████

███████████████████████

69.    Additionally, in reliance on the separate financials of the various entities,

creditors bargained for and received separate guarantees to ensure that any economic value of the

related and guaranteeing company was available as well ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ Delphi Corp., Current Report (Form 8-K) (Hearing Ex. 61), at 2 (June 14, 2005)

(disclosing that the terms of the revolving credit facilities provide "that amounts borrowed under

the Facilities will be guaranteed by Delphi's wholly-owned domestic subsidiaries (except for

insignificant subsidiaries and subsidiaries that participate in accounts receivable financings).");

Financing Motion [Docket No. 0042] (Hearing Ex. 62) at 2 (stating that the Debtor in Possession

Financing obligations would be cross-guaranteed by each Debtor); Motion of Bank of America,

N.A. (I) to Provide Adequate Protection of Security Interests in Collateral; and (II) to Terminate

the Automatic Stay with Respect to Cash Collateral [Docket No. 1022] (Hearing Ex. 63) at 3

(stating that the obligations of Delphi Automotive Systems Human Resources, LLC under a

aircraft lease agreement are guaranteed by Delphi and Delphi Automotive Systems LLC).

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████    In fact, Delphi has even provided projected EBITDAR

levels for some of its subsidiaries.  See Delphi Corp., Current Statement (Form 8-K) at Ex. 99(a)

(Jan. 9, 2008) (Hearing Ex. 66); █████████████████████████████████

████████████████████████████  see also Delphi Corp., Annual Statement (Form

10-K) (Hearing Ex. 45), at 121 (Feb. 27, 2007) (listing foreign entity income and U.S. loss, as

well as deferred tax expense and Cash paid for non-U.S. income taxes); ████████████

███████████████████████████████████████████████████████

███████████████████

71.    When the Debtors issued debt, they told creditors from which legal entities they

could and could not look for repayment.  See Delphi Corp., Prospectus Supplement (Form

424(b)(5)), at 10 (Nov. 17, 2003) (Hearing Ex. 69) ("Delphi's subsidiaries are separate legal

entities and have no obligation to pay, or make funds available to pay, any amounts due on the

notes, the trust preferred securities or the guarantee.").

72.    Additionally, creditors knew from public information which entities were subject

to a large amount of trade claims, see Delphi Corp., Current Statement (Form 8-K) Ex. 99(a) at

31 (Oct. 17, 2005) (Hearing Ex. 70) (describing the levels of trade debt among U.S. entities), the

cash flow at foreign subsidiaries, and  Delphi's corporate structure, see, e.g., Delphi Corp,

Annual Statement (Form 10-K) at ex. 21 (Jan. 28, 2004) (Corporate structure chart).

73.    Finally, the Debtors' cash management system enables "the Debtors, as well as

their creditors and this Court, to trace funds through the system and ensure that all transactions

are adequately documented and readily ascertainable."  Cash Management Motion (Hearing Ex.

47) [Docket No. 24] ¶ 47.

74.    Based on the evidence to be adduced at the hearing ███████████████

███████████████████████████████████

███████████████████████████████

██████████

75.    Based on the evidence to be adduced at the hearing, ███████████████

███████████████████████████████

████████████████████████

76.    Based on the evidence to be adduced at the hearing, ███████████████

███████████████████████████████████

███████████████████████████████████

████████████

77.    Based on the evidence to be adduced at the hearing ███████████████

███████████████████████████████████

██████████████████████████

78.    The Debtors are separate entities and their assets and liabilities are not hopelessly

entangled.

### Summary of Argument

79.    Not only does the Plan lack the support of the Senior Noteholders, who are

receiving drastically less than a full recovery while junior creditors are receiving many millions

of dollars, but it also fails to satisfy the relevant provisions of the Bankruptcy Code.  As a result

of these deficiencies, the Plan is incapable of being confirmed as a matter of law.

80.    First, the Debtors — who bear the burden of proof in these proceedings — cannot

prove that that Plan satisfies section 1129(a)(1) of the Bankruptcy Code, because the Plan

violates sections 510(a), 510(b), 1122 and 1123(a)(4) of the Bankruptcy Code.  These provisions

35

work together to ensure that creditors are granted a proper vote and a proper recovery. The Plan, however, deprives the holders of the Senior Notes of these rights by unlawfully classifying their claims with (a) the TOPrS; (b) claims against other Debtors; and (c) Delphi trade claims.

81.    The Plan's classification of the Senior Notes with the TOPrS is improper because the TOPrS are expressly subordinated to the Senior Notes. This misclassification is particularly egregious because it ludicrously results in the TOPrS voting on whether to waive subordination of their own claims – a decision that must be restricted to senior creditors. Indeed, the Plan expressly affords different treatment to the Senior Notes than to the TOPrS, which confirms that they must be placed in separate classes and which independently violates section 1123(a)(4) and consequently 1129(a)(1).

82.    The Plan's classification of the Senior Notes with claims against other Debtors is equally improper. The requirements for substantive consolidation are not even remotely satisfied. Moreover, the Bankruptcy Code does not permit the use of "deemed" substantive consolidation – that is, the kind of substantive consolidation only for voting and distribution purposes –where, as here, a party objects.

83.    The Plan also violates section 1129(a) because it fails to effectuate the statutory subordination of the MDL Claims, as mandated by section 510(b) of the Bankruptcy Code, and to enforce the contractual subordination agreement between the TOPrS and the holders of the Senior Notes under section 510(a) of the Bankruptcy Code. Section 510(b) was specifically enacted by Congress to protect senior creditors from recoveries being made to creditors whose claims arose on account of securities fraud or recession. These protections cannot be abrogated by this Court or by creditor vote. Despite this, however, the Plan clearly violates section 510(b) by providing a recovery to the 510(b) Note Claims that is pari passu to the recovery afforded the

36

General Unsecured Creditors.  In addition, the Plan does not enforce the subordination agreement between the TOPrS and the Senior Notes, in violation of section 510(a) of the Bankruptcy Code.  By failing to enforce the contractual and statutory subordination provisions, the Plan further violates section 1129(a)(1) of the Bankruptcy Code.

84.     Second, the Plan violates section 1129(b)(2) of the Bankruptcy Code because it discriminates unfairly against and is not fair and equitable to the holders of the Senior Notes. The holders of the Senior Notes are not being paid in full under the Plan and have not consented to the lesser treatment afforded to them under the Plan when value is at the same time being distributed to junior stakeholders.  Under the Supreme Court's holdings in 203 North LaSalle and Ahlers, this should be the final word on the matter and the Bankruptcy Court should not strain its authority to confirm a plan that has been rejected by creditors where it fails to adhere to the absolute priority rule.

85.     The assertion that the holders of the Senior Notes are being paid in full is a transparent fiction.  The Rothschild Valuation, as relied upon by the Debtors, is stale and outdated.  It also is premised on forward-looking projections that (i) are overly optimistic, (ii) fail to take into account the economic downturn in the automotive sector and the economy generally and (iii) new market realities.  In addition, the Rothschild Valuation fails to account for the numerous dilutive provisions of the Plan, such as the Management Compensation Plan and the protections afforded to the Plan Investors in the event the allowed amount of General Unsecured Claims is higher than the $1.45 billion threshold amount under the Investment Agreement.  Indeed, even the Debtors admit that the holders of the Senior Notes will not receive a full recovery without taking any of this into consideration, at the mid-point of the Rothschild Valuation.

37

86.    Given that the holders of the Senior Notes are not being paid in full (and to the

extent the requisite supermajority of holders of the Senior Notes do not vote for the Plan), the

Plan patently violates the absolute priority rule by expressly providing recoveries to the

contractually subordinated TOPrS and the statutorily subordinated MDL Claims, as well as to the

holders of Existing Common Stock.  The United States Supreme Court in <u>Ahlers</u> made it clear

that there are no exceptions to the absolute priority rule that did not exist at the time of the

codification of the absolute priority rule in section 1129(b), and  the Second Circuit has <u>never</u>

recognized the propriety of circumventing the rule.  As such, the Plan cannot be confirmed under

section 1129(b).

87.    <u>Third</u>, the Plan cannot be confirmed because it is premised entirely upon the

impermissible substantive consolidation of the Debtors.  The Debtors bear the burden of proof

that substantive consolidation is warranted under the standards set forth by the Second Circuit in

<u>In re Augie/Restivo</u>, 860 F.2d 515 (2d Cir. 1988), but they cannot begin to make that showing.

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████    As a result, creditors relied on the individual creditworthiness of the specific

Debtor entities with which they did business.  Moreover, after the numerous representations

made to this Court at prior hearings, the Debtors cannot seriously contend that they are

hopelessly entangled when they have maintained separate books and records, tracked

intercompany claims and filed separate schedules and statements.

88.     Unable to satisfy the binding law of this Circuit, the Debtors resort to seeking

something less than true substantive consolidation: the impermissible 'deemed consolidation' of

certain Debtors for voting and confirmation purposes. This is the same form of 'consolidation'

that has been flatly rejected by the Third Circuit in In re Owens Corning, 419 F.3d 195, 210 (3d

Cir. 2005), and is designed solely to prejudice the voting rights and recoveries of the Debtors'

senior creditors. This Court should not countenance this thinly veiled attempt to deprive the

holders of the Senior Notes of the benefit of their contractual bargain unless the Debtors are able

to satisfy the Augie/Restivo test set forth by the Second Circuit.

89.     Fourth, the Debtors are also unable to satisfy the Second Circuit's standard for

granting third-party releases as set forth in In re Metromedia Fiber Network, Inc., 416 F.3d 136

(2d Cir. 2005). The Plan grants broad third-party releases to the Released Parties, GM and the

Plan Investors. Moreover, the Plan provides that each creditor of the Debtors is deemed to have

granted these releases by either voting to accept the Plan or by accepting a distribution

thereunder. There is no evidence, however, that any of the parties being released under the Plan

have satisfied the requirements set forth by the Second Circuit in Metromedia, including that any

of them have contributed the type of value or other consideration to the Debtors' estates (and

hence, their creditors) that would justify the releases sought. The other factors set forth by the

Second Circuit in Metromedia have also not been established. Consequently, the releases

proposed in the Plan should not be approved.

90.     Fifth, as of the date hereof, the Plan cannot be confirmed because it is not feasible

under section 1129(a)(11) of the Bankruptcy Code, as the Debtors lack committed exit financing

and certain conditions to the closing of the Investment Agreement are unsatisfied. Without the

certainty of fully-committed exit financing — which is essential to the emergence of the

39

Reorganized Debtors at the time of the Confirmation Hearing — the Plan will not be feasible,

and will, in turn, be incapable of being confirmed.

91.    For each of these reasons, the Plan should not be confirmed.  The Senior

Noteholders respectfully requests that this Court deny confirmation of the Plan.

## Argument

92.    The Debtors bear the burden of proof to demonstrate that each and every

requirement of section 1129 of the Bankruptcy Code is satisfied.  See In re Washington Assoc.,

147 B.R. 827, 830 (E.D.N.Y. 1992); see also In re Texaco, Inc., 84 B.R. 889, 891 (Bankr.

S.D.N.Y. 1988).  As we now show, the Debtors have failed to meet this burden and the Plan

cannot be confirmed.

I.    **The Plan Violates Sections 1122, 1123(a)(4) and 510(a) of the Bankruptcy Code and Thus, Cannot be Confirmed**

93.    Pursuant to section 1129(a)(1) of the Bankruptcy Code, a court must deny

confirmation of a plan of reorganization unless "the plan complies with the applicable provisions

of this title." 11 U.S.C. § 1129(a)(1); see also In re Coventry Commons Assocs., 155 B.R. 446,

454 (E.D. Mich. 1993); In re Northeast Dairy Co-op. Federation, Inc., 73 B.R. 239, 248–49

(Bankr. N.D.N.Y. 1987).  Section 1129(a)(1) is not satisfied here for five reasons:  (A) the Plan

fails to comply with section 1122 as it improperly classifies the Senior Notes Claims together

with the TOPrS Claims and the claims against Debtors other than Delphi; (B) the Plan provides

different treatment to claims in the same class in violation of section 1123(a)(4); (C) the Plan

does not enforce — and in fact purports to eradicate — the subordination of the TOPrS to the

senior claims of Delphi, in plain violation of section 510(a); (D) the Plan would grant recoveries

to the holders of the MDL Claims in a violation of the subordination mandated by section

510(b); and (E) the Plan is premised on impermissible substantive consolidation of the Debtors.

40

A.          *The Senior Notes Require Separate Classification Because
They Have Distinct Interests and Motivations*

94.    Section 1122 ensures that creditors holding sufficiently distinct interests and

motivated by different considerations enjoy a sufficient and separate voice in a reorganization in

order to protect their interests.  See In re Greystone III Joint Venture, 995 F.2d 1274, 1277 (5th

Cir. 1991) (section 1122 prevents debtors from disenfranchising creditors holding distinct legal

rights against the debtor's assets "by artful classification"); Durrett, 139 B.R. at 3 (Bankr.

D.N.H. 1992) (section 1122 protects the votes of creditors motivated by "totally different

considerations" from undue influence by other creditors).  Given that the holders of the Senior

Notes have sufficiently distinct interests from the TOPrS, trade claims of creditors of the

subsidiaries of Delphi, and the trade claims of the creditors of Delphi, the Senior Notes must be

placed in their own class.

95.    Section 1122 of the Bankruptcy Code provides in relevant part that "a plan may

place a claim or an interest in a particular class only if such claim or interest is substantially

similar to the other claims or interests of such class."  11 U.S.C. § 1122(a) (emphasis added).

Section 1122 of the Bankruptcy Code is a codification of the caselaw existing prior to the

enactment of the Bankruptcy Code.  S. Rep. No. 95-989 at 118 (1978) ("This section codifies

current caselaw surrounding classification of claims and equity interests.").  Section 1122

"requires classification based on the nature of the claim or interest classified, and permits

inclusion of claims or interests in a particular class only if the claim or interest being included is

substantially similar to the other claims or interests of the class."  Id.  As such, not only must

similar claims be classified together, but dissimilar claims must also be separately classified.  In

re Boston Post Rd. Ltd P'ship, 21 F.3d 477, 481 (2d Cir. 1994); see also In re Worldcom, Inc.,

41

2003 Bankr. LEXIS 1401, *138 (Bankr. S.D.N.Y. Oct. 31, 2003) (noting that if claims are classified together, they must be substantially similar).

96.     The Bankruptcy Code does not define what is meant by "substantially similar." The Second Circuit, however, has indicated that claims "enjoy[ing] similar rights and privileges" are substantially similar and should be classified together. Boston Post Road, 21 F.3d at 483; see also In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (stating that the "relevant inquiry is whether all the claims of a class have substantially similar rights to the debtors' assets"); Northeast Dairy, 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987) ("[T]he primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is on that which is held."); 7 Collier On Bankruptcy ¶1122.03[6] (L. King Rev. 15th ed. 2007) ("[O]nly claims carrying a similar interest in voting to accept or reject a plan should be classified together."). Id.

97.     The claims in Class 1C are dissimilar for two reasons. First, the Plan fails to distinguish between senior claims and subordinate claims. Second, the Plan places the claims of creditors of different Debtors in the same class. Thus, the classification scheme proposed by the Plan violates this fundamental tenet of bankruptcy law.

(1)     Subordinate Claims Cannot Be Classified
in the Same Class With Senior Claims

98.     The Senior Notes and TOPrS are not "substantially similar" within the meaning of section 1122. Holders of subordinated claims have different rights to a debtor's assets than holders of claims senior to them and may not receive a distribution of estate property until senior claims are satisfied in full. As such, they must be placed in separate classes. See e.g., Bartle v. Markson, 314 F.2d 303, 305 (2d Cir. 1963) (confirming a portion of a plan allowing holders of subordinated debentures to fully recover because the subordinated creditors were separately

42

classified and the senior unsecured creditors, who were aware of the subordination agreement,

voted to accept the plan); Scolnick v. Connecticut Tel. & Elec. Corp., 265 F.2d 133, 135 (2d Cir.

1959) (confirming a plan separately classifying subordinated debentures and other unsecured

claims and providing for a lesser recovery to the holders of the subordinated debt);[6] see also In re

Worldcom, 2003 Bankr. LEXIS 1401 at *139 (finding that, because subordinated notes are

dissimilar from senior notes, separate classification was appropriate); In re Walnut Equip.

Leasing Co., 1999 Bankr. LEXIS 1460, *4 n.4 (Bankr. E.D. Pa. Nov. 23, 1999) (finding it

"rather obvious" that senior creditors and subordinated creditors are not substantially similar and

should be separately classified); In re Cook, 26 B.R. 187, 190 (D.N.M. 1982) (noting that under

the strictest interpretation of section 1122, one of the only possible bases for separate

classification of unsecured claims is the existence of a subordination agreement); In re

McKenzie, 4 B.R. 88, 90 (Bankr. W.D.N.Y. 1980) (citing Bartle, 314 F. 2d 303) ("Where each

of two classes is unsecured, but one is by contract subordinated to the other, they have different

rights in whatever property of the estate is available for unsecured claims."); 7 Collier On

Bankruptcy ¶1122.03[4][a][ii] (L. King Rev. 15th ed. 2007) (stating that separate classification

---

[6]   The principles set forth in the pre-code classification cases apply with equal force today. It is well recognized
that cases that pre-date the Bankruptcy Code, have the same precedental value as post-code cases unless
Congress expressly changed the Bankruptcy Code to overrule the judicial precedent. See Midlantic Nat'l Bank
v. New Jersey Dept. of Envtl. Prot., 474 U.S. 494, 501 (1986) ("If Congress intends for legislation to change
the interpretation of a judicially created concept, it makes that intent specific.") (citation omitted). Here,
Congress made it clear that it was codifying existing classification caselaw. See S. Rep. No. 95-989 at 118
(1978) (" [Section 1122] codifies current case law surrounding the classification of claims and equity
securities."). Thus, this Court is bound to follow the applicable authority of this Circuit, even if the decision is a
pre-code case. See In re 360Networks (USA) Inc., 327 B.R. 187, 191 (Bankr. S.D.N.Y. 2005) (finding that a
pre-Code second circuit case remained binding authority on the bankruptcy court absent a sufficient statutory
justification to disregard it). See also Cannon v. University of Chicago, 441 U.S. 577, 699 (1979) (determining
that judicially-created precedent under Title VI of the Civil Rights Act of 1964 remained binding law after the
enactment of Title IX because "it is not only appropriate but also realistic to presume that Congress was
thoroughly familiar with these unusually important precedents from this and other federal courts and that it
expected its enactment to be interpreted in conformity with them"); Blockbuster, Inc. v. Galeno, 472 F.3d 53,
58 (2d Cir. 2006) (holding that judicially-created precedent concerning the burden of proving jurisdiction
remained binding under the Class Action Fairness Act of 2005 because it should be "assume[d] that Congress
was "well aware of the statutory language necessary to shift the burden of proof to the plaintiff in light of long-
standing judicial rules placing the burden on the defendant").

of subordinated claims is appropriate, if not required, where some claims are subordinated to other unsecured creditors).

99.    In <u>St. Louis Union Trust Co. v. Champion Shoe Mach. Co.</u>, 109 F.2d 313 (8th Cir. 1940), certain bondholders appealed a confirmation order on the grounds that the plan classified all bondholders in the same class despite the existence of a subordination clause affecting certain bondholders who had agreed to extensions of time for payment. 109 F.2d at 313, 315. The Eighth Circuit reversed the confirmation of the plan, finding that "the appellants' rights were sufficiently distinct from those other bondholders to entitle the appellants and those who were similarly situated to a separate classification." <u>Id.</u> at 316. The court noted that "[t]he rights of the bondholders who consented to the last extension were, by the terms of the trust indenture, subordinated to the rights of those who never consented to any extension and to the rights of those who consented only to the first extension." <u>Id.</u> As such, "[t]he plan which compels them to surrender, without adequate consideration and for the benefit of other bondholders, the superior rights which they acquired is inequitable and unfair." <u>Id.</u>

100.    Similarly, in <u>In re Discon Corp.</u>, 346 F. Supp. 839 (S.D. Fla. 1971), unsecured creditors challenged the confirmation of a plan which placed all unsecured creditors, including holders of subordinated debentures, in one, equally treated class. 346 F. Supp. at 841–42. The district court, noting that the Bankruptcy Act required separate classifications of debt and different treatment thereof where parties had contractually agreed to subordination, vacated the confirmation order. <u>Id.</u> at 841, 845. The court determined that the plan's single classification and equal treatment of all creditors failed to give proper recognition to the subordination agreement. <u>Id.</u> at 845. It was this approach that the Second Circuit Court of Appeals, citing <u>St. Louis Union Trust</u>, adopted in <u>Kyser v. MacAdam</u>, 117 F.2d 232, 237 (2d Cir. 1941), when it

44

held that a mortgage and a materialmen's lien, which have different priorities, could not be

placed in the same class. Kyser, which was reaffirmed by the Second Circuit in Markson and

Scolnick, is still binding authority today, and requires that the TOPrS and the Senior Notes be

separately classified.

101.     Despite the binding authority in this Circuit, the Debtors have previously

attempted to justify classifying the TOPrS and the Senior Notes together.  See Debtors'

Disclosure Statement Reply at ¶36.  The Debtors have misplaced their reliance on four

bankruptcy court decisions from outside of the Second Circuit and one article that appeared in a

PLI Bulletin, all of which are wholly unhelpful to the Debtors' argument that they have properly

classified the Senior Notes and the TOPrS together.  First, the Debtors purport to rely on In re

Frascella Enters, Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007), and In re Pierce Goods Shops

Co., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995).  Neither Frascella nor Pierce Goods addressed

whether it is proper to place subordinated claims and senior claims in the same class and allow

the subordinated creditors to vote with the senior creditors on the issue of whether to waive the

contractual subordination.  The issue in Frascella was whether debt that was guaranteed could be

classified with non-guaranteed debt.  Frascella, 360 B.R. at 443.  In Pierce Goods, the

Bankruptcy Court effectuated the subordination of the junior creditors so the issue of the

modification thereof by a plan of reorganization was never discussed.  Pierce Goods, 188 B.R. at

788.

102.     In re Eagle Bus Manufacturing Inc., 134 B.R. 584, 595 (Bankr. S.D. Tex 1991),

also relied on by the Debtors, fails to support the classification proposed by the Debtors as it

lacks both a substantive legal analysis of the propriety of classifying senior and subordinated

claims together and a discussion of how creditor distributions and subordination were treated

45

under that plan.  Similarly, the last case cited by the Debtors, In re Union Financial Services

Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. MO 2004), does not support the classification

scheme proposed by the Debtors.  Union Financial addressed whether a claimant, post-

confirmation, had waived a classification argument by not objecting to the confirmation of a plan

or appealing the confirmation order.  Id. at 821.  Lastly, the Debtors rely on a 1993 summary of

bankruptcy law prepared by the Practicing Law Institute for the proposition that senior and

subordinated claims may be classified together, as "they have the same legal rights against the

debtor's assets."  David L. Bleich, Chapter 11 Plans, 647 PLI Comm. 437, 520 (1993).  This

generic article, however, wholly fails to address the voting and waiver issues implicated in the

Debtors' classification scheme, but the article notes "[n]otwithstanding this analysis, senior and

subordinated claims may be, and as a general rule are, separately classified."  Id.  (emphasis

added).  Thus, the Debtors are unable to cite any authority in support of their classification

scheme.

        103.    By placing the holders of the Senior Notes in the same class as the holders of the

TOPrS in violation of the law of this Circuit, the Debtors have impermissibly given the TOPrS a

voice in whether to waive their own subordination.  The absurdity of this result demonstrates

precisely how different the interests of the holders of these disparate claims are.

                    (2)     Claims Against Different Debtors Have DifferentRights
                            to the Debtors' Assets and Cannot Be Classified Together

        104.    The Plan further errs by placing creditors of different Debtors in the same class.

This clearly violates the mandate of section 1122 of the Bankruptcy Code which requires that

"all the claims of a class have substantially similar rights to the debtor's assets."  Drexel

Burnham Lambert, 138 B.R. at 757; see also Northeast Dairy Cooperative, 73 B.R. at 250

(stating that, when analyzing a plan's classification scheme, "[e]mphasis is not upon the holder

46

so much as it is on that which is held."); cf. In re Richard Buick, Inc., 126 B.R. 840, 853 (Bankr. E.D. Pa. 1991) (refusing to confirm a plan which classified claims secured by different property in the same class). By their very nature, creditors of different Debtors will look to, and have the right to look to, different and distinct entities for the satisfaction of their claims. This classification scheme is wholly unjustified.

105.    The Debtors evidently seek to justify this patently improper classification scheme through substantive consolidation for voting purposes. As we fully demonstrate in Part II below, the Debtors cannot satisfy the requirements for substantive consolidation, and their proposal to consolidate the Debtors for voting purposes is patently unlawful under any circumstances where, as here, any creditors object.

106.    Not only does this erroneous classification disenfranchise the holders of the Senior Notes, it also alters their substantive rights. The Debtors are asking the creditors of Delphi to waive the subordination of the TOPrS. By classifying non-Delphi creditors, who by virtue of the attempted substantive consolidation of various entities may be receiving a greater recovery than what they would otherwise be entitled to receive, with the senior creditors of Delphi, the Debtors have impermissibly granted to these creditors the right to waive the contractual subordination of the TOPrS, for which they are not beneficiaries. Once again, this absurdity highlights the differences among the members of Class 1C.

(3)    The Plan's Classification Scheme Is Designed Solely
for Gerrymandering Purposes

107.    The Debtors placed substantially dissimilar claims together for the sole purpose of creating the impaired accepting class they need to confirm this Plan even in the face of the rejection of the Plan by the holders of the Senior Notes. The Second Circuit has not countenanced other similarly transparent attempts to rig Plan voting, and neither should this

47

Court.  See In re Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996) (a debtor may not classify

claims with the "sole purpose of creating an impaired assenting class"); see also Boston Post Rd.,

21 F.3d at 481 (classification to gerrymander an affirmative vote is impermissible); In re Mid-

State Raceway, Inc., 343 B.R. 21, 29–31 (Bankr. N.D.N.Y. 2006) (same).

108.    While courts often invoke the principles of proper classification to prevent a

debtor from placing similar claims in separate classes for gerrymandering purposes, the converse

holds equally true: a debtor cannot place dissimilar claims in the same class for the purpose of

creating an impaired assenting class.  See 7 Collier On Bankruptcy ¶1122.03[4][a][ii] (L. King

Rev. 15th ed. 2007) ("[C]lassification of senior and subordinated claims in the same class is not

permitted where the votes of the subordinated claims could bind the holders of the senior claims

to a plan that did not enforce the subordination agreement."); see also In re Perskin, 9 B.R. 626,

631 (Bankr. D. Tex. 1981) ("[Section] 1122 prevents discrimination occasioned by

amalgamating dissimilar claims into one class to gerrymander a plan around typical multi-

creditor difficulties faced by debtors.").

109.    Even where it is unclear whether various unsecured claims are dissimilar, courts

have, as a preventative matter, required a debtor to provide separate classifications where one

group of claimants may influence the outcome of the vote.  See, e.g., In re WorldCom, Inc., 2003

Bankr. LEXIS 1401, at *18 (noting that the court had previously required the debtor to

separately classify trade claims and general unsecured claims because of the court's concern that

trade claimants could unduly influence the outcome of the vote if all the claimants were in one

class).  In re Durrett, certain general unsecured creditors objected to the inclusion in the same

class of a creditor who had waived distributions under the plan in exchange for a transfer of real

property.  139 B.R. at 3.  The court determined that the creditor receiving property must be

48

111.    Although the Plan purports to provide a full recovery to each member of Class

1C, the holders of the subordinated TOPrS will receive a recovery of 90% of their allowed

claims (including any accrued and unpaid pre-petition interest), not the so-called "full recovery"

the Plan purports to pay other General Unsecured Creditors in class 1C.  In addition, the Plan

proposes that Postpetition Interest will be paid to the holders of General Unsecured Claims

(albeit in a reduced amount), but shall not be paid to TOPrS.  See Plan (Hearing Ex. 1) § 1.156.

Moreover, the Plan violates the second section 1123 component in that it forces the holders of

the Senior Notes to relinquish their subordination rights against the holders of TOPrS Claims in

consideration for their treatment under the Plan, but does not require any comparable sacrifice on

the part of the holders of TOPrS Claims in exchange for the same treatment.  This differential

treatment not only violates sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code, but it

also highlights the differences among these claims that warrant separate classification under

section 1122 of the Bankruptcy Code.

C.        *The Favorable Treatment of the TOPrS ViolatesSection 510(a)
          of the Bankruptcy Code.*

112.    On top of these classification and treatment errors, the Plan also fails to enforce

the clear express terms of the Subordinated Notes Indenture that subordinate the TOPrS to the

Senior Notes and other senior claims.  The Subordinated Notes Indenture provides that, in the

event of a bankruptcy, the holders of the Senior Notes must be paid in full (with interest) before

any distribution is made to the holders of the Subordinated Notes.  See Subordinated Notes

Indenture at (Hearing Ex. 12) § 17.01 ("In the event of any . . . bankruptcy . . . all Senior Debt

(including any interest thereon accruing after the commencement of any such proceedings) shall

first be paid in full before any payment or distribution, whether in cash, securities, or other

property, shall be made to any Holder of any of the Debt Securities or Coupons on account

50

thereof."). Moreover, the Subordinated Notes Indenture expressly guarantees that subordination

cannot be waived. See id. at § 17.01 ("Senior Debt shall continue to be Senior Debt and entitled

to the benefits of these subordination provisions irrespective of any amendment, modification or

waiver of any term of the Senior Debt or extension or renewal of the Senior Debt.").

     113.    Section 510(a) of the Bankruptcy Code expressly preserves the right of senior

claimants to enforce subordination agreements in bankruptcy proceedings. See 11 U.S.C.

§ 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent

that such agreement is enforceable under applicable nonbankruptcy law."); see also In re Kors,

Inc., 819 F.2d 19, 24 (2d Cir. 1987) (holding that a chapter 7 trustee cannot ignore the provisions

of a subordination agreement); In re Credit Industrial Corp., 366 F.2d 402, 410 (2d Cir. 1966)

(bankruptcy courts "must enforce lawful subordination agreements according to their terms").

Thus, the TOPrS Claims are expressly subordinated to the Senior Notes Claims pursuant to the

Subordinated Notes Indenture, and that subordination must be enforced under the Plan in order

to adhere to the Bankruptcy Code and satisfy section 1129(a)(1) thereof.

     D.        *The Plan is Fatally Flawed Because it Provides the Holders*
                *of the MDL Claims with a Recovery That is Pari Passu with*
                *Senior Creditors*

     114.    The Plan further errs by providing a recovery to the statutorily subordinated MDL

Claims that is pari passu with the recovery afforded senior creditors in violation of section

510(b) of the Bankruptcy Code. Section 510(b) of the Bankruptcy Code provides:

> For the purpose of distribution under this title, a claim arising from
> rescission of a purchase or sale of a security of the debtor, for
> damages arising from the purchase or sale of a security, or for
> reimbursement or contribution allowed under section 502 on
> account of such claim, shall be subordinated to all claims or
> interests that are senior to or equal the claim or interest represented
> by such security ...

11 U.S.C. § 510(b). The meaning of the section is plain on its face. Certain claims, such as

securities fraud claims, must be subordinated to senior claims. By failing to subordinate the

MDL Claims to the Senior Notes Claims, the Debtors have doomed the Plan to fail under section

1129(a)(1) of the Bankruptcy Code, which prohibits confirmation of a plan that makes

distributions in contravention of the applicable provisions of the Bankruptcy Code.

115.    In enacting the Bankruptcy Code, Congress expressly subordinated securities

fraud claims to other unsecured claims and made such subordination a statutory requirement.

Adherence to this provision is not optional. See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197,

205 (3d Cir. 2003) (510(b) is mandatory, not discretionary); In re Anchorage Police & Fire

Retirement System, 2004 WL 1459270, *2 (N.D. Ill. 2004) ("It is clear that subordination

pursuant to § 510(b) is mandatory, and the wording of the statute is plain and unambiguous ...");

In re SendMyGift.com, Inc., 280 B.R. 667, 676 (Bankr. D. Minn. 2002) ("[I]f the elements of the

statute are present, subordination is mandatory ... because the legislative history and the plain

language of § 510(b) require it."). Moreover, this statutory requirement cannot be abrogated by

creditor vote or by order of the bankruptcy court. See S. Rep. No. 95-595, at 74 (1978) (stating

that the language of section 510 requiring the court to enforce contractual subordination

agreements is subject to waiver by vote, but that statutory subordination must be enforced by a

bankruptcy court).

116.    The inability of the Debtors to effectuate a waiver of the subordination under

section 510(b), either through a "settlement" or by creditor vote on a plan of reorganization, is

based on sound policy. If such waiver were permitted, debtors could collude with "favored

creditors" and grant such creditors enhanced distributions at an elevated priority in order to

secure releases for debtors and the members of its senior management. Confirming a plan that

52

does not enforce statutory subordination creates a slippery slope, by incentivizing future

securities fraud claimants to attempt to entice debtors and their management to ignore the

mandates of section 510(b) in exchange for coveted releases at the expense of the debtors' senior

creditors.

117.    It is undisputed that the MDL Claims are subordinate under section 510(b) to the

Senior Notes Claims.  See Plan (Hearing Ex. 1) § 1.179, 1.181 (tracking the language of section

510(b) to define Section 510(b) Equity Claims and Section 510(b) Note Claims).  Accordingly,

each Senior Noteholder has a statutory right to be paid in full before any distribution is made on

account of the MDL Claims.  Under the Plan, however, the holders of MDL Claims are granted

pari passu treatment with the Senior Notes Claims.  See Plan (Hearing Ex. 1) § 5.5 ("Securities

Settlement disbursing agent shall receive, on behalf of holders of Section 510(b) Note Claims …

New Common Stock, Discount Rights, and/or Oversubscription Cash, in the same proportion of

the distribution of New Common Stock and Discount Rights made to holders of General

Unsecured Claims …").  Since the holders of the Senior Notes are not being paid in full, it is

clear that the treatment of the MDL Claims violates Section 510(b).  The Debtors cannot

abrogate the right of holders of the Senior Notes to be paid in full prior to any distribution to

holders of MDL Claims through a settlement; the other members of Class 1C cannot waive this

right by class vote; and the Court cannot disregard section 1129(a)(1) by confirming a Plan that

violates Section 510(b).

II.     **The Plan Cannot Be Confirmed Because It Is Premised Upon the**
        **Impermissible Substantive Consolidation of the Delphi-DAS Debtors**

118.    There is simply no basis in law or fact to approve substantive consolidation in

these Cases.  "Substantive consolidation has no express statutory basis [in the Bankruptcy Code]

but is a product of judicial gloss."  Augie/Restivo, 860 F.2d at 518 (citing In re Commercial

53

Envelope Mfg Co., 3 B.C.D. 647 (Bankr. S.D.N.Y. 1977)).  The Second Circuit has consistently

and repeatedly held that "substantive consolidation 'is no mere instrument of procedural

convenience…but a measure vitally affecting substantive rights.'"  Augie Restivo, 860 F.2d at

518 (citing Flora Mir Candy Corp. v. R.S.  Dickson & Co., 432 F.2d 1060, 1062 (2d Cir. 1970)).

As a result of its import, it is imperative that true substantive consolidation be applied sparingly,

only "to ensure the equitable treatment of all creditors."  See also In re Adelphia Commc'ns

Corp., 361 B.R. 337, 359 (S.D.N.Y. 2007) (noting that substantive consolidation is a remedy that

must be used with caution).

119.    In considering whether substantive consolidation is necessary, courts of this

circuit are required to make a positive determination of one of the following factors: "(i) whether

creditors dealt with the entities as a single economic unit and did not rely on their separate

identity in extending credit, or (ii) whether the affairs of the debtors are so entangled that

consolidation will benefit all creditors."  Augie Restivo, 860 F.2d at 518 (quotation and citations

omitted) (emphasis added).  Mere convenience of the Debtors, or the Debtors' need to

expeditiously confirm a joint plan of reorganization are insufficient to warrant substantive

consolidation of the Debtors, absent the presence of one of the Augie/Restivo factors.  See id. at

520 ("We do not pause to scrutinize [the bankruptcy judge's] various speculations as to events

that would occur if the proceedings were to continue separately because we do not believe that a

proposed reorganization plan alone can justify substantive consolidation.").

120.    Similarly, substantive consolidation can only be ordered if it is equitable to all of

the creditors involved – it cannot be properly accomplished where it benefits the creditors of one

of the debtors over the creditors of another consolidated debtor.  See Augie/Restivo, 860 F.2d at

518.  The Substantive consolidation scheme employed by the Debtors harms creditors of Delphi,

54

such as the Senior Noteholders, in that it robs them of assets otherwise available to pay creditors

absent consolidation ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ Under the Plan, Delphi and Delphi Automotive

Systems LLC are consolidated and the value of that note is available to trade creditors of the

Delphi-DAS subsidiaries.  Further, 87% of the value of Delphi's foreign subsidiaries flows to

Delphi before it can be accessed by creditors against DAS LLC, see Disclosure Statement

(Hearing Ex. 2) at p. 166, and creditors of Delphi knew and bargained for that value ████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████ The senior rights to those assets held by the creditors' of Delphi are

eviscerated by substantive consolidation.  A senior creditor can not be "made to 'sacrifice the

priority' of its claim based on the bankruptcy court's decision that doing so would benefit the

estate as a whole."  In re Adelphi Commc'ns. Corp., 333 B.R. 649, 662 (S.D.N.Y. 2005)

(quoting Augie/Restivo 860 F.2d at 520).

121.    Unable to meet the applicable standard established by the Second Circuit in

Augie/Restivo, the Debtors tacitly acknowledge, as they must, that they are not seeking, true

substantive consolidation, but only consolidation for "voting and distribution purposes."

Disclosure Statement (Hearing Ex. 2) at pp. 168–169.  In effect, what Debtors are actually

seeking is something that stops short of true substantive consolidation, something that is more

akin to the 'deemed consolidation' that has been squarely rejected by the Third Circuit in In re

Owens Corning, largely in reliance upon the Second Circuit's holding in Augie/Restivo.  See

Owens Corning, 419 F.3d at 210 ("[If] presented with a choice of analytical avenues, we favor

essentially that of Augie/Restivo.").

E.       *The Debtors Cannot Prove the Elements of Augie/Restivo
         as Required by the Binding Law of this Circuit*

122.    The Augie/Restivo test is clear.  While the Debtors claim to have assessed thirteen

factors in undertaking this analysis, they fail to publicly disclose the results of this analysis, other

than to conclude that any harm to creditors as a result of substantive consolidation is

"negligible."  Disclosure Statement (Hearing Ex. 2) at pp. 166–67.  By focusing on a "balancing

of the harm analysis," the Debtors attempt to obfuscate the proper analyses mandated by the

binding law of this Circuit and to shift the burden of proof to the Senior Noteholders ██████

███████████████████████████████████████████████████████████████████

███████

123.    The Debtors argue that substantive consolidation of the Delphi-DAS Debtors

should be approved because consolidation: (i) will result in administrative cost savings; and

(ii) facilitate the settlement structure of the Plan.  See Disclosure Statement (Hearing Ex. 2) at p.

168; ███████████████    In doing so, the Debtors tacitly admit that they are seeking

substantive consolidation – a drastic remedy that has an impact on creditor recovery and priority

– for purposes of plan expediency, a notion that has specifically been rejected by the Second

Circuit.  See Augie/Restivo, 860 F.2d at 520 (noting that the need for advancing a plan is not a

proper basis for substantive consolidation).  Neither administrative savings, nor facilitating a

---

[7]    Throughout the Disclosure Statement, the Debtors state potential factual arguments that they seem to believe
       may be raised in connection with any objection to substantive consolidation.  See Disclosure Statement
       (Hearing Ex. 2) at pp. 167-68.  In this context, the Debtors continually misstate the burden of substantive
       consolidation by alleging numerous issues that an objector would have to prove to prevail in its objection.  To
       the contrary, the burden of proof that this extreme remedy is warranted – lies squarely with the Debtors.  See,
       e.g., Reserve Capital, 2007 Bankr. LEXIS 983, *13 (Bankr. N.D.N.Y. March 21, 2007) (explaining that the
       proponent of substantive consolidation must satisfy either of the two Augie/Restivo factors to obtain an order
       granting substantive consolidation).

plan structure, can support substantive consolidation without a proper showing under

Augie/Restivo. See, e.g., Flora Mir, 432 F.2d at 1063 (noting that although consolidation of the

debtors would permit a speedy resolution to the bankruptcy cases, it was not proper if it meant

sacrificing the rights of creditors); Reserve Capital, 2007 Bankr. LEXIS at 983, *17 (Bankr.

N.D.N.Y. March 21, 2007) ("[A]dditional delay in case administration and ultimate distribution

to creditors that may result in the event that substantive consolidation is denied, that is not

sufficient to warrant consolidation of the cases."). The substantive consolidation proposed by

the Debtors has the specific effect of harming the holders of the Senior Notes by taking away

their right to insist that the subordination agreement with the TOPrS be enforced through a

consolidated vote. In any event, administrative cost savings and the facilitation of the settlement

structure are secondary benefits of substantive consolidation that can only be realized if the

Augie/Restivo test is first satisfied. See Drexel Lambert, 138 B.R. at 763–764 ("As articulated

by the Second Circuit, Courts must examine various factors derived from earlier case law in light

of two critical concerns: first, whether creditors dealt with the entities as a single economic unit

and did not rely on their separate identity in extending credit, and, second, whether the affairs of

the debtors are so entangled that consolidation will benefit all creditors."). The Debtors'

attempted "justifications" are therefore, irrelevant as the Augie/Restivo factors cannot be

satisfied.

(1)    Creditors Did Not Rely On The
Debtors As A Single Economic Unit

124.    The Debtors are unable to prove the first prong of the Augie/Restivo test:  that

creditors did not rely on the separate credit and separate identity of the Delphi-DAS Debtors.  In

assessing the first prong of the Augie/Restivo test, the Debtors' perception of creditor reliance is

irrelevant. Consumer Elecs., 195 B.R. at 249 ("But the first Augie/Restivo test must be applied

57

from the creditors' perspective.  The inquiry is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers, viewed the four stores as one enterprise.").  Creditors are free to develop their own basis of evaluation in extending credit and in purchasing guaranteed debt.  See In re Owens Corning, 419 F.3d 195, 213–14 (3d Cir. 2005) ("Creditors are free to employ whatever metrics they believe appropriate in deciding whether to extend credit free of court oversight.").

125.    There can be little doubt that creditors relied on the separateness of the Debtors. From its inception, after the GM Spin-off, Delphi Corporation has always been a separate and distinct entity that has owned various subsidiaries.  As such, creditors were fully aware of the entities that they had been dealing with. ███████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████ Moreover, while neither the Senior Notes Indenture nor the Subordinated Notes Indenture were guaranteed by any Debtor other than Delphi (or its predecessor in interest), the prospectus issued along with the Subordinated Notes Indenture explicitly told creditors that they would be unable to look to any entity except Delphi for repayment:  "Delphi's subsidiaries are separate legal entities and have no obligation to pay, or make funds available to pay, any amounts due on the notes, the trust preferred securities or the guarantee."  See Delphi Corp., Prospectus Supplement (Form 424(b)(5)) (Hearing Ex. 69), at 10 (Nov. 17, 2003).

126.    There was sufficient information included in Delphi's public filings for creditors to analyze the credit worthiness of the various Debtor entities.  Indeed, creditors could determine

the value of the Debtor entities by analyzing the separate financial information provided for the

foreign subsidiaries, the divisional financials, and the corporate structure provided in Delphi's

Form 10-K's and Form 10-Q's ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

    127.    Not only is it simple to discern that the Debtors portrayed themselves as separate

entities, they actually are separate entities ███████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████ The Debtors have also filed

separate schedules and statements for each Debtor entity in these Cases, separately listing the

claims of creditors recognized by each Debtor entity.

    128.    Substantive consolidation is a two-way street." In re Verestar, 343 B.R. 444, 463

(Bankr. S.D.N.Y. 2006 ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████ These creditors' justified expectations must be recognized and cannot

be obscured by the Debtors' desires for administrative convenience and swift confirmation.

129.    The Debtors, however, have contended that substantive consolidation is appropriate and that the creditors relied on the consolidated entities because the Debtors filed consolidated financial statements.  This statement, however, proves too much.  Substantive consolidation is a rare creditor remedy.  It cannot be the case that every reporting company that files consolidated financial statements should be substantively consolidated in a bankruptcy. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  Simply because consolidated financial statements are available, it does not follow that those who extended credit to the Debtors did so based on the information provided in those statements, when other agencies or affiliates were able to separately extrapolate and rate the entities.

130.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

131.    Substantive consolidation cannot be justified on "single economic unit" grounds where, as here, creditors operated on the assumption that they were dealing with separate entities. See Augie/Restivo, 860 F.3d at 519 (noting the efficiency of the marketplace where creditors establish their own criteria for eligibility when extending credit "will be undermined by imposing substantive consolidation in circumstances where creditors believed they were dealing with separate entities"). The Debtors' reliance on "perceived" inferences are the opposite of that drawn by the Augie/Restivo court: that creditors expect to be able to look to the assets of their particular obligor without competition from creditors of a less sound debtor. Id. at 518. Thus, the Debtors are unable to establish that creditors relied on the consolidated credit of the Debtors and have failed to satisfy the first prong of Augie/Restivo.

132.    Substantive consolidation under these circumstances causes great harm to the Debtors' creditors. Substantive consolidation is proper only as a remedy that ensures equitable treatment of creditors when it is the only fair way to distribute the Debtors assets, either because creditors had initially relied on a Debtor grouping as whole or because the Debtors books and records are so jumbled that it is impossible to tell where creditors' claims properly belong and which assets they can to look to for a recovery. Here, the Debtors' creditors ███████ ███████████████████████ – were able to look to the entities and determine where the value of the Debtors belonged. The holders of the Senior Notes knew from looking at the Debtors' publicly filed financial records that they had the substantially senior right to look to the value of the equity of the foreign subsidiaries of Delphi – a right that the creditors of the subsidiaries of Delphi should not have. The holders of the TOPrS knew from the Debtors' prospectus that "Delphi's subsidiaries are separate legal entities and have no obligation to pay, or make funds available to pay, any amounts due on the notes, the trust preferred securities or the guarantee."

61

Delphi Corp., Prospectus Supplement (Form 424(b)(5)) (Hearing Ex. 69) at 10 (Nov. 17, 2003).

Now, however, the Debtors seek to allow the creditors of those subsidiaries – creditors that had

no obligation to pay the TOPrS – to share in the value of that had been reserved for creditors of

Delphi. This result is inequitable, designed solely to gerrymander the Plan process and contrary

to the very notion of substantive consolidation – a rare and usually unfortunate remedy that is

necessary to ensure equitable treatment, not to prevent it.

(2)    The Debtors are Not Hopelessly Entangled

133.    Substantive consolidation under the second prong of Augie/Restivo, on the basis

that the Debtors are hopelessly entangled is permitted only when "it is so costly and difficult to

untangle the Debtors' financial affairs" that doing so is a 'practical impossibility.'" Worldcom,

2003 Bankr. LEXIS 1401, at *108 (citing In re Seatrade Corp., 369 F.2d 845, 848 (2d Cir.

1966)); see also Reserve Capital, 2007 Bankr. LEXIS at *17 (denying substantive consolidation

where although untangling the debtors' affairs could require "extensive legal and forensic

accounting work," such was not impossible).  Substantive consolidation is justified under an

entanglement theory, for example, when the debtors can show "that it is not possible to create

accurate financial data for each legal entity." Worldcom, 2003 Bankr. LEXIS 1401 at *108

(citing Augie/Restivo, 860 F.2d at 519); see also Verestar, 343 B.R. at 463 (granting motion to

dismiss complaint seeking substantive consolidation where complaint lacked an allegation that it

was "impossible to sort out the intercompany transfers or that the companies' respective rights to

the cash cannot be traced."); Consumer Elecs., 195 B.R. at 248 (no finding under

Augie/Restivo's second prong unless unraveling the corporate structure would be impossible or

prohibitively expensive).

134.    The Debtors are wholly unable to meet this prong, and cannot seriously represent

to this Court that they are hopelessly entangled.  The Debtors were not hopelessly entangled

62

before chapter 11, during the Cases, and will not be entangled after their emergence. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ The Debtors filed separate schedules and statements in the Cases: meaning

that the Debtors, with the assistance of their advisors, was able to identify separate creditors,

assets and liabilities for each entity. If the Debtors were truly hopelessly entangled, this would

have been impossible.



136.    Moreover, the Debtors have consistently represented their separateness to the

Court throughout these Cases. For example, in seeking to continue the use of their integrated

cash management system, the Debtors stated that the system enables "the Debtors, as well as

their creditors and this Court, to trace funds through the system and ensure that all transactions

are adequately documented and readily ascertainable." Cash Management Motion (Hearing Ex.

47) ¶ 47. Similarly, the Debtors sought and were given authority to continue intercompany

transfers in the ordinary course of business, stating that the transactions would be recorded by

each entity and maintained in the appropriate intercompany account. Id. at ¶ 52. Additionally,

the Debtors were ordered to provide the Creditors' Committee with monthly reports identifying all transactions and loans for each Debtor. <u>See</u> <u>Cash Management Order</u> ¶ 15 ("Debtors shall provide to the financial advisors to the official committee of unsecured creditors periodic reports, no less frequently than monthly, which shall identify all loans and borrowings in such period and all intercompany loan balances for each Debtor, and shall include, at a minimum, information regarding any material increase in the credit exposure of any intercompany lender, any material increase in borrowing levels of any intercompany borrower, and any material deterioration in the financial condition of any intercompany lender or borrower . . . ."). If the Debtors were truly hopelessly entangled, none of this would have been possible.

137.    Thus, not only is it neither impossible nor costly to separate the financial affairs of and conduct an accurate financial analysis of the Debtors—the analysis has already been performed. Substantive consolidation on the hopeless entanglement theory is not permitted unless detangling the financials of the various debtors is not only extremely expensive but also virtually impossible. <u>See</u> <u>In re Worldcom</u>, 2003 Bankr. LEXIS 1401, *108 (citations omitted). ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████ Further evidencing the actual separateness of the Debtors and the lack of hopeless entanglement, the Plan contemplates that a complex series of corporate restructuring transactions will be effectuated in conjunction with the Plan. This modification of the corporate structure on the way out of bankruptcy, is a corporate reorganization and is <u>not</u> being accomplished through the proposed substantive consolidation. <u>See</u> <u>Disclosure Statement</u> (Hearing Ex. 2) at pp. 181-184; <u>Plan</u> § 7.3; <u>Plan</u>, Exhibit 7.3. Indeed, the transactions contemplate that detailed corporate formalities will

continue to be observed through, for example, revised certificates of merger, appropriate

instruments of transfer, assignment, guaranty and the like.  Disclosure Statement (Hearing Ex. 2)

at p. 181.

138.    The Debtors are not entangled.  In Worldcom, which was victimized by the

largest accounting fraud in American history, the debtors had multiple accounting systems,

multiple intercompany accounts and ledger systems.  Id. at 36-37.  Moreover, many of the

employees had either left the debtors' employment or did not understand the company's

accounting system, thereby rendering it impossible to create (or recreate) separate financial

statements.  However, as this is not the case for the Debtors, there is simply no basis under

applicable law for this court to find that the Delphi-DAS  are so entangled that the drastic

remedy of substantive consolidation is warranted.

F.              Consolidation of Debtor Entities for "Voting and Distribution
                Purposes Only" Is Nothing More than Impermissible "Deemed
                Consolidation" and Must Be Denied

139.    The Debtors' inability to prove the Augie/Restivo factors is not surprising.  The

Debtors are not seeking any of the hallmarks of true substantive consolidation—they are only

seeking such consolidation for voting and distribution purposes.  If approved, true substantive

consolidation will (i) pool the assets of and claims against the otherwise separate entities, (ii)

create a common-fund for the satisfaction of liabilities of these entities, (iii) eliminate all

intercompany claims and (iv) combine the creditors of these entities into a common class for

voting purposes.  See Augie/Restivo, 860 F.2d at 518.  The proposed claim pooling and common

fund are partial, Plan § 7.2(a), and certain Intercompany Claims are selectively preserved, Plan

§ 7.2(b)(y) ("Except as set forth in this Article, such substantive consolidation shall not (other

than for purposes related to this Plan) . . . affect Intercompany Claims of Debtors against

Debtors.").  This is a perversion of the necessary results of substantive consolidation.  Plan

65

§ 7.2(a) ("[Substantive consolidation is] only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan."). Although the Debtors purport to seek the "substantive consolidation," of certain Debtor groupings, all Debtor entities will survive the consolidation and remain separate and distinct entities post emergence. Plan (Hearing Ex. 1) § 7.2(b). In reality, the Debtors are seeking nothing more than the "deemed consolidation" that has already been rejected by the Third Circuit.

140.    In Owens Corning, the Third Circuit held that even if the debtors had been able to satisfy the necessary elements of substantive consolidation (which they had not), consolidation of debtors solely for a particular purpose, such as to limit the effectiveness or ability of a creditor to object to the plan was not to be countenanced through a court's exercise of its equitable powers. Id. at 216. The Court was particularly offended by the 'deemed' or 'pretend' consolidation because the Debtors were seeking to impede the rights and abilities of creditors, while leaving in place essentially the same corporate structure post-emergence. See id. at 216 ("If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting tax and regulatory benefits achieved by forming subsidiaries in the first place."). For the same reasons adopted by the Third Circuit in Owens Corning, the Plan cannot be confirmed with this substantive consolidation scheme in place.

### III.    The Plan Cannot be Crammed-Down On the Holders of the Senior Notes Under Section 1129(b)(2)

141.    It is not disputed that hundreds of millions of dollars of value is being paid to junior stakeholders under the Plan. The Debtors attempt to justify this massive leakage by labeling the Plan a "settlement plan" rather than an absolute priority plan. See Disclosure

Statement (Hearing Ex. 2) at 101. As we have just shown, however, this is not a "settlement

plan" because the class of Senior Noteholders, as properly constituted, will have voted to reject

the Plan. As such, the Debtors must establish that the Plan satisfies the requirements of the

absolute priority rule. This they cannot do.

142. Section 1129(b) provides in relevant part:

> (1) Notwithstanding section 510(a) of this title, if all of the
> applicable requirements of subsection (a) of this section other than
> paragraph (8) are met with respect to a plan, the court, on request
> of the proponent of the plan, shall confirm the plan
> notwithstanding the requirements of such paragraph if the plan
> does not discriminate unfairly, and is fair and equitable, with
> respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan.

> (2) For the purpose of this subsection, the condition that a plan be
> fair and equitable with respect to a class includes the following
> requirements:

>> . . . (B) With respect to a class of unsecured claims—
>> (i) the plan provides that each holder of a claim of
>> such class receive or retain on account of such claim
>> property of a value, as of the effective date of the
>> plan, equal to the allowed amount of such claim; or
>> (ii) the holder of any claim or interest that is junior to
>> the claims of such class will not receive or retain
>> under the plan on account of such junior claim or
>> interest any property, except that in a case in which
>> the debtor is an individual, the debtor may retain
>> property included in the estate under section 1115,
>> subject to the requirements of subsection (a)(14) of
>> this section . . .

11 U.S.C. § 1129 (b). This latter condition — and the corresponding rule that holders of junior

claims and interests not receive any distribution under a Plan until senior creditors are paid in full

— is a partial codification of the longstanding bankruptcy principle known as the "absolute

priority rule." See 203 N. Lasalle, 526 U.S. at 442. The absolute priority rule, whether set forth

in judicial precedent or as later codified in the Bankruptcy Code has no exception beyond those

67

recognized at the time of the codification of the absolute priority rule. See Ahlers, 485 U.S. at

206 ("We think the statutory language and the legislative history of §1129(b) clearly bar any

expansion of any exception to the absolute priority rule beyond that recognized in our cases at

the time Congress enacted the 1978 Bankruptcy Code.").

143.    The absolute priority rule was initially a creation of judicial interpretation

designed to prevent the practice of "squeezing out" intermediate creditors through collusion

between secured creditors and stockholders. See In re Iridium Operating LLC, 478 F.3d 452,

463 n.16 (2d Cir. 2007) (quoting In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir.

1995)). In codifying the rule, Congress recognized that there was a danger inherent in any

reorganization that a "plan will simply turn out to be too good a deal for the debtor's owners."

203 N. Lasalle, 526 U.S. at 444 (detailing the legislative history of section 1129(b)). Thus, in

codifying the absolute priority rule, Congress guaranteed that unsecured creditors would not be

prejudiced by a plan which allows distributions to junior claimants and holders of interests at the

expense of senior creditors.

144.    Application of the absolute priority rule to the present Cases requires that, in order

to be fair and equitable, the Plan must provide the holders of Senior Notes with compensation for

the entirety of their legal entitlements against the Debtors before any junior claimants and

holders of interests can receive anything. See, e.g., Consol. Rock Prods. Co. v. Du Bois, 312

U.S. 510, 520–21 (1941) ("The full and absolute priority rule . . . would preclude participation by

the equity interests in any of [the debtors'] assets until the bondholders had been made whole.");

see also id. at 528 (whenever "lost rights are of value . . . .[f]ull compensatory provision must be

made for the entire bundle of rights which the creditors surrender").[8]

---

[8]    Although Consolidated Rock was decided under Chapter X of the 1898 Bankruptcy Act, the Court was
construing the same requirement that a plan be "fair and equitable" found in section 1129(b) of the Bankruptcy

145.    These fundamental protections, together with the right of the holders of the Senior

Notes to an unadulterated vote, are eviscerated by the Plan.  The absolute priority rule, its

application under the Bankruptcy Code and its interpretation by the Supreme Court all require

that holders of Senior Notes be paid in full prior to holders of any junior claims or interests

receiving a distribution on account of their claims or interests.  As discussed in greater detail

below, the holders of Senior Notes are not being paid in full under the Plan.  Thus, the

distributions under the Plan to holders of TOPrS, the MDL Claims, and holders of Existing

Common Stock render the Plan unconfirmable.  Moreover, because the Plan purports to require

holders of Senior Notes to waive their seniority rights and provides for distributions of securities

that are of equal rank to those distributed to junior claimants and interests without adequate

compensation, the Plan cannot be confirmed.

A.          *Payment of Senior Notes in the ReorganizedDelphi Stock
             Does not Amount to Payment in Full and Thus The Plan
             is Neither Fair Nor Equitable*

146.    In order to be paid in full as required by section 1129(b)(2)(B)(i), the holders of

the Senior Notes must be paid "property of a value, as of the effective date of the plan, equal to

the allowed amount of such claims."  11 U.S.C. 1129(b)(2)(B)(i).[9]

147.    Thus, by its plain meaning, the Debtors must prove that the present value, as of

the Effective Date, of the combination of New Common Stock and Discount Rights distributed

to the holders of the Senior Notes under the Plan is equal to the full amount owed on the Senior

---

Code and, as discussed further below, where Congress carries over a term used in a prior statute, it is presumed
to have intended that the construction of that term under the prior statute should govern.

[9]    Even if this Court were to find that the Debtors were insolvent, and the holders of the Senior Notes were not
entitled to receive Postpetition Interest from the Debtors, the Plan would still be unconfirmable if <u>any</u>
distribution was provided to the TOPrS.  <u>See</u> Subordinated Notes Indenture at § 17.01 ("In the event of any . . .
bankruptcy . . . all Senior Debt (<u>including any interest thereon</u> accruing after the commencement of any such
proceedings) <u>shall first be paid in full</u> . . . .") (emphasis added).

Notes.  See In re Cornwall Personal Insurance Agency, Inc., 308 B.R. 771, 774 (Bankr. N.D. Tex

2003) (plan proponent bears burden of proof that Plan satisfies all requirements for confirmation,

including present value of property distributed); see also In re Evans Products Co., 65 B.R. 31,

33 (Bankr. S.D. Fla. 1986) ("If, as here, senior classes will receive securities under the plan, the

court must value those securities as of the plan's effective date."); 6 Norton Bankr. L. & Prac. 3d

§ 113:20 at n.2 ("The issuance of stock in satisfaction of unsecured claims necessarily involves

the valuation of the reorganized debtor to ensure that the stock is really worth [the full amount of

unsecured claims] as of the effective date of the plan.").

148.    The Disclosure Statement, however, demonstrates on its face that the Debtors are

unable to satisfy this statutory requirement.  The Rothschild Valuation was prepared prior to

October 22, 2007, and assumes a valuation date of December 31, 2007, but specifically

acknowledges that the Effective Date would not occur until the end of February 2008.  See

Rothschild Valuation (Hearing Ex. 28).  Given the economic changes discussed herein that have

occurred after October 22, 2007, including significant movement in the stock prices of the

Rothschild comps, the Debtors cannot establish through the Rothschild Valuation that the

holders of the Senior Notes are receiving property as of the Effective Date equal to the allowed

amount of their claims.

149.    Based on the fundamental valuations of the Debtors' business, the Plan fails to

provide the holders of Senior Notes with New Common Stock and Discount Rights of a

sufficient value equal to the allowed amount of their claim as of the Effective Date ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Even if this Court finds Rothschild to be credible, the Senior

Noteholders will demonstrate at the Confirmation Hearing that the Court should adopt the lower

because there are methodological and other problems with the Rothschild Valuation that render it

unreliable.

150.    Even at the inflated midpoint of the Rothschild Valuation, $12.7 billion, and

assuming full participation in the Discount Rights Offering, the holders of the Senior Notes will

receive less than a full recovery on account of their claims, before dilution for the stock issued

under the Management Compensation Plan or the issuance of any additional shares to the Plan

Investors if the Debtors underestimated the total amount of Allowed General Unsecured Claims.

See Rothschild Valuation at p. 2.  Moreover, the holders of the Senior Notes are being paid

interest only through January 31, 2008, but the Plan will not become effective until at least one

month later – another reason they are not receiving full payment on account of their claims.  See

Plan (Hearing Ex. 1) § 1.156(b).

> (1)    The Current Trading Prices of the Senior Notes Reveal that the
> Holders Thereof Will Not Be Paid in Full Under the Plan

151.    Courts in this district have recognized the inherent value of looking to trading

prices of a debtor's securities as the true indication of the market value of a debtor.  The market

value of a company's securities is the purest form of valuation of a company.

> [T] here is no support in the record for not treating the public
> market data with deference as the best indicator of value,
> notwithstanding that the market was plainly wrong as an indicator
> of future value and badly misjudged the likelihood of Iridium's
> success. The Court is not bound to accept the value that has been
> ascribed to Iridium's securities by the public markets and has the
> broad discretion to find that the markets somehow were distorted
> and did not fairly reflect the underlying enterprise value of Iridium,
> but to justify disregarding values placed on these securities in an
> efficient public trading market, the Court needs a substantial

71

> reason to depart from that standard and find that the value implied
> by an efficient market is not a trustworthy benchmark.

In re Iridium Operating LLC, 373 B.R. 283, 303 (Bankr. S.D.N.Y. 2007).

152.    In reaching this conclusion, Judge Peck relied upon the Supreme Court's rationale

in Basic Inc. v. Levinson, 485 U.S. 224 (1988):

> With the presence of a market, the market is interposed between
> seller and buyer and, ideally, transmits information to the investor
> in the processed form of a market price.    Thus the market is
> performing a substantial part of the valuation process performed by
> the investor in a face-to-face transaction.    The market is acting as
> the unpaid agent of the investor, informing him that given all the
> information available to it, the value of the stock is with the market
> price.

Iridium Operating LLC, 373 B.R. at 347 (quoting Basic, 485 U.S. at 244) (emphasis added).    The

Third Circuit has also supported this common-sense rationale, by finding that the market

capitalization of a company, reflected in its trading prices is the best measure of a company's

value, "as it reflects all of the information that is publicly available about a company at the

relevant time of valuation."   VPB LLC v. Campbell Soup Co., 482 F.3d 624, 631 (3d. Cir. 2007)

(relying on Basic, 485 U.S. at 243).    There is no evidence that the markets for the Debtors'

securities were distorted, inefficient, or not functioning properly during this period.    The Senior

Notes are a large issue of securities, which allows relatively more liquidity than a smaller issue

of notes and creates a more efficient market.    In fact, Rothschild relied on the trading prices of

the Debtors' securities, including the Senior Notes, in its August report.    In any event, even if the

Court found that using the trading prices was not the most precise way to measure value, the

significant difference between Rothschild's valuation and the market prices of the Senior Notes

(some 3x higher) shows that Rothschild's valuation is not reliable.    If Rothschild's valuation

were correct, market participants could make substantial fortunes by buying Senior Notes at current prices and selling New Common Stock upon the Debtors' emergence.

153.    ███████████████████████████████████

███████████████████████████████████

███████████    At this valuation, the Discount Rights Offering is worthless, as it is completely out of the money and holders of the Senior Notes will receive New Common Stock worth only a fraction of their claim — hardly the payment in full that is touted by the Debtors. Based on this valuation method, it is clear that the New Common Stock is not worth the value asserted to it by the Debtors. Therefore, based on the most reliable and unbiased method of valuation recognized by the Supreme Court and other courts in this Circuit the Plan cannot be confirmed because it provides for distributions to holders of junior claims and interests while senior creditors are receiving less than the full amount of their claims.

(2)    The Rothschild Valuation is Unreliable, Stale and Incorrect.

154.    The Rothschild Valuation radically overvalues Reorganized Delphi and the creditor recoveries thereunder. Unlike many valuations where at least one valuation mechanism – comparable company analysis – is based on historical results, each of the valuation methodologies used by Rothschild is premised on the Debtor's financial projections as contained in the Business Plan, which are both unreliable and unachievable. ████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████    Moreover, the underlying

assumptions contained therein have not been independently verified by Rothschild. Nevertheless the entire Rothschild Valuation is based on the assumptions contained therein.

155.    Like the Business Plan, the Rothschild Valuation is stale. 

        (3)     Even if the Ranges Espoused by the Rothschild Valuation
               Are Correct, Creditors Are Not Paid in Full Thereunder.

156.    The holders of the Senior Notes must accept all the usual risks associated with the ownership of stock. The New Common Stock will be subject to market and industry fluctuations. In their public filings with the SEC, as explained in greater detail throughout this Objection, the Debtors admit and acknowledge many facts that have been omitted from these proceedings. For example, in their recently filed Registration Statement, the Debtors acknowledge all of the uncertainty with the ownership of common stock:

> The market price of our common stock has been, and the market
> price of the common stock of reorganized Delphi is likely to
> continue to be, volatile, experiencing wide fluctuations in response
> to numerous factors, many of which are beyond our control.

Delphi Corporation, Securities Registration Statement (Form S-1/A) (Hearing Ex. 30) at 38 (December 12, 2007). Further, Reorganized Delphi may authorize and issue additional stock, but the holders of Senior Notes are not protected by any anti-dilution provision.

157.    In order to receive the "full recovery" touted under the Plan, the holders of the Senior Notes must participate in the Discount Rights Offering. In other words, they must contribute substantial capital (41 cents for every dollar of claim) to recognize the value of the discount. Even then, the full value of the Discount Rights will only be realized if the New

Common Stock is actually worth $59.61 per share. If the holders of the Senior Notes do not

participate in the Discount Rights Offering, they will receive virtually no recovery on that

percentage of their claims satisfied by the Discount Rights Offering. See Plan (Hearing Ex. 1)

§§ 1.146, 5.3(b) (stating that Non-exercising Creditors will receive a pro rata portion of the

Oversubscription Cash, which in total amounts to the number of Discount Oversubscription

Rights that have been exercised multiplied by $0.25). The Debtors have also acknowledged that

the price of the Discount Rights has neither been tied to any specific value of the Debtors' assets

nor does it guarantee that creditors will actually be paid in full under the Plan:

> The exercise prices of the rights do not necessarily bear any relationship to the book value of our assets, past operations, cash flows, losses, financial condition or other common criteria used to value equity securities. The exercise prices of the rights should not be considered an indication of the actual value of reorganized Delphi or the shares of its common stock....We cannot assure you that the market price of the common stock of reorganized Delphi will not be below the exercise prices of the rights, or decline further below the exercise prices, after the closing of the rights offerings. If that occurs, you will suffer an immediate unrealized loss on those shares as a result. The exercise prices of the rights should not be considered an indication of the future trading price of the common stock of reorganized Delphi.

Delphi Corporation, Securities Registration Statement (Form S-1/A) (Hearing Ex. 30) at 34, 38

(December 12, 2007) (emphasis added).

158.    The recoveries afforded to the holders of the Senior Notes are subject to dilution

by shares issued on account of such claims plus any dilution on or before the Effective Date. If

the aggregate amount of Trade and Other Unsecured Claims exceeds $1.45 billion, the value of

New Common Stock is subject to added dilution on account of certain anti-dilution provisions

contained in the Investment Agreement. See Disclosure Statement (Hearing Ex. 2) at p. 236–37.

Similarly, the value of New Common Stock is subject to further dilution on account of

distributions to certain members of management, directors, and other employees of Reorganized

Delphi under the Management Compensation Plan. See id. at p. 236. The Plan purports to pay

the holders of the Senior Notes interest through January 31, 2008. Absent payment of interest

through the Effective Date, holders of Senior Notes are not paid in full.

159.    Thus, notwithstanding the gross inflation of the Debtors' TEV under the

Rothschild Valuation, the Debtors have not shown, nor is there any real possibility of showing

that the Senior Notes are being paid in full.

B.        *The Plan is Not Fair and Equitable Because Holders of Junior*
          *Claims and Interests are Receiving a Distribution of Estate*
          *Assets Under the Plan*

160.    As just shown and as will be further demonstrated at the Confirmation Hearing, at

an appropriate TEV, the holders of the Senior Notes are not receiving a full recovery on account

of their claims.  Therefore, in order to confirm a plan, holders of junior claims and interests

cannot receive or retain any property pursuant to section 1129(b)(2)(B)(ii).  The Plan, however,

provides for recoveries of hundreds of millions of dollars to the holders of the TOPrS, the

holders of the MDL Claims, and holders of Existing Common Stock

161.    The Subordinated Notes Indenture provides that, the holders of the Senior Notes

are to be paid in full (including post-petition interest) before the TOPrS can be afforded a

recovery.  See Subordinated Notes Indenture at (Hearing Ex. 12) § 17.01.  Despite the fact that

the Senior Notes Claims are not being paid in full, the Plan provides a substantial recovery worth

hundreds of millions of dollars to the holders of the TOPrS while simultaneously purporting to

satisfy the subordination provision.  See Plan (Hearing Ex. 1) §§ 1.84, 11.10.  As with section

76

1129(a)(1) discussed above, failure to adhere to the contractual subordination provision between the TOPrS and the Senior Notes, renders the Plan unconfirmable under section 1129(b).[10]

162.    The MDL Claims may not receive a distribution until the holders of the Senior Notes are paid in full. As discussed in greater detail in the MDL Objection, which is hereby incorporated by reference, the MDL Settlements violate Bankruptcy Rule 9019 by failing to comply with the absolute priority rule. See MDL Objection at pp. 5–15; see also In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007) ("In the Chapter 11 context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be the dispositive factor."). In any event, because the settlements are now being presented for approval in the context of the Plan, this Court cannot confirm the Plan or approve the settlement absent strict adherence to section 1129(b)(2)(B)(ii), which, first requires that the holders of the Senior Notes receive a full recovery. See generally Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968).

163.    Because the holders of Senior Notes are not receiving the full value of their claims, the distribution of New Common Stock, Par Value Rights exercisable at the Plan Equity Value, Seven-Year Warrants Six-Month Warrants and Ten-Year Warrants violates the absolute priority rule. See, e.g., In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 42 (2d Cir.

---

[10]    Although section 1129(b) could be wrongly interpreted as indicating that a court should always ignore section 510(a) for the purposes of cram down, see 11 U.S.C. § 1129(b)(1) ("Notwithstanding section 510(a) of this title ...."), the only sensible reading of this language is that Congress included the provision to allow the court to ignore subordination for the purposes of determining whether a plan is fair and equitable as to those not affected by a subordination agreement or where a class of senior creditors waive subordination. See Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133, 142 n.70 (1979) (stating that the "[n]otwithstanding section 510(a)" language in section 1129(b) "means that to the extent a class of senior claims chooses not to enforce the subordination agreement, the minority in the class will be bound notwithstanding section 510(a) .... if the senior class insists on its rights by dissenting to the plan, then the subordination agreement will be enforced through the fair and equitable test"). Otherwise, Congress would not have included a scenario expressly indicating that a plan would unfairly discriminate if senior debt is not paid in full and subordinated debt receives a distribution. See H.R. Rep. No. 95-595, 413-18 (1977) (explaining that if both senior debt and subordinated debt are owed $100 and a plan purports to pay senior debt $30 and subordinated debt $5, the plan would fail).

1998) (stating that a chapter 11 Plan cannot be confirmed over a dissenting class's objection if

members of a junior class retain any property on account of their prior interests or claims).

Accordingly, the Plan cannot be confirmed.

C.          *The GM Settlement Mandates Payments to Junior Stakeholders,*
            *In Violation of the Absolute Priority Rule*

164.    The GM Settlement cannot be approved because it is not fair and equitable.  In

TMT Trailer the Supreme Court stated that the requirement "that plans of reorganization be both

'fair and equitable,' apply to compromises just as to other aspects of reorganizations." 390 U.S.

at 424.  "The fact that courts do not ordinarily scrutinize the merits of compromises involved in

suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a

proposed compromise forming part of a reorganization plan is fair and equitable." Id.  While

TMT Trailer was decided under Chapter X of the 1898 Bankruptcy Act, as discussed elsewhere

herein, pre-code cases remain binding absent clear legislative intent to alter their holdings.

Moreover, the Second Circuit recognized in Iridium that the holding of TMT Trailer remains

dispositive under chapter 11.  See Iridium, 478 F.3d at 463 (noting that a "settlement presented

for approval as part of a plan of reorganization, because it constitutes part of the plan, may only

be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority

rule").

165.    The GM Settlement cannot be approved under an appropriate TMT Trailer

analysis. In TMT Trailer, the Supreme Court established factors for a bankruptcy court to look

to in deciding whether a proposed settlement is fair and equitable, including (i) the likelihood of

success, (ii) the probability of collection, (iii) the complexity of the litigation, including the delay

and expense and (iv) the views of the creditors in assessing the "wisdom" of the proposed

compromise. <u>TMT Trailer</u>, 390 U.S. at 424.[11]  In the first instance, under the <u>TMT Trailer</u>

analyses as re-affirmed by the Second Circuit in <u>Iridium</u>, the GM Settlement cannot be approved

because it falls below the lowest point in the range of reasonableness.  See <u>In re Stanwich</u>

<u>Financial Services Corp.</u>, 377 B.R. 432, 436 (Bankr. D. Conn. 2007) (noting that bankruptcy

courts in this circuit must make an independent determination that settlement does not fall below

the lowest point in the range of reasonableness).

166.    The Debtors, the Creditors' Committee, and the Equity Committee each analyzed

and sought to pursue numerous causes of action against GM arising from, among other things, its

domination and control of the Debtors.  See <u>Disclosure Statement</u> (Hearing Ex. 2) at pp. 54-61.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  The Creditors' Committee sought authority during these Cases to

prosecute similar causes of action including for avoidance of fraudulent transfers, alter-ego

liability, unjust enrichment, aiding and abetting breach of fiduciary duty, conspiracy, and fraud.

See <u>Disclosure Statement</u> (Hearing Ex. 2) at 57-58; <u>Motion for Order Authorizing the Official</u>

<u>Committee of Unsecured Creditors to Prosecute the Debtors Claims and Defenses Against</u>

<u>General Motors Corporation and Certain Former Officers of the Debtors</u> (Hearing Ex. 7).  The

Equity Committee alleged similar causes of action but also included claims under the Racketeer

---

[11]    Similarly, although the Debtors have not presented the proposed settlement as a compromise under Federal
Rule of Bankruptcy Procedure 9019, which applies to pre-plan settlements, as opposed to settlements embodied
in a plan, the settlement with GM also fails to pass muster under that substantially similar rule.  See <u>In re</u>
<u>Iridium Operating LLC</u>, 478 F.3d 452, 459-60 (2d Cir. 2007) (determining that a settlement's compliance with
the fair and equitable standard espoused by the Supreme Court in <u>TMT Trailer</u> will "often be the dispositive
factor" in determining whether it should be approved under bankruptcy rule 9019).  Thus, as demonstrated
herein, because the settlement is not fair and equitable and fails the <u>TMT Trailer</u> requirements, it similarly fails
to satisfy Bankruptcy Rule 9019.

Influenced and Corrupt Organizations Act and asserted that the claims against GM could have a value as high as approximately $26 billion, not including trebling of certain damages or punitive damages, among other things. See Disclosure Statement (Hearing Ex. 2) at p. 58-59. Thus, it is clear that GM was subject to potentially billions of dollars of claims arising out of the conduct alleged by these parties. Pursuant to the GM Settlement, these claims would be released and GM would walk away with $1.073 billion in preferred stock, $750 million in Cash, and $750 million in a second lien Note, plus retention of the Surviving Claims and the effectuation of the IRC Section 414(l) Transfer, not to mention the survival of one of its largest suppliers.[12]

167.    At the time the GM Settlement was reached, it was promised on a true par plus accrued recovery for unsecured creditors. Although the GM Settlement may have been above the lowest level in the range of reasonableness at the time the deal was originally struck, it is not now. At the time it was announced on September 6, 2007, and embodied in the Initial Plan, while the Senior Notes were trading at approximately $102, the holders of the Senior Notes were receiving 80% of their recovery in New Common Stock and 20% in Cash, while GM was receiving $2.7 billion in Cash. After several modifications to the Plan and constant re-negotiation at the behest of the Plan Investors, however, the holders of the Senior Notes are now receiving 77.3% of their recovery in New Common Stock and 22.7% in out of the money Discount Rights. In contrast, GM is receiving $1.073 billion in preferred stock, $750 million in Cash, and $750 million in a second lien Note, for a total recovery of $2.57 billion. Given that the General Unsecured Creditors are getting New Common Stock, and GM is getting senior securities, the value of the GM settlement has maintained its value in large part while the distribution to General Unsecured Creditors has lost most of its value. Since the beginning of

---

[12]    While GM may be providing some value to the Debtors by restructuring its supply agreements and other relationships with the Debtors, it is also receiving substantial benefits in consideration thereof.

September, the GM recovery has declined just 10.5% since it was reached, while the value of the

distributions to holders of the Senior Notes have declined 68.8% at current market values.

168.    Given the incredible decline in the value of the distributions going to the General

Unsecured Creditors, relative to the distributions to GM, the splits between the creditors are no

longer fair and the proposed settlement falls below the lowest range of reasonableness.

169.    In another violation of the TMT Trailer requirements, the GM Settlement requires

confirmation of a Plan that is not fair and equitable to senior creditors. First, the GM Settlement

locks in the distributions under the Plan because the Plan cannot be modified in any material way

without the consent of General Motors — to the extent that such modification would impact

GM's recovery under the Plan, including distributions to the MDL Plaintiffs. GSA (Hearing Ex.

9) §§ 6.01(b) and (c). Second, the Global Settlement Agreement (the "GSA") requires that the

Plan provide that the GM-Related Parties (as defined in the GSA) be released by the Additional

Releasing Parties. Id. § 4.01(c). The definition of Additional Releasing Parties include, among

others, all of the Debtors' current and former creditors and equity holders. Id. § 1.04(c).

D.        Holders of Senior Notes Must beCompensated for the
          Step-Down in Priority

170.    Additionally, even were this Court to find that the holders of the Senior Notes are

receiving par plus accrued pre and post petition interest under the Plan, the absolute priority rule

is violated because the holders of Senior Notes are not receiving compensation for "the entire

bundle of rights" i.e.—the seniority that they surrender by receiving equity for their debt claims.

Consol. Rock Prods., 312 U.S. at 528.

171.    The phrase "fair and equitable" is a term of art that had acquired a fixed meaning

well prior to the enactment of the Bankruptcy Code. See Case v. Los Angeles Lumber Prods.

Co., 308 U.S. 106, 115 (1939) ("The words 'fair and equitable' . . . are words of art which. . . had

acquired a fixed meaning through judicial interpretations . . . ."). In addition to the absolute

priority rule, this fixed meaning included what is known as the "step-up" requirement. See id. at

117 (citing Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 454–55

(1926)); see also Consol. Rock Prods., 312 U.S. at 528–29. As explained in Consolidated Rock

Products, the "step-up" requirement recognizes that:

> while creditors may be given inferior grades of securities, their
> "superior rights" must be recognized. Clearly, those prior rights
> are not recognized, in cases where stockholders are participating in
> the plan, if creditors are given only a face amount of inferior
> securities equal to the face amount of their claims. They must
> receive, in addition, compensation for the senior rights which they
> are to surrender. If they receive less than that full compensatory
> treatment, some of their property rights will be appropriated for the
> benefit of stockholders without compensation. This is not
> permissible.

Id.; see also In re Imperial 400 Nat'l Inc., 374 F. Supp. 949, 976–77 (D.N.J. 1974) (determining

that senior creditors' "bundle of rights" encompasses both the amounts of their claims and

compensation for loss of priority).

172.    In light of the step-up requirement, courts would historically only confirm plans

providing senior creditors with inferior securities such as common stock only where the senior

creditors were compensated for their loss of priority implicated by their receiving the same

securities distributed to junior classes of claims and interests. See, e.g., Consol. Rock Prods. Co.,

312 U.S. at 527–28; In re Inland Gas Corp., 211 F.2d 381, 383–85 (6th Cir. 1954) (affirming

approval of a plan of reorganization providing bondholders a 10% "step-up" in compensation on

the face amount of their claims); Imperial 400 Nat'l, 374 F. Supp. at 977–79 (conditioning

approval of a proposed plan of reorganization on an amendment including, inter alia, a 10%

"step-up" to senior creditors as compensation for their surrendered senior rights).

173.     Against this judicial precedent, Congress enacted the Bankruptcy Reform Act of

1978, expressing its intent that the step-up component of the fair and equitable requirement

remain viable under the Bankruptcy Code:

> The partial codification of the absolute priority here is not intended
> to deprive senior creditor of compensation for being required to
> take securities in the reorganized debtor that are of any equal
> priority with the securities offered to a junior class. Under current
> law, seniors are entitled to compensation for their loss of priority,
> and the increased risk put upon them by being required to give up
> their priority will be reflected in a lower value of the securities
> given to them than the value of comparable securities given to
> junior that have not lost a priority position.

H.R. Rep. No. 95–595 at 414 (1977).

174.     The plain language of section 1129(b) requires step-up payments.  The Supreme

Court has explained that in order to effect a change to judicial precedent, Congress must

expressly do so.  See, e.g., Midlantic Nat'l Bank, 474 U.S. at 501 ("The normal rule of statutory

construction is that if Congress intends for legislation to change the interpretation of a judicially

created concept, it makes that intent specific. The Court has followed this rule with particular

care in construing the scope of bankruptcy codifications.").  Here, Congress did not expressly

abolish the step-up requirement, but, as indicated above, Congress indicated its intention in the

legislative history to the Bankruptcy Code that the requirement remain an active part of the

Bankruptcy Code.

175.     Moreover, the usual canons of statutory construction indicate that Congress only

partially codified the fair and equitable rule in section 1129(b) of the Bankruptcy Code by setting

forth a non-exhaustive list of requirements included within the meaning of "fair and equitable."

11 U.S.C. § 1129(b)(2).  Indeed, the preamble to section 1129(b)(2) states "the condition that a

plan be fair and equitable with respect to a class includes the following requirements . . . ." Id.

(emphasis added).  Under the Bankruptcy Code, the term "includes" is "not limiting." 11 U.S.C.

83

§ 102(3); see also Am. Surety Co. of N.Y. v. Marotta, 287 U.S. 513, 517 (1933) ("In definitive

provisions of statutes and other writings, 'include' is frequently, if not generally, used as a word

of extension or enlargement rather than as one of limitation or enumeration."). Thus, the step-up

requirement remains a viable aspect of the absolute-priority rule and the fair and equitable

requirement.

176.    Under the Plan, the holders of the Senior Notes are receiving distributions of New

Common Stock of equal priority to the New Common Stock issued to holders of equity interests

but are not being compensated for this "step-down" in priority. The Plan fails to provide holders

of Senior Notes with any "step up" for the loss of priority rights. Compare Plan (Hearing Ex. 1)

§ 5.3 (providing New Common Stock to holders of unsecured claims) with Plan (Hearing Ex. 1)

§ 5.7 (providing New Common Stock to holders of equity interests). Similarly, both the holders

of the TOPrS who are improperly classified with the holders of the Senior Notes, and the MDL

Plaintiffs, are receiving New Common Stock and Discount Rights to purchase common stock

that ranks equally with the holders of the Senior Notes despite the fact that each of these claims

is subordinated to the Senior Notes Claim. Again, the Plan fails to compensate the holders of the

Senior Notes the loss of priority associated with this "step down." Absent sufficient

consideration to account for the "step-down" in priority vis à vis the holders of equity interests

and the subordinated creditors, the holders of the Senior Notes are not being paid in full.[13]

---

[13]    Initially, the step-up requirement may appear to conflict with the pre-Code caselaw that requires that no
claimant be paid in excess of 100% of their claims. However, the two requirements may be reconciled "by
focusing on the calculation of the senior creditor's claim for purposes of distributing the new, inferior securities.
Not only will such a claim consist of the claim allowed under section 502(b) – the credit extended plus interest
and costs – but it will also include a component for the value of the priority claims given up." 7 Collier On
Bankruptcy ¶ 1129.04[4][b][i][A] (L. King Rev. 15th ed. 2007) (citing Kenneth Klee, Cram Down II, 64 Am.
Bankr. L.J. 229, 233-34 (1990)). This "approach recognizes that the fair and equitable rule continues to protect
a creditor's entire bundle of rights including the right to priority (or to a less risky security)." Klee, Cram Down
II, 64 Am. Bankr. L.J. at 234.

177.    To compound this injury, GM — one of the Debtors' other large unsecured

creditors — and the Plan Investors are receiving preferred stock that will have priority over the

New Common Stock issued to the holders of the Senior Notes. This has the effect of imposing a

"double step-down" on the holders of the Senior Notes, who will as a result of the confirmation

of the Plan go from holding senior debt to holding equity that is junior to the equity granted to

other similarly situated unsecured creditors. Such a result is impermissible absent reasonable

compensation for the loss of priority.

E.        *There Are No Exceptions to the Absolute Priority Rule to*
          *Justify Distributions to Holders of Junior Claims and Interests*

178.    There are no exceptions to the absolute priority rule that can justify providing

recoveries to the TOPrS, the MDL Plaintiffs and Existing Equity. <u>Ahlers</u>, 485 U.S. at 206 ("We

think the statutory language and the legislative history of §1129(b) clearly bar any expansion of

any exception to the absolute priority rule beyond that recognized in our cases at the time

Congress enacted the 1978 Bankruptcy Code.").

(1)      There is No "Gifting Exception" in this Circuit

179.    Some debtors in other circuits have attempted to circumvent the absolute priority

rule by providing a recovery to holders of equity interests where unsecured creditors are not paid

in full under the judicially created so-called "gifting exception" to the absolute priority rule.

This exception is derived from the First Circuit's holding in <u>In re SPM Manufacturing Corp.</u>, 984

F.2d 1305 (1st Cir. 1993),[14] but has not been, and should not be, adopted in this Circuit. <u>See</u>

---

[14]    There, a secured lender and unsecured creditors entered into an agreement whereby the secured lender would
        share or "gift" a portion of its proceeds from a chapter 7 liquidation with the unsecured creditors. <u>Id.</u> at 1308.
        The debtors and certain insiders objected to the agreement, arguing that the scheme would violate the chapter 7
        distribution scheme because certain priority tax creditors would receive none of the proceeds. Id. at 1309.
        Based on the objection, the bankruptcy court refused to allow the secured lender to complete the transaction,
        and the district court affirmed. <u>Id.</u> at 1309-10. The First Circuit, however, reversed, finding that the chapter 7
        distribution scheme was irrelevant because the secured lender had not been paid in full and it was free to do
        whatever it wished with the bankruptcy dividends it received. <u>Id.</u> at 1312-13.

Iridium, 478 F.3d at 460–61 (noting that SPM has never been adopted by the Second Circuit and

declining to decide whether it could apply in the chapter 11 context). Since the SPM line of

cases did not exist at the time of the codification of the absolute priority rule, it is not available as

an exception. Ahlers, 485 U.S. at 206 ("We think the statutory language and the legislative

history of § 1129(b) clearly bar any expansion of any exception to the absolute priority rule

beyond that recognized in our cases at the time Congress enacted the 1978 Bankruptcy Code.").

180.    Moreover, even if the rule of law established by SPM was adopted in this Circuit,

it is inapplicable to these Cases on these facts. First, because SPM was Chapter 7 case, the First

Circuit had no occasion to consider the absolute priority rule as embodied in section 1129 of the

Bankruptcy Code. See, e.g., In re Armstrong World Indus., Inc., 422 F.3d 507, 514 (3d Cir.

2005) (rejecting a gifting exception in a chapter 11 case and noting that SPM did not involve the

absolute priority rule); In re OCA, Inc., 367 B.R. 72, 85 (Bankr. E.D. La. 2006) ("[T]he SPM

decision did not implicate the absolute priority rule because the debtor was in Chapter 7 and not

Chapter 11; here, OCA is in Chapter 11, and the absolute priority rule must be applied."); In re

Sentry Operating Company Of Texas, Inc., 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001) (stating

that if the Court were to accept the gifting exception "with respect to § 1129(b) 'unfair

discrimination requirement,' there is no logical reason not to apply it to the § 1129(b) 'fair and

equitable' requirement, or to the § 1129(a)(10) requirement that at least one class has accepted

the plan. To accept that argument is simply to start down a slippery slope that does great

violence to history and to positive law."); In re Scott Cable Communications, Inc., 227 B.R. 596,

603 (Bankr. D. Conn. 1998) ("SPM is inapplicable because chapter 7 does not require a plan and,

therefore, is not subject to the confirmation requirements of § 1129").

181.    Second, GM has not entered into an agreement with any party that is receiving a distribution under the Plan to share the proceeds of GM's distributions under the Plan. All distributions pass under the Plan and are therefore properly treated under the Plan as the property of the Debtors' estates. Moreover, even if the Debtors attempt to justify the distributions to holders of Existing Common Stock as a specific "gift" from GM, SPM is equally inapplicable. The Second Circuit has implied that even if SPM were to apply in this Circuit, it would apply only to secured creditors—a party that had an exclusive interest in definable property—i.e., an interest it was capable of "gifting." See Iridium, 478 F.3d at 461 ("[W]e need not decide if SPM could ever apply to Chapter 11 settlements, because it is clear that the Lenders did not actually have a perfected interest in the cash on hand."); Armstrong, 422 F.3d. at 514 (approving of the district court's rejection of the Debtors' gifting exception argument because the gift came from a class of unsecured creditors rather than a secured lender). There has been no determination by the Court that GM is a secured creditor, and its recoveries in these cases are based on its status as an unsecured creditor and a purported settlement.[15]  Moreover, GM's claims have been the subject of substantial dispute and potential avoidance or disallowance in these cases. Any "property" GM receives is not exclusively that of GM, but properly belongs to all of the Debtors' unsecured creditors. Thus, any "gifting" is improper.

---

[15]    ██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████ Moreover, the SPM line of cases specifically address the rights of a secured creditor with an interest in specific and identifiable property to gift a portion of their recovery to junior creditors, and do not grant such rights to a creditor, such as GM, which is served, if at all, only by a general right of set off.

87

(2)    The So-Called New Value Exception
Is Also Inapplicable to These Cases

182.    The Debtors may also attempt to justify the distribution to holders of Existing

Common Stock, the TOPrS or the MDL Plaintiffs under the "new value" exception to the

absolute priority rule insofar as such parties are giving releases, or may purchase Par Value

Rights, Discount Rights or the various Warrants distributed under the Plan.    This limited

exception is derived from Case v. L.A. Lumber Products Co., 308 U.S. 106 (1939), in which the

Supreme Court found that the objection of an impaired senior class does not bar junior claim

holders from receiving or retaining property interests in the debtor after reorganization, if (i) they

contribute new capital in money or money's worth, (ii) reasonably equivalent to the property's

value, and (iii) necessary for a successful reorganization.    308 U.S. at 118.    However, the Second

Circuit has doubted the existence of any "new value" exception under the Bankruptcy Code and

has never recognized the existence of such "exception."    See Coltex Loop, 138 F.3d at 42-43

(determining that "if old equity's new interest under the plan results in any significant way from

its old status, the plan may not be confirmed").

183.    Under the Plan, holders of Existing Common Stock, the TOPrS Claim and the

MDL Claim are receiving recoveries solely on account of their prior interests.    See Plan (Hearing

Ex. 1) § 5.7.    Moreover, to the extent the Debtors were to argue that the new value exception

applies on account of the exercise of any warrants or the Discount Rights Offering, they cannot

show that any such value is necessary for a successful reorganization.    Indeed, the exercise of

some warrants issued under the Plan may occur up to ten years following confirmation of the

Plan, and, in any event, there is no guarantee that the warrants would be exercised.    See 203 N.

Lasalle, 526 U.S. at 449 (noting that if a new value exception indeed existed, a Plan would only

be confirmable if the old equity contributed "a significant amount of cash to the deal"); OCA,

367 B.R. at 91 (stating that to the extent the exercise of warrants or options "is optional, then it cannot be said that it is necessary [to the reorganization]" and, as such, does not qualify as new value).

184.    Similarly, if the Debtors argue that the so-called new value provided by these parties are the releases of causes of action against the Debtors and GM under the plan, that argument should also fail.  Any underlying causes of action that exist, exist solely on account of such parties' claims against and interests in the Debtors.  Therefore any "new value" that may be obtained from the granting of the releases is solely arising on account of such parties prior interests in the Debtors.  See Coltex Loop, 138 F.3d at 44-45 (holding that plan was unconfirmable where "new value" contributed by equity holders resulted in a less than full recovery by unsecured creditors but allowed such equity holders to retain their interests in the debtors post-emergence).

185.    For all of these reasons, even if this court were to recognize the so-called new value exception for the first time in this Circuit, which it should not, the facts of these Cases do not warrant such extension.  The Debtors must strictly adhere to the absolute priority rule and the Plan cannot be confirmed absent such adherence.[16]

F.    *The Plan Unfairly Discriminates Against the Holders of Senior Notes By Providing Different Recoveries to GM and the Flow-Through Claims*

186.    While section 1129(b) expressly prohibits a plan from discriminating unfairly against a dissenting class, the Plan gives senior treatment to GM and holders of Flow-Through Claims on account of their unsecured claims who compared to the treatment of the Senior Notes.

---

[16] Finally, the only other recognized exception to the absolute priority rule is the "equitable exception" recognized by the Third Circuit in In re Penn Central Transportation Co., 596 F.2d 1127, 1142 (3d Cir. 1979).  However, Penn Central was decided under "exceptional circumstances" where Congress had intervened "to avoid a rail transportation crisis of national import" and is not applicable to these Cases.  See Armstrong, 432 F.3d at 516-17.

While the Bankruptcy Code does not define "discriminating unfairly," courts that have

considered the issue have adopted a variety of different tests. Some courts have held that a plan

will not discriminate unfairly if there is "a rational or legitimate basis for discrimination and the

discrimination [is] . . . necessary for the reorganization." In re 203 N. Lasalle St. Ltd. P'ship,

190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), reversed on other grounds, 526 U.S. 434; 7 Collier

On Bankruptcy ¶1129.04[3] (L. King Rev. 15th ed. 2007) (stating that this test is the majority

rule). Another test adopted more recently by bankruptcy courts creates "a rebuttable

presumption that a plan is unfairly discriminatory . . . when there is: (1) a dissenting class; (2)

another class of the same priority; and (3) a difference in the plan's treatment of the two classes

that results in either (a) a materially lower percentage recovery for the dissenting class (measured

in terms of the net present value of all payments), or (b) regardless of percentage recovery, an

allocation under the plan of materially greater risk to the dissenting class in connection with its

proposed distribution." In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. D. Mich. 1999)

(citing Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am.

Bankr. L.J. 227 (1998)). Under either of these tests, the Plan cannot be confirmed.

          (1)     The Flow-Through Claims Are Treated Better
                    Than General Unsecured Creditors

      187.     Under the Plan, holders of the so-called Flow-Through Claims will have their

claims reinstated and satisfied in the ordinary course of business with Cash. See Plan (Hearing

Ex. 1) § 5.2. This treatment constitutes unfair discrimination because each claim will be satisfied

in full in Cash, while, as previously discussed, the Senior Notes Claims will not as the claims of

these holders are satisfied with a combination of New Common Stock at an inflated valuation

and out of the money Discount Rights. Thus, while one group of General Unsecured Claims is

actually paid in full in cash, another is forced, not only to buy a portion of its own recovery, but

also to assume all of the risks that are attendant with the ownership of New Common Stock,

including that the New Common Stock is worth significantly less than the deemed value

expressed in the Plan.

> (2)    The GM Claim is Granted More Favorable Treatment
> Than Other General Unsecured Creditors

188.    Under the Plan GM will receive, among other things, junior preferred convertible

stock, cash, and have some of its claims reinstated. See Plan (Hearing Ex. 1) § 5.4. In contrast,

holders of Senior Notes will receive New Common Stock of equal priority with that distributed

to holders of common equity and Discount Rights that are worthless at any rational valuation of

the Debtors. The Debtors, however, have provided no rationale for this disparate treatment

among unsecured creditors. While the Debtors assert that GM has provided valuable

consideration for its treatment—which, as with the Flow-Through Claims, comes with

considerably less risk than the recoveries of the Senior Notes which will be entirely in or tied to

the value of the Debtors' New Common Stock—the Debtors have not proven that the disparate

treatment of both the GM and Flow-Through Claims treatment meets either test. Accordingly,

the Plan cannot be confirmed until the Debtors demonstrate that the Plan does not unfairly

discriminate.

## IV.    The Releases Granted to Non-Debtor Third PartiesUnder the Plan Do Not Satisfy the Metromedia Standard

189.    The third-party releases proposed under the Plan cannot be approved, and a Plan

that contains them cannot be confirmed. Third-party releases are granted sparingly under the

binding law of this Circuit. The Second Circuit has stated that a plan of reorganization may

provide a release to third parties only if the release "'plays an important part in the debtor's

reorganization plan.'" Metromedia, 416 F.3d at 141 (quoting In re Drexel Burnham Lambert

Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992)); see also In re Lowenschuss, 67 F.3d 1394, 1401–

02, 1402 n.6 (9th Cir. 1995) (finding that non-debtor releases are prohibited by the Bankruptcy

Code except in the asbestos context); In re W. Real Estate Fund, Inc., 922 F.2d 592, 600–02

(10th Cir. 1990) (per curiam) (same).  Nondebtor releases are "proper only in rare cases" and,

thus, prohibited "absent the finding of circumstances that may be characterized as unique."

Metromedia, 416 F.3d at 142; see also In re Adelphia Commc'ns Corp., 368 B.R. 140, 267

(Bankr. S.D.N.Y. 2007) ("[Metromedia] requires the bankruptcy community in this Circuit to be

much more circumspect in providing for third-party releases than it used to be.").

　　　　190.    Courts have sparingly found such rare and unique circumstances where (i) the

estate received substantial consideration for the release, (ii) the released claims were channeled

to a settlement fund as opposed to extinguished, (iii) the released claims would directly impact

the debtor's reorganization due to indemnity or contribution, or (iv) the plan otherwise provided

for the full payment of the released claims.  Metromedia, 416 F.3d at 142.  Additionally, courts

have noted that releases should be narrowly tailored as to each released individual or entity to

match their contribution to the Plan, whether that contribution be in money or money's worth.

Adelphia Commc'ns, 368 B.R. at 267 (noting that Metromedia requires that releases be justified

on an entity by entity or person by person basis).  No rigid test for the justification of nondebtor

releases exists, but insofar as a debtor attempts to justify a release by pointing to a substantial

contribution by the released party, "a nondebtor release is not adequately supported by

consideration simply because the nondebtor contributed something to the reorganization and the

enjoined creditor took something out."  Id. at 142–43.  Rather, there must be sufficient

justification or consideration for the release itself.  Id.  As the Second Circuit stated in

Metromedia:

> [A] nondebtor release is a device that lends itself to abuse. By it, a
> nondebtor can shield itself from liability to third parties. In form, it

is a release; in effect, it may operate as a bankruptcy discharge
arranged without a filing and without the safeguards of the Code.
The potential for abuse is heightened when releases afford blanket
immunity.

Id. at 142.

191.    Under the Plan, the Debtors intend to provide blanket releases to the "Released

Parties" which are comprised of: "(a) all officers of each of the Debtors, all members of the

boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case

in their respective capacities as of the date of the commencement of the hearing on the

Disclosure Statement, (b) the Creditors' Committee and all current and former members of the

Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all

current and former members of the Equity Committee in their respective capacities as such, (d)

the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f)

all Professionals, (g) the Unions and current or former members, officers, and committee

members of the Unions, (h) the Indenture Trustees, in their capacities as such, and (i) with

respect to each of the above named Persons, such Person's affiliates, advisors, principals,

employees, officers, directors, representatives, financial advisors, attorneys, accountants,

investment bankers, consultants, agents, and other representatives and professionals." Plan

(Hearing Ex. 1) § 1.166.  In addition, by voting to accept the Plan or by accepting their rightful

distribution thereunder the Plan, each holder of a Claim or Interest will also be deemed to have

unconditionally granted a release to the Released Parties for any action arising before the

Effective Date in any way relating to the Debtors.  See Plan (Hearing Ex. 1) § 11.5  Moreover,

the Plan provides separate and overly-broad releases to the Plan Investors, not only on behalf of

the Debtors but also on behalf of all of the Debtors' creditors.  Plan (Hearing Ex. 1) § 11.8.

Finally, the GSA grants GM a release from the Debtor and Debtor affiliates as well as all

creditors of and holders of equity interests in the Debtors. See GSA (Hearing Ex. 9) at § 4.01(c).

192.    These releases are not justified under Second Circuit law.  The first situation

where courts have found unique circumstances—the estate received substantial consideration—

does not apply.  Although the officers and directors have provided service to the Debtors, there is

nothing to justify such broad releases, especially given the allegations that have been brought by

the MDL Group.  While GM has provided a contribution to the estate, it is also potentially liable

to the Debtors and their stakeholders for billions of dollars and is receiving a large recovery

under the Plan in exchange.[17]  As a result, there is no support for the necessity of additional

compensation in the form of a blanket release.  See Adelphia Commc'ns, 368 B.R. at 268–69 ("I

don't doubt that in this case the Settling Parties engaged, as the Plan Proponents argue, in

'tireless efforts' to come together to work out a global compromise aimed at resolving these

cases.  But that's not unique.  It's something creditors have to do in every chapter 11 case, at the

risk of destroying themselves (or their recoveries in the case) with their own quests for

incremental recoveries.").

193.    Similarly, the Plan Investors are adequately compensated for their backstop

commitment, and the Plan's release of a broad range of non-Debtors other than GM and the Plan

Investors is unjustified because the additional Released Parties are not contributing anything

substantial to the creditors of the Debtors.  Adelphia Commc'ns, 368 B.R. at 267–68 ("Likewise,

many players in the bankruptcy process provide benefits to the case.  DIP lenders are certainly in

this category, and so are professionals to the estate or its fiduciaries.  But they get interest and

fees for their services.  Their delivery of services is not unique.").  Moreover, there are no other

---

[17]    An additional reason why the GM releases may not be appropriate is on account of the GM claims being subject
to dispute.  See Adelphia Commc'ns, 368 B.R. at 268 (refusing to approve some releases because "the 'give-
ups' that [the released] parties made were of rights to recover that were subject to fair debate").

94

"unique circumstances" present in these Cases of the level necessary to support the releases under Metromedia.

194.    No channeling trust has been created for any enjoined claims.  Further, while potential claims against GM and some of the Released Parties may require Reorganized Delphi to indemnify those parties for any damages, it is unlikely that any indemnification agreement would cover willful or grossly negligent conduct.  Nevertheless, the Plan's releases covers such. See, e.g., Plan (Hearing Ex. 1) § 11.4. (discharging the Released Parties "for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases").

195.    Finally, the Plan does not provide for any means of payment of any enjoined claims against the third parties.  There is no reserve or fund that could satisfy any claims, but, rather, all claims of whatever sort will be forever extinguished.  See Menard-Sanford v. Mabey In re A.H. Robins Co., 880 F.2d 694, 701 (4th Cir. 1989) (approving of a release because the affected claimants could have received full payment for their claims if they had not opted-out of a settlement).  Accordingly, the Plan cannot be confirmed.

## V.    The Plan Cannot be Confirmed Because Violates Section 1129(a)(11)

196.    Section 1129(a)(11) requires, as a prerequisite to confirmation, that the Plan "is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is

proposed in the plan." 11 U.S.C. § 1129(a)(11). The Debtors' Plan, as currently proposed, is not

feasible because without a fully committed Exit Facility, the Debtors (a) cannot be sure that they

have the continued liquidity to fund operations and (b) will not know whether certain conditions

to the closing of the Investment Agreement (such as the interest expense cap) will be capable of

being satisfied. Unless and until these are known, the Debtors will be unable to satisfy the

requirements of section 1129(a)(11).

197.    Courts have routinely found that proposed plans of reorganization are infeasible

because of a lack of adequate exit financing or a firm commitment for exit financing. See, e.g.,

In re Proud Mary Marina Corp., 338 B.R. 114, 127 (Bankr. M.D. Fla. 2006) (plan not feasible

where exit financing insufficient to satisfy all of the outstanding claims against the estate in full

on the Effective Date of the Plan or make necessary payments after emergence); In re Made in

Detroit, Inc., 299 B.R. 170, 177 (Bankr. E.D. Mich. 2003) (Plan not feasible where no reasonable

assurance that exit financing loan would ever close); In re Global Ocean Carriers Limited, 251

B.R. 31, 46–47 (Bankr. D. Del. 2000) (Plan not feasible where collateral value not sufficient to

secure exit financing). As of this point in time, the Debtors have not yet secured a firm

commitment to Exit Financing.

198.    In addition to the Exit Financing Arrangements, the Debtors are depending on the

Investment Agreement for a significant source of cash for Plan distributions. See Plan (Hearing

Ex. 1) § 7.11–12. The Investment Agreement contains numerous conditions to the obligations of

the Plan Investors, one of which is that the company "shall have demonstrated, to the reasonable

satisfaction of ADAH, that the pro forma interest expense for the Company during 2008 on the

Company's Indebtedness will not exceed $585 million." See Plan (Hearing Ex. 1), Ex. 7.11

§ 9(xx). The Debtors have repeatedly stated that they are seeking the Exit Financing

96

Arrangements during a turbulent time for the capital markets. As such, if the Exit Financing

Arrangements were in fact secured by the Effective Date, it is not at all clear that such

arrangements would generate an interest expense within the $585 million cap in the Investment

Agreement.

199.    Because the Debtors have not secured the necessary funding commitments, they

cannot assure that they can make the necessary Plan distributions, nor can they assure adequate

cash flow to fund continuing operations. In sum, the Plan is currently not feasible under section

1129(a)(11) of the Bankruptcy Code because the Debtors do not have a reasonable chance of

meeting their projections, funding the Plan, or maintaining operations according to the Plan

unless the Exit Financing Arrangements are funded on the Effective Date.

## VI.    The Disclosure Statement that Accompanied the Plan Did Not Contain Adequate Information

200.    Given that the true value of the Debtors is so much lower than contained in the

Rothschild Valuation, the disclosure contained in the Disclosure Statement was inadequate when

mailed to creditors and may have skewed the voting in favor of the Plan.

201.    Although the Court has previously approved the Disclosure Statement as

containing adequate information, after certain modifications were made thereto, the Disclosure

Statement that accompanied the Plan failed to address many issues concerning the actual value of

the Debtors, such as the impact of the economic downturn on the Debtors, their value and their

financial projections. The Senior Noteholders maintain that absent the inclusion of such

information, including, but not limited to more detailed information surrounding valuation, the

disclosure contained therein was inadequate and the outcome of the voting would have been less

favorable to the Plan's acceptance.

**<u>Reservation Of Rights</u>**

202.    The Senior Noteholders expressly reserves any and all rights to amend or

supplement this Objection and to submit a surreply in further support thereof.  Each Senior

Noteholder also reserves the right to joint in any objection filed by any other party in interest.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Senior Noteholders

respectfully request that this Court deny the confirmation of the Plan and grant such other relief

as may be just and proper.

Dated: New York, New York
        January 11, 2008

                                        GOODWIN PROCTER LLP

                                        By:  /s/ Allan S. Brilliant
                                        Allan S. Brilliant (AB 8455)
                                        abrilliant@goodwinprocter.com
                                        Craig P. Druehl (CD 2657)
                                        cdruehl@goodwinprocter.com
                                        Meagan E. Costello (MC 0962)
                                        mcostello@goodwinprocter.com
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        (212) 813-8800
                                                - and -

                                        GOODWIN PROCTER LLP
                                        Gina Lynn Martin (GM 1324)
                                        gmartin@goodwinprocter.com
                                        Exchange Place
                                        Boston, Massachusetts  02109
                                        (617) 570-1330

                                        Attorneys for Davidson Kempner Capital
                                        Management LLC; Elliott Associates, L.P.; Nomura
                                        Corporate Research & Asset Management, Inc;
                                        Northeast Investors Trust; and Whitebox Advisors,
                                        LLC