IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
    In re                          :        Chapter 11
                                                      :
DELPHI CORPORATION, <u>et al.</u>,                    :        Case No. 05-44481 (RDD)
                                                      :
         Debtors.   :        (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>AFFIDAVIT OF SERVICE</u>

      I, Elizabeth Adam, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On January 7, 2008, I caused to be served the documents listed below (i) upon the parties listed on <u>Exhibit A</u> hereto via overnight mail, (ii) upon the parties listed on <u>Exhibit B</u> hereto via electronic notification, (iii) upon the parties listed on <u>Exhibit C</u> hereto via facsimile and (iv) upon the parties listed on <u>Exhibit D</u> hereto via postage pre-paid U.S. mail:

    1)   Notice Of Adjournment Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 8875 (Riverside Claims LLC As Assignee For Product Action International LLC) (Docket No. 11750) [a copy of which is attached hereto as <u>Exhibit E</u>]

    2)   Notice Of Adjournment Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 14109 (Kensa LLC) (Docket No. 11751) [a copy of which is attached hereto as <u>Exhibit F</u>]

      On January 7, 2008, I caused to be served the document listed below upon the parties listed on <u>Exhibit G</u> hereto via overnight mail:

    3)   Notice Of Adjournment Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 8875 (Riverside Claims LLC As Assignee For Product Action International LLC) (Docket No. 11750) [a copy of which is attached hereto as <u>Exhibit E</u>]

On January 7, 2008, I caused to be served the document listed below upon the parties listed on Exhibit H hereto via overnight mail:

4) Notice Of Adjournment Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 14109 (Kensa LLC) (Docket No. 11751) [a copy of which is attached hereto as Exhibit F]

On January 7, 2008, I caused to be served the document listed below upon the parties listed on Exhibit I hereto via overnight mail:

5) Debtors' Amended Supplemental Reply with Respect to Proof of Claim No. 1279 (Nu-Tech Plastics Engineering, Inc.) ("Amended Supplemental Reply - Nu-Tech Plastics Engineering, Inc.") (Docket No. 11756) [a copy of which is attached hereto as Exhibit J]

Dated: January 11, 2008

_____*/s/ Elizabeth Adam*_____
Elizabeth Adam

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 11th day of January, 2008, by Elizabeth Adam, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____*/s/ Leanne V. Rehder*_____

Commission Expires:___*3/2/08*_____

# EXHIBIT A

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

1/11/2008 4:16 PM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein<br>Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092<br>212-450-4213 | 212-450-3092<br>212-450-3213 | donald.bernstein@dpw.com<br>brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com<br>karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler<br>Bonnie Steingart<br>Vivek Melwani<br>Jennifer L Rodburg<br>Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com<br>sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | Jason A. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

1/11/2008 4:16 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

1/11/2008 4:16 PM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1° | Cadiz | | 11006 | Spain | 34 956 226 311 | | adalberto@canadas.com | Representative to DASE |
| Adler Pollock & Sheehan PC | Joseph Avanzato | One Citizens Plz 8th Fl | | Providence | RI | 02903 | | 401-274-7200 | 401-751-0604 | javanzato@apslaw.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Akin Gump Strauss Hauer & Feld, LLP | David M Dunn | 1333 New Hampshire Ave NW | | Washington | DC | 20036 | | 202-887-4000 | 202-887-4288 | ddunn@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Ira S Dizengoff | 590 Madison Ave | | New York | NY | 10022-2524 | | 212-872-1000 | 212-872-1002 | idizengoff@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC, PD George Co, Furukawa Electric Companay, Ltd., and Furukawa Electric North America APD, Inc. |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Anthony Ostlund & Baer PA | John B Orenstein | 3600 Wells Fargo Ctr | 90 S 7th St | Minneapolis | MN | 55402 | | 612-349-6969 | 612-349-6996 | jorenstein@aoblaw.com | Attorneys for Whitebox Hedged High Yield Partners, LP |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Balch & Bingham LLP | Eric T. Ray | PO Box 306 | | Birmingham | AL | 35201 | | 205-251-8100 | 205-226-8799 | eray@balch.com | Attorney for Alabama Power Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S. A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Michael A Trentadue Carina M de la Torre | 2700 First Indiana Plz | 135 N Pennsylvania St | Indianapolis | IN | 46204 | | 317-684-5000 | 317-684-5173 | mtrentadue@boselaw.com cdelatorre@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605 529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | 202-862-2400 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Enhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A. de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston Aaron R. Marcu | 620 Eighth Ave | | New York | NY | 10018 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | 212-248-3141 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Intermet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Garvey Schubert Barer | Roberto Carrillo | 100 Wall St 20th Fl | | New York | NY | 10005 | | 212-965-4511 | 212-334-1278 | rcarrillo@gsblaw.com | Attorney's for Tecnomec S.r.l. |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel to UGS Corp. |
| Goodwin Proctor LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raiffeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raiffeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | 200 Park Avenue | | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc. |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation; Co-Counsel for Yazaki North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | 212-972-1677 | sgross@hodgsonruss.com | Co-Counsel for Yazaki North America, Inc. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | 313-465-7627 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald P. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0041 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | 804-775-1061 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | jdonahue@miheritage.com | Counsel to Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | piricotta@mintz.com pricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Inc. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@morithock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | 609-777-3055 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Ohio Environmental Protection Agency | c/o Michelle T. Sutter | Principal Assistant Attorney General Environmental Enforcement Section | 30 E Broad St 25th Fl | Columbus | OH | 43215 | | 614-466-2766 | 614-752-2441 | msutter@ag.state.oh.us | Attorney for State of Ohio, Environmental Protection Agency |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszjlaw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Robert J. Feinstein, Ilan D. Scharf | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | Rfeinstein@pszjlaw.com lscharf@pszjlaw.com | Counsel for Essex Group, Inc. |
| Patterson Belknap Webb & Tyler LLP | David W. Dykhouse Phyllis S. Wallitt | 1133 Avenue of the Americas | | New York | NY | 10036-6710 | | 212-336-2000 | 212-336-2222 | dwdykhouse@pbwt.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pietragallo Bosick & Gordon LLP | Richard J. Parks | 54 Buhl Blvd | | Sharon | PA | 16146 | | 724-981-1397 | 724-981-1398 | rjp@pbandg.com | Counsel to Ideal Tool Company, Inc. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com  mgr@previant.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Roy Prange | 33 E Main St Ste 900 | | Madison | WI | 53703-3095 | | 608-283-2485 | 608-294-4920 | rlp@quarles.com | Counsel for Flambeau Inc. |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc.  Counsel for Pamela Gellar |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher P. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | 609-227-4646 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang, Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert E. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 502-587-3400 | 502-779-8274 502-587-6391 | wbeard@stites.com loucourtsum@stites.com | Counsel to WAKO Electronics (USA), Inc.,Ambrake Corporation, and Akebono Corporation (North America) |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennessee Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Company |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 19 of 20

1/11/2008 4:15 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Wickens Herzer Panza Cook & Batista Co | James W Moennich Esq | 35765 Chester Rd | | Avon | OH | 44011-1262 | | 440-930-8000 | 440-930-8098 | jmoennich@wickenslaw.com | Counsel for Delphi Sandusky ESOP |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

1/11/2008 4:15 PM
Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | 512-314-4462 | aleinoff@amph.com | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com malerding@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | 917-368-8898 | athau@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | 212-697-1559 | dkarp@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Co-Counsel to Tower Automotive, Inc. |
| Dykema Gossett PLLC | Brendan G Best Esq | 39577 Woodward Ave Ste 300 | | Bloomfield Hills | MI | 48304 | 248-203-0523 | 248-203-0763 | | Attorneys for Tremond City Barrel Fill PRP Group |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | 302-622-7100 | gjarvis@gqelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | 212-763-7600 | carren.shulman@hellerehrman.com | Counsel to @Road, Inc. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | 850-763-8425 | gerdekomarek@bellsouth.net | Counsel to Peggy C. Brannon, Bay County Tax Collection |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

1/11/2008 4:15 PM
Fax

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | 212-947-1202 | rcovino@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuireWoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | 216-579-0212 | mmharner@jonesday.com | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | 312-849-2021 | mmoody@okmlaw.com | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | 212-373-2053 | cweidler@paulweiss.com | Counsel to Ambrake Corporation; Akebono Corporation |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | 330-670-3020 | jlapinsky@republicengineered.com | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | 213-312-2001 | cnorgaard@ropers.com | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | 312-258-5600 | wkohn@schiffhardin.com | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | 212-806-6006 | jminias@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | bmcdonough@teamtogut.com | Conflicts counsel to Debtors |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

1/11/2008 4:15 PM
Fax

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | 212-317-4893 | | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

1/11/2008 4:15 PM
Fax

# EXHIBIT D

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Akebono Corporation North America | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | 866-609-0888 | aswiech@akebono-usa.com | Vice President of Administration for Akebono Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | | sabelman@cagewilliams.com | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | 615-321-9555 | amalone@colwinlaw.com | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | | | Counsel to Tremont City Barrel Fill PRP Group |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | 305-349-2310 | crieders@gjb-law.com | Counsel to Ryder Integrated Logistics, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | | | General Counsel to Jason Incorporated |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | | dbrown@klettrooney.com | Counsel to Entergy |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | | schnabel@klettrooney.com | Counsel to Entergy |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | 305-375-1142 | | Paralegal Collection Specialist for Miami-Dade County |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel to Rotor Clip Company, Inc. |
| Pickrel Shaeffer & Ebeling | Sarah B. Carter Esq | 2700 Kettering Tower | | Dayton | OH | 45423 | | | | |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | 989-754-7690 | They have no email address, have to be notified by mail | Corporate Secretary for Professional Technologies Services |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | 312-207-6400 | cschulman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | | mnewman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | 412-562-2429 | djury@steelworkers-usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/11/2008 4:15 PM
US MAIL

# EXHIBIT E

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|                          |   |                          |
| :                        |   |                          |
| In re                    | : | Chapter 11               |
| :                        |   |                          |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| :                        |   |                          |
| Debtors.                 | : | (Jointly Administered)   |
| :                        |   |                          |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ADJOURNMENT OF CLAIMS OBJECTION HEARING WITH RESPECT
TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 8875 (RIVERSIDE CLAIMS LLC
AS ASSIGNEE FOR PRODUCT ACTION INTERNATIONAL LLC)

PLEASE TAKE NOTICE that on August 24, 2007, Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), objected to proof of claim number 14109 (the "Proof of

Claim") filed by Riverside Claims LLC as assignee for Product Action International LLC (the

"Claimant") pursuant to the Debtors' Twentieth Omnibus Objection Pursuant To 11 U.S.C. §

502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate Or Amended Claims, (B)

Insufficiently Documented Claims, (C) Claims Not Reflected On Debtors' Books and Records,

(D) Untimely Claim, And (E) Claims Subject to Modification, Tax Claims Subject To

Modification, Modified Claims Asserting Reclamation, Consensually Modified And Reduced

Tort Claims, And Lift Stay Procedures Claims Subject To Modification (Docket No. 9151).

PLEASE TAKE FURTHER NOTICE that on December 5, 2007, the Debtors

filed the Notice Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of

Claim No. 8875 (Riverside Claims LLC As Assignee For Product Action International LLC)

(Docket No. 11318) scheduling a claims objection hearing (the "Claims Objection Hearing") for

purposes of holding an evidentiary hearing on the merits of the Proof of Claim for February 7,

2008, at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the

Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that pursuant to Paragraph 9(a)(ii) of the

Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006,

9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To Claims And (II)

Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006

(Docket No. 6089) (the "Order") and the Second Supplemental Order Pursuant To 11 U.S.C. §

502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i)

2

Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered November 20, 2007 (Docket No. 10994), the Claims Objection Hearing is hereby adjourned to February 29, 2008, at 10:00 a.m. (prevailing Eastern time) in the Court.

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will proceed in accordance with the procedures provided in the Order unless such procedures are modified in accordance with Paragraph 9(k) thereof.  All provisions and deadlines set forth in the Order shall remain in full force and effect.  Those deadlines calculated based on the hearing date or the notice date shall be calculated based on the February 29, 2008 hearing date or the January 7, 2008 notice date, as applicable, rather than the original February 7, 2008 hearing date or the original December 5, 2007 notice date.  Please review the Order carefully — failure to comply with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k)) could result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is attached hereto for your convenience.

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the Claims Objection Hearing at any time at least five business days prior to the scheduled hearing upon notice to the Court and the Claimant.

Dated:  New York, New York
          January 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By:  /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession

4

# EXHIBIT F

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :
      In re                         :     Chapter 11
                             :
DELPHI CORPORATION, et al.,          :     Case No. 05-44481 (RDD)
                             :
              Debtors.     :     (Jointly Administered)
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ADJOURNMENT OF CLAIMS OBJECTION HEARING WITH
RESPECT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 14109
(KENSA LLC)

PLEASE TAKE NOTICE that on September 21, 2007, Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), objected to proof of claim number 14109 (the "Proof of Claim") filed by KenSa LLC (the "Claimant") pursuant to the Debtors' Twenty-First Omnibus Objection Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate or Amended Claims, (B) Untimely Equity Claim; (C) Insufficiently Documented Claims, (D) Claims Not Reflected On Debtors' Books and Records, (E) Untimely Claims, And (F) Claims Subject to Modification, Tax Claim Subject To Modification, And Modified Claims Asserting Reclamation (Docket No. 9535).

PLEASE TAKE FURTHER NOTICE that on November 27, 2007, the Debtors filed the Notice Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 14109 (KenSa LLC) (Docket No. 11131) scheduling a claims objection hearing (the "Claims Objection Hearing") for purposes of holding an evidentiary hearing on the merits of the Proof of Claim for January 31, 2008, at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that pursuant to Paragraph 9(a)(ii) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Order") and the Second Supplemental Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered November 20, 2007 (Docket No. 10994), the Claims

2

Objection Hearing is hereby adjourned to February 29, 2008, at 10:00 a.m. (prevailing Eastern time) in the Court.

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will proceed in accordance with the procedures provided in the Order unless such procedures are modified in accordance with Paragraph 9(k) thereof.  All provisions and deadlines set forth in the Order shall remain in full force and effect.  Those deadlines calculated based on the hearing date or the notice date shall be calculated based on the February 29, 2008 hearing date or the January 7, 2008 notice date, as applicable, rather than the original January 31, 2008 hearing date or the original November 27, 2007 notice date.  Please review the Order carefully — failure to comply with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k)) could result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is attached hereto for your convenience.

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the Claims Objection Hearing at any time at least five business days prior to the scheduled hearing upon notice to the Court and the Claimant.

3

Dated:  New York, New York
January 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By:    /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By:  /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

4

# EXHIBIT G

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Riverside Claims LLC | Robyn Spalter | Planetarium Station | PO Box 626 | New York | NY | 10024 |

# EXHIBIT H

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| Kensa LLC | Ralph McDowell David Nowaczewski | Bodman LLP 6th Fl at Ford Field | 1901 St Antoine St | Detroit | MI | 48226 |

# EXHIBIT I

Delphi Corporation
Response Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/11/2008 4:16 PM
Response Service List 070530 Overnight

Delphi Corporation
Special Parties

| Claimant | Contact | Address1 | Address2 | Address3 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| NuTech Plastics | Douglas M. Tisdale Steven A. Klenda | Tisdale and Associates LLC | 1600 Broadway | Suite 2600 | Denver | CO | 80202 |
| NuTech Plastics | Jay A. Schwartz | Schwartz Law Firm, P.C. | 37887 W 12 Mile Road | Suite A | Farmington Hills | MI | 48331 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/11/2008 4:16 PM
NuTech Special Parties

# EXHIBIT J

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
        In re                       :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05-44481 (RDD)
                                    :
              Debtors.              :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' AMENDED SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 1279 (NU-TECH PLASTICS ENGINEERING, INC.)

("AMENDED SUPPLEMENTAL REPLY – NU-TECH PLASTICS ENGINEERING, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Amended Supplemental Reply With Respect To Proof Of Claim No. 1279

(Nu-Tech Plastics Engineering, Inc.) pursuant to paragraph 9(f)(iv) of the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices

And Procedures Governing Objections To Claims (Docket No. 6089), dated December 6, 2006.

<u>Preliminary Statement</u>

1.      Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") supplied parts to General

Motors Corporation ("GM") and Delphi Automotive Systems LLC ("DAS") until December 1,

1999, when it sold substantially all of its assets to another supplier, Rapid Product Technologies,

L.L.C. ("RPT").  The parts included a fuel reservoir with part number 25160694 (the "Part").

GM issued purchase orders for the Part in November 1997 (the "November 1997 Purchase

Order") and June 1998 (the "June 1998 Purchase Order"), and it reissued the second purchase

order using a form generated by its new purchasing system in August 1998 (the "August 1998

Purchase Order").  These purchase orders were issued <u>before</u> DAS existed; DAS was not formed

as a limited liability company until September 1998.  DAS issued its first purchase order for the

Part in May 1999 (the "May 1999 Purchase Order").  DAS did not place orders throughout the

term of the May 1999 Purchase Order because, as Nu-Tech knew, GM had agreed to withdraw

production from Nu-Tech as part of its settlement of a major work stoppage in the summer of

1998.  In accordance with that settlement, the tools needed to make the Part were removed from

Nu-Tech's plant at some point in late 1998 or 1999.

2.      Although Nu-Tech now claims that DAS breached the Part-related

purchase orders, resulting in damages of more than $15.1 million, there is no written evidence of

2

Nu-Tech complaining about DAS's performance until December 2002, when it sued GM and DAS in Michigan state court (the "Michigan Action"). Nu-Tech's contract theory in the Michigan Action, and the basis for its proof of claim here, is that DAS breached the purchase orders by failing to order its requirements from Nu-Tech in 1999 and 2000. This theory fails on three grounds:

- First, Nu-Tech sold its purchase orders and the right to sue for any alleged breach of those contracts to RPT effective December 1, 1999. Accordingly, Nu-Tech was not the real party in interest when it brought the Michigan Action. And although Nu-Tech attempted to reacquire the right to sue by entering into an assignment with RPT in March 2005, that assignment was ineffective because it was executed after the statute of limitations expired.

- Second, DAS cannot be held responsible for any breach of the November 1997 Purchase Order, the June 1998 Purchase Order, or the August 1998 Purchase Order because DAS was not a party to those contracts; indeed, DAS did not exist when GM issued those contracts. Nu-Tech sued GM for breaching its contracts in the Michigan Action and it has since settled with GM. There is no basis for Nu-Tech's continued pursuit of those same claims against DAS.

- Third, assuming for the sake of argument that DAS breached a Part-related contract, Nu-Tech cannot recover damages because it did not take any steps to mitigate its losses.

     3.     In addition to its contract claim, Nu-Tech asserts a promissory-estoppel claim, arguing that DAS broke a promise to award Nu-Tech new business to replace the lost Part business. But like Nu-Tech's contract claim, this claim fails because Nu-Tech sold it to RPT effective December 1, 1999. This claim also fails on the merits for the following reasons:

- First, Nu-Tech has submitted a declaration from Trenia Patrick, a former Delphi buyer who is now assisting Nu-Tech in this litigation, establishing that the promise, if made at all, was made by GM, not DAS.[1]

- Second, only a clear and definite promise qualifies for enforcement, but Nu-Tech cannot identify the person who made the promise, when the promise was made (other than the vague assertion that it was sometime in the fall of 1998), or any of the material terms of the proposed agreement.

---

[1]    Ms. Patrick refused to assist Delphi in this litigation because Delphi would not agree to her request for remuneration in exchange for her cooperation; but she made no such demand of Nu-Tech.

- **Third**, Nu-Tech did not take any action in reliance on the alleged promise, nor would any such action have been reasonable given Nu-Tech's knowledge that DAS awarded new business by issuing a purchase order, not by casual conversation as Nu-Tech alleges.

- **Fourth**, the May 1999 Purchase Order incorporated an integration clause, rendering Nu-Tech's reliance on the pre-contractual promise unreasonable as a matter of law.

- **Fifth**, enforcement of the promise is not necessary to avoid injustice, but rather would provide Nu-Tech's current owner, John G. Cooper, with a windfall. The bulk of the damages Nu-Tech seeks for this claim are based on lease payments made by Nu-Tech to companies owned or controlled by Mr. Cooper. If DAS reimburses Nu-Tech for those payments, the money will go to Mr. Cooper again, this time as the owner of Nu-Tech.

## Background

A.    The November 1997 Purchase Order.

4.    Nu-Tech received its first purchase order for the Part in November 1997, a copy of which is attached to this brief as Exhibit A. The heading of the November 1997 Purchase Order identifies "General Motors Corporation" and the GM operating segment responsible for the Part at that time, "Automotive Components Group Worldwide." (Id. at 1.) The parties agree that the November 1997 Purchase Order was issued by GM. (See Exhibit Q ¶ 4; Patrick Aff. ¶ 11.) As it relates to the Part, the November 1997 Purchase Order was a factory-assist contract. (Exhibit A at 1.) Under a factory-assist contract, the buyer agrees to purchase a certain percentage of its requirements for the goods covered by the contract, but only to the extent that the buyer cannot satisfy its requirements through its own production of the goods. (See Patrick Aff. ¶ 12.) The term of the November 1997 Purchase Order as to the Part was November 11, 1997 through July 31, 1998. (Exhibit A at 10.) Nu-Tech is not seeking any damages under the November 1997 Purchase Order.

4

B.    The June 1998 Purchase Order.

5.        In June 1998, near the end of the term of the November 1997 Purchase Order, Nu-Tech received its second purchase order for the Part, a copy of which is attached to this brief as Exhibit B.  Like the November 1997 Purchase Order, the heading of the June 1998 Purchase Order identifies "General Motors Corporation" and GM's "Automotive Components Group Worldwide" operating segment (id. at 1), and the parties agree that the June 1998 Purchase Order was issued by GM (see Exhibit Q ¶ 5; Cooper Dec. ¶ 9; Patrick Aff. ¶¶ 6, 16). The June 1998 Purchase Order was a requirements contract under which GM agreed to purchase 100% of its requirements for the Part.  (Exhibit B at 1, 9; Cooper Dec. ¶ 9; Patrick Aff. ¶ 19.)  Its term began on August 1, 1998 – the day after the November 1997 Purchase Order expired – and ended on July 31, 1999.  (Exhibit B at 9.)  Again, this purchase order was issued by GM at a time when DAS did not exist.[2]

C.    GM's New Purchasing System And The August 1998 Purchase Order.

6.        The format of the November 1997 Purchase Order and the June 1998 Purchase Order was essentially the same because GM generated both purchase orders using a purchasing system known as PPS.  (See Exhibit Q ¶ 5.)  Shortly after it issued the June 1998 Purchase Order, GM transitioned from PPS to a new purchasing system known as GPS.  (Id.)  In August 1998, GM reissued the June 1998 Purchase Order using the new GPS purchasing system. (Id. ¶¶ 5-6.)  A copy of the reissued purchase order is attached to this brief as Exhibit C. Although different in form, the essential terms of the August 1998 Purchase Order were the same as those set forth in the June 1998 Purchase Order – GM agreed to purchase 100% of its requirements for the Part from August 1, 1998 through July 31, 1999.  (See Exhibit B at 1, 9; Exhibit C at 1-2.)

---

[2]    Automotive Components Group Worldwide was an unincorporated business unit of GM.

    D.    <u>The August 1998 Purchase Order Was An Agreement Between Nu-Tech And GM.</u>

    7.    Nu-Tech's position is that the August 1998 Purchase Order was an agreement between Nu-Tech and DAS.  (<u>See</u> Cooper Dec. ¶ 12; Patrick Aff. ¶ 24.)  This position is based on Nu-Tech's confusion regarding basic facts about DAS and the timing of GM's spin-off of its parts business.  With respect to the spin-off, the affidavit of Nu-Tech's witness Ms. Patrick states that "Delphi Automotive Systems was spun off by General Motors" in "approximately March, 1998," and that the August 1998 Purchase Order was issued "[w]hen Delphi was spun off by General Motors."  (Patrick Aff. ¶¶ 2, 24.)  Similarly, Mr. Cooper, the current owner of Nu-Tech, gave the following testimony at his deposition in December 2007:

> Q:    You believe that in August of 1998 Delphi had already separated from GM; is that right?
>
> A:    That's what I believe, yes.

(<u>Exhibit P</u> at 114:10-114:12.)  In fact, however, the spin-off did not occur until 1999.  (<u>Exhibit Q</u> ¶ 6.)[3]

    8.    As for DAS, Nu-Tech ignores the distinction between Delphi Automotive Systems and DAS – i.e., Delphi Automotive Systems LLC.  Delphi Automotive Systems, an unincorporated business unit of GM, was the GM operating segment responsible for the Part as of August 1998.  Thus, whereas the headings of the November 1997 Purchase Order and the June 1998 Purchase Order identified "General Motors Corporation" and "Automotive Components Group Worldwide," the heading of the August 1998 Purchase Order identified "GM Corporation" and "Delphi Automotive Systems."  (<u>See</u> <u>Exhibit A</u> at 1; <u>Exhibit B</u> at 1; <u>Exhibit C</u> at 1.)  By contrast, DAS, the entity against which Nu-Tech asserts its breach-of-contract claim, is

---

[3]    The specific events comprising the spin-off were detailed in GM's and Delphi's public filings with the United States Securities and Exchange Commission, examples of which are attached to this brief as <u>Exhibit J</u> and <u>Exhibit K</u>.

a Delaware limited liability company that was not formed until September 16, 1998, nearly one

month after GM issued the August 1998 Purchase Order.[4]  (Exhibit L.)

     E.     GM Agreed To Produce The Part Itself To Settle A Work Stoppage.

     9.     In the summer of 1998, one of GM's labor unions stopped work at two

plants in Flint, Michigan.  (Exhibit M; Exhibit Q ¶ 7.)  As part of its agreement with the union

settling the work stoppage, GM agreed to produce the Part itself.  (Exhibit Q ¶ 7.)  At his

deposition, Mr. Cooper acknowledged that GM informed Nu-Tech of this decision in August,

September, or October 1998, and that he understood Nu-Tech would lose the Part business as a

result of GM's settlement of the work stoppage.  (Exhibit P at 27:17-28:12, 29:7-31:13.)  Nu-

Tech did not complain in writing about the loss of this business until it sued GM and DAS in

December 2002.  (See Exhibit Q ¶ 10.)

     F.     The May 1999 Purchase Order And The Statute Of Limitations.

     10.     On May 3, 1999, DAS issued its first Part-related purchase order to Nu-

Tech in the form of an amendment to the August 1998 Purchase Order, a copy of which is

attached to this brief as Exhibit D.  (Exhibit Q ¶ 8.)  Unlike the headings of the previous

purchase orders, all of which identified GM, the heading of the May 1999 Purchase Order

identified "Delphi Automotive Systems LLC" and "Delphi Automotive Systems."  (Exhibit D at

1.)  The May 1999 Purchase Order substituted DAS as the buyer and extended the term of the

agreement through December 31, 2000, but otherwise left intact the essential terms of the August

1998 Purchase Order.  (Id.; Exhibit Q at 8.)

     11.     The May 1999 Purchase Order was the last purchase order Nu-Tech

received for the Part.  Thus, the statute of limitations for any claim that DAS breached a Part-

---

[4]    The assets and liabilities of the Delphi business sector were not transferred from GM to DAS until January 1, 1999.  Before that date, GM conducted the business of Delphi through various divisions and subsidiaries.

related purchase order began to run no later than December 31, 2000, the final day of the term of the May 1999 Purchase Order.  The applicable limitations period was four years.  See Mich. Comp. Laws § 440.2725(1) (providing that "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued").

G.    The Part-Related Tools Were Removed From Nu-Tech's Plant And Nu-Tech Stopped Receiving Orders For The Part In 1999.

12.    In late 1998 or at some point in 1999, GM or DAS removed from Nu-Tech's plant two tools needed to produce the Part.  From that point forward, Nu-Tech did not receive any orders for the Part.  Although Nu-Tech's damages calculation assumes that the orders stopped on December 31, 1998, Mr. Cooper testified at his deposition that Nu-Tech continued to run the tools and produce the Part into 1999.  (Exhibit P at 51:12-52:14, 66:6-66:14.)

H.    Nu-Tech Sells Its Assets To RPT In January 2000.

13.    In September 1999, Nu-Tech was placed in Delphi's troubled-supplier program based on its poor financial condition, and soon after that it began discussions with potential acquirers.  (Exhibit Q ¶ 9; Exhibit S ¶ 4.)  In December 1999, Nu-Tech and RPT entered into a preliminary Memorandum and Agreement Regarding Purchase and Sale of Assets (the "Preliminary Asset Sale Agreement").  (Exhibit G.)  The Preliminary Asset Sale Agreement contemplated that Nu-Tech and RPT would execute a definitive agreement for the sale of Nu-Tech's assets, and that RPT would take over the operation of Nu-Tech's business effective December 1, 1999.  (Id. at 2.)  RPT and Nu-Tech executed a definitive agreement – the Final Agreement:  Purchase and Sale of Business Assets (the "Definitive Asset Sale Agreement") – on January 13 and 14, 2000, respectively, with an effective date of December 1, 1999.  (Exhibit H at 1, 21.)

14.    In paragraph 1.1 of the Definitive Agreement, Nu-Tech agreed to "sell, assign, convey, transfer, set over, and deliver" to RPT "all of the assets, rights, and interests of

8

every conceivable kind or character whatsoever, whether tangible or intangible, that on [December 1, 1999,] were owned by [Nu-Tech] or in which [Nu-Tech] ha[d] an interest of any kind." [5] (Id. art. I, ¶ 1.1.)  The assigned assets included, "without limitation," Nu-Tech's "existing customer purchase orders," "contracts and service agreements," and "contracts and service records relating to sales."[6] (Id. art. I, ¶ 1.1(c), (f)-(g).)

I.    DAS Transferred The Part Business To RPT In The January 2000 Purchase Order.

15.    On January 15, 2000 – the day after Nu-Tech executed the Definitive Asset Sale Agreement – DAS issued an amended purchase order, a copy of which is attached to this brief as Exhibit E, that substituted RPT as the seller of the Part  The January 2000 Purchase Order was consistent with the Asset Sale Agreement in that it recognized that Nu-Tech had sold its purchase orders, including its purchase orders for the Part, to RPT.

J.    Nu-Tech's Action Against GM And DAS In Michigan State Court.

16.    In December 2002, Nu-Tech commenced an action against GM and DAS in Michigan state court (the "Michigan Action").  A copy of Nu-Tech's complaint is attached to this brief as Exhibit T.  Nu-Tech's allegations in the Michigan Action were essentially the same as its allegations here, with the exception that GM was also named as having breached purchase orders and broken promises of replacement business.  (See id.)  The Michigan Action was on the verge of trial when it was stayed as to DAS as a result of these cases, and Nu-Tech later settled with GM.

---

[5]    As Mr. Cooper acknowledged at a deposition in November 2004, Nu-Tech "ceased to exist" from an operating standpoint as a result of the asset sale.  (Exhibit O at 30:17-31:4.)

[6]    As discussed in detail in Part I.B below, Nu-Tech attempted to reacquire its purchase orders and related causes of action by entering into a subsequent agreement with RPT in March 2005, but that agreement is of no effect because it was executed after the applicable statutes of limitations expired.

K.    The Head Of Nu-Tech Believed The Michigan Action Was Meritless.

17.    In March 2005, John W. Mailey – the president, chief executive officer,

and majority shareholder of Nu-Tech during the events giving rise to Nu-Tech's allegations –

prepared an affidavit, a copy of which is attached to this brief as Exhibit N.  Mr. Mailey is now

deceased.[7]  In his affidavit, Mr. Mailey explained his view that "Delphi had a right at any time to

take back its tooling and manufacture [the Part] in Delphi's Flint manufacturing plant," and that

"Delphi fulfilled all the terms and obligations of the purchase orders issued by Delphi to Nu-

Tech for [the Part]."  (Id. ¶¶ 5, 9.)  Furthermore, according to Mr. Mailey, "Delphi at no time

prior to the sale of Nu-Tech to [RPT] made any promise of additional business and Nu-Tech did

not rely upon any promise of additional business."  (Id. ¶ 12.)  Mr. Mailey's view of Nu-Tech's

claims was that they "were completely lacking in merit."  (Id. ¶ 15.)

Argument

I.    Nu-Tech's Contract Theory Is Without Merit.

A.    Nu-Tech Sold Its Part-Related Contracts And Contract Claims To RPT.

18.    Again, under paragraph 1.1 of the Definitive Asset Sale Agreement, Nu-

Tech agreed to "sell, assign, convey, transfer, set over, and deliver" to RPT "all of the assets,

rights, and interests of every conceivable kind or character whatsoever, whether tangible or

intangible, that on [December 1, 1999,] were owned by [Nu-Tech] or in which [Nu-Tech] ha[d]

an interest of any kind."  (Exhibit H art. I, ¶ 1.1.)  The assigned assets included, "without

limitation," Nu-Tech's "existing customer purchase orders," "contracts and service agreements,"

and "contracts and service records relating to sales."  (Id. art. I, ¶ 1.1(c), (f)-(g).)  There is no

question that the May 1999 Purchase Order, as well as the earlier Part-related agreements issued

---

[7]    The Debtors provided Nu-Tech with notice of its intent to offer Mr. Mailey's affidavit pursuant to Fed. R. Evid.
807 in August 2007, and DAS earlier provided Nu-Tech with a similar notice under Michigan state court rules.
(See Exhibit U; Exhibit V.)

by GM, were included in the sale.  Indeed, the day after Nu-Tech executed the Definitive Asset

Sale Agreement, DAS issued the January 2000 Purchase Order naming RPT as the new seller.

(See Exhibit E.)

        19.     Furthermore, any claims arising out of the May 1999 Purchase Order and

the earlier Part-related agreements issued by GM were also covered by the plain language of

these provisions.  The Michigan Uniform Commercial Code – Sales, Mich. Comp. Laws ch. 440,

art. 2 (the "UCC"), confirms that "an assignment of 'the contract' . . . or an assignment in similar

general terms is an assignment of rights" arising under that contract.[8]  Id. § 440.2210(5); accord

FDIC v. Cuvrell (In re F & T Contractors, Inc.), 17 B.R. 966, 987 (Bankr. E.D. Mich. 1982)

(stating that "[t]he law in Michigan has a long and consistent history of cases which hold that an

assignment of a contract constitutes an assignment of the rights thereof"), rev'd on other grounds,

718 F.2d 171 (6th Cir. 1983).

        20.     In arguing that it did not assign its contract claim to RPT, Nu-Tech notes

that the general terms and conditions applicable to the May 1999 Purchase Order (the "Terms

and Conditions") provided that Nu-Tech "may not assign or delegate its obligations under this

contract without Buyer's [DAS's] prior written consent," and that DAS did not provide its prior

written consent.  (Exhibit F § 27.)  This argument misconstrues the legal effect of the non-

assignment provision.  The plain language of the provision is limited to an assignment or

delegation of "obligations," and does not address an assignment of rights.  This is important

under the UCC because a non-assignment provision generally will not be read as prohibiting the

assignment of rights unless it contains specific language on that point.  See Mich. Comp. Laws

§ 440.2210(4) (stating that "a prohibition of assignment of 'the contract' is to be construed as

---

[8]    The general terms and conditions applicable to the Part-related contracts contain a Michigan choice-of-law
    clause.  (See Exhibit F § 29.)

barring only the delegation to the assignee of the assignor's performance"); accord In re Jackson, 311 B.R. 195, 201 (Bankr. W.D. Mich. 2004) (explaining that non-assignment provisions are interpreted "narrowly, as barring only the delegation of duties, and not necessarily as precluding the assignment of rights").

        21.     Furthermore, under the UCC, the "right to damages for breach of [a] whole contract . . . can be assigned despite agreement otherwise." Mich. Comp. Laws § 440.2210(2) (emphasis added). Thus, even if the non-assignment provision did bar an assignment of rights in general, it did not apply to the specific right to damages for breach of the May 1999 Purchase Order or the other Part-related purchase orders. Finally, even assuming that Nu-Tech's assignment did violate the non-assignment provision, that violation "'does not render the assignment ineffective'" under Michigan law, but rather gives DAS a right to damages for breach of the provision. Suggs ex rel. Posner v. Gen. Am. Life Ins. Co., No. 05-60023, 2006 WL 1109270, at *6 (E.D. Mich. Apr. 24, 2006) (quoting Restatement (Second) of Contracts § 322(2)(b) (1981)).

        22.     Nu-Tech also argues that its contract claim was covered by the Definitive Asset Sale Agreement's definition of "Excluded Assets," which encompassed "those assets not specifically or by inference included" in the sold assets. (Exhibit H art I, ¶ 1.4(d).) The Definitive Asset Sale Agreement's listing of sold assets, however, did specifically include Nu-Tech's "purchase orders" and "contracts." (Id. ¶ 1.1(c), (f)-(g).) Nu-Tech's sale of the contracts necessarily included the right to sue for breach because that right is one that arises from the contracts. See Mich. Comp. Laws § 440.2210(5); F & T Contractors, 17 B.R. at 987.

        23.     The fact that Nu-Tech transferred its contracts and any contract claims it had to RPT under the Definitive Asset Sale Agreement is dispositive. In Michigan courts and federal courts alike, the real party in interest must assert the cause of action. See Mich. Ct. R.

201(B) ("An action must be prosecuted in the name of the real party in interest . . . ."); Fed. R.

Civ. P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest.").

Under Michigan law, a real party in interest "is one who is vested with the right of action on a

given claim." <u>Miller v. Chapman Contracting</u>, 730 N.W.2d 462, 464 (Mich. 2007); <u>Moses, Inc.

v. SEMCOG</u>, 716 N.W.2d 278, 287 (Mich. Ct. App. 2005).[9]  When a claim is assigned from one

person to another, the real party in interest is the assignee – in this case, RPT.  <u>See</u> <u>Jewel Constr.

Co. v. Genoak Constr. Co.</u>, Docket No. 268070, 2006 WL 2924528, at *3 (Mich. Ct. App. Oct.

12, 2006) (concluding that assignee "was the real party in interest"); <u>DeJong v. B. F. Goodrich,

Inc.</u>, 292 N.W.2d 157, 160 (Mich. Ct. App. 1980) (explaining that an "assignee of [a] cause of

action . . . is the real party in interest and suit must be brought in its name").

      B.     <u>Nu-Tech Did Not Reacquire The Contract Claim Within The Limitations
Period.</u>[10]

         24.     The limitations period applicable to Nu-Tech's contract claim expired no

later than December 31, 2004.[11]  Approximately three months later, in March 2005, Nu-Tech and

---

[9]    All of the Part-related contracts are governed by Michigan law, and this Court must look to Michigan law "to
determine whether [Nu-Tech] properly possesses the right of action that it asserts in this case." <u>Stichting Ter
Behartiging Van De Belangen Van Oudaandeel-Houders In Het Kapitaal Van Saybolt B.V. v. Schreiber</u>, 407
F.3d 34, 49 (2d Cir. 2005).

[10]   Nu-Tech argues that DAS is barred from raising this issue based on the Michigan trial court's decision denying
DAS's summary-disposition motion in the Michigan Action.  That is incorrect.  The Michigan court's decision
was not a final judgment under Michigan law, which controls this issue because bankruptcy courts "must give
preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged
would do so." <u>Kelleran v. Andrijevic</u>, 825 F.2d 692, 694 (2d Cir. 1987).  A decision denying "a motion for
summary disposition [is] interlocutory in nature," and res judicata therefore "does not apply" to those decisions.
<u>Ind. Ins. Co. v. Auto-Owners Ins. Co.</u>, 680 N.W.2d 466, 471 n.8 (Mich. Ct. App. 2004).  Furthermore, a
decision is "final" only when "all appeals have been exhausted or when the time available for an appeal has
passed." <u>Leahy v. Orion Twp.</u>, 711 N.W.2d 438, 441 (Mich. Ct. App. 2006) (per curiam).  DAS did not have
the right to appeal until the Michigan court issued a final judgment.  That never happened because DAS filed its
voluntary petition with this Court shortly before the action was scheduled to go to trial.  As a result, DAS never
exhausted its appeal rights with respect to the Michigan court's decision, nor did the time for appealing the
decision pass.

[11]   Under the UCC, "[a]n action for breach of any contract for sale must be commenced within 4 years after the
cause of action has accrued." Mich. Comp. Laws § 440.2725(1).  "A cause of action accrues" under this
provision "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." <u>Id.</u>
§ 440.2725(2).  In this case, any breach of contract by DAS occurred no later than December 31, 2000, when

*(cont'd)*

13

RPT entered into an Acknowledgment and Assignment Agreement (the "Assignment

Agreement") providing that:

> In the event it is ever determined by anyone that Nu-Tech in fact did
> transfer any cause of action it possessed against General Motors and/or Delphi
> Corporation to [RPT] as part of the Asset Purchase Agreement, [RPT] hereby
> assigns all of its rights, title and interest in and to said cause of action back to Nu-
> Tech.

(DAS Ex. I § 2.)  Although Nu-Tech argues that this provision cured any real-party-in-interest

defect that existed when it filed the Michigan Action in December 2002, this argument fails for

two reasons.[12]

25.    First, the provision applies only to claims against GM and Delphi, and is

triggered only by a determination that Nu-Tech transferred those claims under the "Asset

Purchase Agreement," which is defined as the "Memorandum and Agreement Regarding

Purchase and Sale of Assets dated December 1, 1999" – i.e., the Preliminary Asset Sale

Agreement.  (Exhibit I at 1 & § 2.)  What DAS seeks is a determination that Nu-Tech transferred

its causes of action under paragraph 1.1 of the Definitive Asset Sale Agreement.  And the causes

of action at issue here are against DAS, a legal entity that is separate from Delphi.  Accordingly,

the Assignment Agreement is of no help to Nu-Tech here.

26.    Even more damaging to Nu-Tech's argument is the well-established

principle that an "assignee stands in the shoes of the assignor and acquires the same rights as the

_____

*(cont'd from previous page)*
the May 1999 Purchase Order expired, and the four-year limitations period therefore expired no later than
December 31, 2004.

[12]    Nu-Tech also cites a provision in the Assignment Agreement providing that the Definitive Asset Sale
Agreement did not cover Nu-Tech's alleged claims against Delphi.  (Exhibit I § 1.)  The meaning of the
Definitive Asset Sale Agreement, however, must be determined based on its clear and unambiguous language,
not on the parties' revisionist explanations of what they intended.  See Harbor Park Market, Inc. v. Gronda, Nos.
267207, 267288, 2007 WL 3119755, at *1 n.3 (Mich. Ct. App. Oct. 25, 2007) (stating that when a contract "is
unambiguous, [a] party's understanding of what was intended by the language is irrelevant to determining what
the language actually says"); Zurich Ins. Co. v. CCR & Co., 576 N.W.2d 392, 395 ("This court does not have
the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent
when the words used by them are clear and unambiguous and have a definitive meaning.").

14

assignor possessed." First of Am. Bank v. Thompson, 552 N.W.2d 516, 520 (Mich. Ct. App. 1996); accord 3333 Centerpoint Parkway Invs. Ltd. P'ship v. Forster, No. 265727, 2006 WL 785369, at *1 (Mich. Ct. App. Mar. 28, 2006) (per curiam) ("Causes of action are generally freely assignable and the assignee acquires the rights and stands in the shoes of the assignor."). As such, the assignee "is subject to the same defenses . . . , including the statute of limitations, as the [assignor] would have been." First of Am. Bank, 552 N.W.2d at 521.  The discussion of assignments in the Restatement (Second) of Contracts includes an illustration of this point, explaining that when A assigns a right to C, "C's right is barred by the Statute of Limitations when A's right would have been."  Restatement (Second) of Contracts § 363 cmt. b., illus. 3 (1981).  Because the statute of limitations would have prevented RPT from suing DAS in March 2005, RPT's attempted assignment in March 2005 cannot be construed as reviving those barred claims.

C.    Nu-Tech's Filing Of The Michigan Action Did Not Toll The Statute Of Limitations.

27.    Nu-Tech argues that the filing of its complaint in the Michigan Action tolled the statute of limitations.  Although Mich. Comp. Laws § 600.5856(a) establishes a general rule that the filing of a complaint tolls the statute of limitations, that rule does not apply when, as here, the complaint is filed by a plaintiff who is not the real party in interest.

28.    The Michigan Court of Appeals addressed this very issue last year in 3333 Centerpoint Parkway Investments Limited Partnership v. Forster, No. 265727, 2006 WL 785369 (Mich. Ct. App. Mar. 28, 2006) (per curiam).  The plaintiffs in that case filed their complaint in March 2004, before the six-year statute of limitations expired.  Id. at *1.  In October 2004, after the statute of limitations expired, the plaintiffs acquired the claims they had asserted in their complaint by entering into an assignment agreement with a third party.  Id. at *2.  The court held

15

that the assigned claims were time-barred, and it explicitly rejected the contention that the filing

of the plaintiffs' complaint in March 2004 tolled the statute of limitations, stating:

> By the time [the third party] assigned [its] rights to any claims . . . , more than six
> years had passed since those claims had accrued.  Plaintiffs' filing their complaint
> <u>could not have tolled the limitations period as to those claims</u>, because plaintiffs
> had not yet "stepped into [the third party's] shoes" [as assignees] at that time.

<u>Id.</u> (emphasis added).

29.     The Michigan Court of Appeals dealt with the same issue and reached the

same result in <u>Cotter v. Britt</u>, No. 274776, 2007 WL 1576386 (Mich. Ct. App. May 31, 2007)

(per curiam), a medical-malpractice action brought on behalf of a minor.  The plaintiff in <u>Cotter</u>

filed her complaint before the applicable limitations period expired, but she was not the real

party in interest at the time of the filing because she had not been appointed the minor's next

friend, as required by Michigan law.  <u>Id.</u> at *1-2.  That appointment did not happen until after the

limitations period expired.  <u>Id.</u> at *1.  The plaintiff, relying on Mich. Comp. Laws § 600.5856(a),

argued that she tolled the statute of limitations by filing her complaint.  <u>Id.</u> at *3.  The court

rejected that argument, explaining that "<u>the filing of a complaint does not necessarily toll the</u>

<u>statute of limitations</u>."  <u>Id.</u> (emphasis added)  Because the plaintiff did not become the minor's

next friend and the real party in interest before the limitations period expired, the court

concluded that "the filing of the complaint did not toll the applicable statute of limitations."  <u>Id.</u>

30.     The sequence of events presented here matches the pattern in <u>Forster</u> and

<u>Cotter</u> in every respect – a plaintiff who was not the real party in interest filed a complaint, then

the statute of limitations expired, then the plaintiff acquired the right to bring the claims asserted

in the complaint (in <u>Forster</u> and this case, through an assignment by a third party; in <u>Cotter</u>,

through an appointment as next friend).  <u>Forster</u> and <u>Cotter</u> leave no doubt that, under these

circumstances, the plaintiff's filing of the complaint does not toll the statute of limitations.

31.     The cases cited by Nu-Tech in support of its position – <u>George Morris</u>

Cruises v. Irwin Yacht & Marine Corp., 478 N.W.2d 693 (Mich. Ct. App. 1991), and Thomas v.

Costa, No. 235031, 2003 WL 460222 (Mich. Ct. App. Feb. 21, 2003) – do not suggest a different

outcome, as those cases deal with an entirely different situation.  Unlike Nu-Tech and the

plaintiffs in Forster and Cotter, the plaintiffs in George Morris Cruises and Thomas were real

parties in interest when they filed their complaints but they did not have the legal capacity to sue

because of some failure to comply with the technical requirements of state law.[13]  See Leite v.

Dow Chem. Co., 478 N.W.2d 892, 892 (Mich. 1992) (explaining that "the real-party-in-interest

[defense] is not the same as the legal-capacity-to-sue defense").  Furthermore, neither George

Morris Cruises nor Thomas says a word about statutes of limitations or the concept of tolling.

Accordingly, those cases provide no support for Nu-Tech's argument that the statute of

limitations is tolled when a complaint is filed by a plaintiff who is not the real party in interest.[14]

           32.     Approaching the issue from a slightly different angle, the Michigan

Supreme Court held last year in Miller that a plaintiff cannot cure a real-party-in-interest defect

by substituting the real party in interest as the named plaintiff "after the expiration of the period

of limitations."  730 N.W.2d at 465.  Thus, if Nu-Tech had tried to substitute RPT as the plaintiff

---

[13]    In George Morris Cruises, the problem was that the plaintiffs had failed "to file a certificate of copartnership
before bringing suit."  478 N.W.2d at 698-99.  In Thomas, the plaintiffs were corporations that lacked the legal
capacity to sue because they did not have certificates of good standing when they filed their action.  2003 WL
460222, at *9-10.

[14]    Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774 (Fed. Cir. 1993), an intellectual-property case,
explains the negative implications of permitting plaintiffs to cure real-party-in-interest defects after filing an
action:

                 As a general matter, parties should possess rights before seeking to have them vindicated in
        court.  Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably
        expand the number of people who are statutorily authorized to sue.  Parties could justify the premature
        initiation of an action by averring to the court that their standing through assignment is imminent.
        Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they
        seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and
        provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of
        litigation.  Inevitably, delay and expense would be the order of the day.

    Id. at 780.

in the Michigan Action in March 2005, there is no question that its attempt would have been

rejected under <u>Miller</u>.  Although Nu-Tech argues that the result should be different in this case,

there is no reason to differentiate between a belated attempt to substitute the real party in interest

(as in <u>Miller</u>) and a belated attempt involving an assignment (the situation here).

        33.      In sum, Nu-Tech sold its contract claim to RPT effective December 1,

1999, and did not reacquire the claim before the statute of limitations expired at the end of

December 2004.  Accordingly, Nu-Tech's contract claim should be disallowed and expunged in

its entirety.

        D.      <u>DAS Was Not A Party To The June 1998 Purchase Order Or The August 1998
Purchase Order.</u>

        34.      Nu-Tech argues that it is entitled to damages on its contract claim from

January 1, 1999, through December 31, 2000, even though DAS did not issue the May 1999

Purchase Order until May 3, 1999.  From January 1, 1999, until May 3, 1999, the operative

agreement was the August 1998 Purchase Order issued by GM.  Thus, even if one assumes that

Nu-Tech did not transfer its claim to RPT or that there was a valid reassignment of the claim to

Nu-Tech, DAS cannot be held responsible for any breach of the August 1998 Purchase Order

because it was not a party to that contract.  There is no risk that an alleged wrong will go

unpunished here, because Nu-Tech sued GM in the Michigan Action and has since settled with

GM for an undisclosed amount.

        35.      Nu-Tech's counterargument is based on the declaration of Ms. Patrick, a

former Delphi employee who is now cooperating with Nu-Tech.  Ms. Patrick asserts that the

August 1998 Purchase Order constituted an "assumption" by DAS of the June 1998 Purchase

Order.  (Patrick Aff. ¶¶ 24, 29.)  According to Ms. Patrick, DAS issued the August 1998

Purchase Order in August 1998 when "Delphi was spun off by General Motors."  (<u>Id.</u> ¶ 24.)  In

fact, however, the spin-off was not completed until late May <u>1999</u>; indeed, DAS itself did not

18

even exist until September 1998, one month after GM issued the August 1998 GM PO.  (Exhibit

L; Exhibit Q ¶ 6.)  Moreover, as explained in the declaration of Tina Weber, Ms. Patrick's

supervisor in August 1998, the August 1998 Purchase Order was merely a reissue of the June

1998 Purchase Order using GM's new purchasing system, and did not represent an assumption of

the June 1998 Purchase Order by DAS.  (Exhibit Q ¶¶ 5-6.)

        E.     Nu-Tech Failed To Mitigate Its Damages.

        36.     Under Michigan law, when a person has breached a contract or committed

some "other legal wrong against another, it is incumbent upon the latter to use such means as are

reasonable to under the circumstances to avoid or minimize the damages.  The person wronged

cannot recover for any item of damage that which could thus have been avoided."  Complete

Auto & Truck Parts, Inc. v. City of Flint, No. 268485, 2007 1934792, at *2 (Mich. Ct. App. Jul.

3, 2007) (quoting Shiffer v. Bd. of Educ. of Gibraltar Sch. Dist., 224 N.W.2d 255, 258 (Mich.

1974)).  In this case, it is undisputed that Nu-Tech knew in August, September, or October 1998

that it was going to lose the Part business as a result of GM's settlement of the work stoppage.

(See Exhibit P at 27:17-28:12, 29:7-31:13.)  Yet Nu-Tech took no steps to mitigate its losses at

any point during its two-year damages period, and in fact did not raise any issue with DAS's

performance in writing during that period.  Instead it remained inactive month after month as it

allegedly incurred losses of nearly $15.1 million, a figure that exceeds Nu-Tech's entire gross

revenue for 1998.  The mitigation principle prohibits Nu-Tech from "capitalizing on a breach or

exploiting a breaching defendant for a windfall" in this manner.  Charter Twp. of Marquette v.

City of Marquette, No. 268535, 2006 WL 3500896, at *7 (Mich. Ct. App. Dec. 5, 2006).

II.     Nu-Tech's Promissory-Estoppel Theory Is Also Without Merit.

        37.     Nu-Tech's promissory-estoppel claim is based on a vague promise

allegedly made by DAS concerning an award of new business to Nu-Tech.  As a threshold matter,

this claim fails for the same reasons set forth in Part I.A above – by selling "all of [its] assets, rights, and interests of every conceivable kind or character whatsoever" under the Definitive Asset Sale Agreement (Exhibit H art. I, ¶ 1.1), Nu-Tech assigned its claim to RPT, and Nu-Tech's attempt to regain possession of the claim in March 2005 is invalid under Michigan law because the applicable statute of limitations had already expired.[15]  In addition, the claim fails on the merits.

38.    Michigan courts have made clear that "promissory estoppel must be cautiously applied, and only where the facts are unquestionable and the wrong to be prevented undoubted."  Booker v. City of Detroit, 650 N.W.2d 680, 685 (Mich. Ct. App. 2002) (internal quotation marks omitted here and throughout), rev'd in part on other grounds, 668 N.W.2d 623 (Mich. 2003); Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). To maintain this claim, Nu-Tech must establish that (1) DAS made a promise, (2) DAS reasonably should have expected the promise to cause Nu-Tech to act in a definite and substantial manner, (3) Nu-Tech did in fact rely on the promise by acting in accordance with its terms, and (4) the promise must be enforced to avoid injustice.  Crown Tech. Park v. D&N Bank, FSB, 619 N.W.2d 66, 71 (Mich. Ct. App. 2000); Novak, 599 N.W.2d at 552.  None of these elements are satisfied here.

---

[15]    A promissory-estoppel claim accrues when the alleged promise is broken, Alliance Assocs., L.C. v. Alliance Shippers, Inc., No. 265101, 2006 WL 1506687, at *4 (Mich. Ct. App. June 1, 2006) (per curiam), which in this case occurred no later than the end of 1998, when the tools needed to make the Part were removed from Nu-Tech's plant and Nu-Tech did not receive any replacement business.  The limitations period applicable to such claims is generally six years from the date of accrual, Huhtala v. Travelers Ins. Co., 257 N.W.2d 640, 643 (Mich. 1977), but where the alleged promise is akin to an agreement governed by the UCC, as in this case, the UCC's four-year period is a better fit.  Thus, the limitations period for Nu-Tech's claim expired either at the end of 2004 or the end of 2002, in either case before Nu-Tech entered into the Assignment Agreement with RPT in March 2005.

A.    <u>DAS Did Not Make The Promise.</u>

39.    The most obvious problem is that DAS did not make the alleged promise.

At his deposition in the Michigan Action, Mr. Cooper testified that Ms. Patrick made the promise

to him in the fall of 1998.  (<u>Exhibit O</u> at 42:2-42:15.)  But Ms. Patrick swears that Mr. Cooper is

wrong.  In her declaration, Ms. Patrick stated that she was "not personally aware of such a

promise."  (Patrick Aff. ¶ 38.)  She also stated that Mr. Cooper had told her "that <u>General</u> <u>Motors</u>

had promised to provide to Nu-Tech a replacement part."[16]  (<u>Id.</u> (emphasis added).)  Because the

declaration of Nu-Tech's own witness establishes that Ms. Patrick did not make the alleged

promise, and that the alleged promise (if it was made at all) came from GM, Nu-Tech cannot

sustain its claim against DAS.  <u>See</u> <u>Capital 1 Commercial Group, Inc. v. Tortora</u>, No. 2006-

075550-CZ, 2007 WL 1485865, at *3 (Mich. Ct. App. May 22, 2007) (per curiam) (rejecting

promissory-estoppel claim when plaintiff failed to show that "defendant made a promise,

verbally or in writing"); <u>Jungslager v. Lampe</u>, No. 264441, 2006 WL 335836, at *3 (Mich. Ct.

App. Feb. 14, 2006) (per curiam) (rejecting claim when plaintiffs failed to "present anything

showing a specific promise by defendant").

B.    <u>The Promise Was Not Clear And Definite.</u>

40.    The promise of new business alleged by Nu-Tech is too vague to be

enforced.  "The sine qua non of the theory of promissory estoppel is that the promise be clear and

definite."  <u>Derderian v. Genesys Health Care Sys.</u>, 689 N.W.2d 145, 157 (Mich. Ct. App. 2004);

<u>accord</u> <u>First Sec. Sav. Bank v. Aitken</u>, 573 N.W.2d 307, 317 (Mich. Ct. App. 1997) ("Promissory

estoppel requires an actual, clear, and definite promise.").  Under this principle, "when material

terms of the agreement are lacking, the degree of certainty necessary in a promise is absent."

---

[16]    Ms. Patrick's recollection is consistent with that of John W. Mailey, the head of Nu-Tech during the relevant
period, who stated in his affidavit in the Michigan Action that DAS "at no time prior to the sale of Nu-Tech to
Rapid Product Technologies, LLC made any promise of additional business."  (<u>Exhibit N</u> ¶ 12.)

Kleiman v. Johnson, No. 219117, 2000 WL 33417403, at *2 (Mich. Ct. App. June 30, 2000) (per curiam); Tomaski v. SRW, Inc., No. 190978, 1997 WL 33343340, at *3 (Mich. Ct. App. Oct. 3, 1997) (per curiam).

41.    In Swartzenberg v. Swartzenberg (In re Swartzenberg), No. 196677, 1997 WL 33344999 (Mich Ct. App. June 24, 1997) (per curiam), for example, the defendant's promise to financially support the plaintiff "was not a clear and definite promise" because "[n]o terms of the support were specified, i.e., the amount of monetary support [the plaintiff] was to receive, the payment schedule, and the method of payment." Id. at *3. And in Sales Engineering, Inc. v. Collins & Aikman Plastics, Inc., No. 251348, 2005 WL 415674 (Mich. Ct. App. Feb. 22, 2005) (per curiam), an alleged promise that the plaintiff would receive commissions for its sales of automotive parts to GM was not clear and definite because the plaintiff "failed to specify which of [the] two defendants made the promise or which parts program the promise related to." Id. at *5.

42.    In this case, Nu-Tech's ambiguous description of the alleged promise reveals only that the new business would involve a price and volume "similar" to that reflected in the June 1998 GM PO and the August 1998 GM PO, and that the promise was made at some point in the "fall of 1998."[17]  (Cooper Dec. ¶ 19; Exhibit O at 42:2-42:15.)  Nu-Tech cannot state with specificity the part that was to be covered by the award or any of the material terms regarding price, volume, or duration.  Nor can it identify with any reasonable degree of particularity when the promise was made or, in light of Ms. Patrick's declaration, who made the promise.  This missing information makes the alleged promise insufficiently clear and definite under Michigan law.

---

[17]    Nu-Tech also contends that it "believed" the new award would be for part number 25180510 (Cooper Dec. ¶ 19), but it does not assert that that part, or any other part for that matter, was mentioned in the alleged promise.

C.    Nu-Tech Did Not Reasonably Rely On The Promise.

43.    Nu-Tech's reliance theory is set forth in Mr. Cooper's declaration, which states that Nu-Tech relied on GM's past practice "of substituting one part for another . . . , Delphi's promises of a replacement part, the [May 1999 Purchase Order], the process of testing a new tool for production of [another] reservoir part . . . , [and] the mentorship relationship between Nu-Tech and Delphi/General Motors" by "retaining the machines, staff and facilities it would need to run the promised replacement part."  (Cooper Dec. ¶ 20.)

44.    On its face, Mr. Cooper's declaration shows that Nu-Tech's actions were not taken in reliance on the alleged promise of a replacement part, but rather were based on a combination of factors that included GM's business practices, Nu-Tech's internal testing process, the May 1999 Purchase Order (which was issued several months after the alleged promise), and Nu-Tech's relationship with Delphi and GM.  Indeed, Nu-Tech does not assert that the alleged promise, standing alone, would have resulted in the actions it took, or that Nu-Tech would have behaved any differently if the alleged promise had not been made.

45.    Moreover, although Nu-Tech claims it retained machines and buildings in reliance on the alleged promise, the record shows that Nu-Tech entered into leases covering those machines and buildings with companies owned or controlled by Mr. Cooper before the alleged promise was made in the fall of 1998.[18]  To state the obvious:  "To establish that plaintiff relied on the purported promise, the alleged reliance cannot precede the promise." Formicola v. CBS Corp., No. 227881, 2002 WL 1963780, at *2 (Mich. Ct. App. Aug. 23, 2002) (per curiam); accord Marrero v. McDonnell Douglas Capital Corp., 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) (per curiam) (explaining that plaintiff who cited post-promise actions in an effort to

---

[18]    A summary of Nu-Tech's leases prepared by DAS's damages expert in 1999 shows that Nu-Tech entered into its building leases no later than September 1, 1998 (Exhibit S at Ex. IV) and into its equipment leases no later than October 7, 1998 (id. at Ex. V).

establish reliance had "inverted the sequence of events necessary to establish promissory estoppel"). Furthermore, under the leases, which did not grant Nu-Tech a termination right, Nu-Tech was obligated to make payments well beyond December 31, 1999, the end of the damages period proposed by Nu-Tech with respect to this claim. (See Exhibit S at Exs. IV & V.) Because Nu-Tech already had a duty to make the payments, it cannot claim that the payments resulted from its reliance on the alleged promise.

46.    With respect to Nu-Tech's assertion that it retained staff in reliance on the alleged promise, it is not clear from Mr. Cooper's declaration when those workers were hired, making it difficult to ascertain whether they joined Nu-Tech before or after the promise. In addition, it is highly unlikely that those workers, who were supposedly hired to produce the replacement part, were allowed to stay on the payroll and remain idle throughout calendar year 1999, as Nu-Tech alleges.[19] If Nu-Tech did allow that to happen, its behavior was unreasonable; it should have terminated the employees or reassigned them to other duties when Nu-Tech did not receive the new business.

47.    Finally, Nu-Tech's reliance on the alleged promise was unreasonable given that DAS's standard practice, both in general and as to Nu-Tech, was to award new business through a process that required potential suppliers to submit bids, followed by DAS reviewing the bids, selecting a supplier, and then issuing a purchase order. As Mr. Cooper testified at his deposition in the Michigan Action, Nu-Tech was well aware of this procedure. (Exhibit O at 23:16-24:3.) Given Nu-Tech's understanding of the bid procedure and its knowledge of the fact that DAS did not commit to new business until it issued a purchase order, its reliance on any naked promise of new business was unreasonable.

---

[19]    Nu-Tech is seeking more than $460,000 in wages and associated taxes on account of these workers.

D.    Nu-Tech's Reliance Was Unreasonable As A Matter Of Law.

48.    As explained in Ms. Patrick's declaration, the May 1999 Purchase Order was subject to the Term and Conditions.  (Patrick Aff. ¶ 29.)  The Terms and Conditions included an integration clause providing, "This contract, together with the attachments, exhibits supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements."  (Exhibit F ¶ 31.)

49.    The promise alleged by Nu-Tech – i.e., that Nu-Tech would receive an award for a new part as a substitute for the Part – is related to and in direct conflict with the May 1999 Purchase Order, which essentially provides that Nu-Tech would remain the supplier of the Part.  Nu-Tech's reliance on the earlier promise was therefore unreasonable as a matter of law from the date of the May 1999 Purchase Order forward.  See N. Warehousing, Inc. v. State Dep't of Educ., 714 N.W.2d 287, 289 (Mich. 2006) ("Promissory estoppel requires reasonable reliance on the part of the party asserting estoppel.  Reliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause."); Able Demolition, Inc. v. City of Pontiac, No. 273295, 2007 WL 1464616, at *4 n.4 (Mich. Ct. App. May 17, 2007) (per curiam) ("Furthermore, the contract contains an integration clause and, therefore, it would have been unreasonable as a matter of law for [plaintiff] to rely on any outside representations to support a promissory estoppel claim.").

E.    Enforcing The Promise Is Not Necessary To Avoid Injustice.

50.    Under Michigan law, Nu-Tech must demonstrate that enforcing the alleged promise is "necessary to avoid injustice."  Crown Tech. Park, 619 N.W.2d at 71; Novak, 599 N.W.2d at 552.  There is no danger of injustice in this case.  Instead, enforcing the promise and awarding Nu-Tech the damages it seeks would result in a windfall for Mr. Cooper.  In 1999,

Nu-Tech made monthly lease payments to entities owned or controlled by Mr. Cooper or to Mr.

Cooper himself under the equipment and building leases described above.  Nu-Tech now seeks

to recover those lease payments, which would again flow to Mr. Cooper in his capacity as the

sole owner of Nu-Tech.  The equitable doctrine of promissory estoppel should not be applied

when doing so would provide a double recovery.

III.     Nu-Tech's Damages Report Significantly Overstates Nu-Tech's Alleged Loss.

51.     According to the damages report submitted by Nu-Tech's damages

witness, Gary Leeman (the "Nu-Tech Report"), Nu-Tech suffered an aggregate loss of

$15,126,582.  This calculation includes $8,545,014 in lost income from January 1, 1999, through

December 31, 2000, lost business value of $5,698,181 in connection with Nu-Tech's asset sale

effective December 1, 1999, and excess costs of $883,387 related to payments under building

and equipment leases and wage-related payments in calendar year 1999.  The Nu-Tech Report

substantially overstates Nu-Tech's losses.

A.     Nu-Tech's Lost Income Does Not Exceed $742,949.

52.     The Nu-Tech Report's calculation of lost income assumes a damages

period of January 1, 1999, through December 31, 2000.  This period starts too early and ends too

late.  As explained above, from January 1, 1999, through May 2, 1999, the operative agreement

was the June 1998 Purchase Order between Nu-Tech and GM.  And on January 14, 2000, Nu-

Tech executed the Definitive Asset Sale Agreement and sold the May 1999 Purchase Order and

any related causes of action to RPT.  Thus, neither the period before May 3, 1999 (when DAS

issued the May 1999 Purchase Order) nor the period after January 14, 2000 (when Nu-Tech

executed the Definitive Asset Sale Agreement) should be included in any damages calculation.

53.     In addition, as explained in Mr. Francis's damages report, the Nu-Tech

Report's lost-income analysis includes three flawed assumptions that result in an inflated

26

calculation:  (i) it is based on an incorrect assumption regarding the number of parts required by

DAS, (ii) it takes into account the financial performance of non-core aspects of Nu-Tech's

business that should not be included in a lost-income analysis,[20] and (iii) it ignores income taxes.

(Exhibit S ¶¶ 6-9.)  As demonstrated in Mr. Francis's report, if one focuses on the appropriate

damages period, corrects the Nu-Tech Report's three flawed assumptions, and otherwise adopts

the Nu-Tech's Reports assumptions and methodology, Nu-Tech's lost income was limited to

$742,949.  (Id. ¶ 10 & Exs. I-II.)

   B.  Nu-Tech Cannot Recover Damages For Lost Business Value.

   54.  The starting point for the Nu-Tech Report's estimation of lost business

value is its flawed calculation of lost income.  The calculation essentially multiplies Nu-Tech's

supposed lost after-tax income in calendar year 1999 by a capitalization rate of 3.91, then

subtracts the lost pre-tax income for 1999 and the consideration Nu-Tech received from RPT

effective December 1, 1999.  Nu-Tech is legally barred from recovering any damages under this

measure under American Anodco, Inc. v. Reynolds Metal Co., 743 F.2d 417 (6th Cir. 1984).

   55.  In that case, a jury awarded the plaintiff-seller damages for "loss of

earnings" and "loss of business value" after finding that the defendant-buyer had breached a

requirements contract.  Id. at 423.  The plaintiff-seller calculated its lost business value by

capitalizing its lost earnings.  Id.  The Sixth Circuit, applying Michigan law, overturned this

portion of the damages award, stating:

> [L]ike any item of damages, loss of profits may only be recovered once.
> [Plaintiff-seller's calculation] set the loss of future profits from the breach
> at $739,269.  The removal of these same profits . . . caused the reduction
> in value of the business when capitalized by the [plaintiff-seller's]
> accountant.  Where the loss of profits and loss of value are intertwined, as

---

[20] For example, Mr. Cooper testified that Nu-Tech's Division 2 processed paperwork to allow Mr. Cooper to pass
his separate conveyor business through Nu-Tech so that the conveyor business could meet customers'
requirements for working with minority-owned businesses.  (Exhibit P at 97:9-99:20.)

they are here, and the loss of value is based on loss of future profits, to
allow both would be to permit a double recovery.

Id. at 424.  Like the plaintiff-seller in American Anodco, Nu-Tech has presented a calculation of

lost business value that is intertwined with and based on its calculation of lost income arising

from DAS's alleged failure to perform under a requirements contract.  Accordingly, allowing Nu-

Tech to recover any damages based on lost business value would provide it with an improper

double recovery.

56.      Nu-Tech has not suffered any damages under this measure in any event.

As explained in Mr. Francis's damages report, the Nu-Tech Report's calculation of $5,698,181 in

lost value is inflated because (i) it is based on the Nu-Tech Report's flawed calculation of lost

income, (ii) the basis for the calculation should be free cash flow rather than net income because

free cash flow is recognized as a better approximation of value, and (iii) the calculation should

use a discount rate rather than a capitalization multiplier because the May 1999 DAS PO was for

a limited duration.  (Exhibit S ¶¶ 6, 13-15.)  Correcting these deficiencies results in an estimated

lost business value of $1,239,089 based on free cash flow for all of 1999.  (Id. ¶ 15 & Ex. III.)  If

Nu-Tech's lost income and the sale price it obtained from RPT are subtracted from this figure, as

they are in the Nu-Tech Report, the calculation drops below zero.[21]

57.      Moreover, Nu-Tech should not recover any damages under a lost-

business-value measure because that would provide Nu-Tech with multiple forms of recovery for

the same alleged harm based on conflicting theories.  (Id. ¶ 16.)  The lost-income calculation

discussed above is designed to provide to Nu-Tech the income it would have earned if it had

produced 100% of DAS's requirements for the Part in 1999 and 2000.  (Id.)  By contrast, the

theory underlying the calculation of lost business value is that Rapid (or another buyer) would

---

[21]     As calculated in the Nu-Tech Report, the sale price alone was more than $1.2 million.

have paid more for Nu-Tech's assets in January 2000 if Nu-Tech had produced 100% of DAS's

requirements in 1999 and Rapid expected that DAS would continue to order 100% of its

requirements from Rapid following the asset sale.  (Id.)  These two hypotheticals cannot coexist

– Nu-Tech could produce the Part and earn the income in 1999 and 2000, or Nu-Tech could

produce the Part in 1999 and then sell its assets for a higher price in January 2000, but not both.

(Id.)  Accordingly, it would be inappropriate to allow Nu-Tech to recover damages based on lost

income and damages based on lost business value.  (Id.)

        C.     Nu-Tech's Calculation Of Excess Costs Is Overstated.

        58.     According to the Nu-Tech Report, DAS's conduct resulted in Nu-Tech

incurring excess costs of $883,387 in 1999.  These costs comprise lease payments under two

building leases and two equipment leases between Nu-Tech and Mr. Cooper or entities owned or

controlled by Mr. Cooper, as well as wage-related payments.  These costs should be taken into

account only to the extent that Nu-Tech was unable to use the buildings, equipment, and labor

for other purposes.  Nu-Tech has not made any attempt to establish that that was the case.

Instead, it asks the Court to assume that the buildings, equipment, and workers were left to

collect cobwebs throughout all of 1999, which seems unlikely at best.

        59.     Moreover, based on an analysis undertaken by BBK, Ltd. in 1999 as part

of its assistance to Nu-Tech under Delphi's troubled-supplier program, the building and

equipment leases executed by Nu-Tech and Mr. Cooper called for payments that were

significantly above market rates for comparable buildings and equipment.  (Id. ¶¶ 6, 17-20.)

With respect to the building leases, for example, BBK estimated that Nu-Tech paid

approximately $11.99 per square foot under the lease for one building, and approximately $10.00

per square foot and under the lease for the other.  By contrast, BBK's market research showed

that the market rate at that time was in the range of $4.00 to $5.00 per square foot.  (Id. ¶ 18.)

Thus, whereas Nu-Tech made aggregate lease payments of $278,670 for those two buildings in 1999, at market rates the aggregate payments would have been somewhere between $103,500 and $129,375.  (Id.)  This analysis suggests that Nu-Tech's leases with Mr. Cooper were negotiated at a distance short of arm's length, and heightens the concerns about providing Mr. Cooper with a windfall recovery as explained in Part II.E above.

60.    The Nu-Tech Report includes in its excess-costs calculation $461,709 in wage-related payments in calendar year 1999, comprising $394,185 in wages, $34,097 in payroll taxes, and $33,427 in health-insurance payments.  (Id. ¶ 21.)  As reflected in the operating payroll and expenses portion of the Nu-Tech Report's lost-income calculation for 1999, those wage-related payments constituted variable costs – i.e., costs that changed directly with Nu-Tech's production of the Part.[22]  (Id.)  If Nu-Tech did not produce the Part in 1999 (as the Nu-Tech Report assumes), then Nu-Tech did not or should not have incurred those costs in 1999.  (Id.)  It is therefore inappropriate to include the wage-related payments as excess costs.  (Id.)

---

[22]    This was confirmed by Mr. Cooper at his deposition when he testified that the workers who had been hired to produce the Part were either laid off or reassigned within "a couple weeks at the most" of Nu-Tech's loss of the Part business.  (Exhibit P at 99:22-100:11.)

Conclusion

WHEREFORE, the Debtors respectfully request that this Court disallow and

expunge the Claim and grant the Debtors such other and further relief as is just.

DATE: New York, New York
January 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

# EXHIBIT A

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

**THIS PURCHASE ORDER**
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| BC934 | 002 | 11/05/97 | 1 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBG | 11/17/97 |

SHIP-TO/NS    932543663

PURCHASE ORDER

1998 MODEL YEAR

| NET | | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|
| 25TH PROX | | GRAND BLANC | MI | COLLECT |

PAYMENT TERMS
OR NONE/25TH PROX

REQUIREMENTS CONTRACT
REVISION

**PO/REV NOTES:**

THIS REVISION TO ADD PART NUMBER 25160694 TO CONTRACT.
PLANT O2 FACTORY ASSIST.
PRICE OF $ 1.86 HAS BEEN ESTABLISHED AND REPRESENTS AN
ESTIMATE BASED ON AN AVERAGE MATERIAL PRICE.
APPROPRIATE ADJUSTMENT WILL BE MADE TO PIECE PRICE, DEPENDING
ON FINAL DECISION TO CONSIGN MATERIAL OR ALLOW UNTECH TO
PURCHASE DIRECT.
LYNN ARENS 11-5-97

**PO/REV CLAUSES:**    ACI   THE NAO DISBURSEMENT CENTER WILL GENERATE PAYMENT FOR MATERIAL
SHIPMENTS FOR PART NUMBERS DETAILED ON YOUR GM CONTRACT AT THE
CURRENT CONTRACT UNIT PRICE.

TO FACILITATE PAYMENT YOU MUST ADHERE TO THE FOLLOWING GUIDELINES:

PACKING SLIPS MUST BE ATTACHED TO EACH SHIPMENT AND INCLUDE THE
FOLLOWING DETAIL:
1.   P.O. NUMBER PROVIDED BY DELPHI ENERGY & ENGINE MGT SYSTEMS
2.   GM PART NUMBER ASSIGNED
3.   DESCRIPTION OF ITEM SHIPPED
4.   SHIP DATE
5.   SHIPPING IDENTIFICATION NUMBER - A UNIQUE PACKING SLIP OR

TAX INFORMATION:

NU TECH PLASTICS ENGINEERING
JOHN MAILEY-PRESIDENT
8018 EMBURY ROAD
GRAND BLANC        MI        48439

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
APPROVER AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS FOR THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER NO. 0888 REV. #75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:   CFF   TRENIA A. TURNER

ACKNOWLEDGED BY                                DATE

030047-000748

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE
GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER

1998 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| IC93A | OO2 | 11/05/97 | 2 OF 10 |

| F.O.B. TERMS | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| COLLECT | BHBC | 11/17/97 |

| F.O.B. POINT | |
|---|---|
| GRAND BLANC | MI |

SHIP-DUNS    932543663

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    ACI

6.    INVOICE NUMBER FOR EACH SHIPMENT
SHIP FROM DUN AND BRADSTREET NUMBER

DO NOT SEND INVOICES FOR MATERIAL (PRODUCT) SHIPMENTS.  THE MATERIAL
SHIPPED WILL BE PAID UNDER THE EVALUATED "PRICED" RECEIPT STRATEGY
OF NAO DISBURSEMENTS.  THE PACKING SLIP NUMBER USED TO IDENTIFY THE
SHIPMENT MUST BE A NUMBER YOUR RECEIVABLES CAN USE TO IDENTIFY THE
PAYMENT ON YOUR REMITTANCE ADVICE.

PHONE CALLS REGARDING QUANTITY DISCREPANCIES MUST BE DIRECTED TO THE
REQUISITIONER.

PHONE CALLS REGARDING PRICE DISCREPANCIES MUST BE DIRECTED TO THE
BUYER.

A MONTHLY STATEMENT IS REQUIRED TO BE SENT TO NAO DISBURSEMENTS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN, OF THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000749

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**PURCHASE ORDER**

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 8GB394 | 002 | 11/05/97 | 3 OF 10 |

| | F.O.B. TERMS | Z NUMBER | EFFECTIVE DATE |
|---|---|---|---|
| | COLLECT | BHBC | 11/17/97 |

1998 MODEL YEAR

| | PAYMENT TERMS | F.O.B. POINT | |
|---|---|---|---|
| NET | | GRAND BLANC | MI |
| 25TH PROX | OR NONE/25TH PROX | | |

SHIP TO: DGNS

FORM GM 90
REV. 1

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:     ACI

PLEASE NOTE; FOB TERMS ON THE CONTRACT ARE FREIGHT COLLECT. ALL
COMMON CARRIER CHARGES MUST BE SENT COLLECT UNLESS OTHER TERMS ARE
NOTED ON THE CONTRACT. NAQ DISBURSEMENTS WILL NOT PROCESS FREIGHT
PAYMENTS DIRECT TO THE SUPPLIER.

UPS "CONSIGNEE BILLING". QUESTIONS SHOULD BE DIRECTED TO UPS BY
PHONING 1-800-354-7527. PLEASE HAVE YOUR INDIVIDUAL LOCATION UPS
SHIPPER ACCOUNT NUMBER READY WHEN CALLING.

AED

CALL (800) 436-6668 FOR TRANSPORTATION ROUTING INSTRUCTIONS FOR
DELPHI ENERGY AND ENGINE MANAGEMENT SYSTEMS SHIPMENTS.
THIS SUPERCEDES ANY PREVIOUS ROUTING INSTRUCTION ISSUED.

SELLER SHALL DEMONSTRATE THAT SELLER HAS THE ABILITY TO RECEIVE AND
PROCESS ORDERS, FORECASTS, PLANNING AND SHIPPING INFORMATION FOR
GENERAL MOTORS AND THEIR CUSTOMERS AND SUPPLIERS, USING EDI AS THE
METHOD FOR COMMUNICATION USING ANSI X12 STANDARDS FOR TRANSMISSIONS
AND TRANSACTION SETS DEFINED BY THE GENERAL MOTORS CUSTOMER FOR EACH

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:     CFF   TRENIA A. TURNER          ACKNOWLEDGED BY

DATE

# AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**PURCHASE ORDER**

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|----------|----------|------------|------|
| 8G934 | 002 | 11/05/97. | 4 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|----------|----------------|
| | BHBC | 11/17/97 |

| SHIP-DENS | | | F.O.B. POINT | | F.O.B. TERMS |
|-----------|---|---|--------------|---|--------------|
| | | | GRAND BLANC    MI | | COLLECT |

| NET | PAYMENT TERMS |
|-----|---------------|
| 25TH PROX | OR NONE/25TH PROX |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    AED EDI APPLICATION. SELLER SHALL ALSO DEMONSTRATE THE ABILITY TO
GENERATE THE GM 1724, LABEL USING INFORMATION TRANSMITTED IN THE
AIAG ANSI X-12, 862 TRANSACTION SET.

SELLER SHALL PROVIDE COMMON BAR CODED SHIPPING LABELS AS THE MEANS
TO IDENTIFY GOODS FOR SHIPMENT AS DEFINED IN THE "GM 1724 GENERAL
MOTORS SHIPPING PARTS IDENTIFICATION LABEL STANDARDS", PUBLISHED
BY THE SUPPLIER QUALITY ADMINISTRATION, GENERAL MOTORS WORLDWIDE
PURCHASING.

CAP

INVOICE TO ADDRESS:
-------------------

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

CFF    CLAUSE CFL - CORPORATE FORCED LABOR & QUALITY CLAUSE:
SELLER REPRESENTS THAT GOODS PURCHASED UNDER THIS ORDER WERE NOT
PRODUCED WITH FORCED LABOR (AS DEFINED IN 19 U.S.C. 1307) EITHER

TAX INFORMATION:

**PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, FORM M89 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.**

BUYER:        CFF    TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

05-44481-rdd   Doc 11980   Filed 01/12/08   Entered 01/12/08 03:52:53   Main Document
Pg 91 of 327

FORM 3846480
REV

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION

PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 16934 | 002 | 11/05/97 | 5 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

PURCHASE ORDER

1998 MODEL YEAR

| PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|
| NET | GRAND BLANC  MI | COLLECT |
| 25TH PROX | | |
| OR NONE/25TH PROX | | |

SHIP DATE
25TH PROX

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    CFL  BY SELLER OR SELLER'S SUPPLIERS.  SELLER SHALL INDEMNIFY BUYER
AGAINST ANY LIABILITY BUYER MAY INCUR IF THIS REPRESENTATION IS
INCORRECT.

SELLER AGREES TO PARTICIPATE IN BUYER'S SUPPLIER QUALITY AND
DEVELOPMENT PROGRAM(S).  IN ADDITION, SELLER SHALL COMPLY WITH
ALL QUALITY REQUIREMENTS AND PROCEDURES SPECIFIED BY BUYER,
AS THE SAME MAY BE REVISED FROM TIME TO TIME, INCLUDING THOSE
APPLICABLE TO SELLER AS SET FORTH IN "QUALITY SYSTEM REQUIREMENTS
QS-9000"

GOVERNING LAW:  THIS AGREEMENT AND ALL TRANSACTIONS CONTEMPLATED
HEREUNDER SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF MICHIGAN, UNITED STATES OF AMERICA,
BUT NOT INCLUDING THE UNITED NATIONS CONVENTION ON CONTRACTS FOR
INTERNATIONAL SALES OF GOODS.  ANY DISPUTES ARISING UNDER THIS
AGREEMENT SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE
FEDERAL OR STATE COURTS LOCATED IN THE STATE OF MICHIGAN.

SELLER, AND ANY GOODS AND SERVICES SUPPLIED BY SELLER, SHALL BE YEAR
2000 COMPLIANT AND COMPATIBLE, AND SHALL FUNCTION WITHOUT ERROR OR
FAULT IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO CALCULATING,
MANAGING, MANIPULATING, COMPARING, AND SEQUENCING) OF DATE AND
DATE-RELATED DATA, FOR THE YEARS 2000 AND BEYOND.  AT BUYER'S REQUEST,

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
VENDOR AGREES TO SELL AND GM AGREES TO BUY THE PRODUCTION SHIPMENTS ARE MADE.
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDOR AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF.
RELEASE AGAINST PURCHASE ORDER, OR D468 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

030047-000752

# AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

## PURCHASE ORDER

### 1998 MODEL YEAR

**THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 6991 | 002 | 11/05/97 | 6 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 11/17/97 |

| SHIP TO/SONS | F.O.B. POINT | |
|---|---|---|
| 25TH PROX | GRAND BLANC | MI |

| NET | PAYMENT TERMS | F.O.B. TERMS |
|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:   CFL  SELLER SHALL CERTIFY IN WRITING ITS COMPLIANCE WITH THE FOREGOING.

CTB (RIGHT TO AUDIT):
GM BUYER RESERVES THE RIGHT TO AUDIT ALL PERTINENT DOCUMENTS
RELATING TO THE GOODS OR SERVICES COVERED BY THIS PURCHASE ORDER
AND IF REQUESTED BY BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION
PROMPTLY.

C40  IF MATH DATA IS TO BE UTILIZED FOR THIS ORDER, C4 COMPLIANCE IS
REQUIRED. THE FOLLOWING C4 GUIDELINES SHOULD BE USED IN CONJUNCTION
WITH THE GM SUPPLIER C4 INFORMATION BOOKLET (GM-1828), AS WELL AS ANY
RELATED STATEMENTS OF WORK, STATEMENTS OF REQUIREMENTS, OR OTHER
SPECIFICATIONS DOCUMENTS GOVERNING THE USE OF C4 AND MATH DATA FOR
THIS ORDER.

BUYER'S PREFERENCE IS TO PROVIDE ALL MATH DATA TRANSMISSIONS TO
SELLER IN THE NATIVE FILE FORMAT OF BUYER'S MATH DATA MASTER. IF
NON-STRATEGIC SOFTWARE IS USED, SELLER ASSUMES ALL COSTS ASSOCIATED
WITH ADDITIONAL TRANSLATIONS. IF SELLER IS TO RETURN ANY MATH DATA,
IT MUST BE DATABANKED IN THE NATIVE FILE FORMAT OF THE MATH DATA
MASTER.

SELLER IS RESPONSIBLE FOR THE INSPECTION AND VERIFICATION OF PARTS
TO THE BUYER'S MATH DATA MASTER.

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, ON A PART BY PART BASIS BEFORE PARTS ARE SHIPPED. THIS PURCHASE ORDER IS ENTERED INTO, AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D889 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

TAX INFORMATION:

BUYER:

CFF   TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000753

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

REV 0

SHIP TO GMNS    932543663

PURCHASE ORDER

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 50980 | 002 | 11/05/97 | 7 OF 10 |

| F.O.B. POINT | | Z NUMBER | EFFECTIVE DATE |
|---|---|---|---|
| GRAND BLANC | MI | BHBC | 11/17/97 |

| NET | | F.O.B. TERMS |
|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | COLLECT |

PAYMENT TERMS

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    C40

IF PORTABLE MATH DATA MEDIA (MAGNETIC TAPES, CASSETTES, OR DISKS) ARE
USED, SUCH ITEMS AND ANY COPIES BELONG SOLELY TO BUYER AND MUST BE
RETURNED WITHIN 30 DAYS.  BUYER'S PORTABLE MATH DATA MEDIA ARE NOT TO
BE USED OR STORED ON SELLER'S LIBRARIES.

BUYER DEVELOPED PROPRIETARY PRODUCTIVITY TOOLS (SUCH AS UG/GRIP,
USER FUNCTIONS, UNIX SCRIPTS, ETC.), PROVIDED FOR USE IN CONNECTION
WITH THIS ORDER, SHALL NOT BE UTILIZED BY SELLER FOR ANY PURPOSE(S)
OTHER THAN THIS ORDER.  ALL COPIES OF BUYER'S PROPRIETARY PRODUCTIVITY
TOOLS ARE TO BE DESTROYED OR RETURNED TO BUYER UPON REQUEST OR AT
COMPLETION OF THIS ORDER.

C95    CLAUSE C95 - SERVICE REQUIREMENTS:
IN ACCEPTING A PRODUCTION CONTRACT, SELLER IS RESPONSIBLE FOR
MAINTAINING TOOLS TO DRAWING SPECIFICATIONS AND PROVIDING, WHEN
SCHEDULED, ANY FUTURE SERVICE REQUIREMENTS FOR CONTRACTED PARTS.
TOOLING MUST BE MAINTAINED UNTIL SELLER RECEIVES WRITTEN NOTICE
FROM A GM BUYER AUTHORIZING THE MOVEMENT OR SCRAP OF TOOLS.

SELLER AGREES TO PROVIDE ALL INFORMATION NECESSARY FOR BUYER TO
COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS AND RELATED LEGAL
REPORTING OBLIGATIONS IN THE COUNTRY(IES) OF DESTINATION.  SELLER
AGREES TO PROVIDE ALL DOCUMENTATION AND/OR ELECTRONIC TRANSACTION

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENT ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D889 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**PURCHASE ORDER**

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 8G984 | 002 | 11/05/97 | 8 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

| SHIP FROM | | |
|---|---|---|
| NET | F.O.B. POINT | |
| 25TH PROX | GRAND BLANC   MI | |
| PAYMENT TERMS | F.O.B. TERMS | |
| OR NONE/25TH PROX | COLLECT | |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:   C95   RECORDS TO ALLOW BUYER TO MEET CUSTOMS RELATED OBLIGATIONS, ANY
LOCAL CONTENT/ORIGIN REQUIREMENTS, AND TO OBTAIN ALL TARIFF AND
TRADE PROGRAM DUTY AVOIDANCE(S) AND/OR REFUND BENEFITS, WHERE
APPLICABLE.

SELLER AGREES TO COMPLY WITH THE AUTOMOTIVE INDUSTRY ACTION GROUP'S
(AIAG) DOCUMENT AND EDI PROTOCOL AND STANDARDS IN THEIR SUPPLIER
INFORMATION KIT FOR US, CANADA, AND MEXICO IMPORTS.

SELLER AGREES TO ASSUME, AND TO INDEMNIFY BUYER AGAINST, ANY AND
ALL FINANCIAL RESPONSIBILITY ARISING FROM SELLER'S FAILURE TO
COMPLY WITH THESE REQUIREMENTS AND/OR TO SUPPLY BUYER WITH THE
INFORMATION REQUIRED TO MEET LEGAL REPORTING OBLIGATIONS, INCLUDING,
WITHOUT LIMITATION, ANY FINES, PENALTIES, FORFEITURES, OR COUNSEL
FEES INCURRED OR IMPOSED AS A RESULT OF ACTIONS TAKEN BY THE
IMPORTING COUNTRY'S GOVERNMENT.

·······PREMIUM FREIGHT CLAUSE.··········
IF SELLER'S ACTS OR OMISSIONS RESULT IN SELLER'S FAILURE TO MEET
BUYER'S REQUIREMENTS AND BUYER REQUIRES A MORE EXPEDITIOUS METHOD
OF TRANSPORTATION FOR THE GOODS THAN THE TRANSPORTATION METHOD
ORIGINALLY SPECIFIED BY BUYER, SELLER SHALL SHIP THE GOODS AS

TAX INFORMATION:

**PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL, AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.**

BUYER:   CFF   TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000755

FORM 5
REV

ACG
AUTOMOTIVE COMPONENTS GROUP

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

SHIP-TO/DUNS    932543663

PURCHASE ORDER

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 86934 | 002 | 11/05/97 | 9 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

| NET | PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    C95  EXPEDITIOUSLY AS POSSIBLE AT SELLER'S SOLE EXPENSE.
                   SCE  SUPPLIER AGREES TO PROVIDE TO GENERAL MOTORS CORPORATION ANY
                        COST DATA OR DOCUMENTATION AS REQUESTED BY THE GENERAL MOTORS
                        COST ENGINEERING ACTIVITY.

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D469 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

TAX INFORMATION:

BUYER:

OFF  TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000756

**THIS PURCHASE ORDER**
**NUMBER MUST APPEAR ON**
**ALL INVOICES, PACKAGES, PACKING SLIPS,**
**AND BILLS OF LADING.**

## PURCHASE ORDER

1998 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 85934 | 002 | 11/05/97 | 10 OF 10 |

**DELCO SYSTEMS**
CLAUSES FOR ADDRESS

**VENDOR:** BHBC NU TECH PLASTICS ENGINEERING
**BUYER :** CFF    TRENIA A. TURNER

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M V S | T I R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXPENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25160694 | RESERVOIR-F/PMP | X | | | 2 | N | 14000 16 | 100 | 1.86000 | USD EACH | 11/17/97 07/31/98 | 11/14/97 | 03/07/96 |

FORM SWPAPP
RPV 06/96

030047-000757

# EXHIBIT B

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1999 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9C34 | 000 | 06/23/98 | 1 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 08/01/98 |

| SHIP-VIA/MEANS | | |
| 932543663 | | |

| NET | PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC          MI | COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:   ACI THE NAO DISBURSEMENT CENTER WILL GENERATE PAYMENT FOR MATERIAL
SHIPMENTS FOR PART NUMBERS DETAILED ON YOUR GM CONTRACT AT THE
CURRENT CONTRACT UNIT PRICE.

TO FACILITATE PAYMENT YOU MUST ADHERE TO THE FOLLOWING GUIDELINES:

PACKING SLIPS MUST BE ATTACHED TO EACH SHIPMENT AND INCLUDE THE
FOLLOWING DETAILS:
1.  P.O. NUMBER PROVIDED BY DELPHI ENERGY & ENGINE MGT SYSTEMS
2.  GM PART NUMBER ASSIGNED
3.  DESCRIPTION OF ITEM SHIPPED
4.  SHIP DATE
5.  SHIPPING IDENTIFICATION NUMBER - A UNIQUE PACKING SLIP OR
    INVOICE NUMBER FOR EACH SHIPMENT
6.  SHIP FROM DUN AND BRADSTREET NUMBER

DO NOT SEND INVOICES FOR MATERIAL (PRODUCT) SHIPMENTS.  THE MATERIAL
SHIPPED WILL BE PAID UNDER THE EVALUATED "PRICED" RECEIPT STRATEGY
OF NAO DISBURSEMENTS.  THE PACKING SLIP NUMBER USED TO IDENTIFY THE
SHIPMENT MUST BE A NUMBER YOUR RECEIVABLES CAN USE TO IDENTIFY
PAYMENT ON YOUR REMITTANCE ADVICE.

TAX INFORMATION:

NU TECH PLASTICS ENGINEERING
JOHN MAILLEY-PRESIDENT
8018 EMBURY ROAD
GRAND BLANC          MI      48439

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE, AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEE'S REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D889 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:  CFF   TRENIA A. TURNER

ACKNOWLEDGED BY _____    DATE _____

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1999 MODEL YEAR

REQUIREMENTS CONTRACT

| THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING. | | |
|---|---|---|
| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
| 9.004 | 000 | 06/23/98 | 2 OF 10 |
| F.O.B. TERMS | | Z NUMBER | EFFECTIVE DATE |
| COLLECT | | BHBC | 08/01/98 |

SHIP-TRANS   932543663

| NET | PAYMENT TERMS | F.O.B. POINT |
|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC    MI |

PO/REV CLAUSES:   ACI PHONE CALLS REGARDING QUANTITY DISCREPANCIES MUST BE DIRECTED TO THE REQUISITIONER.

PHONE CALLS REGARDING PRICE DISCREPANCIES MUST BE DIRECTED TO THE BUYER.

A MONTHLY STATEMENT IS REQUIRED TO BE SENT TO NAO DISBURSEMENTS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

PLEASE NOTE: FOB TERMS ON THE CONTRACT ARE FREIGHT COLLECT. ALL COMMON CARRIER CHARGES MUST BE SENT COLLECT UNLESS OTHER TERMS ARE NOTED ON THE CONTRACT. NAO DISBURSEMENTS WILL NOT PROCESS FREIGHT PAYMENTS DIRECT TO THE SUPPLIER.

UPS "CONSIGNEE BILLING" QUESTIONS SHOULD BE DIRECTED TO UPS BY PHONING 1-800-354-7527. PLEASE HAVE YOUR INDIVIDUAL LOCATION UPS SHIPPER ACCOUNT NUMBER READY WHEN CALLING.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF, APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR 8659 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 009A | 000 | 06/23/98 | 3 OF 10 |

PURCHASE ORDER

1999 MODEL YEAR

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

SHIP NUMBER: 932543663

| PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|
| NET 25TH PROX OR NONE/25TH PROX | GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:    ACI .

                   AED .

CALL (800) 436-6668 FOR TRANSPORTATION ROUTING INSTRUCTIONS FOR
DELPHI ENERGY AND ENGINE MANAGEMENT SYSTEMS SHIPMENTS.
THIS SUPERCEDES ANY PREVIOUS ROUTING INSTRUCTION ISSUED.

SELLER SHALL DEMONSTRATE THAT SELLER HAS THE ABILITY TO RECEIVE AND
PROCESS ORDERS, FORECASTS, PLANNING AND SHIPPING INFORMATION FOR
GENERAL MOTORS AND THEIR CUSTOMERS AND SUPPLIERS, USING EDI AS THE
METHOD FOR COMMUNICATION USING ANSI X12 STANDARDS FOR TRANSMISSIONS
AND TRANSACTION SETS DEFINED BY THE GENERAL MOTORS CUSTOMER FOR EACH
EDI APPLICATION.  SELLER SHALL ALSO DEMONSTRATE THE ABILITY TO
GENERATE THE GM 1724, LABEL USING INFORMATION TRANSMITTED IN THE
AIAG ANSI X-12, 862 TRANSACTION SET.

SELLER SHALL PROVIDE COMMON BAR CODED SHIPPING LABELS AS THE MEANS
TO IDENTIFY GOODS FOR SHIPMENT AS DEFINED IN THE "GM 1724 GENERAL
MOTORS SHIPPING PARTS IDENTIFICATION LABEL STANDARDS", PUBLISHED
BY THE SUPPLIER QUALITY ADMINISTRATION, GENERAL MOTORS WORLDWIDE
PURCHASING.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:      CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                                                    DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9896 | 000 | 06/23/98 | 4 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

PURCHASE ORDER

1999 MODEL YEAR

| F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|
| GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT

SHIP TO DUNS          932543663

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

PO/REV CLAUSES:          AED
                         CAP

INVOICE TO ADDRESS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

CFL    CLAUSE CFL - CORPORATE FORCED LABOR & QUALITY CLAUSE:
       SELLER REPRESENTS THAT GOODS PURCHASED UNDER THIS ORDER WERE NOT
       PRODUCED WITH FORCED LABOR (AS DEFINED IN 19 U.S.C. 1307) EITHER
       BY SELLER OR SELLER'S SUPPLIERS. SELLER SHALL INDEMNIFY BUYER
       AGAINST ANY LIABILITY BUYER MAY INCUR IF THIS REPRESENTATION IS
       INCORRECT.

       SELLER AGREES TO PARTICIPATE IN BUYER'S SUPPLIER QUALITY AND
       DEVELOPMENT PROGRAM(S). IN ADDITION, SELLER SHALL COMPLY WITH
       ALL QUALITY REQUIREMENTS AND PROCEDURES SPECIFIED BY BUYER,
       AS THE SAME MAY BE REVISED FROM TIME TO TIME, INCLUDING THOSE
       APPLICABLE TO SELLER AS SET FORTH IN "QUALITY SYSTEM REQUIREMENTS
       QS-9000".

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED TERMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

FORM 5V
REV 0

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER

1999 MODEL YEAR

REQUIREMENTS CONTRACT

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9C01 | 000 | 06/23/98 | 5 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 08/01/98 |

| F.O.B. POINT | |
|---|---|
| GRAND BLANC | MI |

| F.O.B. TERMS |
|---|
| COLLECT |

| SHIPMENTS | PAYMENT TERMS |
|---|---|
| 932543663 | |
| NET | OR NONE/25TH PROX |
| 25TH PROX | |

PO/REV CLAUSES:

CFL  GOVERNING LAW: THIS AGREEMENT AND ALL TRANSACTIONS CONTEMPLATED
HEREUNDER SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF MICHIGAN, UNITED STATES OF AMERICA,
BUT NOT INCLUDING THE UNITED NATIONS CONVENTION ON CONTRACTS FOR
INTERNATIONAL SALES OF GOODS. ANY DISPUTES ARISING UNDER THIS
AGREEMENT SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE
FEDERAL OR STATE COURTS LOCATED IN THE STATE OF MICHIGAN.

SELLER, AND ANY GOODS AND SERVICES SUPPLIED BY SELLER, SHALL BE YEAR
2000 COMPLIANT AND COMPATIBLE, AND SHALL FUNCTION WITHOUT ERROR OR
FAULT IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO CALCULATING,
MANAGING, MANIPULATING, COMPARING, AND SEQUENCING) OF DATE AND
DATE-RELATED DATA FOR THE YEARS 2000 AND BEYOND. AT BUYER'S REQUEST,
SELLER SHALL CERTIFY IN WRITING ITS COMPLIANCE WITH THE FOREGOING.

CTB (RIGHT TO AUDIT):
GM BUYER RESERVES THE RIGHT TO AUDIT ALL PERTINENT DOCUMENTS
RELATING TO THE GOODS OR SERVICES COVERED BY THIS PURCHASE ORDER
AND IF REQUESTED BY BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION
PROMPTLY.

C4O  IF MATH DATA IS TO BE UTILIZED FOR THIS ORDER, C4 COMPLIANCE IS
REQUIRED. THE FOLLOWING C4 GUIDELINES SHOULD BE USED IN CONJUNCTION
WITH THE GM SUPPLIER C4 INFORMATION BOOKLET (GM-1825), AS WELL AS ANY

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE SHOWN AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OR THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

TAX INFORMATION:

BUYER:   CFF   TRENIA A. TURNER

PART APPROVAL

ACKNOWLEDGED BY                                        DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE
GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 005## | 000 | 06/23/98 | 6 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

1999 MODEL YEAR

SHIP-MENS

9325438663

| NET | PAYMENT TERMS | F.O.B. POINT | | | F.O.B. TERMS |
|---|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC | MI | | COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:    C40  RELATED STATEMENTS OF WORK, STATEMENTS OF REQUIREMENTS, OR OTHER
                        SPECIFICATIONS DOCUMENTS GOVERNING THE USE OF C4 AND MATH DATA FOR
                        THIS ORDER.

                        BUYER'S PREFERENCE IS TO PROVIDE ALL MATH DATA TRANSMISSIONS TO
                        SELLER IN THE NATIVE FILE FORMAT OF BUYER'S MATH DATA MASTER. IF
                        NON-STRATEGIC SOFTWARE IS USED, SELLER ASSUMES ALL COSTS ASSOCIATED
                        WITH ADDITIONAL TRANSLATIONS. IF SELLER IS TO RETURN ANY MATH DATA,
                        IT MUST BE DATABANKED IN THE NATIVE FILE FORMAT OF THE MATH DATA
                        MASTER.

                        SELLER IS RESPONSIBLE FOR THE INSPECTION AND VERIFICATION OF PARTS
                        TO THE BUYER'S MATH DATA MASTER.

                        IF PORTABLE MATH DATA MEDIA (MAGNETIC TAPES, CASSETTES, OR DISKS) ARE
                        USED, SUCH ITEMS AND ANY COPIES BELONG SOLELY TO BUYER AND MUST BE
                        RETURNED WITHIN 30 DAYS. BUYER'S PORTABLE MATH DATA MEDIA ARE NOT TO
                        BE USED OR STORED ON SELLER'S LIBRARIES.

                        BUYER DEVELOPED PROPRIETARY PRODUCTIVITY TOOLS (SUCH AS UG/GRIP,
                        USER FUNCTIONS, UNIX SCRIPTS, ETC.), PROVIDED FOR USE IN CONNECTION
                        WITH THIS ORDER, SHALL NOT BE UTILIZED BY SELLER FOR ANY PURPOSE(S)
                        OTHER THAN THIS ORDER. ALL COPIES OF BUYER'S PROPRIETARY PRODUCTIVITY

TAX INFORMATION:

BUYER:

CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                                      DATE

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-76, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES, AND SHIPPING INSTRUCTIONS.

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER

1999 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9092~~ | 000 | 06/23/98 | 7 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

| SHIP TERMS | PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|---|
| NET | 932543663 | GRAND BLANC    MI | COLLECT |
| 25TH PROX | OR NONE/25TH PROX | | |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:

C40  TOOLS ARE TO BE DESTROYED OR RETURNED TO BUYER UPON REQUEST OR AT
     COMPLETION OF THIS ORDER.

C95  CLAUSE C95 - SERVICE REQUIREMENTS:
     IN ACCEPTING A PRODUCTION CONTRACT, SELLER IS RESPONSIBLE FOR
     MAINTAINING TOOLS TO DRAWING SPECIFICATIONS AND PROVIDING, WHEN
     SCHEDULED, ANY FUTURE SERVICE REQUIREMENTS FOR CONTRACTED PARTS.
     TOOLING MUST BE MAINTAINED UNTIL SELLER RECEIVES WRITTEN NOTICE
     FROM A GM BUYER AUTHORIZING THE MOVEMENT OR SCRAP OF TOOLS.

     SELLER AGREES TO PROVIDE ALL INFORMATION NECESSARY FOR BUYER TO
     COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS AND RELATED LEGAL
     REPORTING OBLIGATIONS IN THE COUNTRY(IES) OF DESTINATION. SELLER
     AGREES TO PROVIDE ALL DOCUMENTATION AND/OR ELECTRONIC TRANSACTION
     RECORDS TO ALLOW BUYER TO MEET CUSTOMS RELATED OBLIGATIONS, ANY
     LOCAL CONTENT/ORIGIN REQUIREMENTS, AND TO OBTAIN ALL TARIFF AND
     TRADE PROGRAM DUTY AVOIDANCE(S) AND/OR REFUND BENEFITS, WHERE
     APPLICABLE.

     SELLER AGREES TO COMPLY WITH THE AUTOMOTIVE INDUSTRY ACTION GROUP'S
     (AIAG) DOCUMENT AND EDI PROTOCOL AND STANDARDS IN THEIR SUPPLIER
     INFORMATION KIT FOR US, CANADA, AND MEXICO IMPORTS.

     SELLER AGREES TO ASSUME, AND TO INDEMNIFY BUYER AGAINST, ANY AND

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, ON D88B REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                              DATE

FORM SW-000
REV 0

**AUTOMOTIVE COMPONENTS GROUP WORLDWIDE**

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

**PURCHASE ORDER**

1999 MODEL YEAR

REQUIREMENTS CONTRACT

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9203a41 | 000 | 06/23/98 | 8 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

SHIP TERMS
932543663

| NET | PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC    MI | COLLECT |

PO/REV CLAUSES:    C95  ALL FINANCIAL RESPONSIBILITY ARISING FROM SELLER'S FAILURE TO
                        COMPLY WITH THESE REQUIREMENTS AND/OR TO SUPPLY BUYER WITH THE
                        INFORMATION REQUIRED TO MEET LEGAL REPORTING OBLIGATIONS, INCLUDING,
                        WITHOUT LIMITATION, ANY FINES, PENALTIES, FORFEITURES, OR COUNSEL
                        FEES INCURRED OR IMPOSED AS A RESULT OF ACTIONS TAKEN BY THE
                        IMPORTING COUNTRY'S GOVERNMENT.

                        .......... PREMIUM FREIGHT CLAUSE ..........
                        IF SELLER'S ACTS OR OMISSIONS RESULT IN SELLER'S FAILURE TO MEET
                        BUYER'S REQUIREMENTS AND BUYER REQUIRES A MORE EXPEDITIOUS METHOD
                        OF TRANSPORTATION FOR THE GOODS THAN THE TRANSPORTATION METHOD
                        ORIGINALLY SPECIFIED BY BUYER, SELLER SHALL SHIP THE GOODS AS
                        EXPEDITIOUSLY AS POSSIBLE AT SELLER'S SOLE EXPENSE.
                  SCE   SUPPLIER AGREES TO PROVIDE TO GENERAL MOTORS CORPORATION ANY
                        COST DATA OR DOCUMENTATION AS REQUESTED BY THE GENERAL MOTORS
                        COST ENGINEERING ACTIVITY.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL, WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST THIS PURCHASE ORDER, ON DR69 REV. 4-76, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:      CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                                              DATE

DELCO SYSTEMS
REF... E CLAUSES FOR ADDRESS

VENDOR: BHBC NU TECH PLASTICS ENGINEERING
BUYER : CFF  TRENIA A. TURNER

**PURCHASE ORDER**

1999 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9694 | 000 | 06/23/98 | 9 OF 10 |

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M T V I S R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXRENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05638496 | CAP | A | | | N | 0 16 | 100 | 1.05000 | USD EA | 08/01/98 07/31/99 | | 09/03/93 |
| 06471223 | VALVE BODY | A | | | N | 0 16 | 100 | 0.39000 | USD EACH | 08/01/98 07/31/99 | | 09/03/93 |
| 06472369 | BODY VALVE | A | | | N | 0 16 | 100 | 0.95000 | USD EA | 08/01/98 07/31/99 | | 09/03/93 |
| 10243265 | RESERVOIR-FUEL | A | | | 2 N | 2235 10 | 100 | 0.58610 | USD EA | 08/01/98 07/31/99 | | 07/16/97 |
| 15624642 | RESERVOIR-F/TNK | A | | | N | 1376 16 | 100 | 1.58700 | USD EA | 08/01/98 07/31/99 | | 12/10/88 |
| 15701701 | RESERVOIR-FUEL | A | | | N | 2752 16 | 100 | 1.37900 | USD EA | 08/01/98 07/31/99 | | 12/12/91 |
| 15721555 | RESERVOIR-F/TNK | A | | | N | 2752 16 | 100 | 1.06200 | USD EA | 08/01/98 07/31/99 | | 01/07/97 |
| 15721556 | RESERVOIR-F/TNK | A | | | N | 2752 16 | 100 | 1.75000 | USD EA | 08/01/98 07/31/99 | | 09/19/96 |
| 25140109 | ARM | A | | | 3 N | 10000 16 | 100 | 0.13500 | USD EACH | 08/01/98 07/31/99 | | 08/16/95 |
| 25160694 | RESERVOIR-F/PMP | A | | | 2 N | 14000 16 | 100 | 1.86000 | USD EACH | 08/01/98 07/31/99 | | 03/17/98 |

FORM SMPAPP
REV. 05/94

AC DELCO SYSTEMS
REF SE CLAUSES FOR ADDRESS

**THIS PURCHASE ORDER**
**NUMBER MUST APPEAR ON**
**ALL INVOICES, PACKAGES, PACKING SLIPS,**
**AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE |
|---|---|---|
| 9C94 | 000 | 06/23/98 |

| PAGE |
|---|
| 10 OF 10 |

**PURCHASE ORDER**

**1999 MODEL YEAR**

VENDOR: BHBC NU TECH PLASTICS ENGINEERING
BUYER : CFF   TRENIA A. TURNER

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M T V I S R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXPENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25554083 | RESERVOIR-F/TNK | A | | | 2 N | 1580 10 | 100 | 2.28000 | USD EA | 08/01/98 07/31/99 | | 01/09/98 |

FORM SMPAPP
REV. 06/94

# EXHIBIT C

Issue Date:    17-Aug-1998

| | |
|---|---|
| Standard Blanket Contract Number: N580000B | Amendment Number:  000 |
| | Part Number:  000000025160694 |

# LINE ITEM DETAIL

# DELPHI

*GM Corporation*

### Automotive Systems

| | | | |
|---|---|---|---|
| This Line Item is effective from | **01-Aug-1998** | through | **31-Jul-1999** |

**Part Description:**        RESERVOIR-F/PMP FUEL
**Amendment Reason:**     New Contract Line Item

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
NU TECH PLASTICS ENGINEERING
8018 EMBURY
GRAND BLANC,MI 48439
UNITED STATES

**Buyer Name:**
Turner, Trenia
**Buyer Code:**    CFF
Phone:        810-257-8305
Fax:            810-257-8016

**Hazardous Material Indicator:**        N

**Terms and Conditions**

*********

| This Period effective from | 01-Aug-1998 | through | 31-Jul-1999 |
|---|---|---|---|

**Freight Terms:**         Collect
**Payment Terms:**        25th Prox
**Delivery Terms:**        FREE ON BOARD - USA
**Delivery DUNS:**        00932543663
**Ship From DUNS:**      00932543663
**Daily Capacity:**        14,000
**Hours Per Day:**        16
**Price Type:**           Expendable

**Price Composition:**

The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.

All Prices are expressed in   *USD*

**Base Price:**                                                            1.860000

| Total Price: | 1.860000 |
|---|---|
| UOM:   EACH | |

**Receiving Plants and Plant Percentage**
As scheduled                                            100%

**Terms & Conditions**
Right to Audit
C4

030047-000759

# EXHIBIT D

Co..ct Line Item Page:          1    of ?                              Issue Date:        09-May-1999
Standard Blanket Contract Number:    N580000B          Amendment Number:    001
                                                        Part Number:    000000025160694

# LINE ITEM DETAIL

## DELPHI
### Automotive Systems

**Delphi Automotive Systems LLC**

| This Line Item is effective from | 01-Aug-1998 | through | 31-Dec-2000 |
|---|---|---|---|

**Part Description:**         RESERVOIR-F/PMP FUEL
**Amendment Reason:**         Expiration Date Extended

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
NU TECH PLASTICS ENGINEERING
8018 EMBURY
GRAND BLANC,MI 48439
...ED STATES

**Buyer Name:**
Arens, Lynn
**Buyer Code:**       CFF
**Phone:**            810-257-8305
**Fax:**              810-257-8016

**Drawing Date:**               11-22-94
**Hazardous Material Indicator:**    N

## Terms and Conditions
*********

| This Period effective from | 03-May-1999 | through | 31-Dec-2000 |
|---|---|---|---|

**Freight Terms:**        Collect
**Payment Terms:**        (M32) MNS-2, On average, payment shall be made on the second day of the second
                          month following Buyers receipt date of goods or services.
**Delivery Terms:**       FREE ON BOARD-USA/CANADA/MEXICO
**Delivery DUNS:**        00932543663
**...  From DUNS:**       00932543663
**..ly Capacity:**        14,000
**Hours Per Day:**        16
**Price Type:**           Expendable

030047-000760

# EXHIBIT E

Contract Header Page:        1  of  1

# CONTRACT HEADER



*Delphi Automotive Systems LLC*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**        00932543663
RAPID PRODUCT TECHNOLOGIES PLT 2
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

**Mailing Address Information:**
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

| Contract Header Number: | N5800 |
|---|---|

This contract sets forth the exclusive terms and conditions under which
seller shall sell and buyer shall purchase the goods or services described
in the line item detail of this contract for the period(s) specified
therein. Terms and conditions proposed by seller which are different from
or in addition to the provisions of this contract are unacceptable to
buyer, are expressly rejected by buyer, and shall not become a part of this
contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

Contract Line Item Page:        1  of  2                                    Issue Date:    15-Jan-2000

**Standard Blanket Contract Number:**   N580000B                    **Amendment Number:**    003
                                                                    **Part Number:**    000000025160694

# LINE ITEM DETAIL

# DELPHI
## Automotive Systems

*Delphi Automotive Systems LLC*

| This Line Item is effective from | **01-Aug-1998** | through | **15-Jan-2000** |

**Part Description:**        RESERVOIR-F/PMP FUEL
**Amendment Reason:**        DUNS Transfer Update

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
RAPID PRODUCT TECHNOLOGIES PLT 2
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

**Buyer Name:**
Arens, Lynn
Buyer Code:        CFF
Phone:             810-257-8305
Fax:               810-257-8016

**Drawing Date:**                    02-10-99
**Hazardous Material Indicator:**    N

**Line Item Notes:**
11-3-99 Amendment created to allow for reprint of purchase order.

**Terms and Conditions:**
*********

| This Period effective from | **03-May-1999** | through | **15-Jan-2000** |

**Freight Terms:**        Collect
**Payment Terms:**        (M32) MNS-2, On average, payment shall be made on
                          the second day of the second month following
                          Buyers receipt date of goods or services.
**Delivery Terms:**       FREE ON BOARD (FOB) - USA/CANADA/MEXICO
**Delivery DUNS:**        00932543663
**Ship From DUNS:**       00932543663
**Daily Capacity:**       14,000
**Hours Per Day:**        16
**Price Type**           Expendable

030047-000601

Contract Line Item Page:          2  of  2                                    Issue Date:    15-Jan-2000

**Standard Blanket Contract Number:**  N580000B        **Amendment Number:**    003
                                                       **Part Number:**      000000025160694


**Price Composition:**

**The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.**

All Prices are expressed in        *USD*

**Base Price:**                                                                    1.860000


| | |
|---|---|
| **Total Price:** | 1.860000 |
| **UOM:**          EACH | |

**Receiving Plants and Plant Percentage**
As scheduled                                    100%

**Terms & Conditions:**
Right to Audit
C4

030047-000602

Contract Attachment Page:    1  of  1

# CONTRACT ATTACHMENT

**DELPHI**

Automotive Systems

*Delphi Automotive Systems LLC*

**Contract Header Number:**    N5800

**Contract Terms & Conditions:**
**Short Description**

**Detailed Description**

030047-000603

# EXHIBIT F

GM Purchase Order Terms and Conditions – March 1998)

## GENERAL TERMS AND CONDITIONS

### 1. ACCEPTANCE:

Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

### 2. SHIPPING AND BILLING:

Seller agrees: (a) to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination; (b) to route shipments in accordance with Buyer's instructions; (c) to make no charge for handling, packaging, storage or transportation of goods, unless otherwise stated as an item on this contract; (d) to provide with each shipment packing slips with Buyer's contract and/or release number and date of shipment marked thereon; (e) to properly mark each package with a label/tag according to Buyer's instructions; (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions. Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements. The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees: (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed Invoice, unless an invoice is requested by Buyer; and (b) to accept payment by electronic funds transfer. The payment date is set forth in  the Line Item Detail of this contract, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services.  Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this contract.

### 3. DELIVERY SCHEDULES:

Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules.  Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's delivery schedules.  Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract.  Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

### 4. PREMIUM SHIPMENTS:

If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Seller's sole expense.

### 5. CHANGES:

Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes.   Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

### 6. SUPPLIER QUALITY AND DEVELOPMENT; INSPECTION:

Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000.  In addition, Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any

property of Buyer covered by this contract. Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

## 7. NONCONFORMING GOODS:

Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer in accordance with Seller's instructions at Seller's risk. Seller's failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

## 8. FORCE MAJEURE:

Any delay or failure of either party to perform its obligations shall be excused if, and to the extent that, it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order; provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

## 9. WARRANTY:

Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purposes intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

## 10. INGREDIENTS DISCLOSURE; SPECIAL WARNINGS AND INSTRUCTIONS:

If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods; (b) the amount of all ingredients; and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to Buyer.

## 11. INSOLVENCY:

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller; (b) filing of a voluntary petition in bankruptcy by Seller; (c)

filing of any involuntary petition in bankruptcy against Seller; (d) appointment of a receiver or trustee for Seller; or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

## 12. TERMINATION FOR BREACH OR NONPERFORMANCE:

Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties; (b) fails to perform services or deliver goods as specified by Buyer; (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods; and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

## 13. TERMINATION FOR CONVENIENCE:

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for; and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract; less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

## 14. INTELLECTUAL PROPERTY:

Seller agrees: (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services; Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification; (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller; (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization; and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered "works made for hire;" to the extent that the works do not qualify as "works made for hire," Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

## 15. TECHNICAL INFORMATION DISCLOSED TO BUYER:

Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

## 16. INDEMNIFICATION:

If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

## 17. INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

## 18. SELLER'S PROPERTY:

Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ("Seller's Property") necessary for the production of the goods. The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has previously paid to Seller for the cost of such items; provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

## 19. BUYER'S PROPERTY:

All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property"). Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract; shall be deemed to be personalty; shall be conspicuously marked by Seller as the property of Buyer; shall not be commingled with the property of Seller or with that of a third person; and shall not be moved from Seller's premises without Buyer's prior written approval. Buyer shall have the right to enter Seller's premises at all reasonable times to inspect such property and Seller's records with respect thereto. Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

## 20. SERVICE AND REPLACEMENT PARTS:

Seller will sell to Buyer goods necessary for it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that shall not, in the aggregate, exceed the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyer's past model service and replacement parts requirements. Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases. For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

21. REMEDIES:

The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods; (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

22. CUSTOMS; EXPORT CONTROLS:

Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licensees or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

23. SETOFF/RECOUPMENT:

In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries; and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

24. NO ADVERTISING:

Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

25. COMPLIANCE WITH LAWS; FORCED LABOR:

Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

26. NO IMPLIED WAIVER:

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

27. NON-ASSIGNMENT:

Seller may not assign or delegate its obligations under this contract without Buyer's prior written consent.

28. RELATIONSHIP OF PARTIES:

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

## 29. GOVERNING LAW; JURISDICTION:

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law.  Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures.  Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

## 30. SEVERABILITY:

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

## 31. ENTIRE AGREEMENT:

This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

Revised: 3/12/98

# EXHIBIT G

# MEMORANDUM AND AGREEMENT
## REGARDING PURCHASE AND SALE OF ASSETS

THIS AGREEMENT is made effective on December 1, 1999 (the "Effective Date"), between:

Seller:     NUTECH PLASTICS ENGINEERING, INC.
            Grand Blanc, Michigan ("Seller")

Lessor:     ABX LEASING, LTD., a Michigan Corporation ("Lessor")

Landlord:   JOHN COOPER, with respect to Lennon Road Facility and Embury
            Road Facility; and JOHNNY GLEN COOPER, with respect to the
            Baldwin Road Facility (collectively, the "Landlord")

and

Purchaser:  RAPID PRODUCT TECHNOLOGIES, L.L.C.
            3511 Auburn Road, Auburn Hills, MI 48326 ("Purchaser").

## RECITALS

This agreement is made with reference to the following facts and circumstances, all of which are true and are incorporated into the agreement of the parties:

A.    Seller owns and operates a certain plastic injecting molding business ("Business") with three leased facilities (all as described on Schedule A) situated in or around Grand Blanc, Michigan (the "Locations"), operated under the name of Nutech Plastics Engineering, Inc. at the Location.

B.    Lessor owns all right, title and interest in certain Injection Molding Machines and CNC Machines with appraised value at $2,800,000, all as more particularly described on Schedule B (the "ABX Machines"). Lessor currently leases the ABX Machines to Seller, but has agreed to sell them to Purchaser pursuant to this Agreement and the Definitive Agreement.

C.    Landlord owns the real estate and Buildings which comprise the Locations. Landlord currently leases the Locations to Seller, but has agreed to lease the

X:\UD\CLIENTS\STRATECH\NUTECH\MEMO2.AGR        1

030047-000552

Locations to Purchaser upon the terms and conditions contained in Schedule A attached hereto.

   D.   The parties have entered into preliminary discussions regarding the purchase by Purchaser and the sale by Seller of a part or all of the assets used in connection with the Business. Further, as a part of the sale, Seller agrees it shall assign to Purchaser all of its rights, but not obligations, associated with the ABX Machines and the Locations; and Lessor and Landlord have agreed to sell the ABX Machines and lease the Locations, respectively, to Purchaser.

   E.   The parties have agreed that this agreement will memorialize some of the more significant points that the parties intend to include in a "Definitive Agreement". Except as specifically provided otherwise in this agreement, the parties intend that this Agreement shall create binding obligations.

   F.   The parties contemplate that Purchaser shall take over operation of the Seller's Business effective December 1, 1999, despite the fact that the Definitive Agreements have not been signed.

## AGREEMENT OF THE PARTIES

   The parties, based on the above recitals, agree to enter into one or more definitive purchase agreements (the "Definitive Agreements") containing the following provisions:

1.   Purchase and Sale of Assets.

   1.1   Purchased Assets. Purchaser shall purchase all of Seller's assets, except the "Excluded Assets" (defined in paragraph 1.4), existing or used in connection with the Business, including, but not limited to, all of Seller's machinery and equipment, inventory, tools, supplies, the name "Nutech Plastics Engineering" Seller's designs, logos, artwork, trademarks, business records (excepting those records required by law to be retained by Seller), customer list, telephone listings, stationery, Seller owned removable trade fixtures, and goodwill pertaining to the Business (collectively referred to as the "Purchased Assets").

   1.2   Additional Assets. Seller, if requested by Purchaser, shall assign to Purchaser all of its right to, title to, and interest in all leases, licenses, permits, purchase orders, commitments, agreements, and other understandings or arrangements to which Seller is a party specifically including, without limitation, all of Seller's rights under or to the ABX

X:\VJD\CLIENTS\STRATECH\NUTECH\MEMO2.VSR                2

030047-000553

Machines and the Locations' leases; provided, however, that Purchaser shall assume all future liabilities and shall hold Seller free from any obligation due thereon arising after the Closing Date, excepting any liabilities existing on the Closing Date.

1.3   Merchandise Inventory. The purchase and sale includes the inventory of (a) salable merchandise, (b) raw materials; and (c) packaging and boxing materials (the "Inventory"). The purchase price of such Inventory (which price is not included in the purchase price for the Purchased Assets), shall be based on Seller's costs, shall be determined on a mutually agreeable date, and shall be paid by Purchaser to Seller at the Closing or on such terms as Seller and Purchaser approve. The purchase price for the Inventory as of November 20, 1999 is set forth on Schedule 1.3. Price adjustments shall be made at Closing to reconcile any additions or deletions of Inventory.

1.4   Excluded Assets. "Excluded Assets" means all of Seller's books of account (although copies of such books and records shall, on reasonable request made by representatives of Purchaser, be provided to Purchaser), claims for refunds of federal and state income taxes, cash, cash equivalents, any prepaid item, and trade, intercompany, and other accounts receivable.

1.5   Covenant Not to Compete. In connection with the purchase and sale of the Purchased Assets, Seller, its Directors, officers and shareholders and, if applicable, other specified individuals (the "Restricted Parties") shall enter into a covenant-not-to-compete agreement for a term of 24 months and within a radius of 100 miles from the Location. The Restricted Parties shall further agree to non-solicitation of Seller's employees and customers.

1.6   Liabilities. Unless otherwise agreed, the purchase and sale specifically excludes all liabilities of Seller ("Excluded Liabilities"). Any liabilities that are to be assumed by Purchaser shall be specifically set forth within the Purchase Agreement and shall be referred to as "Assumed Liabilities", as specified in Schedule 1.6.

2.   Assignment and Purchase and Sale of Leaseholds.

2.1   ABX Machines. Purchaser shall purchase and Lessor shall sell, transfer and convey to Purchaser all right, title and interest to the ABX Machines free and clear of all claims, liabilities, liens and encumbrances of any nature whatsoever. At the Closing, Lessor and Purchaser shall enter into a six month lease in recordable form which further provides for the right to purchase the ABX Machines as stated herein. Lessor shall convey the ABX Machines pursuant to a Warranty Bill of Sale which contains appropriate covenants, representations and warranties as to lessor's ownership; ability to transfer the

X:\JJD\CLIENTS\STRATECH\NUTECH\MBMO2J.GR          3

030047-000554

ABX Machines; and the maintenance and performance history of the ABX Machines. Further, Lessor shall indemnify Purchaser for all liabilities arising on or prior to the Signing Date with respect to the ABX Machines as defined above. Purchaser shall pay Lessor the sum of $2,800,000 for the ABX Machines, which amount shall be due no later than six months from the Closing Date. Finally, in the event Purchaser does not pay Lessor the full $2,800,000 on the Closing Date, Purchaser shall make monthly payments to Lessor to cover Lessor's actual monthly obligation on the ABX Machines not to exceed $76,133 per month.

2.2    Locations.  Purchaser and Landlord agree that Purchaser shall lease the Locations from the Landlord pursuant to the terms outlined on Schedule A, which is attached hereto and hereby made a part of this Agreement. Purchaser acknowledges that certain leasehold improvements of the Locations are and shall remain the property of Landlord.

3.    Purchase Price and Payment of Purchase Price.  The purchase price for the assets to be paid by Purchaser to Seller is the fair market value which has been determined by Purchaser and Seller to be ($825,000 plus the Inventory Price). The purchase price, to be allocated as mutually agreed on by the parties, shall be paid as follows:

3.1    Payment at Signing/Down Payment.  Purchaser shall pay Three Hundred Thousand Dollars ($300,000.00) as a Down Payment with One Hundred Fifty Thousand ($150,000.00) Dollars to be held in escrow for a six month period to serve as an indemnity reserve in the event of a breach of Seller's covenants, representations and warranties contained in this Agreement or the Definitive Agreement, unless John Cooper has delivered a personal guaranty as specified in Section 4.1(c), in which case there shall be no escrow. Michigan National Bank - Corporate Trust Division or an agreeable third-party shall serve as escrow agent.

3.2    Payment to Michigan National Bank.  Purchaser shall pay Five Hundred Twenty-Five Thousand ($525,000.00) Dollars by wire transfer or certified funds to Michigan national Bank at the signing of this Agreement (the "Bank Payment"). The Bank Payment shall be made for the benefit of Seller, applied toward the Purchase Price and in exchange for UCC lien releases to be delivered at the signing.

3.3    Inventory Payment.  Purchaser shall pay the Inventory Payment at the Closing with appropriate adjustments for fluctuations.

X:\LIT\CLIENT5\STRATECH\NUTECH\MEMO2.AGR          4

030047-000555

4.    Representations and Conditions.

4.1    Representations. The parties shall make representations and warranties to each other as agreed by Purchaser and Seller, including appropriate representations and warranties regarding taxes, liens, title, and compliance with all notice requirements. Seller shall not change its normal course of doing business without notice to Purchaser. In addition, the other parties represent as follows:

(a)    John W. Mailey and Seller represent and agree that as a Material part of the asset sale and included in the purchase price they shall individually and jointly and severally transfer, assign and convey all right, title and interest in and to any and all intellectual property held in the name of, or in any manner owned by either John W. Mailey or Nu-Tech, or utilized in connection with the Business operations of Nu-Tech, or related to the existing Business (including, without limitation, all patents, improvements or derivative works of any nature, copyrights, trade marks and any trade secrets or similar property) to Purchaser upon signing (the "Intellectual Property").

(b)    John Cooper, individually and jointly and severally, on behalf of any of his companies (meaning any company in which he or any family members own collectively or individually more than 25%), represent and agree that as a material part of the asset sale and sale of the ABX Machines, and included in the purchase price thereof, they hereby waive any and all interest, claim or right whatsoever in and to the Intellectual Property described in this Agreement. They further agree to assign, convey and transfer any and all right, title or interest which may be discovered in their name associated in any way with the Intellectual Property.

(c)    Notwithstanding any other provision of this Agreement, John Cooper hereby agrees to personally and unconditionally guaranty any amounts claimed by Purchaser with respect to any indemnity obligations of Seller pursuant to this Agreement and/or the Definitive Agreement, related to the Purchased Assets (the "Guaranty"). John Cooper further agrees to deliver a document evidencing the Guaranty here made, on or prior to the Closing Date.

4.2    Conditions. The parties shall agree to appropriate conditions, including approval of title and appraisals financing, as applicable, but in any event including the following material conditions:

X:\LJC\CLIENTS\STRATECH\NUTECH\MEMO2.AGR                5

030047-000556

(a) As of the Signing Date, Seller shall have maintained all current accounts, customers, contracts, purchase orders, requests for quotes and any other oral or written business opportunities;

(b) Seller shall have used its best efforts to secure the Stone Shield Business;

(c) Purchaser shall have negotiated and consummated a strategic growth plan with GM/Delphi satisfactory to Purchaser;

(d) Approval and/or consent for the deal shall have been obtained by Seller from John W. Malley; and

(e) 4 – 1500 Ton Machines would be relinquished by Delphi to Purchaser.

(f) All Assets shall be free and clear of all encumbrances of any nature.

4.3 **Broker.** Seller shall be responsible for payment of any broker commission relating to this agreement.

5. **Binding Contractual Obligations.** Notwithstanding any provisions to the contrary, the provisions of this paragraph shall be binding on each of the parties and are intended to cause contractual liability to arise.

5.1 **Confidentiality; Use of Information.**

A. As used in this agreement, *Information* includes information furnished to Purchaser and its agents or representatives (collectively, the "Representatives"), including attorneys and accountants, by Seller or any representatives of Seller or any party to this Agreement. The information Seller furnishes to Purchaser may include information that is nonpublic, confidential, or proprietary in nature.

B. The parties agree to use the Information solely in connection with the consummation of the transaction contemplated by this agreement and to transmit the Information only to its Representatives who need to know it. The parties shall at all times during the term of this agreement and thereafter hold any Information in strictest confidence. If the transactions contemplated by this agreement do not occur, the parties will return the Information to the appropriate party, without retaining any copies, except for any portion that consists of analysis, compilation, data, studies, or other documents prepared by Purchaser or its Representatives.

X:\JJD\CLIENTS\STRATECH\NUTECH\MEMO2.AGR     6

030047-000557

5.2   <u>Access to Books and Records.</u> During the term of this Agreement, Seller shall afford Purchaser's officers, attorneys, accountants, and other authorized representatives free and full access, on reasonable notice and during normal business hours, to all management personnel, offices, properties, books, and records of Seller so that Purchaser may have a reasonable opportunity to make such investigation as it desires into the management, business, properties, and affairs of Seller. Seller shall furnish to Purchaser financial and operating data and other information, including legal documents, regarding Seller's business, that Purchaser reasonably requests.

5.3   <u>Nonsolicitation.</u> During the thirty (30) days after the effective date of this agreement, Seller will not (1) solicit from any outside sources acquisition proposals relating to Seller's assets or stock; (2) entertain or discuss any acquisition proposals from any unsolicited outside sources relating to Seller's assets or stock; or (3) disclose to any outside sources (other than in the ordinary course of business and other than to its attorneys, accountants, and investment advisers, or to Purchaser) any nonpublished information concerning Seller, its Business, and its financial condition.

6.   <u>Closing Date.</u> This agreement shall begin on the Effective Date noted above. The parties agree to close the transactions contemplated by this Agreement no later than 5:00 p.m. on December 31, 1999 (the "Closing Date").

7.   <u>Miscellaneous.</u>

7.1   <u>Release of Additional Information.</u> Except as expressly set forth in this agreement, this agreement shall not be construed as an agreement by Seller to provide continuous information to Purchaser or to continue the release of information for any specific period.

7.2   <u>Amendment.</u> This agreement cannot be modified except by a writing that is signed by the parties.

7.3   <u>Benefit.</u> This agreement shall inure to the benefit of the parties and shall be binding on their heirs, legal representatives, and assigns.

7.4   <u>Survival of Terms.</u> This agreement shall survive the Termination Date.

7.5   <u>Governing Law.</u> This agreement shall be governed by the laws of the State of Michigan.

030047-000558

The parties have signed this agreement with the "Effective Date" set forth on
the first page.

Seller:

NUTECH PLASTICS ENGINEERING, INC.

Dated: _____12-01-99_____      By: _____
                                   John W. Mailey
                                   Its: President

Purchaser:

RAPID PRODUCT TECHNOLOGIES, L.L.C.

Dated: _____       By: _____
                                   Manu Bhatia
                                   Its: CEO

Dated: _____12-01-99_____      And
                               By: _____
                                   Miguel A. Linares
                                   Its: President

Lessor:

ABX LEASING, LTD., a Michigan Corporation

_____      By: _____
John W. Mailey, individually and       John Cooper
on behalf of any affiliated individual  Its: President
or entity

_____      Landlord:
John Cooper, individually and on
behalf of any affiliated individual    _____
or entity                              John Cooper, individually as Landlord

                                       _____
                                       Johnny Glen Cooper, individually as Landlord

X:\JJO\CLIENTS\STRATECH\NUTECH\MEMO2.AGR          8

030047-000559

## SCHEDULE A

| Facility Location | Description of Cost | Amount |
|---|---|---|
| Lemmon Road, Flint<br>Sq. Ft. = 38,000 | Property Tax<br>Common Costs<br>Allocated Cost / Snow Removal<br>Lease Payment @ $6.84 per Sq. Ft.<br>per year ÷ 12 months | $ 2,363.35<br>$    122.50<br>$      37.50<br><u>$21,666.67</u> |
| | Total Monthly Payment | $24,190.02 |
| | Duration of Lease | Month to Month |

| Facility Location | Description of Cost | Amount |
|---|---|---|
| Embury Road<br>Sq. Ft = 24,947 | Property Tax<br>Common Costs<br>Allocated Cost / Snow Removal<br>Lease Payment @ $7.00 per Sq. Ft.<br>per year ÷ 12 months | $ 1,993.91<br>$    296.00<br>$      37.50<br><u>$14,552.42</u> |
| | Total Monthly Payment | $16,879.83 |
| | Duration of Lease | One year |

| Facility Location | Description of Cost | Amount |
|---|---|---|
| Baldwin Road | Payment | $ 4,500.00 |
| | Total Monthly Payment | $ 4,500.00 |
| | Duration of Lease | Month to Month |

X:\LUDI\CLIENTS\STRATECH\NUTECH\MEMO2.AGR          9

030047-000560

12/07/99  TUE 12:38  [TX/RX NO 7185]

# SCHEDULE B

## ABX MACHINES

\* See attached

030047-000561

# SHEFFERLY, SILVERMAN & MORRIS

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Joe DeVim | FROM: Phillip J. Shefferly, Esq. |
| COMPANY/FIRM: Rapid Products | DATE: December 1, 1999 |
| FAX NUMBER: 248-852-2660 | TOTAL NO. OF PAGES INCLUDING COVER: |
| TELEPHONE NUMBER: | |
| RE: John Cooper | |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY

THIS TRANSMISSION MAY INCLUDE CONFIDENTIAL AND/OR LEGALLY PRIVILEGED INFORMATION INTENDED FOR THE PERSON(S) NAMED ON THIS COVERSHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE NOTIFY US IMMEDIATELY SO THAT WE CAN ARRANGE FOR THE RETURN OF THE DOCUMENTS AT NO COST TO YOU. IF YOU DO NOT RECEIVE ALL PAGES OR HAVE A PROBLEM RECEIVING THIS TRANSMISSION, PLEASE CALL (248) 539-1330 AS SOON AS POSSIBLE. THANK YOU.

*NOTES/COMMENTS:*

**7115 ORCHARD LAKE ROAD, SUITE 500**
**WEST BLOOMFIELD, MICHIGAN 48322**
**TELEPHONE (248) 539-1330   FACSIMILE (248) 539-1355**

030047-000562

12/19/99   16:09 FAX
DEC-01-1999   12:33

DEC.-01'99(WED) 15:24   SHEFFERL SILVERMAN          TEL:248 559 1555          P. 002

11/29/99   18:46   ☎810 777 2287          FAB ENG - EST                      ☎001

# ABX LEASING

| Quantity | Machine | Description/Serial Number | Location | Value |
|---|---|---|---|---|
| 1 | CMT1-50 Chilling System | 3942A02/96-4 | 1 | |
| | | 10hp Upgrade | | |
| | | Cylinder Unlcuising Single Stage | | |
| 1 | CM185-11 | W12A0295015 | 1 | |
| 1 | | CM DD202 Dryer | | |
| 1 | | CM CM-TT-1500 Tilt Table | | |
| 1 | | CM MWC75 Water Temperature Controller | | |
| 1 | | CM CML-LS-18 Loader | | |
| 1 | | CM EOTC-100C Oil Temperature Controller | | |
| 1 | | CM CMG912 Granulator | | |
| 1 | CM300-29 | W14A0195005 | 1 | |
| 1 | | CM DD303 Dryer | | |
| 1 | | CM CM-TT-1500 Tilt Table | | |
| 1 | | CM MWC75 Water Temperature Controller | | |
| 1 | | CM CML-LS-15 Loader | | |
| 1 | | CM EOTC-100C Oil Temperature Controller | | |
| 1 | | CM CMG912 Granulator | | |
| 1 | CM250-21 | H02A0497004 | 1 | |
| 1 | | CAMAC 485 Control | | |
| 1 | | Nozzle Std | | |
| 1 | | Short Stroke Slider Ring | | |
| 1 | | Barrier Mixing Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Sprue Break | | |
| 1 | | Hydraulic Core Pull | | |
| 1 | | PECI | | |
| 1 | | Robot Interface | | |
| 1 | | Power Factor Correction Capacitor | | |
| 1 | | Two zone water manifold | | |
| 1 | | Leveling Pads | | |
| 1 | | Machine Voltage 460/3/60 | | |
| 1 | | Closed Loop Feedthroat Control | | |
| 1 | | Floppy Disk Drive | | |
| 1 | | RJG Interface | | |
| 1 | | Weigh Scale Interface | | |
| 2 | | 480/3/60 Volt, 15 amp Receptacles w/plugs & breakers | | |
| 2 | | Oil ports | | |
| 2 | | MWC200 Water Temperature Controllers | 1 | |
| 1 | | CML GT8 Loader | | |
| 1 | | CM-TT-1500-900 Tilt Table | | |
| 1 | CMVSX 120-95.8 | S90A0397011 | 1 | |
| 1 | | CAMAC VSX Control | | |
| 1 | | Nozzle Std | | |
| 1 | | Slider Ring | | |
| 1 | | High Compression Nylon Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Hydraulic Core Pull | | |
| 1 | | Leveling Pads | | |
| 1 | | Machine Voltage 460/3/60 | | |
| 1 | | CML GT8 Loader | | |
| 2 | | MFCH 75 Temperature Flow Controls | | |

030047-000563

12/07/99  TUE 12:38  [TX/RX NO 7185]

DEC 14 '99 16:17                                                PAGE.15

# ABX LEASING

| Quantity | Machine | | Description/Serial Number | Location | Value |
|---|---|---|---|---|---|
| | | | | ? | |
| 1 | MH300-36 | S | H03A0455007 | | |
| 1 | | | CAMAC 486+ Control | | |
| 1 | | | Nozzle Std | | |
| 1 | | | Short Stroke Slider Ring | | |
| 1 | | | High Compression Nylon Screw | | |
| 1 | | | Material Hopper | | |
| 1 | | | Hydraulic Core Pull | | |
| 1 | | | Leveling Pad | | |
| 1 | | | Clamp & Ejector Motion Keylock Switch | | |
| 1 | | | Machine Voltage 460/3/60 | | |
| 1 | | | Robot Interface | | |
| 1 | | | One Stage Air Eject. | | |
| 1 | | | 36 oz. Ultramex Barrel | | |
| 1 | | | 36 oz. LW1N30 Screw | | |
| 1 | | | 36 oz. Mallard Carbide Tip Assembly | | |
| 1 | | | 21 oz. Ultramex Barrel | | |
| 1 | | | 21 oz. LW1N30 Screw | | |
| 1 | | | 21 oz. Mallard Carbide Tip Assembly | | |
| 1 | | | 4" Nozzle Concentricity Alignment tool | | |
| 1 | | | MFCH100 Temperature Flow Controls | | |
| 2 | | | CM-TT-1500-800 Tilt Table | | |
| 1 | | | CML GT8 Loader | | |
| 1 | | | DD110 Dryer 3933A02/97-0 | | |
| 1 | | | DD110 Dryer voltage 460/1/60 & Floor Mtg Pkg 3933A02/97-144 | | |
| 1 | | | DD110 Dryer voltage 460/1/60 & Floor Mtg Pkg 3933A02/97-145 | | |
| 1 | ES550-60 | 6 | W75A0197001 | 1 | |
| 1 | | | CAMAC 486+ Control | | |
| 1 | | | General Purpose Screw | | |
| 1 | | | 660L Material Hopper | | |
| 1 | | | Manual Mold Purge | | |
| 1 | | | Hydraulic Core Pull:15 | | |
| 1 | | | Hydraulic Mold Gate | | |
| 1 | | | Leveling Pads | | |
| 1 | | | Machine Voltage 460/3/60 | | |
| 1 | | | 60 oz. Ultramex Barrel | | |
| 1 | | | 60 oz. LW1N30 Feedhrew | | |
| 1 | | | 60 oz. Mallard Ultrawear Screw Tip | | |
| 1 | | | 10" Nozzle | | |
| 1 | | | Tilt Table | | |
| 2 | | | MFCH-800 | | |
| 1 | | | GT-8 Loader | | |
| 1 | ES550-60 | 7 | W75A0197002 | 1 | |
| 1 | | | CAMAC 486+ Control | | |
| 1 | | | Nozzle Std | | |
| 1 | | | General Purpose Screw | | |
| 1 | | | 660L Material Hopper | | |
| 1 | | | Manual Mold Purge | | |
| 1 | | | Hydraulic Core Pull:15 | | |
| 1 | | | Hydraulic Mold Gate | | |
| 1 | | | Leveling Pads | | |
| 1 | | | 10inch nozzle (2 piece Design) | | |
| 1 | | | Ultramex Barrell | | |

030047-000564

# ABX LEASING

| Quantity | Machine | Description/Serial Number | Location | Value |
|---|---|---|---|---|
| 1 | | 4 piece Zeiger 4-piece carbide ultra screw | | |
| | | Screw to be LW1N30 in place of standard | | |
| 2 | | MFCH300 Temperature Flow Controllers | | |
| 1 | | CM-TT-1500-500 Tilt Table | | |
| 1 | | CML GT6 Loader | 1 | |
| 1 | Battenfeld BA4500/2800 | Serial #52,523 | | |
| | | Leveling Pads | | |
| 2 | | Hydraulic Manifold speed & pressure setting unilog controls | | |
| 1 | | Hydraulic valve gate circuit | | |
| 1 | | 2 piece Nickerson Nozzle | | |
| 1 | | Bimetallic barrel & Stelline Flighted Screw | 1 | |
| 1 | Swap Cooler | | | |
| 1 | | CM-PTS-1200 | | |
| 1 | | TC-178 Cooling Tower | | |
| 1 | | Air Vibrator Pkg | | |
| 1 | | CM-TT-1500-900 Floor Level Tilter Foot Control | | |
| 1 | | CM-TT-1500-900 Floor Level Tilter Foot Control | | |
| 1 | | Air Vibrator Pkg | | |
| 1 | 9  Okuma Crown-E - S/N 1089 | Includes: | 2 | |
| | | Cycle Time Reduction Function | | |
| | | Animation Simulation | | |
| | | Tool Life Management | | |
| | | Chuck Doen/Close during Spindle Rotation | | |
| | | Tape Storage Capabilities (160MG) | | |
| | | LAP 4 | | |
| 1 | 10 Okuma Crown-E - S/N 1020 | | 2 | |
| | | With OSP700L Control and the following: | | |
| | | Cycle Time Reduction | | |
| | | Animated Simulation | | |
| | | Tool Life Management | | |
| | Novatec Dryers | | 2 | |
| 5 | | DCS-25M 480V Hygro SSVLS 100# HPR | | |
| | | DCS-50M 480V Hygro S3 VL3 200# HPR | | |
| 1 | 11 EL85-2.97 | W10A0256008 | 2 | |
| 1 | | CAMAC 485+ Control | | |
| 1 | | Nozzle STD | | |
| 1 | | Slider Ring | | |
| 1 | | General Purpose Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Leveling Pad | | |
| 1 | | Machine Voltage 480/3/60 | | |
| 1 | 12 EL110-5 | W17A0291015 | 2 | |
| 1 | | CAMAC 416+ Control | | |
| 1 | | Nozzle Std | | |
| 1 | | Slider Ring | | |
| 1 | | General Purpose Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Two Stage Air Eject | | |
| 1 | | PECI | | |
| 1 | | Robot Interface | | |
| 1 | | Leveling Pad | | |
| 1 | | Machine Voltage 480/3/60 | | |

030047-000565

12/14/99  16:10 FAX                                                              018/022
DEC.-01'99 (WED) 15:25   SHEFFERLY, SILVERMAN              TEL:248 539 1355       P. 005
11/29/89   16:46   ☎810 257 2207              FAB ENG - EST                       2 007

# ABX LEASING

| Quantity | Machine | Description/Serial Number | Location | Value |
|---|---|---|---|---|
| 1 | | Spring Mold | | |
| 1 | | CPM9V Screw in place of standard | | |
| 1 | | XALOY 809 Barrel in place of standard | | |
| 1 | | Enlarged Center Hole in Platen | | |
| 1 | | Melt Temperature Monitor with Setpoint | | |
| 1 | | Software Interface | | |
| 4 | | 460/3/60 Volt 30 amp Receptacles | | |
| 1 | | Manual Mold Purge | | |
| 1 | | Additional Detail Timer | | |
| 1 | | Offline Mold Data Storage | | |
| 5 | | DD50 Dryers, 100# hoppers | | |
| 5 | | MFCL75 Temperature Flow Controls | | |
| 5 | | CM-TT-1500-900 Tilt Tables | | |
| 1 | 14 EL110-5 | W11A0194001 | 2 | |
| 1 | | CAMAC 486+ Control | | |
| 1 | | Nozzle: STD | | |
| 1 | | Slider Ring | | |
| 1 | | General Purpose Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Leveling Pads | | |
| 1 | | Machine Voltage 460/3/60 | | |
| 1 | 14 EL110-2.27 | W11A0194005 | 2 | |
| 1 | | CAMAC 486+ Control | | |
| 1 | | Nozzle: STD | | |
| 1 | | Slider Ring | | |
| 1 | | General Purpose Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Leveling Pads | | |
| 1 | | Machine Voltage 460/3/60 | | |
| 1 | 14 EL300 | W14A0195007 | 2 | |
| 1 | | CAMAC 486+ Control | | |
| 1 | | Nozzle: STD | | |
| 1 | | Slider Ring | | |
| 1 | | General Purpose Screw | | |
| 1 | | Material Hopper | | |
| 1 | | Screw Break | | |
| 1 | | PEGI | | |
| 1 | | Robot Interface | | |
| 1 | | Leveling Pads | | |
| 1 | | Machine Voltage 460/3/60 | | |
| 1 | | Spare Parts Order | | |
| 2 | | 2.87 oz Ultramax Barrels | | |
| 2 | | 7oz Ultramax Barrels | | |
| 1 | | 13oz Ultramax Barrel | | |
| 2 | | 7oz LW/N30 Feedscrews | | |
| 2 | | 2.87 oz. LW/1N30 Feedscrews | | |
| 1 | | 13oz LW/1N30 Feedscrew | | |
| 2 | | 2.87 oz Mallard Carbide Screw Tips | | |
| 2 | | 7 oz Mallard Carbide Screw Tips | | |
| 1 | | 13 oz Mallard Carbide Screw Tips | | |
| 1 | | Core Pull (Signals Only) | | |
| 1 | | Closed Loop Control of Feedthroat | | |

030047-000566

12/07/99  TUE 12:38  [TX/RX NO 7185]

DEC 14 '99 16:19                                                         PAGE.18

12/14/99  16:10 FAX                                                      019/022
DEC-07-1999  12:54     ...SEC...CONNERCIAL LINE...                        P.006
05-44481-rdd    Doc 11980    Filed 01/12/08    Entered 01/12/08 03:52:53    Main Document
Pg 141 of 327
DEC.-01'99(WED) 15:25    SHEFFERLY, SILVERMAN        TEL:248 559 1355        P. 006
11/29/99   18:48    ☎810 257 2287        FAB ENG - EST                  ☎005

## ABX LEASING

| Quantity | Machine | Description/Serial Number | Location | Value |
|---|---|---|---|---|
| 1 | TC-175 Cooling Tower | 3941A02/98-13 | 3 | |
| 1 | | CM-FTS-1250  Serial #3941A01/98-14 | | |
| 1 | | Voltage 460/3/60 | | |
| 1 | | MFCF-75 Temp Control Unit | 3 | |
| 1 | | TT-1500-500 Tilt Table | 3 | |
| 1 | | DD-80 Dryer w/100#Hopper, MC Blower | 1 | |
| 1 | | Mallard 3 pc lip assembly | 2 | |
| 1 | | Inductamatix Ultramax 2.97 | 2 | |
| 1 | | LW1NS02.97 oz. Feedscrew | 2 | |
| 2 | | DD 110 Dryers | 2 | |
| 1 | / 6 | MM1600-292 | H34A0198001 | 3 | |

Location:
1 = Embury Rd
2 = Baldwin Rd
3 = Lannon Rd

030047-000567

## SCHEDULE 1.3

## INVENTORY

1. Finished Inventory: $ $231,021.56$

2. Raw Inventory: $ $138,556.77$

3. Reground Inventory: $ $20,146.70$

4. Non-Production/Packaging Materials: $ $122,274.66$

5. Dunnage: $ $21,196.37$

**✱ TBD at Closing.**

030047-000568

12/07/99  TUE 12:38  [TX/RX NO 7185]

DEC 14 '99 16:19                                                        PAGE.20

## SCHEDULE 1.6

## ASSUMED LIABILITIES

Only liabilities arising after December 1, 1999, arising out of the operation of the Business.

X:\LIT\CLIENTS\STRATECHNUTECH\MEMO2.AGR          12

030047-000569

**RAPID PRODUCTS**
3511 AUBURN ROAD
AUBURN HILLS, MI 48326
(248) 852-1735

FRANKLIN BANK, N.A.
SOUTHFIELD, MI 48034
74-7183/2724

12/1/99

PAY TO THE
ORDER OF   Nu Tech Plastics Engineering, Inc.                          $ **300,000.00

Three Hundred Thousand and 00/100********************************************************************

Nu Tech Plastics Engineering, Inc.
3018 Embury Road
Grand Blanc, MI 48439

MEMO PURCHASE OF ASSETS FOR NUTECH

⑃"009188⑃ ⑃272471836⑃ 055500421325"

Cash in bank – Franklin                                               300,000.00

RAPID PRODUCTS                                                        91

Nu Tech Plastics Engineering, Inc.                      12/1/99

300,000.00

030047-000570

Cash in bank – Franklin

TOTAL P.21

# EXHIBIT H

JAN 18 2000 16:17 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074    P.02/23

'01/14/00   14:19 FAX                                                    ☑002/023

**Final**

## AGREEMENT
## PURCHASE AND SALE OF BUSINESS ASSETS

This Agreement ("Agreement") is made on December 1st, 1999, ("Effective Date") between:

**Seller:**    **NUTECH PLASTICS ENGINEERING, INC.**
**Grand Blanc, Michigan** ("Seller")

**Lessor:**    **ABX LEASING, LTD., a Michigan Corporation** ("Lessor")

**Landlord:**    **JOHN COOPER, with respect to Lennon Road Facility and Embury Road Facility; and JOHNNY GLEN COOPER, with respect to the Baldwin Road Facility** (collectively, the "Landlord")

and

**Purchaser:**  **RAPID PRODUCT TECHNOLOGIES, L.L.C.**
**3511 Auburn Road, Auburn Hills, MI 48326** ("Purchaser").

All collectively referred to herein as the "Parties".


## RECITALS

This agreement is made with reference to the following facts and circumstances, all of which are true and are incorporated into the agreement of the parties:

A.    The Parties previously entered into that certain Memorandum and Agreement which is attached as Exhibit A regarding the sale and purchase of the Assets and the ABX machines and the leasing of the locations (the "Memo"). The purpose of this Agreement is to supplement and complete the terms and conditions of the Memo in a definitive fashion.

B.    Seller owns and operates a certain plastic injecting molding business ("Business") with three leased facilities (all as described on Schedule A) situated in or around Grand Blanc, Michigan (the "Locations"), operated under the name of Nutech Plastics Engineering, Inc. at the Location.

C.    Lessor owns all right, title and interest in certain Injection Molding Machines and CNC Machines with appraised value at $2,800,000, all as more particularly described on Schedule B (the "ABX Machines"). Lessor currently leases the ABX

030047-000778

Machines to Seller, but has agreed to sell them to Purchaser pursuant to the Memo and this Definitive Agreement, all as more particularly set forth in the ABX Agreement attached hereto as Exhibit C.

     D.    Landlord owns the real estate and Buildings which comprise the Locations. Landlord currently leases the Locations to Seller, but has agreed to lease the Locations to Purchaser upon the terms and conditions contained in Schedule A of Exhibit A attached hereto.

     E.    The Parties have entered into the agreements outlined in the Memo which include the purchase by Purchaser and the sale by Seller of a part or all of the assets used in connection with the Business. Further, as a part of the sale, Seller agreed it shall assign to Purchaser all of its rights, but not obligations, associated with the ABX Machines and the Locations; and Lessor and Landlord have agreed to sell the ABX Machines and lease the Locations, respectively, to Purchaser.

     F.    The Purchaser took over operation of the Seller's Business effective December 1, 1999, despite the fact that the Definitive Agreements have not been signed.

     G.    Seller desires to sell, and Purchaser desires to purchase, Seller's interest in the "Purchased Assets," as defined in paragraph 1.1. used in connection with the Business.

     H.    John Cooper and John Mailey, the Seller's Shareholders (collectively, the "Shareholder"), will derive a substantial economic benefit from Purchaser's purchase of the Purchased Assets from Seller. In exchange, Shareholder agrees to make certain representations, warranties, covenants, Guarantees and indemnifications only as specifically set forth in this Agreement. In addition, Seller and Shareholder agree not to compete with Purchaser in the conduct of the Business, as provided in a non-competition agreement described in paragraph 1.2 ("Non-Competition Agreement"), as a condition of Purchaser's purchase of the Purchased Assets from Seller. Further, a Personal Guaranty regarding the performance of Seller's and Shareholder's representations warranties, covenants, and indemnifications concerning the title to and the transferability of the Purchased Assets as set forth in Section 7.5 of this Agreement shall be executed at the Closing by John Cooper ("Guaranty" and "Guarantor," respectively). A copy of the Guaranty is attached as Exhibit H.

     **NOW, THEREFORE,** the parties agree as follows:

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4

2

030047-000779

JAN 18 2000 16:18 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074    P.04/23

01/14/00  14:20 FAX    ☒004/023

## AGREEMENT

## ARTICLE I.  AGREEMENT TO PURCHASE AND SELL

1.1    <u>Assets Purchased and Sold</u>. At the Closing, Purchaser shall buy and Seller shall sell, assign, convey, transfer, set over, and deliver (by Warranty Bill of Sale or other appropriate instrument of transfer) to Purchaser all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Effective Date were owned by Seller or in which Seller has an interest of any kind (the "Purchased Assets"). These include, without limitation, the following, except for those assets specifically identified in paragraph 1.4 ("Excluded Assets"):

(a)    <u>Trade Fixtures Machinery and Equipment</u>. All removable trade fixtures, machinery and equipment as defined in the Michigan Uniform Commercial Code, Act. No. 174 of the Michigan Public Acts of 1962, as amended ("UCC").   All as more particularly described on Exhibit 1.1(a) (the "Machinery and Equipment").

(b)    <u>Trade Names and Secrets</u>. All patents, logos, slogans, trademarks, copyrights, know-how, processes, trade secrets, formulas, inventions, telephone numbers, telephone listings, computer programs, software programs, software and technical libraries, engineering data, electronic databases, drawings, license agreements, and all other intellectual and proprietary information, property, and related applications or licenses used in connection with the Business whether or not held in the name of an individual Shareholder ("Trade Secrets"). With regard to the Patents, any and all filings which Seller possesses shall be delivered at Closing.  The Trade secrets shall include, but not be limited to, the Patents attached hereto as Exhibit 1.1(b).

(c)    <u>Purchase Orders</u>. Any existing customer purchase orders, requests for quotation or bid and any other customer solicitation that have not been completed before the Closing ("Purchase Orders").

(d)    <u>Customer List and Miscellaneous Records</u>. Any records, files, lists, or other tangible assets that pertain to Seller's Business, including records that pertain to any of the following: Seller's customers, suppliers, advertising, promotional material, sales, services, delivery, or operations, except those items required to be retained by law, inclusive of accounting records and returns ("Customer List and Miscellaneous Records").  Seller and Shareholder shall have access to such Records as is necessary to defend suit, prepare governmental

030047-000780

filings and other like matters upon reasonable notice, but shall not use such information for commercial exploitation.

(e)    <u>Remote Assets</u>. All assets located off-site of Seller's Location or in the possession of others but owned by or used in connection with the Business ("Remote Assets"). Seller shall deliver to Purchaser at the Closing the situs of the Remote Assets and the situs of the person or entity in possession or control of them.

(f)    <u>Contracts</u>. All contracts and service agreements ("Contracts"). Seller shall deliver these to Purchaser at the Closing.

(g)    <u>Sales Contracts and Service Records</u>. All contracts and service records relating to sales, services, or leasing relating to the Business ("Sales Contracts/Service Records"). Seller shall deliver these to Purchaser at the Closing.

(h)    <u>Goodwill</u>. The goodwill, telephone and fax numbers, yellow-page advertisements, and Seller's right to use the registered name Nu-Tech Plastics Engineering, Inc. and all related names and derivations ("Goodwill").

1.2    <u>Covenant Not to Compete</u>. Seller and Seller Shareholders shall not establish, engage in, or become interested in, directly or indirectly, as an owner, partner, agent, shareholder, employee, independent contractor, consultant, or otherwise, within a radius of 100 miles from the Location, any Plastic Injection Molding Business, trade, or occupation for a period of two years after the latter of the Closing Date or the termination of a shareholder's employment with Purchaser. At the Closing, Seller and Seller's Shareholder shall execute an agreement relating to this provision, which shall be in the form attached as Exhibit 1.2 ("Covenant" or "Non-Competition Agreement").

1.3    <u>Leases: Assignment</u>.

(a)    <u>Real Estate Lease; Leasehold Improvements</u>. Seller agrees to assign to Purchaser a Lease and Leasehold Improvements pertaining to the Locations, excepting those Leasehold Improvements owned by Landlord. The Leases are described in Exhibit A.

(b)    <u>Miscellaneous Leases</u>. Seller agrees to assign to Purchaser miscellaneous leases used in connection with the operation of the Business ("Personal Property Leases").

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4    4

030047-000781

1.4    Excluded Assets. Except as set forth in this provision, this Agreement contemplates the purchase and sale, inclusive of assignments, of the Purchased Assets. However, it specifically excludes Seller's:

(a)    cash, cash equivalents, and investments not relating to the operation of the Business;

(b)    books of account, trade, intercompany and other accounts receivable attributable to services rendered prior to the Effective Date, prepaid expenses, prepaid taxes, credit-plan reserves, lease deposits (except that deposits pertaining to any leases being assigned by Seller shall also be assigned), claims for refunds of federal and states income taxes and deferred tax credits;

(c)    Shareholder's miscellaneous items of personal property and possessions that are not and have not been a part of the operation of the Business; and

(d)    those assets not specifically or by inference included in the above paragraphs or the attached exhibits.

These items shall be known as the "Excluded Assets."

With respect to any Excluded Assets, unless otherwise agreed to in writing, Seller, at Seller's expense, shall remove the Excluded Assets from the Locations as soon as possible after the Closing Date but in no event later than ten (10) days after the Closing. If Seller fails to comply with these provisions, Purchaser, without any liability, may dispose of these items at Seller's expense or make such other arrangement as Purchaser may determine to be appropriate.

1.5    Liabilities Assumed and Excluded

(a)    Assumed Liabilities. Purchaser shall not assume any liability of Seller in connection with the purchase of the Assets unless specifically assumed in this Agreement and the Exhibits ("Assumed Liabilities").

(b)    Excluded Liabilities. Except for the Assumed Liabilities, Purchaser does not assume, nor shall Purchaser be obligated for, any other liabilities or responsibilities whatsoever of Seller or of the Business as conducted by Seller through the Closing Date, inclusive of obligations or liabilities resulting from Seller's total or partial withdrawal from any pension, profit-sharing, or retirement plan ("Excluded Liabilities").

X:\LJD\CLIENTS\STRATECHNUTECH\ASSETPUR.4                5

030047-000782

## ARTICLE II.  PURCHASE PRICE

2.1    Purchase Price; Allocation of Assets.  The purchase price for the Purchased Assets, including the Covenant, is $825,000 plus the Final Inventory Purchase Price calculated as of December 1, 1999 ("Purchase Price"). The Purchase Price is allocated in the manner set forth in Exhibit 2.1.

2.2    Tax purposes.  The Parties agree (a) to be bound by the allocation of assets in paragraph 2.1 for all federal, state, and local income tax purposes and (b) to file Internal Revenue Service Form 8594 (or other forms required by law) in accordance with the allocation of assets in paragraph 2.1.  A copy of the completed form 8594 is attached hereto as Exhibit 2.2.

## ARTICLE III.  TERMS OF PAYMENT

3.1    Deposit.  When the Parties executed the Memo, Purchaser deposited with Seller the sum of $825,000.00, which shall be applied toward the Purchase Price at closing.

3.2    Payment.  The Purchase Price shall be paid as follows:

(a)    Initial Payment.  $825,000.00 is acknowledged as paid to Seller in immediately available funds ("Initial Payment") as payment on the Purchase Price at the signing of the Memo; $525,000 of which was wire transferred to Michigan National Bank as payment in full to the Bank as a secured creditor and the balance of $300,000 was paid to Seller, directly.

## ARTICLE IV.  INVENTORY AND ACCOUNTS RECEIVABLE

4.1    Inventory.  In addition to the purchase and sale of the Purchased Assets, Seller agrees to sell, and Purchaser agrees to purchase, the Inventory of Seller specified on Exhibit 4.1 (the "Purchased Inventory").  The Parties further agree as follows:

(a)    Purchase and Sale of Inventory.  An inventory of all Purchased Inventory dated as of December 1, 1999 shall be attached to Exhibit 2.1, and Seller shall sell, transfer, and deliver to Purchaser all of the Purchased Inventory on the Closing Date.

(b)    Method of Taking Inventory.  The Seller shall conduct the inventory referred to in 4.1(a) and Buyer shall verify the same on or before Closing.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4

030047-000783

(c)    **Final Inventory Purchase Price; Payment Terms.** The Final Inventory Purchase Price was determined to be Three Hundred Ninety Thousand Seven Hundred Seventy-Four and 70/100's ($390,774.70) Dollars, which shall be paid pursuant to the terms of a Promissory Note which is attached hereto as Exhibit 4.1(c).

4.2    **Accounts Receivable.** All accounts receivable for transactions occurring before the Effective Date (December 1st) shall remain the property of Seller regardless of any payment to Purchaser. If Purchaser receives payment for any accounts receivable existing as of the Effective Date, Purchaser shall forward the payment directly to Seller.

## ARTICLE V.  ADJUSTMENTS.

At the Closing, the following shall be adjusted or apportioned and, to the extent practicable, all prorations shall be computed and paid at the Closing. To the extent this is not practicable, all prorations shall be computed and paid as soon as practicable after the Closing.

5.1    **Taxes on Purchased Assets.** Purchaser shall pay all taxes and assessments, extraordinary as well as ordinary, that may be levied on any Purchased Assets where those taxes become due after the Closing Date and arise from Purchaser's actions after the Closing; provided, however, that Seller shall pay for all taxes on Purchased Assets where those taxes arise from Seller's ownership or operation of the Business on or before the Closing and that are due on, before, or after the Closing Date. Current personal property taxes shall be prorated and adjusted between the Parties as of the Closing Date on a due-date basis, except taxes that are paid in advance.

5.2    **Miscellaneous Business Taxes.** Seller shall pay in full all social security, sales, use, withholding, and single-business taxes for all years up to and including the last completed tax year and for all quarters for the current tax year immediately preceding the Closing Date, regardless of when payment of such amounts is due.

5.3    **Miscellaneous.** Adjustments shall be made for payroll, any other prepaid items, and any other unspecified unpaid taxes.

5.4    **Transfer Fees; Sales Taxes.** Purchaser shall pay all transfer fees and applicable sales taxes (excluding Seller's income and other, similar taxes) that arise under or on account of the purchase and sale of the Purchased Assets.

5.5    **Timing of Adjustment.** Except as otherwise provided in this Agreement, the net amount of any of the adjustments set forth in Section 5 of this Agreement shall be, to the extent practicable, either an increase or a decrease in the payments to be made at the Closing.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4

7

030047-000784

## ARTICLE VI.

### (Reserved)

## ARTICLE VII. SELLER'S REPRESENTATIONS,
## COVENANTS, AND WARRANTIES

Seller and Shareholders (with respect to the latter only Sections 7.1, 7.2 and 7.5), represent, covenant, and warrant the following to be true:

7.1     Seller's Status. Seller is a corporation organized, validly existing, and in good standing under the laws of the State of Michigan. Seller is properly authorized, according to its Articles, By-laws, and adopted Resolution, to enter into and carry out the transactions contemplated by this Agreement. Seller has not in the last five (5) years used or assumed any other name in connection with the conduct of the Business. A certified copy of Seller's Articles of Incorporation and any amendments, a Certificate of Good Standing, and a copy of Seller's Bylaws and Resolution shall be furnished at Closing.

7.2     Authority. After their execution, this Agreement and all instruments necessary to carry out the transactions contemplated by this Agreement ("Related Documents") will be legal, valid, and binding obligations of each signatory party to all such instruments acting on behalf of Seller.

7.3     Financial Statements. The financial statements concerning Seller's Business as of the fiscal year preceding the Effective Date, together with any subsequently prepared financial statements supplied by Seller to Purchaser, (a) fairly present Seller's financial position as of the respective dates indicated and the results of operations, retained earnings, and changes in Seller's financial position for the periods indicated and (b) have been prepared in accordance with generally accepted accounting principles as modified by Seller's standard accounting practices.

7.4     Absence of Undisclosed Liabilities. Notwithstanding anything contained in this Agreement to the contrary, except to the extent reserved or reflected in Seller's financial statements and disclosed to Purchaser, as of such dates Seller had no known liabilities or obligations. Seller represents that it does not know or have reasonable grounds to know of any basis for the assertion against Seller, as of such dates and as of the Closing Date, of any liability of any nature or in any amount not fully reflected or reserved against in the financial statements.

7.5     Title to Properties. Seller has good and marketable title to all of the Purchased Assets, including those reflected in Seller's financial statements, subject to no mortgage, pledge, lien, encumbrance, security interest, or charge, except for the following:

030047-000785

recorded liens which shall be removed and released at or before Closing. Further, except as set forth in this paragraph, there are no imperfections of title that would affect the marketability of title of the Purchased Assets. John Cooper, hereby, individually and unconditionally guarantees this representation and agrees to indemnify and hold Purchaser harmless from any and all damages arising out of a breach of this representation.

7.6    Seller's Name. Seller agrees that from and after the Closing Date, Purchaser shall have the right to use in or in connection with the conduct of any business (whether carried on by Purchaser directly or through any affiliate) (a) the name of the Business ("Name") and/or (b) any part or portion of the Name, either alone or in combination with one or more other words. Seller warrants to Purchaser that it has taken all necessary action to protect the Name in the State of Michigan and agrees to take or cause to be taken any and all steps or actions that shall be or become permissible, proper, or convenient to enable or permit Purchaser to use the Name, or any portion of the Name, either alone or in combination with one or more other words, except as presently restricted. It is contemplated that on or as soon as practicable after the Closing Date, Seller will terminate Seller's interest in the Name. After the Closing Date, Seller agrees that it will not use, either directly or indirectly; the Name, either alone or in combination with one or more other words, in or in connection with any business, activities, or operations that Seller directly or indirectly may carry on or conduct.

7.7    Status of Contracts. Seller has complied with all the provisions of contracts described in this Agreement and of all other contracts and commitments to which Seller is a party. Further, other than those contracts or agreements specifically described in this Agreement, Seller has no contract or commitment extending beyond the Closing Date.

7.8    Insurance. All Seller's assets are and will be adequately insured against fire and casualty up to the Closing Date.

7.9    Taxes; MESC Liabilities; Tax Returns and Audits

(a)    Taxes. Through the Closing Date, Seller will fully pay when due all personal property and other taxes of any nature assessed against Seller and/or the Purchased Assets. Without limiting the generality of the foregoing, Seller will have paid or provided for all federal, state, county, and local taxes (including, without limitation, income, corporate franchise, single-business, stamp, transfer, sales and use, employee withholding, and ad valorem taxes) due and payable by Seller on or before the Closing Date, including any unemployment tax liability and any deficit balance in Seller's Michigan Employment Security Commission ("MESC") account.

030047-000786

(b)   Tax Returns; Audits. Seller has, and as of the Closing Date will have, filed all taxes and reports Seller is required to file pursuant to the operation of the Business with all such taxing authorities, including MESC. Seller does not have any outstanding or unsatisfied deficiency assessments with respect to any taxes, and there are no current audits or investigations by or disputes with any authority with respect to any taxes.

(c)   No dispute. Seller is not involved in any dispute with any tax authority about the amount of taxes due, nor has it received any notice of any deficiency, audit, or other indication of deficiency from any tax authority that has not been disclosed to the Parties to this Agreement.

7.10   Licenses and Permits. Seller presently possesses, and will continue to possess at the Closing Date, all governmental licenses, permits, certificates of inspection, other authorizations, filings, and registrations that are necessary for Seller to own and operate the Business as presently conducted.

7.11   Litigation or Insolvency Proceedings

(a)   Litigation. There are no actions, suits, claims, investigations, or legal, administrative, or arbitration proceedings pending or, to the best of Seller's or Shareholder's knowledge, threatened or likely to be asserted against Seller and relating to the Purchased Assets, this Agreement, or the related transactions, before any court, governmental agency or other body, including any quasi-judicial or administrative forum. No judgment, order, writ, injunction, decree, or other similar command of any court or governmental agency or body has been entered against or served on Seller or on any individual Shareholder, except:  The following two Judgments; Bench Tech for 5,000; and American Commodities for 50,000, the payment for which Seller has made appropriate reserves.

(b)   Insolvency Proceedings. Seller is not involved in any proceeding (i) by or against it in any court under the Bankruptcy Code or any state or federal insolvency or debtor's relief act or (ii) for the appointment of a trustee, receiver, liquidator, assignee, or other similar official for Seller or Seller's property.

7.12   Labor Relations -- Employees:

(a)   Collective Bargaining Agreements. There are no collective bargaining agreements currently in effect between Seller and labor unions or organizations representing any of Seller's employees. There does not

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4              10

now exist, and neither any union nor the National Labor Relations Board has made a formal or informal request to Seller to institute, collective bargaining or an employee election.

(b)    <u>Termination of Employees</u>. As of the Closing Date, Seller will terminate all employees and will pay to all employees all wages, salaries, commissions, bonuses, benefit-plan contributions, and other compensation owing. Purchaser may, in its discretion, reemploy some or all of the employees on the day after the Closing Date. After this Agreement is executed, Seller and Purchaser shall jointly announce the Agreement to Seller's employees and shall cooperate so that Seller's notices of termination and any offers of employment by Purchaser are delivered simultaneously so that appropriate management representatives can explain the termination and any offers of employment to the employees.

(c)    <u>Employment Regulations Compliance</u>. With respect to employment matters, Seller acknowledges that:

(i)     Seller is in compliance with all applicable federal, state, and local laws and regulations regarding employment and employment practices, terms and conditions of employment, and wages and hours.

(ii)    There are no unfair labor practice complaints against Seller pending before the National Labor Relations Board, and no such complaints have been threatened.

(iii)   There is no strike or labor dispute, slowdown, or stoppage actually in progress or threatened against Seller.

(iv)    No grievance or arbitration proceedings are pending and no such claims have been asserted.

(v)     Purchaser shall not incur any liability or obligation of any kind arising out of Seller's employment of or termination of Seller's employees nor for any other claim by any of Seller's employees arising out of any employment relationship with Seller.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4                11

(d)   <u>Exclusion of Employee Benefits</u>. Seller acknowledges that:

(i)   Purchaser does not assume any of Seller's employee benefits, unless such employee benefits are specifically assumed as Assumed Liabilities.

(ii)   Purchaser shall have no obligation to provide employee benefits other than any benefits Purchaser, in its sole discretion, agrees to provide to its employees.

7.13   <u>Environmental Matters</u>. To the best of Seller's knowledge, there is no Hazardous Material in, on, or under the Location where the Business is conducted. In addition, there are no presently pending or threatened administrative or enforcement actions, investigations, compliance orders, claims, demands, actions, or litigation based on environmental laws or regulations or otherwise related to the presence of Hazardous Material in, on, or under the premises on which the Business is conducted. Seller makes no other environmental representations or warranties. For purposes of this paragraph, the term "Hazardous Material" means any toxic or hazardous waste or substance (including, without limitation, asbestos and petroleum products) that is regulated by applicable local, state, or federal environmental laws or regulations.

7.14   <u>Conduct of Business</u>. From the date of the most recent financial statements Seller has delivered to Purchaser to the Effective Date, Seller's Business has been (and until the Closing Date shall be) open and conducted by Seller in a normal and regular manner. Furthermore, Seller has not:

(a)   amended its Articles of Incorporation or Bylaws;

(b)   issued or declared any dividend or other distribution or payment with respect to Seller's corporate shares;

(c)   entered into any contract or commitment extending beyond the Closing, except normal commitments made in the ordinary course of business;

(d)   modified the compensation or benefits payable to or to become payable by Seller to any officer, employee, or agent;

(e)   encumbered any Purchased Assets;

(f)   experienced any adverse change or any material damage, destruction, or loss affecting its Purchased Assets or the Business; or

030047-000789

7.15   <u>Condition of Purchased Assets</u>. The following representations are made with respect to the Purchased Assets:

      (a)   The Purchased Assets are presently operating and have been regularly maintained and will be in the same working condition as they are now on the Closing Date.

      (b)   There are no known outstanding citations issued under the Occupational Safety and Health Act ("OSHA") or under the Americans with Disabilities Act ("ADA") by any health, building, or other governmental agency having jurisdiction over the operation of the Purchased Assets or the Business.

7.16   <u>No Violation or Breach</u>. To the best of Seller's knowledge, the performance of this Agreement will not be in violation of any laws, statutes, local ordinances, state or federal regulations, court or administrative orders or rulings, nor is the performance of this Agreement in violation of any loan document's conditions or restrictions in effect for secured or unsecured financing.

7.17   <u>ERISA Plans</u>. Seller has no employee benefit plans that are subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

7.18   <u>Full Disclosure</u>. Neither this Agreement nor any other information furnished to Purchaser in connection with the transactions contemplated by this Agreement contain any untrue statement of a material fact or fail to state a material fact necessary to make these statements not misleading in the light of the circumstances under which they were made.

7.19   <u>Competitors</u>. Neither Seller nor any individual Shareholder has any direct or indirect interest in any person or entity engaged or involved in any business that is competitive with the Business

7.20   <u>Directors, Officers, and Shareholder</u>. The names of Seller's officers, directors, resident agent, and Shareholder are set forth in Exhibit 7.20.

7.21   <u>Patents</u>.  All patents being transferred are valid, enforceable and defendable against any claim of infringement.

7.22   <u>Broker's or Finder's Fees</u>. No agent, broker, investment banker, person, or firm acting on behalf of Seller is or will be entitled to any broker's or finder's fees or any other commission or similar fee from either of the Parties, directly or indirectly, in connection with the sale of the assets contemplated in this Agreement, except: NONE.

030047-000790

7.23   Reliance. Seller makes these representations and warranties with the knowledge and expectation that Purchaser is placing complete reliance on them.

## ARTICLE VIII.  PURCHASER'S REPRESENTATIONS AND WARRANTIES.

Purchaser represents, covenants, and warrants the following to be true:

8.1   Purchaser's Status. Purchaser is a Michigan limited liability company organized, validly existing, and in good standing under the laws of the State of Michigan. Purchaser is properly authorized, according to its Operating Agreement, and adopted Resolution, to enter into and carry out the transactions contemplated by this Agreement. On Seller's request, Purchaser shall provide certification of these matters.

8.2   Authority. After their execution, this Agreement and all instruments necessary to carry out the transactions contemplated by this Agreement ("Related Documents") will be legal, valid, and binding obligations of each signatory party to all such instruments acting on behalf of Purchaser.

8.3   Litigation. There are no actions, suits, or proceedings pending or, to Purchaser's knowledge, threatened or likely to be asserted against Purchaser, before any court, administrative agency, or other body. No judgment, order, writ, injunction, decree, or other similar command of any court or governmental agency concerning this Agreement or the related transactions has been entered against or served on Purchaser.

8.4   Broker's or Finder's Fees. No agent, broker, investment banker, person, or firm acting on behalf of Purchaser is or will be entitled to any broker's or finder's fees or any other commission or similar fee from either of the Parties, directly or indirectly, in connection with the sale of the assets contemplated in this Agreement, except: NONE.

8.5   Reliance. Purchaser makes the foregoing representations and warranties with the knowledge and expectation that Seller is placing complete reliance on them.

8.6   Lease/Purchase of ABX Machines. Purchaser agrees to Lease the ABX Machines according to the terms of the ABX Machine Lease which is being entered into contemporaneous herewith. Furthermore, Purchaser shall have the right (and the obligation in the event Lessor establishes that Lessor has the right and ability to transfer absolute title to all but not less than all of the ABX Machines free from all encumbrances) to purchase the ABX Machines for the total inclusive amount of Two Million Eight Hundred Thousand ($2,800,000.00) Dollars, which sum shall be due and payable in immediately available funds no later than June 30, 2000. Upon and in exchange for such payment, Lessor shall deliver to Purchaser a Warranty Bill of Sale conveying good and marketable title to the ABX Machines to Purchaser.

X:\JJD\CLIENTS\STRATECHN\UTECHASSETPUR.4                14

030047-000791

# ARTICLE IX.  PRE-CLOSING ACTIONS
## AND MISCELLANEOUS COVENANTS.

From the Effective Date until the Closing:

9.1   Purchaser's Access. Seller shall permit Purchaser and Purchaser's representatives to make a full business, financial, accounting, and legal review of Seller's Business, tax returns, and the Purchased Assets to the extent Purchaser deems necessary. Seller shall take all reasonable steps necessary to cooperate with Purchaser in undertaking the review. Except as set forth in this Agreement or as agreed to by the Parties, no such investigation by Purchaser or Purchaser's representatives shall affect the representations and warranties of Seller or Purchaser's reliance on them.

9.2   Purchaser's Due Diligence Review

(a)   Review Period. Purchaser shall have until the Closing Date (the "Review Period") to conduct the inspection and review specified in paragraph 9.1.

(b)   Ongoing Duty to Provide Information. Seller's duty to provide information to Purchaser shall continue through the Closing, even if the Review Period has ended.

9.3   Accuracy of Representations and Warranties and Satisfaction of Conditions. Seller will immediately advise Purchaser in writing if (a) any of Seller's representations or warranties are untrue or incorrect in any material respect or (b) Seller becomes aware of the occurrence of any event or any state of facts that would result in any of the representations and warranties of Seller being untrue or incorrect if Seller were then making them. Seller will not take any action, or omit to take any action, that would result in any of Seller's representations and warranties set forth in this Agreement being untrue or incorrect as of the Closing Date. Seller will use Seller's best efforts to cause all conditions within Seller's control that are set forth in this Agreement to be satisfied as promptly as practicable under the circumstances.

# ARTICLE X. CONDITIONS PRECEDENT TO
## PURCHASER'S OBLIGATIONS AT CLOSING.

Purchaser's obligation to perform this Agreement at the Closing is subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived in writing by Purchaser:

10.1   Accuracy of Representations and Warranties. Seller's representations and warranties contained in this Agreement and the information in all related documents, including, but not limited to, any exhibits to this Agreement provided or executed or any

X:\JJD\CLIENTS\STRATECH\NUTECH.ASSETPUR.4      15

document made pursuant to this Agreement ("Related Documents"), shall be true and correct at the Closing Date as though such representations and warranties were being made on that date. Further, on Purchaser's request, Seller shall deliver to Purchaser a certificate certifying that, as of the Closing Date, all of Seller's Representations and Warranties contained in this Agreement are true and correct.

10.2    Performance of Covenants. Unless otherwise agreed or waived, by the Closing Date Seller shall have in all respects performed and complied with all covenants, agreements, and conditions that this Agreement and all Related Documents require to be performed or complied with. Seller and Shareholder shall properly execute and deliver the Covenant.

10.3    Lien Search. Purchaser shall have received UCC searches in form and content satisfactory to Purchaser.

10.4    Closing Documents, Instruments of Transfer, Etc. At the Closing, Purchaser shall have received the following:

   (a)    A bill of sale in a form sufficient to warrant and effectively transfer the Purchased Assets to Purchaser with good title, free and clear of all encumbrances.

   (b)    Acknowledgment of Seller's ownership of Remote Assets by each party in possession of such assets, free of any claims, setoffs, or charges, and acknowledgment of the transfer of the Remote Assets to Purchaser.

   (c)    Resolutions of Seller's Shareholder and Board of Directors approving and authorizing this Agreement and the transactions contemplated hereby, and identifying the officer or officers authorized to execute all documents.

   (d)    Evidence that all of Seller's non-Shareholder employees have been terminated.

10.5    State of Michigan Certificate regarding Tax Returns. Seller shall have applied for a certificate from the Revenue Commissioner of the State of Michigan showing that Seller has filed all tax returns and reports required to be filed before Closing and that it has paid all taxes due pursuant to Section 27a of Act No. 58 of the Michigan Public Acts of 1986, MCLA 205.27a, MSA 7.657(27a).

10.6    Key Management Employee. Purchaser, at Purchaser's option, shall have entered into any employment agreement with non-Shareholder key employees on terms and conditions that are reasonably satisfactory to Purchaser.

X:\JJD\CLIENTS\STRATECHNUTECH\ASSETPUR.4            16

030047-000793

10.7   Due Diligence Satisfaction. Purchaser shall be satisfied, in Purchaser's sole discretion, with the results of Purchaser's due diligence review, including the inspection and valuation of the Purchased Assets.

10.8   MESC Form 1027. Purchaser shall have received MESC Form 1027 from Seller in the time and manner required by law. Purchaser shall have two days following Purchaser's receipt of MESC Form 1027 to agree to be bound by terms of this Agreement, regardless of any other rights of review granted to Purchaser under this Agreement.

10.9   No Litigation. No action, suit, or other proceeding seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, seeking to obtain damages with respect to the consummation, or involving a claim that consummation of this Agreement violates any law, decree, or regulation shall be threatened or pending before any court, governmental authority, or other lawful body. No other material adverse actions or proceedings shall have been instituted or threatened against Seller or the Business.

10.10   Fire or Other Casualty; Risk of Loss

(a)   Seller's Assumption of Risk. Up until the time of the Closing and except as set forth in this Agreement, Seller assumes all risks of destruction, loss, or damage due to any casualty, including any liability arising out of ownership of the subject matter of this Agreement.

(b)   Insurance. In the event of a casualty to or malfunction of any of the Purchased Assets prior to Closing, Seller's insurance shall be applied toward repair or replacement of the property, and any liability of Purchaser shall be limited to damages in excess of any insurance proceeds received by Seller or Purchaser and applied toward the repair or replacement of the property. Seller shall expeditiously file a claim with its insurance carrier on notice of any casualty or malfunction that is covered by insurance.

(c)   Damage to Seller's Property. If the subject matter of this Agreement is materially damaged at any time before the Closing and the damage cannot reasonably be repaired on payment of the sums available by insurance settlement or from any sums to be paid by Purchaser to Seller at the Closing, Purchaser, at Purchaser's option, shall have the right to terminate this Agreement. On giving notice of such an election, Purchaser shall receive a refund of any deposit in full

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4          17

termination of its rights under this Agreement. This paragraph shall not apply if the damage is caused by Purchaser's negligence.

10.11 <u>Possession</u>. Purchaser shall have received operating control and possession of all of the Purchased Assets.

## ARTICLE XI.  CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS AT CLOSING.

Seller's obligations to perform this Agreement at the Closing are subject to satisfaction at or before the Closing of the following conditions, unless Seller waives those conditions in writing.

11.1 <u>Representations and Warranties</u>. Purchaser's representations and warranties set forth in this Agreement shall be true and correct in all material respects as though made on and as of the Closing Date.

11.2 <u>Purchaser's Performance Obligations</u>. Purchaser shall have performed all obligations under this Agreement before Closing.

11.3 <u>Closing Documentation</u>. Seller shall have received the following payment and documents:

(a)    the required Initial Payment;

(b)    all other instruments and documents that this Agreement reasonably requires Purchaser to deliver to Seller, and such other instruments and documents as Seller shall reasonably request that are not inconsistent with the provisions of this Agreement.

(c)    the Promissory Note covering the Inventory Purchase Price;

(d)    the ABX Machine Lease; and

(e)    the real estate Leases for the Locations.

11.4 <u>Tax Identification</u>. At the Closing, each party shall provide evidence of its tax identification number and complete Internal Revenue Service Form W-9.

## ARTICLE XII.  CONFIDENTIALITY.

Purchaser acknowledges that, pursuant to its right to inspect Seller's books, records, and other documents and material, Purchaser may become privy to confidential information of Seller and that communication of such confidential information to third

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4         18

030047-000795

JAN 18 2000 16:23 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074    P.20/23
'01/14/00  14:31 FAX                                                        ⌀020/023

parties (whether or not Seller authorizes such communication) could injure Seller's business if this transaction is not completed. Purchaser agrees to take reasonable steps to ensure that confidential information it obtains about Seller shall remain confidential and shall not be disclosed or revealed to outside sources. Purchaser further agrees not to solicit any of Seller's customers disclosed in such confidential information. As used in this Agreement, *confidential information* includes information ordinarily known only to Seller's personnel and information such as customer lists, supplier lists, trade secrets, channels of distribution, pricing policies and records, inventory records, and other information normally understood to be confidential or designated as such by Seller.

### ARTICLE XIII.  NOTICES.

All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been given if delivered or mailed first-class, postage-paid, to Seller, if the communication is to Seller, at Seller's address given in this Agreement or, if the communication is to Purchaser, to Purchaser at Purchaser's address given in this Agreement, or to any other address that Purchaser or Seller designates in writing.

### ARTICLE XIV.  INDEMNIFICATION.

14.1    Indemnification by Seller and Shareholder. Seller (and to the extent specifically stated herein in Sections 7.1, 7.2 and 7.5, Shareholder, individually) shall defend, indemnify, and hold harmless Purchaser and its agents, employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses, penalties, and damages (including reasonable legal fees) in connection with or resulting from:

    (a)    all of Seller's debts, liabilities, and obligations, whether accrued, absolute, contingent, known, unknown, or otherwise;

    (b)    any inaccuracy in any of Seller's representations, or Seller's breach of any warranty, contained in this Agreement or the Non-Competition Agreement; and

    (c)    Seller's failure to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition Seller is to perform or observe under this Agreement or the Non-Competition Agreement.

14.2    Indemnification by Purchaser. Purchaser shall defend, indemnify, and hold harmless Seller and its agents, employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses,

030047-000796

JAN 18 2000 16:23 FR DELPHI E. PROFESSIONS 257 8016 TO 812488132074 P.21/23
01/14/00 14:31 FAX 021/023

penalties, and damages (including reasonable legal fees) in connection with or resulting from:

    (a)    all of Purchaser's debts, liabilities, and obligations, whether accrued, absolute, contingent, known, unknown, or otherwise;

    (b)    any inaccuracy in any of Purchaser's representations, or Purchaser's breach of any warranty, contained in this Agreement; and

    (c)    Purchaser's failure to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition Purchaser is to perform or observe under this Agreement.

### ARTICLE XV. REMEDIES ON BREACH

Purchaser shall be entitled to specifically enforce any and all provisions of this Agreement or the Memo.

### ARTICLE XVI. CLOSING

16.1 _Effective Date of the Closing_. The effective date of the Closing shall be the date of the Closing ("Closing Date"); however, the Parties may complete the execution of documents on any date no later than the Closing Date.

16.2 _Closing Location_. The Closing shall be held on the Closing Date at the offices of Purchasers Counsel; Cox, Hodgman & Giarmarco, P.C., 201 West Big Beaver Road, Fifth Floor, Troy MI 48084 at 10:00 AM or at any other location that the Parties agree.

### ARTICLE XVII. MISCELLANEOUS

17.1 _Amendment_. This Agreement shall not be amended, altered, or terminated except by a writing executed by each party.

17.2 _Choice of Law_. This Agreement shall be governed in all respects by the laws of the State of Michigan.

17.3 _Headings_. The paragraph headings used in this Agreement are included solely for convenience.

17.4 _Entire agreement_. This Agreement sets forth the entire understanding of the Parties and, except for the Memo, which this Agreement supplements and completes, this Agreement supersedes and replaces any oral or written agreement(s) relating to this subject matter that the Parties entered into before the date of this Agreement.

X:\JJD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4      20

030047-000797

JAN 18 2000 16:24 FR DELPHI E. POUCHING 810 257 8016 TO 812488132074   P.22/23

01/14/00   11:58   ☎810 257 2299        FAB ENG        ⌧002

JAN. -14' 00 (FRI) 11:24   SHEPPERLY, SILVERMAN        TEL:248 539 1355        P. 003

01/14/00   FRI 11:07 FAX 248 529 2773        COX HODGSAN        ⌧002

JAN-14-2000 07:24 FROM:

01/13/00   18:50 FAX 248 528 2773        COX HODGSAN GIA        TO:248 528 2773        P.002-004

17.5   Waiver. The waiver by any party of any breach or breaches of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of any provision of this Agreement.

17.6   Binding effect. This Agreement, inclusive of its terms and provisions, shall survive the Closing and shall be binding on, inure to the benefit of, and be enforceable by the respective heirs, legal representatives, successors, and assigns of the Parties.

17.7   Construction of Agreement. Each Party and its legal counsel have reviewed and revised this Agreement, and each party and its legal counsel have had equal opportunity for input into this Agreement. Neither Party nor their respective legal counsel shall be construed to be the drafter or primary drafter of this Agreement. If there are any disputes regarding the construction of this Agreement or any of its provisions, ambiguities or questions of interpretation shall not be construed more in favor of one Party than the other; rather, questions of interpretation shall be construed equally as to each Party.

17.8   Counterparts. This Agreement may be signed in counterparts by the parties and such signatures shall be binding upon each party as if signed in person and simultaneously. In addition, facsimile signatures shall be treated as originals.

Purchaser and Seller have executed this Agreement on the dates set forth below, to be effective as of the Effective Date.

SELLER:

NU-TECH PLASTICS ENGINEERING, INC.

Dated: _1 : 14 : 00_        By: _____

Its: _Pres. + CEO_

PURCHASER:

RAPID PRODUCT TECHNOLOGIES, L.L.C.

Dated: _____        By: _Manu Bhatia_ 1/13/00
                                     Manu Bhatia, CEO

Dated: _____        And
                               By: _____
                                     Miguel Linares, President
                                     01/13/00

X:\JD\CLIENTS\STRATECH\NUTECH\ASSETPUR.4        21

JAN 18 2000 16:24 FR DELPHI E. PURCHASING 810 257 8016 TO 812488132074       P.23/23
01/14/00   11:58   ☎810 257 2299         FAB ENG                              ☒003

JAN. -14' 00(FRI) 11:25   SHEPFERLY, SILVERMAN           TEL:248 539 1355        P. 004
   01 14/00   FRI 11:07 FAX 248 528 2773      COX HODGMAN                        ☒003
JAN-14-2000 07:24 FROM:-
   01/13/00   16:55 FAX 248 528 2773        ───────           TO:248 528 2773   P.003/004

## WARRANTY BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, NU-TECH PLASTICS ENGINEERING, INC., a Michigan Corporation ("Seller"), hereby sells to RAPID PRODUCT TECHNOLOGIES, L.L.C., a Limited Liability Company ("Purchaser"), all right, title and interest in and to all Purchased Assets, as more particularly defined in the Memorandum and Agreement and the Asset Purchase Agreement by and between Seller and Purchaser (collectively, the "Agreement"), dated as of December 1, 1999.

With the exception of the 4-1500 Ton HPM Injection Molding Machines, the title to which may be encumbered by General Motors. Seller warrants and agrees that the Purchased Assets are delivered to the Purchaser free of all lawful claims and encumbrances of any nature whatsoever. This Bill of Sale shall be binding upon the Seller, the Shareholders and its successors and assigns.

This Bill of Sale shall be effective as of this 1st day of December, 1999.

NU-TECH PLASTICS ENGINEERING, INC.

By: _____

Its: _____


ACKNOWLEDGED AND ACCEPTED:

RAPID PRODUCT TECHNOLOGIES,
L.L.C.

By: _____ 01/13/00
    Manu Bhatia, CEO

And
By: _____ 01/13/00
    Miguel Linares, President


X:\JJO\CLIENTS\STRATECH\NUTECH\BILLSALE.2

# EXHIBIT I

## ACKNOWLEDGMENT AND ASSIGNMENT AGREEMENT

THIS ACKNOWLEDGMENT AND ASSIGNMENT AGREEMENT is made this 08 day of March, 2005, by and between Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") and Rapid Product Technologies, LLC ("RPT"). Terms not otherwise defined herein shall have the meanings given them in that certain Memorandum and Agreement Regarding Purchase and Sale of Assets dated December 1, 1999 ("Asset Purchase Agreement") by and among Nu-Tech and RPT ("the Parties").

**Preliminary Statement**

A.    An apparent question has arisen as to whether Nu-Tech transferred to RPT any cause of action Nu-Tech had against General Motors and/or Delphi Corporation pursuant to the Asset Purchase Agreement.

B.    The Parties wish to clarify that there was never any intention that such a cause of action was being transferred as part of that transaction and, if anyone were to determine that such transfer did occur, RPT wishes to transfer it back to Nu-Tech.

C.    In the event such a determination is made, RPT agrees to assign all of its rights, title and interest in said cause of action back to Nu-Tech and Nu-Tech agrees to assume all of RPT's rights and obligations to said cause of action.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in consideration of good and valuable consideration the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1.    **Acknowledgement.** The parties acknowledge and agree that it was never their intent that Nu-Tech was transferring any cause of action it possessed against General Motors and/or Delphi Corporation as part of the Asset Purchase Agreement.

2.    **Assignment.** In the event it is ever determined by anyone that Nu-Tech in fact did transfer any cause of action it possessed against General Motors and/or Delphi Corporation to RPT as part of the Asset Purchase Agreement, RPT hereby assigns all of its rights, title and interest in and to said cause of action back to Nu-Tech.

3.    **Further Assurances.** Each party shall, from time to time at the request of the other party, and without any further consideration, execute and deliver such further instruments and take such further action as may be necessary to more effectively evidence the acknowledgment and assignment pursuant to this Agreement.

4.    **Indemnification.** Nu-Tech shall indemnify and defend RPT in the event any creditor of RPT makes a claim against RPT to recover the amount Nu-Tech receives from the cause of action being assigned herein.

1

5.     **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without giving effect to any conflicts of laws rules.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Acknowledgement and Assignment Agreement.

NU-TECH PLASTICS ENGINEERING, INC.

By: _____

JOHN COOPER

Its:

RAPID PRODUCT TECHNOLOGIES, LLC

By: _____

Its: _____PRESIDENT_____

# EXHIBIT J



# FORM 8-K

## GENERAL MOTORS CORP - GM

**Filed: May 28, 1999 (period: May 28, 1999)**

Report of unscheduled material events or corporate changes.

**ITEM 5.** OTHER EVENTS

SIGNATURE

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549-1004


FORM 8-K
CURRENT REPORT PURSUANT TO SECTION 13 OF
THE SECURITIES EXCHANGE ACT OF 1934


Date of Report
(Date of earliest event reported) May 28, 1999
                                  ------------


GENERAL MOTORS CORPORATION
--------------------------------------------------------
(Exact name of registrant as specified in its charter)


| STATE OF DELAWARE | 1-143 | 38-0572515 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |


| 100 Renaissance Center, Detroit, Michigan | 48265-1000 |
| 3044 West Grand Boulevard, Detroit, Michigan | 48202-3091 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |


Registrant's telephone number, including area code    (313)-556-5000
                                                      --------------


- 1 -

Source: GENERAL MOTORS CORP, 8-K, May 28, 1999

ITEM 5. OTHER EVENTS

On May 28, 1999, General Motors Corporation (GM) issued the following news release announcing the complete separation of Delphi Automotive Systems from GM. These actions have now been completed. The news release was as follows:

GENERAL MOTORS TO COMPLETE SEPARATION OF DELPHI AUTOMOTIVE SYSTEMS

DETROIT - General Motors Corporation (NYSE: GM) announced that it will complete the separation from GM of Delphi Automotive Systems Corporation (NYSE: DPH) today. This morning GM distributed 0.69893 of a share of Delphi common stock as a dividend on each share of GM $1-2/3 common stock outstanding on May 25, 1999, which was the record date for the distribution.

As a result of this spin-off of 452,565,000 shares of Delphi common stock and GM's contribution of its remaining 12,435,000 shares of Delphi common stock to a Voluntary Employee Beneficiary Association (VEBA) trust to fund benefits for GM retired hourly employees, GM will no longer own any shares of Delphi.

"This transaction creates value for GM shareholders while allowing for an even more competitive Delphi," said GM Chairman and Chief Executive Officer John F. Smith, Jr. "We wish Delphi and its employees great success as they begin their journey as a fully independent company."

In August 1998, GM announced that its board of directors had determined that it would be in the best interest of GM and its stockholders to separate Delphi from GM. As a first step in this separation, Delphi completed an initial public offering of approximately 17.7 percent of its common stock in February 1999. GM's distribution and contribution to the VEBA trust today of the remaining 82.3 percent of Delphi common stock are the final steps in completing the separation.

Based on Thursday's closing market price of Delphi stock on the New York Stock Exchange of $20-1/2, the indicated value of the spin-off dividend to GM stockholders is approximately $9.3 billion in the aggregate, or approximately $14.33 per share of GM $1-2/3 common stock. GM $1-2/3 common stockholders will receive cash instead of any fractional shares of Delphi stock that would otherwise be delivered to them in the spin-off. As previously announced, GM has received a private-letter ruling from the Internal Revenue Service to the effect that the distribution of the Delphi common stock will be tax-free to GM and its stockholders for U.S. federal income-tax purposes.

An information statement relating to the spin-off has been mailed to holders of GM $1-2/3 common stock. This Information Statement also is available on GM's website: http://www.gm.com. Stockholders who have questions about the Delphi spin-off may also call GM's Information Agent, Morrow & Co., at (800) 566-9058.

* * * * * *

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GENERAL MOTORS CORPORATION
----------------------------
(Registrant)

Date    May 28, 1999
        ------------

By
s/Peter R. Bible
----------------------------
(Peter R. Bible,
Chief Accounting Officer)

- 3 -

</TEXT>
</DOCUMENT>

---

Created by 10KWizard    www.10KWizard.com

# EXHIBIT K



# FORM 10-K405

## DELPHI CORP - DPHIQ

**Filed: February 09, 2000 (period: December 31, 1999)**

Annual report. The Regulation S-K Item 405 box on the cover page is checked

## PART I

DELPHI AUTOMOTIVE SYSTEMS CORPORATION
**ITEM 1.**    BUSINESS

## PART I

**ITEM 1.**    BUSINESS
**ITEM 2.**    PROPERTIES
**ITEM 3.**    LEGAL PROCEEDINGS
**ITEM 4.**    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.**    MARKET FOR REGISTRANT S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS
**ITEM 6.**    SELECTED FINANCIAL DATA
**ITEM 7.**    MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
**ITEM 7A.**   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS
**ITEM 8.**    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
**ITEM 9.**    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

## PART IV

**ITEM 14.**   EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K
SIGNATURES
EXHIBIT INDEX
EX-10.(N) (corporation (the "Borrower"), the several banfrom time to time parties to this Agreement (NATIONAL ASSOCIATION, CITIBANK, N.A., DEUTSCH)
EX-10.(P) (of January 4, 1999 (as amended, supplemented time, the "Credit Agreement"), among DELPHI ADelaware corporation (the "Borrower"), the se)
EX-10.(Q) (AGREEMENT)

EX-12 (Statement regarding computation of ratios)

EX-21 (Subsidiaries of the registrant)

EX-23 (Consents of experts and counsel)

EX-27

## TABLE OF CONTENTS

DELPHI AUTOMOTIVE SYSTEMS CORPORATION
PART I DELPHI AUTOMOTIVE SYSTEMS CORPORATION
ITEM 1. BUSINESS
ITEM 2. PROPERTIES
SUPPLEMENTARY ITEM. EXECUTIVE OFFICERS OF THE REGISTRANT
PART II
ITEM 6. SELECTED FINANCIAL DATA
ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
Unaudited Pro Forma Condensed Consolidated Statement of Operations For The Year Ended December 31, 1998 (in millions, except per share amounts)
Unaudited Pro Forma Condensed Consolidated Balance Sheet As of December 31, 1998 (in millions)
CONSOLIDATED STATEMENTS OF CASH FLOWS
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
DELPHI AUTOMOTIVE SYSTEMS CORPORATION
5. PROPERTY, NET
6. ACCRUED LIABILITIES
8. PENSION AND OTHER POSTRETIREMENT BENEFITS
10. OTHER INCOME, NET
11. STOCK INCENTIVE PLANS
15. QUARTERLY DATA (UNAUDITED)
16. SUBSEQUENT EVENT
PART III
PART IV
SIGNATURES

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549-1004**

**FORM 10-K**

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the Fiscal Year Ended December 31, 1999
OR
[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the Transition Period From ———————— to ————————.

Commission File No. 1-14787

# DELPHI AUTOMOTIVE SYSTEMS CORPORATION

(Exact name of registrant as specified in its charter)

**Delaware**

(State or Other Jurisdiction of
Incorporation or Organization)

**5725 Delphi Drive, Troy, Michigan**

(Address of Principal Executive Offices)

**38-3430473**

(IRS Employer
Identification Number)

**48098**

(Zip Code)

Source: DELPHI CORP, 10-K405, February 09, 2000

Registrant's telephone number, including area code (248) 813-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.01 par value per share (including the associated Preferred Share Purchase Rights) | New York Stock Exchange |
| 6 1/8% notes due May 1, 2004 | New York Stock Exchange |
| 6 1/2% notes due May 1, 2009 | New York Stock Exchange |
| 7 1/8% debentures due May 1, 2029 | New York Stock Exchange |

The notes and debentures identified above are also listed for trading on the Luxembourg Stock Exchange.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ].

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

As of January 31, 2000, the aggregate market value of the registrant's Common Stock, $0.01 par value per share, held by non-affiliates of the registrant was approximately $9.7 billion. The closing price of the Common Stock on January 31, 2000 as reported on the New York Stock Exchange was $17.31 per share. As of January 31, 2000, the number of shares outstanding of the registrant's Common Stock was 562 million shares.

**Documents Incorporated by Reference**

Certain portions, as expressly described in this report, of the registrant's Proxy Statement for the 2000 Annual Meeting of the Stockholders, to be filed within 120 days of December 31, 1999, are incorporated by reference into Part III, Items 10-13.

Table of Contents

**DELPHI AUTOMOTIVE SYSTEMS CORPORATION**

**INDEX**

|  |  | Page |
|---|---|---|
| | **Part I** | |
| Item 1. | Business | 3 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 18 |
| Supplementary Item. | Executive Officers of the Registrant | 19 |
| | **Part II** | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 24 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risks | 40 |
| Item 8. | Financial Statements and Supplementary Data | 42 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 67 |
| | **Part III** | |
| Item 10. | The Board of Directors | 67 |
| Item 11. | Executive Compensation | 67 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 67 |
| Item 13. | Certain Relationships and Related Transactions | 67 |
| | **Part IV** | |
| Item 14. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 68 |

2

Table of Contents

# PART I

## DELPHI AUTOMOTIVE SYSTEMS CORPORATION

### ITEM 1. BUSINESS

*Overview*  Delphi Automotive Systems Corporation ("Delphi") is a world leading supplier of automotive components, integrated systems and modules to the automotive industry, with 1999 net sales of $29.2 billion. We have both extensive technical expertise in a broad range of product lines and strong systems integration skills, which enable us to provide comprehensive, systems-based solutions to automotive vehicle manufacturers ("VMs"). We operate our business along three major product sectors, which work closely together to coordinate our product development and marketing efforts. Our three product sectors are: Electronics & Mobile Communication, which includes our automotive electronics and audio and communication systems; Safety, Thermal & Electrical Architecture, which includes our interior, thermal and power and signal distribution products; and Dynamics & Propulsion, which includes our energy and engine management, chassis and steering products. See Note 12 to our consolidated financial statements included elsewhere in this report for additional product sector information.

We also sell our products to the worldwide aftermarket for replacement parts and to non-VM customers, including a broad portfolio of high-quality aftermarket products, such as air conditioning systems and thermal parts, security systems, batteries, shock absorbers and lubricants. By leveraging our technical knowledge, product portfolio and distribution network, we are able to offer a diversified line of aftermarket products that cover a wide range of vehicle makes.

Several years ago, we began to transform our company from a North American-based, captive component supplier to General Motors Corporation ("General Motors" or "GM") into a global supplier of components, integrated systems and modules for a wide range of customers. We have established an expansive global presence, with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world. We now sell our products to the major VMs around the world. Since 1995, our sales to customers other than GM have grown from 15.9% of our total sales to 24.1% in 1999. For this purpose, our total sales include all sales by entities in which we own a minority interest.

*History*  Delphi was incorporated in Delaware in late 1998, as a wholly owned subsidiary of GM. Prior to January 1, 1999, GM conducted the business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of the Delphi business sector were transferred to Delphi and its subsidiaries in accordance with the terms of a Master Separation Agreement to which Delphi and GM are parties (the "Separation Agreement"). We became an independent company during 1999 through a series of transactions (the "Separation"). The Separation occurred in two stages, the first of which involved an offering to the public of 100 million shares of Delphi's $0.01 par value common stock in February 1999 (the "IPO"). The second stage involved the distribution of Delphi's remaining shares owned by GM (the "Spin-Off") to holders of record of GM $1 2/3 par value common stock in May 1999. The dividend resulted in a distribution of approximately 452.6 million shares, or 80.1%, of Delphi's outstanding common stock. The remaining 12.4 million shares owned by GM were contributed on May 28, 1999 to a voluntary employees' beneficiary association trust for GM's U.S. hourly employees.

*Current Developments*  In January 2000, Delphi completed the acquisition of substantially all the assets of Lucas Diesel Systems and its related aftermarket activities from TRW Inc. for approximately $871 million, subject to adjustments for certain post-closing events. This entity, now Delphi Diesel Systems, a Paris-based company with fiscal 1999 sales of approximately $1.1 billion, is a worldwide producer of diesel fuel-injection systems for light, medium and heavy-duty vehicles. The acquisition is expected to support our key initiatives by:

- Strengthening our technology focus by adding new high-growth diesel product lines, including common rail and electronic unit injection ("EUI")

- Boosting our European sales by more than 20% to more than $5 billion

3

Source: DELPHI CORP, 10-K405, February 09, 2000

- Enhancing our system and product capabilities and complementing our gasoline engine management systems capabilities

- Increasing our reported non-GM sales by an estimated 16% to approximately $8 billion on an annualized basis

## Industry

The automotive parts industry provides components, systems, subsystems and modules to VMs for the manufacture of new vehicles, as well as to the aftermarket for use as replacement parts for current production and older vehicles. We believe that five key trends have been reshaping the automotive parts industry over the past several years:

*Increasing Electronic Content*  The electronic content of vehicles continues to increase, largely driven by increasingly stringent regulatory standards for automotive emissions and safety, as well as consumer demand for increased vehicle performance and functionality at a lower cost. Electronics integration, which generally refers to replacing mechanical components with electronic components and integration of mechanical and electrical functions within the vehicle, allows VMs to achieve substantial reductions in the weight and mechanical complexity of automotive vehicles, resulting in easier assembly, enhanced fuel economy, improved emissions control and better vehicle performance.

*Globalization of Suppliers*  The globalization of VMs, which reflects the broader global market for vehicle sales and the desire of VMs to adapt their products to satisfy regional and cultural variations, has driven the globalization of suppliers as they follow their customers. In order to serve multiple markets in a more cost-effective manner, many VMs are turning to global vehicle platforms such as "world cars," which typically are designed in one location but produced and sold in many different geographic markets around the world.

*Increased Emphasis on Systems and Modules Sourcing*  In order to simplify the vehicle design and assembly processes and reduce their costs, VMs increasingly look to their suppliers to provide fully engineered systems and pre-assembled combinations of components rather than individual components. By offering sophisticated systems and modules rather than individual components, Tier 1 suppliers have assumed many of the design, engineering, research and development and assembly functions traditionally performed by VMs. In addition, suppliers often manufacture and ship component parts to the general location of a VM's assembly line and then provide local assembly of systems and modules.

*Ongoing Industry Consolidation*  The worldwide automotive parts industry is consolidating as suppliers seek to achieve operating synergies through business combinations, build stronger customer relationships and follow their customers as they expand globally, acquire complementary technologies and shift production to locations with more flexible local work rules and practices. The need for suppliers to provide VMs with single-point sourcing of integrated systems and modules on a global basis has also fueled industry consolidation.

*Shorter Product Development Cycles*  Suppliers are under pressure from VMs to respond more quickly with new designs and product innovations to support rapidly changing consumer tastes and regulatory requirements. For example, vehicle demand in North America has shifted from cars to light trucks and vans over the last several years, requiring suppliers to modify their operations to focus on parts for these vehicles. In developing countries, broad economic improvements have been and continue to be made, increasing demand for smaller, less expensive vehicles that satisfy basic transportation needs. In addition, increasingly stringent government regulations regarding vehicle safety and environmental standards are driving new product development.

4

Source: DELPHI CORP, 10-K405, February 09, 2000

PAGES INTENTIONALLY
OMITTED

# EXHIBIT L

# State of Delaware

## The Official Website for the First State

Delaware
It's good
being first.

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware [    ] Go

Citizen Services | Business Services | Visitor Info.

**Department of State: Division of Corporations**

Frequently Asked Questions    View Search Results

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

Incorporation Date / Formation Date: **09/16/1998** (mm/dd/yyyy)

File Number: **2944910**

Entity Name: **DELPHI AUTOMOTIVE SYSTEMS LLC**

Entity Kind: **LIMITED LIABILITY COMPANY (LLC)**

Entity Type: **GENERAL**

Residency: **DOMESTIC**    State: **DE**

## REGISTERED AGENT INFORMATION

Name: **THE CORPORATION TRUST COMPANY**

Address: **CORPORATION TRUST CENTER 1209 ORANGE STREET**

City: **WILMINGTON**    County: **NEW CASTLE**

State: **DE**    Postal Code: **19801**

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Division of Corporations - Online Services

Phone:   **(302)658-7581**

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information   Submit

Back to Entity Search

To contact a Delaware Online Agent click here.



PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "DELPHI AUTOMOTIVE SYSTEMS LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF SEPTEMBER, A.D. 1998, AT 10:01 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 1:16 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2005, AT 11:59 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "DELPHI AUTOMOTIVE SYSTEMS LLC".

2944910    8100H

070626568

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 5709001

DATE: 05-25-07

**030047-002275**

CERTIFICATE OF FORMATION

OF

DELPHI AUTOMOTIVE SYSTEMS LLC

This Certificate of Formation of Delphi Automotive Systems LLC has been duly executed and is being filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Act (6 Del. C. § 18-101. et. seq.).

1.    The name of the limited liability company is Delphi Automotive Systems LLC (the "LLC")

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

3.    The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation of Delphi Automotive Systems LLC this 16th day of September, 1998

By:
Name:    Martin I. Darvick
Its:    Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 10:01 AM 09/16/1998
981358863 - 2944810

030047-002276

09/30/2005    13:14    SKARDEL INC. + 16865640913027393673    NO.751    002

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:16 PM 09/30/2005
FILED 01:16 PM 09/30/2005
SRV 050803282 - 2944910 FILE

# CERTIFICATE OF MERGER

## OF

## DELCO ELECTRONICS LLC

### INTO

### DELPHI AUTOMOTIVE SYSTEMS LLC

Pursuant to the provisions of Section 18-209 of the Delaware Limited Liability Company Act, Delphi Automotive Systems LLC, a Delaware limited liability company certifies the following:

FIRST:    The names of the constituent limited liability companies and their jurisdictions of formation are as follows:

| Name of Limited Liability Company | Jurisdiction of Formation |
| --- | --- |
| Delphi Automotive Systems LLC | Delaware |
| Delco Electronics LLC | Delaware |

SECOND:    The Agreement and Plan of Merger has been approved and executed by each of Delphi Automotive Systems LLC and Delco Electronics LLC.

THIRD:    The name of the surviving limited liability company is Delphi Automotive Systems LLC.

FOURTH:    The merger of Delco Electronics LLC into Delphi Automotive Systems LLC shall be effective at 11:59 p.m. on September 30, 2005.

FIFTH:    The Agreement and Plan of Merger is on file at the place of business of Delphi Automotive Systems LLC at 5725 Delphi Drive, Troy, MI 48098.

SIXTH:    A copy of the Agreement and Plan of Merger will be furnished by Delphi Automotive Systems LLC on request and without cost to any member or other person holding an interest in Delco Electronics LLC or Delphi Automotive Systems LLC.

[Remainder of page intentionally left blank]

529084.05-New York Server 5A

**030047-002277**

IN WITNESS WHEREOF, Delphi Automotive Systems LLC has caused this certificate to be
executed as this 30th day of September, 2005.

Delphi Automotive Systems LLC

By: John Sheehan
Acting Chief Financial Officer,
Chief Accounting Officer and
Controller

$3803-L.05-New York Server 5A.

030047-002278

# EXHIBIT M



# FORM 10-K

## GENERAL MOTORS CORP - GM

Exhibit:

**Filed: March 10, 1999 (period: December 31, 1998)**

Annual report which provides a comprehensive overview of the company for the past year

PAGES INTENTIONALLY OMITTED

| | | | |
|---|---|---|---|
| Trucks | 125 | 142 | 122 |
| | --- | --- | --- |
| Total GME | 2,007 | 1,850 | 1,795 |
| | ----- | ----- | ----- |
| **GMLAAM** | | | |
| Cars | 404 | 495 | 459 |
| Trucks | 248 | 290 | 244 |
| | --- | --- | --- |
| Total GMLAAM | 652 | 785 | 703 |
| | --- | --- | --- |
| **GMAP** | | | |
| Cars | 202 | 176 | 199 |
| Trucks | 217 | 416 | 414 |
| | --- | --- | --- |
| Total GMAP | 419 | 592 | 613 |
| | --- | --- | --- |
| Total Worldwide | 8,149 | 8,776 | 8,263 |
| | ===== | ===== | ===== |

II-6
GENERAL MOTORS CORPORATION AND SUBSIDIARIES

GMA Financial Review

Including $228 million and $3.0 billion of after-tax charges for 1998 and 1997, respectively, related to the competitiveness studies (see Competitiveness Studies), GMA's income was $1.6 billion and $449 million for 1998 and 1997, respectively. Excluding the competitiveness studies charges, GMA's income was $1.9 billion or 1.5% of manufactured products sales and revenues and $3.5 billion or 2.6% of manufactured products sales and revenues for 1998 and 1997, respectively. Income was $2.3 billion or 1.8% of manufactured products sales and revenues in 1996. The decrease in 1998 income was primarily due to lower production volumes at GMNA associated with the work stoppages at two component plants in Flint, Michigan, as discussed below, and the economic downturn throughout Latin America, partially offset by material and structural cost savings.

Members of United Auto Workers Locals 659 and 651 in Flint, Michigan ceased production at two component plants on June 5 and June 11, 1998, respectively. Work stoppages at both facilities were resolved July 28, 1998 when tentative agreements were reached. Both agreements were ratified by the rank and file on July 29, 1998. Operations began to accelerate to normal production levels July 30, 1998. These work stoppages had an aggregate unfavorable after-tax impact of approximately $2.0 billion, or $2.94 per share of GM $1-2/3 par value common stock during 1998 that resulted from a loss of approximately 371,000 units of production. The above unfavorable after-tax impact represents the combined effects for GMNA ($1.5 billion) and Delphi ($450 million).

The increase in 1997 income compared to 1996 (excluding the competitiveness studies charges) was primarily due to higher wholesale sales volumes, continued improvement in the profitability of new vehicles, and lower material and engineering costs. These factors were partially offset by higher retail incentives, increased commercial spending to support the numerous vehicle launches, and the unfavorable impact of approximately $240 million after-tax related to work stoppage production losses in 1997.

Manufactured products sales and revenues for 1998 were $125.7 billion, which represented a decrease of $8.4 billion compared with 1997. The decrease was largely due to a lower number of wholesale units sold as a result of the previously mentioned work stoppages and the economic downturn throughout Latin America. Manufactured products sales and revenues for 1997 were $134.1 billion, which represented an increase of $6.5 billion compared with 1996. The improvement was primarily due to a 513,000 unit increase in wholesale sales volumes.

GMA reported 1998 pre-tax income of $2.6 billion compared with $279 million and $2.6 billion for 1997 and 1996, respectively. Excluding the $224 million and $4.7 billion pre-tax impact of the competitiveness studies charges, GMA's pre-tax income was $2.8 billion and $5.0 billion for 1998 and 1997, respectively. The decrease in 1998 pre-tax income (excluding the competitiveness studies charges) was primarily due to the impact of lower wholesale sales resulting from the previously mentioned work stoppages and higher retail incentives, partially offset by material, engineering and manufacturing cost improvements. The increase in 1997 pre-tax income was primarily due to higher wholesale sales volumes, continued improvement in the profitability of new vehicles, and lower material and engineering costs.

GMA's 1998 worldwide market share decreased to 15.7%, compared with 16.0% and 16.2% in 1997 and 1996, respectively. The decrease in market share was primarily due to dealer inventory shortages due to the above mentioned work stoppages at GMNA. GMNA's 1998 market share was 28.9% compared with 30.8% and 31.0% for 1997 and 1996, respectively.

GMNA reported income of $1.6 billion for 1998 compared with a loss of $12 million and income of $819 million for 1997 and 1996, respectively. Excluding the competitiveness studies charges, GMNA's income was $1.7 billion and $2.4 billion for 1998 and 1997, respectively. The decrease in income for 1998 compared to 1997 (excluding the competitiveness studies charges) was primarily due to the previously discussed work stoppages, minimized by strong cost performance which more than offset price reductions driven by competitive market

pressures. The 1998 cost performance resulted from quality initiatives, material performance and reduced structural cost. The increase in income for 1997 compared to 1996 (excluding the competitiveness studies charges) was primarily due to a 397,000 unit increase in wholesale sales volumes, continued improvement in the profitability of new vehicles, and lower material and engineering costs. These factors were partially offset by higher retail incentives, increased commercial spending to support the numerous vehicle launches in progress, and the unfavorable impact of the work stoppages.

GME reported income of $419 million for 1998 compared with a loss of $17 million and income of $778 million for 1997 and 1996, respectively. Excluding the competitiveness studies charge, GME's income was $471 million for 1997. GME's results also included an after-tax charge in 1998 of $44 million related to work schedule modifications at Opel Belgium and after-tax gains in 1997 of $103 million related to the sale of GME's interest in Avis Europe and $55 million related to a settlement agreement with Volkswagen A.G. Excluding these items, GME's income was $463 million and $313 million for 1998 and 1997, respectively. The increase in 1998 adjusted earnings compared to 1997 was primarily due to savings on material costs and policy & warranty spending, as well as lower equity losses from Saab Automobile A.B. (Saab). The decrease in 1997 adjusted earnings compared to 1996 was primarily due to higher sales and marketing costs under intensely competitive market conditions, and lower equity earnings from Saab related to the launch of the new 9-5 model. The 1996 Restructuring Agreement between GM and Saab's other owners (Investor A.B.) includes certain provisions and options which may

II-7

GENERAL MOTORS CORPORATION AND SUBSIDIARIES

GMA Financial Review (concluded)

impact the relative ownership interests of the parties involved. The agreement gives GM and Adam Opel the right to purchase up to 100% of Investor A.B.'s interest in Saab during 1999 and 2000. Investor A.B. has the right to sell up to 50% of its present holdings in Saab to GM and Adam Opel in 2000. GM currently maintains a 50% ownership interest in Saab.

GMLAAM reported a loss of $175 million in 1998 compared with income of $667 million and $642 million for 1997 and 1996, respectively. The decrease in 1998 earnings compared to 1997 was primarily due to the economic downturn throughout Latin America, $51 million of after-tax charges in 1998 related to the competitiveness studies, and higher incentive costs. The increase in 1997 earnings compared to 1996 was primarily due to an increase in wholesale sales. The financial outlook for GMLAAM is uncertain for 1999 due to the ongoing economic crisis in Latin America. In 1998, GMLAAM reduced employment levels by approximately 21%, in an effort to resize the operations to the current conditions. An additional reduction should be accomplished in 1999 by further significant schedule adjustments. Capital spending has also been greatly reduced to conserve cash in the region.

GMAP reported a loss of $243 million in 1998 compared with a loss of $172 million and income of $110 million for 1997 and 1996, respectively. Excluding the competitiveness studies charges, GMAP's losses were $146 million and $2 million for 1998 and 1997, respectively. Higher losses for 1998 compared to 1997 were primarily attributable to decreased equity earnings at Isuzu resulting from a write down of investments due to the economic downturn in Asia and continued spending associated with GMAP's growth strategy. The decrease in 1997 earnings compared to 1996 was due to increased spending associated with GMAP's growth strategy and the beginning of the economic downturn in Asia.

GMA's effective income tax (credit) rate for 1998 was 34.8% compared with (53.0)% and 13.6% for 1997 and 1996, respectively. Excluding the previously mentioned competitiveness studies charges, the effective income tax rates for 1998 and 1997 were 34.5% and 32.3%, respectively. These adjusted rates indicated a return to a more normalized level. The lower 1996 tax rate resulted from research and experimentation credits in the United States, a favorable resolution of items related to GM's 1995 tax return, and a favorable tax position in Mexico.

Delphi Financial Highlights

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 1998(1) | 1997(1) | 1996(1) |
|  | (Dollars in Millions) | | |
| Manufactured products sales and revenues | $28,479 | $31,447 | $31,032 |
| Pre-tax (loss) income | (332) | 223 | 1,052 |
| Income tax (benefit) expense | (173) | 44 | 259 |
| Minority interests | 11 | 9 | 3 |
| Earnings of nonconsolidated associates | 55 | 27 | 57 |
| (Loss) income | $(93) | $215 | $853 |

- ------------------------
(1)The 1997 and 1997 amounts have been adjusted to reflect the changes to GM's organizational structure resulting from the restructuring of former Hughes which occurred in December 1997. As such, Delphi adjusted amounts

Source: GENERAL MOTORS CORP, 10-K, March 10, 1999

PAGES INTENTIONALLY OMITTED

# EXHIBIT N

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

NU-TECH PLASTICS ENGINEERING, INC.,

Plaintiff,

vs.

Case No. 02-075335-CK

GENERAL MOTORS CORPORATION,
a Delaware Corporation, and DELPHI
AUTOMOTIVE SYSTEMS USA, L.L.C., a
Delaware Limited Liability Corporation, d/b/a
DELPHI AUTOMOTIVE SYSTEMS, L.L.C.

Hon. Robert M. Ransom

Defendants.

---

JAY A. SCHWARTZ (P45268)
DEBORAH E. FORDREE (P49054)
SCHWARTZ LAW FIRM, P.C.
Attorneys for Plaintiff
37887 W. 12 Mile Road, Suite A
Farmington Hills, MI 48331
(248) 553-9400

A. T. LIPPERT, JR. (P16714)
LIPPERT, HUMPHREYS, CAMPBELL,
DUST & HUMPHREYS, P.C.
Attorneys for Defendants        i
4800 Fashion Square Boulevard
Plaza North, Suite 410
Saginaw, MI 48604-2604
(989) 792-2552

JOSEPH E. PAPELIAN (P26582)
Attorney for Defendant Delphi
Delphi Automotive Systems
M/C:  483-400-603
5725 Delphi Drive
Troy, MI 48098-2815
(248) 813-2535

---

## AFFIDAVIT OF JOHN W. MAILEY

STATE OF MICHIGAN          )
COUNTY OF                  ) ss.

John W. Mailey, having been sworn, states:

1.     The facts stated in this affidavit are based upon my personal knowledge. If sworn as a witness, I can testify competently to the facts stated in this affidavit.

2.     I was the majority shareholder of Nu-Tech during the times it sold manufactured parts to General Motors Corporation and Delphi Automotive Systems, LLC pursuant to purchase orders issued by General Motors and Delphi Automotive Systems, LLC.   The purchase orders included purchase orders for parts 25160694 (0694) and 25180510 (0510).

3.     Nu-Tech was a minority enterprise.  I am African-American and was the majority shareholder of the corporation owning 51% of the shares until the time of sale.

4.     The purchase order issued by Delphi for part 0694 was a factory assist contract.  Delphi owned three sets of tooling used for the manufacture of part 0694. Two sets of tooling were provided by Delphi to Nu-Tech for use with its manufacturing equipment.

5.     Delphi had a right at any time to take back its tooling and manufacture part 0694 in Delphi's Flint manufacturing plant.

6.     Nu-Tech provided Delpi with information regarding its manufacturing capacity to produce parts.  The designations of capacity over a given time period were not agreements between Delphi and Nu-Tech to purchase the quantities of parts in the quantities stated as manufacturing capacities.

7.     Delphi had no obligation to purchase any fixed quantity of parts from Nu-Tech at any time.  It had the sole option to determine the quantity of parts to be ordered to meet its own "factory assist" requirements.

2

8.    The purchase order for part 0510 was a spot buy contract.

9.    Delphi fulfilled all the terms and obligations of the purchase orders issued by Delphi to Nu-Tech for part 0694 and 0510.

10.    Delphi was a mentor for Nu-Tech as a minority enterprise.  It had a business interest in providing additional purchase orders to Nu-Tech, but at all times conditioned upon Nu-Tech submitting a successful bid for any part in a competitive bidding process.

11.    Delphi's right to recover its tooling was not at any time conditioned upon Delphi granting additional purchase orders for parts to Nu-Tech.

12.    Delphi at no time prior to the sale of Nu-Tech to Rapid Product Technologies, LLC made any promise of additional business and Nu-Tech did not rely upon any promise of additional business.

13.    At the time Nu-Tech was sold to Rapid Product Technologies, LLC, it was the intent and purpose of the purchase and sale of business asset agreement to convey all assets of the corporation.  I, as the majority shareholder and owner of Nu-Tech, had no knowledge of any unasserted claims for damages against Delphi at the time the sale of Nu-Tech's assets was made in accordance with the agreement.

14.    If Nu-Tech had a claim or unasserted cause of action against Delphi based upon the purchase orders or claims or unasserted causes of action based upon promises or misrepresentations, the sale would not have been concluded and the purchase orders for parts 0694 and 0510 would not have been transferred by Delphi to Rapid Product Technologies, LLC.

3

15.     Subsequent to the sale of Nu-Tech, I was informed by John Cooper that an action would be filed against Delphi and General Motors.  When I was provided with an understanding of the claims to be made in the lawsuit, it was my opinion then and now that the claims were completely lacking in merit.  I did not authorize the filing of a lawsuit at any time prior to the sale of Nu-Tech assets and assignment of purchase orders to Rapid Product Technologies, LLC.

JOHN W. MAILEY

Subscribed and sworn to before me, a notary public, this 01 day of March _____ 2005.

Notary Public
State of Michigan, County of _____
My commission expires: _____
Acting in the County of _____

Michael Laurence
Notary Public - Wayne County, MI
Acting in Oakland County, MI
My Commission Expires 12/31/2010

4

# EXHIBIT O

113004xc.txt

1

1                          STATE OF MICHIGAN

2          IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

3
NU-TECH PLASTICS ENGINEERING, INC.,
4
                   Plaintiff,
5                                        CASE NO: 02-075335-CK
  -v-
6                                        HON. ROBERT M. RANSOM
GENERAL MOTORS CORPORATION, a
7 Delaware Corporation, and DELPHI
AUTOMOTIVE SYSTEMS USA, L.L.C., a
8 Delaware Limited Liability
Corporation, d/b/a DELPHI
9 AUTOMOTIVE SYSTEMS, L.L.C.,

10               Defendants.
  _____/
11

12          The Deposition of JOHN G. COOPER, taken before Zo

13   Turner, CRR, RMR/CSR-2496 and Notary Public, at the offices

14   of Ripka, Boroski & Associates, located at 717 South Grand

15   Traverse, Flint, Michigan, on Monday, November 30, 2004,

16   commencing at or about 10:15 a.m.

17

18  APPEARANCES:

19      Schwartz Law Firm, P.C.
        BY:   JAY A. SCHWARTZ (P-45268)
20      37887 West 12 Mile Road, Suite A
        Farmington Hills, Michigan  48331
21      (248) 553-9400

22          Appearing on behalf of Plaintiff.

23

24

25

□

2

1  APPEARANCES (Continued):
                    Page 1

113004xc.txt

2    Lippert, Humphreys, Campbell,
     Dust & Humphreys, P.C.
3    BY:  A. T. LIPPERT, JR. (P-16714)
     4800 Fashion Square Boulevard
4    Plaza North, Suite 410
     Saginaw, Michigan  48604-2604

5        Appearing on behalf of Defendants Delphi and
6    General Motors.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    3

1                    INDEX OF WITNESS

2
     WITNESS                                          PAGE
3                        Page 2

113004xc.txt

19  Q.  Excuse me, individual or entity.  I misread that.

20       MR. SCHWARTZ:  Is the question is that another lessor

21       or the seller?

22  Q.  (BY MR. LIPPERT):  My question is, first off, John Cooper,

23       individually, we know who that is.  That's you.  Then it also

24       says any affiliated individual.  Who would be any affiliated

25       individual?

□

                                                                12

1  A.  (No audible response.)

2  Q.  That would be Mr. Mailey or somebody else?

3  A.  Gosh, I don't ... I guess I don't know, really, to be honest

4       with you, what that means.

5  Q.  Okay.  Well, if you don't recall or you don't know --

6  A.  Yeah.  ABX Leasing was strictly myself, my own company.

7  Q.  That was the company that leased the real estate to Nu-Tech?

8  A.  Yes.  And the ABX Leasing was just the equipment, the

9       machines.

10  Q.  So you were signing off on this sale because equipment was

11       being sold to --

12  A.  It was being leased to them.  That's what it is.  Okay.  So

13       that's why Mr. Mailey would sign off, as well.  We signed off

14       as Nu-Tech to the new entity.

15  Q.  Okay.  Now, up on the top it says Seller, Nu-Tech Plastics

16       Engineering, Inc., John W. Mailey, its president.

17  A.  Yes.

18  Q.  At that time Mr. Mailey was the president and was executing

19       the contract for and on behalf of the corporation?

20  A.  Yes.

                          Page 11

113004xc.txt
21  Q.  Were you an officer at that time also?

22  A.  No.

23  Q.  You were --

24  A.  I basically was never an officer, if you will.  I was

25      executive vice president of manufacturing what they called

☐

                                                                    13

1       me.

2   Q.  I see.  Well, that would be an officer.

3   A.  Yeah, okay.

4   Q.  So that's why Mr. Mailey's signature appears on behalf of the

5       corporation?

6   A.  Yes.

7   Q.  And this is the document that sold Nu-Tech Plastics

8       Engineering to Rapid Products?

9   A.  Yes.

10  Q.  I want to back ... We jumped to the sale rather quickly,

11      Mr. Cooper.

12  A.  Okay?

13  Q.  So I want to redirect your attention back to the time the

14      corporation was formed.  You said that someone, a mutual

15      acquaintance, had introduced you to Mr. Mailey.  And this

16      concept went forward and formed the corporation which became

17      Nu-Tech.  Did you make a cash investment or a capital

18      investment in Nu-Tech?

19  A.  Yes.  I'm going to say about a hundred thousand, I think or

20      something.  I don't recall, to be honest with you, if it's

21      fifty or a hundred thousand.

22  Q.  And was it for the acquisition of stock or did you loan the

                            Page 12

113004xc.txt

10  A.  No.  No, sir.  Bob Blonde done most of that.

11  Q.  And my question, assume that there were such relationships

12      created --

13  A.  Yes?

14  Q.  -- were there lines of credit established with suppliers?

15  A.  Yes, sir.

16  Q.  People anxious to sell Nu-Tech product like you or anxious

17      Nu-Tech to sell customers product?

18  A.  Yes, sir.

19  Q.  Would you issue purchase orders or first requests for

20      quotations to various suppliers, or would you look in their

21      catalog and get prices?

22  A.  No, we would submit, in most cases, either a phone call or a

23      fax or e-mail or something.  Like I say, Bruce Jones or Bob

24      Blonde would do that.  Bruce Jones more than Bob.

25  Q.  Did you have a standard form of purchase order that you would


☐


                                                                    23


 1      use at Nu-Tech?

 2  A.  Yes, sir.

 3  Q.  Who created that document for you?

 4  A.  Most cases I've created most of the documents there.  They

 5      modified them somewhat for that operation.

 6  Q.  They, being Nu-Tech modified them?

 7  A.  Yes.

 8  Q.  Well, what were you using purchase orders for before you got

 9      to Nu-Tech?

10  A.  Fabricating Engineers was a hundred million dollar business.

11      And so we had all the forms and, you know, those type of

                              Page 21

113004xc.txt

12   things.

13  Q.  Sure.

14  A.  So for basics, it worked good for Nu-Tech.  And it was a

15      little more complicated than they needed in some cases so

16      they modified them a little.

17  Q.  Purchase Orders ... Or after you get an RFQ, then you would

18      submit bids.  Were you a participant in creating bid prices?

19  A.  Like I say, most of them ... I'm going to say I probably

20      looked over 90 percent of the bids.

21  Q.  So you would be satisfied that you would have the equipment,

22      that the tooling would become available from the customer

23      usually on an RFQ that would be indicated?

24  A.  Or we would build tooling.  We built some tooling.  That

25      would be indicated, yes.

☐

                                                                    24

1   Q.  And then you would have the price of the raw material and

2       then you'd put in your cost overhead, profit and submit a

3       price per part?

4   A.  Yes, sir.

5   Q.  You were dealing with many automobile companies apparently.

6       Am I correct?

7   A.  Yes, sir.

8   Q.  Did you submit bids from time to time based upon RFQs that

9       were not accepted by the automotive manufacturers?

10  A.  Oh, yes.

11  Q.  And same with other companies that were prospective

12      customers?

13  A.  Uh-huh (Yes).

                        Page 22

113004xc.txt

14  Q.  Yes?

15  A.  Yes.

16  Q.  So you understood that the submission of a bid or a proposal

17      to manufacture and produce a part was not an agreement for

18      purchase unless you had a purchase order?

19  A.  Yes.

20  Q.  When you received a purchase order, did you understand that

21      that was the contract that created the business relationship

22      between the customer and the producer, the seller?

23  A.  Yes.

24  Q.  So if you got a purchase order from General Motors or Delphi

25      or Chrysler, it was understood that the terms and conditions

                                                                        25

1       of the purchase order prevailed as the agreement of the

2       parties?  It became the agreement of the parties?

3           MR. SCHWARTZ:  Object, foundation.  But go ahead and

4       answer.

5           THE WITNESS:  Yes.

6   Q.  (BY MR. LIPPERT):  Well, you've told me you had a long

7       history of dealing with purchase orders, including creating

8       them?

9   A.  Yes.

10  Q.  Were you involved in submitting the bid which led to the

11      purchase order for ... the General Motors purchase order for

12      part number ... Well, it's a reservoir, a fuel pump

13      reservoir, Part Number 0694?

14  A.  0694, yes.

15  Q.  So you assisted in the preparation of that bid and then you

                            Page 23

113004xc.txt

24  Q.  Or with Delphi, for that matter, do you recall?

25  A.  I don't recall, but ...

0

30

1   Q.  But you're familiar with what the purpose and intent of those

2       agreements are?

3   A.  Yes.

4   Q.  And what the terms and conditions of those agreements would

5       be?

6   A.  Yes, sir.

7           The guy's name, Joe Harris.

8   Q.  Joe Harris?

9   A.  Joe Harris was the salesperson that we hired.

10  Q.  Thank you.  His name has come up before?

11  A.  Yes.

12  Q.  So we have some knowledge of who he might be.

13  A.  Excuse me, I didn't mean to ... I had to say that while I

14      remembered.

15  Q.  No, you did exactly what I hoped you would do.  And I know

16      names pop into people's heads as we move along.

17          I want to jump back in time, later in time, to the sale

18      of Nu-Tech under the terms of that agreement to Rapid

19      Technologies.  At that time, at the time of that sale, the

20      company was essentially out of business; is that correct?  It

21      had sold its purchase orders, it had sold its equipment or

22      leased its equipment, the leases of land were transferred

23      over to Rapid Technologies, so there was no remaining

24      business.  Am I correct?

25  A.  When Rapid took over?

                    Page 28

113004xc.txt

☐

31

```
 1  Q.  Yes, sir.
 2  A.  Whatever date that was?
 3  Q.  Yes.
 4  A.  Nu-Tech ceased to exist, yes.
 5  Q.  So you and Mr. Mailey were still 51/49 percent shareholders,
 6      he being the majority shareholder?
 7  A.  Yes.
 8  Q.  The company, however, was not dissolved.  The corporation was
 9      not dissolved.
10  A.  No, it wasn't.
11  Q.  Was there a reason why it wasn't?
12  A.  Not really.  Not that I ...
13  Q.  Did the directors change at all or the officers change?
14  A.  No.
15  Q.  Did you have directors' meetings after the date of sale to
16      Rapid Technologies?
17  A.  Not on a regular basis.  But him and I met ... Him and I met
18      a few times.
19  Q.  The date of sale was December 1, 1999, at least as appears on
20      the signature page of the agreement?
21  A.  Yes.
22  Q.  What would have been the purpose of your meeting after that
23      date?  Was there some hope of reviving the business or ...
24  A.  Well, yes.  That and just to see where we go from here, if we
25      go or what we do from this point forward.
```

Page 29

113004xc.txt

16  A.  No.  No, sir.  No.

17  Q.  And Delphi had worked with Nu-Tech certainly, as a supplier,

18      a mentored supplier --

19  A.  Yes.

20  Q.  -- to keep it in existence?

21  A.  Yes.

22  Q.  Do you feel or believe, Mr. Cooper, in dealing with the

23      Delphi people, that they did not keep you fully and fairly

24      informed as to what they were doing as the minority supplier

25      and mentor?

42

1  A.  Say that again?

2  Q.  Yes.  Did you feel that at any time that the people you were

3      dealing with at Delphi -- Lynn Arens or Trinia

4      Turner-Patrick, or Trinia Turner you may have known her as --

5      were not dealing with you openly and fairly as a minority

6      mentored supplier?

7  A.  Yes, right at ... You know, pretty much at the end when this

8      0694, they wanted to take those tools back.  We were told

9      that we were going to get a replacement for that job.  In

10      other words, that 0694 was going to be a service part and the

11      new part coming for that would be ... would be ours, our job.

12  Q.  Who would have said that to you?

13  A.  I'm going to say probably Trinia.

14  Q.  And when would that have been said?

15  A.  In ... Probably in the fall of '98.  Yeah, fall of '98.

16  Q.  I see.  Had you had other discussions with Delphi where they

17      said we were going to be bidding out parts and we'll put you

Page 39

113004xc.txt

18    on the bidder's list?

19  A.  Oh, we were on the bid list all the time.

20  Q.  Right.  What she was telling you was what was ordinary course

21      of business practice, was it not, to if parts were to be

22      produced by suppliers, you could be ... you would be included

23      as a bidder?

24  A.  No, no --

25          MR. SCHWARTZ:  Objection, form.  But go ahead, you can

43

1       answer.

2           THE WITNESS:  No.  This part was to replace that.  I

3       had a purchase order for 0694.  Okay?

4   Q.  (BY MR. LIPPERT):  Yes.  We've covered that.

5   A.  And that part was going to ... We were told it was going to

6       be a service part and another part was to replace that part.

7       So we would always have a part to produce at that volume.

8           In other words, that was for the CK truck, I believe,

9       one of the fast moving trucks.  And the part was going to

10      change, but that volume was still there.  We had a purchase

11      order through 2002.

12  Q.  When did Delphi take back the tooling for Part 0694?

13  A.  They took one of those tools back in the fall of '98, later

14      in the fall of '98.  And the second tool, January, February,

15      March, in that time frame, in the winter of '99.

16  Q.  Some year, approximately, before the sale to Rapid?

17  A.  Yes.

18  Q.  And is that when Nu-Tech, then, would have stopped making

19      0694?

Page 40

113004xc.txt

20   A.   Yes.  And --

21   Q.   Did this have anything to do with the strike?

22   A.   That's what they said in the fall when they said we're going

23        to have to take that tool back and ... but you're getting

24        another tool, you know, to replace it.  And they, you know,

25        for the strike ... You know, for the --

44

1   Q.   Do you recall the period of the strike threat, Mr. Cooper?

2        If not, I can suggest to you it was May 11, '98 through July

3        29, '98.

4   A.   Yeah.  What we'd done at that time ... And Delphi came to us,

5        and nothing to do with all the 0694 reservoir, Delphi came to

6        us and said can you run some single and two cavity tools for

7        us as strike protection; run these tools, and the material

8        will go to Mexico, anticipating a strike.  And I'm going to

9        say they probably come, I'm going to say, March time frame or

10       whatever.

11            So we went down the street.  My son had a 10,000 square

12       foot building down the street.  I bought six or seven new

13       machines, set up a separate thing down the street in a couple

14       weeks, which is unheard of.

15            And I got a letter from Delphi, and from Harold Cutler,

16       thanking us for doing that.  But, anyway, we run these strike

17       tools down there, strike protection tools.  And, you know,

18       got them out of trouble and sent the stuff to Mexico and so

19       forth.  Nothing to do with 0694, just several other tools.

20   Q.   Was there a purchase order issued for that strike

21        protection --

Page 41

113004xc.txt

22   A.   Yes.   That was a separate deal.

23   Q.   Yeah.   Do you remember the part number?   It's difficult to

24        recall, I know, but --

25   A.   I don't.   Because there were several parts.   I couldn't even

45

1        tell you what they were now.   I know I bought ... I bought

2        six or seven new machines, all in the small ... smaller

3        tonnage machines.

4    Q.   Was it a reservoir, fuel pump reservoir?

5    A.   No.   No.   They were all just little parts.

6    Q.   I see.

7    A.   They run ... I think the biggest machine I had over there was

8        like a 300.

9    Q.   Did you take any losses on that?   Or was that just a ... Was

10       that a completed project, Mr. Cooper, that came and went?

11   A.   It came and went.   And I stepped up to the plate there

12       because General Motors was mentoring me and then helping me.

13   Q.   Right.

14   A.   So when that went away, I had these half a dozen machines

15       with really no job for them.   But ...

16   Q.   You knew that going in?

17   A.   I knew that ... I didn't have a problem with that there.

18       General Motors had mentored us and was helping us.   That

19       0694, they gave us that job and that job run our company.   I

20       mean, I focused the whole company on that job because it was

21       so profitable.   And I went forward and, you know, purchased

22       buildings and purchased equipment and everything based on

23       that because, them being my mentor, you know, they'd give us

Page 42

# EXHIBIT P

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


---------------------------------


In Re:                              Chapter 11

DELPHI CORPORATION, et al.,         Case No. 05-44481 (RDD)

                Debtors.            (Jointly Administered)


---------------------------------        **ORIGINAL**


DEPONENT:      JOHN GLENN COOPER

DATE:          Thursday, December 20, 2007

TIME:          1:45 p.m.

LOCATION:      37887 West Twelve Mile Road, Suite A

               Farmington Hills, Michigan

REPORTER:      Bonnie J. Humm, CSR-2999

1       APPEARANCES:

2       MR. NICK D. CAMPANARIO

3       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4       333 West Wacker Drive

5       Chicago, Illinois  60606-1285

6       (312) 407-0700

7           Appearing on behalf of Delphi Corporation.

8

9       MS. SUSAN LEIGH BROWN

10      SCHWARTZ LAW FIRM, P.C.

11      37887 West Twelve Mile road, Suite A

12      Farmington Hills, Michigan  48331

13      (248) 553-9400

14          Appearing on behalf of Nu-Tech Plastics

15          Engineering.

16

17      Also Present:  MR. JOSEPH E. PAPELIAN

18

19

20

21

22

23

24

25

PAGES INTENTIONALLY
OMITTED

1         Motors?

2    A.   Oh, it would have been, yes.

3    Q.   Did Nu-Tech help General Motors remove the tool from

4         Nu-Tech?

5    A.   I would guess so.

6    Q.   How big of a tool are we talking here?

7    A.   I'm going to guess it probably weighed 1500 pounds.

8    Q.   And did General Motors give Nu-Tech -- did General Motors

9         let Nu-Tech know that it was going to come in and remove

10        the tools for 0694 before they did it?

11   A.   Oh, I'm sure they probably called.  I wasn't there, but

12        I'm sure they called and said we're sending a truck or

13        whatever.

14   Q.   So you didn't actually get a call from GM saying that,

15        but you assume that happened?

16   A.   I assume that, you know.

17   Q.   Did General Motors tell Nu-Tech why it was removing the

18        tools from Nu-Tech's plant?

19   A.   Not when they physically come and got them.

20   Q.   What about other than when they physically come and got

21        them?

22   A.   Yeah.  Way back somewhere in August, September time

23        frame, when they settled their strike, that's when they

24        told us that they were going to take the job back

25        in-house.

1  Q.   And you're talking August or September of 1998?

2  A.   Yes.  I believe that was '98.

3  Q.   Does that help you remember when the tools were removed?

4  A.   Well, to be honest with you, they never come and got them

5       right away.  They come and got one -- now, I'm just -- I

6       shouldn't even say, but in the fall, October maybe,

7       something like that, September, October.

8               And then the second one they never -- they

9       didn't get it until after the first of the year.  I'm

10      thinking -- I would have to look at our invoicing, but

11      I'm thinking we invoiced in '98 that part, so we -- or

12      '99, I mean, so we would have run that other tool.

13 Q.   And so was it in the fall of '98, then, that someone told

14      you you were going to get a substitute part for 0694?

15 A.   Yes.

16 Q.   Did the two kind of go hand in hand; we're going to move

17      production of 0694 back in-house, and at the same time

18      we're going to give you -- what was it, 0510?

19 A.   No.  It was after that.

20 Q.   It was after?

21 A.   Yeah.  It was after that that they were going to -- they

22      were coming out with a new reservoir, and we would get

23      that reservoir to replace the 0694.  It would never go in

24      the plant.  It would be out to us.

25              In other words, normally they will have a tool

1   made at a tooling house somewheres.  And what they

2   explained to me was -- John Mailey explained to me was

3   they're building the tool out in a tooling house

4   somewhere, sending it to us to PPAP and get the tooling

5   and never go into General Motors.  That's normal

6   procedure.

7   Q.   Was it General Motors who told Nu-Tech that, you know,

8        General Motors was going to bring production of part 0694

9        in-house?

10  A.   That's what I was told.  I physically never --

11  Q.   They didn't say it to you?

12  A.   No, no.  John Mailey, my partner, was the one who dealt

13       with them every day.

14  Q.   Did you learn from John Mailey who, meaning the person,

15       who told him that part 0694 was going to go in-house as a

16       result of the labor strike issues?

17  A.   Yes.  I was told that from John Mailey.

18  Q.   No.  But did John Mailey tell you who told him that?

19  A.   Oh.  I don't recall.

20  Q.   Do you remember which person -- well, let me start over.

21            Did someone tell you personally that Nu-Tech

22       would get part 0510 as a substitute for part 0694?  Did

23       someone tell you that?

24  A.   Just John Mailey, my partner.

25  Q.   Did John Mailey tell you who had told him that?

1   A.   I don't recall that, no.

2   Q.   If he did tell you, you don't remember who it was?

3   A.   Yeah, I don't remember who it would have been.

4   Q.   Do you think he did tell you, or you just can't remember?

5   A.   Pardon me?

6   Q.   Do you think John Mailey did tell you?

7   A.   Oh, yes, I know he told me.

8   Q.   And you just can't remember who it was?

9   A.   Yes.

10  Q.   Do you remember whether it was someone who worked for

11       General Motors?

12  A.   Oh, I'm sure it was.

13  Q.   So after Nu-Tech received a communication from General

14       Motors in the fall of '98, September or October of '98,

15       that GM was going to bring production of part 0694 back

16       in-house, how did you react to that news?

17  A.   Oh, I just about had a heart attack.  That was a good

18       profitable job that they had given us.

19  Q.   And the reason you almost had a heart attack --

20       thankfully you didn't -- is because, based on that

21       communication, it was your understanding that Nu-Tech was

22       losing that business, correct?

23  A.   Yeah, when he said that that day.  And then it was within

24       a week or so he said that, you know, they was going to

25       replace it with this 0510.  In other words, he didn't say

31

1    a number, because they probably didn't have a number

2    then.  But they were going to replace the reservoir with

3    another one that looked similar to it, same volumes and

4    same...

5  Q.  And so you didn't know in the fall of '98 exactly when it

6       was going to happen?

7  A.  No.

8  Q.  But you knew at some point down the line you were going

9       to lose the 0694 business?

10 A.  Yeah.  That's what he told me.

11 Q.  And that you were going to lose it because of GM's strike

12      settlement?

13 A.  Yes.

14 Q.  Did Nu-Tech complain to GM about that?

15 A.  Oh, yes.

16 Q.  What form did those complaints take?  How did it

17      communicate its complaints?

18 A.  We had meetings with purchasing people and with Delphi

19      upper management, Ken -- gosh, I can't...

20 Q.  Ken Szymczak?

21 A.  Pardon me?

22 Q.  Szymczak?

23 A.  Yeah.  Ken and Robinson, Ron or Don or something

24      Robinson.

25 Q.  Were you personally involved in those meetings?

# PAGES INTENTIONALLY OMITTED

51

1          from Nu-Tech; is that correct?

2    A.    They got one tool.  The other one I don't think left.  We

3          run some parts in '99.  I couldn't tell you when.

4    Q.    So you think that --

5    A.    I have invoicing in '99.

6    Q.    You think that when you said in your declaration that a

7          tool was removed on December 31, 1998, you think that was

8          the first tool that was removed?

9    A.    I believe it.  I'd have to -- I got to look, but I

10         recall -- I think I recall invoicing in '99 for this

11         part.

12   Q.    So as best as you can recall, Nu-Tech retained one tool

13         to produce part 0694 until some point in 1999, right?

14   A.    I believe it, yes.

15   Q.    And you just don't remember exactly what point in 1999

16         the second tool was removed, correct?

17   A.    Right.

18   Q.    Do you have a ballpark on when you think it was?

19   A.    Gosh, I don't.  But I can dig that up, but...

20   Q.    So was the procedure under this purchase order the same

21         as under the purchase order that we looked at before in

22         that GM would provide Nu-Tech with a forecast, and

23         Nu-Tech would then, you know, produce that number of

24         parts?  Is that how it worked?

25   A.    Yes.

52

1    Q.   Do you think Nu-Tech produced part 0694 throughout this

2         contract period, throughout the end of July '99, or do

3         you think it was before then that --

4    A.   I don't know for sure, but I'm going to guess that we

5         didn't have the tool in July of '99.  I think they got it

6         before that.

7    Q.   And when the second tool was removed from Nu-Tech,

8         whenever that was, did Nu-Tech stop getting forecasts at

9         that point?

10   A.   To be honest with you, I don't know.  We must have.  We'd

11        have no way to produce it.

12   Q.   Right.  It wouldn't make much sense?

13   A.   Yeah, it wouldn't make sense for them to send forecasts

14        if they had both tools.

15                  MR. PAPELIAN:  I have to leave.  Sorry.

16   Q.   (By Mr. Campanario) Is there a reason why your

17        declaration talks about the removal of a tool on

18        December 31, 1998, but doesn't say anything about the

19        timing of the removal of the other tool?

20                  It just seems not the way I would do it.

21   A.   Yeah, I don't...

22   Q.   Is it because you didn't remember when the other tool was

23        removed?  Or was there some other reason for not

24        including that in your declaration?

25   A.   No.  I don't recall when the second tool was removed.

# PAGES INTENTIONALLY OMITTED

66

1      today.

2                  Do you have an understanding of which of those

3      two scenarios it is?

4    A.   No, I don't.  No.  I never -- at the time maybe I read

5         it, but I didn't...

6    Q.   All right.  That will save us some time.  I know we've

7         gone over this a couple of times; we don't know exactly

8         when the tools were removed.  But by May 3rd of 1999 had

9         they been removed, both of them?

10   A.   May 3rd of '99?

11   Q.   Or maybe you just don't remember.

12   A.   I don't recall --

13   Q.   Okay.

14   A.   -- exactly.  I should, but...

15   Q.   And do you know why the expiration date of the standard

16        blanket contract was extended under the May 1999 document

17        that is Exhibit 17?  Because the expiration date under

18        the old one was July 31, '99, right?

19   A.   Right.

20   Q.   Under this one, it's December 31, 2000?

21   A.   That's right.

22   Q.   Do you know why that is?

23   A.   My assumption, to be honest with you, I assumed we were

24        going to get the tool back.

25   Q.   Wait a second.  I thought you just said you didn't even

PAGES INTENTIONALLY
OMITTED

1          Delphi had separated from GM?

2    A.   Yes.

3    Q.   And that's the basis for you saying that it was Delphi

4         who notified you in September or October of 1998 that

5         production of part 0694 was going to be brought in-house?

6    A.   Yes.

7    Q.   A couple more issues.  I think we have probably 10

8         minutes left, if we're lucky.

9              Are you familiar with the term Division 2?  Is

10        that used within Nu-Tech?

11   A.   No, I don't think so.

12   Q.   Did you review Nu-Tech's financial statements as part of

13        your responsibilities as vice president of Nu-Tech?

14   A.   Back then, yes.

15   Q.   If I showed you a financial statement with a line item

16        entry under sales for Division 2 Purchasing, would that

17        refresh your memory at all?

18   A.   Oh, yeah.  Okay.  Now I know.

19   Q.   What types of activities did Division 2 Purchasing engage

20        in, if you know?

21   A.   Division 2, what I done -- in the automotive industry,

22        minority participation is required on all contracts.  To

23        what extent, the amounts is all over.  My conveyor

24        business, there's no place to get minority content.  In

25        other words, there's not an electrical contractor out

98

1    there you can sub it to that's minority.  In my conveyor

2    business, I done a $125-million-a-year business.

3            As part of the contractual requirements for GM,

4    Ford and Chrysler, everybody else for that matter,

5    Toyota, they require a certain amount of minority

6    participation in your contract.  Example, you get a

7    $10 million contract, you have to have -- Chrysler is up

8    to 20 percent now.  Back then, everybody was around five

9    to seven percent.

10           And there's no place to get that, because the

11   subcontractors are not minority out there.  So you try to

12   buy some steel from a minority company or something to

13   try to get this requirement.  And it was just a hassle

14   every day, every day, every day.

15           So what I done is I run purchase orders through

16   this minority company that got me my participation, and

17   they charged them two points, I think.  Then I have --

18   Q.  You ran the purchase order through Nu-Tech?

19   A.  Right.

20   Q.  So that the conveyor business could be counted as having

21       gone through a minority-owned business?

22   A.  Right.  So I can list these guys as a minority contact.

23       And what they done to earn their money is --

24   Q.  What Nu-Tech did to earn its money?

25   A.  Yeah.  What they did, they obviously done the paperwork;

GRUSKIN & ASSOCIATES
248.737.6691

99

1    you know, I would write them a purchase order, they would

2    write Conte Electric, an electric company, a purchase

3    order, and the money would come back the same way.

4           So they had to write them a purchase order, and

5    then my purchase order to Nu-Tech, I used that as

6    minority participation on the job.

7  Q.  Gotcha, gotcha.

8  A.  I think I give them two percent or something.  That's how

9    I kept the thing afloat for a long time.  That's how I

10   dumped all this million and a half out of Fab.  When they

11   went upside down, they owed Fab a million bucks.

12  Q.  So the Division 2 Purchasing business was Fab conveyor

13   business?

14  A.  Yes.

15  Q.  That was put through Nu-Tech in the way that you just

16   described?

17  A.  Paperwork, just paperwork was all they did.  My own

18   purchasing people controlled, so they got the right

19   specifications and all that kind of stuff.  They just

20   done the paperwork.

21  Q.  Okay.  I understand.

22           I want to go back and talk a little bit about

23   the labor that was required to produce 0694.  Once

24   Nu-Tech stopped receiving releases for 0694, what

25   happened to the workers who had been hired to produce

1      0694?

2   A.  Probably, if you look at my payroll records, most of them

3       got laid off or maybe they went to another job in there.

4       I'm going to guess they probably got laid off.

5   Q.  And how long would you have kept them on payroll before

6       laying them off?

7   A.  If I didn't have anything for them to do, probably a

8       couple weeks at the most, you know.

9   Q.  Okay.  If you didn't lay them off, you reassigned them to

10      do other tasks; is that correct?

11  A.  Yeah.  I don't pay anybody to stand around.

12  Q.  The last thing that I want to talk about is this issue

13      with material costs and whether Nu-Tech had any material

14      costs associated with its production of part 0694.

15          And are you aware that Nu-Tech's financial

16      statements include cost of goods sold in connection with

17      part 0694?

18  A.  Yes.

19  Q.  And do those costs of goods sold include material costs?

20  A.  On the financial statement?

21  Q.  Yes.

22  A.  Yes.

23  Q.  Are you aware that Nu-Tech's tax returns for 1998 include

24      cost of goods sold in connection with part 0694?

25  A.  Now that you mention that, I don't know that, but I'm

PAGES INTENTIONALLY OMITTED

114

RE-EXAMINATION

BY MR. CAMPANARIO:

1

2

3   Q.   In the exchange you just had with your counsel, you

4        testified that in August of 1998, when Nu-Tech sent out

5        an invoice with respect to part 0694, that invoice would

6        go to Delphi?

7   A.   To my knowledge, yes.

8   Q.   Do you mean Delphi as a division of General Motors?

9   A.   No.  At that point in time it was Delphi.

10  Q.   You believe that in August of 1998 Delphi had already

11       separated from GM; is that right?

12  A.   That's what I believe, yes.

13  Q.   And that's the basis for your statement that the invoices

14       went to Delphi as a standalone entity?

15  A.   Yes.

16  Q.   How about with the payments; you also testified that in

17       August of 1998, when Nu-Tech received payments for part

18       0694, those payments came from Delphi, correct?

19  A.   Yes.

20  Q.   And does that mean Delphi as a division of GM, or does

21       that mean Delphi as a standalone entity?

22  A.   Delphi as Delphi, standalone.

23  Q.   And that's based on the same assumption, correct, that by

24       August of 1998 Delphi had separated from GM?

25  A.   Yes.

PAGES INTENTIONALLY
OMITTED

1      STATE OF MICHIGAN)
                    )

2      COUNTY OF WAYNE  )

3             CERTIFICATE OF NOTARY PUBLIC

4          I, BONNIE J. HUMM, a Notary Public in and for

5      the above county and state, do hereby certify that the

6      deposition of said witness was taken before me at the

7      time and place hereinbefore set forth; the witness was by

8      me first duly sworn to testify to the truth; that

9      thereupon the foregoing questions were asked and

10     foregoing answers made stenographically and later reduced

11     to typewritten form; and I certify that this is a true

12     and correct transcript of my stenographic notes so taken.

13         I also certify that I am not a relative or

14     employee of or an attorney for a party; or a relative or

15     employee of an attorney for a party; or financially

16     interested in the action; nor am I interested directly or

17     indirectly in the matter in controversy either as

18     counsel, agent, attorney, or otherwise.

19

20

21     --------------------------------------------
       BONNIE J. HUMM, CSR-2999, RPR

22     Certified Shorthand Reporter
       Registered Professional Reporter

23     Notary Public, Wayne County, Michigan
       My commission expires:  12/5/13

24

25

# EXHIBIT Q

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)


        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :      Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :      Case No. 05-44481 (RDD)
                                          :
        Debtors.                          :      (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF TINA WEBER IN SUPPORT OF DEBTORS' OBJECTION TO
PROOF OF CLAIM NO. 1279 (NU-TECH PLASTICS ENGINEERING, INC.)

I, Tina Weber, declare as follows:

1.     I am currently a Delphi Powertrain Business Line Purchasing Manager.  I have been employed by General Motors Corporation ("GM") or Delphi Corporation ("Delphi") since 1977.  From 1992 to late 1998 I was a chemical-commodity manager for GM with supervisory authority over certain buyers, including Trenia Patrick (formerly Trenia Turner) and another buyer who dealt directly with Nu-Tech Plastics Engineering, Inc. ("Nu-Tech").  In late 1998, I was named a GM business-line purchasing manager and held that position until Delphi separated from GM in 1999.

2.     I make this declaration in support of Delphi's objection to proof of claim number 1279 filed by Nu-Tech.  The statements in this declaration are based upon my personal knowledge.

3.     Nu-Tech supplied several parts to GM and Delphi Automotive Systems LLC ("DAS") from 1996 through 2000, including a fuel reservoir identified as part number 25160694 (the "Part").  During that period, Nu-Tech participated in a mentorship program for minority-owned suppliers that was established by GM and continued by Delphi.

4.     Nu-Tech entered into its first Part-related agreement with GM (not DAS) in November 1997, when GM added the Part to an existing purchase order by issuing Purchase Order 8C934, Rev. No. 002, a copy of which is attached to this declaration as <u>Exhibit A</u>.  Purchase Order 8C934, Rev. No. 002 expired on July 31, 1998, and it is my understanding that Nu-Tech is not asserting that DAS breached that agreement.

5.     In June 1998, GM (not DAS) issued a new purchase order covering the Part – Purchase Order 9C941, a copy of which is attached to this declaration as <u>Exhibit B</u> – with a term running from August 1, 1998, through July 31, 1999.  A short time after it issued Purchase

2

Order 9C941, GM transitioned from one purchasing system (PPS) to another (GPS).  In August

1998, after the transition, GM (not DAS) reissued its purchase order for the Part using the new

purchasing system's form – Standard Blanket Contract Number N580000B (the "GM Purchase

Order"), a copy of which is attached to this declaration as Exhibit C.

      6.      Although Ms. Patrick asserts in her declaration that she issued the GM

Purchase Order when "Delphi was spun off by General Motors" (Patrick Dec. ¶ 24), and that

DAS "assumed" Purchase Order 9C941 by issuing the GM Purchase Order (id.), that is not the

case.  The GM Purchase Order was issued in August 1998, months before the spin-off in 1999.

And again, the purpose of the GM Purchase Order was merely to reissue Purchase Order 9C941

using the form from GM's new purchasing system, without changing the terms of the agreement.

      7.      Meanwhile, in June 1998, one of GM's labor unions stopped work at two

GM plants in Flint, Michigan.  As part of its agreement with the union settling the work stoppage

in July 1998, GM agreed to produce the Part itself using union labor.  By the end of 1998, GM

had recovered from Nu-Tech's plant all of the GM tools needed to produce the Part.

      8.      In May 1999, DAS issued Amendment Number 1 to Standard Blanket

Contract N580000B (the "Purchase Order"), a copy of which is attached to this declaration as

Exhibit D.  This Purchase Order, which was Nu-Tech's first Part-related agreement with DAS (as

opposed to GM), extended the term of the GM Purchase Order through December 31, 2000.  At

the time of this amendment, Nu-Tech did not have the GM tools needed to produce the Part and

DAS was under an obligation to produce the Part itself as part of the labor agreement ending the

strike in the summer of 1998.

      9.      Nu-Tech was placed in Delphi's troubled-supplier program in September

1999.  As part of that program, Delphi's business consultant, BBK, Ltd. ("BBK"), was sent to

3

Tina Weber Declaration

Nu-Tech's headquarters to monitor and develop potential strategies for improving Nu-Tech's business. At about the same time, Nu-Tech, with the assistance of Delphi and BBK, began to look at potential acquirers. Nu-Tech ultimately agreed to sell its assets to another supplier, Rapid Product Technologies, L.L.C. ("Rapid"), in January 2000. On January 15, 2000, the day after Nu-Tech executed its final agreement with Rapid, DAS issued an amendment to the Purchase Order (the "Amended Purchase Order") substituting Rapid as the seller of the Part. A copy of the Amended Purchase Order is attached to this declaration as Exhibit E.

10.    To my knowledge, Nu-Tech did not communicate to Delphi or DAS its assertion that DAS had breached the agreement concerning the Part until it filed its lawsuit against GM and DAS in December 2002.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 5, 2007.

TINA WEBER

4

# EXHIBIT A

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

SHIP-CONS      932543663

PURCHASE ORDER

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| BC934 | 002 | 11/05/97 | 1 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBG | 11/17/97 |

| NET | PAYMENT TERMS | | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | | GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV NOTES:      THIS REVISION TO ADD PART NUMBER 25160694 TO CONTRACT.
PLANT O2 FACTORY ASSIST.
PRICE OF $ 1.86 HAS BEEN ESTABLISHED AND REPRESENTS AN
ESTIMATE BASED ON AN AVERAGE MATERIAL PRICE.
APPROPRIATE ADJUSTMENT WILL BE MADE TO PIECE PRICE, DEPENDING
ON FINAL DECISION TO CONSIGN MATERIAL OR ALLOW UNTECH TO
PURCHASE DIRECT.
LYNN ARENS 11-5-97

PO/REV CLAUSES:      ACI      THE NAO DISBURSEMENT CENTER WILL GENERATE PAYMENT FOR MATERIAL
SHIPMENTS FOR PART NUMBERS DETAILED ON YOUR GM CONTRACT AT THE
CURRENT CONTRACT UNIT PRICE.

TO FACILITATE PAYMENT YOU MUST ADHERE TO THE FOLLOWING GUIDELINES:

PACKING SLIPS MUST BE ATTACHED TO EACH SHIPMENT AND INCLUDE THE
FOLLOWING DETAIL:
1.   P.O. NUMBER PROVIDED BY DELPHI ENERGY & ENGINE MGT SYSTEMS
2.   GM PART NUMBER ASSIGNED
3.   DESCRIPTION OF ITEM SHIPPED
4.   SHIP DATE
5.   SHIPPING IDENTIFICATION NUMBER - A UNIQUE PACKING SLIP OR

TAX INFORMATION:

NU TECH PLASTICS ENGINEERING
JOHN MAILEY-PRESIDENT
8018 EMBURY ROAD
GRAND BLANC      MI      48439

PRODUCTION SAMPLES ARE TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
APPROX AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS FOR THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, DELPHI REV. #75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:      CFF      TRENIA A. TURNER

ACKNOWLEDGED BY                                                          DATE

030047-000748

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE
GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER
1998 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| RC934 | 002 | 11/05/97 | 2 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 11/17/97 |

SHIP-DUNS  932543663

| F.O.B. POINT | |
|---|---|
| GRAND BLANC | MI |

| F.O.B. TERMS |
|---|
| COLLECT |

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:   ACI

6.   INVOICE NUMBER FOR EACH SHIPMENT
     SHIP FROM DUN AND BRADSTREET NUMBER

DO NOT SEND INVOICES FOR MATERIAL (PRODUCT) SHIPMENTS.  THE MATERIAL
SHIPPED WILL BE PAID UNDER THE EVALUATED "PRICED" RECEIPT STRATEGY
OF NAO DISBURSEMENTS.  THE PACKING SLIP NUMBER USED TO IDENTIFY THE
SHIPMENT MUST BE A NUMBER YOUR RECEIVABLES CAN USE TO IDENTIFY THE
PAYMENT ON YOUR REMITTANCE ADVICE.

PHONE CALLS REGARDING QUANTITY DISCREPANCIES MUST BE DIRECTED TO THE
REQUISITIONER.

PHONE CALLS REGARDING PRICE DISCREPANCIES MUST BE DIRECTED TO THE
BUYER.

A MONTHLY STATEMENT IS REQUIRED TO BE SENT TO NAO DISBURSEMENTS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN, THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:      CFF   TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000749

## AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| BCB368 | 002 | 11/05/97 | 3 OF 10 |

**PURCHASE ORDER**

**1998 MODEL YEAR**

| | F.O.B. POINT | | Z NUMBER | EFFECTIVE DATE |
|---|---|---|---|---|
| | GRAND BLANC | MI | BHBC | 11/17/97 |

| F.O.B. TERMS |
|---|
| COLLECT |

REQUIREMENTS CONTRACT REVISION

| SHIP TO—GONS | PAYMENT TERMS |
|---|---|
| NET | |
| 25TH PROX | OR NONE/25TH PROX |

PO/REV CLAUSES: ACI

PLEASE NOTE; FOB TERMS ON THE CONTRACT ARE FREIGHT COLLECT. ALL COMMON CARRIER CHARGES MUST BE SENT COLLECT UNLESS OTHER TERMS ARE NOTED ON THE CONTRACT. NAQ DISBURSEMENTS WILL NOT PROCESS FREIGHT PAYMENTS DIRECT TO THE SUPPLIER.

UPS "CONSIGNEE BILLING". QUESTIONS SHOULD BE DIRECTED TO UPS BY PHONING 1-800-354-7527. PLEASE HAVE YOUR INDIVIDUAL LOCATION UPS SHIPPER ACCOUNT NUMBER READY WHEN CALLING.

AED  CALL (800) 436-6668 FOR TRANSPORTATION ROUTING INSTRUCTIONS FOR DELPHI ENERGY AND ENGINE MANAGEMENT SYSTEMS SHIPMENTS. THIS SUPERCEDES ANY PREVIOUS ROUTING INSTRUCTION ISSUED.

SELLER SHALL DEMONSTRATE THAT SELLER HAS THE ABILITY TO RECEIVE AND PROCESS ORDERS, FORECASTS, PLANNING AND SHIPPING INFORMATION FOR GENERAL MOTORS AND THEIR CUSTOMERS AND SUPPLIERS, USING EDI AS THE METHOD FOR COMMUNICATION USING ANSI X12 STANDARDS FOR TRANSMISSIONS AND TRANSACTION SETS DEFINED BY THE GENERAL MOTORS CUSTOMER FOR EACH

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF, APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D868 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:   CFF   TRENIA A. TURNER       ACKNOWLEDGED BY                    DATE

030047-000750

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

PURCHASE ORDER

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 8G99H | 002 | 11/05/97. | 4 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 11/17/97 |

| SHIP-POINT | PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|---|
| 25TH PROX | NET 25TH PROX OR NONE/25TH PROX | GRAND BLANC   MI | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:

AED  EDI APPLICATION.  SELLER SHALL ALSO DEMONSTRATE THE ABILITY TO
     GENERATE THE GM 1724, LABEL USING INFORMATION TRANSMITTED IN THE
     AIAG ANSI X-12, 862 TRANSACTION SET.

     SELLER SHALL PROVIDE COMMON BAR CODED SHIPPING LABELS AS THE MEANS
     TO IDENTIFY GOODS FOR SHIPMENT AS DEFINED IN THE "GM 1724 GENERAL
     MOTORS SHIPPING PARTS IDENTIFICATION LABEL STANDARDS", PUBLISHED
     BY THE SUPPLIER QUALITY ADMINISTRATION, GENERAL MOTORS WORLDWIDE
     PURCHASING.

CAP

     INVOICE TO ADDRESS:
     --------------------

     NAO DISBURSEMENTS
     DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
     PO BOX 436037
     PONTIAC MI 48343-6037

CFF  CLAUSE CFL - CORPORATE FORCED LABOR & QUALITY CLAUSE:
     SELLER REPRESENTS THAT GOODS PURCHASED UNDER THIS ORDER WERE NOT
     PRODUCED WITH FORCED LABOR (AS DEFINED IN 19 U.S.C. 1307) EITHER

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENT AGE SHOWN BY THE PERCENT AGE SHOWN BY GM 449, REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
RELEASE AGAINST PURCHASE ORDER.
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

TAX INFORMATION:

BUYER:          CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

030047-000751

FORM 3560040
REV

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE
GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1998 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 16934 | 002 | 11/05/97 | 5 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

SHIP TO/VIS    932543663

| PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|
| NET | GRAND BLANC | MI | COLLECT |
| 25TH PROX OR NONE/25TH PROX | | | |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    CFL BY SELLER OR SELLER'S SUPPLIERS. SELLER SHALL INDEMNIFY BUYER
AGAINST ANY LIABILITY BUYER MAY INCUR IF THIS REPRESENTATION IS
INCORRECT.

SELLER AGREES TO PARTICIPATE IN BUYER'S SUPPLIER QUALITY AND
DEVELOPMENT PROGRAM(S). IN ADDITION, SELLER SHALL COMPLY WITH
ALL QUALITY REQUIREMENTS AND PROCEDURES SPECIFIED BY BUYER,
AS THE SAME MAY BE REVISED FROM TIME TO TIME, INCLUDING THOSE
APPLICABLE TO SELLER AS SET FORTH IN "QUALITY SYSTEM REQUIREMENTS
QS-9000."

GOVERNING LAW: THIS AGREEMENT AND ALL TRANSACTIONS CONTEMPLATED
HEREUNDER SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF MICHIGAN, UNITED STATES OF AMERICA,
BUT NOT INCLUDING THE STATE OF MICHIGAN CONFLICT OF LAWS,
INTERNATIONAL SALES OF GOODS. ANY DISPUTES ARISING UNDER THIS
AGREEMENT SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE
FEDERAL OR STATE COURTS LOCATED IN THE STATE OF MICHIGAN.

SELLER, AND ANY GOODS AND SERVICES SUPPLIED BY SELLER, SHALL BE YEAR
2000 COMPLIANT AND COMPATIBLE, AND SHALL FUNCTION WITHOUT ERROR OR
FAULT IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO CALCULATING,
MANAGING, MANIPULATING, COMPARING, AND SEQUENCING) OF DATE AND
DATE-RELATED DATA, FOR THE YEARS 2000 AND BEYOND.  AT BUYER'S REQUEST,

TAX INFORMATION:

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PRIOR TO SHIPMENT OF PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF.
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR DMS REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

PURCHASE ORDER

1998 MODEL YEAR

**THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|----------|----------|------------|------|
| 8931 | 002 | 11/05/97 | 6 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|----------|----------------|
| BHBC | 11/17/97 |

| SHIP TO SONS | NET | PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:   CFL   SELLER SHALL CERTIFY IN WRITING ITS COMPLIANCE WITH THE FOREGOING.

CTB (RIGHT TO AUDIT);
GM BUYER RESERVES THE RIGHT TO AUDIT ALL PERTINENT DOCUMENTS
RELATING TO THE GOODS OR SERVICES COVERED BY THIS PURCHASE ORDER
AND IF REQUESTED BY BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION
PROMPTLY.

C40  IF MATH DATA IS TO BE UTILIZED FOR THIS ORDER, C4 COMPLIANCE IS
REQUIRED. THE FOLLOWING C4 GUIDELINES SHOULD BE USED IN CONJUNCTION
WITH THE GM SUPPLIER C4 INFORMATION BOOKLET (GM-1825), AS WELL AS ANY
RELATED STATEMENTS OF WORK, STATEMENTS OF REQUIREMENTS, OR OTHER
SPECIFICATIONS DOCUMENTS GOVERNING THE USE OF C4 AND MATH DATA FOR
THIS ORDER.

BUYER'S PREFERENCE IS TO PROVIDE ALL MATH DATA TRANSMISSIONS TO
SELLER IN THE NATIVE FILE FORMAT OF BUYER'S MATH DATA MASTER. IF
NON-STRATEGIC SOFTWARE IS USED, SELLER ASSUMES ALL COSTS ASSOCIATED
WITH ADDITIONAL TRANSLATIONS. IF SELLER IS TO RETURN ANY MATH DATA,
IT MUST BE DATABANKED IN THE NATIVE FILE FORMAT OF THE MATH DATA
MASTER.

SELLER IS RESPONSIBLE FOR THE INSPECTION AND VERIFICATION OF PARTS
TO THE BUYER'S MATH DATA MASTER.

TAX INFORMATION:

**PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL** WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, ON A PART NUMBER BASIS, BEFORE PARTS ARE SHIPPED. UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:         CFF   TRENIA A.   TURNER

ACKNOWLEDGED BY                                    DATE

030047-000753

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

932543663

**THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.**

PURCHASE ORDER

1998 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 8080 | 002 | 11/05/97 | 7 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

| NET | PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC | MI | COLLECT |

SHIP:ACNS

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    C40

IF PORTABLE MATH DATA MEDIA (MAGNETIC TAPES, CASSETTES, OR DISKS) ARE
USED, SUCH ITEMS AND ANY COPIES BELONG SOLELY TO BUYER AND MUST BE
RETURNED WITHIN 30 DAYS.  BUYER'S PORTABLE MATH DATA MEDIA ARE NOT TO
BE USED OR STORED ON SELLER'S LIBRARIES.

BUYER DEVELOPED PROPRIETARY PRODUCTIVITY TOOLS (SUCH AS UG/GRIP,
USER FUNCTIONS, UNIX SCRIPTS, ETC.), PROVIDED FOR USE IN CONNECTION
WITH THIS ORDER, SHALL NOT BE UTILIZED BY SELLER FOR ANY PURPOSE(S)
OTHER THAN THIS ORDER.  ALL COPIES OF BUYER'S PROPRIETARY PRODUCTIVITY
TOOLS ARE TO BE DESTROYED OR RETURNED TO BUYER UPON REQUEST OR AT
COMPLETION OF THIS ORDER.

C95  CLAUSE C95 - SERVICE REQUIREMENTS:
IN ACCEPTING A PRODUCTION CONTRACT, SELLER IS RESPONSIBLE FOR
MAINTAINING TOOLS TO DRAWING SPECIFICATIONS AND PROVIDING, WHEN
SCHEDULED, ANY FUTURE SERVICE REQUIREMENTS FOR CONTRACTED PARTS.
TOOLING MUST BE MAINTAINED UNTIL SELLER RECEIVES WRITTEN NOTICE
FROM A GM BUYER AUTHORIZING THE MOVEMENT OR SCRAP OF TOOLS.

SELLER AGREES TO PROVIDE ALL INFORMATION NECESSARY FOR BUYER TO
COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS AND RELATED LEGAL
REPORTING OBLIGATIONS IN THE COUNTRY(IES) OF DESTINATION.  SELLER
AGREES TO PROVIDE ALL DOCUMENTATION AND/OR ELECTRONIC TRANSACTION

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:    CFF    TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

030047-000754

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

PURCHASE ORDER

1998 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|----------|----------|------------|------|
| 9G984 | 002 | 11/05/97 | 8 OF 10 |

| | | | EFFECTIVE DATE |
|---|---|---|---|
| F.O.B. TERMS | Z NUMBER | | 11/17/97 |
| COLLECT | BHBC | | |

SHIP TO GM

932543663

| NET | PAYMENT TERMS | F.O.B. POINT |
|-----|---------------|--------------|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC    MI |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:   C95  RECORDS TO ALLOW BUYER TO MEET CUSTOMS RELATED OBLIGATIONS, ANY
LOCAL CONTENT/ORIGIN REQUIREMENTS, AND TO OBTAIN ALL TARIFF AND
TRADE PROGRAM DUTY AVOIDANCE(S) AND/OR REFUND BENEFITS, WHERE
APPLICABLE.

SELLER AGREES TO COMPLY WITH THE AUTOMOTIVE INDUSTRY ACTION GROUP'S
(AIAG) DOCUMENT AND EDI PROTOCOL AND STANDARDS IN THEIR SUPPLIER
INFORMATION KIT FOR US, CANADA, AND MEXICO IMPORTS.

SELLER AGREES TO ASSUME, AND TO INDEMNIFY BUYER AGAINST, ANY AND
ALL FINANCIAL RESPONSIBILITY ARISING FROM SELLER'S FAILURE TO
COMPLY WITH THESE REQUIREMENTS AND/OR TO SUPPLY BUYER WITH THE
INFORMATION REQUIRED TO MEET LEGAL REPORTING OBLIGATIONS, INCLUDING,
WITHOUT LIMITATION, ANY FINES, PENALTIES, FORFEITURES, OR COUNSEL
FEES INCURRED OR IMPOSED AS A RESULT OF ACTIONS TAKEN BY THE
IMPORTING COUNTRY'S GOVERNMENT.

· · · · · · · · · · · · · ·PREMIUM FREIGHT CLAUSE.· · · · · · · · · · · ·
IF SELLER'S ACTS OR OMISSIONS RESULT IN SELLER'S FAILURE TO MEET
BUYER'S REQUIREMENTS AND BUYER REQUIRES A MORE EXPEDITIOUS METHOD
OF TRANSPORTATION FOR THE GOODS THAN THE TRANSPORTATION METHOD
ORIGINALLY SPECIFIED BY BUYER, SELLER SHALL SHIP THE GOODS AS

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL, AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR DR69 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:     CFF   TRENIA A. TURNER

ACKNOWLEDGED BY                                    DATE

030047-000755

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

**PURCHASE ORDER**

__1998 MODEL YEAR__

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 80934 | 002 | 11/05/97 | 9 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 11/17/97 |

SHIP-DUNS    932543663

| NET | PAYMENT TERMS | F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|---|---|
| 25TH PROX | OR NONE/25TH PROX | GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT
REVISION

PO/REV CLAUSES:    C95    EXPEDITIOUSLY AS POSSIBLE AT SELLER'S SOLE EXPENSE.
                   SCE    SUPPLIER AGREES TO PROVIDE TO GENERAL MOTORS CORPORATION ANY
                          COST DATA OR DOCUMENTATION AS REQUESTED BY THE GENERAL MOTORS
                          COST ENGINEERING ACTIVITY.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:                    OFF   TRENIA  A.  TURNER

ACKNOWLEDGED BY                                              DATE

030047-000756

**THIS PURCHASE ORDER**
**NUMBER MUST APPEAR ON**
**ALL INVOICES, PACKAGES, PACKING SLIPS,**
**AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| E6934 | 002 | 11/05/97 | 10 OF 10 |

## PURCHASE ORDER

**1998 MODEL YEAR**

RE: DELCO SYSTEMS
THE CLAUSES FOR ADDRESS

**VENDOR:** BHBC NU TECH PLASTICS ENGINEERING
**BUYER :** CFF    TRENIA A. TURNER

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M V I S | T R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXPENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25160694 | RESERVOIR-F/PMP | X | | | 2 | N | 14000 16 | 100 | 1.86000 | USD EACH | 11/17/97 07/31/98 | 11/14/97 | 03/07/96 |

FORM SWPAPP
REV 04/94

030047-000757

# EXHIBIT B

**AUTOMOTIVE COMPONENTS GROUP WORLDWIDE**

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

**PURCHASE ORDER**

1999 MODEL YEAR

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9034 | 000 | 06/23/98 | 1 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

SHIP TO/BILL TO: 932543663

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

| F.O.B. POINT | |
|---|---|
| GRAND BLANC | MI |

| F.O.B. TERMS |
|---|
| COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:  ACI THE NAO DISBURSEMENT CENTER WILL GENERATE PAYMENT FOR MATERIAL
SHIPMENTS FOR PART NUMBERS DETAILED ON YOUR GM CONTRACT AT THE
CURRENT CONTRACT UNIT PRICE.

TO FACILITATE PAYMENT YOU MUST ADHERE TO THE FOLLOWING GUIDELINES:

PACKING SLIPS MUST BE ATTACHED TO EACH SHIPMENT AND INCLUDE THE
FOLLOWING DETAILS:
1.  P.O. NUMBER PROVIDED BY DELPHI ENERGY & ENGINE MGT SYSTEMS
2.  GM PART NUMBER ASSIGNED
3.  DESCRIPTION OF ITEM SHIPPED
4.  SHIP DATE
5.  SHIPPING IDENTIFICATION NUMBER - A UNIQUE PACKING SLIP OR
    INVOICE NUMBER FOR EACH SHIPMENT
6.  SHIP FROM DUN AND BRADSTREET NUMBER

DO NOT SEND INVOICES FOR MATERIAL (PRODUCT) SHIPMENTS. THE MATERIAL
SHIPPED WILL BE PAID UNDER THE EVALUATED "PRICED" RECEIPT STRATEGY
OF NAO DISBURSEMENTS. THE PACKING SLIP NUMBER USED TO IDENTIFY THE
SHIPMENT MUST BE A NUMBER YOUR RECEIVABLES CAN USE TO IDENTIFY
PAYMENT ON YOUR REMITTANCE ADVICE.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEE'S REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASES AGAINST PURCHASE ORDER, OR D689 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

NU TECH PLASTICS ENGINEERING
JOHN MALLEY-PRESIDENT
8018 EMBURY ROAD
GRAND BLANC      MI      48439

BUYER: CFF  TRENIA A. TURNER

ACKNOWLEDGED BY _____  DATE _____

ACG AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1999 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9034 | 000 | 06/23/98 | 2 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

SHIP-TO/BILL
932543663

| F.O.B. POINT | |
|---|---|
| GRAND BLANC | MI |

| F.O.B. TERMS |
|---|
| COLLECT |

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:   ACI PHONE CALLS REGARDING QUANTITY DISCREPANCIES MUST BE DIRECTED TO THE REQUISITIONER.

PHONE CALLS REGARDING PRICE DISCREPANCIES MUST BE DIRECTED TO THE BUYER.

A MONTHLY STATEMENT IS REQUIRED TO BE SENT TO NAO DISBURSEMENTS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

PLEASE NOTE; FOB TERMS ON THE CONTRACT ARE FREIGHT COLLECT. ALL COMMON CARRIER CHARGES MUST BE SENT COLLECT UNLESS OTHER TERMS ARE NOTED ON THE CONTRACT. NAO DISBURSEMENTS WILL NOT PROCESS FREIGHT PAYMENTS DIRECT TO THE SUPPLIER.

UPS "CONSIGNEE BILLING". QUESTIONS SHOULD BE DIRECTED TO UPS BY PHONING 1-800-354-7527. PLEASE HAVE YOUR INDIVIDUAL LOCATION UPS SHIPPER ACCOUNT NUMBER READY WHEN CALLING.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF, APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEE'S REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:       CFF   TRENIA A. TURNER

ACKNOWLEDGED BY _____   DATE _____

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9E941 | 000 | 06/23/98 | 3 OF 10 |

PURCHASE ORDER

1999 MODEL YEAR

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

SHIP TO/SPNS   932543663

| PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|
| NET | GRAND BLANC | MI | COLLECT |
| 25TH PROX | | | |
| OR NONE/25TH PROX | | | |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:   ACI

AED

CALL (800) 436-6668 FOR TRANSPORTATION ROUTING INSTRUCTIONS FOR
DELPHI ENERGY AND ENGINE MANAGEMENT SYSTEMS SHIPMENTS.
THIS SUPERCEDES ANY PREVIOUS ROUTING INSTRUCTION ISSUED.

SELLER SHALL DEMONSTRATE THAT SELLER HAS THE ABILITY TO RECEIVE AND
PROCESS ORDERS, FORECASTS, PLANNING AND SHIPPING INFORMATION FOR
GENERAL MOTORS AND THEIR CUSTOMERS AND SUPPLIERS, USING EDI AS THE
METHOD FOR COMMUNICATION USING ANSI X12 STANDARDS FOR TRANSMISSIONS
AND TRANSACTION SETS DEFINED BY THE GENERAL MOTORS CUSTOMER FOR EACH
EDI APPLICATION. SELLER SHALL ALSO DEMONSTRATE THE ABILITY TO
GENERATE THE GM 1724, LABEL USING INFORMATION TRANSMITTED IN THE
AIAG ANSI X-12, 862 TRANSACTION SET.

SELLER SHALL PROVIDE COMMON BAR CODED SHIPPING LABELS AS THE MEANS
TO IDENTIFY GOODS FOR SHIPMENT AS DEFINED IN THE "GM 1724 GENERAL
MOTORS SHIPPING PARTS IDENTIFICATION LABEL STANDARDS", PUBLISHED
BY THE SUPPLIER QUALITY ADMINISTRATION, GENERAL MOTORS WORLDWIDE
PURCHASING.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN OF THE PART OR THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:   CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1999 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9C94 | 000 | 06/23/98 | 4 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

| F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|
| GRAND BLANC | MI | COLLECT |

SHIP TO GM'S: 932543663

REQUIREMENTS CONTRACT

| PAYMENT TERMS | |
|---|---|
| NET | OR NONE/25TH PROX |
| 25TH PROX | |

PO/REV CLAUSES:   AED
CAP

INVOICE TO ADDRESS:

NAO DISBURSEMENTS
DELPHI ENERGY & ENGINE MANAGEMENT SYSTEMS
PO BOX 436037
PONTIAC MI 48343-6037

CFL CLAUSE CFL - CORPORATE FORCED LABOR & QUALITY CLAUSE:
SELLER REPRESENTS THAT GOODS PURCHASED UNDER THIS ORDER WERE NOT
PRODUCED WITH FORCED LABOR (AS DEFINED IN 19 U.S.C. 1307) EITHER
BY SELLER OR SELLER'S SUPPLIERS.  SELLER SHALL INDEMNIFY BUYER
AGAINST ANY LIABILITY BUYER MAY INCUR IF THIS REPRESENTATION IS
INCORRECT.

SELLER AGREES TO PARTICIPATE IN BUYER'S SUPPLIER QUALITY AND
DEVELOPMENT PROGRAM(S).  IN ADDITION, SELLER SHALL COMPLY WITH
ALL QUALITY REQUIREMENTS AND PROCEDURES SPECIFIED BY BUYER,
AS THE SAME MAY BE REVISED FROM TIME TO TIME, INCLUDING THOSE
APPLICABLE TO SELLER AS SET FORTH IN "QUALITY SYSTEM REQUIREMENTS
QS-9000".

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDER AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDER'S REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D869 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:   CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

FORM SM
REV 0

| | | |
|---|---|---|
| | 932543663 | |

| SHIP FROM | | |
|---|---|---|

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9C844 | 000 | 06/23/98 | 5 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

PURCHASE ORDER

1999 MODEL YEAR

| F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|
| GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:    CFL  GOVERNING LAW:  THIS AGREEMENT AND ALL TRANSACTIONS CONTEMPLATED
HEREUNDER SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE
WITH THE LAWS OF THE STATE OF MICHIGAN, UNITED STATES OF AMERICA,
BUT NOT INCLUDING THE UNITED NATIONS CONVENTION ON CONTRACTS FOR
INTERNATIONAL SALES OF GOODS.  ANY DISPUTES ARISING UNDER THIS
AGREEMENT SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE
FEDERAL OR STATE COURTS LOCATED IN THE STATE OF MICHIGAN.

SELLER, AND ANY GOODS AND SERVICES SUPPLIED BY SELLER, SHALL BE YEAR
2000 COMPLIANT AND COMPATIBLE, AND SHALL FUNCTION WITHOUT ERROR OR
FAULT IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO CALCULATING,
MANAGING, MANIPULATING, COMPARING, AND SEQUENCING) OF DATE AND/ING
DATE-RELATED DATA, FOR THE YEARS 2000 AND BEYOND.  AT BUYER'S REQUEST,
SELLER SHALL CERTIFY IN WRITING ITS COMPLIANCE WITH THE FOREGOING.

CT8  (RIGHT TO AUDIT):
GM BUYER RESERVES THE  RIGHT TO AUDIT ALL PERTINENT DOCUMENTS
RELATING TO THE GOODS OR SERVICES COVERED BY THIS PURCHASE ORDER
AND IF REQUESTED BY BUYER, SELLER SHALL PROVIDE SUCH DOCUMENTATION
PROMPTLY.

C40  IF MATH DATA IS TO BE UTILIZED FOR THIS ORDER, C4 COMPLIANCE IS
REQUIRED.  THE FOLLOWING C4 GUIDELINES SHOULD BE USED IN CONJUNCTION
WITH THE GM SUPPLIER C4 INFORMATION BOOKLET (GM-1825), AS WELL AS ANY

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENT SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D660 REV. A-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:

CFF  TRENIA A. TURNER

ACKNOWLEDGED BY _____

DATE _____

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

1999 MODEL YEAR

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9094 | 000 | 06/23/98 | 6 OF 10 |

| Z NUMBER | EFFECTIVE DATE |
|---|---|
| BHBC | 08/01/98 |

| SHIP TERMS | | F.O.B. POINT | |
|---|---|---|---|
| 25TH PROX | | GRAND BLANC    MI | |

| PAYMENT TERMS | | F.O.B. TERMS |
|---|---|---|
| NET 932543663 | | COLLECT |

| 25TH PROX | OR NONE/25TH PROX | |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:

C40 RELATED STATEMENTS OF WORK, STATEMENTS OF REQUIREMENTS, OR OTHER
SPECIFICATIONS DOCUMENTS GOVERNING THE USE OF C4 AND MATH DATA FOR
THIS ORDER.

BUYER'S PREFERENCE IS TO PROVIDE ALL MATH DATA TRANSMISSIONS TO
SELLER IN THE NATIVE FILE FORMAT OF BUYER'S MATH DATA MASTER. IF
NON-STRATEGIC SOFTWARE IS USED, SELLER ASSUMES ALL COSTS ASSOCIATED
WITH ADDITIONAL TRANSLATIONS. IF SELLER IS TO RETURN ANY MATH DATA,
IT MUST BE DATABANKED IN THE NATIVE FILE FORMAT OF THE MATH DATA
MASTER.

SELLER IS RESPONSIBLE FOR THE INSPECTION AND VERIFICATION OF PARTS
TO THE BUYER'S MATH DATA MASTER.

IF PORTABLE MATH DATA MEDIA (MAGNETIC TAPES, CASSETTES, OR DISKS) ARE
USED, SUCH ITEMS AND ANY COPIES BELONG SOLELY TO BUYER AND MUST BE
RETURNED WITHIN 30 DAYS. BUYER'S PORTABLE MATH DATA MEDIA ARE NOT TO
BE USED OR STORED ON SELLER'S LIBRARIES.

BUYER DEVELOPED PROPRIETARY PRODUCTIVITY TOOLS (SUCH AS UG/GRIP,
USER FUNCTIONS, UNIX SCRIPTS, ETC.) PROVIDED FOR USE IN CONNECTION
WITH THIS ORDER, SHALL NOT BE UTILIZED BY SELLER FOR ANY PURPOSE(S)
OTHER THAN THIS ORDER. ALL COPIES OF BUYER'S PROPRIETARY PRODUCTIVITY

TAX INFORMATION:

BUYER:

CFF   TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE

GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9C941 | 000 | 06/23/98 | 7 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

PURCHASE ORDER

1999 MODEL YEAR

SHIP TO: 9325-43663

| NET | PAYMENT TERMS |
|---|---|
| 25TH PROX | OR NONE/25TH PROX |

| F.O.B. POINT | | F.O.B. TERMS |
|---|---|---|
| GRAND BLANC | MI | COLLECT |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:

C40  TOOLS ARE TO BE DESTROYED OR RETURNED TO BUYER UPON REQUEST OR AT
     COMPLETION OF THIS ORDER.

C95  CLAUSE C95 - SERVICE REQUIREMENTS:
     IN ACCEPTING A PRODUCTION CONTRACT, SELLER IS RESPONSIBLE FOR
     MAINTAINING TOOLS TO DRAWING SPECIFICATIONS AND PROVIDING, WHEN
     SCHEDULED, ANY FUTURE SERVICE REQUIREMENTS FOR CONTRACTED PARTS.
     TOOLING MUST BE MAINTAINED UNTIL SELLER RECEIVES WRITTEN NOTICE
     FROM A GM BUYER AUTHORIZING THE MOVEMENT OR SCRAP OF TOOLS.

     SELLER AGREES TO PROVIDE ALL INFORMATION NECESSARY FOR BUYER TO
     COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS AND RELATED LEGAL
     REPORTING OBLIGATIONS IN THE COUNTRY(IES) OF DESTINATION. SELLER
     AGREES TO PROVIDE ALL DOCUMENTATION AND/OR ELECTRONIC TRANSACTION
     RECORDS TO ALLOW BUYER TO MEET CUSTOMS RELATED OBLIGATIONS, ANY
     LOCAL CONTENT/ORIGIN REQUIREMENTS, AND TO OBTAIN ALL TARIFF AND
     TRADE PROGRAM DUTY AVOIDANCE(S) AND/OR REFUND BENEFITS, WHERE
     APPLICABLE.

     SELLER AGREES TO COMPLY WITH THE AUTOMOTIVE INDUSTRY ACTION GROUP'S
     (AIAG) DOCUMENT AND EDI PROTOCOL AND STANDARDS IN THEIR SUPPLIER
     INFORMATION KIT FOR US, CANADA, AND MEXICO IMPORTS.

     SELLER AGREES TO ASSUME, AND TO INDEMNIFY BUYER AGAINST, ANY AND.

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THAT ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

TAX INFORMATION:

BUYER:

CFF  TRENIA A. TURNER

ACKNOWLEDGED BY

DATE

FORM SN-----0
REV 0

ACCG
AUTOMOTIVE COMPONENTS GROUP

AUTOMOTIVE COMPONENTS GROUP WORLDWIDE
GENERAL MOTORS CORPORATION
PLEASE REFERENCE
CLAUSES FOR RETURN
ADDRESS INFORMATION

PURCHASE ORDER

THIS PURCHASE ORDER
NUMBER MUST APPEAR ON
ALL INVOICES, PACKAGES, PACKING SLIPS,
AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9094 | 000 | 06/23/98 | 8 OF 10 |

| | Z NUMBER | EFFECTIVE DATE |
|---|---|---|
| | BHBC | 08/01/98 |

1999 MODEL YEAR

SHIPP-BMS  9325436663

| PAYMENT TERMS | F.O.B. POINT | F.O.B. TERMS |
|---|---|---|
| NET | GRAND BLANC        MI | COLLECT |
| 25TH PROX | | |
| OR NONE/25TH PROX | | |

REQUIREMENTS CONTRACT

PO/REV CLAUSES:    C95  ALL FINANCIAL RESPONSIBILITY ARISING FROM SELLER'S FAILURE TO
                        COMPLY WITH THESE REQUIREMENTS AND/OR TO SUPPLY BUYER WITH THE
                        INFORMATION REQUIRED TO MEET LEGAL REPORTING OBLIGATIONS, INCLUDING,
                        WITHOUT LIMITATION, ANY FINES, PENALTIES, FORFEITURES, OR COUNSEL
                        FEES INCURRED OR IMPOSED AS A RESULT OF ACTIONS TAKEN BY THE
                        IMPORTING COUNTRY'S GOVERNMENT.

            ............PREMIUM FREIGHT CLAUSE.............
            IF SELLER'S ACTS OR OMISSIONS RESULT IN SELLER'S FAILURE TO MEET
            BUYER'S REQUIREMENTS AND BUYER REQUIRES A MORE EXPEDITIOUS METHOD
            OF TRANSPORTATION FOR THE GOODS THAN THE TRANSPORTATION METHOD
            ORIGINALLY SPECIFIED BY BUYER, SELLER SHALL SHIP THE GOODS AS
            EXPEDITIOUSLY AS POSSIBLE AT SELLER'S SOLE EXPENSE.

      SCE  SUPPLIER AGREES TO PROVIDE TO GENERAL MOTORS CORPORATION ANY
            COST DATA OR DOCUMENTATION AS REQUESTED BY THE GENERAL MOTORS
            COST ENGINEERING ACTIVITY.

TAX INFORMATION:

PRODUCTION SAMPLES TO BE SUBMITTED FOR APPROVAL, WHERE INDICATED, IN ACCORDANCE WITH GENERAL MOTORS QUALITY RELIABILITY PRODUCTION PART APPROVAL
PROCESS, PPAP, BEFORE PRODUCTION SHIPMENTS ARE MADE.
VENDOR AGREES TO SELL AND VENDEE AGREES TO PURCHASE AT THE PRICE AND UPON AND SUBJECT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE HEREOF,
APPROXIMATELY THE PERCENTAGE SHOWN BY THE PART OF THE VENDEES REQUIREMENTS OF THE ATTACHED ITEMS FOR THE MODEL YEAR SHOWN.
RELEASE AGAINST PURCHASE ORDER, OR D669 REV. 4-75, WHICH IS A PART OF THIS CONTRACT, WILL BE ISSUED AS REQUIRED, SPECIFYING QUANTITIES
AND SHIPPING QUANTITIES AND SHIPPING INSTRUCTIONS.

BUYER:

        CFF   TRENIA A. TURNER

                                                    ACKNOWLEDGED BY

                                                                            DATE

DELCO SYSTEMS
REFERENCE CLAUSES FOR ADDRESS

VENDOR: BHBC NU TECH PLASTICS ENGINEERING
BUYER : CFF TRENIA A. TURNER

**THIS PURCHASE ORDER NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES, PACKING SLIPS, AND BILLS OF LADING.**

| P.O. NO. | REV. NO. | ISSUE DATE | PAGE |
|---|---|---|---|
| 9091 | 000 | 06/23/98 | 9 OF 10 |

## PURCHASE ORDER
### 1999 MODEL YEAR

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M T V I S R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXPENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05638496 | CAP | A | | | N | 0 / 16 | 100 | 1.05000 | USD EA | 08/01/98 07/31/99 | | 09/03/93 |
| 06471223 | VALVE BODY | A | | | N | 0 / 16 | 100 | 0.39000 | USD EACH | 08/01/98 07/31/99 | | 09/03/93 |
| 064723369 | BODY VALVE | A | | | N | 0 / 16 | 100 | 0.95000 | USD EA | 08/01/98 07/31/99 | | 09/03/93 |
| 10243265 | RESERVOIR-FUEL | A | | | 2 N | 2235 / 10 | 100 | 0.58610 | USD EA | 08/01/98 07/31/99 | | 07/16/97 |
| 15624642 | RESERVOIR-F/TNK | A | | | N | 1376 / 16 | 100 | 1.58700 | USD EA | 08/01/98 07/31/99 | | 12/10/88 |
| 15701701 | RESERVOIR-FUEL | A | | | N | 2752 / 16 | 100 | 1.37900 | USD EA | 08/01/98 07/31/99 | | 12/12/91 |
| 15721555 | RESERVOIR-F/TNK | A | | | N | 2752 / 16 | 100 | 1.06200 | USD EA | 08/01/98 07/31/99 | | 01/07/97 |
| 15721556 | RESERVOIR-F/TNK | A | | | N | 2752 / 16 | 100 | 1.75000 | USD EA | 08/01/98 07/31/99 | | 09/19/96 |
| 25140109 | ARM | A | | | 3 N | 10000 / 16 | 100 | 0.13500 | USD EACH | 08/01/98 07/31/99 | | 08/16/95 |
| 25160694 | RESERVOIR-F/PMP | A | | | 2 N | 14000 / 16 | 100 | 1.86000 | USD EACH | 08/01/98 07/31/99 | | 03/17/98 |

REF \*C DELCO SYSTEMS
REF SEE CLAUSES FOR ADDRESS

VENDOR: BHBC NU TECH PLASTICS ENGINEERING
BUYER : CFF  TRENIA A. TURNER

## THIS PURCHASE ORDER
## NUMBER MUST APPEAR ON
## ALL INVOICES, PACKAGES, PACKING SLIPS,
## AND BILLS OF LADING.

| P.O. NO. | REV. NO. | ISSUE DATE |
|---|---|---|
| 9094 | OOO | 06/23/98 |

PAGE
10 OF 10

## PURCHASE ORDER
## 1999 MODEL YEAR

| PART NUMBER | PART DESCRIPTION | R E A | C L A | PQS REQUIRED (CODES) | M T V I S R | DAILY CAPACITY /HOURS | APRX. % OF BUS. | PRICES EXPENDABLE RETURNABLE | CURR UNIT | DATES EFFECTIVE EXPIRATION | SAMPLE DATE | DRAWING DATE/ NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25554083 | RESERVOIR-F/TNK | A | | | 2 N | 1580 10 | 100 | 2.28000 | USD EA | 08/01/98 07/31/99 | | 01/09/98 |

FORM SMPAPP
REV. 06/94

# EXHIBIT C

Contract Line Item Page: 1 of 1      Issue Date: 17-Aug-1998

Standard Blanket Contract Number: N580000B     Amendment Number: 000

Part Number: 000000025160694

# LINE ITEM DETAIL

## DELPHI
### Automotive Systems

**GM Corporation**



| This Line Item is effective from | **01-Aug-1998** | through | **31-Jul-1999** |
|---|---|---|---|

**Part Description:**      RESERVOIR-F/PMP FUEL

**Amendment Reason:**      New Contract Line Item

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
NU TECH PLASTICS ENGINEERING
8018 EMBURY
GRAND BLANC,MI 48439
UNITED STATES

**Buyer Name:**
Turner, Trenia
**Buyer Code:**     CFF
**Phone:**        810-257-8305
**Fax:**          810-257-8016

**Hazardous Material Indicator:**      N

**Terms and Conditions**

*********

030047-000758

| This Period effective from | 01-Aug-1998 | through | 31-Jul-1999 |
| --- | --- | --- | --- |

**Freight Terms:** Collect
**Payment Terms:** 25th Prox
**Delivery Terms:** FREE ON BOARD - USA
**Delivery DUNS:** 00932543663
**Ship From DUNS:** 00932543663
**Daily Capacity:** 14,000
**Hours Per Day:** 16
**Price Type:** Expendable

**Price Composition:**

The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.

All Prices are expressed in **USD**

**Base Price:** 1.860000

| Total Price: | 1.860000 |
| --- | --- |
| UOM: EACH | |

**Receiving Plants and Plant Percentage**
As scheduled                                                          100%

**Terms & Conditions**
Right to Audit
C4

# EXHIBIT D

Contract Line Item Page:        1  of       Issue Date:   09-May-1999

**Standard Blanket Contract Number:**   N580000B       **Amendment Number:**   001
**Part Number:**   000000025160694

# LINE ITEM DETAIL



# DELPHI

## Automotive Systems

*Delphi Automotive Systems LLC*

| | | | |
|---|---|---|---|
| This Line Item is effective from | 01-Aug-1998 | through | 31-Dec-2000 |

**Part Description:**        RESERVOIR-F/PMP FUEL
**Amendment Reason:**     Expiration Date Extended

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
NU TECH PLASTICS ENGINEERING
8018 EMBURY
GRAND BLANC,MI 48439
UNITED STATES

**Buyer Name:**
Arens, Lynn
**Buyer Code:**        CFF
**Phone:**        810-257-8305
**Fax:**          810-257-8016

**Drawing Date:**        11-22-94
**Hazardous Material Indicator:**        N

**Terms and Conditions**
*********

| | | | |
|---|---|---|---|
| This Period effective from | 03-May-1999 | through | 31-Dec-2000 |

**Freight Terms:**        Collect
**Payment Terms:**       (M32) MNS-2, On average, payment shall be made on the second day of the second
month following Buyers receipt date of goods or services.
**Delivery Terms:**       FREE ON BOARD-USA/CANADA/MEXICO
**Delivery DUNS:**       00932543663
**Ship From DUNS:**       00932543663
**Daily Capacity:**       14,000
**Hours Per Day:**       16
**Price Type:**          Expendable

030047-000760

# EXHIBIT E

Contract Header Page:    1  of  1

# CONTRACT HEADER



*Delphi Automotive Systems LLC*

## SUPPLIER NAME AND ADDRESS INFORMATION:

**DUNS Number:**    00932543663
RAPID PRODUCT TECHNOLOGIES PLT 2
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

**Mailing Address Information:**
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

| Contract Header Number: | N5800 |
| --- | --- |

This contract sets forth the exclusive terms and conditions under which
seller shall sell and buyer shall purchase the goods or services described
in the line item detail of this contract for the period(s) specified
therein. Terms and conditions proposed by seller which are different from
or in addition to the provisions of this contract are unacceptable to
buyer, are expressly rejected by buyer, and shall not become a part of this
contract. Any modification of this contract shall be made only in
accordance with the provisions of paragraph 31 of the contract terms and
conditions.

030047-000600

Contract Line Item Page:     1  of  2                          Issue Date:   15-Jan-2000

**Standard Blanket Contract Number:**   N580000B           **Amendment Number:**   003
                                                            **Part Number:**   000000025160694

# LINE ITEM DETAIL



*Delphi Automotive Systems LLC*

| This Line Item is effective from | **01-Aug-1998** | through | **15-Jan-2000** |
|---|---|---|---|

**Part Description:**          RESERVOIR-F/PMP FUEL
**Amendment Reason:**          DUNS Transfer Update

**Manufacturing DUNS Number:**
00932543663

**Supplier Name and Manufacturing Address:**
RAPID PRODUCT TECHNOLOGIES PLT 2
8018 EMBURY RD
GRAND BLANC,MI 48439
UNITED STATES

**Buyer Name:**
Arens, Lynn
Buyer Code:          CFF
Phone:               810-257-8305
Fax:                 810-257-8016

**Drawing Date:**                02-10-99
**Hazardous Material Indicator:**     N

**Line Item Notes:**
11-3-99 Amendment created to allow for reprint of purchase order.

**Terms and Conditions:**
**********

| This Period effective from | **03-May-1999** | through | **15-Jan-2000** |
|---|---|---|---|

**Freight Terms:**          Collect
**Payment Terms:**          (M32) MNS-2, On average, payment shall be made on
                            the second day of the second month following
                            Buyers receipt date of goods or services.
**Delivery Terms:**         FREE ON BOARD (FOB) - USA/CANADA/MEXICO
**Delivery DUNS:**          00932543663
**Ship From DUNS:**         00932543663
**Daily Capacity:**         14,000
**Hours Per Day:**          16
**Price Type**             Expendable

030047-000601

Contract Line Item Page:          2  of  2                                    Issue Date:    15-Jan-2000

**Standard Blanket Contract Number:**   N580000B          **Amendment Number:**   003
                                                           **Part Number:**   000000025160694

**Price Composition:**

**The Total Price is composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes.**

All Prices are expressed in          *USD*

**Base Price:**                                                                      1.860000

| | |
|---|---|
| **Total Price:** | 1.860000 |
| **UOM:**          EACH | |

**Receiving Plants and Plant Percentage**
As scheduled                                          100%

**Terms & Conditions:**
Right to Audit
C4

030047-000602

# CONTRACT ATTACHMENT

# DELPHI
## Automotive Systems

*Delphi Automotive Systems LLC*

**Contract Header Number:**   N5800

**Contract Terms & Conditions:**
   **Short Description**

**Detailed Description**

030047-000603

# EXHIBIT R

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
                In re                     :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                Debtors.                  :        (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JAMES M. WEBER

I, James M. Weber, declare as follows:

1.      I am a purchasing manager at General Motors Corporation ("GM") responsible for maintaining current contracts and processing engineering work orders.  I have worked for GM for 28 years.

2.      In July 2007, Delphi asked me to determine how many units of Delphi part number 25160694 (the "Part") GM purchased during calendar years 1999 and 2000.  The Part was one component of a number of fuel-tank assemblies GM used in its vehicles during that period.  GM did not purchase the Part from Delphi directly, but rather purchased completed fuel-tank assemblies including the Part from several suppliers.

3.      To determine which assemblies included the Part, I directed that a search be conducted for the Part number in GM's Global Product Description System, or GPDS.  The GPDS contains engineering releases that detail the component parts of the assemblies.

4.      After it was determined which assemblies included the Part, the part numbers for those assemblies were entered into DACOR, the system GM uses to keep track of its payments to suppliers, and reports were generated listing GM's payments during the relevant time period.  Copies of the DACOR reports are attached to this declaration as Exhibit A and

Exhibit B.  They include all GM payments for assemblies containing the Part in calendar years

1999 and 2000 (as well as some purchases outside of that period).

5.      Each entry in the DACOR reports provides information about (from left to

right):  (a) the DUNS identification number of the supplier; (b) the supplier's name; (c) the GM

processing document number associated with that particular transaction; (d) the amount of the

payment; (e) the form of currency used to make the payment; (f) the GM contract number

covering the transaction; (g) GM's part number for the assembly; (h) a description of the

assembly; (i) the number of units GM purchased; (j) the code for the GM payment center that

made the payment; (k) the date of the invoice; (l) the bill of lading number; (m) the unit of

measurement for the assembly (each assembly counted as one unit); (n) the plant code for the

GM plant that received the assembly; (o) the process number associated with the transaction;

(p) the date on which the data were entered into DACOR; (q) the GM account number charged

for the payment; and (r) the applicable price per unit.

6.      I provided the DACOR reports to Delphi during the week of August 20,

2007.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on September _10_, 2007.

JAMES M. WEBER

2

James M. Weber Declaration

# EXHIBIT A

This exhibit will not be filed, in accordance with paragraph 9(f)(ii) of the Court's Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures Governing Objections To Claim (Docket No. 6088), dated December 6, 2006.

# EXHIBIT B

This exhibit will not be filed, in accordance with paragraph 9(f)(ii) of the Court's Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Objections To Claims And (II) Certain Notices And Procedures Governing Objections To Claim (Docket No. 6088), dated December 6, 2006.

# EXHIBIT S

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
              In re                     :        Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :        Case No. 05-44481 (RDD)
                                        :
              Debtors.                  :        (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUPPLEMENTAL DECLARATION OF KEITH R. FRANCIS
IN SUPPORT OF DEBTORS' OBJECTION TO PROOF OF CLAIM
NO. 1279 (NU-TECH PLASTICS ENGINEERING, INC.)

I, Keith R. Francis, declare as follows:

1.      I am a Senior Director at BBK, Ltd. ("BBK"), an international business advisory firm.  I make this declaration in support of the objection by Delphi Corporation ("Delphi") to proof of claim number 1279 filed by Nu-Tech Plastics Engineering, Inc. ("Nu-Tech"), and in particular to respond to the damages report by Nu-Tech's damages witness, Gary Leeman, dated July 19, 2007, as modified by the updated damages calculation Mr. Leeman disclosed during his deposition on December 20, 2007 (the "Modified Nu-Tech Report"). Except as otherwise indicated, I have personal knowledge of or am otherwise competent to testify as to the matters set forth in this declaration.

A.      <u>Background And Qualifications</u>

2.      I am a Certified Public Accountant licensed in Michigan, a Certified Turnaround Professional, and a Certified Insolvency and Restructuring Advisor.  I have more than 30 years of financial and operations expertise, with experience as a self-employed turnaround consultant, a Chief Operating Officer, a Chief Financial Officer, and a partner in a major public accounting and consulting firm.  I began my career at Plante & Moran LLP, a certified public accounting and business advisory firm, and worked there for 24 years, progressing from staff accountant to audit partner, where I worked directly with owners of automotive manufacturing companies.  Since joining BBK, I have managed many engagements from distressed suppliers to automotive original equipment manufacturers ("OEMs").  A copy of my current executive biography is attached to this declaration as <u>Exhibit VI</u>.

3.      BBK provides advisory services regarding finance, strategy, and operations to clients in a variety of industries, including clients in the OEM, supplier, and aftermarket segments of the automotive industry.  BBK's advisory services encompass areas such as corporate restructuring, corporate finance, litigation support, risk and credit management, due

Keith R. Francis Supplemental Declaration

diligence, advanced planning and development, operations assessment, performance improvement, and operations intervention.

4.      In the fall of 1999, Delphi and General Motors Corporation ("GM") asked BBK to provide financial and operational services regarding Nu-Tech as part of their troubled-supplier program.  As part of this engagement, I, with the assistance of others at BBK, reviewed Nu-Tech's business records, monitored Nu-Tech's operations, investigated and analyzed the financial and operational aspects of Nu-Tech's business, assessed Nu-Tech's financial and operational viability, and spent a considerable amount of time at Nu-Tech's headquarters in Grand Blanc, Michigan.  At that time, the majority owner of Nu-Tech was John Mailey, and the minority owner was John Cooper.  BBK's engagement ended in December 1999 or January 2000, at about the same time as Nu-Tech agreed to sell its assets to another company, Rapid Product Technologies, L.L.C.

5.      In August 2007, I was engaged by Delphi's counsel to review, analyze, and respond to Mr. Leeman's damages report dated July 19, 2007, which asserted that Nu-Tech had suffered aggregate damages of $13,957,130, comprising lost income of $7,638,671 over a two-year period beginning on January 1, 1999, and ending December 31, 2000, lost business value of $4,981,901, and excess costs of $1,336,558 in calendar year 1999 related to payments under building and equipment leases and wage-related payments.  At his deposition on December 20, 2007, Mr. Leeman provided to Delphi's counsel a modified damages calculation of $15,126,582, comprising lost income of $8,545,014 over a two-year period beginning on January 1, 1999, and ending December 31, 2000, lost business value of $5,698,181, and excess costs of $883,387 in calendar year 1999 related to payments under building and equipment leases and wage-related payments.  In January 2008, Delphi's counsel asked me to review, analyze, and

3

respond to Mr. Leeman's modified damages calculation.  My engagement did not include

analyzing or interpreting Nu-Tech's agreements or otherwise addressing the merits of Nu-Tech's

claims.

B.      <u>Summary Of Conclusions</u>

6.      My principal conclusions are as follows:

- <u>Lost Income.</u>  The Modified Nu-Tech Report's calculation of lost income is overstated because (i) it is based on an incorrect assumption regarding the number of parts required by Delphi Automotive Systems LLC ("DAS"), (ii) it takes into account the financial performance of non-core aspects of Nu-Tech's business that should not be included in a lost-income analysis, and (iii) it ignores income taxes.  By correcting these three problems, the lost-income calculation for the entire two-year period used by Nu-Tech decreases to about $1.7 million.  Furthermore, with respect to the period from May 3, 1999, through January 14, 2000 (which I have been instructed is the relevant time period), Nu-Tech's lost income was $742,949.

- <u>Lost Business Value.</u>  The Modified Nu-Tech Report's calculation of lost business value is based on the lost-income calculation (after taxes), and it therefore incorporates two of the three same problems identified above.  In addition, Nu-Tech Report improperly (i) uses after-tax income, rather than free cash flow, as the basis for the calculation, and (ii) applies a capitalization rate, which assumes that Nu-Tech's agreement would have continued in perpetuity, rather than a discount rate, an approach consistent with the fact that Nu-Tech's agreement expired at the end of 2000.  When these deficiencies are corrected, Nu-Tech's estimated lost business value is approximately $1.2 million based on its free cash flow for all of calendar year 1999, without any subtractions of lost income or the sale price Nu-Tech obtained from Rapid.  Moreover, Nu-Tech should not be permitted to recover damages based on lost income <u>and</u> damages based on lost business value because those measures would provide Nu-Tech with multiple recoveries for the same alleged harm based on conflicting theories.

- <u>Excess Costs.</u>  With respect to excess costs, the Modified Nu-Tech Report sets forth the lease payments made by Nu-Tech under certain building and equipment leases and certain wage-related payments in 1999.  However, as part of its assistance to Nu-Tech under Delphi's troubled-supplier program in 1999 and 2000, BBK determined that those leases, all of which were issued by Mr. Cooper or entities owned or controlled by him, called for rents that were significantly above market rates.  As for the wage-related payments, those payments should not be included as excess costs

4

because they were variable costs that were or should not have been incurred by Nu-Tech if it did not produce the part at issue.

C.    Lost Income

7.    According to the Modified Nu-Tech Report, Nu-Tech lost income of $8,545,014 from January 1, 1999, through December 31, 2000, as a result of DAS's failure to purchase part number 25160694 (the "Part") from Nu-Tech during that period.  This calculation is flawed in three respects.  First, it assumes that DAS's requirements for the Part during that period totaled 6,161,053 units.  I was provided with payable records generated by GM showing that the requirements were substantially less.  Those reports, which I have been instructed are attached to a separate declaration submitted by a witness from GM, James M. Weber, reflect that GM purchased 4,076,148 units during the two-year period.  I was also directed to calculate the number of units purchased by GM for three discrete periods within this two-year range.  The results of that calculation are as follows:

- January 1, 1999, through May 2, 1999:  1,087,324 units;

- May 3, 1999, through January 14, 2000:  1,614,555 units; and

- January 15, 2000, through December 31, 2000:  1,374,269 units.

8.    Second, the Modified Nu-Tech Report's calculation improperly incorporates sales and costs associated with Nu-Tech's "Division 2" as well as sales and costs associated with "Tooling."  During the time I spent at Nu-Tech in 1999 and 2000, I learned that Division 2 is essentially an accounting pass through entity that does not conduct any operations related to Nu-Tech's business, and that the Tooling business's revenues were approximately equal to its costs.  For these reasons, I have excluded the financial data related to Division 2 and Tooling from my lost-income analysis.

9.      The third flaw in the Modified Nu-Tech Report's calculation of lost income relates to taxes.  Although the Modified Nu-Tech Report subtracts taxes for purposes of calculating lost business value, it does not do so with respect to the lost-income calculation. When, as here, an income statement shows positive income, a calculation of lost income should account for taxes paid on that income.  My lost-income calculation corrects this error using a tax rate of 34%, the same tax rate used in the Modified Nu-Tech Report's calculation of lost business value.

10.     To determine Nu-Tech's lost income, I corrected the three deficiencies outlined above, but otherwise adopted the same assumptions described in the Modified Nu-Tech Report.  I performed four separate calculations.  The first covers the entire period from January 1, 1999, through December 31, 2000, and is set forth on Exhibit I to this declaration.  The second, third, and fourth cover January 1, 1999, through May 2, 1999, May 3, 1999, through January 14, 2000, and January 15, 2000, through December 31, 2000, respectively, and are set forth on Exhibit II.  The final page of Exhibit II is a summary of the four calculations, and includes a line item subtracting taxes at a rate of 34%.

11.     The results of the four calculations are outlined below:

| Period | Lost Income | Nu-Tech Report | Difference |
|---|---|---|---|
| 01-01-99 to 05-02-99 | $596,538 | - | - |
| 05-03-99 to 01-14-00 | $742,949 | - | - |
| 01-15-00 to 12-31-00 | $394,440 | - | - |
| Total | $1,733,929 | $8,545,014 | ($6,811,085) |

D.      Lost Business Value

12.     The Modified Nu-Tech Report calculates lost business value by applying a capitalization rate of 3.91 to the Modified Nu-Tech Report's calculation of lost after-tax income for 1999, and then subtracting lost pre-tax income for that year and the price Nu-Tech obtained

6

from Rapid for the sale of its assets in January 2000. The result of this calculation is an estimated lost business value of $5,698,181.

13.    Because this calculation is based on the Modified Nu-Tech Report's lost-income calculation (after taxes), it includes two of the three of the flaws discussed in Part C above. In addition, in determining business value, it is common to use the business's free cash flow as the baseline for the valuation because free cash flow is a more reliable measure of value than net income. The Modified Nu-Tech Report uses net income, rather than free cash flow, as the foundation for its calculation.

14.    Furthermore, by multiplying income by a capitalization rate, the Modified Nu-Tech Report assumes that Nu-Tech's agreement to sell the Part would continue in perpetuity. However, I have been instructed that the agreement was set to expire on December 31, 2000 – i.e., approximately one year from the date Nu-Tech sold its assets to Rapid. Because the agreement was for a fixed duration, it is more appropriate to apply a discount rate and determine the net present value of the free cash flow to be obtained under the agreement through the end of 2000, rather than a multiplier that assumes an agreement of indefinite duration.

15.    For purposes of my estimation of lost business value, I calculated Nu-Tech's lost free cash flow for all of calendar year 1999 using the same assumptions described in Part C above, and then applied a discount rate of 25.6%, which is the discount rate implied by a capitalization rate of 3.91 (1/3.91 is 25.6%). This calculation, which is set forth on Exhibit III to this declaration, shows an estimate of $1,239,089. This does not take into account any subtraction of lost income or the sale price Nu-Tech received from Rapid. Furthermore, if the calculation is limited to Nu-Tech's free cash flow from May 3, 1999, through December 31, 1999, rather than all of calendar year 1999, the estimate decreases accordingly.

7

Keith R. Francis Supplemental Declaration

16.      Moreover, Nu-Tech should not recover any damages under a lost-business-value measure because that would provide Nu-Tech with multiple forms of recovery for the same alleged harm based on conflicting theories.  The lost-income calculation discussed above is designed to provide to Nu-Tech the income it would have earned if it had produced 100% of DAS's requirements for the part in 1999 and 2000.  By contrast, the theory underlying the calculation of lost business value is that Rapid (or another buyer) would have paid more for Nu-Tech's assets in January 2000 if Nu-Tech had produced 100% of DAS's requirements in 1999 and Rapid expected that DAS would continue to order 100% of its requirements from Rapid following the asset sale.  These two hypotheticals cannot coexist – Nu-Tech could produce the part and earn the income in 1999 and 2000, or Nu-Tech could produce the part in 1999 and then sell its assets for a higher price in January 2000, but not both.  Accordingly, it would be inappropriate to allow Nu-Tech to recover damages based on lost income <u>and</u> damages based on lost business value.

E.    <u>Excess Costs</u>

17.      The final element of the Modified Nu-Tech Report damages calculation is termed excess costs.  These costs comprise payments made by Nu-Tech under building and equipment leases and other wage-related payments in 1999.  All of the leases at issue were between Nu-Tech and either Mr. Cooper himself or entities owned or controlled by Mr. Cooper, and it is my conclusion that Mr. Cooper charged Nu-Tech rents that were well above market rates.  Because of his role in the leasing companies, Mr. Cooper was in a position to mitigate Nu-Tech's alleged excess lease costs by, for example, reducing or suspending rents, but apparently he did not do so.

18.      When Nu-Tech was in Delphi's troubled-supplier program in 1999 and 2000, BBK conducted an analysis of several of Nu-Tech's leases, including the leases at issue

8

Keith R. Francis Supplemental Declaration

here, and compared the economic terms of those leases to market rates for comparable property. The results of the analysis – which are set forth in <u>Exhibit IV</u> to this declaration, which addresses real property leases, and <u>Exhibit V</u>, which deals with personal property leases – demonstrated that the economic terms of the leases were significantly above market.

19.    With respect to the building leases, for example, BBK estimated that Nu-Tech paid approximately $10.00 per square foot under the lease for 8024 Embury Road and approximately $11.99 per square foot under the lease for 4068 Baldwin Road, Building B (these leases are the second and fourth entries on <u>Exhibit IV</u>).  By contrast, BBK's market research showed that the market rate at that time was in the range of $4 to $5 per square foot.  Thus, whereas Nu-Tech made aggregate lease payments of $278,670 ($158,750 for 8024 Embury Road and $119,920 for 4068 Baldwin Road, Building B) for those two buildings in 1999, at market rates the aggregate payments would have been somewhere between $103,500 and $129,375.

20.    As for personal property leases, as shown on <u>Exhibit V</u>, BBK analyzed several of Nu-Tech's leases (including leases not addressed in the Modified Nu-Tech Report), and determined that they carried an average interest rate of 16.56%.  The market interest rate for comparable leases at that time was only 10% to 12%.

21.    The Modified Nu-Tech Report includes in its excess-costs calculation $461,709 in wage-related payments in calendar year 1999, comprising $394,185 in wages, $34,097 in payroll taxes, and $33,427 in health-insurance payments.  As reflected in the operating payroll and expenses portion of the Modified Nu-Tech Report's lost-income calculation for 1999, those wage-related payments constituted variable costs – <u>i.e.</u>, costs that changed directly with Nu-Tech's production of the part at issue.  If Nu-Tech did not produce the part in 1999 (as the Modified Nu-Tech Report assumes), then Nu-Tech did not or should not

9

have incurred those costs in 1999. It is therefore inappropriate to include the wage-related

payments as excess costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed

on January __7__, 2008

KEITH R. FRANCIS

Keith R. Francis Supplemental Declaration

# EXHIBIT I

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Contribution Format**
**1/1/99 - 12/31/00**

---

| Exhibit I |
| --- |

| | Variable/Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Historical - 1998 Ratio |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Sales** | | | | | | | |
| Tooling | | | | | - | - | 0.00% |
| Division 2 Purchasing | | | | | - | - | 0.00% |
| Miscellaneous | | | | | - | 1,229 | 0.02% |
| Delphi | | | 7,581,635 | | 7,581,635 | 4,839,410 | 74.43% |
| Chrysler | | | | | - | 47,171 | 0.73% |
| Johnson Controls | | | | | - | 334,314 | 5.14% |
| GT Products | | | | | - | 649,625 | 9.99% |
| Briskin Manufacturing | | | | | - | 16,066 | 0.25% |
| GM SPO | | | | | - | 368,201 | 5.66% |
| Powertrain | | | | | - | 123,935 | 1.91% |
| Oxford Suspension | | | | | - | 15,277 | 0.23% |
| Reacom | | | | | - | 106,321 | 1.64% |
| Total Sales | | | 7,581,635 | - | 7,581,635 | 6,501,549 | 100.00% |
| | | | | | | | |
| **Cost of Goods Sold** | | | | | | | |
| Tooling | V | | | | - | - | 0.00% |
| Division 2 Purchasing | V | | | | - | - | 0.00% |
| Research & Development | V | 0.02% of Sales | 1,516 | | 1,516 | 1,000 | 0.02% |
| Delphi | V | | | | - | 2,249,565 | 34.60% |
| Chrysler | V | | | | - | 35,997 | 0.55% |
| Johnson Controls | V | | | | - | 275,360 | 4.24% |
| GT Products | V | | | | - | 395,616 | 6.08% |
| Briskin Manufacturing | V | | | | - | 9,431 | 0.15% |
| GM SPO | V | | | | - | 156,821 | 2.41% |
| Powertrain | V | | | | - | 59,852 | 0.92% |
| Oxford Suspension | V | | | | - | 9,408 | 0.14% |
| Reacom | V | | | | - | 66,444 | 1.02% |
| Freight & Delivery | V | 0.67% of Sales | 50,797 | | 50,797 | 43,526 | 0.67% |
| Engineering | V | | - | | | 264 | 0.00% |
| Equipment Maintenance | V | 1.17% of Sales | 88,705 | | 88,705 | 75,976 | 1.17% |
| Supplies - Shop | V | 1.43% of Sales | 108,417 | | 108,417 | 92,974 | 1.43% |
| Supplies - Quality Control | V | 0.21% of Sales | 15,921 | | 15,921 | 13,603 | 0.21% |
| Inventory Overhead Adjustment | V | | | | - | (2,201,564) | -33.86% |
| Total Cost of Goods Sold | | | 265,356 | - | 265,356 | 1,284,273 | 19.75% |
| | | | | | | | |
| **Gross Profit** | | | 7,316,279 | - | 7,316,279 | 5,217,276 | 80.25% |
| | | | | | | | |
| **Operating Payroll & Expenses** | | | | | | | |
| Salaries & Wages - Other | V | 18.22% of Sales | 1,381,374 | | 1,381,374 | 1,184,530 | 18.22% |
| Salaries & Wages - Officer & Admin. | F | | - | 644,000 | 644,000 | 322,000 | 4.95% |
| Contract Labor | V | 1.13% of Sales | 85,672 | | 85,672 | 73,643 | 1.13% |
| Payroll Taxes | V | 8.65% | 8.65% of PR | 119,489 | 55,706 | 175,195 | 130,307 | 2.00% |
| Payroll Expenses - Other | V | 0.00% of Sales | - | | - | 57 | 0.00% |
| Health Insurance | V | 8.48% | 8.48% of PR | 117,141 | 54,611 | 171,752 | 127,681 | 1.96% |
| Total Payroll & Expenses | | | 1,703,676 | 754,317 | 2,457,993 | 1,838,218 | 28.26% |
| | | | | | | | |
| **Profit After Payroll & Expenses** | | | 5,612,603 | (754,317) | 4,858,286 | 3,379,058 | 51.99% |
| | | | | | | | |
| **Other Controllable Expenses** | | | | | | | |
| Advertising | V | 0.00% of Sales | | | - | 143 | 0.00% |
| Bank Service Charges | F | | | 17,576 | 17,576 | 8,788 | 0.14% |
| Blueprints | V | 0.04% of Sales | 3,033 | | 3,033 | 2,585 | 0.04% |
| Contributions | F | | | 4,812 | 4,812 | 2,406 | 0.04% |
| Dues & Subscriptions | F | | | 5,512 | 5,512 | 2,756 | 0.04% |
| Shop Maintenance | F | | | 400 | 400 | 200 | 0.00% |
| Office Maintenance | F | | | 6,742 | 6,742 | 3,371 | 0.05% |
| Machinery Movers & Riggers | V | 2.14% of Sales | 162,247 | | 162,247 | 139,059 | 2.14% |
| Building Maintenance | F | | | 58,308 | 58,308 | 29,154 | 0.45% |
| Fees & Permits | V | 0.01% of Sales | 758 | | 758 | 500 | 0.01% |
| Miscellaneous | V | 0.19% of Sales | 14,405 | | 14,405 | 12,281 | 0.19% |
| Postage & Delivery | V | 0.06% of Sales | 4,549 | | 4,549 | 3,625 | 0.06% |
| Supplies | V | 1.06% of Sales | 80,365 | | 80,365 | 68,873 | 1.06% |
| Telephone | V | 0.42% of Sales | 31,843 | | 31,843 | 27,120 | 0.42% |

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Outside Format**
**1/1/99 - 12/31/00**

| Exhibit I | | | | | | | |

| | Variable/ Fixed | Basis | | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|---|
| Pager Service | V | | 0.06% of Sales | 4,549 | | 4,549 | 3,948 | 0.06% |
| Meals & Entertainment | V | | 0.45% of Sales | 34,117 | | 34,117 | 29,333 | 0.45% |
| Travel | V | | 0.46% of Sales | 34,876 | | 34,876 | 30,014 | 0.46% |
| Uniforms | V | | 0.11% of Sales | 8,340 | | 8,340 | 7,036 | 0.11% |
| Gas & Electric | V | | 3.05% of Sales | 231,240 | | 231,240 | 198,150 | 3.05% |
| Water | V | | 0.01% of Sales | 758 | | 758 | 389 | 0.01% |
| Vehicle Expense | F | | | | 87,718 | 87,718 | 43,859 | 0.67% |
| Total Controllable Expenses | | | | 611,080 | 181,068 | 792,148 | 613,590 | 9.45% |
| | | | | | | | | |
| **Profit After Controllable Expenses** | | | | **5,001,523** | **(935,385)** | **4,066,138** | **2,765,468** | **42.54%** |
| | | | | | | | | |
| Other Non-Controllable Expenses | | | | | | | | |
| Depreciation - Office Equipment | F | | | | 28,722 | 28,722 | 14,361 | 0.22% |
| Depreciation - Leasehold Improvements | F | | | | 41,968 | 41,968 | 20,984 | 0.32% |
| Depreciation - Plant Equipment | F | | | | 281,008 | 281,008 | 140,504 | 2.16% |
| Depreciation - Vehicles | F | | | | 18,166 | 18,166 | 9,083 | 0.14% |
| Amortization Expense | F | | | | 9,206 | 9,206 | 4,603 | 0.07% |
| Interest Expense | V | | 3.20% of Sales | 242,612 | | 242,612 | 207,913 | 3.20% |
| General Insurance | F | | | | 30,392 | 30,392 | 15,196 | 0.23% |
| Workers' Compensation Insurance | V | 1.26% | 1.26% of PR | 17,405 | 8,114 | 25,519 | 19,030 | 0.29% |
| Umbrella Insurance | F | | | | 2,346 | 2,346 | 1,173 | 0.02% |
| Accounting | F | | | | 5,350 | 5,350 | 2,675 | 0.04% |
| Consulting | V | | 0.40% of Sales | 30,328 | | 30,328 | 25,894 | 0.40% |
| Legal Fees | F | | | | 32,134 | 32,134 | 16,067 | 0.25% |
| Taxes - Local | F | | | | 17,422 | 17,422 | 8,711 | 0.13% |
| Taxes - Property Taxes | F | | | | 182,306 | 182,306 | 91,153 | 1.40% |
| Single Business Tax | V | | 0.23% of Sales | 17,438 | | 17,438 | 14,832 | 0.23% |
| Uncollectible Accounts | V | | 0.43% of Sales | 32,601 | | 32,601 | 28,152 | 0.43% |
| Waste Collection | V | | 0.07% of Sales | 5,307 | | 5,307 | 4,245 | 0.07% |
| Total Non-/Controllable Expenses | | | | 345,691 | 657,135 | 1,002,826 | 624,576 | 9.60% |
| | | | | | | | | |
| **Profit Before Equipment & Building Rent** | | | | **4,655,832** | **(1,592,520)** | **3,063,312** | **2,140,892** | **32.94%** |
| | | | | | | | | |
| Additional Rental Expenses Specific to Delphi Part 60694 | | | | | | | | |
| Equipment Rental | F | | | | 493,425 | 493,425 | 979,151 | 15.06% |
| Building Rent | F | | | | 349,930 | 349,930 | 656,455 | 10.10% |
| Total Additional Rental Expense Specific to Delphi Part 60694 | | | | - | 843,355 | 843,355 | 1,635,606 | 25.16% |
| | | | | | | | | |
| **Profit Before Other Income** | | | | **4,655,832** | **(2,435,875)** | **2,219,957** | **505,286** | **7.78%** |
| | | | | | | | | |
| Other Income | | | | | | | | |
| Interest Income | | | | - | - | - | 25,727 | 0.40% |
| Other Income | | | | - | - | - | 11,909 | 0.18% |
| Total Other Income | | | | - | - | - | 37,636 | 0.58% |
| | | | | | | | | |
| **Net Income/(Loss)** | | | | **4,655,832** | **(2,435,875)** | **2,219,957** | **542,922** | **8.36%** |
| | | | | | | | | |
| Less: Delphi Attributed Fixed Expenses | | | | | | | | |
| Total Delphi Attributed Fixed Expenses | | | | 843,355 | | | | |
| 74.43% Fixed Expenses before Equipment & Building Rent | | 1,592,520 | | 1,185,312 | | | | |
| Total Delphi Attributed Fixed Expenses | | | | 2,028,667 | | | | |
| | | | | | | | | |
| **Loss of Income** | | | | **2,627,165** | | | | |

# EXHIBIT II

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income in German Format**
**1/1/99 - 5/2/99**

| Exhibit II-A |
| --- |

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Tooling | | | | | - | - | 0.00% |
| Division 2 Purchasing | | | | | - | - | 0.00% |
| Miscellaneous | | | | | - | 1,229 | 0.02% |
| Delphi | | | 2,022,423 | | 2,022,423 | 4,839,410 | 74.43% |
| Chrysler | | | | | - | 47,171 | 0.73% |
| Johnson Controls | | | | | - | 334,314 | 5.14% |
| GT Products | | | | | - | 649,625 | 9.99% |
| Briskin Manufacturing | | | | | - | 16,066 | 0.25% |
| GM SPO | | | | | - | 368,201 | 5.66% |
| Powertrain | | | | | - | 123,935 | 1.91% |
| Oxford Suspension | | | | | - | 15,277 | 0.23% |
| Reacom | | | | | - | 106,321 | 1.64% |
| Total Sales | | | 2,022,423 | - | 2,022,423 | 6,501,549 | 100.00% |
| | | | | | | | |
| **Cost of Goods Sold** | | | | | | | |
| Tooling | V | | | | - | - | 0.00% |
| Division 2 Purchasing | V | | | | - | - | 0.00% |
| Research & Development | V | 0.02% of Sales | 404 | | 404 | 1,000 | 0.02% |
| Delphi | V | | | | - | 2,249,565 | 34.60% |
| Chrysler | V | | | | - | 35,997 | 0.55% |
| Johnson Controls | V | | | | - | 275,360 | 4.24% |
| GT Products | V | | | | - | 395,616 | 6.08% |
| Briskin Manufacturing | V | | | | - | 9,431 | 0.15% |
| GM SPO | V | | | | - | 156,821 | 2.41% |
| Powertrain | V | | | | - | 59,852 | 0.92% |
| Oxford Suspension | V | | | | - | 9,408 | 0.14% |
| Reacom | V | | | | - | 66,444 | 1.02% |
| Freight & Delivery | V | 0.67% of Sales | 13,550 | | 13,550 | 43,526 | 0.67% |
| Engineering | V | | - | | - | 264 | 0.00% |
| Equipment Maintenance | V | 1.17% of Sales | 23,662 | | 23,662 | 75,976 | 1.17% |
| Supplies - Shop | V | 1.43% of Sales | 28,921 | | 28,921 | 92,974 | 1.43% |
| Supplies - Quality Control | V | 0.21% of Sales | 4,247 | | 4,247 | 13,603 | 0.21% |
| Inventory Overhead Adjustment | V | | | | - | (2,201,564) | -33.86% |
| Total Cost of Goods Sold | | | 70,784 | - | 70,784 | 1,284,273 | 19.75% |
| | | | | | | | |
| **Gross Profit** | | | **1,951,639** | **-** | **1,951,639** | **5,217,276** | **80.25%** |
| | | | | | | | |
| **Operating Payroll & Expenses** | | | | | | | |
| Salaries & Wages - Other | V | 18.22% of Sales | 368,485 | | 368,485 | 1,184,530 | 18.22% |
| Salaries & Wages - Officer & Admin. | F | | - | 644,000 | 644,000 | 322,000 | 4.95% |
| Contract Labor | V | 1.13% of Sales | 22,853 | | 22,853 | 73,643 | 1.13% |
| Payroll Taxes | V | 8.65% of PR | 31,874 | 55,706 | 87,580 | 130,307 | 2.00% |
| Payroll Expenses - Other | V | 0.00% of Sales | - | | - | 57 | 0.00% |
| Health Insurance | V | 8.48% of PR | 31,247 | 54,611 | 85,858 | 127,681 | 1.96% |
| Total Payroll & Expenses | | | 454,458 | 754,317 | 1,208,775 | 1,838,218 | 28.26% |
| | | | | | | | |
| **Profit After Payroll & Expenses** | | | **1,497,181** | **(754,317)** | **742,864** | **3,379,058** | **51.99%** |
| | | | | | | | |
| **Other Controllable Expenses** | | | | | | | |
| Advertising | V | 0.00% of Sales | | | - | 143 | 0.00% |
| Bank Service Charges | F | | | 17,576 | 17,576 | 8,788 | 0.14% |
| Blueprints | V | 0.04% of Sales | 809 | | 809 | 2,585 | 0.04% |
| Contributions | F | | | 4,812 | 4,812 | 2,406 | 0.04% |
| Dues & Subscriptions | F | | | 5,512 | 5,512 | 2,756 | 0.04% |
| Shop Maintenance | F | | | 400 | 400 | 200 | 0.00% |
| Office Maintenance | F | | | 6,742 | 6,742 | 3,371 | 0.05% |
| Machinery Movers & Riggers | V | 2.14% of Sales | 43,280 | | 43,280 | 139,059 | 2.14% |
| Building Maintenance | F | | | 58,308 | 58,308 | 29,154 | 0.45% |
| Fees & Permits | V | 0.01% of Sales | 202 | | 202 | 500 | 0.01% |
| Miscellaneous | V | 0.19% of Sales | 3,843 | | 3,843 | 12,281 | 0.19% |
| Postage & Delivery | V | 0.06% of Sales | 1,213 | | 1,213 | 3,625 | 0.06% |
| Supplies | V | 1.06% of Sales | 21,438 | | 21,438 | 68,873 | 1.06% |
| Telephone | V | 0.42% of Sales | 8,494 | | 8,494 | 27,120 | 0.42% |

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Column Format**
**1/1/99 - 5/2/99**

Exhibit II-A

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Pager Service | V | 0.06% of Sales | 1,213 | | 1,213 | 3,948 | 0.06% |
| Meals & Entertainment | V | 0.45% of Sales | 9,101 | | 9,101 | 29,333 | 0.45% |
| Travel | V | 0.46% of Sales | 9,303 | | 9,303 | 30,014 | 0.46% |
| Uniforms | V | 0.11% of Sales | 2,225 | | 2,225 | 7,036 | 0.11% |
| Gas & Electric | V | 3.05% of Sales | 61,684 | | 61,684 | 198,150 | 3.05% |
| Water | V | 0.01% of Sales | 202 | | 202 | 389 | 0.01% |
| Vehicle Expense | F | | | 87,718 | 87,718 | 43,859 | 0.67% |
| **Total Controllable Expenses** | | | 163,007 | 181,068 | 344,075 | 613,590 | 9.45% |
| | | | | | | | |
| **Profit After Controllable Expenses** | | | **1,334,174** | **(935,385)** | **398,789** | **2,765,468** | **42.54%** |
| | | | | | | | |
| Other Non-Controllable Expenses | | | | | | | |
| Depreciation - Office Equipment | F | | | 28,722 | 28,722 | 14,361 | 0.22% |
| Depreciation - Leasehold Improvements | F | | | 41,968 | 41,968 | 20,984 | 0.32% |
| Depreciation - Plant Equipment | F | | | 281,008 | 281,008 | 140,504 | 2.16% |
| Depreciation - Vehicles | F | | | 18,166 | 18,166 | 9,083 | 0.14% |
| Amortization Expense | F | | | 9,206 | 9,206 | 4,603 | 0.07% |
| Interest Expense | V | 3.20% of Sales | 64,718 | | 64,718 | 207,913 | 3.20% |
| General Insurance | F | | | 30,392 | 30,392 | 15,196 | 0.23% |
| Workers' Compensation Insurance | V | 1.26% of PR | 4,643 | 8,114 | 12,757 | 19,030 | 0.29% |
| Umbrella Insurance | F | | | 2,346 | 2,346 | 1,173 | 0.02% |
| Accounting | F | | | 5,350 | 5,350 | 2,675 | 0.04% |
| Consulting | V | 0.40% of Sales | 8,091 | | 8,091 | 25,894 | 0.40% |
| Legal Fees | F | | | 32,134 | 32,134 | 16,067 | 0.25% |
| Taxes - Local | F | | | 17,422 | 17,422 | 8,711 | 0.13% |
| Taxes - Property Taxes | F | | | 182,306 | 182,306 | 91,153 | 1.40% |
| Single Business Tax | V | 0.23% of Sales | 4,652 | | 4,652 | 14,832 | 0.23% |
| Uncollectible Accounts | V | 0.43% of Sales | 8,696 | | 8,696 | 28,152 | 0.43% |
| Waste Collection | V | 0.07% of Sales | 1,416 | | 1,416 | 4,245 | 0.07% |
| Total Non-/Controllable Expenses | | | 92,216 | 657,135 | 749,351 | 624,576 | 9.60% |
| | | | | | | | |
| **Profit Before Equipment & Building Rent** | | | **1,241,958** | **(1,592,520)** | **(350,562)** | **2,140,892** | **32.94%** |
| | | | | | | | |
| Additional Rental Expenses Specific to Delphi Part 60694 | | | | | | | |
| Equipment Rental | F | | | 493,425 | 493,425 | 979,151 | 15.06% |
| Building Rent | F | | | 349,930 | 349,930 | 656,455 | 10.10% |
| Total Additional Rental Expense Specific to Delphi Part 60694 | | | - | 843,355 | 843,355 | 1,635,606 | 25.16% |
| | | | | | | | |
| **Profit Before Other Income** | | | **1,241,958** | **(2,435,875)** | **(1,193,917)** | **505,286** | **7.78%** |
| | | | | | | | |
| Other Income | | | | | | | |
| Interest Income | | | - | - | - | 25,727 | 0.40% |
| Other Income | | | - | - | - | 11,909 | 0.18% |
| Total Other Income | | | - | - | - | 37,636 | 0.58% |
| | | | | | | | |
| **Net Income/(Loss)** | | | **1,241,958** | **(2,435,875)** | **(1,193,917)** | **542,922** | **8.36%** |

Less: Delphi Attributed Fixed Expenses

| | | |
|---|---|---|
| Total Delphi Attributed Fixed Expenses for 1/1/99 - 5/2/99 | 140,560 | |
| 74.43% Fixed Expenses before Equipment & Building Rent for 1/1/99 - 5/2/99 | 197,553 | |
| Total Delphi Attributed Fixed Expenses | 338,112 | |
| | | |
| **Loss of Income** | **903,846** | |

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Leeman Format**
**5/3/99 - 1/14/00**

| Exhibit II-B |
| --- |

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Sales | | | | | | | |
| Tooling | | | | | - | - | 0.00% |
| Division 2 Purchasing | | | | | - | - | 0.00% |
| Miscellaneous | | | | | - | 1,229 | 0.02% |
| Delphi | | | 3,003,072 | | 3,003,072 | 4,839,410 | 74.43% |
| Chrysler | | | | | - | 47,171 | 0.73% |
| Johnson Controls | | | | | - | 334,314 | 5.14% |
| GT Products | | | | | - | 649,625 | 9.99% |
| Briskin Manufacturing | | | | | - | 16,066 | 0.25% |
| GM SPO | | | | | - | 368,201 | 5.66% |
| Powertrain | | | | | - | 123,935 | 1.91% |
| Oxford Suspension | | | | | - | 15,277 | 0.23% |
| Reacom | | | | | - | 106,321 | 1.64% |
| Total Sales | | | 3,003,072 | - | 3,003,072 | 6,501,549 | 100.00% |
| | | | | | | | |
| Cost of Goods Sold | | | | | | | |
| Tooling | V | | | | - | - | 0.00% |
| Division 2 Purchasing | V | | | | - | - | 0.00% |
| Research & Development | V | 0.02% of Sales | 601 | | 601 | 1,000 | 0.02% |
| Delphi | V | | | | - | 2,249,565 | 34.60% |
| Chrysler | V | | | | - | 35,997 | 0.55% |
| Johnson Controls | V | | | | - | 275,360 | 4.24% |
| GT Products | V | | | | - | 395,616 | 6.08% |
| Briskin Manufacturing | V | | | | - | 9,431 | 0.15% |
| GM SPO | V | | | | - | 156,821 | 2.41% |
| Powertrain | V | | | | - | 59,852 | 0.92% |
| Oxford Suspension | V | | | | - | 9,408 | 0.14% |
| Reacom | V | | | | - | 66,444 | 1.02% |
| Freight & Delivery | V | 0.67% of Sales | 20,121 | | 20,121 | 43,526 | 0.67% |
| Engineering | V | | - | | - | 264 | 0.00% |
| Equipment Maintenance | V | 1.17% of Sales | 35,136 | | 35,136 | 75,976 | 1.17% |
| Supplies - Shop | V | 1.43% of Sales | 42,944 | | 42,944 | 92,974 | 1.43% |
| Supplies - Quality Control | V | 0.21% of Sales | 6,306 | | 6,306 | 13,603 | 0.21% |
| Inventory Overhead Adjustment | V | | | | - | (2,201,564) | -33.86% |
| Total Cost of Goods Sold | | | 105,108 | - | 105,108 | 1,284,273 | 19.75% |
| | | | | | | | |
| **Gross Profit** | | | **2,897,964** | **-** | **2,897,964** | **5,217,276** | **80.25%** |
| | | | | | | | |
| Operating Payroll & Expenses | | | | | | | |
| Salaries & Wages - Other | V | 18.22% of Sales | 547,160 | | 547,160 | 1,184,530 | 18.22% |
| Salaries & Wages - Officer & Admin. | F | | | 644,000 | 644,000 | 322,000 | 4.95% |
| Contract Labor | V | 1.13% of Sales | 33,935 | | 33,935 | 73,643 | 1.13% |
| Payroll Taxes | V | 8.65% of PR | 47,329 | 55,706 | 103,035 | 130,307 | 2.00% |
| Payroll Expenses - Other | V | 0.00% of PR | - | | - | 57 | 0.00% |
| Health Insurance | V | 8.48% of PR | 46,399 | 54,611 | 101,010 | 127,681 | 1.96% |
| Total Payroll & Expenses | | | 674,822 | 754,317 | 1,429,139 | 1,838,218 | 28.26% |
| | | | | | | | |
| **Profit After Payroll & Expenses** | | | **2,223,142** | **(754,317)** | **1,468,825** | **3,379,058** | **51.99%** |
| | | | | | | | |
| Other Controllable Expenses | | | | | | | |
| Advertising | V | 0.00% of Sales | | | - | 143 | 0.00% |
| Bank Service Charges | F | | | 17,576 | 17,576 | 8,788 | 0.14% |
| Blueprints | V | 0.04% of Sales | 1,201 | | 1,201 | 2,585 | 0.04% |
| Contributions | F | | | 4,812 | 4,812 | 2,406 | 0.04% |
| Dues & Subscriptions | F | | | 5,512 | 5,512 | 2,756 | 0.04% |
| Shop Maintenance | F | | | 400 | 400 | 200 | 0.00% |
| Office Maintenance | F | | | 6,742 | 6,742 | 3,371 | 0.05% |
| Machinery Movers & Riggers | V | 2.14% of Sales | 64,266 | | 64,266 | 139,059 | 2.14% |
| Building Maintenance | F | | | 58,308 | 58,308 | 29,154 | 0.45% |

Nu-Tech Plastics Engineering, Inc.
Loss of Income - Leeman Format
5/3/99 - 1/14/00

| Exhibit II-B | | | | | | |
|---|---|---|---|---|---|---|

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Fees & Permits | V | 0.01% of Sales | 300 | | 300 | 500 | 0.01% |
| Miscellaneous | V | 0.19% of Sales | 5,706 | | 5,706 | 12,281 | 0.19% |
| Postage & Delivery | V | 0.06% of Sales | 1,802 | | 1,802 | 3,625 | 0.06% |
| Supplies | V | 1.06% of Sales | 31,833 | | 31,833 | 68,873 | 1.06% |
| Telephone | V | 0.42% of Sales | 12,613 | | 12,613 | 27,120 | 0.42% |
| Pager Service | V | 0.06% of Sales | 1,802 | | 1,802 | 3,948 | 0.06% |
| Meals & Entertainment | V | 0.45% of Sales | 13,514 | | 13,514 | 29,333 | 0.45% |
| Travel | V | 0.46% of Sales | 13,814 | | 13,814 | 30,014 | 0.46% |
| Uniforms | V | 0.11% of Sales | 3,303 | | 3,303 | 7,036 | 0.11% |
| Gas & Electric | V | 3.05% of Sales | 91,594 | | 91,594 | 198,150 | 3.05% |
| Water | V | 0.01% of Sales | 300 | | 300 | 389 | 0.01% |
| Vehicle Expense | F | | | 87,718 | 87,718 | 43,859 | 0.67% |
| Total Controllable Expenses | | | 242,048 | 181,068 | 423,116 | 613,590 | 9.45% |
| | | | | | | | |
| **Profit After Controllable Expenses** | | | 1,981,094 | (935,385) | 1,045,709 | 2,765,468 | 42.54% |
| | | | | | | | |
| Other Non-Controllable Expenses | | | | | | | |
| Depreciation - Office Equipment | F | | | 28,722 | 28,722 | 14,361 | 0.22% |
| Depreciation - Leasehold Improvements | F | | | 41,968 | 41,968 | 20,984 | 0.32% |
| Depreciation - Plant Equipment | F | | | 281,008 | 281,008 | 140,504 | 2.16% |
| Depreciation - Vehicles | F | | | 18,166 | 18,166 | 9,083 | 0.14% |
| Amortization Expense | F | | | 9,206 | 9,206 | 4,603 | 0.07% |
| Interest Expense | V | 3.20% of Sales | 96,098 | | 96,098 | 207,913 | 3.20% |
| General Insurance | F | | | 30,392 | 30,392 | 15,196 | 0.23% |
| Workers' Compensation Insurance | V | 1.26% of PR | 6,894 | 8,114 | 15,008 | 19,030 | 0.29% |
| Umbrella Insurance | F | | | 2,346 | 2,346 | 1,173 | 0.02% |
| Accounting | F | | | 5,350 | 5,350 | 2,675 | 0.04% |
| Consulting | V | 0.40% of Sales | 12,013 | | 12,013 | 25,894 | 0.40% |
| Legal Fees | F | | | 32,134 | 32,134 | 16,067 | 0.25% |
| Taxes - Local | F | | | 17,422 | 17,422 | 8,711 | 0.13% |
| Taxes - Property Taxes | F | | | 182,306 | 182,306 | 91,153 | 1.40% |
| Single Business Tax | V | 0.23% of Sales | 6,907 | | 6,907 | 14,832 | 0.23% |
| Uncollectible Accounts | V | 0.43% of Sales | 12,913 | | 12,913 | 28,152 | 0.43% |
| Waste Collection | V | 0.07% of Sales | 2,102 | | 2,102 | 4,245 | 0.07% |
| Total Non-/Controllable Expenses | | | 136,927 | 657,135 | 794,062 | 624,576 | 9.60% |
| | | | | | | | |
| **Profit Before Equipment & Building Rent** | | | 1,844,167 | (1,592,520) | 251,647 | 2,140,892 | 32.94% |
| | | | | | | | |
| Additional Rental Expenses Specific to Delphi Part 60694 | | | | | | | |
| Equipment Rental | F | | | 493,425 | 493,425 | 979,151 | 15.06% |
| Building Rent | F | | | 349,930 | 349,930 | 656,455 | 10.10% |
| Total Additional Rental Expense Specific to Delphi Part 60694 | | | - | 843,355 | 843,355 | 1,635,606 | 25.16% |
| | | | | | | | |
| **Profit Before Other Income** | | | 1,844,167 | (2,435,875) | (591,708) | 505,286 | 7.78% |
| | | | | | | | |
| Other Income | | | | | | | |
| Interest Income | | | - | - | - | 25,727 | 0.40% |
| Other Income | | | - | - | - | 11,909 | 0.18% |
| Total Other Income | | | - | - | - | 37,636 | 0.58% |
| | | | | | | | |
| **Net Income/(Loss)** | | | 1,844,167 | (2,435,875) | (591,708) | 542,922 | 8.36% |
| | | | | | | | |
| Less: Delphi Attributed Fixed Expenses | | | | | | | |
| Total Delphi Attributed Fixed Expenses for 5/3/99 - 1/14/00 | | | 298,688 | | | | |
| 74.43% Fixed Expenses before Equipment & Building Rent for 5/3/99 - 1/14/00 | | | 419,798 | | | | |
| Total Delphi Attributed Fixed Expenses | | | 718,486 | | | | |
| | | | | | | | |
| **Loss of Income** | | | 1,125,681 | | | | |

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Leeman Format**
**1/15/00 - 12/31/00**

| Exhibit II-C |
| --- |

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Sales | | | | | | | |
| Tooling | | | | | - | - | 0.00% |
| Division 2 Purchasing | | | | | - | - | 0.00% |
| Miscellaneous | | | | | - | 1,229 | 0.02% |
| Delphi | | | 2,556,140 | | 2,556,140 | 4,839,410 | 74.43% |
| Chrysler | | | | | - | 47,171 | 0.73% |
| Johnson Controls | | | | | - | 334,314 | 5.14% |
| GT Products | | | | | - | 649,625 | 9.99% |
| Briskin Manufacturing | | | | | - | 16,066 | 0.25% |
| GM SPO | | | | | - | 368,201 | 5.66% |
| Powertrain | | | | | - | 123,935 | 1.91% |
| Oxford Suspension | | | | | - | 15,277 | 0.23% |
| Reacom | | | | | - | 106,321 | 1.64% |
| Total Sales | | | 2,556,140 | - | 2,556,140 | 6,501,549 | 100.00% |
| | | | | | | | |
| Cost of Goods Sold | | | | | | | |
| Tooling | V | | | | - | - | 0.00% |
| Division 2 Purchasing | V | | | | - | - | 0.00% |
| Research & Development | V | 0.02% of Sales | 511 | | 511 | 1,000 | 0.02% |
| Delphi | V | | | | - | 2,249,565 | 34.60% |
| Chrysler | V | | | | - | 35,997 | 0.55% |
| Johnson Controls | V | | | | - | 275,360 | 4.24% |
| GT Products | V | | | | - | 395,616 | 6.08% |
| Briskin Manufacturing | V | | | | - | 9,431 | 0.15% |
| GM SPO | V | | | | - | 156,821 | 2.41% |
| Powertrain | V | | | | - | 59,852 | 0.92% |
| Oxford Suspension | V | | | | - | 9,408 | 0.14% |
| Reacom | V | | | | - | 66,444 | 1.02% |
| Freight & Delivery | V | 0.67% of Sales | 17,126 | | 17,126 | 43,526 | 0.67% |
| Engineering | V | | - | | - | 264 | 0.00% |
| Equipment Maintenance | V | 1.17% of Sales | 29,907 | | 29,907 | 75,976 | 1.17% |
| Supplies - Shop | V | 1.43% of Sales | 36,553 | | 36,553 | 92,974 | 1.43% |
| Supplies - Quality Control | V | 0.21% of Sales | 5,368 | | 5,368 | 13,603 | 0.21% |
| Inventory Overhead Adjustment | V | | | | - | (2,201,564) | -33.86% |
| Total Cost of Goods Sold | | | 89,465 | - | 89,465 | 1,284,273 | 19.75% |
| | | | | | | | |
| **Gross Profit** | | | **2,466,675** | **-** | **2,466,675** | **5,217,276** | **80.25%** |
| | | | | | | | |
| Operating Payroll & Expenses | | | | | | | |
| Salaries & Wages - Other | V | 18.22% of Sales | 465,729 | | 465,729 | 1,184,530 | 18.22% |
| Salaries & Wages - Officer & Admin. | F | | - | 644,000 | 644,000 | 322,000 | 4.95% |
| Contract Labor | V | 1.13% of Sales | 28,884 | | 28,884 | 73,643 | 1.13% |
| Payroll Taxes | V | 8.65% of PR | 40,286 | 55,706 | 95,992 | 130,307 | 2.00% |
| Payroll Expenses - Other | V | 0.00% of Sales | - | | - | 57 | 0.00% |
| Health Insurance | V | 8.48% of PR | 39,494 | 54,611 | 94,105 | 127,681 | 1.96% |
| Total Payroll & Expenses | | | 574,393 | 754,317 | 1,328,710 | 1,838,218 | 28.26% |
| | | | | | | | |
| **Profit After Payroll & Expenses** | | | **1,892,282** | **(754,317)** | **1,137,965** | **3,379,058** | **51.99%** |
| | | | | | | | |
| Other Controllable Expenses | | | | | | | |
| Advertising | V | 0.00% of Sales | | | - | 143 | 0.00% |
| Bank Service Charges | F | | | 17,576 | 17,576 | 8,788 | 0.14% |
| Blueprints | V | 0.04% of Sales | 1,022 | | 1,022 | 2,585 | 0.04% |
| Contributions | F | | | 4,812 | 4,812 | 2,406 | 0.04% |
| Dues & Subscriptions | F | | | 5,512 | 5,512 | 2,756 | 0.04% |
| Shop Maintenance | F | | | 400 | 400 | 200 | 0.00% |
| Office Maintenance | F | | | 6,742 | 6,742 | 3,371 | 0.05% |
| Machinery Movers & Riggers | V | 2.14% of Sales | 54,701 | | 54,701 | 139,059 | 2.14% |
| Building Maintenance | F | | | 58,308 | 58,308 | 29,154 | 0.45% |

Nu-Tech Plastics Engineering, Inc.
Loss of Income - Leeman Format
1/15/00 - 12/31/00

Exhibit II-C

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Fees & Permits | V | 0.01% of Sales | 256 | | 256 | 500 | 0.01% |
| Miscellaneous | V | 0.19% of Sales | 4,857 | | 4,857 | 12,281 | 0.19% |
| Postage & Delivery | V | 0.06% of Sales | 1,534 | | 1,534 | 3,625 | 0.06% |
| Supplies | V | 1.06% of Sales | 27,095 | | 27,095 | 68,873 | 1.06% |
| Telephone | V | 0.42% of Sales | 10,736 | | 10,736 | 27,120 | 0.42% |
| Pager Service | V | 0.06% of Sales | 1,534 | | 1,534 | 3,948 | 0.06% |
| Meals & Entertainment | V | 0.45% of Sales | 11,503 | | 11,503 | 29,333 | 0.45% |
| Travel | V | 0.46% of Sales | 11,758 | | 11,758 | 30,014 | 0.46% |
| Uniforms | V | 0.11% of Sales | 2,812 | | 2,812 | 7,036 | 0.11% |
| Gas & Electric | V | 3.05% of Sales | 77,962 | | 77,962 | 198,150 | 3.05% |
| Water | V | 0.01% of Sales | 256 | | 256 | 389 | 0.01% |
| Vehicle Expense | F | | | 87,718 | 87,718 | 43,859 | 0.67% |
| Total Controllable Expenses | | | 206,026 | 181,068 | 387,094 | 613,590 | 9.45% |
| | | | | | | | |
| **Profit After Controllable Expenses** | | | 1,686,256 | (935,385) | 750,871 | 2,765,468 | 42.54% |
| | | | | | | | |
| Other Non-Controllable Expenses | | | | | | | |
| Depreciation - Office Equipment | F | | | 28,722 | 28,722 | 14,361 | 0.22% |
| Depreciation - Leasehold Improvements | F | | | 41,968 | 41,968 | 20,984 | 0.32% |
| Depreciation - Plant Equipment | F | | | 281,008 | 281,008 | 140,504 | 2.16% |
| Depreciation - Vehicles | F | | | 18,166 | 18,166 | 9,083 | 0.14% |
| Amortization Expense | F | | | 9,206 | 9,206 | 4,603 | 0.07% |
| Interest Expense | V | 3.20% of Sales | 81,796 | | 81,796 | 207,913 | 3.20% |
| General Insurance | F | | | 30,392 | 30,392 | 15,196 | 0.23% |
| Workers' Compensation Insurance | V | 1.26% of PR | 5,868 | 8,114 | 13,982 | 19,030 | 0.29% |
| Umbrella Insurance | F | | | 2,346 | 2,346 | 1,173 | 0.02% |
| Accounting | F | | | 5,350 | 5,350 | 2,675 | 0.04% |
| Consulting | V | 0.40% of Sales | 10,226 | | 10,226 | 25,894 | 0.40% |
| Legal Fees | F | | | 32,134 | 32,134 | 16,067 | 0.25% |
| Taxes - Local | F | | | 17,422 | 17,422 | 8,711 | 0.13% |
| Taxes - Property Taxes | F | | | 182,306 | 182,306 | 91,153 | 1.40% |
| Single Business Tax | V | 0.23% of Sales | 5,879 | | 5,879 | 14,832 | 0.23% |
| Uncollectible Accounts | V | 0.43% of Sales | 10,991 | | 10,991 | 28,152 | 0.43% |
| Waste Collection | V | 0.07% of Sales | 1,789 | | 1,789 | 4,245 | 0.07% |
| Total Non-/Controllable Expenses | | | 116,549 | 657,135 | 773,684 | 624,576 | 9.60% |
| | | | | | | | |
| **Profit Before Equipment & Building Rent** | | | 1,569,707 | (1,592,520) | (22,813) | 2,140,892 | 32.94% |
| | | | | | | | |
| Additional Rental Expenses Specific to Delphi Part 60694 | | | | | | | |
| Equipment Rental | F | | | 493,425 | 493,425 | 979,151 | 15.06% |
| Building Rent | F | | | 349,930 | 349,930 | 656,455 | 10.10% |
| Total Additional Rental Expense Specific to Delphi Part 60694 | | | - | 843,355 | 843,355 | 1,635,606 | 25.16% |
| | | | | | | | |
| **Profit Before Other Income** | | | 1,569,707 | (2,435,875) | (866,168) | 505,286 | 7.78% |
| | | | | | | | |
| Other Income | | | | | | | |
| Interest Income | | | - | - | - | 25,727 | 0.40% |
| Other Income | | | - | - | - | 11,909 | 0.18% |
| Total Other Income | | | - | - | - | 37,636 | 0.58% |
| | | | | | | | |
| **Net Income/(Loss)** | | | 1,569,707 | (2,435,875) | (866,168) | 542,922 | 8.36% |
| | | | | | | | |
| Less: Delphi Attributed Fixed Expenses | | | | | | | |
| Total Delphi Attributed Fixed Expenses for 1/15/00 - 12/31/00 | | | 404,108 | | | | |
| 74.43% Fixed Expenses before Equipment & Building Rent for 1/15/00 - 12/31/00 | | | 567,962 | | | | |
| Total Delphi Attributed Fixed Expenses | | | 972,070 | | | | |
| | | | | | | | |
| **Loss of Income** | | | **597,637** | | | | |

## Nu-Tech Plastics Engineering, Inc.
### Loss of Income Analysis

| | Exhibit I<br>1/1/99 -<br>12/31/00 | Exhibit II-A<br>1/1/99 -<br>5/2/99 | Exhibit II-B<br>5/3/99<br>1/14/00 | Exhibit II-C<br>1/15/00 -<br>12/31/00 |
|---|---|---|---|---|
| Revenue | $ 7,581,635 | $ 2,022,423 | $ 3,003,072 | $ 2,556,140 |
| Variable Costs | 2,683,191 | 715,747 | 1,062,807 | 904,637 |
| **Contribution Margin** | **4,898,444** | **1,306,676** | **1,940,265** | **1,651,503** |
| Contribution Margin % | 64.6% | 64.6% | 64.6% | 64.6% |
| Less: Delphi Attributed Fixed Costs | 2,028,667 | 338,112 | 718,486 | 972,070 |
| **Operating Income** | **2,869,777** | **968,564** | **1,221,779** | **679,433** |
| Interest Expense | 242,612 | 64,718 | 96,098 | 81,796 |
| **Profit Before Income Taxes** | **2,627,165** | **903,846** | **1,125,681** | **597,637** |
| Income Taxes | 893,236 | 307,308 | 382,732 | 203,197 |
| **Net Income** | **$ 1,733,929** | **$ 596,538** | **$ 742,949** | **$ 394,440** |
| Net Income/(Loss) % | 22.9% | 29.5% | 24.7% | 15.4% |
| EBITDA | 3,151,919 | 1,015,588 | 1,321,704 | 814,626 |
| EBITDA % | 41.6% | 50.2% | 44.0% | 31.9% |

**Assumptions:**

- Revenue derived from GM payment data.

- All Exhibits exclude Division 2 and Tooling in determining cost ratios.

- Exhibit I reflects parts invoiced from 1/1/99 - 12/31/00 at $1.86/part.

- Exhibit II-A reflects parts invoiced from 1/1/99 - 5/2/99 at $1.86/part.

- Exhibit II-B reflects parts invoiced from 5/3/99 - 1/14/00 at $1.86/part.

- Exhibit II-C reflects parts invoiced from 1/15/00 - 12/31/00 at $1.86/part.

# EXHIBIT III

**Nu-Tech Plastics Engineering, Inc.**
**Estimated Damages Based on Loss of Income Analysis**
**1/1/99 - 12/31/99**

**Exhibit III**

| | |
|---|---:|
| Revenue | $ 4,888,791 |
| Variable Costs | 1,730,177 |
| **Contribution Margin** | **3,158,614** |
| Contribution Margin % | 64.6% |
| Less: Delphi Attributed Fixed Costs | 1,014,334 |
| **Operating Income** | **2,144,280** |
| Income Taxes | 729,055 |
| **Cash Flow from Operations** | **1,415,225** |
| Plus: Depreciation & Amortization | 141,071 |
| Less: Capital Expenditures | - |
| Less: Working Capital Requirements | - |
| **Free Cash Flow** | **$ 1,556,296** |
| Discount Rate **(1)** | 25.6% |
| Net Present Value (NPV) | 1,239,089 |
| **Estimated Damages** | **$ 1,239,089** |

**Notes:**

(1) Mr. Leeman's Estimated Lost Value of Business analysis
   uses a capitalization rate of 3.91X, implying a discount rate
   of approximately 25.6%.

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Leelanan Format**
**1/1/99 - 12/31/99**

| Exhibit III |
|---|

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Historical - 1998 Ratio |
|---|---|---|---|---|---|---|---|
| Sales | | | | | | | |
| Tooling | | | | | - | - | 0.00% |
| Division 2 Purchasing | | | | | - | - | 0.00% |
| Miscellaneous | | | | | - | 1,229 | 0.02% |
| Delphi | | | 4,888,791 | | 4,888,791 | 4,839,410 | 74.43% |
| Chrysler | | | | | - | 47,171 | 0.73% |
| Johnson Controls | | | | | - | 334,314 | 5.14% |
| GT Products | | | | | - | 649,625 | 9.99% |
| Briskin Manufacturing | | | | | - | 16,066 | 0.25% |
| GM SPO | | | | | - | 368,201 | 5.66% |
| Powertrain | | | | | - | 123,935 | 1.91% |
| Oxford Suspension | | | | | - | 15,277 | 0.23% |
| Reacom | | | | | - | 106,321 | 1.64% |
| Total Sales | | | 4,888,791 | - | 4,888,791 | 6,501,549 | 100.00% |
| | | | | | | | |
| Cost of Goods Sold | | | | | | | |
| Tooling | V | | | | - | - | 0.00% |
| Division 2 Purchasing | V | | | | - | - | 0.00% |
| Research & Development | V | 0.02% of Sales | 978 | | 978 | 1,000 | 0.02% |
| Delphi | V | | | | - | 2,249,565 | 34.60% |
| Chrysler | V | | | | - | 35,997 | 0.55% |
| Johnson Controls | V | | | | - | 275,360 | 4.24% |
| GT Products | V | | | | - | 395,616 | 6.08% |
| Briskin Manufacturing | V | | | | - | 9,431 | 0.15% |
| GM SPO | V | | | | - | 156,821 | 2.41% |
| Powertrain | V | | | | - | 59,852 | 0.92% |
| Oxford Suspension | V | | | | - | 9,408 | 0.14% |
| Reacom | V | | | | - | 66,444 | 1.02% |
| Freight & Delivery | V | 0.67% of Sales | 32,755 | | 32,755 | 43,526 | 0.67% |
| Engineering | V | | | | - | 264 | 0.00% |
| Equipment Maintenance | V | 1.17% of Sales | 57,199 | | 57,199 | 75,976 | 1.17% |
| Supplies - Shop | V | 1.43% of Sales | 69,910 | | 69,910 | 92,974 | 1.43% |
| Supplies - Quality Control | V | 0.21% of Sales | 10,266 | | 10,266 | 13,603 | 0.21% |
| Inventory Overhead Adjustment | V | | | | - | (2,201,564) | -33.86% |
| Total Cost of Goods Sold | | | 171,108 | - | 171,108 | 1,284,273 | 19.75% |
| | | | | | | | |
| **Gross Profit** | | | **4,717,683** | **-** | **4,717,683** | **5,217,276** | **80.25%** |
| | | | | | | | |
| Operating Payroll & Expenses | | | | | | | |
| Salaries & Wages - Other | V | 18.22% of Sales | 890,738 | | 890,738 | 1,184,530 | 18.22% |
| Salaries & Wages - Officer & Admin. | F | | | 644,000 | 644,000 | 322,000 | 4.95% |
| Contract Labor | V | 1.13% of Sales | 55,243 | | 55,243 | 73,643 | 1.13% |
| Payroll Taxes | V | 8.65% of PR | 77,049 | 55,706 | 132,755 | 130,307 | 2.00% |
| Payroll Expenses - Other | V | 0.00% of Sales | - | | - | 57 | 0.00% |
| Health Insurance | V | 8.48% of PR | 75,535 | 54,611 | 130,146 | 127,681 | 1.96% |
| Total Payroll & Expenses | | | 1,098,565 | 754,317 | 1,852,882 | 1,838,218 | 28.26% |
| | | | | | | | |
| **Profit After Payroll & Expenses** | | | **3,619,118** | **(754,317)** | **2,864,801** | **3,379,058** | **51.99%** |
| | | | | | | | |
| Other Controllable Expenses | | | | | | | |
| Advertising | V | 0.00% of Sales | | | - | 143 | 0.00% |
| Bank Service Charges | F | | | 17,576 | 17,576 | 8,788 | 0.14% |
| Blueprints | V | 0.04% of Sales | 1,956 | | 1,956 | 2,585 | 0.04% |
| Contributions | F | | | 4,812 | 4,812 | 2,406 | 0.04% |
| Dues & Subscriptions | F | | | 5,512 | 5,512 | 2,756 | 0.04% |
| Shop Maintenance | F | | | 400 | 400 | 200 | 0.00% |
| Office Maintenance | F | | | 6,742 | 6,742 | 3,371 | 0.05% |
| Machinery Movers & Riggers | V | 2.14% of Sales | 104,620 | | 104,620 | 139,059 | 2.14% |
| Building Maintenance | F | | | 58,308 | 58,308 | 29,154 | 0.45% |

**Nu-Tech Plastics Engineering, Inc.**
**Loss of Income - Leeman Format**
**1/1/99 - 12/31/99**

| Exhibit III |
| --- |

| | Variable/ Fixed | Basis | Variable | Fixed (2 years) | Total | Historical - 1998 Amount | Ratio |
|---|---|---|---|---|---|---|---|
| Fees & Permits | V | 0.01% of Sales | 489 | | 489 | 500 | 0.01% |
| Miscellaneous | V | 0.19% of Sales | 9,289 | | 9,289 | 12,281 | 0.19% |
| Postage & Delivery | V | 0.06% of Sales | 2,933 | | 2,933 | 3,625 | 0.06% |
| Supplies | V | 1.06% of Sales | 51,821 | | 51,821 | 68,873 | 1.06% |
| Telephone | V | 0.42% of Sales | 20,533 | | 20,533 | 27,120 | 0.42% |
| Pager Service | V | 0.06% of Sales | 2,933 | | 2,933 | 3,948 | 0.06% |
| Meals & Entertainment | V | 0.45% of Sales | 22,000 | | 22,000 | 29,333 | 0.45% |
| Travel | V | 0.46% of Sales | 22,488 | | 22,488 | 30,014 | 0.46% |
| Uniforms | V | 0.11% of Sales | 5,378 | | 5,378 | 7,036 | 0.11% |
| Gas & Electric | V | 3.05% of Sales | 149,108 | | 149,108 | 198,150 | 3.05% |
| Water | V | 0.01% of Sales | 489 | | 489 | 389 | 0.01% |
| Vehicle Expense | F | | | 87,718 | 87,718 | 43,859 | 0.67% |
| Total Controllable Expenses | | | 394,037 | 181,068 | 575,105 | 613,590 | 9.45% |
| | | | | | | | |
| **Profit After Controllable Expenses** | | | **3,225,081** | **(935,385)** | **2,289,696** | **2,765,468** | **42.54%** |
| | | | | | | | |
| Other Non-Controllable Expenses | | | | | | | |
| Depreciation - Office Equipment | F | | | 28,722 | 28,722 | 14,361 | 0.22% |
| Depreciation - Leasehold Improvements | F | | | 41,968 | 41,968 | 20,984 | 0.32% |
| Depreciation - Plant Equipment | F | | | 281,008 | 281,008 | 140,504 | 2.16% |
| Depreciation - Vehicles | F | | | 18,166 | 18,166 | 9,083 | 0.14% |
| Amortization Expense | F | | | 9,206 | 9,206 | 4,603 | 0.07% |
| Interest Expense | V | 3.20% of Sales | 156,441 | | 156,441 | 207,913 | 3.20% |
| General Insurance | F | | | 30,392 | 30,392 | 15,196 | 0.23% |
| Workers' Compensation Insurance | V | 1.26% of PR | 11,223 | 8,114 | 19,337 | 19,030 | 0.29% |
| Umbrella Insurance | F | | | 2,346 | 2,346 | 1,173 | 0.02% |
| Accounting | F | | | 5,350 | 5,350 | 2,675 | 0.04% |
| Consulting | V | 0.40% of Sales | 19,556 | | 19,556 | 25,894 | 0.40% |
| Legal Fees | F | | | 32,134 | 32,134 | 16,067 | 0.25% |
| Taxes - Local | F | | | 17,422 | 17,422 | 8,711 | 0.13% |
| Taxes - Property Taxes | F | | | 182,306 | 182,306 | 91,153 | 1.40% |
| Single Business Tax | V | 0.23% of Sales | 11,244 | | 11,244 | 14,832 | 0.23% |
| Uncollectible Accounts | V | 0.43% of Sales | 21,022 | | 21,022 | 28,152 | 0.43% |
| Waste Collection | V | 0.07% of Sales | 3,422 | | 3,422 | 4,245 | 0.07% |
| Total Non-/Controllable Expenses | | | 222,908 | 657,135 | 880,043 | 624,576 | 9.60% |
| | | | | | | | |
| **Profit Before Equipment & Building Rent** | | | **3,002,173** | **(1,592,520)** | **1,409,653** | **2,140,892** | **32.94%** |
| | | | | | | | |
| Additional Rental Expenses Specific to Delphi Part 60694 | | | | | | | |
| Equipment Rental | F | | | 493,425 | 493,425 | 979,151 | 15.06% |
| Building Rent | F | | | 349,930 | 349,930 | 656,455 | 10.10% |
| Total Additional Rental Expense Specific to Delphi Part 60694 | | | - | 843,355 | 843,355 | 1,635,606 | 25.16% |
| | | | | | | | |
| **Profit Before Other Income** | | | **3,002,173** | **(2,435,875)** | **566,298** | **505,286** | **7.78%** |
| | | | | | | | |
| Other Income | | | | | | | |
| Interest Income | | | - | - | - | 25,727 | 0.40% |
| Other Income | | | - | - | - | 11,909 | 0.18% |
| Total Other Income | | | - | - | - | 37,636 | 0.58% |
| | | | | | | | |
| **Net Income/(Loss)** | | | **3,002,173** | **(2,435,875)** | **566,298** | **542,922** | **8.36%** |
| | | | | | | | |
| Less: Delphi Attributed Fixed Expenses | | | | | | | |
| Total Delphi Attributed Fixed Expenses | | | 421,678 | | | | |
| 74.43% Fixed Expenses before Equipment & Building Rent | | | 592,656 | | | | |
| Total Delphi Attributed Fixed Expenses | | | 1,014,334 | | | | |
| | | | | | | | |
| **Loss of Income** | | | **1,987,839** | | | | |

# EXHIBIT IV

**NuTech Plastics Engineering, Inc.**
**Summary of Real Property Leases**

| Property Address | Date of Lease | Landlord | Tenant | Initial Term | Renewal Options | Square Ft | | | Rate per Square Ft: | | | Annual Rent: | | | Monthly Pmt due 1st | Passthroughs: | | | Security Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Office | Mfng | Total | Office | Mfng | Escalator | Office | Mfng | Total | | R/E Tax | Insurance CAM | CAM | |
| 8018 Embury Road , Suite 2 Grand Blanc Township, MI | 12/24/1996 | John G. Cooper | Nu-Tech Plastics | 5 yrs | 2 @ 5 yrs | 2,000 | 7,000 | 9,000 | $ 14 | $ 10 | None | $ 28,000 | $ 70,000 | $ 98,000 | $ 8,166.67 | Tenant | Tenant | Tenant | $ - |
| 8024 Embury Road Grand Blanc Township, MI | 3/26/1997 | John G. Cooper | Nu-Tech Plastics | 10 yrs | 2 @ 10 yrs | - | 15,875 | 15,875 | $ - | $ 10 | yr 3-10 = $10 plus CPI, not less than $10.10 | $ - | 158,750 | $ 158,750 | $ 13,229.17 | Tenant | Tenant | Tenant | $ - |
| 4068 Baldwin Road, Building A Holly MI | 7/1/1997 | Air Design, L.C. | Nu-Tech Plastics | 3 yrs | TBD 90 days prior to expir | - | 10,000 (estimate) | 10,000 | $ - | $ 15.25 | None | $ - | 152,460 | $ 152,460 | $ 12,705.00 | Tenant | Tenant | Tenant | $ 5,000 |
| 4068 Baldwin Road, Building B Holly MI | 1/1/1998 | Air Design, L.C. | Nu-Tech Plastics | 5 yrs | TBD 90 days prior to expir | - | 10,000 (estimate) | 10,000 | $ - | $ 11.99 | None | $ - | 119,920 | $ 119,920 | $ 9,993.33 | Tenant | Tenant | Tenant | $ 10,000 |
| G - 6437 Lennon Road Swartz Creek MI | 9/1/1998 | John G. Cooper | Nu-Tech Plastics | 7 yrs | 1 @ 5 yrs | 4,000 (2 floors) | 34,000 | 38,000 not spec'd | not spec'd | not spec'd | None | not spec'd | not spec'd | $ 382,000 | $ 31,833.33 | Tenant | Tenant | Tenant | $ 31,833 |
| Total | | | | | | 6,000 | 76,875 | 82,875 | | | | | | $ 911,130 | $ 75,927.50 | | | | $ 46,833 |

$ 82,875

$ 10.99

Divided by total square ft
Rate per total square foot

| Annual Rent if Base Rate = | | Savings/Yr (assume same taxes, ins, CAM) |
|---|---|---|
| | $ 2.00 | $ 165,750 | $ 745,380 |
| | 3.00 | $ 248,625 | $ 662,505 |
| **Market** | 4.00 | $ 331,500 | $ 579,630 |
| **Rate** | 5.00 | $ 414,375 | $ 496,755 |

# EXHIBIT V

**NuTech Plastics Engineering, Inc.**
**Summary of Personal Property Leases**

Lessor: ABX Leasing, LTD. - Owner - John G. Cooper
Lessee: Nu-Tech

| Lease # | Lease Inception | Equip. Location | Equip Description | Cost | Taxes | Freight | Other Fees | Total Cost Per Lease | Cost to ABX | Interest and Profit | Per Lease Agmt Total Amount Financed | Term (# mos) | Mo Pymt | Due Date | Interest Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6/1/1996 | Embury Embury Embury | Chilling System Cinci 300 Ton Cinci 165 Ton | $ 65,706.88 365,048.97 285,681.40 716,437.25 | 34,184.64 | 4,300.00 | - | 754,921.89 | 572,294.00 | 322,415.31 | 1,077,337.20 | 60 | 17,955.62 | 1st | 14.99% |
| 2 | 11/15/1997 | Embury Embury Embury Embury | Cinci 250 Ton 2 PC's Tilt table Loader | 177,106.00 5,600.00 1,894.00 2,835.00 187,435.00 | 11,246.10 | 2,459.00 | 5,000.00 | 206,140.10 | 187,435.00 | 62,382.10 | 268,522.20 | 60 | 4,475.37 | 15th | 10.94% |
| 3 | 11/15/1997 | Embury Embury Embury Embury | Cinci 550T Elektra Tilt table Accessories Loader | 449,140.00 1,894.00 4,790.00 2,835.00 458,659.00 | - | 2,459.00 | 11,228.50 | 472,346.50 | 449,140.00 | 405,396.50 | 877,743.00 | 60 | 14,629.05 | 15th | 27.73% |
| 4 | 11/15/1997 | Embury Embury | Battenfeld 500T Cooling Tower | 213,240.00 37,318.00 250,558.00 | 15,033.48 | 2,459.00 | - | 268,050.48 | 213,240.00 | 89,796.72 | 357,847.20 | 60 | 5,964.12 | 15th | 12.01% |
| 5 | 12/15/1997 | Embury Embury Embury Embury | Cinci 120T Thermolator Loader Dryers (2) | 96,365.00 4,370.00 2,835.00 11,470.00 115,040.00 | 6,902.40 | 2,459.00 | - | 124,401.40 | 102,570.00 | 41,674.40 | 166,075.80 | 60 | 2,767.93 | 15th | 12.01% |
| 6 | 12/15/1997 | Embury Embury Embury Embury Embury | Cinci 300T MFCH-100 TC Loader Tilt table Dryer | 210,817.00 4,780.00 2,835.00 1,895.00 5,735.00 226,062.00 | 13,563.72 | 2,459.00 | - | 242,084.72 | 246,601.00 | 81,098.68 | 323,183.40 | 60 | 5,386.39 | 15th | 12.01% |
| 7 | 12/15/1997 | Embury Embury Embury Embury | Cinci 550T Elektra Tilt Table MFCH-300 Loader | 432,690.00 1,894.00 4,790.00 2,835.00 442,209.00 | 26,532.54 | 2,459.00 | - | 471,200.54 | 442,774.00 | 157,852.06 | 629,052.60 | 60 | 10,484.21 | 15th | 12.01% |
| 8 | 7/17/1998 | Baldwin | Dryers (6) | 57,945.00 | 3,476.70 | 2,955.00 | - | 64,376.70 | 60,374.14 | 44,862.90 | 109,239.60 | 60 | 1,820.66 | 1st | 23.16% |
| 9 | 7/15/1998 | Baldwin Baldwin Baldwin Baldwin | Cinci 85T Elektra Dryers (5) Temp Flow Cont (5) CM-TT-1500 Mkts(5) | 119,000.00 59,400.00 10,925.00 5,013.00 194,338.00 | 11,660.28 | 2,500.00 | - | 208,498.28 | 79,900.00 | 280,499.32 | 488,997.60 | 60 | 8,149.96 | 15th | 40.51% |
| 10 | 7/15/1998 | Baldwin Baldwin | Cinci 85T Elektra Accessories | 119,490.00 *gone* 22,911.00 *some gone* 142,401.00 *gone gone* | 5,049.68 | 985.00 | - | 148,435.68 | 13,550.00 | 86,318.52 | 234,754.20 | 60 | 3,912.57 | 15th | 19.76% |
| 11 | 7/15/1998 | Baldwin Baldwin | Cinci 1101 Elektra (3) Cinci 300T Elektra | 506,384.25 257,894.75 764,279.00 | 45,856.74 | 10,000.00 | - | 820,135.74 | 553,617.00 | 327,132.66 | 1,147,268.40 | 60 | 19,121.14 | 15th | 14.09% |
| 12 | 8/15/1998 | Baldwin Baldwin | Okuma CNC Lathe Accessories | 79,900.00 7,640.00 87,540.00 | 5,252.40 | 2,500.00 | - | 95,292.40 | 87,540.00 | 48,284.00 | 143,576.40 | 60 | 2,392.94 | 15th | 17.48% |
| 13 | 10/7/1998 | Baldwin Baldwin | Okuma CNC Lathe Accessories | 79,900.00 4,700.00 84,600.00 | 5,076.00 | 2,800.00 | - | 92,476.00 | 84,600.00 | 52,580.60 | 145,056.60 | 60 | 2,417.61 | 7th | 19.37% |
| 14 | 4/10/1998 | Lemon | Cinci 1500T Bender Auger (2) Floor Stand | 700,000.00 8,800.00 4,320.00 375.00 712,495.00 | 4,331.97 | 9,500.00 | - | 726,326.97 | 709,500.00 | 237,536.43 | 963,863.40 | 60 | 16,064.39 | 10th | 11.75% |
| 15 | 9/2/1998 | Embury Embury | Swamp Cooler Cooling Tower | 27,301.00 10,017.00 37,318.00 | 2,239.08 | 3,800.75 | - | 43,357.83 | 37,318.00 | 21,854.37 | 65,212.20 | 60 | 1,086.87 | 2nd | 17.40% |
| | | | Total | $3,477,316.25 | $190,405.73 | $54,094.75 | $16,228.50 | $4,738,045.23 | $3,840,453.14 | $2,259,684.57 | 6,997,729.80 $116,628.83 | 60 | | | 16.56% |

**NuTech Plastics Engineering, Inc.**
**Summary of Personal Property Leases**

|  | As Is | Restated to 16.56% | Restated to 12% | Restated to 10% |
|---|---|---|---|---|
| Amount financed | $ 4,738,045 | $ 4,738,045 | $ 4,738,045 | $ 4,738,045 |
| Less 20% profit margin | 0 | 789,674 | 789,674 | 789,674 |
| Less sales tax | 0 | 190,406 | 190,406 | 190,406 |
| Amount financed | 4,738,045 | 3,757,965 | 3,757,965 | 3,757,965 |
| Term in months | 60 | 60 | 60 | 60 |
| Interest rate | 16.56% | 16.56% | 12.00% | 10.00% |
| Monthly payment | 116,629 | 92,504 | 83,594 | 79,846 |
| Monthly savings | N/A | 24,125 | 33,035 | 36,783 |
| Annual savings | N/A | 289,501 | 396,420 | 441,398 |

# EXHIBIT VI



**EXECUTIVE BIOGRAPHY**



## Keith R. Francis- *Senior Director, BBK Southfield*

Keith is a senior executive with more than 30 years of financial and operations expertise. He has experience as a self-employed turnaround consultant, a Chief Operating Officer, a Chief Financial Officer and a partner in a major public accounting and consulting firm.

Since joining BBK, Keith has managed many engagements for distressed suppliers to automotive OEM's. He has a proven ability to prepare accurate and objective assessments under pressure. In a turnaround, he moves forward quickly to provide initial stability and gain the confidence of all stakeholders.

Keith has participated in successful negotiations to transition a $600 million plastic injection molder with international operations, a $30 million gear manufacturer with operations in the US and Mexico, a $100 million metal stamper, and a $50 million aluminum die caster with operations in the US and Canada.

### Background

- Automotive
- Chemicals
- Manufacturing

## Professional Experience

Jay Alix & Associates retained Keith as a turnaround consultant following their acquisition of Peregrine, Inc., a $1.2 billion troubled automotive OEM supplier. He served as Interim Controller at the Peregrine Flint plant, a $180 million manufacturer of door and deck-lid hinges and window regulators for twenty OEM assembly plants. Keith handled all plant financial matters, including a product costing analysis, an asset auction and plant closing. Ultimately he assisted in the successful transfer of product lines to other divisions and outside suppliers.

As COO of Piston Automotive LLC, Keith led the operational turnaround of this minority-owned automotive OEM supplier of in-line sequencing and sub-assembly services. He directed four operating units, customer service, human resources, and accounting. During his tenure, Piston went from a 25 percent operating loss to break even in one year. His accomplishments included improving cash availability by 30 percent, directing a product costing analysis and negotiating price increases and accelerated payments with a major OEM, and negotiating loan payment deferrals and higher advance rates with Piston's senior lender.

As Director of Finance and Administration for Pine River Plastics (a privately held tier one supplier of custom plastic injection molded components for the automotive and consumer products markets), Keith implemented activity based costing, launched a cost reduction program, developed a business succession plan, negotiated loan agreements and obtained 50% property tax abatements and personal property tax reductions, resulting in a net present value savings of $500,000.

Keith began his career at Plante & Moran and worked there for 24 years, progressing from staff accountant to audit partner, where he worked directly with owners of automotive manufacturing companies.

## Education and Certifications

- Master of Science, Corporate Finance, Walsh College
- Bachelor of Science, Accounting, Wayne State University
- Certified Turnaround Professional
- Certified Public Accountant, Michigan
- Certified Insolvency and Restructuring Advisor

Phone: 248.603.6301        Fax: 248.603.6302        Email: kfrancis@e-bbk.com

# EXHIBIT T

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

NU-TECH PLASTICS ENGINEERING, INC.,

        Plaintiff,

v                                  Case No. 07 5 3 3 5 -CK

GENERAL MOTORS CORPORATION,
a Delaware Corporation, and DELPHI
AUTOMOTIVE SYSTEMS USA, LLC, a
Delaware Limited Liability Corporation, d/b/a
DELPHI AUTOMOTIVE SYSTEMS, LLC,

        Defendants.

ROBERT M. RANSOM

_____

SCHWARTZ LAW FIRM, P.C.
By:  Jay A. Schwartz (P45268)
     Deborah E. Fordree (P49054)
Attorney for Plaintiff
37887 W. 12 Mile Road, Suite A
Farmington Hills, Michigan 48331
(248) 553-9400

_____/

# PLAINTIFF'S COMPLAINT

      NOW COMES Plaintiff, NU-TECH PLASTICS ENGINEERING, INC. ("Nu-Tech"), by

and through its attorney, SCHWARTZ LAW FIRM, and for its complaint against Defendants,

GENERAL MOTORS CORPORATION ("GM"), and DELPHI AUTOMOTIVE SYSTEMS

USA, LLC, d/b/a DELPHI AUTOMOTIVE SYSTEMS, LLC, ("Delphi"), states as follows:

      1.     Nu-Tech is a Michigan corporation with its principal place of business in Genesee

County, Michigan.

1

2.      GM is a Delaware corporation, transacting business in Genesee County, Michigan.

3.      Delphi is a Delaware limited liability corporation, transacting business in Genesee County, Michigan.

4.      At all material relevant hereto, Delphi acted on its own and as an agent for GM.

5.      This court has jurisdiction over the controversy alleged herein and the amount in controversy exceeds $25,000.00, exclusive of costs, interest and attorney fees.

## COUNT I

### BREACH OF CONTRACT

6.      Nu-Tech hereby incorporates and restates paragraphs 1 through 5 as though each allegation was stated verbatim.

7.      Nu-Tech, GM and Delphi entered into a contract or contracts whereby Nu-Tech was to manufacture and supply automotive component parts to GM, and GM was to purchase the parts, until December 31, 2000.

8.      Defendants breached the contract and or contracts by, among other things, failing to purchase parts as agreed and by removing equipment necessary for the production of those parts.

9.      As a direct and proximate result of Defendants' actions, Plaintiff sustained damages.

10.     Defendants are liable to Plaintiff for the damages it incurred resulting from Defendants' breach of contract.

2

WHEREFORE, Plaintiff, NU-TECH PLASTICS ENGINEERING, INC. respectfully requests that this Honorable Court enter a judgment in its favor against the Defendants, in an amount in excess of Twenty-Five Thousand ($25,000.00) Dollars and award such further relief as this Court deems just.

COUNT II

PROMISSORY ESTOPPEL

11.     Nu-Tech hereby incorporates and restates paragraphs 1 through 10 as though each allegation was stated verbatim.

12.     Defendants made material representations to NU-TECH, including but not limited to representations regarding the necessity of Plaintiff to increase its manufacturing capabilities to satisfy Defendants' production demands, the necessity of Plaintiff to maintain its manufacturing operations (even after GM removed tooling) to satisfy production of a new part for Defendants which Plaintiff had been selected to produce, the manufacture and production of replacement parts and the necessity requirements to agreements in place.

13.     Defendants' material representations were knowingly false and/or made recklessly with the intention that it should be acted upon by Plaintiff.

14.     Plaintiff relied upon the material representations made by Defendants.

15.     Plaintiff sustained substantial damages as a direct and proximate result of its reliance upon Defendants' material representations.

WHEREFORE, Plaintiff, NU-TECH PLASTICS ENGINEERING, INC., respectfully requests that this Honorable Court enter a judgment in its favor and against the Defendants, in an

3

amount in excess of Twenty-Five Thousand ($25,000.00) Dollars and award such further relief as this Court deems just.

SCHWARTZ LAW FIRM, P.C.

By: _____
Jay A. Schwartz (P45268)
Deborah E. Fordree (P49054)
Attorney for Plaintiff
37887 W. 12 Mile Road, Suite A
Farmington Hills, Michigan 48331
(248) 553-9400

Dated:    December 30, 2002

4

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

NU-TECH PLASTICS ENGINEERING, INC.,

        Plaintiff,

v

                          Case No. 02-75335 -CK

GENERAL MOTORS CORPORATION,
a Delaware Corporation, and DELPHI
AUTOMOTIVE SYSTEMS USA, LLC, a
Delaware Limited Liability Corporation, d/b/a
DELPHI AUTOMOTIVE SYSTEMS, LLC,

        Defendants.

SCHWARTZ LAW FIRM, P.C.
By:  Jay A. Schwartz (P45268)
     Deborah E. Fordree (P49054)
Attorney for Plaintiff

ROBERT M. RANSOM
P-19226

A TRUE COPY
Michael J. Carr, Clerk

## PLAINTIFF'S JURY DEMAND

    NOW COMES Plaintiff, NU-TECH PLASTICS ENGINEERING, INC., by and through

its attorney, SCHWARTZ LAW FIRM, and hereby requests a trial by jury of the within cause.

                      SCHWARTZ LAW FIRM, P.C.

By: _____
            Jay A. Schwartz (P45268)
            Deborah E. Fordree (P49054)
            Attorney for Plaintiff
            37887 W. 12 Mile Road, Suite A
            Farmington Hills, Michigan 48331
Dated:   December 30, 2002       (248) 553-9400

1

# EXHIBIT U

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

333 WEST WACKER DRIVE

CHICAGO, ILLINOIS 60606-1285

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL
(312) 407-0974
E-MAIL ADDRESS
NCAMPANA@SKADDEN.COM

FIRM/AFFILIATE OFFICES
—
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

August 7, 2007

**BY FEDERAL EXPRESS**

Jay A. Schwartz, Esq.
Schwartz Law Firm, P.C.
37887 West Twelve Mile Road, Suite A
Farmington Hills, Michigan 48331

RE:     *In re Delphi Corporation*—Notice To Nu-Tech
Plastics Engineering, Inc. Under Fed. R. Evid. 807
And Fed. R. Bankr. P. 9017

Dear Mr. Schwartz:

Enclosed is the Debtors' Notice To Nu-Tech Plastics Engineering,
Inc. Under Fed. R. Evid. 807 And Fed. R. Bankr. P. 9017.

Sincerely,

Nick D. Campanario

Encl.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
        In re                         :     Chapter 11
                                      :
DELPHI CORPORATION, et al.,           :     Case No. 05-44481 (RDD)
                                      :
        Debtors.                      :     (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE TO NU-TECH PLASTICS ENGINEERING, INC.
UNDER FED. R. EVID. 807 AND FED. R. BANKR. P. 9017

TO:        Nu-Tech Plastics Engineering, Inc., through its counsel, Jay A. Schwartz, Esq.,
Schwartz Law Firm, P.C., 37887 West Twelve Mile Road, Suite A, Farmington
Hills, Michigan 48331

PLEASE TAKE NOTICE that Delphi Corporation and certain of its subsidiaries
and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the
"Debtors"), intend to offer as evidence at the mediation and/or hearing with respect to proof of
claim number 1279 filed by Nu-Tech Plastics Engineering, Inc. ("Nu-Tech") the statements of
John W. Mailey attached to this notice as Exhibit A and Exhibit B, and that the Debtors may rely
on Fed. R. Evid. 807, as made applicable here by Fed. R. Bankr. P. 9017, in connection with Mr.
Mailey's statements.  Mr. Mailey, Nu-Tech's former president, chief executive officer, and
majority shareholder, is deceased.

Dated: August 7, 2007
       Chicago, Illinois

                      SKADDEN, ARPS, SLATE, MEAGHER &
                      FLOM LLP

                      By: _____
                         John Wm. Butler, Jr. (JB 4711)
                         John K. Lyons (JL 4951)
                         Albert L. Hogan, III (AH 8807)
                         Ron E. Meisler (RM 3026)
                      333 West Wacker Drive, Suite 2100
                      Chicago, Illinois 60606
                      (312) 407-0700

                      Attorneys for Delphi Corporation, et al.,
                       Debtors and Debtors-in-Possession

# EXHIBIT V

# LIPPERT, HUMPHREYS, CAMPBELL, DUST & HUMPHREYS, P.C.

### ATTORNEYS AND COUNSELORS AT LAW
### PLAZA NORTH, SUITE 410

B. J. HUMPHREYS
A. T. LIPPERT, JR.
GARY R. CAMPBELL
TOBIN H. DUST
JOHN D.L. HUMPHREYS

4800 FASHION SQUARE BOULEVARD
SAGINAW, MICHIGAN 48604-2604

(989) 792-2552
FAX (989) 792-3881
E-MAIL: lawyers@lhc-law.com

September 21, 2005

Jay A. Schwartz
Schwartz Law Firm, P.C.
37887 W. 12 Mile Rd., Suite A
Farmington Hills, MI 48331

**RE:    *Nu-Tech v. Delphi, et al.***

Dear Mr. Schwartz:

I am enclosing a copy of the statement that I have taken from Mr. Mailey. The interview was tape-recorded and the tapes were transcribed by James Fritzler, a certified court reporter.

I previously filed an affidavit of Mr. Mailey. You have a copy of that affidavit in your possession as part of the pleadings served upon you as counsel for NuTech.

It is my intention to offer both the statement and the affidavit at trial. The particulars of the statement are clearly detailed in the statement and include the business relationship of these parties, the nature of the contracts existing between NuTech and Delphi/General Motors and the reasons for the business failure of NuTech.

This notice is given to you in accordance with MRE 803(24).

Very truly yours,
LIPPERT, HUMPHREYS, CAMPBELL,
DUST & HUMPHREYS, P.C.


A.T. LIPPERT, JR.

ATL:kkp

Enclosure