TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for Delphi Corporation, et al.,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Neil Berger (NB-3599)
Sean McGrath (SM-4676)
Tally Wiener (TW-0215)

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
DELPHI CORPORATION, et al.,                         :    Case No. 05-44481 [RDD]
                                                    :
                          Debtors.                  :    Jointly Administered
                                                    :
-----------------------------------------------------------------x

**DEBTORS' SUPPLEMENTAL REPLY IN FURTHER SUPPORT OF DEBTORS'
OBJECTION REGARDING PROOF OF CLAIM NUMBER 8391
(MOTOROLA, INC./ TEMIC AUTOMOTIVE OF NORTH AMERICA, INC.)**

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including Delphi Automotive Systems LLC ("DAS LLC"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplemental Reply in Further Support of Debtors' Objection Regarding Proof of Claim Number 8391 filed by Motorola, Inc. ("Motorola") and subsequently transferred to Temic Automotive of North America, Inc. ("Temic" and, together with Motorola, the "Claimant") and respectfully represent:

Preliminary Statement

1. Claimant improperly seeks damages based upon an incorrect allegation that the Debtors cancelled a pre-petition requirements contract between Motorola and the Debtors pursuant to which Motorola was to provide 100% of the Debtors' production and service requirements for certain components for incorporation in the Delphi Quadrasteer System for use in the GMT 900 Program (the "GMT900 Quadrasteer Requirements Contract") for General Motors.

2. In support of the damages it seeks, Claimant asserts: (i) as a legal matter, that whether DAS LLC "acted in good or bad faith is of no matter"; and (ii) as a factual matter, that notwithstanding the parties' failure to agree on the consequences of a cancellation, "[e]arly cancellation claims are common in the auto industry. Motorola expected and Delphi knew early cancellation claims would be brought if Delphi cancelled the Contract." These assertions are incorrect and are not supported by any reliable evidence.

3. Claimant's legal position is directly contrary to this Court's prior ruling in the Debtors' bankruptcy proceedings that there can be no breach of a requirements contract in the absence of bad faith. See In re Delphi Corporation, *et al.*, Chapter 11 Case No. 05-44481, Transcript of Proceedings, March 1, 2007, at 25.

4. Claimant's factual allegations are supported solely by self-serving affidavits, which describe Temic's view of industry practice but are, in fact, contrary to industry practice. See Declaration of Jeffrey A. McInerney in Support of Debtors' Supplemental Reply in Further Support of Debtors' Objection Regarding Proof of Claim 8391 (Motorola, Inc./Temic Automotive of North America, Inc.) executed on January 14, 2008 ("McInerney Decl.") ¶ 27 - 31; Declaration of Brad J. Werner in Support of

2

Debtors' Supplemental Reply in Further Support of Debtors' Objection Regarding Proof of Claim Number 8391 (Motorola, Inc./Temic Automotive of North America, Inc.) executed on January 14, 2008 ("Werner Decl.") ¶ 28 - 31.

       5.      The GMT900 Quadrasteer Requirements Contract was not cancelled. See Werner Decl. ¶ 25 & Ex. A.

       6.      Settled Illinois law - the law that would be controlling if Motorola's terms and conditions applied - provides that "[r]easonable elasticity in the requirements in expressly envisaged by [§ 2-306, which governs requirements contracts] and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith." Ill. Comp. Stat. 5/2-306, Uniform Commercial Code Comment 2.

       7.      Motorola understood that General Motors' needs drove DAS LLC's requirements at the time that it entered into the GMT900 Quadrasteer Requirements Contract. See McInerney Decl. ¶ 14; Werner Decl. ¶ 15.

       8.      When General Motors' needs changed, DAS LLC informed Motorola and tried to move forward with developing another Quadrasteer program with Nissan that would have utilized the parts that Motorola was developing with DAS LLC for General Motors. See McInerney Decl. ¶ 18; Werner Decl. ¶ 18.

       9.      Motorola ultimately walked away from the Nissan business, which resulted in DAS LLC's inability to achieve market penetration for this revolutionary product. See McInerney Decl. ¶ 23; Werner Decl. ¶ 24.

       10.      DAS LLC acted in good faith at all times in its dealings with Motorola. See McInerney Decl. ¶ 24.

11.     Consequently, neither the law nor the facts support Claimant's entitlement to any damages, and Claimant's unfounded and overstated cancellation claim should be disallowed and expunged in its entirety.

Procedural Background

12.     On or about June 23, 2006, Motorola filed proof of claim number 8391 and asserted an unsecured nonpriority claim in the amount of $8,385,154 against DAS LLC (the "Claim").

13.     On August 4, 2006, Motorola and Temic filed a Notice of Transfer of Claim Pursuant to Bankruptcy Rule 3001(e)(2) and disclosed that Motorola had transferred "all of its right, title, interest, claims and causes of action in and to, or arising under or in connection with" certain claims filed against the Debtors, including the Claim, to Temic (Docket No. 4858).

14.     On June 15, 2007, the Debtors objected to the Claim pursuant to the Debtors' Seventeenth Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected on Debtors' Books and Records, (C) Insurance Claim Not Reflected on Debtors' Books and Records, (D) Untimely Claims and Untimely Tax Claims, and (E) Claims Subject to Modification, Tax Claims Subject to Modification, and Modified Claims Asserting Reclamation (Docket No. 8270) (the "Seventeenth Omnibus Claims Objection").

15.     On July 6, 2007, Temic filed its Response to the Seventeenth Omnibus Claims Objection (Docket No. 8483) (the "Response"). In the Response, Temic asserted that the Debtors had not presented enough evidence to overcome the presumed validity and amount of the Claim, but Temic did not provide any additional information to support the Claim.

4

16. On November 12, 2007, the Debtors filed their Statement of Disputed Issues Regarding Proof of Claim Number 8391 (Motorola Inc./Temic Automotive of North America, Inc.) (Docket No. 10895).

17. On December 20, 2007, Claimant filed its Supplemental Response to Debtors' Statement of Disputed Issues Regarding Proof of Claim Number 8391 (Motorola, Inc./Temic Automotive of North America, Inc.) (Docket No. 11567) (the "Supplemental Response").

Factual Background

18. In 2001, the Quadrasteer GMT800 system entered the market and generated immediate consumer enthusiasm with technological advancements. In order for DAS LLC to grow the product, it could not depend solely on consumer enthusiasm, and it needed to build its original equipment manufacturer ("OEM") customer base to drive competition between car manufacturers, leading to larger market penetrations. See Werner Decl. ¶ 22.

19. On November 1, 2002, DAS LLC entered into the GMT900 Quadrasteer Requirements Contract with Motorola to meet the needs of General Motors, which was then interested in developing Quadrasteer, *i.e.* a four wheel steering technology option for full-size pick up trucks and sports utility vehicles. See McInerney Decl. ¶ 12 - 13; Werner Decl. ¶ 12 - 13.

20. DAS LLC's requirements from Motorola under the GMT900 Quadrasteer Requirements Contract were based upon the projected needs of General Motors. Motorola understood that General Motors' needs drove DAS LLC's requirements at the time that it entered into the GMT900 Quadrasteer Requirements Contract. See McInerney Decl. ¶ 14-15; Werner Decl. ¶ 14-15.

5

21.     General Motors delayed the launch of the GMT900 Program from calendar year 2005 to calendar year 2006.  See McInerney Decl. ¶ 16;  Werner Decl. ¶ 16.

22.     In December of 2004, General Motors informed DAS LLC that current sales of the Quadrasteer program (then already in production on the GMT800) were weak from a combination of marketing and feature packaging for new vehicle sales.  General Motors further informed DAS LLC that it was unlikely that this product would be offered as an option for the GMT900 platform, thus reducing the requirements to near zero.  This was unfortunate because feedback from the market indicated that the vehicle owners loved the product.  A contributing factor to the change in requirements and the low market penetration was the cost of this product option.  Motorola partially fueled this high cost with several unilateral price increases for its Electronic Steering Controller.  The supply base (including Motorola) was immediately informed of the change in General Motors' requirements.  See McInerney Decl. ¶ 22.

23.     As General Motors' needs changed, DAS LLC pursued Quadrasteer programs with other automotive manufacturers, including Ford, DCX, Toyota, Fiat and Renault, that would utilize the same Motorola parts subject to the GMT900 Quadrasteer Requirements Contract.  See McInerney Decl. ¶ 17;  Werner Decl. ¶ 17.

24.     In the Spring of 2004, DAS LLC received a nomination letter of intent for the production of the Quadrasteer product from Nissan.  This represented a huge opportunity for DAS LLC to foster and grow the Quadrasteer product with substantially more market penetration with a new customer.  Because the Nissan program would use the same architecture as the GMT900, and because Motorola was a strategic supplier at the time of this significant award, DAS LLC invited Motorola to work collaboratively with it on the program.  Following that, Motorola joined DAS LLC

6

in the development of the Nissan Electronic Steering Controller. Motorola designed and built prototypes and took part in weekly product development team meetings with DAS LLC and Nissan. See McInerney Decl. ¶ 18; Werner Decl. ¶ 18.

25. In September 2004, however, Motorola informed the Debtors that the Nissan program did not meet its financial requirements and that supporting the program was inconsistent with Motorola's direction because it would entail revisions to existing processes. See McInerney Decl. ¶ 19; Werner Decl. ¶ 19.

26. As a result of Motorola having rejected the Nissan business, DAS LLC Steering was forced to approach Nissan and inform it that DAS LLC was unable to honor its commitment. This resulted in irreparable damage to DAS LLC's relationship with Nissan. See McInerney Decl. ¶ 20; Werner Decl. ¶ 21.

27. Moreover, Motorola's decision to abandon the Nissan business left DAS LLC without a supplier of a critical component for Quadrasteer, and it was no longer possible for DAS LLC to pursue in good faith additional Quadrasteer business from other customers. DAS LLC could not risk Motorola walking away from other potential new business with Quadrasteer and further damaging DAS LLC's reputation and additional pursuits with Ford, DCX, Toyota, Fiat and Renault and efforts to secure those opportunities were discontinued. See McInerney Decl. ¶ 21.

28. The loss of a supplier of a critical component on Quadrasteer for Nissan and the unsolicited price increases by Motorola for its Electronic Steering Controller, coupled with poor marketing of the product by General Motors, resulted in the inability to achieve market penetration for this revolutionary product. This resulted in damages to DAS LLC. While not the entirety of damages, the portion that DAS LLC believes Motorola is responsible for and which has been clearly communicated to Motorola is $11.3M USD. See McInerney Decl. ¶ 23; Werner Decl. ¶ 24 & Ex. A.

7

29.     DAS LLC at all times acted in good faith and did not breach or cancel the GMT900 Quadrasteer Requirements Contract.  See McInerney Decl. ¶ 24.

30.     Commencing in early 2005, Motorola repeatedly asserted that DAS LLC had cancelled the GMT900 Requirements Contract and DAS LLC consistently corrected this assertion.  For example, on the March 21, 2005, DAS LLC's Purchasing Director wrote "I am in receipt of your letter dated 03Feb05 and wish to clarify that I did not state this program was cancelled. . . ."  Werner Decl. ¶ 25 and Ex. A.

31.     Notwithstanding that correspondence, on May 3, 2005, Motorola presented DAS LLC with a request for cancellation damages in the amount of $8,385,154 compromised of: (i) engineering costs of $4,152,864; (b) capital costs of $708,088; and (c) lost profits of $3,524,201, without any explanatory calculations.  See McInerney Decl. ¶ 25;  Werner Decl. ¶ 26 & Ex. B.

32.     DAS LLC did not pay Motorola the requested cancellation damages because consistent with the GMT900 Requirements Contract, it had acted in good faith and had not breached its contract with Motorola, in asmuchas its decreased requirements were caused by General Motors' decreased requirements.  See McInerney Decl. ¶ 26;  Werner Decl. ¶ 27.

33.      DAS LLC's decision not to pay cancellation damages was also consistent with the parties' course of dealing and trade usage in the automotive industry as well as the approach that DAS LLC has taken with other suppliers of similar Quadrasteer components.  See McInerney Decl. ¶ 27;  Werner Decl. ¶ 28.

8

Argument

A.   The Claim Fails as a Matter of Law

34.   The Debtors do not disagree with Claimant's view of the "Battle of the Forms" discussed at pages 7 to 9 of Claimant's Supplemental Response, *i.e.* that gap-filling provisions of the Uniform Commercial Code govern in instances where conflicting terms cancel each other out.

35.   What the Debtors do disagree with is the Claimant's disregard for the Uniform Commercial Code's provisions concerning requirement contracts and related case law.

36.   Apparently realizing that the law controlling requirements contracts does not impose liability on good faith buyers with changed needs, Claimant argues that "whether [DAS LLC] acted in good or bad faith is of no matter." Supplemental Response, at 2.

37.   The commercial codes of both Illinois and Michigan recognize that "[a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith . . . ." Mich. Comp. Laws §440.2306(1) (2007);  Ill. Comp. Stat. 5/2-306(1) (2007) (emphasis added).

38.   Official Comment 2 to § 2-306 of the Uniform Commercial Code (UCC), the Illinois UCC, and the Michigan UCC provides: "Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance.  A shut-down by a requirements buyer for lack of orders might be

9

permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith."

39.   This Court has previously ruled that there can be no breach of a requirements contract in the absence of bad faith:

> The only limitation [on the rule that a requirements contract is valid and enforceable] is that the contracting party act in good faith in respect of its requirements. However, the evidence here does not show any absence of good faith by DAS. Indeed, I don't believe an absence of good faith is alleged. Moreover, the letter dated March 3, 2005 by Mr. Sharplee to Mr. Robins states, among other things, "perhaps there was nothing that could have been done to prevent these events from occurring from Delphi's perspective," that is the losses that occurred because of the overall nature of the project. So I conclude that Delphi acted in good faith and that its requirements contract should be enforced pursuant to its terms.

In re Delphi Corporation, *et al.*, Chapter 11 Case No. 05-44481, Transcript of Proceedings, March 1, 2007, at 25 - 26.

40.   While the claim filed by LaborSource 2000, Inc. did not raise "Battle of the Forms" issues, this distinction is of no moment because (i) this aspect of the Court's ruling concerns the consequences of good faith behavior in a requirements contract where the buyer's needs have changed; and (ii) whichever form prevails, good faith will defeat a cancellation claim.

41.   Moreover, this Court's ruling echoes clearly established law. See Wilsonville Concrete Products v. Todd Building Co., 574 P.2d 1112 (Or. 1978) ("Both at common law (pre-code) and under the Oregon Uniform Commercial Code, a requirements contract is simply an agreement by the buyer to buy his good faith requirements of good exclusively from the seller. If in good faith the buyer has no requirements, then he is not obligated to buy anything.") (citing 1A Corbin on Contracts 30-33, s 156 (1963)); Schawk, Inc. v. Donruss Trading Cards, Inc., 746 N.E.2d 18 (Ill. App. 1 Dist. 2001) (finding no breach of requirements contract where manufacturer's

10

requirements were reduced to zero following sale of substantially all assets in good faith).  See also Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1338 (7th Cir. 1988) (Posner, J.) ("the seller assumes the risk of all good faith variation in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business.") (quoting HML Corp. v. General Foods Corp., 365 F.2d 77, 81 (3d Cir. 1966)); Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 (3d Cir. 1992) (Alito, J.) ("[U]nder the U.C.C., a requirements buyer may have a good faith reason for demanding no goods from the seller. In such a case, the buyer does not breach by ordering no goods."); MDC Corp., Inc. v. John M. Heartland Co., 228 F.Supp.2d 387 (S.D.N.Y. 2002) (stating that under a requirements contract a buyer may reduce its requirements to zero if acting in good faith) (citing Canusa Corp. v. A&R Lobosco, Inc., 986 F.Supp. 723, 729-30 (E.D.N.Y. 1997));  NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F.Supp. 1004, 1009 (S.D.N.Y. 1991) (finding that, in evaluating whether a buyers reduction to zero is in good faith and therefore not a breach, "[t]he proper inquiry requires an analysis of the buyer's subjective motives to determine if it had a legitimate business reason for eliminating its requirements").  Accord Neofotistos v. Harvard Brewing Co., 171 N.E.2d 865 (Mass. 1961) (seller of brewing by-product in output contract acted in good faith and thus did not breach when it reduced output (analogous to requirements) to zero by voluntarily ceasing the brewing of malt beverages in an exercise of its sound business judgment that such production was no longer profitable).

    42. Wilsonville Concrete Products v. Todd Building Co., 574 P.2d 1112 (Or. 1978) is instructive because it presents an analogous factual situation.  In Wilsonville Concrete, the defendant-buyer, a construction company, contracted with the plaintiff-seller to purchase all concrete needed for the construction of a secured wing at a state hospital.  While the parties had estimated that approximately 3,000 cubic

11

yards would be needed, only 245 cubic yards had been delivered when the state was forced to cancel the project. The termination of the project by the defendant's customer, the state, eliminated its concrete requirements for the project and no further deliveries were accepted from the plaintiff. In ruling in favor of the buyer, the Court found it to be 'hornbook law' that "[I]f in good faith the buyer has no requirements, then he is not obligated to buy anything." Id. at 1114-15. The Court held that "once the hospital project was terminated by the State of Oregon defendant had no good faith need for plaintiff's concrete and defendant was no obligated to buy any further concrete from plaintiff pursuant to the requirements contract." Id. at 1115.

43. When it executed the GMT900 Quadrasteer, DAS LLC agreed to buy its good faith requirements in connection with the GMT900 Quadrasteer program exclusively from Motorola and did so.

44. DAS LLC acted in good faith at all times with respect to its dealings with Motorola, and Motorola has not, and cannot, establish any bad faith on the part of DAS LLC.

45. DAS LLC did not re-source. When General Motors' needs changed, Motorola was timely informed and DAS LLC tried to move forward with developing another Quadrasteer program with Nissan that would have utilized the parts that Motorola was developing with DAS LLC for General Motors. Having walked away from that opportunity -- to the Debtors' great detriment -- Claimant should not now be heard to complain about lost profits.

46. Because the Claim is unfounded in law and not supported by facts, it should be disallowed and expunged in its entirety.

B.     The Claim is Grossly Overstated

47.     Even if Motorola could credibly assert that the Claim is legally viable, the Claim is not one that would be recognized as valid in the automotive industry, but rather would be considered invalid and grossly overstated.

48.     When an original equipment manufacturer, such as General Motors, has a requirements contract from a Tier I supplier, the Tier I supplier needs to procure parts from other companies. In the absence of volume guarantees, both the Tier I and Tier II companies servicing the needs of an original equipment manufacturer assume the risk that volume will decrease or disappear entirely. See McInerney Decl. ¶ 28; Werner Decl. ¶ 29.

49.     While Tier I and Tier II suppliers are not under a legal obligation to compensate their sub-suppliers under such circumstances, in the interest of good will, other forms of consideration are sometimes proposed such as additional business opportunities or the purchase of dedicated capital for reuse in other applications. See McInerney Decl. ¶ 29; Werner Decl. ¶ 30.

50.     Without acknowledging any wrongdoing in connection with the GMT900 Quadrasteer Requirements Contract, DAS LLC did offer an additional business opportunity to Motorola in the form of the proposed Nissan Quadrasteer project, but Motorola ultimately abandoned that opportunity. See McInerney Decl. ¶ 18 - 19; Werner Decl. ¶ 18 - 19.

51.     DAS LLC did not breach any of its contractual obligations to Motorola under the GMT900 Quadrasteer Requirements Contract. In any event, Motorola's damages claim is unsupported by the evidence and is inconsistent with automotive industry standards. See McInerney Decl. ¶ 26 - 27.

52. Contrary to industry standards for example, Motorola seeks reimbursement (a) for payroll of employees recording time on the GMT900 Requirements Contract, which is considered in the industry to be research and development; (b) for lost opportunities (profits) which are not the norm even in a cancellation claim, and (c) for capital equipment that it claims is useless to Motorola for other programs, but has not yet been made available for purchase by DAS LLC. See McInerney Decl. ¶ 31; Werner Decl. ¶ 31.

53. Because the lynchpin of Claimant's position is its view of the treatment of cancellation claims in the automotive industry and that view is presented in self-serving affidavits -- which are contrary to the automotive industry practice -- the Claim should be disallowed and expunged in its entirety as a matter of fact and law.

## Conclusion

54. For all the reasons discussed above, the Debtors are not liable to Claimant and the Claim should be disallowed and expunged in its entirety.

## Memorandum of Law

55. Because the legal points and authorities upon which this Supplemental Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim, and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
January 14, 2008

DELPHI CORPORATION, et al.,
Debtors and Debtors-in-Possession,
By their Bankruptcy Conflicts Counsel,
TOGUT, SEGAL & SEGAL LLP,
By:

/s/ Neil Berger
NEIL BERGER (NB-3599)
SEAN MCGRATH (SM-4676)
TALLY WIENER (TW-0215)
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000