TOGUT, SEGAL & SEGAL LLP
Bankruptcy Conflicts Counsel for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession,
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Neil Berger (NB-3599)
Sean McGrath (SM-4676)
Tally Wiener (TW-0215)

Hearing Date:  February 8, 2008
Hearing Time:  10 a.m.

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                        :
In re                                   :    Chapter 11
                                        :
    DELPHI CORPORATION, et al.,         :    Case No. 05-44481 [RDD]
                                        :
                        Debtors.        :    (Jointly Administered)
                                        :
------------------------------------------------------------X

**DECLARATION OF JEFFREY A. MCINERNEY IN SUPPORT OF DEBTORS'
SUPPLEMENTAL REPLY IN FURTHER SUPPORT OF DEBTORS'
OBJECTION REGARDING PROOF OF CLAIM NUMBER 8391
(MOTOROLA, INC./ TEMIC AUTOMOTIVE OF NORTH AMERICA, INC.)**

Jeffrey A. McInerney, hereby declares as follows:

1.  I make this declaration on behalf of Delphi Automotive Systems LLC ("DAS LLC") in support of Debtors' Supplemental Reply in Further Support of Debtors' Objection Regarding Proof of Claim Number 8391 (the "Supplemental Reply"). I am the Global Buyer for Motors, Actuators and Electrical Assemblies for DAS LLC's Delphi Steering division.

2. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, upon information supplied to me by other employees of DAS LLC, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of DAS LLC's operations and the automobile industry in general.

**My Career in the Automotive Industry and at DAS LLC**

3. I am the Director for North America Supply Management for DAS LLC's Steering division. I have served in this position since August 1, 2006 and have worked for DAS LLC since May of 1989.

4. Prior to assuming this position, I served as the Director of Material Cost Improvement Program at DAS LLC Steering from 2004 to 2006.

5. I have approximately 17 years of experience working in the automotive industry in a variety of roles, including engineering, manufacturing operations, manufacturing planning, and supply chain management. I have interfaced with various automotive original equipment manufacturers ("OEMs") and "Tier II" suppliers in a number of different venues and under a variety of conditions.

6. I have been successful in facilitating numerous contract negotiations, warranty settlements, and difficult contractual disputes. Specifically with our supply base, I have a proven track record of being fair when encountering difficult situations related to the automotive industry.

7. DAS LLC has worked with most of the major automobile manufacturers including, General Motors, Ford, Chrysler, Nissan, etc. DAS LLC

2

Steering also interfaces with over 2000 suppliers on a regular basis and recently finished the renewal of over 600 contract extensions for calendar year 2007.

8. My previous job duties while working for DAS LLC include:

- 1989 – 1995 Manufacturing Supervisor – Led manufacturing teams through production of automotive components and assembly. Transitioned several components through new model launch periods. Interfaced with the end using assembly plants and end customers.

- 1995 – 1997 Process/Manufacturing Engineer – Designed and led the procurement and installation of new manufacturing equipment for programs launching on the manufacturing floor.

- 1997 – 1998 Operations Planner – Led product implementation teams for new programs starting on the manufacturing floor. Worked with product engineering for issues related to new models. Responsible for product footprint development within the plant as well as make/buy decisions of components.

- 1998 - 1999 Delphi Manufacturing System Manager – Worked within a manufacturing facility as the change agent for the implementation of lean manufacturing techniques.

- 1999 – 2002 Sub-Plant Manager – Passenger Car – Led a team of individuals responsible for the production of steering columns for 7

major vehicle assembly centers. Proactively worked with the UAW for conflict resolution.

- 2002 – 2004 Supplier Development Manager – Initiated and implemented lean manufacturing tools in the supply base at strategic supplier locations.

- 2004 – 2006 Director, Material Cost Improvement Program – Worked with product engineers and the supply base to eliminate waste and cost in the design and manufacture of component parts and sub assemblies.

- 2006 – Present Director, North America Supply Management – Responsible for North American Supply base for Steering. This would include contract management, conflict resolution, footprint decisions and fostering supply relationships.

9.      Through my work experience at DAS LLC, I have obtained extensive knowledge and information about the automotive industry. I have had to deal with numerous automotive issues, including production throughput issues, launch difficulties, engineering changes, new product development and implementation. I have also had experience with many contractual issues. These would include warranty claims, cancellation claims, commodity pricing pressures, factory closures and bankruptcies, footprint migration and contract negotiation.

10. As the Director for North America Supply Management, I am allowed access to the business records of the company and company personnel. During the course of my investigation into the present claim involving DAS LLC and Motorola regarding Quadrasteer, I have reviewed several documents, e-mails and have had conversations with numerous employees who are also familiar with the auto industry and our policies, procedures and history of dealing with Motorola.

11. During my 17 years of working in the automobile industry I have become knowledgeable about supply contracts and the process of procuring and executing contracts. In reviewing hundreds of contracts, I have been exposed to the terms and conditions of numerous suppliers, and how our company has chosen to respond to them. I am also familiar with the rare cases of a supplier's absolute refusal to accept DAS LLC's standard terms and conditions and DAS LLC's procedure for approval of non-standard terms and conditions. I have first-hand knowledge of how volume reductions and mix changes are handled in the industry.

**The Contract at Issue**

12. On November 1, 2002, DAS LLC and Motorola Inc. ("Motorola") entered into a requirements contract under which Motorola was to provide 100% of DAS LLC's production and service requirements for a critical component ("Electronic Steering Controller") to be incorporated into the Delphi Quadrasteer System for use in the GMT 900 program (the "GMT900 Quadrasteer Requirements Contract").

13. DAS LLC entered into the GMT900 Quadrasteer Requirements Contract in order to meet the needs of its automaker customer General Motors, which

5

was then interested in developing a four wheel steering technology option for full-size pick up trucks and sport utility vehicles. GMT 900 was to be the replacement program for the GMT 800 Quadrasteer.

14. DAS LLC's requirements from Motorola under the GMT900 Quadrasteer Requirements Contract were based on the needs of its customer General Motors.

15. Motorola understood that General Motors' needs drove DAS LLC's requirements at the time that it entered into the GMT900 Quadrasteer Requirements Contract.

16. General Motors announced that it was delaying the launch of the GMT900 Program from calendar year 2005 to calendar year 2006.

17. In the meantime, DAS LLC pursued Quadrasteer programs with other automotive manufacturers, including Ford, DCX, Toyota, Fiat and Renault, that would utilize the same Motorola Electronic Steering Controller to be used in the GMT900 Quadrasteer program.

18. In the spring of 2004, Nissan issued a letter of intent to DAS LLC, naming it as Nissan's Tier 1 production source for its Quadrasteer program. This represented a huge opportunity for DAS LLC with an important new customer to expand the Quadrasteer product's market penetration. Because the Nissan program would use the same architecture as the GMT900 and Motorola was a strategic supplier at the time, DAS LLC invited Motorola to work collaboratively with it on the program. Following that, Motorola joined DAS LLC in the development of the Nissan Electronic

Steering Controller. Motorola designed and built prototypes and took part in weekly product development team meetings with DAS LLC and Nissan.

19. However, in September 2004, Motorola defaulted on its commitment to DAS LLC over the Nissan Quadrasteer program by abruptly announcing it would immediately terminate all work on the program. Motorola's excuse was that the Nissan program did not meet its financial requirements and that supporting the program was inconsistent with Motorola's direction because it would entail revisions to existing processes. Motorola had failed a series of Nissan quality and process audits and was unwilling to make the necessary investments for success.

**Consequences to DAS LLC from Motorola's Misconduct**

20. Because of Motorola's default on the Nissan Quadrasteer program, we had to inform Nissan that we were now unable to honor our commitment to the program. This resulted in substantial damage to DAS LLC's relationship with Nissan which has not healed to this day.

21. Because Motorola defaulted on the Nissan program and left DAS LLC without a supplier of a critical component like the Electronic Steering Controller, it was no longer possible to pursue in good faith additional Quadrasteer business from other automaker customers. DAS LLC could simply not risk Motorola walking away from other potential new Quadrasteer business and further damaging DAS LLC's reputation as a reliable supplier. As a result, additional pursuits with Ford, DCX, Toyota, Fiat and Renault were discontinued.

22. In December of 2004, General Motors informed DAS LLC that current sales of the GMT800 Quadrasteer program were weak for new vehicle sales and that, as a result, it was now unlikely that Quadrasteer would be offered as an option for the GMT900 platform, thus reducing its requirements to near zero. This was unfortunate because feedback from the market indicated that the vehicle owners loved the product. A contributing factor to the low market penetration and change in GM's requirements was the cost of the option. Motorola partially fueled this high cost with several unilateral price increases for its Electronic Steering Controller. The supply base (including Motorola) was immediately informed of the change in General Motors' requirements.

23. The loss of a critical component supplier like Motorola for the Nissan Quadrasteer program, the several unilateral price increases from Motorola for its Electronic Steering Controller, coupled with poor marketing of the product by General Motors resulted in the inability to achieve market penetration for this revolutionary product. This, in turn, caused considerable financial losses to DAS LLC. The portion of these financial losses that DAS LLC calculates Motorola is responsible for due to its default on the Nissan Quadrasteer program is approximately $11,300,000.

**Motorola's Erroneous Assertion of "Cancellation"**

24. DAS LLC at all times acted in good faith with Motorola and did not cancel or otherwise breach the GMT900 Quadrasteer Requirements Contract.

25.    Nevertheless, in a letter dated May 3, 2005, Motorola submitted a cancellation claim for alleged damages in the amount of $8,385,154 comprised of: (a) engineering costs of $4,152,864; (b) capital costs of $708,088; and (c) lost profits of $3,524,201.

26.    DAS LLC did not pay Motorola the requested cancellation damages because, consistent with the GMT900 Requirements Contract, it had acted in good faith and had not breached any obligation to Motorola, inasmuch as, its decreased requirements were caused by General Motors' decreased requirements.

27.    DAS LLC's decision not to pay cancellation damages was also consistent with the parties' course of dealing and trade usage in the automotive industry, as well as the approach it has taken with other suppliers of similar Quadrasteer components.

28.    When an original equipment manufacturer, such as General Motors, has a requirements contract with a Tier I supplier, the Tier I supplier often needs to procure subcomponents from other companies (Tier II suppliers). In the absence of volume guarantees, both the Tier I and Tier II suppliers servicing the needs of the automaker assume the risk that volume will decrease or disappear entirely, depending on the market. This was the case with the parties' GMT 900 Quadrasteer Requirements Contract.

29.    While Tier I and Tier II suppliers are not under a legal obligation to compensate their sub-suppliers under such circumstances, in the interest of maintaining good business relations, other forms of consideration are sometimes proposed, such as

additional business opportunities or the purchase of dedicated capital for reuse in other applications.

30.  DAS LLC has acted in good faith with Motorola and has not breached any of its contractual obligations under the GMT900 Quadrasteer Requirements Contract, which was not overridden or superseded by the parties' "course of dealing" or any "trade usage in the automotive industry." In any event, Motorola's damage claim is unsupported by the evidence and is inconsistent with automotive industry standards.

31.  Contrary to industry standards, for example, Motorola seeks reimbursement: (a) for payroll of employees recording time on the GMT900 Requirements Contract, which is considered in the industry to be research and development; (b) for lost opportunities (profits) which are not the norm even in a cancellation claim; and (c) for the cost of capital equipment which Motorola claims is useless to it in other programs, but has not yet been made available for purchase by DAS LLC.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed in Saginaw, Michigan on January 14, 2008

*[signature]*
Jeffrey A. McInerney