| | |
|---|---|
| TOGUT, SEGAL & SEGAL LLP<br>Bankruptcy Conflicts Counsel for Delphi Corporation, et al.,<br>Debtors and Debtors-in-Possession,<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br>(212) 594-5000<br>Neil Berger (NB-3599)<br>Sean McGrath (SM-4676)<br>Tally Wiener (TW-0215) | Hearing Date: February 8, 2008<br>Hearing Time: 10 a.m. |

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                  :
In re                                             :     Chapter 11
                                                  :
    DELPHI CORPORATION, et al.,    :     Case No. 05-44481 [RDD]
                                                  :
                               Debtors.       :     (Jointly Administered)
                                                  :
---------------------------------------------------------------X

**DECLARATION OF BRAD J. WERNER IN SUPPORT OF DEBTORS'
SUPPLEMENTAL REPLY IN FURTHER SUPPORT OF DEBTORS'
OBJECTION REGARDING PROOF OF CLAIM NUMBER 8391
(MOTOROLA, INC./ TEMIC AUTOMOTIVE OF NORTH AMERICA, INC.)**

Brad J. Werner, hereby declares as follows:

1. I make this declaration on behalf of Delphi Automotive Systems LLC ("DAS LLC") in support of Debtors' Supplemental Reply in Further Support of Debtors' Objection Regarding Proof of Claim Number 8391 (the "Supplemental Reply"). I am the

Global Buyer for Motors, Actuators and Electrical Assemblies for DAS LLC's Delphi Steering division.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, upon information supplied to me by other employees of DAS LLC, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the DAS LLC's operations and the automobile industry in general.

**My Career in the Automotive Industry and at DAS LLC**

3.      I am the Global Buyer for Motors, Actuators and Electrical Assemblies for DAS LLC's Delphi Steering division.  I have served in this position since May 1, 2003 and have worked for DAS LLC since January, 2002.

4.Prior to assuming this position, I served as the Motor Supplier Quality Engineer at DAS LLC Steering from January 2002 to April 2003.   I have approximately 8 years experience working in the automobile industry in design engineering, supplier quality and as a purchasing agent.

5.4.    . I have had regular contact with automotive suppliers in the product design, quality, and commercial functions.

6.5.    During my time in the automotive industry, I have developed the ability to manage diverse suppliers that provide both unique and standard products.

7.6.    My experience includes management and involvement with suppliers at all stages of projects including, but limited to, early supplier involvement, early launch, production and service.  DAS LLC has worked with most of the major automobile

manufacturers including, but not limited to, General Motors, Nissan, Daimler Chrysler, Ford, Toyota, Fiat, Chery and other many other global original equipment manufacturers ('OEMs").

8.7.    DAS LLC Steering also interacts with over 2000 suppliers on a regular basis and recently finished renewal of over 600 contract extensions for calendar year 2007.

9.8.    My job duties while working for and at DAS LLC have included:

• Supplier Quality Engineer, Motors and Actuators (December 2001- March 2003) - Managing suppliers' product development, launch, and production from the aspect of quality and the DAS LLC SPDP Process.

• Buyer, Bearings (May 2000 – December 2001) Developing and implementing saving initiatives, negotiation strategies and various strategies for key bearing suppliers, selective sourcing of new business to partnering suppliers to provide DAS LLC with lowest total cost suppliers and exceed the annual cost savings targets.

10.9.    Through my work experience at DAS LLC, I have obtained extensive knowledge and information about the automotive industry. I have worked on numerous automotive issues. These include production throughput issues, launch difficulties, engineering changes, new product development and implementation.

11.10.   I have also had experiences in many aspects of contractual issues, including warranty claims, cancellation claims, commodity pricing pressures, factory closures, footprint migration and certainly contract negotiation. During my 8 year career in the automobile industry I have become familiar with settling contractual concerns or changes with suppliers in the automotive industry.

12.11.  I am knowledgeable on DAS LLC's supplier contracts and the process of procuring and executing contracts on unique and custom products.  In preparing, managing and reviewing a large amount of contracts with suppliers, I have been exposed to many requirements changes, as I see Claim 8391 represents, and how our company has chosen to respond to them.  I have first-hand knowledge of how volume reductions and mix changes are handled in the industry.

**The Contract at Issue**

1.12.   On November 1, 2002, DAS LLC and Motorola Inc.  ("Motorola") entered into a requirements contract underpursuant to which Motorola was to provide 100% of the DAS LLC's production and service requirements for a criticalcertain components ("Electronic Steering Controller") to befor incorporatedion intoin the Delphi Quadrasteer System for use in the GMT 900 program (the "GMT900 Quadrasteer Requirements Contract").

2.13.   DAS LLC entered into the GMT900 Quadrasteer Requirements Contract in order to meet the needs of its automaker customer General Motors, which was then interested in developing a four wheel steering technology option for full-size pick up trucks and sports utility vehicles.  GMT 900 was to be the replacement program for the GMT 800 Quadrasteer.

3.14.   DAS LLC's requirements from Motorola under the GMT900 Quadrasteer Requirements Contract were based on the needs of its customer General Motors.

6.15.  Motorola understood that General Motors' needs drove DAS LLC's requirements at the time that it entered into the GMT900 Quadrasteer Requirements Contract.

7.16.  General Motors announced that it was delayinged the launch of the GMT900 Program from calendar year 2005 to calendar year 2006.

17.  In the meantimeAs General Motors' needs changed, DAS LLC pursued Quadrasteer programs with other automotive manufacturers, including Ford, DCX, Toyota, Fiat and Renault that would utilize the same Motorola Electronic Steering Controllerparts to be used insubject to the GMT900 Quadrasteer programRequirements Contract.

18.  In the spring of 2004, Nissan issued a letter of intent to DAS LLC, naming it as Nissan's Tier 1 production source for its Quadrasteer program.  This represented a huge opportunity for DAS LLC with an important new customer to expand the Quadrasteer product's market penetration.  Because the Nissan program would use the same architecture as the GMT900 and Motorola was a strategic supplier at the time, DAS LLC invited Motorola to work collaboratively with it on the program.  Following that, Motorola joined DAS LLC in the development of the Nissan Electronic Steering Controller. Motorola designed and built prototypes and took part in weekly product development team meetings with DAS LLC and Nissan.

8.19.  However, iIn September 2004,  Motorola defaulted on its commitment to DAS LLC over the Nissan Quadrasteer program by abruptly announcing it would immediately terminate all work on the program.  Motorola's excuse was that theinformed

-5-

the Debtors that the Nissan program did not meet its financial requirements and that supporting the program was inconsistent with Motorola's direction because it would entail revisions to existing processes. Motorola had failed a series of Nissan quality and process audits and was unwilling to make the necessary investments for success.

20. The results of multiple audits by Nissan and DAS LLC of Motorola also clearly indicated key concerns with the quality of Motorola's manufacturing process for the product.

**Consequences to DAS LLC from Motorola's Misconduct**

20.21. Due to the fact that Motorola abandoned the Nissan business, DAS LLC was forced to approach Nissan and work to resolve commitments DAS LLC had made to Nissan. This resulted in significant damage to DAS LLC's relationship with Nissan.

21.22. In 2001, the Quadrasteer GMT 800 system entered the market and generated immediate consumer enthusiasm with great technological advancements. In order for DAS LLC to grow the product, it knew that it could not depend solely on consumer enthusiasm; rather it needed to build its OEM customer base to drive competition between car manufacturers, leading to larger market penetrations.

22.23. In the spring of 2004, DAS LLC received a nomination letter from Nissan to be the production source for Quadrasteer on its US Truck and SUV lines. DAS LLC was also in early development with other OEMs such as Ford, Daimler Chrysler and

Fiat for Quadrasteer Applications on their vehicles programs that would utilize a large portion of DAS LLC's next generation Quadrasteer System – the GMT 900 design.

23.24.  The loss of a supplier of an important component on Quadrasteer for Nissan, the unsolicited price increases from Motorola on components for the GMT900, coupled with poor marketing of the product by General Motors, resulted in the inability to achieve market penetration for this revolutionary product.  This resulted in damages to DAS LLC.   The portion that DAS LLC believed Motorola was responsible for was clearly communicated to Motorola as $11.3M.  See Letter from Beverly Gaskin to Adrian Schaffer dated March 21, 2005, a true and correct copy of which is annexed hereto as Exhibit "A."

**Motorola's Erroneous Assertion of "Cancellation"**

24.25.  Commencing in early 2005, Motorola repeatedly asserted that DAS LLC had cancelled the GMT900 Requirements Contract and DAS LLC consistently corrected this assertion.   For example, on the March 21, 2005, DAS LLC's Purchasing Director wrote "I am in receipt of your letter dated 03Feb05 and wish to clarify that I did not state this program was cancelled . . . ."  Exhibit "A."

15.26.  Notwithstanding that correspondence, on May 3, 2005, Motorola presented DAS LLC with a request for cancellation damages in the amount of $8,385,154 compromised of: (i) engineering costs of $4,152,864;  (b) capital costs of $708,088;  and (c) lost profits of $3,524,201, without  any explanatory calculations.  See Letter from Adrian Schaffer Beverly to Beverly Gaskin dated May 3, 2005, a true and correct copy of which is annexed hereto as Exhibit "B."

16.27.  DAS LLC did not pay Motorola the requested cancellation damages because, consistent with the GMT900 Requirements Contract, it had acted in good faith and had not breached any obligation tocontract with Motorola, in as much as, itsthe decreased requirements were caused by General Motors' decreased requirements.

17.28.  DAS LLC's decision not to pay cancellation damages was also consistent with the parties' course of dealing and trade usage in the automotive industry, as well as the approach it has taken with other suppliers of similar Quadrasteer components.

29.    When an original equipment manufacturer, such as General Motors, has a requirements contract withfrom a Tier I supplier, the Tier I supplier often needs to procure subcomponentsparts from other companies (Tier II suppliers).  In the absence of volume guarantees, both the Tier I and Tier II supplierscompanies servicing the needs of the automakeran original equipment manufacturer assume the risk that volume will decrease or disappear entirely, depending on the market.  This was the case with the parties' GMT 900 Quadrasteer Requirements Contract.

29. While Tier I and Tier II suppliers are not under a legal obligation to compensate their sub-suppliers under such circumstances, in the interest of maintaining good business relationsgood will, other forms of consideration are sometimes proposed, such as additional business opportunities or the purchase of dedicated capital for reuse in other applications.

20.30.  DAS LLC acted in good faith and did not breach the GMT900 Requirements Contract.  Even if DAS LLC were to concede this point other consideration

was granted in the form of additional new business opportunity (the Nissan business that Motorola rejected) and the pursuit of purchasing capital equipment that despite being of no use to Motorola is strangely unavailable.DAS LLC has acted in good faith with Motorola and has notdid not breached any of its contractual obligations to Motorola under the GMT900 Quadrasteer Requirements Contract, which  and was notnot overridden or superseded by  with the parties' "course of dealing" or anywith "trade usage in the automotive industry."  In any event, Motorola's damage claim is unsupported by the evidence and is inconsistent with automotive industry standards.

        31.    Contrary to industry standards, for example, Motorola seeks reimbursement (a) for payroll of employees recording time on the GMT900 Requirements Contract, which is considered in the industry to be research and development; (b) to for hasasfor lost opportunities (profits) which are not the norm even in a cancellation claim, and (c) for the cost of capital equipment which Motorolathat it claims is useless to it inMotorola for other programs, but has not yet been available for purchase by DAS LLC.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

    Executed in   __Saginaw____, Michigan on January _14___ , 2008

*[signature]*

_____
Brad J. Werner