Thomas M. Kennedy (TK-0993)                        Hearing Date: January 17, 2008
Susan M. Jennik (SJ-4607)                          Hearing Time: 10 am
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
Tel. (212) 358-1500

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America ("IUE-CWA")
and Its Affiliated Locals, Including Local 698 and Its
Members, Local 711 and Its Members, Local 717 and
Its Members, Local 718 and Its Members, Local 755
and Its Members, and Local 801 and Its Members

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| In re DELPHI CORPORATION, *et al.*, | ) | |
| | ) | **05-44481 (RDD)** |
| Debtors. | ) | **(Jointly Administered)** |
| | ) | |

**LIMITED OBJECTION OF IUE-CWA AND AFFILIATED LOCALS
TO DEBTORS' PROPOSED MANAGEMENT COMPENSATION PLAN AND
SALARIED EMPLOYEE COMPENSATION PROGRAM**

The International Union of Electronic, Electrical, Salaried, Machine and Furniture

Workers-Communications Workers of America ("IUE-CWA"), and certain of its affiliated

locals, including Local 698 and its members, Local 711 and its members, Local 717 and its

members, Local 718 and its members, Local 755 and its members, and Local 801 and its

members (collectively "Affiliated Locals"), by and through their counsel, hereby submit this

limited objection to the Management Compensation Plan ("MCP") set forth in Article VII and

Exhibit 7.8 of the Debtors' First Amended Joint Plan of Reorganization ("POR"), and to the

Salaried Employee Compensation Program ("SECP")[1] described in the Debtors' First Amended

Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi

Corporation and Certain Affiliates, Debtors and Debtors-In-Possession ("Disclosure Statement").

The IUE-CWA and the Affiliated Locals do not otherwise oppose confirmation of the POR.[2]

## BACKGROUND

1.      On October 13, 2005, Debtors filed their Motion For Order Under §§ 105 and 363

Authorizing The Debtors To Implement A Key Employee Compensation Program ("KECP

Motion") (Docket No. 213).  This proposal included enhanced income to Debtors' management

during the Chapter 11 process through the implementation of an annual incentive program

("AIP").  Thus, through the duration of the Chapter 11 cases, Debtors' management employees

have continued to receive their salaries and benefits as well as overly generous performance

awards through the AIP, totaling over $104 million through the first quarter of 2007 (DPH-MCP

00001750.)[3]  During the same period, Delphi's union members have made deep and irreversible

sacrifices to ensure the survival of the companies.[4]

2.      The KECP Motion also included a forward looking proposal to grant, upon

emergence from Chapter 11, an emergence bonus plan consisting of both cash and equity.  The

---

[1]      Together, the Management Compensation Plan and Salaried Employee Compensation Program ("MCP/SECP").

[2]      The IUE-CWA voted to accept the POR; the Affiliated Locals voted to reject the POR solely because they object to the MCP/SECP.

[3]      "DPH-MCP 0000xxxx" refers to the bates numbers on the documents produced by the Debtors' in discovery regarding this Motion.

[4]      There were 8,514 IUE-CWA represented Delphi employees when the petition was filed. As of August 18, 2006, 6,200 of those employees opted to leave with an early attrition program. (Disclosure Statement at DS-40-41.)

2

actual proposed program was set forth in the report prepared by the Debtors' compensation consultant Watson Wyatt Worldwide ("Watson Wyatt") entitled Key Employee Compensation Programs, dated October 8, 2005 ("10/8/05 WW KECP report"), attached as Exhibit 1 to the KECP Motion.[5]  The KECP had three parts: the AIP, an emergence bonus plan, and a prepetition severance plan.  The current proposed MCP/SECP contains similar elements, including a short-term incentive plan ("STIP") in place of the AIP, an emergence equity bonus, an emergence cash bonus and a Salaried Employees Retirement Program ("SERP").

3.      The AIP was the only part of the KECP approved by the Court.  Debtors acknowledge that the longer term elements of the originally proposed compensation program, *i.e.*, cash payments on the Effective Date and long-term equity grants for post-emergence periods, were deferred to the plan confirmation process.  (Disclosure Statement at DS-104-105.) Thus, Debtors are estopped from arguing that the initial proposal established reliance interests which would justify inequitable and excessive executive compensation.

4.      Debtors may not establish binding plan elements before the creation and introduction of the POR.  Motions made under 11 U.S.C. § 363 are not available "to short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a proposed transaction." In re Continental Airlines, Inc., 780 F.2d 1223, 1227 (5th Cir. 1986).  *Sub rosa* plans are inappropriate because they dictate plan terms without the consent of affected parties.  See, In re Tower Automotive, Inc., 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), aff'd, 241 F.R.D. 162 (S.D.N.Y. Dec. 15, 2006).  The Debtors' proposal for

---

[5]      See, footnote 5 in KECP Motion ("The actual terms of the [KECP] set forth in Exhibit 1 to the order shall control.").

emergence cash and equity grants in the initial KECP Motion - which was never granted by the Court - can not now be used to dictate terms to the Court or the creditors.

5.      It is now the appropriate moment for the Court to determine whether the Debtors' proposal regarding executive compensation is equitable. The Court should itself assess the merits and fairness of this management proposal in which the corporation's executives have direct financial interests. In re Integrated Resources, 147 BR 650, 657 (Bankr. S.D.N.Y. 1992). In the context of proposed payments to corporate insiders, "good faith" is a necessary element of inquiry. 2C Bankr. Service L.Ed (September 2005) § 20:119 and cases cited therein; In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997).

6.      "The purpose of the Key Employee Compensation Program is to retain and incentivize Covered Employees . . . during the Debtors' restructuring period." (KECP Motion, ¶ 15.) These purposes have been met through the implementation of the AIPs. The proposed MCP/SECP is an unreasonable transfer of wealth directly from the creditors, and at the expense of the workers, and in its current form it is manifestly inequitable.

7.      The proposed MCP/SECP is not a *fait accompli*; this bank has not yet been held up. The Court should independently weigh the equity of delivering to the executives a platinum compensation plan where the survival of the companies is due to the sacrifices of its workers. While the initial KECP proposal was overreaching and greeted with scorn[6], the proposed MCP/

---

[6]      "It's not every day that investors can view the contortions performed by compensation consultants trying to justify the monster executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched." Morgenson, Gretchen, "Oohs and Ahs At Delphi's Circus," *New York Times Sunday Business*, November 13, 2005, Section 3, pp 1 and 4, 2005 WLNR 18334017.

SECP, rather than recognizing the need and equity of a shared sacrifice, includes new provisions

which are even more inequitable.  The proposed MCP/SECP should be rejected.

## I.    GENERAL OBJECTIONS

### A.    Delphi Failed to Use an Appropriate Peer Group to Benchmark its Program Against the Market

8.    Delphi argues throughout the Plan and the Declaration of Nick Bubnovich

("Bubnovich"), dated January 9, 2008 ("Bubnovich Dec.") that its MCP is competitive and

market based.  But the evidence it relies upon for these assertions rests on comparisons with

companies that are far too large, that are in a far different economic position and are involved in

far different industries.  The alleged competitiveness of the MCP for the top 11 Delphi Strategy

Board ("DSB") members, for example, rests on medians drawn from a list of 18 public

companies that range in revenues from $5 to $50 billion dollars and include 12 companies that

Delphi acknowledges are not in its industry and 8 companies that Delphi acknowledges are not

competitors for talent with Delphi.  (DPH-MCP 00000161.)  The impact of a change in

comparative groups is illustrated by an email dated July 9, 2007 from Bubnovich which states

that "the old peer group (with all the large companies) indicated a median CEO salary of almost

$1.5 million.  The revised peer group (median revenue of $23 B), which is used in our Plan

Investor report, indicates a median salary of around $1.2 million."  Delphi chose to utilize these

companies instead of a more comparable group plainly because it achieve the results it desired.[7]

9.    In fact, the evidence shows that Delphi and Watson Wyatt were prepared to

manipulate the proposed comparator group to obtain the result they desired.  In a memo dated

September 30, 2005 to the Compensation Committee, a Delphi executive wrote that "Watson

---

[7]    For example, the UCC compensation expert has recommended the exclusion certain companies. (DPH-MCP00033750-53.)

Wyatt believes the current comparator group is appropriate at this time" even though the Compensation Committee later requested that a group of the 2005 peer group profile companies be removed because they were not appropriate comparators. On September 12, 2006, Bubnovich suggested deleting the actual list of comparative companies from a presentation to the Unsecured Creditors Committee (DPH-MCP00010328) because "Its kind of a can of worms."[8] (DPH-MCP00010354.) Given the admitted inclusion of companies in the alleged peer group that are not competitors for talent with Delphi, are much larger and do not operate in the same industry, the entire basis for the Delphi MCP is flawed and should be rejected.

**B.      Delphi Cannot Justify Its MCP Based On An Alleged Reliance By Its Executives.**

10.      Delphi cannot establish a reliance interest among its executives because Delphi and Watson Wyatt have always been aware its management compensation plans were likely to be modified as part of the plan approval process. For example, Bubnovich was called upon to review the compensation package for a new high level executive hire in the spring of 2006. Apart from opining that it was a "pretty rich package", he pointed out that the description of the Annual LTI Grants and Emergence Payments in the summary of benefits were problematic. (DPH-MCP 0008974.)

11.      In May, 2006, Bubnovich pointed Mark R.Weber ("Weber"), Executive Vice President Global Business Services and special liaison to the Debtors' Compensation Committee, specifically to the page in the October, 2005 plan that states that the company intends to seek creditor agreement or court approval for its MCP, and advised Weber to tell

---

[8]      It should not be forgotten that it was the testimony of the allegedly disinterested Mr. Bubnovich regarding comparative data on which the Court based its approval of the proposed AIP program over the union objections that the Plan was overly lucrative and presumed too easily met targets.

6

executives that:

> We all know that negotiations between various creditor constituencies and the debtor are common, if not standard, practice in large Ch 11 cases. The debtor and all of its executives know that it cannot unilaterally adopt a substantial compensation program. While we believe the proposed equity program is fair, consistent with competitive practice, and necessary, we also have always intended to discuss it with our creditors constituencies, which, by the way, is clearly stated on p. 21 of the WW report, and make revisions based on the creditors' valid concerns . . .

(DPH-MCP 0008978.)

Delphi simply cannot show on this record that its executives could have reasonably relied upon the October, 2005 KECP motion to establish the terms of their future compensation.

## II.    SPECIFIC OBJECTIONS

### A.    Proposed Emergence Equity Bonus

#### 1.    The Value of the Equity Award Is Excessive

12.    The initial KECP proposed that 10% of the equity of Reorganized Delphi be allocated for executive compensation, with three-quarters of that used for the initial emergence equity grants and one-quarter reserved for future grants. (10/8/05 WW KECP report at 23.) In what may be seen, mistakenly, as an exercise in restraint, the proposed MCP/SECP calls for a mere 8% of the equity of the emergent company to be allocated to management's remuneration.[9] The true picture of executive greed emerges by comparing the value of ten (10%) percent of the initial assumed Total Equity Value ("TEV") of $4 billion (10/8/05 WW KECP report at 22), *i.e.,* $400 million, to eight (8%) per cent of the Distributable Equity Value ("DEV") of $7.8 billion, *i.e.,* $624 million. (Disclosure Statement at DS-xvi.)

13.    There is no dispute that the value of the initial 10% program was $400 million.

---

[9]    The proposed MCP/SECP would deliver to management an initial equity grant of 3% and set aside a further 5% of the equity of the company exclusively for management's future remuneration.

7

The Watson Wyatt report of December, 2006 ("12/06 WW Report") calculates the estimated award value at $166,881,542 and the reserve value at $233,118,458, which maintains a the total equity flowing to management of $400 million. (DPH-MCP00000284)   The calculation of the combined value of the 3% award and the 5% reserve totaling 8% yields a total value of $624 million which is an increase in value to these executives of 56% from the initial (and itself inflated) KECP proposal in October, 2005.

14.    The billions of dollars in increased value in Reorganized Delphi are a direct result of the new labor agreements, through which thousands of good jobs have been given up and wages and benefits for the remaining jobs have been slashed.  While the working men and women of Delphi have united to sacrifice their livelihoods for the future success of the companies, these burdens were not borne so that the management could enjoy a massive equity windfall.  Indeed, the large claims held by the IUE-CWA and UAW will be satisfied under the POR with equity – that management now threatens to dilute even further by this unwarranted equity give away.

### 2.    The Form of Equity Is Inequitable

15.    The initial KECP proposed that each executive's equity award be provided one-third in restricted stock or units and two-thirds in stock options.  (10/8/05 WW KECP report at 22.)  The proposed MCP/SECP calls for the equity award to the highest level executives and DSB members to be made one-half in restricted stock or units and one-half in stock options, and some now unspecified combination of stock options, restricted stock units and cash to the rest of management.  (Disclosure Statement at DS-98, ¶ 4.)  Increasing the up-front award conflicts with the professed compensation goals, meant to guide and justify this compensation, of creating

sustainable shareholder value over the long-term.[10] This is a move in the wrong direction as it would result in greater immediate executive compensation while diminishing concern for future shareholder gains.

### 3.    The Exercise Price Should Better Incentivize Management

16.    The initial KECP stated that "each option's strike price will be set based on the mid-point of the valuation range in any disclosure statement approved by the Court".  (10/8/05 WW KECP report at 22.)  The share price at the mid-point of the valuation range is $55.61, below the Plan Equity Value ("PEV") which values each share at $59.61 on the effective date. (Disclosure Statement at DS-xvi.)  Thus, management could buy shares at a discount.  Such a result violates the provision of the plan requiring that "the exercise price of a SAR or an option must be equal to or greater than the fair market value of the Company's common stock on the date of grant ... ".  (Disclosure Statement at DS-97.)

17.    The strike price of the stock options should be set at the high end of the Rothschild valuation.  (Disclosure Statement at DS-xvi.)  A strike price of $65.60 ensures that management is incentivized to create long-term sustainable growth in the company, therefore making the whole painful Chapter 11 process, where the working men and women of Delphi made substantial long-term sacrifices for the benefit of the company, worthwhile.

### B.    **Proposed Emergence Cash Bonus**

### 1.    The Emergence Cash Bonus Is Arbitrary and Far Too Generous

18.    The MCP awards cash payments of $87 million directly upon emergence.  Delphi justifies these awards as representing 80% of annual LTI "looking back" at the unpaid LTIP

---

[10]    As Bubnovich stated when explaining that the entire equity awards in the new company could be issued as options "If that stock never goes up in value, then the optionees will never receive a dime.  That's how stock options work." (DPH-MCP00008978.)

9

from 2004. (Bubnovich Dec. ¶ 35.) Delphi and Watson Wyatt discussed exactly how this 80%

value would be established. On October 3, 2005 the cost of the Emergence Bonus Program was

calculated as $66.7 million. (DPH-MCP00007413.) On October 6, 2005, Bubnovich explained

that he had calculated the cash bonus as 80% of the <u>expected value</u> of the grant as opposed to

80% of the <u>cost</u> of the grant, in order "to bring the cost of the program more in line with the

historic cost. <u>I believe that we would have a difficult time getting the program approved</u> if it was

more costly than the historic LTI program. Now if we want to do it as 80% of expected value we

can. <u>Bigger fight on our hands, and the competitive benchmarks are not as compelling.</u>" (DPH-

MCP 00007454.) (Emphasis added.)  Delphi executives responded that they had a "problem"

with the proposed change from 80% of the expected value to 80% of the expected cost. Mr.

Bubnovich's heroic response: "no problem. Consider the number changed". (DPH-MCP

00007454.)

19.    This subtle shift in calculation increased the cost of the cash give-away from

$66.7 million in the October 3, 2006 draft KECP report (DPH-MCP00007413) to the 87.9

million cost reflected days later in the KECP report dated October 8, 2005. DPH-MCP00007641.

2.    <u>Emergence Cash Bonus Not Justified as Replacing LTI's "Lost" During
Chapter 11 Period.</u>

20.    Delphi is seeking to justify the cash emergence bonus as a replacement for LTI's

lost as a result of the bankruptcy.   But Delphi's stock options were underwater during the period

leading up to Chapter 11, so there is no cause to replace these "lost opportunities" with big bags

of cash. There were 73,684,530 stock options outstanding as of 12/31/2004 that had been granted

as part of Delphi's long-term incentive plan between 1999 and 2004.  Their total worth at a stock

price of $16.00 would have been $238,818; at $12.00 they would have been worth in total

10

$57,102, and at a stock price of $8 their total value was zero. (DPH-MCP00006783.)  Since the

2004 exercise price on stock options was $10.02 and Delphi stock at the time of the bankruptcy

filing was trading below that level, the net compensation provided by the 2004 LTIP program

was zero.  There is no need to provide any executives compensation for lost LTIP earning

opportunities in 2004 or during the bankruptcy period itself as these awards were not lost due to

the bankruptcy but due to the performance of Delphi and the market value of its stock.

> 3.    Cash bonus on emergence does not serve the purpose of long-term
> incentive program without any vesting period or performance goals.

21.    A cash bonus in any amount can only reasonably relate to the Debtors' stated goal

of replacing long-term incentive programs if it is phased in over a substantial period of time and

plays an incentive role by being tied to performance.   Under the proposed MCP program, the

payment would "be made in a lump sum as soon as possible after the effective date". (DPH-

MCP00007461 - Oct 05 WW KECP report)[11]  In another instance where management was

proposing to give itself a big cash payout[12], a memo from Weber to the Compensation

Committee dated February 2, 2005[13] stated that Watson Wyatt did not support an up-front payout

for executives, but would support a vesting period of between 18 and 24 months. (DPH-

MCP00006733.)

22.    Management's "lost" long-term incentive grants would have served the purpose of

a long-term grant, and so should any cash replacement.  Even Bubnovich recognized that these

---

[11]    Where they are held to be appropriate, emergent cash bonuses have been designed to
serve other corporate goals such as retention in other Chapter 11 cases.  In the Friedmans
situation the management KERP included cash payments that vested 50% on exit, 25% 6 months
after that and the balance was paid a year after exit.  Additionally, in that recovery management
only received options. (DPH-MCP00006828.)

[12]    The retention grants totaling $21 million paid to executives in 2005.

[13]    This was prior to Bubnovich's involvement in the matter.

11

purported replacements were devoid of performance incentives, querying Delphi executives in an Aug. 23, 2006 email "Do you think there is any preemptive benefit to reconsidering the design of the emergence cash bonus program before the October hearing, such that the payments are tied to emergence values? This would make it a little more performance oriented. Alternatively, we could just wait for the UCC to counter with such a design change." He continued later in the email stream "I firmly believe that the UCC might insist upon such a design change, so forewarned is forearmed. Might make the whole program more palatable to the Judge, too." Delphi responded that they did not want to change the 1st day proposal before hearing from the UCC, "otherwise we bargain with ourselves". (DPH-MCP00010375-376.) The record does not show any other attempts to make this program less inequitable or anything other than a naked transfer of wealth from creditors and stakeholders to management.

### C.    Salaried Employee Retirement Program

23.    The MCP includes a freeze in the Salaried Employee Retirement Program ("SERP"). The MCP proposes to grant an extra $11.5 million to certain DSB executives as a result of the freeze with an extra $11.5 million in equity.[14] (DPH-MCP00003755-58). But that is not market practice. In conversations between Watson Wyatt and Delphi the representative from Watson Wyatt conveyed that he "was quite uncomfortable with making any changes to the basic SERP design (including the pay averaging period) in conjunction with the freeze of this plan upon emergence. I don't have any direct intelligence as to competitive practice for companies that emerge from bankruptcy, but my gut instinct is that it would not be at all unusual for executives to loose the entire accrued SERP upon emergence, so that if Delphi execs can keep

---

[14]    They propose to grant this equity all in restricted stock units. (DPH-MCP00037953.)

12

the existing frozen SERP that should be seen as a very good thing." (DPH-MCP00013629.)
(Emphasis added.)

24.    Watson Wyatt identified other companies including Hayes Lemmerz and UAL in
which SERP benefits were cancelled for both retirees and employees still active in the company
during bankruptcy proceedings. (DPH-MCP00013672.)  In other bankruptcy cases, such as
Collins & Aikman and Imperial Sugar,  SERP benefits were substantially reduced without any
additional compensation to the affected executives. (DPH-MCP00013672.)

25.    Further, the SERP was amended immediately prior to freeze to allow vesting and
retirement at age 55 instead of 62, providing for a 5 year certain form of benefit and lifting the
$5,000 cap on monthly benefits in place during the Chapter 11 period.  (DPH-MCP00000150.)
While the cost of these improvements is generally unstated, the cost of lifting the $5,000 cap
alone is $42 million. (DPH-MCP00000150.) On October 2, 2006 Watson Wyatt staff working to
benchmark the SERP to market inquired "How many companies change the formula when they
freeze the plan?. . . I suspect typical practice is to make no changes." (DPH-MCP00013610.) His
Watson Wyatt colleague (not Bubnovich) responded that "neither of us are aware of a situation
where the plan was amended to change the benefit formula immediately prior to the plan freeze."
(DPH-MCP00013609.)

26.    Delphi justifies this give away to senior executives because the "going forward
retirement benefits ... are below the median for certain DSB executives." (Final Report DPH-
MCP-00000141.)  But improving the SERP prior to its freeze at a cost well in excess of $42
million and  bestowing an additional $11.5 million upon the highest executives is simply not
consistent with the other bankruptcy cases cited by Watson Wyatt and it is particularly
unwarranted in light of the other inequitable and unfair compensation elements being proposed

13

to enrich these same executives.

### D.   Short-Term Incentive Program

27.     The proposed STIP (apparently the AIP under another name), which Delphi asserts is valued at $46 million, is also overly generous, particularly when taken as part of the whole compensation package. (Disclosure Statement at DS-97.) There are insufficient details in the plan materials to understand the true extent of the munificence which will undoubtedly be received by the management of Delphi for doing their jobs. We note that the only proposed limits border on absurd, *e.g.,* "awards are limited to an annual individual maximum of $7.5 million". (Exhibit 7.8 to POR, MCP, one page Summary of STIP.) Additionally, while the proposal states that target awards and performance levels will be determined "before the commencement of or within the first 25% of the performance period", the history of the petition period AIPs is one of easily reachable goals set late in the period. If this pattern continues the power of the STIP to incentivize management to stretch performance and grow shareholder value will be considerably diminished.

### ARGUMENT

### I.     THE DEBTOR DOES NOT HAVE INDEPENDENT EXPERT SUPPORT TO DEMONSTRATE GOOD FAITH OR SOUND BUSINESS JUDGMENT IN ITS PROPOSAL FOR THE MCP/SECP

### A.     The Debtors' Expert Is Not Independent

28.     The Debtors' expert, Bubnovich, has hopelessly compromised his independence so that his report and testimony cannot be used to support the proposed MCP/SECP Bubnovich summed up his attitude towards building this compensation program on December 19, 2005 when he ridiculed the idea of "being a slave to the data" and stated that " the purpose of compensation programs is not to be consistent with so-called competitive date. The purpose is

14

to support the company's business and people strategy". (DPH-MCP00008458.)  It would be difficult to demonstrate a greater propensity towards advocacy by a so-called expert witness.

29.    The record evidence in this case demonstrates that the Debtors' expert failed to maintain the independent posture required of a credible expert witness. He identified himself with the Debtors' management personnel and apparently viewed himself as one of them.  While editing a document being prepared for the independent compensation consultant to the Creditors Committee, Bubnovich suggested deleting a proposal for "6 month clawback for quits" by stating: "let's consider dropping this; we're negotiating with ourselves here".  (DPH-MCP00010355.) The Debtors then did drop this proposal. (DPH-MCP00010362.)

30.    An expert report by one who is retained by a party merely to advocate its position rather than to independently render an expert opinion should be disregarded. Mad Auto Wrecking, Inc. v. C.I.R., T.C. Memo. 1995-153, 1995 WL 149132 * 9 (U.S. Tax Ct. 1995).  See also, In re Bridgestone/ Firestone, Inc., 190 F.Supp.2d 1125, 1132 (S.D.Ind. 2002) (Finding expert's opinion rendered "virtually useless" because his independent credibility was questionable.). The lack of independence revealed by certain experts was deplored in In re Energy Co-op., Inc., 109 B.R. 822, 829 (N.D.Ill.1989):

> In this case, as in many others recently, the concept of an "independent expert" has been severely wounded. There appears to be an increasing willingness on the part of experts retained for trial to testify in accordance with the wishes of the party retaining them, with not even the slightest momentary embarrassment or apology for having offered an opinion at a much earlier time different than that effected by an appropriate retainer. These trial opinions should be seen for what they are--purchased testimony--and not affording a level of confidence sufficient to enable a fact-finder to rely on them. Professional integrity is being comprised and, in this case as in others, findings must be predicated on objective, clear or reliable evidence rather than "independent expert" opinion as presented here by both sides.

**B.    <u>The Debtors Cannot Demonstrate Good Faith and Sound Business Judgment in Proposing the MCP-SECP</u>**

15

31.     The Debtors must demonstrate actual good faith in the proposed transaction, In re

M Capital Corp., 290 B.R. 743, 747 (9th Cir. 2003); cf., In re Adams Apple, Inc., 829 F.2d 1484

(9th Cir. 1987), particularly here where the proposed compensation package is directed toward

insiders and would amount to self-dealing, The Official Committee of Subordinated

Bondholders v. Integrated Resources, Inc., 147 BR 650, 657 (Bankr. S.D.N.Y. 1992), appeal

dismissed, 3 F.3d 49 (2d Cir.1993) (business judgment rule incorporates question of whether

proposal is "tainted by self-dealing or manipulation"). Fairness and equity are essential factors of

a "good faith" determination:

> In evaluating the totality of circumstances surrounding a plan a court has " 'considerable
> judicial discretion' in finding good faith, with the most important feature being an
> inquiry into the 'fundamental fairness' of the plan."

In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001) (quoting In re American

Family Enterprises, 256 B.R. 377, 401 (D.N.J. 2000) (quoting In re New Valley Corp., 168 B.R.

73, 80-81 (Bankr. D. N.J. 1994)).

32.     Additionally, "Implicit in the grant of authority of 11 U.S.C. § 363(b)(1) . . . is the

further requirement that the ... debtor ... justify the proposed transaction with sound business

reasons in order to satisfy the estate representative's fiduciary duty to the debtor, creditor, and

equity holders. Thus, ... a bankruptcy judge must expressly find from the evidence presented at

the hearing a sound business reason justifying the proposed transaction." Bassano, Joseph M., et

al., 9B Am.Jur.2d Bankruptcy § 1539 (August 2005) and cases cited therein. The Court of

Appeals in In re Lionel Corporation, 722 F.2d 1063, 1071 (2d Cir. 1983), rejected a proposed

distribution and held that a bankruptcy judge must "expressly find from the evidence presented

before him at the hearing a good business reason to grant such an application." Lionel held that

16

the critical factor is the impact on a plan of reorganization, and reiterated that the burden of proof is on the debtor in such an application.

33.    The District Court in In re Integrated Resources, 147 BR 650, 657 (Bankr. S.D.N.Y. 1992), explained that a Court should itself assess the merits and fairness of a business transaction such as this one involving a management proposal in which the corporation's executives have direct financial interests.  In the context of proposed payments to the top corporate insiders, "good faith" is a necessary element of inquiry, 2C Bankr. Service L.Ed (September 2005) § 20:119 and cases cited therein; In re Gucci, 126 F.3d 380, 390 (2d Cir. 1997). A management compensation program proposed without first discussing its provisions with the Union "is not an example of sound business judgment."  In re Geneva Steel Co., 236 B.R. 770, 773 (Bankr. D. Utah 1999).

34.    Finally, "[i]t is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." In re Momentum Mfg. Corp., 25 F.3d 1132, 1135 (2d Cir. 1994); Norton, William L., 1 Norton Bankr. L. & Prac. 2d § 4:5 (July 2005); In re Charles & Lillian Brown's Hotel Inc., 93 BR 49, 54 (Bankr. S.D.N.Y. 1988); In re Amarex Inc., 30 BR 763, 767 (Bankr. W.D. Okla. 1983) (Bankruptcy Court is a court of equity which may, in its discretion, deny even that relief which is within its power to grant based on equitable principles.)

## C.    The MCP/SECP Does Not Meet the Tests for Sound Business Judgment

35.    A summary of the factors courts consider in determining if the structure of a compensation proposal and the process for developing the proposal meet the "sound business

17

judgment" test was presented in <u>In re Dana Corp.</u>, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y.

2006), as follows:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?* (emphasis added)
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

The proposed MCP/SICP fails each one of these tests and should not be approved by this

court.

> 1.   <u>There Is Not a Reasonable Relationship Between the Plan Proposed and the Results to Be Obtained</u>

36.   There are several material changes between what was proposed in the 10/8/05

WW KECP report and what is now being proposed in the MCP/SECP. None of these alterations

are in line with the Debtors' compensation theory which sets as its second and third goals to

"[l]ink the majority of the total compensation opportunity to performance-based incentives, . . .

and the creation of sustainable shareholder value consistent with Delphi's long-term strategic

goals [and] [a]lign executives' interests with those of shareholders by making stock-based

incentives a core element of our executives' compensation . . . ." Exhibit 7.8 to POR, MCP at 1;

Disclosure Statement at DS-94.

37.    Cash payments as emergence bonuses are not favored.  In re Geneva Steel Co.,

236 B.R. 770, 774 (Bankr. D. Utah 1999). There has been no showing that the MCP/SCIP is

needed to retain employees as was the case in In re U.S. Airways, Inc., 329 B.R. 793, 798

(Bankr. E.D. Va. 2005).

38.    The proposed cash payment to Chairman Steve Miller, who is leaving the Debtor,

is nothing more than a "golden parachute" disfavored in a bankruptcy reorganization. In re Bush

Industries, Inc., 315 B.R. 292, 307 (Bankr. W.D.N.Y. 2004). Pursuant to § 280G(b)(2) of the

Internal Revenue Code, any lump-sum severance payment which is three times or more the

amount of the employee's base salary is a "golden parachute payment" subject to a higher tax

rate.

> 2.    The Cost of the Plan Is Not Reasonable in the Context of the Debtor's
>        Assets, Liabilities and Earning Potential

39.    The Delphi bankruptcy must be analyzed in the context of the company's

industrial sector at the time of emergence in 2008.  A generous compensation program focusing

on the next 18 months is inconsistent with Delphi's likely earnings potential during that period.

As noted by the court in Dana Corp., at 582, n. 21, and as recognized generally, the auto industry

is in a precarious position:

> The dire state of the auto industry has been reported by Debtors' counsel at hearings
> throughout these cases and in the press. *See i.e.* Thomas Content, *Suppliers Must Think
> Globally, Leaders Say Many in Auto Parts Industry are Struggling,* Milwaukee Journal
> Sentinel, Aug. 9, 2006, at D1 (" 'The past 18 months in the automotive supply world has
> been particularly painful and challenging. Much of our industry went into a "hunker-
> down" mode, and in many cases, companies placed well-thought-out strategies on hold
> while they fought for survival,' said Tom Amato, an executive vice president of
> Metaldyne Corp., a supplier based in Plymouth, Mich."); *Dana Has New Cuts in Mind to*

*Save $540 Million,* St. Louis Post Dispatch, November 10, 2006, at B2 ("Dana is among the auto parts manufacturers hit hard by U.S. auto industry's financial woes. Other manufacturers in Chapter 11 bankruptcy are Delphi Corp., Tower Automotive Inc., Collins & Aikman Corp. and Dura Automotive Systems Inc.").

40.     The same newspaper headlines cited in <u>Dana</u>, are at least equally true today. While Delphi may have excellent long-term prospects, due chiefly to the sacrifices of its union employees, the near term outlook is not conducive to the massive increase in executive compensation urged by Delphi.

3.     <u>The Scope of the Plan Is Not Fair and Reasonable and Unfairly<br>Discriminates in Favor of the Most Highly Compensated Employees</u>

41.     In this case the Unions, including IUE-CWA and its members, have made an extraordinary contribution to the success of the reorganization. The pre-petition hourly workforce has been reduced by approximately 85% and the wages and benefits of the remaining employees have been drastically reduced. While the IUE-CWA has been allowed a claim, that claim is not being paid in cash and its value could be significantly reduced if the market does not recognize the assumed share value. In contrast, the Debtor proposes to award $79 million in cash payments to management employees, whose numbers have not been significantly reduced and who have received XX in payments through the AIP program during this proceeding. As in <u>In re Hawaiian Airlines, Inc.</u>, 2005 WL 3964424 *2 (Bankr. D. Hawaii 2005), "No one has given sufficient credit ... to the company's rank and file employees." Excessive management bonuses have been reduced where concessions from union employees are required for a successful reorganization. <u>In re Allied Holdings, Inc.</u>, 337 BR 716, 725 (Bankr. N.D. Geo. 2005).

4.     <u>The Plan Is Not Consistent with Industry Standards and the Due Diligence<br>Efforts of the Debtors and Were Inadequate</u>

20

42.    The Debtor's selection of companies to comprise the peer group violates the requirement that the selected companies must be comparable. Reasonableness of executive compensation under the tax code requires "a comparison of salaries paid by similar businesses to similar employees under similar circumstances." Sunbelt Clothing Co., Inc. v. C.I.R., 1997 WL 419964 *9 (Tax Ct. Jul. 28, 1997). The test for whether compensation for personal services is reasonable and therefore an allowable corporate deduction is stated as follows: "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." 29 C.F.R. § 1.162-7. The Second Circuit has enunciated the factors to be considered in assessing the reasonableness of employee compensation, as follows:

(1) *Employee's role in the company:* including the employee's position, hours worked, and duties performed, plus any special duties or role (such as personally guaranteeing corporate loans);

(2) *External comparison with other companies:* salaries paid to comparable employees in similar companies;

(3) *Character and condition of the company:* including the sales, net income, capital value, and general economic fitness of the company;

(4) *Potential conflicts of interest:* ability to 'disguise' dividends as salary, particularly when the employee is the sole or majority shareholder, and/or where a large percentage of the compensation is paid as a 'bonus'; and,

(5) *Internal consistency in compensation:* consistency of the compensation system throughout the ranks of the company.

Rapco, Inc. v. C.I.R., 85 F.3d 950, 954 (2d Cir. 1996) (Footnotes omitted.). The Court expanded on the comparisons required by these factors: "They also require a suitable comparison of the employee's compensation to other employees in the same company, and similar employees in analogous companies-sturdy benchmarks for determining the reasonableness of an employee's

21

reward." *Id.* at 955.  In applying this factor to the specific evidence presented to the Tax Court, the Second Circuit approved discounting of taxpayer evidence which included a comparison to publicly traded Standard & Poor's 500 companies and not to sufficiently similar companies. *Id.*

43.    The Tax Court requires detailed information about peer group comparitors to find them adequately similar. In <u>Miller & Sons Drywall, Inc. v. C.I.R.</u>, T.C. Memo. 2005-114, 2005 WL 1200189 *14-15 (U.S. Tax Ct. May 19, 2005), the Court rejected one expert's comparison study because it included a broader pool of construction industries than the drywall construction industry of the taxpayer, and another study because it included companies in industries such as mineral extraction which were not sufficiently comparable.  <u>See also, Eberl's Claim Service, Inc. v. C.I.R.</u>, 249 F.3d 994, 1002 (10th Cir. 2001); <u>B&D Foundations, Inc. v. C.I.R.</u>, T.C. Memo. 2001-262, 2001 WL 1168133 *16 (U.S. Tax Ct. Oct. 3, 2001) (expert studies rejected which did not include sufficient information about the comparitor companies, including the number of employees, business conditions in geographic area, and how similar business to the taxpayer's); <u>Mad Auto Wrecking, Inc. v. C.I.R</u>, T.C. Memo. 1995-153, 1995 WL 149132 *9 (U.S. Tax Ct. Apr. 5, 1985) ("Indeed, comparing compensation paid to officers of companies that differ markedly provides guidance of dubious value.")

44.    Similarly, bankruptcy courts have required executive compensation comparisons be made to similar companies. <u>In re Allied Holdings, Inc.</u>, 337 BR 716, 725, n. 8 (Bankr. N.D.Ga. 2005) (court approved comparison "to similar employees of 40 other companies within the trucking industry."); <u>Pereira v. Cogan</u>, 294 B.R. 449, 480 (S.D.N.Y. 2003), <u>rev'd on other grounds</u>, *sub nom.* <u>Pereira v. Farace</u>, 413 F.3d 330 (2d Cir. 2005) ("It is important for the benchmarking study that the members of the comparator group be comparable to the executive position being evaluated.  That means that the comparator group should be composed of

22

executives performing similar tasks at companies in similar industries and of similar size and revenue as the company whose executive position is being benchmarked."); In re Apex Automotive Warehouse, L.P., 238 B.R. 758, 775 (Bankr. N.D. Ill. 1999) (rejecting benchmark testimony regarding executive bonuses where "the companies with which they benchmarked were clearly much larger and more profitable than [the debtor].")

## CONCLUSION

For all of the foregoing reasons, the proposed MCP/SECP should not be approved.

Dated: New York, New York
January 11, 2008

Respectfully submitted,

KENNEDY, JENNIK & MURRAY, P.C.
Counsel for IUE-CWA and its affiliated locals
including Local 698 and its members, Local 711
and its members, Local 717 and its members, Local
718 and its members, Local 755 and its members
and Local 801 and its members

By: _____
Thomas M. Kennedy (TK 0993)
Susan M. Jennik (SJ 4607)
113 University Place
New York, NY 10003
Tel. (212) 358-1500

On the Brief:
Elizabeth C. Kennedy, Esq. (EK 2835)