**Hearing Date And Time: January 25, 2008 at 10:00 a.m.**
**Objection Deadline: January 22, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                              :
        In re                                 :      Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :      Case No. 05-44481 (RDD)
                                              :
                                              :      (Jointly Administered)
                        Debtors.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x

EXPEDITED MOTION PURSUANT TO 11 U.S.C. § 105(a) AND FED. R. BANKR. P. 6004 AND
9019 AUTHORIZING AND APPROVING COMPROMISE WITH INTEVA PRODUCTS, LLC AND
TO AMEND AND RESTATE ORDER UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R.
BANKR. P. 2002, 6004, 6006, AND 9014 AUTHORIZING AND APPROVING (I) SALE OF
CERTAIN OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL THE ASSETS OF THE
COCKPITS AND INTERIOR SYSTEMS AND INTEGRATED CLOSURE SYSTEMS BUSINESSES
FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(III) ASSUMPTION OF CERTAIN LIABILITIES

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this expedited motion (the "Motion") authorizing and approving a compromise

with Inteva Products, LLC and to amend and restate the Order Under 11 U.S.C. §§ 363, 365, And

1146 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 Authorizing And Approving (I) Sale Of Certain

Of Debtors' Assets Comprising Substantially All The Assets Of The Cockpits And Interior Systems And

Integrated Closure Systems Businesses Free And Clear Of Liens, Claims, And Encumbrances, (II)

Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III)

Assumption Of Certain Liabilities (Docket No. 11579) (the "Interiors and Closures Sale Approval

Order").  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and together

with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

2

9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan") (Docket No. 11386) and the First Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement") (Docket No. 11388).  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are section 105(a) of the Bankruptcy Code and rules 6004(g) and 9019 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

3

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however,

---

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

        10.     The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

        11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was $482 million.

D.    The Debtors' Transformation Plan

        12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors and a plan framework support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework support agreement.  On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P.  Under the Delphi-Appaloosa EPCA, the new plan investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.  On October 29, 2007, the Debtors filed a motion requesting this Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).  In addition, on November 14, 2007, December 3, 2007, and December 5, 2007,  the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA.  On December 10, 2007, this Court entered an order granting the motion and approving the proposed amendments (Docket No. 11382).

[5]    As of August 29, 2007, this Court had entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA") (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for an order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6]    On September 6, 2007, Delphi announced that it had entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA").  Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM other than as may arise out of their ordinary course customer-supplier relationship.  The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  See Docket No. 9263.  On October 29, November 14, December

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth,

transforming their salaried workforce to ensure that the Company's organizational and cost

structure is competitive and aligned with its product portfolio and manufacturing footprint;[8] and

fifth, devising a workable solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization

13.    By filing the Plan and related Disclosure Statement, the Debtors reached

another key milestone in their chapter 11 cases.  The Plan is based upon a series of global

---

3, December 5, and December 10, 2007, the Debtors filed certain proposed amendments to the GSA and MRA.
The approval of such amendments will be considered in connection with the confirmation of the Plan.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to
maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example, the
Debtors have sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, their brake
hose and catalyst businesses, and their Saltillo, Mexico brake plant business, as well as their manufacturing
equipment and test development equipment at the chassis facility in Saginaw, Michigan.  The Debtors also
received court approval to sell substantially all of the assets used in their interiors and closures businesses
(subject to certain cure disputes) and for bid procedures related to the upcoming sale of substantially all assets
used in their steering and halfshaft business.

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments , which will be transitioned as part of the Company's transformation plan:  Steering
(for which bidding procedures were approved on December 20, 2007) and Automotive Holdings Group.  To
ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11
U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing
Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing
Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed
assets, travel and expense reporting, general ledger, and contract administration processes and significantly
reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms
of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on
May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried
Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding
waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a
plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.
On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees
Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court granted the Debtors'
motion for authority to perform under the terms of that waiver.  On October 4, 2007, the IRS, at Delphi's
request, further modified the conditions to the initial waivers so that they are generally consistent with the
conditions to the most recent waiver.

settlements and compromises that involve nearly every major constituency in the Debtors'

reorganization cases, including GM.  Attached as exhibits to the Plan are two agreements, the

GSA and the MRA, which provide for a comprehensive settlement with GM.  Both agreements

are subject to this Court's approval as part of the confirmation process.  This Court has scheduled

a hearing to consider confirmation of the Plan to commence on January 17, 2008.  Currently, the

Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

        14.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

        15.     By this Motion, the selling Debtor entities (the "Selling Debtor Entities")

described in the October 15, 2007 Master Sale and Purchase Agreement (the "Original

Agreement")[10] seek, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, to reach a compromise that facilitates the closing of the sale of the Interiors and Closures

Businesses with the buyer, Inteva Products, LLC ("Inteva"), by modifying the payment structure

under the Original Agreement, as agreed to by and among the Sellers and Inteva and certain of

---

[10]    Under the Original Agreement, the Selling Debtor Entities include Delphi, Delphi Automotive Systems LLC
("DAS LLC"), Delphi Automotive Systems (Holdings) Inc., and Delphi Technologies, Inc.  Certain assets
would be sold under the Original Agreement by non-Debtor affiliates of the Selling Debtor Entities listed on
Schedule 1 to the Original Agreement.  The Selling Debtor Entities and the selling non-Debtor affiliates are
collectively referred to as the "Sellers."  For the purpose of convenience, references to the "Sellers" herein
(including in all exhibits) means, as the context requires, (i) the Selling Debtor Entities to the extent such
reference implicates assets of the Selling Debtor Entities or (ii) non-Debtor affiliates to the extent such
reference implicates assets of the non-Debtor affiliates.  Moreover, for convenience, use of the term "Selling
Debtor Entities" means, as the context requires, the specific Debtor entity undertaking the transaction(s)
referenced to the extent such transaction affects the assets of such entity.

its affiliates (the "Buyers")[11] pursuant to their January 11, 2008 Letter Agreement (the "Letter

Agreement," and together with the Original Agreement, the "Agreement") in consideration for

the waiver of certain of the Buyers' conditions to closing.  Copies of both the Original

Agreement and the Letter Agreement are attached hereto as Exhibit A and Exhibit B,

respectively.  Due to the modifications sought, the Selling Debtor Entities believe that they must

first return to this Court to seek approval of an amended Interiors and Closures Sale Approval

Order (the "Amended Sale Approval Order").

Basis For Relief

F.      Background To The Letter Agreement

        16.     On October 15, 2007, the Selling Debtor Entities filed a motion for orders

pursuant to 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014

(a) (i) approving the bidding procedures, (ii) granting certain bid protections, (iii) approving the

form and manner of sale notices, and (iv) setting a sale hearing date (the "Sale Hearing") and (b)

authorizing and approving (i) sale of certain of Debtors' assets comprising substantially all the

assets of the cockpits and interior systems and integrated closure systems businesses (the

"Interiors and Closures Businesses") free and clear of liens, claims, and encumbrances, (ii)

assumption and assignment of certain executory contracts and unexpired leases, and (iii)

assumption of certain liabilities (Docket No. 10606) (the "Sale Motion").  The Sale Motion

described, among other things, that the Original Agreement contemplated a global divestiture of

the Company's Interiors and Closures Businesses to the Buyers for the purchase price of $106

million (the "Purchase Price"), which was comprised of the preliminary purchase price of

approximately $80 million, subject to certain adjustments (the "Preliminary Purchase Price"),

---

[11]   This Motion will refer to Inteva Products LLC., together with any affiliates it identifies in Schedule 1 of the
        Agreement, as the "Buyers," or to any of them separately as a "Buyer."

9

and the Post-Closing Payments of approximately $26 million. [12]  Under the Original Agreement, the Buyers would pay the Sellers the Preliminary Purchase Price at Closing.  The Interiors and Closures Sale Approval Order authorizes the Sale of the Interiors and Closures Businesses to the Buyers for the Purchase Price.

17.    On December 26, 2007, Delphi received a letter from Inteva (the "Inteva Letter"), in which Inteva raised certain concerns which could have affected the consummation of the sale, and Inteva sought an opportunity to discuss this issue further with Delphi.  On December 28, 2007, Delphi responded to the Inteva Letter (the "Response Letter"), stating that it believed that Inteva was obligated to proceed to closing notwithstanding the concerns it has raised but that Delphi was willing and desired to discuss resolution of such concerns.[13]  Although the Selling Debtor Entities continued to reject the concerns raised in the Inteva Letter, the Selling Debtor Entities believed that reaching an amicable resolution was consistent with their transformation plan (by ensuring the disposition of non-core assets) and in the best interests of the Selling Debtor Entities' estates because such a resolution would increase the certainty of closing on the sale in a timely manner and for fair and reasonable consideration.

G.    The Letter Agreement

18.    To address concerns raised by Inteva in the Inteva Letter, the Buyers and Sellers have entered into the Letter Agreement.  The Letter Agreement, among other things,

---

[12]    In addition to the Preliminary Purchase Price, on each of the first, second, third, fourth, and fifth anniversaries of the closing date, Inteva will pay $1 million to DAS LLC.  On the first business day following the earliest of: (i) the business day immediately following the fifth anniversary of the closing date and (ii) the date the Buyers sell substantially all of the ownership interests in the Interiors and Closures Businesses and the joint ventures being sold under the Agreement (a sale to an unrelated third party of 80% or more of the equity of Inteva would be deemed to be a sale of such assets), Inteva will pay $21 million to DAS LLC (collectively, the "Post-Closing Payment").

[13]    Copies of the Inteva Letter and the Response Letter are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

10

relates to (i) changes to the cash consideration payable to the Sellers at closing, (ii) execution of

a promissory note by Inteva in favor of Delphi at closing, and (iii) Inteva's waiver of

substantially all of the material conditions to closing.

19.    The significant terms of the Letter Agreement are as follows:[14]

(a)    <u>Purchase Price</u>.  The Purchase price remains unchanged at $106 million.

(b)    <u>Preliminary Purchase Price</u>.  The Letter Agreement provides that instead of paying the Preliminary Purchase Price of $78 million in cash consideration at closing (plus $2 million to be paid to Delphi under a deposit escrow agreement executed under the Original Agreement), the Buyers would pay $60.5 million at closing (plus the deposit), and pay the remaining $17.5 million of the Preliminary Purchase Price as required by a promissory note payable from Inteva to Delphi.

(c)    <u>The Note</u>.[15]  At the closing of the Sale, Inteva would execute and deliver to Delphi an unsecured promissory note (the "Note") made by Inteva in favor of Delphi in the principal amount of $17.5 million.  Interest would accrue on the Note at a simple interest rate of LIBOR[16] plus 400 basis points annually (capped at 9% annually).  Such interest would be payable by Inteva to Delphi on a quarterly basis until the principal on the Note is paid in full. Inteva would pay Delphi the outstanding principal on the Note based on the following payment terms:  (i) $1.0 million on the first anniversary of the closing, (ii) $1.0 million on the second anniversary of the closing, (iii) $5 million on the third anniversary of the closing, (iv) $5 million on the fourth anniversary of the closing, and (v) $5.5 million on the fifth anniversary of the closing.  Additional payments of principal may be required under the terms of the Note.

(d)    <u>Buyers' Waiver Of Closing Conditions</u>.  The Letter Agreement further provides that Inteva, on behalf of itself and all of the Buyers, irrevocably and unconditionally waives the conditions to closing set forth in Sections 7.2.4 (Customer Contracts), 7.2.5 (Permit Transfers), 7.2.8 (General Motors Contract), 7.2.9 (UAW Agreement), and 7.2.10 (IUE-CWA Contract) of the Original Agreement.  With respect to the condition to closing set forth in Section 7.2.6 (No Material Adverse Effect) of the Original Agreement, the Letter Agreement provides that Inteva irrevocably and unconditionally waives any Material Adverse Effect resulting from any action of, or omission by, any customer or supplier of the Interiors and Closures Businesses.

---

[14]    In the event of any discrepancy between the Letter Agreement and this summary, the provisions of the Letter Agreement control.

[15]    A substantially final copy of the Note to be executed at Closing is available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[16]    "LIBOR" means the London Inter-Bank Offer Rate for deposits in US Dollars for a term of six months rounded upwards, if necessary, to the nearest 1/100th stated on an annual basis.

20.    Based on the waiver of these material conditions to closing, the Selling
Debtor Entities believe that, upon the Letter Agreement becoming effective, no further
negotiations on the terms and conditions will be necessary to close on the sale of the Interiors
and Closures Businesses.  As a result, entry into the Letter Agreement is in the best interests of
the Selling Debtor Entities, their estates, and their stakeholders.

21.    Finally, because the Buyers and Sellers have been proceeding on a
timeline to close the sale of the Interiors and Closures Businesses on February 2, 2008, which is
within ten days after the hearing of this Motion, the Selling Debtor Entities request that the
Amended Sale Approval Order include a waiver of the ten-day stay provided under Bankruptcy
Rule 6004(g).  If the stay is not waived, the parties would have to delay closing, which in
addition to affecting the Buyers and Sellers would also affect the Interiors and Closures
Businesses' customers and suppliers, who are aware of such timing.

22.    Attached hereto as Exhibit C is a marked copy of the proposed Amended
Sale Approval Order (without exhibits), which is marked to show the proposed changes to
Interiors and Closures Sale Approval Order based on the Sellers' request to seek authority to
enter into and perform under the Letter Agreement.[17]

---

[17]    The hearing on the Original Motion as it pertained to 15 objections (the "Objections") filed to the Notice Of
Cure Amount With Respect To Executory Contract Or Unexpired Lease To Be Assumed And Assigned In
Connection With The Sale Of Interiors And Closure Businesses (Docket Nos. 10962 and 10963) and Notice Of
Cure Amount With Respect To Executory Contract Or Unexpired Lease To Be Assumed And Assigned In
Connection With The Sale Of Interiors And Closures Businesses (Docket No. 11164 and 10965) was adjourned
to January 25, 2008.  Prior to the January 25, 2008 omnibus hearing, the Selling Debtor Entities may further
revise the Amended Sale Approval Order to address the Objections.  If further revisions are made, the Selling
Debtor Entities will file a marked copy of the Amended Sale Approval Order to address such revisions prior to
the January 25, 2008 hearing.

<u>Applicable Authority</u>

H.      <u>Section 105(a) Of The Bankruptcy Code</u>

23.      Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Section 105(a) forms "'the basis for a broad exercise of power in the administration of a bankruptcy case.'"  <u>In re Elmendorf</u>, 345 B.R. 486, 503 (Bankr. S.D.N.Y. 2006) (quoting <u>In re Flores</u>, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003) (internal quotation omitted)).

24.      The Amended Sale Approval Order, which amends, among other things, the method of the Buyers' payment of the Preliminary Purchase Price to the Sellers under the Agreement, is both necessary and appropriate to the administration of the Selling Debtor Entities' reorganization cases.  The Company has stated that to achieve the necessary cost savings and operational effectiveness envisioned in its transformation plan, it must streamline its product portfolio to capitalize on its world-class technology and market strengths and make the necessary manufacturing realignment consistent with its new focus.  As part of the Company's transformation plan, the Company identified the Interiors and Closure Systems Businesses as non-core businesses subject to disposition.

25.      The Sale of the Interiors and Closures Businesses represents that largest sale of assets approved by this Court to date.  Despite establishing a competitive bidding process and soliciting bids for the Interiors and Closures Businesses, the Selling Debtor Entities did not receive a bid that was either higher or otherwise better than the one submitted by the Buyers.  Even with the modifications to the payment structure, the Buyers' bid is still the highest and best bid received by the Selling Debtor Entities.  The Letter Agreement allows the Selling Debtor Entities to proceed to the closing of the Sale under terms that maximize the value of the assets being sold for the benefit of the Selling Debtor Entities, their estates, and their stakeholders.

13

Therefore, the Selling Debtor Entities assert that the Amended Sale Approval Order is necessary and appropriate under section 105(a) of the Bankruptcy Code.

I.    Bankruptcy Rule 9019

26.    By this Motion, the Selling Debtor Entities seek to reach a compromise with the Buyers by entering into the Letter Agreement.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Communications Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

27.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of the debtor's estate.  See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

28.     The Supreme Court in <u>TMT Trailer Ferry</u> set forth the following factors
that courts should consider in determining whether a proposed settlement or compromise is in the
best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)
the difficulties associated with collection, (c) the complexity of the litigation and the attendant
expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.
<u>TMT Trailer Ferry</u>, 390 U.S. at 424-25; <u>see also</u> <u>Nellis</u>, 165 B.R. at 122; <u>Fry's Metals, Inc. v.</u>
<u>Gibbons</u> (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

29.     Courts in this district have further elaborated on these factors to consider
the following factors, among other factors, where applicable: (a) the balance between the
likelihood of plaintiff's or defendant's success should the case go to trial vis-à-vis the concrete
present and future benefits held forth by the settlement without the expense and delay of a trial
and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the
settlement is not approved, (c) the nature and breadth of releases to be obtained by the directors
and officers as a result of the settlement, and (d) the extent to which the settlement is truly the
product of arms-length bargaining, and not of fraud or collusion.  <u>Adelphia</u>, 327 B.R. at 159-60;
<u>accord</u> <u>In re Texaco Inc.</u>, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

30.     The bankruptcy court need not determine that all of the foregoing criteria
favor approval of a compromise, and the proposed compromise need not be the best agreement
that the debtor could have achieved under the circumstances.  <u>See</u> <u>Adelphia</u>, 327 B.R. at 159-60.
Instead, the court's proper "role is to determine whether the settlement as a whole is fair and
equitable," <u>In re Lee Way Holding Co.</u>, 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls
"'within the reasonable range of litigation possibilities.'"  <u>In re Telesphere Communications, Inc.</u>,
179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted).  To that end, courts should not

15

substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 17 F.3d 600 (2d Cir. 1994).

31.    The Letter Agreement between the Sellers and Buyers should be approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Selling Debtor Entities and their estates.  If the parties were to commence litigation based on the concerns raised in the Inteva Letter, the outcome of any such litigation would be uncertain, and a trial on the merits would involve significant time and expense and impose an administrative burden on the Selling Debtor Entities' estates.  Additionally, active litigation between the Buyers and the Sellers would delay, if not irreparably harm, the closing of the sale of the Interiors and Closures Businesses.  By entering into the Letter Agreement, the Buyers and the Sellers could put each party's concerns behind them and work together to consummate the sale of the Interiors and Closures Businesses without further delay or the distraction of potential litigation.

32.    Thus, in the exercise of their business judgment, the Selling Debtor Entities believe that the terms of the Letter Agreement are reasonable and are in the best interests of their estates.  Based on the benefits to be realized from entering into the Letter Agreement, together with the potential harm to the estates if the relief requested herein is not granted, the Selling Debtor Entities respectfully request that the Motion be granted.

J.      Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

33.      Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

34.      Courts in this district have waived these ten-day stays upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will grant waivers when doing so is important to the Debtor's financial health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

35.      In this instance, the Buyers and Sellers have been proceeding on a timeline to close the sale of the Interiors and Closures Businesses on February 2, 2008, which is within ten days after the hearing of this Motion.  This timeline has already been communicated to the customers and suppliers of the Interiors and Closures Businesses.  If the stay is not waived, the parties would have to delay closing, which in addition to affecting the Buyers and Sellers, would also affect the planning of the Interiors and Closures Businesses' numerous customers and suppliers.  The Selling Debtor Entities, therefore respectfully request that the Amended Sale Approval Order include a waiver of the ten-day stay provided under Bankruptcy Rule 6004(g).

17

36.    Because the Selling Debtor Entities have demonstrated a need requiring the immediate effectiveness of the Amended Sale Approval Order, this Court should exercise its authority under Bankruptcy Rule 6004(g) and waive the ten-day stay as it otherwise would apply to the Amended Sale Order.

## Notice Of Motion

37.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 19, 2007 (Docket No. 10661). In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[18]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

38.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

---

[18]    The Debtors have noticed this Motion for the omnibus hearing on January 25, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on January 25, 2008.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until January 22, 2008 to file an objection to the Motion.

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving entry into the Letter Agreement by amending the Interiors and Closures Sale Approval Order and (ii) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            January 15, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession