**Bidding Procedures Hearing Date And Time:  January 25, 2008 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  January 22, 2008 at 4:00 p.m.**
**Sale Hearing Date And Time:  February 21, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  February 14, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x
                                                             :
    In re                                                    :    Chapter 11
                                                             :
DELPHI CORPORATION, et al.,                                  :    Case No. 05-44481 (RDD)
                                                             :
                                                             :    (Jointly Administered)
                        Debtors.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P. 2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF DEBTORS' ASSETS PRIMARILY USED IN DEBTORS' BEARINGS BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("BEARINGS BUSINESS SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of the Selling Debtor Entities' (defined below) assets (the "Acquired Assets") primarily used in the Selling Debtor Entities' global bearings business (the "Bearings Business") to the Buyer or the Successful Bidder (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed Contracts, the "Assigned Contracts") to the Buyer or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyer or the Successful Bidder, as the case may be.  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

2

Background

A.    The Chapter 11 Filings

        1.        On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code

sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

        2.        No trustee or examiner has been appointed in these cases.  On October

17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee," and

together with the Creditors' Committee, the "Statutory Committees").

        3.        On September 6, 2007, the Debtors filed the Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In

Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In

Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the

First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates,

Debtors And Debtors-In-Possession (the "Plan") (Docket No. 11386) and the First Amended

Disclosure Statement with respect to the Plan (the "Disclosure Statement") (Docket No.

11388).  The Court entered an order approving the adequacy of the Disclosure Statement and

granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389)

(the "Solicitation Procedures Order").

4.        This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.        The statutory predicates for the relief requested herein are sections 363, 365, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.        Current Business Operations Of The Debtors

6.        Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.        The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

and modules, and other electronic technology. The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted

the Company's business through various divisions and subsidiaries. Effective January 1, 1999,

the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM. In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications. Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income. Every year thereafter, however,

with the exception of 2002, the Company has suffered losses. In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors

incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

employee special attrition programs.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording
of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating
loss in calendar year 2004 was $482 million.

10.     The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of

which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle

production environment for domestic OEMs resulting in the reduced number of motor vehicles

that GM produces annually in the United States and related pricing pressures, and (iii)

increasing commodity prices.

11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major stakeholders had not progressed sufficiently by the end of the third

quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to

complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

12.     On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying

---

[4]     In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement.
On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and
commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the
original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I,
Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co.
and an affiliate of Pardus Capital Management, L.P.  Under the Delphi-Appaloosa EPCA, the new plan
investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to
support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-
Appaloosa EPCA on August 2, 2007.  On October 29, 2007, the Debtors filed a motion requesting this
Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).  In

the Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

---

addition, on November 14, 2007, December 3, 2007, and December 5, 2007,  the Debtors filed certain
additional proposed amendments to the Delphi-Appaloosa EPCA.  On December 10, 2007, this Court entered
an order granting the motion and approving the proposed amendments (Docket No. 11382).

[5]    As of August 29, 2007, this Court had entered the following orders approving settlements between Delphi
and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America
  (the "UAW") (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication
  Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die
  Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals
  832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
  International Union and USW Local 87L (Docket No. 9169).
On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice
Delphi's motion for an order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing
rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6]    On September 6, 2007, Delphi announced that it had entered into agreements with GM consisting of a Global
Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA").  Delphi's
comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM other than as
may arise out of their ordinary course customer-supplier relationship  The GSA and MRA were filed as
Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  See Docket No. 9263.  On October 29, November 14,
December 3, December 5, and December 10, 2007, the Debtors filed certain proposed amendments to the
GSA and MRA.  The approval of such amendments will be considered in connection with the confirmation of
the Plan.

[7]    In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and
"non-core" product lines and plants.  The Debtors have been working to divest non-core assets so as to
maximize the value of their estates for stakeholders.  During the 2006 and 2007 calendar years, for example,
the Debtors have sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, their
brake hose and catalyst businesses, and their Saltillo, Mexico brake plant business, as well as their
manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan.  The
Debtors also received court approval to sell substantially all of the assets used in their interiors and closures
businesses (subject to certain cure disputes) and for bid procedures related to the upcoming sale of
substantially all assets used in their steering and halfshaft business.

cost structure is competitive and aligned with its product portfolio and manufacturing

footprint;[8] and fifth, devising a workable solution to their current pension situation.[9]

E.      The Debtors' Plan Of Reorganization

13.     By filing the Plan and related Disclosure Statement, the Debtors reached

another key milestone in their chapter 11 cases.  The Plan is based upon a series of global

settlements and compromises that involve nearly every major constituency in the Debtors'

reorganization cases, including GM.  Attached as exhibits to the Plan are two agreements, the

GSA and the MRA, which provide for a comprehensive settlement with GM.  Both agreements

are subject to this Court's approval as part of the confirmation process.  This Court has

scheduled a hearing to consider confirmation of the Plan to commence on January 17, 2008.

Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first

quarter of 2008.

---

[8]     As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its
product portfolio on core technologies for which the Company believes it has significant competitive and
technological advantages.  The Company's revised operating structure consists of its four core business
segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic
Architecture.  The Company also has two additional segments , which will be transitioned as part of the
Company's transformation plan: Steering (for which bidding procedures were approved on December 20,
2007) and Automotive Holdings Group.  To ensure that their organizational and cost structure is competitive,
the Debtors obtained an Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors To
Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing
Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts
receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract
administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]     To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms
of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on
May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for
Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional
funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is
required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29,
2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi
Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court
granted the Debtors' motion for authority to perform under the terms of that waiver.  On October 4, 2007, the
IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally
consistent with the conditions to the most recent waiver.

14.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.    By this Motion, Delphi and the selling Debtor entities described in the Agreement (as defined below) (the "Selling Debtor Entities")[10] seek approval for the sale of the Bearings Business to ND Acquisition Corp. (the "Buyer"),[11] subject to additional competitive bidding pursuant to the proposed Bidding Procedures.  To effect the Sale, the Selling Debtor Entities seek two types of relief.  First, at the omnibus hearing to be held on January 25, 2008, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Buyer pursuant to the Agreement (as defined below) and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing to be held on February 21, 2008, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the Sale to the Buyer or the Successful Bidder, as the case may be, including, without limitation, the assumption and

---

[10]    Under the Agreement, the Selling Debtor Entities include Delphi Automotive Systems LLC ("DAS LLC") and Delphi Technologies, Inc.  For convenience, use of the term "Selling Debtor Entities" means, as the context requires, the specific Debtor entity undertaking the transaction referenced to the extent such transaction affects the assets of such entity.

[11]    This Motion will refer to ND Acquisition Corp., together with any affiliates it identifies in Schedule 1 of the Agreement, as the "Buyer," which, as the context requires, means the specific Buyer entity undertaking the transaction.

9

assignment of the Assumed Contracts to the Buyer, and the assumption by the Buyer of the Assumed Liabilities.

Basis For Relief

16.     The Company has stated that to achieve the necessary cost savings and operational effectiveness envisioned in its transformation plan, it must streamline its product portfolio to capitalize on its world-class technology and market strengths and make the necessary manufacturing realignment consistent with its new focus.  As part of the Company's transformation plan, the Company identified the Bearings Business as a non-core business subject to disposition.

17.     Accordingly, following extensive marketing efforts, on January 15, 2008, the Selling Debtor Entities and the Buyer entered into a Sale and Purchase Agreement, a copy of which is attached hereto as Exhibit D (the "Agreement").  The Agreement contemplates a global divestiture of the Bearings Business to the Buyer for a purchase price (the "Purchase Price") of up to $44.2 million, subject to certain adjustments.[12]

F.      The Bearings Business

18.     The Bearings Business produces both wheel bearings and roller clutch product lines.  As the inventor of the Gen III wheel bearing technology in 1979, the Bearings Business is a recognized and trusted market leader.  It is the leading producer of Gen III wheel bearings in North America and the primary North American supplier of such parts to GM.  The Bearings Business occupies a 1.3 million square foot plant set on 133 acres in Sandusky, Ohio.  The plant houses integrated design, engineering, and manufacturing teams.  The Company has

---

[12]    It should be noted that the Agreement provides that the Purchase Price may be adjusted to $18.2 million, subject to certain further adjustments, if, prior to the closing, (a) a competitive operating agreement (the "Competitive Operating Agreement") between the Selling Debtor Entities and the local UAW has not yet been executed or become effective or (b) the Selling Debtor Entities have failed to achieve certain labor-related cost savings.

invested more than $140 million in new tooling and refurbishment for older equipment and new state-of-the-art machinery and equipment since 2000. Two distinct manufacturing processes are used in the plant: flexible product focused cells, which can be shifted from one model of wheel bearings to another with relative ease, and high volume manufacturing, which provides a highly automated and efficient high volume output.

19.    The Bearings Business employs approximately 1,000 people, including approximately 775 Hourly Employees. The hourly workforce is represented by the UAW.

G.    Factors Leading To The Sale

20.    Although the Company believes that the Bearings Business is fundamentally strong, the Bearings Business does not fit within the Company's anticipated product portfolio under its transformation plan. In particular, the Company has determined, after an intensive product portfolio review, that the Bearings Business is outside the primary focus of the Company's growth and long-term strategic goals.

21.    The Company believes, however, that as a standalone business, the Bearings Business could become more profitable and competitive. The Company has therefore determined that the value of the Bearings Business would be maximized through its divestiture. To achieve that goal, while balancing the needs of its customers, the Company is seeking to sell the Bearings Business. The Company, including its Selling Debtor Entities, will carefully manage the transition of the Bearings Business and the Sale will be completed in coordination with the Company's customers, employees, unions, and other stakeholders.

22.    The Company has actively marketed the Bearings Business since February 2007. As part of this process, the Company identified several potential purchasers for the Bearings Business and provided those parties with access to information about the Bearings Business.

11

23.     The Selling Debtor Entities evaluated the terms and benefits of the proposals, as well as the benefits of other alternatives to divesting the Bearings Business.  In their business judgment the Selling Debtor Entities concluded that the proposal from the Buyer, which formed the basis of the Agreement, offered the most advantageous terms and the greatest economic benefit.  This decision was based in part on the Selling Debtor Entities' ability to maximize the value of the business line as a going concern and their belief that the Buyer would continue to provide quality products to the Company's customers, many of whom buy other products from Delphi.  The Buyer is a wholly owned subsidiary of Resilience Capital Partners LLC ("Resilience Capital").  Resilience Capital is a private equity investment firm focused on investing in underperforming and turnaround situations, typically investing in companies with revenues of between $25 million and $250 million.  Resilience Capital typically acquires lower middle market companies that have solid fundamental business prospects, but have suffered from a cyclical industry downturn.  Since its inception in 2001, Resilience Capital has acquired approximately 16 companies with combined revenues in excess of $1 billion.

H.      The Agreement

24.     Pursuant to the Agreement, (a) the Selling Debtor Entities would (i) sell the Acquired Assets owned by the Selling Debtor Entities free and clear of any Interests and/or Claims,[13] except for Permitted Encumbrances as defined in the Agreement, in consideration for

---

[13]    "Interests and/or Claims" means any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtor Entities' or the Buyer's

the Purchase Price, subject to adjustments and other consideration, and (ii) assume (if

applicable) and assign the Assigned Contracts to the Buyer and (b) the Buyer will assume the

Assumed Liabilities.

25.     The significant terms of the Agreement are as follows:[14]

(a)     <u>General Terms</u>.  The Buyer would acquire the Acquired Assets, which
comprise all of the non-cash assets primarily used by the Bearings Business (other than the
certain assets expected to be excluded), including certain real property, personal property,
inventory, contracts, administrative assets, permits, consents, environmental permits, certain
purchased intellectual property, and certain documented technical information pertaining to
the design or manufacture of the Bearings Business' products, through an asset sale.

(b)     <u>Bankruptcy Court Approval</u>.  The Sale of the Acquired Assets would be
subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)     <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement
and related documentation.[15]  At the closing, certain of the Selling Debtor Entities and the
Buyer would enter into, among others, the following ancillary agreements (collectively, the
"Ancillary Agreements"):[16] (i) the Patent Assignment, (ii) the Trademark Assignment, (iii)
the Deposit Escrow Agreement, (iv) the Transition Services Agreement, (v) the Bills of Sale,
(vi) the Assignment and Assumption Agreements, (vii) the Indemnity Escrow Agreement,
(viii) the Inventory Adjustment Escrow Agreement, and (ix) the Sensor Supply Agreement.
The Ancillary Agreements would be delivered to the Selling Debtor Entities on terms
reasonably satisfactory to the Selling Debtor Entities on or before the closing and would be
performed in all material respects.

(d)     <u>Purchase Price</u>.  The Purchase Price to be paid by the Buyer to the
Selling Debtor Entities would be up to $44.2 million, subject to certain adjustments.  Among
other adjustments, the Purchase Price may be reduced by $26 million, if, prior to the closing,

---

interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in
connection with, or in any way relating to the operation of the Bearings Business prior to the Closing Date,
including the transfer of the Acquired Assets to the Buyer.

[14]    In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement
control.

[15]    Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available
upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who
show that they would be affected by the relief requested in this Motion.

[16]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the
Agreement.

13

(a) the Competitive Operating Agreement has not yet been executed or become effective or (b) the Selling Debtor Entities have failed to achieve certain labor-related cost savings.

(e)　　Deposit Amount.　On or before 3:00 (prevailing Eastern time), January 16, 2008, the Buyer will deliver to an escrow agent pursuant to the Deposit Escrow Agreement the sum of $750,000.00 to be held as an earnest money deposit (such amount, together with the interest accrued thereon prior to closing, the "Deposit Amount").　Upon closing, the Selling Debtor Entities would receive the Deposit Amount.　Upon a material breach by the Buyer of the Agreement or the Bidding Procedures which results in termination of the Agreement, the Selling Debtor Entities would receive the Deposit Amount.　If the Agreement is terminated for any reason other than a breach by the Buyer, then, on: (i) the date which would be 15 days after such termination or (ii) in the event that an Alternative Transaction (defined below) is completed, the Return Date (defined below) (whichever would be earlier), the Deposit Amount would be returned to the Buyer.

(f)　　Escrow.　Provided the closing is on or after the effective date of the Selling Debtor Entities' confirmed plan of reorganization (the "Effective Date"), the Buyer would deliver to the Selling Debtor Entities the Purchase Price in accordance with the Agreement.　If, however, the closing is before the Effective Date, (i) the Buyer would deliver to an indemnity escrow agent $2,000,000.00 of the Purchase Price (the "Indemnity Escrow Amount") to be held, in an interest bearing account, as collateral to secure the rights of the Buyer under certain indemnity provisions of the Agreement, and (ii) the Buyer would deliver to an inventory adjustment escrow agent $500,000.00 of the Purchase Price (the "Inventory Adjustment Escrow Amount") to be held, in an interest bearing account, as collateral to secure the rights of the Buyer under certain inventory adjustment provisions of the Agreement.　The Indemnity Escrow Amount would be held by the indemnity escrow agent from the closing until the third anniversary of the closing (the "Escrow Period"); except that if the Effective Date occurs during the Escrow Period, the indemnity escrow agent would immediately deliver the Indemnity Escrow Amount to the Selling Debtor Entities. Thereafter, the Selling Debtor Entities' indemnification obligations under the Agreement, if any, would be the sole responsibility of Delphi and then post-reorganization Delphi though the applicable periods set forth in the Agreement.　The Inventory Adjustment Escrow Amount would be held by the inventory adjustment escrow agent from the closing until the earlier of (y) 150 days after the closing or (z) the date of any payment provided for in the inventory adjustment provision of the Agreement.

(g)　　Representations And Warranties.　Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale generally standard in a transaction of this type and the Acquired Assets and the Buyer would provide representations and warranties generally standard in a transaction of this type.　The representations and warranties of the Selling Debtor Entities would survive for a period of one year following the closing, other than certain warranties related to environmental matters and warranty claims, which would survive for three years following the closing.

14

(h)    Covenants.  Between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyer (which consent would not be unreasonably withheld): (i) sell or otherwise dispose of Acquired Assets, excluding sales of tooling to customers, sales of inventory, and sales of receivables to financial institutions or credit collection agencies, in each case in the ordinary course of business, (ii) incur, assume, or guarantee any debt obligation that would become an Assumed Liability, (iii) incur any encumbrance on any material Acquired Assets, in each case other than the Permitted Encumbrances as defined in the Agreement, (iv) increase the cash compensation of any of the Selling Debtor Entities' employees accepting employment with the Buyer (the "Transferred Employees") other than (A) in the ordinary course of business or (B) as required by any agreement in effect as of the date of the Agreement or as required by law, (v) make any material change in the accounting methods or practices followed by the Bearings Business (other than such changes that are required by law, made in conformance with GAAP, or required in connection with the preparation of certain financial statements), (vi) terminate or make any material amendment to a Material Contract, (vii) terminate or make any material amendment to a collective bargaining agreement, (viii) fail to maintain insurance in a manner consistent with the Selling Debtor Entities' past practice, or (ix) agree or commit to do any of the foregoing.

(i)    Indemnity.  Under the Agreement, the Buyer would be obligated to indemnify the Selling Debtor Entities on account of certain losses resulting from or arising out of any (i) Assumed Liability, (ii) certain future liabilities set forth in the Agreement, (iii) employment rights of any Transferred Employees or any other person employed by the Buyer on or after the closing for any claims relating to or arising from events occurring on or after the closing, and (iv) the Buyer's failure to comply with certain obligations related to employees.  The Selling Debtor Entities would be obligated to indemnify the Buyer on account of (i) retained liabilities, (ii) any employment rights of any Transferred Employees or any other person employed by the Selling Debtor Entities prior to the closing for any claims relating to or arising from events occurring prior to the closing, or (iii) the Selling Debtor Entities' breach of certain representations, warranties, or covenants provided in the Agreement.  However, the Selling Debtor Entities' indemnification obligations would be limited to indemnification claims that are notified to the Selling Debtor Entities on or before the first anniversary of the closing, except for indemnification claims made with respect to certain environmental matters, which claims would have to be notified to a Seller on or before the third anniversary of the closing.  Further, the Selling Debtor Entities would not be obligated to the Buyer for indemnifiable losses until (y) an individual claim exceeds $10,000.00 and (z) the aggregate amount of indemnifiable losses exceeds $200,000.00.  If the aggregate amount of indemnifiable losses indemnified by the Selling Debtor Entities reaches 7.5% of the Purchase Price, the Selling Debtor Entities would have no further obligations with respect to indemnifiable losses.  With respect to environmental matters, (i) the Selling Debtor Entities would indemnify the Buyer for environmental damages arising from pre-closing environmental contamination and pre-closing environmental compliance matters except to the extent exacerbated by the negligent actions of the Buyer, and (ii) the Buyer would indemnify the Selling Debtor Entities for environmental damages arising from post-closing environmental contamination and post-closing environmental compliance matters

15

except to the extent exacerbated by the negligent actions of the Selling Debtor Entities. With respect to environmental damages arising from circumstances that may be considered both pre- and post-closing, the damages would be allocated between the parties in proportion to the extent that the releases of, or noncompliance underlying, such damages arose pre- or post-closing.

(j)     Closing Conditions. In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters (including certain competition filings), the respective obligations of each party to effect the transactions contemplated by the Agreement would be subject to the satisfaction or waiver of the following conditions: (i) the Buyer's assumption of obligations of existing UAW-Delphi collective bargaining agreements applicable to the Manufacturing Facility, as modified, and (ii) no material adverse effect occurring from the date of the Agreement and be continuing at closing. In addition, the obligation of the Buyer to consummate the transactions contemplated by the Agreement would be subject to the satisfaction, or waiver by the Buyer, at or prior to the closing, of the following conditions: (a) the performance and compliance by the Selling Debtor Entities in all material respects with all agreements and obligations required by the Agreement to be performed or complied with by the Selling Debtor Entities at or prior to the closing, (b) the delivery by the Selling Debtor Entities of duly executed copies of each of the Ancillary Agreements, (c) the Buyer and GM having entered into definitive documentation, including a supply agreement, which meets certain conditions, (d) the Buyer having obtained financing to fund the Purchase Price, the terms of which would be satisfactory to the Buyer in its sole discretion, (e) no material adverse effect occurring and continuing at the closing affecting the Bearings Business, (f) contracts with the top four aftermarket customers of the Bearings Business must contain, as of the closing, terms and conditions consistent with the terms and conditions of such contracts, and (g) all permits, including environmental permits, and other authorizations necessary for the lawful conduct of the Bearings Business having been transferred or reissued, as applicable, to the Buyer if legally required to enable the Buyer to continue the permitted activity, unless the same may be transferred or reissued, as applicable, under applicable law after closing. Finally, the obligation of the Selling Debtor Entities to consummate the transactions contemplated by the Agreement would be subject to the fulfillment at or prior to the closing of the following conditions, which can be waived by the Selling Debtor Entities: (i) the truth and correctness, as of the closing date, of certain representations and warranties of the Buyer contained in the Agreement except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on the Buyer's ability to consummate the transactions contemplated by the Agreement, (ii) the performance and compliance by the Buyer in all material respects with all agreements and obligations required by the Agreement to be performed or complied with at or prior to the closing, and (iii) the delivery by the Buyer of duly executed copies of each of the Ancillary Agreements.

(k)     Termination. The Agreement could be terminated prior to closing in the following circumstances: (i) upon mutual written consent of the Selling Debtor Entities and the Buyer, (ii) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if closing does not occur within 45 days after entry of the

16

Sale Approval Order for any reason other than failure to obtain regulatory approvals; provided, however, that this period would be automatically extended for an additional 30 days if a Competitive Operating Agreement has been executed by either or both the Buyer and Selling Debtor Entities and the UAW, but has not been fully implemented, (iii) by either party, if the Selling Debtor Entities consummate an Alternative Transaction (defined below), (iv) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity (other than this Court), (v) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if this Court has not entered the Sale Approval Order on or before 90 days after the date of the Agreement, or if such Sale Approval Order, as of the date that is 90 days after the date of the Agreement, is subject to a stay or injunction, (vi) by the Buyer upon written notice to the Selling Debtor Entities, provided the Buyer is not in material breach of any of its obligations under the Agreement, if (A) the Selling Debtor Entities have breached or failed to perform any of their obligations under the Agreement or (B) a material adverse effect has occurred, so long as such event is continuing at the time of any such termination and is not reasonably capable of being cured within 45 days after entry of the Sale Approval Order or the date of the Agreement, whichever is earlier, and (vii) by the Selling Debtor Entities, upon written notice to the Buyer and provided that the Selling Debtor Entities are not in material breach of any of their obligations under the Agreement, if the Buyer has breached or failed to perform in any material respect any of its obligations contained in the Agreement, which breach is not cured within 30 days after written notice thereof, or is incapable of being cured by the Buyer.

(l)     Break-Up Fee.  If the Agreement is terminated under certain circumstances and the Selling Debtor Entities consummate an alternative transaction for the sale of the Bearings Business and the Selling Debtor Entities sell, transfer, lease, or otherwise dispose of all or substantially all of the Bearings Business or the Acquired Assets in a transaction or a series of related transactions with a party other than the Buyer (an "Alternative Transaction"), then the Selling Debtor Entities would, upon consummation of the Alternative Transaction, pay the Buyer $1.5 million (the "Break-Up Fee"), which is approximately 3.4% of the Purchase Price and the Expense Reimbursemen (defined below). Notwithstanding the foregoing, if the Agreement is terminated pursuant to the rights described in paragraph 25(k)(ii) above, and the Selling Debtor Entities enter into an Alternative Transaction with GM pursuant to the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring, dated June 22, 2007, then in certain circumstances , the Selling Debtor Entities would pay the Buyer the Break-Up Fee and Expense Reimbursement (as defined below).  The Break-Up Fee, however, would not be paid if closing does not occur because the Buyer fails to secure financing.

(m)     Expense Reimbursement.  If the Agreement is terminated for any reason other than (i) by mutual consent or (ii) consummation would violate competition or other government regulations then, subject to certain exceptions, the Selling Debtor Entities would be required to reimburse the Buyer's reasonable, actual out-of-pocket fees and expenses incurred in connection with the investigation or negotiation of the transactions contemplated

by the Agreement (the "Expense Reimbursement"), provided that the Buyer is not then in breach of the Agreement or the Bidding Procedures.  The Expense Reimbursement would be immediately earned upon termination and payable promptly after invoiced by the Buyer, except that if the Selling Debtor Entities in good faith believed that the amount of the Expense Reimbursement sought was not reasonable, then the Selling Debtor Entities would have the right to seek the review of this Court before paying such amount.  If the Buyer would become entitled to the Break-Up Fee and/or the Expense Reimbursement, then the Break-Up Fee and/or the Expense Reimbursement would be the sole remedy of the Buyer for the breach by the Selling Debtor Entities of the terms of the Agreement or the Deposit Escrow Agreement.

(n)    <u>Transfer Taxes</u>.  The Selling Debtor Entities and the Buyer would use commercially reasonable efforts and cooperate in good faith to exempt the Sale from any sales taxes, documentary and stamp taxes, transfer, documentary, sales, use, registration, recording, stamp, use, gross receipts, excise, value-added, and other such taxes and related fees ("Transfer Taxes") as may be payable in connection with the Sale.  In the event that an exemption(s) is unavailable, the Buyer would be liable for and pay all Transfer Taxes arising out of or incurred in connection with the Agreement.

I.    <u>Workforce Provisions</u>

26.    As of the closing, the Buyer would offer employment to <u>all</u> of the Selling Debtor Entities' active employees related to the Bearings Business, including both hourly and salaried employees.  Salaried employees would be offered compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits offered prior to closing.  Prior to tendering such offers to salaried employees, the Buyer would provide the Selling Debtors Entities information to satisfy the Selling Debtor Entities that this "substantially comparable in the aggregate" requirement is met, which satisfaction would not be unreasonably withheld.  If not met, the Buyer would have the opportunity to cure any deficiency.  The Buyer would maintain this requisite level of compensation and benefits for a minimum of one year from the closing.

18

27.    The significant terms of the Agreement, with respect to hourly or

salaried employees, as applicable, are as follows:[17]

(a)    <u>Collective Bargaining Agreements</u>.  Unless the Buyer is otherwise able
to negotiate a new collective bargaining agreement with the UAW prior to closing, the Buyer
would assume the terms and conditions of all of the UAW-Delphi collective bargaining
agreements applicable at the Manufacturing Facility, as the same may be modified by (i)
proceedings in this Court, (ii) agreement between the Selling Debtor Entities and the UAW or
an approved plan of reorganization in these chapter 11 cases, and (iii) a memorandum of
understanding between Delphi and the UAW regarding the effects of the sale upon bargain unit
members (the "Effects MOU").  The parties would agree that the Agreement would be, to the
extent possible, interpreted in a manner consistent with the Effects MOU and that, to the extent
the Effects MOU is inconsistent with the Agreement, the terms of the MOU would control.
The Buyer would recognize the seniority status of employees employed in accordance with a
collective bargaining agreement for all purposes of continued employment with the Buyer.

(b)    <u>Inactive Employees</u>.  Employees not active as of the closing due to
disability, family medical leave, or other approved leaves of absence (the "Inactive
Employees") would remain the Selling Debtor Entities' responsibility until the Inactive
Employees returned to active employment in accordance with the Selling Debtor Entities' leave
policies or collective bargaining agreement, as applicable.  When an Inactive Employee is
ready to return to work, the Buyer would offer employment to such Inactive Employee.

(c)    <u>Employee Benefit Plans</u>.  All employees transferred to the Buyer as of
the closing, and such employees' dependents and beneficiaries, would cease to participate in
and be eligible for benefits under the Selling Debtor Entities' benefit plans, but would
commence participation in and become eligible for benefits under the Buyer's employee
benefits plans.  Inactive Employees who would become employees of the Buyer, and their
dependents and beneficiaries, would cease to participate in and be eligible for benefits under
the Selling Debtor Entities' benefit plans as of the date on which such Inactive Employee
became an employee of the Buyer.  The Buyer would recognize an employee's pre-closing
credit service with the Selling Debtor Entities for eligibility and vesting purposes but not
benefit accrual purposes with respect to the Buyer's employee benefit plans.  In no case would
credited service be recognized if such recognition would cause a duplication of compensation
or benefits as between the Selling Debtor Entities and the Buyer.

(d)    <u>COBRA</u>.  The Selling Debtor Entities would retain responsibility for all
liabilities for claims of employees transferred to the Buyer related to compliance with the
requirements of continuation coverage under certain sections of the Internal Revenue Code and
ERISA.

---

[17]    Potential bidders should note that Section 6.7 of the Agreement addresses, among other things, the terms and
conditions of employment of UAW-represented employees, and these issues remain subject to the parties'
rights and obligations related to bargaining with the UAW.

(e)    Workers' Compensation.  The Selling Debtor Entities would retain
responsibility for all liabilities for workers' compensation related to injuries or illnesses
incurred prior to the closing and the Buyer would assume such responsibility related to injuries
or illnesses incurred on or after the closing.

J.    Bidding Procedures

28.    The Sale of the Bearings Business would be subject to higher or

otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor Entities believe

that the proposed structure of the Bidding Procedures is the one most likely to maximize the

realizable value of the Bearings Business for the benefit of the Selling Debtor Entities, their

estates, their stakeholders, and other interested parties.  Accordingly, the Selling Debtor

Entities seek approval of the Bidding Procedures for the Sale of the Bearings Business.

29.    The Bidding Procedures describe, among other things, the assets

available for sale, the manner in which bidders and bids become "qualified," the coordination

of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of

any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s),

and this Court's approval thereof (collectively, the "Bidding Process").

30.    The proposed Bidding Procedures attached hereto as Exhibit A provide,

in relevant part, as follows:[18]

(a)    Participation Requirements:  To ensure that only bidders with
financial ability and a serious interest in the purchase of the Acquired Assets participate in
the Bidding Process, the Bidding Procedures provide for certain requirements for a potential
bidder to become a "Qualified Bidder": (i) executing a confidentiality agreement in form and
substance satisfactory to the Selling Debtor Entities, (ii) providing the Selling Debtor Entities
with certain financial assurances, including current audited financial statements or such other
form of financial disclosure and credit-quality support or enhancement acceptable to the
Selling Debtor Entities and their financial advisors as to such bidder's ability to close, and
(iii) submitting a preliminary (non-binding) written proposal reflecting (A) the purchase price

---

[18]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this
summary have the meanings ascribed to them in the Bidding Procedures.

range, (B) any assets and/or equity interests expected to be excluded, (C) the structure and financing of the transaction, (D) any anticipated regulatory approvals, (E) the anticipated time frame and any anticipated impediments to obtaining such approvals, (F) any additional conditions to closing the qualified bidder may wish to impose, and (G) the nature and extent of any due diligence the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

      (b)   Due Diligence:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Selling Debtor Entities would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  Except as otherwise stated in the Agreement, due diligence would not continue after the Bid Deadline (defined below).

      (c)   Bid Deadline:  All bids would have to be received not later than 11:00 a.m. (prevailing Eastern time) by February 11, 2008 (the "Bid Deadline").  The Selling Debtor Entities could extend the Bid Deadline once or successively, but would not be obligated to do so.  The Selling Debtor Entities would also provide the UAW with notice of all Qualified Bidders and their contact information.

      (d)   Bid Requirements:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit in the amount of $750,000, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

      (e)   Qualified Bids: To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Selling Debtor Entities than, those contained in the Agreement, (ii) have a value of the Purchase Price plus the amount of the Break-Up Fee and the Expense Reimbursement, plus $500,000 in the case of an initial Qualified Bid, plus $250,000 in the case of any subsequent Qualified Bids over the immediately preceding highest Qualified Bid, (iii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iv) not be conditioned on bid protections, other than the bidding increments contemplated in the Bidding Procedures, (v) contain acknowledgements and representations that the bidder (A) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the marked agreement, (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than 15 days after entry of the Sale

Approval Order, subject to the receipt of any governmental approvals, which would have to be obtained 60 days after entry of such order, and (vii) be received by the Bid Deadline. The Selling Debtor Entities would retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the bid requirements described herein. Notwithstanding the foregoing, the Buyer would be deemed a Qualified Bidder, and the Agreement would be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than the Agreement would be referred to as a "Subsequent Bid."

       (f)   <u>Conduct Of Auction</u>: If the Selling Debtor Entities receive at least one Qualified Bid in addition to that of the Buyer, they would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on February 13, 2008 or such later time as the Selling Debtor Entities notify all Qualified Bidders who have submitted Qualified Bids in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least one Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Selling Debtor Entities whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Selling Debtor Entities would provide such bidders with copies of the Qualified Bid which the Selling Debtor Entities then believe would be the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, (iv) the Selling Debtor Entities would be able to employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of this Court entered in connection with the Sale, and (v) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000 higher than the previous bid or bids, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

       (g)   <u>Selection Of Successful Bid</u>: As soon as practicable after the conclusion of the Auction, the Selling Debtor Entities, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder"). The Selling Debtor Entities would sell the Acquired Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the Sale Hearing.

       (h)   <u>Sale Hearing</u>: The Selling Debtor Entities request that the Sale Hearing be scheduled for February 21, 2008 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled in the Selling Debtor Entities' sole discretion, subject to this Court's approval as necessary, without notice other than by an

announcement of the adjourned date at the Sale Hearing.[19]  If no Qualified Bid other than that of the Buyer is received, the Selling Debtor Entities would proceed with the sale of the Acquired Assets to the Buyer following entry of the Sale Approval Order.  If the Selling Debtor Entities receive additional Qualified Bids, then at the Sale Hearing, the Selling Debtor Entities could seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Selling Debtor Entities unless and until approved by this Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Selling Debtor Entities would be permitted to effectuate a sale to the Alternate Bidder without further order of this Court.

        (i)   Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the purchase price upon closing of the Sale to the Successful Bidder. If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Selling Debtor Entities would not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit would irrevocably become property of the Selling Debtor Entities.  On the Return Date, the Selling Debtor Entities would return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

        (j)   Reservation Of Rights:  The Selling Debtor Entities, after consultation with the agents for its secured lenders' and the Creditors' Committee, would be permitted to (i) determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) reject, at any time, any bid (other than the Buyer's initial bid) that is (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (C) contrary to the best interests of the Selling Debtor Entities, their estates, and their stakeholders as determined by the Selling Debtor Entities in their sole discretion.

K.    Bid Protections

        31.    At various times over the course of the last seven months, the Buyer has

expended, and likely would continue to expend, considerable time, money, and energy

pursuing the purchase of the Bearings Business.  Moreover, the Buyer has engaged in extended

---

[19]   The Sale Hearing would be set for a date at least six business days after the Auction.  The Selling Debtor Entities will notify parties-in-interest of the Sale Hearing Date under the Notice Procedures described herein.

arm's length and good faith negotiations regarding a possible sale.  The Buyer is not an "insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  The Agreement is the culmination of these efforts.

32.      In recognition of this expenditure of time, energy, and resources, the Selling Debtor Entities have agreed to provide certain bid protections to the Buyer (the "Bid Protections").  Specifically, the Agreement provides for, and the Selling Debtor Entities respectfully request that this Court approve, a Break-Up Fee payable by the Selling Debtor Entities to the Buyer in the amount of $1.5 million (which is approximately 3.4% of the Purchase Price) if (i) the Selling Debtor Entities terminate the Agreement to consummate an Alternative Transaction or consummate such Alternative Transaction or (ii) in certain circumstances, the Agreement is terminated pursuant to the rights described in paragraph 25(k)(ii) above, and the Selling Debtor Entities enter into an Alternative Transaction with GM pursuant to the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring, dated June 22, 2007.

33.      In addition, the Selling Debtor Entities respectfully request this Court's approval of the term in the Agreement providing for reimbursement of the Buyer's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement under certain circumstances.

34.      If the Buyer becomes entitled to receive any Break-Up Fee and/or Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement would be the sole and exclusive remedy of the Buyer, whether at law or in equity, for any breach by Delphi or any of its affiliates of the terms and conditions of the Agreement or the Deposit Escrow Agreement.

35.    The Bid Protections were a material inducement for, and a condition of, the Buyer's entry into the Agreement. The Selling Debtor Entities believe that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Buyer in connection with the Sale and (b) the fact that the Buyer's efforts have increased the chances that the Selling Debtor Entities would receive the highest or otherwise best offer for the Acquired Assets.

36.    The Buyer is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement without the approval of the Bid Protections and the Bidding Procedures Order. Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Selling Debtor Entities would lose the opportunity to obtain what they believe to be the highest and best offer for the Acquired Assets.

37.    Moreover, payment of the Break-Up Fee would not diminish the Selling Debtor Entities' estates. The Selling Debtor Entities would not expect to pay the Break-Up Fee unless they do so to accept an alternative Successful Bid, which must exceed the price offered by the Buyer by an amount sufficient to pay the Break-Up Fee. The Expense Reimbursement is a necessary cost of obtaining a binding commitment from the Buyer for the sale of the Bearings Business. The Selling Debtor Entities thus request that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

L.    Assumption And Assignment Of Contracts

38.    The Selling Debtor Entities seek authority under section 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Buyer or the Successful Bidder, as the case may be. The approximate cost to cure the Assumed Contracts related to the Bearings Business is $4.43 million. Pursuant to the Solicitation Procedures Order, each non-Debtor part to an Assumed Contract already has received a cure notice (the "Plan Cure

25

Notice"). The Plan Cure Notice stated, with respect to the Assumed Contract, the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"). The Plan Cure Notice provided parties to the Assumed Contracts an opportunity to object to the Cure Amount. and notified each party that such party's lease or contract will be assumed under the Plan. Thus, unless the Selling Debtor Entities and the non-Debtor party to an Assumed Contract agree otherwise to the Cure Amount or the Cure Amount is otherwise resolved in accordance with the Solicitation Procedures Order, the Cure Amounts listed on the Plan Cure Notices control the amounts required to cure all defaults under the Assumed Contracts in connection with the Sale. In connection with the proposed Sale, the Selling Debtor Entities also seek authority under section 363 of the Bankruptcy Code to assign the Postpetition Contracts to the Buyer or the Successful Bidder, as the case may be. There are no past due obligations under the Postpetition Contracts.

39.    In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor Entities propose to file with this Court and serve on each non-Debtor party to an Assigned Contract a notice substantially in the form attached hereto as Exhibit E (the "Purchaser Assumption/Assignment Notice"). The Purchaser Assumption/Assignment Notice would identify the Buyer as the party that would be assigned all of the Selling Debtor Entities' right, title, and interest in the Assigned Contracts, subject to completion of the bidding process provided under the Bidding Procedures.[20] Non-Debtor parties to any Assumed Contract would be required to file an objection to the assumption and/or assignment of the Assumed Contract within ten days of service of the Purchaser Assumption/Assignment Notice, and such parties

---

[20]    The Selling Debtor Entities propose to serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the Postpetition Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of assignment.

would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

40.     At least 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, whichever is later, the Selling Debtor Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as <u>Exhibit F</u>, to each non-Debtor party to an Assigned Contract identifying any Qualified Bidders as potential parties to which the Assigned Contracts would be assigned.  The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor Entities the ability to address promptly any adequate assurance issues that contract parties may have with any of the Qualified Bidders.  Non-Debtor counterparties to any Assumed Contract would be required to file an objection to the assumption and/or assignment of the Assumed Contract within ten days from the service of the Qualified Bidder Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

M.     <u>Notice Of Sale Hearing</u>

41.     Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for the Buyer, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v) all entities known to have expressed an interest in a transaction with respect to

the Acquired Assets during the past six months, [21] (vi) all entities known to have asserted any

lien, claim, interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and

local regulatory or taxing authorities or recording offices, including but not limited to

environmental regulatory authorities, which have a reasonably known interest in the relief

requested by the Motion, (viii) all parties to Assigned Contracts, (ix) the United States

Attorney's office, (x) the United States Department of Justice, (xi) the Securities and Exchange

Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as

defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental

Case Management Order")), and (xiv) such other entities as are required to be served with

notices under the Supplemental Case Management Order.

N.    <u>Publication Notice</u>

42.    The Selling Debtor Entities also propose, pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to

the form annexed hereto as <u>Exhibit G</u> in the <u>Wall Street Journal</u>, the <u>New York Times</u>, and the

<u>Sandusky Register</u> by the Mailing Date or as soon as practicable thereafter, be deemed proper

notice to any other interested parties whose identities are unknown to the Selling Debtor

Entities.

---

[21]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

Applicable Authority

O.    Approval Of Bidding Procedures

43.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to

use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of

business may be authorized if the debtor demonstrates a sound business justification for it.  See

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d

Cir. 1983) (business judgment rule requires finding that good business reason exists to grant

debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124

B.R. 169, 178-179 (D. Del. 1991).

44.    The Second Circuit has held that, although the bankruptcy court sits as

an "overseer of the wisdom with which the bankruptcy estate's property is being managed by

the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between

creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's

section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently

review the . . . debtor's decision[s] . . . in the course of the swift administration of the

bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with

disputed issues." Id. at 1098-99.

45.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted).  Thereafter, "[p]arties

29

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections."  Lionel Corp., 722 F.2d at 1071.

46.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be "so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice."  In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

47.    As set forth above, the Selling Debtor Entities have sound business justifications for pursuing a sale process at this time.  Although the Selling Debtor Entities believe that the Bearings Business is fundamentally strong, the Bearings Business does not fit the Debtors' anticipated product portfolio under their transformation plan.  Thus, the Selling Debtor Entities have determined that the Bearings Business' value would be maximized through its divestiture.  Moreover, delaying the sale of the Acquired Assets may result in the erosion of the Bearings Business' value. Accordingly, there is a sound business purpose for pursuing the sale process promptly and in accordance with the Bidding Procedures.

48.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address these concerns by assuring initial bidders that any auction procedure would be reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures also reflects sound business judgment.

P.    Approval Of The Bid Protections

49.    Bidding incentives encourage potential bidders to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.  See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it."); United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL 21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it").  One court, explaining the force of the business judgment rule in this context, stated that "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large." Integrated Resources, 147 B.R. at 660.

50.    This district has established a three-part test for determining when to permit bidding incentives.  Id. at 657-58.  The three questions for a court to consider when assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price." Id. at 657.

31

51.     Here, the Selling Debtor Entities seek authority to utilize the Bidding

Process and Bid Protections in the event that the Buyer is not ultimately the Successful Bidder

or must increase the Buyer's bid price to become the Successful Bidder.  The Bid Protections

are fair and reasonable in amount, particularly in view of the efforts previously made and to be

made by the Buyer and the risk to the Buyer of being used as a stalking horse.  Moreover, the

maximum payment under the proposed Bid Protections – the $1.5 million Break-Up Fee

(approximately 3.4% of the Preliminary Purchase Price) – not only constitutes a fair and

reasonable percentage of a proposed purchase price, but is within the range that is customary

for similar transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance

Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up

fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No.

01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior

transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing

4.13% break-up fee if court approved alternative transaction); In re PSINet, Inc., Case No. 01-

13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller

consummated transaction with alternative bidder); In re Teligent, Inc., Case No. 01-12974

(SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25% depending

on value of alternative transaction).  In addition, the payment of the Break-Up Fee or the

Expense Reimbursement, as the case may be, is reasonable in light of the significant

investment in time and resources that the Buyer would have contributed as the stalking horse

bidder.

52.     The Selling Debtor Entities submit that the Bidding Procedures and the

Bid Protections have encouraged competitive bidding because the Buyer would not have

32

entered into the Agreement without such provisions.  The Bidding Procedures and the Bid

Protections have thus induced a bid that otherwise would not have been made.  Finally, the

mere existence of the Bidding Procedures and Bid Protections permits the Selling Debtor

Entities to insist that competing bids be materially higher or otherwise better than the

Agreement, which would produce a clear benefit to the Selling Debtor Entities, their estates,

and their stakeholders.

Q.    Sale Of The Acquired Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

53.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession

may sell property free and clear of any lien, claim, or interest in such property if, among other

things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such
    interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the
    aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a
    money satisfaction of such interest.

11 U.S.C. § 363(f).

54.    Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor

Entities to sell the Acquired Assets free and clear of all liens, claims (including successor

liability claims), and encumbrances, other than the Permitted Encumbrances.  See, e.g., In re

Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27,

2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims

achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, 332

33

F.3d 283 (3d Cir. 2003).  This Court and other courts in the Second Circuit have approved sale

approval orders authorizing the sale of assets free and clear of all interests and claims,

including successor liability claims.  See In re Refco, Inc., Case No. 05-60006 (Nov. 15, 2006)

(authorizing certain debtors to sell customer lists free and clear of interests and claims,

including successor liability claims); In re Refco, Inc., Case No. 05-60006  (Nov. 14, 2005)

(authorizing debtors to sell the regulated commodities futures merchant business free and clear

of interests and claims, including successor liability claims); In re PSINet Inc., Case No. 01-

13213 (Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of liens and

claims, including claims otherwise arising under doctrines of successor liability).  Because the

Buyer is not a successor to the Selling Debtor Entities, successor liability claims should not

follow the Purchased Assets.

    55. Excluding Permitted Encumbrances, each lien, claim, or encumbrance

that is not the result of an assumed liability satisfies at least one of the five conditions of

section 363(f), and the Selling Debtor Entities submit that any such lien, claim, or

encumbrance would be adequately protected by attachment to the net proceeds of the Sale,

subject to any claims and defenses that the Selling Debtor Entities may possess with respect

thereto.  Accordingly, except for the liens resulting from the Assumed Liabilities or the

Permitted Encumbrances, the Selling Debtor Entities request that the Acquired Assets be

transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances,

with such liens, claims, and encumbrances to attach to the proceeds of the Sale of the Acquired

Assets.

R.    The Buyer Is A Good Faith Purchasers Pursuant To
Section 363(m) Of The Bankruptcy Code And The Transaction
Contemplated By The Agreement Should Carry The
Protections Of Section 363(n) Of The Bankruptcy Code

56.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b)
or (c) of this section of a sale or lease of property does not affect the validity of
a sale or lease under such authorization to an entity that purchased or leased
such property in good faith, whether or not such entity knew of the pendency of
the appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

good faith of a purchaser is shown by the integrity of his conduct during the
course of the sale proceedings; where there is a lack of such integrity, a good
faith finding may not be made.  A purchaser's good faith is lost by "fraud,
collusion between the purchaser and other bidders or the trustee, or an attempt
to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In

re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc.

v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y.

June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

57.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

The trustee may avoid a sale under this section if the sale price was controlled
by an agreement among potential bidders at such sale, or may recover from a
party to such agreement any amount by which the value of the property sold
exceeds the price at which such sale was consummated, and may recover any
costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering
such amount.

11 U.S.C. § 363(n).

35

58.    The Selling Debtor Entities submit, and will present evidence at the Sale

Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.

Throughout the negotiations, the Buyer has at all times acted in good faith.  Moreover, to the

extent that the Acquired Assets are sold to a Successful Bidder, it will be because of a well

planned competitive process and intense negotiations at arm's length to be conducted at an

Auction.  As a result of the foregoing, the Selling Debtor Entities request that the court make a

finding that the Purchase Price to be paid by the Buyer constitutes reasonably equivalent value

and fair consideration under any applicable law and that the Buyer or the Successful Bidder, as

the case may be, has purchased the Acquired Assets and assumed the Assigned Contracts and

Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy

Code.  Because a key element of a good faith finding is that the Buyer's successful bid is not

the product of fraud or collusion between the purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders, the Selling Debtor Entities further

request that this Court make a finding that the transactions contemplated by the Agreement are

not avoidable under section 363(n) of the Bankruptcy Code.

S.    Relief From Transfer Taxes Under Section 1146(c) Of the Bankruptcy Code

59.    Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer,

or exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp

tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers

pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.  See City

of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir.

1985) (holding that when transfer is necessary to consummation of plan, transfer is "under a

plan" within meaning of section 1146(c)); In re United Press Int'l, Inc., No. 91 B 13955, 1992

Bankr. LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (holding that section 1146(c)

exemption applied to section 363 sale in instance in which it found "the value of the Debtor's

assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan"); In re Beulah

Church of God In Christ Jesus, Inc., 316 B.R. 41, 50-51 (Bankr. S.D.N.Y 2004) (stating that

determination of applicability of section 1146(c) exemption depends on whether transfers are

in view of, and integral to, a Chapter 11 plan that is subsequently confirmed); City of New

York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985)

(stating that section 1146(c) was designed to reach transfer of assets, on which "plan hinged

and which the court had to approve prior to the confirmation").

60.     As set forth above, as part of their transformation plan, the Selling

Debtor Entities have identified non-core product lines, including the Bearings Business, that do

not fit into the company's future strategic framework, and have planned to sell or wind-down

these product lines.  As mentioned above, on December 10, 2007, the Debtors filed the Plan,

and a hearing on confirmation of the Plan is scheduled to commence in two days.  Section 7.30

of the Plan contemplates the Debtors selling assets outside the Plan, but obtaining relief as if

such divestitures were part of the Plan.  Thus, this sale process may continue after a Plan has

already been filed, which would squarely satisfy Beaulah Church.  See Beulah Church, 316

B.R. at 50-51.  In light of the foregoing, the Selling Debtor Entities submit that the Sale should

be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales,

recording, or similar taxes.

T.     The Assumption And Assignment Of The Assumed Contracts

61.     Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if –

37

>  (A)    the trustee assumes such contract or lease in accordance with the
>  provisions of this section; and
>
>  (B)    adequate assurance of future performance by the assignee of such
>  contract or lease is provided, whether or not there has been a default in such
>  contract or lease.

11 U.S.C. § 365(f)(2).

62.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or executory contract of a debtor. It provides:

>  (b)(1)  If there has been a default in an executory contract or unexpired lease of
>  the debtor, the trustee may not assume such contract or lease unless, at the time
>  of the assumption of such contract or lease, the trustee –
>
>  (A)    cures, or provides adequate assurance that the trustee will
>  promptly cure, such default;
>
>  (B)    compensates, or provides adequate assurance that the trustee will
>  promptly compensate, a party other than the debtor to such contract or lease, for
>  any actual pecuniary loss to such party resulting from such default; and
>
>  (C)    provides adequate assurance of future performance under such
>  contract or lease.

11 U.S.C. § 365(b)(1).

63.    Courts give the phrase "adequate assurance of future performance" a

"practical, pragmatic construction." EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g

Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d

300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of

each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y.

1983) (holding that adequate assurance was furnished on two separate grounds). Courts have

consistently held that the phrase does not require total assurances. See In re Natco Indus., Inc.,

38

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the

debtor will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr.

S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will

fall "considerably short of an absolute guaranty of performance").  In fact, adequate assurance

has been provided by demonstrating the Buyer's financial health and experience in managing

the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06

(Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective

assignee of lease from debtor had financial resources and had expressed willingness to devote

sufficient funding to business to give it strong likelihood of succeeding).

63.     To the extent that any defaults exist under any prepetition executory

contract or unexpired lease that is to be assumed and assigned in connection with the sale of

the Acquired Assets or any portion thereof, the Selling Debtor Entities would cure any such

default.  The Buyer has the financial resources to perform under the Assumed Contracts and

are contractually required under the Agreement to provide adequate assurance of future

performance under each Assumed Contract.  Moreover, if necessary, the Selling Debtor

Entities will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the

Buyer or the Successful Bidder, as the case may be, their experience in the industry, and their

willingness and ability to perform under the contracts to be assumed and assigned to them.

65.     The Sale Hearing therefore will provide this Court and other parties-in-

interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer or

the Successful Bidder(s) to provide adequate assurance of future performance under the

contracts to be assumed.  This Court therefore should have a sufficient basis to authorize the

Selling Debtor Entities to assume and assign the Assumed Contracts as set forth in the

Agreement.

U.    Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

66.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 10 days after

entry of the order, unless the court orders otherwise."

67.    Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y.

2005) ("As I find that the required business need for a waiver has been shown, the order may

provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re

PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a

business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).

In general, courts will grant waivers when doing so is important to the Debtor's financial

health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004)

(affirming decision waiving ten-day stay because "time was of the essence"); In re Decora

Industries, Inc., No. 00-4459, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court

understands that an immediate closing is required to remedy Debtors' precarious financial and

business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing

the parties to close.").

68.    The Selling Debtor Entities expect to continue to market the Bearings

Business to prospective buyers immediately after the Court enters the Bidding Procedures

Order.  During this time, however, Bankruptcy Rule 6004(g) would preclude the Buyer from

receiving the protections afforded by the Bidding Protections.  In recognition of the time and

effort expended by the Buyer in connection the Sale and to reduce the Buyer's risk that the

40

Selling Debtor Entities might obtain a higher and better offer for the Bearings Business during

those ten days, the Buyer should receive the protections afforded by the Bid Protections.  The

Selling Debtor Entities, therefore respectfully request that the Bidding Procedures Order

include a waiver of the ten-day stay provided under Bankruptcy Rule 6004(g).

        69.    Because the Selling Debtor Entities have demonstrated a need requiring

the immediate effectiveness of the Bidding Procedures Order, this Court should exercise its

authority under Bankruptcy Rule 6004(g) and waive the ten-day stay as it otherwise would

apply to the Bidding Procedures Order.

V.    <u>Conclusion</u>

        70.    The Selling Debtor Entities submit that the granting of the Bidding

Procedures, Bid Protections, and Notice Procedures, the setting of a Sale Hearing, and the

entry of an order approving the Sale of the Acquired Assets free and clear of liens, claims, and

encumbrances, the assumption and/or assignment of the Assigned Contracts, and the

assumption of the Assumed Liabilities by the Buyer or the Successful Bidder (as the case may

be) are in the best interests of the Selling Debtor Entities' estates and will maximize value for

all stakeholders.

<u>Notice</u>

        71.    Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order and the Ninth Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures,

entered October 19, 2007 (Docket No. 10661).  Specifically, the Selling Debtor Entities have

provided notice of this Motion on the Master Service List (as defined in the Supplemental Case

Management Order), each party who filed a notice of appearance or request for documents in

41

accordance with Bankruptcy Rule 2002, and all entities known to have expressed an interest in

a transaction with respect to the Acquired Assets during the past six months. Further, after

entry of the Bidding Procedures Order, notice with respect to the Motion and Sale would be

provided in accordance with the Notice Procedures described herein. In addition, the Debtors

have complied with the Supplemental Case Management Order with respect to the filing of this

Motion and the need for expedited relief.[22] In light of the nature of the relief requested, the

Debtors submit that no other or further notice is necessary.

Memorandum Of Law

72.        Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Selling Debtor Entities respectfully request that the requirement of

the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

New York be deemed satisfied.

WHEREFORE the Selling Debtor Entities respectfully request that this Court

enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii)

approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale

of the Acquired Assets free and clear of liens, claims, and encumbrances to the Buyer or to the

Successful Bidder, (ii) the assumption and/or assignment of the Assigned Contracts to the

Buyer or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the

Buyer or the Successful Bidder, and (c) granting them such other and further relief as is just.

---

[22]    The Debtors have noticed this Motion for the omnibus hearing on January 25, 2008. In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing. The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on January 25, 2008. Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until January 22, 2008 to file an objection to entry of the Bidding Procedures Order.

Dated:     New York, New York
           January 15, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP


By:   /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -


By:   /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession