Hearing Date & Time:  January 17, 2008 at 10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                                              :
     In re                                           :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No. 05-44481 (RDD)
                                                              :
                                                              :    (Jointly Administered)
              Debtors.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -     x

# MEMORANDUM OF LAW (A) IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION AND (B) IN RESPONSE TO OBJECTIONS THERETO

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ..................................................................................1

II.    MATERIALS FILED IN SUPPORT OF THE PLAN ........................................................4

III.    BACKGROUND AND OVERVIEW OF THE PLAN ........................................................5
    A.    General..........................................................................................................5
    B.    Certain Events Preceding The Chapter 11 Filings .........................................6
    C.    Commencement And Prosecution Of The Chapter 11 Cases ..........................8
    D.    Overview Of The Plan ....................................................................................9
    E.    Acceptance Of The Plan ...............................................................................13

IV.    MODIFICATIONS ......................................................................................................17

V.    THE PLAN COMPLIES WITH THE BANKRUPTCY CODE AND SHOULD
    BE CONFIRMED......................................................................................................21
    A.    The Plan Complies With The Applicable Provisions Of Title 11 (Section
        1129(a)(l))..................................................................................................22
        1.    The Plan Properly Designates Classes Of Claims And Interests
            (Section 1122)...............................................................................23
        2.    Mandatory Contents Of The Plan ..................................................24
            (a)    The Plan Provides Equal Treatment Within Classes
                (Section 1123(a)(4))...........................................................25
            (b)    The Plan Provides Adequate Means For Implementation
                (Section 1123(a)(5))...........................................................25
            (c)    The Plan Prohibits The Issuance Of Non-Voting Securities
                (Section 1123(a)(6))...........................................................27
            (d)    The Selection Of Officers And Directors Is Consistent With
                The Interests Of Creditors And Equity Security Holders
                And With Public Policy (Section 1123(a)(7)) ...............................27
        3.    Discretionary Contents Of The Plan (1123(b))...........................................29
            (a)    Settlement Of Certain Claims ..............................................32
            (b)    Executory Contracts And Unexpired Leases .................................34
            (c)    The Offer Or Sale Of Securities Under The Plan Are
                Governed By The Exemption Provided In Section 1145 Of
                The Bankruptcy Code (Section 1123(b)(6)) ...............................35
            (d)    Enforcement Of Subordination Rights (Section 510(a)) ...............35
    B.    The Plan Complies With The Applicable Provisions Of Title 11 (Section
        1129(a)(2))..................................................................................................36
    C.    The Plan Was Proposed In Good Faith (Section 1129(a)(3)) ...............................39

D.  All Payments To Be Made By The Debtors In Connection With These
    Cases Are Subject To The Approval Of The Court (Section 1129(a)(4)) ............42
E.  The Plan Discloses All Required Information Regarding Postconfirmation
    Directors, Management, And Insiders (Section 1129(a)(5)) ................................45
F.  The Plan Does Not Provide For Any Rate Change Subject To Regulatory
    Approval (Section 1129(a)(6)) ........................................................................46
G.  The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7)) ......................46
H.  The Plan Has Been Accepted By The Requisite Classes Of Creditors and
    Interest Holders (Section 1129(a)(8)) ..................................................................52
I.  The Plan Provides For The Payment Of Priority Claims (Section
    1129(a)(9)) ..........................................................................................................54
J.  The Plan Has Been Accepted By At Least One Impaired, Non-Insider
    Class (Section 1129(a)(10)) ................................................................................56
K.  The Plan Is Feasible (Section 1129(a)(11)) ..........................................................57
L.  The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12).........63
M.  Continuation Of Retiree Benefits (Section 1129(a)(13)) ......................................63
N.  The Plan Satisfies The "Cramdown" Requirements ..............................................66
    1.  Unfair Discrimination ..............................................................................67
    2.  The Plan Is Fair And Equitable ................................................................68
        (a)  Absolute Priority Rule ................................................................68
        (b)  No "Premium Payments" ............................................................79
        (c)  The Valuation Is Reasonable ......................................................80

VI.  RESPONSES TO OBJECTIONS ......................................................................82
A.  Bondholder Group ................................................................................................82
    1.  Classification And Treatment ....................................................................83
    2.  MDL Claims ..............................................................................................85
    3.  Substantive Consolidation ........................................................................88
        (a)  The Plan's Substantive Consolidation Is Warranted. ....................88
        (b)  Standards For Substantive Consolidation ....................................90
        (c)  There Is A Substantial Identity, Interrelationship, And
             Entanglement Between And Among The Debtor Groups To
             Be Consolidated ..........................................................................94
        (d)  Delphi-DAS Debtors ....................................................................96
        (e)  DASHI Debtors ............................................................................97
        (f)  Connection Systems Debtors ......................................................97
        (g)  Specialty Electronics Debtors ....................................................98
    4.  Releases ......................................................................................................98
B.  Taxing Authorities ..............................................................................................103
C.  PBGC And FCI ..................................................................................................105
D.  Securities Lead Plaintiffs And ERISA Named Plaintiffs ..................................107
E.  Unions ................................................................................................................109
F.  Miscellaneous Objections ..................................................................................120
    1.  Equistar Chemicals, L.P. ........................................................................120
    2.  Audio MPEG ............................................................................................122

VII.  CONCLUSION ......................................................................................................126

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
     In re                                        :        Chapter 11
                                                          :
DELPHI CORPORATION, <u>et al.</u>,                          :        Case No. 05-44481 (RDD)
                                                          :
                                                          :        (Jointly Administered)
     Debtors.                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  - -  x

### MEMORANDUM OF LAW (A) IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION AND (B) IN RESPONSE TO OBJECTIONS THERETO

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this memorandum of law (the "Memorandum") in support of confirmation of the

First Amended Joint Chapter 11 Plan of Delphi Corporation and Certain Affiliates, Debtors and

Debtors-in-Possession (as it may be amended, supplemented or otherwise modified, the "Plan")[1]

pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as

amended and in effect on October 8, 2005 (the "Bankruptcy Code").  In support thereof, the

Debtors respectfully represent as follows:

I.        PRELIMINARY STATEMENT

The Plan is the culmination of a reorganization strategy that began even before

the Debtors sought chapter 11 relief.  It represents a hard-earned and closely monitored

restructuring effort that was made possible by the cooperative efforts of the Debtors, the

Creditors' Committee and the Equity Committee, Delphi's principal U.S. labor unions, General

---

[1]      Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Plan.

Motors Corporation ("GM"), parties to the MDL Proceedings, prospective plan investors, and their respective advisors, among others.

Since filing these Chapter 11 Cases in October 2005, the Debtors have strived to transform their business in a way that maximizes value for the benefit of all stakeholders. Now, after achieving substantially all their transformation goals, and with nothing more to gain from the chapter 11 reorganization process, the Debtors have proposed a Plan that embodies the products of these efforts and provides for recoveries for all their stakeholders, including equity security holders. The Creditors' Committee and the Equity Committee support the Plan. Indeed, the Plan achieves an outcome in these Chapter 11 Cases that maximizes the value derived from the Debtors' assets and distributes that value to parties-in-interest on a fair and equitable basis, consistent with the statutory priorities contained in the Bankruptcy Code.

As described in Section 3.1 of the Plan, Delphi and its 41 debtor subsidiaries and affiliates have been substantively consolidated into 12 groups for voting and distribution purposes. The overarching concentration of assets and value associated with the Debtors are in Groups 1 and 2. Group 1 consists of Delphi (the parent), DAS (Delphi's principal U.S. operating subsidiary) and a group of DAS subsidiaries. Group 2 consists of DASHI (Delphi's principal holding company for its non-U.S. subsidiaries) and certain DASHI debtor affiliates.

In addition to the unqualified support of both Statutory Committees, the Plan Investors and GM for the Plan, all of the impaired classes in Groups 1 and 2 voted in favor of the Plan. Indeed, Class 1C, which included the claims of the Senior Noteholders, TOPrS, trade claims, and all other general unsecured claims asserted against the Delphi-DAS Debtors, voted overwhelmingly in support of the Plan (i.e, approximately 80% in number and 78% in amount of the ballots cast voted in favor of the Plan). Indeed, even when the Class IC vote is evaluated on

2

an informal "subclass" basis, <u>each</u> of Delphi and DAS and each of the Senior Notes Claims,

TOPrs Claims and all other Class 1C creditors <u>separately</u> approved the Plan.[2]  Moreover, these

voting results would not change even if the Court required all non-conforming and late ballots to

be counted and granted all relief pending before the Court under Bankruptcy Rule 3018.[3]

        Accordingly, many of the objections to confirmation of the Plan have thus been

resolved by the favorable votes of the Debtors' stakeholders.  The remaining objections fail to

acknowledge that the Plan is based on the settlements that make the recoveries provided by the

Plan possible.  The settlements with Delphi's principal U.S. labor unions provided tangible

savings that in part allow the Debtors to emerge from chapter 11 with a cost structure that makes

the Debtors an attractive investment for the Plan Investors and without which the distributions

under the Plan would not be possible.  GM has made very significant concessions and

commitments to the Debtors that are also necessary for Plan distributions, and GM would not

have been willing to so contribute to the successful reorganization of the Debtors without the

distributions to creditors and stockholders and the releases provided under the Plan.  The

contributions of both the Plan Investors and GM were also contingent on the resolution of

litigation risks embodied in the MDL Settlements.  The Plan also constitutes a settlement with

the Creditors' Committee and the Equity Committee, which support the Plan.  In the face of this

---

[2]    Even when the votes allocated to the 42 Debtor entities are evaluated on a deconsolidated basis, 39 of the 42
Debtor entities separately approve the Plan – only ASEC Manufacturing General Partnership and Delphi
Electronics (Holding) LLC in Group 1 and Delphi Diesel Systems Corporation in Group 5 have rejected the
Plan.

[3]    One of the classes in one of the subsidiary Debtors (Delphi Diesel Systems Corp. – Class 6C) rejected the Plan
because less than two-thirds in amount of the ballots cast supported the Plan.  Depending on whether the Court
granted certain of the relief requested in the Bankruptcy Rule 3018 motions pending before it, one additional
class in each of two additional subsidiary Debtors (Connection System Debtors – Class 3C and Delco
Electronics Overseas Corporation – Class 5C) would have rejected the Plan based on a reduction in dollar
amounts voted in favor of the Plan below the two-thirds threshold.  The Debtors have separately filed objections
to the 3018 motions which the Debtors believe are dispositive to the issues claimed by the movants.

complex settlement structure, the support of stakeholders voting on the Plan, and the support of

the Creditors' Committee and the Equity Committee, objections that seek to attack a narrow

aspect of the Plan should be overruled and the Plan should be confirmed.

II.    MATERIALS FILED IN SUPPORT OF THE PLAN

        The Debtors submit this memorandum of law in support of confirmation of the

Plan.  In further support of confirmation, the Debtors have submitted concurrently herewith, and

rely upon, the following additional items, among others:

- the evidentiary declarations of Robert S. Miller (the "Miller Declaration"), Craig G. Naylor (the "Naylor Declaration"), John D. Sheehan (the "Sheehan Declaration"), Dean R. Unrue (the "Unrue Declaration"), Colin E. Wittmer (the "Wittmer Declaration"), David L. Resnick (the "Resnick Declaration"), Randall S. Eisenberg (the "Eisenberg Declaration"), Keith D. Stipp (the "Stipp Declaration"), and Nick Bubnovich (the "Bubnovich Declaration"), and in support of Confirmation of the Plan;

- the declarations of Eric S. Kurtzman of Kurtzman Carson Consultants, LLC (the "Kurtzman Declaration"), the Debtors' solicitation agent and vote tabulation agent for all creditors except holders of Senior Notes, TOPrS, and Existing Common Stock, and the declaration of Jane Sullivan of Financial Balloting Group, LLC (the "Sullivan Declaration"), the Debtors' solicitation agent and vote tabulation agent for the holders of Senior Notes, TOPrS, and Existing Common Stock, that provide a summary of the voting on the Plan (the "Voting Summary Declarations"); and

- Appendices A through F:

  Appendix A – Confirmation Requirements Of The First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors In Possession: The Plan Complies With The Requirements Of Section 1129 Of The Bankruptcy Code

  Appendix B – Chart Of Objections To The Confirmation Of The First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession Organized By Nature Of Objection

  Appendix C – Chart Of Objections To Confirmation of The First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession Organized By Objector

  Appendix D – Amended Opinion And Order Regarding Lead Plaintiffs' Motions For (1) Final Approval Of Settlements, (2) Settlement Class Certification, (3) Final

Approval Of Plans Of Allocation, And (4) Award Of Attorneys' Fees; And Delphi Trust I Interim Counsel's Motion For Attorneys' Fees, dated January 11, 2008

<u>Appendix E</u> – Findings Of Fact, Conclusions Of Law, And Order Under 11 U.S.C. § 1129(a) And (b) And Fed. R. Bankr. P. 3020 Confirming First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (attached thereto is a revised version of the Plan, marked to show proposed, non-material changes to the version of the Plan that was distributed to creditors entitled to vote on the Plan).

Each of the foregoing declarants will be available at the Confirmation Hearing to answer questions that the Court or other parties-in-interest may have. In further support of the Plan, the Debtors will introduce into evidence a number of documents as identified on a witness and exhibit list distributed at the meet and confer conducted on January 14, 2008 in accordance with the applicable scheduling order.

III.    BACKGROUND AND OVERVIEW OF THE PLAN

A.    <u>General</u>

Delphi is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines. It is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Technology developed and products manufactured by Delphi make Delphi a leader in making cars and trucks smarter, safer, and better. At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.

The Company supplies products to nearly every major global automotive original equipment manufacturer, and in 2006, sales to several of the major global original equipment manufacturers ("OEMs"), including GM, Ford Motor Company, DaimlerChrysler Corporation, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company, each exceeded $750 million. The revenue share for 2006 and the first six months of 2007 for customers other than GM –

Delphi's former parent and largest customer – were 56% and 59%, respectively.  Delphi and its subsidiaries and affiliates as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.

Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

Since its separation from GM in 1999, Delphi has sought to diversify its customer base by taking advantage of its technological and manufacturing core competencies.  Delphi has entered and continues to pursue additional opportunities in adjacent markets such as communications (including telematics), computer components, automotive aftermarket, consumer electronics, energy, and the medical devices industry, though sales from such adjacent markets do not materially impact Delphi's revenues or operating income.

B.    Certain Events Preceding The Chapter 11 Filings

In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income in the aggregate.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004,

the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  In 2006 the Debtors incurred a net loss

of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special

attrition programs.

        The Debtors believe that the Company's financial performance deteriorated

because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions

preventing the Debtors from exiting non-profitable, non-core operations, all of which have the

effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

        In light of these factors, Delphi determined that it would be imprudent and

irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues, and forward looking revenue requirements.  Delphi was aware that to settle

these issues, it would be imperative to reach agreements with its Unions and GM.  Accordingly,

in the six-month period before the Petition Date, Delphi intensified its efforts to engage its

Unions and GM in discussions seeking consensual modifications to the collective bargaining

agreements that would permit Delphi to align its U.S. operations to its strategic portfolio and be

competitive with its U.S. peers.  In addition, Delphi sought to obtain financial support from GM

to implement Delphi's restructuring plan.  Despite significant efforts during 2005 to reach a

---

[4]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million

resolution with these parties, Delphi determined that the discussions with the Unions and GM

were not leading to the implementation of a plan sufficient to address these critical issues on a

reasonable timetable.  Thus, to preserve value for all stakeholders, the Company decided to

commence the Chapter 11 Cases for its U.S. businesses to complete its transformation plan.[5]

      C.      <u>Commencement And Prosecution Of The Chapter 11 Cases</u>

      On October 8 and 14, 2005, the Debtors commenced the Chapter 11 Cases.

Since then, the Debtors have been focused on identifying and resolving certain key issues so that

they can successfully emerge from chapter 11 and return to profitability.  On March 31, 2006,

the Debtors outlined the following five key areas of their transformation plan (the

"Transformation Plan") that the Company believed would enable it to return to stable, profitable

business operations: first, modifying the Company's labor agreements to create a competitive

arena in which to conduct business; second, concluding their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company;  third, streamlining their product portfolio to capitalize on their

world-class technology and market strengths and make the necessary manufacturing alignment

with their new focus;  fourth, transforming their salaried workforce to ensure that the Company's

organizational and cost structure is competitive and aligned with its product portfolio and

manufacturing footprint; and fifth, devising a workable solution to their pension situation.  Much

of the effort throughout these Chapter 11 Cases has been focused on meeting the goals outlined

in the Transformation Plan.

---

[5]    Delphi's non-U.S. subsidiaries are not chapter 11 debtors, and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of Delphi's foreign subsidiaries commenced any reorganization, bankruptcy, or insolvency cases.

Delphi has made significant progress in achieving the objectives of its

Transformation Plan and is now poised to emerge from chapter 11.  First, Delphi has negotiated

amended collective bargaining agreements with its U.S. Unions that should make Delphi more

competitive in its U.S. operations.  Second, Delphi has entered into comprehensive settlement

and restructuring agreements with GM, a key objective in these Chapter 11 Cases.  Third, with

respect to its product portfolio and manufacturing facility realignment, Delphi has made

substantial progress in identifying and beginning to divest or wind down those facilities and

business lines that are not within Delphi's future plans.  Fourth, Delphi is implementing

important cost savings in its organizational cost structure and rationalization of its salaried

workforce to competitive levels that will allow it to emerge from chapter 11 much leaner and in a

better competitive position.  Fifth, Delphi has received favorable pension funding waivers from

the IRS and received additional waivers related to freezing its pension plans which, combined

with the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l) and

Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.

§§ 1001-1461 ("ERISA"), and adequate debt financing and equity infusions, will allow Delphi to

fund its pension plans upon emergence from chapter 11.  As a result of its progress in achieving

the goals of its Transformation Plan, Delphi has been able to formulate a business plan going

forward that will allow it to return to profitability.

     D.    Overview Of The Plan

The Plan is the culmination of Delphi's Transformation Plan within the chapter 11

context.  Delphi has determined that it has achieved those aspects of its Transformation Plan for

which the chapter 11 reorganization process was necessary and that it is now time to emerge

from chapter 11 to capture the value that was created through the Transformation Plan's

implementation.  (See Tr. of Dec. 7, 2003 Hr'g 16:2-7.)  The Plan incorporates and is premised

9

on the settlements that Delphi reached with critical stakeholders in these reorganization cases.

(See Tr. of Dec. 7, 2003 Hr'g 131:19-21.)  The Debtors, all of the Debtors' principal U.S. labor

unions, GM, and the lead plaintiffs in certain securities actions (on behalf of holders of various

claims based on alleged violations of federal securities law and ERISA) are all parties to

settlements with the Debtors which, together with the Investment Agreement, allow for various

recoveries to be provided to general unsecured creditors and stockholders under the Plan.

In particular, the Debtors' settlement with GM, which is essential to the Plan,

provides significant consideration to Delphi, and this consideration allows Delphi to provide

distributions to other stakeholders that would be impossible to deliver without the settlement.

Recoveries under the Plan, which are premised upon and in substantial part are derived from the

GM settlement, consist of distributions of equity in Reorganized Delphi, rights to purchase

equity in Reorganized Delphi, and warrants to purchase equity in Reorganized Delphi.

The Plan, which is supported by GM, the Plan Investors, and the Statutory

Committees, provides distributions to all of Delphi's stakeholders.  Specifically, holders of

General Unsecured Claims (with the exception of the TOPrS, as discussed below), including

holders of claims based on the Debtors' debt securities and trade claims, will receive 100% of the

amount of their claims (and applicable postpetition interest through the earlier of January 31,

2008 and the Confirmation Date) at Plan Equity Value (as explained below) through a

distribution of New Common Stock of Reorganized Delphi and transferable subscription rights

to participate in a discount rights offering to acquire shares of New Common Stock.  The holders

of General Unsecured Claims (other than holders of TOPrS, as discussed below) will receive

distributions equal to the allowed amount of their claims plus interest accrued during the

pendency of the Chapter 11 Cases.  The recovery for holders of General Unsecured Claims will

amount, in the aggregate, to the principal amount of such holders' claims plus accrued postpetition interest at the negotiated Plan Equity Value, i.e., "par plus accrued recovery at Plan Equity Value."

The Plan provides that all general unsecured creditors, including holders of subordinated notes issued in connection with trust preferred securities issued in 2003 by Delphi Trust I and Delphi Trust II (the "TOPrS"), will receive New Common Stock and Discount Rights. The Plan provides in essence that all unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest. Thus, holders of TOPrS claims will receive a distribution equal to $379 million at Plan Equity Value, which amounts to a 90% recovery of principal and accrued prepetition interest on such TOPrS claims. Under the Plan, holders of General Unsecured Claims would not be permitted to recover from the distributions to holders of TOPrS any portion of their claim that might remain unpaid even if the value of distributions to holders of General Unsecured Claims is later determined to be less than Plan Equity Value. Because the Plan pays senior debt in full and the holders of TOPrS receive the residual distributions available after payment of senior claims, the distributions under the Plan satisfy the subordination provisions of the subordinated notes and accordingly those provisions need not continue in effect after the distributions provided for under the Plan.

Under the terms of the Plan and the settlement agreement between the Debtors and GM, GM will receive approximately $2.573 billion in consideration. GM will also receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock. In partial exchange for the consideration distributed to GM

11

under the Plan, GM will provide Delphi with labor subsidies, certain ongoing, post-bankruptcy revenue commitments, and other consideration. GM's contributions to Delphi's Plan, and the settlement of GM's claims against the Debtors, constitute a substantial source of funds that allows distributions to be made to the Debtors' other stakeholders. Without the GM settlement, those distributions could not be made.

Subject to the approval of settlements by the Court and the District Court presiding over the matter, and under the terms of the Plan, certain lead plaintiffs in a multi-district securities class action litigation will receive, on behalf of themselves and the class they represent, shares of New Common Stock of Reorganized Delphi and transferable subscription rights to participate in the discount rights offering in the same proportion as Plan distributions to general unsecured creditors. The resolution of this litigation is critical to the Debtors' reorganization because it will eliminate the significant risks and costs associated with litigating complex actions under federal securities laws and ERISA and related derivative actions in which the plaintiffs have alleged damages in excess of $1 billion.

In addition, holders of existing Delphi common stock will have the opportunity to receive a direct distribution of New Common Stock, a distribution of non-transferable subscription rights to purchase shares of New Common Stock of Reorganized Delphi through a par value rights offering, and freely transferable warrants to purchase shares of New Common Stock of Reorganized Delphi that are exercisable for six months, seven years, and ten years following the Debtors' emergence from chapter 11.

The Plan Investors have agreed to make a substantial investment in the Reorganized Debtors in furtherance of the Debtors' Transformation Plan and the Plan. This investment will be made pursuant under the terms of the Investment Agreement, as amended.

12

Under the Investment Agreement, as amended, the Plan Investors have agreed to invest up to $2.55 billion through the purchase of New Preferred Stock in Reorganized Delphi for $800 million, New Common Stock in Reorganized Delphi for $175 million, and any shares of New Common Stock in Reorganized Delphi that are not subscribed for in the Discount Rights Offering (up to $1.575 billion).

Finally, the Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' estates for purposes of voting and distribution with respect to the Plan. The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common funds. The Debtors in four consolidated groups will be substantively consolidated with each other but not with any other Debtor. Eight of the 42 Debtors will not be substantively consolidated with any other Debtor.

As set forth below, the Debtors believe that, as set forth in the Liquidation Analysis (see Disclosure Statement Appendix E), whether based on a substantive consolidation of all of the Debtors or based on the Debtors' proposed partially-consolidated substantive consolidation groups, the Plan satisfies the "best interests" test.

E.    Acceptance Of The Plan

Creditors voted overwhelmingly in favor of the Plan. In particular, approximately 3,400 creditors holding total claims of more than $5.1 billion cast ballots accepting the Plan.

All Classes for which the Debtors received votes on the Plan voted to accept it, with the exception of Class 6C (General Unsecured Claims - Delphi Diesel Systems Corp.), as set forth below:

| Class Name | Class Description | | | % Of Ballots Voting To Accept | % Of Amount Voting To Accept | Result | Treatment |
|---|---|---|---|---|---|---|---|
| 1A-12A | Secured Claims | | | N/A | N/A | Deemed ACCEPT | Unimpaired |
| 1B-12B | Flow-Through Claims | | | N/A | N/A | Deemed ACCEPT | Unimpaired |
| 1C | Delphi-DAS Debtors (Total) | | | 80.34% | 78.03% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of Allowed General Unsecured Claims (holders of TOPrS Claims receive such consideration equal to 90% of their Allowed General Unsecured Claim, without Postpetition Interest) |
| | breakdown | Delphi Corp. | Senior Notes | 73.82% | 70.78% | Accept | |
| | | | TOPrS | 85.14% | 96.42% | Accept | |
| | | | All Other Delphi Corp. Creditors | | | | |
| | | All Other Class 1C | | 80.72% | 87.84% | Accept | |
| 2C | DASHI Debtors | | | 100.00% | 100.00% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 3C | Connection System Debtors | | | 91.00% | 83.64% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 4C | Specialty Electronics Debtors | | | 100.00% | 100.00% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 5C | Delco Electronics Overseas Corporation | | | 80.00% | 72.28%[6] | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 6C | Delphi Diesel Systems Corp. | | | 91.23% | 48.40% | REJECT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 7C | Delphi Furukawa Wiring Systems LLC | | | 100.00% | 100.00% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 8C | Delphi Mechatronic Systems, Inc. | | | 84.68% | 89.72% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |

---

[6]    A motion under Bankruptcy Rule 3018 (a "Rule 3018 Motion") with respect to this Class is pending.  The outcome of that motion could affect whether this Class has accepted the Plan.

| Class Name | Class Description | % Of Ballots Voting To Accept | % Of Amount Voting To Accept | Result | Treatment |
|---|---|---|---|---|---|
| 9C | Delphi Medical Systems Corporation | 0.00% | 0.00% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 10C | Delphi Medical Systems Colorado Corporation | 83.06% | 81.36% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 11C | Delphi Medical Systems Texas Corporation | 91.43% | 98.95% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 12C | MobileAria, Inc. | 80.00% | 99.83% | ACCEPT | New Common Stock and Discount Rights equal to 100% of the Face Amount of their Allowed General Unsecured Claims |
| 1D - 12D | GM Claims | 100.00% | 100.00% | ACCEPT | Consideration set forth in the Delphi-GM Definitive Documents |
| E | 510(b) Note Claims | 100.00% | 100.00% | ACCEPT | New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement through the Securities Settlement disbursing agent |
| 1F-12F | Intercompany Claims | N/A | N/A | Deemed ACCEPT | Claims either reinstated or cancelled and discharged |
| G-1 | Existing Common Stock | N/A | 78.15% | ACCEPT | New Common Stock, Par Value Rights, Seven-Year Warrants, Six-Month Warrants, and Ten-Year Warrants |
| G-2 | 510(b) Equity Claims | 100.00% | 100.00% | ACCEPT | New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the Securities Settlement through the Securities Settlement disbursing agent |
| 1H | 510(b) ERISA Claims | 100.00% | 100.00% | ACCEPT | New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement through the ERISA Settlement disbursing agent |
| 8H | 510(b) ERISA Claims | 100.00% | 100.00% | ACCEPT | New Common Stock, Discount Rights, and/or Oversubscription Cash as described in the ERISA Settlement through the ERISA Settlement disbursing agent |
| 1J-12J | Interests in the Affiliate Debtors | N/A | N/A | Deemed ACCEPT | Unimpaired |
| 1I | Other Interests | N/A | N/A | Deemed REJECT | No receipt or retention of any property on account of such Other Interests |

Moreover, despite total proofs of claim and scheduled liabilities aggregating approximately $37 billion, and more than 665,000 creditors and potential claimants, only 43 objections to confirmation of the Plan were filed.[7]  As plainly evidenced by the Plan formulation process, the Statutory Committees' support of the Plan, the Plan voting results, and the lack of significant objections to the Plan, the Plan is in the best interests of the Debtors' estates, creditors, and other stakeholders.  Notwithstanding that there are only a few objections to the Plan, which the Debtors believe are without merit, the Debtors recognize their obligation under the Bankruptcy Code to demonstrate by a preponderance of evidence that the Plan satisfies all requirements of section 1129 of the Bankruptcy Code.

Accordingly, the Debtors submit this memorandum of law to demonstrate how the Plan satisfies all applicable requirements of the Bankruptcy Code.  The Debtors also submit a chart, attached hereto as Appendix A, outlining the Debtors' compliance with section 1129, whether each aspect of such compliance is contested, and certain evidence submitted in support of the Debtors' compliance.  To assist the Court in evaluating objections to the Plan, the Debtors have attached as Appendix B hereto a chart that summarizes all of the objections by category of issue raised.  The Debtors also have attached as Appendix C hereto a chart listing the identity of each objecting party, the general nature of each objection, the Debtors' response to the objection, the substance of any modification made to the Plan, and the terms of the proposed Confirmation Order to address that objection.  In sum, as explained herein and in those charts, the Plan can and should be confirmed.

---

[7]    Of the 43 objections, only 36 were timely filed.

IV.    MODIFICATIONS

            The Debtors intend to make certain non-material modifications to the Plan,

including (a) clarifications to the Plan; (b) corrections to correct clerical errors contained within

the Plan; and (c) modifications intended to address Plan objections.

            Section 1127(a) of the Bankruptcy Code provides:

> The proponent of a plan may modify such plan at any time
> before confirmation, but may not modify such plan so that such
> plan as modified fails to meet the requirements of sections 1122
> and 1123 of this title.  After the proponent of a plan files a
> modification of such plan with the court, the plan as modified
> becomes the plan.

Section 1127(d) provides:

> Any holder of a claim or interest that has accepted or rejected
> a plan is deemed to have accepted or rejected, as the case may
> be, such plan as modified, unless, within the time fixed by the
> court, such holder changes such holder's previous acceptance
> or rejection.

The Bankruptcy Rule designed to implement section 1127(d), in turn, provides in relevant part

that:

> In a . . . chapter 11 case, after a plan has been accepted and before
> its confirmation, the proponent may file a modification of the plan.
> If the court finds after hearing on notice to the trustee, any
> committee appointed under the Code, and any other entity
> designated by the court that the proposed modification does not
> adversely change the treatment of the claim of any creditor or the
> interest of any equity security holder who has not accepted in writing
> the modification, it shall be deemed accepted by all creditors and
> equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.

            Because creditors have notice of the confirmation hearing, and will have an

opportunity to object to any proposed modifications at that time, the requirements of section

1127(d) of the Bankruptcy Code have been met.  Cf. Citicorp Acceptance Co. v. Ruti-

17

Sweetwater (In re Sweetwater), 57 B.R. 354, 358 (D. Utah 1985) (creditors who had knowledge of pending confirmation hearing, when debtor's Rule 3019 motion was to be heard, had sufficient opportunity to raise objections to modification of plan).

Section 1127 of the Bankruptcy Code gives a plan proponent the right to modify the plan "at any time" before confirmation.  This right would be meaningless if the promulgation of all plan modifications – ministerial or substantive, adverse to certain claimants or not – necessitated a resolicitation of votes.

Accordingly, in keeping with traditional bankruptcy practice,[14] courts have typically allowed the proponent to make non-material changes to a plan without any special procedures or vote resolicitation.  See, e.g., In re American Solar King Corp., 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("if a modification does not 'materially' impact a claimant's treatment, the change is not adverse") (citation omitted); In re Mount Vernon Plaza Community Urban Redevelopment Corp., 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted plan as modified because "[n]one of the changes negatively affects the repayment of creditors, the length of the plan, or the protected property interests of parties in interest").

The proposed modifications to the Plan are as follows:[8]

### 1.3    Administrative Claims Bar Date

"Administrative Claims Bar Date" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to Professional Claims, which shall be subject to the provisions of Article 10.4 10.3 hereof, and except with respect to Investment Agreement Claims, which shall be subject to the provisions of Article 10.2 hereof.

---

[14]    For example, it is customary for plan proponents to submit plan modifications immediately before or even during confirmation hearings.

[8]    Additions are indicated with double underlining; deletions are indicated with a strike-through.

## 2.1    Administrative Claims

Subject to the provisions of Article X of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim shall have agreed upon in writing; provided, however, that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, DIP Facility Second Priority Term Claim, and the Investment Agreement Claims shall be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, DIP Facility Second Priority Term Claim, and the Investment Agreement Claims shall have agreed upon in writing or as determined by the Bankruptcy Court, which Claims shall be paid in accordance with Article X of this Plan, and (y) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or and Allowed Administrative Claims arising under contracts assumed during the Chapter 11 Cases prior to the Effective Date shall be deemed Allowed Administrative Claims and paid by the Debtors or the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided that (i) any cure payments associated with the assumed contracts shall be paid in accordance with Sections 2.1(a) or 2.1(b), except as otherwise provided in Article VIII, and (ii) the contracts shall not have been rejected pursuant to Section 8.1(a) of the Plan.  Holders of Administrative Claims shall not be entitled to Postpetition Interest unless the documents governing such Administrative Claims explicitly so provide.

## 5.3    Class 1C through Class 12C (General Unsecured Claims).

(a)    Except as otherwise provided in and subject to Articles 7.15(b), 9.8, and 11.10 of this Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, and after giving effect to Article 11.10 of this Plan, each holder of an Allowed General Unsecured Claim shall receive the number of shares of New Common Stock (at Plan Equity Value) equal to 77.378.4% of the Face Amount of such Claim; provided, however, that in each case fractional shares of New Common Stock shall not be distributed to holders of Allowed General Unsecured Claims, and all such fractional shares shall be rounded, and distributions shall be made, in accordance with Article 9.10 of this Plan.  The Plan Equity Value is equal to the Debtors' total enterprise value of $13.312.8 billion, less net debt and warrant value of approximately $5.54.8 billion, which results in a distributable equity value of $7.88.0 billion, or $59.61 per share of New Common Stock based on 131,266,407134,345,642 shares issued and outstanding (assuming full conversion of the New Preferred Stock) as of the Effective Date (the "Plan Equity Value").

19

### 7.14    Exit Financing

On the Effective Date, the Reorganized Debtors shall receive the proceeds of the Exit Financing Arrangements, in the aggregate mount necessary to implement the Plan within the terms and conditions previously approved by the Bankruptcy Court as which include an asset-backed revolving credit facility in an aggregate principal amount of $1.6 billion, a funded senior secured first lien term facility in an aggregate principal amount of $3.7 billion, and a funded senior secured second lien term facility in amount of $1.5 billion, of which up to $750 million will be in the form of the GM Note(s), the terms of which are described in the exit financing engagement letter and term sheet attached hereto as Exhibit 7.14, as such term sheet may be amended, modified, or supplemented, to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations.  The Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Exit Financing Arrangements.

### 7.21    Collective Bargaining Agreements.

(a)    UAW.  Pursuant to this Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, a copy of which is attached hereto as Exhibit 7.21(a), on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, a copy of which is attached hereto as Exhibit 1 to the UAW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding and Exhibit 2 to the UAW 1113/1114 Settlement Approval Order shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

### 12.3    Waiver Of Conditions To Confirmation Or Consummation.

12.3    Waiver Of Conditions To Confirmation Or Consummation.  The conditions set forth in Articles 12.1(a), 12.2(c), and 12.2(e) of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing; provided, however that in connection with the satisfaction or waiver of the condition set forth in Article 12.2(e) of this Plan, no material modification of the Investment Agreement, the Delphi-GM Definitive Documents, and the exhibits to each such agreements (except exhibits B and C to the Investment Agreement) that have a material adverse effect on the recoveries of unsecured creditors or existing equity holders may be made without the consent of the Creditors' Committee or the Equity Committee, as the case may be, and the respective non-Debtor counterparty to the agreement.  The condition set forth in Article 12.2(d) may be waived by the Debtors, provided that if any of Appaloosa, GM, or the Statutory Committees, object to such waiver, the waiver shall not become effective unless the Bankruptcy Court determines the effectiveness of such waiver (provided that such parties shall have waived their right to object to such waiver if the objection is not received within two business days from the time of the receipt of the written notice from the Debtors of such waiver of Article 12.2(d)). Article 12.2(i) of this Plan may be waived jointly by the Debtors and Appaloosa (as lead Plan Investor), provided, however that no waiver of Article 12.2(i) of this Plan shall be effective unless notice is first given to the Creditors' Committee; provided further, however, that such

waiver shall be effective upon the earlier of (i) the Creditors' Committee's consent and (ii) 12:00 noon New York time on the third Business Day after the notice is given to the Creditors' Committee unless the Creditors' Committee has provided written notice pursuant to Article 14.8 of this Plan that the Creditors' Committee has voted affirmatively to object to the effectiveness of the waiver solely on the basis that the recoveries of unsecured creditors would be materially adversely affected if the waiver were implemented (and in such case the waiver shall not become effective unless the Bankruptcy Court thereafter determines that the effectiveness of the waiver would not materially adversely affect unsecured creditors' recoveries).  No other condition set forth in Articles 12.1 and 12.2 of this Plan may be waived.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

### Plan Exhibit 7.8

After consultation with the Creditors' Committee, Delphi's compensation committee determined to:

(a)    reduce the aggregate long-term incentive opportunity awarded at emergence, on an annualized basis, for all DSB Members and executives in Bands A through F from approximately $68 million (as disclosed on page 2 of the Supplement to Management Compensation Plan filed on December 28, 2007) to approximately $58 million and

(b)    revise the payment schedule for the aggregate Chapter 11 Effective Date Executive Payments (which are approximately $87 million in the aggregate) such that while the entire $87 million is vested as of the Effective Date, one-half of the awards (or approximately $43.5 million) will be deferred and paid on the first anniversary of the Effective Date of the Plan. An executive would forfeit the vested deferred payment only if the executive voluntarily terminated their employment prior to the anniversary date without the Company's agreement; in all other situations, the deferred payment would be paid at the time of the executive's departure.

As a result of these determinations, the aggregate long-term incentive opportunities for the full 18 month award period have been reduced by an additional $15 million from an aggregate of approximately $102 million to $87 million.

Because none of the aforementioned changes materially affects the treatment of any holders of

Claims or Interests, the Debtors respectfully request that the modifications be approved.


V.    THE PLAN COMPLIES WITH THE BANKRUPTCY CODE AND SHOULD BE
        CONFIRMED

To confirm the Plan, the Court must find that both the Plan and the Debtors are in

compliance with each of the requirements of section 1129(a) of the Bankruptcy Code.  See

Grogan v. Garner, 498 U.S. 279, 291 (1991); Kane v. Johns-Manville Corp., 843 F.2d 636, 648

(2d Cir. 1988); In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) ("[T]he

final burden of proof at . . . confirmation hearings remains a preponderance of the evidence."); In

re Cellular Info. Sys., Inc., 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) ("I find the Fifth Circuit's

analysis [in Briscoe Enterprises, Ltd., II] persuasive and conclude that a plan proponent must

demonstrate that its plan satisfies section 1129(b) by a preponderance of the evidence."); see also

Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II, (In re Briscoe Enters., Ltd., II),

994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's

appropriate standard of proof both under § 1129(a) and in a cramdown.").  As set forth below,

both the Plan and the Debtors meet all of the requirements of section 1129(a) of the Bankruptcy

Code.  Accordingly, the Plan should be confirmed.

      A.     The Plan Complies With The Applicable Provisions Of Title 11 (Section
                1129(a)(l))

        Section 1129(a)(1) requires that a plan comply with the "applicable provisions" of

the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1)

explains that this provision encompasses the requirements of sections 1122 and 1123 of the

Bankruptcy Code, which govern classification of claims and interests and the contents of the

plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), as reprinted in 1978 U.S.C.C.A.N.

5787, 5912;  H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368;

see also In re Johns-Manville Corp., 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (noting that

confirmation objections under section 1129(a)(1) usually involve failure of plan to conform to

either section 1122(a) or 1123 of Bankruptcy Code), aff'd sub nom. Kane v. Johns-Manville

Corp., 843 F.2d 636 (2d Cir. 1988); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149

(Bankr. S.D.N.Y. 1984).

1.      The Plan Properly Designates Classes Of Claims And Interests (Section 1122)

Section 1122 of the Bankruptcy Code provides:

(a)     Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)     A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

Under section 1122(a) of the Bankruptcy Code, the relevant inquiry is whether all claims of a class have substantially similar rights to a portion of each debtor's estate. A plan proponent is afforded significant flexibility in classifying claims under section 1122(a) provided there is a reasonable basis for the classification scheme. See, e.g., Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); In re Piece Goods Shops Co., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) ("Plan proponents are to be given considerable discretion in classifying claims according to the facts and circumstances of their cases.") (citing In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990)).

The Plan meets the requirements of section 1122 of the Bankruptcy Code. The Plan classification of claims conforms to the statute and separately classifies Claims based on reasonable legal and business justifications. The Plan provides for separate grouping and classification for Claims and Interests for each Debtor based upon differences in the legal nature and priority of such Claims and Interests. As previously described, General Unsecured Claims, which include claims arising as a result of trade claims (other than GM's claims), claims arising

23

from Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims, are classified together under the Plan.

Despite the foregoing, certain objectors to the Plan argue that the Plan cannot be confirmed because the TOPrS should not be classified with other general unsecured claims. These objections should be overruled for the reasons set forth below in Part V of this memorandum, "Responses To Objections."

2.    <u>Mandatory Contents Of The Plan</u>

Section 1123(a) of the Bankruptcy Code identifies eight requirements for the contents of a plan of reorganization.[9]  Specifically, this section requires that a plan: (i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide for equality of treatment within each class; (v) provide adequate means for the plan's implementation; (vi) provide for the prohibition of non-voting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  <u>See</u> 11 U.S.C. § 1123(a).

The Plan fully complies with each requirement of section 1123(a).  As previously noted with respect to the Plan's compliance with section 1122, Article III of the Plan designates Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code, and Article IV of the Plan specifies the Classes of Claims and Interests that are not impaired under

---

[9]    This Memorandum will not address sections 1123(a)(8) or 1129(a)(16) of the Bankruptcy Code.  Section 1123(a)(8) applies only in cases in which the debtor is an individual and, therefore, is not applicable in these Chapter 11 Cases.  Likewise, section 1129(a)(16) does not apply because each of the Debtors is a moneyed business or commercial corporation or limited liability company.

the Plan, as required by section 1123(a)(2) of the Bankruptcy Code. Article IV of the Plan

specifies the treatment of each Class of Claims and Interests that is impaired in accordance with

section 1123(a)(3) of the Bankruptcy Code. As set forth below, the Plan also complies with

sections 1123(a)(4)-(7) of the Bankruptcy Code.

(a)    The Plan Provides Equal Treatment Within Classes
       (Section 1123(a)(4))

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the

same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment of such particular claim or interest." 11

U.S.C. § 1123(a)(4). The Plan provides that all members of each class under the Plan will

receive the same treatment afforded all other members of the class.

Contrary to the objections of a small handful of creditors, the Plan's proposed

treatment of the subordinated TOPrS and other general unsecured claims in Class 1C is

consistent with section 1123(a)(4) of the Bankruptcy Code. Those objections should be

overruled for the reasons set forth in Part V of this memorandum, "Responses To Objections."

(b)    The Plan Provides Adequate Means For
       Implementation (Section 1123(a)(5))

Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide

"adequate means" for its implementation. 11 U.S.C. § 1123(a)(5). The Plan meets this

requirement. Article VII of the Plan, entitled "Means for Implementation of the Plan," sets forth

numerous provisions to facilitate implementation of the Plan. Such provisions relate to, among

other things, (a) the continued corporate existence of each of the Debtors subject to the

Restructuring Transactions; (b) the execution and delivery of the corporate documents that will

govern the Debtors, including but not limited to the Certificate of Incorporation of Reorganized

Delphi and Bylaws of Reorganized Delphi; (c) the method for choosing the Board of Directors of

25

Reorganized Delphi; (d) the designation of officers of Reorganized Delphi and directors and

officers of the Affiliate Debtors; (e) the entry into the Management Compensation Plan; (f) the

procedures for asserting SERP claims; (g) the cancellation of Existing Securities; (h) the

consummation of the Investment Agreement; (i) the establishment of the Cash Reserve in such

amounts as the Debtors determine are necessary to make the required future payments to

Administrative Claims, Priority Tax Claims, and as otherwise provided by the Plan; (j) the

implementation of the Rights Offering; (k) the issuance of the New Common Stock, the New

Preferred Stock, and the New Warrants; (l) the consummation of the MDL Settlements, the GM

settlement, and the Union Settlement Agreements; and (m) the substantive consolidation of

certain of the Debtors for voting and distribution purposes.  See also Plan at Article VIII

(Treatment Of Unexpired Leases And Executive Contracts) and Article IX (Provisions

Governing Distributions).

       Moreover, the Plan contemplates that as a condition precedent to emergence,

Delphi will enter into the Exit Financing Arrangements within the authority granted by to the

Debtors by this Court's Exit Financing Arrangements order (Docket No. 10960).  On July 9

and 10, 2008, the Debtors formally launched the exit financing in New York, and London, and

presently expect to complete the syndication and drafting of the Exit Financing Arrangements in

early February.  The Exit Financing Arrangements will include a $1.6 billion in an asset-backed

revolving credit facility, $3.7 billion in a first-lien term loan facility, and up to $825 million in a

second-lien term loan facility.  These Exit Financing Arrangements will together provide the

Debtors with sufficient funds to repay the DIP Facility Revolver Claims, the DIP Facility First

Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments

required to be made on the Effective Date, and conduct the Debtors' post-reorganization

operations.  See Resnick Declaration ¶ 9.  The Plan accordingly contains adequate means for its

implementation.

(c)    The Plan Prohibits The Issuance Of Non-Voting
Securities (Section 1123(a)(6))

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

constituent documents prohibit the issuance of nonvoting equity securities.  In accordance with

this requirement, Article 7.4 of the Plan provides that the corporate governance documents of

Reorganized Debtors, among other things, will be restated to prohibit the issuance of non-voting

equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  The form

of the restated corporate governance documents, which are attached as Exhibits 7.4(a) and (b) to

the Plan, include a provision prohibiting the issuance of non-voting equity securities.  See

Exhibit 7.4(a) to Plan (Certificate Of Incorporation), Article 4.1; Exhibit 7.4(b) to Plan (Bylaws),

Article 6.1.

(d)    The Selection Of Officers And Directors Is
Consistent With The Interests Of Creditors And
Equity Security Holders And With Public Policy
(Section 1123(a)(7))

Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions

with respect to the manner of selection of any director, officer, or trustee, or any successor

thereto, be "consistent with the interests of creditors and equity security holders and with public

policy."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the

Bankruptcy Code, which directs courts to examine the methods by which the management of the

reorganized corporation is to be chosen to provide adequate representation of those whose

investments are involved in the reorganization – i.e., creditors and equity holders.  See 7 Collier,

Bankruptcy ¶ 1123.01[7] (15th rev. ed. 2007).

27

The Plan complies with section 1123(a)(7) by properly and adequately disclosing or otherwise identifying the procedures for determining the identities and affiliations of all individuals or entities proposed to serve on or after the Effective Date as officers and directors of Reorganized Delphi in Articles 7.5 and 7.6 of the Plan.  Specifically, the Plan provides that the existing senior officers of the Debtors will serve in their current capacities after the Effective Date.  A five-member search committee (the "Search Committee")[10] will select the members of the initial Board of Directors of Reorganized Delphi (the "Reorganized Board of Directors"). The Reorganized Board of Directors will consist of nine directors and will initially include the following: (i) three directors nominated by Appaloosa and elected by the Series A Preferred Shareholders (Class III Directors); (ii) an Executive Chairman (Class I Director); (iii) a Chief Executive Officer (the initial Chief Executive Officer will be Rodney O'Neal) (Class I Director); (iv) one director selected by the representative of the Plan Investors on the Search Committee, with such director being approved by either the Company or the Creditors' Committee (Class II Director); (v) one director selected by the Creditors' Committee (Class I Director); and (vi) two additional directors selected by the Creditors' Committee and the Joint Investor Director (Class II Directors).

The initial term of the three classes of directors with respect to the Reorganized Board of Directors will expire for the Class I Directors at the annual shareholder meeting in 2009, for the Class II Directors at the annual shareholder meeting in 2010, and for Class III Directors at the annual shareholder meeting in 2011.  After the expiration of the respective initial terms, each director may be reelected for a one-year term.

---

[10]    The members of the Search Committee will consist of one representative from each of Delphi, Appaloosa, the Creditors' Committee, the Plan Investors, and the Equity Committee.  Heidrick & Struggles International, Inc. will assist the Search Committee in selecting initial directors and the executive chairman for the Reorganized Board of Directors.

In addition, Article 7.7 of the Plan provides that the existing directors and officers of the Affiliate Debtors will continue to serve in their current capacities after the Effective Date, provided that Reorganized Delphi reserves the right to identify new officers and members of the boards of directors or similar governing bodies of the Reorganized Debtors.

The method for choosing the Reorganized Board of Directors embodied in the Plan is the result of a negotiated agreement among various key constituencies which was approved by this Court in the order approving the Delphi-Appaloosa EPCA (Docket No. 8856) and the Investment Agreement Order (Docket No. 11382). As a result of this negotiated agreement, the interests of numerous parties are adequately represented by the Reorganized Board of Directors. Moreover, the selection process has been designed to ensure that the boards of directors will be both independent and highly qualified. Accordingly, the Plan provisions satisfy the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3.    Discretionary Contents Of The Plan (1123(b))

Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization. For example, a plan may "impair or leave unimpaired any class of claims [or] interests" and provide for the assumption or rejection of executory contracts and unexpired leases. 11 U.S.C. § 1123(b)(1) and (2). A plan also may provide for: (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate," (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any claim or interest," and (c) "the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(3)(A)-(B), 1124(b)(4). Finally, a plan may "modify the rights of holders of secured claims or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims," and may "include any other appropriate

29

provision not inconsistent with the applicable provisions of [title 11]."  11 U.S.C. § 1123(b)(5)-(6).

As described above, the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving others Unimpaired.  The Plan thus modifies the rights of the holders of certain Claims and Interests and leaves the rights of others unaffected.  See Plan Articles II through V.  The Plan is a settlement and compromise of the Claims and Interests of various parties based upon the relationship and transactions among such parties and the Debtors.  The Plan also provides for (i) the assumption or rejection of executory contracts and unexpired leases to which the Debtors are parties (see Plan Art. VIII) and (ii) the retention and enforcement of certain claims by Reorganized Delphi.  See Plan Article 7.24.

The Plan also provides for certain Releases by the Debtors and Debtors-in-Possession and by holders of Claims and Interests (the "Releases").  With respect to the Releases by the Debtors, Article 11.4 of the Plan provides that, pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties[11] for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the

---

[11]    "Released Parties" means, collectively, (a) all officers of each of the Debtors, all members of the boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) all Professionals, (g) the Unions and current or former members, officers, and committee members of the Unions, (i) the Indenture Trustees, in their capacities as such, and (j) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest

that is treated in the Plan, the business or contractual arrangements between any Debtor and any

Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases,

or any act, omission, occurrence, or event in any manner related to any such Claims, Interests,

restructuring, or the Chapter 11 Cases.[12]

Further, with respect to the holders of Claims and Interests, Article 11.5 of the

Plan provides that each Person who votes to accept the Plan is deemed to release and discharge

the Released Parties, to the fullest extent permissible under applicable law, as such law may be

extended subsequent to the Effective Date, in consideration for the obligations of the Debtors

and the Reorganized Debtors under the Plan and the Cash, New Common Stock, New Warrants,

and other contracts, instruments, releases, agreements, or documents to be delivered in

connection with the Plan.  In addition, Articles 11.6 and 11.7 provide that the releases contained

in the Union Settlement Agreements and the settlement agreements with GM are incorporated by

reference in the Plan, and Article 11.8 provides for the release and exculpation of the Plan

Investors in consideration for the contributions to the Debtors' reorganization.  As the Court has

noted previously, "GM logically would not want to make the types of agreements and

concessions it would most optimally make for the benefit of the estate unless it got a

---

[12]  Notwithstanding such portion of Section 11.4, nothing in the Plan shall be deemed to release (i) any of the
Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions
contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union
Settlement Agreements or the transactions contemplated thereby, or (iii) any of the Debtors or the Plan
Investors or their affiliates from their obligations under the Investment Agreement or the transactions
contemplated thereby.

comprehensive release for those types of potential claims." (Tr. of Dec. 7, 2003 Hr'g 18:17-20.)

The releases are appropriate and in full accord with applicable law.[13]

Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan

includes additional appropriate provisions that are not inconsistent with applicable provisions of

the Bankruptcy Code, including, but not limited to: (i) the provisions of Article IX governing

distributions on account of Allowed Claims and procedures for resolving Disputed Claims and (ii)

the provisions of Article XIII of the Plan governing retention of jurisdiction by the Court over

certain matters after the Effective Date. Accordingly, the Plan complies with the applicable

provisions of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(1)

of the Bankruptcy Code.

(a)    Settlement Of Certain Claims

In determining whether to approve a proposed settlement, courts ascertain

whether the proposed settlement is fair and equitable, reasonable, and in the best interests of a

debtor's estate. See In re Granite Broad. Corp., 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007)

(applying Bankruptcy Rule 9019 factors to settlement included in reorganization plan); Motorola,

Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452,

461-65 (2d Cir. 2007) (setting forth same standard in non-plan context). Accordingly, in

deciding whether to grant final approval of the comprehensive settlements set forth in the Plan,

---

[13]    The Releases are consistent and in full accord with applicable law in the Second Circuit and elsewhere. Courts
within the Second Circuit have held that bankruptcy courts may permanently enjoin actions by third-parties
against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network,
Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert
Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992);
In re Spiegel Inc., No. 03-11540, 2006 WL 2577825, at *8 (Bankr. S.D.N.Y. Aug. 16, 2006), appeal dismissed,
2007 WL 656902 (S.D.N.Y. Feb. 28, 2007); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330
B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). Despite the Plan's compliance with applicable law, certain objectors
contend that the Plan's release provisions are inappropriate. These objections should be overruled, as more fully
discussed in the fifth part of this memorandum.

including with GM and regarding the MDL Claims, this Court "need only canvass the issues to determine if the settlement falls below the lowest point in the range of reasonableness." In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006) (citation and internal quotations marks omitted here and throughout); accord In re Adelphia Communications, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007).

The factors to be weighed in making this determination include (1) the balance between the likelihood of success in the litigation compared to the present and future benefits offered by the settlement, (2) the prospect of complex and protracted litigation with its attendant expense, inconvenience, and delay, and the difficulties associated with collection of any judgment, (3) the paramount interests of the creditors, which includes the relative benefits to be received by members of any affected class and the degree to which creditors either do not object to or affirmatively support the proposed settlement, (4) the degree to which the settlement is supported by other parties in interest, (5) the competency and experience of counsel who support the settlement, (6) the nature and breadth of releases to be obtained by officers and directors, and (7) the extent to which the settlement is the product of arm's length bargaining. See WorldCom, 347 B.R. at 137; Adelphia Commc'ns, 368 B.R. at 226. When evaluating a settlement under a plan, courts also review whether the debtor's creditors supported the settlement by voting for the plan. Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 794 n.4 (S.D.N.Y. aff'd, 68 F.3d 26 (2d. Cir. 1995)).

For all of the reasons set forth herein, as well as in consideration of the evidence presented (see the Sheehan Declaration ¶¶ 113-122; Stipp Declaration passim; Miller Declaration ¶¶ 25-35.) and the support of the Debtors' creditors of the settlements as demonstrated by the overwhelming votes in favor of the Plan, the Debtors established that these factors weigh heavily

33

in favor of approving the settlements embodied in the Plan, including those with GM. Indeed, GM's contributions to the Plan, and the settlement of GM's claims against the Debtors, constitute a substantial source of funds that allow distributions to be made to certain of the Debtors' stakeholders. Without the GM settlement, those distributions could not be made. Thus, these substantial contributions, along with others provided for in the Global Settlement Agreement and the Master Restructuring Agreement, are essential to the Debtors' restructuring. Because GM's contributions squarely address several of the key tenets of Delphi's Transformation Plan, the Debtors' reorganization as contemplated in the Plan would not be possible but for the agreements with GM embodied in the Global Settlement Agreement and the Master Restructuring Agreement. Sheehan Declaration ¶¶ 113-122. The settlements are fair, reasonable, and appropriate under the circumstances, comply with Bankruptcy Rule 9019, and should be approved.

(b)    Executory Contracts And Unexpired Leases

Article VIII of the Plan establishes procedures by which the Debtors can assume and reject executory contracts and resolve all disputes regarding such assumption and rejection, including disputes as to the cure of defaults and the provision of adequate assurance of future performance. The Debtors submit that they have exercised appropriate business judgment in determining whether to assume, assume and assign, or reject each of their executory contracts and unexpired leases under the Plan. Before filing the Assumption/Rejection Exhibits, the Debtors commenced an extensive review of all executory contracts and unexpired leases and determined, as an exercise of their business judgment, which contracts were necessary for the operations of the Reorganized Debtors. Based upon this review, the Debtors prepared and filed Exhibit 8.1(a) to the Plan on December 28, 2007 (Docket No. 11608), which listed contracts to be rejected.

34

      (c)      The Offer Or Sale Of Securities Under The Plan
Are Governed By The Exemption Provided In
Section 1145 Of The Bankruptcy Code (Section
1123(b)(6))

Under section 1145(a) of the Bankruptcy Code, the issuance of the New Common Stock to the holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims and the issuance of the Seven-Year Warrants and Ten-Year Warrants to holders of Existing Common Stock to be distributed under the Plan in exchange for certain Claims and Interests against the Debtor, and the subsequent resale of such securities by entities which are not "underwriters" (as defined in section 1145(b) of the Bankruptcy Code), are not subject to the registration requirements of Section 5 of the Securities Act of 1933.

Section 1145(a)(1)(A) of the Bankruptcy Code provides for exemption from securities law registration requirements for the issuance of a debtor's securities if the securities are being issued pursuant to a reorganization plan in exchange for a creditor's "claim against," or "an interest in," the debtor.  See generally In re Kenilworth Sys. Corp., 55 B.R. 60 (Bankr. E.D.N.Y. 1985).

The terms of the Plan show that these securities are being distributed to holders of Allowed Claims and Interests in exchange for those Claims and Interests.  Accordingly, the distributions should receive the benefit of the exemption under section 1145 of the Bankruptcy Code.

      (d)      Enforcement Of Subordination Rights (Section
510(a))

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law."  11 U.S.C. § 510(a).  On the other hand, the

Senate Judiciary Committee report issued in connection with the promulgation of the Bankruptcy

Code states that in a chapter 11 case the class that is the beneficiary of a subordination agreement

may waive its rights under the agreement.  S. Rep. No. 95-989 (1978), reprinted in 1978

U.S.C.C.A.N. 5787, 5860; see also H.R. Rep. No. 95-595 (1978), reprinted in 1978 U.S.C.C.A.N.

5963, 6315.  This is in accord with pre-Code jurisprudence in this circuit.  See, e.g., Bartle v.

Markson Bros., 314 F.2d 303, 305 (2d Cir. 1963).

As discussed above, the Plan implements the subordination provisions of the

TOPrS indenture by reallocating distributions that would otherwise go to holders of TOPrS to

holders of senior debt.  Thus, holders of senior debt receive the allowed amount of their claims

plus postpetition interest while holders of TOPrS receive 90% of the allowed amount of their

claims.  Because these one-time distributions under the Plan implement the subordination

provisions, there is no need for the subordination provisions to remain in place.  Accordingly, the

Plan expressly provides for the deemed satisfaction and waiver of subordination rights. See Plan,

Article 11.10(a).  The Class 1C members holding senior debt have voted in favor of the Plan,

thereby confirming their agreement and acknowledgement that the Plan properly satisfies and

waives the subordination rights.  Thus, the Plan thus satisfies section 510(a) of the Bankruptcy

Code.

B.    The Plan Complies With The Applicable Provisions Of Title 11 (Section
      1129(a)(2))

Section 1129(a)(2) requires the proponent of a plan to "compl[y] with the

applicable provisions of title 11 [of the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2).  The

principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the

requirements of the Bankruptcy Code regarding solicitation of acceptances of the plan.  See, e.g.,

In re Texaco Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) (holding that the "priincipal

purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan"); In re Johns-Manville Corp., 68 B.R. at 629-30; In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); see also S. Rep. No. 95-989, at 126 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412.

The Debtors have complied with the applicable provisions of title 11, including the requirements of section 1125 regarding disclosure and plan solicitation. Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). In these cases, the Court approved the Disclosure Statement by an order dated December 10, 2007 (the "Solicitation Procedures Order") which, among other things, specifically found that the Disclosure Statement contained adequate information within the meaning of section 1125. In addition, the Court considered and, in the Disclosure Statement Order approved (i) all materials to be transmitted to those holders of Claims and Interests (collectively, the "Solicitation Materials") entitled to vote on the Plan, (ii) the timing and method of delivery of the Solicitation Materials, and (iii) the rules for tabulating votes to accept or reject the Plan.

Thereafter, in compliance with the Solicitation Procedures Order, the Debtors and their agents transmitted solicitation packages to holders of Claims and Interests and other parties

in interest.[14]  These Solicitation Packages were distributed promptly after entry of the Disclosure

Statement Order and in accordance with the Court's instructions.[15]  The Debtors did not solicit

the acceptance or rejection of the Plan by a creditor or interest holder before the transmission of

the Disclosure Statement.  In addition, the Debtors caused the Confirmation Hearing Notice[16] to

be published in the <u>New York Times</u> (national edition), the <u>Wall Street Journal</u> (national,

European, and Asian editions), <u>USA Today</u> (worldwide), the <u>Automotive News</u> (national

edition), and in local editions of the following: the <u>Adrian Daily Telegram</u>, the <u>Arizona Daily

Star</u>, the <u>Buffalo News</u>, the <u>Chicago Sun Times</u>, the <u>Cleveland Plain Dealer</u>, the <u>Clinton News</u>,

the <u>Columbus Dispatch</u>, the <u>Daily Leader</u>, the <u>Dayton Daily News</u>, the <u>Detroit Free Press</u>, the

<u>Detroit News</u>, the <u>El Paso Times</u>, the <u>Fitzgerald Herald Leader</u>, the <u>Flint Journal</u>, the <u>Gadsden

---

[14]    In accordance with the Solicitation Procedures Order, the approved Solicitation Materials transmitted were
(1) the Confirmation Hearing Notice, (2) a CD-ROM containing (a) the Solicitation Procedures Order (without
exhibits), (b) the Disclosure Statement and publicly filed materials appended thereto, (c) the Plan and publicly
filed materials appended thereto, (d) the official committee of unsecured creditors solicitation letter (the
"Creditors' Committee Letter"), and (e) the official committee of equity security holders solicitation letter (the
"Equity Committee Letter"), (3) paper copies of the Creditors' Committee Letter and Equity Committee Letter,
(4) the UAW informational letter to its members who received ballots ("UAW Informational Letter"), (5) the
Postpetition Interest Rate Determination Notice for all holders of General Unsecured Claims, other than Senior
Note Claims and TOPrS Claims, (6) as to Classes C, D, E, G-1, G-2, and H (collectively, the "Voting Classes"),
a ballot and return envelope (such ballot and envelope being referred to as a "Ballot"), and (7) to the extent
appropriate as determined by the Debtors, an Internal Revenue Service form W-9 (Request for Taxpayer
Identification Number and Certification) or form W-8BEN to be returned with a party's ballot.  In addition, as to
Classes A, B, and J, a Notice To Unimpaired Creditors of (I) Filing Of Joint Plan Of Reorganization, (II)
Treatment Of Claims Under Plan, (III) Hearing On Confirmation Of Plan, And (IV) Deadline And Procedures
For Filing Objections Thereto ("Unimpaired Creditors Notice") was transmitted.  Further, as to Class I, a Notice
Of Non-Voting Status With Respect To Certain Claims And Interests ("Notice of Non-Voting Status") was
transmitted.

[15]    Affidavits of service of the Solicitation Materials executed by Kurtzman Carson Consultants, LLC (Docket No.
11974) and Financial Balloting Group, LLC (Docket No. 11981) were filed with the Court on January 11, 2008
and January 12, 2008, respectively.  These affidavits demonstrate that the Solicitation Materials were served in
accordance with the requirements of the Solicitation Procedures Order.

[16]    The full title of the Confirmation Hearing Notice is "Notice of (1) Approval Of Disclosure Statement;
(2) Hearing On Confirmation Of Plan; (3) Deadline And Procedures For Filing Objections To Confirmation Of
Plan; (4) Deadline And Procedures For Temporary Allowance Of Certain Claims For Voting Purposes;
(5) Deadline For Asserting Cure Claims For Assumed Contracts; (6) Treatment Of Certain Unliquidated,
Contingent, Or Disputed Claims For Notice, Voting, And Distribution Purposes; (7) Record Date; (8) Voting
Deadline For Receipt Of Ballots; (9) Proposed Releases, Exculpation, And Injunction In Plan."

Times, the Grand Rapids Press, the Greensville News, the Indianapolis Star, the Kansas City Star,

the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News,

the Milwaukee Journal Sentinel, the Mobile Beacon, the Mobile Register, the Oakland Press, the

Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky

Register, the Toledo Blade, the Tribune Chronicle, the Tulsa World, the Tuscaloosa News, and

The Vindicator, between December 19, 2007 and December 24, 2007.[17] [18]

        The Debtors thus have complied with the applicable provisions of title 11 of the

United States Code, including section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017

and 3018, and, as a result, the Plan meets the requirements of section 1129(a)(2) of the

Bankruptcy Code.

    C.     The Plan Was Proposed In Good Faith (Section 1129(a)(3))

        Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a

plan of reorganization only if the plan has been "proposed in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3). The Second Circuit has held that the standard of

good faith requires "a showing that the plan was proposed with 'honesty and good intentions' and

with 'a basis for expecting that a reorganization can be effected.'" Koelbl v. Glessing (In re

Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (quoting Manati Sugar Co. v. Mock, 75 F.2d 284, 285

---

[17]    See Affidavits of publication of the Confirmation Hearing Notice have been filed by individuals on behalf of each of the listed publications (Docket Nos. 11657, 11658, 11659, 11660, 11661, 11662, 11663, 11664, 11665, 11666, 11667, 11668, 11670, 11671, 11672, 11673, 11674, 11675, 11677, 11678, 11680, 11681, 11682, 11683, 11684, 11774, 11775, 11776, 11777, 11778, 11779, 11780, 11783, 11784, 11785, 11786, 11845, and 11902).

[18]    In addition, in compliance with the Solicitation Procedures Order, the Debtors have provided notice to any holders of Claims or Interests of a change in voting status on account of an objection filed after the Solicitation Date and notice of any right to file a Rule 3018 Motion. See Solicitation Procedures Order ¶ 25; see also Affidavit Of Service Sheryl Betance Regarding (1) Notice To Parties Subject To A Post-Solicitation Date Objection; and (2)Notice Of Non-Voting Status With Respect To Certain Claims And Interests (filed on January 15, 2008 (Docket No. 12078)).

(2d Cir. 1935)); see also In re Johns-Manville, 68 B.R. at 631-32.  In the context of a chapter 11

plan, courts have held that a plan is considered proposed in good faith "'if there is a likelihood

that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy]

Code.'"; In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting In re Texaco

Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988)).  "The requirement of good faith must be viewed

in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan."

In re Leslie Fay, 207 B.R. at 781 (citations omitted).

            In determining whether a plan will succeed and accomplish goals consistent with

the Bankruptcy Code, courts look to the terms of the reorganization plan itself.  See In re Sound

Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that good faith test provides

court with significant flexibility and is focused on examination of plan itself, rather than other,

external factors), aff'd in part and remanded in part on other grounds, 103 B.R. 521 (D.N.J. 1989),

aff'd, 908 F.2d 964 (3d Cir. 1990).  The plan proponent must show, therefore, that the plan has

not been proposed by any means forbidden by law and that the plan has a reasonable likelihood

of success.  See In re Century Glove, Inc., No. 90-400-SLR, 1993 WL 239489, at *4 (D. Del.

Feb. 10, 1993) ("A court may only confirm a plan for reorganization if . . . 'the plan has been

proposed in good faith and not by any means forbidden by law.' . . . . Moreover, '[w]here the plan

is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of

success, the good faith requirement of section 1129(a)(3) is satisfied.'") (citations omitted); see

also Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.

P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same); Koelbl, 751 F.2d at 139 (citations omitted)

(noting that plan provisions may not contravene any law, including state law, and plan must have

been proposed with "a basis for expecting that a reorganization can be effected").

The Plan has been proposed by the Debtors in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to Claim holders under the circumstances of these Chapter 11 Cases.  The Court has previously acknowledged that "[i]t is my experience with these debtors . . . that these debtors from their board through their senior management, and certainly their professionals, take their responsibilities as debtors and debtors-in-possession with the utmost seriousness and have conducted themselves accordingly."  (Tr. of Dec. 7, 2003 Hr'g 10:17-23.)  As further described in the Disclosure Statement, as well as in the Miller Declaration, the Sheehan Declaration, the Resnick Declaration, and the Eisenberg Declaration, the Debtors believe that the value of the Estates of the Debtors is greater in the reorganization contemplated by the Plan than it would be in a liquidation.  Accordingly, the Debtors believe the Plan will result in greater recoveries to claimholders than could be realized if the Debtors were to liquidate.

To arrive at this stage in these Chapter 11 Cases, the Debtors actively involved their creditor constituencies throughout the plan formulation process.  See Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (holding that good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors").  As described in detail above and in the Disclosure Statement, prior to and following the commencement of the Chapter 11 Cases, the Debtors initiated a comprehensive review of their businesses, assets, and capital needs and initiated restructuring negotiations with their principal stakeholders.  The Debtors provided substantial information to all constituencies, which included monthly meetings between the Debtors' top management and the Creditors' Committee and assistance to the Creditors' Committee.  The Plan reflects the end product of those arm's-length negotiations and constitutes the agreement among all such parties-in-interest regarding the terms

41

of the Debtors' restructuring.  The Debtors, all of the Debtors' principal U.S. labor unions, GM, and the lead plaintiffs in certain securities actions are all parties to settlements with the Debtors which, together with the Investment Agreement, allow for various recoveries under the Plan. The Plan, which is supported by GM, the Plan Investors, and the Statutory Committees, provides distributions to all of Delphi's stakeholders.  See Official Committee of Unsecured Creditors Solicitation Letter and the Official Committee of Equity Security Holders Solicitation Letter, which were included in the Solicitation Packages that were sent to creditors.

The support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by holders of Claims that cast Ballots reflect the overall fairness of the Plan and the acknowledgment by the Debtors' stakeholders that the Plan has been proposed in good faith and for proper purposes.  See In re Eagle-Picher Indus., Inc., 203 B.R. 256, 274 (S.D. Ohio 1996) (finding that plan of reorganization was proposed in good faith when, among other things, it was based on extensive arm's-length negotiations among plan proponents and other parties-in-interest).  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

D.    All Payments To Be Made By The Debtors In Connection With These Cases Are Subject To The Approval Of The Court (Section 1129(a)(4))

Section 1129(a)(4) of the Bankruptcy Code requires that any payment made or to be made for services or for costs and expenses in connection with the case has been approved by, or is subject to the approval of, the court as reasonable.  Specifically, section 1129(a)(4) of the Bankruptcy Code requires that:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

42

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and approved, or subject to approval, by the court.  See In re River Vill. Assocs., 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993), aff'd, 181 B.R. 795 (E.D. Pa. 1995); see also In re Johns-Manville, 68 B.R. 618 at 632; In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986); In re S. Indus. Banking Corp., 41 B.R. 606, 612 (Bankr. E.D. Tenn. 1984).

All payments made or to be made by the Debtors for services or for costs or expenses in connection with the Chapter 11 Cases, including all Professional Claims, fees of the Plan Investors, DIP Lenders, and exit financing facility fees have been approved by or are subject to approval by this Court pursuant to, among other things, sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code, and orders entered by this Court.  See Plan Article 10.3 and Order Pursuant To 11 U.S.C. §§ 105(a) And 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals (Docket No. 0869).  In addition, the Court authorized the establishment of the Fee Review Committee, which is comprised of representatives of each of the U.S. Trustee for this District, the Debtors, and the Creditors' Committee to review, comment on, and, if necessary, object to the various fee applications filed in these Chapter 11 Cases.  (Docket No. 4959.)  All fee applications filed in these cases remain subject to final review by the Bankruptcy Court.  Moreover, all payments to be made in connection with the Effective Date or which relate to the success of the reorganization or which otherwise are required to be disclosed either are disclosed in the Disclosure Statement or will be disclosed at or before the Confirmation Hearing.

The foregoing procedures for the Court's review and ultimate determination of the fees, costs, and expenses to be paid by the Debtors satisfy the requirements of section 1129(a)(4).

43

See In re Resorts Int'l, Inc., 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990) (as long as fees, costs, and expenses are subject to final approval of court, section 1129(a)(4) is satisfied); In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (requirements of section 1129(a)(4) satisfied when plan provided for payment of only "allowed" administrative expenses).  No payments within the scope of section 1129(a)(4) will be made without Court approval.  In addition, Article XIII of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, including requests by Professionals.[19]  Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.[20]

---

[19]  Law Debenture Trust Company of New York ("Law Debenture") objects to confirmation of the Plan "unless the Plan is modified to provide for the payment of the Law Debenture's post-petition fees and expenses, with post-petition interest" (Docket No. 11935 at 3).  Wilmington Trust Company ("WTC")'s limited objection also requests the payment WTC's post-petition fees and expenses (Docket No. 12012).  The Debtors are willing to pay Law Debenture's and WTC's fees provided that, to the extent the Debtors object to any such fees, such fees would be subject to approval by this Court pursuant to section 1129(a)(4) of the Bankruptcy Code.

[20]  The Plan permits the resolution of cure disputes after confirmation, including after the Effective Date.  In addition, to the extent a final order is entered setting a cure amount in excess of that asserted by the Debtors, the Plan permits the Debtors to reject the executory contract at issue within five days of the entry of the final order.  One objector, who has since withdrawn its objection (Docket No. 11872), contested these procedures, arguing that the Debtors must either reject or assume all executory contracts on or prior to the Confirmation Date, and the objector asserted that the Debtors cannot extend the resolution and payment of cure amounts past the Effective Date.  Given the thousands of executory contracts that the Debtors will assume pursuant to the Plan, the procedures to resolve assumption issues set forth in the Plan are appropriate under section 365 of the Bankruptcy Code.  By its express terms, section 365 does not require a debtor to cure a default at the time of assumption.  Instead, it may provide adequate assurance that it will promptly cure such default.  There is no dispute that the Debtors can provide adequate assurance that they will promptly cure defaults under assumed executory contracts once the Cure Amount Claim is Allowed.  The Plan sets forth procedures to resolve disputes regarding cure claims in an expeditious manner.  A contract counter-party need only follow the procedures set forth in the Plan and it can be assured that any disputes regarding the assumption of its executory contract will be resolved, through either settlement or adjudication, in a timely fashion.  Given the size and complexity of these cases, it would be unrealistic to require the Debtors to resolve every dispute regarding the assumption or rejection of executory contracts without the procedures set forth in the Plan.  The procedures set forth in the Plan.  See Alberts v. Humana Health Plan, Inc. (In re Greater S.E. Cmty. Hosp. Corp.), 327 B.R. 26, 34 (Bankr. D.D.C. 2005).  Procedures similar to those set forth in the Plan are routinely approved in cases of this size.  See In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. April 25, 2007) (order confirming plan that provides procedure for resolution and payment of cure claims after effective date of plan and permits debtors to reject contracts after effective date to extent parties unable to resolve cure disputes); In re Adelphia Communications Corp., Case No. 02-41729 (Bankr. S.D.N.Y. January 5, 2007) (same).

E.      The Plan Discloses All Required Information Regarding Postconfirmation
        Directors, Management, And Insiders (Section 1129(a)(5))

Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization

may be confirmed if the proponent discloses the identity of those individuals who will serve as

management of the reorganized debtor, the identity of any insider to be employed or retained by

the reorganized debtor and the compensation proposed to be paid to such insider.  11 U.S.C. §

1129(a)(5)(B).  In addition, under section 1129(a)(5)(A)(ii), the appointment of, or continuation

in office of, existing management must be consistent with the interests of creditors, equity

security holders, and public policy.  11 U.S.C. § 1129 (a)(5)(A)(ii).

In determining whether the postconfirmation management of a debtor is

consistent with the interests of creditors, equity security holders, and public policy, a court must

consider proposed management's competence, discretion, experience, and affiliation with entities

having interests adverse to the debtor.  See In re Sherwood Square Assocs., 107 B.R. 872, 878

(Bankr. D. Md. 1989); see also In re W.E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La.

1982) (a court should consider whether "the initial management and board of directors of the

reorganized corporation will be sufficiently independent and free from conflicts and the potential

of post-reorganization litigation so as to serve all creditors and interested parties on an even and

loyal basis").  In general, however, "[t]he [d]ebtor should have first choice of its management,

unless compelling cause to the contrary exists." Sherwood Square Assoc., 107 B.R. at 878.  The

case law also is clear that a plan may contemplate the retention of the debtor's existing directors

and officers.  See, e.g., Texaco, 84 B.R. at 908 (determining that section 1129(a)(5) was satisfied

where plan disclosed debtor's existing directors and officers who would continue to serve in

office after plan confirmation).

The manner of selection of the Reorganized Board of Directors and post-emergence management is described above and, in the Debtors' view, complies with section 1129(a)(5) of the Bankruptcy Code.  Indeed, the method for choosing the Reorganized Board of Directors is a result of a negotiated agreement among various key constituencies, including the Creditors' Committee, and as a result, the interests of numerous parties should be adequately represented.[21]  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

F.     The Plan Does Not Provide For Any Rate Change Subject To Regulatory Approval (Section 1129(a)(6))

Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval.  11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction.

G.     The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7))

The Bankruptcy Code protects individual creditors and equity security holders who are impaired by the Plan and who have not voted to accept the Plan through the "best

---

[21]   Courts have found, when officers or directors have not yet been selected and identified, that disclosure of those officers and directors who are known, as well as the manner in which others will be selected, is sufficient to comply with section 1129(a)(5) of the Bankruptcy Code.  See, e.g., In re Am. Solar King Corp., 90 B.R. 808, 815-17 (Bankr. W.D. Tex. 1988) (noting that "debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed in subsection (a)(5)(A)(i)"); In re AG Consultants Grain Div., Inc., 77 B.R. 665, 669 (Bankr. N.D. Ind. 1987) (debtor complied with section 1129(a)(5) despite fact that it did not specifically reveal identity and affiliation of any individuals who would serve after confirmation); In re Eagle Bus Mfg., Inc., 134 B.R. 584, 599 (Bankr. S.D. Tex. 1991) (finding sufficient disclosure of officer and director identities "to the extent known as of the Hearing"), aff'd, 158 B.R. 42 (S.D. Tex. 1993).

interests" test of section 1129(a)(7) of the Bankruptcy Code, which provides that a court shall

confirm a plan of reorganization if, with respect to each impaired class of claims or interests:

> (A) each holder of a claim or interest of such class – (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest
> property of a value, as of the effective date of the plan, that is not less than the
> amount that such holder would so receive or retain if the debtor were liquidated
> under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7). Thus, through the "best interests" test of section 1129(a)(7), the

Bankruptcy Code protects dissenting members of impaired, accepting classes by ensuring that

such creditors or shareholders receive, pursuant to a proposed plan, at least what they would

receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See Bank of Am.

Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441 n.13 (1999). The "best

interests" test focuses on individual dissenting creditors rather than classes of claims. Id.; see

also In re Leslie Fay Cos.., 207 B.R. at 787; In re Drexel Burnham Lambert Group, Inc., 138 B.R.

723, 761 (Bankr. S.D.N.Y. 1992); In re Century Glove, Inc., 1993 WL 239489, at *7.

A court, in considering whether a plan is in the "best interests" of creditors, is not

required to consider any alternative to the plan other than the dividend projected in a liquidation

of all of the debtor's assets under chapter 7 of the Bankruptcy Code. See In re Crowthers McCall

Pattern, Inc., 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); In re Jartran, Inc., 44 B.R. 331, 389-93

(Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash

received would be insufficient to pay priority claims and secured creditors so that unsecured

creditors and stockholders would receive no recovery); In re Victory Constr. Co., 42 B.R. 145,

151 (Bankr. C.D. Cal. 1984). As section 1129(a)(7) of the Bankruptcy Code makes clear, the

liquidation analysis applies only to non-accepting impaired claims or equity interests. If a class

of claims or equity interests unanimously accepts the plan, the best interests test automatically is

deemed satisfied for all members of that accepting class. See 11 U.S.C. § 1129(a)(7). The test

47

requires that each holder of a claim or interest either accepts the plan or will receive or retain

under the plan property having a present value, as of the effective date of the plan, not less than

the amount that such holder would receive or retain if the debtor were liquidated under chapter 7

of the Bankruptcy Code.

In this case, the best interests test is satisfied as to each impaired Class of Claims

and Interests because a chapter 7 liquidation of the Debtors' estates would adversely affect the

ultimate proceeds available for distribution to all holders of impaired Claims and Interests.

Indeed, a review of the Liquidation Analysis supports the position that a chapter 7 liquidation

would result in significantly reduced recoveries to creditors.

To determine the value that impaired creditors and equity security holders would

receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must

first determine the aggregate dollar amount that likely would be generated by the hypothetical

liquidation of the Debtors' assets by a chapter 7 trustee (the "Liquidation Value").  Here, the

Liquidation Value of the Debtors would consist of the net proceeds from the disposition of the

Debtors' assets, augmented by any cash held by the Debtors.

The Liquidation Value available to holders of Claims and Interests would be

reduced by, among other things, (a) the costs, fees, and expenses of the liquidation, as well as

other administrative expenses of the Debtors' chapter 7 cases; (b) unpaid Administrative Claims;

and (c) priority claims and Priority Tax Claims.  The Debtors' costs of liquidation under chapter

7 would include the compensation of trustees as well as counsel and other professionals retained

by such trustees, asset disposition expenses, applicable taxes, litigation costs, claims arising from

the operation of the Debtors during the pendency of the chapter 7 cases, and all unpaid

48

Administrative Claims incurred by the Debtors during the Reorganization Cases that are allowed in the chapter 7 cases.

As set forth in the Disclosure Statement and the Eisenberg Declaration, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtors, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  The Debtors believe that the dissenting members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case.  The liquidation itself would trigger certain priority claims, such as claims for severance pay, and would likely accelerate the payment of other priority claims and Priority Tax Claims that otherwise would be payable in the ordinary course of business.  These priority claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims to the extent of the value of the underlying collateral, before the balance would be made available to pay general unsecured claims or to make any distribution in respect of Interests.  The Debtors believe that the liquidation also would generate a significant increase in general unsecured claims, such as rejection damage claims and tax and other governmental claims.

In addition, holders of Claims and Interests will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns, supplemented by GM's support, rather than a forced liquidation will allow the realization of more value for the Debtors' assets.  Moreover, in a liquidation, GM would likely assert the full amount of its claims relating to, among other things, OPEB obligations covered under the Benefit Guaranty.  In addition, the Debtors' pension plans would be terminated in a chapter 7 case, resulting in the assertion of significant claims by the PBGC.  These events could

increase the total amount of general unsecured claims by billions of dollars, and the recovery on

such claims would be reduced by wind-down costs and would be subordinated to additional

administrative claims that would be created.  For example, salaried employees who supported the

wind - down of the U.S. operations would be entitled to severance payments.  The resulting

increase in the general unsecured and administrative claims would decrease percentage

recoveries to unsecured creditors of the Debtors.  All of these factors lead to the conclusion that

recoveries under the Plan would be at least as much, and in many cases significantly greater, than

the recoveries available in a chapter 7 liquidation.

The following chart summarizes the range of creditor recoveries under the

Debtors' Hypothetical Liquidation Analysis consistent with Substantive Consolidation under the

Plan as well as a Substantive Consolidation – All Debtors.

| ($Millions) | Net Proceeds Available For Distribution | | Secured Recovery[2] | | Admin & Priority Recovery | | General Unsecured, Trust Preferreds[1], and PBGC Recovery | | Equity Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Lower | Higher | Lower | Higher | Lower | Higher | Lower | Higher | Lower | Higher |
| Debtor(s) | $ | $ | % | % | % | % | % | % | $ | $ |
| **Substantive Consolidation Under The Plan** | | | | | | | | | | |
| Delphi-DAS Debtors | 3,781 | 5,338 | 76% | 100% | 0% | 30% | 0% | 0% | - | - |
| DASHI Debtors | 3,564 | 5,036 | 100% | NA | 100% | 100% | 55% | 83% | - | - |
| Delphi Medical Systems Colorado Corporation | 15 | 20 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Medical Systems Texas Corporation | 4 | 6 | 100% | NA | 0% | 78% | 0% | 0% | - | - |
| Delphi Medical Systems Corporation | 0 | 5 | 100% | NA | 0% | 19% | 0% | 0% | - | - |
| Connection Systems Debtors | 14 | 18 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Diesel Systems Corporation | 105 | 137 | 100% | NA | 0% | 100% | 0% | 1% | - | - |
| Delphi Mechatronic Systems, Inc. | 22 | 29 | 100% | NA | 0% | 42% | 0% | 0% | - | - |
| Specialty Electronics Debtors | 6 | 7 | 100% | NA | 100% | 100% | 0% | 0% | - | - |
| Delco Electronics Overseas Corporation | 42 | 47 | 100% | NA | 12% | 100% | 0% | 0% | - | - |
| MobileAria Inc. | 3 | 3 | 100% | NA | 0% | 100% | 0% | 0% | - | - |
| Delphi Furukawa Wiring Systems LLC | 5 | 6 | 100% | NA | 50% | 85% | 0% | 0% | - | - |
| | | | | | | | | | | |
| **Substantive Consolidation - All Debtors** | 7,459 | 10,434 | 100% | 100% | 65% | 100% | 0% | 18% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - The Trust Preferred subordinated debt is classified under the Delphi-DAS Debtors.
2 - DIP claims have a 100% recovery in all instances.

The Liquidation Analysis contains two separate analyses – a  "Substantive

Consolidation – All Debtors" analysis and a "Substantive Consolidation Under The Plan"

50

analysis based on the Debtors' proposed partially-consolidated substantive consolidation

groupings.  The "Substantive Consolidation – All Debtors" analysis assumes that the Debtors are

substantively consolidated and that creditors share in the proceeds of all of the Debtors' assets

without regard to (a) the separate legal identity of each Debtor and (b) which Debtors are

obligated on particular claims.  The "Substantive Consolidation Under The Plan" analysis

assumes that only certain of the Debtors are consolidated, and that the Debtors are liquidated

through those groupings or independently.[22]

      The PBGC is a primary creditor of Delphi and each of its subsidiaries.  The

PBGC's claims arise out of joint and several liability of each of the Debtors to the PBGC under

applicable non-bankruptcy law.  In a "Substantive Consolidation Under The Plan" liquidation

(accounting for partial consolidation of Debtor entities), the PBGC would have a claim against

each consolidated Debtor group or Debtor and would be entitled to receive a distribution from

the proceeds of asset liquidations of each consolidated Debtor group or Debtor on account of

such claim.  Alternately, in a "Substantive Consolidation – All Debtors" liquidation, the PBGC's

claims against Delphi's subsidiaries would be deemed a single claim against the consolidated

Debtors' assets and would share in distributions with all other unsecured creditors of each of the

other Debtors.  As a consequence, the estimated recovery of the PBGC, based on the

assumptions contained in the attached liquidation analysis, is higher in the "Substantive

Consolidation Under The Plan" scenario – 55% to 83% for the PBGC – and lower in the

"Substantive Consolidation – All Debtors" scenario 0% to 18% for the PBGC.  Correspondingly,

---

[22]   When a court has found substantive consolidation appropriate, the best interests test is likewise conducted on a consolidated basis. See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 773 (Bankr. S.D.N.Y. 1992); In re Leslie Fay Cos., 207 B.R. 764, 772, 787-88 (Bankr. S.D.N.Y. 1997); see also In re Stone & Webster, Inc., 286 B.R. 532, 544-45 (Bankr. D. Del. 2002); In re Affiliated Foods, Inc., 249 B.R. 770, 789 (Bankr. W.D. Mo. 2000).

the recoveries of other unsecured creditors based on such assumptions is generally lower in the

"Substantive Consolidation Under The Plan" scenario – 0% for general unsecured creditors

(except for the DASHI Debtors and Delphi Diesel Systems Corp.) – and generally higher in the

"Substantive Consolidation – All Debtors" scenario - 0% to 18% for general unsecured creditors.

Holders of existing common stock would receive no distribution under either liquidation scenario.

Based on the foregoing, each dissenting holder of a Claim or Interest in each such

Class will receive or retain under the Plan, on account of such Claim, property of a value, as of

the Effective Date of the Plan, that is not less than the amount that it would receive in a chapter 7

liquidation of the Debtors' assets on such date.  As a result, the Plan satisfies the requirements of

section 1129(a)(7) of the Bankruptcy Code.

H.    The Plan Has Been Accepted By The Requisite Classes Of Creditors and Interest
       Holders (Section 1129(a)(8))

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests under a plan has either accepted the plan or is not impaired by the plan.  Under section

1126 of the Bankruptcy Code, a class of claims or interests that is not impaired under a plan is

"conclusively presumed" to have accepted the plan and need not be further examined under

section 1129(a)(8).  11 U.S.C. § 1126(f); see also In re Toy & Sports Warehouse, 37 B.R. at 150.

Even if certain impaired classes of claims or interests do not accept a plan and therefore do not

satisfy the requirements of section 1129(a)(8), the plan nevertheless may be confirmed over such

nonacceptance pursuant to the "cramdown" provisions of section 1129(b)(1) of the Bankruptcy

Code.  As a result, the confirmation requirement contained in section 1129(a)(8) is the only

condition of section 1129(a) that is not necessary for confirmation of a plan of reorganization.

Acceptance of a plan of reorganization by an impaired class of claims or interests

is determined by reference to section 1126 of the Bankruptcy Code, which identifies the

members of a class that may vote on a plan and the number and amount of votes necessary for

the acceptance of a plan by a class of claims or interests.  In particular, section 1126 provides

that a plan is accepted (a) by an impaired class of claims if the class members accepting hold at

least two-thirds in amount and more than one-half in number of the claims held by the class

members that have cast votes on the plan and (b) by a class of impaired interests if the class

members accepting hold at least two-thirds in amount of the interests held by the class members

that have cast votes on the plan.  Under section 1126(g) of the Bankruptcy Code, however,

impaired classes that neither receive nor retain property under the plan are deemed to have

rejected the plan.

Applying these standards demonstrates compliance with section 1129(a)(8) by all

the Classes of the Plan except Class 6C (General Unsecured Claims – Delphi Diesel Systems

Corp.) and Class 1I (Other Interests).  Holders of Claims and Interests in Class 1I are not entitled

to receive any distribution under the Plan and therefore are conclusively presumed to have

rejected the Plan.  See 11 U.S.C. § 1126(g).   Although holders of Class 6C from a numerosity

perspective voted overwhelmingly in favor of the Plan - 52 votes (91.2%) in favor and 5 votes

against (8.8%) – this class did not accept the Plan, in part because of the $1,407,641.55 vote of

SPCP Group LLC, as agent for Silver Point Capital Fund LP and Silver Point Capital Offshore

Fund LTD ("Silverpoint").  That comprised 51% of the amount voted in that class.  Nevertheless,

as discussed more fully below, the Debtors have met the "cramdown" requirements in section

1129(b) of the Bankruptcy Code to obtain Confirmation of the Plan notwithstanding the rejection

of the Plan by Class 6C and Class 1I.

Although creditors in Class 9C (Delphi Medical Systems Corporation) faxed two

conforming ballots in favor of the Plan before the voting deadline, the voting agent received no

timely ballot that conformed to the requirements of the Solicitation Procedures Order (Docket

No. 11389).  Nevertheless, there is a presumption that "'impaired classes which failed to vote and

did not object to confirmation of the plan are deemed to have accepted the plan for purposes of

meeting the requirements of § 1129(a)(8) of the Bankruptcy Code.'"  In re Adelphia Commc'ns,

368 B.R. 140, 259-63 & n.270 (Bankr. S.D.N.Y. 2007) (quoting In re Campbell, 89 B.R. 187,

188 (Bankr. N.D. Fla. 1988), and reasoning that "creditor democracy could otherwise be frozen

as a consequence of the disinterest of others") appeal dismissed, 367 B.R. 84 (S.D.N.Y. 2007);

accord Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.), 836 F.2d 1263, 1266-67

(10th Cir. 1988).  Thus, Delphi Medical Systems Corporation should be deemed to have received

sufficient votes to confirm its Plan.

I.    The Plan Provides For The Payment Of Priority Claims (Section 1129(a)(9))

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the effective date of a plan and that the holders of certain other priority claims

receive deferred cash payments.  11 U.S.C. § 1129(a)(9).  In particular, pursuant to section

1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(1)

of the Bankruptcy Code –  administrative claims allowed under section 503(b) of the Bankruptcy

Code – must receive cash equal to the allowed amount of such claims on the effective date of the

plan.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a

kind specified in section 507(a)(3) through (7) of the Bankruptcy Code – generally,  wage,

employee benefit, and deposit claims entitled to priority – must receive deferred cash payments

of a value equal to the allowed amount of such claim or cash equal to the allowed amount of

such claim on the effective date of the plan, depending upon whether the class has accepted the

plan.  Id. § 1129(a)(9)(B).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a

kind specified in section 507(a)(8) of the Bankruptcy Code – i.e., priority tax claims – must

receive deferred cash payments over a period not to exceed six years, the present value of which equals the allowed amount of the claim.  Id. § 1129(a)(9)(C); see United States v. TM Bldg. Prods., Ltd., 231 B.R. 364, 372 (S.D. Fla. 1998) (stating that term "deferred cash payments" means periodic payments, interval of which is determined by balancing circumstances of debtor with reasonable right of creditor to receive prompt payment of its claim); In re Mason & Dixon Lines, Inc., 71 B.R. 300, 303 (Bankr. M.D.N.C. 1987) (same).

The Plan satisfies these requirements.  Subject to the provisions of Article X of the Plan, the Plan provides that all holders of Allowed Administrative Claims will, on the first Periodic Distribution Date after an Administrative Claim is Allowed or becomes payable pursuant to an agreement between the relevant Debtor or Reorganized Debtor and the holder of such Administrative Claim, be paid in full in Cash or subject to such other treatment as the parties have agreed.  See Plan Article 2.1.  Article 2.1 also provides that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and Allowed Administrative Claims arising under contracts assumed during the Chapter 11 Cases before the Effective Date shall be paid by the Debtors or the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, except that (i) any cure payments associated with the assumed contracts are to be paid in accordance with Articles 2.1(a) or 2.1(b) of the Plan, except as otherwise provided in Article VIII of the Plan, and (ii) the contracts may not have been rejected pursuant to Article 8.1(a) of the Plan.  In addition, DIP Claims shall be paid in full in Cash on the Effective Date.  See Plan Article 10.1.

Article 2.2 of the Plan also provides that the holder of each Allowed Priority Tax Claim will receive, at the sole option of the Debtors or the Reorganized Debtors, as appropriate,

in full satisfaction of its Allowed Priority Tax Claim (i) equal Cash payments made during a

period not exceeding six years after the assessment of the tax on which such Claim is based,

totaling the principal amount of such Claim plus Postpetition Interest, plus simple interest at the

rate required by applicable law on any outstanding balance from the Effective Date, or such

lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to

by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors),

provided that such treatment is on more favorable terms to the Debtors (or the Reorganized

Debtors) than the treatment set forth in clause (i) above, or (iii) payment in full in Cash plus

Postpetition Interest.

Accordingly, the Plan satisfies the requirements set forth in section 1129(a)(9) of

the Bankruptcy Code with respect to payment of Priority Claims.

J.    The Plan Has Been Accepted By At Least One Impaired, Non-Insider Class
      (Section 1129(a)(10))

Section 1129(a)(10) of the Bankruptcy Code provides that:

If a class of claims is impaired under the plan, at least one class of claims that is
impaired under the plan has accepted the plan, determined without including any
acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 771

(Bankr. S.D.N.Y. 1992).

As described above and as indicated in the Voting Summary Declarations,

Classes 1D through 12D (GM) have accepted the Plan.[23]  Accordingly, the Debtors have satisfied

this requirement.

---

[23]    A single accepting class with respect to a single debtor is sufficient to satisfy section 1129(a)(10), even in a
multi-debtor plan context.  See In re Resorts Int'l, Inc., 145 B.R. 412, 479 (Bankr. D.N.J. 1990) (court found
section 1129(a)(10) satisfied where accepting impaired classes were creditors of some, but not all, debtors).

K.    The Plan Is Feasible (Section 1129(a)(11))

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of

reorganization may be confirmed only if the confirmed plan "is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor or any successor to the

debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11

U.S.C. § 1129(a)(11).  This section "requires courts to scrutinize carefully the plan to determine

whether it offers a reasonable prospect of success and is workable."  7 Collier, Bankruptcy ¶

1129-74 to 74.1 (15th rev. ed. 2007); see also In re Deluca, No. 95-11924-AM, 1996 Bankr.

LEXIS 1950, at *48 Bankr. E.D. Va. 1996); In re Cellular Info. Sys., Inc., 171 B.R. 926, 945

(Bankr. S.D.N.Y. 1994); In re Rivers End Apartments, Ltd., 167 B.R. 470, 476 (Bankr. S.D.

Ohio 1994); Johns-Manville, 68 B.R. at 635.

It is clear, however, that section 1129(a)(11) does not require a guarantee of the

plan's success; rather, the proper standard is whether the plan offers a "reasonable assurance of

success."  See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y.

1992) ("'It is not necessary that success be guaranteed, but only that the plan present a workable

scheme of reorganization and operation from which there may be a reasonable expectation of

success'" and "[t]he mere prospect of financial uncertainty cannot defeat confirmation on

feasibility grounds since guarantee of future is not required." (emphasis omitted)(citations

omitted)); Johns-Manville, 843 F.2d at 649 (a plan may be feasible although its success is not

guaranteed); In re Texaco Inc., 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is

that there be reasonable assurance of commercial viability."); In re Prudential Energy Co., 58

B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce

without the protection of the Code is not the standard under § 1129(a)(11)."); see also Morrill v.

Waern Bldg. Corp. In re Waern Bldg. Corp., 145 F.2d 584, 588 (7th Cir. 1944) ("[T]he word

57

feasible does not connote absolute insurance of success but only reasonable assurance of

success."); Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341

(8th Cir. 1985) (similar); Rivers End, 167 B.R. at 476 (to establish feasibility, plan "proponent

must demonstrate that its plan offers a reasonable prospect of successand is workable" (citation

omitted)); In re Whittaker Mem. Hosp. Ass'n, 149 B.R. 812, 816 (Bankr. E.D. Va. 1993) ("It is

not a blanket guarantee [of success] which is required, but rather a reasonable likelihood of

success."); In re Apex Oil Co., 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) (guarantee of success

is not required to meet feasibility standard of section 1129(a)(11)); In re Elm Creek Joint

Venture, 93 B.R. 105, 110 (Bankr. W.D. Tex. 1988) (guarantee of success is not required under

section 1129(a)(11), only reasonable expectation that payments will be made).

        The plan proponent has an obligation to provide the court and interested parties

with sufficient information to make the feasibility determination.  See Crestar Bank v. Walker In

re Walker, 165 B.R. 994, 1005 (Bankr. E.D. Va. 1994).  Courts have identified a number of

factors relevant to evaluating the feasibility of a proposed plan of reorganization, including:  (a)

the prospective earnings or earning power of the debtor's business, (b) the soundness and

adequacy of the capital structure and working capital for the debtor's postconfirmation business,

(c) the debtor's ability to meet its capital expenditure requirements, (d) economic conditions, (e)

the ability of management and the likelihood that current management will continue, and (f) any

other material factors that would affect the successful implementation of the plan.  See, e.g.,

Prudential Energy Co., 58 B.R. at 862-63; see also In re Deluca, 1996 Bankr. LEXIS 1950, at

*51; In re Adamson Co., 42 B.R. 169, 176 (Bankr. E.D. Va. 1984); Texaco, 84 B.R. at 910; Toy

& Sports Warehouse, 37 B.R. at 151; Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson), 767

F.2d 417, 420 (8th. Cir. 1985) (Bankr. D.N.J. 1989), aff'd in part, 103 B.R. 521 (D.N.J. 1989); In re Sound Radio, Inc., 93 B.R. 849, 856 (8th Cir. 1985).

For purposes of determining whether the Plan satisfies these feasibility standards, the Debtors have analyzed their ability to meet their obligations under the Plan. The Debtors' strategic five-year business plan and the projections provided by the Debtors in Appendix C to the Disclosure Statement (the "Projections") indicate that, after giving effect to Confirmation, the Reorganized Debtors are reasonably assured to (a) be able to meet their debts as such debts mature and (b) not be left with unreasonably small capital with which to operate their businesses as a result of the Plan or any transactions contemplated by the Plan. See Disclosure Statement Appendix C; Sheehan Declaration at ¶ 169.

The Debtors also have built appropriate flexibility into the Projections to enhance their ability to maintain cash flows even if economic or other conditions are less favorable than expected. See Toy & Sports Warehouse, 37 B.R. at 151 (despite uncertainty as to whether debtors would be able to use their flagship store, their projections were flexible enough to indicate that they could operate profitably without that store, which satisfied feasibility test). The Projections therefore demonstrate that (a) the Plan provides a feasible means of completing a reorganization of the Debtors' businesses as provided in the Plan and (b) subject to the risks described in the Disclosure Statement (see, e.g., Disclosure Statement Article X), there is reasonable assurance that the Debtors will be able to satisfy all of their obligations under the Plan, including under the assumed executory contracts and unexpired leases.

Further, management of the Reorganized Debtors is well qualified to achieve success postconfirmation. The reliability of the business plan is supported by management's proven track record of meeting their projections during the past two-and-a-half years. Moreover,

59

Delphi's management team was instrumental in implementing the transformation plan and achieving substantially all of the goals they hoped to accomplish during these Chapter 11 Cases, and they have Delphi in a position to emerge successfully from chapter 11. <u>See</u> Sheehan Declaration at ¶ 164.

Moreover, the Exit Financing Arrangements together with the investment of the Plan Investors will provide the Debtors with sufficient funds to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct the Debtors' post-reorganization operations. <u>See</u> Sheehan Declaration at ¶ 165.  On November 16, 2007, the Court entered an order authorizing the Debtors to enter into a "best efforts" engagement letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. in connection with the Exit Financing Arrangements and the consummation of the Exit Financing Arrangements within the authority granted is a condition precedent to the Effective Date of the Plan. <u>See</u> <u>id.</u>; Plan, Art. 12.2(a).

Primarily as a result of improved operating performance and lower capital expenditures for the 2007 fiscal year than forecast in the business plan included in its Disclosure Statement, the Company's year-end unaudited cash position is preliminarily estimated to be approximately $850 million favorable to the business plan. <u>See</u> Sheehan Declaration at ¶ 166. After adjusting anticipated cash flows in 2008 to reflect retiming of certain payments previously forecast for 2007 and lowering projections for certain emergence cash payments in 2008, Delphi is reducing its planned exit facilities from the previously announced $6.8 billion authorized by the Bankruptcy Court to approximately $6.1 billion. <u>See</u> Sheehan Declaration at ¶ 166.  This reduction in necessary borrowing provides further support for the Debtors' expectation that the

60

Exit Financing Arrangements will be finalized by early February and in advance of the currently

contemplated Effective Date of the Plan.

Once a suitable lending syndicate has been assembled, and as soon as practicable,

the Debtors intend to negotiate and enter into definitive credit documents with respect to the Exit

Financing Arrangements.  See Sheehan Declaration at ¶ 167.  In an effort to assemble a suitable

lending syndicate, on January 9 and January 10, 2008, the Debtors held lender presentation

meetings in New York and London, respectively, to pitch the Debtors' exit financing to potential

lenders.  See Id.  At those meetings, the Debtors highlighted to potential investors key factors

that make Delphi particularly creditworthy, including (a) world class technology through

investment in research and development, (b) strong market share across continuing businesses,

(c) strong, diversified growth across OEMs and geographies, (d) high levels of booked business

through 2011, (e) flexible workforce in low cost countries, (f) transformational expense

reductions through bankruptcy protection, (g) an experienced automotive management team,

(h) a large equity investment by plan investors, (i) strong support from GM, (j) significant free

cash flow generation after transformation, (j) strong collateral coverage, and (k) substantial

liquidity levels.  See Id.   As a result of these efforts, the Debtors expect to receive commitments

from interested lenders by January 23, 2008 and to have credit documentation for the exit

financing in place by early February.  See Id.

The Bondholder Group (as defined below) and WTC contend that the Plan is not

feasible within the meaning of section 1129(a)(11) because the Debtors have not yet received

firm commitments from a lending syndicate with respect to the Exit Financing Arrangements.

The objections misstate the required showing of feasibility with respect to financing at

confirmation.  The Debtors must show by a preponderance of the evidence that confirmation of

the Plan will not lead to the need for another financial reorganization or to liquidation.  See In re

Cellular Info. Sys., 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994); accord In re Texaco, 84 B.R. at

910 ("The Debtors have established at the confirmation hearing that, upon the emergence of the

[d]ebtors from Chapter 11, there is at least a reasonable prospect that the Debtors' earning

capacity, together with their ability to obtain financing and sell assets, will be sufficient to fund

the Plan.  Such evidence adequately supports a finding by this Court that the Plan is feasible

within the meaning of section 1129(a)(11).").  The Debtors have made such a showing with

respect to their financing.  See Sheehan Declaration at ¶ 170.

Further evidence of the feasibility of the Plan can be found in the independent

review of the Debtors' business plan conducted by the Plan Investors, which the Plan Investors

conducted in connection with their decision to make an investment of up to $2.55 billion

pursuant to the Investment Agreement.  This independent review provides further validation for

the Debtors' belief that the Plan offers a reasonable prospect of success and is workable.

Moreover, in the cases finding that a plan is not feasible due to a lack of exit

financing, the debtors did not present evidence regarding the availability of exit financing or the

identity of specific investors.  See, e.g., In re Chadda, No. 07-12665bif, 2007 WL 3407375

(Bankr. E.D. Pa. 2007); In re Repurchase Corp., 332 B.R. 336 (Bankr. N.D. Ill. 2005).  Here, in

contrast, the Debtors are in the process of negotiating the Exit Financing Arrangements and

entered into a "best efforts" agreement with Citigroup and J.P. Morgan, and the Debtors' lead

arrangers have already begun assembling a syndicate of potential lenders with respect to the Exit

Financing Arrangements, as set forth above.

Moreover, entry into the Exit Financing Arrangements is a condition precedent to

the occurrence of the Effective Date under Article 12.2 of the Plan.  Unlike some of the

conditions precedent in Article 12.2, the condition precedent related to the Exit Financing

Arrangements cannot be waived.  See Plan Article 12.3.  Thus, the financial reorganization

represented by the Plan could not occur without the consummation of the Exit Financing

Arrangements.  Confirmation of the Plan, therefore, could not lead to the need for another

financial reorganization or a liquidation of the Debtors because the Plan would not become

effective unless the Debtors obtained the Exit Financing Arrangements.  In this sense, it would

be appropriate for the Court to assume that the Exit Financing Arrangements will occur for the

purposes of determining the feasibility of the Plan.

       For all these reasons, the Plan satisfies the feasibility standard of section

1129(a)(11) of the Bankruptcy Code.

    L.    The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12))

       Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28

U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that

provision be made for their payment.  11 U.S.C. § 1129(a)(12).  All fees payable under 28 U.S.C.

§ 1930 have been paid or will be paid on the Effective Date, thereby satisfying section

1129(a)(12) of the Bankruptcy Code.

    M.    Continuation Of Retiree Benefits (Section 1129(a)(13))

       Since the Petition Date, the Debtors have modified (and until the Debtors emerge

from chapter 11 may still modify) certain salaried and hourly retiree benefits based on either

their unilateral right to modify such benefits pursuant to the relevant pension benefit plan

language and applicable law, or pursuant to court order.  For example, before the filing of these

Chapter 11 Cases, the Debtors determined to modify certain benefits related to current and

former executives, which changes became effective shortly after the Petition Date.  Pursuant to

the applicable plan language, the Debtors had the unilateral right to modify these plans and accordingly court approval was not sought.

On the other hand, with respect to Union-represented hourly retirees, the Debtors did not unilaterally modify retiree benefits. Rather, the Debtors entered into agreements with their respective Unions to modify certain retiree benefits for former (and current) hourly employees. These agreements are specifically referenced in Articles 7.21 and 7.23 of the Plan. Those sections specifically provide for treatment of certain retiree benefits for certain of the Debtors' unionized current and former employees pursuant to the Union Settlement Agreements approved by multiple orders from the Court. Those orders include section 1114 approval of modification of retiree welfare benefits for certain current and former employees represented by the (a) UAW, entered on July 19, 2007, (b) IUE-CWA, entered on August 16, 2007, (c) IAM, the IBEW, and the IUOE, entered on August 16, 2007, and (d) USW, entered on August 29, 2007. Pursuant to Articles 7.21 and 7.23 of the Plan, the underlying Union agreements addressing modification of certain retiree benefits will be automatically assumed in accordance with the applicable order issued by the Court.

In addition, the Debtors obtained the right to modify retiree benefits pursuant to a court order under section 363(b) of the Bankruptcy Code based on that certain agreement dated August 3, 2007, pursuant to which Delphi and GM formalized their agreement on the treatment of certain non-represented hourly individuals in the "Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees" (the "Non-Represented Term Sheet"). The Debtors did not believe court approval was necessary because they believed they had the unilateral right to make such modifications (and such modifications are in the ordinary course of the Debtors' business). See In re Doskocil Cos., 130 B.R. 870

(Bankr. D. Kan. 1991).  Nonetheless, the Debtors sought court approval out of an abundance of caution and because benefits related to hourly retirees were at issue.  On August 16, 2007, the Court granted the Debtors' motion pursuant to 11 U.S.C. § 363 to allow modification of retiree welfare benefits for certain non-represented hourly active employees and retirees of Debtors and approved the Non-Represented Term Sheet  (Docket No. 9107).  In approving the Non-Represented Term Sheet, the court agreed that section 1114 of the Bankruptcy Code was inapplicable.  (Tr. of Aug. 16, 2007 Hr'g 24:10-25:15.)

Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continuation, after the plan's effective date, of all retiree benefits, at levels established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code for the duration of the period that the debtor has obligated itself to provide such benefits.  11 U.S.C. § 1129(a)(13).  Through the authorization of the Delphi-GM Definitive Documents in Article 7.20 of the Plan, the assumption of the collective bargaining agreements as set forth in Article 7.21 of the Plan, and the assuming and continuing of the plans referenced in Article 7.23 of the Plan, the Reorganized Debtors will continue to pay "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), thereby satisfying section 1129(a)(13) of the Bankruptcy Code, provided, however, that during the Chapter 11 Cases, modifications to certain retiree benefits were made solely in accordance with the terms of the existing benefit plans, and not as a result of subsections (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code.  See Sheehan Declaration at ¶ 175.

N.    The Plan Satisfies The "Cramdown" Requirements

The holders of General Unsecured Claims in Class 6C have not accepted the

Plan.[24]  Further, the holders of Other Interests in Class 1I neither receive nor retain any property

under the Plan and, therefore, are deemed not to have accepted the Plan pursuant to section

1126(g) of the Bankruptcy Code.  Nevertheless, section 1129(b)(1) of the Bankruptcy Code

provides that, if certain requirements are met, a plan may be confirmed notwithstanding that

section 1129(a)(8) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of . . . section [1129(a) of the Bankruptcy
> Code] other than paragraph (8) are met with respect to a plan, the court, on
> request of the proponent of the plan, shall confirm the plan notwithstanding the
> requirements of such paragraph if the plan does not discriminate unfairly, and is
> fair and equitable, with respect to each class of claims or interests that is impaired
> under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

Thus, to confirm a plan that has not been accepted by all impaired classes, the

plan proponent must show that the plan "does not discriminate unfairly" and is "fair and

equitable" with respect to the nonaccepting impaired classes.  See Travelers Ins. Co. v. Bryson

Props., XVIII In re Bryson Properties, XVIII, 961 F.2d 496, 500 (4th Cir. 1992) ; In re Catron,

186 B.R. 194, 197 (Bankr. E.D. Va. 1995); In re Snyder, 144 B.R. 393, 396 (C.D. Ill. 1990)

---

[24]    Even though Class 3C (creditors of Connection System Debtors ("Connection") and Class 5C (creditors of
Delco Electronics Overseas Corporation ("DEOC")) did not vote against the Plan, as a result of an outstanding
Rule 3018 motion by Silverpoint, Classes 3C and 5C could at a later date fail section 1126 compliance on
account of the value of the votes voted.  With respect to numerosity, however, Class 5C still satisfies
section  126 of the Bankruptcy Code.  To the extent the cramdown requirements ultimately apply with respect
to Classes 3C and 5C, the Debtors submit that such requirements are satisfied with respect to Classes 3C and 5C.
The analysis set forth herein with respect to Class 6C applies with equal force to these Classes.

 Silverpoint's Rule 3018 motion seeks permission to vote with respect to Class 3C approximately $937,000 in
claims, half of which have already been disallowed and expunged by final court order.  With respect to
Class 5C, Silverpoint seeks to vote certain claims for which ballots have already been counted.  Even were
Silverpoint to prevail on the remaining aspects of its Rule 3018 motion, the outcome would not change the
acceptance of the Plan by those classes.

(stating that "if all of the elements required for confirmation other than the requirements in §

1129(a)(8) are present, the court must confirm the plan if it does not discriminate unfairly and it

is fair and equitable to each class of claims which have not accepted the plan"); In re Zenith

Elecs. Corp., 241 B.R. 92,105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of

creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless

confirm the plan if it 'does not discriminate unfairly and is fair and equitable'" (citation omitted));

Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.), 150 F.3d 503, 519

(5th Cir. 1998); Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.

P'ship), 115 F.3d 650, 653 (9th Cir. 1997); John Hancock Mut. Life Ins. Co. v. Route 37 Bus.

Park Assocs., 987 F.2d 154, 157 n.5 (3d Cir. 1993).

1.    Unfair Discrimination

The Bankruptcy Code does not provide a standard for determining when "unfair

discrimination" exists.  Bankruptcy courts in the Second Circuit have held that a plan unfairly

discriminates "where similarly situated classes are treated differently without a reasonable basis

for the disparate treatment." In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928, at *59

(Bankr. S.D.N.Y. Oct. 31, 2003).  If there is a reasonable basis for disparate treatment, there is

no unfair discrimination.  Id.; see also In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr.

S.D.N.Y. 1990) (upholding separate classification of and discrimination against different secured

claims because of different risks associated with claims).

In assessing whether a plan unfairly discriminates, courts typically examine the

facts and circumstances of the particular case to determine the existence of unfair discrimination.

See, e.g., In re Bowles, 48 B.R. 502, 507 ("[T]he courts should use a flexible standard to

determine what is equitable and this flexibility comes from a case-by-case approach examining

carefully the totality of the facts and circumstances of the case."); see also In re Freymiller

67

Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that determination of

unfair discrimination requires court to "consider all aspects of the case and the totality of all the

circumstances"); In re Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that

courts "have recognized the need to consider the facts and circumstances of each case to give

meaning to the proscription against unfair discrimination").

   Here, there is no unfair discrimination against holders of claims in Class 6C

because the only similarly situated class is Class 6D (GM Claims).  Under the Plan, GM will

receive cash and a note, assume certain pension and OPEB liabilities, and be bound by two

agreements that govern their near- and long-term relationship to the Debtors.  Class 6D receives

this treatment based specifically upon the Debtors' settlement with GM, whose relationship to the

Debtors and mutual claims are described in detail above.  The nature of the GM-Delphi

relationship and their mutual claims is unique in the context of these cases.  This clearly

constitutes a reasonable basis for the difference in treatment.

   There is likewise no unfair discrimination against Class 1I because, under the Plan,

the Other Interests in class 1I include "options, warrants, call rights, puts, awards, or other

agreements to acquire Existing Common Stock."  These are not direct interests in the Debtors,

but instead are speculative or contingent rights to obtain interests at a future date.  Thus, the

different treatment of interests in this class is not unfairly discriminatory when compared to the

treatment accorded holders of common stock.

   2.  The Plan Is Fair And Equitable

   (a)  Absolute Priority Rule

   Liquidity Solutions, Inc. ("LSI") contends that the Plan is not fair and equitable

because holders of Claims and Interests junior to Class 6C receive a distribution while senior

claims in Class 6C are not paid in full, including postpetition interest.  This structure, Liquidity

Solutions, Inc. argues, violates the so-called "absolute priority rule."

The absolute priority rule, a doctrine that predates the Bankruptcy Code,

mandates that a class must be paid before a junior class receives a distribution.  See Case v. Los

Angeles Lumber Prods. Co., 308 U.S. 106, 115-16 (1939) (recognizing absolute priority rule as

part of fair and equitable standard).  Section 1129(b)(2)(B) codifies that pre-Bankruptcy Code

doctrine.  See H.R. Rep. No. 95-595, at 413 (1977) ("[Section 1129(b)(2)(B)] codifies the

absolute priority rule . . . ."); see generally Kenneth N. Klee, All You Ever Wanted To Know

About Cram Down Under The New Bankruptcy Code, 53 Am. Bankr. L. J. 133, 143 (1979)

(section 1129(b)(2)(B) "essentially appl[ies] a relaxed version of the traditional absolute priority

rule").

(i)    The Plan Provides For Full Payment Of Class 6C Claims

Section 1129(b)(2)(B)(i) of the Bankruptcy Code provides that to be fair and

equitable with respect to a class of dissenting unsecured claims, the following requirement must

be met:

> the plan provides that each holder of a claim of such class receive or retain on
> account of such claim property of a value, as of the effective date of the plan,
> equal to the allowed amount of such claim[.]

11 U.S.C. § 1129(b)(2)(B)(i) (emphasis added).

The Plan provides that each holder of a Class 6C Claim will receive property at

least equal to the full amount of its claim with postpetition interest.  Specifically, the holders of

Class 6C Claims will receive 100% of the amount of their claims (and applicable postpetition

interest through the earlier of January 31, 2008 and the Confirmation Date) at Plan Equity Value

through a distribution of New Common Stock of Reorganized Delphi and transferable

subscription rights to participate in a discount rights offering to acquire shares of New Common

69

Stock.  LSI argues that the Plan Equity Value is overstated and that accordingly Class 1C claim

holders will not receive payment in full with interest as promised by the Plan. The Debtors,

however, have shown that the Plan Equity Value is reasonable, as set forth below.  See Resnick

Declaration ¶ 11-19.  Accordingly, Class 6C claims will receive payment in full with postpetition

interest and cannot complain of distributions being provided to junior classes.  Thus, the Plan

satisfies the absolute priority rule as to Class 6C.

> (ii)    The Bankruptcy Code Requires Payment Only Of The
>         Allowed Amount Of Class 6C Claims

LSI's argument is premised on the proposition that the Plan must pay postpetition

interest.  Subparagraph (i) of section 1129(b)(2)(B), however, requires only that holders of

unsecured claims to receive the "allowed amount" of their claims.  It's express and unambiguous

terms cannot be construed to require the distribution of postpetition interest.  See United States v.

Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) ("[W]here . . . the statute's language is plain, 'the

sole function of the courts is to enforce it according to its terms.'") (citation omitted).  The

allowed amount of a claim, as mandated by section 502(b)(2) of the Bankruptcy Code, does not

include unmatured interest (thus excluding the allowance of postpetition interest).  See 11 U.S.C.

§ 502(b)(2) (court shall allow claim "except to the extent that . . . such claim is for unmatured

interest"); Int'l Asset Recovery Corp. v. Thompson Mckinnon Sec. Inc., 335 B.R. 520,

527 (S.D.N.Y. 2005) ("The general rule regarding post-petition interest is clear: unsecured or

under-secured creditors are not entitled to post-petition interest on a pre-petition claim.").

Section 1129(b)(2)(B) must be construed in a manner that does not conflict with section

502(b)(2).  See In re Enron Corp., __ B.R.__, No.01-16034, 2007 WL 2446498, at *3 (S.D.N.Y.

Aug. 27, 2007) (construing sections other than 502(b) and 1129 and stating that, "The Court

must read the Bankruptcy Code as a whole, taking care that it does not construe any provision 'in

a manner that would place it in conflict with other provisions.'") (quoting In re Smart World

Techs., LLC, 423 F.3d 166, 183 (2d Cir. 2005)).

   The plain reading of sections 1129(b)(2)(B)(1) and 502(b)(2) is further supported

by a review of the legislative history of section 1124 of the Bankruptcy Code.  Prior to the 1994

revisions to the Bankruptcy Code, section 1124(3) specified that a creditor receiving full

payment of an "allowed claim" was not impaired if "the holder of such claim or interest receives,

on account of such claim or interest, cash equal to (A) with respect to a claim, the allowed

amount of such claim." One bankruptcy court applied section 1124(3), in conjunction with

section 502(b)(2), to allow a solvent debtor to pay the allowed claims of unsecured creditors in

full, excluding postpetition interest, while still providing that creditors were unimpaired.  In re

New Valley Corp., 168 B.R. 73, 77-80 (Bankr. D.N.J. 1994).  Following the New Valley

decision, Congress repealed section 1124(3) to prevent debtors from treating creditors as

unimpaired without payment of postpetition interest on their claims.  H.R.Rep. No. 103-835, at

47-48 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3356-57.

   Thus, when faced with a court that read section 502(b)(2) (defining "allowed

claim" as not including postpetition interest) with section 1124(3), which provided that payment

of an "allowed claim" in full on emergence rendered a claim unimpaired, Congress took action

and repealed the statute.  Yet Congress chose not to alter section 1129(b)(2)(B)(i), which just as

clearly provides that to be fair and equitable with respect to a class of dissenting unsecured

claims the debtor must pay only the "allowed amount" of the claims in that class.  If Congress

intended that debtors be required to pay postpetition interest for purposes of the fair and

equitable test, it would have amended section 1129(b)(2)(B)(i) at the same time it took action to

prevent the same result in the impairment context.

71

The argument is also made that the Plan runs afoul of uncodified components of the fair and equitable doctrine.  Premised on the contention that distribution to junior classes first requires payment of postpetition interest to creditors, this is nothing more than an argument that some uncodified component of the absolute priority rule alters the express requirements of section 1129(b)(2)(B).  Because Congress codified the absolute priority rule in section 1129(b)(2)(B), it makes little sense that Congress intended that particular component of the statute to include additional requirements uncodified by Congress.  Accordingly, the argument that an uncodified requirement of the fair and equitable doctrine mandates payment of postpetition interest before distribution to junior holders of claims or interests negates Congress' clear intention with respect to the absolute priority rule as expressed in the plan language of section 1129(b)(2)(B).  As a result, the Plan satisfies the requirement of section 1129(b)(2)(B)(i).

      (iii)     Uncodified Aspects Of The Fair And Equitable Requirement

          (1)     Prior Solvent Debtor Cases Are Not Applicable In This Case

Two recent decisions purporting to impose an uncodified component of the absolutely priority rule that postpetition interest must be paid are not applicable in this case.  In Official Comm. of Unsecured Creditors v. Dow Corning Corp. In re Dow Corning Corp., 456 F.3d 668, 680 (6th Cir. 2006), the Sixth Circuit held that unsecured creditors were entitled to postpetition interest at the default rate absent compelling equitable factors affecting interest rate.  The court stated in dicta that the absolute priority rule requires a solvent debtor to pay postpetition interest to unsecured creditors before equity is entitled to receive a distribution.[25]  Id.

---

[25]    For the reasons set forth above, the Dow Corning court's assertion that an uncodified component of the absolute priority rule requires payment of postpetition interest before a recovery for equity negates the plain meaning of section 1129(b)(2)(B) and should not be followed.  Although lower courts must give due deference to Circuit

*(cont'd)*

at 678.  In addition, the court in <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321 (Bankr. D. Del.

2004), overruled an equity committee objection to a plan that proposed to pay unsecured claims

postpetition interest, holding that, notwithstanding section 502(b)(2), "payment of post-petition

interest before any distribution to equity holders in a chapter 11 case is not prohibited by the

Code and, in fact, <u>may</u> be required." <u>Id.</u> at 344 (emphasis added).

These decisions do not apply for two reasons.  First, the holding of <u>Dow Corning</u>

and <u>Coram Healthcare</u> are not on point.  In <u>Dow Corning</u>, the issue was whether the contract rate

or the default rate should be used to calculate the postpetition interest provided to certain

unsecured creditors under the debtor's plan of reorganization.  <u>Dow Corning</u>, 456 F.3d at 674-80.

Thus, the court decided the discrete issue of what rate of interest applied rather than whether

postpetition interest is required.  The <u>Coram Healthcare</u> issue is the reverse of the issue presented

here.  In that case, the court decided, in the context of an objection from an equity committee,

whether it is <u>permissible</u> to pay postpetition interest to a class of unsecured claims when equity is

not getting a full recovery, and the court correctly ruled in the affirmative.  <u>Coram Healthcare</u>,

315 B.R. at 343-45.  Here, the issue is whether a debtor is <u>required</u> to pay such interest if it

provides any recovery to a junior class.  Accordingly, the <u>Dow Corning</u> and <u>Coram Healthcare</u>

cases are in apposite.

Second, the dicta set forth in <u>Dow Corning</u> and <u>Coram Healthcare</u> applies only to

solvent debtors.  <u>See</u> <u>Dow Corning</u>, 456 F.3d at 678 (articulating dicta that solvent debtors must

pay postpetition interest before providing recovery to equity); <u>Coram Healthcare</u>,  315 B.R. at

_____

*(cont'd from previous page)*

Court of Appeal decisions from outside their circuit and lower courts are not bound by those decisions.  <u>See</u> <u>In re Hubbard</u>, 23 B.R. 671, 673 (Bankr. S.D. Ohio 1982).

344 (citing chapter 7 provisions in support of same proposition).[26]  Here, however, the Debtors

are not solvent.  Much of the value that is provided to junior stakeholders on account of their

Claims and Interests is related to and derived from Delphi's settlement with GM as set forth in

the Global Settlement Agreement and the Master Restructuring Agreement..[27]  See Sheehan

Declaration at ¶ 21.  Thus, any uncodified rule that a solvent debtor must pay postpetition

interest to unsecured creditors before it makes any distribution to equity security holders is not

applicable here.

        In sum, neither the plain language of the Bankruptcy Code nor any uncodified

component of the fair and equitable test require the Plan to provide postpetition interest to

holders of Class 6C Claims.  Accordingly, the Plan is confirmable despite Class 6C's failure to

vote to accept the Plan.

(2)     New Value Contribution

---

[26]  In Coram Healthcare, the bankruptcy court cites section 726(a)(5) (providing for postpetition interest on all claims in chapter 7 liquidations once the allowed amount of all claims have been paid) and section 1129(a)(7) (requiring chapter 11 plan to provide at least as much to claimants as would liquidation under chapter 7) in support of its holding that a reorganization plan may provide postpetition interest on unsecured claims.  Coram Healthcare. 315 B.R. at 344.  Other courts have also relied on these sections to suggest that a solvent debtor must pay postpetition interest before it provides a recovery to equity.  See M&I Thunderbird Bank v. Birmingham (In re Consolidated Water Utilities, Inc.), 217 B.R. 588, 591-592 (9th Cir. B.A.P. 1998); In re Butler, 42 B.R. 777, 787 (Bankr. E.D. Ark. 1984).  The best interests test under section 1129(a)(7), however, should not be confused with the fair and equitable test under 1129(b).  As noted elsewhere in this Memorandum, the Debtors can show that their proposed distribution to Class 6C meets the best interests test without paying postpetition interest.  Accordingly, sections 726(a)(5) and 1129(a)(7) do not support a requirement that the Plan must provide postpetition interest to Class 6C.

[27]  An argument that the Debtors' proposed distribution to equity security holders proves, by itself, that the Debtors are solvent proves too much.  The Dow Corning court stated that "[t]he absolute priority rule imposes somewhat different requirements when a solvent debtor seeks confirmation of its plan."  Dow Corning, 456 F.3d at 678.  But, if paying equity alone means that a debtor is solvent, then the explicit condition that a debtor be solvent is superfluous and the absolute priority rule would be no different for a "solvent" debtor than it would be for an "insolvent" debtor.  Indeed the distinction would be meaningless because a debtor paying equity without paying unsecured claims postpetition interest would always violate the absolute priority rule.  But the Dow Corning court and the authority upon which it relies distinguish between a solvent and insolvent debtor.  To avoid rendering this distinction meaningless, solvency must mean something other than simply making a distribution to equity security holders.

74

The Supreme Court has noted that the phrase "on account of such junior claim" in section 1129(b)(2)(B)(ii) of the Bankruptcy Code should be interpreted to mean that recovery for junior classes is barred only when that recovery is "because of" a claim or interest.  See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 451 (1999).  The Supreme Court also noted that reading section 1129(b)(2)(B)(ii) of the Bankruptcy Code as a blanket prohibition on recovery for equity or junior classes in the context of cramdown would leave the phrase "on account of " without meaning.  Id.  For old equity or junior classes to retain their interests pursuant to the exception, there must be a capital contribution that is (1)"new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received."  See, e.g., Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. In re Bonner Mall P'ship, 2 F.3d 899, 908 (9th Cir. 1993).

Here, Delphi has made a substantial new value contribution, including agreeing to contribute Delphi stock for Plan currency to the Class 6C creditors.  The Plan provides for satisfaction of the control group liability claims of the PBGC and the DIP Facility.  Absent such satisfaction, Delphi Diesel Systems Corp. would be jointly and severally liable for the DIP Facility and PBGC Claims.  Indeed, the PBGC has filed a proof of claim against Delphi Diesel Systems Corp. (as well as against DEOC) in excess of $5 billion.  In, addition, as a guarantor under the DIP Facility, Delphi Diesel Systems Corp. could become responsible for the DIP Facility but for the provision of the Plan providing for the repayment of the DIP Facility.  Finally, there can be no doubt that Delphi Diesel Systems Corp., and thus the creditors of that Debtor, will benefit substantially from the Plan's payment of the Company's Administrative Claims, the payment of prepetition claims through Plan currency, the MDL settlements, and the benefits provided with respect to the global settlement reached with GM, including revenue support and

75

labor cost support, among other things.  In short, Delphi has made substantial new value

contributions which permit the distributions to be made to the junior classes pursuant to the Plan.

(3)    GM's Significant Contribution

Distributions to be made to junior classes are the result of GM's significant

contribution.  Under applicable law in the Second Circuit, creditors may agree to direct a portion

of the recoveries they would receive on account of their claims under a Plan to certain junior

creditors or interest holders who would otherwise receive a smaller distribution or no distribution

at all on account of their junior claims or interests, bypassing or leapfrogging intermediate

classes of creditors or interest holders.  "Creditors are generally free to do whatever they wish

with the bankruptcy dividends they receive, including sharing them with other creditors, so long

as recoveries received under the Plan by other creditors are not impacted."  In re Worldcom, Inc.,

2003 WL 23861928, at *61.  Thus, senior classes may forgo a portion of their allowed recovery

to enable junior classes of creditors to receive a distribution from a debtor's estate.  See Official

Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1312-13 (1st Cir.

1993) (holding in chapter 7 context that creditors are free to do whatever they wish with estate

assets they receive, including sharing such assets with other creditors).

In Worldcom, the bankruptcy court applied the reasoning of SPM in the chapter

11 context:

> The holding of [SPM] and its progeny affirming the propriety of contributions by certain
> creditors to other creditors under the Bankruptcy Code is applicable to the [contributions
> to Class 6B by the Ad Hoc Committee of Dissenting Bondholders], which are in
> furtherance of a consensual plan of reorganization.

Worldcom, 2003 WL 23861928, at *61.  The Worldcom court also concluded that "[t]he

absolute priority rule is inapplicable to contributions of Plan recoveries made by certain creditors

to other creditors. Agreements by creditors to share their recoveries under a plan of

76

reorganization with other creditors need not benefit an entire class.  Moreover, the contributing

creditor need not be a secured creditor."  Id. (citations omitted).

   The Plan, including the distributions challenged by the objections, represents

exactly the type of compromise addressed by the court in Worldcom.  GM and its affiliates filed

a proof of claim against the Debtors' estates for $6 billion plus further purported significant

unliquidated claims.  In addition, in its third quarter 2007 Form 10-Q filed on November 8, 2007,

GM stated that its exact amount of claims could not be established (due in part to the contingent

nature of many of its claims), but estimated the amount of its claims could be as much as $13

billion.  Under the terms of the Plan and the settlement agreement between the Debtors and GM,

GM will receive approximately $2.573 billion in consideration.  Providing a meaningful

distribution to all of Delphi's stakeholders was an important element of settlement discussions

with GM.  GM's intent to allocate a portion of its distribution to junior classes (and even

creditors on the same priority level as GM) is evidenced by GM's actions in October 2007.  After

it became apparent in September 2007 that the Debtors would need to adjust certain distributions

under the Plan, GM agreed to reduce its recovery from $2.7 billion in cash to approximately

$2.573 billion in various forms of consideration, consisting of only $750 million in cash and the

remainder in a second lien note and junior preferred convertible stock.  GM agreed to these

reductions in part to maintain the settlement structure underlying the Plan, including payments to

junior classes as well as previously agreed payments to other general unsecured creditors.  As a

result, the distributions being paid to junior classes would have been paid to GM absent the

settlement with GM, and these distributions accordingly do not violate the absolute priority rule.

   Recently, though, in Motorola, Inc. v. Official Committee of Unsecured Creditors

(In re Iridium Operating LLC), 478 F.3d 452 (2d Cir. 2007), the Second Circuit interpreted SPM

in the context of a pre-plan settlement under Fed. R. Bankr. P. 9019 and distinguished the facts

and circumstances of <u>SPM</u> from <u>Motorola</u>.  In so doing, the Second Circuit held that a settlement,

for which the debtors sought approval outside of a plan under Fed. R. Bankr. P. 9019, between a

consortium of purportedly secured lenders and the creditors' committee before the plan of

reorganization violated the absolute priority rule.

   The <u>Iridium</u> case is distinguishable for several reasons.  First, the <u>Iridium</u> case

involved a pre-plan settlement that would have offended the Bankruptcy Code's priority scheme

in a meaningful way by providing that administrative claims would not be paid in full.  Here, the

Debtors seek approval of the GM settlement and the resulting payments to junior classes in the

context of Plan confirmation, with the attendant protections of creditor voting and opportunity to

object to the Plan.  Moreover, the Plan provides for payment of at least the allowed amount of

General Unsecured Claims (and applicable postpetition interest through the earlier of January 31,

2008 and the Confirmation Date) at Plan Equity Value, even if certain of the objectors disagree

with the nature or sufficiency of the Plan currency they will receive.  The Debtors are

accordingly not seeking to circumvent the strictures of the Bankruptcy Code's priority scheme

through a settlement.  To the contrary, GM's settlement of its claims against the Debtors have

allowed for meaningful distributions provided under the Plan.

   Likewise, the contributing creditor in the <u>Iridium</u> case held asserted secured

claims that were actively contested by the creditors' committee.  Here, as noted above, the

ultimate amount of GM's claim has been negotiated or consented to by the Debtors, the Plan

Investors, the Creditors' Committee, and the Equity Committee, and the impact of the ultimate

amount of GM's claim with respect to distributions to other stakeholders was considered in those

negotiations.  Here, unlike most cases involving a contribution to junior classes when property

78

specifically earmarked for a specific creditor or class of creditors is directed to a junior class, the resolution (and adjustment in October 2007) of the GM claim has been linked to the stakeholders' ultimate resolution of distributions under the Plan. Thus, even though the Plan does not explicitly provide for the delivery of a portion of gift of GM's distribution directly to junior classes, that contribution has always been implicit in the Plan.

Indeed, even if the recoveries to Class 6C were less than the allowed amount of its claims, the Plan is still fair and equitable. The recoveries afforded to the Debtors' stakeholders are attainable only because of the settlements embodied in the Plan, including the considerable contributions provided by GM. This fairness is evidenced by the support of the Creditors' Committee and Equity Committee, which act as fiduciaries for their constituents, rending any objection that the Plan is not fair and equitable is self-serving and contrary to the facts of this case.

In sum, neither the plain language of the Bankruptcy Code nor any uncodified component of the fair and equitable test requires the Plan to provide postpetition interest. As a result, the distributions afforded to junior classes are not prohibited by the absolute priority rule and the objections to that effect should be overruled.

(b)      No "Premium Payments"

An uncodified component of the fair and equitable standard is that no creditor or interest holder may be paid a premium over the full amount of its claim. See, e.g., In re MCorp Fin., Inc., 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("If former stockholders' interests are eliminated, a valuation is required to make sure that the senior classes of claims are not being provided for more than in full."), appeal dismissed on other grounds, 139 B.R. 820 (S.D. Tex. 1992). This aspect of the fair and equitable standard is satisfied here because no class senior to Class 6C (Delphi Diesel Systems Corp.) or Class 1I (Delphi Corporation) will receive more than

79

payment in full, as shown by the Resnick Declaration.  The only class of claims senior to

Class 6C is Secured Claims, Priority Tax Claims, and Administrative Claims of Delphi Diesel

Systems Corp.  The Plan provides that holders of these Claims will receive the allowed amount

of their claims and no more.

These types of Claims and the MDL Claims as to Delphi Corporation are all

senior to Class 1I.  But again, none of these Claims receives more than payment in full.

(c)    The Valuation Is Reasonable

As an initial matter, the Plan Equity Value was chosen from a range of potential

values as the result of arm's-length negotiations between sophisticated parties, including the Plan

Investors and the Creditors' Committee.  The Plan Equity Value is based on the total enterprise

value of the Reorganized Debtors, less net debt and warrant value.  According to the Debtors'

financial advisor and investment banker, Rothschild, the Debtors' range of potential total

enterprise values falls within the range of $11.2 billion to $14.1 billion.  See Resnick Declaration

at ¶ 14.  Rothschild made this assessment after a comprehensive and methodical analysis of the

Debtors, including a review of the Debtors' business plan, a trading values analysis, a precedent

transactions analysis, and a discounted cash flow analysis.  See Resnick Declaration at ¶ 14.

Although the midpoint of the valuation is lower ($12.7 billion) than the negotiated total

enterprise value of $13.3 billion, the entire range of possible values is reasonable.  See Resnick

Declaration at ¶ 14.

A debtor's reorganization value is a factual determination for the court.  In

assessing the evidence presented, courts recognize the incentives of interested parties to over- or

undervalue the debtor.  See, e.g., In re Coram Healthcare Corp., 315 B.R. at 339; cf. In re Granite

Broadcasting Corp., 369 B.R. 120, 140-41 (Bankr. S.D.N.Y. 2007) ("'People who must back

their beliefs with their purses are more likely to assess the value of the [asset] accurately than are

people who simply seek to make an argument.'" (citation omitted)).  Courts weigh the expert

testimony provided based on their view of the qualifications and credibility of the expert

witnesses.  In re Am. HomePatient, Inc., 298 B.R. 152, 173 (Bankr. M.D. Tenn. 2003) aff'd, 420

F.3d 559 (6th Cir. 2005); see also In re Nellson Nutraceutical, Inc., No. 06-10072, 2007 WL

201134, at *41-42 (Bankr. D. Del. Jan. 18. 2007) (evaluating and weighing qualifications and

credibility of competing experts); In re Oneida Ltd., 351 B.R. 79, 90-92 (Bankr. S.D.N.Y. 2006)

(discrediting equity committee's expert when he adjusted certain of debtor's projections and was

retained on contingency fee basis).  As made clear in the Resnick Declaration, this Court has

been presented with a well-reasoned, thorough valuation by an expert of unimpeachable

qualifications.

        The fact that the ultimate point in the range of total enterprise values was agreed

among the parties further supports the determination of the Plan Equity Value.  The objections

do not contest the reasonableness of the range of values determined by Rothschild, but rather

contest the precise point in the range that is being used for purposes of Plan distributions.  The

Court has correctly noted that the "pinpoint valuation of such a set of businesses is a fantasy and

that valuation ultimately in this context . . . is one that should be premised upon a negotiation

based on a course economic reality but that ultimately reflects a willingness by all of the parties

to live with what they believe is fair in light of the entire context."  (Tr. of Dec. 7, 2003 Hr'g

18:24-5, 19:1-5.); accord In re Exide Techs., 303 B.R. 48, 62 (Bankr. D. Del. 2003) (also noting

impropriety of using historical results or the market for valuation purposes when they do not

reflect benefits of restructuring).

        In sum, the Debtors have met the requirements for cramdown of Class 6C and

Class 1I.  Accordingly, the Plan should be confirmed despite the nonacceptance of these classes.

81

VI.    RESPONSES TO OBJECTIONS

As indicated above, a total of 43 objections were filed to the Plan, some of which have been resolved or withdrawn.  These objections, any resolutions, and the Debtors' responses are summarized in the charts attached hereto as Appendix B and Appendix C.  Although the charts address each objection, this memorandum focuses on some of the more substantive objections that cannot be easily summarized in chart form.  The Debtors' responses to each of these objections are discussed in turn.

A.    Bondholder Group

An ad hoc group of bondholders consisting of Davidson Kempner Capital Management LLC, Elliott Associates, L.P., Nomura Corporate Research & Asset Management, Northeast Investors Trust, and Whitebox Advisors, LLC, which are represented by common counsel (the "Bondholder Group"),[28] assert several objections to confirmation of the Plan, including objections with respect to classification and treatment, the MDL Claims, substantive consolidation, and the release provisions set forth in the Plan.

As a threshold matter, the Bondholder Group's entire objection hinges upon the assumption that holders of Senior Note Claims would vote to reject the Plan. (See, e.g., Bondholder Group Objection 1 and 35 ("Assuming that the holders of the Senior Notes vote to reject the Plan – as we trust will happen –  the Plan cannot be confirmed" and ("[T]he Plan lack[s] the support of the Senior Noteholders . . .")).  As described above, however, the holders of Senior

---

[28]    Two different sets of creditors submitted the Bondholder Group's Preliminary Objection (Docket No. 11471) and Memorandum of Law and Supplemental Objection (Docket No. 11951) filed on January 11, 2008. Specifically, five creditors - Caspian Capital Investors, LLC, Castlerigg Master Investments Ltd., CR Intrinsic Investors, Elliott Associates, and Everest Capital Limited  - were dropped from the group filing the January 11, 2008 Objection. Attached hereto at Appendix F is a chart showing that the list of creditors submitting responses and objections on behalf of the Bondholder Group to the Disclosure Statement and Plan, respectively, has changed several times.

Note Claims voted in <u>favor</u> of Plan.  Accordingly, the great majority of the Bondholder Group's

objection is now moot, especially with respect to cramdown and substantive consolidation, as set

forth below.

        1.     <u>Classification And Treatment</u>

        The Bondholder Group asserts that the Plan cannot be confirmed because the

TOPrS are placed in the same class (Class 1C) as other general unsecured creditors.  As an initial

matter, both the Senior Noteholders <u>and</u> the TOPrS voted overwhelmingly in favor of the Plan,

demonstrating support of the classification and treatment of Class 1C Claims contained in the

Plan.  Because the voting results show that the TOPrS and the remaining Class 1C claimants, if

classified separately, have each voted separately to accept the plan, the Bondholder Group's

objection to classifying the two groups together is moot.  (See chart set forth herein in section

III.E.)

        In any event, contractually subordinated unsecured claims may be placed in the

same class as senior and other unsecured claims.  Courts have noted that, under section 1122(a)

of the Bankruptcy Code, the "similarity of claims is not judged by comparing creditor claims

inter se.  Rather, the question is whether the claims in a class have the same or similar legal

status in relation to assets of the debtor." <u>In re Frascella Enters., Inc.</u>, 360 B.R. 435, 442 (Bankr.

E.D. Pa. 2007) (citing <u>In re Piece Goods Shops Co.</u>, 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995));

<u>see also</u> <u>In re Union Fin. Servs. Group, Inc.</u>, 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004)

("The fact that [creditor's] [c]laim is subordinated to other class members does not change the

fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), <u>aff'd</u>, 155 F.

App'x 940 (8th Cir. 2005); <u>In re Eagle Bus Mfg., Inc.</u>, 134 B.R. 584, 595 (Bankr. S.D. Tex. 1991)

("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior

Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other

Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy

Code. . . . "), aff'd, 158 B.R. 421 (S.D. Tex. 1993); see also David L. Bleich, Chapter 11 Plans,

647 PLI/Comm 437, 519-20 (1993) (senior and subordinated claims "belong in the same class

since they are 'substantially similar,' i.e., they have the same legal rights against the debtor's

assets, the subordination being only a private matter between them").

The Plan's classification has a rational basis because it is based on the respective

legal rights of each holder of a Class 1C claim against the applicable consolidated estate.   The

classification recognizes that the TOPrS, the Senior Notes, and other senior debt are all non-

priority unsecured claims in relation to the Debtors subject to Class 1C claims, and as such may

be classified in the same class, even though contractually one group is subordinated to the other.

Consequently, the classification of claims within  Class 1C is appropriate and the Plan meets the

requirements of section 1122(a).

The Bondholder Group also asserts that the Plan cannot be confirmed because it

treats claims in Class 1C differently because holders of TOPrS Claims are to receive 90% of the

amount of their claims while other general unsecured claims in Class 1C receive payment in full

with accrued postpetition interest.  Initially, it would seem that the Bondholder Group, which

holds Senior Debt, would have no standing to object to any allegedly lesser treatment afforded to

a junior class.  Nevertheless, the Plan's proposed treatment of the subordinated TOPrS and other

general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which

requires that all members of a class receive the same treatment.  The Plan provides that all

general unsecured creditors, including holders of TOPrS, will receive New Common Stock and

Discount Rights.  The Plan also provides that all Class 1C unsecured creditors including TOPrS

are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion

of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the

latter with postpetition interest in accordance with the TOPrS indenture.  After the senior

unsecured creditors are paid in full, with required postpetition interest, the remainder of the

distribution available to the class of general unsecured Claims will then be distributed to holders

of TOPrS Claims.  Thus, the distribution scheme governing Class 1C complies with section

510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions[29]

enforceable in a case under title 11.

  2.  <u>MDL Claims</u>

  The Bondholder Group further claims that the Section 510(b) Note Claims,

Section 510(b) Equity Claims, and the Section 510(b) ERISA Claims (collectively, the "MDL

Claims") are subordinated in all respects to general unsecured claims, and should not be afforded

the treatment proposed under the Plan.  The Bondholders' Group argues that the subordination

provisions of 11 U.S.C. § 510(b) apply outside the context of a cramdown case.  This is incorrect,

and the Bondholders' Group has not identified a single decision supporting its position.  The

language in section 510(b) cited by the Bondholders' Group merely sets forth the relative priority

of certain claims – those "arising from rescission of a purchase or sale of a security of the debtor

or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security,

or for reimbursement or contribution allowed under section 502 on account of such claim" –

---

[29] <u>See</u> Indenture between Delphi Corporation and Bank One Trust Co., N.A. (the "TOPrS Indenture"), dated October 28, 2003, which is Confirmation Exhibit Number __.  The TOPrS Indenture provides that in the event Delphi commences a bankruptcy, insolvency, or other such proceeding, "all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property, shall be made to any Holder of any of the Debt Securities or Coupons on account thereof."  Indenture § 17.01(d).  Senior Debt  is deemed "paid in full" once the holders thereof receive "cash, securities or other property equal to the amount of such Senior Debt then outstanding."  <u>Id.</u>  In the event that the trustee or any holder receives a distribution under the Indenture in contravention of the subordination provision, such distribution is deemed held in trust for the benefit of Senior Debt holders and is subject to disgorgement.  Id.  Each holder specifically covenanted and agreed to be bound by the subordination provisions. <u>Id.</u> § 17.01.

within the comprehensive priority scheme established under the Bankruptcy Code. Again,

because of the results of the voting on the Debtors' Plan, there is no requirement that the Debtors'

Plan comply strictly with that scheme, including the portion of the scheme reflected in section

510(b).

      Furthermore, the MDL Settlements and the distributions to be made pursuant to

the Plan are appropriate and necessary components of the Plan for several reasons. First,

as discussed above the Plan is a settlement plan that provides distributions in varying amounts to

all of the Debtors' stakeholders. Under the settlement structure of the Plan, the Debtors have

sought to resolve most material contingencies, including the MDL Proceedings and the rank and

priority of the MDL Claims.[30] The MDL Settlements take into account the risks and rewards

that the MDL Claims would or would not be subordinated, in whole or part, to general unsecured

Claims. In the Debtors' judgment, these contingencies had to be resolved to obtain the funding

of the Plan contemplated under the GM settlement and the Investment Agreement.

      Second, unlike substantially all other Claims and Interests to be allowed under the

Plan at their face value, the MDL Claims to be allowed under the MDL Settlements are allowed

in amounts which are substantially less than the actual damages associated with such claims as

estimated either by the Debtors or asserted by the plaintiffs in the MDL Proceedings.

Accordingly, even though these Claims might have been ultimately determined to be

subordinated to general unsecured Claims, the actual amount of these Claims if litigated to their

conclusion or if estimated by the Court might be substantially higher than the Claims proposed to

be allowed under the Plan. The Debtors believe that the reduced amounts of these Claims

---

[30]    The Plan does not assert that the MDL Claims are equal in rank and seniority to general unsecured Claims.
Conversely, the Plan does not assert that the MDL Claims are junior to the general unsecured Claims.

proposed to be allowed under the Plan have facilitated the overall settlements embodied in the Plan.

Third, the settlements provide the Debtors with a resolution of the MDL Claims as well as related insurance claims arising from the MDL Proceedings and certain government investigations and proceedings, which will allow the Debtors to avoid the costs of further litigation with respect to those matters.  Although it is possible that the Debtors could avoid liability altogether with respect to those matters if the litigation continued, or that the claims related to the MDL would be estimated at zero for purposes of the Plan, that is not a certain outcome and in any event would most likely require the expenditure of significant time and money by the Debtors to achieve that result.  The Debtors accordingly concluded that the settlements offered the best opportunity to obtain a resolution of the MDL Claims and related matters while timely moving toward a successful emergence from chapter 11 protection.

Fourth, the MDL Settlements also resolve claims against certain current and former directors and officers of the Debtors, as well as certain underwriters of the Debtors' debt offerings.  In the absence of a settlement, some of these other defendants would have asserted indemnification and other reimbursement claims against the Debtors based on the claims asserted against them in the MDL proceedings.  The MDL Settlements resolve these indemnification claims against the Debtors at no additional cost to their Estates.  In the absence of the MDL Settlements, the Debtors could be exposed to these reimbursement claims by some of these other defendants.

Fifth, there is no doubt that the Claims at issue in the MDL Proceedings are complex, and that resolving those Claims other than through a settlement would involve protracted litigation involving, among other things, dispositive motions, extensive discovery, and,

if necessary, trial.  Even an estimation process in this Court would unduly delay the resolution of the Chapter 11 Cases and deplete the assets of these estates.

Finally, addressing the MDL Claims facilitated the payment of insurance proceeds by the Debtors' insurers and thereby made it easier to achieve the MDL Settlements. By voting to accept the Plan, creditors and equity security holders have supported the treatment of MDL Claims provided by the Plan and the MDL Settlements.  For this reason, and because the Debtors have satisfied the requirements for approval of settlements under Bankruptcy Rule 9019, the Court should overrule any objections related to the MDL Settlements.

           3.      <u>Substantive Consolidation</u>

        (a)      The Plan's Substantive Consolidation Is Warranted.

The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of the Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; in other words, no objection to the substantive consolidation of the other Debtor groups has been filed.

The objections that have been made have been rendered moot by the acceptance of the affected classes.  With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors <u>supports</u> the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot.  Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing.  **Thus, again, your vote on this Plan is important.**"  (Disclosure Statement at DS-113) (bold in original text).

88

As for distribution, with or without substantive consolidation, all creditors of the

Delphi-DAS Debtors would receive the same exact form of distribution.  In short, even if the

Plan did not provide for the substantive consolidation of Delphi, DAS, and 20 of their

subsidiaries and affiliates, the Plan would still have provided for the creditors of those 22

Debtors to receive the same stock and discount rights that are currently provided for under the

Plan.  Therefore, any argument with respect to whether the substantive consolidation of the

Delphi-DAS Debtors for distribution purposes is appropriate is of no moment; the outcome

would be the same with or without the substantive consolidation for distribution purposes.

Even though the Debtors believe that any challenge to substantive consolidation is

moot, for the avoidance of doubt, the Debtors demonstrate below that the substantive

consolidation set forth in the Plan is appropriate under the Bankruptcy Code and applicable

precedent.  The authority to order substantive consolidation of several debtor estates derives

from sections 105 and 1123(a)(5) of the Bankruptcy Code.  Section 105 provides in relevant part

that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."  11 U.S.C. § 105(a).  See Union Sav. Bank v.

Augie/Resdivo Baking Co. (In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d. Cir. 1988);

First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 974 F.2d 712,

720 (6th Cir. 1992) ("In exercising its equitable discretion, bankruptcy court may consolidate

cases involving related debtors."); Woburn Assocs. v. Kahn (In re Hemingway Trans., Inc.), 954

F.2d 1, 11-12 & n.14 (1st Cir. 1992); Eastgroup Prop. v. S. Motel Ass'n, 935 F.2d 245, 248 (11th

Cir. 1991); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C.

Cir. 1987).  In addition, section 1123(a)(5) sets forth "merger or consolidation of the debtor with

one or more persons" as one of several examples of measures available to debtors to "provide

adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).

            In the Second Circuit, the two critical factors to consider in examining a proposed

substantive consolidation are "(i) whether creditors dealt with the entities as a single economic

unit and 'did not rely on their separate identity in extending credit,' or (ii) whether the affairs of

the debtors are so entangled that consolidation will benefit all creditors." Augie/Restivo, 860

F.2d at 518 (citations omitted); see also In re 599 Consumer Elecs., Inc., 195 B.R. 244, 248

(S.D.N.Y. 1996) ("It is necessary to consider both of those two critical factors . . .  Conceivably,

[however,] substantive consolidation could be warranted on either ground; the Second Circuit's

use of the conjunction 'or' suggest that the two cited factors are alternatively sufficient criteria.")

(citations omitted).  In applying the second factor of the Augie/Restivo test, courts have used a

balancing test pursuant to which substantive consolidation "should be ordered [only] where the

inequalities of substantive consolidation are outweighed by the practical difficulties of tracing

complex transactions between interrelated entities."  In re Drexel Burnham Lambert Group, Inc.,

138 B.R. 723, 765 (Bankr. S.D.N.Y. 1992).

                        (b)        Standards For Substantive Consolidation

            There are no statutorily prescribed standards for substantive consolidation.  The

propriety of substantive consolidation must be determined on a case-by-case basis.  See, e.g.,

FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992).  Courts have examined the

following factors in determining whether substantive consolidation of debtors' estates is

warranted:

- the presence or absence of consolidated financial statements and tax returns;

- ownership by the parent corporation of all or substantially all of the capital stock or other interest in a subsidiary;

- the existence of intercompany guaranties;

- the presence of officers common to both parent and subsidiary;

- parent and subsidiary boards of directors comprised of the same slate of directors;

- the shifting by the parent of individuals on and off the subsidiary's board of directors;

- directors and executives of the subsidiary not acting independently in the interest of the subsidiary but in accordance with directives from the parent's board or management;

- assumption by the parent of contractual obligations of its subsidiaries;

- the degree of difficulty in segregating and ascertaining individual assets and liabilities;

- the existence of transfers of assets without observance of corporate formalities;

- the commingling of assets and business functions;

- the profitability of consolidation at a single location;

- the financing of the subsidiary by the parent or its affiliates;

- the undercapitalization of one of the entities in the affiliated group;

- the subsidiary having substantially no business except that with its parent or its affiliates or no assets except those conveyed to it by the parent or an affiliate;

- the formal legal requirements of the subsidiary and parent are not observed;

- the parent referring to the subsidiary as a department or division;

- creation of subsidiaries to satisfy regulatory requirements peculiar to specific jurisdictions;

- creation of subsidiaries to satisfy requirements of lenders;

- the parent paying expenses, salaries, or rents of the subsidiaries; and

- sharing of overhead, management, accounting, and other related expenses among the different corporate entities.

See Fish v. East, 114 F.2d 177, 191 (10th Cir. 1940); Eastgroup, 935 F.2d at 249-50; Simon v.

New Ctr. Hosp. (In re New Ctr. Hosp.), 187 B.R. 560, 569 (E.D. Mich. 1995); In re Drexel

Burnham Lambert Group, Inc., 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992); In re Crabtree, 39

B.R. 718, 723-24 (Bankr. E.D. Tenn. 1984); In re Vecco Constr. Indus., Inc., 4 B.R. 407, 410

(Bankr. E.D. Va. 1980).  None of these factors is necessarily determinative of the issue, and all

of these factors need not exist for substantive consolidation to be approved.  Eastgroup, 935 F.2d

at 250; In re Gainesville P-H Prop., Inc., 106 B.R. 304, 305 (Bankr. M.D. Fla. 1989).

        Generally, these factors are examined in the context of a substantive consolidation

analysis to determine: (i) whether there is a "substantial identity" or an inseparable

"interrelationship" or "entanglement" between the debtors to be consolidated and (ii) whether the

benefits of consolidation outweigh the harm or prejudice to creditors, including whether

individual creditors relied upon the separate identity of one of the entities to be consolidated such

that they would be prejudiced by the consolidation.  Augie/Restivo, 860 F.2d at 518.

        Some courts have recognized a "liberal trend" in their substantive consolidation

rulings based on "'increased judicial recognition of the widespread use of interrelated corporate

structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax

and business planning purposes.'"  Drexel Burnham, 138 B.R. at 765 (citation omitted).  The

Drexel Burnham court applied the "liberal trend" standard enunciated by Eastgroup, which

provides that a showing by the proponent of consolidation that "'(1) there is substantial identity

between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or

to realize some benefit'" creates the rebuttable "presumption that creditors did not rely on the

separateness of the entities."  Drexel Burnham, 138 B.R. at 765 n.9 (quoting and applying

Eastgroup, 935 F.2d at 249).  In a business world composed of complex corporate structures, the

"liberal trend" is a product of courts' acknowledgment of the contextual reality within which their

findings of debtor "entanglement" are being made.  See, e.g., In re Standard Brands Paint Co.,

154 B.R. 563, 569-73 (Bankr. C.D. Cal. 1993) (although debtors kept separate audited books and

records and observed all corporate formalities under state law, court nevertheless found

substantive consolidation warranted based upon functional analysis of debtors' business which

showed that debtors operated as a single consolidated entity; court viewed this as more modern

approach to determination of "substantial identity" among group of debtors); New Ctr. Hosp.,

187 B.R. at 569 ("'Even when the financial relationships among the parties to be consolidated are

capable of being untangled, the affairs of the parties may nonetheless be "inextricably

intertwined." If intercompany debts and transfers are numerous and the operations are

interdependent, the parties are "entangled" even if a detailed analysis of the records could

ultimately identify the true assets and liabilities of the separate entities.'").

       The Bondholder Group has failed to rebut the Debtors' prima facie showing that

substantive consolidation is warranted. A party seeking substantive consolidation bears the

initial burden of making a prima facie case that substantive consolidation is warranted. Drexel

Burnham, 138 B.R. at 766. A prima facie case is established by demonstrating 'that (1) there is

substantial identity between the entities to be consolidated; and (2) consolidation is necessary to

avoid some harm or to realize some benefit.'" Id. The burden then shifts to the objecting

creditor to demonstrate that "(1) it has relied on the separate credit of one of the entities to the

consolidation; and (2) it will be prejudiced by substantive consolidation." Id. (quoting Eastgroup,

935 F.2d at 249); In re Bonham, 226 B.R. 56, 83 (Bankr. D. Alaska 1998), aff'd, 229 F.3d 750

(9th Cir. 2000). If the creditor can rebut the prima facie case, then the court can approve

substantive consolidation only if the benefits of consolidation outweigh the harm to the creditor.

Id. The Bondholder Group fails to show that the bondholders that extended credit to the Debtors

relied on the separateness of the Debtors. And even if they had, the Debtors have demonstrated

that the benefits of substantive consolidation outweighs any harm that the Bondholder Group or

any other objector asserts.  Accordingly, substantive consolidation is proper and should be

approved.

> (c)    There Is A Substantial Identity, Interrelationship,
> And Entanglement Between And Among The
> Debtor Groups To Be Consolidated

As discussed below, many of the foregoing factors demonstrate the substantial

identity and extensive interrelationship and interdependence between and among the Debtors

within the four consolidated groups.  The Debtors submit that these factors warrant substantive

consolidation of the Debtor groups to be consolidated.

Taking seriously the standards for substantive consolidation in the Second Circuit,

the Debtors and their advisors conducted an exhaustive review of the Debtors' operations to

determine what substantive consolidation would be appropriate, if any.  See Eisenberg

Declaration at ¶¶ 14-15.  In fact, as a result of this review, the Debtors determined that the

following entities operate in a sufficiently independent manner such that they do not require or

warrant consolidation with any other entity:  Delco Electronics Overseas Corporation, Delphi

Diesel Systems Corp., Delphi Furukawa Wiring Systems LLC, Delphi Mechatronic Systems,

Inc., Delphi Medical Systems Corporation, Delphi Medical Systems Colorado Corporation,

Delphi Medical Systems Texas Corporation, and MobileAria, Inc.  Based on that review,

however, the Debtors determined that the substantive consolidation of the following Debtor

groups, as proposed under the Plan, is appropriate under both factors of the Augie/Restivo test:

| Consolidated Debtor Group Or Debtor Name | Debtors In Group |
|---|---|
| Delphi-DAS Debtors | Delphi Corporation, Delphi Automotive Systems LLC, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Services Solutions, Inc., Delphi Liquidation Holding Company, Delphi LLC, Aspire, Inc., Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Exhaust Systems Corporation, and Environmental Catalysts, LLC |
| DASHI Debtors | Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc. |
| Connection System Debtors | Packard Hughes Interconnect Company and Delphi Connection Systems |
| Specialty Electronics Debtors | Specialty Electronics, Inc. and Specialty Electronics International Ltd. |

The Delphi-DAS Debtors generally present themselves as "Delphi" and do not distinguish themselves as separate legal entities in marketing materials or press releases. Delphi regularly prepares and files only consolidated financial statements, including providing only consolidated financial information in a prospectus to raise $1.5 billion in bonds. See Eisenberg Declaration at ¶17. There is accordingly no basis for creditors of these Debtors to rely on their separate identities in extending credit, and the analysis performed by the Debtors and their advisors determined that creditors did not so rely. See Eisenberg Declaration at ¶17. The rationale for the three other Debtors groups is discussed below.

Likewise, it is in the best interests of the Debtors' creditors to proceed under the substantive consolidation scenario proposed by the Plan because, within the Debtor groups to be

consolidated, it would be too difficult and costly to trace the complex transactions between

interrelated entities. Thorough discussions of substantive consolidation are contained in the

Sheehan Declaration and the Eisenberg Declaration. Some of the key factors in support of

operational entanglement of the consolidated Debtor groups are as follows:

(d)    Delphi-DAS Debtors

- The Plan substantively consolidates Delphi with each of its seven direct Debtor subsidiaries. With the exception of DAS, these direct Debtor subsidiaries are generally non-operating holding companies established to facilitate the operations and efficiencies of the entire company.

- Four of the seven entities (Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Automotive Systems Global (Holding), Inc. and Delphi Foreign Sales Corporation) do not have a trial balance, indicating a lack of separate financial records, or have minimal scheduled liabilities, if any, indicating a lack of material creditors.

- The other two direct Debtor subsidiaries of Delphi (Delphi Automotive Systems Services LLC and Delphi Automotive Human Resources LLC) are employee leasing companies for which prepetition liabilities were subject to first day orders and therefore their creditor claims were satisfied through these orders.

- Although most of the Company's U.S. operations are owned by DAS, many of the most significant contracts relating to these operations are entered into by Delphi on behalf of itself and its subsidiaries. These contracts include the U.S. collective bargaining agreements, healthcare benefits, prepetition credit facilities, and GM's indemnifications under the agreements entered into at the time of the spin-off from GM.

- Delphi's global technology, relied upon by its manufacturing operations throughout the world, is substantially owned by a subsidiary of DAS.

- DAS has historically relied on Delphi for financing and funding for its operations.

- Delphi relies on, but does not reimburse, for corporate services provided by DAS.

- Delphi and DAS have certain unreconciled prepetition intercompany activity that would require considerable effort and expense to reconcile.

- As is typical for large corporations, DAS was included in Delphi's consolidated Federal tax returns, and participated in its integrated cash management system, under which funds collected by different operational divisions of the Debtors at various banks in various locations throughout the world are, through a series of transactions, transferred to concentration accounts and used, through other accounts, to pay operating expenses.

- In addition to consolidating Delphi with DAS, the Plan also consolidates 14 of DAS's 24 directly or indirectly wholly – owned Debtor subsidiaries within the Delphi–DAS Debtors.  Most of these are non-operating entities that were established to facilitate operations and that serve a specific purpose.[31]

        (e)        DASHI Debtors

- Delphi Automotive Systems (Holding), Inc. ("DASHI") is an indirect, wholly owned subsidiary of Delphi.  DASHI is owned 13% by DAS and 87% by Delphi NY Holdings Corporation (which is wholly owned directly by Delphi).  DASHI wholly owns indirectly Delphi's foreign operating subsidiaries, which are not debtors and not subject to the Chapter 11 process.

- Although DASHI is not substantively consolidated with the Delphi-DAS group under the Plan, it is substantively consolidated with seven of its direct wholly owned subsidiaries.  These are generally non-operating holding companies established with a specific purpose to facilitate Delphi's foreign operations.

- Five of the DASHI Debtors (Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., and Delphi International Holdings Corp.) do not have a trial balance, indicating a lack of separate financial records, or do not have scheduled liabilities, indicating a lack of creditors.

- Two of the DASHI Debtors (Delphi International Services, Inc. and Delphi China LLC) are non-operating entities without any third party scheduled liabilities, indicating a lack of non-Delphi creditors.

        (f)        Connection Systems Debtors

- The Plan substantively consolidates Packard Hughes Interconnect Company with Delphi Connection Systems.

- Packard Hughes Interconnect Company and Delphi Connection Systems also share a trial balance.

- These entities have overlapping business documents and essentially operate as a single entity.

---

[31] Eight of these 14 entities (Delphi Liquidation Holding Company, Delphi Electronics (Holding) LLC, Delphi Automotive Systems Tennessee, Inc., Delphi LLC, Aspire, Inc., Delphi Integrated Service Solutions, Inc., DREAL, Inc., and Delphi Receivables LLC) do not have independent trial balances or do not have scheduled liabilities.  Four of the 14 (ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Environmental Catalysts, LLC, and Exhaust Systems Corporation) did not exhibit characteristics consistent with legal entity identification to the public, such as business documents displaying the entity's legal name or preparing a form with legal entity information to provide to suppliers upon request.  Two of the 14 (Delphi Automotive Systems Risk Management Corp. and Delphi Technologies, Inc.) were formed to serve specific supporting functions for Delphi, such as managing foreign exchange hedging and intellectual property, respectively, would not serve a purpose without the rest of the Delphi enterprise.

(g)    Specialty Electronics Debtors

- The Plan substantively consolidates Specialty Electronics, Inc. with Specialty Electronics International, Ltd.

- Specialty Electronics International, Ltd. does not have a separate trial balance; its financial data is included with that of Specialty Electronics, Inc. and cannot be segregated.

- These entities have overlapping business documents and essentially operate as a single entity.

See Sheehan Declaration at ¶¶ 82-91, Eisenberg Declaration at ¶¶ 15-28.

As discussed above, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of voting and distribution with respect to the Plan.  The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor Claims from the resulting common fund.  Through this pooling of assets, all creditor claims (save for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated. There is no harm to holders of TOPrS Claims through substantive consolidation because the rationale for paying less than the full amount of these claims is based on the subordination provisions of their indenture, not on substantive consolidation.  In light of these factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled.

4.    Releases

The Bondholder Group also contends that the third-party releases and related injunction provisions contained in the Plan are legally impermissible.  The contributions of those parties that receive releases under the Plan are substantial, and based on those contributions and

98

the need for those contributions to make the Plan distributions possible, the third-party releases

under the Plan are essential to the success of the Plan and the Debtors' reorganization.  See

Sheehan Declaration at ¶ 124.

A majority of courts, including the Second Circuit, have held that bankruptcy

courts may permanently enjoin actions by third-parties against non-debtors as part of a

restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re

Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham

Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d

285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 WL 2577825, at *8 (Bankr.

S.D.N.Y. Aug. 16, 2006) appeal dismissed, 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007);

Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr.

S.D.N.Y. 2005).  Courts consider several equitable factors in determining whether third-party

releases are appropriate, including, among other things, whether there is an identity of interests

between the debtor and the third-party; whether the non-debtor has contributed substantial

consideration to the restructuring; and whether the third-party releases and related injunction are

necessary to further the restructuring.  See, e.g., Gillman v. Cont'l Airlines (In re Cont'l Airlines),

203 F.3d 203, 211-214 (3d Cir. 2000); In re Mahoney Hawkes, LLP, 289 B.R. 285, 296-300

(Bankr. D. Mass. 2002); In re Dow Corning Corp., 287 B.R. 396 (E.D. Mich. 2002).  Although

courts have considered these and other factors, such factors are not an exclusive list of

considerations, nor are they a list of conjunctive requirements.  See, e.g., In re Master Mortgage

Inv. Fund, Inc., 168 B.R. 930, 935-36 (Bankr. W.D. Mo. 1994).

In these Chapter 11 Cases, the facts noted herein support the third-party releases

under the Plan and therefore the releases should be approved.  The releases of each of the major

99

constituencies in these cases, including the Debtors' officers, directors, and employees, the

Creditors' Committee, the Equity Committee, the Plan Investors, the DIP Agent, the DIP Lenders,

the Unions, and GM, allow these parties to participate in the Debtors' restructuring cases and

protect individuals who have contributed to the restructuring process.  The Released Parties have

participated in complex negotiations with an unprecedented scope.  Moreover, the amounts

contributed by certain of these parties as part of settlements or other agreements are substantial.

The contributions made by some Released Parties amount to billions of dollars invested in

Delphi's reorganization.  Further, these parties conditioned their settlements and agreements on

receiving the releases contemplated by the Plan.

   With respect to GM, the releases granted in the Plan and in the Global Settlement

Agreement are justified by GM's significant financial contributions to and close relationship with

the Debtors.  GM made significant claims against the Debtors in these Chapter 11 Cases and

agreed to settle those claims for less than the asserted value and in exchange for debt securities

rather than equity or cash.  These concessions by GM are material and essential to the success of

the Debtors' reorganization as set forth in the Plan.  Moreover, Delphi's unusual relationship with

GM gives rise to circumstances warranting the releases provided for in the Plan and the Global

Settlement Agreement that reasonably may be characterized as unique.  As Delphi's former

parent and largest customer, GM has played an important role in the Debtors' Chapter 11 Cases,

and its support of the Plan is critical to the future success of the Company.  Given that Delphi is

GM's largest supplier, the success of the Debtors' reorganization is also vital to GM.

   Under the terms of the Delphi-Appaloosa EPCA, the Plan Investors committed to

purchase $800 million of Series A Preferred Stock and Series B Preferred Stock  (as defined in

the Investment Agreement) and approximately $175 million of New Common Stock in

reorganized Delphi. Additionally, on the terms and subject to the conditions of the Delphi-

Appaloosa EPCA, the Plan Investors committed to purchase any unsubscribed shares of new

common stock in connection with the approximately $1.575 billion rights offering that was to be

made available to holders of Delphi's existing common stock. Altogether, the Plan Investors

have agreed invest up to $2.55 billion in the reorganized Company pursuant to the Investment

Agreement. In exchange for this essential and significant investment, the Plan provides for

releases of the Plan Investors.

The Plan Investors and GM, whose settlements make Plan distributions possible,

have both required that the Debtors include the release provisions in the Plan. The injunction

provided by the release and related provisions is critical to this reorganization. See Sheehan

Declaration ¶¶ 123-132.

The Debtors are obligated to indemnify certain of the Released Parties for various

types of losses. As such, a suit brought against such a Released Party would necessarily involve

the Debtors and would potentially consume assets of the Debtors' estates. Certain Released

Parties—in particular, the DIP Agent, the DIP Lenders, and the Plan Investors—have contributed

or will contribute significant assets to the reorganization, either in the form of debtor-in-

possession or exit financing. Absent the funding provided by these parties, the Debtors would

likely be unable to successfully reorganize.

If the third-party releases for directors, officers, and employees of the Debtors are

not approved, then they may have or assert indemnification claims against the Debtors. A claim

against the directors, officers, and employees of the Debtors would therefore be, in effect, a

claim directly against the estates from which the value of the Debtors is derived.

Nothing in the Plan limits the liability of any person not specifically released thereunder including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability. Article 11.5 of the Plan does not release any Released Party (other than GM) from any cause of action held by a governmental entity existing as of the Effective Date based (i) on the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.

In summary, the financing and other contributions provided by the Released Parties are essential and the reorganization embodied in the Plan would be impossible without their involvement. Additionally, it is vital for the effectiveness of the Debtors' reorganization efforts that the released parties who continue to be actively involved in this process will be free from suits arising from their contributions to the Debtors' reorganization.[32]

---

[32] The Bondholder Group also objects to the Plan based on the Debtors' ostensible failure to meet cramdown and feasibility requirements. With respect to cramdown, such requirements do not apply to the Senior Notes because Class 1C voted in favor of the Plan. Accordingly, this memorandum need not and does not address this portion of the Bondholder Group's objection. See In re Adelphia Commc'ns Corp., 368 B.R. 140, 224 (Bankr. appeal dismissed, 367 B.R. 84 (S.D.N.Y. 2007)) (noting that because court was not addressing cramdown situation, "the additional requirements of section 1129(b) [were] inapplicable"); accord Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 646, 650 (2d Cir. 1988) (stating that section 1129(b) applies only as to "classes that voted against the plan"); Herbert Construction Co. v. Greater New York Sav. Bank (In re 455 CPW Associates), 1999 WL 675972 (S.D.N.Y. Aug. 31, 1999) (rejecting dissenting creditor's argument that plan violated absolute priority rule because class to which creditor belonged had voted in favor of plan). Other cases reaching the same result include WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship), 227 B.R. 445, 449-50 (S.D.N.Y. 1998) and In re Northeast Dairy Cooperative Federation, Inc., 73

*(cont'd)*

B.    Taxing Authorities

Four state taxing authorities objected to the Plan with respect to the proposed

treatment of secured tax claims under the Plan. [33]    Secured tax claims are classified in Article 5.1

of the Plan with all other Secured Claims and are thus unimpaired and were not entitled to vote

on the Plan.  See 11 U.S.C. §§ 1124, 1126(f).  The last sentence of Article 5.1 of the Plan

provides that "any Claim arising as a result of a tax lien that would otherwise be a Secured Claim

shall be paid in accordance with Article 2.2 of [the] Plan."  Article 2.2 addresses the payment of

priority tax claims.  Thus, the Plan provides that holders of secured tax claims are classified as

Secured Creditors, but the Debtors have certain flexibility in paying these claims.

Article 5.1 of the Plan provides that liens giving rise to secured tax claims will

remain in full force and effect, as provided for under applicable non-bankruptcy law, until the

Secured Claim is satisfied in full.  Therefore, even if the Debtors elect to stretch out the

payments on account of allowed secured tax claims in accordance with Articles 2.2 and 5.1 of

the Plan, holders of secured tax claims will retain their liens, to the extent they are valid under

non-bankruptcy law, until receiving payment in full on their allowed claims.  This treatment is

consistent with Article 5.1 which provides that "at the sole option of the Debtors or Reorganized

Debtors, each Allowed Secured Claim shall be satisfied in full in Cash or Reinstated."  As

_____

(cont'd from previous page)
    B.R. 239, 252 (Bankr. N.D.N.Y. 1987).  In addition, with respect to feasibility, the Debtors have demonstrated
    that the Plan is feasible under section 1129(a)(11) of the Bankruptcy Code in section IV.K above.

[33]    The objections were filed by (a) Angelina County, Bexar County, Cameron County, Cypress-Fairbanks ISD,
    Dallas County, City of El Paso, City of Harlingen, Harlingen CISD, Harris County, City of McAllen, Montague
    County, Nueces County, City of Pharr, San Benito CISD, City of San Marcos, San Marcos CISD, South Texas
    College, South Texas ISD, Tarrant County, and Valley View ISD (Docket No. 11754); (b) Pima County, AZ
    (Docket No. 11823); (c) Burkburnett I.S.D., Wichita County, Hidalgo County, Hidalgo County Drainage Dist.
    #1 and Hidalgo I.S.D. (Docket No. 11847); and (d) Johnson County, Kansas (Docket No. 11906).

defined in Article 1.165 of the Plan, Reinstated "means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of a Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code . . . ."

Moreover, Article 1.156 of the Plan provides for Postpetition Interest on Priority Tax Claims (and secured tax claims) with "interest accruing from the Petition Date through the earlier of the Confirmation Date or January 31, 2008 at the non-penalty rate set forth in the applicable state or federal law . . . ."  If the Debtors elect to pay an allowed secured tax claim in "equal Cash payments during a period not to exceed six years after the assessment of the tax on which the Claim was based," the Plan provides that the Debtors will pay Postpetition Interest "plus simple interest at the rate required by applicable law."  Plan, Article 2.2.  The reinstatement of the lien together with Postpetition Interest, and simple interest if the payment on the Allowed Secured Claim is stretched out over six years, leaves holders of secured tax claims fully protected.

In addition, to the extent that the Debtors elect to make tax payments over a period of six years, certain objectors request a specific remedy or cure rights in the event that the Debtors default on the scheduled payments.  Although the Plan does not provide for such recourse, Article XIII of the Plan provides that the Court will retain jurisdiction over "all matters arising out of, and related to the Chapter 11 Cases and [the] Plan, including, among others, . . . (d) to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided herein."  Therefore, in the event of default, the taxing authorities have the right to enforce such payment in the Bankruptcy Court.

Furthermore, certain taxing authorities also challenge Article 9.8 of the Plan, which requires the Debtors to establish and fund a Disputed Reserve for Claims that have not yet

been allowed.  The objectors argue that if the Disputed Reserve has insufficient funds to pay their Claims, they will have no other recourse against the Debtors.  This objection should be overruled for at least two reasons.  First, as discussed above, to the extent that a secured tax claim is not satisfied in full, the taxing authority will retain its lien under non-bankruptcy law.  Therefore, in the unlikely event that the Disputed Reserve has insufficient funds to satisfy the Allowed Claims, the holders of secured tax claims will be able to exercise their rights under non-bankruptcy law to enforce its lien.  Moreover, the Debtors anticipate that they will have approximately $6 million in allowed secured tax claims.  Given the anticipated exit financing facilities and the fact that unimpaired secured creditors (and holders of Priority Tax Claims) need to be paid in full if general unsecured creditors, let alone existing shareholders, are to receive any recovery, there can be no doubt that holders of secured tax Claims, to the extent their Claims are allowed, will be paid in full under the Plan.

Finally, to the extent that any of the objecting parties challenge the treatment of administrative tax claims, the objectors have provided no explanation why they should be treated differently than all other holders of administrative claims.  Article 10.5 of the Plan sets for the procedures for payments of Administrative Claims.  Article 10.5 states that "no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business."  For tax claims that are payable in the ordinary course of business, therefore, no request for payment need be made under the Plan.  For the reasons stated above, the taxing authorities' objections should be overruled.

C.    PBGC And FCI

The Pension Benefit Guaranty Corporation (the "PBGC") objects (Docket No. 11949) to confirmation of the Plan on the grounds that Article 7.22(d) of the Plan is unclear regarding minimum funding waivers (the "Waivers") received by the Debtors from the IRS with

105

respect to ERISA-qualified defined benefit pension plans sponsored by the Debtors (the "Pension Plans").  The PBGC expresses concern that, absent express language to the contrary in the Plan, the Debtors' obligations under the Waivers maybe be discharged pursuant to the Plan.  Fiduciary Counselors, Inc. ("FCI"), the independent fiduciary of the Pensions Plans, also objects (Docket No. 11957) to confirmation of the Plan.  FCI joins in the PBGC's objection with respect to the Waivers and, additionally, FCI asserts that it is unclear under the Plan whether deemed substantive consolidation of certain of the Debtors' estates will affect the joint and several liability of each of the Debtors to the Pension Plans.

In addition, given the current language in the Plan, the Debtors believe that FCI's concerns regarding joint and several liability are unfounded, and that its proposed addition to the Confirmation Order is unnecessary.  The Debtors agree that nothing in the Plan should affect the Debtors' obligations under the Waivers.  Accordingly, the Debtors have added a provision in their proposed Confirmation Order that resolves the PBGC's and FCI's objections with respect to the Waivers.  The Debtors believe that this resolves the PBGC's and FCI's objections with respect to the Waivers.

The Debtors believe that FCI's concern regarding joint and several liability is unfounded.  FCI requests assurances "clarifying that the deemed consolidation of the Debtors' estates will not impact each Debtors' statutory joint and several liability for unpaid minimum funding contributions to the Pension Plans."  Although the Debtors recognize that many parties seek express assurances that their particular rights are not affected by the Plan, the Debtors do not believe that, given the number of parties-in-interest, accommodations are warranted to each party that so requests.  Here, the language in the Plan is clear:

> "Nothing in this Plan shall be construed as discharging, releasing, or relieving the
> Debtors or the Debtors' successors, including the Reorganized Debtors, or <u>any</u>

> party, in any capacity, from any liability for minimum funding under 26 U.S.C. §
> 412 and 29 U.S.C. § 1082 or liability under 29 U.S.C. 1362 with respect to the
> Pension Plans or the PBGC."

Plan, Art. 7.22(e) (emphasis added).  The carveout to the discharge could not be broader.  It

applies to "any party."  FCI's proposed language, therefore, is redundant and unnecessary and

should not be included in either the Plan or the Confirmation Order.

      D.      Securities Lead Plaintiffs And ERISA Named Plaintiffs

      In their responses and reservations of rights, the Securities Lead Plaintiffs and the

ERISA Named Plaintiffs raise an issue regarding the timing of the releases set forth in Articles

11.5 and 11.7 of the Plan.  Their concern is that the Plan releases could become effective without

the MDL Settlements becoming effective, resulting in releases by the Securities Lead Plaintiffs

and the ERISA Named Plaintiffs without an accompanying settlement of their claims and

interests.  The Securities Lead Plaintiffs and the ERISA Named Plaintiffs propose Plan language

that would address this alleged problem by excluding their claims and intrests from the Plan

releases.

      The sequence of events envisioned by the Securities Lead Plaintiffs and the

ERISA Named Plaintiffs is that the Plan releases would become effective and then the MDL

Settlements would fail, either because (a) the MDL Settlements are not finally approved by the

United States District Court for the Eastern District of Michigan (the "District Court") or (b) the

MDL Settlements are not finally approved by this Court.[34]  With respect to the former scenario,

the District Court granted final approval of the MDL Settlements in an opinion and order issued

---

[34]    The Securities Lead Plaintiffs state that the Plan language they propose "will become relevant and necessary
only if the Securities [settlement] is not approved by final orders of this Court and the District Court."  (Docket
No. 11939 ¶ 6.)  Similarly, the ERISA Named Plaintiffs state that their concern "could become germane only if
the ERISA [settlement] is not finally approved by this Court."  (Docket No. 11973 ¶ 5.)

on January 10, 2008 and amended on January 11, 2008.  A copy of the amended opinion and

order (the "District Court's Order") is attached hereto as <u>Appendix D</u>.  As noted on page 37 of

the District Court's Order, "there [were] no substantive objections to either the ERISA or the

[s]ecurities [s]ettlement" in the District Court, making it highly unlikely that the District Court's

final approval of the MDL Settlements will be disturbed on appeal.

As for the latter scenario, it is not possible because it is precluded by the terms of

the Plan.  The releases provided in Articles 11.5 and 11.7 take effect on "the Effective Date" of

the Plan.[35]  Under Article 12.2, the Effective Date is subject to several conditions precedent,

including:  "The Bankruptcy Court shall have entered one or more orders, which may be the

Confirmation Order, approving the MDL Settlements."  <u>See</u> Plan Article 12.2(f).  Unlike some of

the conditions precedent in Article 12.2, the condition precedent related to the MDL Settlements

cannot be waived.  <u>See</u> Plan Article 12.3.  Accordingly, if this Court does issue an order granting

final approval of the MDL Settlements, the Effective Date will not occur and the Plan releases

will not become effective.

In sum, because of the District Court's final approval of the MDL Settlements and

the Plan language regarding the conditions precedent to the effectiveness of the Plan releases, the

concern raised by the Securities Lead Plaintiffs and the ERISA Named Plaintiffs is not well-

founded, and there is no basis for amending the Plan releases to create an exception for their

claims and interests.

---

[35]    Under the Plan, "Effective Date" means "the Business Day determined by the Debtors on which all conditions
to the consummation of this Plan set forth in <u>Article 12.2</u> of this Plan have been either satisfied or waived as
provided in <u>Article 12.3</u> of this Plan and the day upon which this Plan is substantially consummated."  <u>See</u> Plan
Article 1.69.

E.       Unterline{Unions}

Two of the Debtor's unions – the UAW and the IUE-CWA (collectively, the "unions") – have argued that the Management Compensation Plan (the "MCP"), which is attached as Exhibit 7.8 to the Plan, as amended on December 28, 2007, is not fair and reasonable to the Debtors' stakeholders or to the unions.  Yet the MCP was the result of a long and comprehensive process involving the Compensation and Executive Development Committee of the Delphi's Board of Directors (the "Compensation Committee") and an independent third-party consultant and has been reviewed by several of the Debtors' key constituents, including the Creditors' Committee, the Equity Committee, and the Plan Investors.  The Compensation Committee's approval of the MCP was reasonable and the MCP is both fair and reasonable to the Debtors' stakeholders.  Accordingly the union's objections should be overruled.[36]

To attract, motivate, and retain talented management, the Compensation Committee determined that developing a competitively benchmarked executive and salaried employee compensation program was necessary.  The Investment Agreement also requires a competitively benchmarked salaried executive compensation program.  The Compensation Committee, comprised of three independent directors who joined Delphi's Board of Directors during the past three years, has developed the MCP based on the advice of Watson Wyatt Worldwide Inc. ("Watson Wyatt"), its independent outside advisor.  In particular, the Compensation Committee sought to provide a target total compensation opportunity sufficient to

---

[36]    The two parties that have objected to the MCP are the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America (the "IUE-CWA").  The final objection filed by the UAW is Objection Of UAW To Confirmation Of Debtors First Amended Joint Plan Of Reorganization (Docket No. 11938) (the "UAW Objection"), and the final objection filed by the IUE-CWA is Limited Objection Of IUE-CWA And Affiliated Locals To Debtors' Proposed Management Compensation Plan And Union Salaried Employee Compensation Program (Docket No. 12026) (the "IUE-CWA Objection") (collectively the "Objections").

attract and motivate high-caliber executives who could effectively manage Delphi's complex global businesses; the Compensation Committee took into account the competitive marketplace, as well as each executive's experience and performance.  In general, this process involved developing and adjusting, in conjunction with Watson Wyatt, a target pay structure that provides median total direct compensation opportunities at planned levels of performance and total direct compensation opportunities which could be above the median when Delphi achieves performance that exceeds the plan.  In this regard, the Compensation Committee based its decision on market total direct compensation comparisons developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and automobile industry survey data.

The Compensation Committee also received significant input from the Creditors' Committee and the Equity Committee.  For example, the Creditors' Committee requested an immediate reduction upon emergence of the non-Delphi Strategy Board ("DSB") executives' equity-based long-term incentive program award to market median (the "one-step" approach) as opposed to an earlier discussed "two-step" approach whereby the non-DSB awards would be first reduced by 50 percent of the difference between original proposed opportunities and the market median and thereafter reduced to the median.  The Debtors accepted this recommendation, and they adopted the one-step approach.  Also, at the request of the Equity Committee, the Debtors agreed to reserve for future annual grants to executives (including the initial target grant of equity) only 8 percent of the available shares of Reorganized Delphi's fully diluted common stock, as opposed to the previously contemplated 10% of available shares.  These changes, which were approved by the Compensation Committee, are within competitive practice.

As a result of the extensive analysis, the Compensation Committee, with the advice of Watson Wyatt and incorporating certain comments of the Creditors' Committee and the Equity Committee, concluded that the MCP was within the range of competitive practice and was consistent with the ordinary course of the business of companies similar in size to the Debtors and of companies in the automobile supplier and general automobile industry.

In response to the extensive benchmarking work performed by Watson Wyatt and the Compensation Committee and lengthy and numerous discussions they had on the executive compensation design of a go-forward competitive executive compensation plan, the unions assert that the design is flawed for a variety of reasons. None of these assertions, however, call into question the fairness and reasonableness of the MCP.

Equivalence Of Sacrifice. As an initial matter, the UAW's argument that the MCP violates the "equivalence of sacrifice" provisions in the UAW-Delphi-GM Memorandum of Understanding is misguided.[37] The UAW argues that this provision prohibits the Debtors from establishing an at-market system of executive compensation. See UAW Objection ¶ 42 ("Even if it were true that the MCP would provide the executives with market-level compensation, that would not be fair to the UAW-represented employees"). The UAW's objection boils down to the proposition that the Debtors must reduce their executives' compensation opportunities to some undefined percentage below market. See id. ¶¶ 42, 56. The Compensation Committee concluded that the provision was never intended to mean – and could not mean – that any worker at Delphi would be required to be paid wages and compensation below market. Therefore, the Compensation Committee was comfortable that defining a market-

---

[37] Although the IUE-CWA states that the MCP does not "recogniz[e] the need and equity of a shared sacrifice" between Delphi management and IUE-CWA-represented workers, the IUE-CWA neglects to mention that there is no "equivalence of sacrifice" provision in any of its agreements with Delphi. See IUE-CWA Objection 4-5.

based program, which in several instances required executives to make substantial economic

sacrifices from what they had previously been provided, was appropriate.  Importantly, neither

the UAW nor the other unions which objected challenge the structure of the Plan or their

distributions under the Plan.

The UAW's suggestion that the Debtors' management has not shared in the

sacrifice of these Chapter 11 Cases or that management will have been made whole going

forward after emergence is simply baseless.  The non-DSB executives' long-term incentive

("LTI") opportunities would be reduced by approximately 50 percent on a go-forward basis in

comparison to prebankruptcy practices.  The retirement portion of the executives' former

supplemental life insurance program, which historically ranged from roughly $2.5 million to $3

million on average as a guaranteed death benefit paid to executives, was determined to be not

competitive and was eliminated.  Delphi's senior executives generally have agreed to waive an

amount equal to 10 percent of their base pay from and after January 1, 2006 through the end of

these Chapter 11 cases, only to have those reductions later made permanent.  Delphi executives

are the only group of employees at Delphi who been provided with below-market compensation

for the Chapter 11 Cases – even if the executive compensation program is implemented.

Executives went without their entire LTI opportunities during these Chapter 11 Cases and, even

with the achievement-based emergence cash opportunities proposed, the executive group would

still be short of competitive benchmarks.  Concerning each of these individual matters, and

certainly in the aggregate, the executives, from their perspective, have sacrificed substantially.

As set forth above, the Debtors' goal through their compensation program was to

set salaried and hourly compensation opportunities at competitive levels before emergence from

chapter 11.  The Debtors have come closer to achieving this benchmark with respect to hourly

employees through the Union Settlement Agreements, even though many union-represented employees, including those of the UAW, are still above market, and the MCP merely attempts to complete this goal.  Given the evenhanded nature with which the Debtors have approached compensation, the concessions already made by the Debtors' management, and the reasonable and market-based nature of the MCP, it is clear that the MCP is not inconsistent with the "equivalence of sacrifice" provisions in the UAW-Delphi-GM Memorandum of Understanding and, therefore, does not cause the Plan to be unfair or otherwise unreasonable.

<u>Peer Group Selection</u>.  The unions' complaints about the peer group that Watson Wyatt used in connection with its work are unavailing.  Indeed, despite their opportunity to do so, the unions chose not proffer any witness that would support their argument that a different peer group should be used.  Moreover, throughout their papers, the unions make conclusory statements – of the type an expert would make, regarding the sufficiency of a peer group in connection with the benchmarking analysis of executive compensation.[38]  In any event, as set forth in the Bubnovich Declaration, the criteria used for the selection of the peer group are more than reasonable and, again, the unions have proffered no testimony – let alone expert testimony – to the contrary.  The unions also argued that Watson Wyatt inappropriately selected as Delphi's peers certain companies that were "top-of-the-line" companies, such as PepsiCo, DuPont, 3M Co.

---

[38]    For example, in paragraph 8 of the IUE-CWA Objection, the drafter of brief – not a witness – opines that the peer group selected by Watson Wyatt is inappropriate for use in an executive compensation study because "the evidence [Watson Wyatt] relies upon for [its] assertions rests on comparisons with companies that are far too large, that are in a far different economic position and are involved in far different industries."  Moreover, the drafter of the brief appears to opine that it is not common in the executive compensation consultant industry to include companies in one's peer group if they "are not competitors for talent with Delphi, are much larger and do not operate in the same industry."  <u>See</u> IUE-CWA Objection ¶ 9.  Yet there is no attempt made – by even the drafter of the brief – to demonstrate why the other criteria Watson Wyatt used ("prior peer group" and "geography" as well as generally the global presence of the companies) constitute an insufficient basis in the executive compensation field to include a company in one's peer group.  <u>See</u> Bubnovich Decl. Ex. 1, at 33; Supp. Bubnovich Decl. ¶ 10.  On one occasion, counsel asserts "that is not market practice," yet there is no witness attesting to that statement.  IUE-CWA Objection ¶ 23.

See UAW Objection ¶¶ 43-46.  As an initial matter, there is no evidence suggesting that the selection of so-called top-of-the-line companies skews the benchmarking process.  Indeed, the only evidence in the record on this issue is the testimony of Mr. Bubnovich, who clearly explains that his selection of such companies is consistent with the methods he has employed as an expert in the field of executive compensation consulting for over twenty years.  The union's complaints about Watson Wyatt's peer group are without merit.[39]

       Emergence Equity Opportunities.  The IUE-CWA takes aim at the emergence equity opportunities for Delphi's executives.  The IUE-CWA claims that Watson Wyatt originally proposed $400 million in 2005 and increased that proposal to $625 million without justification.  See IUE-CWA Objection ¶ 12.  The IUE-CWA misunderstands Watson Wyatt's analysis.  As has been the case since 2005, Watson Wyatt's benchmarking analysis recommended a certain percentage of equity in Reorganized Delphi to be set aside for its executives; it did not recommend any dollar amount because benchmarking for this type of compensation opportunity is done by looking at percentages, not actual amounts.  The ultimate decision to set aside 8 percent is well within the range of competitive practice and is well supported by the data reviewed by Watson Wyatt.  Again, the unions proffer no witness undermining Watson Wyatt's decision to use percentages in its benchmarking analysis.  Moreover, the substantial majority of the set asides will be awarded by the future Compensation Committee of the Reorganized Debtors and is not implicated in the emergence awards.

---

[39]  The UAW makes several references to what was done in the Delta Air Lines chapter 11 case (i.e., the transfer of only 2.4 percent of equity to 1,200 executives and Delta's CEO's decision to forgo any emergence cash or equity award).  Although the UAW faults Watson Wyatt's choice of companies for a peer group, the UAW appears to suggest that the appropriate peer group that should be used in this case is a peer group of one company: Delta Air Lines.  Despite the obvious problems with this suggestion, the unions have put forward no witness supporting this argument.

Performance-Based Emergence Cash Opportunities.  The IUE-CWA argues that

the performance-based emergence cash opportunities are inappropriate for a variety of reasons.

The IUE-CWA's primary objection is that the opportunities are too generous, suggesting that

management strong-armed Watson Wyatt to use inflated numbers to calculate the amount of the

cost of the LTI opportunities, citing an e-mail between Mr. Bubnovich and management

regarding whether the company historically calculated "LTI value" using "cash value" or

"expected value."  (IUE-CWA Objection ¶ 18.)  As Mr. Bubnovich explained during his

deposition, the e-mail string discusses a confusion over what the historic "LTI value" in fact was

(Mr. Bubnovich assumed the historic practice was to use "cost value" and not the Company's

actual historic practice of using "expected value").  As Mr. Bubnovich explained during his

deposition, the use of either number when annualized over the then-expected length of the

Chapter 11 Cases (eighteen months) resulted in a participant's opportunities that would be below

market practice.  Moreover, throughout their papers, the unions refer to the performance-based

emergence cash opportunities as being too high or being paid too quickly.  However, when

compared to competitive LTI opportunities for a 28-month period, the only evidence in the

record pegs the compensation opportunities at below-market, and the Compensation Committee

was well within its discretion to approve such a program.  Lastly, the IUE-CWA argues that

Delphi executives did not "lose" any LTI equity-based opportunities.  The IUE-CWA

misunderstands Watson's Wyatt's analysis.  The analysis concludes that, in general, an LTI

opportunity is consistent with competitive practice, and, thus, Delphi executives' effective lack of

such opportunities during the Chapter 11 Cases made them well below market.

SERP.  The Compensation Committee, with the advice of Watson Wyatt,

approved a freezing of the defined benefit plans, including the SERP.  Going forward (after the

freeze), the Compensation also adopted a new defined contribution plan.  In conjunction with the

freeze, there also would be changes in the design of the SERP, including a lifting of the $5,000-

a-month cap on payments to participants as well as a changing of the vesting age (i.e., changing

SERP cliff vesting from 100 percent at age 62 to a 70 percent at age 55, with at least 10 years

service, and increasing until age 62 when the plan fully vests).  Separately, there was a

competitive difference for certain executives when comparing their benefits package at Delphi

through and after emergence and with other companies'.  As a result, the Compensation

Committee determined to make up the difference to certain executives who would have had a

shortfall from competitive practice in the amount of approximately $11.5 million.  (IUE-CWA

Objection ¶¶ 23-26.)  These modifications to the SERP are all within the range of competitive

practice, and the benefits to certain executives were competitively benchmarked against benefit

opportunities at peer group companies.

   Other Components Of The MCP.  The unions oppose various other aspects of the

MCP.  The unions object to the proposed short-term incentive plan ("STIP").  However, the

existence of a STIP to provide compensation opportunities for its participants is standard practice

across corporate America.  The unions object to the form of the LTI equity-based opportunity

being one-half restricted stock and one-half stock options.  (IUE-CWA Objection ¶ 15; UAW

Objection ¶ 54.)  The unions object to various provisions in the change-in-control agreement,

including ones that provide certain high-level executives with severance of up to three times their

salary and bonus and include a "no-mitigation" clause (UAW Objection ¶ 22).  Such proposals fit

comfortably within competitive practice.  The only evidence in the record is that these and other

challenged clauses are consistent with competitive practice, and the unions have presented no

contrary testimony other than anecdotal observations by counsel regarding the alleged

excessiveness or unreasonableness of the proposals.  Accordingly, the proposals are fair and reasonable.[40]

Over the course of roughly twenty meetings, and with the assistance of its independent compensation advisor, Watson Wyatt, the Compensation Committee determined that the executive compensation program developed by Watson Wyatt represents a market-based compensation program consistent with Delphi's at-market competitive compensation philosophy. The executive compensation program is a reasonable and well-considered executive compensation and benefits program that is designed to attract and motivate high-caliber executives needed to lead the Reorganized Delphi after emergence from chapter 11 protection. Because this executive compensation and benefits program, which is summarized in the MCP, is in the best interests of the Debtors, their estates, their stakeholders, and all other parties-in-interest, the unions' objections should be overruled.

The UAW's Supplemental Objection.  Hours before the Debtors' brief was due, the UAW filed the Supplement to Objection of UAW To Confirmation of Debtors' First Amended Joint Plan of Reorganization (Docket No. 12074) (the "Supplemental UAW Objection").  The Supplemental UAW Objection focuses on the following: (i) the proposed cash payout under the MCP is unprecedented in scope and would make the executives more than whole for the period of the Chapter 11 Cases; (ii) the implementation of the MCP will not create an "equivalence of sacrifice"; and (iii) the MCP's proposed LTIP is inconsistent with Delphi's "equivalence of sacrifice pledge".  Like the UAW's earlier objections, these too are unavailing.[41]

---

[40]    The IUE-CWA also suggests the Court set the strike price of options at $65.60.  (IUE-CWA Objection ¶ 16-17.) The MCP, however, does not establish the strike price at any value other than at fair-market value, and thus the issue is irrelevant.  See Plan, Ex. 7.8.

[41]    A section of the UAW's brief questions the background and motives of individuals involved in the development of the executive compensation program.  Specifically, the UAW suggests that Craig Naylor is not experienced

*(cont'd)*

117

First, the UAW argues that the proposed cash payout under the MCP is unprecedented in scope and would make the executives more than whole for the period of the Chapter 11 Cases. The purpose of emergence cash programs historically has been to compensate those select executives whose efforts contributed to a successful chapter 11 case. Delphi management believed that a successful reorganization would be contingent upon efforts of not only the top executives, but also the balance of the executive team. Agreeing with this view, the Compensation Committee approved the participation of the entire executive team in the emergence cash program. Accordingly, given Delphi's view of executive contributions, Delphi's program is still consistent with the historical scope of such programs.[42]

The UAW again objects specifically to the emergence cash opportunities of Messrs. Miller and O'Neal. As explained in Watson Wyatt's final report on these compensation opportunities, the proposed payments are well within the range of competitive practice. Also, the Watson Wyatt report enumerates the Compensation Committee's views on the performance of Messrs. Miller and O'Neal during the case, which justifies the increases above Watson Wyatt's proposal at the beginning of this case.

_____

(cont'd from previous page)

enough to hold the position of chair of the Compensation Committee. Such suggestion is based on an inaccurate interpretation of the background of Mr. Naylor, who was a senior executive for over thirty years with DuPont. The UAW also suggests that the motives of Watson Wyatt's senior consultant, Mr. Bubnovich, are in doubt. In the case of Mr. Bubnovich, the select words or phrases plucked out of context in certain e-mails do not undermine his independence or role as consultant to the Compensation Committee. Also, although many of the points raised by the UAW now were already discussed above, the Debtors will respond to a few of the key points, and reserve its right to supplement if appropriate.

[42]    The Debtors' intention was to provide a different vehicle by which to provide a competitive LTI incentive opportunity. As such, the emergence cash opportunities, which in truth were well below market, were designed to motivate a timely and quick exit from chapter 11. The sooner the exit, the sooner the payment. The program is also intended to compensate executives for their contributions during the case by, for example, successfully reorganizing the company, retaining all key customers, avoiding service disruptions, and developing and generating new business.

118

Second, the UAW argues that the implementation of the MCP will not create an "equivalence of sacrifice" on the part of management.  Most of the provisions about which the UAW complains are consistent with competitive practice.  The two items that the UAW highlights as noncompetitive are (i) accelerated vesting of non-vested equity awards post-emergence and (ii) the maintenance (freeze) of the defined benefit SERP. Concerning the first item, the provision, as set forth in the Watson Wyatt report, was subsequently modified during negotiations with the Plan Investors, which now limits the amount of equity that will be accelerated.  Concerning the second item, while it is true that in other cases SERP benefits have been lost or impaired, those are cases involving limited creditor recoveries.  In this particular case, cancellation of the SERP would result in the following anomaly: retirees would effectively receive their full benefit (given the level of recovery of unsecured creditors in this case) while the actives would receive nothing.  Last, it was not just the SERP that was frozen and preserved with respect to accruals prior to emergence, but also the hourly and salaried pension plan benefits.

Third, the UAW argues that the MCP's proposed LTIP is inconsistent with Delphi's "equivalence of sacrifice" pledge.  Not so.  One basis for the UAW's claim in this regard is that the Debtors' prepetition plan made only 6.5 percent of outstanding equity available for equity-based compensation opportunities.  However, the 8 percent proposed under the MCP is at the low end of competitive practice and does not represent a substantial increase over the prepetition program.  As discussed above, by focusing on the dollar estimates of the proposed equity reserve, the UAW misunderstands Watson Wyatt's analysis, which benchmarks the equity as a percent of common shares outstanding.  Importantly, the UAW has proffered no witness – let alone an expert witness – who asserts that Watson Wyatt's methodology is incorrect. Accordingly, the Supplemental UAW Objection should be overruled.

F.    Miscellaneous Objections

1.    Equistar Chemicals, L.P.

Equistar Chemicals, LP ("Equistar") filed a limited objection (Docket No. 11869) to the Plan on the grounds that the Plan may prejudice its prepetition claim, secured by setoff rights, that it may have against the Debtors.  Equistar's objection, however, is misplaced.  An objection to the Plan is not the proper means to adjudicate what clearly is a claims or setoff dispute.  As Equistar concedes in its objection, the Court has already entered an order modifying Equistar's claim.[43]  A Plan objection is an improper means of seeking relief from such an order.

In its objection, Equistar asserts that the Plan violates the fair and equitable standard of section 1129(b)(1) by unfairly discriminating against Equistar's claim allegedly secured by a right of setoff.  Equistar states that it "should receive, on account of its claim, a secured claim in the amount of $545,000.06 and an unsecured claim in the amount of $413,965.86."  First, Equistar is not currently the holder of a secured claim.  As noted above, the order on the Twentieth Omnibus Claims Objection modified Claim 10718 to an unsecured non-priority claim.  To the extent Equistar seeks relief from that order, it must use the appropriate procedure, which does not include a Plan objection.  Accordingly, Equistar is the holder of a

---

[43]    Equistar filed proof of claim number 10718 ("Claim 10718") in the total amount of $958,965.92, which included a secured claim in the amount of $545,000.06, secured by the right of setoff, and an unsecured claim in the amount of $413,965.86.  On August 24, 2007, the Debtors filed the Debtors' Twentieth Omnibus Claims Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And Amended Claims, (B) Insufficiently Documented Claims, (C) Claims Not Reflected On Debtors' Books And Records, (D) Untimely Claim, And (E) Claims Subject To Modification, Tax Claims Subject To Modification, Modified Claims Asserting Reclamation, Consensually Modified And Reduced Tort Claims, And Lift Stay Procedures Claims Subject To Modification (Docket No. 9151) (the "Twentieth Omnibus Claims Objection"), seeking to modify, subject to further objection, Claim 10718 to a general unsecured claim in the total amount of $450,000.00.  Equistar failed to file a response, and on September 28, 2007, the Court entered an order (Docket No. 9692) granting the relief requested in the Twentieth Omnibus Claims Objection with respect to, inter alia, Claim 10718.  Accordingly, Equistar is the holder of a general unsecured claim in the amount of $450,000.00, subject to further objection.

general unsecured claim without standing to assert that the Plan unfairly discriminates against secured claims.

In addition, secured claims are unimpaired by the Plan.  Section 1129(b)(1) of the Bankruptcy Code, by its express terms, applies only to a "class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  Because secured claims are not impaired, the Debtors need not meet the requirements of section 1129(b)(1) with respect to this class of Claims.  Accordingly, even if Equistar is the holder of a secured Claim, section 1129(b)(1) is not a basis to object to the Plan.  Furthermore, Article 1.185 of the Plan defines "Secured Claim" to include a claim "that is subject to setoff under section 553 of the Bankruptcy Code."  Because Article 5.1 of the Plan states that "each Allowed Secured Claim shall be satisfied in full in Cash or Reinstated," the Debtors do not agree that the Plan prejudices Equistar with respect to any secured claim that it holds on account of setoff rights.

Finally, pursuant to paragraph 18 of the Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 9014 (i) Authorizing Debtors To Obtain Postpetition Financing, (ii) To Utilize Cash Collateral, And (iii) Granting Adequate Protection To Prepetition Secured Parties (the "Final DIP Financing Order"), entered October 28, 2005 (Docket No. 797), this Court approved procedures by which a party with a prepetition right to setoff may exercise such a right. During the more than two years since the Final DIP Financing Order was entered, Equistar has apparently failed to use these procedures.  Because Equistar has had two years to effectuate its right of setoff, Equistar cannot now be heard to complain that its specific, alleged right is not protected by the Plan.  Accordingly, Equistar's objection should be overruled.

121

2.    Audio MPEG

Audio MPEG, Inc. and Societa' Italiana per lo Sviluppo dell'Elletronica,

S.I.SV.EL., S.p.A. (collectively, the "Licensors") filed an objection (Docket No. 11883) to the

Plan, asserting that they are parties to a license agreement (the "License Agreement") with one of

the Debtors, pursuant to which the Licensors granted that Debtor a license to use certain patents.

The Licensors' objection is meritless.

First, the Licensors argue that the License Agreement cannot be assumed by the

Debtors because it is not assignable under section 365(c)(1).  The Licensors, however, rely on a

reading of section 365(c)(1) of the Bankruptcy Code that the majority of courts, including the

courts in this jurisdiction, do not follow.  See In re Adelphia Commc'n. Corp., 359 B.R. 65, 72

(Bankr. S.D.N.Y. 2007) ("[T]he law in this district, and by far the better view, is that where the

assumption is to be effected by a debtor in possession (as contrasted to a trustee), the right to

object to assignment does not by itself affect the right to assume.") (emphasis in original) (citing

In re Footstar, Inc., 323 B.R. 566, 573-74 (Bankr. S.D.N.Y. 2005)).  Thus, even if the License

Agreement is not assignable under section 365 of the Bankruptcy Code (which the Debtors do

not concede), the Debtors can nonetheless assume the agreement.  See Institut Pasteur v.

Cambridge Biotech Corp., 104 F.3d 489, 493 (1st Cir. 1997) (assumption of executory contract

not barred by fact that contract not assignable).

The Licensors also argue that the Debtors place the burden of asserting the

requirement for cure of all defaults under the License Agreement on Licensors and provide no

adequate assurance of future performance.  Nothing in section 365 of the Bankruptcy Code

mandates that a debtor must assert, in the first instance, the cure amount it believes it must pay to

assume a contract.[44]  Accordingly, the fact that the procedure set forth in the Plan requires a

contract party to assert a cure amount does not violate section 365 of the Bankruptcy Code.

Next, the Licensors argue that the Debtors must file certain royalty statements,

complete an audit, and make cash payments on account of royalties due to cure defaults under

the License Agreement, for which, the Licensors argue, the Plan does not provide.  They also

assert that the Plan does not provide assurances that the Debtors can perform under the

agreement.  The Debtors dispute Licensors' contention.  To the extent the parties' dispute cannot

be resolved consensually, such dispute should be adjudicated pursuant to the procedures set forth

in the Plan, not at the hearing on the confirmation of the Plan.  See Article 8.2(b) of the Plan ("if

there is a dispute regarding (i) the nature or amount of any Cure, [or] (ii) the ability of any

Reorganized Debtor . . . to provide 'adequate assurance of future performance' (within the

meaning of 365 of the Bankruptcy Code) . . . the matter shall be set for hearing in the Bankruptcy

Court").

The Licensors also argue that the alleged "classification" of Material Supply

Agreements differently under the Plan than Other Executory Contracts violates section

1123(a)(4).  Although the Plan does establish different procedures for adjudicating cure and

adequate assurance disputes for the two categories of contracts, the Plan does not treat Material

Supply Agreements and Other Executory Contracts as different "classes" of claims under the

Plan.[45]  In fact, executory contracts (or Cure Claims) are not in any "class" under the Plan.  In

---

[44]  Requiring a claimant to assert, in the first instance, the amount of and basis for its claim is not a novel concept.
See Fed. R. Bankr. P. 3003(c)(2) (creditor whose claim is not scheduled . . . . must file proof of claim to
participate in distribution on account of such claim).

[45]  The Licensors assert that the Debtors must pay cash, rather than stock, when curing defaults under its license
agreement.  Although the Debtors dispute Licensors position as a matter of law, as a practical matter,
counterparties to Other Executory Contracts will receive cash in satisfaction of their Allowed Cure Amount
Claims.

123

addition, under section 1126 of the Bankruptcy Code, a right to a cure payment is not a "claim"

entitling a creditor to vote on a plan of reorganization.  See Phoenix Mut. Life Ins. Co. v.

Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1281 (5th Cir.

1991) (when debtor expressly assumes lease, lessee has no claim under section 1126 and is not

entitled to vote on plan); see also Boston Post Road L.P. v. Fed. Deposit Ins. Corp. (In re Boston

Post Road L.P.), 21 F.3d 477, 484 (2d Cir. 1994) (citing Greystone III for same proposition).

        The Licensors also assert that section 1129(a)(9)(A) requires the Debtors to pay

cure amounts on the Effective Date.  First, as set forth above, the Debtors are not required to cure

defaults under the License Agreement on the Effective Date.  In addition, section 1129(a)(9)(A)

of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the

effective date of the plan, … receive on account of such claim cash equal to the allowed amount

of such claim."  11 U.S.C. § 1129(a)(9)(A) (emphasis added).  The Licensors do not currently

hold an allowed claim under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate

that they be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size

and complexity as these, routinely pay administrative claims after the effective date of plan.  See,

e.g., In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming

plan establishing administrative claims bar date after effective date); In re Delta Air Lines, Inc.,

Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same).  Indeed, debtors routinely establish,

pursuant to plans of reorganization, administrative claims bar dates after the effective date of

such plans.  Id.  To require a debtor to do otherwise would place an unreasonable burden on

debtors to identify and resolve all administrative claims prior to the effective date of a plan.

Such a burden should not be placed on the Debtors.  As noted above, the Plan adequately

124

protects the Licensors' rights under section 365 of the Bankruptcy Code, including any right to receive cash payments.

For all of the reasons set forth herein, the Licensors objections should be overruled.

VII.    CONCLUSION

The Plan complies with and satisfies all of the requirements of sections 1127 and 1129 of the Bankruptcy Code.  Accordingly, the Debtors request that the Court (i) confirm the Plan, (ii) overrule any remaining Objections, and (iii) grant the Debtors such other and further relief as is just and proper.

Dated:  January 16, 2008
        New York, New York


                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                            FLOM LLP

                                        By:    _____/s/ John Wm. Butler, Jr_____
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700


                                                    –and –


                                        By:    _____/s/ Kayalyn A. Marafioti_____
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000


                                        Attorneys for Delphi Corporation, et al.,
                                        Debtors and Debtors-in-Possession


126