**Appendix B**

*Chart Of Objections To The Confirmation Of The First Amended Joint Plan Of Reorganization
Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession*

*Organized By Nature Of Objection[1]*

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **A.** | | **Substantive Consolidation** | |
| 1. | 11471, 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11951 | The objectors allege that the Plan is premised upon the unlawful substantive consolidation of the Debtors for voting and distribution purposes only. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  The objections that have been made have been rendered moot by the acceptance of the affected classes.  With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors <u>supports</u> the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot.  Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing.  **Thus, again, your vote on this Plan is important.**" (Disclosure Statement at DS-113) (bold in original text). |

---

[1]    This chart reflects all objections entered on the docket as of 12:00 p.m. (Eastern Standard Time) on January 16, 2008.  The status of resolution of certain objections is as of 12:00 p.m. (Eastern Standard Time) on January 16, 2008.  Late objections are indicated in **BOLD**.

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 2. | 11908, 11951 | The objectors assert that the Debtors have provided no facts legally supporting the bases upon which substantive consolidation can be approved by the Court and cannot meet the applicable standard for substantive consolidation under Second Circuit law, particularly the creditor reliance and hopeless entanglement tests. | In the Second Circuit, the two critical factors to consider in examining a proposed substantive consolidation are (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) when the affairs of the debtors are so entangled that consolidation will benefit all creditors." In re Augie/Restivo Banking Co. Ltd., 860 F.2d 515, 518 (2d Cir. 1988); see also In re 599 Consumer Elecs., Inc., 195 B.R. 244, 248 (Bankr. S.D.N.Y. 1996) ("It is necessary to consider both of these two critical factors . . . Conceivably, [however,] substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggest that the two cited factors are alternatively sufficient criteria.") (citations omitted). In applying the second factor of the Augie/Restivo test, courts have used a balancing test pursuant to which substantive consolidation "should be ordered only where the inequalities of substantive consolidation are outweighed by the practical difficulties of tracing complex transactions between interrelated entities." In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 765 (Bankr. S.D.N.Y. 1992). As set forth in the Eisenberg Declaration and as thoroughly described in the Memorandum Of Law (A) In Support Of Confirmation Of First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B) In Response To Objections Thereto (the "Memorandum"), taking seriously the standards for substantive consolidation in the Second Circuit, the Debtors and their advisors conducted an exhaustive review of the Debtors' operations to determine what substantive consolidation would be appropriate, if any. Based on that review, the Debtors determined that the substantive consolidation of the Debtor groups, as proposed under the Plan, is appropriate under both factors of the Augie/Restivo test. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 3. | 11908 | The objector asserts that the proposed substantive consolidation unfairly and improperly favors the creditors of Delphi over the creditors of DAS LLC. The objector asserts that in a liquidation, the creditors of Delphi would likely receive nothing as Delphi has very little assets, and therefore, the objector argues, the DAS LLC creditors rights will be impaired by the proposed substantive consolidation. | With or without substantive consolidation, all creditors of the Delphi-DAS Debtors would receive the same exact form of distribution. Even if the Plan did not provide for the substantive consolidation of Delphi, DAS, and 20 of their subsidiaries and affiliates, the Plan would still have provided for the creditors of those 22 Debtors to receive the same stock and discount rights that are currently provided for under the Plan. Therefore, any argument with respect to whether the substantive consolidation of the Delphi-DAS Debtors for distribution purposes is appropriate is of no moment; the outcome would be the same with or without the substantive consolidation for distribution purposes. |
| 4. | 11957 | Fiduciary Counselors requests that the confirmation order clarify that the deemed substantive consolidation of the Debtors' estates will not impact each Debtors' statutory joint and several liability for unpaid minimum funding contributions to the Pension Plans. | The Debtors believe that the Plan has no ambiguity and the objector's suggested language is unnecessary and inappropriate. |
| **B.** | | **Releases And Waivers** | |
| 5. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11883, 11885, 11951 | The objectors object to the release and exculpation provisions of the Plan that allegedly force the objectors to release rights it would otherwise have against the Debtors and third parties, including GM. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. The Debtors anticipate that the objection of the Michigan DEQ and the United States will be resolved by including language in the Confirmation Order. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 6. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11883, 11951 | Objectors assert that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and such objectors do not consent. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| 7. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867 | The objectors assert that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objectors assert such provision should be stricken or not apply to the objectors. | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| 8. | 11950, 11951 | The objectors allege that no channeling trust has been created for any enjoined claims and the Plan does not provide for any means of payment for enjoined claims against third parties. | Although courts may examine whether a release channels enjoined claims to settlement fund, courts have also approved releases where (i) the estate received substantial consideration, (ii) the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contributions, and (iii) whether the plan otherwise provided for the full payment of the enjoined claims. See In re Oneida Ltd., Case No. 06-10489, 2006 Bankr. LEXIS 1985 at * 39 (Aug. 30, 2006). In this case, the Debtors have received substantial consideration from the Released Parties and the releases are therefore proper. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 9. | 11950 | The United States objects to the Plan to the extent it seeks to release (1) non-debtors from liability to the United States under any statute for conduct in connection with the Debtors, the Chapter 11 case, or the Plan, as such releases are allegedly invalid as against the United States, especially with reference to GM's environmental and tax liabilities and (2) GM from potential claims that may be asserted by the United States because there has arguably been no showing of extraordinary circumstances that justify such a release. The Government also objects to the Bankruptcy Court's jurisdiction and the constitutionality of the releases. | The Debtors are negotiating language with the objector that they anticipate will resolve certain objections related to the release language.<br><br>A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| 10. | 11872 | BoA asserts that to assume its leases and cure defaults thereunder, that the guaranties, liens, and security agreements to which BoA is allegedly entitled under the leases must survive and continue post-confirmation.  Thus, BoA objects to the Plan to the extent that the cancellation or discharge and/or release under sections 7.10, 11.1, and 11.2 of the Plan would modify or terminate its rights to maintain its liens and security interests. | This objection has been resolved. |
| 11. | 11847 | Hidalgo County objects to the Plan to the extent that it releases or discharges liens of taxing authorities. | The taxing authorities' liens will be treated in accordance with Article 5.1 of the Plan. |
| 12. | 11939, **11973** | The objectors assert that the releases contained in sections 11.5 and 11.7 of the Plan must be read in conjunction with the releases contained in the MDL Settlements.  The objectors further assert that such a reading would only allow for the releases contained in sections 11.5 and 11.7 of the Plan upon the effective date of the MDL Settlements. | The Debtors believe that the requested revisions to Article 11.5 and 11.7 are unnecessary in connection with the MDL Settlements and the confirmation of the Plan. |

|  | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 13. | 11881 | Bosch objects to the Plan to the extent the injunctive provisions impair a post-emergence patent infringement claim for any infringement occurring on or after the Effective Date of the Plan. | The Debtors and Bosch have executed a settlement agreement, which, among other things, establishes a procedure for the resolution of Bosch's patent infringement claims. Bosch's objection is moot. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **C.** | | **Section 1122 Objections** | |
| 14. | 11471, 11791, 11792, 11804, 11847 11852, 11853, 11855, 11867, 11908, 11951 | The classification of claims proposed under the Plan violates section 1122 of the Bankruptcy Code by classifying together claims that are not "substantially similar," _e.g._, creditors of different Debtors are placed in the same class.  In addition, objectors assert that the classification under the Plan improperly gerrymanders the vote. | Contractually subordinated unsecured claims may be placed in the same class as senior and other unsecured claims.  Courts have noted that, under section 1122(a) of the Bankruptcy Code, the "similarity of claims is not judged by comparing creditor claims inter se. Rather, the question is whether the claims in a class have the same or similar legal status in relation to assets of the debtor." In re Frascella Enters., Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) (citing In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995)); see also In re Union Fin. Servs. Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004) ("The fact that [creditor's] [c]laim is subordinated to other class members does not change the fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), aff'd, 155 F. App'x 940 (8th Cir. 2005); In re Eagle Bus Mfg., Inc., 134 B.R. 584, 595 (Bankr. S.D. Tex. 1991) ("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy Code."), aff'd, 158 B.R. 421 (S.D. Tex. 1993); see also David L. Bleich, Chapter 11 Plans, 647 PLI/Comm 437, 519-20 (1993) (senior and subordinated claims "belong in the same class since they are 'substantially similar,' i.e., they have the same legal rights against the debtor's assets, the subordination being only a private matter between them.").  The Plan's classification has a rational basis because it is based on the respective legal rights of each holder of a Class 1C claim against the applicable consolidated estate.   The classification recognizes that the TOPrS, the Senior Notes, and other senior debt are all non-priority unsecured claims in relation to the Debtors subject to Class 1C claims, and as such may be classified in the same class, even though contractually one group is subordinated to the other.  Consequently, the classification of claims within Class 1C is appropriate and the Plan meets the requirements of section 1122(a). |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **D.** | | **Section 1123(a)(4) Objections** | |
| 15. | 11471, 11944, 11951 | The objectors allege that the Plan violates section 1123(a)(4) of the Bankruptcy Code because it provides different treatment to claims classified together within a single class (e.g. holders of TOPrS will receive only 90% of their allowed claim). | The Plan's proposed treatment of the subordinated TOPrS and other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment.  The Plan provides that all general unsecured creditors, including holders of TOPrS, will receive New Common Stock and Discount Rights.  The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture.  After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders of TOPrS Claims.  Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| 16. | 11951 | The objector alleges that the Plan requires disparate contributions of members of the class for their distributions because the Senior Notes are required to forego their subordination rights. | Under the Plan, senior debt will be paid in full, and because of the payment in full,  the subordination agreement is being deemed satisfied.  The Senior Notes are being paid principal plus accrued postpetition interest under the terms of the Plan.  In compliance with the subordination agreement, Senior Notes and other general unsecured claims are being paid par plus accrued, while the TOPrS will receive the residual distributions available in the General Unsecured Claims class after these distributions are made. |
| 17. | 11885 | MDEQ objects to the Plan to the extent it proposes paying MDEQ with stock, because MDEQ is allegedly not permitted to hold stock under state laws.  MDEQ asserts that this limitation results in a violation of section 1123(a)(4) of the Bankruptcy Code, because MDEQ would not be treated the same as similarly situated claimants. | A creditor's particular organizational structure does not negate the value of currency to be distributed under a chapter 11 plan, nor should a creditor's preferred form of distribution form a basis for finding a plan violative of the Bankruptcy Code.  In addition, the MDEQ's claim is classified as a Flow-Through Claim and will not receive a distribution of New Common Stock pursuant to the Plan.  Moreover, the Plan does not violate section 1123(a)(4) nor discriminate against MDEQ as all holders of claims in the same class receive the same Plan currency in exchange for their claims. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 18. | 11951 | The objector alleges that the Plan discriminates unfairly because it treats the Flow-Through Claims and GM Claims differently than the General Unsecured Claims. | The rationale for the classification and treatment of flow-through claims is clearly described in John D. Sheehan's Declaration. The basis for classification of the flow through claims is to minimize disruption to their ordinary course relationship with customers, avoid litigation over environmental matters when the extent of alleged conditions might not be fully known or knowable, minimize disruption to their relationship with their employees, and avoid litigation over claims that would be satisfied by insurers. |
| 19. | 11791, 11792, 11804, 11852, 11853, 11855, 11867, 11937, 11940, 11951 | The objectors assert that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by assuming a participation in the rights offering, allegedly reducing claims without due process, not providing certain creditors with the same distribution as all others, and not providing Disputed Claims any post-Effective Date interest). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code. See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| 20. | 11791, 11792, 11804, 11852, 11853, 11855, 11867, 11940 | The objectors assert that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 21. | 11883 | The objectors assert that pursuant to section 8.2 of the Plan, the Debtors treat non-debtor parties to Material Supply Agreements differently than they treat non-debtor parties to Other Executory Contracts (e.g. requiring non-debtor parties to Other Executory Contracts would be required to take affirmative action to protect their rights and enforce the Debtors' obligations under section 365 of the Bankruptcy Code) and because such treatment is allegedly not supported by a reasonable justification, it is an impermissible classification. The Licensors further assert that, as a result, the Debtors do not propose to provide all executory contract parties with equal value, as required under section 1123(a)(4) of the Bankruptcy Code. | Although the Plan does establish different procedures for adjudicating cure and adequate assurance disputes for the two categories of contracts, the Plan does not treat Material Supply Agreements and Other Executory Contracts as different "classes" of claims under the Plan. In fact, executory contracts (or Cure Claims) are not in any "class" under the Plan. In addition, under section 1126 of the Bankruptcy Code, a right to a cure payment is not a "claim" entitling a creditor to vote on a plan of reorganization. See Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1281 (5th Cir. 1991) (when debtor expressly assumes lease, lessee has no claim under Section 1126 and is not entitled to vote on plan; see also Boston Post Road L.P. v. Federal Deposit Insurance Corp. (In re Boston Post Road L.P.), 21 F.3d 477, 484 (2d Cir. 1994) (citing Greystone III for same proposition).   The Debtors have employed procedures for resolving Cure claims related to Material Supply Contracts, based on the exigencies of those types of contracts. These procedures were approved by the Court in the Solicitation Procedures Order.  There is nothing in sections 1123 and 1129 of the Bankruptcy Code that require a debtor to disclose its views of administrative claims before the claimants do.  Although the procedures for asserting Cure Claims with respect to counterparties to Material Supply Agreements differ from those for counterparties to Other Executory Contracts, the differing procedures do not violate the requirements of the Bankruptcy Code. |
| 22. | 11935 | Law Debenture asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code, because distributions are not reserved for Law Debenture's alleged general unsecured, unsubordinated claims for postpetition fees and expenses, and because all other general unsecured claims receive 100% distributions, plus postpetition interest. | To the extent that Law Debenture has a general unsecured claim, it will be treated as all other general unsecured claims are treated. The Debtors and Law Debenture continue to discuss the Indenture Trustee's objections, however. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **E.** | | **Section 510(a) Objections** | |
| 23. | 11471, 11937, 11951 | The Bondholders assert that the Plan violates section 510(a) of the Bankruptcy Code in that it purports to waive and nullify the subordination of the TOPrS claims without affording the Senior Notes payment in full. | The Plan's proposed treatment of the subordinated TOPrS and other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment.  The Plan provides that all general unsecured creditors, including holders of TOPrS, will receive New Common Stock and Discount Rights.  The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture.  After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders of TOPrS Claims.  Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| **F.** | | **Best Interests Test** | |
| 24. | 11906, 11908, 12075 | The objectors assert that the Debtors have not established under section 1129(a)(7) that stakeholders in each of the individual cases will be no worse under the "deemed" substantive consolidation schemes than they would be if their respective Debtor's case stands on it own and the Plan does not prove that it pays DAS LLC creditors at least as much as they would receive in a liquidating chapter 7. | The liquidation analyses attached as Appendix E to the Disclosure Statement clearly demonstrate that there is no residual value for unsecured creditors of any Debtor after satisfying secured payments to the DIP Lenders and the PBGC. |
| 25. | 11882 | Randy Halazon, a former employee of Delphi, asserts that the Plan is unfair and inequitable to the extent it does not include the foreign subsidiaries as part of the liquidation analysis. | This objection is incorrect.  The liquidation analysis assumes the going concern sale of the remaining non-Debtor businesses, which are primarily located outside of the United States. |

|  | **Objection Docket No.** | **Objection Asserted** | **Resolution, Response or Proposal** |
|---|---|---|---|
| **G.** | | **Cramdown** | |
| 26. | 11951 | The objector alleges that the Debtors must satisfy the absolute priority rule because the Senior Noteholders voted to reject the Plan. | This statement is incorrect.  As an initial matter, both the Senior Noteholders and the TOPRS voted in favor of the Plan, demonstrating support of, among other things, the classification and treatment of Class 1C Claims contained in the Plan.  Because the voting results show that the Senior Notes, the TOPrS, and the remaining Class 1C claimants, if classified separately, have voted to accept the plan, the Bondholder Group's objection to classifying the three groups together is moot. |
| 27. | 11908, 11951 | The objectors allege that the Plan is not fair and equitable because holders of claims and interests junior to the Senior Notes are receiving distributions under the Plan and the Senior Notes are allegedly not being paid in full based on, among other things, recoveries that are premised on participation in the Rights Offering and the Senior Noteholders are not being compensated for the loss of their seniority. | The distributions made under the Plan to holders of Senior Notes provide for a par plus accrued at Plan Equity Value recovery, as supported by the testimony of David Resnick and John Sheehan. |
| 28. | 11951 | The objector alleges that the distributions to junior classes of creditors cannot be justified by a gifting exception, which is not recognized in the Second Circuit. | As more fully explained in the Memorandum, the distributions made to junior classes are the result of GM's significant contribution to this reorganization. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 29. | 11951 | The objector alleges that the new value exception does not justify the distributions to holders of junior claims and interests. | The Senior Noteholders argument regarding new value is inapplicable to Class 1C, because that class voted to accept the Plan. The new value exception does apply, however, to Class 6C, which voted to reject the Plan. The Supreme Court has noted that the phrase "on account of such junior claim" in section 1129(b)(2)(B)(ii) of the Bankruptcy Code could be interpreted to mean that recovery for junior classes is barred only when that recovery is "because of" a Claim or Interest. See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434, 451 (1999). The Supreme Court also noted that reading the section 1129(b)(2)(B)(ii) as a blanket prohibition on recovery for equity in the context of cramdown would leave the phrase "on account of " without meaning. Id. For old equity to retain its interests pursuant to the exception, the capital contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received. Bonner Mall Partnership v. U.S. Bancorp Mortgage Co., 2 F.3d 899, 908 (9th Cir. 1993). Here, Delphi has made a substantial new value contribution, including agreeing to contribute Delphi stock for Plan currency to the Class 6C creditors. The Plan provides for satisfaction of the control group liability claims of the PBGC and the DIP Facility. Absent such satisfaction, Delphi Diesel Systems Corp. could be jointly and severally liable for several large claims. Indeed, the PBGC has filed a proof of claim against Delphi Diesel Systems Corp. in excess of $5 billion. In, addition, as a guarantor under the DIP Facility, Delphi Diesel Systems Corp. could become responsible for the DIP Facility but for the provision of the Plan providing for the repayment of the DIP Facility. Finally, there can be no doubt that Delphi Diesel Systems Corp., and thus the creditors of that Debtor, will benefit substantially from the Plan's payment of the Company's Administrative Claims, the payment of prepetition claims through Plan currency, the MDL settlements, and the benefits provided with respect to the global settlement reached with GM, including revenue support and labor cost support, among other things. In short, Delphi has made substantial new value contributions which permit the distributions to be made to the junior classes pursuant to the Plan. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 30. | 11908, 11937 | The objectors assert that the Plan violates the Absolute Priority Rule because Unsecured Claims allegedly will not receive full payment under the Plan with postpetition interest, but junior claims and interests, including the TOPrS Claims, Section 510(b) Claims and equity interests, receive a distribution. | The overwhelming support of the plan by the consolidated Debtor classes demonstrates support for the distributions under the Plan, and the settlements that enable those distributions to be made. |
| | **H.        Feasibility** | | |
| 31. | 11951, 12012 | The objector alleges that the Plan should not be confirmed because the Debtors do not have fully committed exit financing and may not meet the interest rate cap in the Investment Agreement. | The objections misstate the required showing of feasibility with respect to financing at confirmation.  The Debtors must show by a preponderance of the evidence that confirmation of the Plan will not lead to the need for another financial reorganization or to liquidation.  See In re Cellular Info. Sys., 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994); accord In re Texaco, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ("The Debtors have established at the confirmation hearing that, upon the emergence of the [d]ebtors from Chapter 11, there is at least a reasonable prospect that the Debtors' earning capacity, together with their ability to obtain financing and sell assets, will be sufficient to fund the Plan.  Such evidence adequately supports a finding by this Court that the Plan is feasible within the meaning of section 1129(a)(11).").  The Debtors have made such a showing with respect to their financing.  Among other thing, the Debtors have negotiated the Exit Financing Arrangements and entered into a "best efforts" agreement with Citigroup and J.P. Morgan.  In addition, the Debtors' lead arrangers have already begun assembling a syndicate of potential lenders with respect to the Exit Financing Arrangements.  Finally, entry into the Exit Financing Arrangements is a condition precedent to the occurrence of the Effective Date under Article 12.2 of the Plan.  Unlike some of the conditions precedent in Article 12.2, the condition precedent related to the Exit Financing Arrangements cannot be waived.  See Plan Article 12.3.  Thus, the financial reorganization represented by the Plan could not occur without the consummation of the Exit Financing Arrangements.  Confirmation of the Plan, therefore, could not lead to the need for another financial reorganization or a liquidation of the Debtors because the Plan would not become effective unless the Debtors obtained the Exit Financing Arrangements. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **I.** | | **Valuation** | |
| 32. | 11471, 11951 | The objector alleges that the current trading prices of the Senior Notes accurately reflect the value of Delphi, and that the Rothschild valuation is inaccurate. | According to the Debtors' financial advisor and investment banker, Rothschild, the Debtors' range of potential total enterprise values fall within the range of $11.2 billion to $14.1 billion.  Rothschild made this assessment after a comprehensive and methodical analysis of the Debtors, including a review of the Debtors' business plan, a trading values analysis, a precedent transactions analysis, and a discount cash flow analysis. |
| 33. | 11908 | The objector asserts that general unsecured creditors are not being paid in full because such creditors receive distributions of stock and rights at Plan value, but the Plan value is substantially above the midpoint of the valuation range prepared by Rothschild and the Plan value has changed by hundreds of millions of dollars between the September 6 Plan and the First Amended Plan. | The Plan Equity Value was chosen from a range of potential values (which range was determined after a thorough analysis) as the result of arms'-length negotiations between sophisticated parties, including the Plan Investors and the Creditors' Committee. The Plan Equity Value is based on the total enterprise value of the Reorganized Debtors, less net debt and warrant value.  Although the midpoint of the valuation is lower ($12.7 billion) than the negotiated total enterprise value of $13.3 billion, the entire range of possible values is reasonable and any particular point in the value range is just as probable as any other value in that range. |
| 34. | 11908 | The objector asserts that to meet the requirement of section 1129(b) of the Bankruptcy Code and to provide general unsecured creditors with a full recovery, the Debtors must establish that on the effective date of the Plan, the stock will be worth 75.5% of such creditors' claims and the rights will be equal to the remaining 24.5% of the claims, or that the stock which creditors can purchase as part of the Discount Rights Offerings is worth the 24.5% after deducting the amount the creditors have to advance to acquire the stock.  The objector asserts that to the extent the Plan does not provide creditors with property of a value as of the Effective Date in full payment of the claims, the Plan is not confirmable. | The fact that the ultimate point in the range of total enterprise values was agreed among the parties further supports the determination of the Plan Equity Value.  The objections do not contest the reasonableness of the range of values determined by Rothschild, but rather contest the precise point in the range that is being used for purposes of Plan distributions.  The Court has correctly noted that the "pinpoint valuation of such a set of businesses is a fantasy and that valuation ultimately in this context . . . is one that should be premised upon a negotiation based on a course economic reality but that ultimately reflects a willingness by all of the parties to live with what they believe is fair in light of the entire context." (Tr. of Dec. 7, 2003 Hr'g 18:24-5, 19:1-5.) |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 35. | 11908 | The objector further asserts that, while the Debtors today cannot know the value of the stock as of the Effective Date, that value can be determined by employing a look back period post-confirmation and adjusting stock distributions based on the actual value of the stock. The objector alleges that to do otherwise creates a great risk that creditors will not be paid in full. | The Plan Equity Value is premised on the Debtors' total enterprise values. The Debtors' range of potential total enterprise values fall within the range of $11.2 billion to $14.1 billion. Rothschild made this assessment after a comprehensive and methodical analysis of the Debtors, including a review of the Debtors' business plan, a trading values analysis, a precedent transactions analysis, and a discount cash flow analysis. |
| **J.** | **Settlements** | | |
| 36. | 11951 | The objector alleges that the GM Settlement cannot be approved because it is not fair and equitable, falls below the lowest point in the range of reasonableness, and mandates distributions to junior creditors. | The standard for approving a settlement as part of a Plan of reorganization is whether the proposed settlement is fair and equitable, reasonable, and in the best interests of the Debtors' estates. The Debtors believe that the settlement with GM is well within the range of reasonableness and should be approved by the Bankruptcy Court as part of the Plan as this consideration allows Delphi to provide distributions to other stakeholders that would be impossible to deliver without the settlement. |
| 37. | 11951 | The objector alleges that the Plan cannot be approved because it violates the absolute priority rule by providing distributions based on the MDL Settlements. Specifically, the Plan provides a distribution to holders of claims arising from the MDL litigation, which violates section 510(b) because holders of Senior Notes are not being paid in full. | The MDL Settlements, which the Debtors will seek approval of alongside the Plan, were adequately described in the Disclosure Statement and that certain of the claims resolved in the MDL Settlements could be junior in priority to unsubordinated general unsecured claims. The Disclosure Statement also noted that by voting to accept the Plan, creditors would be resolving the issue of whether the Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims should receive the treatment proposed in the Plan. The overwhelming majority of unsecured creditors have voted to accept the Plan. Moreover, as thoroughly described in the Memorandum, the MDL Settlements and the distributions to be made pursuant to the Plan are appropriate and necessary components of the Plan. |

|  | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 38. | 11937 | The objector alleges that the Plan has not been proposed in good faith because Plan Investors allegedly are being treated far better than they are entitled while General Unsecured Creditors allegedly will receive inferior and improper treatment. | The Plan has been proposed by the Debtors in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to Claim holders under the circumstances of these Chapter 11 Cases. The support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by holders of Claims that cast Ballots reflect the overall fairness of the Plan and the acknowledgment by the Debtors' stakeholders that the Plan has been proposed in good faith and for proper purposes. |
| | **K.     Taxing Authorities** | | |
| 39. | 11754, 11823, 11847, 11906, 12075 | The taxing authorities object to any aspect of the Plan that attempts to reduce their claims from statutory amounts, including fees and interest from the Petition Date until the taxes are paid in full. | For the avoidance of doubt, any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
| 40. | 11754, 11823, 11847 | The taxing authorities object to their prepetition claims being paid over a period beyond six years from assessment of the taxes made the subject of the claims. | Article 2.2 of the Plan complies with 1129(a)(9)(C) of the Bankruptcy Code which specifically allows for deferred cash payments from the date of assessment. |
| 41. | 11754, 11847 | The taxing authorities object to any part of the Plan which requires claimants to file a formal request for payment of their administrative expense claims. | Administrative claimants are treated equally under the Plan and must file an administrative claim within 45 days of the Effective Date. |
| 42. | 11754 | The taxing authorities object to any part of the Plan which limits payment of statutory fees, penalties and interest on administrative expense claims. | The Debtors will pay allowed administrative claims as provided in Section 2.1 of the Plan. |
| 43. | 11754, 11847 | The taxing authorities object to the Plan insofar as it allows for more than 60 days from the Effective Date for filing objections to the objectors' claims, as it would be unreasonable and prejudicial to all creditors. | All creditors under the Plan are subject to the same objection procedure. The taxing authorities have shown no reason why they should be treated differently from other parties in this respect. |
| 44. | 11754, 11847 | The taxing authorities assert that the Plan should not allow for payment to inferior lien creditors prior to payment of the superior tax lien claims. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. The Plan does not contemplate the priming of tax liens. |
| 45. | 11823 | The taxing authority asserts that the Plan would impermissibly strip secured tax claimants of their liens without having first paid all taxes and interest by treating such secured claims in the same manner as priority tax claims, which does not provide for the retention of liens. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 46. | 11823, 11906, 12075 | The taxing authorities further assert that section 9.8 of the Plan effectively gives the Debtors the power to convert otherwise non-dischargeable secured tax claims into general unsecured claims if such secured tax claims are disputed and sufficient funds have not been set aside in the distribution reserve. | The Debtors believe that the majority of claims have been resolved or reconciled and any amounts set aside in the distribution reserve will be sufficient. |
| 47. | 11847 | The taxing authority asserts that the Plan is not fair and equitable because it does not explicitly provide for retention of tax liens and does not explicitly afford for payment of 2007 and 2008 taxes. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. |
| 48. | 11847 | The taxing authority asserts that the Plan impermissibly requires tax claimants to estimate 2007 and 2008 tax claims, as opposed to providing for payment of those claims in the ordinary course under section 503(b) of the Bankruptcy Code. | Administrative claimants are treated equally under the Plan and must file an administrative claim within 45 days of the Effective Date. |
| 49. | 11847 | The taxing authority asserts that the Plan does not contain cure provisions in case of default in payments to tax claimants. | The Court retains jurisdiction under Article XIII of the Plan. No cure provision is necessary. |
| 50. | 11847 | The taxing authority asserts that the Plan should specifically identify the dates of expected distribution with respect to payment of secured claims. Hidalgo County proposes that plan payments on undisputed portions of tax claims commence 60 days after the Effective Date, and continue in monthly lump sum payments as the amounts become allowed. | The Plan identifies distribution dates in Article 1.67, the timing of which the Debtor asserts are proper. In addition, Article 2.1 of the Plan specifically provides that Administrative Claims will be paid on the first Distribution Date occurring after the later of the date an Administrative Claim becomes an Allowed Administrative Claim and the date such Claim becomes payable pursuant to an agreement between the Debtors, provided, however, that Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. |
| 51. | 11847 | The taxing authority asserts that tax claims are impaired under the Plan. | The Debtors' disagree with this assertion. Any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
| 52. | 11847 | The taxing authority alleges that the Plan violates the absolute priority rule by affording payment in full in cash to other secured creditors and treating secured tax claimants as unsecured priority tax claimants to be paid over six years. | The Debtors' disagree with this assertion. Any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 53. | 11906, 12075 | The taxing authority asserts that the Plan fails to treat its priority tax claim in the manner required by section 1129(a)(9)(C) of the Bankruptcy Code, because the Plan fails to ensure the payment of deferred cash payments of a value as of the date of the Plan equal to the allowed amount of the priority tax claim. | The Debtors' disagree with this assertion.  Any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
| 54. | **12081** | Monroe County asserts that payment of its claims in the form of stock is unacceptable under its rules, state law, and the trust indenture under which it operates. | A creditor's particular organizational structure does not negate the value of currency to be distributed under a chapter 11 plan, nor should a creditor's preferred form of distribution form a basis for finding a plan in violation of the Bankruptcy Code. |
| | **L.** | **Treatment Of Administrative Expense Claims** | |
| 55. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11883 | The objectors allege that the timing of the payment of administrative expense claims under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | The objectors assert that section 1129(a)(9)(A) requires the Debtors to pay cure amounts on the Effective Date.  Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added).  The objectors do not currently hold <u>allowed</u> claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan.  <u>See</u>, <u>e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same)**.**  Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans.  <u>Id.</u>  To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> administrative claims prior to the effective date of a plan.  Such a burden should not be placed on the Debtors. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 56. | 11927 | Timken asserts that the Plan unfairly and impermissibly discriminates between the treatment for cure claims that were previously satisfied and General Unsecured Claims because paid cure claims will not be given postpetition interest, while general unsecured claims will be paid with postpetition interest. Timken asserts that it only received cash and should now receive postpetition interest like other holders of general unsecured claims. | Timken's contract was assumed in December 2006 at the request of Timken. The Debtors are not obligated to pay any interest on the assumed contract nor are the Debtors paying any interest on Cure claims paid in cash as approved by the Cure procedures in the Solicitation Procedures Order. |
| 57. | 11881 | Bosch asserts that the Plan fails to explicitly set forth the source of Debtor funding for administrative claims. | The Debtors and Bosch have executed a settlement agreement, which, among other things, establishes a procedure for the resolution of Bosch's patent infringement claims. Bosch's objection is moot. |
| | **M.    Setoff Rights** | | |
| 58. | 11869 | Equistar seeks to preserve its right of setoff and objects to the Plan to the extent it disallows or impairs claims of setoff or offset, which would allegedly result in the discharge of Equistar's secured claim without providing it the indubitable equivalent of its claim. | Because Secured Claims (including claims secured by setoff) are paid in full under the Plan, Equistar is not prejudiced. Equistar can follow the Court-approved procedures for exercising its setoff rights. |
| 59. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11944 | The objectors allege that the Plan violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, and thus the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | **N.    Estimation Of Disputed Claims** | | |
| 60. | 11791, 11792, 11804, 11849, 11852, 11853, 11855, 11867, 11944 | The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| 61. | 11881 | Bosch objects to the Plan to the extent the estimation provisions could be interpreted as applying to and limiting post-emergence patent infringement claims. | The Debtors and Bosch have executed a settlement agreement, which, among other things, establishes a procedure for the resolution of Bosch's patent infringement claims. Bosch's objection is moot. |

| | **OBJECTION DOCKET NO.** | **OBJECTION ASSERTED** | **RESOLUTION, RESPONSE OR PROPOSAL** |
|---|---|---|---|
| **O.** | | **General Objections To Assumption And Cure** | |
| 62. | 11872, 11883, 11944 | Creditors assert that the Plan also violates sections 1123(b)(2) and 365(b)(1) of the Bankruptcy Code because it provides that the Debtors will have the right to reject contracts for five days after the entry of an order establishing a Cure amount in excess of that provided by the Debtors, thus allowing the Debtors to assume agreements without any adequate assurance of future performance under the agreement, as the Debtors could revisit their decision to assume or reject. | The Debtors have correctly reserved the right to reject a contract if the ultimate cure amount is materially inconsistent with the Debtors' estimates. The Debtors have not reserved the right to decide to assume a contract after the Confirmation Date.<br><br>Bank of America has indicated that it will withdraw its objection during a conference call scheduled with chambers on January 15, 2008. |
| 63. | 11883 | The Licensors assert that the Plan does not comply with sections 365, 1129(a)(1), and 1129(a)(2) because it requires the Licensors to request payment of its cure claim and demand demonstrative evidence of adequate assurance, allegedly shifting the burden from the Debtors to the Licensors, rather than obligating the Debtors to affirmatively provide for the cure of their defaults. | There is nothing in sections 1123 and 1129 of the Bankruptcy Code that require a debtor to disclose its views of administrative claims before the claimants do. Indeed, claimants always initiate the claims process by filing proofs of claim. The filing requirement for non-debtor parties to Other Executory Contracts is a necessary aspect of the administrative review process. To require claimants to file a claim for amounts due under the claimant's contract is not unduly burdensome and is designed to ensure an orderly and efficient review process. |
| 64. | 11792, 11804, 11849, 11852, 11855, 11867, 11871, 11872, 11876, 11883, 11888, 11894 | The contract counterparties object to the assumption and cure of contracts. | This is not an objection to confirmation of the Plan. The Debtors assert that the procedures set forth in Article 8 of the Plan provide for the cure of all defaults under the contract counterparties' executory contracts, and that such procedures are appropriate, notwithstanding the fact that the Debtors may make cure payments after the Effective Date. |
| **P.** | | **Pension-Related Objections** | |
| 65. | 11949, 11957 | PGBC and Fiduciary Counselors argue that Plan section 7.22(d) is inconsistent with the Debtors' obligations under condition 4 of the IRS Minimum Funding Waiver regarding the Hourly Plan and suggests that the following language be added to section 7.22(d): "Notwithstanding anything that may be contrary in this Plan [of Reorganization], Delphi will make the contributions and satisfy the conditions set forth in the minimum funding standard waiver letters issued to Delphi by the Internal Revenue Service." | The Debtors are including language in the Confirmation Order that should resolve the objection of these parties with respect to this issue. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **Q.** | | **Employee/Retiree Objections** | |
| 66. | 11753, 11806, 11812, 11822, 11940, **12013**, 12016, **12083** | Former employees and retirees object generally to the Plan, the reorganization of the Debtors and the treatment of their claims. | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |
| 67. | **12079** | Orval Wright asserts that, because he worked for GM for over 30 years, his pension plan should not have been transferred to Delphi upon separation and that his flowback opportunities to GM should have been better explained to him. | This is not an objection to confirmation of the Plan. |
| 68. | **12080** | Keith Miller asserts that he was not provided sufficient time to return his ballot because he did not receive it from his proxy in a timely manner. | The Debtors are confident that their solicitation process was sound and they received ballots from a significant number of shareholders.  In compliance with the Solicitation Procedures Order, and set forth in the Affidavit of Service of Jane Sullivan For Financial Balloting Group LLC Solicitation Packages On Holders Of Public Securities, dated January 12, 2008 (Docket No. 11981), the Debtors had transmitted Solicitation Packages to Intermediate Record Holders – who then send Solicitation Packages to their Beneficial Holders – by December 15, 2007, a full twenty-three days before Mr. Miller alleges he received the packages.   The Debtors should not be held responsible for the exigencies of the postal service or the delays imposed by its stockholders' Nominee or its agent. |

|  | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| **R.** | | **Management Compensation Plan** | |
| 69. | 11475, 11580, 11582, 11822, 11938, 12016, 12026 | The objectors assert that (i) the Management Compensation Plan is unreasonable and overly generous because of the increase in the cash awards, (ii) the form and amount of equity allocated under the compensation program is improper, (iii) certain executives should not be included in the Management Compensation Program, (iv) the Management Compensation Program is not necessary for the implementation of the Debtors' plan of reorganization, and (v) the methodology used to calculate awards under the program was improper and unfair. | The Management Compensation is appropriate, and is based on independent third party input and guidance from the Statutory Committees. As more fully set forth in the Debtors' Memorandum, to attract and retain talented management, the Debtors determined that it was necessary to develop competitively benchmarked executive and non-executive compensation programs. The Investment Agreement also requires a competitively benchmarked salaried executive compensation program. Delphi's Compensation Committee (which is comprised of three independent directors who joined the Board of Directors during the past three years) has developed the Management Compensation Plan based on the advice of Watson Wyatt Worldwide, Inc. ("Watson Wyatt"), an independent outside advisor to the Compensation Committee. In particular, the Compensation Committee sought to provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involved developing and adjusting, in conjunction with Watson Wyatt, a target pay structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assessed market total direct compensation comparisons developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data. As a result of the extensive analysis conducted by the Compensation Committee and Watson Wyatt, as well as the advice of the Creditors' Committee and the Equity Committee, the Management Compensation Plan is within the range of competitive practice and is consistent with the ordinary course of the business of companies similar in size to the Debtors and of companies in the automobile supplier and general automobile industry. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 70. | 11475, 11580, 11938 | The UAW alleges that the Management Compensation Plan fails to comply with the good faith requirement section 1129(a)(3) of the Bankruptcy Code and fails to comply with the "equivalence of sacrifice" principle set forth in the memorandum of understanding between the UAW and Delphi, because management has continued to receive their salaries, benefits, and the AIP during the chapter 11 cases and the Management Compensation Plan will prevent such equivalence of sacrifice going forward. | The UAW's suggestion that the Debtors' management has not shared in the sacrifice of these Chapter 11 Cases or that management will have been made whole going forward after emergence is simply without merit. The non-DSB executives' long-term incentive ("LTI") opportunities would be reduced by approximately fifty percent on a go-forward basis in comparison to pre-bankruptcy practices. The retirement portion of the executives' former supplemental life program, which historically ranged from roughly $2.5 to $3 million on average as a guaranteed death benefit paid to executives, was determined to be not competitive and eliminated. Delphi's senior executives generally agreed to waive an amount equal to ten percent of their base pay from and after January 1, 2006 through the end of this case, only to have those reductions later made permanent. Delphi executives are the only group of employees at Delphi who will have received below market compensation for the Chapter 11 Cases – even if the executive compensation program is implemented. Executives went without their entire LTI opportunities during the case and, even with the achievement-based emergence cash opportunities proposed, the executive group would still be short of competitive benchmarks. Concerning each of these individual matters, and certainly in the aggregate, the executives, from their perspective, have sacrificed substantially.<br><br>The Debtors' goal through their compensation program was to set salaried and hourly compensation at competitive levels before emergence from chapter 11. The Debtors have come closer to achieving this benchmark with respect to hourly employees through the Union Settlement Agreements, even though many union-represented employees, including those of the UAW, are still above market, and the MCP merely attempts to complete this goal. Given the even-handed nature with which the Debtors have approached compensation, the concessions already made by the Debtors' management, and the reasonable and market-based nature of the MCP, there can be no question that the MCP is not inconsistent with the "equivalence of sacrifice" provisions in the UAW-Delphi-GM Memorandum of Understanding and, therefore, does not cause the Plan to be unfair or otherwise unreasonable. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 71. | 11938, 12026 | The objectors assert that the Debtors cannot justify the management compensation proposals by relying on the recommendations of their independent outside compensation advisors and Delphi's compensation committee. | Delphi's Compensation Committee (which is comprised of three independent directors who joined the Board of Directors during the past three years) has developed the Management Compensation Plan based on the advice of Watson Wyatt. The Compensation Committee has met more than 20 times since September 2006 to thoroughly discuss, review, and refine the executive compensation and executive benefit programs. The Management Compensation Program was also thoroughly reviewed by the Plan Investors and the Creditors' Committee, and satisfies Section 7.8 of the Plan. |
| 72. | 11822, 11938, 12016 | Objectors argue that implementation of the Management Compensation Plan, for which the objectors allege management and the compensation committee lacked good faith in proposing, will have a severe negative impact on Delphi in that it would be destructive to employee morale, and harmful to Delphi going forward. | The Management Compensation Program is necessary to retain key members of the Debtors. None of the Unions has challenged in any way the fact that since Delphi was spun off from GM as an independent entity, there historically have been four components to the compensation structure for the Company's executive workforce: (i) salary, or base wages, (ii) health care and other benefits, (iii) a performance-based, short-term annual incentive program, and (iv) a long-term incentive opportunity. Nor does any Union dispute the fact that since the Debtors sought chapter 11 relief, two of the four components of their executive compensation program have been canceled - the short-term and the long-term performance incentive plans - thus leaving in place only base salary and benefits. As a point of undisputed fact, therefore, more than half of the total compensation package of the Debtors' executives has been absent since the commencement of these Chapter 11 Cases. |
| 73. | 12026 | The IUE-CWA asserts that the Debtors cannot establish a reliance interest among its executives because Delphi and Watson Wyatt have always been aware its compensation plans were likely to be modified as part of the plan approval process. | The Debtors believe that it was necessary to bring the Management Compensation Program to market levels to not only retain, but also attract, hirable executives. |
| 74. | 11582, 12026 | The IUE-CWA asserts that there is no justification for paying executives a cash emergence bonus, notwithstanding the lost long term incentive plan earning opportunities in 2004 and during the bankruptcy, because the awards were not lost due to the bankruptcy, but rather the performance of Delphi. | The Debtors believe that the performance-based emergence cash opportunities are reasonable and appropriate under the circumstances of these Chapter 11 Cases. An LTI equity-based opportunity is consistent with competitive practice and, thus, Delphi executives' lack of such opportunities made them well below market. |

| | OBJECTION DOCKET NO. | OBJECTION ASSERTED | RESOLUTION, RESPONSE OR PROPOSAL |
|---|---|---|---|
| 75. | 12026 | The IUE-CWA asserts that the SERP amendments, which were administered prior to a freeze of all SERP-related benefits, are unjustified and out of line with comparable chapter 11 cases. | SERP benefits are a component of executives' compensation and program modifications were made with Watson Wyatt's input and were approved by the compensation committee. The Debtors believe that the modifications made to the program were appropriate and within competitive practice. |
| | **S.** | **Other Plan-Related Objections** | |
| 76. | 11881 | Bosch asserts that the Plan's provisions regarding the retention of jurisdiction should not apply to post-petition patent infringement claims as the proper place for such claims is the federal district court. | The Debtors and Bosch have executed a settlement agreement, which, among other things, establishes a procedure for the resolution of Bosch's patent infringement claims. Bosch's objection is moot. |
| 77. | 11906, 12075 | The claimant objects to payment of any post-petition interest at the Michigan (as opposed to the Kansas) statutory rate. | This is not a confirmation objection. Any creditor that is entitled to receive the Michigan postpetition interest rate was entitled to file an interest rate objection notice under the Solicitation Procedures Order. |
| 78. | 11908 | The objector asserts that payment in full for general unsecured creditors should include interest until payment is made, not just until January 31, 2008, as the Plan currently states. | The settlements reached between the Debtors, GM, the Plan Investors, and the Statutory Committees provide for payments through January 31, 2008. |
| 79. | 11935, 12012 | The Indenture Trustees allege that the Plan fails to satisfy their claims arising from their fees and expenses under the indentures. | The Debtors will continue discussions with the Indenture Trustees to adequately address mechanics for their fees and expenses. |
| 80. | 11944 | The objector argues that the Plan impermissibly bars distributions to a disputed claim if any portion of the claim is disputed. | The Debtors disagree with this assertion. The Debtors are not required to make distributions on disputed claims. |
| 81. | 11951 | The objector asserts that the Disclosure Statement did not contain adequate information. | The Debtors disagree with this assertion. The Disclosure Statement was approved by the Court as containing adequate information. |
| 82. | **12017** | The objector asserts that as a shareholder, he is entitled to the same percentage of ownership in Reorganized Delphi as he had in Delphi before it filed its chapter 11 petition. | The objector will receive distributions under the Plan pursuant to Article 5.7 on account of his equity interests. |

| DOCKET # | OBJECTING PARTY |
|---|---|
| 11471 | Caspian Capital Advisors et al. |
| 11475 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") |
| 11580 | UAW (Amended) |

| Docket # | Objecting Party |
|---|---|
| 11582 | International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America |
| 11753 | Sharyl Y. Carter |
| 11754 | Texas Taxing Authorities |
| 11791 | KenSa LLC |
| 11792 | Comerica Leasing Corporation |
| 11804 | Freudenberg-NOK, General Partnership, Freudenberg-NOK, Inc |
| 11806 | Sharyl Carter |
| 11811 | Darla and Allan Schmidt |
| 11812 | Frank X. Budelewski |
| 11822 | Randy Halazon |
| 11823 | Pima County |
| 11847 | Hildago County I.S.D., Hildago County, Burkburnett I.S.D., Wichita County |
| 11849 | Lear Corporation |
| 11852 | Comerica Leasing Corporation |
| 11853 | KenSa LLC |
| 11855 | Freudenberg-NOK, General Partnership, Freudenberg-NOK, Inc |
| 11867 | Cooper-Standard Automotive Inc. |
| 11869 | Equistar Chemicals, LP |
| 11871 | American Axle & Manufacturing, Inc |
| 11872 | Bank of America Leasing & Capital, LLC. |
| 11876 | Automodular Assemblies Inc. |
| 11881 | Robert Bosch Corporation |
| 11883 | Audio MPEG, Inc., S.I.SV.EL., S.p.A. |
| 11885 | Michigan Department of Environmental Quality |
| 11888 | Fujikura America, Inc. |
| 11894 | AT&T Entities |
| 11906 | Board of County Commissioners of Johnson County, Kansas |
| 11908 | Riverside Claims, LLC |
| 11927 | The Timken Company |
| 11935 | Law Debenture Trust Company of New York |
| 11937 | Liquidity Solutions, Inc. d/b/a  Revenue Management |

| Docket # | Objecting Party |
|---|---|
| 11938 | UAW |
| 11939 | Lead Plaintiff and the Prospective Class |
| 11940 | Retiree Claimants |
| 11944 | Equity Corporate Housing I |
| 11949 | Pension Benefit Guaranty Corporation |
| 11950 | United States Of America |
| 11951 | Davidson Kempner Capital Management LLC, et al |
| 11957 | Fiduciary Counselors, Inc. |
| **11973** | **ERISA Lead Plaintiffs** |
| 12012 | Wilmington Trust Company |
| **12013** | **Larry Vanderpool** |
| 12016 | Randy Halazon (see also Docket No. 11822) |
| **12017** | **Robert W. Ward** |
| 12026 | International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America |
| 12075 | Board of County Commissioners of Johnson County, Kansas |
| **12079** | **Orval W. Wright** |
| **12080** | **Keith Miller** |
| **12081** | **Monroe County Water Authority** |
| **12083** | **Naomi M. Frye** |