**Appendix C**

***Chart Of Objections To The Confirmation Of The First Amended Joint Plan Of Reorganization
Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession[1]***

***Organized By Objector[2]***

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 1. | 11471, 11951 | Caspian Capital Advisors, Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Nomura Corporate Research & Asset Management, Inc.; Northeast Investors Trust; and Whitebox Advisors, LLC (the "Senior Noteholders")[3] | The Senior Noteholders' objection is based on the assumption that the holders of Senior Note Claims voted to reject the Plan. | Contrary to the assumption of the Senior Noteholders, holders of Senior Note Claims voted to <u>ACCEPT</u> the Plan. |
| | | | Section 1122 Objections | |
| | | | (a)    The Senior Noteholders assert that classification of claims proposed under the Plan violates section 1122 of the Bankruptcy Code by classifying together | Contractually subordinated unsecured claims may be placed in the same class as senior and other unsecured claims.  Courts have noted that, under section 1122(a) of the Bankruptcy Code, |

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession filed on December 10, 2007 (Docket No. 11386) (the "Plan").

[2]    This chart reflects all objections entered on the docket as of 12:00 p.m. (Eastern Standard Time) on January 16, 2008.  The status of resolution of certain objections is as of 12:00 p.m. (Eastern Standard Time) on January 16, 2008.

[3]    Docket No. 11471 (the "Preliminary Objection") was filed on behalf of Caspian Capital Advisors, LLC; Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliott Associates, L.P.; Everest Capital Limited; Nomura Corporate Research & Asset Management, Inc.; Northeast Investors Trust; and Whitebox Advisors, LLC.

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | claims that are not "substantially similar," e.g., creditors of different Debtors are placed in the same class.  In addition, objectors assert that the classification under the Plan improperly gerrymanders the vote. | the "similarity of claims is not judged by comparing creditor claims inter se.  Rather, the question is whether the claims in a class have the same or similar legal status in relation to assets of the debtor."  In re Frascella Enters., Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) (citing In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995)); see also In re Union Fin. Servs. Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004) ("The fact that [creditor's] [c]laim is subordinated to other class members does not change the fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), aff'd, 155 F. App'x 940 (8th Cir. 2005); In re Eagle Bus Mfg., Inc., 134 B.R. 584, 595 (Bankr. S.D. Tex. 1991) ("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy Code."), aff'd, 158 B.R. 421 (S.D. Tex. 1993); see also David L. Bleich, Chapter 11 Plans, 647 PLI/Comm 437, 519-20 (1993) (senior and subordinated claims "belong in the same class since they are 'substantially similar,' i.e., they have the same legal rights against the debtor's assets, the subordination being only a private matter between them.").  The Plan's classification has a rational basis because it is based on the respective legal rights of each holder of a Class 1C claim against the applicable consolidated estate.  The classification recognizes that the TOPrS, the Senior Notes, and other senior debt are all non-priority unsecured claims in relation to the Debtors subject to Class 1C claims, and as such may be classified in the same class, even though contractually one group is subordinated to the other.  Consequently, the classification of claims within  Class 1C is appropriate and the Plan meets the requirements of section 1122(a). |
| | | | Section 1123(a)(4) Objections | |
| | | | (b)    The Senior Noteholders assert that the Plan distributes a different percentage of recovery to the same members of a class because holders of TOPrS claims will receive only 90% of their allowed claims. | The Plan's proposed treatment of the subordinated TOPrS and other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment.  The Plan provides that all general unsecured creditors, including holders |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | of TOPrS, will receive New Common Stock and Discount Rights.  The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture.  After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders of TOPrS Claims.  Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| | | | (c)    The Senior Noteholders assert that they will not receive a full recovery because their recoveries are premised on participation in the Rights Offering. | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code.  See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (d)    The Senior Noteholders assert that the Plan requires disparate contributions of members of the class for their distributions because the Senior Notes are required to forego their subordination rights. | Under the Plan, senior debt will be paid in full, and because of the payment in full,  the subordination agreement is being deemed satisfied.  The Senior Notes are being paid principal plus accrued postpetition interest under the terms of the Plan.  In compliance with the subordination agreement, Senior Notes and other general unsecured claims are being paid par plus accrued, while the TOPrS will receive the residual distributions available in the General Unsecured Claims class after these distributions are made. |
| | | | Section 510(a) Objections | |
| | | | (e)    The Bondholders assert that the Plan violates section | The Plan's proposed treatment of the subordinated TOPrS and |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | 510(a) of the Bankruptcy Code in that it purports to waive and nullify the subordination of the TOPrS claims without affording the Senior Notes payment in full. | other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment. The Plan provides that all general unsecured creditors, including holders of TOPrS, will receive New Common Stock and Discount Rights. The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture. After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders of TOPrS Claims. Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| | | | Section 510(b) Objections | |
| | | | (f)   The objectors allege that the Plan cannot be approved because it violates the absolute priority rule by providing distributions based on the MDL Settlements. Specifically, the Senior Noteholders assert that the Plan provides a distribution to holders of claims arising from the MDL litigation, which violates section 510(b) because holders of Senior Notes are not being paid in full. | The MDL Settlements, which the Debtors will seek approval of alongside the Plan, were adequately described in the Disclosure Statement and that certain of the claims resolved in the MDL Settlements could be junior in priority to unsubordinated general unsecured claims. The Disclosure Statement also noted that by voting to accept the Plan, creditors would be resolving the issue of whether the Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims should receive the treatment proposed in the Plan. The overwhelming majority of unsecured creditors have voted to accept the Plan. Moreover, as thoroughly described in the Memorandum Of Law (A) In Support Of Confirmation Of First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B) In Response To Objections Thereto (the "Memorandum"), the MDL Settlements and the distributions to be made pursuant to the Plan are appropriate and necessary components of the Plan. |
| | | | Substantive Consolidation Objections | |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | (g)   The Senior Noteholders assert that the Debtors have provided no facts legally supporting the bases upon which substantive consolidation can be approved by the Court and cannot meet the applicable standard for substantive consolidation under Second Circuit law, particularly the creditor reliance and hopeless entanglement tests. | In the Second Circuit, the two critical factors to consider in examining a proposed substantive consolidation are (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) when the affairs of the debtors are so entangled that consolidation will benefit all creditors." In re Augie/Restivo Banking Co. Ltd., 860 F.2d 515, 518 (2d Cir. 1988); see also In re 599 Consumer Elecs., Inc., 195 B.R. 244, 248 (Bankr. S.D.N.Y. 1996) ("It is necessary to consider both of these two critical factors . . . Conceivably, [however,] substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggest that the two cited factors are alternatively sufficient criteria.") (citations omitted).  In applying the second factor of the Augie/Restivo test, courts have used a balancing test pursuant to which substantive consolidation "should be ordered only where the inequalities of substantive consolidation are outweighed by the practical difficulties of tracing complex transactions between interrelated entities."  In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 765 (Bankr. S.D.N.Y. 1992).  As set forth in the Eisenberg Declaration and as thoroughly described in the Memorandum, taking seriously the standards for substantive consolidation in the Second Circuit, the Debtors and their advisors conducted an exhaustive review of the Debtors' operations to determine what substantive consolidation would be appropriate, if any.  Based on that review, the Debtors determined that the substantive consolidation of the Debtor groups, as proposed under the Plan, is appropriate under both factors of the Augie/Restivo test. |
| | | | (h)   The Senior Noteholders assert that the Debtors' proposed consolidation for voting and distribution purposes only is improper. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS LLC") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  The objections that have been made have been rendered moot by the acceptance of the affected classes.  With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors supports the |

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot. Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing. **Thus, again, your vote on this Plan is important.**" (Disclosure Statement at DS-113) (bold in original text). |
| | | | Cramdown | |
| | | | (i) The Senior Noteholders assert that the Debtors must satisfy the absolute priority rule because the Senior Noteholders voted to reject the Plan. | This assertion is incorrect. As an initial matter, both the Senior Noteholders and the TOPRS voted in favor of the Plan, demonstrating support of, among other things, the classification and treatment of Class 1C Claims contained in the Plan. Because the voting results show that the Senior Notes, the TOPrS, and the remaining Class 1C claimants, if classified separately, have voted to accept the plan, the Bondholder Group's objection to classifying the three groups together is moot. |
| | | | (j) The objectors allege that Plan is not fair and equitable because holders of claims and interests junior to the Senior Notes are receiving distributions under the Plan and the Senior Notes are allegedly not being paid in full based on, among other things, recoveries that are premised on participation in the Rights Offering and the Senior Holders are not being compensated for the loss of their seniority. | The distributions made under the Plan to holders of Senior Notes provide for a par plus accrued at Plan Equity Value recovery, as supported by the testimony of David Resnick and John Sheehan. |
| | | | (k) The objector alleges that the GM Settlement cannot be approved because it is not fair and equitable, falls below the lowest point in the range of reasonableness, and mandates distributions to junior creditors. | The standard for approving a settlement as part of a Plan of reorganization is whether the proposed settlement is fair and equitable, reasonable, and in the best interests of the Debtors' estates. The Debtors believe that the settlement with GM is well within the range of reasonableness and should be approved by the Bankruptcy Court as part of the Plan as this consideration allows Delphi to provide distributions to other stakeholders that would be impossible to deliver without the settlement. |
| | | | (l) The Senior Noteholders assert that the distributions to junior classes of creditors cannot be justified by a | As more fully explained in the Memorandum, the distributions made to junior classes are the result of GM's significant |

6

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | gifting exception, which is not recognized in the Second Circuit. | contribution to this reorganization. |
| | | | (m) The Senior Noteholders assert that the New Value exception does not justify the distributions to holders of junior claims and interests. | The Senior Noteholders argument regarding new value is inapplicable to Class 1C, because that class voted to accept the Plan. The new value exception does apply, however, to Class 6C, which voted to reject the Plan. The Supreme Court has noted that the phrase "on account of such junior claim" in section 1129(b)(2)(B)(ii) of the Bankruptcy Code could be interpreted to mean that recovery for junior classes is barred only when that recovery is "because of" a Claim or Interest. See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434, 451 (1999). The Supreme Court also noted that reading the section 1129(b)(2)(B)(ii) as a blanket prohibition on recovery for equity in the context of cramdown would leave the phrase "on account of " without meaning. Id. For old equity to retain its interests pursuant to the exception, the capital contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received. Bonner Mall Partnership v. U.S. Bancorp Mortgage Co., 2 F.3d 899, 908 (9th Cir. 1993). Here, Delphi has made a substantial new value contribution, including agreeing to contribute Delphi stock for Plan currency to the Class 6C creditors. The Plan provides for satisfaction of the control group liability claims of the PBGC and the DIP Facility. Absent such satisfaction, Delphi Diesel Systems Corp. could be jointly and severally liable for several large claims. Indeed, the PBGC has filed a proof of claim against Delphi Diesel Systems Corp. in excess of $5 billion. In, addition, as a guarantor under the DIP Facility, Delphi Diesel Systems Corp. could become responsible for the DIP Facility but for the provision of the Plan providing for the repayment of the DIP Facility. Finally, there can be no doubt that Delphi Diesel Systems Corp., and thus the creditors of that Debtor, will benefit substantially from the Plan's payment of the Company's Administrative Claims, the payment of prepetition claims through Plan currency, the MDL settlements, and the benefits provided with respect to the global settlement reached with GM, including revenue support and |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | labor cost support, among other things.  In short, Delphi has made substantial new value contributions which permit the distributions to be made to the junior classes pursuant to the Plan. |
| | | | (n)     The Senior Noteholders assert that the Plan discriminates unfairly because it treats the Flow-Through Claims and GM Claims differently than the General Unsecured Claims. | The rationale for the classification and treatment of flow through claims is clearly described in John D. Sheehan's Declaration.  The basis for classification of the flow through claims is to minimize disruption to their ordinary course relationship with customers, avoid litigation over environmental matters when the extent of alleged conditions might not be fully known or knowable, minimize disruption to their relationship with their employees, and avoid litigation over claims that would be satisfied by insurers. |
| | | | Third Party Release Objections | |
| | | | (o)     The Senior Noteholders assert that under Second Circuit law, the Plan cannot be confirmed because the third party releases granted to officers and directors, GM, and the Plan Investors are not warranted and not based on a substantial contribution to the estates. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release.  The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| | | | (p)     The Senior Noteholders assert that no channeling trust has been created for any enjoined claims and the Plan does not provide for any means of payment for | Although courts may examine whether a release channels enjoined claims to settlement fund, courts have also approved releases where (i) the estate received substantial consideration, |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | enjoined claims against third parties. | (ii) the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contributions, and (iii) whether the plan otherwise provided for the full payment of the enjoined claims. <u>See</u> <u>In re Oneida Ltd.</u>, Case No. 06-10489, 2006 Bankr. LEXIS 1985 at * 39 (Aug. 30, 2006). In this case, the Debtors have received substantial consideration from the Released Parties and the releases are therefore proper. |
| | | | Valuation Objections | |
| | | | (q)    The objectors allege that the current trading prices of the Senior Notes accurately reflect the value of Delphi, and that the Rothschild valuation is inaccurate. | According to the Debtors' financial advisor and investment banker, Rothschild, the Debtors' range of potential total enterprise values fall within the range of $11.2 billion to $14.1 billion. Rothschild made this assessment after a comprehensive and methodical analysis of the Debtors, including a review of the Debtors' business plan, a trading values analysis, a precedent transactions analysis, and a discount cash flow analysis. |
| | | | Feasibility Objection | |
| | | | (r)    The objectors allege that the Plan should not be confirmed because the Debtors do not have fully committed exit financing and may not meet the interest rate cap in the Investment Agreement. | The objections misstate the required showing of feasibility with respect to financing at confirmation. The Debtors must show by a preponderance of the evidence that confirmation of the Plan will not lead to the need for another financial reorganization or to liquidation. <u>See</u> <u>In re Cellular Info. Sys.</u>, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994); <u>accord</u> <u>In re Texaco</u>, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ("The Debtors have established at the confirmation hearing that, upon the emergence of the [d]ebtors from Chapter 11, there is at least a reasonable prospect that the Debtors' earning capacity, together with their ability to obtain financing and sell assets, will be sufficient to fund the Plan. Such evidence adequately supports a finding by this Court that the Plan is feasible within the meaning of section 1129(a)(11)."). The Debtors have made such a showing with respect to their financing. Among other thing, the Debtors have negotiated the Exit Financing Arrangements and entered into a "best efforts" agreement with Citigroup and J.P. Morgan. In addition, the Debtors' lead arrangers have already begun assembling a syndicate of potential lenders with respect to the Exit Financing Arrangements. Finally, entry into the Exit Financing Arrangements is a condition precedent to the occurrence of the Effective Date under Article 12.2 of the Plan. Unlike some of |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | the conditions precedent in Article 12.2, the condition precedent related to the Exit Financing Arrangements cannot be waived. See Plan Article 12.3. Thus, the financial reorganization represented by the Plan could not occur without the consummation of the Exit Financing Arrangements. Confirmation of the Plan, therefore, could not lead to the need for another financial reorganization or a liquidation of the Debtors because the Plan would not become effective unless the Debtors obtained the Exit Financing Arrangements. |
| | | | Disclosure Statement Objections | |
| | | | (s)    The Senior Noteholders assert that the Disclosure Statement did not contain adequate information. | The Debtors disagree with this assertion. The Disclosure Statement was approved by the Court as containing adequate information. |
| 2. | 11475, 11580,[4] 11938 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") | (a)    The objectors assert that (i) the Management Compensation Plan is unreasonable and overly generous because of the increase in the cash awards, (ii) the form and amount of equity allocated under the compensation program is improper, (iii) certain executives should not be included in the Management Compensation Program, (iv) the Management Compensation Program is not necessary for the implementation of the Debtors' plan of reorganization, and (v) the methodology, including the selection of "peer companies," used to calculate awards under the program was improper and unfair. | The Management Compensation is appropriate, and is based on independent third party input and guidance from the Statutory Committees. As more fully set forth in the Debtors' Memorandum, to attract and retain talented management, the Debtors determined that it was necessary to develop competitively benchmarked executive and non-executive compensation programs. The Investment Agreement also requires a competitively benchmarked salaried executive compensation program. Delphi's Compensation Committee (which is comprised of three independent directors who joined the Board of Directors during the past three years) has developed the Management Compensation Plan based on the advice of Watson Wyatt Worldwide, Inc. ("Watson Wyatt"), an independent outside advisor to the Compensation Committee. In particular, the Compensation Committee sought to provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involved developing and adjusting, in conjunction with Watson Wyatt, a target pay |

---

[4]    The UAW filed an amended preliminary objection to clarify that it is objecting to the Management Compensation Plan as part of the Plan.

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assessed market total direct compensation comparisons developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data. As a result of the extensive analysis conducted by the Compensation Committee and Watson Wyatt, as well as the advice of the Creditors' Committee and the Equity Committee, the Management Compensation Plan is within the range of competitive practice and is consistent with the ordinary course of the business of companies similar in size to the Debtors and of companies in the automobile supplier and general automobile industry. |
| | | | (b)   The UAW alleges that the Management Compensation Plan fails to comply with the good faith requirement section 1129(a)(3) of the Bankruptcy Code and fails to comply with the "equivalence of sacrifice" principle set forth in the memorandum of understanding between the UAW and Delphi, because management has continued to receive their salaries, benefits, and the AIP during the chapter 11 cases and the Management Compensation Plan will prevent such equivalence of sacrifice going forward. | The UAW's suggestion that the Debtors' management has not shared in the sacrifice of these Chapter 11 Cases or that management will have been made whole going forward after emergence is simply without merit. The non-DSB executives' long-term incentive ("LTI") opportunities would be reduced by approximately fifty percent on a go-forward basis in comparison to pre-bankruptcy practices. The retirement portion of the executives' former supplemental life program, which historically ranged from roughly $2.5 to $3 million on average as a guaranteed death benefit paid to executives, was determined to be not competitive and eliminated. Delphi's senior executives generally agreed to waive an amount equal to ten percent of their base pay from and after January 1, 2006 through the end of this case, only to have those reductions later made permanent. Delphi executives are the only group of employees at Delphi who will have received below market compensation for the Chapter 11 Cases – even if the executive compensation program is implemented. Executives went without their entire LTI opportunities during the case and, even with the achievement-based emergence cash opportunities proposed, the executive group would still be short of competitive benchmarks. Concerning each of these individual matters, and certainly in the |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | aggregate, the executives, from their perspective, have sacrificed substantially.<br><br>The Debtors' goal through their compensation program was to set salaried and hourly compensation at competitive levels before emergence from chapter 11. The Debtors have come closer to achieving this benchmark with respect to hourly employees through the Union Settlement Agreements, even though many union-represented employees, including those of the UAW, are still above market, and the MCP merely attempts to complete this goal. Given the even-handed nature with which the Debtors have approached compensation, the concessions already made by the Debtors' management, and the reasonable and market-based nature of the MCP, there can be no question that the MCP is not inconsistent with the "equivalence of sacrifice" provisions in the UAW-Delphi-GM Memorandum of Understanding and, therefore, does not cause the Plan to be unfair or otherwise unreasonable. |
| | | | (c)    The UAW asserts that the Debtors cannot justify the management compensation proposals by relying on the recommendations of their independent outside compensation advisors and Delphi's compensation committee. | Delphi's Compensation Committee (which is comprised of three independent directors who joined the Board of Directors during the past three years) has developed the Management Compensation Plan based on the advice of Watson Wyatt Worldwide, Inc. ("Watson Wyatt"), an independent outside advisor to the Compensation Committee. The Compensation Committee has met more than 20 times since September 2006 to thoroughly discuss, review, and refine the executive compensation and executive benefit programs. The Management Compensation Program was also thoroughly reviewed by the Plan Investors and the Creditors' Committee, and satisfies Section 7.8 of the Plan. |
| | | | (d)    The UAW argues that implementation of the Management Compensation Plan, and the alleged lack of good faith demonstrated by management, will have a severe negative impact on Delphi in that it would be destructive to employee morale, and harmful to Delphi going forward. | None of the Unions has challenged in any way the fact that since Delphi was spun off from GM as an independent entity, there historically have been four components to the compensation structure for the Company's executive workforce: (i) salary, or base wages, (ii) health care and other benefits, (iii) a performance-based, short-term annual incentive program, and (iv) a long-term incentive opportunity. Nor does any Union dispute the fact that since the Debtors sought chapter 11 relief, |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | | two of the four components of their executive compensation program have been canceled - the short-term and the long-term performance incentive plans - thus leaving in place only base salary and benefits. As a point of undisputed fact, therefore, more than half of the total compensation package of the Debtors' executives has been absent since the commencement of these Chapter 11 Cases. |
| 3. | 11582, 12026[5] | International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA") | (a) | The IUE-CWA asserts that (i) the Management Compensation Plan is unreasonable and overly generous because of the increase in the cash awards from the motion the Debtors filed on the first days of the cases, (ii) the form and amount of equity allocated under the compensation program is improper, (iii) certain executives should not be included in the Management Compensation Program, (iv) the Management Compensation Program is not necessary for the implementation of the Debtors' plan of reorganization, and (v) the methodology used to calculate awards under the program, including the selection of "peer companies" and the setting of the strike price for options, was improper and unfair. | The Management Compensation is appropriate, and is based on independent third party input and guidance from the Statutory Committees. As more fully set forth in the Debtors' Memorandum, to attract and retain talented management, the Debtors determined that it was necessary to develop competitively benchmarked executive and non-executive compensation programs. The Investment Agreement also requires a competitively benchmarked salaried executive compensation program. Delphi's Compensation Committee (which is comprised of three independent directors who joined the Board of Directors during the past three years) has developed the Management Compensation Plan based on the advice of Watson Wyatt, an independent outside advisor to the Compensation Committee. In particular, the Compensation Committee sought to provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involved developing and adjusting, in conjunction with Watson Wyatt, a target pay structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assessed market total direct compensation comparisons developed from proxy data from a comparable group of large, diversified |

---

[5]     The IUE-CWA filed its objection on January 14, 2008 due to discussions it was holding with the Debtors regarding the filing of the objection under seal. The IUE-CWA served the Debtors with the objection on January 11, 2008.

| | Docket No. | Objector | Summary of Objection | | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | | companies, as well as from manufacturing and auto industry survey data. As a result of the extensive analysis conducted by the Compensation Committee and Watson Wyatt, as well as the advice of the Creditors' Committee and the Equity Committee, the Management Compensation Plan is within the range of competitive practice and is consistent with the ordinary course of the business of companies similar in size to the Debtors and of companies in the automobile supplier and general automobile industry. |
| | | | (b) | The IUE-CWA further asserts that the Debtors cannot establish a reliance interest among its executives because Delphi and Watson Wyatt have always been aware its compensation plans were likely to be modified as part of the plan approval process. | The Debtors believe that it was necessary to bring the Management Compensation Program to market levels to not only retain, but also attract, hirable executives. |
| | | | (c) | The IUE-CWA asserts that there is no justification for paying executives a cash emergence bonus, notwithstanding the lost long term incentive plan earning opportunities in 2004 and during the bankruptcy, because the awards were not lost due to the bankruptcy, but rather the performance of Delphi. | The Debtors believe that the performance-based emergence cash opportunities are reasonable and appropriate under the circumstances of these Chapter 11 Cases. An LTI equity-based opportunity is consistent with competitive practice and, thus, Delphi executives' lack of such opportunities made them well below market. |
| | | | (d) | The IUE-CWA asserts that the SERP amendments, which were administered prior to a freeze of all SERP-related benefits, are unjustified and out of line with comparable chapter 11 cases. | SERP benefits are a component of executives' compensation and program modifications were made with Watson Wyatt's input and were approved by the compensation committee. The Debtors believe that the modifications made to the program were appropriate and within competitive practice. |
| 4. | 11753, 11806 | Sharyl Y. Carter | Sheryl Carter objects to the Plan, bankruptcy, and reorganization of Delphi and the layoff of employees. | | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. In addition, the Court has approved Memoranda of Understanding with each of Delphi's primary unions which provide for the transformation of the Debtors' businesses. Objections to provisions in those agreements, including provisos for the lay off of employees were ripe for objection at that time but are now moot. |
| 5. | 11754 | Angelina County et al. (collectively, the "Texas Taxing Authorities") | (a) | The Texas Taxing Authorities object to all parts of the Plan that attempt to reduce their claims from that which is allowed by the Texas Property Tax Code and assert that they are entitled to payment of their | For the avoidance of doubt, any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | prepetition claims plus statutory fees and interest from the Petition Date until the taxes are paid in full. | Plan. |
| | | | (b) | The Texas Taxing Authorities object to their prepetition claims being paid over a period beyond six years from assessment of the taxes made the subject of the claims. | Article 2.2 of the Plan complies with 1129(a)(9)(C) of the Bankruptcy Code which specifically allows for deferred cash payments from the date of assessment. |
| | | | (c) | The Texas Taxing Authorities object to any part of the Plan which attempts to allow for payment of the administrative expense allegedly owing claimants other than in cash and in full on the Effective Date. | The objectors assert that section 1129(a)(9)(A) requires the Debtors to pay cure amounts on the Effective Date.  Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added).  None of the objectors holds an <u>allowed</u> claims under section 507(a)(1), thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan.  <u>See</u>, <u>e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same**)**.  Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans.  <u>Id.</u>  To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> administrative claims prior to the effective date of a plan.  Such a burden should not be placed on the Debtors. |
| | | | (d) | The Texas Taxing Authorities object to any part of the Plan which requires claimants to file a formal request for payment of their administrative expense claims. | Administrative claimants are treated equally under the Plan and must file an administrative claim within 45 days of the Effective Date. |
| | | | (e) | The Texas Taxing Authorities object to any part of the Plan which limits payment of statutory fees, penalties and interests on administrative expense claims. | The Debtors will pay allowed administrative claims as provided in Section 2.1 of the Plan. |
| | | | (f) | The Texas Taxing Authorities object to the Plan insofar as it allows for more than 60 days from the Effective Date for filing objections to the objectors' claims, as it would be unreasonable and prejudicial to | All creditors under the Plan are subject to the same objection procedure.  The taxing authorities have shown no reason why they should be treated differently from other parties in this respect. |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | all creditors. | |
| | | | (g) | The Texas Taxing Authorities assert that the Plan should not allow for payment to inferior lien creditors prior to payment of the superior tax lien claims. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. The Plan does not contemplate the priming of tax liens. |
| | | | (h) | The Texas Taxing Authorities assert that each objector "hereby cast a ballot against confirmation of the Plan." | Ballots for and against the Plan must be cast pursuant to the Solicitation Procedures Order. |
| 6. | 11791, 11853[6] | KenSa LLC ("KenSa") | (a) | The objector asserts that the classification of claims proposed under the Plan violates section 1122 of Bankruptcy Code. | The Plan provides for substantive consolidation for "voting and distribution" purposes. Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed. The objections that have been made have been rendered moot by the acceptance of the affected classes. With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors supports the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot. Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing. **Thus, again, your vote on this Plan is important.**" (Disclosure Statement at DS-113) (bold in original text). |
| | | | (b) | The objector asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by allegedly reducing claims without due process and not providing certain creditors with the same distribution as all others). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code. See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he |

---

[6]    KenSa filed an amended and restated objection to the Plan. This amended and restated objection is identical in all respect but appears to have been filed to provide for service to the required parties.

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c)  The objector asserts that the Plan improperly proposes to substantively consolidate various Debtors for plan voting and distribution only. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  Thus, the objection has been rendered moot by the acceptance of the affected classes.  In addition, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan.  The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  Through this pooling of assets, all creditor claims (except for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated.   In light of these factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled. |
| | | | (d)  The objector alleges that the payment of administrative expense claims as much as 90 days after the Effective Date under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A) (emphasis added).  KenSa does not currently hold allowed claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that it be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan.  See, e.g., In re Dana Corp., Case |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same). Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans. Id. To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve all administrative claims prior to the effective date of a plan. Such a burden should not be placed on the Debtors. |
| | | | (e)   The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| | | | (f)   The objector asserts that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| | | | (g)   The party objects to the release and exculpation provisions of the Plan contained in sections 11.8 and 11.11 that allegedly force the objector to release rights it would otherwise have against the Debtors and third parties, including GM. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | recoveries under the proposed Plan without the GM Release. |
| | | | (h) | The objector asserts that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objector asserts such provision should be stricken or not apply to the objector. | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (i) | The objector alleges that because the Plan allegedly violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (j) | The objector asserts that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and the party does not consent to such release. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| 7. | 11792, 11852[7] | Comerica Leasing Corporation ("Comerica") | (a) | The objector asserts that the classification of claims proposed under the Plan violates section 1122 of Bankruptcy Code. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  The objections that have been made have been rendered moot by the acceptance of the affected classes.  With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors <u>supports</u> the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot.  Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing.  **Thus, again, your vote on this Plan is important.**"  (Disclosure Statement at DS-113) (bold in original text). |
| | | | (b) | The objector asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by allegedly reducing claims without due process and not providing certain creditors with the same distribution as all others). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code.  <u>See</u> 7 <u>Collier on Bankruptcy</u>, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting <u>In re UNR Indus., Inc.</u>, 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), <u>rev'd on other grounds</u>, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c) | The objector asserts that the Plan improperly proposes | The Plan provides for substantive consolidation for "voting and |

---

[7] Comerica filed an amended and restated objection to the Plan.  This amended and restated objection is identical in all respect but appears to have been filed to provide for service to the required parties.

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | to substantively consolidate various Debtors for plan voting and distribution only. | distribution" purposes. Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed. Thus, the objection has been rendered moot by the acceptance of the affected classes. In addition, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan. The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund. Through this pooling of assets, all creditor claims (except for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated. In light of these factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled. |
| | | | (d) The objector alleges that the payment of administrative expense claims as much as 90 days after the Effective Date under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added). Comerica does not currently hold <u>allowed</u> claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that it be paid on the Effective Date. Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan. <u>See, e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same). Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans. <u>Id.</u> To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> |

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | administrative claims prior to the effective date of a plan. Such a burden should not be placed on the Debtors. |
| | | | (e) The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| | | | (f) The objector asserts that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| | | | (g) The party objects to the release and exculpation provisions of the Plan contained in sections 11.8 and 11.11 that allegedly force the objector to release rights it would otherwise have against the Debtors and third parties, including GM. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| | | | (h) The objector asserts that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objector asserts such provision should be stricken or not apply to the objector. | |
| | | | (i)  The objector alleges that because the Plan allegedly violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect.  As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ."  The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (j)  The objector asserts that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and the party does not consent to such release. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| | | | (k)  The objector asserts that to the extent the Plan purports to assume any agreement with Comerica without curing all prepetition defaults, Comerica objects to such assumption. | This is not an objection to the Plan.  The procedures set forth in Article VIII of the Plan provide for the cure of all defaults under the contract counterparties' executory contracts, which procedures the Debtors believe are appropriate, notwithstanding the fact that the Debtors may make cure payments after the Effective Date. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| 8. | 11804, 11855[8] | Freudenberg-NOK General Partnership ("FNGP") and Freudenberg-NOK, Inc. ("FNOK", collectively with FNGP, "Freudenberg-NOK") | (a) | The objector asserts that the classification of claims proposed under the Plan violates section 1122 of Bankruptcy Code. | The Plan provides for substantive consolidation for "voting and distribution" purposes. Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed. The objections that have been made have been rendered moot by the acceptance of the affected classes. With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors supports the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot. Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing. **Thus, again, your vote on this Plan is important.**" (Disclosure Statement at DS-113) (bold in original text). |
| | | | (b) | The objector asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by allegedly reducing claims without due process and not providing certain creditors with the same distribution as all others). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code. See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c) | The objector asserts that the Plan improperly proposes | The Plan provides for substantive consolidation for "voting and |

[8] Freudenberg filed an amended and restated objection to the Plan. This amended and restated objection is identical in all respect but appears to have been filed to provide for service to the required parties.

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | to substantively consolidate various Debtors for plan voting and distribution only. | distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  Thus, the objection has been rendered moot by the acceptance of the affected classes.  In addition, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan.  The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  Through this pooling of assets, all creditor claims (except for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated.   In light of these factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled. |
| | | | (d)    The objector alleges that the payment of administrative expense claims as much as 90 days after the Effective Date under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added).  FNGP and FNOK do not currently hold allowed claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan.  See, e.g., In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same).  Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans. Id.  To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve all |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | | administrative claims prior to the effective date of a plan. Such a burden should not be placed on the Debtors. |
| | | | (e) | The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| | | | (f) | The objector asserts that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| | | | (g) | The party objects to the release and exculpation provisions of the Plan contained in sections 11.8 and 11.11 that allegedly force the objector to release rights it would otherwise have against the Debtors and third parties, including GM. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| | | | (h) | The objector asserts that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objector asserts such provision should be stricken or not apply to the objector. | |
| | | | (i)  The objector alleges that because the Plan allegedly violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect.  As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ."  The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (j)  The objector asserts that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and the party does not consent to such release. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| | | | (k)  The contract counterparty raises objections related to certain executory contracts that may be assumed by the Debtors, including contracts that have allegedly expired. | This is not an objection to the Plan.  The procedures set forth in Article VIII of the Plan provide for the cure of all defaults under the contract counterparties' executory contracts, which procedures the Debtors believe are appropriate, notwithstanding the fact that the Debtors may make cure payments after the Effective Date. |
| 9. | 11811 | Darla and Allan Schmidt | The Schmidts object to the treatment of Delphi stock under the Plan. | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| 10. | 11812 | Frank Budelewski | (a) | Frank Budelewski objects to the pension plan described in the Plan on several bases. He asserts age discrimination against the Debtors, because a retiree over the age of 65 is entitled to cash, while a retiree under the age of 65 may only be entitled to stock. In addition, he asserts that because he worked for GM for over 30 years, his pension plan should not have been transferred to Delphi upon separation. | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |
| 11. | 11822, 12016 | Randy Halazon | (a) | Randy Halazon, a former employee of Delphi, asserts that the Plan is unfair and inequitable to the extent it does not include the foreign subsidiaries as part of the liquidation analysis. | This objection is incorrect. The liquidation analysis assumes the going concern sale of the remaining non-Debtor businesses, which are primarily located outside of the United States. |
| | | | (b) | Randy Halazon also asserts that the Management Compensation Plan and other management compensation is unreasonable and unfair to the other stakeholders in the case. | The Management Compensation is appropriate, and is based on independent third party input and guidance from the Statutory Committees. To attract and retain talented management, the Debtors determined that it was necessary to develop competitively benchmarked executive and non-executive compensation programs. The Investment Agreement also requires a competitively benchmarked salaried executive compensation program. Since Delphi was spun off from GM as an independent entity, there historically have been four components to the compensation structure for the Company's executive workforce: (i) salary, or base wages, (ii) health care and other benefits, (iii) a performance-based, short-term annual incentive program, and (iv) a long-term incentive opportunity. Since the Debtors sought chapter 11 relief, two of the four components of their executive compensation program have been canceled - the short-term and the long-term performance incentive plans - thus leaving in place only base salary and benefits. As a point of undisputed fact, more than half of the total compensation package of the Debtors' executives has been absent since the commencement of these Chapter 11 Cases. |
| 12. | 11823 | Pima County | (a) | Pima County asserts that the Plan would impermissibly strip secured tax claimants of their liens without having first paid all taxes and interest by treating such secured claims in the same manner as priority tax claims, which does not provide for the retention of liens. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | (b) | Pima County further asserts that section 9.8 of the Plan effectively gives the Debtors the power to convert otherwise non-dischargeable secured tax claims into general unsecured claims if such secured tax claims are disputed and sufficient funds have not been set aside in the distribution reserve. | The Debtors believe that the majority of claims have been resolved or reconciled and any amounts set aside in the distribution reserve will be sufficient. |
| | | | (c) | Pima County asserts that payment of its claim over a six year period is objectionable, because interest accumulating over that time would cause the total value of Pima County's claim to surpass the value of the property securing Pima County's claim, thereby causing a portion of Pima County's claim to become unsecured. | Article 2.2 of the Plan complies with 1129(a)(9)(C) of the Bankruptcy Code which specifically allows for deferred cash payments from the date of assessment. |
| | | | (d) | Pima County asserts that the Plan violates section 1129(a)(7) of the Bankruptcy Code because, contrary to its treatment under the Plan, in a liquidation scenario, Pima County would receive payment of its tax claim in full, including principal, prepetition interest, and postpetition interest up to the value of the property securing its claim. Thus, Pima County asserts that the Plan cannot be confirmed unless it provides for Pima County's retention of its liens and payment in full on Pima County's claim, including interest at the state statutory interest rate of 16%. | For the avoidance of doubt, any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
| 13. | 11847 | Burkburnett I.S.D., Wichita County, Hildago County, Hildago County Drainage District No. 1, Hildalgo I.S.D. ("Texas Tax Units") | (a) | Texas Tax Units assert that the classification of claims proposed under the Plan violates section 1122 of the Bankruptcy Code, because claims secured by first priority liens are classified with claims secured by junior liens. | Contractually subordinated unsecured claims may be placed in the same class as senior and other unsecured claims. Courts have noted that, under section 1122(a) of the Bankruptcy Code, the "similarity of claims is not judged by comparing creditor claims inter se. Rather, the question is whether the claims in a class have the same or similar legal status in relation to assets of the debtor." In re Frascella Enters., Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) (citing In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995)); see also In re Union Fin. Servs. Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004) ("The fact that [creditor's] [c]laim is subordinated to other class members does not change the fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), aff'd, 155 F. App'x 940 (8th Cir. 2005); In re |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | <u>Eagle Bus Mfg., Inc.</u>, 134 B.R. 584, 595 (Bankr. S.D. Tex. 1991) ("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy Code."), <u>aff'd</u>, 158 B.R. 421 (S.D. Tex. 1993); <u>see also</u> David L. Bleich, <u>Chapter 11 Plans</u>, 647 PLI/Comm 437, 519-20 (1993) (senior and subordinated claims "belong in the same class since they are 'substantially similar,' i.e., they have the same legal rights against the debtor's assets, the subordination being only a private matter between them."). The Plan's classification has a rational basis because it is based on the respective legal rights of each holder of a Class 1C claim against the applicable consolidated estate.   The classification recognizes that the TOPrS, the Senior Notes, and other senior debt are all non-priority unsecured claims in relation to the Debtors subject to Class 1C claims, and as such may be classified in the same class, even though contractually one group is subordinated to the other.  Consequently, the classification of claims within  Class 1C is appropriate and the Plan meets the requirements of section 1122(a). |
| | | | (b) Texas Tax Units allege that the Plan violates the absolute priority rule by affording payment in full in cash to other secured creditors and treating secured tax claimants as unsecured priority tax claimants to be paid over six years. | Article 2.2 of the Plan complies with 1129(a)(9)(C) of the Bankruptcy Code which specifically allows for deferred cash payments from the date of assessment. |
| | | | (c) Texas Tax Units assert that the Plan is not fair and equitable because it does not explicitly provide for retention of tax liens and does not explicitly afford for payment of 2007 and 2008 taxes. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. |
| | | | (d) Texas Tax Units assert that the Plan impermissibly requires tax claimants to estimate 2007 and 2008 tax claims, as opposed to providing for payment of those claims in the ordinary course under section 503(b) of the Bankruptcy Code. | Administrative claimants are treated equally under the Plan and must file an administrative claim within 45 days of the Effective Date. |
| | | | (e) Texas Tax Units propose that the time for filing objections to its tax claims should be limited to 60 days from the Effective Date. | All creditors under the Plan are subject to the same objection procedure.  The taxing authorities have shown no reason why they should be treated differently from other parties in this |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | | respect. |
| | | | (f) | Texas Tax Units assert that the Plan does not contain cure provisions in case of default in payments to tax claimants. | The Court retains jurisdiction under Article XIII of the Plan. No cure provision is necessary. |
| | | | (g) | Texas Tax Units assert that the Plan should specifically identify the dates of expected distribution with respect to payment of secured claims. Texas Tax Units proposes that plan payments on undisputed portions of tax claims commence 60 days after the Effective Date, and continue in monthly lump sum payments as the amounts become allowed. | The Plan identifies distribution dates in Article 1.67, the timing of which the Debtor asserts are proper. In addition, Article 2.1 of the Plan specifically provides that Administrative Claims will be paid on the first Distribution Date occurring after the later of the date an Administrative Claim becomes an Allowed Administrative Claim and the date such Claim becomes payable pursuant to an agreement between the Debtors, provided, however, that Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. |
| | | | (h) | Texas Tax Units object to the Plan to the extent that it provides that any lien, other than Texas tax liens is of higher priority than Texas Tax Units' liens, both as to pre- and post-petition claims and to the extent that it provides for payment to creditors of lower priority prior to the satisfaction in full of secured tax claims to the extent they are not, or may not be, adequately protected. | The treatment provided by Article 5.1 in respect of secured claims complies with the requirements of section 1129 of the Bankruptcy Code. The Plan does not contemplate the priming of tax liens. |
| | | | (i) | Texas Tax Units object to the Plan to the extent that it fails to provide for payment of interest at the statutory rate (12%) during the period from the Petition Date through the date of payment. | This is not a confirmation issue but a claims resolution issue. Secured Claims may be entitled to interest under applicable Bankruptcy Code sections but the Debtors will not negotiate specific interest rates at the confirmation hearing. |
| | | | (j) | Texas Tax Units assert that tax claims are impaired under the Plan. | Each Allowed Secured Claim shall be reinstated or satisfied in full in cash which cash payment may be made in accordance with section 2.2 of the Plan. |
| | | | (k) | Texas Tax Units request that 2006 property taxes be paid in the ordinary course and without having to file administrative expense claims. | Administrative claimants are treated equally under the Plan and must file an administrative claim within 45 days of the Effective Date. |
| | | | (l) | Texas Tax Units objects to the Plan to the extent that it releases of discharges liens of taxing authorities. | The taxing authorities liens will be treated in accordance with Article 5.1 of the Plan. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| 14. | 11849 | Lear Corporation ("Lear") | (a) | The objector asserts that the classification of claims proposed under the Plan violates section 1122 of Bankruptcy Code. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  The objections that have been made have been rendered moot by the acceptance of the affected classes.  With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors supports the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about substantively consolidating the Delphi-DAS Debtors for voting purposes is moot.  Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing.  **Thus, again, your vote on this Plan is important.**"  (Disclosure Statement at DS-113) (bold in original text). |
| | | | (b) | The objector asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by allegedly reducing claims without due process and not providing certain creditors with the same distribution as all others). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code.  See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c) | The objector asserts that the Plan improperly proposes to substantively consolidate various Debtors for plan voting and distribution only. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  Thus, the objection has been rendered moot by the acceptance of the affected classes.  In |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | addition, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan.  The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  Through this pooling of assets, all creditor claims (except for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated.   In light of these factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled. |
| | | | (d)   The objector alleges that the payment of administrative expense claims as much as 90 days after the Effective Date under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim."  11 U.S.C. § 1129(a)(9)(A) (emphasis added).  Lear does not currently hold <u>allowed</u> claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date.  Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan.  <u>See</u>, <u>e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same).  Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans.  <u>Id.</u>  To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> administrative claims prior to the effective date of a plan.  Such a burden should not be placed on the Debtors. |
| | | | (e)   The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 |

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| | | | (f) The objector asserts that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| | | | (g) The party objects to the release and exculpation provisions of the Plan contained in sections 11.8 and 11.11 that allegedly force the objector to release rights it would otherwise have against the Debtors and third parties, including GM. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| | | | (h) The objector asserts that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objector asserts such provision should be stricken or not apply to the objector. | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | (i) | The objector alleges that because the Plan allegedly violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (j) | The objector asserts that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and the party does not consent to such release. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| | | | (k) | The objector reserves the right to object to assumption or assumption and assignment of its contracts, because the Cure notices allegedly were not sent to counsel for Lear until January 8. | The Debtors and Lear are negotiating a settlement agreement and anticipate Lear's objection being resolved. |
| 15. | 11867 | Cooper-Standard Automotive, Inc. ("Cooper-Standard") | (a) | The objector asserts that the classification of claims proposed under the Plan violates section 1122 of Bankruptcy Code. | The Plan provides for substantive consolidation for "voting and distribution" purposes. Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed. The objections that have been made have been rendered moot by the acceptance of the affected classes. With respect to voting and the 22 Delphi-DAS Debtors, with or without substantive consolidation, the vote by each Debtor's creditor body (or "sub class") with respect to the Delphi-DAS Debtors supports the Plan; therefore, any argument or challenge by the Bondholder Group or otherwise about |

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | substantively consolidating the Delphi-DAS Debtors for voting purposes is moot. Indeed, the Court specifically requested the insertion of the following language into the Disclosure Statement: "The Bankruptcy Court will be appraised of and may consider the voting results, on a Debtor by Debtor basis, as part of such [substantive consolidation] hearing. **Thus, again, your vote on this Plan is important.**" (Disclosure Statement at DS-113) (bold in original text). |
| | | | (b)  The objector asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by allegedly reducing claims without due process and not providing certain creditors with the same distribution as all others). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code.  See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c)  The objector asserts that the Plan improperly proposes to substantively consolidate various Debtors for plan voting and distribution only. | The Plan provides for substantive consolidation for "voting and distribution" purposes.  Only the creditors of Delphi and Delphi Automotive Systems LLC ("DAS") have objected to substantive consolidation; no objection to the substantive consolidation of the other Debtor groups has been filed.  Thus, the objection has been rendered moot by the acceptance of the affected classes.  In addition, the Plan and the settlements underlying it are based on the substantive consolidation of certain of the Debtors' estates for purposes of all actions associated with confirmation and consummation of the Plan.  The effect of the substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  Through this pooling of assets, all creditor claims (except for TOPrS Claims) will be paid in full with postpetition interest, and there are accordingly no inequalities to balance against the difficulties of untangling those Debtor entities that will be consolidated.  In light of these |

| | Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|
| | | | | factors in support of the limited substantive consolidation proposed by the Plan, and the fact that creditors are not harmed by such consolidation, the objections to substantive consolidation should be overruled. |
| | | | (d) The objector alleges that the payment of administrative expense claims as much as 90 days after the Effective Date under section 2.1 of the Plan violates section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added). Cooper-Standard does not currently hold <u>allowed</u> claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date. Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan. <u>See</u>, <u>e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same). Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans. <u>Id.</u> To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> administrative claims prior to the effective date of a plan. Such a burden should not be placed on the Debtors. |
| | | | (e) The objector asserts that the proposed estimation of Disputed Claims pursuant to section 9.8(b)(iii) the Plan violates section 502(c) of the Bankruptcy Code. | Article 12.2(i) of the Plan requires that the aggregate amount of all Trade and Other Unsecured Claims that have been asserted or scheduled but not yet disallowed shall be no more than $1.45 billion, as of the Effective Date. As stated in the Unrue Declaration, as of January 11, 2007, the amount of the Trade and Other Unsecured Claims was $1.47 billion. |
| | | | (f) The objector asserts that the proposed limitation in section 9.8(c) of the Plan creates unfair treatment of creditors within a same class (by relegating creditors with disputed claims to a non-recourse position) and thus violates section 1123(a)(4). | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate. The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| | | | (g) The party objects to the release and exculpation provisions of the Plan contained in sections 11.8 and 11.11 that allegedly force the objector to release rights | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. <u>See</u>, |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | it would otherwise have against the Debtors and third parties, including GM. | e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| | | | (h) | The objector asserts that the injunction contained in section 11.14 of the Plan prohibits holders of claims from asserting any right of offset to recover a claim, which eliminates the setoff rights of creditors without compensation (or the "indubitable equivalent"), is contrary to the state law rights of holders of claims preserved in section 553(a) of the Bankruptcy Code, and conflicts with the proposed treatment of secured creditors with setoff rights under section 5.1 of the Plan (which states that all setoff rights are preserved). The objector asserts such provision should be stricken or not apply to the objector. | This objection is incorrect. The provisions of Article 5.1 and 11.14 do not conflict. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (i) | The objector alleges that because the Plan allegedly violates the setoff rights preserved in section 553(a) of the Bankruptcy Code, the Plan does not satisfy the requirement of section 1129(a)(1) of the Bankruptcy Code. | This objection is incorrect. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (j) | The objector asserts that the third party releases in section 11.5 and 11.8 of the Plan are not appropriate plan provisions without express agreement of a party in interest and the party does not consent to such release. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| | | | (k)    The contract counterparty objects to any assumption or assumption and assignment of its contracts, because the Cure notices allegedly were not sent to counsel for Cooper-Standard until January 8 and it has not been able to determine which contracts the Debtors intend to assume and what the cure amounts should be. | The parties are negotiating a settlement of this objection. |
| 16. | 11869 | Equistar Chemicals, L.P. ("Equistar") | Equistar seeks to preserve its right of setoff and objects to the Plan to the extent it disallows or impairs claims of setoff or offset, which would allegedly result in the discharge of Equistar's secured claim without providing it the indubitable equivalent of its claim. | Because Secured Claims (including claims secured by setoff) are paid in full under the Plan, Equistar is not prejudiced. Equistar can follow the Court-approved procedures for exercising its setoff rights. |
| 17. | 11871 | American Axle & Manufacturing, Inc. (on behalf of itself and Colfor Manufacturing, Inc.) | The party objects to the assumption of certain contracts, including one that has expired, and asserts that a controlling contract is not being assumed as necessary. The objector notes that the objection is filed to preserve its rights and that if the objection to the assumption of the contracts listed on the cure notice is preserved until after confirmation, the objection need not be prosecuted. | Because Article VIII of the Plan sets forth a procedure to address American Axle's objection after confirmation, the objection to the Plan is therefore not ripe and will be resolved or adjudicated at a later date. With respect to American Axle's assertion that one contract that was listed on the Debtors' notice is an expired contract, the Debtors have verified that although it is still a valid contract, there are no further supply requirements, and therefore Article VIII of the Plan is consistent with American Axle's position and the contract will not be assumed pursuant to Article 8.2(a). |
| 18. | 11872 | Bank of America, N.A. ("BoA") | (a)    BoA asserts that the Plan potentially seeks to assume certain aircraft leases with BoA while improperly modifying the leases by circumventing the Debtors' obligation to reaffirm or execute new Guaranties, | This objection has been resolved. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | terminating the liens and security interests that are granted to BoA under and with respect to the Leases, and denying BoA attorney's fees, which BoA asserts it is entitled to under the Leases and which must survive and continue post-confirmation. Thus, to the extent the cancellation or discharge and/or release under sections 7.10, 11.1, and 11.2 of the Plan would modify or terminate its rights to maintain its liens and security interests, BoA objects. | |
| | | | (b)  BoA asserts that the Plan's proposed cure procedures violate sections 1123(b)(2) and 365(b)(1) of the Bankruptcy Code because the Plan allows for cure determinations after the Effective Date and because the Debtors can reject a contract if no cure agreement is reached. | This objection has been resolved. |
| 19. | 11876 | Automodular Corporation f/k/a Automodular Assemblies Inc. and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. (collectively, "Automodular") | Automodular asserts that prior to the Court's approval of the assumption of the contracts, the Court must require the Debtors and/or its assignee to pay the correct pre-petition and post-petition amounts due pursuant to section 365(b)(1)(A)&(B) of the Bankruptcy Code, including curing defaults, compensating the non-debtor party for actual pecuniary loss, and providing adequate assurance of future performance.  Automodular reserves its right to object to the cure notice as well as the assumption of any of Automodular's contracts. | This is not an objection to confirmation of the Plan.  The procedures set forth in Article VIII of the Plan provide for the cure of all defaults under Automodular's executory contracts, which procedures the Debtors believe are appropriate, notwithstanding the fact that the Debtors may make cure payments after the Effective Date. |
| 20. | 11881 | Robert Bosch GmbH and Robert Bosch LLC ("Bosch") | (a)  The objection filed by Bosch is a protective objection in the event parties are unable to finalize their settlement.  In its objection, Bosch asserts that the Plan's provisions regarding the retention of jurisdiction should not apply to postpetition patent infringement claims as allegedly the proper place for such claims is the federal district court.  In addition, it objects to the Plan to the extent that the injunctive provisions or estimation provisions could impair a post-emergence patent infringement claim for any | Resolved.  The Debtors and Bosch have executed a settlement agreement, which, among other things, establishes a procedure for the resolution of Bosch's patent infringement claims. Bosch's objection is moot. |

|  | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
|  |  |  |  | infringement occurring on or after the Effective Date of the Plan. Finally, Bosch asserts that the Plan fails to explicitly set forth the source of Debtor funding for administrative claims. |  |
| 21. | 11883 | Audio MPEG, Inc. and Societa' Italiana per lo Sviluppo dell'Elettronica, S.I.SV.EL., S.p.A. (the "Licensors") | (a) | The Licensors object to assumption of their license agreement, asserting that (1) the license agreement cannot be assumed by the Debtors because it is not assignable under non-bankruptcy law as it pertains to rights to the use of patents, (2) the Debtors' proposed cure under the Plan is insufficient and will not place the Licensors in the position of receiving the full benefit of their bargain, which could allegedly only be accomplished by prompt filing of royalty statements, completion of the audit and cash payment of all royalties due and owing under the license agreement, (3) the Debtors have not and cannot provide adequate assurance of future performance under the license agreement, and (4) the proposed assumption is so contingent and speculative that it is impermissible because the Debtors may ultimately reject the agreements. | The Licensors argue that the License Agreement cannot be assumed by the Debtors because it is not assignable under section 365(c)(1). However, the Licensors rely on a reading of section 365(c)(1) of the Bankruptcy Code that the majority of courts, including the courts in this jurisdiction, do not follow. See In re Adelphia Comm. Corp., 359 B.R. 65, 72 (Bankr. S.D.N.Y. 2007) ("[T]he law in this district, and by far the better view, is that where the assumption is to be effected by a debtor in possession (as contrasted to a trustee), the right to object to assignment does not by itself affect the right to assume.") (emphasis in original) (citing In re Footstar, Inc., 323 B.R. 566, 570 (Bankr. S.D.N.Y. 2005)). Thus, even if the License Agreement is not assignable under section 365 of the Bankruptcy Code (which the Debtors do not concede), the Debtors can nonetheless assume the agreement. See Institut Pasteur v. Cambridge Biotech Corp., 104 F.3d 489, 493 (1st Cir. 1997) (assumption of executory contract not barred by fact that contract not assignable). In addition, the Debtors dispute Licensors' contention that the Plan does not provide assurances that the Debtors can perform under the agreement. To the extent the parties' dispute cannot be resolved consensually, such dispute will be adjudicated pursuant to the procedures set forth in the Plan, not in the context of Plan confirmation. Indeed, Article 8.2(b) of the Plan provides that, "if there is a dispute regarding (i) the nature or amount of any Cure, [or] (ii) the ability of any Reorganized Debtor . . . to provide 'adequate assurance of future performance' (within the meaning of 365 of the Bankruptcy Code) . . . the matter shall be set for hearing in the Bankruptcy Court." |
|  |  |  | (b) | The Licensors assert that the Plan does not comply with sections 365, 1129(a)(1), and 1129(a)(2) because it requires the Licensors to request payment of its cure claim and demand demonstrative evidence of adequate assurance, allegedly shifting the burden | There is nothing in sections 1123 and 1129 of the Bankruptcy Code that require a debtor to disclose its views of administrative claims before the claimants do. Indeed, claimants always initiate the claims process by filing proofs of claim. The filing requirement for non-debtor parties to Other Executory Contracts |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | from the Debtors to the Licensors, rather than obligating the Debtors to affirmatively provide for the cure of their defaults. | is a necessary aspect of the administrative review process. To require claimants to file a claim for amounts due under the claimant's contract is not unduly burdensome and is designed to ensure an orderly and efficient review process. |
| | | | (c) | The Licensors assert that the Plan does not contain contingencies to increase the shares of stock issued for subsequent distributions to account for fluctuations in the value thereof and thus payment of cure amounts in stock does not provide the Licensors with the full benefit of their bargain. | The Licensors are not the holders of an Allowed Claim entitling them to be paid cash on the Effective Date. |
| | | | (d) | The Licensors assert that pursuant to section 8.2 of the Plan, the Debtors treat non-debtor parties to Material Supply Agreements differently than they treat non-debtor parties to Other Executory Contracts (e.g. requiring non-debtor parties to Other Executory Contracts would be required to take affirmative action to protect their rights and enforce the Debtors' obligations under section 365 of the Bankruptcy Code) and because such treatment is allegedly not supported by a reasonable justification, it is an impermissible classification. The Licensors assert that, as a result of these factors, the Debtors do not propose to provide all executory contract parties with equal value, as required under section 1123(a)(4) of the Bankruptcy Code. | Although the Plan does establish different procedures for adjudicating cure and adequate assurance disputes for the two categories of contracts, the Plan does not treat Material Supply Agreements and Other Executory Contracts as different "classes" of claims under the Plan. In fact, executory contracts (or Cure Claims) are not in any "class" under the Plan. In addition, under section 1126 of the Bankruptcy Code, a right to a cure payment is not a "claim" entitling a creditor to vote on a plan of reorganization. See Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1281 (5th Cir. 1991) (when debtor expressly assumes lease, lessee has no claim under Section 1126 and is not entitled to vote on plan); see also Boston Post Road L.P. v. Federal Deposit Insurance Corp. (In re Boston Post Road L.P.), 21 F.3d 477, 484 (2d Cir. 1994) (citing Greystone III for same proposition). The Debtors have employed procedures for resolving Cure claims related to Material Supply Contracts, based on the exigencies of those types of contracts. These procedures were approved by the Court in the Solicitation Procedures Order. There is nothing in sections 1123 and 1129 of the Bankruptcy Code that require a debtor to disclose its views of administrative claims before the claimants do. Although the procedures for asserting Cure Claims with respect to counterparties to Material Supply Agreements differ from those for counterparties to Other Executory Contracts, the differing procedures do not violate the requirements of the Bankruptcy Code. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | (e) The Licensors assert that the Plan impermissibly provides for payment of administrative claims following the Effective Date, as opposed to on the Effective Date, allegedly violating section 1129(a)(9)(A) of the Bankruptcy Code. | Section 1129(a)(9)(A) of the Bankruptcy Code provides that the holder of a claim under section 507(a)(1) must, "on the effective date of the plan, … receive on account of such claim cash equal to the <u>allowed amount</u> of such claim." 11 U.S.C. § 1129(a)(9)(A) (emphasis added). The Licensors do not currently hold <u>allowed</u> claims under section 507(a)(1), and thus section 1129(a)(9)(A) does not mandate that they be paid on the Effective Date. Furthermore, debtors, especially in cases the same size and complexity as these, routinely pay administrative claims after the effective date of plan. <u>See</u>, <u>e.g.</u>, <u>In re Dana Corp.</u>, Case No. 06-10354 (Bankr. S.D.N.Y. Dec. 26, 2007) (order confirming plan establishing administrative claims bar date after effective date); <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 25, 2007) (same). Indeed, debtors routinely establish, pursuant to plans of reorganization, administrative claims bar dates after the effective date of such plans. <u>Id.</u> To require a debtor to do otherwise would place an unreasonable burden on debtors to identify and resolve <u>all</u> administrative claims prior to the effective date of a plan. Such a burden should not be placed on the Debtors. |
| | | | (f) The Licensors further object to the third party releases and exculpation provisions contained in sections 11.5 and 11.8 of the Plan arguing that the Licensors may have rights under the License Agreement against third parties, which arguable should not be waived unless a party in interest expressly agrees, which Licensors do not. | A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan. <u>See</u>, <u>e.g.</u>, <u>Deutsche Bank AG v. Metromedia Fiber Network, Inc.</u> (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); <u>Drexel Burnham Lambert Group, Inc. v. Hart Holding Co.</u> (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); <u>In re Spiegel Inc.</u>, No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); <u>Rosenberg v. XO Commc'ns, Inc.</u> (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005). The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties. The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. In |

|  | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
|  |  |  |  | addition, the Investment Agreement entered into by the Debtors requires a release of the Plan Investors in exchange for their substantial contributions to the Debtors' reorganization. |
| 22. | 11885 | The Michigan Department of Environmental Quality ("MDEQ") | (a)  MDEQ objects to the Plan to the extent the GM release language releases GM affiliated parties from any cause of action held by a governmental entity and based upon environmental laws. | The Debtors are negotiating language with the objector that they anticipate will resolve certain objections related to the release language.<br><br>A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
|  |  |  | (b)  MDEQ objects to the Plan to the extent it proposes paying MDEQ with stock, because MDEQ is allegedly not permitted to hold stock under state laws.  MDEQ asserts that this limitation results in a violation of section 1123(a)(4) of the Bankruptcy Code, because MDEQ would not be treated the same as similarly situated claimants. | A creditor's particular organizational structure does not negate the value of currency to be distributed under a chapter 11 plan, nor should a creditor's preferred form of distribution form a basis for finding a plan violative of the Bankruptcy Code.  In addition, the MDEQ's claim is classified as a Flow-Through Claim and will not receive a distribution of New Common Stock pursuant to the Plan.  Moreover, the Plan does not violate section 1123(a)(4) nor discriminate against MDEQ as all holders of claims in the same class receive the same Plan currency in exchange for their claims. |
| 23. | 11888 | Fujikura America, Inc. ("Fujikura") | Fujikura raises objections related to certain executory contracts that may be assumed by the Debtors, including contracts for which Fujikura allegedly did not receive cure notices.  Fujikura | This is not an objection to confirmation of the Plan.  Any of Fujikura's disputes related the potential assumption of its executory contracts will be handled in the procedures provided |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | asserts that the Plan must provide for the payment in cash on the Effective Date of all defaults under these executory contracts. | for in Article VIII of the Plan, which procedures the Debtors believe are appropriate. |
| 24. | 11894 | AT&T et al. ("AT&T") | AT&T objects to the Plan to the extent that the Debtors' contracts with AT&T are to be assumed without payment in full of all pre-petition and post-petition amounts owed and further request that the Court compel the Debtors to cure all defaults under the assumed contract. | This is not an objection to confirmation of the Plan. The procedures set forth in Article VIII of the Plan provide for the cure of all defaults under the AT&T Entities' executory contracts, which procedures the Debtors believe are appropriate, notwithstanding the fact that the Debtors may make cure payments after the Effective Date. |
| 25. | 11906, 12075 | Johnson County | (a)  The objector asserts that the Plan violates section 1129(a)(7)(A)(ii) of the Bankruptcy Code, because the Plan fails to ensure that Claimant will receive or retain property of a value, as of the effective date of the Plan, that is not less than the amount such claimant would receive of retain if the debtor were liquidated under Chapter 7. | The liquidation analyses attached as Appendix E to the Disclosure Statement clearly demonstrate that there is no residual value for unsecured creditors of any Debtor after satisfying secured payments to the DIP Lenders and the PBGC. |
| | | | (b)  The objector further asserts that the Plan fails to provide fair and equitable treatment of the objector's secured claim, thereby violating sections 1129(b)(1) and (2)(A) of the Bankruptcy Code. | The Debtors disagree with this assertion. Under section 5.1 of the Plan, valid, enforceable, and perfected prepetition liens shall survive the Effective Date. Moreover, when the claimant's claim is allowed, the claimant will likely be paid in full in cash. Thus, Johnson County is treated fairly and equitable under the Plan in compliance with sections 1129(b)(1) and (2)(A) of the Bankruptcy Code. |
| | | | (c)  The objector alleges that the Plan fails to comply with state law as required by  section 1129(a)(3) of the Bankruptcy Code, because the proposed treatment of secured claims as set forth in section 5.1 of the Plan allegedly allows divestment of the objector's real estate tax lien. The objector further alleges that it is entitled to the express retention of its real property tax liens, including those for post-petition taxes, until all taxes, penalties and statutory interest, as set forth by state law, are satisfied in full. | For the avoidance of doubt, any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
| | | | (d)  The objector objects to payment of any post-petition interest at the Michigan (as opposed to the Kansas) statutory rate. | This is not a confirmation objection. Any creditor that is entitled to receive the Michigan postpetition interest rate was entitled to file an interest rate objection notice under the Solicitation Procedures Order. |

|  | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
|  |  |  | (e) | The objector asserts that the Plan fails to treat its priority tax claim in the manner required by section 1129(a)(9)(C) of the Bankruptcy Code, because the Plan fails to ensure the payment of deferred cash payments of a value as of the date of the Plan equal to the allowed amount of the priority tax claim. | The Debtors' disagree with this assertion.  Any holder of a Secured Claim, which Claim arose as a result of a tax lien, shall retain their lien in accordance with applicable non-bankruptcy law until the Claim is paid in full with Postpetition Interest as provided in the Plan. |
|  |  |  | (f) | The objector objects to section 9.8 of the Plan, because it provides that no payments will be made on disputed claims such as those filed by the objector until such claims are allowed and then only to the extent sufficient assets are available in the distribution reserve to satisfy them. | The Debtors believe that the majority of claims have been resolved or reconciled and any amounts set aside in the distribution reserve will be sufficient. |
| 26. | 11908 | Riverside Claims LLC | (a) | The objector asserts that the Plan violates sections 1129(a)(1) and 1122 of the Bankruptcy Code by classifying the claims of different Debtors in one class, particularly classifying creditors of Delphi Automotive Systems LLC ("DAS LLC") together with the holders of senior notes, whose debt is allegedly owed by Delphi. | Contractually subordinated unsecured claims may be placed in the same class as senior and other unsecured claims.  Courts have noted that, under section 1122(a) of the Bankruptcy Code, the "similarity of claims is not judged by comparing creditor claims inter se.  Rather, the question is whether the claims in a class have the same or similar legal status in relation to assets of the debtor."  In re Frascella Enters., Inc., 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) (citing In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995)); see also In re Union Fin. Servs. Group, Inc., 325 B.R. 816, 821 n.3 (Bankr. E.D. Mo. 2004) ("The fact that [creditor's] [c]laim is subordinated to other class members does not change the fact that as between [creditor] and [debtor] the claim is unsecured nonpriority."), aff'd, 155 F. App'x 940 (8th Cir. 2005); In re Eagle Bus Mfg., Inc., 134 B.R. 584, 595 (Bankr. S.D. Tex. 1991) ("The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior Subordinated Note Claims and the 13% Senior Note Claims in GLI Class 7 with all other Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy Code."), aff'd, 158 B.R. 421 (S.D. Tex. 1993); see also David L. Bleich, Chapter 11 Plans, 647 PLI/Comm 437, 519-20 (1993) (senior and subordinated claims "belong in the same class since they are 'substantially similar,' i.e., they have the same legal rights against the debtor's assets, the subordination being only a private matter between them."). The Plan's classification has a rational basis because it is based |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | on the respective legal rights of each holder of a Class 1C claim against the applicable consolidated estate.   The classification recognizes that the TOPrS, the Senior Notes, and other senior debt are all non-priority unsecured claims in relation to the Debtors subject to Class 1C claims, and as such may be classified in the same class, even though contractually one group is subordinated to the other.  Consequently, the classification of claims within  Class 1C is appropriate and the Plan meets the requirements of section 1122(a). |
| | | | (b)   The objector asserts that general unsecured creditors are not being paid in full because such creditors receive distributions of stock and rights at Plan value, but the Plan value is substantially above the midpoint of the valuation range prepared by Rothschild and the Plan value has changed by hundreds of millions of dollars between the September 6 Plan and the First Amended Plan. | The Plan Equity Value was chosen from a range of potential values (which range was determined after a thorough analysis) as the result of arms'-length negotiations between sophisticated parties, including the Plan Investors and the Creditors' Committee. The Plan Equity Value is based on the total enterprise value of the Reorganized Debtors, less net debt and warrant value.  Although the midpoint of the valuation is lower ($12.7 billion) than the negotiated total enterprise value of $13.3 billion, the entire range of possible values is reasonable and any particular point in the value range is just as probable as any other value in that range. |
| | | | (c)   The objector further asserts that the Plan does not provide for fair and equitable treatment of claims, because junior creditors and equity are receiving value without senior creditors being paid in full. | The distributions made under the Plan to holders of Senior Notes provide for a par plus accrued at Plan Equity Value recovery, as supported by the testimony of David Resnick and John Sheehan. The overwhelming support of the plan by the consolidated Debtor classes demonstrates support for the distributions under the Plan, and the settlements that enable those distributions to be made. |
| | | | (d)   The objector asserts that payment in full for general unsecured creditors should include interest until payment is made, not just until January 31, 2008, as the Plan currently states. | The settlements reached between the Debtors, GM, the Plan Investors, and the Statutory Committees provide for payments through January 31, 2008. |
| | | | (e)   The objector asserts that to meet the requirement of section 1129(b) of the Bankruptcy Code and to provide general unsecured creditors with a full recovery, the Debtors must establish that on the effective date of the Plan, the stock will be worth 75.5% of such creditors' claims and the rights will be equal to the remaining 24.5% of the claims, or that the | The fact that the ultimate point in the range of total enterprise values was agreed among the parties further supports the determination of the Plan Equity Value.  The objections do not contest the reasonableness of the range of values determined by Rothschild, but rather contest the precise point in the range that is being used for purposes of Plan distributions.  The Court has correctly noted that the "pinpoint valuation of such a set of |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | stock which creditors can purchase as part of the Discount Rights Offerings is worth the 24.5% after deducting the amount the creditors have to advance to acquire the stock.  The objector asserts that to the extent the Plan does not provide creditors with property of a value as of the Effective Date in full payment of the claims, the Plan is not confirmable. | businesses is a fantasy and that valuation ultimately in this context . . . is one that should be premised upon a negotiation based on a course economic reality but that ultimately reflects a willingness by all of the parties to live with what they believe is fair in light of the entire context."  (Tr. of Dec. 7, 2003 Hr'g 18:24-5, 19:1-5.) |
| | | | (f) | The objector further asserts that, while the Debtors today cannot know the value of the stock as of the Effective Date, that value can be determined by employing a look back period post-confirmation and adjusting stock distributions based on the actual value of the stock.  The objector alleges that to do otherwise creates a great risk that creditors will not be paid in full. | The Plan Equity Value is premised on the Debtors' total enterprise value.  The Debtors' range of potential total enterprise values fall within the range of $11.2 billion to $14.1 billion.  Rothschild made this assessment after a comprehensive and methodical analysis of the Debtors, including a review of the Debtors' business plan, a trading values analysis, a precedent transactions analysis, and a discount cash flow analysis. |
| | | | (g) | The objector asserts that the Debtors have provided no facts legally supporting the bases upon which substantive consolidation can be approved by the Court. | In the Second Circuit, the two critical factors to consider in examining a proposed substantive consolidation are (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) when the affairs of the debtors are so entangled that consolidation will benefit all creditors."  In re Augie/Restivo Banking Co. Ltd., 860 F.2d 515, 518 (2d Cir. 1988); see also In re 599 Consumer Elecs., Inc., 195 B.R. 244, 248 (Bankr. S.D.N.Y. 1996) ("It is necessary to consider both of these two critical factors . . . Conceivably, [however,] substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggest that the two cited factors are alternatively sufficient criteria.") (citations omitted).  In applying the second factor of the Augie/Restivo test, courts have used a balancing test pursuant to which substantive consolidation "should be ordered only where the inequalities of substantive consolidation are outweighed by the practical difficulties of tracing complex transactions between interrelated entities."  In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 765 (Bankr. S.D.N.Y. 1992).  As set forth in the Eisenberg Declaration and as thoroughly described in the Memorandum Of Law (A) In Support Of Confirmation Of First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | Affiliates, Debtors And Debtors-In-Possession And (B) In Response To Objections Thereto (the "Memorandum"), taking seriously the standards for substantive consolidation in the Second Circuit, the Debtors and their advisors conducted an exhaustive review of the Debtors' operations to determine what substantive consolidation would be appropriate, if any. Based on that review, the Debtors determined that the substantive consolidation of the Debtor groups, as proposed under the Plan, is appropriate under both factors of the Augie/Restivo test. |
| | | | (h)    The objector asserts that the proposed substantive consolidation unfairly and improperly favors the creditors of Delphi over the creditors of DAS LLC. The objector asserts that in a liquidation, the creditors of Delphi would likely receive nothing as Delphi has very little assets, and therefore, the objector argues, the DAS LLC creditors rights will be impaired by the proposed substantive consolidation. | With or without substantive consolidation, all creditors of Delphi-DAS Debtors would receive the same exact form of distribution. Even if the Plan did not provide for the substantive consolidation of Delphi, DAS, and 20 of their subsidiaries and affiliates, the Plan would still have provided for the creditors of those 22 Debtors to receive the same stock and discount rights that are currently provided for under the Plan. Therefore, any argument with respect to whether the substantive consolidation of Delphi-DAS Debtors for distribution purposes is appropriate is of no moment; the outcome would be the same with or without the substantive consolidation for distribution purposes. |
| | | | (i)    The objectors assert that the Debtors have not established under section 1129(a)(7) that stakeholders in each of the individual cases will be no worse under the "deemed" substantive consolidation schemes than they would be if their respective Debtor's case stands on it own and the Plan does not prove that it pays DAS LLC creditors at least as much as they would receive in a liquidating chapter 7. | The liquidation analyses attached as Appendix E to the Disclosure Statement clearly demonstrate that there is no residual value for unsecured creditors of any Debtor after satisfying secured payments to the DIP Lenders and the PBGC. |
| 27. | 11927 | The Timken Company And Timken U.S. Corp. ("Timken"), | Timken asserts that the Plan unfairly and impermissibly discriminates between the treatment for cure claims that were previously satisfied and General Unsecured Claims because paid cure claims will not be given postpetition interest, while general unsecured claims will be paid with postpetition interest. Timken asserts that it only received cash and should now receive postpetition interest like other holders of general unsecured claims. | Timken's contract was assumed in December 2006 at the request of Timken. The Debtors are not obligated to pay any interest on the assumed contract nor are the Debtors paying any interest on Cure claims paid in cash as approved by the Cure procedures in the Solicitation Procedures Order. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| 28. | 11935 | Law Debenture Trust Company of New York, as successor Indenture Trustee for the 8.25% Junior Subordinated Notes due 2033 and the Adjustable Rate Junior Subordinated Notes due 2033 (collectively, "Law Debenture") | (a) | The Indenture Trustee alleges that the Plan fails to satisfy their claims arising from their fees and expenses under the indentures. | The Debtors will continue discussions with the Indenture Trustees to adequately address mechanics for their fees and expenses. The Debtors are proposing language in their Confirmation Order that may resolve this objection. |
| | | | (b) | Law Debenture asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code, because distributions are not reserved for Law Debenture's alleged general unsecured, unsubordinated claims for postpetition fees and expenses, and because all other general unsecured claims receive 100% distributions, plus postpetition interest. | To the extent that Law Debenture has a general unsecured claim, it will be treated as all other general unsecured claims are treated. The Debtors and Law Debenture continue to discuss the Indenture Trustee's objections, however. |
| 29. | 11937 | Liquidity Solutions, Inc. ("Liquidity") | (a) | Liquidity asserts that claims are improperly classified because the TOPrS are subordinate to senior debt and thus they should not be classified together with general unsecured claims. | The Plan's proposed treatment of the subordinated TOPrS and other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment. The Plan provides that all general unsecured creditors, including holders of TOPrS, will receive New Common Stock and Discount Rights. The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture. After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders of TOPrS Claims. Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | | which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| | | | (b) | Liquidity argues that the Plan improperly treats members of the same class differently by denying Disputed Claims any post-Effective Date interest. Further, it argues that the estimation procedures create unfair treatment of creditors within the same class. | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code. See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (c) | Liquidity asserts that the Plan violates the absolute priority rule because Unsecured Claims allegedly will not receive full payment under the Plan with postpetition interest, but junior claims and interests, including the TOPrS Claims, Section 510(b) Claims and equity interests, receive a distribution. | The overwhelming support of the plan by the consolidated Debtor classes demonstrates support for the distributions under the Plan, and the settlements that enable those distributions to be made. |
| | | | (d) | Liquidity argues that the Plan has not been proposed in good faith because Plan Investors allegedly are being treated far better than they are entitled while General Unsecured Creditors allegedly will receive inferior and improper treatment. | The Plan has been proposed by the Debtors in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to Claim holders under the circumstances of these Chapter 11 Cases. The support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by holders of Claims that cast Ballots reflect the overall fairness of the Plan and the acknowledgment by the Debtors' stakeholders that the Plan has been proposed in good faith and for proper purposes. |
| 30. | 11939 | Lead Plaintiffs[9] | (a) | The Lead Plaintiffs assert that the third party release | The Debtors believe that the requested revisions to Article 11.5 |

---

[9]   The Lead Plaintiffs consist of the Teachers' Retirement System Of Oklahoma, Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP, the Court-appointed Lead Plaintiffs in the consolidated securities class action entitled In re Delphi Corp. Securities Litigation, Master Case No. 05-md-1725 (GER) (E.D.Mich.).

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | provisions contained in section 11.5 and 11.7 of the Plan must be read in conjunction with the Securities Settlement and that as currently drafted, the releases are inconsistent with the Securities Settlement because they potentially provide for releases of GM and certain other third parties whether or not the Securities Settlement becomes effective.  The Lead Plaintiffs propose that the following language be added to the end of section 11.5 of the Plan to alleviate this issue:<br><br>(iii) this Article 11.5 shall not release any claim or cause of action currently asserted or which could be asserted in the MDL Actions by Lead Plaintiffs against GM pursuant to the Delphi-GM Global Settlement Agreement or Article 11.7 of this Plan, or any defendant or potential defendant who is a Released Party; provided, however, that any and all releases of any Released Party by Lead Plaintiffs shall be fully enforceable as provided for in the MDL Settlements. | and 11.7 are unnecessary in connection with the MDL Settlements and the confirmation of the Plan. |
| | | | (b) | Lead Plaintiffs reserve the right to present their issue regarding third party releases to the Court for adjudication to the extent necessary if it is not resolved on or prior to the hearing on January 17, 2008 or any adjourned date.  In addition, Lead Plaintiffs reserve the right to respond in writing and orally at the hearing to any objections to approval of the Securities Settlement that are filed. | No response is necessary. |
| 31. | 11940 | Retiree Claimants | The objection filed by the Retiree Claimants is a protective objection in the event parties are unable to finalize their settlement. | | |
| | | | (a) | The objectors assert that section 7.9 of the Plan impermissibly and unreasonably requires claimants that have already filed proofs of claim regarding benefits related to the supplemental executive retirement plan to file additional claims within 30 days after the effective date. | The Debtors are adding language to the Confirmation Order that will not require those who have already filed SERP claims to refile them. |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | (b) | The objectors assert that the Plan violates sections 1129(a)(13) and 1114 of the Bankruptcy Code because it allegedly attempts to eliminate certain retiree benefits, including basic health and life insurance benefits. | The Debtors satisfy section 1114 of the Bankruptcy Code and any modifications of retiree benefits will be accomplished under the terms of the agreements. |
| | | | (c) | The objectors assert that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Discount Rights Offering creates unfair treatment of creditors within a same class (by assuming a participation in the rights offering, allegedly reducing claims without due process, not providing certain creditors with the same distribution as all others, and not providing Disputed Claims any post-Effective Date interest). | A plan's treatment of specific classes of claims and its overall treatment of specific creditors holding claims within such classes are entirely different matters, with only the former being subject to section 1123(a)(4) of the Bankruptcy Code.  See 7 Collier on Bankruptcy, ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Somme reds., 15th ed. rev. 2007) (stating that "[t]he equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims [or] interests, and not to the plan's overall treatment of the creditors holding such claims or interests…Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'") (quoting In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994). |
| | | | (d) | The objectors allege that section 9.8(c) of the Plan violates section 1123(a)(4) of the Bankruptcy Code, because it creates unequal treatment of creditors within the same class by relegating creditors with disputed claims to a non-recourse position. | The timing of the Discount Rights Offering makes it necessary for claimants to have reconciled or temporarily allowed claims to participate.  The Debtors filed the Rights Offering Estimation Motion to assist claimants in this regard. |
| 32. | 11944 | Equity Corporate Housing ("Equity") | (a) | Equity asserts that the Plan may not be confirmed because it relies on the Discount Rights Offering Motion which allegedly violates section 502(c), the absolute priority rule, and section 1123(a)(4) of the Bankruptcy Code. | The Plan's proposed treatment of the subordinated TOPrS and other general unsecured claims is consistent with section 1123(a)(4) of the Bankruptcy Code, which requires that all members of a class receive the same treatment.  The Plan provides that all general unsecured creditors, including holders of TOPrS, will receive New Common Stock and Discount Rights.  The Plan also provides that all Class 1C unsecured creditors including TOPrS are entitled to the same distribution from the Debtors' Estates, but the Plan reallocates a portion of the TOPrS' distribution to senior unsecured creditors to the extent necessary to provide the latter with postpetition interest in accordance with the TOPrS indenture.  After the senior unsecured creditors are paid in full, with required postpetition interest, the remainder of the distribution available to the class of general unsecured Claims will then be distributed to holders |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | | | of TOPrS Claims. Thus, the distribution scheme governing Class 1C complies with section 510(a) of the Bankruptcy Code, which makes the TOPrS indenture's subordination provisions enforceable in a case under title 11. |
| | | | (b) | Equity asserts that the Plan violates Section 502(c) because the claims are not contingent or unliquidated and thus not subject to estimation and the estimation procedure has the effect of reducing the claim without a proper hearing. | The claims are not being estimated for distribution purposes, but only to create a reserve. Although section 502(c) provides that a court shall estimate claims for purposes of "allowance," courts have used section 502(c) to estimate claims for more limited purposes, such as determining the amount to be placed in a reserve fund. See, e.g., In re Jacom Computer Servs., Inc., 280 B.R. 570, 573 (Bankr. S.D.N.Y. 2002) (ordering estimation of disputed claims for establishing appropriate reserve); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (estimating disputed claims for reserve purposes). |
| | | | (c) | Equity asserts that the Plan should not be confirmed because it does not preserve Equity's right to setoff, which violates section 553(a). | This objection is incorrect. As defined in Article 1.185 of the Plan, "Secured Claim" includes a Claim "that is subject to setoff under section 553 of the Bankruptcy Code. . . ." The treatment to be afforded Secured Claims, including such setoff claims, is set forth in Article 5.1 of the Plan and adequately protects the setoff rights of the objectors. |
| | | | (d) | Equity argues that the Plan impermissibly bars distributions to a disputed claim if any portion of the claim is disputed. | The Debtors disagree with this assertion. The Debtors are not required to make distributions on disputed claims. |
| | | | (e) | Equity argues that the Plan should not be confirmed because it allows the Debtors to reject a contract after confirmation if the cure claim is too high, in contravention of section 365. | There is nothing in sections 1123 and 1129 of the Bankruptcy Code that require a debtor to disclose its views of administrative claims before the claimants do. Indeed, claimants always initiate the claims process by filing proofs of claim. The filing requirement for non-debtor parties to Other Executory Contracts is a necessary aspect of the administrative review process. To require claimants to file a claim for amounts due under the claimant's contract is not unduly burdensome and is designed to ensure an orderly and efficient review process. |
| 33. | 11949 | The Pension Benefit Guaranty Corporation ("PBGC") | (a) | The objection filed by PBGC is a protective objection in the event parties are unable to finalize their settlement. | |

| | Docket No. | Objector | | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|---|---|
| | | | (b) | PGBC argues that Plan section 7.22(d) is inconsistent with the Debtors' obligations under condition 4 of the IRS Minimum Funding Waiver regarding the Hourly Plan and suggests that the following language be added to section 7.22(d): "Notwithstanding anything that may be contrary in this Plan [of Reorganization], Delphi will make the contributions and satisfy the conditions set forth in the minimum funding standard waiver letters issued to Delphi by the Internal Revenue Service." | The Debtors are including language in the Confirmation Order that should resolve this objection. |
| | 11950 | United States Of America (the "United States") | (a) | The United States objects to the Plan to the extent it seeks to release (1) non-debtors from liability to the United States under any statute for conduct in connection with the Debtors, the Chapter 11 case, or the Plan, as such releases are allegedly invalid as against the United States, especially with reference to GM's environmental and tax liabilities and (2) GM from potential claims that may be asserted by the United States because there has arguably been no showing of extraordinary circumstances that justify such a release. The United States also objects to the Bankruptcy Court's jurisdiction and the constitutionality of the releases. | The Debtors are negotiating language with the objector that they anticipate will resolve certain objections related to the release language.<br><br>A majority of courts, including the Second Circuit, have held that bankruptcy courts may permanently enjoin actions by third-parties against non-debtors as part of a restructuring plan.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-42 (2d Cir. 2005); Drexel Burnham Lambert Group, Inc. v. Hart Holding Co. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); In re Spiegel Inc., No. 03-11540, 2006 Bankr. LEXIS 2158, at *22-23 (Bankr. S.D.N.Y. Aug. 16, 2006); Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394, 436-40 (Bankr. S.D.N.Y. 2005).  The releases contemplated by the Plan are just given the unique circumstances that the Debtors' chapter 11 cases present and substantial contributions made by the released parties.  The contributions of GM, in particular, are essential to the settlements contemplated under the Plan and the Debtors would not have been able to achieve their transformation plan or the recoveries under the proposed Plan without the GM Release. |
| | | | (b) | The United States argues that the Plan does not provide for a channeling injunction, nor has there been a showing of extraordinary circumstances that justify the proposed release of GM from potential claims that may be asserted by the United States and therefore allegedly discharges the obligations of the | Although courts may examine whether a release channels enjoined claims to settlement fund, courts have also approved releases where (i) the estate received substantial consideration, (ii) the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contributions, and (iii) whether the plan otherwise provided for the full payment of the |

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | non-debtors for no satisfactory reason. | enjoined claims.  See  In re Oneida Ltd., Case No. 06-10489, 2006 Bankr. LEXIS 1985 at * 39 (Aug. 30, 2006).  In this case, the Debtors have received substantial consideration from the Released Parties and the releases are therefore proper. |
| 35. | 11957 | Fiduciary Counselors, Inc. ("Fiduciary Counselors") | (a) | Fiduciary Counselors joins PGBC's objection, asserting that Plan section 7.22(d) is inconsistent with the Debtors' obligations under the IRS Minimum Funding Waiver regarding the Hourly Plan. | Settlement discussions ongoing.  Confirmation Order language under negotiation. |
| | | | (b) | Fiduciary Counselors also requests that the confirmation order clarify that the deemed substantive consolidation of the Debtors' estates will not impact each Debtors' statutory joint and several liability for unpaid minimum funding contributions to the Pension Plans by inserting the following italicized language in section 7.22(e) of the plan as follows: "Nothing in this Plan shall be construed as discharging, releasing, or relieving the Debtors, *or any of them*, or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from any liability for minimum funding under 26 U.S.C. § 412 and 29 U.S.C. § 1082 or liability under 29 U.S.C. § 1362 with respect to the Pension Plans or the PBGC." | The Debtors believe that the Plan has no ambiguity and the objector's suggested language is unnecessary and inappropriate. |
| 36. | 11973 | ERISA Lead Plaintiffs[10] | (a) | The objectors assert that the releases contained in sections 11.5 and 11.7 of the Plan must be read in conjunction with the releases contained in the ERISA settlement agreement entered into between the ERISA plaintiffs and Delphi.  The objectors further assert that such a reading would only allow for the releases contained in sections 11.5 and 11.7 of the Plan upon the effective date of the ERISA settlement agreement. | The Debtors believe that the requested revisions to Article 11.5 and 11.7 are unnecessary in connection with the MDL Settlements and the confirmation of the Plan. |
| | | | (b) | The objectors argue that the Plan should be amended to contain the following language in section 11.5 of the Plan: | The Debtors believe that the requested revisions to Article 11.5 and 11.7 are unnecessary in connection with the MDL Settlements and the confirmation of the Plan. |

---

[10]    The ERISA Lead Plaintiff objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.

| | DOCKET NO. | OBJECTOR | | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|---|
| | | | | (iii) this Article 11.5 shall not release any claim or cause of action currently asserted or which could be asserted in the MDL Actions by Lead Plaintiffs against GM pursuant to the Delphi-GM Global Settlement Agreement or Article 11.7 of this Plan, or any defendant or potential defendant who is a Released Party; provided, however, that any and all releases of any Released Party by Lead Plaintiffs shall be fully enforceable as provided for in the MDL Settlements. | |
| | | | (c) | ERISA Lead Plaintiffs reserve the right to respond in writing and orally at the hearing to any objections to approval of the Securities Settlement that are filed. | No response is required. |
| 37. | 12012 | Wilmington Trust Company as indenture trustee for the senior notes and debentures ("Wilmington Trust")[11] | (a) | Wilmington Trust asserts that in order for the Debtors to establish that the Plan is feasible, as required under section 1129(a)(11) of the Bankruptcy Code, they must present evidence of a firm financing commitment. Wilmington Trust argues that, in light of the turmoil in the credit markets, it will be difficult for the Debtors to stay within their $585 million cap on interest imposed by the Delphi-Appaloosa EPCA. | The objections misstate the required showing of feasibility with respect to financing at confirmation. The Debtors must show by a preponderance of the evidence that confirmation of the Plan will not lead to the need for another financial reorganization or to liquidation. See In re Cellular Info. Sys., 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994); accord In re Texaco, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ("The Debtors have established at the confirmation hearing that, upon the emergence of the [d]ebtors from Chapter 11, there is at least a reasonable prospect that the Debtors' earning capacity, together with their ability to obtain financing and sell assets, will be sufficient to fund the Plan. Such evidence adequately supports a finding by this Court that the Plan is feasible within the meaning of section 1129(a)(11)."). The Debtors have made such a showing with respect to their financing. Among other thing, the Debtors have negotiated the Exit Financing Arrangements and entered into a "best efforts" agreement with Citigroup and J.P. Morgan. In addition, the Debtors' lead arrangers have already begun assembling a syndicate of potential lenders with respect to the Exit Financing Arrangements. Finally, entry into the Exit Financing |

[11]    Wilmington Trust received an extension of time to file its objection until 4:00 p.m. (prevailing Eastern time) on Monday, January 14, 2008.

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | | Arrangements is a condition precedent to the occurrence of the Effective Date under Article 12.2 of the Plan.  Unlike some of the conditions precedent in Article 12.2, the condition precedent related to the Exit Financing Arrangements cannot be waived.  See Plan Article 12.3.  Thus, the financial reorganization represented by the Plan could not occur without the consummation of the Exit Financing Arrangements.  Confirmation of the Plan, therefore, could not lead to the need for another financial reorganization or a liquidation of the Debtors because the Plan would not become effective unless the Debtors obtained the Exit Financing Arrangements. |
| | | | (b)  Wilmington Trust asserts that although section 10.4 of the Plan appears to allow the Debtors to pay Wilmington Trust's fees and expenses, that section of the Plan only addresses prepetition fees and expenses incurred by Wilmington Trust and thus the only mechanism for it to obtain compensation is pursuant to an application for payment of a substantial contribution award under section 503 of the Bankruptcy Code. | The Debtors will continue discussions with the Indenture Trustees to adequately address mechanics for their fees and expenses. |
| | | | (c)  Wilmington Trust also asserts that despite the requirements of section 10.4 of the Plan and the Solicitation Procedures Order, Exhibit 10.4 to the Plan fails to set forth any specific amount of fees that the Debtors believe would be reasonable and that the Debtors should be required to file an amended version of Exhibit 10.4 setting forth in good faith the amount of reasonable fees and expenses to which the Debtor will agree for each Indenture Trustee. | The Debtors will continue discussions with the Indenture Trustees to adequately address mechanics for their fees and expenses. |
| 38. | 12013 | Larry Vanderpool[12] | The objector objects to the information provided to employees in connection with the various union memorandums of understanding, and asserts that information provided is misleading. | This is an objection to the party's treatment under the Plan.  Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |

---

[12]   Larry Vanderpool's objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.

|     | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|-----|-----------|----------|----------------------|-----------------------------------|
| 39. | 12017 | Robert W. Ward[13] | The objector asserts that as a shareholder, he is entitled to the same percentage of ownership in Reorganized Delphi as he had in Delphi before it filed its chapter 11 petition. | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |
| 40. | 12081 | Monroe County Water Authority ("Monroe County")[14] | Monroe County asserts that payment of its claims in the form of stock is unacceptable under its rules, state law, and the trust indenture under which it operates. | A creditor's particular organizational structure does not negate the value of currency to be distributed under a chapter 11 plan, nor should a creditor's preferred form of distribution form a basis for finding a plan in violation of the Bankruptcy Code. |
| 41. | 12079 | Orval W. Wright[15] | Orval Wright asserts that, because he worked for GM for over 30 years, his pension plan should not have been transferred to Delphi upon separation and that his flowback opportunities to GM should have been better explained to him. | This is not an objection to confirmation of the Plan. |
| 42. | 12080 | Keith Miller[16] | Keith Miller asserts that he was not provided sufficient time to return his ballot because he did not receive it from his proxy in a timely manner. | The Debtors are confident that their solicitation process was sound and they received ballots from a significant number of shareholders.  In compliance with the Solicitation Procedures Order, and set forth in the Affidavit of Service of Jane Sullivan For Financial Balloting Group LLC Solicitation Packages On Holders Of Public Securities, dated January 12, 2008 (Docket No. 11981), the Debtors had transmitted Solicitation Packages to Intermediate Record Holders – who then send Solicitation Packages to their Beneficial Holders – by December 15, 2007, a full twenty-three days before Mr. Miller alleges he received the packages.   The Debtors should not be held responsible for the exigencies of the postal service or the delays imposed by its stockholders' Nominee or its agent. |

---

[13]    Robert W. Ward's objection was entered on the docket on January 14, 2008, but dated December 26, 2007.

[14]    Monroe County's objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.

[15]    Orval Wright's objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.

[16]    Keith Miller's objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 43. | 12083 | Naomi M. Frye[17] | Naomi Frye asserts that New Common Stock should be valued at $79.93 per share and that this should be effectuated for all shareholders as if they had filed a class action. | This is an objection to the party's treatment under the Plan. Although such party may not support their treatment, the Plan as a whole has been overwhelmingly accepted by Delphi's stakeholders. |

---

[17]    Naomi Frye's objection was filed after the objection deadline of 4:00 p.m. (prevailing Eastern time) on Friday, January 11, 2008.