**LOWENSTEIN SANDLER PC**
Michael S. Etkin, Esq. (ME 0570)
S. Jason Teele, Esq. (ST 7390)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700  (Telephone)
(212) 262-7402  (Facsimile)

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2481 (Facsimile)

*Bankruptcy Counsel to Lead Plaintiffs and the Class*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————
|                              | :   | Chapter 11 |
| In re:                       | :   |            |
| DELPHI CORPORATION, et al.,  | :   | Case No. 05-44481 (RDD) |
|                              | :   | (Jointly Administered) |
|          Debtors.            | :   |            |
|                              | :   |            |
————————————————————————:

## LEAD PLAINTIFFS' RESPONSE TO OBJECTION TO MOTION TO APPROVE SETTLEMENT OF MULTIDISTRICT LITIGATION

Teachers' Retirement System Of Oklahoma, Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H. and Stichting Pensioenfonds ABP, the Court-appointed Lead Plaintiffs (the "Lead Plaintiffs")[1] in the consolidated securities class action entitled *In re Delphi Corp. Securities Litigation*, Master Case No. 05-md-1725 (GER) (E.D.Mich.) (the "Securities Litigation"), respectfully submit this

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Court-approved version of the Disclosure Statement (the "Disclosure Statement") with annexed Plan of Reorganization (the "Plan").

response to the single objection to the Debtors' motion to approve the Multidistrict Litigation Settlement (the "MDL Settlement"), and respectfully state:

## I.
## PRELIMINARY STATEMENT

1.     The MDL Settlement is an essential component of the Plan, which itself is based upon a series of interdependent settlements that are critical to the Debtors' timely emergence from chapter 11.  Upsetting one of these interdependent settlements will lead to the unraveling of other settlements potentially precluding confirmation of the Plan to the detriment of all creditors.  Under the Plan, most creditors will receive distributions equal to 100% of their allowed claims plus accrued interest at Plan Equity Value, while other creditor constituencies and interest holders will receive meaningful distributions, including the holders of the claims that are the subject of the MDL Settlement.  The Debtors will be in a position to provide these distributions if the settlements embodied in the Plan -- including the MDL Settlement -- are approved by this Court.

2.     The Court should not hesitate to approve the MDL Settlement.  As demonstrated herein, the MDL Settlement easily satisfies each of the requirements for approval of a compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Rule 9019").  The alternatives to the MDL Settlement would result in the expenditure of huge sums of money, additional delays in bringing these cases to a conclusion, the creation of hundreds of millions of dollars of potential indemnification claims and a potential threat to the other settlements that are fundamental to the resolution of these cases.

3.     Significantly, of a universe of more than 500,000 parties in interest, only a group of five senior note holders represented by Goodwin Proctor, LLP has filed an objection to the MDL Settlement (the "Goodwin Proctor Objection").[2]  The primary focus of these objections

---

[2]     While objections to confirmation have been filed, only a few argue against confirmation on grounds that are, directly or indirectly, relevant to the approval of the MDL Settlement.  *See* Docket Nos. 11908 (Riverside Claims, LLC); 11937 (Liquidity Solutions, Inc.), and 11951

is that the MDL Settlement cannot be approved by the Court because it violates the absolute priority rule.  These arguments are moot in light of the Plan's acceptance by all classes of claims and interests.  As set forth below, and as all parties must acknowledge, the absolute priority rule does not apply where all classes of impaired claims and interests vote to accept a plan.

4.    The Goodwin Proctor Objection, and all confirmation objections raising similar issues, should also be overruled because these objecting creditors are being paid in full with accrued interest under the Plan.  Lead Plaintiffs assume that the Debtors will adequately address these issues in their brief in support of the Plan and at the confirmation hearing and Lead Plaintiffs adopt and support those arguments here.

5.    The Goodwin Proctor Confirmation Objection argues that confirmation should be denied irrespective of a favorable vote on the Plan because the MDL Settlement violates the subordination provisions of section 510(b) of the Bankruptcy Code, which they assert are not waivable.  This argument, too, incorrectly assumes the applicability of the absolute priority rule and fails by its own weight.  It also fails in the face of applicable case law from this District confirming a plan of reorganization that waived section 510(b) subordination over the objections of a major shareholder.

6.    Lead Plaintiffs and the Debtors do not seek to have this Court go where no court has gone before.  The District Court (defined below) has already approved the MDL Settlement on a final basis (Joint Exhibit 118).  In approving the MDL Settlement, the District Court was required to consider a host of factors, many of which this Court must now also consider.  The District Court determined that the MDL Settlement satisfies each of the applicable factors, and stated:

> The proposed Settlements conclude a significant portion of a high-profile, hotly contested lawsuit involving allegations of massive fraud on the investing public and one that affects the retirement security of thousands of Delphi employees.   No contravening

(group of bond holders represented by Goodwin Proctor, LLP (the "Goodwin Proctor Confirmation Objection")).  This Response is intended as a response to these arguments as well.

public interest justifies deviating from the strong public interest in encouraging settlement of complex class action litigation. *See In re Cardizem*, *supra*, 218 F.R.D. at 534 ("[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Id.* (citation omitted).)

In addition, the Court is confident that the approval of these settlements will assist Delphi and its employees and shareholders in concluding its bankruptcy proceeding and returning to a more solid financial condition without the cloud of substantial litigation hanging over it.

Final Approval Order (defined below) (Joint Exhibit 118) at 38-39.

7.    For the reasons set forth in this Response, in the Debtors' anticipated brief and on the record at the confirmation hearing, the Court should approve the MDL Settlement in connection with confirmation of the Plan.

## II.
## BACKGROUND

8.    On October 8 and 14, 2005 (collectively, the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.    Lead Plaintiffs are, and represent, creditors, equity holders and parties-in-interest in the Debtors' chapter 11 cases.  Lead Plaintiffs and the now certified class suffered damages substantially in excess of $1 billion as a result of their purchases of certain of the Debtors' common stock and debt securities between March 7, 2000 and March 3, 2005 (the "Class Period").  These damages were caused by the Debtors, certain of their current and/or former directors and officers and others in the context of the concealment and misrepresentation of the true financial condition of the Debtors before and during the Class Period.

A.    **The Securities Litigation.**

10.    The Securities Litigation was commenced on March 7, 2005, in the United Sates District Court for the Southern District of New York.  On June 27, 2005, pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Judge Naomi Reice Buchwald appointed Lead Plaintiffs to prosecute the Securities Litigation.  On September 8, 2005, Judge Buchwald consolidated the underlying actions which had been filed pursuant to the PSLRA into the Securities Litigation.

11.    On September 30, 2005, following an extensive investigation of their claims, Lead Plaintiffs filed their consolidated class action complaint (the "Complaint").[3]

12.    On December 12, 2005, the Judicial Panel on Multidistrict Litigation transferred the consolidated action pending before Judge Buchwald in the Southern District of New York to the United States District Court for the Eastern District of Michigan (the "District Court").  By order dated October 17, 2006, the District Court ratified the appointment of Lead Plaintiffs and Co-Lead Counsel.  *See In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 458 F. Supp. 2d 455, 463 (E.D. Mich. 2006).

13.    Lead Plaintiffs and their counsel took immediate and effective action to establish the class they represent as a significant stakeholder in the Debtors' chapter 11 cases.  At various hearings before this Court concerning issues relevant to Lead Plaintiffs, the Debtors, through their counsel, made it clear that a framework for the resolution of the claims advanced in the Securities Litigation was critical to the Debtors' ultimate emergence from chapter 11.

14.    On July 11, 2007, the District Court appointed Judge Layne R. Phillips "Master for Settlement Negotiations" pursuant to Federal Rule of Civil Procedure 53.  Over the course of several months in 2007, Lead Plaintiffs, the Debtors and other parties to the Securities Litigation and this chapter 11 proceeding, with the assistance of Judge Phillips, conducted

---

[3]    The Complaint was filed more than one year before the Securities and Exchange Commission filed its complaint against the Debtors and others, which was not filed until October 30, 2006.

discussions and negotiations regarding a settlement of the Securities Litigation.  The parties'
negotiations included six days of face-to-face mediation with Judge Phillips.

15.    On August 31, 2007, the parties' negotiations resulted in an agreement
resolving the Securities Litigation as to the Debtors and certain other defendants including
current and former directors and officers and certain underwriters in connection with the Debtors'
securities.  On August 31, 2007, the MDL Settlement[4] was submitted to the District Court for
preliminary approval and for scheduling of a final fairness hearing.  On September 5, 2007, the
District Court granted preliminary approval of the MDL Settlement.  On November 13, 2007, the
District Court conducted a final fairness hearing, *inter alia*, on Lead Plaintiffs' motion to approve
the MDL Settlement.

16.    On December 4, 2007, the District Court tentatively approved a
modification to the MDL Settlement (the "Modification"), subject to certain notice procedures,
which Modification, as set forth on the record during the December 4, 2007 hearing and as
described in the Disclosure Statement and provided for in the Plan, is supported by Lead
Plaintiffs, the Debtors and others.  No objections to the Modification were filed in the District
Court or otherwise received by Lead Plaintiffs as required by the supplemental notice procedures
directed by the District Court.

17.    On January 10, 2008, the District Court issued an opinion and order finally
approving the MDL Settlement and the Modification and amended the opinion and order on
January 11, 2008 to correct a few clerical errors (the "Final Approval Order") (Joint Exhibit
118).

18.    The MDL Settlement is also subject to the approval of this Court.  On
September 7, 2007, the Debtors filed a motion seeking approval of the MDL Settlement pursuant
to, *inter alia*, Rule 9019.  Since the filing of the Rule 9019 Motion, the Debtors, with the consent
of Lead Plaintiffs and other stakeholders, determined to seek approval of the MDL Settlement in

---

[4]    The MDL Settlement is annexed to the Plan as Exhibit 7.19(a).

two steps. The first step entailed obtaining preliminary approval of the MDL Settlement, class certification for voting purposes and the means for soliciting the votes of class members consistent with the MDL Settlement. On October 25, 2007, this Court granted such preliminary approval and an order preliminarily approving the MDL Settlement (the "Preliminary Approval Order") was entered on October 29, 2007. *See* Docket No. 10746.

19. The second step is final approval of the MDL Settlement by this Court at the same time and in connection with confirmation of the Plan. Pursuant to the Preliminary Approval Order, all parties in interest who failed to object to the Rule 9019 Motion, other than certain specified Potential Objectors, were barred from raising any objection to the MDL Settlement (and none did). As to the Potential Objectors, their objection deadline with respect to the MDL Settlement was January 11, 2008, at 4:00 p.m. No objections were filed. As previously set forth, the Goodwin Proctor Objection, which was filed on October 19, 2007, is the only such objection filed.

**B.    The Plan.**

20. Under the Plan, the Debtors will distribute New Common Stock and Discount Rights to general unsecured creditors and to Lead Plaintiffs on behalf of the class. The Plan was the product of tireless negotiations over many months with many pitched battles leading to all of the compromises embodied in the Plan. It is a quilt of interrelated settlements between the Debtors and, *inter alia*, GM, the Debtors' unions, the Statutory Committees, Lead Plaintiffs in the Securities Litigation and others. The Plan, in its current form, would not be possible without the compromises agreed to by all of the Settlement Negotiation Parties. *See* Disclosure Statement at DS-xiii, 162.

21. For example, the Debtors' settlement with GM (the "GM Settlement")[5] is one of the five cornerstones of the Debtors' transformation. *See* Disclosure Statement at DS-viii, DS-x (the GM Settlement "is a necessary and essential component of the Debtors'

---

[5]    The GM Settlement is annexed to the Plan as Exhibit 7.20(a).

reorganization."); DS-xiii (the GM Settlement "provides significant consideration to Delphi, which allows Delphi to provide distributions to other stakeholders that would be impossible to deliver without the settlement.").  GM is not obligated to consummate the GM Settlement if it does not obtain the releases provided for therein, including releases from Lead Plaintiffs and the class they represent.  The releases are characterized as one of the three principal components of the consideration to be received by GM under the GM Settlement.  *See* GM Settlement at Art. IV; Disclosure Statement at DS-68-71.

22.    The MDL Settlement also "is critical to the Debtors' reorganization."  *See* Disclosure Statement at DS-xiv.  In addition to the importance of the MDL Settlement to other settlements embodied in the Plan, the Debtors' business plan assumes the resolution of the Securities Litigation.  Specifically, the business plan does not include the potential costs of defense or certain indemnification obligations (which are being assumed under the Plan) and provides for only a limited pool of insurance post-restructuring.  Thus, failure to approve the MDL Settlement would not only severely and negatively impact the Plan, but would also necessitate fundamental revisions to the business plan to account for the expenses of the Securities Litigation and potential dollar for dollar indemnification obligations to certain directors and officers in the likely event that such costs and liabilities exceed available insurance coverage.  The allowed claim being provided to Lead Plaintiffs and the class under the Plan pales in comparison to the impact on the distributions available to the Debtors' stakeholders absent the MDL Settlement.  Moreover, the negative impact on the economics of the GM Settlement, even assuming it survives in some form absent a resolution of the Securities Litigation, would also have to be taken into account.

23.    Additionally, the Securities Litigation was, in the Debtors' judgment, a material contingency which had to be resolved to obtain the funding of the Plan contemplated under the GM Settlement and the Investment Agreement.  *See* Disclosure Statement at DS-141.

24.    Finally, holders of the Debtors' common stock will receive a meaningful distribution under the Plan.  *See* Disclosure Statement at DS-xiv.  If the MDL Settlement is not

approved, this distribution will be significantly diluted, if not disappear altogether, and would likely cause the Official Committee of Equity Security Holders (the "Equity Committee") to abandon their crucial support for the Plan.

25.    All creditors and interest holders of the Debtors will receive substantial value under the Plan that is not available under any other scenario.  The Debtors can only implement the Plan if all of the settlements embodied in it, including the MDL Settlement, are approved by the Court.  *See* Disclosure Statement at DS-xiv, 162.  As set forth in detail in the Disclosure Statement, the MDL Settlement and distributions to be made pursuant to the Plan are "necessary and appropriate components of the Debtors' Plan."  *See* Disclosure Statement at 141. Approving the MDL Settlement and confirming the Plan is thus the surest way to provide substantial value to all of the Debtors' stakeholders and enable the Debtors to successfully emerge from chapter 11.

### III.
### ARGUMENT

### The MDL Settlement Should Be Approved Pursuant To Rule 9019 And Applicable Bankruptcy Law

### A.    The Absolute Priority Rule Does Not Prevent Approval Of The MDL Settlement.

26.    The Plan has been accepted by all impaired classes of creditors.  It is beyond cavil that as a result of this acceptance, the absolute priority rule is not a factor in the Court's consideration of the confirmability of the Plan or, by extension, whether the MDL Settlement should be approved.  *See*, *e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, *43 (Bankr. S.D.N.Y. 2003); *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D.Fla. 1996); *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) ("This is a consensual plan. Under the Bankruptcy Code, the absolute priority rule applies only in the context of cramdown of an impaired rejecting class under § 1129(b). The absolute priority rule is a component of the "fair and equitable" requirement of § 1129(b), which only comes into play if there is a rejecting class."); *In re Winters*, 99 B.R. 658, 663 (Bankr. W.D.Pa. 1989) ("The absolute priority rule is

now applicable only when the proponent of the plan seeks to "cramdown" the plan under the alternative confirmation standard contained in § 1129(b) on a class that is impaired and has rejected the plan.").

27.    The Goodwin Proctor Confirmation Objection nevertheless asserts that section 510(b) of the Bankruptcy Code *requires* subordination of the Section 510(b) Note Claims and Section 510(b) Equity Claims irrespective of the inapplicability of the absolute priority rule. Goodwin Proctor argues that the fact that the Plan provides distributions to the holders of these claims renders the Plan unconfirmable under section 1129(a)(1).    *See* Goodwin Proctor Confirmation Objection (Docket No. 11951) at ¶¶ 114-117.  Their rationale is that subordination pursuant to section 510(b) of the Bankruptcy Code is non-waivable and, as a result, "each Senior Noteholder has a statutory right to be paid in full before any distribution is made on account of the MDL Claims." *Id*. at ¶ 117.  This argument is simply wrong for a number of reasons.  First, in a "settlement plan," creditors may waive their right to section 510(b) subordination.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 721-722 (Bankr. S.D.N.Y. 1992) (confirming a plan providing distributions to employee-shareholders over the objection of a 40% shareholder where "parties with a stake in the controversy have agreed to an overall settlement, in lieu of battling it out over the merits.").  Second, the assumption inherent in their argument is that the absolute priority rule bars subordinated creditors from receiving distributions until senior creditors are paid in full.  This assumption is invalid because the absolute priority rule does not apply in these cases by virtue of the fact that all classes of impaired claims and interests have voted to accept the Plan incorporating the MDL Settlement.  Third, the cases cited in the Goodwin Proctor Confirmation Objection, *see id*. at ¶ 115, do not stand for the proposition that a court must enforce subordination under section 510(b) of the Bankruptcy Code in favor of an objecting creditor regardless of whether a plan is accepted by all impaired classes or the class in which the objecting creditor belongs.  The reason is obvious - the law is to the contrary since section 510(b) of the Bankruptcy Code merely provides a mechanism for establishing the priority of certain claims, it does not trump the will of an accepting class to allow for a compromise that

-10-

provides a recovery to claimants subordinated pursuant to section 510(b).  Fourth, the Goodwin

Proctor Confirmation Objection attempts to spin the legislative history to suggest that it supports

the proposition that subordination under section 510(b) of the Bankruptcy Code is not waivable

regardless of the applicability of the absolute priority rule.  In fact, the legislative history

indicates that a court is "required" to both enforce subordination agreements (pursuant to section

510(a) of the Bankruptcy Code) and to subordinate claims subject to section 510(b) of the

Bankruptcy Code.  It does not state that section 510(b) is not waivable nor does it state simply

that section 510(b) subordination must be enforced regardless of an affirmative vote by creditors

in support of a plan.  Finally, assuming the Court accepts the Debtors' valuation, their argument

fails because the Plan provides the senior noteholders with payment in full plus accrued interest

at Plan Equity Value.

       28.    Even assuming, *arguendo*, that the absolute priority rule is applicable

here, it does not prevent the Court from approving the MDL Settlement.  The absolute priority

rule generally operates to preclude junior creditors or interest holders from receiving or retaining

money or property under a plan of reorganization unless all senior classes of claims and interests

are paid in full.  *See*, *generally*, *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle

Street Partnership*, 526 U.S. 434 (1999); *In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d

Cir. 2007).

       29.    In *In re Iridium*, the Second Circuit held that "whether a particular

settlement's distribution scheme complies with the [Bankruptcy] Code's priority scheme must be

the most important factor for the bankruptcy court to consider when determining whether a

settlement is 'fair and equitable' under Rule 9019."  Nevertheless, the Second Circuit did not

create a *per se* rule against the approval of settlements that do not comply strictly with the

absolute priority rule.  *Iridium*, 478 F.2d at 464 ("In our view, a rigid *per se* rule cannot

accommodate the dynamic status of some . . . settlements.").  In this vein, the Second Circuit

held that "where the remaining factors weigh heavily in favor of approving a settlement," the

Court "in its discretion could endorse a settlement that does not comply in some minor respects

with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule."  478 F.2d at 464-465.  The Second Circuit's decision in *Iridium* must be read to stand for the proposition that bankruptcy courts can approve settlements that do not comply with the absolute priority rule if there are compelling facts to support such approval.

30.    The Goodwin Proctor Confirmation Objection acknowledges that the *Iridium* decision does not create a *per se* rule and that a court can approve a settlement that may be violative of the absolute priority rule when there are compelling reasons to do so.  So compelling are the reasons to approve the MDL Settlement that the Debtors' cases present a textbook example of the kind of settlement the Second Circuit must have had in mind when deciding *Iridium*.

31.    Fundamentally, the Plan is not possible or feasible without each of the interdependent settlements embodied in it.  Because the settlements are interdependent -- this is especially true in the case of the MDL Settlement, GM Settlement, Investment Agreement, and the Debtors' settlements with the Statutory Committees -- non-approval of one settlement will upset the entire distribution scheme of the Plan, delay confirmation and limit the Debtors' ability to make any meaningful distributions to creditors.  *See* Disclosure Statement at DS-xiii.

32.    Absent the MDL Settlement, the Debtors may not have the advantage of many of the other settlements that are critical to the Plan.  The distributions provided for under the Plan are being primarily funded by the GM Settlement without which the Debtors believe that their estates would be hopelessly insolvent, and in which case the Debtors' ability to make the proposed distributions under the Plan would be in substantial doubt.  *See* Disclosure Statement at DS-141. In furtherance of the settlements embodied in the Plan, the Debtors have sought to resolve most material contingencies that were required to be resolved in their judgment to obtain the funding for Plan distributions contemplated under the GM Settlement and the Investment Agreement, including resolving the Securities Litigation.  *Id.*

33.    Another compelling reason why the Court should approve the MDL

Settlement is the amount of the claim being allowed under the MDL Settlement in relation to the overall damages asserted in the Securities Litigation.  While most other claims and interests to be allowed under the Plan are allowed at their full value, the $179 million allowed claim to be granted to the Lead Plaintiffs and the class they represent under the MDL Settlement is a negotiated amount which is substantially less than the over $1 billion in potential damages associated with such claims as estimated by either the Debtors or the Lead Plaintiffs in the Securities Litigation.  *Id.*  Accordingly, the MDL Settlement provides for an allowed claim of less than 18% of the total damages claimed in the Securities Litigation.  The actual amount of this claim if litigated to its conclusion or if estimated by the Bankruptcy Court will potentially be hundreds of millions of dollars more than the claim proposed to be allowed under the MDL Settlement, not to mention the expense of such litigation and the delays in the Debtors' emergence from chapter 11.  *Id.*  In the Debtors' view, the reduced amount of this claim has facilitated all of the other settlements embodied in the Plan which make possible the distributions to creditors and equity holders proposed pursuant to the Plan.  *Id.*

34.     Additionally, the MDL Settlement provides the Debtors and their directors and officers with a complete resolution of the Securities Litigation, as well as related insurance claims that arise from the Securities Litigation and certain government investigations and proceedings.  The Debtors have concluded that it is unlikely that these claims will ever be valued at zero and that the MDL Settlement offers the best opportunity to obtain a resolution of the Securities Litigation while moving toward a successful emergence from chapter 11.  *Id.* at DS-141-142.

35.     As alluded to in the preceding paragraph, the MDL Settlement also resolves claims against certain current and former directors and officers of the Debtors.  *Id.*  This is extraordinarily important because the Debtors are assuming the indemnification obligations to several of the directors and officers under the Plan.  *See* Plan at § 11.12.  This alone provides a benefit of potentially hundreds of millions of dollars to the estates and creditors because the Debtors' remaining available insurance coverage in the absence of the approval of the MDL

-13-

Settlement will be insufficient to fund all of the potential expenses and liabilities relating to the Securities Litigation.  As the Court is aware, the Debtors maintain two tiers of director and officer liability insurance.  *See* Rule 9019 Motion at ¶ 48.  There is only approximately $90 million of coverage remaining under the first tier.  *Id.* The second tier provides "insurance of last resort" and the insurers have taken the position that no coverage is available if the Debtors agree to indemnify certain directors and officers who are defendants in the Securities Litigation (for example, by assuming the indemnification obligations as provided for in the Plan).  *Id.*  Thus, the MDL Settlement, coupled with the Insurance Settlement, relieves the Debtors of potentially hundreds of millions of dollars of costs and indemnification claims that would have to be paid in full.

36.    The almost imperceptible, if any, increase in distributions to other creditors if the MDL Settlement is not approved also weighs decidedly in favor of approving the MDL Settlement.  In the first instance, and as demonstrated above, there will be a net decrease in value available to creditors and interest holders if the MDL Settlement is not approved because the cost, delay and economic impact on the current Plan structure results in a significantly greater loss than the actual distribution to Lead Plaintiffs and the class under the MDL Settlement. Moreover, based on the Plan Equity Value of $59.61 per share of the New Common Stock, *see* Disclosure Statement at DS-xiii, the holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive distributions on New Common Stock totaling only approximately 3.2% (assuming full exercise of the Discount Rights) of the total shares being issued under the Plan.  *See* Disclosure Statement at DS-xv.  As discussed below, assuming subordination under section 510(b), the holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will still be entitled to receive a meaningful distribution from the Debtors.  Thus, the Debtors will be able to distribute to other creditors only a *de minimis* additional amount of New Common Stock and Discount Rights if the MDL Settlement is not approved.  And, as previously explained, this re-distribution, if it happens at all, will come at a heavy price.

37.    As demonstrated above and in the sections that follow, there are a plethora

of compelling reasons why the MDL Settlement is crucial to the Debtors' reorganization and should be approved even though it may deviate from the absolute priority rule. *Iridium* does not preclude the approval of the MDL Settlement. On the contrary, the limited exception created by the Second Circuit in *Iridium* provides an additional basis upon which the Court may approve the MDL Settlement.

**B.    The Remaining Standards For Approving Compromises in Bankruptcy.**

38.    In addition to the absolute priority rule, which *Iridium* instructs must be considered, when and if applicable, in approving compromises, Rule 9019 sets forth a number of other factors that the Court must weigh when considering the approval of a settlement agreement. All of these factors weigh heavily in favor of approving the MDL Settlement.

39.    Preliminarily, there is a dearth of case law on the question of the substantive standards for approving a settlement in the context of a plan of reorganization. Nevertheless, "the same degree of court scrutiny should be required whether a settlement is independent of a plan, or part of the plan." Norton Bankruptcy Law and Practice 2d, § 90.10. This principle is borne out by the strong public policy supporting the confirmation of plans of reorganization. *See*, *e.g.*, In re *Hibbard Brown & Co., Inc.*, 217 B.R. 41 (Bankr. S.D.N.Y. 1998); *Nordhoff Investments, Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 190 (3d Cir. 2001); *Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547, 1555 (11th Cir.1988); *In re Central Florida Elec., Inc.*, 194 B.R. 280, 283 (Bankr. M.D. Fla. 1996). Accordingly, the Court should consider the MDL Settlement under the standards set forth in Rule 9019 and as developed by the case law in this District.

40.    Lead Plaintiffs submit that the MDL Settlement is fair and equitable and meets the applicable criteria for approval of a settlement pursuant to Bankruptcy Rule 9019(a) which permits this Court to approve a compromise or settlement. *See WorldCom*, 347 B.R. at 136, *citing In re Drexel Burnham Lambert Group, Inc.*, 140 B.R. 347, 349 (S.D.N.Y. 1992). Bankruptcy Rule 9019(a) provides:

> (a)    Compromise.  On motion by the trustee and after notice and a hearing the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

41.    The key question under Rule 9019(a) is whether the MDL Settlement is "fair and equitable" and in the best interests of the Debtors' estates, an analysis that requires the Court to arrive at a decision based on the probabilities of success on the merits if the matter was litigated to conclusion.  *See TMT Trailer Ferry Protective Comm. For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In conducting its analysis, the Court must make an informed judgment concerning the "complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *Id*.  Included in this analysis is a comparison of the MDL Settlement "with the likely rewards of litigation."  *Id*.

42.    The Second Circuit has developed several factors to guide the Court's inquiry into whether the MDL Settlement should be approved.  These factors include (a) the balance between the litigation's possibility of success and the settlement's future benefits, (b) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment, (c) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement, (d) whether other parties in interest support the settlement, (e) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement, (f) the nature and breadth of releases to be obtained by officers and directors, and (g) the extent to which the settlement is the product of arm's length bargaining.  *See Iridium*, 478 F.3d at 461-62.

43.    It is axiomatic that when considering the MDL Settlement, the Court need conduct neither a trial, nor a "mini-trial," nor "a rehearsal of the trial" on the merits to actually

resolve the extant factual and legal issues, but must simply consider whether against the background of those issues, the MDL Settlement is reasonable. *Newman v. Stein*, 464 F.2d 689 (2d Cir. 1973), *cert. denied sub nom., Benson v. Newman*, 409 U.S. 1039 (1972). *See also*, *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998); *In re International Distrib. Ctrs., Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989); *Drexel Burnham Lambert Group*, 140 B.R. at 349. Instead, the Court's responsibilities are to "familiarize itself with all facts necessary for an intelligent and objective opinion, canvass the issues, and see whether the settlement falls below the lowest point in the range of reasonableness." *Ashford Hotels*, 226 B.R. at 802; *see also In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983). Moreover, the Court's assessment should be made in light of the general presumption in favor of settlements in bankruptcy cases. *See In re Tower Automotive, Inc.*, 342 B.R. 158, 164 (Bankr. S.D.N.Y. 2006) (internal citations omitted).

44. The settlement evaluation process is not designed to substitute the Court's judgment for that of the Debtors. *Carla Leather*, 44 B.R. at 465. While a Court is not expected to "rubber stamp" the proposed settlement, *see, e.g., In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), the Court should give considerable weight to the Debtors' informed judgment that a compromise is fair and equitable. *Protective Committee for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968), *reh'g denied*, 391 U.S. 909 (1968). *See also, International Distrib. Ctrs.*, 103 B.R. at 423; *Drexel*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991); *Carla Leather*, 44 B.R. at 472.

45. Finally, where, as here, a settlement is presented for approval in connection with a plan of reorganization, the absolute priority rule set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code is relevant to the Court's analysis. *See Iridium*, 478 F.3d at 462-465. However, as previously stated, this analysis is only required where at least one class of impaired creditors has voted to reject a plan of reorganization. *See*, *e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, *43 (Bankr. S.D.N.Y. 2003); *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D.Fla. 1996); *In re Winters*, 99 B.R. 658, 663 (Bankr. W.D.Pa. 1989) ("The absolute priority rule is . . . applicable only when the proponent of the plan seeks to

"cramdown" the plan under the alternative confirmation standard contained in § 1129(b) on a class that is impaired and has rejected the plan."). Because all classes of creditors have voted to accept the Plan, the Court need not consider this factor. However, in an abundance of caution, Lead Plaintiffs address this issue below. Again, even if the absolute priority rule does apply in these cases, it would not prevent the approval of the MDL Settlement.

**C.      The MDL Settlement Satisfies All Of the Relevant Criteria For The Approval Of Compromises In Bankruptcy And Should Be Approved.**

46.      The MDL Settlement easily meets the applicable criteria for the approval of a compromise pursuant to Rule 9019(a) and should be approved. As set forth above, the MDL Settlement is one of the interdependent settlements embodied in the Plan that make the distributions thereunder possible.

> **i.      The Balance Between The Securities Litigation's Possibility Of Success And The MDL Settlement's Future Benefits Weighs Heavily In Favor Of Approving The MDL Settlement (The First _Iridium_ Factor).**

47.      The MDL Settlement provides the Debtors with a complete resolution of the Securities Litigation as well as related insurance claims arising from the Securities Litigation and certain government investigations and proceedings, which will allow the Debtors to avoid the costs of further litigation and significant indemnification claims. _See_ Disclosure Statement at DS-141-142. This is a material benefit to all of the Debtors' stakeholders because absent the MDL Settlement, the Debtors' business plan would have to be substantially revised to account for the costs of the litigation, the costs of satisfying directors' and officers' indemnification obligations that are being assumed under the Plan, and the potential cost of replacing some or all of the GM consideration or other funding of the Plan that is conditioned on the release to GM provided under the MDL Settlement.

48.      The Debtors maintain that it is unlikely that they could avoid liability if the litigation continued, or that the Section 510(b) Note Claims and Section 510(b) Equity Claims would be estimated at zero for purposes of the Plan. Moving forward with this complex

-18-

litigation would require the Debtors to invest significant amounts of time and money, would likely delay confirmation of the Plan and will negatively impact the distributions to creditors proposed thereunder. *See* Disclosure Statement at DS-141.

> **ii.    The Likelihood Of Complex And Protracted Litigation, With Its Attendant Expense, Inconvenience, And Delay, Including The Difficulty In Collecting On The Judgment Weighs Heavily In Favor Of Approving The MDL Settlement (The Second *Iridium* Factor).**

49.    There is no doubt that the claims in the Securities Litigation are complex. Litigating those claims would require a multitude of dispositive motions, extensive discovery, and a lengthy and complex trial before the District Court. The risks attendant to any litigation make it impossible for any party to predict the outcome to a reasonable degree of certainty. On the other hand, as demonstrated herein, it is apparent that the benefits of the MDL Settlement far outweigh the risks and costs which the Debtors, and by extension, their creditors and interest holders, would undertake if the Securities Litigation was to continue.

50.    The Debtors face litigation risks of an extraordinary magnitude. In addition to the expense of the litigation, the Debtors face potentially hundreds of millions of dollars of indemnification claims by certain current and former directors and officers who are defendants in the Securities Litigation and whose indemnification obligations the Debtors are assuming. As previously demonstrated, the Debtors have only limited insurance available to fund these claims. Costs and a judgment against the indemnified directors and officers exceeding the available insurance will have to be paid by the Debtors. The Debtors also risk losing the consideration they so desperately need from GM, because the GM Settlement is contingent on the Debtors securing releases from, *inter alia*, Lead Plaintiffs. *See* GM Settlement at Art. IV. Resolving the Securities Litigation is also important in connection with the Investment Agreement. *See* Disclosure Statement at DS-141. Losing the consideration provided by GM and the Plan Investors' investment would leave the Debtors "hopelessly insolvent," Disclosure Statement at DS-141, and would destroy creditors' recoveries in these cases. It also would jeopardize scores of jobs that the Debtors and their labor unions have worked so hard to

preserve.  Continuing the litigation would further delay the Debtors' exit from bankruptcy, which "may lead to degradation of [the Debtors'] total enterprise value and a corresponding reduction in Plan recoveries . . . ."  Disclosure Statement at DS-x.  These facts should be given "considerable weight" by the Court.  *See In re Adelphia Communications Corp.*, 327 B.R. 143, 164 (Bankr. S.D.N.Y. 2005).

51.      The Debtors are well aware of these risks, *see generally*, Rule 9019 Motion; Disclosure Statement at DS-141-142, and have determined that settlement "offers the best opportunity to obtain a resolution of the [Securities Litigation] . . . while moving toward a successful emergence from chapter 11 . . . ."  Disclosure Statement at DS-141-142.  The Court should not overlook the significance of the Debtors' conclusion, which reflects the Debtors' business judgment exercised by members of their board of directors who are not defendants in the Securities Litigation.  *See* Rule 9019 Motion at ¶ 81.  *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991) (holding that courts should give weight to the opinions of the debtor that the relevant factors have been considered and that the settlement is fair and reasonable); *see also In re NW Investors II, LLC*, 2007 WL 2228151, *4 (E.D.N.Y. 2007) (same).

52.      The risks, expenses and delays associated with the Securities Litigation are not the only risks, expenses and delays that the Debtors had to consider before agreeing to the MDL Settlement.  Lead Plaintiffs' claims in these cases exceed $1 billion.  Given this level of potential damages, the Debtors will be constrained to spend substantial time and money defending against these claims in this and other courts.  Not surprisingly, Lead Plaintiffs would contest any effort by the Debtors to adjudicate the claims in this Court through an estimation proceeding.  A claims estimation proceeding, therefore, would involve many of the same risks, delays and expenses as litigation.  So great are the risks, delays and expenses associated with a contested estimation proceeding that compromise is encouraged.  *See In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 926 (S.D.N.Y. 1991) (settlement "is the more appropriate method of resolving" claims because estimation "would unduly delay the resolution of [the]

Chapter 11 cases, possibly for years, deplete the assets of these estates, and consume substantial resources of the judiciary.").  Indeed, even in the context of claims estimation, the Debtors have already concluded that it is unlikely the Court would estimate these claims at zero.  *See* Disclosure Statement at DS-141.

53.    Subordinating the Section 510(b) Note Claims and Section 510(b) Equity Claims would provide an illusory, if any, benefit to creditors.  While the Section 510(b) Note Claims and Section 510(b) Equity Claims may be subordinated to the holders of the Debtors' senior notes and unsubordinated general unsecured creditors, all Section 510(b) Note Claims associated with the purchase of senior notes (which alone could amount to at least $80 million) will have to be paid in full before holders of other subordinated debt instruments or equity holders receive a distribution.  *See* Preliminary Approval Order, Ex. 1 to Ex. A.  Moreover, all Section 510(b) Note Claims associated with the purchase of subordinated notes will have to be paid in full before equity holders would be entitled to receive a distribution under the Plan.  Finally, the Section 510(b) Equity Claims would significantly dilute the distributions to equity currently contemplated under the Plan, and would likely cause the Equity Committee to abandon their agreement to support the Plan.  As discussed below, such material changes in the treatment of subordinated creditors and equity holders will destroy the distribution scheme under the Plan and will require the Debtors to re-solicit votes on a revised plan, which would likely result in the rejection of the Plan by three classes of creditors (the Section 510(b) Note Claims, Section 510(b) Equity Claims, and Equity).  Such an outcome would have a disastrous effect on the Debtors' planned emergence from chapter 11, since it may cause other major stakeholders and constituencies to rethink their position.

54.    Accordingly, due to the enormous costs, risks and delays associated with continuing the Securities Litigation rather than settling it as provided for in the MDL Settlement, this factor weighs heavily in favor of approving the MDL Settlement.

iii.    **The MDL Settlement Serves The Paramount Interests Of The Creditors (The Third *Iridium* Factor).**

55.    The MDL Settlement clearly is in the best interests of the Debtors and their creditors. Absent the MDL Settlement, many of the other settlements critical to the Plan will be jeopardized as well as the Plan itself.

56.    The specific reasons why the MDL Settlement is in the paramount interest of creditors is detailed above. In summary:

(a) distributions provided under the Plan are being primarily funded by the GM Settlement, without which the Debtors believe that their estates would be hopelessly insolvent and in which case the Debtors' ability to make the proposed distributions under the Plan would be in substantial doubt. *See* Disclosure Statement at DS-141.

(b) the claim to be allowed under the MDL Settlement is a negotiated amount which totals less than 18% of the total damages asserted in the Securities Litigation. The substantially reduced, negotiated amount of this claim should be juxtaposed against the 100% recoveries, plus interest, that virtually all other creditors are to receive under the Plan, and the substantial distributions that other creditors and equity holders are to receive.

(c) the MDL Settlement provides the Debtors and their directors and officers with a complete resolution of the Securities Litigation. The Debtors have exercised their business judgment to conclude that the MDL Settlement offers the best opportunity to obtain a resolution of the Securities Litigation while moving toward a successful emergence from chapter 11. *Id*. at DS-141-142.

(d) the MDL Settlement removes any possibility that the Debtors will have to pay hundreds of millions of dollars of potential litigation costs and indemnification claims of the directors and officers who are defendants in the Securities Litigation and which obligations relating to indemnification the Debtors are assuming. With potentially minimal available insurance, the Debtors will be required to pay these costs and claims directly.

(e) failure to approve the MDL Settlement will lead to the re-distribution of a *de minimis* amount of additional value to other creditors which is more than offset by the costs and expenses discussed above.  Even assuming subordination, the holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will be entitled to receive some meaningful distribution under the Debtors' current distribution scheme in any event.

57.     The MDL Settlement also serves the paramount interest of creditors by providing certainty and finality to the Debtors' emergence form chapter 11.  If the MDL Settlement is not approved, the Plan cannot be confirmed without first re-soliciting creditors' votes on a modified plan (*i.e.*, a plan that does not embody the MDL Settlement, the Debtors' settlements with the Equity Committee and, possibly, the GM Settlement and Investment Agreement at least in their current form).  It is axiomatic that material modifications of plans of reorganization require disclosure and re-solicitation.  *See*, *e.g.*, *In re Adelphia Communications Corp.*, 368 B.R. 140, 147 (Bankr. S.D.N.Y. 2007) (holding that re-solicitation is not required for "minor" changes to a plan); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 738 (Bankr. S.D.N.Y. 1992) (same); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 813, 823 (Bankr. M.D.Fla. 2006); *In re Rhead*, 179 B.R. 169, 176 (Bankr. D.Az. 1995) (chapter 11 plan could be modified without new disclosure and re-solicitation of votes, where modified plan did not impact upon or affect rights of any of the objectors); *In re Downtown Inv. Club III*, 89 B.R. 59, 65 (9th Cir. BAP 1988) (material plan modification required formal disclosure statement and court approval).  Re-solicitation is generally required where "(1) the debtor intended to solicit votes from previously dissenting creditors; or (2) if the modification materially and adversely impacted parties who previously voted for the plan."  *In re American Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988).

58.     Here, excising the MDL Settlement from the Plan, a settlement that the Debtors have already characterized as material and necessary to their emergence from chapter 11, would significantly dilute certain creditors and all equity holders' recoveries under the Plan, and in this way, would materially and adversely impact the holders of several classes of claims

and interests, including Lead Plaintiffs and the class. Re-solicitation of these creditors' and interest holders' votes would be required under section 1127 of the Bankruptcy Code and Rule 3019 before the Court could confirm such a modified plan. Given the enormous universe of claimants who received the Debtors' initial solicitation materials and voted on the Plan, re-solicitation would be a costly and time consuming undertaking. The delay associated with having to adjourn the confirmation hearing to re-solicit votes on the Plan could prove disastrous to all creditors.

59.    Accordingly, this factor weighs heavily in favor of approving the MDL Settlement.

### iv.    Other Parties In Interest Support The MDL Settlement (The Fourth *Iridium* Factor).

60.    The Debtors' stakeholders have voted in favor of the Plan. Of the hundreds of thousands of parties-in-interest in these cases, only one small group has objected to the MDL Settlement and only two other creditors have made arguments against confirmation of the Plan that are indirectly relevant to the MDL Settlement. On the other hand, the Statutory Committees, GM, the Plan Investors and all other creditors of the Debtors support the Plan (and by extension the settlements embodied in it) and do not object to the MDL Settlement. The lack of opposition to the MDL Settlement and the support of the Plan by creditors and parties-in-interest are significant facts that the Court should not ignore.

61.    Thus, this factor weighs heavily in favor of approving the MDL Settlement.

### v.    The Competency And Experience Of Counsel Supporting, And The Experience And Knowledge Of The Bankruptcy Court Judge Reviewing, The Settlement Is A Factor That Weighs Heavily In Favor Of Approving The MDL Settlement (The Fifth *Iridium* Factor).

62.    Lead Plaintiffs submit that they and the Debtors have been advised throughout the process by counsel that are competent and experienced with respect to the federal securities laws, and insurance and bankruptcy matters. The Final Approval Order includes

findings concerning the competency of counsel involved in negotiating the MDL Settlement on behalf of the Debtors and Lead Plaintiffs. *See* Final Approval Order (Joint Exhibit 118) at 29-30. Lead Plaintiffs submit, and no party can seriously challenge, that this Court possesses the experience and knowledge necessary to render an informed and appropriate judgment regarding the MDL Settlement. Accordingly, this factor weighs heavily in favor of approving the MDL Settlement.

> **vi.    The Releases Contained In The MDL Settlement Are Necessary And Appropriate (The Sixth *Iridium* Factor).**

63.    The MDL Settlement provides a series of releases by and among Lead Plaintiffs, the Debtors, certain of the current and former officers and directors, certain underwriters of the Debtors' debt securities, and GM and certain of the Debtors' insurers. These releases are a material part of the consideration being exchanged under the MDL Settlement. These releases are also significant to GM. *See* GM Settlement at Art. IV. The releases of the Debtors' current and former officers and directors are therefore necessary.

64.    Lead Plaintiffs understand that the releases were considered and approved by members of the Debtors' board who are not defendants in the Securities Litigation and vetted by a special subcommittee of the board that was approved by board members who are not defendants in the Securities Litigation. *See* Rule 9109 Motion at ¶ 81. *See also In re Adelphia Communications Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) (holding that this factor was of no moment where the "[b]oard members who considered the settlement were wholly disinterested"). Thus, the releases contained in the MDL Settlement are appropriate.

65.    The Goodwin Proctor Objection subtly intimates that the Court should be concerned about collusion or the perception of collusion as a result of the Debtors' approval of the releases contained in the MDL Settlement. *See* Goodwin Proctor Objection at ¶ 18. Any implication that the MDL Settlement is the product of collusion among Lead Plaintiffs and the Debtors (or any other parties) is ludicrous and should be rejected out of hand. As the District Court noted, the MDL Settlement was achieved with the assistance of Judge Phillips, a former

federal district court judge, who is "one of the foremost mediators of complex actions." *See* Final Approval Order (Joint Exhibit 118) at 30. Moreover, the District Court was required to consider whether the MDL Settlement was the product of arm's length negotiation, and it concluded that it was. *Id*.

66.     The Goodwin Proctor Objection also asserts that the Debtors' board of directors may not have focused on the "elevation of priority" of the Section 510(b) Note Claims and the Section 510(b) Equity Claims when it considered and approved the MDL Settlement. *See* Goodwin Proctor Objection at ¶ 19. No support is offered for this assertion and it strains credulity to infer that Debtors' counsel did not discuss this issue with the board of directors. Moreover, this consideration is totally irrelevant to the issue of whether the releases contained in the MDL Settlement are necessary and appropriate. The Court should presume that the board of directors considered this issue when it approved the MDL Settlement.

67.     The Goodwin Proctor Objection also erroneously asserts that the releases set forth in the MDL Settlement are inappropriate because they amount to improper third party releases under section 524 of the Bankruptcy Code. *See* Goodwin Proctor Objection at ¶ 20. They miss the point: the releases in the MDL Settlement are not third party releases; they are releases by Lead Plaintiffs and the class they represent of the Debtors, the Debtors' directors and officers, GM and the other defendants settling with Lead Plaintiffs and the class. No releases are being given other than by parties to the Securities Litigation who are signatories to the MDL Settlement.

68.     Because the releases set forth in the MDL Settlement are necessary and appropriate, and the MDL Settlement would not be possible without the releases, this factor weighs heavily in favor of approving the MDL Settlement.

       **vii.**       **The MDL Settlement Is The Product Of Arm's Length Negotiation (The Seventh *Iridium* Factor).**

69.      There can be no doubt that the MDL Settlement is the product of arms' length negotiation by sophisticated parties represented by competent counsel.  Over the course of several months in 2007, Lead Plaintiffs, the Debtors and other parties, with the assistance of Judge Phillips, who was appointed by the District Court to serve as special master, conducted lengthy and difficult discussions and negotiations regarding the settlement.  The District Court, in the Final Approval Order, concluded that the settlement was arrived at after arms' length bargaining.  Thus, this factor weighs heavily in favor of approving the MDL Settlement.

70.      Based on the weight of the foregoing facts and arguments, it is abundantly clear that each of the *Iridium* factors weighs heavily in favor of the Court's approval of the MDL Settlement.  As a result, the MDL Settlement, consistent with *Iridium*, can and should be approved regardless of any deviation from the absolute priority rule.

## CONCLUSION

71.     For all of the reasons set forth herein, Lead Plaintiffs submit that the MDL
Settlement should be approved by the Court because it is reasonable, fair and equitable to all of
the Debtors' stakeholders, and satisfies all of the criteria required for the approval of settlements
set forth in Rule 9019 and applicable Second Circuit case law.

Dated:  January 16, 2008
        New York, New York

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By:  /s/ *Michael S. Etkin*
Michael S. Etkin, Esq. (ME-0570)
S. Jason Teele, Esq. (ST-7390)
1251 Avenue of the Americas, 18th Floor
New York, New York 10019
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

-- and --

65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:     (973) 597-2500
Facsimile:     (973) 597-2481

*Bankruptcy Counsel for Lead Plaintiffs and the
Class*

**NIX, PATTERSON & ROACH, L.L.P.**
Jeffrey J. Angelovich, Esq.
Bradley E. Beckworth, Esq.
Susan Whatley, Esq.
205 Linda Drive
Daingerfield, Texas 75638
Telephone:     (903) 645-7333

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
John P. Coffey, Esq.
Hannah E. Greeenwald, Esq.
Matthew C. Moehlman, Esq.
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400

**GRANT & EISENHOFER, P.A.**
Stuart M. Grant, Esq.
James J. Sabella, Esq.
485 Lexington Avenue
New York, NY 10017
Telephone:    (646) 722-8500

-- and --

Sharan Nirmul, Esq.
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:    (302) 622-7000

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, L.L.P.**
Michael Yarnoff, Esq.
Sean M. Handler, Esq.
Benjamin J. Hinerfeld, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone:    (610) 667-7056

*Co-Lead Counsel for Lead Plaintiffs and the
Class*