IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

     In re                        :    Chapter 11

                              :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)

                              :

             Debtors.    :    (Jointly Administered)

                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

      I, Elizabeth Adam, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On January 16, 2008, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight mail, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

           Debtors' Objection to Amended Motion of Verizon Services Corp. for Payment of Administrative Expense Claim Pursuant to MobileAria Sale Order (Docket No. 12192) [a copy of which is attached hereto as Exhibit D]

Dated: January 23, 2008

                            */s/ Elizabeth Adam*
                              Elizabeth Adam

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 23rd day of January, 2008, by Elizabeth Adam, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:    */s/ Leanne V. Rehder*

Commission Expires:  *3/2/08*

# EXHIBIT A

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

1/23/2008 11:09 AM
Master Service List Overnight Mail

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Arnall Golden Gregory LLP | Attn Darryl S. Laddin | Attorneys for Verizon Services Corp. | 171 17th Street NW, Suite 2100 | Atlanta | GA | 30363 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/23/2008 2:18 PM
Verizon Special Parties

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein  Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092  212-450-4213 | 212-450-3092  212-450-3213 | donald.bernstein@dpw.com  brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com  karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler  Bonnie Steingart  Vivek Melwani  Jennifer L Rodburg  Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com  sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

1/23/2008 11:09 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

1/23/2008 11:09 AM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1° | Cadiz | | 11006 | Spain | 34 956 226 311 | | adalberto@canadas.com | Representative to DASE |
| Adler Pollock & Sheehan PC | Joseph Avanzato | One Citizens Plz 8th Fl | | Providence | RI | 02903 | | 401-274-7200 | 401-751-0604 | javanzato@apslaw.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Akin Gump Strauss Hauer & Feld, LLP | David M Dunn | 1333 New Hampshire Ave NW | | Washington | DC | 20036 | | 202-887-4000 | 202-887-4288 | ddunn@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Ira S Dizengoff | 590 Madison Ave | | New York | NY | 10022-2524 | | 212-872-1000 | 212-872-1002 | idizengoff@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC, PD George Co, Furukawa Electric Company, Ltd., and Furukawa Electric North America APD, Inc. |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Anthony Ostlund & Baer PA | John B Orenstein | 3600 Wells Fargo Ctr | 90 S 7th St | Minneapolis | MN | 55402 | | 612-349-6969 | 612-349-6996 | jorenstein@aoblaw.com | Attorneys for Whitebox Hedged High Yield Partners, LP |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Balch & Bingham LLP | Eric T. Ray | PO Box 306 | | Birmingham | AL | 35201 | | 205-251-8100 | 205-226-8799 | eray@balch.com | Attorney for Alabama Power Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | 312-984-3150 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitanlange-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitanlange-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Blank Rome LLP | Marc E. Richards | The Chrylser Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Michael A Trentadue Carina M de la Torre | 2700 First Indiana Plz | 135 N Pennsylvania St | Indianapolis | IN | 46204 | | 317-684-5000 | 317-684-5173 | mtrentadue@boselaw.com cdelatorre@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimilliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | 202-862-2400 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston Aaron R. Marcu | 620 Eighth Ave | | New York | NY | 10018 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy S. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | 212-652-3863 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | 212-248-3141 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc. /SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-990-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | ddragich@foley.com | Counsel to Intermet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Garvey Schubert Barer | Roberto Carrillo | 100 Wall St 20th Fl | | New York | NY | 10005 | | 212-965-4511 | 212-334-1278 | rcarrillo@gsblaw.com | Attorney's for Tecnomec S.r.l. |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goodwin Proctor LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel to UGS Corp. |
| Goodwin Proctor LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbeler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., MS 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation; Co Counsel for Yazaki North America, Inc. |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | 212-972-1677 | sgross@hodgsonruss.com | Co-Counsel for Yazaki North America, Inc. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Honigman, Miller, Schwartz and Cohn, LLP | Lawrence J. Murphy | 2290 First National Building | 660 Woodward Ave | Detroit | MI | 48226 | | 313-465-7488 | 313-465-7489 | lmurphy@honigman.com | Attorneys for Guide Corporation and Lightsource Parent Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | 313-465-7627 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa G Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | 248-645-1568 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | 678-384-7034 | lmcbryan@hwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | 312-861-2200 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | 816-960-0411 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Inc. |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | 804-775-1061 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers Law Group, P.C. | Merle C. Meyers | 44 Montgomery Street | Suite 1010 | San Francisco | CA | 94104 | | 415-362-7500 | 415-362-7515 | mmeyers@mlg-pc.com | Counsel to Alps Automotive, Inc. |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.com | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.com | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | 248-786-3596 | jdonahue@miheritage.com | Counsel to Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb, Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | piricotta@mintz.com pricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | 609-777-3055 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Ohio Environmental Protection Agency | c/o Michelle T. Sutter | Principal Assistant Attorney General Environmental Enforcement Section | 30 E Broad St 25th Fl | Columbus | OH | 43215 | | 614-466-2766 | 614-752-2441 | msutter@ag.state.oh.us | Attorney for State of Ohio, Environmental Protection Agency |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszjlaw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Robert J. Feinstein Ilan D. Scharf | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | Rfeinstein@pszjlaw.com Ischarf@pszjlaw.com | Counsel for Essex Group, Inc. |
| Patterson Belknap Webb & Tyler LLP | David W. Dykhouse Phyllis S. Wallitt | 1133 Avenue of the Americas | | New York | NY | 10036-6710 | | 212-336-2000 | 212-336-2222 | dwdykhouse@pbwt.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Paul H. Spaeth Co. LPA | Paul H. Spaeth | 130 W Second St Ste 450 | | Dayton | OH | 45402 | | 937-223-1655 | 937-223-1656 | spaethlaw@phslaw.com | Attorneys for F&G Multi-Slide Inc and F&G Tool & Die Co. Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pietragallo Bosick & Gordon LLP | Richard J. Parks | 54 Buhl Blvd | | Sharon | PA | 16146 | | 724-981-1397 | 724-981-1398 | rjp@pbandg.com | Counsel to Ideal Tool Company, Inc. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadranglegroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Roy Prange | 33 E Main St Ste 900 | | Madison | WI | 53703-3095 | | 608-283-2485 | 608-294-4920 | rlp@quarles.com | Counsel for Flambeau Inc. |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to Russell Reynolds Associates, Inc. Counsel for Pamela Gellar |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | 312-258-5600 | egeekie@schiffhardin.com | Counsel to  Means Industries |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Autommotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | 609-227-4646 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to INA USA, Inc. |
| Squire, Sanders & Dempsey L.L.P. | G. Christopher Meyer | 4900 Key Tower | 127 Public Sq | Cleveland | OH | 44114 | | 216-479-8692 | 216-479-8776 | cmeyer@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | 609-392-7956 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee cp@stevenslee | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 502-587-3400 | 502-779-8274 502-587-6391 | wbeard@stites.com loucourtsum@stites.com | Counsel to WAKO Electronics (USA), Inc.,Ambrake Corporation, and Akebono Corporation (North America) |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 20

1/23/2008 2:19 PM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennessee Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | 81-3-3286-3919 | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Campbell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Clinnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Wickens Herzer Panza Cook & Batista Co | James W Moennich Esq | 35765 Chester Rd | | Avon | OH | 44011-1262 | | 440-930-8000 | 440-930-8098 | jmoennich@wickenslaw.com | Counsel for Delphi Sandusky ESOP |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 20

1/23/2008 2:19 PM
Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | Counsel to Airgas, Inc. |
| Akebono Corporation North America | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | 212-692-8251 | |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | 212-826-8800 | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 4

1/23/2008 2:19 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | Counsel to Tyz-All Plastics, Inc.; Co-Counsel to Tower Automotive, Inc. |
| Dykema Gossett PLLC | Brendan G Best Esq | 39577 Woodward Ave Ste 300 | | Bloomfield Hills | MI | 48304 | 248-203-0523 | Attorneys for Tremond City Barrel Fill PRP Group |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | Counsel to Aluminum International, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel @Road, Inc. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | 248-723-0396 | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | 678-384-7000 | Counsel to Vanguard Distributors, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | 212-556-2100 | Counsel to KPMG LLP |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | Counsel to Entergy |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | Counsel to Entergy |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | 212-906-1200 | UCC Professional |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | Counsel to Siemens Logistics Assembly Systems, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 4

1/23/2008 2:19 PM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | 410-385-3418 | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Pickrel Shaeffer & Ebeling | Sarah B. Carter Esq | 2700 Kettering Tower | | Dayton | OH | 45423 | | |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | 973-621-3200 | Counsel to Jason Incorporated, Sackner Products Division |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | Counsel to Sony Electronics, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | 248-352-4700 | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | Attorneys for Sanders Lead Co., Inc. |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | 714-966-1000 | Counsel to Toshiba America Electronic Components, Inc. |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 4

1/23/2008 2:19 PM
US MAIL

# EXHIBIT D

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Conflicts Counsel for Delphi Corporation, et al.,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Lara Sheikh (LS-0879)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

**Hearing Date: January 25, 2008**
**At:  10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                    :

In re:                     :    Chapter 11
                    :    Case No. 05-44481 [RDD]

DELPHI CORPORATION, *et al.*,  :
                    :    Jointly Administered
          Debtors.    :
                    :
-------------------------------------------------------------x

## DEBTORS' OBJECTION TO AMENDED MOTION OF VERIZON SERVICES CORP. FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO MOBILEARIA SALE ORDER

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), hereby submit this objection (the "Objection") to the Amended Motion

("Amended Motion") of Verizon Services Corp. ("Verizon") for Payment of

Administrative Expense Claim Pursuant to MobileAria Sale Order (the "Motion") and

respectfully represent:

## PRELIMINARY STATEMENT

1.        In its Amended Motion, Verizon asserts a new, previously unasserted claim for Overage Charges.[1]  This new claim is:  (a) late and time barred by the claims bar date (the "Sale Order Bar Date") that was contained in the Court's July 26, 2006 Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing (I) Rejection of Certain Executory Contracts of MobileAria, Inc. And (II) Assumption And Assignment of Certain Executory Contracts of MobileAria, Inc. (the "MobileAria Sale Order"), and (b) beyond and outside of the scope of expressly defined amendment that was permitted by the Court when it considered the Original Motion on November 29, 2007 (the "November 29 Hearing").

2.        Moreover, despite being directed to do so by this Court, Verizon has failed to present any evidence in support of the Misactivation and Overactivation Charges which controverts the Original Absmeier Declaration and the explanations that were submitted by Delphi in its Objection to the Original Motion.

3.        Based upon the foregoing, the Amended Motion should be denied.

## PROCEDURAL BACKGROUND[2]

4.        On June 6, 2006, the Debtors moved (the "MobileAria Sale Motion") for an Order to, among other things, assume and assign certain executory contracts and to sell substantially all of the assets of MobileAria.

---

[1]        Capitalized terms which are not defined herein shall have the meanings set forth in the Debtors' Objection (the "Objection") to Verizon's original Motion (the "Original Motion") For Payment of Administrative Expense Claim Pursuant to MobileAria Sale Order. (Docket No. 10882) and in the Amended Motion.  In addition, the Debtors incorporate herein by reference all of the factual allegations contained in their Objection to the Original Motion and in the declaration of John Absmeier that was submitted therewith.

[2]        A more expansive description of the procedural history of the Debtors' cases and the contractual relationship between MobileAria and Verizon is contained in the Debtors' Objection to the Original Motion, and that history is respectfully incorporated herein by reference.

5.      Verizon objected to the proposed MobileAria Sale Motion and

asserted various claims for damages.  The parties were unable to resolve all of Verizon's

objections prior to the hearing to reconsider the MobileAria Sale Motion.  Consequently,

the Debtors and Verizon negotiated paragraph 42 of the MobileAria Sale Order which

permitted Verizon to seek payment of Schedule 3 Disputes, as defined in the

MobileAria Sale Order, up to an amount of $700,000.[3]  A copy of the MobileAria Sale

Order is annexed hereto as Exhibit "1."  However, Verizon's ability to seek payment of

Schedule 3 Disputes was subject to a defined, agreed upon deadline (the "Sale Order

Bar Date"):

> "In the event that Verizon seeks to recover for charges arising with
> respect to a Schedule 3 Dispute, Verizon shall submit such charges
> to MobileAria within 60 days of this Order (the "Asserted Schedule
> 3 Disputes") or be deemed to waive such Schedule 3 Dispute.

MobileAria Sale Order para. 42(a).

6.      The Court entered the MobileAria Sale Order on July 21, 2006.

7.      After entry of the MobileAria Sale Order, Verizon asserted various

Schedule 3 Disputes to the Debtor.  The $407,228.36 Overage Charges that are described

in the Amended Motion at paragraphs 18-21 and in the Declaration of Margaret L.

Sheppard in support thereof (the "Sheppard Declaration") at paragraphs 22-25 (the

"New Overage Charges Claim") were never submitted or asserted prior to the Sale

Order Bar Date.  See Declaration of John Absmeier, paras. 14-20, annexed hereto as

Exhibit "2."

8.      After more than a year of diligence and attempts by the Debtors to

settle claims and charges that Verizon submitted prior to the Sale Order Bar Date, on

---

[3]      Verizon asserts that the amounts sought in the Original and Amended Motions are Schedule 3
Disputes.

September 25, 2007, Verizon filed its Original Motion for allowance of an administrative

expense claim consisting of, predominantly, "Overage Charges" of $678,579.09.[4]

9.      In its Original Motion Verizon explained that it "incurred a total of

$678,573.09 in additional charges as a result of MobileAria causing more data to be

transmitted over the GPS system that was permitted under the applicable data usage

plan (collectively, the "Overage Charges"), and that those Overage Charges were

caused by MobileAria having initially selected the wrong usage plan for GPS Units.

Original Motion, para. 12.  In its Original Motion, in its subsequent Reply (Docket No.

11025), and at the November 29 Hearing, Verizon repeatedly argued that MobileAria

was liable because MobileAria initially failed to select the appropriate data usage plan

for the GPS Units:

- "At all relevant times, MobileAria itself was responsible for contacting the wireless carrier to set up the data plan for each GPS unit, and was responsible for and controlled the amount of data to and from each GPS unit."  (Original Motion, para. 15);

- "As plainly set forth in the Motion, Verizon clearly communicated to MobileAria at the outset of the project, that the majority of the GPS Units would be activated under a 2 meg plan, and thus required to transmit no more than 2 megabytes of data per month in the course of their operation." (Verizon Reply, para. 5);  and

- "Here, a fundamental specification that was communicated to MobileAria in writing in the order submitted and also in -- at the outset of this contract and before the contract was entered into was that these units needed to stay within two megs of usage.  That was what had been provided to Verizon by its prior supplier . . . It was a fundamental cost component that was in fact provided." (November 29 Hearing Transcript, page 15, annexed hereto as Exhibit "3.")

10.      MobileAria spent considerable time, resources and effort since

entry of the MobileAria Sale Order, and in opposition to the Original Motion, and it

---

[4]      Verizon sought immediate payment of $497,532.61 on account of the Overage Charges, which represented a net sum after credit for amounts previously paid by MobileAria to Verizon on account of other claims that had been timely submitted by Verizon.

concluded and asserted that, among other things, Verizon had never provided any evidence to support its allegations that MobileAria was somehow contractually or otherwise responsible to arrange the wireless service plans with Verizon Wireless Corporation, and that Verizon had failed to identify any contractual or legal basis that could give rise to Verizon's Overage Charges.

11.    Verizon pressed its argument and Overage Charges at the November 29 Hearing.  There, the Court observed that Verizon's Original Motion failed because:  (a) Verizon did not specify the contractual basis for the Overage Charges;  and (b) Verizon did not support its allegations with an affidavit or declaration.

12.    The Court concluded and directed:

> "I'm going to give you one more chance on this because I don't like motions for reargument and rehearing.  This motion is woefully short of any factual support.  But for this argument about specifications, the major claim would be subject to dismissal on the papers because there's nothing in the contract that gives you a right to this except for this definition of specifications. . . . you can make a real motion with the real documents attached as you would to a proof of claim.  And a real affidavit from a real client that lays out the elements of the other claim.  And so we're not spent here just sort of speculating and the debtor doesn't have to go through a discovery process before you've established the elemental basis for asserting a claim in bankruptcy court. . ."

> So again, I really think the focus is on the order or the orders and what they say . . . But the order better be pretty clear as far as what it says if you're going to still pursue this contention that . . . MobileAria obligated itself to cap the megahertz . . . "

November 29 Transcript, pages 20-24.

13.    Verizon failed to follow the Court's direction.  Instead, Verizon asserted an entirely new claim in its Amended Motion, but labeled it "Overage Charges."

14.     The amount and theory of the Overage Charges sought by Verizon has changed since the Original Motion.  In the Original Motion, Verizon represented that the Overage Charges totaled $678,579.09.  In the Amended Motion, Verizon represents that the Overage Charges total $549,929.69.  No explanation for the nearly $130,000 variance is provided in the Amended Motion.

15.     Moreover, the alleged factual basis for the Overage Charges has completely changed.  In the Original Motion, Verizon asserted that the Overage Charges resulted from MobileAria's failure to have selected the 'correct' two-megabyte usage plan ("2 Meg Plan") from Verizon Wireless.  In the Amended Motion, Verizon asserts, for the first time, that $142,701.33 of the Overage Charges arise from MobileAria initially failing to follow SOAFs[5] and that $407,228.36 results from MobileAria's failure to upgrade GPS Units that were initially programmed correctly by MobileAria but which where then moved to a different geographic location.

16.     Verizon's Amended Motion should be denied.  The Amended Motion:  fails to comply with the Court's limited and specific authority for amendment; is outside of the scope of what this Court permitted at the November 29 Hearing;  fails to provide the contractual bases for claims;  and, as demonstrated below, the New Overage Charges Claim is time barred by the MobileAria Sale Order.  Although the Amended Motion is accompanied by a Declaration which mimics the Amended Motion, it also fails to specify the contractual bases for Verizon's claims.[6]

---

[5]     This amount seems to be a new Misactivation Charge that is different from the Misactivation Charge that was asserted in the Original Motion in the amount of $164,672.32.

[6]     Other than quoting the best efforts acknowledgment contained in §18 of the GPS Agreement, the Sheppard Declaration does not contain a single reference to a particular provision of the GPS Agreement to support any of the claims contained in the Amended Motion.

17.    Verizon's Amended Motion is a perpetuation of Verizon's fishing

expedition that leaves the Court and the Debtors speculating what the true bases of

Verizon's claims could be, and permitting it to go forward would require the Debtors to

expend additional time and resources in discovery concerning claims which are not

contractually or factually supported.

**VERIZON'S REQUEST FOR OVERAGE CHARGES IN THE
AMENDED MOTION IS A NEW CLAIM THAT IS TIME BARRED
AND VERIZON'S OTHER CLAIMS FAIL**

18.    For the last 18 months, Verizon strenuously asserted to the Debtors

and to this Court that the Overage Charges resulted from MobileAria's failure to

initially secure the appropriate usage plan from Verizon Wireless.  That argument was

repeated numerous times and the Debtors were required to expend extensive time and

resources to research and defend that claim.

19.    The Court expressly limited Verizon's ability to support its original

claim for Overage Charges with orders (as defined in the GPS Agreement) and a

declaration by a Verizon representative.  Notwithstanding, Verizon failed to comply

with the Court's direction and instead has asserted an entirely new theory and a new

set of factual allegations that do not relate back to the Overage Charges in the Original

Motion, and which were never submitted to MobileAria prior to the Sale Order Bar

Date.

**A.    The New Overage Charges**

20.    Verizon now asserts that Overage Charges include 2 pieces.  First,

$142,701.33 which was "incurred for each misactivated unit because of the failure of

MobileAria to activate the unit on the selected plan."  Amended Motion at para. 17.

21.    Second, Verizon asserts that it incurred at least $407,228.36 of

Overage Charges "as a result of MobileAria failing to change the data usage plan of a

unit that was previously activated on a 2 Meg Plan.  In each such instance, MobileAria

initially had activated the GPS unit on a 2 Meg Plan, but the unit was subsequently

transferred to an area in which Verizon required its GPS units to operate with enhanced

functionality, and thus under the Unlimited Plan."  Amended Motion at para. 18.  These

new factual allegations were never communicated to MobileAria prior to the Amended

Motion.  See Absmeier Declaration, paras. 17-20.  Moreover, these new factual

allegations are entirely outside of the scope of the evidence that this Court demanded at

the November 29 Hearing.

22.    "The Bar Date is critically important to the administration of a

successful chapter 11 case for it is intended 'to be a mechanism for providing the debtor

and creditors with finality.'"  In re Enron Creditors Recovery Corp., 370 B.R. 90, 94

(Bankr. S.D.N.Y. 2007), quoting In re Manville Forest Products Corp., 89 B.R. 358, 374

(Bankr. S.D.N.Y. 1988).

23.    A "claimant may amend a timely claim after the bar date to correct

defects of form, provide more detailed allegations of fact relating to the timely claim, or

plead a new theory of recovery *under the facts set forth in the timely claim.*"  In re Asia

Global Crossing, Ltd., 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (emphasis added);

Integrated Resources, Inc. v. AmeriTrust Co., N.A. (In re Integrated Resources, Inc.), 157

B.R. 66, 70 (S.D.N.Y. 1993);  Enron Corp. 298 B.R. 513, 520 (Bankr. S.D.N.Y. 2003);  In Re

McLean Industries, Inc., 121 B.R. 704, 708, (Bankr. S.D.N.Y. 1990);  In re W. T. Grant Co.,

53 B.R. 417, 420 (Bankr. S.D.N.Y. 1985);  see In re G.L. Miller & Co., 45 F.2d 115, 116 (2d

Cir. 1930).

24.    A claimant "may not, however, through the guise of an

amendment, circumvent the bar date by asserting a new claim."  Id., at 507;  Enron

Corp. 298 B.R. at 520;  In re Drexel Burnham Lambert Group, Inc., 151 B.R. 684, 694

(Bankr. S.D.N.Y. 1993).

25.    Consequently, "the bankruptcy court must examine the proposed

post-bar date amendment to ensure that it amends a timely claim and does not assert a

new claim." In re Asia Global Crossing, 324 B.R. at 507.

26.    "Bar dates would be rendered meaningless if creditors were

granted leave to amend to assert new novel claims based on broad language in a timely-

filed Proof of Claim . . . Instead 'court[s] must subject post-bar date amendments to

careful scrutiny to assure that there was no attempt to file a new claim under the guise

of amendment.'" In re Calpine Corporation, 2007 WL4326738 (Bankr. S.D.N.Y. 2007),

quoting In re Enron Corp. 419 F.3d at 133 (quoting In re Integrated Resources, Inc. 157

B.R. at 70).

27.    A Bankruptcy Court may a permit post-bar date claim amendment

to a timely filed proof of claim, but it must first examine whether there was a timely

assertion of the facts supporting the claim.  In re Calpine, at 4.  A claim relates back to a

timely filed claim if it "(1) corrects a defect of form in the original claim;  (2) describes

the original claim with greater particularity;  or (3) pleads a new theory of recovery of

the facts set forth in the original claim." In re Calpine, at 3.

28.    Only if the "relation back" threshold is satisfied, may Courts

examine whether, based upon the facts of a case, it would be equitable to allow the

amendment.  In re Calpine, at 5.  Here, the Amended Motion, as it pertains to the New

Overage Charges Claim, fails the relation back test.

29.    The New Overage Charges Claim was never submitted to the

Debtors prior to the Sale Order Bar Date.  In fact, Verizon readily acknowledges that it

never timely submitted the New Overage Charges claim to the Debtors and that it was

first researched and developed after November 29, 2007 – after the Court considered the Original Motion and nearly 15 months after the Sale Order Bar Date.  Sheppard Declaration, at para. 25.  Consequently, there was never a timely claim pertaining to the New Overage Charges Claim which could be amended.  On this basis alone, Verizon's New Overage Charges Claim may not be allowed.

30.     Moreover, as to the New Overage Charges Claim, the Amended Motion does not correct a defect of form in the Original Motion and it doesn't arise out of the same conduct or occurrence set forth in the Original Motion.  The New Overage Charges Claim is a new theory based upon completely new allegations of facts. Absmeier Declaration at paras. 17-20.

31.     The Court directed Verizon to correct the Original Motion to support the original Overage Charges by producing orders and real evidence to support Verizon's contention that MobileAria was somehow contractually responsible for selecting the type of usage plan for the GPS Units.  Instead, Verizon has abandoned that theory and has asserted that MobileAria failed to follow SOAF instructions for transferred GPS units, presumably after Verizon selected the type of plan for the GPS Units.  The Amended Motion does not describe the Overage Charges portion of the Original Motion with any greater particularity;  it describes a completely new claim which is not, and cannot be, supported by a citation to any section of the GPS Agreement.

32.     Finally, Verizon cannot argue that the Amended Motion pleads a new theory of recovery for the New Overage Charges Claim on any facts set forth in the Original Motion because Verizon had not even identified alleged facts in support of the New Overage Charges Claim until after the November 29 Hearing.  The Amended

10

Motion sets forth new facts that were not contained in the Original Motion and which were never previously presented to MobileAria. Absmeier Declaration at paras. 17-20.

33.    Verizon's half-hearted assertion that its new theory of recovery arises from the GPS Agreement (Sheppard Declaration, at para. 25) is not sufficient to establish relation back because the Original Motion did not provide the Debtors or the Court with reasonable notice of this new claim. In re Calpine, at 5 ("The fact that the New Claims arise out of the same Indentures is not sufficient to establish relation back because the Original Claims did not provide the Debtors with reasonable notice of their proposed amendment.") The Original Motion did not mention the relocation of GPS Units or Verizon's request to upgrade and/or change the usage plan on those GPS Units. Absmeier Declaration, paras. 17-20. This new theory is both novel and substantively dissimilar to the specific claims made in the Original Motion.

34.    The foregoing amply demonstrates that the New Overage Charges Claim in the Amended Motion does not relate back, and it fails the threshold test that Courts must consider before proceeding to determine whether amended claims may be permitted. Based upon the foregoing alone, the Court should deny the New Overage Charges Claim which has been untimely asserted in the Amended Motion.

35.    Even if, *arguendo*, Verizon somehow prevailed to establish that the New Overage Charges Claim relates back to the Original Motion, this new claim should not be permitted because to do so would be inequitable. In re Calpine, at 4. Courts consider equitable factors when determining whether to allow an amendment:

(i)    Undue prejudice to the opposing parties;

(ii)    Bad faith or dilatory behavior on the part of the claimant;

(ii)    Whether other creditors would receive a windfall were the amendment not allowed;

11

(iv)    Whether other claimants might be harmed or prejudice; and

(v)    The justification for the inability to file the amended claim at the time the original claim was filed.

36.    The "equitable factors" which are relevant herein demonstrate that it would be inequitable to permit Verizon's amended motion.[7]

37.    The Debtors will suffer undue prejudice by allowing Verizon to proceed with the New Overage Charges Claim and discovery related thereto.  A finding a prejudice "can be based on the size of the contested claims and the disruptive effect that allowance of the contested claims would have on the current administration of the estate."  In re Calpine, at 7;  In re Enron Creditors Recovery Corp., 370 B.R. at 101.

38.    The claims asserted by Verizon are administrative expense claims and they are substantial in amount.  Verizon admits that it has had information to support its claims for more than 15 months, and more than 15 months have elapsed since the Sale Order Bar Date.  Sheppard Declaration, at para. 25.

39.    More than 16,700 proofs of claim have been filed in these cases and more than 20 omnibus claim objections have been filed by the Debtors.  Success of the Debtors' Reorganization rests, in part, upon the amount of allowed claims and working capital.  Therefore, allowance of the New Overage Charges Claim could signal the ability for other claimants to amend their proofs of claim at this late date when the Debtors are seeking to effectuate a plan of reorganization.  See, In re Calpine, at 6 (The disruptive effect that allowance of the contested claim would have on the administration of the estate could constitute prejudice);  In re Enron Corp., 419 F.3d at 130 (Courts have also taken into account whether allowance of a late claim would

---

[7]    Bankruptcy Rule 9006 of the Federal Bankruptcy Procedure governs the admission of late-filed new claims, as opposed to amendments.  Verizon filed its new claim as an "Amended Motion." Consequently, Bankruptcy Rule 9006 and the excusable neglect standard contained therein is inapplicable to the Amended Motion.  See, Calpine, supra.

12

jeopardize the success of a reorganization); <u>In re O'Brien Envtl. Energy, Inc.</u>, 188 F.3d

116 (3d Cir. 1999). Allowing Verizon to proceed with the New Overage Charges Claim

would have all of these prejudicial effects upon the Debtors.

       40.    Verizon has failed to offer any justifiable reason why it failed to

assert this New Overage Charge Claim during the last 15 months or when it so

strenuously argued its original Overage Charge theory at the November 29 Hearing.

       41.    Based upon the foregoing, the Debtors assert that the New Overage

Charges Claim does not relate back to the Original Motion, and that even if some

strained argument it could be said to do so, it would be highly prejudicial to allow

Verizon to proceed with that claim.

       42.    Moreover, Verizon has failed to adhere to the Court's express and

limited instructions that would have permitted Verizon to continue to assert the

Misactivation and Overactivation Charges. No evidence or identification of contractual

obligation has been submitted in support of those claims.

       43.    Consequently, the Amended Motion should be denied in its

entirety.

### DEBTORS' PRELIMINARY SUBSTANTIVE
### OBJECTIONS TO VERIZON'S AMENDED MOTION

       44.    The Amended Motion fails for various procedural reasons. In

addition, and preliminarily, the Debtors assert that the claims contained in the

Amended Motion fail for various substantive reasons.

A.  <u>The Misactivation Charges</u>

       45.    Verizon asserts that Overage Charges now includes $142,701.33

arising from MobileAria initially failing to follow SOAFs. In its Original Motion,

Verizon coined this type of claim as "Misactivation Charges," and asserted that those

charges totaled $164,672.32 incurred "as a result of MobileAria failing to activate GPS

Units on the correct data usage plan." Original Motion at para. 19. Verizon fails to

explain the different amounts asserted by Verizon for this claim, and the Debtors

should not have to again analyze or read through thousands of lines of data and

speculate how and why this claim may be valid.

46.     The Debtors responded to the Misactivation Charges in paragraphs

23 and 24 of their Objection to Verizon's Original Motion. The Debtors described that

after analysis of data previously provided by Verizon, MobileAria determined that only

approximately 2% of lines were activated on an erroneous plan. This is consistent with

Schedule 3 of the MobileAria Sale Order: "Units activated with Verizon Wireless on the

wrong plan. $86,017.82. MobileAria to issue check." MobileAria already paid Verizon

$86,000 on account of alleged Misactivation Charges.

47.     At the conclusion of the November 29 Hearing, the Court directed

Verizon to provide evidence in support of the Misactivation Charges that the Debtors

could analyze to understand why the payment that they already made for these charges

was inadequate. November 29 Transcript at page 26. Verizon has failed to do that.

48.     Instead, the documents that are attached as Exhibit "B" to the

Amended Motion in support of the $142,701.33 Misactivation Claims, are the same

documents and information that were provided by Verizon to the Debtors on more than

one occasion prior to the Original Motion. This is particulary troubling because the

Debtors already analyzed four large, separate sets of data that Verizon submitted prior

to the Original Motion in support of Misactivation Charges. Absmeier Declaration,

paras. 25-27. The Debtors analyzed that information, shared their analysis with

Verizon, and paid more than $86,000 to Verizon. Verizon has failed to present any

14

reliable, new evidence upon which the Debtors can rely for this branch of Verizon's

request for relief.  Absmeier Declaration, para. 28.

B.  The New Overage Charges Claim

      49.    The New Overage Charges Claim is entirely new.  However, upon

preliminary review, the Debtors can discern that it has no merit.  SOAFs were not used

to move a vehicle or GPS Unit from one place to another or to upgrade an account.

Consequently, the SOAFs that are attached to the Amended Motion do not support the

New Overage Charges Claim.  Neither the Amended Motion nor the Sheppard

Declaration provide any identification of a contractual obligation for MobileAria to

move or upgrade GPS Units.  Finally, the Midwest units that are indicated in the SOAFs

which are attached Exhibits C-1 and C-2 to the Amended Motion are all first-time

installations, not transfers from Pennsylvania or any other geographic location.

Absmeier Declaration, paras. 18-19, 21-24.  Consequently, on its face, the New Overage

Charges Claim has no merit.

C.  The Overactivation Charges

      50.    Finally, while the Amended Motion provides thousands of lines of

information purportedly in support of Verizon's Overactivation Charges, the Amended

Motion does no more than point a finger to support this branch of its claim.  Verizon

only asserts that "MobileAria easily could have avoided the overactivations by using

proper tracking methods."  Sheppard Declaration, para. 28.  Once more, Verizon has

failed to point to any contractual obligation on the part of MobileAria to undertake

extra-contractual obligations in the event that Verizon failed to make any of its vehicles

available for installations in accordance with Verizon's strict roll-out schedule.

      51.    GPS Units were activated based upon an installation schedule that

was dictated by Verizon and agreed to by MobileAria.  Activation requests were

submitted to Verizon Wireless approximately 48 hours in advance of the scheduled installation date to enable the installers to set up and provision the GPS Units upon installation.  When Verizon's trucks were not available on the agreed installation date, units remained activated until the installation could be rescheduled.  Because deployment was spread out across the United States, and to adhere to Verizon's deployment schedule, it could take several weeks to a few months for an installment to be rescheduled and actually occur.  This caused many GPS Units to be activated but not used for several months.  Absmeier Declaration at paras. 29, 31,32.  Verizon has failed to contradict this explanation by the Debtors.

52.    Verizon continues to assert that it incurred $133,945.20 of Overactivation Charges on account of GPS Units that were activated but were never installed.  The Debtors fully responded to this claim in its Objection and in paragraphs 25 through 29 of Absmeier's Original Declaration.  New in the Amended Motion, however, is Verizon 's arguments that:  (i) many of the Verizon trucks missed their installation appointments because of "weather conditions that posed a safety hazard to the installers";  and (ii) "MobileAria simply could have exhausted any unused account numbers from the previous night or nights and requested new account numbers sufficient to meet only the deficit needed for the specific installations on the particular night."  See Amended Motion, paras. 22-23, Sheppard Declaration paras. 27-30.

53.    The Debtors are not aware of any weather conditions that posed a safety hazard to MobileAria's installers which would have caused Verizon trucks to have missed their scheduled appointments, and this is a new allegation by Verizon.  The Debtors records indicate that at most, 57 installation appointents were delayed because of cold condidtions that could have effected antenna sealing applications;  and

16

57 missed installlations represents less than .4% of the installations that occurred before

MobileAria was sold.  Absmeier Declaration, para. 30.

54.    Moreover, MobileAria was contractually obligated to follow

Verizon's strict roll-out schedule and committed to activate and install approximately

1,000 GPS Units per week during the deployment period.  Activations were submitted

to Verizon Wireless by MobileAria pursuant to Verizon's instructions and according to

the roll-out schedule that Verizon dicatated.  Absmeier Declaration, para. 31.

55.    Activation requests were submitted to Verizon Wireless

approximately 48 hours in advance of the scheduled installation date in order for the

installers to be able to set up and provision the GPS Units upon installation.  Absmeier

Declaration, para 32.  MobileAria could not simply use devices that were activated the

night before because the garage locations were often distant from each other, so that

hardware could not be transported throughout the country by installers as they flew or

drove to the next installation site.  Absmeier Declaration, para. 33.

56.    Verizon cannot reasonably suggest that GPS Units which were

activated, but which could not be installed because their trucks missed their scheduled

appointment, could have easily and seamlessly transferred throughout the country to

meet and modify Verizon's strict roll-out program.  That scenario would have been

unworkable and MobileAria was not contractually obligated to undertake that task.

Absmeier Declaration, para. 34.

57.    Moreover, Verizon has failed to controvert that based upon the

Debtors' prior analysis of the documents provided by Verizon in support of the

Overactivation Charges, at least $33,972.33 in alleged Overactivation Charges were

actually on account of lines with data usage.  A GPS unit cannot reflect data usage

unless it is both installed and powered on.  Consequently, it is apparent that many of

17

the GPS Units that Verizon included in this group could not have caused overactivation charges. Absmeier Original Declaration, para. 28.

58.    Notwithstanding Verizon's apparent responsibility for the bulk of the Overactivation Charges and the resulting damages suffered by MobileAria, as a customer courtesy, MobileAria paid Verizon $39,300 on account of a total of 1,309 spare and activated GPS Units that were not deactivated. Verizon has failed to articulate any basis in the Amended Motion to explain how the amount paid by MobileAria on account of 1,309 spare and activated GPS Units could be increased to $133,945.20 for only 1,151 GPS Unit accounts. Absmeier Declaration, para. 37.

59.    Based upon all of the foregoing, the claims asserted in the Amended Motion have no evidentiary support or merit, and the Amended Motion should be denied.

## Reservation of Rights

60.    The Debtors' submission of this Objection is without prejudice to (a) the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expunction, reduction, or reclassification of the Claims asserted in the Original and Amended Motions; (b) the Debtors' right to later identify additional documentation supporting disallowance, expunction, reduction, or reclassification; and (c) the Debtors' right to seek reimbursement for overpayments made to Verizon or other damages suffered by the Debtors on account of the GPS Agreement and continued litigation of baseless claims.

61.    The legal authorities upon which the Debtors rely are set forth with specificity above. Consequently, the Debtors respectfully request that this Court dispense with the requirement of any separate memorandum of law in support hereof.

Notwithstanding, the Debtors reserve the right to submit a separate memorandum of law in support hereof.

WHEREFORE, the Debtors respectfully request that the Court disallow and deny the Amended Motion, and grant such other and further relief as is just and appropriate.

Dated:   New York, New York
         January 16, 2008

                                        DELPHI CORPORATION, *et al.*
                                        By their attorneys,
                                        TOGUT, SEGAL & SEGAL LLP
                                        By:

                                        /s/ Neil Berger
                                        ALBERT TOGUT (AT-9759)
                                        NEIL BERGER (NB-3599)
                                        Members of the Firm
                                        One Penn Plaza
                                        New York, New York 10119
                                        (212) 594-5000

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                        :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

ORDER UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL OF ASSETS OF
MOBILEARIA, INC. FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES</u>

("MOBILEARIA SALE ORDER")

Upon the motion, dated June 6, 2006 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11 U.S.C. §§ 363 and

365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) approving (i) bidding procedures, (ii)

the granting of certain bid protections, (iii) the form and manner of sale notices, and (iv) the

setting of a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the

"Sale") of certain of the Debtors' assets (the "Acquired Assets") comprising substantially all of

the assets of MobileAria, Inc. ("MobileAria") free and clear of liens, claims and encumbrances to

Wireless Matrix USA, Inc. (the "Purchaser") pursuant to the Asset Sale and Purchase Agreement

dated June 6, 2006 by and between MobileAria and the Purchaser (as amended on the record at

the auction held on July 6, 2006 to, <u>inter alia</u>, increase the cash consideration to be provided by

the Purchaser to $11.2 million, the "Agreement"),[1] or to the party submitting the highest or

otherwise best bid (the "Successful Bidder") at the auction held on July 6, 2006 (the "Auction"),

(ii) the assumption and assignment of certain executory contracts and unexpired leases (including

the Post-Petition Contracts) (the "Assigned Contracts") to the Purchaser or the Successful

Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchaser

or the Successful Bidder; and the Court having entered an order on June 22, 2006 (the "Bidding

Procedures Order") approving (a) bidding procedures, (b) the granting of certain bid protections,

(c) the form and manner of sale notices, and (d) the setting of the Sale Hearing; and the Auction

having been held on July 6, 2006; and the Sale Hearing having been held on July 19, 2006, at

which time all interested parties were offered an opportunity to be heard with respect to the

Motion; and the Court having reviewed and considered (x) the Motion, (y) the objections thereto,

all of which have been resolved, (z) the arguments of counsel made, and the evidence proffered

or adduced, at the Sale Hearing; and it appearing that the relief requested in the Motion is in the

best interests of MobileAria, its estate, its creditors, and all other parties in interest; and the Court

having considered the arguments of counsel at the Sale Hearing; and upon the record of the Sale

Hearing; and after due deliberation thereon, and sufficient cause appearing therefor,

     IT IS HEREBY FOUND AND DETERMINED THAT:[2]

     A.    The Court has jurisdiction over the Motion and the transactions

contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.  A true and correct copy of the Agreement is attached hereto as <u>Schedule 1</u>.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  <u>See</u> Fed. R. Bankr. P. 7052.

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections

363 and 365 of 11 U.S.C. §§ 101-1330, as in effect on October 14, 2005 (the "Bankruptcy

Code"), and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014.

C.      As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and

sufficient notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment of the

Assigned Contracts, and the Cure Amounts has been provided in accordance with 11 U.S.C. §§

102(l), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, (ii) such notice was good

and sufficient, and appropriate under the particular circumstances, and (iii) no other or further

notice of the Motion, the Sale Hearing, the Sale or the assumption and assignment of the

Assigned Contracts is or shall be required.

D.      As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

Hearing, MobileAria has marketed the Acquired Assets and conducted the sale process in

compliance with the Bidding Procedures Order, and the Auction was duly noticed and conducted

in a non-collusive, fair, and good faith manner.

E.      MobileAria (i) has full corporate power and authority to execute the

Agreement and all other documents contemplated thereby, and the transfer and conveyance of

the Acquired Assets by MobileAria has been duly and validly authorized by all necessary

corporate action of MobileAria, (ii) has all of the corporate power and authority necessary to

consummate the transactions contemplated by the Agreement, and (iii) has taken all corporate

3

action necessary to authorize and approve the Agreement and the consummation by MobileAria

of the transactions contemplated thereby, and no consents or approvals, other than those

expressly provided for in the Agreement, are required for MobileAria to consummate such

transactions.

F.    MobileAria has demonstrated both (i) good, sufficient, and sound business

purpose and justification for the Sale, because, among other things, MobileAria and its advisors

diligently and in good faith analyzed all other available options in connection with the

disposition of the Acquired Assets and determined that the terms and conditions set forth in the

Agreement, and the transfer to Purchaser of the Acquired Assets pursuant thereto, represent a fair

and reasonable purchase price and constitute the highest or otherwise best value obtainable for

the Acquired Assets and (ii) compelling circumstances for the Sale pursuant to 11 U.S.C. §

363(b) prior to, and outside of, a plan of reorganization in that, among other things, absent the

Sale the value of the Acquired Assets will be substantially diminished.

G.    A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including

without limitation: (i) the Office of the United States Trustee for the Southern District of New

York, (ii) counsel for the Purchaser, (iii) counsel for @Road, Inc., (iv) counsel for the Official

Committee of Unsecured Creditors appointed in the above-captioned chapter 11 cases (the

"Creditors' Committee"), (v) counsel for the Official Committee of Equity Security Holders

appointed in the above-captioned chapter 11 cases, (vi) all entities known to have expressed an

interest in a transaction with respect to the Acquired Assets during the past six months, (vii) all

entities known to have asserted any Interests or Claims (as defined below) in or upon the

Acquired Assets, (viii) all federal, state, and local regulatory or taxing authorities or recording

offices, including but not limited to environmental regulatory authorities, which have a

reasonably known interest in the relief requested by the Motion, (ix) all parties to Assigned

Contracts, (x) the United States Attorney's office, (xi) the United States Department of Justice,

(xii) the Securities and Exchange Commission, (xiii) the Internal Revenue Service, (xiv) all

entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket

No. 2883) (the "Supplemental Case Management Order")) and such other entities that are

required to be served with notices under the Supplemental Case Management Order.

        H.      The Purchaser is not an "insider" of any of the Debtors, as that term is

defined in 11 U.S.C. § 101(31).

        I.      The Agreement was negotiated, proposed, and entered into by MobileAria

and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

Neither MobileAria nor the Purchaser has engaged in any conduct that would cause or permit the

Sale to be avoidable under 11 U.S.C. § 363(n).

        J.      The Purchaser is a good faith purchaser under 11 U.S.C. § 363(m) and, as

such, is entitled to all of the protections afforded thereby.  The Purchaser is acting in good faith

within the meaning of 11 U.S.C. § 363(m) in undertaking the transactions contemplated by the

Agreement.

        K.      The consideration provided by the Purchaser for the transfer of the

Acquired Assets and the assignment of the Assigned Contracts pursuant to the Agreement (i) is

fair and reasonable, (ii) is the highest or otherwise best offer for the Acquired Assets, (iii) will

provide a greater recovery for MobileAria's creditors than would be provided by any other

practical available alternative, the Debtors having reserved, however, all of the rights against

@Road, Inc., and (iv) constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the

District of Columbia.  Such transfers and assignments constitute transfers and assignments for

reasonably equivalent value and fair consideration.

L.      The Sale must be approved and consummated promptly to preserve the

viability of MobileAria as a going concern.  A prompt Sale of the Acquired Assets is the best

way to maximize value for the MobileAria's estate and creditors.

M.      With the exception of the Assumed Liabilities, the transfer of the Acquired

Assets and the assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement

will be a legal, valid, and effective transfer of the Acquired Assets and assignment of the

Assigned Contracts, and will vest the Purchaser with all right, title, and interest to the Acquired

Assets and all rights related to the Assigned Contracts free and clear of any and all liens, claims,

interests, and encumbrances of any type whatsoever (whether known or unknown, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or

unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent,

liquidated or unliquidated, matured or unmatured, material or non-material, disputed or

undisputed, whether arising prior to or subsequent to October 14, 2005, and whether imposed by

agreement, understanding, law, equity, or otherwise, including claims otherwise arising under

doctrines of successor liability), including, but not limited to those (i) that purport to give to any

party a right or option to effect any forfeiture, modification, right of first refusal, or termination

of MobileAria's or the Purchaser's interest in the Acquired Assets, or any similar rights, and (ii)

relating to taxes arising under or out of, in connection with, or in any way relating to the

operation of MobileAria's business prior to the transfer of the Acquired Assets to the Purchaser

(collectively, the "Interests and/or Claims").

N.    If the Sale of the Acquired Assets were not free and clear of all Interests

and/or Claims as set forth in the Agreement and this Sale Order, or if the Purchaser would, or in

the future could, be liable for any of the Interests and/or Claims as set forth in the Agreement and

this Sale Order, including, without limitation, the Retained Liabilities, the Purchaser would not

have entered into the Agreement and would not consummate the Sale or the transactions

contemplated by the Agreement, thus adversely affecting MobileAria, its estate, and its creditors.

O.    MobileAria may sell its interests in the Acquired Assets free and clear of

all Interests and/or Claims because, in each case, one or more of the standards set forth in 11

U.S.C. § 363(f)(1)-(5) has been satisfied.  Those (i) holders of Interests and/or Claims and (ii)

non-debtor parties to the Assigned Contracts who did not object, or who withdrew, settled, or

otherwise resolved their objections, to the Sale, the Motion, or the assumption and assignments

of Assigned Contracts contemplated by the Agreement and the Motion, are deemed to have

consented to the Sale, to such assumption and assignments, and to the other transactions

contemplated in the Agreement, pursuant to 11 U.S.C. §§ 363(f)(2) and 365(c).  Those (i)

holders of Interests and/or Claims and (ii) non-debtor parties to Assigned Contracts who did

object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately

protected by having their Interests and/or Claims, if any, attach to the cash proceeds of the Sale

ultimately attributable to the property against or in which they claim an Interest or Claim.

P.    The (i) transfer of the Acquired Assets to the Purchaser and (ii)

assumption and assignment to the Purchaser of the Assigned Contracts and Assumed Liabilities

will not subject the Purchaser to any liability whatsoever with respect to the operation of the

Business prior to the Closing Date or by reason of such transfer under the laws of the United

States, any state, territory, or possession thereof, or the District of Columbia based, in whole or

in part, directly or indirectly, on any theory of law or equity, including, without limitation, any

theory of equitable law, including, without limitation, any theory of antitrust or successor or

transferee liability.

Q.    MobileAria has demonstrated that it is an exercise of its sound business

judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the

consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in

the best interests of MobileAria, its estate, and its creditors.  The Assigned Contracts being

assigned to, and the liabilities being assumed by, the Purchaser are an integral part of the

Business and the Acquired Assets being purchased by the Purchaser and, accordingly, such

assumption and assignment of Assigned Contracts and liabilities are reasonable, enhance the

value of MobileAria's estate, and do not constitute unfair discrimination.

R.    MobileAria has (i) cured, or has provided adequate assurance of cure, of

any monetary or non-monetary default existing prior to the Closing Date under any of the

Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts

provided on Schedule 2 hereto, and (ii) provided compensation or adequate assurance of

compensation to any party for any actual pecuniary loss to such party resulting from a default

prior to the date hereof under any of the Assigned Contracts, within the meaning of 11 U.S.C. §

365(b)(1)(B) (the "Cure").  Further, the Purchaser has provided adequate assurance of its future

performance of and under the Assigned Contracts, within the meaning of 11 U.S.C. §§

365(b)(1)(C) and 365(f)(2)(B).  The Court hereby finds that the Assigned Contracts to be

assumed and assigned under the Agreement shall be assigned and transferred to, and remain in

8

full force and effect for the benefit of Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer, pursuant to 11 U.S.C. § 365(f).

S.    Approval of the Agreement and consummation of the Sale of the Acquired Assets and assignment of the Assigned Contracts at this time are in the best interests of MobileAria, its creditors, its estate, and other parties in interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

<u>General Provisions</u>

1.    The Motion is GRANTED.

2.    All objections to the Motion or the relief requested therein, including, without limitation, objections to the Sale, any Cures or Cure Amounts, or the assumption and assignment of the Assigned Contracts, that have not been withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits.

<u>Approval Of The Agreement</u>

3.    Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and conditions thereof are hereby approved.

4.    Pursuant to 11 U.S.C. § 363(b), MobileAria is authorized and directed to perform its obligations under the Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement.

5.    Each of the signatories to the Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Sale Order.

6.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession, the Acquired Assets and the Assigned Contracts, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement.

7.      This Sale Order and the Agreement shall be binding in all respects upon all creditors (whether known or unknown) of MobileAria, the Purchaser, all successors and assigns of the Purchaser and MobileAria, all affiliates and subsidiaries of the Purchaser and MobileAria, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Sale Order is inconsistent with the terms of the Agreement, this Sale Order shall govern.

8.      The Agreement and any related agreements, documents, or other instruments, including, without limitation, the Ancillary Agreements, may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material.

## Sale And Transfer Of The Acquired Assets

9.      Except as expressly permitted or otherwise specifically provided for in the Agreement or this Sale Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of the Agreement, the Acquired Assets shall be transferred to the Purchaser free

10

and clear of all Interests and/or Claims of any kind or nature whatsoever, with all such Interests and/or Claims to attach to the cash proceeds of the Sale in the order of their priority, with the same validity, force, and effect which they now have as against the Acquired Assets, subject to any claims and defenses MobileAria may possess with respect thereto.

10.     The transfer of the Acquired Assets and the assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and assignment of the Assigned Contracts , and shall vest the Purchaser with all right, title, and interest in and to the Acquired Assets and the assignment of the Assigned Contracts free and clear of all Interests and/or Claims of any kind or nature whatsoever, including without limitation, any Interests or Claims held by any of the Debtors, their affiliates, their affiliates' creditors, vendors, suppliers, customers, employees or lessors and any other person (collectively, "Claimants").  Purchaser shall not be liable in any way (as assignee, successor entity, or otherwise) for any Interests or Claims that any Claimant or other third party may have against MobileAria or its affiliates, or the Business, or under any Assigned Contract.

11.     If any person or entity which has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests or Claims against or in the Acquired Assets shall not have delivered the foregoing to MobileAria prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Acquired Assets, or otherwise, then (a) MobileAria is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Purchaser is hereby

11

authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once

filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all

Interests and/or Claims in the Acquired Assets of any kind or nature whatsoever.

12.    This Sale Order (a) shall be effective as a determination that, upon the

Closing Date, all Interests and/or Claims of any kind or nature whatsoever existing as to

MobileAria, the Acquired Assets, or the Assigned Contracts prior to the Closing Date have been

unconditionally released, discharged, and terminated (other than any surviving obligations), and

that the conveyances described herein have been effected and (b) shall be binding upon and shall

govern the acts of all entities including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register, or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Acquired Assets.

13.    Except as expressly permitted or otherwise specifically provided by the

Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade, and other creditors, holding Interests or Claims of any kind or nature whatsoever against or

in MobileAria or the Acquired Assets or the Assigned Contracts (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or non-contingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to, MobileAria,

the Acquired Assets, the Assigned Contracts, the operation of the Business prior to the Closing

Date, or the transfer of the Acquired Assets and the Assigned Contracts to the Purchaser, hereby

are forever barred from asserting against the Purchaser, its successor or assign, its property, the

Acquired Assets or the Assigned Contracts, such persons' or entities' Interests or Claims.

14.    Upon the consummation of the transactions contemplated by the

Agreement, the Purchaser shall not be deemed to (a) be the successor of MobileAria, (b) have, de

facto, or otherwise, merged with or into MobileAria, (c) be a mere continuation or substantial

continuation of MobileAria or the enterprise(s) of MobileAria, or (d) be liable for any acts or

omissions of MobileAria in the conduct of the Business.

Assumption And Assignment To The Purchaser Of The Assigned Contracts

15.    Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned

upon the Closing Date, MobileAria's assumption and assignment to the Purchaser, and the

Purchaser's assumption on the terms set forth in the Agreement, of the Assigned Contracts is

hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with respect thereto

are hereby deemed satisfied.

16.    MobileAria is hereby authorized and directed in accordance with 11

U.S.C. §§ 105(a), 363, and 365 to (a) assume and assign to the Purchaser, effective upon the

Closing Date, the Assigned Contracts free and clear of all Interests and/or Claims of any kind or

nature whatsoever and (b) execute and deliver to the Purchaser such documents or other

instruments as may be necessary to assign and transfer the Assigned Contracts and Assumed

Liabilities to the Purchaser.

17.    The Assigned Contracts shall be transferred to, and remain in full force

and effect for the benefit of, the Purchaser in accordance with their respective terms,

notwithstanding any provision in any such Assigned Contract (including those of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or

conditions such assignment or transfer, and, pursuant to 11 U.S.C. § 365(k), MobileAria shall be

relieved from any further liability with respect to the Assigned Contracts after such assignment

to and assumption by the Purchaser, except for the Cure of any defaults required to be cured by

MobileAria pursuant to 11 U.S.C. § 365(b) as expressly provided herein.

18.    All monetary or non-monetary defaults or other obligations of MobileAria

under the Assigned Contracts (including, without limitation, any Cure obligations) subsequently

arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or

any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall

be cured by MobileAria on or before the Closing Date or as soon thereafter as practicable, and

the Purchaser shall have no liability or obligation with respect to any Interest or Claim arising

from any Assigned Contract that arose or accrued prior to the Closing Date (including, without

limitation, any Cure obligations), except as otherwise expressly provided in the Agreement.

Each non-debtor party to any Assigned Contracts is deemed to have consented to the assumption

and assignment of the Assigned Contracts to Purchaser and is forever barred from asserting any

default existing as of the date of the Closing or any purported written or oral modification to the

Assigned Contracts.

19.    Each non-Debtor party to an Assigned Contract hereby is forever barred,

estopped, and permanently enjoined from (a) asserting against MobileAria or the Purchaser, or

the property of either of them, any default existing, arising or accruing on or before the Closing

Date, (b) asserting against the Purchaser any counterclaim, defense, setoff or any other Interest

or Claim asserted or assertable against MobileAria, and (c) imposing or charging against

14

Purchaser any rent accelerations, assignment fees, increases or any other fees as a result of MobileAria's assumption and assignment to Purchaser of the Assigned Contracts.  The validity of the assumption and assignment of the Assigned Contracts shall not be affected by any dispute between MobileAria or any of its affiliates and any non-debtor party to an Assigned Contract.

20.    The failure of MoblieAria or the Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of MobileAria's and Puchaser's rights to enforce every term and condition of the Assigned Contracts.

<u>Additional Provisions</u>

21.    The consideration provided by the Purchaser for the Acquired Assets under the Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, and any state, territory, possession, or the District of Columbia.

22.    Upon the occurrence of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Acquired Assets and Assigned Contracts or a bill of sale transferring good and marketable title in such Acquired Assets and Assigned Contracts to the Purchaser on pursuant to the terms of the Agreement.

23.    Except as otherwise provided in the Agreement, upon the Closing Date, each of MobileAria's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Interests and/or Claims against the

15

Acquired Assets and the Assigned Contracts, if any, as may have been recorded or may

otherwise exist.

24.       Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Agreement.

25.       All entities who are currently, or as of the Closing Date may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Agreement are hereby directed to surrender possession of the Acquired Assets to the

Purchaser upon the occurrence of the Closing Date.

26.       The Purchaser shall have no liability or responsibility for any liability or

other obligation of MobileAria arising under or related to the Acquired Assets or the Assigned

Contracts other than for the Assumed Liabilities.  Without limiting the generality of the

foregoing, and except as otherwise specifically provided herein and in the Agreement, the

Purchaser shall not be liable for any Interests or Claims against MobileAria or any of its

predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any

kind or character whether known or unknown as of the Closing Date, now existing or hereafter

arising, whether fixed or contingent, with respect to MobileAria or any obligations of

MobileAria arising prior to the Closing Date, including, but not limited to, liabilities on account

of any taxes arising, accruing, or payable under, out of, in connection with, or in any way

relating to the operation of the Business prior to the Closing Date.

27.       Any amounts that become payable by MobileAria pursuant to the

Agreement or any Ancillary Agreement shall (a) constitute administrative expenses of

MobileAria's estate under 11 U.S.C. §§ 503(b) and 507(a)(1), and (b) be immediately payable if and when such obligation to pay or bear such amount shall arise under the Agreement, without any further order of this Court.

28.    Purchaser shall not be liable, either directly or indirectly, as purchaser, successor, transferee, assignee or otherwise, for any liabilities of or any Interest or Claim against or in MobileAria or any of its affiliates (whether under federal or state law or otherwise).  Under no circumstances shall the Purchaser be deemed a successor of or to MobileAria for any Interest or Claim against or in MobileAria or the Acquired Assets of any kind or nature whatsoever.  The sale, transfer, assignment, and delivery of the Acquired Assets shall not be subject to any Interests or Claims, and Interests or Claims of any kind or nature whatsoever shall remain with, and continue to be obligations of, MobileAria.  All persons holding Interests or Claims against or in MobileAria or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or Claims of any kind or nature whatsoever against the Purchaser, its property, its successors and assigns, the Acquired Assets, or the Assigned Contracts with respect to any Interest or Claim of any kind or nature whatsoever such person or entity had, has, or may have against or in MobileAria, its estate, its officers, its directors, its shareholders, the Acquired Assets, or the Assigned Contracts.

29.    Nothing contained in any plan of reorganization confirmed in the above-captioned cases or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Agreement or the terms of this Sale Order.

30.    The transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the

17

Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization

provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the

Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.  The

Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the

protections afforded by section 363(m) of the Bankruptcy Code.

31.     The consideration provided by the Purchaser for the Acquired Assets

under the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n)

of the Bankruptcy Code.

32.     MobileAria, including, but not limited to, its officers, employees, and

agents, is hereby authorized to execute such documents and do such acts as are necessary or

desirable to carry out the transactions contemplated by the terms and conditions of the

Agreement and this Sale Order.  MobileAria shall be, and it hereby is, authorized to take all such

actions as may be necessary to effectuate the terms of this Sale Order.

33.     The terms and provisions of the Agreement and this Sale Order shall be

binding in all respects upon, and shall inure to the benefit of, MobileAria, its estates, and its

creditors, the Purchaser, and its respective affiliates, successors, and assigns, and any affected

third parties, including, but not limited to, all persons asserting an Interest or Claim in the

Acquired Assets to be sold to the Purchaser pursuant to the Agreement, notwithstanding any

subsequent appointment of any trustee, party, entity, or other fiduciary under any section of any

chapter of the Bankruptcy Code, as to which trustee, party, entity, or other fiduciary such terms

and provisions likewise shall be binding.

34.    Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of MobileAria's estate, such as funds that are trust funds under any applicable state lien laws.

35.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

36.    The failure specifically to include or to reference any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

37.    The provisions of this Sale Order are nonseverable and mutually dependent.

38.    Nothing in this Sale Order shall alter or amend the Agreement and the obligations of MobileAria and the Purchaser thereunder.

39.    This Court retains exclusive jurisdiction to interpret, construe, enforce and implement the terms and provisions of this Sale Order, the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith (including the Ancillary Agreements) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets and assignment of the Assigned Contracts to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed to MobileAria pursuant to the Agreement, (c) resolve any disputes arising

19

under or related to the Agreement, except as otherwise provided therein, (d) interpret,

implement, and enforce the provisions of this Sale Order, (e) protect the Purchaser against any

Interests and/or Claims against MobileAria or the Acquired Assets, of any kind or nature

whatsoever, attaching to the proceeds of the Sale and (f) determine all disputes among

MobileAria, the Purchaser and any non-debtor parties to any Assigned Contract concerning, <u>inter</u>

<u>alia</u>, MobileAria's assumption and assignment of any Assigned Contract to Purchaser under the

Agreement.

40.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

41.    Pursuant to the terms of the Agreement and the Bidding Procedures Order,

MoblieAria shall credit the Purchaser the amount of one hundred ninety-five thousand dollars

($195,000.00) against the $11,200,000 cash consideration to be provided to MobileAria at

Closing, after which credit Purchaser shall have no right to the Break-Up Fee.

Verizon Contract

42.    Notwithstanding any other provision of this Sale Order, the following

shall apply with respect to the assumption of the Verizon Contract and the assignment of the

Verizon Contract to the Purchaser:

(a)    Verizon has asserted that MobileAria is responsible for the payment of certain

charges and other liabilities, as more particularly identified in <u>Schedule 3</u> hereto,

including, without limitation, all charges that have arisen prior to the date of this

Order associated with alleged errors that may have resulted in inaccurate billings

20

to Verizon (the "Schedule 3 Disputes"), in the amount of up to $700,000. Any

amounts paid by MobileAria with respect to the Schedule 3 Disputes shall be

credited to the $700,000. Verizon and MobileAria shall each work in good faith

during the next 60 days to attempt to resolve these matters. In the event that

Verizon seeks to recover for charges arising with respect to a Schedule 3 Dispute,

Verizon shall submit such charges to MobileAria within 60 days of the date of

this Order ("Asserted Schedule 3 Disputes") or be deemed to have waived such

Schedule 3 Dispute. If either MobileAria or Verizon reasonably determines that

the disputes described on Schedule 3 or with respect to the Asserted Schedule 3

Disputes cannot be resolved consensually, MobileAria or Verizon may seek this

Court's determination of same. The Purchaser shall not be liable to Verizon for

all or any portion of the alleged amounts due that are described in this

subparagraph. Any and all amounts due and owing from MobileAria to Verizon

pursuant to this subparagraph (a) shall constitute administrative expenses of

MobileAria's estate under 11 U.S.C. §§ 503(b) and 507(a)(1) without further

order of the Court with priority over claims of MobileAria's affiliates.

(b)     Other than warranty and indemnity obligations as referred to in subparagraph (c)

below, with respect to any defaults under the Verizon Contract that are not known

as of the date of this Sale Order, after reasonable investigation, and are not

matters of the types that constitute Schedule 3 Disputes (collectively, the

"Previously Unasserted Pre-Closing Defaults"), MobileAria shall be responsible

for such Previously Unasserted Pre-Closing Defaults under the Verizon Contract

up to the sum of $1,000,000. Verizon shall have one year from the Closing to

21

assert any Previously Unasserted Pre-Closing Defaults (such then-asserted claims, the "Category 2 Claims").  If MobileAria or Verizon reasonably determines that the Category 2 Claims cannot be resolved consensually, MobileAria or Verizon may seek this Court's determination of same.  Any and all amounts due and owing from MobileAria to Verizon pursuant to this subparagraph (b) shall constitute administrative expenses of MobileAria's estate under 11 U.S.C. §§ 503(b) and 507(a)(1) without further order of the Court with priority over claims of MobileAria's affiliates.

(c)     The Purchaser agrees to perform the warranty and indemnity obligations set forth in the Verizon Contract.

(d)     With respect to any future obligations that arise subsequent to the Closing, the Purchaser shall perform such future obligations as and when they become due.

(e)     Verizon hereby withdraws its Objection Of Verizon Services Corp. To Assumption And Assignment Of Executory Contracts In Connection With Motion Of Debtors For An Order Authorizing And Approving (i) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. Free And Clear Of Liens, Claims And Encumbrances, (ii) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (iii) Assumption Of Certain Liabilities (the "Objection") with prejudice and agrees that, should Verizon seek to terminate the Verizon Contract for convenience pursuant to the terms thereof, each of the Purchaser and MobileAria shall be relieved from all of their obligations under this paragraph 43.

22

(f)      Certain of the Schedule 3 Disputes involve assertions by Verizon that, as of the

date hereof, MobileAria has not completed certain repairs and other work due

under the Verizon Contract ("WIP").  If MobileAria is unable to or fails to

complete any or all of the WIP, then Purchaser shall be obligated to promptly

complete such WIP in a commercially-reasonable manner.   Purchaser shall seek

payment of its reasonable actual out-of-pocket costs and expenses attributable to

Purchaser's performance of WIP, including, but not limited to Purchaser's direct

labor costs ("WIP Costs").   Mobile Aria shall deliver to the Escrow Agent the

sum of $100,000 to pay the estimated WIP Costs ("WIP Escrow").   Purchaser

may periodically deliver to the Escrow Agent and Mobile Aria invoices related to

WIP Costs.  The Escrow Agent shall pay all invoiced WIP Costs ten (10) days

after its receipt of the invoices from the WIP Escrow, provided, however, Mobile

Aria does not object, in good faith, in detail and in writing to some or a portion of

the invoiced WIP Costs.   The Escrow Agent shall promptly pay all undisputed

WIP Costs.   In the event of a dispute, the parties shall try to work out their

differences consensually.  If either the Purchaser or MobileAria reasonably

determines that a WIP Cost dispute cannot be resolved consensually, the

Purchaser or MobileAria may seek this Court's determination of same.  Any and

all invoiced amounts due and owing from MobileAria to Purchaser pursuant to

this paragraph 43(f) shall constitute administrative expenses of MobileAria's

estate under 11 U.S.C. §§ 503(b) and 507(a)(1) without further order of the Court

with priority over claims of MobileAria's affiliates.

<u>Waiver of Stay</u>

23

43.    As provided by Fed. R. Bankr. P. 7062 and notwithstanding Rules 6004(g) and

6006(d) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, this Sale

Order shall take effect and be enforceable immediately upon its entry.

44.    Time is of the essence in closing the Sale and MobileAria and Purchaser intend to close the Sale as soon as possible.  Therefore, any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

Dated: New York, New York
        July 21, 2006

                        /s/Robert D. Drain
                        UNITED STATES BANKRUPTCY JUDGE

**EXECUTION COPY**

**AMENDED AND RESTATED ASSET SALE AND PURCHASE AGREEMENT**

**BETWEEN**

**WIRELESS MATRIX USA, INC.**

**AND**

**MOBILEARIA, INC.**

**Dated as of July 20, 2006**

# TABLE OF CONTENTS

**Page**

1.    CONVEYANCE OF THE ACQUIRED ASSETS: .........................................................10

    1.1    Acquired Assets Transaction ...............................................................10

        1.1.1    Acquired Assets ........................................................10
        1.1.2    Excluded Assets ........................................................10
        1.1.3    Post-Closing Asset Deliveries ..................................11
        1.1.4    Prorations: ................................................................12
        1.1.5    Non-Assignable Permits and Contracts: ...................13

2.    ASSUMPTION OF LIABILITIES: ......................................................................14

    2.1    Assumed Liabilities ........................................................................14

    2.2    No Expansion of Third Party Rights ...............................................14
    2.3    Retained Liabilities ........................................................................14

3.    ACQUIRED ASSETS - PERSONNEL MATTERS – TRANSFERRED
    EMPLOYEES: ..................................................................................................15

    3.1    Business Employees ......................................................................15

    3.2    Cooperation ...................................................................................16
    3.3    No Third Party Rights ....................................................................16

4.    PURCHASE PRICE: .......................................................................................16

    4.1    Purchase Price; Deposit Amount ...................................................16

        4.1.1    Deposit Amount .......................................................16
        4.1.2    Delivery of Purchase Price ......................................17
    4.2    Allocation of Purchase Price ..........................................................17
    4.3    Other Adjustments ........................................................................18

5.    REPRESENTATIONS AND WARRANTIES: ....................................................18

    5.1    Representations and Warranties of Seller ......................................18

        5.1.1    Organization and Good Standing .............................18
        5.1.2    Corporate Power; Due Authorization ........................18
        5.1.3    No Violations ...........................................................18
        5.1.4    Sufficiency of Acquired Assets ................................19
        5.1.5    Personal Property; Condition of Personal Property: ...19
        5.1.6    Litigation .................................................................19
        5.1.7    Intellectual Property Assets: ....................................19
        5.1.8    Insurance .................................................................21
        5.1.9    Compliance with Other Instruments and Laws; Permits ........................21
        5.1.10  Brokers ....................................................................21
        5.1.11  Consents and Approvals...........................................21
        5.1.12  Financial Statements ...............................................22
        5.1.13  Events Subsequent to Latest Financial Statements ..............................22
        5.1.14  Contracts: ................................................................22
        5.1.15  Tax Matters:.............................................................23
        5.1.16  Employee Issues: .....................................................24

i

# TABLE OF CONTENTS
(continued)

Page

|   |   | 5.1.17 Absence of Other Representations or Warranties | 25 |
| 5.2 |   | Representations and Warranties of Purchaser | 25 |
|   |   | 5.2.1 Corporate Data | 25 |
|   |   | 5.2.2 Corporate Power; Due Authorization | 25 |
|   |   | 5.2.3 No Violations | 25 |
|   |   | 5.2.4 Litigation | 25 |
|   |   | 5.2.5 Brokers | 26 |
|   |   | 5.2.6 Solvency | 26 |
|   |   | 5.2.7 Availability of Funds | 26 |
|   |   | 5.2.8 Adequate Assurance of Future Performance | 26 |
|   |   | 5.2.9 Compliance with Law | 26 |
|   |   | 5.2.10 Anti-Money Laundering | 26 |
| 5.3 |   | Survival of Representations, Warranties and Covenants of the Seller | 27 |
| 5.4 |   | Survival of Representations, Warranties and Covenants of the Purchaser | 27 |
| 6. | | CONDITIONS TO CLOSING: | 27 |
| 6.1 |   | Conditions to Obligations of Seller and Purchaser | 27 |
|   |   | 6.1.1 Sale Approval Order | 27 |
|   |   | 6.1.2 No Law, Judgments, etc | 27 |
| 6.2 |   | Conditions to Obligations of Purchaser | 27 |
|   |   | 6.2.1 Accuracy of Representations and Warranties | 27 |
|   |   | 6.2.2 Performance of Covenants | 28 |
|   |   | 6.2.3 Payment of Cure Amounts | 28 |
|   |   | 6.2.4 Certification | 28 |
|   |   | 6.2.5 Other Approvals | 28 |
| 6.3 |   | Conditions to Obligations of Seller | 28 |
|   |   | 6.3.1 Accuracy of Representations and Warranties | 28 |
|   |   | 6.3.2 Performance of Covenants | 28 |
|   |   | 6.3.3 Delivery of Purchase Price | 29 |
| 7. | | CLOSING: | 29 |
| 7.1 |   | The Closing | 29 |
| 7.2 |   | Ancillary Agreements | 29 |
| 7.3 |   | Seller's Deliveries | 29 |
| 7.4 |   | Purchaser's Deliveries | 30 |
| 8. | | CERTAIN ADDITIONAL COVENANTS: | 30 |
| 8.1 |   | Bankruptcy Actions: | 30 |
| 8.2 |   | Registrations, Filings and Consents; Further Actions | 31 |
| 8.3 |   | Operation of the Business Pending Closing: | 31 |
| 8.4 |   | Assumed Contracts; Cure Amounts | 31 |
| 8.5 |   | Post-Closing Covenants | 32 |
|   |   | 8.5.1 Seller Post-Closing Covenants: | 32 |

ii

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 8.5.2 | Technical Documentation | 33 |
| | 8.5.3 | Books and Records and Litigation Assistance From and After Closing: | 33 |
| | 8.5.4 | Payment and Collections | 34 |
| | 8.5.5 | Intellectual Property Transition Rights | 35 |
| 8.6 | Further Assurances | | 35 |
| 8.7 | [Reserved] | | 35 |
| 8.8 | Certain Transactions | | 35 |
| 8.9 | Communications with Customers and Suppliers | | 35 |
| 9. | TERMINATION: | | 35 |
| 9.1 | Termination | | 35 |
| | 9.1.1 | By Either Party: | 35 |
| | 9.1.2 | By Purchaser | 36 |
| | 9.1.3 | By Seller | 37 |
| 9.2 | Notice of Termination | | 37 |
| 9.3 | Break-Up Fee; Expense Reimbursement: | | 37 |
| | 9.3.1 | Break-Up Fee | 37 |
| | 9.3.2 | Expense Reimbursement | 37 |
| 9.4 | Procedure and Effect of Termination | | 38 |
| 10. | OTHER TAX MATTERS: | | 38 |
| 11. | BIDDING PROCEDURES: | | 39 |
| 11.1 | MobileAria Initial Bankruptcy Actions | | 39 |
| 11.2 | Court Approval | | 39 |
| 11.3 | Qualified Bidder | | 40 |
| 11.4 | Bid Deadline | | 41 |
| 11.5 | Due Diligence | | 41 |
| 11.6 | Bid Requirements | | 42 |
| 11.7 | Qualified Bids | | 42 |
| 11.8 | Bid Protection | | 43 |
| 11.9 | Auction, Bidding Increments and Bids Remaining Open | | 43 |
| 11.10 | Acceptance of Qualified Bids | | 44 |
| 11.11 | Sale Hearing | | 45 |
| 11.12 | Return of Good Faith Deposit | | 45 |
| 11.13 | Reservation of Rights | | 45 |
| 12. | INDEMNIFICATION: | | 45 |
| 12.1 | Seller's Agreement to Indemnify | | 45 |
| 12.2 | Purchaser's Agreement to Indemnify | | 46 |
| 12.3 | Limitations on Agreements to Indemnify | | 46 |
| 12.4 | Third Party Indemnification Procedures | | 47 |

# TABLE OF CONTENTS
(continued)

**Page**

| 13. | MISCELLANEOUS: | 47 |
|---|---|---|
| 13.1 | Bulk Sales Laws | 48 |
| 13.2 | Notices | 48 |
| 13.3 | Assignment | 48 |
| 13.4 | Entire Agreement | 48 |
| 13.5 | Waiver | 49 |
| 13.6 | Severability | 49 |
| 13.7 | Amendment | 49 |
| 13.8 | Expenses | 49 |
| 13.9 | Third Parties | 49 |
| 13.10 | Headings | 49 |
| 13.11 | Counterparts | 49 |
| 13.12 | Governing Law | 49 |
| 13.13 | Public Announcements | 49 |
| 13.14 | Sales or Transfer Taxes | 50 |
| 13.15 | Venue and Retention of Jurisdiction | 50 |
| 13.16 | Risk of Loss | 50 |
| 13.17 | Enforcement of Agreement | 50 |
| 13.18 | Dispute Resolution | 50 |
| 13.19 | No Right of Setoff | 50 |
| 13.20 | Limitation on Damages | 50 |

# LIST OF SCHEDULES

| Schedule Designation | Schedule Description |
| --- | --- |
| A | Seller's Knowledge |
| B | Reference Balance Sheet |
| 1.1.2.A | Third Party Bailed Assets |
| 1.1.2.D | Excluded Contracts |
| 1.1.2.G | Privileged Information and Materials |
| 1.1.2.J | Other Excluded Assets |
| 1.2.1 | Certain Licensed Intellectual Property |
| 2.1.1 | Transferred Contracts |
| 2.1.3 | Certain Assumed Liabilities |
| 4.2 | Allocation of Purchase Price |
| 5.1.1 | Organization and Good Standing |
| 5.1.3 | No Violations |
| 5.1.4 | Sufficiency of Acquired Assets |
| 5.1.5.A | Title to Personal Property |
| 5.1.5.C | Other Inventory Locations |
| 5.1.5.D | Machinery, Equipment and Capitalized Tools (Value Greater than $5,000 USD) |
| 5.1.6 | Litigation |
| 5.1.7.A.1 | Owned Intellectual Property |
| 5.1.7.A.2 | Licensed Intellectual Property |
| 5.1.7.A.3 | Software |
| 5.1.7.B | Intellectual Property Litigation Claims |
| 5.1.7.C | Rights Granted to Third Parties |
| 5.1.7.D | Free and Clear Owned Intellectual Property |
| 5.1.7.E | Excluded License |
| 5.1.8 | Insurance |
| 5.1.9 | Permits |
| 5.1.11 | Third Party Consents |
| 5.1.12(i) | December 31, 2003, 2004 and 2005 Unaudited Balance Sheets and Income Statements for the Business |
| 5.1.12(ii) | Unaudited Balance Sheet and Income Statement for Four Months Ended April 30, 2006. |
| 5.1.13 | Absence of Certain Changes |
| 5.1.14.A | Listed Contracts |
| 5.1.14.B | Listed Contracts – Exceptions |
| 5.1.15.A | Tax Returns |
| 5.1.15.D | Tax Matters |
| 5.1.16.A | Business Employees |
| 5.1.16.B | Funding |
| 6.2.5 | Third Party Approvals |
| 7.2.1 | Assignment of Lease |
| 7.2.2.A | Assignment of Patent Rights |
| 7.2.2.B | Assignment of Trademark Rights |
| 7.2.3 | Assignment and Assumption Agreement |
| 7.2.4 | Escrow Agreement |

v

7.2.5          Bill of Sale
7.2.6          License from Delphi Technologies, Inc. to WIRELESS MATRIX of Vehicle
               Bus Adapter firmware and Power Moding Profile software

## AMENDED AND RESTATED ASSET SALE AND PURCHASE AGREEMENT

**THIS AMENDED AND RESTATED ASSET SALE AND PURCHASE AGREEMENT** (this "**Agreement**") dated as of **July 20, 2006,** by and between **WIRELESS MATRIX USA, INC.**, a Delaware corporation ("**WIRELESS MATRIX**") and **MOBILEARIA, INC.**, a Delaware corporation ("**MobileAria**" or "**Seller**").

### R E C I T A L S:

**WHEREAS**, MobileAria is engaged in the Business (as hereinafter defined).

**WHEREAS**, Delphi Automotive Systems LLC, a Delaware limited liability company ("**Delphi**") owns approximately 71% of MobileAria's issued and outstanding capital stock.

**WHEREAS**, on October 8, 2005, Delphi and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, on October 14, 2005 (the "**Petition Date**"), MobileAria filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court.  As of the Petition Date, the MobileAria bankruptcy case has been consolidated with the Delphi bankruptcy cases (collectively, MobileAria's bankruptcy case and the Delphi bankruptcy cases are referred to as the "**Bankruptcy Cases**").

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, MobileAria desires to sell to WIRELESS MATRIX all right, title and interest of MobileAria in and to the Acquired Assets (as hereinafter defined), and Purchaser (as hereinafter defined) desires to make such purchase, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement.

**WHEREAS**, MobileAria and Wireless Matrix entered into that certain Asset Sale and Purchase Agreement dated June 6, 2006 (the "**Stalking Horse Agreement**") and now desire to amend and restate the Stalking Horse Agreement to reflect the results of the Auction (as hereinafter defined).

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

### DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of

Products delivered to customers, all other accounts or notes receivable and the full benefit of all security for such accounts or notes and any claim, remedy or other right related to any of the foregoing.

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

"**Administrative Assets**" means books, records and other administrative assets used in or necessary for continuing the operations of MobileAria including but not limited to advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files; provided, however that Administrative Assets do not include Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Sale and Purchase Agreement, including its Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.2.

"**Alternate Bid(s)**" shall have the meaning set forth in Section 11.11.

"**Alternate Bidder(s)**" shall have the meaning set forth in Section 11.11.

"**Alternative Transaction**" shall have the meaning set forth in Section 9.3.1.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means those Transferred Contracts entered into by Seller before the Petition Date.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article 2, but only to the extent that an obligation: (a) arises on or after the Closing; and (b) with respect to obligations arising under Transferred Contracts: (i) does not arise from or relate to any breach by the Seller of any provision of any of the Transferred Contracts; (ii) does not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of any of the Transferred Contracts; and (iii) is ascertainable by reference to the express terms of the Transferred Contracts.

"**Auction**" shall have the meaning set forth in Section 11.9.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall have the meaning set forth in Section 11.4.

"**Bidding Procedures**" means the bidding procedures set forth in Section 11.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures.

"**Bidding Process**" shall have the meaning set forth in Section 11.1.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.1.

"**Business**" means providing location-based, data communication, productivity, and security services, as well as designing, marketing, and making available vehicle installed hardware units in the business-to-business market for remote and mobile platforms such as trucks, trailers, and service vehicles.  For avoidance of doubt, the Business does not include services or hardware for entertainment media distribution or playback or any services or hardware for the consumer or automotive markets.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"**Business Employees**" shall have the meaning set forth in Section 3.1.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Cases.

"**Competing HW**" shall have the meaning set forth in Section 8.5.1.A.

"**Competitive Business**" shall have the meaning set forth in Section 8.5.1.A.

"**Contracts**" mean all written or material oral purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases (for real property, personal property or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any nature, including quotations and bids outstanding on the Closing Date.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications for registration thereof; (v) copies,

3

files and tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of the Assumed Contracts under the Sale Approval Order that are Transferred Contracts.

"**Defending Party**" shall have the meaning set forth in Section 13.18.

"**Delphi**" shall have the meaning set forth in the Recitals.

"**Demanding Party**" shall have the meaning set forth in Section 13.18.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**Disclosure Schedule**" means, collectively, the Schedules to Seller's Representations and Warranties contained in Section 5.1.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" shall have the meaning set forth in Section 4.1.2.

"**Escrow Amount**" shall have the meaning set forth in Section 4.1.2.

"**Escrow Period**" shall have the meaning set forth in Section 4.1.2.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Excluded Contracts**" shall have the meaning set forth in Section 1.1.2.D.

"**Excluded License**" shall have the meaning set forth in Section 5.1.7.E.

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.3.2.

"**Expiration Date**" shall have the meaning set forth in Section 5.3.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

4

"**Financial Statements**" shall have the meaning set forth in Section 5.1.12.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time consistently applied.

"**Good Faith Deposit**" shall have the meaning set forth in Section 11.6.3.

"**Governmental Entity**" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Including**" means, whether or not initially capitalized, including without limitation.

"**Indemnification Claim**" shall have the meaning set forth in Section 12.4.

"**Intellectual Property**" means the Patent Rights, Trademark Rights, Copyrights, Software, Technical Documentation, Trade Secrets, Know-How and registered domain names and IP addresses.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies, and other inventory, wherever located.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Know-How**" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Licensed Intellectual Property**" means Seller's rights with respect to all Intellectual Property licensed or sublicensed to Seller from an affiliated or unaffiliated third party.

"**Lien**" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**Listed Contracts**" means the Seller's contracts and commitments listed on Schedule 5.1.14.A.

"**Marked Agreement**" shall have the meaning set forth in Section 11.6.2.

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the business, assets, properties, financial condition or results of operations of the Business taken as a whole, except any change or event resulting from, relating to or arising out

of: (a) any act or omission of a Seller taken with the prior written consent of the Purchaser; (b) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from the filing of the Bankruptcy Cases or from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any of such countries; (h) acts of God; (i) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (j) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (k) changes in any Law; (l) any existing event, occurrence or circumstance listed in the Disclosure Schedule as of the date hereof; (m) any adverse change in or effect on the Business that is entirely cured by Seller before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 9.1 hereof; or (n) the regulatory status of the Purchaser.

"**MobileAria**" means MobileAria, Inc., a Delaware corporation.

"**Notice**" shall have the meaning set forth in Section 13.18.

"**OFAC**" shall have the meaning set forth in Section 5.2.10.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary course of business consistent with custom and practice of the Business from and after the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Documents**" means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

"**Owned Intellectual Property**" means all Intellectual Property in and to which Seller holds, or has a right to hold, in whole or in part, right, title and interest.

"**Party**" or "**Parties**" means Purchaser and/or Seller.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents, and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by

international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Permitted Lien**" means Liens of Seller's pre-Petition Date secured lenders and post-Petition Date secured lenders which Liens will be released on or prior to the Closing of the Sale.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Seller's premises, at the place of business of a vendor or elsewhere.

"**Petition Date**" shall mean October 14, 2005.

"**Post-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Post-Petition Contracts**" means the Contracts of MobileAria relating to the Business entered into in the Ordinary Course of Business or approved by the Bankruptcy Court, in either case on or after the Petition Date.

"**Potential Bidder**" shall have the meaning set forth in Section 11.3.

"**Pre-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Premises**" means the suite of offices leased by Seller for the Business at 800  West El Camino Real, Suite 240, Mountain View, California  94040.

"**Purchase Price**" means the payment referred to in Section 4.1.

"**Products**" means location-based, data communication, productivity, and security services for remote and mobile platforms in the commercial business-to-business market, including trucks, trailers, and service vehicles.  Products include back end server software, client software, and vehicle installed hardware units.  For avoidance of doubt, Products do not include services or hardware for entertainment media distribution or playback or any services or hardware for the consumer or automotive markets.

"**Purchased Intellectual Property**" means all Owned Intellectual Property and Licensed Intellectual Property.

"**Purchaser**" means **WIRELESS MATRIX USA, INC.**

"**Purchaser Damages**" shall have the meaning set forth in Section 12.1.

"**Qualified Bid**" shall have the meaning set forth in Section 11.7.7.

"**Qualified Bidder**" shall have the meaning set forth in Section 11.3.3.

"**Reference Balance Sheet**" means the balance sheet of the Business attached as Schedule B.

"**Required Bid Documents**" shall have the meaning set forth in Section 11.6.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Retention Bonus**" shall have the meaning set forth in Section 3.1.4.

"**Return Date**" shall have the meaning set forth in Section 11.12.

"**Sale**" means the sale of the Business in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets and Assumed Liabilities to the Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than, Permitted Liens and Liens encompassed within Assumed Liabilities assumed by Purchaser pursuant to Article 2, if any.

"**Sale Hearing**" shall have the meaning set forth in Section 11.10.

"**Sale Motion**" shall have the meaning set forth in Section 11.11.

"**SDN List**" shall have the meaning set forth in Section 5.2.10.

"**Seller**" means MobileAria, Inc, a Delaware corporation.

"**Seller Damages**" shall have the meaning set forth in Section 12.3.1.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A, in each of their respective functional areas without imputation of the knowledge of any other Person.

"**Software**" means computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Stalking Horse Agreement**" shall have the meaning set forth in the recitals.

"**Straddle Period**" means any taxable period that begins on or prior to the Closing Date and ends after the Closing Date.

"**Subsequent Bid**" shall have the meaning set forth in Section 11.7.7.

"**Successful Bid(s)**" shall have the meaning set forth in Section 11.9.6.

"**Successful Bidder(s)**" shall have the meaning set forth in Section 11.9.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Technical Documentation**" means all documented technical information currently in the files of the Business primarily used in the Business owned by Seller, in each case pertaining to the design or manufacture of the Products of the Business.

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.E.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third-Party Requirements**" shall have the meaning set forth in Section 5.1.3.

"**Trade Secrets**" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" means: (i) trademarks, trade names and service marks; (ii) the good will associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

9

"**Transferred Contracts**" means the Contracts of Seller to be assigned to Purchaser at Closing as described in Section 2.1.1.

"**Transferred Employees**" shall have the meaning set forth in Section 3.1.3.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**USA PATRIOT Act**" shall have the meaning set forth in Section 5.2.10.

"**Verizon Contract**" shall have the meaning set forth in Section 1.1.5.A.

"**Verizon Open Accounts Receivable**" means all Accounts Receivable from Verizon Services Corp. for subscriber services to be performed after the Closing Date.  All Accounts Receivable from Verizon Services Corp. for hardware and hardware installations is an Excluded Asset.

"**Warranties**" refers to the representations and warranties provided by Seller to Purchaser, or by Purchaser to Seller, as the case may be, in each case as referred to in Article 5 of this Agreement.

1.    **CONVEYANCE OF THE ACQUIRED ASSETS:**

**1.1    Acquired Assets Transaction.**  Upon the terms and subject to the conditions set forth in this Agreement at Closing Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from the Seller, free and clear of all Liens except: (i) Permitted Liens; and (ii) Liens included in the Assumed Liabilities assumed by Purchaser pursuant to Article 2, if any, all of the assets and properties described in Section 1.1.1 below (collectively, the "**Acquired Assets**"), subject in each case to Section 1.1.2.

**1.1.1    Acquired Assets.**  The Acquired Assets consist of all of Seller's right, title and interest in and to the rights and assets primarily used in, primarily arising from, primarily relating to, or necessary for the conduct of the Business (other than the Excluded Assets), including, without limitation: all Verizon Open Accounts Receivable (including any cash or cash equivalents received with respect to Verizon Open Accounts Receivable prior to the Closing Date), Personal Property, Permits, Inventory, rights under Transferred Contracts (including Seller's rights against third party manufacturers to the extent any liability is assumed by Purchaser pursuant to Section 2.1), Administrative Assets and Purchased Intellectual Property (including Trademark Rights including Trademark Rights in MobileAria and all Product names, but not including Delphi and related names), in each case if such assets are primarily used in, primarily arising from, primarily relating to, or necessary for the conduct of the Business, including all of Seller's rights in: (i) tangible Personal Property located at the Premises; and (ii) all Personal Property owned by or leased to the Seller in connection with the Business located at any outsource partner's location, including Qwest Communication; and (iii) all prepaid Inventory held by any Affiliate of Seller primarily for use in the Business, provided that such Affiliate has been paid in full or been assigned the corresponding receivable by Seller.

**1.1.2    Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

**A.    Bailed Assets.**  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by any other third party listed in Schedule 1.1.2.A ("**Third Party Bailed Assets**").

**B.    Personnel and Medical Records.**  All work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws: Purchaser will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with Purchaser in connection with the sale hereunder, with the prior written consent of such employee or after posted written notice or other appropriate notice to such employees if legally required.  If an employee objects to provision of personnel or medical records to Purchaser, the records will not be provided.

**C.    Certain Financial Assets.**    Cash, cash equivalents, bank accounts and all accounts receivable (other than Verizon Open Accounts Receivable or cash or cash equivalents received in respect thereof).

**D.    Certain Contracts.**    All Contracts of Seller that are not Transferred Contracts, including Contracts set forth on Schedule 1.1.2.D ("**Excluded Contracts**").

**E.    Tax Refunds.**  Any refund of Taxes paid, or claim for refund of Taxes paid, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

**F.    Privileged Information and Materials.**  Information and materials protected by the attorney-client privilege or that, in the case of environmental-related documents, Seller considers to be proprietary information; and the lack of which excluded information and materials are not material to the operation of the Business, and provided that such materials are listed on Schedule 1.1.2.F hereto.

**G.    Insurance.**  The benefit of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the Business (including any right to proceeds thereunder).

**H.    Certain Rights.**    All of the rights and claims of the Seller available to Seller under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

**I.    Other Excluded Assets.**  All computer hardware, equipment, or other assets listed on Schedule 1.1.2.I.

**1.1.3    Post-Closing Asset Deliveries.**    Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other similar materials constituting Acquired Assets are still in the possession of Seller, Seller shall promptly deliver them to Purchaser at no cost to Purchaser.  Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting

Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to Seller at no cost to Seller other than reimbursing Purchaser's reasonable out-of-pocket costs.

### 1.1.4    **Prorations:**

   **A.**  To the extent that Seller has made any payment relating to the Business prior to the Closing Date with respect to any item listed in Subparagraph B below relating to periods on or following the Closing Date, Purchaser shall reimburse Seller on a per diem basis; and

   **B.**  To the extent Purchaser makes any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, Seller shall reimburse Purchaser on a per diem basis, in each case for the following:

   (i)  Rent for the Premises and copier leases and other pre-paid amounts under Transferred Contracts (such other pre-paids to be mutually agreed by the parties before Closing);

   (ii)  Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

   (iii)  Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business; and

   (iv)  Electric, fuel, gas, telephone and internet services and other utility charges.

   **C.**  **Verizon.** If Seller receives payments from Verizon Services Corp. pursuant to the Verizon Contract that are for installations and subscriber services to be performed by Purchaser following the Closing Date, Seller shall transfer such payments to Purchaser. If Purchaser receives payments from Verizon Services Corp. pursuant to the Verizon Contract attributable to installations and subscriber services previously performed by Seller relating to periods on or before the Closing Date, Purchaser shall transfer to Seller such funds allocable to each such installation performed by Seller and all such subscriber services rendered by Seller.

   **D.**  **Further Assurance.**  The parties will use commercially reasonable efforts to determine the amounts of the above prorations and settle such amounts at Closing. To the extent that, within sixty (60) days after Closing, Seller, on the one hand, or Purchaser, on the other hand, receives any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, the Seller or Purchaser shall, as soon as practicable but no later than ninety (90) days after Closing, send any such bill or invoice to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, Purchaser may pay all amounts shown to be due thereon, and may invoice Seller for all amounts owed by Seller thereunder, and in such case Seller shall reimburse such amounts.

   Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within forty-five (45) days after the end of the month in which a bill or invoice is sent to a Party (or Affiliate thereof); provided, however, that the disputed portion of any

such item shall be paid within forty-five (45) days after the final determination thereof on an item-by-item basis.  When Purchaser makes a payment to a third party which is required to be reimbursed to Purchaser by Seller, the reimbursement payment shall be considered the repayment of an advance.

### 1.1.5   Non-Assignable Permits and Contracts:

**A.**   **Non-Assignability.**   After giving effect to the Sale Approval Order, to the extent that any Permit included in the Acquired Assets or any Transferred Contract other than that Agreement No. C0505851 by and between the Seller and Verizon Services Corp. (the "**Verizon Contract**") is not capable of being assigned to Purchaser at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, until any such consent or waiver is obtained.

**B.**   **Efforts to Obtain Consents and Waivers.**   At Purchaser's request, Seller shall, at its expense, use commercially reasonable efforts, and Purchaser shall, at Seller's expense, cooperate with Seller, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.1.5.A after the Closing.

**C.**   **If Waivers or Consents Cannot be Obtained.**   To the extent that the consents and waivers referred to in Section 1.1.5.A are not obtained by Seller, or until the impracticalities of assignment referred to therein are resolved, Seller's sole responsibility with respect to such matters, notwithstanding Section 1.1, shall be to use, during the one hundred eighty (180) day period commencing with the Closing, all commercially reasonable efforts, at no cost to Purchaser (other than pursuant to Section 1.1.5.D below), to: (i) provide to Purchaser the benefits of any such Permit or Transferred Contract, all as referred to in Section 1.1.5.A, included in the Acquired Assets; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, without incurring any financial obligation to Purchaser; and (iii) at the request and direction of Purchaser, enforce for the account of Purchaser and at the cost of Purchaser any rights of Seller arising from the Permits included in the Acquired Assets or Transferred Contracts referred to in Section 1.1.5.A against such issuer thereof or other party or parties thereto.

**D.**   **Obligation of Purchaser to Perform.**   To the extent that Purchaser is provided the benefits pursuant to Section 1.1.5.C of any Permit included in the Acquired Assets or Transferred Contracts, Purchaser shall perform, on behalf of Seller, for the benefit of the issuer thereof or the other party or parties thereto the obligations of Seller thereunder or in connection therewith and if Purchaser shall fail to perform to the extent required herein, Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.1.5.C in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or, at Purchaser's request, Seller may perform at Purchaser's sole reasonable cost and expense, in which case Purchaser shall reimburse Seller's reasonable costs of such performance immediately upon receipt of an invoice.

## 2.   ASSUMPTION OF LIABILITIES:

**2.1**   **Assumed Liabilities.**   At and as of the Closing, Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all

obligations, liabilities and responsibilities specifically referred to in this Section 2.1 ("**Assumed Liabilities**"), other than the Retained Liabilities, as follows:

**2.1.1**    The obligations of Seller to be performed under the Contracts listed on Schedule 2.1.1 **(**the "**Transferred Contracts**") and the obligations of Seller to be performed under licenses and Permits included in the Acquired Assets that are assigned or otherwise transferred to Purchaser pursuant to this Agreement and listed on Schedule 2.1.1.

**2.1.2**    Obligations described in Article 3 of this Agreement with respect to Transferred Employees.

**2.1.3**    The obligation to pay for assets, goods or services ordered by Seller on or prior to the Closing and that are received by the Purchaser after Closing, provided that: (i) no single purchase or related group of purchases shall exceed $5,000 unless tied directly to a commitment purchase order from a customer and set forth on Schedule 2.1.3; and (ii) miscellaneous lesser amounts in the ordinary course of business consistent with amounts disclosed to Purchaser as "Expenses" in the income statements provided to Purchaser as part of the Financial Statements (other than Bank Service Charges).

**2.1.4**    Liabilities and obligations arising out of, resulting from, or relating to sales pursuant to Transferred Contracts of products or services by the Business, including all Product warranty, Product returns, Product liability (other than design defects) and Product recall liability related thereto.

**2.1.5**    All deferred revenue obligations arising under the Verizon Contract including all obligations to fulfill orders relating to products of the Business outstanding on the Closing Date set forth on Schedule 2.1.

**2.2**    **No Expansion of Third Party Rights.**    The assumption by Purchaser of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against Purchaser or Seller as compared to the rights and remedies which such third party would have had against Seller absent the Bankruptcy Cases, had Purchaser not assumed such Assumed Liabilities. Without limiting the generality of the preceding sentence, the assumption by Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

**2.3**    **Retained Liabilities.**    Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume or be deemed to have assumed, and shall have no liability or obligation with respect thereto, any other liabilities of the Company (collectively, "**Retained Liabilities**") including without limitation the following: (i) liabilities in respect of employment or services performed on or prior to the Closing; (ii) product liability claims to the extent based on a defective design for Products designed by Seller and sold prior to the Closing Date except as expressly set forth in Section 2.1.4; (iii) existing litigation for which a claim has been made to or threatened in writing against Seller on or before the Closing Date; (iv) all Tax liabilities of Seller for all periods (but excluding any Tax liabilities allocated to Purchaser pursuant to Section 10.3 of this Agreement); (v) any liability or obligation of Seller for administrative fees and expenses, including, without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (vi) any liability or obligation of Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement; (vii) all Debt owed by  Seller to any party; (viii)  all Claims, except for Assumed Liabilities; (ix) all liabilities to employees of Seller

who are not Transferred Employees as defined in Section 3.1.3 or (x) any liability or obligation not expressly assumed pursuant to Section 2.1 hereof.

3.    **ACQUIRED ASSETS - PERSONNEL MATTERS – TRANSFERRED EMPLOYEES**:

    **3.1    Business Employees.**  Listed on Schedule 5.1.16.A are all employees and consultants of Seller that perform services exclusively or primarily for the Business (each employee required to be so listed a "Business Employee"). With respect to each such employee and consultant (as limited in definition for purposes of this Article 3 only) included thereon, Schedule 5.1.16.A lists: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or contract); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., authorized leave or absence, etc.)); (v) each such person's annual base rate of compensation; (vi) any additional compensation otherwise payable to such person or for which such person is expressly eligible; and, if applicable; (vii) any consideration, payment, or benefit to which such person may be entitled upon termination of services to the Seller or Purchaser; and (viii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws).‑

        **3.1.1**  Not later than July 27, 2006, Purchaser will offer employment to substantially all Business Employees (other than as set forth on Schedule 5.1.16.A) with such new employment to commence (if accepted) with effect from the Closing and will confirm the list of such employees to Seller promptly thereafter.

        **3.1.2**  Not later than two (2) business days after the date hereof, Seller will provide Purchaser with an updated Schedule 5.1.16.A, such updated schedule to include certain key employees as indicated on the initial schedule.

        **3.1.3**  Purchaser's offer of employment to substantially all persons identified on Schedule 5.1.16.A, will be on Purchaser's standard terms and conditions as applied to similarly situated employees; provided, however, that Purchaser shall give each such employee credit for time previously employed by Seller for all purposes within Purchaser's direct control. Any Business Employee that accepts and commences employment with Purchaser pursuant to a written offer letter with Purchaser shall be referred to herein as a "Transferred Employee".

        **3.1.4    Retention Bonus.**  Purchaser shall allocate an aggregate of $500,000 among certain of the Transferred Employees (the "**Retention Bonus**").   The method of allocation of the Retention Bonus among the Transferred Employees shall be as Purchaser may determine in its sole discretion.  On the Purchaser's first regular payroll date following the six (6) month anniversary of the Closing, Purchaser shall commence payment of the Retention Bonus in such amounts as determined by Purchaser to such Transferred Employees (subject to applicable deductions and withholding).

    **3.2    Cooperation.**  Seller and Purchaser will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

    **3.3    No Third Party Rights.**  No provision of this Agreement confers rights or remedies upon any person, including Transferred Employees, other than the parties to this Agreement and Delphi.

4.    **PURCHASE PRICE:Purchase Price; Deposit Amount.**  Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall be the amount of: (i) Eleven Million Two Hundred Thousand Dollars (US $11,200,000.00); plus (ii) assumption of the Assumed Liabilities; and less (iii) the Break-Up Fee. The final aggregate purchase price, as so determined, is referred to herein as the "**Purchase Price**".

        4.1.1    **Deposit Amount.**  Upon execution of the Stalking Horse Agreement, Purchaser delivered to the Escrow Agent pursuant to the terms of the Escrow Agreement $500,000 in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures:

                A.    **Deposit Instructions.**  On the Closing Date, Seller and Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Seller in the Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price);

                B.    **Termination of Agreement.**  Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Escrow Agreement, to be retained by Seller. Any such payment shall constitute Seller's sole recourse in connection with such failure to consummate the transactions contemplated hereby; and

                C.    **Other Reason.**  Upon termination of this Agreement for any other reason, or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, Seller and Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Purchaser in the Escrow Agreement, to be retained by Purchaser.

                D.    **Temporary Escrow.**  Seller and Purchaser acknowledge that in order to execute this Agreement more expeditiously, Purchaser delivered to DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303 ("**DLA**") the Deposit Amount within one (1) business day following the execution of the Stalking Horse Agreement (such deposit to be temporarily in lieu of the provisions set forth above). Promptly following the execution of an Escrow Agreement substantially in the form attached hereto as Schedule 7.2.4 by each of the parties thereto, the Purchaser directed DLA to deliver the Deposit Amount to the Escrow Agent as set forth in Section 4.1.1 above as if such funds had been delivered by the Purchaser to the Escrow Agent as set forth therein.  Such funds remained the property and under the control of Purchaser until such time as Purchaser directs DLA pursuant to the preceding sentence, at which time the other provisions of this Section 4.1.1 shall control.

        4.1.2    **Delivery of Purchase Price.**  At Closing, Purchaser shall pay to Seller an aggregate amount equal to the Purchase Price less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.2) and less $575,000 by wire transfer in U.S. Dollars in immediately available funds to the account of the appropriate Seller, pursuant to this Agreement and a notice delivered by Seller to Purchaser prior to Closing.   At Closing, Purchaser shall pay

to JPMorgan Chase Bank, NA as "**Escrow Agent**" hereunder $575,000 of the Purchase Price (which when added to the Deposit Amount (total is $1,075,000) is hereinafter referred to as the "**Escrow Amount**") to be held by the Escrow Agent as collateral to secure the rights of the Purchaser under Article 12 hereof.  The Escrow Amount shall be held pursuant to the provisions of an escrow agreement substantially in the form of Schedule 7.2.4 (the "**Escrow Agreement**"). The Escrow Amount will be held by the Escrow Agent from the Closing Date until the one (1) year anniversary of the Closing Date (the "**Escrow Period**"); provided, however, that in the event Purchaser has made a claim under Article 12 prior to the end of the Escrow Period, then the Escrow Period shall continue (and the Escrow Agent will continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved.  The costs and expenses of the Escrow Agent will be paid from and borne solely by the Escrow Amount. Notwithstanding the foregoing, the Parties acknowledge that $100,000 of the Escrow Amount is provided to satisfy certain requirements of paragraph 43(f) of the Sale Approval Order, and the Parties agree to execute an additional Escrow Agreement prior to the Closing consistent with such paragraph (the "**Additional Escrow Agreement**").  Notwithstanding anything to the contrary contained in this Agreement, as soon as reasonably practicable after all claims arising under paragraph 43(f) of the Sale Approval Order are resolved by the parties hereto or by order of the Bankruptcy Court, any remaining amounts held by the Escrow Agent under the Additional Escrow Agreement shall be disbursed to Seller.

      **4.2**    **Allocation of Purchase Price.**  The Parties agree to allocate the Purchase Price among the Business and the agreements provided herein for transfer of the Business to Purchaser, for all purposes (including financial, accounting and tax) (the "**Allocation**") in a manner consistent with the Allocation Schedule set forth in Schedule 4.2 to be mutually agreed upon by Purchaser and Seller in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, based on the fair market value of the Acquired Assets.  Purchaser shall provide to Seller a draft Allocation within fifteen (15) days following the Closing Date.  This Allocation shall become final and binding on the parties, unless Seller notifies Purchaser within fifteen (15) days after receipt of such Allocation of Seller's disagreement with such Allocation. In the event Seller timely notifies Purchaser of such disagreement, the parties shall resolve such disagreement in the manner described in Section 13.18 of this Agreement.  Purchaser and Seller shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.  Seller shall provide Purchaser and Purchaser shall provide Seller with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

      **4.3**    **Other Adjustments.**

      **4.3.1**    Purchaser agrees to buy from Delphi certain inventory up to 6,228 "VTCUs", as defined in the Verizon Contract, which Delphi, in turn, shall have purchased from Prolificx (the "Prolificx Inventory") if, and only to the extent that such Prolificx Inventory meets, in all respects, Purchaser's requirements to fulfill customer purchase orders under the Verizon Contract and the BP Agreement (collectively, "Customer Purchase Orders").  In the event that such Prolificx Inventory does not meet Purchaser's requirements to fulfill Customer Purchase Orders for VTCUs, then Delphi should have a right of first refusal to sell to Purchaser modified

VTCUs that meet Purchaser's requirements (the "Modified VTCUs") if and only if Delphi can deliver such Modified VTCUs to Purchaser to meet the terms and conditions of Customer Purchase Orders, including the delivery date. Purchaser's obligation to purchase up to 6,228 VTCUs shall be inclusive of any Modified VTCUs purchased.  Purchaser shall promptly notify Delphi of Purchaser's acceptance of a Customer Purchase Order for Modified VTCUs.  Upon receipt of such notice from Purchaser, Delphi shall have five (5) calendar days to provide Purchaser with written confirmation that it can and will provide such Modified VTCUs to Purchaser in accordance with the terms and conditions of the Customer Purchase Order, including the delivery date.  Delphi's right of first refusal shall expire without further notice if Delphi fails to provide the confirmation set forth herein.

**4.3.2**    Upon reasonable request and after receipt of a Customer Purchase Order, Delphi shall comply with Purchaser's requests to inspect, test and obtain information concerning the Prolificx Inventory and any Modified VTCUs as contemplated by this Section 4.3 and provide such other adequate assurances of Delphi's ability to provide Prolificx Inventory or Modified VTCUs within the time specified within the Customer Purchase Order.  All such requests to inspect, test and/or obtain information concerning the Prolificx Inventory and any Modified VTCUs shall provide sufficient time for Delphi to transfer such Prolificx Inventory or Modified VTCUs to a testing facility as mutually agreed to between the parties.

**4.3.3**    Provided that Delphi confirms within five (5) calendar days of a request by Purchaser that it will provide Purchaser with Prolificx Inventory or Modified VTCUs in accordance with the terms of Purchaser's Customer Purchase Orders, Purchaser shall purchase all Prolificx Inventory and Modified VTCUs from Delphi as needed prior to purchasing any VTCUs from any other source.

**4.3.4**    The Prolificx Inventory and any Modified VTCUs shall be purchased by Purchaser at the same VTCU unit price provided for in that certain Amendment No. 1 dated May 10, 2006 to the Prolificx Manufacturing Services and License Agreement between Prolificx New Zealand Ltd. and the Seller dated August 1, 2005 (the "Prolificx Agreement").

**4.3.5**    Purchaser shall have no obligation to purchase the Prolificx Inventory or the Modified VTCUs (i) if such Prolificx Inventory or Modified VTCUs is not first quality inventory saleable to Customers in the ordinary course of Purchaser's business and/or (ii) if the warranty (of 3 years from the date of delivery to Purchaser) for the Prolificx Inventory or the Modified VTCUs (which shall be no less favorable to Purchaser than the warranty for Prolificx Inventory) is not in full force and effect in all respects or in any other manner diminished.

**4.3.6**    Regarding Purchaser's acquisition of inventory from Delphi under this section, Purchaser shall have the same rights, including warranty rights, as Seller, Delphi and its affiliates have, as buyers, against Prolificx or otherwise arising under the Prolificx Agreement, including without limitation, transfer of title and invoicing and payment terms.

**4.3.7**    Delphi shall not (i) sell the Prolificx Inventory to any party other than to Purchaser nor (ii) delegate its obligations under this Section 4.3 without the consent of Purchaser.

**4.3.8**    Nothing herein shall limit in any respects Purchaser's rights under the law or in equity as against Seller or Delphi with respect to the obligations set forth in this Section 4.3.

**4.3.9**    Subject to all of the other terms and conditions of this Section 4.3 relating to the Prolificx Inventory, Purchaser agrees that it shall purchase from Delphi 2,000 VTCUs, whether or not it has received Customer Purchase Orders for such Prolificx Inventory, within one (1) year from the Closing Date.

**5.    REPRESENTATIONS AND WARRANTIES**

**5.1    Representations and Warranties of Seller.**    All information set forth in the Disclosure Schedules with respect to any clause of this Section 5.1 shall be deemed disclosed under and incorporated into any other clause of this Section 5.1 as to which such disclosure would clearly be appropriate based solely on the language in such disclosure and such other clause.    Seller represents and warrants to Purchaser as follows:

**5.1.1    Organization and Good Standing.**    Except as otherwise set forth on Schedule 5.1.1, Seller is a legal entity duly organized, validly existing and in good standing under the laws of its the state of Delaware, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure so to qualify or to be so licensed would not have a Material Adverse Effect.

**5.1.2    Corporate Power; Due Authorization.**    Seller has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements, subject to Bankruptcy Court approval, to which Seller is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein.    The execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of Seller.    Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, this Agreement, and the Ancillary Agreements, have been duly and validly executed and delivered by or on behalf of the Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser) constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

**5.1.3    No Violations.**    No consent, approval, authorization of, declaration, filing or registration with any domestic or foreign government or regulatory authority or any other third party is required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (including the assignment of all Transferred Contracts and all Purchased Intellectual Property), except for: (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court that have been made or obtained, or will be made or obtained prior to the Closing; and (ii) consents, approvals, authorizations, declarations, filings and registrations set forth on Schedule 5.1.3, the lack of which would not have a Material Adverse Effect. The items referred to in clauses (i) through (ii) of this Section 5.1.3 are hereinafter referred to as the "**Third-Party Requirements**".

**5.1.4**    **Sufficiency of Acquired Assets**.    The Acquired Assets comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted, except as identified on <u>Schedule 5.1.4</u>.

**5.1.5**    Personal Property; Condition of Personal Property:

**A.**    **Title to Personal Property**.    Except for the Personal Property leases and other Personal Property referred to in <u>Schedule 5.1.5.A</u>, Seller has good, valid and marketable title to the Personal Property and Inventory included in the Acquired Assets.  Upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer the Acquired Assets free and clear of any Lien, except as otherwise expressly indicated on <u>Schedule 5.1.5.A</u>.

**B.**    **Condition of Personal Property**.    To the Seller's Knowledge, the Personal Property included in the Acquired Assets are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

**C.**    **Inventory**.    Except to the extent identified in <u>Schedule 5.1.5.C</u>, the Inventory included in the Acquired Assets will, as of the Closing, be located at Seller's Mountain View, CA site and such other locations as set forth on Schedule 5.1.5.C, be fit for the purpose for which it is ordinarily acquired, and, in the case of finished goods Inventory, merchantable in the Ordinary Course of Business in all material respects.

**D.**    **Machinery, Equipment and Tools**.    Regarding the Acquired Assets, <u>Schedule 5.1.5.D</u> sets forth a list of substantially all machinery, equipment and capitalized tools with an acquisition value greater than $5,000 USD, included in the Acquired Assets and primarily used in or related to the Business.

**5.1.6**    **Litigation**.    Except for the pendency of the Bankruptcy Cases and any Claims referred to in <u>Schedule 5.1.6</u>, there is no suit, action, proceeding or, to Seller's Knowledge, investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to any of the Seller's Knowledge, threatened against or affecting Seller.

**5.1.7**    **Intellectual Property Assets:**

**A.**    Schedule 5.1.7.A.1 sets forth a true and complete list, including a complete identification of each patent, trademark registration, copyright registration, domain name registration, and application therefor included in the Owned Intellectual Property; and <u>Schedule 5.1.7.A.2</u> sets forth a true and complete list of all Licensed Intellectual Property. <u>Schedule 5.1.7.A.3</u> sets forth a true and complete list, in all material respects, of all Software used in, arising from, relating to, or necessary for the conduct of the Business.  To Seller's Knowledge there are no impediments to the ability of Seller under applicable Laws to maintain in effect or renew their respective rights, in all material respects, in and to the Owned Intellectual Property. Except as set forth on <u>Schedule 5.1.11</u>, <u>Schedule 5.1.14.B</u> and/or <u>Schedule 6.2.5</u>, to Seller's Knowledge there are no impediments to the ability of Seller under applicable Law to grant to Purchaser by license or assignment the rights to the Licensed Intellectual Property as contemplated in this Agreement.

**B.**    To Seller's Knowledge, Seller is conducting the Business in a manner that does not violate the intellectual property right of another Person and no Claim has

been made by any third party against Seller of Intellectual Property infringement or misappropriation resulting from the operation of the Business, except as set forth in Schedule 5.1.7.B.

**C.**    Seller has not granted any license, sublicense or other permission to use the Owned Intellectual Property included in the Acquired Assets to any third party, except as set forth on Schedule 5.1.7.C.

**D.**    Except as set forth on Schedule 5.1.7.D, all Owned Intellectual Property included in the Acquired Assets: (i) is owned solely and exclusively by Seller; and (ii) upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer the Owned Intellectual Property free and clear of any encumbrances thereon.

**E.**    Except as set forth on Schedule 5.1.7.E, no Owned Intellectual Property or any Product that contains any is, in whole or in part, governed by an Excluded License.  For purposes of this Agreement, an "**Excluded License**" means any license that requires, as a condition of modification and/or distribution of software subject to the Excluded License, that: (i) such software and/or other software combined and/or distributed with such software be disclosed or distributed in source code form or (ii) such software and/or other software combined and/or distributed with such software and any associated intellectual property be licensed on a royalty free basis (including for the purpose of making additional copies or derivative works).

**F.**    Seller has taken commercially reasonable steps to protect rights in confidential information (both of the Seller and that of third parties that the Seller has received under an obligation of confidentiality), has required all current and former employees with whom the Seller has shared confidential information to execute legally binding written non-disclosure agreements, and has entered nondisclosure or other similar agreements with substantially all third parties to whom the Seller has shared confidential information, except where the failure to do so would not have a Material Adverse Effect.

**G.**    The Seller has secured from all parties who have created any material portion of, or otherwise have any rights in or to, the Owned Intellectual Property, valid and enforceable written assignments or licenses of any such work or other rights to the Seller and provided true, complete and correct copies of such assignments or licenses to Purchaser.

**H.**    The Seller does not export vehicle hardware units from the United States and has not determined whether it would require a license to do so.

**5.1.8    Insurance.**    Schedule 5.1.8 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.  All such policies are outstanding and in full force and effect.

**5.1.9    Compliance with Other Instruments and Laws; Permits.**    The Business is in compliance with all Laws applicable to the conduct of the Business and all Permits, except where the failure to be in compliance would not have a Material Adverse Effect. All Permits that are necessary for the conduct of the Business and the ownership and operation of the Acquired Assets have been duly obtained, are in full force and effect, and, to Seller's Knowledge, are listed on Schedule 5.1.9, and there are no proceedings pending or, to Seller's

Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit, except in each case as would not, individually or in the aggregate, result in a Material Adverse Effect.  The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by Seller will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.10  Brokers.**    Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

**5.1.11  Consents and Approvals.**    Assuming that the Third-Party Requirements will be satisfied, made or obtained and will remain in full force and effect, and assuming receipt of the consents, approvals and authorizations listed in Schedule 5.1.11, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Seller, nor the consummation by Seller of the Sale, nor compliance by Seller with any of the provisions hereof and of the Ancillary Agreements, will, with or without the passage of time or the giving of notice: (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of Seller; (ii) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which Seller is a party or by which its properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to Seller or to any of its properties or assets; or (iv) result in the creation or imposition of any Lien other than Permitted Encumbrances on any asset of Seller, except in the case of clauses (ii), (iii) and (iv) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that: (a) would not individually or in the aggregate have a Material Adverse Effect; or (b) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.12  Financial Statements.**   (i) The unaudited balance sheets and statements of income, as of and for the fiscal years ended December 31, 2003, December 31, 2004 and December 31, 2005, for the Business are set forth in Schedule 5.1.12(i); and (ii) the unaudited balance sheet and statement of income for the four (4) months ended April 30, 2006 for the Business are set forth in Schedule 5.1.12(ii) (such financial statements in clause (i) and (ii) are collectively referred to as the "**Financial Statements**").    Except as set forth on Schedule 5.1.12(ii), the Financial Statements (including the notes thereto) were compiled from the books and records of the Business, are in accordance with such books and records, have been prepared in accordance with GAAP consistently applied (except as set forth therein) throughout the periods covered thereby and present fairly the assets, liabilities, financial position and results of operations of the Business as of the dates and for the periods indicated; provided, however, that the Financial Statements referred to in clause (ii) of the preceding sentence are subject to normal year-end adjustments (which, except as set forth on Schedule 5.1.12(ii) will not be material individually or in the aggregate) and lack footnotes required by GAAP.

**5.1.13  Events Subsequent to Latest Financial Statements.**    Except as referred to on Schedule 5.1.13 or as otherwise contemplated by or referred to in this Agreement

or the Ancillary Agreements, since April 30, 2006: (i) there has not been any Material Adverse Change; and (ii) the Business has been conducted and carried on only in the Ordinary Course of Business.

### 5.1.14  Contracts.

**A.**    Schedule 5.1.14.A lists all Contracts of Seller or its affiliates related to the Business that involve payment or performance obligations that individually exceed $25,000, and such Schedule includes all other Contracts to which Seller is a party or by which any of its properties are bound or that primarily relate to, are primarily used in, are primarily arising from, or are necessary for the conduct of the Business (including license and distribution agreements and arrangements among Seller, its Affiliates or third parties), other than Accounts Receivable (collectively, "**Listed Contracts**").    Seller has delivered or made available to Purchaser either: (i) true, correct and complete copies in all material respects; or (ii) accurate written descriptions in all material respects, of the Listed Contracts, except as set forth on Schedule 5.1.14.A.  Schedule 5.1.14.A identifies all Post-Petition Contracts included within the Listed Contracts other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business.  Except as set forth on Schedule 5.1.14.A, and except for Post-Petition Contracts that are immaterial to the Business, none of the Post-Petition Contracts included within the Listed Contracts contains any provisions restricting its assignment to Purchaser pursuant to the terms of this Agreement.

**B.**    Each of the Listed Contracts is valid, binding and, subject to payment of all Cure Amounts, if applicable (which Cure Amounts will be paid by Seller as set forth in the Sale Approval Order), enforceable against Seller, to the extent set forth therein, and, to Seller's Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect.  Except as set forth on Schedule 5.1.14.B, and other than with respect to monetary defaults by Seller under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Seller, and to Seller's Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to date under, and is not in material default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable) in respect of, any of such Listed Contracts, and there is not a material default thereunder or material claim of default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable) and there has not occurred any event which, with the passage of time or the giving of notice or both, would constitute a material default thereunder (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable), on the part of Seller, or to Seller's Knowledge, on the part of any other party thereto.  Except as set forth in Schedule 5.1.14.B, and other than with respect to monetary defaults by Seller under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Seller has received no written claim or notice from any other party to any such Listed Contract that Seller has breached in any material respects any obligations to be performed by it thereunder, or is otherwise in material default or delinquent in any material respects in performance thereunder (except with respect to defaults, delinquencies or obligations that need not be cured or performed, as appropriate, under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable).

### 5.1.15  Tax Matters.

**A.**     Seller has: (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all Tax Returns required to be filed and such Tax Returns were true, correct and complete; and (ii) and have paid all Taxes shown thereon as due and owing, except where the failure to file such Tax Returns or to pay such Taxes would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**B.**     Except as set forth on Schedule 5.1.15.A, Seller has properly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor or other third party (including federal income taxes, sales and use taxes, personal property taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) and has properly and timely paid the same to the proper Tax receiving officers or authorized depositories, except in each case where such failure would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**C.**     Seller is not a party to any Tax allocation, Tax sharing agreement or Tax indemnity arrangement, except as provided in this Agreement, under which Purchaser could be subject to Tax or other liability after the Closing.

**D.**     Except as disclosed in Schedule 5.1.15.D, no claim has ever been made by an authority in a jurisdiction in which Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction or authority with respect to, in connection with, associated with or related to, Seller; no agreements or waivers are outstanding extending the statutory period of limitations applicable to any Tax Return of Seller with respect to a Tax assessment or deficiency; and Seller has not received any: (i) notice of underpayment of Taxes or other deficiency that has not been paid with respect to, in connection with, associated with or related to, Seller; or (ii) any objection to any Tax Return, with respect to, in connection with, associated with or related to, Seller, except in each case where such matter would not result in any liability to the Purchaser or any Lien on the Acquired Assets.  Except as disclosed in Schedule 5.1.15.D, all deficiencies asserted or assessments made as a result of any examinations with respect to, in connection with, associated with or related to, Seller have been fully paid or are fully reflected as a liability in the financial statements of the Seller.

**E.**     Seller is not a party to any agreement, contract arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any excess parachute payments within the meaning of IRC Code Section 280G.

**F.**     There are no Tax liens on any of Seller's assets, except for liens for Taxes not yet due and payable.

**G.**     Except for Transfer Taxes relating to the Sale, since April 30, 2006, Seller has not incurred any Taxes other than in the ordinary course of business and Seller has made adequate provisions on its books of account for all Taxes with respect to the Acquired Assets and the Business for such period, except for Taxes that would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**H.**     Seller has no liability for the Taxes of any Person other than Seller or any of its subsidiaries (i) under Treasury Regulation 1.1502-6 (or any similar Treasury Regulations), (ii) as a transferee or successor, (iii) by contract, or (iv) otherwise, except in each case where such liability would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**5.1.16 Employee Issues:**

    **A.**    **Business Employees.**  Schedule 5.1.16.A contains a list of all Business Employees, and the information thereon is true, complete and correct in all material respects.

    **B.**    **Seller Performance.**  Seller has performed and discharged, or will perform and discharge on or before the Closing Date, its obligations with respect to all of the Business Employees, up to and including the Closing Date, including working time, payment of wages and salaries, benefits, employer's contributions to any relevant social security, health, welfare and occupational pension scheme, severance or any other payments, and payment of all other costs and expenses relating to their employment (including without limitation any taxation, accrued holiday and vacation pay, accrued bonus or other sums payable with respect to employment) up to and including the Closing Date, except as otherwise set forth on Schedule 5.1.16.B.

    **5.1.17 Absence of Other Representations or Warranties.**  Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets, the Assumed Liabilities, the sale of the Business, and in particular but without limitation, Seller makes no representations with respect to any plan(s) of Purchaser for the future conduct of the Business.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information  not contained in this Agreement or the Ancillary Agreements, or on any projected volumes of the Business, all which were produced only for information purposes.

    **5.2**    **Representations and Warranties of Purchaser.**  Purchaser warrants and represents to Seller as follows:

    **5.2.1 Corporate Data.**  Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

    **5.2.2 Corporate Power; Due Authorization.**  Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser.  This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Seller), valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

    **5.2.3 No Violations.**  Neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated herein, nor compliance by Purchaser with any of the provisions hereof, will: (i) except for the Third-Party Requirements, require Purchaser to obtain any consent, approval or action of, or

25

make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Purchaser's properties or assets.

       5.2.4 **Litigation.** Except for the pendency of the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

       5.2.5 **Brokers.** Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

       5.2.6 **Solvency.** Upon the consummation of the transactions contemplated by this Agreement: (i) Purchaser will not be insolvent; (ii) Purchaser will not be left with unreasonably small capital; (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Purchaser will not be impaired; and (v) immediately following closing, Purchaser will have sufficient capital to continue the Business as a going concern (it being understood that Purchaser will have no obligation to continue all or any portion of the Business as a going concern).

       5.2.7 **Availability of Funds.** Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

       5.2.8 **Adequate Assurance of Future Performance.** Purchaser has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Seller) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

       5.2.9 **Compliance with Law.** Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

       5.2.10 **Anti-Money Laundering.** Purchaser is in compliance with**:** (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in

which Purchaser operates or does business.  Neither the Purchaser nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities. Purchaser agrees that should it, or any of its directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Purchaser shall inform the Seller in writing immediately.

**5.3    Survival of Representations, Warranties and Covenants of the Seller.**  The representations and warranties made by the Seller in Section 5.1 shall survive the Closing and shall expire on the first anniversary of the Closing Date (the "**Expiration Date**"); provided, however, that if, at any time prior to the first anniversary of the Closing Date, Purchaser delivers to Seller a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Seller and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the first anniversary of the Closing (and the Expiration Date with respect thereto shall be extended) until such time as such claim is fully and finally resolved. The covenants made by the Seller shall survive the Closing.

**5.4    Survival of Representations, Warranties and Covenants of the Purchaser.** The representations and warranties made by the Purchaser in Section 5.2 shall survive the Closing and shall expire on the Expiration Date; provided, however, that if, at any time prior to the first anniversary of the Closing Date, Seller delivers to Purchaser a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Purchaser and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the first anniversary of the Closing (and the Expiration Date with respect thereto shall be extended) until such time as such claim is fully and finally resolved.  The covenants made by the Purchaser shall survive the Closing.

**6.    CONDITIONS TO CLOSING:**

**6.1    Conditions to Obligations of Seller and Purchaser.**    The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1    Sale Approval Order.**  The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2    No Law, Judgments, etc.**  No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each party taking any and all steps required by Section 8.2 of this Agreement).

**6.2    Conditions to Obligations of Purchaser.**    The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

27

**6.2.1**    **Accuracy of Representations and Warranties**.    Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time).  Subject to the preceding sentence, Seller may update or supplement the Disclosure Schedule prior to Closing by written notice to Purchaser, but any such update or supplement shall not be taken into account in determining whether the condition set forth in this Section 6.2.1 has been satisfied or whether there has been a breach of any representation, warranty or covenant has been breached for any purpose under this Agreement.  Any claim that Purchaser may have based on matters disclosed by Seller in such updated or supplemented Disclosure Schedule will be deemed waived by Purchaser if Purchaser nonetheless completes the transactions contemplated herein.

**6.2.2**    **Performance of Covenants**.    Each of the Ancillary Agreements to which Seller is a party shall have been executed and delivered by Seller to Purchaser, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Seller on or before the Closing shall have been performed in all respects.

**6.2.3**    **Payment of Cure Amounts**.    Seller shall have paid all Cure Amounts with respect to Assumed Contracts as set forth in Section 8.4 hereof.  Seller shall have cured any and all monetary defaults that arose under or otherwise became due and owing prior to the Closing Date under Transferred Contracts that are Post-Petition Contracts.

**6.2.4**    **Certification**.    Seller shall furnish to Purchaser a certification in a form acceptable to Purchaser pursuant to Treasury Regulation Section 1.1445-2(b)(2) that Seller is not a foreign person.

**6.2.5**    **Other Approvals**.    Except as expressly obviated by the terms of the Sale Approval Order, the third party consents set forth in Schedule 6.2.5 shall have been received and all consents, approvals and filings in connection with Third-Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchaser.

**6.3**    **Conditions to Obligations of Seller**.    Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

**6.3.1**    **Accuracy of Representations and Warranties**.    The representations and warranties of Purchaser contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

**6.3.2**    **Performance of Covenants**.    Each of the Ancillary Agreements to which Purchaser is a party shall have been executed and delivered by Purchaser to Seller, and all

other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing shall have been performed in all material respects.

    **6.3.3**  **Delivery of Purchase Price**. Purchaser shall have delivered to Seller the Purchase Price by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Seller to Purchaser on the Closing Date.

**7.**   **CLOSING.**

    **7.1**   **The Closing**. Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby shall take place at the offices of DLA Piper, 2000 University Avenue, East Palo Alto, California 94303 at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), but not earlier than July 31, 2006, or on such other date or at such other time as the Parties may agree. For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. EDT on the Closing Date.

    **7.2**   **Ancillary Agreements**. At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

    **7.2.1**  Assignment of Lease regarding 800 West El Camino Real, Mountain View, CA 94040 property substantially in the form of Schedule 7.2.1, including the landlord's consent thereto.

    **7.2.2**  Intellectual Property Transfer Documents as follows:

    **A.**   An assignment from MobileAria to WIRELESS MATRIX of the Patent Rights set forth in Schedule 5.1.7.A.1 substantially in the form attached hereto as Schedule 7.2.2.A.

    **B.**   An assignment from MobileAria to WIRELESS MATRIX of the Trademark Rights set forth in Schedule 5.1.7.A.1 substantially in the form attached hereto as Schedule 7.2.2.B.

    **7.2.3**  Assignment and Assumption Agreement relating to the Transferred Contracts, consistent with the Sale Approval Order substantially in the form attached hereto as Schedule 7.2.3.

    **7.2.4**  Escrow Agreement between Seller, Purchaser and the Escrow Agent substantially in the form attached hereto as Schedule 7.2.4, and the Additional Escrow Agreement referred to in Section 4.1.2.

    **7.2.5**  Bill of sale substantially in the form attached hereto as Schedule 7.2.5.

    **7.2.6**  An Agreement in substantially the form attached hereto as Exhibit 7.2.6.

    **7.2.7**  A non-exclusive, royalty-free license for vehicle adaptor bus technology on terms reasonably agreeable to  Delphi Technologies and Purchaser.

**7.3**   **Seller's Deliveries.**   At the Closing, Seller shall deliver to Purchaser the following, in proper form for recording where appropriate:

**7.3.1**   Executed assignments for the Permits and Contracts to be acquired by Purchaser pursuant to Article 1.

**7.3.2**   An officer's certificate, dated as of the Closing Date, executed on behalf of Seller, certifying that the conditions specified in Section 6.2 have been fulfilled.

**7.3.3**   A certificate, dated as of the Closing Date, executed on behalf of Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Seller's Organizational Documents; and (ii) a true and correct copy of the resolutions of Seller's board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which Seller is a party and the consummation of the transactions contemplated hereby and thereby.

**7.3.4**   Certified copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.5**   Duly executed bill of sale transferring the Acquired Assets to Purchaser.

**7.3.6**   Appropriate receipts.

**7.4**   **Purchaser's Deliveries.**   At the Closing, Purchaser shall deliver to Seller, in proper form for recording where appropriate:

**7.4.1**   The Purchase Price less the Deposit Amount as required by, and in accordance with, Section 4.1.

**7.4.2**   An Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.3**   An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4**   A certificate, dated as of the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchaser's Organizational Documents; and (ii) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

**8.**   **CERTAIN ADDITIONAL COVENANTS:**

**8.1**   **Bankruptcy Actions:**

**8.1.1**   The Bidding Procedures are set forth in Section 11.1.  As further specified below, Seller shall file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Approval Order.

**8.1.2**    Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.2**    **Registrations, Filings and Consents; Further Actions.**    Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

**8.3**    **Operation of the Business Pending Closing:**

**8.3.1**    Except: (i) as otherwise provided herein; (ii) as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) subject to any changes that may be required under applicable Laws; (iv) as set forth in the following sentence, until the Closing, Seller will (a) carry on the Business in substantially the same manner as heretofore; and (b) will perform in all material respects all of its obligations under all Listed Contracts and not amend, alter or modify in any significant respect that is adverse to the Business any provision of any Listed Contract; keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relations with the Business; endeavor to maintain the goodwill of the Business; and promptly advise Purchaser of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets.-

**8.3.2**    Seller shall promptly notify Purchaser if Seller becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2, 6.2.1 or 6.2.5 hereof to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Seller to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.3.3**    Purchaser shall promptly notify Seller if Purchaser becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.3.1 hereof to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Purchaser to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.4**    **Assumed Contracts; Cure Amounts.**    As soon as practicable after the date hereof, Seller shall, pursuant to a motion in form and substance reasonably acceptable to

Purchaser (which motion may be incorporated into the Sale Motion), move to assume and assign to Purchaser the Assumed Contracts and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Seller shall pay Cure Amounts as agreed to by the Seller and each party to an Assumed Contract or, absent such agreement, by order of Court in the time and manner specified by the Sale Approval Order. Notwithstanding anything in this Agreement to the contrary, at any time prior to the conclusion of the Sale Hearing, Purchaser may notify the Seller that it has elected not to take an assignment of one or more Assumed Contracts and Seller shall have no obligation to assume or make payment of the Cure Amount with respect to any such Assumed Contract. Seller agrees to make such information available as Purchaser reasonably requests in order to make a determination with respect to such Assumed Contracts.

     **8.5**    <u>**Post-Closing Covenants**</u>.  From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

     **8.5.1**   <u>**Seller Post-Closing Covenants**</u>:

     **A.**    <u>**Non-Competition**</u>.  Seller has as at Closing, established the reputation of the Business. Seller undertakes and agrees with Purchaser that for a period of three (3) years after the Closing Date, except with the consent of Purchaser, Seller shall not either on its own account or in conjunction with or on behalf of any person, firm or company whether by sales, marketing, investing, management or other activities, carry on, license or be engaged, concerned or interested, directly or indirectly, whether as a shareholder, director, employee, partner, agent or otherwise in carrying on any business which is engaged in the design, development, manufacture or sale of Products (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 8.5.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any person, or a division or business unit thereof, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date if the Competitive Business accounts for five (5%) percent or less of the sales or five (5%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than fifteen (15%) percent of such acquired business's sales or value; (ii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (iii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any person engaged in a Competitive Business; (iv) provision of consulting services to any Person for the purpose of designing or manufacturing on behalf of Seller or any Seller Affiliate or selling to Seller or any Seller Affiliate components and parts solely for automotive applications other than those that would constitute Products; (v) consistent with the generally applicable Seller or any Seller Affiliate troubled supplier practices, direct or indirect activities of Seller or any Seller Affiliate to advise, operate, manage or finance a troubled supplier of Seller or its Affiliates; and (vi) the design, development, manufacture or sale of telematic modems and other telematics hardware and the communication of digital data for the remote resource management market for any kind of vehicle, including commercial vehicles, and derivatives of such hardware (collectively, "**Competing HW**"); provided that Seller does not provide subscription services (other than repair or replacement of defective hardware) associated with the use of Competing HW; and, provided, further, that Competing HW may be

sold only to original equipment manufacturers, any distributor or reseller, and commercial users requiring volumes exceeding 5,000 units.  For further clarification, Seller agrees not to market or sell products that combine all of the following features in one Competing HW unit: CDMA (EVDO), GPS, 802 technologies, Windows CE operating platform, USB/Serial/GPIO interfaces and 64MG internal memory capabilities.

**B.**    While the restrictions contained in this Section 8.5.1 are considered by the parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions shall be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser and/or the Business but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction shall apply with such modifications as may be necessary to make it valid and effective.

**C.**    Seller will cooperate with Purchaser to transition the letter of credit arrangement set forth in Section 4.3 as of the Closing Date.

**8.5.2    Technical Documentation.**    Seller has delivered, or will deliver on or before the Closing, to the Purchaser, a copy of all Technical Documentation included in the Acquired Assets.  For a period of not less than one (1) year commencing at Closing, Purchaser and its Affiliates shall use reasonable efforts to maintain all Technical Documentation applicable to product design, test, release, validation and manufacture it acquires from Seller and its Affiliates in connection with the purchase of the Acquired Assets under Article 1 of this Agreement at a location at which they shall be reasonably accessible to Seller and its Affiliates upon reasonable request and with reasonable advance notice.  During such one (1) year period, Purchaser shall not intentionally destroy or give up possession of its final copy of such documentation without offering Seller the opportunity, at Seller's expense but without any payment to Purchaser, to obtain a copy of such documentation.

**8.5.3    Books and Records and Litigation Assistance From and After Closing:**

**A.**    Purchaser and its Affiliates shall use reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchaser by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than one (1) year from the Closing Date, or for any longer period as may be required of the Business by any government agency, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense.  If and when Seller believes that such records are no longer legally required, it will notify Purchaser.  During such period, Purchaser shall: (i) provide Seller or its Affiliates with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of  the Business as of December 31, 2006; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets during such period.  Seller or its Affiliates shall reimburse Purchaser for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Purchaser wishes to destroy or dispose of such books and records after one (1) year from the

Closing Date, it shall first give not less than thirty (30) days' prior written notice to Seller or its Affiliates, and Seller or its Affiliates shall have the right, at its option, upon prior written notice given to Purchaser within twenty (20) days of receipt of Purchaser's notice, to take possession of said records within thirty (30) days after the date of Purchaser's notice to Seller hereunder.

**B.**    Purchaser, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations; (ii) make available documents and records delivered to it by Seller reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller and its Affiliates will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and its Affiliates in connection with such claim.

**8.5.4    Payment and Collections.**    Seller shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchaser after Closing, and Purchaser shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Seller after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, Seller or Purchaser, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.  Seller shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Seller with respect to such items.  Purchaser shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Seller shall cooperate with Purchaser as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

**8.5.5    Intellectual Property Transition Rights.**    Seller will have the right to continue to use the MobileAria corporate name and office materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of MobileAria, but only in connection with the Bankruptcy Cases and the dissolution and wind down of Seller.

**8.6    Further Assurances.**    If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

**8.7    [Reserved]**

**8.8** **Certain Transactions.** Purchaser shall not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by this Agreement or the Ancillary Agreements or the expiration or termination of any applicable waiting period; (ii) significantly increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) materially delay or prevent the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.9** **Communications with Customers and Suppliers.** Prior to the Closing, Purchaser shall not, and shall cause its Subsidiaries and representatives not to, contact, engage in any discussions or otherwise communicate with any of the Business' customers, suppliers and others with whom it has material commercial dealings without obtaining the prior written consent of Seller (which may be conditioned on Seller having the right to participate in any meetings or discussion with any such customers, suppliers or others); provided, that Purchaser and Seller shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of Purchaser, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition. Purchaser may contact Verizon Services Corp. to: (i) ensure orderly transition of the Verizon Contract to Purchaser; and (ii) reduce and assess the likelihood of termination of the Verizon Contract by Verizon Services Corp. or material reduction of the amount of business conducted pursuant to the Verizon Contract, provided that Purchaser provides at least twenty-four (24) hour prior notice to Seller and permits Seller to supervise such correspondence at Seller's election.

## 9.    TERMINATION

**9.1** **Termination.** Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

### 9.1.1    By Either Party:

**A.** By mutual written consent of Seller and Purchaser.

**B.** Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any regulatory Governmental Entity, other than the Bankruptcy Court.

**C.** If Seller consummates an Alternative Transaction.

**D.** Providing the terminating Party is not in default of its obligations under this Agreement, by either Seller or Purchaser if the Closing shall not have occurred on or prior to August 31, 2006.

**E.**    If the Bankruptcy Court has not entered the Sale Approval Order, on or before July 26, 2006 (the "**Termination Date**") or such Sale Approval Order is subject to a stay or injunction; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1.1.E shall not be available to Purchaser if Purchaser shall have failed to perform, or caused any of its respective Affiliates to perform, any of its respective material obligations under this Agreement.

**9.1.2    By Purchaser.**    By Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) (i) at any time prior to Closing, if a Material Adverse Effect shall have occurred, Purchaser may terminate within ten (10) Business Days after receiving written notice of such event, so long as such event is continuing at the time of any such termination; or (ii) if Verizon Services Corp. has terminated, threatened to terminate, or Verizon otherwise evidences an intent to terminate the Verizon Contract or materially reduce the amount of business conducted pursuant to the Verizon Contract.

**9.2    Notice of Termination.**    In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

**9.3    Break-Up Fee; Expense Reimbursement**:

**9.3.1    Break-Up Fee.**    Subject to Section 9.3.4, in the event that: (i) Seller sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all or a material portion of the Business or the Acquired Assets in a transaction or a series of transactions with one or more parties other than Purchaser (such event being an "**Alternative Transaction**"), Seller shall, within two (2) Business Days after the consummation of an Alternative Transaction(s), pay to Purchaser an amount equal to one hundred ninety-five thousand dollars ($195,000.00) (the "**Break-Up Fee**"), unless the Agreement is then terminated under Sections 9.1.1.B; in which case no Break-Up Fee shall be payable.  The claim of Purchaser for a Break-up Fee shall be paid to Purchaser from the sale proceeds of an Alternative Transaction and, until paid in full, shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code.

**9.3.2    Expense Reimbursement.**    In the event this Agreement is terminated pursuant to Sections 9.1.1.D or 9.1.1.E, and provided that Purchaser is not then in breach of this Agreement for which Seller had previously notified Purchaser, and, in the case of Section 9.1.1.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Seller or any action or conduct of Seller and not from the status of Purchaser or any intentional action or conduct of Purchaser, then Seller shall be obligated to pay Purchaser an amount equal to Purchaser's reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**") up to a maximum of $120,000.  Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Seller to Purchaser promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by Purchaser to be delivered to Seller within ten (10) Business days of termination of this Agreement.  The claim of Purchaser for an

Expense Reimbursement shall constitute a superpriority administrative expense under Section 364(c)(1) of the Bankruptcy Code.

**9.3.3**    Payments to Purchaser pursuant to this Section 9.3 shall be by wire transfer of immediately available funds in U.S. Dollars, to such account or accounts as Purchaser shall designate in writing.

**9.3.4**    Purchaser acknowledges and agrees that, in the event that it terminates this Agreement or Seller terminates this Agreement and Purchaser becomes entitled to receive or receives any Expense Reimbursement, Purchaser shall not be entitled to receive nor shall it receive the Break-Up Fee or any portion thereof, and, conversely, that in the event that Purchaser becomes entitled to receive or receives any Break-Up Fee, it shall not be entitled to receive nor shall it receive the Expense Reimbursement or any portion thereof. In the event that Purchaser would be entitled to receive both the Break-Up Fee and Expense Reimbursement but for the operation of this Section 9.3.4, Purchaser shall be entitled to receive the greater of such amounts.

**9.4**    **Procedure and Effect of Termination.**    In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto.   If this Agreement is terminated as provided herein no Party shall have any liability or further obligation to any other Party resulting from such termination except for the provisions of: (i)(a) Purchasers' obligations under that certain confidentiality agreement between the Parties dated April 10, 2006; (b) Article 9 (Termination); and (c) Sections 4.1.1 (Deposit Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8 (Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.15 (Venue and Retention of Jurisdiction) and 13.18 (Dispute Resolution), all of which shall remain in full force and effect; and (ii) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination; provided, however, that in the event Purchaser is entitled to receive the Break-Up Fee, the right of Purchaser to receive such amount shall constitute Purchaser's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement, and provided, further, that in the event Seller is entitled to receive the Deposit Amount, the right of Seller to receive such amount shall constitute Seller's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by Purchaser of any of its representations, warranties, covenants or agreements set forth in this Agreement.   In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

## 10.    **OTHER TAX MATTERS:**

**10.1**    Seller will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Purchaser shall make available to Seller (and to Seller's accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably

requested by Seller to prepare these Tax Returns.  Seller will make all payments required with respect to any such Tax Return.

**10.2**    Purchaser will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Seller will include the operations of the Business).  Purchaser shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the Business pertaining to: (a) any period ending after the Closing Date; and (b) the portion of any Taxes for which Purchaser is liable as determined in accordance with Section 10.3 below.

**10.3**    For purposes of this Article 10 and Section 2.3, whenever it is necessary to allocate the liability for Taxes for a Straddle Period, the determination of the Taxes of the Business for the portion of the Straddle Period ending at the end of the Closing Date (the "**Pre-Closing Portion**") and the portion of the Straddle Period beginning after the Closing Date (the "**Post-Closing Portion**") will be determined by assuming that the Straddle Period consisted of two taxable years or periods, one of which ended at the close of business on the Closing Date and the other of which began at the beginning of the day after the Closing Date, and items of income, gain, deduction, loss or credit related to the Acquired Assets and the Business for the Straddle Period will be allocated between such two (2) taxable years or periods on a "closing of the books basis" by assuming that the books associated with the Business were closed at the end of the Closing Date; provided, however, that all real property taxes, personal property taxes, ad valorem obligations and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets (other than Taxes resulting from the transactions described herein as provided for in Section 10.1) for a Straddle Period shall be apportioned between Seller and Purchaser as of the Closing Date based on the number of days of such taxable period up to and including the Closing Date and the number of days of such taxable period following the Closing Date.  Seller shall be liable for the proportionate amount of such taxes that is attributable to the period up to and including the Closing Date; Purchaser shall be liable for the proportionate amount of such taxes that is attributable to the period following the Closing Date.

**10.4**    Seller and Purchaser will cooperate in connection with: (i) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets.  Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to Purchaser's chief financial officer.

**10.5**    Seller shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.

**11.    BIDDING PROCEDURES:**

**11.1    MobileAria Initial Bankruptcy Actions.**  This Article 11 sets forth the bidding procedures (the "Bidding Procedures") to be employed with respect to the Agreement and the sale (the "Sale") of the Acquired Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate the Purchaser for its efforts

and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Seller and its Affiliates' creditors, shareholders and bankruptcy estate.

      **11.2**   **Court Approval.**   Promptly after the execution of this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court seeking: (i) entry of the Bidding Procedures Order approving the Bidding Procedures, the Break-Up Fee and the Expense Reimbursement; and (ii) subject to the competitive bidding process provided under the Bidding Procedures, entry of the Sale Approval Order approving this Agreement and the transaction specified herein.  It is a material inducement to Purchaser to be able to acquire the Acquired Assets pursuant to the provisions of Sections 363 and 365 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to Section 363(f) of the Bankruptcy Code.  Therefore, notwithstanding anything in this Agreement to the contrary, any and all obligations of Purchaser under this Agreement are subject to the entry of the Sale Approval Order approving this Agreement and the transaction specified herein, and ordering, finding or concluding that, among other things: (a) notice of the Sale Motion and the transactions contemplated hereunder was proper and sufficient to all parties entitled to such notice; (b) the sale of the Acquired Assets to Purchaser is approved pursuant to Section 363(b) of the Bankruptcy Code; (c) the assumption and assignment of the Assumed Contracts to the Purchaser is approved pursuant to Section 365 of the Bankruptcy Code and that the Cure Amounts to be paid by the Seller on the Closing Date to the non-debtor parties to the Assumed Contracts satisfy all monetary obligations and defaults of the Seller to those non-debtor third parties required to be cured pursuant to Section 365(b)(1) of the Bankruptcy Code; (d) the sale of the Acquired Assets to the Purchaser pursuant to this Agreement will be free and clear of all known and unknown Liens pursuant to Section 363(f) of the Bankruptcy Code; (e) Purchaser is not a continuation of Seller or its estate, there is no continuity of enterprise between Seller and Purchaser, Purchaser is not a successor to Seller or its estate and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Purchaser and Seller or its estate; (f) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code; (g) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code; (h) Purchaser is not assuming or acquiring any of Seller's liabilities except as specifically provided in this Agreement; and (i) the Sale Approval Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d).  Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted to the Purchaser as far prior to their filing with the Bankruptcy Court as reasonably practicable for the Purchaser's prior review and, solely with respect to the Bidding Procedures Order and the Sale Approval Order, approval, which shall not be unreasonably withheld or delayed.  Should Seller not have received Purchaser's approval of the Bidding Procedures Order and the Sale Approval Order prior to Seller's deadline for filing with the Bankruptcy Court, Seller may file such documents with the Bankruptcy Court and may submit a revised Bidding Procedures Order and/or Sale Approval Order reflecting agreed modifications thereto, if any, to the Bankruptcy Court prior to the hearing thereon.

      **11.3**   **Qualified Bidder.**   Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Seller, in order to participate in the bidding process, each person (a "Potential Bidder"), other than the Purchaser, must deliver (unless previously delivered) to Seller:

            **11.3.1**  An executed confidentiality agreement in form and substance satisfactory to Seller.

**11.3.2** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors; and

**11.3.3** A preliminary (non-binding) written proposal regarding: (i) the purchase price; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite Financial Assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that the Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**".  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired  Assets and the Business as provided in Section 11.5 below.  Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

**11.4    Bid Deadline.**  A Qualified Bidder (other than Purchaser) that desires to make a bid shall deliver written copies of its bid to: MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040, Attention: Richard Lind with copies to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: Stephen H. Olsen; (ii) the Seller's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Randall G. Reese; (iii) the Seller's financial advisor, Pagemill Partners, LLC, 2475 Hanover Street, Palo Alto, California 94304, Attention: Milledge A. Hart; (iv) the Seller's corporate counsel, DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303, Attention: James M. Koshland; (v) counsel to the Creditors' Committee), Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude; (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; (vii) counsel to the debtors' prepetition lenders, Simpson Thacher & Bartlet LLP, 25 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman; and (viii) the debtors' pre-petition lenders' financial advisor, Alvarez & Marsal, 600 Lexington Avenue, 6th Floor, New York, New York 10022, Attention: Andrew Hede so as to be received not later than 11:00 A.M. (New York Time), on June 29, 2006 (the "**Bid Deadline**").  As soon as reasonably practicable following receipt of each Qualified Bid, Seller shall deliver to Purchaser and its counsel complete copies of all items and information enumerated in Section 11.6 of this Agreement.

**11.5    Due Diligence.**  Seller shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Business.  Due diligence access may include management presentations as may be scheduled by Seller, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.  Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional due diligence shall not continue after the Bid Deadline. Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  Neither Seller nor any of its Affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**11.6    Bid Requirements.**    All bids must include the following documents (the "Required Bid Documents"):

**11.6.1**  A letter stating that the bidder's offer is irrevocable until the earlier of: (i) two (2) Business Days after the closing of the Sale of the Acquired Assets; or (ii) August 31, 2006.

**11.6.2**  An executed copy of the Agreement, together with all schedules a ("**Marked Agreement**") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

**11.6.3**  A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to US$500,000.

**11.6.4**  Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller and its advisors.

**11.7    Qualified Bids.**  A bid will be considered only if the bid:

**11.7.1**  Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Seller than, those contained in the Agreement.

**11.7.2**  Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.7.3**  Proposes a transaction that Seller determines, in its sole discretion, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $ 400,000; and (ii) $100,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.7.4**  Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.7.5** An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.7.6** Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within twenty (20) days after entry of such order.

**11.7.7** Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Seller shall have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, further, however, that no bid shall be deemed by Seller to be a Qualified Bid unless such bid proposes a transaction that Seller determines, in its sole discretion, has a value, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee, plus $400,000, taking into account all material terms of any such bid. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Purchaser is referred to as a "**Subsequent Bid**".

If Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

**11.8**    **Bid Protection.  [Reserved]**

**11.9**    **Auction, Bidding Increments and Bids Remaining Open.**  If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before July 10, 2006, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, in accordance with the following procedures:

**11.9.1** Only Seller, Delphi, Purchaser, any representative of the Committee, any representative of the secured lenders (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**11.9.2**  At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer to all Qualified Bidders who have informed Seller of their intent to participate in the Auction. Should an Auction take place, Purchaser shall have the right, but not the obligation, to participate in the Auction. Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

**11.9.3**  All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.9.4**  Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.9.5**  Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $100,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), Seller shall give Purchaser a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement that may be payable to Purchaser under this Agreement and shall give effect to any assets and/or equity interests to be retained by Seller.

**11.9.6**  At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "**Successful Bid(s)**" and the bidder(s) making such bid, the "**Successful Bidder(s)**").

**11.10**  **Acceptance of Qualified Bids.**  Seller shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

**11.11**  **Sale Hearing.**  The Sale Hearing will be held before the Honorable Robert Drain on July 19, 2006 at 10:00 a.m. (New York City time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or

rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Seller shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**11.12  Return of Good Faith Deposit.**  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Seller.   On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.13  Reservation of Rights.**  Seller, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of  the Sale; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion

**12.   INDEMNIFICATION:**

**12.1   Seller's Agreement to Indemnify.**  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 12 prior to the Expiration Date, then Seller agrees to indemnify and hold harmless Purchaser subject to the terms of this Article 12, from and after the Closing, from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Purchaser Damages**") incurred by Purchaser as a result of or arising out of: (i) those Retained Liabilities and those Excluded Assets that are retained at Closing by Seller; (ii) a breach of any representation or warranty in this Agreement; (iii) any covenant to be performed on or before Closing; or (iv) a breach of any agreement or covenant of Seller in this Agreement to be performed after Closing; and the sole source to satisfy any remedy with respect to (i) and (ii) above shall be the Escrow Amount, and the limit of Seller's obligation with

respect to clauses (i) and (ii) above, shall be $975,000.00. Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date. As soon as possible after the Expiration Date, the Escrow Amount, including all cash, interest accrued thereon and other property retained by the Escrow Agent, will be delivered to Seller by the Escrow Agent, less an amount necessary to satisfy the amount of all then outstanding claims by Purchaser for Purchaser Damages in accordance with the terms of the Escrow Agreement.

**12.2** **Purchaser's Agreement to Indemnify.** If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this Article 12, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Seller Damages**") incurred by Seller as a result of or arising out of: (i) the Assumed Liabilities; (ii) a breach of any representation or warranty of Purchaser contained herein; (iii) any covenant to be performed on or before Closing; (iv) a breach of any agreement or covenant of Purchaser contained herein to be performed after Closing; or (v) the use, operation or ownership of the Business or any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to Section 12.1. The maximum amount of Purchaser's obligations under clauses (i), (ii) and (v) above shall be $975,000.00. Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date.

**12.3** **Limitations on Agreements to Indemnify.** The obligations of either Party to indemnify the other pursuant to this Article 12 are subject to the following limitations:

**12.3.1** Each Party agrees that, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement;

**12.3.2** In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein;

**12.3.3** Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party; and

**12.3.4** Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's own gross negligence or willful misconduct.

**12.3.5** No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds USD

$20,000.00, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount).

To the extent an indemnifying party makes any indemnification payment pursuant this Article 12 for which the indemnified party has a right to recover against a third party (including an insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

**12.4    Third Party Indemnification Procedures.**  The obligations of any indemnifying party to indemnify any indemnified party under Sections 12.1 or 12.2 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**12.4.1**  Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 12.3.3), and, to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party. Failure to give prompt written notice of a Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 12, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice.  The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

**12.4.2**  Anything in this Section 12.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**13.    MISCELLANEOUS:**

**13.1    Bulk Sales Laws.**  Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2    Notices.**  All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first

business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

| | |
|---|---|
| **If to Seller:** | **MOBILEARIA, INC.** |
| | c/o Delphi Corporation |
| | 2151 East Lincoln Road |
| | Kokomo, Indiana 46904 |
| | Attn:  Ronald E. Jobe, General Director, Finance |
| | Fax No.:  765-451-0210 |
| | |
| **With a copy to:** | **DELPHI CORPORATION** |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | Attn:  Assistant General Counsel - Commercial & Transactional |
| | Fax No.:  248-813-2491 |
| | |
| **With a copy to:** | **DLA Piper** |
| | 2000 University Avenue |
| | East Palo Alto, California  94303 |
| | Attn:  Jim Koshland |
| | Fax No.:  650-833-2001 |
| | |
| If to Purchaser: | **WIRELESS MATRIX USA, INC.** |
| | 12369B Sunrise Valley Drive |
| | Reston, Virginia, 20190 |
| | Attn:  Maria Izurieta |
| | Fax No.:  703-262-4013 |
| | |
| With a copy to: | **COOLEY GODWARD LLP** |
| | 11951 Freedom Drive |
| | Reston, VA 20190 |
| | Attn:  Ryan E. Naftulin, Esq. |
| | Fax No.:  (703) 456-8100 |

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

**13.3    Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

**13.4    Entire Agreement.**  This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.   This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**13.5    Waiver.**  Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a

continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6    Severability.**  Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7    Amendment.**  This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**13.8    Expenses.**  Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**13.9    Third Parties.**  Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**13.10    Headings.**  The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**13.11    Counterparts.**  More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**13.12    Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of New York and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**13.13    Public Announcements.**  Seller and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**13.14    Sales or Transfer Taxes.**  All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the

transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser.

**13.15  Venue and Retention of Jurisdiction.**  All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

**13.16  Risk of Loss.**  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Seller.

**13.17  Enforcement of Agreement.**  The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**13.18  Dispute Resolution.**  Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response. The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 13.18 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.15 above.

**13.19  No Right of Setoff.**  Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**13.20  Limitation on Damages.**  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT SHALL PURCHASER OR SELLER BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers.

**MOBILEARIA, INC.**                                  **WIRELESS MATRIX USA, INC.**

By:                                                   By:

Print Name:                                           Print Name:    J. Richard Carlson

Title:                                                Title:    CEO and President

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers

**MOBILEARIA, INC.**

By _Richard Clint_
Print Name _Richard Clint_
Title _President_

**WIRELESS MATRIX USA, INC.**

By
Print Name
Title

| Counterparty | Agreement |
|---|---|
| 12 Planet, Inc. | Mutual Confidentiality Agreement effective July 17, 2002 betweenMobileAria, Inc. and I2 Planet, Inc. |
| A2S Advanced Systems Solutions Limited | Mutual Confidentiality Agreement effective February 28, 2002 betweenMobileAria, Inc. and A2S Advanced Systems Solutions Limited |
| Absolute Wireless Inc. | Installation Services Agreement dated May 11, 2006 between MobileAria, Inc. and Absolute Wireless Inc. |
| Accounting Services | Standard Engagement Terms and Fee Schedule Letter for accounting services dated October 31, 2000 from ManageComm, Inc. to MobileAria, Inc. |
| Acevedo, Natalie | Employee Assignment and Proprietary Inventions assignment agreements |
| ACNielson Vantis | Confidentiality Agreement effective June 29, 2001 betweenMobileAria, Inc. and ACNielson Vantis |
| Active RFID Systems, Inc. | Mutual Confidentiality Agreement effective October 5, 2005 betweenMobileAria, Inc. and Active RFID Systems, Inc. |
| AdvanTel, Inc. | Maintenance Service Agreement dated March 13, 2003 by and between MobileAria, Inc. and AdvanTel, Inc. |
| Advantra International NV | Agreement effective September 11, 2003 betweenMobileAria, Inc. and Advantra International NV |
| Alcoff, Ed | Employee Assignment and Proprietary Inventions assignment agreements |
| ALK Technologies/TravRoute | Mutual Confidentiality Agreement effective June 15, 2001 betweenMobileAria, Inc. and ALK Technologise/TravRoute |
| AmBell Corporation | Mutual Confidentiality Agreement effective April 30, 2000 betweenMobileAria, Inc. and AmBell Corporation |
| Apache Software Foundation | Apache License Version 2.0, January 2004 |
| Aragon, Vincent | Employee Assignment and Proprietary Inventions assignment agreements |
| Arsenault Associates | Mutual Confidentiality Agreement effective February 21, 2001 betweenMobileAria, Inc. and Arsenault Associates |
| Asefaw, Solomon | Employee Assignment and Proprietary Inventions assignment agreements |
| Asset Growth Partners, Ltd. | Standard Office Lease dated March 6, 2003 by and betweenMobileAria, Inc. and Asset Growth Partners, Ltd., as amended. |
| Auto Club of America | Mutual Confidentiality Agreement effective February 14, 2001 betweenMobileAria, Inc. and Auto Club of America |
| Automobile Club of Southern California | Reciprocal Non-Disclosure Agreement effective April 25, 2001 betweenMobileAria, Inc. and Automobile Club of Southern California |
| Auto Page Unlimited Inc. | Installation Services Agreement dated June 12, 2006 between MobileAria, Inc. and Auto Page Unlimited Inc. |
| BMC Software Distribution, Inc. | Agreement between Remedy Software and Seller for Remedy software and maintenance as evidenced by Remedy Invoice Number CMG121272 dated August 9, 2005, Remedy Invoice Number CMG1215124 dated February 17, 2006, WIPRO / CMango Invoice number WIPRO-14 dated May 9, 2006, BMC Software Invoice Number 6226052 dated June 14, 2006 and Remedy Software Contract Number 52856 |
| BMC Software Distribution, Inc. | Agreement between Remedy Software and Seller for Remedy software and maintenance as evidenced by Remedy Invoice Number CMG121272 dated August 9, 2005, Remedy Invoice Number CMG1215124 dated February 17, 2006, WIPRO / CMango Invoice number WIPRO-14 dated May 9, 2006, BMC Software Invoice Number 6226052 dated June 14, 2006 and Remedy Software Contract Number 52856 |
| Babichev, Alexander | Employee Assignment and Proprietary Inventions assignment agreements |
| Bagga, Neeraj | Employee Assignment and Proprietary Inventions assignment agreements |
| Bathula, Satya | Employee Assignment and Proprietary Inventions assignment agreements |
| Blum, Rodney | Employee Assignment and Proprietary Inventions assignment agreements |
| Bobcat Company | Confidentiality Agreement effective April 16, 2003 betweenMobileAria, Inc. and Bobcat Company |
| Bolsh, Alan | Employee Assignment and Proprietary Inventions assignment agreements |
| Booz-Allen & Hamilton, Inc. | Confidentiality Agreement effective December 15, 2000 betweenMobileAria, Inc. and Booz Allen & Hamilton Inc. |
| Bortoli, Chris | Employee Assignment and Proprietary Inventions assignment agreements |
| Boulder Global Development Group, LLC | Mutual Confidentiality Agreement effective May 8, 2001 betweenMobileAria, Inc. and Boulder Global Development Group, LLC. |
| BP Amoco Chemical Company | Confidentiality Agreement effective May 5, 2003 betweenMobileAria, Inc. and BP Amoco Chemical Company |
| BP Products North America, Inc. | BP and MobileAria AMPS Airtime Services Agreement effective March 2003 by and betweenBP Products North America, Inc. and MobileAria, Inc. |
| BP Products North America | MobileAria Fleet Telematics Services Agreement between MobileAria, Inc. and BP Products North America, Inc., dated January 17, 2003 |
| Breo Ventures, LLC | Confidentiality Agreement effective October 20, 2000 betweenMobileAria, Inc. and Breo Ventures, LLC. |
| Bridgetown Communications | Installation Services Agreement dated June 13, 2006 between MobileAria, Inc. and Bridgetown Communications. |
| Bridgetown Communications | Mutual Confidentiality Agreement between MobileAria, Inc. and Bridgetown Communications dated June 13, 2006 |
| BrightPoint | Settlement and Release Agreement dated June 28, 2002 between MobileAria, Inc. and BrightPoint. |
| Brockway, Jared | Employee Assignment and Proprietary Inventions assignment agreements |
| Brown, Craig | Employee Assignment and Proprietary Inventions assignment agreements |
| Buena Vista Internet Group | Mutual Nondisclosure Agreement effective December 8, 2000 betweenMobileAria, Inc. and Buena Vista Internet Group |
| Cameron, Deborah L. | Mutual Confidentiality Agreement effective January 21, 2003 betweenMobileAria, Inc. and Deborah L. Cameron |
| CAT Technology | Mutual Confidentiality Agreement effective January 9, 2001 betweenMobileAria, Inc. and CAT Technology |
| Catalyst Capital Partners, Inc. | Confidentiality Agreement effective May 11, 2004 betweenMobileAria, Inc. and Catalyst Capital Partners, Inc. |
| Cellco Partnership d/b/a Verizon Wireless | Joint Marketing Agreement between MobileAria, Inc. and Cellco d/b/a Verizon Wireless. |
| Cellco Partnership dba Verizon Wireless | Mutual nondisclosure agreement #750-02132-2004 effective January 1, 2005 by and betweenCellco Partnership dba Verizon Wireless and MobileAria, Inc. |
| Cellocator, Ltd. | Demonstration Confidentiality Agreement effective September 19, 2001 between MobileAria, Inc. and Coradiant Inc. |
| Cellport Systems, Inc. | Mutual Confidentiality Agreement effective March 16, 2001 betweenMobileAria, Inc. and CellPort Systems, Inc. |
| Centrality Communications, Inc. | Mutual Confidentiality Agreement effective September 8, 2004 betweenMobileAria, Inc. and Centrality Communications, Inc. |
| Certicom International Corp. | Mutual Confidentiality Agreement effective January 28, 2003 betweenMobileAria, Inc. and Certicom International Corp. |
| Chan, Andrew | Employee Assignment and Proprietary Inventions assignment agreements |
| Chander, Bala | Employee Assignment and Proprietary Inventions assignment agreements |
| Chanderraju, Varma | Employee Assignment and Proprietary Inventions assignment agreements |
| Chen, Juilin | Employee Assignment and Proprietary Inventions assignment agreements |
| Chernov, Vladimir | Employee Assignment and Proprietary Inventions assignment agreements |
| Chhabra, Maninder | Employee Assignment and Proprietary Inventions assignment agreements |
| Cho Graphics | Confidentiality Agreement effective August 15, 2001 betweenMobileAria, Inc. and Cho Graphics |
| Chung, Chi | Employee Assignment and Proprietary Inventions assignment agreements |
| Cisco Systems | Mutual Confidentiality Agreement effective March 16, 2001 betweenMobileAria, Inc. and Cisco Systems |
| Clarity, LLC | Mutual Confidentiality Agreement effective February 4, 2002 betweenMobileAria, Inc. and Clarity, LLC |
| Clarke, Jeffrey | Employee Assignment and Proprietary Inventions assignment agreements |

| Counterparty | Agreement |
|---|---|
| CMango Services Management Company | Agreement between Remedy Software and Seller for Remedy software and maintenance as evidenced by Remedy Invoice Number CMG121272 dated August 9, 2005, Remedy Invoice Number CMG1215124 dated February 17, 2006, WIPRO / CMango Invoice number WIPRO-14 dated May 9, 2006, BMC Software Invoice Number 6226052 dated June 14, 2006 and Remedy Software Contract Number 52856 |
| CMango Services Management Company | Agreement between Remedy Software and Seller for Remedy software and maintenance as evidenced by Remedy Invoice Number CMG121272 dated August 9, 2005, Remedy Invoice Number CMG1215124 dated February 17, 2006, WIPRO / CMango Invoice number WIPRO-14 dated May 9, 2006, BMC Software Invoice Number 6226052 dated June 14, 2006 and Remedy Software Contract Number 52856 |
| CMANGO, Inc. | Agreement between Remedy Software and Seller for Remedy software and maintenance as evidenced by Remedy Invoice Number CMG121272 dated August 9, 2005, Remedy Invoice Number CMG1215124 dated February 17, 2006, WIPRO / CMango Invoice number WIPRO-14 dated May 9, 2006, BMC Software Invoice Number 6226052 dated June 14, 2006 and Remedy Software Contract Number 52856 |
| CMG, Inc. | Mutual Confidentiality Agreement effective January 28, 2002 betweenMobileAria, Inc. and The Crystal Mountain Group (CMG), Inc. |
| Conlisk, Steve | Employee Assignment and Proprietary Inventions assignment agreements |
| Consortium Executive Search | Settlement and Release Agreement dated June 5, 2002 between MobileAria, Inc. and Consortium Executive Search. |
| CONTEX Engineering International, Inc. | Mutual Confidentiality Agreement effective September 5, 2002 betweenMobileAria, Inc. and CONTEX Engineering International, Inc. |
| Coradiant Inc. | Demonstration Confidentiality Agreement effective September 19, 2001 betweenMobileAria, Inc. and Coradiant Inc. |
| Courreges, Nicolas | Employee Assignment and Proprietary Inventions assignment agreements |
| Creative & Response Research | Confidentiality Agreement effective June 28, 2001 betweenMobileAria, Inc. and Creative & Response Research |
| Cross Country Global ITS Services Corp. | Mutual Confidentiality Agreement effective February 7, 2003 betweenMobileAria, Inc. and Cross Country Global ITS Services Corp. |
| CTA Consulting | Mutual Confidentiality Agreement effective April 30, 2004 betweenMobileAria, Inc. and CTA Consulting |
| Cusanza, Christopher | Employee Assignment and Proprietary Inventions assignment agreements |
| CustomWeather, Inc. | Mutual Confidentiality Agreement effective June 10, 2003 betweenMobileAria, Inc. and CustomWeather, Inc. |
| Cyron, Alan | Employee Assignment and Proprietary Inventions assignment agreements |
| Cytranz, Inc. | Mutual Confidentiality Agreement effective November 12, 2002 betweenMobileAria, Inc. and Cytranz, Inc. |
| Dange, Milind | Employee Assignment and Proprietary Inventions assignment agreements |
| Data Dimensions | Confidentiality Agreement effective June 11, 2001 betweenMobileAria, Inc. and Sadiq Patankar |
| Datascan Technologies, Inc. | Mutual Confidentiality Agreement effective April 19, 2005 betweenMobileAria, Inc. and Datascan Technologies, Inc. |
| Davies, Jonathan | Employee Assignment and Proprietary Inventions assignment agreements |
| Dean, Philip | Employee Assignment and Proprietary Inventions assignment agreements |
| Dejai Pty Ltd | Mutual Confidentiality Agreement effective June 2, 2004 betweenMobileAria, Inc. and Dejai Pty Ltd and/or RoadPilot (Asia Pacific) Pty Ltd. |
| Dhingra, Ruchika | Employee Assignment and Proprietary Inventions assignment agreements |
| DHL Danzas | Danzas AE Customs Brokerage Services Invoice No. 107698954 dated June 6, 2006 |
| Dokakis, Anna | Employee Assignment and Proprietary Inventions assignment agreements |
| Doraiswami, Vijayaraghavan | Consulting Agreement dated December 16, 2005 between Vijayaraghavan Doraiswamiand the Seller. |
| Dow Jones & Company, Inc. | Nondisclosure Agreement effective June 8, 2001 betweenMobileAria, Inc. and Dow Jones & Company Inc. |
| DPAC Technologies | Mutual Confidentiality Agreement effective July 29, 2004 betweenMobileAria, Inc. and DPAC Technologies |
| Dubrovsky, Vladimir | Employee Assignment and Proprietary Inventions assignment agreements |
| Duffy, Darrell | Employee Assignment and Proprietary Inventions assignment agreements |
| Duko, Artur | Employee Assignment and Proprietary Inventions assignment agreements |
| Durand, Kimberly | Employee Assignment and Proprietary Inventions assignment agreements |
| Eletel Inc. | Mutual Confidentiality Agreement effective July 20, 2001 betweenMobileAria, Inc. and Eletel Inc. |
| Ember Corporation | Mutual Confidential Disclosure Agreement effective July 2, 2003 betweenMobileAria, Inc. and Ember Corporation |
| EMS Technologies Canada, Ltd. | Mutual Confidentiality Agreement effective October 16, 2002 betweenMobileAria, Inc. and EMS Technologies Canada, Ltd. |
| Enterprise Information Solutions, Inc. | Mutual Confidentiality Agreement effective February 27, 2004 betweenMobileAria, Inc. and Enterprise Information Solutions, Inc. |
| Ericsson Inc. | Mutual Confidentiality Agreement effective July 10, 2001 betweenMobileAria, Inc. and Ericsson Inc. |
| Esex Electronics, Inc. | Mutual Confidentiality Agreement effective August 25, 2003 betweenMobileAria, Inc. and Essex Electronics Incorporated |
| Esmonde, Richard | Employee Assignment and Proprietary Inventions assignment agreements |
| Esparza, Robert | Employee Assignment and Proprietary Inventions assignment agreements |
| Exelon Corporation | Confidentiality and Nondisclosure Agreement effective March 29, 2006 betweenExelon Corporation and MobileAria, Inc |
| Extended Systems of Idaho, Inc. | Settlement and Release Agreement dated May 30, 2002 between MobileAria, Inc. and Extended Systems of Idaho, Inc.B99Settlement and Release Agreement dated May 30, 2002 between MobileAria, Inc. and Extended Systems of Idaho, Inc. |
| Extended Systems Incorporated | Mutual Non-Disclosure effective November 14, 2001 between MobileAria, Inc. and Extended Systems Incorporated |
| Fairbank, Daniel | Employee Assignment and Proprietary Inventions assignment agreements |
| FedEx Ground Package System, Inc. | Mutual Nondisclosure Agreement effective April 29, 2005 betweenMobileAria, Inc. and FedEx Ground Package System, Inc. |
| Ferdowsian, Zoya | Employee Assignment and Proprietary Inventions assignment agreements |
| FleetRisk Advisors, LLC | Mutual Confidentiality Agreement effective June 22, 2004 between MobileAria, Inc. and FleetRisk Advisors, LLC |
| Fonix Corporation | Mutual Confidentiality Agreement effective May 23, 2005 betweenMobileAria, Inc. and Fonix Corporation |
| Forrester Research | Confidentiality Agreement effective September 19, 2001 betweenMobileAria, Inc. and Forrester Research |
| Freightliner LLC | Confidentiality and Non-Disclosure Agreement for Proprietary Information effective June 7, 2001 betweenMobileAria, Inc. and Freightliner LLC |
| Gayles, Edward | Employee Assignment and Proprietary Inventions assignment agreements |
| Gearworks Inc. | Mutual Confidentiality Agreement effective May 9, 2001 betweenMobileAria, Inc. and Gearworks, Inc. |
| GenX Mobile Incorporated | Mutual Confidentiality Agreement effective November 30, 2004 betweenMobileAria, Inc. and Genx Mobile Incorporated |
| Geographic Data Technology, Inc. | Mutual Confidentiality Agreement effective February 14, 2001 betweenMobileAria, Inc. and Geographic Data Technology, Inc. |
| Ghazanfari, Ira | Employee Assignment and Proprietary Inventions assignment agreements |

| Counterparty | Agreement |
|---|---|
| Giffin, Doug | Employee Assignment and Proprietary Inventions assignment agreements |
| Globespan Virata, Inc. | Mutual Confidentiality Agreement effective September 17, 2004 betweenMobileAria, Inc. and GlobespanVirata, Inc. |
| Go2 Systems, Inc. | Mutual Confidentiality Agreement effective January 24, 2001 betweenMobileAria, Inc. and Go2 Systems, Inc. |
| Gordienko, Eugene | Employee Assignment and Proprietary Inventions assignment agreements |
| Grober, Rochelle | Employee Assignment and Proprietary Inventions assignment agreements |
| Hall, Kenneth | Employee Assignment and Proprietary Inventions assignment agreements |
| Halliburton Energy Services, Inc. | Confidentiality Agreement effective March 4, 2004 betweenMobileAria, Inc. and Halliburton |
| Hearney, Michael | Employee Assignment and Proprietary Inventions assignment agreements |
| Hi-G-Tek Ltd. | Mutual Confidentiality Agreement effective March 3, 2003 betweenMobileAria, Inc. and Hi-G-Tek Ltd. |
| Holzman, Mathew | Employee Assignment and Proprietary Inventions assignment agreements |
| Houlihan Lokey Howard & Zukin | Mutual Confidentiality Agreement effective February 3, 2005 betweenMobileAria, Inc. and Houlihan Lokey Howard & Zukin |
| IBM | IBM Agreement for Exchange of Confidential Information effective July 25, 2002 betweenMobileAria, Inc. and International Business Machines Corporation and related Confidential Disclosure Agreement – Supplement for Disclosure effective February 15, 2006 |
| IDEO | Settlement and Release Agreement dated June 5, 2002 between MobileAria, Inc. and IDEO. |
| IITRON, Taipei, Taiwan | Mutual Confidentiality Agreement effective June 20, 2001 betweenMobileAria, Inc and IITRON |
| Indus International, Inc. | Mutual Confidentiality Agreement effective March 13, 2006 betweenMobileAria, Inc. and Indus International, Inc. |
| Infobahn Software World | Settlement and Release Agreement dated April 18, 2002 between MobileAria, Inc. and Infobahn Software World. |
| InfoGation Corp. | Mutual Confidentiality Agreement effective June 12, 2001 betweenMobileAria, Inc. and InfoGation Corp. |
| InfoSpace, Inc. | Mutual Confidentiality Agreement effective May 23, 2001 betweenMobileAria, Inc. and InfoSpace, Inc. |
| Innovative Software Engineering, L.L.C. | Reciprocal Non-Disclosure Agreement effective October 10, 2005 betweenMobileAria, Inc. and Innovative Software Engineering, LLC. |
| Innvo Systems Pte Ltd | Mutual Confidentiality Agreement effective April 29, 2003 betweenMobileAria, Inc. and Innvo Systems Pte Ltd |
| Intel Corporation | Corporate Non-Disclosure Agreement effective November 6, 2003 betweenMobileAria, Inc. and Intel Corporation |
| InterNap | Mutual Confidentiality Agreement effective June 20, 2001 betweenMobileAria, Inc. and InterNap |
| International Truck & Engine Corporation | Mutual Confidentiality Agreement effective January 17, 2003 betweenMobileAria, Inc. and International Truck & Engine Corporation (ITEC) |
| Internet MainStreet, Inc. | Settlement and Release Agreement dated June 7, 2002 between MobileAria, Inc. and the Internet MainStreet, Inc. |
| Intrinsyc Software International, Inc. | Mutual Confidentiality Agreement effective April 19, 2005 betweenMobileAria, Inc. and Intrinsyc Software International, Inc. |
| Iridium Satellite LLC | Mutual Non-Disclosure Agreement effective May 7, 2003 betweenMobileAria, Inc. and Iridium Satellite LLC |
| Iron Mountain | Three-Party Escrow Service Agreement effective April 7, 2006 by and between MobileAria, Inc. and its affiliates and subsidiaries, Verizon Services Corp and Iron Mountain Intellectual Property Management, Inc. |
| Iteris, Inc. | Mutual Confidentiality Agreement effective September 22, 2002 betweenMobileAria, Inc. and Iteris, Inc. |
| Itochu Technology, Inc. | Mutual Confidentiality Agreement effective July 16, 2001 betweenMobileAria, Inc and Itochu Technology Inc. |
| Ivus Technical Services, Inc. | Mutual Confidentiality Agreement effective May 1, 2001 betweenMobileAria, Inc and Ivus Technical Services, Inc. |
| IXI Mobile | Mutual Confidentiality Agreement effective April 13, 2000 betweenMobileAria, Inc and IXI Mobile |
| J. B. Hunt | Mutual Confidentiality Agreement effective May 24, 2005 betweenMobileAria, Inc and JB Hunt, LLC. |
| Jain, Monali | Employee Assignment and Proprietary Inventions assignment agreements |
| JCorporate Inc. | JSPtags (JSP Tags) and Jgroup Software license |
| Jester, Daniel | Employee Assignment and Proprietary Inventions assignment agreements |
| Johnson, Suena | Employee Assignment and Proprietary Inventions assignment agreements |
| Joseph, Dwight | Employee Assignment and Proprietary Inventions assignment agreements |
| JP Systems, Inc. | Mutual Confidentiality Agreement effective November 21, 2000 betweenMobileAria, Inc and JP Systems, Inc. |
| Kalman, Israel | Mutual Confidentiality Agreement effective March 11, 2004 betweenMobileAria, Inc and Israel Kalman |
| Kienhofer, Juergen | Employee Assignment and Proprietary Inventions assignment agreements |
| Kim, Jay | Employee Assignment and Proprietary Inventions assignment agreements |
| King, Chuck | Mutual Confidentiality Agreement effective August 12, 2003 betweenMobileAria, Inc and Chuck King |
| Kinzie, Al | Mutual Confidentiality Agreement effective January 31, 2006 betweenMobileAria, Inc and Al Kinzie |
| Kirsen Technologies Corp. | Mutual Confidentiality Agreement effective January 25, 2004 betweenMobileAria, Inc and Kirsen Technologies, Corp. |
| Kiryung Electronics | Mutual Confidentiality Agreement effective December 16, 2003 betweenMobileAria, Inc and Kiryung Electronics |
| Kodancha, Vinay | Employee Assignment and Proprietary Inventions assignment agreements |
| Kolkowitz, Dan | Employee Assignment and Proprietary Inventions assignment agreements |
| Krishnamurthy, Rajesh | Employee Assignment and Proprietary Inventions assignment agreements |
| Lagodsky, Alla | Employee Assignment and Proprietary Inventions assignment agreements |
| Lai, Alan | Employee Assignment and Proprietary Inventions assignment agreements |
| Lat-Lon, LLC | Mutual Confidentiality Agreement effective April 28, 2003 betweenMobileAria, Inc and Lat-Lon, LLC |
| LetsTalk.com, Inc. | Settlement and Release Agreement dated May 29, 2002 between MobileAria, Inc. and LetsTalk.com, Inc. |
| LG Infocomn Inc. | Mutual Confidentiality Agreement effective July 17, 2001 between MobileAria, Inc and LG Infocomn, Inc. |
| Lion Bridge Tech. | Mutual Confidentiality Agreement effective September 18, 2001 betweenMobileAria, Inc and Lion Bridge Tech |
| Liston, Rachel | Employee Assignment and Proprietary Inventions assignment agreements |
| Liu, Gong | Employee Assignment and Proprietary Inventions assignment agreements |
| LogikKos, Inc. | Mutual Confidentiality Agreement effective December 9, 2002 betweenMobileAria, Inc and Logikos, Inc. |
| Lu, Linda | Employee Assignment and Proprietary Inventions assignment agreements |
| Lucent Technologies Inc. | Non-Disclosure Agreement effective October 6, 2005 between MobileAria, Inc and Lucent Technologies, Inc. |
| Lunsford, Eric | Employee Assignment and Proprietary Inventions assignment agreements |
| Lynn, Owen | Employee Assignment and Proprietary Inventions assignment agreements |
| Mahesh, Subramanian | Employee Assignment and Proprietary Inventions assignment agreements |
| MAI Mark Airington Installations | Mutual Nondisclosure Agreement effective June 1, 2006 betweenMAI Mark Airington Installations and MobileAria, Inc. |
| MAI Mark Airington Installations | Installation Services Agreement effective June 1, 2006 betweenMAI Mark Airington Installations and MobileAria, Inc. |
| ManageComm, Inc. | Standard Engagement Terms and Fee Schedule Letter for accounting services dated October 31, 2000 from ManageComm, Inc. to MobileAria, Inc. |
| Martin, Kurt | Confidentiality Agreement effective January 24, 2002 betweenMobileAria, Inc and Kurt Martin |
| McGuinn, Kevin | Employee Assignment and Proprietary Inventions assignment agreements |
| McNish, Ian | Employee Assignment and Proprietary Inventions assignment agreements |
| Mehta, Kaushal | Employee Assignment and Proprietary Inventions assignment agreements |

| Counterparty | Agreement |
|---|---|
| Mentora Group, Inc. | Mutual Confidentiality Agreement effective September 11, 2001 betweenMobileAria, Inc and Mentora Group, Inc. |
| Mentora Group, Inc. | Mentora Master Service Agreement effective September 24, 2001 betweenMobileAria, Inc and Mentora Group, Inc. |
| Microsoft Corporation | Microsoft Corporation Non-disclosure agreement (standard reciprocal) effective February 13, 2002 by and between Microsoft Corporation and MobileAria, Inc. |
| Microsoft Corporation | Microsoft Corporation Non-Disclosure Agreement (Standard Reciprocal) effective February 25, 2002 betweenMobileAria, Inc and Microsoft |
| Miles, Brian Keith | Employee Assignment and Proprietary Inventions assignment agreements |
| Milligan, Alan | Employee Assignment and Proprietary Inventions assignment agreements |
| Miskew, John N. | Mutual Confidentiality Agreement effective June 20, 2005 betweenMobileAria, Inc and John Miskew |
| Mitchell International Inc. | Non-disclosure Agreement effective April 21, 2006 by and betweenMitchell International Inc. and MobileAria |
| Mitropoulos, Aphrodite | Employee Assignment and Proprietary Inventions assignment agreements |
| MMC Communications. | Settlement and Release Agreement dated June 6, 2002 between MobileAria, Inc and MMC Communications. |
| Mobiapps Inc. | Mutual Confidentiality Agreement effective December 6, 2002 betweenMobileAria, Inc and MobiApps, Inc. |
| MobileBriefs, Inc. | Mutual Confidentiality Agreement effective August 9, 2001 betweenMobileAria, Inc and MobileBriefs, Inc. |
| Mohanram, Narayan | Employee Assignment and Proprietary Inventions assignment agreements |
| More, Deepak | Employee Assignment and Proprietary Inventions assignment agreements |
| Morton, James | Mutual Confidentiality Agreement effective December 2, 2004 betweenMobileAria, Inc and Jim Morton |
| MSI | Installation Services Agreement dated May 11, 2006 between MobileAria, Inc. and MSI |
| MSNBC Interactive News, L.L.C. | MSNBC Interactive News LLC Non-Disclosure Agreement (Non-Standard Reciprocal) effective April 28, 2001 between MobileAria and MSNBC Interactive News, LLC |
| Mulay, Aniruddha | Employee Assignment and Proprietary Inventions assignment agreements |
| Mullen, John | Employee Assignment and Proprietary Inventions assignment agreements |
| Murray, Bradley M | Employee Assignment and Proprietary Inventions assignment agreements |
| Nauslar, Gary | Employee Assignment and Proprietary Inventions assignment agreements |
| NEC BNS | Mutual Confidentiality Agreement effective March 16, 2001 betweenMobileAria, Inc and NEC BNS |
| Networkcar, Inc. | Mutual Confidentiality Agreement effective September 13, 2001 betweenMobileAria, Inc and Networkcar, Inc. |
| Networkcar, Inc. | Mutual Confidentiality Agreement effective May 1, 2001 betweenMobileAria, Inc and Networkcar, Inc. |
| NEXIQ Technologies, Inc. | Mutual Confidentiality Agreement effective March 6, 2001 betweenMobileAria, Inc and NEXIQ Technologies, Inc. |
| NFO Technologies, Inc. | Settlement and Release Agreement dated May 31, 2002 between MobileAria, Inc. and NFO Technologies, Inc. |
| NFO WorldGroup, Inc. | Mutual Confidentiality Agreement effective February 5, 2000 betweenMobileAria, Inc and NFO Worldgroup, Inc. |
| Nigam, Rohit | Employee Assignment and Proprietary Inventions assignment agreements |
| Noregon Systems, Inc. | Non-Disclosure Agreement effective September 19, 2002 betweenMobileAria, Inc and Noregon Systems, Inc. |
| Nortel Networks Inc. | Mutual Non-Disclosure Agreement effective October 12, 2005 betweenMobileAria, Inc and Nortel Networks, Inc. |
| Nuance Communications | Non-Disclosure Agreement effective November 29, 2000 between MobileAria, Inc. and Nuance Communications |
| Nuance Communications | Mutual Confidentiality Agreement effective November 29, 2000 betweenMobileAria, Inc and Nuance Communications |
| O'Gara Group, Inc., The | Confidentiality Agreement effective August 9, 2004 betweenMobileAria, Inc and Bill O'Gara |
| O'Gara, Tom | Employee Assignment and Proprietary Inventions assignment agreements |
| ObjectFX Corporation | Mutual Confidentiality Agreement effective February 13, 2003 betweenMobileAria, Inc and ObjectFX Corporation |
| Obot, Jim | Mutual Confidentiality Agreement effective July 14, 2003 betweenMobileAria, Inc and Jim Obot |
| Oliver, Carmell LaVett | Consulting Agreement dated March 24, 2006 between Carmell Oliver and the Seller. |
| Oliver, Carmell LaVett | Independent Contractor Innovations and Proprietary Rights Assignment Agreement between MobileAria, Inc. and Carmell L. Oliver dated March 22, 2006 |
| Openssl License – | Openssl License – |
| Orr, Michael | Settlement and Release Agreement dated May 29, 2002 between MobileAria, Inc. and Michael Orr. |
| Orr, Michael | Employee Assignment and Proprietary Inventions assignment agreements |
| Otel Telecom | Installation Services Agreement dated June 15, 2006 between MobileAria, Inc. and OTEL Telecom |
| Pacyna, Kathleen | Mutual Confidentiality Agreement effective March 25, 2001 betweenMobileAria, Inc and Kathleen Pacyna |
| Palm, Inc. | License and Confidentiality Agreement effective March 15, 2001 betweenMobileAria, Inc. and Palm, Inc. |
| Paoletti, Giovanni | Employee Assignment and Proprietary Inventions assignment agreements |
| PepsiCo, Inc. | Confidentiality and Nondisclosure Agreement effective September 7, 2005 betweenPepsico Inc. and MobileAria, Inc |
| Peruvemba, Subramanian | Employee Assignment and Proprietary Inventions assignment agreements |
| Petersen, Jennifer | Mutual Confidentiality Agreement effective October 2, 2002 betweenMobileAria, Inc. and Jennifer Petersen |
| PHH Arval | Letter of Intent dated August 11, 2004 between PHH Vehicle Management Services and MobileAria, Inc |
| PHH Vehicle Management Services, LLC | Confidentiality Agreement effective July 14, 2004 betweenPHH Vehicle Management Services, LLC and MobileAria, Inc |
| PHH Vehicle Management Services, LLC (PHH | Fleetoutlook Services Agreement dated June 10, 2006 between MobileAria, Inc. and PHH Vehicle Management Services, LLC |
| Pillarsetty, Kavitha | Employee Assignment and Proprietary Inventions assignment agreements |
| Pliskin, Dan | Employee Assignment and Proprietary Inventions assignment agreements |
| Plude, Scott | Employee Assignment and Proprietary Inventions assignment agreements |
| PolarCom Inc. | Mutual Nondisclosure Agreement effective May 30, 2006 by and betweenPolarcom Inc. and MobileAria, Inc. |
| PolarCom Inc. | Installation Services Agreement effective May 30, 2006 between MobileAria and PolarCom, Inc. |
| Prabhu, Naveen | Employee Assignment and Proprietary Inventions assignment agreements |
| Prolificx Group | Mutual Confidentiality Agreement effective January 10, 2005 betweenMobileAria, Inc and Prolificx Group |
| Prolificx New Zealand Ltd. | Manufacturing Services and License Agreement between MobileAria, Inc. and Prolificx New Zealand LTD and made and entered into as of August 1, 2005 as amended |
| Puerto Rico Telephone | Mutual Confidentiality Agreement effective September 29, 2005 betweenMobileAria, Inc and Puerto Rico Telephone |
| Pumatech, Inc. | Mutual Confidentiality Agreement march 9, 2001 betweenMobileAria, Inc and Pumatech, Inc. |
| Quake Global, Inc. | Quake Global, Inc. Mutual Non-Disclosure Agreement effective May 14, 2003 betweenMobileAria, Inc and Quake Global, Inc. |
| Qualnetics Corporation | Services and Licensing Agreement dated March 1, 2006 betweenQualnetics Corporation and MobileAria, Inc. |
| Qualnetics Corporation | Mutual Confidentiality Agreement effective July 19, 2004 betweenMobileAria, Inc and Qualnetics Corporation |
| Qwest Communications Corporation | Qwest Total Advantage Agreement effective May 10, 2004 betweenQwest Communications Corporation and MobileAria, Inc. |
| QWest Interprise Networking | QWest Interprise Networking Invoice # 30122677 dated November 17, 2005 |
| R Systems, Inc. | Call Center Services Agreement effective October 31, 2005, between MobileAria, Inc. and R Systems, Inc. |
| Rajagopalan, Subhasri | Employee Assignment and Proprietary Inventions assignment agreements |
| Rajani, Purvi | Employee Assignment and Proprietary Inventions assignment agreements |

| Counterparty | Agreement |
| --- | --- |
| Ramasubramanian, Ramasamy | Employee Assignment and Proprietary Inventions assignment agreements |
| Rand McNally & Company | Mutual Confidentiality Agreement effective August 7, 2002 betweenMobileAria, Inc and Rand McNally & Company |
| Red Hat, Inc. | Agreement between MobileAria, Inc. and Red Hat, Inc. |
| Remote Communications Company | Installation Services Agreement effective May 15, 2006 by and betweenMobileAria, Inc. and Remote Communications Company. |
| Response Services Center, LLC | Mutual Confidentiality Agreement effective January 25, 2001 betweenMobileAria, Inc and Responsive Services Center, LLC |
| Reyes, Raul | Independent Contractor Services Agreement effective May 30, 2006 by and betweenMobileAria, Inc. and Mr. Raul Reyes. |
| Reyes, Raul | Independent Contractor Innovations and Proprietary Rights Assignment Agreement between MobileAria, Inc. and Raul Reyes dated May 24, 2006 |
| R.F. Solutions | Settlement and Release Agreement dated May 31, 2002 between MobileAria, Inc. and R.F. Solutions. |
| Richion, Michael | Employee Assignment and Proprietary Inventions assignment agreements |
| RightNow Technologies, Inc. | Settlement and Release Agreement dated June 4, 2002 between MobileAria, Inc. and RightNow Technologies, Inc. |
| Riley, David | Employee Assignment and Proprietary Inventions assignment agreements |
| Riviere, Pablo | Employee Assignment and Proprietary Inventions assignment agreements |
| Robidart Asssociates, Inc. | Mutual Confidentiality Agreement effective August 4, 2003 betweenMobileAria, Inc and Robidart Associates, Inc. |
| Robinson, Peter | Employee Assignment and Proprietary Inventions assignment agreements |
| Rockcastle, Ted | Employee Assignment and Proprietary Inventions assignment agreements |
| Rosenberg, Mitchell | Employee Assignment and Proprietary Inventions assignment agreements |
| Ryder System, Inc. | Mutual Confidentiality Agreement effective June 1, 2005 betweenMobileAria, Inc and Ryder Systems, Inc. |
| Saleem, Hammad | Employee Assignment and Proprietary Inventions assignment agreements |
| Saama Technologies, Inc. | Settlement and Release Agreement. dated May 29, 2002 between MobileAria, Inc. and Saama Technologies, Inc. |
| Sanoyca, Andre | Employee Assignment and Proprietary Inventions assignment agreements |
| Schlumberger Technology Corporation | Confidentiality Agreement effective June 8, 2005 betweenMobileAria, Inc and Schlumberger Technology Corporation |
| Scott Kornak Consulting | Mutual Confidentiality Agreement effective November 21, 2005 betweenMobileAria, Inc. and Scot Kornak |
| Seapine Software, Inc. | Settlement and Release Agreement between MobileAria, Inc. and Seapine Software, Inc. |
| Sentelligence, Inc. | Mutual Confidentiality Agreement effective May 13, 2003 betweenMobileAria, Inc and Sentelligence, Inc. |
| Shao, Victor | Employee Assignment and Proprietary Inventions assignment agreements |
| Shembekar, Seema | Employee Assignment and Proprietary Inventions assignment agreements |
| Sierra Wireless, Inc. | Mutual Confidentiality Agreement effective September 3, 2004 betweenMobileAria, Inc and Sierra Wireless, Inc. |
| Sinha, Prokash | Employee Assignment and Proprietary Inventions assignment agreements |
| SiriCOMM, Inc. | Mutual Confidentiality Agreement effective April 4, 2002 by and betweenSiriCOMM, Inc. and MobileAria, Inc. |
| Smartroute Systems | Mutual Confidentiality Agreement effective January 16, 2001 by and betweenSmartroute Systems and MobileAria, Inc. |
| Smith, Lisa | Employee Assignment and Proprietary Inventions assignment agreements |
| softDSP Co. Ltd | Nondisclosure Confidential Agreement effective November 28, 2003 by and betweensoftDSP Co. Ltd. and MobileAria, Inc. |
| softDSP Co. Ltd | Mutual Confidentiality Agreement effective December 8, 2003 by and betweenSoftDSP and MobileAria, Inc. |
| Software SETT Corporation | Mutual Confidentiality Agreement effective September 12, 2001 by and betweenSoftware Sett Corp. and MobileAria, Inc. |
| Sonic Software Corporation | Master Professional Services Agreement dated August 29, 2005 by and betweenMobileAria, Inc. and Sonic Software Corporation. |
| Sonic Software Corporation | Sonic MQ Version 6.1 End User Product License Agreement (for Invoice Order dated July 28, 2005). |
| Sprint Spectrum L.P. (d/b/a Sprint) | PCS Telemetry Services Agreement dated April 3, 2003 by and between Sprint Spectrum L.P., d/b/a Sprint PCS and MobileAria, Inc. |
| Sprint/United Management Company | Mutual Non-Disclosure Agreement effective November 29, 2005 by and betweenSprint/United Management Company and MobileAria |
| SRI Consulting Business Intelligence | Confidentiality Agreement effective May 31, 2001 by and betweenSRI Consulting Business Intelligence and MobileAria, Inc. |
| Stempler, Gary | Employee Assignment and Proprietary Inventions assignment agreements |
| Stepanov, Vladimir | Employee Assignment and Proprietary Inventions assignment agreements |
| Strategy.com Incorporated | Mutual Non-Disclosure Agreement effective June 12, 2001 by and betweenStrategy.com Incorporated and MobileAria, Inc. |
| Straw, Phil | Employee Assignment and Proprietary Inventions assignment agreements |
| Strickland, Lan | Employee Assignment and Proprietary Inventions assignment agreements |
| Suliman, Haytham | Employee Assignment and Proprietary Inventions assignment agreements |
| Summerville, Gene | Employee Assignment and Proprietary Inventions assignment agreements |
| Sun Microsystems, Inc | Sun Microsystems, Inc. Binary Code License Agreement for the Java 2 Platform Standard Edition Runtime Environment 5.0 |
| Suson, Clint | Mutual Confidentiality Agreement effective July 15, 2005 by and betweenClint Suson and MobileAria, Inc. |
| Suson, Clint | Consulting Agreement dated October 29, 2005 between Clint Suson and Seller. |
| Suson, Clint | Independent Contractor Innovations and Proprietary Rights Assignment Agreement between MobileAria, Inc. and Clint Suson dated July 18, 2005. |
| Synnex Technologies, Inc. | Letter regarding Synnex Information Technologies, Inc. settlement dated June 10, 2002. |
| Svoboda, Melora | Employee Assignment and Proprietary Inventions assignment agreements |
| Tanner Installations | Installation Services Agreement effective May 15, 2006 by and betweenMobileAria, Inc. and Tanner Installations. |
| Team Telematics, LLC | Mutual Confidentiality Agreement effective April 30, 2004 betweenMobileAria, Inc. and Team Telematics, LLC. |
| TechnoCom | Mutual Confidentiality Agreement effective November 11, 2003 betweenMobileAria, Inc. and TechnoCom Corporation |
| Technology Electronics Solutions | Mutual Confidentiality Agreement effective December 17, 2004 betweenMobileAria, Inc. and Technology Electronics Solutions (TES) |
| TELA Wireless Devices Inc. | Mutual Confidentiality Agreement effective April 28, 2004 betweenMobileAria, Inc. and TELA Wireless Devices, Inc. |
| Telcontar | Data License Agreement effective August 12, 2003 by and betweenTelcontar and MobileAria, Inc. |
| Telcontar | Operating Agreement entered into August 12, 2003 by and betweenTelcontar and MobileAria, Inc. |
| Telcontar | Mutual Confidentiality Agreement effective July 30, 2002 betweenMobileAria, Inc. and Telcontar |
| Tele-Mobile Company | Confidentiality Agreement effective June 7, 2005 betweenMobileAria, Inc. and Tele-Mobile Company d/b/a TELUS Mobility |

| Counterparty | Agreement |
| --- | --- |
| Telenavigation Inc | Settlement and Release Agreement dated June 5, 2002 by and betweenMobileAria, Inc. and Telenavigation, Inc. (the "Releasing Party"). |
| Telesector Resources Group, Inc. | Non-Disclosure Agreement effective April 1, 2004 betweenMobileAria, Inc. and Telesector Resources Group, Inc. d/b/a Network Services (a Verizon Company) |
| Televigation | Mutual Confidentiality Agreement effective January 17, 2001 betweenMobileAria, Inc. and Televigation |
| Telex Communications, Inc. | Mutual Confidentiality Agreement effective August 27, 2001 betweenMobileAria, Inc. and Telex Communications, Inc. |
| TEMIC Sprachverarbeitung GmbH | Mutual Confidentiality Agreement effective July 16, 2001 by and between TEMIC Sprachverarbeitung GmbH and MobileAria, Inc. |
| TenSquare Inc. | Mutual Confidentiality Agreement effective June 7, 2001 betweenMobileAria, Inc. and TenSquare Inc. |
| Terion | Mutual Confidentiality Agreement effective October 11, 2004 betweenMobileAria, Inc. and Terion |
| Thakur, Rajiv | Employee Assignment and Proprietary Inventions assignment agreements |
| Thayer, Peter | Employee Assignment and Proprietary Inventions assignment agreements |
| The Next Market | Mutual Confidentiality Agreement effective October 18, 2001 betweenMobileAria, Inc and The Next Market |
| ThingMagic, LLC | Mutual Confidentiality Agreement effective May 17, 2004 betweenMobileAria, Inc. and ThingMagic, LLC |
| Three Rivers Cellular | Installation Services Agreement effective May 10, 2006 by and betweenMobileAria, Inc. and Three Rivers Cellular. |
| Tian, Yong | Employee Assignment and Proprietary Inventions assignment agreements |
| TMW Systems, Inc. | Non-Disclosure Agreement effective October 8, 2003 between MobileAria, Inc. and TMW Systems, Inc. |
| Toshiba America Inc | Lease with Maintenance Agreement dated October 4, 2005 betweenMobileAria, Inc. and Toshiba Financial Services. |
| TrafficCast | Mutual Confidentiality Agreement effective February 8, 2001 by and betweenTrafficCast and MobileAria, Inc. |
| Transport International Pool, Inc. | Confidentiality Agreement effective August 5, 2003 by and betweenTransport International Pool, Inc. and MobileAria, Inc. |
| Trialon Corporation | Mutual Confidentiality Agreement effective January 17, 2006 by and betweenTrialon Corp. and MobileAria, Inc. |
| Tsola, Inc. | Mutual Confidentiality Agreement effective January 31, 2001 by and betweenTsola,Inc. and MobileAria, Inc. |
| Tu, Kuei-Chung | Employee Assignment and Proprietary Inventions assignment agreements |
| Unknown | Java Concurrent Utilities software license |
| UPS | United Parcel Service Account W29-A35 |
| Vainshtok, Victoria | Employee Assignment and Proprietary Inventions assignment agreements |
| Verizon Services Corp. | Agreement for GPS System and Services made and entered into as of May 15, 2005 betweenVerizon Services Corp. ("Customer") and MobileAria, Inc.  ("Supplier"). |
| Verizon Services Corp. | Three-Party Escrow Service Agreement effective April 7, 2006 by and betweenMobileAria, Inc. and its affiliates and subsidiaries, Verizon Services Corp and Iron Mountain Intellectual Property Management, Inc. |
| Video Domain US | Mutual Confidentiality Agreement effective October 27, 2003 by and betweenVideo Domain US and MobileAria, Inc. |
| Vinton, Tammy | Employee Assignment and Proprietary Inventions assignment agreements |
| Vishnevskaya, Oksana | Employee Assignment and Proprietary Inventions assignment agreements |
| Visual Data Corporation | Mutual Confidentiality Agreement effective April 6, 2001 by and betweenVisual Data Corporation and Mobilaria, Inc. |
| Vlaanderen, Bert | Employee Assignment and Proprietary Inventions assignment agreements |
| Voice Access Technologies, Inc. | Mutual Confidentiality Agreement effective December 4, 2000 by and betweenVoice Access Technologies and Mobilaria, Inc. |
| Volt Delta Resources, Inc. | Mutual Confidentiality agreement effective May 10, 2002 by and betweenVolt Data Resources, Inc. and MobileAria, Inc. |
| Volvo Penta of the Americas, Inc. | Secrecy and Confidentiality agreement effective January 17, 2005 by and between Volvo Penta of the Americas, Inc. and MobileAria, Inc. |
| V&V Design Pvt Ltd. | Mutual Confidentiality Agreement effective August 13, 2001 by and between V&V Design Private Ltd. and MobileAria, Inc. |
| Wainwright, Thomas | Employee Assignment and Proprietary Inventions assignment agreements |
| Wang, Kai | Employee Assignment and Proprietary Inventions assignment agreements |
| Wang, Wei | Employee Assignment and Proprietary Inventions assignment agreements |
| Wavemakers | Mutual confidentiality agreement effective November 20, 2002 by and betweenWavemakers and MobileAria, Inc. |
| Wayland Systems | Mutual Confidentiality Agreement effective December 20, 2002 by and betweenWayland Systems and MobileAria, Inc. |
| Weatherbank, Inc. | Mutual Confidentiality Agreement effective April 27, 2001 by and betweenWeatherbank, Inc. and Mobilaria, Inc. |
| Weaver, Stacey | Employee Assignment and Proprietary Inventions assignment agreements |
| Webraska Mobile Technologies, S.A. | Mutual Confidentiality Agreement effective April 18, 2001 by and between Webraska Mobile Technologies SA and MobileAria, Inc. |
| Webraska Mobile Technologies, S.A. | Sample Software confidentiality agreement effective May 21, 2001 by and between Webraska Mobile technologies SA and MobileAria, Inc. |
| WhereNet Corp. | Mutual Confidentiality Agreement effective May 1, 2003 by and betweenWhereNet corp. and MobileAria, Inc. |
| Williams, Rodney | Mutual Confidentiality Agreement effective February 1, 2001 by and betweenRodney Williams and MobileAria, Inc. |
| Winkler, Todd | Employee Assignment and Proprietary Inventions assignment agreements |
| WirelessCar | Mutual non-disclosure agreement effective July 17, 2001 by and betweenWireless Car North America, Inc. and MobileAria |
| Wollenberg, Steve | Employee Assignment and Proprietary Inventions assignment agreements |
| Wong, Wing | Employee Assignment and Proprietary Inventions assignment agreements |
| Wood, Thomas | Employee Assignment and Proprietary Inventions assignment agreements |
| Xoriant corporation | Mutual Confidentiality Agreement effective September 19, 2001 by and betweenXoriant Corporation and Mobilaria, Inc. |
| Xtrasource, Inc. | Mutual Confidentiality Agreement effective June 4, 2001 by and betweenXtrasource,Inc. and Mobilaria, Inc. |
| Yahoo! Inc. | Mutual Nondisclosure Agreement effective August 9, 2001 betweenMobileAria, Inc. and Yahoo! Inc. |
| Yamamoto, Rena | Employee Assignment and Proprietary Inventions assignment agreements |
| Zhu, Joshua | Employee Assignment and Proprietary Inventions assignment agreements |
| Zucker, Daniel | Employee Assignment and Proprietary Inventions assignment agreements |

**TOTAL CURE OBLIGATIONS**

## Schedule 3

| Dispute | Charges | Resolution |
|---|---|---|
| 1568 units assigned incorrectly to the wrong accounts. | N/A | Complete reassignment. |
| Units activated with Verizon Wireless on the wrong plan. | $86,017.82 | MobileAria to issue check. |
| 1309 spares and deactivated units were not deactivated. | $39,300.00 | MobileAria to issue check. |
| Billing multiple installations Invoices. | $34,802.57 | Credit issued and received. |
| Increased Inventory levels. | N/A | MobileAria secured 500 units. Parties to discuss securing additional 500 units. |
| Units remaining out of communication for extended periods. | $42,347.00 | MobileAria to issue check. |
| Establish EDI. | N/A | MobileAria working on the issue.  Purchaser to continue. |
| Other Alleged Billing Errors | TBD | To be addressed in the future. |

### WIP Items

| | | |
|---|---|---|
| Availability of harnesses and Antennas for construction Vehicles. | N/A | Installation scheduling in in progress.  Purchaser to Continue MobileAria's obligations. |
| Remedy reports and ticket Management. | N/A | MobileAria to work Purchaser to continue MobileAria's obligations. |
| HelpDesk support. | N/A | MobileAria working on resolution.  Purchaser to continue MobileAria's obligations. |
| Dedicated line to Verizon Wireless. | N/A | MobileAria working on the Issue.  Purchaser to continue. |

TOGUT, SEGAL & SEGAL LLP                          **Hearing Date:  January 25, 2008**
Bankruptcy Co-Counsel for Delphi Corporation, et al.,                    **At:  10:00 a.m.**
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Lara Sheikh (LS-0879)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :    Case No. 05-44481 [RDD]
DELPHI CORPORATION, *et al.*,                                :
                                                             :    Jointly Administered
                                     Debtors.                :
                                                             :
-------------------------------------------------------------x

**DECLARATION OF JOHN ABSMEIER IN SUPPORT
OF DEBTORS' OBJECTION TO AMENDED MOTION OF
VERIZON SERVICES CORP. FOR PAYMENT OF ADMINI-
STRATIVE EXPENSE CLAIM PURSUANT TO MOBILEARIA SALE ORDER**

JOHN ABSMEIER, hereby declares pursuant to section 1746 of title 28 of the
United States Code:

      1.      I am the former Director, Program Management for MobileAria,

Inc. ("MobileAria"), one of the debtors and debtors in possession in the above-

captioned cases (collectively the "Debtors").

      2.      I am authorized to submit this Declaration on behalf of the Debtors.

      3.      Except as otherwise set forth herein, all statements in this

Declaration are based on my personal knowledge, my familiarity with the Debtors'

books and records, the Debtors' relationship with Verizon pertaining to the GPS

Agreement[1], my review of relevant documents and discussion with the Debtors'

counsel.  If I were called upon to testify, I could and would testify competently to the

facts set forth herein.

4.    I submit this Declaration in support of the Debtors' pre-fixed

objection (the "Objection") to the amended motion (the "Amended Motion") by Verizon

Services Corp. ("Verizon") for Payment of Administrative Expense Claim Pursuant to

MobileAria Sale Order.

5.    On November 9, 2007, I submitted my Declaration (the "Original

Declaration") in support of the Debtors' objection to the original motion (the "Original

Motion") by Verizon for payment of an administrative expense claim, which was

considered by the Bankruptcy Court on November 29, 2007.  I respectfully incorporate

herein by reference all of the statements and representations that were contained in my

Original Declaration.

6.    I have read the Amended Motion and the Objection and am fully

familiar with the facts, circumstances and status of matters set forth therein.

7.    Verizon negotiated a wireless service agreement for the GPS Units

with its affiliate, Verizon Wireless, without MobileAria's participation or input.

8.    MobileAria was not a party to and had no input regarding

Verizon's negotiations with Verizon Wireless.

9.    MobileAria recommended to Verizon that it select a limited 6 Mb

plan for the GPS Units to be activated with a limited usage plan.  Verizon did not follow

---

[1]    Terms used but not otherwise defined herein shall have the meaning ascribed to such terms by
the Objection.

2

MobileAria's recommendation and selected the limited 2 Mb plan rather than a limited 6 Mb plan.

10.    As a customer courtesy, and without any contractual obligation to do so, MobileAria facilitated activation of the GPS Units in accordance with Verizon's instructions as part of the process of deployment and installation of the GPS Units.

11.    Specifically, Verizon completed a Sales Order Activation Form ("SOAF") for each GPS Unit which identified the wireless plan that would be initially activated for the unit.  MobileAria then forwarded the data from the SOAFs with instructions to activate the GPS Units, as set forth in the SOAF, and associated hardware identification information for the installation to Verizon Wireless.

12.    MobileAria did not receive any compensation for its role in facilitating activation of wireless service for the GPS Units and viewed the service as a ministerial customer courtesy.

I.    **The Sales Order Bar Date**

13.    On June 6, 2006, the Debtors moved for an Order to, among other things, assume and assign certain executory contracts and to sell substantially all of the assets of MobileAria.

14.    Verizon objected to the MobileAria Sale Motion and asserted various claims for damages.  The parties were unable to resolve all of Verizon's objections prior to the hearing to reconsider the MobileAria Sale Motion.  Consequently, the Debtors and Verizon negotiated paragraph 42 of the MobileAria Sale Order which permitted Verizon to seek payment of Schedule 3 Disputes, as defined in the MobileAria Sale Order, up to amount of $700,000.

3

15.     However, Verizon's ability to seek payment of Schedule 3 Disputes was subject to a defined, agreed upon deadline (the "Sale Order Bar Date"):

> "In the event that Verizon seeks to recover for charges arising with respect to a Schedule 3 Dispute, Verizon shall submit such charges to MobileAria within 60 days of this Order (the "Asserted Schedule 3 Disputes") or be deemed to waive such Schedule 3 Dispute.

MobileAria Sale Order para. 42(a).

16.     The Court entered the MobileAria Sale Order on July 21, 2006.

17.     After entry of the MobileAria Sale Order, Verizon submitted various Schedule 3 Disputes to the Debtor.  However, the $407,228.36 New Overage Charges Claim that is described in the Amended Motion at paragraphs 18-21 and in paragraphs 22-25 of the Declaration of Margaret L. Sheppard in support thereof (the "Sheppard Declaration") were never submitted to the Debtors or asserted prior to the Sale Order Bar Date.

18.     The Debtors expended time and resources for more than a year to try to understand and settle claims and charges that Verizon submitted prior to the Sale Order Bar Date.  On September 25, 2007, Verizon filed its Original Motion for allowance of an administrative expense claim consisting of, predominantly, "Overage Charges" of $678,579.09.  The Debtors had already spent considerable time and resources to research Verizon's original Overage Charges Claim, but repeatedly concluded that the claim was not factually or legally supported.

19.     In paragraphs 18, 19 and 20 of the Amended Motion, and in pargraphs 22 through 25 of the Sheppard Declaration, Verizon asserts, for the first time, that Overage Charges of $407,228.36 were incurred "as a result of MobileAria failing to change the data usage plan of a unit that was previously activated on a 2 Meg Plan . . . but [which] was subsequently transferred to an area in which Verizon required its GPS

4

units to operate with enhanced functionality, and thus under the Unlimited Plan." This claim was never submitted or communicated to MobileAria or the Debtors prior to the Sale Order Bar Date and was never communicated prior to the Amended Motion.

20.    I note that in paragraph 25 of the Sheppard Declaration, Ms. Sheppard acknowledges that this new theory was never even considered, researched or formulated by Verizon prior to November 29, 2007.

21.    I have reviewed Exhibits C-1 and C-2 submitted with the Amended Motion in support of the New Overage Charge Claim and have no means to reach the conclusion that Verizon has reached. MobileAria never had any contractual obligation to select wireless service plans for GPS units, nor did it have any contractual obligation to reactivate or upgrade GPS units if Verizon transferred a unit to a new geographic location.

22.    Upon a preliminary review, I can discern that the New Overage Charge Claim is invalid. SOAFs were never used to move a vehicle or GPS unit from one place to another or to upgrade an account. Moreover, the Midwest units that are indicated in the SOAFs that are attached to Exhibit C-1 and C-2 of the Amended Motion are all first-time installations, not transfers from Pennsylvania or any other geographic location.

23.    Moreover, neither the Amended Motion nor the Sheppard Declaration describe or otherwise articulate how or when any of the GPS units were moved from one geographic location to another.

24.    Consequently, on its face, the New Overage Charge Claim has no evidentiary support or merit.

B.      **The Misactivation Charges**

25.      In paragarph 17 of the Amended Motion and paragraph 21 of the Sheppard Declaration, Verizon asserts that $142,701.33 of the Overage Charges were allegedly incurred as a result of MobileAria having initially failed to activate GPS units on a correct data usage plan.  This also appears to be a new claim because in its Original Motion, Verizon asserted that it incurred "Misactivation Charges" of $164,672.30 as additional data usage charges that allegedly resulted from certain GPS units having been activated with a data usage plan other than that specified by Verizon.  Neither the Amended Motion nor the Sheppard Declaration explain whether these are both the same claim and if they are, the basis for the different amount of damages.

26.      As I described in my original declaration, MobileAria activated wireless service for GPS units consistent with Verizon's instructions in the SOAFs that were completed by Verizon.  Research by the Debtors concluded that only approximately 2% of lines were activated on an erroneous price plan.

27.      The Amended Motion does not separately identify Misactivation Charges and the information that is submitted in support of this branch of the Overage Charges Claim in the Amended Motion appears to be the same information that Verizon provided to MobileAria prior to the Original Motion.  This is particuarly troubling because the Debtors already analyzed four large, separate sets of data that Verizon submitted prior to the Original Motion in support of Misaction Charges. Therefore, MobileAria can only conclude, absent analysis of tens of thousands of lines of data, that the Overage Charges of $142,701.33 identified in the Amended Motion are the Misactivation Charges that were identified by Verizon in the Original Motion and prior thereto.

6

28.     MobileAria paid Verizon $86,000 on account of Misactivation

Charges before it had an opportunity to fully analyze the data regarding alleged errors.

This was consistent with the parties' agreement, as evidenced by Schedule 3 of the

MobileAria Sale Order:  "Units activated with Verizon Wireless on the wrong plan.

$86,017.82.  MobileAria to issue check."  After making that payment, MobileAria

analyzed data that was provided by Verizon, which appears to be the identical

information that was annexed to the Amended Motion, and that analysis revealed that

only $42,714.26 in misactivation charges related to accounts that MobileAria

erroneously activated with the wrong plan.

**C.**     **The Overactivation Charges**

29.     Verizon continues to assert that it incurred $133,945.20 of

Overactivation Charges on account of GPS units that were activated but were never

installed.  The Debtors and I fully responded to this claim in paragraphs 25 through 29

of my Original Declaration.  New in the Amended Motion, however, is Verizon's

arguments that:  (i) many of the Verizon trucks missed their appointments, which were

set by Verizon's strict roll-out schedule, because of "weather conditions that posed a

safety hazard to the installers";  and (ii) "MobileAria simply could have exhausted any

unused account numbers from the previous night or nights and requested new account

numbers sufficient to meet only the deficit needed for the specific installations on the

particular night."  See Amended Motion, paras. 22-23 and Sheppard Declaration, paras.

27-30.

30.     I do not recall any weather conditions that posed safety hazards to

MobileAria's installers which would have caused Verizon trucks to have missed their

scheduled appointments, and this is a new allegation by Verizon.  The Debtors records

7

indicate that at most, 57 installation appointents were delayed because of cold conditions that could have effected antenna sealing applications;  and 57 missed installations represents less than 0.54% of the installations that occurred before MobileAria was sold.

31.    MobileAria was contractually obligated to follow Verizon's strict roll-out schedule and it committed to activate and install approximately 1,000 GPS units per week during the deployment period.  Activations were submitted to Verizon Wireless by MobileAria pursuant to Verizon's instructions and according to the roll-out schedule that Verizon dicatated.

32.    Activation requests were submitted to Verizon Wireless approximately 48 hours in advance of the scheduled installation date so that the installers could be able to set up and provision the GPS Units upon installation.  When Verizon's trucks were not available on the agreed installation date, units remained activated until the installation could be rescheduled.  Because deployment was spread out across the United States, and to adhere to Verizon's ongoing deployment schedule, it could take several weeks to a few months for an installment to be rescheduled and actually occur.  This caused many GPS Units to be activated but not used for several months.  In some cases, GPS Units were never used if Verizon's truck was never available and the installation never occurred.

33.    MobileAria could not simply use devices activated the night before for completely new installation locations because the garage locations were often distant from each other, so that hardware could not be transported throughout the country by installers as they flew or drove to their next installation site.

34.    Verizon cannot reasonably suggest that GPS Units which were

8

activated, but which could not be installed because their trucks missed their scheduled appointment, could have easily and seamlessly transferred throughout the country to meet and modify Verizon's strict roll-out program. That scenario would have been unworkable and MobileAria was not contractually obligated to undertake that task.

35.    The information supplied as Exhibit D to the Amended Motion is the same information that was submitted to MobileAria prior to the Original Motion.

36.    In addition, based upon an analysis of the data previously provided by Verizon, $33,972.33 in alleged Overactivation Charges were actually on account of lines with data usage. A GPS Unit cannot reflect data usage unless it is both installed and powered on. Consequently, many of the GPS Units that Verizon included in this group could not have caused Overactivation Charges. MobileAria deployed significant resources at great time and expense including the Vice President of Engineering to conduct an analysis of the Overactivation Charges, which analysis resulted in the above conclusions, and they have not been contradicted by Verizon.

37.    Notwithstanding Verizon's apparent responsibility for the bulk of the Overactivation Charges and the resulting costs and damages suffered by MobileAria, as a customer courtesy, MobileAria paid Verizon $39,300 on account of a total of 1,309 spare and activated GPS Units that were not deactivated. This is consistent with Schedule 3 of the MobileAria Sale Order which provides: "1,309 spares and deactivated units were not deactivated. $39,300.00  MobileAria to issue check." Verizon has failed to articulate any basis in its Original Motion and Amended Motion to explain how the amount paid by MobileAria on account of 1,309 spare and activated

GPS Units could equal the $133,945.20 sought by Verizon for only 1,151 GPS Units.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  January 15, 2008

/s/ John Absmeier
John Absmeier

1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10          Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                 United States Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 November 29, 2007

19                 10:08 AM

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2    HEARING re Expedited Motion for Orders Under U.S.C. Section 363

3    and Fed. R. Bankr. P. 2002, 6004 and 9014; (A)(i)Approving

4    Bidding Procedures; (ii)Granting Certain Bid Protections;

5    (iii)Approving Form and Manner of Sale Notices; and (iv)Setting

6    Sale Hearing Date; and (B)Authorizing and Approving Sale by

7    Delphi Automotive Systems LLC and Delphi Technologies, Inc. of

8    Certain Equipment and Other Assets Primarily Used in Debtor's

9    Saginaw Chassis Business Free and Clear of Liens

10

11   HEARING re Motion of Verizon Services Corp. for Payment of

12   Administrative Expense Claim Pursuant to MobileAria Sale Order

13

14   HEARING re Twenty-second Omnibus Claims Objection Pursuant to

15   11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 to Certain

16   (A)Duplicate or Amended Claims; (B)Equity Claims;

17   (C)Insufficiently Documented Claims; (D)Claims Not Reflected on

18   Debtors' Books and Records; (E)Untimely Claims; and (F)Claims

19   Subject to Modification, Tax Claims Subject to Modification,

20   Modified Claims Asserting Reclamation, Claims Subject to

21   Modification that are Subject to Prior Orders and Modified

22   Claims Asserting Reclamation that are Subject to Prior Orders

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2   A P P E A R A N C E S :

3

4   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5        Attorneys for Debtor

6        333 West Wacker Drive

7        Chicago, IL 60606

8

9   BY:   JOHN WM. BUTLER, JR.

10

11  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12       Attorneys for Debtor

13       Four Times Square

14       New York, NY 10036

15

16  BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18  TOGUT, SEGAL & SEGAL, LLP

19       Attorneys for Debtor

20       One Penn Plaza

21       Suite 3335

22       New York, NY 10119

23

24  BY:   NEIL BERGER, ESQ.

25

4

HONIGMAN MILLER SCHWARTZ & COHN LLP

     Attorneys for TRW Automotive

     2290 First National Building

     660 Woodward Avenue

     Detroit, MI 48226


BY:   DONALD F. BATY, ESQ.

     (TELEPHONICALLY)


ARNELL GOLDEN GREGORY LLP

     Attorneys for Verizon Services Corp.

     171 17th Street, NW

     Suite 2100

     Atlanta, GA 30363


BY:   DARRYL S. LADDIN, ESQ.


FOLEY & LARDNER LLP

     Attorneys for Intermet Corporation

     One Detroit Center

     500 Woodward Avenue

     Suite 2700

     Detroit, MI 48226


BY:   DAVID G. DRAGICH, ESQ.

5

LATHAM & WATKINS LLP

    53rd at Third

    885 Third Avenue

    New York, NY 10022


BY:   MICHAEL RIELA, ESQ.


FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

    One New York Plaza

    New York, NY 10004


BY:   RICHARD J. SLIVINSKI, ESQ.

6

P R O C E E D I N G S

1

2          THE COURT:  Please be seated.  Okay.  Delphi

3   Corporation?

4          MR. BUTLER:  Your Honor, good morning.  Jack Butler

5   and Kayalyn Marafioti from Skadden Arps here on behalf of the

6   debtors for their twenty-fifth omnibus hearing.  We have filed

7   and served a proposed agenda and we propose to move to the

8   agenda in that order.

9          THE COURT:  That's fine.

10          MR. BUTLER:  Your Honor, relating to the first three

11   matters on the agenda, agenda item matter number 1, is

12   solicitation and procedures motion at docket number 9266.

13   Matter number 2, which is the proposed amendment to the --

14   excuse me.  Number 2 is actually the adjournment motion by the

15   equity committee at docket number 10795.  And matter number 3,

16   which is the Delphi Appaloosa investment agreement amendment

17   motion, at docket number 10760.  Based on a chambers conference

18   held yesterday, which all of the objectors to those motions

19   participated, those matters have been adjourned for hearing

20   until 10 a.m. on December 6th.  We've filed-- made this notice

21   on this agenda and filed this publicly and served it on the

22   2002 list as well as the masters service list.

23          THE COURT:  Okay.  That's fine.

24          MR. BUTLER:  Matter number 4 on the agenda, Your

25   Honor, is the debtor's motion for a default judgment against

7

1    Mr. Furukawa.

2              MR. BERGER:  Good morning, Judge.  Neil Berger --

3              THE COURT:  Good morning.

4              MR. BERGER:  -- Togut, Segal and Segal.  Your Honor,

5    we served a counterclaim, a claim for affirmative relief

6    against Furukawa.  The debtors applied for a default judgment.

7    Furukawa responded.  We have been actively engaged with

8    Furukawa's new counsel.  We hope in the next couple of days to

9    submit a discovery stipulation and order to Your Honor to move

10   to the substantive matters.  This matter is being adjourned to

11   the December 11th hearing.  Hopefully, it's a place hold, Your

12   Honor, and we can get to real discovery and get to the

13   (indiscernible) of the matter.

14             THE COURT:  Okay.  That's fine.

15             MR. BUTLER:  Your Honor, matter number 5 is the

16   Saginaw Chassis asset sale motion.  This is the sale hearing.

17   The motion was filed at docket number 9368.  Your Honor

18   previously approved the bidding procedures and bid protection

19   order at docket 10958.  Under that order, this matter was to

20   come for hearing either today or next month depending on

21   whether alternative bids were received.  No bids were received

22   by the bid deadline and therefore pursuant to Your Honor's

23   prior order, this is now ripe for consideration by the Court in

24   terms of the sale.

25             THE COURT:  Okay.

8

1          MR. BUTLER:  Your Honor, this motion which we

2   presented earlier to you at our last omnibus hearing deals with

3   the sale of the Saginaw Chassis assets free and clear of all

4   liens for approximate consideration of 42.6 million dollars.

5   Your Honor may recall from the prior hearing that a portion of

6   that is allocated to assets and another portion is allocated to

7   general assets.  And another portion is allocated to inventory.

8   And a final portion element of it is reimbursement of expenses

9   because the Canadian assets are now being -- we're required --

10  company transaction are now being relocated by the debtors for

11  the purchaser's benefit.

12          There is, Your Honor, in connection with this, an

13  evidentiary index.  Very briefly, the debtor's declaration is

14  Exhibit 1.  The agreements, including all the amendments are

15  Exhibits 2 and 3.  The court documents relating to this sale

16  are Exhibits 4 through 11 and all the appropriate service

17  notices are Exhibits 12 through 14.  I'd like to move those

18  matters into evidence.

19          THE COURT:  Okay.  Any objection to that?  All right.

20  Those are admitted.

21  (Debtor's Exhibit 1, debtor's declaration in connection with

22  Saginaw Chassis asset sale motion, was hereby received into

23  evidence, as of this date.)

24  (Debtor's Exhibits 2, 3, Saginaw Chassis asset sale motion

25  agreements, including all amendments, were hereby received into

9

1   evidence, as of this date.)

2   (Debtor's Exhibits 4-11, court documents relating to Saginaw

3   Chassis asset sale, were hereby received into evidence, as of

4   this date.)

5   (Debtor's Exhibit 12-14, all service notices relating to

6   Saginaw Chassis asset sale, were hereby received into evidence,

7   as of this date.)

8           MR. BUTLER:  And Mr. Sheehan's available for cross-

9   examination or for any questions the Court may have.

10          THE COURT:  Okay.  Well, I saw no objections to the

11  relief and I've reviewed the declaration as well as the

12  agreement and I don't have any questions.

13          MR. BUTLER:  Okay.  Thank you, Your Honor.  Your

14  Honor, the only other items I would indicate for the record in

15  addition to the evidentiary record is that I just do want to

16  say that Delphi has had discussions with the UAW regarding

17  their review of this agreement.  There was a concern with

18  respect to a specific provision of the agreement, Section 9.1.C

19  of the agreement, that the debtors could waive the purchaser's

20  requirement to assume the obligation of the collective

21  bargaining agreements as a condition of closing.  We've given

22  assurances to the UAW that Delphi would not waive this

23  condition to closing without first obtaining the UAW's

24  concurrence.

25          THE COURT:  Okay.

10

1          MR. BUTLER:  That was the element of our discussions

2    with them.  I just wanted to say that on the record.

3          Otherwise, Your Honor, unless you have any questions,

4    we would present the matter for Your Honor's review based on

5    the papers and the other --

6          THE COURT:  When is the closing expected to occur?

7          MR. BUTLER:  I think, Your Honor, promptly after the

8    order becomes final.

9          MR. BALY (TELEPHONICALLY):  Your Honor, --

10         MR. BUTLER:  January 2nd is the actual date, Your

11   Honor.  Sorry.

12         THE COURT:  Okay.  I think we have counsel for the

13   purchaser on the phone.

14         MR. BATY (TELEPHONICALLY):  Yes.  I'm sorry, Your

15   Honor.  Again, Donald Baty on behalf of TRW (indiscernible)

16   Systems.  The agreement is set to close on January 2nd.

17         THE COURT:  Okay.  And people here are not in

18   agreement with you.  All right.  And as I recall, that was one

19   of the reasons to have this heard today so that could occur.

20         MR. BUTLER:  Yeah.  And actually, Your Honor, even

21   though what I had said at the last hearing, this, as Your Honor

22   I think is aware, this particular transaction has been a long

23   time baking and it really focused around resolving matters with

24   General Motors in terms of the supply agreement.  And there

25   was, I think, on the purchaser a justifiable desire that once

11

1    that agreement finally was achieved that they wanted the

2    certainty of knowing they can proceed with this transaction.

3    So even though the closing may actually be closing on January

4    2nd, the commitment we made to the purchaser when we presented

5    the original bidding procedures motion was that if there -- was

6    to bifurcate the process in such a way that if there were no

7    competitive offers made -- which is not, by the way, Your

8    Honor, a complete surprise to the company because this

9    disposition does relate and the value is associated, among

10   other things, with the supply agreement with General Motors and

11   the sale -- and the union agreement so that ultimately it's not

12   a complete surprise that given the fact there's been an

13   agreement with General Motors and the purchaser here that they

14   would be the successful purchaser.

15            THE COURT:  Right.  Okay.  Does anyone else have

16   anything to say on this motion?  All right.  I will approve the

17   motion then under Sections 363(b) and (f).

18            MR. BUTLER:  Thank you, Your Honor.  And you're free

19   to stay on the phone, sir, but if you want to you, you can ring

20   off.

21            MR. BATY (TELEPHONICALLY):  Thank you.

22            THE COURT:  Okay.

23            MR. BUTLER:  Your Honor, matter number 6 is the

24   Verizon administrative expense motion claim at docket number

25   9596 and Mr. Berger has also handled this matter for Delphi.

12

1          THE COURT:  Okay.

2          MR. LADDIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. LADDIN:  Daryl Laddin of Arnall Golden & Gregory

5  on behalf of Verizon Services Corporation.  We are here today

6  on the motion of Verizon seeking payment for the sum of 479,000

7  dollars.  We view this today, Your Honor, as a status

8  conference or scheduling conference --

9          THE COURT:  Can you say that number again?

10          MR. LADDIN:  $479,532.61.

11          THE COURT:  And that's a lesser number than the

12  numbers in your papers but that's because of credits you've

13  received or amounts you've received?

14          MR. LADDIN:  Yeah.  Your Honor may recall from the

15  sale hearing and the sale order that was entered that the

16  amount that was reserved for potential, quote unquote, Schedule

17  3 disputes was 700,000 dollars.  The actual damages that have

18  been incurred are over 800,000 dollars but Verizon has also

19  been paid over 200,000 dollars.  So while we would like to seek

20  the full 800,000 dollars that Verizon has lost, what we're

21  entitled to seek, we believe, under the sale order is only the

22  479,000 which is, again, the difference between 700,000 and

23  what Verizon was in fact paid for these, quote unquote,

24  Schedule 3 disputes.

25          THE COURT:  Okay.  And I'll ask Mr. Berger this but

13

1    my understanding was that the debtor contends that at least

2    some of those payments were mistaken and you may want them

3    back?

4           MR. BERGER:  Yes, Judge.

5           THE COURT:  So if that's the case, you're seeking

6    more than -- you're disputing the right to have those --

7    whatever payments the debtor wants back, you're disputing the

8    right to get those back, too?

9           MR. LADDIN:  That is absolutely right and --

10          THE COURT:  Okay.

11          MR. LADDIN:  -- you know, I will note while that

12   would be the equivalent of a compulsory counterclaim, they've

13   only, quote unquote, reserved their rights to seek to recover

14   that money.  They haven't actually asked the Court -- they

15   haven't filed the equivalent of the counterclaim which I think

16   obviously they would need to do in this proceeding in order to

17   get that money back.

18          The -- I can go into some of the factual detail if

19   Your Honor would like.  Obviously the motion was fairly

20   detailed itself as well as the reply that we filed.

21          THE COURT:  Okay.  I think I really only have one

22   question which is on the issue of the main dispute, which is

23   can you identify to me any contractual provision that supports

24   your claim?

25          MR. LADDIN:  There are two points with respect to

14

1    that, Your Honor.  First, what MobileAria contends in its

2    factual recitations is a disagreement with Verizon over what

3    the specifications were that Verizon provided to MobileAria.

4    And MobilAria contends in its declaration that it followed

5    Verizon's specifications.  The contract itself provides in

6    Section 18, and this is in our papers, that "MobileAria

7    recognizes that the product and services which are to be

8    provided under this agreement are vital to Verizon and must be

9    delivered and installed without interruption, delay, cessation

10   or limitation and in full compliance with the scheduled

11   development dates" -- excuse me -- "developmental dates and

12   requirements set forth in the orders and performed in full

13   compliance with the specifications."  They contend that they

14   did comply with those specifications --

15            THE COURT:  Well, where are the specifications

16   designated?

17            MR. LADDIN:  The specifications, Your Honor, is a

18   defined term in the agreement.  First of all, there are the

19   orders.  It has to comply with the requirements set forth in

20   the Order's, capital O, defined term and comply with the,

21   capital S, Specifications.  "An Order is a purchase order" --

22   and this is in the definition section -- "An Order is a

23   purchase order or other written communication and/or electronic

24   transmission the customer may deliver to supplier for the

25   purchase of product and/or service."  And Specifications is

15

1   defined to mean -- lower case -- "specifications for the

2   product or services set forth in an order as well as suppliers'

3   then current published specifications and documentation and

4   applicable industry and governmental requirements."  Here, a

5   fundamental specification that was communicated to MobileAria

6   in writing in the order submitted and also in -- at the outset

7   of this contract and before the contract was entered into was

8   that these units needed to stay within two megs of usage.  That

9   was what had been provided to Verizon by its prior supplier,

10  which was At Road.  It was a fundamental cost component that

11  was in fact provided.

12           THE COURT:  Do you have any order that says that?

13           MR. LADDIN:  All of the orders will indicate whether

14  they're going to be activated under the two meg plan or under

15  an unlimited plan.  So, yes, the orders will provide that.

16           Secondly, the fundamental --

17           THE COURT:  That's a different point, I think.

18           MR. LADDIN:  Well, they have to comply with the

19  speci --

20           THE COURT:  Whether they're activated under one plan

21  or another is separate from saying that they cannot exceed two

22  megs.

23           MR. LADDIN:  Well, the specification is you have to

24  comply with two megs.  The specification is for a two-meg plan

25  and it says you've got to meet the specifications.  It's two

16

1   megs.  And this was a -- this was a fundamental issue from

2   Verizon's perspective.  This was --

3           THE COURT:  Why doesn't it appear anywhere in the

4   agreement then?

5           MR. LADDIN:  Pardon?

6           THE COURT:  Why doesn't it appear anywhere in the

7   agreement then?

8           MR. LADDIN:  Because -- Your Honor, because it was --

9   first of all, because it was such a given that it was --

10          THE COURT:  This is about a 100-page agreement.

11          MR. LADDIN:  That's true.  That's true.  But, Your

12   Honor, the fundamental principle of contract law --

13          THE COURT:  Is there anyone who's saying this besides

14   you?

15          MR. LADDIN:  I'm sorry?

16          THE COURT:  Is there any employee affidavit, any

17   factual indication of this at all?

18          MR. LADDIN:  Yes.  Absolutely, Your Honor.

19          THE COURT:  Where?

20          MR. LADDIN:  I realize that they raise the issue in

21   their surreply which is something that's not permitted under

22   the rules and was outside the agreement on briefing between

23   myself and counsel.  But --

24          THE COURT:  I would have come up with the same point

25   because I usually review proofs of claim for the documentation

17

1    in support.

2            MR. LADDIN:  Your Honor, there is no question that at

3    an evidentiary hearing that I will have a witness here who will

4    testify to that.

5            THE COURT:  But I'm talking about a piece of paper, a

6    contract.

7            MR. LADDIN:  The order --

8            THE COURT:  Do you have anything that specifies a cap

9    on the megahertz in writing?

10           MR. LADDIN:  There are communications between the

11   clients with respect to the two megs.  And --

12           But the second point, Your Honor -- and I realize

13   Your Honor is focused on this issue.  But the second point is

14   that the fundamental principle of contract law is to force the

15   intent of the parties.  And there's nothing in this contract

16   that says that MobileAria can apply a pig in a poke.

17   Effectively, what their argument is is that they could provide

18   a product that had a million megs of usage which would be

19   ridiculous.  But that is where that argument leads and it's

20   what leads them to claim what the specifications were that were

21   provided by Verizon.  And the law in New York, as elsewhere, is

22   pretty clear on contract interpretation.  It says that

23   extrinsic evidence that shows a latent ambiguity and what the

24   parties intended is admissible.  And it's also a fundamental

25   principle of contract law that when a contract is either

18

1    ambiguous, incomplete -- and granted, there's no question, Your

2    Honor, that specific term isn't in here.

3            THE COURT:  Which term?

4            MR. LADDIN:  Within this written document.  "Where a

5    contract is ambiguous or incomplete or uncertain as to the

6    intention of the parties, the Court is to consider extrinsic

7    evidence as to the surrounding matters and circumstances

8    including the additional terms that were not included in the

9    writing in order to determine the intent."

10           Now, I can --

11           THE COURT:  Well, but again, I think you're hanging

12   your hat -- and having read through the agreement, I think it

13   is the only place to hang it, on the definition of the word

14   "specifications"?  And that says "shall mean specifications for

15   the product" -- by the way, there's nothing in the description

16   of the product that specifies, as far as I can see, a cap on

17   megahertz.  Well -- or of the service.  And that's including in

18   the exhibits to the agreement, Exhibits B and G and the like.

19           "As set forth in an order".  So that's a -- an order

20   is defined in paragraph 8, as well as in the Defined Terms, and

21   it says "as well as suppliers', then current published,

22   specifications and documentation and applicable industry and

23   government requirements."

24           So I don't see why I should be listening to any

25   parole evidence on this.  There's the orders and, although

19

1   you're not relying on it, published specifications and

2   documentation of the supplier.

3            MR. LADDIN:  "An order is a purchase order or other

4   written communication delivered to the supplier."

5            THE COURT:  Right.

6            MR. LADDIN:  That would be extrinsic evidence that's

7   outside the four corners of this document.

8            THE COURT:  Well, no.  It's incor -- but where -- but

9   I don't see the order.  Where's the order?

10            MR. LADDIN:  We don't have them here today.  This

11   isn't an evidentiary hearing.  We had agreed with counsel --

12            THE COURT:  But this is a document.  It's just a

13   document.  It's part of the contract.

14            MR. LADDIN:  An order -- orders were submitted

15   subsequent to execution of this document.

16            THE COURT:  Right.

17            MR. LADDIN:  Okay.

18            THE COURT:  Do the orders specify that there's a cap

19   on the megahertz?

20            MR. LADDIN:  I believe that the orders state -- and I

21   don't have the orders with me so I cannot say precisely what

22   those orders state.  But my understanding is --

23            THE COURT:  Well, I'm not -- that doesn't cut it.

24            MR. LADDIN:  What I've been told is --

25            THE COURT:  That doesn't cut it either.

20

1        MR. LADDIN:  What they state, Your Honor, is --

2        THE COURT:  But you don't know.

3        MR. LADDIN:  They state that --

4        THE COURT:  And it's not before me.

5        MR. LADDIN:  But, Your Honor --

6        THE COURT:  I'm going to give you one more chance on

7 this because I don't like motions for reargument and rehearing.

8 This motion is woefully short of any factual support.  But for

9 this argument about specifications, the major claim would be

10 subject to dismissal on the papers because there's nothing in

11 the contract that gives you a right to this except for this

12 definition of specifications.  I'll hear from Mr. Berger but my

13 inclination is to have you adjourn this so that you can make a

14 real motion with the real documents attached as you would to a

15 proof of claim.  And a real affidavit from a real client that

16 lays out the elements of the other claim.  And so we're not

17 spent here just sort of speculating and the debtor doesn't have

18 to go through a discovery process before you've established the

19 elemental basis for asserting a claim in a bankruptcy court.

20 Which is not some lawyer saying I've been told this, that and

21 the other thing but a client saying this is what happened,

22 under oath, and submitting the agreement that supports it.

23        MR. LADDIN:  And, Your Honor, if we do go through the

24 extra briefing that Your Honor is --

25        THE COURT:  It's not briefing.

21

1          MR. LADDIN:  Motion.  Excuse me.

2          THE COURT:  It's not briefing.  I don't want to hear

3    from lawyers.

4          MR. LADDIN:  Understood.

5          THE COURT:  I want the claim.

6          MR. LADDIN:  Understood.  Additional file.  We will

7    also include in there the law with respect to the extrinsic

8    evidence that the Court can and should --

9          THE COURT:  I'll give you the law right now 'cause I

10   have it and I'll cite it to you.  All right?  In fact, you can

11   look at it.  But let me hear from Mr. Berger first.

12         MR. BERGER:  Briefly, Your Honor -- sorry.

13         THE COURT:  We all have a cold, I see.

14         MR. BERGER:  I have to be brief.  We appreciate and

15   embrace Your Honor's observations.  We've asked the same

16   questions.  I don't need law.  I need documents.  If there's

17   definitive documents and we can look at them and research them,

18   we will.  What I'd ask Your Honor is that the motion either be

19   withdrawn without prejudice or denied without prejudice and a

20   new document filed that we can respond to.

21         THE COURT:  Well, I think that you would need to have

22   a suitable time to respond to the proof of claim.

23         MR. BERGER:  Yes.

24         THE COURT:  My hope is, if there is a proof of claim,

25   that actually -- a proof of administrative claim, that actually

22

1    sets forth the factual basis, you will be able to reconcile it

2    and negotiate as you have with ninety-nine percent of all the

3    other claims filed and, frankly, with everyone except for

4    basically pro se claimants, some of whom have wanted to appear

5    in court.

6            MR. BERGER:  We commit to Your Honor that if we get

7    that information, we will look at it and we will negotiate with

8    counsel business to business people as well.

9            THE COURT:  Okay.  Now as far as contract

10   interpretation, "Under the law of New York, a written contract

11   is to be interpreted so as to give effect to the intention of

12   the parties expressed in the unequivocal language they've

13   employed."  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d

14   Cir. 1992)  "Under New York law, if a contract is unambiguous

15   on its face, its proper construction is a question of law."

16   Metropolitan Life Insurance Company v. RJR Nabisco, Inc., 906

17   F.2d 884, 889 (2d Cir. 1990)  "The Court should not look beyond

18   the confines of the contract to extrinsic evidence if its

19   relevant provisions are plain and unambiguous."  W.W.W.

20   Associates, Inc. v. Giancontieri, 77 NY2d 157, 162 (1990)

21   "When parties set down their agreement in a clear complete

22   document, their writing should be enforced according to its

23   terms."  Vermont Teddy Bear Company, Inc. v. 538 Madison Realty

24   Co., 1 NY3d 470, 475 (2004)  "This is particularly appropriate

25   if the contract was negotiated between sophisticated counsel

23

1    business people negotiating at arms length."  (Id.)  In such

2    circumstances, "Courts should be extremely reluctant to

3    interpret an agreement as impliedly stating something which the

4    parties have neglected to specifically include.  Hence, Courts

5    may not, by construction, add or excise terms nor distort the

6    meaning of those used and thereby make a new contract for the

7    parties under the guise of interpreting the writing."  (Id.)

8    See also Wallace v. 600 Partners Co., 86 NY2d 543, 548 (1995).

9    "Given the terms of the contract, their plain meaning, a Court

10   should find contractual provisions ambiguous only if they are

11   reasonably susceptible to more than one interpretation by

12   reference to the contract alone."  Krumme v. Westpoint Stevens,

13   Inc., 238 F.3d 133, 139 (2d Cir. 2000); Burger King Corporation

14   v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990).

15   "Contract language is unambiguous if it has a definite and

16   precise meaning unattended by danger of misconception in the

17   purport of the contract itself and concerning which there is no

18   reasonable basis for a difference of opinion."  Metropolitan

19   Life Insurance v. RJR Nabisco, 906 F.2d 889  "Language whose

20   meaning is otherwise plain is not ambiguous merely because the

21   parties urge different interpretations in the litigation.

22   (Id.)  See also Lee v. BSB Greenwich Mortgage L.P., 267 F.3d

23   172, 179 (2d Cir. 2001).  "Any ambiguity in a contract must

24   emanate from the language used in the contract rather than from

25   one party's subjective perception of the terms."

24

1        Consequently, I believe your contract which, again,

2    is fifty some pages with an additional -- roughly fifty pages

3    of single-spaced specifications and exhibits must be read as

4    written.  And that one should particularly follow the following

5    quote from Vermont Teddy Bear at 476:  "The logic of the

6    proposition that a term is clearly contrary to a party's

7    financial interest does not justify judicial insertion of a

8    contract term."  See also Rowe v. Great Atlantic and Pacific

9    Tea Co., 46 NY2d 62, 72 (1978).  "Courts should be extremely

10   reluctant to interpret an agreement as impliedly stating

11   something the parties have neglected to specifically include.

12   Such lack of foresight does not create rights or obligations."

13       So again, I really think the focus is on the order or

14   the orders and what they say.  And in that regard, I note that

15   the integration provision in paragraph 55 cross-referenced

16   paragraphs 8 and 13 and put limitations -- or recognized

17   limitations in those paragraphs on orders that amend the

18   agreement.  So I think it's clear to me that the parties very

19   carefully documented this transaction and I agree with you that

20   they left room for the order concept.  But the order better be

21   pretty clear as far as what it states if you're going to still

22   pursue this contention that DASLC obligated itself -- I'm not -

23   - I'm sorry -- MobileAria obligated itself to cap the

24   megahertz.  It may have been good business for it recognizing

25   that it replaced someone and it itself could be replaced to try

25

1    to make Verizon happy.  But that's different than saying that

2    it's bound by a contract.  It's one thing to have a happy

3    customer who will renew that contract in the future.  It's

4    another thing for that customer to say you breached my

5    contract.

6            So anyway, I don't think we need to hear anymore on

7    this because it's really a question of establishing at least a

8    basis for going forward with the claim in the first place.  You

9    know, there's a lot of law on this in the context of secured

10    creditors asserting claims against consumers where Courts

11    require affidavits and the documents.  It's the same here.  You

12    really need to do that.  So I'm going to give you -- when is

13    the next omnibus day?

14            MR. BUTLER:  December 20th, Your Honor.

15            THE COURT:  And when's the one after that?

16            MR. BUTLER:  January 25th -- 25th, I believe.

17            THE COURT:  All right.  The debtor's response date

18    should be ten days -- should be January 15th -- that's a

19    weekday.  Yeah, that's a Tuesday.  So the hearing on this would

20    be the twenty-fifth omnibus day.  And you should file your

21    amended proof of claim by December 17th which is a Monday.

22            MR. LADDIN:  That's what day of the week?  I don't

23    have my --

24            THE COURT:  Monday.  And serve it on Mr. Berger.

25            MR. LADDIN:  We will do that.

26

1          THE COURT:  Okay.  Thank you.

2          MR. LADDIN:  Thank you, Your Honor.

3          MR. BERGER:  Thank you, Judge.

4          THE COURT:  And obviously, that will cover the other

5     elements of the claim, too.  If there's some support for the

6     contentions about the trucks not being there or being there --

7     you know, the issue about -- the other two elements of the

8     claim --

9          MR. LADDIN:  Yeah.

10         THE COURT:  I need an affidavit that says that's in

11    fact the case.

12         MR. LADDIN:  No, that's fine, Your Honor.  It clearly

13    is.  Those are factual disputes and we'll set that out in more

14    detail.

15         THE COURT:  Okay.  And my guess is, if there is such

16    an affidavit with backup, Mr. Berger will be speaking with you

17    about those elements of the claim and in all likelihood the

18    hearing on that element of it will be adjourned either to

19    independently reconcile them in an informal way or for you all

20    to have a discovery schedule because there's no sense on having

21    a hearing on a non-evidentiary basis if there actually is an

22    evidentiary issue.

23         MR. LADDIN:  That's right.  With respect to timing,

24    could we have until the 18th, Your Honor, the Tuesday?

25         THE COURT:  That's fine.

27

1          MR. LADDIN:  Okay.  Thank you.

2          THE COURT:  But since we're getting near the

3     holidays, by 4 on the 18th.

4          MR. LADDIN:  That's fine.  Thank you.

5          THE COURT:  Okay.

6          MR. BUTLER:  Your Honor, the next matter on the

7     agenda is matter number 7.  It's the twenty-second omnibus

8     claim objections filed by the debtor at docket number 10738.

9     As in the past, Your Honor, we have received various responses

10    and we have also in this particular case -- elected to withdraw

11    two of the objections that we had originally filed.

12         There were 131 proofs of claim on the objection on

13    various procedural and substantive bases.  There are two

14    objections that the debtors have chosen to withdraw.  One is

15    with respect to the claims filed by UniSeal.  And the other one

16    is with respect to the claim filed by Contrain (ph.) Funds, LLC

17    or Airmark.

18         The Airmark -- the Contrain Airmark -- our claim

19    number is 10389 and we have agreed to withdraw that because

20    Contrain has agreed to actually withdraw it in a separate

21    stipulation.  So that's how that's been resolved.

22         And with respect to the UniSeal claim, that's claim

23    number 1916, and that -- we're withdrawing that because that's

24    been involved -- taken up in some respects in our caps dealing,

25    dealing with suppliers and caps order, and we will be filing in

28

1   our twenty-fourth omnibus claims objection a motion to modify

2   that claim consistent with the caps agreement.  So we've taken

3   that off of this particular omnibus objection.

4        That leaves, Your Honor, 129 proofs of claim.  There

5   are thirty-two proofs of claim for which we've received

6   responses.  This is different than what we filed in our omnibus

7   reply yesterday.  We received additional response overnight and

8   consistent with our understanding with the Court, when we

9   receive response, even if it's not timely, we still take it off

10  of this track and put it into the claims track.  So that means

11  there are thirty-two proofs of claims that should be adjourned

12  pursuant to the responses.  That leaves ninety-seven proofs of

13  claim to address at this hearing.

14        The responses that we are adjourning into the claims

15  track, there are actually thirty responses covering the thirty-

16  two proofs of claim.  And those assert liquidated claims for

17  approximately forty-three and a half million dollars.  The

18  ninety-seven claims we're dealing with at this hearing asserted

19  liquidated claims of approximately 28.9 million.  Of that,

20  we're asking Your Honor today to expunge thirty-eight of those

21  claims with an asserted amount of approximately 1.7 million.

22  And with respect to the other fifty-nine claims that assert

23  approximately 27.2 million dollars for the claims, we're asking

24  to modify those claims on various bases, including modifying

25  the identity of the debtor and the class and the amount of the

29

1    claim and in some cases reducing the asserted amount of the

2    claims.  That would, if Your Honor grants the relief requested,

3    reduce those claims to nineteen million dollars in the

4    aggregate or an approximate aggregate reduction of 8.2 million.

5            So again, as in prior matters, Your Honor, when we've

6    dealt with the omnibus objections at omnibus hearings, we're

7    asking Your Honor today for relief as to the ninety-seven

8    proofs of claim as to which no objections have been received

9    and to move the thirty-two proofs of claim into the claims

10   track and then we'll have the other two objections that we will

11   have withdrawn, as I've described on the record.

12           THE COURT:  Okay.  And as to the ones that are

13   covered by the order, each of those parties got the individual

14   notice contemplated by the claims procedure?

15           MR. BUTLER:  Yes.  We've been doing the

16   particularized notice, Your Honor.  And we will also, if Your

17   Honor grants the relief requested, send out particularized

18   notice as to the relief received.

19           THE COURT:  Okay.  All right.  Does anyone want to

20   address this omnibus motion?  All right.  I'll grant the

21   omnibus motion as modified as sought on the record and as

22   reflected in the modified order to either disallow or modify

23   the treatment of those claims by claimants who have not opposed

24   the relief sought.  And that's based not only on their lack of

25   an objection but also the statements regarding those claims in

30

1    the motion.  So you can submit that order.

2            MR. BUTLER:  Thank you, Your Honor.  Your Honor, one

3    other matter with respect to claims, just on this record, and

4    that is I did want to indicate to the Court that the debtors

5    have been studying very carefully amended Bankruptcy Rule 3007

6    which I think one can adduce, although it's not specifically

7    stated, I think one can adduce this to be applied to all

8    pending cases as of December 1, 2007 because the amended

9    bankruptcy rules don't provide anything to the contrary, unlike

10   the BAPCA implementation procedures.  And so we're assuming

11   they're applicable to this case.  And there are, under the

12   amended Rule, there is a specific authorization for debtors to

13   seek relief from the Court or to seek guidance from the Court

14   on the implementation of that Rule as to the particular case.

15   And as with other bankruptcy rules, there's always the ability

16   of the company to ask the Court to reconcile the requirements

17   of the rules as to the administration of the rule in the

18   particular case.

19           So I wanted Your Honor to know that we're going to be

20   filing a motion to amend our claims procedures order on Friday

21   to be heard at the December 20th hearing date to ask Your Honor

22   for guidance on reconciling amended Bankruptcy Rule 3007

23   against our current claims procedure order in this case.

24           THE COURT:  Okay.  I mean, I could tell you that my -

25   - the underlying point of that Rule is to give claimants notice

31

1   and adequate notice.  And, frankly, I think what you're doing,

2   as far as the particularized notices, is more than the rule

3   requires.  But I'm happy to hear that motion.

4           MR. BUTLER:  Your Honor, I'm actually hopeful that

5   Your Honor, when we file the motion at the end of the day, that

6   we will be able to continue our current procedures.  Because we

7   think they are with Your Honor early on in this case one in

8   particularized notice and we've been doing that.  So I think

9   that we probably far see the amended Rule.  But the point for

10  us is we simply didn't want to have an ambiguity in this record

11  and then have all of a sudden objections based on --

12          THE COURT:  No, I understand that.

13          MR. BUTLER:  -- noncompliance of the rules.  So --

14          THE COURT:  I understand that.  That's fine.

15          MR. BUTLER:  So we will be filing that on Friday for

16  consideration.

17          THE COURT:  Okay.  In other words, I think you can

18  still have omnibus objections as long as people get

19  particularized notice.

20          MR. BUTLER:  Thank you, Your Honor, for that

21  guidance.

22          THE COURT:  Okay.

23          MR. BUTLER:  Your Honor, the last matter on today's

24  agenda, now moving as matter number 8, this is Internet

25  Corporation's motion for payment of administrative expenses.

32

1    There are a small number of exhibits before I cede the podium

2    to Mr. Dragich for their argument.  There are a small number of

3    exhibits that I believe there's no objection to in terms of

4    being put into the record which was Exhibit 1 is Intermet's

5    motion for payment of the administrative expense claim and the

6    various exhibits.  Exhibit 2 is our objection with the various

7    evidentiary exhibits, the contracts and so forth, the

8    settlement agreements.  And then the prior joint stipulation

9    between the parties that Your Honor signed at docket number

10   9696.  But seeing as this argument in part relates up to the

11   documents between the parties, we wanted to move those matters

12   into evidence.  There is no objection, I believe.

13           THE COURT:  No opposition?

14           MR. DRAGICH:  No objection, Your Honor.

15           THE COURT:  Okay.  Can I start with a point the

16   debtors raised towards the end of their objection that I don't

17   think you've had a chance to respond to, which is why isn't

18   this claim barred by the settlement agreement from August?

19           MR. DRAGICH:  Your Honor, for the record, David

20   Dragich from Foley & Lardner on behalf of Intermet Corporation.

21   In response to your question, the claim -- Intermet's claim,

22   whatever its character, whether it's administrative or a pre-

23   petition claim, is not barred or waived as a consequence of the

24   settlement agreement.  Your Honor, if we turn to the debtor's

25   objection in paragraph 14, it recites the language of the

33

1    settlement agreement.  And the very last three lines, let's

2    say, it provides that the debtors release or waive the claims

3    arising out of events, causes, acts, statements or omissions --

4                THE COURT:  Well, you left --

5                MR. DRAGICH:  -- which occurred before --

6                THE COURT:  You left out some language.  The release

7    says "The releasing parties" -- which would include Intermet --

8    "further release and waive any right to assert any other claim,

9    cause of action, demand or liability of every kind and nature

10   whatsoever, including those arising under contract statute or

11   common law whether or not known or suspected at this time which

12   relate to the claim in which the releasing parties have, ever

13   had or hereafter shall have against the debtors based upon

14   arising out of, related to or by reason of any event, cause,

15   thing, act, statement or omission occurring before the petition

16   date."  And I'm assuming what the debtors contend is that this

17   is at least related to the 2003 contract since that's what

18   gives rise the right to a rebate -- refund, a refund of the

19   rebate.  I mean, I understand.  If it said -- but the word

20   "related to" is pretty broad.

21               MR. DRAGICH:  Well, Your Honor, it depends.  I agree

22   that it's broad.  But it says related to or by any reason of

23   any event, cause, thing or omission occurring -- it relates to

24   those acts or omissions before -- that occurred before the

25   petition date.  It's our position, Your Honor, that the act or

34

1   the omission, Delphi's failure and cessation of ordering parts

2   from Intermet, was a post-petition act not one --

3         THE COURT:  But isn't the "thing" -- you know, they

4   use that word "thing", too.  Isn't the "thing" the contract?

5         MR. DRAGICH:  The contract is what defines the

6   parties' obligation but the breach or the termination -- it's

7   our view was the post-petition -- arose from the post-petition

8   conduct of the debtor.

9         THE COURT:  And it has no relation to the "thing" --

10  to the contract?

11        MR. DRAGICH:  Well, it's an obligation of the

12  contract so, yes.

13        THE COURT:  So it relates to it.

14        MR. DRAGICH:  We're reading -- Intermet and the

15  debtors read the clause differently, Your Honor.

16        THE COURT:  Okay.

17        MR. DRAGICH:  And that is that it's our view the

18  "related to" is not relates to the contract.  It relates to the

19  act or omission.  And if it's the act or omission that we're

20  addressing, that's the post-petition omission by the debtor to

21  order the steering knuckles under the supply agreement from

22  Intermet.

23        THE COURT:  Okay.

24        MR. DRAGICH:  Your Honor seems relatively familiar

25  with the background.  Would you like a brief recitation of some

35

1    of the underlying facts, Your Honor, that are not in dispute?

2         THE COURT:  Well, let me just -- only one point.  And

3    it goes back to the settlement agreement again.  What is the

4    relation of this rebate agreement to the claim that was filed?

5    Was the rebate agreement related to the provision of the

6    products and services that were covered by the claim?

7         MR. DRAGICH:  I don't recall, Your Honor.  I can't

8    answer that as I sit here -- stand here.

9         THE COURT:  Okay.  Okay.  All right.

10        MR. DRAGICH:  Your Honor, what -- the factual issues

11   are largely agreed to between the parties as far as entry into

12   the supply agreement, entry into the rebate agreement and what

13   the rebate requires of the parties.  So I won't repeat those

14   here.  What the parties have agreed to do with respect to the

15   claim, if Your Honor allows the claim, whether it be

16   administrative or pre-petition, the amount of that claim has

17   not yet been reconciled.  The debtor has not said outright that

18   there is no claim -- or no claim.  Whether it should be allowed

19   or not is a separate issue.  But the parties have agreed that

20   if Your Honor grants a claim, whether it be administrative or

21   pre-petition, that an evidentiary hearing be scheduled for the

22   next omnibus hearing to determine what that amount is.

23        THE COURT:  Okay.

24        MR. DRAGICH:  Your Honor, what we request is that the

25   Court allow an administrative claim pursuant to the obligations

36

1   of the rebate agreement.  Intermet views this as a post-

2   petition administrative claim because it arose solely because

3   of the debtors' post-petition conduct, its termination of the

4   supply agreement.  Your Honor approved a sale today regard the

5   Saginaw Chassis asset sale motion.  And that sale sold

6   substantially all of the assets that the debtor used in

7   supplying General Motors pursuant to the GMT 900 program.

8   Intermet in turn supplied Delphi pursuant to that program.  So

9   if Delphi is no longer supplying at all as a result of that

10  sale, there has been a termination of the contract that in 2007

11  September, just a couple months ago, at that time, the debtors

12  ceased ordering parts from Intermet.  But for two years --

13          THE COURT:  Well, see, you're not saying they've

14  actually formally terminated but they're in anticipatory breach

15  in essence?

16          MR. DRAGICH:  We believe, Your Honor, they've

17  terminated by their conduct.  And we've sent them ---

18          THE COURT:  At a minimum it would be anticipatory

19  breach, I guess.

20          MR. DRAGICH:  Which we've given a notice pursuant to

21  our letter prior to this motion.  The motion itself could be

22  deemed a notice of termination as a consequence of that breach.

23  They clearly, Your Honor, are not going to be ordering

24  additional parts from Intermet.  They no longer supply pursuant

25  to that program.

37

1          The purpose behind this concept, Your Honor, under

2    503 of the Code is to encourage parties to continue to do

3    business with the debtor on a post-petition basis.  This

4    section assumes that if the debtor commits a post-petition

5    breach as part of that ongoing relationship, the nondebtor

6    party will be protected.  It will be protected because it will

7    be awarded a resulting administrative claim.  That's what

8    Intermet requests today, Your Honor.

9          THE COURT:  How does this further that policy?

10         MR. DRAGICH:  Your Honor, for two years

11   post-petition -- so almost two years.  From October 2005 until

12   September 2007, Intermet performed under that contract.  That

13   entire contract, when viewed in total, imposed upon the debtor

14   the obligation if it didn't order the minimum requirements to

15   refund that advanced rebate that was previously paid by

16   Intermet.  That was a central component of the contract.

17   Intermet relied on all terms of the contract in providing a

18   benefit to the debtor for almost two years during the

19   bankruptcy proceeding.

20         THE COURT:  How's that different from the pension

21   years in McFarland's Race Elevator?  They worked for the debtor

22   post-petition.

23         MR. DRAGICH:  But, Your Honor, as --

24         THE COURT:  But --

25         MR. DRAGICH:  I'm sorry.

38

1          THE COURT:  -- the Court said that the consideration

2    for the particular claim that was asserted to be an

3    administrative claim was provided pre-petition.

4          MR. DRAGICH:  Can you repeat your question, Your

5    Honor.  I'm not sure I followed that.

6          THE COURT:  Well, those people worked post-petition.

7    And they were paid for their post-petition work.  And they were

8    paid for their -- the portion of their post-petition pension

9    that came due post-petition for the post-petition work.  But

10   the second circuit said the claim based on pre-petition

11   consideration, even though it accrued post-petition, was a pre-

12   petition claim.  And even though they were working post-

13   petition.  They were under a contract that covered the whole --

14   you know, pre- and post-petition period.  But the Court said

15   this consideration they already provided by their hours worked

16   pre-petition.  Therefore it's a pre-petition claim.

17         MR. DRAGICH:  I think the situation here is different

18   though, Your Honor, because in this instance Intermet has

19   provided value to the debtor post-petition in the form of

20   continuing its supply.

21         THE COURT:  They were working.  I mean, there's

22   nothing more valuable than having an employee show up at the

23   office and do his or her job.

24         MR. DRAGICH:  Agreed, Your Honor.  And they were paid

25   for that labor.  Like Intermet was paid for the goods that it

39

1    shipped.  However, the difference is, Your Honor, is that here

2    we're dealing with a commercial contract.  And all of the

3    commercial terms are relevant as far as inducing the parties to

4    act.  In this instance, Intermet assumed and performed the

5    contract on the basis that the debtor would return performance.

6    Meaning, they were only willing to assume the risk of

7    continuing supply if the debtor would then also perform its

8    obligation if it didn't fulfill the minimum requirements.

9        THE COURT:  Did Intermet move to compel assumption or

10   rejection of the contract?

11       MR. DRAGICH:  It didn't, Your Honor, because -- nor

12   did the debtor reject the contract.  If the debtor truly wanted

13   to relieve itself of the obligations within the rebate

14   agreement or the underlying supply agreement, it could have

15   rejected the contract.  It didn't do that.  It simply --

16       THE COURT:  It didn't assume it, though, either, did

17   it?

18       MR. DRAGICH:  No, Your Honor.  By its conduct, it

19   breached the contract and in our view terminated.  The whole

20   purpose of the contract is now gone, Your Honor, because the

21   debtor no longer supplies General Motors pursuant to that

22   program.  So there would be no business purpose for the debtor

23   to assume a contract that it's not performing.

24       Just moving to one other issue raised in the debtors'

25   objection, Your Honor, I think I've addressed our view on the

40

1   waiver issue pursuant to the settlement agreement.  I'd also --

2   the debtor also argues in the objection that Intermet somehow

3   waived its claim by failing to file a proof of claim.  The

4   debtor contends that Intermet had merely a contingent claim.

5   If Your Honor accepted that view, every party in this case,

6   every nondebtor party to an executory contract would have to

7   file a proof of claim irrespective of whether there's been a

8   pre-petition breach.  Surely that's not a requirement that the

9   Court would impose on each and every nondebtor party to a

10  contract.  At the time of the filing, at the time of the bar

11  date, there had been no termination of the contract and

12  therefore Intermet would not have reason to file a claim.  So

13  for that reason, Your Honor, Intermet believes it had not

14  waived the claim in any way as far as failing to file a proof

15  of claim because it wasn't required to.  And second, the

16  settlement agreement does not constitute a waiver because it

17  deals solely with acts or omissions of the debtor giving rise

18  to a claim that were pre-petition.  And it's our view that the

19  acts that gave rise to the claim in this instance were post-

20  petition.  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. BUTLER:  Your Honor, I only have a couple of

23  observations.  The first observation is that I understand Mr.

24  Dragich's need to argue what he does which this -- and he

25  relies in looking at Exhibit 2-B, the settlement agreement, and

41

1    at the relevant paragraph there that Your Honor discussed on

2    the record with him.  And he relies on the words before the

3    petition date which is a concession as we're concerned that

4    if -- that he's saying all these acts occurred after the

5    petition date and somehow were not related because I think it's

6    a concession by Intermet that if in fact it was before the

7    petition date, they are barred by the settlement agreement and

8    they did not file any other proof of claim.  The proof of claim

9    that has -- so they're either barred by the bar date order or

10   they're barred by their own signature on a settlement

11   agreement.

12           THE COURT:  Well, I don't see how they'd be barred by

13   the bar date order because the bar date order gives a -- you

14   haven't rejected this contract yet.

15           MR. BUTLER:  Right.  Your Honor -- that's correct,

16   Your Honor, but the reality is that if people have specific

17   claims, for example, I mean -- and I know the facts are in

18   dispute here and I think that among the facts that are not in

19   dispute just so the record indicates, Your Honor, the 417,200

20   dollars is, I think -- the debtors would concede the

21   appropriate calculation under the contract.  But that relates

22   to -- the vast majority of that relates to transactions that

23   occurred in the pre-petition period.  And Intermet knows that

24   as well.

25           THE COURT:  Well, that's -- I'm sorry.  That's why I

42

1    asked -- I didn't ask this correctly.  This rebate agreement is

2    just -- there's this one-page agreement.  Is it incorporated in

3    some other executory contract where they were supposed to be

4    providing this knuckle?

5            MR. BUTLER:  No.  As I understand it, Your Honor, the

6    rebate agreement was part of the original undertaking back in

7    200 -- I think it's 2003, if I remember the exact date.

8            THE COURT:  I'm not sure it matters.  It goes to the

9    bar date issue.  If it's part and parcel of an agreement that's

10   still executory and hasn't been rejected, then I think they

11   have more time to file a proof of claim.  If it's a stand alone

12   document, I think you're probably right, that they were

13   obligated to file a proof of claim because a big portion of it

14   is pre-petition.  And liquidated.

15           MR. BUTLER:  Yes, Your Honor.

16           THE COURT:  But it's just not clear to me whether it

17   is part of -- whether it's a stand alone agreement or whether

18   it's actually a rider to or an exhibit to or incorporated in an

19   ongoing agreement.

20           MR. BUTLER:  Your Honor, I mean, they haven't -- this

21   is their proof of claim, their motion.  I mean, I know the

22   facts -- the facts of the case are it is a stand alone

23   agreement.  It relates to the transaction.  It relates to it.

24           THE COURT:  Well, that's a separate issue about

25   whether --

43

1          MR. BUTLER:  I know, but that's the point.  And --

2          THE COURT:  Yeah.

3          MR. BUTLER:  And that's sort of observation number

4    one.  Your Honor, observation number two is that Intermet knows

5    the law here.  They know the law applicable to this and it's

6    not what they just argued before Your Honor.  They understand

7    Ace Elevator, Your Honor's case.  They understand second

8    circuit law and they understand that administrative priority

9    claims require that the claim arise out of a post-petition

10   transaction on the part of the debtor and be allowable only to

11   the extent that the consideration supporting the claim is right

12   to payment was both supplied to and beneficial to the debtors'

13   estate and the operation of its business from the Ace Elevator

14   Company case.  And the reason we know that is because they

15   themselves -- Intermet Corporation was a debtor itself in

16   Chapter 11.  That is exactly the lines they used in fighting

17   all of the administrative claims in their case.  And we filed

18   an example of that, which is now before Your Honor as Exhibit

19   2-A, the Intermet objection -- their omnibus objection to

20   claims in their case that was filed.  So Intermet knows the

21   law.

22         THE COURT:  Do you know, did they win on that one?

23         MR. BUTLER:  Yeah.  I have no idea what the outcome

24   was.

25         THE COURT:  Okay.  I mean, because if they did, you

44

1    may have a judicial estoppel point.  Otherwise --

2            MR. BUTLER:  But it states -- well, it's their

3    position.  It's not -- I don't know what their judgm -- whether

4    the judge agreed.

5            THE COURT:  No, I know.

6            MR. BUTLER:  It certainly indicates what their view

7    is.

8            THE COURT:  It's the difference between shrugging

9    your shoulders and say well, I felt that one day but I feel it

10   different today and actually being estopped as a legal matter.

11           MR. BUTLER:  Yeah.  I haven't gone through the -- and

12   sought what the order was.  My -- I suspect in fact that they

13   did win it but we certainly could find out, Your Honor.

14           THE COURT:  Okay.

15           MR. BUTLER:  But that's certainly -- Intermet knows

16   the issue.  And then finally, whether or not they themselves

17   were judicially estopped based on that position they've taken

18   in their cases, the fact is they can't -- this claim can't

19   survive as an administrative claim under the law here in the

20   second circuit and in this district.

21           THE COURT:  Okay.

22           MR. BUTLER:  There is no question here that this did

23   not arise out of a pre-petition transaction.  We agree with Mr.

24   Dragich the facts are the facts and they've been indicated

25   here.  This was a December 12th, 2003 letter agreement.  The

45

1   rebate was advanced at that time.  The majority of the

2   production here occurred in 2004 and 2005 prior to the Chapter

3   11 being filed.  There was never an attempt by them to seek

4   assumption of the contracts.  Other parties have.  Your Honor

5   knows there is a contract assumption procedures process here in

6   this case that suppliers insisted on.  They never availed

7   themselves of any of those issues.  And while it's true the

8   debtors have not terminated this contract, this contract may

9   well to the extent that it has no benefit to the estate be

10  rejected and then the rejection would be considered under the

11  Bankruptcy Code a pre-petition rejection not an administrative

12  act.  There is no administrative act here.

13          And I just don't see either under the case law

14  applicable in this district or under the actual facts of this

15  case or given the failure of Intermet to protect any interest

16  it might have with respect to the executory contract in this

17  case for the last two and a half years to come in and now say

18  oh, well, it can't be a pre-petition claim so now it's got to

19  be administrative because that's the only way we can win is

20  something, Your Honor, that the Court should dispose of.  Thank

21  you.

22          THE COURT:  Okay.

23          MR. DRAGICH:  Your Honor, may I address --

24          THE COURT:  Yeah.  You could stay there if you're --

25  that's fine.

46

1          MR. DRAGICH:  Okay.  Thank you, Your Honor.  Just

2     with respect to the pleading that the debtors attached that

3     Intermet filed in its own case, Your Honor, I don't think we

4     have a disagreement as to what the law says.  And I think we

5     accurately cited it in our papers in our case.

6          THE COURT:  I'm not going to hold it against you.

7          MR. DRAGICH:  Well, Your Honor, I'd like to just

8     explain, Your Honor, our position on that because I think it

9     bears responding to the debtors' remarks.

10         If the debtor engages in a post-petition act that

11    causes the nondebtor party damages, it's our position that the

12    creditor is entitled to an administrative claim.  If the

13    nondebtor party provides value to the debtor post-petition and

14    the debtor accepts that benefit, we believe that the nondebtor

15    party is entitled to administrative claim.  That's what our

16    papers say.

17         How you apply the facts of the situation in the

18    Intermet case and here is the issue where we disagree.  In that

19    case, Your Honor, just very briefly, there were services

20    rendered by sales representatives pre-petition.  And the

21    argument in that case by the representatives was that the

22    debtor, Intermet in that case, post-petition failure to renew a

23    contract gave rise to administrative claims.  So we're talking

24    about totally different facts, Your Honor, and that's why we

25    believe the cases are not on the same issue.

47

1          THE COURT:  But this -- you have to admit this is not

2     a tort, right?  They didn't burn down Intermet's building, as

3     I'm reading in Brown.  The wrong here is a breach of a

4     contract, isn't it?

5          MR. DRAGICH:  Agreed, Your Honor.  Post-petition

6     breach is our view.

7          THE COURT:  Well, all right.  Of a contract that

8     hasn't been assumed.

9          MR. DRAGICH:  Correct, Your Honor.  We believe it's

10    been terminated by the debtors' conduct.

11         THE COURT:  All right.  Okay.  All right.  Intermet

12    Corporation seeks allowance as an administrative claim of its

13    right to a refund under a 2003(e) pre-petition agreement with

14    Delphi Automotive Services -- Systems, excuse me, LLC, DAS LLC.

15    As is clear from the claim and from oral argument, that claim

16    is premised upon the alleged post-petition breach of that

17    agreement.  The agreement has not been assumed by DAS LLC nor

18    rejected.  However, Intermet contends that with the sale, which

19    I've approved today, of the Saginaw Michigan operation, DAS LLC

20    is at least an anticipatory breach of the agreement and that it

21    is no longer capable of being performed further without their

22    being a refund owed under it.

23         It appears from Exhibit C to the motion for

24    administrative expense payment that a large portion of the

25    refund is attributable to pre-petition conduct of DAS LLC in

48

1    addition to being based upon a pre-petition agreement.

2         As was noted at oral argument, although it was

3    asserted that this element of the agreement was important to

4    Intermet, Intermet has never moved in this case to compel

5    assumption or assignment of the -- I'm sorry, assumption or

6    rejection of the agreement under the procedures previously

7    adopted by the Court for such requests.

8         The debtor objects to the administrative expense

9    claim on two main grounds, at least the two grounds that I'm

10   going to focus on.  The first, is that the administrative

11   expense claim is barred as having been released by Intermet

12   pursuant to a settlement agreement that it entered into in

13   August of this year with Delphi Corporation on behalf of itself

14   and certain of its U.S. affiliates, including DAS LLC.  In that

15   agreement, the releasing parties, which include Intermet,

16   agreed upon the allowed amount of a large claim that had been

17   failed by Intermet, roughly 3.7 million dollars, as a pre-

18   petition general unsecured claim.  And then provided for a

19   further release and waiver of any right "to assert any other

20   claim, cause of action, demand or liability of any kind and

21   nature whatsoever including those arising under contract,

22   statute or common law, whether or not known or suspected at

23   this time which relate to the claim that was settled and which

24   the releasing parties have, ever had or hereafter shall have

25   against the debtors based upon arising out of, related to or by

49

1    reason of any event, cause, thing, act, statement or omission

2    occurring before the petition date."

3            I think two points are worth noting in respect of

4    this release.  First, it is a release not only of claims, which

5    may be susceptible to a somewhat narrow definition but might

6    not apply to administrative expense claims.  But also releases

7    the right to assert any liability of any kind or nature

8    whatsoever including those arising under statute.  And of

9    course, the basis for asserting an administrative expense is

10   under Section 503(b) of the Bankruptcy Code.

11           Second, as discussed at oral argument, the release is

12   broadly written to apply to any such rights that Intermet may

13   have or hereafter shall have by recognizing rights arising in

14   the future, i.e., during the post-petition period.  Arising out

15   of, based upon or related to by reason of any event, cause of

16   action, thing, act statement or omission occurring before the

17   petition date.

18           Intermet contends it can get out of this release or

19   that this release doesn't cover its administrative expense

20   claim because the administrative expense arises post-petition.

21   However, it is very clearly related to and by reason of a pre-

22   petition thing, the defining agreement, that gives rise to the

23   right to the refund, which is the 2003 contract.  And it is at

24   a minimum related to that agreement since that's how the

25   calculation of the claim is made based upon the terms of the

50

1    rebate agreement or the refund provided for in the 2003

2    agreement.

3            So I conclude, based on a reading of the settlement

4    agreement, that Intermet has released this claim -- or this

5    administrative expense claim.

6            I will, however, address the other argument that the

7    debtor made here in opposition to the administrative expense

8    claim which is that even if the administrative expense claim

9    had not been released, it would not be entitled to

10   administrative expense treatment.  I believe that that argument

11   is correct.  The law on what constitutes an administrative

12   expense is quite clear in the second circuit and the parties

13   essentially acknowledge that with one exception that I should

14   deal with first.  The cases cited first and foremost by

15   Intermet are cases involving post-petition torts or other

16   wrongful activity separate and apart from the breach of the

17   contract.  And those cases, i.e., Reading Company v. Brown, 391

18   U.S. 471 (1968) and Pennsylvania Department of Environmental

19   Resources v. Tri-State Clinical Labs, Inc., 178 F.3d 685 (3d

20   Cir. 1999), therefore, really are not applicable here.  The

21   Courts in those cases were dealing with the problems of

22   permitting a debtor to commit a tort or other wrongful activity

23   other than the breach of a contract post-petition.  And having

24   that -- the victim of that wrongful activity nevertheless

25   compensated in so-called tiny bankruptcy dollars.  And

51

1   obviously for the correct and good reasons concluded that that

2   would not be proper and therefore provide for an administrative

3   claim for such wrongful activity.

4        Here, however, the right as claimed by Intermet to

5   have its breach claim treated as an administrative expense is

6   determined by those cases that deal with the rights of parties

7   to unassumed and unrejected executory contracts to assert a

8   claim for administrative expense treatment.  And those cases

9   are clear that the claimant has a tough burden to sustain its

10  right to priority treatment under Section 503(b) which provides

11  for administrative expense priority for the actual necessary

12  cost and expenses of preserving the estate.  As the Supreme

13  Court stated in Howard Delivery Service, Inc. v. Zurich

14  American Insurance Co., 126 Supreme Court 2105 (2006), "to give

15  priority to a claimant not clearly entitled thereto is not only

16  inconsistent with the policy of equality of distribution, it

17  dilutes the value of the priority for those creditors that

18  Congress intended to prefer."

19       Given that well-established principle, the Courts in

20  this circuit have set forth a test for the allowance of an

21  administrative expense claim including on behalf of a party to

22  an unassumed and unrejected executory contract.  That party

23  must demonstrate, one, that its claim arose from a transaction

24  with or on account of consideration furnished to the debtor-in-

25  possession; and, two, the transaction or consideration directly

52

1    benefited the debtor-in-possession.  And the reference to the

2    debtor-in-possession there is key.  It's not the debtor, i.e.,

3    the pre-petition debtor but the post-petition debtor.  Here,

4    the transaction was with the pre-petition debtor under the 2003

5    contract and, more importantly, the consideration provided the

6    600,000 dollars was provided pre-petition.  Therefore, there

7    was no inducement by the debtor-in-possession in return for

8    that consideration.

9           The fact that it is alleged at least that Intermet

10   continued to provide the steering knuckle sets post-petition is

11   no different to my mind than the fact that the employees of Ace

12   Elevator or McFarlands continued to work post-petition.  The

13   particular claim that they were asserting and that Intermet is

14   asserting is premised upon the provision of pre-petition

15   consideration under a pre-petition agreement.  And

16   consequently, under the law of this circuit, and I believe

17   everywhere else would be therefore treated as a pre-petition

18   claim if it were not waived.  See generally In re Patient

19   Education Media, Inc., 221 B.R. 97 (Bankr. S.D.N.Y. 1998) which

20   I believe is the most favorable case to a claimant in

21   Intermet's position but clearly under the reasoning of Judge

22   Bernstein in that case, would not accord the administrative

23   expense status to someone in Intermet's position.  See also In

24   re Ace Elevator, 347 B.R. 473 (Bankr. S.D.N.Y. 2006) and the

25   cases cited therein including specifically Trustees of

53

1    Amalgamated Insurance Fund v. McFarlands, Inc., 79 F.2d 98 (2d

2    Cir. 1986).

3            So, for those separate and independent reasons, each

4    of which would justify denial of the motion, I'll deny the

5    motion.  So, Mr. Butler, you can submit an order to that

6    effect.

7            MR. BUTLER:  Yes, Your Honor, we will.  Your Honor,

8    that completes the matters set for the omnibus agenda today.

9            THE COURT:  Okay.  Thank you.  Let's hope we all get

10   over our colds.

11           MR. BERGER:  Yes, Your Honor.

12           (Whereupon these proceedings were concluded at 11:30

13   a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

54

**I N D E X**

**E X I B I T S**

| DEBTORS' | DESCRIPTION | ID. | EV. |
|---|---|---|---|
| 1 | Debtor's Declaration in support of Saginaw Chassis asset sale motion settlement | | |
| 2-3 | Agreements, including amendments, in connection with Saginaw Chassis asset sale motion | 31 | 31 |
| 4-11 | Court documents relating to Saginaw Chassis asset sale | | |
| 12-14 | All service notices relating to sale | 31 | 32 |
| 1 | Intermet's motion for payment of administrative claims | 34 | 4 |
| 2 | Debtor's objection to Intermet's motion plus evidentiary exhibits | 35 | 6 |
| 3 | Prior joint stipulation | 35 | 8 |

55

1                          I N D E X, CONT'D

2

3                            R U L I N G S

4    DESCRIPTION                                    PAGE      LINE

5    Saginaw Chassis asset sale motion granted

6

7    Twenty-second omnibus claim objection          32        20

8    granted pursuant to modified agreement

9

10   Motion of Intermet Corporation for payment     53         3

11   of administrative expenses denied

12

13

14

15

16

17

18

19

20

21

22

23

24

25

56

**C E R T I F I C A T I O N**

I Lisa Bar-Leib, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.


                                              November 30, 2007

Signature of Transcriber                Date



Lisa Bar-Leib

typed or printed name