# EXHIBIT 1

**THE OFFSHORE GROUP**

## SHELTER PLAN
### SERVICE AGREEMENT

This AGREEMENT entered into by and between Delphi Automotive Systems LLC, a corporation organized and existing under the laws of the State of Delaware, hereinafter referred to as CLIENT, and OFFSHORE INTERNATIONAL, INC., a corporation organized and existing under the laws of the State of Arizona, hereinafter referred to as OFFSHORE.

## RECITALS:

OFFSHORE has an existing established contractual relationship with Maquilas Teta Kawi S.A. de C.V. ("Maquilas"), a Mexican corporation, for the furnishing of manufacturing space, labor, and services in Guaymas/Empalme, Sonora, Mexico, and has sufficient receiving warehouse space in Tucson, Arizona, for consolidation of shipments.

OFFSHORE provided manufacturing space, labor and services to Exemplar Manufacturing Company and/or its affiliates ("EXEMPLAR") under terms similar to those set forth in this Agreement. CLIENT will receive some of such services as set forth below.

CLIENT is desirous of using OFFSHORE'S services in connection with the manufacture of CLIENT'S products, all on the terms and conditions set forth herein.

## AGREEMENTS:

### ARTICLE I - MANUFACTURING AND WAREHOUSE SPACE

A. Within ten (10) days after the execution of this agreement, or as mutually agreed by the Parties, CLIENT will deliver to OFFSHORE a complete list of CLIENT'S requirements for the Mexican Facility and all other requirements for CLIENT'S manufacturing operation. OFFSHORE will undertake the necessary steps to provide facilities in Mexico and the United States that meet CLIENT'S requirements, and will provide all necessary coordination between the Mexican contractors and CLIENT.

B. CLIENT will provide OFFSHORE a written description of all CLIENT'S equipment to be used in its manufacturing process in Mexico, together with an explanation of all electrical requirements, not later than 30 days prior to the

 **THE OFFSHORE GROUP**

date scheduled for installation of electrical utilities at the Mexican Facility, as agreed to by the parties.

C. OFFSHORE will make available to CLIENT, for its use in carrying out the manufacturing process in Mexico pursuant to this Agreement, a Mexican Facility that consists of Buildings 20, 21, 22, 4, and 7 (also known as Plants 4 and 8) of the OFFSHORE'S "Bella Vista" industrial park, located at Carretera Internacional Km. 1969 Guadalajara-Nogales Km.2 Empalme, Sonora, Mexico, consisting of approximately 208,612 square feet of manufacturing space for a period of 24 months commencing December 9, 2002. Notwithstanding EXEMPLAR's prior occupation of the Mexican Facility, the Facility will be provided in accordance with the Standard Building Specifications, attached hereto as Exhibit A and incorporated herein by this reference. Outside storage is permitted only with OFFSHORE'S written consent. Outside storage, if required, may be negotiated separately.

D. CLIENT acknowledges that the Mexican Facility may contain equipment and/or improvements installed by Exemplar and its predecessors which is over and above the standard building specification provided by OFFSHORE. As such, any settlement of any claim for payment by Exemplar for such equipment or improvements utilized by CLIENT shall be borne by CLIENT.

D. OFFSHORE will provide an office for the CLIENT'S on-site manager within the Manufacturing Facility.

E. INTENTIONALLY LEFT BLANK.

F. OFFSHORE will provide and maintain throughout the term of this Agreement, fire, casualty and such other insurance that is commercially reasonable and appropriate for the building that will be the site of CLIENT'S manufacturing operations in Mexico (the "Mexican Facility"). CLIENT will obtain and maintain any and all insurance that it deems necessary or appropriate for its material and equipment, whether located in the Mexican Facility, elsewhere in Mexico, while in transit, or in the United States, including OFFSHORE'S U.S. Facilities. At no time shall OFFSHORE be liable for any damages that occur during handling of CLIENT'S material and equipment. Upon CLIENT'S written request, OFFSHORE will acquire, through qualified brokers and at CLIENT'S expense, Mexican insurance covering CLIENT'S material and equipment.

## ARTICLE II - SERVICES, REPAIR AND MAINTENANCE

Shelter Plan Agreement                                     2
Guaymas
05/22/02

 **THE OFFSHORE GROUP**

A.  OFFSHORE will furnish one (1) private telephone line and two (2) telephone extensions in the Mexican Facility. CLIENT will pay all monthly telephone service charges. Recognizing that Exemplar has paid installation fees for previous telephone lines that will be used by CLIENT, CLIENT will only reimburse OFFSHORE for its actual cost for the installation of any new additional private telephone lines requested by CLIENT.

B.  OFFSHORE will keep the Mexican Facility in good repair at all times. It is expressly understood and agreed that all maintenance and repairs of the premises will be the responsibility of OFFSHORE, except for the cost of repairs for damage caused by CLIENT, which will be the responsibility of CLIENT. In addition, the cleaning of the production area within the Mexican Facility will be the responsibility of CLIENT.

## ARTICLE III – LABOR

A.  OFFSHORE agrees to cause Maquilas to exert its best efforts to provide up to 1800 hourly and 120 salary employees to assemble and manufacture CLIENT'S Components into Finished Products. CLIENT will have direct supervisory control and management responsibility for all workers who are allocated to CLIENT'S operations at the Mexican Facility. Notwithstanding anything to the contrary contained herein, OFFSHORE and Maquilas will be deemed to be exerting their best efforts to provide additional workers hereunder if they are attempting to do so, in good faith. In making such efforts to provide additional workers, OFFSHORE and Maquilas may take into account the limitations of the available labor pool, the concurrent demand for additional employees by third parties, including, without limitation, other customers of OFFSHORE and/or Maquilas in the Empalme/Guaymas region, and other factors reasonably deemed relevant by OFFSHORE and Maquilas.

B.  CLIENT will have the right to select from the potential workers provided by OFFSHORE, those who meet CLIENT'S minimum requirements. The labor force will include production line workers, material handlers, group leaders, and inspectors. In addition to the foregoing labor force, which will be paid on an hourly basis, OFFSHORE will provide CLIENT with a pool of workers from whom CLIENT can select such salaried personnel as CLIENT may deem necessary for the better implementation of this Agreement.

Once CLIENT has accepted the workers, hourly or salaried, furnished by OFFSHORE, CLIENT will have full authority and responsibility to train,

 **THE OFFSHORE GROUP**

supervise, retain, and dismiss these workers. CLIENT represents, warrants and agrees that CLIENT has sole responsibility and authority for assuring that the manufacturing process and the products manufactured meet CLIENT'S standards for product quality.

C. Since the workload hereunder may not be at a continuous and steady rate, it may become necessary from time to time to vary the total work force utilized in CLIENT'S operations at the Mexican Facility. Accordingly, OFFSHORE agrees to use its best efforts to assist the CLIENT, when requested by CLIENT, in reducing the work force in order to minimize the severance and labor charges to CLIENT hereunder. Notwithstanding the foregoing, OFFSHORE agrees to move 62 of the salaried employees assigned to Delphi to other assignments within the Mexican Facility, with other OFFSHORE clients, or to other facilities, within 9 months of the effective date of this Agreement, and if OFFSHORE cannot assign such 62 employees as provided herein after the conclusion of such 9 months, OFFSHORE will terminate the employment of such persons and shall be solely responsible for the related severance costs.

D. The labor rates paid by OFFSHORE to the Mexican workers are based on Mexican Labor Laws (an example of how labor rates are calculated is described in Exhibit "B" attached hereto) and include Social Security, taxes, and all other benefits prescribed by Mexican Law. It is agreed that any increase in such wage caused by an act of the Government of Mexico, or resulting from a collective bargaining agreement between Maquilas Teta Kawi S.A. de C.V. and the Union, or by direction of the CLIENT, will be paid by CLIENT to OFFSHORE.

E. OFFSHORE warrants that in providing CLIENT with personnel for the performance of this Agreement, it will in all respects conform to the laws, rules, regulations, and orders of appropriate Mexican governmental authorities.

F. The Parties acknowledge that OFFSHORE and/or the Maquilas employ personnel for operations other than CLIENT's within the same industrial park that encompasses the Mexican Facility. OFFSHORE agrees to hold CLIENT harmless and to indemnify and defend CLIENT against any obligation as a "Secondary Employer" ("patrón solidario") as may be imposed on CLIENT under Article 15 of the Mexican Federal Labor Law, as amended from time to time, related to the employment of any personnel not employed by CLIENT

**THE OFFSHORE GROUP**

## ARTICLE IV - SHIPPING, CUSTOMS AND PERMITS

A. **United States Customs and Duties.**  CLIENT will retain title to all of its materials, products, machinery, and equipment used in connection with its operations hereunder.  Therefore, for U.S. Customs purposes, OFFSHORE will not be the "importer of record" and will not be responsible for meeting the corresponding compliance obligations, including, but not limited to: classification of goods, valuation, record keeping, NAFTA determination, country of origin determination, duty calculation, cost submission, and reconciliation reporting; and  U.S. Customs broker's charges, government fees, fines, penalties,  and all other charges or exactions involved in the U.S. import process.    CLIENT will also be responsible for supplying to OFFSHORE, on a timely basis, all information necessary for the preparation of commercial invoices and any other documents prepared by OFFSHORE for the CLIENT in the import process.

B. CLIENT will manage the solicitation of documentation and information from suppliers of materials incorporated into finished products produced at Maquilas in order to document the NAFTA status of such finished goods. Furthermore, CLIENT shall assist Maquilas in the determination of the NAFTA eligibility of such finished goods and CLIENT will provide OFFSHORE with written supporting documents, including a prepared NAFTA certificate of origin, to be signed by Maquilas as the Producer/Exporter of such goods. Maquilas shall retain on-site records in accordance with Mexican laws relating to NAFTA. Client shall provide OFFSHORE or its designees, on a timely basis, information required for the preparation of pro-forma or commercial invoices and any other customs-related documents prepared by OFFSHORE or its designees at the request of CLIENT in the U.S. import process.

CLIENT expects OFFSHORE, and Maquilas to apply for Mexico's PROSEC program, and to take advantage of available opportunities under the NAFTA agreement to reduce or eliminate duties paid in Mexico with regard to the operations contracted by CLIENT.  CLIENT will provide OFFSHORE and Maquilas with data required for the PROSEC application, as well as documentation and certifications relating to the NAFTA status of goods to be imported into Mexico.  OFFSHORE will ensure that Maquilas maintains its maquiladora program, its PROSEC approval, its Mexican customs filings and associated permits and reports in compliance with applicable Mexican law, and that Maquilas further require any Mexican customs broker they employ to comply with the same requirements.

 **THE OFFSHORE GROUP**

If CLIENT so elects, OFFSHORE will, through Maquilas and their designated Mexican customs broker, coordinate with Mexican authorities the customs clearance of the importation of CLIENT'S materials, parts and components and any other required inputs (the "Inputs"), as well as machinery and equipment, and the export from Mexico of the finished products, any machinery and equipment, and other items. To the extent that OFFSHORE or its designees provide such services, CLIENT shall supply OFFSHORE, on a timely basis, with all pertinent information and documentation, including, without limitation, complete descriptions, make, model and serial numbers, weights, costs, country of origin and certificates of origin, in order for OFFSHORE to process the shipments and obtain the necessary permits on behalf of CLIENT. CLIENT, at its option and with agreement of Offshore, may nominate and contract with a Mexican customs broker to conduct Mexican import and export operations on behalf of Maquilas, at CLIENT's expense. If CLIENT exercises this option, it will ensure that the Mexican Broker maintains a close working relationship with Maquilas, and Offshore agrees to ensure that Maquilas does the same with such Mexican Broker.

C. In view of OFFSHORE'S reliance on data supplied by CLIENT, CLIENT agrees to indemnify and hold OFFSHORE harmless, including reasonable attorneys' fees, for any action, claim, loss, assessment or penalty imposed by the U.S. Customs Service against OFFSHORE in connection with the entry of client's products into the U.S.

D. In view of CLIENT'S reliance on data supplied and customs operations provided by OFFSHORE or its designees, OFFSHORE agrees to indemnify and hold CLIENT harmless, including reasonable attorneys' fees, for any action, claim, loss, assessment or penalty imposed by the Mexican government against OFFSHORE, OFFSHORE's designees, or CLIENT in connection with OFFSHORE or its designee's Mexican import and export and NAFTA-related services relating to CLIENT's production in Mexico.

E. **Mexican Customs and Duties.**   CLIENT will reimburse, in accordance with Article VI, subparagraph A., all duly documented freight charges, customs and brokerage fees, tariffs, duties, payments to the government of Mexico, and other costs and expenses incurred by OFFSHORE or its designees in the performance of its duties under this Article IV for the account of CLIENT. CLIENT and OFFSHORE and its designees shall cooperate to identify and shall use their best efforts to recover any refunds of duties paid by CLIENT to which CLIENT, OFFSHORE or its designees shall be legally entitled to claim.

 **THE OFFSHORE GROUP**

F. **Administrative Services.** OFFSHORE will provide necessary administrative services to effect shipment of material and equipment to and from Guaymas/Empalme, Sonora, Mexico.

G. **Reimbursable Expenses.** All freight charges, customs and brokerage fees, tariffs, duties, payments to the government of Mexico, and other costs and expenses incurred by OFFSHORE in the performance of its duties under this Article IV, are incurred for the account of CLIENT. CLIENT will reimburse OFFSHORE for all amounts so paid for its account in accordance with Article VI, subparagraph A.

H. **Pending Liabilities.** The parties understand and acknowledge that several contingencies exist prior to the Effective Date of this Agreement, relating to Exemplar's operation with OFFSHORE. To resolve such contingencies, Delphi agrees to pay, at or within 5 days of the execution of the this Agreement, $35,000 USD as a full and final settlement of the following: all payments due by Exemplar to Offshore due to unpaid services or products, all amounts due by Exemplar to Offshore for open customs pedimentos, all other claims for payment from Exemplar to Offshore, of whatever nature, known or unknown at this time, except as the parties otherwise agree in this Agreement, and any payments as may have to be made in connection with labor cases currently being litigated relating to employees assigned to Exemplar, and Offshore agrees to hold harmless, defend, and indemnify Delphi against any costs or liabilities relating to such litigation.

I. **Pending Liabilities: Customs Pedimentos:** The parties acknowledge that the resolution of potential customs charges resulting from the reconciliation of pedimentos relating to Exemplar and its predecessor companies may have a serious financial impact on OFFSHORE. As such, CLIENT and OFFSHORE agree to use their best efforts to cooperate to mitigate the financial impact and thereby reduce any customs charges resulting from such reconciliation of the Exemplar pedimentos with actual inventory in Mexico. CLIENT agrees to assist OFFSHORE with CLIENT'S personnel and expertise, as mutually agreed with OFFSHORE, and at CLIENT'S expense for such personnel and their incidental expenses. CLIENT and OFFSHORE agree that CLIENT'S liability for customs charges is limited to, and included in, the amount stated in paragraph H immediately preceeding this paragraph.

## ARTICLE V - FEES AND COSTS

A. CLIENT agrees to pay the following fees during the term of this Agreement:

**THE OFFSHORE GROUP**

(i) **Facilities Fee.** A fee (the "Facilities Fee") of $$0.42 per sq/ft for each month of CLIENT'S use of Buildings 20, 21, and 22 (Plant 4) of the Mexican Facility and $0.385 per sq/ft for each month of CLIENT's use of Buildings 4 and 7 (Plant 8) of the Mexican Facility, during the term of this Agreement. The Facilities Fee for the next month will be billed in the last weekly billing of the prior month. In addition, OFFSHORE shall include in this billing an amount equal to 15% of the Facilities Fee. This amount shall cover OFFSHORE'S obligation to Maquilas Teta Kawi to advance Mexico's value added tax (IVA) on the space. OFFSHORE shall credit CLIENT for the IVA paid on the Mexican facilities within 15 days of Maquilas Teta Kawi being able to utilize the IVA, or otherwise receiving a refund of the IVA from the Mexican government. Credit will be given to CLIENT at the peso/US dollar exchange rate that applies on the date the IVA is credited by Maquilas Teta Kawi.

(ii) **Park Maintenance Fee ("PMF"):** of $.02 per sq./ft. per month for each month of CLIENT'S use of the Mexican Facility. The PMF covers the costs and expenses associated with the management, repair, maintenance and insuring of OFFSHORE'S Industrial Park (not the Mexican Facility).

(iii) **Shelter Plan Fee.** CLIENT agrees to pay OFFSHORE a weekly fee for its goods and services hereunder (the "Shelter Plan Fee"), which will be calculated as follows:

By multiplying 1) the number of actual hours paid during the week by CLIENT in its manufacturing process, by 2) the applicable hourly rate set forth in the following schedule:

**Offshore Shelter Plan Fee Schedule**
**per employee Hour \***

| Headcount | Shelter Fee per employee hour |
|-----------|-------------------------------|
| 1-25 | $2.73 |
| 26-50 | $2.63 |
| 51-100 | $2.37 |
| 101-200 | $1.75 |
| 201-300 | $1.34 |
| 301-400 | $1.13 |
| 401-500 | $0.93 |
| 501-750 | $0.88 |

 **THE OFFSHORE GROUP**

| | |
|---|---|
| 751-999 | $0.77 |
| 1000-1199 | $0.70 |
| 1200-1399 | $0.64 |
| 1400-1599 | $0.61 |
| 1600-1799 | $0.57 |
| 1800-1999 | $0.545 |
| 2000-2250 | $0.50 |
| 2251-2500 | $0.48 |
| 2501-2999 | $0.47 |

    \* CLIENT agrees that the rate to be used to determine the weekly Shelter Plan Fee will be the rate applicable to the highest number of workers employed in connection with the manufacture of CLIENT'S products during any single day of the week for which payment is being calculated. For example, if 201 employees are assigned to CLIENT any day of any given week, and 201 is the highest number of employees assigned to CLIENT for that week, the rate applicable to all 201 employees for that week will be $1.34. In calculating the Shelter Plan Fee, salaried personnel shall be deemed to work 48 hours per week. The Shelter Plan Fee shall commence on the first day that the employees furnished by OFFSHORE begin to perform work for CLIENT.

B. **Reimbursable Costs.** CLIENT further agrees to reimburse OFFSHORE for the following costs and charges incurred by OFFSHORE in connection with this Agreement in accordance with the procedures described in Article VI hereof:

    (i) All payments made by OFFSHORE, for CLIENT'S account, in the performance of this Agreement. CLIENT understands and agrees that the payments made to, or for the benefit of, workers consist of wages, taxes, fringe benefits and other personnel costs, and that the amount of such payments depends on a variety of factors, such as applicable statutes and regulations, as well as pertinent collective bargaining agreements. The factors affecting the amounts of the payments are subject to amendment from time to time. An example of a Wage and Fringe Calculation displaying the typical components of the payment amount is set forth on Exhibit "B" attached hereto. The actual amount of the payments (the "Weekly Compensation Amount") will be computed weekly, and the corresponding amount to be reimbursed to OFFSHORE will be based on the U.S. dollar-Mexican peso exchange



**THE OFFSHORE GROUP**

rate at which OFFSHORE purchased pesos from a major Mexican and/or U.S. financial institution for the applicable week.

CLIENT further agrees to reimburse OFFSHORE for any overtime hours authorized by CLIENT at the overtime premium paid by OFFSHORE for CLIENT'S account. Overtime payments will be calculated by the sum of (1) the wages and fringe benefits multiplied by two for double time (or multiplied by three for triple time), and (2) the applicable Shelter Plan Fee.

(ii) All costs incurred by OFFSHORE in connection with services provided at CLIENT'S written request that are not otherwise referred to herein. CLIENT'S request for additional services must be made in writing on CLIENT'S "Purchase Requisition" form and must be signed by CLIENT'S representative.

(iii) The cost of electric power consumed by CLIENT in the Mexican facility. OFFSHORE (at CLIENT'S cost) shall coordinate the installation of an electrical meter for the facility.

(iv) The cost of water and sewer charges, if applicable, consumed by CLIENT. OFFSHORE (at CLIENT'S cost) shall coordinate the installation of a water meter for the facility.

(v) The cost of bus transportation for CLIENT'S workers.

(vi) The cost for CLIENTS' participation in the Employee Sports Complex (the Employee Sports Complex is operated by a non-profit entity created by OFFSHORE. CLIENTS' representatives are invited and shall have the right at any time during the term of this Agreement to join the Board of this entity, which directs its operations and budget.)

(vii) All other payments made by OFFSHORE, on behalf of the CLIENT in the performance of this Agreement.

C. <u>Worker Termination Costs</u>. Except as otherwise provided in Article III (C), CLIENT will have the sole responsibility to pay any and all costs associated with the severance or termination of any and all workers (the "Severance Payments"), including production line workers, material handlers, group leaders and inspectors, supervisory workers, monthly salaried administrative, technical workers and confidential workers hired at the request of the

 **THE OFFSHORE GROUP**

CLIENT, but only to the extent that such severance benefits are calculated on the basis of employment assignment to CLIENT, Exemplar, and its predecessors: Exemplar/Thomas & Betts, Augat, Inc., and National Industries (the "Employment Period"). CLIENT will reimburse OFFSHORE for any and all costs that OFFSHORE incurs in connection with the severance or termination of any workers for the Employment Period. If more than fifty (50) workers are terminated in any one week, for any reason, CLIENT shall advance to OFFSHORE or Maquilas (prior to the date on which Severance Payments are payable to such terminated workers) the amount of the Severance Payments that are due to such terminated workers.

D. **Adjustment for Economic Factors:** OFFSHORE will notify CLIENT of the Shelter Plan Fee, thirty days prior to the beginning of each contract year, beginning with year two.

The rate modification will be determined in accordance with the procedure set forth in Exhibit C, "Economic Factors Adjustment" herein, and is intended to preserve, in a general way, the financial expectations of the parties as they exist at the commencement of the Shelter Plan Agreement. The Economic Factors Adjustment recognizes changes in Mexican and U.S. price levels and the peso/US Dollar exchange rate.

E. **Facilities Fee Adjustment:** The Facilities Fee shall be adjusted annually, at the same time as the Shelter Fee. The Facilities Fee will be adjusted in accordance with the procedure set forth herein and will equal the percentage increase (or decrease), if any, in the cost of living for the preceding year based upon the United States Consumer Price Index - All Items - U.S. City Average, All Urban Consumers (USCPI) issued by the Bureau of Labor Statistics of the United States Department of Labor (the base year and price for said Index is 1967 equals 100). In the event the Index ceases to be published, the most comparable substitute shall be used thereafter as selected by the mutual agreement of the parties.

## ARTICLE VI - INVOICES AND PAYMENT

A. OFFSHORE will submit invoices for amounts owed under this Agreement to CLIENT on a weekly basis, as set forth below, except for the monthly Facilities Fee, which shall be billed monthly in advance.

B. Each invoice will contain the following information:

 **THE OFFSHORE GROUP**

      (i) The total number of basic, non-overtime hours worked during the relevant week;

      (ii) The total overtime hours and the associated overtime premium cost; and

      (iii) A summary of costs incurred by OFFSHORE for the CLIENT'S account pursuant hereto, including, but not limited to, a) freight for moving CLIENT'S materials, equipment, and finished products across the border; b) Mexican brokerage charges; and c) supplies.

C.  Each invoice will be accompanied by paid receipts or third party invoices for costs incurred by OFFSHORE in the U.S. for CLIENT'S account pursuant to this Agreement and for which OFFSHORE is seeking reimbursement. With respect to costs incurred by OFFSHORE in Mexico (other than freight and customs charges), the invoice will be accompanied by a document signed by CLIENT'S on-site representative, whose signature will conclusively signify the accuracy of (i) the number of basic and overtime hours worked during the relevant work week, (ii) the number of workers utilized during the relevant period, and (iii) the costs incurred in Mexico (other than freight and customs charges) for which reimbursement is sought in the invoice. The approval of such Mexican costs, as evidenced by the signature of CLIENT'S on-site representative, will constitute the binding agreement of CLIENT to reimburse OFFSHORE for the such approved Mexican costs.

D.  D.  CLIENT hereby agrees to pay OFFSHORE the amount of each such invoice as follows: 1) **Labor Charges:** On Thursday of each week, OFFSHORE shall provide to CLIENT an estimate of the charges corresponding to the week in which labor charges are incurred. The estimate invoice shall be due and payable on the following Tuesday via electronic transfer to OFFSHORE's bank. Actual invoice for the prior week's labor charges and the associated Shelter Plan Fee will be issued every Wednesday, with any estimate payments reflected on such invoice as either true-up payments to be made by Delphi, or true-up credits to be counted against future Delphi payments. The balance due on such invoice is due 7 days from the invoice date (i.e. the following Tuesday).    2) **Non-Labor Charges.** All other (non-labor) invoice charges will be due and payable within 10 days after CLIENT'S receipt of such invoice. If any portion of the invoice is disputed by CLIENT, CLIENT agrees that it will pay the undisputed portion of the invoice as if there were no such dispute about the remainder of the invoiced amount. OFFSHORE acknowledges and understands that CLIENT cannot



**THE OFFSHORE GROUP**

process payments without invoices, and therefore CLIENT will not be in breach for failure to pay any invoices not delivered.

E.   Payments made pursuant to this Agreement will be net of any and all taxes. In the event that payments made pursuant to this Agreement are subject to withholding taxes or other similar taxes, which CLIENT is required to pay for the account of OFFSHORE, CLIENT will promptly pay such taxes for the account of OFFSHORE. CLIENT will promptly forward a withholding receipt for any withholding taxes paid. Any value-added tax, sales tax or other similar taxes related to the fees and expenses incurred under this Agreement will be refunded to CLIENT within 15 days of Maquilas Teta Kawi/OFFSHORE being able to utilize the IVA or similar tax, or otherwise receiving a refund of the IVA, or similar tax, from the Mexican government

F.   CLIENT understands and agrees that certain purchases requested by CLIENT may require deposits, progress payments (as in the case of construction projects), or payment on delivery (as in the case of a vehicle purchase).   In such instances, OFFSHORE, will inform CLIENT in advance of the need for such special payments, and shall invoice the CLIENT for the amount due and will make the corresponding purchase, deposit, or progress payment when such invoice is paid in full by CLIENT.

## ARTICLE VII - TERM AND TERMINATION

A.   The term of this Agreement is for a period of 24 months commencing on the Effective Date.

B.   This Agreement may be terminated by CLIENT at any time during the term of this Agreement or any renewal period thereafter, without penalty or any continuing obligation whatsoever to OFFSHORE for any material breach of this Agreement by OFFSHORE that remains uncured after 30 days after receiving written notice of such breach.   The Agreement may also be terminated by CLIENT without breach by OFFSHORE anytime during the term of this Agreement or any renewal period thereafter, by giving OFFSHORE ninety (90) days written notice of its intention to terminate.  At the time of giving such notice, CLIENT will pay OFFSHORE a termination fee equal to the immediately preceding 30-day billing for the Shelter Plan Fee and the Facilities Fee under Article V hereof.   The parties agree that OFFSHORE will suffer damages as a result of CLIENT'S early termination of this Agreement, and that such damages will be difficult to accurately quantify. The termination fee is intended to approximate the damages to be suffered by

 **THE OFFSHORE GROUP**

OFFSHORE as a result of such termination and not as a penalty, and shall be OFFSHORE's total and exclusive remedy for such anticipated termination, except for the severance expenses mentioned in the following sentence, and OFFSHORE hereby waives any other right to a remedy, whether in contract, tort, or any other cause of action or claim. CLIENT acknowledges that termination of this agreement, whether during the first or subsequent years, will give rise to certain termination and severance expenses relating to the workers Offshore has employed at the request of the CLIENT. Such expenses are the sole responsibility of the CLIENT, to the extent and as stated in ARTICLE V, Section C of this agreement. These expenses are in addition to any termination fee owed by the CLIENT to Offshore as a result of the termination of this agreement. Offshore will attempt to minimize severance expenses by any means available including using its best efforts to place client's employees in other facilities with other Offshore client companies.

C. If CLIENT terminates this Agreement, payment of Facilities Fee due hereunder shall continue, regardless of CLIENT'S notice of termination, until the end of the stated term of this Agreement, or upon occupancy of the Facility by a new client acceptable to OFFSHORE at OFFSHORE'S sole discretion, whichever is earlier. In such an event, OFFSHORE shall be under a duty to use best efforts to secure a new client for occupancy of the Facility, and will give good faith consideration to any potential shelter client as may be proposed by CLIENT.

## ARTICLE VIII - OPTION TO RENEW

As long as there has not theretofore occurred an event of default hereunder, CLIENT may renew this Agreement for three separate, additional periods of one (1) year each. CLIENT may exercise its right to renew this Agreement for the next succeeding year by giving OFFSHORE written notice of its intention no fewer than one hundred twenty (120) days prior to the then scheduled expiration of the Agreement.

## ARTICLE IX - PRODUCT LIABILITY

CLIENT hereby indemnifies, and agrees to protect, defend and hold OFFSHORE and Maquilas Teta Kawi S.A. de C.V harmless against all demands, obligations, claims, costs, expenses, judgments, awards and liabilities of any nature, claimed or asserted by any person, and against all losses in any way suffered, incurred, or paid or that may be suffered, incurred, or paid by OFFSHORE as a result of, or in



**THE OFFSHORE GROUP**

any way arising out of, or consequential to the design, manufacture, use, delivery, consumption, or integration into other products of any of CLIENT'S products.

## ARTICLE X - LAWS, RULES AND REGULATIONS

A. OFFSHORE will exert its best efforts to cause its subcontractors to comply with all of the laws, rules, and regulations of governmental authorities of Mexico.

B. OFFSHORE ensures that it has complied with the requirements of Section LXXIV/LXXX of the Transitory Provisions of the Income Tax Law in relation to CLIENT'S tax status or liability under the tax laws of Mexico. The CLIENT represents and warrants that it has investigated and is satisfied with its understanding of the tax effects of its operations under the Agreement and, in connection therewith, has not relied on any statement made by OFFSHORE other than stated above.

C. If there is a change in Mexican tax laws or regulations that could cause an increase in OFFSHORE/Maquilas Teta Kawi S.A. de C.V.'s Mexican taxes in connection with any action or election by CLIENT to avoid Mexican taxes due to the presence in Mexico of CLIENT's machinery, equipment, inventory and employees, CLIENT agrees that it will not take any such action or make any such election without the written consent of OFFSHORE. Furthermore, to the extent that changes in Mexican tax laws or regulations cause Mexican taxes to be payable by OFFSHORE/Maquilas Teta Kawi S.A. de C.V. in connection with the presence in Mexico of CLIENT's machinery, equipment, inventory and employees under the Shelter Plan Agreement without any action or election by CLIENT, OFFSHORE and CLIENT agree, within thirty (30) days written notice from OFFSHORE, to utilize reasonable efforts to revise the structure for the Shelter Plan Agreement so as to mitigate such Mexican taxes. If such efforts do not result in an alternative structure which would mitigate such Mexican taxes then the parties agree to negotiate whether and to what extent the service fee should be adjusted to take into account the increased Mexican taxes payable by OFFSHORE/Maquilas Teta Kawi S.A. de C.V.

D. Hazardous Waste: OFFSHORE represents and warrants that at delivery of the Facility to CLIENT, the Facility is in compliance with all environmental laws and regulations, and is not subject to any corrective action plan relating to the environmental remediation of the Facility. OFFSHORE will hold harmless, defend and indemnify CLIENT from and against any action relating to any

 **THE OFFSHORE GROUP**

non-compliance with environmental laws, regulations or judicial or administrative orders relating to any environmental condition of the Facility relating to conditions existing at the Facility prior to the date of delivery to CLIENT (even is such a condition may have been created by EXEMPLAR).

CLIENT will not generate, release, store, place, use or dispose of any hazardous, toxic, or dangerous matter, substance or waste in, on or about the Mexican Facility or the Park. CLIENT agrees to indemnify, defend and hold OFFSHORE and its affiliates, and their respective owners, directors, officer, assignees, and agents, employees harmless from any and all claims, actions, administrative proceedings (including informal proceedings), judgments, damages, punitive damages, penalties, fines, costs, liabilities, interest or losses, including reasonable attorneys' fees and expenses, consultant fees and expert fees, together with all other costs of any kind that arise during or after the term of this Agreement, directly or indirectly, from or in connection with a breach of the covenant in this Section or from or in connection with the failure of CLIENT or its agents, contractors, representatives or employees to comply with any laws or other requirements regarding protection of the environment, public health or safety.

E.  CLIENT agrees to comply with all regulations of general application to the Industrial Park and its occupants, if any, whether now or hereafter in effect, in particular those related to use and upkeep of common areas.

## ARTICLE XI - APPLICABLE LAW

To the extent this Agreement's performance relates to compliance with Mexican laws and regulations, this Agreement will be interpreted and construed by the laws of Mexico.  In all other respects, this Agreement will be interpreted and construed in accordance with, and will be governed by, the laws of the State of Arizona.

## ARTICLE XII - OWNERSHIP; BAILMENT

All right, title, and interest to materials, products, machinery, tools, and equipment used in connection with CLIENT'S manufacturing process at the Mexican Facility will remain at all times the property of CLIENT.  If and to the extent that OFFSHORE takes possession of any such materials, products, machinery, tools, or equipment, it does so as bailee on behalf of CLIENT.  At no time will OFFSHORE be deemed to have any ownership interest in such property.

 **THE OFFSHORE GROUP**

## ARTICLE XIII – SUBCONTRACT

Without in any way relieving it of any obligation or duty otherwise undertaken hereunder, OFFSHORE will have the right to enter into a subcontract with Maquilas Teta Kawi S.A. de C.V., a Mexican corporation, to provide services hereunder in Mexico.

## ARTICLE XIV - CONFIDENTIAL INFORMATION

The parties acknowledge and agree that the performance of this Agreement by either of them, or of any subcontractor of either of them, will not entail the disclosure, whether voluntarily or involuntarily, by either party to the other of any trade secrets or any proprietary or confidential information.  In the event that at any time during the term of this Agreement either party proposes to disclose to the other party, or to utilize in connection with its operations under this Agreement, any such trade secret or proprietary or confidential information, the disclosing party will promptly notify the other party prior to making such disclosure or utilization.  The parties agree that, promptly after the receipt of such notice, they will negotiate an amendment hereto providing for safeguarding such trade secret or proprietary or confidential information.

## ARTICLE XV – ARBITRATION

Any controversy arising between the parties or any person claiming under either of them relating to this Agreement or the performance or breach of any provisions hereof will be settled by arbitration in Pima County, Arizona, in accordance with the governing rules of the American Arbitration Association; provided, however, the parties will be entitled to pursue all the discovery that would be available to them under, and in accordance with the rules, applicable to actions in the Superior Court of Pima County, Arizona.

Each party will be entitled to, and promptly after receipt of notice of the filing of an arbitration claim, will appoint a person to act as arbitrator from a panel of qualified arbitrators of the American Arbitration Association.  The two selected arbitrators will promptly appoint a third arbitrator.

The arbitration decree shall be final and non-appealable.  Judgment thereon may be entered by any court of competent jurisdiction.  The prevailing party in any such matter will be entitled to recover its costs and expenses, including attorneys' fees, from the non-prevailing party.



**THE OFFSHORE GROUP**

Nothing contained in this Article XV will limit the right of any party to exercise self help remedies or to obtain any provisional or ancillary remedies, including, but not limited to, injunctive relief or appointment of a receiver, from a court of competent jurisdiction.

## ARTICLE XVI - TIMING; SECURITY

A. Time is of the essence hereof of this Agreement.

B. As collateral security for CLIENT'S faithful performance of its obligation hereunder, CLIENT hereby grants OFFSHORE a security interest in all property of CLIENT (the "Collateral") that is in the possession or control of OFFSHORE or Maquilas Teta Kawi S.A. de C.V., a Mexican corporation.

## ARTICLE XVII - DEFAULTS AND REMEDIES

If any of the Parties fail to pay or perform their duties in a material manner under this Agreement, such material failure will be considered to be an Event of Default hereunder. Failure by either party to make a payment when due hereunder within seven (7) days after receiving written notice of such failure to pay, or to perform any other material obligation hereunder within seven (7) days after written notice of such failure to pay or perform from the non-defaulting party (the "Default Notice"), shall constitute an Event of Default hereunder; provided, however, if the failure to perform a material obligation (other than the payment of any amounts due hereunder) cannot reasonably be cured within the thirty (30) days after the Default notice, it shall not constitute an Event of Default if the defaulting party commences reasonable steps to correct such failure within such thirty (30) day period and diligently pursues such corrective action to its logical conclusions as soon as practicable. Upon the occurrence of an Event of Default, the non-defaulting party will be entitled to pursue all remedies available to it under this Agreement or under the common law of the State of Arizona, including but not limited to, the right of set-off. The Parties agree that the non-defaulting party may pursue such remedies through its agents.

No failure or delay on the part of the aggrieved party to exercise any such right, power or remedy and no notice or demand which may be given to or made with respect to any such remedies shall operate as a waiver thereof, or limit or impair the aggrieved party's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights.



**THE OFFSHORE GROUP**

## ARTICLE XVIII – RIGHT TO AUDIT

Upon reasonable advance notice, CLIENT shall have the right to audit the books and records of OFFSHORE, and its designees providing services under this Agreement, and OFFSHORE will cooperate with CLIENT in such an audit and grant CLIENT access to such records as, in CLIENT's reasonable discretion, are necessary for CLIENT to perform such an audit. OFFSHORE will ensure that CLIENT's right to audit is preserved in its contracts with such designees.

## ARTICLE XIX - ENTIRE AGREEMENT

The terms and provisions contained herein constitute the entire Agreement between the parties and supersede all previous communications and understandings, either oral or written, between the parties hereto with respect to the subject matter hereof. No agreements or understandings varying or extending the terms of this Agreement will be binding upon either party hereto unless in writing signed by a duly authorized officer or representative thereof of each party.

For purposes of this Agreement, the Effective Date shall be _____ (date).

OFFSHORE INTERNATIONAL, INC.
an Arizona corporation

By: Luis F. Seldner

Its: President
Date:

Company: Delphi Automotive Systems LLC.

By: James A. Spencer

Its: Vice President

(Client)


**THE OFFSHORE GROUP**

## EXHIBIT A – STANDARD BUILDING SPECIFICATIONS
[to be provided by OFFSHORE]


**THE OFFSHORE GROUP**

## EXHIBIT B – MEXICAN LABOR RATES CALCULATION
### [to be provided by OFFSHORE]



**THE OFFSHORE GROUP**

## EXHIBIT C

### ECONOMIC FACTORS ADJUSTMENT

The parties acknowledge and agree that economic changes in either Mexico or the United States may have an effect on the expectations of the parties at the outset of this Agreement. In an attempt to preserve those expectations, in a general way, the parties agree that the Shelter Plan Fee will be increased or decreased annually. Offshore agrees that thirty (30) days prior to the beginning of each contract year (such date is referred to herein as the "Calculation Date"), beginning with year two, it will calculate the Shelter Plan Fee for the next contract year and will notify Client of such adjusted Shelter Plan Fee.

Offshore will calculate the new Shelter Plan Fee in accordance with the following procedure:

## I.  CALCULATION OF ADJUSTMENT FOR MEXICAN ECONOMIC CHANGES

$([A \text{ divided by } B] - 1) \times 100 = $ the Percentage Adjustment to be made to Mexican Portion of the prior year's Shelter Plan Fee (*i.e.* 70% of such prior year's Shelter Plan Fee)

Where:

$A = (1 + [\text{Percent of Change in Mexican CPI divided by } 100])$

$B = (1 + [\text{Percent of Change in Exchange Rate divided by } 100])$

## II.  CALCULATION OF ADJUSTMENT FOR UNITED STATES ECONOMIC CHANGES

Change in US CPI, as defined herein
= the Percentage Adjustment to be

 **THE OFFSHORE GROUP**

made to US Portion of the prior year's Shelter Plan Fee (*i.e.* 30% of such prior year's Shelter Plan Fee).

## III.   FINAL CALCULATIONS

1.   The Percentage Adjustment calculated under Clause I will be applied to 70% of such prior year's Shelter Plan Fee, and the result thereof is referred to as "X."

2.   The Percentage Adjustment calculated under Clause II will be applied to 30% of such prior year's Shelter Plan Fee, and the result thereof is referred to as "Y."

3.   The percentage equal to the sum of X and Y will be applied to the Shelter Plan Fee for the current contract year to determine the increase or decrease in the Shelter Plan Fee for the following contract year.

## IV.   DEFINITIONS

1.   Percent of Change in Mexican CPI. The parties agree to measure the percentage increase (or decrease) in the cost of living in Mexico for the preceding twelve months by reference to the Mexican National Consumer Price Index (*Indice National de Precios al Consumidor*) (the "Mexican Price Index"), which is published by the Banco de Mexico. The base year and price for the Mexican Price Index will be 1994 equals 100.

Offshore will measure the change in the Mexican Price Index, expressed as a percentage, over a twelve (12) month period ending on the date of the Mexican Price Index that is most recently published and available on the Calculation Date.

 **THE OFFSHORE GROUP**

2. <u>Percent of Change in Exchange Rate</u>  The parties agree that the Percent of Change in Exchange Rate means the change in the Exchange Rate, as hereinafter defined, since the Measuring Date, as hereinafter defined. The "Exchange rate for settlement of obligations denominated in foreign currency payable in the Mexican Republic" (*Tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la republica mexicana*), as published by Banco de Mexico, is referred to herein as the "Exchange Rate."

The Measuring Date to be used on the first Calculation Date is the date on which this Agreement was executed, at which time the Exchange Rate used by Offshore in establishing the Shelter Plan Fee for the first contract year was 10.1 Mexican Pesos to the US Dollar. On each subsequent Calculation Date, the Measuring Date will be the immediately preceding Calculation Date, and the Exchange Rate (the "Starting Exchange Rate") against which the Percent of Change in Exchange Rate is to be calculated will be the Ending Exchange Rate, as hereinafter defined, that was used in establishing the Shelter Plan Fee for the current contract year.

The Percentage Change in the Exchange Rate will be determined by calculating the percentage change between the Starting Exchange Rate and the Ending Exchange Rate, which is defined to be the result of dividing (1) the sum of the average exchange rates for all months since the applicable Measuring Date, by (2) the number of months between the Measuring Date and the Calculation Date.

Both the Mexican Price Index and the Exchange Rate are published by the Banco de Mexico at www.banxico.org.mx, and in the *Diario Oficial de la Federacion,* which is available at the following commercial web site: www.cpware.com.

3. <u>Change in US CPI</u>. The parties agree that the Change in the US CPI will be measured over the twelve (12) month period preceding the Calculation Date.

## V.   EXAMPLE

**THE OFFSHORE GROUP**

1.   Assume:

|  |  |  |
|---|---|---|
| The Percent of Change in Mexican CPI | = | 10% |
| The Percent of Change in Exchange Rate | = | 8% |
| The Change in US CPI | = | 3% |
| Prior Year's Shelter Plan Fee    = | $1.00 | |

2.   Then:

A = (1 + [10/100]) = 1.10
B = (1 + [08/100]) = 1.08

3.   Percentage Adjustment for Mexican Economic Changes:

([1.10/1.08] − 1) x 100 = 1.85%

4.   Application of Percentage Adjustment for Mexican Economic Changes to Shelter Plan Fee:

1.85% of (70% of Shelter Plan Fee) = 1.3% (rounded from 1.295% to the nearest hundredth)

5.   Application of Percentage Adjustment for US Economic Changes to Shelter Plan Fee
3% of (30% of Shelter Plan Fee) = 0.9%

6.   Amount of Adjustment (increase or decrease) of Shelter Plan Fee for the next contract year will be the sum of (i) the result of applying item 4 to the current Shelter Plan Fee, plus (ii) the result of applying item 5 to the current Shelter Plan Fee, plus (iii) the current Shelter Plan Fee.

(i)    ($1.00 x 1.3% = $0.013), plus
(ii)   ($1.00 x 0.9% = $0.009),
(iii)  The sum of (i) and (ii) is $0.022, plus
(iv)   $1.00, the Shelter Plan Fee for the current contract year, results in
$1.02 (rounded from $1.022 to the nearest hundredth) as the Shelter Plan Fee for following contract year.

THE OFFSHORE GROUP

Upon reasonable advance notice, CLIENT shall have the right to audit the books and records of OFFSHORE, and its designees providing services under this Agreement, and OFFSHORE will cooperate with CLIENT in such an audit and grant CLIENT access to such records as, in CLIENT's reasonable discretion, are necessary for CLIENT to perform such an audit. OFFSHORE will ensure that CLIENT's right to audit is preserved in its contracts with such designees.

## ARTICLE XIX - ENTIRE AGREEMENT

The terms and provisions contained herein constitute the entire Agreement between the parties and supersede all previous communications and understandings, either oral or written, between the parties hereto with respect to the subject matter hereof. No agreements or understandings varying or extending the terms of this Agreement will be binding upon either party hereto unless in writing signed by a duly authorized officer or representative thereof of each party.

For purposes of this Agreement, the Effective Date shall be 12/09/02 (date).

OFFSHORE INTERNATIONAL, INC.
an Arizona corporation

By: Luis F. Seldner

Its: President
Date: Dec. 9th 2002

Company: Delphi Automotive Systems LLC.

By: James A. Spencer

Its: Vice President

(Client)

# THE OFFSHORE GROUP

March 19, 2004

Mr. Bjoern Goeke
Supply Manager, Indirect and ME
Delphi Mexico Operations
Mexico Technical Center
48 Walter Jones Blvd., Mail Station 30B-310
El Paso, TX  79906
*(via electronic and regular mail)*

Dear Bjoern:

The purpose of this letter is to respond specifically to several points you raised in your letters of January 23, 2004 and February 13, 2004.  While we have discussed these points with you and other Delphi managers, the following is submitted per your request for a formal response.

*A.* Delphi's decline of the incremental adjustment to employee compensation per the union agreement negotiated by Maquilas Teta Kawi.  As stated within Article III, paragraph D of the Shelter Plan Service Agreement (Agreement) executed by Delphi and Offshore on December 9, 2002:  *The labor rates paid by OFFSHORE to the Mexican workers are based on Mexican Labor Laws (an example of how labor rates are calculated is described in Exhibit "B" attached hereto) and include Social Security, taxes, and all other benefits prescribed by Mexican Law.  It is agreed that any increase in such wage caused by an act of the Government of Mexico, or resulting from a collective bargaining agreement between Maquilas Teta Kawi S.A. de C.V. and the Union, or by direction of the CLIENT, will be paid by CLIENT to OFFSHORE.* (my emphasis).

As such, Offshore is within the terms of the Agreement in implementing the employee compensation adjustment.

*B.* Delphi's decline of the 3% increase in personal transportation.  As stated in Article V, B of the Agreement:  ***Reimbursable Costs.***  *CLIENT further agrees to reimburse OFFSHORE for the following costs and charges incurred by OFFSHORE in connection with this Agreement....,* and subclause (v): *The cost of bus transportation for CLIENT'S workers.*

Offshore is acting within the terms of the Agreement in its implementation of the increase in personal transportation costs (which Maquilas Teta Kawi negotiated with its suppliers).

---

777 E. MacArthur Circle, Suite 1        *Offshore International Inc.*              Tel: 520.889.0022
Tucson, AZ USA 85714                   *Offshore International LLC*             Fax: 520.573.9316
offshoregroup.com



# THE OFFSHORE GROUP

*C.* Delphi's decline of $1 per month per employee for the Employee Sports Complex. In the Agreement, Article V, B, the Agreement states: ***Reimbursable Costs.*** *CLIENT further agrees to reimburse OFFSHORE for the following costs and charges incurred by OFFSHORE in connection with this Agreement....,* and continuing in subclause (vi) states: *The cost for CLIENTS' participation in the Employee Sports Complex (the Employee Sports Complex is operated by a non-profit entity created by OFFSHORE. CLIENTS' representatives are invited and shall have the right at any time during the term of this Agreement to join the Board of this entity, which directs its operations and budget.)*

Offshore is acting within the terms of the Agreement in its implementation of this charge.

*D.* Finally, your letters remind us that: *Delphi Global Supply Management is the only area within Delphi Corp. entitled and empowered to negotiate contracts with outside suppliers.*

In Mexico, Offshore works through its affiliate and subcontractor, Maquilas Teta Kawi, S.A. de C.V. as the supplier to Delphi of services under the Agreement. As such, the appropriate entity to work with on specific services issues such as those raised above is, on a day to day basis, Maquilas Teta Kawi, while overall contractual issues are normally handled directly by Offshore with input from Maquilas Teta Kawi.

Bjoern, I am hopeful that the above will serve to clarify these matters.

Very sincerely,

*Jeffrey A. Prileson*

Jeffrey A. Prileson
Chief Financial Officer

Cc: L.F. Seldner; C. Espriu

---

777 E. MacArthur Circle, Suite 1          *Offshore International Inc.*          Tel: 520.889.0022
Tucson, AZ USA 85714                       *Offshore International LLC*           Fax: 520.573.9316
offshoregroup.com

August 4, 2005

Mr. Luis F. Seldner
President
Offshore International, INC.
777 East MacArthur Circle, Suite 1
Tucson, AZ 85714

Dear Luis Felipe,

This letter is to notify Offshore of Delphi's decision to renew the contract for the Shelter
Plan Service Agreement between Delphi Automotive Systems LLC and Offshore
International Inc, dated December 9th, 2002 for buildings 20, 21, and 22, also known as
plant 4, through September 8th, 2006 under the same terms and conditions of the
agreement currently in force. It is also Delphi's desire not to include buildings 4 and 7,
also known as plant 8 in the renewal.

This letter shall constitute an amendment to the Shelter Agreement pursuant to the terms
above and we therefore ask you to sign your consent below on behalf of Offshore.

I am sending you two originals of this letter. Please sign and return one of them by DHL
no later than August 15th, 2005.

I look forward the opportunity of continuing our relationship

Sincerely,

Gabriel E. Llausás
Manager, Delphi Global Supply Management


CONSENTED AND AGREED TO:

Mr. Luis F. Seldner
President
Offshore International, INC.


cc:    Sean Kelly, Ubaldo de La Hoya, Raúl Cuéllar, Noel Villalobos, Sara Romero, Al
       Armendariz, Jose Luis Armendariz, Luis Carlos Martínez Pérez, Rubén Lizárraga