1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION, ET AL.

9

10         Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              January 22, 2008

19              10:14 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    HEARING re Motion of Bank of America for Entry of Order

3    Temporarily Allowing Claims for Voting on Plan Pursuant to Fed.

4    R. Bankr. P. 3018(a)

5

6    HEARING re Motion of Technology Properties Ltd. for Entry of

7    Order Temporarily Allowing Claims for Voting on Plan Pursuant

8    to Fed. R. Bankr. P. 3018(a)

9

10   HEARING re Motion for Order Estimating Claims for Purposes of

11   Voting on Plan of Reorganization

12

13   HEARING re Motion of SPCP Group, LLC Pursuant to Bankruptcy

14   Rule 3018(a) Requesting Temporarily Allowance of Claims for

15   Purposes of Voting to Accept or Reject the Plan

16

17   HEARING re First Amended Joint Plan of Reorganization of Delphi

18   Corporation and Certain Affiliates, Debtors and Debtors-in-

19   Possession

20

21   HEARING re Motion for Order Approving Multidistrict Litigation

22   and Insurance Settlements

23

24

25

3

1

2    HEARING re Motion for Order Pursuant to 11 U.S.C. Section

3    105(a) and 502(c) Estimating or Provisionally Allowing Certain

4    Unreconciled Claims Solely for Purposes of Administration of

5    Discount Rights Offering

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed By:  Lisa Bar-Leib

```
                                                                          4
 1
 2    A P P E A R A N C E S:
 3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 4          Attorneys for Debtors
 5          333 West Wacker Drive
 6          Chicago, IL 60606
 7
 8    BY:   JOHN WM. BUTLER, JR., ESQ.
 9          ALBERT L. HOGAN III, ESQ.
10
11    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
12          Attorneys for Debtors
13          Four Times Square
14          New York, NY 10036
15
16    BY:   KAYALYN A. MARAFIOTI, ESQ.
17
18    LATHAM & WATKINS, LLP
19          Attorneys for Official Committee of Unsecured Creditors
20          885 Third Avenue
21          New York, NY 10022
22
23    BY:   MARK A. BROUDE, ESQ.
24
25
```

```
                                                               5

 1

 2    FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

 3          Attorneys for Official Committee Equity Security Holders

 4          One New York Plaza

 5          New York, NY 10004

 6

 7    BY:   RICHARD J. SLIVINSKI, ESQ.

 8          BONNIE STEINGART, ESQ.

 9

10    WHITE & CASE, LLP

11          Attorneys for Appaloosa Management and Harbinger Capital

12          1155 Avenue of the Americas

13          New York, New York 10036

14

15    BY:   THOMAS E. LAURIA, ESQ.

16          DOUGLAS P. BAUMSTEIN, ESQ.

17

18    WEIL, GOTSHAL & MANGES LLP

19          Attorneys for General Motors

20          767 Fifth Avenue

21          New York, New York 10153

22

23    BY:   JEFFREY L. TANENBAUM, ESQ.

24          MICHAEL KESSEL, ESQ.

25
```

6

1

2  LOWENSTEIN SANDLER PC

3        Attorneys for Lead Plaintiff

4        65 Livingston Avenue

5        Roseland, NJ 07068

6

7  BY:   MICHAEL S. ETKIN, ESQ.

8        S. JASON TEELE, ESQ.

9

10  KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

11        Attorneys for Wilmington Trust Company

12          as Indentured Trustee

13        599 Lexington Avenue

14        New York, NY 10022

15

16  BY:   EDWARD M. FOX, ESQ.

17

18  COHEN, WEISS AND SIMON LLP

19        Attorneys for UAW

20        330 West 42nd Street

21        New York, NY 10036

22

23  BY:   BABETTE CECCOTTI, ESQ.

24        PETER DECHIARA, ESQ.

25

7

1

2    KENNEDY, JENNIK & MURRAY, P.C.

3          Attorneys for IUE-CWA

4          113 University Place

5          New York, NY 10003

6

7    BY:   THOMAS M. KENNEDY, ESQ.

8          SUSAN M. JENNIK, ESQ.

9

10   KELLER ROHRBACK PLLC

11         Attorneys for ERISA lead plaintiffs

12         3101 North Central Avenue

13         Suite 900

14         Phoenix, AZ 85012

15

16   BY:   GARY A. GOTTO, ESQ.

17

18

19

20

21

22

23

24

25

8

```
1                    P R O C E E D I N G S
2           THE COURT:  Be seated.  Okay.  Delphi Corporation.
3           MR. BUTLER:  Your Honor, good morning.  Jack Butler,
4    Kayalyn Marafioti and Al Hogan on behalf of the debtors for the
5    third day of the debtors' confirmation hearing.  With Your
6    Honor's permission we'd proceed with closing arguments.
7           THE COURT:  Yes.
8           MR. BUTLER:  Your Honor, after 836 days before this
9    Court attending to the reorganization of the largest industrial
10   Chapter 11 case in U.S. history, I stand before you now, on
11   behalf of the forty-two debtors and debtors-in-possession,
12   seeking confirmation of the first amended plan of
13   reorganization, pursuant to Section 1129 of the Bankruptcy
14   Code.
15          While the first part of my argument will focus on the
16   remaining objections to confirmation, and putting aside the
17   ERISA and lead plaintiff's objections, which I think will be
18   resolved in connection with MDL, all of the remaining
19   objections relate to Section 7.8 of the plan.  At the
20   conclusion of that argument, with Your Honor's permission, I'd
21   like to spend a few minutes at the end of the argument,
22   discussing the Chapter 11 cases, the plan and the debtors'
23   confirmation case taken as a whole.
24          THE COURT:  Okay.
25          MR. BUTLER:  At the moment, Your Honor, we're going
```

9

1    to focus on Section 7.8.  And if you look at Exhibit 1 in the

2    index at (vi), there is a reason that Section 7.8 in the

3    debtors' plan was included under the means for implementation

4    of the plan.  It was a carefully negotiated provision.

5    Negotiated with the parties in interest in this case, dealing

6    with issues of importance to the plan investors, the statutory

7    committees and others relating -- and to the debtors, of

8    course, relating to how to implement an executive management

9    program that would support the debtors' reorganization and

10   successful execution of its plan.  And that is set forth in

11   Section 7.8 of the plan on page 37 of the plan.  And this is

12   the provision that we are focused on.

13          We have three objectors who have objections to this

14   provision.  They are the UAW, who has filed objections at

15   Dockets number 11475, 11580, 11938 and 12143.  The IUE at

16   Docket number 11582 and Docket number 12026.  And an individual

17   by the name of Randy Halazon, H-A-L-A-Z-O-N, who's filed the

18   same, a January 4th letter, a two-page letter, that was

19   docketed at 11822 and also, again, at 12016 but it's the same

20   letter objection.

21          And while Mr. Halazon objects to a number of issues,

22   at the very end of the letter he says in there, in his closing,

23   and I quote from the second to last paragraph, "No one in their

24   right mind could possibly think that the 500 million bankrupt

25   bonuses to be paid, with far more in the future to come, is in

10

1   any way fair and equitable treatment."  And as I reflected over

2   the weekend about this morning's argument and reread the

3   objections and reread Mr. Halazon's objection, I was struck

4   about the importance in this argument of avoiding hyperbole and

5   talking about the facts and the realities of the debtors' case.

6   The reality is that, in addition to the executive program --

7   executive compensation program design was approved by the

8   compensation committee and has been approved by others, which

9   we'll talk about in a few minutes.

10           The programs -- the emergence -- so-called emergence

11  programs that are before the Court really involve two things.

12  They involve emergence cash programs which are, in the

13  aggregate, eighty-seven million dollars which representatives

14  will talk about in a few minutes.  A sixty-seven percent

15  discount to the original LTI in which they're based.  And there

16  to be paid half in cash in 2008 and half in cash in 2009.  And

17  then there are forward looking long-term incentive

18  opportunities to be dealt with to cover the first eighteen

19  months post-emergence that are half performance based and half

20  time vested, again in a reduced amount of eighty-seven million

21  dollars.  And the criteria for the administration of those --

22  of all of those -- that LTI opportunity will be determined by

23  the successor board of directors.  That is the board that the

24  creditors elect under the selection process set forth in the

25  plan.  So, rather than there being a 500 million dollar set of

11

1    bonuses being paid, the reality is much different.

2         The debtors' burden, Your Honor, today as plan

3    proponent is to demonstrate compliance with Section 1120 by a

4    preponderance of the evidence.  It is important to reflect on

5    the fact that no objector has presented a single expert, a

6    single fact witness or a single rebuttal witness in opposition

7    to the debtors' evidentiary case.

8         While the UAW and the IUE designated various

9    discovery exhibits produced to them by the debtors and its

10   advisors, as I think the record makes clear this information

11   does not controvert the debtors prima facie case for

12   confirmation nor do they swing the needle close, let alone

13   below, the threshold required for the debtors to carry the

14   evidentiary burden for confirmation of the plan taken as a

15   whole.

16        I do want, at the outset, to reflect for a moment,

17   Your Honor, on the e-mails that were presented on cross-

18   examination that will undoubtedly be repeated during oral

19   argument here today.  There's no doubt in my mind that Friday

20   afternoon's examination, at least for a moment and for a period

21   of an hour or more, shifted focus from the uncontroverted

22   testimony as to the merits of the program to a useful reminder

23   of the scrutiny that every blackberry communication is

24   subjected to in this electronic age.

25        But even though the public post mortem review of such

12

1    communications can be distasteful and even inflammatory, it

2    does not follow and the evidence in this case does not support

3    the view that the final product is flawed or unreliable,

4    especially in the absence of contrary evidence, especially here

5    where not expert fact or rebuttal evidence was introduced by

6    the objectors.

7            It is also, I think, instructive, at least to me --

8    instructive to note that when the e-mail communications were

9    displayed that involved a director, those communications

10   illustrated thoughtful challenges and probing questions which,

11   in our view, underscores the propriety of the process and

12   underscores the amount of time and effort that the directors

13   went through -- the independent directors went through in

14   working on and developing this program.

15           Just a word, Your Honor, about the AIP.  For reasons

16   that are somewhat inexplicable to me, we spent a lot of time on

17   Friday on the IAP, which had been approved previously by Your

18   Honor on four separate orders and which is -- will -- in terms

19   of the post-emergence AIP, so long as the debtors emerge by the

20   end of March, we won't be back here for a fifth AIP.  That'll

21   be determined by the post-emergence board of directors.

22           Back -- we look at Exhibit 150, page 39.  Back in

23   August of this year, the debtors made a presentation to the

24   joint statutory committees, a committee in which both the UAW

25   and IUE serve; one as a voting member and one as a non-voting

13

1   member.  And we spent time with them looking at the first three

2   months -- first three payouts in this case.  And this was the

3   chart that was presented to them, slightly different than the

4   chart that they presented from the debtors' records, one of the

5   internal charts.  And this chart shows, from August 9, 2007, a

6   reflection of the fact that there had been over a billion

7   dollars worth of value created in terms of additional EBITDA

8   over those three periods.  And there was a total of twenty-six

9   or twenty-seven million dollars paid in additional payouts to

10  the debtors' executive management team, the 506 odd members of

11  management who contributed to that result.

12          And I think it is important, again, however

13  inconvenient a truth it is that executive management deserves

14  to be paid.  I think it's important to reflect on

15  contributions.  And I think it is absolutely self-evident in

16  the record, as it was in the prior AIP hearings that these

17  payments, these incentive payments, were earned and there was

18  significant value that benefited the estate by these

19  contributions.

20          I also -- if you look briefly, and I don't have the

21  exact chart on this but I think Your Honor can access the

22  reports made regarding second-half performance at Exhibit 153.

23  Back just in November there was a comparison, this is page 23

24  of the joint statutory committee book, and there was a

25  comparison for the first half of the last part of 2007, how the

14

1    different divisions were performing against plan.  And you can

2    see that three of them were below plan, a couple are very close

3    to plan and there's just two that were exceeding plan.  And if

4    you look in the next pages in Exhibit 154, pages 18 and 20, you

5    see the results reported to the statutory committees in January

6    of this year dealing with performance and the performance in

7    October and November was not as good as the year before in

8    October and again in November.  If you look at November,

9    marginally -- just marginally different than the November

10   performance.  And the fact is, at the end of the day, the

11   second half of 2007 performance, before the creditors committee

12   exercises their 200 million dollars worth of adjustment

13   authority they have, is likely to be well below 120 percent.

14   And I would be very surprised if at the end of the day that

15   there are payments under the second half program much above the

16   110 percent level.  And so, when you sort this out the record

17   just -- the record just doesn't support the fact that the --

18   under the AIP that people have been getting unreasonable

19   payments.  Your Honor has entered an order saying that they are

20   reasonable.  And I do -- I think that's just an important point

21   to note as we move forward.

22          I also think it's important in connection with

23   looking forward.  The testimony that was in the record that

24   AIP, going forward, is just as -- is, during the Chapter 11

25   case, is based on separate targets.  The testimony was not

15

1    based on base salary.  Adjustments in base salary do not impact

2    targets for AIP.  And there is not the kind of geometric

3    progression that was tried to be illustrated on cross-

4    examination.

5              I think it's also important to note, from the

6    seven -- the record in Section 7.8 and its attachments that the

7    new Delphi board will set the emergence targets I indicated for

8    2008, assuming we've emerged by the end of March.  And it'll be

9    the creditors' selected board that'll make those

10   determinations.

11             Turning, Your Honor, now to the process the

12   compensation committee used.  Back in the very first day of

13   this case the company filed, and it's at Exhibit 265, a motion

14   that -- with a business case setting forth its original KECP,

15   its Key Executive Compensation Program, which had various

16   elements on it.  And I would point out, unlike what was

17   indicated in the record or at least by argument from counsel,

18   the AIP was approved in four separate orders.  The severance

19   portion of that was approved in first day orders.  But the

20   emergence programs were deferred and incorporated into the plan

21   process.  And we should take just a minute and talk about why

22   that is -- why that was.  And that was -- that issue was

23   reviewed -- was discussed numerous times during the course of

24   the two and a half years.  And ultimately, on this record, we

25   are at this -- we were at a hearing before Your Honor we talked

16

1    about the fact that the company, after consultation with other

2    stakeholders here had decided that it was best, we thought, in

3    the company's interest to evaluate the emergence programs in

4    the context of a plan and as part of a plan.  Where creditors

5    can vote, where there is the disclosure associated with a plan,

6    where the -- the process can be evaluated, ultimately, under

7    1129 rather than under other sections of the Bankruptcy Code.

8    Where the relief granted occurs only on the effective date and

9    is not a use of property during the course of the Chapter 11

10   case but rather something that occurs on the effective date of

11   the plan when all of the parties receive the benefit of the

12   bargain under the plan of reorganization.

13          And so we -- that was the way in which we structured

14   this and that's what we're before Your Honor on, an integrated

15   provision of the confirmation -- of the plan of reorganization

16   and it's part of our confirmation case.

17          It is important to know, though, even in the early

18   KECP that was filed, and I turn -- point out now pages 7 and 8

19   of Exhibit 3 which is part of Exhibit 265, to point out the

20   fact that even in connection with that program there were give-

21   ups and cancellations.  And that is -- and there's two

22   important ones to point out.  There was, and Your Honor will

23   recall from the testimony on Friday, there was a twenty-one

24   million dollar retention program that was adopted -- cash-pay

25   program that was adopted in 2005 as part of the various

17

1    delivery vehicles for the LTI in that year, that was in place

2    of the options.  You heard the testimony from Mr. Bubnovich,

3    and, I believe, from Mr. Naylor who basically indicated that

4    was done because of the -- the unreliability, at that point in

5    time of options and in order to retain people there were cash

6    payments put in place.  The facts are, and the record

7    indicates, that program was cancelled as the company entered

8    Chapter 11 and fourteen million of the vested amounts of money,

9    of the twenty-one million dollars, was never paid to the

10   executives.

11           In addition, Your Honor asked questions and heard

12   answers about the LTI in 2003, 2004 and 2005 and understands

13   from the record that a third of that -- those LTI opportunities

14   were cash.  And the cash were part of the performance

15   achievement plan and the facts are that the 2003 LTI grants

16   were honored but as part of the first day motion the debtors

17   cancelled the 2004 grants and the 2005 grants.  And those PAPs

18   and the cash associated with those were never made available to

19   the executives.

20           THE COURT:  Had they been vested?

21           MR. BUTLER:  Excuse me?

22           THE COURT:  Were those vested?

23           MR. BUTLER:  Yes, they were vested.  They had

24   performance criteria associated with them.

25           THE COURT:  I guess that's what -- I was asking the

18

1   wrong question.  Were those -- would those performance criteria

2   have been met?

3            MR. BUTLER:  I think, Your Honor, that was an open

4   question.  Some of the -- some of the performance criteria I

5   think could have been met.  I think others -- I think it was

6   questionable.  It was not based on stock price, for example.

7   And the -- ultimately the -- in evaluating the program, the

8   decision that was made at the time was rather than to have

9   people -- the 2004 program and the 2005 program, those

10  criteria, Your Honor would have had to been earned in the

11  Chapter 11 case.  Part of it occurred pre-petition, part of it

12  occurred post.  And I know the judgment that the comp committee

13  made at the time was that if we were going to make any payments

14  during the Chapter 11 case that those ought to be made as part

15  of a program presented to the Court.  And so -- those programs

16  were cancelled.  The 2005 program was in fact paid in, I think,

17  early 2006 under Your Honor's first day orders dealing with --

18  with employees.

19           Now, Your Honor, just to say -- and I think it's

20  another of the inconvenient truths there is, and I stand here

21  before Your Honor as corporate counsel for the company and

22  explaining the views of the board of directors, the

23  compensation committee and what the company believes are in its

24  best interest.  Throughout this process others represented

25  individual members of management and they had their views.  And

19

1   many of their views weren't, ultimately, adopted in these

2   programs.  But why did we put this up first?  Why did the

3   company present this in -- on the first day of its Chapter 11

4   case?  And the reason for that was, I think -- I hope, to the

5   Court was self-evident.  And that is, in these large

6   restructuring cases there is never a good time to talk about

7   executive management compensation.  It is one of -- another of

8   those inconvenient truths.  And the company made the decision

9   that it was important to layout at the beginning what the

10  expectations were even if the company couldn't get all of those

11  elements approved and needed to sort through those elements in

12  connection with the process.

13          The company believed it was important to maintain

14  competitive pay during the Chapter 11 case, insofar that it's

15  possible.  And the evidence in the AIP hearings, the evidence

16  in this hearing, which are uncontroverted is that the executive

17  management team did not have fully competitive pay during the

18  Chapter 11 cases.  And we'll talk about that in some detail in

19  a few minutes.

20          Early on, and I also think it's important and I know

21  Your Honor will do this, the fact is one of the elements of how

22  testimony is presented in this case is that direct examination

23  is replaced by declarations.  And the Court doesn't have to and

24  doesn't need to and we understand why, go through the time and

25  resources to listen to live testimony.  But it is important to

20

1    consider the declarations of Mr. Miller and Mr. Naylor and

2    Mr. Bubnovich in those sections of the declarations that were

3    not challenged on cross examination, and I'll talk about Mr.

4    Miller's in a second.  But much of Mr. Naylor's testimony and

5    all of Mr. Miller's testimony was not challenged at all by

6    the -- by the objectors during cross-examination and stands for

7    the testimony that was presented on an uncontroverted basis.

8         One of the elements of that testimony that was not

9    challenged was the compensation committee process described in

10   Exhibit 90 at page 5.  And the -- the facts are that this

11   compensation committee and these three independent directors

12   spent more than twenty meetings over several years evaluating

13   executive compensation from the bottom up.  Rewriting and

14   approving a management compensation philosophy, examining every

15   element of the program, receiving draft reports, some thirty

16   of -- there were thirty of them or more prepared; I think they

17   reviewed five or six of them, asking questions, challenging,

18   pushing back, taking some advice, rejecting others as they went

19   through a process that developed into the final report that's

20   before Your Honor.

21        I think it's important to note, too, we looked at a

22   lot of reports on Friday.  I'm not sure, on cross-examination,

23   we ever looked at Exhibit 90 which was actually the report

24   that's before the Court.  There were two reports before the

25   Court and we'll address both of them during these arguments.

21

1   But the exhibit -- the report that was before the Court is the

2   December 28, 2007 report from which Exhibit -- page 5 that's on

3   the screens is drawn.  But it is the report that was submitted

4   and approved by the compensation committee after input with the

5   statutory committees and after a complete review with the plan

6   investors.  And I think it's important to look at this process.

7   This is not particularly a business judgment case.  This is

8   1129 not 363.  But I think it's important to look at the work

9   these -- these directors did over this multi-year basis to try

10  to come up with a reasonable program in their judgment.

11          If you look at the Miller testimony, at Exhibit 67,

12  and look at his testimony on experience and the experience he

13  has as chief executive officer and now currently is the

14  executive chair.  Paragraph 43 talked about the importance of

15  coming up with a compensation philosophy and strategy.  And

16  there is unrebutted testimony that the compensation committee

17  philosophy here reflects a thorough, well-considered and

18  effective philosophy and strategy.

19          In paragraph 44 of his testimony, also unrebutted and

20  also unchallenged on cross-examination, is Mr. Miller's belief

21  that this philosophy and strategy aligns with the interest of

22  key stakeholders in the case.  And goes through and explains

23  each of the bases for that view.

24          Paragraph 45 of that same declaration also talked

25  about the importance, and this was something that was really a

22

1    focus of this Chapter 11 case.  I think we forget, sometimes,

2    because we're here at the end and hopefully upon the verge of

3    moving forward, we forget that when this company filed

4    Chapter 11 on October 8th, when I stood before Your Honor with

5    a series of charts and showed you pictures of how Delphi

6    operated around the world, we were filing the largest

7    industrial case in U.S. history in an industry that had just-

8    in-time inventory and with a company that was quite capable, if

9    it did things poorly, of shutting down the entire global

10   automotive business because of its relationship -- it's

11   supplier relationship to every one of the global OEMs across

12   the world.

13           And I think that we forget about the Herculean tasks

14   that took place and the basic philosophy of the company during

15   the Chapter 11 case to maintain supply, to maintain continuity

16   of supply, to not try to do this Chapter 11, going forward, in

17   terms of disrupting customer relationships.  And that work,

18   which was largely executed by the executive management team, is

19   one of the significant factors that allowed the company to

20   exceed its business plan during the course of the Chapter 11

21   and prepare to move forward going forward, post emergence.

22           I hope Your Honor has had the opportunity to reflect

23   on Exhibit 66, Mr. Naylor's testimony.  Much of Mr. Naylor's

24   testimony at Exhibit 66, which should be on the screen, and

25   I'll just point out to a couple of portions of his testimony

23

1    that go to the views of the effort.  And as Mr. Naylor

2    testified with respect to the last sentence, the compensation

3    committee wanted the executive comp program to be competitive

4    and at market median.  That was the whole program.  Nowhere,

5    and I think Mr. Naylor was clear on this in his testimony,

6    nowhere did Mr. Naylor say that every single element

7    independently had to be at market median but the program, the

8    total direct compensation, the TDC, needed to be at market

9    median and they -- and Mr. Naylor testified, regarding a number

10   of things that the company did and the compensation committee

11   did to drive individual elements of compensation towards market

12   median.

13          But paragraph, I think, 12 of the declaration --

14   that's fine, we can stick with paragraph 16 but I'll just make

15   a comment.  Paragraph 12 of the declaration, I think, clearly

16   outlines the goals of the committee and how they tried to

17   operate going forward.

18          I think it's also important, and this is something

19   that also was not controverted in any way by the objectors and

20   there is uncontroverted testimony in the record, and I'll go

21   through this, in several places about the fact that this

22   compensation program is very unusual.  It requires that all

23   executives that go forward with the company waive all of the

24   rights they have with respect to the company, other than the go

25   forward program that's been approved by the plan investors.  So

24

1   for example, one of the things that has to be waived are their

2   claims under the change of control agreements that the company

3   had estimated, again with Watson Wyatt's assistance, could be

4   as much as 253 million dollars.  And the fact of the matter is

5   that had that 253 million dollars not been wiped out, assuming

6   that people grant us the waivers and they can't get the new

7   program unless they do, and under Section 8.1 of the

8   agreement -- of the plan, we've rejected all of the management

9   contracts and all of the other management benefits people would

10  have.  Without this 253 the company couldn't have reached the

11  1.45 billion dollar limit on UGIC in this Chapter 11 case.

12          Mr. Naylor also testified, on an uncontroverted

13  basis -- go to the next paragraph, please -- in paragraph 18

14  about the various negotiations between the committees and

15  between -- I should say discussions with the committees and

16  with the plan investors.  And I want to be very clear here,

17  neither of the statutory committees has endorsed this

18  management compensation program.  When we settled with the

19  creditors committee, I agreed with Mr. Rosenberg, and I'll say

20  here again today, their agreement with respect to that -- the

21  matters that they had to review does not reflect an endorsement

22  or an independent approval of this program.  That was an

23  important point that they raised and we agree with that and

24  acknowledge that they had a particular area they were focused

25  on.  We satisfied the requirements of Section 7.8 insofar as

25

1    the committee was concerned and we moved forward.

2           But the fact of the matter is the equity committee

3    wanted the company to reduce the grants from ten percent to

4    eight percent in terms of the total grants that would be

5    available without going out to shareholder approval in the

6    future.  And that was done.  There was -- one of the

7    suggestions the committee made, well before the final

8    negotiations, was that the non-DSB executives equity or LTI

9    awards be moved to market median in a one-step rather than two-

10   step approach.  Your Honor's aware from the record that

11   originally when the company -- the compensation committee

12   understood that the LTI was, in fact, for non-DSB members was

13   in fact over market.  The company wanted to take it down in two

14   steps, one now, one eighteen months from now.  The committee

15   suggested that we do it immediately and ultimately on the 28th

16   of December that's what the compensation committee agreed to

17   do.

18          Also in Mr. Naylor's declaration, he talks about, in

19   connection with the ratification of the final report, the steps

20   that were taken and the additional items that -- that the

21   compensation committee considered on the 28th of December.  And

22   one of those, and we'll talk more about when I talk about Mr.

23   Miller and Mr. O'Neal at the end of these arguments, and one of

24   the things that was never brought up in cross-examination and

25   never rebutted was the Watson Wyatt report on emergence cash

26

1   performance payments for the executive COB and CEO.  And

2   there's testimony in the record about those and the report

3   stands for what it states and we'll go through it in a few

4   minutes on an unrebutted basis.

5            Mr. Naylor also talked about the supplemental life

6   program.  And we'll talk more about this, Your Honor, but it's

7   important to know, and this is the kind of scrutiny that the

8   compensation committee went through, this was actually a

9   benefit in the pre-requisites table of the final report.  And

10  the supplemental life program is actually a guaranteed death

11  benefit payment that is provided by the company.  And it simply

12  says the company's program was, and is, that if you are an

13  executive and you die in office you get a multiple -- your

14  estate gets, you don't, a multiple of your salary if you die in

15  office.  And in this company, as in others -- some others, that

16  benefit was also extended to executives when they retired.  The

17  fact of the matter is that when you retire, one thing that's

18  true in life for all of us, we're all going to die.  And so it

19  turns into a conditional benefit, you know, will you die in

20  office if you get it when you retire turns into a guaranteed

21  benefit.  And this is a vested benefit guarantee, part of the

22  program, people have it and the comp committee looked at it and

23  said, you know, we don't think that's market competitive to

24  have it in retirement and took it away from the executives.

25  And the testimony in the record is that's a benefit that those

27

1   who had it, on average, had a two and a half million dollar

2   payment -- retirement payment taken away from them which had

3   existed prior to this point and which was eliminated.  Just

4   another example of the work the comp committee did in trying to

5   look at every element of this.  This wasn't -- this particular

6   program was somewhat esoteric, was tied up in the perquisites

7   of the programs and even every one of those was examined pretty

8   carefully.

9          Next please.  The -- also I talked about the A

10  through F and this is, simply, the one-step transition that we

11  talked about.  Paragraph 22, again, uncontested.  Please?  And

12  paragraph 24 trying to think about -- and this is the idea and

13  you saw some of the -- you saw some of the evidence go in and

14  some of the -- what I think the objectors will argue is

15  contradictory proposals and suggestions back and forth, but

16  Mr. Naylor testified, again on an uncontradicted basis, that

17  the committee considered, over this two year period when they

18  met more than twenty times, a wide variety of compensation,

19  benefits, programs and ideas, things that they thought were

20  right, things that they thought were not right and Mr. Naylor

21  testified, and I thought his testimony was quite credible,

22  about the work that they did to evaluate and come up with the

23  programs.  This is not a science, it's an art.  There are

24  materiality standards and others which were testified to.  And

25  again, the -- I think uncontroverted testimony here is that,

28

 1   you know, material changes -- changes of five percent, three,

 2   five, six, seven percent in that range are not material.

 3   There's no evidence in the record to the contrary that they

 4   would be considered material.  And again, Mr. Naylor's

 5   testimony on how they considered lots of various things in

 6   coming to the conclusions that they did.  Next, please.

 7             And finally, in dealing with his view of a equality

 8   of sacrifice and his view and the view of the company regarding

 9   that -- that -- the equivalence of sacrifice provision was

10   never intended and could not mean that anyone would be paid

11   wages or compensation below market.  And that is a view that

12   the company -- that this program is based on.  Next, please.

13             Let's move on, if we can, to -- that's okay.  Let's

14   move on, if we can, now to Exhibit 144.  This is the -- and I

15   just want the Court to understand the updates that were given

16   on the comp committee process.  The statutory committees, of

17   which the objectors are a part, received many briefings on the

18   work of the compensation committee, the effort that was going

19   on, the different points that were happening, the input that

20   was being sought.  And Your Honor sees it -- hears it February

21   7, 2007 report at Exhibit 144.  At Exhibit 145 here's a update

22   back in March of 2007 and again in Exhibit 150 there was a

23   further update in the summer of 2007, as the company reports on

24   the process that it's undertaking to the committees that

25   culminated in a lengthy presentation at Exhibit 151, which I

29

1    hope Your Honor will have the opportunity to look at.  I'm not

2    going to go through it in great detail but on the September

3    11th meeting the committee was informed that the EPCA

4    condition, which we'll talk about in a few minutes, had been

5    satisfied.  That is that the lead plan investors had concurred

6    in the compensation program.  And this report that follows is a

7    summary of what that program is.  And I'll just ask you to flip

8    through it, I'm not going to go through it in any great detail.

9    But the process was reviewed.  Each of the elements of the

10   program were reviewed on the following pages.  And so, in

11   September of this year the -- shortly after the original plan

12   of reorganization was filed on September 6th, the committee

13   received a comprehensive review of much of what Your Honor has

14   seen during the course of this hearing.

15           So the process here, Your Honor, we would argue is a

16   carefully crafted process, a huge amount of effort.  I think if

17   Your Honor considers this in terms of what independent

18   directors might do I think it's the amount of time and effort

19   and care that was taken by the independent directors here, I

20   think, frankly, in a Chapter 11 case is almost unprecedented.

21   Just a huge focus on working on this, on getting input from

22   stakeholders and ultimately -- and when I say stakeholders I

23   mean the two committees on specific items and the plan

24   investors in detail.

25           Your Honor's aware, because you approved the EPCA,

30

1    that there was a specific EPCA requirement we had to deal with.

2    It's set forth in Exhibit 3, Trial Exhibit 3 in Appendix A, and

3    there's Exhibit 7.11, this is the -- this is the particular

4    provision on page, I think it is, 59 of the EPCA.  And this is

5    a requirement that we do two things, the company do two things.

6    One, we enter into agreements, a compensation program, that's

7    reasonably acceptable to the lead investor and secondly, it's

8    also important -- second in the hole, that we resolve any

9    claims of the former executive officers on terms acceptable to

10   the lead investors or as otherwise ordered by the Bankruptcy

11   Court.

12        There was a requirement here, fundamental to the

13   investment agreement, that the -- that the plan investors have

14   a material say in the go forward program and that the former

15   program be wiped out on terms acceptable to them.  That's what

16   7.11 required.  That's what this provision required at (xxi) on

17   page 59.  And what ultimately happened, in connection to that,

18   you've already seen and the record is clear with the evidence

19   that ADH signed off on the program, that we complied with

20   provision 1 and also complied with provision 2, and we'll walk

21   through that and explain it.

22        In doing that, Your Honor, and I don't -- I won't go

23   through it but Exhibit 90, on pages 39 to 43, again the final

24   report that's before the Court today that wasn't looked at much

25   on Friday, summarizes for Your Honor on pages 39 through 43,

31

1    and we'll not go through them individual, all of the changes

2    that the plan investors required.  This wasn't simply an idle

3    review.  This was a line-by-line, provision-by-provision review

4    by the plan investors of what needed to be done in order to get

5    their concurrence and that's set forth on each of these pages

6    as you go forward.

7            So the uncontroverted testimony in the record, Your

8    Honor, is that the plan investors did what was required to be

9    done under the EPCA, that the company performed, that the plan

10   investors concurred in and gave the approvals necessary to

11   suggest that they had fully reviewed this as the new money into

12   the case, those people that are going to put in the investment

13   to allow the company to go forward that they had signed off as

14   the EPCA required.

15           Now all that culminated in a series of plan

16   documents.  And let's briefly talk about the plan documents.

17   The plan documents begin with Section 7.8 of the plan of

18   reorganization.  We looked at that a few minutes ago.  And it

19   carries forward what the EPCA required.  One, that we enter

20   into employment agreements and other programs that are set

21   forth on Exhibit 7.8 and that we -- that the executives had to

22   waive everything that they had previously in order to get the

23   benefits of this program.  And that ultimately the other

24   agreement that we had with them was that they would also sign

25   off on the emergence payment separately, which they did and

32

1    that there would be -- this also -- there would be this review

2    opportunity on an aggregate basis, by the creditors committee,

3    which was also completed and satisfied.  That condition was

4    also satisfied.

5            Now, again, just a note here on the record, Your

6    Honor, the disclosure statement and the original exhibits to

7    the disclosure statement included sixty-one pages of disclosure

8    and information about executive compensation.  Another, sort

9    of, unprecedented amount of disclosure in this plan process.  I

10   don't think that anyone here could probably show another plan

11   in which as much disclosure has been made.  Yes, it was a

12   multi-hundred page disclosure statement.  But the fact is that

13   there was detailed disclosure in sixteen pages of the

14   disclosure statement from DS-92 through DS-107.  And there was

15   a plan exhibit, 7(a) that was forty-five pages giving all of

16   the summaries of the plans and having a form of the employment

17   and CIC agreements.

18           And, Your Honor, I would point out that the eight

19   points -- we'll talk about the percentage of the -- the LTI

20   percentages, but you'll note that the eight percent number is

21   here in the plan and it was reduced from ten percent after

22   discussions with the equity committee and was actually in the

23   plan in 7.8.

24           I also, Your Honor, would like to point out to you

25   what plan Exhibit 8.1(a) says.  And that's on Exhibit 2,

33

1    Exhibit 8.1 to Exhibit 2 on page 1.  And again, this is the

2    list of executory contracts and leases to be rejected.  In this

3    case every lease, every executory contract the company has is

4    being assumed other than the agreements relating to management.

5    If you look at 1, 2 and 3, they all relate to management.

6         As we went forward and negotiated this over the

7    course of December, if you look at the supplement to Exhibit --

8    the Plan Exhibit 7.8 that was filed on December 28th, again,

9    this was -- and again, to be clear, this supplement, Exhibit 2

10   was filed on the deadline Your Honor required in the

11   solicitation procedures order in connection to the time that

12   all the plan exhibits had to be filed in order so people could

13   make informed decisions when they voted on the plan of

14   reorganization.  Included in Exhibit 7.8, in that supplement,

15   were a number of important disclosures that related to

16   executive compensation.

17        First, there were -- in reviewing the final program

18   there were two discreet items that Watson Wyatt continued to

19   tell the compensation committee could not be benchmarked as

20   being market competitive.  That included the second step in

21   bands A through F, in terms of the go forward LTI.  And it

22   included the supplemental life benefit program that I talked to

23   you about in terms of for retirees.  The compensation committee

24   voted on that day, as was disclosed, to eliminate -- to confirm

25   its prior vote to eliminate the retiree benefit, supplemental

34

1    life benefit.  Those two and a half million dollars per

2    executive on average in terms of the senior executives, you

3    have the DSB and some others.  And it also -- it also agreed to

4    swallow hard and take the entire adjustment for LTI in one step

5    for bands A through F.

6           Just so the record is clear, and the record -- and it

7    is clear on this point, that adjustment means that there is a

8    fifty percent adjustment in the LTI opportunities that bands A

9    through F had gotten historically to what they're going to get

10   under this new program going forward.  And that was disclosed.

11   The other disclosures the company made in connection under 7.8

12   on December 28th is as follows.  The company -- the next major

13   disclosure -- you can move forward -- was to formally approve

14   Mr. O'Neal's contract.  This was the contract, and you heard

15   the testimony from Mr. Naylor, this was the contract that was

16   negotiated between the new plan investors, those people that

17   will have three members of the board of directors that were on

18   the selection committee to pick the executive chair of the

19   company and the plan investors had a negotiation with Mr.

20   O'Neal as to a form of contract using the prior change of

21   control agreement, employment agreements that had been filed

22   back by the company on -- earlier in December it used -- it

23   made these -- it went through and made various changes and

24   negotiated with Mr. O'Neal for circumstances that are related

25   to the chief executive officer.

35

1          And so those were approved and they were filed.  So

2     as part of the Plan Exhibit 7.8, that supplement on December

3     28th, we filed the entire contract for Mr. O'Neal and the

4     entire change of control agreement for Mr. O'Neal, which are

5     set forth and I'll address it a little later when I talk about

6     Mr. O'Neal's compensation.

7          We also, then, continue to negotiate with the

8     creditors committee.  You had these specific rights under

9     Section 7.8 of the plan.  And those rights resulted in a plan

10    modification -- I'm sorry.  Excuse me.  Before I go to that,

11    let me just deal with this last item in 7.8.

12         The company also -- and we'll talk more about this.

13    Your Honor saw this on cross-examination and re-direct, the

14    compensation committee also made a decision on the 28th, which

15    was included in the plan exhibits and publicly announced, that

16    it made it's final determinations about the emergence payments

17    for Mr. O'Neal and Mr. Miller which were based on a series of

18    factors set forth here, not the original LTI program but rather

19    a separate independent set of factors.  And a report, which was

20    never challenged by the objectors during the cross-examination,

21    the emergence cash payments report by Watson Wyatt dated

22    December 28th.  Next, please?

23         And then, ultimately, there was disclosure about the

24    changes -- these changes, what they would do and now, Your

25    Honor, you can see that the effective date payments in the

36

1    aggregate are eighty-seven million dollars or thirty-seven

2    million on an annualized basis.  Those are the cash payments

3    that are going forward -- excuse me, the -- I got that right?

4    Yeah.  And then the change in bands A through F as we go

5    through.  And these are -- those changes were ultimately

6    clarified.

7              Your Honor, we then went on, after that period of

8    time the company did -- go to the next document, please.  And

9    we continued to negotiate with the creditors committee and with

10   their expert, Pearl Meyer, on her view versus our expert's

11   views of various issues.  And at the end of the day, you know,

12   we resolved the discussions between the parties by this

13   language, which was specifically approved by the creditors

14   committee as resulting in additional reductions.  There were

15   two things that were done.  One was to make cash payable over

16   two different -- in two steps, which we agreed to do.  And then

17   there was a reduction here, you can see, in the -- a further

18   reduction in the -- in the LTI which was a reduction of ten

19   million on an annualized basis, fifteen million on the

20   aggregate basis in the plan.  So those two additional changes

21   were made.  And as you can see on the next exhibit there was a

22   confirmation from the committee that they were satisfied that

23   this met -- this met the requirements of 7.8.

24             Mr. Rosenberg, as you can see in my exchange with

25   him, was very clear and I'm clear on this record again today

37

1    that this -- that we acknowledge the admonition from the

2    committee that we should not use the settlement to suggest the

3    committee affirmatively endorses the program, another

4    inconvenient truth in these cases is nobody wants to endorse

5    the program.  We acknowledge that.  That's not what 7.8 was

6    about.  But we did satisfy the conditions of 7.8 after an

7    independent review by the creditor fiduciary.

8             That's what went before the parties, Your Honor, for

9    voting.  And the results, in -- on Exhibit 95 which Your Honor

10   has seen before, page 55 of Exhibit 95, the results are an

11   overwhelming acceptance by eighty-one percent of the parties

12   that cast ballots.  There is a rejection by class 6C but

13   there's no objecting party here at confirmation with respect to

14   6C that his objection has not been settled.  And we'll deal

15   with 6C and evidence in compliance with that under 1129.

16            So eighty-one percent of the ballots voted in favor

17   of the plan.  That doesn't, obviously, change the Court's

18   independent obligations to decide whether we've met the

19   requirements and hurdles of Section 1129, including 1129(a)(4)

20   and (a)(5) which can touch on emergence payments and on

21   management compensation.  However, the debtors' view is that

22   this program should be treated like all of the other provisions

23   of the plan of reorganization, subject to 1129.  And when you

24   look at the vote -- the vote on page 55, on page 58 in terms of

25   all the sub-classes voting in favor and in looking at it even

38

1   from a debtor perspective on page 59 of that report, again Your

2   Honor is familiar with these

3            And I would point out, Your Honor, that while this is

4   not dispositive in any way the reality is that neither the UAW

5   or the IUE International voted against the plan either.  They

6   didn't vote to reject the plan.  And in fact the ballot

7   reports, you'll see them next, this is from Exhibit 62, the IUE

8   voted to support the plan.  And the UAW didn't vote on the plan

9   at all.  Neither of them rejected.  I will note that some of

10  the, as indicated on the next exhibit, some of the IUE -- the

11  IUE locals voted to reject on a one dollar basis but filed a

12  ballot to reject in 1C.  But the large claim, the 126 million

13  dollar claim, was voted in favor.

14           And what this means, Your Honor, the bottom line is

15  that impaired classes, except 6C for which there's no

16  unresolved objector, voted overwhelmingly in favor and neither

17  of the objectors before the Court today voted to reject.  And

18  what is being asked for in these objections, in our view -- in

19  the debtors' view, is that you're being asked, Your Honor, to

20  in some respects ignore the plain vote of the unimpaired

21  classes.  To ignore the twenty plus meetings of the

22  compensation committee and the work that they did, to ignore

23  the third-party consent rights of the plan investors and all

24  the work they did and the modifications they made.  And to

25  ignore the creditors committee's separate review of the -- the

39

1   limited review that they did and the determination that 7.8 of

2   the plan, insofar as the creditors committee had a role, that

3   that provision was satisfied.

4           And so you have, Your Honor, it seems to the debtors

5   you have here, we think, a pretty -- an unrebutted case and

6   more than a prima facie case in terms of process, plan investor

7   involvement, the way the plan documents were prepared, the

8   amount -- the unprecedented amount of disclosure to creditors

9   and equity holders and other stakeholders and the overwhelming

10  vote in favor of the plan.

11          Having said that, we acknowledge that Your Honor has

12  an independent obligation to review the plan taken as a whole

13  and decide whether the plan taken as a whole complies with

14  1129.  And for that reason, let me spend the next few minutes

15  talking about specific issues.  I want to talk briefly about --

16  start with the peer group analysis.

17          The record here is again, I think, uncontroverted.

18  That if you look at Exhibit 265, and this Exhibit A to 265,

19  page 36.  This was the 2005 peer group.  And if Your Honor

20  takes a look at this peer group and then takes a look at the

21  next page, which is the peer group for 2006 and you look at all

22  the companies that the debtors knocked out.  And then you look

23  at the final peer group, and again going back to the final

24  report, one we didn't look at much, Exhibit 90, page 33 of the

25  final report, you have a peer group that Mr. Bubnovich

40

1    testified to at the end of the day was reasonable and that Mr.

2    Naylor testified to met the requirements of the compensation

3    committee.  And he even testified, on cross, as to -- and in

4    his declaration as to his individual views as chairman of the

5    comp committee from his prior experiences at other companies

6    including DuPont, as to the appropriateness of the peer group

7    in terms of being from different industries and a range of

8    revenues and a range of considerations in terms of how someone

9    is selected for the peer group.

10          Now the fact is, we had a lot of examination on

11   Friday about testing.  And we were, in some respects, the

12   debtors were asked on examination to -- and cross-examination

13   to defend against the expert not in the room.  And that is

14   allegations that the creditors committee expert had even though

15   the creditors committee had settled and her report had been

16   withdrawn and is not in evidence here and not before the Court.

17          And there was a fair amount of discussion with Mr.

18   Bubnovich about the way in which he went to test this peer

19   group when we looked at manufacturing groups.  The fact is

20   that all the testimony -- all the testimony about Caterpillar,

21   all the testimony about Eaton, which was Ms. Meyer's preferred

22   company which moved things lower.  Caterpillar, which at the

23   end of the day the record, I think, indicates would move things

24   higher.  The fact of the matter is neither Eaton or Caterpillar

25   are in the peer group before the Court.  It's important the

41

1   record indicate that.  The -- what's before the Court in

2   Exhibit 90 on page 33 has neither of those companies.  And the

3   reality is that they were -- as it looked at manufacturing

4   groups, there was a lot of testing that went on and the

5   uncontroverted testimony from Mr. Bubnovich was that he went

6   through a -- a second round of testing in which he looked at

7   ten basic manufacturing companies, those are the ones that were

8   in the peer group that nobody was contesting.  And excluded

9   eight -- the creditors committee compensation consultant didn't

10  like.  And then created another list of manufacturing companies

11  that included all of the companies that the creditors committee

12  compensation consultant had used and came up with a potential

13  pool of manufacturing companies.  He testified from six billion

14  to forty-one billion and then created a series of fifteen peer

15  groups, Mr. Bubnovich testified, and went through all the

16  various permutations.  And Mr. Bubnovich's testimony was when

17  he tested that, that all of them -- I shouldn't say all of them

18  -- that the majority of them clustered around being somewhere

19  in the negative two to four percent range when compared to this

20  peer group.  And that was another set of tests.

21       But I do want to point that all of that -- all of

22  that testing that we talk about, all the issues relating to

23  Caterpillar, Eaton, Pearl Meyer, all of that discussion has to

24  do with the testing of -- the various testing that was done in

25  connection with the negotiations that resulted in the

42

1    settlement with the creditors committee as it related to 7.8

2    and the satisfaction of that condition.

3           The -- and so, Your Honor, I don't believe there's

4    any evidence in the record to suggest that the final peer

5    group, that is the peer group on page 33 of the final report,

6    Exhibit 90, is in any way flawed or in any way inappropriate in

7    connection with these cases.  In fact, when you compare it to

8    the peer group that the compensation committee started out with

9    back on Exhibit 8 to Exhibit 265, the 2005 peer group, there is

10   a huge migration from size of company, from industry to putting

11   in a number of companies that are much lower in revenues, much

12   more focused -- representative in the automotive industry by

13   still maintaining the diversity of the -- of the peer group.

14   And when you look back again at the peer group, the final peer

15   group on page -- Exhibit 90, page 33, what you find is, and I

16   understand that there was lots of questions about Pepsi and

17   Coke but there's nothing in the record.  There's not a single

18   bit of evidence in the record.  Not a single expert, not a

19   single bit of rebuttal to suggest that that is inappropriate

20   and that that's an inappropriate way to construct peer groups.

21          When you look at the peer group TDC analysis -- this

22   is Exhibit 95, page 73 and these were charts that were used on

23   cross-examination, some of these charts.  The fact of the

24   matter is that for the DSB taken as a whole -- and Mr. Naylor's

25   testimony was we need to take these things as a whole.  I look

43

1   at the total direct compensation as a whole, not necessarily

2   every individual element.  And what you see, Your Honor, is

3   that the DSB peer group -- the DSB total direct compensation is

4   less than the peer group analysis.

5          When you look at the next page, which is the non-DSB,

6   there was -- there is a less than five percent difference

7   between the -- and that should be and we all stipulated that's

8   non-DSB not DSB at the bottom -- that the three 375, while

9   marginally higher, I guess 8,000 dollars higher than the -- not

10  8,000, excuse me -- yeah, higher than the peer group.  The

11  testimony, again uncontroverted, is -- both by Mr. Naylor and

12  by Mr. Bubnovich, is that that was not material.  And again,

13  nothing in the record to suggest otherwise.  I think it was Mr.

14  Kennedy who tried to suggest, well if it was twenty-five or

15  fifty or 75,000 or some other number that's not in the record

16  what would that mean?  But there's nothing in the record to

17  suggest that the -- that this is an unreasonable analysis.

18         Similarly, when you move on to the last page of that,

19  this is also -- in looking at the emergence payments here, both

20  the LTI opportunity which will be awarded over the next

21  eighteen -- excuse me the LTI opportunity -- the cash

22  opportunity which is going to be dealt with now, how that fits

23  in.  And again, this we'll talk about in a few minutes, that

24  opportunity has been discounted, effectively, sixty-seven

25  percent against the original LTI opportunity that was proposed.

44

1    THE COURT:  Let me make sure I understand on the peer

2    group.  First, for the DSB, am I right that the peer group is

3    not used for those who aren't covered by proxies, is that

4    correct?

5         MR. BUTLER:  Your Honor, it's -- it's -- as I

6    understand it and I think what the evidence suggested is it's

7    not directly used it's interpolated.

8         THE COURT:  Okay.

9         MR. BUTLER:  So it's averaged in for peer group

10   purposes.

11        THE COURT:  And then as far as the peer group and the

12   final report, the only one that was in Chapter 11 was Federal-

13   Mogul?

14        MR. BUTLER:  I have to go back and look, Your Honor.

15   That may be correct.

16        THE COURT:  I think the only one that may arguably

17   have been in some distress at some point was Visteon?

18        MR. BUTLER:  Visteon was in distress.  I have to go

19   through and look at the others.  But again --

20        THE COURT:  Well, why don't we do that?

21        MR. BUTLER:  Okay.  Let's go back and look at --

22        THE COURT:  You can just bring it back up.

23        MR. BUTLER:  The -- I mean I'm -- on a public record

24   I don't know that I would argue about people who are in

25   distress or not but there are some other -- there are certainly

45

1   a couple of other companies that have gone through some

2   restructurings.  But, you're right.  Federal-Mogul is the only

3   one that's in Chapter -- who was in Chapter 11 and Visteon is,

4   I think, viewed as a troubled supplier at the moment.

5           THE COURT:  Now, it -- can you go to the next chart?

6   The one that was up after this one that shows the DSB pie

7   chart?  Okay.  I don't -- I actually think there was one

8   breakdown for Federal-Mogul but it was just for the two senior

9   most executives.  But is there anything in the record to

10  suggest that for Federal-Mogul or Visteon there would be a

11  sixty-one percent of salary long-term incentive opportunity for

12  senior executives?

13          MR. BUTLER:  Your Honor, there are 570 exhibits.  I'm

14  not aware -- I didn't look at it on that basis because at least

15  the debtors' case, which Your Honor may or may not accept, but

16  the debtors' case and I think the testimony both from

17  Mr. Bubnovich and Mr. Naylor is the peer group's not

18  constructed nor, frankly, would the debtors think it's

19  appropriate to construct a peer group based on Chapter 11

20  companies.  This is a peer -- you know this company, and again

21  I think, sometimes, you have to take a step back and focus on

22  the fact that this is a twenty-odd billion dollar plus company,

23  the largest supplier poised to be, certainly, again the largest

24  supplier in the world of technology in automotive parts to the

25  automotive industry worldwide.  And it views the peer group

46

1    it's going to use -- it's not going to set up a peer group of

2    people who are bankrupt.  I mean, there's nothing in the record

3    that suggests that that would be the appropriate way to think

4    of this.

5              THE COURT:  Well, except Mr. Naylor testified that

6    his -- his approach was novel.

7              MR. BUTLER:  No, I don't think he testified that the

8    approach relating to the peer group was novel.

9              THE COURT:  No, but his approach of applying a peer

10   group LTI opportunity to a cash emergence bonus was novel.

11             MR. BUTLER:  No, you're asking about the cash -- I

12   haven't -- I'm not really to the cash emergence yet, Your

13   Honor.

14             THE COURT:  I'm just -- I'm just trying to figure out

15   the relevance of the peer group analysis to this -- that aspect

16   of this proposal.

17             MR. BUTLER:  Your Honor, I don't -- I don't know

18   that -- that the -- I mean, I can go to -- this particular

19   analysis right here, on page 73, and the next one on page 74, I

20   think, go much more to the weight of the evidence with respect

21   to the design of the program, the post-emergence program, the

22   equity program.

23             THE COURT:  Okay.

24             MR. BUTLER:  I'm going to address cash separately.

25             THE COURT:  Okay.

47

1          MR. BUTLER:  I think these go much more to that.  I

2     think what happens on page -- what you might be talking about

3     in terms of page 72 on Exhibit 95, the next page, is this is

4     the -- this is the example of competitive practice against what

5     the Delphi executives are getting in terms of shortfalls.  And

6     this is, obviously, the -- while not referenced in here, this

7     pie chart is referenced against peer groups.  And that -- and I

8     think I hear Your Honor saying gee, is the competitive

9     shortfall one that Your Honor's going to give weight to or not

10    give weight to.  I hear that -- at least I think that was the

11    question you were asking from the peer group measurement as

12    related to the cash emergence.

13          THE COURT:  Right.

14          MR. BUTLER:  The -- the salmon-colored piece of the

15    pie and the white piece of the pie.

16          THE COURT:  For example, when Watson Wyatt was asked

17    to advise the compensation committee about what would be an

18    appropriate emergence bonus for Mr. O'Neal and Mr. Miller, it

19    didn't look at the twenty or so peer companies.  It didn't do

20    comparable LTI analysis.  It simply looked at a handful of

21    Chapter 11 cases and saw what senior executives got in those

22    cases.

23          MR. BUTLER:  Yeah, I think Your Honor, with respect

24    to the uncontroverted testimony relating to Mr. O'Neal and Mr.

25    Miller's -- that report, they did look for those two positions,

48

1    at what happened with those kinds of executives in other

2    Chapter 11 cases.  The reason -- and again, what the testimony

3    has said and what the record indicates and

4    Your Honor -- and we'd ask Your Honor to consider is the whole

5    premise of the program from the time the KECP was put into

6    place back in terms of our proposal, back in 2005, was the

7    company believed that it needed to provide for its executives,

8    worldwide, the same kinds of opportunities that they could get

9    from competitors, all right.  And they certainly didn't say to

10   their executives, we want you to evaluate yourself by everybody

11   who's in bankruptcy.  They certainly didn't say, you know,

12   that's -- those are the guidelines.  And in fact, to the 113

13   executives not involved in a Chapter 11 process but who, from a

14   perspective of, you know, how you manage a global enterprise,

15   all had to be managed the same way because you can't really,

16   and I recognize the testimony said you could be sure every last

17   country didn't do something.  And we're not suggesting -- I

18   can't give you this confidence, Your Honor, that every last

19   country -- that there was no adjustment anywhere but the

20   evidence is uncontroverted that with respect to LTI

21   opportunities and similar opportunities, all executives

22   everywhere were treated the same.

23          And the fact is that what the company believed, you

24   know, this large industrial company, globally based and

25   globally competitive in terms of what it needed to do for

49

 1    talent and resources.  What it decided it needed to do was to

 2    try to provide opportunities that were similar to companies

 3    outside of Chapter 11 out of a fear of losing their talent and

 4    this wasn't on retention.  I'm not going to make a big

 5    retention argument here although, I think, inherently all

 6    compensation is in some respect -- has a retentive element to

 7    it.  But this wasn't intended as a retention program and it

 8    wasn't presented that way.  Although I recognize, at one point,

 9    Mr. Bubnovich in the early reports compared -- in looking for

10    market comps, benchmarked it against some of the retention

11    programs that had been put in place by the companies because

12    it's the only data, he testified, he could find.

13            But in any event, I think the -- the -- and we'll

14    talk about the cash opportunities in a few minutes.  But I

15    recognize your question here, Your Honor.  And I think that --

16    and I acknowledge that as it relates to the cash emergence

17    bonus or payment, the payment opportunity for cash emergence,

18    at that particular opportunity we need to make the case to you,

19    and I think we did on the record but I'll try and do it in

20    argument in a few minutes, about why that, from an LTI

21    perspective, made sense.

22            THE COURT:  Okay.

23            MR. BUTLER:  And I just wanted to cover off the peer

24    group point and if I may, Your Honor, I wanted to briefly make

25    sure that we're clear on the record about SERP, if I may.  And

50

1    that is, I wanted to point to Exhibit 2, again back to Exhibit

2    8.1(a) and page 2 of that exhibit.  And just so the record is

3    perfectly clear here, we did terminate all agreements for SERP

4    benefits and that's the third paragraph of Exhibit 1(a).  And

5    one of the things that was required by the plan investors,

6    among others.  And so, when you look at the comp exhibit that

7    was used on Friday, Exhibit 302 at page 7, and there was much

8    made about the -- how the SERP program somehow didn't line up

9    with the retiree program here.  The point was made that four or

10   five, and I don't know how you'd get to five, but five had

11   cancelled their programs.  In fact, Delphi cancelled its

12   program too.

13          Now the reality is, and the disclosure statement

14   talks about this, the reality is that those parties will -- are

15   all class C creditors, class 1C creditors.  And they will

16   receive the same treatment as everybody else does in class 1C,

17   as their claims are processed.  And they will get the plan

18   currency that everyone else gets.  And that's how all of the

19   retiree benefits under the SERP are going to be dealt with.

20          In terms of the go forward benefits, the active

21   benefits, again on this comp you have, that was used here, you

22   have four or five companies that continued these and some

23   companies that did not.  However, there is not a single company

24   up there, that I'm aware of, that did not continue it, who

25   provided a dividend to creditors that even approximated par

51

1    plus accrued of plan value.  Most of those dividends were

2    either -- were pennies on the dollar, certainly less than a

3    quarter, and -- and nothing like the consideration here.  And

4    they also, you know, when you look at the automotive industry

5    and I recognize that three of them -- that Federal-Mogul did

6    continue it, Collins & Aikman and Hayes did not, they replaced

7    it actually.  The -- this you can see in terms of the DC SERP,

8    so they did have a SERP benefit going forward.  And what we're

9    doing here is freezing the SERP benefit and providing a new

10   benefit going forward.

11        And I think it is important, again, to look at the

12   final SERP report, Exhibit 90, pages 21 to 22, again something

13   we didn't look a lot at -- a draft of one of these earlier

14   pages earlier on.  But this explains exactly what we're doing

15   and page 22 of the report has the benchmark -- what was

16   proposed against what was benchmarked as being competitive.

17   And it would certainly seem to line up appropriately there.

18        A lot was made of the 5,000 dollar cap.  I think Your

19   Honor's aware and can take judicial notice of the fact that

20   5,000 dollar cap was put in in the first day motion here to

21   create a temporary authority for the payment during Chapter 11

22   of the SERP payments.  It was not a perspective cap.  It was

23   not a permanent cap.  It was part of the first day orders and

24   it was used only during the Chapter 11 case.  It was never

25   intended to be permanent.  Instead, it was -- it intended to

52

1    deal with while the company was in Chapter 11.

2           Let me now address emergence equity and then I'll go

3    to the cash awards in particular.  With respect to emergence

4    equity, one item that I want to make clear on the record, I

5    think it's clear, but I just want to make sure we say it

6    because I -- I actually recognize the objectors concerns that

7    it could be -- the record could be confused on this point and

8    that is to talk about, in terms of the emergence equity awards,

9    at what price they're struck.

10          And the answer to that question and the answer has

11   always been that they would be struck at plan value.  And by

12   plan value, if you turn to Exhibit 95, page 60, the plan value

13   that we're dealing with right now is, sort of, the implied plan

14   value.  The price hasn't changed.  It's $59.61.  And they'll be

15   struck at the same price as all the other equity is that's

16   being distributed in connection with the plan.  The common

17   equity that's being distributed at the plan, albeit as we

18   indicated in Mr. Resnick's declaration and provided, again, in

19   that portion of the hearing that was also uncontroverted.

20   Because of the additional liquidity the company has the implied

21   plan value here is no longer, really, in the thirteen billion

22   range it's more around 12.8, closer to the midpoint of

23   Mr. Resnick's valuation of twelve billion, 813 million.  But

24   the number is 59.61.  And so when you look at that on Plan

25   Exhibit 95, page 60 and page 61, again, just to make the point,

53

1   this was the description in the original -- this is page 61 of

2   that exhibit and this was in the original and testified to by

3   Mr. Resnick in his declaration, Exhibit 85, this was the

4   original disclosure (xvi) of the disclosure statement regarding

5   the low mid-point plan value and high-end.  And then that was

6   modified on page 62 of the -- of Exhibit 95 and again in

7   Mr. Resnick's uncontroverted declaration, Exhibit 85.

8            And as a result of there being additional cash and

9   therefore less pro forma debt to be borrowed, the result of

10  that, obviously and the shares are being held constant.  That

11  basically means that 5961 stays constant but it moves down in

12  terms of implied plan value, in terms of the arithmetic and so

13  that the value which management and creditors are taking this

14  currency is at 12.8 billion.  So I just wanted to make sure

15  that was clearly on the record.

16           The second point I wanted to make about emergence to

17  the equity is to talk about the percentage comps.  If you go to

18  Exhibit 265, I think it's Exhibit 3 to that document at pages

19  24 and 25, there was a report here that that I think made it

20  clear and I think it's uncontroverted that, you know, when you

21  look at the amount set aside for -- for management that it's

22  all about the percentages, not the absolute value.  And that

23  is, if you look at the percentages on this plan, in Section 7.8

24  it's eight percent.  You can see the equity dilution in the S&P

25  500 is -- the median is 13.11 percent.  In the top 200

54

1    companies its sixteen percent.

2         And if you turn to page 25, all this is, sort of,

3    uncontroverted.  In fact the eight percent is at the low end of

4    the range.  And there's nothing, as I said, in the record to

5    the contrary on that.  And the record's also clear that only

6    three percent of that is being used now.  And the other five

7    percent, to the extent it's used, is determined by the

8    emergence board of directors, the new board being elected by

9    the creditors.

10        Why have eight percent in here?  Why have any

11   percentage?  Why do all the plans of reorganization typically

12   have these set asides in the plans?  The answer is pretty

13   simple.  If you don't have the set aside then you have to hold

14   shareholders -- special shareholders meetings when you get out

15   and go through this.  So people, instead, do this as part of

16   the voting process in connection with emergence.  And -- so I

17   just wanted to point that out.

18        The third point I'd like to make about emergence

19   equity, in addition -- is, and this is at Exhibit 3, it's

20   described in the disclosure statement at pages 98 and 99, I

21   just wanted to talk about -- focus us on how these awards are

22   structured and how their determinations are made.  This was

23   part of the negotiations with the plan investors, it got their

24   concurrence.  And the important element here, I think, is to

25   point out that half of these are incentive based, half of these

55

1    are time vested.  But the determinations of what those

2    performance measures will be is going to be made by the new

3    board of directors, the post-emergence board of directors not

4    by the current compensation committee.

5              So, how these awards are structured exactly, what the

6    delivery mechanism is for various of the bands and how the --

7    what the performance measures are for the performance

8    restricted awards will be determined by the creditor selected

9    board of directors.

10             And the last point I wanted to make about emergence

11   equity is, again if you look back at 7.8 and the modification

12   that we put in place, we now have a modification that provide

13   an LTIP opportunity at emergence of fifty-eight million on an

14   annualized basis or eighty-seven million in the aggregate.  And

15   that is a number that was -- that has been approved by the plan

16   investors and that the creditors committee has indicated

17   satisfies the requirements of Section 7.8 of the plan.

18             Turning now, Your Honor, to cash emergence.  First

19   I'd like to -- what we've got up on the screens is Exhibit 265.

20   And there was quite a bit of testimony back and forth about

21   this and the reality is that the company did use LTI

22   opportunities.  And the testimony, I think, was less than

23   crystal clear on this issue because the cost number kept moving

24   around in terms of what the cost was, as in Mr. Bubnovich's

25   declaration he dealt with this.  But the testimony, I think,

56

1    the focus was that this -- the delivery vehicles was a third

2    cash to the PAP program I talked about, two thirds of which had

3    been forfeited by the executives.  Forty percent in options

4    until 2005 when it was replaced with the twenty-one million

5    dollar cash retention program.  Fourteen million dollars of

6    which was forfeited by the executives when the company entered

7    Chapter 11.  And thirty percent RSUs.

8          And I believe Mr. Bubnovich's testimony is that this

9    costing here is his estimate of what the costs of those

10   programs would be not, I think, what the targets are.  In fact,

11   there is no evidence in the record, I think, to contradict the

12   view that the targets here, you know -- I don't believe the

13   targets change.  The costing changed depending upon what the

14   price of the stock was.  I think we actually look at the stock

15   value in those particular years; look at the pricing of it, the

16   cost may have varied.  But whether that's clear or not in the

17   record, I think the facts are.  Whether it's ultimately clear

18   in the record that the actual target between 2003 and 2005 for

19   executives never changed from that approximately 110 million

20   dollar range that Mr. Bubnovich testified to.  The cost of it

21   changed depending upon the delivery vehicles and the pricing of

22   the stock at the time.

23         But the fact is, you know, when we walk through this

24   program I want the Court to -- and we'll end on this point, as

25   Your Honor evaluates this the reality is that at the end of the

57

1    day you asked -- you asked and I think Mr. Bubnovich testified

2    to the fact and I think the other declarations and the program

3    makes clear that the performance element of this particular

4    aspect of the program was defined in two ways.  One there was a

5    twenty percent initial discount taken and then second, this

6    program had a performance -- a time variable performance.  That

7    is to say, the amount of the award, which was a discounted

8    amount to the original LTI opportunities, was fixed for the

9    duration of the case.  And therefore -- and I think the purpose

10   of ultimately of page 16 in the original presentation of what's

11   before the Court on Exhibit 3 to Exhibit 265 is the fact that

12   if the company was able to get out in fifteen months, these

13   awards would have more value in real terms to the executives

14   then if it took eighteen months because the value to them would

15   go down.  The aggregate costs wouldn't change but the value

16   would go down over time.

17          And ultimately, the value ultimately, you know, was

18   estimated at the time of -- if you remember -- if Your Honor

19   remembers when we sat before you or stood before you at the

20   opening of the case, the company estimated it would take

21   eighteen months for the company to get out of Chapter 11.  And

22   therefore the company's view at the time was that these

23   opportunities have been discounted by essentially fifty

24   percent.

25          The testimony in the record was that it was based on

58

1    110 million dollars worth of opportunities on an annualized

2    basis.  They would have gotten 58.6 million dollars and it was

3    about a fifty percent discount.  In reality, because the

4    Chapter 11 has taken twenty-seven or twenty-eight months and

5    they have not been given any additional adjustment for these

6    awards, the effective discount is actually sixty-seven percent.

7           And while I know Your Honor expressed various -- had

8    questions and probed into this issue, I would simply, from the

9    debtors' perspective, take the view, I would ask Your Honor to

10   consider that once you discount the program by two thirds, in

11   terms of the effective discount here.  To the extent that

12   Your Honor had any particular concerns; I would hope that that

13   would satisfy them.  Because what's effectively being delivered

14   to executives here, is a third of what they otherwise would

15   have been entitled to.

16          THE COURT:  But when you say that they would have

17   been entitled to, they never got 110 million dollars in cash?

18          MR. BUTLER:  That's correct.  So Your Honor, the

19   question is how many different ways do you want to discount.

20   I'm saying, once you take two third of it away, effectively,

21   you discount it by sixty-seven percent.  If you want to

22   discount it for -- you know, a third of it was cash.  A third

23   of it was RSUs, a third of it was -- and in fact, in 2005 --

24   I'll just make the point, we were criticized in cross-

25   examination that the company didn't pick 2005.  As the

59

1    testimony indicates, as the record indicates, had we chosen

2    2005, right, sixty percent -- seventy percent -- seventy

3    percent of the program would have been cash driven because

4    that's what the 2005 program was.  The testimony, again, is

5    uncontroverted that the -- that the stock options were replaced

6    by retention cash in 2005.  And a lot was said about how we

7    were criticized in picking 2004 instead of 2005.  Had we picked

8    the delivery vehicles in 2005, seventy percent would have been

9    cash, thirty percent would have been RSUs.  That is -- you

10   know, it struck at whatever the value was at that point in

11   time, in late 2005 when we were getting ready to file.

12           And the -- my only point is, from those delivery

13   vehicles the fact is that the effective value of -- to the

14   executives of those awards had been discounted by two thirds.

15   I mean, it's just math.  That's what they have gotten here.

16   And it's also, I think, uncontroverted here that the -- and

17   we'll talk about -- we'll look at some comps in just a few

18   minutes and some other opportunities here.  But the reality is,

19   and I'll do this when I talk -- there's a chart that comes up

20   later on, in which, you know, for example the LTI opportunities

21   in Northwest -- I mean, you know, it goes across the board.

22   But in Northwest the LTI opportunities were continued during

23   the entire Chapter 11 case as ordinary course.  They never had

24   this issue.  They never had this fight.  They were just

25   continued.

60

```
 1              THE COURT:  And what were they?

 2              MR. BUTLER:  I don't know what all the LTI -- Your

 3    Honor, I presume they had a competitive LTI program.  That's

 4    what companies tend to do.

 5              THE COURT:  I doubt they were cash.

 6              MR. BUTLER:  You know, well they would be whatever

 7    opportunities they delivered -- however they calculated the

 8    currency in Chapter 11, Your Honor.

 9              THE COURT:  I repeat, I doubt they were cash given,

10    and I read this again today, Judge Garber's remark on what the

11    executives kept and didn't keep in Chapter 11.

12              MR. BUTLER:  I'm only reporting them.  Your Honor,

13    with respect to -- again the report finding.  If we go to

14    Exhibit 90, page 31, again the final report, as I said the

15    final report provides thirty-four million dollars on an

16    annualized basis.  And the -- and by the way it's not really

17    accurate anymore that it excludes the COB because it's not --

18    it really doesn't at this point.  As everything's shook out the

19    total amount was eighty-seven million dollars including the

20    COB's award.  But it's a -- it's still a sixty-seven percent

21    discount.

22              Now let me address Mr. O'Neal and Mr. Miller.

23    Mr. O'Neal, if we go to Exhibit 91, this was the emergence cash

24    program from Watson Wyatt, a report that was not controverted

25    by the objectors.  And if you go to -- and this is Bates
```

61

1    stamped.  If you go to Bates stamp 4562, here are the examples

2    of what they looked at in terms of what senior people got.

3    The -- most of them much, much smaller companies than Delphi.

4    But you saw -- they called out the -- a retention bonus of 1.5

5    million for Mr. Clausen and then three and a half million

6    dollars in total enterprise value payments.  In Collins &

7    Aikman, a range of 1.7 million dollars; in Cow Pine, a 15.7

8    million dollar payment.  In Enron, Mr. Cooper got twelve and a

9    half million on top of the additional payments.  In Interstate

10   Bakeries, much smaller than this company, a range of four and a

11   half to twelve and a half.  Dana -- Mr. Burns had the

12   opportunity to receive three to four and a half a year, going

13   forward.  And Mr. Steinman (ph.) -- this is just the point.

14   It's really unknown because the programs were continued.  You

15   can see the notes there.  It's just not clear from the record

16   as to what payments were actually received.

17         And then there is a Mr. Grinstein at Delta who took

18   nothing in terms of incentive opportunities.  And we're going

19   to hear from the unions because they designated aspects of that

20   record.  We'll hear from them about their view that Delta was

21   the right way to go.

22         And if you look at the next pages, you have a

23   recommendation here and described, and I won't go into detail,

24   that said the fifty to the seventy-fifth percentile that these

25   would be the ranges that Watson Wyatt found would be

62

1    appropriate.  And if you look at the conclusions on page -- at

2    Bates page 4564, the various factors that they -- they reached.

3              Now, the view there was that five to ten million

4    dollars would be within the range of competitive practice and

5    an even higher price would take place if you took into play

6    foregone salary.  The -- if you look at the supplemented plans,

7    7.8, for Mr. O'Neal -- just focus on Mr. O'Neal for a minute.

8    Mr. Naylor testified about notwithstanding the 500,000 or so

9    waiver of comp that Mr. O'Neal gave up in the Chapter 11 cases,

10   that they evaluated the 5.3 that was in the exhibit agreement.

11   They had talked -- he testified they had spoken to the --

12   conveyed that recommendation to the plan investors based on all

13   these factors, that that was what was settled on in the plan

14   investors agreement, ultimately, and that they approved that

15   agreement.  So that payment to Mr. O'Neal had the additional

16   benefit of the third party negotiation with -- with the plan

17   investors.  And it also had the benefit of the compliance in

18   Section 7.8 of the review of the creditors committee which had

19   the opportunity to argue if they had a problem with the cash

20   emergence payments in the aggregate.  And the committee, as is

21   clear from the record, reached the agreement that the terms of

22   that section were satisfied based on the adjustments made to

23   the program.

24             Turning to Mr. Miller's compensation, Mr. Miller's

25   compensation was a little bit different, Exhibit 67 at page 16,

63

1    footnote 2, Your Honor's aware of this.  In January of 2006,

2    Mr. Miller gave up any compensation during the course of the

3    case, took a buck for the rest of the case and in anticipation

4    of a final payment by the board at the end of the case that was

5    not related to any specific program but an overall judgment

6    about what would be a fair and reasonable payment to him.

7              The uncontroverted testimony -- we hear a lot about

8    his original sign-on bonus or payments.  And the uncontroverted

9    testimony here is that that payment was made to induce Mr.

10   Miller to come to Delphi and replace other streams of lost

11   income.

12             It's also Mr. Naylor's testimony that the supplement,

13   I'll have you look again at the supplement to plan Exhibit 7,

14   8, which we've been looking at off and on, that the amount of

15   compensation, it was not LTI related at all but rather an

16   examination of these various factors.  And that they

17   considered, among other things, what had been waived and, you

18   know, money's fungible, Your Honor, in terms of how you look at

19   it.

20             The testimony, I think, is the waiver of Mr. Miller's

21   was approximated somewhere in the 6.7 million dollar range.

22   And if that's the math, then ultimately the addition between

23   that and 8.3 is 1.6 million.  And you can use any, sort of,

24   variation of that theme but the fact of the matter is that, you

25   know, he's certainly not getting -- you know, if you said he

64

1    should -- you know, if the appropriate thing to do would be to

2    get back what he gave up and get a meaningful emergence bonus

3    in this, sort of, 5.3 range or some number that had been set

4    aside originally.  Those numbers would have been much closer to

5    twelve than the 8.3.  So there's not -- I don't think it's

6    accurate to suggest here that Mr. Miller is getting more than

7    what had been contemplated, potentially, possibly at the

8    beginning of the case.

9        I think it -- what has happened here is during the

10   case he waived his compensation with no guarantee that he would

11   get any of it back.  And ultimately he got a payment that, if

12   you look at the Watson Wyatt report at page 91 -- the same one

13   we were looking at before, at the end of the day that report

14   on -- if you look at 4563, that Bates stamp, he's getting

15   something that is squarely in the middle of those ranges and

16   the recommendations that Watson Wyatt made on 4564.

17        So, Your Honor, I think from the standpoint of

18   looking at those, there was a very careful assessment made.

19   There were a variety of factors testified to by both -- by both

20   Mr. Naylor and Mr. Bubnovich.  And there was -- and in

21   Mr. Miller's declaration that went unchallenged, he wasn't

22   crossed on any of that stuff.  And ultimately, there is a

23   report, uncontroverted, about what competitive practices might

24   be inside a Chapter 11 case.

25        THE COURT:  Again though, is there any -- anything in

65

1    the record indicating that in any other Chapter 11 case there's

2    been anything comparable to seventy-three and a half million

3    dollars paid to executives on emergence bonuses, leaving aside

4    the top -- the top two individuals.

5              MR. BUTLER:  Your Honor, there's nothing on the

6    record on those numbers, no.

7              THE COURT:  Okay.

8              MR. BUTLER:  I mean, there's also -- I mean, just to

9    say it there are also -- the question is, you know, how many

10   records are there of twenty-six billion dollar companies in

11   Chapter 11 that are actually operating and that actually

12   operating and that actually continue to generate those revenues

13   and are going to reorganize.  And are going to, you know -- and

14   believe -- and have set for the case of what the competitive

15   needs were.  I mean, you know --

16             THE COURT:  Suffice it to say, there was no study

17   done of any -- any operating companies in Chapter 11 and what

18   emergence bonuses were paid?

19             MR. BUTLER:  The only -- the only study that was done

20   that I think touches any portion of that were the -- and you

21   heard Mr. Bubnovich talk about them a bit was the retention

22   payments, the retention programs that other companies had.

23   Those payments were often paid at the end of the case or partly

24   paid at the end of the case or during the case, quite apart

25   from incentive comp, the retention bonuses.  And there have

66

1    been retention bonuses paid in lots of cases.  And there is --

2    there is, in the October 8th report, there are charts that

3    indicate what those are and how this would line up in

4    connection with those.  Those, sort of, Chapter 11 cases that

5    he -- that he cited at those times but I think he testified

6    those were not nearly a perfect fit for these cases.

7         Your Honor I'd like to, if I can, move on to --

8         THE COURT:  And what was the percentage of those?

9         MR. BUTLER:  I need to move back and look at the --

10   the -- they were all in the small percentages, Your Honor.  I

11   think we actually -- that's Exhibit -- let me just think of

12   the -- I think that -- I'm trying to remember, was it Exhibit

13   265?  Let me just go and see if that's the right exhibit.

14   Let's move further back in there.  It should be in the -- like

15   sixteen, seventeen, somewhere in there.

16        There were two -- there were two charts in the

17   original report --

18        THE COURT:  No, it's the one --

19        MR. BUTLER:  Next two pages.  It's 17 and 18.  And 17

20   and 18, again, this is based -- this assessment is based on the

21   eighty-seven million dollar aggregate and on the -- and on the

22   -- and you see the fifteen peer groups, and based -- and these

23   are based -- they compare to these retention programs.  So --

24   and if you look at the examples on what Mr. Bubnovich testified

25   to was, that the annual cost of this program was between

1   seventy-five and eighty-one percent if you looked at the annual

2   cost and the aggregate cost and this company ranked in the

3   seventy-ninth percentile of revenues and the sixty-seventh

4   percentile of assets.  And so he believed it fell within the

5   range.  That was his testimony looking at those particular

6   debtors.  And the fact is that the annualized numbers there

7   would have to be adjusted downward, Your Honor, because it

8   took -- those are based -- I believe his testimony was on

9   eighteen months in Chapter 11 and in fact there were twenty-

10  seven months.  And so, ultimately, there would be a reduction.

11  You would probably have to reduce each of those percentages by

12  a third or so in terms of the annualized percentages to get to

13  the accurate numbers.  And that looked at the -- at that peer

14  group that they put in place.  And then on page 18 they looked

15  at -- they looked at retention plans that they had in their

16  database of 117 companies not -- no matter what the size is,

17  and interesting statistics here is, while in terms of revenues

18  and assets this company, as I would expect, is in the ninety-

19  sixth plus percentile because it's one of the largest cases

20  ever filed, that the annual cost actually, of this case, is

21  relatively less.  And the reason for that, I believe, in this

22  case has to do with the fact that the relative -- when you

23  compare it to other companies, smaller companies tend to use

24  larger amounts of their asset size and revenue size to pay to

25  executives.  I know, I have myself been involved in companies

68

1    where there's been a much larger percentage paid to executives

2    of the relative value.  Remember even if the -- even in one of

3    the earlier charts that we talked about this in evidence, Your

4    Honor, when the AIP program -- when there was an additional

5    billion dollars worth of value created, there was a couple of

6    percentage points, I think two to four percent, that was paid

7    to executives.  And so the relative size as opposed to the

8    absolute amounts, the relative sizes here fall within the

9    ranges in these charts -- on both of these charts.

10            It's hard to argue with Your Honor that the absolute

11   size of this is not larger than other companies when this case

12   is the largest industrial case ever filed.  I mean, I don't

13   know how to -- I -- that's another one of the, sort of,

14   inconvenient truths in the case.  I can't defend against or

15   advocate against, you know, or explain away the fact that we're

16   largest company and therefore the absolute amount is larger

17   than other companies or smaller.  There's just no way --

18            MR. BUTLER:  There's just no way -- there's no way to

19   be able --

20            THE COURT:  I just haven't seen anything like this

21   before.  I haven't seen it in cases I presided over which were

22   large companies.  I haven't seen it in cases down the hall.  It

23   just seems anomalous to me.

24            MR. BUTLER:  Well, Your Honor, this case -- I think

25   in some of the other cases you presided over you had retention

69

1    programs that I presume you've approved prior to the -- at

2    least the Congress vote, maybe you haven't, I don't know.

3    There are certainly -- the data would suggest that 120 of them

4    got approved by somebody, so -- in the database.  And in the

5    prior chart on page 17, you see the larger comparable companies

6    where there were, in the larger Chapter 11 cases, these were

7    filed.

8           And, you know -- but, I mean, the data's not perfect.

9    And I think, ultimately, you know, the question I think that's

10   before Your Honor is even if Your Honor views this as unique,

11   even if, you know, you have Mr. Naylor testifying his approach

12   to this he thought was, in his view, not even bankruptcy for a

13   novel approach.

14          The question is does it violate Section 1129 of the

15   Bankruptcy Code when it has been developed over two and a half

16   years by the company, negotiated with its plan investors,

17   negotiated with its statuary committees, put out to vote, and

18   eighty-one percent of the people vote in favor of the plan

19   which includes these provisions?

20          You know, is there to be a blue pencil on any one

21   element of a plan of reorganization is, I gather, the question

22   that Your Honor needs to deal with.  I recognize that.  I mean,

23   I can't answer that.  But I go back to the fact, and I'll say

24   it one more time and then move on, which is that the premise in

25   this case from the beginning was that the total direct

70

1    compensation, the TDC, for executives in this case, needed to

2    be maintained near or at market.  And without paying any LTI or

3    LTI equivalent in connection with the case, the fact is you're

4    paying people a third, or half of that.  And that violated one

5    of the basic premises of the company operating, which is why

6    the company went on record at the beginning of the case, not at

7    the end, but at the beginning of the case, saying they thought

8    this was an appropriate way of doing this.  The company could

9    have seeing as it was one of the old Act -- or rather, the old

10   Code, the company could have come in with their retention

11   program on top of other programs, could have done other things.

12   It chose not to.  It chose instead to tell its executives and

13   tell the company that it would -- and its stakeholders -- that

14   it would rely on trying to develop a competitive program.

15        THE COURT:  But -- I mean, it's a given, but I should

16   say it, that program was never up for approval.  It was never

17   before me for approval.

18        MR. BUTLER:  Correct.  It kept getting deferred, and

19   ultimately -- and I thought the Court was in favor of this --

20        THE COURT:  Absolutely.

21        THE COURT:  Ultimately, the Court, I thought, was in

22   favor of having this considered in the context of a plan of

23   reorganization, included in a plan of reorganization, so Your

24   Honor could evaluate the votes on the plan and evaluate the

25   recoveries to stakeholders and all of the other factors that

71

1    Your Honor believed were relevant to the Court's consideration

2    of this program.

3            That's exactly what the debtors did.  And I don't --

4    I mean, while I think if executives were sitting up here, some

5    of them would argue reliance to you.  I'm not making that

6    argument here.  I think people are sophisticated.  I think that

7    they understand that it had not been approved.  I think that it

8    will -- I think it will negatively affect the company if this

9    plan is not confirmed, you know.

10           And I think the company did exactly what people

11   expected it to do in this Chapter 11 case, and I think what the

12   Court expected it to do.  It incorporated the work that had

13   gone on for two and a half years into its plan of

14   reorganization.  It put sixty odd pages of disclosure about it.

15   It sent it out for a vote.  It got the vote it needed, and it

16   is here -- you know, it's here dealing with objections raised,

17   understandably, by two unions, who are, I think

18   constitutionally opposed to executive compensation, frankly,

19   who, you know, didn't -- neither of which voted to reject the

20   plan.  And that's where we find ourselves.

21           But I would obviously urge Your Honor, you know, if

22   this is, you know -- the plan should not be blue lined when we

23   went through, I think, the appropriate process and steps and

24   obtained the votes we needed.  And I think we can demonstrate

25   compliance with 1129.

72

1        THE COURT:  Is there anything in the record as to how

2   in the literature on executive compensation one goes about

3   valuing long term incentive plans that includes restricted

4   stock and stock options?

5        MR. BUTLER:  I don't know that there is any

6   literature in the record.

7        THE COURT:  I mean, I did not get any sense from Mr.

8   Bubnovich's testimony that he applied any accepted methodology

9   for valuing these things.

10        MR. BUTLER:  No, I think -- I think --

11        THE COURT:  He couldn't really tell me how he valued

12   them.  And he changed what he told me, I think, twice when I

13   was questioning him and eventually gave me the answer I think

14   he thought I wanted.  But it seems to me there is a

15   fundamental -- and this is why you don't do this in Chapter 11

16   until the end, there's a fundamental difference between stock

17   and stock options and performance based cash, on the one hand,

18   and cash, whether there's a time discount or not, on the other.

19        MR. BUTLER:  Well, Your Honor, I think ultimately, I

20   mean, I think the company believed when it developed this

21   program that there -- as I said, and I think the record

22   indicates -- there were a number of inherent performance based

23   aspects to these cash awards.  One, they're payable at the end

24   in the context of a successful Chapter 11 case.  And we all

25   know, and at some point I'll touch briefly on, you know, what

73

1    the company had to jump through to actually make this happen.

2    I've explained some of it already.  And the company believed

3    quite strongly that the time element here was highly a

4    performance motivator, that trying to do this as quickly as

5    possible was important to all parties in this case to maintain

6    value.  I don't think there's any question about the value

7    that's been created in this Chapter 11 case.

8             THE COURT:  I understand that.  Usually, though,

9    that's reflected primarily in the exit stock that you get.

10   And, of course, you have the time incentive there, because the

11   faster you get to an exit that has value attached to it, the

12   more that stock is worth on a present value basis.

13            MR. BUTLER:  Your Honor, this stock, just to say it,

14   the stock being awarded here at emergence is not backward

15   looking.  It is forward looking, and it's intended to

16   compensate professionals for the next eighteen months.

17            THE COURT:  I understand --

18            MR. BUTLER:  Not for anything that occurred in the

19   Chapter 11 case.

20            THE COURT:  I understand that.  But I'm just focusing

21   on traditional incentives in a Chapter 11 case and trying to

22   explore whether in fact there's a basis for any sort of long

23   term incentive for the period of the Chapter 11 case.

24            MR. BUTLER:  Well, Your Honor, if you conclude that

25   you're not --

74

1      THE COURT:  Beyond just coming out and preserving

2  your job and actually getting a cash award -- I mean, a stock

3  award.

4      MR. BUTLER:  Well, Your Honor, if you believe -- if

5  you actually believe that, then you would have to believe that

6  what Congress intended would be that there would be a class of

7  employees who in Chapter 11, during the Chapter 11 case, would

8  by congressional intent, be paid half of what they're otherwise

9  entitled to.

10      THE COURT:  Well, but again --

11      MR. BUTLER:  And that's -- I mean, I don't think that

12  can be the --

13      THE COURT:  Generally speaking, and this is reflected

14  by the change in 2005, the stock options are out of the money.

15  And, generally speaking -- in fact I think this is almost a

16  given -- you wouldn't issue new reorganized stock or dilute

17  existing shareholders during a Chapter 11 case.  So the idea of

18  stock based performance -- I'm sorry, stock based long term

19  incentive compensation just doesn't work in a Chapter 11 until

20  the end, which is why leaving aside the emergence bonus aspect

21  of it, I fully understood the committee's desire to have this

22  at the end, because that's when you actually have the capital

23  structure and you can figure out what the proper stock to award

24  is.  But, given that, I guess I would question your statement.

25  I don't see where Congress anticipated people locking in value

75

1   based on an analogy to a target that doesn't work anymore in

2   Chapter 11.

3           MR. BUTLER:  Well, Your Honor --

4           THE COURT:  I can understand if the company is at a

5   competitive disadvantage and losing people.  Although it's not

6   applicable to this case, Congress basically made that, through

7   very restrictive drafting, almost impossible to fix.  But the

8   idea of matching that type of long term performance I think

9   raises some serious issues for a Chapter 11 case, because you

10  don't have the type of aligned incentive, which is to maintain

11  value or increase value, which you have through stock on

12  emergence.  You have an incentive just to get the case over

13  with.  I mean, I --

14          MR. BUTLER:  Your Honor, that would suggest people

15  are going to breach their fiduciary duties.  And I just -- I

16  don't think the Court can infer that.

17          THE COURT:  Well, but it's an -- it just doesn't seem

18  to be related to an appropriate measure for compensation in a

19  Chapter 11 case.  I just -- I understand that it may be

20  appropriate and has been done frequently in the past, to reward

21  people, and not just the senior people -- in fact sometimes the

22  senior people get rewarded more than they deserve and the

23  junior people don't get what they deserve -- but to reward

24  people for taking on extra work and achieving a result that's,

25  you know, perceived at the end of the case to have been

76

1   exceptional.

2          And I don't think you need to go through the record

3   here orally.  I think the record is clear that this company

4   took on exceptional problems, and as a company led by its

5   executives in the Chapter 11 case, handled those problems in an

6   exemplary way.  But the question I have is whether one would

7   apply traditional means of rewarding executives for that

8   exemplary performance, as opposed to a novel mean, which is to

9   try to analogize their compensation structure in a Chapter 11

10  to what it would be outside of 11, particularly when the

11  company's in a distressed environment.  And, again, I've just

12  never seen that before.  And I think Mr. Bubnovich was candid.

13  He said this was novel.

14          MR. BUTLER:  Novel in lieu of, for example, retention

15  programs.

16          THE COURT:  Well, yes, that's right, novel in lieu of

17  retention.

18          MR. BUTLER:  And that's the point.  I mean, I think

19  that's the point.  It's not that companies have not

20  traditionally put in place programs that were designed to

21  deliver, vehicles that were feasible in a Chapter 11 case,

22  during the Chapter 11 case.  And this is a pre-October 17, 2005

23  case, as Your Honor pointed out.  We were perfectly entitled to

24  go forward with those programs.  There are -- the data right on

25  the board -- 120 companies that had done it.  And if you look

77

1    at how this program aligns with those, it aligns pretty well

2    with those programs.  But it's not a retention program.

3           And what the company tried to do, because the focus

4    here from the compensation committee was to have a KECP as

5    opposed to a KERP and trying to have a program that had

6    incentives in it.  And the company did believe, and the comp

7    committee believed, and this is what the record says, is that

8    the company did believe that there was an incentive,

9    particularly in this kind of Chapter 11 case, to move the case

10   forward as quickly as possible while still jumping through all

11   the hurdles Your Honor's recognized the company jumped through.

12          And so I guess the real question is, when looking at,

13   again, the Exhibit 95 for a second, if we go back and look at

14   the -- I want to look at the pies at the end, if I can, which

15   are -- I'm trying to find the exhibit number -- pages 73, 74,

16   72 -- it's really 72.

17          The real question, I gather, is that in terms of

18   should a Chapter 11 debtor seek in a Chapter 11 case, when

19   addressing executive compensation for its management team, you

20   know, is it supposed to ignore the salmon part of the pie, the

21   one third of the pie, or whatever it is, and not address that

22   and say gee, you're just out of luck, and, you know, that's the

23   way the cookie crumbles?

24          I think if the company had put out a release to its

25   employees, to its executives, saying for the next, you know,

78

1    number of years while we're struggling through all these

2    issues, we're going to, you know, by fiat, pay you only sixty

3    percent of what your TDC is, your total compensation is, and

4    that's it, you're not going to get anything else, I think the

5    company would have had an unmitigated disaster on its hands.

6    And I don't think any major company ever does that.

7         And so what the company tried to do, without coming

8    to the Court and putting in place a retention program, which

9    120 other companies plus had done, and others in the peer group

10   had done, the bankruptcy peer group that Mr. Bubnovich

11   described in his October 8th report, what the company tried to

12   do was fashion a program that would be linked to but discounted

13   from the prior LTI opportunities.  And the company believed

14   that was a reasonable approach, Your Honor.  And whether it's,

15   you know, it's novel or not, I don't think makes it

16   unreasonable when you look at this reality.

17        And I guess I'm very troubled by the prospect that we

18   would conclude that this group of workers would by design out

19   of the box only be willing to get two-thirds or less of their

20   TDC.  And as was evidenced by the debtors in 2005, before the

21   debtors entered Chapter 11, you adjust -- and I think this is

22   another important point -- you adjust delivery vehicles based

23   on the circumstances.  So in 2005 -- and we're criticized I

24   said by not using 2005 -- but in 2005 the debtors went to a

25   seventy percent cash based LTI program for 2005 -- that's what

79

1    the record indicates -- from what had been a seventy percent

2    stock based program in 2004.  And so seventy percent was cash

3    driven in 2005.  And what the company basically has done here

4    is said that the appropriate vehicle in a Chapter 11 case is a

5    hundred percent cash, not seventy percent cash or forty percent

6    cash or thirty percent cash, but a hundred percent cash, but it

7    should be discounted.  And initially the debtors discounted it

8    by twenty percent.

9             The testimony, again, I think unrebutted, is that the

10   expectation of the debtors at the time they put the program

11   together was it would be effectively discounted fifty percent,

12   because we thought it would take eighteen months to get out, at

13   a minimum.  And at the end of the day it's been discounted by

14   sixty-seven percent.  And I just don't -- you know, when Your

15   Honor thinks about that and thinks about the delivery

16   mechanisms and looks at the pie, I just -- it's hard to

17   understand why the Court would want to conclude that it's, you

18   know, it's unreasonable for a company to adjust its delivery

19   mechanisms as it had done pre-petition, to address changing

20   circumstances in an effort to provide, you know, direct total

21   compensation that is reasonable.

22             THE COURT:  Was there any evidence in the record that

23   this is done by other companies?

24             MR. BUTLER:  Your Honor, I mean, this is a circular

25   question.  The evidence in the record is that other companies

80

1    do it by retention programs.  That's the evidence in the

2    record.

3            THE COURT:  But retention programs are suspect even

4    before BAPCPA.

5            MR. BUTLER:  You know, post emergence, Your Honor, I

6    mean, you know, I mean, going forward I think you're going to

7    see more and more programs designed to address this issue.

8    This isn't -- you know, and they're going to be broad based,

9    because otherwise you won't get management managing companies.

10           THE COURT:  Well --

11           MR. BUTLER:  We don't have to deal with BAPCPA,

12   because we're not there in this case.

13           THE COURT:  I just don't -- if this had been brought

14   on -- and I think I gave you all this message -- before me at a

15   hearing at the beginning of the case, I never would have

16   approved it.  Now, maybe that's partly because of the dynamics

17   in the union negotiations, but well --

18           MR. BUTLER:  Should I move on, Your Honor?

19           THE COURT:  Yes.

20           MR. BUTLER:  With respect, Your Honor, to equivalence

21   of sacrifice, just a couple of points.  The objectors chose not

22   to essentially take on Mr. Miller's testimony.  And if you look

23   at Exhibit 67 at paragraphs 46 and 47, he testified about

24   equivalence of sacrifice and what, as executive chairman of the

25   company, he believed it was intended and how it was construed

81

1    by the company throughout the cases, in paragraph 46.  And in

2    paragraph 47 he addressed a number of the sacrifices that were

3    not made available.

4           And they run through first -- and I'll just run

5    through some of these that are going through -- in his

6    declaration he deals with the lack of the LTI portion or

7    component of the program.  Second, the elimination of the

8    supplemental health, there's a two and a half million to three

9    million dollars in guaranteed death benefits.  The waiver of

10   their base salaries, and that reduction -- the record's clear

11   that reduction was now made permanent by the compensation

12   committee -- and that they will have been paid below market

13   median on a TDC basis, even if Your Honor approves the programs

14   before the Court.  That's Mr. Miller's testimony, again,

15   uncontroverted.

16          The next item I'd like to point out to you, and

17   you've already seen the testimony on the 257 million dollars in

18   terms of the change in control claims.  If you look at Exhibit

19   154, and this is another, I think, very important issue for

20   Your Honor to consider in balancing all of these factors, and

21   this is one that we raised in our papers and I think there

22   hasn't, frankly, been given enough attention to, and that is

23   that throughout this case the company needed to get to 1.45

24   billion dollars.  That was what was negotiated ultimately.

25          And as you can see, and this is a presentation back

82

1    in January, but similar charts were provided to the committees

2    virtually every month over a twelve month period, and the first

3    of these charts was presented in November of 2000 -- I believe

4    2006.  And you can see that on the original estimate in

5    November 2006, the company estimates were that it was basically

6    at 1.7 billion dollars at that point in time, assuming -- and

7    that assumed it could be successful in a lot of various areas.

8    There were a lot of questions whether the company could get

9    down to the 1.7 billion, but included in that was the 257

10   million dollars for change in control.  And, again, that goes

11   all the way back to the November 8th estimates.  That was

12   eventually eliminated from the change in estimate, because one

13   of the requirements of Section 7.8 of the plan is that all the

14   executives have to waive that benefit.  That's a 257 million

15   dollar benefit to the estate.

16        THE COURT:  Are there executives waiving that benefit

17   that are not being employed post confirmation?

18        MR. BUTLER:  No, Your Honor, the answer to that

19   question I think probably is no.  And the reason for that --

20   and the point is to go forward and get the new package, which

21   includes these elements that are here before your Court today,

22   this entire package.  You have to give up the 257.  And every

23   executive's got a choice, right?  And executives could say I

24   don't want to work for you anymore and I'll take my claim in

25   planned currency and I'll deal with it that way just like

83

1    everybody else is, and, you know, and go do something else

2    someplace else for somebody else.  And that's a decision every

3    executive can make.

4           The agreement we have with the plan investors is, you

5    know, while it's not codified in the confirmation order

6    because, you know, these are human beings and you try to deal

7    with things on a little less public basis, but there's a very

8    clear expectation by the company that you -- to continue going

9    forward, you will waive these agreements, because if you can't

10   waive them, you don't get the new program, number one, and

11   number two, the company's rejected all the prior programs.  So

12   there's essentially no way to compensate you, and therefore we

13   expect the waivers will come as on an individual basis.  But

14   under the labor law, people have to make their own waivers.

15   You can't force it on them.

16          And I just want to point out that another equivalence

17   of sacrifice point here is this waiver which was demanded by

18   the plan investors and by the company and which is absolutely

19   necessary, and there's really uncontroverted evidence on this,

20   we couldn't have gotten to the billion-450 cap without it.  It

21   was one of the drivers of this cap, of this arrangement.

22          On Exhibit 268 at page 7, two other things we talked

23   about briefly before, but just to say the PAP for two of the

24   cycles was cancelled and the cash retention program that had

25   been part of the 2005 LTI, the twenty-one million dollar

84

1    program was cancelled, the last fourteen million dollars of

2    that was cancelled as additional payments.

3           On Exhibit 2 in Section 7.8 at pages 1 and 2, you'll

4    see here, and we've been over this before, the LTI going

5    forward for bands A through F has been reduced from a hundred

6    million to fifty million, roughly, approximate numbers, a fifty

7    percent reduction.  And then there was a further overall

8    reduction to fifteen million dollars in the aggregate pool set

9    forth, again, on Exhibit 2, Exhibit (sic) 7.8.

10          And then also in the next paragraph -- or in the same

11   paragraph we talked about the supplemental life benefit

12   program, which you've got uncontroverted testimony about the

13   value of that for parties.  So to suggest that the executives

14   have not had to sacrifice in this case as they are brought into

15   market or other of their programs are not renewed, I think the

16   evidence doesn't suggest that at all.  And I think it strongly

17   supports these contributions, and I would again point out not a

18   single bit of evidence to the contrary submitted by any

19   objector.

20          So overall, Your Honor, at the end of the day, I

21   think that the -- just in reviewing the points made here from

22   the company's perspective very quickly, I think, Your Honor,

23   that the process that the compensation committee used is almost

24   unprecedented in its scope and care and the consideration they

25   took to the issues they had to deal with.

85

1          You had the benefit of statutory committee

2    involvement on elements of the program and compliance with 7.8

3    from a creditors' committee perspective, the requirements

4    there.  You had the oversight of the plan investors who have,

5    in many respects, as much to gain or lose as anybody from

6    having an appropriately incentivized management team going

7    forward, making many modifications, but at the end of the day,

8    signing off on the plan.

9          You have all of this in a plan of reorganization that

10   has been overwhelmingly approved by creditors.  You have

11   nobody, even the objectors, having -- you know, who are

12   objecting here -- having rejected the plan at the time they

13   bring these forward.  I think there is a very good record on

14   peer group analysis and on SERP and the other matters.  I think

15   we've explained the key elements of the emergence equity award

16   to you, and we certainly have vetted the Court's concerns on

17   the cash emergence payments.

18         But at the end of the day, I'd just like Your Honor

19   to focus on the fact that there does need to be a delivery

20   vehicle to address the total direct compensation that an

21   employee's entitled to get.  And think of the -- consider the

22   steps the company took in migrating towards a cash program pre-

23   petition, and consider that the cash program that we're asking

24   Your Honor to find not to be unreasonable and therefore deny

25   confirmation of a plan under 1129, that we ask Your Honor to

86

1    conclude at the end of the day that the sixty-seven percent

2    discount that has been taken here more than offsets whatever

3    concerns the Court may have in absolute terms.  And then

4    finally, again, I think at the end of the day the testimony

5    involving Mr. O'Neal and Mr. Miller's compensation and the

6    decisions made by Mr. Naylor and the compensation committee and

7    the expert reports they received are uncontroverted.

8        So at the end of the day, Your Honor, we believe that

9    from an 1129 perspective that we have complied with 1129(a)(4)

10   and (a)(5) and the other remaining provisions of 1129 as it

11   relates to that.  I would like, and Your Honor indicated that

12   you didn't think it was necessary to review the other aspects

13   of the plan, I would like at an appropriate time to come back

14   up here and address certain elements of those for the record,

15   particularly as it relates to the GM settlements and other

16   matters that I think need to be part of the closing arguments.

17       THE COURT:  Okay.

18       MR. BUTLER:  Thank you, Your Honor.

19       THE COURT:  Okay.  Thanks.

20       MR. BUTLER:  I also, obviously, Your Honor, would

21   like the opportunity to briefly rebut any of the objectors.

22       THE COURT:  Right.  Okay.  Mr. DeChiara?

23       MR. DECHIARA:  Good morning, Your Honor, or should I

24   say good afternoon?  Peter DeChiara from the law firm of Cohen,

25   Weiss and Simon for the United Auto Workers.

1              Your Honor, as much as any party to this case, the

2    UAW would like to see Delphi out of bankruptcy.  We have no

3    objection to the plan or reorganization, apart from the

4    management compensation plan.  And we regret that we have to --

5    we have had to object to confirmation.  But Delphi left us no

6    choice with this management compensation plan.  After all the

7    sacrifice that our members have made to allow Delphi to

8    reorganize, the UAW could not stand by and not protest a plan

9    that would line the pockets of management with cash that should

10   be reinvested into the company.

11             The UAW's objection is not about payback or

12   retribution or trying to embarrass management or anyone else.

13   It's about to trying to insure that everyone is sacrificing to

14   help assure the long term success of this company.

15             The UAW's members have made their sacrifices.  Our

16   objection sets forth a list of deep and ongoing sacrifices in

17   pay, benefits, jobs and job security that the UAW members have

18   given and that they will live with for many years to come.

19             The exhibit on the screen, Joint Exhibit 95,

20   demonstrative slide 16, which was prepared by the debtors,

21   shows us a picture of the so-called labor transformation that

22   made it possible for Delphi to reorganize.  It shows where

23   labor costs were pre-petition and how profoundly they have been

24   reduced.

25             Courts have interpreted the good faith standard of

88

1    Section 1129(a)(3) as requiring that a plan of reorganization

2    be fundamentally fair.  Debtors bear the burden of proving that

3    the plan of reorganization, including the management

4    compensation plan, is fundamentally fair, including to the UAW

5    representative workers.  This is a burden they fail to meet.

6            Mr. Butler, in his opening statements, commented on

7    the fact that we had no witnesses, we had no expert, we had no

8    independent evidence.  The fact is we didn't need any of that.

9    This plan is so transparently unfair on its face that it fails

10   to make a prima facie case of meeting Section 1129(a)(3).  In

11   the settlement agreement between the UAW and Delphi, made

12   binding by order of this Court, Delphi management committed to

13   sacrifice on pay and compensation in a manner equivalent to the

14   sacrifice made by the UAW represented employees.  The

15   management compensation plan betrays this commitment.

16           What does the equivalence of sacrifice clause mean?

17   The Court was exactly right on Friday when the Court said that

18   the management compensation plan means what it plainly says.

19   The dictionary defines sacrifice as giving up something of

20   value.  Arguably, what the equivalence of sacrifice clause

21   would require would be to allow the company to put up a slide

22   like this showing that management labor costs have been reduced

23   in the same equivalent fashion.  But at the very least it means

24   that management should not have a compensation plan that makes

25   them better off now than they were pre-petition, that is richer

89

1    even than the plan that Delphi itself proposed in October 2005

2    and that it argued then was reasonable, or that gives

3    management new terms and conditions of employment superior even

4    to what their own expert deems to be market median.

5           One thing the claim clause does not say is that

6    management has satisfied its commitment to the UAW if the

7    company's highly paid compensation consultant and its hand-

8    picked compensation committee says that the plan overall is

9    market.  Delphi might have struck other deals with other

10   parties that have terms like that.  That is not in the

11   equivalence of sacrifice clause with the UAW.

12          With that introduction, let me examine the various

13   elements of the management compensation plan.  First, the

14   eighty-seven million dollars in cash that would vest upon

15   emergence.  What Delphi is seeking here is literally

16   unprecedented.  Mr. Bubnovich testified that he looked and

17   could find no prior example of a cash emergence payout of this

18   scope which would pay cash to hundreds of executives.  Mr.

19   Bubnovich testified that it was "less common than more common"

20   that debtors pay cash emergence payments at all.  He further

21   testified that even when there are cash emergence awards, they

22   are only for a handful of top officers.

23          A colleague of Mr. Bubnovich at Watson Wyatt wrote in

24   an e-mail -- and this is Mr. Bubnovich's deposition, Exhibit 6

25   at 2, "You asked me to look for cash emergence data for large

90

1    recently emerged or emerging companies.  Unfortunately, I have

2    not found a single one of those.  I don't know if it's the

3    post-2005 rules or just the general way of the world, but the

4    significant value in most of the execs deals are in the form of

5    equity granted as part of the emergence."

6            THE COURT:  Wasn't that responding to the top -- his

7    inquiry about the top two?

8            MR. DECHIARA:  No, Your Honor, I think this was in

9    terms of the entire cash emergence program.  We can call up the

10   document, Your Honor.  I don't have -- I don't have --

11           THE COURT:  I just -- I don't recall it that way,

12   because they weren't looking for support for the entire

13   emergence program on that basis.  He was focused on the

14   compensation committee's focus on Mr. Miller and Mr. O'Neal at

15   that point, I think.

16           MR. DECHIARA:  Your Honor, the view that's expressed

17   in the case law -- and here I cite Geneva Steel Co., 236 B.R.

18   770.  In that case the debtor proposed an emergence payout for

19   senior executives of half stock and half cash.  The Court held

20   that paying the "entire emergence bonus in stock is the better

21   approach."  In fact, in Geneva Steel, the CEO voluntarily

22   agreed to take all stock.

23           Here, by contrast, far from willing to make a

24   sacrifice, Mr. Miller testified before us that he wants all

25   cash.  Nor is there precedence for a cash payout of this scope

91

1    in Delphi's prior history.  The pre-petition long term

2    incentive plan only allowed for cash payments to approximately

3    100 executives, not the 561 that the management compensation

4    plan would cover.

5              THE COURT:  But what was the amount of that cash

6    allocation?

7              MR. DECHIARA:  Your Honor, I don't have that fig --

8              THE COURT:  I mean, the testimony, I think, for 2004

9    is it was a third, so that's roughly thirty-five million

10   dollars.

11             MR. DECHIARA:  Your Honor, I don't have that figure

12   about the amount of the cash.

13             THE COURT:  Okay.  But if for 2005 it was a third

14   plus the twenty-one million, so it was roughly fifty million, I

15   think.

16             MR. DECHIARA:  Your Honor, I don't know that there

17   are exhibits in the record that set that forth.  I'm not

18   familiar with them.

19             THE COURT:  Well, okay, I'll ask Mr. Butler to point

20   that out.  I mean, I think Bubnovich testified that there was a

21   third of 110 for 2004 was cash.

22             MR. DECHIARA:  The cash payout does nothing to

23   further the goals set forth in Delphi's own compensation

24   philosophy.  It doesn't serve to attract and retain high

25   caliber executives.  It doesn't link the executives' interests

92

1   with those of shareholders or align their interests with

2   Delphi's long term strategic goals.  It just puts a large wad

3   of cash in the pockets of incumbent executives, many of whom

4   will soon be leaving as Delphi shrinks in size after emergence.

5          Delphi says the cash payment is to make up for the

6   absence of the long term incentive plan during the Chapter 11.

7   But if what was lost, as Mr. Naylor insisted, was long term

8   incentive opportunity -- as he put it "The operative word was

9   opportunity" -- the company should compensate the executives,

10  if at all, with another opportunity, not with cold hard cash.

11         Moreover, under the pre-petition plan, vesting was

12  over five years.  Meaning, if the plan had been in place during

13  the Chapter 11, grants made, say, in January 2007 would have

14  vested in January 2012.  Under the cash payout, vesting is

15  immediate upon emergence.

16         The pre-petition long term incentive plan also had

17  performance targets.  The cash payment, by contrast, has no

18  performance element.  The executive gets the payment so long as

19  during the Chapter 11 case he didn't quit, he didn't get

20  himself fired, and so long as he still has a pulse when Delphi

21  emerges from bankruptcy.

22         On cross-examination, Mr. Naylor testified that he

23  didn't know whether, had the pre-petition plan remained in

24  place during the Chapter 11, the executives' performance would

25  have satisfied the pre-petition plan's performance targets.  So

93

1    as far as the chairman of the compensation committee who

2    approved the MCP knows, the executives may have gotten little

3    or nothing, even if the pre-petition long term incentive plan

4    had remained in place.  So how then could he conclude that the

5    cash payments are a fair compensation?

6            In any event, the loss is unquantified.  We saw the

7    pie chart a few minutes ago, that the company had relied

8    heavily on, that had the piece of the pie that shows

9    competitive shortfall.  That's the competitive shortfall that

10   management allegedly suffered during the case as a result of

11   not having the long term incentive plan in place.

12           That pie chart has no dollar value placed on it.  And

13   when Mr. Naylor was asked on cross-examination what the dollar

14   value was, he gave no answer.  He could give no answer.  So how

15   could eighty-seven million dollars be the proper amount of

16   compensation, discounted or not discounted, for that supposed

17   competitive shortfall when we don't know what the competitive

18   shortfall was.  The Court questioned Mr. --

19           THE COURT:  Well, it's somewhere between sixty-one

20   percent and zero of their compensation.

21           MR. DECHIARA:  Right, Your Honor.  Your Honor

22   questioned Mr. Bubnovich on cross-examination about how he came

23   up with the eighty-seven million dollar figure.  And, Your

24   Honor, frankly I struggled to understand what Mr. Bubnovich was

25   saying, because I am fairly familiar with his record, I had sat

94

1    through and took part of his deposition, I had read his

2    reports, and I had never heard this explanation.  And as Your

3    Honor just mentioned from the bench, he kept changing his

4    answer.

5              But this is what I think I understood.  The eighty-

6    seven million dollars was based on what the executives received

7    under the pre-petition long term incentive plan in 2004.  But

8    the 2004 payment was for pre-petition performance, not for

9    performance during the Chapter 11 case.  Again, how do we know

10   the executives would have met any targets during the Chapter 11

11   case?  From this record we don't.

12             THE COURT:  Well, I think the company's response to

13   that is that just as it set a reasonable target in 2004, it set

14   a reasonable target for the post-petition, pre-confirmation

15   period.  You may disagree with whether the target was

16   reasonable or not, but I think that's the response, is that

17   each year has a reasonable target in it.  Some years you hit

18   them, some of the years you don't.  But it's a reasonable

19   target.  You don't go with last year's target for this year.

20             MR. DECHIARA:  I think that's exactly my point, Your

21   Honor, that the company is essentially saying we should

22   compensate the executives for the long term incentive

23   opportunities they received in 2004.  And my point is, but that

24   was based on performance they made in 2004.

25             THE COURT:  No, I don't think it's for what they

95

1    received.  I think it was simply a discount based upon the

2    aggregate amount that they could have received, the

3    opportunity, in other words, the hundred million.  They

4    received less than that, although they did pretty well that

5    year.  But the opportunity is valued by him at hundred million.

6    And then you then apply whatever your criteria for realizing on

7    that opportunity.

8             MR. DECHIARA:  Your Honor, let's focus on 2004, as

9    the record shows, as between 2003, 2004, and 2005, in 2004

10   there was the highest payout --

11            THE COURT:  Right.

12            MR. DECHIARA:  -- the highest opportunity.  My

13   colleague, Mr. Kennedy, asked Mr. Bubnovich on cross-

14   examination why 2004, other than that it was the year with the

15   highest payout.  And on cross-examination, Mr. Bubnovich could

16   give no reason.  The only fair conclusion is that 2004 was

17   picked to maximize the executives' cash payout.  That's

18   anything but sacrifice.

19            And I think it's important to look at how else

20   management faired during the Chapter 11 case, apart from the

21   absence of the long term incentive plan.  Of the approximately

22   560 executives to be covered by the management compensation

23   plan, all received their full salaries and their full benefits

24   during the Chapter 11 case, with the sole exception of those

25   DSB members, and now we're talking about less than twenty

1    people out of 561, that even Watson Wyatt concluded had to have

2    their base salaried reduced by ten percent to bring them in

3    line with market.

4         The executives also received their AIP bonuses in

5    every half year period during the Chapter 11 case.  This was

6    better than they did pre-petition.  In 2001, 2003, and 2004,

7    the executives received no AIP bonuses.  The executives not

8    only received their AIP bonuses during the case, but as Mr.

9    Naylor put it, they did quite well.  In the first half of 2006,

10   the bonuses were 183 percent above target.  In the first half

11   of 2007, 176 percent above target.  And this wasn't due to

12   exceptional performance by the managers.  Indeed, a member of

13   Delphi's board wrote in an e-mail to Mr. Naylor that "The board

14   was convinced to set too low of a financial target."  And

15   that's Naylor deposition, Exhibit 11.  In other words,

16   management got a windfall.

17        THE COURT:  But wasn't he asking whether that -- he

18   didn't say that, he was asking?

19        MR. DECHIARA:  No, Your Honor, I think he asserted

20   that as a fact.  Perhaps we can look at the document.  That's

21   dep -- can you -- yeah, can you blow that up?  Your Honor, in

22   the middle there's a dash that says the quote "And it looks

23   like the board was convinced to set too low of a financial

24   target."  That's an assertion by a member of the board, it's

25   not a question.

97

1           And, Your Honor, let me just say something about

2    these e-mails.  Mr. Butler suggested that perhaps these e-mails

3    are just a phenomenon of people being too quick to use their

4    BlackBerrys.  I would suggest that what these e-mails show is

5    the real inner workings, the real raw thought and incentives

6    and motivations that went behind this plan.  It's what you see

7    before it gets scrubbed by the lawyers and put into pretty

8    PowerPoint pictures by the graphic artists.  It's the real

9    stuff.  And that's why these e-mails -- we're not playing a

10   game of gotcha with these e-mails.  What we're trying to do is

11   see what the real thinking was behind this plan.

12           In sum, management during the Chapter 11 case did not

13   sacrifice on salary or benefits, did very well on bonuses,

14   better even than pre-petition.  And there's no evidence of the

15   dollar value of any loss they suffered that would justify the

16   eighty-seven million dollar cash emergence grant.

17           Now, let's focus on the proposed cash payments to the

18   two top officers, Mr. Miller and Mr. O'Neal.  Mr. Naylor

19   admitted that in October 2005 the amount proposed for these two

20   individuals was a total of eight million dollars, 5.3 for Mr.

21   Miller and 2.7 for Mr. O'Neal.  And that's Naylor Exhibit 18.

22   Why don't you put on the screen?  The compensation committee

23   believed such payments would have been reasonable then.  But

24   now the MCP proposes 8.3 million --

25           THE COURT:  But at that point Miller hadn't given --

98

1    he was not getting a dollar a year at that point.

2              MR. DECHIARA:  At that point he was getting a salary.

3              THE COURT:  Right.

4              MR. DECHIARA:  Right.  He was getting three-quarters

5    of a million -- he testified that he earned three-quarters of a

6    million dollars in salary.

7              THE COURT:  So, I mean, shouldn't I take into account

8    that -- I mean isn't this apples to oranges?  The real bonus

9    he's getting, if you factor in what the company negotiated as

10   far as his salary and right to a short term incentive, is,

11   like, a million dollars.

12             MR. DECHIARA:  Your Honor, I don't follow how that

13   is.  He --

14             THE COURT:  He gave up, like, 6.5 million dollars of

15   salary and AIP.

16             MR. DECHIARA:  Your Honor, in total, Mr. Miller,

17   under the proposed management compensation plan will walk away

18   with having received over twelve million dollars in cash.

19             THE COURT:  I understand that.  I'm just talking

20   about this analysis compared to the actual bonus that's

21   proposed.  And I think -- isn't it inescapable that you have to

22   take into account the fact that he was only paid a dollar for

23   most of the case?

24             MR. DECHIARA:  Your Honor, first he voluntarily

25   waived that.  And there's nothing in the record, and there's no

99

1    testimony in his declaration, that he waived that with the hope

2    or expectation or reliance that he would receive it back.  It

3    was -- it was sacrifice.  And that's what's called for here.

4    But now to make that sacrifice disappear and to say oh, you

5    know, I was waiving my salary --

6              THE COURT:  No.  But I think that's a different

7    point.  I think you're focusing on the sacrifice point there.

8    I'm just trying to focus on what's the analysis of an

9    appropriate emergence bonus for a senior executive.

10             MR. DECHIARA:  Your Honor, I think the sacrifice

11   point, at least as far as the UAW is concerned, and there may

12   be no other parties in this case, that care about the

13   equivalence of sacrifice clause.  But for the UAW that is the

14   core issue.  That is the issue that matters to the members of

15   the UAW, to the leadership of the UAW, and it is a requirement

16   that was carefully negotiated and approved by this Court.  And

17   what we're trying to do, through this objection, is to make

18   Delphi live up to that commitment.

19             The 8.3 million dollars for Mr. Miller and 5.3

20   million for Mr. O'Neal is a total of 13.6 million.  So a

21   whopping seventy percent above what was proposed for the two of

22   them, in the 2005 plan.  Mr. Miller, by his own testimony, has

23   made millions and millions of dollars as the "turnaround kid

24   rescuing America's most troubled companies."  He testified that

25   he had no expectation of receiving 8.3 million dollars.  And he

1    hasn't relied in any way on receiving that amount.  And I think

2    that goes to Your Honor's waiver point.  If he waived his

3    salary, he waived his salary, and now is admirable sacrifice.

4    But now to say well, we're going to give him a cash bonus that

5    more than makes up for it, that eliminates the sacrifice.  He's

6    already received from Delphi three million dollar signing bonus

7    and three quarters of a million dollars in salary.  So if the

8    MCP Is approved, for about two years of work, during which he

9    also found the time to serve on the boards of two other

10    companies and write a book, he will have received over twelve

11    million dollars in cash -- in cash, from Delphi.  How can that

12    possibly be deemed -- whatever else, how can that possibly be

13    deemed sacrifice.

14             As for Mr. O'Neal, under the proposed management

15    compensation plan, he will receive nearly double what was

16    proposed in October 2005.  Sure his job title changed to CEO.

17    But even so, can taking double the previously proposed payout

18    be sacrificed?  Especially when, as I'll discuss in a moment,

19    he's getting an above median CEO salary going forward.  The

20    company says he waived his twenty percent of salary during --

21    he waived twenty percent of his salary during the Chapter 11

22    case.  But the salaries of the top executives, including Mr.

23    O'Neal, were already above market.  That's Naylor deposition

24    Exhibit 10, at page 5.  Delphi was already paying Mr. O'Neal

25    more than it should have been.  Now, we know for certain that

1    the salary proposed for Mr. O'Neal, the new management

2    compensation plan, is above median.  Mr. Bubnovich explained in

3    a 2007 e-mail, this is Naylor deposition Exhibit 14, that "the

4    old peer group (with all the large companies) indicated a

5    median CEO salary of almost 1.5 million.  The revised peer

6    group (median revenue of twenty-three billion) which is used in

7    our plan investor report indicates a median salary of around

8    1.2 million.  Delphi is now proposing to pay Mr. O'Neal a base

9    salary of 1.5 million undisputedly above the 1.2 million dollar

10   median.

11          In his deposition, at page 199, Mr. Naylor testified

12   that Delphi couldn't afford to pay above median.

13   "Q.  What about paying above median, are there any problems

14   with that?

15   "A.  Yeah, we didn't think we could afford it.

16          On the next page of his deposition transcript.

17   "Q.  So are you saying that given this state of the auto

18   industry, in general, it would not be in the long-term interest

19   of Delphi to pay above median?

20   "A.  It might not be in the short term interest.  Because

21   what this company needs to do is start earning a sustainable

22   profit so that it can reinvest in technology and so on.  And if

23   you went above median, that would be less money you had to

24   invest in the future.  And we just didn't believe that that was

25   necessary."

1          Well, one might say it's only 300,000 dollars.  But

2     by paying Mr. O'Neal 300,000 dollars above median and base

3     salary, Delphi is actually taking on a far greater cost.  Even

4     at his minimum AIP bonus of 125 percent of base salary, his

5     base salary plus bonus would be half a million dollars more if

6     his salary were at median.  And the cost mushrooms with his

7     change of control severance payment.  A base salary of 300,000

8     dollars above median with minimum bonus, would yield a

9     severance payment over two million dollars more than if his

10    base salary were at median.  Under his proposed base salary,

11    with a minimum bonus, Mr. O'Neal's change in control severance

12    would be over ten million dollars.  An amount he could

13    potentially get on top of his proposed 5.3 million dollar cash

14    emergence bonus.  And that's not even to mention how his above

15    median salary would cost the company in other ways.  Such as

16    the employer match or the defined contribution pension plan.

17    The company does not and cannot deny any of this.  Its

18    response, Mr. O'Neal negotiated his salary of the plan

19    investors.  But Mr. Naylor plainly testified that following

20    this negotiation the compensation committee approved the 1.5

21    million dollar salary.  In other words, it approved an above

22    median salary, which, according to Mr. Naylor's deposition

23    testimony, the company couldn't afford.  And, in any event, if

24    Mr. O'Neal's salary represents the best deal he could

25    negotiate, that's not sacrifice.  That's getting the best deal

1    he could get.

2            Having focused on the top two, now let's look at how

3    the rest of the executives would fare under the management

4    compensation plan.  First, let's talk about the vast majority

5    that non-DSB members -- who constitute 540 of the 561.  Mr.

6    Naylor testified that, pre-petition, the total direct

7    compensation of the non-DSB members was above market.  Since

8    then, they have received full salary and full benefits, and did

9    well under the bonus program.  In fact, according to Watson

10   Wyatt, their AIP bonuses are now above market by about nineteen

11   percent, that's Bubnovich declaration, Exhibit 5.  We know that

12   pre-petition management had a long-term incentive plan that

13   said aside 6.5 percent of the company's equity, with equity

14   grants vesting over five years.   Under the management

15   compensation plan, management would get more equity, eight

16   percent, with grants vesting more quickly, over three years.

17   So in terms of long-term incentive plans, management is better

18   off.  Even Watson Wyatt concluded that the non-DSB executives,

19   under the management compensation plan would be above market,

20   as indicated in Exhibit 5 to Mr. Bubnovich's declaration.  So

21   where is the sacrifice if it's not in salary, benefits,

22   bonuses, or long-term incentive plan, it's nowhere, that's

23   where it is, there's no sacrifice, there's no picture like the

24   Exhibit 16 showing the union labor cost sacrifice.

25            Now, let's talk about the DSB.  Mr. Bubnovich tells

1   us that they would not be above market under the management

2   compensation plan.  But what is this based on?  Delphi's -- and

3   I guess what I'm about to get to is something Mr. Butler chose

4   not to discuss.  But I think it's critical, a critical flaw in

5   the company's case.  Delphi's compensation philosophy, drafted

6   by Mr. Bubnovich and adopted by the compensation committee,

7   calls for benchmarking the DSB based on proxy data "as well as

8   based on survey data."  Mr. Bubnovich looked at the proxy data

9   and the survey data for the DSB executives and the survey data

10  showed the DSB executives were, in his words, substantially

11  above market.  And that's paragraph 14 to his supplemental

12  declaration.  In particular, according to a Watson Wyatt

13  analyst who e-mailed Mr. Bubnovich in December 2007 -- and

14  that's  Bubnovich declaration Exhibit 7 -- "the survey data

15  showed the DSB executives to be eighty-six percent above

16  market, using only Watson Wyatt's surveys and 102 percent above

17  market, using a weighted average of all survey sources."  Given

18  these results, what did Mr. Bubnovich choose to do?  He chose

19  to simply not use the survey data.  When questioned by the

20  Court as to why Mr. Bubnovich said -- as to why, Mr. Bubnovich

21  said that if he used the survey data, the compensation

22  committee would have to reduce the pay of the non-DSB

23  executives by too much.

24          THE COURT:  No.  The DSB executives.

25          MR. DECHIARA:  Thank you, You Honor, the DSB

105

1   executives.  This was a remarkable response.  It revealed the

2   results oriented nature of Mr. Bubnovich's approach.  The

3   desired result was to justify a rich compensation package.  If

4   the data didn't fit that result, it was the data that had to be

5   discarded.  Mr. Bubnovich said he wasn't a slave to the data.

6   I think that was a gross understatement.  He didn't feel

7   constrained by the data at all.

8          The other remarkable thing about Mr. Bubnovich's

9   answer is that it reveals the double-standard that Delphi uses

10  in approaching compensation matters for its executives versus

11  for its hourly employees.  If the company believes that the

12  union workers are overpaid based on a compensation analysis, it

13  merits an aggressive Section 1113/1114 litigation to slash

14  those wages.  If the data shows management is overpaid, well

15  the data is no good.  But was the survey data in any way

16  improper?  Of course not.  Mr. Bubnovich used the survey data

17  for the non-DSB executives.  In other words, he used it for 540

18  of the 561 executives, covered by the management compensation

19  plan.  And as I already noted, the compensation philosophy

20  document, drafted by Mr. Bubnovich and approved by the

21  compensation committee, required the use of the survey data for

22  the DSB executives.  At least with the upper portion of the

23  DSB, there was proxy data to rely on.  There was no sufficient

24  proxy data for the lower portion of the DSB because the proxy

25  data only shows the pay of the top five highest paid executives

1   in the company.  And the job titles of the lower DSB numbers do

2   not typically appear in the top five.  So with insufficient

3   proxy data, did Mr. Bubnovich rely on a survey data?  No.  He

4   testified that to gauge the market level of the DSB -- of the

5   lower DSB, he extrapolated -- that was the word -- he

6   extrapolated from the proxy data for the upper DSB.  Well,

7   "extrapolated" sounds impressive and technical, perhaps

8   involving some sort of formula.  But, in fact, what Mr.

9   Bubnovich meant was that he just assumed the market level for

10  the lower DSB was the same as what the proxy data showed was

11  the market level for the upper DSB.  The Court asked Mr.

12  Bubnovich if such extrapolation was a standard technique and

13  Mr. Bubnovich's response was only that he guessed, maybe it's

14  been done before elsewhere.

15          Mr. Bubnovich also tried to explain, in paragraph 15

16  of his supplemental declaration, why he believed the survey

17  data was not good for the lower DSB.  He testified that he

18  searched for and found limited proxy data on people with the

19  same job titles as those in the lower DSB, say human resources

20  vice president.  And found the proxy data showed that these

21  people were paid more than the people with the same job titles

22  in the surveys.  But by definition the people he found in the

23  proxy data had to be among the top five highest paid executives

24  in their company.  So it's not surprising that the pay of the

25  rare human resources vice president, who is in the top five

1    highest paid executives in her company, would be above the pay

2    of the many more human resources vice presidents listed in the

3    survey data who are not in the top five, like the lower DSB

4    members themselves.  In other words, the proxy data Mr.

5    Bubnovich could find on the lower DSB executives was not a

6    representative sample; it was a sample of the highest paid

7    people with those job titles.

8            Okay.  But what about the upper half of the DSB for

9    whom theirs was proxy data.  Is Mr. Bubnovich's analysis at

10   least accurate there?  The proxy data was drawn from an

11   eighteen company peer group.  Mr. Bubnovich admitted that

12   Perlmeyer, a well-respected compensation consultant, came by

13   the creditors' committee, criticized his peer group for

14   including non-manufacturing companies.  Mr. Bubnovich claimed

15   that it wouldn't have made a material difference even if he had

16   included manufacturing companies.  But if that were true, why

17   would Perlmeyer bother to criticize his approach?  This is a

18   Chapter 11 case.  This is not an academic seminar.  She must

19   have believed that it mattered.  In the peer group chart on

20   page 33 of Mr. Bubnovich's report, his December 28, 2007

21   report, the only reason Mr. Bubnovich checked for including

22   companies like Pepsi, Coke and others outside the auto parts

23   industry is their revenue size.  But each of these companies

24   has revenues larger than Delphi.  And Mr. Bubnovich admitted

25   that some compensation on analysts also look at market

108

1   capitalization as a measure of firm size.  He further admitted

2   that the median market capitalization for the eighteen peer

3   group companies substantially exceeded Delphi's.  Perhaps most

4   troubling to the UAW about the peer group is the double-

5   standard it embodies.  Mr. Miller explained that when Delphi

6   compared hourly workers all in compensation to workers at other

7   companies, those other companies were companies in the auto

8   parts industry and are all smaller.  So according to Delphi,

9   when one looks at executive compensation, one looks at bigger

10  more successful companies in healthy industries.  And when one

11  analyzes hourly worker compensation, on the other hand, the

12  benchmark group one uses is exclusively smaller companies in

13  the same troubled industry.

14          The last element of the management compensation plan

15  I want to discuss is the eight percent of equity proposed to be

16  set aside for management.  There was no dispute that with the

17  reorganized equity value of 7.8 billion dollars, the value of

18  the equity set aside for management under the management

19  compensation plan would be worth 624 million dollars.  There's

20  also no dispute that the October 2005 proposal for a ten

21  percent equity set aside was only projected to be worth 400

22  million dollars, since at the time, Delphi was projecting a

23  reorganized equity value of four billion dollars.  How would

24  management possibly be sacrificing if it got an equity set

25  aside worth 224 million dollars more than what it proposed and

109

1    what it deemed reasonable in October 2005?

2            THE COURT:  Is there anything in the record to

3    contradict the evidence that Mr. Butler alluded to that

4    accepted measurement for a set aside from management equity is

5    at the median two or three points above eight percent?

6            MR. DECHIARA:  Your Honor, our answer -- my answer to

7    that is that one needs to look at the real value, not just the

8    percentage.

9            THE COURT:  No.  But that wasn't my question.  Does

10   anyone do that?

11           MR. DECHIARA:  Does anyone look at the real value?

12           THE COURT:  Yeah.

13           MR. DECHIARA:  Your Honor, I know of one case in

14   which there is an equality of sacrifice clause and that's this

15   case.

16           THE COURT:  Well, what I'm going to ask you about

17   now -- I was going to ask you about that later.  There are a

18   lot of opinions, including out of the second circuit, that talk

19   about the equivalent sacrifice in connection with 1113.  And

20   they very clearly don't talk about a dollar for dollar

21   comparison.

22           MR. DECHIARA:  No, Your Honor --

23           THE COURT:  They talk about people's rights, market

24   forces, and the like.  So I figure you have to tell me

25   something than just a dollar for dollar comparison.

1          MR. DECHIARA:  Your Honor, I'm not at all suggesting

2     a dollar for dollar analysis.  Clearly, hourly workers are paid

3     much less and paid in a much different fashion than executives.

4     So it would be impossible to do a dollar for dollar -- or be

5     meaningless to do a dollar for dollar comparison.  And the

6     clause doesn't say it has to be equal sacrifice.  It says

7     equivalent sacrifice.  And that could be interpreted in

8     different ways.  I think one reasonable interpretation is to

9     show how the overall total cost of management's compensation

10    has been reduced in a manner similar to how we saw in the slide

11    deposition, Exhibit 16.  Exactly as it's shown in the slide

12    that we saw at the beginning.  But at the very least, even if

13    one doesn't accept that analysis, that interpretation,

14    management can't be better off --

15         THE COURT:  But again, the evidence -- and I'm not

16    aware of anything contrary to that, which is why I asked you

17    this, is that normally in these types of situations, both in

18    and out of bankruptcy, the set aside for management (a)is done

19    on a percentage basis; and (b)is above eight percent.  So I'm

20    just trying to figure out where's the -- I'm not following your

21    argument then given those two factors.

22         MR. DECHIARA:  Your Honor, my argument is that the

23    equivalent of sacrifice requires a look at the real value.

24         THE COURT:  But they will respond, I think quite

25    cogently, that they're giving up two to three percent, or

111

1   proportionately twenty to twenty-five percent of what is

2   normally given.

3          MR. DECHIARA:  Your Honor, I'm not aware --

4          THE COURT:  In terms of the stock set aside.  No, I

5   understand your point about vesting earlier and the like.

6   That's a point going the other way.  But just in terms of the

7   percentage amount of post-reorganization equity, instead of

8   getting ten to eleven percent, they're getting eight percent.

9          MR. DECHIARA:  Your Honor, why this matters to the

10  UAW is that the concessions made -- the sacrifices made by the

11  union workers made it possible that there is a reorganized

12  equity value of 7.8 billion dollars.  The reason it was 400 --

13  I'm sorry.  The reason it was four billion and now it's 7.8

14  billion is to a large extent, perhaps not entirely, but to a

15  large extent, I don't think anyone would deny, attributable to

16  the sacrifice of the hourly workers.  So it's important to the

17  union that the Court look at the actual value of what the

18  management executives are getting under the equity set aside.

19         Let me take an example of sacrifice.  An example of

20  sacrifice is Delta Airlines.  Delta Airlines is a company that

21  was a debtor in this Court, this very Court, quite recently.

22  It's a large sophisticated debtor.  It had sophisticated

23  counsel and advisors.  It operates in a competitive industry

24  and it cares about having -- being able to attract high

25  quality, high caliber talent.  But in its management

112

1    compensation plan, Delta assumed -- which assumed its

2    reorganized equity value would be ten billion dollars, set

3    aside 2.4 percent for 1200 executives.  That's a total of 240

4    million dollars worth of stock, a fraction of what Delphi

5    management seeks divided among twice as many executives.  And

6    by the way, Delta's executives received no AIP bonuses during

7    the Chapter 11.  And as we saw in a prior slide, their CEO took

8    no cash.

9            So what explains the difference between Delta and

10   Delphi?  The difference is Delta management was willing to

11   sacrifice and Delphi's management isn't, even though Delphi's

12   management is bound by an equivalent of sacrifice clause in

13   it's UAW settlement.  So how does Delphi claim management

14   sacrifice?  Mr. Naylor has a short list, in paragraph 26 of his

15   declaration, of examples what he claims were sacrifices by

16   management.  And I went through these examples with Mr. Naylor

17   on cross-examination and he admitted that the items management

18   gave up were all items that were above market or non-

19   competitive.  For example, the elimination of life insurance

20   for the retired executives.  And let me just say a word about

21   that.  We've seen the number thrown around that the executives

22   gave up an average benefit of 2.5 to three million dollars, but

23   that's the benefit their estate would get when they die.  The

24   value -- the cost of the insurance is what it would cost the

25   executive to go out and replace it.  And in the plan documents,

113

1  the executives are being given the opportunity to go and

2  purchase a replacement plan.  But there's nothing in the record

3  that shows what the cost is of that.  So what they lose, the

4  difference is what it would cost them to replace it, not 2.5

5  million dollars.

6           And for the elimination of each of these non-

7  competitive items, management is proposing adding many others.

8  For example, the defined benefits SERP.  It wasn't canceled; it

9  was frozen.  Or it's proposed to be frozen.  But not only

10  frozen, but improved.  There's no dispute the vesting age will

11  go down from sixty-two to fifty-five.  The lifting of the 5,000

12  dollar per month cap, the latter which Mr. Bubnovich testified

13  would cost forty-two million dollars alone.  Delphi --

14           THE COURT:  Do you dispute Mr. Butler's statement

15  that the 5,000 dollar cap was imposed simply for the duration

16  of the Chapter 11 case to deal with priority issue in the first

17  day motion and was never intended to continue?

18           MR. DECHIARA:  I'm not in a position to dispute that,

19  Your Honor, but by lifting the cap now is not an example of

20  sacrifice.

21           THE COURT:  Okay.

22           MR. DECHIARA:  Delphi is even proposing to compensate

23  certain DSB members with eleven million dollars worth of

24  restricted stock as compensation of the freezing of the DB

25  SERP.  And Mr. Naylor admitted on cross-examination that the

1    unionized workers got no compensation for the freezing of their

2    defined benefit plan.

3              Another improvement is the term in the proposed new

4    employment agreement that would provide for accelerated vesting

5    of equity upon involuntary termination.  Management clearly

6    wanted this provision, especially in light of the anticipated

7    reduction in management ranks that Delphi would shortly

8    experience.  Mr. Naylor was unable to testify that such a

9    provision was market competitive.  Indeed, in an e-mail, Mr.

10   Bubnovich -- this is Bubnovich deposition Exhibit 39 --

11   referred to this provision as "something special" from

12   management, indicating that accelerated vesting is not

13   achievable "solely by reference to competitive data."  And

14   what's most interesting about this e-mail is what it reveals

15   about Mr. Bubnovich's view of what management may legitimately

16   seek in a management compensation plan.  In the e-mail,

17   Bubnovich advised a top management executive that constituents

18   in Chapter 11 "pursue only and aggressively their own

19   interests."  And that there's "nothing wrong or untoward if

20   management puts its foot down" and insists upon the accelerated

21   vesting provision.  This view, that there's nothing wrong with

22   management aggressively pursuing its own interest, could not be

23   more at odds with the equivalent of sacrifice provision.

24             Now, why does it matter what Mr. Bubnovich thinks?

25   Because by his own testimony, he is the "architect" of this

1    management compensation plan.  It's his views that pervade the

2    design of this plan.  So why would Watson Wyatt, the so-called

3    independent experts, advance management's interest, going so

4    far to discard survey data to propose an unprecedented cash

5    payout?  Because Watson Wyatt is anything but independent.  How

6    could it be?  Delphi is a multi-million dollar client of Watson

7    Wyatt's.  The management compensation consulting services are

8    but a small piece of the twelve million dollars that Delphi has

9    paid to Watson Wyatt since the Chapter 11 filing.  Watson

10   Wyatt's business with Delphi is terminable at will, according

11   to Mr. Bubnovich, either by Delphi's board, which is headed by

12   Mr. Miller and Mr. O'Neal, or Delphi's management, which is now

13   headed by Mr. O'Neal.  To keep that large chunk of business,

14   Watson Wyatt has every incentive to keep Delphi management

15   happy.

16          Now, I don't mean to suggest that Watson Wyatt is

17   alone in having this type of conflict of interest.  It's a

18   systemic problem among compensation consultants that has been

19   repeatedly criticized in the media, by academics, and it's now

20   caught the attention of Congress.  But it's a conflict of

21   interest that this Court should not ignore and that colors the

22   entire case.

23          Now, I also don't want to make too much of Mr.

24   Bubnovich asking Mr. Miller for a reference while at the same

25   time evaluating Mr. Miller's compensation.  But how could

116

1    someone who considers himself independent ask for and accept

2    that kind of a favor?  Could someone imagine a judge perhaps

3    thinking of leaving the bench at some time in the near future

4    asking one of the parties in a pending case to serve as a job

5    reference?

6           Let's discuss Mr. Naylor, as chair of the

7    compensation committee.  Mr. Naylor testified he's no

8    compensation expert.  So what he did as chair -- so what did he

9    as chair of the compensation committee rely on to evaluate the

10   management compensation plan?  Mr. Naylor spent his thirty plus

11   business career as a business executive in a large corporation.

12   Given his professional history, how could he help but identify

13   and sympathize with the very individuals for whom he was

14   supposed to serve as an outside check?  But he was not only a

15   business executive; he was an executive at DuPont, a supplier

16   to Delphi, and knew Mr. O'Neal and others from that time.  So

17   he was reviewing the pay of people who were part of the same

18   clubby network of business connections in which he spent his

19   entire career.  But more to the point is that he and the others

20   on the compensation committee relied heavily and exclusively on

21   Watson Wyatt, even though tens of millions, hundreds of

22   millions of dollars are at stake in this management

23   compensation plan and even though Mr. Naylor testified that

24   experts can and do disagree.  And as Mr. Butler said this

25   morning, that compensation is more of an art than a science.

1          The compensation never even sought a second opinion.

2    Bubnovich was their man and now it's upon Bubnovich's word.

3    The same man who changed his answers twice when he was

4    answering the Court's questions on Friday.  It's on Mr.

5    Bubnovich's word that Delphi asked this Court to approve the

6    management compensation plan.  There are no expectation or

7    reliance interests that justify approving the cash or other

8    elements of this plan.  The management compensation plan has

9    always been subject to Court approval and there is no dispute

10   that the executives were told this.  And Mr. Butler, I think,

11   wisely said today that he's not arguing reliance.  There's no

12   argument that there's heightened attrition, that we need a rich

13   compensation plan to keep people from quitting.  In fact,

14   Delphi had the opposite problem, it's soon going to have too

15   many executives on its hand and it's going to need to get rid

16   of some of them.

17          Finally, the implementation of the management

18   compensation plan would not only be unfair but also harmful.

19   It would be destructive to employee morale and to labor

20   relations.  Delphi's betrayal of its equivalence of sacrifice

21   pledge will anger and demoralize the very workers on whose

22   skills and efforts Delphi's success ultimately depends.  Mr.

23   Butler mentioned just in time delivery.  Delphi needs motivated

24   workers to be able to make precision products and meet that

25   just in time delivery system.  This management compensation

1    plan has the potential to further strain an already tense labor

2    relations climate between Delphi and the UAW.  United Airlines

3    is a cautionary tale.  There, the oversized management

4    compensation plan caused United's unions to unite in protest

5    and demand pay increases.

6              Let me end on this note.  Anyone who reads the

7    business pages knows that the top pay -- that the pay of top

8    management in America, particularly CEOs, has reached dizzying

9    heights in recent years.  So far beyond any reasonable multiple

10   of the pay of hourly workers that it's become a significant

11   social economic and increasingly political issue.  The

12   scandalous amounts paid to top corporate management in America

13   today is an issue beyond this case and this Court.  But this

14   Court does have the power to make things right in this case.

15   To enforce a binding commitment made by Delphi to the UAW.  We

16   ask the Court to consider what is at stake.  Letting Mr. Miller

17   walk off with 8.3 million dollars in cash, letting management

18   pocket another 7.8 million, letting management get all the

19   expensive goodies built into this plan by an architect who sees

20   nothing wrong with management aggressively pursuing it's

21   interest, all this at a time when the company needs cash to

22   succeed post-bankruptcy when, according to the chair of its

23   compensation committee, it can't afford to pay above market.

24   The management compensation plan is fundamentally unfair to the

25   working men and women whose sacrifice made this reorganization

119

1    possible.  The objection should be sustained.

2         THE COURT:  Mr. Kennedy?

3         MR. KENNEDY:  Do you want me to proceed directly,

4    Your Honor?

5         THE COURT:  Sure.

6         MR. KENNEDY:  Good morning or rather afternoon, Your

7    Honor.  For the record, Tom Kennedy representing the IUE-CWA.

8    Many of the points I would wish to make in closing have been

9    made by my colleague I thought very effectively and I will

10   therefore try to limit our remarks to points that I think would

11   assist the court in making its ultimate determination.  Since

12   October 13, 2005, this case has been labeled a labor

13   transformation case and so it is that.  For the IUE-CWA alone,

14   7,000 well paying union jobs with a defined benefit pension

15   plan and good health care have been lost.  There have been soft

16   landings for those members as a result of the negotiations but

17   as we sit here today, in January of 2008, those individuals,

18   for the most part, are no longer employed at anything like the

19   wages and benefits they had previously enjoyed.  Communities

20   throughout the Midwest have been deeply impacted, families

21   devastated, and all in the name of achieving what market survey

22   has showed was a market level wage for the production of

23   Delphi's auto parts.  It would be impossible to emphasize how

24   often publicly, privately, in our meetings and our

25   negotiations, Delphi insisted that its wage survey showed our

120

1    members' wages were above average in the auto part industry.

2    And so we believed and so we told our members and so they

3    believed and so they voted to approve the contract that

4    resulted in the loss of those jobs and reduction in their

5    wages.  And now, of course, we consider the other end of the

6    spectrum setting management's compensation.  And there we find,

7    as Mr. DeChiara pointed out, repeated elements that not only

8    ignore the notion of finding a market median but even where

9    there is an allegation of market comparison, a definition of

10   market that is so broad as to render the concept meaningless.

11           In our view and from our research and I think from

12   the testimony, there are three elements of this plan that are

13   unique in bankruptcy jurisprudence that even the company does

14   not defend as consistent with Chapter 11 precedent.  First, of

15   course, is the cash emergence plan.  The second is the

16   treatment of the SERP which has not only been continued but

17   substantially improved.  And the third, our other monetary

18   items I'll describe in a moment, that are equally made

19   available to management.  If we were to look at the elements of

20   the total direct compensation, salary, short-term incentive

21   plan and long-term incentive plan, their -- the IUE-CWA does

22   not oppose the notion of executive compensation.  We're aware

23   that these are the typical elements of an executive

24   compensation plan.  We simply suggest to this Court that the

25   fundamental fairness under 1129(a)(3) that you're entitled to

121

1    utilize in weighing this plan, requires that the debtor

2    demonstrate that those elements are at a market median.  And

3    that is defined as not a collection of companies they could

4    find that they would like to compare themselves to but a market

5    representative of the industry in which they operate.

6         And we do not regard that approach as one which is a

7    function of expert testimony.  Mr. Butler pointed out on a

8    number of occasions that the unions have not called their own

9    expert witness.  In our view, neither has the company.  In our

10   view, Mr. Bubnovich may be knowledgeable about compensation but

11   he is far short of an independent expert.  And I would point

12   the Court to the standards established in the second Dana

13   compensation opinion on this question of the market comparison.

14   Three of them refer to whether the plan and proposal is

15   consistent with industry standards.  The next one is what is

16   available, what is generally applicable, in a particular

17   industry?  Those two demonstrate that the appropriate analysis

18   for a Chapter 11 Court is restricted to the industry in which

19   the debtor operates.

20        We've also cited in our brief Internal Revenue Code

21   standards which are similar.  For compensation to be

22   deductible, it has to be established as reasonable not in the

23   abstract, not in comparison to what American executives, but in

24   comparison to the industry in which the executive operates.

25        Now why is that important here?  Because we have the

1    advantage of Delphi having done that comparison.  There is a

2    survey data which was reviewed by Watson Wyatt in 2005, which

3    included a specific comparison to companies in the automobile

4    parts and accessories industries.  That's Exhibit 8 to the

5    Bubnovich deposition, pages 12 to 32.  They go through a series

6    of executive analysis which is similar to executives at Delphi

7    demonstrating what the survey shows would be paid.  There is a

8    temptation based on Bubnovich's testimony to look at the number

9    in the aggregate.  Yes, it's eight-six percent or 102 percent.

10   I believe under Watson Wyatt, it was 147 percent.  Those are

11   aggregate numbers and extraordinary ones, really, when you

12   consider them.  But for the purpose of establishing this plan,

13   the Watson Wyatt figures are actually position by position and

14   it is the debtors' responsibility to establish a basis for

15   going beyond what the debtors' themselves have demonstrated

16   constituted market compensation on those three points:  the

17   salary, short-term and long-term for those individual

18   positions.  They have utterly failed to establish a basis for

19   going beyond what they themselves have established as market

20   compensation in the automobile industry.  The last Dana 2

21   standard is, quote, did the debtor receive independent counsel

22   in performing due diligence and in creating and authorizing the

23   incentive compensation?  Mr. Butler repeated frequently during

24   his presentation how involved, lengthy and full of colored

25   charts the process was for the compensation committee making

1    its determination.  But at the end of the day, the process

2    rests on the validity of the information given to the decision

3    makers; garbage in, garbage out.

4            In this particular instance, the committee relied

5    entirely upon the assistance of Mr. Bubnovich.  Mr. Bubnovich,

6    in turn, was in, our view, not an independent counsel.  He was

7    not an independent expert.  He had drunk the Kool-Aid in a big

8    way in terms of working with these executives and his e-mail

9    chain, though I gather from Mr. Butler's remarks, he regarded

10   it as inflammatory, perhaps even unfair.

11           We don't think so.  That e-mail chain showed a

12   gentleman who was working not with the compensation committee

13   to determine what management should be paid, but with

14   management to determine what the compensation committee should

15   come out with.  There's a reason; there's a separate criteria

16   under Dana 2 for independent counsel.  It's no more than Lord

17   Acton once advised, power corrupts.  And the power to set your

18   own salary is one that inevitably will be abused and that is

19   essentially in our view what happened here.  And if you look at

20   the reports, it is completely consistent with an individual

21   that made a determination of, first, what management wanted,

22   second, how we could bring it about and, third, even included

23   one item that he said no to, namely, the life insurance

24   provision that we think again Mr. Butler has deeply exaggerated

25   by suggesting it's two and a half million a piece.  That's not

124

1   the present value of that benefit.  But by including one in

2   which he had said no, in our view, he was doing that

3   intentionally to legitimize all of the other areas in which he

4   had said yes.  And that simply doesn't meet the Dana 2

5   standards of independent counsel.

6          There are particular areas that we had wanted to

7   address and suggest to the court are inappropriate.  Obviously,

8   the first one is the emergence cash grant.  Of course, there

9   are no prior examples, the witness admitted it's a back end

10  KERP; it's certainly not tied to emergence values.  I thought

11  of interest in that discussion was the e-mail which he

12  suggested to the company, should we tie the emergence cash to

13  emergence values or should we wait for the UCC to suggest this.

14  Well, I guess they made the right choice.  They waited and the

15  UCC never suggested it and therefore they never included it.

16  But the analysis was not that of an independent expert deciding

17  what would sensibly be part of a compensation scheme for a

18  company this large.  It was, what can we get away with, how can

19  we game the system, why should we play this card now, let's

20  keep it back.  Remember, everything is negotiable in a Chapter

21  11.

22          The emergence cash grant, the evidence shows, was

23  intended to replace lost LTIP opportunities.  Well, there are

24  three comments on that I want to make.  The first is, as Your

25  Honor's questioning demonstrated, this was a jury-rigged,

1   let's-figure-out-something-to-get-money-to-the-guys proposal.

2   There was no methodology here.  There was no reason it was

3   eighty percent, or seventy percent or ninety percent.  They

4   just selected eighty as a results driven analysis of how to get

5   to the number they wanted.  There was no reason they selected

6   2004 except for the fact that it was the highest number.  The

7   emergence cash simply does not have a methodology that they

8   could support and it doesn't have a substantive reason either

9   because the LTIP opportunities for the most part, the majority

10  of it, was stock which would have been worthless.  Those were

11  stock options that the record demonstrated had no value.  They

12  were certainly not capable of being issued during the Chapter

13  11.  There was no long-term incentive lost in that sense.  And

14  Mr. Butler pointed out in his remarks that he didn't know why

15  the unions were emphasizing the AIP.  Well, we were emphasizing

16  it, at least I was emphasizing it, for two reasons.  First is

17  we think it showed the company gaming the system.  That AIP

18  paid off a very high percentage.  I think it was 187 in one of

19  the periods, somewhere of 176 maybe in another and that

20  suggests to us that this whole compensation program was infused

21  with efforts to increase cash to executives.  But even assuming

22  it had not been gamed, the second part is that if you simply

23  compare a Delphi executive in the two years, '04 and '05, to

24  the two years, '06 and '07, they did better in '06 and '07 then

25  they had done before.  They got 104 million in AIP.  The AIP in

126

1    the two prior years had been zero.  So that if you looked at

2    pie chart which wasn't a collection of their anonymous

3    opportunities but was instead an analysis of what they got

4    paid, they did better in the bankruptcy.

5            THE COURT:  But did they have a better year as a

6    company?

7            MR. KENNEDY:  Yes, they did, Your Honor, because we

8    accepted less in the way of wages and it made -- it drove the

9    company more effectively.

10           THE COURT:  But how's -- there's nothing specific on

11   that, is there?

12           MR. KENNEDY:  The only thing specific is the zeros in

13   the years before 2006 and then 104 million in '06 and '07.

14           THE COURT:  Okay.

15           MR. KENNEDY:  I don't know what the targets were in

16   '05 and '06, perhaps they were targets that weren't -- in fact

17   I know they weren't targets that Mr. Bubnovich had anything to

18   do with which might have had some impact on whether they were

19   paid off or not.  The compensation committee was obviously of a

20   different composition, I believe.  Mr. Naylor, I believe, had

21   joined the committee in February of '05.  So, frankly, I don't

22   know why they paid off zero then.  The company could argue we

23   were doing great that's why we paid off more.  Maybe that's so,

24   maybe that's so; I certainly can't say that it isn't.  I can

25   say that if we're looking for the purpose of legitimizing the

1    emergence cash grant on money lost, if you do better in the two

2    years than you had in the prior two, it substantially weakens

3    the argument that there was a loss that needs to be addressed

4    with a further cash payoff.

5            One of the -- the next topic I want to address is

6    really the SERP.  The SERP is obviously a unqualified, unfunded

7    plan.  And could we bring up the Exhibit 2, page 21 of the

8    Bubnovich declaration?  What about the next page?  Yeah.  This

9    report on the defined benefit SERP to me is shocking in a

10   particular way.  Moving a vesting age to fifty-five is an event

11   that has costs in pension funds, significant costs.  Adding a

12   five year certain annuity, the item on the bottom, is an event

13   that has costs and significant costs.  Mr. Bubnovich testified

14   that the total cost for these amendments was 87 million

15   dollars, and yet despite the reams, and we are talking about

16   reams of paper that was produced by Delphi as its plan, nowhere

17   in that plan does it reflect the cost of these improvements.

18   Now, that can hardly be because they forgot to include it.  In

19   our view, it had to have been intentional in effort to avoid

20   drawing attention to the double extraordinary nature of this

21   SERP.  It should have been eliminated and it should never have

22   been improved.  There is no precedent for improving a SERP

23   prior to its freezing and the e-mails that we read from their

24   chief pension actuary, mentioning that the Delphi executive

25   who's in charge of pensions agreed with him, indicated that

128

1   most often the SERP benefits are lost rather than improved.

2          THE COURT:  But the company says, I think with some

3   credibility here, that the claims if you terminated this SERP,

4   i.e., you didn't continue on with a modified DC SERP would have

5   offset that amount and more.

6          MR. KENNEDY:  Well, the claims are obviously payable

7   in claim dollars and this is going to be paid in real time

8   dollars and that's a present value number which over time will

9   be a multiple of that number whereas the payment as a claim is

10  a one time number.  I don't think those are apples and apples.

11         THE COURT:  But I guess I -- you know, in a case

12  where the company is reorganizing and I think it is undisputed

13  that competitively their competitors would have a SERP and you

14  have substantial claims for terminating it that -- leaving

15  aside the improvement point, it wouldn't seem to me to be

16  reasonable to terminate.  I don't see why you would do that.

17         MR. KENNEDY:  Well, we think the drain on the estate

18  of maintaining the SERP is higher and greater than terminating

19  it and dealing with this as a claims process.  For instance, if

20  you were to say to the plan investors, yes, we have a 1.4

21  billion dollar cap on claims, but would you rather pay before

22  we go and cross to the SERP or stretch the cap 100 million to

23  encompass the claims --

24         THE COURT:  Well, didn't they --

25         MR. KENNEDY:  -- I'm guessing they would go for that.

129

1        THE COURT:  -- didn't they have that choice?  I mean

2   it seems to me that they're looking to have management that

3   they want to keep and attract and this is one way to do it.

4        MR. KENNEDY:  But, Your Honor, the flaw in your

5   argument is that they will have a SERP, we're not suggesting

6   they won't have a SERP, they're going to have a defined

7   contribution SERP going forward.  We're now talking about the

8   freezing and maintenance of the existing defined

9   contribution -- defined benefit SERP -- the defined benefit

10  SERP and the whole notion of performance going forward,

11  compensation going forward, being paid in '08, '09 and '10,

12  that is going to be under the defined contribution.  There's no

13  retentive effect to the continuation of the defined benefit

14  SERP.  And for the comparison purposes, the pie charts, the pie

15  chart for the SERP quality is a generally, I believe in most

16  large companies certainly going to be in this one, a defined

17  contribution plan not a defined benefit plan.

18       THE COURT:  Okay.

19       MR. KENNEDY:  I wanted to address the long-term

20  incentive performance equity.  In response to your questions to

21  Mr. DeChiara, let me acknowledge that the non Chapter 11

22  universe that we are aware of suggests a higher than eight

23  percent overhang for companies of similar size.  That's a fair

24  comment and a truth.  But there are a couple of points in

25  connection with the LTIP equity that warrant not only that

130

1    being below for Delphi but for being further below the

2    benchmark than the eight percent that's been proposed.  The

3    first is that going into the Chapter 11 the LTIP program was

4    6.5 percent, not eight, not nine, not ten, not more.  Second is

5    we've, as Mr. DeChiara pointed out, the October 2005 iteration

6    of this program assumed a 400 million dollar value to the

7    shares that would be allocated to management.  At the 7.8

8    billion dollar plan value, if we were using 400 million as a

9    standard, that's 5.5 percent.  6.5 percent, a continuation of

10   the prior percentage, would still yield substantially more than

11   the 400 million that was originally set forth in the October

12   '05 proposal.

13          And the third point is that, as originally set forth,

14   the division between restricted stock units and options was

15   one-third RSU, two-thirds options.  It's now been restated as

16   half RSUs and half options so that the award, the three percent

17   award which is being done on emergence, is now much more

18   valuable to management.  RSUs are two and a half times as

19   valuable, Mr. Bubnovich testified in his deposition, which is

20   in the record, than options are assuming at forty percent

21   Black-Scholes standard which is what he thought was

22   appropriate.  So that a movement, and I don't have the number

23   as a result of this arithmetic, but the movement from one-third

24   to one-half RSUs versus regular stock is a multi tens of

25   millions of dollars in our view adjustment to the equity that

131

1   they have not demonstrated a basis for imposing.

2          The next point I wanted to address is the 11.5

3   million in restricted stock options which are being provided to

4   management that arise from the elimination of the SERP.  The

5   elimination of the SERP in our view, does not give rise -- it

6   may give rise to claims, that's true, but it doesn't give rise

7   to the right of managers or executives to obtain additional

8   stock.  And they did that by comparing -- all right, let's

9   assume Joe works another ten years and Joe now is going to be

10  half of the time under the defined benefit SERP and half the

11  time under defined contribution SERP and make some assumptions

12  about he earns and what his ultimate dollar take is from the

13  combination of those plans, and he's going to be getting less

14  because it's a defined contribution model instead of a defined

15  benefit.  Okay.  I wouldn't care to estimate the amount of

16  money the workers are no longer going to be receiving as a

17  result of their pension changing from a defined pension plan to

18  a defined contribution plan which is what has happened.  And

19  they have not been compensated for that change in plans.  You

20  can graph out what's going to be the take they get in tens

21  years or twelve years or whenever they retire; it's going to be

22  a big gap and times a lot of people it would be a lot of money.

23  We didn't suggest to the company that it was necessary for the

24  employees to be made whole for that change, it's a necessary

25  and inevitable consequence of changing from a defined benefit

132

1   to a defined contribution.  For the managers, however, that

2   necessary and inevitable consequence of the change is one they

3   feel they need to address and pay so that we have 11.5 million

4   in restricted stock units being paid to blunt the impact of the

5   change to the defined composition -- the defined compensation

6   SERP which we think is inappropriate and we oppose.

7           There's also -- the next point I want to address,

8   Your Honor, is the -- it's not included with a number of the

9   other points, but it's obvious from reading the final report in

10  December of '07 that there's an additional four million dollars

11  in cash which is being awarded to executives to compensate them

12  for the reduction in salary, the ten percent reduction that

13  they took as part of the effort to show some participation in

14  the reductions.  We think that's completely inappropriate.

15  It's a burden on the estate; it's not insignificant.  The ten

16  percent reductions only brought them to market.  Many of them

17  were more than market anyway.  So the idea that cash is being

18  taken from the estate to compensate the executives to bring

19  their salaries more in line with market, we think is wrong.

20  Now --

21          THE COURT:  I'm sorry.  You're saying that's part of

22  the 87 million or a separate item?

23          MR. KENNEDY:  You know I don't know, Your Honor.  I

24  was unable to tell.  Perhaps Mr. Butler knows.  I know it's

25  referred to at Page 13 of Exhibit 2 to the Bubnovich deposition

133

1    which is at 265.  And I have it here.  It says the amount of

2    the shortfall between the proposed LTI equity opportunities and

3    median opportunities plus the amount of the permanent reduction

4    in salaries, as well as certain downward adjustments, were

5    estimated at four million.  This shortfall was the basis for

6    the committee to adjust upward the LTI opportunities to certain

7    DSV executives so that it may be encompassed in the LTI cost.

8            Finally, the money to Miller and O'Neal -- I think

9    it's important, interestingly enough, although I share

10   everything Mr. DeChiara said in connection with those awards,

11   that they not be the focus of this proceeding or this case.

12   This, in our view, is not a case where the appropriate response

13   by the Court is to, for a symbolic way, take down the

14   composition of some of the leaders to generally demonstrate

15   that things have to be fair and suggesting that there's a limit

16   and all sorts of other reasons one might do that.  We think

17   there are systemic problems with this compensation system.  It

18   is not an effort to achieve an industry market.  The cash that

19   they're receiving, in our view, is reflective of the problems

20   with the system as a whole.  But it would be an insufficient

21   response, in our view, to concentrate on them as a vehicle for

22   solving that problem.  They're not.  The -- in our view, they

23   should receive collectively what they were anticipated they

24   would receive in October of 2005.  That's some eight million to

25   be split how ever they -- wherever they want.  We don't think

134

1    there's a basis for increasing it, that's obviously a business

2    judgment issue.  We leave that to the Court to determine its

3    fairness.  But it certainly is not the place where fairness

4    could be achieved by focusing on those particular pieces of

5    compensation.

6         So we think the presentation as a whole recognizing

7    that it's the company's burden to demonstrate that this system

8    meets fundamental fairness -- and I speak here not only on

9    behalf of the international IUE, Your Honor, which did vote in

10   favor of this plan.  We have lots of reasons to want to be out

11   of bankruptcy.  I also speak on behalf of a number of

12   affiliated IUE local unions that voted against it.  So there's

13   no confusion about whether the IUE was an enthusiast for this

14   plan.  We were not and our local unions opposed it.  The

15   company's witness described important parts of this case as a

16   novel approach you don't see very often that makes some sense.

17   Boy, that's faint praise for the transfer of millions of

18   dollars to executives.

19        The opening remarks by Mr. Butler have pointed out

20   the need to avoid hyperbole and to reflect the inconvenient

21   truths.  And his repetition of the phrase "inconvenient truth",

22   in our view, was part of an effort to convince the Court that

23   although it may be politically unpopular, this is really a

24   program that has met market tests, is consistent with something

25   or another and therefore ought to be approved even though it

1    might look bad if you were viewing it from the point of view of

2    a local union meeting.  And I don't think that's the case in

3    this plan.  There is an inconvenient truth here.  The

4    inconvenient truth here is that the company lacks independent

5    expert.  They lack evidence of market value.  They ignored the

6    surveys that demonstrated what the compensation should have

7    been.  They've placed cash in the hands through this emergence

8    bonus of executives that lost nothing that are entitled to

9    nothing more than they're already getting.  And the

10   inconvenient truth, in our view, is that the company has to

11   have a blue pencil applied to this plan.

12           The Court, in our view, should use its discretion to

13   indicate that yes, it will approve the plan of reorganization

14   but only upon substantial change in the management compensation

15   portion and that the company has to recognize that given the

16   sacrifices of all the constituents in this case, a market-based

17   compensation plan is not only fair and just but the only one

18   that's appropriate.

19           THE COURT:  Okay.

20           MR. KENNEDY:  Thank you.

21           THE COURT:  Yeah?  Just briefly.

22           MR. BUTLER:  Your Honor, just so the record's clear

23   on Mr. Kennedy's last -- one of his last points.  Page -- if

24   you go to Exhibit 90, page 13, that's where the reference to

25   this four million dollars.  And it's in the middle part of the

136

1    report.  And there was an adjustment made by the compensation

2    committee to certain LTI opportunities for three or four

3    executives at the recommendation of the CEO of the company.

4    And that's the explanation of it right there.  And there was an

5    upward adjustment of which the aggregate total of four million

6    dollars.  There was not any reimbursement of lost salary to the

7    DSB members or anything of the sort.  There was a four million

8    dollar amount that based on the calculation that Concurry (ph)

9    did, they decided to reallocate to, I say, three or four

10   executives.  I think it was responsibilities changed during the

11   course of the Chapter 11 case.

12            THE COURT:  Do you -- if you know how much of it was

13   attributable to permanent reduction in salaries?

14            MR. BUTLER:  I don't know how much -- I have no idea

15   was attributable to the aggregate amount of salaries but the

16   point was that it still remained.  After making this

17   adjustments, the TDC was still below the peer group TDC.  This

18   was intended to adjust the peer group, the opportunities for, I

19   think, three or four executives.  So it was not in any way an

20   adjustment.  And the report indicates that and it's disclosed

21   in the final reports so there's no -- there was no secret about

22   this.  It was laid out plainly in the final report as part of

23   the LTI.  It has nothing to do with the cash for other

24   programs.

25            I just have a couple of items that I wanted to

1    address which was, first, in Mr. DeChiara's presentation

2    arguing both equivalence of sacrifice and 1129(a)(3).  Mr.

3    DeChiara -- and in the papers filed by the unions, the

4    suggestion is that there can't be any evidence of sacrifice or

5    the Court ought to disregard everything that occurs by the

6    company and with respect to executive compensation, unless we

7    can prove that the end result is below market, the sacrifice is

8    an equivalent of below market.  And that I just don't think

9    that's an appropriate formulation of this.  It's certainly not

10   what I think equivalence of sacrifice is either in the second

11   circuit or was in the MOU agreement which just factually, as

12   the record indicates, was not negotiated in the MOU but was

13   carried over from the 2003 agreement.  With respect to the --

14   and there were a lot of -- just inconsistencies in the argument

15   that at one point, the argument was that if you negotiated, it

16   can't be equivalence of sacrifice.  And I know the unions

17   believe that they sacrificed and they negotiated all the MOUs

18   to the result that it ultimately got backstopped by General

19   Motors in this case.  But it's hard to understand how, on the

20   one hand, as it relates to them moving from out of market

21   towards market and negotiating that with soft landings, which I

22   acknowledged they believe and I think was painful and a

23   difficult exercise under the standards that they would impose

24   on management, none of those would be counted.  Because if you

25   take their words and apply them, none of them would be counted

138

1    and I don't think that's what they ultimately mean and I don't

2    think that's how the court should think of this.

3            I also want to point out, Your Honor, in terms of the

4    second opinion issue I hear, there was a process here.  And

5    Your Honor's well aware of it in the record, in which this

6    program was vetted in at least two ways.  First, it was vetted

7    with the plan investors who were putting equity in the company

8    and then making all the changes they chose to make and then

9    concluding that it was in the best interest of the company to

10   go forward with this program and that -- and at the comp

11   committee, Mr. Naylor testified to this, that was viewed as a

12   second opinion by the comp committee.  They did take that into

13   account.  Also into account, and again on the creditor's

14   committee review of this they negotiated for specific rights

15   under Section 7.8 of the plan.  They had their own independent

16   compensation consultant; they evaluated the plan and they

17   reached agreements with the company in which the creditor's

18   committee concluded that the debtors' had complied with Section

19   7.8 plan of the plan and settled with the company.  And that

20   included, even in the cash portion of this, the company

21   adopting the creditor's committee suggestion that the cash

22   awards be spread out over two years.  So there was a retentive

23   nature to this even beyond the Chapter 11 case.  That half the

24   awards would not be paid until 2009 and would also be

25   appropriate.

139

1        In connection with Mr. Miller and Mr. O'Neal, I think

2   Your Honor has the math right.  The eight million that Mr.

3   Kennedy says that they would have no problem with having this

4   group paid for, when added to the 7.3 million dollars worth of

5   undisputed waivers in the record that occurred during the case

6   by these two individuals, you get 15.3 million.  And the total

7   that's being suggested for them is something under that by a

8   couple of million dollars.  I know money's fungible but this is

9   not a case where people are trying to get more than what had

10  been contemplated.  They, in fact, were getting less.  And I --

11  we don't need to put up on the board, but the reality is Mr.

12  Miller testified in his declaration -- I think it was in

13  footnote 2 of his declaration -- testified to the fact that

14  when he made -- gave this waiver, he was relying at the end of

15  the day that the compensation at the end of the case would make

16  a reasonable and fair determination of what he should be paid.

17  That's what he relied on.  Not on any individual element of

18  compensation but rather he relied that he would be treated

19  appropriately and fairly at the end of the case by the

20  compensation committee who acted, I think, on a report that is

21  not disputed in terms of evidence in the record.

22        There's also, I think, in Mr. DeChiara's discourse

23  with the Court, some confusion about whether something is above

24  market or above median.  Mr. Naylor's testimony was that the

25  compensation committee's efforts was to drive the total direct

140

1   compensation of executives to median, to market median.  But it

2   was total direct compensation, it wasn't every individual

3   element had to be exactly median.  And even with respect to

4   total direct compensation, the testimony was that they want to

5   make sure there was not material variances in that and there

6   were percentages banded about as to what that might be.  There

7   was, and all the records shows and all the compensation stuff

8   shows, it was acknowledgement that the DSB elements, salary

9   elements, cash base salary element to this had been above a

10  median, not above market.  It's still within the range, that's

11  the point here.  I don't want to make sure the record's unclear

12  about what's above median and above market.  And Mr. DeChiara

13  said above -- it was above market.  That's not what the record

14  supports.  It was above median and the comp committee took

15  action to move that in the general direction towards median by

16  making permanent the voluntary waivers that had been in place

17  during the course of the case.

18          There was discussion on the -- on the peer group

19  issue and the survey issue and whether it was appropriate to

20  use predictive data versus actual data for the bottom ten

21  people in the DSB.  This is -- this issue, which the court

22  explored at some time in cross-examination affects ten out of

23  560 executives.  And there was a decision closed to the

24  parties, disclosed to the plan investors, disclosed to the

25  creditor's committee, there was a decision by the comp

141

1    committee after consultation with its expert to use -- and

2    extrapolate actual data as opposed to using predictive data

3    which ultimately they determined and their judgment did not

4    make sense to them.  And that was the judgment that was --

5    actually, we're not backing away from that judgment, the

6    company believes that was the right result as to those

7    particular cases.  It's not systemic as Mr. Kennedy suggests,

8    it was a determination about ten slots in the lower part of the

9    DSB and the testimony was that the survey data here didn't even

10   cover some of the positions.  When I went back and redirect and

11   asked about survey data's to certain positions, the testimony

12   was even the survey data did not cover those positions.

13         With respect to a couple of Mr. Kennedy's comments, I

14   would just indicate -- again, there was at one point in the

15   cross-examination, there was a proxy statement tossed up that

16   had a 6.5 percent number in it and I think, if Your Honor

17   examines that exhibit, what that reflected was the 6.5 percent

18   addition to a pool that was being put in that particular year.

19   In fact, reality is the actual dilution in the total pool was

20   something on the order of eighteen percent and that was in

21   addition; I think if one went back and actually read the words

22   of that proxy statement.

23         The -- with respect to the SERP issues, the fact of

24   the matter is the record here, I think, is now clear that the

25   SERP as to retirees is being cancelled and terminated and

142

1    they'll have claims in the Chapter 11 case.  With respect to go

2    forward executives, it is being -- it is being frozen and then

3    replaced and there are enhancements that are being put in

4    connection with the frozen plan that had been disclosed.

5    Again, to benchmark to what was be viewed as a competitive

6    benefit and that information which again is uncontroverted in

7    terms of it being competitive, the measurements were all in the

8    final report that we went over at the time.

9           The -- and then the other thing, I don't believe the

10   Dana opinions, which I've read, I don't think go to emergence

11   programs and to the post emergence structure of management

12   compensation to suggest that as a matter of law in this

13   district or in this circuit, that there is -- or even in the

14   court of the judge who wrote that opinion, that there is the

15   only peer group that could be looked at is a peer group in the

16   very same industry.  I just don't think that's a -- their

17   reading of that opinion and I don't think that's what -- how

18   peer group analysis is done in evaluating management

19   compensation.  I recognize any connection with elements of

20   compensation that are paid under 363 during a process, a

21   Chapter 11 process, that often times people will look more

22   closely and focus on Chapter 11 comparables and occasionally

23   industry comparables but the clear, I think, accepted process

24   in the management compensation business is to look at

25   broad-based peer groups and I think that's the testimony in

143

1    this record.

2            And the last point I simply, Your Honor, would like

3    to make as we -- in response to these items, is I do think that

4    Mr. Kennedy had actually commented in his opening remarks that

5    the IUE is very familiar with management comp, is very familiar

6    with the elements of management comp and has -- and had no

7    issues with how the -- with management getting all of those

8    elements so long that there was fundamental fairness at a

9    market median.  Well, the evidence when you take the total of

10   our compensation as a whole, the evidence here is that is added

11   actually slightly below market median.  That's the undisputed

12   evidence.  And while people want to beat up on individual

13   elements of this, the overall conclusion I think from the

14   evidentiary record can't be disputed.  And the question really

15   on, and probably the question of the day, really probably

16   focuses on the cash emergence program where the debtors

17   attempted to use a delivery vehicle in the Chapter 11 case that

18   would provide the LTC, the long-term part of the pie to their

19   management team on the same way that my view, and Mr. Kennedy

20   even acknowledged, they were entitled to all of the elements of

21   the pie, the question is the fundamental clearance of how to

22   deliver them.  We did not believe and we do not believe as a

23   debtor that it's fair under any method to ignore it and simply

24   eliminate it.  And so the question is what vehicle to use?  The

25   record, in this case, indicates the company even pre-petition

144

1    migrated from a stock based system to a delivery vehicles to

2    primarily cash in 2005 using seventy percent of the value was

3    delivered in cash and proposed a program here that would --

4    where a hundred percent was delivered in cash and essentially

5    placed it -- the opportunity here for this to be evaluated at

6    the end of the case, backward looking with the court being able

7    to decide whether there has been performance by the executives

8    in a backward looking kind of way.  And ultimately if Your

9    Honor concludes that the program provides a benefit which

10   hardly compensates or makes up for what was given up but in

11   fact is discounted two-thirds as the record sort of -- as the

12   record indicates.  And as to Mr. DeChiara's equivalence of

13   sacrifice arguments and some of my other comments I would

14   simply go back to the arguments I made earlier, Your Honor,

15   where I went through half a dozen particular items that had

16   been -- that had been negotiated down.  Much of which are just

17   kind of Mr. DeChiara because he believes that they were above

18   market.  But again, that goes back to the basic disagreement

19   between the two of us as to how one evaluates that because

20   applying those same standards, then the UAW -- the UAW

21   sacrifices wouldn't be viewed as sacrifices.  I don't know.

22          I'll just end on that and ask Your Honor to confirm

23   the plan of reorganization and I do have other items but Your

24   Honor made a point to me that you were comfortable with the

25   balance of the record and therefore I won't go into those in

145

1    any detail.

2         THE COURT:  Okay.  All right.  I'll be back at 2 just

3    to give people a chance to stretch their legs.  Let's continue

4    at 2:00.

5         (Recess from 1:50 p.m. until 2:03 p.m.)

6         THE COURT:  Please be seated.  Okay.  We're back on

7    the record in In re Delphi Corporation.  I have before me the

8    debtors' request for confirmation of their first amended joint

9    plan of reorganization as modified.  And I'm going to address

10   certain elements of the confirmation standards set forth in

11   primarily Section 1129(a) of the Code but also two or three

12   other sections of the Bankruptcy Code first.  And then address

13   second the limited objections by the UAW and the IUE to one

14   aspect of the plan.

15        I address the first points notwithstanding the fact

16   that at this point I believe there are no remaining objections

17   to the plan except for the union objections as well as the one

18   or two sentence objection by Mr. Hallovey (ph.) based on the

19   same general view regarding the proposed management

20   compensation plan aspect of this plan.

21        I do that because the Court has an independent

22   obligation under 1129(a) to review and consider the factors set

23   forth therein.  And particularly in light of certain of the

24   objections and features of the plan, I've done that.  And

25   having undertaken that analysis, I conclude that the plan

1   satisfies all of the aspects of Section 1129 with the exception

2   of 1129(a)(4) which I'll deal with at the end of my remarks.

3          A number of the objections raised classification

4   issues under Section 1122 of the Code and/or Section 1123(a)(4)

5   which provides for the same treatment of each claim in each

6   respective class unless the holder of a particular claim has

7   agreed to a less favorable treatment.  Based upon the voting on

8   the plan, which with two exceptions was overwhelmingly in favor

9   of confirmation of the plan, I find that the plan does, in

10  fact, satisfy Sections 1122 and 1123(a)(4).

11         The plan classified all unsecured claims whether

12  contractually subordinated or not against Delphi Corporation

13  and the DAS group debtors in one class.  However, the

14  disclosure statement made it very clear in a number of sections

15  in bold print that the Court would consider holders' votes

16  carefully in evaluating whether the plan met the classification

17  and treatment requirements of 1122 and 1123(a)(4).  And the

18  debtors, true to their word, tabulated the votes not only for

19  the entire class of unsecured creditors but also by category of

20  senior debt versus sub-debt and also on a debtor by debtor

21  basis.  And on a debtor by debtor basis and on a senior debt

22  and junior debt basis, the plan was accepted with the exception

23  of two debtors that would not have implicated any 1122 or

24  1123(a)(4) issues.

25         On that basis, I conclude that I do not have to

1    consider in any great detail, other than to observe that it

2    appeared to me to be a credible valuation, Rothschild's

3    conclusion that the senior debt would be paid in full under the

4    plan because of the plan vote.  The debtors could, under

5    Section -- I'm sorry, under Bankruptcy Rule 3019, if they

6    wished, modify the plan to set up different subclasses but

7    given the vote there is no need to.  And at best, their

8    classification scheme and my ruling that it satisfies the

9    requirements of the Bankruptcy Code and, in particular,

10   Sections 1122 and 1123(a)(4) would be harmless error.  That

11   very point was made by the second circuit in Kane v. Johns-

12   Manville Corporation, 843 F.2d 636 at 647, citing Bankruptcy

13   Rule 9005.

14           I also note that given the affirmative plan vote,

15   with the two exceptions, for relatively second tier debtors

16   that I'll address in a moment, all of the objections with

17   respect to the absolute priority rule and the application of

18   1129(b) are rendered moot since the senior class in each case

19   waived its rights to assert absolute priority distribution.

20   See again Kane v. Johns-Manville, 843 F.2d at 650 as well as In

21   re Jersey City Medical Center, 817 F.2d 1055, 1062 (3rd Cir.

22   1987).

23           With regard to the two classes of unsecured creditors

24   of debtors that did not accept the plan, I conclude that the

25   plan can be confirmed as it is drafted.  First, there is no

148

1    extant objection to confirmation by a creditor in those

2    classes.  Secondly, I accept the debtors' analysis in two

3    respects that would permit distribution to the parent companies

4    shareholders as well as the immediate shareholders of those

5    debtors.  First, this plan satisfies the new value exception to

6    the absolute priority rule in that it provides for the

7    satisfaction of a joint several claim that would exist against

8    each of those debtors through financial undertakings and the

9    distribution of assets at levels above them which would provide

10   substantial new value to those entities and relieve them of

11   their underfunded pension liability and the contingent

12   liability that they had in respect of the potential termination

13   of the pension plan.

14          Secondly, as I'll discuss in a little bit more detail

15   later, a key element of this plan is the debtors' settlement

16   with GM, which is a multi-faceted settlement involving issues

17   that go both to claims arising from the spin-off of the debtors

18   from GM as well as ongoing issues tied to the customer

19   relationship between the debtors and GM.

20          The provision of value by GM to the debtors and vice

21   versa under that settlement is quite complex.  However, I

22   believe that one element of the settlement, and a key element,

23   without which the settlement would not have been achieved, is a

24   release by all of the debtors of GM and related release by

25   third parties including the debtors' shareholders of related

149

1    claims.  The consideration in respect of those releases, to my

2    mind, would not necessarily flow to these two second and third

3    tier debtors but rather would flow above them including as far

4    as to the shareholders of Delphi Corporation at least in

5    reasonable relation to at least a substantial portion of what

6    they're attaining under the plan.

7            So consequently, I believe that the plan, even though

8    there is no objection to it being crammed down, could, if there

9    had been an objection, or would be subject to cramdown on those

10   descending classes.

11           The plan also contemplates a partial substantive

12   consolidation by groups of debtor entities.  The plan, I

13   believe, or the issue of the propriety of substantive

14   consolidation under the plan, is not, I believe as a matter of

15   law, rendered moot by the overwhelming affirmative vote in

16   favor of the plan.  However, in my view, the fact of such a

17   vote as well as the absence of any extant objection to the

18   plan's proposed partial substantive consolidation is the

19   primary factor that I should consider in connection with this

20   particular proposed substantive consolidation.  That was the

21   analysis undertaken by the Court in In re Standard Brands Paint

22   Company, 154 B.R. 563 and In re Creditors Service Corporation,

23   195 B.R. 680.  The first case comes from the central district

24   of California, 1993; the second from the southern district of

25   Ohio, 1996.

150

1    I also note that based upon Mr. Eisenberg's

2    declaration as well as his limited testimony in response to my

3    questioning, I conclude that no particular creditor is harmed

4    by substantive consolidation.  And that also has been a

5    substantial factor when Courts have considered the issue.  See,

6    for example, In re Winn-Dixie Stores, Inc., 356 B.R. 239

7    (Bankr. M.D. Fla. 2006); In re Gucci, 174 B.R. 401 (Bankr.

8    S.D.N.Y. 1994); and In re Affiliated Foods Inc., 249 B.R. 770

9    (Bankr. W.D. Mo. 2000).

10    That's particularly the case here as it was in the

11    Winn-Dixie Stores case because this plan, as I noted earlier,

12    relies in large part upon the complicated settlement with GM

13    which crosses the borders of the various debtor groups and

14    which is, as I said earlier, is well supported by the record

15    and in the best interest of the debtors' estate.

16    I questioned Mr. Eisenberg, the debtors' primary

17    witness on substantive consolidation with respect to the two

18    debtors who had a class that did not accept the plan.  Again,

19    there was no objection by any creditor of those debtors to

20    substantive consolidation which goes a long way to, in my mind,

21    establishing that substantive consolidation is appropriate as

22    laid out in the debtors' disclosure statement.  But in

23    discussing those two debtors which are ACEC Manufacturing

24    General Partnership and Delphi Electronics Holding LLC, Mr.

25    Eisenberg went through the relevant section in Exhibit B to his

151

1    declaration, which appears at page 28, in which he discussed

2    the factors in support of the substantive consolidation

3    involving both of those two entities.

4         Let me take Delphi Electronics Holding first.  It

5    appears to me to be a true holding company with no scheduled

6    assets or liabilities.  Therefore, it would have such

7    liabilities only to the extent that it would have joint and

8    several liabilities across the board with the debtors.  With

9    such an entity, I don't see any evidence in the record that

10   substantive consolidation would harm any party.  And indeed,

11   given the recovery of the creditors of that entity, it appears

12   to me to be to their benefit.

13        A similar analysis would apply to ACEC Manufacturing

14   General Partnership.  It did have scheduled assets and

15   liabilities based on my knowledge of the sale of its indirect

16   primary asset during the case.  However, its liabilities exceed

17   the assets and consequently again, it appears to me that

18   substantive consolidation under the plan would be of no

19   detriment to its creditors given their treatment under the

20   plan.

21        I've also considered the releases injunction and

22   exculpation provisions of the plan in the confirmation order.

23   In light of the standards set forth in In re Metromedia Fiber

24   Network, Inc., 416 F.3d 136 (2nd Cir. 2005) as well as cases

25   that have interpreted that decision.  And I conclude again,

152

1    taking into account the fact that there are no extant

2    objections to those provisions, that those releases exculpation

3    provisions and related injunctive provisions are consistent

4    with the standard set forth in Metromedia.  Judge Gerber in In

5    re Adelphia Communications Corporation, 368 B.R. 140,

6    distinguished the types of persons and/or circumstances where

7    releases may be appropriate.  He noted that -- and this is at

8    268 -- that releases and related exculpation and injunctive

9    provisions with regard to indemnified persons with regard to

10   unique transactions where third parties are contributing

11   substantial value, in particular, are appropriate grounds for a

12   third party release in a plan.  This disclosure statement, or

13   the plan's disclosure statement, described at length the

14   rationale for the releases in the plan and, in particular, the

15   release being provided to GM.  It's also clear to me that the

16   releases related to the plan investors were also adequately

17   disclosed and supportable under the logic of Metromedia and

18   Adelphia.

19         Also with the appropriate caveats accepting

20   willfulness conduct and the like, the other released parties

21   would be entitled to their releases under the plan.

22         In particular, in regard to the GM settlement, I

23   believe that District Judge McMahon's opinion in In re Karta

24   Corporation, 342 B.R. 45 (S.D.N.Y. 2006) is appropriate given

25   the key role that that settlement played in the debtors'

1    reorganization.  But that in each case, given the consideration

2    provided to the estate and the actual or anticipated

3    consideration back in the form of release, it appears to me

4    first that the released parties' interest are aligned in

5    interest with the debtor; and secondly that the releases

6    offered very reasonable relationship to the protection of the

7    estate and go no further than necessary to protect those

8    interests as Judge McMahon analyzed Metromedia in the Karta

9    case.

10        In that regard, I also should observe that I've

11   considered the relative strength of the claims that are being

12   released -- of the claims of third parties that are being

13   released, particularly, in light of where I know the case as

14   well as case law in respect of third party claims related to

15   the debtors' claims.  And it appears to me that consistent with

16   Judge Gerber's analysis in In re Global Crossing Ltd., 295 B.R.

17   726 (Bankr. S.D.N.Y. 2003), the nature of the claims being

18   released by third parties is very much more than offset by the

19   benefits that they are receiving under the plan.

20        Finally, I've considered the plan's mechanism for

21   dealing with executory contracts and unexpired leases which

22   originally raised or prompted or provoked a number of

23   objections.  As is often the case with an operating debtor that

24   has a number of contractual relationships, many of those

25   objections really were tied to simply trying to assure that the

154

1    nondebtor party to the contracts' cure claim and adequate

2    assurance claims were appropriately addressed.  But more than a

3    handful of the objections raised the point that in the

4    objectors' view, a debtor cannot obtain an order authorizing

5    assumption or rejection of an executory contract or unexpired

6    lease after confirmation of a plan.  I believe this is too

7    narrow a view under the case law and commentary.  Rather, as

8    long as the motion to assume or reject is pending prior to

9    confirmation and the debtor is dealing with that motion in good

10   faith, I believe that the debtor can obtain an order

11   authorizing assumption or rejection after confirmation.  And

12   indeed, in light of the development of the facts over issues

13   pertaining to cure and adequate assurance and the like is free

14   to change its mind.  See, for example, In re J.M. Fields, Inc.,

15   26 B.R. 852 (Bankr. S.D.N.Y. 1983) and In re Gunter Hotel

16   Associates, 96 B.R. 696 (Bankr. W.D. Tex. 1988) as well as the

17   relevant discussion in Collier on Bankruptcy at paragraph

18   365.04.

19        I've reviewed the confirmation order that has been

20   proposed by the debtors having received a blacklined copy of it

21   this morning, which the debtors provided, as they said they

22   would, at the close of the proceedings on Friday.  And I am

23   prepared to make consequently all of the findings in it with

24   the one exception that I addressed a moment ago dealing with

25   the management compensation aspects of the plan which I want to

155

1    turn to now.

2            The standard by which the Court should consider the

3    three objections to the plan that all relate to management

4    compensation issues is an interesting question.  The two unions

5    rely upon Section 1129(a)(3) of the Code, which states that

6    "The Court shall confirm a plan only if the plan has been

7    proposed in good faith and not by any means forbidden by law."

8    The unions contend that the management compensation provisions

9    baked into the plan through Sections 7.8 and attached exhibits

10   are fundamentally unfair and therefore violate Section

11   1129(a)(3).  I believe this goes too far under the facts of

12   this particular case based upon my review of an extensive

13   record and two days of testimony.  I believe that 1129(a)(3)

14   primarily goes to the negotiation and proposal of a plan and

15   that it is within that context or within that prism that the

16   Court should consider its fundamental fairness.  The cases

17   relied upon by the objectors are consistent with that view.

18   They did not look at the reasonableness of proposed management

19   compensation or the fairness of proposed management

20   compensation on a stand alone basis, but rather considered

21   whether management issues tainted the negotiation and pursuit

22   of confirmation of a plan which was, in fact, what the Court

23   found in In re Bush Indus., Inc., 315 B.R. 292 (Bankr. W.D.N.Y.

24   2004) where Judge Buckeye concluded that managements focus

25   almost exclusively on its own proposed compensation and

1   perquisites improperly tilted the negotiating process.   In

2   contrast, see In re Granite Broadcasting Corporation, 369 B.R.

3   120 at 137-138 (Bankr. S.D.N.Y. 2007), where the Court found,

4   contrary to Bush Industries, that there was no 1129(a)(3)

5   problem because the plan was negotiated independently of the

6   senior managers' interest.   And the plan funder and the

7   managers agreed on provisions relating to management's

8   employment terms following the formulation of the plan of

9   reorganization.   It was also noted, contrary to Bush

10  Industries, that in that case, in Granite Broadcasting,

11  management was going to play an important role going forward

12  and consequently, it was totally consistent with fair process

13  that those who would be owning the stock of the company on a

14  going forward basis would, after negotiation of the plan of

15  reorganization, negotiate management's employment terms.

16          This does not mean, however, that there isn't an

17  applicable provision of 1129 for the union's objections.   I

18  believe that provision is Section 1129(a)(4).   I believe this

19  is the provision that the debtors view as being applicable.   At

20  least during oral argument, Mr. Butler stated that this is not

21  an issue to be determined under Section 363(b) of the Code

22  since it comes at the end of the case and is couched in a plan

23  upon which there has been a disclosure statement and creditors

24  have voted.

25          Section 1129(a)(4) states "Any payment, made or to be

157

1   made by the proponent, by the debtor or by a person issuing

2   securities or acquiring property under the plan, for services

3   over costs and expenses in or in connection with the case or in

4   connection with the plan and incident to the case, has been

5   approved by or is subject to the approval of the Court as

6   reasonable."  This provision has been applied not only to

7   professionals but also to senior management and, in one case,

8   employees of a trustee.  See In re American Freight Systems

9   Inc., 1998 U.S. App. LEXIS 7847 (10th Cir. April 23, 1998); In

10  re Sherwood Square Associates, 107 B.R. 872 at 877, 878 (Bankr.

11  D. Md. 1989); as well as In re AIOC, A-I-O-C, Corporation, 2000

12  Bankr. LEXIS 1360 (Bankr. S.D.N.Y. June 1, 2000).

13          That having been said, there are very few cases and

14  none in any detail, that discuss how the Court should go about

15  an 1129(a)(4) analysis.  In one level, I believe that it is

16  appropriate as with the substantive consolidation analysis, for

17  the Court to take into account the affirmative vote in favor of

18  the plan given that the elements of the management compensation

19  plan were described at length in the disclosure statement and,

20  secondly, obviously affect the recovery by all parties in

21  interest who are receiving distributions under the plan,

22  certainly in the form of stock, which is most of the parties

23  receiving distribution under the plan.

24          On the other hand, I don't believe that the Court

25  should be as deferential in this analysis as I would be, or as

158

1    I was, in connection with the substantive consolidation

2    analysis.  I say that because Section 1129(a)(4) sets forth its

3    own standard as reasonable.

4           Secondly, I believe that Congress was concerned that

5    in Chapter 11 cases there is a risk that payments for services

6    rendered during the case or in connection with the plan and

7    incident to the case might be improper or unreasonable and

8    therefore put the burden on the Court to police the system to

9    avoid the risk of those who would be voting on the plan from

10   being unduly pressured to accept unreasonable payments going to

11   third parties including not only professionals who'd be

12   involved in the case but also to insiders.

13          I also believe that the Court's obligation to do its

14   own analysis as to whether payments under Section 1129(a)(4)

15   are reasonable is influenced by the case law and in particular,

16   the second circuit case law with regard to administrative

17   claims.  The payments proposed under the management

18   compensation plan are not in respect of administrative claims,

19   obviously, although they are cash payments.  And further, one

20   element of the analysis of the reasonableness of those payments

21   is to compare them to the rights of the recipients or the

22   proposed recipients including their claims against the estate.

23   And as the second circuit has said, and more recently the

24   Supreme Court has said, because the presumption in bankruptcy

25   cases is that the debtors' limited resources will be equally

159

1    distributed among his creditors, statutory priorities are

2    narrowly construed.  See In Re Bethlehem Steel Corporation, 479

3    F.3d 167, 172 (2nd Cir. 2007) as well as Howard Delivery

4    Service, Inc. v. Zurich America Insurance Company, 126 Sup.Ct.

5    2105, 2116 (2006).

6            There's one other element to the analysis of the

7    proposed management compensation program under the plan that

8    goes beyond Section 1129(a)(4) that I also should note.  It is

9    unique to the UAW in the MOU agreed to between the UAW and the

10   debtors.  Delphi agreed to, in paragraph -- or Section I, "the

11   principle of equivalence of sacrifice" when establishing

12   compensation and benefit levels for salaried employees and

13   management to ensure that sacrifices by UAW-represented

14   employees are reflected in the pay and benefit practices of all

15   non-represented employees."

16           There has been back and forth between the debtors and

17   the UAW as to the meaning of this provision.  I believe that it

18   should be viewed, first, in terms of its plain words and

19   second, in the context of analysis using the same context under

20   Section 1113(b)(1)(a) of the Bankruptcy Code.  I note first

21   that obviously given that Delphi and the UAW entered into the

22   MOU, the Court never entered an order under Section 1113

23   authorizing the rejection of the UAW Delphi collective

24   bargaining agreement.  Rather, the parties negotiated a

25   resolution of that dispute.  However, that dispute was clearly

160

1   a backdrop to those negotiations.  And moreover, I believe that

2   the Court's interpretation, again, of a similar concept in the

3   1113(b) concept -- I'm sorry, in the 1113(b) context is a

4   reasonable interpretation of the concept of equivalence of

5   sacrifice.  Section 1113(b)(1)(a) states that the debtor

6   satisfy the Court that "all creditors, the debtor and all

7   affected parties are treated fairly and equitably in connection

8   with a proposal to reject or modify a collective bargaining

9   agreement.  The purpose of this provision, according to the

10  second circuit, is to spread the burden of saving the company

11  to every constituency while ensuring that all sacrifice to a

12  similar degree" -- see Truck Drivers Local 807 v. Carey

13  Transportation, Inc., 816 F.2d 82.  Continuing on in that case,

14  the second circuit states "The debtor is not required to prove

15  in all instances that managers and non-union employees will

16  have their salaries and benefits cut to the same degree that

17  union workers' benefits are to be reduced.  To be sure, such a

18  showing would assure the Court that these affected parties are

19  being asked to shoulder a proportionate share of the burden.

20  But we declined to hold that this showing must be made in every

21  case.  Rather, a debtor may rely on proof that managers and

22  non-union employees are assuming increased responsibilities as

23  a result of staff reductions without receiving commensurate

24  salary increases.  This is surely a sacrifice for these

25  individuals, particularly where, as here, the Court finds that

1    only the employees covered by the pertinent bargaining

2    agreements are receiving pay and benefits above industry

3    standards, it is not unfair or inequitable to exempt the other

4    employees from pay and benefit reductions.

5            A similar point was made by Judge Gropper in In re

6    Northwest Airlines Corporation, 346 B.R. 307 (Bankr. S.D.N.Y.

7    2006) when he discussed the same requirements.  He stated,

8    again, quoting Kerry Transportation and Century Brass, "the

9    purpose of the fair and equitable requirement is to 'spread the

10   burden' of saving the company to every constituency while

11   ensuring that all sacrifice to a similar degree."  He noted,

12   however, it is not necessary for all affected parties to

13   receive identical modifications.  And concessions asked of

14   various labor groups may reflect differences in the groups'

15   wage and benefit levels.  Further, he states, "because it is

16   often difficult to compare the differing sacrifices of parties

17   in interest, Courts supply a flexible approach in determining

18   what constitutes fair and equitable treatment."  He cited cases

19   for those propositions in In re Allied Delivery System Company,

20   49 B.R. 700 (Bankr. N.D. Oh. 1985).  "The Court did not look

21   for dollar for dollar proportionality but rather looked at the

22   merits of each party's legal position as well as the nature of

23   the concessions that were being asked of various labor groups

24   including whether parties, as in the Kerry case, were above

25   market to begin with or not.  In the In re Indiana Grocery

1   Company, Inc. case, 136 B.R. 82 (Bankr. S.D. Ind. 1990), which

2   Judge Gropper cites for its -- "equity under Section 1113 means

3   fairness under the circumstances, the Court found that there

4   was no sacrifice by management or any evidence of increased

5   duties or other give-ups in any way."  In Northwest, Judge

6   Gropper stated as for the sacrifices by non-union personnel,

7   "the evidence is that management base pay was cut up to fifteen

8   percent and cash compensation for officers was reduced by

9   approximately twenty percent in December 2004.  In December

10  2005, the debtors instituted additional pay and benefit cuts

11  for management to achieve total payroll reductions of seventy-

12  three million.  During the bankruptcy, there has been no effort

13  by these debtors to institute a Key Employee Retention Plan, or

14  KERP, for top level officers."

15          So, in addition to considering whether the proposed

16  management compensation plan under the plan is reasonable under

17  Section 1129(a)(4), I have considered whether it comports with

18  the equivalence of sacrifice provision in the UAW MOU as

19  applied and interpreted by the foregoing cases.

20          In considering the reasonableness of the management

21  compensation plan, I've done two things.  First, I've

22  considered it pursuant to its own goals which are set forth in

23  numerous places, including the declarations of Mr. Bubnovich

24  and Mr. Naylor.  Secondly, I've reviewed it in light of factors

25  most recently discussed by Judge Lifland in a somewhat

163

1    different context in In re Dana Corporation, 358 B.R. 567

2    (Bankr. S.D.N.Y. 2006) in which he considered a proposed out of

3    the ordinary course management compensation program offered up

4    under Section 363(b) of the Code during the case in its early

5    stages.  In Dana, he asked, noting numerous cases that have

6    applied a similar logic, is there a reasonable relationship

7    between the plan proposed and the results to be obtained?  Is

8    the cost of the plan reasonable in the context of the debtors'

9    assets, liabilities and earning potential?  Is the scope of the

10   plan fair and reasonable?  Does it apply to all employees?

11   Does it discriminate unfairly?  Is the plan or proposal

12   consistent with industry standards?  And what were the due

13   diligence efforts of the debtor in investigating the need for a

14   plan including analyzing which employees need to be

15   incentivized?  And again, what is generally applicable in a

16   particular industry?

17          The plan is multi-faceted.  It covers all four

18   traditional aspects of management employees compensation, that

19   is, base salary, short term incentives or bonuses, a long term

20   incentive element as well as retirement benefits and other

21   benefits.  In addition, it has an element that is intended not

22   to be forward looking, i.e., looking to the period after which

23   the debtors emerge from Chapter 11, but rather, is intended to

24   cover what the debtors was a lost or foregone compensation

25   opportunity during the Chapter 11 cases.  The debtors'

164

1    philosophy in respect of the compensation program cannot be

2    faulted.  It is to provide its senior managers, who in this

3    case number approximately 560 individuals given the size of the

4    debtors, with competitive market-based compensation in the

5    aggregate.  More specifically, the debtors have adopted a

6    policy to attract, motivate and retain talented and dedicated

7    management by providing competitive benchmark-based

8    compensation at market for executives as determined by

9    independent third parties.  In addition, they want to link most

10   of total direct compensation to performance-based incentives in

11   the creation of long term shareholder value and have stock-

12   based incentives as a core element requiring that the

13   executives maintain a meaningful amount of stock during their

14   tenure.  Finally, they want to provide sufficient flexibility

15   to the board to recognize and reward individual performance.

16        I am well aware of the merits of the last point.  And

17   I note generally that while bankruptcy courts must confront as

18   I have during the course of the case proposals that are out of

19   the ordinary course related to management compensation and also

20   must do so under 1129(a)(4), I do not believe it's an

21   appropriate role of the Court to micromanage that issue but

22   rather to recognize that compensation programs and decisions

23   are at the heart of the management process where an appropriate

24   amount of flexibility needs to be maintained.  Moreover,

25   micromanagement, I think, would be inconsistent with the notion

165

1    of a debtor-in-possession which is at the heart of Chapter 11.

2              On the other hand, it is critical for the Court to

3    review the fairness of the process of implementing the

4    foregoing goals and if there are questions with regard to the

5    fairness of that process, the reasonableness of the outcome.

6              The two unions have raised serious issues going to

7    the reasonableness of the process of setting at least certain

8    elements of the proposed management compensation program.  Let

9    me be careful, however, in explaining why I've reached that

10   conclusion.  I do not believe they have established that the

11   compensation committee, and in particular, Mr. Naylor, is under

12   or was operating under any debilitating bias or conflict.  That

13   simply was not established by the evidence before me.  Nor do I

14   believe that they have shown that the debtors' compensation

15   consultant was under an improper bias or conflict simply from

16   the fact that it performed other lucrative services for the

17   debtor or could be dismissed by the debtor at will.  In the

18   fish bowl of Chapter 11, I believe that any attempt by the

19   debtor to influence Watson Wyatt through either of those two

20   avenues would explode in the debtors' face.  Moreover, there's

21   absolutely no evidence that the debtor or its management used

22   any such leverage.

23             On the other hand, I believe that the particular

24   individual managing the Watson Wyatt process, Mr. Bubnovich,

25   did approach the process of advising the debtors' compensation

1    committee and ultimately the board from an improperly skewed

2    perspective.  I do accept the argument by the unions that Mr.

3    Bubnovich, who very clearly maintained full control over the

4    Watson Wyatt process, viewed himself less as a disinterested

5    expert than as a advocate to achieve a result for management

6    that all too often was such that he would not advise

7    management, and more importantly, the compensation committee,

8    of the weaknesses of his analysis but rather was looking down

9    the road to a negotiation with other parties in interest,

10   including, ultimately, the Court.  I do not believe this to be

11   the proper role of an expert.  And particularly, it is not the

12   proper role of a compensation expert who can only be credible

13   in an environment like this when he or she remains

14   disinterested.

15        Therefore, notwithstanding that the compensation

16   committee was extremely active in considering the appropriate

17   standards and criteria and ultimate calculation of each element

18   of the proposed management compensation program meeting in

19   excess of twenty times on the issue.  I believe that I cannot

20   rely upon a business judgment analysis here but need to look

21   behind the facts -- I'm sorry -- behind the conclusions

22   asserted by Mr. Bubnovich to the compensation committee and

23   ultimately adopted by the debtors.  I believe that's

24   particularly appropriate with respect to the portion of the

25   management compensation program that deals not with prospective

167

1   compensation but rather is intended to provide additional

2   compensation to management for the Chapter 11 period.  Frankly,

3   there is some issue in my mind as to whether that is the only

4   aspect of the program that is fully covered by Section

5   1129(a)(4) although I believe, as I'll say in a moment, that

6   portions of the prospective compensation also take into account

7   the foregone opportunities for long term incentive compensation

8   during the case and therefore are also properly reviewable

9   under 1129(a)(4).

10          The unions criticize almost every element of the

11  proposed management compensation program.  I, however, do not

12  go so far.  First, I believe that the evidence shows that the

13  proposed reservation of stock in the form of stock options and

14  restricted stock grants upon emergence is reasonable and

15  consistent with market practices.  Under the proposal, an

16  aggregate of eight percent of reorganized common stock at an

17  appropriate strike price is reserved for management three

18  percent of which will be issued in the form of options and

19  restricted stock on the effective date on a fifty/fifty basis

20  and five percent of which will be issued subject to the

21  determination of the new board in the future.  The value of

22  that stock clearly has increased substantially based upon

23  comparison the debtors' current projections with projections at

24  the commencement of the case.  However, I believe that the

25  appropriate measure of the reasonableness of this grant is not

168

1    the assumed value of it but rather the comparison of the

2    percentage grant with grants by comparable companies both in

3    and out of Chapter 11 or emerging from Chapter 11 and never

4    having been in Chapter 11.  The record clearly shows that this

5    eight percent grant is substantially below what is customary

6    under the circumstances.  That fact is not offset by the fact

7    that there is somewhat more restricted stock as compared to

8    stock options being issued on the effective date.  The value of

9    the debtors and consequently of their stock on emergence is

10   attributable to many parties, among others certainly, to the

11   union workers and the concessions that they made as part of

12   their negotiated revisions of their collective bargaining

13   agreements.  But I believe it is also attributable to the

14   management group and the percentage amount accords them a

15   reasonable amount of that value as part of a long term

16   incentive opportunity post-emergence compared to the market

17   place.

18            There was considerable dispute over the issue of

19   whether the salaries of the management group are at market or

20   above market as of the emergence date.  That dispute hinged

21   upon, among other things, the choice of comparable companies by

22   which to evaluate salary as well as the data that Mr. Bubnovich

23   chose to use and chose not to use coming from comparable

24   companies.

25            I believe that, with two exceptions, the salary of

169

1   the covered employees here is within a reasonable market range.

2   The exceptions pertain first to the so-called DSB group, that

3   is, the most senior group of roughly twenty Delphi managers and

4   Mr. O'Neal.  With regard to Mr. O'Neal, I accept that given his

5   position, his salary coming out of the Chapter 11 case would be

6   first and foremost negotiated with the plan investors.  And Mr.

7   Naylor was candid that that's how the compensation committee

8   viewed it as well.  Consequently, the fact that his salary is

9   higher than market data for competitors does not particularly

10  bother me although I do believe it is relevant to issues with

11  regard to his compensation for the period of the Chapter 11

12  case itself.

13         I am much more bothered by the distinct possibility

14  that the salaries of the DSB group are substantially still

15  above market.  A portion of that group -- it's not clear

16  whether it was ten or more -- took a ten percent salary

17  reduction during the Chapter 11 cases to reflect what the

18  compensation committee was told was an above-market

19  compensation for those individuals, as did Mr. O'Neal take a

20  twenty percent reduction.

21         It appears, however, from Mr. Bubnovich's testimony

22  that this group may be even more above market given Mr.

23  Bubnovich's refusal to consider and input relevant survey data

24  for the DSB group.  I also have some concern that Mr. Bubnovich

25  has chosen a group of peer companies that may pay more

170

1    generally for executives than what may be the true peer group

2    for the debtors' executives.

3            However, I believe that except with respect to the

4    DSB group, the effect of the foregoing is relatively modest.

5    Meaning that I believe that with the exception of the DSB group

6    again, the debtors' executives covered by the proposed

7    management compensation plan are in a competitive market range

8    whereas, I believe, the DSB group may be materially above that

9    range.

10           It's also been contended that before freezing and

11   terminating the defined benefit plan SERP for executives, the

12   debtors improperly or uncompetitively improved the plan.  This

13   is on top of, obviously, any continuation of the plan as a

14   defined contribution plan going forward.  That was done both by

15   lowering the vesting age and by providing roughly eleven

16   million of additional stock to account for the change from a DB

17   SERP to a DC SERP going forward for certain executives.  Again,

18   while a vesting age of fifty-five, it appears to me, based on

19   this record, is market, it is unusual to have made these

20   changes as to the frozen plan, a benefit that I believe is

21   above market and above customary practice.

22           So, in sum -- oh, let me address one final point

23   which I do not believe the debtors have been criticized on per

24   se which is that the management compensation as proposed

25   contemplates the continuation of the short term incentive plan

171

1    that has been in existence during the course of the case.  I

2    have previously found after lengthy hearings that the criteria

3    for that short term incentive plan were appropriate after

4    vetting with the creditors' committee.  There will be a similar

5    vetting process here as long as the committee's around and then

6    thereafter by the board.  And I believe there's been no

7    evidence submitted that that process is unreasonable or

8    inappropriate.

9            And consequently, in sum, I conclude that those

10   aspects of the proposed management compensation plan, all of

11   which are primarily prospective looking, are slightly over

12   market in ways that will cost the debtor substantial amount of

13   money, in my view, over a hundred million dollars of value,

14   potentially above market.  But that they are nevertheless

15   appropriate on a going forward basis.  I say that

16   notwithstanding the flaw in Mr. Bubnovich's approach based on

17   my own review in light of the unions' criticism as well as in

18   light of the review undertaken by the creditors' committee, the

19   equity committee and the plan investor all under -- in the case

20   of the creditors' committee and the plan investors, under

21   Section 7.8 of the plan.  And indeed, in a number of important

22   respects, the committee's review, as well as the plan

23   investors' review, produced the original package that was

24   proposed.

25           Let me turn then to the aspect of the plan that I

172

1   believe is particularly problematic.  And that is the aspect

2   dealing with not post-emergence compensation but what is proper

3   compensation for management during the Chapter 11 case.  As I

4   noted earlier, management received short term incentive

5   compensation during the Chapter 11 case notwithstanding the

6   vociferous objections of the unions.  Management also received

7   their salaries unabated with the exception of the ten percent

8   and, in the case of Mr. O'Neal, twenty percent discount that I

9   noted a moment ago.  However, as I noted also, it appears to me

10  that that discount, at least in respect of managers other than

11  Mr. O'Neal, may well not have been enough to bring the

12  managers' salaries to market levels.

13          What they did not receive during the course of the

14  case was a long term incentive opportunity.  Generally

15  speaking, such opportunities come in the form of stock

16  allotments as is the case here with respect to the eight

17  percent allotted going forward post-emergence from Chapter 11.

18  Those opportunities are just that.  They're opportunities.

19  They typical corporation does not make a gift of stock but

20  provides stock options at a strike price that reflects a

21  successful performance, at least by the company, before there

22  is significant value to be obtained by the executive or -- or

23  and/or in the form of a restricted stock grant that vests over

24  a fairly lengthy period.  Here, pre-petition, it was five

25  years.  Which also has an element of optionality in it since

173

1      the stock price can go down as well as up.

2             Distressed companies find inevitably that long term

3      incentive compensation in the form of stock grants and stock

4      option grants cannot be used as a practical matter.  That is

5      for two reasons.  One, the stock is traditionally under water;

6      and two, its existing pre-reorganization stock at the bottom of

7      the priority chain.  And the grant of more of it during the

8      case is an improper dilution of those who are holding stock as

9      well as generally a reflection of an analysis that properly

10     takes place at the end of the case when the debtors' capital

11     structure has been set in place by a plan.

12            In some instances -- in many instances in the past,

13     debtors have tried to overcome this problem which obviously

14     healthy companies don't have in keeping their work force happy

15     by proposing key employee retention plans, plans that reward,

16     in the form of generally cash, employees for staying on to work

17     for the debtor.  Such plans, as the unions have noted, have a

18     cloudy reputation and are, as a practical matter, largely

19     eliminated by Congress in the 2005 amendments to the Bankruptcy

20     Code.  This case is not governed by those amendments and so I

21     have not reviewed these proposed cash payments on emergence in

22     light of those amendments.  That is, the debtor was free, if it

23     chose, to file a KERP plan to provide for payments to keep its

24     managers working during the course of a Chapter 11 case.  It

25     didn't do that at least in name.  Instead, the debtors filed a

1    motion for approval of a so-called KECP, K-E-C-P, which

2    included both a short term incentive plan, which the Court

3    subsequently approved, as well as a surrogate or a proposed

4    surrogate for a long term stock incentive opportunity.  The

5    Court never heard that aspect of the motion.  It was

6    continually deferred at the request of the creditors' committee

7    and with some pressure from the Court.

8           The debtors contend based upon Mr. Bubnovich's

9    comparable company data that, for their senior executives,

10   roughly sixty percent of their compensation is attributable to

11   a long term incentive opportunity for the more junior

12   executives a smaller percentage as set forth in the pie charts

13   attached to Watson Wyatt's presentation, which is an exhibit to

14   Mr. Bubnovich's declaration.  Therefore, they tried to place a

15   value on that opportunity and provide some comparable

16   equivalent to it in the proposed long term incentive

17   compensation for the Chapter 11 period.  They did so by valuing

18   the opportunity at its face at 110 million dollars, discounting

19   it by twenty percent and then providing that that amount would

20   be paid in cash at the conclusion of the Chapter 11 case

21   whenever that would be.  Obviously, as time progressed, that

22   present value discount became substantial.  The eighty percent

23   figure was roughly eighty-seven million dollars.  On an

24   annualized basis, the amount would be approximately thirty-four

25   million dollars.

1          The question raised by the unions and, frankly, by me

2   is whether that analytical process bears any relation to

3   reality.  Mr. Bubnovich was candid in saying that the approach

4   was "a novel one".  He had not seen it before in his lengthy

5   experience in Chapter 11 cases.  To the contrary, he testified

6   that as far as emergence cash bonus awards were concerned, such

7   rewards were rare or not the norm in Chapter 11 cases and in

8   far lower amounts.  This is corroborated by the fact that he

9   applied a different analysis looking at Chapter 11 cases and

10  data only when considering the propriety of a proposed cash

11  emergence award for the two most senior executives of the

12  debtors, Mr. Miller and Mr. O'Neal.

13         The issue raised by the debtors' request raises a

14  number of sub-issues, one of which I can deal with fairly

15  easily.  The debtors, as I said, made their motion for approval

16  of the KECP early in the Chapter 11 case.  They also advised

17  their managers, including new hires, that they would seek such

18  cash emergence awards at the end of the case.  The question

19  then is what sort of reliance, if at all, did the managers

20  place on the filing of the KECP and also such statements by the

21  debtors.  The statements that I've reviewed in the record were

22  couched carefully in stating that ultimately the Court would

23  have to consider and approve such compensation and that there's

24  no assurance that the Court would do so.  The debtors also have

25  stated candidly that they are not couching their request based

1        upon reliance to parties' detriment by the managers.

2                A related issue is whether notwithstanding the

3        novelty of the debtors' approach with regard to the proposed

4        eighty-seven million dollars of cash emergence bonuses, the

5        approach is still reasonable.  In that regard, I considered why

6        Mr. Bubnovich applied a twenty percent discount to the 110

7        million dollars and why he tied the program to one criteria

8        which was emergence from Chapter 11.  Frankly, he didn't really

9        have an answer on either point other than it seemed right

10       which, again, is of little to no help to a fact finder and

11       discredits, in my view, the ability of the compensation

12       committee and the board and ultimately the Court to rely upon

13       his analysis.  He was also, to put it charitably, confusing

14       about why he applied a 110 million dollar base to start off the

15       process, particularly, recognizing that the payment would be

16       made at some date, in any event, since it's tied simply to

17       emergence from Chapter 11 and would be made in cash as opposed

18       to stock options, restricted stock and some form of

19       performance-based cash award which he testified constituted a

20       third of the long term incentive plan for the company in 2004

21       although he could not describe what the performance parameters

22       were.  Nor did his discounting and use of the 110 million

23       dollar base, to my mind, take into account that in three of the

24       five years of its existence pre-petition the debtor didn't, in

25       fact, pay out anything in respect of long term incentive plan

1    payments through actual realizable stock.

2           On top of that, the debtors have not indicated in the

3    record any comparable amount of cash emergence bonuses in

4    comparable Chapter 11 cases.  And apparently Watson Wyatt

5    undertook no such analysis except in respect of the seniormost

6    two managers where based upon the exhibit to Mr. Bubnovich's

7    declaration, the proposal by the debtors on its face without

8    one element that I'll discuss was at the high end.

9           The proposal as to the two most senior executives,

10   Mr. Miller and Mr. O'Neal, proposed a 13.6 million dollar cash

11   emergence bonus.  This proposal, however, needs to be examined

12   in the light of what was previously given up by those

13   executives.  In particular, Mr. Miller, during the course of

14   the Chapter 11 case gave up approximately 6.7 million dollars

15   of value that he would have otherwise been entitled to under

16   the terms of his employment by agreeing to take, for the

17   relevant period, only a dollar a year in compensation.  I do

18   not believe that it is reasonable by any means to hold Mr.

19   Miller now that the case has been successful and that the

20   company's reorganization goals have been realized to that

21   dollar a year pledge.  He took the risk indeed that the company

22   would not successfully achieve its Chapter 11 goals and would

23   have run the risk of taking less than what he had previously

24   agreed to before the one dollar waiver.  But having achieved

25   those goals, I believe the proper measure of his compensation

1    for the Chapter 11 period should include the amount that he

2    previously gave up.

3         With regard to Mr. O'Neal, he gave up roughly 500,000

4    dollars during the chapter case, but, unlike Mr. Miller, he is

5    being employed on a going forward basis on an above market

6    salary.  And I believe that's important to keep in mind when

7    evaluating his proposed cash emergence bonus.

8         But in any event, I have had to consider what, if

9    anything, should be paid to the entire management group in

10   respect of an emergence cash bonus.  I do not believe the

11   debtors have carried their burden to show that what they have

12   proposed, an eighty-seven million dollar payment, including

13   73.4 million to those other than the top two executives is

14   reasonable.  And I believe it would be a true extension of

15   Chapter 11 practice to authorize its payment.

16        There is some kernel of truth, however, to the

17   debtors' contention that as far as their out of Chapter 11

18   competitors are concerned, they have been undercompensating

19   their management on the long term incentive plan aspect of

20   compensation during the Chapter 11 case.  It is also true that

21   this case has been, on an operational level, I believe one that

22   would merit an award to executives, not just the top two but

23   any of the executives who, in the determination of the board

24   and the compensation committee in light of the particular

25   demands of the debtors being in Chapter 11, performed in a way

1   to contribute to the achievements that the debtors have

2   accomplished which are detailed in Mr. Miller's declaration.

3           That is, however, offset by two things:  first, in my

4   views as to certain groups of executives being compensated

5   above market on a going forward basis, as I discussed

6   previously and second, my belief that although the executives

7   have given up certain rights to which they were entitled, just

8   as the union gave up certain rights to which it was entitled or

9   the unions.  Those rights were generally given up because they

10  were above market or for other reasons, such as the executives'

11  desire to continue to be employed by the reorganized debtors

12  and consequently, their willingness to give up their change in

13  control rights.

14          Nevertheless, it seems to me that the area where

15  equivalence of sacrifice in a bankruptcy context is most

16  applicable is in the area of long term incentive during the

17  Chapter 11 case when the traditional stock incentive, almost by

18  definition, has to go by the boards.  And I believe that it is

19  incumbent on any proposal to propose some surrogate for such

20  compensation to take into account the circumstances of Chapter

21  11 in a way beyond the way that this proposal does so.

22          Now I could simply say that the proposed compensation

23  plan is deficient in the area of the performance-based -- I'm

24  sorry -- the performance-based emergence cash bonus.  But

25  having been through the hearing and knowing the debtors' need

1    to emerge from Chapter 11 promptly, I believe I need to go

2    further than that and explain why and in what respect it is

3    deficient in terms of actual dollars.

4            I should note, finally, that we are talking about

5    actual dollars here in a debtor that is seeking to raise exit

6    financing and can use every dollar that it has, another reason

7    to be skeptical with regard to the asserted reasonableness of

8    the eighty-seven million dollar cash emergence bonus.

9            Taking into account all of the foregoing factors and

10   looking at the proposed management compensation program as a

11   whole both in light of what is reasonable in Chapter 11 cases

12   as well as the debtors' agreement to adhere to the equivalence

13   of sacrifice principle, I believe that the appropriate

14   aggregate emergence bonus for the entire group included Mssrs.

15   Miller and O'Neal is 16.5 million dollars.  I believe further

16   that the compensation committee, while maintaining the ability

17   to be flexible, should take into account the evidence deduced

18   at this hearing as far as awarding such bonuses including, for

19   example, whether an individual who is being compensated

20   substantially above market should get a bonus, and secondly, to

21   take into account the fact that I believe such bonuses are

22   generally awarded for services in connection with the Chapter

23   11 case and in general responding to problems and issues

24   created by the debtor being in Chapter 11.  That may include

25   every executive on the list but I believe that's something that

181

1    the compensation committee should have the flexibility to

2    decide.  By no means do I believe that this dollar amount

3    should go to the seniormost executives exclusively, or even

4    almost exclusively, but rather it's an amount to reward

5    exemplary service across the board which I believe occurred

6    here across the board given the achievements that are detailed

7    in the record and that I take judicial notice of.

8            So, I am prepared to enter the confirmation order

9    provided that the management compensation plan is changed in

10   that one respect.  I recognize that the issue of executive

11   compensation is in some respects a lightening rod; it's clearly

12   a sensitive issue not only for the executives but also for the

13   union employees.  I have tried to look at the issue, however,

14   objectively and not to let in any notions of emotionalism.  And

15   I believe that that's the proper way to review it on all sides

16   now, the unions as well as the debtors given the requirements

17   that Congress imposed under the Bankruptcy Code.

18           MR. BUTLER:  Thank you, Your Honor.  With respect to

19   that, we'll confirm with the company and stakeholders and look

20   at the modification that you're requiring.

21           THE COURT:  Okay.

22           MR. BUTLER:  We have several other matters on the

23   confirmation agenda and dealing with the rights offering and

24   dealing with the MDL approval which we did bring before Your

25   Honor.

182

1          THE COURT:  Right.

2          MR. BUTLER:  And on an unrelated topic to the matter

3     you just ruled on, we'd also -- I think the plan investors and

4     General Motors and the statutory committees would like to have

5     a very brief chambers conference on an unrelated topic.

6          THE COURT:  Okay.

7          MR. BUTLER:  So I just -- in terms of timing, do you

8     want to try to complete the rest of the work today?

9          THE COURT:  I'd like to, yeah.

10         MR. BUTLER:  Okay.  Do you want to take a break and

11    give you lunch --

12         THE COURT:  Well, how long do you think the chambers

13    conference is going to be?

14         MR. BUTLER:  Probably I would assume under ten

15    minutes.

16         THE COURT:  All right.

17         MR. BUTLER:  And the --

18         THE COURT:  Do you want to do that before the MDL

19    or --

20         MR. BUTLER:  It's unrelated to the MDL; it's

21    unrelated to the matters that are contested here.

22         THE COURT:  I know that there are people here on the

23    MDL and that -- maybe I'd like to get that out of the way, if

24    we can.

25         MR. BUTLER:  Okay.

183

1            THE COURT:  And then I'm happy to have a chambers

2     conference with you all.

3            MR. BUTLER:  Okay.  Would it be possible to take a

4     five minute break before we keep going?  Just to --

5            THE COURT:  Well, we have everyone here.

6            MR. BUTLER:  Okay.  I'm happy to present it, Your

7     Honor.

8            MR. DECHIARA:  Your Honor, those of us at this table

9     heard different things when Your Honor said the dollar amount

10    that you believed should be the aggregate cash emergence.

11           THE COURT:  16.5 million.

12           MR. DECHIARA:  If you could just say that again,

13    please?

14           THE COURT:  16.5 million.

15           MR. DECHIARA:  Thank you.

16           THE COURT:  Okay.  Sixteen --

17           MR. KENNEDY:  1-6.

18           THE COURT:  1-6.

19           MS. CECCOTTI:  Point 5.

20           MR. KENNEDY:  And, Your Honor, just to clarify one

21    point.  It wasn't clear in my own mind.  Is that inclusive of

22    the award --

23           THE COURT:  Yes.

24           MR. KENNEDY:  -- that's been given to Mr. Miller?

25           THE COURT:  Yes.

184

1          MR. KENNEDY:  All right.  Thank you.

2          THE COURT:  But again, it's an aggregate.  The board

3    can allocate that how it wishes.

4          MR. SPEAKER:  Jack, are there other parties that will

5    want to sit here?

6          MR. BUTLER:  I don't know.  I think --

7          THE COURT:  I don't think so.

8          MR. BUTLER:  Your Honor, the next matter on the

9    agenda then, on the confirmation agenda, is the item involving

10   the approval of the Multidistrict Litigation and Insurance

11   settlement at Docket number 9296.  There was one objection --

12   actually, it was four objections, I believe, in total that were

13   filed by individuals represented by -- individual bondholders

14   represented by the Goodwin Procter firm.  At the settlement

15   with the bondholders on the first day of the confirmation

16   hearing, all of those objections were withdrawn.  So insofar as

17   the debtors' are aware, the MDL settlement -- or the MDL motion

18   is now unopposed.  The one thing that we had talked about

19   earlier in connection with this and I think it was the point

20   that the lead plaintiffs made, was a request that Your Honor,

21   in terms of order -- entry of orders consider entry of this

22   order prior to the entry of the confirmation order if Your

23   Honor is prepared to grant this relief.

24          Your Honor may recall that in October of 2007, the

25   debtors, after consulting with the creditors' committee, the

185

1    securities lead plaintiff and the ERISA named plaintiffs,

2    determined to proceed with the motion under a two-step

3    bifurcated approach.  Under that step, we sought from this

4    Court an order preliminarily approving the settlement granting

5    certain relief, such as solicitation, voting and lifting the

6    automatic stay with respect to certain documents produced to

7    the securities lead plaintiffs.  The Court granted that order

8    and it was docketed at Docket number 10746 on October 29th of

9    2007.

10         Today's hearing, which at the preliminary hearing it

11   was determined by the Court and it's what the debtors sought,

12   that the second part of the bifurcated hearing would take place

13   essentially in a companion manner to the confirmation hearing

14   but independently of the confirmation hearing because the

15   motion had been sought separately.  We are now preceding with

16   the second step of that hearing and asking Your Honor to give

17   final approval of the settlement in connection with

18   confirmation of the debtors' First Amended Joint Plan.  Under

19   the order that was entered at the point of the bifurcated

20   hearing back in October, there were certain parties that had

21   the right to file objections thereafter.  That included the

22   creditors' committee, the United States Department of Labor,

23   Wilmington Trust Company as indenture trustee, the ad hoc

24   committee of trade creditors, what I refer to as the ad hoc

25   committee of bondholders or the Goodwin Procter group and the

186

1    equity committee.  The order that was entered back in October

2    barred all the parties from objecting to final approval of the

3    settlement and no other party other than the ad hoc

4    bondholders' committee filed an objection to this motion.

5              Your Honor, I would also point out in considering

6    this matter, the MDL settlement was described in detail in the

7    plan of reorganization.  And there was, at Your Honor's

8    direction, in fact, language inserted into the disclosure

9    statement indicating that the Court would pay attention to --

10   in considering this matter, would pay attention to the manner

11   in which classes vote both on an aggregate basis and as to

12   various subclasses and groups there.  And we had been through,

13   and I would simply ask to be entered into this record, the

14   prior the exhibits dealing with -- Your Honor -- in fact, Your

15   Honor take judicial notice of the entire confirmation record.

16             THE COURT:  That's fine.  And in particular, the

17   voting tabulations.

18             MR. BUTLER:  Yes, Your Honor.

19             THE COURT:  Okay.  I'll do that.

20             MR. BUTLER:  Which indicate that over 80.1 -- eighty-

21   one percent of the ballots voted in favor and has the record

22   Your Honor is familiar with as it relates to all of the various

23   elements.  Only Class 6(c) as a consolidated class, that

24   group -- that class voted against the plan.  There was one

25   other, the ASEC (ph.) debtors on a deconsolidated basis, the

1    ASEC debtors also voted against the plan.

2            Your Honor, one of the things that is important here

3    is that as part of this, we're asking Your Honor to consider

4    the various releases and consider the various terms and

5    provisions of the comprehensive settlement.  This matter has

6    been approved on a final basis by the district court.  I think

7    Your Honor is aware that there was a modification process

8    through the district court that was reflective of a reduction

9    in consideration in the class here with respect to the lead

10   securities plaintiffs.  Under the plan there was a reduction in

11   the amount, I think, down to 179 million from 204 million, if I

12   recall.  And there was consideration that was to be paid to the

13   debtors from a third party which was directed instead to the

14   settlement funds, the escrow funds maintained by the district

15   court.  All that was disclosed in the district court litigation

16   and we have filed, I believe, as an exhibit here -- to the

17   confirmation record, we have filed the final stipulation to the

18   modifications entered and approved by the district court.

19           Your Honor, in terms of reviewing this matter which

20   Bankruptcy Rule 9019 and the various cases relied on in this

21   Court for evaluating 9019 would be developed, we did file a

22   response to the bondholder objection.  It does state the

23   company's positions.  It states the law.  In the absence of

24   objection, while I'm perfectly prepared to argue this, in the

25   absence of objection, I think I'd like to, with that

188

1   introduction, rely on the record that's now been incorporated

2   here and in our papers.

3           THE COURT:  Okay.  Now the confirmation order had a

4   couple of changes in it that related to the MDL settlement.  Is

5   that something that you all have agreed on?

6           MR. BUTLER:  Your Honor, there are some additional --

7   I mean, I think there are some additional comments, just to say

8   it on the confirmation order.  We're still processing some

9   additional comments to that order --

10          THE COURT:  Okay.

11          MR. BUTLER:  -- so I'm not sure it's -- I mean, I

12  don't think the findings are going to change.

13          THE COURT:  All right.

14          MR. BUTLER:  But we're trying to resolve any

15  differences we have with people although there aren't any -- I

16  think Your Honor's ruled on the actual objections.  But I would

17  propose that just so that we can deal with it appropriately

18  that we would submit the final MDL order along with the

19  confirmation order probably tomorrow morning.  I don't think

20  it's going to get done before the day is up.

21          THE COURT:  Okay.  And my intention would be to enter

22  the MDL order first --

23          MR. BUTLER:  Yes, Your Honor.

24          THE COURT:  -- since that's what was contemplated.

25          MR. BUTLER:  Right.  The --

189

1          MR. BROUDE:  The order should be entered first.  The

2     one thing that we're working out with the debtor -- I think we

3     all agree on is that if for some reason the confirmation order

4     ends up being revoked, likewise the MDL order gets revoked.

5          THE COURT:  I think that -- well, that's certainly in

6     here already.

7          MR. BUTLER:  Yeah.  I mean, that's clear.

8          THE COURT:  That's very clear.

9          MR. BUTLER:  I mean, I've said it on the record.

10         THE COURT:  And that's why this is done as part of a

11     plan.

12         MR. BUTLER:  Exactly, Your Honor.

13         THE COURT:  Or part of this plan of confirmation.

14         MR. BUTLER:  Right.  That is correct.  This will --

15     we need to go effective here for this to be final in this court

16     under the plan.

17         I would also -- so, Your Honor, I don't have anything

18     more on this matter unless -- Mr. Etkin --

19         MR. ETKIN:  I have nothing to add in terms of

20     argument, Your Honor.  We're prepared to rely on the record and

21     the pleadings that have been filed.

22         It's our understanding at least that we do have a

23     final form, a final approval order that the parties are

24     comfortable with and that we're prepared to submit to the

25     Court.  So I don't know whether Mr. Butler was alluding to

190

1    anything -- changes to that --

2              MR. BUTLER:  Only that the creditors' committee have

3    submitted some additional suggested comments last evening which

4    we need to review with you and sort out whether there will be

5    any changes before we submit it to the Court.

6              MR. ETKIN:  Okay.  Well, I'm --

7              MR. BUTLER:  Either we'll submit it and the

8    creditors' committee will submit a letter or they won't, but I

9    wanted to give the three of us the opportunity to talk about

10   it.

11             MR. ETKIN:  Okay.  Well --

12             THE COURT:  But the form of confirmation order that I

13   got this morning, the blackline, you've seen, right?

14             MR. ETKIN:  I've seen that, Your Honor, and there's

15   one little tweak that was agreed to.  I think it was just a

16   glitch in the blackline.

17             THE COURT:  All right.

18             MR. ETKIN:  But I don't think it's anything --

19             MR. BUTLER:  That's why I wanted --

20             THE COURT:  All right.  If it's a glitch, that's

21   fine.  All right.  I obviously reviewed this settlement once

22   before.  It was subsequently revised and I've reviewed it

23   again.  I originally reviewed it in the context of the

24   bondholder objections.  I believe that, first, the settlement

25   was negotiated on an arms length basis.  It was the result of a

1    mediation ordered by the district court in Michigan.  The vote

2    on the plan, in my view, has removed the one issue that

3    existed, which is the absolute priority issue and following

4    very full disclosure in the disclosure statement, I believe the

5    vote was on a fully informed basis and consequently, the

6    classes voting in favor of the plan have waived the

7    applicability of Section 510(b).  I think they did so because

8    the disclosure statement set forth appropriately the rationale

9    for the settlement.  And I conclude, as did the debtors, that

10   the settlement is in the best interest of the estate and fair

11   and equitable.  Obviously, the vote dealt with any issues that

12   might have otherwise been in place because of the Iridium case.

13   And consequently, subject to all the terms and conditions of

14   the settlement, I'll approve it.

15           MR. ETKIN:  Thank you, Your Honor.

16           MR. BUTLER:  Your Honor, the next matter on the

17   agenda is the rights offering estimation motion at Docket

18   number 11606 pursuant to which the debtors seek the entry of an

19   order under Sections 105(a) and 502(c) of the Bankruptcy Code

20   estimating certain unreconciled claims for purposes of a

21   discount rights offering.

22           Your Honor, there were sixty-four responses filed to

23   the motion.  They were summarized in the exhibits to the

24   debtors' reply.  I'm not going to try and reiterate them now,

25   particularly seeing as all but one objection, I believe, as I

192

1  look through and just verify where we are -- I believe all but

2  one objection was resolved or withdrawn.  And the single

3  objection that is pending is the objection of David N.

4  Goldsweig, G-O-L-D-S-W-E-I-G, at Docket number 11854.  That

5  objection is pending but Mr. Goldsweig had informed us that

6  while he was not going to withdraw it, he did not intend to

7  prosecute his objection.

8           THE COURT:  Okay.

9           MR. BUTLER:  Understood that we were going to say

10  that on the record.

11          For the most part, Your Honor, these sixty-four

12  responses involved adjustments of one kind or another and to

13  the estimated amounts that were negotiated between the parties.

14  There are three settlements that involve more than a

15  participation and amount of adjustment and I want to briefly

16  summarize them to you.  The first is a settlement with Robert

17  Bosch GmbH and Robert Bosch LLC at Docket number 11879.  And in

18  that settlement, there was an agreement that Bosch could

19  liquidate its discount rights and pay the proceeds that are to

20  go into an account held by the debtors or third party escrow

21  agent if requested by Bosch.  Upon the liquidation of their

22  claim, the proceeds would be distributed to the parties in

23  accordance with the order or agreement resolving Bosch's

24  claims.  We still have -- the debtors would still retain the

25  rights to recover any excess discount rights but it would be

193

1   limited to the amount of funds available in that account, that

2   third party account.

3          With respect to Comerica, Comerica filed an

4   objection.  I believe this is at -- there are a couple of

5   objections there.  I believe this is for the objection at 11793

6   and 11858.  And this dispute involved the debtors' agreement to

7   purchase equipment leased to the debtors by Comerica.  The

8   lease expired pre-petition.  The debtors and Comerica are

9   working on how to value the purchase of the equipment since

10  that time.  We've remained in possession of the equipment.  We

11  affirmed our agreement in principle to purchase the agreement

12  and to pay cash for that purchase, net of amounts already paid.

13  And we've worked out a valuation process or we're working

14  through a valuation process.  General Motors has affirmed its

15  guaranty under the lease and therefore Comerica has agreed on

16  this record that it's not entitled to participate in the

17  discount rights offering and we have removed their claim from

18  the order.

19          THE COURT:  Okay.

20          MR. BUTLER:  The third, the last party that we needed

21  to deal with, is General Electric Capital Corporation.  And we

22  agreed to two matters there.  There was an agreement to the

23  participation amount and there was an agreement that the

24  debtors agree not to reject GE's existing commercial leases

25  under Section 365 and waive any rights to do so under the plan

194

1    or otherwise.  And the concern from them was just how they

2    would be affected under the discount rights offering.  But we

3    reached an agreement.  We got a concession from GE and that is

4    that they agree to cap their cure claim amount under Section

5    365 for all purposes for pre-petition amounts to $651,626.18.

6    There's no waiver by either party about what might happen with

7    respect to administrative claims.  But for purposes of the

8    debtors evaluating the settlement, we're able to evaluate it

9    based on a sum certain and we were prepared to proceed with the

10   settlement on that basis.

11            THE COURT:  So as far as the discount rights are

12   concerned, if you haven't worked out their claim by the time of

13   the discount rights date, they will --

14            MR. BUTLER:  No.  They essentially --

15            THE COURT:

16            MR. BUTLER:  comply with the order like everyone

17   else?

18            MR. BUTLER:  Yeah, but they essentially can't

19   participate now -- they won't participate in this now but they

20   have a cure -- 'cause they're going the cure claim route.

21            THE COURT:  Oh, okay.

22            MR. BUTLER:  And they're going to the cure claim

23   route.  They wanted certainty that we wouldn't say it was zero.

24            THE COURT:  Okay.

25            MR. BUTLER:  We agreed on a cap and they -- therefore

195

1    they would not participate in this.

2            THE COURT:  Okay.

3            MR. BUTLER:  -- and they understand the various --

4    the people have been able to evaluate the risks.

5            Your Honor, in terms of having resolved -- with those

6    three specific settlements, having resolved sixty of the

7    matters -- responses as outlined on the response we filed and

8    with Mr. Goldsweig not prosecuting his objection in these three

9    settlements, unless Your Honor wants additional testimony with

10   respect this matter, or argument, I think the purposes of the

11   motion were clear and the papers were clear.

12           THE COURT:  I just had one question.  If it turns out

13   that there were -- that the claim was less -- if there's an

14   adjustment to be made, you had two options.

15           MR. BUTLER:  Right.

16           THE COURT:  My question is do you do the first option

17   unless it's not available and then go to the cash pay option?

18   Is that how it's going to work?

19           MR. BUTLER:  Our first option, and people can correct

20   me if I'm wrong, but my recollection of the motion as we

21   prepared it was the first option was to offset against the

22   stock.

23           THE COURT:  Right.

24           MR. BUTLER:  And --

25           THE COURT:  And is that -- is that what you would

196

1    do --

2              MR. BUTLER:  Yes.

3              THE COURT:  If you could do it, that's what you would

4    do?

5              MR. BUTLER:  That would be -- that's our first

6    approach.

7              THE COURT:  All right.  It wasn't entirely clear to

8    me but I think that's right.  That's the way it should be done.

9              MR. BUTLER:  Unless someone's throwing tomatoes at my

10   back, Your Honor, I think that's --

11             THE COURT:  No.  They're nodding actually.

12             MR. BUTLER:  -- the debtors will stick by that.  So I

13   think that, in fact, is the -- is, in fact --

14             THE COURT:  Okay.

15             MR. BUTLER:  -- the intention.

16             THE COURT:  All right.

17             MR. BUTLER:  It's our general intention to do that.

18             THE COURT:  Okay.  All right.  Does anyone have

19   anything to say on this motion?  All right.  You answered my

20   one question about it.  Clearly, the debtors needed to fix as

21   best they can a process by which to know who gets how many

22   registration rights.  And I believe this was a fair and

23   reasonable way to do it as evidenced, I think, by the fact that

24   it brought out of the woodwork those parties who had questions

25   about what they would be getting and the debtors' treatment

197

1    which have all been, I believe, resolved.  So I'll grant the

2    motion.

3                MR. BUTLER:  Thank you, Your Honor.  Your Honor,

4    before we conclude the formal record in the confirmation

5    hearing, there was one point that had been negotiated with an

6    objector and General Motors.  I believe Weil Gotshal, a

7    representative from Weil Gotshal -- I don't know if it's Mr.

8    Tanenbaum or someone else has an acknowledgment that they're

9    supposed to make on the record with respect to revisions to

10   paragraph 52 of the confirmation order.

11               MR. TANENBAUM:  So acknowledged.

12               MR. BUTLER:  My understanding is that there's a

13   carve-out under paragraph 52 in favor of a regulatory agency

14   and that we were supposed to obtain Mr. Tanenbaum's or someone

15   from Weil's acknowledgment on the record that GM consents to

16   the additional carve-out that was negotiated with that

17   regulatory agency.

18               MR. TANENBAUM:  Your Honor, we consent to the

19   language that's in the order.

20               THE COURT:  Okay.  Very well.

21               MR. BUTLER:  Can I have just one moment, Your Honor?

22               THE COURT:  Yes.

23               MR. BUTLER:  Your Honor, I believe that concludes the

24   confirmation hearing record for purposes of this hearing.  We

25   will work on finalizing any remaining changes to both the MDL

198

1    order and the confirmation -- I think we submitted the rights

2    offering order but as to the MDL order and the confirmation

3    order -- and we'll plan to submit that, if not later today

4    probably tomorrow at this point.

5              THE COURT:  Okay.  Very well.  So who is it that

6    wants to meet with me?  You and the two committees?

7              MR. BUTLER:  I think we'd like to have a very brief

8    chambers conference involving representatives of General

9    Motors, the plan investors, the two statutory committees and

10   the debtors.

11             THE COURT:  Okay.  Well, why don't you come around

12   then?

13             MR. BUTLER:  Thank you.

14             THE COURT:  Thank you.

15             (Whereupon these proceedings were concluded at 4:07

16   p.m.)

17

18

19

20

21

22

23

24

25

199

1

2                                    **I N D E X**

3

4                                   **R U L I N G S**

5    **DESCRIPTION**                                    **PAGE**       **LINE**

6    **First Amended Joint Plant of Reorganization**   **181**          **8**

7    **of Delphi and Delphi affiliates approved under**

8    **condition that the management compensation**

9    **plan be modified to cap emergence bonus at**

10   **16.5 million dollars in the aggregate**

11

12   **MDL settlement motion approved**                **191**          **14**

13

14   **Rights offering estimation motion approved**    **197**          **1**

15

16

17

18

19

20

21

22

23

24

25

200

1

2                          **C E R T I F I C A T I O N**

3

4      I Lisa Bar-Leib, court-approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8

9                                              January 24, 2008

10     Signature of Transcriber            Date

11

12     Lisa Bar-Leib

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25