**Hearing Date And Time: February 21, 2008 at 10:00 a.m.**
**Objection Deadline: February 19, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                         :
      In re                      :     Chapter 11
                          :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                          :
                          :     (Jointly Administered)
           Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x

DEBTORS' EXPEDITED MOTION TO STRIKE (I) NON-CONFORMING CURE
AMOUNT NOTICES AND (II) IMPROPER OBJECTIONS PURSUANT TO
SOLICITATION PROCEDURES ORDER, CONFIRMATION ORDER, PLAN
OF REORGANIZATION, 11 U.S.C. § 105(a),  AND FED. R. BANKR. P. 9010

("NON-CONFORMING CURE NOTICE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion To Strike (i) Non-Conforming Cure Amount Notices And

(ii) Improper Objections Pursuant To Solicitation Procedures Order, Confirmation Order, Plan of

Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 (the "Motion"), and respectfully

represent as follows:

Background

A.      The Chapter 11 Filings

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders.

3.      On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession  (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

2

respect to the Plan (Docket No. 11388) (the "Disclosure Statement").  The Court entered an

order approving the adequacy of the Disclosure Statement and granting the related solicitation

procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court

entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation

Order"), which became a final order on February 4, 2008.

        4.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

        5.     The statutory predicates for the relief requested herein are section 105(a),

of the Bankruptcy Code and rule 9010 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.     <u>Current Business Operations Of The Debtors</u>

        6.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[2]

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,

*(cont'd)*

3

7.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

9.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

_____
(cont'd from previous page)
    2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs.

　　　　　10.　　　The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

　　　　　11.　　　In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005,

the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.　　　The Debtors' Transformation Plan

　　　　　12.　　　On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

---

[3]　　Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was $482 million.

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their current pension situation.

E.      Confirmation Of The Debtors' Plan Of Reorganization

        13.     The confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases.

The GSA and the MRA provide for a comprehensive settlement with GM, and both agreements

were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors

are focusing their efforts on satisfying the conditions for the Plan to become effective and allow

them to emerge from chapter 11.  Currently, the Debtors continue to expect that they will emerge

from chapter 11 during the first quarter of 2008.

        14.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

6

F.      Preliminary Statement

15.      The Debtors are party to thousands of executory contracts, many of which are with the Debtors' trade suppliers (the "Material Supply Agreements").  In accordance with the Solicitation Procedures Order[4], the Plan, and 11 U.S.C. § 365, the Debtors embarked upon a process to assume ongoing prepetition Material Supply Agreements.

16.      When considering the process of assuming contracts, the Debtors were concerned by possible third-party interference with contractual relationships between the Debtors and their suppliers.  To that end, the Debtors requested this Court to approve detailed procedures, including requiring counterparties to sign and return the original forms served upon such counterparties.  As an added precaution, the Debtors imprinted unique bar codes upon the original cure amount notices to prevent the submission of self-made forms that could be returned by interested parties.  Such precautions turned out to be warranted because, among other things, certain purchasers of claims executed and returned self-made forms designed to appear identical in form to the Court-approved notices served by the Debtors.  In fact, certain of these self-made forms were returned by purchasers of claims even though no cure amounts were owed to the purported assignors (i.e., underlying counterparties).  In fact there is no related assumable Material Supply Agreement.  Absent the unique bar codes imprinted on each original cure amount notice, the Debtors' job of sorting executed and returned cure amount notices would have been immeasurably more difficult.

---

[4]      On December 10, 2007, the court entered that certain Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures for Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures (the "Solicitation Procedures Order") (Docket No. 11389). The Solicitation Procedures Order, together with Article VIII of the Plan, as modified by the Confirmation Order (Docket No. 12359), establishes, among other things, certain procedures relating to the assumption of executory contracts, including procedures for a contract counterparty to object to the Debtors' proposed cure amounts and/or the proposed assumption of such counterparty's contracts.

17.     Moreover, the Debtors have been inundated with requests to deviate from the Court approved cure procedures.  For example, in early January, the ad hoc trade committee requested that the Debtors make a number of exceptions to the Solicitation Procedures Order to enable their committee members, among other things, to execute cure amount notices and to direct the Debtors to make cure payments directly to the committee members instead of paying the underlying counterparty.  Because the Debtors were unwilling to accept directions that were inconsistent with the Solicitation Procedures Order, the ad hoc trade committee filed an expedited motion for, among other things, relief from the Solicitation Procedures Order.  On January 10, 2008, this Court held a hearing on the above and denied the relief requested, because, among other reasons, the committee's request was contrary to the procedures set forth in the Solicitation Procedures Order and such requests would interfere with the Debtors' relationships with their trade suppliers that are important to the Debtors' ongoing businesses.

18.     The notices and issues addressed by this Motion are comparable to the issues addressed by this Court with respect to the ad hoc trade committee's motion.  Accordingly, the Debtors make this Motion to strike non-conforming cure notices and improper objections filed to date.

## Relief Requested

19.     By this Motion, the Debtors request entry of an order pursuant to the Solicitation Procedures Order, the Confirmation Order, the Plan, and under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9010 striking certain non-conforming cure amount notices that were returned to the Debtors and an objection that was filed for which no cure amount notice was returned.  Specifically, the Debtors wish to strike following:

- Cure amount notices that included instructions to pay a party other than the counterparty;

8

- Cure amount notices that were executed by a third party (rather than the contract counterparty), which third party did not satisfy the requirements of Bankruptcy Rule 9010;

- Cure amount notices from parties who failed to return an executed original cure amount notice and instead returned a self-made form for which a related assumable contract exists or a copy of the cure amount notice, which copy was plainly marked as such (and an example of which is attached as <u>Exhibit B</u> hereto);

- Cure amount notices from parties who failed to return an executed original cure amount notice for which no related assumable contract exists;

- Objections that were filed to cure by parties who failed to return the cure amount notice; and

- Cure amount notices that were returned after the 7:00 p.m. (prevailing Eastern time) deadline on January 11, 2008.

With respect to the foregoing categories, excluding unauthorized instructions to pay a third party, the Debtors request that, to the extent the Court grants the relief requested with respect to a specific party, the applicable counterparty be entitled to receive only the default cure election treatment (i.e., the plan currency to be distributed to holders of allowed general unsecured claims) in the cure amount proposed by the Debtors in the cure amount notice they previously distributed. For the convenience of the recipients, the Debtors' proposed cure amounts, to the extent applicable, are set forth on the <u>Schedules</u> <u>1</u>, <u>2</u>, <u>3</u>, <u>4</u>, <u>5</u>, and <u>6</u> attached hereto.

<u>Basis For Relief</u>

20.    On December 10, 2007, the Court entered the Solicitation Procedures Order, which order sets forth certain procedures with respect to cure of defaults under certain executory contracts.  In accordance with the Solicitation Procedures Order, on or before December 21, 2007, the Debtors transmitted three different court-approved notices relating to

Material Supply Agreements.[5]  Specifically, the Debtors delivered (i) cure amount notices to

counterparties to Material Supply Agreements (the "Counterparties"), (ii) duplicate cure amount

notices to Counterparties who designated alternate addresses on purchase orders, and (iii)

courtesy cure amount notices to claims traders and other assignees and transferees of claims.

21.    The Debtors served on the Counterparties the cure amount notice, a form

of which was approved as Exhibit O pursuant to paragraph 43 of the Solicitation Procedures

Order (the "Cure Amount Notice") and is attached hereto as Exhibit A.  This Cure Amount

Notice stated the Debtors' intent to assume or assume and assign the contract listed on a schedule

attached to the Cure Amount Notice and to provide cure in the corresponding amount reflected

on the schedule attached to such notice (the "Cure Amount").  The Cure Amount Notices (a total

of 1,669 of which were served) gave each Counterparty, among other things, the right to elect to

be paid the Cure Amount in cash or plan currency,[6] and described certain procedures approved

by this Court for Counterparties to object to the assumption of their contracts or to the Cure

Amount.  Cure Amount Notices contained the Counterparty's name and address, the purchase

order numbers for those contracts assumed under the Plan with corresponding cure amounts, and

a bar code which provides a unique identifier for the Counterparty and links this data to the

particular original Cure Amount Notice.   This bar code identifier was designed to maintain the

integrity of this process by allowing KCC to, among other things, ensure that a returned Cure

---

[5]    To provide notice of cure amounts to certain Counterparties that were inadvertently excluded from the initial
service of Cure Amount Notices (the "Omitted Contracts"), on January 29, 2008 and February 1, 2008, the
Debtors filed and caused to be served the Notice Of Cure Amount With Respect To Executory Contract To Be
Assumed Or Assumed And Assigned Under Plan Of Reorganization (Docket No. 12375) pursuant to paragraph
24 of the Confirmation Order.  Counterparties to the Omitted Contracts had ten days from the date of mailing of
the foregoing notice to file an objection to the Debtors' proposed assumption and Cure amount.  These Omitted
Contracts, however, are not the subject of this Motion.

[6]    Plan currency is that form of payment to be provided to holders of Allowed General Unsecured Claims pursuant
to Article 5.3 of the Plan (the "Plan Currency").

Amount Notice (and the data contained therein) was the same Cure Amount Notice that KCC

had served on the Counterparty returning the form and that the data contained on the Cure

Amount Notice for which a Counterparty made elections was accurately recorded and reflected.

This system also provided significant administrative efficiency by allowing the Debtors to easily

and accurately track and document responses to the Cure Amount Notices by reducing the need

for, and potential error associated with, manual entry of this data.

22.    The Debtors also provided a separate courtesy notice to Counterparties for

whom the Debtors had multiple addresses so as to notify the Counterparty at multiple points of

contact that the Cure Amount Notice had been served upon the primary address contained in the

Debtors' books and records (the "Duplicate Notice").  The form of Duplicate Notice, approved

pursuant to paragraph 45 of the Solicitation Procedures Order (see Exhibit Q thereto), is attached

hereto as Exhibit B.  A total of 1,030 Duplicate Notices were served.  The Duplicate Notice

informed its recipients in detail that substantive rights were affected by the Cure Amount Notice

and put the recipient on notice to locate the original Cure Amount Notice.  To facilitate this

effort, the Debtors attached to the Duplicate Notice a copy of the original Cure Amount Notice

sent to the primary address for that Counterparty, which copy was prominently watermarked

with the word "COPY" printed on each page.  The Duplicate Notice instructed the recipient that

only original Cure Amount Notices would be accepted.  The Duplicate Notice also provided

KCC's contact information so that the Counterparties could obtain and return a new original of

the Cure Amount Notice in the event that the initial original version was misplaced.  The Debtors

implemented this process to avoid receipt of duplicate and/or self-made Cure Amount Notices.

This system was designed to maintain the integrity of the cure reconciliation and avoid the

ambiguity of receiving multiple contradicting Cure Amount Notices for the same contract.

23.      Additionally, as set forth in the Solicitation Procedures Order, the Debtors provided a separate notice to claims traders and other assignees and transferees of claims, the form of which was approved pursuant to paragraph 44 of the Solicitation Procedures Order (see Exhibit P thereto), and which is attached hereto as Exhibit C.  This notice advised the recipient that they may have purchased a claim from one or more of the Counterparties to whom Cure Amount Notices were sent and that the election therein might impact the currency to be distributed to such Counterparty.  This notice further informed its recipients that pursuant to the Solicitation Procedures Order, the Debtors were authorized, but not directed, to remit resolved or uncontested distributions on account of cure directly to the Counterparty whose contract is being assumed or assumed and assigned.  The Solicitation Procedures Order stated that this notice "shall be the only notice the Debtors shall be required to provide to these purchasers with respect to the cure and these purchasers shall have no rights or recourse against the Debtors with respect to the cure."  See Solicitation Procedures Order ¶ 43.  A total of 10,765 of these notices were served.

24.      Despite this Court's Solicitation Procedures Order, and in contravention of the specific instructions on the notices, the Debtors received more than one hundred non-conforming Cure Amount Notices (the "Non-Conforming Notices").  As stated above, these Non-Conforming Notices fall into six categories:[7]

    A.      Cure amount notices that included instructions to pay a party other than the counterparty;

---

[7]    At the hearing held on January 10, 2008 in connection with the ad hoc trade committee's Motion For Order (I) Extending Deadline For Submission Of Cure Notices, (II) Approving Cure Notices Executed By Movants With Respect To Their Claims, And (III) Directing Debtors (A) To Reconcile Cure Claims With Corresponding Claims, And (B) To Make Cure Claim Distributions Directly To Movant (Docket No. 11803)  (the "Ad Hoc Motion Hearing"), the Court adjudicated many of the issues implicated by this Non-Conforming Cure Notice Motion and denied all relief sought by the ad hoc trade committee and reaffirmed the Court's Solicitation Procedures Order.

B.      Cure amount notices that were executed by a third party (rather than the contract counterparty), which third party did not satisfy the requirements of Bankruptcy Rule 9010;

C.      Cure amount notices from parties who failed to return an executed original cure amount notice and instead returned a self-made form for which a related assumable contract exists or a copy of the cure amount notice, which copy was plainly marked as such (and an example of which is attached as Exhibit B hereto);

D.      Cure amount notices from parties who failed to return an executed original cure amount notice for which no related assumable contract exists;

E.      Objections that were filed to cure by parties who failed to return the cure amount notice; and

F.      Cure Amount Notices that were returned after the 7:00 p.m. (prevailing Eastern time) deadline on January 11, 2008.

25.      By this Motion, the Debtors seek entry of an order striking (a) those instructions included with certain Cure Amount Notices identified on Schedule 1 hereto as "Unauthorized Instructions," which direct the Debtors to pay a party other than the Counterparty, (b) those Cure Amount Notices identified on Schedule 2 hereto as "Improperly Executed Notices" because they were not executed or, if executed by a third party, no valid power of attorney was provided by the signatory on the returned notice, (c) the Cure Amount Notices identified on Schedule 3 hereto as "Non-Original Cure Amount Notices" because the parties returned Duplicate or self-made copies of the Cure Amount Notice rather than the original Cure Amount Notice, (d) the Cure Amount Notices identified on Schedule 4 hereto as "Self-Made Non-Original Cure Amount Notices" because the parties self-made Cure Amount Notices which they returned to KCC even though the Debtors never sent such parties (and their purported assignors) any Cure Amount Notices by the Debtors, (e) the objection identified on Schedule 5 hereto as an "Improper Objection" because the party failed to return a Cure Amount Notice, and (f) those Cure Amount Notices identified on Schedule 6 hereto as "Untimely Notices" because

13

they were returned after the court-mandated deadline of January 11, 2008 at 7:00 p.m. prevailing

Eastern time (the "Deadline").  If this relief is granted, the Debtors propose that such parties who

received a Cure Amount Notice receive the default treatment (i.e., Plan Currency) in the amount

set forth on the Cure Amount Notice.[8]  With respect to any disregarded Unauthorized

Instructions, however, the Debtors are not seeking default treatment for the affected parties with

respect to their Cure Amount Notice, unless the Cure Amount Notice is also included on a

separate Schedule to this Motion.  Indeed, if the Cure Amount Notice was validly executed and

properly returned, the Debtors will accept such notice, but pursuant to this Motion, the Debtors

seek this Court's approval to disregard the instructions attached or scrawled upon such notice.

<u>Non-Conforming Cure Amount Notices</u>[9]

G.    <u>Cure Amount Notices Directing The Debtors To Pay A Cure Amount To A Third Party</u>

26.    The Solicitation Procedures Order authorized the Debtors to "remit

resolved, uncontested, or adjudicated distributions on account of cure directly to the contract

party whose contract is being assumed or assumed and assigned."  <u>See</u> Solicitation Procedures

Order ¶ 43.  The Solicitation Procedures Order also stated that these purchasers of claims shall

have no rights or recourse against the Debtors with respect to the cure."  <u>See</u> Solicitation

Procedures Order ¶ 43.

27.    During the Debtors' review of the Cure Amount Notices, the Debtors

determined that, despite these requirements of the Solicitation Procedures Order and the

Bankruptcy Rules, certain Cure Amount Notices included instructions to make cure payments to

---

[8]    With respect to any self-made notices that were returned for which no Cure Amount Notice was ever sent, the
Debtors seek to strike such notices in their entirety.

[9]    There are several instances in which the Debtors have sought relief with regard to particular Cure Amount
Notices on several bases and accordingly certain parties are named on multiple schedules.

a third party without valid a power-of-attorney (the "Unauthorized Instructions").   Thus, the

Debtors wish to strike these Unauthorized Instructions.

28.    Set forth on <u>Schedule 1</u> hereto is a list of the parties whom the Debtors

have identified as returning Cure Amount Notices that included Unauthorized Instructions.  The

Debtors request that the Unauthorized Instructions be stricken.  As noted above, however, the

Debtors intend to honor the elections made by the Counterparty or the Cure Amount Notices

listed on <u>Schedule 1</u> in accordance with the Solicitation Procedures Order to the extent that they

are not otherwise listed on another schedule herein and thus objected to on another basis but

Payment in such instances will be made to the Counterparty in accordance with the Solicitation

Procedures Order.

H.    <u>Cure Amount Notices Executed By Third Parties Or Returned Unexecuted</u>

29.    In paragraph 43 of the Solicitation Procedures Order, the Debtors were

"authorized to provide <u>counterparties to supply contracts</u> that the Debtors intend to assume with

the Cure Amount Notice."  <u>See</u> Solicitation Procedures Order ¶ 43.  (Emphasis added.)  The

Solicitation Procedures Order further required that "[p]arties wishing to object to the assumption

of their contracts under the terms set forth in the Cure Amount Notice shall be required to return

the Cure Amount Notice in accordance with the instructions provided therein."  <u>See</u> Solicitation

Procedures Order ¶ 43.  These procedures do not contemplate or allow a party other than the

Counterparty to execute and return the Cure Amount Notice.[10]

---

[10]    This Court  specifically addressed this issue in the Ad Hoc Motion Hearing during which the ad hoc trade
committee sought authority, among other things, for claims traders to file the Cure Amount Notice on behalf of
their transferors.  <u>See</u> Transcript, p.76.  In response, this Court stated that the relief sought by the ad hoc trade
committee was contrary to the Solicitation Procedures Order and further opined that "this is not an instance
where the debtor is just being difficult about a deadline or a procedure and trying to prevent the real party in
interest from having its wishes set forth; but rather would have the debtor change the relationship with its
contract parties and get in the middle of [the claims trader's] relationship with them."  <u>See</u> Transcript, p. 98-99.

30.     Moreover, Bankruptcy Rule 9010(a) provides that a party may act in a
case before the Bankruptcy Court only in the following ways: personally, through an attorney, or,
in limited circumstances, through an authorized third party.  Fed. R. Bankr. P. 9010(a).  If a party
does not act personally or through an attorney, however,  Bankruptcy Rule 9010(c) establishes
parameters by which that party may act through a third party.  This Rule requires that the
authority of the third party to act "be evidenced by a power of attorney conforming substantially
to the appropriate Official Form." Fed. R. Bankr. P. 9010(c).  In addition, the Rule mandates that
the "execution of any such power of attorney shall be acknowledged before" an appropriate
official.  Fed. R. Bankr. P. 9010(c).  Therefore, subject to the limited exceptions set forth in this
Bankruptcy Rule, a party may act only personally, through an attorney, or through an agent
evidencing a valid power of attorney.

31.     During the Debtors' review of the Cure Amount Notices, the Debtors
determined that, despite the requirements of the Solicitation Procedures Order, the notices, and
the Bankruptcy Rules, certain Cure Amount Notices were (i) not executed by the Counterparty to
which the Cure Amount Notice was served or by its attorney, but rather by third parties without
valid powers-of-attorney or (ii) returned unexecuted (the "Improperly Executed Notices").
Accordingly, the Debtors wish to strike these Improperly Executed Notices.

32.     Set forth on Schedule 2 hereto is a list of the parties who returned Cure
Amount Notices that the Debtors have identified as the Improperly Executed Notices.  The
Debtors request that the Cure Amount Notices listed on Schedule 2 be stricken.  If this Motion is
granted against a party listed on Schedule 2, the Debtors request that such party receive the
Default Treatment.

16

I.      Non-Original Cure Amount Notices

      33.    As stated above, the Debtors provided a separate courtesy notice (a.k.a., a Duplicate Notice) to Counterparties for whom the Debtors had multiple addresses.  For the convenience of the recipient, the Debtors attached a watermarked-copy of the Cure Amount Notice as an exhibit to the Duplicate Notice.  The Court-approved Duplicate Notice clearly stated in bold and prominent text that "the original Cure [Amount] Notice must be completed, executed, and returned" and "only original forms will be accepted for purposes of exercising your right to contest the cure amount or make a cure election."  (Emphasis in original.)  The Duplicate Notice also clearly stated that original Cure Amount Notices would be reissued by KCC upon request.  In fact, upon request, KCC promptly re-issued Cure Amount Notices with an appropriate bar code by e-mail, overnight delivery, mail, or fax.

      34.    During the Debtors' review of the Cure Amount Notices, the Debtors determined that, notwithstanding this Court's order and instructions on the notice, certain parties returned (i) a self-made cure election form created to look like the forms provided to Counterparties by the Debtors for which an assumable executory contract exists, (ii) a self-made cure election form for which no assumable executory contract exists (the "Self-Made Non-Original Cure Amount Notices"), or (iii) an executed, watermarked-Duplicate Notice (each of (i), (ii), and (iii), a "Non-Original Notice").  Because these Non-Original Notices do not conform to the requirements set forth in the Solicitation Procedures Order, the Debtors seek to strike these Non-Original Notices.[11]

---

[11]    The Debtors are in receipt of dozens of request for exceptions to the Solicitation Procedures Order.  In light of the size of these cases, the number of parties involved, and the varying interests, should the Debtors permit an exception, their ability to enforce the established procedures and resolve cure related disputes would be impaired.  Nevertheless, the Debtors recognize that on equitable grounds, this Court may accept watermarked-Duplicate Notices that are otherwise in full compliance with the Solicitation Procedures Order.  While the

*(cont'd)*

35.    Set forth on Schedule 3 hereto is a list of the parties who returned either a self-made cure election form for which an assumable executory contract exists or an executed, watermarked-Duplicate Notice.  The Debtors request that such Non-Original Notices listed on Schedule 3 be stricken.  If this relief is granted against a party listed on Schedule 3, the Debtors request that such party receive the default treatment, i.e., Plan Currency, in the cure amount proposed by the Debtors and listed on the schedule attached to the original Cure Amount Notice (the "Default Treatment").  For ease of reference, the column titled, "Aggregate Proposed Cure Amount" on Schedule 3 reflects the Debtors' proposed Cure Amount listed on the Cure Amount Notice.

36.    Additionally, notwithstanding this Court's Solicitation Procedures Order and instructions on the notice, during the Debtors' review of the Cure Amount Notices the Debtors identified Self-Made Non-Original Cure Amount Notices.  As described above, these self-made forms were returned by purchasers of claims even though no cure amounts are believed to be owed to the purported assignors – in fact, the Debtors do not believe there is an assumable Material Supply Agreement related to such Self-Made Cure Amount Notices.  Set forth on Schedule 4 hereto is a list of the parties who returned Self-Made Non-Original Cure Amount Notices.  The Debtors seek to strike these Self-Made Non-Original Cure Amount Notices in their entirety without further obligation to such parties.

J.    Objection Filed without a Returned Cure Amount Notice

37.    The Solicitation Procedures Order provided in paragraph 38 that those parties "wishing to object to the assumption of their contracts under the terms set forth in the

_____
(cont'd from previous page)
        Debtors are sympathetic to such Counterparties, it is not within the Debtors' discretion to deviate from this
        Court's order.

Cure Amount Notice shall be required to return the Cure Amount Notice." <u>See</u> Solicitation

Procedures Order ¶ 38.  The Solicitation Procedures Order also approved the form of the Cure

Amount Notice provided to these Counterparties.  In bold and prominent typeface, the Cure

Amount Notice stated that if a party failed to return a Cure Amount Notice but timely filed and

served an objection, the "objection will <u>not</u> be considered."  (Emphasis in original.)

   38. During the Debtors' review of the Cure Amount Notices, the Debtors

determined that, notwithstanding the Court's order and the instructions on the notice, the party

listed on <u>Schedule 5</u> hereto filed an objection with this Court to the proposed Cure Amount but

did not return a Cure Amount Notice (the "Improper Objection").  Thus, the Debtors wish to

disqualify this Improper Objection and request that this Court strike the Improper Objection.  If

this relief is granted, the Debtors request that such party receive the Default Treatment.

K.  <u>Untimely Cure Amount Notices</u>

   39. Paragraph 38 of the Solicitation Procedures Order provided that those

parties "wishing to object to the assumption of their contracts under the terms set forth in the

Cure Amount Notice shall be required to return the Cure Amount Notice <u>in accordance with the</u>

<u>instructions provided therein</u> so as to be received by the undersigned counsel to the Debtors . . .

on or before January 11, 2008."  (Emphasis added.)  In addition, in bold and prominent typeface,

the Cure Amount Notice stated that this form be returned to KCC "so as to be <u>received</u> by 7:00

p.m. (prevailing Eastern time) on January 11, 2008" and that the consequence of any failure to

timely return the form would result in the contract(s) being assumed and the party being "paid

the cure amount listed on Schedule 1" to the Cure Amount Notice in Plan Currency.

   40. During the Debtors' review of the Cure Amount Notices, the Debtors

determined that, notwithstanding the Court's order and instructions on the notice, certain Cure

Amount Notices were returned to KCC after the Deadline (the "Untimely Notices").  Thus, the

Debtors wish to strike these Untimely Notices.  Set forth on <u>Schedule 6</u> hereto is a list of the

parties who returned Untimely Notices.  The Debtors request that the Untimely Notices listed on

<u>Schedule 6</u> be stricken.  If this relief is granted against any party listed on <u>Schedule 6</u>, the

Debtors request that such party receive the Default Treatment.

<u>Applicable Authority</u>

41.    The Solicitation Procedures Order set forth very specific guidelines and

procedures, as described more fully above and which have been previously approved by this

Court, for the purpose of determining and resolving disputes regarding Cure Amounts.  Further,

the Plan and Confirmation Order incorporated these same procedures.  The Cure Amount

Notices and the Improper Objection that are the subject of this Motion do not conform to the

court-approved procedures.  Accordingly, this Court should strike the Cure Amount Notices and

the Improper Objection included in the Schedules hereto.

42.    Bankruptcy Rule 9010(a) sets forth the protocols for a party to act in a

case before the Bankruptcy Court.  A "party may (1) appear in a case under the Code and act

either on the entity's own behalf or by an attorney authorized to practice in the court, and (2)

perform any act not constituting the practice of law, by an authorized agent, attorney in fact, or

proxy."  Fed. R. Bankr. P. 9010(a).  If a party does not act personally or through an attorney,

Bankruptcy Rule 9010(c) establishes parameters by which that party may act through a third

party.  This rule requires that the "authority of any agent, attorney in fact, or proxy to represent a

creditor for any purpose other than the execution and filing of a proof of claim or the acceptance

or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the

appropriate Official Form. The execution of any such power of attorney shall be acknowledged

before one of the officers enumerated in 28 U.S.C. § 459, § 953, Rule 9012, or a person

authorized to administer oaths under the laws of the state where the oath is administered."  Fed.

20

R. Bankr. P. 9010(c).  See also In re Eddie Haggar, 190 B.R. 281, 286 (Bankr. N.D. Tex. 1995)

(upholding proxies because they substantially complied with requirements of Rule 9010(c)).

Therefore, pursuant to the Bankruptcy Rules, documents that are executed by third parties must

specifically evidence the authority to act on behalf of another party.  Additionally, that authority

must be granted and evidenced in a manner that complies with the particular requirements of the

Bankruptcy Rules.  For these reasons, in accordance with Bankruptcy Rule 9010, the Debtors are

not required to accept documents, including the Cure Amount Notices and the instructions to pay

third parties associated therewith, if those documents do not evidence such authority as set forth

above.

43.    Finally, section 105(a) of the Bankruptcy Code provides that "[t]he court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).  "'Section 105 is an omnibus provision phrased in

general terms as to be the basis for a broad exercise of power in the administration of a

bankruptcy case.'"  In re Elmendorf, 345 B.R. 786, 502 (Bankr. S.D.N.Y. 2006) (quoting In re

Flores, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003).  Accordingly, section 105 of the Bankruptcy

Code and the Solicitation Procedures Order authorize this Court to disqualify and strike the Non-

Conforming Notices, Improper Objection, and Unauthorized Instructions as set forth above.

Separate Contested Matters

44.    The Debtors request that, to the extent that an objection to this Motion is

filed with respect to any Non-Conforming Notice (or related instruction), objection, or cure

payment dispute (each, a "Dispute") which the Debtors have included in this Motion, each such

objection together with the Motion be deemed to constitute a separate contested matter as

contemplated by Bankruptcy Rule 9014.  The Debtors further request that any order entered by

the Court with respect to the Motion be deemed a separate order with respect to each party

against whom this Motion was filed.

<u>Timely Objection Required</u>

45.      The Debtors request the authority to adjourn the hearing on a Dispute to a

future hearing, the date of which may be determined by the Debtors by serving notice to the

Counterparty.  As provided in the Case Management Order, if a Counterparty or other party

whose cure payment is subject to this Motion and who is served with the relevant Motion fails to

file and serve a timely objection in compliance with these procedures, then the Debtors will

present to the Court on **February 21, 2008 at 10:00 a.m.** an appropriate order seeking relief

with respect to such cure payment consistent with the relief sought herein.  Upon entry of such

an order, however, the Debtors will serve notice of the entry of such order upon the affected

party.

<u>Notice</u>

46.      Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order and the Tenth Supplemental Order. In addition, the

Debtors have complied with the Supplemental Case Management Order with respect to the filing

of this Motion and the need for expedited relief.[12]  As this Motion does not seek to object to the

allowance of claims and does not fall within the ambit of Bankruptcy Rule 3007, particularized

notice will not be served upon parties that are the subject of this Motion.  However, for ease of

---

[12]   The Debtors have noticed this Motion for the omnibus hearing on February 21, 2008. In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing. The Debtors have been
informed that the Creditors' Committee has consented to this Motion being heard on February 21, 2008. Because
this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until February 19, 2008 at
4:00 p.m. prevailing Eastern time to respond to the Motion.  The objection deadline would have been February
18, 2008 at 4:00 p.m. prevailing Eastern time, but due to the Federal holiday and Bankruptcy Rule 9006, the
objection deadline is extended by one day.

reference and to facilitate parties easily locating the Schedule(s) on which their non-conforming

cure notice or improper objection is referenced, the Debtors have included Exhibit D which lists

the parties subject to this Motion in alphabetical order and referenced on Schedules 1, 2, 3, 4, 5,

and 6. Parties who received Duplicate Notices as a part of the service of Cure Amount Notices

on or before December 21, 2007 will be sent the Notice of Non-Conforming Cure Notice Motion,

which notice will include Exhibit D to this Motion referenced above. In light of the nature of the

relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

47.    Because the legal points and authorities upon which this objection relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a)

granting this Motion and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         February 11, 2008

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP


                              By:    /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 9331)
                                   Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606


                                   - and -


                              By:    /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036

                              Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession

24