1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DELPHI CORPORATION, ET AL,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14               United States Bankruptcy Court

15               One Bowling Green

16               New York, New York

17

18               January 10, 2008

19               10:14 AM

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1  Hearing re Doc #10931; Notice of presentment of claims

2  objection hearing with respect to debtor's objection to proof

3  of claim no. 16573 (Tower Automotive, Inc.).

4

5  HEARING re Doc #10976; Debtor's amended statement of disputed

6  issues with respect to proof of claim no. 16573 (Tower

7  Automotive, Inc.)

8

9  HEARING re Doc #5452; Third omnibus claims objection with

10  respect to debtor's objection to proof of claim no. 12813.

11

12  HEARING re Doc#6968; Claims objection hearing regarding claims

13  of Contrarian Funds LLC as assignee of ETCO.

14

15  HEARING re Doc #11685; Notice of presentment of joint

16  stipulation and agreed order disallowing and expunging proof of

17  claim number 12183 - MJ Celco.

18

19  HEARING re:  Doc #11686; Notice of presentment of joint

20  stipulation and agreed order (I) compromising and allowing

21  proof of claim number 16573 and (II) disallowing and expunging

22  proof of claim number 15221 (Tower Automotive, Inc.).

23

24

25

3

1   HEARING re Doc #11687; Notice of presentment of joint

2   stipulation and agreed order compromising and allowing proof of

3   claim number 9080 and 9081 Benecke Kaliko Ag.

4

5   HEARING re Doc 11688; Notice of presentment of joint

6   stipulation and agreed order compromising and allowing proofs

7   of claim number 10381; 12668, 12670 and 16271, and disallowing

8   and expunging proof of claim number 16374.

9

10   HEARING re Doc 11689; Notice of presentment of joint

11   stipulation and agreed order compromising and allowing proof of

12   claim number 813 (Contrarian Funds, LLC as transferee of

13   Entergy Mississippi, Inc.).

14

15   HEARING re Doc 11690; Notice of presentment of joint

16   stipulation and agreed final order compromising and allowing

17   proofs of claim numbers 7571 and 7572.

18

19   HEARING re Doc 5452; Debtor's objection to proof of claim no.

20   1279 Nu-Tech Plastics Engineering, Inc.

21

22   HEARING re Doc 11788; Proposed seventeenth claims hearing

23   agenda.

24

25

4

1   HEARING re Doc 7999; Claims objection hearing regarding claim

2   of Entergy Mississippi, Inc.

3

4   HEARING re Doc 8270; Claims objection hearing regarding claims

5   of Montgomery County Treasurer.

6

7   HEARING re Doc 8617; Claims objection hearing regarding claim

8   of SPCP Group, LLC as assignee of key plastics.

9

10   HEARING re Doc 9151; Claims objection hearing regarding claims

11   of Federal-Mogul Corporation.

12

13   HEARING re 9535; Claims objection hearing regarding claims of

14   Northern Engraving Corporation.

15

16   HEARING re Doc 10783; Claims objection hearing regarding claim

17   of the SPCP Group, LLC as assignee of Beaver Manufacturing

18   Company.

19

20

21

22

23

24

25   Transcribed by:  Pnina Eilberg

5

1

2  A P P E A R A N C E S :

3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4        Attorneys for Debtor

5        333 West Wacker Drive

6        Chicago, IL 60606

7

8  BY:   JOHN K. LYONS, ESQ.

9        THOMAS J. MATZ, ESQ.

10       ALBERT L. HOGAN, III, ESQ.

11       NICK D. CAMPANARIO, ESQ.

12

13  JACOB & WEINGARTEN, P.C.

14        2301 W. Big Beaver

15        Suite 777

16        Troy, MI 48084

17

18  BY:   A. JAY SCHWARTZ, ESQ.

19

20

21

22

23

24

25

6

1                           P R O C E E D I N G S

2              THE COURT:  Okay.  Delphi Corporation.

3              MR. LYONS:  Good morning, Your Honor.  John Lyons on

4    behalf of Delphi Corporation.  This is the seventeenth claims

5    hearing we've had with Your Honor.  Here with me in court today

6    we have Tom Matz, my partner Al Hogan and Nick Campanerio from

7    Skadden and we have Karen Kraft and Dean Unrue from Delphi.

8    Mr. Hogan is also going to introduce some other Delphi

9    witnesses who are here for the Nu-Tech matter.

10             Your Honor, I propose to move very quickly through

11   the agenda, certainly the uncontested portion of the agenda so

12   we can turn our attention to the Nu-Tech contested matter.

13             THE COURT:  Okay.

14             MR. LYONS:  Your Honor, the first three items are

15   going to be adjourned.  That of Conastoga Rivers, that's a

16   motion to file a late claim.  That's being adjourned to January

17   31st.  The second matter, the State of Michigan, that's a

18   claims matter.  That's going to be adjourned to the February

19   20th claims hearing.  And the motion of Samsung to reconsider

20   an expunged claim, that is being adjourned to January 31st.

21             THE COURT:  Okay.

22             MR. LYONS:  Your Honor, we have an additional twelve

23   matters relating to uncontested matters that we have settled.

24   I will quickly go through, Your Honor, what the asserted amount

25   is and what the settled amount is.  The terms of the

7

1    stipulations themselves are going to be submitted, Your Honor.

2    And certainly, if you have any questions you can --

3             THE COURT:  Unless you have any agreements with

4    parties about things you need to put on the record -- the

5    stipulations also set forth the settled amounts and the

6    asserted amounts.

7             MR. LYONS:  They do, Your Honor.

8             THE COURT:  Correct?  So I don't think you need to go

9    through those.

10            MR. LYONS:  Okay.

11            THE COURT:  I'll just rely on the agenda.

12            MR. LYONS:  Okay.  Very good.  Well, one matter I

13   would like to mention is Tower, Your Honor.  We had some very

14   helpful assistance from Jonathan Flaxer as mediating that --

15   that particular claim.

16            THE COURT:  Okay.

17            MR. LYONS:  Your Honor, with that I'll turn the

18   podium over to my partner, Al Hogan, for the Nu-Tech matter,

19   unless Your Honor has any questions.

20            THE COURT:  Let me just look through the agenda.  No,

21   that's fine.  Thank you.

22            MR. LYONS:  Thank you, Your Honor.

23            MR. HOGAN:  Good morning, Judge.  Al Hogan from

24   Skadden Arps, Slate, Meagher and Flam for the debtors.  We're

25   here today for the contested claims hearing with respect to

8

1   proof of claim number 1279 filed by Nu-Tech Plastic

2   Engineering, Inc.

3           Judge, as we typically do in the contested claims

4   proceedings, with Your Honor's permission we'll deal with the

5   evidentiary matters first.  We have, by agreement of the

6   parties, a somewhat modified procedure today.  We have all of

7   our witnesses in court but the parties have agreed to make

8   these submissions, in essence, on the papers subject to

9   Your Honor having questions of the witnesses.

10          THE COURT:  Okay.  So said differently or said

11  otherwise, the parties themselves do not wish to cross examine

12  the witnesses who've submitted declarations or affidavits but

13  they're here in case I want to ask them questions, at which

14  point, of course, the parties would be free to cross or re-

15  direct.

16          MR. HOGAN:  Or to follow-up, yes.  And Judge, in the

17  evidentiary materials we've submitted the parties did agree to

18  designate the depositions and do counter-designations.  Those

19  are in as per discussions by the party and there's no -- no

20  problem on those.

21          THE COURT:  Okay.  All right.

22          MR. HOGAN:  All right.  Judge with respect to the

23  evidentiary record, in the exhibit binders there are fifty-one

24  numbered exhibits with just a few exceptions.  There's

25  agreement of the parties as to the admissibility of the

9

1   evidence.  I would just go through a couple of items where we

2   wanted to make sure that we were clear in terms of what the --

3   what the evidence was.

4          Exhibit number 44 is the debtor's demonstrative

5   timeline.  Judge, that's not being admitted as substance of

6   evidence but it is a demonstrative.  It is the --

7          THE COURT:  Okay.

8          MR. HOGAN:  -- debtor's view of the case.  With

9   respect to the -- the other documents, the only disagreement

10  among the parties is with respect to item number 11.  That is

11  the affidavit of John W. Maley (ph.).  There's a dispute about

12  that and I'll address it in a moment.  There's also,

13  technically, item number 12 and 13, the debtor's aren't

14  offering those as evidence.  Those are there just to show the

15  required notice under -- under the Federal Rule of Evidence.

16         With respect to all of the other exhibits, I

17  understand there's -- there's no dispute, based on what I've

18  said, and so I'd move for the admission of everything other

19  than item number 11.

20         THE COURT:  Which is, again, the Maley affidavit?

21         MR. HOGAN:  Yes, sir.

22         THE COURT:  Okay.

23         MR. SCHWARTZ:  Jay Schwartz on behalf of Nu-Tech,

24  Your Honor.  The only -- the demonstrative exhibit, also, is

25  not being admitted into evidence.

10

1          MR. HOGAN:  As we discussed.

2          THE COURT:  Right.

3          MR. SCHWARTZ:  Yes.  Everything else he said is

4    accurate.

5          THE COURT:  All right.  Okay.  All right.  So as --

6    as counsel for the debtors has just summarized, I will admit

7    into evidence the items that the parties have agreed upon, as

8    being admissible.  And let me hear you, then, briefly on

9    Mr. Maley's affidavit, which I gather is being objected to on

10   the basis of hearsay?

11   (All uncontested exhibits were hereby received as Exhibits 1-51

12   for identification, as of this date.)

13         MR. HOGAN:  That is correct, Judge.  Judge, if I

14   could, my colleague, Nick Campanerio, who has assisted me on

15   this case, if I could cede the podium to him to discuss this

16   affidavit, if that's all right with Your Honor?

17         THE COURT:  Okay.

18         MR. HOGAN:  Thank you, Judge.

19         MR. CAMPANERIO:  Good morning, Your Honor.  Nick

20   Campanerio on behalf of -- on behalf of the debtors.  The

21   affidavit of John Maley has been objected to on hearsay grounds

22   by Nu-Tech.  John Maley was the president, he was the chief

23   executive officer and he was the majority owner of Nu-Tech

24   during the time period -- the relevant time period in this

25   case.  And the requirements of Rule 807 of the Federal Rules of

11

1    Evidence are satisfied here.

2            There's no dispute that Nu-Tech received notice of

3    our intention to present this affidavit here today.  Those

4    notices are in the record.  Mr. Maley's affidavit addresses

5    material facts concerning Nu-Tech's relationship with Delphi as

6    it relates to the specific part we're talking about here and

7    also to the allegation that Nu-Tech received a promise of a

8    replacement part once Nu-Tech lost that business.  And it is

9    the most probative evidence on those points.  And I'm just

10   going to give you one example of that.  Excuse me -- sorry.

11   One example of that -- at his deposition a couple of weeks ago

12   Mr. Cooper testified, with respect to the promise of the

13   replacement part, that the person who received that promise was

14   John Maley and that he did not personally receive that promise.

15   That's in the record.  That's Exhibit 49 at page 29.

16           At that point Mr. Maley becomes very important for

17   the claim because he's the only one that can know who made the

18   promise, was it someone from GM?  Was it someone from Delphi?

19   He's the only person that can tell us when the promise was made

20   and he's the only one who has the knowledge about what was

21   actually said.  Mr. Maley's affidavit addresses that point and

22   he says, very clearly, that there was no such promise and

23   that's at paragraph 12.

24           Another factor under Rule 807 is trustworthiness.

25   This is an affidavit; therefore it's a sworn statement.

12

1   Mr. Maley made this statement under penalty of perjury.  His

2   testimony is corroborated by other evidence that's in the

3   record.  For example, on the promise point, Trinia Patrick

4   (ph.), who's a former Delphi buyer who is now assisting Nu-Tech

5   in this litigation, also says in her affidavit that she's not

6   aware of any such promise of replacement business to Nu-Tech.

7   And so that adds further indicia of trustworthiness to Maley's

8   statement.

9          And so on some note, the Rule 807 factors are

10  satisfied here.  And I think that -- I think that the correct

11  answer on this is to admit the affidavit.  And since we're in a

12  bench trial setting, Your Honor could give the affidavit

13  whatever weight it feels it is entitled to.

14          THE COURT:  But you're relying on the residual

15  exception.

16          MR. CAMPANERIO:  Correct.

17          THE COURT:  And there are specific exceptions,

18  Nu-Tech's referred to one, which is based on the fact that

19  Mr. Maley's no longer with us.  But in that case he had to have

20  been subject to examination.  And is agreed that he was not on

21  this affidavit -- he was not deposed in connection with this

22  affidavit, right?

23          MR. CAMPANERIO:  Correct, Your Honor.  I would agree

24  that he was not deposed, in fact.  But in terms of -- I think

25  it's important to -- to point out here that Nu-Tech had ample

13

1   opportunity to depose him.

2          THE COURT:  But was -- when did the affidavit -- why

3   don't you elaborate on that?

4          MR. CAMPANERIO:  Okay.  The affidavit was executed by

5   Mr. Maley in March of 2005.  Nu-Tech received notice of the

6   affidavit no later than September of 2005.  And Nu-Tech chose

7   not to take the deposition of Mr. Maley at any point from the

8   time the affidavit was executed up until the time that he died.

9          THE COURT:  But as far as the debtor's are concerned,

10  shouldn't I take into account the fact that the automatic stay

11  came into effect and then the claims procedures came into

12  effect to set up a whole regime for discovery and the like.  I

13  mean, if they had sought --

14         MR. CAMPANERIO:  Right.  When --

15         THE COURT:  -- unless -- unless they knew he was

16  really sick.  You know, unless you -- unless they knew that,

17  you know, I might -- I might go with that point.  But otherwise

18  wouldn't -- wouldn't you have -- wouldn't Mr. Butler or someone

19  have shown up here if they had sought to take his deposition

20  and say wait a minute, Judge, they're jumping the gun?

21         MR. CAMPANERIO:  A couple of points in response, Your

22  Honor.  It was no secrete that Mr. Maley's health was failing.

23  In fact, when Nu-Tech moved to lift the automatic stay one of

24  the subjects that was discussed in this courtroom during that

25  hearing was the fact that Mr. Maley's health was failing and

14

1  there was discussion about lifting the automatic stay for the

2  limited purpose of allowing Nu-Tech to take his deposition.

3          THE COURT:  So you guys opposed it then?

4          MR. CAMPANERIO:  Pardon me?

5          THE COURT:  Did you all oppose that motion then?

6          MR. CAMPANERIO:  No, I thought we had agreed to -- I

7  thought we had agreed to lift the stay for the purpose of

8  allowing you to take the deposition.

9          MR. HOGAN:  Judge, I believe that's correct.

10          THE COURT:  That's right.  The order permits that.

11          MR. CAMPANERIO:  And just one --

12          THE COURT:  And did the affidavit -- the affidavit

13  preceded that, of course --

14          MR. CAMPANERIO:  Correct.

15          THE COURT:  -- because it was pre-petition.

16          MR. CAMPANERIO:  Yeah, March 2005.

17          THE COURT:  All right.  Why aren't -- why aren't you

18  relying upon the admission against interest exception?

19          MR. CAMPANERIO:  The reason we're not relying on the

20  Admission Against interest exception is that by the time Mr.

21  Maley swore out this affidavit in March 2005, he had

22  transferred his equity stake in Nu-Tech to Mr. Cooper.

23          THE COURT:  Okay.

24          MR. CAMPANERIO:  And so he was -- he, therefore, was

25  no longer --

15

1        THE COURT:  So if Nu-Tech is properly the plaintiff

2   here, then he wouldn't benefit from it.

3        MR. CAMPANERIO:  Correct.

4        THE COURT:  Okay.

5        MR. CAMPANERIO:  Thank you, Your Honor.

6        MR. SCHWARTZ:  Just so the Court understands the

7   chronology, Mr. Maley -- the lawsuit in State Court started in

8   2002.  And you'll hear some argument later that it was not

9   until 2005 that Delphi first raised an issue about the standing

10  of Nu-Tech.  The filed a motion for summary disposition.

11  Nu-Tech opposed it, there was oral argument out and the judge

12  allowed a reply brief to be submitted.  That is when Delphi

13  went and got the affidavit of Mr. Maley.  Discovery was closed,

14  they got an affidavit and they attached it to a reply brief.

15  So there was not any opportunity to take his deposition in the

16  State Court action.

17       With respect to the Rule itself -- and the reason why

18  he had transferred his interest back to Mr. Cooper, there had

19  been litigation between Mr. Cooper and Mr. Maley.  Mr. Maley

20  owed Mr. Cooper a lot of money and --

21       THE COURT:  Well, no, they're not relying on the

22  adverse interest exceptions.  So I don't think you need to get

23  into that.

24       MR. SCHWARTZ:  Okay.

25       THE COURT:  I mean, you're saying that, in a sense,

16

1    to say that he had a motive --

2              MR. SCHWARTZ:  To fabricate.

3              THE COURT:  Okay.

4              MR. SCHWARTZ:  And which is one of the factors --

5              THE COURT:  Which I guess is fair.  I shouldn't have

6    cut you off because that -- that goes into 807 as well.

7              MR. SCHWARTZ:  It does, Your Honor.  And the case I

8    cite, and I know you're -- it sounds like you're familiar with

9    the rule is Sternhagen v Dow Co., 108 F. Sub 2d, 1113, which,

10   kind of, surveys all the different cases that have analyzed it

11   and the factors that you should look at.  And if you look at

12   the majority of those factors, this affidavit shouldn't fall

13   within the exception.  The -- this was not preserved on

14   videotape, so that no one could see his demeanor.  It was not

15   subject to cross-examination.  It was not in close proximity to

16   the events.  He gave this deposition -- he gave the affidavit

17   in '05 and these events happened in 1999 or in 2000.

18              I disagree with Mr. Campanerio that it's

19   corroborated.  Most of the evidence is - most of the things

20   that he says in his affidavit are not corroborated by anybody

21   in Nu-Tech.  He had a motivation to fabricate because of the

22   litigation that he'd had with Mr. Cooper.

23              THE COURT:  Well, on that score, was that litigation

24   still pending?

25              MR. SCHWARTZ:  At the time that he gave his

17

1  affidavit, no.  At the time he gave his affidavit he had

2  already lost.  He'd lost a judgment and he gave back the stock

3  to Mr. Cooper.

4          THE COURT:  So, at best, your point is that he had

5  sour grapes.

6          MR. SCHWARTZ:  Correct.

7          THE COURT:  Okay.

8          MR. SCHWARTZ:  He was -- and some of the items that

9  he says are not based on personal knowledge.  So, I don't think

10 it falls within the hearsay exceptions.  I also think, with

11 respect to the claims procedure order, Judge, all witnesses are

12 supposed to be subject to cross-examination if they're going to

13 give evidence -- going to give testimony at trial.

14          THE COURT:  Well, it's hard to do that if you're

15 dead.  So, I think -- I think we can read an exception into the

16 procedures on that bases.

17          MR. SCHWARTZ:  Very good.  But those -- those are

18 the -- those are the basics.  We didn't have an opportunity to

19 cross examine him, which we certainly would have done.  And

20 therefore it shouldn't come and it doesn't fall within the

21 exceptions.  There are specific exceptions for someone who is

22 deceased, other hearsay exceptions, which I did cite and you

23 commented on.  And it doesn't fall within that.

24          THE COURT:  Okay.

25          MR. HOGAN:  Judge, I don't have anything further on

18

1    that point.

2         THE COURT:  All right.  I -- I understand that this

3    is a bench trial and under some circumstances where it's a

4    close call I would take that into account and just look at

5    credibility.  But here I'm actually going to exclude the

6    affidavit.  I believe that given the prior litigation between

7    Mr. Cooper, who's really the person who stands to gain here,

8    and Mr. Maley and what I think is fair to say the -- as far as

9    the laying the blame on the claimant for the failure to depose

10   Mr. Maley, it seems to me that knowing the contents of the

11   affidavit as much blame, if you will, could be laid on the

12   debtors not to arrange for his deposition given that the stay

13   had been lifted.

14        In any event, it seems to me that, particularly since

15   I think he is, in many respects, the only person testifying as

16   to a lot of the items in his affidavit.  And that the

17   corroborating testimony is limited to just the knowledge of the

18   witness.  So therefore it's not that strongly corroborative,

19   since it's just limited to her knowledge and she didn't have

20   control of the whole situation from the purchaser's point of

21   view, GM/Delphi.  I don't believe that the purposes of the

22   hearsay rules would be served by having the affidavit admitted,

23   so I won't admit it.

24        MR. HOGAN:  Okay.  Very good, Judge.  With that

25   exception, I believe all the documentary evidentiary issues are

19

1    taken care of.

2          Judge, I know you don't -- don't care for opening

3    statements.  We're, sort of, in the mode where we -- we really

4    just have a limited presentations --

5          THE COURT:  Well, you're relying on -- on the papers

6    so I think we're, kind of, at closing statements, frankly.

7          MR. HOGAN:  We're really very close to closing

8    statements.  I would propose first -- I would like to introduce

9    the witnesses from Delphi whose declarations are in evidence,

10   just so you know who they are.

11         THE COURT:  Okay.

12         MR. HOGAN:  And actually, I may have misspoke.

13   There's only one Delphi employee here but I'll introduce

14   Ms. Tina Weber first -- could you please stand up, Tina?  She

15   is a -- with the Delphi's Power Train business line, a

16   purchasing manager.  Jim Weber is a General Motors Corporation

17   program purchasing manager, employee of General Motors.  And

18   Mr. Keith Frances (ph.) is a senior director of BBK limited;

19   he's our spokesman for damages.

20         THE COURT:  Okay.

21         MR. HOGAN:  So they're here, Judge, if you have any

22   questions of them.  In terms of the closing discussion, I would

23   propose that since the claimant does have the burden of proof,

24   perhaps its appropriate for Mr. Schwartz to address the

25   Court --

20

 1          THE COURT:  Well before we get to --

 2          MR. HOGAN:  Certainly.

 3          THE COURT:  Are your witnesses here too, Mr.

 4  Schwartz?

 5          MR. SCHWARTZ:  They are, Your Honor.  Do you want me

 6  to introduce them?

 7          THE COURT:  Yes.

 8          MR. SCHWARTZ:  This is John Cooper.  He's the owner

 9  of Nu-Tech.  He's to my left.  Ms. Trina Turner-Patrick who

10  worked for Delphi and Mr. Gary Lehman (ph.) who is the damage

11  expert.

12          THE COURT:  Okay.  All right.  I -- as is every

13  judge, am somewhat tempted to ask questions but I actually

14  think that I'll respect the parties' decisions to rely on the

15  submissions that they've made, including the exhibits that

16  they've designated.  I do that, primarily, because I think that

17  my questions, at best, just go around the edges and they're

18  more properly directed at counsel in pointing me to the

19  significance of various pieces of evidence or answering my

20  questions about the significance of various pieces of evidence.

21          So, I appreciate you're all coming in and don't want

22  you to feel like you made a wasted trip but having reviewed

23  everything again last night and briefly this morning a couple

24  of points, for the third time, I'm just going to go ahead and

25  ask you all to do closing argument.  And I think Mr. Schwartz

21

1   should go first on that.

2           MR. HOGAN:  Thank you, Judge.

3           MR. SCHWARTZ:  Most of the salient facts, I don't

4   think, are in dispute in this claim, Judge.  There's not a

5   dispute that there was a contract between Delphi and Nu-Tech.

6   That it was a requirements contract and that it was breached.

7           THE COURT:  Well, there's a dispute as to when Delphi

8   Automotive Systems, LLC, entered into a contract.

9           MR. SCHWARTZ:  You're right, Your Honor.  They -- but

10  there is an acknowledgement that DAS signed the May 1999

11  purchase order.

12          THE COURT:  Correct.

13          MR. SCHWARTZ:  And you're getting -- that was

14  right -- you're leading into my first point which is, I think

15  the only issue with respect to that -- the only issue in

16  dispute between the parties on that is really the time frame.

17  There's no dispute between May 1999 and December 31, 2000

18  because that purchase order we agree on.  There's a purchase

19  order that preceded it, in August of '98 that they claim was a

20  GM purchase order, we say it's a Delphi purchase order.

21          As I've indicated, Judge, this is Exhibit 16.  These

22  are the reasons why I believe it's clear that Delphi is

23  responsible.

24          THE COURT:  and when you say this, you mean which

25  purchase order?

22

1          MR. SCHWARTZ:  This is the -- I'm sorry; this is the

2  August '98 purchase order that is in dispute.

3          THE COURT:  Okay.

4          MR. SCHWARTZ:  I think it's the only one that's in

5  dispute.

6          THE COURT:  Okay.

7          MR. SCHWARTZ:  If you look at the document itself,

8  Judge, it's on Delphi letterhead.  The effective date is August

9  17 -- and this is where it says the line item is effective,

10  August 1, 1998 through July 31, 1999.  Why that is significant,

11  Judge, is that if you look at Exhibit 17, which is the next

12  exhibit, that's the one that they concede is a Delphi purchase

13  order.  And if you look at the same, the line item as

14  effective, it's the same date.  This is Exhibit 17, August 1,

15  1998 through December 31, 2000.

16          So in the purchase order that they've admitted is

17  theirs, it was effective back to August of 1998, even if they

18  weren't in existence if you believe their theory.

19          THE COURT:  Well, go to -- and I apologize.  I was

20  working off your submissions, not these exhibit books.  So --

21          MR. SCHWARTZ:  Do you want me to ---

22          THE COURT:  -- I'm not sure what number it is.  It's

23  Exhibit E in the debtor's supplemental objection.  It's the RPT

24  amendment.

25          MR. SCHWARTZ:  The one that happened afterwards?

23

1        THE COURT:  Yeah.

2        MR. SCHWARTZ:  Yes.  That is exhibit --

3        THE COURT:  Is that 18?

4        MR. SCHWARTZ:  18.

5        THE COURT:  Okay.  That has the same language about

6   this line is effective from 1 August, 1998.

7        MR. SCHWARTZ:  Correct.

8        THE COURT:  So are you contending that the contract

9   with RPT went back to the orders from '98?

10        MR. SCHWARTZ:  No, I'm saying it was a -- Delphi was

11   extending.  And what they gave to RPT after RPT and Nu-Tech

12   entered into their transaction, was an extension put into RPT's

13   name.

14        THE COURT:  But you're relying on this same language?

15        MR. SCHWARTZ:  Yes, as far as the effective date.

16   Judge, I have evidence better than the document itself.

17        THE COURT:  Okay.

18        MR. SCHWARTZ:  I have an admission by Delphi's lawyer

19   that this is a Delphi contract.

20        THE COURT:  Okay.  Let's go to that because I was a

21   little confused by that too.

22        MR. SCHWARTZ:  Okay.  Look at Exhibit 28, Judge.

23   Exhibit 28 is Delphi's second amended answer to complaint in

24   the State Court.  Do you -- would it be easier if I use my --

25   the submission that I sent you, because I have that also.

24

1       THE COURT:  It would be because that's the one I

2  marked up.  And I apologize for that but --

3       MR. SCHWARTZ:  I'd rather we were on the same page.

4       THE COURT:  Okay.

5       MR. SCHWARTZ:  It is Exhibit P.

6       THE COURT:  Okay.

7       MR. SCHWARTZ:  Okay.  If you go to paragraph 7, this

8  is their response -- Delphi's response to the lawsuit.  And I'm

9  focusing on the last -- well, you can read the paragraph,

10  Judge.

11       THE COURT:  Okay.

12       MR. SCHWARTZ:  I'm focusing on the last sentence

13  which is the admission that the purchase orders, both the '98

14  and the May 1999, which they continue to acknowledge is theirs,

15  were Delphi's.

16       THE COURT:  That's the sentence that says this

17  purchase order was amended by Delphi Automotive Systems?

18       MR. SCHWARTZ:  Correct.  Yes.

19       THE COURT:  But Delphi Automotive Systems, LLC, is

20  defined as Delphi, not Delphi Automotive Systems.  That's at

21  the very beginning of the complaint.

22       MR. SCHWARTZ:  Yes.

23       THE COURT:  So lawyers who are very careful when they

24  do answers, particularly when they're admitting items of

25  complaint, I think use defined terms when they -- when they

25

1    want -- when they're covering the term that they've defined.

2         MR. SCHWARTZ:  I think a fair reading of this, Judge,

3    is whichever entity Delphi's counsel is referring to was the

4    same one.  There's not a designation that --

5         THE COURT:  Don't we all agree that before Delphi

6    Automotive Systems, LLC was formed and before any Delphi

7    Automotive Systems Corporation was formed, General Motors had a

8    division that it referred to as Delphi Automotive Systems?

9         MR. SCHWARTZ:  It referred to it and Delphi

10   Automotive Systems did business --

11        THE COURT:  And so --

12        MR. SCHWARTZ:  -- conducted business and signed

13   contracts.

14        THE COURT:  So it was a division of GM, not a

15   corporation.

16        MR. SCHWARTZ:  Delphi Automotive Systems, the

17   defendant -- there's never -- again, until 2005 there was never

18   a suggestion -- I take that back.  Until this claims

19   proceeding, there's never been a suggestion that the wrong

20   defendant was named.  It was never raised in the State Court by

21   Delphi at any time, in answering the complaint or at any time

22   in the first three, four, five years -- three, four, five years

23   of the lawsuit if there was a suggestion that the wrong Delphi

24   was named in the complaint it would have been amended.  And

25   that goes into the equitable estopple; we're going to talk

26

1    about that.

2            THE COURT:  Well, I'm sorry; it would have been

3    amended how?

4            MR. SCHWARTZ:  The claim -- it would have been

5    amended -- it would have been amended to the name of the Delphi

6    entity that entered into this -- this contract.

7            THE COURT:  But they're -- they're saying that no

8    Delphi entity entered into it as a separate legal entity as

9    opposed to a division of -- of GM.

10           MR. SCHWARTZ:  And Judge, that's why I submitted to

11   you all the corporate documents, the filings with the SEC about

12   the business that Delphi was doing separately.

13           THE COURT:  No, I understand that's a separate --

14           MR. SCHWARTZ:  Prior --

15           THE COURT:  -- that's a separate point.  But on this

16   point I don't see -- I don't see a -- I guess I don't see a

17   basis for estopple.

18           MR. SCHWARTZ:  Okay.

19           THE COURT:  I mean, I --

20           MR. SCHWARTZ:  Judge, you have --

21           THE COURT:  -- you can persuade me though.  I'm

22   trying to --

23           MR. SCHWARTZ:  I'll try.  Ms. Patrick, who worked for

24   Delphi at the time and issued this says this was a Delphi

25   purchase order.

27

1          THE COURT:  No, that's a separate point.  I'm just

2   focusing on --

3          MR. SCHWARTZ:  I'm trying to persuade you.

4          THE COURT:  -- the fact that you're saying that

5   they've raised this new defense.

6          MR. SCHWARTZ:  Well --

7          THE COURT:  I mean, they certainly raised it in time

8   for you to allege that there was a different corporation but

9   that hasn't been done except -- except as you've done it here.

10  I mean, you have alleged -- you've disputed their allegation --

11         MR. SCHWARTZ:  Yes.

12         THE COURT:  -- that DAS LLC was formed in September.

13         MR. SCHWARTZ:  Yes.

14         THE COURT:  Okay.  The two other points, and I'll try

15  to persuade you, Judge, one is you have Ms. Patrick's

16  affidavit, who worked for Delphi who issued this purchase order

17  and said this is a Delphi purchase order.

18         THE COURT:  But she -- but in her depo -- she --

19  she's -- I mean, my impression, at least, from her -- her

20  affidavit is that she's not a lawyer.  I mean, it -- how much

21  should I take away from her statement that she understands the

22  intricacies of what GM was going between 1998 and 1999 with

23  regard to setting up various Delphi Automotive entities and

24  doing this corporate spin-off and the like?

25         MR. SCHWARTZ:  I don't --

28

1          THE COURT:  I mean, her -- her boss was very candid

2    in her deposition and said I don't really know.  I'm not a

3    lawyer.  That's not part of my job.

4          MR. SCHWARTZ:  And I -- and I would give you the same

5    answer for Ms. Patrick.  However, she knows whose paying her.

6    She knows where she's working.  She knows when she's issuing

7    new forms and new letterhead.  And she said -- her testimony

8    is, this was Delphi.  She's hear and you can question her

9    further if you'd like to.

10         THE COURT:  Well, no but Delphi --

11         MR. SCHWARTZ:  This was a Delphi purchase order.

12         THE COURT:  But again -- but Delphi, again -- and I

13   appreciate that the name Delphi was around but just saying it's

14   Delphi doesn't establish that it was this legal entity or any

15   legal entity.

16         MR. SCHWARTZ:  Okay.  Let me try it from a different

17   approach.

18         THE COURT:  Okay.

19         MR. SCHWARTZ:  General Motors say, Delphi is

20   responsible for this purchase order.

21         THE COURT:  Well that one I -- and this is -- I want

22   to focus in on that because although they say that in a -- in a

23   litigation letter, has anyone attached or is there -- it's

24   interesting we've gotten to this point in the case with me

25   asking this question, but that's because the debtors have

29

1    settled their disputes with GM, is there an acquisition or a

2    transition or spin-off agreement in the record --

3              MR. SCHWARTZ:  There's not -- I'm sorry.

4              THE COURT:  -- pursuant to which, you know, GM spun

5    off DAS LLC and in which the parties specified which

6    liabilities DAS LLC would be assuming and which it wouldn't be?

7    And which assets it would be getting and which assets it

8    wouldn't?

9              MR. SCHWARTZ:  The answer to the question is, Judge,

10   it is not produced during discovery, that document, the master

11   separation agreement.  It is specifically referred to in GM's

12   letter by paragraph of that agreement.

13             THE COURT:  Well, but that's -- well, could we go to

14   the letter for a second?

15             MR. SCHWARTZ:  Yeah.  It's Exhibit H, Judge.  And I'm

16   talking about the second -- the top of the second page.

17             THE COURT:  Right.  And he says that pursuant to

18   Section 2.01(a) of the Master Separation Agreement, Delphi

19   assumes certain purchase orders including, but not limited to,

20   the purchase order giving rise to Nu-Tech's claims to Delphi,

21   effective January 1, 1999.

22             MR. SCHWARTZ:  Yes.

23             THE COURT:  But -- I mean, is there anything to

24   corroborate -- I mean, is there anything to corroborate that?

25             MR. SCHWARTZ:  There's nothing to dispute it.  I

30

1    don't have the agreement.  It wasn't produced during discovery

2    and they've offered nothing --

3              THE COURT:  Well, was it asked for?

4              MR. SCHWARTZ:  The documents relating to the -- the

5    spin-off was and we got a general objection.  I will -- I did

6    not pursue it further, which I know was my right with you,

7    Judge, to do.  But there is nothing contradicting that.

8              THE COURT:  Okay.

9              MR. SCHWARTZ:  And the last point, and I know I made

10   it in my brief, Judge, is that the position they're taking --

11   that Delphi is taking that it was not until the LLC was formed,

12   the whole spin-off ended, that occurred after the May 1999

13   purchase order which they are acknowledging.

14             THE COURT:  '99?

15             MR. SCHWARTZ:  '99, correct.  Which they're

16   acknowledging was theirs.

17             THE COURT:  Right.  No, I -- I think --

18             MR. SCHWARTZ:  It's an inconsistency --

19             THE COURT:  I think that -- I'll ask Mr. Hogan this,

20   but it seems to me that the -- pointing to the date of the

21   spin-off is irrelevant if -- if there was a live entity, a live

22   legal entity DAS, LLC, that entered into a contract, the '99

23   purchase order, then it really doesn't matter when it was spun-

24   off, it was a -- it had a separate corporative existence

25   unless, for some reason, the entity with a different name was

31

1    the one that was -- that you're suing now but that's not

2    alleged, I don't think.  I'm sorry, the same -- a different

3    entity with the same name is the debtor now and they're not

4    asserting that.  So I -- and I don't think they're disputing

5    that the -- the -- that the purchase order that's May 3, 1999,

6    is a binding contract on DAS, LLC.  I don't think they're

7    disputing that.  So I think the date of the spin-off is pretty

8    much relevant.  It's when the entity existed unless, as you

9    say, that entity, DAS, LLC, assumed GM's obligations under the

10   prior purchase orders, the August one.

11          MR. SCHWARTZ:  The other thing, Judge --

12          THE COURT:  August '98.  Could I -- could I ask you,

13   is there anything in the record with -- because I think you

14   also suggest, in various ways, that DAS, LLC, impliedly assumed

15   GM's obligations under the August '98 order.  Is there anything

16   in the record to show that DAS, LLC, paid obligations arising

17   before May 3, 1999?

18          MR. SCHWARTZ:  Let me see.  I was just -- I was going

19   to point to you, at least -- if you look at the Cooper

20   affidavit -- declaration?

21          THE COURT:  Uh-huh.

22          MR. SCHWARTZ:  Exhibit 5, although it's not a -- it's

23   not a check it's a Delphi Automotive Systems letter, which I

24   will tell you does not say LLC after it but it's from their

25   director of purchasing to Mr. Maley from Delphi.

32

1          THE COURT:  Well, that's just a thank you letter,

2    right?

3          MR. SCHWARTZ:  It is but it's not a G -- and then if

4    you look at the very next exhibit, that's the GM letter with

5    the same type of thank you from the GM person, at the same time

6    for settling -- for helping to settle the same strike.

7          THE COURT:  Okay.  But again, just going to my

8    question about --

9          MR. SCHWARTZ:  I'm looking for payment, Judge.  I

10   apologize.

11         THE COURT:  Okay.

12         MR. SCHWARTZ:  Judge, we have -- and this is a

13   different Delphi entity, it's Exhibit 12.  It's Delphi Engine -

14   - Energy and Engine Management System talking about payments on

15   December of '98.

16         THE COURT:  Okay.

17         MR. SCHWARTZ:  And this -- this is to the Patrick

18   affidavit.

19         THE COURT:  Well, would I --

20         MR. SCHWARTZ:  But I do not have a check.

21         THE COURT:  Okay.  All right.  Okay.

22         MR. SCHWARTZ:  Any other questions, at least, on the

23   that issue?

24         THE COURT:  No, I don't think so.

25         MR. SCHWARTZ:  All right.  It is our belief, because

33

1   of that evidence, that the relevant time frame for damage

2   purposes is January 1, 1999, not May 1, 1999, that's what all

3   that issue goes towards.

4          The second issue that has been raised, or the second

5   defense that's been raised, is does Nu-Tech possess the claim.

6   And I would submit to Your Honor the only way that Nu-Tech

7   doesn't possess the claim is that the debtor would have to get

8   over three hurdles to establish that.

9          First, you'd have to look at the transaction between

10  Nu-Tech and RPT.  And I know we've -- both sides briefed this.

11  This is Exhibits -- I'm sorry.  I hold the exhibits in the --

12  it's Exhibit 20 and 21 but there is some language I wanted to

13  look at.  Let me find the letters for you.

14          THE COURT:  I have them.

15          MR. SCHWARTZ:  Do you have them?

16          THE COURT:  Yeah.

17          MR. SCHWARTZ:  Okay.  Before I talk about it, Judge,

18  because I think this is significant to one of the points that

19  Delphi raises in their argument, and it goes to damages when

20  there's a breach of a contract, especially installment contract

21  or requirements contract like we have here.  Under Michigan

22  law, Blazer Foods v Restaurant Properties, 259 Mich at 241,

23  2003 and H.J. Tucker v Chalmers, 234, Mich at 550, 1999, both

24  of those cases say that when a party breaches a contract,

25  materially, the non-breaching party has two choices.  They can

34

1  terminate the contract and sue for damages or they can continue

2  to perform and sue for partial damages.

3          What happened here when this requirements contract

4  was not being filled, and we know from the record Nu-Tech

5  believed they were going to get the part or get a replacement

6  part and that's why they continued trying to work Delphi, who

7  actually got them to the position that they were in as of the

8  time the tools were taken.  They did not -- they never -- Nu-

9  Tech never terminated the contract.  They continued to be

10 ready, willing and able to perform under the contract.

11         I think a fair reading of both the memorandum and

12 then the supplement asset purchase agreement; because they are

13 one integrated document the way they're written.

14         THE COURT:  I don't understand how that can be.  I

15 understand it says that they are -- it doesn't really say

16 they're one integrated document.

17         MR. SCHWARTZ:  It says one supplements the other.

18         THE COURT:  Right. And so If one is different from

19 the other, the later one governs, which is defined as

20 definitive, right?

21         MR. SCHWARTZ:  I disagree with you, Judge.  Because

22 of the language in the integration clause in the latter

23 agreement, which doesn't say it supercedes the prior one.

24         THE COURT:  But it's not -- well, let's go -- why

25 don't we go to that language.

35

1          MR. SCHWARTZ:  Do you have those pulled out or do you

2    want me to get the letters?

3          THE COURT:  No, I have them.

4          MR. SCHWARTZ:  Okay.  They're Exhibit 20 and 21 in

5    the record at this point.

6          THE COURT:  All right.

7          MR. SCHWARTZ:  Exhibit 21, the integration clause,

8    which is paragraph 17.4.

9          THE COURT:  Right.

10          MR. SCHWARTZ:  It indicates -- it specifically refers

11    to the memo and it indicates that this agreement is going to

12    supplement it and complete it.  It doesn't say it's going to

13    supercede it or it doesn't have language like you typically see

14    that where inconsistent this latter agreement will govern.  It

15    doesn't say that.

16          THE COURT:  Right but if it is different than the

17    prior document, which is --

18          MR. SCHWARTZ:  It's 20 in the exhibits now.

19          THE COURT:  Right.  Which is the memorandum and

20    agreement and, in fact, that's defined as the memo in -- in

21    recital A in the final agreement, the one that's marked final.

22    And it says the purpose of this agreement is to supplement and

23    complete the terms and conditions of the memo in a definitive

24    fashion.  If -- if the memo lists, for example, a description

25    of the purchase assets in a way that's different then the

36

1    definitive agreement or the final agreement, you would have to

2    assume, wouldn't you, that the final agreement is the one that

3    completes the earlier asset -- the earlier one.

4            MR. SCHWARTZ:  I think, because of the language the

5    parties chose, no.

6            THE COURT:  Okay.

7            MR. SCHWARTZ:  Logically, I agree with you, Judge.

8    But that's not the language the parties of the contract chose

9    to use.

10           THE COURT:  Okay.

11           MR. SCHWARTZ:  And it is a confusing agreement, I

12   agree with you.  But I think the structure of the agreement,

13   Judge, either the memo which is more abbreviated or the

14   agreement of purchase and sale of business assets, but I think

15   it relates to an issue that Delphi has raised, was that RPT was

16   going to take over the business operations, the business

17   assets, and move forward after the closing in 2000.  That what

18   Nu-Tech was trying to keep was things that were theirs up until

19   the time of closing.  So when you look at excluded assets, at

20   least the categories of what they were trying to keep, cash,

21   accounts receivable, pre-paid items, refunds, those are the

22   types of items, in general, they were trying to keep.

23           The causes of action that they would have for

24   breaching the purchase order up till that point was Nu-Techs.

25   It's a general intangible.

37

1          THE COURT:  Well --

2          MR. SCHWARTZ:  RPT --

3          THE COURT:  -- isn't the -- isn't the contract for

4     the pump used and useful in the business?  I mean, Mr. Cooper's

5     testimony -- the contract for the -- was it 06 --

6          MR. SCHWARTZ:  0694.

7          THE COURT:  -- he testifies that's, like, the

8     foundation of his business.

9          MR. SCHWARTZ:  It was the foundation of his business,

10    that's why it went under.

11         THE COURT:  And it ran through, and was not

12    terminated, it ran through 2000.

13         MR. SCHWARTZ:  Correct.

14         THE COURT:  December 21, 2000, the date of this

15    agreement is --

16         MR. SCHWARTZ:  January 14, 2000 is the second one.

17         THE COURT:  -- although, if you rely on the

18    integration it's effective on December 1, 1999.

19         MR. SCHWARTZ:  I agree.

20         THE COURT:  And it would be hard to see anything more

21    used in connection with the business then that contract.

22         MR. SCHWARTZ:  That wasn't the only asset that was

23    sold, Judge.

24         THE COURT:  Oh, I know.  But it certainly was an

25    important one.

38

1          MR. SCHWARTZ:  It was the -- it was the -- it was the

2    foundation the business was built upon.  But there was other

3    tools, there was other parts --

4          THE COURT:  But I -- I'm not disagreeing with that.

5          MR. SCHWARTZ:  Okay.

6          THE COURT:  Okay. I'm just looking at the definition

7    of purchased assets --

8          MR. SCHWARTZ:  Okay.

9          THE COURT:  -- in the memorandum and agreement.

10         MR. SCHWARTZ:  Okay.

11         THE COURT:  Which says that purchaser shall purchase

12   all seller's assets, except excluded assets, existing or used

13   in connection with -- in connection with the business.  To me

14   that says they purchased the contract.

15         MR. SCHWARTZ:  It -- they did not purchase the cause

16   of action.

17         THE COURT:  But if you purchase a contract, you don't

18   think you purchase the right to sue for breach?

19         MR. SCHWARTZ:  That's the cases I just cited, Judge.

20   That's why there's a distinction between what you choose to do

21   with your legal rights.  So no, I disagree with that.

22         THE COURT:  Go back to the case you cited, I missed

23   that.

24         THE COURT:  Blazer Foods v Restaurant Properties,

25   H.A. Chalker v. Chalmer's.  Each time you don't fulfill the

39

1    contract -- the contract continues.  You can choose to continue

2    it, you can choose to terminate.

3          THE COURT:  Right.

4          MR. SCHWARTZ:  Each time you choose is a separate

5    breach of that contract.  RPT, when they entered into this

6    transaction, new what had happened with part 0694, they knew it

7    wasn't there.  It hadn't been there for a year.  That's why

8    Nu-Tech was in the financial straights that it was.  It had the

9    rights to continue on with the contract, if they would have

10   brought any parts but the cause of action, which when you sell

11   a business is a general intangible, it's not a hard asset, and

12   if you -- and the definition gets even clearer, I think, in the

13   second agreement to a degree --

14         THE COURT:  Okay.

15         MR. SCHWARTZ:  -- when it starts listing categories.

16   You have a broad statement that everything's being transferred.

17   And then you have an equally broad exclusion -- excluded asset

18   section, 1.4(d) that everything's excluded unless specifically

19   or by inference in the paragraphs or the exhibits.  And there

20   is no reference to the causes of action being transferred.

21         THE COURT:  Well, let me -- let me make sure I

22   understand your point you made just before that, then.  So

23   you're saying that even though RPT bought the contract and I'm

24   going to say, had, under this definition by inference, the

25   right to enforce the contract going forward, nevertheless, Nu-

40

1    Tech had the right to sue for damages going forward?

2            THE COURT:  No, up to the point of the transfer.

3            THE COURT:  Up to the point of the transfer.

4            MR. SCHWARTZ:  Correct.

5            THE COURT:  Okay.

6            MR. SCHWARTZ:  It's no different than, I believe -- I

7    analogize it to the other things that were listed, pre-paid

8    items, tax refunds that you're entitled to, accounts

9    receivable, work you've -- things that are yours that have

10   value up to that point, Nu-Tech was keeping.  That's what the

11   excluded -- that's what the first three paragraphs under

12   excluded assets talk about.

13           THE COURT:  Okay.

14           MR. SCHWARTZ:  So, I believe, because the general

15   intangible -- I believe if you look at the excluded language

16   broadly, it eliminates general intangibles that Nu-Tech kept

17   the claim.  If you believe that there's a conflict, that the

18   two provisions conflict with one another, then you have an

19   ambiguity in the contract and you've got evidence from both

20   parties to the transaction, Nu-Tech and RPT, that there was

21   never an intent, it was never part of the transaction to sell

22   the cause of action.  The only one -- the only party that's

23   alleging that it was sold is Delphi.  And it's an issue they've

24   raised late in the game, which is my third part that I'll get

25   to.

41

1          Do you have any other questions of me on the

2     contracts, Judge?

3          THE COURT:  No, that's fine.

4          MR. SCHWARTZ:  Can I add one point, only because it

5     came up in their brief and since this is closing argument?

6     There was a suggestion -- they cited to the Michigan UCC

7     statute, 450.2210, that somehow that should answer the question

8     we're dealing with.  But what they didn't cite you to was

9     subsections 4 and subsections 5 which both they, this is the

10    general rule unless the circumstances indicate to the contrary

11    which they do here because we have a signed agreement that

12    deals with these issues.  So the contracts are what has to be

13    interpreted.  It's not going to be governed by the general

14    provision the MCLI that they cited to.  That's the only other

15    thing -- point that I had on that.

16         THE COURT:  Okay.

17         MR. SCHWARTZ:  Okay.  So I believe Nu-Tech has always

18    had the claim.  That's hurdle one that Delphi has to get over.

19    Hurdle number two is that in the event Nu-Tech didn't have the

20    claim, it was assigned back to them during the pendancy of the

21    litigation.  The -- Delphi didn't raise this issue until three

22    years into the litigation.  When they did, Nu-Tech -- and

23    that's when they got the motion for summary disposition.  Nu-

24    Tech immediately talked to RPT.  They signed the

25    acknowledgement and they signed back to Nu-Tech the right to

42

1   sue.  And therefore they continue to be -- they continue to be

2   the party pursuing the action.

3          This was the -- the claim that was litigated in front

4   of the Trial Court below.  I agree with Delphi that you're not

5   bound to follow that judge's decision, although that was the

6   judge that dealt with this litigation for years, knew that the

7   parties had been litigating this, that Delphi had been aware of

8   the claims from the beginning, discovery was over when this

9   issue first arose and that judge denied it.  But I'm not

10  suggesting that you are bound by it.  I just think you should -

11  -

12          THE COURT:  And it's fair to say --

13          MR. SCHWARTZ:  -- use your discretion.

14          THE COURT:  -- he wasn't given the issue in the

15  context of a statute of limitations issue.

16          MR. SCHWARTZ:  That's correct.  That was another new

17  one for this Court.

18          THE COURT:  Okay.

19          MR. SCHWARTZ:  The cases that Delphi cites, they cite

20  you to two unpublished, non-precedential cases, for you to

21  reach this decision.  I said it to you, the Oakstra (ph.) case

22  with the tolling statute.  That if you file another lawsuit,

23  even in Oakstra it was filed in the wrong state.  It was

24  pending for a period of time.  And then when it came back to

25  Michigan the statute still told, even though the first court

43

1   never had jurisdiction over it.

2           THE COURT:  But that was a proper plaintiff from the

3   start.

4           MR. SCHWARTZ:  Wrong court, right plaintiff.  I agree

5   with you.  I would cite to other cases, Judge, and again I'm

6   raising this because they brought up a new case in their brief

7   that isn't in my brief.  But in both cases these were the wrong

8   plaintiffs from the start.  The statute ran and they corrected

9   the situation and the court refused to deny, on the statute of

10  limitations grounds, this is Salt Marsh v Bernard, 151 MICH HAP

11  476.  The second one is Wieczorek, W-I-E-C-Z-O-R-E-K, v

12  Volkswagon Werk, and Werk is W-E-R-K, 731 F.2d., 304.  It's a

13  Sixth Circuit Michigan case in 1984.  And both of those cases

14  were --

15          THE COURT:  I'm sorry.  731 F.2nd?

16          MR. SCHWARTZ:  Yes, 309.  One was a legal malpractice

17  case, Judge, the Salt Marsh case.  The second one was an auto

18  accident case.  And in both of those cases the plaintiff filed

19  a suit not on behalf of the estate, someone had died, and just

20  went in their own name and filed it -- filed a lawsuit.  The

21  plaintiff didn't have standing to bring the claim.  The

22  defendant filed a motion for summary -- statute of limitations

23  expired.  The plaintiff went to the Probate Court in Michigan,

24  corrected the situation and in front of the judge said this was

25  an innocent mistake, we've been litigating the case and the

44

1    court, in both those situations, allowed the claims to

2    continue.  They didn't talk about tolling.  But the language,

3    and I think it's relevant to this situation, Judge, this is at

4    491 of the Salt Marsh case; justice is best served by

5    precluding the avoidance of a valid claim, such as the one

6    here, by a legal technicality which does not prejudice the

7    defendant provided the plaintiff acted in good faith in their

8    belief when they filed the suit, which is what happened here.

9           So, you've got published cases that show you what

10   Michigan does.  Delphi doesn't cite you to any published case

11   that distinguishes the tolling statute.  They cite you to a

12   Supreme Court case that says tolling won't apply -- which --

13   and that is a published case, but it didn't deal with tolling

14   at all.  The question in that case was, the statute of

15   limitations runs and you want to -- there's a misnomer in the

16   party name, like we were talking about earlier with Delphi, if

17   we named the wrong Delphi and there was another Delphi entity

18   that should have been named.  In Michigan you can correct the

19   misnomer.

20          In that case, the Supreme Court said that you

21   wouldn't be correcting a misnomer, it was a trustee in

22   bankruptcy that should have been pursuing the claim, not the

23   individual.  And to add the trustee after the statute of

24   limitations ran out is adding a new party.  When you add a new

25   party, if the statute's run out, under the Michigan court rules

45

1   it doesn't relate back.  And therefore, the Court didn't allow

2   that to happen.  And that's a non-tolling case.  That's the

3   only published case that they've cited to you.

4            So that's hurdle number two that Delphi has to get

5   over.  And third, Judge, and I think this is most applicable

6   because of what's happened in this litigation, is I want to

7   talk to you about equitable estopple.

8            Assuming Nu-Tech did sell the claim and while that

9   lawsuit was pending and the assignment came back to Nu-Tech,

10  the statute of limitations had run out, the doctrine of

11  equitable estopple should stop them from raising it.  And I

12  cited to you the Penny case in my brief.  But what it says is,

13  a party by it's representations, admissions or silence,

14  intentionally or negligently induces another party to believe

15  certain facts, the other party must not only have justifiably

16  relied on the belief but must also -- but also be subject to

17  prejudice if the party's permitted to deny the facts upon which

18  the second party relied.  That's the Penny case that I cited to

19  you.

20           In Penny, because it's a little bit similar to this

21  case, it was a product liability case, many defendants were

22  listed.  One of the defendants participated in discussions with

23  the cases involved in part of litigating the case, but the

24  plaintiff had never properly served them.  He sat silent.  He

25  participated in the litigation.  The case got -- the summons

46

1   expired.  The case got dismissed against him and that's where

2   the court, the Michigan court said, when he was participating,

3   involved in the litigation and he didn't step forward and say

4   something when he knew there was a defect that could have been

5   corrected, because he had gotten a copy of the dismissal order

6   and didn't notify claims counsel on it, when plaintiff's

7   counsel still could have corrected it before the statute ran.

8           THE COURT:  Have you looked at Barret Camp 33, Inc.

9   v Corporate Design Group, Inc. --

10          MR. SCHWARTZ:  No.

11          THE COURT:  -- (1999) Mich App, Lexis 759?

12          MR. SCHWARTZ:  I have not, Judge, but I wanted to go

13  through, factually, what happened here.  And I will cite you

14  one other -- and I'm happy to talk about the case I just -- I

15  don't know it.

16          THE COURT:  Okay.

17          MR. SCHWARTZ:  Judge, this is the chronology.  Nu-

18  Tech files its lawsuit on December 30th, '02.  Delphi answers

19  it March 14th, '03.  Doesn't say a word about standing or real

20  party in interest.  They amend their answer September 24th,

21  '03, don't say a word about lack of standing or real party in

22  interest.

23          It's not until the second amended complaint -- the

24  second amended answer to the complaint which was filed

25  12/20/04, is the first time they raised the issue.  They filed

47

1    that amended answer and affirmative defenses.  All they say is

2    lack of standing.  They don't say why but that is in the

3    affirmative defenses.  At that point Nu-Tech's promissory

4    estopple claim is gone.  And under the cases I talked to you

5    about earlier about breach of contract, there's a breach every

6    day that goes by, all of their breach -- Nu-Tech's breach of

7    contract claims are gone except for the last ten days, because

8    there's a four year period of time that at that point to

9    settle.

10         The ConAgra v Farmer State Bank case, 237 Mich App

11   109, (1999) says, silence can form the basis of equitable

12   estopple when the silent party had a duty or obligation to

13   speak.

14         THE COURT:  But why -- why is there a duty and an

15   obligation to speak on a defendant's part?  I'm going to read

16   you the quote from this case I just cited you.

17         MR. SCHWARTZ:  Okay.

18         THE COURT:  There is also no merit to Barrett's

19   claim, that was the plaintiff, that it was prejudiced by the

20   length of time between the filing of its complaint and

21   defendant's summary disposition motion.  In this regard Barrett

22   has not made any showing of prejudice arising from the delay.

23   Further, there is no merit to Barrett's contention that the

24   doctrine of latches should bar defendants from seeking summary

25   disposition on the basis of lack of standing.  He cites

48

1    Torakis v Torakis, 194 Mich App 201.

2              Moreover, although Barrett puts forth a theory that

3    estopple by silence bars defendants from seeking dismissal of

4    this case on the ground of lack of standing, Commercial Union

5    Insurance v. Medical Protective Company, it gives the cite,

6    does not support plaintiff's contention.  As defendants

7    correctly observe, they were under no affirmative duty to

8    advise or assist Barrett or its counsel in drafting pleadings

9    that would withstand dispositive motions.  Indeed, counsel for

10   defendants have an ethical obligation to represent their

11   clients with zeal.  This obligation would be undermined were we

12   to hold that defense counsel should assist plaintiff's counsel

13   regarding proper pleading.

14              MR. SCHWARTZ:  The answer to your question, Judge, is

15   Delphi was under an obligation, under the Michigan court rules,

16   when they filed their answer to the complaint.  MCR 2.11(f)(3)

17   Affirmative Defenses.  Affirmative defenses must be stated in a

18   party's responsive pleading either as originally filed or as

19   amended in accordance with MCR 2.118.  Under a separate and

20   distinct heading, a party must state the facts constituted, and

21   then it lists the laundry lists of the statute of limitations,

22   statute of frauds.  But now I'm going to go to subsection B.

23              THE COURT:  All right, now, I'm sorry.  This is

24   2.113?

25              MR. SCHWARTZ:  2.111 --

49

1          THE COURT:  111, okay.

2          MR. SCHWARTZ:  F, subparagraph 3.  I read you the

3    introduction.

4          THE COURT:  I'm sorry, F(3)?  F(3), okay.

5          MR. SCHWARTZ:  F, as in Frank.

6          THE COURT:  Okay.

7          MR. SCHWARTZ:  And then 3, talks about affirmative

8    defenses.  This is pleading requirements.

9          THE COURT:  Okay.

10          MR. SCHWARTZ:  3(b) says, this is what they have to

11   do; A defense that by reason of other affirmative defense seeks

12   to avoid the legal effect or defeat the claim of the opposing

13   party in whole or in part.  C talks about a ground of defense

14   that if not raised in the pleading would be likely to take the

15   adverse party by surprise.  Those are -- that's their

16   obligation to raise.  MCR 2.112, this is pleading special

17   matters, under subparagraph A, subparagraph 2, a party wishing

18   to raise an issue about B, the capacity of a party to sue or be

19   sued, C, the authority of a party to sue or be sued in a

20   representative capacity, must do so by specific allegations,

21   including supporting facts peculiarly within the pleaders

22   knowledge.

23          Those are obligations they had when the complaint was

24   filed.  They were aware of the Nu-Tech, RPT transaction.

25   Nothing happened all of a sudden in '04 for them to become

50

1    aware of it.  BBK, their agent, helped broker that deal.  So

2    they didn't raise it timely the way the court rules require.

3    Their silence prejudiced Nu-Tech because by the time they do

4    raise it the statute of limitations is gone as to one claim and

5    all but gone as to the other.  And there can be no doubt what

6    happened because you saw what happened -- what Nu-Tech did when

7    this got raised is, they immediately went to RPT and got the --

8    got the acknowledgment that the transaction -- the cause of

9    action wasn't assigned.  And in the event that it was, it was

10   assigned back.  They would have done the same thing back in '02

11   or '03 or earlier in '04 had it been raised timely.  It was

12   something thought up after the fact, after discovery was over,

13   when the case was on the verge of trial.  And this is the

14   perfect situation for equitable estopple.

15          The only other case that I'd cite, Judge, that I

16   think is somewhat applicable, it rises out of Michigan, in re

17   Kent Holland Dye Casting, 922, F.2d., 342.  It's a Sixth

18   Circuit Michigan case, 1999 -- 1991.

19          So for all of those hurdles, Judge, I don't think --

20   I think the Nu-Tech is the proper party here.

21          The last thing that I want to address, Judge, is

22   damages.

23          THE COURT:  I'm sorry, is damages?

24          MR. SCHWARTZ:  The last thing I want to address is

25   damages.

51

1          THE COURT:  Okay.

2          MR. SCHWARTZ:  Nu-Tech hired, you know, Gary Lehman

3   as it's damage expert.  I've given you the report.  It's

4   detailed.  The analysis is there and I'll answer questions if

5   you have any or Mr. Lehman is here.  But it -- I contrasted

6   that with Mr. Frances' supplemental declaration which I

7   recently saw because the numbers were so different.

8          And I think you should be comparing apples to apples,

9   and when you look at numbers you'll see why.  Because it's

10  clear Mr. Francis, number one, he's a fact witness.  He worked

11  out at Nu-Tech when BBK came -- got involved.  He's not an

12  independent expert that was hired, which under the accounting

13  ethic rules, I think, he shouldn't be giving expert testimony.

14  He didn't conduct his own analysis.  He took Mr. Lehman's and

15  then gave some criticisms.  He's not -- from what I can look at

16  his qualifications, he's a CPA.  I mean, he looks like he's

17  very good at what he does with helping turn around businesses.

18  But I'm not sure that he's qualified to give business valuation

19  analysis.  I didn't see it on his CV.

20          But looking at the two, what -- if you look at --

21  looking at Exhibit number 3, I want to talk about the lost

22  income.  And we'll look at 1999, the first year.  Lehman went

23  through his whole analysis.  He figured variable costs, fixed

24  costs, what the gross sale should have been under the

25  requirements contract.  And he came up with damages in 1999,

52

1    Judge, of 4,446,213.

2           If you look at Mr. Francis' Exhibit 3, he says,

3    before taxes, the number should be 2,144,280.  There's a big

4    discrepancy between the two.  And looking at the discrepancy,

5    Judge, first of all Mr. Francis as a general and he criticized

6    Mr. Lehman of including division two expense in his analysis.

7    And Mr. Lehman has given a supplemental declaration that that

8    did not occur and he walked through how he calculated things.

9    Mr. Francis also provided to this Court an affidavit showing

10   after tax profits for Nu-Tech's damages, and that's not a

11   proper measure of damages.  Nu-Tech is awarded anything in a

12   lawsuit, they've got to pay tax on the recovery, depending on

13   the circumstances, but certainly here because these are lost

14   profits.  So, Mr. Francis' bottom line conclusions after tax I

15   don't think are appropriate so I looked back at his schedule.

16   He -- he showed, pre-tax, 2,144,280 for 1999.

17          The difference between his number and Mr. Lehman's --

18   there's two differences.  The first difference is how many

19   units were sold.  And as I indicated to the -- well, the

20   difference between the two is 500,000 units, which accounts for

21   over a million dollars of damage between -- the difference

22   between Lehman and Francis.

23          Exhibit 27 in the exhibit book, and there is an

24   exhibit, Judge and if you've read it I won't waste time looking

25   at it.  But there's an exhibit that I attached to my summary

53

1    which showed the efforts in the trial court that we went

2    through to try to find out how many units were sold during 1999

3    and 2000 because that -- you have to know that to calculate the

4    profit loss.   It was not produced in the State Court.   This is

5    Exhibit S, Judge.   We asked at interrogatories, we asked it in

6    letters and we were constantly told that Delphi and GM didn't

7    have that number for us.

8            So Mr. Lehman did the next best thing he could.   He

9    went to an authoritative source as to the GM cars that were

10   sold in 1999, published statistics, they used this part.   Mr.

11   Francis was deposed, and again his number is 500,000.   During

12   this proceeding a Mr. Weber, one of their other witnesses,

13   provided a report, a day care -- a Day Core report, a thick

14   report.   And that was a report showing what GM paid outside

15   people for assemblies that had this part.   And he, I think,

16   testified honestly.   That's what I was asked to do and that's

17   what I did.

18           The problem with the Day Core report is, it doesn't

19   account for all the parts that were manufactured.   Only the

20   ones that went into an assembly that GM bought.   Anything that

21   GM did in-house with the part wouldn't be in that number.

22   There is a different way to compute it, Mr. Weber explained.

23   There's a program they have called Global Product Description

24   System.   I think it's Mr. Lehman's declaration.   He's familiar

25   with it.   When you have recalls, they have the data to tell you

54

1    how many parts and who has got the parts.

2         Well, Mr. Francis was asked for the volume of parts

3    you used to come up with your profit loss, did you use the Day

4    Core report?  He said no.

5         THE COURT:  Well, when you say they have the data who

6    are you referring to when you say they?

7         MR. SCHWARTZ:  Delphi.  If Delphi doesn't GM does.

8         THE COURT:  Well, that's a distinction though, right?

9    Delphi doesn't control GM.

10        MR. SCHWARTZ:  It is a distinction.  It is but the --

11   Mr. Lippard (ph.) represented both GM and Delphi in the lawsuit

12   up until this bankruptcy pleading was filed.  And he was asked,

13   specifically --

14        THE COURT:  But you've been referring to things since

15   then.

16        MR. SCHWARTZ:  Okay. What I'm referring to since then

17   is that Delphi has produced a witness from General Motors, Mr.

18   Weber, who went into their system.  And what I'm suggesting is,

19   there was another way he could have given us a completely

20   accurate --

21        THE COURT:  But I don't -- you haven't made a motion

22   to exclude this evidence.  In fact, it's been admitted.  I'm

23   not quite sure where you're going with this.

24        MR. SCHWARTZ:  I'm trying to show -- I'm trying to

25   explain to you where the differences are.

55

1        THE COURT:  Well, no, you're doing more then that.
2   You're trying to say that they hid the ball from you and that
3   therefore I shouldn't consider the evidence of what GM
4   submitted.
5        MR. SCHWARTZ:  That's not what I'm suggesting, Judge.
6        THE COURT:  Okay.
7        MR. SCHWARTZ:  I'm talking about the weight to give
8   the difference between Lehman's analysis and Delphi's
9   analysis --
10       THE COURT:  Okay.
11       MR. SCHWARTZ:  -- Mr. Francis.  That's what I'm
12  suggesting.  I'm not suggesting to ignore Francis completely.
13       THE COURT:  All right. But what's the basis to
14  dispute the data that GM provided the debtors and that's in the
15  exhibit?
16       MR. SCHWARTZ:  GM -- the data that you saw was what
17  GM purchased from Delphi for the part.  It's not all the
18  requirements for the part.
19       THE COURT:  Well, is there any evidence that they --
20  that there was any other production?
21       MR. SCHWARTZ:  I believe, in the cross examination
22  that we presented to you, from Mr. Weber, that there was a way,
23  using this other system, to track every part that was
24  manufactured.  I believe that's in the designations.
25       THE COURT:  But is -- that -- but is there anything

56

1    to suggest that there was any other production besides by

2    Delphi of the part?

3          MR. SCHWARTZ:  There's nothing in the record.

4    Logically, you have after-market parts.  You have parts that

5    are needed by dealers but there's nothing in the record, Judge.

6    And this is closing argument, you're right.

7          THE COURT:  Okay.

8          MR. SCHWARTZ:  Assume that the Day Core report is

9    right, Judge, Mr. Francis acknowledges he didn't use it in

10   coming up with his number.  He testified he was given a

11   spreadsheet to come up with his number.  His spreadsheet isn't

12   attached to his report.  So, part of the difference between

13   Lehman's 4.4 million and Francis' 2.1 million is the units.

14   And I'm just point out on the record, Judge; it is the units

15   that is the issue.  I don't suggest that if the units are less

16   than what Mr. Lehman used that our damages shouldn't be less.

17   It should be what the units are.  But this is the evidence that

18   you have in front of you.

19          The second reason for the difference, one was the

20   unit the second is, if you look closely at Mr. Francis'

21   analysis, he attributes all of the labor, all of the overhead

22   that Nu-Tech was incurring, to Delphi -- to this part.  There's

23   testimony on the record they had something called Division Two,

24   they had tools.  Mr. Lehman went through and broke that out to

25   come up with his labor amount.  He figured out labor as a cost

57

1   of the total sales and labor as a cost of these smaller --

2   there's -- it's a smaller number.  But again, the difference is

3   Mr. Francis lumped all of the labor costs to the Delphi sales

4   which is going to lower profit and is going to lower the

5   numbers.  Those are really the only -- the two factors as to

6   why there's such a big discrepancy for 1999 lost income.

7          And the same thing for 2000 lost income.  Again, now

8   the numbers -- the difference in units went from 500,000 to a

9   million, five.  Different units between Lehman and Francis

10  which came up with a significantly different number for 2000.

11         The second part of the analysis, Judge, and I know --

12         THE COURT:  B4efore you go on to the second part --

13         MR. SCHWARTZ:  Yes.

14         THE COURT:  You went, fairly quickly, over Francis'

15  point about taxes.

16         MR. SCHWARTZ:  Yes.

17         THE COURT:  Can you go over that point of your again?

18         MR. SCHWARTZ:  Yes.  Mr. Francis, in giving -- the

19  reply brief that we got from Delphi, I think they said that the

20  damages, at most, should be 750,000 dollars because they're --

21  they're using the May 31 period till the end of the year.  But

22  they say it should be 750.  That's an after tax number.  He was

23  asked at his deposition why are you using the after tax?  If

24  the new check is awarded that they have to pay tax on, he

25  didn't have an explanation for it.

58

1          So the numbers they're giving you is -- even if you

2     believe his number completely, that's your ruling, his number

3     isn't accurate.  It has to be a before tax number.

4          THE COURT:  Because?

5          MR. SCHWARTZ:  Because if there's an award to Nu-

6     Tech, at least this was at trial court, Nu-Tech was awarded the

7     amount.  The jury or the judge is a total -- figure out the

8     amount Nu-Tech is awarded and then deduct taxes for them.  Nu-

9     Tech was awarded it, they 1099'd the money.  They pay tax at

10    the end of the year.  There's no reason for it to be after tax.

11         THE COURT:  Well, he -- he wasn't applying taxes to -

12    - he didn't come up with a gross number and then -- and then

13    reduce it for taxes --

14         MR. SCHWARTZ:  Yes, he did.

15         THE COURT:  -- on that number, right?

16         MR. SCHWARTZ:  Yes, he did.

17         THE COURT:  He did it for what Nu-Tech would have

18    paid on -- on the taxes, right?

19         MR. SCHWARTZ:  No, no.  The numbers that he gave you

20    in his brief, the 750, is after tax, an after tax number.  He

21    criticizes Mr. Lehman about taxes and I'm comfortable with

22    Mr. Lehman's analysis.  He says he though Mr. Lehman handled

23    the taxes differently, which Mr. Lehman denies.  And if you go

24    through his declaration he didn't.  He thought he used taxes

25    differently when doing his lost profit versus the way he did

59

1    with his business valuation, which didn't occur.

2             THE COURT:  Okay.

3             MR. SCHWARTZ:  So that's -- with respect to lost

4    income that's -- those are the two reasons why Lehman and

5    Francis are so far apart.  I guess three if you're going to put

6    the taxes in as well.

7             With respect to business valuation, as I indicated

8    Mr. Francis, I don't think, is a business valuation expert.  He

9    didn't do a business value analysis.  Mr. Lehman did a cap rate

10   analysis, which I think is appropriate.  There was no

11   criticisms about the different -- the methodology he used or

12   the factors that he used in doing the cap rate or that he used

13   the wrong cap rate.  He came up with the loss -- using 1999's

14   numbers and the money that Nu-Tech should have earned in 1999,

15   he did a cap rate of what the business value should have been

16   had this requirement of contracts not been broken.  Lehman's

17   number was 5.8 million.  That's -- and that's Exhibit 12 to

18   his -- I want -- Judge, if you have -- because for the next

19   point it would be helpful if you had Mr. Lehman's --

20            THE COURT:  I have it right here.

21            MR. SCHWARTZ:  Okay.  Exhibit 12 to his declaration

22   is where he walks through how he did his cap rate analysis.

23   Because my suggestion to you, Judge, is let's assume that

24   Mr. Francis was right and his lost profits were 2.1 --

25            THE COURT:  I'm sorry.  I don't think it's 12.

60

1   That's just his summary of estimated damages final.  Is it

2   somewhere in this --

3           MR. SCHWARTZ:  Let me see.  I think it is, Judge.

4   It's -- it's the document -- it says at the top Nu-Tech

5   estimated loss value of business, final.  It's about half way

6   through the -- mine is two-sided.

7           THE COURT:  I'll just flip through till I get to it.

8   Okay.

9           MR. SCHWARTZ:  Okay.  That's his -- that's how he got

10  to his cap rate of the 5.8 million.  That's the formula that he

11  used, which I think is the appropriate formula in determining -

12  -

13          THE COURT:  Oh wait, maybe I didn't find it.  What is

14  the heading again?

15          MR. SCHWARTZ:  It says at the top Nu-Tech --

16          THE COURT:  Nu-Tech estimated lost value of business?

17          MR. SCHWARTZ:  Yes.

18          THE COURT:  Okay.

19          MR. SCHWARTZ:  All right.  That's the methodology he

20  used.  If you assume that Mr. Francis is right that the loss --

21  that everything he said was right, that the lost -- the total

22  lost profits should have been two million, one.  To come up

23  with a cap rate, because he didn't do it, but if you -- to

24  figure out what lost value, with his numbers, you would input

25  the 2.1 million for where you got the 4.4 in Lehman's and you

61

1    would do the exact same methodology.  That would give you a

2    business loss of 3.4 million dollars, using Mr. Francis' number

3    for 1999 -- for the -- to the loss of value business.

4            Excess costs, Judge, they are what they are and I

5    have nothing to add to that.  And then the last point that I

6    have on damages, Judge, and I pointed out to the -- I pointed

7    you to the statute in the brief and I gave you how to compute

8    it.  Michigan has a mandatory pre-judgment interest statute.

9    The interest rate fluctuates every six months so you actually

10   have to do a computation to come up with the number.  But

11   whatever number you come up with, Judge, Nu-Tech is entitled to

12   the last five years of interest that has run on that while this

13   case has been pending.  That's mandatory not discretionary.

14           Do you have any questions of me or my witnesses?

15           THE COURT:  No, I -- I wouldn't question the

16   witnesses after I've heard argument.

17           MR. SCHWARTZ:  Okay.

18           THE COURT:  But as far as the lost value of the

19   business is concerned, what is your response to the debtor's

20   argument that you're double counting?

21           MR. SCHWARTZ:  There isn't a double -- the lost -- if

22   you look at the schedule that we're on right now, the estimated

23   value of business final.  The lost profits are the profits that

24   that business should have earned in 1999.  And had those

25   profits flowed through the books -- the value of the business

62

1   is what the fair market value would be.  There's methodologies

2   to calculate that, like the cap rate.

3            If you look at Mr. Lehman's -- this schedule, he

4   starts with lost income, lost profit.  He takes off taxes.  He

5   gets to the net income.  He uses the cap rate to tell you the

6   total lost value.  Then he deducts the profits.  They're

7   claiming it's a double count, it's right in his calculation

8   that he deducted it.  This is -- this is the same Exhibit 12.

9   And then he deducted the sale to RPT, which was appropriate

10  also, that's what lowered the number.  So I think, if you read

11  his schedule accurately, you can see there's not a double

12  count.  They're different components of loss.

13           THE COURT:  Let me just go to one other point.  Does

14  his valuation of the lost value of the business assume that

15  the -- that but for Delphi's breach the agreement would be in

16  place going forward?

17           MR. SCHWARTZ:  It assumes that the lost business

18  value is based on '99's number.  That's the profit numbers that

19  he used.  So it's assuming that they would have continued --

20  the contract would have been in place up to the time of the RPT

21  sale.

22           THE COURT:  Well, let's stick on that for a second,

23  then.

24           MR. SCHWARTZ:  Okay.

25           THE COURT:  Does it then assume that the contract

63

1    would be in place beyond the RPT sale --

2              MR. SCHWARTZ:  It assumes --

3              THE COURT:  -- if there had not been such a sale?

4              MR. SCHWARTZ:  No, you're right, Judge.  It assumes

5    that the contract was still in place through 2000.  What a

6    buyer would have -- what a buyer would have come into Nu-Tech

7    and would have seen in 1999 was the contract was in place if

8    they were willing to buy it what the fair market value would

9    have been.

10             THE COURT:  But if you -- if the buyer shows up, for

11   example, in November of 2000, there's not much to see there.

12   There's a month.

13             MR. SCHWARTZ:  Depending -- with what happened here,

14   yes.  But that's not --

15             THE COURT:  Well, that's my question.  Is he assuming

16   renewal of that contract, going forward?

17             MR. SCHWARTZ:  No.  To do a cap rate analysis doesn't

18   assume -- it assumes what the value of -- what the fair market

19   value is of that business, based upon its financials.  I didn't

20   do it based on 2000's numbers because of the RPT sale, because

21   the contract was ending, he does that in '99's numbers.

22             THE COURT:  But the contract is limited in time.  So

23   anyone buying the business would ask whether the contract's

24   going to be renewed.

25             MR. SCHWARTZ:  That's true.  But -- that is true,

64

1   Judge.  But that's also making an assumption that had this not

2   been breached, that Nu-Tech wouldn't have continued to grow,

3   wouldn't have gotten other contracts.  That was the history up

4   until that point.

5           THE COURT:  But how is that attributable to Delphi?

6           MR. SCHWARTZ:  In doing the cap rate analysis, Judge,

7   it's not.

8           THE COURT:  Okay.

9           MR. SCHWARTZ:  The cap rate looks at what the

10  value -- what -- looking at the business' financials today,

11  what the fair market value is.

12          THE COURT:  But again, that goes to my question which

13  is, when you look at the value today, is his analysis assuming

14  the value of a contract that expires at the end of 2000?

15          MR. SCHWARTZ:  Yes.

16          THE COURT:  And how is that taken into account?

17          MR. SCHWARTZ:  Because, I believe and maybe I'm

18  misstating it, but I believe it's based on 1999's performance

19  applied to the cap rate.  The cap rate takes into account a

20  variety of factors; the size of the business --

21          THE COURT:  Including the expiration of the contract?

22          MR. SCHWARTZ:  I don't know.  I can only say I don't

23  know.  I believe it's the size of the business, the industry

24  amongst many others.

25          THE COURT:  But the business has shown -- implodes if

65

1    you don't have that contract.

2            MR. SCHWARTZ:  The business did implode without the

3    contract.  I agree with you.

4            THE COURT:  So I don't -- that's why I -- I'm having

5    a hard time seeing that a snapshot that doesn't consider the

6    fact that the contract is limited in time.

7            MR. SCHWARTZ:  Because had they not -- there's no

8    evidence that this company would have gone out of business and

9    not gotten another contract in 2000 or another one in 1999.

10           THE COURT:  I don't understand that.  Why?

11           MR. SCHWARTZ:  Because the --

12           THE COURT:  Why should I assume that there would be a

13   no contract when they pulled the -- pulled the equipment and

14   according to Mr. Cooper's testimony he'd laid off the workers,

15   he wouldn't have them work for more than, you know, a week or

16   so.

17           MR. SCHWARTZ:  And all of that happened because of

18   Delphi's actions of not fulfilling the requirement contracts.

19   That's the damage that was lost.

20           THE COURT:  No, but at the -- at the -- but --

21           MR. SCHWARTZ:  Had there not been this damage,

22   Judge -- and maybe I can approach it a different way.  Maybe

23   I'm not explaining it well.  There would have been another 4.4

24   million dollars of income into this business to reinvest, to

25   try to get other business, to get other tools, to expand.  And

66

1    all of that has value to a business.

2            THE COURT:  Okay.

3            MR. SCHWARTZ:  And again, Judge, I know you're -- I

4    heard your admonition you don't want to hear from the witness

5    but if you want to ask Mr. Lehman that question, he is here.

6            THE COURT:  No, I'm not --

7            MR. SCHWARTZ:  It's because it's a theoretical

8    question that I can't answer any more then I did.

9            THE COURT:  I -- I'm not going to ask any witness

10   questions after they know the answer to be given.  And I

11   appreciate he's an expert but I'm not going to do that.

12           MR. SCHWARTZ:  Okay.

13           THE COURT:  Was -- is there anything in the record

14   about Mr. Maley's health problems and when they started?

15           MR. SCHWARTZ:  The only -- what was in the record was

16   at the -- in -- this case was set for trial in April, I

17   believe, 2005.  There was a motion filed by GM and Delphi

18   indicating that Mr. Maley had had a stroke and wanted an

19   adjournment of the trial, which Nu-Tech opposed and the Court

20   granted.  That was in the record in both sides.  It was never

21   corroborated but there was a representation of that.

22           THE COURT:  All right.  But certainly nothing going

23   back to 2000 or 1999?

24           MR. SCHWARTZ:  No, that was the first time there was

25   any health issue.

67

1          THE COURT:  Okay.  All right.  Okay.  Thank you.

2          MR. SCHWARTZ:  Thanks, Judge.

3          MR. HOGAN:  Judge, Al Hogan for the debtors.  Your

4     Honor, I actually intend to be rather brief.  I'm mindful that

5     the Court has read the submissions and heard plaintiff's

6     discussion.  If the Court has any specific questions I'm happy

7     to address those first to make sure that we --

8          THE COURT:  Okay.  Well, yeah -- why don't -- I just

9     want to go over some things that Mr. Schwartz said and hear

10    your response to them.  The first one is, why shouldn't I rely

11    upon the letter from GM's counsel referring to his

12    understanding that under Section 2.01 of the Master Separation

13    Agreement, DAS, LLC, assumed the -- the '98 agreement?

14         MR. HOGAN:  Right.  Judge, I suppose the -- the first

15    thing of that is that's General Motors assertion in -- in a

16    letter to the debtors.  The exhibit right behind that, Exhibit

17    42, is the debtor's response where we reject that request.  And

18    so, it's certainly not an admission on the behalf -- on behalf

19    of Delphi.

20         I think that the separation agreements in this --

21    that govern the spinoff are -- are publicly available.  And

22    although the parties did not debate it and haven't addressed

23    it, my understanding of those agreements and what the -- the

24    Exhibit 41 --

25         THE COURT:  I thought they -- they are publicly

68

1    available?

2         MR. HOGAN:  Yeah, I think the Master Separation

3    Agreement is publicly available.  It was filed at the time of

4    the --

5         THE COURT:  Was it filed with the 10K or 10Q or

6    something like that?

7         MR. HOGAN:  I think it was filed with a K around the

8    time of the spinoff.  And I think it's also been recently --

9    yes, it was filed publicly back at the time of the spinoff.

10   And Judge, I think that you're seeing on those two letters are

11   -- is an exchange between General Motors and Delphi.  Again,

12   it's not conclusive at all but it relates to the relationship

13   between GM and Delphi under those separation agreements.  My

14   understanding of them is that there were no third-party

15   beneficiary rights created as to others.  And so, the procedure

16   that you're seeing here is actually the one that --

17        THE COURT:  So you're saying it's an indemnification

18   right?

19        MR. HOGAN:  I -- I think -- I wouldn't want to use

20   that phrase, Judge, because I don't have the -- that's not in

21   the brief and so I didn't discuss it.  But what I believe the

22   proper procedure here is, is what happened and that is that the

23   plaintiff sued General Motors.  I think that was glossed over

24   in --

25        THE COURT:  No, that's in the letter.  It's -- it's -

69

1   - that comes out of General Motor's counsel's letter.

2          MR. HOGAN:  Correct.  Correct.  And so there's no

3   doubt that when -- when the spinoff occurred and whatever

4   happened between GM and Delphi, there's no question that

5   whatever causes of action Nu-Tech or anyone else had against

6   GM, they still had against GM.  And suing GM is the proper

7   thing to do if you believe that they breached a contract with

8   you.  And that's what Nu-Tech did in this case.

9          Whether or not vis a vis GM and Delphi, Delphi

10  assumed to indemnify that's a separate issue from whether or

11  not that agreement vested any rights in any third parties.  And

12  again, my understanding is that it specifically did not create

13  third-party beneficiary rights as to any -- any parties like

14  Nu-Tech.

15         THE COURT:  Okay.  But as I understand it, there was

16  a settlement between GM and Nu-Tech, right?  There's no

17  judgment?

18         MR. HOGAN:  That is correct, Judge.

19         THE COURT:  So you can't -- you're not pointing to

20  the one recovery rule here.

21         MR. HOGAN:  No.  I'm not saying that the --

22         THE COURT:  You're not relying on the one recovery

23  rule.

24         MR. HOGAN:  I'm not relying on the one recovery rule.

25  We're relying specifically on the fact, and I think Your Honor

70

1    was discussing this in your points, as to the corporate

2    entities which are now the debtors, the first contract that was

3    issued on behalf of a corporation that had a legal existence

4    was the May 1999 purchase order from DAS, LLC.

5                THE COURT:  Okay.

6                MR. HOGAN:  If there were multiple parties, multiple

7    legal entities, liable under any previous agreement I don't

8    think the payment in this case would -- it's not the one

9    payment rule that solves it, I agree.

10               THE COURT:  Okay.  What is your -- do you have a view

11   on Mr. Schwartz' theory that under the RPT purchase transaction

12   New Tech reserved for itself any contract breach causes of

13   action that arose before the closing?

14               MR. HOGAN:  I've got a pretty strong view on that

15   one, Judge.  And that is I think the discussion that Your Honor

16   had was there are two agreements there.  The second agreement

17   clearly sets forth what was being assigned.  Mr. Schwartz,

18   several times, characterized this as an intangible kind of

19   asset.  If you look at the purchase agreement, the supplement,

20   in paragraph 1.1 it says that what is being assigned is all the

21   assets' rights and interest of every conceivable kind or

22   character whatsoever, whether tangible or intangible, that on

23   the effective date were owned by the seller.  That -- and then

24   -- and then it lists specific things with respect to that.  And

25   one of those is purchase orders.  So that's in -- that's in

71

1    article 1, section 1.1 and 1.1(c).  I don't know how to read

2    that other than -- and then we decided the Michigan case law

3    that says as a matter of course --

4         THE COURT:  Well, but then he points to the excluded

5    assets definition.

6         MR. HOGAN:  Yeah.  The excluded assets is an

7    interesting clause but I think the excluded assets, which is

8    1.4(d) says those assets, not specifically included in the

9    above paragraphs.  So it says, go back up and read everything

10   that precedes this sentence.  And because purchase orders are

11   specifically identified in 1.1(c) and because the -- the scope

12   of what was being given away with respect to those purchase

13   orders is also defined in 1.1(c), it's explicit.  It's whatever

14   tangible or intangible assets or rights or interest that they

15   have.  I think it's pretty clear that this asset agreement, on

16   its face, transferred everything with respect to those purchase

17   orders on -- as of the effective date.

18        And I think it's -- it's plain from the reading when

19   you read 1 -- 1.1 through 1.4.  So I disagree quite strongly

20   there, Judge.

21        THE COURT:  Well, I mean, he relies heavily on

22   1.4(d).

23        MR. HOGAN:  Yes.

24        THE COURT:  That's really what he hangs his hat on.

25   That the excluded assets are everything not specifically or by

72

1   inference, included in the above paragraphs or the attached

2   exhibits.

3          MR. HOGAN:  Right.  And I read the above paragraphs

4   as everything that precedes in article 1.

5          THE COURT:  So you include 1.3, 1.2, and 1.1 as the

6   above paragraphs.

7          MR. HOGAN:  Yes, I would look at it and see

8   everything preceding that is -- is excluded.  Everything

9   preceding that is specifically spelled out as being

10  transferred.

11         And Judge, you know, the other thing is that there's

12  certainly no -- there's no explicit indication anywhere, even

13  in the excluded assets paragraph, that causes of action are --

14  that are being specifically reserved.  And in this case,

15  given -- and we'll accept it as true, that the part in question

16  was -- was an important part.  And if you believe that there

17  was a breach the failure to mention that is striking.  I think,

18  instead, everybody knew where the state of the world was as of

19  the end of 1999 and that is that these tools had been removed.

20  And I don't think there was anything other than were giving you

21  everything with respect to this purchase order, as of the date

22  of this transfer.

23         The fact of the matter is, Delphi issued a subsequent

24  purchase order to RPT the next day.  And there was nothing --

25  there was nothing -- no issue raised there, no problem, no note

73

1    was made of that.  So everybody, including Delphi, appeared

2    to -- at least on our systems, we appeared to acknowledge that

3    the rights, with respect to these purchase orders, had been

4    transferred.

5            So Judge, I think -- I think the agreement is clear

6    that the --

7            THE COURT:  Have you -- have you read the cases that

8    Mr. Schwartz cited on non-proper party plaintiff?

9            MR. HOGAN:  Yes I have, Judge.

10           THE COURT:  Not the ones he cited in his brief but

11   the ones he cited at oral argument?

12           MR. HOGAN:  No, I have not.

13           THE COURT:  Okay.

14           MR. HOGAN:  The ones cited at oral argument, I don't

15   believe we've seen before.  The one cited in the brief, I

16   believe went -- the primary case you relied on was the

17   jurisdiction --

18           THE COURT:  No, I read those.

19           MR. HOGAN:  You got those?  You know, Judge, I

20   haven't seen those other cases.  I think however, Judge, the

21   Michigan Supreme Court case that we cited is very recent.  It

22   is from the Michigan Supreme Court.  It's quite clear it

23   establishes, without question, that the real party in interest

24   must be party to the lawsuit prior to the time that the statute

25   of limitations expires.  And Judge, in that case it's not a --

74

1    the -- several Courts have even said, it may seem like a harsh

2    rule but it's not a question of notice, it's not a question of

3    anything like that.  The Michigan Supreme Court in that case,

4    the named plaintiff was the actual injured party.  And the fact

5    that the --

6              THE COURT:  No, I -- I know.

7              MR. HOGAN:  -- real party interest.  So that's --

8              THE COURT:  -- I read the case.

9              MR. HOGAN:  It's very clear from that standpoint.

10   The other two cases that we cited from the Michigan Court of

11   Appeals are unpublished.  They're not binding authority but

12   they're certainly precedential.  They're certainly persuasive.

13   And they go right to the point.  Those actually do say that if

14   the real party in interest is not a party to the lawsuit and

15   the statute of limitations expires that the initial complaint

16   just doesn't toll.  So I think the -- I think the rule is very

17   clear there.  I think it fits in precisely with the fact

18   pattern we have.  There's certainly no authority that I've

19   seen, and I haven't seen those other cases to the contrary.

20             THE COURT:  Have you -- have you considered Mr.

21   Schwartz' estopple point?

22             MR. HOGAN:  The estopple point -- I know he cited the

23   Penny case and the -- and Judge, we actually hadn't found the

24   case that you quoted from.  The Penny case, to me, seemed to be

25   a situation where counsel was affirmatively hiding information.

75

1    Where they were taking steps.

2              THE COURT:  He cited the Michigan court rule about

3    having to disclose the capacity to sue or be sued.

4              MR. HOGAN:  Right.  The Michigan court rule with

5    respect to pleading, I think, is a pleading rule.  I don't

6    think it's an equitable estopple rule.  I don't believe --

7              THE COURT:  But he says it sets up a duty and you

8    need a duty -- I mean, one element of equitable estopple is

9    that there be a duty.

10             MR. HOGAN:  I'm sorry, Judge?

11             THE COURT:  One element of equitable estopple is that

12   the -- a duty have been -- has been breached.  A duty to

13   disclose.

14             MR. HOGAN:  Judge, I think, first of all it said --

15   the pleading rule, and I hadn't seen it before, it wasn't cited

16   in the papers.  The pleading rule goes to the -- the complaint

17   or the amended complaint.  And clearly that, in this case, what

18   happened was a new defense did come in apparently, I'll take

19   counsel's representation in the prior pleadings it wasn't

20   there.  A new defense came in before the pendency of the

21   statute of limitations.  It said quite clearly that they were

22   going to raise a statute of limitations defense and it

23   indicated that another defense was that Nu-Tech did not have

24   standing.

25             Now, the other fact that was not hidden from Nu-Tech

76

1    was that they had entered into this asset purchase agreement.

2    So equitable estopple is -- it's certainly a balancing test,

3    there's equities here.  I think the case that Your Honor cited

4    seems to indicate that it's not a party's job to warn someone

5    when they are about to let their rights lapse.  And I think

6    here we're with --

7                THE COURT:  But you said that the amended pleading

8    did raise this question --

9                MR. HOGAN:  Yes.

10               THE COURT:  -- before the limitations period expired?

11               MR. HOGAN:  Yes, Judge.  The amended pleading -- and

12   it was closed.  The amended pleading was December 20th.

13               THE COURT:  It didn't raise the statute of

14   limitations issue though, it just raised the standing issue?

15               MR. HOGAN:  No, it did raise the statute of

16   limitations issue.

17               THE COURT:  It did.  But that wasn't the subject of

18   the summary motion?

19               MR. HOGAN:  It doesn't appear that it was presented

20   in --

21               THE COURT:  That way.  But it was --

22               MR. HOGAN:  -- that fashion.

23               THE COURT:  And that amended answer is in the record?

24               MR. HOGAN:  Yes it is, Judge.  It's in --

25               THE COURT:  Okay.  I'll find it.

77

1          MR. HOGAN:  Okay.  It's the -- we'll have it for you

2     in just a moment.  It's tab 28.  It's page 5 of that amended

3     answer, I believe, if I have it correctly.

4          So Judge, I don't think equitable estopple.  I think

5     the -- that doctrine applies and circumstances are far more

6     egregious here where you have the different kind of conduct.

7     And because of that, Judge, I think that's a completely

8     dispositive issue in this case.  I think it's clear that the

9     statute of limitations expired.  The real party in interest was

10    not a party to that lawsuit.  I think they tried to cure that

11    after the fact and whatever sympathetic note that might get,

12    the Michigan courts are quite clear in the Miller cases, the

13    one that's the most striking in this respect, is that that is

14    simply not -- not permissible.  That that cure does not -- does

15    not happen.

16         Judge, if you have any other questions with respect

17    to the statute of limitations argument, I'm happy to answer

18    them but I think it's -- our argument's pretty straight forward

19    there.

20         THE COURT:  Okay.

21         MR. HOGAN:  Concerning -- Judge, concerning -- I'll

22    go in, sort of, second order.  Concerning the purchase orders

23    at issue here, there's not doubt Delphi stands before you, and

24    other Courts, often and talks about requirements contracts.

25    The May 1999 purchase order issued by DAS was a requirements

78

1    contract.  There's -- discussing things like equity here,

2    Judge, I think it's striking -- we talked about it from a

3    mitigation of damages point of view but there's also no doubt

4    that when that requirements contract was issued Nu-Tech didn't

5    have the tools to produce this part.  There's --

6              THE COURT:  But that, kind of, begs the question. Why

7    did DAS enter into the contract?

8              MR. HOGAN:  Judge, it sure does.  I tell you -- we

9    got everyone here you don't want to ask questions --

10             THE COURT:  And there's no real answer that, I think,

11   contradicts the contract which is that they entered into it.

12             MR. HOGAN:  Judge, we're not -- we're not contesting

13   for a moment that that contract was issued, whether it was a

14   requirements contract, I wish I could but I can't.

15             THE COURT:  Okay.

16             MR. HOGAN:  The only evidence in the record was from

17   Ms. Weber and she said --

18             THE COURT:  She thought it might have been a mistake.

19             MR. HOGAN:  -- mistake.

20             THE COURT:  But it's there so --

21             MR. HOGAN:  It's there.  But -- but Judge, if we're

22   talking about, sort of, any kind of an equitable undertone

23   here, I think it is important to note that it looks like that

24   was a mistake.  And a party then seeking to take advantage of a

25   mistake, I believe, had a duty to do something more than record

79

1   modification.

2          THE COURT:  Well, what about the fact, though, that

3   DAS also entered into a contract which it termed an amendment

4   with RPT?

5          MR. HOGAN:  That's another good question.  I think

6   that there's no evidence on the record on that and I would say

7   it's, once again, a mistake.  My best guess here.

8          THE COURT:  I mean --

9          MR. HOGAN:  Yeah.

10         THE COURT:  A couple of mistakes at that point.

11         MR. HOGAN:  A couple of mistakes.

12         THE COURT:  Okay.

13         MR. HOGAN:  I think, Judge, what you see -- but it's

14  interesting, what you see is that the evidence indicates that

15  there's the June 1998 purchase order, then there is the August

16  purchase order, that's happening during a period of a systems

17  transition.  And then you see the May 1999 purchase order and

18  that's happening right at the time that you actually are seeing

19  the legal entity DAS, LLC, emerge to the public and so you get

20  that.  And then the third one happens when you get a change in

21  the underlying vendor.  And there's no evidence on this record,

22  one could speculate that there's automatic things that happen

23  in circumstances like that but there is no evidence --

24         THE COURT:  Well, there's no evidence either way on

25  that.

80

1        MR. HOGAN:  There's no evidence either way, that's

2    exactly right.  But Judge, there's also no question that

3    everybody understood that when the May 1999 purchase order was

4    issued Nu-Tech didn't have the parts.  And now to claim

5    multiple months and years of damages without addressing that

6    issue --

7        THE COURT:  Well, but what about the point that, you

8    know, there's a termination provision and they do have the

9    right to wait don't they?  They could either declare a breach,

10   an anticipatory breach, or sit and wait for performance?

11       MR. HOGAN:  Judge, I don't know.  I -- the case law

12   on that -- you know, it's interesting.  Probably in the

13   harshest view that might be correct but one would also say that

14   -- that the breach became -- at some point the breach became

15   fairly obvious.  And -- and to not -- not raise this issue --

16   there's nothing in the record in terms of, certainly no written

17   correspondence of any nature, indicating that this was raised

18   with Delphi.  And at the end of 1999, when the rapid technology

19   transaction was taking place, one would think, if this was a

20   right that people really intended to assert, that there would

21   have been some clarity at that point.

22       So I'm not -- I'm not going to say that people

23   shouldn't be held to their contract.  We simply aren't going to

24   -- Delphi's not going to take that position.  But I do want to

25   point out, from the equitable arguments that plaintiffs makes,

81

1    it's not entirely clear that there was best efforts here to try

2    to -- to mitigate damages in 1999.

3            So Judge, with respect to the earlier purchase

4    agreements, I think we spelled it out pretty clearly in our

5    papers.  The August 1998 purchase agreement was not issued by a

6    Delphi that was an existing legal entity.  It was -- and the

7    world was well aware that Delphi was a name that was developing

8    a branding center with General Motors.  That had been happening

9    for quite some time.  But it was also quite well publicly

10   announced when that entity was its own distinct legal actor.

11   And so the fact of the matter is, General Motors Corporation

12   still appears on that 1998 purchase order.  It's not until you

13   get to the May 1999 purchase order that it's obvious now that

14   you're dealing with Delphi Automotive Systems, LLC.

15           THE COURT:  Okay.

16           MR. HOGAN:  And if you've got no other questions with

17   respect to the purchase order issue, I'll touch, very briefly,

18   on damages.

19           I can start where you left off with plaintiff's

20   counsel, that is I think that the reason why you don't see that

21   I'm just -- it strikes me that breach of contract damages are

22   just traditionally measured as the lost profits under the

23   contract.  It puts you in the position that you would have been

24   in.  The reason that you don't see the kind of forward looking

25   damages projections is just where Your Honor was going and that

82

1   is that there's no question if you're doing business valuation,

2   that valuation is based on the future anticipated earning

3   streams of the company.  And Mr. Lehman actually did

4   acknowledge that in his deposition.  So I just don't think this

5   is a proper -- putting aside the disputes that we have, and

6   Your Honor has seen the expert reports, but putting aside the

7   technical differences, I just don't think this is a proper

8   measure for breach of contract damages.  I think the Sixth

9   Circuit spoke to that pretty clearly, interpreting Michigan law

10  finding that lost profits -- lost business value, when it flows

11  from a lost profits, kind of, measure just aren't appropriate

12  and I think that's the case here.

13          Judge, with respect to the other damages period, if

14  we're unsuccessful in the statute of limitations argument,

15  again going back to where we were with which entities issued

16  the purchase orders here, it's pretty clear that even under --

17  even under the plaintiff's view that those damages terminated

18  as to lost profits when the purchase orders were assigned.  And

19  Delphi issued the new purchase order to RPT and the period

20  should begin no sooner then May 1999 and it should be

21  calculated based on the lost profits measure.  Mr. Francis sets

22  that forth in his report and the numbers that we believe would

23  be appropriate are there for Your Honor to consider.

24          Judge, that's all I have on damages and so if you

25  have any other questions I'd be happy to answer them but I

83

1    think that's it.

2                    THE COURT:  Okay.

3                    MR. HOGAN:  Thank you, Judge.

4                    THE COURT:  I had one question for you, Mr. Schwartz,

5    on damages.  You had mentioned the -- that you thought that the

6    GM report on the purchases from Delphi of the part was

7    potentially flawed because it didn't list all purchases that GM

8    made, is that right?  Is that how --

9                    MR. SCHWARTZ:  It didn't -- my understanding is that

10   the -- there's a GM GPSD report, Ms. Weber explained, that

11   would track every part of this part that was made during that

12   period of time.

13                   THE COURT:  By whom though?

14                   MR. SCHWARTZ:  By whoever -- whoever Delphi

15   contracted it to.

16                   THE COURT:  Okay.

17                   MR. SCHWARTZ:  The report that we were given is an

18   accounts payable report.  The GM accounts payable report.

19                   THE COURT:  From GM?

20                   MR. SCHWARTZ:  Right.

21                   THE COURT:  But isn't this part -- but wouldn't -- I

22   guess this is my question, and it's not a rhetorical question,

23   was -- if -- GM would have purchased through Delphi, wouldn't

24   it, those parts?  It wouldn't have purchased them from the

25   subcontractors?

84

1       MR. SCHWARTZ:  If GM was the one purchasing from

2   Delphi, yes.  Delphi wasn't -- again, after-market parts -- if

3   Delphi was selling to other people it didn't go to GM.  GM

4   tracks it because they go in GM vehicles.

5       THE COURT:  Okay.

6       MR. SCHWARTZ:  So they said they -- my understanding

7   of the program is they need it for warranty purposes.  And

8   Judge, maybe --

9       THE COURT:  I mean, no one else made this -- no one

10   else used this part, right?  So -- so you're limiting it to,

11   like, repair shops that would order instead of GM?

12       MR. SCHWARTZ:  Or dealers, yes.  They went into GM

13   vehicles -- my understanding is these only went into GM

14   vehicles.

15       THE COURT:  Okay.

16       MR. SCHWARTZ:  The part.

17       THE COURT:  All right.  I understand.  Is there

18   anything in the record that would clarify that point, Mr.

19   Hogan, that -- whether --

20       MR. HOGAN:  Judge, I don't believe so.

21       THE COURT:  -- whether Delphi sold this part to

22   entities other than GM?

23       MR. HOGAN:  Judge, I don't believe that they're --

24   first of all, I don't believe -- think there's any evidence on

25   that point.  I think everything indicates that Delphi sold this

85

1    part only to General Motors.  I think other -- also --

2              THE COURT:  Well, but there's -- I mean, is there

3    anything that says that in the record?

4              MR. HOGAN:  No.  No, there's not but there's no

5    purchase order or anything else that indicates anything to the

6    contrary.

7              THE COURT:  Okay.

8              MR. HOGAN:  Any more -- any more questions on the GM

9    volume?

10             THE COURT:  No.

11             MR. HOGAN:  Okay.  Thank you, Judge.

12             THE COURT:  All right.  As you -- I think probably

13   both of you know it, certainly Mr. Hogan knows, my normal

14   practice is to rule from the bench.  And in this case, in

15   addition to the other reasons why I like to rule from the

16   bench, it's also important to the case to know whether, I'm

17   talking about the Chapter 11 case in general, to know what the

18   debtor's claim picture is, the picture for allowed claims.

19             This is a fairly large claim, as asserted.  So I'm

20   going to ask Mr. Lyons is -- is determination of this claim

21   something that -- that is important to know before the

22   confirmation hearing or is this something that can await, if I

23   ask for it, further briefing on a couple of issues that were

24   raised or responses that were raised at oral argument?

25             MR. LYONS:  Your Honor, it is important.  We are

86

1   currently above the 1.45 and this is the -- I think this is

2   the -- has the largest variance.

3         THE COURT:  All right.  Then what I'm going to do is

4   ask the parties to focus on two points that Mr. Schwartz raised

5   that I want to focus on.  I read the cases the parties cited

6   and some other cases on the issue of the effect of the statute

7   of limitations on a lawsuit that was brought originally by not

8   the proper party.  But he cited to me two additional cases that

9   he says are on point on that issue that I had not been aware

10  of.  He's also referred to cases and arguments on estopple

11  related to the assertion of the statute of limitations defense.

12        What I would like is, by Monday at 4 for the parties

13  to submit brief, and I really do mean brief discussions limited

14  to those cases and, I guess, any contradictory or supportive

15  cases that would come up in Shepherds or otherwise, that have

16  not been cited by the parties already.  As well as brief

17  submissions on the estopple point.  And in particular,

18  commenting on the effect of the Michigan court rules that were

19  cited.  Those should be simultaneous submissions.  My

20  expectation is that they be no more than fifteen pages and I

21  would hope less than that.  And I will give a ruling on or

22  before the 17th on it.

23        MR. HOGAN:  Judge, one question, the fifteen pages on

24  each issue or combined?

25        THE COURT:  No, combined.

87

1          MR. HOGAN:  That's what I thought.  Thank you.

2          THE COURT:  Okay.  Is that clear?

3          MR. HOGAN:  Yes.

4          THE COURT:  Let me say one more thing, because I know

5     that -- you can sit down.  My practice, at times, and I

6     appreciate that the parties have made efforts, I'm sure, to

7     discuss a consensual resolution of this -- of this claim, but

8     where efforts like that have failed in the past, at times,

9     particularly after a hearing like this or a trial like this, I

10    have given the parties a preliminary indication of my views.

11    And that has, at times, helped them to settle the matters

12    before them.  And I think it's worthwhile to do that here.  But

13    I want to emphasize it is preliminary and I'm perfectly capable

14    of being persuaded by what you submit on Monday.  And based on

15    my reviewing, again, certain of the exhibits.  But that being

16    said, it is an indicator for you of what the trial court thinks

17    after the hearing.  And again, it's based upon a considerable

18    review of the record before the hearing started.

19          I -- oh, I'm sorry; before I do that I'm going to add

20    another item to your -- to your assignment for Monday and that

21    is a discussion of whether I can refer to, as a matter of the

22    record either in the case or the public record, a filing that

23    discloses the actual terms of the Master Separation Agreement.

24    It may be on the Court's docket, I -- I don't know.  It may be

25    in a 10K or a 10Q or an 8K but the first issue is whether I can

88

1    refer to it, I'm pretty sure I can.  So I don't think you'll

2    take a lot of time on that but you're free to discuss that.

3    And the second is, to point me to the applicable provisions on

4    the assumption issue.

5            Okay.  That being said, and that's another reason why

6    this ruling is preliminary, my preliminary conclusion on this

7    litigation is that I do not believe that the legal entity DAS,

8    LLC, assumed, retroactively, GM's obligations under the Part

9    Purchase Agreement in -- in the May 1999 amendment or impliedly

10   after that time or impliedly after its formation.  And I

11   accept, I believe, the fact that it was not formed until

12   September of 1998.  That is after the August '98 purchase

13   order.  I believe that under Michigan law a plaintiff needs to

14   show more than Nu-Tech has to show implied assumption of an

15   agreement.  And I have, I believe, case law to support that.

16   The best way to have showed that would have been that DAS, LLC,

17   paid amounts that GM had owed under the '98 -- August '98 or

18   before purchase orders and that's not in the record.

19           I don't believe the face of the May 1999 purchase

20   order evidences an assumption of GM's obligations existing

21   prior to the date of that order.  I've reviewed the language

22   that Mr. Schwartz pointed me to but as I noted at oral

23   argument, that same language as appears in the RPT order, which

24   is also listed as an amendment, amendment number 3.  And I

25   believe in both cases one should view those documents as

89

1   documents going forward and creating liability and obligations

2   for, in the first case, DAS LLC and in the second case RPT on a

3   going forward basis.

4           That being said, it seems to me that in the absence

5   of something in the Master Separation Agreement that would give

6   Nu-Tech third-party beneficiary rights or similar rights, I

7   believe we're looking at damages here for breach of the May '99

8   agreement and not agreements going backwards.

9           It also appears to me, based upon the case law that

10  the debtors have cited that the statute of limitations defense

11  is very strong.  I say that first because of my interpretation

12  of what was actually sold under the agreement with RPT and also

13  then based upon the policy behind and the case law interpreting

14  the proper party in interest issue when viewed in connection

15  with an expired statute of limitations.

16          As far as the damages calculations are concerned, I

17  believe that two of the points raised by the debtors in

18  criticism of Nu-Tech's calculation have been clarified and

19  are -- and are probably not well taken.  Those are that Mr.

20  Lehman was over inclusive in putting costs in and/or excluding

21  them. That -- i.e., that he took into account division two

22  costs and the like when in fact he says he didn't and there's

23  really no rebuttal of that other than saying yes he did.  I

24  haven't seen any rebuttal of that, at least.  No one has -- has

25  suitably answered my questions, I believe, about the tax

90

1   deduction criticism in the debtor's supplemental response but

2   I'm not particularly persuaded by it.

3            However, I think that the raw data of the actual

4   purchases from Delphi by GM should be the starting point as

5   opposed to the CSM data.  Although one might increase it

6   slightly based upon Mr. Schwartz' speculation that there may be

7   some other purchasers, notwithstanding that there's nothing in

8   the record to suggest that.

9            And finally, I am quite skeptical about the element

10  of damages pertaining to lost value of the business in light of

11  the nature of this contract and the nature of the relationship.

12  One would assume, I believe, at some point that Delphi would

13  wake up to the fact that it had a termination right and had a

14  contract out there that was serving no purpose for it.  One

15  would hope that that would -- that moment when the light bulb

16  would go off would be at least at the time when the May '99

17  purchase order would expire.  Assuming that likelihood, I

18  believe that the lost business value argument comes down to a

19  contention that if the business had had that extra cash, on top

20  of the cash it would, somehow exponentially, thrived.  My

21  belief is that that is not properly taken into -- that -- that

22  type of damage calculation is too speculative.

23           Now, having said all of that, let me reiterate that

24  it is possible that the cases cited by Mr. Schwartz will change

25  my mind on a key issue.  And secondly, that I'll conclude that

91

1    after reviewing the amended complaint and the court rules, the

2    Michigan court rules, that DAS played fast and loose with Nu-

3    Tech, precluding it from becoming the proper party in interest

4    within the limitations period.

5           And finally, it's conceivable to me, although my

6    understanding of the Delphi/GM relationship is based on the

7    litigation between the parties, that was commenced earlier in

8    this case, is one where there were not intended to be third-

9    party beneficiaries of the Master Separation Agreement.  The

10   actual provisions of that agreement may change my mind on that

11   point.

12          I've not addressed, and the parties didn't address at

13   oral argument, the -- the equitable breach claim.  But based on

14   my review of Mr. Cooper's declaration and his deposition

15   testimony as well as the dates of the leases, the expiry dates

16   of the leases, and the fact that DAS LLC did enter into a

17   specific contract in May of 1999 in respect of the part, I am

18   quite likely to conclude that the equitable contract claim will

19   not fly.  The contract suggests -- the '99 contract suggests

20   that a replacement part was superceded.  The leases had already

21   been entered into and were going to run longer than the alleged

22   equitable promise.  And moreover, Mr. Cooper is, I believe, too

23   vague in his declaration, particularly when viewed in light of

24   his deposition testimony where he says that he was not told

25   directly about the replacement part issue but rather his -- the

92

1   other shareholder was, that the alleged agreement is not

2   specific enough to support such a claim.

3         So, again, I look forward to seeing your submissions

4   on those three issues.  And I'll give my oral ruling, probably

5   on the day of the confirmation hearing although it's

6   conceivable I'd give it before.

7         MR. LYONS:  So, Your Honor, that means see you

8   tomorrow on the Light Source matter?

9         THE COURT:  Yes.

10        MR. LYONS:  Thank you.

11    (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93

**I N D E X**

**E X H I B I T S**

DESCRIPTION                    PAGE

All Exhibits                                    10


RULINGS

Page      Line

Affidavit of Mr. Maley      18        14

Not Admitted

94

1

2                       C E R T I F I C A T I O N

3

4       I, Pnina Eilberg, court approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8

9       _____   January 14, 2008

10      Signature of Transcriber              Date

11

12      Pnina Eilberg

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25