1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION ET AL.,


          Debtor.


- - - - - - - - - - - - - - - - - - - -x


                    United States Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    January 10, 2008

                    2:36 PM



B E F O R E:

HON. ROBERT  D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Order signed on 1/3/2008 Scheduling Hearing on

3   Debtors' Expedited Motion to Permit Opportunity for Statutory

4   Committee Members to Participate in Exit Financing Syndication.

5

6   HEARING re Motion to Authorize Expedited Motion to Permit

7   Opportunity for Statutory Committee Members to Participate in

8   Exit Financing Syndication.

9

10  HEARING re Notice of Hearing re Exit Financing Participation

11  Motion.

12

13  HEARING re Objection to Debtors' Expedited Motion to Permit

14  Opportunity for Statutory Committee Members to Participate in

15  Exit Financing Syndication and Affirmation of Services, on

16  behalf of United States Trustee.

17

18  HEARING  re Order to Show Cause setting hearing re: Motion for

19  order (1) extending deadline for submission of cure notices,

20  (2) approving the cure notices executed by movants with respect

21  to their claims, and (3) directing the debtors to reconcile.

22

23

24

25

3

1

2   **HEARING**  re Motion for Order (1) extending deadline for

3   submission of cure notices, (2) approving the cure notices

4   executed by movants with respect to their claims, and (3)

5   directing the debtors to reconcile cure claims with

6   corresponding claim.

7

8   **HEARING re Debtors** response to Ad Hoc Trade Committee's motion

9   for order (1) extending deadline for submission of cure

10  notices, (2) approving the cure notices executed by movants

11  with respect to their claims, and (3) directing the debtors to

12  reconcile.

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Penina Wolicki

25

4

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4         Attorneys for Debtors

5         Four Times Square

6         New York, NY 10036

7

8    BY:   JOHN BUTLER, ESQ.

9         KAYALYN MARAFIOTI, ESQ.

10        THOMAS J. MATZ, ESQ.

11

12

13   WACHTELL, LIPTON, ROSEN & KATZ

14        Attorneys for Capital Research and Management

15        51 West 52nd Street

16        New York, NY 10019

17

18   BY:   RICHARD G. MASON, ESQ.

19

20   LATHAM & WATKINS LLP

21        Attorneys for Creditors' Committee

22        885 Third Avenue

23        New York, NY 10022

24

25   BY:   ROBERT J.  ROSENBERG, ESQ.

5

OFFICE OF THE UNITED STATES TRUSTEE

     33 Whitehall Street

     New York, NY 10004


BY:   ALICIA M. LEONHARD, ESQ.



KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

     Attorneys for ad hoc Trade Committee

     1633 Broadway

     New York, NY 10019


BY:   ADAM L. SHIFF, ESQ.

     DANIEL N. ZINMAN, ESQ.



SCHWARTZ LAW FIRM

     37887 W. Twelve Mile Road

     Farmington Hills, MI 48331


BY:   JAY A. SCHWARTZ, ESQ.

6

**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**

      **Attorneys for Official Committee of Equity Holders**

      **One New York Plaza**

      **New York, NY 10004**

**BY:   DEBRA TORRES, ESQ.**

7

1                    P R O C E E D I N G S

2            THE COURT:  Okay.  First, I'm sorry we got started a

3      little late today.  It was a busy morning calendar, and there

4      are some last minute things on the calendar today in connection

5      with another case.  So, in any event, Delphi Corporation.

6            MR. BUTLER:  Your Honor, good afternoon.  We're here

7      for a non-omnibus agenda hearing.  It's Jack Butler and Kay

8      Marafioti and Tom Matz on behalf of -- from Skadden on behalf

9      of the debtors, Delphi Corporation.  We're here on two orders

10     to show cause that have been entered -- scheduling today for a

11     hearing on two different matters.  The first is an order to

12     show cause procured by the debtors dealing with the exit

13     financing participation motion filed at docket number 11691.

14     And the only -- there are no objections filed by any parties

15     other than the U.S. -- United States Trustee, who has filed her

16     objection separately, and Ms. Leonhard's here to argue that

17     objection on behalf of the United States Trustee.

18            Your Honor, what we were seeking to do here, we

19     thought, was relatively straightforward.  And that is simply to

20     say that at this point in the Chapter 11 cases, with our

21     disclosure statement out, our solicitation period ending

22     tomorrow, the exit financing arrangements having been approved

23     by Your Honor on November 16th, so that that order has been

24     entered and is final; and the -- and the financing having been

25     launched by J.P. Morgan and by Citibank yesterday here in New

8

1   York, and today over in London, that we thought it was

2   appropriate to ask the Court, as the debtors, for dispensation

3   to permit any statutory committee member to participate in the

4   exit financing syndication.  I would underscore, that's not to

5   lead the financing, it's not to be an arranger, it's not to

6   have, if you will, book status, it's not to be a book runner or

7   any of those things; but rather to, if it chose to, invest in

8   the exit financing syndication.

9           You know, for example, Your Honor something more than

10  twenty-five percent of our prepetition bonds are owned within

11  holders of the statutory committees.  And to the extent those

12  folks or others want to invest, you know, essentially evaluate

13  their investment and roll over their investment in the company

14  going forward or invest in the bonds, they -- we believe -- as

15  they invest in the exit financing, rather, we believe that they

16  ought to be able to do so.  The -- we don't believe that there

17  was any -- we clearly believe there's no actual conflict, and

18  we believe that there's no appearance of a conflict.  And

19  that's why we filed the motion.  Because, Your Honor, my, you

20  know, my schooling in bankruptcy over the years has been, you

21  know, disclose, disclose, disclose, and lay things out, and

22  find out whether people have concerns about them.  And that can

23  clearly address any suggestion that there is an appearance of a

24  conflict.  And therefore we believed filing a motion by the

25  debtors in possession, after consultation with our statutory

9

1    committees, but filing it as the debtors, laying out and

2    disclosing all of this for the world, seeing whether there are

3    any objections from any parties in interest, and there are no

4    objections from any claim holder or any interest holder in the

5    cases; and then getting a very limited ruling from Yours --

6    from Your Honor, simply if you're inclined to do it, to simply

7    authorized statutory committee members to participate in the

8    exit financing if they so choose.  We believed, as we balanced

9    any potential appearances of conflict we could make a remedy by

10   this motion against the potential prejudice of the estate of

11   keeping potential investors out of the market place or

12   requiring that they walk away from the committees at a time

13   we're trying to conclude these cases, after having provided

14   leadership over the last two and a half years, we believed was

15   prejudicial to the estate, and not in the interest of our

16   interest holders or creditors or the debtors in possession.

17            THE COURT:  Who are the members of the creditors'

18   committee presently?

19            MR. BUTLER:  Could you help me on that, Mr.

20   Rosenberg?

21            MR. ROSENBERG:  Certainly.

22            MR. BUTLER:  It has changed.

23            MR. ROSENBERG:  It has, indeed.  The present members,

24   Your Honor, are Capital Research, which is the chair of the

25   committee and the very substantial holder that Mr. Butler is

10

1    referring to.  There is one union, the IUE.  There is the

2    indentured trustee for the senior bonds, Wilmington Trust.  And

3    there are three trade creditors.

4            THE COURT:  When you made this motion, did you --

5    were there particular members that looked like they were going

6    to trade in others, and others that you assume are not going

7    to?

8            MR. ROSENBERG:  I think, Your Honor, as far as --

9            THE COURT:  Or not trade, but just be interested

10    in --

11           MR. ROSENBERG:  -- yes.

12           THE COURT:  -- considering exit financing.

13           MR. ROSENBERG:  As far as creditors' committee is

14    concerned, the motion is really directed for Cap. Re., which is

15    a major player in these sorts of transactions in a difficult

16    financial market, and again, as the chair of the creditors'

17    committee, it would -- to the extent they are willing to

18    invest, it would be, you know, an important signal to the rest

19    of the market place to let them do so.  Mr. Butler, of course,

20    and I don't mean to take over his argument if he's in the

21    middle of it, he has focused on the lack of prejudice if the

22    cases are over in a week or two.  And of course, that's true.

23    But if something goes wrong here and the cases are not over in

24    a week or two, and in the meantime, you've had resignations,

25    and let's, since we're being honest, focus upon the chair of

11

1   the committee, who's been so instrumental in getting us from

2   here to there, in order to participate in the financing which

3   is good for the estate, we would have a very difficult

4   situation going forward and putting the pieces together, you

5   know, without the most sophisticated members of the committee.

6           THE COURT:  So it's your view that if I were to grant

7   this motion, there'd be sufficient members of the committee

8   other than Cap. Re. or other than those who are likely to

9   participate in pursuing the exit financing, to vote on

10  committee issues related to the exit financing?

11          MR. ROSENBERG:  Oh, oh, absolutely, Your Honor.  I

12  would not anticipate -- I certainly wouldn't want to prejudge

13  the issue.  But the only -- there's only one committee member

14  who is in the business of lending money, so --

15          THE COURT:  Well, the indentured trustee wouldn't be

16  doing it.

17          MR. ROSENBERG:  Certainly not.  And I don't believe

18  the trade committee member -- the trade members would, so.

19          THE COURT:  And the union -- it's an unusual thing

20  for a union to do, right?

21          MR. ROSENBERG:  I would certain -- if the union has

22  that much cash, Your Honor, we might want to reconsider what

23  we've done here.

24          THE COURT:  Okay.

25          MR. ROSENBERG:  But that's correct, Your Honor.  We

12

1    would have five unconflicted, nonlending members to look at

2    anything that was done here.

3              THE COURT:  Now, there was no mention in the motion

4    about any sort of screening device analogous to what you might

5    do in the Federated type of order.

6              MR. ROSENBERG:  Yeah, well --

7              THE COURT:  And I don't know whether that's

8    contemplated here or not.  I mean, so I'm asking --

9              MR. ROSENBERG:  -- it actually was contemplated, Your

10   Honor, to the extent of screening Cap. Re.. And again, we're

11   now focused on Cap. Re.  Obviously the issue comes up on the

12   equity committee as well.

13             THE COURT:  Right, and I'll turn to that.

14             MR. ROSENBERG:  That would have to be discussed.

15   Screening Cap. Re. from any committee discussion of or vote

16   upon the financing, which I think is what Your Honor is

17   focusing on.

18             THE COURT:  Well, no, it goes beyond that.  I

19   understand that point.  And that's why I asked the question

20   about other committee members being available to vote.  But I

21   guess I take it that it would be Cap. Re.'s desire that the

22   person who serves on the committee would be involved in the

23   credit analysis, and would know whether, in fact, Cap. Re. did

24   participate or not.

25             MR. ROSENBERG:  Yes.  That's correct, Your Honor. Mr.

13

1    Mason is Cap. Re.'s personal counsel.  He might address that

2    further.  But yes, we are not talking about screening off a

3    committee representative from the Cap. Re. decision making.

4            THE COURT:  Okay.

5            MR. ROSENBERG:  That's not feasible.

6            THE COURT:  All right.

7            MR. MASON:  Just to speak to that point for a second,

8    Your Honor.  Richard Mason, Wachtell, Lipton, Rosen & Katz for

9    Cap. Re.  You may recall that early in these Chapter 11 cases,

10   we made a submission to the U.S. Trustee and to Your Honor

11   whereby we said that David Daigle, who is the Cap. Re.

12   representative on the creditors' committee, would in effect,

13   wall himself off.  And he's been a very lonely person at Cap.

14   Re. for the past two years.  I would say that if Your Honor

15   were inclined to grant the motion, and Cap. Re. were to move

16   forward in considering placing an order, to use the financial

17   term for the financing, it's probably not feasible for them to

18   do that without at least talking to Mr. Daigle and getting his

19   general impressions.  He's a very careful person, so I suspect

20   he would continue to be careful and certainly not expose

21   committee level or committee sensitive information.  I think as

22   the debtor has said in its motion, and it's my sense as well

23   and the Cap. Re. sense as well, that the material information

24   for a credit-type decision at this point is really out in the

25   public domain.  And so I'm not concerned about that issue.  But

14

1    he would -- we would, in effect, have to modify our submission,

2    and frankly I'd do it --

3         THE COURT:  And it would cover just this financing?

4    The modification would cover just this --

5         MR. MASON:  Right.

6         THE COURT:  -- financing?  It wouldn't cover any

7    other activity that Cap. Re. might be doing?

8         MR. MASON:  Yes.  That is actually correct, Your

9    Honor.  So he would talk with his other internal people about

10   this financing, and he'd have give him his impression of Delphi

11   generally and of the general situation going forward, so that

12   they can make an intelligent decision.  And to reiterate what

13   Mr. Rosenberg said, we would of course, continue on the

14   committee, and would recuse ourselves from committee

15   deliberations and decisions about the exit financing.

16        THE COURT:  Okay.  As far as the equity committee is

17   concerned --

18        MS. TORRES:  Your Honor?

19        THE COURT:  I'm going to ask you the same types of

20   questions.  Is it contemplated that all of the members of the

21   equity -- current members of the equity committee might

22   participate in this financing if I granted the motion, or would

23   there be members, who in all likelihood would not?

24        MS. TORRES:  There would be members who in all

25   likelihood would not.

15

1          THE COURT:  More than one?

2          MS. TORRES:  More than one.

3          THE COURT:  Okay.  And you would also contemplate

4  that those who would be pursuing a consideration of

5  participating in the financing, that they would not have any

6  role in committee deliberations on the financing or related

7  issues?

8          MS. TORRES:  That's correct, Your Honor.

9          THE COURT:  And, I guess similarly, is it your view

10  that those who are on the equity committee that would be

11  interested in considering the exit financing opportunity, would

12  they be able to screen themselves off a la the Federated model,

13  or would it be contemplated that they would be involved in

14  the -- the actual representative on the committee would be

15  involved in the credit decision.

16          MS. TORRES:  Your Honor, the size of the entities who

17  have representatives on the equity committee are a bit

18  different than the size of Cap. Re., for example.  So that --

19  there would probably be some involvement --

20          THE COURT:  There would be involvement?

21          MS. TORRES:  Yes.  But I think --

22          THE COURT:  In the credit decision?

23          MS. TORRES:  -- to the extent that -- to the extent

24  that that's necessary, every precaution would be taken to, as

25  my colleague just said, to keep that to a minimum.

16

1          THE COURT:  All right.  I mean, there's no direct

2    statement to this effect in the motion.  But just as in orders

3    where I approve Federated type screening devices, I would

4    expect that if I were to grant this motion the order would say

5    that nothing in this order relieves any member of the committee

6    from its obligations under the securities laws.  I mean, you

7    still are bound by those laws, State, Federal, whatever.  So

8    this really just addresses --

9          MS. TORRES:  Okay.

10         THE COURT:  -- I'm now, I guess I'm going back to Mr.

11   Butler, but this really just addresses concerns that the

12   committee members and the debtor would have, and I guess also

13   the arrangers might have regarding the potential conflict under

14   the Bankruptcy Law, of committee members who might want to

15   participate in the exit financing.

16         MR. BUTLER:  Yes, Your Honor.  I think also, the

17   factor is from the debtor's perspective, while we didn't

18   participate in those discussions, my understanding is that the

19   United States Trustee's office was approached by some of the

20   individual committee members, and after deliberation the

21   trustee was -- the U.S. Trustee was not receptive to the

22   approach.  And from the debtor's perspective, the reason we

23   brought this motion is for -- in order to provide, sort of,

24   full transparency in the Chapter 11 process to this request,

25   and to explain why it's in the best interests of the estate.

17

1          And while I'll address Ms. Leonhard's objections

2    later on if I have that opportunity, the fact is, and I'll say

3    it here on the record now, I think we have over two and a half

4    years, this debtor and this (indiscernible) has demonstrated on

5    both sides, a track record of working closely together and

6    cooperating with each other, and we don't bring this motion

7    lightly.  And certainly, do not, by anything we said in this

8    motion, and I hope the motion -- because the motion didn't even

9    address the point, are we attempting to usurp in any way, the

10   statutory authority of the U.S. Trustee.

11          Your Honor will rule whatever Your Honor rules today.

12   But if Your Honor is to grant this motion, this motion doesn't

13   preclude the United States Trustee from doing whatever she

14   believes is required of her by statute.  I would hope that if

15   she goes through the normal balance purview that she does, that

16   she would take comfort in this order and in the disclosure

17   that's been made, and in the lack of objection from any party

18   in the case, and of the facts that are unique here.  Because

19   this is very different than, for example, the Partis situation

20   of the equity committee, which we can address later.  So I just

21   wanted, from the debtor's perspective, Your Honor, here in open

22   Court to say that we have an enormous amount of respect for the

23   Trustee and for her office, and this is -- nothing in this

24   motion is -- nor the relief we're seeking, is intended to usurp

25   her authority.

18

1          THE COURT:  Okay.  All right.  Did you have anything

2     more you wanted to say or --

3          MR. BUTLER:  Actually, that's really basically the

4     point, Your Honor.

5          THE COURT:  Okay.  All right.  Let me hear from the

6     U.S. Trustee.

7          MS. LEONHARD:  Okay.  Thank you, Your Honor.  Good

8     afternoon, Your Honor.  Alicia Leonhard for the United States

9     Trustee.  I think I've -- what I've heard the debtor say today

10    and in the motion is -- are two things.  First of all, that

11    there's a commercial exigency requiring these parties to be

12    involved in the exit financing and stay on the committee; and

13    two, that oh, the case is almost over.  So it doesn't really

14    matter, it's fine, we can let them do -- let them participate.

15    But, Your Honor, there is -- there are no commercial exigency

16    grounds that excuse a fiduciary from its duties, and timing is

17    not an excuse either.  So, for example, if you have a Chapter 7

18    trustee who's also a fiduciary, we would be appalled if the

19    Chapter 7 trustee came in and said, well, Your Honor, no -- I

20    was having trouble selling this property so I'm going to buy

21    it.  And the -- or saying, oh well, the case is almost over so

22    it's okay if I buy up the last of the assets.  It'll benefit

23    creditors.

24          Now, and in fact, with the trustee, that's a, you

25    know, it's a bankruptcy crime, but here we're not going there.

19

1    But I'm not casting -- we're not casting aspersions on any

2    member of the committees.  Because as far as our knowledge is,

3    everybody has carried out their duties faithfully and honestly

4    and to the best of their ability.  But our view is that the

5    roles are in direct conflict because there are -- there are

6    just simply different interests being served.  And second, it's

7    just simply --

8              THE COURT:  Well, let's focus on that for a second.

9              MS. LEONHARD:  Yes.

10              THE COURT:  And I think it's important to look at the

11    specific facts.  I would certainly agree with you in your

12    trustee example, for example.

13              MS. LEONHARD:  Um-hum.

14              THE COURT:  But, I mean, there's a union on the

15    committee.  The debtor, in consultation with the committee and

16    with a lot of input from the committee, sought to eject the

17    union's collective bargaining agreement, and sought to

18    negotiate in the context of that motion and in the context of

19    its business plan.  It wasn't negotiating a sale of the

20    business, but it was negotiating a significant issue in the

21    case, one of the two or three driving issues in the case.

22              MS. LEONHARD:  Well --

23              THE COURT:  I don't think the union was violating its

24    fiduciary duty to stay on the committee, was it?

25              MS. LEONHARD:  Well, I think the difference is, I

20

1    mean, granted, I understand that's -- that example.  But here

2    we have a transfer of property going on in this -- who these

3    parties will be lending money and getting a security interest

4    in return.  I think it's a bit different --

5            THE COURT:  But isn't it -- I mean, I guess that's

6    where the timing comes in.  And again, I understand your

7    general point that simply a matter of exigency or if it's good

8    for the case wouldn't relieve someone of their fiduciary duty.

9    But it seems to me that either the exit financing is going to

10   happen --

11           MS. LEONHARD:  Um-hum.

12           THE COURT:  -- in the context of a confirmed plan,

13   which the committee, of course, is on record supporting, or it

14   won't.

15           MS. LEONHARD:  Um-hum.

16           THE COURT:  If it happens, then there's very little

17   left for the committee to do except sort of look over the

18   debtor's shoulder on claims issues and fee applications.  I

19   guess until substantial consummation, they'd be looking at

20   transactions out of the ordinary course.  But I think the

21   debtors have been very clear that if they get the exit

22   financing, they intend to substantially consummate immediately.

23           MS. LEONHARD:  Um-hum.

24           THE COURT:  So in that situation, I'm having a hard

25   time seeing where the committee member is so dramatically

21

1    opposed to the interest of unsecured creditors that it would

2    not be able to fulfill it's fiduciary duties.  In other words,

3    it's different to me than the creditor in America West who

4    participated in the DIP loan and rolled eighty-five percent of

5    its -- proposed to roll eighty-five percent of its prepetition

6    claim into an administrative priority claim and a secured

7    claim.  And obviously, it was a DIP loan, so that was early in

8    the case.

9         MS. LEONHARD:  Um-hum.

10        THE COURT:  Turning to look at the other scenario

11   that's the flip side or the -- the side that could happen, and

12   I guess this is the reason why the committee members are not

13   resigning from the committee, it's conceivable that either the

14   plan would not be confirmed or the condition to consummation of

15   raising the exit financing would not occur.  At that point, how

16   would they be conflicted?  Because they wouldn't be -- they

17   wouldn't be participating any more.  It seems to me, it is, in

18   this instance, a limited scope of issues that, at least as far

19   as conflicts are concerned, we'll deal with information in a

20   second, but as far as conflicts are concerned, it seems to me

21   that they would recuse themselves from any deliberations over

22   the exit financing that the committee would have.  For example,

23   if the debtor said, you know, we're holding out for a lower

24   rate and to -- but what do you think, committee, should we?

25   The people who would be in the exit financing would recuse

22

1   themselves from that deliberation.  They'd leave the room and

2   they wouldn't be part of that vote.  So it just seems to me

3   that this situation, when you look at the specific facts, the

4   timing is significant.

5           I don't think it's just because the debtor assumes

6   the case is going to be over with.  Because if you assume the

7   case is going to be over with, then they would resign because

8   they'd have no more purpose for being on the committee, but --

9           MS. LEONHARD:  I guess, Your Honor --

10          THE COURT:  -- if in fact their role was to be one of

11  an au -- you know, a full fledged committee member deliberating

12  on anything, if the plan weren't confirmed or consummated, then

13  it would seem to me that they'd go back to the status quo ante.

14  They wouldn't be an exit financer then, because by definition,

15  that's why the plan wasn't going forward.  Now, I suppose

16  there's potentially a scenario where they didn't -- they were

17  responsible for not providing the exit financing and there

18  might be a claim against them for that.  Under those scenarios,

19  I would assume they'd resign, you know.  But that's a pretty --

20  that's a very hypothetical scenario, it seems to me, or a

21  speculative one.

22          MS. LEONHARD:  Well, I think the issue is, Your

23  Honor, is can you really put conditions on fiduciary duties?

24  And I'm not sure that you can.

25          THE COURT:  Well, case law says you can.

23

1        MS. LEONHARD:  I'm sorry?

2        THE COURT:  The case law says you can.  The case law

3   says you look at it on a case by case basis in the -- in the

4   Penn Dixie case, Judge Lifland and then the District Court said

5   you look at it on a case by case basis.  There it was argued by

6   the debtor that the committee member wanted to acquire the

7   debtor, that they had an agenda to acquire the debtor, and they

8   had moved to have the committee be formed in the first place.

9   And they were chair of the committee, and you know, they

10  clearly had an agenda.  I don't think Judge Lifland disputed

11  that, but he said it was okay.  There'd be enough ways to

12  circumscribe them if and when their acquisition agenda became

13  real.

14       MS. LEONHARD:  Well, I think that, you know, it's a

15  case by case basis, because it is -- I mean, you obviously have

16  to look at the facts of the situation.  Now, frankly, you know,

17  we are at a bit of a disadvantage because we don't have all the

18  facts.  But I think -- our view simply is that our role is to

19  preserve the integrity of the committee system, the committee

20  structure, and it really sets a bad precedent for committee

21  members to, you know, I mean, what do we say if it happened a

22  month ago, would we have said it was okay?  I just don't think

23  you can put this kind of timing -- and I understand Your

24  Honor's argument.  But I think that the other issue too, that

25  it's not -- it is not -- that is really still relevant, is the

24

1    appearance of impropriety issue.  And you know, I think this

2    case, we all know this is a very large case, very complex.

3    It's been going on for two years.  And it's under really

4    incredible daily public scrutiny.  And frankly, there are a lot

5    of really unhappy people around, you know, the creditors who

6    aren't getting what they want, which is always true in a

7    bankruptcy case.

8              THE COURT:  None of those people objected.

9              MS. LEONHARD:  That's true, Your Honor.  That's true.

10   But you know, these -- but the U.S. Trustee, I don't think that

11   that is really relevant.  Because it's our role to be the

12   arbiter and -- not the arbiter, but to be the watchdog of the

13   committee system.  And of course, you know, the creditors'

14   committee which was -- or the equity committee, are going to

15   support their members, I guess.  You know, they're not going to

16   come in and support us.  But I don't think it's relevant,

17   especially in this case to --

18             THE COURT:  I don't  --

19             MS. LEONHARD:  -- only us --

20             THE COURT:  -- I don't know about that.  I mean, I

21   think that the point that the case law makes and that Collier

22   makes is that where there are conflicts on a committee, and you

23   know, every committee is made up of claimants --

24             MS. LEONHARD:  Um-hum.

25             THE COURT:  -- and each claimant has their own issue.

25

1    But the case law says where there are conflicts on a committee,

2    in the first instance, it's up for the committee to police

3    itself.

4           MS. LEONHARD:  I --

5           THE COURT:  And I guess I haven't -- I need to get a

6    better sense as to where it's laying down on that issue.   I

7    mean, I don't see that it is or they are, because it's both

8    committees.

9           MS. LEONHARD:  Um-hum.

10          THE COURT:  Usually you hear about that from another

11   committee member, and these committee members, at least a

12   couple of them, have been not shy about speaking up.  You know,

13   Mr. Fox and the union's counsel, I think, would, you know, if

14   they felt that -- I mean leaving aside committee counsel, but

15   if they felt that someone was taking advantage of their

16   position on the committee, contrary to unsecured creditors'

17   interests, you know, it would be incumbent upon them to speak

18   up.

19          MS. LEONHARD:  Well, you know, and I -- I think one

20   thing I will say about that is with respect to conflicts,

21   conflicts -- I don't read conflicts in the case law as meaning

22   a potential breach of duty -- fiduciary duty.  It's more the

23   conflicts among the debtor and the creditor.  For example, your

24   union example, where there's a, obviously a dispute, a ripe

25   dispute that needs to be resolved.  And that doesn't disqualify

26

1    somebody from being on a committee.  But I think the -- you

2    know, and -- but I think that the other issue that we really

3    haven't addressed yet is the appearance of impropriety.  And as

4    I started earlier -- started to say earlier, this is a large

5    case with a lot of people who are, you know -- no matter what

6    happens, I think that if there's a dual role.  There will be an

7    impression -- perception that the committee member is enriching

8    itself or is somehow not meeting its duties --

9           THE COURT:  But how -- but let's explore that

10    perception.

11           MS. LEONHARD:  Okay.

12           THE COURT:  Is there any reality to it?

13           MS. LEONHARD:  Yes.  I mean, reality so far -- yet,

14    no, but there is reality to it where, you know, articles get

15    put in the newspaper --

16           THE COURT:  No, no --

17           MS. LEONHARD:  -- that kind of thing.

18           THE COURT:  -- I don't -- you can't stop what people

19    write in the newspaper.

20           MS. LEONHARD:  Right.

21           THE COURT:  But is there literally any reality to

22    that perception which is that if this motion were granted, a

23    committee member that participated in the financing would be

24    enriching itself at the expense of the unsecured creditors?

25           MS. LEONHARD:  Well, I don't even think you -- you

27

1    know, and maybe you don't have to go even so far as enriching.

2    It's simply you have to --

3              THE COURT:  Well, or using its position on its -- on

4    the committee at the expense of the unsecured creditors.

5    Because that's really the -- that's really the conflict.

6              MS. LEONHARD:  Um-hum.

7              THE COURT:  That's the fiduciary duty.  You cannot

8    use your position on the committee to the detriment of the --

9    of your constituency, the unsecured creditors, or to your

10   benefit.

11             MS. LEONHARD:  Um-hum.

12             THE COURT:  You cannot -- you can press your claim.

13   The union can press its claim.  Wilmington Trust can press its

14   claim on behalf of the bond holders.  But it can't use its

15   position on the committee to press the claim.  It can't

16   manipulate that position to help itself.  And in those type of

17   disputes it stands on its own as a creditor.

18             MS. LEONHARD:  Um-hum.

19             THE COURT:  And I've thought through, I guess, what

20   it is that's involved in participating in the exit financing,

21   which anyone else can do.  I mean, the debtors made no secret

22   about it.  You know, it would be happy to get anyone to

23   participate in the exit financing.

24             MS. LEONHARD:  Um-hum.

25             THE COURT:  And in fact, right now, the committee

28

1   members are probably the only people that it's wrong for them

2   to talk to about the exit financing.  Any other creditor's

3   entirely free to talk to J.P. Morgan or Citibank.  So, I

4   don't -- again, if they're not involved in the committee's

5   deliberations with the debtor and within it's own purview about

6   the terms of the exit financing, if it's screened off from all

7   of that, how would it be using its position on the committee

8   to?

9          MS. LEONHARD:  Well, I think it's just the fact that

10  the dual role exists, you know --

11         THE COURT:  But it doesn't -- but it's not using that

12  role.  It's not -- it's precluded by being sent out of the

13  room --

14         MS. LEONHARD:  I understand that.

15         THE COURT:  -- whenever the issue comes up from -- I

16  mean, frankly, I actually think that the financial press and

17  the national press and most law professors, and all law

18  professors that people respect, actually look at the facts, and

19  so, just, you know, if someone's going to spout off without

20  thinking about the facts, that doesn't --

21         MS. LEONHARD:  Well, I mean --

22         THE COURT:  -- I think when people say the appearance

23  of impropriety, you actually have to see impropriety appearing

24  as opposed to just assuming someone's going to allege it.

25         MS. LEONHARD:  Well, I think that, you know, as I

29

1    say, I mean, we're sort of, in a lot of ways, grasping here,

2    because we don't have all the facts.

3              THE COURT:  I appreciate that.  This concept

4    appeared, you probably remember this, it appeared at the last

5    paragraph of the disclosure statement order.  And I said, now,

6    we've got to, you know, you have to flesh this out some more.

7              MS. LEONHARD:  Um-hum.

8              THE COURT:  It wasn't in this form.  But the idea

9    arose there.  And I think it's right of the U.S. Trustee to

10   analyze it and be aware of it.  And I would do it even if you

11   didn't do it, because I think it's -- the role of a committee

12   is central to a case.  But I guess, there's nothing that I have

13   seen that suggests to me that this relief would lead a

14   committee member to cross the line, particularly where, and we

15   haven't talked about this, on the informational issues.

16             MS. LEONHARD:  Um-hum.

17             THE COURT:  The order provides that nothing in the

18   order would relieve the committee members from the securities

19   laws.

20             MS. LEONHARD:  Right.  Well, that --

21             THE COURT:  Because I have a pretty good idea about

22   what information is out there in the public, having just gone

23   through the disclosure statement hearing and know that this is

24   a public company anyway that files reports.  And I have a

25   pretty good idea, I guess, of what the committee knows at this

30

1    point.  But I don't -- this isn't a hearing on what the

2    committee knows.

3              MS. LEONHARD:  Right.

4              THE COURT:  So I think if the committee has material

5    inside information then, obviously, someone who sits on the

6    committee is running some risk in participating in an exit

7    financing, depending on how that's structured.

8              MS. LEONHARD:  Um-hum.  Yeah, well, and that's, you

9    know, I think we're really not inclined to -- the only time

10   we're really inclined to approve a wall is to -- so that an

11   agency like Cap. Re. can comply with its obligations under

12   securities law.  I mean, that's why Mr. Daigle was walled off

13   and all that.

14             THE COURT:  Well, see, they do that anyway.  I mean,

15   I look at it a little differently.  I think that those types of

16   orders are not to protect committee members from the securities

17   laws, and in fact that's why I put the provision in it.

18             MS. LEONHARD:  Um-hum.

19             THE COURT:  Instead, it's to give them assurance that

20   this action of trading in securities during the case is -- does

21   not cause them to run afoul of their fiduciary duties.

22   Assuming that they comply with the screening procedure.  Now,

23   here, what's been represented to me is that while the committee

24   members would not be -- I'm sorry, why the committee members

25   would be screened from the committee's decisions and decision

31

1   making process and analysis of the financing, and so therefore,

2   they wouldn't know what the debtor and the committee was

3   thinking about strategically as far as their negotiations with

4   the arrangers and the leads.  And so they wouldn't be a conduit

5   to the arrangers and the leads in any way.  There still would

6   be some information, I guess, some role, that the committee

7   member would have as far as, I guess, due diligence on the

8   debtor.  Then that's all that's contemplated, right Mr. Mason?

9           MR. MASON:  Yes, Your Honor.  The -- my understanding

10  of my client, the way they work is that they don't make

11  investment decisions individually, so their team would get

12  together.  And given that Mr. Daigle has been active in this

13  matter for two plus years, they would want to know his

14  impressions and views both generally and about the business

15  plan going forward and so forth.

16          THE COURT:  So, if something were put in the order to

17  the effect that Daigle will not have access to -- not Daigle,

18  but anyone participating or any institution participating in

19  the financing pursuant to this order representative on the

20  committee, would be able to discuss that financing with his or

21  her institution only in respect of due diligence on the debtor

22  as opposed to any information that the debtor or the committee

23  would have as regard to the financing itself, that would be

24  okay?

25          MR. MASON:  So -- right.  In other words, if there

32

1    were a view about the financing and possible, say interest

2    rates the debtor would be prepared to pay, that sort of stuff

3    that he may or may not have heard --

4              THE COURT:  He wouldn't have access to that.  And

5    even if he somehow got access to it, he wouldn't talk about it.

6              MR. MASON:  -- with other people.

7              THE COURT:  Right.

8              MS. LEONHARD:  Well, I think the last issue, and

9    maybe Mr. Butler resolved this, is the fact that it appears to

10   be an order constraining the U.S. Trustee from acting.

11             THE COURT:  No, I don't view it that way.

12             MS. LEONHARD:  Okay, well.

13             THE COURT:  I don't view it that way.

14             MS. LEONHARD:  You know --

15             THE COURT:  I think -- I think if that were their

16   relief that the debtor were seeking, a different analysis would

17   apply, because you have a specific statute --

18             MS. LEONHARD:  Right.

19             THE COURT:  -- that talks about a specific standard

20   for removing someone from a committee and for review of that.

21   But I think, nevertheless, that this is a live judiciable

22   issue, because you have committee members who clearly have

23   fiduciary duties who are in doubt about -- or to put it

24   differently, are being cautious along with the debtor, to make

25   sure that what is being proposed, at least as far as the Court

33

1    is concerned, would be consistent with their fiduciary duties.

2            MS. LEONHARD:  Um-hum.

3            THE COURT:  And that -- I mean, I agree with Mr.

4    Butler.  I always say this, if you're ever in doubt in a

5    bankruptcy case, whether it's whether you should seize and

6    asset or sell and asset, without Bankruptcy Court approval,

7    it's time to ask for Bankruptcy Court approval.

8            MS. LEONHARD:  Well, you know, I --

9            THE COURT:  On notice.  And I think notice is

10   important.  I mean, I understand there are thousands of

11   creditors here, and more shareholders.  But many of those

12   creditors are quite vocal and quite well heeled and certainly

13   have their reasons, if they wanted to be difficult on a

14   principle basis, to raise this issue, and they haven't.

15           MS. LEONHARD:  Well --

16           THE COURT:  I don't believe that this issue is

17   particularly subject to extrapolation or analogy to other

18   situations.  I mean, I think it's very different, for example,

19   than the America West case.  I think it's -- I mean, you

20   mentioned in your footnote, the Partis issue.

21           MS. LEONHARD:  Um-hum.

22           THE COURT:  That was a very different stage in the

23   case.  People who were literally negotiating a lot if they were

24   going to wear that hat.  And I think even -- even under the

25   Penn Dixie case, they would have been conflicted.  Although it

34

1    would have been a little closer call than America West.  But I

2    think they would have, you know, been conflicted and properly

3    got off the committee, the equity committee.  So I think that

4    consistent with the case law and what Collier says, you look at

5    these things based on the facts and unless you have an exactly

6    analogous situation or a very closely analogous situation, the

7    only precedent you can take away from it is how you analyze the

8    facts as opposed to anything that can be pulled out from this

9    fact pattern and applied to another one.

10           MS. LEONHARD:  Well, I understand -- I mean, I do

11   agree, it's fact specific.  But I just don't think that, you

12   know -- we just have a -- we disagree.  So obviously -- but in

13   any case, you know, I really have nothing further unless the

14   Court has more questions.  But we would -- I think that the

15   harm to the -- our view is the harm to the committee structure

16   and the perception is much, much greater than any harm there

17   would be -- I mean, if you're going to use timing as an issue.

18   Well, the case is almost over.  And if even if it's a, you

19   know, a month or not, the committees will have sufficient

20   members to carry on the role.

21           THE COURT:  Well, but you were talking the chair of

22   the committee, who is very involved in the negotiations.  I

23   mean, if -- I mean, I guess, I don't know if this has been

24   broached with you, but would the -- I mean, one approach would

25   be to say that they get off, and if the financing didn't go

35

1   through, you'd reappoint them.  But, you know, it seems like

2   it's kind of -- if one were prepared to do that, then I think

3   that kind of answers the question as to whether there's a real

4   conflict or not.

5          MS. LEONHARD:  Well, but I mean, if the financing

6   doesn't go through, then I mean, I think, you know, don't we

7   have -- we have a bigger problem in the case.

8          THE COURT:  No, I think you have -- yeah, you'd need

9   a committee.  You'd need a chairman --

10         MS. LEONHARD:  Right.

11         THE COURT:  -- who's had two years of experience and

12  has looked all these people in the eye and knows how to put it

13  back together again.  I mean, I think that's why they're not

14  resigning is that they're actually aware of their fiduciary

15  duties.  They're not thinking selfishly, and they're saying,

16  you know, I need to stay on the committee.  You know, there's

17  been a big investment in what I've done for all the unsecured

18  creditors.

19         MS. LEONHARD:  Well, I mean, but I guess also, it

20  depends on, you know, I mean, obviously there's been -- there's

21  talking going on between the parties now, negotiation already

22  going on.  Because the debtors aggressively -- so well, but I

23  think --

24         THE COURT:  But not -- but no, let me, on that point

25  I want to make sure I understand that.  I mean, what's been

36

1    represented to me by both Mr. Butler and Mr. Mason and Mr.

2    Rosenberg, is that the committee members who would participate

3    in the exit financing are not arrangers, not underwriters.

4    They are literally people who say, I'll do it.  I'll put in the

5    money for that amount.  And so, I want to know, are they

6    already involved in negotiating the terms of the financing?

7            MR. BUTLER:  Absolutely not --

8            MR. ROSENBERG:  No, Your Honor.

9            MR. BUTLER:  Your Honor, if I can just -- I'm sorry.

10   I mean, Your Honor, the fact is that there's no one on the

11   committee -- I mean the two points here that we thought were

12   relevant was the fact, among others, but was that the

13   financing, that actual valuation of the structure of the

14   financing, the financing, the selection of the agents -- the

15   way the financing's all put together, that's already been

16   reviewed.  It's been approved by the Court.  There's a final

17   order on that.  And we're not coming back for any more Court

18   review of that issue.  We're not asking for any more committee

19   review of that issue.  We obviously keep --

20           THE COURT:  There's some flexibility in that -- in

21   those parameters.

22           MR. BUTLER:  Except that the discretion has been

23   given to the company, to the debtors in possession, to exercise

24   their business judgment in closing consistent with the approval

25   and authorization we've gotten.  So for example, Your Honor --

37

1          THE COURT:  Okay.

2          MR. BUTLER:  -- you authorized at that hearing --

3          THE COURT:  Let me go to the next step.

4          MR. BUTLER:  Okay.

5          THE COURT:  In exercising that discretion, I'm

6     assuming the committee -- I'm sorry, I'm assuming the debtors

7     will discuss and negotiate, if need be, with the arrangers.

8          MR. BUTLER:  Yes, Your Honor.

9          THE COURT:  But they're not going to be negotiating

10    with the people on the committees who are able to participate

11    in the financing?

12         MR. BUTLER:  That's absolutely correct.

13         THE COURT:  They'd be precluded from doing that.

14         MR. BUTLER:  Right.  And we negotiate -- that's

15    absolutely correct.  The -- no one on the committee is going to

16    be at the table with the arrangers and the book runners in this

17    deal.  They're not -- that's not -- you know, that's what I was

18    trying to say.  There's no one on the committee, to put it in

19    the parlance, there's no one on the committee that's going to

20    be at lead table status for this deal.

21         THE COURT:  Okay.

22         MR. BUTLER:  The -- those folks have been selected

23    and they're out doing their jobs and, you know, what we're

24    trying to do is, because of the, you know, the very large

25    investor -- the large investment represented by members of the

38

1    committee, that -- in the company already, we simply are trying

2    to make sure that the estate's not prejudiced in this -- in

3    this unique circumstance, as I think we've laid the facts down.

4              MR. MASON:  Your Honor, just briefly, speaking for

5    Cap. Re., what I would imagine would happen here is what would

6    happen in the typical non-bankruptcy corporate finance context,

7    which is that assuming Cap. Re. were interested in

8    participating in the exit financing, it would place an order at

9    the right time in the next few weeks with the agent or with the

10   arranger, and would specify the amount in which it was

11   interested in purchasing an which trunch of debt, and what it

12   viewed the appropriate terms to be.  So the interest rate, any

13   financial covenants or other features.  And the arranger would

14   then discuss with the -- would negotiate with the debtor, and

15   we'd either get a yes or a no or a maybe.  And if it turns out

16   that the proposal that we made or that Cap. Re. made was in the

17   debtor's and arranger's view, uneconomic, there would be, you

18   know, presumably money elsewhere.  There's nothing greener

19   about the money we have than the money (indiscernible) has, for

20   example.

21             THE COURT:  And again, I'm going back to a question I

22   asked you earlier --

23             MR. MASON:  Yes.

24             THE COURT:  -- because I think this probably makes

25   sense to put in the order.  As far as the role of the

39

1   particular committee member who sits on the committee on behalf

2   of Cap. Re. or, you know, the equity committee member, that

3   person's role in advising Cap. Re. on its bid is limited to due

4   diligence about the debtor.  It's not going to be telling --

5   he's not or she's not going to be telling Cap. Re. anything

6   about the debtor's strategy on DIP financing -- on exit

7   financing?

8           MR. MASON:  That's correct, Your Honor.  So that, for

9   example, a natural question from someone uninvolved would be

10  well, how much do you think the debtor is prepared to pay in

11  interest.

12          THE COURT:  Right.

13          MR. MASON:  That's a no-no.

14          THE COURT:  So it's really just based -- it's

15  historical due diligence on the debtor's business.

16          MR. MASON:  They might ask Mr. Daigle, for example,

17  what do you think an appropriate rate is for us to, you know,

18  request, to put in our order.  And I think that that's fine for

19  him to answer.  It should be.  But certainly they should not be

20  asking or he shouldn't be answering anything about the debtor's

21  strategy.

22          THE COURT:  Okay.  All right.

23          MS. LEONHARD:  Well, I can -- I can see I'm sort of

24  the lonely voice and I'll stop here.  But I would say that, you

25  know, since Mr. Butler is not restraining the U.S. Trustee in

40

1   any way, when -- if this happens, if the Court enters the

2   order, we presume there'll be full disclosure from all the

3   parties --

4            THE COURT:  That's part of the --

5            MS. LEONHARD:  -- and at that time --

6            THE COURT:  -- relief.

7            MS. LEONHARD:  -- the U.S. Trustee will conduct her

8   due diligence and determine how to handle the ongoing

9   membership of these people in the committee.  So --

10           THE COURT:  Okay.

11           MS. LEONHARD:  -- thank you, Your Honor.

12           THE COURT:  I mean, I don't have any problem, for

13  example, with you or one of your colleagues talking to the

14  committee representative about what it is that he or she said

15  to the institution.

16           MS. LEONHARD:  Um-hum.

17           THE COURT:  I think that would be entirely

18  appropriate.  And you know, I think that'd be a good thing to

19  do.

20           MS. LEONHARD:  Thank you, Your Honor.

21           THE COURT:  Okay.  All right.  I have -- does anyone

22  else have anything to say on this motion?  All right.  I have

23  before me the debtor's motion to permit statutory committee

24  members, that is members of the official creditors' committee

25  and the official shareholders' committee, to participate on or

1    in the syndication of the proposed exit financing in connection

2    with the debtor's proposed Chapter 11 plan.  It's clear from

3    the record of this hearing that the participation that is

4    contemplated by this motion and by the order is limited to

5    participation as or not as an arranger or an underwriter or a

6    lead book maker, but one who would submit a bid in connection

7    with the financing, and would communicate that bid to the

8    arrangers.  It is not contemplated that the committee members

9    who would be covered by this order, would therefore be in any

10   negotiations with the debtor directly in regard to exit

11   financing.  It's also clear from the record of this hearing

12   that anyone participating in the exit financing process who

13   would be on one of the official committees, would be screened

14   off from the committee's access to information about that

15   process and the committee's deliberations about that process,

16   such as any deliberations about the debtor's strategy in

17   connection with exit financing.

18           While the motion does not contemplate a complete

19   screening procedure a la the Federated case and numerous orders

20   entered in this district and elsewhere in connection with

21   buying and selling claims during a Chapter 11 case, it is

22   contemplated that the committee representatives' role, on

23   behalf of his or her institution, would be limited to

24   discussing historical or business due diligence and not

25   permitted to include any discussion of the debtor's strategy

42

1   regarding exit financing.

2          The motion was unopposed except by the United States

3   Trustee, which objected to the motion on the basis that the

4   requested relief, which to be fair to the U.S. Trustee, was not

5   as clearly spelled out in the motion as it has been developed

6   on the record of this hearing, would result in a potentially

7   disabling conflict for committee members that could come up in

8   two ways:  One, it could give rise to a potential conflict with

9   the committee members' duty of loyalty.  It also could result,

10  according to the U.S. Trustee, in the inappropriate use of

11  information that a committee member might have or receive.  In

12  addition, the U.S. Trustee has stated that the relief requested

13  might create an appearance of impropriety on behalf of the

14  committee members that the Court should take into account.  And

15  I should note, finally, that the record is clear that the

16  purpose of the motion was intended to provide comfort to the

17  debtor, the committee members, and to the arrangers, that

18  indeed the committee members could, without violating their

19  fiduciary duties, participate in the financing on the terms

20  that I've described.  That is, this motion, very clearly does

21  not seek any sort of declaratory judgment as to whether the

22  U.S. Trustee is within her rights or discretion in removing any

23  committee member.

24          However, I think properly, the debtor wanted to air

25  the issue with the creditor and shareholder body and with the

43

1    Court, since the extent and nature of the committee members'

2    fiduciary duties, while clear as a general basis, is ultimately

3    one that requires analysis of the particular facts at hand

4    before one can get comfortable that the duties are not being

5    breached or potentially breached in such as way that would make

6    the action or the proposed action improper.  So it made sense

7    for the Court to be asked to consider the issue after notice

8    and the opportunity to object.

9           It's clear from the case law and commentators that

10   the Court -- I'm sorry, that committee members have fiduciary

11   duties to the unsecured creditors, in the case of creditors'

12   committees and to the shareholders in the case of equity

13   committees.  However, membership on a committee does not

14   preclude members from pursuing their own interests, so long as

15   this can be done without running afoul of their fiduciary

16   duties.  See for example, In re Schatz Federal Bearings Company

17   5 BR 543-548 (Bankruptcy S.D.N.Y. 1980); In re Barney's Inc.,

18   197 BR 431 (Bankruptcy S.D.N.Y 1996); and In re Penn Dixie

19   Industries Inc., 9 BR 936 (S.D.N.Y 1981).  In that case the

20   District Court, in affirming Bankruptcy Judge Lifland

21   concluded, as have all of the other authorities that have

22   considered the issue, as well as Collier, that the issue of

23   whether a committee member adequately represents the interests

24   of a class as a whole is one that "can only be resolved by

25   reference to the facts of each particular case" (ibid. 940).

44

1        In some cases the fact-based analysis is rather easy.

2   See, for example, In re America West Airlines, 142 BR 901

3   (Bankruptcy District of Arizona 1992), in which the Court

4   concluded that a committee member who had entered into a DIP

5   financing agreement with the debtor in which it lent 23 million

6   dollars and in return received a priority secured claim on

7   almost all of the assets of the debtor as well as a super

8   priority administrative claim, and that would have rolled up

9   all but fifteen percent of its unsecured claim into the secured

10  debt, that is around 54 million dollars, had clearly

11  transformed itself into a position where on any number of

12  issues, it would be in conflict with the interests of the

13  unsecured creditors.

14        However, here, as I noted at oral arguments, it

15  appears to me that given the nature of the proposal and the

16  timing of that proposal, that with the screening and

17  limitations that I described at the beginning of my bench

18  ruling, the committee members who would be permitted to

19  participate in this opportunity would not have placed

20  themselves in a position where they would, on most matters, be

21  likely to act contrary to the interests of the unsecured

22  creditors.  As I said before, if the exit financing goes

23  through, the committee's role will be extremely limited and

24  unrelated to the exit financing which will have become an

25  accomplished fact.  If the exit financing doesn't go through,

45

1    the committee will have a major role.  But those who would have

2    participated in the exit financing, obviously would not have

3    participated in it under that scenario, and therefore would not

4    have transformed themselves.  As I noted at oral argument, one

5    can spin out other hypotheticals that might put them in a

6    conflict position, but those hypotheticals, for example, the

7    committee members failing to honor commitment on exit

8    financing, I think are, at this point, entirely speculative, as

9    were the hypotheticals in Barney's.

10            Consequently, as I said earlier, it seems to me that

11   the committee members who want to participate in this financing

12   are not resigning from the committee, not because they're

13   seeking some undue advantage through their committee

14   membership, but rather because they are continuing to exercise

15   their fiduciary duties to stay on the committee, recognizing

16   the very steep learning curve that they've gone through in

17   respect to the debtor, and the need to protect their

18   constituents in the down side scenario, where the plan, which

19   each committee has recommended, is not consummated.

20            Because this is a fact-based inquiry, based on

21   hornbook principles which I've enunciated, although committee

22   members have these fiduciary duties, they're allowed to

23   represent their own interests so long as either that interest

24   doesn't taint their judgment generally or they don't take undue

25   advantage of their committee position in supporting those

46

1   interests, and applies those principles to quite unusual facts,

2   I don't believe that the trustee's concern about the

3   precedential effect of my ruling is one that any subsequent

4   judge would be worried about.  In fact, as I've said, given

5   different scenarios, different timing, and different -- or

6   proposed lack of constraints as I've imposed here, very

7   different relief would be granted.  I would deny that type of

8   motion.  Similarly, it's not only permissible but proper for a

9   U.S. Trustee to review how, in fact, the committee members

10  would be participating in their institution's due diligence.

11  And I'm sure the committee members would understand that role

12  that the U.S. Trustee has to play as far as questioning them

13  about what, in fact, they intend to say to their institution.

14  So I believe that this motion is consistent with the two

15  committees' fiduciary duties and the integrity of the role that

16  those committees will play in the case.  And consequently, with

17  the qualifications and limitations that I've set forth on the

18  record, I'll approve it.

19          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

20  second matter on this non-omnibus hearing agenda is a order to

21  show cause that was granted yesterday for a hearing today on

22  the ad hoc trade committee's motion for order extending

23  deadline for submission of cure notices, approving cure notices

24  executed by movants with respect to their claims, and directing

25  debtors to reconcile cure claims the corresponding claims and

47

1    to make cure claim distributions directly to the movants.  That

2    motion was filed at docket number 11803.  The Court's show

3    cause order was entered at docket 11809.  And the debtors

4    responded this morning by filing the debtor's response to the

5    ad hoc trade committee's cure notice extension motion at docket

6    number 11865.

7         MR. SHIFF:  Your Honor, may I be heard?

8         THE COURT:  Yes.

9         MR. SHIFF:  For the record, Your Honor, it's Adam

10   Shiff of Kasowitz, Benson, Torres & Friedman, here on behalf of

11   Argo Partners, ASM Capital, Avenue Capital, Contrarian Capital,

12   Hane Capital, Longacre Master Fund, and Sierra Liquidity Fund,

13   each of whom, at least as of the time of the disclosure

14   statement hearing or the current time, populate what's been

15   described and I think has been described before the Court, as

16   the ad hoc trade committee.  Your Honor, first of all, we'd

17   like to thank the Court for allowing us to be heard today, and

18   signing an order to show cause yesterday allowing that to take

19   place.  Needless to say, we understand the exigencies the Court

20   is under right now at this time, with confirmation rapidly

21   approaching.

22        Just so we're clear, Your Honor, we are not here in

23   any way to upset the plan confirmation process or the hearings

24   that are seeking or that will take place before you next week.

25   We're simply seeking what we believe is a very limited relief

48

1    with respect to one section of the solicitation order that was

2    entered by the Court following the disclosure statement

3    hearing, Your Honor, which -- relating to cure claims as Mr.

4    Butler described the title of our motion.  Your Honor, we

5    believe that these issues that we've raised in the motion

6    directly impact upon the reconciliation of our claims as well

7    as an enforcement of the settlement reached with the debtors

8    that was set forth on the record of the disclosure statement

9    hearing.

10         Your Honor, as the Court is aware, and it's quoted in

11   our papers as well as the debtor's reply that was filed this

12   afternoon, as a means or as a settlement of various objections,

13   we had asserted to the plan and disclosure statement, the

14   debtors had agreed to use commercially reasonable efforts to

15   reconcile, and if agreed, allowed claims.  You can leave out

16   the rest of the quotes that are cited.  As the Court is also,

17   I'm sure, aware, as on or about December 21, in accordance with

18   the solicitation order, the debtors mailed out numerous

19   notices.  And in accordance with the solicitation order, they

20   sent or had KCC, we believe, send to non-debtor parties to

21   executory contracts, a what I will describe as a detailed

22   notice of a cure claim amount.  In addition to that, where

23   debtors had multiple addresses, they sent that notice to one

24   address and sent a form or copy or limited type of notice to

25   other addresses with clear instructions that only the one

49

1    notice that was sent to the entity they designated as the main

2    address could be returned.  In addition, they sent, as we

3    described it, a generic notice to our clients or other

4    transferees of claims that are subject to this motion

5    indicating that your contract or the claim that arises under

6    your contract may be subject to a cure notice that was mailed

7    to somebody else.

8            Your Honor, as soon as these notices went out, and I

9    don't need to belabor the Court with the timeline that we set

10   forth in our papers, I trust the Court has seen that, but as

11   soon as that went out, we attempted to contact the debtors to

12   seek to tie or match what our -- the proofs of claim that

13   underlied our claims or the scheduled claims for that matter,

14   and what we -- and what was sent to the various non-debtor

15   parties to executory contracts.  Your Honor, despite repeated

16   efforts, we were un -- and despite the representation to the

17   Court and the agreement that was set forth for the Court, we

18   were not given the information necessary to reconcile such

19   claims.

20           THE COURT:  Let me stop you.  These are executory

21   contracts, so do the claims that you've been assigned, or the

22   proofs of claim, are they protected proofs of claim on the

23   assumption that the contract will be rejected?  What types of

24   claims are these?

25           MR. SHIFF:  In most instances, Your Honor, since

50

1   these are filed, certainly if they're scheduled amounts,

2   certainly it's what the debtor believed what was owing as of

3   the petition date.

4          THE COURT:  Okay.

5          MR. SHIFF:  And in, I believe, certainly most cases,

6   I can't represent all cases -- I haven't looked through all

7   claims, we can talk about numbers in a minute, these are

8   generally proofs of claims for amounts owing as of petition

9   date, not rejection damage claims.  So these are the very

10  claims that --

11         THE COURT:  But you don't -- do you have an

12  assignment of the contract?

13         MR. SHIFF:  Of the underlying contract itself, no,

14  Your Honor.  Simply, the -- call it the account receivable, if

15  that's an acceptable term.  As well as in many cases various,

16  and they vary by creditor and the like, various powers of

17  attorney and other --

18         THE COURT:  Well, that was going to be my next

19  question.  Do you have the power to direct the contract party

20  in respect of its prepetition claim?  For example, do you have

21  the ability, by contract, as part of the purchase of their

22  prepetition claim, to control how they settle that claim?

23         MR. SHIFF:  In -- Your Honor, we represent seven

24  different parties, each of whom have different forms and each

25  of which sometimes gets negotiated out slightly differently

51

1    when they're dealing with a creditor.  But as a general matter,

2    it's my understanding that we do have, at least most instances.

3    I don't want to misrepresent to the Court.  But at least in

4    most of those instances, we do have that right.  Some have

5    specific powers of attorney, others just give us rights with

6    respect to disposition of the claim.

7          THE COURT:  So why can't you just send those people a

8    notice and say we direct you to elect treatment X or elect

9    treatment Y when you get this notice.

10         MR. SHIFF:  Well, Your Honor, that's been -- that's

11   been part of the problem.  In the first instance, these notices

12   having been mailed out on December 21, the Friday before

13   Christmas, arriving whatever days they arrive, I'm not going to

14   try to speculate how long the mail takes, so you know, so one

15   issue has been actually reaching all these people.  The second

16   issue is that it's not crystal clear, because we didn't have

17   the reconciliation information, that if we have a number of

18   contracts with party X and the debtor is seeking to cure, so to

19   speak, a number of purchase orders or certain other contracts

20   with that party, we did not have the information to necessarily

21   call up that person and say okay, you need -- or at least do it

22   in the time frame that was required, which was now today,

23   essentially, because things -- ballots or election forms are

24   due Friday -- you know, tomorrow in California.

25         We have, as we described in our motion, with the

52

1   information we have been able to obtain, have started that

2   process.  But the problems were compounded, because in certain

3   instances, the creditors, and I don't want to speculate as to

4   why, but maybe because they knew they had sold this claim,

5   didn't have the notice.  Maybe they threw it away, or as we

6   described earlier, in the case of the multiple address

7   entities --

8           THE COURT:  But isn't that -- I mean, if they've

9   agreed with you to take your direction -- with your clients, to

10  take your direction, that's -- they've screwed up, right?

11          MR. SHIFF:  They would have screwed up -- in some

12  cases they may have done it before we got to them.  Because, as

13  I described, it took -- there was some lag time there.  In

14  other cases, there are entities, and one happened that I know

15  of --

16          THE COURT:  How many contract parties are we talking

17  about here?

18          MR. SHIFF:  I don't have the exact number.  I know

19  the total amount of claims that we're talking about is

20  approx -- total of what we believe are cure claims we own, is

21  approximately 40 million.  We believe --

22          THE COURT:  No, no.  I'm not -- not dollar amount.

23  I'm talking about number of parties that you could write a

24  letter to or fax or send an e-mail to.

25          MR. SHIFF:  I believe it's approximate -- Your Honor,

53

1    that's consistent, I know.  I'm just trying to do some math in

2    my head, having spoken to number of people.  In a few

3    instances, I know of three members who had approximately fifty,

4    who I think --

5              THE COURT:  Each or together?

6              MR. SHIFF:  -- fifty each.  So they were the larger

7    ones, let's say.  So maybe in total you're talking, I think

8    those are smaller 200 to maybe 250 or some number like that.

9              THE COURT:  Are those different claimants or

10   different contracts?

11             MR. SHIFF:  Those would be -- I don't -- I'm not sure

12   of that, Your Honor.

13             THE COURT:  But let's assume that they're literally

14   different people, don't your clients have a record of whose

15   claims they bought?

16             MR. SHIFF:  They certainly do.

17             THE COURT:  So why can't they send them an e-mail or

18   a fax or whatever, that says we bought your account receivable

19   X in connection with -- well, do -- let's just say that.  We

20   bought your account receivable X.  You've got this -- you may

21   have received a notice from the debtor about the assumption of

22   this -- of a contract to which this account receivable relates.

23   If you did, we direct you to elect -- I don't know what your

24   clients want to elect, cash or stock --

25             MR. SHIFF:  Two points.  One is the cash versus

54

1   stock, the other is the amount.  But let's just say elect cash

2   to make it easy --

3             THE COURT:  Okay.

4             MR. SHIFF:  -- for these purposes.

5             THE COURT:  All right.

6             MR. SHIFF:  Because the default is stock.

7             THE COURT:  All right.  So what's to stop you from

8   doing that?

9             MR. SHIFF:  No.  Your Honor, nothing has stopped us.

10  And I think we have -- and I don't have it based on number of

11  creditors, but I know on dollar amount of the approximately

12  forty million or so, we have obtained, at least what believe,

13  and I know people will review them and may say differently, but

14  we believe we've obtained already doing that, thirty-two of --

15  I'm sorry, twenty-two million of the forty, and there's

16  approximately eighteen million that we have not been able to

17  accomplish that yet, and --

18            THE COURT:  Well --

19            MR. SHIFF:  -- there's a few reasons.

20            THE COURT:  -- when you say accomplish that.  Let

21  me -- maybe you were going to tell me in a second, but when you

22  say accomplish that, you mean get something back from them

23  acknowledging that they've received your instruction?

24            MR. SHIFF:  No, no.  Where they have told us or in

25  many cases copied us on the form that they filled out in

55

1   accordance with what we --

2          THE COURT:  But that's just -- that's just to give

3   you reassurance. As far as putting them on notice of what you

4   want, what's precluding you from doing that --

5          MR. SHIFF:  No, no.  We have --

6          THE COURT:  -- as far as -- you've done that?

7          MR. SHIFF:  -- we have Your Honor.  We have --

8          THE COURT:  Okay.

9          MR. SHIFF:  -- whenever -- and there are probably a

10  few due to the, what I'll describe as the reconciliation

11  problem, which is matching a purchase order to an invoice.  But

12  with respect to certainly the vast majority, we have done that.

13  The problem has become that either they don't have the forms in

14  some cases for -- either because they threw them out, or

15  because in the case of I know one is Toyota, that I'd heard

16  about earlier, the apparent -- the original notice went to

17  someplace in Michigan, I guess where the part was delivered

18  from, as opposed to the corporate office, which I think is

19  actually foreign.  And when we contacted the people we had

20  dealt with, they could not get their hands on the original.

21  And we sub --

22          THE COURT:  Well, why can't you --

23          MR. SHIFF:  -- subsequently contact KCC --

24          THE COURT:  -- why, in your notice to these people,

25  can't you, you know, in addition to referring to the form,

56

1    attach a copy of it?

2            MR. SHIFF:  Well, Your Honor, that's one of the

3    problems.  What the form does say, and that's one of the

4    problems with the relief we would like, is what the form does

5    say, at least, is you must file this -- it doesn't say it in

6    the order, it says it on the form, that you must file the

7    original.  So much so that if you request a replacement ballot

8    somehow, and we can talk about the difficulty we've had doing

9    that, the originals are deemed no good.  So one of the things

10   we had suggested in our motion, akin almost to a proof of

11   claim, that if you don't have the form you get from the debtor,

12   you fill out something that conforms with Official Form 10,

13   that would be one -- that would be one item --

14           THE COURT:  Right.

15           MR. SHIFF:  -- that would be helpful.

16           THE COURT:  And then -- but separate and apart from

17   whether you want to elect cash or stock -- elect cash, excuse

18   me, I guess the issue I have is, as between your clients and

19   your assignors, who are not assignors of the contract but of

20   the claim --

21           MR. SHIFF:  Simply of the claim, Your Honor.

22           THE COURT:  -- and the debtor, why should the debtor

23   get involved between you and your assignor with regard to the

24   cure amount?

25           MR. SHIFF:  Your Honor, I don't think what we're

57

1    asking for is for the debtor to get involved.  I think what

2    we're actually asking for the debtor is not to be involved in

3    that.  So to say that if we did file -- let's assume on behalf

4    of someone we had a power of attorney.  We go ahead and we file

5    a form and check whatever it is we want to check.  That that

6    form not be thrown out the door.  If somebody wants to come in

7    and then challenge that form or our transfer, almost like a

8    regular 3001, if someone's going to challenge that, that's

9    fine.  But what the procedures as they're being described, and

10   I actually thing there's some ambiguity in the order we can

11   discuss, but what this is essentially saying is don't waste

12   your time, creditor, don't bother mailing in any form.  And

13   even if you wanted to mail something in you couldn't because

14   you don't have a copy of the original and we don't accept

15   anything else.  So --

16            THE COURT:  Well, no.  You should go through that

17   some more.  That doesn't sound -- they're getting a notice that

18   says we're going to assume your contract.  We think the cure

19   claim is X.

20            MR. SHIFF:  Correct.

21            THE COURT:  If you disagree, send back --

22            MR. SHIFF:  The form.

23            THE COURT:  -- the form with the cure claim on it.

24            MR. SHIFF:  Right, and they --

25            THE COURT:  We've already talked about the

58

1    election --

2            MR. SHIFF:  Okay.

3            THE COURT:  -- so that, I don't see why you can't

4    just instruct them on what to do on that.

5            MR. SHIFF:  Because logistically -- we can, but the

6    logistics, because of the timing, whether it's the holidays,

7    whether it's because we didn't have some of the information --

8            THE COURT:  But --

9            MR. SHIFF:  -- from the debtor, we haven't been able

10   to get it done.  And on that front, we're asking for a few days

11   to finish getting this, what we'll describe the eighteen

12   million, as I described.

13           THE COURT:  -- but you sent out the notices -- when

14   you say get it done, what you haven't done, necessari -- you've

15   done all you can do.  You sent out the notices to all these

16   people saying how you want them to elect, right?

17           MR. SHIFF:  We've sent them out, certainly to most.

18   As I said, there are some, I think, we've had difficulty

19   identifying from the information we have.  But in most, we've

20   sent them out.

21           THE COURT:  But why don't -- I mean, I'm assuming you

22   sent them out to everyone who had an executory contract that

23   you had an assignment that related to that contract?

24           MR. SHIFF:  We sent out as many as we could identify,

25   Your Honor.  I can't -- I just don't know exactly who sent out

59

1   what.

2          THE COURT:  But when you say identify, your clients

3   have a list of all their assignors?

4          MR. SHIFF:  Correct.

5          THE COURT:  I don't know why you wouldn't send it out

6   to every one of them.

7          MR. SHIFF:  We -- Your Honor, we first got that list,

8   I believe, was it January 4.

9          THE COURT:  No, your clients entered into

10  transactions with these people.

11         MR. SHIFF:  No, but the list is then getting cured.

12         THE COURT:  Unless they threw away their -- I mean,

13  they have their records, right?

14         THE COURT:  They have their -- right.  We could send

15  it out to every creditor we bought a claim from, or every

16  creditor that looks like it might be a contract.  And they may

17  have done that.  I can't tell you what each of these seven have

18  done, but I know the result has been --

19         THE COURT:  They should have.

20         MR. SHIFF:  -- okay.

21         THE COURT:  Shouldn't they?  I mean, if they had the

22  power of attorney to direct them what to do, I would assume

23  that's how they would exercise it --

24         MR. SHIFF:  And I think in most --

25         THE COURT:  -- by telling them what to do.

60

1          MR. SHIFF:  -- and I'm just trying to be very careful

2    because we do have, as I said, seven clients, with many of

3    these.

4          THE COURT:  Right.

5          MR. SHIFF:  I think in most instances, at least, that

6    is what they have followed.

7          THE COURT:  Okay.

8          MR. SHIFF:  The result of which has been, we believe

9    we've gotten our hands on -- and we're still talking to some of

10   them.  I'm sure a lot will come in in the last minute, we've

11   got our hands on fifty-three percent or so.

12         THE COURT:  And if one or two of those don't submit

13   it in time, isn't that a matter between you and them?

14         MR. SHIFF:  Your Honor, certainly we will -- if

15   something goes wrong here, certainly we will have whatever

16   rights we have against them.  There's no doubt about that.  But

17   what we're talking about -- I think what we're talking about

18   doing here doesn't get -- doesn't get in anyone else's way.

19   It's a couple more days --

20         THE COURT:  Well, it could, though --

21         MR. SHIFF:  -- to accomplish --

22         THE COURT:  -- because aren't you asking for an order

23   that says that the debtors should accept your election on any

24   contract that you elect?

25         MR. SHIFF:  Your Honor, it would certainly be our

61

1    preferred form of relief.  However, we would --

2            THE COURT:  But how do I know that you're entitled to

3    make that election?  We don't have any information

4    ultimately --

5            MR. SHIFF:  Correct.  But what we could do, Your

6    Honor --

7            THE COURT:  -- about what rights you have vis a

8    vis --

9            MR. SHIFF:  -- but what we could do, Your Honor --

10           THE COURT:  -- each of your assignors.

11           MR. SHIFF:  -- is, to the extent we do make such an

12   election, and we get it in now by the date, whatever the right

13   date is, and then someone later, the debtor, whoever, has a

14   problem with that, or someone wants to prove that, whether

15   that's before this Court or somewhere else, at least we haven't

16   been prejudiced by having it prejudged that there is no way we

17   can do it.

18           THE COURT:  So you're talking about a provisional

19   election?

20           MR. SHIFF:  I would be -- that, at least, would give

21   us some comfort that our rights, at least, to -- will not have

22   been impaired because we couldn't reach the person or whatever

23   happened.

24           THE COURT:  But again, I mean, rights against whom?

25           MR. SHIFF:  It would be our right to claim -- it

62

1    would be both our right to say that the -- our election is

2    valid -- let's say cash.  Let's make it easier.

3                  THE COURT:  No, but again, your rights really are

4    through your assignors, aren't they?

5                  MR. SHIFF:  Our rights are through our assignors?

6    Well, certainly -- that's who we acquired them from, certainly,

7    yes.

8                  THE COURT:  Well, I mean, what you're saying, what

9    you're trying to protect is your rights being impaired, but

10   what rights are those?  Are those rights vis a vis the debtor

11   or are those rights vis a vis the assignors?

12                 MR. SHIFF:  It's the right to receive this cure

13   payment.

14                 THE COURT:  And where does that come through?

15                 MR. SHIFF:  The right to receive the cure payment

16   comes through the original transferor, if that's what the

17   Court's getting at.

18                 THE COURT:  Okay.

19                 MR. SHIFF:  But the problem --

20                 THE COURT:  Again, that's why I --

21                 MR. SHIFF:  -- becomes, however, if all this stuff

22   goes out the door and these -- our election forms, as I'll

23   describe them, are ignored or, you know we can't mail them in,

24   or whatever it is, right.  And then if everything gets given

25   out to these various multiple address entities, we then never

63

1  had the right to either prove up that we did have the right to

2  make the election, and then are left in the very difficult

3  position of trying to chase people down for cash --

4           THE COURT:  But why can't you prove -- I don't

5  understand why you couldn't prove that up, as against your

6  contract party.

7           MR. SHIFF:  We might be able to ultimately prove that

8  up.  Yeah, we will be able to prove that up, right?  We'll have

9  to go sue them for not having followed our election --

10          THE COURT:  Right.

11          MR. SHIFF:  -- and then we're running around chasing

12  whatever number of entities --

13          THE COURT:  But maybe that's how it should be.

14          MR. SHIFF:  -- there are.

15          THE COURT:  Why shouldn't it be that way?

16          MR. SHIFF:  It shouldn't be that way, Your Honor,

17  because I think consistent with the way the bankruptcy transfer

18  rules work, when you put on notice that you are the party to

19  receive various, you know, consideration and treatment on a

20  claim, that that is actually presumptively, assuming nobody

21  objections, is presumptively valid.  And we're not asking the

22  Court to necessarily give us that alt -- if that was even put

23  into almost an escrow account, or something, that we're not

24  left trying to chase our tails to get it.  And maybe more

25  importantly than the money, the election, once made, I mean, is

64

1    irrevocable.  Either they'll get stock or they'll get cash.

2    And, you know, rather than simply being stuck with that, since

3    our rights are -- we at least believe our rights, what they

4    are.  I know, it could be subject to some dispute.  We have

5    valid 3001s on file.  That those rights just be honored, and at

6    least protectively by not ignoring our forms and letting

7    everything out the door.  Because we would --

8              THE COURT:  But aren't we talking --

9              MR. SHIFF:  -- lose the right to elect -- I'm sorry.

10             THE COURT:  -- we're talking about cure claims here

11   now, right?

12             MR. SHIFF:  Correct, Your Honor.  Which, I mean, the

13   cure claim, and I know the debtor has some stuff on this which

14   I saw in their reply, I mean part of the cure claim is the

15   payment of the prepetition account receivable.  That's the very

16   number we're talking about, and we were supposed to have

17   assistance reconciling.  And that's the very amount we

18   assert --

19             THE COURT:  But haven't you all gone through your

20   claims?

21             MR. SHIFF:  We are part of the way through.  I mean,

22   there's certainly been a lot of progress made.  I know the

23   debtor cited to some numbers.

24             THE COURT:  Well, but if -- I mean, that's what they

25   committed to do, is to go through all the prepetition claims.

65

1    If those are gone through and reconciled --

2              MR. SHIFF:  Right.  But Your Honor, for example,

3    let's assume we're talking about reconciling claim X for fifty

4    dollars, and we're talking back and forth.  Then they send a

5    cure notice out to party Y that says, all right, your cure now

6    is, I don't know, ten dollars, let's say, which we don't get,

7    we don't see --

8              THE COURT:  Was there a --

9              MR. SHIFF:  -- then the reconciliation --

10             THE COURT:  -- I'm sorry, was there a deadline on the

11   reconciliation effort?

12             MR. SHIFF:  No, I believe it was a best -- what was

13   it?

14             MR. BUTLER:  Commercially reasonable efforts.

15             MR. SHIFF:  Commercially reasonable efforts.

16             MR. BUTLER:  By the confirmation date.  And things

17   would only be allowed if the debtors agreed.  There was no

18   agreement to allow a single claim.

19             MR. SHIFF:  That's correct, Your Honor.  I think the

20   only deadline was on us to get them an initial list of claims a

21   few days after the disclosure statement hearing, which we did.

22   But, we're simply, because of where we stand right now, we know

23   there are forms out there.  We know we have -- at least

24   believe, we have the right --

25             THE COURT:  But if you're going through this

66

1    reconciliation process --

2              MR. SHIFF:  Correct.

3              THE COURT:  -- you must have a list of your

4    assignors.

5              MR. SHIFF:  Correct.

6              THE COURT:  And a list of the prepetition accounts

7    receivable.

8              MR. SHIFF:  Correct.

9              THE COURT:  Which you're pretty far along in deciding

10   what that amount should be.

11             MR. SHIFF:  In most cases.

12             THE COURT:  You could certainly instruct them in good

13   faith what you think it should be.  You can instruct the

14   assignors what you think it should be, right?

15             MR. SHIFF:  You Honor --

16             THE COURT:  So why can't you send them all, just as

17   you would an election notice, why can't you say this is a

18   reminder that, you know, whatever day, July 15, 2007, you

19   assigned us account receivable X.  You may have received, in

20   December, an assumption notice from the debtors that requires

21   you to do two things.  One, if you wish to have a cash

22   distribution, make an election.  Two, decide whether the cure

23   amount is right or not.  This is to advise you that we instruct

24   you to make the cash election, and we instruct you that our

25   belief as to the cure amount is whatever it is, fifty dollars.

67

1    Under our agreement with you, you have an obligation, you've

2    given us a power of attorney, whatever the language is, to take

3    our instructions, fill out the notice and send it back.

4            MR. SHIFF:  Your Honor, we have done what we could do

5    exactly like that, literally over the past week, because that's

6    really when the number started to come in.

7            THE COURT:  Okay.

8            MR. SHIFF:  And sitting here today --

9            THE COURT:  But why -- as far as the numbers --

10           MR. SHIFF:  -- we really can't do anything else --

11           THE COURT:  -- but wait.  But you already had the

12   numbers.  Why couldn't you just send that out before that?

13           MR. SHIFF:  We didn't know -- we didn't have lists

14   of -- we first received lists --

15           THE COURT:  But you had lists of people.  You had the

16   assignors.  And you had the claim.

17           MR. SHIFF:  Right.  But we didn't have the numbers,

18   Your Honor.

19           THE COURT:  What numbers?

20           MR. SHIFF:  Because you have --

21           THE COURT:  The numbers of what?  I'm sorry.

22           MR. SHIFF:  In other words, the claim -- a claim with

23   a certain party, you know, company X's 1,000 dollar claim,

24   could be comprised of different -- or is in most instances

25   comprised of different purchase orders or subsets, some of

68

1    which are being -- as we've now seen what's being assumed, some

2    of which are being assumed, some aren't.  So you need,

3    literally, to have all that information and then go back and

4    say, okay, they've taken out three of the ten pieces.  Okay,

5    for that don't settle for less than 300 dollars.

6            THE COURT:  Okay.

7            MR. SHIFF:  That's what we haven't been able to do.

8            THE COURT:  All right.

9            MR. SHIFF:  But, Your Honor, certainly -- listen.

10           THE COURT:  I understand.

11           MR. SHIFF:  We've done what we could do.

12           THE COURT:  Your assignments were in bulk from

13   individual creditors as opposed to by particular contract.

14           MR. SHIFF:  Certainly, at least, in most instances,

15   yes.  Your Honor, certainly, we have done -- and these are

16   people, obviously, who are in this business and they've -- this

17   is not the first case, you know, where they've had trade

18   claims.  They've gone out and they've done what they can.

19   There is -- even if we can come up with some other, maybe, ways

20   they should have phrased their e-mails, sitting here today with

21   the deadline tomorrow in California, they certainly cannot do

22   much else.  I mean, they are working the phones right now.

23   They are having, as I said -- started to say earlier, seeking

24   to get replacement ballots out of the claims agent.  And there

25   has been a delay.  And not to aspire any intention to that

69

1    other than they're very busy, maybe with ballots and notices

2    and all kinds of notices.  And as to getting those ballots,

3    a) so they -- or at least having a couple days to get those

4    duplicate or original election forms to be executed, either by

5    them at least as a protective matter, or by the original

6    transferor as we, you know, continue to try to work them; we

7    don't see any real prejudice to the debtors.  Now, I know --

8            THE COURT:  I -- one point I'm confused about, which

9    is, as far as the relief you're seeking is concerned, what sort

10   of provisional instructions would you give the debtor if you

11   don't know the cure amounts?

12           MR. SHIFF:  Well, Your Honor, I think it would be --

13   the way, I mean, the way the system is set up, the very system

14   that's in place right now, let's just take the good old classic

15   example.  Regular executory contract party gets a notice, never

16   transferred his claim.  He says, you know, he thinks it's

17   twenty dollars, I mean, you know, he thinks it's twenty

18   dollars, the debtor thinks it's ten dollars.  And now the

19   plan --

20           THE COURT:  But he knows what he thinks.  He's going

21   to say twenty dollars.

22           MR. SHIFF:  I may have misspoke.  There's a dispute

23   between the debtor and the non-debtor contract party as to the

24   amounts.

25           THE COURT:  Right.

70

1          MR. SHIFF:  The procedures have a process by which

2   that person's supposed to file an objection post effective

3   date.

4          THE COURT:  Right.

5          MR. SHIFF:  It gets reconciled.  And then ultimately

6   after a final order, amounts that are reserved on behalf of

7   that claim get paid.  So what we're suggesting is this should

8   just be treated no differently.

9          THE COURT:  But do you put in?  What would your

10  clients put in, in their cure -- in their cure notice?  They

11  don't know.

12         MR. SHIFF:  In some cases we don't know.

13         THE COURT:  So how could they put it in?

14         MR. SHIFF:  What we'd like to get -- we'd like to use

15  those three days that we're talking about or five days, to get

16  the additional information.  And it's one of the problems of

17  relief we do seek to get that additional information from the

18  debtors.

19         THE COURT:  But don't --

20         MR. SHIFF:  Or there may be cases where --

21         THE COURT:  -- but don't --

22         MR. SHIFF:  -- we use -- sorry.

23         THE COURT:  -- the customers -- don't the trade

24  creditors know what they're owed?  I mean, why wouldn't they

25  put in exactly what they sold to you?

71

1        MR. SHIFF:  They might.  They might not.  But --

2        THE COURT:  But why wouldn't they?

3        MR. SHIFF:  But they might have thrown it away, in

4   may cases.

5        THE COURT:  Well, that -- but -- the throwing away,

6   you know, to me that's their look out.  I mean, they should

7   know better than that.  I mean, why would they -- I mean --

8        MR. SHIFF:  I mean, there's just no way to --

9        THE COURT:  -- they know they entered into a

10  transaction with you.  They know that the cure is going to be

11  paid a hundred cents on the dollar if it's assumed.  To just

12  throw it away and, you know -- that's, you know --

13        MR. SHIFF:  Your Honor, I'm using the word probably

14  thrown away, a little too loosely or colloquially.  However, in

15  the case of example where the original form is in Detroit and

16  the entities and we entered into the deal with are in Japan --

17        THE COURT:  All right.  No, I understand your point

18  about the original form.  And I'm going to talk to Mr. Butler

19  about that.  But as far as not relying upon your contract party

20  to put in the same amount that they sold to you, I think that's

21  pretty paranoid, isn't it?  I mean, they sold an account

22  receivable to, you know, Contrarian or whoever.  They probably

23  made some representation --

24        MR. SHIFF:  Certainly.

25        THE COURT:  -- in the agreement, that that's what

72

1    they were owed.  And then when the debtor sends them a notice

2    to say what are you owed, for them not to put it in is pretty

3    farfetched.

4              MR. SHIFF:  Your Honor --

5              THE COURT:  Why should the debtor have to recreate

6    what they're owed.  They know it.  They sold it to you.  They

7    made a representation to you.  You paid them a certain

8    percentage on the dollar for that very account receivable.

9              MR. SHIFF:  Correct, Your Honor.  And, but, the facts

10   are, and I'm -- I don't want to be accused of testifying from

11   the podium or anything, the facts are, we have reached out to

12   people, and there are times when either, again, the throw --

13   what I'm using as the throw away, but they haven't done it or

14   they haven't bothered to do it, or it's missing, or what have

15   you.  And I know, we'll discuss replacement ballots

16   subsequently.

17             THE COURT:  But, you know, if you haven't done it,

18   they -- I mean, I think that's kind of a risk that you take

19   when you deal with these people.

20             MR. SHIFF:  Well, Your Honor, that may be.  But we

21   also think there is a -- at least on this piece of it, there is

22   a fix that does reduce that risk and protects people's rights

23   and does not --

24             THE COURT:  And what is that fix?

25             MR. SHIFF:  We think the fix is a combination of

73

1   items, is a few more days to get this done, because we have not

2   been able -- and I say get this done, get -- well we'll come

3   back to who execute -- but get executed forms with the proper

4   amounts into KCC's hands.  So that would be one item.  The --

5          THE COURT:  Well, let me stop you there.  Why

6   wouldn't it be better to see what actually happens by the

7   deadline.  And then people can make a motion under Rule 60 if

8   in fact, you know, if that's warranted.  So that the person

9   who's been negligent isn't rewarded, but the person who has a

10  valid basis for being able to change their ballot has the right

11  to come back under the rules.  Why decide this now?

12         MR. SHIFF:  Your Honor --

13         THE COURT:  As you said, I mean, people are sending

14  in their ballots.  A lot of people don't send their ballot till

15  the last day.

16         MR. SHIFF:  No question.

17         THE COURT:  And your twenty-two million dollar may go

18  up to forty million.  You may only have a two million dollar

19  problem, and that -- maybe that's with Toyota, and you know,

20  you may rather have a claim against Toyota than against Delphi.

21         MR. SHIFF:  Your Honor, we would like -- what we're

22  trying to avoid is having this date and this issue sort of just

23  be a complete bar to our being able --

24         THE COURT:  Well, nothing's a complete bar under the

25  rules.  You know?  Even a bar date's not a complete bar under

74

1    the rules.

2          MR. SHIFF:  Right.  And I understand that.  And I

3    don't know if excusable neglect would apply to this.  That

4    might be --

5          THE COURT:  I don't know.  Maybe it would.

6          MR. SHIFF:  -- something someone has to argue.

7          THE COURT:  I don't know.

8          MR. SHIFF:  That would be an interesting -- right.

9    That would be an interesting issue.

10         THE COURT:  Because we don't know yet.  No, I'm

11    sorry.  I think excusable neglect would apply.  But I don't

12    know whether it would be sustainable or not because we don't

13    know the facts.

14         MR. SHIFF:  Right, well ultimately you will not know

15    the facts until you identify which of the --

16         THE COURT:  Right.

17         MR. SHIFF:  -- 200, whatever they are, weren't done

18    "properly".

19         THE COURT:  Or five.  Who knows?

20         MR. SHIFF:  Or whatever the number is, yes, Your

21    Honor.  That's certainly correct.  What I know we're going to

22    hear, or I expect we're going to hear is, well, you know, you

23    sat on your rights.  You didn't do anything.  You didn't try to

24    fix the situation, and --

25         THE COURT:  But that may be legitimate.

75

1            MR. SHIFF:  Okay.  Well --

2            THE COURT:  Not you guys.  But, you know, whoever,

3    Toyota.

4            MR. SHIFF:  Right.  One way to resolve that is at

5    least have -- allowing at least for the -- and maybe people

6    don't need permission to do this, and I don't think they do, I

7    mean, transferees can send in ballots and say hey, this is a

8    valid ballot.

9            THE COURT:  But you don't know what it -- but you

10   don't know what --

11           MR. SHIFF:  That's the problem.  Right, Your Honor.

12   That's exactly the problem.

13           MR. BUTLER:  Your Honor, at some point, can the

14   debtors be heard, because this is not --

15           THE COURT:  Yeah.  I'm sorry.  I've probably been

16   going on too long myself.  But I'm just trying to figure out

17   what really is being sought here, so.

18           MR. SHIFF:  If it would be helpful, I can -- I can

19   summarize what's being sought or --

20           THE COURT:  Okay.

21           MR. SHIFF:  -- perhaps the Court --

22           THE COURT:  All right.

23           MR. SHIFF:  -- does know.

24           THE COURT:  Okay.

25           MR. SHIFF:  All right.  Very briefly.  We would

76

1    like -- we seek to have the deadline that is tomorrow moved to

2    January 16th.  We seek to have the authority, at least

3    protectively, to file, to the extent we can, on behalf of the

4    transferors.  We seek to have the debtors work with us over the

5    next -- through that period, whatever it may be, January 16th,

6    work with us to get the best information possible --

7              THE COURT:  But what is that -- what does that mean?

8              MR. SHIFF:  -- that is to try -- reconciliation which

9    we believe they have as to the scheduled claim or the proof of

10   claim as it may be, and the -- essentially the cure -- the cure

11   amount/purchase order number.  And I think finally, and this

12   one may be an issue to deal with another time, or it may tie to

13   the other issue, is under the order, it gives the debtors the

14   authority, but does not direct them, to make payments to --

15   directly to the transferors.  And we would ask either that they

16   be directed, with respect to our group, not all to make them to

17   us, or in the event there is at least a dispute as to who

18   should get the payment --

19             THE COURT:  Wait --

20             MR. SHIFF:  -- provide for an escrow --

21             THE COURT:  -- I'm sorry.  Directly to transferor?

22             MR. SHIFF:  I'm sorry?

23             THE COURT:  You mean transferee?

24             MR. SHIFF:  Under the order -- maybe I misspoke at

25   the end.  The order gives them the authority but not the

77

1    direction to pay the transferor.

2            THE COURT:  Oh.  But you want it to pay the

3    transferee?

4            MR. SHIFF:  We would like them to pay the transferee.

5    And if there is a dispute or a problem, we would understand,

6    certainly, the money going into what's called an escrow, rather

7    than us having to chase around the globe for that payment.

8            THE COURT:  But, on that point --

9            MR. SHIFF:  And in certain instances, If I -- I'm

10   sorry, Your Honor.  I just --

11           THE COURT:  -- no, you go ahead.

12           MR. SHIFF:  Last one.  I'm sorry, Your Honor.  In

13   certain instances, although we've been focusing on stock -- on

14   cash, some of the other items that might get distributed here

15   may require quick action from people, be it stock or right.

16   And we're concerned, just as the experience we've had here

17   trying to track down these forms, if we have to try to track

18   down stock or rights in a limited time frame, we may very well

19   be frustrated again.  And we would think, if there's any dis --

20   we think it should come to us --

21           THE COURT:  Well, but, what -- on what authority

22   would you have the debtor pay the -- pay your clients in

23   respect to cure claims as opposed to --

24           MR. SHIFF:  We believe it's under 3001(e).  We

25   believe it's our claim.  They've assigned us the rights.  It's

78

1    been duly filed.  And we think it's simply just like a proof of

2    claim -- just like we got the ballot for the same claim to make

3    those elections, it would be the same exact issue here.  And

4    those distributions are coming to us.  There's just no

5    difference.  And I know there's a citation to a, whether it's a

6    law review article or a newspaper article in the papers that

7    talk about rejection damages claims being different than cure

8    claims.  But what we're talking about here, at least for the

9    most part are -- is that very amount, is that prepetition

10   amount that has to be cured and that we have assignments on.

11          THE COURT:  Well now, this was brought on, on one

12   day's notice by order to show cause --

13          MR. SHIFF:  Yes, Your Honor.

14          THE COURT:  -- but none of your contract parties have

15   effectively had notice of this.

16          MR. SHIFF:  That's correct.  Other than we've -- the

17   ones we've been speaking to, reach out to, but yes.

18          THE COURT:  So I don't see how I can grant that type

19   of relief without them having notice of this.

20          MR. SHIFF:  That's fine, Your Honor.  I think there's

21   time on that last point to deal with it.  That was one of the

22   reasons we had suggested in our papers, and as -- you're not

23   supposed to propose compromises in the papers.  One of the

24   reasons we even had the notion of having at least an escrow

25   mechanism so we put there, as to that last prong, certainly we

79

1  can, if we need to, expand the relief.  We would also hope or

2  expect that if we got just almost letters from those people

3  directing the debtors to pay us, maybe it gets obviated on

4  those?

5      THE COURT:  I guess I'm still -- I still don't

6  understand.  If you don't know what the cure amounts are, and

7  the whole premise of this is that you don't, how can you -- how

8  can you file cure amounts on behalf of transferees and have the

9  debtor escrow them?

10     MR. SHIFF:  Your Honor, we can do two things that are

11 relevant.  One, more time, maybe we do get the right number.

12 Two, there is still a cash versus stock election that is

13 relevant to us and --

14     THE COURT:  No, I understand.  That's a separate

15 point.

16     MR. SHIFF:  -- okay.  As to that piece, certainly we

17 don't need to have the number.  We can take a quick look at the

18 number and know what we want to elect.  I don't want to be

19 prejudiced --

20     THE COURT:  Well, wait --

21     MR. SHIFF:  -- irrevocably if someone else made the

22 wrong --

23     THE COURT:  -- I'm sorry.  I've been -- maybe I've

24 been incorrectly assuming -- I'm assuming that your clients

25 would elect one way across the board for each client.  I mean,

80

1    are you telling me that --

2          MR. SHIFF:  Oh, you mean in terms of the election

3    itself --

4          THE COURT:  Yeah.

5          MR. SHIFF:  -- as opposed to the amount?  Yeah, no, I

6    think that's safe to assume.

7          THE COURT:  Okay.  All right.  Okay.

8          MR. SHIFF:  Thank you, Your Honor.

9          THE COURT:  I want to hear from Mr. Butler, please.

10         MR. BUTLER:  Your Honor, the first point, is I don't

11    understand why we're going through this hearing.  It wasn't Mr.

12    Shiff who stood before the Court representing these creditors,

13    it was Mr. Rosner and Mr. Zinman at the disclosure statement

14    hearing.  But they settled.

15         THE COURT:  Say -- well, I'm sure they talked with

16    him.

17         MR. SHIFF:  Same firm.  Same clients.

18         THE COURT:  I expect they talked with him.

19         MR. BUTLER:  And the order that they agreed to that

20    was signed by Your Honor at the disclosure statement hearing,

21    the solicitation procedures order, says at paragraph 44, and I

22    quote, the generic notices spoke to "is the only notice the

23    debtor shall be required to provide to these claims purchasers

24    with respect to the cure, and these claims purchasers shall

25    have no rights or recourse against the debtors with respect to

1    the cure."  The mechanics -- the same order, at paragraph --

2    the immediately -- and that's at paragraph 44 of that order;

3    at paragraph 43 of the order, there is very specific language

4    about the fact that these cure notices will go out to the

5    counter parties to the supply contracts and the payments will

6    go to them.  And why is that?  Be cause this is cure, and

7    Section 365 and not a claim.  And there is no authority.  And

8    Mr. Shiff and Mr. Zinman didn't quote any authority to suggest

9    that they -- that this is -- cure constitutes claim for

10   purposes of voting, for purposes of claims reconciliation or

11   anything else.  Cure is tied inextricably to the underlying

12   contract.

13        They concede -- they don't have the contract.  365

14   says the debtors deal with the contract vendor, the other party

15   to the contract, the counter party, if we seek to assume the

16   contract.  And we have to cure the defaults under that contract

17   with the vendor.  Not with some third party.  There's no case

18   law I'm aware of, there's certainly nothing in the statute that

19   says that a claims trader can acquire the right to cure and

20   can, in my view, interfere, perhaps even tortiously interfere,

21   with the contractual relationship between the debtor and its

22   contract vendees, particularly in this case, where these supply

23   agreements, all right, do not permit assignment.  And we put in

24   our papers, we concede that the Michigan Uniform Commercial

25   Code does allow accounts but not under other rights, to be

82

1    assigned, all right?  But what was assigned -- whatever was

2    assigned, and whatever those agreements were -- that those

3    transfer agreements are, not one of which is in evidence, and

4    not one of which we've seen; whatever those transfer agreements

5    are, whatever rights they extend to some 1,187 claims that are

6    out there, dealing with, you know, many hundreds of contracts

7    if not thousands of contracts and purchase orders, are whatever

8    they are between the individual claims purchaser and the

9    contract vendee.  That is not -- we don't care what those

10   arrangements are.  It's none of our business, and if they,

11   between them have allocated rights that ultimate -- so long as

12   it, by the way, doesn't breach our agreement and so long as

13   it's not -- you know, it's enforceable.  If it's enforceable,

14   they can deal with that in a State Court process outside of the

15   Bankruptcy Court.

16        But this isn't Rule 3001 territory.  This is Section

17   365 territory.  All right?  And this issue has been dealt with

18   before in this Court in this case, and there's a final order

19   that determines it.  And these parties were at the hearing,

20   objected, and settled on the record.  So I don't understand how

21   we're getting into the merits of what they'd like to have.  I

22   understand, and I'm frankly, as a personal matter, sympathetic

23   to some of the issues they may be having now.  Just as the ABI

24   Journal article talked about, that we attached as Exhibit E to

25   our response, claims traders who buy executory contracts that

83

1    may be assumed, all right, may not be purchasing what they

2    think they're purchasing.  The point's been made.  Exhibit E

3    lays it out specifically.  The commentator -- the commentators,

4    we quoted the paragraphs in our reply here.  The paragraph --

5    the commentators have the warning.  They said look, a cure --

6    "A cure is not a payment on account of rejection damages claim.

7    It is a payment to a contract counter party to facilitate the

8    debtor's ongoing performance under the contract.  Under those

9    circumstances, there is no rejection damages claim and the

10   debtor can successfully move to disallow any such claim.  Thus

11   absent some arrangement between the three parties, the debtor

12   will pay the cure amount to the contract counter party, not to

13   the purchaser of the rejection damages claim."  And it goes on.

14        There is -- and when you look at the case law, you

15   know, look at 1126.  Someone whose -- a contract's going to be

16   assumed can't vote.  I mean, they have -- whatever they bought

17   out there, and he made the comment, Mr. Shiff made the comment,

18   that he's got a sophisticated -- these are sophisticated

19   purchasers, all right.  And these sophisticated purchasers

20   bought trade claims, but they didn't -- they didn't focus on

21   the fact that they were buying trade claims of ongoing supply

22   agreements which were subject to terms and conditions with

23   Delphi, which couldn't be abrogated.  And therefore they had to

24   use the exception provision under the Michigan Uniform

25   Commercial Code, which controls, which says all you got is an

84

1    account.  All right?  That doesn't answer the question under

2    the bankruptcy code.  Section 365 controls this issue.

3              And it's not like we haven't -- this is not a new

4    issue in this case.  This issue was contemplated.  This relief

5    relating to how we would deal with cures was filed in the

6    original solicitation procedures motion back on September 6th.

7    Lots of parties have looked at these papers over the last three

8    or four months.  And at a contested disclosure statement

9    hearing this order and this relief was granted.  And we went

10   the extra mile.  We added a provision, and I acknowledge, the

11   notice to claims purchasers provision, we added.  After

12   consultations with the committees and talking about other

13   possibilities, we added a claim purchasers provision in our

14   omnibus reply that we filed on December 5th, which found its

15   way into the order;  which said, to the extent we knew there

16   was a claims purchaser on the docket, we sent them,

17   essentially, a warning flag that said -- it's a generic notice,

18   Mr. Shiff was right, it was a warning flag saying, better check

19   out what your relationships are with your purchasers -- or with

20   your assignors.  Better figure out whether they're executory

21   contracts covered by cure.  And you ought to go protect

22   yourself if you have those rights.  Because we don't know

23   whether you do.

24             Nothing required us to do that, but in order to try

25   to protect the people here as best we could as the debtors, we

85

1    sent that notice out.  And that was under paragraph 44 and

2    Exhibit P of the -- of the solicitation procedure order.  And

3    those are the notices that caused them to focus on this issue.

4    Maybe they hadn't focused on it before.  But as Your Honor

5    pointed out, and as we said in paragraph 18 of our reply, they

6    could have had either, at the disclosure statement procedures

7    hearing when we had -- you know back on December 6th or

8    December 7th or December 8th, they could have sent a notice out

9    if they had the rights under their contracts, which I don't

10   know that they do, they could have sent a notice out there to

11   their entire acquisition file saying these are our rights, this

12   is what we instruct you to do.  When you get these notices we

13   expect you to send them to us.  Whatever they choose to do.

14   But that's between them and the counter party to the contract.

15         And I'm not saying -- standing here, Your Honor,

16   telling you that we even have agreed to that, because it's not

17   clear to me that the rights on a nonassignable contract, which

18   is nonassignable pursuant to its terms.  If they didn't look at

19   the contracts that they purchased accounts from, you know, I

20   can't help that.  But the right to cure is inherently intrinsic

21   to the contract and to the terms of the contract under 365.

22         So we had discussions with -- over the last week with

23   the claims purchasers here.  But we're not prepared to

24   essentially rewrite a solicitation procedures order which is

25   unambiguous and to which they agreed.  And we'd ask the Court

86

1     to enforce the order and the settlement against the settling

2     party.  And so, I mean, I just -- I really, truly, don't

3     understand why we're here other than they have recognized that

4     they have some risk associated with having acquired contracts

5     that may in fact -- accounts related to contracts that may be

6     assumed as opposed to simply having the payments made.  But I

7     don't believe there's going to be any payments made on it.  To

8     the extent we're -- assuming a contract, Your Honor, I believe

9     is a matter of law.  We will not be making any payments on

10    account of the claims that have been reconciled.  If a claim

11    has been reconciled and there's a contract cure payment made,

12    that claim will get no payment on it.  That's the law.  That's

13    what the code says.

14            THE COURT:  What about the point Mr. Shiff made that

15    they've contacted some of these contract counter parties who

16    say, well we don't have the cure form?

17            MR. BUTLER:  That could raise -- I mean, Your Honor,

18    we're presuming at confirmation we'll be able to prove that

19    we've properly served people.  Assuming we've properly served

20    people, and a contract party either throws away the form or

21    doesn't throw away the form, you know, all that does is

22    create --

23            THE COURT:  Aren't they able to get a -- I mean,

24    within the deadline, aren't they able to get a copy and send

25    that in?

87

1          MR. BUTLER:  They can contact us back and we can

2     issue a new ballot to them.  But these bal -- some of the

3     ballots, Your Honor, are like currency.  And you're right, the

4     balance are -- the ballots are issued uniquely to a particular

5     place.  We weren't going to send out 300 ballots for the same

6     cure notice to somebody.  And so we -- and, you know, those

7     procedures were all laid out in the order they're bound to.  We

8     didn't dream this up, Your Honor.  It's in the solicitation

9     procedures order.  The forms -- the form he's speaking about,

10    is the form -- is paragraph 45 and Form Q, Attachment Q to the

11    solicitation procedures order.

12          THE COURT:  So if, for some reason, the debtor is

13    dilatory in sending out a replacement ballot, that would

14    presumably be a basis to extend the deadline or relief

15          MR. BUTLER:  Yes.  If we got a request.  I mean, I'm

16    not aware of -- maybe there have been requests flowing into KCC

17    for replacement ballots from the proper party.  If Mr. Shiff's

18    clients are calling and asking for ballots, they're not

19    entitled to them.

20          THE COURT:  Okay.

21          MR. BUTLER:  That's not who's entitled to them.  The

22    contract -- the contract counter party is entitled to these

23    ballots.  They're entitled to make the cure decisions.  And I

24    don't know that Mr. Shiff's clients have any rights to

25    interfere with that.  And ultimately, if they press those

88

1    rights, it's not clear to me that they're not tortiously

2    interfering with the estate.

3            THE COURT:  Well, if they're not -- the other

4    alternative he raised would be to get out of the process of

5    getting between the debtor and the contract parties, but simply

6    to make a provisional election themselves.  What -- where would

7    the harm be in that?

8            MR. BUTLER:  Under what right do they have to do

9    that?  They don't own the -- they're not the contract -- they

10   admitted -- Your Honor asked the question, they admitted, they

11   are not the contract -- they are not the contract counter

12   party.  They have no rights under 365.  All right?  And the

13   solicitation procedures order, which binds them, I keep coming

14   back to this order, it's like we're -- we're like rewriting

15   history as if we didn't have a contested disclosure statement

16   hearing.  We had a contested disclosure statement hearing.

17   They objected.  All right?  We spent hours negotiating a

18   settlement.  It was put on the record and approved by Your

19   Honor, and then Your Honor entered an order.  Now they don't

20   like what the order says.

21           I don't know how we have that conversation, frankly.

22   I mean, I don't know how we get beyond that point.  But

23   assuming we get beyond that point, they have made no showing

24   here at this hearing and nothing in their papers suggest, that

25   they have any cognizable rights under Section 365 of the

89

1    bankruptcy code.  It is the only section that deals with the

2    assumption of a contract and cure.  And I have not been able to

3    find any case law -- we've looked, maybe they haven't -- we've

4    looked.  I haven't been able to find anything to suggest that

5    there are rights that purchasers have of those claims.  And in

6    fact, what we have been able to find and look at, is the case

7    law we put in here, which points out -- the 1126 analogy, which

8    basically says, you assume the contract, there's no prepetition

9    claim to -- it's extinguished.  There's no prepetition claim to

10   vote under 1126.  And we pointed out the journal article that

11   we found, which we thought -- which is exactly on point, which

12   raises these very warnings to claims purchasers, saying don't

13   buy executory contract accounts if you don't know how you're

14   going to administer them.  And you don't provide for it.

15           THE COURT:  Are some of the contracts that the

16   debtor's proposing to assume contracts where the debtors are

17   proposing modifications or additional ways to provide adequate

18   assurance for future performance or anything like that?

19           MR. SHIFF:  I don't think we're doing much, Your

20   Honor, in the way of modifications at this point.  We've been

21   negoti -- those have been negotiated.  The GSM organization has

22   been sitting down with all -- I mean, that's the other irony of

23   this -- for months.  There's been at least five months of

24   extensive negotiations about these contracts between the Delphi

25   and the contract vendors.

90

1          THE COURT:  Well I guess --

2          MR. SHIFF:  -- counter parties.

3          THE COURT:  -- I guess where I'm going with that, and

4    maybe this is a better question for Mr. Shiff, is, under 365

5    the debtor has to meet three requirements:  cure and adequate

6    assurance of future performance.  And if you're changing the

7    contract, anyway, you obviously need consent.  And it's my

8    experience that contract parties often negotiates various parts

9    of those tests to come up with an overall agreement.  Is

10   that -- are you saying that some of that has already happened?

11         MR. BUTLER:  Yes.  There's been -- there has been

12   extensive negotiations about the terms on which parties will

13   continue -- agree to negotiate going forward, about, you know,

14   the supply chains been -- had extensive discussions with the

15   company.  And very positive constructive discussions.  There's

16   a very good relationship between the supply base.

17         THE COURT:  So if you got a surprising cure claim

18   back, for example, your -- the people who have been negotiating

19   the contracts may go to the supplier and say well, wait a

20   minute.  You know the premise of our negotiations going

21   forward, we always thought the claim was X, and now you're

22   saying it's 200,000 more.  Maybe we need to think about some

23   other aspect of this contract?

24         MR. BUTLER:  Particularly seeing as all these

25   contracts or virtually all of them can be terminated by Delphi

91

1    for convenience.  That's correct, Your Honor.

2            THE COURT:  Okay.

3            MR. BUTLER:  And they're not assignable.  I mean,

4    remember, these are supply agreements.  And I do believe that

5    one of the reasons that we're here today is that the claims

6    purchasers, at some point in the last couple of weeks, have

7    come to understand that they bought accounts from nonassignable

8    supply agreements, that in fact, are going to be assumed by the

9    debtors.  And, you know, and that may not be what they thought

10   they had.  I don't know.  I don't know what any of their

11   contracts are between them and their assignors.  Certainly it

12   is Delphi's position that to the extent that those things do

13   anything other than what Michigan law permits, they're void and

14   not enforceable.  And, you know, and we take the supply

15   agreements very seriously.  They're the counter -- they're one

16   of the absolute cornerstones of the company's operations.  And

17   we go to great lengths to, as everybody in the auto sector, to

18   defend our contracts and the relationships with them and the

19   nonassignability of them and similar issues.

20           So I mean, and Your Honor, there's a lot we could

21   talk about here, but what I'm -- I guess I've been trying to

22   understand is how we got initially beyond the settlement, and

23   even if there wasn't a settlement, beyond the participation of

24   these movants in the solicitation procedures hearing, where

25   this order was entered and is now a final order of the Court.

92

1   And it's clear and unambiguous on its face.  I just don't know

2   how we go any -- go beyond that, nor do I think we should.  I

3   mean, these are issues that, in a very complex case, we have

4   devoted hundreds of hours negotiating and thinking about and

5   talking to people about and trying to sort through.  And

6   there's nothing here from the debtor's perspective, there's

7   nothing nefarious here.  This has been perfectly transparent.

8   These cure procedures have been out there publicly since

9   September 6th, for Pete's sakes.  There's nothing nefarious in

10  any of this from the debtor's perspective.  But we do have to

11  have an ability to be able to sort through these things.  And

12  to the extent that there's claims purchasers that are going to

13  have issues with their assignors, that is not something that

14  the debtors want to be involved in, nor do we think this Court

15  ought to be involved in.  And that's, I think, a State Court

16  issue between those parties.

17            THE COURT:  Okay.  Thank you.  Yes.

18            MR. SHIFF:  Your Honor, I'll try to be brief.  We

19  understand and are not disputing the existence of this order

20  and that it governs.  What we're before the Court is asking for

21  what we consider, and people can characterize it differently, I

22  won't call it limited relief, but relief in certain ways, from

23  that order, which we think the Court has the authority to do

24  under a simple standard.

25            THE COURT:  I understand.  But --

93

1          MR. SHIFF:  Extending the deadline --

2          THE COURT:  -- and one of the reasons I granted the

3     order to show cause is because it wasn't clear to me whether

4     this would be really a big deal or not.  But it does seem to me

5     that what you're proposing would get your clients in the middle

6     of the dealings between the debtor and its contract parties.

7     And that does seem to me to be a big deal.  Particularly where

8     there are ongoing supply relationships.  I don't know how you

9     get over that.  I mean if -- you made the case in your papers

10    that you're the real party in interest because the prepetition

11    amount owed was assigned to you.  And generally, Courts want to

12    hear from the real party in interest.  But I'm pretty persuaded

13    here that that's really not the case because this is an

14    assumption situation where the real party in interest really

15    has the ability, if they want to, to negotiate with the debtor

16    as guided by 365, the hoops to go through there, and the terms

17    of the underlying contract, whether it's assignable or not,

18    whether it's terminable at will, all those things.  And that

19    may lead suppliers to reach certain agreements.

20         There may be economic consequences of their doing

21    that in terms of what they have assigned to you.  But I have no

22    idea what those might be because I haven't seen any of the

23    assignments, and at the end of the day, that's between you and

24    them.  It seems.

25         MR. SHIFF:  Well, Your Honor, to take this into

94

1    pieces.  I think there are certain aspects of what you just

2    said that may impact on that relationship, and we'll come back

3    to that.  And there are certain aspects that don't.  A couple

4    of days and replacement ballots sent to the transferors,

5    certainly doesn't impact upon any relationship that might exist

6    between -- you know, with respect to the underlying contract,

7    or you know, the special negotiations that might be taking

8    place.  So I think there's a threshold --

9            THE COURT:  But isn't up for them to ask for that?

10           MR. SHIFF:  Sorry, Your Honor?

11           THE COURT:  Isn't it up to them to ask for that?

12           MR. SHIFF:  Yes.  And in most of these instances what

13   we've done, and what we have done, I should say, is we've

14   contacted those people, we gave them a number at KCC to call,

15   and they have not gotten the form back.  It's just -- it's -- I

16   mean there are numerous -- it's happened numerous times.  And

17   again, not suggesting anyone instructed them --

18           THE COURT:  But it's not at the deadline -- there's

19   no deadline yet.  They're not even in breach of any contract

20   they may have with you under that at this point.  Are they?

21           MR. SHIFF:  If they don't get the ballots in -- I'm

22   sorry.

23           THE COURT:  By today.  I mean, there's no deadline

24   yet.

25           MR. SHIFF:  No, no.  It's -- the deadline's

95

1    effectively today.

2              THE COURT:  I guess, I don't see why we don't wait to

3    see what they do.

4              MR. SHIFF:  Because I think we can possibly avoid a

5    lot of what might be the problems, if we give them -- coming

6    back to the issue of whether we execute or not in the contract

7    relationship.  On the more base issues.  If we give them that

8    time and instruct KCC to get them those ballots to avoid --

9              THE COURT:  But they're not asking for that time.

10   They're not asking for it.

11             MR. SHIFF:  Well, they've asked KCC for the ballots.

12   We know the debtors have --

13             MR. BUTLER:  How do we know -- I mean you're making

14   assertions --

15             THE COURT:  If they have asked KCC for a ballot --

16             MR. BUTLER:  -- confirmation on that.

17             MR. SHIFF:  I'm sorry, Your Honor.

18             THE COURT:  -- if they've asked KCC for the ballots

19   and KCC doesn't get them a ballot, I'll give them time.  But

20   there's no records that that's happened.

21             MR. SHIFF:  It's not before the Court.  Certainly

22   not, no.  We will have to --

23             THE COURT:  I mean, that's -- Mr. Butler

24   acknowledges, that's -- if that actually happens, that's

25   remediable.

1        MR. SHIFF:  Your Honor, we think, as to the issues

2   with respect to the contracts, I mean, there's been a lot of

3   assertions here that 365 does not impact the claim and doesn't

4   involve reconciling claims.  And then there's talk about, well

5   if you have a cure, then it reduces the claim.  I mean, it's --

6   I mean, I don't know what 365 is if it's not -- I mean 365 has

7   a few different pieces, which the Court has walked through, the

8   adequate assurance, section certainly.  One of them is curing

9   the default, which is paying the prepetition claim.  And that

10  is --

11        THE COURT:  But it's between --

12        MR. SHIFF:  -- what our client has --

13        THE COURT:  -- but as between the debtor and the

14  contract party are concerned.  And this often happens.  Those

15  hoops, and there are three main ones, the debtor can't assume

16  anything but the contract; it has to cure; and it has to

17  provide accurate assurance.  Those things are negotiated as a

18  package very often.  And to pull one out and say that the

19  negotiation has to occur with someone else, where there's

20  nothing in the record to suggest that the contract party has,

21  you know, assigned the contract or the right to do that to

22  anyone else, I think is -- that's a big deal.  I think that's

23  more than what I -- when I saw your order to show cause

24  yesterday, I thought the relief you were seeking was all about.

25        MR. SHIFF:  Right, no, Your Honor.  As to that point,

97

1   and I appreciate what the Court is saying, and I don't want to

2   belabor it.  What we're seeking as to that is to submit

3   ballots, forms, on behalf of the transferee, if they can, and

4   then it will get dealt with.  It may be that they already

5   agreed to some package that reduced the claim and we have to go

6   sue somewhere else.  And that's fine.  I mean we'll have to

7   deal with that.  But we don't want anything to preclude us from

8   doing that.  Quite frankly, I think if you read paragraph 43,

9   although it does talk about providing the notices to the

10   counter parties, the rest of the section talks about parties

11   wishing to object, parties -- I mean, it's a different word,

12   and what we're simply looking for is something that doesn't

13   preclude us from doing that.  And then there may be fights

14   before the Court as to how much or who gets it, and that's

15   fine.

16          THE COURT:  Well, okay.

17          MR. SHIFF:  And I think the similar point on the

18   payment of the claim, where we would seek to at least at the

19   very least, not have that go out the door to what we allege is

20   the wrong party, and allow us, if we can't get it resolved, to

21   bring it on before the Court.  But I think -- and I think the

22   last point, just to finish it up, is -- and I know there's no

23   proof at this point that people haven't gotten ballots, I

24   certainly would think it would make some sense, and don't see

25   any prejudice, combined potentially with a few days, to let

98

1    people use copies if they can't get the originals.

2              THE COURT:  Well, but they can call the -- they can

3    call the ballot agent.

4              MR. SHIFF:  And if they get it then they can get them

5    in.

6              THE COURT:  Well, but, you know, if they call the

7    ballot agent five minutes before the ballot's due, I think

8    there's a problem.  But if they call --

9              MR. SHIFF:  Certainly.

10             THE COURT:  -- you know, in the morning, then the

11   ballot agent is probably going to get it to them.

12             MR. SHIFF:  We probably are five minutes before,

13   but -- no, they have been calling, Your Honor.  But I know it's

14   not in the record, and that's something we'll have to develop,

15   I guess, further

16             THE COURT:  All right.  I think that the relief

17   you're seeking here is relief that, as Mr. Butler says, is

18   contrary to the order.  And that order was on, I believe, ample

19   notice.  It also, and as importantly, is relief that I think is

20   not merely a procedural correction of an error or relief that

21   would have no material effect on the debtors or other parties

22   in interest.  The main reason for that conclusion is that I

23   think it depends -- granting the relief would depend on me

24   overlooking the primary relationship here, in fact the only

25   relationship here, that the debtor has, which is with its

99

1    contract counter party, who are obviously ongoing trade

2    suppliers and vendees who are important to the debtor's ongoing

3    business.  And under Section 365, they are the ones who really

4    need to deal with the cure notice, because it's not just a cure

5    notice.  It's an assumption notice that lays out and reminds

6    the contract parties -- counter parties, of their rights under

7    Section 365, which are not limited to insisting upon cure.

8            I believe that your clients, as a very function of

9    the assignment agreement which they entered into, know who

10   these people are and could have, and I believe as you say they

11   have, contacted them and given them what your clients believe

12   are their obligations under your clients' agreements with those

13   people.  But those aren't three-party agreements.  The debtor

14   is not a party to those agreements.  And if they don't do what

15   they're supposed to do under your agreements, you have rights

16   against them.  I don't know what those obligations are and what

17   those rights are because they're not in the record.  But I

18   believe that, again, as I said earlier, contrary to when I

19   signed this order to show cause, this is not an instance where

20   the debtor is just being difficult about a deadline or a

21   procedure and trying to prevent the real party in interest from

22   having its wishes set forth; but rather would have the debtor

23   change the relationship with its contract parties and get in

24   the middle of your relationship with them.  And they're really

25   two separate relationships.

1        So I don't see a basis, given that fact, for amending

2    the order.  I don't think it was a scrivener's error and I

3    don't think it was sort of slipped in overnight.  I think you

4    have the ability to contact all of these people and to say make

5    X election if you want to do that.  And it's up to them whether

6    they're going to comply or not.  And that's why the --

7    paragraph 45 in the order was in there, in that notice to you

8    all, so you could do those sorts of things.  But I don't think

9    the debtor should get in the middle of that potential dispute

10   between you and them, and hold up distributions or create, you

11   know, a fund to fight over, just as I don't believe the debtor,

12   when it hears that a creditor of a creditor has an issue with

13   its creditor, and maybe had a lien against the creditor and is

14   worried about the creditor, that the debtor should get sucked

15   into that fight.  I think it's a similar -- it's an analogous

16   situation.

17        MR. SHIFF:  Your Honor, certainly we hear you on your

18   views on that topic.

19        THE COURT:  Well, let me just say again --

20        MR. SHIFF:  I'm sorry.

21        THE COURT:  -- as far as the issue about whether

22   people have had sufficient time to make their elections or not

23   or respond to the cure notice, obviously the notice itself, the

24   order, determined that the deadline was appropriate.  However,

25   if they didn't get a copy of the notice or if they made a

101

1    request -- a timely request for a new notice or a new form and

2    they don't get it, they have -- they clearly have their rights

3    under the bankruptcy rules to seek relief and an extension of

4    time then.  But to do it in advance, I think is really giving

5    you all -- your clients a form of relief that is unwarranted.

6            MR. SHIFF:  Well, Your Honor, I think on your last

7    point, you, I think, addressed where I was going ahead, which

8    was on what I consider, at least, to be the procedural side of

9    this.  And I hear the Court.  I just may add that one of the

10   potential difficulties here will be that the party who will now

11   need to seek that relief is not the party who ultimately has

12   the economics.  And we're setting up a dispute.  If we extend

13   it a few days, I think you are setting up the situation where

14   it's much more likely this doesn't become an issue.  And I just

15   don't see any harm in a couple of days --

16           THE COURT:  You know, I just don't -- I mean, it

17   seems to me, particularly given that these are all people that

18   the debtor wants to continue in contractual relationships with,

19   that if, you know, Toyota, or Chrysler or some other company

20   calls up the debtor and says, you know, we made a request of

21   the balloting agent and we just didn't get our form in, I don't

22   see that -- you know, and they didn't get it back to us, I

23   don't see the debtor forcing those people to come into Court.

24   I mean, it's just -- that'd be pretty dumb, so.  I think that

25   it's -- you know.  I also frankly don't see those people

1    putting down some number that's different from the number that

2    you purchased from.  If they do, they're making a calculation

3    that it's -- you know, on a net basis to them, that was stating

4    the damages to your -- that they might owe to your clients, it

5    makes sense to do that.  But, you know, that's a pretty --

6    people have the right to breach contracts, but if they have a

7    contract with your client, it's hard for me to imagine that

8    they'd really -- it's likely that they're going to do that

9    unless it's a pretty unusual situation.  So I think you're

10   going to have to just wait and see what happens.  Send in

11   more -- you know, send them a letter saying -- I mean, I think

12   you did send them a letter.

13            MR. SHIFF:  We have, Your Honor.

14            THE COURT:  We want you to make a cash election.

15            MR. SHIFF:  We certainly have.  And obviously,

16   there's a limit to what we can do now before the deadline.

17            THE COURT:  Okay.

18            MR. SHIFF:  But we hear the Court.  If there is a

19   problem people can seek the relief they need to.

20            THE COURT:  Okay.

21            MR. SHIFF:  Thank you.

22            THE COURT:  All right.  So I'm going to deny the

23   motion for the reasons stated.

24            MR. SHIFF:  Thank you, Your Honor.

25            MR. BUTLER:  Thank you, Your Honor.

103

1        THE COURT:  Mr. Butler, do you want to have someone

2   submit an order to that effect.

3        MR. BUTLER:  We will.  We will, Your Honor.

4        THE COURT:  Run a copy by Mr. Shiff.  Don't settle

5   it, just run it by him.

6        MR. BUTLER:  We will, Your Honor.  Thanks.

7        THE COURT:  Okay.  Thank you.

8        MR. BUTLER:  That's all we had today.

9        THE COURT:  Okay.  All right.

10      (Proceedings concluded at 4:53 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

104

**I N D E X**

RULINGS

|  | Page | Line |
|---|---|---|

Exit Financing            46      17

Participation Motion

Approved with Limitations

Motion to Extend Deadline 102     22

etc. Denied

105

1

2                         C E R T I F I C A T I O N

3

4       I Penina Wolicki, court approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8

9       _____ ___January 14, 2008_____

10      Signature of Transcriber                 Date

11

12      ___PENINA WOLICKI_____

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25