1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION, ET AL.

9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                January 18, 2008

19                10:07 AM

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2   HEARING re Bank of America Motion for Entry of Order

3   Temporarily Allowing Claims for Voting on Plan Pursuant to Fed.

4   R. Bankr. P. 3018(a)

5

6   HEARING re Motion of Technology Properties Ltd. for Entry of

7   Order Temporarily Allowing Claims for Voting on Plan Pursuant

8   to Fed. R. Bankr. P. 3018(a)

9

10  HEARING re Motion for Order Estimating Claims for Purposes of

11  Voting on Plan of Reorganization

12

13  HEARING re Motion of SPCP Group, LLC Pursuant to Bankruptcy

14  Rule 3018(a) Requesting Temporarily Allowance of Claims for

15  Purposes of Voting to Accept or Reject the Plan

16

17  HEARING re First Amended Joint Plan of Reorganization of Delphi

18  Corporation and Certain Affiliates, Debtors and Debtors-in-

19  Possession

20

21  HEARING re Motion for Order Approving Multidistrict Litigation

22  and Insurance Settlements

23

24

25

3

1

2   HEARING re Motion for Order Pursuant to 11 U.S.C. Section

3   105(a) and 502(c) Estimating or Provisionally Allowing Certain

4   Unreconciled Claims Solely for Purposes of Administration of

5   Discount Rights Offering

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed By:  Lisa Bar-Leib

4

1

2   A P P E A R A N C E S:

3   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8   BY:   JOHN WM. BUTLER, JR., ESQ.

9         RON E. MEISLER, ESQ.

10        ALBERT L. HOGAN III, ESQ.

11

12  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

13        Attorneys for Debtors

14        Four Times Square

15        New York, NY 10036

16

17  BY:   KAYALYN A. MARAFIOTI, ESQ.

18

19  LATHAM & WATKINS, LLP

20        Attorneys for Official Committee of Unsecured Creditors

21        885 Third Avenue

22        New York, NY 10022

23

24  BY:   ROBERT J. ROSENBERG, ESQ.

25

5

1

2   FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

3        Attorneys for Official Committee Equity Security Holders

4        One New York Plaza

5        New York, NY 10004

6

7   BY:   BONNIE STEINGART, ESQ.

8         JENNIFER RODBERG, ESQ.

9

10  GOODWIN PROCTER, LLP

11       Attorneys for the Ad Hoc Committee of Bondholders

12       599 Lexington Avenue

13       New York, NY 10022

14

15  BY:   ALLAN S. BRILLIANT, ESQ.

16        RICHARD WYNER, ESQ.

17

18  GOODWIN PROCTER, LLP

19       Attorneys for the Ad Hoc Committee of Bondholders

20       901 New York Avenue, N.W.

21       Washington, D.C. 20001

22

23  BY:   JOHN MOUSTAKAS, ESQ.

24        MICHAEL K. ISENMAN, ESQ.

25

6

1

2  WHITE & CASE, LLP

3        Attorneys for Appaloosa Management and Harbinger Capital

4        1155 Avenue of the Americas

5        New York, New York 10036

6

7  BY:   THOMAS E. LAURIA, ESQ.

8        DOUGLAS P. BAUMSTEIN, ESQ.

9

10  WEIL, GOTSHAL & MANGES LLP

11        Attorneys for General Motors

12        767 Fifth Avenue

13        New York, New York 10153

14

15  BY:   JEFFREY L. TANENBAUM, ESQ.

16        ROBERT LEMONS, ESQ.

17

18  LOWENSTEIN SANDLER PC

19        Attorneys for Lead Plaintiff

20        65 Livingston Avenue

21        Roseland, NJ 07068

22

23  BY:   MICHAEL S. ETKIN, ESQ.

24        S. JASON TEELE, ESQ.

25

7

KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

      Attorneys for Wilmington Trust Company

       as Indentured Trustee

      599 Lexington Avenue

      New York, NY 10022


BY:   EDWARD M. FOX, ESQ.


COHEN, WEISS AND SIMON LLP

      Attorneys for UAW

      330 West 42nd Street

      New York, NY 10036


BY:   BABETTE CECCOTTI, ESQ.

      PETER DECHIARA, ESQ.


KENNEDY, JENNIK & MURRAY, P.C.

      Attorneys for IUE-CWA

      113 University Place

      New York, NY 10003


BY:   THOMAS M. KENNEDY, ESQ.

      SUSAN M. JENNIK, ESQ.

8

ARENT FOX PLLC

        Attorneys for Audio MPEG, Inc. and SISVEL

        1050 Connecticut Avenue, NW

        Washington, DC 20036

BY:   MARY JOANNE DOWD, ESQ.

KELLEY DRYE & WARREN LLP

        Attorneys for PBL&C

        101 Park Avenue

        New York, NY 10178

BY:   ERIC R. WILSON, ESQ.

MCDERMOTT WILL & EMERY LLP

        Attorneys for Timken

        340 Madison Avenue

        New York, NY 10017

BY:   JAMES M. SULLIVAN, ESQ.

9

1

2   WARNER NORCROSS & JUDD LLP

3          900 Fifth Third Center

4          111 Lyon Street NW

5          Grand Rapids, MI 49503

6

7   BY:   GORDON J. TOERING, ESQ.

8

9   SEYFARTH SHAW LLP

10          Attorneys for Fuji America Inc.

11          620 Eighth Avenue

12          New York, NY 10018

13

14   BY:   ROBERT W. DREMLUK, ESQ.

15

16   KELLER ROHRBACK PLLC

17          Attorneys for ERISA lead plaintiffs

18          3101 North Central Avenue

19          Suite 900

20          Phoenix, AZ 85012

21

22   BY:   GARY A. GOTTO, ESQ.

23

24

25

10

1

2    BUCHANAN INGERSOLL & ROONEY PC

3         Attorneys for Fiduciary Counselors, Inc.

4         The Brandywine Building

5         1000 West Street, Suite 1410

6         Wilmington, DE 19801

7

8    BY:   MARY F. CALOWAY, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

11

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Okay.  We're back on

3    the record in Delphi Corporation.  Mr. Butler?

4            MR. BUTLER:  Your Honor, good morning.  Jack Butler,

5    Kayalyn Marafioti and Al Hogan here again on behalf of the

6    debtors in connection with the second day of our confirmation

7    hearing, Delphi Corporation and its subsidiaries and affiliated

8    debtors and debtors-in-possession in connection with the First

9    Amended Plan.

10           Your Honor, a couple of housekeeping items before we

11   continue with the proofs in this case, in the debtors' direct

12   case.  First, there are, as we talked about at the end of the

13   record yesterday, a few additional exhibits to move into

14   evidence.  We indicated in connection with 1129(a)(5) that we'd

15   be filing formally the Notice of Delphi Corporation Debtor

16   Subsidiaries under 1129(a)(5).  We did that.  It's at Docket

17   number 12247 setting forth the officers and directors of the

18   subsidiary debtors, the officers of Delphi Corporation and

19   restating selection procedures in the plan with respect to the

20   selection of the directors of Delphi Corporation.  And that

21   would be Exhibit 556.

22           Exhibit 557 is the supplemental declaration of Nick

23   Bubnovich.  This was a declaration that actually is an appendix

24   to his deposition.  It's been admitted previously as that but

25   we want to call it out separately in connection with this

12

1   morning's proceedings.  That's at Exhibit 557.

2            And Exhibit 558 is the final stipulation in the MDL

3   case on the -- that accepted the modifications requested here

4   from the creditors' committee with respect to the reduction and

5   consideration in the MDL classes here in exchange for a direct

6   payment being made by a third party on the other side, the

7   federal side, of the case -- the district court side of the

8   case.

9            THE COURT:  And that stipulation is then combined

10  with the rest of the MDL agreement is what was approved by the

11  district court earlier this month?

12           MR. BUTLER:  That's correct, Your Honor.

13           THE COURT:  Okay.

14           MR. BUTLER:  And that's at Exhibit 558.  So I'd like

15  to move, Your Honor, into admission Exhibits 556 through 558.

16           THE COURT:  All right.  Is there any objection to the

17  admission of those exhibits?  Okay, they'll be admitted.

18           MR. BUTLER:  Thank you, Your Honor.  Your Honor, when

19  we concluded yesterday's hearing, we had three witnesses to

20  complete in connection with the debtors' direct case.  We're

21  into our -- what I refer to in my earlier remarks as the Group

22  III witnesses here in connection with the debtors' direct case

23  in support of confirmation.  And we're now moving into the

24  portions of the plan of reorganization, specifically, Section

25  7.8 of the plan and the related plan exhibits, the deal with

13

1    the executive compensation program.

2            The witnesses we have in connection with that are

3    Craig G. Naylor, the chairman of the compensation committee,

4    Nick Bubnovich, the outside consultant from Watson & Wyatt, and

5    then Mr. Miller.  We will be recalling Mr. Miller for those

6    portions of his direct declaration that relate to executive

7    compensation.

8            So if it's acceptable to the Court, I would proceed.

9            THE COURT:  Okay.  So did you want to call Mr. Naylor

10   first?

11           MR. BUTLER:  Yes.

12           THE COURT:  All right.

13           MR. BUTLER:  We'll start with Mr. Naylor.  So, Your

14   Honor, the first witness, our seventh witness in support of

15   confirmation of the plan, the first witness this morning would

16   be Craig G. Naylor, as I said, who's chairman of the

17   compensation committee of the board of directors -- actually,

18   that's called the compensation executive development committee

19   of the board of directors -- and one of the independent

20   directors of Delphi Corporation's board.  His declaration has

21   been admitted as Exhibit 66 and his deposition has been

22   admitted as Exhibit 264.  I'd like now to present Mr. Naylor to

23   the Court for cross-examination by any party and any questions

24   the Court might have.

25           THE COURT:  Okay.  Does anyone wish to cross-examine

14

1    Mr. Naylor?

2         MR. DECHIARA:  Your Honor, Peter DeChiara from the

3    law firm of Cohen, Weiss & Simon for the UAW.  I would wish to

4    cross-examine Mr. Naylor but before that, UAW has an objection

5    to a portion of Mr. Naylor's declaration.  And I believe now

6    would be an appropriate time to address that.

7         THE COURT:  Okay.

8         MR. BUTLER:  This would be with respect, Your Honor,

9    to paragraph 25 which was reserved when the exhibits -- when

10   Exhibit 66 came in.

11        MR. DECHIARA:  Your Honor, before I discuss my

12   objection, I think it would be helpful to call to the screen

13   page 55 from Mr. Naylor's deposition which is the basis for my

14   objection.  I would ask the operator to do that.

15        THE COURT:  Okay.

16        MR. DECHIARA:  Your Honor, in paragraph 25 of the

17   declaration, not the first sentence but the second and third

18   and fourth sentences, Mr. Naylor testifies about what happened

19   at the negotiations between the UAW and Delphi.  And in his

20   deposition, Mr. Naylor was asked -- and he testi -- he was

21   asked, "Did you participate or observe the negotiations between

22   the UAW and Delphi and GM?"

23      "A.  I did not participate and I did not observe.

24      "Q.  Have you reviewed any of the bargaining proposals by

25   any of the parties?

15

1     "A.   You were kept up to date on the major developments in

2     the negotiations but not every aeration --

3     "Q.   Right?

4     "A.   -- that occurred.

5     "Q.   That was my question.  Did you actually look at the

6     documents that constituted the bargaining proposals between the

7     parties?

8     "A.   Oh, no, no.

9     "Q.   And that would be true up until today as we sit here?

10    "A.   Correct."

11         So, I think that testimony clearly shows that Mr.

12    Naylor has no first-hand knowledge about these matters.  So our

13    objection is based on hearsay.

14         Now to the extent that this portion of the

15    declaration would come in simply to show what Mr. Naylor may

16    have been told by others about what happened in negotiations as

17    opposed to the truth of the matter about what happened at

18    negotiations, then the UAW has no objection.  Our objection is

19    simply to the extent that this would come in as to what

20    actually occurred at negotiations.  And we believe if that's

21    the purpose then this is clearly hearsay.

22         THE COURT:  Okay.

23         MR. BUTLER:  Your Honor, our response is really on

24    two fronts.  One, there is an agreement between the UAW and the

25    debtors that neither party would call any bargaining witnesses

16

1   at this hearing.  The view would be that to bring the

2   bargaining witnesses into court could damage labor relations

3   between the parties and we agreed not to do that.

4        MR. DECHIARA:  Your Honor --

5        MR. BUTLER:  Can I finish, please?

6        THE COURT:  Go ahead.

7        MR. BUTLER:  And then, what he have instead tried to

8   do through this declaration under paragraph 25 is provide, and

9   I think it's appropriate to do so, what the chairman of the

10  compensation committee and the committee was informed and the

11  basis of their understanding and how they took that into

12  account in connection with the deliberations of the committee.

13       THE COURT:  Okay.  But the latter point I don't think

14  the UAW is objecting to, correct?

15       MR. DECHIARA:  That's right, Your Honor.  Only to the

16  extent it comes in for the truth of the matter as to what

17  happened at the negotiations.  That's the basis of our

18  objection.

19       THE COURT:  Okay.  In my view, the objection's well

20  taken.  The provision speaks for itself and I would rely on in

21  primarily.  It seems to me to be a studiedly worded provision

22  and for the parties to try to interpret it based upon their own

23  respective views as to what it means would not be particularly

24  helpful to me anyway.  So, I'll grant the objection.

25       MR. BUTLER:  Thank you, Your Honor.

17

1          MR. DECHIARA:  Thank you, Your Honor.

2          MR. BUTLER:  So, Your Honor, is that -- just so the

3     record is clear, does that mean it comes in not for the truth

4     of the matter asserted but for the -- represent the

5     understanding of the --

6          THE COURT:  Yes.

7          MR. BUTLER:  -- parties.

8          THE COURT:  That's right.

9          MR. BUTLER:  Thank you.

10          MR. DECHIARA:  Your Honor, now I would like to

11     proceed with the cross-examination of Mr. Naylor.

12          THE COURT:  Okay.  Mr. Naylor, would you come up,

13     please?  Have a seat there, please.

14          (Witness duly sworn)

15          THE COURT:  And just for the record, would you spell

16     your name?

17          THE WITNESS:  Spell my name?

18          THE COURT:  Yeah.

19          THE WITNESS:  N-A-Y-L-O-R.

20          THE COURT:  And it's C-R-A-I-G?

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.

23     CROSS-EXAMINATION BY

24     MR. DECHIARA:

25     Q.   Good morning, Mr. Naylor.

18

1   A.   Good morning.

2   Q.   Mr. Naylor, in October of 2005, Delphi proposed a Key

3   Employee Compensation Plan to this Court, is that correct?

4   A.   Yes.

5   Q.   And in that Key Employee Compensation Plan, Delphi

6   proposed that the CEO would receive a cash award at emergence

7   of 5.3 million dollars and that Mr. O'Neil, the number two

8   person in management, would receive 2.7 million dollars for a

9   total of eight million dollars, is that correct?

10  A.   Yes.

11  Q.   And were Mr. -- to the extent you know, were Mr. Miller

12  and Mr. O'Neil aware of the amounts that were being proposed in

13  the October 2005 plan?

14  A.   I don't recall if they were aware before it was proposed

15  or -- certainly became aware after it was --

16  Q.   Your answer is they certainly became aware after it was

17  proposed?

18  A.   Yes.

19  Q.   So as of on or about October 2005, they were aware that a

20  total of eight million dollars was being proposed for their

21  cash emergence award, correct?

22  A.   Correct.

23  Q.   Did you or anyone else on the compensation committee ever

24  tell them to expect more?

25  A.   No.

19

1   Q.   I'd like to show you what's been marked, that was marked

2   at your deposition, as Naylor Deposition Exhibit 18.

3              MR. SPEAKER:  That may be 17.

4              MR. DECHIARA:  Hang on.

5              (Pause)

6              MR. DECHIARA:  Your Honor, there seems to be some

7   technical difficulties with Exhibit 18.  Your Honor, if you

8   have the hard copy and if the witness has the hard copy and I

9   have the hard copy and counsel has the hard copy, I suggest we

10  just proceed.

11             THE COURT:  All right.  But I'm not sure I have a

12  hard copy.

13             MR. DECHIARA:  I'd like the Court to have a hard copy

14  since it's --

15             THE COURT:  Well, can someone give me one?  Thanks.

16  And Mr. Naylor you have one?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19  Q.   Okay.  Mr. Naylor, what -- the amounts that Delphi is

20  clearly proposing in the management compensation plan for Mr.

21  Miller is 8.3 million dollars?

22  A.   Correct.

23  Q.   And Mr. Naylor 5.3?

24  A.   Mr. O'Neil?

25  Q.   I'm sorry.  Excuse me.  Mr. O'Neil.

20

1    A.    I'll take it if it's offered.

2    Q.    I apologize.  Mr. O'Neil.

3    A.    Yes.

4    Q.    For a total of 13.6?

5    A.    Correct.

6    Q.    Now this document, this one-page document, it looks like

7    it's -- the bottom portion is an e-mail from you to various

8    individuals, is that correct?

9    A.    Yes.

10   Q.    Including Raymond Miltrovich?  Who's Raymond Miltrovich?

11   A.    He's another member of the compensation committee.

12   Q.    Okay.  And you wrote this on December 15th, 2007?

13   A.    Yes.

14   Q.    Okay.  Okay.  You say in the second paragraph of your e-

15   mail, you say "Whereas we are not necessarily bound by the CEO

16   plus COO total awards shown in the October 2005 filing, it is a

17   good place to start.  And we should have justification for

18   raising that figure."  Is it true that you believe that that

19   total eight million figure was a good place to start with your

20   analysis?

21   A.    Yes.

22   Q.    And then going down, the fifth paragraph, you say "I gave

23   Jack our initial thinking on Rod's and Steve's awards, dot,

24   dot, dot, five million" -- there's that little doohickey in

25   front of the five million.  Does that million approximately?

21

1  A.    Yes.

2  Q.    Okay.   "approximately five million for Rod" -- that's Rod

3  O'Neil?

4  A.    Yes.

5  Q.    "and approximately 7.5 million dollars for Steve" --

6  that's Steve Miller?

7  A.    Correct.

8  Q.    Okay.  So that was your initial thinking?

9  A.    Um-hmm.

10  Q.    And when you say "your" or when you say "our", who is the

11  "our"?

12  A.    That's the compensation committee.

13  Q.    Okay.  And who is Jack?

14  A.    Jack Butler of Skadden.

15  Q.    Of Skadden?  Okay.  Okay.  The next sentence says "He is

16  going to think about this as well as the next steps towards

17  making a final recommendation from our committee before the

18  12.28 filing and get back to us this coming week."  Who's the

19  "he" referred to in that sentence?

20  A.    "He" is Jack Butler.

21  Q.    Okay.  So am I correct to read this as what you were

22  saying was Jack Butler was going to think about this and -- was

23  he going to make a final recommendation from your committee?

24  A.    No.

25  Q.    Can you explain what that means?

22

1    A.    That's just input.

2    Q.    He was going to give his input?

3    A.    Right.

4    Q.    Okay.  Okay.  Then Mr. Miltrovich responds to you that

5    same day, correct, in the top portion of the document?

6    A.    Yes.

7    Q.    Okay.  And he says he thinks an award of four million for

8    each of them, meaning a total of eight, is simply not adequate.

9    Is that correct?

10   A.    Yes.

11   Q.    And at the bottom of his e-mail, he says I'm still at

12   eight million for Steve and 5.5 million for Rod, correct?

13   A.    Yes.

14   Q.    Okay.  But actually, it wound up being even more than

15   eight million for Steve, correct?

16   A.    Yes.

17   Q.    That being proposed?

18   A.    Yes.

19   Q.    Okay.  Was there any discussion in this process that led

20   to the amounts that are being proposed for these two executives

21   of the financial hardship that either of them may be suffering?

22   A.    Explain what you mean by financial hardship.

23   Q.    Were they having problems paying their mortgage, their car

24   payments, their rent, college tuition, anything like that?

25   A.    That did not enter into the deliberations.

23

1    Q.    Okay.   Was there any discussion in your committee in

2    December of 2007 when you were discussing these figures

3    regarding the equivalance of sacrifice provision of the

4    UAW/Delphi settlement?

5    A.    Remind me, what time period are you talking about?

6    Q.    The time period of this document, December of 2007, just a

7    month ago.

8    A.    The equivalence of sacrifice discussions occurred mostly

9    prior to this period.

10   Q.    Okay.   So your answer to my question when I ask were there

11   any discussions in this time frame would be no?

12   A.    Not specifically, no, right.

13   Q.    In the proposed management compensation plan, the proposal

14   for Mr. O'Neal's salary going forward -- his base salary would

15   be 1.5 million dollars, correct?

16   A.    Yes.

17   Q.    But the benchmark for a CEO that was determined by Watson

18   Wyatt was 1.2 million for base salary, correct?

19   A.    At one point, there was a benchmarking done where 1.2

20   million was my understanding of the benchmark, yes.

21   Q.    Okay.   I'd like to show you now Exhibit 14 of your

22   deposition.

23          MR. DECHIARA:   And I'll ask the operator to call that

24   to the screen.

25   Q.    Okay.   Mr. Naylor, this is a four-page document.   It looks

24

1    like a chain of e-mails.  What I'm going to do is ask you about

2    the top half of the second page.  Is that an e-mail from Mr.

3    Bubnovich?

4    A.    This is what's on the screen now?  This page?

5    Q.    Yes.

6    A.    Yes.

7    Q.    And who is Mr. Bubnovich?

8    A.    He is the person at Watson Wyatt that we were working with

9    to design the compensation programs.

10   Q.    He was the compensation consultant?

11   A.    Yes.

12   Q.    Okay.  In this e-mail, Mr. Bubnovich has two numbered

13   sections to his e-mail.  I'd like to refer you to number 2 --

14   A.    Okay.

15   Q.    -- at the bottom.  He says "As far as Rod's salary goes, I

16   think there is a little confusion about the peer groups.  The

17   old peer group with all the large companies indicate immediate

18   CEO salary of almost 1.5 million.  The revised peer group,

19   median revenue of twenty-three billion" or B, "which is used in

20   our plan investor report, indicates a median salary of around

21   1.2 million."  Do you see that?

22   A.    Yes.

23   Q.    Does that refre -- so is it true that under the more

24   recent peer group, the benchmark salary for the CEO is 1.2

25   million?

25

1   A.   Yes.

2   Q.   So what Mr. -- and what's being proposed in the management

3   compensation plan is 300,000 dollars above that, correct?

4   A.   Yes.

5   Q.   It's 1.5?

6   A.   Yes.

7   Q.   Okay.  Now Mr. O'Neil's compensation under the management

8   compensation plan would not just be base salary, correct?  It

9   would not only be base salary, correct?

10  A.   Correct.

11  Q.   He would be entitled to a AIP bonus?

12  A.   A performance -- short term performance incentive, yes.

13  Q.   Okay.  And under the proposed employment agreement, that

14  would be a minimum of 125 percent of his base salary?

15  A.   I believe that's correct.

16  Q.   Okay.  So that would be factored into -- so his bonus is

17  based on his base salary, correct?  It's factored on to the

18  base salary, correct?

19  A.   In part.

20  Q.   Okay.  Well, let's say that Mr. -- hypothetically that Mr.

21  O'Neil received the minimum of his bonus which is 125 percent

22  of 1.5 million.  Do you know what that is off-hand?

23  A.   No.  I mean, you could do the math.  Twenty-five percent.

24  Q.   Okay.  In anticipation of your not being able to do that,

25  I brought a calculator --

26

1    A.    1.875 million.  I can save you some time.

2            MR. DECHIARA:  Thank you.

3    Q.    So if Mr. O'Neil's bonus was 1.875 million, his base

4    salary plus bonus would be -- do you know what the answer to

5    that is?  And I promise this won't be a math quiz.

6    A.    3.375 --

7    Q.    Correct.

8    A.    -- million.

9    Q.    Now if he had had a base salary of 1.2 million, the

10   benchmarking amount that we were talking about before, his AIP

11   bonus, if his AIP bonus was 125 percent of 1.2 million, do you

12   know what that would be?

13   A.    1.5 million.

14   Q.    1.5 million.  And what would the sum be?

15   A.    2.7 million.

16   Q.    2.7.  So now if he had gotten this 125 percent bonus, the

17   difference in his compensation to the extent it's base salary

18   plus bonus is now a difference between 2.7 million and 3.375

19   million, correct?

20   A.    Yes.

21   Q.    Which comes out to about a half a million dollars.

22   A.    Correct.

23   Q.    Okay.  Now also his compensation -- Mr. Naylor is entitled

24   to -- I'm sorry.  Mr. O'Neal is entitled to participate in the

25   new defined contribution plan that will be created under the

27

1    management compensation plan?

2    A.    Yes.

3    Q.    And a defined contribution plan is a plan where, in this

4    case at least, there's an employer match?  The employer puts in

5    money on behalf of the employee?

6    A.    Yes.

7    Q.    And the amount of that match would include -- would factor

8    in both base salary and the bonus?

9    A.    Yes.

10   Q.    Okay.  And under the change of control agreements that are

11   being proposed under this management compensation plan, Mr.

12   O'Neil and the other -- and certain other top executives would

13   be entitled to three times their pay severance in the event of

14   a -- in the event that there is an occurrence that satisfies

15   the change in control conditions, correct?

16   A.    Yes.

17   Q.    Okay.  So if that were to occur, that would include base

18   salary plus bonus, correct?

19   A.    Yes.

20   Q.    So if under what the company is proposing, I think we

21   said -- again, assuming that Mr. O'Neil's bonus was 125 percent

22   of base salary, I think we agreed a minute ago his salary and

23   bonus would be 3.375 million, correct?

24   A.    Correct.

25   Q.    So if there were conditions satisfying the change in

28

1    control agreement, how much would he walk away with?

2    A.    Three times that.

3    Q.    Do you have the figure handy?

4    A.    No, I don't have that one.

5            MR. DECHIARA:  Your Honor, may I give the witness my

6    calculator?

7            THE COURT:  You can just do the -- just do the math.

8            MR. DECHIARA:  I should just do it?  Okay.

9    Q.    My calculator says ten million -- 10.125 million.  Does

10    that sound right?

11    A.    Sounds about right, yes.

12    Q.    Now if -- going back to if Mr. O'Neil's base salary had

13    been 1.2 million, we had talked about how with the bonus,

14    assuming the bonus is 125 percent, his compensation would be

15    2.7 million.  So if we multiply that by three to see what his

16    change of control payment would be, it would be three times 2.7

17    which equals 8.1, correct?

18    A.    Yes.

19    Q.    So now the difference that original 300,000 dollar

20    difference we were talking about in base salary in terms of

21    change in control, now it swells to over two million dollar

22    difference, correct?

23    A.    Yes.

24    Q.    Now if there were conditions that satisfy the change in

25    control conditions, Mr. O'Neil would get, as we just mentioned,

29

1   somewhat over ten million dollars, assuming his AIP bonus was

2   125 percent, correct?

3   A.    Yes.

4   Q.    Okay.  And that would be in addition to the 5.3 million

5   dollar cash emergence payment he would get

6   A.    Yes.

7   Q.    And if he -- if the change of control conditions occurred

8   and Mr. O'Neil lost his job involuntarily and he went out and

9   looked for another job and found one relatively quickly and he

10  was making a decent salary, would he have to give back any of

11  that ten -- over ten million dollars that he would take from

12  Delphi?

13  A.    No.

14  Q.    Without prying into any attorney/client privileges and if

15  your response would require one, don't respond, but are you

16  aware of what any federal bankruptcy courts have said about the

17  purpose of severance payments?

18  A.    No.

19  Q.    You retired from DuPont in December 2006, correct?

20  A.    Correct.

21  Q.    And you knew Mr. O'Neil when you were at DuPont, right?

22  A.    I had met him.

23  Q.    Okay.  Well, DuPont was a supplier to Delphi.

24  A.    Correct.

25  Q.    So Delphi gave DuPont business?

30

1   A.   Yes.

2   Q.   And Mr. O'Neil was part of the management team that gave

3   DuPont business, correct?

4   A.   Well, I have no knowledge that he was part of the

5   decision-making -- he himself was part of the decision-making

6   process to award business to DuPont.

7   Q.   But you did get to meet various members of Delphi

8   management when you were at DuPont and one of those individuals

9   was Mr. O'Neil, correct?

10  A.   Yes.

11  Q.   Okay.  Without naming who those other individuals are, are

12  those other individuals also covered under the management

13  compensation plan that's being proposed?

14  A.   I'm trying to think.  Most of the -- the members of senior

15  management that I met other than Mr. O'Neil are not with Delphi

16  anymore.

17  Q.   You were working at DuPont from February 2000 --let me put

18  it this way.  From February 2005 to December 2006, you were

19  both working at DuPont and serving on the Delphi board,

20  correct?

21  A.   Correct.

22  Q.   Okay.  And during that period, your job was -- your job at

23  DuPont was a full-time job, correct?

24  A.   Yes.

25  Q.   Okay.  And I believe -- correct me if this is inaccurate,

31

1    but I believe you testified in your deposition that it

2    typically required ten to twelve hour days and significant

3    travel on weekends and other personal time.  Is that accurate?

4    A.   Yes.

5    Q.   And your position on the Delphi board while you were

6    working so hard at DuPont allowed you or paid you 140,000

7    dollars a year plus expense reimbursement, correct?

8    A.   Correct.

9    Q.   And before you got the position on the Delphi board, you

10   were interested in finding that kind of a position, correct?

11   A.   Uhh --

12   Q.   Let me be more specific.  You were interested in finding a

13   position on a corporate board, correct?

14   A.   Yes.  I became interested during that period of time.

15   Q.   Okay.  And then you interviewed for the position on the

16   Delphi board, correct?

17   A.   Yes.

18   Q.   And one of the people you interviewed with was Mr. O'Neil,

19   correct?

20   A.   I met him during the period of time I was interviewing.

21   The people who interviewed me were David Farr and John Opie

22   (ph.), two other independent directors on the board, in terms

23   of what I would term interviewing me.  I met Mr. O'Neil during

24   that period of time.

25   Q.   Okay.  Well, you spoke to Mr. O'Neil during the process

32

1   that -- during the interview process.  Would that be a fair way

2   to put it?

3   A.   During the period of time I was interviewing, I had at

4   least one discussion with him.  I honestly don't remember how

5   many times we talked but at least once.

6   Q.   Okay.  But he told you what Delphi was looking for in a

7   board director and you had a discussion about what Delphi's

8   needs were?

9   A.   He -- as I recall, what we discussed were the situation

10  Delphi was in.  You know, he was the C -- COO, I think at the

11  time under Mr. Bettenberg, as the CEO.  So it was kind of the

12  state of affairs in Delphi.

13  Q.   You're not an expert in compensation, are you?

14  A.   I -- I would not consider myself an expert in

15  compensation.

16  Q.   Okay.  You have no formal training in compensation

17  matters, is that true?

18  A.   I have no formal training other than business experience.

19  Q.   Okay.  So it's fair to say, is it not, that you and the

20  other members of the compensation committee relied heavily on

21  Watson Wyatt's advice, correct?

22  A.   Correct.

23  Q.   Now given your experience on the compensation committee

24  and whatever business experience you had before, is it fair to

25  say there's not necessarily a right and a wrong answer when it

33

1    comes to compensation matters?

2    A.    There are -- there's usually a range of right answers.

3    Q.    Right.   Okay.   So there's a range of right answers and

4    determining compensation requires judgment, correct?

5    A.    Correct.

6    Q.    And isn't it fair to say that even among compensation

7    experts, there could be disagreement as to what constitutes the

8    range?

9    A.    Yes.

10    Q.    And in determining this management compensation plan,

11    there's a lot at stake here.   There's millions of dollars at

12    stake, correct?

13    A.    Yes.

14    Q.    And, in fact, Delphi can't afford to pay above median

15    market, can it?

16    A.    Well, the compensation philosophy set the objective to be

17    at median in part because we wanted to be -- have a competitive

18    cost structure inside Delphi including compensation.

19    Q.    But isn't that true also that Delphi just can't afford to

20    pay above median?

21    A.    Well, would it cost the company to have massive issues if

22    we were slightly above median in a particular area?   No, I

23    can't say that.   It's not quite that categorical.

24    Q.    Okay.   Let me show you page 199 of your deposition.   Two-

25    thirds of the way towards the bottom, the question you were

34

1  asked, "What about paying above median?  Are there any problems

2  with that?"  Do you see that?  There, on line 18 --

3  A.    Yes.

4  Q.    -- and 19?  And your answer was, "Yeah, we don't think we

5  could afford it."  And then let me turn you to the next page,

6  200, starting line 18, you said in answer to a question "It

7  might not even be in the short term interest because what this

8  company needs to do is start earning a sustainable profit so

9  that it can invest in technology and so on.  And if you went

10  above median, that would be less money you had to invest in the

11  future.  And we just didn't believe that was necessary."  Do

12  you stand by that?

13  A.    Yes.

14  Q.    So given how much was at stake here, and given that

15  experts can differ in terms of their judgment, did you at any

16  time -- you, meaning, the compensation committee try to get a

17  second opinion from anyone other than Watson Wyatt?

18  A.    Well --

19  Q.    Or solicit a second opinion from anyone other than Watson

20  Wyatt?

21  A.    No.  No, we didn't.  Recognizing that Watson Wyatt was

22  using survey data from many sources, we felt like it was not a

23  single point of input.  It was a range of input that t hey were

24  consolidating for us.

25  Q.    Did you recognize that Watson Wyatt, apart from its

35

1    services providing management compensation consulting to

2    Delphi, has a longstanding business relationship with Delphi

3    that is in the -- since the Chapter 11 was over, I believe,

4    twelve million dollars?  Were you aware of that?

5    A.    I'm not aware of that number.  I was aware that they have

6    other dealings with Delphi.

7    Q.    Okay.  We've talked a fair amount about the top two

8    individuals under the management compensation plan.  Let's now

9    talk about the other individuals.  What is the DSB?  What does

10   that stand for?

11   A.    The Delphi Strategy Board.

12   Q.    And that's the top twenty-one management executives?

13   A.    Yes.

14   Q.    And then what are the non-DSB executives?

15   A.    Those are the executives below the DSB in levels of

16   responsibility, what we call the salary band starting with A

17   through F, I think it is.

18   Q.    And they're 400 -- around 540 of them?

19   A.    Approximately.

20   Q.    Okay.  So the proposed management compensation plan covers

21   the top twenty-one who are the DSB and then the non-DSB

22   executives who are about 540, correct?

23   A.    Correct.

24   Q.    So the vast majority are in the non-DSB, correct?

25   A.    Correct.

36

1    Q.   Okay.  Pre-petition, before Delphi filed this Chapter 11

2    bankruptcy petition, the non-DSB -- let me step back.  Total

3    direct compensation means salary plus short term bonus plus

4    long term incentive, correct?

5    A.   Yes.

6    Q.   Okay.  And that's abbreviated as TDC? Total Direct Co --

7    A.   Yes.

8    Q.   And that's something that the compensation committee used

9    and something that Watson Wyatt used?  That concept is

10   something that was used in the analysis, correct?

11   A.   Yes.

12   Q.   Okay.  And the total direct compensation of the non-DSB

13   executives pre-petition was above market, correct?

14   A.   Yes.

15   Q.   Okay.  And since pre-petition, since the bankruptcy

16   petition was filed, have the non-DSB executives taken any

17   salary cuts?

18   A.   Salary cuts?  No.

19   Q.   Okay.  And they received their short term bonuses each

20   period during the course -- since the filing of the Chapter 11,

21   correct?

22   A.   As they were -- as they des -- there were some people,

23   there were some divisions, for example, that did not receive

24   short term incentives during the bankruptcy period.  So those

25   executives, no, they did not --

37

1   Q.   Right.  But they were all eligible --

2   A.   They were eligible.

3   Q.   The program was available to all of them throughout the

4   course of the --

5   A.   Yes.

6   Q.   Let me just finish the question for the clarity of the

7   record.  The program was available to all of them since the

8   bankruptcy filing, correct?

9   A.   Yes, as approved by the Court.

10  Q.   I'd like to now show you Joint Exhibit 93.

11       MR. DECHIARA:  Your Honor, this is a document that I

12  had a colloquy with Mr. Butler about before he went on the

13  record.  I think there's an agreement.  There's a typo.  And I

14  just want to correct it before -- to avoid any confusion to --

15  before I go further with my questioning.  Yeah.  Can you show

16  the whole document?  Your Honor, the line under the -- the

17  caption under the top pie chart says DSBTDC.  I think we have

18  agreement that that should say non-DSB.  Is that true, Mr.

19  Butler?

20       MR. BUTLER:  That's agreed.  It's a non-DSB chart.

21  That's non-DSB total direct compensation.

22  Q.   With that clarification, Mr. Naylor, the yellow piece of

23  the pie, do you see that?

24  A.   Yes.

25  Q.   That represents the short term bonuses you were talking

38

1    about a second ago?

2    A.    Yes.

3    Q.    And the top pie is the Delphi folks and the bottom pie is

4    the market, correct?

5    A.    Yes.

6    Q.    And the yellow piece of the pie on the top is bigger than

7    the yellow piece of the pie at the bottom, correct?  It's the

8    non-DSB at Delphi, their short term bonuses are worth 87,000

9    dollars whereas the market is 73,000 dollars, correct?

10   A.    I think we should clarify that the bottom pie chart is the

11   survey.

12   Q.    Right.

13   A.    So that's representative of market -- you know, market is

14   not necessarily an exact science to determining that.  So this

15   was a survey data.

16   Q.    Right.  This is an exhibit prepared by Watson Wyatt,

17   correct?

18   A.    Yes.

19   Q.    And Watson Wyatt looked at the survey?

20   A.    Yes.

21   Q.    And this is what Watson Wyatt says the market is, correct?

22   A.    That's what they said the survey showed.

23   Q.    Okay.  Well, did they do other than survey data?  Did

24   Watson Wyatt look at anything else for the non-DSB executives?

25   A.    Did they look at anything else, meaning -- I'm not sure

39

1   what you mean, did they look at anything else?

2   Q.   Did Nick Bubnovich base his analysis what the market was

3   for the non-DSB executives on anything other than survey data?

4   A.   Not to my knowledge.

5   Q.   Okay.  So this bottom pie chart is Watson Wyatt's analysis

6   of what the market is, correct?

7   A.   It's their representation of the market from the survey

8   data.

9   Q.   Okay.  And we see, do we not, that the short term bonuses

10  for the non-DSB are above market, correct?

11  A.   It's short term incentive opportunity.

12  Q.   Is that a yes?

13  A.   Yes.

14  Q.   Okay.  Now let's look at long term incentive, which is

15  that third component of total direct compensation.  And I'd

16  like to compare pre-petition to what's being proposed in the

17  management compensation plan.  There was pre-petition a long

18  term incentive plan, correct?

19  A.   Upon emergence.

20  Q.   No, no.  Before --

21  A.   Oh, pre-petition?

22  Q.   Pre-petition.

23  A.   Yes.  Yes.

24  Q.   There existed at Delphi a long term incentive plan for the

25  executives, correct?

40

1   A.   Yes.

2   Q.   Okay.  And under that long term incentive plan, 6.5

3   percent of the equity of Delphi was set aside for management,

4   correct?

5   A.   That is what is contained in a document that we looked at

6   during the deposition.  I have since learned that that number

7   is not comparable to some of the numbers that I quoted in my

8   declaration.  In other words, they're not apples to apples

9   comparisons.

10  Q.   Okay.  Well, let's just start with is the 6.5 -- whatever

11  it represents, is it true that 6.5 percent of the equity of

12  Delphi was set aside for management?

13  A.   I cannot verify that that is a correct number because I

14  don't know exactly what is the characterization of that 6.5

15  percent.

16  Q.   I'd like to ask you to look at the first exhibit to your

17  deposition.  And, Mr. Naylor, this is a document that Delphi

18  filed with the Federal Securities and Exchange Commission,

19  correct?

20  A.   Yeah, it looks that way.

21  Q.   Okay.  And is it -- and in this document, there is a

22  discussion of the long term incentive plan on page 10, correct?

23  A.   Page 10 -- okay --

24  Q.   It's --

25  A.   Which page number are you referring to?

41

1   Q.   It says -- on the upper right-hand corner, it says page 14

2   of 73.

3   A.   Okay.

4   Q.   And I think it's also on your screen.

5   A.   Yes.

6   Q.   Okay.  And then if you go on the left-hand side, it says

7   "as a percentage of outstanding shares".  Do you see that line?

8   A.   Yes.

9   Q.   And that says 6.5 percent of total shares.  Do you see

10  that?

11  A.   Yes.

12  Q.   Okay.  When you testified in your deposition, was that

13  what you were referring to?

14  A.   Yes.

15  Q.   Now under the pre-petition long term incentive plan, there

16  was a vesting period of five years, correct?

17  A.   In this plan --

18  Q.   Yes, the pre-petition.

19  A.   -- that we're looking at here?  I believe so, yes.

20  Q.   And in the plan that Delphi is now proposing, the

21  management compensation plan, there would be a three-year

22  vesting period, correct?

23  A.   Correct.

24  Q.   And it's more beneficial to the recipient of the equity

25  grant to have it vest in three years rather than in five,

42

1    correct?

2    A.    Potentially, yes.

3    Q.    So just to summarize, since pre-petition, the non-DSB

4    folks who started above market have received no salary cuts,

5    have received the same short term bonus opportunities, which

6    are above market according to Watson Wyatt, and there are these

7    changes that we've just discussed, these differences that we've

8    just discussed between the long term incentive plan pre-

9    petition and what's being proposed now.  Is that right?

10   A.    Well, I can't say that, for example, the short term

11   incentive opportunities that the non-DSB received or has

12   received during bankruptcy are above market.

13   Q.    Okay.

14   A.    Because that's not the survey data we were looking at on

15   the pie chart.

16   Q.    Okay.  And just for the record, what Delphi is proposing

17   in the management compensation plan is that eight percent of

18   the equity of reorganized Delphi be made available to

19   management, correct?

20   A.    Correct.

21   Q.    Okay.  Now, is it true that as a general matter a company

22   with larger revenues or the executives of a company with larger

23   revenues have a higher market level of pay than the executives

24   of a company with smaller revenues?

25   A.    Generally.

43

1    Q.    And is it not true that since pre-petition when Delphi

2    filed its bankruptcy petition or just before until now, its

3    revenues have gone down considerably, correct?

4    A.    They've gone down.  I don't know whether considerably is

5    the right adjective.

6    Q.    Okay.  But the arrow points down.  That's the direction

7    they've gone in?

8    A.    Yes.

9    Q.    Okay.  So the market level of pay for the Delphi

10   executives has actually decreased over the course of the --

11   from just before the bankruptcy filing until now, correct?

12   A.    Well, that's possible.  I can't say whether the level of

13   revenue reduction has a material effect on the survey data one

14   might look at.

15   Q.    Well, it certainly hasn't gone up, has it?

16   A.    The revenue has not gone up.

17   Q.    No.  But nor has the market level for Delphi's executives?

18   A.    Well, I don't know that because there is inflation.  There

19   are annual adjustments to many people's salaries.  So during a

20   two-year period, the market data changes.

21   Q.    Well, then why did you change the peer group?

22   A.    Well, we wanted -- as we saw the level of Delphi's revenue

23   decreasing and looking prospectively into the emergence period,

24   we wanted to make sure that the peer group was looking

25   prospectively as much as possible.  So we examined were there

44

1   any adjustments that needed to be made.

2   Q.   During the course of your work with Watson Wyatt, you

3   knocked a couple of the big companies off the peer group,

4   correct?

5   A.   Yes.

6   Q.   And that brought down the market level of the pay,

7   correct?

8   A.   Well, it brought down the average revenue.  I don't recall

9   exactly what it did to the market pay because, again, you have

10  inflation -- there's a number of moving parts over time.

11  Q.   Let me refer you to paragraph 26 of your declaration.

12  It's on page 14 and it continues on to page 15.  Are you there?

13  A.   This is the upper right-hand corner, page 14 and 15?

14  Q.   Well, I'm going to ask you questions about paragraph 26

15  which starts on the very bottom two lines of page 14 and

16  continues on to the next page.

17  A.   Okay.

18  Q.   Okay.  Are you with me?

19  A.   Yes, I think I've got -- oh, it's up here now.

20  Q.   Okay.  Now in that paragraph, you cite certain examples of

21  what you deemed to be sacrificed by management -- by Delphi

22  management in terms of compensation, correct?

23  A.   Correct.

24  Q.   Now the first example you give is concerning a reduction

25  in the compensation of the executives in bands A through F.

45

1    You see that?

2    A.   Yes.

3    Q.   And is that the same as the non-DSB people?

4    A.   Yes.

5    Q.   And Watson Wyatt had determined that their compensation

6    was above market, correct?

7    A.   Yes.

8    Q.   And if you look at page 14 of Exhibit 1 to your

9    declaration, which is the December 28th, 2007 Watson Wyatt

10   report, there's a -- there are two pie charts.  Could you turn

11   to that?  Do you see that?

12   A.   Yes.  What's on the screen here?

13   Q.   Yeah.  Do you see that page?

14   A.   Yes.

15   Q.   Okay.  And at the bottom -- the two pie charts -- the

16   bottom caption of the left one shows non-DSB TDC at 487 and the

17   survey TDC at 363.  Am I right to say that that was Watson

18   Wyatt's analysis of the non-DSB folks being above market?

19   A.   Yes.

20   Q.   Okay.  So the first change that you mention in terms of

21   sacrifice is bring down the non-DSB to market, correct?

22   A.   Yes.

23   Q.   Okay.  Now the second example is that retired executives

24   would no longer get life insurance.  Is that right?

25   A.   Yes.

46

1   Q.   And Watson Wyatt determined that giving life insurance to

2   retired executives was not a market competitive form of

3   compensation, correct?  Currently?

4   A.   Yes.  It was generally -- I mean, it's --

5   Q.   So the second example --

6   A.   It's done but not broadly.

7   Q.   I'm sorry?

8   A.   It's done but not broadly.

9   Q.   Well, Watson Wyatt determined it was not market

10  competitive, correct?

11  A.   Yes.  Yes.

12  Q.   So the second example is taking away an item that was not

13  market competitive, correct?

14  A.   Yes.

15  Q.   Now, the third example talks about certain pay cuts during

16  the Chapter 11 case for senior executives.  Do you see that?

17  A.   Yes.

18  Q.   Now, that is a reference to the ten percent base salary

19  reduction that the top ten DSB -- in other words, the top ten

20  of the top twenty-one -- a ten percent pay cut that they took,

21  correct?

22  A.   Yes.

23  Q.   And the reason they took that was because Watson Wyatt had

24  determined -- well, let me rephrase that.  Watson Wyatt had

25  determined that their base salary was above market, correct?

47

1   A.   Yes.

2   Q.   And that that pay cut was necessary to bring them down to

3   market level, correct?

4   A.   Well, there was a gap -- that pay cut was necessary.

5   There was -- the pay cut -- the voluntary pay cut that they

6   took and the benchmark data or the survey data that we were

7   looking at from Watson Wyatt were not connected.  In other

8   words, there was not cause and effect there.

9   Q.   Well, okay.  Maybe we could just do it more clearly this

10  way.  Can you turn to page 12 of the Watson Wyatt report that's

11  attached as Exhibit 1 to your declaration?  Okay.  Again, we

12  have two pie charts.  The left one represents the compensation

13  of the Delphi DSB executives and the right is the one Watson

14  Wyatt deems to be the peer group, correct?

15  A.   Yes.

16  Q.   And the slice of the pie on both pies in the upper right-

17  hand corner is base salary, correct?

18  A.   Yes.

19  Q.   And the base salary for the DSB people was 681,000

20  dollars?

21  A.   Right.

22  Q.   And Watson Wyatt determined that level as market was

23  609,000?

24  A.   Yes.

25  Q.   Okay.  And so, the ten percent dropped those -- brought

48

1   that base salary in the left-hand pie chart down, correct?

2   A.    Yes.

3   Q.    The fourth example you give of sacrifice by the Delphi

4   executives is you say, quote -- and I'm reading from page 15 of

5   your declaration.  The fourth example is that "The executive

6   group is the only group within Delphi that will have received

7   below market compensation for the Chapter 11 cases even if the

8   executive compensation program that the compensation committee

9   has approved is ultimately implemented."  Do you see that?

10  A.    Yes.

11  Q.    Okay.  Let me turn you to page 31 of the Watson Wyatt

12  report that's attached as Exhibit 1 to your declaration.  And

13  this has -- I'm going to refer you to the left-hand pie chart.

14  There's a slice of the pie that says "competitive shortfalls".

15  Do you see that?

16  A.    Yes.

17  Q.    And that is a visual depiction, if you will, of the same

18  insertion I just read in your declaration.  You're saying that

19  even with the emergence cash opportunities, there'd still be

20  that competitive shortfall piece.  Is that it?

21  A.    Correct.

22  Q.    And, first of all, there will be an emergence equity

23  payment under the management compensation plan if it's

24  approved, is that not correct?

25  A.    On a going forward basis, yes.

49

1   Q.   Okay.  So it's not depicted -- the emergence equity is not

2   depicted on that pie on the left, correct?

3   A.   Correct.

4   Q.   Okay.  Now what's the dollar amount of that slice of the

5   pie that says "competitive shortfall"?

6   A.   If it's not on this chart, and I don't see it on there, I

7   don't offhand know what the dollar value is.

8   Q.   Your answer is you don't know?

9   A.   No.

10  Q.   Now, if you look on the left -- the right-hand chart pie,

11  the one that says "competitive fact", does it show -- it says

12  on the right side, the upper right-hand corner says "long term

13  incentive opportunity".

14  A.   Yes.

15  Q.   Do you see that?

16  A.   Yes.

17  Q.   So it's Delphi's contention that the emergence cash being

18  paid on emergence would go towards at least in part

19  compensating the executives for their not having received long

20  term incentive opportunity during the Chapter 11 case?

21  A.   Yes.

22  Q.   Now under that pre-petition "long term incentive

23  opportunity" plan which the executives were not eligible to

24  participate in during the Chapter 11, there were performance

25  targets, correct?

50

1   A.   In part.

2   Q.   Okay.  And do you know whether those given how Delphi

3   performed or how the individuals performed, do you know whether

4   those performance targets would have been satisfied?

5   A.   Would have been satisfied when?  What period?

6   Q.   During the course of the Chapter 11.  In other words, let

7   me -- let's take a counter factual situation.  Let's pretend

8   that the long term incentive plan had been in place during the

9   Chapter 11.  Given what actually occurred historically, the

10  company's performance, the executives' performances, do you

11  know whether the targets under the plan would have been

12  satisfied?

13  A.   I don't know directly whether they would have been

14  satisfied.

15  Q.   You cannot testify here today that they would have been

16  satisfied, is that correct?

17  A.   Correct.  Correct.

18  Q.   Now under the -- I think you already testified but under

19  the pre-petition incentive plan, equity grants vested over a

20  five year period, correct?

21  A.   Yes.

22  Q.   So, again, let's take our counterfactual situation where

23  the long term incentive plan, the pre-petition long term

24  incentive plan had been in operation.  And let's say grants had

25  been made under that.  Let's say a grant was made in January

51

1    2007.  Are you with me with my hypothetical?

2    A.    Okay.

3    Q.    That grant would not have fully vested until five years

4    later, until January 2012, correct?

5    A.    Under the pre-petition regime, yes.

6    Q.    Okay.  But under the cash emergence that is going to

7    compensate or allegedly compensate the executives for not

8    participating in the long term incentive plan, all of that cash

9    vests immediately upon emergence, correct?

10   A.    First of all, it's partial compensation.  It does not

11   compensate them fully for the opportunity lost.  And the latest

12   agreement we have with the creditors' committee says that all

13   of the emergence cash vests at emergence.  But only half of it

14   is paid at emergence.

15   Q.    Okay.  So just to focus my question, is it not true that

16   whereas under the long term incentive plan, vesting -- a grant

17   made in January 2007 of equity would not have fully vested

18   until 2012 whereas under the emergence cash plan being proposed

19   now by the company, all of the cash will vest when Delphi

20   emerges?

21          MR. BUTLER:  Objection.  Asked and answered.  Sorry,

22   it's not -- those are the last three questions and he answered

23   each of them and that's what the testimony was.

24          MR. DECHIARA:  I'm just trying to clarify, Your

25   Honor.

52

1          THE COURT:  I think it's clear.

2          MR. DECHIARA:  Okay.  Thank you.

3    Q.   Now, under the pre-petition long term incentive plan,

4    there was a cash element to it, correct?

5    A.   Yes.

6    Q.   And approximately how many executives were entitled to

7    participate in the cash element of the pre-petition long term

8    incentive plan?

9    A.   I don't recall.  It was -- and I think we've said in the

10   600s.  You're talking total DSB and non-DSB?

11   Q.   No, no.  I'm talking about the pre-petition --

12   A.   Correct.

13   Q.   -- long term incentive plan.  Do you know how many

14   individuals were eligible to participate in the cash portion?

15   A.   In the cash portion?

16   Q.   Right.

17   A.   Offhand, I don't know.

18   Q.   Okay.  Let me ask you to look at page 28 of your

19   deposition transcript.  Why don't you just read that page to

20   yourself and see if that refreshes your recollection of what

21   the number is.

22   A.   Okay.

23   Q.   Does that refresh your recollection?

24   A.   Yes.

25   Q.   And the answer is there were a hundred --

53

1    A.    Approximately a hundred.

2    Q.    Okay.  And the cash emergence award here would be -- there

3    would be about 561 eligible to participate in the cash award

4    under the proposed management compensation plan?

5    A.    Correct.

6    Q.    I'd like to talk about what else the executives may or may

7    not have lost during the course of the Chapter 11.  You've

8    already mentioned that there was those ten at the very top who

9    took a ten percent pay cut.  Apart from those, were there any

10   executives who took any salary cuts?

11            MR. BUTLER:  Objection.  Asked and answered earlier?

12            MR. DECHIARA:  No.  I was talking about the non-DSB

13   earlier.  Now I'm talking about the entire DSB, the entire non-

14   DSB.

15   Q.    Except for those ten at the very top who took the ten

16   percent cut, did any of them take any salary cuts?

17   A.    Yes.

18            THE COURT:  Any other than --

19            MR. DECHIARA:  Other than the ten at the top who took

20   the ten percent.

21            THE COURT:  Okay.

22   Q.    Did any others take any salary cuts?

23   A.    Yes.

24   Q.    They did?

25   A.    Mr. O'Neil took a twenty percent cut.

54

1    Q.    Okay.

2    A.    And Mr. Miller took a cut to one dollar per year.

3    Q.    Okay.  Those were the guys we were talking about at the

4    beginning?  The ones getting the -- proposed to get the 8.3

5    million and the 5.3 million?

6    A.    Correct.

7    Q.    Okay.  Apart from them -- and thank you for that

8    clarification.  Apart from them and apart from the other ten at

9    the top, did anyone else get any salary cuts?

10   A.    I don't believe so, no.

11   Q.    Okay.  And all the executives received their full employee

12   benefits, correct?

13   A.    Clarify what you mean by employee benefits.

14   Q.    Well, let me ask you to look at page 29 to the Watson

15   Wyatt report that's attached as Exhibit 1 to your declaration.

16   And do you see at the bottom of this page -- this is a page

17   from Watson Wyatt.  Do you see that?

18   A.    Yes.

19   Q.    And you see it says at the very -- the bottom bullet, it

20   says "During the case, the executives have received their

21   salaries and continue participation in benefit programs".  And

22   I'll just stop reading there.  You can read the rest of the

23   sentence and everyone can see it but I'll just stop there.  Is

24   it accurate that the employees had the same participation in

25   benefit programs?

55

1   A.   Yes.  That is described here.

2   Q.   Okay.  Now let's talk about short term incentive bonuses.

3   Let's talk first pre-petition.  Isn't it true that there were

4   years pre-petition when the executives got zero short term

5   bonuses?

6   A.   That's the definition of "opportunity".  It's not

7   guaranteed.  So, yes, there were periods --

8   Q.   And so, for example, 2001 they got zero --

9   A.   I --

10  Q.   -- bonuses?

11  A.   I don't remember exactly which years they did or did

12  not --

13  Q.   Okay.  Let me refer you to page 32 of your transcript of

14  your deposition.  Now just read it to yourself and then my

15  question is going to be did the executives receive short term

16  incentive bonuses in 2001 and 2003.

17  A.   No.

18  Q.   They received it for neither year, correct?

19  A.   I'm sorry?

20  Q.   They received bonuses in neither of those years?

21  A.   Correct.

22  Q.   Now, during the course of the Chapter 11, by contrast, the

23  executives received short term incentive bonuses in each half

24  year period?

25  A.   Yes.  Some did, not all.

56

1  Q.   Well, the program was made available, correct?

2  A.   There was opportunity, yes --

3  Q.   Okay.  I'd ask --

4  A.   -- for all --

5  Q.   -- you to look at deposition 6 -- I'm sorry.  Exhibit 6 to

6  your deposition.  And looking at this exhibit, it shows that in

7  the first half of 2006, the short term bonuses that the

8  executives received was more than 183 percent above --

9            MR. DECHIARA:  Strike that.

10 Q.   It was more than 183 percent of the target, correct?

11 A.   For overall, yes.

12 Q.   Okay.  And the numbers for the next half year period, the

13 second half of 2006, they were 118 percent of the target?

14 A.   Yes, overall.

15 Q.   And for the first half of 2007, they were 176 percent of

16 the target, correct?

17 A.   Yes.

18 Q.   So they did pretty well under the bonuses, isn't that

19 true?

20 A.   Yes.

21 Q.   And let me refer you to Exhibit 11 of your deposition.

22 This is -- I'm going to refer you to the bottom e-mail.  This

23 is an e-mail from Mr. David Farr to you in May of '07, is that

24 right?

25 A.   Yes.

57

1    Q.    Who is Mr. Farr?

2    A.    He's another member of board of directors.

3    Q.    Okay.  You can look at the whole document but what I want

4    to ask you a question about is the sentence in the middle where

5    Mr. Farr says, "Yes, things are getting better but we are in

6    the middle of a very important negotiation with GM and UAW.  It

7    looks like the board was convinced to set a too low of a

8    financial target for the first half" -- and I'll end there.

9    And you can read as much as you want after that.  Is it true

10   that Mr. Farr believed that the board had -- and the board is

11   the Delphi board of directors that he's referring to?

12   A.    Yes.

13   Q.    That he believed the Delphi board of directors had set too

14   low of a target for the first half 2006 short term bonus

15   program?

16   A.    Well, I can't say for sure what he believed.  We see what

17   he wrote.

18   Q.    Okay.  But is that -- is what I said a fair reading, in

19   your eyes, of what he intended?

20   A.    He was concerned that it might have been set too low.

21   Q.    Okay.  In the management compensation plan that's being

22   proposed, there are new employment agreements that are being

23   proposed, correct?

24   A.    Yes.

25   Q.    Okay.  And under -- one of the terms of that employment

58

1    agreement is that if an executive involuntarily terminated,

2    there would be an accelerated vesting of his or her equity

3    grants, correct?

4    A.    Yes.

5    Q.    Now, do you know whether that's competitive practice to

6    have that sort of a term?

7    A.    Not offhand.  I don't believe it is -- I'm trying to

8    remember how it was characterized to us.  It's not unheard of

9    in the marketplace.

10   Q.    Okay.  Well, what I'm asking you is as you sit here today

11   as the chairman of the compensation committee of Delphi, and

12   Delphi is proposing this management compensation plan including

13   this provision, can you testify and tell this Court that that

14   provision is market competitive?

15   A.    I can't testify to that.

16   Q.    In fact, isn't it true that Watson Wyatt told -- said in

17   its report that there are only two other companies it could

18   find that had similar provisions?

19   A.    I don't remember how many companies they found with that

20   provision.

21   Q.    After emergence, Delphi's management ranks are going to

22   shrink, correct?  And I'm not talking long term.  I'm talking

23   about in the immediate -- in the short term after emergence,

24   the management ranks are going to shrink, correct?

25   A.    Well, that's -- that is the plan.  And as with any plan,

59

1    that's not a certainty.

2    Q.   Well, it's -- is Delphi going to sell two of its

3    divisions?  Its steering division and another?

4    A.   Delphi is trying to sell.  No, that's not a foregone

5    conclusion that they will have sold.

6    Q.   Of course.  But the plan is, the expectation is -- let me

7    not ask a compound question.  The expectation is that the ranks

8    of management will go from what is now in the mid-500s to the

9    mid-400s, correct?

10   A.   To the 400s.  Mid or high 400s, I'm not sure.

11   Q.   Somewhere in the 400s?

12   A.   Yes.  Yes.

13   Q.   So for some of those who are going to lose their jobs,

14   this accelerated vesting provision is pretty valuable, isn't

15   it?

16   A.   It depends on your definition of "pretty valuable".

17   Q.   Okay.  Now the employment agreements also have what I'll

18   call a no mitigation clause.  I asked you about this in the

19   deposition.  Do you know what I'm referring to when I say a no

20   mitigation clause?

21   A.   You have to refresh my memory.

22   Q.   You have a clause that says that when an executive gets

23   his severance, even if he finds a better paying job the next

24   day, there's no obligation to give back any portion of his

25   severance?

60

1    A.    Correct.

2    Q.    Is what I just said a correct characterization of how that

3    clause operates?

4    A.    Yes.

5    Q.    Okay.  And that would be a pretty valuable thing for

6    these -- to have for these executives who may lose their jobs,

7    correct?

8    A.    If that set of circumstances occurs.

9    Q.    Are you familiar with the SERP, S-E-R-P, Supplemental -- I

10    don't know if it's "executive" or "employee" but Supplemental

11    Executive Retirement Plan?

12    A.    Yes.

13    Q.    And pre-petition, there was a defined benefit SERP,

14    correct?

15    A.    Yes.

16    Q.    Okay.  And that, under the proposed management

17    compensation plan, the SERP defined benefit plan will be

18    frozen, correct?

19    A.    Yes.

20    Q.    Okay.  The vesting age of the -- I'm sorry.  The vesting

21    age under that defined benefit SERP will be reduced from sixty-

22    two to age fifty-five, correct?

23    A.    Yes.

24    Q.    Is that a benefit to those who are covered by that plan?

25    A.    It's our understanding of market and it is a benefit.

61

1    Q.    Okay.  And it's an improvement to the plan, correct?

2    A.    An improvement to market, as we understand it.

3    Q.    Well, it's an improvement from the point of view of the

4    people who are covered by the plan?

5    A.    Yes.

6    Q.    It's better for them, correct?

7    A.    Yes.  Yes.

8    Q.    And by reducing the vesting age, that means -- well, let

9    me ask you this first.  Because it's a supplemental retirement

10   plan, that means it's not a qualified plan under pension law --

11   A.    Correct.

12   Q.    Okay.  And that means that unlike some other pension plans

13   where there's a qualified trust from which the money comes,

14   this money under the supplemental unqualified plan comes out of

15   Delphi's assets?

16   A.    That's my understanding.

17   Q.    Okay.  So by lowering the vesting age, it means that if

18   these executives retire, they'll be eligible to take money out

19   of Delphi, so to speak, sooner than they would if they had to

20   wait till they were sixty-two, correct?

21   A.    Yes.

22   Q.    And that, of course, has a cost to Delphi, correct?

23   A.    Yes.

24   Q.    And what is that cost?

25   A.    What is that cost --

62

1   Q.   What's the dollar --

2   A.   -- on what basis?

3   Q.   Any basis you can give me.  What is the dollar value?

4         THE COURT:  No.  Ask a specific question.

5         MR. DECHIARA:  Okay.

6   Q.   Do you have any knowledge of what the dollar value to

7   Delphi would be of that change in the defined -- that proposed

8   change in the defined benefit SERP?

9   A.   It would depend on what range of assumptions one chose to

10  run that calculation.  I could --

11  Q.   Have you seen any studies on this by Delphi or Watson

12  Wyatt or anyone else?

13  A.   There were -- as I recall, there were some studies done to

14  estimate that change.

15  Q.   And are you familiar with any of those estimates that you

16  could share with us now?

17  A.   I don't have the numbers in my head at this moment.

18  Q.   Okay.  And just to be clear, I'm not looking for precise

19  numbers.  Can you give me any estimate, any range, any measure?

20        MR. BUTLER:  Objection.  Asked and answered.

21  A.   I'm sorry.  I just don't recall.

22  Q.   Okay.

23        THE COURT:  Overruled.

24  Q.   Yet, that's not the only way these defined benefit

25  supplement SERP is going to be improved, is it?

63

1    MR. BUTLER:  Objection, foundation.  I don't know

2  where he's leading to.

3    THE COURT:  Why don't you ask if there have been any

4  other changes to the SERP?

5    MR. DECHIARA:  Okay.

6  Q.   Are there any other changes being planned or proposed?

7  A.   I think there were.  I don't recall what they all were.

8  Q.   Okay.  Well, currently, isn't there a limit under the plan

9  that an executive who receives benefits under the plan cannot

10  get more than 5,000 dollars a month?

11  A.   During the case?

12  Q.   Isn't there currently a limit?

13  A.   Currently there is a limit.

14  Q.   Yes, yes.

15  A.   Yes.

16  Q.   That 5,000 dollar cap currently exists?

17  A.   Yes.

18  Q.   Is it being proposed in the management compensation plan

19  that that cap be lifted so that executives who get benefits

20  under the plan can get more than 5,000 dollars a month?

21  A.   As I recall a discussion there, the -- some of those

22  claims were going to be -- claims by executives who had been

23  capped were going to go into the claims pool that was dealt

24  with as part of the overall emergence.  For active employees

25  that would retire in the future, there would not be a 5,000

64

1   dollar cap.

2   Q.   Okay.  So currently there is a 5,000 dollar cap for any

3   participant under the plan, correct?  Correct?

4   A.   Yes.  Any retiree.

5   Q.   Right.

6   A.   Yes.

7   Q.   But now for incumbent -- active executives --

8   A.   Yes.

9   Q.   -- the proposal is that when they retire, that 5,000

10  dollar cap won't exist?

11  A.   Correct.

12  Q.   Okay.  And that would be a benefit to those executives,

13  correct?

14  A.   I don't know what you mean by a benefit.  It's what

15  they've earned.

16  Q.   Well, but it would be a benefit that they could draw on it

17  faster and get that money to them sooner and do what they want

18  to do with it rather than having to wait to get it in 5,000

19  dollar monthly pieces.  Isn't that correct?

20  A.   It would be -- yeah.  For those who deserve more than

21  5,000 dollar a month, it would be a better situation than if

22  there was a cap remaining.

23  Q.   Okay.  And do you know how much that will cost Delphi?

24  A.   Not offhand.

25  Q.   Okay.  Let me show you page 22 of the Watson Wyatt report

65

1    that's attached as Exhibit 1 to your declaration.  And the --

2    let me just point it out.  This item here that says -- towards

3    the bottom it says "Liability frozen SERP" and then there's a

4    bullet point that says "Lift 5,000K cap" and there's one that

5    says "Continue 5,000K cap".

6    A.    Yes.

7    Q.    And you see their dollar figures that are attached on the

8    right side?

9    A.    Yes.

10   Q.    Is the difference between those two numbers the cost of

11   the proposal to lift the 5,000 dollar cap?

12   A.    That's my understanding.

13   Q.    And that's forty-two million dollars?

14   A.    Yes.

15   Q.    Isn't it true that the overall employment in the auto

16   parts industry is decreasing?

17   A.    What geography are you talking about?

18   Q.    The United States auto parts industry.  Isn't it true that

19   overall the levels of employment, the number of people

20   employed, is decreasing?

21   A.    Anecdotally, that's my understanding.  I don't have data.

22   Q.    Okay.  If you can look at page 79 of your deposition,

23   starting from the middle of the page, the question was "Are you

24   familiar with the general state of the United States auto parts

25   industry?"

66

1      "A.  Somewhat familiar.  I'd say yes.

2      "Q.  Would you describe it as a troubled industry?

3      "A.  Troubled in the sense that there is less wealth

4  generation occurring in that segment of the automotive industry

5  than in past.

6      "Q.  Is overall employment in the industry contracting?

7      "A.  My understanding is that it is, yes."

8          MR. BUTLER:  Objection.  What is the purpose of

9  that -- that's exactly what he just testified to.

10          MR. DECHIARA:  No.  He hedged it with an anecdotally.

11          THE COURT:  It was kind of a waste of time.

12          MR. DECHIARA:  I'm sorry, Your Honor?

13          THE COURT:  Why don't we move on?  That was a waste

14  of time.

15          MR. DECHIARA:  Well, if I could just ask the witness

16  if he agrees with --

17          THE COURT:  He already does agree.  It's the same

18  thing.

19          MR. DECHIARA:  Okay.

20  Q.   And as part of that overall contraction of the ranks of --

21  that overall contraction of employment in the industry, isn't

22  it not also true that the ranks of employment of management

23  employees is contracting in the industry?

24  A.   I would assume so.  Again, I don't have data --

25  Q.   Okay.

67

1    A.    -- to support that one way or the other.

2    Q.    Well, if your assumption is correct, in other words, that

3    the ranks of management in the industry is contracting, isn't

4    it true that there would be a surplus of executives in the

5    industry?

6    A.    No, I wouldn't conclude that.

7    Q.    Okay.  If the ranks of manage -- if your assumption is

8    correct that the ranks of management is contracting, wouldn't

9    that have put downward pressure on the market level of pay of

10   executives in the industry as there are more executives chasing

11   few jobs, so to speak?

12   A.    Not necessarily.

13   Q.    Let me refer you to page 227 of your transcript of your

14   deposition.  If you could just read to yourself the bottom half

15   of that page and then I want to ask you a question.  There you

16   described there being turbulence in the American auto parts

17   industry, correct?

18   A.    I think that's why we're here today.

19   Q.    And you also said that there's "not a lot of wealth

20   creation occurring right now" in the industry?  Is that a fair

21   characterization of what you believe to be true?

22   A.    Yes.

23   Q.    And what impact, if any, in your view does this turbulence

24   in the industry and the fact that there's a lack of wealth

25   creation, what impact does that have on the market level of pay

68

1    for executives in the industry?

2    A.    Well, it could have a number of effects.  It could be

3    harder to attract executives into this industry versus other

4    perhaps more attractive industries.  So one might actually have

5    to pay more.

6    Q.    Is there another way of looking at it?

7    A.    There's probably many ways of looking at it.

8    Q.    Okay.  Now, under the proposed management compensation

9    plan, the proposal that there would be -- eight percent of

10   Delphi's equity would be set aside for management, correct?

11   A.    Yes.

12   Q.    And three percent of that would be paid upon emergence and

13   five percent not upon emergence, correct?

14   A.    Yes.

15   Q.    Is there any restrictions in the proposed plan as to how

16   soon that other five percent could be granted to management?

17   A.    No.

18   Q.    In the October 2005 Key Employee Compensation Plan that

19   was proposed, the proposal was to set aside ten percent of

20   Delphi's equity for the executives, correct?

21   A.    Yes.

22   Q.    And at that time, the assumption was that the value of

23   Delphi's equity upon emergence would be four billion dollars,

24   correct?

25   A.    There was an estimate made along those lines.

69

1    Q.    Okay.  So I'm going to ask you a question where I don't

2    think you're going to need my calculator.  If that plan had

3    been implemented and those assumptions had become true, then

4    the ten percent set aside if the equity value of Delphi upon

5    reorganization was four billion, the value of the equity set

6    aside would be 400 million, correct?

7    A.    Yes.

8    Q.    Okay.  Now, do you know how much Delphi in its disclosure

9    statement has said that the value of reorganized Delphi's

10   equity will be?

11   A.    I think on the same basis, it's somewhere between seven

12   and eight billion.

13   Q.    If I said 7.8 billion, would that sound right?

14   A.    That sounds about right.

15   Q.    Okay.  So tell me if you need the calculator, but eight

16   percent times 7.8 billion is how much?  And I'm not trying to

17   test your math?  You want me to just do the --

18   A.    620 something million --

19   Q.    624.

20   A.    Okay.

21   Q.    Okay. So is it fair to say that the value of the equity

22   that's being proposed to be set aside for management under the

23   current plan given the current assumption of Delphi's

24   reorganized equity value being 7.8 billion is 624 million,

25   correct?

70

1    A.    Yes.

2    Q.    And -- which is 224 million more than what was being set

3    aside under the earlier plan assuming the assumptions of the

4    earlier plan become true, correct?

5    A.    Right.  We're at eight percent now, correct?  Yeah, eight

6    percent of the value, not ten?

7    Q.    And that's a 224 million dollar difference in value for

8    something over 500 individuals?  Is that right?

9    A.    Yes.

10   Q.    Now under the October 2005 Key Employee Compensation Plan,

11   the equity set aside for management would have been granted

12   one-third in restricted stock and two-thirds in stock options,

13   correct?

14   A.    That's my recollection.

15   Q.    And under the proposed plan, it's a little more

16   complicated.  For the folks bands D and above -- in other

17   words, sort of the upper half of the non-DSB and the entire

18   DSB, they would get one-half restricted stock and the other

19   half stock options?

20   A.    That's my recollection.

21   Q.    So, in other words, under the proposal, they're getting

22   more -- the proportion of their equity grant is more in

23   restricted stock than stock options, right?

24   A.    For those -- for that segment, yes.

25   Q.    Okay.  And isn't that true that it's more valuable to the

71

1    recipient to get the equity in restricted stock than stock

2    options?

3    A.    Generally.

4    Q.    And as for the folks who are below band D, so sort of the

5    bottom portion of the non-DSB, there's absolutely no

6    restriction on what proportion they can get of their equity

7    grants in restricted stock under the proposal that's being made

8    now?  Is that correct?

9    A.    Yes.  That was the subject of negotiations with the plan

10   investors.

11   Q.    Okay.  But your answer to my question is yes, what I said

12   is correct?

13   A.    Yes.

14   Q.    In determining the market level for the top portion of the

15   DSB group, Watson & Wyatt used a peer group analysis, correct?

16   A.    Yes.

17   Q.    I'd like you to please turn to page 33 of your -- the

18   Watson Wyatt report attached as Exhibit 1 to your declaration.

19   Is this the peer group that the compensation committee adopted

20   for purposes of the management compensation plan?

21   A.    Yes.

22   Q.    And there is a heading in the document that says "Reason

23   for Including in Peer Group".  Do you see that?

24   A.    Yes.

25   Q.    Okay.  And it gives different reasons.  And let's start

72

1    with the first company, Texaco.  Do you see that?

2    A.    Yes.

3    Q.    Okay.  Now -- first of all, who prepared this chart?

4    A.    Watson Wyatt.

5    Q.    Okay.  And Watson Wyatt determined where to put the x's

6    and where not to put the x's?

7    A.    They had the initial proposal.  I think we made some

8    changes through compensation committee discussions.

9    Q.    Okay.  And this was the final result?

10   A.    Yes.

11   Q.    Okay.  So for Pepsi, there's no x under "Industry", right?

12   A.    Yes.

13   Q.    That's 'cause Pepsi is a beverage company and doesn't --

14   is not in the auto parts industry?

15   A.    Right.

16   Q.    And there's no x under "Geography"?

17   A.    No.

18   Q.    And there's no x under "Competitive Per Count", correct?

19   A.    Yes.

20   Q.    Correct?  There's not --

21   A.    Correct.  There's not --

22   Q.    And there's an x under "Revenue Size"?

23   A.    Yes.

24   Q.    And the revenue size of Pepsi, according to this chart, is

25   thirty-five billion dollars?

73

1    A.    Yes.

2    Q.    And Delphi's revenue is twenty-one billion dollars?

3    A.    Prospectively, yes.

4    Q.    What do you mean "prospectively"?

5    A.    On the chart, we were looking into the future.  That is

6    not the current --

7    Q.    Oh, okay.

8    A.    -- Delphi revenue.

9    Q.    Okay.  I'm not going to go through all these and take up

10   the Court's time but there are about a half a dozen of -- on

11   the top portion of this peer company where there's no check for

12   "Industry", "Geography" or "Competitor Per Count" and the

13   checks are for "Prior Peer Group" and "Revenue Size", correct?

14   A.    There's a number of those, yes.

15   Q.    Okay.  And each one of those, their revenue is above

16   Delphi's prospective revenue?

17   A.    No.  There's an x in Visteon and that's -- they're not

18   above --

19   Q.    Right.  Oh, okay.  Well, I'm talking about the ones that

20   say from, let's say, from Ray (ph.) on up.  I mean, there are a

21   couple of sections.  You know, Johnson is marked --

22            THE COURT:  I think we can read it.

23            MR. DECHIARA:  Okay.  Your Honor can read it so I

24   don't want to waste any more time.  Thank you, Your Honor, for

25   your accommodating me on this.  I'm almost done with my cross-

74

1   examination.

2   Q.   Mr. Naylor, can you turn to Exhibit 5 of your deposition?

3   Is this -- can you describe what this document is, if you know?

4   A.   This was -- well, it's an e-mail, as I recall, and it's

5   kind of a working document where questions were posed and

6   feedback was given.

7   Q.   Okay.  And the feedback is on the right side of the

8   document?

9   A.   Yes.

10  Q.   And the feedback was prepared by Delphi management?

11  A.   Yes, as I recall, this --

12  Q.   Okay.  I'd like to focus your attention on the middle

13  paragraph on the right margin --

14          THE COURT:  I'm sorry.  Before you do that?  Who's

15  asking the questions in this e-mail?

16          THE WITNESS:  Let me just look at these again.  These

17  are my questions on behalf of the compensation committee.

18          THE COURT:  Okay.

19  Q.   Focusing your attention on the right-hand side, the

20  paragraph that's headed "Communications" -- do you see that?

21  A.   Yes.

22  Q.   Second sentence.  It says "The executive compensation

23  program in the KECP" -- that's the Key Employee Compensation

24  Program?

25  A.   Yes.

75

1    Q.    "-- was reviewed and executives were told that although

2    there could be no assurance that final Court approval would be

3    obtained, our proposed compensation program would include" --

4    and then it goes on to describe it.  You can read the rest to

5    yourself.  Is it true, as far as you know, that Delphi told its

6    executives that there was no assurance that final Court

7    approval would be obtained for the proposed management

8    compensation plan?

9    A.    Correct.

10              MR. DECHIARA:  Thank you, Your Honor.  I have no

11   further on cross.

12              THE COURT:  Okay.

13              (Pause)

14              THE COURT:  Okay.  You ready to go ahead, Mr.

15   Kennedy?

16              MR. KENNEDY:  We're going to hand up, Judge --

17              THE COURT:  Well, I'm not looking at them unless

18   they're not on the screen.  'Cause the screen's working fine.

19              MR. KENNEDY:  Okay.  Thank you.

20   CROSS-EXAMINATION BY

21   MR. KENNEDY:

22   Q.    Good morning, Mr. Naylor.

23   A.    Good morning.

24   Q.    My name's Tom Kennedy.  I represent the IUE-CWA and I'm

25   going to try not to duplicate the questions and answers that

76

1    you've already given this morning.  But there are some

2    additional points that I think would benefit the record if we

3    clarified.  You indicated that the current Delphi non-DSB

4    executives number about 540.  Is that correct, sir?

5    A.    Yes.

6    Q.    And am I correct that 115 of those 540 executives are non-

7    U.S. based?

8    A.    Approximately.

9    Q.    And those 115 executives are employed by non-debtor

10   entities, correct?

11   A.    Yes, I believe so.

12   Q.    And isn't it accurate that the management compensation

13   plan you've proposed applies without distinction to those 115

14   executives that are employed by non-debtor entities?

15   A.    Yes.

16   Q.    So that those 115 non-debtor entity employed executives

17   will participate in the emergence cash bonus?

18   A.    Yes.

19   Q.    Is that correct?

20   A.    As they did in the bankruptcy proceeding elimination of

21   LTI.

22   Q.    And they'll participate in the emergence equity program as

23   well, correct?

24   A.    Yes.

25   Q.    And they will participate in the SERP to the extent

77

1    they're in the SERP at the point of the freeze?

2    A.   Yeah, except I'm sure some of them have more locally based

3    SERP programs.  I'm not familiar with all the countries and all

4    the different laws.  But, yeah, to the extent they should be

5    covered by a U.S. based SERP, they would be.

6    Q.   Now you commented that one of the reasons as the chairman

7    of the compensation committee, that you did not seek a second

8    opinion from any compensation consultants on the program other

9    than Watson Wyatt is that you knew Watson Wyatt was using

10   service data from many different sources?  Is that correct?

11   A.   Yes.

12   Q.   And did you understand in working with the Watson Wyatt

13   group for the management compensation plan that Watson Wyatt

14   had been the compensation consultant for Delphi prior to 2005?

15   A.   Prior to 2005, I was not -- I know they were the

16   compensation consultant prior to filing in October '05.  I

17   don't recall offhand whether they were employed in '04 and

18   earlier or not.  They might have been.

19   Q.   Sitting here, you don't know?

20   A.   I just don't recall off the top of my head.

21   Q.   Is it your understanding that prior to filing the

22   bankruptcy petition in October of 2005, Delphi's management

23   compensation program for its DSB and non-DSB executives was at

24   market level?

25   A.   Could you restate that?

78

1    Q.    Sure.  Just to get a little background, as I understand

2    it, you became a member of the compensation committee in

3    February of 2005?

4    A.    Yes.

5    Q.    And at that point, did you make an effort to determine

6    whether the compensation being paid in February 2005 to Delphi

7    executives was at market level?

8    A.    Did I personally --

9    Q.    Yes.

10   A.    No.

11   Q.    Well, at what point did you become chairman of the

12   compensation committee?

13   A.    January '07.

14   Q.    Okay.  From February '05 through December '06, were you a

15   member of the compensation committee?

16   A.    Yes.

17   Q.    And you were a member of the compensation, I take it then,

18   in the discussions that led up to the filing in October '05 of

19   the bankruptcy petition?

20   A.    Yes.

21   Q.    And in the course of preparing for that bankruptcy

22   petition, did you form a view as to whether the executives at

23   Delphi were being compensated at market level?

24   A.    I'm trying to remember when the original Watson Wyatt

25   report came in.  I don't remember whether it was before or

79

1  after October '05.  I think it was in '05 where the DSB

2  salaries and the non-DSB LTI -- there was a view that they were

3  not at market.  but that information became available to us

4  in -- I think it was in 2005.  I just -- I don't remember the

5  exact date.

6  Q.   Well, as I understand it, there was a report from Watson

7  Wyatt that was dated October 8th, 2005?  Is that the report

8  you're referring to, sir?

9  A.   I -- yes.

10  Q.   And is it your testimony that prior to October 8th, 2005,

11  you were not aware that the compensation for non-DSB executives

12  was above market?

13  A.   I -- I can't say with absolute certainty that I was not

14  aware through, you know, preliminary discussions of the report

15  that was going to arrive on October 8 or not.  But it was

16  around that period when we became aware that areas that we were

17  not at market.

18  Q.   Between February '05 and September '05, did the

19  compensation committee make any decisions concerning

20  compensation to be paid to Delphi executives?

21  A.   I'm sure we made some decisions.  I don't recall exactly

22  what decision we made in what month.

23  Q.   What I'm trying to get at is, in the course of making

24  those decisions, would you not have had occasion to review

25  whether the compensation for executives was at market level

80

1   prior to October of '05?

2   A.   That work was underway -- again, my understanding coming

3   on the committee was that we were using some kind of survey or

4   benchmarking process to set the current level of compensation.

5   I was not in the middle of those proceedings because they

6   preceded me coming on the board.  So that was my understanding

7   arriving on the board and the committee.

8   Q.   As you identified in your earlier testimony, Delphi

9   maintains a list of comparable companies against which it

10  benchmarks the pay of its executives, is that correct?

11  A.   Yes.

12  Q.   And I'd like to direct your attention to Exhibit 12 of

13  your deposition, page 2.  Does that represent the Delphi peer

14  group profile that was in place in 2005?

15  A.   Yes.

16  Q.   And that was compiled by Watson Wyatt?

17  A.   Yes.

18  Q.   And would you agree with me that for purposes of analyzing

19  Delphi's total direct compensation for its executives, the

20  validity of that analysis depends upon having an accurate group

21  of comparable companies?

22  A.   It's a very important part of that work.

23  Q.   And as compensation committee chair, or at least as a

24  member of the compensation committee, you were involved in

25  developing a different peer group for 2006, correct?

81

1    A.    Yes.

2    Q.    And I'd like to bring up Exhibit 13 in your deposition.

3    Now that is, as you, I believe, earlier identified, that is the

4    2006 comparable company universe that Delphi's using to measure

5    its total direct compensation for its executives?

6    A.    Was using, yes.

7    Q.    Was using, yes.  And that new peer group drops nine

8    previously included individuals, correct?  Included companies?

9    A.    I haven't done the count.

10    Q.    All right.  But just the --

11    A.    There are --

12    Q.    The companies identified on the left-hand column of the

13    lower part represent the 2005 companies that have been removed

14    from the comparable company universe?

15    A.    Yes.

16    Q.    Now did you obtain any documentation other than this chart

17    which establishes why Pepsi and Coke, as two examples, would be

18    appropriate comparators for building the universe against which

19    to measure the marketness of the TDC for Delphi?

20    A.    You asked did I receive any documents?

21    Q.    Yes.

22    A.    I don't recall receiving any documents.

23    Q.    Well, did you get a presentation about Pepsi or Coke that

24    amplified what they would be doing as a comparator for Delphi

25    other than the fact that they have a substantial revenue size

82

1    and they've been on the prior peer group?

2    A.   I don't think there was any presentation to that effect.

3    I think that was your question.  Did I receive a presentation?

4    No.

5    Q.   Well, we all know Pepsi and Coke.  We drink it.  We do

6    other things with Pepsi and Coke.  What is it that you know

7    about them that other folks don't do --

8              THE COURT:  Maybe you do.

9              MR. KENNEDY:  Yeah.  Yeah.

10   Q.   What is it --

11             MR. KENNEDY:  Let me rephrase.

12   Q.   What is it that you know about Pepsi and Coke that makes

13   them a sensible company to compare the salaries of Delphi's

14   auto executives against?

15   A.   Well, they -- they have a revenue size that is in the

16   range of what Delphi was.  They have a global reach, that is,

17   they participate in many countries.  And Delphi is globalizing.

18   And it is potentially true that we could compete for talent

19   with those companies, either people leaving Delphi to those

20   types of companies or people being hired into Delphi from those

21   companies.

22   Q.   Potentially true?

23   A.   Those companies, or the kind of the universe they

24   represent, maybe not those specific companies.

25   Q.   But of course, you're using those specific companies to

83

1    build a comparison, correct?

2    A.    One has to pick something to represent --

3    Q.    And those three factors, the revenue size, the global

4    footprint and the potential for competition for talent,

5    wouldn't that be true against almost all of the members of the

6    Fortune 500?

7    A.    It could be.

8    Q.    So that when Watson Wyatt is building a comparison, they

9    have a high level of freedom to select companies within a

10   twenty to thirty billion dollar revenue range that you, as the

11   compensation committee person, or chair, would accept.  Is that

12   correct?

13   A.    Would review and then accept.

14   Q.    Okay.  Well, in the review that you conducted in

15   connection with Pepsi and Coke, again, consisted of what?

16   A.    Well, we -- they were on the previous peer group, so there

17   was some rationale, just as I discussed earlier.  And there was

18   no particular reason to remove them from the peer group based

19   on that previous rationale.

20   Q.    Is it also fair to say that apart from what you've told

21   us, there was no particular reason to include them in the peer

22   group?

23   A.    There was no particular reason to include?  No.  I

24   wouldn't say that.

25   Q.    Okay.  But you've given us the reasons for including them,

84

1    correct?

2    A.    Yes.

3    Q.    In fact, I take it that you ultimately changed the 2006

4    comparator group.  Am I right about that?

5    A.    Yes.

6    Q.    You identified at least four of these companies as being

7    too large?

8    A.    Yes.

9    Q.    And those companies were Caterpillar, Dow, UTC and

10   Motorola?

11   A.    I believe those were the four that were removed.  There's

12   another exhibit that shows the latest peer group.

13   Q.    Is the reason for removing those four companies, solely

14   related to their size?  And I'm referring, of course, to their

15   revenues when I say that.

16   A.    As I recall the discussions we had, that was certainly the

17   trigger for reviewing them, and at least the primary reason

18   they were removed.

19   Q.    I take it you work closely with Mr. Bubnovich at Watson

20   Wyatt?

21   A.    Yes.

22   Q.    And did Mr. Bubnovich give you an opinion on whether the

23   adoption of a new comparator group that had only eighteen

24   members, which I take it is the case, would have an impact on

25   compensation results, and the comparison between Delphi and the

85

1    new eighteen-company universe?

2    A.    Yes.   Yes, there was an opinion.

3    Q.    And isn't it accurate to state that he told you that the

4    impact on compensation by changing the comparator group to

5    eighteen companies would yield a lower but not materially lower

6    compensation result?

7    A.    That's my recollection.

8    Q.    Did you ever ask Mr. Bubnovich what his definition of

9    materiality was?

10   A.    Not that I recall.

11   Q.    So it could be five, six, or seven percent difference.

12   You don't know what he meant when he said lower but not

13   materially lower?

14   A.    Well, my understanding was that material would be -- it

15   would have to be enough to take the -- Delphi out of the range.

16   There's always a range.   It's not a pinpoint number for these

17   aspects of compensation.   Material meant -- or it was not

18   material if it was a difference that would not take Delphi out

19   of the range of market competitive compensation.

20          MR. KENNEDY:   Could we bring up Exhibit 93?

21   Q.    Now, Exhibit 93 compares the non-DSB total direct

22   compensation between the incumbents, in effect, and the

23   universe, which is the lower pie.   Correct?

24   A.    Yes.

25   Q.    And I believe this exhibit was attached to the December

86

1   28, 2007 Watson Wyatt report.  Is that your memory as well,

2   sir?

3   A.    I believe so.

4   Q.    In any event is it -- are you in agreement with me that

5   this comparison rests on the eighteen-company comparator group

6   that you established sometime in 2007?

7   A.    This is the non-DSB.

8   Q.    Oh, that's true.  Yeah, okay.  Fine.

9   A.    So, that's a different --

10  Q.    Thank you.  You corrected me.

11  A.    -- comparison.

12  Q.    But just -- I want to explore for a minute, the range idea

13  that we were talking about with respect to the DSB.  You'll

14  notice that the upper chart is -- has a value of 375,000

15  dollars as an average compensation figure?

16  A.    Yes.

17  Q.    And the survey average has 363,000?

18  A.    Yes.

19  Q.    And I take it, it's your position that that difference is

20  within range?

21  A.    We -- yes, yes.  That was not material to a large degree.

22  Q.    All right.  And that difference is approximately 12,000

23  dollars?

24  A.    Yes.

25  Q.    Now, from your perspective as the chairman of the

87

1    compensation committee, if this were 25,000 dollars higher, if

2    this number was 388,000 dollars, as an example, would that be a

3    material -- excuse me, would that be within the range of market

4    that you could accept?

5    A.    Just repeat those numbers again --

6    Q.    Sure.

7    A.    -- I'm sorry.

8    Q.    If instead of a 12,000 dollar difference, this difference

9    was a 25,000 dollar difference, meaning it was -- the

10   arithmetic would be 388,000 over 363, would you still regard

11   that as being within the range?

12   A.    It's -- it probably is within a range.  And our philosophy

13   was to migrate to median.  So even though it's within the

14   range, that doesn't necessarily mean we wouldn't take action to

15   migrate to the median.

16   Q.    Well, how far of a difference for the non-DSB group, would

17   you accept over the survey results and still regard it as being

18   within range?

19   A.    First of all, I would consult with the experts in

20   compensation as to what constitutes materiality.  My first

21   guess would be, or my first estimate would be, something in the

22   five percent or less was probably within a range that most

23   compensation people would consider reasonable.  But beyond

24   that, you would have to take a hard look at it.

25   Q.    But what's interesting is that, in fact, when Mr.

88

1    Bubnovich indicated to you that the new eighteen-company

2    comparison group would result in a reduced compensation level,

3    but not materially different, you didn't ask him what his

4    definition of material was, did you?

5              MR. BUTLER:  Objection.  That's more testifying or

6    oral argument, Judge, as opposed to a question of a witness.

7              MR. KENNEDY:  I'll withdraw it.  I'll withdraw it.

8    Q.   Am I correct that Watson Wyatt prepared a presentation for

9    the compensation committee on the relationship between the DSB

10   salaries and market salaries in December of 2006?  Does that

11   ring a bell?

12   A.   I believe so.  We've had dozens of reports from Watson

13   Wyatt, so.

14             MR. KENNEDY:  Well, could we bring up Exhibit 286.

15   And what I have is a Bates page.  That's 21193.  Since I don't

16   think the document has internal numbering.  Did you see the

17   first flash?  That was a -- why don't we bring that first page

18   up for the witness.

19   Q.   There's an executive summary, December 2006.

20   A.   Okay.

21   Q.   Mr. Naylor?

22   A.   Yes.

23   Q.   So just to tell you where we are.  And we're looking at a

24   page that identifies the DSB compensation as compared to the

25   published survey -- or surveys that Watson Wyatt had reviewed,

89

1   correct?

2   A.   Yes.

3   Q.   And those -- that survey indicated that the base salary

4   levels were thirteen percent above the seventy-fifth percentile

5   in the market.  Am I correct about that?

6   A.   Yes.

7          MR. KENNEDY:  And can we go on to the next page,

8   which would be 21194.

9   Q.   And if reviewed as a function of proxy data, the base

10  salary levels were above the peer group by twelve percent.  Is

11  that also correct?

12  A.   Yes.  If you choose that piece of it.

13  Q.   Now, you were -- reviewed with my colleague, Mr. DeChiara,

14  what I'll call the roll up effect of salary increments, in

15  terms of the AIP and other compensation aspects that are

16  related to salary, correct?

17  A.   Yes.

18  Q.   Do you know what, as a labor lawyer, we would call a roll

19  up on salary applies to the executives?  In other words, if you

20  wanted to find the total cost to the company, what percentage

21  you would multiply a salary difference by to come up with a

22  total financial impact of a salary increase?

23  A.   I'm not familiar with exactly what that is.  I know it

24  exists, but I'm not -- I don't have the numbers.

25  Q.   Well, when you were advised that the DSB salaries were

90

1   eighty-seven percent over the market, did you get a study done

2   of what that meant in dollar terms to Delphi, not just focusing

3   on the salary, but going through all of the benefits that are

4   salary related?

5           MR. BUTLER:  Objection.  Foundation?  Where is where

6   they were told they were eighty-seven percent over market?  I

7   just want to --

8           THE COURT:  Yeah, I don't think --

9           MR. KENNEDY:  Well, they were told --

10          MR. BUTLER:  Your question said eighty-seven percent

11  over market.

12          MR. KENNEDY:  Yes.

13          MR. BUTLER:  I'd just like to know what the

14  foundation for that is.

15          MR. KENNEDY:  Okay.  Let me state it differently.

16  Because I think I may actually have been in error on that.  I

17  was adding thirteen percent to the seventy-five percentile, I

18  think is what I was getting that.

19  Q.   In any event, when you were told that the Delphi salaries

20  were thirteen percent above the seventy-fifth percentile, did

21  you have any study done as to what the dollar impact on Delphi

22  was of that difference, as rolled through all of the salary-

23  related benefits?

24          MR. BUTLER:  Objection, again.  Foundation.  Just for

25  the record, do you mean thirteen percent or twelve percent, Mr.

91

1   Kennedy?

2            MR. KENNEDY:  Well I said thirteen, which was the

3   prior slide.  So I was referring to thirteen.  Thirteen was by

4   survey --

5            MR. BUTLER:  I'm just trying to understand what

6   you're --

7            MR. KENNEDY:  You're correct.  Yeah.  We're looking

8   at a slide that says twelve percent, but the prior slide had

9   been thirteen.

10           MR. BUTLER:  Okay.

11           MR. KENNEDY:  Which was the basis for the question.

12  BY MR. KENNEDY:

13  Q.   Have I confused you, Mr. Naylor?  The --

14  A.   Well, if we're talking about --

15  Q.   I'm trying.

16  A.   -- the numbers that are in this report, whether -- if

17  you're talking about this twelve percent --

18  Q.   Well, let's talk about the twelve percent, because --

19  A.   Okay.

20  Q.   -- we're looking at it.  Did you conduct a study or have a

21  study done of what the dollar cost to Delphi was of having

22  salaries that were twelve percent above the seventy-fifth

23  percentile?

24  A.   No.

25  Q.   What did you do, if anything, as part of the compensation

92

1    plan, to reflect the fact that the base salary levels for the

2    DSB executives were twelve or thirteen percent above the

3    seventy-fifth percentile of the market?

4    A.    There were a lot of deliberations.  But ultimately we

5    decided to keep the ten percent voluntary salary reductions

6    that were taken by a number of members of the DSB, make those

7    permanent to bring them much closer to the median.

8    A.    Well, I don't know if you're able to do this math.  I

9    can't.  But if you take a salary which is thirteen points above

10    the seventy-fifth percentile and reduce it by ten percent, how

11    far down into the seventy-fifth percentile does that bring it?

12    A.    Within range.

13    Q.    And range being defined as what, sir?

14    A.    We talked about that earlier.

15    Q.    Well you said range was five percent in your earlier

16    comment.  I take it we would have to have a broader definition

17    of range to encompass the --

18    A.    Not necessarily.

19    Q.    So is it your view, then, a ten percent salary reduction

20    would take the DSB executives down to the median, as presented

21    by the universe of eighteen companies?

22    A.    Again, you have the ten percent salary reduction and the

23    passage of time, where no salary increases were being granted,

24    while inflation and other salaries were increasing.  So our

25    belief was, if we took a one-time ten percent cut, plus the

93

1    passage of time, we would be well within range of the median,

2    at approximately emergence.

3    Q.    Was that computed at some point, what the actual dollar --

4    A.    I don't recall a computation on that.

5    Q.    So the -- is it fair to say that the compensation

6    committee, as notional matter in discussions, concluded that

7    although there was evidence that the DSB salaries were above

8    market that the ten percent reduction and a lack of increases

9    in '06 and '07, or '05 as well, made them market range?  Is

10   that correct?

11   A.    That was our judgment.

12   Q.    And you did that, though, just as a discussional matter?

13   There were no documents or calculations which supported that?

14   A.    I don't recall calculations on that.

15   Q.    Do you know if these calculations that are reflected on

16   this report in December of '06 assumed the ten percent cut was

17   already in place?

18   A.    No.  I said earlier, that was subsequently -- with this

19   information, we subsequently decided to make an adjustment to

20   get to median over time.

21   Q.    Well, when was the ten percent cut adopted by Delphi

22   executives?

23   A.    I believe it was the beginning of '06.

24   Q.    And this is a report in December of '06 that we're talking

25   about now that's up on the screen, correct?

94

1   A.   Right.

2   Q.   So did the report in December of '06 calculate the

3   salaries at the '05 level or the '05 minus ten percent level?

4   A.   I believe this is the '05 level that we're looking at as

5   plus twelve percent on this slide, over at the seventy-fifth

6   percentile.

7   Q.   Was the ten percent cut in place for the entire DSB?

8   A.   No.

9   Q.   Well these figures we've just been talking about, though,

10  are for the entire DSB, correct?

11  A.   Yes.

12  Q.   So how could ten percent for just a portion of the DSB

13  adjust or impact on the salaries of the DSB members that never

14  took the ten percent cut?

15  A.   It didn't.

16  Q.   So your testimony then, that the compensation committee's

17  response to being thirteen points over the seventy-fifth

18  percentile for the DSB in salaries was to recognize the ten

19  percent figure as a reflection of getting to market, that

20  doesn't apply to half of the DSB, does it?

21  A.   That ten percent cut did not apply to, what, it was eleven

22  individuals.

23  Q.   Well there's twenty-one people on the DSB.

24  A.   Yeah.

25  Q.   And only the top ten took the ten percent cut.

95

1   A.    Um-hmm.

2   Q.    So the bottom eleven didn't.  So your analysis as to how

3   you got the DSB to market rate wouldn't apply to more than half

4   of the DSB.  Can you agree with me on that?

5   A.    Yes.

6   Q.    Was the compensation committee involved in setting the

7   short-term incentive plan program from October of '05 through

8   now?

9   A.    Yes.

10  Q.    And that has been called, in this proceeding, the AIP,

11  correct?

12  A.    Yes.

13  Q.    Now, are you aware of the structure of the AIP?

14  A.    Am I aware --

15  Q.    Let me be more specific.  Are you aware that the AIP is

16  structured as having a target payout and then a maximum payout?

17  A.    Yes.

18  Q.    And from the questions Mr. DeChiara asked, I take it

19  you're well aware that in two of the three six-month periods

20  that have been completed, the maximum payout was hit almost

21  exactly?  Is that correct?

22  A.    The maximum payout?

23        MR. BUTLER:  Objection.  Foundation.  Is that -- I

24  don't know what almost exactly is, and that's not what the --

25        MR. KENNEDY:  Let's bring it up --

96

1          MR. BUTLER:  -- indicated.

2          MR. KENNEDY:  -- okay.  Let's bring it up.  Can we

3    bring up Exhibit 6 in Mr. Naylor's -- Naylor's deposition.

4          (Pause)

5          MR. KENNEDY:  Well, could we do this in paper?  I

6    want to know which Delphi executives have been near the plug.

7    We've lost power on this.

8          THE COURT:  We all have the -- I have the --

9          MR. KENNEDY:  Yeah, we have it.  It's okay.  We'll

10   use the --

11         THE COURT:  It's okay.  We don't need the -- we don't

12   need it on the chart -- on the screen.  You can go ahead, Mr.

13   Kennedy.

14         MR. KENNEDY:  You'll try to get it back on, and we'll

15   trundle along until we do.

16         THE COURT:  Okay.

17         MR. KENNEDY:  So Exhibit 6.  The chart -- the book I

18   gave -- you have it anyway, correct, sir?

19         THE COURT:  I've been using it throughout.

20         MR. KENNEDY:  All right.  Fine.  Do you want me to

21   wait?  Oh, all right.

22   BY MR. KENNEDY:

23   Q.   Do you have Exhibit 6 in front of you, sir?

24   A.   Yes.

25   Q.   All right.  I just want to clarify that.  The first half,

97

1    2006 incentive award, the maximum possible award was 40.8

2    million.  Is that correct?

3    A.    Yes.

4    Q.    And the actual funds spent was 38.9 million?

5    A.    Yes.

6    Q.    Okay.  And for the second half of 2006, the maximum

7    potential award was 25.6 million.  And the actual amount spent

8    was 25.5 million?

9    A.    This middle -- this column called formula performance

10   award, I'm not sure that's the maximum payout possible.

11   Q.    I see.  I see.  Well, if it's not, I stand corrected.  Do

12   you have any sense of what it is?

13   A.    What what is?

14   Q.    What the relationship between formula performance award

15   and the maximum awards are?

16   A.    I think the formula performance award was if every

17   division met their target and corporately everything was met,

18   what could be -- what would be the opportunity.

19   Q.    Wouldn't that be a definition of the maximum possible

20   award?

21   A.    No.  I said, if every division met their target, not

22   exceeded their target.

23   Q.    Oh, I see.  I see.  I see.  So this is, in effect, meeting

24   plan, you might call it?

25   A.    I believe that's what this column represents.

98

1    Q.   I see.  So the --

2              MR. BUTLER:  Your Honor, could we take a moment?

3              THE COURT:  Okay.

4              (Pause)

5              MR. KENNEDY:  I was being schooled by Mr. Butler on

6    the incentive program, briefly.  And I'm about to be told by my

7    associate.  Okay, is there anybody else who would care to

8    help?  Well, I'm going to -- I'm going to try to puzzle this

9    out just the two of us.

10   Q.   Looking at Exhibit 6, the fifth line to the right gives

11   the payout as a percentage of the target, correct?

12   A.   Yes.

13   Q.   And did you play a role in setting what that payout would

14   be?

15   A.   We played a role in setting the targets which then

16   calculated to that percentage payout.

17   Q.   After the first half 2006 results were in, did you have

18   any concerns about a payout which was 183 percent of the

19   target?

20   A.   There were questions asked.

21   Q.   And what precisely did you do in response to those

22   questions being asked?  How did you make this tougher, if at

23   all?

24   A.   Well, we did several things.  We shared this with the

25   total board, which, of course, they were aware of the total

99

1    payout and so on.  We looked carefully at all the future

2    periods and how the targets were being set to make sure that

3    there was adequate stretch, if you will, in those targets, that

4    they were reasonable but not impossible to achieve.  I also, at

5    one point, asked the Delphi auditor, the lead person for our

6    auditors, Ernst & Young, who sat in business reviews where the

7    plan was being discussed and the targets flow from the plan, to

8    get another pair of eyes looking at the target setting process.

9    And he came back to me subsequent to my request saying that he

10   had been in several reviews, talked to a number of people, and

11   was fully satisfied that these targets were being legitimately

12   set, that there was no gaming, if you will, of the target

13   setting.

14   Q.   Did you ever determine what percentage of the U.S. based

15   executives got as much as 200 percent payout on the AIP?

16   A.   I don't recall calculating that or asking for that.

17              MR. KENNEDY:  Could we bring up Exhibit 295?  We

18   can't bring it up.   Look at 295 page 3, Your Honor.

19              THE COURT:  I'm sorry.  What is this an exhibit to?

20              MR. KENNEDY:  Exhibit -- it's a freestanding exhibit,

21   Your Honor.  It's just Exhibit 295 in the book.  It's -- would

22   be within the book I just --

23              THE COURT:  Isn't 295 what you handed me earlier?

24              MR. KENNEDY:  Well, yes, that would be one way of

25   doing it.

100

1          THE COURT:  I need a book.

2          MR. KENNEDY:  If you want to see -- Susan, can you

3     give Jack your book?  He wants to see the 295 the Judge is

4     looking at.

5          THE COURT:  This is Delphi AIP review?  This thing?

6          MS. SPEAKER:  Yes.

7          MR. KENNEDY:  Yes.

8          THE COURT:  Okay.  I'm okay.  I have a copy of it.

9     BY MR. KENNEDY:

10    Q.   Now, you were aware, I take it, Mr. Naylor, that Delphi

11    was having discussions with Pearl Meyer, as -- in her role with

12    the creditors' committee in September of 2006?

13    A.    I don't recall exactly when those conversations started.

14    But I am aware of conversations that had occurred with her

15    throughout a number of months.

16    Q.   Because I want to direct your attention to page 3.  Do you

17    see that chart that shows executive actual payout/target award

18    distribution?

19    A.   Yes.

20    Q.   That excludes the DSB, correct?

21    A.   Yes.

22    Q.   But the other, the 540 executives, it appears that my

23    reading of the chart, fifty-five percent of them got a 200

24    percent payout, correct?

25    A.   Approximately.

1          MR. KENNEDY:  Now, would you bring up -- would you

2     bring up Chart 97 -- I should say Exhibit 97.  Oh, you can't.

3     Right.  That's the pie charts.

4          THE COURT:  When you say the pie charts, that's the

5     thing that's attached to the -- one of the pages of the Wyatt?

6          MR. KENNEDY:  Yes, it is.  Yeah, I believe it's the

7     last page of the -- I think it's the last page of the exhibits

8     attached to Mr. Naylor's declaration.

9          (Pause in proceedings)

10         MR. KENNEDY:  Your Honor, could we take a five minute

11    recess.  It may help electronically and we've been going quite

12    a while for the witness here.

13         THE COURT:  Yeah, that's fine.  How long do you --

14    how much more time do you think you have?

15         MR. KENNEDY:  Well, I'll try to speed it up, Your

16    Honor.  I would think probably forty minutes, something like

17    that.

18         THE COURT:  Okay.  I'll be back at twenty-five of --

19    twenty-five of one.

20         (Recess from 12:32 p.m. until 12:42 p.m.)

21         THE COURT:  Please be seated.  Okay.  We're back on

22    the record.  And I understand we -- you all fixed the plug or

23    the surger or whatever?  Okay.  You can go ahead, Mr. Kennedy.

24    BY MR. KENNEDY:

25    Q.   Mr. Naylor, we were, prior to the break, discussing the --

102

1   more than half of the non-DSB executives who received 200

2   percent payouts on the AIP program.  And I want to direct your

3   attention to the comparison that's now up on the screen, which

4   is Exhibit 93.  And the yellow portion of the pie chart refers

5   to the short-term incentive opportunity, correct?

6   A.   Yes.

7   Q.   So where in that chart, that pie, is the 200 percent

8   actual recovery that more than half of the non-DSB executives

9   received?

10  A.   It's not.  That wasn't the purpose of this chart.

11  Q.   But wouldn't it be a rational element of a compensation

12  program to compare the actual compensation that the executives

13  were receiving as against actual compensation that executives

14  are receiving at other companies?

15  A.   Not necessarily.

16  Q.   Okay.  So in terms of the emergence cash bonus, the

17  emergence equity bonus for the long term equity program, in the

18  MCP, is the actual payout under the AIP for the last couple of

19  years included in any way in those programs or factored in?

20  A.   No.

21  Q.   All right.  Let me ask you some questions about the

22  emergence cash program.  The MCP calls for calls for

23  approximately eighty-seven million in cash to be paid to Delphi

24  executives?  Is that correct?

25  A.   Yes.

1    Q.    And that emergence cash bonus, that's a backward looking

2    program?

3    A.    Yes.

4    Q.    And it's primarily put in place to recognize the long-term

5    income void that occurred during the Chapter 11 case?

6    A.    The LTI opportunity that was forfeited during the case.

7    Q.    Okay.  And that LTI opportunity that didn't occur from

8    October '05 through now, that included stock options that -- or

9    I should say, long-term stock that wasn't granted, correct?

10   A.    Yes.

11   Q.    And did it also include previously issued long-term

12   opportunities that were cancelled as part of the bankruptcy

13   proceeding?

14   A.    I don't believe so.  I think it only included the, you

15   know, during the case, opportunities that were forfeited.

16   Q.    Now, that eighty-seven million dollars is going to be paid

17   to how many different executives?  Is that the 540?

18   A.    560.  I think it was approximate --

19   Q.    Okay, 560 meaning the DSB plus the 540?

20   A.    Yes.

21   Q.    Okay.  And that group includes the 115 non-U.S. executives

22   that we discussed earlier?

23   A.    Yes.

24   Q.    Now, those 115 executives were working for companies that

25   are not part of the bankrupt estate, correct?

104

1  A.   Yes.

2  Q.   And those companies were free to set the compensation for

3  their executives in any way they wanted to during the term of

4  the bankruptcy proceeding.  Isn't that also correct?

5  A.   I don't know that to be the case.

6  Q.   Well --

7  A.   What I do know is those 115 executives along with all the

8  other executives, forfeited their LTI opportunity during the

9  case.

10  Q.   Do you know if those 115 nondebtor entity employees

11  received compensation in other ways from their nonbankrupt

12  entities to address the fact that they were no longer getting

13  LTI during the term of the case?

14  A.   To my knowledge, they did not.

15  Q.   Did you make that inquiry?

16  A.   I did not make a specific inquiry.  That was the

17  understanding that we had.

18  Q.   And how did you reach that understanding?

19  A.   Well, because that was the policy during the period, that

20  the LTI opportunity would be forfeited by all executives,

21  debtor --

22  Q.   Why --

23  A.   -- and nondebtor.

24  Q.   I understand that was the policy with respect to LTI.  But

25  you don't know, sitting here today, what the compensation

105

1    policies were for all of the nondebtor entities during the

2    period of time of this Chapter 11 case, do you?

3    A.    No.

4    Q.    So you don't know if those executives received

5    compensation opportunities or dollars that --

6    A.    I don't know for a fact.

7    Q.    -- all right.

8         MR. KENNEDY:  Now, could we bring up Exhibit 265.  No

9    excuse me.  Let me say that differently, I'm sorry.  Exhibit 3

10   to 265.  Mr. Sidley, page 3.  I'm sorry, make that page 17.

11        (Pause in proceedings)

12        MR. KENNEDY:  Seven -- actually 17.  I believe that's

13   7.  I believe -- let's see.  That's 16.  Okay.  Whoops, that's

14   18.  All right.  That's -- okay.  I think that's 17 we're

15   looking at.

16   Q.    Now, this is the October 8, 2005 report from Watson Wyatt

17   that was included as part of original Key SIP motion, correct?

18   A.    Yes.

19   Q.    And this is a chart that illustrates how the 87.9 million

20   aggregate compares to the costs incurred by other large

21   companies?  Do you understand that's what this document is?

22   A.    Yes.

23   Q.    And the -- first, the annual cost as a percentage of

24   revenues, if we looked at Delphi's costs compared to other

25   companies, Delphi's in the seventy-ninth percentile?  It's at

106

1    the document at the left under revenues, on the bottom boxed

2    row.  Do you see that.

3    A.    In revenues.  That's what you mean, in revenues?

4    Q.    Well, you see the figure seventy-nine percent?

5    A.    Yes.

6    Q.    Do you interpret being at seventy-nine percent of a

7    comparison group, is that being at the median?

8    A.    No.

9    Q.    So this proposal, even as it's stated, is substantially

10    over the median for the comparison group of companies, correct?

11    As measured as an annual cost of the percentage of revenues.

12    A.    Again, I'm not sure whether this percentile -- does this

13    percentile relate to Delphi's standing in that group with

14    respect to revenues or the cost of this plan?

15    Q.    Well, let me ask you -- let me ask this differently.  Do

16    you know what the seventy-nine percent refers to?

17    A.    It looks to me like it refers to revenues.  Delphi is in

18    the seventy-ninth percentile of revenues of the peer group

19    companies.

20    Q.    And do you see the eighty-one percent in the next row?

21    A.    Yes.

22    Q.    The eighty-one percent aggregate?

23    A.    Yes.

24    Q.    Do you understand what that means?

25    A.    Yes.

107

1   Q.   What does the eighty-one percent refer to?

2   A.   That's the aggregate cost of the emergence plan as a

3   percent of revenue.

4   Q.   Well it's -- isn't it the percentile rank for Delphi?

5   A.   It's the percentile rank,  It's within that peer group.

6   Q.   All right.  So my only point behind all this is that

7   within the peer group that's identified in that page, the

8   program that Delphi's proposing, it places it at the eighty-one

9   percent, correct?

10  A.   Yes.

11  Q.   Substantially over median?

12  A.   Yes.

13  Q.   All right.  Now, let's look at the companies.  The --

14  there are fifteen companies identified here?

15  A.   Yes.

16  Q.   And were they selected by Watson Wyatt or by the

17  compensation committee?

18  A.   I believe they were selected by Watson Wyatt, where they

19  could get a comparison.

20  Q.   And two of the companies are Enron and WorldCom?

21  A.   Yes.

22  Q.   Are there any other purposes for which Delphi uses Enron

23  as a comparison to set its executive compensation?

24  A.   No.

25  Q.   Do you know how Watson Wyatt happened to select these

108

1   fifteen companies?

2   A.   I believe they were companies where they could find a

3   retention program that had been put in place as a comparative.

4   Q.   Well, Enron, for example, as it concluded the Chapter 11

5   proceedings, was terminating its operations, correct?  Selling

6   them all off?

7   A.   I believe so.

8   Q.   So that giving a backward looking bonus to executives who

9   are about to lose their employment is really a different

10  situation than Delphi is facing, isn't it?

11  A.   Perhaps, yes.

12  Q.   Isn't it, in fact, rare from companies emerging from a

13  Chapter 11 to offer a cash bonus program to its executives?

14  A.   I don't know how you define rare.  It happens --

15  Q.   Well, doesn't happen very often?

16  A.   -- it does not happen very often, is my understanding.

17  Q.   Okay.  And the reason why you thought this thing made

18  sense was to replace the missing LTIP opportunities, right?

19  A.   Yes.

20  Q.   Now, did you analyze what the missing LTIP opportunities

21  actually were worth to the employees involved?

22  A.   Did I personally analyze --

23  Q.   Or did the compensation committee conduct that analysis?

24  A.   We were advised by Watson Wyatt who did the analysis.

25          MR. KENNEDY:  All right.  I'd like to bring up

109

1    Exhibit 264, Exhibit 10, or attachment 10 to Exhibit 264.  And

2    I'd like to make page 10.

3    Q.   This is the exhibit you received sometime -- that they

4    created sometime in February '05, sir?  If we go to page 10 of

5    that document?  Now, would you agree with me --

6              THE COURT:  I'm sorry.  I missed that.  What is the

7    date of this document?

8              MR. KENNEDY:  February 2 of 2005.

9    Q.   Now, it's entitled Underwater Stock Options.  And in fact,

10   the LTIP opportunities that Delphi had issued in the years 1999

11   through 2004 were underwater as of October of 2005, correct?

12   A.   I believe -- and I'm looking here -- I don't know whether

13   absolutely all of them were.  Certainly most of them were.

14   Q.   Well, would you identify any of them for me that you think

15   were still of economic value as of October 2005?

16   A.   I don't know offhand exactly what the stock price was in

17   October --

18   Q.   Wasn't it in the low --

19   A.   -- this is February, right?

20   Q.   That's February.  That happens to be February.  But the

21   dot options are still the same numbers, correct?  Meaning, it

22   was a $10.02 strike price on the 2004 options?

23   A.   Yes.

24   Q.   So October of '05, that still would have been the strike

25   price, right?

110

1    A.    Yes.

2    Q.    And are you aware that the shares of Delphi were trading

3    in the very low dollar numbers, below eight dollars as of

4    October 2005?

5    A.    I believe that was the stock price at that time.

6    Q.    Okay.  And if that's true, at least as of October, the

7    long term incentive options that Delphi had issued were

8    worthless.  Isn't that correct?

9    A.    At that point in time.

10   Q.    The -- Watson Wyatt concluded that stock -- "Stock options

11   are presently not retentive nor highly valued by employees".

12   And did you accept that analysis as correct?

13   A.    Where are you reading that from?

14   Q.    It's the --

15   A.    Oh, okay, the stock options --

16   Q.    -- you see it?  The first line below the first bullet?

17   A.    Yes.

18   Q.    The second bullet.  So the long term stock options that

19   you were -- or that the emergence cash bonus is intended to

20   replace, at least prior to the bankruptcy, were worthless.

21   What is it you were expecting, that had there been no

22   bankruptcy, Delphi would have done in the years '06 and '07

23   that would have generated long term income opportunities for

24   the membership -- for the executives?

25   A.    Again, the operative word is opportunity.  So what we

111

1    benchmark is the opportunity not the actual payout, because it

2    is pay at risk.  That's the --

3    Q.   And when you benchmark opportunity, I take it you're

4    really saying, you look at what other companies did in that

5    period of time, and the emergence cash bonus is to pay the

6    Delphi executives for what other companies would have done?

7    A.   Other comparison companies.

8    Q.   But was there any realistic prospect in October of 2005

9    that Delphi, with a two or three-dollar stock price was going

10   to be issuing stock options that had value?

11   A.   There was not a discussion about that.  So I don't know

12   what you mean by that.  That was the whole purpose of our

13   filing in October of '05.

14   Q.   Now, the long term -- the eight percent of shares, is that

15   available for all of the U.S. executives?  Is that the plan?

16   A.   The eight percent of shares?

17   Q.   The eight -- excuse me, the long term equity opportunities

18   that has been built in, is going to be eight percent set aside,

19   three percent paid on emergence, is that available for all of

20   the Delphi executives?

21   A.   They all have the opportunity to participate.

22   Q.   All right.  Do you know how many executives were able to

23   participate in the Delphi stock option program prior to the

24   filing of the bankruptcy?

25   A.   Not offhand.

112

1        MR. KENNEDY:  Could we bring up Exhibit 19 to Mr.

2    Naylor's transcript?

3    Q.   If you can read the first box -- excuse me, the second

4    box, the third line.  It says:  "(Recalled that only the top

5    110 executives currently received stock options)".  It's a

6    document dated February 2, 2005 to you from Mark Weber.

7    A.   Yes.

8    Q.   Does that refresh your recollection on how many

9    individuals received -- were eligible to receive stock options

10   prior to the bankruptcy?

11   A.   Yes.

12   Q.   And was it 110 people?

13   A.   Yes.

14   Q.   So the new program -- and I take it that was only in the

15   upper levels of the A through F, or whatever it is, group.

16   That's how that 110 was determined?

17   A.   I believe that what's it was, yes.

18   Q.   So that the new program will be providing up to eight

19   percent of the value of the company to these 500 executives.

20   And was there a discussion about what the reasons would be for

21   broadening the group that would be eligible for this program,

22   why you would go from 110 to 560?

23   A.   The reason was that we felt that we needed to incent or

24   provide an incentive for those executives to participate in the

25   long-term prospects of the company, thereby motivating them to

113

1    give their maximum effort.

2    Q.   If the -- in --

3              MR. KENNEDY:  So let me withdraw that.  Let me

4    withdraw that.  Excuse me, Your Honor.  I'm trying to avoid

5    asking questions that have already been covered.

6    Q.   Now, you were asked some questions about the SERP program,

7    S-E-R-P, sir.  Did you participate in developing a program to

8    compensate executives who lost benefits as a result of the

9    freezing of the SERP?

10   A.   Yes.

11   Q.   And that's about 11.5 million's been set aside to do that?

12   A.   That's my recollection.

13   Q.   And that's being paid in restricted stock units?

14   A.   I believe so.

15   Q.   And how many executives are eligible to participate in

16   that 11.5 million dollar program?

17   A.   A dozen, thereabouts.

18   Q.   A dozen?

19   A.   I don't -- that's not an exact number.  It's in that

20   range.

21   Q.   Is it less than all of the full DSB, for example?

22   A.   Yes.

23   Q.   And what about the remainder of the DSB and the other

24   Delphi executives?  Are they being compensated for their loss

25   under the SERP program?

114

1    A.    Relative to market it was -- we determined that there was

2    no loss on the part of the executives that are not included.

3    Therefore they were not included.

4    Q.    Now, as part of the -- well, are you aware that union

5    members had their DC plan frozen as part of the arrangements

6    between the union and the company -- unions and the company?

7    A.    Their what plan?

8    Q.    Their defined benefit contribution plan.

9    A.    I was aware there were changes made.  I don't remember

10   exactly what they were.

11   Q.    And in both executive and non -- and production worker

12   contexts, the defined benefit plans have been replaced with

13   defined contribution plans, correct?

14   A.    I believe that's true.

15   Q.    Did the -- any of the employees, non-executive employees,

16   receive any compensation for the fact that their pension

17   benefits will now be lower as a result of the loss of their

18   defined benefit plan, to your knowledge?

19   A.    Not to my knowledge.

20   Q.    In making your decisions about the SERP, I take it you

21   also decided to improve its benefits, correct?

22   A.    Where they were not --

23   Q.    The compensation committee did?

24   A.    -- where they were not market, yes, we made some

25   adjustments.

115

1   Q.   Did you -- were you aware that Watson Wyatt executives had

2   misgivings about making any improvements to a SERP plan for a

3   bankrupt company?

4   A.   Was I aware when?

5   Q.   Were you aware when you were making --

6   A.   I'm aware now, but --

7   Q.   -- the decisions.  Were you aware when you were making the

8   decisions to amend the SERP plan, which occurred sometime

9   during the bankruptcy process?  Were you aware then?

10  A.   What I recall is, as in many of our deliberations, there

11  was actual debate, different points of view that the committee

12  had to reconcile.  So there may have been, in this case, some

13  divergence of views within Watson Wyatt.  I don't recall

14  specifically being aware of it or not being aware of it.  But

15  divergent opinions were typical.

16         MR. KENNEDY:  Well, could we bring up Exhibit 302.

17  And I would -- Bates number 13672.

18  Q.   Are you familiar with this table, sir, which summarizes

19  the disposition of SERP issues at some notable cases?

20  A.   What is the date of his document.

21         MR. KENNEDY:  Could we go back to the first page?

22  Well, go another page in.  I'm sorry.  Could we then go back to

23  where we were, and I'll see if I can figure it out?  That's

24  13672.

25  Q.   I'm afraid it did not come as part of a coherent document

116

1    to us.  As a consequence, I don't have the date to give you.

2    Do you have a recollection as to what the date might have been?

3    A.    Not offhand.

4    Q.    Do you recall seeing it before?

5    A.    I believe so.  I'd have to refresh my memory and see more

6    than one page here.

7            MR. KENNEDY:  Well, why don't we go to the next page

8    just to see if that helps, then.  No, I don't think so.  Why

9    don't we go back where we were?

10   Q.    Tell me when you've read it.

11   A.    (Reading)  I haven't read it all, but okay.  I'm familiar

12   with it here.

13   Q.    Now, I take it from the logo in the bottom right that

14   Watson Wyatt prepared this?

15   A.    Yes.

16   Q.    And they presented it to the compensation committee to

17   provide you some background on SERP issues?  Is that correct?

18   A.    Presumably.

19   Q.    And I believe this is a list, just looking at it, of

20   companies that have been in bankruptcy.  Would you agree with

21   me on that?

22   A.    Yes.

23   Q.    Did you receive any tables of companies that were in

24   bankruptcy, how they treated their SERPs, other than this

25   document that we have up now as Bates 13672?

1   A.   I don't recall.

2   Q.   Well, in this particular chart, several of the companies

3   that are identified here did terminate SERPs, correct?

4   A.   Yes.

5   Q.   And that would be UAL, Collins & Aikman, and Hayes

6   Lemmerz?

7   A.   Yes.

8   Q.   Was the SERP program in the Delphi case preserved for

9   retirees or just for actives?

10  A.   Well, it was preserved for actives, and it was preserved

11  for retirees with a cap on it.

12  Q.   So that when there's some --

13  A.   If you call that preserved.

14  Q.   -- yeah.  All right, so.  Well, okay.

15  A.   It was not preserved in its previous form.

16  Q.   It was impaired, in essence, by the --

17  A.   Yes.

18  Q.   -- by the imposition of a cap.  And I take it that the

19  executives that had been entitled under the SERP to payments of

20  more than 5,000 a month, now have a claim for that amount?

21  A.   That's my understanding, yes.

22  Q.   Okay.  Did you give any consideration to terminating the

23  SERP for all the executives and awarding them, instead, claims

24  in this proceeding?

25  A.   Well, as a result of seeing that that had happened

118

1    previously, yes.  That was one of the range of possibilities

2    that we did look at.

3    Q.   In fact, if we look at the chart with respect to retirees,

4    four of the eight companies terminated the SERP for retirees,

5    and one of the others, you're uncertain about what happened,

6    correct?

7    A.   One of the others I'm uncertain about?

8    Q.   Well, there's a question mark in the box for U.S. Airways

9    for retirees, that's why said that.

10   A.   Oh.  Yes.

11   Q.   So even searching as hard as they could for companies that

12   had done something on the SERP in bankruptcy, a majority of the

13   examples they came up with had terminated the SERP for

14   retirees, correct, or impaired it?

15   A.   The majority?

16   Q.   Well, four terminated it completely and one impaired.

17          MR. KENNEDY:  But, anyway, I'll withdraw the

18   question.

19   Q.   Now, in this particular SERP program, employees who are

20   involuntarily terminated receive their SERP, correct?

21   A.   Yes.

22   Q.   And employees who leave without good cause --

23          MR. KENNEDY:  -- excuse me.  Let me withdraw that.

24   Q.   -- who leave with good cause, are entitled to leave with

25   their SERP.  Is that also correct?

119

1   A.   Yes.

2   Q.   And in fact, as part of this plan, Delphi has limited any

3   future power to amend the SERP.  Isn't that also correct?

4   A.   I don't know that to be the case.

5         MR. KENNEDY:  All right.  Could we bring up Exhibit 3

6   to Mr. Naylor's -- wait a minute, hold on a minute.  Exhibit 3

7   to Mr. Naylor's deposition.  It's the May 21, 2007 compensation

8   committee minutes.

9   Q.   And I'd like to direct your attention to the line which

10  begins five lines from the bottom, from the words:  "that it

11  would be appropriate that the defined benefit SERP provide that

12  the company not have the power to adversely amend that benefit

13  in the future without the employees' consent".  Does that

14  refresh your recollection on what --

15  A.   Yes.

16  Q.   So in fact, the company has not only improved the benefits

17  of the SERP, maintained the SERP itself, but it's made it no

18  longer defeasible from the point of view of individuals,

19  without their consent, correct?

20  A.   Correct.

21        MR. KENNEDY:  All right.  I have no further questions

22  of the witness, Your Honor.

23        THE COURT:  Okay.

24        MR. KENNEDY:  Your Honor, would it be appropriate to

25  take a lunch break, come back and complete --

120

1    THE COURT:  Yes, it would be.  Unfortunately, I had

2  an emergency in another case.  So I have about a five to ten

3  minute call at three, just for your planning purposes.  But why

4  don't we resume at 2:00?

5    MR. KENNEDY:  Thank you, Your Honor

6    MR. BUTLER:  Thank you, Your Honor.

7    THE COURT:  And I'm sure you understand this sir, but

8  you shouldn't -- you should talk about anything other than your

9  testimony.

10    (Whereupon the morning session was concluded at 1:11

11  p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

121

1

2                          **I N D E X**

3

4                      **T E S T I M O N Y**

5   **WITNESS**              **EXAM BY**                    **PAGE**

6   Craig Naylor        Mr. DeChiara (cross)            17

7   Craig Naylor        Mr. Kennedy (cross)             75

8

9                      **E X H I B I T S**

10  **DEBTORS'**  **DESCRIPTION**                  **ID.**      **EVID.**

11  556      Notice of Delphi Corp. Debtor              11, 17

12           Subsidiaries under 1129(a)(5)

13  557      Supplemental declaration of Nick           11, 17

14           Bubnovich

15  558      Final stipulation in MDL case              11, 17

16

17

18

19

20

21

22

23

24

25

122

1

2                        C E R T I F I C A T I O N

3

4        I Lisa Bar-Leib, court-approved transcriber, certify that the

5        foregoing is a correct transcript from the official electronic

6        sound recording of the proceedings in the above-entitled

7        matter.

8

9                                            January 23, 2008

10       Signature of Transcriber              Date

11

12       Lisa Bar-Leib

13       typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25