1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                January 18, 2008

                2:29 PM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2  HEARING re Bank of America Motion for Entry of Order

3  Temporarily Allowing Claims for Voting on Plan Pursuant to Fed.

4  R. Bankr. P. 3018(a)

5

6  HEARING re Motion of Technology Properties Ltd. for Entry of

7  Order Temporarily Allowing Claims for Voting on Plan Pursuant

8  to Fed. R. Bankr. P. 3018(a)

9

10  HEARING re Motion for Order Estimating Claims for Purposes of

11  Voting on Plan of Reorganization

12

13  HEARING re Motion of SPCP Group, LLC Pursuant to Bankruptcy

14  Rule 3018(a) Requesting Temporarily Allowance of Claims for

15  Purposes of Voting to Accept or Reject the Plan

16

17  HEARING re First Amended Joint Plan of Reorganization of Delphi

18  Corporation and Certain Affiliates, Debtors and Debtors-in-

19  Possession

20

21  HEARING re Motion for Order Approving Multidistrict Litigation

22  and Insurance Settlements

23

24

25

3

HEARING re Motion for Order Pursuant to 11 U.S.C. Section
105(a) and 502(c) Estimating or Provisionally Allowing Certain
Unreconciled Claims Solely for Purposes of Administration of
Discount Rights Offering

Transcribed By:  Lisa Bar-Leib

4

A P P E A R A N C E S:

SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

     Attorneys for Debtors

     333 West Wacker Drive

     Chicago, IL 60606


BY:   JOHN WM. BUTLER, JR., ESQ.

     RON E. MEISLER, ESQ.

     ALBERT L. HOGAN III, ESQ.


SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

     Attorneys for Debtors

     Four Times Square

     New York, NY 10036


BY:   KAYALYN A. MARAFIOTI, ESQ.


LATHAM & WATKINS, LLP

     Attorneys for Official Committee of Unsecured Creditors

     885 Third Avenue

     New York, NY 10022


BY:   ROBERT J. ROSENBERG, ESQ.

5

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP

    Attorneys for Official Committee Equity Security Holders

    One New York Plaza

    New York, NY 10004


BY:   BONNIE STEINGART, ESQ.

    JENNIFER RODBERG, ESQ.


GOODWIN PROCTER, LLP

    Attorneys for the Ad Hoc Committee of Bondholders

    599 Lexington Avenue

    New York, NY 10022


BY:   ALLAN S. BRILLIANT, ESQ.

    RICHARD WYNER, ESQ.


GOODWIN PROCTER, LLP

    Attorneys for the Ad Hoc Committee of Bondholders

    901 New York Avenue, N.W.

    Washington, D.C. 20001


BY:   JOHN MOUSTAKAS, ESQ.

    MICHAEL K. ISENMAN, ESQ.

6

1

2    WHITE & CASE, LLP

3         Attorneys for Appaloosa Management and Harbinger Capital

4         1155 Avenue of the Americas

5         New York, New York 10036

6

7    BY:   THOMAS E. LAURIA, ESQ.

8         DOUGLAS P. BAUMSTEIN, ESQ.

9

10   WEIL, GOTSHAL & MANGES LLP

11        Attorneys for General Motors

12        767 Fifth Avenue

13        New York, New York 10153

14

15   BY:   JEFFREY L. TANENBAUM, ESQ.

16        ROBERT LEMONS, ESQ.

17

18   LOWENSTEIN SANDLER PC

19        Attorneys for Lead Plaintiff

20        65 Livingston Avenue

21        Roseland, NJ 07068

22

23   BY:   MICHAEL S. ETKIN, ESQ.

24        S. JASON TEELE, ESQ.

25

7

1

2   KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

3       Attorneys for Wilmington Trust Company

4        as Indentured Trustee

5       599 Lexington Avenue

6       New York, NY 10022

7

8   BY:   EDWARD M. FOX, ESQ.

9

10   COHEN, WEISS AND SIMON LLP

11       Attorneys for UAW

12       330 West 42nd Street

13       New York, NY 10036

14

15   BY:   BABETTE CECCOTTI, ESQ.

16       PETER DECHIARA, ESQ.

17

18   KENNEDY, JENNIK & MURRAY, P.C.

19       Attorneys for IUE-CWA

20       113 University Place

21       New York, NY 10003

22

23   BY:   THOMAS M. KENNEDY, ESQ.

24       SUSAN M. JENNIK, ESQ.

25

8

ARENT FOX PLLC

      Attorneys for Audio MPEG, Inc. and SISVEL

      1050 Connecticut Avenue, NW

      Washington, DC 20036

BY:   MARY JOANNE DOWD, ESQ.

KELLEY DRYE & WARREN LLP

      Attorneys for PBL&C

      101 Park Avenue

      New York, NY 10178

BY:   ERIC R. WILSON, ESQ.

MCDERMOTT WILL & EMERY LLP

      Attorneys for Timken

      340 Madison Avenue

      New York, NY 10017

BY:   JAMES M. SULLIVAN, ESQ.

9

WARNER NORCROSS & JUDD LLP

     900 Fifth Third Center

     111 Lyon Street NW

     Grand Rapids, MI 49503


BY:   GORDON J. TOERING, ESQ.


SEYFARTH SHAW LLP

     Attorneys for Fuji America Inc.

     620 Eighth Avenue

     New York, NY 10018


BY:   ROBERT W. DREMLUK, ESQ.


KELLER ROHRBACK PLLC

     Attorneys for ERISA lead plaintiffs

     3101 North Central Avenue

     Suite 900

     Phoenix, AZ 85012


BY:   GARY A. GOTTO, ESQ.

1

2    BUCHANAN INGERSOLL & ROONEY PC

3         Attorneys for Fiduciary Counselors, Inc.

4         The Brandywine Building

5         1000 West Street, Suite 1410

6         Wilmington, DE 19801

7

8    BY:   MARY F. CALOWAY, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

11

1                    P R O C E E D I N G S

2              THE COURT:  Okay.  It actually worked out so that you

3    all have my uninterrupted attention now for the rest of the

4    day.  So we're back on the record in Delphi, and again, Mr.

5    Naylor, you're still under oath.

6              MR. BUTLER:  Thanks, Judge.

7              THE COURT:  Okay.

8    BY MR. BUTLER:

9    Q.        Mr. Naylor, during your cross examination, you were

10   asked by the UAW about how it is you became to be on the

11   Delphi board.  Do you recall that -- those questions and your

12   answers?

13   A.        Yes.

14   Q.        All right.  In your own words, would you explain to

15   the Court how it is you were -- you came to be on the Delphi

16   board, how that recruitment process occurred?

17   A.        Yes.  There was a search company, Egon Zender, I

18   believe who -- part of their business is board seats, and they

19   approached me.  It was the end -- the fourth quarter of 2004.

20   I don't remember exactly when, about a seat on a board and

21   through a couple discussions, they finally revealed it was

22   Delphi.

23              And then I had interviews with first David Farr, who

24   is the head of the governance committee, and then John Opie who

25   is the lead independent director, about joining the Board, and

12

1   I met with a couple of other people in Delphi, one of which was

2   Mr. O'Neil.  I met with the head -- the lad attorney in the

3   company at the time.  I think I had a conversation with Mr.

4   Battenberg, but the real interviewing was with Mr. Opie and Mr.

5   Farr.

6   Q.        But the impetus of all these discussions was a recall

7   you received from the search company; is that correct?

8   A.        I'm sorry.

9   Q.        The impetus of all these discussions was a call you

10  received from the search company; is that correct?

11  A.        Yes.  That was the beginning.

12            MR. DECHIARA:  Objection.  Form, leading.

13            THE COURT:  Sustained.

14  Q.        During your cross examination, Mr. Naylor, you were

15  asked a series of questions about the peer groups that the

16  compensation committee had looked at over a period of time.  Do

17  you recall those questions and your answers to them??

18  A.        Yes.

19  Q.        We have -- could you put on the screen, please,

20  Exhibit 264 and Exhibit 13 of that?  In your earlier testimony,

21  Mr. Naylor, you were asked questions about, and testified about

22  the excluded companies.  Do you see those companies at the

23  bottom of the chart?

24  A.        Yes.

25  Q.        Did you participate in any discussions regarding how

13

1   those companies -- how those companies should have been

2   excluded from the peer group?

3   A.        Yes.

4   Q.        Would you tell the Court in your own words what those

5   discussions were?

6   A.        Well, we were in the habit of periodically looking at

7   this peer group companies, recognizing it is the starting point

8   for a lot of the senior executive compensation.  So we were

9   periodically questioning whether we had the appropriate peer

10  group from which to index those studies from.

11        So in this particular case, it was apparent that some

12  of these companies were significantly larger than Delphi, and

13  it appeared that we had, in our view at the time, too many

14  companies outside the industry.

15        We didn't want exclusively automotive industry

16  companies because that didn't seem appropriate, nor is that the

17  practice elsewhere, as far as I know, but it looked like it was

18  too heavily weighted toward very large companies weighed beyond

19  the size of Delphi, and too many companies outside the

20  automotive industry.

21  Q.        And just from terms of sequence, you had those

22  discussions and then this proposed new peer group came back to

23  you; is that correct?

24  A.        Yes.

25  Q.        And did you have any discussions about this peer

14

1   group?

2   A.        Yes.  We did then and later on this was further

3   reduced, per my testimony, to take off again some companies

4   that were at the high end.  As it looked like the Delphi

5   prospective revenue was going to be lower than it had been in

6   the past, after emergence and after the transformation.

7           We took a look at this peer group companies and

8   decided that, well, we need to bring it closer to what we think

9   the Delphi revenue is going to be as far as the medium is

10  concerned.  So I think we went from about twenty-three six --

11  23.6 billion to 21 billion in the next iteration of looking at

12  these peer companies.

13  Q.        And would you pull up Exhibit 66 and Exhibit 1, Page

14  29 to that, please, on the screen?  I'm sorry.  I'm looking for

15  the peer -- go back to the -- maybe -- it's Exhibit 1, I think,

16  to this.  It's the peer groups.

17                  MR. DECHIARA:  Page 33.

18                  MR. BUTLER:  And could you blow that up, please?

19  Q.        Is this the peer group that the compensation

20  committee approved at the conclusion of its deliberation?

21  A.        Yes.

22  Q.        Do you have a view, as chairman of the compensation

23  committee, whether this is a reasonable or unreasonable peer

24  group?

25  A.        Based on what I know about peer group selection,

15

1    before I joined Delphi, because the company I worked for,

2    Dupont, does the same type of comparisons with peer group

3    companies where things, including compensation, but not just

4    compensation, and the advice that we got from Watson Wyatt,

5    indicated that we had, you know, about the right mix of

6    industry, revenue, geographic reach, representative companies

7    in some of the industries where we compete for talent, which go

8    beyond the automotive industry.

9            So it's probably never perfect, but this looked to be

10   a reasonable representation from all of those different

11   standpoints, of a group of companies with which we should

12   compare ourselves.

13   Q.      Throwing out a Mr. O'Neil's base salary, you were

14   asked a series of questions on cross examination about Mr.

15   O'Neil's salary, and do you recall those questions and the

16   answers you gave?

17   A.      Yes.

18   Q.      In your own words, would you please explain to the

19   Court why the compensation committee chose at the end of the

20   day to keep Mr. O'Neil's salary at 1.5 million dollars?

21   A.      Well, it became apparent, as we went into the latter

22   part of 2007, that -- and this was as a result of conversations

23   with the plan investors primarily, that Mr. O'Neil, the CEO's

24   compensation, including base salary, was primarily going to be

25   the subject of a negotiation or discussion between the plan

16

1    investors and Mr. O'Neil.

2          So the compensation committee offered its

3    perspectives, but at the end of the day, this was an agreement,

4    the employee agreement between Mr. O'Neil and Appaloosa, who

5    represented the plan investors, as to what his compensation

6    should be.  So at that point the compensation committee took a

7    back seat recognizing that this was prospective compensation

8    for Mr. O'Neil that would start after this compensation

9    committee had completed its work.

10   Q.        Was the compensation committee ever called upon to

11   approve the results of -- or the products of -- product of the

12   negotiations between Mr. O'Neil and the plan investors?

13   A.        Yes.

14   Q.        Did the compensation committee take action with

15   respect to that contract?

16   A.        Yes, we approved it.

17   Q.        When you approved it, did you -- before you approved

18   it, did you review it?

19   A.        Yes.

20   Q.        Did you reach a conclusion about whether that

21   contract was reasonable or unreasonable, taken as a whole?

22   A.        Yes.  We thought that, you know, there may be parts

23   of it, perhaps the base salary that were at the high end of

24   reasonable range, based on the benchmarking work we had done,

25   but they were not completely outside the range of compensation

17

1    for executives with that level of responsibility.

2    Q.        Do you recall whether that contract included any

3    provisions in it regarding whether base salary could be

4    adjusted?

5    A.        Yes.  I don't remember exactly what they were, but

6    there was some maximum percentage.  It was ten percent, or

7    something like that, by which it could be adjusted.

8    Q.        Let's, if we could, put on the -- this has been

9    admitted into evidence, Exhibit 2 to that 7.08 and this is

10   Paragraph 5A of Mr. O'Neil's contract.  No, that's the --

11   that's the CIC.  I'm looking for the employment agreement,

12   which is the agreement before that.  And I'm looking for

13   Paragraph 5A of it.  Let's blow this up first.  Is this -- just

14   take a look at this.  Does this look like the contract.  I'm

15   sorry.  That's not the contract.  That's the form contract.

16   I'm looking at Mr. O'Neil's contract.  This would be exhibit --

17   this was filed in the supplement 7.08 on November 28th.  It

18   should be Exhibit 2.  It should be Exhibit 2 and it should be

19   7.8 to that exhibit and it should be Schedule number two.

20        Let's go back to supplement.  Can we go to Schedule

21   1, excuse me, Schedule 1 which I think is Mr. O'Neil's

22   contract.  Okay.  Let's go next, please.  Yeah, okay, that's

23   great, but let's go back one page.  Looking at the monitor in

24   front of you, Mr. Naylor, does this appear to be the contract

25   that you reviewed on behalf of the compensation committee with

18

1    respect to Mr. O'Neil?

2    A.        Yes.

3    Q.        Looking at Paragraph 5 of that contract, this is on

4    Page 2 of 18.  Can you blow up 5A, please?  Read that.  Does

5    that refresh your recollection?

6    A.        Yes.

7    Q.        Having refreshed your recollection, was your

8    provision added to Mr. O'Neil's contract regarding reductions

9    in salary?

10   A.        Yes.

11   Q.        And as you recall it now, what was that?

12   A.        Well, it could be adjusted to as low as 1.3 million.

13   Q.        Okay.  Thank you.  If you know, Mr. Naylor -- I want

14   to turn to AIP now.  If you know, do you know whether AIP at

15   Delphi is calculated as a percentage of base salary or on some

16   other basis?

17   A.        The AIP generally is not calculated as a percentage

18   of salary.  It's a target set based on the peer company reviews

19   of what would constitute target for a given level of

20   responsibility.

21   Q.        And are those target awards related to base salary in

22   any way?

23   A.        I would say only to the extent that base salary is a

24   surrogate for level of responsibility that they carry.

25   Q.        So in your cross examination you were asked the

19

1    question if -- if base salary went up by some percentage, then

2    AIP would go up by some percentage.  Having refreshed your

3    recollection, do you still believe that to be the case?

4    A.        No.  That was -- that line of questioning, as I

5    recall, was indexed off of what was the minimum percentage of

6    base salary that Mr. O'Neil would get in AIP.  So we were

7    really talking about that provision.  I probably mistakenly

8    extrapolated that to the broader AIP program.

9    Q.        But in fact -- well, let's answer the question.  If

10   someone's base salary is increased, does it follow

11   automatically that they would get more incentive awards?

12   A.        No.

13   Q.        What would have to happen in order for their

14   incentive aware opportunities to go up?

15   A.        Their incentive award opportunity to go up?

16   Q.        The opportunity to go up?

17   A.        Yeah.  It would have to be the result of some

18   benchmarking that would indicate the peer group, or whatever

19   the survey comparison is, had gone up.

20   Q.        So the independent target would have to go up?

21   A.        Right.  Correct.

22   Q.        Turning to change -- the change of control, you were

23   asked questions during your cross examination, you gave

24   answers, as to the circumstances under which the change in

25   control might be payable.  Do you recall those questions and

20

1   your answers to them?

2   A.      Yes.

3   Q.      Are you aware -- do you recall, Mr. Naylor, are there

4   any circumstances in which an employee who might otherwise be

5   entitled to change of control benefit, would not be able to

6   receive it?

7   A.      Well, if they were released for cause, for sure, they

8   do not receive it.  There may have been other stipulations in

9   there for cause being an unethical behavior, or something like

10  that, that they would not be entitled to the provisions.

11  Q.      Let's go to exhibit -- this has been admitted into

12  evidence, Exhibit 1, plan exhibit 7.8, and go to the -- this is

13  Paragraph 5.4 of the non-compete agreement.  I would ask you to

14  take a look at this paragraph which is entitled non

15  competition, and let me know when you've had a chance to look

16  at it.

17  A.      Okay.

18  Q.      Is your recollection refreshed about other

19  circumstances in which the -- a CIC beneficiary would not

20  receive their CIC?

21  A.      There was a non compete clause such as shown here,

22  where this was the protect Delphi from an executive leaving and

23  going to work for a competitor, or engaging in competitor

24  related activities following their tenure at Delphi.  So that

25  would release the CIC, or the EA agreements.

21

1   Q.        So under the proposed CIC agreement there would be --

2   you couldn't get your CIC if you went to a competitor?

3   A.        Correct.

4            MR. DECHIARA:  Objection, leading.

5            THE COURT:  It's already been answered.  You can

6   move on.

7   Q.        Mr. Naylor, one other question.  Do you have a view

8   as to why a executive would view this CIC agreement as being --

9   having any benefit to him or her, if he couldn't get the

10  benefit if he went to a competitor?

11  A.        Do I have a view as to why they would see --

12  Q.        Let's just hypothetically.  You're an executive.  I'm

13  offering you this agreement.

14  A.        Um-hum.

15  Q.        You can't have -- you can't get anything if you go to

16  a competitor.  I'm saying here's a benefit for you, Mr. O'Neil,

17  or rather Mr. Naylor.  Would you view this as being beneficial

18  if you were restricted from going to competitors?

19  A.        No, because I'm probably most marketable and most

20  competitive if I move to a competitor.

21  Q.        And if you had this, would you -- would you view your

22  potential employment opportunities as only within the

23  automotive industry or elsewhere?  What's the world you'd look

24  at as an executive?

25  A.        Well, by and large, I'd view the world as the world

22

1  X, the automotive industry as my opportunity, and that

2  certainly restricts my marketability to find another place of

3  employment.

4  Q.        I next want to go to the ten percent reductions, Mr.

5  Naylor, that were taken -- you asked questions about the DSB,

6  and the reductions that were taken in base salary, the waivers

7  that were made of the base salary during the Chapter 11 case.

8  Do you recall the questions asked and the answers you gave?

9  A.        Yes.

10 Q.        Do you know whether all the members of the DSB took

11 the ten percent reduction or whether only some took it?

12 A.        My recollection is only some took the ten percent

13 reduction.

14 Q.        Do you have a recollection of who did not take the

15 reduction?

16 A.        By in large, those that did not take it were not

17 direct reports of Mr. O'Neil.  That is they perhaps didn't

18 report directly to him.  I know his -- he and his direct

19 reports took the ten percent.  That's the only recollection I

20 have about who did and did not take the reduction.

21 Q.        You were asked a series of questions about the

22 employment -- or excuse me, the emergence cash payments

23 proposed for Mr. Miller and Mr. O'Neil.  Do you recall the

24 questions and the answers that you gave?

25 A.        Yes.

23

1   Q.        I'd like to put up Exhibit 2, Section 7.8, please.

2   This would be the supplement to the plan Section 7.8.  Go to

3   Page 2, please, of that, that next -- and would you blow up the

4   -- go back to the last page before this now.  Okay.  I think

5   you can go to the next page then.  Would you blow up that?

6   Would you blow up that -- just the first paragraph so people

7   can see it more easily.  Would you just take a quick look at

8   this, Mr. Naylor, and let me know when you're finished?

9   A.        Okay.

10  Q.        Is that summary an accurate reflection insofar as you

11  recall of the deliberations of the compensation committee with

12  respect to the factors they considered in reaching these

13  decisions?

14  A.        Yes.

15  Q.        In your own words to the Court, could you explain the

16  factors you considered and the relative weighting you placed on

17  them as you thought about these issues?

18  A.        Yes.  We -- as with all the compensation, we try to

19  come at it first from a standpoint of performance base.  That

20  is what aspects of performance should we attach to whatever

21  compensation recommendation we make.  So when we looked at the

22  performance of Delphi during the case, several factors came

23  into light.

24          That is the length and complexity of this case, the

25  number of factors.  I recall someone described it as three or

24

1    four dimensional chess, if I recall.  This was an incredibly

2    difficult, complex, lengthy case, and that plus the fact that

3    if the chairman and the CEO did not work together in a

4    complimentary and mutually supportive fashion, there's no way

5    that we could have achieved the progress through the case.

6         So that was taken into account.  We looked at and

7    asked some questions about, well, what -- how does this case

8    and the expected recoveries by the creditors, the equity

9    holders, et cetera, compare to other Chapter 11 cases.  You

10   know, where does it sit in the spectrum of outcomes.

11        And what we were told, and to the best of my

12   knowledge, this is certainly at a very high percentile of

13   outcomes in terms of recovery.  So of course all this was not

14   known, could not be known in October, 2005.  This was the

15   performance through the case.

16        So we were taking that into account as we looked at

17   this.  If the company had just gone through the case and not

18   transformed itself to emerge in a fundamentally different,

19   competitive position, that would have been a serious problem.

20   Actually quite the opposite was true.

21        We had a five part business plan, and by in large, we

22   are on schedule with every aspect of the transformation that

23   needed to occur to change the competitive position, improve the

24   competitive position of Delphi coming out.

25        So when we looked at it, we really tried to figure

25

1    out what are the aspects of performance that the executives had

2    a primary role to play, and how did they compare to what might

3    be considered a median outcome for a case like this, and we

4    concluded that this was significantly above the median for the

5    outcome.

6           So we tried to take a performance look at it and

7    that's the main reasons why we recommended that instead of the

8    total of eight million, we went to the 13.6 that was in the

9    recommendation.

10   Q.        You said that you took it also -- would you just tell

11   me what weight if any you placed on the last factor in here,

12   what was included in this waiver of approximately 7.2 million?

13   A.        I didn't mention that.  I'd say that that was a

14   factor to consider, but this -- this deliberation was primarily

15   about the performance.  That was just a consideration after

16   primarily considering the performance.

17   Q.        You were asked some questions in your cross

18   examination about comparing the amount of money reserved in the

19   original keyset for Mr. O'Neil and Mr. Miller.  Do you recall

20   those questions and your answers to them?

21   A.        Yes.

22   Q.        Do you recall the amount of money that was originally

23   allocated to the two of them?

24   A.        Yes.

25   Q.        What was that?

26

1   A.        Eight million dollars.

2   Q.        Eight million dollars.  And what positions did they

3   hold at the time there were those allocations?

4   A.        Chairman and CEO in the case of Mr. Miller and COO in

5   the case of Mr. O'Neil.

6   Q.        And at the time that report was prepared, did the

7   office of Executive Chairman exist at Delphi?

8   A.        Office of the -- no.

9   Q.        And just to again do the math, if you added up the

10  amount of money that was in the original award of eight

11  million, and the amount waived by the executives during the

12  case of seven (indiscernible), that equals 15.3 million, does

13  it not?

14  A.        The --

15  Q.        The original allocation plus the waived amount is how

16  much, if you add them together?

17  A.        Yes.  If there was seven -- the waived amount was 7.3

18  or 7.4, something like that.  Yes, so 15.3.

19  Q.        And what was the amount again of your total award to

20  them?

21  A.        13.6.

22  Q.        I'd like to put up, if we could, the Watson White

23  Report, which I think is Exhibit 90, Page 13.  This has been

24  admitted into -- also admitted into evidence.  This would be

25  Page 13.  And could you blow up the first paragraph of that,

27

1    the first at present?  I'd ask you to take a look at this, Mr.

2    Naylor.

3    A.        Okay.  So the only exception --

4    Q.        Let me just ask --

5    A.        Yeah, I do --

6    Q.        -- the question before you answer.

7    A.        Yeah.

8    Q.        Does this refresh your recollection as to what

9    members of the DSB took ten percent reductions?

10   A.        Yes.

11   Q.        And what is the -- and after having your recollection

12   refreshed, what do you recall now about the DSB members?

13   A.        The only DSB members that were excluded were those

14   hired after the Chapter 11 filing, which I believe was at least

15   two people, maybe three.  I don't recall.

16   Q.        Mr. Naylor, you were asked a series of questions

17   about -- in connection with the emergency equity awards, the

18   amount reserved for the executives, and the difference between

19   doing ten percent and eight percent.  Do you recall those

20   questions and the answers you gave?

21   A.        Yes.

22   Q.        Do you recall the -- the discussions -- in those

23   questions and answers, do you recall making comparisons between

24   the percentage amounts, the percentage range, eight to ten

25   percent, and the ascribed value of those ranges based on the --

28

1    the change in the equity value of the company?

2    A.       Yes.

3    Q.       When the company filed Chapter 11, what -- if you

4    recall, what was the anticipated equity value, plan equity

5    value of the company?

6    A.       I think the estimate at that time was four billion.

7    Q.       And what is that today?

8    A.       7.8 billion is the number I've seen most recently.

9    Q.       And to whom does that increase in value benefit among

10   all the people in this room, all the stakeholders?  Who

11   benefits from that, in your view?

12   A.       Well, it's probably easier to answer who does not

13   benefit from it.  It's a fairly small subset.  I can't think of

14   anybody who did not benefit from the increase in value of the

15   enterprise.  I mean the -- it's a healthier enterprise.  The

16   company's in a better shape than it was at filing, and

17   certainly that value indicates the prospects for the company

18   are healthier than they would otherwise have been --

19   Q.       Did you participate in the Board of Director's final

20   approval process with respect to the plan that's before this

21   Court today for confirmation?

22   A.       Could you repeat that?

23   Q.       Did you participate in the Board of Director's

24   approval process for the plan of reorganization that's before

25   this Court for confirmation today?

29

1    A.        Yes.

2    Q.        As part of your view -- and did you review the

3    disclosure statement and plan, the amended disclosure statement

4    and plan, prior to the Board deliberating on it?

5    A.        Yes.

6    Q.        Did you vote on the approval process?

7    A.        Yes.

8    Q.        How did you vote?

9    A.        Approve.

10   Q.        Why?

11   A.        Why did I vote approve?  Because the -- it is time

12   for this company to emerge from the Chapter 11 proceedings.

13   The transformation has largely been completed.  The enterprise

14   is in a much healthier state.  We have healthy prospects for

15   the company, including future business prospects with the

16   bookings and so on.

17            And time is of the essence.  I think staying in

18   Chapter 11 any longer than absolutely necessary, with the

19   provisions and the terms that were all in that disclosure

20   statement, did not make sense, and it was time to emerge.

21            And we had investors.  We had the transformation

22   essentially completed, and we had financing largely put in

23   place.

24   Q.        After you were -- when you were evaluating the range

25   of what set aside ought to be proposed by the company with

30

1    respect to this equity for executives, did you focus on the

2    eight percent versus ten percent, the absent dollar amounts

3    that are derived by those percentages, both of them or a

4    combination?  Explain what was your principle focus and why?

5    A.        Our principle focus was the percentage because the

6    data would indicate that that is how the benchmarking is done,

7    that's how companies in the past have decided what amount of

8    equity should be set aside for the executives.

9              So if the value of the enterprise went up, that's a

10   good thing for everyone concerned, and it is due at least in

11   part to the performance of the management team.  So that's a

12   good thing, but the percentage is the real criteria.

13   Q.        You were asked a series of questions about -- during

14   your cross examination about items that the executives had

15   given up.  Do you recall those questions and your answers to

16   them?

17   A.        Yes.

18   Q.        Would you put up on the screen, please, and it's been

19   admitted into evidence, Exhibit 1 and Exhibit 8.1A to that at -

20   - this may be -- actually, this is Exhibit 2.  Excuse me.  Plan

21   exhibits filed on December 28th.  Exhibit 2, Exhibit 8.1A.

22   Could you just blow the title up, please?

23             That's okay.  Go to the next page and blow that up,

24   please.  Do you recall what this exhibit was attached to the

25   plan that you earlier testified you reviewed and approved Mr. -

31

1    - excuse me, Mr. Naylor?

2    A.      Yes.

3    Q.      And in your own words, what is this list?

4    A.      This list is a list of agreements and prior

5    commitments, if you will, that we were asking all the

6    executives to relinquish, basically as a condition of

7    employment in Delphi, following the emergence.

8    Q.      So, just so the record is clear, Paragraph 3 provides

9    for the termination of all CERT benefits unless continued in

10   the new program; isn't that correct?

11                   MR. DECHIARA:  Objection.  Leading.

12                   THE COURT:  You can ask it -- go ahead.

13                   THE WITNESS:  I'm reading it here again to make

14   sure.  Yes.

15   Q.      So I want to keep this, but I want to jump to another

16   exhibit and come back.  Exhibit 302, please, Bates label 13672.

17   So you were asked about this chart, Exhibit 302 in your direct

18   -- or in your cross examination and you were asked a series of

19   questions and answered -- made answers.  Do you recall those

20   questions and answers?

21   A.      Yes.

22   Q.      In connection with that, the -- we now know from your

23   testimony that the CERT was rejected on the active side.  Can -

24   - a couple of questions.  Do you have an understanding, and

25   again, without going into the attorney client privilege, but do

32

1   you have an understanding as to the retirees where SERP was

2   rejected, what the likely course of action for them is as a

3   result of the rejection of their SERP agreements?

4   A.        I think this is the segment that are part of the

5   claims process in the -- in the bankruptcy proceeding and the

6   plan.  So they get rolled into all the other claimants and a

7   decision will be made through that process.

8   Q.        And do you have an understanding under the plan as to

9   what allowed claims are going to be received in terms of value?

10  A.        The last number I heard was somewhere around 1.4

11  billion.

12  Q.        That's the number of claims, but I'm just asking

13  about, if I'm a claimant and my claim is allowed, am I going to

14  get two cents on my claim -- if you know, two cents on my

15  claim, ten cents par plus accrued plan value, what would it be?

16  If you know.  We can put the documents on.

17             MR. DECHIARA:  Objection to the inflection, Your

18  Honor.

19             THE WITNESS:  Again. I'm not sure I have the

20  terminology straight, but I believe that if you're talking

21  about the recovery by the creditors, it is par plus accrued, or

22  it's at least par and I think partially plus accrued, the last

23  I recall.

24  Q.        All right.  In terms of -- did the compensation

25  committee take into consideration that the likely recoveries

33

1   and outcomes with respect to retirees for whom the SERP was

2   being terminated, when it -- when it evaluated, whether to

3   continue the SERP for actives?

4   A.        Could you repeat that, please?

5   Q.        Did you decide to continue the SERP for actives when

6   you froze -- you testified you froze it and replaced it and all

7   that, but I'm saying the basis SERP benefit you continued for

8   actives, correct?

9   A.        Yes.

10  Q.        All right.  When you made that decision, did you

11  consider whether -- in making that decision, what the likely

12  recovery to retirees would be, even though you terminated the

13  SERP for them?

14          MR. DECHIARA:  Objection, Your Honor.  I

15  believe, as I understand the question, I don't believe it's

16  factually accurate.  I don't believe the SERP has been

17  terminated for employees.

18          MR. KENNEDY:  He said terminated for retirees.

19          THE COURT:  Did you compare the treatment of

20  retirees in light of the rejection of the SERP with the

21  decision whether to continue benefits comparable to the SERP

22  for active employees?

23          THE WITNESS:  We had so many conversations on

24  this subject.  I believe it was considered.  I don't believe it

25  was a major consideration in those deliberations.

34

1    Q.        In your own words to the Court, what were the major

2    considerations in continuing the SERP?

3    A.        Continuing the --

4    Q.        The SERP for actives?

5    A.        For actives, the DC?

6    Q.        Correct.

7    A.        SERP?  Well, to -- again, recognizing that our plan

8    was to have a going concern, an enterprise following emergence.

9    When we looked at practice in industry in general, there is a

10   move toward the defined contribution plans now, and so that's

11   what we -- we instituted, again, to be at market, so to speak

12   in that area of compensation.

13   Q.        Let's go back to Exhibit 8.1A and blow it up again,

14   please.  As to Paragraph 1, did you have any understanding as

15   the chairman of the compensation committee, what was being

16   rejected by the debtors under the plan with respect to

17   Paragraph 1?

18   A.        Yes.

19   Q.        And in your words, what's your understanding?

20   A.        Well, my understanding was that the previous change

21   in control agreements -- I guess we're still operating under

22   those at this point -- were examined and were judged to be

23   above market in terms of the payout that would be awarded

24   executives if there was a change in control, and I think there

25   was a number -- it was in excess of 200 million dollars, or

35

1   something like that, that would be the cost of the current

2   change in control agreements, and we just -- we could not in

3   good conscious allow that to continue and that's when we

4   started talking about the -- making rejection of those

5   agreements, termination of those agreements as a condition of

6   employment and new change in control agreements being

7   instituted at emergence.

8   Q.       And what -- did you reach a decision on those -- that

9   subject matter as a compensation plea?

10  A.       Yes.  We did make it a condition of employment and

11  the new Delphi after emergence, that the executives reject and

12  relinquish their claim under that previous change in control

13  regime.

14  Q.       Can we put Exhibit 1, Section 7.8, which is the claim

15  version.  Could you blow it up, please?  If you read the plan

16  revision 7.8, does this include the direction of the

17  compensation committee that you just described?

18  A.       Yes.

19  Q.       One last set of questions, Mr. Naylor, and then I'll

20  be concluded, and that has to do with the issue of second

21  opinion or third party review, or input with respect to the

22  management compensation program.  You were asked a series of

23  questions about that topic on cross examination and gave

24  various answers.  Do you recall those questions and answers?

25  A.       Yes.

36

1   Q.        Could you keep that same up, please, just as I had

2   it, please?  Thank you.  Was there any -- during the course of

3   this process, were there any -- was there any other opinions or

4   participation by third parties in the review and design of this

5   program, just before the -- that's included in the plan?

6                   MR. DECHIARA:  Objection.  It's beyond the scope

7   of the cross examination.

8                   MR. BUTLER:  No, you asked about second

9   opinions.

10                  THE COURT:  No, I'll overrule that.  It's

11  consistent with second opinion, so you can answer that

12  question.

13                  THE WITNESS:  Yeah, I'm --

14  Q.        If you recall, Mr. Naylor, who else reviewed the

15  plan?

16  A.        Oh.  Again, the plan in its entirety was reviewed by

17  the statutory committees and the plan investors.  So there were

18  multiple reviews of this plan, and there were a few adjustments

19  made through those reviews.  What you see here was the result

20  of all those reviews, including the compensation committee.

21  Q.        And after the compensation committee received input

22  from the plan investors, did it make adjustments to the

23  compensation program?

24  A.        Yes.

25  Q.        And did it reach agreement with the plan investors

37

1   with respect to the compensation program?

2   A.        Yes.

3   Q.        With respect to the emergence awards and emergence

4   equity, did the compensation committee receive input from the

5   creditor's committee?

6   A.        Yes.

7   Q.        And did the compensation committee make adjustments

8   to that plan based on that input?

9   A.        Yes.

10  Q.        And at the end of the day, did the company reach an

11  understanding with the creditor's committee whereby if you made

12  the changes, they would not exercise any rights to object under

13  these provisions?

14  A.        Correct.

15            MR. BUTLER:  I have no further questions, Your

16  Honor.

17            THE COURT:  Okay.  I have a couple questions,

18  Mr. Naylor, but before that, you can shut that blind back

19  there, which I believe -- I'm sure it's making it kind of hot

20  in the corner.  Mr. Naylor, you testified, I think, that with

21  regard to Mr. O'Neil's salary on emergence and going forward,

22  that that was in the compensation committees view a perspective

23  matter and therefore something that was first and foremost a

24  negotiation between Mr. O'Neil and the plan investors.  Is that

25  --

38

1          THE WITNESS:  Correct.

2          THE COURT:  -- how you remember your testimony?

3     Am I right, though, that with regard to Mr. O'Neil's emergence

4     bonus, that was not covered by that -- by that question, and

5     that was something that was instead, as per your later

6     testimony, something that the compensation committee and the

7     Board primarily focused on as opposed to plan investors?

8          THE WITNESS:  Yeah, the emergence cash award was

9     first put forward to the plan investors by the compensation

10    committee.  In the course of their discussions with Mr. O'Neil

11    that went on for a month or more, they ultimately agreed to

12    that 5.3 million dollars.

13         THE COURT:  And that was part of this 7.8

14    provision?  That was consistent with the provision of 7.8 that

15    Mr. Butler just took you through, that's still up on the

16    screen, where the -- both the plan investors and the creditor's

17    committee have to have agreement on those types of payments?

18         THE WITNESS:  Yes.  Right.  I believe the only -

19    - the only part that perhaps has not been discussed with the --

20    with the statutory committees is Mr. Miller's award.  Again,

21    I'm trying to remember the sequence of events here.  I'm not

22    sure.

23         THE COURT:  Okay.  Then you also discussed the

24    factors that the compensation committee took into account when

25    considering the emergence bonus awards for Mr. Miller and Mr.

39

1   O'Neil.  You remember that?

2                    THE WITNESS:  Yes.

3                    THE COURT:  And you mentioned first and foremost

4   the committee looked at the debtor's performance, to some

5   extent the foregone compensation during the course of the case,

6   and then you also had been given information by Watson and

7   Wyatt on competitive benchmarking?

8                    THE WITNESS:  Yes.

9                    THE COURT:  Am I right that this -- these two

10  bonuses therefore were not looked at as surrogates for foregone

11  long term investment opportunity -- the long term opportunity

12  that I gather you -- you've testified that the other officers

13  and executives, emergence bonuses, is meant in part to reflect?

14                   THE WITNESS:  Right.

15                   THE COURT:  Is that right?

16                   THE WITNESS:  You are correct in that the -- one

17  consideration was the foregone LTI opportunities during the

18  case, but it was really not the primary consideration for those

19  two individuals.

20                   THE COURT:  Okay.  And when you talk about the

21  waiver of approximately 7.3, 7.4 million, I want to make sure I

22  understand the components of that.  As far as Mr. Miller is

23  concerned, that's the waiver of his salary; correct?

24                   THE WITNESS:  Correct.

25                   THE COURT:  Because he took a dollar a year for

40

1    the --

2                    THE WITNESS:  Yes.

3                    THE COURT:  -- course of the case.  Did it

4    involve anything else or was it --

5                    THE WITNESS:  Mr. O'Neil --

6                    THE COURT:  No, I'm talking about Mr. Miller

7    first.

8                    THE WITNESS:  Oh, Mr. Miller?

9                    THE COURT:  Yeah.

10                   THE WITNESS:  That was his salary and the -- if

11   he was participating in the AIP, the short term incentive

12   during that period, it included that potential.

13                   THE COURT:  Okay.  And now for Mr. Miller, was

14   it the same thing or was that just -- was that the 20 percent?

15                   THE WITNESS:  For Mr. O'Neil?

16                   THE COURT:  I'm sorry.  For Mr. O'Neil.

17                   THE WITNESS:  For Mr. O'Neil it was that twenty

18   percent of his salary.  I believe that was the only -- it was

19   530,000, I believe, foregone through the case.  That's just the

20   salary.

21                   THE COURT:  Okay.  And I want to make sure I

22   understand this.  There's been testimony about Watson Wyatt's

23   view, which then I gather the compensation committee was

24   convinced of, that the DSB members were being compensated in

25   the salary portion of their compensation during the Chapter 11

41

1    case, above the median.  Do you remember that testimony?

2                    THE WITNESS:  Yes, I remember that testimony.

3                    THE COURT:  And then there was the determination

4    of ten of them to reduce their salary by ten percent.

5                    THE WITNESS:  Well, I think we just clarified

6    through the cross examination by Mr. Butler that there were --

7    there's 21 members of the DSB.  Again, I don't remember how

8    many people exactly were hired after the Chapter 11 filing.  It

9    was at least two, maybe three, with the exception of those two

10   or three, the other 18 or 19 people took the ten percent

11   reduction -- voluntary reduction effective January 1, '06.

12                    THE COURT:  Okay.  And then Mr. O'Neil took a 20

13   percent reduction.

14                    THE WITNESS:  Correct.

15                    THE COURT:  Was it the view of Watson Wyatt and

16   the compensation committee that Mr. O'Neil's salary standing

17   alone, if you just look at the salary, was also above the

18   median?  Was that a basis or a rationale for the twenty percent

19   reduction?

20                    THE WITNESS:  No.  That was purely -- let's call

21   it an act of solidarity with Mr. Miller's reduction to one

22   dollar in an effort to try and move the case along,

23   particularly with respect to the labor negotiations.

24                    THE COURT:  Okay.  Okay.  The last question I

25   had is -- no, that is the last question I had.  Thank you.

42

1    EXAMINATION BY MR. KENNEDY:

2    Q.        Mr. Naylor, I just wanted to address again briefly

3    this issue of emergence cash to Mr. Miller and Mr. O'Neil.  The

4    amount that as given up by Mr. Miller, you computed at 6.75

5    million; is that correct, sir?

6    A.        That's the number I recall, yes.

7    Q.        And in computing the amount that Mr. Miller gave up,

8    how did you factor in the three million dollar bonus that he

9    received in June of 2005?

10   A.        The period we looked at was January, '06 to December,

11   '07 and that three million dollars preceded that period.

12   Q.        So the three million dollar bonus that he received

13   didn't figure in any way in your determination of how much of a

14   emergence bonus he should receive?

15   A.        We were aware of it but, no, that was for a different

16   purpose and time period.

17   Q.        Now, during the period of time in 2005 when Mr.

18   Miller was drawing a salary, I believe he was drawing a salary

19   of 1.5 million?

20   A.        In '05?

21   Q.        Yes, at the rate of 1.5 million?

22   A.        Yes, I believe so, right.

23   Q.        And assuming that salary would have stayed constant

24   in '06 and '07 he would have -- or did fail to receive three

25   million, one a half million for each year.  Is the remaining

43

1    three and three quarter million that you computed him as having

2    given up all of it AIP?

3    A.        Yes.  We did not factor in LTI, at least the best of

4    my recollection, LTI was not part of the calculation.

5    Q.        Now, Mr. O'Neil continued to receive AIP rather

6    during the '06 and '07 years; correct?

7    A.        Correct.

8    Q.        So that the amount that Mr. O'Neil did not receive

9    during '06 and '07 is just a half a million dollars; correct?

10   A.        Correct.

11   Q.        Now, you've, as I understand your testimony,

12   indicated that the 13.6 million was primarily about performance

13   in taking the company through the Chapter 11 and its emergence,

14   correct?

15   A.        Yes.

16   Q.        And one of the key criteria you used in making that

17   determination was to measure the recoveries by debtors in the

18   Delphi case as opposed to other cases?

19   A.        Yes.

20   Q.        And in that making that determination that the 13.6

21   million was appropriate, did you assume that the creditors are

22   going to receive par plus accrued?

23   A.        We -- this was evolving and changing somewhat through

24   the period of time we were making this determination, so at one

25   time, it was par plus accrued, maybe earlier in the case and

44

1    then I think there was some relatively minor changes to that,

2    but what remained was that the recoveries by creditors and

3    equity was based on the -- our assessment above median by more

4    than a little bit.

5    Q.        And what are you assuming the recoveries for

6    creditors are going to be now, in making that determination?

7    A.        I don't know exactly what it is.  I think it's par.

8    It may not be par plus accrued, but it's at least par.

9    Q.        And are you referring to the amount that's going to

10   be paid under plan?

11   A.        Yes.

12   Q.        You're talking about what I'll call the plan presumed

13   recovery.  You think it's par at this point?

14   A.        Yes.

15   Q.        Okay.  In any event, you're not -- in making that

16   determination that the recoveries have been above the median.

17   You're not looking at the market value in which the securities

18   are trading today as we sit here, or the bonds I guess I should

19   say, are trading today?

20   A.        No.  We -- no.

21   Q.        Did you consider putting target emergence values as a

22   criteria for awarding either the emergence cash in general or

23   the emergence cash to Miller and O'Neil?

24   A.        Did we ever consider that?  No, I don't believe so.

25   What we decided to do was to asses their performance as we got

45

1   close to the end of the case, as opposed to setting targets.

2   Q.        Well, they're being paid all in cash where the

3   creditors are essentially being paid in stock, correct?

4   A.        Yes.  Their emergence award is --

5   Q.        Their emergence cash is the cash --

6   A.        The cash award is cash.

7   Q.        -- obviously?

8   A.        Right.

9   Q.        All right.  Now, I want to talk to you a little bit

10  about this ten percent of reduction in salaries.  I gather in

11  the exchange with counsel, you've clarified in your own mind

12  that most of the members of the DSB did give up ten percent of

13  their salary, correct?

14  A.        Correct.

15  Q.        Okay.  Could we bring up Exhibit 2 to Mr. Bubnovich

16  deposition, which I think is 265?  Now, were the -- were the

17  DSB members who gave up salary paid back any of that salary by

18  the company?

19  A.        Not that I'm aware of.

20  Q.        Okay.  Could we bring up Exhibit 2 to the -- not to

21  his declaration.  To the exhibit, or to the deposition.  I'm

22  sorry if I said declaration.  I apologize.  That's Exhibit 265.

23  I'm sorry.  Correct me.  It's Exhibit 2 to the declaration.

24  Yeah, Page 13.  Okay, could you blow up the one, two, three,

25  fourth paragraph as Mr. Butler has had you do several times?

46

1    The ones that begins the amount of the shortfall.  Okay, do you

2    have that in front of you, Mr. Naylor?

3    A.        Yes.

4    Q.        You'll note that it says, quote, the amount of the

5    shortfall between the proposed LTI equity opportunities and

6    median opportunity, plus the amount of the permanent reduction

7    in salaries, as well as certain downward adjustments were

8    estimated at four million.  This shortfall was the basis to the

9    committee to adjust upward the LTI opportunities for certain

10   DSB executives, et cetera.

11        Does that refresh your recollection on whether the

12   DSB executives who had a ten percent reduction in compensation

13   were paid back that money in some way by the company?

14   A.        Nobody has been paid back anything.

15   Q.        Okay.  Well, what is the phrase plus the amount of

16   permanent reduction in salaries refer to as part of the basis

17   to adjust upward the LTI?

18   A.        As I recall, there are a number of executives in this

19   group whose responsibilities actually increased as a result of

20   reorganization and the transformation of the company.  So for

21   them, they not only took a ten percent reduction, they had an

22   increase in responsibility which widened the gap, if you will,

23   between what they should be paid and what they were being paid,

24   and that was going to be reconciled after emergence.

25   Q.        Is it your contention, Mr. Naylor, that that

47

1   paragraph says that, what you've just told us?

2   A.        That's my recollection of the basis for the salary

3   part of that four million.

4   Q.        Well, which DSB executives, you can describe them by

5   category and not by name if you'd like, that were adjusted

6   upward in the second sentence of that paragraph?

7   A.        I certainly know them by name and this -- I believe

8   the compensation committee felt that the CEO was in the best

9   position to decide where responsibilities had changed, who took

10  salary cuts, and decide where that four million dollars was

11  best placed.

12            So our reconcile there was that that was going to be

13  at the discretion of the CEO to decide how to allocate that

14  four million dollars.

15  Q.        And it's your understanding that the phrase, the

16  permanent reduction in salaries is not referring generally to

17  the ten percent that was given up by the DSB members?

18  A.        My understanding was that was a consideration, but

19  this was not attempt to across the board true it up, if you

20  will.

21  Q.        All right.  How many of the DSB members were trued up

22  on the amount they had suffered as a reduction in salaries

23  through this four million dollars?

24  A.        I don't recall.

25  Q.        Okay.

48

1          THE COURT:  Well, was there a true up for

2    anyone, unless they assumed new responsibility?

3          THE WITNESS:  I don't know.

4          THE COURT:  Okay.

5    Q.        In fact, you're not certain that it was only people

6    who assumed new responsibilities that received the true up, are

7    you?

8    A.        That was my understanding.  I can't be certain

9    because I don't have the numbers and what Mr. O'Neil decided.

10   Q.        You talked about the increase in value from an

11   assumed four billion in October, 2005 plan to the current

12   assumed plan value of 7.8 billion.  How much of that was

13   attributable to union members consenting to a reduction of

14   their jobs and their compensation in benefits?

15   A.        I don't have that calculation, so I don't know.

16   Q.        Do you have any sense of whether it's a major

17   portion, small portion, majority, less?

18   A.        Well, my sense is that recognizing that the union

19   based employees compensation was approximately two or three X

20   market prior to filing that reductions that are now down to --

21   again, my understanding is they're still above market, that

22   that was a material piece.

23          MR. DECHIARA:  Objection, move to strike that

24   testimony.  Lack of foundation.  The witness just testified as

25   to the market level of what the union members' salary were.

49

1   There's no foundation that this witness has either expertise as

2   a compensation expert, nor that he studied any expert reports

3   or consulted with any experts as to the market level of the

4   union employees.

5              THE COURT:  Well, he was just asked what his

6   understanding was of the -- of the amount of the increase in

7   the equity value attributed to the union, and so I'll take his

8   answer as far as his understanding was concerned.

9              MR. KENNEDY:  All right.  I have no further

10  questions, Your Honor.

11             THE COURT:  Okay.

12  EXAMINATION BY MR. DECHIARA:

13  Q.         Mr. Naylor, what was Mr. O'Neil's base salary during

14  the course of the Chapter 11 case?

15  A.         1.2 million, I believe.

16  Q.         Do you know the dollar value of the twenty percent

17  reduction that he took?

18  A.         From January 1, '06 to December 31, '07 it was

19  $530,000.

20  Q.         And now as a -- he took that voluntarily?

21  A.         Yes.

22  Q.         Okay.  Were you aware, or are you aware of any

23  discussions he had with the compensation committee that he

24  would get that money back?

25  A.         There were never any discussions I was a party to

50

1   about that subject.

2   Q.        Okay.  You were asked during redirect by counsel a

3   couple of questions about Mr. O'Neil's proposed employment

4   agreement going forward.  If I could direct you to Page 2 of

5   that proposed employment agreement, which is attached as

6   Schedule 1 to Naylor Deposition Exhibit 2, it's the supplement

7   to management compensation (indiscernible) document.  One more

8   page.  Another page.  Next page.  Okay.  Slow up.  Okay.  Isn't

9   it true that Mr. O'Neil could only get a salary reduction in

10  the event that there was an across the board salary reduction

11  for similarly affecting other company executives?

12  A.        Yes.

13  Q.        And then can you pull up the paragraph on the side B.

14  And isn't it true that the minimum of AIP bonus that Mr. O'Neil

15  would get would be based as a percentage of his base salary?

16  A.        Yeah, that's how the floor was --

17  Q.        Right.  So if his base salary were bigger, the floor

18  of his AIP bonus would go up, too, correct?

19              THE COURT:  Unless this is going somewhere,

20  we've already been through this.

21              MR. DECHIARA:  That was my only question, Your

22  Honor.

23              THE COURT:  All right.

24  Q.        Okay.  Just a couple more questions.  You testified -

25  - well, Mr. Naylor, you're aware that there's an equivalence of

51

1   sacrifice clause in the agreement between UAW and GM and

2   Delphi?

3                   MR. BUTLER:  Objection.  Not a proper -- that

4   wasn't raised on redirect.

5                   THE COURT:  Sustained.

6   Q.      Okay.  Mr. Naylor, you testified on redirect about

7   communications between the compensation committee and various

8   statutory committees concerning the proposed management

9   compensation plan.  Do you recall that?

10  A.      Yes.

11  Q.      Okay.  Did any of those other committees, or did any

12  of those committees or other entities that had those

13  communications, discuss the equivalence of sacrifice clause in

14  the UAW agreement?

15                  MR. BUTLER:  Objection.  That's outside the

16  scope of redirect as well.

17                  MR. DECHIARA:  I don't think it is, Your Honor.

18                  MR. BUTLER:  No discuss about the equivalence

19  sacrifice on redirect.

20                  MR. DECHIARA:  On redirect the issue was raised

21  --

22                  THE COURT:  Well, you talking about 7.8?

23                  MR. DECHIARA:  No, Your Honor.  The witness

24  testified that various groups had input into the management

25  compensation plan.

52

1          THE COURT:  In connection with 7.8?

2          MR. DECHIARA:  Okay.  Maybe I stand corrected.

3    Q.        Was that -- was the input from the other groups

4    limited to certain aspects of the management compensation plan

5    or was it -- did they comment generally about different

6    aspects?

7    A.        They reviewed the entire plan as proposed.

8    Q.        And had comments about various aspects of the plan;

9    is that correct?

10   A.        Yes.

11   Q.        Okay.  Did any of them raise the equivalence of

12   sacrifice clause in the UAW agreement?

13   A.        Not to my knowledge.

14   Q.        Did the compensation committee every solicit input

15   from the UAW as to whether the UAW believed the proposed

16   management compensation plan satisfied the equivalence of

17   sacrifice requirement?

18         MR. BUTLER:  Objection.  Outside of the scope of

19   redirect.

20         THE COURT:  I'll let him answer that.

21         THE WITNESS:  No.

22         MR. DECHIARA:  That's all I have on redirect.

23   Thank you.

24         THE COURT:  Okay.

25         MR. BUTLER:  Your Honor, I have no recross.

53

1          THE COURT:  Okay.  You can step down, Mr.

2   Naylor.

3          MR. BUTLER:  Your Honor, can I just at this

4   point get a sense from the Court of how long we're going to go

5   today, and get a sense from the parties as to the length of

6   their cross --

7          THE COURT:  Okay.  I mean obviously I'd like to

8   finish up with the witnesses today.

9          MR. BUTLER:  It is now --

10         THE COURT:  How long -- I mean --

11         MR. BUTLER:  I'm just trying to figure out --

12         THE COURT:  How long do you think you'll be with

13  Mr. Bubnovich is next?

14         MR. BUTLER:  Yeah.  I just want to figure out

15  order of witnesses depending upon how long we're going.

16         MR. DECHIARA:  I would think we would take an

17  equivalent length of time, in view of the technical matters.  I

18  could probably make it go faster, Your Honor.

19         THE COURT:  Let's try to make it go faster.

20         MR. DECHIARA:  Okay.  Well, I think I'll --

21         THE COURT:  I mean I have his -- I have his

22  declaration, his report.  I mean I think we can -- if you can

23  hone in on what you view as what's problematic with his report,

24  I think that's the way to go.

25         MR. DECHIARA:  Well, then we'll speed things up.

54

1          THE COURT:  Okay.

2          MR. DECHIARA:  So I don't know.

3          MR. BUTLER:  Your Honor, can I suggest -- can we

4  take a five minute recess so I can just consult with counsel

5  just about expected lengths of time and sort of how we'll

6  produce our witnesses.

7          THE COURT:  Okay.  That's fine.

8          MR. BUTLER:  And do we have a sense from the

9  Court as to how long you're willing to go tonight.

10         THE COURT:  Seven.

11         MR. BUTLER:  Okay.  Thank you, Judge.

12         MR. DECHIARA:  Seven.

13         THE COURT:  Seven.

14         MR. BUTLER:  Thanks.  If we could just have a

15  five minute recess.

16         THE COURT:  If that strange music keeps playing

17  maybe I'll stay longer.

18      (RECESS.)

19         THE COURT:  Okay, we're back on the record at

20  Delphi.

21         MR. BUTLER:  Your Honor, we did have an

22  opportunity to meet and confer during the recess, and I'll

23  address that in just a moment.  Before you -- I just wanted to

24  ask the Court's permission whether Mr. Naylor can be excused as

25  a witness.

55

1          THE COURT:  Oh, as a witness?

2          MR. BUTLER:  Yes.

3          THE COURT:  Oh, yes.  I had already excuse him.

4          MR. BUTLER:  Okay.  We just wanted to make sure.

5  He wanted to know if he could leave.

6          THE COURT:  Yes.  Yes.

7          MR. BUTLER:  Okay.  Thank you.  The -- Your

8  Honor, we had an opportunity to meet and confer with the unions

9  and they estimate their cross, I believe, of the two remaining

10  witnesses is between three and four hours.  We'll have some

11  obviously redirect and depending on your -- the Court stamina,

12  maybe we can get the evidentiary record closed today.

13          There still remains in the confirmation hearing

14  obviously oral argument on this aspect of the case and closing

15  arguments on the plan altogether.  There is -- there also

16  remains the MDL and rights offering motions to be dealt with,

17  so I think you're probably going over to Tuesday, no matter

18  what we do, which will coincide with our previous schedule,

19  Your Honor, of saying we will be submitting to you proposed

20  confirmation order on Tuesday.

21          THE COURT:  Okay.

22          MR. BUTLER:  So it looks like that.

23          THE COURT:  Are there still objections to the

24  rights offering?

25          MR. BUTLER:  We've actually resolved all of

56

1    them, Your Honor.

2                    THE COURT:  Okay.  All right.

3                    MR. BUTLER:  So that should be a short hearing.

4                    THE COURT:  Okay.

5                    MR. BUTLER:  On that subject.  So that's the

6    best estimate we have, Your Honor.  The next witness, our

7    eighth witness in support of confirmation is Nick Bubnovich,

8    who is a senior consultant at Watson Wyatt Worldwide and has

9    acted as compensation consultant to the compensation committee

10   at Delphi Corporation.

11                   His declaration has been entered into evidence

12   as Exhibit 88 and his deposition has been entered into evidence

13   as Exhibit 265.  I'd like now to present Mr. Bubnovich --

14                   THE COURT:  And he has a supplemental

15   declaration.

16                   MR. BUTLER:  -- oh, yeah, you're right, and he

17   has a -- you're right, Your Honor.  Thank you.  He has a

18   supplemental designation -- a supplemental declaration that we

19   marked and has been entered into evidence as 557, Exhibit 557,

20   and Your Honor, we would like to present Mr. Bubnovich for

21   cross examination in any questions by the Court.

22                   THE COURT:  Okay.  Mr. Bubnovich, would you come

23   up, please?  Would you please raise your right hand?  Do you

24   swear to tell the truth, the whole truth and nothing but the

25   truth, so help you God?

57

1              THE WITNESS:  I do.

2              THE COURT:  And for the record, would you spell

3    your name?

4              THE WITNESS:  b-u-b-n-o-v-i-c-h.

5              THE COURT:  Okay.  Thank you.

6    EXAMINATION BY MR. KENNEDY:

7    Q.        Now, Mr. Bubnovich, my name is Tom Kennedy.  I

8    represent the IUE-CWA.  When did you start consulting with

9    Delphi on compensation issues?

10   A.        August, 2005.

11   Q.        Prior to your working with Delphi was Watson Wyatt

12   the compensation advisor to Delphi?

13   A.        Yes.

14   Q.        And was Watson Wyatt the compensation advisor to

15   Delphi from the spin off in 1999 through the point that you

16   began doing it?

17   A.        No.

18   Q.        So when did -- when did Watson Wyatt start then?

19   A.        Watson Wyatt's work as advisor to the compensation

20   committee began I think in December, '04.

21   Q.        And was it your function as advisor to the

22   compensation committee to help them create a compensation

23   program?

24   A.        Yes.

25   Q.        And isn't it true that you believe that compensation

58

1   programs do not have to be consistent with competitive data?

2   A.        Yes, I actually do believe that.

3   Q.        Now, have you been involved with Chapter 11 programs

4   before?

5   A.        Yes.

6   Q.        And am I accurate that you believe that a simple

7   truth about Chapter 11 is that everything is negotiable?

8   A.        Yes, I did write that and yes, I think that that's

9   virtually self-evident.

10  Q.        And did you advise management of Delphi that none of

11  the constituents in this Chapter 11 proceeding are going to be

12  surprised that management has decided it needs a little

13  something special for itself?

14  A.        Well, the context of that e-mail --

15  Q.        My question, sir, is whether you gave them that

16  advice?

17  A.        I gave them that advice in the context of developing

18  the compensation program that's the subject of this hearing.

19  Q.        Okay.  At some point did management representatives

20  for Delphi advise you that they wanted to make sure that a

21  vested SERP and a vested equity program was part of the Delphi

22  management compensation plan?

23  A.        Management made a presentation to the compensation

24  committee on those two topics arguing that that was important,

25  that those would be important pieces of a compensation program

59

1    going forward.

2    Q.        And did you advise Delphi management that what they

3    wanted was not achievable by competitive data?

4    A.        Well, in my report, with respect to those two items,

5    I did note that I could not find any data to support those

6    particular positions.

7    Q.        That's your report to the compensation committee,

8    correct?  You were just referring to now?

9    A.        Yes.

10   Q.        My question is whether you advised Delphi management

11   directly that what they wanted in terms of the vested SERP and

12   the vested equity programs were not achievable by competitive

13   data?

14   A.        Well, when we refer in this context to vested, the

15   reference is really to the sequence of events upon an

16   involuntary termination without cause.  Again, the context is

17   if someone is involuntarily terminated without cause after, for

18   example, thirty years of service, and this individual is one or

19   two years short of vesting in his or her SERP, it seemed

20   reasonable, not withstanding the data, to vest this person in

21   that benefit which he or she may have accrued over, again, 20,

22   30 year period.

23   Q.        So you were making a judgment as to what you felt was

24   a reasonable element of a compensation program, not

25   withstanding the competitive data that you had developed in

60

1    connection with that element; correct?

2    A.        The judgment was made by the compensation committee.

3    Q.        Isn't it a fact that you advised the compensation

4    committee that you regarded it as reasonable, even though it

5    wasn't supported by the competitive data?

6    A.        Well, as I sit here today, I would say yes, I believe

7    that that's a reasonable provision.

8    Q.        When you were working in 2006, to put a time frame on

9    it, on developing an emergency equity program, did you

10   structure that program with the goal of making sure that the

11   chief operating officer got more than 3.11 times his salary?

12   A.        Absolutely not.

13   Q.        I'd like -- could we bring up Exhibit 40?

14            THE COURT:  Is it to his deposition or --

15   Q.        I'm sorry.  This would be Exhibit 40 to the Bubnovich

16   declaration, to the Bubnovich deposition, which is Exhibit 265.

17   Would you move to Page 3 of that document?

18   A.        Yes.  Page 3.

19   Q.        They'll bring it up as well.  You have Page 3?  Could

20   you blow up the middle chunk of text.  Right there, yeah.  Do

21   you see where in discussing Mr. O'Neil's compensation you make

22   the statement, quote, his median multiple has to be somewhere

23   north of 3.11 times, or X, closed quotes?

24   A.        Can I read the entire paragraph first, please?

25   Q.        Please.  Yeah, please.  Go ahead.

61

1    A.          Okay.  I read it.

2    Q.          All right.  Am I accurate that the words you wrote in

3    that e-mail were, quote, his median multiple has to be

4    somewhere north of 3.11 X, closed quotes?

5    A.          The context of the e-mail --

6    Q.          First, just to be clear, those are the words you

7    wrote, correct?

8    A.          I did write those words.

9    Q.          Okay.  And the -- you then state that, quote, we need

10   to interpolate from the data to arrive at a median and 75th

11   multiple that makes sense for a CEO of 1.5 million, closed

12   quotes?

13   A.          Well, among the things I wrote in this paragraph are,

14   I don't know where you are getting the competitive LTI data.

15   What you've got is wrong.

16   Q.          Right.

17   A.          Okay.  Now, what I'm telling them is that the data

18   they are using is -- doesn't make sense.  I make reference to

19   the fact that we have our blended LTI data, would provide for

20   an LTI multiple of 3.11 for someone making a million dollars

21   worth of salary.  Now, a blended LTI data refers to a mix of

22   the Watson Wyatt Towers Merin and Mercer long term incentive

23   databases.

24          Okay.  So if someone making one million dollars in

25   salary is supposed to have an LTI multiple of 3 plus, and at

62

1   this time, you know, Rodney was still COO and not CEO, I

2   believe I can say that common sense tells us that a CEO making

3   1.5 million dollars would certainly have a greater multiple.

4        Thus the last sentence, read in the context of the e-

5   mail, means that the data with respect to a CEO, has got to be

6   higher than the 3.11 for someone making a million dollars who's

7   not a CEO.

8   Q.       But weren't you in fact willing to drive the data as

9   necessary to arrive at the result that you concluded was

10  appropriate?

11  A.       There is no way you can interpret this paragraph in

12  that way.

13  Q.       Okay.  Could we go to the page before that, which is

14  -- I don't see the Bates but, yeah, the page before that and

15  could you blow up the language on the bottom?  Well, actually

16  the bottom, yeah.  This again is an e-mail from you to a

17  Matthew Pullam; is that correct?

18  A.       Yes.

19  Q.       And Matthew Pullam I take it is a Watson Wyatt person

20  who works with you on compensation issues?

21  A.       No, he has since left the firm.

22  Q.       Well, at that time, is it fair to say he worked with

23  you?

24  A.       Yes.

25  Q.       Okay.  And you indicate that, quote, as far as

63

1    reasonableness goes, the truth is that not everything has to be

2    or is consistent, closed quotes?

3    A.        Again, can I read the entire e-mail first?

4    Q.        Please.  Of course.

5    A.        I apologize to the Court for my use of barnyard

6    language.  In the context here I was very frustrated with my

7    colleagues in Detroit and I apologize.  Okay, I've read it.

8    Q.        Okay.  I notice that in it you say, quote, maybe it

9    is we did some kind of R square intercept shit and came up with

10   the following multiples, but Rodney's multiple has got to be

11   three plus, and the CEO position even higher, closed quote.

12   Isn't that an example of your arriving at a predetermined

13   conclusion in trying to drive the data to get that?

14   A.        No.

15   Q.        Okay.  Now, is it a function of your role as

16   consultant to the compensation committee to advise Delphi on

17   its bargaining strategy with the unsecured creditor's

18   committee?

19   A.        Yes, I provided management with information in

20   connection with the negotiations.

21   Q.        Well, in August of 2006, did you advise the company

22   or its agents on the bargaining strategy to use with the UCC

23   over the emergence cash bonus?

24   A.        I don't recall specifically now.

25   Q.        All right.  Could we bring up Exhibit 18 to Mr.

64

1    Bubnovich's deposition, specifically Page 3.  I keep saying

2    deposition.  Yeah, deposition is right, Exhibit 264, five

3    maybe.  65.  18, yeah, 18.  And could we move to Page 2.  I

4    believe -- excuse me, make that Page 3, and could we bring up

5    the bottom language, beginning with good morning?  Mr.

6    Bubnovich, first, would you read that entire e-mail and

7    indicate when you sent it and to whom?

8    A.        It is an e-mail that I sent to Mr. Butler.

9    Q.        Mr. Jack Butler to my left?

10   A.        Yes.

11   Q.        And you sent that on August 23rd, 2006?

12   A.        Yes, I did.

13   Q.        And you asked Mr. Butler if, quote, there is any

14   preemptive benefit to reconsidering the design of the emergence

15   cash bonus program before the October hearing, such that the

16   payments are tied to emergence values, closed quotes.  What did

17   you mean by, quote, tied to emergence values, closed quotes?

18   A.        In my role as advisor to the compensation committee I

19   believe it's incumbent on me to raise a number of different

20   issues and approaches to the design of the compensation

21   programs.  At this time, apparently, the expectation must have

22   been that there be a confirmation hearing in October.

23            So I was suggesting whether the emergence cash

24   program should be redesigned so that in some -- should be

25   redesigned in some fashion, one possibility being to make the

65

1   payment of the cash there under contingent upon some recovery

2   by the creditors or some total enterprise value.

3   Q.        And if either of those things were done, it would

4   make the cash bonus program a little more performance oriented,

5   correct?

6   A.        Yes.

7   Q.        And you also advised Mr. Butler that, quote,

8   alternatively, we could just wait for the UCC to counter with

9   such a design change, closed quote?

10  A.        I did write that.

11  Q.        And when you drafted this program, did you do it

12  keeping elements in it that were sort of whole cards that you

13  could give up later?  Is that how you approached it?

14  A.        I don't -- I don't believe so.

15  Q.        Well, you're a compensation expert.  I assume you've

16  been aware of the idea of having the cash bonus tied to

17  emergence values since the moment you started working on it for

18  Delphi sometime in 2005; correct?

19  A.        Well, I'm already on the record as saying that in a

20  Chapter 11 everything is pretty much negotiable.

21  Q.        Well, that's certainly true, and I appreciate your

22  underscoring it, but my question is whether you were aware when

23  you started with the emergence program that it could be tied to

24  performance -- or excuse me, to emergence values?

25  A.        I don't remember that being considered at the time.

66

1   I don't remember that being discussed at the compensation

2   committee or any additional discussion about that.  Our theory

3   at the time was that it, and still is actually, performance

4   based.  The issue simply in these chain of e-mails is do we

5   want to plus up the performance elements.

6   Q.       Well, is there some reason you didn't suggest to the

7   compensation committee, in the initial structuring of the

8   program, that they make it performance based by tying the cash

9   to some emergence value?

10  A.       No.  I didn't do that at the time, and I don't

11  recall, again, as I just mentioned, I don't recall any

12  discussion about that.

13  Q.       Did the UCC ever counter with a proposal to redesign

14  the cash bonus program to be tied to emergence values?

15            MR. BUTLER:  Objection.  Your Honor, the IUE is

16  part of the creditor's committee, and they've been involved in

17  whatever the discussions were in the settlement discussions

18  were between the committee and the company that resulted in the

19  ultimate -- the ultimate outcome of the committee's agreement

20  or Section 7.08, 78.  I'm not sure it should be a subject of

21  discussion here in the Court presented by a member of the

22  committee.

23            MR. KENNEDY:  Well, I think the -- we're a

24  member of the committee, although how much they tell us, in all

25  candor, is another issue, but the -- I'm not standing and

67

1    representing what I learned as a committee member.  I'm asking

2    this witness what he knows about the interactions between the

3    committee and the company on this point.

4                    I think the record -- I believe I know the

5    answer will be that that was not the case, but I think the --

6                    THE COURT:  You can -- you can ask the question.

7    Q.        Do you recall the question?

8    A.        No.  Could you please repeat it for me?

9    Q.        Sure.  Did the UCC ever propose that the cash bonus

10   program be tied to emergence values?

11   A.        No.

12   Q.        From time to time, did you receive pressure from

13   members of Delphi management to change your views on what

14   constituted market compensation?

15   A.        No, I think a little background here would provide

16   some perspective.

17   Q.        I asked for a yes or no answer, Mr. Bubnovich?

18   A.        Executives that are Fortune 50 company like Delphi,

19   didn't get to the top of the heap being passive.  Importantly

20   to most of the executives have spent their entire life in the

21   auto industry, and many of whom have been involved in labor

22   negotiations for years and years.

23               They recognize and have learned over time that when

24   you enter into any sort of negotiations and you ask for X you

25   invariably end up with less than X.  I trust, too, that the

68

1   leaders of the UAW probably feel the same way.

2           Now with that as the background --

3           MR. DECHIARA:  Objection, Your Honor, lack of

4   foundation as to that piece about the UAW.

5           THE COURT:  It's neither here nor there.

6   Go ahead.

7           THE WITNESS:  No.  With that bit of background

8   one of the concerns that the Delphi management had was that if

9   a median compensation program, or a market compensation

10  program, however it is defined, was presented to the UCC or the

11  other constituents, invariably negotiations would result in

12  reductions to that program.  So yes, they were concerned.  Did

13  they pressure me into making changes to the report that I

14  thought were outside the data?  No.  We've already gone over a

15  couple of e-mails where --

16  Q.      In fact, we have another one to do.  Could we go to

17  Bubnovich deposition, which is 265, Exhibit 13?  And to Page 13

18  of that?  Mr. Bubnovich, you originally recommended, and I take

19  it you're the author of this report that we have up here?

20  A.      Yes.

21  Q.      You originally recommended an emergence cash bonus of

22  66.7 million; correct?

23  A.      Well, I don't know that recommend is the right word.

24  I had it -- prepared a draft report that had that figure in it.

25  Q.      Well, who is who's responsible for generating at the

69

1   time of this report, the 66.7 million dollar figure?

2   A.        Well, I am.

3   Q.        Okay.  And you didn't regard providing this -- or

4   drafting this report as essentially a recommendation to the

5   compensation committee as to what the emergence bonus plan

6   should be?

7   A.        Well, the exhibit is clearly marked draft.

8   Q.        Yeah, it is, yeah, but when you were drafting it, was

9   it in your mind that this would be your recommendation to the

10  compensation committee?

11  A.        Yeah, subject to whatever input or other feedback I

12  got from people who were reviewing the draft.

13                 THE COURT:  I'm sorry.  What's the date of this?

14                 MR. KENNEDY:  The date is October 2nd, I think.

15                 MR. DECHIARA:  '05.

16  Q.        '05, yeah.

17  A.        It's marked 10/03 draft.

18  Q.        10/03, sorry.  It's October 3rd then, and you --

19  calculating the 66 million dollar number, were you approaching

20  that number on the basis of 80 percent of the 2004 LTI figure?

21  A.        This figure is based, yes, on 80 percent of the 2004

22  LTI cost data that I was provided.

23  Q.        Okay.  In fact, the 80 percent of the 2004 LTI result

24  can be computed in two different ways, one by cost and the

25  other by value; is that correct?

70

1    A.        That's correct.

2    Q.        And just for the record, what is the difference

3    between those two ideas, doing it by cost or doing it by value?

4    A.        Well, value would be the participant's opportunity in

5    this context.  Cost would be the pretax cost to the company.

6    Q.        Now, did you advise Delphi management and send them

7    this draft on or about October 3rd telling them that you were

8    anticipating an emergence cash bonus of 66.7 million?

9    A.        Yes, it was circulated to members of management.

10   Q.        Did you receive any feedback from management that the

11   numbers for emergence in the draft report are different than

12   they had anticipated?

13   A.        Yes, I did.

14   Q.        And did you explain to management that what you had

15   prepared that's on the screen now is a cost calculation?

16   A.        Yes, I did.

17   Q.        And did you advise the, quote, I believe that we

18   would have a difficult time getting the program approved it was

19   more costly than the historic LTI program, close quotes?

20   A.        Could I see the e-mail that --

21   Q.        Yes, you may.  I'm referring to Exhibit 12 to your

22   deposition transcript, Exhibit 265.  And I was specifically

23   referring to language which appears in the middle block, if

24   that could be highlighted.  Well, not quite that -- good job.

25   The exhibit reference is 12.  Okay, now I hesitate to ask this,

71

1    but if we could increase the -- no, not that one.  Don't,

2    don't.  Well, that will be later, but -- okay, right from there

3    down.  There you go.  Good, good -- okay, that's it.  Would you

4    take a minute to read that, Mr. Bubnovich?

5    A.        Okay.  I've read it.  I've read it.

6    Q.        Okay.  And you saw the language that I identified a

7    moment ago?

8    A.        Again, could you point it out to me, please?

9    Q.        Sure.  I'm referring to the sentence that goes,

10   quote, I believe that we would have a difficult time getting

11   the program approved it if was more costly than the historic

12   LTI program, closed quotes?

13   A.        To use a literary reference, this e-mail is sort of

14   stream of consciousness.

15   Q.        Well, stream of your consciousness, correct?

16   A.        Yes.

17   Q.        Okay.  And then what were you basing the judgment

18   that you thought it would be difficult to get the program

19   approved if it was more costly than the historic LTI program?

20   A.        I had some reservations while I was writing that

21   particular paragraph, which in the next paragraph, I

22   subsequently decided weren't that critical to proposing a

23   program that was more costly than the historic cost incurred by

24   the company.

25   Q.        Do you know what -- your voice dropped off, by the

72

1    way, at the end.  You said then by Delphi, right?  What was the

2    historic cost to Delphi, your understanding of it in October of

3    '06 when you wrote this e-mail?

4    A.          Approximately 67 million dollars.

5    Q.          And the current -- well, we'll get to that in a

6    minute.  All right.  You then said, quote, bigger fight on our

7    hands and the competitive benchmarks are not as compelling,

8    closed quotes.  When you said bigger fight, were you referring

9    to a bigger fight in the court getting the plan approved?

10   A.          Yes, that anticipated that shortly after the Chapter

11   11 filing there would be, you know, a hearing on this matter.

12   Q.          And the competitive benchmarks are not as compelling.

13   Which competitive benchmarks are you referring to that are not

14   as compelling if you move from the cost to a value approach to

15   doing this emergence calculation?

16   A.          That I'm not entirely sure what I meant at the time.

17   I don't -- I don't quite recall.

18   Q.          Now, if we could take that down, leave the exhibit up

19   and move up the page a little bit, maybe you can be reading the

20   next e-mail from the one in front of you while we do this

21   electronic -- no, keep the page up.  That's okay.  The second

22   block of type right up there.  That's good enough, I think.

23   Now, a Delphi executive wrote back to you that he had a problem

24   with the approach that you used; is that correct, on October

25   6th?

73

1    A.        Yes.

2    Q.        And he indicated to you that he had a representation

3    credibility issue based on two senior execs he had recruited;

4    is that correct?

5    A.        Yes.  That's what his e-mail says.

6    Q.        And then your response was, quote, no problem.

7    Consider the number changed.  That is why we do and review

8    drafts, closed quotes; is that correct?

9    A.        I did write that and I will say that the essence of

10   the e-mail chain is the one paragraph we haven't looked at

11   which is the bottom paragraph of my e-mail at 841.

12   Q.        Well, I'm comfortable -- I'm comfortable with the

13   essence of the e-mail, as we've described it.  Now, after this

14   e-mail, did you present to the compensation committee a written

15   proposal that the emergence bonus be 66 million dollars?

16   A.        That I don't recall.  I don't think so.

17   Q.        Isn't it a fact that the next document in this chain,

18   because we're now at October 6th, '05, is the October 8th plan

19   that you developed?

20   A.        Yes.

21   Q.        Okay.  And the October 8th plan that you developed

22   has the 89 million dollar number; correct?

23   A.        That's correct.

24   Q.        And that represents a change to computing the 80

25   percent of the 2004 LTI by value instead of cost?

74

1    A.        That's right.  The compensation committee was told

2    that the proposed emergence cash program would be based on the

3    historic opportunities that were afforded to the participants.

4    Q.        Did you share this -- these -- this e-mail chain

5    that's up on the screen with the compensation committee before

6    or at the same time you advised them about your recommendation

7    to do the emergence bonus as a function of value?

8    A.        No, I don't believe they saw this e-mail chain.

9    Q.        And they never saw the original draft at 66 million;

10   correct?

11   A.        That I don't know.  I would probably say that they

12   did see it.  I don't recall specifically, but as a draft, I

13   believe I would have circulated it to the chair of the

14   compensation committee.

15   Q.        Did you ever express to the compensation committee

16   your concern that the competitive benchmarks are not as

17   compelling if the emergence cash is computed on value instead

18   of cost?

19   A.        I think the compensation committee was always focused

20   on the opportunities and my analysis was something that, in

21   using cost, was something that they probably hadn't considered

22   before because again, you know, what's in front of the

23   compensation committee is generally a list of names and awards

24   and the opportunity.

25             So I think the framework for the compensation

75

1    committee is always opportunities, as opposed to the cost.

2    Q.        I take it that's a no, you did not advise the

3    compensation committee of the -- that the competitive

4    benchmarks are not as compelling in the use of value on the LTI

5    program as opposed to cost?

6    A.        I don't specifically recall.

7    Q.        One of your primary functions, I take it, with the

8    compensation committee was to assist them in performing

9    benchmarking to compare the Delphi comp program with other

10   companies?

11   A.        Yes.

12   Q.        At some point did you perform a survey to establish

13   the relative compensation costs for Delphi executives as

14   compared to the other executives in the -- in the United

15   States?

16   A.        We did our first analysis of Delphi executive pay in

17   December -- strike that, September, '05.

18   Q.        And at some point did you benchmark each of the DSB

19   positions against similar positions in three or four or five

20   different surveys?

21   A.        Yes.

22   Q.        And these surveys were published reports by human

23   resource consulting firms that Watson Wyatt selected?

24   A.        Yes.

25   Q.        And survey methodology of that sort is one that is

76

1    typically used by compensation efforts to benchmark corporate

2    position compensation?

3    A.        Yes.

4    Q.        And it's a system that you've used before, correct?

5    A.        Yes.

6    Q.        Now, when you bench marked the DSB members against

7    survey data, you found that each element of their pay was

8    substantially above the survey media?

9    A.        Which of the various bench marking exercises are you

10   talking about?  What's the time frame here, if you can help me

11   out?

12   Q.        I'm talking about a survey process that we discussed

13   in your deposition that was done at the end of 2005 and the

14   beginning of 2006 I believe it is.

15   A.        I think -- I think you're referring to end of 2006

16   actually.

17   Q.        All right.  Well, let's look at the end of 2006 then.

18   A.        Okay.

19   Q.        So you have that bench marking process firmly in

20   mind?

21   A.        Yes.

22   Q.        Okay.  And then that bench marking process, you

23   compared the DSB members against the survey data that you had

24   regarded as appropriate for that purpose, correct?

25   A.        Yes.

77

1   Q.      And in doing that, you determined that each element

2   of the DSB member's pay was substantially above the survey

3   median?

4   A.      Yes, I believe we've even looked at a summary of that

5   during Mr. Naylor's deposition.

6   Q.      And that was somewhere between 30 and 50 percent

7   above the survey median for each of the elements of the DSB

8   compensation?

9   A.      During my deposition that was what I guessed.

10  Q.      And am I correct that the bottom DSB positions were

11  86 percent over the median when bench marked against the Watson

12  Wyatt survey data?

13  A.      I don't recall.  If you have a specific exhibit we

14  could look at it.

15  Q.      Okay.  I'd like to look at Exhibit 7 from Mr.

16  Bubnovich's deposition.  The bottom print, could you bring that

17  up?  Do you see the sentence -- well, please read it first and

18  tell me when you're ready.

19  A.      Okay.  I've read it.

20  Q.      All right.  Am I correct that the bottom eleven DSB

21  positions, when bench marked against the Watson Wyatt survey

22  data, were 86 percent over the median; is that correct?

23  A.      Yes, that's what the chain of e-mails suggests.

24  Q.      And if you -- if we go up to the upper e-mail, which

25  is to you from a Tina Shaw, I gather Ms. Shaw is an employee of

78

1    Watson?

2    A.        Yes.

3    Q.        And she works with you on compensation matters?

4    A.        Yes.

5    Q.        And she states for all eleven positions, we did not

6    bench mark to proxy to recap the weighted average of all survey

7    sources, skipping the parenthetical, indicates the market

8    differential is 102 percent.  Do you see that?

9    A.        Let me read the whole e-mail.

10   Q.        Sure.  Please do.

11   A.        Okay.  I've read it.

12   Q.        Okay.  And that 102 percent is the weighted average

13   of all survey sources.  Do you know what survey sources Ms.

14   Shaw was referring to?

15   A.        No.

16   Q.        All right.  Then she says, quote, after singling out

17   WWDS data, it looks like the market differential is 147

18   percent, closed quotes.  Do you know what she means by singling

19   out WWDS data?

20   A.        I assume she means comparing it specifically or only

21   Watson Wyatt Data Services data.

22   Q.        Now, this e-mail was sent in December of 2007,

23   correct?

24   A.        Yes.

25   Q.        And at some point, was Watson Wyatt required to

79

1    forward compensation information to the purchasers, or the

2    investors, I guess, to assist them in determining whether to

3    approve the compensation plan?

4    A.        Well, the context of these e-mails, though, that is

5    the references to Pearl and Joe, are to the unsecured

6    creditor's committee compensation consultants and not the plan

7    investors, but information was sent to the UCC and its

8    advisors.

9    Q.        All right.  And isn't it a fact that you and Watson

10   Wyatt decided to exclude the 2006 DSB published survey bench

11   marking data from Appaloosa, and that you did that in order to

12   not let them know what the actual divergence between market and

13   the executive compensation salaries were?

14   A.        No.

15   Q.        Well, I direct your attention to the third paragraph

16   of the e-mail, which reads, quote, please remember that we

17   decided to exclude the 2006 DSB published survey bench marking

18   from the Surbaloosa (phonetic) report, and for purposes of

19   determining the market, closed quotes.  What could she mean by

20   that, other than the fact that Watson made a decision to not

21   let the investors know how far off the DSB folks were from the

22   DSB published survey bench mark?

23   A.        I got a little confused in the sentence by the

24   reference to Surbaloosa.  It's not really a typo.  She didn't

25   mean Appaloosa.  Earlier, actually a year before when Surberis

80

1    (phonetic) was a possible plan investor, shorthand for all the

2    plan investors was Surbaloosa.

3    Q.        Yeah, I'm aware of that.  So let's substitute the

4    words, quote, the plan investors, closed quote, for Surbaloosa,

5    and if we read it that way --

6              THE COURT:  Well, let me just ask you, was this

7    data supplied to Appaloosa or did you exclude this data from

8    what you shared with Appaloosa?

9              THE WITNESS:  No.  All of the information that

10   we had was sent to Appaloosa in September.  I think what she

11   means is --

12             THE COURT:  That was my question.

13             THE WITNESS:  Okay.  Could you please ask the

14   question again?

15   Q.        Sure.  Isn't it a fact, and the only conclusion one

16   could draw from this e-mail, that the DSB bench marking data,

17   was withheld from Appaloosa in '07 when you were sending them

18   information on the management compensation plan?

19   A.        No, it doesn't mean that.  Let me --

20   Q.        What does it mean?

21   A.        It means that in the report, the plan investor

22   report, the bench marking does not include the survey data.  As

23   I testified during my deposition, I decided and told the

24   compensation committee so, that I didn't think the survey data

25   was an appropriate match for the Delphi executives.

1    Q.         So that was the reason you didn't include it in the

2    information sent to Appaloosa?

3    A.         No.  You're mischaracterizing what I said.  I said I

4    sent Appaloosa, in September of '07, all the information that

5    we had.

6    Q.         Well, what was the decision to exclude that she

7    refers to in her e-mail of December 19, 2007?

8    A.         She is talking about the plan investor report.

9    Again, in the plan investor report, when we bench mark the DSB

10   executives and we say compared to the market, the market is the

11   proxy data, not the survey data.  So I think all she's trying

12   to tell me here is remember this data that now we're going to

13   send to the UCC wasn't the basis for the conclusions that were

14   reached in our report.

15              But again, I sent everybody all of the data that I

16   had, even the materials that I didn't use, or rely on in

17   preparing my report.

18   Q.         Let me talk about the peer groups a little bit that

19   you have worked with the compensation committee in assembling?

20   A.         Sure.

21   Q.         Do you agree with the statement that there is no one

22   right way to do a peer group?

23   A.         Yes.

24   Q.         In 2006, you assisted the committee in preparing a

25   peer group of 22 companies, correct?

82

1   A.        Yes, I did.

2   Q.        And could we bring that up?  That's Exhibit 13, I

3   think, to the -- no, it's not.  Let's make it nine.  I'm sorry.

4   Let's make it Exhibit 9 to the Bubnovich declaration.  Yeah,

5   and could you expand it a little.  Now, I want to talk about

6   the -- you need to move the right margin over a little bit.

7   I'm actually asking about the last column.  There you are.

8   Good.  That's fine.

9            Now, under the competitor for talent category, nine

10  of the 22 people in your view did not -- 22 companies did not

11  compete with Delphi for talent, correct?

12  A.        Yeah, the box isn't necessarily -- I'm sorry, the

13  column isn't checked with an X.  That's true.

14  Q.        Okay.  The companies that were checked, how many

15  people -- well, let me withdraw that.  How did you determine

16  whether a company -- let me give you an example of Dow

17  Chemical, was a competitor for talent with Delphi?

18  A.        Management made a presentation to the compensation

19  committee concerning those companies that it viewed as its

20  competitors for talent and identified certain situations where

21  the company had lost executives to one or more of these

22  companies, or where the company had, Delphi that is, had hired

23  or recruited executives from these companies.

24  Q.        So would even one example of an executive, either

25  going to or going from Delphi, and one of these companies, be a

83

1   basis for putting an X in the competitor for talent?

2   A.        Yes, that's possible.

3   Q.        So for instance, Best Buy, which is the seventh

4   company on the list, it's your understanding that one person

5   was either hired from or lost to a Best Buy?

6   A.        I just testified a minute ago that it could be as low

7   as one, yes.

8   Q.        And I'm asking you if in that instance, with respect

9   to Best Buy, isn't it a fact that you were advised of only one

10  individual that was either hired from or lost to Best Buy by

11  Delphi?

12  A.        I don't remember that.

13  Q.        Would you turn to your deposition.  Excuse me, yeah

14  your deposition.  That is Exhibit 265, and I'm referring to

15  Page 152.  Or no, I'll pass on from that.  Never mind.  At some

16  point the competitor group decreased from the 22 we were

17  looking at a moment ago, to 18 because of the deletion of four

18  of the larger companies that were on the list of 22, correct?

19  A.        Yes.

20  Q.        And isn't it true that the change from the group of

21  22 to the group of 18, caused the comparative total direct

22  compensation target to go down?

23  A.        Yes, but not by a material amount.

24  Q.        Okay.  And it's my understanding that you define

25  materiality as seven percent?

84

1   A.        When I was asked that question at my deposition I did

2   answer it as seven percent.  The actual different between the

3   peer group was three percent.

4   Q.        And would that three percent was across the board,

5   meaning for all 540 execs?

6   A.        No, no.

7   Q.        Or was it just for the DSB --

8   A.        Just for the DSB positions that were bench marked

9   against the proxy data.

10  Q.        Now, the change in comparator group reduced the

11  appropriate comparison for CEO salary from 1.5 million to 1.2

12  million, correct?

13  A.        Yes.

14  Q.        And that of course is a drop of 20 percent?

15  A.        That is correct.

16  Q.        But it's your understanding and view that the drop

17  with respect to the other executives was only three percent?

18  A.        Well, the three percent drop was total compensation.

19  You've isolated, you know, one part of one executive's pay,

20  which happened to have a drop of 20 percent, so, yes.

21  Q.        So the three percent is the TDC figure, meaning the

22  LTI, the short term and the salary?

23  A.        That's correct.

24  Q.        Now, in reviewing the comparison between total direct

25  compensation at the comparator companies and Delphi's, for the

85

1    purposes of the short term compensation element, were you using

2    the target or the actual?

3    A.        Originally I was using actual.

4    Q.        And at some point you changed the target?

5    A.        Yes.

6    Q.        When was that?

7    A.        Fall of this year.  I'm sorry, fall of last year.

8    Q.        Are you aware that the AIP payouts for Delphi

9    executives in 2001, 2003, 2004 and 2005 were zero?

10   A.        I'm aware that there were several years pre-petition

11   where nothing was paid and other years where there were modest

12   amounts paid, yes.

13   Q.        Could we bring up Exhibit 20 to Mr. Bubnovich's

14   deposition, and again we're using Bates numbers.  Use Bates

15   20288.  I believe that lists the AIP percentages from 1999 to

16   2005.  Do you see that, sir?

17   A.        Yes, I do.

18   Q.        And in '01, '03, '04 and '05 it's zero?

19   A.        Yes, it is.

20   Q.        Okay.  Now, you've also seen the payouts which were

21   for fifty -- more than fifty percent of the executives, 200

22   percent of their target in '06 and '07, correct?

23   A.        I thought the 55 percent was for the first six months

24   of '06.

25   Q.        You may be right.  You may be right.  Let's assume

86

1    then that there were AIP payouts in excess of the targets in

2    '06 and '07.  Would you agree with me on that?

3    A.        I don't know about the second half of '07.  I'll

4    agree with you for '06 and the first six months of '07.

5    Q.        Okay.  So that in the point of view of individual

6    executives employed at Delphi, they're actually making more

7    money in terms of a W-2 sense, than during the bankruptcy than

8    they had prior to the bankruptcy, correct?

9    A.        Well, their performance is much better.  That's the

10   difference.

11   Q.        They didn't have you helping to set the targets in

12   the prior months either.

13                  MR. BUTLER:  Objection.

14                  THE WITNESS:  I didn't set the targets.

15                  MR. BUTLER:  Your Honor --

16                  THE WITNESS:  Sorry.

17   Q.        How does the management compensation plan reflect the

18   fact that the AIP payouts before the bankruptcy were mostly

19   zero, after the bankruptcy they have been doing swell.  What in

20   the management compensation plan, as you've proposed it,

21   reflects that actual difference between having money and not on

22   the AIP front?

23   A.        Well, with all due respect, sir, you're confusing the

24   amount that's earned or as this particular page shows, that's

25   not earned, which is based on performance with the

87

1    opportunities, not withstanding the fact that nothing was

2    earned in '01, '03, '04 and '05, the executives had

3    opportunities that were essentially the same as those during

4    the Chapter 11 and those proposed post emergence.

5    Q.        Yeah, but up until the fall of '06 you were also

6    using actual as in the pie chart for Delphi executives on how

7    well they had been doing, correct?

8    A.        No.

9    Q.        Well, I believe you just told me that you changed in

10   the fall of 2006, in computing the AIP portion of the pie

11   chart, from actual to target?

12   A.        You misunderstand the process.  Let me explain it.

13   For Delphi we were using the target opportunity, not the actual

14   pay.  When I started the process of preparing the plan investor

15   report, and using proxy data, the only data that was available

16   in the proxies was actual bonuses earned at the peer companies.

17   So I was comparing Delphi target opportunities to peer actual.

18   Later at the end of last year, I changed from target to target

19   because when the SEC changed the executive compensation proxy

20   reporting rules, target information became available in --

21   beginning in March of '07 for the proxies filed beginning in

22   March.

23           Now, again the difference from target to actual to

24   target to target, not material, one percent.

25   Q.        Okay.  The amount of actual AIP payout then had no

88

1    impact on the emergence cash program?

2    A.        No.

3    Q.        So it made no difference for purposes of determining

4    the emergency cash payment whether someone had been at 200 of

5    AIP or zero; is that correct?

6    A.        That's correct.

7    Q.        Okay.  Now, the emergence cash program, as you're

8    presenting it to the Court, or the company is, calls for 87

9    millions dollars in cash to be paid to Delphi executives,

10   correct?

11   A.        Yes.

12   Q.        And that was the -- or is close to the figure that

13   was proposed in 2005 as well, correct?

14   A.        Yes.

15   Q.        Now, after the 2005, or even at the time of the 2005

16   KECP motion, you were aware that this emergence cash program

17   was always subject to court approval, correct?

18   A.        Yes.

19   Q.        And in fact you have discussed with Delphi

20   executives, what if there is no emergence cash program,

21   correct?

22   A.        Probably.

23   Q.        And you also advised them that after the various

24   approval processes with the committee and so on, they could end

25   up with only a small amount of equity as emergence program.  Is

89

1    that also correct?

2    A.        I probably discussed it as a possibility, yes.

3    Q.        Now, in structuring the emergence cash program,

4    you've told me that the payout was figured as 80 percent of the

5    cost of the 2004 L-tip, correct?

6    A.        No.

7    Q.        Of the value, I thought.  I believe it's of the value

8    of the --

9    A.        The opportunity.

10   Q.        Okay, the opportunity.  But in any event, the year

11   involved is 2004?

12   A.        Yes.

13   Q.        And did you select 2004 because it was the most

14   lucrative L-tip year in recent history?

15   A.        No.

16   Q.        Are you aware that that's a fact, that the 2004 L-tip

17   opportunity was much higher than prior years?

18   A.        I don't recall if I knew that.

19   Q.        Okay.  Well, could we go to Mr. Bubnovich's

20   deposition Exhibit 3, Page 16.  First, do you recognize this

21   page as being a page from the key employee compensation program

22   report you prepared dated October 8th, 2005?

23   A.        Yes.

24   Q.        And this slide tells us that the L-tip cost was 75.2

25   million in 2003?

90

1    A.        Yes, it does.

2    Q.        And 91.3 million in 2004?

3    A.        Yes.

4    Q.        And then 2005, I gather from the asterisks, that one

5    might look at 2005 as a combination of the 49.6 plus the 21

6    reflected in the asterisk?

7    A.        Yeah, so it would make it 70, if you wanted to.

8    Q.        All right.  So of the three years, we had a 70, a 75

9    and a 91, and you selected the 91 as the year in which to

10   measure the emergence cash bonus, correct?

11   A.        That is the case.  Yes, that's what this one says.

12   Q.        Other than the fact that that would result in the

13   highest possible payment to the affected Delphi executives,

14   what other reason would one select the middle year for that?

15   A.        I don't know.

16   Q.        Okay.

17   A.        But I --

18   Q.        The number of executives that are going to be

19   participating in the post emergence bonus program is 540; is

20   that correct?

21   A.        Yes, that's correct.

22   Q.        And isn't it true that most companies cover only a

23   small number of executives for L-tip?

24   A.        No, that's not true.

25   Q.        Okay.  Could we go to Exhibit 13 to Mr. Bubnovich's

91

1    deposition, which is the --

2    A.        Could we go back to Page 16?

3    Q.        I'm happy to go back wherever you wish, although

4    let's keep going, and then we'll have an opportunity to fill

5    that in later?

6    A.        Okay.  Thank you.

7    Q.        I'll lose my thought otherwise and I apologize for

8    that if I -- when I was younger, I didn't lose thoughts.  I'm

9    looking at Page 16?

10   A.        I'm sorry.  What exhibit are we on?

11   Q.        We're on -- we're on Exhibit 13, which is the October

12   3 draft of what ultimately became the October 8, 2005 Delphi

13   executive compensation program.

14             MR. BUTLER:  This is exhibit what again?  I'm

15   sorry, Tom.

16             MR. KENNEDY:  It's Exhibit 13.

17             THE WITNESS:  Okay.

18             MR. KENNEDY:  And I'm referring to Page 15.

19             MR. BUTLER:  Thank you.

20   Q.        That's Page 16.  Could we go to -- yeah, there we

21   are.  Could you highlight the second bullet?  Okay.  Now, Mr.

22   Bubnovich, you prepared this draft, correct?

23   A.        Yes.

24   Q.        And I notice in your second bullet on Page 15 you

25   write the words, quote, most companies have historically

92

1   covered only a small number of executives, closed quotes,

2   referring in the title to the emergence bonus cash plan.  Did

3   you write those words, sir?

4   A.      Yes, I did write those words.

5   Q.      Okay.  Now, in this emergence plan, what performance

6   is required of the executive after the date of emergence, in

7   order to entitle them to the full recovery of their portion of

8   the emergence bonus, cash bonus?

9   A.      Emergence cash plans, in my experience, historically

10  were designed to reward those executives who made substantive

11  contributions during the case.  Often it was viewed that they

12  were instrumental in expediting the Chapter 11, or perhaps did

13  something that increased the recovery of the creditors.

14          Delphi management on the other hand, believed that a

15  successful emergence was contingent not only on the very

16  highest levels of management, but on the efforts of the entire

17  team.  Agreeing with that view, the compensation committee

18  decided to cover a much greater group than historically would

19  be covered by these sorts of programs.

20  Q.      All right.  I move to strike as non-responsive.  I

21  asked you, sir, what amount of performance, what type of

22  performance is going to be required, after the emergence date,

23  of the executives who are entitled to participate in this cash

24  program?

25  A.      Well, the design of the program is that the sooner

93

1    the exit the sooner the payment, but it was always intended, I

2    believe under the program, that contributions would be weighed

3    at the end of the case and adjustments would be made to

4    recognize contributions.  And in this particular case, you

5    know, no business disruptions, successful reorganization, given

6    creditor recoveries, sales pipeline, reasonably flow --

7    Q.       But Mr. Bubnovich, you've been very forthcoming.  Let

8    me apologize for not asking my question clearly.  Let me try it

9    again.  Isn't it true that after the performance date, there's

10   no -- excuse me, after the emergence data, there's no

11   additional performance required of Delphi executives to be able

12   to participate in the cash bonus plan?

13   A.       Okay.  I'll answer that as yes.

14   Q.       Now, in fact, if an executive leaves Delphi, he is

15   still entitled to get this money, correct?

16   A.       Well, any executive who left Delphi during the case

17   would not get any payment.

18   Q.       So true.  How about executives that leave after the

19   emergence?  Are they going to be able to get this payment?

20   A.       If the payment is approved, it will be deemed vested

21   and not withstanding that it will be paid in two tronches, yes,

22   they will be entitled to it.

23   Q.       And Delphi is expecting its number of executives to

24   be reduced by approximately 100 as it rolls forward and

25   hopefully is able to sell the divisions it seeks to sell; is

94

1   that correct?

2   A.        I believe that's approximately correct.

3   Q.        And those hundred executives that are departing are

4   also being able to take with them in effect the emergence cash

5   bonus payment from Delphi?

6   A.        Well, they made contributions during the case.

7   That's why they're able to take it with them.

8   Q.        And what about the 115 executives that are employed

9   by non-debtor entities, they're also participating in the

10  emergence cash bonus program, correct?

11  A.        Yes, they are.  They're part of the team.

12  Q.        Now, do you agree with me that it is less common than

13  more common that a company exiting from Chapter 11 will have an

14  emergence cash bonus plan for its executives?

15  A.        I think a little bit of background helps here.

16  Q.        Excuse me.  I appreciate the background, but let me

17  ask the question.  Do I need to ask it again, sir?  It's a yes

18  or no question.  Do you agree that it is less common than more

19  common that a company exiting Chapter 11 will have an emergence

20  cash bonus plan for its executives?

21  A.        I believe I testified at my deposition that it is

22  less common.

23  Q.        Thank you.  And do you know a man by the name of Josh

24  Wilson?

25  A.        Yes, I do.

95

1    Q.        Mr. Wilson is the head of compensation practice in

2    Atlanta?

3    A.        Yes, he is.

4    Q.        And did you send him an e-mail, and I'm referring to

5    Exhibit 6 of your deposition, sir, sometime in December of 2007

6    concerning -- well, let me just get that up.  Would you take a

7    minute to review the e-mail?  I'm basically looking at Page 2,

8    if we could get to Page 2.  If you could bring up the bottom e-

9    mail and tell me when you've read it, sir.

10   A.        Okay.  I've read it.

11   Q.        All right.  Now, around December 24th, 2007, you

12   asked Mr. Wilson to look for cash emergence data for large

13   recently emerged or emerging companies, correct?

14   A.        Yes.

15   Q.        And when you say emerging companies you're referring

16   to companies coming out of Chapter 11?

17   A.        Yes.  Again, the context of these e-mails was in

18   connection with the report I was preparing for Steve and Rod's

19   emergence bonuses.

20   Q.        Okay.  These are --

21   A.        I was not asking him to look for general emergence

22   bonus covering a wide group of people.

23   Q.        Well, let's look at his answer.  He goes, quote,

24   unfortunately I have not found a single one of these -- those.

25   I don't know if it's the post 2005 rules or just a general way

96

1    of the world, but the significant value in most of the exec

2    deals are in the form of equity granted as part of the

3    emergence, closed quotes.  You got that response from him, sir?

4    A.        No, I think that's a very insightful response because

5    a lot of times what might really be an emergence bonus is built

6    into the post emergence equity award.

7    Q.        Okay.  So in fact you replied to him later that same

8    day when you said, quote, I am looking for emergence cash

9    bonuses, generally rationalized as rewarding the exec for the

10   job done during the case, closed quotes.  Is that what you

11   wrote, sir?

12   A.        Yes, that's what I wrote.

13   Q.        Okay.  And ultimately, if we go to the top of Page 1,

14   Mr. Wilson sent you seven examples, correct?

15   A.        As we discussed in my deposition, it's actually only

16   six, but yes, he did give me --

17   Q.        Okay.  And these examples appear at Page 4 of the e-

18   mail chain, and essentially they identify instances in which

19   one executive got a success or emergence bonus at six different

20   companies, and in one of them two people got it.  Is that

21   correct?

22   A.        Yeah.  Well, actually in W. R. Grace that wasn't an

23   emergence bonus.  That's Mr. Festa's (phonetic) retention bonus

24   maybe.

25   Q.        Okay.  It's called a success or emergence bonus on

97

1   the chart?

2   A.        Right.  Now sometimes when you're parsing through

3   many documents that constitute a Chapter 11 case, you know, you

4   don't quite identify or understand exactly what the number

5   might be.

6   Q.        So you don't think that particular company, W. R.

7   Grace should be on the list?

8   A.        I can tell you for a fact that that is Mr. Festa's

9   retention bonus opportunity, not -- there's still a Chapter 11

10  so there is no emergence bonus yet.

11  Q.        All right.  So there are five examples then that he

12  was able to find of even one executive in a company getting a

13  cash emergence bonus; is that correct?

14  A.        Yes, that was his -- that was all his research found.

15  Q.        Now, did you -- in looking at the 88 million dollar

16  aggregate for the cash emergence program, did you look to see

17  whether that is at or above the median for any companies that

18  have recently emerged from bankruptcy?

19  A.        Yes, at the time, I did undertake an exercise to try

20  and compare the proposed cost of the emergence program to the

21  proposed cost of various Chapter 11 companies retention

22  programs.

23  Q.        Now, isn't it a fact that the 88 million dollar

24  figure is 31 percent above the median when compared to the

25  other companies you were able to find?

98

1   A.          As I testified in my deposition, I considered that at

2   this time a flawed analysis, not proving much, and it was

3   subsequently abandoned, never considered thereafter.

4   Q.          okay.  Well, let's just look at the analysis.  The

5   analysis that was originally done concluded that the cash

6   payment expressed as a percentage of revenues, I think it was,

7   placed Delphi at the 81st percentile; is that correct?

8   A.          The analysis that I did does say that, if you choose

9   to value it.

10  Q.          Okay.  Well -- now the long term incentive plan

11  setting aside eight percent of Delphi --

12             THE COURT:  Are you moving off the cash bonuses

13  now?

14             MR. KENNEDY:  Yes, I am, Your Honor.

15             THE COURT:  I have a couple questions for you,

16  Mr. Bubnovich.

17             MR. KENNEDY:  Sure.

18             THE COURT:  Did you do any other comparable

19  analysis comparing other Chapter 11 companies to the proposed

20  Delphi cash emergence bonus plan?

21             THE WITNESS:  Well, the cash emergence plan is a

22  vehicle adopted by the compensation committee to provide a type

23  of long term incentive opportunity to the participants.  Now,

24  some companies, W. R. Grace for example, skin the cat a little

25  bit differently.

1          You know, Grace has got an LTI program that is

2     covered up to 280 participants.  Now, if you move all the --

3               THE COURT:  Now, I'm going to proceed through my

4     questions, okay?

5               THE WITNESS:  Okay.

6               THE COURT:  So I want you to -- I'll give you a

7     chance to elaborate, I hope.

8               THE WITNESS:  Okay.  Thank you.

9               THE COURT:  But did you do any analysis, more

10    than anecdotal analysis, a rigorous analysis comparing Delphi's

11    proposed cash exit bonus plan with other Chapter 11 companies?

12              THE WITNESS:  As my materials I think make

13    clear, I couldn't do that type of analysis because nobody else

14    that I could find, had a program that was of the scope of

15    Delphi's proposed program covering that many people.

16              THE COURT:  Okay.  Now, when Mr. Naylor

17    testified as to getting bench mark data from Watson Wyatt with

18    regard to the cash emergence bonus program, was that the data

19    limited to -- was that data limited to the so called merit type

20    emergence bonuses that you referred to earlier?

21              THE WITNESS:  Well, if I remember the section of

22    Mr. Naylor's testimony, I thought he was talking simply about

23    the data that I delivered concerning the proposed emergence

24    bonuses for Mr. Miller and Mr. O'Neil.

25              THE COURT:  And is that your understanding -- is

100

1    that the data you provided on emergence bonuses?

2                    THE WITNESS:  Yes.

3                    THE COURT:  And is it fair to say that that's

4    the data that's up on the screen now?

5                    THE WITNESS:  No.

6                    THE COURT:  Okay.  But it was as to senior

7    executives, like the top one or two people in the company?

8                    THE WITNESS:  Yeah.  I prepared a separate

9    report that discussed the potential emergence bonuses for the

10   executive chairman of the board of the CEO.

11                   THE COURT:  And you were comparing their

12   proposed range of bonuses to other similarly situated

13   executives in other Chapter 11 cases?

14                   THE WITNESS:  I compared -- I did two analyses

15   in the report.  The one compared the long term incentive and

16   emergence bonuses paid to executives in other cases.  So --

17                   THE COURT:  No, but --

18                   THE WITNESS:  -- I mixed -- I mixed the

19   concepts.

20                   THE COURT:  But when I -- I guess the point I

21   want to understand is when you say two executives, are you

22   talking about the very senior most executives comparable to Mr.

23   O'Neil and Mr. Miller?

24                   THE WITNESS:  Yes, Your Honor.

25                   THE COURT:  Okay.  Did you provide any

1    comparable data with regard to cash emergence bonuses with

2    regard to other types of executives that would be covered by

3    Delphi's plan?

4                    THE WITNESS:  No.  Again, I could find nothing

5    that matched the scope of Delphi's program.

6                    THE COURT:  Okay.  Now, I heard an earlier

7    answer of yours to one of Mr. Kennedy's questions when he was

8    asking you about historically emergence cash bonuses.

9                    THE WITNESS:  Well, I think the question you're

10   referring to, and I remember it, he asked me about is it true

11   that --

12                   THE COURT:  No, that's not the one.

13                   THE WITNESS:  That's not the one?  Okay.  I'm

14   sorry.

15                   THE COURT:  He asked you is it true that most

16   companies in Chapter 11 have covered only a small number of

17   executives.

18                   THE WITNESS:  I believe I answered that as yes.

19                   THE COURT:  And you said yes.  And then you said

20   that it's used to reward people for a job well done.

21                   THE WITNESS:  Yes.

22                   THE COURT:  Merit based.

23                   THE WITNESS:  Yeah.

24                   THE COURT:  And then I thought I heard you say

25   that that was the rationale for Delphi's proposal.

1          THE WITNESS:  Certainly the rationale for some

2     of the adjustments that were made during the case for some of

3     the individuals.

4          THE COURT:  But I also understood from both your

5     and Mr. Naylor's testimony that with the exception of Mr.

6     Miller and Mr. O'Neil, the way that the compensation committee

7     arrived at the amount, the aggregate amount of the emergence

8     bonuses, was as a proxy or a surrogate for foregone LTI?

9          THE WITNESS:  That is correct, subject to a

10    twenty percent discount from the 2004 levels.

11         THE COURT:  Okay.  How was that figure -- how

12    was that methodology arrived at?

13         THE WITNESS:  Well, Mr. Kennedy was cross

14    examining me about size of the 2004 LTI awards versus --

15         THE COURT:  No, how was the methodology arrived

16    at to use that as a basis for calculating emergence bonuses?

17         THE WITNESS:  Well, the intent was to provide

18    some sort of equivalent vehicle to provide a long term

19    incentive opportunity during the case.  The company wanted, and

20    the compensation committee agreed, everyone should have salary,

21    annual incentive opportunity and some sort of long term

22    incentive opportunity to maintain -- pay at competitive levels.

23         THE COURT:  But am I right that -- leave aside

24    the discounting for a second.

25         THE WITNESS:  Okay.

103

1          THE COURT:  And I'll ask you why you reached

2    that, but am I right that the long term incentive opportunity

3    was tied only to being around on emergence?

4          THE WITNESS:  Yes.  Anyone who was able to

5    remain employed during the entire case, would receive the

6    emergence cash bonus, assuming it was approved by the Court.

7          THE COURT:  What in the market place of Chapter

8    11 companies is comparable to that?

9          THE WITNESS:  I think the comparables would be

10   those companies that provide the long term incentive

11   opportunity.

12         THE COURT:  You mean a KESP plan that's approved

13   early in the case?

14         THE WITNESS:  Yes.  Yeah, it would be some kind

15   of long term incentive opportunity, you know, albeit, and a

16   critical distinction would be, you know, those sorts of cases

17   or those sorts of situations involve a performance element.

18   For example, you known, the Kalpine (phonetic) case, the

19   performance element was tied to TEV.  W. R. Grace's LTI is

20   based on e-bit (sic) growth.  So, you know, the fair

21   distinction is that, you know, those programs have a direct

22   performance component, and as you just asked me in this case,

23   there is not such a performance component.

24         Anyone who stays until the end of the case would

25   be -- would receive a payment.

1        THE COURT:  If you had such a -- well, I guess

2   there was no such program here, but did Watson Wyatt provide

3   the debtors with any analysis of what a comparable amount would

4   be in respect to a comparable program like that?

5        THE WITNESS:  I'm not sure I --

6        THE COURT:  If Delphi --

7        THE WITNESS:  -- understand the questions.

8        THE COURT:  -- if Delphi had such a program as

9   the ones you've just described --

10        THE WITNESS:  Um-hum.

11        THE COURT:  -- did Watson Wyatt undertake an

12   analysis to see what the amount would be if Delphi had adopted

13   a program along the lines of the ones that you described?

14        THE WITNESS:  I think the amounts would be

15   similar to a little bit higher.

16        THE COURT:  But did --

17        THE WITNESS:  To answer your question, it's no.

18   I'm sorry.  The answer to your question is no, we did not

19   undertake that analysis.

20        THE COURT:  Okay.  And do you have such an

21   analysis of bench marks for such long term incentive programs?

22        THE WITNESS:  I have knowledge of certain

23   Chapter 11 company's programs.

24        THE COURT:  But Watson Wyatt doesn't have a

25   database to that effect?

105

1    THE WITNESS:  No, it does not.

2                 THE COURT:  Okay.  All right.

3                 MR. KENNEDY:  Just to follow up on this.  I want

4    to make sure I understand the significance of Exhibit 14 to

5    your deposition, sir, Page 17.  Would you bring that up?  Page

6    17.

7    Now -- well, tell me when you're at it, sir.

8                 THE WITNESS:  Okay.  I'm there.

9    Q.        The notes refer to a peer group comprised of the

10   following 15 companies with revenues of five billion and above.

11   Who is it that assembled that peer group?

12   A.        I did, maintained the database of Chapter 11

13   companies retention programs.

14   Q.        And your -- I'm trying to square that with your

15   testimony to the Court a few minutes ago that Watson Wyatt did

16   not maintain a database of companies emerging from Chapter 11?

17   A.        Well, I understood the Court's question to be in

18   relation to long term incentive programs.  This is what I would

19   call a peer retention program or KERP.

20   Q.        So these peer groups essentially that you're

21   referring to had in place KERP?

22   A.        Yes.

23   Q.        And would it be fair to categorize the emergence cash

24   bonus plan as a back end KERP?

25   A.        It's a program that could be looked at in a variety

106

1    of ways.  You know, one could call it -- one could say it has

2    features that are very similar to a retention program.

3    Q.        I didn't hear the last part?

4    A.        I said it does have features that are similar to

5    retention programs.

6    Q.        So you would agree with me that it's in effect a PRP

7    at the back end of the proceeding?

8    A.        The design isn't quite the same as your typical KERP,

9    but again, it is paid as his Honor's questions to me pointed

10   out, at the end of the case, if someone is still employed.

11   Q.        The -- let's talk a little bit about the long term

12   incentive --

13                 THE COURT:  Can we just have this for a second?

14   Is this the -- is this the analysis that you said was flawed?

15                 THE WITNESS:  Well, when the motion was being

16   prepared, the first day motions, I didn't anticipate that my

17   report was going to be attached to those motions.  Mr. Butler

18   kind of surprised me the week before, and I was struggling to

19   find some bench marks.  And so I came up with this.  I don't

20   believe that's it an appropriate comparison now.

21                 As I said earlier, nothing ever came of this.

22   This was never discussed subsequently by a compensation

23   committee.  I never brought it out.  It died on the vine.

24                 THE COURT:  I'm sorry.  What is the date of

25   this?

1          THE WITNESS:  October, '05.

2          MR. BUTLER:  October 8th, Your Honor.

3          THE COURT:  But wasn't it then a -- it was a

4     KERP then?  I mean it was a KERP motion?  I just don't

5     understand why -- why it's apples and oranges in that context.

6          THE WITNESS:  I guess I never viewed it strictly

7     as a KERP.

8          THE COURT:  Well, the motion said KERP.

9          THE WITNESS:  I don't know.

10         MR. KENNEDY:  Your Honor, just so the record is

11    not messed up.  I think it was called KECP.

12         THE WITNESS:  Yeah.

13         MR. KENNEDY:  There's a very interesting initial

14    that's different.

15         THE COURT:  Okay.  All right.

16         MR. KENNEDY:  It's really a KERP.

17         THE COURT:  So I'm sorry.  The reason it's broad

18    is because it's a comparison of the KECP to KERPs?

19         THE WITNESS:  Yes.  You know, again the -- if

20    you view the program as the type of LTI vehicle, I think it's

21    more appropriate to compare it to LTI opportunities rather than

22    KERPs.

23         THE COURT:  Again, just to make sure I

24    understand, there is no comparative chart for that in a Chapter

25    11 case?  There's no comparative chart for other LTI like

1    opportunities?

2                    THE WITNESS:  Well, in my report I do compare

3    the emergence cash opportunity to long term incentive

4    opportunities.

5                    THE COURT:  No, but not for Chapter 11 cases?

6                    THE WITNESS:  That's correct.

7                    THE COURT:  Your report deals with companies

8    with a stock option, have true opportunity value?

9                    THE WITNESS:  Yes.

10                   THE COURT:  During the period in question?

11                   THE WITNESS:  Yes.  Yeah, yes, that's correct.

12                   THE COURT:  Which you -- well, I would -- okay,

13   fine.

14                   MR. KENNEDY:  Okay.

15                   THE COURT:  You can continue.

16                   MR. KENNEDY:  May I continue, Your Honor?

17                   THE COURT:  Yes.

18   Q.      Did you ever advise Delphi that in your view the

19   documents they had submitted in support of the key-sip motion

20   was not in --

21                   THE COURT:  Let me just take a break.  I want to

22   get a little bit of composure back.

23           (RECESS.)

24                   THE COURT:  Continue, Mr. Kennedy.

25                   MR. KENNEDY:  Thank you, Your Honor.  I've been

109

1    encouraged by my colleagues to go more quickly and I will

2    certainly do that.

3    Q.        I'd like to ask a couple of questions about the SERP

4    program, Mr. Bubnovich.  Do you understand that a SERP is a non

5    qualified pension benefit?

6    A.        Yes.

7    Q.        And you're aware that this particular SERP, and

8    indeed I believe all SERPs are not funded by the companies

9    involved.  Do you agree with that, sir?

10   A.        I'm sorry.  Ask the question again.

11   Q.        They're not pre-funded SERPs.  There's no trust and

12   that sort of thing?

13   A.        Yes.

14   Q.        And they're paid out of general assets, correct?

15   A.        Yes.

16   Q.        And did you do an analysis of how other companies in

17   Chapter 11 have treated their SERP program?

18   A.        Yes, I did.

19   Q.        And isn't it true that most often SERPs are lost or

20   substantially impaired during a Chapter 11 process?

21   A.        That's particularly true when recoveries are limited

22   or low, yes.

23   Q.        Well, in this case the recoveries are going to be

24   whatever the market pays the people who get the Delphi stock,

25   correct?

1   A.        Well, the creditors, as I understand the plan, are to

2   be provided with an amount of stock that is equal to par plus

3   accrued and yes, equity values do fluctuate.

4   Q.        Now, the frozen SERP is -- continues to be payable to

5   both actives and retirees, correct?

6   A.        Well, the SERP is not payable to actives.  It's only

7   payable to the retirees.

8   Q.        You're exactly correct.  I apologize for that.  Am I

9   correct that if post emergence, your current plan is that

10  current retirees will continue to receive a check up to a 5,000

11  cap and actives will get their SERP benefits as they qualify

12  for them?

13  A.        No.

14  Q.        Okay.  How was I wrong?

15  A.        Well, the cap is being -- the plan of reorganization

16  provides that the $5,000 cap is to be eliminated and that the

17  program with respect to retirees is terminated.

18  Q.        So that -- I want to make sure I understand this.

19  Existing retirees now, as we sit here, are getting their SERP

20  checks?

21  A.        Subject to the cap.

22  Q.        Subject to the cap.  And is it part of the post

23  emergence plan that those retirees will not longer get a check,

24  or that they'll simply still be subject to the cap?

25  A.        No.  They will no longer get a check.  Instead they

111

1   will have a claim the same as any other unsecured creditor.

2   Q.        Now, Mr. Naylor testified that the cost of lifting

3   the cap to Delphi on a going forward basis will be

4   approximately 42 million dollars.  Have you computed the cost

5   of the other changes and benefits that are being enacted as

6   part of the freezing of the SERP?

7   A.        No.  I didn't compute them, but they were computed,

8   yes, in the aggregate.

9   Q.        And in the aggregate, what are those costs?

10  A.        87 million dollars.

11  Q.        And is that a present value number?

12  A.        Yes.

13  Q.        And do you know what the discount rate was used to

14  arrive at it?

15  A.        No, I don't.  It was calculated by our actuarial

16  group.

17  Q.        And does that 87 million dollars include the cost of

18  -- that we have identified sort of colloquially as 42 million

19  for lifting the $5,000 cap?

20  A.        I'm not sure.  I'd have to look at the materials.

21  Q.        So that the 87 million dollar figure could actually

22  be a portion of this additional SERP cost arising from the --

23  A.        I simply don't know without looking at the

24  information.

25  Q.        And the 87 million dollars is a charge that Delphi is

112

1   going to be carrying on its books?

2   A.      Yes.

3   Q.      And if the SERP were terminated for actives as well

4   as for retirees, would Delphi be freed of that 87 million

5   dollar obligation?

6   A.      Yes.

7   Q.      Now, are you -- have you done a study of how many

8   companies emerging from Chapter 11 with billions -- with

9   revenues of five billion or above, have amended their SERP to

10  improve its benefits at the time of the freeze?

11  A.      I'm sorry, sir.  Ask the question again.

12  Q.      Sure.  It had a lot of elements.  I'm trying to

13  figure out what Delphi is doing now in connection with the

14  SERP.  Do you know if other companies that have done the same

15  thing have amended a SERP to improve its benefits immediately

16  prior to the freeze in emerging Chapter 11 situation?

17  A.      I don't know.

18  Q.      Have you looked if there were such examples?

19  A.      I did not look.  Our actuarial practice was asked to

20  find whatever data that it could on the subject.

21  Q.      And isn't it a fact that your actuarial practice got

22  back to you with an e-mail which said, quote, neither of us are

23  aware of a situation where the plan was amended to change the

24  benefit formula immediately prior to the plan freeze, closed

25  quotes?

113

1   A.        Yes, I believe that's true.

2   Q.        And who is Keith Williams?  Let me ask that?

3   A.        Keith Williams is the lead actuary on the Delphi

4   account for Watson Wyatt.

5   Q.        And as you're a senior compensation person, I take it

6   he's a senior actuary for Watson?

7   A.        Yes.

8   Q.        And are you aware that he wrote an e-mail on October

9   4th of 2006 indicating that he told Delphi management that,

10  quote, I was quite uncomfortable with making any changes to the

11  basis SERP design in conjunction with the freeze of the his

12  plan on emergence, closed quotes?

13  A.        Yes.  He wrote that e-mail in the context of having

14  no knowledge at the time about the subject matter.

15  Q.        Well, you have a lot of knowledge about the subject

16  matter, don't you?  And you don't have any other examples of

17  companies freezing -- or I should say amending their SERP to

18  improve benefits prior to the freeze either, do you?

19  A.        No, I do not have that information for a Chapter 11

20  company.

21  Q.        In fact Mr. Williams as a senior pension actuary

22  observed I believe in his October e-mail that, quote, it would

23  not be at all unusual for executives to lose the entire accrued

24  SERP upon emergence, closed quotes.  Isn't that true?

25  A.        Yes, but again I don't know that he had -- he didn't

1    provide any data to support that.

2    Q.      Well, all right, that's his opinion as a senior

3    pension actuary.  Do you have data to show that he's wrong?

4    A.      No.

5            MR. KENNEDY:  I have no further questions, Your

6    Honor.

7            THE COURT:  Okay.  Thanks.  Do you have

8    questions?

9            MR. DECHIARA:  I do, Your Honor.

10           THE COURT:  Okay.

11           MR. DECHIARA:  Your Honor, I know it's late.  I

12   will do everything I can not duplicate what Mr. Kennedy has

13   done.

14           THE COURT:  Okay.

15           MR. DECHIARA:  And so it might take me a few

16   minutes to go through my notes and know which questions to

17   skip.

18           THE COURT:  That's fine.

19           MR. DECHIARA:  If the Court would please bear

20   with me.  Thank you.

21   EXAMINATION BY MR. DECHIARA:

22   Q.      Good afternoon, Mr. Bubnovich.  I'm Peter Dechiara

23   from Cohen, Weiss and Simon for the United Auto Workers.  I

24   would like to ask you to look at what has been marked as Naylor

25   Exhibit 7.  And I'd like you in particular -- if you can -- the

115

1    second page of the document says, Delphi Corporation

2    compensation philosophy and strategy.  Are you familiar with

3    this document?

4    A.        Yes.

5    Q.        Okay.  And did you prepare this document?

6    A.        Yes.  I was the scrivener, if you will.

7    Q.        Okay.  And when was this prepared?

8    A.        It was prepared early 2007.  There were numerous

9    drafts.

10   Q.        If you would pull up the paragraph, the first bullet

11   point.  Right.  About half way down in this paragraph with the

12   first bullet point it says -- I'll start with the sentence that

13   says in this regard.  It's in the middle of the paragraph.  In

14   this regard the committee assesses both total direct

15   compensation, which is the sum of salary plus annual incentive

16   opportunity plus long term incentive opportunity, and total

17   compensation, which includes other aspects of pay, including

18   retirement benefits.  Market total direct compensation

19   comparisons for the members of the Delphi strategy board, DSB,

20   are developed from proxy data from a comparable group of large

21   diversified companies, as well as from manufacturing and auto

22   industry survey data.  Do you see that?

23   A.        Yes.

24   Q.        So the as well as means that according to Delphi's

25   compensation philosophy as adopted by the compensation

116

1    committee, in determining the market level for the DSB, one

2    should look both at proxy data and at survey data, correct?

3    A.        Yes, that's what it says.

4    Q.        And in fact, you looked at survey data, and you found

5    that the survey data showed that the DSB members were well

6    above market, correct?

7    A.        Yes.

8    Q.        And you decided not to put that in your report that

9    had been presented as part of the support for the management

10   compensation program, correct?

11   A.        Yes.

12   Q.        And in fact for the lower eleven of the 21 DSB

13   members, there was insufficient proxy data, correct?

14   A.        From the peer group, yes.

15   Q.        So what you did was you, quote, extrapolated from the

16   proxy data for the top half of the DSB, correct?

17   A.        That is correct.

18   Q.        And what you mean by extrapolated is you simply found

19   that the proxy data showed that the top half of the DSB were at

20   market, so you just assumed that the bottom half were, too; is

21   that a fair characterization of what you did?

22   A.        That is a fair characterization.

23   Q.        Let me refer you to Paragraph 14 of your declaration.

24   On Page 7, Paragraph 14, there's a reference to Pearl Meyer of

25   Steven Holland Partners.  I believe there's been some

1  testimony, but just to make the record clearer, Pearl Meyer was

2  or is the compensation consultant for the creditor's committee?

3  A.      Yes.

4  Q.      And she's in the same profession that you are,

5  correct?

6  A.      Yes.

7  Q.      And is she a well respected member of that

8  profession?

9  A.      Yes.

10  Q.      And are her views generally well regarded?

11  A.      Yes.

12  Q.      Let me turn you to Paragraph 5 of your supplemental

13  declaration.  It's on Page 3 of your supplemental declaration.

14  It's document 557, Joint Exhibit 557.  Mr. Bubnovich, you

15  testified just a moment ago that you had using the proxy data,

16  found that the top part of the DSB group were within a

17  competitive range, correct?

18  A.      Yes.

19  Q.      And the way you reached that result was using a peer

20  group analysis, correct?

21  A.      Yes.

22  Q.      Okay.  In the first sentence of Paragraph 5 of your

23  declaration on Page 3 it says around November, 2007 I met with

24  the compensation consultant for the creditor's committee,

25  that's Pearl Meyer?

118

1    A.         Yes.

2    Q.         Who suggested to me that the Delphi peer group for

3    compensation bench marking purposes should be revised so that

4    it solely comprised manufacturing companies, end quote.  Do you

5    see that?

6    A.         Yes.

7    Q.         So that it was Pearl Meyer's view that it was

8    inappropriate to include Coke and Pepsi and Best Buy, and the

9    other non manufacturing companies, that were on the peer group,

10   that led to the proxy analysis, correct?

11   A.         I disagree with Pearl's view.  I think it's actually

12   quite common for very large companies to use a peer group

13   comprising companies of diverse industries.

14   Q.         Well, we don't Pearl Meyer here to testify and I'm

15   certainly not qualified as an expert.  I just want to establish

16   that Pearl Meyer disagreed with your view, correct?

17   A.         Yes.  She is not here.  That is correct.  Yes, and

18   she did disagree.

19   Q.         She did disagree.  Thank you.  Did Pearl Meyer have

20   any other criticisms of your analysis in support of the

21   management compensation plan?

22                  MR. BUTLER:  Objection, Your Honor.  I think

23   that's improper.  It's not -- this is supposed to be a cross

24   examination of the declaration.  I'm not sure what Pearl

25   Meyer's report is -- Pearl Meyer is not here.  Her report is

119

1    not here.  The committee is not -- the committee has signed off

2    on 708, 78.  I mean I just think -- I'm not sure --

3                    MR. KENNEDY:  Your Honor, I think from our --

4                    MR. BUTLER:  (indiscernible) our views are.

5                    MR. KENNEDY:  Your Honor, this is a case where

6    the company is basing virtually its entire case in support of

7    the management compensation plan, based on the view of its

8    compensation --

9                    THE COURT:  I'm sorry.  You don't have to -- you

10   can ask leading questions.  If you know, for instance, you

11   should do that.

12                   MR. DECHIARA:  Okay.  I'll stick to leading

13   questions.

14                   THE COURT:  I don't --

15                   MR. DECHIARA:  Okay.  Fair enough, Your Honor.

16   Thank you.

17                   MR. ROSENBERG:  Your Honor, if I might, very

18   quickly, the committee did not sign off.  The committee agreed

19   not to object.

20                   THE COURT:  Okay.  But anyway --

21                   MR. DECHIARA:  I'm not asking anything about the

22   creditor's committee.  I'm just asking about Pearl Meyer.

23                   THE COURT:  All right.  You can -- again, you

24   can ask leading questions, so --

25                   MR. DECHIARA:  I'll limit myself to leading

120

1    questions.

2                    THE COURT:  If there's a criticism you know

3    about, you can ask him about it.

4                    MR. DECHIARA:  Okay.  Fair enough.  Fair enough,

5    Your Honor.

6    Q.        Isn't it true that Pearl Meyer believed that it would

7    have been appropriate in determining the market level of pay of

8    the lower half of the DSB to use the survey data that you did

9    not use?

10   A.        Well, I actually don't know if Pearl thought it would

11   be appropriate.  Pearl took the data that I sent her and

12   calculated essentially the same numbers that I had calculated

13   and concluded that the lower level DSB members were

14   substantially above the median in the survey.

15   Q.        But she based that view that they were above market

16   based on a use of survey data, correct?

17   A.        Yes.

18   Q.        And she thought it was a flaw in your methodology not

19   to -- not to use the survey data, correct?

20                   MR. BUTLER:  Objection, Your Honor.  We don't

21   know it from our beliefs or not.  I don't understand --

22                   THE COURT:  I sustain.

23                   MR. DECHIARA:  Your Honor, can I show the

24   witness a document I'm not putting into evidence?  I just want

25   to see if it refreshes the witness's recollection?

121

1               THE COURT:  You can do that.

2               MR. DECHIARA:  Thank you.

3       Q.      I'm showing you a document, Mr. Bubnovich, which I am

4       not going to put into evidence and see if it refreshes your

5       recollection.

6               MR. BUTLER:  Objection, Your Honor.  I'd like to

7       see the document he's showing the --

8               MR. DECHIARA:  (Indiscernible).

9               MR. BUTLER:  And I believe it's a document that

10      was withdrawn by --

11              MR. DECHIARA:  It is.

12              MR. BUTLER:  Your Honor, this is a document that

13      in the meet and confer, the UAW agreed not to put into

14      evidence.

15              MR. DECHIARA:  And we're not putting it into

16      evidence.

17              MR. BUTLER:  Well, this is the report that was

18      withdrawn by the creditor's committee.

19              MR. DECHIARA:  Your Honor, it is a report that

20      was served in this case --

21              THE COURT:  What is the question you're asking

22      the witness?

23              MR. DECHIARA:  The question was, isn't it true

24      that Pearl Meyer believed that Mr. Bubnovich's methodology was

25      flawed because he chose not to use the survey data for the

122

1    lower portion of the DSB.  The survey data showed that they

2    were well above market.

3                    THE COURT:  Well, I --

4                    MR. BUTLER:  Your Honor, the UAW can't use the

5    views of an expert not introduced in this case as a --

6                    THE COURT:  I'll sustain that objection.  But

7    let me -- I'm going to ask a related question.  Why, Mr.

8    Bubnovich, do you believe the survey data is flawed?

9                    THE WITNESS:  The bench marking process and the

10   decision making around it is not a hundred percent science.

11   There's art, if you will, or judgment.  The data, for whatever

12   reason, was so far below the actual pay of the DSB members that

13   when I brought this to the attention of the committee, the

14   compensation committee -- I'm sorry -- in early 2007 and told

15   them if this is our bench mark, it means that half the DSB have

16   to have their pay substantially reduced.  Now, in one of the e-

17   mails that Mr. Kennedy presented, there's a brief exchange

18   where I mention this and say that is going to produce an absurd

19   result.

20                    Now it made no sense to the compensation

21   committee to have to reduce salaries and annual incentive

22   opportunities by 30, 40, 50 percent.

23                    THE COURT:  Right.

24                    THE WITNESS:  This was a dilemma --

25                    THE COURT:  That's the basis for your rationale

1    that the data was not appropriate.

2                THE WITNESS:  Right.  I didn't believe that it

3    properly reflected the scope of the positions at --

4                THE COURT:  Let me ask you a question.  The

5    company took the position both in litigation and in

6    negotiations that the unionized workers had to reduce their

7    wages by approximately two times, fifty percent, based on

8    competitive market data.

9                THE WITNESS:  Right.

10               THE COURT:  Is it logical, or would it have been

11   logical for the union's expert to have responded by saying

12   that's absurd.  That would mean we have to reduce salaries by

13   two times?  In other words, aren't you just walking into your

14   criticism of the data by saying that would force us to change

15   the status quo?

16               THE WITNESS:  Well, again, I didn't -- as I

17   said, I don't believe, nor did the compensation committee

18   believe that that was the bench mark for the --

19               THE COURT:  I understand it creates personnel

20   issues.

21               THE WITNESS:  Um-hum.

22               THE COURT:  But I'm just focusing on the data.

23   Was there anything wrong with the data, as data, any reason to

24   question it as what the bench mark companies were paying?

25               THE WITNESS:  Well, this gets a little complex

124

1    and please bear with me while I try to explain this.  The

2    survey data in effect tries to predict pay based on the various

3    data that's gathered about various positions at different sized

4    companies.  So to take a simple and super simplified example,

5    if we find that the pay for a position at a company with

6    revenues of 200 X is ten, and the company with 300 X is

7    fifteen, the data will try to predict what the pay will be for

8    the same position with revenues of ten times that.

9                    Now, often the predictions don't work out.

10   There's a statistical approach called regression analysis --

11                    THE COURT:  Well, let me ask you, was any of

12   that contemplated here when you didn't consider the data?

13                    THE WITNESS:  Well, I didn't tell the

14   compensation -- I didn't take the compensation committee

15   through the details about regression analysis and all that.  It

16   was just, look, this data strikes me as flawed, doesn't seem to

17   properly match up with the Delphi positions.

18                    THE COURT:  But that's just based on Delphi's

19   own existing position.

20                    THE WITNESS:  Yes.

21                    THE COURT:  Okay.  All right.  I don't think you

22   need to say anything more about this issue.

23                    MR. DECHIARA:  May I have one question, Your

24   Honor, just one?

25   Q.        Moving on to the non DSB, the 540 out of the 560?

125

1   A.        Yes.

2   Q.        You used survey data for them, correct?

3   A.        Yes.  We bench marked 173 peoples' jobs.

4   Q.        Thank you.  Let's now look at the peer group

5   analysis.  The reason you used Pepsi and Coke and others, other

6   companies like that, was because of their revenue size,

7   correct?

8   A.        Yes.  Revenue size as well as the geography that they

9   have global operations and so the extent of their business

10  operations was similar to Delphi.

11  Q.        Well, you didn't check for -- let's just take Pepsi,

12  for example, you didn't check the box for geography.  You

13  checked the box for -- would you like to see the document?

14  A.        Yes, please.

15  Q.        I'm sorry.  I'm just trying to expedite things.  I'm

16  referring to Exhibit 1 to your declaration, which is your

17  December 28th, 2007 report, and in particular I'm referring to

18  Page 33.

19              THE COURT:  Which number is this?

20              MR. DECHIARA:  What number --

21              THE COURT:  The document?

22              MR. DECHIARA:  It's Joint Exhibit 88?

23              THE COURT:  Okay.  It's on the screen.  I can

24  see it now.

25              MR. DECHIARA:  Right.

126

1   Q.        Okay.  So my question -- my original question was the

2   reason you used -- let's just focus on Pepsi, even though there

3   are others that are in the same font and same category.  The

4   reason you used Pepsi was because of revenue size, correct?

5   A.        That's correct.

6   Q.        And isn't it true that one could also, in looking at

7   size of a company, for purposes of peer group analysis, not

8   just look at revenue size but also look at market

9   capitalization?

10  A.        It's possible, yes.

11  Q.        Okay.  And do you know what the median market

12  capitalization of Delphi -- I'm sorry, let me just start with

13  Delphi.  You know Delphi's market capitalization?

14  A.        Well, upon emergence, it's expected to 7.8 billion

15  dollars.

16  Q.        Okay.  And do you know the market capitalization of

17  the peer group company?

18  A.        I don't recall right now.

19  Q.        But it would be fair to say that it would be well

20  north of 7.8 billion?

21  A.        Yes.  This was covered in my deposition, yes.

22  Q.        And isn't it true that I believe you testified in

23  your deposition that other -- other compensation analysts at

24  Watson Wyatt, when doing compensation analysis, used market

25  capitalization in addition to revenue size in looking at

1    company size for purposes of compensation, correct?

2    A.        I'm not sure I testified to that.  What I acknowledge

3    was that our template has market capitalization on it, so we

4    capture that data when we download proxy data.  The market data

5    is generally used to make an assessment about the total value

6    owned by a particular executive in relation to the company's

7    market cap, what we call carried interest.

8    Q.        But isn't it true that other compensation consultants

9    look at market capitalization when they're looking at firm

10   size, when doing compensation analysis?

11   A.        You know, from time to time I do believe that some

12   compensation consultants take it into consideration in

13   selecting a peer company.

14   Q.        In 2006 Delphi's EBDA and net income was in the

15   negative billions of dollars, correct?

16   A.        Yes.

17   Q.        And in 2006 the EBDA and net income of the companies

18   on the peer group was in the positive billions of dollars,

19   correct?

20   A.        Yes.  None of them were in Chapter 11.

21   Q.        Yes, and none of them were in Chapter 11?

22   A.        Correct.

23   Q.        Can you call up Page 85 of Mr. Bubnovich's

24   deposition?  Let me just read the first answer on the top of

25   Page 85.  It says, quote, well, again I remember Pearl saying

1    that, you know, these, many of these companies don't belong in

2    a peer group, end quote.  What were you saying there?  What was

3    that in reference to?

4    A.        Well, again, as we've already discussed, Pearl

5    thought that the peer group should be solely manufacturing

6    companies.

7                   MR. DECHIARA:  Your Honor, I just have a couple

8    -- I'm winding up.  I just have a couple more questions.

9    Q.        Since the beginning of the Chapter 11 case Delphi has

10   paid your firm over 12 million dollars?

11   A.        That's correct.

12   Q.        And only a small fraction of that, about maybe 13

13   percent is for management consultation consulting services; is

14   that correct?

15   A.        Yes, they paid it that much.  Whether it's a small

16   fraction or not, I don't know.

17   Q.        Well, let me refer you to Paragraph 9 of your first

18   declaration.

19   A.        I can see the -- okay.

20   Q.        Okay.  Paragraph 9, the first sentence says, since

21   the inception of these Chapter 11 cases, Watson Wyatt's fees

22   through November, 2007 have amounted to 12 million dollars plus

23   -- I won't read out the whole number -- of that amount, and

24   again, I'll approximate, 1.5 million approximately, or

25   approximately 13 percent was related to Watson Wyatt's work

1   related to executive compensation consulting.  Is that true?

2   A.        That's exactly correct.

3   Q.        Okay.  And is it fair to say it's standard for a

4   company like Watson Wyatt, when it had the relationship with a

5   company like Delphi, that that relationship is terminable at

6   will?

7   A.        It's certainly true in my case.

8   Q.        And it's terminable at will at the will of the Board

9   of Delphi, correct?

10  A.        Well, in my case, I was hired by the compensation

11  committee, so they could terminate --

12  Q.        I'm not talking about you as an individual.  I'm

13  talking about Watson Wyatt.

14  A.        Well, yeah, that's right.

15  Q.        So Watson Wyatt's relationship with Delphi is

16  terminable at will, by Delphi; correct?

17  A.        Well, I've never seen the contract between the

18  actuarial group and Delphi.  So I don't know if that's Board

19  level.  Most likely is, or if it was signed by management.

20  Q.        Okay.  Well, let's just take this one step at a time.

21  You haven't seen the contract, correct?

22  A.        That's correct.

23  Q.        But it's standard practice, in a relationship like

24  this, for it to be terminable at will, correct?

25  A.        That's correct.

130

1    Q.        Okay.  And then let's ask the question, it's

2    terminable at will by whom?  Is it Delphi's Board or Delphi's

3    management.  Do you know the answer to that?

4    A.        I don't know the answer to that.

5    Q.        Okay.  But in either event, whether it's -- if it's

6    the Board, it's a Board that headed by Mr. Miller and Mr.

7    O'Neil, correct?

8    A.        Mr. Miller is the executive chair of the Board, yes.

9    Q.        Is that the same Mr. Miller who stands to gain 8.3

10   million dollars under this plan?

11   A.        Yes.

12   Q.        And if it's management, there are a whole lot of

13   management people who stand to gain a whole lot under this

14   plan, correct?

15   A.        Yes.

16   Q.        What is Irvin or Arvin Meritor?

17   A.        Arvin Meritor is a company based in Troy, Michigan

18   that provides parts primarily to the truck industry but also

19   the auto industry.

20   Q.        Is it a major auto parts company?

21   A.        Yes, I would say yes.

22   Q.        And there was a point during the period, the same

23   period that you were doing your work evaluating the

24   compensation that would be paid to Delphi management, where you

25   sought Arvin Meritor as a new client, correct?

1   A.         That's correct.  They called me and asked me to make

2   a presentation to them.

3   Q.         Okay.  And you asked Mr. Miller, the executive chair

4   of Delphi, to serve as a reference for you, did you not?

5   A.         That's correct.  I left a note with his secretary.

6   Q.         And he got back to you and said he would serve as a

7   reference, correct?

8   A.         His secretary told me that it was okay.

9   Q.         Did you have any doubt that his secretary was

10  conveying her boss's sentiments directly?

11  A.         Yes.  No, I'm not -- I'm not --

12  Q.         Okay.  So Mr. Miller agreed to be your reference?

13  A.         Yes.

14  Q.         Okay.  Mr. Miller didn't have any obligation to do

15  that, did he?

16  A.         No.

17  Q.         That was a favor to you?

18  A.         As I remember, I think he and the CEO were neighbors,

19  so it made some sense to select him.

20  Q.         He agreed to be your reference, did he not?

21  A.         Yes.

22             MR. DECHIARA:  I have no further questions, Your

23  Honor.

24             THE COURT:  Okay.  Redirect?

25             MR. BUTLER:  Yeah.  Your Honor, can we take a

1    five minute recess?

2                    THE COURT:  That's fine.

3              (RECESS.)

4                    THE COURT:  Okay.

5                    MR. BUTLER:  Thank you, Your Honor.

6    EXAMINATION BY MR. BUTLER:

7    Q.        Mr. Bubnovich, if you'd look, let's go back to

8    Exhibit 14 to your deposition 265, Page -- first of all, is it

9    correct that this is the report that was filed in connection

10   with the first day paper which was October 8, 2005?

11   A.        Yes.

12   Q.        And would you go to Page 16 of the report, please?

13   A.        I have it.

14   Q.        Okay.  When you look at the proposed cash cost of the

15   emergence fund, that would be the 87.9 million, correct?

16   A.        Yes.

17   Q.        Okay.  Is that an annualized cost?

18   A.        No.

19   Q.        Is it an absolute cost?

20   A.        Yes.

21   Q.        In your own words, if you know it, can you explain

22   how the company arrived at an absolute cost of 87.9 million for

23   this program?

24   A.        The company took the opportunities that had been

25   afforded to the participants under the prior LTI programs and

133

1  just carried those opportunities over into the emergency bonus

2  plan, subject to a twenty percent discount.

3  Q.        So was the 87.9 million intended for a twelve month

4  period?

5  A.        No.  The 87.9 is the entire cost of the program over

6  the case.

7  Q.        Well, explain the calc to me, please.  If you used

8  2004 LTI, is that 91.3?

9  A.        It's the 87.9.

10 Q.        Well, explain to me how you calculated 87.9.  The

11 91.3 is a twelve month cost; is that correct?

12 A.        That's right.

13 Q.        Okay.  And is the 87.9 a twelve month cost?  Are they

14 calculating on twelve months or some other period of time?

15 A.        Well, the 87.9 is the total cost estimated at the

16 time of paying emergence cash bonuses over the life of the

17 case.

18 Q.        I understand that, but was it based on an estimated

19 duration of the case?

20 A.        No.  That number is not.

21 Q.        All right.  So I'm still -- I need you to help me

22 explain how you got to 87.9 because I can't do the walk from

23 91.3 to 87.9, so perhaps you can help?

24 A.        The 87.9 represents 80 percent of the 2004

25 opportunities.  That became the basis for each participant's

1    award.   Then I took that cost and I annualized it, assuming

2    different durations for the Chapter 11 case.   So the cost at 18

3    months is annualized at 58.6 million dollars.

4    Q.        And based on the actual duration of the case, what's

5    the annualized cost, if you know it?

6    A.        Approximately 34 million dollars.

7    Q.        So just looking at the chart here, if we were

8    comparing apples to apples, what number should we be comparing

9    against the 49.6 to 91.3 and the 75.2?

10   A.        The 34 million.

11   Q.        Now again, please, in your own words, could you

12   explain to the Court, if you recall, what the compensation

13   committee asked you to do in designing this incentive payment

14   program?

15   A.        The compensation committee asked me to present it

16   with data that -- bench marking the various pay components,

17   primarily total direct comp, to the market so that we could

18   establish what the median was.   In addition, I also bench

19   marked other aspects of the proposed program including, for

20   example, the change in control agreements, provided them

21   information about the proposed freeze of the SERP as well the

22   proposed new defined contribution program.

23   Q.        I appreciate that, but you designed, I think, from

24   your earlier testimony, you said you were a principle architect

25   of t his emergent bonus plan; is that correct?   I'm talking

135

1    about the -- you recall the emergence bonus plan; is that

2    correct?

3                    MR. KENNEDY:  Your Honor, I believe that's a

4    leading question.  This is the direct --

5                    THE COURT:  No, it's okay.  I think it's -- he's

6    just laying a foundation for his question.

7                    THE WITNESS:  Okay.  I'm sorry.  Can you ask the

8    question again?

9    Q.      I believe you testified earlier -- did you play a

10   role in designing the emergence cash program?

11   A.      Yes.

12   Q.      Was your role minor or major?

13   A.      I would say my role was major as an advisor to the

14   committee and structuring the program, coming up with the

15   various design elements, costing it out, yes.

16   Q.      Okay.  Focusing just on that program, not on the rest

17   of your assignment?

18   A.      Okay.

19   Q.      Just on that program, in your own words, can you

20   explain to the Court what, if you recall, what the compensation

21   committee charged you to do in -- and what the goals were of

22   developing this program?

23   A.      The compensation committee was interested in

24   providing a vehicle that would provide something similar to the

25   LTI opportunities that had been afforded prior to the case.

1    Obviously once the company had filed for Chapter 11, the use of

2    equity based compensation made no sense.  One of the things

3    that the compensation -- I told the compensation committee

4    might make some sense is to design the type of program that

5    would reward the executives for a swift an exit as possible.

6          So under this program the sooner the exit occurred,

7    the sooner they would be paid.

8    Q.      So that goes to your point that if they could have

9    engineered a reorganization in fifteen months, that's what this

10   chart means on Page 16?

11   A.      That's correct.

12             MR. KENNEDY:  Objection.  Leading.

13             THE COURT:  That's all right.  You can answer

14   that question.

15             THE WITNESS:  That's correct.

16   Q.      Did you formulate the idea of using LTI as that -- as

17   the device against which to measure this performance?

18   A.      Yeah.  Subsequently it occurred to me that that was

19   an approach given that the emergence cash program was thought

20   of as a form of substitute for a long term incentive program

21   that couldn't be delivered any more on equity based

22   compensation.

23   Q.      My question was you testified, I believe, in cross

24   examination that this was for, other than Mr. Miller and Mr.

25   O'Neil, this was a replacement of sorts for LTI; is that

137

1    correct?

2    A.       Yes.

3    Q.       My question to you was that design element something

4    that you developed or something that was developed by the

5    company?

6    A.       Well, I'm not sure I -- can you perhaps rephrase the

7    question?  I'm not quite sure I understand it.

8    Q.       Who decided to use LTI, 80 percent of LTI?

9    A.       I did.

10   Q.       In your own words, would you tell the Court why you

11   chose to do that?

12   A.       Well, I thought it was appropriate to have a discount

13   given that we had this what I'll anomaly between the prior

14   years cost and the opportunity.  I didn't think it was

15   appropriate to propose a program that was as expensive as -- or

16   that provided the same level of opportunities that existed pre-

17   petition.

18                   THE COURT:  And that was simply because the

19   company was in bankruptcy or why was that?

20                   THE WITNESS:  Well, I think because the company

21   was in bankruptcy.  I mean to be quite frank, I thought it

22   might make the whole program more palatable.

23   Q.       As advisor of the compensation committee, did you

24   have a view at the time as to whether the company wanted to get

25   this program adopted at the beginning or at the end of the

138

1    case?

2    A.        The company wanted it adopted at the beginning of the

3    case.

4    Q.        Why was that, if you know?

5    A.        Well, I believe the intention was to let everyone

6    know what their opportunities were, to motivate them toward a

7    quick and timely exit.  It's kind of a novel approach.  Again,

8    you don't see it very often, but it makes some sense.

9    Everybody wants to know what his or her deal is, and if the

10   program had been approved up front, it takes some of the risk

11   away.

12            People understand that, you know, if they work hard

13   through the case, there will be this reward for them at the

14   end.

15   Q.        Do you have any personal knowledge of why the company

16   didn't obtain approval of this early -- in the early days of

17   the case?

18   A.        I believe it was deferred at the request of the

19   unsecured creditors and also as part of -- because of the

20   negotiations with the union.

21   Q.        I'd like to direct your attention now to Page 17 of

22   your report.

23            THE COURT:  Is going on to a new topic at this

24   point?

25            MR. BUTLER:  It's the same.

139

1        THE COURT:  Same topic?

2        MR. BUTLER:  Yeah.  I was just trying -- I only

3   have a few more questions, Your Honor.

4        THE COURT:  No, I had a question, if you were

5   going to go on to a different topic.  That's why I --

6        MR. BUTLER:  No, no.  Okay.  If you want --

7        THE COURT:  I'm not hurrying you along.

8        MR. BUTLER:  Page 17 of that report.  Just the

9   next page.

10  Q.       Mr. Bubnovich, at the time that you provided this

11  report to the company and it was filed with the company's first

12  day motions, did you have a professional judgment or view about

13  the appropriateness of this data?

14  A.       Yes.

15  Q.       What was that view?

16  A.       Well, again, I was trying to compare the cost of the

17  proposed emergence plan to data that I had about the cost of,

18  in this case, retention programs.  And so I compared the

19  proposed cost of the emergence bonus plan to a group of 15

20  large Chapter 11 companies, that is those that had revenues of

21  5 billion or more, and what this shows is that in Delphi's case

22  its revenue was about in the 79th percentile of those

23  companies, and its cost, as of this proposed program as a

24  percentage of revenues, lined up pretty well.

25       Again, at about the same percentage level.  And then

140

1    if you look at it in terms of assets, again, you know,

2    reasonably similar than in -- that's Page 17.

3    Q.        When you did this calculation, it's based on the

4    annualized analysis?

5    A.        Well, I did annualized and aggregate.

6    Q.        Okay.  When you did annualized, which number on Page

7    16 did you use, for purposes of trying to do the calc?

8    A.        The 58.6, which is the 18 months annualized number.

9    Q.        And why did you compare an 18 month number to a 12

10   month annualization?

11   A.        Well, at that time, I believe the expectation was

12   that the company would be in and out in 18 months.

13   Q.        If you had -- if you had used a twelve month number

14   so that it was apples and apples, would those percentages have

15   gone up or down?

16   A.        Well, I do have the twelve month -- I do have the

17   twelve month number.  The twelve month number would be the

18   aggregate number.

19   Q.        Okay.  Can you explain that, please?

20   A.        Yeah.  The last row in the chart on Page 17 is

21   entitled percentage rank, and then Delphi's revenues with

22   respect to the peer group would be in the 79th percentile.  And

23   then the annual cost, if you look just at the aggregate, that

24   would be in the 81st percentile.  So again, pretty similar, you

25   know, both at or around the 80th percentile.

1    And then in terms of assets, again, pretty close to a

2    push.  Delphi's assets were in the 67th percentile and the

3    entire aggregate cost over a twelve month period would be 71

4    percent.

5    Q.        Okay.  What does the 81 percent mean?  Can you

6    explain the calc behind that 81 percent?

7    A.        Sure.  It means that when you array the costs of the

8    15 programs, top to bottom, Delphi's costs would be near the

9    top, the 81st percentile, essentially between number 12 and 13,

10   but that's okay because if you also array the company's revenue

11   size, Delphi would be in the same position between number 12

12   and 13.  15 being the largest company or the -- being the

13   largest company in terms of revenue and 15 being the company

14   with the greatest cost in terms of a retention program.

15                 MR. BUTLER:  Your Honor, that's my only

16   questions on --

17                 THE COURT:  Okay.  Mr. Bubnovich, going back to

18   the approach of proposing a vehicle to replace the former LTI

19   opportunity which was in the form of a stock, you said you

20   chose a 20 percent discount basically to reflect that the

21   company was in bankruptcy and it seemed more palatable.  Again,

22   it was 80 percent of what, just so I can be clear in my head.

23   What was it 80 percent of?

24                 THE WITNESS:  It was 80 percent of the

25   opportunities.

142

1          THE COURT:  But be more -- can you --

2          MR. KENNEDY:  I'm sorry, Your Honor.  I couldn't

3    hear the witness.

4          THE COURT:  80 percent of opportunities, but

5    could you be more specific on that?

6          THE WITNESS:  Okay.  Let me try and give an

7    example that I hope would -- it will straight this.  Okay, if

8    we start with 100, that was the opportunities at Delphi in

9    2002, 2003.  They subsequently decided, management and the

10   compensation committee.  Now, at this time I'm not involved.

11   I'm just trying to give you the background.

12          They decided less is more, okay?  Now, whereas

13   previously if a stock option or share of stock was worth five

14   dollars, and somebody had an opportunity of a hundred, they

15   would give them 20 shares of stock, cost, pre-tax, $100.

16   Subsequently because they were getting under pressure, they

17   didn't have as many shares as they needed to affect the

18   program, they adopted what I call the less is more program.

19          So even though the share might be worth five

20   dollars, or the option five dollars, they told people it's

21   worth seven.  So they said here's -- we're still giving you a

22   hundred dollar opportunity.  That's' what the participants are

23   told, but now they're not getting twenty shares.  They're

24   getting sixteen.

25          As a consequence of that, since the shares

143

1    really were only worth five dollars, the cost was less than the

2    opportunity.  Now --

3                    THE COURT:  I'm going to ask you the question

4    again.  Based on the actual number that you applied the 80

5    percent to --

6                    THE WITNESS:  Yes.

7                    THE COURT:  That came up -- doing that

8    calculation comes up with the number that then is fixed for the

9    duration of the case, as I understand it.

10                   THE WITNESS:  That's correct.

11                   THE COURT:  So what was the base that you

12   applied the 80 percent to?

13                   THE WITNESS:  The base was approximately 110

14   million.

15                   THE COURT:  And how did you derive that 110

16   million dollar figure?

17                   THE WITNESS:  That 110 million dollar figure was

18   given to me by management as the aggregate opportunities for

19   the executive team.

20                   THE COURT:  And I guess you have to define that.

21   How did they value the opportunities?

22                   THE WITNESS:  Using -- the opportunities were

23   valued as the sum of the awards that were given to

24   participants, which varied by level.  So think of it as the sum

25   of the value of the restricted stock, long term stock options

144

1   and cash awards that were given.

2          THE COURT:  And the awards that were actually

3   given in a prior year?

4          THE WITNESS:  Yes.

5          THE COURT:  When you say actually given, do you

6   mean in light of hindsight as to what their actual value turned

7   out to be?

8          THE WITNESS:  No, no.  It was just the

9   opportunity.  So again, the sum of the --

10         THE COURT:  So is that number going to be higher

11  or lower than what you would value it in hindsight as to how

12  the stock actually performed?

13         THE WITNESS:  Well, that value is much higher.

14         THE COURT:  The opportunity is higher?

15         THE WITNESS:  The opportunity is higher because,

16  you know, the stock options never went in the money, the

17  restricted stock has no value.

18         THE COURT:  So was there any thought of any

19  further discounting under this methodology to reflect the fact

20  that instead of getting stock options, the participants would

21  be getting cash?

22         THE WITNESS:  No, other than the twenty percent,

23  no.

24         THE COURT:  And why was that?

25         THE WITNESS:  I don't recall, but there was no -

145

1   - there was no additional discount to reflect the potential

2   difference in that.

3                  THE COURT:  But let me make sure I understand

4   this.  When -- generally speaking when people have an

5   opportunity --

6                  THE WITNESS:  Yes.

7                  THE COURT:  -- for example, when they have a

8   warrant, that opportunity can be valued -- you're familiar with

9   the black shoals, right?

10                 THE WITNESS:  Yes.  Yes, I am.

11                 THE COURT:  When you refer to LTI opportunity

12  here, you're not referring to that type of value?

13                 THE WITNESS:  Yes, I am.

14                 THE COURT:  You are?

15                 THE WITNESS:  Yes, I am.

16                 THE COURT:  Well, then why is the base that you

17  applied the 80 percent to, I thought you testified that was

18  actually higher than what the amount would be in hindsight.

19                 THE WITNESS:  Well, I understood your question

20  to be in hindsight the opportunity, the case of the stock

21  option, turned out to be zero.

22                 THE COURT:  Well, but maybe I'm -- I'm sorry.

23  My question wasn't clear.  In 2004 it turned out that there

24  really was value in hindsight, in the stock.  You could

25  actually see what the value was?

146

1          THE WITNESS:  That's right.  I had a value at

2     the time of the award, but the 2007 award -- I'm sorry, the

3     2004 awards did not vest prior to the filing.  No one ever

4     realized any value associated with those awards.  At the time

5     of the award, for example, the stock might have had a value of

6     five dollars.

7          That value, which is the opportunity, that value

8     is never realized.

9          THE COURT:  Let me ask you this again.  The base

10    for the 87 plus million was what again?  It was 105?

11          THE WITNESS:  110.

12          THE COURT:  110.  How is that 110 derived?

13          THE WITNESS:  The 110 is the sum of the various

14    opportunities that were afforded to each participant.

15          THE COURT:  Okay.

16          THE WITNESS:  Let me try an example.

17          THE COURT:  But were those opportunities valued

18    based on the risk of those opportunities bearing fruit or not?

19    Was there a discount to reflect whether the risk would bear

20    fruit or not, and does that 110 million reflect that?

21          THE WITNESS:  The answer to that is no.

22          THE COURT:  Okay.  So there wasn't an equivalent

23    black shoal type of valuation to come up with that 110 million

24    dollar number?

25          THE WITNESS:  That's correct.

147

1          THE COURT:  Okay.  And given that, since --

2    well, then what was the 110 based on?

3          THE WITNESS:  Could I try an example?

4          THE COURT:  Okay.

5          THE WITNESS:  Okay.  We've got a participant who

6    receives restricted stock, stock options and participation in

7    their performance plan, which is cash, okay?  Now, if the price

8    of the stock at the time of the award was five dollars, and the

9    person got ten restricted shares, that's fifty dollars.  That

10   ten options, with a strike price of five, then there was a

11   black shoals value, or a value ascribed to those options.

12          So let's just assume it was forty percent.  So

13   if each option had a value of two dollars, that's two times ten

14   options, twenty dollars, and then if the person had a chance to

15   earn at target, twenty dollars under the cash piece of the

16   plan, the sum of those three numbers, fifty, twenty, twenty,

17   equals 90, it that person's opportunity.

18          Then it was the sum of all the participant's

19   opportunities equal 110.

20          THE COURT:  Okay.  But it's restricted stock,

21   right?

22          THE WITNESS:  Restricted stock was part of the

23   award package, yes.

24          THE COURT:  And was there any discount to the

25   fact that it was restricted stock?

148

1          THE WITNESS:  No, because the sole -- the sole

2    vesting criteria were continued service.

3          THE COURT:  Okay.  And was there any discount in

4    respect to the cash portion?

5          THE WITNESS:  No.

6          THE COURT:  How big was the cash portion, what

7    percentage?

8          THE WITNESS:  The cash portion was thirty

9    percent of the total award for the hundred plus people who

10   received the cash award.

11         THE COURT:  And what were the criteria for

12   awarding that?

13         THE WITNESS:  Band D and above.

14         THE COURT:  No, no, what do they have to do to

15   get it?

16         THE WITNESS:  To earn the award the performance

17   criteria were non-GM sales and either return on net assets or

18   maybe it was a cash flow metric.  I don't quite remember.  It

19   was non-GM sales plus a financial metric that was a return on

20   assets or something else.

21         THE COURT:  Okay.  And you say that the stock

22   option piece of evaluating the opportunity was valued in light

23   of its optionality as opposed to its face?

24         THE WITNESS:  That's correct.  It's what's

25   called its fair value versus its face value.  It's the same

1    value that's now used to determine the cost for P&L purposes or

2    for SEC reporting.

3                    THE COURT:  And so it's those three components

4    and those three ways that made up the base to which you applied

5    a percent?

6                    THE WITNESS:  Yes.

7                    THE COURT:  Okay.  Was there any rationale for

8    not -- for any -- was there any discussion of any further

9    discount, given the fact that this would be a cash payment?

10                   THE WITNESS:  No.

11                   THE COURT:  Okay.  Is there a basis?  Why

12   wouldn't you further discount it given that this is cash, a

13   hundred percent cash?

14                   THE WITNESS:  Well, I don't think a discount is

15   -- a discount might very well be appropriate if we were talking

16   about converting the program to all cash for one year only.

17   So, you know, here though, since it was expected that the

18   program would run for at least 18 months, you know, the

19   opportunity is essentially discounted substantially by time.

20                   THE COURT:  Okay.  Thanks.

21   Q.        Mr. Bubnovich, you were asked a series of questions

22   on cross examination about peer groups, and you gave a series

23   of answers?

24   A.        Yes.

25   Q.        Do you recall those questions and answers?

150

1    A.        Yes, I do.

2    Q.        So I'd like to turn to Exhibit 9 to your -- to

3    Exhibit 265, which is your deposition, and we'll blow this up

4    again.  Is this the peer group that you recommended in 2006?

5    A.        Yes.

6    Q.        And who made the recommendation at the bottom to

7    exclude companies form the form of peer comparison?

8    A.        I did.

9    Q.        Did you do that by yourself or did you consult with

10   the compensation committee?

11   A.        Well, I consulted the compensation committee.  I mean

12   I think everyone was of one mind that some of those companies

13   didn't belong in the peer group.

14   Q.        If you recall, did the compensation committee give

15   you any instructions with respect to the development of the

16   peer group?

17   A.        Yes.  They told me that they thought there should be

18   no more auto industry companies in there, and so I suggested

19   that we add companies like Borg Warner, Federal Mogul, Parker

20   Hannifin, TRW, Goodyear, to give the peer group a little bit of

21   an industry flavor.

22            They also agreed with me that it was appropriate in

23   Delphi's circumstances, given the size of Delphi, that the

24   program -- or I'm sorry, that the peer group include companies

25   from diversified group of industries.

1    Q.        Now, you filed a supplement, and let's keep this up.

2    You filed a supplemental declaration.  Are you familiar with

3    it?

4    A.        Yes.

5    Q.        What was the general purpose of that declaration?  Do

6    you recall?

7    A.        Yeah.  The purpose of that declaration was to address

8    issues that had been raised in the original briefs filed by the

9    IUE and the UAW and to respond to some of the criticism that

10   had been voiced earlier from the UCCs compensation consultant.

11   Q.        Did you perform any manufacturing only peer group

12   analyses?

13   A.        Yes, I did.

14   Q.        And can you explain to the Court in your own words

15   what you did and what those results were?

16   A.        Well, originally I constructed a peer group that

17   omitted the non-manufacturing companies and then added six

18   manufacturing companies.  My purpose in doing so was to see

19   what extent it changed the results for -- under the existing

20   peer group.  So this was what I called my provisional

21   manufacturing peer group versus the existing peer group.

22          And in my mind, the difference were not material, a

23   difference of about five percent.  Subsequently I decided that

24   a more detailed analysis of an all manufacturing peer group

25   should be conducted.  So beginning on this past Sunday morning,

152

1    I had some of the people work for me construct 15 manufacturing

2    peer groups.

3            Now, let me explain the methodology.  It's true that

4    a peer group could be sensitive to size as well as one or more

5    particular companies.  So we identified 18 companies with the

6    same SIC, standard industry classification code as Delphi.  We

7    arrayed the 18 companies, beginning with the largest, which was

8    Caterpillar, number one, all the way down to the smallest,

9    Oshkosh Truck, which was number 18.

10           Now, again, who is to say in a peer group that maybe

11   Whirlpool shouldn't be in there.  So then we began to create

12   peer groups taking six companies from each of these, from the

13   list of 18, and added them to the ten manufacturing companies

14   in the current peer group.

15           Now, when we created all 15 peer groups, we got, as

16   you might imagine, a wide range of differences.  The range was

17   from plus two percent, meaning that one of the peer groups

18   actually raised the median TDC to minus 15, meaning that that

19   particular peer group produced competitive data that was

20   fifteen percent below the Delphi peer group.

21           But the key thing was there was a cluster of

22   companies at minus two, minus three and minus four.  Eight of

23   the peer groups were in that range.  Now again, in my view,

24   that's not material and it suggests to me that any peer group

25   that was all manufacturing would not produce a material

153

1    different in result to the Delphi, the exiting Delphi peer

2    group.

3    Q.        Having done that exercise, do you have an opinion as

4    to whether the appropriate peer group is an all manufacturing

5    peer group or a diversified peer group?

6    A.        As I said earlier, I believe that it's not all

7    uncommon for large companies to have a diversified peer group.

8    You know, for example, International Paper, they have a peer

9    group that is based on revenue, geography, and competition for

10   talent.

11             You know, if you look closely at the discussion of

12   peer groups that now appears in proxies, you will see a lot of

13   companies saying we are including this company or this range of

14   companies because we believe we compete for talent with them.

15             Not that we've actually lost anybody or are going to

16   hire somebody from those companies.  We believe these really

17   are our competitors for talent.  Other companies that have a

18   diversified peer group include Kraft, Coca Cola, again, very

19   typical for large companies, Fortune 50, to have diversified

20   peer groups because in their mind the supply of talent is much

21   less than the demand.

22             There simply aren't that many people who can run

23   complex business operations, or have the experience running,

24   you know, large business units.

25   Q.        Let's look at, if we can, the peer group that

154

1   (indiscernible).  So it's Page 33 of Exhibit 90.  Could you

2   blow this up, please?  That's great.  The peer group that's

3   here, this is the peer group -- do you have an opinion with

4   respect to this peer group, Mr. Bubnovich?

5   A.        Yeah.  I think it's a solid peer group.

6   Q.        And in your own words, will you tell the Court why

7   you think it's solid peer group?

8   A.        Well, again, it includes a diversified group of

9   companies, which I think is appropriate.  The background as Mr.

10  Naylor testified was that it became apparent in the summer of

11  '07 that Delphi's revenues going forward, following the sale of

12  interiors and steering, would be more in the low twenty ranges,

13  so we reduced the peer group from a median of 23.6 to 21.1.

14  Then the compensation committee and I talked about which

15  companies do we remove and we decided we would just remove the

16  four largest from the 2006 peer group.

17  Q.        Why did you remove those four large companies?

18  A.        Well, it brought the median down from 23.6, as I

19  said, to 21, thus matching Delphi's expected revenues.  Again,

20  we were trying to make sure that median of the peer group was

21  more consistent with Delphi's projected revenues going forward.

22  Q.        I'm going to change subjects, Judge.  Anything else

23  you want to --

24            THE COURT:  The LTI upon which the cash

25  emergence bonus was based, did you do a peer group analysis for

155

1    that LTI?

2              THE WITNESS:  Okay.  Can you -- I want to make

3    sure I understand your question.  Could you ask it again,

4    please?

5              THE COURT:  Well, for the -- for the management

6    compensation plan, you looked at the peer group to compare

7    various segments of that plan?

8              THE WITNESS:  Yes.

9              THE COURT:  And my question is a little

10   different that that comparison.  The cash awards, cash bonus

11   awards, are based upon 80 percent of the 2004 LTI.  Did you do

12   a peer group comparison to determine whether the 2004 LTI was

13   within the median of peer group companies?

14             THE WITNESS:  Well, I think if -- let me answer

15   the question this way and you tell me if this is responsive to

16   it.  If I were to compare the emergence cash bonuses to the LTI

17   opportunities in this peer group or any other similar peer

18   group, manufacturing, anything, they would be substantially

19   below.

20             The reason for that is since 2004 you had a --

21             THE COURT:  No, no.  I'm looking at 2000 -- did

22   you do a comparison for 2004?

23             THE WITNESS:  Against the peer group?

24             THE COURT:  Yes.

25             THE WITNESS:  That actually was done.

156

1          THE COURT:  Okay.  And was it in the median?

2          THE WITNESS:  Yes.  It was right about the

3     median, a little bit -- a little bit lower.

4          THE COURT:  Does that appear in the exhibits?

5          THE WITNESS:  It is -- it appears -- the answer

6     is yes.  I don't know which of these exhibits it is, though.

7          THE COURT:  Okay.  Okay.  You can go ahead.

8     Mr. Bubnovich, I want to now turn to and focus on your

9     supplemental declaration at 557.  It's Exhibit 557, and I want

10    to go directly to the methodology you chose to utilize in

11    evaluating the DSB executive compensation.  In your cross

12    examination and in questions from the Court, you were asked

13    about why you chose not to survey data, with respect to the

14    lower DSB.  Is that correct?

15    A.      Yes.

16    Q.      Do you recall those questions and answers?

17    A.      Yes, yes.

18    Q.      I guess my first question, do you have a view or can

19    you explain to the Court why there wasn't proxy data for those

20    positions that you could have drawn from?

21    A.      Well, a number of those positions, you know, for

22    example, treasurer, senior vice president in HR, weren't

23    reported as top five positions in the Delphi peer group.  So I

24    couldn't bench mark, again, those particular positions against

25    the peer group data.

157

1    Q.        And if you recall, and just to illustrate the point,

2    can you explain to the court what positions would be in the

3    lower ten of the DSB that you weren't able to find proxy data

4    for?  Do you recall any of the positions?

5    A.        Yeah.  Treasurer, VP of audit, VP sales and

6    marketing, VP of government relations, communications, EVP of

7    operations.  Those were the positions that come to mind right

8    now.

9    Q.        Now, what size companies does the survey data cover?

10   A.        Well, the survey --

11   Q.        The actual data, not the -- just the data?  What size

12   companies?

13   A.        All sizes.

14   Q.        From?

15   A.        From, you know, 100 million in revenue, you know, all

16   the way on up but, you know, most of the companies tends to be

17   clustered down at the lower ends because there's more companies

18   that have a billion dollars of revenue or 500 million than 25

19   million.

20   Q.        So with respect to this clustered data, if I asked

21   you to tell me about the executive vice president of

22   operations, explain to me how you would construct that and

23   comprise them against the data?

24   A.        Well, you know, again, that's a pretty unique

25   position because even though the title is operations, it's

1    really not the business operations and so, you know, it's

2    difficult to find a match for survey, under the surveys for

3    that job.  And again, there was no proxy match that we could

4    find anywhere.

5             So again, it's judgment about whether a

6    particular position can be effectively bench marked and that's

7    one that you have to say, well, we can't find an effective

8    bench mark for it, and survey data or proxy data and thus you

9    have to come up with a different approach to bench mark that

10   job.

11   Q.       So was there survey data that you could reliably look

12   to for the executive vice president of operations?

13   A.       No.  No, in that particular case, no.

14   Q.       How about the vice president of government relations?

15   A.       Yes.  That's a job that can be matched.  The same for

16   treasurer, VP audit, yes.

17   Q.       And the vice president of sales?

18   A.       Yes.

19   Q.       Okay.  So if I ask you about the vice president of

20   government relations, ask you to give me the survey data, just

21   walk through for all of us how the mechanics work on that?  How

22   are you going to report back to me?

23   A.       Okay.  Well, you go to the various surveys to find a

24   match for the position.  We're using position descriptions that

25   were provided us by the company, one paragraph long, that

1    summarize the job.  Then you try and match it with a similar

2    position in the survey.

3              So if you find three good matches say in three

4    different surveys, then you compile the data.  Now, in

5    compiling the data, we use a regression analysis.  You know,

6    most all surveys include formulas that allow you to predict the

7    pay for a position based on the companies revenue.

8              So the data allows -- you know, it's all online now,

9    for you to plug in the revenue for a company.  In this case,

10   let's just say Delphi, 25 billion, and then the survey predicts

11   what the pay would be for that position at a company of the

12   inserted revenue.

13             Then it's all totaled, averaged and it's reported

14   generally as the three surveys are average and then reported as

15   generally the 25th percentile, the median, and the 75th.

16   Q.        And do you perform these kinds of analyses in the

17   regular course of your job as a consultant for compensation

18   committees generally?

19   A.        Yes.

20   Q.        And is that, in terms of your professional

21   experience, is that where the analysis ends?  You get the

22   number off the computer and you give it to the committee?

23   A.        No.  No, not at all.  As -- you know, one of the

24   things I always tell clients, and I can't remember if it was

25   quoted back to me from an e-mail that I wrote, but you

160

1    shouldn't be slaves to the data.  The data is merely a starting

2    point.  You have to take into consideration a whole lot of

3    other factors, including a person's tenure, performance,

4    experience, you know, all those things can affect a decision

5    about where you pay somebody.

6    Q.        And why do you need to look to those other factors?

7    Why isn't it a more black and white analysis?

8    A.        Well, it's simply not black and white.  It's not a

9    hundred percent science.  You know, companies have different

10   strategies, have different approaches.  They asses individuals

11   differently.  Again, they want to take into account a whole

12   variety of factors, you know, to determine where pay should be

13   set.

14            It's judgmental.  It's really -- in operation, it is

15   more judgmental than data driven.

16   Q.        When you looked at the survey data, did you believe

17   it was reliable or unreliable with respect to the positions you

18   were evaluating?

19   A.        I believe it was unreliable.

20   Q.        And as an expert, why do you reach that conclusion?

21   What is the basis for it?

22   A.        It was so different from the actual pay, the

23   underlying data when I looked at it did not correlate well in

24   terms of predicting what the pay would be for the positions,

25   and I so informed the compensation committee.

1    Q.        But again, the Court asked you questions similar to

2    this.  Is this just you waking up as an expert and saying I

3    don't like the data?  I mean is that the basis of your

4    conclusion, or is there something else, some other judgment

5    that goes in as an expert?

6    A.        Well, it's --

7                    MR. KENNEDY:  Objection.  Leading.

8                    MR. DECHIARA:  Objection, Your Honor.  I'm

9    sorry, you go first, Mr. Kennedy.

10                   MR. KENNEDY:  Leading.

11                   THE COURT:  You can answer the question.

12                   THE WITNESS:  No, it's not waking up and

13   deciding that the data is not appropriate.  No, again, I took

14   into account, as I said, the tremendous disparity in the data,

15   the fact that the correlations under the survey didn't seem

16   strong, the fact that I've seen this sort of thing before and

17   have told compensation committees or boards that my faith in

18   the data was not as robust as my faith in the proxy data, which

19   is clearly actual data, actual pay data as opposed to predicted

20   data.

21   Q.        Can you explain the difference between actual pay

22   data and predicted data?

23   A.        Well, again in the proxy, what you find is the pay

24   that somebody actually received, as well as now detail about

25   the opportunities.  Predicted pay, under surveys is

162

1    unfortunately a little bit complex and difficult to explain.

2              You know, I'll try.  As I said earlier, survey firms

3    such as Watson Wyatt, Towers, Perin, Mercer and all the others

4    collect reams of data about different positions, and it may

5    very well be that for a particular position most of the data

6    collected is for smaller companies.

7              That data is nonetheless used to develop what's

8    called a regression formula which is used to predict pay at

9    different sized companies.  So to take a super simplified

10   example, if a HR firm gathered the pay data -- let's just think

11   in terms of salary for fifty positions -- I'm sorry, for fifty

12   different companies for the same position, let's just call it

13   vice president of audit, and all of those companies had

14   revenues of five billion or less, that data is nonetheless

15   converted into a regression formula.

16             Think of it as a line on a page where we've got all

17   these data points down at the lower left hand side.  The bottom

18   access, the X access is revenue.  The Y access, the left hand

19   side is pay.  So a line is produced beyond five billion in

20   revenue, even though we didn't get any -- collect any data from

21   those companies, and used to predict the pay for that same

22   position at a company with revenues more than five billion.

23             So you could predict the pay for somebody at --

24   working that same position at a company with ten billion, 15

25   billion 25 billion, 50 billion revenue.  Now, my experience is

163

1      that those predictions don't quite match up with reality.

2                      THE COURT:  Now, why doesn't the regression

3      formula take that experience into account?

4                      THE WITNESS:  I'm sorry.  What?

5                      THE COURT:  Why doesn't the regression formula

6      take that experience that you have and that other consultants

7      who developed the formula into account?

8                      THE WITNESS:  Well, it can.  That's just pure

9      math based on the data that's collected.  Now, what the

10     regression formula will do is it will give you a sense of the

11     correlation.  It will tell you how strong or weak the

12     correlation is.  So, the correlation might be strong at say ten

13     billion, but it might be weak at 25 billion.

14                      And again, in looking at the underlying

15     correlation data, it wasn't particularly strong with the survey

16     data.  You know, it's --

17                      THE COURT:  And when did you do that analysis,

18     looking at the underlying --

19                      THE WITNESS:  Well, that would have been done at

20     the end of 2006, early 2007.

21                      THE COURT:  That's not described in your

22     affidavit, is it?

23                      THE WITNESS:  No.

24                      THE COURT:  Okay.

25     Q.      Mr. Bubnovich, in your experience as a compensation

164

1   consultant, have you ever advised any other compensation

2   committee that they should not rely on this type of survey

3   data?

4   A.        Yes.  I tend to be a believer in using the proxy data

5   for the top executives.  I generally don't believe in using

6   survey data for that group.

7   Q.        Did you perform any other examinations or tests to

8   evaluate your -- the opinion you've expressed here today that

9   this survey data was unreliable?

10  A.        Yes, I did.

11  Q.        Can you tell the Court in your own words what you

12  did?

13  A.        As I mentioned earlier, there were a number of

14  positions whose pay was not reported in the Delphi peer group

15  proxy, but I knew having looked at a lot of proxies and through

16  other clients that some of those positions are in fact reported

17  in proxies.  For example, senior VP of HR.

18           So what I decided to do was to look for as many

19  examples as I could of proxies that reported these lower level

20  DSB positions.  So as it turned out, I found actually -- so I

21  downloaded all companies, revenue range five to 50 billion, and

22  we'll just focus on one example here, that reported the pay for

23  a position that had human resources reported in the top five of

24  the proxy.

25           Now, I got about, as I remember, 40 or 45 matches.

1   So the first thing I did was scrub the data to take out

2   positions that I thought weren't really the top HR.  For

3   example, a lot of these positions said, you know, general

4   counsel and head of HR. So I figured that person was more

5   likely the general counsel rather than really head of HR.

6           So I struck all of those.  I was finally left with

7   about 25 or 30 positions, senior vice president of HR whose pay

8   was reported in the proxy.  Now, the median and 75th percentile

9   size of these companies was much below that of Delphi, yet the

10  pay for these positions was much higher than the survey data.

11          So that confirmed to me that the survey data was not

12  as reliable, didn't reflect the actual pay for these senior

13  level positions.

14  Q.      Is this the analysis that you testified to in

15  Paragraph 15 of your declaration that is displayed on the

16  screens?

17  A.      Yes, it is.

18  Q.      And you base these conclusions on actual data and not

19  predicted data; is that correct?

20  A.      That's correct.

21              MR. BUTLER:  I have no further questions, Your

22  Honor.

23              MR. KENNEDY:  Could we have a minute, Your

24  Honor?

25              (RECESS.)

166

1    EXAMINATION BY MR. DECHIARA:

2    Q.       Mr. Bubnovich, you testified on redirect about

3    something called regression analysis.  Do you recall that?

4    A.       Yes.

5    Q.       And regression analysis is a standard statistical

6    methodology used in your profession?

7    A.       Yes.

8    Q.       And it's a standard statistical methodology used by

9    economists, if you know?

10   A.       I don't know.  I don't know.

11   Q.       Okay.  By physical or social scientists, do you know?

12   A.       I don't know.

13   Q.       Okay.  You used survey data to determine the bench

14   marking for the non DSB executives.  In other words, the group

15   of the 540, correct?

16   A.       That's correct.

17   Q.       Let me just ask you about Paragraph 15 of your

18   supplemental declaration which you testified about at the end

19   of your redirect examination.  Let me see if I understand what

20   you said you did.  Generally, for the job titles in the lower

21   half of the DSB, such as VP of HR, there's no proxy data,

22   right?

23   A.       There was no proxy data reported for the Delphi peer

24   group.

25   Q.       As a general matter, putting aside Delphi, as a

1    general matter, the job titles, that are the job titles that

2    are in the lower half of the DSB, those job titles are

3    generally reported in the proxy data which is why you had to do

4    your extrapolation exercise; correct?

5    A.        No.  That's true.  They're generally not reported in

6    the proxy data, and except to the extent that I was able to

7    identify some of them from the wide range of companies that I -

8    -

9    Q.        Now, once in a while -- once in a while there will be

10   -- there will appear in the -- let me -- the proxy data is the

11   company's reports on the top five paid officers of the company;

12   correct?

13   A.        Yes.

14   Q.        Okay.  So once in a while they'll be a company that

15   will report a job title that is the same job title as the

16   bottom eleven Delphi DSB, once in a while you'll find a proxy

17   data point for one of those people because they will be in the

18   top five of the top five paid positions for that company;

19   correct?

20   A.        Yes.

21   Q.        Okay.  So -- but that's unusual, is it not?

22   A.        For some of those positions, yes, because --

23   Q.        So when you were looking at the job titles, when you

24   were finding job titles that appear in the lower half of the

25   DSB, and then you were finding proxy data for them and saying

168

1   oh, this proxy data shows that these individuals are paid more

2   than the survey data shows, you were using those rare instances

3   where one of those people with one of those job titles was in

4   the top five paid of their company; correct?

5   A.        Yeah, that's what I said, yes.

6             MR. DECHIARA:   Okay.   That's all I have, Your

7   Honor.

8   EXAMINATION BY MR. KENNEDY:

9   Q.        Mr. Bubnovich, in your redirect examination with Mr.

10  Butler, you indicated that one of the steps you took to create

11  your supplemental declaration was to review the proposed Pearl

12  Meyer group and construct an all manufacturing peer group;

13  correct?

14  A.        Yes.

15  Q.        And Paragraph 6 of your supplemental declaration,

16  which is Exhibit 30 to the Bubnovich deposition, does that

17  describe the process that you went through to build that all

18  manufacturing peer group?

19  A.        Yes.

20  Q.        And you essentially took the companies that had been

21  suggested by Ms. Meyer, six of them, and added a seventh; is

22  that correct?

23  A.        I took five of hers and added a sixth.

24  Q.        Okay.   Thank you.   And the sixth that you added was

25  selected entirely by you; correct?

169

1    A.        That's correct.

2    Q.        And that company was Caterpillar, am I right?

3    A.        Yes.

4    Q.        And you added Caterpillar to the group to allow you

5    to analyze what an all manufacturing peer group would look

6    like?

7    A.        That's correct, and because Caterpillar had been a

8    member in the 2006 peer group.

9    Q.        And you knew in fact what the Caterpillar salary

10   terms were at the time you selected them to be put into this

11   all manufacturing peer group; correct?

12   A.        No.  I could not remember.

13   Q.        Well, you had been, or they had been a member of the

14   2006 Delphi 22 company peer group, so isn't it likely at the

15   time you selected them for inclusion, when you made your all

16   manufacturing peer group that you were aware of what their

17   salary ranges were?

18   A.        We're talking about a lot of data and a lot of

19   information.  I actually did not remember.  Now, the context

20   here is really this is why I created the 15 companies to

21   eliminate the effects of one or two companies on a peer group

22   and to get a sense for what the data would look like when you

23   had a wider number of peer groups using many different

24   companies and different revenue sizes.

25   Q.        So when you entered Caterpillar to this group, you

170

1    had no foreknowledge that it would either increase or decrease

2    the likely results; is that correct?

3    A.        I did not remember what the information was with

4    respect to Caterpillar.  I will concede that since -- certainly

5    given Caterpillar's size, it was definitely more likely than

6    not that that would be a high paying company.

7    Q.        Okay.  Well, let's bring --

8    A.        I can see the point.

9    Q.        I'm sorry.  Did you finish, sir?  I didn't mean to

10   interrupt.

11   A.        Yes, I can see the point.

12   Q.        But let's bring up Exhibit 32 to Exhibit 265, if you

13   follow me there?

14   A.        Um-hum.

15   Q.        And make that Page 4, if you could.  I think we're on

16   Page 1 at the moment.  Could you get to Page 4?  I see we are.

17   Would you increase that?  Now, this -- are you -- take a moment

18   to look the slide over, Mr. Bubnovich.

19   A.        Okay.  I have it.

20   Q.        All right.  Now, this is the slide which shows

21   division president, executive total compensation; correct?

22   A.        That's right.

23   Q.        And it identifies ten or eleven companies; is that

24   correct?

25   A.        Yes.

171

1    Q.        And the company that has the largest number of

2    positions included in the group is Caterpillar; correct?

3    A.        That's right.

4    Q.        It has seven of the -- I guess six of the entries are

5    Caterpillar, if I read that right?  Actually it's five.

6    A.        Five.  I agree.

7    Q.        Okay.  And the median for that group is 2.8 million

8    dollars; is that right?

9    A.        Sure.

10   Q.        And the 75th percentile is 3.1 million dollars?

11   A.        Yes.

12   Q.        And every single one of the Caterpillar entries is in

13   excess of four million, ranging from 4.2 to 4.89 million?

14   A.        That's correct.

15   Q.        So is that some kind of lucky break, or did you know

16   that at the time you added Caterpillar to this group, it would

17   have the effect of being essentially 100 percent of the median?

18   A.        Well, at the time I did not know, but again, this is

19   why I decided it was more appropriate to construct 15 different

20   peer groups to give myself a better view -- a better sense of

21   the effect on comparison -- the effect in comparing the Delphi

22   peer group to an all manufacturing peer group.

23   Q.        And you personally selected the companies to be used

24   in each of those 15 manufacturing -- each of those 15 peer

25   groups?

172

1    A.        No, it was done randomly.

2    Q.        Oh, really?  No further questions, Your Honor.

3              THE COURT:  I had one question.  You did a

4    extrapolation from the proxy data for the senior DSB members to

5    get comparables for the junior DSB members?

6              THE WITNESS:  Yes.

7              THE COURT:  What formula did you apply to do

8    that extrapolation?

9              THE WITNESS:  The formula simply was that

10   whatever the amount -- whatever the difference from the market

11   for the ten positions that we could bench mark to, the proxy

12   information, was considered to be the same for the remaining

13   positions.

14             So very simply, if the top ten were below market

15   by five percent, then it was assumed that the bottom ten were

16   below market by five percent.  Or if it was plus then, then it

17   was plus ten.

18             THE COURT:  And how does that differ from a

19   regression analysis?

20             THE WITNESS:  It differs substantially.

21   Regression analysis is a statistical technique.  This was --

22   this was judgmental.

23             THE COURT:  Is your approach one that's

24   generally followed in your profession, that extrapolation

25   approach?

173

1          THE WITNESS:  That I don't know.  I don't know

2     how often, you know, something like that is done.  My guess is

3     it's certainly done from time to time.  The other thing that

4     sometimes --

5          THE COURT:  Is there anything in the literature

6     about it?

7          THE WITNESS:  Not that I'm aware of.

8          THE COURT:  Okay.

9          THE WITNESS:  The other thing that's sometimes

10    done with the data is if it's so desperate with respect to the

11    actual positions, the company might decide instead of using the

12    median, that maybe they ought to be using the 75th percentile,

13    or they'll make some other adjustments to the data to reflect

14    what they believe are differences in the incumbent positions

15    and the survey positions.

16          THE COURT:  And that's what the companies do, or

17    is that what the consultants do?

18          THE WITNESS:  Well, the consultants would advise

19    them, for example, to adjust the median data by ten or fifteen

20    percent to reflect what our differences between the position

21    description in the survey and the actual job of the incumbent.

22          THE COURT:  Okay.  Thank you.  Any more

23    questions?

24          MR. DECHIARA:  None, Your Honor.

25          THE COURT:  Okay.  You can step down, sir.

174

1          THE WITNESS:  Thank you.

2          MR. KENNEDY:  You want to keep going?

3          THE COURT:  I don't know.  How long do you

4   expect Mr. Miller's testimony to be?

5          MR. BUTLER:  Your Honor, my cross examination I

6   think would take ten minutes.

7          MR. DECHIARA:  I'd be around that around that

8   order as well, Your Honor.

9          THE COURT:  All right.  I'll go to eight

10  o'clock.

11         MR. BUTLER:  Your Honor, Delphi's ninth and

12  final witness in support of its confirmation case is Robert S.

13  Miller, Jr.  Steve Miller is the executive chairman of Delphi

14  Corporation.  His declaration has been admitted into evidence

15  as Exhibit 67, subject to a one paragraph that is still at

16  issue with the UAW, and his deposition has been admitted into

17  evidence, Exhibit 551.  We would now present Mr. Miller for

18  cross examination by the parties.  Any questions the Court

19  might have.

20         THE COURT:  Okay.  Do you want to deal with the

21  objection?

22         MR. DECHIARA:  Yes.  Your Honor, may I go to the

23  podium because then I'll just do cross?

24         THE COURT:  Okay.  That's fine.  In the mean

25  time, Mr. Miller, if you could come up and have a seat, please.

175

1          MR. BUTLER:  Mr. Bubnovich is excused?

2          THE COURT:  Yes.  You're excused Mr. Bubnovich.

3     What paragraph are we talking about?

4          MR. DECHIARA:  Your Honor, it's Paragraph 48 of

5     Mr. Miller's declaration.  He speaks about and asserts that the

6     union workers' compensation was to be above market in the first

7     sentence, and in the last sentence he again asserts that there

8     had to be a reduction to bring them in line with market

9     compensation.

10         The basis for the objection is foundation.  Mr.

11    Miller is not an expert witness.  The question of whether or

12    not the union workers' wages were above or below market before

13    or after, or at any other time, is a question that's subject to

14    expert testimony.

15         It was a core issue in the 11/13 proceedings.

16    The UAW had two economists who were prepared to testify --

17         THE COURT:  So again, you are objecting to this

18    being admitted for the truth of the proposition but not for

19    what Mr. Miller understood?

20         MR. DECHIARA:  Right, Your Honor.  Purely I'm

21    objecting based on it coming in for the truth.

22         THE COURT:  Okay.  That's fine.  It will come in

23    only on that basis.

24         MR. DECHIARA:  Only not for the truth?

25         THE COURT:  Correct.

1          MR. DECHIARA:  Yes.  Thank you, Your Honor.

2          THE COURT:  Well, it will come in for what the -

3  - for what Mr. Miller, and to the extent he's referring to the

4  board understood.

5          MR. DECHIARA:  That's fine, Your Honor.  Okay.

6  Thank you.

7          THE COURT:  Okay.  Would you raise your right

8  hand please?

9          THE WITNESS:  Sure.

10          THE COURT:  Do you swear to tell the truth, the

11  whole truth and nothing but the truth so help you God?

12          THE WITNESS:  I so swear.

13          THE COURT:  And would you state your name for

14  the record?

15          THE WITNESS:  Excuse me.  Yes.  My name is

16  Robert S. Miller, m-i-l-l-e-r.

17          THE COURT:  Okay.  You can go ahead Mr.

18  Dechiara.

19          MR. DECHIARA:  Thank you.

20  Q.       Good evening, Mr. Miller.  My name is Peter Dechiara

21  from the law firm of Cohen Weiss and Simon.  We represent the

22  UAW in this matter.  You're familiar that there were certain

23  comparisons done by Delphi management comparing the all in

24  labor costs of union workers to other workers.  Are you

25  familiar with those?

1    A.        Yes.

2    Q.        And the companies that the other workers -- I'm

3    sorry, the workers at the other companies that were being used

4    for the comparison were all companies in the auto parts

5    industry; correct?

6    A.        That is correct.

7    Q.        You didn't use Pepsi or Coke or Best Buy, correct?

8    A.        No.

9    Q.        Okay.  And they were all smaller companies; correct?

10   A.        Well, given that we were at birth the largest auto

11   parts company, it stands to reason if we compared ourselves to

12   other auto parts companies they would be smaller.

13   Q.        Right.  So you didn't look at, again, Pepsi or Best

14   Buy which by any measure are bigger companies than Delphi;

15   correct?

16   A.        That is correct.  When we go to sell products, we

17   sell against the other auto parts companies, not against Coke

18   and Pepsi.

19   Q.        And therefore looking at other companies for

20   compensation purposes, looking at other companies in the auto

21   parts industry, makes sense; correct?

22   A.        For the hourly workers against whom we have to

23   calculate our costs in making a bid for new business, it is

24   critical to be competitive with other hourly worker situations,

25   and that is what the comparison was based on.

178

1   Q.        Okay.  So when you look at hourly worker compensation

2   comparisons you just look at the auto parts industry, but with

3   the executives you do something else; is that right?

4           THE COURT:  It's not going to be ten minutes if

5   you keep going like you're doing.

6           MR. DECHIARA:  I apologize, Your Honor.  It's

7   hard to resist the temptation.

8           THE WITNESS:  Yeah, you are correct.

9   Q.        Okay.  You were paid a signing bonus of three million

10  dollars at the outset of this case when you joined Delphi?

11  A.        Yes, to replace other streams of income I had to give

12  up to come there.

13  Q.        And you would stand to gain 8.3 million dollars in

14  cash if this court approves the management compensation plan?

15  A.        That is correct.

16  Q.        So you stand to have earned 11.3 million dollars in

17  cash since you signed on to Delphi if the court approves the

18  management compensation plan?

19  A.        You left out I earned three quarters of a million

20  dollars, which was six months of my annual rate of salary until

21  I waived that January 1st, 2006.

22  Q.        Okay, so it's 11.3 million --

23  A.        Slightly --

24  Q.        -- plus three quarters of a million?

25  A.        Yes.

1    Q.       Okay.  When you signed on for -- at Delphi, did you

2    have an expectation that at the end of the case you would get a

3    cash emergence award of 8.3 million dollars?

4    A.       When I signed on, I had no expectation that we were

5    going to have to go into Chapter 11 to resolve our issues.  I

6    spent three months trying to get General Motors and the unions

7    to work with me to resolve our issues without having to go

8    through this very expensive Chapter 11 process.  That was not

9    to be.  So I can say I had no expectation that I would be

10   eligible for an emergence bonus because I had no expectation we

11   were going to go in.

12   Q.       And after the company did go into Chapter 11, did you

13   at that time form an expectation that at the end of the Chapter

14   11 you would get an 8.3 million dollar cash payment at

15   emergence?

16   A.       Well, if you mind, let me give just a brief history -

17   -

18   Q.       I do mind.  I'd like you to answer my question.  Did

19   you have an expectation --

20   A.       I had no expectation.  What I did was to trust --

21   Q.       You answered my question.

22   A.       -- the Board of Directors at the end of the case,

23   would make an appropriate decision.  I had no participation in

24   the discussions that led up to their decision.

25   Q.       Did you rely in any way to your detriment on the

180

1    expectation that you would get 8.3 million dollars?

2    A.        I relied on an expectation that come the end of the

3    case, more than two years, I guess, after our filing, that the

4    Board would take action, it deemed appropriate and fair.

5    Q.        While you've been -- while this case has been in

6    Chapter 11, you've sat on the board of United Airline?

7    A.        Yes, sir.

8    Q.        Have you been compensated for that?

9    A.        Yes, sir.

10   Q.        How much?

11   A.        I honestly forget because we've gone through a

12   Chapter 11 case there, but I was -- it was an ordinary retainer

13   kind of arrangement and I've got, I forget, 10,000 shares of

14   stock we're awarded at the time of emergence.

15   Q.        Well, to be best -- to the best of your ability, if

16   you can give me just an order of magnitude of the value that

17   you've been paid by United Airlines while you've been working

18   here at Delphi?

19   A.        $100,000 a year.

20   Q.        And you've sat on the board of Symantec?

21   A.        Symantec.

22   Q.        Symantec, and same questions.  Order of magnitude,

23   how much value have you gotten from Symantec?

24   A.        Well, in a way it's been --

25                   THE COURT:  This is --

181

1          THE WITNESS:  Sorry.

2          THE COURT:  -- I'm not quite sure where you're

3   going with this.

4          MR. DECHIARA:  I'll move on, Your Honor.

5          THE COURT:  Other than the fact that --

6          THE WITNESS:  Thank you.

7          THE COURT:  Mr. Miller's --

8   Q.          During this Chapter 11 case, during which you stand

9   to earn over 11.3 million dollars, you've also found the time

10  to write a book?

11  A.          That is true.  And I should explain that the book was

12  written over a period from mid '06 until the first quarter of

13  '07.  I had a collaborator so I didn't have to do any of the

14  hard work.  The collaborator I met with about once every three

15  or four weeks on Saturdays and Sundays only, and at times when

16  there wasn't otherwise a Delphi business reason to be working.

17  Q.          And the book, it's called Turnaround Kid, What I

18  Learned Rescuing America's Most Troubled Companies?

19  A.          Yes.

20  Q.          And have you -- is it fair to say that you have had

21  considerable earnings over the years rescuing America's most

22  troubled companies?

23  A.          I don't know what the definition of considerable is.

24  Q.          Have you earned millions and millions of dollars?

25  A.          Several million dollars.

182

1    Q.        And is it also not true that given that you are the

2    turnaround kid, that you will have no problem finding gainful

3    employment after you leave Delphi, if you choose to do so?

4    A.        I would guess that the phone will ring again.

5              MR. DECHIARA:  I have no further questions, Your

6    Honor.

7              THE COURT:  Okay.

8    EXAMINATION BY MR. KENNEDY:

9    Q.        Good evening, Mr. Miller.  My name is Tom Kennedy.  I

10   represent the IUE-CWA.  You stand to receive under the plan 8.3

11   million dollars; is that correct, Mr. Miller?

12   A.        That's correct.

13   Q.        Are you prepared to take that 8.3 million dollars in

14   stock in Delphi at planned value?

15   A.        I have not participated in any discussions with the

16   compensation committee about the currency or the nature of the

17   fee.  Emergence cash is cash.  This was a recommendation the

18   committee made to the Board.  I have decided I would accept it

19   in cash.  I haven't thought about whether I would take planned

20   currency.

21   Q.        All the same to you, stock and plan value, or cash?

22   A.        No.

23   Q.        No economic difference?

24   A.        I would have a preference for cash.

25   Q.        So would the creditors, but anyway, no other

1    questions, Your Honor.

2              THE COURT:  Okay.  Any redirect?

3              MR. BUTLER:  No redirect, Your Honor.

4              THE COURT:  Okay.  Go ahead.

5              THE WITNESS:  Could I answer a question you

6    didn't ask?

7              THE COURT:  Well, you may want to look at your

8    lawyer for that.

9              MR. BUTLER:  No.

10             THE WITNESS:  All right.  Okay.

11             THE COURT:  See, that's why he's the turn around

12   kid.  He listens to his lawyer.

13             MR. BUTLER:  All right.  Just one moment,

14   please?

15             THE COURT:  Yes.

16             MR. BUTLER:  I just want to check with my

17   colleagues, Your Honor.  I thought I might try -- I believe all

18   of the evidentiary objections have been now been resolved.  All

19   the exhibits are in based on the Court's rulings, and we have

20   presented all of our witnesses.  So from the debtor's

21   perspective, as to the confirmation hearing, as -- confirmation

22   portion, and not the rights off on other matters, we would

23   consider the record closed.

24             I'm not aware of anyone else who intends to put

25   any evidence into the record.

184

1          THE COURT:  Okay.  Is that right?

2          MR. DECHIARA:  Yes, Your Honor.  The UAW has no

3    witnesses.

4          THE COURT:  Okay.

5          MR. KENNEDY:  Same for the IUE.

6          THE COURT:  Okay.  Then the record of the

7    confirmation hearing is closed.  And that means that at ten on

8    Tuesday, I'll hear a brief closing argument on the two limited

9    objections.

10          MR. BUTLER:  Thank you, Your Honor.  And then

11    we'll --

12          THE COURT:  Then we'll proceed to the -- well,

13    to a ruling.  I'll give you a ruling that morning, and then

14    we'll proceed to the MDL settlement and the registration rights

15    motion.  I don't think there's anything else.

16          MR. BUTLER:  No, those were the remaining

17    matters, Your Honor.  We'll have obviously subject to whatever

18    Your Honor's rulings are on Tuesday.  We will be planning to

19    submit the order that day.

20          THE COURT:  That's fine.  If you could submit it

21    -- I'm not saying for you to drive yourself crazy over this, or

22    drive everyone else crazy.  If you could submit it in the

23    morning, you know, at eight or so, that would be fine, but if

24    not, whenever you get to it.

25          MR. BUTLER:  That's going to be our goal, Your

1     Honor.

2                    THE COURT:  Okay.

3                    MR. BUTLER:  Thank you very much.

4                    THE COURT:  Okay.  Thank you.

5                    MR. KENNEDY:  Your Honor, could I ask a

6     clarification on something?

7                    THE COURT:  Excuse me.  If you could just let

8     Mr. Kennedy speak.

9                    MR. KENNEDY:  Just so I didn't misunderstand

10    something, the order that's to be submitted Tuesday morning is

11    after Your Honor's ruling; correct.

12                   THE COURT:  No, as is often the case, and is the

13    case here, plan proponents will submit a draft confirmation

14    order, a proposed confirmation order in connection with the

15    confirmation hearing, in the case the Court has any issues with

16    it, assuming that the Court's going to grant confirmation.

17                   And there's one that's been submitted.  I've

18    been told it's going to be updated.  I certainly wouldn't enter

19    it unless I decide to confirm the plan.  But it's perfectly

20    appropriate to submit a draft order.

21                   MR. KENNEDY:  Should we submit a counter order?

22                   THE COURT:  No.

23                   MR. KENNEDY:  Okay.

24                   THE COURT:  No.

25                   MR. KENNEDY:  Thank you.

186

1          THE COURT:  I'm looking at provisions that don't

2    have anything to do with the IUE.

3          MR. KENNEDY:  Okay.

4          THE COURT:  UAW objection.  There are other --

5    there are other changes to the confirmation order that Mr.

6    Butler has alluded to dealing with various settlements and

7    other things, and that's what I would look at.

8          MR. KENNEDY:  Thank you, Your Honor.

9          THE COURT:  I expect that any ruling on the --

10   on your two objections will be dealt with separately.

11         MR. KENNEDY:  Thank you.

12         MR. DECHIARA:  Your Honor, should we expect that

13   the debtor will circulate whatever revisions to the order?

14         MR. KENNEDY:  To whoever you provided it to

15   before.

16         MR. BUTLER:  Yes, Your Honor.  Thank you.

17         MR. KENNEDY:  I'm assuming it's to incorporate

18   things that people have agreed upon.

19         MR. BUTLER:  Yes, that's correct, Your Honor.

20   Thank you, Judge.

21         (Whereupon the afternoon session was concluded at

22   7:53 p.m.)

23

24

25

187

**I N D E X**

**T E S T I M O N Y**

| WITNESS | EXAM BY | PAGE |
|---------|---------|------|
| Craig Naylor | Mr. DeChiara (cross) | 17 |
| Craig Naylor | Mr. Kennedy (cross) | 75 |

**E X H I B I T S**

| DEBTORS' | DESCRIPTION | ID. | EVID. |
|----------|-------------|-----|-------|
| 556 | Notice of Delphi Corp. Debtor Subsidiaries under 1129(a)(5) | | 11, 17 |
| 557 | Supplemental declaration of Nick Bubnovich | | 11, 17 |
| 558 | Final stipulation in MDL case | | 11, 17 |

188

C E R T I F I C A T I O N

I Lisa Bar-Leib, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.


                                        January 23, 2008

Signature of Transcriber            Date


Lisa Bar-Leib

typed or printed name