**Hearing Date: February 21, 2008**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO MOTION BY JIMMY MUELLER, DAVID GARGIS,
AND KEITH LIVINGSTON FOR RELIEF FROM AUTOMATIC STAY

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), respectfully submit this objection (the "Objection") to the motion for relief from the automatic stay by Jimmy Mueller, David Gargis, and Keith Livingston (Messrs. Mueller, Gargis, and Livingston, collectively, the "Movants") dated December 5, 2007 (Docket No. 11350) and re-noticed on December 31, 2007 (Docket No. 11611) (the "Motion") to file a complaint in the United States District Court for the Northern District of Alabama (the "Alabama District Court") against Delphi and the Delphi Hourly-Rate Employee Pension Plan.

<u>Preliminary Statement</u>

1.      The Movants are current or former non-degreed quality reliability engineers employed at Delphi's production facility in Athens, Alabama (the "Athens Facility").  Although the Movants were at one time hourly Delphi employees whose employment status was governed by collective bargaining agreements ("CBAs") with the United Automobile, Aerospace and Agricultural Implement Workers Union of America and applicable local union (the "UAW"), each Movant voluntarily transferred to salaried employee status years ago:  Mr. Mueller transferred from hourly to salaried status in 1999, Mr. Gargis transferred from hourly to salaried status in 1998, and  Mr. Livingston transferred from hourly to salaried status in 1995.

2.      The Movants allege, and it is undisputed, that they requested that Delphi transfer them back to hourly employee status in 2006 and 2007 and that Delphi denied their requests.  It is also undisputed that the Movants' express rationale for seeking to return to the UAW bargaining unit, subsequently reaffirmed by letter from their counsel,

2

was to participate in one of the special hourly attrition programs negotiated by the UAW,

Delphi, and GM.  Delphi denied the requests. Delphi was decreasing, not increasing, the

hourly workforce, and was not willing to incur increased incentive attrition program costs

or to hire three replacements for the Movants' three salaried positions.  The Movants assert

an unfettered right, in their sole discretion, to transfer from salaried to hourly at any time

for any reason.  Delphi asserts that Delphi has sole discretion to determine whether regular,

full-time salaried employees will be transferred to hourly status.  The Movants now seek

relief from the automatic stay to file a federal action under the Employee Retirement

Income Security Act (ERISA) against Delphi in Alabama.

3.      The lawsuit that the Movants are contemplating is precisely the kind

of postpetition litigation against a debtor that the automatic stay was intended to preclude.

As a threshold matter, the Movants have failed to carry their burden to provide an initial

showing that cause exists under 11 U.S.C. § 362(d)(1) to lift the automatic stay.  Courts in

this Circuit have held that absent such an initial showing by a party seeking relief from the

stay, the request for relief should simply be denied without requiring the debtor to

demonstrate why the stay should remain in place.  The Movants have offered only a series

of unsupported conclusory pronouncements.  As a result, this Court has solid grounds upon

which to summarily deny the Motion consistent with established practice in this Circuit.

4.      Moreover, notwithstanding the unsupported assertions in the Motion

to the contrary, the Movants' contemplated litigation implicates central elements of the

Debtors' reorganization and likely would give rise to issues that fall within the exclusive

jurisdiction of the Bankruptcy Court.  Therefore, such matters could not appropriately be brought before the Alabama District Court.

5.    In the complaint they propose to file in the Alabama District Court, a draft of which was filed with the Motion (the "Draft Complaint"), the Movants seek a court order that would "allow each of the [Movants] the same benefits to which hourly employees are allowed and have been allowed since the date of each request for retransfer," or, as the Movants allege, since mid-2006.  Draft Complaint, p. 4.  Such benefits presumably would include those provided under the collectively bargained 2006 UAW-GM-Delphi special attrition programs (including monetary incentive payments thereunder) approved by this Court for which the Movants may have been eligible had they been hourly employees, or those provided under the collectively bargained 2007 program provided in the memorandum of understanding regarding Delphi's restructuring entered into among the UAW, Delphi, and General Motors Corporation, dated June 22, 2007, which this Court approved on July 19, 2007 (the "UAW Settlement Agreement").[1]

6.    Pursuant to paragraph 12 of this Court's order approving the UAW Settlement Agreement and pursuant to Article XIII of the Plan (defined herein), this Court has retained exclusive jurisdiction over the UAW Settlement Agreement and matters related thereto.  Accordingly, this Court is the only forum in which the Movants may properly file the Draft Complaint.

7.    Moreover, the deadlines for filing objections to the UAW Settlement Agreement and the Plan both passed before the Motion was filed.  The Movants did not

---

[1]    The UAW Settlement Agreement is attached as Exhibit 1 to this Court's order approving that agreement (Docket No. 8693).

object to either the UAW Settlement Agreement or confirmation of the Plan.  As a

consequence, even if they were to file the Draft Complaint in this Court, any claims they

might have likely would be barred.

        8.     For the reasons set forth herein, the automatic stay should not be

modified as the Movants have requested, and the Motion should be denied.

Background

A.     <u>The Chapter 11 Filings</u>

        9.     On October 8 and 14, 2005, the Debtors filed voluntary petitions in

this Court for reorganization relief under chapter 11 of title 11 of the United States Code,

11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors now

operate their businesses and manage their properties as debtors-in-possession under

Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration

of these cases.

        10.     No trustee or examiner has been appointed in these cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed

an official committee of equity holders.

        11.     On September 6, 2007, the Debtors filed the Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In

Possession (Docket No. 9263) (the "Plan") and the Disclosure Statement With Respect To

Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And

Debtors-In Possession (Docket No. 9264).  On December 10, 2007, the Debtors filed the

Plan (Docket No. 11386) and the First Amended Disclosure Statement with respect to the

5

Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order

approving the adequacy of the Disclosure Statement and granting the related solicitation

procedures motion on December 10, 2007 (Docket No. 11389) (the "Solicitation

Procedures Order"). On January 25, 2008, the Court entered an order confirming the Plan

(as modified) which became a final order on February 4, 2008 (Docket No. 12359) (the

"Confirmation Order").

B.        Current Business Operations Of The Debtors

12.        Delphi and its subsidiaries and affiliates (collectively, the

"Company") as of December 31, 2006 had global net sales of $26.4 billion and global

assets of approximately $15.4 billion.[2] At the time of its chapter 11 filing, Delphi ranked

as the fifth largest public company business reorganization in terms of revenues and the

thirteenth largest public company business reorganization in terms of assets. Delphi's non-

U.S. subsidiaries are not chapter 11 debtors and have continued their business operations

without supervision from the Court.[3]

13.        The Company is a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines,

and is one of the largest global suppliers of vehicle electronics, transportation components,

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on
February 27, 2007.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-
core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish
insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007,
DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a
social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court
approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's
transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major automotive original equipment manufacturer ("OEM").

14.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

15.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] In 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. In 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

16.    The Debtors believe that the Company's financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Debtors from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs, (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures, and (c) increasing commodity prices.

17.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

18.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and

8

manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.     Confirmation Of The Debtors' Plan Of Reorganization

19.     The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases.  The GSA and the MRA provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to emerge from chapter 11.  Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

20.     The Debtors expect to emerge from the reorganization as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.     The Motion And The Movants' Contemplated Action Against Delphi In Alabama

(i)     Procedural History

21.     The Motion, which is dated December 5, 2007, was actually filed December 7, 2007 and noticed for the omnibus hearing on December 20, 2007.  The Debtors subsequently advised the Movants' counsel that, under the Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures (Docket No. 245) (as amended and supplemented from time to time, the "Case Management Order"), the Motion was not timely filed for hearing on December 20, 2007, and service of the Motion appeared to be defective.

22.     Subsequently, Movants' counsel re-noticed the Motion for hearing at the omnibus hearing scheduled for January 25, 2008.  Movants' counsel also has asserted that service has now been provided in accordance with the Case Management Order.

23.     Shortly before the January 2008 omnibus hearing, Delphi and the Movants agreed to adjourn the hearing on the Motion until February 21, 2008, in part to permit the parties to pursue a consensual resolution of the matters at issue.  As the Debtors represented on the record at the January 2008 omnibus hearing, the Debtors' deadline for objecting to the Motion was extended to February 14, 2008.

24.     As of the filing of this Objection, the parties have not arrived at a consensual resolution of this matter.

(ii)     The Relief Requested And The Movants' Contemplated Complaint

25.     The Draft Complaint alleges that before they voluntarily transferred to salaried status many years ago, the Movants were promised that they could transfer back to hourly employee status at any time.  The Movants seek a court order that, among other things, would require Delphi to "retransfer" them to the Delphi Hourly Rate Pension Plan and provide them the same benefits to which hourly employees are entitled.  The Motion requests relief from the automatic stay to file and prosecute the Draft Complaint in the Alabama District Court.

26.     Delphi disputes the Movants' assertions that, after approximately

nine, ten, and thirteen years of employment, respectively, as salaried employees, they are

entitled to transfer to hourly status at their sole discretion, regardless of Delphi's

employment needs, or solely for the purpose of exiting Delphi through a costly incentive

attrition program.

<u>Argument</u>

27.     Bankruptcy Code section 362 provides that a bankruptcy petition

"operates as a stay, applicable to all entities," of commencement or continuation of judicial

proceedings against the debtor.  <u>See</u> 11 U.S.C. § 362(a)(1).  The automatic stay extends to

all matters that may have an effect on a debtor's estate, enabling bankruptcy courts to

ensure that debtors have the opportunity to reorganize.  <u>See</u> <u>Manville Corp. v. Equity Sec.</u>

<u>holders Comm.</u> (In re Johns-Manville Corp.), 801 F.2d 60, 62-64 (2d Cir. 1986); <u>see also</u>

<u>Fid. Mortgage Investors v. Camelia Builders, Inc.</u>, 550 F.2d 47, 53 (2d Cir. 1976) ("Such

jurisdiction is 'necessary to exclude any interference by the acts of others or by

proceedings in other courts where such activities or proceedings tend to hinder the process

of reorganization.'") (citation omitted); <u>AP Indus. Inc. v. SN Phelps & Co.</u> (In re AP Indus.

Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents creditors

from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate

so that all creditors and their claims can be assembled in the bankruptcy court for a single

organized proceeding.").  The fundamental purpose of the automatic stay is to provide a

debtor with a breathing spell to effectuate restructuring.  <u>See</u>, <u>e.g.</u>, <u>Borman v. Raymark</u>

<u>Indus.</u>, 946 F.2d 1031, 1036 (3d Cir. 1991).  Accordingly, Bankruptcy Code section

362(a)(1) stays pending litigation to "forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it," and "avoid interference with the. . . rehabilitation of the debtor." Borman, 946 F.2d at 1036 (quoting Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir. 1982)).

28.    Under section 362(d)(1), "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay…for cause." 11 U.S.C. § 362(d)(1). "Neither the statute nor the legislative history defines the term 'for cause' and the legislative history gives only very general guidance…[E]xisting case law indicates that 'the decision of whether to lift the stay [is committed] to the discretion of the bankruptcy judge.'" In re Sonnax Indus., Inc, 907 F.2d 1280, 1285, 1286 (2d Cir. 1990) (internal citation omitted). "Thus the 'facts of each request will determine whether relief is appropriate under the circumstances.'" Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999) (quoting legislative history).

29.    Because the Movants contemplate the commencement of a judicial proceeding against Delphi after the Petition Date, section 362(d)(1) is applicable in determining whether this Court should grant the Motion.

A.    The Movants Have Failed To Make An Initial Showing Of Cause For Lifting The Automatic Stay As Required Under 11 U.S.C. § 362(d)(1)

30.    The automatic stay is one of the most fundamental and significant protections that the Bankruptcy Code affords a debtor. Midlantic Nat'l Bank. v. N.J. Dep't of Envt'l Prot., 474 U.S. 494, 503 (1986); see also In re Drexel Burnham Lambert Group Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("[a]utomatic stay is key to the collective and preservative nature of a bankruptcy proceeding").

31.     A party seeking to lift the automatic stay bears the burden of showing that the required cause exists to do so.  See, e.g., In re Mazzeo, 167 F.3d at 142 ("The burden is on the moving party to make an initial showing of 'cause' for relief from the stay.").  "Only if the movant makes such a showing does any burden shift to the debtor; absent a showing of cause, the court should simply deny relief from the stay."  Id.; see also Sonnax, 907 F.3d at 1285 ("If the movants fail to make an initial showing of cause...the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.");  Capital Commc'ns Fed. Credit Union v. Boodrow (In re Boodrow), 126 F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the movant 'fails to make an initial showing of cause.'") (citing Sonnax, 907 F.3d at 1285).

32.     The only justification in the Motion for the relief the Movants seek consists of half a dozen conclusory pronouncements, virtually all of which are inaccurate in material respects (as discussed below), and all of which are unsupported by evidence.  A party seeking to lift the stay must provide more than "mere conclusory statements" to meet its burden of providing an initial showing of cause for lifting the stay.  See, e.g., Global Cable, Inc. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 2006 U.S. Dist. LEXIS 37112 at * 9 (S.D.N.Y. June 6, 2006) ("mere '[c]onclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause'" under Bankruptcy Code section 362(d)(1)) (quoting In re Texaco, Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988)).

33.     Accordingly, the Movants have failed to provide the required initial showing of cause for lifting the stay.  Given that the Movants have failed to carry their initial burden of proof, this Court has grounds to deny the relief requested in the Motion without requiring any showing from Delphi that it is entitled to the continued protection of the automatic stay.  As a result, Delphi requests that the Court sustain this Objection and "simply deny relief from the stay."  In re Mazzeo, 167 F.3d at 142.

B.     Even Assuming *Arguendo* That The Movants Have Met Their Initial Burden, The Sonnax Factors Weigh Against Lifting The Automatic Stay

34.     Even if the Movants have carried their initial burden, under the criteria that courts generally consider when determining whether to lift the stay, Delphi should retain the protections of the stay under these circumstances.  The Second Circuit has identified "a number of factors (the 'Sonnax Factors') that may be relevant in deciding whether the stay should be lifted to allow litigation against a debtor to continue in another forum."  Id. (citing Sonnax, 907 F.2d at 1286).  The Sonnax factors are as follows:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

Id. at 1286.  All twelve factors may not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each

14

of the twelve factors.  <u>Burger Boys, Inc. v. South St. Seaport Ltd. Partnership</u> (In re Burger Boys, Inc.), 183 B.R. 682, 688 (S.D.N.Y. 1994).  Finally, to the list of these factors "can be added that cause 'requires the establishment of a legally sufficient basis for the action sought.'"  <u>In re Drexel Burnham Lambert Group Inc.</u>, No. 90B-10421, 1990 WL 302177, at *7 (Bankr. S.D.N.Y. Dec. 14, 1990), citing <u>In re Drexel Burnham Lambert Group Inc.</u>, 113 B.R. 830, 838 (Bankr. S.D.N.Y. 1990).

35.    The <u>Sonnax</u> factors weigh overwhelmingly in favor of retaining the protections of the automatic stay for the Debtors and denying the Motion.  As discussed below, permitting the Movants to file suit against Delphi in the Alabama District Court will not result in a substantial resolution of the material issues in question, nor would it serve the interests of judicial economy.  The Alabama District Court is not a specialized tribunal with special expertise required to hear the issues raised in the Draft Complaint.  On the contrary, this Court, having presided over these cases since the Petition Date, would be in a far better position to adjudicate the matter, in large part because the Movants' contemplated litigation bears a close relationship to key components of the Debtors' chapter 11 cases and to Delphi's transformation plan.

36.    In light of the relief requested therein, the Draft Complaint implicates the 2006 and 2007 UAW-GM-Delphi special attrition programs, the UAW Settlement Agreement, the Global Settlement Agreement with GM (the "GSA"), and the Plan.  As a consequence, a court adjudicating the matter likely would have to consider a variety of related matters, such as the cost-sharing agreements between GM and Delphi, agreements between GM and Delphi regarding related expenses and liabilities, the related

GM claims treatment, and issues regarding eligibility for "check the box" OPEB from GM
or eligibility under the Benefit Guarantee Term Sheet.

37.    The agreements and other documents listed above address the core
issues in these chapter 11 cases.  As a result, granting the relief the Movants request could
interfere significantly with bankruptcy cases and prejudice the interests of other creditors.
The risks posed by such potential developments tip the balance of harms decidedly in favor
of maintaining the stay.

38.    Finally, there is no legally sufficient basis for the relief that Movants
ultimately seek – participation in the attrition program and early retirement offered by
UAW Settlement Agreement.  Under the terms of the UAW Settlement Agreement,
participation in the attrition program and early retirement Movants seek is now foreclosed
because participation in the attrition program and selection of an attrition option must have
occurred, at the latest, by August 17, 2007.  Thus, the time frame for participation in UAW
attrition programs is now over and Movants' failure to object when this Court approved the
UAW Settlement Agreement denies them a legally sufficient basis for the relief that they
seek.[5]  Similarly, Movants' failure to object to the Plan before the objection deadline of
January 11, 2008 pursuant to the Solicitation Procedures Order likewise denies them a
legally sufficient basis to attack the Plan which incorporates the UAW Settlement
Agreement.

39.    The Movants' Memorandum Of Law In Support Of Motion To
Vacate Stay (the "Movants' Memorandum") contains a series of unsupported

---

[5]    To the extent that Movants seek to participate in an attrition program offered pursuant to the prior UAW
special attrition program available in 2006, they are also foreclosed for the same reasons.

16

pronouncements ostensibly set forth in response to a recitation of the <u>Sonnax</u> Factors.  <u>See</u>

Movants' Memorandum p. 3.  Virtually all of these statements are inaccurate, and all of

them are unsupported by evidence.  The following discussion examines several of them

within the context of these chapter 11 cases.

> (i)    Disposition Of The Draft Complaint By The Alabama District Court Would
> Leave The Ultimate Material Issues In Dispute Unresolved And Would Not
> Serve The Interests Of Judicial Economy

40.    The Movants assert that "determination of the [issues raised by the

Draft Complaint] will result in a partial or complete resolution of the issues" and would

serve the interests of judicial economy.  Movants' Memorandum, p. 3.  This statement is

incomplete and misleading.

41.    If the Alabama District Court had the authority to determine whether

the Movants are entitled to transfer to hourly status many years after voluntarily becoming

salaried employees, then the Movants' contemplated action might result in a partial

resolution of the issues.  Such a finding, however, would amount to little more than a

threshold ruling of little importance for the Movants by itself and would leave the ultimate

material issues in dispute substantially unresolved.  After all, the Movants' fundamental

objective is to obtain benefits available to hourly employees and participate in the attrition

program and early retirement initiatives approved by this Court.  The adjudication of any

rights the Movants may have to participate in such programs and initiatives, however, falls

within the exclusive province of this Court.  As discussed below, the Alabama District

Court would not have jurisdiction over such questions.  In this context, whether the

Movants are entitled to the transfer they have requested is a question that is intimately and

17

inextricably linked to the Movants' ultimate objectives.  As a consequence, this Court
would have jurisdiction over this preliminary determination as well.

42.    The determination of the Movants' entitlement to the benefits made
available to hourly employees during the period in question would implicate the UAW
Settlement Agreement and this Court's order approving it (the "UAW Settlement Approval
Order").  Under the UAW Settlement Approval Order, this Court "retain[s] jurisdiction to
hear and determine all matters arising from the implementation and performance of this
order and the UAW Settlement Agreement."  UAW Settlement Approval Order ¶ 12.  In
addition, the UAW Settlement is incorporated into and forms an integral part of the Plan.
Plan section 7.21(a) specifically assumes the UAW Settlement Agreement and Article 11
of the Plan, specifically incorporates certain release and exculpation provisions of the
UAW Settlement Agreement.

43.    Under the Plan and applicable case law, this Court retains exclusive
jurisdiction over the interpretation and implementation of the Plan.  See Article XIII of the
Plan; see In re Birting Fisheries, Inc., 300 B.R. 489, 501 (B.A.P. 9th Cir. 2003)
(bankruptcy court had exclusive jurisdiction to interpret and enforce a plan); In re Bally
Total Fitness of Greater New York, Inc., No. 07-12395 (); 2007 WL 2779438, at *2
(Bankr. S.D.N.Y. Sept. 17, 2007) (BRL) (bankruptcy court has exclusive jurisdiction to
determine whether plan complies with Bankruptcy Code); In re Winn-Dixie Stores, Inc.,
356 B.R. 813, 816 (Bankr. M.D. Fla. 2006) (same); In re WorldCom, Inc., No. 02-13533,
2006 WL 2400325, at *4 (Bankr. S.D.N.Y. May 8, 2006) (AJG) (recognizing bankruptcy
court exclusive jurisdiction over release provisions of plan).

18

44.    Accordingly, the Alabama District Court ultimately could not serve as the appropriate forum in which to resolve disputes concerning which hourly employee benefits the Movants might be entitled to receive.  As a result, allowing the Movants to file the Draft Complaint in the Alabama District Court likely would yield no meaningful resolution of the issues, nor would doing so serve the interests of judicial economy.

(ii)    Granting The Relief Requested Would Result In Interference With Central Aspects Of The Chapter 11 Cases

45.    The Movants assert that the Draft Complaint  "does not seek any direct monetary relief against the Debtor.", p. 3 (emphasis added).  The Movants also assert that the Draft Complaint "does not have any connection with or interference with [sic] the bankruptcy case" and that "[i]t is clear that allowing the Movants to [prosecute the Draft Complaint in the Alabama District Court] will have no effect on the Bankruptcy Estate.  Movants Memorandum, pp. 3-4.  If these statements are not simply mistaken, they are certainly misleading and reflect profound misconceptions on the Movants' part concerning key elements of the Debtors' transformation plan.

46.    As previously discussed, the Draft Complaint implicates orders of this Court concerning the Plan and various Plan-related agreements.  A plan of reorganization serves as the cornerstone of virtually any debtor's restructuring, and the agreements discussed herein form part of the Debtors' Plan.  Such matters fall squarely within this Court's jurisdiction, and "'jurisdiction of the bankruptcy courts in all 'proceedings in bankruptcy' is intended to be exclusive of all other courts.'"  In re Curtis, 40 B.R. 795, 801 (Bankr. D. Utah 1984) (quoting United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 217 (1915)).

19

47.     In addition, if the Movants' contemplated litigation is permitted to proceed, other potentially similarly situated employees may commence actions of their own asserting rights under the UAW Settlement Agreement (or any of the other memoranda of understanding that Delphi has executed with its principal unions during these cases) in any number of jurisdictions.  Such actions could divert the Debtors' resources and disrupt their post-confirmation preparations for emergence from chapter 11.  Perhaps more importantly, they could affect other divestitures of non-core businesses.

48.     Thus, the relief requested in the Motion has the potential to interfere significantly with the administration of these cases.  In In re Curtis, the source of the Sonnax factors, the noted that interference with the debtors' administration of the reorganization is the most important factor in determining whether to grant stay relief.  In re Curtis, 40 B.R. at 806.  "Even slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit." Id.

(iii)    The Alabama District Court Is Not A Specialized Tribunal With
         Particularized Expertise In The Issues Raised In The Draft Complaint

49.     The Movants assert that the Alabama District Court "is more suited to determine" the Movants' "claims under ERISA as the [Alabama] District Court has the necessary expertise to hear" them.  Movants' Memorandum, p. 3.  In fact, however, the Alabama District Court is not "a specialized tribunal with the necessary expertise … established to hear the cause of action." Sonnax, 907 F.2d at 1286.  In this context, "specialized tribunals" are limited to those with particularized expertise directly related to claims brought before them and generally are established primarily to hear such causes of action.  See, e.g., In re Worldcom, Inc., No. 02-13533, 2007 WL 841948, at * 7 (Bankr.

S.D.N.Y. March 12, 2007) (AJG) (Mississippi District Court was not "specialized tribunal" for purposes of adjudicating federal anti-discrimination statutes).  The Alabama District Court is a court of general jurisdiction.  It brings no particularized expertise to bear on the claims asserted in the Draft Complaint and was not established specifically to hear such causes of action.

Conclusion

WHEREFORE the Debtors respectfully request that the Court enter an

order (i) denying the Motion and (ii) granting them such other and further relief as is just.

Dated:        New York, New York
              February 14, 2008

                                       SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP

                                       By:    /s/ John Wm. Butler, Jr.
                                              John Wm. Butler, Jr. (JB 4711)
                                              John K. Lyons (JL 4951)
                                              Ron E. Meisler (RM 3026)
                                       333 West Wacker Drive, Suite 2100
                                       Chicago, Illinois 60606
                                       (312) 407-0700

                                                   - and -

                                       By:    /s/ Kayalyn A. Marafioti
                                              Kayalyn A. Marafioti (KM 9632)
                                              Thomas J. Matz (TM 5986)
                                       Four Times Square
                                       New York, New York 10036
                                       (212) 735-3000

                                       Attorneys for Delphi Corporation, et al.,
                                         Debtors and Debtors-in-Possession