**Hearing Date: February 21, 2008**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO SUPPLEMENTAL MOTION OF AUTOMODULAR ASSEMBLIES INC.,
TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO
COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND ALLOW AND
<u>DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM</u>

("OBJECTION TO AUTOMODULAR SUPPLEMENTAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, including

Delphi Automotive Systems LLC ("DAS LLC"), debtors and debtors-in-possession in the above-

captioned cases (the "Debtors"), hereby submit this objection (the "Supplemental Objection") to the

Supplement In Support Of Motion Of Automodular Assemblies Inc., Tec-Mar Distribution Services,

Inc., And Automodular Assemblies (Ohio) Inc. (collectively, "Automodular") To Compel

Assumption Or Rejection Of Executory Contracts And Allow And Direct Payment Of

Administrative Expense Claim (Docket No. 12453) (the "Supplemental Motion"), and respectfully

represent as follows:

Preliminary Statement

1.    On November 30, 2007, Automodular filed the Motion Of Automodular

Assemblies Inc., Tec-Mar Distribution Services, Inc., And Automodular Assemblies (Ohio) Inc. To

Compel Assumption Or Rejection Of Executory Contracts And Allow And Direct Payment Of

Administrative Expense Claim (Docket No. 11180) (the "Motion").  On December 13, 2007, the

Debtors filed their Objection to Automodular's Motion (Docket No. 11447) (the "Objection").

Thereafter, on February 1, 2008, Automodular filed its Supplemental Motion.  The Debtors

continue to object to Automodular's requested relief as set forth herein.[1]

2.    In the Supplemental Motion, Automodular raises nine claims that it

contends arise from breaches of several contracts with DAS LLC for work to be performed at two

Automodular locations, one in Lordstown, Ohio (the "Lordstown Claims") and the other in Oshawa,

Ontario, Canada (the "Ontario Claims").  In broad terms, Automodular contends that following

reductions in the production volume at Automodular's Lordstown and Ontario facilities,

---

[1]    The Debtors incorporate by reference the Objection as if fully set forth herein.

Automodular was contractually entitled to a per-piece price increase to account for costs associated with those reductions. In the aggregate, these volume reduction claims amount to $1,359,680.28. (See Supplemental Motion ¶¶ 10, 12.) As described more fully below, this argument fails because, among other things, the contracts are requirements contracts. Moreover, the plain language of the contracts contradicts Automodular's position. In addition, Automodular alleges that it is entitled to $322,307.54 in damages for early termination of production at the Ontario facility of assemblies for use in a vehicle that GM ceased to manufacture at the close of the 2007 model year. (See Supplemental Motion ¶ 12(f).) This claim fails because GM's production of the vehicle model was terminated as projected, and as fully understood by Automodular, in 2007. Moreover, this was, again, a requirements contract with no minimum purchase guarantee. Automodular raises six additional claims[2] for varying amounts which range from $191.98 to $183,931.00 (the "Secondary Claims"), each of which the Debtors dispute as more fully discussed below. For the reasons that follow, the Debtors request that this Court deny the Supplemental Motion in its entirety.

<u>Argument</u>

A.    The Contracts Are Requirements Contracts Contemplating Varying Volumes, And With No Volume Guarantees

3.    The contracts at issue contain clear and unambiguous language establishing them as requirements contracts with a single per-unit price for each part for each calendar or model year, rather than an arrangement involving volume-based pricing. (See Motion Exs. A, C at Ex. A (which specifically state, "Requirement Contract for 100%").) Specifically, the Lordstown Claims are governed by a series of purchase orders, all of which expressly incorporate Delphi's General

---

[2]    These additional claims relate to (a) a debit memo that Automodular asserts was improperly taken by DAS LLC, (b) the calculation of a currency adjustment, (c) a requested price increase for the addition of a foam pad to the assembly process, (d) a requested price adjustment for the cost of screws, (e) a requested price adjustment for a label and clip, and (f) alleged short charges on certain invoices.

Terms and Conditions[3] by reference and state that each is "a Requirement Contract for 100% unless otherwise specified."  (See Motion Ex. A.)  The Ontario Claims are governed by a long-term agreement (the "Long Term Contract") which also expressly states that it is a requirements contract. (See Motion Ex. C, Long Term Contract ¶ 1 ("Buyer agrees to purchase, approximately one hundred percent of Buyers production and service requirements").)  The Long Term Contract states that "all products will be ordered . . . and delivered . . . in accordance with written purchase orders issued by Buyer," and "Buyer's General Terms and Conditions . . . are hereby incorporated into this Contract by reference."  (See Motion Ex. C, Long Term Contract ¶ 6.)  Each of the purchase orders issued under the Long Term Contract explicitly states that it is itself a "Requirement Contract for 100% unless otherwise specified." (Supporting Declaration of Michael Bauman executed February 14, 2008, at Exhibit A.)  It is indisputable that the contracts state one fixed price for each part number at a particular time, with no provision for variation based on volume.[4]

4.      With respect to volume, the contracts here do not require the Debtors to purchase any particular number of units from Automodular.  Instead, they provide that the Debtors will purchase "approximately 100% of [its] production and service requirements."  (Motion Exs. A & C.)  With respect to price, each Contract lists a single per-unit price for each part, without any provision for alternative prices if the number of units purchased by the Debtors falls below any particular level.  (Id.)

5.      Although the Long Term Contract includes forecasts of the annual number of assemblies DAS LLC anticipates purchasing, these projections cannot be construed as creating an

---

[3]      Capitalized terms not defined herein have the meanings set forth in the Objection.

[4]      The Debtors have paid Automodular the prices stated in the purchase orders for all of the assemblies at issue. The Debtors acknowledge that some adjustment to the prices listed on the purchase orders is appropriate based on the currency exchange rate but not to the extent alleged by Automodular.  That issue is addressed more fully below.

ambiguity regarding price or volume.  (See Motion Ex. C, Long Term Contract Ex. A.)  The parties

expressly addressed the purpose and effect of those forecast volumes in section 2.7 of the General

Terms and Conditions, which the Long Term Contract incorporates by reference.  (See Motion Ex.

C, Long Term Contract ¶ 6.)  That section provides that:

> Buyer may provide Seller with estimates, forecasts or projections of its future
> anticipated volume or quantity requirement for goods.  Seller acknowledges that any
> such forecasts are provided for informational purposes only and, like any other
> forward looking projections, are based on a number of economic and business factors,
> variables and assumptions, some or all of which may change over time.  Buyer
> makes no representation, warranty, guaranty or commitment of any kind or nature,
> express or implied, regarding any such forecasts provided to Seller, including with
> respect to the accuracy or completeness of such forecasts.

(Motion Ex. C, General Terms and Conditions § 2.7.)  This provision defeats any effort to use the

volume forecasts as the basis for altering the pricing structure set forth in the contracts.  At most,

the projections provided in the Long Term Contract merely protect Automodular against the risk of

either an unreasonably disproportionate increase in orders or a bad-faith decrease in orders, and

neither situation is even alleged to exist here.

      6.     Automodular contended in the depositions taken that the various bidding

documents support its position and are part of the contracts with the Debtors.  This is just another

attempt by Automodular to ignore the terms of its own contracts with the Debtors.  Specifically, the

contracts at issue have a clear integration clause.[5]  When the parties enter into an integrated

---

[5]     The integration clause at paragraph 29 of the General Terms and Conditions provides: "This Contract, together
with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract,
constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract
and supersedes all prior oral or written representations and agreements.  This Contract may only be modified
by a written contract amendment issued by Buyer."  This Court has previously ruled in these cases, in the
context of the litigation of a claim objection, that an integration clause contained in a Delphi purchase order
should be upheld.  In that contested matter, which involved the Debtors' objection to proof of claim number
2707 filed by Laborsource 2000, Inc. ("Laborsource"), a Delphi supplier asserted a claim based on, among
other things, the allegedly early termination of a requirements contract, which contract was in the form of a
blanket purchase order issued from Delphi to Laborsource.  Laborsource relied, at least in part, on a document
issued by Delphi soliciting bids for the project, as well as Laborsource's own bid.  This Court found, however,

*(cont'd)*

agreement, the parol-evidence rule generally prohibits a party from presenting "evidence of contract negotiations" or "prior or contemporaneous agreements" to "contradict or vary . . . the terms of a contract which is clear and unambiguous." UAW-GM Human Res. Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998) (explaining parol-evidence rule); accord Wiggins v. Orhanen, Docket No. 264497, 2006 WL 3020259, at *1 (Mich. Ct. App. Oct. 24, 2006) (per curiam) (same).

7.    Moreover, Section 2.5 of the General Terms and Conditions specifically provides that "[i]f the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation" (emphasis added).  This paragraph unambiguously precludes Automodular from seeking a price adjustment based on GM's, and thus Delphi's, reduced requirements and resulting change in line speed or production schedule.

8.    Under Michigan law, the agreed governing law of these contracts, when the language in the contract is clear and unambiguous, that language "is reflective of the parties' intent as a matter of law." Quality Prods., 666 N.W.2d at 259; accord UAW-GM Human Res. Center, 579 N.W.2d at 414 ("This court does not have the right to make a different contract for the parties . . .

_____
*(cont'd from previous page)*

that the purchase order "has a clear provision providing that it sets forth the complete and final agreement between buyer and seller and that no other agreement in any way modifying any of set terms and conditions will be binding upon that buyer, that is DAS [LLC], unless made in writing and signed by buyer's authorized representative.  The agreement also incorporates specifically by reference [Delphi's] terms and conditions of January 2001 which, as the agreement states, the supplier has received a copy of.  Those terms and conditions are also in evidence and they provide for, among other things, again, an integration provision requiring that any changes to them be expressly agreed to in writing by DAS [LLC]."  (March 1, 2007 Claims Hearing transcript at 22.)  This Court then noted that, under Michigan law, the parol evidence rule "excludes the admission of parol evidence where the party's intent that a written instrument be the complete expression of their agreement is clear on the face of the agreement."  (Id. at 25.)  Based in part on the language on the face of Delphi's purchase order, this Court held that Laborsource could not rely on parole evidence to challenge the express and clear terms of Delphi's purchase order.  (Id.)

when the words used by them are clear and unambiguous and have a definitive meaning.").[6]  In

analyzing whether a contract is clear on its face, courts must "not strain to find ambiguity," Cole v.

Auto-Owners Ins. Co., 723 N.W.2d 922, 924 (Mich. Ct. App. 2006), and must avoid "creating

ambiguities where none exist," UAW-GM Human Res. Center, 579 N.W.2d at 414.  In this case, the

language of the contracts creates no ambiguities.

>       9.       Michigan courts recognize "the validity of 'requirements' contracts,"

including "in the context of service agreements."  See J & B Sausage Co. v. Dep't of Mgmt &

Budget, LC No. 04-000091-MK, 2007 WL 28409, at *3 (Mich. Ct. App. Jan. 4, 2007) (citing E.C.

Dailey Co. v. Clark Can Co., 87 N.W. 761 (Mich. 1901); Hickey v. O'Brien, 82 N.W. 241 (Mich.

1900)).[7]  Consistent with the explicit exclusion of any volume guarantee in the General Terms and

Conditions, applicable law also provides that volumes under requirements contracts are not certain

in any respect.  Indeed, in the absence of bad faith (of which there is no evidence in this case), a

buyer does not breach a requirements contract by ordering even nothing under the contract.  See,

e.g., Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 (3d Cir. 1992) (applying Michigan law,

and explaining that if buyer has "good faith reason for demanding no goods from the seller . . . the

buyer does not breach by ordering no goods"); NCC Sunday Inserts, Inc. v. World Color Press, Inc.,

759 F. Supp. 1004, 1008-09 (S.D.N.Y. 1991) ("the seller assumes the risk of all good faith

variations in the buyer's requirements") (citing Empire Gas Corp. v. American Bakeries Co., 840

---

[6]     Michigan courts recognize that "the intent of the contracting parties is best discerned by the language actually
used in the contract."  Rory v. Continental Ins. Co., 703 N.W.2d 23, 30 n.21 (Mich. 2005); accord Royal Prop.
Group, LLC v. Prime Ins. Syndicate, Inc., 706 N.W.2d 426, 432 (Mich. Ct. App. 2005) (explaining that
"language of the parties' contract is the best way to determine what the parties intended").

[7]     The Debtors provide to Automodular as bailee goods, and Automodular assembles those goods for shipment to
GM.  Because Automodular is providing services, common law rather than the Uniform Commercial Code
governs the contracts.  See J & B Sausage Co. 2007 WL 28409, at *1-2.

F.2d 1333, 1337-38 (7th Cir. 1988)).[8]  This Court has also noted in these chapter 11 cases that

Michigan law recognizes requirements contracts, even when no requirements arise, with the only

limitation being that the contracting party must act in good faith with respect to its requirements.

(See Transcript, March 1, 2007 Claims Hearing at 25.)  Courts are more concerned when the

variation from the estimate is a disproportionate increase, rather than a decrease because "if the

market price of the subject goods rises above the contract price, a buyer in a requirements contract

might be tempted to demand more goods than it truly needs in order to resell them for the better

market price.  On the other hand, exploitation, beyond bad faith, is not a concern if a buyer demands

less than a stated estimate."  Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541, 544-45

(1st Cir. 1993).

B.      A Reduction In Volume Is Not A Change In Scope Under The Contracts

10.     Despite the well-settled nature of a requirements contract, and the specific

language in the contracts precluding price adjustments based on volume reductions, Automodular

contends that a separate provision in the General Terms and Conditions entitles it to a per-piece

price increase based only on reduced volumes of goods and services provided.

11.     In particular, Automodular asserts that a reduction in volume, which results

in a change in line speed or the number of shifts required per day, constitutes a "change in scope" as

---

[8]     Cases reaching this conclusion are legion.  See, e.g., Wiseco, Inc. v. Johnson Controls, Inc., 155 Fed. Appx.
815, 817 (6th Cir. 2005) (explaining that section 2306(1) permits "good faith reductions in requirements, as
opposed to increases, even though the reductions may be highly disproportionate to stated estimates");
Brewster, 33 F.3d at 364-65 (buyer "may reduce its requirements to any amount, including zero, so long as it
does so in good faith"); Atlantic Track, 989 F.2d at 544 (section 2306(1) "permits good faith reductions that are
highly disproportionate"); Empire Gas Corp. v. Am. Bakeries Co., 840 F.2d 1333, 1338 (7th Cir. 1988) (buyer
can "reduce his requirements to zero if he was acting in good faith, even though the contract contained an
estimate of those requirements"); Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc., 636 F.2d 232, 232
(8th Cir. 1980) (per curiam) (section 2306(1) allows buyer "to order reductions which are highly
disproportionate to a stated estimate, if such reductions are done in good faith"); R.A. Weaver & Assocs., Inc.
v. Asphalt Constr., Inc., 587 F.2d 1315, 1322 (D.C. Cir. 1978) (section 2306(1) "does not preclude good faith
reductions that are highly disproportionate to . . . stated estimates").

that phrase is used in paragraph 3 of the General Terms and Conditions.[9]  Paragraph 3 of the

General Terms and Conditions, titled "Specifications, Design And Scope Changes," however,

provides: "Buyer may at any time require Seller to implement changes to the specifications or

design of the goods or the scope of any services or work covered by this Contract, including work

related to inspection, testing or quality control."  (See Motion Ex. C, General Terms and Conditions

¶ 3.)  The term "scope," as used in paragraph 3 of the General Terms and Conditions, thus refers to

and includes such incremental obligations as require additional work to complete.  The phrase

"change in scope" does not include, as Automodular claims, reductions in the volume of goods or

services provided.  (Id.)  Furthermore, the structure of the General Terms and Conditions itself

undermines Automodular's contention that a volume reduction constitutes a change in scope.

Changes in volume are addressed separately in Section 2.7 of the General Terms and Conditions,

that is, in a section other than the section entitled "Specification, Design And Scope Changes"

pursuant to which Seller acknowledges that any forecasts are for informational purposes only and

are subject to change.[10]  (Id.)  Delivery schedules are also addressed separately at paragraph 2.5 of

the General Terms and Conditions.  That section expressly states that price adjustments will not be

made based on changes to the delivery schedule resulting from a change in DAS LLC's customer's

requirements.

---

[9]      In the Motion, Automodular assert that, with respect to volume reductions, "Delphi issued notices of change in scope."  (Motion ¶¶ 4, 9.)  Automodular has acknowledged that in fact GM, not Delphi, issued the notices of "change in scope."  (See Dell Dep. 89, line 18.)  This GM notice should not be relevant to the Debtors contractual relationship with Automodular, and are not germane to the issues at hand.

[10]      Section 2.7 provides: "Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirement for goods.  Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time.  Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts."  (Motion Ex. C, General Terms and Conditions § 2.7.)

12.     Automodular's argument that a volume reduction constitutes a change in scope would convert the contracts from requirements contracts for 100% of the Debtors' requirements to contracts with volume-based pricing.  Contrary to the structure of much of the auto industry, Automodular also argues that it is entitled to a price increase because the drop in production volume increases its per-piece cost.[11]  Automodular has asserted to Delphi Thermal Systems that the reduction in line speed that results from a decrease in required volume changes labor costs.  Once again, movant's argument contradicts the plain language of the contract. Specifically, the Long Term Contract expressly provides that, with respect to the work at the Ontario facility, "[n]o price increases . . . will be made on account of . . . (ii) any increases in Seller's labor, materials, overhead, or other costs."  (Motion Ex. C, Long Term Contract ¶ 3; Objection ¶ 15.)  In sum, the contracts themselves provide the conclusive bar to Automodular's unilateral efforts to renegotiate the arm's-length agreements at issue here.

13.     To bolster its flawed legal argument, Automodular further concludes that the Debtors "admitted that General Motors issued changes in the scope of work to be performed under the contract."  (See Supplemental Motion ¶ 17.)  It is true that GM issued direction to the Debtors, including, for example, requiring that component parts be added or removed from the assembly process.  These changes would be considered changes in scope under the Delphi General Terms and Conditions and are addressed in the Secondary Claims section of this brief.  For example, adding a foam pad to the production of a CRFM could change the scope of work to be performed.  The Debtors therefore admitted that GM had issued changes in scope with respect to the goods that DAS

---

[11]     Automodular calculates the price increase it demands, not by reviewing and assessing its costs, but by multiplying the contract price by the inverse of the volume reduction (for example, if the volume requirements decreases by 10%, Automodular increased the per piece price by 10%).  This method of calculating the price increase is altogether inconsistent with the contracts.  Indeed, the contracts on their face and by their nature do not support a price adjustment based on a reduction in the volume of goods that the Debtors required.  (See Objection ¶¶ 13-15.)

LLC provides to GM.  But that is irrelevant to the volume reduction issue.  Indeed, the Debtors do

not admit that GM issued to the Debtors any change in scope document relating to volume

reductions.[12]  In fact, the Debtors received no such document from GM relating to the goods

covered by the contracts.  Moreover, the Debtors are currently unaware of any instance in which

GM has considered a volume reduction to be a change in scope.

14.    Nevertheless, Automodular asserts that it received a notice of "scope change"

directly from GM relating to the same vehicles.  But, the contracts at issue here are between DAS

LLC and Automodular, not GM and Automodular.  Any documentation regarding changes in scope

issued by GM is irrelevant and, in any case, cannot be considered here.  The General Terms and

Conditions, which are expressly incorporated by reference into each purchase order, contain an

integration clause stating that the contract "constitutes the entire agreement between [Automodular]

and [the Debtors] . . . and supersedes all prior oral or written representations and agreements."

(Motion Ex. C, General Terms and Conditions ¶ 29.)  Under Michigan law, this clause precludes

Automodular from relying on extrinsic documents to contradict the unambiguous pricing terms set

forth in the contracts.  See, e.g., UAW-GM Human Resource Center, 579 N.W.2d at 415-18 ("when

the parties include an integration clause in their written contract, it is conclusive"); Ind.

Lumbermen's Mut. Ins. Co. v. County of Luce, No. 236082, 2002 WL 1277026, at *1 (Mich. Ct.

App. June 7, 2002) (per curiam) ("The contract has an explicit integration clause; therefore, the

clause is conclusive that the contract is complete.").  Moreover, of note, Automodular made

requests to GM for price adjustments based on alleged changes in scope relating to reductions in

---

[12]    This refers to the same "Change in Scope Form" discussed in footnote 9, which Automodular received from
GM.

volume, and GM has declined thus far to change its prices and has formally rejected one request. (<u>See</u> Transcript of Deposition of Chris Dell on February 11, 2008 at 121-25.)

15.    In sum, to allow Automodular to force a price adjustment on account of a reduction in volume not only would contradict the express terms of the contracts and the law relating to requirements contracts, but it contradicts DAS LLC's ordinary course of business.  The Debtors conduct business with most of their suppliers through requirements contracts.  The Debtors' requirements frequently fluctuate based on the needs of their customers and the trends in the automobile industry.  If suppliers were able to demand price adjustments every time volumes change, as Automodular has done here, the Debtors would lose the ability to predict costs and bid accurately on future work.  Furthermore, the Debtors' own contracts with their customers are generally requirements contracts, and generally do not allow the Debtors to adjust their costs when volumes change.  Automodular's reading makes no sense under the law or the reality of the automotive parts business.

C.    The Requirements Contracts Also Preclude Automodular's
       Claim For Termination Costs

16.    Automodular also seeks $322,307.54 under the Long Term Contract for costs associated with "early termination" of the GMX 231 model in 2007.  As explained above, in a requirements contract, a good faith reduction in requirements, even to zero, is not considered an actionable breach of contract.  <u>Tigg Corp.</u>, 962 F.2d at 1126 (if buyer has "good faith reason for demanding no goods from the seller . . . the buyer does not breach by ordering no goods").  Here, the end of production of the GMX 231 model was in good faith and was solely the result of GM's termination of this vehicle line – not any nefarious desire on the Debtors' part to get out of the requirement contracts.  <u>See, e.g.</u>, <u>R.A. Weaver & Assocs., Inc. v. Asphalt Constr. Inc.</u>, 587 F.2d 1315 (D.C. Cir. 1978) (finding that change in requirements of buyer's own customers is sufficient

justification for buyer to make corresponding change in quantity of goods requested under requirements contract); TVA v. Imperial Prof'l Coatings, 599 F. Supp. 436 (E.D. Tenn. 1984) (same).  DAS LLC continued to order CRFMs from Automodular for other vehicles pursuant to the Long Term Contract.  Even if DAS LLC had not continued to order parts under the contracts, because DAS LLC's requirements for the GMX 231 were reduced due to legitimate business reasons, the Debtors complied with the terms of the contracts and thus Automodular cannot recover for costs relating to the reduction in requirements.  (See Transcript, March 1, 2007 Claims Hearing at 25.)

17.    Furthermore, despite the fact that the Long Term Contract runs through 2010, it covers multiple vehicle models, not all of which are slated to run through 2010.  In fact, the GMX 231 model was always slated to end by 2007.  (See Supporting Declaration of Greg Conley, executed February 14, 2008, ¶ 11.)  Automodular should not have formed any expectation that this particular model would be in production through 2010.  (Id.)  Automodular therefore is not entitled to fees and costs associated with the termination of the GMX 231 model, because the contract was not terminated early, but rather the vehicle model in question terminated as projected.

D.    Automodular's Secondary Claims Are Inflated And Unsubstantiated

18.    Automodular has identified Secondary Claims relating to:

(a)    a debit memo for overcharges for grease used by Automodular ($183,931.00);

(b)    a currency exchange rate adjustment pursuant to the Long Term Contract ($156,354.77);

(c)    the addition of a foam pad to the production process ($66,012.00);

(d)    adjustments for materials including screws ($10,630.00) and a label and clip ($1,131.11); and

(e)    short charges on invoices ($191.98 and $4,442.05).

13

(Supplemental Motion ¶¶ 10, 12.)  Automodular has failed to provide sufficient supporting documentation to justify any of the Secondary Claims.  Both the Long Term Contract and the General Terms and Conditions include provisions requiring Automodular to "provide detailed cost breakdown information" (Motion Ex. C, Long Term Contract ¶ 5) and "documentation of changes in [Automodular's] cost of production." (Motion Ex. C, General Terms And Conditions ¶ 3.)  The Long Term Contract requires that the "Buyer and Seller will work together to implement cost savings and productivity improvements . . . in order to reduce Seller's costs of supplying each product," and that "the Seller agrees to work cooperatively with Buyer on Supplier Development and Cost Management."  (Motion Ex. C, Long Term Contract ¶ 5.)  The Debtors consistently requested additional information and sought to work with Automodular to eliminate or offset costs incurred beyond those provided for in the contracts.  Automodular has not, however, provided the necessary support for its claims relating to the debit memo, the currency adjustment, and price adjustments for parts including the foam pad, the label and clip, and the steel screw, or the short charges as required under the contracts.  Furthermore, even it had established that it faced increased costs, Automodular has not established that it made efforts to become more efficient to offset those increased costs.

19.    <u>Debit Memo</u>. Automodular asserts that it is owed $183,931.00 for grease charges.  (<u>See</u> Supplemental Motion ¶12(e).)  Yet, Automodular admitted that it overcharged DAS LLC for the grease.  Following the parties' agreement about the amount of the overcharge, the Debtors issued a debit memo.  (<u>See</u> Conley Decl. ¶ 13.)  At the time the debit memo was issued and taken, Automodular <u>did not contest</u> the validity of the amount it owed to the Debtors.  Instead, Automodular insisted that DAS LLC not take the debit absent a price increase based on the volume reduction.  (<u>Id</u>.)  That position is baseless.  Tying the Debtors' ability to effect the debit memo to the

14

resolution of the volume reduction disputes is merely an attempt by the movant to hold the Debtors

hostage.  The General Terms and Conditions provide that "with respect to any monetary obligations

of Seller . . . to Buyer . . . Buyer may at any time, as applicable, recover, recoup or setoff such

amounts by deducting such amounts from any sums that are, or will become, owing, due or payable

to Seller or Seller's affiliates by Buyer or Buyer's affiliates."  (<u>See</u> Motion Ex. C, General Terms

and Conditions ¶ 21).  Accordingly, Automodular cannot refuse to comply with the terms of its

contract by refusing to accept the debit for the overcharges simply because it is unhappy with the

other terms of the bargain it struck.

　　　　　20.　　　<u>Currency Exchange</u>. Automodular also seeks $156,354.77 based on currency

exchange adjustments pursuant to the Long Term Contract.  (Supplemental Motion ¶ 12.)  This

amount is inflated.  Indeed, most of the amount of the currency exchange deficiency is related to the

alleged price increase due to volume reductions.  As to the balance, the Debtors cannot comprehend

Automodular's calculation of the currency exchange deficiency.  Nevertheless, the Debtors

acknowledge that the Long Term Contract calls for quarterly adjustments to the currency exchange

rate, and accordingly, the Debtors have adjusted the price reflected on the affected purchase orders

to account for the proper currency exchange rate for each quarter to date using the contract price

and materials costs.  Automodular rejected these purchase orders and insists that the currency

exchange issue be resolved only as a package deal with its claims regarding the volume reduction,

debit memo, and foam pad.  (<u>See</u> Conley Decl. ¶ 14.)  The currency exchange issue should easily be

separated out and resolved using the contract pricing and the actual cost of materials.

　　　　　21.　　　<u>Foam Pad</u>. Automodular claims $66,012.00 for the re-introduction of a foam

pad into the production process on certain assemblies.  The Debtors are willing to adjust the per

piece price of goods provided by Automodular to account for the addition of the foam pad to the

production process at a fair and reasonable cost.  The Debtors, however, worked with Automodular

to streamline production so that the addition of the foam pad does not require any additional labor.

(See Conley Decl. ¶ 15.)  Based on their review of the series of quotes provided by Automodular,

the Debtors concluded that Automodular's quotation of $.118 per piece is inflated and

unsubstantiated.  Automodular previously bid $.05 per piece, even when they needed to increase

labor to add the foam pad.  (Id. at ¶ 16)  The documents show that the addition of the foam pad

should increase the price by no more than $.05 per piece or an aggregate amount of no more than

$28,000.  Delphi's General Terms and Conditions provide that Delphi Thermal Systems "will

equitably determine any adjustment in price" relating from a change to the specifications of its

assemblies.  (Motion Ex. C, General Terms and Conditions ¶ 3.)   Because it is up to Delphi

Thermal Systems to determine the equitable price adjustment, Automodular cannot unilaterally

demand a certain price.

       22.   <u>Miscellaneous Items</u>.  Finally, Automodular has added in the Supplemental

Motion relatively small claims for a screw (in the amount of $10,630.00), short charges on invoices

(in the amounts of $191.98 and $4,442.05), and a label and clip addition (in the amount of

$1,131.11).  With respect to the steel screws, DAS LLC did not grant the price increase for the

increased cost of screws when it was requested in 2004.[13]  Automodular was purchasing the screws

on behalf of DAS LLC from the underlying supplier, and DAS LLC negotiated with the underlying

supplier to prevent it from raising prices for DAS LLC.  (See Conley Decl. ¶ 17.)  Automodular was

not entitled to pass along a cost that DAS LLC would not have incurred had it purchased the screws

---

[13]    Because this claim arose in 2004, it should have been included on Automodular's prepetition proof of claim.
This claim is therefore precluded by the Bar Date in these cases.  The parties have reached a settlement in
principle with respect to Automodular's prepetition claim, which after applying a setoff, results in Automodular
owing money to Delphi.

directly.  Moreover, Automodular has not provided evidence that it actually paid any increased price for the screws.

23.    As of the time of filing this objection, Automodular has not provided any explanation or support for the short charges on invoices that it has first asserted in paragraph 12 of the Supplemental Motion.  (See Supplemental Motion ¶ 12.)   Upon receipt of an explanation of and support for these allegations as required under the Long Term Contract and the General Terms and Conditions, the Debtors will investigate to determine if any amounts are owed Automodular.

24.    Lastly, the cost of the label and clip addition at the Ontario facility was incorporated into the purchase order prices as a change in scope on October 1, 2006.  In fact, the Debtors have only recently learned that, although the cost of the label and clip was added on to all part numbers, Automodular is incorporating a label and clip into only two of the assemblies.  The Debtors have been paying for a label and clip that is not being used on the remaining assemblies since October 1, 2006.  Therefore it is actually Automodular that owes the Debtors for the clip and label charges.[14]  (See Conley Decl. ¶ 18.)

## Conclusion

25.    The Debtors have complied with their obligations under the contracts. Automodular is not entitled to price adjustments or compensation due a change in DAS LLC's requirements, and it has failed to establish a basis for its remaining claims.[15]  For all of the reasons set forth above, the Supplemental Motion should be denied in its entirety.[16]

---

[14]    The Debtors reserve their rights in law and in equity to pursue Automodular to recover all overpayments made to Automodular and its affiliates.  (See General Terms and Conditions ¶ 21.)

[15]    The Debtors reserve their rights to respond or supplement the Supplemental Objection to the extent that Automodular introduces new docs or information in its final witness declarations.

[16]    In the Motion, Automodular seeks to compel immediate assumption or rejection of its contracts.  Since Automodular filed the Motion, the Debtors have served their notices of intent to cure pursuant to the

*(cont'd)*

17

<u>Memorandum Of Law</u>

26.    Because the legal points and authorities upon which this Supplemental

Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be

deemed satisfied.

---

*(cont'd from previous page)*

Solicitation Procedures Order.  Automodular received a notice of intent to cure those of its purchase orders that were issued prepetition and remain in effect.  Automodular therefore has received the notice it seeks in the Motion as to whether its contracts will be cured.  (<u>See</u> Motion ¶¶ 13-15.)  With respect to those contracts that are not subject to assumption, Automodular has filed prepetition claims and may assert administrative claims for any alleged postpetition defaults.  As explained in the Objection at paragraphs 5 through 10, Automodular's request to compel assumption or rejection is unnecessary and therefore should be denied.

WHEREFORE, the Debtors respectfully request that the court enter an order (i)

denying the Motion and (ii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          February 14, 2008

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP

                                    By:  _/s/ John Wm. Butler, Jr._____
                                         John Wm. Butler, Jr. (JB 4711)
                                         John K. Lyons (JL 4951)
                                         Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois  60606
                                    (312) 407-0700

                                            - and -


                                    By:  _/s/ Kayalyn A. Marafioti_____
                                         Kayalyn A. Marafioti (KM 9632)
                                         Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York  10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession