Hearing Date & Time: February 21, 2008 at 10:00 a.m.
Objection Deadline: February 19, 2008 at 4:00 p.m.

David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to Argo Partners, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF ARGO PARTNERS, INC. TO DEBTORS' EXPEDITED MOTION TO STRIKE (I) NON-CONFORMING CURE AMOUNT NOTICES AND (II) IMPROPER OBJECTIONS PURSUANT TO SOLICITATION PROCEDURES ORDER, CONFIRMATION ORDER, PLAN OF REORGANIZATION, 11 U.S.C. § 105(A), AND FED. R. BANKR. P. 9010**

Argo Partners,Inc. ("Argo"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the Debtors' Expedited Motion to Strike (I) Non-Conforming Cure Amount Notices and (II) Improper Objections Pursuant to Solicitation Procedures Order, Confirmation Order, Plan of Reorganization, 11 U.S.C. § 105(A), and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9010 (the "Motion to Strike"), and respectfully represent as follows:

## Preliminary Statement

The Motion to Strike asks this Court to eliminate timely, properly submitted cure notice election forms solely because they were submitted by Argo on behalf of claim transferors. The

Debtors, relying on a myopic reading of the Solicitation Procedures Order (as defined below) and a flawed interpretation of this Court's prior holding, as well as a misunderstanding of Bankruptcy Rule 9010, ask this Court to interfere in the relationship between Argo and its claim transferors.

Despite extensive efforts by Argo to ensure that its transferors complete cure notice election forms, operating under a severely truncated timeframe -- caused by Debtors' delay in providing Argo with sufficient information to identify all transferors -- 16 of Argo's transferors never completed cure notices. Two of those transferors gave the original cure notice forms to Argo for Argo to complete, which Argo did. As for the other 14, rather than having no cure notice submitted, and therefore defaulting to plan currency treatment (worth substantially less than cash), Argo completed cure notice election forms on behalf of its transferors. Argo had clear authority to fill out the cure notice election forms on behalf of transferors under its transfer agreements.

Pursuant to each transfer agreement, Argo is vested with a power-of-attorney by a claim transferor. That is a matter of public record because each transfer agreement was filed on the docket (with notice to the Debtors). Moreover, Argo attached to each cure notice election form a supplemental notice specifically identifying the corresponding Notice of Transfer (as defined below) and transfer agreement with the relevant transferor. Thus, the Debtors clearly had notice of each Argo transfer agreement.

Each power-of-attorney contained in Argo's transfer agreements authorizes Argo to act on behalf of a transferor on matters related to the transferred claim. Argo, as transferee, is also entitled to receive all payments on its claims, including cure payments. Thus, Argo is authorized to submit cure notice election forms on behalf of its transferors. But the Debtors wholly

disregard Argo's powers-of-attorney and never even explained why Argo's powers-of-attorney are insufficient to confer authority for Argo to execute cure notice election forms.

Rather, the Debtors assert a clear-cut rule that any cure notice election form submitted by anybody who is not a contract counterparty (as opposed to an attorney-in-fact of a contract counterparty) must be rejected. The Debtors' position is not supported by the Solicitation Procedures Order which never prohibited completion of forms by third-parties such as those with powers-of-attorney. Moreover, Bankruptcy Rule 9010, which the Debtors erroneously argue requires completion of an official bankruptcy form, really requires a form "substantially complying" with the official forms; Argo's transfer agreements with powers-of-attorney are such forms. And Debtors' argument that this Court already ruled to exclude Argo's cure notice election forms is mistaken. The Court never reviewed Argo's powers-of-attorney to determine their impact on cure election.

The Motion to Strike should be denied with respect to the Relevant Cure Notices (as defined below) and the Court should recognize the treatment elected by Argo in those notices.

## Background

### A. Argo As Transferee Of Claims, Including Cure Claims.

1. Argo holds certain trade claims against the Debtors (the "Claims"), transferred from various parties ("Transferors") through post-petition transfers ("Claims Transfers"). Each Claims Transfer is governed by a transfer of claim agreement (a "Transfer Agreement") between Argo, as the transferee, and the prior claimholder, as Transferor.

2. Throughout these bankruptcy cases, Argo has publicly filed notices of transfer pursuant to Bankruptcy Rule 3001(e) (collectively, the "Notices of Transfer"). Argo attached to each Notice of Transfer a copy of the relevant Transfer Agreement. Each Notice of Transfer was served upon the Debtors.

3. While each Transfer Agreement may vary slightly -- a result of negotiations between Argo and Transferors -- each Transfer Agreement necessarily contains a power-of-attorney provision. See Declaration of Scott Krochek in Support of Objection Of Argo Partners to Debtors' Expedited Motion to Strike (I) Non-Conforming Cure Amount Notices and (II) Improper Objections Pursuant to Solicitation Procedures Order, Confirmation Order, Plan of Reorganization, 11 U.S.C. § 105(A), and Fed. R. Bankr. P. 9010 (the "Krochek Decl."), filed contemporaneously with this Objection, at ¶ 4. In fact, empowering Argo with power-of-attorney is an absolute condition without which Argo simply will not conduct a transfer. See Id. Copies of the Transfer Agreements between Argo and the Relevant Transferors (as defined below) (the "Relevant Transfer Agreements") are attached to the Krochek Decl. at Exhs. A through P.

4. The Relevant Transfer Agreements each contain a provision substantially similar to the following provision empowering Argo with power-of-attorney (collectively, the "Power-of-Attorney Provisions"):

> Assignor hereby irrevocably appoints Assignee as its true and lawful attorney and authorizes Assignee to act in Assignor's stead, to demand, sue for, compromise and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Claim herein assigned. Assignor grants unto Assignee full authority to do all things necessary to enforce the claim and its rights thereunder pursuant to this Assignment of Claim.

(See e.g. Krochek Decl. at Exh. A) (emphasis added).

5. The language of the Power-of-Attorney Provisions could not be any clearer. Argo is the designated and rightful recipient of any payments on a Claim, including cure payments.

6. Argo is also empowered to act on behalf of the Transferor in all respects related to the transferred Claim, including electing the form of treatment of that Claim (in this instance, electing cash versus plan currency consisting of stock and discounted stock rights ("Plan

Currency")).

**B. Cure Notice Procedures.**

7. On December 10, 2007, the Court entered an Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, and Procedures For Temporary Allowance of Certain Claims, (III) Hearing Date to Consider Confirmation of Plan, (IV) Procedures for Filing Objections to Plan, (V) Solicitation Procedures for Voting on Plan, (VI) Cure Claim Procedures, (VII) Procedures for Resolving Disputes Relating to Postpetition Interest, and (VIII) Reclamation Claim Procedures (the "Solicitation Procedures Order").

8. The Solicitation Procedures Order approved, *inter alia*, two forms of notice with respect to cure claims. (See Solicitation Procedures Order at ¶¶ 43-44; Exhibits O & P). First, it approved a form notice (the "Transferor Cure Notice") containing a schedule identifying the specific contract being assumed and the Debtors' proposed cure amount for that contract (the "Cure Amount"). (See Solicitation Order at ¶ 43; Exhibit O). The Transferor Cure Notice provided an opportunity to accept or reject the Debtors' proposed Cure Amount and, if accepting that amount, to elect whether to receive cash payment or Plan Currency. The Transferor Cure Notice provided that any Transferor Cure Notice not timely submitted to the Debtors' claims agent, would be deemed an acceptance of the proposed Cure Amount and an election of Plan Currency.

9. Second, the Solicitation Procedures Order approved a form notice (the "Transferee Notice") sent to each assignee, transferee, or purchaser of a claim from a Transferor receiving a Transferor Cure Notice. (See Solicitation Procedures Order at ¶ 44; Exhibit P). Unlike the Transferor Cure Notice, the Transferee Notice was a generic form that did not identify the contract counterparty, the contract itself, or the proposed Cure Amount. (See Solicitation Procedures Order, Exhibit P). The Transferee Notice provided no information that would enable

a transferee, such as Argo, to identify the relevant Transferor, contract being assumed, or Debtors' proposed Cure Amount for that contract.

10. Upon information and belief, on or about December 21, 2007, the Debtors sent the Transferor Cure Notices to Transferors of Argo's Claims (the "Cure Notices") and the Transferee Notices to Argo.

**C. The Transferee Notices Fail to Provide Sufficient Information to Enable Argo to Determine Which Transferors Received Cure Notices.**

11. Several times in the last week of December, 2007 and in the first week of January, 2008, counsel for the Delphi Trade Committee (which includes Argo) informed Debtors' counsel that the Transferee Notices lacked the information necessary for members of the Delphi Trade Committee: to identify which Transferors received Transferor Cure Notices and to determine whether Transferors Cure Notices would impact transferee's claims. Without that information, the Delphi Trade Committee explained, it was extremely difficult to ensure that Transferors elected the treatment desired by Claim transferees.

12. On January 4, 2008 -- one week before the deadline for submitting Cure Notices -- counsel for the Debtors provided the Delphi Trade Committee with lists of contracts, cure amounts, and contract counterparties. Argo immediately began contacting Transferors regarding the Cure Notices.

13. On or about January 9, 2008, Argo Partners, Inc., ASM, Avenue Capital Management, LLC, Contrarian Capital Management, LLC, Hain Capital Group, Longacre Master Fund, Ltd., and Sierra Liquidity Fund, LLC filed a Motion for Order (I) Extending Deadline For Submission of Cure Notices (II) Approving the Cure Notices Executed by Movants With Respect to Their Claims, and (III) Directing the Debtors (A) to Reconcile Cure Claims with Corresponding Claims and (B) to make Cure Claim Distributions Directly to Movants (the "Cure

Notice Motion").

14. On January 10, 2008, one day prior to the deadline to submit Cure Notice forms, this Court denied the Cure Notice Motion. Specifically, the Court denied the request for an extension of time for Transferors to elect a cure method, and ruled, in part, that a Bankruptcy Rule 3001(e) filing is not necessarily an assignment of the underlying contract, the assumption (and cure of any defaults) of which is governed by section 365. The Court ruled that the rights under section 365, including assumption of a contract, are governed by the relationship between the Debtors and the Transferors, not the transferees.

15. However, the Court acknowledged several times that it had not seen the actual Transfer Agreements or other applicable documents, stating, "I haven't seen any of the assignments . . .", (Tr. 93:22), and "[T]here's nothing in the record to suggest that the contract party has, you know, assigned the contract or the right to do that to anyone else . . ." (Tr. 96:19-22). Nor did the Court ever address whether a third-party can sign a Transferor Cure Notice and make an election on behalf of a Transferor under the powers-of-attorney in a Transfer Agreement. Further, the Court suggested that transferees contact each of their Transferors and direct them to select the cure treatment desired by the transferees. (See Tr. 66:16-67:3). Argo continued it extensive efforts to do so.

**D. Argo's Extensive Efforts To Obtain Transferor Completed Cure Notices.**

16. In the week between January 4, 2008 and January 11, 2008 Argo took extensive efforts and went through unbounded lengths to get each of Argo's 16 Transferors to complete Transferor Cure Notices. Those efforts included calling each Transferor (often, repeatedly). (See Krochek Decl. at ¶ 21).

17. Two Transferors, Pridgeon & Clay, Inc. (proposed cure amount $122,201.19) and Hyland Machine, Co. (proposed cure amount $22,262.96) sent to Argo their original Transferor

Cure Notices asking that Argo complete those forms and submit them to the Debtors (the "Two Original Transferor Cure Notices"). Argo signed those Two Original Transferor Cure Notices and timely sent them to KCC. Copies of the Two Original Transferor Cure Notices are attached to the Krochek Decl. as Exhs. Q and R.

18. In addition, the following fourteen (14) Transferors (together with Pridgeon & Clay, Inc. and Hyland Machine, Co., the "Relevant Transferors") failed to complete and submit Transferor Cure Notices (the "Relevant Cure Notices"):

| Transferor Name | Proposed Cure Amount |
|---|---|
| Ampex Metal Products | 231,668.44 |
| Barry Industries | 18,375.00 |
| Computer Optical Products | 32,901.92 |
| Eagle Fasteners | 11,080.20 |
| Fluidyne Racing Products | 29,834.20 |
| Fulton Industries | 48,839.82 |
| Jamak Fabrication | 2,522.59 |
| Lyon Manufacturing | 6,398.00 |
| Mendiguen Y Zarraua | 9,640.96 |
| Metalbages SA | 22,262.96 |
| R&F Products | 143,806.43 |
| Soc Claudem | 5,510.97 |
| UFE | 17,077.94 |
| Actuant d/b/a Power Packer | 43,371.00 |

(See Krochek Decl. at ¶ 25). In those instances, either Argo could not reach the Transferor or the Transferor simply failed -- despite Argo's direction -- to complete and submit its Transferor Cure Notice. (See Id.)

19. Critically, none of the Relevant Transferors stated to Argo that they would not submit Cure Notices because they agreed with the Debtors' proposed Cure Amount and wanted Plan Currency over cash. (See Krochek Decl. at ¶ 26).

20. When it was clear that the Relevant Transferors would not submit their Cure

Notices, Argo decided to exercise its powers-of-attorney, pursuant to the Power-of-Attorney Provisions, and to complete the Two Original Transferor Cure Notices on behalf of Pridgeon & Clay, Inc. and Hyland Machine, Co. and to complete re-created Transferor Cure Notices on behalf of the other Relevant Transferors (the "Re-Created Transferor Cure Notices").[1] (See Krochek Decl. at ¶ 27).

21. In addition, for each Cure Notice completed and submitted by Argo, Argo attached a Supplemental Notice of Transfer of Claim Other Than for Security ("Supplemental Notice of Transfer") identifying the Notice of Transfer relating to the underlying Claim Transfer including the related docket entry number. An example of a Re-Created Transferor Cure Notice (with Supplemental Notice of Transfer) is attached to the Krochek Decl. as Exh. S.

**E. <u>Motion to Strike.</u>**

22. On or about February 11, 2008, the Debtors filed the Motion to Strike, which was noticed for a hearing on an expedited basis.[2] If the Motion to Strike is granted, Argo will be forced to receive Plan Currency instead of cash on account of the Relevant Cure Notices; a result inconsistent with Argo's right to elect treatment of its claims and that could cost Argo significant sums, as Plan Currency is worth materially less than the equivalent amount of cash. (See Krochek Decl. at ¶ 29).

23. Moreover, the distribution of Plan Currency would create further significant administrative difficulties, due to the nature of transferring stock from the Relevant Transferors to Argo and potential tax ramifications of such transfers. Additionally, the distribution of the

[1] The Re-Created Transferor Cure Notices do not prejudice the Debtors because, besides the lack of a bar-code, the Re-Created Transferor Cure Notices are identical to the Transferor Cure Notices and are sufficient to put the Debtors on notice of each of the Relevant Cure Notices.

[2] No attempt was made by the Debtors to obtain the consent of Argo to having an expedited hearing on the Motion to Strike nor was any additional notice or warning provided to Argo, notwithstanding the fact that the Debtors undoubtedly knew that Argo would be affected by and likely object to the Motion to Strike.

Discount Rights (as defined in the Plan) - part of the Plan Currency - would create timing risk to Argo, given that such Discount Rights are only exercisable for a short period of time. (See Krochek Decl. at ¶ 30).

**OBJECTION**

**A. The Court Should Enforce the Transferor Cure Notices Executed by Argo.**

**1. Argo Has Authority Under the Transfer Agreements to Execute the Transferor Cure Notices.**

24. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. In interpreting a contract under the laws of New York, the intent of the parties governs. The contract should be construed so as to give full meaning and effect to all of its provisions." In re Metz, 231 B.R. 474, 479 (E.D.N.Y. 1999) (citations omitted).

25. Pursuant to the Transfer Agreements, Argo is entitled to elect treatment of the Cure Amounts. Each Transfer Agreement contains a Power-of-Attorney Provision empowering Argo to act on behalf of the Transferor with respect to the Claim. Moreover, Argo is entitled to receive payments on account of its Claims which includes cure payments. The authority of Argo to execute the Transferor Cure Notices on behalf of the Transferors and elect cash payment logically follows from these provisions of the Transfer Agreements.

26. The Transfer Agreements reflect that the only parties whose interests are really at stake (i.e., Argo and the Relevant Transferors) are in agreement that Argo can act on behalf of Transferors. That fact is best evidenced by the fact that Pridgeon & Clay, Inc. and Hyland Machine, Co. transmitted the Two Original Transferor Cure Notices to Argo to complete. The only party raising any dispute is the Debtors, someone who does not have any interest in the Transfer Agreements. It would seem that the Debtors' motive is solely to force Argo to accept

payment of the Cure Amounts in Plan Currency, which is worth far less than the cash equivalent.

27. Critically, the Debtors have known for some time -- and certainly well before their Motion to Strike -- of the clear language of the Transfer Agreements empowering Argo to elect treatment for all aspects of its Claims. That was made a matter of public record, of which the Debtors received notice, when Argo filed its Notices of Transfer pursuant to Bankruptcy Rule 3001(e).[3] The Debtors were again reminded of the Transfer Agreements through the Supplemental Notices of Transfer attached to the Two Original Transferor Cure Notices and the Re-Created Transferor Cure Notices.

28. Ironically, the Debtors solicited Argo for plan votes with respect to the Claims (which arise from the very contracts subject to the Cure Notices). The Debtors did not solicit plan votes from the Transferors. Apparently, the Debtors acknowledge that Argo is authorized by its Transfer Agreements to vote on the plan which determined what Plan Currency is, but argue that Argo cannot elect whether to receive that Plan Currency for a portion of its Claims. Rather, the Debtors will only acknowledge Transferor Cure Notices from Transferors, who were never solicited for plan votes, and therefore less familiar with the real value of Plan Currency.

29. As such, the Court should direct the Debtors to acknowledge the Re-Created Transferor Cure Notices as well as the Two Original Transferor Cure Notices. Moreover, the Court should direct the Debtors to pay any Cure Amount treatment directly to Argo. The distribution of cash or Plan Currency to Transferors, rather than Argo, would create further significant administrative difficulties, due to, for instance, complexities of transferring stock from the Transferors to Argo and potential tax ramifications of such transfers. (See Krochek Decl. at ¶ 30). Additionally, distribution of the discounted rights portion of Plan Currency

[3] To be perfectly clear, Argo cites its Bankruptcy Rule 3001(e) filings solely to show that the Debtors were on notice of the provisions of the Transfer Agreements. For purposes of this Objection, Argo does not argue that those filings, by themselves, empowered Argo to execute Transferor Notices.

would create timing risk to Argo, given that such discount rights are only exercisable for a short period of time. (Id.).

**2. Debtors' Reliance on Bankruptcy Rule 9010 Is Unavailing.**

30. The Debtors cite to Bankruptcy Rule 9010 and seem to argue for a narrow interpretation of the form of power of attorney that would allow a transferee signature on a Transferor Cure Notice to be enforceable. The Debtors contend that because Argo did not submit an Official Form 11A General Power of Attorney or Official Form 11B Specific Power of Attorney, the Debtors can simply disregard the Power-of-Attorney Provisions in the Transfer Agreements.

31. However, Bankruptcy Rule 9010 and the cases interpreting it (including the only case cited by the Debtors) do not support the Debtors' view and, in fact, support a finding that the Transfer Agreements are sufficient to make the powers of attorney contained therein enforceable.

32. Bankruptcy Rule 9010 provides, in its pertinent part, that:

> The authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose other than the execution and filing of a proof of claim or the acceptance or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the Official Form.

Bankruptcy Rule 9010 (emphasis added). Thus, a power of attorney need not be the official form, but rather must only substantially conform to the official form.

33. Courts have interpreted this standard flexibly, enforcing powers of attorney where the power of attorney was acknowledged by "a notary rather than an agent of the corporation" and where "there was an individual rather than a corporate acknowledgment," finding these errors "harmless." In re Ben Franklin Retail Stores, Inc., 214 B.R. 852, 863 (Bankr. N.D. Ill. 1997). Even the lone case cited by the Debtors is in accord with this holding. See In re Eddie

Haggar Ltd., Inc., 190 B.R. 281, 286 (Bankr. N.D. Tex. 1995) (ruling that the failure to contain the address of the proxy receiver and the failure to have the proxy/power of attorney acknowledged or notarized were harmless errors).

34. The Transfer Agreements and the Power-of-Attorney Provisions contained therein substantially conform to the official form. Like the official forms, which contains language expressly acknowledging the grant of a power of attorney and the scope of the power of attorney, compare Official Form 11A (general power of attorney) with Official Form 11B (special power of attorney), the Power-of-Attorney Provisions contain specific language granting Argo the authority "to act in Assignor's stead, to demand, sue for, compromise and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Claim herein assigned." (See e.g., Krochek Decl. at Exh. A, at p. 2). Additionally, the Transfer Agreements reference the Debtors' bankruptcy cases and the relevant Claim. See Krochek Decl. at Exhs. A through P. Thus, the Transfer Agreements and the Power-of-Attorney Provisions contained therein substantially conform with the official forms.

35. Even if this Court were to rule that Transfer Agreements and the Power-of-Attorney Provisions contained therein do not substantially conform with the official forms, Argo has the right to submit amended or corrected powers of attorney that remedy any defects. See In re Eddie Haggar Ltd., Inc., 190 B.R. at 286 (even if original powers of attorney had not substantially conformed to the official form, Court could have relied on amended powers of attorney presented to the Court); In re Monterey Equities-Hillside, 73 B.R. 749, 754 (Bankr. N.D. Cal. 1987) (filing of amended petition containing powers of attorney that comply with Bankruptcy Rule 9010 and the official form cured any defect with originally filed petition). Thus, if this Court rules that the Transfer Agreements and the Power-of-Attorney Provisions

contained therein are not enforceable under Bankruptcy Rule 9010, then Argo should be given a reasonable opportunity to cure any defects with an amended document.

**3. Argo's Right To Submit Relevant Cure Notices On Behalf Of Transferors Has Not Yet Been Addressed By This Court.**

36. The Debtors cite to the Solicitation Procedures Order and the Court's ruling on the Cure Notice Motion as binding and determinative of the issues raised in the Motion to Strike. However, neither the Solicitation Procedures Order nor the Cure Notice Motion addressed the actual impact of the Transfer Agreements and the Power-of-Attorney Provisions.

37. The Solicitation Procedures Order only provided that the Debtors were "authorized to provide counterparties to supply contracts that the Debtors intend to assume with the Cure Amount Notice." (¶ 43). The Debtors erroneously argue that, therefore, the Solicitation Procedures Order "do[es] not contemplate or allow a party other than the Counterparty to execute and return the Cure Amount Notice." (Motion to Strike ¶ 29). But that is clearly a misreading of the Solicitation Procedures Order which does not preclude parties empowered to act on behalf of the counterparty from executing Cure Notices.

38. Moreover, whether Argo was authorized by the Transfer Agreements and the Power-of-Attorney Provisions to submit Cure Notices was never addressed by the Court's ruling on January 10, 2008, which only considered whether Bankruptcy Rule 3001(e), by itself, gave transferees the right to complete Transferor Cure Notices. In fact, this Court noted repeatedly that it did not have the Transfer Agreements before it and could not determine the rights under them. See e.g. Tr. 93:22 ("I haven't seen any of the assignments . . ."); Tr. 96:19-22 ("[T]here's nothing in the record to suggest that the contract party has, you know, assigned the contract or the right to do that to anyone else . . .").

39. Now, the Court has those Transfer Agreements before it and they clearly provide

Argo with the right to execute the Two Original Transferor Cure Notices and the Relevant Cure Notices on behalf of the Relevant Transferors.

40. Moreover, this Court, in denying the Cure Notice Motion, stated that it was concerned about Argo and the other transferees interfering with the relationship between the Transferors and the Debtors. Here, none of the Transferors contend that Argo is interfering with their relationship with the Debtors and the Transfer Agreements are clear that the Transferors voluntarily empowered Argo to elect treatment for the Claims. Moreover, the fact that Pridgeon & Clay, Inc. and Hyland Machine, Co. provided to Argo the Two Original Transferor Cure Notices demonstrated that they agree with Argo's authority to complete those forms. What is actually happening is that the Debtors are interfering in the relationship between Argo and the Transferors; a relationship that is well-documented and clearly set out in the Transfer Agreements.

41. The issues raised in this Objection are new and the Court's prior rulings in the Solicitation Procedures Order and on the Cure Notice Motion did not address the impact of Argo's Transfer Agreements on their ability to complete the Relevant Cure Notices.

**B. Alternatively, This Court Should Enforce The Two Original Transferor Notices and the Relevant Cure Notices Under Bankruptcy Code Section 105(a) To Avoid An Unjust Result.**

42. Pursuant to section 105(a), this Court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Even if the Court holds that Argo is not authorized under the Transfer Agreements to execute the Two Original Transferor Notices and the Relevant Cure Notices, the Court should exercise it equitable powers to accept Argo's election of cure treatment.

43. The treatment election portion of the Cure Notices provides creditors with the option of waiving the requirement that the Debtors provide full cash payment on their cure

claims pursuant to section 365(b)(1)(A). The Solicitation Procedures Order considers any unreturned Cure Notice to be an election to waive the cash payment requirement in favor of Plan Currency. The Relevant Transferors -- despite Argo's extensive and diligent efforts -- never submitted Cure Notices and Pridgeon & Clay, Inc. and Hyland Machine, Co. insisted that Argo complete the Two Original Transferor Cure Notices. Thus, if Argo's completed Relevant Cure Notices are stricken by the Court, there will be a void, meaning: the Relevant Transferors, through their silence, will be deemed to elect Plan Currency over cash.

44. It is undisputed that Argo owns the Claims affected by the Two Original Transferor Notices and the Relevant Cure Notices and that Argo's Claims will be reduced on account of cure payments. (See Debtors' Motion Debtors' Twenty-Seventh Omnibus Objection Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P. 3007 To Certain Claims To Implement Cure Payments And Modify General Unsecured Claims By Amount Of Cure Payments, filed February 15, 2008). Thus, whether cure payments are made in cash or Plan Currency, worth substantially less, will have a direct economic impact on Argo.

45. Because Argo has a real, undisputed interest in Claims affected by the Cure Amounts, the Court should use its equitable powers to recognize Argo's election of cash treatment. Argo should not be forced to incur losses by involuntarily accepting Plan Currency solely because Relevant Transferors failed to complete their Cure Notices in disregard of Argo's extensive efforts to ensure that all Transferors submit Cure Notices.

46. Moreover, Argo should not be forced to bear the cost and the economic risk that will arise if Transferors receive Cure Amount treatment rather than Argo. Argo, as the rightful holder of the Claims affected by the Cure Amounts and pursuant to the clear language of the Transfer Agreements, should be the recipient of Cure Amount treatment.

47. If, for some reason, the notices filed by Argo are insufficient to enforce the Transferors' and Argo's election for cash treatment, Argo respectfully requests that it have a reasonable period of time to cure any deficiencies in connection therewith.

**Waiver of Memorandum of Law**

48. Pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York, because there are no novel issues of law presented herein, Argo respectfully requests that the Court waive the requirement that Argo file a memorandum of law in support of this Objection.

**CONCLUSION**

For the foregoing reasons, Argo respectfully request that the Court deny the Motion to Strike and grant such other and further relief as is just and proper.

Dated: February 19, 2008
New York, New York

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

/s/Daniel A. Fliman
David S. Rosner (DR-4214)
Adam L. Shiff (AS-7571)
Daniel N. Zinman (DZ-7562)
Daniel A. Fliman (DF-2236)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
*Counsel to Argo Partners, Inc.*