HEARING DATE: February 21, 2008 at 10:00 a.m. (E.T.)
OBJECTION DEADLINE: February 19, 2008 by 4:00 p.m. (E.T.)

DREIER LLP
Paul Traub (PT 3752)
Ira S. Sacks (IS 2861)
Maura I. Russell (MR 1178)
Anthony B. Stumbo (AS 9374)
Kristin Lamar (KL 2681)
499 Park Avenue
New York, New York 10022
Tel. (212) 328-6100

DREIER STEIN KAHAN
    BROWNE WOODS GEORGE LLP
Alvin Galstian, Esq.
The Water Garden
1620 26th Street
6th Floor, North Tower
Santa Monica, CA 90404
Tel. (424) 202-6090

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                           :
In re:                                     :        **Chapter 11**
                                           :
**DELPHI CORPORATION, *et al.,* Debtors.** :        **Case No. 05-44481 (RDD)**
                                           :        **(Jointly Administrated)**
-------------------------------------------------------------x

**OBJECTION OF CERTAIN CONTRACT COUNTERPARTIES TO THE DEBTORS'
EXPEDITED MOTION TO STRIKE (I) NON-CONFORMING CURE AMOUNT
NOTICES AND (II) IMPROPER OBJECTIONS PURSUANT TO SOLICITATION
PROCEDURES ORDER, CONFIRMATION ORDER, PLAN OF
REORGANIZATION, 11 U.S.C. § 105(A), AND FED. R. BANKR. P. 9010**

Cyro Industries, Energy Conversion Systems Holdings LLC, EPCOS Inc., Fujikoki

America Inc., Heraeus, Inc., Intermet Corporate, Intermet Jackson, Johnson Electric North

America, Inc, Key Plastics LLC, MEMC Electronic Materials Inc., Micron Semiconductor

Products Inc., Multek Flexible Circuits Inc., Nichicon America Corp., Panasonic Automotive

Systems Company, Parlex Corporation, Phillips Semiconductors, Sagami America Ltd., Stahl

Specialty Company, Toko America Inc., and Waupaca Foundry Inc. (collectively, the

"Objecting Contract Counterparties"), by their undersigned counsel Dreier LLP ("Dreier NY")

and its affiliate Dreier Stein Kahan Browne Woods George LLP ("Dreier Santa Monica", and

together with Dreier NY, "Dreier"),[1] hereby submit this Objection (the "Objection") to Debtors'

Expedited Motion to Strike (I) Non-Conforming Cure Amount Notices and (II) Improper

Objections Pursuant to Solicitation Procedures Order, Confirmation Order, Plan of Reorganization,

11 U.S.C § 105(a) and Fed. R. of Bankr. P. 9010 (the "Motion").   In support of the Objection, the

Objecting Contract Counterparties respectfully represents as follows:

## SUMMARY

The Motion must be denied with respect to the cure amount notices (the "Cure Notices")

filed by the Objecting Contract Counterparties, totaling $15,329,909.09.  .  That result is required

by Section 365(b)(1) of the Bankruptcy Code, 11 U.S.C. § 365(B)(1).  Section 365(b)(1)

mandates the payment of the cure amount ("Cure Claims") in cash with respect to the

assumption or assumption and assignment of an executory contract.  In order to change that

paradigm, the contract counterparty must knowing, willingly and voluntarily give up its right to

receive full payment in cash.  That did not happen here.  On the contrary, the Objecting Contract

Counterparties made plain that each of them wanted to receive the Cure Amount in full in cash

as required by § 365(b)(1).

The procedures that were effectuated by the Debtors in connection with the Cure Notices,

---

[1]    The Objecting Contract Counterparties note that each of them have transferred their respective underlying pre-petition claims against the Debtors to SPCP GROUP, L.L.C., as Agent for Silver Point Capital Fund, L.P., and Silver Point Capital Offshore Fund, Ltd. ("Silver Point") pursuant to a duly executed assignment of claims, which assignment included the right to receive payment on account of the amounts due under the purchase orders that are the subject of the respective Cure Notices.   Dreier NY has acted as counsel to Silver Point in connection with the underlying assignment of claims agreements.

and the associated implementation of a "default election" whereby creditors who did not timely submit original Cure Notices would be deemed to have elected the "Plan Consideration", were an attempt on the part of the Debtors to create the **illusion** that the Objecting Contract Counterparties were being paid in full and had chosen to accept Plain Consideration instead of cash.  That is a false illusions in two respects:  (1) the Objecting Contract Counterparties did not elect to receive Plan Consideration; they elected to receive cash; and (2) the "Plan Consideration" does not constitute payment in full on account of the Cure Claims, but instead merely affords the Objecting Contract Counterparties what they would have received had the Debtors not sought to assume such executory contracts. [2]

That result is flatly contrary to § 365(b)(1).  As a result of the Debtors' purported assumption of the executory contracts, the Debtors will receive all of the benefits afforded under the executory contracts without having to pay the affected contract counterparties their respective Cure Claims in full in cash. This manipulation of § 365(b)(1)  will save the Debtors millions of dollars with respect to the Objecting Contract Counterparties alone, and likely hundreds of millions of dollars with respect to other similarly situated contract counterparties.

Each of the Objecting Contract Counterparties filed properly and timely Cure Notices and the Motion is without basis.  Indeed, the Motion with respect to these Objecting Contract Counterparties is based principally on a distorted reading and misapplication of Rule 9010 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the notion that being less than 30 minutes late in filing because of a vehicle breakdown experienced by the messenger

---

[2]    Based upon the trading prices on the Debtors senior unsecured notes on January 11, 2008, which received the same "Plan Consideration" (but for variation of interest rate and accrual period) as the Objecting Contract Counterparties will received if the Motion is granted,  the market value of Plan Consideration was approximately **37.5** cents per dollar of accrued Cure Claim.

service delivering some of the Cure Notices somehow makes the notices ineffective.

As we shall more fully demonstrate, the Motion must be overruled with respect to the Objecting Contract Counterparties.

**FACTS**

### A.    Introduction

1.    On October 8, 2005 (the "Petition Date"), thirty-nine of the above-captioned debtors (the "Debtors") filed with this Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and are operating their businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' chapter 11 cases and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a "core" proceeding under 28 U.S.C. § 157(b)(2).

### B.    Background

3.    On December 10, 2007, the Court entered the *Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, And Procedures For Temporary Allowance Of Certain Claims, (III) Hearing Date To Consider Confirmation Of Plan, (IV) Procedures For Filing Objections to Plan, (V) Solicitation Procedures For Voting On Plan, (VI) Cure Claim Procedures, (VII) Procedures For Resolving Disputes Relating To Postpetition Interest, And (VIII) Reclamation Claim Procedures* (the "Solicitation Procedures Order").

4.      The Debtors did not file a motion seeking to fix the underlying cure amount that would be due to the affected contract counterparty to the executory contracts (the majority of which are outstanding pre-petition purchase orders) that the Debtors sought to assume, but obtained Court approval of the Debtor's procedures for providing notices of Cure Amounts as set forth in paragraphs 43 through 45 on page 26 of the   in the Solicitation Procedures Order.

5.      The procedure followed in serving and noticing the service of the Cure Notices was effected to impede the exercise of rights under the Cure Notices.  For example, the *Affidavit of Service of Evan Gershbein for 1) Notice Of Cure Amount With Respect To Executory Contract To Be Assumed Or Assumed And Assigned Under Plan Of Reorganization (the "Personalized Notice"); 2) Notice To Contract Counterparty With Multiple Addresses Of Transmittal Of Cure Amount Notice; 3) Notice To Holders, Assignees, Transferees, And Purchasers Of Claims Of Cure Procedures Established Under Solicitation Procedures Order* filed by Kurtzman Carson Consultants LLC ("KCC") (Docket No. 11773) (the "Cure Notice Affidavit of Service"), states that the Cure Notices were mailed on December 21, 2007.  Although the Cure Notices were purportedly served on December 21, 2007, the Cure Notice Affidavit of Service was not filed until January 8, 2008, some eighteen (18) days AFTER the purported service of the Cure Notice, and only three (3) days BEFORE the January 11, 2008 deadline for return of the Cure Notices.

6.      The Cure Notice Affidavit of Service was the **only** publicly available document by which the Objecting Contract Counterparties could review to determine whether they were even intended to be a recipient of the underlying Cure Notices.  This afforded the confused and somewhat shell-shocked Objecting Contract Counterparties with **less than three (3) days** to: (a) confirm that they were an intended recipient of a Cure Notice; (b) track down the original Cure

Notice, as that was the only one that could be submitted; and (c) get a signed original cure notice

to California by no later than 4:00 p.m. (Pacific time) on January 11, 2008.

7.     Additional obstacles were thrown in the path of the Objecting Contract

Counterparties.    Although the Debtors clearly had in their possession specific contact

information for either the actual Objecting Contract Counterparty employee who was charged

with the responsibility for monitoring the Debtors' bankruptcy proceeding, or their respective

outside counsel who was monitoring the case on their behalf (as evidenced by either the notices

of appearance and/or proofs of claim filed by or on behalf of the Objecting Contract

Counterparties), the Debtors chose to (a) send these Cure Notices, over the peak of the holiday

season, to multi-million (and in some instances multi-billion) dollar companies, **without

addressing the Cure Notice to a particular person**, or even to the "legal department" or "credit

manager" of the Objecting Contract Counterparties, with no indication on the outside of the

mailing envelope that the enclosed document was important or time sensitive; and (b) mail many

of the Cure Notices to either P.O. Box addresses, and/or addresses where the subject Contract

Counterparties were not longer conducting business.

8.     Given the critical importance of receipt of the original Cure Notices and the

extremely condensed time line, the Debtors' service of the Cure Notices was not designed to

ensure that such Cure Notice was received by the Objecting Contract Counterparties' employees

or representatives involved with the Debtors' bankruptcy proceedings and familiar with

underlying executory contract.  Indeed, the service of the Cure Notices was designed to ensure

the opposite and the Debtors succeeded:  most, if not all, of the Objecting Contact Counterparties

did not receive the Cure Notices, or duplicate Cure Notices as provided by KCC, until

approximately January 10 and 11, 2008, and such Cure Notices were to be completed and

returned to KCC, in original form with original signatures, by 4:00 p.m. Pacific time on January 11, 2008.

9.      The Objecting Contract Counterparties cannot emphasize strongly enough for the Court the frenzy that these Cure Notices caused within the Objecting Contract Counterparties themselves, as well as in the industry of similarly-situated creditors, all over the country, and the world, as the affected contract counterparties scrambled (i) to find out if they should have gotten a Cure Notice; (ii) if so, if they did and where was it; (iii) then contact KCC and obtain a replacement Cure Notice from KCC; and (iv) then to figure out a way to get a signed original of the Cure Notice to California by the deadline.  On January 10, 2008, on behalf of itself and the Objecting Contract Counterparties, Silver Point, through Dreier NY, requested an extension of time to file the Cure Notices until January 16, 2008, but such request was denied.

10.      In an attempt to meet this compressed deadline, on January 11, 2008, given Dreier Santa Monica's close proximity to KCC's office in El Segundo, CA,[4] the following Objecting Contract Counterparties duly executed a letter authorizing Dreier to sign their respective Cure Notices on their behalf (the "Authorization Letters"): Cyro Industries, EPCOS Inc., Energy Conversion Systems Holdings LLC, Fujikoki America Inc., Johnson Electric North America, Inc., Nichicon America Corp., Panasonic Automotive Systems Company, Parlex Corporation, Phillips Semiconductors, Sagami America Ltd., and Toko America Inc. (collectively, the "Dreier Contract Counterparties").   Each of the Authorization Letters directed Dreier how to complete the respective Cure Notice (including whether the subject Dreier Contract Counterparty accepted or disputed the stated Cure Amount, and which election (cash or plan consideration) each such

---

[4]      As a point of reference, as set forth on the attached report from Mapquest.com attached hereto as Exhibit "A", the trip from Dreier Santa Monica's office to KCC's office in El Segundo, California is 14.04 miles, and should have taken approximately 17 minutes by vehicle.

Dreier Contract Counterparty elected to receive).   Each Authorization Letter was clear and unambiguous as to the authorization and direction Dreier, as their counsel for that (then) limited purpose was to act on the respective Dreier Contract Counterparties behalf, and each Authorization Letter was attached to the respective Cure Notices filed by Dreier Santa Monica on behalf of the Dreier Contract Counterparties.

11.     The Cure Notices with regard to the following Objecting Contract Counterparties were executed by Silver Point because of late receipt of the original Cure Notices and the compressed time deadlines: Intermet Corporate, Intermet Jackson, Key Plastics LLC, MEMC Electronic Materials Inc., Micron Semiconductor Products Inc., Multek Flexible Circuits Inc., Stahl Specialty Company, Waupaca Foundry Inc. (the "SPCP Contract Counterparties"), and copies of the same are attached hereto as Exhibit "B").  The SPCP Contract Counterparties had assigned their underlying claims to Silver Point.   The SPCP Contract Counterparties, understandably confused by the Cure Notice and the Solicitation Procedures Order, upon their receipt of their respective Cure Notices, immediately forwarded the original Cure Notices to Silver Point, advising Silver Point that since Silver Point owned the underlying claim, Silver Point needed to sign the Cure Notices.

12.     Given the time exigencies and pursuant to agency and power of attorney rights that were granted to Silver Point pursuant to Assignment of Claim agreements between Silver Point and the respective SPCP Contract Counterparties (collectively the "Subject Assignment Documents", copies of which are attached hereto as Exhibit "C"), Silver Point executed the Cure Notices as an authorized representative of the SPCP Contract Counterparties and delivered such Cure Notices to Dreier Santa Monica for delivery to KCC prior to the 4:00 p.m (Pacific time) deadline on January 11, 2008.

13.     The Motion seeks to strike the SPCP Contract Counterparties' Cure Notices as being improperly executed.  Although the SPCP Contract Counterparties believe that their Cure Notices were properly executed, in an abundance of caution, the respective SPCP Contract Counterparties have executed powers of attorneys attached hereto as Exhibit "D", which specifically ratify the Cure Notices as executed by Silver Point, take effect retroactively to January 11, 2008, and authorize Silver Point to take all actions with regard to the same.

14.     Taking into account both the distance between Santa Monica and El Segundo and the Friday afternoon traffic, as groups of Cure Notices became available to be delivered, Dreier Santa Monica dispatched such Cure Notices to messengers from First Legal Support Services ("First Legal") for delivery at KCC's offices in El Segundo before 4:00 p.m. (Pacific time) on January 11, 2008.  The first messenger, carrying the Cure Notices for all of the SPCP Contract Counterparties, as well as the Cure Notices of Cyro Industries, Fujikoki America, Inc., Nichicon Corp., Panasonic Automotive, Phillips Semiconductors, and Toko America, Inc., departed Dreier Santa Monica's offices at 1:40 p.m. (Pacific time) and arrived at KCC's offices at 2:51 p.m. (Pacific time).

15.     At approximately 2:15 p.m. Pacific time on January 11, 2008, Dreier Santa Monica dispatched a second messenger from First Legal to hand-deliver to KCC the original completed Cure Notices prior to 4:00 p.m. Pacific time that day for: Nichicon America Corp., EPCOS Inc., Sagami America Ltd., Parlex Corporation and Johnson Electric North America, Inc. (collectively, the "Alleged Late Arriving Contract Counterparties").

16.     As evidenced by the Declaration of Jayson Giannone attached hereto as Exhibit "E" (the "Giannone Affidavit"), the First Legal messenger carrying the Alleged Late Arriving Contract Counterparties' Cure Notices (the "Stranded Messenger") experienced a vehicle break

down enroute to KCC.   The Stranded Messenger immediately contacted First Legal and requested a replacement messenger.   First Legal dispatched a replacement messenger (the "Replacement Messenger").   The Replacement Messenger retrieved the package from the Stranded Messenger and proceeded to KCC's offices, arriving at 4:20 p.m. (Pacific time) on January 11, 2008 (per the Replacement Messengers' watch) or 4:26 p.m. Pacific time on January 11, 2008 (per KCC's records).

17.     On January 28, 2008, the Alleged Late Arriving Contract Counterparties learned that KCC was deeming the Alleged Late Arriving Contract Counterparties' Cure Notices to be untimely filed.  Immediately upon receipt of said information, Dreier contacted Neil Berger, Esq. of Togut, Segal & Segal LLP, special counsel to the Debtors, explaining the situation concerning the messenger breakdown, communicating the belief that same clearly fell within the "excusable neglect" standard, and requesting that the Debtors acknowledge that, given the circumstances, the Alleged Late Arriving Contract Counterparties Cure Notices would be deemed timely filed rather that requiring the Alleged Late Arriving Contract Counterparties file a motion.  Dreier also offered to provide the Giannone Affidavit to the Debtors if they so desired.

18.     Mr. Berger advised that he was not responsible for, or aware of, the position that the Debtors would be taking on the late filed Cure Notices, but did agree to make inquiry.  On the evening of February 6, 2008, Mr. Berger advised Dreier that the Debtors were not in a position to consent to the relief that was requested by Dreier, and that it would be necessary for the Alleged Late Arriving Contract Counterparties to file a motion with this Court. Simultaneously with the filing of this Objection, the Alleged Late Arriving Contract Counterparties have filed a Motion and Request for an Order, pursuant to Bankruptcy Rule 9006(b)(1), Extending the Time to File Certain Notices of Cure Amount with Respect to Executory

Contract to be Assumed or Assumed and Assigned Under Plan of Reorganization and deeming those Cure Notices timely filed (the "Extension Motion").

19.     On February 11, 2008, the Debtors filed the Motion objecting, *inter alia*, to the Cure Notices submitted to KCC by Dreier Santa Monica's delivery agent, First Legal, on the basis that (i) the Cure Notices were improperly executed (applicable to all Objecting Contract Counterparties' Cure Notices), (ii) one Cure Notice was non-original (applicable to ECS, as defined and described below), and/or (iii) the Cure Notices were untimely filed (applicable to the Alleged Late Arriving Contract Counterparties' Cure Notices).

## THE DEBTORS' MOTION TO STRIKE THE CURE NOTICES SHOULD BE DENIED

A.     **The Debtors Failed To Comply With Local Rules Which Are In Place To Safeguard Creditors' Due Process Rights**

20.     The Debtors have failed to comply with basic procedures laid out in the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in failing to file the Cure Notice Affidavit of Service within the three (3) day period mandated by Local Rule 9078-1.  That was a critical failure.  Had the Cure Notice Affidavit of Service been timely filed, it would have afforded the Objecting Contract Counterparties and their representatives sufficient time to confirm the identify of the recipients of the Cure Notices, make the necessary elections and forward same to KCC for processing.

21.     As set forth in the Affidavit of Benjamin Tecmire of Silver Point, annexed hereto as Exhibit "F", during the period between January 4 and January 8, 2008, Mr. Tecmire contacted KCC several times and requested a list of parties who were served with the Cure Notices.  That inquiry was made so that, to the extent the Cure Notices pertained to a claim that Silver Point acquired, Silver Point could reach out to the affected creditor to make sure that they tracked down the form and timely submitted same.  Mr. Tecmire's request was repeatedly denied and he

was told that information as to whether a Cure Notice was sent particular contract counterparty would only be divulged to that particular contract counterparty. Finally, after the close of business on the east coast on January 8, 2008, the list of contract counterparties who received Cure Notices was made public via the filing of the Cure Notice Affidavit of Service.

22.     Local Rule 9078-1 states "unless the Court orders otherwise, any party serving a pleading or other document **shall file a proof of service** by the earlier of (i) three days following the date of service, and (ii) the hearing date."[5]   The Cure Notices allegedly were served on December 21, 2007, yet the Cure Notice Affidavit of Service, which was the only publicly available way for the Objecting Contract Counterparties to verify whether they were intended recipients of the Cure Notices, was not filed until January 8, 2008. That plainly violates the mandatory requirements of Local Rule 9078-1, to the severe prejudice of the Objecting Contract Counterparties.

23.     Given that a service list/labels had to have been assembled by KCC in order to serve the Cure Notice, the filing of an affidavit of service would have required little effort on the part of the Debtors. The filing of an affidavit of service would have, without doubt, assisted creditors who were attempting to identify the recipients of the Cure Notices. It is disingenuous for the Debtors to insist on hyper-technical compliance with alleged orders and rules, and create chaos and confusion by failing to comply with the Local Rule and failing (either intentionally or unintentionally) to provide creditors with access to critical data pertaining to the Cure Notices. For that reason alone, the Motion must be denied.

---

[5]     The Objecting Contract Counterparties have reviewed the docket and the case management orders, including supplemental orders 1 through 10 (Docket Nos. 245,2883,2995,3293,3589,3629,3730, 3824, 5401, 10661 and 12487 , respectively) and none of these orders or any other order of which we are aware,  waive, extend or otherwise modify Local Rule 9078-1.

**B.**     **The Debtors' Motion Focuses Entirely On Form Rather Than the Substance of the Cure Notices**

24.     The Debtors' Motion focuses solely on hyper-technicalities and, if granted, would deprive known creditors of their due process rights.   For all of the Objecting Contract Counterparties, the Motion concentrates on the Cure Notices' form and not on the substance of each Cure Notice.  As the Second Circuit made plain in *In re Ames Dept. Stores, Inc.*, 144 Fed. Appx. 900, 901, 2005 WL 1916360 *1 (2nd Cir.  Aug. 10, 2005), "where the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form." *See Interconnect Telephone Services, Inc. v. Farren (In re Interconnect Telephone Services, Inc.)*, 54 B.R. 859, 860 (Bankr. S.D.N.Y. 1985) ("the Movants essentially ask this Court to engage in a 'hyper-technical interpretation of pleadings [that] subordinate substance to form', …, which this Court simply will not do"); *In re Rebeor*, 93 B.R. 16, 22 (Bankr. N.D.N.Y. 1988) ("The Court holds fast to the belief that the liberal rules of pleading in federal court should prevail in this equitable forum and, accordingly, discourages the sacrifice of truth and substance to form and sport").

25.     The Debtors' have not argued – because they clearly cannot – argue that by allowing any of the Cure Notices their rights would be substantively harmed.  First, as explained fully above, the Authorization Letters and the Subject Assignment Documents expressly and clearly grant Dreier and Silver Point, as applicable, the authority to execute the Cure Notices. Although the Debtors may not like the elections that were made by the Objecting Contract Counterparties, there is absolutely no question that each such election was made with the knowledge and consent of the respective Objecting Contract Counterparties.  Second, in terms of timing, the Allegedly Late Arriving Contract Counterparties Cure Notices were at most twenty

six (26) minutes late.  There is no argument that can be made that such a delay unfairly prejudices the Debtors or their other creditors.

26.    As a result, the Motion objects to the Cure Notices on hyper-technical grounds and deprives known creditors of their due process rights: the Debtors are using these technicalities to avoid paying known creditors in cash 100% of cure amounts as required under § 365(b)(1) of the Bankruptcy Code and/or denying the objection rights of creditors.  For that reason as well, the Debtors should not be permitted to evade their obligations under § 365(b)(1) and the Motion must be denied.

**C.    The Cure Notices Were Properly Executed By The Dreier Contract Counterparties and the SPCP Contract Counterparties**

27.    The Debtors seek to strike and invalidate the SPCP Contract Counterparties and the Dreier Contract Counterparties' Cure Notices as being improperly executed.  Rule 9010(c) of the Federal Rule of Bankruptcy Procedure  (the "Bankruptcy Rules") states that "[t]he authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose … shall be evidenced by a power of attorney conforming substantially to the appropriate Official Form." Fed. R. Bankr. P. 9010(c).    Such authority was granted to Silver Point under the Subject Assignment Documents.

28.    The Dreier Contract Counterparties Cure Notices were properly executed as well. The Authorization Letters are attached to all of the Dreier Contract Counterparties' Cure Notices on the respective creditors' letterhead expressly granting Dreier the authority to sign, complete and serve the Cure Notices.  Attached hereto and incorporated herein as Exhibit "G" are copies of the Cure Notices which contain the Authorization Letters for each of the Dreier Contract Counterparties.  The Authorization Letters gave Dreier explicit directions on how each Objecting

Contract Counterparty wanted the Cure Notice to be completed.  There can be no doubt as to the Objecting Contract Counterparties' intentions and directions.

29.    The Objecting Contract Counterparties submit that Dreier and/or Silver Point, as applicable, had the requisite authority, regardless of whether the Subject Assignment Documents or the Authorization Letters substantially conformed to the Official Form as proscribed by the Bankruptcy Rules. For example, under Bankruptcy Rule 9010(a), Dreier was permitted to sign the Cure Notices for its clients even without an Authorization Letter.  Rule 9010(a) expressly provides that "a debtor, creditor, equity security holder, indenture trustee, committee or other party may (1) appear in a case under the [Bankruptcy] Code and act either in the entity's own behalf or by an attorney authorized to practice in the court."   Thus, as attorneys authorized to practice in this court, Dreier had the authority to sign the Cure Notices on behalf of the Dreier Contract Counterparties without the need for separate powers of attorney.  However, in an effort to evidence the intentions of the Dreier Contract Counterparties, Dreier and the Dreier Contract Counterparties executed the Authorization Letters and attached same to the Cure Notices.

30.    In *In re Eddie Haggar Ltd., Inc.*, 190 B.R. 281 (Bankr. N.D. TX 1995), an interested party objected to proxies on the ground that the proxies did not meet the requirements under the Bankruptcy Rules.  *Id.* at 286.  The court, in overruling the objection, held that although some of the proxies were not acknowledged, notarized or did not contain addresses, the proxies substantially complied with the requirements and therefore the omissions constituted harmless error.  *Id.*

31.    Similarly, Rule 61 of the Federal Rules of Civil Procedure (the "Federal Rules") made applicable to this matter by Bankruptcy Rule 9005, provides that "the court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the

substantial rights of the parties."   Because the Cure Notices plainly evidenced each of the Objecting Contract Counterparties' intentions with regard to their respective Cure Notices, any failure to comply with Rule 9010(c) should be disregarded.   *See Ja-Lo Enterprises, Inc. v. Thoben-Hill Properties, (In re Ja-Lo Enterprises, Inc.)*, 1993 WL 766866, *2 (S.D.N.Y. April 29, 1993) ( "the harmless error rule requires one seeking to benefit by an adversary's error either to show prejudice, or to convince the tribunal that the error caused or inherently would cause sufficient harm to the judicial process itself to require sanction for that reason alone").

32.     The Debtors cannot argue that the alleged failure to comply with Rule 9010(c) unfairly prejudices the Debtors or the other creditors in the case, nor can they show that such an error harms the judicial process itself.   On the contrary, by granting the Motion, the Court would allow the Debtors to avoid their obligation to pay cure costs in full as is required by § 365(b)(1) of the Bankruptcy Code when assuming (or assuming and assigning) executory contacts or to disregard a creditors objection rights.   Thus, the Cure Notices were properly executed.

33.     Although the Objecting Contract Counterparties believe the Authorization Letters and Subject Assignment Documents were sufficient to granting Dreier and/or Silver Point, as applicable, the authority to execute the Cure Notices, in an abundance of caution, each of the Objecting Contract Counterparties have executed powers of attorneys (the "Ratification Powers of Attorney"), which specifically ratify the Cure Notices submitted on behalf of the Objecting Contract Counterparties, and take effect retroactively to January 11, 2008.   Attached hereto and incorporated herein as Exhibit "H" are copies of each of the Ratification Powers of Attorney. As the court in *Eddie Haggar*, 190 B.R. at 286, explained, "any question concerning [the proxies'] authenticity was affirmatively answered by the amended proxies."   The Objecting Contract Counterparties submit that the attached Ratification Powers of Attorneys answer any

questions regarding the validity of the Cure Notices and the Authorization Letters attached thereto

34.    For all of the foregoing reasons, the Cure Notices were properly executed and the Debtors' Motion should be denied.

**D.    The Alleged Late Arriving Contract Counterparties' Cure Notices Should Be Deemed Timely Filed**

35.    On February 19, 2008, the Alleged Late Arriving Contract Counterparties filed a motion with the Court seeking an extension of time to file the Cure Notices pursuant to Bankruptcy Rule 9006(b)(1)(2).

36.    Rule 9006(b)(1)(2) provides that "when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of the court, the court for cause shown may at any time in its discretion … (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1)(2).    The Alleged Late Arriving Contract Counterparties respectfully submit that the facts surrounding the lateness of their Cure Notices meet the excusable neglect standard as set forth in Bankruptcy Rule 9006(b)(1)(2).

37.    The Supreme Court, in *Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993), set out four factors to be considered when evaluating excusable neglect: "[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith. *Id.*    The four factors do not hold equal weight.    Rather, the Second Circuit has "focused on the third factor: 'the reason for the delay'" *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d. 355, 368 (2d Cir. 2003).

38.     Turning to the third – and most important – *Pioneer* factor, the Alleged Late Arriving Contract Counterparties submit that the delay was outside of their control and therefore supports the denial of the Debtors' Motion.  As stated above, Dreier dispatched the second First Legal messenger one hour and forty-five minutes before the deadline to submit the Cure Notices. The travel time, as shown on Exhibit "A", is approximately seventeen (17) minutes, leaving an extra one hour and twenty-eight minutes for unexpected delays.  However, after his vehicle broke down, the Stranded Messenger had to wait for the Replacement Messenger to arrive at the scene of the break down and retrieve the Cure Notices for delivery to KCC.  These circumstances clearly demonstrate that the delay was outside of the Alleged Late Arriving Contract Counterparties' reasonable control.

39.     The circumstances here are comparable to those in *Ontario Die Company v. Bruno Machinery Corp. (In re Bruno Machinery Corp.)*, 2007 WL 2071747 (N.D.N.Y. July 12, 2007), where the court found that, although the attorney had other alternatives to filing a proof of claim electronically by ECF, the failure to timely file a proof of claim because counsel was unable to do so electronically constituted excusable neglect and thus extended the time to file a proof of claim. *Id.* at *4.

40.     Here, the Objecting Contract Counterparties had no options when trying to meet the deadlines and satisfy requirements imposed by the Solicitation Procedures Order: the Cure Notices had to be delivered to KCC in original form containing original signatures.  Therefore, the short delay in filing was not within the reasonable control of the Objecting Contract Counterparties and therefore the third *Pioneer* factor favors allowing the extension.

41.     The first *Pioneer* factor favors an extension as well.  The twenty (20) to twenty-six (26) minute delay in filing the Alleged Late Arriving Contract Counterparties' Cure Notices,

does not prejudice the Debtors.  This delay was minimal and the Debtors do not (and cannot) argue that any steps were taken during those twenty (20) to twenty-six (26) minutes in reliance upon the fact that the Alleged Late Arriving Contract Counterparties had not submitted their Cure Notices by the 4:00 pm (Pacific time) deadline.

42.     With respect to the second *Pioneer* factor, the length of the delay plainly was *de minimis* and in no way affects any of the Debtors' judicial proceedings.  Again, we emphasize that the delay was, at most, twenty-six (26) minutes.  Thus, the second *Pioneer* factor clearly supports the request for an extension.

43.     Finally, the fourth *Pioneer* factor also weighs in favor of allowing the extension. The Alleged Late Arriving Contract Counterparties acted in good faith by allowing time for reasonable delays that could occur in delivering the Cure Notices to KCC on time.  The delay was purely due to acts outside of the Alleged Late Arriving Contract Counterparties' reasonable control and not due to bad faith.

44.     Therefore, the Alleged Late Arriving Contract Counterparties have established excusable neglect.  The extension motion should be granted, the Alleged Late Arriving Contract Counterparties Cure Notices should be deemed timely filed and the Motion should be denied.

**E.     The Dreier Contract Counterparties' Cure Notices Filed On Non-Original Forms Should Be Deemed Effective**

45.     According to the Motion, the Cure Notice of Energy Conversion Systems Holdings LLC ("ECS"), allegedly was filed on a non-original form.  The Cure Notice Affidavit of Service reflects that two (2) Cure Notices were sent to ECS and to its affiliate ECS Magnet Engineering GMBH ("ECSM").  The first Cure Notice, for purchase orders aggregating approximately $82,000, was sent to ECS in Winowa, MS, and the second Cure Notice for purchase orders aggregating approximately $60,000 was sent to, ECSM at an address in

Denmark that ECSM has not occupied since 2006. Neither ECS, nor ECSM received either of the original Cure Notices, but ECS received the "copy" Cure Notice for ECSM.  When ECS requested replacement Cure Notices from KCC for both ECS and ECSM, KCC only forwarded the Cure Notice for ECSM, which was received from KCC.  Therefore, given the exigencies, ECS and ECSM, through Dreier, submitted an original Cure Notice for ECSM and a "copy" Cure Notice for ECS, as this was the only form available.  Accordingly, it would be unjust to reject ECS' Cure Notice on the grounds that the same was not an original, as said original did not arrive prior to the January 11, 2008 deadline.  Further, ECS will execute any original Cure Notices as the Debtors provide to ratify the "copy" Cure Notice.

**F.    The Heraeus, Inc. ("Heraeus") Cure Notice Was Properly Executed**

46.    The Debtors also seek to strike and invalidate the Cure Notice filed on behalf of Heraeus, Inc. (the "Heraeus Cure Notice").  The Heraeus Cure Notice was executed and filed by counsel to Heraeus, Inc, McDermott Will & Emery LLP ("MWE").  Prior to the filing of the Heraeus Cure Notice, Heraeus transferred all of its right, title and interest in and to the claims that relate to the Heraeus Cure Notice to Liquidity Solutions, Inc. ("LSI").  LSI subsequently transferred said interest in such claims to Silver Point via a duly executed Assignment of Claim Agreement.  Heraeus hereby reasserts the legal points regarding execution of documents by attorneys and attorneys-in-fact as set forth herein, thus rendering the Heraeus Cure Notice as executed by MWE proper and enforceable.

47.    Although Heraeus believes that MWE was granted the proper authority to execute the Heraeus Cure Notice, in an abundance of caution, Heraeus has executed a power of attorney (the "Heraeus Power of Attorney"), which specifically ratifies the Heraeus Cure Notice submitted, and takes effect retroactively to January 11, 2008.  Attached hereto and incorporated

herein as Exhibit "I" are copies the Heraeus Cure Notice, the Heraeus Power of Attorney, and the related Assignment of Claim documents.  As the court in *Eddie Haggar*, 190 B.R. at 286, explained, "any question concerning [the proxies'] authenticity was affirmatively answered by the amended proxies," Heraeus submits that the attached Heraeus Power of Attorney answers any questions regarding the validity of the Heraeus Cure Notice.

### G.    The Motion Is A Subterfuge To Avoid Making Cure Payments

48.    The Motion, as it relates to the Objecting Contract Counterparties should be denied in its entirety.  The Objecting Contract Counterparties urge the Court to see the true – and improper – objectives of the Motion.

49.    As this Court is aware, there is significant disagreement amongst the various constituencies involved in the Debtors' cases with regard to the true value of the "Plan Consideration" being provided to various creditor constituencies under the confirmed First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (the "Plan")[6].   This disagreement was evident for many months prior to the confirmation of the Plan and it should come as no surprise to the Court or the Debtors that the Objecting Contract Counterparties all elected to receive the Cash Payment provided for under the Cure Notice if there was no objection to the Cure Amount.

50.    The Debtors' attempts to strike the Objecting Contract Counterparties Cure Notices or Objection to the Cure Notices, as applicable, has the resulting effect of displacing the affirmative, unambiguous and explicit elections of the Objecting Contract Counterparties for Cash Payments with the default option of payment of the "Plan Consideration".  To allow the

---

[6]    As previously set forth in footnote 2, based upon the trading prices on the Debtors senior unsecured notes on January 11, 2008, which received the same "Plan Consideration" (but for variation of interest rate and accrual period) as the Objecting Contract Counterparties will received if the Motion is granted,  the market value of Plan Consideration was approximately **37.5** cents per dollar of accrued Cure Claim.

Motion to succeed would deprive contract counterparties of their rights regarding cure payments relating to contracts assumed under the provisions of Bankruptcy Code Section 365.

51.    Section 365 of the Bankruptcy Code provides that **"if there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-(A) cures, or provides adequate assurance that the trustee will promptly cure, such default…"**

52.    Given the current fair market value of the stock that comprises the Plan Consideration, payment of the Plan Consideration to the Objecting Contract Counterparties in the alleged satisfaction of the obligations relating to the Cure Notices does not result in payment in full of the cure amounts.    Forcing the Objecting Contract Counterparties to accept Plan Consideration would result in the Debtors receiving the full benefits of the assumed contracts, while the Objecting Contract Counterparties would be obligated to fulfill the underlying Purchase Orders that are being assumed for less than less than full payment.    With regard to the assumption of executory contracts, it is established in the Southern District of New York that a debtor must cure a "default by payment or adequate assurance that this sum will be paid [and] [s]uch assurance must be in the form of cash or collateral that is nonspeculative." *In re Bronx-Westchester Mack Corp.*, 4 B.R. 730, 734 (Bankr. S.D.N.Y. 1980).    Therefore, the Objecting Contract Counterparties possess the definitive right to receive, and the Debtors are required to make, payment with regard to the Cure Notices in 100% cash, and not speculative Debtor securities.

53.    The Objecting Contract Counterparties submit that the entire process surrounding the timing of the service and deadline for the submission of the Cure Notices and the obstacles and roadblocks that were implemented by the Debtors were designed to make it extremely

difficult, if not impossible, for the Objecting Contract Counterparties to actually receive payment, in full, of any outstanding cure amount as required by § 365(b)(1). The Debtors have leveraged themselves into a position whereby they are using this Court's orders to trample the contracting parties' due process rights and to manipulate parties' rights under §365(b)(1). The Motion is a ruse by the Debtors to avoid having to pay cash pursuant to the Cure Notices, and/or to deny proper objection rights of the Objecting Contract Counterparties to the Cure Notices.

## MEMORANDUM OF LAW

54. As the legal points and authorities upon which this Objection relies are incorporated herein, the Objecting Contract Counterparties respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

**WHEREFORE,** the Objecting Contract Counterparties request that this Court enter an order (i) denying the Debtors' Motion as the same relates to the Objecting Contract Counterparties; and (ii) granting the Objecting Contract Counterparties such other and further relief as is just and proper.

Dated: February 19, 2008                    Respectfully Submitted,
       New York, New York

                                             **DREIER LLP**

                                             /s/  *Maura I. Russell*
                                             Paul Traub (PT 3752)
                                             Ira S. Sacks (IS 2861)
                                             Maura I. Russell (MR 1178)
                                             Anthony B. Stumbo (AS 9374)
                                             Kristin Lamar (KL 2681)
                                             499 Park Avenue
                                             New York, New York 10022
                                             Tel. (212) 328-6100

-and-

**DREIER STEIN KAHAN
  BROWNE WOODS GEORGE LLP**
Alvin Galstian, Esq.
The Water Garden
1620 26th Street
6th Floor, North Tower
Santa Monica, CA 90404
Tel. (424) 202-6090