HEARING DATE: March 19, 2008 at 10:00 a.m. (E.T.)
RESPONSE DEADLINE: March 12, 2008 by 4:00 p.m. (E.T.)

DREIER LLP
Paul Traub (PT 3752)
Ira S. Sacks (IS 2861)
Maura I. Russell (MR 1178)
Anthony B. Stumbo (AS 9374)
Kristin Lamar (KL 2681)
499 Park Avenue
New York, New York 10022
Tel. (212) 328-6100

DREIER STEIN KAHAN
    BROWNE WOODS GEORGE LLP
Alvin Galstian, Esq.
The Water Garden
1620 26th Street
6th Floor, North Tower
Santa Monica, CA 90404
Tel. (424) 202-6090

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DELPHI CORPORATION, *et al.*,

Debtors.

Chapter 11

Case No. 05-44481 (RDD)

(Jointly Administered)

MOTION AND REQUEST FOR AN ORDER OF CERTAIN CONTRACT
COUNTERPARTIES EXTENDING THE TIME TO FILE CERTAIN NOTICES OF
CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACT TO BE ASSUMED
OR ASSUMED AND ASSIGNED UNDER PLAN OF REORGANIZATION

Nichicon America Corp., EPCOS Inc., Sagami America Ltd., Parlex Corporation and

{00330150.DOC;}

1

Johnson Electric North America, Inc. (the "Contract Counterparties"), by their undersigned counsel Dreier LLP ("Dreier NY") and its affiliate Dreier Stein Kahan Browne Woods George LLP ("Dreier Santa Monica", and together with Dreier NY, "Dreier"), hereby submit this motion (the "Motion") and Request for an Order, pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1) (the "Bankruptcy Rules"), Extending the Time to File Certain Notices of Cure Amount with Respect to Executory Contract to be Assumed or Assumed and Assigned Under Plan of Reorganization (the "Cure Notices") and deeming those Cure Notices timely filed. In support of the Motion, the Contract Counterparties respectfully represents as follows:

## FACTS

### A.  Introduction

1.  The Contract Counterparties submit this Motion with regard to the Cure Notices that were completed and filed, pursuant to valid powers of attorney attached thereto, by Dreier on January 11, 2008, on behalf of the Contract Counterparties. Copies of the six (6) executed and completed Cure Notices in question are attached hereto as Exhibits "A-1" through "A-6" (collectively, the "Subject Cure Notices").

2.  On October 8, 2005 (the "Petition Date"), thirty-nine of the above-captioned debtors (the "Debtors") filed with this Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating their businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtors' chapter 11 cases and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a "core" proceeding under 28 U.S.C. § 157(b)(2).

**B.    Background**

4.    Pursuant to the *Order Approving (I) Disclosure Statement, (II) Record Date, Voting Deadline, And Procedures For Temporary Allowance Of Certain Claims, (III) Hearing Date To Consider Confirmation Of Plan, (IV) Procedures For Filing Objections to Plan, (V) Solicitation Procedures For Voting On Plan, (VI) Cure Claim Procedures, (VII) Procedures For Resolving Disputes Relating To Postpetition Interest, And (VIII) Reclamation Claim Procedures*, dated as of December 10, 2007 (the "Solicitation Procedures Order"), the Debtors established certain procedures with regard to the Cure Notices, including, but not limited to, delivery of the Subject Cure Notices to the Contract Counterparties.

5.    According to *the Affidavit of Service of Evan Gershbein for 1) Notice Of Cure Amount With Respect To Executory Contract To Be Assumed Or Assumed And Assigned Under Plan Of Reorganization (the "Personalized Notice"); 2) Notice To Contract Counterparty With Multiple Addresses Of Transmittal Of Cure Amount Notice; 3) Notice To Holders, Assignees, Transferees, And Purchasers Of Claims Of Cure Procedures Established Under Solicitation Procedures Order* filed by Kurtzman Carson Consultants LLC ("KCC") on January 8, 2008 (*Docket No. 11773*) (the "Cure Notice Affidavit of Service"), the Cure Notices were mailed on or about December 21, 2007.

6.    The Cure Notice Affidavit of Service was the **only** publicly available document by which the Contract Counterparties could review to determine whether they were even intended to be a recipient of the underlying Cure Notices. This afforded the confused and

{00330150.DOC;}    3

somewhat shell-shocked Contract Counterparties with **less than three (3) days** to: (a) confirm that they were an intended recipient of a Cure Notice; (b) track down the original Cure Notice, as that was the only one that could be submitted; and (c) get a signed original Cure Notice to California by no later than 4:00 p.m. (Pacific time) on January 11, 2008.

7.      Additional obstacles were thrown in the path of the Contract Counterparties. Although the Debtors clearly had in their possession specific contact information for either the actual Contract Counterparty employee who was charged with the responsibility for monitoring the Debtors' bankruptcy proceeding, or their respective outside counsel who was monitoring the case on their behalf (as evidenced by either the notices of appearance and/or proofs of claim filed by or on behalf of the Contract Counterparties), the Debtors chose to (a) send these Cure Notices, over the peak of the holiday season, to multi-million (and in some instances multi-billion) dollar companies, **without addressing the Cure Notice to a particular person**, or even to the "legal department" or "credit manager" of the Contract Counterparties, with no indication on the outside of the mailing envelope that the enclosed document was important or time sensitive; and (b) mail many of the Cure Notices to either P.O. Box addresses, and/or addresses where the subject Contract Counterparties were not longer conducting business.

8.      Given the critical importance of receipt of the original Cure Notices and the extremely condensed time line, the Debtors' service of the Cure Notices was not designed to ensure that such Cure Notice was received by the Contract Counterparties' employees or representatives involved with the Debtors' bankruptcy proceedings and familiar with underlying executory contract. Indeed, the service of the Cure Notices was designed to ensure the opposite and the Debtors succeeded: most, if not all, of the Contact Counterparties did not receive the Cure Notices, or duplicate Cure Notices as provided by KCC, until approximately January 10

and 11, 2008, and such Cure Notices were to be completed and returned to KCC, in original form with original signatures, by 4:00 p.m. Pacific time on January 11, 2008.

9.  The Contract Counterparties cannot emphasize strongly enough for the Court the frenzy that the Cure Notices caused within the Contract Counterparties themselves, as well as in the industry of similarly-situated creditors, all over the country, and the world, as the affected contract counterparties scrambled (i) to find out if they should have gotten a Cure Notice; (ii) if so, if they did and where was it; (iii) then contact KCC and obtain a replacement Cure Notice from KCC; and (iv) then to figure out a way to get a signed original of the Cure Notice to California by the deadline. On January 10, 2008, Dreier NY requested an extension of time to file the Cure Notices until January 16, 2008 on behalf of the Contract Counterparties and other third parties, but such request was denied.

10. In an attempt to meet this compressed deadline, on January 11, 2008, given Dreier Santa Monica's close proximity to KCC's office in El Segundo, CA,[1] the Contract Counterparties duly executed a letter authorizing Dreier to sign their respective Subject Cure Notices on their behalf (the "Authorization Letters"). Each of the Authorization Letters directed Dreier how to complete the respective Subject Cure Notice (including whether the subject Contract Counterparty accepted or disputed the stated Cure Amount, and which election (cash or plan consideration) each such Dreier Contract Counterparty elected to receive). Each Authorization Letter was clear and unambiguous as to the authorization and direction Dreier, as their counsel for that (then) limited purpose was to act on the respective Contract Counterparties

---

[1]   As a point of reference, as set forth on the attached report from Mapquest.com attached hereto as Exhibit "B", the trip from Dreier Santa Monica's office to KCC's office in El Segundo, California is 14.04 miles, and should have taken approximately 17 minutes by vehicle.

{00330150.DOC;}                                                5

behalf, and each Authorization Letter was attached to the respective Subject Cure Notices filed by Dreier Santa Monica on behalf of the Dreier Contract Counterparties.

11.  At approximately 2:15 p.m. Pacific time on January 11, 2008, Dreier Santa Monica dispatched a messenger from First Legal Support Services ("First Legal") to hand-deliver to KCC the original completed Subject Cure Notices prior to 4:00 p.m. Pacific time that day.

12.  As evidenced by the Declaration of Jayson Giannone attached hereto as Exhibit "C" (the "Giannone Affidavit"), the First Legal messenger carrying the Subject Cure Notices (the "Stranded Messenger") experienced a vehicle break down enroute to KCC. The Stranded Messenger immediately contacted First Legal and requested a replacement messenger. First Legal dispatched a replacement messenger (the "Replacement Messenger"). The Replacement Messenger retrieved the package from the Stranded Messenger and proceeded to KCC's offices, arriving at 4:20 p.m. (Pacific time) on January 11, 2008 (per the Replacement Messengers' watch) or 4:26 p.m. Pacific time on January 11, 2008 (per KCC's records).

13.  On January 28, 2008, the Contract Counterparties learned that KCC was deeming the Contract Counterparties' Subject Cure Notices to be untimely filed. Immediately upon receipt of said information, Dreier contacted Neil Berger, Esq. of Togut, Segal & Segal LLP, special counsel to the Debtors, explaining the situation concerning the messenger breakdown, communicating the belief that same clearly fell within the "excusable neglect" standard, and requesting that the Debtors acknowledge that, given the circumstances, the Contract Counterparties Subject Cure Notices would be deemed timely filed rather that requiring the Contract Counterparties file a motion. Dreier also offered to provide the Giannone Affidavit to the Debtors if they so desired. Mr. Berger advised that he was not responsible for, or aware of,

the position that the Debtors would be taking on the Subject Cure Notices, but did agree to make inquiry. On the evening of February 6, 2008, Mr. Berger advised Dreier that the Debtors were not in a position to consent to the relief that was requested by Dreier, and that it would be necessary for the Contract Counterparties to file a motion with this Court.

### REQUESTED RELIEF

14.   By this Motion, the Contract Counterparties are requesting that the Court enter an order, pursuant to Bankruptcy Rule 9006(b)(1) extending the deadline to file the Subject Cure Notices and deeming the Subject Cure Notices timely filed.

### BASIS FOR RELIEF

15.   Rule 9006(b)(1)(2) provides that "when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of the court, the court for cause shown may at any time in its discretion … (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1)(2).   The Contract Counterparties respectfully submit that the facts surrounding the lateness of their Subject Cure Notices meet the excusable neglect standard as set forth in Bankruptcy Rule 9006(b)(1)(2).

16.   The Supreme Court, in *Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993), set out four factors to be considered when evaluating excusable neglect: "[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith. *Id.* The four factors do not hold equal weight. Rather, the Second Circuit has "focused on the

third factor: 'the reason for the delay'" *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d. 355, 368 (2d Cir. 2003).

17. Turning to the third – and most important – *Pioneer* factor, the Contract Counterparties submit that the delay was outside of their control and therefore supports the Court's entry of an order granting an extension to file the Subject Cure Notices and deeming the Subject Cure Notices to be timely filed. As stated above, Dreier dispatched the First Legal messenger one hour and forty-five minutes before the deadline to submit the Cure Notices. The travel time, as shown on Exhibit "B", is approximately seventeen (17) minutes, leaving an extra one hour and twenty-eight minutes for unexpected delays. However, after his vehicle broke down, the Stranded Messenger had to wait for the Replacement Messenger to arrive at the scene of the break down and retrieve the Subject Cure Notices for delivery to KCC. These circumstances clearly demonstrate that the delay was outside of the Contract Counterparties' reasonable control.

18. The circumstances here are comparable to those in *Ontario Die Company v. Bruno Machinery Corp. (In re Bruno Machinery Corp.)*, 2007 WL 2071747 (N.D.N.Y. July 12, 2007), where the court found that, although the attorney had other alternatives to filing a proof of claim electronically by ECF, the failure to timely file a proof of claim because counsel was unable to do so electronically constituted excusable neglect and thus extended the time to file a proof of claim. *Id.* at *4.

19. Here, the Contract Counterparties had no options when trying to meet the deadlines and satisfy requirements imposed by the Solicitation Procedures Order: the Cure Notices had to be delivered to KCC in original form containing original signatures. Therefore,

the short delay in filing was not within the reasonable control of the Contract Counterparties and therefore the third *Pioneer* factor favors allowing the extension.

20. The first *Pioneer* factor favors an extension as well. The twenty (20) to twenty-six (26) minute delay in filing the Contract Counterparties' Subject Cure Notices, does not prejudice the Debtors. This delay was minimal and the Debtors do not (and cannot) argue that any steps were taken during those twenty (20) to twenty-six (26) minutes in reliance upon the fact that the Contract Counterparties had not submitted the Subject Cure Notices by the 4:00 pm (Pacific time) deadline.

21. With respect to the second *Pioneer* factor, the length of the delay plainly was *de minimis* and in no way affects any of the Debtors' judicial proceedings. Again, we emphasize that the delay was, at most, twenty-six (26) minutes. Thus, the second *Pioneer* factor clearly supports the request for an extension.

22. Finally, the fourth *Pioneer* factor also weighs in favor of allowing the extension. The Contract Counterparties acted in good faith by allowing time for reasonable delays that could occur in delivering the Subject Cure Notices to KCC on time. The delay was purely due to acts outside of the Contract Counterparties' reasonable control and not due to bad faith.

23. Therefore, the Contract Counterparties have established excusable neglect. The Motion should be granted, the Contract Counterparties' Subject Cure Notices should be deemed timely filed.

### NOTICE

24. Notice of this Motion has been provided to: (a) Delphi Corporation, (b) counsel for the Debtors, (c) counsel for the agent under the postpetition credit facility, (d) counsel for the official committee of unsecured creditors, (e) counsel for the official committee of equity

security holders, (f) counsel for A-D Acquisition Holdings, LLC c/o Appaloosa Management L.P., (g) counsel for Harbinger Del-Auto Investment Company, Ltd., and (h) the Office of the United States Trustee for the Southern District of New York. Dreier submits that no other or further notice need be provided.

## MEMORANDUM OF LAW

25. As the legal points and authorities upon which the Motion relies are incorporated herein, the Contract Counterparties respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

**WHEREFORE,** the Contract Counterparties request that this Court enter an order in substantially the form as attached hereto as Exhibit "D" (i) granting the Motion; and (ii) granting the Contract Counterparties such other and further relief as is just and proper.

Dated: February 19, 2008          Respectfully Submitted,
New York, New York

                                          **DREIER LLP**

/s/ Maura I. Russell
Paul Traub (PT 3752)
Ira S. Sacks (IS 2861)
Maura I. Russell (MR 1178)
Anthony B. Stumbo (AS 9374)
Kristin Lamar (KL 2681)
499 Park Avenue
New York, New York 10022
Tel. (212) 328-6100

-and-

**DREIER STEIN KAHAN
BROWNE WOODS GEORGE LLP**

Alvin Galstian, Esq.
The Water Garden
1620 26th Street
6th Floor, North Tower
Santa Monica, CA 90404
Tel. (424) 202-6090