SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY IN SUPPORT OF EXPEDITED MOTION TO STRIKE (I)
NON-CONFORMING CURE AMOUNT NOTICES AND (II) IMPROPER OBJECTIONS
PURSUANT TO SOLICITATION PROCEDURES ORDER, CONFIRMATION ORDER,
PLAN OF REORGANIZATION, 11 U.S.C. § 105(a),  AND FED. R. BANKR. P. 9010

("DEBTORS' OMNIBUS REPLY IN SUPPORT OF
MOTION TO STRIKE NON-CONFORMING CURE NOTICES")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Reply In Support Of The Debtors' Expedited Motion To Strike (i) Non-Conforming Cure Amount Notices And (ii) Improper Objections Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 (Docket No. 12615) (the "Motion"),[1] and respectfully represent as follows:

<u>Preliminary Statement</u>

1.    The Motion seeks entry of an order striking certain non-conforming Cure Amount Notices that were returned to the Debtors.  Despite requesting entry of an order striking over 440 non-conforming Cure Amount Notices, the Debtors received only 30 objections (the "Objections") to the Motion.  As of Wednesday, February 20, 2008 at 10:00 a.m. (prevailing Eastern time), 4 of these Objections have been withdrawn or otherwise resolved.

2.    The Debtors seek the relief requested in the Motion in order so that they can satisfy certain conditions to the effectiveness of the Debtors' Plan.  In particular, pursuant to the Plan, Discount Rights (as defined therein) are to be distributed on a pro rata basis to holders of allowed claims in certain classes pursuant to a Discount Rights Offering (as defined therein).  <u>See</u> Plan Article 7.15; <u>see also</u> Motion For Order Estimating Or Provisionally Allowing Certain Unreconciled Claims Solely For The Purposes Of Administering The Discount Rights Offering (Docket No. 11606).  Prior to

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

the Discount Rights Offering, the Debtors must inform the rights agent of the number of

Discount Rights to be distributed to each holder of allowed claims.  Moreover, to the

extent a cure payment is to be satisfied in Plan currency, the Debtor must so inform the

rights agent prior to the Discount Rights Offering so that the applicable counterparty will

be able to participate in the Discount Rights Offering.  To calculate the number of

Discount Rights to be distributed to each holder of an allowed claim in connection with

the Discount Rights Offering, which calculation must be done before the Discount Rights

Offering can commence, the Debtors must know in advance the aggregate and per holder

amount of allowed claims to be satisfied by the Discount Rights Offering, including

whether any cure payments are to be satisfied in plan currency.  Because the Discount

Rights Offering will commence as soon as reasonably practicable, any further delay in

this process would be to the detriment of the Debtors' other creditors that are entitled to

participate in the rights offering, as well as to the effectiveness of the Plan.[2]

        3.      In addition, certain Objections allege insufficient time for

discovery, yet the Solicitation Procedures Order, the related notices served, and the actual

notices returned are the key document necessary to make a ruling on this Motion.  Of

course, the objecting parties know what documents they did (or did not, as they case may

be) return to the Debtors with respect to the Cure Amount Notices.  The Debtors will

submit a copy of all such documents to the Court and any requesting objector[3] prior to the

---

[2]     While certain Objectors allege that the Motion is a play to force parties to take securities instead of cash, this is imply not the case.  The Debtors need finality on this issue to calculate the share count and the Court's order on this Motion will do just that.  In addition, each Objection has some defect at issue with its Cure Amount Notice.  The Debtors cannot unilaterally deviate from the Court's order and are merely prosecuting this Motion to enforce the Court's order.

[3]     For certain documents, a confidentiality agreement must be executed.

hearing with respect to the Motion.  An Objector's request for an exception to the

Solicitation Procedures Order is a matter to be determined by the Court; this is not an

issue requiring extensive document reviews or other forms of discovery.  In other words,

the expedited nature of the Motion does not create any undue harm or prejudice to these

parties.

   4.  The issues presented by this Motion and the objections thereto

have already been considered by this Court.  Indeed, in early January, the ad hoc trade

committee requested that the Debtors make a number of exceptions to the Solicitation

Procedures Order to enable their committee members, among other things, to execute

cure amount notices and to direct the Debtors to make cure payments directly to the

committee members instead of paying the underlying counterparty.  Because the Debtors

were unwilling to accept directions that were inconsistent with the Solicitation

Procedures Order, the ad hoc trade committee filed an expedited motion for, among other

things, relief from the Solicitation Procedures Order.  On January 10, 2008, the Court

denied the relief requested, because, among other reasons, the ad hoc trade committee's

request was contrary to the procedures set forth in the Solicitation Procedures Order and

such requests would interfere with the Debtors' relationships with their trade suppliers

that are important to the Debtors' ongoing businesses.[4]  Indeed, as set forth below, the

Objectors are attempting to end run the procedures set forth in the Solicitation Procedures

---

[4]  The relevant portion of the January 10, 2008 hearing transcript is attached hereto as <u>Exhibit 1.</u>

Order, which have already been tested and upheld by the Court at the January 10, 2008 hearing.  There simply is no basis to grant a <u>third</u> bite at the apple.[5]

5.    The Debtors filed the Motion because of, among other things, the need to maintain the integrity of Court-approved process which was designed to protect the Debtors and their suppliers.  Among other things, the Debtors wanted to avoid third-party interference with the contractual relationships with their suppliers and vendors who are important to the Debtors' ongoing business.  In addition, the Debtors could not accept requests by claims traders' requests which, if accommodated, would impose significant administrative burden upon the Debtors.

6.    Specifically, Delphi's accounts payable system is programmed and in place to ensure correct and timely payment to the Debtors' vendors and provides comfort and predictability to the Debtors' supply base, which is critical to the Debtors' ongoing business relationships with their suppliers.   Attempting to manually override the accounts payable system would require programming to tailor one payment out of thousands so that a party not in Delphi's accounts payable system would  receive a cure payment.  Doing so would be burdensome to the Debtors and would likely lead to errors, including, without limitation, inadvertent payment to both the counterparty and the claims trader for cure related to the same contract and possibly future missed payments to the counterparty.

---

[5]    The Objectors' efforts are comparable to a motion for reconsideration.  But, none of the Objectors has even attempted to (nor could they) satisfy the applicable motion for reconsideration standard.

7.      The Debtors endeavor to sustain high-quality long-term relationships with their suppliers.  This has been achieved through the careful, direct maintenance of individual relationships in which the Debtors have attempted to work one-on-one with suppliers to enhance and strengthen their association.  If the Debtors take direction from a third party rather than a supplier, then the Debtors risk disrupting their relationships with suppliers.  One missed payment to a supplier-which could happen if the Debtors try to manually override the accounts payable system-could do harm to the relationship with a supplier and even alter the favorable terms upon which they supply product or threaten the continued supply of that product.

8.      Given these interdependent concerns, the Debtors requested the Court to approve detailed procedures, including requiring counterparties to sign and return the original forms served upon such counterparties.  These procedures were approved by the Court on December 10, 2007 (see Solicitation Procedures Order (Docket No. 12359)).[6]  As an added precaution, the Debtors imprinted unique bar codes upon the original cure amount notices to identify any potential tampering and prevent the submission of self-made forms that could be returned by interested parties.

9.      Such precautions proved to be warranted because, among other things, certain purchasers of claims executed and returned self-made forms designed to

---

[6]      In compliance with the Solicitation Procedures Order, and as fully set forth in the affidavit of service by Kurtzman Carson Consultants LLC ("KCC") (Docket No. 117733), KCC caused the Cure Amount Notices to be served on December 21, 2007 by first class prepaid U.S. mail.  The Motion stated that the number of Duplicate Notices served by KCC was 1,030 and that the number of Transferee Notices was 10,765.  Unfortunately, the figures set forth in the Motion were inadvertently transposed.  The actual number of Duplicate Notices served by KCC was 10,765 and the actual number of Transferee Notices was 1,030.

appear identical in form to the Court-approved notices served by the Debtors.  Certain of

these self-made forms were returned by purchasers of claims even though no cure

amounts were owed to the purported assignors.  Absent the unique bar codes imprinted

on each original cure amount notice, the Debtors' job of sorting executed and returned

cure amount notices would have been immeasurably more difficult.

10.    The Objections and the Debtors' responses thereto, by Objector,

including resolution of the withdrawn or otherwise resolved Objections, are summarized

in the chart attached hereto as Exhibit 2.  Attached hereto as Exhibit 3 is a chart

summarizing the Objections by the nature of the Objection.  This Reply, therefore, does

not repeat each of the Debtors' responses to the Objections contained in Exhibits 2 and 3,

but instead highlights certain of the Objections.

Response To Objections

A.    General Responses

11.    The Objectors Cannot Satisfy The Reconsideration Standard.

Without discussing the standards for reconsideration under Rules 9023 or 9024 of the

Bankruptcy Rules, the Objectors, in essence, seek reconsideration of the Solicitation

Procedures Order, as well as of the Court's denial of the ad hoc trade committee's motion

for relief from the Solicitation Procedures Order.[7]  Even if any of the Objectors had

---

[7]    It is particularly surprising that Argo Partners, Inc., ASM Capital L.P. and ASM Capital II L.P.,
and Contrarian Funds LLC—members of the ad hoc trade committee—have violated the
Solicitation Procedures Order and then objected to the Debtors' Motion in light of the Court's
January 10, 2008 ruling.  Such Objectors' contention that the Motion does not address the same
issues as the Court's January 10, 2008 ruling is simply without merit.

complied with Local Bankruptcy Rule 9023-1(a) and filed a timely motion for
reconsideration, which they did not, none of the Objectors can satisfy the governing
standard for granting a reconsideration motion.

12.     "The standard for granting . . . a motion [for reconsideration] is strict,
and reconsideration will generally be denied unless the moving party can point to
controlling decisions or data that the court overlooked-matters, in other words, that might
reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX
Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).  "A motion to reconsider should not be
granted where the moving party seeks solely to relitigate an issue already decided." Id.
Such "limitations are designed to ensure finality and prevent the [motion for
reconsideration] from becoming a vehicle by which a losing party may examine a
decision 'and then plug the gaps of the lost motion with additional matters." Id. (quoting
Carolco Pictures, Inc. v. Sirota, 700 F.Supp. 169, 170 (S.D.N.Y. 1988)).  Accordingly,
the movant must show that the court overlooked controlling decisions or factual matters
"that might materially have influenced its earlier decision." Anglo American Ins. Group,
P.L.C. v. CalFed Inc., 940 F.Supp. 554, 557 (S.D.N.Y. 1996) (quoting Morser v. AT & T
Info. Sys., 715 F.Supp. 516, 517 (S.D.N.Y. 1989). Alternatively, "the movant must
demonstrate the need to correct a clear error or prevent manifest injustice." Griffin Indus.,
Inc. v. Petrojam, Ltd., 72 F.Supp.2d 365, 368 (S.D.N.Y. 1999).  There simply are no new
decisions or facts warranting reconsideration of the Solicitation Procedures Order.  Nor is
there even in a scintilla of evidence suggesting any sort of manifest injustice.

13.     The Debtors Have A Duty To Comply With Solicitation Procedures
Order And Preserve Estate Assets.  To the extent certain Objectors contend that the

Debtors' enforcement of the Court's Solicitation Procedures Orders is "hyper technical," such contention is simply mistaken. As set forth above, the Debtors requested that the Court approve the procedures set forth in the Court's Solicitation Procedures Order with respect to the assumption of ongoing prepetition Material Supply Agreements for significant reasons, including prevention of third-party interference with contractual relationships and the inevitable administrative nightmare of attempting to pay parties other than counterparties. To the extent a party had an issue with the procedures, such party should have objected at the hearing with respect to the Disclosure Statement. The Debtors are charged with implementing a final order. The Debtors cannot not unilaterally grant exceptions to the Court's Solicitation Procedures Order. Accord, e.g., In re Urbanco, Inc., 122 B.R. 513, 521 (W.D. Mich. 1991) (observing that bankruptcy court can enforce its order by a number of means, including but not limited to, invocation of civil contempt under 11 U.S.C. § 105(a), conversion under 11 U.S.C. § 1112(b), and appointment of trustee under § 1104 who could commence adversary proceeding for breach of debtor's fiduciary duties for failure to comply with court orders); see also 11 U.S.C. § 1142 (requiring debtor to carry out the plan and comply with any orders of the court). Moreover, even if the Debtors could make exceptions, granting exceptions with respect to the cure procedures set forth in the Solicitation Procedure would encourage others to seek similar relief, undermining the integrity and finality of the entire cure procedure process.[8]

---

[8]    To the extent an Objector argues that the Debtors will not suffer prejudice by granting exceptions to the Solicitation Procedures Order, and/or that the Objector will be prejudiced by the Debtors' Motion, such arguments are similarly misplaced. Indeed, even though, as set forth above, the Debtors will suffer harm absent the grant of the Motion (i.e., the potential delay of the Discount Rights Offering, the administrative nightmare of attempting to manually override the Debtors'

*(cont'd)*

14.    In addition, as set forth above, the administrative burden of
accepting instructions to pay third parties, rather than paying the supplier, would require
the Debtors to embark upon a burdensome process which includes, among other things,
manually overriding addresses and payment parties.  Not only are missed payments a
significant concern, but the process would present significant risk of double payment and
overpayment.  This substantial risk of error contravenes the Debtors' duty to preserve
estate assets.  Indeed, numerous courts in the Second Circuit have acknowledged the duty
of trustees or debtors-in-possession to preserve assets of the estate.  See, e.g., In re First
Central Financial Corp., 377 F.3d 209, 216-17 (2d Cir. 2004) (noting duty of trustee to
preserve assets of estate); In re Bennett Funding Group, Inc., 255 B.R. 616, 630-31
(N.D.N.Y. 2000) (noting Bankruptcy Code's broad policy of protecting assets of estate);
In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998) (noting
significant role of bankruptcy court in protecting assets of estate to maximize  benefit of
creditors).  The procedures approved by the Court with respect to cure of defaults
appropriately provides for the minimization of error.

15.    Numerous Objectors have attempted to challenge the accuracy
and/or reliability of the Debtors' process with respect to the Cure Amount Notices and the
related Motion.  These challenges lack merit.  KCC's careful preparation and
transmission of Cure Amount Notices, the procedure for receiving and recording

_____

(cont'd from previous page)

current accounts payable system, and the undermining of the integrity of the entire cure procedure
process), the Debtors have no burden to show prejudice where, as here, it is simply requesting that
the Court enforce a prior order of the Court.  What is more, the fact that certain parties failed to
comply with the Solicitation Procedures Order and the Bankruptcy Rules, and now complain
about the self-inflicted harm created by such failure, should not be grounds for granting
dispensation from the Solicitation Procedures Order or the Bankruptcy Rules.

elections contained in the returned Cure Amount Notices, and the process by which the Debtors became aware of and reviewed the Non-Conforming Notices were designed to be simple and reliable. To the extent the Debtors received new information subsequent to filing the Motion demonstrating compliance with the Solicitation Procedures Order with respect to a Cure Amount Notice, the Debtors are withdrawing the Motion with respect to such notices, as set forth below, and disclosed on Exhibit 4 hereto.

16. <u>None Of The Third-Party Objectors Is An Assignee Under Section 365 Of The Bankruptcy Code</u>. Many of the Objectors argue that they are the rightful owners of the cure payments, and, therefore, the appropriate parties to return the Cure Amount Notice. As already argued by the Debtors, and ruled upon by the Court at the January 10, 2008 hearing, this is not so. Specifically, given the rigorous validation and safety requirements for parts purchased by the Debtors, paragraph 24 of the Debtors' standard terms and conditions, not surprisingly, prevents suppliers from assigning contractual rights and obligations to other parties without Debtors' consent. Because of Debtors' general contractual prohibition against assignment of rights and obligations (and unless a specific contract was negotiated to provide otherwise as an exception to the Debtors' Standard Terms and Conditions), the third parties purchased, at most, accounts receivable from contract counterparties under applicable Michigan law[9]. See MICH. COMP. LAWS ANN. § 44.2210 (2008); Ferndale Laboratories, Inc. v. Schwarz Pharma, Inc.,

---

[9]    Michigan law applies because the cure amount relates to contracts, specifically purchase orders, integrating Delphi's standard Terms and Conditions. Article 26 of the Terms and Conditions provides that the law of the Buyer's state (Michigan) controls. See General Terms And Conditions § 26. The Michigan Supreme Court has repeatedly emphasized that "a fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written." Rory v. Continental Insurance Company, 473 Mich. 457, 468, 703 N.W. 2d 23 (2005) (emphasis in original) (citations omitted).

123 F.App'x 641, 647-48 (6th Cir. 2005) (Uniform Commercial Code provision adopted

by Michigan favoring assignability of contract rights is inapplicable if parties include

anti-assignment provision in contract). However, prohibitions on the assignment of a

contract may be overridden if a party wants to assign account receivables:

> (4) Except as otherwise provided in subsection (5) and sections 2A303 and 9407, and subject to subsection (8), **a term in an agreement between an account debtor and an assignor** or in a promissory note **is ineffective to the extent that it does 1 or more of the following**:
>
> (a) Prohibits, restricts, or **requires the consent of the account debtor** or person obligated on the promissory note **to the assignment or transfer of**, or the creation, attachment, perfection, or enforcement of a security interest in, **the account**, chattel paper, payment intangible, or promissory note.

MICH. COMP. LAWS ANN. § 440.9406 (2008) (emphasis added).

17.    The right to collect on an account receivable <u>claim</u>, however, is not

the same as a right to cure of a contractual <u>default</u> under section 365 of the Bankruptcy

Code. It is well settled that under section 365 of the Bankruptcy Code, a debtor must

cure outstanding defaults prior to assumption of a prepetition executory contract. 11

U.S.C. § 365(b)(1)(A). At least one commentator has written precisely on point

concluding that absent some arrangement among the parties (debtor, claimant, and claims

purchaser), the debtor should pay the cure amount to the contract party, not to the claims

purchaser:

> Parties to executory contracts and unexpired leases often file "protective" rejection-damages claims, anticipating that the debtor may reject the contract. Claims traders who buy these protective rejection damage claims may have a rude awakening if the debtor assumes the contract or lease under the reorganization plan. Pursuant to § 365(b)(1)(A) of the Code, a debtor must cure pre-petition defaults before it can assume a contract or lease. **A cure is not a payment on account of a rejection-damages claim; it is a payment to a contract counterparty to facilitate the debtor's ongoing performance under the contract. Under those**

**circumstances, there is no rejection-damages claim, and the debtor can successfully move to disallow any rejection-damage claim. Thus, absent some arrangement among the three parties, the debtor will pay the cure amount to the contract counterparty, not the purchaser of the rejection-damages claim.** The problem becomes even stickier if the plan provides for full satisfaction of unsecured claims, with pre-petition interest. Naturally, the purchaser would hope to receive a distribution on account of the rejection-damages claim in accordance with the plan treatment. It is incumbent upon the purchaser to contract around this potential problem. To the extent possible, purchasers should identify and avoid buying protective claims. If the claimant believes that the debtor will likely reject a contract, creating a rejection-damages claim, the purchaser may require the claimant to compel the debtor to assume or reject the executory contract or lease. In connection with any agreed rejection, the parties could fix the rejection-damages claim and agree to releases of chapter 5 actions.

Carrianne Basler and Michelle Campbell, <u>Savvy Claims Purchasers Must Avoid Pitfalls</u>, 25-5 ABIJ 26 (June 2006) (emphasis added). Accordingly, here, even if any of the claims purchasers could demonstrate that they acquired any rights or influence on cure matters through their transfer agreements, the claims purchasers failed to obtain the Debtors' acknowledgment and agreement. Accordingly, the Debtors' obligation to cure a monetary default through a cure payment runs to the party to the executory contract and, likewise, any decision with respect to such cure appropriately resides with the contract counterparty.

18.    This conclusion is further buttressed by the treatment of a right to cure under section 1126 of the Bankruptcy Code. Under this provision, a right to a cure payment is not a "claim" entitling a creditor to vote on a plan of reorganization. <u>See Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture</u> (In re Greystone III Joint Venture), 995 F.2d 1274, 1281 (5th Cir. 1991) (when debtor expressly assumes lease, lessee has no claim under section 1126 and is not entitled to vote on plan); <u>see also</u>

Boston Post Road L.P. v. Federal Deposit Insurance Corp. (In re Boston Post Road L.P.),

21 F.3d 477, 484 (2d Cir. 1994) (citing Greystone III for same proposition).

        19.     The Court specifically addressed this issue at the January 10, 2008

hearing, stating that the relief sought by the ad hoc trade committee was contrary to the

Solicitation Procedures Order and

> would depend on [the Court] overlooking the primary relationship, here, in
> fact the only relationship here, that the debtor has, which is with its
> contract counterpart[ies], who are obviously ongoing trade suppliers and
> vendees who are important to the debtor's ongoing business. And under
> section 365, they are the ones who really need to deal with the cure notice,
> because it [is] not just a cure notice. It [is] an assumption notice that lays
> out and reminds the contract parties-counterparties, of their rights under
> section 365, which are not limited to insisting on cure.

Transcript, pp. 98-99. In other words, the Objectors are attempting to undo the prior

Solicitation Procedures Order and ask the Court to referee the rights and obligations

between claims traders and the contract counterparties under transfer agreements. The

Court should not be used as a vehicle to improve a claims traders' position vis-a-vis

contract counterparties under the transfer agreements. Section 365 of the Bankruptcy

Code, and not the whim of an assignee of an account receivable, dictates the entity which

cure payments under an executory contract should be made. The Court's Solicitation

Procedures Order appropriately so held, and the Court upheld such order at the January

10, 2008 hearing. This issue should not be revisited now.

B.     Specific Procedural Grounds To Strike Non-Conforming Cure Amount Notices

        20.     Cure Amount Notices Executed By Third Parties Or Returned

Unexecuted (a.k.a., Improperly Executed Notices). As set forth in the Motion, paragraph

43 of the Solicitation Procedures Order provides that the Debtors were "authorized to

provide counterparties to supply contracts that the Debtors intend to assume with the

14

Cure Amount Notice."  See Solicitation Procedures Order ¶ 43.  (Emphasis added.)  The

Solicitation Procedures Order further required that "[p]arties wishing to object to the

assumption of their contracts under the terms set forth in the Cure Amount Notice shall

be required to return the Cure Amount Notice in accordance with the instructions

provided therein."  See Solicitation Procedures Order ¶ 43.  (Emphasis added.)  These

procedures do not contemplate or allow a party other than the counterparty to execute and

return the Cure Amount Notice.[10]

       21.      Even though the Debtors submit that the Solicitation Procedures

Order, the Court's prior ruling at the January 10, 2008 hearing, and section 365 of the

Bankruptcy Code each prohibits a party other than the counterparty to execute and return

the Cure Amount Notice, to the extent Bankruptcy Rule 9010(a) applies, the Objectors

failed to comply with the requirements of this Rule within the timeframe mandated in the

Solicitation Procedures Order.[11]

---

[10]    The Court specifically addressed this issue at the January 10, 2008 hearing during which the ad hoc trade committee sought authority, among other things, for claims traders to file the Cure Amount Notice on behalf of their transferors.  See Transcript, p.76.  In response, the Court stated that the relief sought by the ad hoc trade committee was contrary to the Solicitation Procedures Order and further opined that "this is not an instance where the debtor is just being difficult about a deadline or a procedure and trying to prevent the real party in interest from having its wishes set forth; but rather would have the debtor change the relationship with its contract parties and get in the middle of [the claims trader's] relationship with them."  See Transcript, pp. 98-99.

[11]    Bankruptcy Rule 9010(a) provides that a party may act in a case before the Bankruptcy Court only in the following ways: personally, through an attorney, or, in limited circumstances, through an authorized third party.  Fed. R. Bankr. P. 9010(a).  If a party does not act personally or through an attorney, however,  Bankruptcy Rule 9010(c) establishes parameters by which that party may act through a third party.  This Rule requires that the authority of the third party to act "be evidenced by a power of attorney conforming substantially to the appropriate Official Form." Fed. R. Bankr. P. 9010(c).  In addition, the Rule mandates that the "execution of any such power of attorney shall be acknowledged before" an appropriate official.  Fed. R. Bankr. P. 9010(c).  Therefore, subject to the limited exceptions set forth in this Bankruptcy Rule, a party may act only personally, through an attorney, or through an agent evidencing a valid power of attorney.

22.     Ironically, certain Objectors contend that Bankruptcy Rule 9010(a) applies and that they are in compliance with the Rule, and certain Objectors contend that Bankruptcy Rule 9010(a) does not apply to the Cure Amount Notices for a variety of reasons.  The Debtors do not take any position with respect to the applicability of Bankruptcy Rule 9010(a) because none of the Objectors complied with the requirements of the Rule within the timeframe mandated in the Solicitation Procedures Order.  Set forth on Exhibit 5 hereto is a chart showing which of the Objectors submitted Cure Amount Notices that are the subject of this Motion on the grounds that the returned notices were improperly executed, despite attempts to use a power of attorney.  The chart, illustrates the specific Bankruptcy Rule 9010 deficiency with respect to the each of the Improperly Executed Notices.

23.     None of the Objectors has presented any justification to deviate from the requirements of the Solicitation Procedures Order, the notices, and the Bankruptcy Rules.  Indeed, as the Court recognized at the January 10, 2008 hearing, ownership of a claim is distinct from being the proper recipient of a cure payment and does not entitle a claims trader to interfere with the Debtors' relationship with its supplier. Accordingly, the Improperly Executed Notices should not be recognized.

24.     Non-Original And Self-Made Cure Amount Notices.  As set forth above, the Debtors designed the procedures for assumption of ongoing prepetition Material Supply Agreements, which includes the printing of a unique bar code for each Cure Amount Notice.  This security measure was implemented to facilitate the identification of multiple Cure Amount Notices with respect to a single agreement.  This measure was necessary because, among other things, the Debtors issued multiple notices

to a counterparty at various addresses to ensure appropriate notice.  In direct contravention of these procedures, the third parties listed on Schedule 3 to the Motion either (i) failed to return either an executed original Cure Amount Notice and instead returned a self-made form or (ii) returned a Duplicate Notice.  Because certain parties were likely looking for loopholes in the Debtors' procedures, such parties submitted up to three executed Cure Amount Notices—each slightly different that the other, all on account of the same contract(s).[12]  This result has created a significant amount of extra work for the Debtors because many more notices must be reviewed and considered.  Had the Solicitation Procedures Order been followed, this process would have been very efficient and effective.

25.    With respect to the watermarked-Duplicate Notices that are otherwise in full compliance with the cure procedures listed on Schedule 3 to the Motion, in light of the Debtors' duty to comply with the Solicitation Procedures Order and the importance of maintaining the integrity of the entire cure process, the Debtors moved to strike this subset of Cure Amount Notices because it is not for the Debtors to grant unilateral exceptions to the Solicitation Procedures Order.

26.    Late Filed Cure Amount Notices.  Certain Objectors attempt to convince the Court to arbitrarily deviate from the Court-approved deadline with respect to the return of the Cure Amount Notices.  Indeed, the Debtors would be prejudiced by the inevitable opening of the floodgates if an exception were granted with respect to the

---

[12]    Attached hereto as Exhibit 6 is an example of how claims traders submitted multiple invalid Cure Amount Notices for the same purchase order, illustrating the inherent confusion created by self-made and duplicate Cure Amount Notices.

deadline.  See, e.g., In re Enron Corp., 419 F. 3d 115, 132 (2d Cir. 2005); In re Kmart

Corp., 381 F.3d 709, 714 (7th Cir. 2004) (noting that if court allowed all similar late-filed

claims, "Kmart could easily find itself faced with a mountain of such claims"); Enron

Creditors Recovery Corp., __ B.R. __, 2007 WL 1705653, at *10-11 (Bankr. S.D.N.Y.

June 13, 2007) ("It can be presumed in a case of this size with tens of thousands of filed

claims, there are other similarly-situated potential claimants. . . . Any deluge of motions

seeking similar relief would prejudice the Debtors' reorganization process." (citation

omitted)); In re Dana Corp. 2007 WL 1577763, *6 (Bankr. S.D.N.Y. 2007) ("the

floodgates argument is a viable one").  Allowing late-filers to prevail may inspire many

other claimants to submit or file late cure notices or other late documents in this case.

Granting any exceptions in this instance may also call into question the Debtors' efforts to

enforce the Court approved cure procedure.

27.    The Supreme Court held that excusable neglect is the failure to

comply with a filing deadline because of negligence.  Pioneer Investment Services Co. v.

Brunswick Associates Limited Partnership, 507 U.S. 380, 394 (1993).  In examining

whether a creditor's failure to file a claim by the bar date constituted excusable neglect,

the Supreme Court found that the factors include "(1) the danger of prejudice to the

debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the

reason for the delay, including whether it was within the reasonable control of the movant,

and (4) whether the movant acted in good faith." Id. at 395.  The Second Circuit has held

the most important factor is the reason for the delay, including whether it was within the

reasonable control of the movant.  The Second Circuit has taken a "hard line" when

applying the Pioneer factors and has held that the equities will rarely favor a party who

18

does not follow the clear dictates of a court rule or order.  <u>See</u> February 14, 2007 Hearing

Transcript at 27 (Docket No. 7446).  Furthermore, "where the rule is entirely clear, the

Second Circuit continues to expect that a party claiming excusable neglect will, in

ordinary course, lose under the Pioneer test."  <u>Id.</u>  To satisfy <u>Pioneer</u>, the Objectors must

meet their burden and provide evidence of circumstances justifying the extraordinary

relief it sought under the "excusable neglect" standard.

> 28.    Absent appropriate circumstances, granting the relief requested by

the late-filing Objectors would excuse such Objectors from their obligation to timely

submit a Cure Amount Notice and would encourage others to seek similar relief with

respect to the cure procedures, undermining the integrity and finality of the entire cure

procedure process.  The resulting uncertainty would greatly prejudice the Debtors, their

estates, and their creditors.

> 29.    <u>Receipt Of Cure Amount Notices</u>.  Certain Objectors contend that

they did not receive the Cure Amount Notice.  Courts, however, uniformly presume that

an addressee receives a properly mailed item when the sender presents proof that it is

properly addressed, stamped, and deposited in the mail.  <u>See</u> <u>In re R.H. Macy Co., Inc.</u>,

161 B.R. 355 (Bankr. S.D.N.Y. 1993), citing <u>Hagner v. United States</u>, 285 U.S. 427, 430

(1932) ("the rule is well settled that proof that a letter properly directed was placed in a

post office creates a presumption that it reached its destination in usual time and was

actually received by the person to whom it was addressed");  <u>see</u> <u>also</u> <u>Leon v. Murphy</u>,

988 F.2d 303, 309 (2d Cir. 1993) (finding, under New York law, that when a sender

"presents proof of office procedure followed in a regular course of business, and these

procedures establish that the required notice has been properly addressed and mailed," a

presumption of receipt arises); In re Alexander's Inc., 176 B.R. 715, 721 (Bankr.

S.D.N.Y. 1995) (stating, "It is black letter law that once an item is properly mailed, the

law presumes that it is received by the addressee.")

    30.    "While the presumption is a rebuttable one, it is a very strong

presumption and can only be rebutted by specific facts and not by invoking another

presumption and not by a mere affidavit to the contrary." In re Dana Corp., No. 06-

10354, 2007 WL 1577763, *3 (Bankr. S.D.N.Y. 2007); see Hagner v. U.S., 285 U.S. at

430 ("proof that a letter properly directed was placed in a post office creates a

presumption that it reached its destination in usual time and was actually received by the

person to whom it was addressed"); In re Mid-Miami Diagnostics, L.L.P., 195 B.R. 20,

22 -23 (Bankr. S.D.N.Y. 1996) ("A creditor's denial of receipt, standing alone, does not

rebut the presumption that the mail was received, but merely creates a question of fact.").

"The presumption can only be overcome by clear and convincing evidence that the

mailing was not, in fact, accomplished." Moody v. Bucknum, 951 F.2d 204, 207 (9th Cir.

1991).

    31.    KCC's affidavit of service with respect to the Cure Amount Notice

(Docket No. 117733) confirms that the Cure Amount Notices were served upon the

Objectors. The Objectors bear the burden of rebutting the presumption of receipt of the

Cure Amount Notice and the sworn testimony of KCC that the notices were properly

mailed. See, e.g., Alexander's Inc., 176 B.R. at 71. The Objectors have not, and cannot,

rebut this strong presumption. Accordingly, the Debtors respectfully request that these

Objections be overruled.

## Modifications To Proposed Order

32.    The Debtors have revised the proposed Order to include a schedule showing that the Debtors are withdrawing the Motion with respect to certain Cure Amount Notices based upon new information received by the Debtors subsequent to filing the Motion.  The bases for such withdrawal include, among other things, that counterparties were in the midst of negotiating cure and assumption and assignment in connection with an active divestiture, and that certain counterparties provided documentation showing that their counsel executed and submitted the Cure Amount Notice on their behalf.  Attached hereto as Exhibit 4 is a chart summarizing the relevant Cure Amount Notices and the Debtors' bases for withdrawing the Motion with respect to each such notice.  In addition, attached hereto as Exhibit 7 is the proposed Order marked to show changes to the text of the order against the version originally filed with the Court.

33.    Winzeler Stamping Co. Eft ("Winzeler"), a counterparty, was included on Exhibit D to the Motion, which is the index listing all of the parties subject to the Motion, but was inadvertently omitted from Schedule 6 to the Motion.  Accordingly, the Debtors have revised Schedule 6 to include Winzeler.  With the Court's permission, the Debtors propose to serve the Order on Winzeler and give Winzeler ten days to respond.  If Winzeler does not respond within the ten-day period, then Winzeler would receive the default treatment (i.e., Plan currency) in the amount set forth on the original Cure Amount Notice. If Winzeler submits a response within the relevant timeframe, then the dispute with Winzeler would be adjourned to the March 19, 2008 hearing.

WHEREFORE, the Debtors respectfully request that the Court enter (a) an order granting the Motion, (b) overruling the Objections, and (b) granting such other further relief as is just.

Dated: New York, New York
        February 20, 2008

                            SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                            By:    /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr.
                                John K. Lyons
                                Ron E. Meisler
                            333 West Wacker Drive, Suite 2100
                            Chicago, Illinois  60606
                            (312) 407-0700

                                    - and -

                            By:    /s/ Kayalyn A. Marafioti
                                Kayalyn A. Marafioti (KM 9632)
                                Thomas J. Matz (TM 5986)
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession