1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION ET AL.,

9

10        Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            January 10, 2008

19            2:36 PM

20

21  B E F O R E:

22  HON. ROBERT  D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

47

1    to make cure claim distributions directly to the movants.  That

2    motion was filed at docket number 11803.  The Court's show

3    cause order was entered at docket 11809.  And the debtors

4    responded this morning by filing the debtor's response to the

5    ad hoc trade committee's cure notice extension motion at docket

6    number 11865.

7             MR. SHIFF:  Your Honor, may I be heard?

8             THE COURT:  Yes.

9             MR. SHIFF:  For the record, Your Honor, it's Adam

10   Shiff of Kasowitz, Benson, Torres & Friedman, here on behalf of

11   Argo Partners, ASM Capital, Avenue Capital, Contrarian Capital,

12   Hane Capital, Longacre Master Fund, and Sierra Liquidity Fund,

13   each of whom, at least as of the time of the disclosure

14   statement hearing or the current time, populate what's been

15   described and I think has been described before the Court, as

16   the ad hoc trade committee.  Your Honor, first of all, we'd

17   like to thank the Court for allowing us to be heard today, and

18   signing an order to show cause yesterday allowing that to take

19   place.  Needless to say, we understand the exigencies the Court

20   is under right now at this time, with confirmation rapidly

21   approaching.

22             Just so we're clear, Your Honor, we are not here in

23   any way to upset the plan confirmation process or the hearings

24   that are seeking or that will take place before you next week.

25   We're simply seeking what we believe is a very limited relief

48

1   with respect to one section of the solicitation order that was

2   entered by the Court following the disclosure statement

3   hearing, Your Honor, which -- relating to cure claims as Mr.

4   Butler described the title of our motion.  Your Honor, we

5   believe that these issues that we've raised in the motion

6   directly impact upon the reconciliation of our claims as well

7   as an enforcement of the settlement reached with the debtors

8   that was set forth on the record of the disclosure statement

9   hearing.

10          Your Honor, as the Court is aware, and it's quoted in

11  our papers as well as the debtor's reply that was filed this

12  afternoon, as a means or as a settlement of various objections,

13  we had asserted to the plan and disclosure statement, the

14  debtors had agreed to use commercially reasonable efforts to

15  reconcile, and if agreed, allowed claims.  You can leave out

16  the rest of the quotes that are cited.  As the Court is also,

17  I'm sure, aware, as on or about December 21, in accordance with

18  the solicitation order, the debtors mailed out numerous

19  notices.  And in accordance with the solicitation order, they

20  sent or had KCC, we believe, send to non-debtor parties to

21  executory contracts, a what I will describe as a detailed

22  notice of a cure claim amount.  In addition to that, where

23  debtors had multiple addresses, they sent that notice to one

24  address and sent a form or copy or limited type of notice to

25  other addresses with clear instructions that only the one

49

1    notice that was sent to the entity they designated as the main

2    address could be returned.  In addition, they sent, as we

3    described it, a generic notice to our clients or other

4    transferees of claims that are subject to this motion

5    indicating that your contract or the claim that arises under

6    your contract may be subject to a cure notice that was mailed

7    to somebody else.

8            Your Honor, as soon as these notices went out, and I

9    don't need to belabor the Court with the timeline that we set

10   forth in our papers, I trust the Court has seen that, but as

11   soon as that went out, we attempted to contact the debtors to

12   seek to tie or match what our -- the proofs of claim that

13   underlied our claims or the scheduled claims for that matter,

14   and what we -- and what was sent to the various non-debtor

15   parties to executory contracts.  Your Honor, despite repeated

16   efforts, we were un -- and despite the representation to the

17   Court and the agreement that was set forth for the Court, we

18   were not given the information necessary to reconcile such

19   claims.

20           THE COURT:  Let me stop you.  These are executory

21   contracts, so do the claims that you've been assigned, or the

22   proofs of claim, are they protected proofs of claim on the

23   assumption that the contract will be rejected?  What types of

24   claims are these?

25           MR. SHIFF:  In most instances, Your Honor, since

50

1    these are filed, certainly if they're scheduled amounts,

2    certainly it's what the debtor believed what was owing as of

3    the petition date.

4              THE COURT:  Okay.

5              MR. SHIFF:  And in, I believe, certainly most cases,

6    I can't represent all cases -- I haven't looked through all

7    claims, we can talk about numbers in a minute, these are

8    generally proofs of claims for amounts owing as of petition

9    date, not rejection damage claims.  So these are the very

10   claims that --

11             THE COURT:  But you don't -- do you have an

12   assignment of the contract?

13             MR. SHIFF:  Of the underlying contract itself, no,

14   Your Honor.  Simply, the -- call it the account receivable, if

15   that's an acceptable term.  As well as in many cases various,

16   and they vary by creditor and the like, various powers of

17   attorney and other --

18             THE COURT:  Well, that was going to be my next

19   question.  Do you have the power to direct the contract party

20   in respect of its prepetition claim?  For example, do you have

21   the ability, by contract, as part of the purchase of their

22   prepetition claim, to control how they settle that claim?

23             MR. SHIFF:  In -- Your Honor, we represent seven

24   different parties, each of whom have different forms and each

25   of which sometimes gets negotiated out slightly differently

51

1    when they're dealing with a creditor.  But as a general matter,

2    it's my understanding that we do have, at least most instances.

3    I don't want to misrepresent to the Court.  But at least in

4    most of those instances, we do have that right.  Some have

5    specific powers of attorney, others just give us rights with

6    respect to disposition of the claim.

7            THE COURT:  So why can't you just send those people a

8    notice and say we direct you to elect treatment X or elect

9    treatment Y when you get this notice.

10           MR. SHIFF:  Well, Your Honor, that's been -- that's

11   been part of the problem.  In the first instance, these notices

12   having been mailed out on December 21, the Friday before

13   Christmas, arriving whatever days they arrive, I'm not going to

14   try to speculate how long the mail takes, so you know, so one

15   issue has been actually reaching all these people.  The second

16   issue is that it's not crystal clear, because we didn't have

17   the reconciliation information, that if we have a number of

18   contracts with party X and the debtor is seeking to cure, so to

19   speak, a number of purchase orders or certain other contracts

20   with that party, we did not have the information to necessarily

21   call up that person and say okay, you need -- or at least do it

22   in the time frame that was required, which was now today,

23   essentially, because things -- ballots or election forms are

24   due Friday -- you know, tomorrow in California.

25           We have, as we described in our motion, with the

52

1  information we have been able to obtain, have started that

2  process.  But the problems were compounded, because in certain

3  instances, the creditors, and I don't want to speculate as to

4  why, but maybe because they knew they had sold this claim,

5  didn't have the notice.  Maybe they threw it away, or as we

6  described earlier, in the case of the multiple address

7  entities --

8          THE COURT:  But isn't that -- I mean, if they've

9  agreed with you to take your direction -- with your clients, to

10 take your direction, that's -- they've screwed up, right?

11         MR. SHIFF:  They would have screwed up -- in some

12 cases they may have done it before we got to them.  Because, as

13 I described, it took -- there was some lag time there.  In

14 other cases, there are entities, and one happened that I know

15 of --

16         THE COURT:  How many contract parties are we talking

17 about here?

18         MR. SHIFF:  I don't have the exact number.  I know

19 the total amount of claims that we're talking about is

20 approx -- total of what we believe are cure claims we own, is

21 approximately 40 million.  We believe --

22         THE COURT:  No, no.  I'm not -- not dollar amount.

23 I'm talking about number of parties that you could write a

24 letter to or fax or send an e-mail to.

25         MR. SHIFF:  I believe it's approximate -- Your Honor,

53

1    that's consistent, I know.  I'm just trying to do some math in

2    my head, having spoken to number of people.  In a few

3    instances, I know of three members who had approximately fifty,

4    who I think --

5              THE COURT:  Each or together?

6              MR. SHIFF:  -- fifty each.  So they were the larger

7    ones, let's say.  So maybe in total you're talking, I think

8    those are smaller 200 to maybe 250 or some number like that.

9              THE COURT:  Are those different claimants or

10   different contracts?

11             MR. SHIFF:  Those would be -- I don't -- I'm not sure

12   of that, Your Honor.

13             THE COURT:  But let's assume that they're literally

14   different people, don't your clients have a record of whose

15   claims they bought?

16             MR. SHIFF:  They certainly do.

17             THE COURT:  So why can't they send them an e-mail or

18   a fax or whatever, that says we bought your account receivable

19   X in connection with -- well, do -- let's just say that.  We

20   bought your account receivable X.  You've got this -- you may

21   have received a notice from the debtor about the assumption of

22   this -- of a contract to which this account receivable relates.

23   If you did, we direct you to elect -- I don't know what your

24   clients want to elect, cash or stock --

25             MR. SHIFF:  Two points.  One is the cash versus

54

1   stock, the other is the amount.  But let's just say elect cash

2   to make it easy --

3             THE COURT:  Okay.

4             MR. SHIFF:  -- for these purposes.

5             THE COURT:  All right.

6             MR. SHIFF:  Because the default is stock.

7             THE COURT:  All right.  So what's to stop you from

8   doing that?

9             MR. SHIFF:  No.  Your Honor, nothing has stopped us.

10  And I think we have -- and I don't have it based on number of

11  creditors, but I know on dollar amount of the approximately

12  forty million or so, we have obtained, at least what believe,

13  and I know people will review them and may say differently, but

14  we believe we've obtained already doing that, thirty-two of --

15  I'm sorry, twenty-two million of the forty, and there's

16  approximately eighteen million that we have not been able to

17  accomplish that yet, and --

18            THE COURT:  Well --

19            MR. SHIFF:  -- there's a few reasons.

20            THE COURT:  -- when you say accomplish that.  Let

21  me -- maybe you were going to tell me in a second, but when you

22  say accomplish that, you mean get something back from them

23  acknowledging that they've received your instruction?

24            MR. SHIFF:  No, no.  Where they have told us or in

25  many cases copied us on the form that they filled out in

55

1  accordance with what we --

2          THE COURT:  But that's just -- that's just to give

3  you reassurance. As far as putting them on notice of what you

4  want, what's precluding you from doing that --

5          MR. SHIFF:  No, no.  We have --

6          THE COURT:  -- as far as -- you've done that?

7          MR. SHIFF:  -- we have Your Honor.  We have --

8          THE COURT:  Okay.

9          MR. SHIFF:  -- whenever -- and there are probably a

10 few due to the, what I'll describe as the reconciliation

11 problem, which is matching a purchase order to an invoice.  But

12 with respect to certainly the vast majority, we have done that.

13 The problem has become that either they don't have the forms in

14 some cases for -- either because they threw them out, or

15 because in the case of I know one is Toyota, that I'd heard

16 about earlier, the apparent -- the original notice went to

17 someplace in Michigan, I guess where the part was delivered

18 from, as opposed to the corporate office, which I think is

19 actually foreign.  And when we contacted the people we had

20 dealt with, they could not get their hands on the original.

21 And we sub --

22          THE COURT:  Well, why can't you --

23          MR. SHIFF:  -- subsequently contact KCC --

24          THE COURT:  -- why, in your notice to these people,

25 can't you, you know, in addition to referring to the form,

56

1    attach a copy of it?

2           MR. SHIFF:  Well, Your Honor, that's one of the

3    problems.  What the form does say, and that's one of the

4    problems with the relief we would like, is what the form does

5    say, at least, is you must file this -- it doesn't say it in

6    the order, it says it on the form, that you must file the

7    original.  So much so that if you request a replacement ballot

8    somehow, and we can talk about the difficulty we've had doing

9    that, the originals are deemed no good.  So one of the things

10   we had suggested in our motion, akin almost to a proof of

11   claim, that if you don't have the form you get from the debtor,

12   you fill out something that conforms with Official Form 10,

13   that would be one -- that would be one item --

14          THE COURT:  Right.

15          MR. SHIFF:  -- that would be helpful.

16          THE COURT:  And then -- but separate and apart from

17   whether you want to elect cash or stock -- elect cash, excuse

18   me, I guess the issue I have is, as between your clients and

19   your assignors, who are not assignors of the contract but of

20   the claim --

21          MR. SHIFF:  Simply of the claim, Your Honor.

22          THE COURT:  -- and the debtor, why should the debtor

23   get involved between you and your assignor with regard to the

24   cure amount?

25          MR. SHIFF:  Your Honor, I don't think what we're

57

1    asking for is for the debtor to get involved.  I think what

2    we're actually asking for the debtor is not to be involved in

3    that.  So to say that if we did file -- let's assume on behalf

4    of someone we had a power of attorney.  We go ahead and we file

5    a form and check whatever it is we want to check.  That that

6    form not be thrown out the door.  If somebody wants to come in

7    and then challenge that form or our transfer, almost like a

8    regular 3001, if someone's going to challenge that, that's

9    fine.  But what the procedures as they're being described, and

10   I actually thing there's some ambiguity in the order we can

11   discuss, but what this is essentially saying is don't waste

12   your time, creditor, don't bother mailing in any form.  And

13   even if you wanted to mail something in you couldn't because

14   you don't have a copy of the original and we don't accept

15   anything else.  So --

16           THE COURT:  Well, no.  You should go through that

17   some more.  That doesn't sound -- they're getting a notice that

18   says we're going to assume your contract.  We think the cure

19   claim is X.

20           MR. SHIFF:  Correct.

21           THE COURT:  If you disagree, send back --

22           MR. SHIFF:  The form.

23           THE COURT:  -- the form with the cure claim on it.

24           MR. SHIFF:  Right, and they --

25           THE COURT:  We've already talked about the

58

1    election --

2              MR. SHIFF:  Okay.

3              THE COURT:  -- so that, I don't see why you can't

4    just instruct them on what to do on that.

5              MR. SHIFF:  Because logistically -- we can, but the

6    logistics, because of the timing, whether it's the holidays,

7    whether it's because we didn't have some of the information --

8              THE COURT:  But --

9              MR. SHIFF:  -- from the debtor, we haven't been able

10   to get it done.  And on that front, we're asking for a few days

11   to finish getting this, what we'll describe the eighteen

12   million, as I described.

13             THE COURT:  -- but you sent out the notices -- when

14   you say get it done, what you haven't done, necessari -- you've

15   done all you can do.  You sent out the notices to all these

16   people saying how you want them to elect, right?

17             MR. SHIFF:  We've sent them out, certainly to most.

18   As I said, there are some, I think, we've had difficulty

19   identifying from the information we have.  But in most, we've

20   sent them out.

21             THE COURT:  But why don't -- I mean, I'm assuming you

22   sent them out to everyone who had an executory contract that

23   you had an assignment that related to that contract?

24             MR. SHIFF:  We sent out as many as we could identify,

25   Your Honor.  I can't -- I just don't know exactly who sent out

59

1    what.

2             THE COURT:  But when you say identify, your clients

3    have a list of all their assignors?

4             MR. SHIFF:  Correct.

5             THE COURT:  I don't know why you wouldn't send it out

6    to every one of them.

7             MR. SHIFF:  We -- Your Honor, we first got that list,

8    I believe, was it January 4.

9             THE COURT:  No, your clients entered into

10   transactions with these people.

11            MR. SHIFF:  No, but the list is then getting cured.

12            THE COURT:  Unless they threw away their -- I mean,

13   they have their records, right?

14            THE COURT:  They have their -- right.  We could send

15   it out to every creditor we bought a claim from, or every

16   creditor that looks like it might be a contract.  And they may

17   have done that.  I can't tell you what each of these seven have

18   done, but I know the result has been --

19            THE COURT:  They should have.

20            MR. SHIFF:  -- okay.

21            THE COURT:  Shouldn't they?  I mean, if they had the

22   power of attorney to direct them what to do, I would assume

23   that's how they would exercise it --

24            MR. SHIFF:  And I think in most --

25            THE COURT:  -- by telling them what to do.

60

1          MR. SHIFF:  -- and I'm just trying to be very careful

2    because we do have, as I said, seven clients, with many of

3    these.

4          THE COURT:  Right.

5          MR. SHIFF:  I think in most instances, at least, that

6    is what they have followed.

7          THE COURT:  Okay.

8          MR. SHIFF:  The result of which has been, we believe

9    we've gotten our hands on -- and we're still talking to some of

10   them.  I'm sure a lot will come in in the last minute, we've

11   got our hands on fifty-three percent or so.

12         THE COURT:  And if one or two of those don't submit

13   it in time, isn't that a matter between you and them?

14         MR. SHIFF:  Your Honor, certainly we will -- if

15   something goes wrong here, certainly we will have whatever

16   rights we have against them.  There's no doubt about that.  But

17   what we're talking about -- I think what we're talking about

18   doing here doesn't get -- doesn't get in anyone else's way.

19   It's a couple more days --

20         THE COURT:  Well, it could, though --

21         MR. SHIFF:  -- to accomplish --

22         THE COURT:  -- because aren't you asking for an order

23   that says that the debtors should accept your election on any

24   contract that you elect?

25         MR. SHIFF:  Your Honor, it would certainly be our

61

1    preferred form of relief.  However, we would --

2              THE COURT:  But how do I know that you're entitled to

3    make that election?  We don't have any information

4    ultimately --

5              MR. SHIFF:  Correct.  But what we could do, Your

6    Honor --

7              THE COURT:  -- about what rights you have vis a

8    vis --

9              MR. SHIFF:  -- but what we could do, Your Honor --

10             THE COURT:  -- each of your assignors.

11             MR. SHIFF:  -- is, to the extent we do make such an

12   election, and we get it in now by the date, whatever the right

13   date is, and then someone later, the debtor, whoever, has a

14   problem with that, or someone wants to prove that, whether

15   that's before this Court or somewhere else, at least we haven't

16   been prejudiced by having it prejudged that there is no way we

17   can do it.

18             THE COURT:  So you're talking about a provisional

19   election?

20             MR. SHIFF:  I would be -- that, at least, would give

21   us some comfort that our rights, at least, to -- will not have

22   been impaired because we couldn't reach the person or whatever

23   happened.

24             THE COURT:  But again, I mean, rights against whom?

25             MR. SHIFF:  It would be our right to claim -- it

62

1   would be both our right to say that the -- our election is

2   valid -- let's say cash.  Let's make it easier.

3          THE COURT:  No, but again, your rights really are

4   through your assignors, aren't they?

5          MR. SHIFF:  Our rights are through our assignors?

6   Well, certainly -- that's who we acquired them from, certainly,

7   yes.

8          THE COURT:  Well, I mean, what you're saying, what

9   you're trying to protect is your rights being impaired, but

10  what rights are those?  Are those rights vis a vis the debtor

11  or are those rights vis a vis the assignors?

12         MR. SHIFF:  It's the right to receive this cure

13  payment.

14         THE COURT:  And where does that come through?

15         MR. SHIFF:  The right to receive the cure payment

16  comes through the original transferor, if that's what the

17  Court's getting at.

18         THE COURT:  Okay.

19         MR. SHIFF:  But the problem --

20         THE COURT:  Again, that's why I --

21         MR. SHIFF:  -- becomes, however, if all this stuff

22  goes out the door and these -- our election forms, as I'll

23  describe them, are ignored or, you know we can't mail them in,

24  or whatever it is, right.  And then if everything gets given

25  out to these various multiple address entities, we then never

63

1    had the right to either prove up that we did have the right to

2    make the election, and then are left in the very difficult

3    position of trying to chase people down for cash --

4            THE COURT:  But why can't you prove -- I don't

5    understand why you couldn't prove that up, as against your

6    contract party.

7            MR. SHIFF:  We might be able to ultimately prove that

8    up.  Yeah, we will be able to prove that up, right?  We'll have

9    to go sue them for not having followed our election --

10           THE COURT:  Right.

11           MR. SHIFF:  -- and then we're running around chasing

12   whatever number of entities --

13           THE COURT:  But maybe that's how it should be.

14           MR. SHIFF:  -- there are.

15           THE COURT:  Why shouldn't it be that way?

16           MR. SHIFF:  It shouldn't be that way, Your Honor,

17   because I think consistent with the way the bankruptcy transfer

18   rules work, when you put on notice that you are the party to

19   receive various, you know, consideration and treatment on a

20   claim, that that is actually presumptively, assuming nobody

21   objections, is presumptively valid.  And we're not asking the

22   Court to necessarily give us that alt -- if that was even put

23   into almost an escrow account, or something, that we're not

24   left trying to chase our tails to get it.  And maybe more

25   importantly than the money, the election, once made, I mean, is

64

1  irrevocable.  Either they'll get stock or they'll get cash.

2  And, you know, rather than simply being stuck with that, since

3  our rights are -- we at least believe our rights, what they

4  are.  I know, it could be subject to some dispute.  We have

5  valid 3001s on file.  That those rights just be honored, and at

6  least protectively by not ignoring our forms and letting

7  everything out the door.  Because we would --

8            THE COURT:  But aren't we talking --

9            MR. SHIFF:  -- lose the right to elect -- I'm sorry.

10           THE COURT:  -- we're talking about cure claims here

11 now, right?

12           MR. SHIFF:  Correct, Your Honor.  Which, I mean, the

13 cure claim, and I know the debtor has some stuff on this which

14 I saw in their reply, I mean part of the cure claim is the

15 payment of the prepetition account receivable.  That's the very

16 number we're talking about, and we were supposed to have

17 assistance reconciling.  And that's the very amount we

18 assert --

19           THE COURT:  But haven't you all gone through your

20 claims?

21           MR. SHIFF:  We are part of the way through.  I mean,

22 there's certainly been a lot of progress made.  I know the

23 debtor cited to some numbers.

24           THE COURT:  Well, but if -- I mean, that's what they

25 committed to do, is to go through all the prepetition claims.

65

1    If those are gone through and reconciled --

2              MR. SHIFF:  Right.  But Your Honor, for example,

3    let's assume we're talking about reconciling claim X for fifty

4    dollars, and we're talking back and forth.  Then they send a

5    cure notice out to party Y that says, all right, your cure now

6    is, I don't know, ten dollars, let's say, which we don't get,

7    we don't see --

8              THE COURT:  Was there a --

9              MR. SHIFF:  -- then the reconciliation --

10             THE COURT:  -- I'm sorry, was there a deadline on the

11   reconciliation effort?

12             MR. SHIFF:  No, I believe it was a best -- what was

13   it?

14             MR. BUTLER:  Commercially reasonable efforts.

15             MR. SHIFF:  Commercially reasonable efforts.

16             MR. BUTLER:  By the confirmation date.  And things

17   would only be allowed if the debtors agreed.  There was no

18   agreement to allow a single claim.

19             MR. SHIFF:  That's correct, Your Honor.  I think the

20   only deadline was on us to get them an initial list of claims a

21   few days after the disclosure statement hearing, which we did.

22   But, we're simply, because of where we stand right now, we know

23   there are forms out there.  We know we have -- at least

24   believe, we have the right --

25             THE COURT:  But if you're going through this

66

1    reconciliation process --

2           MR. SHIFF:  Correct.

3           THE COURT:  -- you must have a list of your

4    assignors.

5           MR. SHIFF:  Correct.

6           THE COURT:  And a list of the prepetition accounts

7    receivable.

8           MR. SHIFF:  Correct.

9           THE COURT:  Which you're pretty far along in deciding

10    what that amount should be.

11           MR. SHIFF:  In most cases.

12           THE COURT:  You could certainly instruct them in good

13    faith what you think it should be.  You can instruct the

14    assignors what you think it should be, right?

15           MR. SHIFF:  You Honor --

16           THE COURT:  So why can't you send them all, just as

17    you would an election notice, why can't you say this is a

18    reminder that, you know, whatever day, July 15, 2007, you

19    assigned us account receivable X.  You may have received, in

20    December, an assumption notice from the debtors that requires

21    you to do two things.  One, if you wish to have a cash

22    distribution, make an election.  Two, decide whether the cure

23    amount is right or not.  This is to advise you that we instruct

24    you to make the cash election, and we instruct you that our

25    belief as to the cure amount is whatever it is, fifty dollars.

67

1    Under our agreement with you, you have an obligation, you've

2    given us a power of attorney, whatever the language is, to take

3    our instructions, fill out the notice and send it back.

4              MR. SHIFF:  Your Honor, we have done what we could do

5    exactly like that, literally over the past week, because that's

6    really when the number started to come in.

7              THE COURT:  Okay.

8              MR. SHIFF:  And sitting here today --

9              THE COURT:  But why -- as far as the numbers --

10             MR. SHIFF:  -- we really can't do anything else --

11             THE COURT:  -- but wait.  But you already had the

12   numbers.  Why couldn't you just send that out before that?

13             MR. SHIFF:  We didn't know -- we didn't have lists

14   of -- we first received lists --

15             THE COURT:  But you had lists of people.  You had the

16   assignors.  And you had the claim.

17             MR. SHIFF:  Right.  But we didn't have the numbers,

18   Your Honor.

19             THE COURT:  What numbers?

20             MR. SHIFF:  Because you have --

21             THE COURT:  The numbers of what?  I'm sorry.

22             MR. SHIFF:  In other words, the claim -- a claim with

23   a certain party, you know, company X's 1,000 dollar claim,

24   could be comprised of different -- or is in most instances

25   comprised of different purchase orders or subsets, some of

68

1  which are being -- as we've now seen what's being assumed, some

2  of which are being assumed, some aren't.  So you need,

3  literally, to have all that information and then go back and

4  say, okay, they've taken out three of the ten pieces.  Okay,

5  for that don't settle for less than 300 dollars.

6          THE COURT:  Okay.

7          MR. SHIFF:  That's what we haven't been able to do.

8          THE COURT:  All right.

9          MR. SHIFF:  But, Your Honor, certainly -- listen.

10         THE COURT:  I understand.

11         MR. SHIFF:  We've done what we could do.

12         THE COURT:  Your assignments were in bulk from

13  individual creditors as opposed to by particular contract.

14         MR. SHIFF:  Certainly, at least, in most instances,

15  yes.  Your Honor, certainly, we have done -- and these are

16  people, obviously, who are in this business and they've -- this

17  is not the first case, you know, where they've had trade

18  claims.  They've gone out and they've done what they can.

19  There is -- even if we can come up with some other, maybe, ways

20  they should have phrased their e-mails, sitting here today with

21  the deadline tomorrow in California, they certainly cannot do

22  much else.  I mean, they are working the phones right now.

23  They are having, as I said -- started to say earlier, seeking

24  to get replacement ballots out of the claims agent.  And there

25  has been a delay.  And not to aspire any intention to that

69

1    other than they're very busy, maybe with ballots and notices

2    and all kinds of notices.  And as to getting those ballots,

3    a) so they -- or at least having a couple days to get those

4    duplicate or original election forms to be executed, either by

5    them at least as a protective matter, or by the original

6    transferor as we, you know, continue to try to work them; we

7    don't see any real prejudice to the debtors.  Now, I know --

8              THE COURT:  I -- one point I'm confused about, which

9    is, as far as the relief you're seeking is concerned, what sort

10   of provisional instructions would you give the debtor if you

11   don't know the cure amounts?

12             MR. SHIFF:  Well, Your Honor, I think it would be --

13   the way, I mean, the way the system is set up, the very system

14   that's in place right now, let's just take the good old classic

15   example.  Regular executory contract party gets a notice, never

16   transferred his claim.  He says, you know, he thinks it's

17   twenty dollars, I mean, you know, he thinks it's twenty

18   dollars, the debtor thinks it's ten dollars.  And now the

19   plan --

20             THE COURT:  But he knows what he thinks.  He's going

21   to say twenty dollars.

22             MR. SHIFF:  I may have misspoke.  There's a dispute

23   between the debtor and the non-debtor contract party as to the

24   amounts.

25             THE COURT:  Right.

70

1          MR. SHIFF:  The procedures have a process by which

2    that person's supposed to file an objection post effective

3    date.

4          THE COURT:  Right.

5          MR. SHIFF:  It gets reconciled.  And then ultimately

6    after a final order, amounts that are reserved on behalf of

7    that claim get paid.  So what we're suggesting is this should

8    just be treated no differently.

9          THE COURT:  But do you put in?  What would your

10   clients put in, in their cure -- in their cure notice?  They

11   don't know.

12         MR. SHIFF:  In some cases we don't know.

13         THE COURT:  So how could they put it in?

14         MR. SHIFF:  What we'd like to get -- we'd like to use

15   those three days that we're talking about or five days, to get

16   the additional information.  And it's one of the problems of

17   relief we do seek to get that additional information from the

18   debtors.

19         THE COURT:  But don't --

20         MR. SHIFF:  Or there may be cases where --

21         THE COURT:  -- but don't --

22         MR. SHIFF:  -- we use -- sorry.

23         THE COURT:  -- the customers -- don't the trade

24   creditors know what they're owed?  I mean, why wouldn't they

25   put in exactly what they sold to you?

1              MR. SHIFF:  They might.  They might not.  But --

2              THE COURT:  But why wouldn't they?

3              MR. SHIFF:  But they might have thrown it away, in

4     may cases.

5              THE COURT:  Well, that -- but -- the throwing away,

6     you know, to me that's their look out.  I mean, they should

7     know better than that.  I mean, why would they -- I mean --

8              MR. SHIFF:  I mean, there's just no way to --

9              THE COURT:  -- they know they entered into a

10    transaction with you.  They know that the cure is going to be

11    paid a hundred cents on the dollar if it's assumed.  To just

12    throw it away and, you know -- that's, you know --

13             MR. SHIFF:  Your Honor, I'm using the word probably

14    thrown away, a little too loosely or colloquially.  However, in

15    the case of example where the original form is in Detroit and

16    the entities and we entered into the deal with are in Japan --

17             THE COURT:  All right.  No, I understand your point

18    about the original form.  And I'm going to talk to Mr. Butler

19    about that.  But as far as not relying upon your contract party

20    to put in the same amount that they sold to you, I think that's

21    pretty paranoid, isn't it?  I mean, they sold an account

22    receivable to, you know, Contrarian or whoever.  They probably

23    made some representation --

24             MR. SHIFF:  Certainly.

25             THE COURT:  -- in the agreement, that that's what

72

1   they were owed.  And then when the debtor sends them a notice

2   to say what are you owed, for them not to put it in is pretty

3   farfetched.

4            MR. SHIFF:  Your Honor --

5            THE COURT:  Why should the debtor have to recreate

6   what they're owed.  They know it.  They sold it to you.  They

7   made a representation to you.  You paid them a certain

8   percentage on the dollar for that very account receivable.

9            MR. SHIFF:  Correct, Your Honor.  And, but, the facts

10  are, and I'm -- I don't want to be accused of testifying from

11  the podium or anything, the facts are, we have reached out to

12  people, and there are times when either, again, the throw --

13  what I'm using as the throw away, but they haven't done it or

14  they haven't bothered to do it, or it's missing, or what have

15  you.  And I know, we'll discuss replacement ballots

16  subsequently.

17            THE COURT:  But, you know, if you haven't done it,

18  they -- I mean, I think that's kind of a risk that you take

19  when you deal with these people.

20            MR. SHIFF:  Well, Your Honor, that may be.  But we

21  also think there is a -- at least on this piece of it, there is

22  a fix that does reduce that risk and protects people's rights

23  and does not --

24            THE COURT:  And what is that fix?

25            MR. SHIFF:  We think the fix is a combination of

73

1   items, is a few more days to get this done, because we have not

2   been able -- and I say get this done, get -- well we'll come

3   back to who execute -- but get executed forms with the proper

4   amounts into KCC's hands.  So that would be one item.  The --

5               THE COURT:  Well, let me stop you there.  Why

6   wouldn't it be better to see what actually happens by the

7   deadline.  And then people can make a motion under Rule 60 if

8   in fact, you know, if that's warranted.  So that the person

9   who's been negligent isn't rewarded, but the person who has a

10  valid basis for being able to change their ballot has the right

11  to come back under the rules.  Why decide this now?

12              MR. SHIFF:  Your Honor --

13              THE COURT:  As you said, I mean, people are sending

14  in their ballots.  A lot of people don't send their ballot till

15  the last day.

16              MR. SHIFF:  No question.

17              THE COURT:  And your twenty-two million dollar may go

18  up to forty million.  You may only have a two million dollar

19  problem, and that -- maybe that's with Toyota, and you know,

20  you may rather have a claim against Toyota than against Delphi.

21              MR. SHIFF:  Your Honor, we would like -- what we're

22  trying to avoid is having this date and this issue sort of just

23  be a complete bar to our being able --

24              THE COURT:  Well, nothing's a complete bar under the

25  rules.  You know?  Even a bar date's not a complete bar under

74

1    the rules.

2            MR. SHIFF:  Right.  And I understand that.  And I

3    don't know if excusable neglect would apply to this.  That

4    might be --

5            THE COURT:  I don't know.  Maybe it would.

6            MR. SHIFF:  -- something someone has to argue.

7            THE COURT:  I don't know.

8            MR. SHIFF:  That would be an interesting -- right.

9    That would be an interesting issue.

10           THE COURT:  Because we don't know yet.  No, I'm

11   sorry.  I think excusable neglect would apply.  But I don't

12   know whether it would be sustainable or not because we don't

13   know the facts.

14           MR. SHIFF:  Right, well ultimately you will not know

15   the facts until you identify which of the --

16           THE COURT:  Right.

17           MR. SHIFF:  -- 200, whatever they are, weren't done

18   "properly".

19           THE COURT:  Or five.  Who knows?

20           MR. SHIFF:  Or whatever the number is, yes, Your

21   Honor.  That's certainly correct.  What I know we're going to

22   hear, or I expect we're going to hear is, well, you know, you

23   sat on your rights.  You didn't do anything.  You didn't try to

24   fix the situation, and --

25           THE COURT:  But that may be legitimate.

75

1            MR. SHIFF:  Okay.  Well --

2            THE COURT:  Not you guys.  But, you know, whoever,

3    Toyota.

4            MR. SHIFF:  Right.  One way to resolve that is at

5    least have -- allowing at least for the -- and maybe people

6    don't need permission to do this, and I don't think they do, I

7    mean, transferees can send in ballots and say hey, this is a

8    valid ballot.

9            THE COURT:  But you don't know what it -- but you

10   don't know what --

11           MR. SHIFF:  That's the problem.  Right, Your Honor.

12   That's exactly the problem.

13           MR. BUTLER:  Your Honor, at some point, can the

14   debtors be heard, because this is not --

15           THE COURT:  Yeah.  I'm sorry.  I've probably been

16   going on too long myself.  But I'm just trying to figure out

17   what really is being sought here, so.

18           MR. SHIFF:  If it would be helpful, I can -- I can

19   summarize what's being sought or --

20           THE COURT:  Okay.

21           MR. SHIFF:  -- perhaps the Court --

22           THE COURT:  All right.

23           MR. SHIFF:  -- does know.

24           THE COURT:  Okay.

25           MR. SHIFF:  All right.  Very briefly.  We would

76

1  like -- we seek to have the deadline that is tomorrow moved to

2  January 16th.  We seek to have the authority, at least

3  protectively, to file, to the extent we can, on behalf of the

4  transferors.  We seek to have the debtors work with us over the

5  next -- through that period, whatever it may be, January 16th,

6  work with us to get the best information possible --

7            THE COURT:  But what is that -- what does that mean?

8            MR. SHIFF:  -- that is to try -- reconciliation which

9  we believe they have as to the scheduled claim or the proof of

10  claim as it may be, and the -- essentially the cure -- the cure

11  amount/purchase order number.  And I think finally, and this

12  one may be an issue to deal with another time, or it may tie to

13  the other issue, is under the order, it gives the debtors the

14  authority, but does not direct them, to make payments to --

15  directly to the transferors.  And we would ask either that they

16  be directed, with respect to our group, not all to make them to

17  us, or in the event there is at least a dispute as to who

18  should get the payment --

19            THE COURT:  Wait --

20            MR. SHIFF:  -- provide for an escrow --

21            THE COURT:  -- I'm sorry.  Directly to transferor?

22            MR. SHIFF:  I'm sorry?

23            THE COURT:  You mean transferee?

24            MR. SHIFF:  Under the order -- maybe I misspoke at

25  the end.  The order gives them the authority but not the

77

1   direction to pay the transferor.

2           THE COURT:  Oh.  But you want it to pay the

3   transferee?

4           MR. SHIFF:  We would like them to pay the transferee.

5   And if there is a dispute or a problem, we would understand,

6   certainly, the money going into what's called an escrow, rather

7   than us having to chase around the globe for that payment.

8           THE COURT:  But, on that point --

9           MR. SHIFF:  And in certain instances, If I -- I'm

10  sorry, Your Honor.  I just --

11          THE COURT:  -- no, you go ahead.

12          MR. SHIFF:  Last one.  I'm sorry, Your Honor.  In

13  certain instances, although we've been focusing on stock -- on

14  cash, some of the other items that might get distributed here

15  may require quick action from people, be it stock or right.

16  And we're concerned, just as the experience we've had here

17  trying to track down these forms, if we have to try to track

18  down stock or rights in a limited time frame, we may very well

19  be frustrated again.  And we would think, if there's any dis --

20  we think it should come to us --

21          THE COURT:  Well, but, what -- on what authority

22  would you have the debtor pay the -- pay your clients in

23  respect to cure claims as opposed to --

24          MR. SHIFF:  We believe it's under 3001(e).  We

25  believe it's our claim.  They've assigned us the rights.  It's

1    been duly filed.  And we think it's simply just like a proof of

2    claim -- just like we got the ballot for the same claim to make

3    those elections, it would be the same exact issue here.  And

4    those distributions are coming to us.  There's just no

5    difference.  And I know there's a citation to a, whether it's a

6    law review article or a newspaper article in the papers that

7    talk about rejection damages claims being different than cure

8    claims.  But what we're talking about here, at least for the

9    most part are -- is that very amount, is that prepetition

10   amount that has to be cured and that we have assignments on.

11           THE COURT:  Well now, this was brought on, on one

12   day's notice by order to show cause --

13           MR. SHIFF:  Yes, Your Honor.

14           THE COURT:  -- but none of your contract parties have

15   effectively had notice of this.

16           MR. SHIFF:  That's correct.  Other than we've -- the

17   ones we've been speaking to, reach out to, but yes.

18           THE COURT:  So I don't see how I can grant that type

19   of relief without them having notice of this.

20           MR. SHIFF:  That's fine, Your Honor.  I think there's

21   time on that last point to deal with it.  That was one of the

22   reasons we had suggested in our papers, and as -- you're not

23   supposed to propose compromises in the papers.  One of the

24   reasons we even had the notion of having at least an escrow

25   mechanism so we put there, as to that last prong, certainly we

79

1    can, if we need to, expand the relief.  We would also hope or

2    expect that if we got just almost letters from those people

3    directing the debtors to pay us, maybe it gets obviated on

4    those?

5              THE COURT:  I guess I'm still -- I still don't

6    understand.  If you don't know what the cure amounts are, and

7    the whole premise of this is that you don't, how can you -- how

8    can you file cure amounts on behalf of transferees and have the

9    debtor escrow them?

10             MR. SHIFF:  Your Honor, we can do two things that are

11   relevant.  One, more time, maybe we do get the right number.

12   Two, there is still a cash versus stock election that is

13   relevant to us and --

14             THE COURT:  No, I understand.  That's a separate

15   point.

16             MR. SHIFF:  -- okay.  As to that piece, certainly we

17   don't need to have the number.  We can take a quick look at the

18   number and know what we want to elect.  I don't want to be

19   prejudiced --

20             THE COURT:  Well, wait --

21             MR. SHIFF:  -- irrevocably if someone else made the

22   wrong --

23             THE COURT:  -- I'm sorry.  I've been -- maybe I've

24   been incorrectly assuming -- I'm assuming that your clients

25   would elect one way across the board for each client.  I mean,

80

1    are you telling me that --

2              MR. SHIFF:  Oh, you mean in terms of the election

3    itself --

4              THE COURT:  Yeah.

5              MR. SHIFF:  -- as opposed to the amount?  Yeah, no, I

6    think that's safe to assume.

7              THE COURT:  Okay.  All right.  Okay.

8              MR. SHIFF:  Thank you, Your Honor.

9              THE COURT:  I want to hear from Mr. Butler, please.

10             MR. BUTLER:  Your Honor, the first point, is I don't

11   understand why we're going through this hearing.  It wasn't Mr.

12   Shiff who stood before the Court representing these creditors,

13   it was Mr. Rosner and Mr. Zinman at the disclosure statement

14   hearing.  But they settled.

15             THE COURT:  Say -- well, I'm sure they talked with

16   him.

17             MR. SHIFF:  Same firm.  Same clients.

18             THE COURT:  I expect they talked with him.

19             MR. BUTLER:  And the order that they agreed to that

20   was signed by Your Honor at the disclosure statement hearing,

21   the solicitation procedures order, says at paragraph 44, and I

22   quote, the generic notices spoke to "is the only notice the

23   debtor shall be required to provide to these claims purchasers

24   with respect to the cure, and these claims purchasers shall

25   have no rights or recourse against the debtors with respect to

81

1   the cure."  The mechanics -- the same order, at paragraph --

2   the immediately -- and that's at paragraph 44 of that order;

3   at paragraph 43 of the order, there is very specific language

4   about the fact that these cure notices will go out to the

5   counter parties to the supply contracts and the payments will

6   go to them.  And why is that?  Be cause this is cure, and

7   Section 365 and not a claim.  And there is no authority.  And

8   Mr. Shiff and Mr. Zinman didn't quote any authority to suggest

9   that they -- that this is -- cure constitutes claim for

10  purposes of voting, for purposes of claims reconciliation or

11  anything else.  Cure is tied inextricably to the underlying

12  contract.

13          They concede -- they don't have the contract.  365

14  says the debtors deal with the contract vendor, the other party

15  to the contract, the counter party, if we seek to assume the

16  contract.  And we have to cure the defaults under that contract

17  with the vendor.  Not with some third party.  There's no case

18  law I'm aware of, there's certainly nothing in the statute that

19  says that a claims trader can acquire the right to cure and

20  can, in my view, interfere, perhaps even tortiously interfere,

21  with the contractual relationship between the debtor and its

22  contract vendees, particularly in this case, where these supply

23  agreements, all right, do not permit assignment.  And we put in

24  our papers, we concede that the Michigan Uniform Commercial

25  Code does allow accounts but not under other rights, to be

82

1    assigned, all right?  But what was assigned -- whatever was

2    assigned, and whatever those agreements were -- that those

3    transfer agreements are, not one of which is in evidence, and

4    not one of which we've seen; whatever those transfer agreements

5    are, whatever rights they extend to some 1,187 claims that are

6    out there, dealing with, you know, many hundreds of contracts

7    if not thousands of contracts and purchase orders, are whatever

8    they are between the individual claims purchaser and the

9    contract vendee.  That is not -- we don't care what those

10   arrangements are.  It's none of our business, and if they,

11   between them have allocated rights that ultimate -- so long as

12   it, by the way, doesn't breach our agreement and so long as

13   it's not -- you know, it's enforceable.  If it's enforceable,

14   they can deal with that in a State Court process outside of the

15   Bankruptcy Court.

16         But this isn't Rule 3001 territory.  This is Section

17   365 territory.  All right?  And this issue has been dealt with

18   before in this Court in this case, and there's a final order

19   that determines it.  And these parties were at the hearing,

20   objected, and settled on the record.  So I don't understand how

21   we're getting into the merits of what they'd like to have.  I

22   understand, and I'm frankly, as a personal matter, sympathetic

23   to some of the issues they may be having now.  Just as the ABI

24   Journal article talked about, that we attached as Exhibit E to

25   our response, claims traders who buy executory contracts that

83

1    may be assumed, all right, may not be purchasing what they

2    think they're purchasing.  The point's been made.  Exhibit E

3    lays it out specifically.  The commentator -- the commentators,

4    we quoted the paragraphs in our reply here.  The paragraph --

5    the commentators have the warning.  They said look, a cure --

6    "A cure is not a payment on account of rejection damages claim.

7    It is a payment to a contract counter party to facilitate the

8    debtor's ongoing performance under the contract.  Under those

9    circumstances, there is no rejection damages claim and the

10   debtor can successfully move to disallow any such claim.  Thus

11   absent some arrangement between the three parties, the debtor

12   will pay the cure amount to the contract counter party, not to

13   the purchaser of the rejection damages claim."  And it goes on.

14        There is -- and when you look at the case law, you

15   know, look at 1126.  Someone whose -- a contract's going to be

16   assumed can't vote.  I mean, they have -- whatever they bought

17   out there, and he made the comment, Mr. Shiff made the comment,

18   that he's got a sophisticated -- these are sophisticated

19   purchasers, all right.  And these sophisticated purchasers

20   bought trade claims, but they didn't -- they didn't focus on

21   the fact that they were buying trade claims of ongoing supply

22   agreements which were subject to terms and conditions with

23   Delphi, which couldn't be abrogated.  And therefore they had to

24   use the exception provision under the Michigan Uniform

25   Commercial Code, which controls, which says all you got is an

84

1    account.  All right?  That doesn't answer the question under

2    the bankruptcy code.  Section 365 controls this issue.

3           And it's not like we haven't -- this is not a new

4    issue in this case.  This issue was contemplated.  This relief

5    relating to how we would deal with cures was filed in the

6    original solicitation procedures motion back on September 6th.

7    Lots of parties have looked at these papers over the last three

8    or four months.  And at a contested disclosure statement

9    hearing this order and this relief was granted.  And we went

10   the extra mile.  We added a provision, and I acknowledge, the

11   notice to claims purchasers provision, we added.  After

12   consultations with the committees and talking about other

13   possibilities, we added a claim purchasers provision in our

14   omnibus reply that we filed on December 5th, which found its

15   way into the order;  which said, to the extent we knew there

16   was a claims purchaser on the docket, we sent them,

17   essentially, a warning flag that said -- it's a generic notice,

18   Mr. Shiff was right, it was a warning flag saying, better check

19   out what your relationships are with your purchasers -- or with

20   your assignors.  Better figure out whether they're executory

21   contracts covered by cure.  And you ought to go protect

22   yourself if you have those rights.  Because we don't know

23   whether you do.

24          Nothing required us to do that, but in order to try

25   to protect the people here as best we could as the debtors, we

85

1    sent that notice out.  And that was under paragraph 44 and

2    Exhibit P of the -- of the solicitation procedure order.  And

3    those are the notices that caused them to focus on this issue.

4    Maybe they hadn't focused on it before.  But as Your Honor

5    pointed out, and as we said in paragraph 18 of our reply, they

6    could have had either, at the disclosure statement procedures

7    hearing when we had -- you know back on December 6th or

8    December 7th or December 8th, they could have sent a notice out

9    if they had the rights under their contracts, which I don't

10   know that they do, they could have sent a notice out there to

11   their entire acquisition file saying these are our rights, this

12   is what we instruct you to do.  When you get these notices we

13   expect you to send them to us.  Whatever they choose to do.

14   But that's between them and the counter party to the contract.

15          And I'm not saying -- standing here, Your Honor,

16   telling you that we even have agreed to that, because it's not

17   clear to me that the rights on a nonassignable contract, which

18   is nonassignable pursuant to its terms.  If they didn't look at

19   the contracts that they purchased accounts from, you know, I

20   can't help that.  But the right to cure is inherently intrinsic

21   to the contract and to the terms of the contract under 365.

22          So we had discussions with -- over the last week with

23   the claims purchasers here.  But we're not prepared to

24   essentially rewrite a solicitation procedures order which is

25   unambiguous and to which they agreed.  And we'd ask the Court

86

1    to enforce the order and the settlement against the settling

2    party.  And so, I mean, I just -- I really, truly, don't

3    understand why we're here other than they have recognized that

4    they have some risk associated with having acquired contracts

5    that may in fact -- accounts related to contracts that may be

6    assumed as opposed to simply having the payments made.  But I

7    don't believe there's going to be any payments made on it.  To

8    the extent we're -- assuming a contract, Your Honor, I believe

9    is a matter of law.  We will not be making any payments on

10   account of the claims that have been reconciled.  If a claim

11   has been reconciled and there's a contract cure payment made,

12   that claim will get no payment on it.  That's the law.  That's

13   what the code says.

14          THE COURT:  What about the point Mr. Shiff made that

15   they've contacted some of these contract counter parties who

16   say, well we don't have the cure form?

17          MR. BUTLER:  That could raise -- I mean, Your Honor,

18   we're presuming at confirmation we'll be able to prove that

19   we've properly served people.  Assuming we've properly served

20   people, and a contract party either throws away the form or

21   doesn't throw away the form, you know, all that does is

22   create --

23          THE COURT:  Aren't they able to get a -- I mean,

24   within the deadline, aren't they able to get a copy and send

25   that in?

87

1        MR. BUTLER:  They can contact us back and we can

2    issue a new ballot to them.  But these bal -- some of the

3    ballots, Your Honor, are like currency.  And you're right, the

4    balance are -- the ballots are issued uniquely to a particular

5    place.  We weren't going to send out 300 ballots for the same

6    cure notice to somebody.  And so we -- and, you know, those

7    procedures were all laid out in the order they're bound to.  We

8    didn't dream this up, Your Honor.  It's in the solicitation

9    procedures order.  The forms -- the form he's speaking about,

10   is the form -- is paragraph 45 and Form Q, Attachment Q to the

11   solicitation procedures order.

12        THE COURT:  So if, for some reason, the debtor is

13   dilatory in sending out a replacement ballot, that would

14   presumably be a basis to extend the deadline or relief

15        MR. BUTLER:  Yes.  If we got a request.  I mean, I'm

16   not aware of -- maybe there have been requests flowing into KCC

17   for replacement ballots from the proper party.  If Mr. Shiff's

18   clients are calling and asking for ballots, they're not

19   entitled to them.

20        THE COURT:  Okay.

21        MR. BUTLER:  That's not who's entitled to them.  The

22   contract -- the contract counter party is entitled to these

23   ballots.  They're entitled to make the cure decisions.  And I

24   don't know that Mr. Shiff's clients have any rights to

25   interfere with that.  And ultimately, if they press those

88

1    rights, it's not clear to me that they're not tortiously

2    interfering with the estate.

3            THE COURT:  Well, if they're not -- the other

4    alternative he raised would be to get out of the process of

5    getting between the debtor and the contract parties, but simply

6    to make a provisional election themselves.  What -- where would

7    the harm be in that?

8            MR. BUTLER:  Under what right do they have to do

9    that?  They don't own the -- they're not the contract -- they

10   admitted -- Your Honor asked the question, they admitted, they

11   are not the contract -- they are not the contract counter

12   party.  They have no rights under 365.  All right?  And the

13   solicitation procedures order, which binds them, I keep coming

14   back to this order, it's like we're -- we're like rewriting

15   history as if we didn't have a contested disclosure statement

16   hearing.  We had a contested disclosure statement hearing.

17   They objected.  All right?  We spent hours negotiating a

18   settlement.  It was put on the record and approved by Your

19   Honor, and then Your Honor entered an order.  Now they don't

20   like what the order says.

21           I don't know how we have that conversation, frankly.

22   I mean, I don't know how we get beyond that point.  But

23   assuming we get beyond that point, they have made no showing

24   here at this hearing and nothing in their papers suggest, that

25   they have any cognizable rights under Section 365 of the

89

1    bankruptcy code.  It is the only section that deals with the

2    assumption of a contract and cure.  And I have not been able to

3    find any case law -- we've looked, maybe they haven't -- we've

4    looked.  I haven't been able to find anything to suggest that

5    there are rights that purchasers have of those claims.  And in

6    fact, what we have been able to find and look at, is the case

7    law we put in here, which points out -- the 1126 analogy, which

8    basically says, you assume the contract, there's no prepetition

9    claim to -- it's extinguished.  There's no prepetition claim to

10   vote under 1126.  And we pointed out the journal article that

11   we found, which we thought -- which is exactly on point, which

12   raises these very warnings to claims purchasers, saying don't

13   buy executory contract accounts if you don't know how you're

14   going to administer them.  And you don't provide for it.

15            THE COURT:  Are some of the contracts that the

16   debtor's proposing to assume contracts where the debtors are

17   proposing modifications or additional ways to provide adequate

18   assurance for future performance or anything like that?

19            MR. SHIFF:  I don't think we're doing much, Your

20   Honor, in the way of modifications at this point.  We've been

21   negoti -- those have been negotiated.  The GSM organization has

22   been sitting down with all -- I mean, that's the other irony of

23   this -- for months.  There's been at least five months of

24   extensive negotiations about these contracts between the Delphi

25   and the contract vendors.

90

1          THE COURT:  Well I guess --

2          MR. SHIFF:  -- counter parties.

3          THE COURT:  -- I guess where I'm going with that, and

4     maybe this is a better question for Mr. Shiff, is, under 365

5     the debtor has to meet three requirements:  cure and adequate

6     assurance of future performance.  And if you're changing the

7     contract, anyway, you obviously need consent.  And it's my

8     experience that contract parties often negotiates various parts

9     of those tests to come up with an overall agreement.  Is

10    that -- are you saying that some of that has already happened?

11         MR. BUTLER:  Yes.  There's been -- there has been

12    extensive negotiations about the terms on which parties will

13    continue -- agree to negotiate going forward, about, you know,

14    the supply chains been -- had extensive discussions with the

15    company.  And very positive constructive discussions.  There's

16    a very good relationship between the supply base.

17         THE COURT:  So if you got a surprising cure claim

18    back, for example, your -- the people who have been negotiating

19    the contracts may go to the supplier and say well, wait a

20    minute.  You know the premise of our negotiations going

21    forward, we always thought the claim was X, and now you're

22    saying it's 200,000 more.  Maybe we need to think about some

23    other aspect of this contract?

24         MR. BUTLER:  Particularly seeing as all these

25    contracts or virtually all of them can be terminated by Delphi

1    for convenience.  That's correct, Your Honor.

2          THE COURT:  Okay.

3          MR. BUTLER:  And they're not assignable.  I mean,

4    remember, these are supply agreements.  And I do believe that

5    one of the reasons that we're here today is that the claims

6    purchasers, at some point in the last couple of weeks, have

7    come to understand that they bought accounts from nonassignable

8    supply agreements, that in fact, are going to be assumed by the

9    debtors.  And, you know, and that may not be what they thought

10   they had.  I don't know.  I don't know what any of their

11   contracts are between them and their assignors.  Certainly it

12   is Delphi's position that to the extent that those things do

13   anything other than what Michigan law permits, they're void and

14   not enforceable.  And, you know, and we take the supply

15   agreements very seriously.  They're the counter -- they're one

16   of the absolute cornerstones of the company's operations.  And

17   we go to great lengths to, as everybody in the auto sector, to

18   defend our contracts and the relationships with them and the

19   nonassignability of them and similar issues.

20         So I mean, and Your Honor, there's a lot we could

21   talk about here, but what I'm -- I guess I've been trying to

22   understand is how we got initially beyond the settlement, and

23   even if there wasn't a settlement, beyond the participation of

24   these movants in the solicitation procedures hearing, where

25   this order was entered and is now a final order of the Court.

92

1  And it's clear and unambiguous on its face.  I just don't know

2  how we go any -- go beyond that, nor do I think we should.  I

3  mean, these are issues that, in a very complex case, we have

4  devoted hundreds of hours negotiating and thinking about and

5  talking to people about and trying to sort through.  And

6  there's nothing here from the debtor's perspective, there's

7  nothing nefarious here.  This has been perfectly transparent.

8  These cure procedures have been out there publicly since

9  September 6th, for Pete's sakes.  There's nothing nefarious in

10  any of this from the debtor's perspective.  But we do have to

11  have an ability to be able to sort through these things.  And

12  to the extent that there's claims purchasers that are going to

13  have issues with their assignors, that is not something that

14  the debtors want to be involved in, nor do we think this Court

15  ought to be involved in.  And that's, I think, a State Court

16  issue between those parties.

17          THE COURT:  Okay.  Thank you.  Yes.

18          MR. SHIFF:  Your Honor, I'll try to be brief.  We

19  understand and are not disputing the existence of this order

20  and that it governs.  What we're before the Court is asking for

21  what we consider, and people can characterize it differently, I

22  won't call it limited relief, but relief in certain ways, from

23  that order, which we think the Court has the authority to do

24  under a simple standard.

25          THE COURT:  I understand.  But --

93

1          MR. SHIFF:  Extending the deadline --

2          THE COURT:  -- and one of the reasons I granted the

3    order to show cause is because it wasn't clear to me whether

4    this would be really a big deal or not.  But it does seem to me

5    that what you're proposing would get your clients in the middle

6    of the dealings between the debtor and its contract parties.

7    And that does seem to me to be a big deal.  Particularly where

8    there are ongoing supply relationships.  I don't know how you

9    get over that.  I mean if -- you made the case in your papers

10   that you're the real party in interest because the prepetition

11   amount owed was assigned to you.  And generally, Courts want to

12   hear from the real party in interest.  But I'm pretty persuaded

13   here that that's really not the case because this is an

14   assumption situation where the real party in interest really

15   has the ability, if they want to, to negotiate with the debtor

16   as guided by 365, the hoops to go through there, and the terms

17   of the underlying contract, whether it's assignable or not,

18   whether it's terminable at will, all those things.  And that

19   may lead suppliers to reach certain agreements.

20          There may be economic consequences of their doing

21   that in terms of what they have assigned to you.  But I have no

22   idea what those might be because I haven't seen any of the

23   assignments, and at the end of the day, that's between you and

24   them.  It seems.

25          MR. SHIFF:  Well, Your Honor, to take this into

94

1    pieces.  I think there are certain aspects of what you just

2    said that may impact on that relationship, and we'll come back

3    to that.  And there are certain aspects that don't.  A couple

4    of days and replacement ballots sent to the transferors,

5    certainly doesn't impact upon any relationship that might exist

6    between -- you know, with respect to the underlying contract,

7    or you know, the special negotiations that might be taking

8    place.  So I think there's a threshold --

9              THE COURT:  But isn't up for them to ask for that?

10             MR. SHIFF:  Sorry, Your Honor?

11             THE COURT:  Isn't it up to them to ask for that?

12             MR. SHIFF:  Yes.  And in most of these instances what

13   we've done, and what we have done, I should say, is we've

14   contacted those people, we gave them a number at KCC to call,

15   and they have not gotten the form back.  It's just -- it's -- I

16   mean there are numerous -- it's happened numerous times.  And

17   again, not suggesting anyone instructed them --

18             THE COURT:  But it's not at the deadline -- there's

19   no deadline yet.  They're not even in breach of any contract

20   they may have with you under that at this point.  Are they?

21             MR. SHIFF:  If they don't get the ballots in -- I'm

22   sorry.

23             THE COURT:  By today.  I mean, there's no deadline

24   yet.

25             MR. SHIFF:  No, no.  It's -- the deadline's

95

1    effectively today.

2              THE COURT:  I guess, I don't see why we don't wait to

3    see what they do.

4              MR. SHIFF:  Because I think we can possibly avoid a

5    lot of what might be the problems, if we give them -- coming

6    back to the issue of whether we execute or not in the contract

7    relationship.  On the more base issues.  If we give them that

8    time and instruct KCC to get them those ballots to avoid --

9              THE COURT:  But they're not asking for that time.

10   They're not asking for it.

11             MR. SHIFF:  Well, they've asked KCC for the ballots.

12   We know the debtors have --

13             MR. BUTLER:  How do we know -- I mean you're making

14   assertions --

15             THE COURT:  If they have asked KCC for a ballot --

16             MR. BUTLER:  -- confirmation on that.

17             MR. SHIFF:  I'm sorry, Your Honor.

18             THE COURT:  -- if they've asked KCC for the ballots

19   and KCC doesn't get them a ballot, I'll give them time.  But

20   there's no records that that's happened.

21             MR. SHIFF:  It's not before the Court.  Certainly

22   not, no.  We will have to --

23             THE COURT:  I mean, that's -- Mr. Butler

24   acknowledges, that's -- if that actually happens, that's

25   remediable.

96

1          MR. SHIFF:  Your Honor, we think, as to the issues

2     with respect to the contracts, I mean, there's been a lot of

3     assertions here that 365 does not impact the claim and doesn't

4     involve reconciling claims.  And then there's talk about, well

5     if you have a cure, then it reduces the claim.  I mean, it's --

6     I mean, I don't know what 365 is if it's not -- I mean 365 has

7     a few different pieces, which the Court has walked through, the

8     adequate assurance, section certainly.  One of them is curing

9     the default, which is paying the prepetition claim.  And that

10    is --

11          THE COURT:  But it's between --

12          MR. SHIFF:  -- what our client has --

13          THE COURT:  -- but as between the debtor and the

14    contract party are concerned.  And this often happens.  Those

15    hoops, and there are three main ones, the debtor can't assume

16    anything but the contract; it has to cure; and it has to

17    provide accurate assurance.  Those things are negotiated as a

18    package very often.  And to pull one out and say that the

19    negotiation has to occur with someone else, where there's

20    nothing in the record to suggest that the contract party has,

21    you know, assigned the contract or the right to do that to

22    anyone else, I think is -- that's a big deal.  I think that's

23    more than what I -- when I saw your order to show cause

24    yesterday, I thought the relief you were seeking was all about.

25          MR. SHIFF:  Right, no, Your Honor.  As to that point,

97

1   and I appreciate what the Court is saying, and I don't want to

2   belabor it.  What we're seeking as to that is to submit

3   ballots, forms, on behalf of the transferee, if they can, and

4   then it will get dealt with.  It may be that they already

5   agreed to some package that reduced the claim and we have to go

6   sue somewhere else.  And that's fine.  I mean we'll have to

7   deal with that.  But we don't want anything to preclude us from

8   doing that.  Quite frankly, I think if you read paragraph 43,

9   although it does talk about providing the notices to the

10  counter parties, the rest of the section talks about parties

11  wishing to object, parties -- I mean, it's a different word,

12  and what we're simply looking for is something that doesn't

13  preclude us from doing that.  And then there may be fights

14  before the Court as to how much or who gets it, and that's

15  fine.

16          THE COURT:  Well, okay.

17          MR. SHIFF:  And I think the similar point on the

18  payment of the claim, where we would seek to at least at the

19  very least, not have that go out the door to what we allege is

20  the wrong party, and allow us, if we can't get it resolved, to

21  bring it on before the Court.  But I think -- and I think the

22  last point, just to finish it up, is -- and I know there's no

23  proof at this point that people haven't gotten ballots, I

24  certainly would think it would make some sense, and don't see

25  any prejudice, combined potentially with a few days, to let

98

1    people use copies if they can't get the originals.

2              THE COURT:  Well, but they can call the -- they can

3    call the ballot agent.

4              MR. SHIFF:  And if they get it then they can get them

5    in.

6              THE COURT:  Well, but, you know, if they call the

7    ballot agent five minutes before the ballot's due, I think

8    there's a problem.  But if they call --

9              MR. SHIFF:  Certainly.

10             THE COURT:  -- you know, in the morning, then the

11   ballot agent is probably going to get it to them.

12             MR. SHIFF:  We probably are five minutes before,

13   but -- no, they have been calling, Your Honor.  But I know it's

14   not in the record, and that's something we'll have to develop,

15   I guess, further

16             THE COURT:  All right.  I think that the relief

17   you're seeking here is relief that, as Mr. Butler says, is

18   contrary to the order.  And that order was on, I believe, ample

19   notice.  It also, and as importantly, is relief that I think is

20   not merely a procedural correction of an error or relief that

21   would have no material effect on the debtors or other parties

22   in interest.  The main reason for that conclusion is that I

23   think it depends -- granting the relief would depend on me

24   overlooking the primary relationship here, in fact the only

25   relationship here, that the debtor has, which is with its

99

1    contract counter party, who are obviously ongoing trade

2    suppliers and vendees who are important to the debtor's ongoing

3    business.  And under Section 365, they are the ones who really

4    need to deal with the cure notice, because it's not just a cure

5    notice.  It's an assumption notice that lays out and reminds

6    the contract parties -- counter parties, of their rights under

7    Section 365, which are not limited to insisting upon cure.

8            I believe that your clients, as a very function of

9    the assignment agreement which they entered into, know who

10   these people are and could have, and I believe as you say they

11   have, contacted them and given them what your clients believe

12   are their obligations under your clients' agreements with those

13   people.  But those aren't three-party agreements.  The debtor

14   is not a party to those agreements.  And if they don't do what

15   they're supposed to do under your agreements, you have rights

16   against them.  I don't know what those obligations are and what

17   those rights are because they're not in the record.  But I

18   believe that, again, as I said earlier, contrary to when I

19   signed this order to show cause, this is not an instance where

20   the debtor is just being difficult about a deadline or a

21   procedure and trying to prevent the real party in interest from

22   having its wishes set forth; but rather would have the debtor

23   change the relationship with its contract parties and get in

24   the middle of your relationship with them.  And they're really

25   two separate relationships.

100

1          So I don't see a basis, given that fact, for amending

2     the order.  I don't think it was a scrivener's error and I

3     don't think it was sort of slipped in overnight.  I think you

4     have the ability to contact all of these people and to say make

5     X election if you want to do that.  And it's up to them whether

6     they're going to comply or not.  And that's why the --

7     paragraph 45 in the order was in there, in that notice to you

8     all, so you could do those sorts of things.  But I don't think

9     the debtor should get in the middle of that potential dispute

10    between you and them, and hold up distributions or create, you

11    know, a fund to fight over, just as I don't believe the debtor,

12    when it hears that a creditor of a creditor has an issue with

13    its creditor, and maybe had a lien against the creditor and is

14    worried about the creditor, that the debtor should get sucked

15    into that fight.  I think it's a similar -- it's an analogous

16    situation.

17          MR. SHIFF:  Your Honor, certainly we hear you on your

18    views on that topic.

19          THE COURT:  Well, let me just say again --

20          MR. SHIFF:  I'm sorry.

21          THE COURT:  -- as far as the issue about whether

22    people have had sufficient time to make their elections or not

23    or respond to the cure notice, obviously the notice itself, the

24    order, determined that the deadline was appropriate.  However,

25    if they didn't get a copy of the notice or if they made a

101

1    request -- a timely request for a new notice or a new form and

2    they don't get it, they have -- they clearly have their rights

3    under the bankruptcy rules to seek relief and an extension of

4    time then.  But to do it in advance, I think is really giving

5    you all -- your clients a form of relief that is unwarranted.

6              MR. SHIFF:  Well, Your Honor, I think on your last

7    point, you, I think, addressed where I was going ahead, which

8    was on what I consider, at least, to be the procedural side of

9    this.  And I hear the Court.  I just may add that one of the

10   potential difficulties here will be that the party who will now

11   need to seek that relief is not the party who ultimately has

12   the economics.  And we're setting up a dispute.  If we extend

13   it a few days, I think you are setting up the situation where

14   it's much more likely this doesn't become an issue.  And I just

15   don't see any harm in a couple of days --

16             THE COURT:  You know, I just don't -- I mean, it

17   seems to me, particularly given that these are all people that

18   the debtor wants to continue in contractual relationships with,

19   that if, you know, Toyota, or Chrysler or some other company

20   calls up the debtor and says, you know, we made a request of

21   the balloting agent and we just didn't get our form in, I don't

22   see that -- you know, and they didn't get it back to us, I

23   don't see the debtor forcing those people to come into Court.

24   I mean, it's just -- that'd be pretty dumb, so.  I think that

25   it's -- you know.  I also frankly don't see those people

102

1  putting down some number that's different from the number that

2  you purchased from.  If they do, they're making a calculation

3  that it's -- you know, on a net basis to them, that was stating

4  the damages to your -- that they might owe to your clients, it

5  makes sense to do that.  But, you know, that's a pretty --

6  people have the right to breach contracts, but if they have a

7  contract with your client, it's hard for me to imagine that

8  they'd really -- it's likely that they're going to do that

9  unless it's a pretty unusual situation.  So I think you're

10 going to have to just wait and see what happens.  Send in

11 more -- you know, send them a letter saying -- I mean, I think

12 you did send them a letter.

13         MR. SHIFF:  We have, Your Honor.

14         THE COURT:  We want you to make a cash election.

15         MR. SHIFF:  We certainly have.  And obviously,

16 there's a limit to what we can do now before the deadline.

17         THE COURT:  Okay.

18         MR. SHIFF:  But we hear the Court.  If there is a

19 problem people can seek the relief they need to.

20         THE COURT:  Okay.

21         MR. SHIFF:  Thank you.

22         THE COURT:  All right.  So I'm going to deny the

23 motion for the reasons stated.

24         MR. SHIFF:  Thank you, Your Honor.

25         MR. BUTLER:  Thank you, Your Honor.

103

1        THE COURT:  Mr. Butler, do you want to have someone

2   submit an order to that effect.

3        MR. BUTLER:  We will.  We will, Your Honor.

4        THE COURT:  Run a copy by Mr. Shiff.  Don't settle

5   it, just run it by him.

6        MR. BUTLER:  We will, Your Honor.  Thanks.

7        THE COURT:  Okay.  Thank you.

8        MR. BUTLER:  That's all we had today.

9        THE COURT:  Okay.  All right.

10      (Proceedings concluded at 4:53 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25