Eduardo J. Glas, Esquire (# EG7027)                    Hearing date: February 21, 2008
McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
Attorneys for Automodular Corporation f/k/a
Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc.,
and Automodular Assemblies (Ohio) Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | Chapter 11 |
| | : | |
| In re: | : | Case Nos. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| DELPHI CORPORATION | : | |
| INC., et al. | : | |
| | : | |
| | : | |
| Debtors. | : | |
| | : | |

## REPLY BRIEF IN SUPPORT OF MOTION OF AUTOMODULAR ASSEMBLIES CORPORATION F/K/A AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND MOTION TO ALLOW AND DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

        Automodular Corporation f/k/a Automodular Assemblies Inc., Tec-Mar Distribution Services,

Inc., and Automodular Assemblies (Ohio) Inc.[1] (collectively, "Automodular" or "Movant") hereby

submits the following Reply in support of its Motion to Compel Assumption or Rejection of

Executory Contracts and Motion to Allow and Direct Payment of Administrative Expense

Claims [D.I. # 11180] (the "Motion") as follows:

---

[1] As of January 1, 2008, the company changed its name to Automodular Corporation.

## PRELIMINARY STATEMENT

The present dispute focuses on the rights and obligations of the parties under two contracts to provide services assembling auto parts to be installed in GM cars. Automodular was directed to change the nature of its services by GM, Delphi's ultimate customer. Automodular was obligated to follow GM's instructions pursuant to Automodular's contractual obligations with Delphi. GM considered the changes required of Automodular a change in the scope of the services provided by Automodular. The very form that GM used to notify Automodular of the changes could not be clearer as its title was Scope Change Form. Ignoring the language of its own contractual forms, Delphi disputes that the changes at issue here were scope changes and has refused to negotiate with Automodular a price adjustment as required by the parties' contracts.

Moreover, Delphi's obduracy in connection with the scope change issue is not the only instance in which Delphi has failed to follow its obligations in its contracts with Automodular. Since early 2006, Delphi has failed to adjust the prices as required in one of its contracts with Automodular. Similarly, Delphi has failed to even negotiate a price increase for a design change that it clearly recognizes as a scope change. Finally, Delphi has taken improper credits and refused to return the monies owed to Automodular. As explained in more detail below, all these Delphi actions and others are breaches of the parties' contracts and Automodular needs to be made whole through the allowance of a corresponding administrative expense as the breaches arose postpetition or in contracts that Delphi is seeking to assume.

## BACKGROUND

1.     On October 8, 2005, Delphi and certain of its subsidiaries and affiliates filed for bankruptcy protection pursuant to Chapter 11 of Title 11 of the Bankruptcy Code.

ME1 7149007v.1

2.    On November 30, 2007, Automodular filed its Motion seeking assumption or rejection of the U.S. Contract and the Ontario Contract (as further defined in the Motion and collectively the "Contracts") as well as payment of the post-petition amounts owed.  On the same date, Automodular filed an Affidavit of Christopher Dell in support of the Motion [D.I. #11195]. Automodular hereby incorporates by reference the Motion, Affidavit and any and all exhibits thereto, as if fully set forth herein.

3.    On December 13, 2007, Debtors filed an Objection to the Motion [D.I. # 11447].

4.    On December 21, 2007, the parties served written discovery requests [See Automodular Notice of Service D.I. # 11587] and on January 9, 2008, the parties responded to the pending requests.[2]

5.    On February 1, 2008, Automodular filed a Supplement in Support of Motion of Automodular Assemblies Corporation f/k/a Automodular Assemblies, Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. to Compel Assumption or Rejection of Executory Contracts and Motion to Allow Direct Payment of Administrative Expense [Docket 12453] (the "Supplemental Motion").  The Supplemental Motion is incorporated herein by reference as is fully set forth herein.

6.    On February 14, 2008, Debtors filed an Objection to the Supplemental Motion [D.I. #12661] (the "Supplemental Objection").

---

[2] Automodular asserts that Debtors have failed to comply with their discovery obligations and as such, Automodular recently sent the Debtors a discovery deficiency letter in an effort to meet and confer with respect to the insufficient responses.  Debtors have not yet responded to the letter.

**Page 3**

## THE PARTIES' BUSINESS DEALINGS

7.      Automodular is engaged in the sub-assembly and sequencing of automotive modules delivered to original equipment manufacturers or "OEM's" on a just-in-time basis.  (See Michael Blair Declaration ¶¶6-7)

8.      Automodular does business with Delphi in two locations - Oshawa, Canada and Lordstown, Ohio.  General Motors Corporation ("GM") is the OEM and Delphi is a Tier 1 supplier to GM in both the Oshawa and Lordstown locations.  Automodular provides services, it provides no parts.

9.      To prepare for a contract, such as the one with Delphi, Automodular must design an assembly system that can operate at ***precisely the speed*** needed to meet the demands for modules emanating from the OEM's vehicle production line, and a logistics system capable of delivering assembled modules in sequence, on-time and without defects.  See Michael Blair Declaration at ¶¶10-11.

10.     In this situation, Delphi agreed to a price-per-piece formula, whereby Automodular calculates the costs it expects to incur over the life of the contract and reduces this to a price-per-piece or per module by dividing the total cost by the anticipated volume agreed to between Automodular and the customer.

11.     A critical component of negotiations is the rate or speed of the manufacture line (including the net jobs per hour and number of shifts) since the rate will determine labor levels. When the rate of manufacture changes, labor and other fixed costs change because everything has to be rebalanced so that Automodular can produce at a new rate.

12.     With respect to the Lordstown facility, the contract was formed on the basis of a request for a quote from Delphi, a bid from Automodular and an acceptance and purchase order

from Delphi. The Oshawa Contract went through the exact same process, but added another step

with a 3-page Long Term Agreement.

## I.    The U.S. Contract for Lordstown

13.    In August 2003, Automodular provided Delphi with pricing that assumed a

quoted volume and that the work would be produced on 2 shifts. Many documents were

exchanged that included references to necessary shifts, volume, line speed, fixed costs, etc. and

the pricing associated therewith. Automodular repeatedly stated that any volume variation

exceeding 10% would necessitate a pricing adjustment. Since Delphi would not accept a bid

with a fixed and variable component the fundamental understanding between the parties and the

foundation upon which the pricing negotiations were made was that fixed costs would be spread

over a projected volume of cars within a certain range. See Michael Blair Declaration at ¶20.

14.    In October 2003, Automodular agreed to adjust its pricing to $3.42 per unit, for 3

shifts, assuming volumes of 300,800 per year (+/- 10%). In June 2004, Delphi issued purchase

orders accepting Automodular's quote to provide services to Delphi at the Lordstown facility as

specified amongst other items, in the request for quote and bid documents, consistent with the

pricing and parameters outlined in the bid documents. See Michael Blair Declaration at ¶¶22-23.

## II.    The Ontario Contract for Oshawa

15.    With respect to the Oshawa Contract, the parties exchanged bid documents in

early 2000. In March of 2000, Automodular provided a quote based on Delphi's bid package,

including volume estimates, and estimated floor space, manpower and capital/tooling.

Automodular provided a revised quote in August of 2000 with a selling price and based on a 2

shift situation for two car lines. Delphi then revised its business assumptions and the parties

exchanged quotes and discussed the proposed work at Oshawa in September 2000. See Michael Blair Declaration at ¶25.

16.     On October 19, 2000, Delphi accepted Automodular's bid and awarded the contract to Automodular. In addition, in June 2005, Automodular contracted with Delphi under a Long Term Contract (or "LTA") with a term from July 1, 2005 to June 30, 2010 for services at the Oshawa location. The LTA required the capacity to handle 83 jobs per hour. Although the LTA was signed in June of 2005, the parties had already exchanged a request for quotes, various bids and a formal acceptance by Delphi. The acceptance letter by Delphi specifically confirms the award of the contract to Automodular with prices specified and acceptance of Automodular's currency exchange provision. Upon acceptance of the final bid by Automodular, a contract for work to be performed was formed, and Automodular had already started purchasing and operating in reliance on the accepted quote. Therefore, the LTA was not intended to supersede the quote and acceptance. See Michael Blair Declaration at ¶¶26-30.

## III.     <u>Summary of Changes in Scope Generally</u>

17.     Automodular, in quoting customers who prefer a price-per-piece arrangement, describes, the number of shifts and the jobs per hour required in every contract, which are key factors in determining costs. Delphi knew that Automodular was recovering its costs based on these critical factors as shown on Automodular's changes in quotes when different shifts were required and its bid conditions specified a pricing change if volume variances were more than 10%. See Michael Blair Declaration at ¶¶31-33. Delphi likewise requested additional pricing and quotes when it changed the shifts from 2 to 3 or from 3 to 2.

18.     Therefore, any of the following constitutes a change of scope of the work: (a) change in content; (b) change in line speed which requires re-balancing the lines; (c) change in

ME1 7149007v.1

number of shifts; and/or (d) change in volume of cars to an extent that it affects the spread of fixed costs. Automodular is entitled to a price adjustment because the nature of the service that was contracted was altered. See Michael Blair Declaration at ¶34.

19.    In the case of Automodular's contracts with Delphi, scope changes, although ordered by GM, were implemented at both Oshawa and Lordstown for the benefit of Delphi.

20.    Part of the contract relationship between the parties included certain General Terms and Conditions **drafted by Delphi**. Pursuant to Section 3 of the General Terms and Conditions, Delphi could require Automodular to implement changes to the specifications or design of the goods **or to the scope of any services** covered by the contract.

21.    In the event of a disagreement arising from a scope change, the parties were required to work to resolve the disagreement in good faith and Automodular must continue performing while the parties attempted to resolve the disagreement. See Section 3 of General Terms and Conditions. Automodular continued to perform throughout the Contracts but Delphi refused to negotiate a pricing adjustment for the scope changes. Therefore, Delphi did not comply with its good faith obligations, which in and of itself is a breach of the Contracts.

IV.    <u>Breaches Relating to The U.S. Contract - Lordstown</u>

22.    The Debtors' breaches of contract related to the Lordstown facility currently encompass two issues: (a) the adjustment for steel increase for screws purchased from ITW Medalist; and (b) a change in scope for work performed under the contract or a "de-rate" of jobs and volume.[3]

---

[3] There were additional claims relating to the addition of a TOC clip and the Debtors failure to pay certain invoices. Both of those issues have now been resolved.

## A.    Increased Price Related to ITW Medalist Screws

23.    The first claim relates to Debtors' failure to pay for a price increase required by a third-party supplier.  Pursuant to the parties' agreement, Automodular was to purchase screws from ITW Medalist at a fixed price for the length of the contract.  However, any price increases given by the suppler were to be passed on by way of Automodular's piece price adjustment.  See Michael Blair Declaration at ¶¶40-41 (and exhibits L and M thereto); Also see Christopher Dell Declaration at ¶¶22-25 (and exhibits I through J thereto).

24.    In December of 2004, Automodular notified Delphi that ITW Medalist was implementing a price increase.  Automodular immediately provided notice to Delphi of the price increase and requested a piece price adjustment based on the quoted increase.  Delphi never paid the adjusted price but Automodular continued to provided services to the Debtors after the Petition Date.  Although the price increase went into effect as early as December 2004, Automodular continued to incur increased expenses after the Petition Date.  Automodular's claim for the increased screw price is revised to include a total of $7,468 which was incurred post-petition and $3,162 which was incurred pre-petition.[4]

## B.    Scope Changes

25.    The second issue relating to Lordstown is the Debtors' failure to pay for certain changes in the scope of work to be provided, which amounts to no less than $738,845.00.

26.    GM issued a change in scope for the work to be performed at Lordstown beginning July 17, 2006.  The Scope Change Form issued the following changes:

---

[4] Although the Contracts should presumably be assumed pursuant to the Plan of Reorganization, the Debtors have not yet provided a Notice of Intent to Cure with respect to the Contracts and all subparts related thereto. Automodular has objected to the Notice of Intent to Cure and will formally object to the cure amount at the time set for cure objections.

(a) shifts were reduced from 3 shifts to 2 shifts, with a final build rate change from 1296 per day to 1008 per day;

(b) an increase in line rate from 54 net jobs per hour to 63 net jobs per hour was issued;

(c) shifts and volume were adjusted from 8 hours per shift to 9 hours per shift and from 1008 volume to 1100 volume per day;

(d) an increase in line speed from 1100 to 1136 per day was issued; and

(e) an increase in line speed from 1136 to 1154 per day was issued.

See Chart attached hereto as Exhibit A.

27.     Based on the change of scope from 3 shifts to 2 shifts, an increase in line rate from 54 net jobs per hour to 63 net jobs per hour, and volume change, Automodular provided a revised quote to Delphi.  Automodular notified Delphi that changes to the number of shifts, hours per shift and net jobs per hour will be treated as a scope change and pricing would be adjusted accordingly.  The price adjustment is **not** related to an increase in labor costs, materials, overhead or other costs, but rather addresses the changes in services to be provided under the contract.  See Michael Blair Declaration at ¶¶45-46.

## V.     Breaches Relating to The Ontario Contract - Oshawa

28.     With respect to the Oshawa contract, Delphi breached the contract by failing to compensate Automodular for several changes in scope and failing to make payments as required under the contract.

29.     In summary, Automodular asserts, at a minimum, the following claims (a) a failure of the Debtors to adjust for the currency exchange rate pursuant to paragraph 3 of the Ontario Contract - $156,354.77; (b) a change in the scope of work or de-rate of jobs and volume

- $620,835.27; (c) labor and costs incurred for the addition of labels and a clip - $1,131.11; (d) costs and labor for the installation of an additional foam pad on two cars lines beginning November 6, 2006 and November 11, 2006 - $66,012.00; (e) an unauthorized retroactive credit for grease application taken by the Debtors - $183,931.00; (f) fees and costs associated with early termination of the GMX 231 prior to the 2010 contract termination date - $278,757.08; and (g) Short Charges on certain invoices - $191.98 and $4,442.05.

## A.    The Currency Exchange Rate

30.    First, pursuant to paragraph 3 of the LTA, effective the first day of each quarter, pricing would be adjusted to reflect the exchange rate as of that date.  Delphi stopped applying the exchange rate as of January/April 1, 2006.  Delphi has admitted on several occasions that it was responsible for the changes in the exchange rate.  Despite this provision, and Delphi's admitted obligations, Delphi has failed to properly apply the foreign exchange adjustment.[5]  See Michael Blair Declaration at ¶50; Christopher Dell Declaration at ¶¶39-40.

## B.    Unauthorized Grease Backcharge

31.    Second, Delphi improperly took an unauthorized retroactive adjustment relating to Automodular's application of the nygel grease.  Automodular has been charging $0.30 per application for the nygel grease.  Delphi unilaterally deducted $183,931[6] from payments owed to Automodular.  Automodular has requested the return of the funds but Delphi has refused.  See Michael Blair Declaration at ¶51; Christopher Dell Declaration at ¶¶36-38.

---

[5] As of the date of this Reply, the Debtors have agreed with Automodular as to how to calculate the foreign exchange rate, however, the Debtors have still not agreed on the application of the exchange rate.
[6] The total credit taken was actually $186,046.  However, when Delphi took the credit, it offset it against amounts owed for the labels and clips in the amount of $2,115.00

**Page 10**

C.    **Delphi's Early Termination of GMX231**

32.    Third, Automodular provided services to Delphi with respect to several car lines

at the Oshawa facility.  Delphi improperly terminated the GMX231 line early by terminating the

car line as of June 19, 2007 prior to the expiration of the June 20, 2010 contract term.  See

Michael Blair Declaration at ¶53; Christopher Dell Declaration at ¶¶41-42.

D.    **Addition of Foam Pad**

33.    Fourth, although Automodular was required to add a foam pad to the assembly of

two cars as of November 6, 2006, Delphi has failed to compensate Automodular for the services

rendered with respect to the addition of the foam pad to the assembly.  The Debtors admit that

the addition of this part is considered a scope change and a design record change under the terms

of the parties' agreement.  The installation of the foam pad requires labor, including time to

install, space, overhead, which increases the risk of quality errors, SGA and profit which was

included in the quote and pricing from Automodular to Delphi.  Debtors have not only refused to

pay for the additional services rendered, but now claim any payment should be based on their

unilateral assessment of the scope of work to be provided.  See Michael Blair Declaration at ¶54;

Christopher Dell Declaration at ¶¶43-44.  Automodular has indicated that the cost of providing

this additional service was $0.118 per piece, while Delphi has offered to increase pricing by only

$0.03 per piece.

E.    **Addition of Label & Clip**

34.    Fifth, Automodular was required to add a label and clip to the assembly line.  This

constitutes a scope change and a design record change under the contract.  Automodular

provided documentation in support of the additional cost associated with the label and clip.

Delphi admitted that the cost of the label and clip would be added as of October 1, 2006 but has

**Page 11**

not compensated Automodular for the additional work.  See Michael Blair Declaration at ¶55;

Christopher Dell Declaration at ¶38.

**F.**   **Scope Changes**

35.    Finally, two cars models were assembled at the GM facilities serviced by

Automodular and scope changes were issued for both of them.

    (a)    With respect to Car # 1, the work was:

        (i)    de-rated from 66.875 net jobs per hour for 1,560 units per day to 61.5 jobs per hour for 2,356 per day as of July 17, 2006; and

        (ii)    de-rated to 59.5 net jobs per hour.

    (b)    With respect to Car # 2, the work was:

        (i)    de-rated from 65 net jobs per hour for 1,070 units per day to 63.25 jobs per hour for 2,572 per day as of January 23, 2006;

        (ii)    de-rated to 55 jobs per hour for 2,440 per day as of May 8, 2006; and

        (iii)    de-rated to 45.4 jobs per hour for 2,204 per day as of February 26, 2007.

See Chart attached hereto as Exhibit B.  See also, Michael Blair Declaration at ¶¶56-59;

Christopher Dell Declaration at ¶¶27-35.

36.    These de-rates forced Automodular to change its production process resulting in a

change in pricing on a per piece basis.  As a result, Automodular requested a price increase to

Delphi pursuant to Section 3 of the General Terms & Conditions.  Delphi, however, refused to

negotiate any price increase.

## ARGUMENT

37.    Pursuant to the Debtors' approved Plan of Reorganization, any contracts not

specifically rejected, will be assumed by the Debtors.  As of the date of this filing, the Debtors

have not rejected either of the Contracts.  Pursuant to Section 365 of Title 11 of the Bankruptcy Code, the Debtors must cure all defaults under a contract (including the Contracts at issue here) prior to assumption.

38.     Debtors incurred, and continue to incur, substantial pre and post-petition expenses for services provided pursuant to the Contracts.  As a result, Automodular has sustained large economic losses due to Debtors' failure to pay for the services provided.  Delphi as admitted that it has received the benefit of the services outlined in the Motion and must therefore cure all defaults under the Contracts as well as promptly pay for the services which are continuously being provided to Debtors on an ongoing basis.

## I.     Debtors' Argument that the Contracts are Requirements Contracts Does Not Prevent Automodular's Recovery

39.     Debtors' principal argument to escape liability is to argue that the Contracts were requirements contracts that preclude the Court from looking to the actual business assumptions relied upon by the parties.  This argument fails for several reasons.

40.     Debtors rely on J & B Sausage Co. v. Dep't of Mgmt & Budget, 2007 WL 28409, at *3 (Mich. Ct. App. Jan. 4, 2007) for the proposition that Michigan law recognizes the validity of "requirements" contracts.  Though J & B is instructive in that regard -- holding that a contract is a "requirements" contract only if there is express language which obligates a seller to provide, and a buyer to purchase, all that the buyer shall need (Id. at *3) -- it really has no bearing on the outcome of the present dispute.  Nor, does Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119 (3d Cir. 1992).  These cases address general propositions regarding requirements contracts -- not changes in scope of the work to be provided in "requirements" contracts. Assuming *arguendo* that Debtors are correct and the contracts at issue are requirements contracts, the issue for the Court to decide is not whether the Debtors are obligated to purchase services from Automodular,

**Page 13**

but what *price* the Debtors are obligated to pay for such services as a result of the change in the scope of services to be provided.

41.     Debtors also cite <u>NCC Sunday Inserts, Inc. v. World Color Press, Inc.</u>, 759 F.Supp. 1004, 1008-09 (S.D.N.Y. 1991) for the proposition that absent bad faith, a buyer can reduce its order to zero under the contract without breaching the agreement.  That case (applying Illinois law, not Michigan) deals with a buyer that faced millions in losses if it stayed in business.  That is not the case here.  Furthermore, the courts have recognized that exceptions to this rule apply when a seller has made extraordinary expenditures and investments in expectation of the continuation of the business or where a termination of the requirements business would place a grossly disproportionate burden upon a seller because of the kind of undertakings contemplated by the contract.  <u>See</u> <u>Schawk, Inc. v. Donruss Trading Cards, Inc.</u>, 746 N.E.2d 18, 24 (Ill. App. 2001).  Automodular reasonably relied on the projected length of the business term when it provided its quote that built in fixed costs, labor, space, overhead, etc.  If Debtors intended to terminate the line early, then its acceptance of a quote based on a longer contract term is not an act in good faith.

42.     In arguing that the Contracts are requirements contracts, Debtors improperly focus on "volume" throughout the Supplemental Objection and incorrectly argue that Automodular requested a price adjustment every time volumes change.  This is simply wrong.  Automodular has not requested a price change "every time" volume changes.  Automodular understands that the industry requires flex from both parties.  However, the agreed business terms between the parties recognized that a 10% variation or more would require a price change.  Importantly though, it was not just volume that was effected by the changes.  Rather, the number of shifts and line speed were dramatically changed.  These factors were crucial to the pricing and

**Page 14**

quote provided by Automodular for the work when the original business relationship was formed.  In fact both witnesses for Debtors admit that volume is a critical component in determining a price to bid.  Automodular changed the scope of its services due to the changes mandated by GM and Delphi.  Such changes are captured within the language of Section 3 of the General Terms and Conditions, and should result in a price adjustment.  Michael Bauman, a purchasing manager with Debtor, specifically stated that "Quoted volume is meant by the buyer to give the supplier an understanding of what the volume may be, understanding that it always changes. … They're meant for planning purposes so that the supplier can develop a quotation." (Bauman Deposition Tr. at p. 54.) (See also Conley Deposition Tr. at p. 24.)

43.      As the Contracts were breached by the Debtors, they cannot now rely on the provisions therein to support an early termination of services contemplated under the Contracts. See e.g. City of Flint v. OK Indus., Inc., 2007 WL 1061908 (Mich. App. April 10, 2007) (citing proposition that one who first breaches a contract cannot maintain an action against the other contracting party for his alleged subsequent breach or failure to perform).  Regardless, Automodular will address Delphi's arguments.  Delphi mistakenly claims that Section 2.7 of its General Terms and Conditions defeats any reliance on volume forecasts.  In fact, Section 2.7 is a relatively standard general provision incorporated into many contracts where the buyer provides non-binding forecasts to assist the seller in planning its production.  Binding commitments are followed up only with purchase orders from the buyer.  Non-binding forecast provisions are placed in general terms whether or not the underlying contracts are for a fixed volume or percentage of requirements.

44.      In contrast, the volume projections exchanged between the parties during the negotiation process ran to the very foundation of the agreement and calculation of a per-piece

ME1 7149007v.1

price.  Volume projections were provided by Delphi and a range of volumes was contained in

every bid by Automodular.  Without a common understanding on volumes there was never a

meeting of the minds between the parties.  When Delphi accepted the offers of Automodular they

accepted a commitment to purchase services from Automodular with the specified range of

volumes.

45.    Debtors' reliance on Section 2.5 of the General Terms and Conditions is also

misplaced.  That section does not bar recovery here.  Automodular recognizes that the market

fluctuates and there will be times when work will increase or decrease.  However, in this case,

the parties specifically contemplated and contractually agreed that certain changes in the nature

of the service (i.e. line speed or number of shifts) would require a price adjustment.

## II.    A Reading of the General Terms and Conditions and Related Documents Supports Automodular's Claims

46.    The General Terms and Conditions (the "General Terms") were drafted by Delphi

and therefore, must be construed against Delphi.  <u>See Klapp v. United Insurance Group Agency,</u>

<u>Inc</u>., 663 N.W.2d 447, 455 (Mich. 2003).  The General Terms include the following provision:

> Buyer may at any time require Seller to implement
> changes to the specifications or design of the goods ***or to
> the scope of any services or work covered by this
> Contract,*** including work related to inspection, testing or
> quality control.

emphasis added.

47.    Debtors argue that "scope" only includes additional work and does not include a

reduction in volume or services.  This argument is wholly unsupported by the evidence.  Debtors

point to nothing in support of their interpretation of what a "scope" change includes.  In fact,

scope change is not a defined term in either the General Terms or the LTA and neither of the two

witnesses produced by Delphi could explain what a scope change means.  Greg Conley testified

**Page 16**

that the task of determining what would qualify as a change in scope by Delphi was not in his expertise (Conley Deposition at p. 48). Bauman testified that "I'm not familiar with that term scope change." (Bauman Deposition at p. 33) and admitted after reading section 3 of the General Terms and Conditions that a scope change could be more than a change in design (Id. at pp. 35-36).

48.    As to Delphi's purported unfamiliarity with the Scope Change Form used by GM, it is not surprising as both Delphi witnesses, one of which was a purchasing manager and the other an engineer, admitted that such forms would not come to them, but would more likely be sent to the sales department at Delphi. (See Conley Deposition Tr. at 40)

49.    More importantly though, Section 3 of the General Terms does not limit a change in scope to include only additional services but includes the "scope of **any** services or work covered by this Contract." (emphasis added)

50.    Debtors further argue that they did not issue a Design Record Change Notice for reductions in volume because changes in volume are not "scope changes" under the General Terms. Debtors' interpretation of the General Terms makes little sense. Paragraph 3 of the General Terms, when read in its entirety, speaks of design changes **or** scope changes. It is in the conjunctive and therefore, a scope change is not the same as a design change. Design changes admittedly may include additions or removals of parts to the car line. However, scope changes have a much broader interpretation and can include changes to the scope of the work to be provided.

51.    GM clearly recognized that the changes implemented here were a change in scope by issuance of a "Scope Change Form." The document issued by GM could not be more clear. Debtors ask the Court to ignore these forms because they were issued by GM. Debtors'

ME1 7149007v.1

argument has no basis in law or fact.  GM, in this case, was the OEM and Delphi was the Tier 1 supplier to the OEM.  The business relationship for the work provided by Automodular affected and involved all three parties.  Scope changes issued by GM affected all parties in the supply chain.  Indeed, under its contracts with Delphi, Automodular was obligated to follow GM's directives regarding number of shifts to be operated and line speed.  In fact, if Automodular failed to comply with the new schedule it would be held in breach by Delphi.  Debtors request that the Court ignore GM's Scope Change Forms because they don't like the fact that they exist exalts form over substance and ignores the practical realities of the industry.

52.     Debtors also argue that because the Contracts are requirements contracts, with an integration clause, they can ignore all of the previous business dealings between the parties.  This result would result in a windfall to the Debtors.  As demonstrated below, that result is not supported by the case law or the facts here.

### III.     Extrinsic Evidence is Permitted Despite an Integration Clause

53.     Debtors' reliance on an integration clause is misplaced.  Purchase orders issued by Debtors reference their General Terms and Conditions which contain an integration provision.  However, the purchase orders standing by themselves are not integrated contracts.  They are not countersigned documents.  For the US Contract, the purchase orders represent the acceptance of the offer made by Automodular.  Only the combination of the two documents creates a contract and only the two documents together can be integrated into one contract.  To the extent that the terms of the purchase order conflict with the terms of the offer (i.e. Automodular's bid) then the court must resolve the conflict by accepting extrinsic evidence.  *See, e.g*. UCC § 2-207 (    )

54.     Debtors rely on UAW-GM Human Resources Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. App. 1998) for the proposition that "the parol-evidence rule

<u>generally</u> prohibits a party from presenting" parol or extrinsic evidence regarding an "integrated agreement." Debtor's Objection ¶ 6 (emphasis added). There are clear exceptions, and the circumstances of this case give rise to one of those exceptions. The <u>UAW</u> Court recognized that parole evidence is admissible "where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'" <u>Id</u>. at 418. Here, the agreement is obviously incomplete on its face.

55. With respect to Lordstown, Debtors argue that the relationship was solely based on a serious of purchase orders. However, Debtors ignore the fact that a purchase order in and of itself is not a contract, but may form a part of the contract - either the offer or acceptance. In this case, the Debtors' request for quotation started the process, and Automodular's response providing a quote for the work to be provided was then the offer and the Debtors' purchase order was the acceptance.

56. The purchase orders cannot be understood in a vacuum. For example, if you look at one of the purchase orders - 550162897, it references part number 52423591. However, no where on the purchase order does it say what the requirement is to build that part. Debtors' witness conceded that the purchase orders themselves do not include all of the information necessary to determine what changes were being made or what services were to be provided. See e.g. Bauman Deposition Tr. at pp. 13-18. Another example is Section 2.5 of the General Terms which states that "Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract." However, the General Terms do not include any quantities, dates or times for deliveries but do recognize that the parties must look outside the General Terms themselves to establish those requirements.

57.     Thus, the statement of requirement (or SOR) that GM provides along with Automodular's quotation outlines how that part is to be assembled and the sequencing process understood and therefore those documents must form part of the contract between the parties just as much as the bare bones purchase orders.

## IV.    Extrinsic Evidence is Permitted When the Contract is Ambiguous

58.     As stated above, Debtors admitted that they drafted the General Terms.  As such, any ambiguity is construed against Delphi.  See Klapp v. United Insurance Group Agency, Inc., 663 N.W.2d 447, 455 (Mich. 2003).   In this case the Contracts themselves, and more specifically, application of Paragraph 3 of the General Terms, are ambiguous.  The term "scope" is admittedly not defined in any of the documents.  A reading of the Contracts (including the purchase orders) does not further explain the parties' understanding of what constitutes a scope change.  Therefore, it is necessary to look outside the Contracts to better understand the meaning of this section.

59.     Under Michigan law, extrinsic evidence is admissible for the purposes of interpreting an ambiguous agreement.  See, e.g., Tel-Towne Prop. Group v. Toys "R" Us-Delaware, Inc., 2007 WL 2572031, at *4 (E.D. Mich. Sept. 5, 2007) ("If, however, the contract language is ambiguous, the court may consider extrinsic evidence to ascertain the parties' intent or to determine whether there is a latent ambiguity.") (citing Glenwood Shopping Ctr. Limited Partnership v. K Mart Corp., 356 N.W.2d 281 (1984); Henry v. J.B. Publishing Co., 221 N.W.2d 174 (1974); Wonderland Shopping Center Venter Limited Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085 (6th Cir. 2001).

60.     The statement of work, request for a quote, review of work, bid documents, formal letters of quotation, all form a part of the parties' understanding with respect to the work

**Page 20**

to be provided under the Contracts. Once Automdoular receives a RFQ, it designs an assembly system to operate at the precise speed needed to meet the demands for the work proposed. Automdular's quote in response outlines a break down of its fixed costs and how they are to be spread over the length of the contract depending on the volume quoted. As the assembly system is specifically designed for the customer, Automodular's quote also includes the rate or speed of the manufacture line (including the net jobs per hour and number of shifts).

61.     The Lordstown pre-contract documents clearly contemplated a price change if the volume exceeded a 10% variation. The exchange of documents also referred to the shifts, line speed and fixed costs associated with the pricing. If the Debtors thought that a change in shifts did not justify a price increase, then why did they request a new quote when they changed the shift requirements from 2 to 3 shifts?

62.     For the Oshawa work, the bid documents provided a quote based on Delphi's bid package, including volume estimates, and estimated floor space, manpower and capital/tooling. Further exchanges included quotes with a selling price and based on a 2 shift situation for two car lines. Automodular started purchasing and operating in reliance on the accepted quote. Therefore, the LTA was not intended to supersede the quote and acceptance.

**V.      Extrinsic Evidence is Permitted When There is a Latent Ambiguity**

63.     In addition to being admissible for the purposes of interpreting an ambiguous agreement, extrinsic evidence is also admissible for ascertaining whether there is a latent ambiguity which is not apparent from the face of the agreement. See, e.g., Scholz v. Montgomery Ward & Co., Inc., 468 N.W.2d 845, 853 (Mich. 1991) ("A latent ambiguity is one where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice

**Page 21**

among 2 or more possible meanings.") (citations and punctuation omitted) (Levin, J., concurring in part, dissenting in part). Therefore, even if the documents seem patently unambiguous, the present dispute has evidenced that a latent ambiguity exists with respect to the scope of work to be provided under the original Contracts and with respect to the parties' interpretation of what is considered a change in scope under Paragraph 3 of the General Terms.

## VI.    The Debtors' Other Arguments Fail

64.    Debtors argue that because there was a decrease in volume, and even though the line speed and services also changed, then Automodular is not entitled to compensation. In support, Debtors cite paragraph 3 of the Long Term Agreement that applied to Oshawa only. This section provides that no price increase shall occur on account of "any increases in Seller's labor, materials, overhead, or other costs." Automodular is **<u>not</u>** claiming an **increase** in labor, materials, overhead or other costs. Wages didn't increase, material prices didn't change, instead it was a change in the work requested by Debtor that affected costs. Therefore, this argument by the Debtors is irrelevant and simply an attempt to mislead the Court.

65.    Debtors also argue that GM has declined to change its prices or formally rejected a request by Automodular to change its prices. Again, Debtors' argument is an attempt to avoid addressing the issue at hand. The GM issues referred to by Delphi are by and between Automodoular and GM, and are not related to the present dispute. Thus, the disputes (if any) between Automodular and GM are not relevant to this matter. Despite that, and to clarify the mis-statements in the Objection, there were three (3) instances when Automodular requested pricing changes from GM. The parties are still negotiating one of those requests (Debtors misleadingly say GM declined to change the price); the second was initially rejected but will be revisited by the parties; and the third was **granted or approved** by GM.

Page 22

## VII.    Automodular's Remaining Claims are Valid and Supported by the Record

66.    Debtors admit that many of the "secondary claims" are compensable claims but then attempt to argue that Automodular has not provided sufficient supporting documentation for the claims.  Automodular has provided invoices, spreadsheets, letters, emails, etc. in support of the claims.  Automodular has provided numerous documents in support of its claims and Debtors' assertion to the contrary is disingenuous.

67.    Debtors further attempt to muddy the waters by claiming that Automodular has not established that it made efforts to become more efficient to offset the increased costs. Debtors provide no basis for this argument.  Despite that, Automodular did provide documents to the Debtors evidencing the fact that the parties engaged in a program to review any potential savings and it was determined at the end of that program that there were no cost savings to be made.

### A.    Early Termination of GMX231 Line

68.    Debtors argue that the GMX231 line was terminated on time in 2007, despite the fact that the Contract runs through 2010.  Although the Debtors cite Mr. Conley's declaration, neither the Debtors nor Mr. Conley cite to any documents supporting the argument that the early termination of the Contract was contemplated by the parties.

### B.    Unauthorized Grease Backcharge

69.    Without any support, Debtors claim that Automodular did not contest the validity of the amount it owed the Debtors.  The Debtors have again taken great liberties with the facts of this case.  The documents provided by Automodular clearly show that Automodular did **not** consent to the credit, objected to it being taken, and requested the immediate return of the funds.

ME1 7149007v.1

70.     Automodular did offer in a letter to Delphi to resolve a number of outstanding issues including adjustment for the currency exchange rate, the scope change for the Oshawa contract and the addition of the foam pad work, in exchange for which Automodular offered to deduct the cost of applying nygel grease.  (Dell Letter October 5, 2006, DPH-00119)  The offer was a package deal and contained both demands and concessions in the spirit of compromise and good faith negotiation.  In response Delphi refused to negotiate any of the outstanding issues, but unilaterally decided to take the credit offered for the nygel grease.

71.     Debtors claim that they were entitled to take the credit as part of a setoff of amounts due and owing.  However, Debtors provide nothing to indicate they were entitled to a credit and nothing to indicate the credit was authorized.  The credit taken by the Debtors was a unilateral action that was not approved by Automodular.

72.     Debtors' own arguments in this case weigh strongly against allowance of any grease credit.  Debtors repeatedly argue that the parties are bound by the contract documents and cannot adjust for changes in the market.  Debtors cannot have their cake and eat it too.  If Debtors want to accept benefits of the parties' contractual relationship then they must accept the burdens as well.

## C.     Debtors' Failure to Adjust for the Currency Exchange

73.     Although Debtors have admitted the obligation to adjust for currency exchange, they have failed to do so.  Debtors' justification for its breach of contract is to argue that Debtors "cannot comprehend" the calculations.  Notably, Debtors had no issues comprehending the currency exchange rate application prior to January 2006.  Furthermore, since then, Automodular has sent the Debtors numerous documents evidencing the calculations (including the LTA itself) and has offered to verbally explain all calculations to the Debtors.  Debtors' assertion that they

**Page 24**

haven't adjusted for the currency exchange for over two (2) years simply because they don't understand it is unjustifiable.  Throughout this time, if the currency exchange rate benefited the Debtors, then the Debtors gladly accepted the credits associated therewith.  Again, Debtors cant have it both ways - they cannot accept the benefits of the contracts without also complying with the obligations required therewith.

74.    As Debtors have admitted to failing to properly adjust for the currency exchange rate, Automodular is entitled to attorney fees and costs associated with its motion to compel compliance with these obligations.

**D.    Debtors' Failure to Pay for the Foam Pad**

75.    Debtors admit that the addition of the foam pad is a design record change or a scope change under the Contract but have not substantiated their failure to pay for the additional services provided.  Debtors argue that the pricing should be limited to a quote provided by Automodular in 2005.  However, throughout its pleadings, Delphi argues that the quotes do not form the basis of the contractual relationship.

76.    Automodular notified the Debtors in 2006 that the previous quote was no longer valid and that the additional work would require labor, space and overhead.  Pursuant to Paragraph 3 of the General Terms, the parties are to negotiate in good faith for any price adjustments.   Delphi did not negotiate in good faith but rather refused to compensate Automodular for the additional work.  Automodular has quoted the work at $0.118 per piece and Delphi has not rebutted that with any legitimate support.

**E.    Debtors' Failure to Pay for the Screws, Labels and Clips, and Short Charges**

77.    First, Automodular's claims for the price increase related to the screws was included in its original Motion (See Exhibit B attached to the Motion).  The documentation

**Page 25**

provided in this matter clearly states that Automodular can pass through to Delphi through a per piece price adjustment any increases in price rendered by the supplier. Debtors demanded that Automodular purchase certain screws from ITW Medalist. When Automodular received notice of the price increase from ITW Medalist, it immediately notified the Debtors. Debtors have offered nothing to contradict its established obligations.[7]

78.     Second, Automodular provided documentation in support of its claims for short charges directly to the Debtors. To date, Debtors have offered no justification for their failure to pay for these invoices in full.

79.     Finally, Debtors mischaracterize the obligations relating to the label and clip. The Debtors admitted that effective October 1, 2006, they would adjust for the addition of the label and clip. However, Debtors already took a credit of $2,115 for the label and clip and owe and additional $1,131.11

80.     Debtors admit that the addition or removal of parts from the assembly line constitute changes in scope under the Contracts. Despite that admission, Debtors have yet to compensate Automodular for the addition of the foam pad, labels and clip, screws, etc. Debtors' admission that the above constitute changes in scope, and failure to pay for those changes, justifies an award of attorney fees and costs on these issues.

WHEREFORE, Automodular respectfully requests that this Court grant the relief requested in the motion by (1) compelling Debtors to cure all defaults under the assumed Contracts; (2) granting Automodular an administrative expense claim for the amount due and owing under the Contracts and compelling Debtors to make immediate payment; and (3)

---

[7] Debtors attempt to argue that the entire claim is pre-petition simply because the price was increase effective December 2004. This argument fails because the price increase continued throughout the parties' relationship and applies to screws purchased and supplied after the Petition Date.

**Page 26**

granting such other and further relief as deemed just and proper, including but not limited to

Automodular's attorney fees and costs associated with the claims.

/s/ Eduardo J. Glas
Eduardo J. Glas, Esquire (# EG7027)
McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York  10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile

and

Katharine L. Mayer, Esquire
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19899
(302) 984-6300

Attorneys for Automodular Corporation f/k/a
Automodular Assemblies Inc., Tec-Mar Distribution
Services, Inc., and Automodular Assemblies (Ohio) Inc.

DATED: February 20, 2008

**Page 27**