MICHAEL J. GARCIA                              HEARING DATE: February 29, 2008
United States Attorney for the                 TIME:  10:00 AM
Southern District of New York
By: MATTHEW L. SCHWARTZ
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-1945
Fax: (212) 637-2750

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE:                                         Chapter 11

    DELPHI CORPORATION, *et al.*,          Case No. 05-44481 (RDD)

               Debtors.         (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# UNITED STATES OF AMERICA'S MOTION FOR
# LEAVE TO FILE LATE CLAIM

The United States of America (the "Government"), by its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for an order, pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1), extending the time for the United States Equal Employment Opportunity Commission (EEOC) to file its proof of claim (claim number 16727, or the "EEOC Claim"), and allowing such claim against the debtors as if the EEOC had filed its claim before the bar date.

The EEOC Claim corresponds to the monetary component of damages in an enforcement action pending in the United States District Court for the Western District of New York, brought by the EEOC on behalf of a nationwide class of

Delphi Corporation employees based upon a sick leave policy in place at the company that is in violation of the Americans with Disabilities Act under clear Second Circuit law. Delphi's unlawful policy was first brought to the attention of the EEOC in August 2006 — after the Bar Date — when an employee at a Delphi plant in Rochester, New York, complained to Delphi and to the EEOC. The EEOC then quickly investigated the complaint and determined that it was valid, attempted conciliation efforts with Delphi, and when they failed, filed suit in federal court (and, simultaneously, filed the EEOC Claim in this Court). The EEOC's efficient and diligent prosecution of its claims after it learned about the unlawful policy — all of which occurred after the Bar Date — therefore comfortably satisfies the multi-factor test for "excusable neglect" that courts apply to claims filed after the bar date. This Court should therefore allow the EEOC Claim.

## BACKGROUND

**A.  Debtors' Bankruptcy and the Bar Date Order**

1.  On October 8 and 14, 2005 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 1101 *et seq.*, as amended (the "Bankruptcy Code").

2.  The Bar Date in these jointly-administered cases was July 31, 2006.

**B.  The EEOC's Investigation of Delphi's Unlawful Sick Leave Policy**

3.  On or about August 28, 2006, the EEOC National Call Center was first contacted about a potential claim of discrimination at Delphi Corporation ("Delphi") by Stanley Straughter ("Straughter" or the "Charging Party"), a Delphi employee in

Rochester, New York. *See* Declaration of Margaret A. Malloy ("Malloy Decl.") ¶ 4.

4.  Over the next several months, the EEOC worked with Straughter to prepare and finalize a formal charge of discrimination. On August 30, 2006, the EEOC sent Straughter a questionnaire to complete. *See* Malloy Decl. ¶ 5; Ex. A.

5.  Straughter filled out the questionnaire on or about September 5, 2006. Among other things, Straughter's responses indicated that he had been fired by Delphi on August 17, 2006, "for not showing [his] medical history," and that he had already made Delphi aware of his complaint. *See* Malloy Decl. ¶ 5; Ex. B.

6.  Specifically, Straughter informed the EEOC that he had been employed as a laborer by Delphi since May 22, 2006. He called in sick to work on August 14 and 15, 2006, and returned to work on August 16, 2006, with a note from his doctor. Delphi informed Straughter that he needed to execute a medical release so that Delphi could obtain more information about his medical condition from his personal physician. Straughter initially refused to sign, but was told that Delphi would not accept the excuse for his absence without the release. Straughter then signed the release, but modified it to permit Delphi only to verify that he was unable to work on August 14th and 15th, but not to discuss his actual medical condition. Delphi did not accept this modified release, and when Straughter explained that he believed Delphi's policy was unlawful, he was immediately fired for being an "unsatisfactory temporary employee." *See* Malloy Decl. ¶ 6.

7.  Delphi's sick leave policy, if Straughter's allegations were true, was a plain violation of the Americans with Disabilities Act, under both the text of the

statute and under established Second Circuit law. *See* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."); *Conroy v. New York State Dep't of Correctional Services*, 333 F.3d 88, 95-96 (2d Cir. 2003) (holding that policy of requiring employees to submit diagnoses to justify sick leave violates ADA, and remanding to develop factual record concerning whether policy was consistent with business necessity).

8.   On the basis of Straughter's allegations, EEOC Investigator Jennifer Carlo drafted a Charge of Discrimination for Straughter's signature, which she sent to him on or about September 13, 2006. *See* Malloy Decl. ¶ 7; Ex. C. Ms. Carlo and Straughter subsequently discussed the draft Charge of Discrimination, and on September 18, 2006, Ms. Carlo sent a revised Charge of Discrimination to Straughter for his signature. *See* Malloy Decl. ¶ 7; Ex. D.

9.   On or about September 22, 2006, Straughter formally filed his Complaint of Discrimination with the EEOC; it was indexed as EEOC Charge No. 525-2006-01314. *See* Malloy Decl. ¶ 8; Ex. E.

10.   On October 2, 2006, the EEOC forwarded the Charge of Discrimination to Delphi for a response, giving the company until October 23, 2006, to provide a position statement. The EEOC also served Delphi with a Request for Information as part of its investigation. Among other things, the Request sought basic

statistical information about Delphi, a copy of the relevant union's collective bargaining agreement with Delphi, and the identities of potential witnesses to Delphi's unlawful activities, including any employees who had either (a) been required to sign a medical authorization form, or (b) refused to sign one.  Finally, the EEOC indicated to Delphi that it was open to "consider[ing] a resolution by mutually agreed to settlement."  *See* Malloy Decl. ¶ 9; Ex. F.

11.    On October 17, 2006, Delphi (through its attorneys) requested an extension of time in which to respond to the Charge of Discrimination.  The EEOC agreed to extend Delphi's response date until November 6, 2006.  *See* Malloy Decl. ¶ 10; Ex. G.

12.    On November 6, 2006, Delphi responded to the Charge of Discrimination, essentially admitting the factual allegations of Straughter's complaint, but contending that he could not demonstrate a prima facie case of retaliation or violation of the ADA.  Relying on EEOC guidance that an employer "may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, as long as it has a policy or practice of requiring all employees . . . to do so," Delphi argued that it was permitted to require its employees to execute a release so that the company could obtain medical records and speak with personal physicians to question the validity of a doctor's note.  Delphi did not, however, respond to the EEOC's Request for Information.  *See* Malloy Decl. ¶ 11; Ex. H.

13.    On December 11, 2006, the EEOC contacted Delphi to remind the

5

company that it had not fully responded to the Request for Information. The EEOC gave Delphi until December 29, 2006, to provide a complete response. *See* Malloy Decl. ¶ 12; Ex. I.

14.     On January 31, 2007 — more than three months since the information was first due, and more than a month after the last deadline — Delphi responded to the EEOC's Request for Information. Among other things, Delphi indicated that it was "unable to answer" the EEOC's request for documentation regarding employees who had been required to sign a medical authorization pursuant to Delphi's unlawful policy because "it does not keep a log of every employee asked to sign an authorization." Delphi did provide, however, the identity of three other employees who had, like Straughter, refused to sign an authorization. *See* Malloy Decl. ¶ 13; Ex. J.

15.     After reviewing Delphi's submissions, the EEOC determined that it needed further information to investigate the claim of discrimination. Therefore, on or about February 26, 2007, the EEOC sent Delphi a second Request for Information. Among other things, the second Request sought an explanation of why Straughter's modified medical authorization was insufficient, given Delphi's proffered justification for its policy; a copy of the policy; exemplars of medical authorizations used by Delphi; and certain information pertaining to the other employees who had refused to sign authorizations. Delphi was to respond by March 19, 2007. *See* Malloy Decl. ¶ 14; Ex. K.

16.     On or about April 4, 2007, Delphi finally responded to the EEOC's

6

second Request for Information, providing some documentation and objecting to a variety of the EEOC's requests as, variously, irrelevant or overly broad. *See* Malloy Decl. ¶ 15; Ex. L.

17.     Throughout this give-and-take process with Delphi, the EEOC simultaneously pursued other avenues of investigating the Charge of Discrimination, including collecting further information from Straughter. *See* Malloy Decl. ¶ 16.

18.     On or about May 22, 2007, the EEOC issued its Letter of Determination. In relevant part, the EEOC concluded:

> The investigation determined that [Delphi] subjected [Straughter] and a class of employees nationwide to an unlawful policy of making disability-related inquiries that are not job-related and consistent with business necessity, in violation of the ADA. [Straughter] offered to sign a revised release that would have allowed [Delphi] to speak with his doctor and verify the dates he was off work and that it was for a legitimate, medical reason. This should have satisfied [Delphi]'s need to verify the absence. [Straughter]'s refusal to sign the release as it was written and his objection that the medical inquiry was overly broad was protected activity as defined by the statute. Consequently, [Delphi]'s discharge of [Straughter] for opposing the policy was unlawful retaliation.

The EEOC also informed Delphi that it would like to "eliminate the unlawful practices through informal methods of conciliation" and invited Delphi to discuss settlement of the Charge. *See* Malloy Decl. ¶ 17; Ex. M.

19.     The following day, May 23, 2007, the EEOC contacted Delphi to begin conciliation efforts and outlined a comprehensive remedy for Delphi's discriminatory practices, which included, among other things: (a) eliminating

7

Delphi's unlawful sick leave policy, (b) providing anti-discrimination training to Delphi employees, (c) posting EEOC materials in conspicuous places throughout Delphi facilities, (d) developing a meaningful anti-discrimination complaint procedure, (e) reinstating Straughter, (f) paying monetary damages to Straughter to make him whole for Delphi's unlawful discrimination, as well as similar relief for any other individuals determined to have been harmed by Delphi's discriminatory practices, and (g) paying pain and suffering damages to Straughter. In addition, the EEOC proposed that Delphi agree to permit it to monitor compliance with the terms of any conciliation agreement for not less than three years. Delphi was to respond to the EEOC's offer, as well as certain additional requests for information, by June 6, 2007. *See* Malloy Decl. ¶ 18; Ex. N.

20. On or about June 12, 2007, Delphi responded to the EEOC's offer of conciliation. Delphi flatly rejected the EEOC's offer, and indicated that it did "not intend to submit a counter-proposal." *See* Malloy Decl. ¶ 19; Ex. O.

21. On June 19, 2007, the EEOC confirmed to Delphi that conciliation efforts had failed, and that the case was being forwarded to the legal unit of the EEOC's New York District Office for review to determine whether the EEOC would file an enforcement action in United States District Court. *See* Malloy Decl. ¶ 20; Ex. P. On the same date, the EEOC sent a similar notice to Straughter. *See* Malloy Decl. ¶ 20; Ex. Q.

22. The EEOC's Regional Attorney's Manual (available at www.eeoc.gov/litigation/manual/index.html) outlines the steps that the EEOC must

8

take before filing a federal court action to remedy alleged violations of the ADA. In cases (such as this one) that require approval from the Commissioners at EEOC headquarters in Washington prior to filing suit, the legal unit must prepare a "presentation memorandum" to the General Counsel containing its assessment of the case. The presentation memorandum is extensive, requiring the legal unit not only to describe the background and legal analysis involved in a case, including the proof that it anticipates introducing, but also to prepare a breakdown of anticipated litigation costs and to include a draft of the complaint to be filed. (A sample presentation memorandum is contained in the Manual). The Commissioners must then authorize the litigation before it can be filed. *See* Malloy Decl. ¶ 21.

23.  In this case, the pre-filing process unfolded very quickly. The EEOC filed a complaint on behalf of a class of Delphi employees in the United States District Court for the Western District of New York on or about September 28, 2007 (the "EEOC Complaint"), just over three months after conciliation efforts had failed. The EEOC Complaint seeks, *inter alia*, injunctive relief, as well as monetary relief to make the victims of Delphi's policy whole. The EEOC Complaint also seeks punitive damages. *See* Malloy Decl. ¶ 22; Ex. R.

**C.    The EEOC Claim**

24.  Because Delphi was at that time in bankruptcy, and because the enforcement action sought monetary damages, the EEOC also protected its interest by filing claims in this bankruptcy. On or about October 16, 2007, the EEOC filed two claims with the Debtors' claims agent. Claim number 16727 asserts an

unliquidated priority claim, corresponding to damages caused by Delphi's pre-petition conduct. *See* Malloy Decl. ¶ 23; Ex. S. Claim number 16728 asserts an unliquidated priority administrative expense claim, corresponding to damages caused by Delphi's post-petition conduct. *See* Malloy Decl. ¶ 23; Ex. T.

25. On or about October 26, 2007, debtors filed their Twenty-Second Omnibus Objection, including an objection to both of the EEOC's claims (numbers 16727 and 16728).

26. On November 26, 2007, the Government filed its response to debtors' objection, noting that the EEOC Claim should be deemed timely because it accrued after the bar date.[1] Pursuant to this Court's prior orders in this case, the Government's response served to adjourn debtors' objection to the EEOC's claims; debtors have not yet rescheduled a hearing on those objections.

27. On January 28, 2008, however, debtors filed a Notice of Deadline to File Motion for Leave to File Late Claim With Respect to Late Claim Filed by United States Equal Employment Opportunity Commission (Proof of Claim 16727).

---

[1] Claim number 16728 is actually an administrative claim for debtors' post-petition liabilities, and so is not subject to the Bar Date at all. *See* Bar Date Order ¶ 5(c) ("Proofs of claim are not required, at this time, to be filed by any Person or Entity . . . which asserts a Claim allowable . . . as an administrative expense of the Debtors' chapter 11 cases."). *See generally In re Pro Set, Inc.*, 193 B.R. 812, 815-16 (Bankr. N.D. Tex. 1996) ("Because administrative expense claimants . . . do not file proofs of claim, the deadlines set for filing a proof of claim do not apply to them.") (citing WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE 2d § 42:14 (1994)). It is not clear whether debtors are pressing their objection to the EEOC's administrative claim.

**D.     *EEOC v. Delphi Corporation***

28.     Meanwhile, Delphi answered the EEOC Complaint on or about November 30, 2007.  The answer did not assert any bankruptcy-related defenses. *See* Malloy Decl. ¶ 24; Ex. U.

29.     Pursuant to a scheduling order entered by Magistrate Judge Payson, fact discovery in the *EEOC v. Delphi* enforcement action is presently expected to last until July 24, 2008, and expert discovery will last until August 29, 2008. Dispositive motions are due no later than October 24, 2008.  No trial date has been scheduled, but the Court has scheduled an interim status conference for July 9, 2008.  *See* Malloy Decl. ¶ 25; Ex. V.

30.     Discovery, in other words, has just begun in the enforcement action: the parties only just made their initial disclosures on February 6, 2008.  (The EEOC provided 215 pages of documentation; Delphi provided none).  The parties anticipate that one of the main subjects of discovery will be trying to identify the Delphi employees that were subject to and injured by its unlawful policy.  Because Delphi has not even identified the facilities at which the policy was or is in place, identifying all putative class members is, at this point, impossible.  *See* Malloy Decl. ¶ 26.

## ARGUMENT

## THE EEOC CLAIM SHOULD BE ALLOWED

31.     Section 502 of the Bankruptcy Code provides that a proof of claim is not timely filed unless it is permitted under specified conditions in Chapter 7 or

11

under the Federal Rules of Bankruptcy Procedure. *See* 11 U.S.C. § 502(b)(9). In Chapter 11 cases, a proof of claim is filed pursuant to Bankruptcy Rule 3003(c), which provides in relevant part:

> (2) Who Must File. Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.
>
> (3) Time For Filing. The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed. Not withstanding the expiration of such time, a proof of claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2), (c)(3), and (c)(4).

Fed. R. Bankr. P. 3003(c).

32. Bankruptcy Rule 3003(c) is read in conjunction with Bankruptcy Rule 9006(b)(1), which provides an exception to the requirement under Rule 3003(c) that a proof of claim should be filed before the claims bar date:

> [W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Fed. R. Bankr. P. 9006(b)(1).

33. The Supreme Court defined the term "excusable neglect" in *Pioneer Investment Services v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993). In *Pioneer*, a Chapter 11 case, a creditor sought an extension of the claims bar date under Rule 9006(b)(1) after the bar date had lapsed. The Court held that

12

Congress intended Rule 9006(b)(1) to be a "flexible" rule, and defined neglect broadly, permitting courts "to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Id.* at 388.  After determining that "neglect" is not limited to situations where the failure to timely file was beyond the control of the filer, the majority held that an equitable evaluation must be made to determine whether the neglect was "excusable."  *Id.* at 394-95.  The Court then determined that the following non-exhaustive list of factors should be considered in each case to determine whether the neglect is "excusable":

> i.  the reason for the delay, including whether it was within the reasonable control of the movant;
>
> ii.  the danger of prejudice to the debtor;
>
> iii.  the length of the delay and its potential impact on judicial proceedings; and
>
> iv.  whether the movant acted in good faith.

*Id.*

34.  Applying these standards, courts in this district routinely permit late-filed claims that accrued after the claims bar date, or in situations where the claimant was unaware that its claim had accrued until after the bar date.  For example, in the Enron bankruptcy, Judge Gonzales permitted a multi-million dollar claim filed five months after the bar date, noting that the claimant "was not even aware that it had a claim until after the bar date, and that 'the facts here are

13

sufficiently unique that . . . allowing [the claimant]'s late proofs of claim against the Debtors would [not] create "floodgate" concerns."' *In re Enron Corp.*, 419 F.3d 115, 132 (2d Cir. 2005) (quoting *In re Enron Corp.*, No. 01-16034 (AJG), order at 12-14 (Bankr. S.D.N.Y. Sept. 23, 2003)).

35.    In this case, the facts giving rise to the EEOC Claims did not occur until after the July 2006 bar date had passed. The Charging Party was fired by Delphi in August 2006. He then reported Delphi's unlawful policy to the EEOC on September 22nd, and the EEOC promptly opened an investigation. Finding the Charging Party's allegations to have merit, the EEOC initiated an enforcement proceeding on behalf of a class of employees in the Western District of New York on September 28, 2007.

36.    Indeed, to the extent that there was any inexcusable delay in the year that elapsed between the Charging Party's initial complaint of discrimination and the EEOC's filing of its enforcement action, it is directly attributable to Delphi. During that year, Delphi sought at least one extension of time, and on several occasions simply failed to respond to the EEOC's requests, requiring the investigation to take that much longer. The time breaks down as follows:

| | |
|---|---|
| 8/28/2006 | EEOC contacted by Charging Party |
| 8/28/2006-9/22/2006 | Waiting for Charging Party to finalize Claim |
| 10/2/2006-11/6/2006 | Waiting for Delphi to Respond to Claim and Request for Information |
| 11/6/2006-1/31/2007 | Waiting for Delphi to Respond to Request for Information |

14

| | |
|---|---|
| 2/26/2007-4/4/2007 | Waiting for Delphi to Respond to Second Request for Information |
| 5/22/2007 | Letter of Determination |
| 5/23/2007-6/12/2007 | Waiting for Delphi to Respond to Conciliation Offer and Request for Information |
| 6/19/2007-9/28/2007 | Administrative Process Relating to Filing Federal Court Litigation |
| 9/28/2007 | *EEOC v. Delphi* Filed |
| 10/12/2007 | EEOC Claim Filed |

In short, approximately six months of the time between notice and filing was attributable to Delphi's delay, another one month related to waiting for the Charging Party to finalize his complaint so that the EEOC's investigation could begin, and three months were consumed by the EEOC's administrative review process — required by regulation — for filing federal court litigation. This was not a case where the creditor dragged its feet.

37. As the EEOC was not aware of Delphi's illegal policy until the bar date had passed, and because it diligently pursued its claim once it was notified of Delphi's unlawful policy, its failure to file a "timely" claim is excusable. With particular respect to the *Pioneer* factors, (i) the delay is not attributable to the EEOC, which did not learn about the claim until after the Bar Date had passed and then prosecuted its investigation quickly and efficiently; (ii) Debtors will not be prejudiced by allowing the EEOC Claim, as they are still in the midst of processing the timely-filed claims against them and have only litigated a handful of the

15

contested claims; (iii) because Delphi's Plan has already been confirmed and because the Court has scheduled claims hearing dates at least into September 2008, allowing the EEOC Claim will not delay judicial proceedings; and (iv) the EEOC acted in good faith by pursuing its investigation quickly and then filing its claim approximately two weeks after filing the enforcement action in the Western District. Each of the *Pioneer* factors, therefore, weighs in favor of permitting the EEOC's claim.

38.     *Lone Star Industries v. Rankin County, Mississippi Board of Supervisors (In re New York Trap Rock Corp.)*, 153 B.R. 642 (Bankr. S.D.N.Y. 1993) is directly on point. In that case, the debtor sought to enjoin the Rankin County (Mississippi) Board of Supervisors from prosecuting a lawsuit brought under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.*, because the County did not file its proof of claim — which, as here, was the monetary damage component of its enforcement action — until after the claims bar date had passed. The CERCLA action in that case concerned sludge oil contamination on debtor's property in Mississippi, and related clean-up costs. Even though the contamination had occurred pre-petition, Judge Schwartzberg concluded that the County's technically untimely claim could potentially be allowed under *Pioneer* because neither the debtor nor the County were aware of the potential CERCLA claim prior to the bar date. *See Lone Star Indus.*, 153 B.R. at 647.

16

39.     Subsequently, however, the Court disallowed the late claim.  In doing so, however, it relied on two critical considerations that underscore exactly why it would be appropriate to *allow* the EEOC's claim.  First, the Court held that permitting the late-filed claim would prejudice the debtors because it "will have a disruptive effect on the reorganization proceeding because it will put on hold the confirmation of the debtor's proposed plan."  *In re New York Trap Rock Corp*, 153 B.R. 648, 652 (Bankr. S.D.N.Y. 1993).  In addition, the Court concluded that the County had strategically waited to file its proof of claim until after it realized that other strategies (such as calling its claim an administrative expense) would not work, raising a "significant question as to the Board's good faith assertion of its prepetition CERCLA claim when it originally *elected* not to participate in the reorganization process and *instead*, commenced a district court CERCLA lawsuit."  *Id.* at 653 (emphasis supplied).

40.     Neither concern exists here.  *First*, debtors' plan has already been confirmed, and the overwhelming majority of the claims are yet to be litigated. There is therefore no prejudice to the debtor arising out of the EEOC's late claim. *Second*, there can be no real accusation that the EEOC acted in bad faith or otherwise strategically chose not to assert its claim here.  Unlike in *Trap Rock*, the EEOC did not file a district court action *instead* of asserting a proof of claim; rather, it filed *both* an enforcement action in district court *and* a proof of claim in this Court.

17

41.     In short, the EEOC prosecuted the Charging Party's claim of discrimination quickly and included Delphi in every step of the process — which was the only reason the investigation was not wrapped up even sooner. Allowing the EEOC to assert its claim would neither prejudice the debtors nor impact the administration of these cases. On the other hand, if the EEOC is *not* able to press its claim in this case, then in future cases, it would be on the horns of a dilemma: either file charges of discrimination without having had sufficient time to investigate — a result that would both waste public resources and needlessly embarrass the targets of complaints that turned out to be unfounded — or don't file charges at all — and thereby allow an employer's bankruptcy to excuse its discrimination. Disallowing the EEOC's claim would also create a perverse incentive for bankrupt employers to stonewall investigations so that they could claim prejudice from the delay, rather than — as the anti-discrimination laws encourage — cooperate with law enforcement to eliminate unlawful practices through conciliation.

## CONCLUSION

For the foregoing reasons, the Government's motion should be granted, the EEOC Claim should be allowed, and the Debtors' objection should be denied.

Dated:  February 22, 2008
        New York, New York

                                      Respectfully submitted,

                                      MICHAEL J. GARCIA
                                      United States Attorney for the
                                      Southern District of New York
                                      Attorney for the United States of America

By:   /s/ Matthew L. Schwartz
        MATTHEW L. SCHWARTZ (MS-8159)
        Assistant United States Attorney
        86 Chambers Street
        New York, New York 10007
        Tel.: (212) 637-1945
        Fax: (212) 637-2750