IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
     In re                   :    Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :    Case No. 05-44481 (RDD)
                                                      :
        Debtors. :    (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

     I, Elizabeth Adam, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

     On February 7, 2008, I caused to be served the documents listed below (i) upon the parties listed on Exhibit A hereto via postage pre-paid U.S. mail:

    1)  Notice Of Sale Of Certain Assets At Auction [a copy of which is attached hereto as Exhibit B]

    2)  Expedited Motion For Orders Under 11 U.S.C. §§ 363, 365, And 1146 And Fed.R. Bankr. P. 2002, 6004, 6006, And 9014(A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Debtors' Assets Primarily Used In Debtors' Bearings Business Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities ("Bearings Business Sale Motion") [a copy of which is attached hereto as Exhibit C]

    3)  Sale And Purchase Agreement [a copy of which is attached hereto as Exhibit D]

    4)  [Proposed] Order Under 11 U.S.C. §§ 363, 365, And 1146 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 Authorizing And Approving (I) Sale Of Certain Of Debtors' Assets Comprising Substantially All Assets Primarily Used In Debtors' Bearings Business Free And Clear Of Liens, Claims, Interests, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain

Liabilities ("Bearings Business Sale Approval Order") [a copy of which is attached hereto as Exhibit E]

5) Bearings Business Bidding Procedures [a copy of which is attached hereto as Exhibit F]

6) Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002 And 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In Connection With Sale Of Debtors' Bearing Business ("Bearings Bidding Procedures Order") [a copy of which is attached hereto as Exhibit G]

On February 8, 2008, I caused to be served the documents listed below (i) upon the parties listed on Exhibit H hereto via overnight mail:

7) Notice Of Sale Of Certain Assets At Auction [a copy of which is attached hereto as Exhibit B]

8) Expedited Motion For Orders Under 11 U.S.C. §§ 363, 365, And 1146 And Fed.R. Bankr. P. 2002, 6004, 6006, And 9014(A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Debtors' Assets Primarily Used In Debtors' Bearings Business Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities ("Bearings Business Sale Motion") [a copy of which is attached hereto as Exhibit C]

9) Sale And Purchase Agreement [a copy of which is attached hereto as Exhibit D]

10) [Proposed] Order Under 11 U.S.C. §§ 363, 365, And 1146 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 Authorizing And Approving (I) Sale Of Certain Of Debtors' Assets Comprising Substantially All Assets Primarily Used In Debtors' Bearings Business Free And Clear Of Liens, Claims, Interests, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities ("Bearings Business Sale Approval Order") [a copy of which is attached hereto as Exhibit E]

11) Bearings Business Bidding Procedures [a copy of which is attached hereto as Exhibit F]

12) Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002 And 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In Connection With Sale Of Debtors' Bearing Business ("Bearings Bidding Procedures Order") [a copy of which is attached hereto as Exhibit G]

Dated: February 22, 2008

_/s/ Elizabeth Adam_
Elizabeth Adam

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 22nd day of February, 2008, by Elizabeth Adam, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _/s/ Leanne V. Rehder_

Commission Expires: _3/2/08_

# EXHIBIT A

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | Address3 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| ENVIRONMENTAL PROTECTION AGENCY | | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW | | WASHINGTON | DC | 20460 |
| ENVIRONMENTAL PROTECTION AGENCY | MARCUS C PEACOCK | DEPUTY ADMINISTRATOR | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW | WASHINGTON | DC | 20460 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 1 | | 1 CONGRESS ST SUITE 1100 | | | BOSTON | MA | 02114-2023 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 10 | | 1200 SIXTH AVENUE | | | SEATTLE | WA | 98101 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 2 | | 290 BROADWAY | | | NEW YORK | NY | 10007-1866 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 3 | | 1650 ARCH STREET | | | PHILADELPHIA | PA | 19103-2029 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 4 | | ATLANTA FEDERAL CENTER | 61 FORSYTH STREET SW | | ATLANTA | GA | 30303-3104 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 5 | | 77 WEST JACKSON BOULEVARD | | | CHICAGO | IL | 60604-3507 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 6 | | FOUNTAIN PLACE 12TH FLOOR STE 1200 | 1445 ROSS AVE | | DALLAS | TX | 75202-2733 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 7 | | 901 NORTH 5TH STREET | | | KANSAS CITY | KS | 66101 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 8 | | 999 18TH STREET SUITE 500 | | | DENVER | CO | 80202-2466 |
| ENVIRONMENTAL PROTECTION AGENCY REGION 9 | | 75 HAWTHORNE STREET | | | SAN FRANSISCO | CA | 94105 |
| EPA HAZARDOUS SUBSTANCE | | SUPERFUND YORK OIL SITE | US EPA REG II SUPERFUND ACCT | PO BOX 360188M | PITTSBURGH | PA | 15251 |
| EPA HAZARDOUS SUBSTANCE SF | | RELIABLE EQUIPMENT MI | ACCT NO 05297T126A SITE LE | PO BOX 70753 | CHICAGO | IL | 60673 |
| EPA HAZARDOUS SUBSTANCE SF RELIABLE EQUIPMENT MI | | ACCT NO 05297T126A SITE LE | PO BOX 70753 | | CHICAGO | IL | 60673 |
| EPA HAZARDOUS SUBSTANCE SUPERF | | C\O MELLON BANK RM 153 2713 | 3 MELLON BANK CTR | | PITTSBURGH | PA | 15259 |
| EPA HAZARDOUS SUBSTANCE SUPERFUND | | US EPA RGN IV  SUPERFUND ACCTG | PO BOX 100142 | | ATLANTA | GA | 30384 |
| EPA HAZARDOUS SUBSTANCE SUPERFUND | | PO BOX 360582M | | | PITTSBURGH | PA | 15251 |
| EPA HAZARDOUS SUBSTANCE SUPERFUND EPA REGION III | | SUPERFUND ACCTG  PO BOX 360515 | | | PITTSBURGH | PA | 15251 |
| EPA HAZARDOUS SUBSTANCE SUPERFUND YORK OIL SITE | | US EPA REG II SUPERFUND ACCT | PO BOX 360188M | | PITTSBURGH | PA | 15251 |
| EPA TRI DATA PROCESSING | | PO BOX 1513 | | | LANTHAM | MD | 20703 |
| Ohio Environmental Protection Agency | | 347 N. Dunbridge Road | | | Bowling Green | OH | 43402 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | | K W ZANK\TRUST DIV A\C5115114 | 611 WOODWARD AVE | | DETROIT | MI | 48226 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY - REGION 5 | BLAURA RIPLEYSPRFUND EACT SECT | 77 WEST JACKSON BLVD | | | CHICAGO | IL | 60604 |
| US ENVIRONMENTAL PROTECTION | | AGENCY REGION II YORK OIL CO | SITE 83 CV 1623 | PO BOX 360188M | PITTSBURGH | PA | 15251 |
| US ENVIRONMENTAL PROTECTION AGENCY | DAVID J KENNEDY | ASSISTANT US ATTORNEY SDNY | 86 CHAMBERS ST 3RD FL | | NEW YORK | NY | 10007 |
| US ENVIRONMENTAL PROTECTION AGENCY REGION 5 | | PO BOX 70753 | | | CHICAGO | IL | 60673 |
| US ENVIRONMENTAL PROTECTION AGENCY REGION 2 | JANE M KENNY | REGIONAL ADMINISTRATOR | 290 BROADWAY | 26TH FLOOR | NEW YORK | NY | 10007 |
| US ENVIRONMENTAL PROTECTION AGENCY REGION II YORK OIL CO | | SITE 83 CV 1623 | PO BOX 360188M | | PITTSBURGH | PA | 15251 |
| US EPA | DIANA EMBIL | REGION 5 77 WEST JACKSON BLVD | | | CHICAGO | IL | 60604-3590 |
| US EPA | REGINALD PALLESEN | REGION 5 77 WEST JACKSON BLVD | | | CHICAGO | IL | 60604-3590 |

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | Address3 | City | State | Zip |
|---|---|---|---|---|---|---|---|
| US EPA | TOM NASH | REGION 5 77 WEST JACKSON BLVD | | | CHICAGO | IL | 60604-3590 |
| US EPA | | C/O RTP FINANCE | MAIL DROP D143-02 | | DURHAM | NC | 27711 |
| US EPA | | | | | ANN ARBOR | MI | 48105 |
| US EPA - REGION 3 | | 1650 ARCH ST | (3PM52) | | PHILADELPHIA | PA | 19103-2029 |
| US EPA - REGION 4 ATLANTA FEDERAL CENTER | | 61 FORSYTH ST SW | | | ATLANTA | GA | 30303-3104 |
| US EPA - REGION 5 | WILLIAM D MESSENGER | 77 WEST JACKSON BLVD | | | CHICAGO | IL | 60604-3590 |
| US EPA - REGION 8 | | 999 18TH ST | SUITE 200 | | DENVER | CO | 80202-2466 |
| US EPA MAIL CODE 6205J | | 1200 PENNSYLVANIA AVENUE NORTHWEST | | | WASHINGTON | DC | 20460 |
| USEPA REGION IV | GAIL GINSBERG REG ADMIN | 77 W JACKSON | | | CHICAGO | IL | 60604 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

2/22/2008 3:24 AM
Divestures - Environmental Special Parties

# EXHIBIT B

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                       :

     In re                          :    Chapter 11
                                         :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                                       :

                  Debtor.    :    (Jointly Administered)
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

<u>NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION</u>

PLEASE TAKE NOTICE THAT:

       1.     Pursuant to the **Order Under 11 U.S.C. §§ 363 And Fed. R. Bankr. P. 2002, And 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In Connection With Sale Of Debtors' Bearings Business** (Docket No. 12355) (the "Bidding Procedures Order") entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on January 25 2008, Delphi Corporation ("Delphi") and certain of its affiliates, including certain affiliated chapter 11

Debtors as set forth in the Agreement (the "Selling Debtor Entities"),[1] have entered into a Sale And Purchase Agreement (the "Agreement") with ND Acquisition Corp. (the "Buyer") for the purchase of substantially all of the Debtors' assets (the "Acquired Assets") primarily used in the bearings business of Delphi, free and clear of liens, claims, encumbrances, and interests. Capitalized terms used but not otherwise defined in this notice have the meanings ascribed to them in the Bidding Procedures Order.

2.      All interested parties are invited to make an offer to purchase the Acquired Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the "Bidding Procedures") by **11:00 a.m.** (prevailing Eastern time) on **February 11, 2008**. Pursuant to the Bidding Procedures, the Selling Debtor Entities may conduct an auction for the Acquired Assets (the "Auction") beginning at **10:00 a.m.** (prevailing Eastern time) on **February 13, 2008** at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or 333 West Wacker Drive, Chicago, Illinois 60606.

3.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order. A copy of the Bidding Procedures is available by contacting the undersigned counsel to the Selling Debtor Entities or by accessing Delphi's Legal Information Website, www.delphidocket.com.

4.      A hearing to approve the Sale of the Acquired Assets to the highest and best bidder will be held on **February 21, 2008** at **10:00 a.m.** (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, before the Honorable Robert D. Drain, United States Bankruptcy Judge. The hearing on the Sale may be adjourned without notice other than an adjournment in open court.

5.      Objections, if any, to the proposed Sale must be filed and served in accordance with the Bidding Procedures Order, and **actually received** no later than **4:00 p.m. (prevailing Eastern time) on February 14, 2008.**

6.      This notice is qualified in its entirety by the Bidding Procedures Order.

---

[1]  Under the Agreement, the Selling Debtor Entities include Delphi Automotive Systems LLC and Delphi Technologies, Inc.

2

Dated:   New York, New York
          January 28, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

3

# EXHIBIT C

**Bidding Procedures Hearing Date And Time:  January 25, 2008 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  January 22, 2008 at 4:00 p.m.**
**Sale Hearing Date And Time:  February 21, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  February 14, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                            :
     In re                                  :     Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :     Case No. 05-44481 (RDD)
                                            :
                                            :     (Jointly Administered)
                        Debtors.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P.
2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN
BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING
SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF DEBTORS' ASSETS
PRIMARILY USED IN DEBTORS' BEARINGS BUSINESS FREE AND CLEAR OF LIENS, CLAIMS,
AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("BEARINGS BUSINESS SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of the Selling Debtor Entities' (defined below) assets (the "Acquired Assets") primarily used in the Selling Debtor Entities' global bearings business (the "Bearings Business") to the Buyer or the Successful Bidder (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed Contracts, the "Assigned Contracts") to the Buyer or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyer or the Successful Bidder, as the case may be.  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee," and together with the Creditors' Committee, the "Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Plan") (Docket No. 11386) and the First Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement") (Docket No. 11388).  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389) (the "Solicitation Procedures Order").

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 363, 365, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

and modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.        Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted

the Company's business through various divisions and subsidiaries.  Effective January 1, 1999,

the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.        Events Leading To The Chapter 11 Filing

9.        In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors

incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

employee special attrition programs.

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording
        of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
        loss in calendar year 2004 was $482 million.

5

10.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of

which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle

production environment for domestic OEMs resulting in the reduced number of motor vehicles

that GM produces annually in the United States and related pricing pressures, and (iii)

increasing commodity prices.

11.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major stakeholders had not progressed sufficiently by the end of the third

quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to

complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas:[4] first, modifying

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors and a plan framework
support agreement with those investors and GM.  On July 9, 2007, Delphi confirmed that it had formally
terminated the equity purchase and commitment agreement and related plan framework support agreement.
On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and
commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the
original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I,
Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as Goldman Sachs & Co.
and an affiliate of Pardus Capital Management, L.P.  Under the Delphi-Appaloosa EPCA, the new plan
investors agreed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to
support the Company's transformation plan and plan of reorganization.  This Court approved the Delphi-
Appaloosa EPCA on August 2, 2007.  On October 29, 2007, the Debtors filed a motion requesting this
Court's approval of certain proposed amendments to the Delphi-Appaloosa EPCA (Docket No. 10760).  In

the Company's labor agreements to create a competitive arena in which to conduct business;[5]

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6]

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;[7]

fourth, transforming their salaried workforce to ensure that the Company's organizational and

---

addition, on November 14, 2007, December 3, 2007, and December 5, 2007, the Debtors filed certain additional proposed amendments to the Delphi-Appaloosa EPCA. On December 10, 2007, this Court entered an order granting the motion and approving the proposed amendments (Docket No. 11382).

[5] As of August 29, 2007, this Court had entered the following orders approving settlements between Delphi and each of its U.S. labor unions:
- International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") (Docket No. 8693);
- International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (Docket No. 9106);
- International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers (Docket No. 9107); and
- United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and USW Local 87L (Docket No. 9169).

On September 4, 2007, at Delphi's request, this Court entered an order withdrawing without prejudice Delphi's motion for an order under sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing rejection of collective bargaining agreements and modification of retiree welfare benefits (Docket No. 9221).

[6] On September 6, 2007, Delphi announced that it had entered into agreements with GM consisting of a Global Settlement Agreement (the "GSA") and a Master Restructuring Agreement (the "MRA"). Delphi's comprehensive settlement with GM resolves all outstanding disputes between Delphi and GM other than as may arise out of their ordinary course customer-supplier relationship The GSA and MRA were filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively. See Docket No. 9263. On October 29, November 14, December 3, December 5, and December 10, 2007, the Debtors filed certain proposed amendments to the GSA and MRA. The approval of such amendments will be considered in connection with the confirmation of the Plan.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of their estates for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors have sold substantially all of the assets related to MobileAria, Inc., their chapter 11 affiliate, their brake hose and catalyst businesses, and their Saltillo, Mexico brake plant business, as well as their manufacturing equipment and test development equipment at the chassis facility in Saginaw, Michigan. The Debtors also received court approval to sell substantially all of the assets used in their interiors and closures businesses (subject to certain cure disputes) and for bid procedures related to the upcoming sale of substantially all assets used in their steering and halfshaft business.

7

cost structure is competitive and aligned with its product portfolio and manufacturing

footprint;[8] and fifth, devising a workable solution to their current pension situation.[9]

E.    The Debtors' Plan Of Reorganization

          13.    By filing the Plan and related Disclosure Statement, the Debtors reached

another key milestone in their chapter 11 cases.  The Plan is based upon a series of global

settlements and compromises that involve nearly every major constituency in the Debtors'

reorganization cases, including GM.  Attached as exhibits to the Plan are two agreements, the

GSA and the MRA, which provide for a comprehensive settlement with GM.  Both agreements

are subject to this Court's approval as part of the confirmation process.  This Court has

scheduled a hearing to consider confirmation of the Plan to commence on January 17, 2008.

Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first

quarter of 2008.

---

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments , which will be transitioned as part of the Company's transformation plan: Steering (for which bidding procedures were approved on December 20, 2007) and Automotive Holdings Group.  To ensure that their organizational and cost structure is competitive, the Debtors obtained an Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9]    To that end, on May 31, 2007, this Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 pension plan year funding waivers, which were approved by the IRS on May 1, 2007, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Pension Plans").  On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Pension Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.  On September 28, 2007, the IRS approved a similar waiver with respect to the Delphi Hourly-Rate Employees Plan for the September 30, 2007 pension plan year.  On October 25, 2007, this Court granted the Debtors' motion for authority to perform under the terms of that waiver.  On October 4, 2007, the IRS, at Delphi's request, further modified the conditions to the initial waivers so that they are generally consistent with the conditions to the most recent waiver.

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.     By this Motion, Delphi and the selling Debtor entities described in the Agreement (as defined below) (the "Selling Debtor Entities")[10] seek approval for the sale of the Bearings Business to ND Acquisition Corp. (the "Buyer"),[11] subject to additional competitive bidding pursuant to the proposed Bidding Procedures.  To effect the Sale, the Selling Debtor Entities seek two types of relief.  First, at the omnibus hearing to be held on January 25, 2008, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Buyer pursuant to the Agreement (as defined below) and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing to be held on February 21, 2008, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the Sale to the Buyer or the Successful Bidder, as the case may be, including, without limitation, the assumption and

---

[10]    Under the Agreement, the Selling Debtor Entities include Delphi Automotive Systems LLC ("DAS LLC") and Delphi Technologies, Inc.  For convenience, use of the term "Selling Debtor Entities" means, as the context requires, the specific Debtor entity undertaking the transaction referenced to the extent such transaction affects the assets of such entity.

[11]    This Motion will refer to ND Acquisition Corp., together with any affiliates it identifies in Schedule 1 of the Agreement, as the "Buyer," which, as the context requires, means the specific Buyer entity undertaking the transaction.

9

assignment of the Assumed Contracts to the Buyer, and the assumption by the Buyer of the Assumed Liabilities.

Basis For Relief

16.    The Company has stated that to achieve the necessary cost savings and operational effectiveness envisioned in its transformation plan, it must streamline its product portfolio to capitalize on its world-class technology and market strengths and make the necessary manufacturing realignment consistent with its new focus.  As part of the Company's transformation plan, the Company identified the Bearings Business as a non-core business subject to disposition.

17.    Accordingly, following extensive marketing efforts, on January 15, 2008, the Selling Debtor Entities and the Buyer entered into a Sale and Purchase Agreement, a copy of which is attached hereto as Exhibit D (the "Agreement").  The Agreement contemplates a global divestiture of the Bearings Business to the Buyer for a purchase price (the "Purchase Price") of up to $44.2 million, subject to certain adjustments.[12]

F.    The Bearings Business

18.    The Bearings Business produces both wheel bearings and roller clutch product lines.  As the inventor of the Gen III wheel bearing technology in 1979, the Bearings Business is a recognized and trusted market leader.  It is the leading producer of Gen III wheel bearings in North America and the primary North American supplier of such parts to GM.  The Bearings Business occupies a 1.3 million square foot plant set on 133 acres in Sandusky, Ohio.  The plant houses integrated design, engineering, and manufacturing teams.  The Company has

---

[12]    It should be noted that the Agreement provides that the Purchase Price may be adjusted to $18.2 million, subject to certain further adjustments, if, prior to the closing, (a) a competitive operating agreement (the "Competitive Operating Agreement") between the Selling Debtor Entities and the local UAW has not yet been executed or become effective or (b) the Selling Debtor Entities have failed to achieve certain labor-related cost savings.

10

invested more than $140 million in new tooling and refurbishment for older equipment and new state-of-the-art machinery and equipment since 2000. Two distinct manufacturing processes are used in the plant: flexible product focused cells, which can be shifted from one model of wheel bearings to another with relative ease, and high volume manufacturing, which provides a highly automated and efficient high volume output.

19. The Bearings Business employs approximately 1,000 people, including approximately 775 Hourly Employees. The hourly workforce is represented by the UAW.

G.    Factors Leading To The Sale

20. Although the Company believes that the Bearings Business is fundamentally strong, the Bearings Business does not fit within the Company's anticipated product portfolio under its transformation plan. In particular, the Company has determined, after an intensive product portfolio review, that the Bearings Business is outside the primary focus of the Company's growth and long-term strategic goals.

21. The Company believes, however, that as a standalone business, the Bearings Business could become more profitable and competitive. The Company has therefore determined that the value of the Bearings Business would be maximized through its divestiture. To achieve that goal, while balancing the needs of its customers, the Company is seeking to sell the Bearings Business. The Company, including its Selling Debtor Entities, will carefully manage the transition of the Bearings Business and the Sale will be completed in coordination with the Company's customers, employees, unions, and other stakeholders.

22. The Company has actively marketed the Bearings Business since February 2007. As part of this process, the Company identified several potential purchasers for the Bearings Business and provided those parties with access to information about the Bearings Business.

11

23.      The Selling Debtor Entities evaluated the terms and benefits of the proposals, as well as the benefits of other alternatives to divesting the Bearings Business.  In their business judgment the Selling Debtor Entities concluded that the proposal from the Buyer, which formed the basis of the Agreement, offered the most advantageous terms and the greatest economic benefit.  This decision was based in part on the Selling Debtor Entities' ability to maximize the value of the business line as a going concern and their belief that the Buyer would continue to provide quality products to the Company's customers, many of whom buy other products from Delphi.  The Buyer is a wholly owned subsidiary of Resilience Capital Partners LLC ("Resilience Capital").  Resilience Capital is a private equity investment firm focused on investing in underperforming and turnaround situations, typically investing in companies with revenues of between $25 million and $250 million.  Resilience Capital typically acquires lower middle market companies that have solid fundamental business prospects, but have suffered from a cyclical industry downturn.  Since its inception in 2001, Resilience Capital has acquired approximately 16 companies with combined revenues in excess of $1 billion.

H.      The Agreement

24.      Pursuant to the Agreement, (a) the Selling Debtor Entities would (i) sell the Acquired Assets owned by the Selling Debtor Entities free and clear of any Interests and/or Claims,[13] except for Permitted Encumbrances as defined in the Agreement, in consideration for

---

[13]    "Interests and/or Claims" means any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtor Entities' or the Buyer's

12

the Purchase Price, subject to adjustments and other consideration, and (ii) assume (if

applicable) and assign the Assigned Contracts to the Buyer and (b) the Buyer will assume the

Assumed Liabilities.

           25.      The significant terms of the Agreement are as follows:[14]

           (a)      <u>General Terms</u>.  The Buyer would acquire the Acquired Assets, which comprise all of the non-cash assets primarily used by the Bearings Business (other than the certain assets expected to be excluded), including certain real property, personal property, inventory, contracts, administrative assets, permits, consents, environmental permits, certain purchased intellectual property, and certain documented technical information pertaining to the design or manufacture of the Bearings Business' products, through an asset sale.

           (b)      <u>Bankruptcy Court Approval</u>.  The Sale of the Acquired Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

           (c)      <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.[15]  At the closing, certain of the Selling Debtor Entities and the Buyer would enter into, among others, the following ancillary agreements (collectively, the "Ancillary Agreements"):[16] (i) the Patent Assignment, (ii) the Trademark Assignment, (iii) the Deposit Escrow Agreement, (iv) the Transition Services Agreement, (v) the Bills of Sale, (vi) the Assignment and Assumption Agreements, (vii) the Indemnity Escrow Agreement, (viii) the Inventory Adjustment Escrow Agreement, and (ix) the Sensor Supply Agreement. The Ancillary Agreements would be delivered to the Selling Debtor Entities on terms reasonably satisfactory to the Selling Debtor Entities on or before the closing and would be performed in all material respects.

           (d)      <u>Purchase Price</u>.  The Purchase Price to be paid by the Buyer to the Selling Debtor Entities would be up to $44.2 million, subject to certain adjustments.  Among other adjustments, the Purchase Price may be reduced by $26 million, if, prior to the closing,

---

[14]    In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement control.

interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Bearings Business prior to the Closing Date, including the transfer of the Acquired Assets to the Buyer.

[14]    In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement control.

[15]    Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[16]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

13

(a) the Competitive Operating Agreement has not yet been executed or become effective or (b) the Selling Debtor Entities have failed to achieve certain labor-related cost savings.

(e)    <u>Deposit Amount</u>.  On or before 3:00 (prevailing Eastern time), January 16, 2008, the Buyer will deliver to an escrow agent pursuant to the Deposit Escrow Agreement the sum of $750,000.00 to be held as an earnest money deposit (such amount, together with the interest accrued thereon prior to closing, the "Deposit Amount").  Upon closing, the Selling Debtor Entities would receive the Deposit Amount.  Upon a material breach by the Buyer of the Agreement or the Bidding Procedures which results in termination of the Agreement, the Selling Debtor Entities would receive the Deposit Amount.  If the Agreement is terminated for any reason other than a breach by the Buyer, then, on: (i) the date which would be 15 days after such termination or (ii) in the event that an Alternative Transaction (defined below) is completed, the Return Date (defined below) (whichever would be earlier), the Deposit Amount would be returned to the Buyer.

(f)    <u>Escrow</u>.  Provided the closing is on or after the effective date of the Selling Debtor Entities' confirmed plan of reorganization (the "Effective Date"), the Buyer would deliver to the Selling Debtor Entities the Purchase Price in accordance with the Agreement.  If, however, the closing is before the Effective Date, (i) the Buyer would deliver to an indemnity escrow agent $2,000,000.00 of the Purchase Price (the "Indemnity Escrow Amount") to be held, in an interest bearing account, as collateral to secure the rights of the Buyer under certain indemnity provisions of the Agreement, and (ii) the Buyer would deliver to an inventory adjustment escrow agent $500,000.00 of the Purchase Price (the "Inventory Adjustment Escrow Amount") to be held, in an interest bearing account, as collateral to secure the rights of the Buyer under certain inventory adjustment provisions of the Agreement.  The Indemnity Escrow Amount would be held by the indemnity escrow agent from the closing until the third anniversary of the closing (the "Escrow Period"); except that if the Effective Date occurs during the Escrow Period, the indemnity escrow agent would immediately deliver the Indemnity Escrow Amount to the Selling Debtor Entities. Thereafter, the Selling Debtor Entities' indemnification obligations under the Agreement, if any, would be the sole responsibility of Delphi and then post-reorganization Delphi though the applicable periods set forth in the Agreement.  The Inventory Adjustment Escrow Amount would be held by the inventory adjustment escrow agent from the closing until the earlier of (y) 150 days after the closing or (z) the date of any payment provided for in the inventory adjustment provision of the Agreement.

(g)    <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale generally standard in a transaction of this type and the Acquired Assets and the Buyer would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Selling Debtor Entities would survive for a period of one year following the closing, other than certain warranties related to environmental matters and warranty claims, which would survive for three years following the closing.

14

(h)    Covenants.  Between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyer (which consent would not be unreasonably withheld): (i) sell or otherwise dispose of Acquired Assets, excluding sales of tooling to customers, sales of inventory, and sales of receivables to financial institutions or credit collection agencies, in each case in the ordinary course of business, (ii) incur, assume, or guarantee any debt obligation that would become an Assumed Liability, (iii) incur any encumbrance on any material Acquired Assets, in each case other than the Permitted Encumbrances as defined in the Agreement, (iv) increase the cash compensation of any of the Selling Debtor Entities' employees accepting employment with the Buyer (the "Transferred Employees") other than (A) in the ordinary course of business or (B) as required by any agreement in effect as of the date of the Agreement or as required by law, (v) make any material change in the accounting methods or practices followed by the Bearings Business (other than such changes that are required by law, made in conformance with GAAP, or required in connection with the preparation of certain financial statements), (vi) terminate or make any material amendment to a Material Contract, (vii) terminate or make any material amendment to a collective bargaining agreement, (viii) fail to maintain insurance in a manner consistent with the Selling Debtor Entities' past practice, or (ix) agree or commit to do any of the foregoing.

(i)    Indemnity.  Under the Agreement, the Buyer would be obligated to indemnify the Selling Debtor Entities on account of certain losses resulting from or arising out of any (i) Assumed Liability, (ii) certain future liabilities set forth in the Agreement, (iii) employment rights of any Transferred Employees or any other person employed by the Buyer on or after the closing for any claims relating to or arising from events occurring on or after the closing, and (iv) the Buyer's failure to comply with certain obligations related to employees.  The Selling Debtor Entities would be obligated to indemnify the Buyer on account of (i) retained liabilities, (ii) any employment rights of any Transferred Employees or any other person employed by the Selling Debtor Entities prior to the closing for any claims relating to or arising from events occurring prior to the closing, or (iii) the Selling Debtor Entities' breach of certain representations, warranties, or covenants provided in the Agreement.  However, the Selling Debtor Entities' indemnification obligations would be limited to indemnification claims that are notified to the Selling Debtor Entities on or before the first anniversary of the closing, except for indemnification claims made with respect to certain environmental matters, which claims would have to be notified to a Seller on or before the third anniversary of the closing.  Further, the Selling Debtor Entities would not be obligated to the Buyer for indemnifiable losses until (y) an individual claim exceeds $10,000.00 and (z) the aggregate amount of indemnifiable losses exceeds $200,000.00.  If the aggregate amount of indemnifiable losses indemnified by the Selling Debtor Entities reaches 7.5% of the Purchase Price, the Selling Debtor Entities would have no further obligations with respect to indemnifiable losses.  With respect to environmental matters, (i) the Selling Debtor Entities would indemnify the Buyer for environmental damages arising from pre-closing environmental contamination and pre-closing environmental compliance matters except to the extent exacerbated by the negligent actions of the Buyer, and (ii) the Buyer would indemnify the Selling Debtor Entities for environmental damages arising from post-closing environmental contamination and post-closing environmental compliance matters

15

except to the extent exacerbated by the negligent actions of the Selling Debtor Entities.  With
respect to environmental damages arising from circumstances that may be considered both
pre- and post-closing, the damages would be allocated between the parties in proportion to
the extent that the releases of, or noncompliance underlying, such damages arose pre- or
post-closing.

        (j)     <u>Closing Conditions</u>. In addition to certain other customary closing
conditions relating to bankruptcy court approvals and regulatory matters (including certain
competition filings), the respective obligations of each party to effect the transactions
contemplated by the Agreement would be subject to the satisfaction or waiver of the
following conditions: (i) the Buyer's assumption of obligations of existing UAW-Delphi
collective bargaining agreements applicable to the Manufacturing Facility, as modified, and
(ii) no material adverse effect occurring from the date of the Agreement and be continuing at
closing.  In addition, the obligation of the Buyer to consummate the transactions
contemplated by the Agreement would be subject to the satisfaction, or waiver by the Buyer,
at or prior to the closing, of the following conditions: (a) the performance and compliance by
the Selling Debtor Entities in all material respects with all agreements and obligations
required by the Agreement to be performed or complied with by the Selling Debtor Entities
at or prior to the closing, (b) the delivery by the Selling Debtor Entities of duly executed
copies of each of the Ancillary Agreements, (c) the Buyer and GM having entered into
definitive documentation, including a supply agreement, which meets certain conditions, (d)
the Buyer having obtained financing to fund the Purchase Price, the terms of which would be
satisfactory to the Buyer in its sole discretion, (e) no material adverse effect occurring and
continuing at the closing affecting the Bearings Business, (f) contracts with the top four
aftermarket customers of the Bearings Business must contain, as of the closing, terms and
conditions consistent with the terms and conditions of such contracts, and (g) all permits,
including environmental permits, and other authorizations necessary for the lawful conduct
of the Bearings Business having been transferred or reissued, as applicable, to the Buyer if
legally required to enable the Buyer to continue the permitted activity, unless the same may
be transferred or reissued, as applicable, under applicable law after closing.  Finally, the
obligation of the Selling Debtor Entities to consummate the transactions contemplated by the
Agreement would be subject to the fulfillment at or prior to the closing of the following
conditions, which can be waived by the Selling Debtor Entities: (i) the truth and correctness,
as of the closing date, of certain representations and warranties of the Buyer contained in the
Agreement except where the failure of such representations and warranties to be true and
correct would not have a material adverse effect on the Buyer's ability to consummate the
transactions contemplated by the Agreement, (ii) the performance and compliance by the
Buyer in all material respects with all agreements and obligations required by the Agreement
to be performed or complied with at or prior to the closing, and (iii) the delivery by the Buyer
of duly executed copies of each of the Ancillary Agreements.

        (k)     <u>Termination</u>.  The Agreement could be terminated prior to closing in the
following circumstances: (i) upon mutual written consent of the Selling Debtor Entities and
the Buyer, (ii) by either party, provided the terminating party is not in material breach of its
obligations under the Agreement, if closing does not occur within 45 days after entry of the

16

Sale Approval Order for any reason other than failure to obtain regulatory approvals; provided, however, that this period would be automatically extended for an additional 30 days if a Competitive Operating Agreement has been executed by either or both the Buyer and Selling Debtor Entities and the UAW, but has not been fully implemented, (iii) by either party, if the Selling Debtor Entities consummate an Alternative Transaction (defined below), (iv) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity (other than this Court), (v) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if this Court has not entered the Sale Approval Order on or before 90 days after the date of the Agreement, or if such Sale Approval Order, as of the date that is 90 days after the date of the Agreement, is subject to a stay or injunction, (vi) by the Buyer upon written notice to the Selling Debtor Entities, provided the Buyer is not in material breach of any of its obligations under the Agreement, if (A) the Selling Debtor Entities have breached or failed to perform any of their obligations under the Agreement or (B) a material adverse effect has occurred, so long as such event is continuing at the time of any such termination and is not reasonably capable of being cured within 45 days after entry of the Sale Approval Order or the date of the Agreement, whichever is earlier, and (vii) by the Selling Debtor Entities, upon written notice to the Buyer and provided that the Selling Debtor Entities are not in material breach of any of their obligations under the Agreement, if the Buyer has breached or failed to perform in any material respect any of its obligations contained in the Agreement, which breach is not cured within 30 days after written notice thereof, or is incapable of being cured by the Buyer.

      (l)    Break-Up Fee.  If the Agreement is terminated under certain circumstances and the Selling Debtor Entities consummate an alternative transaction for the sale of the Bearings Business and the Selling Debtor Entities sell, transfer, lease, or otherwise dispose of all or substantially all of the Bearings Business or the Acquired Assets in a transaction or a series of related transactions with a party other than the Buyer (an "Alternative Transaction"), then the Selling Debtor Entities would, upon consummation of the Alternative Transaction, pay the Buyer $1.5 million (the "Break-Up Fee"), which is approximately 3.4% of the Purchase Price and the Expense Reimbursemen (defined below). Notwithstanding the foregoing, if the Agreement is terminated pursuant to the rights described in paragraph 25(k)(ii) above, and the Selling Debtor Entities enter into an Alternative Transaction with GM pursuant to the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring, dated June 22, 2007, then in certain circumstances , the Selling Debtor Entities would pay the Buyer the Break-Up Fee and Expense Reimbursement (as defined below).  The Break-Up Fee, however, would not be paid if closing does not occur because the Buyer fails to secure financing.

      (m)    Expense Reimbursement.  If the Agreement is terminated for any reason other than (i) by mutual consent or (ii) consummation would violate competition or other government regulations then, subject to certain exceptions, the Selling Debtor Entities would be required to reimburse the Buyer's reasonable, actual out-of-pocket fees and expenses incurred in connection with the investigation or negotiation of the transactions contemplated

by the Agreement (the "Expense Reimbursement"), provided that the Buyer is not then in breach of the Agreement or the Bidding Procedures.  The Expense Reimbursement would be immediately earned upon termination and payable promptly after invoiced by the Buyer, except that if the Selling Debtor Entities in good faith believed that the amount of the Expense Reimbursement sought was not reasonable, then the Selling Debtor Entities would have the right to seek the review of this Court before paying such amount.  If the Buyer would become entitled to the Break-Up Fee and/or the Expense Reimbursement, then the Break-Up Fee and/or the Expense Reimbursement would be the sole remedy of the Buyer for the breach by the Selling Debtor Entities of the terms of the Agreement or the Deposit Escrow Agreement.

    (n) <u>Transfer Taxes</u>.  The Selling Debtor Entities and the Buyer would use commercially reasonable efforts and cooperate in good faith to exempt the Sale from any sales taxes, documentary and stamp taxes, transfer, documentary, sales, use, registration, recording, stamp, use, gross receipts, excise, value-added, and other such taxes and related fees ("Transfer Taxes") as may be payable in connection with the Sale.  In the event that an exemption(s) is unavailable, the Buyer would be liable for and pay all Transfer Taxes arising out of or incurred in connection with the Agreement.

I. <u>Workforce Provisions</u>

    26. As of the closing, the Buyer would offer employment to <u>all</u> of the Selling Debtor Entities' active employees related to the Bearings Business, including both hourly and salaried employees.  Salaried employees would be offered compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits offered prior to closing.  Prior to tendering such offers to salaried employees, the Buyer would provide the Selling Debtors Entities information to satisfy the Selling Debtor Entities that this "substantially comparable in the aggregate" requirement is met, which satisfaction would not be unreasonably withheld.  If not met, the Buyer would have the opportunity to cure any deficiency.  The Buyer would maintain this requisite level of compensation and benefits for a minimum of one year from the closing.

27.    The significant terms of the Agreement, with respect to hourly or salaried employees, as applicable, are as follows:[17]

(a)    <u>Collective Bargaining Agreements</u>.  Unless the Buyer is otherwise able to negotiate a new collective bargaining agreement with the UAW prior to closing, the Buyer would assume the terms and conditions of all of the UAW-Delphi collective bargaining agreements applicable at the Manufacturing Facility, as the same may be modified by (i) proceedings in this Court, (ii) agreement between the Selling Debtor Entities and the UAW or an approved plan of reorganization in these chapter 11 cases, and (iii) a memorandum of understanding between Delphi and the UAW regarding the effects of the sale upon bargain unit members (the "Effects MOU").  The parties would agree that the Agreement would be, to the extent possible, interpreted in a manner consistent with the Effects MOU and that, to the extent the Effects MOU is inconsistent with the Agreement, the terms of the MOU would control. The Buyer would recognize the seniority status of employees employed in accordance with a collective bargaining agreement for all purposes of continued employment with the Buyer.

(b)    <u>Inactive Employees</u>.  Employees not active as of the closing due to disability, family medical leave, or other approved leaves of absence (the "Inactive Employees") would remain the Selling Debtor Entities' responsibility until the Inactive Employees returned to active employment in accordance with the Selling Debtor Entities' leave policies or collective bargaining agreement, as applicable.  When an Inactive Employee is ready to return to work, the Buyer would offer employment to such Inactive Employee.

(c)    <u>Employee Benefit Plans</u>.  All employees transferred to the Buyer as of the closing, and such employees' dependents and beneficiaries, would cease to participate in and be eligible for benefits under the Selling Debtor Entities' benefit plans, but would commence participation in and become eligible for benefits under the Buyer's employee benefits plans.  Inactive Employees who would become employees of the Buyer, and their dependents and beneficiaries, would cease to participate in and be eligible for benefits under the Selling Debtor Entities' benefit plans as of the date on which such Inactive Employee became an employee of the Buyer.  The Buyer would recognize an employee's pre-closing credit service with the Selling Debtor Entities for eligibility and vesting purposes but not benefit accrual purposes with respect to the Buyer's employee benefit plans.  In no case would credited service be recognized if such recognition would cause a duplication of compensation or benefits as between the Selling Debtor Entities and the Buyer.

(d)    <u>COBRA</u>.  The Selling Debtor Entities would retain responsibility for all liabilities for claims of employees transferred to the Buyer related to compliance with the requirements of continuation coverage under certain sections of the Internal Revenue Code and ERISA.

---

[17]    Potential bidders should note that Section 6.7 of the Agreement addresses, among other things, the terms and conditions of employment of UAW-represented employees, and these issues remain subject to the parties' rights and obligations related to bargaining with the UAW.

19

(e)    Workers' Compensation.  The Selling Debtor Entities would retain responsibility for all liabilities for workers' compensation related to injuries or illnesses incurred prior to the closing and the Buyer would assume such responsibility related to injuries or illnesses incurred on or after the closing.

J.    Bidding Procedures

28.    The Sale of the Bearings Business would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Bearings Business for the benefit of the Selling Debtor Entities, their estates, their stakeholders, and other interested parties.  Accordingly, the Selling Debtor Entities seek approval of the Bidding Procedures for the Sale of the Bearings Business.

29.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").

30.    The proposed Bidding Procedures attached hereto as Exhibit A provide, in relevant part, as follows:[18]

(a)    Participation Requirements:  To ensure that only bidders with financial ability and a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for certain requirements for a potential bidder to become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and substance satisfactory to the Selling Debtor Entities, (ii) providing the Selling Debtor Entities with certain financial assurances, including current audited financial statements or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Selling Debtor Entities and their financial advisors as to such bidder's ability to close, and (iii) submitting a preliminary (non-binding) written proposal reflecting (A) the purchase price

---

[18]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

range, (B) any assets and/or equity interests expected to be excluded, (C) the structure and financing of the transaction, (D) any anticipated regulatory approvals, (E) the anticipated time frame and any anticipated impediments to obtaining such approvals, (F) any additional conditions to closing the qualified bidder may wish to impose, and (G) the nature and extent of any due diligence the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

(b)  Due Diligence:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Selling Debtor Entities would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  Except as otherwise stated in the Agreement, due diligence would not continue after the Bid Deadline (defined below).

(c)  Bid Deadline:  All bids would have to be received not later than 11:00 a.m. (prevailing Eastern time) by February 11, 2008 (the "Bid Deadline").  The Selling Debtor Entities could extend the Bid Deadline once or successively, but would not be obligated to do so.  The Selling Debtor Entities would also provide the UAW with notice of all Qualified Bidders and their contact information.

(d)  Bid Requirements:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit in the amount of $750,000, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(e)  Qualified Bids:  To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Selling Debtor Entities than, those contained in the Agreement, (ii) have a value of the Purchase Price plus the amount of the Break-Up Fee and the Expense Reimbursement, plus $500,000 in the case of an initial Qualified Bid, plus $250,000 in the case of any subsequent Qualified Bids over the immediately preceding highest Qualified Bid, (iii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iv) not be conditioned on bid protections, other than the bidding increments contemplated in the Bidding Procedures, (v) contain acknowledgements and representations that the bidder (A) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the marked agreement, (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than 15 days after entry of the Sale

Approval Order, subject to the receipt of any governmental approvals, which would have to be obtained 60 days after entry of such order, and (vii) be received by the Bid Deadline. The Selling Debtor Entities would retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the bid requirements described herein. Notwithstanding the foregoing, the Buyer would be deemed a Qualified Bidder, and the Agreement would be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than the Agreement would be referred to as a "Subsequent Bid."

(f)    Conduct Of Auction: If the Selling Debtor Entities receive at least one Qualified Bid in addition to that of the Buyer, they would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on February 13, 2008 or such later time as the Selling Debtor Entities notify all Qualified Bidders who have submitted Qualified Bids in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least one Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Selling Debtor Entities whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Selling Debtor Entities would provide such bidders with copies of the Qualified Bid which the Selling Debtor Entities then believe would be the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, (iv) the Selling Debtor Entities would be able to employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of this Court entered in connection with the Sale, and (v) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000 higher than the previous bid or bids, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(g)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Selling Debtor Entities, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder"). The Selling Debtor Entities would sell the Acquired Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the Sale Hearing.

(h)    Sale Hearing: The Selling Debtor Entities request that the Sale Hearing be scheduled for February 21, 2008 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled in the Selling Debtor Entities' sole discretion, subject to this Court's approval as necessary, without notice other than by an

22

announcement of the adjourned date at the Sale Hearing.[19]  If no Qualified Bid other than that of the Buyer is received, the Selling Debtor Entities would proceed with the sale of the Acquired Assets to the Buyer following entry of the Sale Approval Order.  If the Selling Debtor Entities receive additional Qualified Bids, then at the Sale Hearing, the Selling Debtor Entities could seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Selling Debtor Entities unless and until approved by this Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Selling Debtor Entities would be permitted to effectuate a sale to the Alternate Bidder without further order of this Court.

(i)    Return Of Good Faith Deposits:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) would be held in an interest-bearing escrow account and all Qualified Bids would remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, would be applied against the payment of the purchase price upon closing of the Sale to the Successful Bidder. If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Selling Debtor Entities would not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit would irrevocably become property of the Selling Debtor Entities.  On the Return Date, the Selling Debtor Entities would return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

(j)    Reservation Of Rights:  The Selling Debtor Entities, after consultation with the agents for its secured lenders' and the Creditors' Committee, would be permitted to (i) determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) reject, at any time, any bid (other than the Buyer's initial bid) that is (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (C) contrary to the best interests of the Selling Debtor Entities, their estates, and their stakeholders as determined by the Selling Debtor Entities in their sole discretion.

K.    Bid Protections

31.    At various times over the course of the last seven months, the Buyer has expended, and likely would continue to expend, considerable time, money, and energy pursuing the purchase of the Bearings Business.  Moreover, the Buyer has engaged in extended

---

[19]    The Sale Hearing would be set for a date at least six business days after the Auction.  The Selling Debtor Entities will notify parties-in-interest of the Sale Hearing Date under the Notice Procedures described herein.

arm's length and good faith negotiations regarding a possible sale.  The Buyer is not an

"insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy

Code.  The Agreement is the culmination of these efforts.

        32.     In recognition of this expenditure of time, energy, and resources, the

Selling Debtor Entities have agreed to provide certain bid protections to the Buyer (the "Bid

Protections").  Specifically, the Agreement provides for, and the Selling Debtor Entities

respectfully request that this Court approve, a Break-Up Fee payable by the Selling Debtor

Entities to the Buyer in the amount of $1.5 million (which is approximately 3.4% of the

Purchase Price) if (i) the Selling Debtor Entities terminate the Agreement to consummate an

Alternative Transaction or consummate such Alternative Transaction or (ii) in certain

circumstances, the Agreement is terminated pursuant to the rights described in paragraph

25(k)(ii) above, and the Selling Debtor Entities enter into an Alternative Transaction with GM

pursuant to the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring,

dated June 22, 2007.

        33.     In addition, the Selling Debtor Entities respectfully request this Court's

approval of the term in the Agreement providing for reimbursement of the Buyer's reasonable,

actual out-of-pocket fees and expenses incurred in connection with the transactions

contemplated by the Agreement under certain circumstances.

        34.     If the Buyer becomes entitled to receive any Break-Up Fee and/or

Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement would be

the sole and exclusive remedy of the Buyer, whether at law or in equity, for any breach by

Delphi or any of its affiliates of the terms and conditions of the Agreement or the Deposit

Escrow Agreement.

35.     The Bid Protections were a material inducement for, and a condition of, the Buyer's entry into the Agreement.  The Selling Debtor Entities believe that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Buyer in connection with the Sale and (b) the fact that the Buyer's efforts have increased the chances that the Selling Debtor Entities would receive the highest or otherwise best offer for the Acquired Assets.

36.     The Buyer is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement without the approval of the Bid Protections and the Bidding Procedures Order.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Selling Debtor Entities would lose the opportunity to obtain what they believe to be the highest and best offer for the Acquired Assets.

37.     Moreover, payment of the Break-Up Fee would not diminish the Selling Debtor Entities' estates.  The Selling Debtor Entities would not expect to pay the Break-Up Fee unless they do so to accept an alternative Successful Bid, which must exceed the price offered by the Buyer by an amount sufficient to pay the Break-Up Fee.  The Expense Reimbursement is a necessary cost of obtaining a binding commitment from the Buyer for the sale of the Bearings Business.  The Selling Debtor Entities thus request that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

L.     Assumption And Assignment Of Contracts

38.     The Selling Debtor Entities seek authority under section 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Buyer or the Successful Bidder, as the case may be.  The approximate cost to cure the Assumed Contracts related to the Bearings Business is $4.43 million.  Pursuant to the Solicitation Procedures Order, each non-Debtor part to an Assumed Contract already has received a cure notice (the "Plan Cure

25

Notice").  The Plan Cure Notice stated, with respect to the Assumed Contract, the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount").  The Plan Cure Notice provided parties to the Assumed Contracts an opportunity to object to the Cure Amount. and notified each party that such party's lease or contract will be assumed under the Plan.  Thus, unless the Selling Debtor Entities and the non-Debtor party to an Assumed Contract agree otherwise to the Cure Amount or the Cure Amount is otherwise resolved in accordance with the Solicitation Procedures Order, the Cure Amounts listed on the Plan Cure Notices control the amounts required to cure all defaults under the Assumed Contracts in connection with the Sale.  In connection with the proposed Sale, the Selling Debtor Entities also seek authority under section 363 of the Bankruptcy Code to assign the Postpetition Contracts to the Buyer or the Successful Bidder, as the case may be.  There are no past due obligations under the Postpetition Contracts.

39.      In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor Entities propose to file with this Court and serve on each non-Debtor party to an Assigned Contract  a notice substantially in the form attached hereto as Exhibit E (the "Purchaser Assumption/Assignment Notice").  The Purchaser Assumption/Assignment Notice would identify the Buyer as the party that would be assigned all of the Selling Debtor Entities' right, title, and interest in the Assigned Contracts, subject to completion of the bidding process provided under the Bidding Procedures.[20]  Non-Debtor parties to any Assumed Contract would be required to file an objection to the assumption and/or assignment of the Assumed Contract within ten days of service of the Purchaser Assumption/Assignment Notice, and such parties

---

[20]    The Selling Debtor Entities propose to serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder Assumption/Assignment Notice (as defined below) upon each non-Debtor counterparty to the Postpetition Contracts as a means of fulfilling any requirement under the applicable contract to provide notice of assignment.

26

would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

40.    At least 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, whichever is later, the Selling Debtor Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as Exhibit F, to each non-Debtor party to an Assigned Contract identifying any Qualified Bidders as potential parties to which the Assigned Contracts would be assigned.  The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor Entities the ability to address promptly any adequate assurance issues that contract parties may have with any of the Qualified Bidders.  Non-Debtor counterparties to any Assumed Contract would be required to file an objection to the assumption and/or assignment of the Assumed Contract within ten days from the service of the Qualified Bidder Assumption/Assignment Notice, and such parties would be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

M.    Notice Of Sale Hearing

41.    Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion, the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for the Buyer, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v) all entities known to have expressed an interest in a transaction with respect to

27

the Acquired Assets during the past six months, [21] (vi) all entities known to have asserted any

lien, claim, interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and

local regulatory or taxing authorities or recording offices, including but not limited to

environmental regulatory authorities, which have a reasonably known interest in the relief

requested by the Motion, (viii) all parties to Assigned Contracts, (ix) the United States

Attorney's office, (x) the United States Department of Justice, (xi) the Securities and Exchange

Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as

defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental

Case Management Order")), and (xiv) such other entities as are required to be served with

notices under the Supplemental Case Management Order.

N.    Publication Notice

42.    The Selling Debtor Entities also propose, pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to

the form annexed hereto as Exhibit G in the Wall Street Journal, the New York Times, and the

Sandusky Register by the Mailing Date or as soon as practicable thereafter, be deemed proper

notice to any other interested parties whose identities are unknown to the Selling Debtor

Entities.

---

[21]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

Applicable Authority

O.    Approval Of Bidding Procedures

43.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to

use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of

business may be authorized if the debtor demonstrates a sound business justification for it.  See

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d

Cir. 1983) (business judgment rule requires finding that good business reason exists to grant

debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124

B.R. 169, 178-179 (D. Del. 1991).

44.    The Second Circuit has held that, although the bankruptcy court sits as

an "overseer of the wisdom with which the bankruptcy estate's property is being managed by

the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between

creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's

section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently

review the . . . debtor's decision[s] . . . in the course of the swift administration of the

bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with

disputed issues." Id. at 1098-99.

45.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted).  Thereafter, "[p]arties

29

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting

the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply

to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections."  Lionel Corp., 722 F.2d at 1071.

46.    As a rule, the debtor's business judgment "should be approved by the

court unless it is shown to be "so manifestly unreasonable that it could not be based upon

sound business judgment, but only on bad faith, or whim or caprice."  In re Aerovox, Inc., 269

B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

47.    As set forth above, the Selling Debtor Entities have sound business

justifications for pursuing a sale process at this time.  Although the Selling Debtor Entities

believe that the Bearings Business is fundamentally strong, the Bearings Business does not fit

the Debtors' anticipated product portfolio under their transformation plan.  Thus, the Selling

Debtor Entities have determined that the Bearings Business' value would be maximized

through its divestiture.  Moreover, delaying the sale of the Acquired Assets may result in the

erosion of the Bearings Business' value. Accordingly, there is a sound business purpose for

pursuing the sale process promptly and in accordance with the Bidding Procedures.

48.    Moreover, a prospective purchaser of assets from a chapter 11 debtor

may be reluctant to make an offer because it knows that even if it reaches agreement with the

debtor, its offer will be subject to a higher bid by another party.  Pre-approved bidding

procedures address these concerns by assuring initial bidders that any auction procedure would

be reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures

also reflects sound business judgment.

P.    Approval Of The Bid Protections

49.    Bidding incentives encourage potential bidders to invest the requisite

time, money, and effort to negotiate with a debtor and perform the necessary due diligence

attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of

the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight

to enter the bidding by providing some form of compensation for the risks it is undertaking")

(citation omitted).  Bankruptcy courts often approve bidding incentives under the business

judgment rule.  See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003)

("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any

such argument had been made, the Court would be compelled . . . to reject it."); United States

Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL

21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing

bidding incentives "unless they are unreasonable or appear more likely to chill the bidding

process than to enhance it").  One court, explaining the force of the business judgment rule in

this context, stated that "the business judgment rule does not become inapplicable simply

because a court decides a break-up fee is too large." Integrated Resources, 147 B.R. at 660.

50.    This district has established a three-part test for determining when to

permit bidding incentives.  Id. at 657-58.  The three questions for a court to consider when

assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up

fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage,

bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price."

Id. at 657.

31

51.    Here, the Selling Debtor Entities seek authority to utilize the Bidding

Process and Bid Protections in the event that the Buyer is not ultimately the Successful Bidder

or must increase the Buyer's bid price to become the Successful Bidder.  The Bid Protections

are fair and reasonable in amount, particularly in view of the efforts previously made and to be

made by the Buyer and the risk to the Buyer of being used as a stalking horse.  Moreover, the

maximum payment under the proposed Bid Protections – the $1.5 million Break-Up Fee

(approximately 3.4% of the Preliminary Purchase Price) – not only constitutes a fair and

reasonable percentage of a proposed purchase price, but is within the range that is customary

for similar transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance

Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up

fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No.

01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior

transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing

4.13% break-up fee if court approved alternative transaction); In re PSINet, Inc., Case No. 01-

13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller

consummated transaction with alternative bidder); In re Teligent, Inc., Case No. 01-12974

(SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25% depending

on value of alternative transaction).  In addition, the payment of the Break-Up Fee or the

Expense Reimbursement, as the case may be, is reasonable in light of the significant

investment in time and resources that the Buyer would have contributed as the stalking horse

bidder.

52.    The Selling Debtor Entities submit that the Bidding Procedures and the

Bid Protections have encouraged competitive bidding because the Buyer would not have

32

entered into the Agreement without such provisions.  The Bidding Procedures and the Bid

Protections have thus induced a bid that otherwise would not have been made.  Finally, the

mere existence of the Bidding Procedures and Bid Protections permits the Selling Debtor

Entities to insist that competing bids be materially higher or otherwise better than the

Agreement, which would produce a clear benefit to the Selling Debtor Entities, their estates,

and their stakeholders.

Q.    Sale Of The Acquired Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

53.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession

may sell property free and clear of any lien, claim, or interest in such property if, among other

things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such
    interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the
    aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a
    money satisfaction of such interest.

11 U.S.C. § 363(f).

54.    Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor

Entities to sell the Acquired Assets free and clear of all liens, claims (including successor

liability claims), and encumbrances, other than the Permitted Encumbrances.  See, e.g., In re

Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27,

2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims

achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, 332

33

F.3d 283 (3d Cir. 2003).  This Court and other courts in the Second Circuit have approved sale

approval orders authorizing the sale of assets free and clear of all interests and claims,

including successor liability claims.  See In re Refco, Inc., Case No. 05-60006 (Nov. 15, 2006)

(authorizing certain debtors to sell customer lists free and clear of interests and claims,

including successor liability claims); In re Refco, Inc., Case No. 05-60006  (Nov. 14, 2005)

(authorizing debtors to sell the regulated commodities futures merchant business free and clear

of interests and claims, including successor liability claims); In re PSINet Inc., Case No. 01-

13213 (Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of liens and

claims, including claims otherwise arising under doctrines of successor liability).  Because the

Buyer is not a successor to the Selling Debtor Entities, successor liability claims should not

follow the Purchased Assets.

        55.     Excluding Permitted Encumbrances, each lien, claim, or encumbrance

that is not the result of an assumed liability satisfies at least one of the five conditions of

section 363(f), and the Selling Debtor Entities submit that any such lien, claim, or

encumbrance would be adequately protected by attachment to the net proceeds of the Sale,

subject to any claims and defenses that the Selling Debtor Entities may possess with respect

thereto.  Accordingly, except for the liens resulting from the Assumed Liabilities or the

Permitted Encumbrances, the Selling Debtor Entities request that the Acquired Assets be

transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances,

with such liens, claims, and encumbrances to attach to the proceeds of the Sale of the Acquired

Assets.

R.      The Buyer Is A Good Faith Purchasers Pursuant To
        Section 363(m) Of The Bankruptcy Code And The Transaction
        Contemplated By The Agreement Should Carry The
        Protections Of Section 363(n) Of The Bankruptcy Code

        56.     Section 363(m) of the Bankruptcy Code provides:

    The reversal or modification on appeal of an authorization under subsection (b)
    or (c) of this section of a sale or lease of property does not affect the validity of
    a sale or lease under such authorization to an entity that purchased or leased
    such property in good faith, whether or not such entity knew of the pendency of
    the appeal, unless such authorization and such sale or lease were stayed pending
    appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

    good faith of a purchaser is shown by the integrity of his conduct during the
    course of the sale proceedings; where there is a lack of such integrity, a good
    faith finding may not be made.  A purchaser's good faith is lost by "fraud,
    collusion between the purchaser and other bidders or the trustee, or an attempt
    to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In

re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc.

v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y.

June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

        57.     Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

    The trustee may avoid a sale under this section if the sale price was controlled
    by an agreement among potential bidders at such sale, or may recover from a
    party to such agreement any amount by which the value of the property sold
    exceeds the price at which such sale was consummated, and may recover any
    costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering
    such amount.

11 U.S.C. § 363(n).

35

58.     The Selling Debtor Entities submit, and will present evidence at the Sale

Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.

Throughout the negotiations, the Buyer has at all times acted in good faith.  Moreover, to the

extent that the Acquired Assets are sold to a Successful Bidder, it will be because of a well

planned competitive process and intense negotiations at arm's length to be conducted at an

Auction.  As a result of the foregoing, the Selling Debtor Entities request that the court make a

finding that the Purchase Price to be paid by the Buyer constitutes reasonably equivalent value

and fair consideration under any applicable law and that the Buyer or the Successful Bidder, as

the case may be, has purchased the Acquired Assets and assumed the Assigned Contracts and

Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy

Code.  Because a key element of a good faith finding is that the Buyer's successful bid is not

the product of fraud or collusion between the purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders, the Selling Debtor Entities further

request that this Court make a finding that the transactions contemplated by the Agreement are

not avoidable under section 363(n) of the Bankruptcy Code.

S.     Relief From Transfer Taxes Under Section 1146(c) Of the Bankruptcy Code

59.     Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer,

or exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp

tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers

pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.  See City

of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir.

1985) (holding that when transfer is necessary to consummation of plan, transfer is "under a

plan" within meaning of section 1146(c)); In re United Press Int'l, Inc., No. 91 B 13955, 1992

Bankr. LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (holding that section 1146(c)

exemption applied to section 363 sale in instance in which it found "the value of the Debtor's

assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan"); In re Beulah

Church of God In Christ Jesus, Inc., 316 B.R. 41, 50-51 (Bankr. S.D.N.Y 2004) (stating that

determination of applicability of section 1146(c) exemption depends on whether transfers are

in view of, and integral to, a Chapter 11 plan that is subsequently confirmed); City of New

York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985)

(stating that section 1146(c) was designed to reach transfer of assets, on which "plan hinged

and which the court had to approve prior to the confirmation").

60.    As set forth above, as part of their transformation plan, the Selling

Debtor Entities have identified non-core product lines, including the Bearings Business, that do

not fit into the company's future strategic framework, and have planned to sell or wind-down

these product lines.  As mentioned above, on December 10, 2007, the Debtors filed the Plan,

and a hearing on confirmation of the Plan is scheduled to commence in two days.  Section 7.30

of the Plan contemplates the Debtors selling assets outside the Plan, but obtaining relief as if

such divestitures were part of the Plan.  Thus, this sale process may continue after a Plan has

already been filed, which would squarely satisfy Beaulah Church.  See Beulah Church, 316

B.R. at 50-51.  In light of the foregoing, the Selling Debtor Entities submit that the Sale should

be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales,

recording, or similar taxes.

T.    The Assumption And Assignment Of The Assumed Contracts

61.    Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if –

37

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

62.    Under section 365(a) of the Bankruptcy Code a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

63.    Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction."  EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase does not require total assurances.  See In re Natco Indus., Inc.,

38

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the

debtor will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr.

S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will

fall "considerably short of an absolute guaranty of performance").  In fact, adequate assurance

has been provided by demonstrating the Buyer's financial health and experience in managing

the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06

(Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective

assignee of lease from debtor had financial resources and had expressed willingness to devote

sufficient funding to business to give it strong likelihood of succeeding).

          64.      To the extent that any defaults exist under any prepetition executory

contract or unexpired lease that is to be assumed and assigned in connection with the sale of

the Acquired Assets or any portion thereof, the Selling Debtor Entities would cure any such

default.  The Buyer has the financial resources to perform under the Assumed Contracts and

are contractually required under the Agreement to provide adequate assurance of future

performance under each Assumed Contract.  Moreover, if necessary, the Selling Debtor

Entities will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the

Buyer or the Successful Bidder, as the case may be, their experience in the industry, and their

willingness and ability to perform under the contracts to be assumed and assigned to them.

          65.      The Sale Hearing therefore will provide this Court and other parties-in-

interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer or

the Successful Bidder(s) to provide adequate assurance of future performance under the

contracts to be assumed.  This Court therefore should have a sufficient basis to authorize the

Selling Debtor Entities to assume and assign the Assumed Contracts as set forth in the

Agreement.

U.    Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

66.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 10 days after

entry of the order, unless the court orders otherwise."

67.    Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y.

2005) ("As I find that the required business need for a waiver has been shown, the order may

provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re

PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a

business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).

In general, courts will grant waivers when doing so is important to the Debtor's financial

health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004)

(affirming decision waiving ten-day stay because "time was of the essence"); In re Decora

Industries, Inc., No. 00-4459, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court

understands that an immediate closing is required to remedy Debtors' precarious financial and

business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing

the parties to close.").

68.    The Selling Debtor Entities expect to continue to market the Bearings

Business to prospective buyers immediately after the Court enters the Bidding Procedures

Order.  During this time, however, Bankruptcy Rule 6004(g) would preclude the Buyer from

receiving the protections afforded by the Bidding Protections.  In recognition of the time and

effort expended by the Buyer in connection the Sale and to reduce the Buyer's risk that the

40

Selling Debtor Entities might obtain a higher and better offer for the Bearings Business during

those ten days, the Buyer should receive the protections afforded by the Bid Protections. The

Selling Debtor Entities, therefore respectfully request that the Bidding Procedures Order

include a waiver of the ten-day stay provided under Bankruptcy Rule 6004(g).

69.    Because the Selling Debtor Entities have demonstrated a need requiring

the immediate effectiveness of the Bidding Procedures Order, this Court should exercise its

authority under Bankruptcy Rule 6004(g) and waive the ten-day stay as it otherwise would

apply to the Bidding Procedures Order.

V.    Conclusion

70.    The Selling Debtor Entities submit that the granting of the Bidding

Procedures, Bid Protections, and Notice Procedures, the setting of a Sale Hearing, and the

entry of an order approving the Sale of the Acquired Assets free and clear of liens, claims, and

encumbrances, the assumption and/or assignment of the Assigned Contracts, and the

assumption of the Assumed Liabilities by the Buyer or the Successful Bidder (as the case may

be) are in the best interests of the Selling Debtor Entities' estates and will maximize value for

all stakeholders.

Notice

71.    Notice of this Motion has been provided in accordance with the

Supplemental Case Management Order and the Ninth Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures,

entered October 19, 2007 (Docket No. 10661). Specifically, the Selling Debtor Entities have

provided notice of this Motion on the Master Service List (as defined in the Supplemental Case

Management Order), each party who filed a notice of appearance or request for documents in

41

accordance with Bankruptcy Rule 2002, and all entities known to have expressed an interest in

a transaction with respect to the Acquired Assets during the past six months.  Further, after

entry of the Bidding Procedures Order, notice with respect to the Motion and Sale would be

provided in accordance with the Notice Procedures described herein.  In addition, the Debtors

have complied with the Supplemental Case Management Order with respect to the filing of this

Motion and the need for expedited relief.[22] In light of the nature of the relief requested, the

Debtors submit that no other or further notice is necessary.

Memorandum Of Law

72.    Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Selling Debtor Entities respectfully request that the requirement of

the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

New York be deemed satisfied.

WHEREFORE the Selling Debtor Entities respectfully request that this Court

enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii)

approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale

of the Acquired Assets free and clear of liens, claims, and encumbrances to the Buyer or to the

Successful Bidder, (ii) the assumption and/or assignment of the Assigned Contracts to the

Buyer or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the

Buyer or the Successful Bidder, and (c) granting them such other and further relief as is just.

---

[22]    The Debtors have noticed this Motion for the omnibus hearing on January 25, 2008.  In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the
Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The
Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on
January 25, 2008.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will
have until January 22, 2008 to file an objection to entry of the Bidding Procedures Order.

Dated:       New York, New York
               January 15, 2008

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -


By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

43

## Exhibit A

**Bidding Procedures**

**<u>Exhibit B</u>**

**Bidding Procedures Order**

**<u>Exhibit C</u>**

**Sale Approval Order**

**<u>Exhibit D</u>**

**Sale And Purchase Agreement**

## **Exhibit E**

**Buyer Assumption/Assignment Notice**

**<u>Exhibit F</u>**

**Qualified Bidder Assumption/Assignment Notice**

**<u>Exhibit G</u>**

**Publication Notice**

# EXHIBIT D

EXECUTION COPY

**SALE AND PURCHASE AGREEMENT**

**BY AND BETWEEN**

**DELPHI AUTOMOTIVE SYSTEMS LLC**

**AND**

**ND ACQUISITION CORPORATION**

**DATED AS OF**

**JANUARY 15, 2008**

## TABLE OF CONTENTS

1.    DEFINITIONS. ........................................................................................... 1
      1.1  Certain Defined Terms. ..................................................................... 1
      1.2  Other Interpretive Provisions. .......................................................... 15
2.    PURCHASE AND SALE. .......................................................................... 15
      2.1  Transfers by Sellers and their Affiliates. ......................................... 15
      2.2  Assumption of Liabilities. ................................................................ 18
      2.3  Future Liabilities ............................................................................. 18
      2.4  Retained Liabilities. ........................................................................ 18
      2.5  Deferred Items. ............................................................................... 20
3.    PURCHASE PRICE; ADJUSTMENT; ALLOCATION. ............................. 21
      3.1  Deposit Amount. .............................................................................. 21
      3.2  Purchase Price. ............................................................................... 21
      3.3  Inventory Adjustment ...................................................................... 23
      3.4  Facilities and Non-Billable Tooling Adjustment ............................... 25
      3.5  Escrow. ........................................................................................... 25
      3.6  Allocation of Purchase Price. .......................................................... 26
      3.7  Prorations. ...................................................................................... 26
4.    REPRESENTATIONS AND WARRANTIES OF SELLERS. .................... 27
      4.1  Organization. ................................................................................... 27
      4.2  Authorization; Enforceability. .......................................................... 27
      4.3  RESERVED. .................................................................................... 27
      4.4  Financial Statements. ..................................................................... 27
      4.5  No Conflicts or Approvals. .............................................................. 28
      4.6  Sufficiency of Acquired Assets. ...................................................... 28
      4.7  Compliance with Law; Permits. ....................................................... 28
      4.8  Proceedings. ................................................................................... 28
      4.9  Absence of Certain Changes . ........................................................ 29
      4.10 Tax Matters. .................................................................................... 29
      4.11 Employees. ...................................................................................... 29
      4.12 Intellectual Property. ....................................................................... 30
      4.13 Contracts. ........................................................................................ 31
      4.14 Environmental Matters .................................................................... 32
      4.15 Insurance. ........................................................................................ 33
      4.16 Personal Property Assets, Inventory. .............................................. 33
      4.17 Real Property  ................................................................................. 34
      4.18 No Brokers' Fees. ........................................................................... 34
      4.19 Product Claims. ............................................................................... 34
      4.20 No Other Representations or Warranties. ........................................ 34
      4.21 Fair Disclosure. ............................................................................... 34
      4.22 Survival. ........................................................................................... 34
5.    REPRESENTATIONS AND WARRANTIES OF BUYERS. ...................... 34
      5.1  Organization. ................................................................................... 34
      5.2  Authorization; Enforceability. .......................................................... 35
      5.3  No Conflicts or Approvals. .............................................................. 35
      5.4  Proceedings. ................................................................................... 35
      5.5  Solvency. ......................................................................................... 35
      5.6  Anti-Money Laundering. .................................................................. 35
      5.7  RESERVED. .................................................................................... 36
      5.8  No Inducement or Reliance; Independent Assessment. ................... 36

|  | 5.9 Financial Ability | 36 |
|  | 5.10 No Brokers' Fees. | 37 |
|  | 5.11 Compliance with Laws. | 37 |
|  | 5.12 Adequate Assurance of Future Performance | 37 |
| 6. | COVENANTS AND AGREEMENTS. | 37 |
|  | 6.1 Conduct of Business between Signing and Closing. | 37 |
|  | 6.2 Bankruptcy Actions. | 38 |
|  | 6.3 Assumed Contracts; Cure Amounts | 39 |
|  | 6.4 Performance Under Contracts | 39 |
|  | 6.5 Non-Competition. | 40 |
|  | 6.6 Tax Matters; Cooperation. | 40 |
|  | 6.7 Employees; Benefit Plans; Labor Matters. | 41 |
|  | 6.8 Contact with Seller Employees, Customers and Suppliers. | 45 |
|  | 6.9 Technical Documentation. | 46 |
|  | 6.10 Books and Records and Litigation Assistance From and After Closing. | 46 |
|  | 6.11 Corporate Names. | 48 |
|  | 6.12 Intellectual Property Licenses. | 48 |
|  | 6.13 Post-Closing Obligations. | 49 |
|  | 6.14 RESERVED. | 48 |
|  | 6.15 Further Actions. | 49 |
|  | 6.16 Further Assurances. | 49 |
|  | 6.17 Shared Items Transferred to Buyers. | 50 |
|  | 6.18 Buyer's Financing Activities. | 50 |
|  | 6.19 Customs Duties. | 50 |
|  | 6.20 Environmental Access. | 50 |
|  | 6.21 Permit Transfers. | 50 |
| 7. | CONDITIONS TO CLOSING. | 51 |
|  | 7.1 Conditions to Obligations of Seller and Buyer. | 51 |
|  | 7.2 Conditions to Obligations of Buyer. | 51 |
|  | 7.3 Conditions to Obligations of Sellers. | 52 |
| 8. | CLOSING | 53 |
|  | 8.1 Closing Time and Date. | 53 |
|  | 8.2 Ancillary Agreements. | 53 |
|  | 8.3 Seller's Deliveries at Closing. | 53 |
|  | 8.4 Buyer's Deliveries at Closing. | 54 |
| 9. | TERMINATION. | 54 |
|  | 9.1 Termination | 54 |
|  | 9.2 Break-Up Fee; Expense Reimbursement. | 55 |
|  | 9.3 Procedure and Effect of Termination. | 56 |
| 10. | BIDDING PROCEDURES | 57 |
|  | 10.1 Delphi Initial Bankruptcy Actions | 57 |
|  | 10.2 Qualified Bidder. | 57 |
|  | 10.3 Bid Deadline. | 58 |
|  | 10.4 Due Diligence. | 59 |
|  | 10.5 Bid Requirements. | 59 |
|  | 10.6 Qualified Bids | 59 |
|  | 10.7 Bid Protection. | 60 |
|  | 10.8 Auction, Bidding Increments and Bids Remaining Open. | 60 |
|  | 10.9 Acceptance of Qualified Bids. | 61 |
|  | 10.10 Sale Hearing. | 61 |
|  | 10.11 Return of Good Faith Deposit. | 62 |

     10.12   Reservation of Rights..................................................................................... 62
11.     **LIABILITY, INDEMNIFICATION.** ............................................................................. **63**
     11.1  LIMITATIONS OF LIABILITY. ............................................................. 63
     11.2  Survival ............................................................................................... 63
     11.3  Indemnification. .................................................................................. 63
     11.4  Environmental Matters; Exclusive Remedy......................................... 65
     11.5  Product Claims.  ................................................................................. 70
     11.6  Indemnification Procedure.  ............................................................... 70
     11.7  Mitigation.  .......................................................................................... 71
     11.8  Dispute Resolution.  ........................................................................... 71
12.     **MISCELLANEOUS.** ................................................................................................. **71**
     12.1  Fees and Expenses. ........................................................................... 71
     12.2  Bulk Sales Laws. ................................................................................ 71
     12.3  Payments in Dollars  .......................................................................... 72
     12.4  Amendment. ....................................................................................... 72
     12.5  Assignment.  ....................................................................................... 72
     12.6  Waiver ................................................................................................. 72
     12.7  Notices ................................................................................................ 72
     12.8  Entire Agreement.  .............................................................................. 73
     12.9  Counterparts.  ..................................................................................... 73
     12.10  Publicity.............................................................................................. 73
     12.11  Headings. ........................................................................................... 73
     12.12  Severability......................................................................................... 73
     12.13  Third Parties....................................................................................... 74
     12.14  Governing Law.................................................................................... 74
     12.15  Venue and Retention of Jurisdiction.  ................................................ 74
     12.16  No Right of Setoff............................................................................... 74
     12.17  Risk of Loss........................................................................................ 74
     12.18  Enforcement of Agreement . .............................................................. 74
     12.19  Bankruptcy Court Approval. ............................................................... 74

## SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (the "**Agreement**"), dated as of **January 15, 2008** between **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Delphi**"), on behalf of itself and the other entities set forth on Schedule 1 (each a "**Seller**" and together with Delphi, "**Sellers**"), and **ND ACQUISITION CORPORATION**, a Delaware corporation ("**Buyer**"):

**WHEREAS,** Delphi and its Affiliates (as hereinafter defined) are engaged in the Business (as hereinafter defined);

**WHEREAS,** the Sellers own the Acquired Assets (as hereinafter defined);

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq. (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS,** as contemplated by Sections 363, 365 and 1146 of the Bankruptcy Code, the Sellers desire to sell to the Buyer all of their rights, titles and interests in and to the Acquired Assets (as hereinafter defined), and Buyer desires to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree:

1. **DEFINITIONS.**

    1.1    **Certain Defined Terms.**  As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

    "**180-Day Post-Closing Period**" – Section 3.2.4.

    "**180-Day Termination Cost**" – Section 3.2.4.

    "**365-Day Post-Closing Period**" – Section 3.2.4.

    "**365-Day Termination Cost**" – Section 3.2.4.

    "**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets, including intercompany payables and all trade accounts payable set forth on the Reference Balance Sheet to the extent not settled prior to the Closing Date.

    "**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers to the extent arising from the conduct of the Business or relating to the Acquired Assets, including Intercompany Receivables and all other accounts or notes receivable and the full benefit of all security for such accounts or notes, including the trade

accounts receivable set forth on the Reference Balance Sheet to the extent not paid prior to the Closing Date.

"**Acquired Assets**" – Section 2.1.1.

"**Administrative Assets**" mean books, records and other administrative assets primarily used or held for use in the Business, including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records and sale order files; <u>provided</u>, <u>however</u>, that Administrative Assets does not include Intellectual Property or Technical Documentation.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  For purposes of this definition, "control" means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person.

"**Agreement**" means this Sale and Purchase Agreement (including the Schedules and Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

"**Allocation**" – Section 3.6.1.

"**Alternate Bid(s)**" – Section 10.10.

"**Alternate Bidder(s)**" – Section 10.10.

"**Alternative Transaction**" – Section 9.2.1.

"**Ancillary Agreements**" means the agreements referred to in Section 8.2.

"**Assumed Liabilities**" – Section 2.2.

"**Assumed Contracts**" – Section 6.3.1.

"**Auction**" – Section 10.8.

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Benchmark Inventory Amount**" means the amount of $10,123,483 as set forth in the statement of Inventory of the Business as of September 30, 2007, attached as <u>Schedule 3.4</u>.

"**Bid Deadline**" – Section 10.3.

"**Bidding Procedures**" – Section 10.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and certain provisions of this Agreement, substantially in the form that is attached as <u>Exhibit 10.1</u> hereto.

"**Bidding Process**" – Section 10.1.

"**Break-Up Fee**" – Section 9.2.1.

"**Business**" means the design, testing, manufacture, development, marketing and sale of the Products by the Sellers at the Manufacturing Facility.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Employee Benefit Plans**" means Buyer's pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Buyer Parent**" means The Resilience Fund II, L.P., a Delaware limited partnership.

"**Buyer**" – Recitals.

"**Cap Amount**" – Section 11.3.2.B.

"**Capital Procurement Agreement**" means the Capital Procurement Agreement dated June 6, 2007 by and between GM and Delphi Corporation.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits and less all outstanding checks and electronic payments of the Business.

"**Claims**" mean all Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" – Section 8.1.

"**Closing Date**" – Section 8.1.

"**Closing Inventory Statement**" means the statement of Inventory of the Business (as adjusted in accordance with this Agreement) as of 11:59 P.M. (Eastern Standard Time) on the Closing Date, which statement will be prepared and delivered in accordance with Section 3.3.

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union representing Transferred Employees (including material local agreements, amendments, supplements, letters and memoranda of understanding of any kind).

"**Committee**" – Section 10.3.

"**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

"**Competitive Business**" – Section 6.5.1.

"**Competitive Operating Agreement**" means a collective bargaining agreement between the Sellers or Buyer, as applicable, and the UAW Local 913 providing substantially the terms set forth in Schedule 1.1.C.

"**Confidential Information Memorandum**" means the Confidential Information Memoranda dated June 2007, relating to the Business.

"**Confidentiality Agreement**" means the confidentiality agreements between Buyer Parent and Delphi relating to the Sale, dated July 12, 2007.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefore; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Corporate Trademark Rights**" means Trademark Rights used both in the Business and in other businesses conducted directly or indirectly by Delphi.

"**CPA Firm**" – Section 3.3.1.C.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to Buyer of the Assumed Contracts under the Sale Approval Order.

"**Data Room**" means the data room(s) in which the documents and information related to the Business and the Acquired Assets were disclosed to Buyer and Buyer Parent's representatives and counsel.

"**Debt Obligations**", as applied to any Person, mean obligations for borrowed money as evidenced by bonds, debentures, notes, financing or capital (as opposed to operating) leases and other similar instruments, and all guaranties of such obligations.

"**Deductible Amount**" - Section 11.3.2.B.

"**Deferred Items**" – Section 2.5.1.

"**Delphi**" – Recitals.

"**Deposit Amount**" – Section 3.1.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement referred to in Section 8.2.2, dated as of the date hereof, executed by and among Buyer, Delphi and Escrow Agent concurrently with this Agreement.

"**Effects MOU**" – Section 7.1.6.

"**Emergence Date**" – Section. 3.5.

"**Employees**" means Hourly Employees and Salaried Employees.

"**Encumbrance**" means: with respect to the Acquired Assets any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

"**Environment**" means the following media (whether individually or commingled): indoor or outdoor air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground), and ground (whether at the surface or below the surface), soil, soil gas, and sediment.

"**Environmental Claim**" means any claim, cause of action, governmental information request, notice of potential responsibility, investigation or written notice by any Governmental Authority arising under any Environmental Law and any notice, claim or cause of action alleging Liability by any other person or entity under any Environmental Law, the common law or other Law, including those arising out of, based on or resulting from: (i) the Release of any Hazardous Materials on or migrating from the Manufacturing Facility or related to the Business; or (ii) any violation, or alleged violation, of any Environmental Law.

"**Environmental Compliance Matter**" means an event, condition, activity, practice, action or omission at the Manufacturing Facility or with respect to the Business which gives rise to an actual or alleged breach or violation of an Environmental Law or an Environmental Permit.

"**Environmental Contamination**" means the Release of a Hazardous Material at, in, under, on, about or migrating to or from the Manufacturing Facility.

"**Environmental Damages**" means Losses arising out of an actual or alleged violation under an Environmental Law or relating to the Remediation of a Release of any Hazardous Material, but in all cases excluding Losses deemed consequential or loss of profit, and also excluding expenses of investigating information solely for the purposes of making an Indemnification Claim under this Agreement.

"**Environmental Laws**" means all Laws relating to a Release or threatened Release of Hazardous Materials into the Environment or the exposure of any person to Hazardous Materials (but excluding the Occupational Health and Safety Act and similar worker safety Laws applying to employees) or protection of the Environment or natural resources.

"**Environmental Matters**" – Section 11.4.1.(D).

"**Environmental Permits**" mean any licenses, Permits, Consents, authorizations and approvals issued by any Governmental Authority and required to be obtained under Environmental Laws in respect of the Acquired Assets or for the conduct and the operation of the Business.

"**Equityholders' Committee**" – Section 10.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement.

"**Escrow Period**" - Section 3.5.

"**Estimated Inventory Adjustment**" – Section 3.3.2.

"**Estimated Inventory Amount**" – Section 3.3.2.

"**Excluded Assets**" – Section 2.1.2.

"**Excluded Software**" means the Software identified on Schedule 2.1.2.M.

"**Expense Reimbursement**" – Section 9.2.2.

"**Facilities and Non-Billable Tooling**" means all Seller payments to vendors made between July 1, 2007 and the Closing, and presented and accepted for payment within fifteen Business Days after the Closing, for procurement of machinery and non customer re-billable tooling related to the Capital Procurement Agreement.

"**Facilities and Non-Rebillable Tooling Peg Amount**" means the amount of Three Million Five Hundred Thirty-Seven Thousand Dollars ($3,537,000).

"**Facilities and Non-Rebillable Tooling Statement** – Section 3.4.1.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and operate certain portions of the Business or are Sellers: Delphi Corporation and Delphi Technologies, Inc.

"**Final Inventory Statement**" – Section 3.3.1.C.

"**Financial Statements**" – Section 4.4.

"**Future Liabilities**" – Section 2.3.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**GM**" – Section 7.2.4

"**Good Faith Deposit**" – Section 10.5.3.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**Grievances**" - Section 6.7.9.

"**Hazardous Materials**" means any element, compound, mixture, solution, substance, chemical, material, constituent, waste, pollutant or contaminant which is listed, defined or regulated under an Environmental Law or an Environmental Permit, including petroleum or any fraction thereof or any petroleum-based or petroleum-derived substance, polychlorinated biphenyls, asbestos or asbestos-containing materials, leaded paint or any other material or substance which has the characteristics of being explosive, infectious, carcinogenic, mutagenic, toxic, noxious, radioactive, flammable, corrosive or caustic (whether solid, liquid or gaseous).

"**Headcount Price Adjustment**" – Section 3.2.3.

"**Headcount Reduction Cost Adjustment**" – Section 3.2.4.

"**Hourly Employees**" means the hourly employees represented by the UAW employed at the Manufacturing Facility who are employed by Sellers in the Business in the United States immediately prior to the Closing and identified on <u>Schedule 4.11.1</u>.

"**Hourly Workforce**" means the total number of Hourly Employees employed at the Manufacturing Facility at the time specified.

"**Inactive Employees**" – Section 6.7.3.A.

"**Indemnifiable Losses**" – Section 11.3.1.

"**Indemnification Claim**" – Section 11.6.

"**Indemnity Escrow Agent**" means the escrow agent identified in the Indemnity Escrow Agreement.

"**Indemnity Escrow Agreement**" means the escrow agreement substantially in the form of Exhibit 8.2.6.

"**Indemnity Escrow Amount**" – Section 3.4.

"**Individual Claim Amount**" – Section 11.3.2.B.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Intercompany Receivables**" mean the right of any Seller or its Affiliates to payment and performance of any Liabilities of the Business.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies and other inventory, primarily used or held for use in the Business wherever located.

"**Inventory Adjustment Escrow Agent**" means the escrow agent identified in the Inventory Adjustment Escrow Agreement.

"**Inventory Adjustment Escrow Agreement**" means the escrow agreement substantially in the form of Exhibit 8.2.7.

"**Inventory Adjustment Escrow Amount**" – Section 3.4.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Knowledge of Buyer**" or "**Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.A.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, Permits, Consents, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet, including those arising under any Law, Claim, Environmental Claim, Consent, Governmental Approval, Governmental Order, Contract, Environmental Permit or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used principally by the Business, except that Licensed Intellectual Property does not include Sublicensed Intellectual Property.

"**Losses**" mean any and all claims, Liabilities, losses, damages, Environmental Claims, Environmental Damages, contribution, cost recovery, response costs, removal costs, oversight costs, natural resource damages, medical monitoring, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Management Presentations**" mean the presentations, expert meetings, site visits and question and answer sessions, provided by Delphi and Sellers (and their advisers and counsel) to Buyer Parent and the Buyer (and their advisers and counsel), with respect to the Business, the Acquired Assets and the in view of the transactions contemplated herein.

"**Manufacturing Facility**" means the Business' manufacturing facilities located at 2509 Hayes Avenue, Sandusky, Ohio.

"**Marked Agreement**" – Section 10.5.2.

"**Material Adverse Effect**" means any change, occurrence or development that has a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations or financial condition of the Business, taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions; (ii) affecting companies in its industry or its markets generally; (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of this Agreement by Buyer pursuant to Section 9.1 hereof; (v) resulting from increases in energy, electricity, natural gas, oil, steel, aluminum, other raw materials or other operating costs; (vi) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business; (vii) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (viii) resulting from any actions required under this Agreement to obtain any Consent; (ix) resulting from   any action approved by the Bankruptcy Court; (x) resulting from any act of God or other *force majeure* type event; (xi) resulting from the regulatory status of any Buyer, or (xii) resulting from acts of war or terrorism, whether or not directed at the Business or Buyer.

"**Material Contracts**" – Section 4.13.1.

"**Notice**" - Section 11.8.

"**Objection**" – Section 3.3.1.B.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.6.

"**Ordinary Course of Business**" means, in all material respects, the usual, regular and ordinary course of a business consistent with the past practice thereof, provided that where the Sellers' past practices were modified following filing of the Bankruptcy Cases, such term means the ordinary course consistent with custom and practice of the Sellers' from and after the Petition Date to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Owned Intellectual Property**" means Intellectual Property in and to which Sellers hold, or have a right to hold, in whole or in part, any right, title and interest.

"**Owned Real Property**" – Section 4.17.

"**Party(ies)**" means Delphi, Sellers and/or Buyer.

"**Patent Rights**" mean: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents and patent applications (including provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permanently Terminated**" means, with respect to an Hourly Employee, (a) such individual's employment will have been terminated in order to achieve greater efficiency and (b) at the time of termination, Buyer or Seller, as applicable, does not intend to replace such individual with any other employee, whether a new hire or existing employee. An Hourly Employee that is terminated, laid off or otherwise ceases employment due to volume reductions or decreased production shall not be considered Permanently Terminated.

"**Permits**" – Section 4.7.

"**Permitted Encumbrance**" means: (i) purchase money security interests securing obligations totaling no more than $800,000 in the aggregate arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government contracts; (iii) security interests securing obligations totaling no more than $800,000 in the aggregate relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances in favor of any Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders which, upon Closing, will attach to the proceeds of the Sale attributable to the sale of the assets of the Filing Affiliates in the same order and priority that the Encumbrances attached to the assets of the Filing Affiliates, subject to all existing defenses and other

objections; (v) any Encumbrance that may be created by or on behalf of Buyer and; (vi) in relation to Owned Real Property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged in the Ordinary Course of Business prior to Closing; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Owned Real Property; (e) easements, covenants, restrictions and other encumbrances of public record; and (f) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the respective underlying asset to which such Encumbrances relate as used on the Closing Date.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory primarily used or held for use in the Business, including production machinery, equipment (including that new machinery, tooling and equipment described on Exhibit A of the Capital Procurement Agreement which has been delivered as of the Closing Date), tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Owned Real Property, at the place of business of a vendor or elsewhere; provided, however, that the Personal Property does not include Intellectual Property or Technical Documentation.

"**Petition Date**" – Recitals.

"**Post-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring after the Closing.

"**Post-Closing Environmental Contamination**" means Environmental Contamination occurring after the Closing.

"**Potential Bidder**" – Section 10.2.

"**Pre-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring prior to the Closing.

"**Pre-Closing Environmental Contamination**" means Environmental Contamination occurring prior to the Closing.

"**Pre-Closing Work Practice Price Adjustment**" – Section 3.2.2.

"**Pre-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into before the Petition Date.

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority.

"**Product(s)**" means the wheel bearings and roller clutches included in Delphi's global bearings business.

"**Product Claims**" mean all Liabilities arising out of, resulting from, or relating to product warranty or product returns with respect to Products, including all Liabilities arising from, caused by or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product that was made, manufactured, assembled, installed, sold, leased or licensed by Sellers.

"**Productive Inventory**" means Inventory consisting of finished goods, work-in-process or raw materials.

"**Purchase Price**" – Section 3.2.1.

"**Purchased Intellectual Property**" means Sellers' right, title and interest in Owned Intellectual Property that is used  principally in the Business, including the Intellectual Property listed in <u>Schedule 4.12.1.A</u> and <u>Schedule 4.12.1.B</u>.

"**Qualified Bid**" – Section 10.6.6.

"**Qualified Bidder**" – Section 10.2.3.

"**Reference Balance Sheet**" – Section 4.4.

"**Release**" means any release, spilling, emitting, leaking, pumping, injection, deposit, leaching, migrating, pouring, emptying, escaping, dumping, discarding, abandonment, disposal, placement, burial or discharge of any Hazardous Materials at, in, onto, under or through the Owned Real Property or the Environment (including, without limitation, the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"**Relevant Items**" – Section 3.3.1.B.

"**Remedial Works**" means the legally required works, designs, investigations, Remediation and activities carried out by a Party in relation to Environmental Contamination or Environmental Compliance Matters, but excluding expenses of investigating information solely for the purposes of making an Indemnification Claim under this Agreement.

"**Remediation**" means any legally required investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure, or post-closure operation and maintenance activities in connection with the suspected, threatened or actual Release of Hazardous Materials.

"**Remediation Standards**" means standards which are: (i) the minimum Remediation criteria or standards required under Environmental Laws, including but not limited to the use of risk assessment methodologies where permitted; and (ii) applicable to industrial use.

"**Remedy**" - Section 11.4.5.A.

"**Required Bid Documents**" – Section 10.5.

"**Response**" – Section 11.8.

"**Retained Liabilities**" – Section 2.4.

"**Return Date**" – Section 10.11.

"**Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Sellers primarily in the Business in the United States immediately prior to the Closing and identified on Schedule 4.11.1.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets from Sellers to Buyer in accordance with this Agreement.

"**Sale Approval Order**" means the order of the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, the Sale free and clear of all Encumbrances on Acquired Assets sold by a Filing Affiliate, other than Permitted Encumbrances, substantially in the form attached hereto as Exhibit 10.2.

"**Sale Hearing**" – Section 10.9.

"**Sale Motion**" means the motion filed by the Filing Affiliates with the Bankruptcy Court for entry of the Sale Approval Order.

"**SDN List**" – Section 5.6.

"**Seller Employee Benefit Plans**" means Sellers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Seller(s)**" means Delphi and the Sellers set forth on Schedule 1.

"**Seller Employees**" means all Salaried Employees and Hourly Employees listed on Schedule 4.11.1, except for Inactive Employees.

"**Shared Intellectual Property**" means Owned Intellectual Property (other than Corporate Trademark Rights and Excluded Software) that is used in the Business and in one or more other businesses conducted directly or indirectly by Delphi or an Affiliate but is not used principally in the Business.

"**Significant Customer(s)**" – Section 4.13.3.

"**Significant Supplier(s)**" – Section 4.13.4.

"**Software**" means computer software and programs, including source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Sublicensed Intellectual Property**" means Seller's rights with respect to the Intellectual Property listed in Schedule 6.12.1 and any other Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used by the Business but is not used principally by the Business.

"**Subsequent Bid**" – Section 10.6.6.

"**Successful Bid(s)**" – Section 10.8.6.

"**Successful Bidder(s)**" – Section 10.8.6.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, escheat, capital, capital gains, sales, use, *ad valorem*, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Claim**" means any Claim related to Tax or Taxes.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or used principally in the Business, in each case pertaining to the design or manufacture of the Products.

"**Third Party**" or "**third party**" means any person not a Party, Buyer, Seller or a Competent Authority.

"**Total Termination Cost**" means, with respect to the time period specified, all costs and expenses incurred by or scheduled to be incurred by Buyer in order to Permanently Terminate Hourly Employees in the 365-day period following the Closing Date, including, but not limited to, severance, ratification or other bonuses allocated to all Union employees (including those to be terminated and those not to be terminated).

"**Trade Secrets**" mean: (i) all forms and types of financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the

information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean: (i) trademarks, trade names and service marks; (ii) the goodwill associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; and (iv) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Taxes**" – Section 6.6.2.

"**Transferred Employee**" – Section 6.7.1.

"**Transition Services Agreement**" - Section 8.2.3.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America, including UAW Local Number 913.

"**UAW Local Number 913**" means the local bargaining unit at the Manufacturing Facility.

"**Union(s)**" means the UAW.

"**Work Practice Changes**" mean the changes to work practices at the Manufacturing Facility as set forth in Schedule 1.1.D.

    **1.2**    **Other Interpretive Provisions**.    The words "**hereof**", "**herein**" and "**hereunder**" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "**include**", "**includes**" and "**including**" are deemed to be followed by the phrase "without limitation."  The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "**dollars**" or "**$**" are deemed references to the lawful money of the United States of America.  References to undertakings by the "**Buyer(s)**" or the "**Seller(s)**" are understood to be undertakings by Delphi and Buyer to cause the Buyer to perform, and by the relevant Seller to perform, as the case may be.

**2.**    **PURCHASE AND SALE.**

    **2.1**    **Transfers by Sellers and their Affiliates.**

    **2.1.1**    **Purchase and Sale of the Acquired Assets**.  Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Sellers will sell, transfer, assign, convey and deliver to the Buyer, and the Buyer will purchase, accept and acquire from the Sellers, free and clear of all Encumbrances except

Permitted Encumbrances, all of the assets and properties described in the next sentence (collectively, the "**Acquired Assets**"), subject in each case to Section 2.1.3. The Acquired Assets consist of all of Sellers' rights, titles and interests in and to the non-cash assets used principally in the Business except for the Excluded Assets, including: Owned Real Property, Personal Property, Inventory, Contracts, Administrative Assets, Permits, Consents, Environmental Permits, Purchased Intellectual Property and Technical Documentation.  Except for the Acquired Assets, the Sellers will retain all other assets, properties, rights and interests owned, used or held by the Sellers.

    2.1.2   **Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets will not be included in the Acquired Assets (the "**Excluded Assets**"):

    **A.**     **Third Party Assets**.  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third party, including third party  bailed assets used in the Business and located at the Manufacturing Facility, all as set forth on Schedule 2.1.2.A, provided however, that any Contracts or other rights the Sellers have pertaining to such third party bailed or leased assets will be transferred as part of the Acquired Assets.

    **B.**     **Intellectual Property**.  Corporate Trademark Rights and Shared Intellectual Property (subject to the limited rights granted to the Buyer pursuant to Sections 6.11 and 6.12).

    **C.**     **Financial Assets**.   All Cash and Accounts Receivable of the Business as of Closing.

    **D.**     **Insurance**.  Insurance coverage and insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums; provided, however, that Buyer will receive the benefit of all such claims and rights under third party property and casualty policies arising subsequent to the date of this Agreement and prior to the Closing.

    **E.**     **Records**.  Any books, records and other materials that any Seller is required by Law to retain, all Tax Returns of any Seller for time periods prior to Closing, and related work papers, and all "Delphi" marked sales and promotional materials and brochures.

    **F.**     **Claims**.  All claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities.

    **G.**     **Tax Refunds**.  All refunds or credits of or against any Taxes paid by or on behalf of any Seller with respect to any period ending on or prior to the Closing Date.

    **H.**     **Bankruptcy Rights**.  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever

kind or nature, as set forth in Sections 544 through 551, inclusive, 553, and 558 and any related actions, including any and all proceeds of the foregoing.

I.    **Personnel Records.**  All work histories, personnel and medical records of employees and former employees of any Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the Buyer will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if Sellers so elects.  All such personnel and medical records of Transferred Employees are books and records governed by Section 6.10 of this Agreement.  Upon written request of Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to Sellers (or an Affiliate of Sellers as directed) at which time Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the Buyer with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to any Buyer, the records will not be provided, except that Sellers will provide such records to the extent Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local law without adverse consequences to Sellers or to any Affiliate of Sellers.

J.    **Privileged Information and Materials.**  Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States).

K.    **Reserved.**

L.    **Common Delphi Services.**  Subject to the provisions of the Transition Services Agreement, common Delphi services, if any, including legal, insurance, accounting, finance, tax and information technology and support.

M.    **Inventory and Other Assets.**  (i) All Inventory, products, rights, properties, assets and businesses of the Business which will have been transferred or disposed of by Sellers prior to Closing in the Ordinary Course of Business; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law; (iii) all computer hardware, equipment, Software and other assets listed on Schedule 2.1.2.M; and (iv) Vehicles assigned to Seller Employees under Seller's company vehicle program and pooled vehicles.

N.    **Cadiz Assets.**  All assets formerly used in and located at Sellers' Cadiz, Spain facilities.

**2.1.3    Post-Closing Asset Deliveries.**  Should Sellers or Buyer, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver them to Buyer at no cost to Buyer.  Should Sellers or Buyer, in their reasonable discretion, determine

after the Closing that books, records or other materials constituting Excluded Assets were delivered to Buyer, Buyer will promptly return them to Sellers at no cost to Sellers.

**2.2**     **Assumption of Liabilities.**    Other than the Retained Liabilities, the Buyer will assume, and will thereafter pay, perform and discharge as and when due, and will be liable with respect to (i) the following Liabilities of the Sellers, whether arising before, on or after the Closing Date, arising out of, relating to or incurred in connection with the Business and (ii) any Liabilities otherwise assumed by Buyer pursuant to the terms of this Agreement or by operation of Law pursuant to the Sale Approval Order (collectively, the "**Assumed Liabilities**"):

**2.2.1**    All Liabilities of the Sellers arising under any Contracts, licenses, Permits, Environmental Permits, Consents, Governmental Approvals or Orders, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyer pursuant to the terms of this Agreement; and other obligations relating to any Buyer's ownership or use of the Acquired Assets; and

**2.2.2**    All deferred revenue obligations, including all obligations to fulfill orders relating to Products of the Business outstanding on the Closing Date and Buyer shall be entitled to all payments for such fulfilled orders.

**2.3**     **Future Liabilities.**    Notwithstanding anything herein to the contrary, on and after the Closing Date the Buyer will pay, perform and discharge as and when due, and will be liable with respect to the following Liabilities arising on or after the Closing, arising out of, relating to or incurred in connection with the Business, or by operation of Law pursuant to the Sale Approval Order (collectively, the "**Future Liabilities**"):

**2.3.1**    All Liabilities relating to the Acquired Assets including Claims and other obligations relating to any Buyer's ownership or use of the Acquired Assets;

**2.3.2**    All Liabilities arising out of, resulting from, or relating to product warranty or product return with respect to Products sold on or after Closing, including all Liabilities arising from, caused by or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product that was made, designed, manufactured, assembled, installed, sold, leased or licensed (whether or not any such Products are manufactured before or after the Closing) by Sellers;

**2.3.3**    All Liabilities in the nature of general, automobile and product liability, including any Liability for Claims made for injury to persons and/or property arising from, caused by or arising out of the design, manufacture or assembly of any Product sold on or after Closing (regardless of whether any such Products are designed or manufactured before or after Closing), and any Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products;

**2.3.4**    Liabilities with respect to Transferred Employees except as otherwise set forth in Section 6.7;

**2.3.5**    Any and all Environmental Claims, Environmental Contamination, or Environmental Damages relating to Post-Closing Environmental Contamination or Post-Closing Environmental Compliance Matters;

**2.3.6**    Any and all Tax Claims, to the extent that they arise out of or relate to the period after Closing; and

**2.3.7**    All Liabilities that Buyer agrees to pay for or be responsible for pursuant to the terms of this Agreement or any Ancillary Agreement or as required by operation of Law pursuant to the Sale Approval Order.

**2.4**    **Retained Liabilities.**    Except as referred to in Section 2.2, Buyer will not assume or be deemed to have assumed, and will have no Liability with respect thereto, any Liabilities of any Seller and such Seller will continue to be responsible for such Liabilities (collectively, "**Retained Liabilities**").    The Retained Liabilities include, but are not limited to:

**2.4.1**    Accounts Payable of the Business as of Closing;

**2.4.2**    All Liabilities in the nature of general and automobile Liability arising before Closing, and product liability, including any Liability for Claims made for injury to persons and/or property, arising from, caused by or arising out of the manufacture or assembly of any Product sold before Closing, and any liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products sold before the Closing.

**2.4.3**    Any and all Environmental Claims, Environmental Contamination, Environmental Damages or Liabilities relating to Pre-Closing Environmental Contamination or Pre-Closing Environmental Compliance Matters.

**2.4.4**    Liabilities pertaining to acts or omissions of Seller's current or former employees for periods prior to the Closing;

**2.4.5**    Liabilities under any Seller Employee Benefit Plan sponsored or maintained by Sellers or any of the Sellers' Affiliates;

**2.4.6**    Tax Liabilities for periods ending on or before the Closing Date;

**2.4.7**    Any Claim of Sellers arising prior to the Closing Date for administrative fees and expenses that are "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code;

**2.4.8**    Liabilities related to the Excluded Assets;

**2.4.9**    Except as expressly provided in Section 2.2, any Liability of the Sellers arising out of, relating to, or incurred in connection with the businesses retained by the Sellers and which are not arising out of, relating to or incurred in connection with the Business; and

**2.4.10**    All Liabilities arising out of, resulting from, or relating to product warranty or product return with respect to Products sold before the Closing, including all Liabilities arising from, caused by or arising out of any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product that was manufactured, assembled, installed, sold leased or licensed by Sellers, provided, however, that Buyer will service any such recall or warranty claim on

Sellers' behalf and Sellers will reimburse Buyer (at cost) for all Product Claims pursuant to Section 11.5.

### 2.5    Deferred Items.

2.5.1    **Non-Assignability.**    To the extent that any Contract or Permit included in the Acquired Assets is not capable of being assigned (whether pursuant to Section 365 of the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (or a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

2.5.2    **Efforts to Obtain Necessary Consents.**    The applicable Seller will, at its expense, use commercially reasonable efforts, and the applicable Buyer will, at its expense, cooperate with Sellers, to obtain the necessary Consents and to resolve the impracticalities of assignment referred to in Section 2.5.1 before or after the Closing.

2.5.3    **If Consents Cannot be Obtained.**    To the extent that the Consents referred to in Section 2.5.1 are not obtained by the applicable Seller, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 2.1.2, will be to use, during the twelve (12) month period commencing with the Closing, commercially reasonable efforts, at no cost to Sellers, to: (i) provide to Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, without incurring any financial obligation to Buyer; and (iii) enforce for the account of Buyer and at the cost of Buyer any rights of Sellers arising from any Deferred Item referred to in Section 2.5.1 against such issuer thereof or other party or parties thereto.

2.5.4    **Obligation of Buyer to Perform.**    To the extent that Buyer is provided the benefits pursuant to Section 2.5.3 of any Deferred Item, Buyer will perform, on behalf of Sellers, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of Sellers thereunder or in connection therewith and if Buyer will fail to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may suspend their performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or Sellers may perform at Buyer's sole cost and expense, in which case Buyer will reimburse Sellers' costs of such performance immediately upon receipt of an invoice therefore.

2.5.5    **Standard of Care.**    Sellers will have no Liability to any Buyer arising out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyer or its Affiliates.  Buyer will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

3.      **PURCHASE PRICE; ADJUSTMENT; ALLOCATION.**

    **3.1    Deposit Amount.**  On or before 3:00 (prevailing Eastern time), January 16, 2008, Buyer will deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement Seven Hundred Fifty Thousand Dollars ($750,000.00) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Buyer to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures (which procedures will be set forth in the Deposit Escrow Agreement):

    **3.1.1**    Delphi and Buyer will jointly instruct the Escrow Agent to deliver the Deposit Amount on the Closing Date, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement;

    **3.1.2**    Upon a material breach by Buyer of this Agreement or the Bidding Procedures which results in termination of this Agreement, Delphi and Buyer will jointly instruct the Escrow Agent to deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement, to be retained by Delphi; or

    **3.1.3**    Upon termination of this Agreement in accordance with the termination provisions set forth in Article 9 for any reason other than a Buyer breach, then, on: (i) the date which is fifteen (15) days after such termination; or (ii) in the event that an Alternative Transaction is completed, the Return Date (which ever is earlier) Delphi and Buyer will jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyer in the Deposit Escrow Agreement, to be retained by Buyer.

    **3.2    Purchase Price.**

    **3.2.1**    Subject to the terms and conditions of this Agreement, on the Closing Date, in consideration of the Sale, Buyer will pay to Delphi or the Sellers designated by Delphi, by wire transfer in immediately available funds, an amount equal to forty-four million, two hundred thousand dollars ($44,200,000.00), subject to (i) the Pre-Closing Work Practice Price Adjustment, (ii) the Headcount Price Adjustment, (iii) the Headcount Reduction Cost Adjustment, and (iv) the Estimated Inventory Adjustment (the "**Purchase Price**"), less the Deposit Amount.

    **3.2.2**    In the event that, prior to the Closing, (i) a Competitive Operating Agreement has not yet (a) been executed or (b) become effective or (ii) Seller has failed to (a) reduce the Hourly Workforce to 623 or fewer or (b) implement all Work Practice Changes, Buyer will be entitled to a downward adjustment of the Purchase Price in the amount of twenty-six million dollars ($26,000,000.00) (the "**Pre-Closing Work Practice Price Adjustment**").

    **3.2.3**    Subject to the adjustments set forth in Section 3.2.4, in the event Buyer is entitled to the Pre-Closing Work Practice Price Adjustment, Sellers will be entitled to an upward price adjustment of (i) $100,000 for each Hourly Employee Permanently Terminated prior to Closing, (ii) $75,000 for each Hourly Employee Permanently

Terminated between 1 and 180 days following the Closing Date, and (iii) $70,000 for each Hourly Employee Permanently Terminated between 181 and 365 days following the Closing Date (the "**Headcount Price Adjustment**"), provided that, prior to or within one year after the Closing Date, (i) the Sellers or the Buyer have implemented at least one Work Practice Change; (ii) a Competitive Operating Agreement has (a) been executed and (b) become effective; and (iii) as of the date that is 365 days after the Closing Date, the Hourly Workforce is 748 or fewer.

**3.2.4**   The Sellers will bear (a) the entire cost of achieving reductions to the Hourly Workforce pursuant to any agreement to reduce the Hourly Workforce reached prior to the Closing Date, whether such cost is to be paid prior to or after the Closing, and (b) the full cost of the employee wages and benefits with respect to employees to be terminated within 365 days after the Closing (less any subsidy Buyer actually receives from GM on account of each such employee).   As set forth below in this Section 3.2.4, the Buyer and Seller will each bear a portion of the cost of reductions to the Hourly Workforce following the Closing Date.   The Purchase Price will be adjusted downward to the extent that the average cost to Permanently Terminate Hourly Employees in the 365-day period following the Closing incurred by Buyer exceeds $25,000 (the "**Headcount Reduction Cost Adjustment**").   The Headcount Reduction Cost Adjustment for the 180-day period immediately following the Closing (the "**180-Day Post-Closing Period**") will be calculated by <u>subtracting</u> (i) the <u>product of</u> (w) $25,000 <u>and</u> (x) the total number of Hourly Employees agreed to be Permanently Terminated pursuant to agreement reached during the 180-day Post-Closing Period <u>from</u> (ii) the Total Termination Cost with respect to the Hourly Employees to be Permanently Terminated pursuant to agreement reached in the 180-Day Post-Closing Period (the "**180-Day Termination Cost**").   The Headcount Reduction Cost Adjustment for the period occurring on and between the 181st day after the Closing and the 365th day after the Closing (the "**365-Day Post-Closing Period**") will be calculated by <u>subtracting</u> (iii) the <u>product of</u> (y) $25,000 <u>and</u> (z) the total number of Hourly Employees to be Permanently Terminated pursuant to agreement reached during the 365-Day Post-Closing Period <u>from</u> (iv) the Total Termination Cost with respect to Hourly Employees to be Permanently Terminated pursuant to agreement reached during the 365-Day Post-Closing Period (the "**365-Day Termination Cost**").

**3.2.5**   The Headcount Price Adjustment and Headcount Reduction Cost Adjustment, if any, will be paid as follows:

(i)   At the Closing, the Purchase Price will be adjusted upward by the <u>product</u> of (a) $100,000.00 <u>and</u> (b) the difference between 768 and the Hourly Workforce on the Closing Date provided the Hourly Workforce is less than 748 employees.

(ii)   On the date that is eighteen (18) months after Closing Date or as soon as practicable thereafter, the Buyer will pay to the Sellers (a) the <u>product</u> of (x) $75,000 <u>and</u> (y) the difference between the Hourly Workforce on the Closing Date and the Hourly Workforce on the day that is 180 days after the Closing Date, provided the Hourly Workforce is less than 748 employees, <u>less</u> (b) the 180-Day Termination Cost; and

(iii)   On the second anniversary of Closing Date or as soon as practicable thereafter, the Buyer will pay to the Sellers (a) the <u>product</u> of (x)

$70,000 <u>and</u> (y) the difference between the Hourly Workforce on the day that is 180 days after the Closing Date and the Hourly Workforce on the day that is 365 days after the Closing Date, provided the Hourly Workforce is less than 748 employees, <u>less</u> (b) the 365-Day Termination Cost.

**3.3**    **Inventory Adjustment**.    If the value of Inventory reflected in the Final Inventory Statement is less than the Estimated Inventory Amount, Delphi will pay to Buyer an amount equal to such deficiency.    If the value of Inventory reflected in the Final Inventory Statement is greater than the Estimated Inventory Amount, Buyer will pay to Delphi an amount equal to such excess.    Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Final Inventory Statement as provided in this Section 3.3.

**3.3.1**    **Preparation of Closing Inventory Statement.**

**A.**    Within sixty (60) days after the Closing Date, Buyer will prepare and deliver to Delphi a Closing Inventory Statement.    The Closing Inventory Statement will be based on a physical inventory of the Inventory of the Business, and utilizing a methodology, and accounting therefore, in accordance with GAAP, to be taken by the Buyer, at its sole cost and expense, and the Seller shall be given opportunity to observe such physical inventory,  within fifteen (15) Business Days after the Closing Date, consistent with past practice, except that, with respect to Productive Inventory, any such Inventory reasonably expected not to be used within one (1) year after Closing will be deemed to have no value. Buyer will, after Closing and pending agreement or final determination of the Closing Inventory Statement, allow Delphi and its Affiliates and their accountants, agents and advisers such access to the Business, all relevant employees and all relevant records, information and other documentation (and will, upon request, provide copies thereof) as is reasonably necessary to enable, confirm and verify the Closing Inventory Statement and to settle the Final Inventory Statement, including access to and the services of key personnel.

**B.**    Delphi will, within thirty (30) days after the delivery by Buyer of the Closing Inventory Statement, complete its review of such statement.    If Delphi disagrees with the Closing Inventory Statement, Delphi will, on or before the last day of such thirty (30) day period, inform Buyer in writing (the "**Objection**") of disagreements which on an item by item basis (individually) or in relation to a series of related items in the aggregate, exceed $100,000 (collectively, "**Relevant Items**").    Any Objection will specify in reasonable detail the nature of any disagreement so asserted, and include all supporting schedules, analyses, working papers and other documentation.    If: (i) no such Objection has been timely provided to Buyer; or (ii) the sum of all Relevant Items fails to exceed $100,000, then: (a) the Closing Inventory Statement will be deemed to be the Final Inventory Statement; and (b) Buyer's calculations will be final and binding on the Parties of all items therein.

**C.**    Buyer will then have thirty (30) days following the date it receives the Objection to review and respond to the Objection.    If Delphi and Buyer are unable to resolve all of their disagreements with respect to the determination of the foregoing items by the fifteenth (15th) day following Buyer's response thereto, after having used their good faith efforts to reach a resolution, they will refer their

remaining differences to a mutually agreed upon independent third party certified public accounting firm (the "**CPA Firm**"), who will, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 3.3, and only with respect to the specific Relevant Items remaining disputed, whether and to what extent, if any, the Closing Inventory Statement requires adjustment.  Delphi and Buyer will request the CPA Firm to use its commercially reasonable efforts to render its determination within thirty (30) days.  In resolving any disputed item, the CPA Firm: (i) will be bound by the principles set forth in this Section 3.3 and <u>Schedule 3.3.1.C</u>; (ii) will limit its review to matters specifically set forth in the Objection that remain disputed; and (iii) will not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party.  The CPA Firm's determination will be conclusive and binding upon Delphi and Buyer.  Delphi and Buyer will make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the Parties' respective accountants subject to any conditions such accountants may impose) and supporting documentation relating to the Closing Inventory Statement, and all other items reasonably requested by the CPA Firm.  The "**Final Inventory Statement**" will be: (i) the Closing Inventory Statement if the Parties so agree or if so determined in accordance with Section 3.3.2; or (ii) if an Objection is made under Section 3.3.2, the Closing Inventory Statement, as adjusted pursuant to the agreement of the Parties, or as adjusted by the CPA Firm.  The fees, costs and expenses of the CPA Firm under this Section 3.3.1: (i) will be borne by Delphi in the proportion that the aggregate dollar amount of such disputed items so submitted that are unsuccessfully disputed by Delphi (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted; and (ii) will be borne by Buyer in the  proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Delphi (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted. Whether any dispute is resolved by agreement among the Parties or by the CPA Firm, changes to the Closing Inventory Statement may be made only for items as to which Delphi have taken exception in the Objection. Each Party will bear its own expenses incurred in this dispute resolution process, including fees of its accountants, attorneys and other agents.

> **3.3.2   <u>Preparation of the Estimated Inventory Amount</u>.**   No more than twenty-one days prior to the Closing, Seller will conduct a physical inventory of the Inventory of the Business (in which Buyer and its advisors shall be permitted to observe and participate) and utilizing a methodology, and accounting therefore, in accordance with GAAP, prepare a statement of such Inventory.  The value of the Inventory as set forth in such statement, which value shall be reasonably acceptable to Buyer, shall be the "**Estimated Inventory Amount**."   In the event the Seller and Buyer cannot agree prior to the Closing on the Estimated Inventory Amount, notwithstanding their good faith efforts to do so, the Estimated Inventory Amount shall be the mid-point between Seller's proposed Estimated Inventory Amount and Buyer's proposed Estimated Inventory Amount.   The Purchase Price will be (i) adjusted downward to the extent the Benchmark Inventory Amount exceeds the Estimated Inventory Amount <u>or</u> (ii) adjusted upward to the extent the Estimated Inventory Amount exceeds the Benchmark Inventory Amount.  Such upward or downward adjustment is the "**Estimated Inventory Adjustment**."

**3.4**    **Facilities and Non-Billable Tooling Adjustment.**  If the value of Facilities and Non-Billable Tooling reflected in the Facilities and Non-Billable Tooling Statement is less than the Facilities and Non-Billable Tooling Peg Amount, Delphi will pay to Buyer an amount equal to such deficiency.  If the value of Facilities and Non-Billable Tooling reflected in the Facilities and Non-Billable Tooling Statement is greater than the Facilities and Non-Billable Tooling Peg Amount, Buyer will pay to Delphi an amount equal to such excess.  Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Facilities and Non-Billable Tooling Statement.

**3.4.1**    **Preparation of Facilities and Non-Rebillable Tooling Statement.**  Within forty-five (45) calendar days of the Closing Date, Delphi will prepare and deliver to Buyer a Facilities and Non-Rebillable Tooling Statement.  The Facilities and Non-Rebillable Tooling Statement will set forth the Facilities and Non-Rebillable Tooling and will provide a listing of such payments, with vendor name, receipt number, and dollar amount as of Closing Date.  If requested, Buyer will be provided a copy of specific receipt for each vendor payment and evidence of presentment and acceptance of payment.  Within forth-five (45) calendar days after receipt of the Facilities and Non-Rebillable Tooling Statement, Buyer will identify in writing to Delphi any disputes with the Facilities and Non-Rebillable Tooling Statement.  If no such correspondence takes place, the Facilities and Non-Rebillable Tooling Statement will be deemed final and the deficiency or excess payment described in Section 3.4 will be due.  If there are any irreconcilable differences, the Parties will utilize the Dispute Resolution as the method to resolve any such difference.

**3.5**    **Escrow.**  Provided the Closing is on or after the effective date of the Filing Affiliates' confirmed plan of reorganization (the "**Emergence Date**"), Buyer shall deliver to Sellers the Purchase Price in accordance with Section 3.2.1 of this Agreement.  If, however, the Closing is before the Emergence Date, (i) Buyer shall deliver to the Indemnity Escrow Agent pursuant to the Indemnity Escrow Agreement Two Million Dollars ($2,000,000.00) of the Purchase Price (the "**Indemnity Escrow Amount**") to be held by the Indemnity Escrow Agent, in an interest bearing account, as collateral to secure the rights of the Buyer under Article 11 hereof, and (ii) Buyer shall deliver to the Inventory Adjustment Escrow Agent pursuant to the Inventory Adjustment Escrow Agreement Five Hundred Thousand ($500,000.00) of the Purchase Price (the "**Inventory Adjustment Escrow Amount**") to be held by the Inventory Adjustment Escrow Agent in an interest bearing account, as collateral to secure the rights of the Buyer under Section 3.3.  The Indemnity Escrow Amount and the Inventory Adjustment Escrow Amount shall be held pursuant to the provisions of the Indemnity Escrow Agreement and the Inventory Adjustment Escrow Agreement, respectively. The Indemnity Escrow Amount will be held by the Indemnity Escrow Agent from the Closing Date until the third anniversary of the Closing Date (the "**Escrow Period**"); provided, however, that in the event the Emergence Date occurs during the Escrow period, the Indemnity Escrow Agent shall immediately deliver the Indemnity Escrow Amount to the Sellers and thereafter, the Sellers' obligations under Article 11, if any, shall be the sole responsibility of post-reorganization Delphi through the applicable periods set forth in Article 11.  The Inventory Adjustment Escrow Amount shall be held pursuant to the provisions of the Inventory Adjustment Escrow Agreement by the Inventory Adjustment Escrow Agent from the Closing Date until the earlier of (y) the date which is one hundred fifty (150) days after the Closing Date (less any disputed Relevant Items, which will be retained by the Inventory Adjustment Escrow Agent until resolution of such Relevant Items), or (z) the date of any payment provided for in Section 3.3 of this Agreement.  The

costs and expenses of each of the Indemnity Escrow Agent and Inventory Adjustment Escrow Agent, will be paid from and borne solely by the Indemnity Escrow Amount and Inventory Adjustment Escrow Amount, respectively.

### 3.6    Allocation of Purchase Price.

3.6.1    The Parties agree to allocate the Purchase Price (i.e., both the Purchase Price and any adjustments thereto) among the Business and the agreements provided herein for transfer of the Business to Buyer and its Affiliates, for all purposes (including financial, accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached as <u>Schedule 3.6.1</u>; and

3.6.2    Buyer and Sellers will each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.    Delphi will provide Buyer and Buyer will provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

### 3.7    Prorations.

3.7.1    To the extent that any Seller makes any payment relating to the Business prior to, on or following the Closing Date with respect to any item listed in Section 3.7.2 below relating to periods on or following the Closing Date, Buyer will reimburse Sellers on a per diem basis; and

3.7.2    To the extent Buyer is required to make any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, Seller will reimburse Buyer on a per diem basis, in each case for the following:

A.    Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

B.    Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business;

C.    Electric, fuel, gas, telephone and other utility charges;

D.    Regarding Business Employees, payroll expenses (excluding vacation pay) and other employee-related payments (of whatsoever kind) or assessments and installments on special benefit assessments;

E.    Reimbursable employee business expenses of Transferred Employees; and

**F.**    Payments and charges due pursuant to any Contract other than pursuant to Collective Bargaining Agreements, Employee Benefit Plans and employee payroll-related items except as set forth in Section 6.6, Permit, commitment or other binding arrangement to which Sellers are a party or is obligated and which are being assumed by Buyer pursuant to this Agreement.

## 4.    REPRESENTATIONS AND WARRANTIES OF SELLERS.

Each Seller represents and warrants, as of the date hereof, severally and not jointly, to Buyer with respect to the Acquired Assets or being sold by such Seller, as follows:

**4.1    Organization.**  Each Seller is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  Each Seller has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

**4.2    Authorization; Enforceability.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, as applicable, each Seller has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.   Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Seller.  This Agreement has been duly executed and delivered by Delphi, and the Ancillary Agreements will be duly executed and delivered by Delphi and each Seller, as applicable, and, assuming due authorization, execution and delivery by Buyer or Buyer Parent, as applicable, constitutes, or will constitute, a valid and binding agreement of Delphi and each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except: (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect any by general equitable principles relating to enforceability; (b) that enforceability of Section 9.2 of this Agreement is subject to entry and effectiveness of the Bidding Procedures Order and (c) that, unless otherwise set forth in the Bidding Procedures Order, enforceability of all other provisions of this Agreement is subject to entry and approval of the Sale Approval Order.

**4.3    RESERVED.**

**4.4    Financial Statements.**  Schedule 4.4.1 sets forth (a) the unaudited, pro-forma balance sheet of the Business as of December 31, 2006 (such balance sheet, the

"**Reference Balance Sheet**") and the related unaudited, pro-forma statement of income for the year ended December 31, 2006, and (b) the unaudited, pro-forma balance sheet of the Business as of September 30, 2007 and the related unaudited, pro-forma statement of income for the nine month period ended September 30, 2007 in each case including Seller's pro-forma adjustments. (The foregoing balance sheets and income statements of the Business are referred to as "**Financial Statements**").  Except as set forth on Schedule 4.4.2, the Financial Statements: (i) are true in all material respects with respect to the purpose for which they were prepared; (ii) were prepared from statements prepared and used by Seller in the ordinary course of managing the Business; and (iii) present fairly in all material respects, the assets, liabilities, financial position and results of operations of the Business on a pro-forma basis recognizing that the Acquired Assets comprising the Business have not been operated as separate "stand alone" entities within Delphi, as of the dates and for the respective periods covered, and, as a result, the Business has been allocated certain charges and credits as discussed in the notes accompanying the Financial Statements and as otherwise described in Schedule 4.4.2.

**4.5    No Conflicts or Approvals.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, except as set forth on Schedule 4.5, the execution, delivery and performance of this Agreement and of the Ancillary Agreements by Delphi and each Seller that is a party do not: (i) violate, conflict with or result in a breach by any of Delphi or Sellers of the Organizational Documents of any of Delphi or Sellers; (ii) violate or result in a breach of any Governmental Order or Law applicable to any of Delphi or Sellers or any of their respective properties or assets; or (iii) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations, of declarations or filings with the Bankruptcy Court, except: (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**4.6    Sufficiency of Acquired Assets.** The Acquired Assets, together with the Intellectual Property rights to be licensed from Sellers to Buyer pursuant to Section 6.12, comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted, except for: (i) Excluded Assets, and (ii) assets used to produce the general corporate services that are currently provided by Sellers to the Business, including those described in the Transition Services Agreement or any Ancillary Agreement.

**4.7    Compliance with Law; Permits.**  Except as set forth on Schedule 4.7, since January 1, 1999, to the Knowledge of the Sellers, the Business has been and is currently in material compliance with all Laws, except where noncompliance would not have a Material Adverse Effect.  To the Knowledge of Sellers, the Sellers possess all licenses, consents, approvals, permits and other Governmental Approvals ("**Permits**") necessary to own, lease and operate the Acquired Assets except where the failure to have such Permits would not have a Material Adverse Effect.  This Section 4.7 shall not apply to compliance with Environmental Laws and Environmental Permits, which is covered by Section 4.14.

**4.8    Proceedings.**  Except for claims raised in connection with the pendency of the Bankruptcy Cases, and for the Claims and other items set forth in Schedule 4.8, (and

except with respect to compliance with Environmental Laws, which is covered by Section 4.14), within the three (3) years immediately preceding the Closing Date, there have been no material Proceedings against the Business or any of the Acquired Assets, and there are no pending or, to the Knowledge of Sellers, threatened Proceedings against the Business or any of the Acquired Assets.

**4.9    Absence of Certain Changes.**    Except as set forth in <u>Schedule 4.9</u> or as otherwise contemplated or expressly permitted by this Agreement, since September 30, 2007: (i) the Business has been conducted only in the Ordinary Course of Business; and (ii) there has not been any change or development in or affecting the Business that has had, or would have, a Material Adverse Effect.

**4.10    Tax Matters.**    The Sellers have withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Employee.

**4.11    Employees.**    Regarding the Business:

**4.11.1** <u>Schedule 4.11.1</u> contains a list of all Seller Employees, including for all Seller Employees: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual base rate of compensation; (vi) each person's date of hire; and, if applicable (vii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws);

**4.11.2** <u>Schedule 4.11.2</u> sets forth a list of each Seller Employee Benefit Plan applicable to Seller Employees.  <u>Schedule 4.11.2</u> separately identifies each Seller Employee Benefit Plan that is, as of the Closing Date, required to be provided to Hourly Employees pursuant to the terms of the Collective Bargaining Agreements immediately prior to the Closing Date;

**4.11.3** Copies of the following materials have been delivered or made available to Buyer with respect to each Seller Employee Benefit Plan to the extent applicable: (i) current plan documents; and (ii) current agreements and other documents relating to the funding or payment of benefits;

**4.11.4** Except as: (i) set forth in <u>Schedule 4.11.4</u>; and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge of Sellers, threatened Proceedings with respect to any Seller Employee Benefit Plans that would result in a Liability that would have a Material Adverse Effect;

**4.11.5    Collective Bargaining Agreements.**    Schedule 4.11.5 lists all or substantially all Collective Bargaining Agreements.   Seller has given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements.   Except as disclosed on <u>Schedule 4.11.5</u>, Seller is in compliance with each Collective Bargaining Agreement;

**4.11.6 <u>Grievances, Labor Negotiations</u>.** Except as disclosed on <u>Schedule 4.11.6</u>, or as reflected in the Collective Bargaining Agreements, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers; (ii) no Seller has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; and (iii) no Grievances relating to any employee of Sellers are pending as of the Closing; and

**4.11.7 <u>Labor/Employment Claims</u>.** Sellers are in compliance with all applicable labor and employment Laws in connection with the operation of the Business and the Acquired Assets. Except as set forth on <u>Schedule 4.11.7</u>, there are no pending or threatened Claims against Sellers whether under applicable Laws, employment agreements or otherwise asserted by any present Employee or former Employee or any other Person as relates to the Business, including claims on account of or for: (a) wages or salary for any period other than the current payroll period; (b) any amount of vacation pay or pay in lieu of vacation or time off; (c) violations of Laws pertaining to payment of wages and fair labor standards, including but not limited to maximum work hours, minimum wages and overtime pay, other than overtime pay for work done during the current payroll period; (d) violations of Laws pertaining to employee relations, civil rights, employment discrimination, affirmative action, or fair employment practices; (e) violations of Laws pertaining to labor relations, unfair labor practices, union security or union membership, (f) violations of Laws pertaining to immigration or employment eligibility; or (g) violations of Laws pertaining to occupational health and safety or workers' compensation; and, to Sellers' Knowledge, there are no such claims which have yet to be asserted. Except as set forth on <u>Schedule 4.11.7</u>, there are no pending or threatened investigations by any Governmental Authority with respect to any alleged violation of labor or employment Laws in connection with the operation of the Business or the Acquired Assets. No Seller is subject to any consent decree or formal or informal settlement agreement with any Governmental Authority pursuant to any labor or employment Laws.

**4.12    <u>Intellectual Property</u>.**

**4.12.1** <u>Schedule 4.12.1.A</u> and <u>Schedule 4.12.1.B</u>, respectively, list all patents and patent applications and all trademark registrations and applications therefore included in the Purchased Intellectual Property. Except: (i) as set forth in <u>Schedules 4.12.1.A</u> and <u>4.12.1.B</u> or (ii) rights to any patent or patent application filed in Europe retained by employee-inventors pursuant to European Law, and subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest in such patents, patent applications, trademark registrations and applications, and have the right to transfer Sellers' right, title and interest in them as set forth in this Agreement.

**4.12.2** Subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own or otherwise have the right to transfer all other Purchased Intellectual Property and license the Shared Intellectual Property as set forth in this Agreement.

**4.12.3** Except as set forth in <u>Schedule 4.12.3</u>, Sellers have no Knowledge of any allegation by any third party of Intellectual Property infringement or

misappropriation, resulting from the operation of the Business during the last two (2) years, that would have a Material Adverse Effect.

**4.12.4** Except as set forth in <u>Schedule 4.12.4</u>, Sellers have no Knowledge of any infringement of the Purchased Intellectual Property.

**4.13** <u>Contracts</u>.

**4.13.1** <u>Schedule 4.13.1</u> sets forth a list as of the dates set forth therein of each of the following Contracts to which any of the Sellers with respect to the Business, is party or by which any of them is bound as of the date of this Agreement and that are included in the Acquired Assets, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

**A.** Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the relevant Seller party thereto with respect to the Business;

**B.** Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, other than letters of credit, overdrafts and other current-account credit facilities entered into in the Ordinary Course of Business, in each case exceeding $500,000;

**C.** Guarantees of the obligations of other Persons involving the potential expenditure by the Sellers in respect of the Business after the date of this Agreement of more than $500,000 in any instance;

**D.** Contracts (other than Contracts with prospective suppliers or customers relating to the development of Products) under which any Seller has licensed material Purchased Intellectual Property to, or material Licensed Intellectual Property from, any other Person;

**E.** Contracts involving the expenditure by the Sellers in respect of the Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such contracts that are terminable by the Sellers without penalty on not more than one hundred eighty (180) days notice; and

**F.** Contracts providing that a Seller in respect of the Business will receive future payments aggregating more than $500,000 per annum or $2,000,000 in the aggregate prior to the expiration of such Contract.

**4.13.2** Except as set forth in <u>Schedule 4.13.2</u>, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, to the Knowledge of Sellers: (i) no event has occurred that constitutes (or with notice or lapse of time would constitute) a default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyer, if applicable) that would have a Material Adverse Effect by: (a) any Seller under any Material Contract; or (b) to the Knowledge of Sellers, any other party to any Material Contract; (ii) there are no material unresolved disputes under any of the Material Contracts; (iii) the

assignment of any Material Contract pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such Material Contract, or bring into operation any other provision thereof, (iv) each Material Contract is in full force and effect; and (v) to Sellers' Knowledge, no notice of termination or default has been issued with respect to any Material Contract.

**4.13.3** Set forth on <u>Schedule 4.13.3</u> is a list of the top five (5) customers ("**Significant Customers**") of the Business as of December 31, 2006 setting forth for each the amount of gross revenue received in 2006 and year-to-date 2007.  Seller has received no written notice, and has no Knowledge, that any Significant Customer will cease to do business with the Business or substantially reduce either the purchase of products from the Business or the pricing thereof.   Buyer acknowledges that the foregoing shall not be deemed a guarantee of customer volumes or pricing.

**4.13.4** Set forth on <u>Schedule 4.13.4</u> is a list of the top five (5) suppliers ("**Significant Suppliers**") of the Business as of December 31, 2006 setting forth for each the amount of gross purchases in 2006 and year-to-date 2007.   Seller has received no written notice, and has no Knowledge, that any Significant Supplier will cease to do business with the Business or substantially reduce sale of products to the Business or increase the pricing thereof.  Buyer acknowledges that the foregoing shall not be deemed a guarantee of supplier volumes or pricing.

**4.14**     **Environmental Matters**.   Except as disclosed in <u>Schedule 4.14</u>, to the Knowledge of the Sellers:

**4.14.1** The Sellers with respect to the Acquired Assets and the Business are, and have been for the past five (5) years, in material compliance with all applicable Environmental Laws and with Environmental Permits;

**4.14.2** The Sellers have not received any written notice, from a Governmental Authority, alleging that the Owned Real Property, the Acquired Assets or the Business as currently operated violates in any material respects, or is subject to any material liability under, any Environmental Laws or Environmental Permits;

**4.14.3** The Sellers have not received, and are not aware of the issuance of any pending or threatened material Environmental Claim with respect to the Owned Real Property, the Acquired Assets or the Business;

**4.14.4** There has been: (i) no Release of Hazardous Materials on, at, under or migrating to or from any Owned Real Property in concentrations exceeding legally applicable and relevant standards for the Owned Real Property as currently used or otherwise in concentrations likely to give rise to Environmental Damages; and (ii) no notice or request for information from any Governmental Authority under 42 U.S.C. §9601 et seq. of any Release of Hazardous Materials that was generated or used by the Business;

**4.14.5**   This Section 4.14 contains the sole and exclusive representations and warranties of Sellers in this Agreement with respect to Environmental Matters pertaining to the Business and the Owned Real Property and Acquired Assets.

**4.14.6** Sellers have delivered or otherwise made available to Buyer copies of any Phase I or Phase II environmental assessments and any material reports, Governmental Authorities' inspection reports, studies, analyses or test results or material correspondence with Governmental Authorities in the possession or control of any Seller pertaining to Hazardous Materials in, at, on, beneath or adjacent to any Owned Real Property, or non-privileged reports regarding the Sellers' compliance with Environmental Laws in connection with the Business, the Owned Real Property or the Acquired Assets;

**4.14.7** (i) A list of all material Permits required under Environmental Law to operate the Business as currently operated at the Owned Real Property is set forth in Schedule 4.14.

(ii) Sellers have timely filed applications for renewal of such Permits at the Owned Real Property.

**4.15** **Insurance.** Schedule 4.15 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder. All such policies are outstanding and in full force and effect.

**4.16** **Personal Property Assets, Inventory.**

**4.16.1** Except as set forth on Schedule 4.16.1, the Sellers have good and marketable title to, or hold by valid and existing lease or license, all Personal Property reflected as assets on the Reference Balance Sheet or acquired after December 31, 2006, except with respect to assets disposed of in the Ordinary Course of Business since such date.

**4.16.2** The Sellers, with respect to the Acquired Assets, will own, or have valid leasehold interests in, all Personal Property and Inventory being transferred to Buyer under this Agreement, and to Sellers' Knowledge, all transferred Personal Property used by the Business are in such condition (considering age and purpose for which they are used) as to enable the Business to be conducted as currently conducted.

**4.16.3** Except to the extent identified in Schedule 4.16.3, the Inventory included in the Acquired Assets will, as of the Closing, be located at the Owned Real Property. All Productive Inventory included in the Acquired Assets is saleable and usable in the ordinary course, except for such Inventory as to which an adjustment is made in the Closing Inventory Statement, and no Inventory is excess, damaged or obsolete. Excess inventory is, in the case of non-service parts, Inventory that exceeds the volume of inventory releases from customers in the prior thirteen (13) weeks, and, in the case of service parts and aftermarket, Inventory that exceeds the volume of inventory releases from customers in the prior fifty-two (52) weeks.

**4.16.4** Schedule 4.16.4 sets forth a list of substantially all machinery, equipment and capitalized tools with a book value greater than $100,000 included in the Acquired Assets.

**4.17   Real Property**.   Schedule 4.17 lists all real property owned which constitutes Acquired Assets (the "**Owned Real Property**").   With respect to each such parcel of the Owned Real Property and except as otherwise specified on Schedule 4.17 and except where the failure of any of the following to be true and correct would not have a Material Adverse Effect, the identified owner has good and marketable fee simple title to the parcel of the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

**4.18   No Brokers' Fees.**   Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyer would be liable.

**4.19   Product Claims.**   Schedule 4.19 lists all Product Claims during the three (3) years immediately preceding the Closing Date.

**4.20   No Other Representations or Warranties.**   Except for the representations and warranties contained in this Article 4, the Sellers make no other express or implied representation or warranty to Buyer, and in particular but without limitation, no Seller is making any representations with respect to any plan(s) of Buyer for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose.   For avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence or with respect to the information contained in the Confidential Information Memorandum, Data Room, management presentations, reports or any financial forecasts or projections or other information furnished by Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

**4.21   Fair Disclosure.**   Any matter disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations, warranties or Schedules contain a reference to such Schedule, so long as it is reasonably apparent that such matter also applies to such other representations and warranties.

**4.22   Survival.**   Each of the foregoing representations and warranties will expire on the first anniversary of the Closing Date, other than the representations and warranties contained in Sections 4.14 and 4.19, which will expire on the third anniversary of the Closing Date.

**5.     REPRESENTATIONS AND WARRANTIES OF BUYER.**

The Buyer hereby represents and warrants to Sellers, as of the date hereof and of the Closing Date, as follows:

**5.1   Organization.**   The Buyer is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.   The Buyer has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse

effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.2**    **Authorization; Enforceability.**    Buyer has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.    The execution and delivery of this Agreement and the Ancillary Agreements by the Buyer, and the performance of its obligations under any such agreement, will be duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and the Ancillary Agreements will be duly executed and delivered by the Buyer and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the Buyer, enforceable against it in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**5.3**    **No Conflicts or Approvals.**    The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation by Buyer of the transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by Buyer of the Organizational Documents of Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which Buyer or its properties or assets may be bound; or (iii) violate or result in a breach of any Governmental Order or Law applicable to Buyer or its properties or assets, require any Governmental Approval, except, with respect to the foregoing clauses (ii) and (iii) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.4**    **Proceedings.**    There are no Proceedings pending or, to the Knowledge of Buyer, threatened against the Buyer that could reasonably be expected to restrain, delay or inhibit the ability of Buyer to consummate the transactions contemplated by this Agreement. The Buyer is not subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.5**    **Solvency.**    Upon the consummation of the transactions contemplated by this Agreement: (i) the Buyer will be not insolvent; (ii) none of the Buyer or the other legal entities constituting the Business will be left with unreasonably small capital; (iii) none of the Buyer or the Business will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Buyer and the other legal entities constituting the Business will not be impaired; and (v) immediately following Closing, Buyer individually and in the aggregate will have sufficient capital to continue the Business as a going concern.

**5.6**    **Anti-Money Laundering.**    Buyer is in compliance with: (i) all applicable provisions of  the Uniting and Strengthening America by Providing Appropriate Tools

Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer operates or does business.  Neither any Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Buyer agrees that should Buyer or Buyer Parent, or any of their directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Buyer will inform Delphi in writing immediately.

    **5.7**    **RESERVED**.

    **5.8**    **No Inducement or Reliance; Independent Assessment**.

        **5.8.1**    With respect to  the Acquired Assets, the Business or any other rights or obligations to be transferred hereunder or pursuant hereto, Buyer has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Delphi, any of its Affiliates, or any agent, employee, attorney or other representative of Delphi representing or purporting to represent Delphi or any Seller that are not expressly set forth herein (including the Schedules and Exhibits hereto and thereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Delphi, any Affiliate of Delphi, or any agent, employee, attorney, other representative of Delphi or other Person will have or be subject to any Liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information, including the Confidential Information Memorandum and any information, documents or material made available in the Data Room or any Management Presentations or in any other form in expectation of the transactions contemplated by this Agreement.

        **5.8.2**    Buyer acknowledges that it has made its own assessment of the present condition and the future prospects of the Business and is sufficiently experienced to make an informed judgment with respect thereto.  Buyer acknowledges that neither Delphi nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the Business or its profitability for Buyer, or with respect to any forecasts, projections or business plans prepared by or on behalf of Delphi and delivered to Buyer in connection with Buyer's review of the Business and the negotiation and the execution of this Agreement.

    **5.9**    **Financial Ability.**  Buyer has the financial ability and will have available at Closing sufficient Cash in immediately available funds to pay the Purchase Price and all later adjustments thereto, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.  In particular, Buyer has delivered to Sellers (i) an equity commitment letter from Buyer Parent demonstrating Buyer Parent's agreement

to fund a portion of the Purchase Price, and (ii) letters from four (4) debt financing institutions, all expressing an interest in funding Buyer's purchase of the Business.

  **5.10** **No Brokers' Fees**. Buyer has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

  **5.11** **Compliance with Laws**. Buyer is in compliance with all Laws applicable to Buyer, except with respect to those violations that could not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Buyer from consummating the transactions contemplated by this Agreement.

  **5.12** **Adequate Assurance of Future Performance**. Buyer has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed Contract, provided, however, that in the event the Bankruptcy Court enters an order requiring the Buyer to undertake action in order to demonstrate such adequate assurance with respect to a particular contract, the Buyer may elect instead to have Sellers remove such contract from the list of Assumed Contracts.

**6.**  **COVENANTS AND AGREEMENTS**.

  **6.1**  **Conduct of Business between Signing and Closing**.

   **6.1.1** Except as: (i) contemplated by this Agreement; (ii) disclosed on Schedule 6.1.1; (iii) required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iv) required by or resulting from any changes of applicable Laws; or (v) set forth in the disclosure of this Agreement or the transactions contemplated hereby, from and after the date of this Agreement and until the Closing, Delphi will cause the Sellers to (a) conduct the operations of the Business in the Ordinary Course of Business, (b) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relationships with the Business, (c) maintain all contracts with respect to development and purchase of machinery, equipment and tooling, including the items set forth on Schedule 6.1.1(a), and (d) maintain all machinery, equipment and tooling in the Ordinary Course of Business.  Except: (x) as contemplated by this Agreement or as disclosed on Schedule 6.1.1(b); or (y) as required by, arising out of, relating to or resulting from the Bankruptcy Cases (including consensual resolutions between Delphi and any of the Unions and an approved plan of reorganization) or otherwise approved by the Bankruptcy Court, from and after the date of this Agreement and until the Closing, Delphi will cause the Sellers to refrain from doing any of the following without the prior written consent of Buyer (which consent will not be unreasonably withheld or delayed):

   **A.**  Sell or otherwise dispose of Acquired Assets, excluding sales of tooling to customers, sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the Ordinary Course of Business;

**B.**    Incur, assume or guarantee any Debt Obligation that would become an Assumed Liability;

**C.**    Incur any Encumbrance on any material Acquired Assets, in each case, other than Permitted Encumbrances;

**D.**    Increase the cash compensation of the Transferred Employees other than: (i) in the Ordinary Course of Business; or (ii) as required by Law;

**E.**    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; (ii) made in conformance with GAAP; or (iii) required in connection with the preparation of the Financial Statements);

**F.**    Terminate or make any material amendment to a Material Contract;

**G.**    Terminate or make any material amendment to a Collective Bargaining Agreement;

**H.**    Fail to maintain insurance in a manner consistent with Sellers' past practice; or

**I.**    Agree or commit to do any of the foregoing.

**6.2    Bankruptcy Actions.**

**6.2.1**    As soon as practicable after the execution of this Agreement, the Sellers will file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and entry of a Sale Approval Order.

**6.2.2**    Sellers and Buyer shall use their commercially reasonable efforts to have the Bankruptcy Court (i) enter the Bidding Procedures Order as soon as reasonably practicable following the execution of this Agreement and (ii) enter the Sale Approval Order as and when contemplated by the Bidding Procedures Order, including providing testimony as required at any hearing before the Bankruptcy Court.

**6.2.3**    The Sellers shall comply with all requirements of the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to Buyer of the Assumed Contracts) to Buyer pursuant to this Agreement.  Notice of the hearings on the request for entry of the Bidding Procedures Order and the Sale Approval Order, notice of any hearings at which objections to proposed cure amounts or other issues regarding the proposed assumption and assignment of the Contracts as contemplated by this Agreement and notice of the deadline for all objections to entry of the Bidding Procedures Order, the Sale Approval Order or any other order related thereto or to the Sale Motion shall be properly served by the Sellers in accordance with all applicable Bankruptcy Rules and all applicable local rules and standing orders of the Bankruptcy Court on all parties required to receive such notices, including, without limitation, all parties who have asserted Liens in the Acquired Assets, all parties to Contracts transferred pursuant to

this Agreement, counsel to any statutory committee appointed in the Bankruptcy Cases, the Office of the United States Trustee for the Southern District of New York, all indenture trustees for debt issued by the Sellers, all parties filing notices of appearance or requests for papers in any of the Bankruptcy Cases, the Internal Revenue Service, the U.S. Environmental Protection Agency and any applicable state environmental agency, the Pension Benefit Guaranty Corporation, and, to the extent required, each of each Seller's creditors.  In addition, notice of the Sale Motion and the hearing on the request for entry of the Sale Approval Order and the objection deadline for such hearing shall be given by the Sellers, in a form reasonably satisfactory to Buyer, by publication of a notice in the Wall Street Journal National Edition and the Detroit Free Press at a time reasonably in advance of such objection deadline and hearing.  Upon entry of the Bidding Procedures Order by the Bankruptcy Court, the Sellers will strictly comply with such Bidding Procedures Order.

**6.2.4**    Sellers shall cause their indemnification obligations arising under this Agreement to be borne by (i) the Filing Affiliates' successor in interest or (ii) Delphi on and after the Emergence Date.

**6.3**    **Assumed Contracts; Cure Amounts.**

**6.3.1**    No later than as soon as practicable after the Auction, Delphi will, pursuant to a motion (which motion may be incorporated into the Sale Motion), move to assume and assign to Buyer the Pre-Petition Contracts listed on Schedule 6.3.1 (collectively, the "**Assumed Contracts**") and will provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Seller will pay Cure Amounts as agreed to by Delphi and each party to an Assumed Contract or, absent such agreement, by order of Bankruptcy Court in the time and manner specified by the Sale Approval Order.

**6.3.2**    Sellers and Buyer shall use commercially reasonable efforts to have included in the Sale Approval Order an authorization for Sellers to assume and assign to Buyer the Assumed Contracts.

**6.3.3**    RESERVED.

**6.3.4**    Notwithstanding anything to the contrary in this Agreement or otherwise, the Buyer shall have the right (i) through Closing to amend Schedule 6.3.1 hereto to delete any Assumed Contract; and (ii) through January 30, 2008 to amend Schedule 6.3.1 hereto to add any Pre-Petition Contract related to the operation of the Business to this list of Assumed Contracts.  Sellers shall use reasonably commercial efforts to assist Buyer in making its determination as to whether to delete from Schedule 6.3.1 any Assumed Contracts, including, without limitation, providing Buyer with copies of all such Assumed Contracts and all amendments or supplements thereto and providing Buyer with access to, and contact and other information it possesses, with respect to all third parties to such Assumed Contracts.

**6.4**    **Performance Under Contracts.**

Subject to the terms and conditions of this Agreement, Buyer shall, from and after the Closing Date, (a) assume all obligations and liabilities of Sellers that constitute Assumed Liabilities and Future Liabilities under the Contracts that are transferred to Buyer at Closing; and

(b) take all actions reasonably necessary to satisfy the Assumed Liabilities and Future Liabilities related to each of the Contracts that are transferred to Buyer at Closing.

### 6.5    Non-Competition.

6.5.1    Delphi undertakes and agrees with Buyer that from the Closing Date and through December 31, 2012, except with the consent of Buyer, Delphi will not, and will procure that each Affiliate of Delphi will not, either on its own account or in conjunction with or on behalf of any person, firm or company, whether by sales, marketing or other activities, carry on or be engaged, whether as a shareholder, director, employee, partner or agent in carrying on any business which is engaged in the design, development, manufacture, remanufacture or sale of Products as carried on by the Business at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 6.5.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which is not primarily engaged in a Competitive Business, provided that Delphi will use commercially reasonable efforts to divest, as soon as practicable after such acquisition or merger, any portion of the Business of such Person that constitutes a Competitive Business, if the Competitive Business accounts for more than fifteen (15%) percent of the sales of the acquired business; (ii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any Person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater); (iii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any Person engaged in a Competitive Business; (iv) provision of consulting services to, the license of any technology that Delphi or any Delphi Affiliate owns or has license to use to, or the financing (on its own behalf or on behalf of any other Person) of any Person for the purpose of designing or manufacturing on behalf of Delphi or any Delphi Affiliate or selling to Delphi or any Delphi Affiliate components and parts for automotive applications; (v) consistent with Delphi's troubled supplier practices, any direct or indirect activities of Delphi or any Delphi Affiliate to advise, operate, manage or finance a troubled supplier of Delphi or its Affiliates; or (vi) any business or activity conducted by Delphi or any Affiliate, joint venture, subsidiary or division of Delphi (excluding the Business) and any natural extensions thereof as of the Closing Date (each of which will be deemed not to breach this Section 6.5.1), including:(a) any activity conducted using the Excluded Assets; and (b) the design, development, manufacture, remanufacture or sale of the Excluded Products.

6.5.2    In the event that the covenants contained in Section 6.5.1 are more restrictive than permitted by Law, the Parties agree that the covenants contained in Section 6.5.1 will be enforceable and enforced to the extent permitted by Law.

### 6.6    Tax Matters; Cooperation.

6.6.1    The Party that is the owner of the Acquired Assets as of December 31 of a particular year shall (i) be responsible for filing applicable Ohio Inter-County Returns of Taxable Business Property due the following year, regardless of whether the due date for such returns is prior to, on or after the Closing, and (ii) make all payments

required with respect to any such returns.  Any property Taxes paid with respect to the Tax year of the Closing shall be prorated in accordance with Section 3.7 hereof.

6.6.2    Sellers and Buyer will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers, and deliveries to be made to the Buyer hereunder from any transfer, documentary, sales, use, registration, recording, stamp, value-added and other such taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code.  If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the acquired assets to the Buyer will contain the following endorsement:

> Because this [instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [Seller], it is exempt from the imposition and payment of all stamp taxes or other similar taxes pursuant to 11 U.S.C. § 1146(c).

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, such Transfer Taxes arising out of or incurred in connection with this Agreement will be borne solely by Buyer.  The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return.  Delphi will prepare the Transfer Tax returns for which Delphi is responsible as soon as is practicable and provide the Buyer with a copy to review. Buyer agrees to provide Delphi with comments and the amount of transfer tax to be paid in sufficient time to enable Delphi to timely file the return and pay the Transfer Tax.

6.6.3    Delphi and Buyer will cooperate in connection with: (i) the preparation and filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes direct access to accounting and finance personnel.

6.7    **Employees; Benefit Plans; Labor Matters**.

6.7.1    **Seller Employees**    Seller and Buyer will collectively update Schedule 4.11.1 as of the day prior to Closing:

A.    Subject to Section 6.7.1.B, effective as of the Closing, the Buyer will offer employment to all Seller Employees, with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing.  Any Seller Employee who accepts Buyer's offer of employment shall be referred to herein as a "**Transferred Employee**."

B.    Buyer shall offer all Transferred Employees designated on Schedule 4.11.1 as Salaried Employees compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits offered by Seller to such Salaried Employees immediately prior to Closing.  Prior

to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate" requirement and advise Buyer accordingly.  If Buyer's offers do not meet this requirement, Buyer will have an opportunity to cure any deficiency.  Seller's satisfaction that Buyer's offers meet this requirement will not be unreasonably withheld.  For all such Transferred Salaried Employees, Buyer will maintain such level of compensation and benefits for a minimum of twelve (12) months  following the Closing Date.

     **6.7.2  Collective Bargaining Agreements.**  Unless Buyer is otherwise able to negotiate a new CBA with the UAW prior to Closing, Buyer will assume the terms and conditions of the following Collective Bargaining Agreements: (i) the UAW-Delphi Collective Bargaining Agreements applicable at the Manufacturing Facility, in each case as modified by: (a) any Bankruptcy Court Proceedings; (b) any consensual agreement reached between Sellers and the UAW or an approved plan of reorganization in connection with the Bankruptcy Cases; and (c) the Effects MOU.  The Parties agree that, to the maximum extent possible, this Agreement will be interpreted in a manner consistent with the Effects MOU; however, if any provision of the Effects MOU is inconsistent with any of the terms of this Agreement, the provisions of the Effects MOU will govern.  Buyer will recognize the seniority status of all Seller Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyer.

     **6.7.3  Inactive Employees.**

     **A.**  Employees who are not active employees as of the Closing due to disability, family medical leave or other approved leave of absence as set forth on Schedule 6.7.3 ("**Inactive Employees**") will remain Sellers' responsibility until such employee is ready to return to active employment in accordance with Sellers' leave policies or collective bargaining agreement, as applicable.

     **B.**  When an Inactive Employee is ready to return to active status in accordance with Sellers' leave policies, Buyer will offer employment to such individual in accordance with Section 6.7.1 and, provided such individual accepts Buyer's offer of employment, such individual will be considered a Transferred Employee as of such date.  In the event that an employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Sellers and Buyer; provided that such process does not violate any applicable Collective Bargaining Agreement or Law.

     **C.**  If Sellers and Buyer do not agree as to an individual's fitness for active employment, the issue will be submitted to a mutually agreed upon independent medical evaluator, whose determination will be final and binding on the Parties.  The cost of such independent medical evaluation will be shared equally by the Parties.

     **6.7.4  Employee Benefit Plans.**

     **A.**  Transferred Employees and their dependents and beneficiaries shall cease to participate in and to be eligible for benefits under the Seller

Employee Benefit Plans (other than vested pension benefits) as of the Closing. Inactive Employees, who become Transferred Employees pursuant to the provisions of Section 6.7.3, and their dependents and beneficiaries will cease participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) as of the date on which such Inactive Employees become Transferred Employees. Notwithstanding the preceding sentences, the Seller Employee Benefit Plans which are welfare plans as defined under ERISA will retain liability for all claims incurred by the Transferred Employees and their dependents and beneficiaries prior to the Closing, (or prior to the date on which an Inactive Employee becomes a Transferred Employee, as applicable), including claims which are not submitted until after the Closing (or the date on which an Inactive Employee becomes a Transferred Employee, as applicable).  A claim will be deemed incurred, as applicable:

(i)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(ii)    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

(iii)    On the date immediately following a Transferred Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

**B.**    Buyer will not assume any Seller Employee Benefit Plans applicable or any other Liabilities relating to any Seller Employee Benefit Plan, including:

(i)    Any employee benefit plan to which Sellers or any of their subsidiaries have incurred or expect to incur liability, direct or indirect, contingent or otherwise, under Title IV of ERISA with respect to the termination of, or withdrawal from, any Seller Employee Benefit Plan; or

(ii)    Any accumulated funding deficiency (as defined in Section 302 of ERISA) that has occurred, exists or is reasonably expected to occur with respect to any Seller Employee Benefit Plan subject to Title IV of ERISA with respect to which Sellers or any of their Affiliates have or may have any Liability, direct or indirect, contingent or otherwise.

**C.**    Transferred Employees, other than those who are Inactive Employees as of the Closing, and their dependents and beneficiaries will commence participation in and be eligible for benefits under the Buyer Employee Benefit Plans as of the Closing.  Inactive Employees who become Transferred Employees pursuant to Section 6.7.3 and their dependents and beneficiaries will commence participation in and eligibility for benefits under the Buyer Employee Benefit Plans as of the date on which such inactive Employees become Transferred Employees.

**D.**    Buyer will recognize a Transferred Employee's pre-Closing credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans.  However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Sellers and Buyer.

**6.7.5**   RESERVED.

**6.7.6**   **COBRA**.  Seller will retain responsibility for all Liabilities for claims of the Transferred Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs prior to or as the result of the Closing.

**6.7.7**   **WARN Act.**  Seller will be responsible for all notice obligations and liabilities relating to WARN Act or other similar notice Laws, if any, arising from any Plant Closing or Mass Layoff taking place prior to Closing.  Buyer will be responsible for all notice obligations and liabilities relating to WARN Act or other similar notice Laws, if any, arising from any Plant Closing or Mass Layoff taking place after the Closing.

**6.7.8**   **Workers' Compensation**.  Sellers will retain all Liabilities for workers' compensation related to injuries or illnesses incurred by Transferred Employees prior to the Closing.  Buyers will assume all Liabilities for workers' compensation related to injuries or illnesses incurred by Transferred Employees on or after the Closing.

**6.7.9**   **Grievances**.    Seller will retain responsibility to administer and all Liabilities for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims of Transferred Employees filed prior to the Closing and claims based upon acts or omissions occurring prior to Closing.  Buyer will administer and bear all Liabilities for Grievances involving claims of Transferred Employees filed after the Closing and claims based upon acts or omissions occurring after the Closing. Subject to the terms outlined in this Section 6.7.9, Buyer agrees to administer Grievances filed prior to the Closing and/or involving claims based upon acts or omissions occurring prior to Closing provided that Seller will be responsible for any monetary Liabilities for such grievances.  To the extent the administration or resolution of any Grievances requires both the Buyer's and Sellers' participation, the following apply:

**A.**    Buyer and Sellers will cooperate in the defense of the Grievances;

**B.**    Buyer will not settle any Grievance without Sellers' consent if such settlement will result in Liabilities for Seller.   Such consent will not be unreasonably withheld;

**C.**    Sellers will not settle any Grievance without Buyer's consent if such settlement will result in Liabilities for Buyer.  Such consent will not be unreasonably withheld;

**D.**　　If the seniority of an employee is reinstated as a result of the disposition of a Grievance or Governmental Order, Buyer will reinstate the employee as if such employee had been a Transferred Employee as of the Closing;

**E.**　　For Transferred Employees who have been continuously employed, back pay Liabilities to the extent relating to an event, occurrence or cause of action arising prior to the Closing will be allocated to Seller.  Liabilities relating to an event, occurrence or cause of action arising subsequent to the Closing will be allocated to Buyer;

**F.**　　For employees who become Transferred Employees because they are reinstated through the grievance procedure, back pay Liability will be allocated to Seller;

**G.**　　The Parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Closing; and

**H.**　　If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the Liabilities resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

**6.7.10**　**Vacation; Profit Sharing.**　Regardless of the vesting date, Sellers will be responsible for the amount of all accrued and unutilized vacation pay and any profit sharing or incentive compensation of Transferred Employees due for the calendar year in which the Closing occurs on a pro rata basis using the number of days worked by the Transferred Employees for Seller in that calendar year.

**6.7.11**　**Cooperation.**　Sellers and Buyer will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.7.

**6.7.12**　**Union Notifications.**　Sellers and Buyer will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, unions and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

**6.7.13**　**Effect of Section 6.7.**　No provision in this Section 6.7 shall (i) create any third-party beneficiary or other rights in any Seller employee or former Seller employee (including any beneficiary or dependent thereof) or any other Person other than the parties hereto and their respective successors and permitted assigns, (ii) constitute or create an employment agreement for any Seller Employee or Transferred Employee or (iii) constitute or be deemed to constitute an amendment to any Seller Employee Benefit Plan or Buyer Employee Benefit Plan.

**6.8**　　**Contact with Seller Employees, Customers and Suppliers.**　Prior to the Closing, except in the ordinary course as a supplier to certain customers and without

discussing the Sale, Buyer and its Affiliates and their respective representatives will contact and communicate with the Seller Employees, customers, suppliers and licensors of the Business in connection with the transactions contemplated by this Agreement only with the prior consent of Delphi, which consent, except with respect to GM, may be conditioned upon a designee of Delphi being present at any such meeting or conference. Notwithstanding anything in this Section 6.8 to the contrary, Buyer is not required to seek Delphi's consent before contacting or communicating with GM or the UAW with respect to any matter related to Buyer's potential operation of the Business.

**6.9    Technical Documentation.**  Sellers have delivered, or will deliver on or before the Closing, to the Buyer, a copy of all Technical Documentation included in the Acquired Assets.  For a period of not less than ten (10) years commencing at the Closing, Buyer will use reasonable efforts to maintain all Technical Documentation applicable to Product design, test, release and validation at a location at which it will be reasonably accessible to Delphi upon request.  During such ten (10) year period, Buyer will not destroy or give up possession of the final copy of such Technical Documentation without offering Delphi the opportunity to obtain a copy of such documentation at Delphi's expense but without any payment to Buyer.

**6.10    Books and Records and Litigation Assistance From and After Closing.**

**6.10.1**  Buyer will preserve and keep all books, records, computer files, software programs and any data processing files delivered to Buyer by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by Law, Governmental Order or in connection with any ongoing litigation, audit or appeal of Taxes, or Tax examination, at Buyer's sole cost and expense.  During such period, Buyer will: (i) provide Seller with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets.  Seller or its Affiliates will reimburse Buyer for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Buyer wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Seller, and Seller will have the right, at its option, upon prior written notice given to Buyer within sixty (60) days of receipt of Buyer's notice, to take possession of said records within ninety (90) days after the date of Buyer's notice to Seller hereunder.

**6.10.2**  Buyer will, from time to time, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate) (to the extent possible through Transferred Employees) with technical assistance and information in respect to any claims brought against Sellers and their Affiliates involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings.  Sellers will reimburse Buyer and its Affiliates for their reasonable, actual direct out-of-pocket costs (travel, employee time (other than for clerical services), hotels, etc.) of providing such services.  In particular, Buyer, for itself

and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by Law and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available their documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Buyer and its Affiliates must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Buyer must notify Sellers of the existence of such privileged documents); and (b) Sellers and their Affiliates will agree to keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Buyer's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.

      6.10.3  Seller will use commercially reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files not delivered to Buyer pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Order or in connection with any ongoing litigation, audit or appeal of Taxes, or Tax examination, at Seller's sole cost and expense.  During such period, Seller will: (i) provide Buyer with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business; and (ii) make such books and records available to Buyer and its Affiliates as may be reasonably required by Buyer and its Affiliates in connection with any legal proceedings against or governmental investigations of Buyer or its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Buyer and its Affiliates, the Business or the Acquired Assets.  Buyer or its Affiliates will reimburse Seller for the reasonable out-of-pocket expenses incurred in connection with any request by Buyer to make available records pursuant to the foregoing sentence.  In the event Seller wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Buyer, and Buyer will have the right, at its option, upon prior written notice given to Seller within sixty (60) days of receipt of Seller's notice, to take possession of said records within ninety (90) days after the date of Seller's notice to Buyer hereunder.

**6.11    Corporate Names.**

**6.11.1** Buyer will have the right (including the right to authorize its relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of no more than one hundred fifty (150) days after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith, provided that Buyer and its Affiliates will clearly indicate to recipients of such written materials that the Business is owned by Buyer and its Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of Seller.

**6.11.2** After such one hundred fifty (150) day period, Buyer will neither use nor permit or the Business to use the name "Delphi" and any trademarks, trade names, brandmarks, brand names, trade dress or logos relating or confusingly similar thereto (including on any signs, billboards, advertising materials, telephone listings, web sites, labels, stationery, office forms, packaging or other materials) in connection with the Business or otherwise.

**6.11.3** Each of the Parties acknowledges and agrees that the remedy at Law for any breach of the requirements of this Section 6.11 would be inadequate, and agrees and consents that without intending to limit any additional remedies that may be available, temporary and permanent injunctive and other equitable relief may be granted without proof of actual damage or inadequacy of legal remedy in any Proceeding which may be brought to enforce any of the provisions of this Section 6.11.

**6.12    Intellectual Property Licenses.**

**6.12.1    License to Buyer.**  Delphi, on behalf of itself and its Affiliates, hereby grants to Buyer, as of the Closing Date, a worldwide, perpetual, fully paid, royalty free, non-exclusive license to use (and to sublicense as provided in Section 6.12.3) the Shared Intellectual Property to develop, manufacture, use, import, export, offer to sell and sell Products and services of the Business and reasonable expansion thereof, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, subject to any restrictions arising from rights granted to third parties prior to January 1, 1999.  Further, Delphi, on behalf of itself and its Affiliates, hereby grants to Buyer, as of the Closing Date, a worldwide, perpetual, fully paid, royalty free, non-exclusive sub-license to use (and to sublicense as provided in Section 6.12.3), to the extent permitted by and subject to the terms and conditions of the contracts listed in Schedule 6.12.1, any Sublicensed Intellectual Property needed to develop, manufacture (including sub-contract manufacturing), import, export, offer to sell and sell Products and services of the Business and reasonable expansion thereof, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith.  The  license and sub-license granted to Buyer under this Section 6.12.1 is transferable to a purchaser of all or substantially all of the Business.

**6.12.2    License to Sellers.**  Buyer, on behalf of itself and its Affiliates, hereby grants to Seller as of the Closing Date, a worldwide, perpetual, paid-up, royalty free, non-exclusive license to develop, manufacture, use, import, export, offer to sell and sell

products and services of the type provided by Sellers and their Affiliates as of the Closing Date (other than the Products), and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, using any Purchased Intellectual Property licensed pursuant to this Section 6.12.2, subject to any restrictions arising from rights granted to third parties prior to the Closing Date.

**6.12.3 Further Understandings.** The licenses granted above in this Section 6.12: (i) include the right for the licensed party to sub-license to any of its Affiliates, to its and their successors, and to suppliers, customers and others in connection with the conduct of the businesses contemplated by this Agreement; and (ii) do not include any right to use any Trademark Rights.

**6.13 Post-Closing Obligations.** Buyer agrees to take any and all commercially reasonable actions necessary to cause Delphi and its Affiliates to be absolutely and unconditionally relieved on or prior to the Closing Date of all Liabilities and obligations arising out of the letters of credit, performance bonds and other similar items issued and outstanding in connection with the Business and assumed by Buyer pursuant to this Agreement, and Buyer will indemnify Delphi and its Affiliates against any Losses of any kind whatsoever with respect to such Liabilities and obligations.

**6.14 RESERVED.**

**6.15 Further Actions.**

**6.15.1** Within three (3) Business Days after the entry of an unstayed Sale Approval Order by the Bankruptcy Court, the Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.

**6.15.2** At all times prior to the Closing: (i) Delphi will notify Buyer in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same; and (ii) Buyer will notify Delphi in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same.

**6.16 Further Assurances.** If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that, to the extent not indemnified or required hereunder the cost of such action or of such instruments and documents related thereto shall be borne by the party requesting them.  The foregoing covenant will survive the Closing of the transactions contemplated herein.

**6.17**   **Shared Items Transferred to Buyer.** With respect to any contracts for goods or services included in the Acquired Assets and that are used by both the Business and other operations of Delphi or its Affiliates that are set forth on Schedule 6.17, and that will be transferred to Buyer at Closing, Buyer will provide Sellers with the benefits of such contracts in substantially the same manner described in Section 2.5 above regarding Deferred Items, and Delphi will cause Sellers to reimburse Buyer for such benefits in substantially the manner described in Section 2.5, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Seller and the other Party or Parties to such contract or contracts, or until the termination of such contract or contracts.

**6.18**   **Buyer's Financing Activities.**

**6.18.1**  Buyer acknowledges and agrees that Sellers and their Affiliates have no responsibility for any financing that Buyer may raise in connection with the transactions contemplated hereby including with respect to any offering materials and other documents prepared by or on behalf of or utilized by Buyer or its Affiliates, or Buyer's financing sources, in connection with Buyer's financing activities in connection with the transactions contemplated hereby which include any information provided by Sellers or any of their Affiliates.

**6.18.2**  Buyer will take, or cause to be taken, all actions and will do, or cause to be done, all things necessary, proper or advisable to: (i) enter into definitive financing agreements with respect to any financing required to consummate the Sale, so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date; and (ii) consummate such financing at or prior to Closing, provided that the terms of such financing is satisfactory to Buyer.

**6.18.3**  Buyer has delivered to Sellers (i) an equity commitment letter from Buyer Parent demonstrating Buyer Parent's agreement to fund a portion of the Purchase Price and (ii) letters from four (4) debt financing institutions, all expressing an interest in funding Buyer's purchase of the Business.

**6.19**   **Customs Duties.**   The Buyer expressly agrees to reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Buyer following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under Sellers' importer/exporter identification numbers and bonds/guarantees post-Closing.

**6.20**   **Environmental Access.**   Prior to Closing, Buyer is permitted to perform reasonable environmental due diligence assessments and compliance audits of the Owner Real Property, the Acquired Assets and the Business which may include Phase I and Phase II assessments. Buyer will share its final reports (or the most recent draft reports if no final reports are prepared) with Sellers as soon as they are available under an appropriate, separate confidentiality agreement.

**6.21**   **Permit Transfers.** Sellers shall assist and cooperate with Buyer with respect to the transfer of or application for any Environmental Permits listed pursuant to Section 4.14.8 that require transfer to Buyer or procurement of new Permits by Buyer in connection with the transaction contemplated hereby.

7.      **CONDITIONS TO CLOSING.**

      **7.1**      **Conditions to Obligations of Seller and Buyer.**      The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

      **7.1.1**      **Sale Approval Order and Bidding Procedures Order.**  The Sale Approval Order and Bidding Procedures Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction.

      **7.1.2**      **No Law, Judgments, etc.**   No provisions of any applicable Law or Governmental Order that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect (each Party taking any and all steps required by Section 6.15 of this Agreement).

      **7.1.3**      **Governmental Approvals.**    All required Governmental Approvals regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated.

      **7.1.4**      **RESERVED.**

      **7.1.5**      **RESERVED.**

      **7.1.6**      **Seller CBAs.**   Buyer's assumption of existing UAW-Delphi  Collective Bargaining Agreements applicable to the Sandusky, Ohio sites, as modified by: (i) agreement between Buyer and the UAW; (ii) U.S. Bankruptcy Court proceedings, including Delphi's Section 1113 and 1114 motion, consensual resolution between Delphi and the UAW, or an approved plan of reorganization, if applicable; and (iii) a Memorandum of Understanding between Delphi and the UAW regarding the effects of the Sale upon bargaining unit members (the "**Effects MOU**").

      **7.1.7**      **No Material Adverse Effect.**    Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing at Closing.

      **7.2**      **Conditions to Obligations of Buyer.**    The obligation of Buyer to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Buyer):

      **7.2.1**      **Accuracy of Warranties.**    Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in Article 4 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time) except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on Seller or Seller's ability to consummate the transactions contemplated by this Agreement.

**7.2.2    Performance of Covenants**.  Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

**7.2.3    Delivery of Ancillary Agreements**.  Sellers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.2.4    General Motors Agreements**.  Buyer and General Motors Corporation ("**GM**") shall have entered into definitive documentation, including a supply agreement for the Products which (a) is consistent with the pro-forma financials presented in the Confidential Information Memorandum, including with respect to aftermarket sales, (b) releases Seller from its existing supply obligations to GM, and (c) includes wage support and GM's agreement that sales to third parties of directed-buy Products will continue consistent with the pro-forma financials presented in the Confidential Information Memorandum.

**7.2.5    Buyer's Financing Package Commitment.** Buyer shall have obtained financing to fund the Purchase Price, the terms of which shall be satisfactory to Buyer in its sole discretion.

**7.2.6    No Material Adverse Effect** .  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing at Closing affecting the Business.

**7.2.7    Agreements with Customers**.  The Contracts with the top four aftermarket customers of the Business shall, as of the Closing, contain terms and conditions (including pricing provisions) consistent with the terms and conditions of such Contracts.

**7.2.8    Permit Transfers**.  All Permits, Environmental Permits and other authorizations necessary for the lawful conduct of the Business shall have been transferred or reissued, as applicable, to Buyer if legally required to enable Buyer to continue the permitted activity, unless the same may be transferred or reissued, as applicable, under applicable Law after the Closing.

**7.3    Conditions to Obligations of Sellers**.  Except as otherwise permitted by this Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**7.3.1    Accuracy of Warranties**.  The representations and warranties of Buyer contained in Article 5 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

**7.3.2    Performance of Covenants**.  Buyer and its Affiliates will have performed and complied in all material respects with all agreements and obligations

required by this Agreement to be performed or complied with by it at or prior to the Closing.

     **7.3.3**   **Delivery of Ancillary Agreements**.   Buyer will have delivered duly executed copies of each of the Ancillary Agreements.

## 8.   CLOSING.

     **8.1**   **Closing Time and Date**.   Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the transactions contemplated by this Agreement will take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 7 will have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree (the "**Closing Date**").   For tax and accounting purposes, the effective time of the transaction will be 11:59 p.m. Eastern time on the Closing Date.

     **8.2**   **Ancillary Agreements**.   At or prior to the Closing, the Sellers will duly execute and deliver to the Buyer, and the Buyer will duly execute and deliver to Sellers, each of the following agreements (each of the agreements and instruments referred to in Sections 8.2, 8.3 and 8.4 is an "**Ancillary Agreement**" and are collectively, "**Ancillary Agreements**") to which they are to be a party:

     **8.2.1**   A Patent Assignment substantially in the form of Exhibit 8.2.1.A and a Trademark Assignment substantially in the form of Exhibit 8.2.1.B, as well as any other instruments necessary to transfer the Purchased Intellectual Property;

     **8.2.2**   The Deposit Escrow Agreement, substantially in the form set forth in Exhibit 8.2.2;

     **8.2.3**   The Transition Services Agreement, substantially in the form set forth in Exhibit 8.2.3;

     **8.2.4**   The Bills of Sale, substantially in the form set forth in Exhibit 8.2.4;

     **8.2.5**   The Assignment and Assumption Agreements, substantially in the form set forth in Exhibit 8.2.5;

     **8.2.6**   The Indemnity Escrow Agreement substantially in the form set forth in Exhibit 8.2.6;

     **8.2.7**   The Inventory Adjustment Escrow Agreement substantially in the form set forth in Exhibit 8.2.7; and

     **8.2.8**   The Sensor Supply Agreement substantially in the form set forth in Exhibit 8.2.8.

     **8.3**   **Seller's Deliveries at Closing**.   At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the relevant Buyer:

**8.3.1**    Quit claim deed for the Owned Real Property, substantially in the form of Exhibit 8.3.1 or such other form of conveyance in substance equivalent to such form of deed;

**8.3.2**    Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order;

**8.3.3**    An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 7.2 have been fulfilled; and

**8.3.4**    All other documents and papers reasonably requested by Buyer to transfer title to the Acquired Assets in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.4**    **Buyer's Deliveries at Closing.**    At or prior to the Closing, Buyer will deliver or cause to be delivered to Delphi and each Seller designated by Delphi the following:

**8.4.1**    The balance of the Purchase Price by wire transfer of immediately available funds to an account or accounts designated by Delphi; and

**8.4.2**    An officer's certificate, dated as of the Closing Date, executed on behalf of Buyer, certifying that the conditions specified in Section 7.3 have been fulfilled.

## 9.    TERMINATION.

**9.1**    **Termination.**    This Agreement may be terminated at any time prior to the Closing:

**9.1.1**    By the mutual written consent of Delphi and Buyer.

**9.1.2**    By either Party:

**A.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing will not have occurred within forty-five (45) days after entry of the Sale Approval Order for any reason other than a failure of the conditions set forth in Sections 7.1.2 or 7.1.3, provided, however, this period shall be automatically extended for and additional thirty (30) days if a Competitive Operating Agreement has been executed by either or both of the Parties and the UAW, but has not been fully implemented.

**B.**    If Seller consummates an Alternative Transaction.

**C.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if any Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) has issued a Governmental Order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby and such Governmental Order or other action has become final and nonappealable, or in the reasonable opinion of the terminating Party is likely to become final and nonappealable.

**D.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before the date that is ninety (90) days after the date of this Agreement, or if such Sale Approval Order, as of the date that is ninety (90) days after the date of this Agreement, is subject to a stay or injunction on such date.

**9.1.3**    By Buyer, upon written notice to Delphi and provided that Buyer is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if:

**A.**    Delphi has breached or failed to perform in any respect any of its representations, warranties, covenants or other agreements contained in this Agreement or

**B.**    If a Material Adverse Effect has occurred, so long as such event is continuing at the time of any such termination and not reasonably capable of being cured within forty-five (45) days after entry of the Sale Approval Order or the date of this Agreement, whichever is earlier.

**9.1.4**    By Delphi, upon written notice to Buyer and provided that Delphi is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if Buyer has breached or failed to perform in any material respect any of its obligations or covenants contained in this Agreement, and such breach or failure to perform: (i) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (ii) is incapable of being cured by Buyer.

**9.2    Break-Up Fee; Expense Reimbursement.**

**9.2.1**    Subject to Section 9.2.3, in the event that this Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B or 9.1.2.D and Delphi sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, of all or substantially all of the Business or the Acquired Assets in a transaction or a series of related transactions with one or more parties other than Buyer (such event being an "**Alternative Transaction**"); then, Delphi will, upon the consummation of the Alternative Transaction(s), pay to Buyer an amount equal to One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "**Break-Up Fee**") and the Expense Reimbursement provided for in Section 9.2.2.

Notwithstanding anything in Section 9.2.1 to the contrary, if this Agreement is terminated pursuant to Section 9.1.2.A, 9.1.2.B or 9.1.2.D and Delphi sells or otherwise transfers the Business or all or substantially all of the assets of the Business to GM, including pursuant to the UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring, dated June 22, 2007, then Delphi will, upon consummation of such transaction, pay to the Buyer the Break-Up Fee and Expense Reimbursement.

**9.2.2**    In the event this Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B, 9.1.2.D, 9.1.3, or 9.1.4 and provided that Buyer is not then in breach of this Agreement or the Bidding Procedures, then Delphi will be obligated to pay Buyer an

amount equal to Buyer's reasonable, actual, out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees  expenses of its financial advisors, and expenses of other consultants) incurred in connection with the investigation or negotiation of the transactions contemplated by this Agreement (the "**Expense Reimbursemen**t").  Any Expense Reimbursement payable upon termination of this Agreement will be immediately earned upon such termination and payable by Delphi to Buyer promptly upon the delivery of an invoice related to such Expense Reimbursement to Delphi by Buyer to be delivered to Delphi within ten (10) Business Days of termination of this Agreement; provided, however, that if Delphi believes, in good faith, that the amount of the Expense Reimbursement sought by Buyer is not reasonable then Delphi will have the right to seek Bankruptcy Court review thereof prior to paying the disputed portion of the Expense Reimbursement.  For the avoidance of doubt, in the event Delphi disputes a portion of the Expense Reimbursement as presented by Buyer, it will pay to Buyer the undisputed portion of the Expense Reimbursement promptly upon delivery of the invoice described in the preceding sentence.   For purposes of this paragraph, the Parties acknowledge that the reasonableness standard of Sections 328 and 330 of the Bankruptcy Code do not apply to such fees and expenses.

9.2.3    Buyer acknowledges and agrees that if Buyer becomes entitled to receive any Break-Up Fee and/or Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement will be the sole and exclusive remedy of Buyer, whether at law or in equity, for any breach by Delphi or any of its Affiliates of the terms and conditions of this Agreement or the Deposit Escrow Agreement.

9.2.4    Notwithstanding anything to the contrary in this Agreement, if the Closing does not occur solely for a reason referred to in Section 7.2.5 (unless financing is precluded due to a Material Adverse Effect precluding financing), in no event will Buyer be entitled to any Break-Up Fee or Expense Reimbursement.

9.2.5    In addition to the amounts set forth in the preceding paragraphs, in the event this Agreement is terminated pursuant to Sections 9.1.1, 9.1.2 or 9.1.3, Buyer shall be entitled to a return of the Deposit Amount.

9.2.6    After entry of the Bidding Procedures Order, obligations of the Seller to pay the Expense Reimbursement and the Break-Up Fee under this Agreement shall be entitled to superpriority administrative expense claim status in the Bankruptcy Cases and payable without further order of the Bankruptcy Court pursuant to the terms of this Agreement and the Bidding Procedures Order, and the obligation to pay the Expense Reimbursement and Break-Up Fee in full in cash when due shall not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for any Seller.

9.2.7    The forfeiture of a portion of the Deposit or the entire Deposit, if so required by this Agreement, shall be the sole and exclusive remedy of the Sellers or their bankruptcy estates, whether at law or in equity, for any breach by Buyer or any of their Affiliates of the terms and conditions of this Agreement.  The Parties agree that the amounts payable pursuant to this Section shall be in the nature of liquidated damages.

9.3    **Procedure and Effect of Termination.**  In the event of the termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to

Section 9.1, written notice thereof will forthwith be given to all other Parties.   If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

**9.3.1**   Buyer will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**9.3.2**   The provisions of the Confidentiality Agreement will continue in full force and effect;

**9.3.3**   The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 9 (Termination); and (ii) Sections 3.1 (Deposit Amount), 12.1 (Fees and Expenses), 12.5 (Assignment), 12.6 (Waiver), 12.7 (Notices), 12.8 (Entire Agreement), 12.10 (Publicity), 12.14 (Governing Law) and 12.15 (Venue and Retention of Jurisdiction); and

No Party to this Agreement will have any Liability under this Agreement to any other Party except: (i) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, (ii) as provided in Section 9.2, and (iii) as contemplated by Section 9.3.3 above.

## 10.    **BIDDING PROCEDURES.**

**10.1**   **Delphi Initial Bankruptcy Actions.**  This Article 10 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Acquired Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate Buyer for their efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

**10.2**   **Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Sellers, in order to participate in the bidding process, each person (a "**Potential Bidder**"), other than Buyer or Buyer Parent, must deliver (unless previously delivered) to Delphi, its counsel, its in-house counsel, and its financial advisors at the addresses provided in Section 10.3:

**10.2.1** An executed confidentiality agreement in form and substance satisfactory to Delphi.

**10.2.2** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

**10.2.3** A preliminary (non-binding) written proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform post-Closing, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement will be deemed a "**Qualified Bidder**".  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi will determine, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi will allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 10.4 below.  Buyer will be deemed a Qualified Bidder for purposes of the Bidding Process.

**10.3    Bid Deadline.**  A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Steve Olsen, Director of Mergers & Acquisitions for Delphi Corporation, with copies to: (i) Delphi's counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: Ron E. Meisler and Brian M. Fern; (ii) Delphi's in-house counsel, Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Attn: Deputy General Counsel – Transactional & Restructuring; (iii) Delphi's financial advisor, KeyBanc Capital Markets, 127 Public Square, Cleveland, Ohio 44114, Attention: Jeffrey E. Johnston; (iii) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg and Mark A. Broude; (iv) counsel for the agent under Delphi's postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick; so as to be received not later than 11:00 A.M. (EST), on February 11, 2008 (the "**Bid Deadline**").  Delphi may extend the Bid Deadline once or successively, but is not obligated to do so.  If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension.  As soon as reasonably practicable following receipt of each Qualified Bid, Sellers will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").  The Sellers also will provide the UAW with notice of all Qualified Bidders and their contact information.  Qualified Bidders should note that Section 6.7 of the Agreement addresses, among other things, the terms and conditions of employment of UAW-represented employees, and these issues remain subject to the parties' rights and obligations related to bargaining with the UAW.

**10.4**   **Due Diligence.**   Delphi will afford each Qualified Bidder due diligence access to the Acquired Assets and the Business.   Due diligence access may include Management Presentations as may be scheduled by Delphi, access to Data Rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree.   Delphi will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.   Any additional due diligence will not continue after the Bid Deadline.   Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at Management Presentations or site inspections.   Neither Delphi nor any of its Affiliates (nor any of their respective representatives) will be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**10.5**   **Bid Requirements.**   All bids must include the following documents (the "**Required Bid Documents**"):

**10.5.1**   A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Sale of the Acquired Assets.

**10.5.2**   An executed copy of this Agreement, together with all Schedules and Exhibits (a "**Marked Agreement**"), marked to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price (as defined in this Agreement).

**10.5.3**   A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal Seven Hundred Fifty Thousand Dollars ($750,000.00).

**10.5.4**   Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**10.6**   **Qualified Bids.**   A bid will be considered only if the bid:

**10.6.1**   Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**10.6.2**   Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that Delphi determines, in its sole discretion, are similar to, and are not materially more burdensome or conditional than the terms of the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus the Expense Reimbursement, plus: Five Hundred Thousand Dollars ($500,000.00) in the case of an initial Qualified Bid, plus Two Hundred Fifty Thousand Dollars ($250,000.00) in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**10.6.3**   Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**10.6.4** Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**10.6.5** Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required Governmental Approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any Governmental Approvals which must be obtained within sixty (60) days after entry of such order.

**10.6.6** Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi will have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, Buyer will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of Buyer is referred to as a "**Subsequent Bid**". If Delphi does not receive any Qualified Bids other than the Agreement received from Buyer, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of this Agreement.

**10.7    Bid Protection.**    Recognizing Buyer's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to Buyer. Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed. As a result, Delphi has agreed that if Delphi does not close with Buyer because Delphi consummates an Alternative Transaction and Buyer is not in breach of the Agreement or the Bidding Procedures, Delphi will pay to Buyer the Break-Up Fee and the Expense Reimbursement to the extent required under Section 9.2.1 hereof. In the event the Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.B, 9.1.2.D or 9.1.3 hereof, then in certain circumstances Delphi will be obligated to pay Buyer's Expense Reimbursement to the extent required under Section 9.2.2 of this Agreement. The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) will be governed by the provisions of the Agreement and the order of the Bankruptcy Court approving the Bidding Procedures.

**10.8    Auction, Bidding Increments and Bids Remaining Open.**    If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on February 13, 2008, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285 or Four Times Square, New York, New York 10036 (at

Delphi's election) or such later time or other place as Delphi will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

10.8.1  Only Delphi, Buyer, any representative of the Committee and the Equityholders' Committee, any representative of Delphi's secured lenders (and the legal and financial advisers to each of the foregoing), any representative of the UAW and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only Buyer and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

10.8.2  At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi will provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction and the UAW.

10.8.3  All bidders who have submitted Qualified Bids will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

10.8.4  Sellers may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

10.8.5  Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least Two Hundred Fifty Thousand ($250,000.00)  higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyer), Delphi shall give effect to any Break-Up Fee or Expense Reimbursement that may be payable to Buyer under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

10.8.6  At the conclusion of the Auction, or as soon thereafter as practicable, Sellers, in consultation with its financial advisors, will: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

10.9  **Acceptance of Qualified Bids.**  Sellers will sell the Acquired Assets for the highest or otherwise best Qualified Bid, as determined by Delphi, upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**").  If, after an

Auction in which Buyer: (i) will have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it will, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee and Expense Reimbursement.  Delphi's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Delphi's acceptance of the bid.  Delphi will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**10.10  Sale Hearing.**  The Sale Hearing will be held before the Honorable Judge Robert Drain on February 21, 2008 at 10:00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court Approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If Delphi does not receive any Qualified Bids (other than the Qualified Bid of Buyer), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to Buyer following entry of the Sale Order.  If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi will seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and Delphi will be permitted to effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**10.11  Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of Delphi.  On the Return Date, Delphi will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**10.12  Reservation of Rights.**  Delphi, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than Buyer's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of  the Sale; or (c) contrary to the best interests of Sellers, its estate and creditors as determined by Delphi in its sole discretion.

## 11.    LIABILITY, INDEMNIFICATION.

**11.1    LIMITATIONS OF LIABILITY.** NEITHER DELPHI NOR ANY OF THE OTHER SELLERS UNDERTAKES ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES; DELPHI WILL NOT BE LIABLE FOR ANY, AND BUYER ASSUMES LIABILITY FOR ALL, PERSONAL INJURY AND PROPERTY DAMAGE CONNECTED WITH BUYER'S INVESTIGATION AND EXAMINATION OF THE ACQUIRED ASSETS, THE HANDLING, TRANSPORTATION, POSSESSION, PROCESSING, FURTHER MANUFACTURE OR OTHER USE OR RESALE OF ANY OF THE ACQUIRED ASSETS AFTER THE CLOSING DATE, WHETHER SUCH ACQUIRED ASSETS ARE USED OR RESOLD ALONE OR IN COMBINATION WITH OTHER ASSETS OR MATERIALS; AND BUYER ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD IN THEIR PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYER IS PURCHASING AND ACQUIRING SUCH ACQUIRED ASSETS ON THAT BASIS PURSUANT TO BUYER'S OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO SUCH ACQUIRED ASSETS TO COMPLETE SUCH INVESTIGATION OR EXAMINATION.

**11.2    Survival.** Except with respect to (a) representations and warranties of the Sellers, which shall expire in accordance with Section 4.22, and (b) obligations set forth in Sections 2.2 (*Assumption of Liabilities*), 2.3 (Future Liabilities), 2.4 (*Retained Liabilities*), 2.5 (*Deferred Items*), 3.2 (*Purchase Price*), 3.6 (*Allocation of Purchase Price*), 6.5 (*Non-Competition*), 6.6 (*Tax Matters; Cooperation*), 6.7 (*Employees; Benefit Plans; Labor Matters*), 6.9 (*Technical Documentation*), 6.10 (*Books and Records and Litigation Assistance from and after Closing*), 6.11 (*Corporate Names*), 6.12 (*Intellectual Property Licenses*), 6.13 (*Post-Closing Obligations*), 6.15 (*Further Actions*), 6.16 (*Further Assurances*) 6.17 (*Shared Items Transferred to Buyer*), Article 11 (*Liability, Indemnification*) and Article 12 (*Miscellaneous*) (*and the definitions referenced in this Agreement used therein*), which provisions shall survive in accordance with their terms, the agreements of Sellers and Buyer in this Agreement will not survive Closing.

**11.3    Indemnification.**  Except as may be expressly set forth in this Agreement or in an Ancillary Agreement, no Seller or Buyer will be required to indemnify any other party to any of such agreements.

**11.3.1  Buyer's Indemnification of Delphi.**  From and after the Closing, Buyer will defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Losses actually incurred by Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents, including in connection with any actions, suits, demands, assessments, judgments and settlements, in any such case reduced by the amount of insurance proceeds recovered from any Person or entity with respect thereto ("**Indemnifiable Losses**") relating to, resulting from or arising out of any (i) Assumed Liability; (ii) Future Liability; (iii) any employment rights of any of the Transferred Employees or any other person employed by Buyer on or after the Closing for any Claims relating to or arising from events occurring on or after the Closing; and (iv) Buyer's failure to comply with any of its obligations under Section 6.7 of this Agreement.

**11.3.2 Sellers' Indemnification of Buyer.** Subject to the limitations set forth in this Article 11, from and after the Closing, each Seller of Acquired Assets will, solely with respect to the Acquired Assets sold by such Seller and related Retained Liabilities and/or covenants, severally and not jointly indemnify, defend and hold harmless Buyer and its Affiliates and their respective directors, officers, employees, partners, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of (i) any Retained Liability (including any Liabilities associated with Excluded Assets); (ii) any employment rights of any Transferred Employees or any other person employed by Sellers prior to the Closing for any Claims relating to or arising from events occurring prior to the Closing; or (iii) Sellers' breach of any representation, warranty or covenant provided under Articles 4 and 6 and Section 11.4.6 of this Agreement.

**A.** Seller's obligation to indemnify for Indemnifiable Losses shall apply only to those Claims which are notified to a Seller on or before the first (1st) anniversary of the Closing Date with the exception of any claims for indemnification made pursuant to Sections 11.4 or 11.5, which shall be notified to a Seller on or before the third (3rd) anniversary of the Closing Date.

**B.** Except as provided below, no Seller shall be liable for Indemnifiable Losses pursuant to this Section 11.3.2 until: (i) an individual claim or occurrence is greater than Ten Thousand Dollars ($10,000.00) ("**Individual Claim Amount**"); and (ii) the amount of all Indemnifiable Losses (which exceeds the Individual Claim Amount) in the aggregate exceeds Two Hundred Thousand Dollars ($200,000.00) ("**Deductible Amount**"), after which point Seller will be obligated to indemnify Buyer from and against Indemnifiable Losses exceeding the Individual Claim Amounts that are in excess of the Deductible Amount until the aggregate amount of Indemnifiable Losses indemnified by the combined Sellers reaches an amount equal to seven and one-half percent (7½%) of the Purchase Price, after which point Seller(s) will have no further obligation with respect to Indemnifiable Losses under this Agreement. The term "**Cap Amount**" refers to the maximum amount payable by a Seller or all Sellers as the case may be. Buyer agrees that, from and after the Closing, the indemnification provided in this Section 11.3.2 is the exclusive remedy for a breach by Seller of any agreement or covenant contained in this Agreement that, by its terms, is intended to be performed by Seller after the Closing Date or against Seller for any applicable Retained Liabilities or Excluded Assets, and that there shall be no remedy for any breach by Seller of a representation or warranty, or any breach of a covenant or agreement that, by its terms, is intended to be performed by such Seller on or prior to the Closing Date. Liabilities relating to, resulting from or arising out of any Retained Liability or Excluded Asset or breach of any covenant hereof shall not be subject to the Individual Claim Amount, Deductible Amount or the Cap Amount.

**C.** In calculating amounts payable hereunder, the amount of any Indemnifiable Losses shall be determined without duplication of any other Losses for which a Claim has been made by Buyer or could be made under any other representation, warranty, covenant or agreement included herein, i.e., an indemnified Party may not recover more than once for a particular identifiable Loss.

**11.4**   **Environmental Matters; Exclusive Remedy.**

**11.4.1  Indemnification of Seller and Buyer.**

**A.**   Subject to the provisions of this Agreement, each Seller shall indemnify the appropriate Buyer for Environmental Damages, Environmental Claims and Liabilities arising from Pre-Closing Environmental Contamination and Pre-Closing Environmental Compliance Matters except to the extent exacerbated by the negligent actions of the other Party.

**B.**   Subject to the provisions of this Agreement, Buyer shall indemnify Seller for Environmental Damages, Environmental Claims and Liabilities arising from Post-Closing Environmental Contamination and Post-Closing Environmental Compliance Matters except to the extent exacerbated by the negligent actions of the other Party.

**C.**   Subject to the provisions of this Agreement, including, without limitation, the next sentence, for those Environmental Damages, Environmental Claims and Liabilities arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Environmental Compliance Matters and Post-Closing Environmental Compliance Matters, such Environmental Damages, Environmental Claims and Liabilities shall be allocated between the Parties in proportion to the extent that the Releases of or noncompliance underlying such Environmental Damages, Environmental Claims and Liabilities arose pre- or post-Closing, and each Party shall indemnify the other for its share as determined by such allocation.

**D.**   Section 11.6 shall apply to any disputes between the Parties as to Environmental Claims, Pre-Closing Environmental Contamination, Pre-Closing Environmental Compliance Matters, Post-Closing Environmental Contaminations, and Post-Closing Environmental Compliance Matters (collectively, "Environmental Matters").

**11.4.2  Limitations on Liability.**  Claims relating to Environmental Matters are subject to the limitations of this Section 11.4.2 and to the Deductible Amounts and Cap Amounts of Sections 11.3.2.  Sellers shall not be liable under this Agreement for:

**A.**   In the case of Environmental Claims arising from Pre-Closing Environmental Compliance Matters, unless written notice of such Claim has been served on the non-claiming Party on or before three (3) years following the Closing Date;

**B.**   In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, unless written notice of such Claim has been served on the non-claiming Party on or before three (3) years following the Closing Date;

**C.**   The incremental incurred cost and expense to meet a Remediation Standard under Environmental Law that is more stringent or

sensitive than that applicable to the type of use in effect at or before Closing (e.g., industrial use);

**D.**    For the costs of any Remedial Work or Remedy undertaken by a claiming Party voluntarily which is not required by Law, Environmental Permit or Governmental Order;

**E.**    In the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Contamination: (i) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are reasonably necessary to avert the emergency; and (ii) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this Section 11.4.2.E shall be deemed to be Environmental Damages;

**F.**    Where, subject to Section G, below, and insofar as the Parties agree to treat all Pre-Closing investigations of the environmental condition of the Manufacturing Facility as confidential, for any Environmental Damages Claims to the extent that such Claims would not have arisen or were increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing such confidential information to any relevant Competent Authority or Third Party (other than to lenders providing financing to Buyer, or to potential future buyers in connection with any subsequent sale of the Acquired Assets) without the prior written consent of the non-claiming Party; and

**G.**    The following shall not be deemed to be or to have been volunteering or disclosing or information for the purpose of Section F;

(i)    Where the disclosure is required by any law (including any Environmental Law, Environmental Permit or Governmental Order);

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated;

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party; or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure.

**11.4.3  Buyer Release of All Environmental Claims Against General Motors Corporation.**  Buyer on behalf of itself and its successors and assigns, agrees to waive and forever release, any and all claims it or they may have against the General Motors Corporation, and its successors and assignees, for any Environmental Claims, Environmental Contamination, Environmental Damages, Pre-Closing Environmental Contamination, Pre-Closing Environmental Compliance Matters, and any other claims under any Environmental Laws (including but not limited to the federal Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 as amended thereafter and the rules promulgated and amended thereafter, and Ohio Revised Code Chapter 3746 and the rules promulgated thereunder and amended thereafter) associated with GM's prior ownership, use or operation of the Acquired Assets, including the Owned Real Property and Manufacturing Facility, and Sellers' ownership, use or operation of the Acquired Assets, including the Owned Real Property and Manufacturing Facility.

      **11.4.4  <u>Exclusive Remedy.</u>**  The sole remedy of the Parties for any Claim for damages relating to Environmental Matters resulting or arising in any manner from or with respect to any dispute arising from or related to this Agreement or the transactions contemplated hereby shall be a Claim made pursuant to, and subject to the limitations of, this Article 11.

      **11.4.5  <u>Remediation of Environmental Damage</u>.**

      **A.**      Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of an Environmental Compliance Matter for such Environmental Contamination ("**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws and Remediation Standards using risk assessment and related risk evaluation methods.  Remedial Work may be conducted using the most cost-effective and reasonable methods of investigation, corrective measures, remediation, abatement, and/or containment (including, to the extent reasonably necessary, the use of institutional and engineering controls or deed restrictions for use of the Owned Real Property for industrial purposes only, provided that such controls or restrictions do not unreasonably prevent or inhibit any uses of the Owned Real Property that occurred as of the Closing Date, including any construction or expansion for industrial use and operations.

      **B.**      The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, conduct such Remedy in a reasonably expeditious manner.

      **C.**      The conduct of a Remedy shall be as follows:

      (i)      The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party shall adopt where such comments do not materially increase any cost or liability of the Remedy (unless such increase is necessary to comply with applicable Environmental Law);

      (ii)      When requested, the claiming Party shall reasonably cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)      Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation or use of the Manufacturing Facility, and Buyer will reasonably cooperate with Seller including providing access to the Manufacturing Facility during normal business hours and the use of utilities, including reimbursement by Seller of Buyer's actual cost and expense for the utilities in the conduct of the Remedy, provided that Sellers shall promptly repair, restore or reimburse Buyer for any damages or other costs incurred by Buyer as a result of providing such access;

(iv)      Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy;

(v)      The claiming Party shall have the right to observe all Remedial Work and to take split samples at the claiming Party's cost and expenses; and

(vi)      The conduct of the Remedy shall be deemed complete when, as the case may be:

(1)      The non-claiming Party has fully implemented the legally required Remedy and has received subsequent written approval regarding the Remedy by a Competent Authority (except to the extent any reopeners contained in any such approval are triggered); or

(2)      Where approval or other oversight by a Competent Authority is not required by Environmental Law and subject to Section 11.4.5.A of this Agreement, the legally required Remedy meets the Remediation Standards which are allowed by applicable Environmental Laws.

**11.4.6** <u>Remediation of Specific Recognized Environmental Conditions</u>.

**A.**      Seller agrees to retain responsibility for the "Specific Recognized Environmental Conditions" at the Manufacturing Facility as set forth herein.  The Specific Recognized Environmental Conditions are:

(i)      free product plume in the groundwater relating to the free product detected at the Former Water Production Well, which Well is depicted on <u>Exhibit 11.4.6</u>;

(ii)      free product plume in the groundwater relating to the free product detected at the Former Quench Pit, which Pit is depicted on <u>Exhibit 11.4.6</u>; and

(iii)      chlorinated solvent contamination plume relating to the chlorinated solvents detected in Monitoring Well No. MW -303, which Well is depicted on <u>Exhibit 11.4.6</u>.

**B.**     Seller agrees to perform the following tasks to address the Specific Recognized Environmental Conditions:  (i) for the Former Production Well and Former Quench Pit, to remove all free product to the extent technically feasible and technically practicable; and (ii) for the MW-303 chlorinated solvent compounds, to achieve risk-based remedial criteria based upon U.S. Environmental Protection Agency's Risk Assessment Guidance for Superfund commonly know as "RAGS") considering the continued industrial use of the Owned Real Property (collectively the "Specific Remedial Works") provided that a target lifetime cancer risk of $10^{-5}$ shall be applied to the risk assessment.  For the purpose of Section 11.4.6, "free product" means non-aqueous phase liquid that exceeds one-eighth inch (1/8") in thickness.

**C.**     The Specific Remedial Works for the Specific Recognized Environmental Conditions shall be conducted to comply with Section 11.4.6 and shall be:  (i) with respect to 11.4.6.A(iii), determined using risk assessment and related risk evaluation methods provided by the U.S. Environmental Protection Agency consistent with RAGS provided that a target lifetime cancer risk of $10^{-5}$ shall be applied to the risk assessment; and (ii) conducted using the most cost-effective and reasonable methods of investigation, corrective measures, remediation, abatement, and/or containment (including, to the extent reasonably necessary, the use of institutional and engineering controls or deed restrictions for use of the Owned Real Property for industrial purposes only, provided that such controls or restrictions do not unreasonably prevent or inhibit any uses of the Owned Real Property that occurred as of the Closing Date, including any construction or expansion for industrial use and operations).

**D.**     The Seller's obligation for the Specific Remedial Works for the Specific Recognized Environmental Conditions shall be deemed complete when Seller provides Buyer with a written certification by a competent environmental consultant that Seller has completed the Specific Remedial Works, subject to Buyer's review and approval of the certification which approval shall not be unreasonably withheld or delayed.

**E.**     Seller agrees to conduct the Specific Remedial Works of the Specific Recognized Environmental Conditions in a reasonably expeditious manner, and the requirements of Section 11.4.5(C)(i)(ii)(iii)(iv) and (v) of this Agreement shall apply to the conduct of the Specific Remedial Works by Seller.

**F.**     Buyer agrees that the Owned Real Property shall be subjected to a deed restriction that limits the Owned Real Property to industrial use and that all groundwater use shall be prohibited on the Owned Real Property.

**G.**     Seller, at its sole cost and expense, shall perform a risk assessment at the Manufacturing Facility in accordance with RAGS (provided that a target lifetime cancer risk of $10^{-5}$ shall be applied) to determine if any of the areas of interest identified in the Field Investigation Report dated January 4, 2007, and the Field Investigation Report for Field Event #2, dated November 2, 2007, pose an unacceptable risk to human health.  Seller's performance of this risk assessment shall have no effect on Seller's obligations under this Agreement.

**H.**    Notwithstanding any other provision in this Agreement to the contrary, Seller's obligations under Section 11.4.6 shall not be subject to the limitations of Section 11.4.2 (except for 11.4.2.F), Section 11.4.5.A, 11.4.5.B., or 11.4.5.C(vi), or any of the limitations of 11.3.2, except for the Cap Amount.

**11.5    Product Claims.**  Each Seller shall indemnify the appropriate Buyer for any Indemnifiable Losses with respect to any Product Claim, provided that notice of such Indemnifiable Loss is provided to Seller on or before the third anniversary of the Closing.

**11.6    Indemnification Procedure.**  The obligations of any indemnifying Party to indemnify any indemnified Party under Sections 11.3.1, 11.3.2, 11.4.1 or 11.5 with respect to Indemnifiable Losses resulting from the assertion of liability by third parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**11.6.1** Any Party against whom any Indemnification Claim is asserted shall give the Party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of this Section 11.6.1), and the indemnifying Party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified Party. Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying Party's obligations under this Article 11, except to the extent that the indemnifying Party is actually prejudiced by such failure to give prompt written notice.  Any written notice delivered by the indemnified Party to the indemnifying Party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Losses that have been or may be sustained by the indemnified Party.  The indemnified Party shall, and shall cause its employees and representatives to, cooperate with the indemnifying Party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying Party with all available information and documents concerning such Indemnification Claim. If the indemnifying Party, within ninety (90) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified Party against whom such claim has been made shall (upon further written notice to the indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying Party, subject to the right of the indemnifying Party to assume the defense of such Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the indemnified Party.

**11.6.2** Anything in this Section 11.6 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the indemnifying

party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**11.6.3  Indemnification Payments.**  All payments under this Article 11 shall be treated as adjustments to the Purchase Price.

**11.7    Mitigation.**  Notwithstanding any other provision of this Agreement, in no event shall a Party be entitled to indemnification pursuant to this Agreement to the extent any Losses were attributable to such Party's own gross negligence or willful misconduct or to the extent such Losses could have reasonably been avoided by an Indemnitee, or the damage to such Indemnitee from such Losses reasonably could have been mitigated.

**11.8    Dispute Resolution.**  Seller and Buyer will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving Party shall submit to the other a written response (the "**Response**").  The Notice and the Response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the Parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or Response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one Party to the other will be honored promptly.   All negotiations pursuant to this Section 11.8 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

## 12.    MISCELLANEOUS.

**12.1    Fees and Expenses.** Except as set forth in Section 9.2.2 and except as otherwise provided in the Ancillary Agreements, Delphi, on behalf of Sellers, on the one hand, and Buyer, on the other hand, will each bear its own expenses and the expenses of its Affiliates in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including their respective brokers' or finders' fees and all fees and expenses of their respective counsel, auditors, consultants and other representatives. Buyer will be solely responsible for all expenses in connection with its due diligence review of the Business, including, without limitation, surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, UCC lien and other searches. Buyer and Seller will split equally any cost in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.

**12.2    Bulk Sales Laws.**  Buyer waives compliance by Delphi and Sellers with any applicable bulk sales Law.

**12.3    Payments in Dollars.**  Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. Dollars in same day or immediately available funds.

**12.4    Amendment.**  This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.

**12.5    Assignment.**  This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party, underlined provided, that no assignment of any rights or obligations hereunder will be made by any Seller or Buyer without the written consent of the other Party, except (i) the assignment of this Agreement by a Filing Affiliate to a succeeding entity following such Filing Affiliate's emergence from Chapter 11 (which assignment will not require the other Party's consent) and (ii) the assignment of this Agreement by Buyer to any of its Affiliates, any lender of the Buyer or any purchaser of all or substantially all of the assets of the Business.

**12.6    Waiver.**  Any waiver by Sellers or Buyer of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**12.7    Notices.**  Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

<u>If to any Buyer:</u>     **The Resilience Fund II, L.P.**
25201 Chagrin Boulevard, Suite 360
Beachwood, Ohio 44122
Attn:  Steven Rosen and Bassem Mansour
Tel.:  (216) 292-0200
Fax No.:  (216) 292-4750

<u>With a copy to:</u>     **Jones Day**
77 W. Wacker
Chicago, Illinois 60601
Attn: Walter S. Holzer
Tel.:  (312) 782-3939
Fax No.: (312) 782-8585

|  |  |
|---|---|
| **If to Delphi:** | **DELPHI CORPORATION** |
|  | 5725 Delphi Drive |
|  | Troy, Michigan 48098 |
|  | Attn:  Fred J. Bellar III |
|  | Fax No.: |
|  |  |
| **With a copy to:** | **DELPHI CORPORATION** |
|  | 5725 Delphi Drive |
|  | Troy, Michigan 48098 |
|  | Attn:    Deputy General Counsel - |
|  |            Transactional & Restructuring |
|  | Fax No.:  248-813-2491 |

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

**12.8    Entire Agreement.**  This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof.

**12.9    Counterparts.**   This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

**12.10    Publicity.**  Except as required by Law (and then only after prior consultation with the other Party) or in connection with the Bankruptcy Cases, neither Party (nor any of the other Buyer and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (not to be unreasonably withheld, delayed or conditioned).

**12.11    Headings.**  The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

**12.12    Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**12.13    Third Parties.**  Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

**12.14    Governing Law.** This Agreement will in all respects be governed by and construed in accordance with the laws of the State of New York, and to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**12.15    Venue and Retention of Jurisdiction**.    The Parties irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto, during such time period, except in the Bankruptcy Court).

**12.16    No Right of Setoff.**  Neither Party nor any of its Affiliates may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it under this Agreement or any Ancillary Agreement against any amounts owed under this Agreement or any Ancillary Agreement by such Person to the other Party or any of such other Party's Affiliates.

**12.17    Risk of Loss.**  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

**12.18    Enforcement of Agreement.**  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**12.19    Bankruptcy Court Approval**.  Except for those sections of the Agreement expressly approved under the Bidding Procedures Order, the Parties' obligations hereunder are expressly subject to entry of the Sale Approval Order.

*[Remainder of the page left intentionally blank.]*

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By _____/s/_____
        Name: **Fred J. Bellar III**
        Title:  **Executive Director M&A**

**ND ACQUISITION CORPORATION**

By _____/s/_____
        Name: **Steven Rosen**
        Title:   **Vice President and Treasurer**

The following Persons sign this Agreement solely with respect to the Acquired Assets being bought or sold by such Person.

**DELPHI TECHNOLOGIES, INC.**

By:_____/s/_____
        Name: **Fred J. Bellar III**
        Title:   **Executive Director M&A**

## **SCHEDULES**

| | |
|---|---|
| Schedule 1 | Detail of Sellers and Buyers |
| Schedule 1.1.A | Buyers' Knowledge |
| Schedule 1.1.B | Sellers' Knowledge |
| Schedule 1.1.C | Competitive Operating Agreement |
| Schedule 1.1.D | Work Practice Changes |
| Schedule 2.1.2.A | Third Party Assets |
| Schedule 2.1.2.M | Excluded Computer Hardware, Equipment, Software and Other Assets |
| Schedule 3.3.1.C | Inventory |
| Schedule 3.4 | Benchmark Inventory Amount |
| Schedule 3.6.1 | Allocation |
| Schedule 4.4.1 | Financial Statements |
| Schedule 4.4.2 | Exceptions to GAAP |
| Schedule 4.5 | No Conflicts or Approvals |
| Schedule 4.7 | Noncompliance with Law |
| Schedule 4.8 | Proceedings against Sellers |
| Schedule 4.9 | Absence of Certain Changes |
| Schedule 4.11.1 | Transferred Employees |
| Schedule 4.11.2 | Employee Benefit Plans |
| Schedule 4.11.4 | Proceedings relating to Seller Employee Benefit Plans |
| Schedule 4.11.5 | Collective Bargaining Agreements |
| Schedule 4.11.6 | Labor Relations |
| Schedule 4.11.7 | Labor/Employment Claims |
| Schedule 4.12.1.A | Patents |
| Schedule 4.12.1.B | Trademarks |
| Schedule 4.12.3 | Allegations of Third Party of Intellectual Property |
| Schedule 4.12.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.13.1 | Material Contracts |
| Schedule 4.13.2 | Default/Post-Petition Contracts |
| Schedule 4.13.3 | Significant Customers |
| Schedule 4.13.4 | Significant Suppliers |
| Schedule 4.14 | Environmental Matters |
| Schedule 4.15 | Insurance |
| Schedule 4.16.1 | Defects in Title for Personal Property Assets |
| Schedule 4.16.3 | Other Inventory Locations |
| Schedule 4.16.4 | Machinery, Equipment and Capitalized Tools |
| Schedule 4.17 | Owned Real Property |
| Schedule 4.19 | Product Claims |
| Schedule 6.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 6.1.1.(a) | Schedule from Capital Procurement Agreement |
| Schedule 6.1.1.(b) | Assets to be Disposed |
| Schedule 6.3.1 | Assumed Contracts |
| Schedule 6.7.3 | Inactive Employees |
| Schedule 6.12.1 | Sub-Licensed Intellectual Property Contracts |
| Schedule 6.17 | Shared Items |

## EXHIBITS

| | |
|---|---|
| Exhibit 8.2.1.A | Patent Assignment |
| Exhibit 8.2.1.B | Trademark Assignment |
| Exhibit 8.2.2 | Deposit Escrow Agreement |
| Exhibit 8.2.3 | Transition Services Agreement |
| Exhibit 8.2.4 | Bills of Sale |
| Exhibit 8.2.5 | Assignment and Assumption Agreements |
| Exhibit 8.2.6 | Indemnity Escrow Agreement |
| Exhibit 8.2.7 | Inventory Adjustment Escrow Agreement |
| Exhibit 8.2.8 | Sensor Supply Agreement |
| Exhibit 8.3.1 | Deed for Owned Real Property |
| Exhibit 10.1 | Form of Bidding Procedures Order |
| Exhibit 10.2 | Form of Sale Approval Order |
| Exhibit 11.4.6 | Remediation of Specific Recognized Environmental Conditions |

## SCHEDULE 1

## DETAILS OF SELLERS AND BUYERS

|  | **ASSET** |  | **SELLER** | **BUYER** |
|---|---|---|---|---|
| **MANUFACTURING FACILITY:** |  |  |  |  |
| Sandusky, Ohio | Asset |  | Delphi Automotive Systems LLC |  |
|  |  |  |  |  |
| **TECHNOLOGY:** |  |  |  |  |
| Troy, Michigan | Asset |  | Delphi Technologies, Inc. |  |
|  |  |  |  |  |

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
          In re                           :          Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :          Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :          (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363, 365, AND 1146 AND FED. R. BANKR. P. 2002, 6004,
6006, AND 9014 AUTHORIZING AND APPROVING (I) SALE OF CERTAIN OF
DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL ASSETS PRIMARILY USED
IN DEBTORS' BEARINGS BUSINESS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(III) ASSUMPTION OF CERTAIN LIABILITIES

("BEARINGS BUSINESS SALE APPROVAL ORDER")

            Upon the motion, dated January 15, 2008 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11 U.S.C. §§ 363, 365,

and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding

procedures, (ii) granting certain bid protections, (iii) approving the form and manner of sale

notices, and (iv) setting a sale hearing date (the "Sale Hearing") and (b) authorizing and

approving (i) the sale (the "Sale") of certain of the Debtors' assets (the "Acquired Assets")

comprising substantially all the assets that comprise the Debtors' global bearings business (the

"Bearings Business"), free and clear of liens, claims, encumbrances, and interests to ND

Acquisition Corp. (the "Buyer") pursuant to the Sale and Purchase Agreement, dated January 15,

2008 (such Sale Purchase Agreement, including all schedules, exhibits, and related agreements

and documents, the "Agreement," a copy of which is attached hereto as Exhibit A), by and

between certain affiliated Debtors of Delphi as set forth in the Agreement (the "Selling Debtor

Entities"),[1] and the Buyer or to the party submitting the highest or otherwise best bid (the

"Successful Bidder"), (ii) the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain

postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and

collectively with the Assumed Contracts, the "Assigned Contracts") to the Buyer or the

Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by

the Buyer or the Successful Bidder; and the Court having entered an order on January [➥], 2008

(the "Bidding Procedures Order") (Docket No. ____) (a) approving bidding procedures, (b)

granting certain bid protections, (c) approving the form and manner of sale notices, and (d)

setting the Sale Hearing; and the Sale Hearing having been held on February 21, 2008, at which

time all interested parties were offered an opportunity to be heard with respect to the Motion; and

the Court having reviewed and considered the Motion and the arguments of counsel made, and

the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief requested

in the Motion is in the best interests of the Selling Debtor Entities, their estates, their

stakeholders, and all other parties-in-interest; and after due deliberation thereon, and sufficient

cause appearing therefor,

      IT IS HEREBY FOUND AND DETERMINED THAT:[2]

---

[1]    Under the Agreement, the Selling Debtor Entities are comprised of Delphi Automotive Systems LLC and Delphi Technologies, Inc.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

A.    The Court has jurisdiction over the Motion and the transactions contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 363, 365, and 1146 of 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014.

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, the Bid Deadline, the Auction, and the assumption and assignment of the Assumed Contracts, and the Cure Amounts as approved herein has been provided in accordance with 11 U.S.C. §§ 102(l), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, (ii) such notice was good, sufficient, and appropriate under the circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale, the Bid Deadline, the Auction, or the assumption and assignment of the Assumed Contracts or assignment of the Postpetition Contracts as provided herein is necessary or shall be required.

D.    As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Selling Debtor Entities have marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order and in a manner that afforded a full, fair, and reasonable opportunity for any entity to make a higher or better offer to purchase the Acquired Assets.

3

E.    The Selling Debtor Entities (i) have full power and authority to execute
the Agreement and all other applicable documents contemplated thereby, and the transfer and
conveyance of the Acquired Assets by the Selling Debtor Entities has been duly and validly
authorized by all necessary action of the Selling Debtor Entities, (ii) have all of the power and
authority necessary to consummate the transactions contemplated by the Agreement, and (iii)
have taken all action necessary to authorize and approve the Agreement and to consummate the
transactions contemplated thereby, and no consents or approvals, other than those expressly
provided for in the Agreement, are required for the Selling Debtor Entities to consummate such
transactions.

F.    The Selling Debtor Entities have demonstrated (i) good, sufficient, and
sound business purposes and justification for the Sale because, among other things, the Selling
Debtor Entities and their advisors diligently and in good faith analyzed all other available options
in connection with the disposition of the Acquired Assets and determined that (a) the terms and
conditions set forth in the Agreement, (b) the transfer to Buyer of the Acquired Assets pursuant
thereto, and (c) the Purchase Price agreed to as reflected in the Agreement are all fair and
reasonable and together constitute the highest or otherwise best value obtainable for the
Acquired Assets and (ii) that compelling circumstances for the Sale pursuant to 11 U.S.C. §
363(b) prior to, and outside of, a plan of reorganization exist because, among other things, absent
the Sale the value of the Acquired Assets will be substantially diminished.

G.    A reasonable opportunity to object or be heard with respect to the Motion
and the relief requested therein has been afforded to all interested persons and entities, including
without limitation: (i) the Office of the United States Trustee for the Southern District of New
York, (ii) counsel for the Buyer, (iii) counsel for the official committee of unsecured creditors

4

appointed in these chapter 11 cases, (iv) counsel for the official committee of equity security

holders appointed in these chapter 11 cases, (v) all entities known to have expressed an interest

in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities

known to have asserted any Interests and/or Claims (as defined below) in or upon the Acquired

Assets, (vii) all federal, state, and local regulatory or taxing authorities or recording offices,

including but not limited to environmental regulatory authorities, which have a reasonably

known interest in the relief requested by the Motion, (viii) all parties to Assigned Contracts, (ix)

the United States Attorney's office, (x) the United States Department of Justice, (xi) the

Securities and Exchange Commission, (xii) the Internal Revenue Service, (xiii) all entities on the

Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105

And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the

"Supplemental Case Management Order")), and (xiv) such other entities as are required to be

served with notices under the Supplemental Case Management Order.

H.    The Buyer is not an "insider" of any of the Debtors as that term is defined

in 11 U.S.C. § 101(31).

I.    The Agreement was negotiated, proposed, and entered into by the Selling

Debtor Entities and the Buyer without collusion, in good faith, and from arm's-length bargaining

positions.  Neither the Selling Debtor Entities nor the Buyer has engaged in any conduct that

would cause or permit the Sale or any part of the transactions contemplated by the Agreement to

be avoidable under 11 U.S.C. § 363(n).

J.    The Buyer is a good faith purchaser under 11 U.S.C. § 363(m) and, as

such, is entitled to all of the protections afforded thereby.  The Buyer will be acting in good faith

5

within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the

Agreement at all times after the entry of this order.

       K.      The consideration provided by the Buyer for the Acquired Assets pursuant

to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the

Acquired Assets, (iii) will provide a greater recovery for the Selling Debtor Entities' stakeholders

than would be provided by any other practical available alternative, and (iv) constitutes

reasonably equivalent value and fair consideration under the Bankruptcy Code and under the

laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

       L.      The Sale must be approved and consummated promptly to preserve the

viability of the Bearings Business as a going concern. The Sale is in contemplation of, and a

necessary condition precedent to, a reorganization plan for the Debtors and, accordingly,

constitutes a transfer to which section 1146(c) of the Bankruptcy Code applies.

       M.      The transfer of the Acquired Assets to the Buyer will be a legal, valid,

and effective transfer of the Acquired Assets and shall vest the Buyer with all right, title, and

interest of the Selling Debtor Entities to the Acquired Assets free and clear of any and all liens,

claims, interests, and encumbrances (including, without limitation, Encumbrances as defined in

the Agreement) of any type whatsoever (whether known or unknown, secured or unsecured or in

the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed,

contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-

material, disputed or undisputed, whether arising prior to or subsequent to the commencement of

the chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or

otherwise, including claims otherwise arising under doctrines of successor liability), including

6

but not limited to those (i) that purport to give to any party a right or option to effect any

forfeiture, modification, right of first refusal, or termination of the Selling Debtor Entities' or the

Purchaser's interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising

under or out of, in connection with, or in any way relating to the operation of the Bearings

Business prior to the Closing Date, including the transfer of the Acquired Assets to the Buyer (all

such liens, claims, interests, and encumbrances listed herein, the "Interests and/or Claims").

     N.     If the Sale of the Acquired Assets with respect to the Selling Debtor

Entities were not free and clear of all Interests and/or Claims as set forth in the Agreement and

this order, or if the Buyer would, or in the future could, be liable for any of the Interests and/or

Claims as set forth in the Agreement and this order, the Buyer would not have entered into the

Agreement and would not consummate the Sale or the transactions contemplated by the

Agreement, thus adversely affecting the Selling Debtor Entities, their estates, and their

stakeholders.

     O.     The Selling Debtor Entities may sell their interests in the Acquired Assets

free and clear of all Interests and/or Claims because, in each case, one or more of the standards

set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests and/or Claims

who did not object, or withdrew their objections to the Sale, are deemed to have consented to the

Sale pursuant to 11 U.S.C. § 363(f)(2).  Those holders of Interests and/or Claims who did object

fall under one or more of the other subsections of 11 U.S.C. § 363(f), and all holders of Interests

and/or Claims are adequately protected by having their Interests and/or Claims, if any, attach to

the cash proceeds of the Sale ultimately attributable to the property against or in which they

claim an Interest and/or Claim with the same priority, validity, force, and effect as they attached

to such property immediately before the closing of the Sale.

7

P.      Except as expressly provided in the Agreement, the (i) transfer of the

Acquired Assets to the Buyer and (ii) assumption and/or assignment to the Buyer of the

Assigned Contracts and Assumed Liabilities will not subject the Buyer to any liability

whatsoever with respect to the operation of the Bearings Business prior to the Closing of the Sale,

or by reason of such transfer under the laws of the United States, any state, territory, or

possession thereof, or the District of Columbia based, in whole or in part, directly or indirectly,

on any theory of law or equity including, without limitation, any theory of equitable law,

antitrust, or successor or transferee liability.

Q.      The Selling Debtor Entities have demonstrated that it is an exercise of

their sound business judgment to assume and/or assign the Assigned Contracts as applicable to

the Buyer in connection with the consummation of the Sale, and the assumption and/or

assignment of the Assigned Contracts is in the best interests of the Selling Debtor Entities, their

estates, and their creditors.  The Assigned Contracts being assigned to, and the liabilities being

assumed by, the Buyer are an integral part of the Acquired Assets being purchased by the Buyer

and, accordingly, such assumption and/or assignment of Assigned Contracts and liabilities is

reasonable and enhances the value of the Selling Debtor Entities' estates.

R.      The Selling Debtor Entities have (i) cured, or have provided adequate

assurance of cure of, any default existing prior to the Closing of the Sale under all of the

Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts

provided on Schedule 1 hereto and (ii) provided compensation or adequate assurance of

compensation to any party for any actual pecuniary loss to such party resulting from a default

prior to the date hereof under any of the Assumed Contracts, within the meaning of 11 U.S.C. §

365(b)(1)(B).  The Buyer has provided adequate assurance of its future performance of and

8

under the Assumed Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

Pursuant to 11 U.S.C. § 365(f), the Assumed Contracts to be assumed and assigned under the

Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit

of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their

assignment or transfer.

S.      Approval of the Agreement and consummation of the Sale of the Acquired

Assets and assignment of the Assigned Contracts at this time are in the best interests of the

Selling Debtor Entities, their stakeholders, their estates, and other parties-in-interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

General Provisions

1.      The Motion is GRANTED.

Approval Of The Agreement

2.      Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and

conditions thereof are hereby approved.

3.      Pursuant to 11 U.S.C. § 363(b), the Selling Debtor Entities are authorized,

but not directed, to perform their obligations under the Agreement and comply with the terms

thereof and consummate the Sale in accordance with and subject to the terms and conditions of

the Agreement.

4.      Each of the signatories to the Agreement is authorized, but not directed, to

take all actions necessary or appropriate to effectuate the terms of this order.

9

5.      The Selling Debtor Entities are authorized, but not directed, to execute and
deliver, and empowered to perform under, consummate, and implement, the Agreement, together
with all additional instruments and documents as may be reasonably necessary or desirable to
implement the Agreement, and to take all further actions as may be requested by the Buyer for
the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or
reducing to possession the Acquired Assets and the Assigned Contracts, or as may be necessary
or appropriate to the performance of the obligations as contemplated by the Agreement.

6.      This order and the Agreement shall be binding in all respects upon all
stakeholders (whether known or unknown) of the Debtors, the Buyer, all successors and assigns
of the Buyer and the Selling Debtor Entities, all affiliates and subsidiaries of the Buyer and the
Selling Debtor Entities, and any subsequent trustees appointed in the Debtors' chapter 11 cases or
upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.
To the extent that any provision of this order is inconsistent with the terms of the Agreement, this
order shall govern.

7.      The Agreement and any related agreements, documents, or other
instruments may be modified, amended, or supplemented by the parties thereto in accordance
with the terms thereof without further order of the Court; provided that any such modification,
amendment, or supplement is not material.

<u>Sale And Transfer Of The Acquired Assets</u>

8.      Except as expressly permitted or otherwise specifically provided for in the
Agreement or this order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of
the Agreement, the Selling Debtor Entities' right, title, and interest in the Acquired Assets shall

10

be transferred to the Buyer free and clear of all Interests and/or Claims, with all such Interests

and/or Claims to attach to the cash proceeds of the Sale in the order of their priority, with the

same validity, force, and effect which they had as against the Acquired Assets immediately

before such transfer, subject to any claims and defenses the Selling Debtor Entities may possess

with respect thereto.

9.       The transfer of the Acquired Assets to the Buyer pursuant to the

Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

the Buyer with all right, title, and interest of the Selling Debtor Entities in and to the Acquired

Assets free and clear of all Interests and/or Claims of any kind or nature whatsoever.

10.      If any person or entity which has filed financing statements, mortgages,

mechanic's liens, lis pendens, or other documents or agreements evidencing Interests and/or

Claims against or in the Acquired Assets shall not have delivered to the Selling Debtor Entities

prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all Interests and/or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Selling Debtor

Entities are hereby authorized to execute and file such statements, instruments, releases, and

other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the

Buyer is hereby authorized to file, register, or otherwise record a certified copy of this order

which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the

release of all Interests and/or Claims in the Acquired Assets of any kind or nature whatsoever.

11.      This order (a) shall be effective as a determination that, upon the Closing

of the Sale, all Interests and/or Claims of any kind or nature whatsoever existing as to the Selling

11

Debtor Entities or the Acquired Assets prior to the Closing of the Sale have been unconditionally

released, discharged, and terminated (other than any surviving obligations), and that the

conveyances described herein have been effected and (b) shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

            12.      All persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

creditors, and other stakeholders, holding Interests and/or Claims of any kind or nature

whatsoever against or in the Selling Debtor Entities or the Acquired Assets (whether legal or

equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to, the Bearings

Business, the Acquired Assets, the operation of the Bearings Business by the Selling Debtor

Entities prior to the Closing of the Sale, or the transfer of the Acquired Assets to the Buyer,

hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer,

its successors or assigns, their property, or the Acquired Assets, such persons' or entities'

Interests and/or Claims.  Nothing in this order or the Agreement releases or nullifies any

Liability to a governmental agency under any environmental laws and regulations that any entity

would be subject to as owner or operator of any Acquired Assets after the date of entry of this

order.  Nothing in this order or the Agreement bars, estops, or enjoins any governmental agency

from asserting or enforcing, outside the Court, any Liability described in the preceding sentence.

Notwithstanding the above, nothing herein shall be construed to permit a governmental agency to

obtain penalties from the Buyer for the Selling Debtor Entities' violation of environmental laws

and regulations prior to Closing.

13.    All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of the Selling Debtor

Entities to sell and transfer the Acquired Assets to the Buyer, in each case in accordance with the

terms of the Agreement or this order.

<u>Assumption And Assignment To The Purchaser Of The Assumed Contracts</u>

14.    Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned

upon the Closing of the Sale, the Selling Debtor Entities' assumption and assignment to the

Buyer, and the Buyer' assumption on the terms set forth in the Agreement, of the Assumed

Contracts is hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with

respect thereto are hereby deemed satisfied.

15.    The Selling Debtor Entities are hereby authorized in accordance with 11

U.S.C. §§ 105(a), 363, and 365 to (a) assume and/or assign to the Buyer, effective upon the

Closing of the Sale, the Assigned Contracts free and clear of all Interests and/or Claims of any

kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other

instruments as may be necessary to assign and transfer the Assigned Contracts and Assumed

Liabilities to the Buyer.

13

16.     The Assumed Contracts shall be transferred to, and remain in full force

and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding

any provision in any such Assumed Contract (including those of the type described in sections

365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment

or transfer and, pursuant to 11 U.S.C. § 365(k), the Selling Debtor Entities shall be relieved from

any further liability with respect to the Assumed Contracts after such assignment to and

assumption of such contracts by the Buyer.

17.     All defaults or other obligations of the Selling Debtor Entities under the

Assumed Contracts arising or accruing prior to the Closing of the Sale (without giving effect to

any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured by the Selling Debtor Entities in accordance with the terms

of the Agreement, and the Buyer shall have no liability or obligation arising or accruing prior to

the date of the Closing of the Sale, except as otherwise expressly provided in the Agreement.

Each non-debtor party to any Assumed Contracts shall be deemed to have consented to the

assumption and assignment of the Assumed Contracts to the Buyer and shall be forever barred,

estopped, and permanently enjoined from asserting against the Selling Debtor Entities or the

Buyer, or the property of any of them, any default existing, arising, or accruing as of the date of

the Closing or any purported written or oral modification to the Assumed Contracts.  Each non-

debtor party to any Assumed Contract shall be forever barred, estopped, and permanently

enjoined from asserting against the Buyer (or its property, including the Acquired Assets) any

claim, counterclaim, defense, breach, condition, setoff asserted or assertable against the Debtors.

The failure of the Debtors or the Buyer to enforce prior to the Closing of the Sale one or more

terms or conditions of any Assumed Contracts shall not be a waiver of such terms or conditions

14

or of the Debtors' or Buyer's rights to enforce every term and condition of any such Assumed

Contracts.  There shall be no rent accelerations, assignment fees, increases (including of rates),

or any other fees charged to the Buyer as a result of the assumption and assignment of the

Assumed Contracts.

Additional Provisions

18.    The transactions contemplated by the Agreement, and the execution,

delivery, and/or recordation of any and all documents or instruments necessary or desirable to

consummate the transactions contemplated by the Agreement shall be, and hereby are, exempt

from the imposition and payment of all stamp taxes or any other similar taxes pursuant to section

1146(c) of the Bankruptcy Code.

19.    The consideration provided by the Buyer for the Acquired Assets under

the Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration

under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent

Transfer Act, and under the laws of the United States, and any state, territory, or possession

thereof, or the District of Columbia.

20.    Upon the Closing of the Sale, this order shall be construed as and shall

constitute for any and all purposes a full and complete general assignment, conveyance, and

transfer of all of the Acquired Assets and the Assigned Contracts or a bill of sale transferring

good and marketable title in such Acquired Assets and Assigned Contracts to the Buyer pursuant

to the terms of the Agreement.

21.    Upon the Closing of the Sale, each of the Selling Debtor Entities' creditors

is authorized and directed to execute such documents and take all other such actions as may be

15

necessary to release their respective Interests and/or Claims against the Acquired Assets, if any,

as such Interests and/or Claims may have been recorded or may otherwise exist.

22.    Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Agreement.

23.    All entities which are currently, or as of the Closing of the Sale may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Agreement are hereby directed to surrender possession of the Acquired Assets to the Buyer

upon the Closing of the Sale.

24.    All entities holding Interests and/or Claims against or in the Selling

Debtor Entities or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are,

forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise

pursuing such Interests and/or Claims of any kind or nature whatsoever against the Buyer, its

property, its successors and assigns, or the Acquired Assets with respect to any Interest and/or

Claim of any kind or nature whatsoever which such person or entity had, has, or may have

against or in the Selling Debtor Entities, their estates, their officers, their directors, their

shareholders, or the Acquired Assets.  Following the Closing of the Sale, no holder of an Interest

and/or Claim in or against the Selling Debtor Entities shall interfere with the Buyer's title to or

use and enjoyment of the Acquired Assets based on or related to such Interest and/or Claim or

any actions that the Selling Debtor Entities may take, or have taken, in their chapter 11 cases.

16

25.     The transactions contemplated by the Agreement are undertaken by the

Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the Buyer,

unless such authorization is duly stayed pending such appeal.  The Buyer is a purchaser in good

faith of the Acquired Assets pursuant to section 363(m) of the Bankruptcy Code, and is entitled

to all of the protections afforded by section 363(m) of the Bankruptcy Code.

26.     The consideration provided by the Buyer for the Acquired Assets under

the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of

the Bankruptcy Code.

27.     The Selling Debtor Entities, including, but not limited to, their officers,

employees, and agents, are hereby authorized to execute such documents and do such acts as are

necessary or desirable to carry out the transactions contemplated by the terms and conditions of

the Agreement and this order.  The Selling Debtor Entities shall be, and they hereby are,

authorized to take all such actions as may be necessary to effectuate the terms of this order.

28.     The terms and provisions of the Agreement and this order shall be binding

in all respects upon the Selling Debtor Entities, their estates, and their stakeholders, the Buyer

and its affiliates, successors, and assigns, and any affected third parties, including, but not

limited to, all entities asserting an Interest and/or Claim against or in the Acquired Assets to be

sold to the Buyer pursuant to the Agreement, notwithstanding any subsequent appointment of

any trustee or other fiduciary under any section of any chapter of the Bankruptcy Code, as to

which trustee or other fiduciary such terms and provisions likewise shall be binding, and shall

17

inure to the benefit of the Selling Debtor Entities and the Buyer and their affiliates, successors, and assigns.

29.     Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of the Selling Debtor Entities' estates or of the other Sellers, such as funds that are trust funds under any applicable state lien laws.

30.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

31.     The failure specifically to include or to reference any particular provision of the Agreement in this order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

32.     The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Selling Debtor Entities' estates.

33.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

18

34.    To the extent that any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with, or derogates from the provisions of the Agreement and this order, the provisions of this order shall control.  The Selling Debtor Entities' obligations under this order and Agreement (including all Exhibits, Schedules, and Ancillary Agreements) shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Selling Debtor Entities and the reorganized or reconstituted debtors, as the case may be, after the effective date of the confirmed plan or plans in the Debtors' cases.

35.    This Court retains exclusive jurisdiction to interpret, construe, enforce, and implement the terms and provisions of this order, the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Buyer, (b) compel delivery of the purchase price or performance of other obligations owed to the Selling Debtor Entities pursuant to the Agreement, (c) resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this order, (e) protect the Buyer against any Interests and/or Claims against or in the Selling Debtor Entities or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (f) determine all disputes among the Selling Debtor Entities, the Buyer, and any non-Debtor parties to any Assigned Contracts concerning, inter alia, the Selling Debtor Entities' assumption and/or assignment of any Assigned Contract to the Purchaser under the Agreement.

19

36.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:  New York, New York
        _____

                            _____
                            UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT F

## DELPHI CORPORATION
## BEARINGS BUSINESS BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of substantially all of the assets that comprise the global bearings business (the "Bearings Business") of Delphi Corporation ("Delphi") and certain of its affiliates, including certain affiliated chapter 11 Debtors as set forth in the Agreement (the "Selling Debtor Entities" or the "Sellers").[1]  On January 15, 2008, the Sellers executed that certain Sale And Purchase Agreement (the "Agreement") with ND Acquisition Corp. (the "Buyer").  The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), and certain other closing conditions.

On January 15, 2008, the Selling Debtor Entities and certain of their affiliates (collectively, the "Debtors") filed an Expedited Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006 And 9014 (A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of Debtors' Assets Primarily Used In Debtors' Bearings Business Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities (the "Sale Motion").  On January 25, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002 And 9014 (I) Approving Bidding Procedures,  (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In Connection With Sale Of Debtors' Bearings Business (the "Bidding Procedures Order").  The Bidding Procedures Order set February 21, 2008 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Selling Debtor Entities to enter into the Agreement.  All capitalized terms used but not otherwise defined in these Bidding Procedures have the meanings ascribed to them in the Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified Bidders and Bids, respectively, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), the ultimate selection of the Successful Bidder(s) (as defined herein), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").  The Debtors intend to consult with, among others, the official committee of unsecured creditors (the "Creditors' Committee") throughout the Bidding Process.  In the event that the Debtors and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

---

[1]    Under the Agreement, the Selling Debtor Entities are comprised of Delphi Automotive Systems LLC and Delphi Technologies, Inc.

## Assets To Be Sold

The assets proposed to be sold include substantially all of the assets primarily used in the Bearings Business (the "Acquired Assets").

## "As Is, Where Is"

The sale of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Buyer, to the extent set forth in the Agreement and, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

## Free Of Any And All Claims And Interests

Except, with respect to the Buyers, to the extent otherwise set forth in the Agreement and, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder, all of the Sellers' right, title, and interest in and to the Acquired Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests on and/or against the Acquired Assets (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Acquired Assets.

## Participation Requirements

Any person who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder.  As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than the Buyers, must deliver (unless previously delivered) to the Selling Debtor Entities and their counsel at the addresses provided below, unless otherwise ordered by the Bankruptcy Court or as otherwise determined by the Sellers in their discretion:

(a)      An executed confidentiality agreement in form and substance satisfactory to the Selling Debtor Entities.

(b)      Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Bearings Business, current audited financial statements of the equity holders of the Potential Bidder who must guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement as may be acceptable to the Selling Debtor Entities and their financial advisors; and

(c)      A preliminary (non-binding) proposal regarding:  (i) the purchase price range, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite Good Faith Deposit), (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals, (v) any conditions to closing that the Potential

2

Bidder may wish to impose in addition to those set forth in the Agreement, provided that there be no financing condition, and (vi) the nature and extent of additional due diligence the Potential Bidder may wish to conduct and the date by which such due diligence must be completed.

A Potential Bidder who delivers the documents described in the foregoing subparagraphs and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale if selected as a Successful Bidder, and who the Sellers determine in their sole discretion is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder."  Notwithstanding the foregoing, the Buyer will be deemed a Qualified Bidder for purposes of the Bidding Process. As promptly as reasonably practicable after a Potential Bidder delivers all of the materials required above, the Selling Debtor Entities will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder.  At the same time when the Selling Debtor Entities notify the Potential Bidder that it is a Qualified Bidder, the Selling Debtor Entities will allow the Qualified Bidder to commence due diligence with respect to the Acquired Assets and the Bearings Business as described below.

## Due Diligence

The Sellers will afford each Qualified Bidder due diligence access to the Acquired Assets and the Bearings Businesses.  Due diligence access may include such management presentations as may be scheduled by the Selling Debtor Entities, access to data rooms, on site inspections, and such other matters which a Qualified Bidder may request and as to which the Sellers, in their sole discretion, may agree.  The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional diligence access or information grant to any Qualified Bidder other than the Buyer will be promptly made available to the Buyer.  Any additional due diligence will not continue after the Bid Deadline.  The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. Neither the Sellers nor any of their Affiliates (or any of their respective representatives) will be obligated to furnish any information relating to Acquired Assets and the Bearings Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

## Bid Deadline

A Qualified Bidder who desires to make a bid must deliver the Required Bid Documents (as defined herein) to:  Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Stephen H. Olsen, Director, Mergers & Acquisitions, Automotive Holdings Group, with copies to:  (i) the Selling Debtor Entities' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Brian M. Fern, (ii) the Selling Debtor Entities' financial advisor, KeyBanc Capital Markets Inc., 127 Public Square, Cleveland, Ohio 44114, Attention: Paul E. Schneir, (iii) counsel to the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert J.  Rosenberg, and (iv) counsel for the agent under Delphi's postpetition credit

3

facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick, so as to be received not later than 11:00 a.m. (prevailing Eastern time) by February 11, 2008 (the "Bid Deadline"). Delphi may extend the Bid Deadline once or successively, but is not obligated to do so. If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension. As soon as reasonably practicable following receipt of each Qualified Bid, the Selling Debtor Entities will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to (i) counsel for the official committee of equity security holders (the "Equityholders Committee") and (ii) counsel for the Buyer. The Sellers also will provide the UAW with notice of all Qualified Bidders and their contact information. Qualified Bidders should note that Section 6.7 of the Agreement addresses, among other things, the terms and conditions of employment of UAW-represented employees, and these issues remain subject to the parties' rights and obligations related to bargaining with the UAW.

## Bid Requirements

All bids must include the following documents (the "Required Bid Documents"):

(a)      A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Acquired Assets.

(b)      An executed copy of the Agreement, together with all schedules marked (a "Marked Agreement") to show those amendments and modifications to such Agreement and schedules that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement).

(c)      A good faith deposit (the "Good Faith Deposit") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Selling Debtor Entities in their sole discretion) payable to the order of Delphi (or such other party as the Sellers may determine) in the amount of $750,000.

(d)      Written confirmation from General Motors that General Motors approves the bidder to operate the wheel bearings business.

(e)      Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that is satisfactory to the Sellers and their advisors.

## Qualified Bids

A bid will be considered only if the bid:

(a)      Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

(b)      Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Selling Debtor Entities determine, in their sole discretion, are similar to, and are not materially more burdensome or conditional than, the terms of the Agreement and that has a value, either individually

or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee and the Expense Reimbursement, plus $250,000 in the case of an initial Qualified Bid, plus $250,000 in the case of any subsequent Qualified Bids over the immediately preceding highest Qualified Bid.

(c)      Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment.

(d)      Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

(e)      Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required Governmental Approvals) within not more than 45 days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any Governmental Approvals, which must be obtained within 60 days after entry of such order.

(f)      Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that the Selling Debtor Entities will have the right, in their sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and may deem such bids to be Qualified Bids.  Notwithstanding the foregoing, the Buyers will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of the Buyers is referred to as a "Subsequent Bid."

If the Selling Debtor Entities do not receive any Qualified Bids other than the Agreement received from the Buyers, the Selling Debtor Entities will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

## **Bid Protection**

Recognizing the Buyers' expenditure of time, energy, and resources, the Selling Debtor Entities have agreed to provide certain bidding protections to the Buyers.  Specifically, the Selling Debtor Entities have determined that the Agreement furthers the goals of the Bidding Procedures by setting a floor which all other Qualified Bids must exceed.  As a result, the Selling

5

Debtor Entities have agreed that if the Buyers are not the Successful Bidder, the Selling Debtor Entities will, in certain circumstances, pay to the Buyers a Break-Up Fee.  The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) will be governed by the provisions of the Agreement and the Bidding Procedures Order.

## Auction

If the Selling Debtor Entities receive one or more Qualified Bids in addition to the Agreement, the Selling Debtor Entities will conduct an auction (the "Auction") of the Acquired Assets and the Bearings Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. (prevailing Eastern time) on February 13, 2008, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or 333 West Wacker Drive, Chicago, Illinois 60606 (at the Selling Debtor Entities' election) or such later time or other place as the Selling Debtor Entities notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second Business Day prior to the Sale Hearing), in accordance with the following procedures:

(a)    Only the Sellers, the Buyers, any representative of the Creditors' Committee and the Equityholders' Committee, any representative of the Selling Debtor Entities' secured lenders under their postpetition credit facility (and the legal and financial advisers to each of the foregoing), any representative of the UAW, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only the Buyers and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(b)    At least one Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Selling Debtor Entities whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Selling Debtor Entities will provide copies of the Qualified Bid or combination of Qualified Bids which the Selling Debtor Entities believe is the highest or otherwise best offer to the UAW and all Qualified Bidders who have informed the Selling Debtor Entities of their intent to participate in the Auction.

(c)    All Qualified Bidders who have submitted Qualified Bids will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

(d)    The Selling Debtor Entities may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith.

(e)    Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $250,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each Qualified Bidder has had the opportunity

6

to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyer), the Selling Debtor Entities may give effect to any Break-Up Fee or Expense Reimbursement that may be payable to the Buyer under the Agreement as well as any assets and/or equity interests to be retained by any Selling Debtor Entity.

## Selection Of Successful Bid

At the conclusion of the foregoing steps in the Auction, or as soon thereafter as practicable, the Sellers, in consultation with their financial advisors, will: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer for the Acquired Assets and the Bearings Business received at the Auction (the "Successful Bid(s)," and the bidder(s) making such bid, the "Successful Bidder(s)").

The Selling Debtor Entities will sell the Acquired Assets for the highest or otherwise best Qualified Bid to the Successful Bidder(s), upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.  If, after an Auction in which the Buyer: (i) will have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement, and (ii) is the Successful Bidder, it will, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid, less (b) the Break-Up Fee.

The Selling Debtor Entities' presentation of a particular Qualified Bid to the Court for approval does not constitute the Selling Debtor Entities' acceptance of the bid.  The Selling Debtor Entities will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

## The Sale Hearing

The Sale Hearing will be held before the Honorable Judge Robert Drain on February 21, 2008 at 10:00 a.m. (prevailing Eastern Time) in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, but may be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If the Selling Debtor Entities do not receive any Qualified Bids (other than the Qualified Bid of Buyer), the Selling Debtor Entities will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Buyer following entry of the Sale Approval Order.  If the Selling Debtor Entities do not receive additional Qualified Bids, then, at the Sale Hearing, the Selling Debtor Entities will seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder").  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Selling Debtor Entities or the Successful Bidder, or (ii) a breach or failure to perform on the part of such Successful Bidder, then the Alternate Bid will be

7

deemed to be the Successful Bid and the Selling Debtor Entities will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid without further order of the Bankruptcy Court.

## Return Of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two Business Days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder, together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Selling Debtor Entities will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of the Selling Debtor Entities. On the Return Date, the Selling Debtor Entities will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

## Reservations Of Rights

The Selling Debtor Entities, after consultation with the agents for their secured lenders and the Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject at any time any bid (other than the Buyers' bid) that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Selling Debtor Entities, their estates, and stakeholders as determined by Selling Debtor Entities in their sole discretion.

8

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

        In re                       :       Chapter 11

                             :

DELPHI CORPORATION, <u>et al.</u>,     :       Case No. 05-44481 (RDD)

                             :

               Debtors.    :       (Jointly Administered)

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002 AND 9014 (I)
APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID
PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE
NOTICES, AND (IV) SETTING SALE HEARING DATE IN CONNECTION
<u>WITH SALE OF DEBTORS' BEARINGS BUSINESS</u>

("BEARINGS BIDDING PROCEDURES ORDER")

           Upon the expedited motion, dated January 15, 2008 (the "Motion"), of

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

orders pursuant to 11 U.S.C. §§ 363, 365, and 1146 and Fed. R. Bankr. P. 2002, 6004,

6006, and 9014 (a)(i) approving the bidding procedures set forth herein and attached

hereto as <u>Exhibit 1</u> (the "Bidding Procedures"), (ii) granting certain bid protections, (iii)

approving the form and manner of sale notices, and (iv) setting a sale hearing date (the

"Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of

substantially all of the non-cash assets (the "Acquired Assets") primarily used in the

Debtors' global bearings business, free and clear of liens, claims, encumbrances, and

interests to ND Acquisition Corp. (the "Buyer") pursuant to the Sale And Purchase

Agreement, dated January 15, 2008, by and between certain affiliated chapter 11 Debtors



as set forth in the Agreement (the "Selling Debtor Entities")[1] and the Buyer (the

"Agreement")[2] or to the Successful Bidder (as hereinafter defined) submitting a higher or

otherwise better bid, (ii) the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain

postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and

collectively with the Assumed Contracts, the "Assigned Contracts") to the Buyer or the

Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed

Liabilities") by the Buyer or the Successful Bidder; and upon the record of the hearing

held on January 25, 2008 with respect to the Motion (the "Bidding Procedures Hearing");

and after due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.       The Court has jurisdiction over this matter and over the property of

the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and

1334.

B.       This matter is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A), (N), and (O).

C.       The relief requested in the Motion as granted herein is in the best

interests of the Selling Debtor Entities, their estates, their stakeholders, and other parties-

in-interest.

---

[1]       Under the Agreement, the Selling Debtor Entities are comprised of Delphi Automotive Systems
          LLC and Delphi Technologies, Inc.

[2]       Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them
          in the Agreement.

[3]       Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed
          as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

2

D.      The notice of the Motion and the Bidding Procedures Hearing given by the Selling Debtor Entities constitutes due, sufficient, and timely notice thereof.

E.      The Selling Debtor Entities have articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures, (ii) grant certain bid protections as provided in the Agreement and in this order, (iii) approve the manner of notice of the Motion, the Sale Hearing, and the assumption and/or assignment of the Assigned Contracts, (iv) approve the form of notice of the Motion and the Sale Hearing to be distributed to stakeholders and other parties-in-interest, including prospective bidders, (v) approve the form of notice of the assumption and assignment of the Assumed Contracts to be filed with the Court and served on parties to each Assumed Contract, and (vi) set the Sale Hearing.

F.      The Break-Up Fee and the Expense Reimbursement may be paid in accordance with the terms, conditions, and limitations of the Agreement, as modified by this order (together, the "Bid Protections"), (i) if triggered, shall be deemed an actual and necessary cost and expense of preserving the Selling Debtor Entities' estates, within the meaning of sections 503 and 507(b) of the Bankruptcy Code, (ii) are of substantial benefit to the Selling Debtor Entities' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the Sale and the efforts that have been and will be expended by the Buyer notwithstanding that the proposed Sale is subject to higher or better offers for the Acquired Assets, (iv) were negotiated by the parties at arms' length and in good faith, and (v) are necessary to ensure that the Buyer will continue to pursue their proposed acquisition of the Acquired Assets.  The Bid Protections were a material inducement for, and condition of, the Buyer's entry into the Agreement.  The Buyer is

3

unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless they are assured of payment of the Bid Protections.  Thus, assurance to the Buyer of payment of the Bid Protections promoted more competitive bidding by inducing the Buyer to hold its bid open.  Without the Bid Protections, other bidding would have been limited.  Further, because the Bid Protections induced the Buyer to research the value of the Acquired Assets and to submit a bid that will serve as a minimum or floor bid on which other bidders can rely, the Buyer has provided a benefit to the Selling Debtor Entities' estates by increasing the likelihood that the price at which the Acquired Assets are sold will reflect their true worth.  Finally, absent authorization of the Bid Protections, the Selling Debtor Entities may lose the opportunity to obtain the highest or otherwise best available offer for the Acquired Assets.

G.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Acquired Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

Bidding Procedures

1.    The Bidding Procedures, as set forth on Exhibit 1 attached hereto and incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern all proceedings relating to the Agreement and any subsequent bids for the Acquired Assets in these cases, and the Auction, if applicable.

2.    The Selling Debtor Entities may: (i) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer, (ii) consult with the representative of any official committee or significant constituent in connection with the Bidding Procedures, and (iii) reject at any time before entry of an order of the Court

4

approving a Qualified Bid any bid (other than the Buyer's bid) which, in the Selling

Debtor Entities' sole discretion, is (a) inadequate or insufficient, (b) not in conformity

with the requirements of the Bankruptcy Code or the Bidding Procedures, or (c) contrary

to the best interests of the Selling Debtor Entities, their estates, and their stakeholders.

The Selling Debtor Entities are authorized (x) to terminate the Bidding Process or the

Auction at any time if they determine, in their business judgment, that the Bidding

Process will not maximize the value of the Acquired Assets to be realized by the Selling

Debtor Entities' estates and (y) to seek Bankruptcy Court approval of the Agreement with

the Buyers.

<u>Sale Hearing</u>

       3.      The Court shall hold a Sale Hearing on February 21, 2008 at 10:00

a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, Room 610, New York, New York 10004, at

which time the Court shall consider the remainder of the Motion not approved by this

Order, approve the Successful Bidder, and confirm the results of the Auction, if any.

Objections to the Motion, if any, shall be filed and served no later than 4:00 p.m.

(prevailing Eastern time) on February 14, 2008 (the "Objection Deadline").

       4.      The failure of any objecting person or entity to timely file and

serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale

Hearing or thereafter, of any objection to the Motion, the Sale, or the Selling Debtor

Entities' consummation and performance of the Agreement (including the transfer of the

Acquired Assets and Assigned Contracts free and clear of liens, claims, interests,

encumbrances (and in the case of Assumed Contracts, defenses)), with the exception of

any objection to the conduct of the Auction or the Selling Debtor Entities' selection of the Successful Bidder, which may be made at the Sale Hearing.

    5.  The Sale Hearing, or any portion thereof, such as with respect to the proposed assumption and assignment of a particular executory contract, may be adjourned by the Debtors from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

Bid Protections

    6.  The Bid Protections, as modified by this order, are hereby approved, and any and all objections to the Bid Protections that were not consensually resolved at or before the Hearing are hereby overruled.  Notwithstanding anything to the contrary in Section 9.2 of the Agreement, (i) the Buyer's right to seek an Expense Reimbursement shall be capped at $1 million and (ii) if a Qualified Bid is received on or before the Bid Deadline, the Buyer shall not be eligible to receive the Break-Up Fee or Expense Reimbursement or to participate in the Auction unless, prior to or at the Auction, it has waived the financing contingency set forth in Section 7.2.5 of the Agreement, provided, however that item (ii) does not apply if no Qualified Bids exist as of the Bid Deadline.  Notwithstanding anything to the contrary in the Bid Procedures, a bid is not qualified if it is conditioned on the bidder obtaining financing.

    7.  The Selling Debtor Entities' obligation to pay the Bid Protections, as provided by the Agreement and modified by this order, shall survive termination of the Agreement and, until paid in accordance with the Agreement, shall constitute a superpriority administrative expense claim in favor of the Buyer.  The Selling Debtor

6

Entities shall be authorized to pay the Bid Protections to the Buyer in accordance with the

terms of the Agreement without further order of the Court.

Notice

8.      Notice of (i) the Motion, including the proposed Sale of the

Acquired Assets to the Buyer, (ii) the Sale Hearing, the Bid Deadline, and the Auction,

and (iii) the proposed assumption and assignment of the Assumed Contracts to the Buyer

pursuant to the Agreement or to a Successful Bidder (and any deadlines for objections

associated therewith) shall be good, sufficient, and timely notice, and no other or further

notice shall be required, if notice is given as follows:

(a)    Notice Of Sale Hearing.  Within five days after entry of this
order (the "Mailing Date"), the Debtors (or their agent) shall serve the Motion, the
Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the
Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the Office of the
United States Trustee for the Southern District of New York, (ii) counsel for the Buyers,
(iii) counsel for the official committee of unsecured creditors appointed in these chapter
11 cases, (iv) counsel for the official committee of equity security holders appointed in
these chapter 11 cases, (v) counsel for the agent under the Debtors' postpetition credit
facility, (vi) all entities known to have expressed an interest in a transaction with respect
to the Acquired Assets during the past six months, (vii) all entities known to have
asserted any lien, claim, interest or encumbrance in or upon the Acquired Assets, (viii) all
federal, state, and local regulatory or taxing authorities or recording offices, including but
not limited to environmental regulatory authorities, which have a reasonably known
interest in the relief requested by the Motion, (ix) all parties to Assigned Contracts, (x)
the United States Attorney's office, (xi) the United States Department of Justice, (xii) the
Securities and Exchange Commission, (xiii) the Internal Revenue Service, and (xiv) all
entities on the Master Service List (as defined by the Supplemental Order Under 11
U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014
Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And
Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management
Order")).

(b)    Assumption/Assignment Notice For Buyer.  At least 20 days
prior to the Sale Hearing, the Selling Debtor Entities shall file with the Court and serve
on all non-Debtor parties to the Assigned Contracts a notice (the "Buyer Assumption/
Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 2,
identifying the Buyer as the party which will be assigned all of the Selling Debtor

7

Entities' right, title, and interest in the Assigned Contracts, subject to completion of the bidding process provided under the Bidding Procedures. The non-Debtor party to an Assumed Contract shall have ten days from the service of the Buyer Assumption/ Assignment Notice to object to the proposed assumption and assignment to the Buyer and shall state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Buyer and shall be forever barred from asserting any objection with regard to the assumption and assignment.

(c)    Assumption/Assignment Notice For Qualified Bidders.  At least 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, whichever is later, the Selling Debtor Entities shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 3, to be sent to each non-Debtor party to an Assigned Contract identifying all Qualified Bidders (except the Buyer, which notice shall be governed by the Buyer Assumption/Assignment Notice set forth above). The non-Debtor party to an Assumed Contract shall have ten days from the service of the Qualified Bidder Assumption/Assignment Notice to object to the proposed assumption and assignment to any Qualified Bidder and shall state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to any Qualified Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

(d)    Publication Notice. On or before the Mailing Date, or as soon thereafter as is practicable, the Debtors shall cause notice substantially in the form of the notice attached hereto as Exhibit 4 to be published in the Wall Street Journal (International Edition), the New York Times, and the Sandusky Register.

9.    To the extent that any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with, or derogates from the provisions of this order, the provisions of this order shall control. The Debtors' obligations under this order and the portions of the Agreement pertaining to the Bid Protections shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon Debtors, and the reorganized or reconstituted debtors, as the case may be, after the effective date of the confirmed plan or plans in the Debtors' cases.

8

10.    Notwithstanding rules 6004(h), 6006(d), 7062, or 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") or any other

Bankruptcy Rule or rule 62(a) of the Federal Rules of Civil Procedure, this order shall be

immediately effective and enforceable upon its entry and there shall be no stay of

execution of this order.

11.    This Court shall retain jurisdiction to hear and determine all

matters arising from the implementation of this order.

12.    The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the

Motion.

Dated:    New York, New York
          January 25, 2008


                                    /s/ Robert D. Drain
                                    UNITED STATES BANKRUPTCY JUDGE

9

# EXHIBIT H

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---------|---------|----------|----------|------|-------|-----|
| ENVIRONMENTAL PROTECTION AGENCY | | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW | WASHINGTON | DC | 20460 |
| ENVIRONMENTAL PROTECTION AGENCY | MARCUS C PEACOCK D | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW | WASHINGTON | DC | 20460 |
| US EPA MAIL CODE 6205J | | 1200 PENNSYLVANIA AVENUE NW | | WASHINGTON | DC | 20460 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

2/22/2008 3:25 AM
Overnight - Divestures - Environmental Special Parties