**Hearing Date and Time: February 29, 2008 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (IL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                        Debtor.           :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO UNITED STATES OF AMERICA'S
MOTION FOR LEAVE TO FILE LATE CLAIM

1.      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby object (the "Objection") pursuant to Rule 9006 of the Federal Rules of Bankruptcy

Procedures (the "Bankruptcy Rules"), to the United States Of America's Motion For Leave To

File Late Claim (Docket No. 12831) (the "Motion") filed by the United States of America (the

"Government").  In support of this Objection, the Debtors submit (i) the Declaration Of Evan

Gershbein In Support Of Debtors' Objection To United States Of America's Motion For Leave

To File Late Claim, executed and sworn to on February 27, 2008 by Evan Gershbein of

Kurtzman Carson Consultants LLC ("KCC"), the noticing agent in these chapter 11 cases (the

"Gershbein Declaration"), a copy of which is attached hereto as Exhibit A and (ii) the

Declaration Of Dean Unrue In Support Of Debtors' Objection To United States Of America's

Motion For Leave To File Late Claim, executed and sworn to on February 27, 2008 by Dean

Unrue, the claims administrator for Delphi in these chapter 11 cases (the "Unrue Declaration"), a

copy of which is attached hereto as Exhibit B.  In further support of this Objection, the Debtors

respectfully represent as follows:

Preliminary Statement

2.      On August 26, 2006, the Equal Employment Opportunity Commission

(the "EEOC") received a call from Stanley Straughter.  Mr. Straughter is a former temporary

employee hired postpetition who Delphi allegedly terminated on August 17, 2006 for refusing to

execute a medical release form to allow a Delphi doctor to confirm with Mr. Straughter's

personal physician that he was absent from work due to a medical condition.  Jennifer Carlo, an

investigator employed by the EEOC, promptly investigated Mr. Straughter's complaint that

Delphi violated his rights under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101

2

et seq., (the "ADA") by reason of this policy.  Three weeks later, Ms. Carlo drafted a charge of

discrimination which Mr. Straughter reviewed, approved, and filed with the EEOC.  The charge

of discrimination asserted, among other things, that Mr. Straughter's rights under the ADA were

violated due to Delphi's "policy and/or practice of making unlawful medical inquiry when

employees are out sick."  See Charge of Discrimination, attached as part of Exhibit C to the

Declaration of Margaret A. Malloy (the "Malloy Declaration") (Docket No. 12832).

3.        It is uncontested that four months earlier, the EEOC was served with the

Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7),

3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving

Form And Manner Of Notice Thereof, entered by this Court on April 12, 2006 (Docket No. 3206)

(the "Bar Date Order") setting a bar date of July 31, 2006 (the "Bar Date") for creditors to file

proofs of claim in Delphi's chapter 11 cases and, in fact, did not file a timely proof of claim.  It is

also uncontested that Delphi served substantially all of its employees with the Bar Date Order

and, with the exception of Mr. Straughter, not a single employee ever filed a proof of claim

asserting that he or she was injured by Delphi's supposedly unlawful medical release policy.

4.        Moreover, even though the Government has asserted that the EEOC was

not aware of Delphi's allegedly unlawful policy at the time the bar date expired, there is no doubt

that the EEOC learned of this policy in September 2006 when Ms. Carlo actively began to work

with Mr. Straughter to prosecute his charge of discrimination against Delphi.  Notwithstanding

this knowledge, the EEOC inexplicably waited until October 2007, almost 13 months later,

before filing proof of claim number 16727 (the "Proof of Claim") asserting an unliquidated claim

on behalf of potential employees who were damaged by this policy prior to October 8, 2005 (the "Petition Date") (the "ADA Claim").[1]

5.        During this 13-month delay, Delphi undertook a massive claims estimation project to set a limit for <u>asserted</u> trade and other prepetition general unsecured claims (the "EPCA Target") that ultimately evolved into a closing condition that Delphi was required to meet, among other conditions, to obtain funding under a plan of reorganititon from a group of outside investors (the "Plan Investors").  Throughout 2006 and into 2007, the EPCA Target was modified to account for progress made during Delphi's expedited claims administration process and to otherwise update claims estimates.  In early September 2007, the EPCA Target was finalized at $1.45 billion and incorporated into Delphi's plan of reorganization (the "Plan").

6.        Because the EEOC's proof of claim was never filed in the Debtors' chapter 11 cases prior to the setting of the EPCA Target, the Debtors did not consider the EEOC's proof of claim in fixing, or measuring compliance with, the EPCA Target.  During the confirmation hearing, Dean Unrue, the Delphi claims administrator, testified that the Debtors were below the EPCA Target by a mere $2 million.  Based in part upon Mr. Unrue's testimony, this Court found the Plan was feasible and confirmed the Plan.

7.        After Mr. Unrue testified, and one day before this Court entered an order confirming the Plan, the EEOC finally responded to Delphi's month-old request to set a consensual cap regarding the EEOC's late claim until the merits of the claim, including whether the claim should be expunged on timeliness grounds, could be adjudicated in due course.  The

---

[1]    Although the Debtors deny engaging in any illegal conduct under the ADA, to the extent the EEOC is pursuing a claim solely on Mr. Straughter's behalf, the Debtors do not, by this Objection, seek to disallow and expunge such claim on timeliness grounds because Mr. Straughter's claim clearly arose postpetititon and, if valid, would constitute an administrative expense claim not subject to the Bar Date Order.  However, in the Proof of Claim, the EEOC is pursuing prepetition claims on behalf of other employees that it alleges were harmed by Delphi's medical release policy prior to the Petition Date.  It is this claim that is subject to the Motion and this Objection and which the Debtors are now seeking to have disallowed and expunged.

4

EEOC informed the Debtors that it could only agree to a cap of $15 million.  It based this

number on potential damages of $100,000 per employee for 150 Delphi employees allegedly

adversely affected by Delphi's sick leave policy.  In justifying this number, the EEOC indicated

its belief that the number could go even higher, stating that an additional 500 employees could

receive similar damages.  In its proposal, the EEOC did not, and still has not, identified a single

Delphi employee nationwide, other than Mr. Straughter, who even arguably suffered any

economic injury due to Delphi's allegedly unlawful policy.  The EEOC also stated separately that

if Delphi sought to estimate, on a nonconsensual basis, the Proof of Claim in the Bankruptcy

Court, the EEOC would file a motion to withdraw the reference to the United States District

Court for the Western District of New York.  The settlement proposal was in stark contrast to a

previous offer made by the EEOC to Delphi to resolve the entire Straughter matter for back pay,

$115,000.00 for pain and suffering damages, and establishment of a fund in the amount of

$200,000.00 to compensate other similar plaintiffs.

        8.      Pursuant to this Court's protocol, Delphi filed a notice requiring the

EEOC to file a motion for leave to file a late claim.  On February 22, 2008, the Government filed

the Motion and, in support, submitted a declaration of Margaret Malloy, the EEOC's trial lawyer

assigned to the Straughter matter.  Surprisingly, the EEOC did not submit a declaration of Ms.

Carlo, the EEOC's chief investigator for the Straughter matter and the person at the EEOC with

primary knowledge of facts relevant to the Motion.  Instead, the EEOC decided to support its

request with the declaration of a lawyer who did not even join the EEOC until late December

2006 and first became involved in the Straughter matter sometime in the summer of 2007.  See

Transcript of February 25, 2006 deposition of Margaret Malloy ("Malloy Dep. Tr."), attached

hereto as Exhibit C at 7:23-8:2; 24:10-17.  She could not even recall when she became involved

in the Straughter matter but placed her involved sometime before May 22, 2007.  Id. at 51:12-16.

Thus, she had no first hand knowledge of what the EEOC knew in September 2006 much less

why it did not file a proof of claim when it received the charge of discrimination.  Moreover,

based upon instruction of her counsel, she generally refused to answer questions regarding facts

set forth in her declaration, including whether the EEOC knew whether any Delphi employee,

other than Mr. Straughter and three other reprimanded employees (each of whom only received

written reprimands but were not fired), actually suffered economic injury by reason of Delphi's

supposedly unlawful medical release policy.  Id. at 30:3-19; 31:23-32:3; 66:13-65:3.  Thus,

because Ms. Malloy has no personal knowledge of the underlying facts during the relevant time

period or, alternatively, refused to answer questions concerning potentially relevant facts, the

EEOC has failed to submit credible, probative evidence in support of its Motion, thus warranting

denial.  Id. at 21:19-25; 29:22-30:14; 31:17-32:4; 33:6 -12; 36:13-24; 49:15-20; 51:22-53:9;

56:13-57:2; 61:7-18.

9.      Moreover, even if the Government's evidentiary submissions are

considered by the Court, it still cannot demonstrate excusable neglect under the Pioneer

factors.  First and foremost, the Government has not provided any rational explanation why the

EEOC waited over 13 months after learning of Delphi's supposedly unlawful policy before filing

a proof of claim.  Ms. Malloy offers no reason in her declaration and, when asked at deposition

why the EEOC waited 13 months to file its proof of claim, her lawyer instructed her not to

answer on the grounds that such information could not be divulged because of privilege.  Id. at

49:15-20.[2]  Furthermore Ms. Malloy confirmed that filing a proof of claim on behalf of the

EEOC could have been done at any time and did not require levels of internal approval or any

other lengthy authorization.  Id. at 34:6-35:7.  Thus, the ability to file a proof of claim was

---

[2]      At Ms. Malloy's deposition, the EEOC's counsel made a standing instruction to the wtiness not to answer
questions when he objected to a question on the basis of a privilege.  Id. at 13: 9-17.

clearly within the EEOC's control.  For unknown reasons, it waited until October 2007 to finally file the Proof of Claim.

10.    Second, the Debtors suffered prejudice as a result of the delay.  Because the Proof of Claim was not promptly filed, the Debtors were unable to build in the asserted amount of the Proof of Claim into the EPCA Target and, if necessary, adjust the EPCA Target if claims litigation was unsuccessful in reducing or disallowing the EEOC's claim.  Although the Debtors believe the EEOC's potential estimate of its claim is baseless, the size of the EEOC's asserted estimate underscores the prejudice to the Debtors if the Motion is granted.

11.    Third, the length of the delay and impact on Delphi's judicial proceedings further dictates denial of the Motion.  As stated above, during the 13-month delay, the Debtors set the EPCA Target and prosecuted claims objections to meet the stringent requirements imposed under the agreements with the Plan Investors.  If the Motion is granted, not only could it erode the progress the Debtors have achieved since confirmation to further reduce claims below the EPCA Target, but it could open the floodgates to other late claims that could jeopardize compliance with the EPCA Target and, accordingly, the Debtors' emergence from chapter 11.

12.    Finally, the timing of the filing of the proof of claim, the EEOC's disproportionate response to the Debtors' request to consensually cap the EEOC's unliquidated claim, and its threat to further delay adjudication of the claim by seeking to withdraw the reference if this Court tries to estimate the EEOC claim, allows this Court to draw its own inference regarding whether the EEOC is acting in good faith in prosecuting the Motion.  For the reasons set forth herein, the Motion should be denied and the Proof of Claim disallowed and expunged.

7

<u>Background</u>

13.    On April 12, 2006, this Court entered the order (Docket No. 3206)

establishing the Bar Date.

14.    On April 20, 2006, KCC served copies of the Bar Date Notice on a

comprehensive list of individuals and entities.  Specifically relevant to the ADA Claim, KCC

served the Bar Date Notice on the EEOC via U.S. mail at the address below, which is the address

of the EEOC set forth in the Complaint:

> EEOC
> 1801 L St. NW
> Washington, D.C.  20507

Gershbein Declaration at ¶4.  KCC also served the Bar Date Notice on the U.S. Attorney for the

Southern District of New York via U.S. mail at the address below:

> David N. Kelly USA
> US Attorney S District Of NY
> One St. Andrews Plaza
> New York, NY  10007

<u>Id.</u> at ¶ 4.  Finally, among the parties upon whom KCC served the Bar Date Notice were

substantially all Delphi employees.  Unrue Declaration at ¶¶ 4-6; Gershbein Declaration at ¶ 5.

15.    By the July 31, 2006 Bar Date, neither the EEOC nor any Delphi

employee filed a claim that asserted the allegedly discriminatory conduct set forth in the ADA

Claim.

16.    On August 17, 2006, Mr. Straughter, a temporary employee who was

hired by Delphi on May 22, 2006, was terminated.  <u>See</u> Malloy Declaration at ¶¶ 4-8.  On

September 22, 2006, Mr. Straughter filed a charge of discrimination with the EEOC.  <u>Id.</u>  The

EEOC did not file a proof of claim on account of the ADA Claim until approximately 13 months

later, on October 17, 2007.

8

17.     Over 16,000 proofs of claim were timely filed by the Bar Date.  Together with scheduled liabilities for which no proof of claim had been filed, these proofs of claim asserted more than $36 billion in liquidated amounts plus certain unliquidated amounts.

18.     Throughout the summer and fall of 2006, the Debtors were heavily involved in framework discussions with their key stakeholders to come to an agreement on a plan for the Debtors' emergence from chapter 11.  See Unrue Declaration at ¶ 10.  It became apparent that the Debtors' ability to consummate a framework agreement, and obtain necessary funding from outside investors, was predicated upon a clear understanding of the scope of the general unsecured claims that would ultimately be allowed in these cases.  Id.  To that end, in October and November 2006, the Debtors began a massive internal claims estimation effort to gauge the scope and amount of general unsecured claims anticipated at emergence from chapter 11 and devised detailed claims administration procedures to efficiently and expeditiously adjudicate disputed and unliquidated claims.  Id.

19.     On December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with the Plan Investors and a plan framework support agreement with those investors and General Motors Corporation, both of which contained the EPCA Target, a limit on trade and other unsecured claims that could not be exceeded as a condition to plan funding.  Id. at ¶ 11.

20.     The Debtors then began an extensive claims administration process designed to expeditiously reduce the claims pool to meet the EPCA Target, filing 27 omnibus claims objections to date.  Id. at ¶ 12.

21.     Throughout late 2006 and into 2007, the EPCA Target was modified to account for progress made during Delphi's expedited claims administration process and to

9

otherwise update claims estimates.  Id. at ¶ 13.  In early September 2007, the EPCA Target was

finalized at $1.45 billion and incorporated into Delphi's plan of reorganization (the "Plan").  Id.

22.     On September 28, 2007, without leave of this Court, the EEOC filed a

complaint against Delphi in the United States District Court for the Western District of New

York alleging violations of the ADA based on Mr. Straughter's charge of discrimination and on

behalf of Mr. Straughter and other unidentified Delphi employees (the "Complaint").  On

October 18, 2007, also without leave of this Court, and 15 months after the Bar Date and at least

13 months after the EEOC knew of the ADA Claim, the EEOC filed the Proof of Claim,

attaching a copy of the Complaint.  The Debtors objected to the ADA Claim on October 26,

2007 (Docket No. 10738).

23.     As early as November 20, 2007, however, counsel for the Government

and the Debtors began to discuss a possible resolution of the Debtors' objection to the ADA

Claim, including capping the ADA Claim.  On January 24, 2008, counsel for the Government

sent counsel for the Debtors an email indicating that the EEOC would not agree to cap the ADA

Claim in an amount less than $15 million.

24.     This was in stark contrast to the Government's previous offer to Delphi

eight months earlier to settle the matter at a fraction of the proposed $15 million amount.  By

letter dated May 23, 2007, a copy of which is attached as Exhibit N to the Malloy Declaration,

the EEOC initially made Delphi an offer of conciliation to settle the Straughter matter, which

offer included, among other things, (a) back pay for Straughter, (b) $115,000.00 for "emotional

distress, pain, suffering, humiliation or embarrassment", and (c) the creation by Delphi of a

$200,000.00 fund to provide compensation for other Delphi employees affected by Delphi's

allegedly discriminatory conduct.  Delphi did not accept the EEOC's offer.

25.    On January 25, 2008, this Court entered an order (Docket No. 12359)

confirming the Plan.  The effectiveness of the Plan is contingent on, among other things,

satisfaction of the EPCA Target.

<u>Argument</u>

A.    <u>The EEOC Was Properly Served With And Is Presumed To Have Received The Bar Date
Notice</u>

26.    The EEOC does not contest, nor could it, that KCC served the Bar Date

Notice on both the EEOC and the U.S. Attorney for the Southern District of New York.

Gershbein Declaration at ¶ 4.  Even if it did, there is a presumption that the EEOC was properly

served with the Bar Date Notice by KCC's confirmation that it mailed the Bar Date Notice to

both parties.  <u>See</u> <u>Hagner v. U.S.</u>, 285 U.S. 427, 430 (1932) ("proof that a letter properly directed

was placed in a post office creates a presumption that it reached its destination in usual time and

was actually received by the person to whom it was addressed"); <u>In re Mid-Miami Diagnostics,

L.L.P.</u>, 195 B.R. 20, 22 -23 (Bankr. S.D.N.Y. 1996) ("A creditor's denial of receipt, standing

alone, does not rebut the presumption that the mail was received, but merely creates a question of

fact.").  "While the presumption [of receipt] is a rebuttable one, it is a very strong presumption

and can only be rebutted by specific facts and not by invoking another presumption and not by a

mere affidavit to the contrary."  <u>In re Dana Corp.</u>,  No. 06-10354, 2007 WL 1577763, *4

(Bankr.S.D.N.Y. May 2007).  The Government has failed to present any objective evidence to

rebut this presumption.

27.    Because the EEOC is presumed to have received the Bar Date Notice, it

was obligated to follow the procedures referenced therein to file a proof of claim, or risk having

its claim barred.  The EEOC did not file the Proof of Claim before the Bar Date,[3] and it should

not be granted an extension of the Bar Date.

B.    The Government Has Not Met Its Burden Of Proof For Establishing Excusable Neglect
      Under Bankruptcy Rule 9006(b)

28.    Because the EEOC is presumed to have received the Bar Date Notice, the

EEOC can file the untimely Proof of Claim only if the Government meets its burden to establish

excusable neglect.  See In re R.H. Macy & Co., Inc., 161 B.R. 355, 360 (Bankr. S.D.N.Y. 1993)

("the burden of proving 'excusable neglect' is on the creditor seeking to extend the bar date").

The Government cannot meet this burden.

29.    The United States Supreme Court has outlined factors to be considered in

determining whether there is excusable neglect on the part of the moving party, which includes:

"the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial

proceedings, the reason for the delay, including whether it was within the reasonable control of

the movant, and whether the movant acted in good faith."  Pioneer Inv. Servs. Co. v. Brunswick

Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  The Second Circuit applied the factors set forth

in Pioneer and noted that "reason for the delay" is the most important factor in the analysis.

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115,

123 (2d Cir. 2005).  The Second Circuit has also noted that, under the Pioneer standard, "'the

equities will rarely if ever favor a party who fails to follow the clear dictates of a court rule' and

'that where the rule is entirely clear, we continue to expect that a party claiming excusable

neglect will, in the ordinary course, lose under the Pioneer test.'"  Id. (quoting Silivanch

v.Celebrity Cruises, Inc., 333 F.3d 355, 366-67 (2d Cir. 2003)).  Here, the EEOC's alleged

---

[3]    As noted above, the EEOC filed proof of claim number 14821, on the Bar Date, which asserted a completely
different claim than the ADA Claim.  Filing a proof of claim on the Bar Date suggests that the EEOC was in
fact served, and had knowledge of, the Bar Date.

reason for its delay – that it did not know of the existence of the ADA Claim until after the Bar

Date and that it took 13 months to investigate the claim – does not warrant a departure from the

Second Circuit's strict approach.  The EEOC waited at least 13 months after it knew of the ADA

Claim to file the Proof of Claim and the employees on whose behalf the ADA Claim is asserted

knew, or should of known, of the ADA Claim well before the Bar Date.  This delay, including

the EEOC's failure to adequately explain the delay, coupled with the other <u>Pioneer</u> factors,

including the prejudice to the Debtors, weighs heavily against permitting EEOC to file a late

proof of claim.

      (i)      The EEOC's Alleged Lack Of Knowledge Of The ADA Claim
                    <u>Does Not Constitute Excusable Neglect</u>

      30.      The Government asserts that the reason for the EEOC's delay in filing the

Proof of Claim was that the EEOC did not know about the existence of the ADA Claim until

after the Bar Date.  <u>See</u> Motion at 2.  Although the Government asserts that the EEOC exercised

"efficient and diligent prosecution of its claims," it has not, however, provided factual support to

justify the EEOC's 13-month delay.  Further, the employees on whose behalf the Complaint and

Proof of Claim were filed had, or should have had, knowledge of the claim at the time the

conduct giving rise to such claim occurred, which would have been well in advance of the Bar

Date.  To allow the EEOC to pursue a recovery on behalf of employees who themselves knew of

the claims but missed the Bar Date would be to circumvent the policy behind the Bar Date with

respect to these employees by rewarding their failure to file a claim with a chance at recovery

simply because the EEOC did not know about the existence of a claim.

      31.      As noted above, the most important <u>Pioneer</u> factor in determining

excusable neglect is the reason for the delay.  <u>See</u> <u>Midland</u>, 419 F.3d at 123.  Even assuming that

the EEOC's lack of knowledge of the ADA Claim is a valid reason for delay – which, as

explained in further detail below, the Debtors dispute – the Government has not provided a valid explanation for the EEOC's 13-month delay after it had knowledge of the ADA Claim. Instead, the Government asserts that the EEOC was engaged in "efficient and diligent prosecution of its claims" and suggests that the Debtors are partially responsible for the EEOC's delay by not timely responding to the EEOC's information requests.

32.    However, even though it has the burden to prove excusable neglect, the only factual support submitted by the Government to support its allegations is the declaration of an EEOC lawyer, Ms. Malloy, who was not involved in the Straughter matter until sometime in the summer of 2007. <u>See</u> Malloy Dep. Tr. at 7:23-8:2; 24:10-17; 51:12-16. Because Ms. Malloy has no personal knowledge of what occurred prior to her involvement in the summer of 2007, the Government has provided no factual support to account for at least the first eight months of the EEOC's delay. Furthermore, when asked point-blank to explain the 13-month delay, the Government – again, the party with the burden of proof – has refused to provide a sufficient explanation, but rather has hid behind privileges. <u>Id.</u> at 49:15-20.

33.    Ms. Malloy did, however, confirm that the EEOC could have filed a proof of claim while it was completing its lengthy investigation of Mr. Straughter's allegations. <u>Id.</u> at 34:6-35:7. Indeed, Ms. Malloy testified that no extraordinary approvals were needed within the EEOC, or any other part of the Government, to file such a proof of claim and that the EEOC's investigation protocols did not need to be completed to file a proof of claim. <u>Id.</u> But again, even though the Government has the burden of proof, Ms. Malloy refused to explain why the EEOC failed to file such a claim until 13 months after discovering Delphi's supposedly unlawful medical release policy.

34.    In analyzing the reason (or lack thereof) for the EEOC's delay in the context of the <u>Pioneer</u> factors, a recent unpublished <u>Enron</u> decision is instructive. In that case, a

14

creditor, with a claim based upon a guaranty executed by the debtor, sought leave to file a proof

of claim approximately 20 months after the bar date.  In re Enron Corp., 2007 WL 294114, *2

(Bankr. S.D.N.Y. 2007).  The creditor asserted that its failure to timely file a claim was the result

of its inability to verify that the guaranty had actually been executed by the debtor, that the

creditor worked diligently to find an executed copy of the guaranty but was unable to do so until

well after the bar date, and that the debtor added to the delay by refusing to provide an executed

copy of the guaranty.  Id.  The court, however, held that the creditor did not satisfy the excusable

neglect standard.  Id. at *7.  In so holding, the court noted that the debtor was not obligated to

assist the creditor in finding a copy of the guaranty and that the creditor could have sought the

intervention of the court if it believed the debtor was not properly responding to the creditor's

inquiries.  Id. at *6.  In addition, the court noted that the creditor could have simply filed a proof

of claim without attaching an executed copy of the guaranty and explained why the executed

copy was missing.  Id.

        35.     Here, the Government offers no explanation for the EEOC's failure to file

a protective proof of claim while it completed its investigation, though Ms. Malloy admitted that

filing a proof of claim was within the reasonable control of the EEOC and it could have done so

without extraordinary approvals within the EEOC.  Malloy Dep. Tr. at 34:6-35:7.  In addition,

although the Debtors maintain that they acted properly during the EEOC's investigation, just as

the court in the Enron decision noted with respect to the creditor in that case, the EEOC could

have sought relief from this Court if it believed that the Debtors were not properly and timely

responding to its information requests in conjunction with its investigation.  The EEOC did not

make such a request.  As the Enron decision illustrates, the Government's unsupported argument

that the Debtors somehow caused the EEOC's delay does not meet the excusable neglect

standard.

36.     In the Motion, the Government suggests that not allowing the EEOC to file an untimely claim would put the EEOC "on the horns of a dilemma" because it would be forced to choose between filing a discrimination charge prior to a full investigation or not file a charge at all.  See Motion at 18.  The Government's argument misses the point.  As Ms. Malloy admitted, the EEOC could have filed a proof of claim prior to the completion of its supposed "full-blown investigation".  Malloy Dep. Tr. at 34:6-35:7.  Indeed, bar dates, by their very nature, necessarily put some creditors in the difficult position of having to quickly figure out what claims they may have and how they need to protect themselves, and claimants often file unliquidated and/or contingent claims to protect their rights even though they may not yet have all the information relevant to their claims, as the Debtors have experienced first-hand in these cases.[4]  The EEOC is no different than any of these other creditors, even if it is required by its own internal regulations to follow certain investigative protocol prior to filing an actual complaint asserting discrimination.  The EEOC could have filed a protective proof of claim during the 13 months after it learned of the ADA Claim, but chose not to, and has provided no justification for that choice.  See In re Calpine Corp., 2007 WL 4326738, *6-7 (S.D.N.Y. 2007) (finding that a delay of over six months in filing claims after bar date not result of excusable neglect and noting that the claimants "had the ability to . . . file supplemental Proofs of Claim at any time and have not offered any explanation as to why no such supplements were filed until such a late date."); In re Northwest Airlines Corp., 2007 WL 498285, *3 (Bankr. S.D.N.Y. 2007) ("[Movant] cannot properly ground its excusable neglect argument on the fact that it conducted

---

[4]     The Debtors note that the Bar Date was approximately 10 months after the Petition Date and only approximately four months after the Bar Date Notice was served, and thus all creditors had less than 13 months to complete their investigation and diligence, but most still managed to timely file claims.

an investigation and tried to resolve the issue by good faith negotiations.  All of this can be done

after a filing is first made and rights are preserved.").

      37.      Furthermore, the cornerstone of the Government's argument – that the

EEOC did not have knowledge of the ADA Claim until after the Bar Date – is undermined by the

fact that the employees who did have knowledge of a claim (to the extent one existed) did not

file proofs of claim.  Because the injunctive relief sought in the Complaint is prospective, it has

no bearing on, and, indeed, cannot be satisfied through, the Proof of Claim,[5] and thus the

compensatory relief for alleged <u>prepetition</u> violations of the ADA is the only relief relevant to

the Proof of Claim.  But, all employees on whose behalf this compensatory relief is sought would

have had knowledge of a claim at the time such discriminatory conduct occurred, and, to

preserve their rights to assert such a prepetition claim against the Debtors' estates, were obligated

to file a proof of claim regardless of whether the EEOC had knowledge of the claim.  <u>See</u>

<u>O'Loghlin v. County of Orange</u>, 229 F.3d 871, 874 (9th Cir. 2000) (holding that employee's

ADA claim based on prepetition conduct was discharged in bankruptcy where employee failed to

file proof of claim, even though employee never received right to sue letter from EEOC) (citing

<u>McSherry v. Trans World Airlines, Inc.</u>, 81 F.3d 739, 741 (8th Cir.1996)).

      38.      Because no employee filed a prepetition proof of claim arising from the

same set of facts as the ADA Claim,[6] the employees adversely affected by Delphi's allegedly

illegal conduct are barred from asserting an ADA claim against the Debtors based upon

prepetition conduct.  To allow the EEOC to file an untimely proof of claim on behalf of these

---

[5]    By their objection to the Proof of Claim, the Debtors are not seeking to cutoff any claim to injunctive relief, nor
    any other postpetition claim, that the EEOC holds.  Although the Debtors dispute the merits of any such claims,
    by this Objection they are seeking to expunge the prepetition Proof of Claim only.

[6]    Slaughter, the charging employee who initiated the ADA Claim, was not hired until after the Petition Date, and
    thus any claim that he holds did not arise prepetition.

employees, and recover compensatory damages directly for the benefit of such employees, on the grounds that the EEOC did not know about the ADA Claim, would allow the employees to circumvent the Bar Date by recovering, through the EEOC, on account of claims for which they are individually barred from asserting.  See E.E.O.C. v. Jefferson Dental Clinics, PA, 478 F.3d 690, 696-99 (5th Cir. 2007) (distinguishing between the EEOC's role when it seeks injunctive relief versus monetary relief and holding that res judicata precludes EEOC from recovering monetary damages on behalf of employee who previously lost individual state court discrimination case).[7]

39.    The Government relies on Lone Star Inds. v. Rankin County, Miss. Bd. of Supervisors (In re New York Trap Rock Corp.), 153 B.R. 642 (Bankruptcy S.D.N.Y. 1993) for the proposition that its alleged lack of knowledge of the ADA Claim excuses it from filing a timely proof of claim.  Contrary to the Government's assertions, Lone Star is inapposite.  In that case, the government asserted a claim against the debtor for cleanup and response costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") as a result of prepetition environmental contamination by the debtor.  Id. at 644.  Neither the Debtor

---

[7]    The Debtors acknowledge the Supreme Court's decision in E.E.O.C. v. Waffle House, Inc., 534 U.S. 279 (2002) and its limited holding that an arbitration agreement between an employee and employer does not preclude the EEOC from pursuing victim-specific monetary relief on behalf of such employee.  See also E.E.O.C. v. Sidley Austin LLP, 437 F.3d 695, 696 (7th Cir. 2006) (relying on Waffle House and holding that EEOC was not precluded from pursuing monetary damages on behalf of employees barred from bringing their own suits).  However, as acknowledged by the Supreme Court in its ruling, "The only issue before this Court is whether the fact that [the individual employee] has signed a mandatory arbitration agreement limits the remedies available to the EEOC."  Id. at 297.  Accordingly, Waffle House, which relied on part in the lack of privity of contract between the EEOC and an employer who signs an arbitration agreement with its employee, does not address the issue presented here.  Additionally, because of the unique factual circumstances presented in the bankruptcy context, only prepetition claims are affected by the Bar Date, and any remedy of the EEOC with respect to postpetition conduct, including injunctive relief, is unaffected.  Also, the fresh start policy underlying the Bankruptcy Code is unique to the bankruptcy context and was not present in the Waffle House or any other non-bankruptcy decision relying on Waffle House.  A debtor's ability to understand its prepetition claim and emerge from bankruptcy with a fresh start requires that it not be subject to late claims filed by the government on behalf of claimants that the debtor believed were otherwise barred by the bar date.  Accordingly, the Debtors believe that the limited holding of Waffle House is not applicable.

18

nor the government knew of the contamination until after the bar date.  Id. 647.  The court held

that the government's lack of knowledge of its claim may constitute excusable neglect.  Id.

However, a CERCLA claim is much different than an ADA claim and thus Lone Star is not

analogous to the issue at bar.  A CERCLA claim is based on environmental contamination that,

by its very nature, is difficult to detect at the point at which a claim arises because the

contamination usually occurs underground.  Not so with an ADA claim.  As noted above, an

employee adversely affected by unlawful employer conduct will known of his claim at the time

of such conduct.  Accordingly, the Lone Star court's analysis of an environmental claim is not

applicable to a discrimination claim, and Lone Star has little precedential value.

          40.     More importantly, however, the bankruptcy court, in a separate opinion

deciding the same matter, held that the claimant in Lone Star did not meet the excusable neglect

standard because, like the EEOC here, it waited to long to file its late claim.  See In re New York

Trap Rock Corp., 153 B.R. 648 (Bankr. S.D.N.Y. 1993).  The court noted that the government

waited nine months until after it knew of the existence of the oil contamination to file its

CERLCA claim and found that "the delay in filing the proposed claim since May and June of

1992, when the [government] first acquired actual notice of the potentially hazardous condition,

was solely within the [government's] control."  Id. at 653.  The court held that "[t]his delay is

inexcusable."  Id.  Here, the EEOC waited 13 months after it knew of the ADA Claim to file the

Proof of Claim.  Therefore, even if the first opinion in Lone Star supports the Government's

argument that the EEOC's lack of knowledge excuses its failure to meet the Bar Date, the later

decision squarely negates the EEOC's request for relief because the EEOC waited 13 months

after it learned of the ADA Claim to file the Proof of Claim.

(ii)        The Debtors Would Be Prejudiced By Allowing The EEOC To
           File A Late Claim

41.        Allowing the EEOC to file the Proof of Claim will prejudice the Debtors.

Although the EEOC's proposed claim itself may be only one of thousands, allowing the EEOC to

file the Proof of Claim may inspire many other similarly situated potential claimants to file

similar motions and thus would unfairly impede the Debtors' ability to meet a condition to its

emergence from chapter 11 pursuant to the confirmed Plan.  Courts have often looked primarily

to concerns about opening the floodgates to similar late-filed claims as a reason not to allow late

claims.  See, e.g., In re Enron Corp., 419 F. 3d 115, 132 (2d Cir. 2005); In re Kmart Corp., 381

F.3d 709, 714 (7th Cir. 2004) (noting that if court allowed all similar late-filed claims, "Kmart

could easily find itself faced with a mountain of such claims"); Enron Creditors Recovery Corp.,

__ B.R. __, 2007 WL 1705653, at *10-11 (Bankr. S.D.N.Y. June 13, 2007) ("It can be presumed

in a case of this size with tens of thousands of filed claims, there are other similarly-situated

potential claimants. . . . Any deluge of motions seeking similar relief would prejudice the

Debtors' reorganization process." (citation omitted)); In re Dana Corp.  2007 WL 1577763, *6

(Bankr.S.D.N.Y. 2007) ("the floodgates argument is a viable one").

42.        As stated above, in October and November 2006, the Debtors began a

massive internal claims estimation effort to gain an understanding of the scope and amount of the

general unsecured claims filed against the Debtors, which would be necessary for the Debtors to

obtain funding from outside investors and emerge from chapter 11.  See Unrue Declaration at 12.

In the year and a half since the Bar Date and the 15 months since the commencement of the

internal claims estimation effort, the Debtors have achieved great progress towards achieving the

EPCA Target.  Id. at 14.

20

43.     Had the EEOC filed its untimely unliquidated Proof of Claim a year earlier, when it first acquired actual notice of an alleged violation from Mr. Straughter's formal executed complaint against Delphi, the Debtors would have been able to include the Proof of Claim in its internal claims estimation process  and factor the unliquidated Proof of Claim into its calculation of the EPCA Target.  Id. at 15.  Opening the door to late unliquidated claims such as the EEOC's, after the EPCA Target has been relied upon by all those with a stake in the negotiations that allowed the Debtors to confirm its Plan, would erode progress the Debtors have made in further reducing claims below the EPCA Target and could threaten the Debtors' ability to emerge from chapter 11.  Id.

(iii)     The Good Faith Factor

44.     As stated above, the timing of the filing of the proof of claim, the EEOC's disproportionate response to the Debtors' request to consensually cap the EEOC's unliquidated claim, and its threat to further delay adjudication of the claim by seeking to withdraw the reference if this Court tries to estimate the EEOC claim, allows this Court to draw its own inference regarding whether the EEOC is acting in good faith in prosecuting the Motion  The good faith of the moving party is an additional Pioneer factor.  See Midland, 419 F.3d at 123.

Conclusion

45.     The Government seeks to allow the EEOC to maintain its late proof of claim without having satisfied any of the grounds for relief from the Bar Date Order.  Relief under Bankruptcy Rule 9006(b) is not available to the EEOC.  Accordingly, the Motion should be denied.

Memorandum Of Law

46.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and

21

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

denying the Motion, (b) disallowing and expunging the Proof of Claim, and (c) granting them

such other and further relief as is just.


Dated: New York, New York
         February 28, 2008


                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP


                              By: /s/ John Wm. Butler, Jr._____
                                  John Wm. Butler, Jr. (JB 4711)
                                  John K. Lyons (JL 4951)
                                  Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                        - and –


                              By: /s/ Kayalyn A. Marafioti_____
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession